Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>                    Defendants.<br><br>DC COMICS,<br><br>                    Counterclaimant,<br>          vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>                    Counterclaim Defendants. | Case No. CV 04-8400 SGL (RZx)<br><br>[Honorable Stephen G. Larson]<br><br>**PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLARIFICATION AND/OR RECONSIDERATION OF THE COURT'S MARCH 26, 2008 PARTIAL SUMMARY JUDGMENT ORDER**<br><br>[Complaint filed: October 8, 2004]<br><br>Date:   June 16, 2008<br>Time:   10:00 a.m.<br>Place:  Courtroom 1<br><br>[Notice Of Motion; Declaration of Marc Toberoff Filed Concurrently Herewith] |

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................1

**ARGUMENT** ........................................................................................3

I.   **DEFENDANTS, AT BEST, HOLD A COPYRIGHT IN THE "IMAGE" OF THE ACTION COMICS NO. 1 COVER "AS DEPICTED" IN THE AD, DEVOID OF SUPERMAN CONTEXT** ............................................................................3

    A.   **The Copyright In A Pictorial Work Protects Only Its Visual Content And Objective Appearance**......................4

    B.   **Defendants Can Not Own The Basic Ideas Or Subject Matter Depicted In The Ad**.......................................5

    C.   **Publication of the Ad Did Not "Copyright" Superman Elements**...........................................................6

II.  **REPRODUCTION IN THE AD OF THE PRE-EXISTING COVER DOES NOT QUALIFY FOR COPYRIGHT PROTECTION** ....................................................................8

    A.   **The Reproduction in the Ad of the Cover of Action Comics No. 1 is Not Sufficiently "Original" To Be Copyrightable**...........................................................8

        1.   The Variations in the Advertisement are Trivial..............9

        2.   An Unwarranted Copyright In The Ad's "Cover Image" Improperly Threatens the Copyright in the Underlying Work ....................................................11

III. **THE PROMOTIONAL ANNOUNCEMENTS DO NOT HAVE DIVESTIVE EFFECT ON PLAINTIFFS' COPYRIGHT** .......................................................................13

    A.   ***Batjac's* Narrow Holding Regarding Derivative Works in the Public Domain and the Policies Behind It Do Not Fit This Case**...............................................................13

i

B.   **There is No Precedent For Expanding *Batjac* Beyond The Public Domain Context To Subsisting Statutory Copyrights As It Conflicts With Longstanding Copyright Precepts** ...................................................15

IV.   **PLAINTIFFS NEED NOT HAVE INCLUDED THE ADS IN THEIR TERMINATION NOTICES AS THE ADS WERE DETECTIVE'S DERIVATIVE WORKS, NOT SIEGEL'S WORKS** ..........................................................16

V.   **PLAINTIFFS' FAILURE TO LOCATE THE OBSCURE ADS CONSTITUTES HARMLESS ERROR; THEIR TERMINATION NOTICES PROVIDED DEFENDANTS WITH AMPLE NOTICE** ....................................17

VI.   **THE ORDER'S HISTORICAL SUMMARY INCLUDES CONTESTED FACTS PROPERLY DECIDED AT TRIAL** .......20

A.   **The Order May Be Interpreted As "Ruling" on Issues of Fact Not Before the Court** ..................................20

B.   **The Disputed Contents of Action Comics, No. 1 Present Issues of Fact Inappropriate for Summary Judgment** ........21

C.   **Even if the Court Were to Rule As to the Disputed Literary Elements in Action Comics No. 1, Due Process Requires Giving the Parties an Opportunity to Brief the Issues** ................................................................22

D.   **Elements Listed in the Court Order as Being the Preserve of the Defendants First Appeared in Action Comics No. 1** ...................................................23

**CONCLUSION** ......................................................25

TABLE OF CONTENTS

1

## <u>TABLE OF AUTHORITIES</u>

2

3

<u>Federal Cases</u>                                                                 <u>Page</u>

4

*ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts,*
5
402 F.3d 700 (6th Cir. 2005) ......................................................... 11

6

*Batjac Productions Inc. v. Goodtimes Home Video Corp.,*
7
160 F.3d 1223 (9th Cir. 1998) ............................................... *passim*

8

*Bleistein v. Donaldson Lithographing Co.,*
9
188 U.S. 239 (1903) ...................................................................... 4

10

*Buckingham v. U.S.,*
11
998 F.2d 735 (9th Cir. 1993) ........................................................ 22

12

*Cavalier v. Random House,*
13
297 F.3d 815 (9th Cir. 2002) .................................................... 2, 4

14

*Celotex Corp. v. Catrett,*
15
477 U.S. 317 (1986) .................................................................... 22

16

*Classic Film Museum, Inc. v. Warner Bros., Inc.,*
17
597 F.2d 13 (1st Cir. 1979) .......................................................... 14

18

*Cordon Holding B.V. v. Northwest Publishing Corp.,*
19
63 U.S.P.Q.2d 1013, 2002 WL 530991 (S.D.N.Y. 2002) ........................... 15

20

*Cordon Art B.V. v. Walker,*
21
40 U.S.P.Q.2d  1506, 1996 WL 672969 (S.D.Cal. 1996) ........................... 8

22

*Corwin v. Walt Disney Co.,*
23
2004 WL 5486639 (M.D. Fla. 2004) ......................................................... 4

24

*Cosmos Jewelry Ltd. v. Po Sun Hon Co.,*
25
470 F.Supp.2d 1072 (C.D.Cal. 2006) .......................................... 10

26

*Darden v. Peters,*
27
488 F.3d 277 (4th Cir. 2007) ...................................................... 11

28

*Donald v. Zack Meyer's TV Sales*,
426 F.2d 1027 (5th Cir. 1970) ...................................................................... 9

*Durham Indus., Inc. v. Tomy Corp.*,
630 F.2d 905 (2d Cir. 1980) ............................................................... 9-10, 12

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ........................................................... 9-11, 12

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
499 U.S. 340 (1991) ................................................................................... 15

*Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*,
462 F.3d 1072 (9th Cir. 2006) .................................................................... 2

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
193 F.2d 162 (1st Cir. 1951) ....................................................................... 6

*Gardenia Flowers, Inc. v. Josehp Markovits, Inc.*,
280 F.Supp. 776 (S.D.N.Y. 1968) ............................................................ 11

*Gracen v. Bradford Exch.*,
698 F.2d 300 (7th Cir. 1983) .................................................................... 12

*Greene v. Solano County Jail*,
513 F.3d 982 (9th Cir. 2008) .................................................................... 22

*Harris Custom Builders, Inc. v. Hoffmeyer*,
92 F.3d 517 (7th Cir. 1996) ............................................................... 12, 15

*Hearn v. Meyer*,
664 F.Supp.832 (S.D.N.Y. 1987) ....................................................... 10, 11

*JCW Investments, Inc. v. Novelty, Inc.*,
482 F.3d 910 (7th Cir. 2007) ...................................................................... 5

*Kisch v. Ammirati & Puris Inc.*,
657 F. Supp. 380 (S.D.N.Y. 1987) .............................................................. 4

TABLE OF AUTHORITIES

*Ideal Toy Corp. v. Kenner Prods.  Div. of General Mills Fun Group, Inc.*,
443 F. Supp. 291, 301 (S.D.N.Y. 1977) ........................................................ 7

*L. Batlin & Son, Inc. v. Snyder*,
536 F.2d 486 (2d Cir. 1976) .............................................................. 9-11

*Levine v. McDonalds Corp.*,
735 F.Supp. 92 (S.D.N.Y. 1990) ................................................................ 22

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) .................................................................. 4

*Magic Marketing, Inc. v. Mailing Services of Pittsburgh, Inc.*,
634 F.Supp. 769 (W.D. Pa. 1986).............................................................. 10

*Maljack Productions, Inc. v. UAV Corp.*,
964 F.Supp. 1416 (C.D.Cal. 1997) ............................................................ 12

*Masterson Marketing, Inc. v. KSL Recreation Corp.*,
495 F. Supp. 2d 1044 (S.D.Cal. 2007)......................................................... 5

*Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*,
724 F.2d 357 (2d Cir. 1983) .................................................................. 6

*McCulloch v. Albert E. Price, Inc.*,
823 F.2d 316 (9th Cir. 1987) ................................................................. 4

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) ................................................................ 7

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)......................................................................... 18

*Milton H. Greene Archives, Inc. v. BPI Communications, Inc.*,
378 F.Supp.2d 1189 (C.D.Cal. 2005) ........................................................ 15

*Oddo v. Reis*,
743 F.2d 630 (9th Cir. 1984) .............................................................. 1, 17

*Pasillas v. McDonald's Corp.*,
927 F.2d 440 (9th Cir. 1991) ................................................................ 5

TABLE OF AUTHORITIES

v

*Past Pluto Prods. Corp. v. Dana*,
627 F.Supp. 1435 (S.D.N.Y. 1986) ........................................................ 11-12

*Perry v. Sonic Graphic Sys.*,
94 F.Supp.2d 616 (E.D.Pa. 2000) ............................................................ 21

*Portsmouth Square, Inc. v. Shareholders Protective Comm.*,
770 F.2d 866 (9th Cir.1985) .................................................................... 22

*Satava v. Lowry*,
323 F.3d 805 (9th Cir. 2003) ................................................................ 6, 9

*Scholastic Entertainment, Inc. v. Fox Entertainment Group, Inc.*,
336 F.3d 982 (9th Cir. 2003) .................................................................. 22

*Shaw v. Lindheim*,
919 F.2d 1353 (9th Cir. 1990) ............................................................ 5, 22

*Shea v. Fantasy Inc.*,
Not Reported in F.Supp.2d, 2003 WL 881006 (N.D.Cal. 2003) .................. 15

*Sherry Manufacturing Co. v. Towel King of Florida, Inc.*,
753 F2d 1565 (11th Cir. 1985) ................................................................ 11

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
309 U.S. 390 (1940) .............................................................................. 21

*Shoptalk, Ltd. v. Concorde-New Horzions Corp.* ("*Shoptalk*"),
168 F.3d 586 (2d Cir. 1999) ............................................................ *passim*

*Sid & Marty Krofft Television v. McDonald's Corp.*,
562 F.2d 1157, 1175 (9th Cir. 1977) ...................................................... 21

*Silverman v. CBS, Inc.*,
632 F. Supp. 1344 (S.D.N.Y. 1986) .......................................................... 7

*Sobhani v. @Radical.Media Inc.*,
257 F.Supp.2d 1234 (C.D.Cal. 2003) ...................................................... 13

TABLE OF AUTHORITIES

*Spilman v. Mosby-Yearbook, Inc.*,
115 F. Supp. 2d 148 (D.Mass. 2000) ........................................................... 11

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) ....................................................................... 5

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477, 487 (9th Cir. 2000) ............................................................... 21

*Toho Co. Ltd. v. William Morrow & Co.*,
33 F.Supp.2d. 1206 (C.D.Cal. 1998) ........................................................... 7

*Toliver v. Sony Music Ent.*,
149 F. Supp. 2d 909 (D.Alaska 2001) ......................................................... 5

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) ..................................................................... 22

*Walker v. Forbes, Inc.*,
28 F.3d 409 (4th Cir. 1994) ......................................................................... 21

*Walt Disney Prods. v. Air Pirates*,
581 F.2d 751 (9th Cir. 1978) ....................................................................... 7

*Warner Bros., Inc v. American Broadcasting Cos.*,
530 F. Supp. 1187 (S.D.N.Y. 1982) ............................................................ 7

*Winfield Collection, Ltd. v. Gemmy Indus., Corp.*,
311 F. Supp. 2d 611 (E.D. Mich. 2004) ...................................................... 5

*Woods v. Universal City Studios, Inc.*,
920 F. Supp. 62 (S.D.N.Y. 1996) ................................................................ 5

**Federal Authorities**                                                          **Page**

17 U.S.C. § 101 ........................................................................................... 8, 9

17 U.S.C. § 103 ........................................................................................... 12, 15

17 U.S.C. § 304 ........................................................................................... 1, 16-19

TABLE OF AUTHORITIES

37 C.F.R. §202.1 ....................................................................... 11

37 C.F.R. § 210.10 ............................................................... 17-18

H.R. REP. NO. 94-1476 (1976)...................................................... 5

Compedium I,
Compendium of Copyright Office Practices ............................... 13

Compedium II,
Compendium of Copyright Office Practices ........................ 11, 13

**Other Authorities**                                          **Page**

3 JAY DRATLER, JR. & STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW:
COMMERCIAL CREATIVE AND INDUSTRIAL PROPERTY § 6.04A.................... 18

1 NIMMER ON COPYRIGHT § 2.01 ....................................................... 9

1 NIMMER ON COPYRIGHT § 2.12 ....................................................... 7

1 NIMMER ON COPYRIGHT § 3.03 ..................................................... 15

1 NIMMER ON COPYRIGHT § 4.12 ............................................... 12, 16

3 NIMMER ON COPYRIGHT § 9.05 ..................................................... 18

3 NIMMER ON COPYRIGHT § 11.05 ................................................... 18

3 NIMMER ON COPYRIGHT § 13.03 ..................................................... 5

1 PATRY § 2:17 (2008) ................................................................... 19

1 PATRY § 2:21 (2008) ................................................................... 19

2 PATRY § 6:35 (2008) ................................................................... 16

2 PATRY § 7:43 (2008) ................................................................... 18

### **INTRODUCTION**

The Court's March 26, 2008 order ("Order") on the parties' cross-motions for partial summary judgment upheld the validity of Plaintiffs' "Superman" Notices of Termination filed pursuant to 17 U.S.C. § 304(c) and Plaintiffs' recapture of Jerome Siegel's co-authorship share of the original illustrated <u>Superman</u> story published in Action Comics No. 1 ("Action Comics No. 1"). The Order also held that at least one "promotional announcement" containing a depiction of the cover of Action Comics No. 1 "obtained statutory copyright protection *before* the earliest possible date covered by Plaintiffs' termination notices" and "thus falls outside the reach of the termination notice." Order at 39:22-28 (emphasis in original). The Court further ruled on the scope of the material contained in the "promotional announcement" which "remains for defendants to exploit." Order at 40:1-23. Plaintiffs respectfully request that the Court: (a) clarify that Defendants did not secure any copyrightable <u>Superman</u> elements via the "promotional announcements;" and/or (b) reconsider the Court's application of *Batjac* to Action Comics No. 1's <u>statutory</u> copyright.

With the Superman Terminations upheld as valid, the focus of the parties will be on establishing the scope of the Superman work(s) recaptured by Plaintiffs for purposes of Defendants' accounting to Plaintiffs as co-owners and determining the parameters of what Plaintiffs may exploit subject to a duty to account to Defendants. *See Oddo v. Reis*, 743 F.2d 630, 632-33 (9th Cir. 1984).

After ruling that at least one promotional announcement was beyond the reach of Plaintiffs' termination notices, the Court severely circumscribed the scope of Defendants' purported copyrighted material therein:

> "***Obviously, nothing concerning the Superman storyline (that is, the literary elements contained in Action Comics, Vol. 1) is on display in the ads***; thus, Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities in general, do not remain within defendants sole possession to exploit."

Order at 40: 9-13(emphasis added).

> "***Instead the only copyrightable elements left arise from the pictorial illustration in the announcements, which is fairly limited***.

1

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

> The person in question has great strength (he is after all holding aloft a car). The person is wearing some type of costume, but significantly the colors, if any, for the same are not represented, as the advertisement appears only in black and white. The argument that the "S" crest is recognizable in the promotional advertisement is not persuasive. What is depicted on the chest of the costume is so small and blurred as to not be readily recognizable, at best all that can be seen is some vague marking or symbol its precise contours hard to decipher. ***The Court thus concludes that defendants may continue to exploit the image of a person with extraordinary strength who wears a black and white leotard and cape*.**"

Order at 40:13-23 (emphasis added).

Plaintiffs seek clarification of this conclusion – "defendants may continue to exploit the image of a person with extraordinary strength who wears a black and white leotard and cape" – for three reasons. Firstly, Plaintiffs wish to have the contours of this "image" firmly delimited to ensure that Defendants are not able to use this extremely narrow black and white snapshot to fashion a putative Superman character and derivative Superman works without accounting to Plaintiffs, thereby diminishing the value of Plaintiffs' recaptured copyright. Secondly, Plaintiffs seek to ensure that Defendants' right to exploit "a person with extraordinary strength who wears a black and white leotard and cape" does not in any way affect Plaintiffs' right to exploit Action Comics No. 1, as its co-owner, including "Super-strength" on display throughout Action Comics No. 1.[1]

The Court's ruling that Defendants have retained only the specific "image of a person with extraordinary strength who wears a black and white leotard and cape"

---

[1] Plaintiffs disagree with Defendants' sudden protest that the Court could not rule on the copyrightable contents of the promotional announcement, especially considering that Defendants had placed this at issue and insisted that the "[the Ads] speak for themselves and do not require some 'special lens' to resolve." Order at 40:5-7, quoting Defendant's Reply in Support of Summary Judgment at 44.  *See also* Defendant's Motion for Summary Judgment at 38:8-39:4 (claimed an "unfettered right to use the content of the Announcements"); 42:7-9 (requesting an order "determining that [Defendants] are entitled to continue using all of the copyrightable elements contained in the Announcements").  The assessment of the Ad is limited to the drawing itself, which is, as admitted by Defendants, of such a basic nature that the Court's competency to analyze it cannot be disputed.  *See Funky Films, Inc. v. Time Warner Entertainment Co.*, L.P., 462 F.3d 1072 (9th Cir. 2006) (Courts can look at objective "actual concrete elements" and reach summary judgment); *Cavalier v. Random House*, 297 F.3d 815, 826 (9th Cir. 2002) (Courts can consider "the objective details in appearance" when examining pictorial works on summary judgment).  Since Defendants placed the content of the Ads at issue they cannot be heard to complain just because they dislike the results.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

appears to limit Defendants to this image alone because this diminished, vague black and white reproduction ("Cover Image") of the actual cover of Action Comics No. 1 ("Cover") is *not the* detailed full color Cover Image, nor can it be viewed in the literary context of, Action Comics No. 1, the joint work that the Cover adorns.

However, Plaintiffs fear that Defendants will claim that, notwithstanding Plaintiffs' recapture of Jerome Siegel's ("Siegel") copyright in Action Comics No. 1, Plaintiffs cannot exploit it without infringing Defendants' purportedly "exclusive" copyright in the Ad's graphic image.  Plaintiffs further fear that Defendants will use the protectable and non-protectable elements contained in this simple, finite image to derive their own "Superman," purportedly not subject to an accounting.  Both scenarios would effectively emasculate Plaintiffs' recapture of Action Comics No. 1, and seriously undermine the policy goals of the Copyright Act's termination provisions.

## **ARGUMENT**

## I.   **DEFENDANTS, AT BEST, HOLD A COPYRIGHT IN THE "IMAGE" OF THE ACTION COMICS NO. 1 COVER "AS DEPICTED" IN THE AD, DEVOID OF SUPERMAN CONTEXT**

By the Court's Order, Defendants have exclusively retained all rights to the Ad, but not any part of the Superman story, character, themes or other *literary* elements contained in Action Comics No. 1, which fell within Plaintiffs' termination. Order at 39:26- 41:2.  Defendants are thus limited to the copyrightable material, if any, conveyed by such publication:  The vague "Cover Image" of Action Comics No. 1 is not the Cover (or the similar interior panel on page 8 of Action Comics No.1), and is not imbued with any part of the *later* published story of Action Comics No. 1. The indistinguishable black and white image cannot be viewed in the context of the now famous Superman character and mythology thereafter published in Action Comics No. 1.  Thus, the image in the Ad depicts "a person of extraordinary strength," but not Superman's Super-strength.   As the Court acknowledged:

3

"What remains of the Siegel and Shuster's Superman copyright that is still subject to termination (and, of course, what defendants truly seek) is *the entire storyline* from Action Comics, Vol. 1…, *none of which is apparent from the announcement*."

Order at 40:23-41:2 (emphasis added).

## A.    The Copyright In A Pictorial Work Protects Only Its Visual Content And Objective Appearance

In copyright infringement cases involving pictorial works, the works are objectively compared in a side-by-side analysis of actual visual content, not literary or thematic elements subjectively invoked by the works.

In *Cavalier v. Random House*, 297 F.3d 815 (9th Cir. 2002), a copyright infringement suit involving illustrated children's stories, the Ninth Circuit noted that the analysis for pictorial works differs from that used to assess literary works in that it focuses *exclusively* on the objective appearance of the works:

> "The precise factors evaluated for literary works do not readily apply to art works.  Rather a court looks to the similarity of the objective details in appearance.  *See McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 319 (9th Cir. 1987) [citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)]"

*Cavalier*, 297 F.3d at 826.  *See also Corwin v. Walt Disney Co.*, 2004 WL 5486639, at *15 (M.D. Fla. 2004) ("When analytically dissecting…protectable and unprotectable elements, the Court will focus on objective details in appearance.") The Ninth Circuit's methodology in *Cavalier* which considers only a pictorial work's objective appearance is amply supported.[2]

---

[2] *See Pasillas v. McDonald's Corp.*, 927 F.2d 440, 441–42 (9th Cir. 1991) (Court analyzed similarity between man-in-the-moon masks by focusing on their objective features);  *Winfield Coll., Ltd. v. Gemmy Indus., Corp.*, 311 F. Supp. 2d 611, 617 (E.D. Mich. 2004) (three-dimensional figures of witches "crashing" not substantially similar because witches did not look the same); *Woods v. Universal City Studios, Inc.*, 920 F. Supp. 62, (S.D.N.Y. 1996) (motion picture "12 Monkeys" copied plaintiff's drawing when comparison showed that film replicated drawing in striking detail); *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 916 (7th Cir. 2007) (two dolls are substantially similar as a matter of law when an objective observer would think they were the same); *Masterson Marketing, Inc. v. KSL Recr. Corp.*, 495 F. Supp. 2d 1044, 1048-49 (S.D. Cal. 2007) (photo of Arizona Biltmore Hotel in Squaw Peak did not infringe earlier photo of same locale, from same vantage point in same horizontal format, as photos did not use same color adjustment, dodging-burning or image sharpening).

4

### B.   Defendants Can Not Own The Basic Ideas Or Subject Matter Depicted In The Ad

In line with the above case law governing pictorial works, the *ideas* or *subject matter* depicted in the Ad – a person in black and white tights and cape, a person of extraordinary strength, or a person lifting a car – are not copyrightable.  *See* 17 U.S.C. § 102(b)("[i]n no case does copyright protection for an original work of authorship extend to any idea…concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work").[3]

Thus the Ad's effectively generic depiction of a man with "extraordinary strength" does not entitle Defendants to lay claim to this concept.  *See Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) ("Copyright law protects an author's expression; facts and ideas within a work are not protected."); 1 Nimmer & Nimmer, NIMMER ON COPYRIGHT ("*NIMMER*") § 2.03 [D] ("Copyright may be claimed only in the 'expression' of a work of authorship and not in its 'idea'");  *see also* 3 NIMMER § 13.03[B][2][a]; *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1990); *Swirsky v. Carey*, 376 F.3d 841, 845 n.4 (9th Cir. 2004).  "Extraordinary strength," outside of its special context in the Superman mythology, is an idea that cannot be copyrighted. *Toliver v. Sony Music Ent.* 149 F. Supp. 2d 909, 919 (D.Ak. 2001) ("Were Plaintiff to own the copyright to all other songs depicting the tale of a woman rejecting a man's dominance, she would most certainly be among the wealthiest troubadours in the land").  The literary cannon is replete with characters exhibiting "extraordinary strength" (e.g., Hercules, Samson, Perseus, Beowulf, and Frankenstein).

Therefore, the *subject matter* of the pictorial "image" in the Ad, as opposed to the image, itself, is unprotected by copyright.  *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 193 F.2d 162, 164 (1st Cir. 1951) ( "[C]opyright on a work of art does not protect a subject, but only the treatment of a subject"); *Satava v.*

---

[3] This provision merely "restate[s], in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged."  H.R. REP. NO. 94-1476, at 57 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670.

*Lowry*, 323 F.3d 805 (9th Cir. 2003) (glass-in-glass sculpture of jellyfish not protected by copyright; consists of unprotected elements and ideas).

In *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357 (2d Cir. 1983), the Second Circuit ruled that Mattel, the manufacturer of the "Masters of the Universe" action figures, could not bring a copyright infringement suit against a competing line of action figures because it could not hold a copyright in mere super-strong characters with muscular torsos:  "[N]early all of the similarity can be attributed to the fact that both are artist's renderings of the same unprotectible idea – a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose.  The rendering of such an idea is not in itself protectible; only the particularized expression of that idea."  *Id.* at 360.

Accordingly, Defendants could only hold a copyright, if at all, in the particular "image of *a person* with extraordinary strength who wears a black and white leotard and cape" depicted in the promotional announcements.  Order at 40:20-21 (emphasis added).  And that "person" is not Superman.

### C.   Publication of the Ad Did Not "Copyright" Superman Elements

The Court appears to clearly distinguish the vague black and white "image" of the "Cover Image" in the Ad from the Cover of Action Comics No. 1, and, indeed, refers to the Ad as depicting a "person," not "Superman."  Order at 40:15-23.  The Cover is in color and clearly defines the "Superman" character, his physical appearance, costume and "S" shield.  In contrast, the Ad is "fairly limited."  Order at 40: 14-21.  Even if Defendants are held to hold a statutory copyright in the Ad's "image," via its publication, the parameters of that copyright are necessarily confined to what the Ad communicated at the time of publication.  The Ad makes no reference to Superman, and Ad's Cover Image, could not serve, as matter of law, to have conveyed or "published" any Superman element.

The stand alone, black and white reproduction of the Cover in the Ad, diminished to the point of being barely legible, is a far cry from the well articulated

6

actual color Cover.  Aside from its visual appearance, the Cover, unlike the Ad, is not viewed in a vacuum, but in the context of the joint work of which it is a part. The actual Cover no longer depicts "a person with extraordinary strength" (Order at 40:22-23), but Superman's "Super-strength" as an inextricable part of Siegel and Shuster's specific expression of *the protectable Superman character*.  *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002)("[P]rotectable expression includes the specific details of an author's rendering of ideas."); *see Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) (comic book character more likely to contain unique elements of expression, as the "plot of the piece not only centers around the character but is quite subordinated to the character's role")*;* 1 NIMMER § 2.12 (A character is more readily protectible when depicted in "cartoons …rather than 'word portraits'").[4]  The Cover, like the interior panel it mimics, is part of Action Comics, No. 1, successfully recaptured on April 16, 1999.  Order at 72.

Superman's "Super-strength," as expressed in Action Comics No. 1, is inarguably featured on nearly every page of the comic book story, essentially defining the copyrightable character.[5]  The "image" in the Ad clearly does not depict

---

[4] As Plaintiffs have noted in the past, characters can be copyrighted apart from the story in which they appear. 1 NIMMER § 2.12 ("it is clearly the prevailing view that characters *per se* are entitled to copyright protection"); *Warner Bros., Inc v. American Broadcasting Cos*., 530 F. Supp. 1187 (S.D.N.Y. 1982) ("Superman" character is protectible); *Toho Co. Ltd. v. William Morrow & Co*., 33 F.Supp.2d. 1206, 1216 (C.D. Cal 1998) (Godzilla character held protectible); *Silverman v. CBS, Inc*., 632 F. Supp. 1344, 1355 (S.D.N.Y. 1986) (characters from "Amos 'n' Andy" held protectible);  *Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Fun Group, Inc*., 443 F. Supp. 291, 301 (S.D.N.Y. 1977) (finding characters in the movie "Star Wars" to be copyright protected).

[5]  Panel 4 on page 1 of Action Comics No. 1 (found in Addendum A to the Court's March 26, 2008 order), states that Superman "could easily raise tremendous weights"; panel 5 states "Early, Clark decided he must turn his titanic strength into channels that would benefit mankind and so was created…"  Panel 6 states "Superman! Champion of the oppressed.  The physical marvel who had sworn to devote his existence to helping those in need!"  Page 2, panel 1, depicts Superman carrying a woman as he races across the sky. Page 2, panel 5, shows Superman knocking down the door of the Governor's mansion. Page 2, panel 8 has Superman carrying the Governor's servant with one arm up the stairs of the mansion.  On page 3, panel 3, Superman is seen knocking down a steel door.  Page 5, panel 7, shows Superman knocking a wife beater against a wall hard enough to knock off the plaster.  Page 9, panels 1-3, show Superman lifting up a car full of hoodlums.  First he lifts the car with one arm. He then shakes the hoodlums out of the car before finally smashing the car "to bits." Page 9, panels 5-6, depict Superman carrying a hoodlum into the sky with one arm. Page 10, panel 3, has Superman carrying Lois through the sky.  Page 11, panel 4, has Superman

7

Superman's "Super-strength" or other Superman traits for the reasons set forth above.   Superman's "heroic abilities in general, do not remain within defendants sole possession to exploit."  Order at 40: 9-13; 40:23-41:2.

Plaintiffs respectfully request that the Court confirm that Defendants do not exclusively own *any* Superman elements to Plaintiff's detriment by virtue of the Ad's slightly earlier publication and specifically, that Superman's "Super-strength" is part of the recaptured Action Comics No. 1 character and story.

## II.   REPRODUCTION IN THE AD OF THE PRE-EXISTING COVER DOES NOT QUALIFY FOR COPYRIGHT PROTECTION

### A.   The Reproduction in the Ad of the Cover of Action Comics No. 1 is Not Sufficiently "Original" To Be Copyrightable

There is no question that the Ad constitutes a derivative work and that Detective Comics had "the right" pursuant to the March 1, 1938 grant from Siegel and Shuster to reproduce the Cover of Action Comics, No. 1 in the Ad.[6]  The key question here is whether and to what extent Detective Comics obtained a copyright in this Cover Image.  That issue turns on the following:

> "First, to support a copyright the original aspects of a derivative work must be more than merely trivial.  Second, the scope of protection afforded a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material."

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1219 (9th Cir. 1997).

---

clinging to the side of a skyscraper.  Page 12, panels 3-5 and page 12, panels 1-6, portray Superman carrying a man through the sky under one arm.

[6]  The promotional announcement for the pre-existing Action Comics No. 1 remains derivative of Action Comics No. 1 even if published a few days prior. *Any* work that is "based upon one or more pre-existing works" is a derivative work.  17 U.S.C. §101.  Even if a derivative work is published *before* the pre-existing work is itself published, that first-published work is still a "derivative" work. *See Cordon Art B.V. v. Walker*, 40 U.S.P.Q.2d  1506, 1996 WL 672969 at *5 (S.D.Cal. 1996)("The art reproductions that Defendant copied were prepared from and based upon the [unpublished] original drawings and master blocks; *as such, the copied works are derivative works* under § 101 of the 1976 U.S. Copyright Act.")(emphasis added).

8

1    1.    The Variations in the Advertisement are Trivial

2        Plaintiffs submit that the differences between the Ad's "Cover Image and the

3    Cover, namely that it is "fuzzy" and unarticulated due to substantial reduction and in

4    black and white, do not constitute more than trivial variations of the prior Cover and

5    thus do not satisfy the fundamental "originality" prerequisite to copyright protection.

6    Moreover, even if the variations in the Cover Image were viewed as sufficiently

7    "original" to merit copyright protection, such would, as a matter of law, extend only

8    to the limited *visual differences* between the Cover Image and the Cover itself.  1

9    *NIMMER* § 3.04[A].[7]

10       A trivial or "miniscule variation" between the underlying and derivative work

11   will not suffice.  *Durham Indus., Inc.*, 630 F.2d at 910.  *See  Satava v. Lowry*, 323

12   F.3d 805, 813 (9th Cir 2003) (While the amount of "creative input by the author

13   required to meet the originality standard is low, it is not negligible."); *Donald v. Zack*

14   *Meyer's TV Sales*, 426 F.2d 1027, 1030-31 (5th Cir. 1970) ("The variation must be

15   meaningful and must result from original creative work" and not be a "mere

16   copycat"); *Magic Marketing, Inc. v. Mailing Services of Pittsburgh, Inc.*, 634 F.Supp.

17   769, 771 (W.D. Pa. 1986) (even "independent efforts" can be "too trivial" to be

18   original); *Gardenia Flowers, Inc. v. Josehp Markovits, Inc.*, 280 F.Supp. 776, 782

19   (S.D.N.Y. 1968) (no originality "[w]hen the copyright claimant has added nothing of

20   his own to a work.")

21       Reproductions, such as the Cover Image, even those involving technical skill,

22   do not merit copyright protection.  *See Entertainment Research Group,* 122 F.3d at

23   1222. (even "quite difficult and intricate decisions" that "enable one to reproduce or

24   transform an already existing work into another medium or dimension" are

25

26   ───────────────
     [7] *See also Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) ("[C]opyrights in derivative works secure
27   protection only for the incremental additions of originality contributed by the authors of the derivative
     works."); *L. Batlin & Son, Inc. v. Snyder* 536 F.2d 486, 491 (2d Cir. 1976) ("[T]here must be at least some
28   substantial variation, not merely a trivial variation such as might occur in the translation to a different
     medium" for a derivative work to qualify for copyright protection.)

9

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

insufficient); *L. Batlin & Son, Inc.*, 536 F.2d 486 491-93 ("true artistic skill [is required] to make [a] reproduction copyrightable"); *Hearn v. Meyer*, 664 F.Supp. 832, 835-40 (S.D.N.Y. 1987) (no originality in reproductions of illustrations where the variations included one being "greener than the original," another's being "lighter than the original which has a bluer sky and a deeper brown"); *Durham Indus., Inc.*, 630 F.2d at 910 (no originality through "the demonstration of some 'physical,' as opposed to 'artistic' skill").

Derivative works are routinely denied copyright when they involve only minor – even if perceptible – variations on the underlying work.  *See, e.g., L. Batlin & Son*, 536 F.2d at 489 (differences in the shape and elements of design were "minor" and not sufficiently original to be afforded copyright protection).  The changes here, like those of *Hearn, supra*, were trivial at best – "the cover is shown in black and white instead of color, [and] the scale of the artwork itself is diminished…"  Order at 37:22-23.  The "Cover Image" makes little or no original contribution to the Cover and interior panel of Action Comics No. 1 from which it is derived.  Given that more substantial differences in medium and dimensionality are insufficient for copyright protection, it can hardly be said that mere size reduction constitutes originality.[8]  Miniscule variations in spacing and position are also insufficient to establish originality.[9]  Nor does the change from color to black and white merit copyright

---

[8] *See, e.g., Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F.Supp.2d 1072, 1082 (C.D.Cal. 2006) (no originality in depiction of "flower as having five petals slightly overlapping, slightly longer than they are wide, and with slightly pointed tips," with different types of "finish"); *Past Pluto Prods. Corp. v. Dana*, 627 F.Supp. 1435, 1440-43 (S.D.N.Y. 1986) (no originality in soft foam sculpture of Statue of Liberty).

[9] *See Sherry Manufacturing Co. v. Towel King of Florida, Inc.*, 753 F2d 1565, (11th Cir. 1985) (no originality where "the majority of those distinguishing details are so minor that they are virtually unnoticeable upon a cursory comparison," and "[t]hose variations which do eventually rise to the forefront of our attention do so only because they entail simple, but more obvious, changes in the spacing and dimensions of non-detailed features"); *L. Batlin & Son, Inc.*, 536 F.2d at 489 (differences in "very minute details," such as shapes being "smooth" and "rough," a "fatter" base, holding arrows instead of leaves, the "shape" of a face, altogether insufficient to establish copyright protection.)  Even noticeable differences are insufficient if "it cannot be said that such variances affect the arrangements of the components or the overall impression" of the work. *Gardenia Flowers, Inc.*, 280 F.Supp. at 782 (denying copyright where author "did not create anything new" in floral arrangements.) *See ATC Dist. Group v. Whatever It Takes Trans.& Parts*, 402 F.3d 700, 712 (6th Cir. 2005) (no protection where "[t]he illustrations were…a form of slavish copying that is the antithesis of originality.")

10

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

1    protection.  *See* 37 C.F.R. §202.1(a) ("mere variations …of coloring" "not subject to

2    copyright").[10]

3          Therefore, the miniscule visual differences between the Cover Image and the

4    Action Comics, No. 1 Cover and interior panel do not render the Cover Image

5    sufficiently "original" to be copyrightable.  That this derivative material was

6    "published" first is beside the point:  to grant a derivative Cover Image, with such a

7    trivial degree of originality, copyright protection is impermissible.

8          2.    An Unwarranted Copyright In The Ad's "Cover Image" Improperly Threatens the Copyright in the Underlying Work.

9          The second prong of the "originality" analysis is necessary in order to avoid

10   granting the owner of a derivative work a "*de facto* monopoly" in the underlying

11   work, foreclosing exploitation of the underlying copyright.  *See Entertainment*

12   *Research Group,* 122 F.3d at 1219 (9th Cir. 1997) (protection for a derivative work

13   "must not in any way affect the scope of any copyright protection in that preexisting

14   material."); *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983)

15   (requiring a "sufficiently gross difference between the underlying and the derivative

16   work to avoid entangling subsequent artists depicting the underlying work in

17   copyright problems.") [11]  *See* 17 U.S.C. § 103(b) (a derivative work "does not imply

18

---

19   [10] *See Compendium of Copyright Office Practices* § 5.03.02(a) (1984) ("[M]ere coloration cannot support a
20   copyright even thought it may enhance the aesthetic appeal or commercial value of a work."); *Darden v.
      Peters*, 488 F.3d 277, 287 (4th Cir. 2007) (no originality where derivative works made only slight color
      variations); *Spilman v. Mosby-Yearbook, Inc.*, 115 F. Supp. 2d 148 (D. Mass. 2000) (derivative book lacked
21   minimum degree of originality when changes were only enhancements such as coloration of the text and
      variations in typographic ornamentation); *Hearn*, 664 F.Supp. at 835-40 (S.D.N.Y. 1987) (no originality in
22   reproductions of illustrations where variations included one being "greener than the original," another being
23   "lighter than the original which has a bluer sky and a deeper brown," and a face having a "deeper yellow.")

24   [11] *See also Durham Indus., Inc. v. Tomy Corp.* 630 F.2d 905, 909 (2d Cir. 1980) (copyright in derivative
      work "must not in any way affect the scope of any copyright protection in [the] preexisting material.");
25   *Gracen v. Bradford Exch.* 698 F.2d 300, 304 (7th Cir. 1983) ("especially as applied to derivative works, the
      concept of originality…[has] a legal rather than aesthetic function – to prevent overlapping claims."); *Harris
26   Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir. 1996)(It is a fundamental precept of
      copyright law that "publication of a derivative work does not affect the validity of a copyright in the
27   preexisting work, despite the incorporation of the underlying work into the derivative work." );  *Maljack
      Productions, Inc. v. UAV Corp.*, 964 F.Supp. 1416, 1422 (C.D.Cal. 1997)("publication of a derivative work
28   does not affect the validity of the copyright in a preexisting work."); *Past Pluto Prods. Corp.*, 627 F.Supp. at
      1441 (a derivative work copyright "in no way embraces or protects the underlying, pre-existing work.");

11

1   any exclusive right in the preexisting material. The copyright in such work is

2   independent of, and does not affect or enlarge the scope, duration, ownership, or

3   subsistence of, any copyright protection in the preexisting material.")[12]

4        To grant a copyright in the derivative Cover Image would be contrary to well

5   settled law and invite *precisely* the situation that the statute and case law governing

6   derivative works are meant to avoid. [13]  That the promotional announcement was

7   published just prior to Action Comics, No. 1 does not alter the conclusion that the

8   Cover Image therein was not sufficiently original to be copyrightable, avoiding the

9   prohibited use of the derivative Ad to entangle and limit the copyright of the

10   underlying Action Comics No. 1.

---

Berne Convention, Art. 2(3) ("alterations of a literary or artistic work" are "without prejudice to the copyright in the original work.")

[12] Section 103(b) of the current Act parallels its predecessor, section 7 of the 1909 Act, 17 U.S.C. § 7 (repealed) ("publication of any such new [derivative] works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works..."); Berne Convention, Art. 2(3) ("alterations of a literary or artistic work" are "without prejudice to the copyright in the original work."); 1 NIMMER § 4.12[A] at 4-60 (noting that divestiture of copyright in the underlying work due to the publication of a derivative work only occurs if the publication injects the underlying work into the public domain, such as publication without notice.)

[13] Indeed, Defendants have made detailed arguments that derivative works cannot be allowed to interfere with underlying works, conceding the *Entertainment Research Group* standard.  To counter Plaintiffs' infringement claim in the "Superboy" action, Defendants have argued pursuant to 17 U.S.C. § 103(b) that Siegel's 13 page Superboy story is derivative of Superman and thus cannot interfere with the Superman or *Smallville* copyrights.  *See Defendants' Supplemental Memorandum of Points and Authorities of Derivative Work IssuePursuant to Court's July 27, 2007 Order*, filed September 10, 2007, at 15:18-21 ("[T]he courts must draw the line in such a way that the derivative work author will not be empowered to harass or interfere with the rights of the original work owner to use and license the underlying work through actual or threatened litigation.") and 16:4-6 ("In terms of methodology, to determine whether a derivative work possesses the requisite originality, courts must compare the derivative work to the pre-existing work.") Defendants counsel Roger Zissu furthered this derivative works argument during oral argument on the parties' cross motions for summary judgment, relying on *Sobhani v. @Radical.Media Inc.*, 257 F.Supp.2d 1234, 1239-40 (C.D.Cal. 2003). Toberoff Decl. Ex. C, 5:11-14:25.

12

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

## III.   THE PROMOTIONAL ANNOUNCEMENTS DO NOT HAVE DIVESTIVE EFFECT ON PLAINTIFFS' COPYRIGHT

### A.   _Batjac's_ Narrow Holding Regarding Derivative Works in the Public Domain and the Policies Behind It Do Not Fit This Case

The promotional announcements cannot act to divest Superman elements from Plaintiffs' recaptured Action Comics No. 1 copyright.  There is no support for the broad proposition that publication of a derivative work has a divestive effect on the copyright of the underlying work where the underlying work _has a statutory copyright_ and neither works are in the public domain.  _Batjac Prods., Inc. v. GoodTimes Home Video Corp._, 160 F.3d 1223 (9th Cir. 1998) does not stand for this.

Unlike the instant case, where the underlying work _has a statutory copyright_ and neither works are in the public domain, in _Batjac_ a copyright holder tried  to use a purported common-law copyright in an unpublished screenplay to recover and revive a statutorily copyrighted derivative film from the public domain.[14]  Had _Batjac_ reached a different result, "the perpetual protection provided to common law copyrights would 'swallow the rule of limited monopoly found in the constitution and copyright statutes'" and "through [an] unpublished screenplay, an author could maintain perpetual control over the [a public domain] motion picture…. [and] extend protection of the film beyond its statutory maximum"  _Batjac_, 160 F.3d at 1234.  Neither _Batjac_, nor the authority it relies on, has ever been expanded beyond its

---

[14] Screenplays to motion pictures are treated as a special case by the copyright office, as "[w]here a preexisting unpublished screenplay is embodied in a motion picture," those elements are published.  See Compendium II, Compendium of Copyright Office Practices 910-04, cited in _Batjac_, 160 F.3d at 1230.  However, the unique status of screenplays can be seen in the Copyright Office's markedly different approaches with respect to dramatic and literary works: a "detailed plot summary of a play" does not publish the play, and "publication of a movie version of an unpublished story," does not publish the story.  See Compendium I: Compendium of Copyright Office Practices, § 3.1.1 IV(a), cited in _Batjac_, 160 F.3d at 1230.  Additionally, screenplays are given special attention when registered for copyright, as examiners are directed to "question an application for a feature film or a network television production which is limited to the authorship of the 'script,'" as the Office still regards a motion picture as an "integrated, single work, and [] it is unusual for separate claims in component parts of the motion picture to be submitted."  Toberoff Decl., Ex. D, Decision of the Copyright Office Board of Appeals re: "Husbands," dated May 14, 2002, at 5.

13

*narrow* consideration of the relationship between an underlying common law copyright and a derivative work in the public domain. [15]

*Batjac's* result oriented decision, to a large degree, relied on policy that copyright law should not reward those who circumvent the Act and improperly try to co-opt works in public domain or extend the life of a statutory copyright beyond its statutory term.  It adopted the argument of the U.S. Register of Copyright which "turns upon impropriety of the moviemakers' use of artifice to extend the term limits set forth in the Act for copyrighted works and so continues to have force today." *Id.* at 1234.

Indeed, *Batjac* expressly limited its holding to "the narrow case before us" wherein the entity responsible for placing a film in the public domain by failing to renew its copyright attempted an end run around the Copyright Act by asserting a *common law copyright* in the film's underlying screenplay. *Id*. *Batjac* did not consider and expressly declined to apply its holding to situations where, as here, the underlying work (Action Comics No. 1) is squarely protected by a statutory copyright. *Id.* at 1231 (limiting holding to "the narrow case before us"). [16]

**B.**    **There is No Precedent For Expanding *Batjac* Beyond The Public Domain Context To Subsisting Statutory Copyrights As It Conflicts With Longstanding Copyright Precepts**

---

[15] *See Batjac*, 160 F.3d 1223, 1225, 1233-34 (9th Cir. 1998) ("[A] common law copyright in the underlying screenplay does not survive the motion picture's loss of copyright and falls into the public domain due to a failure to renew the movie's copyright.")(citations omitted); *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 591–93 (2d Cir. 1999) (publication of the motion picture divested the common law copyright in the underlying screenplay only because the motion picture entered the public domain after its term of statutory copyright); *Classic Film Museum, Inc. v. Warner Bros., Inc.*, 597 F.2d 13 (1st Cir. 1979) (publication of the motion picture divested the copyright in the underlying screenplay as otherwise the holder of the underlying screenplay would control the motion picture even after its term of statutory copyright.)

[16] Other Courts faced with the same fact pattern and reaching the same result have similarly limited their holdings.  *See, e.g., Harris Custom Builders, Inc.*, 92 F.3d at 520 (finding a divestiture of copyright where the underlying work was unpublished and remained so, but noting that "[i]f the basis of Harris' claim of copyright was that the underlying architectural plans were registered or published with notice, it could prevail.")

14

The basic copyright precepts governing derivative works preclude *Batjac*'s application to the instant facts, where *both* works have subsisting statutory copyrights, but the derivative work was published or registered first.  To secure a statutory copyright a "work must be original to the author."  *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 345 (1991).  Thus, as correctly noted by the Court, the copyright in a derivative work only extends to newly added copyrightable material not to the pre-existing material from which it is derived.  Order at 37:9-15; 17 U.S.C. § 103(b) ("The copyright in a…derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."); 1 NIMMER § 3.03, at 3-10.

To hold otherwise would enable the owner of a derivative work to claim it had seized the entire or heart of an underlying work by merely publishing or registering the derivative work first – in this case, a mere eight days before – even though the underlying work still has a subsisting statutory copyright.

As a manifestation of the harsh and anomalous result of expanding *Batjac*, [17] Defendants will now claim that notwithstanding Plaintiffs' joint ownership of a valid statutory copyright in the original Action Comics No.1, Plaintiffs may not exploit it without infringing Defendants' putative copyright in the diminutive Cover illustration reproduced in a obscure, purely derivative announcement promoting the imminent publication of Action Comics No. 1.  In this instance, Defendants' claim

---

[17] Cases following *Batjac* have been limited to situations where the owner of an unpublished work sought to use a purported copyright in the underlying work to secure protection for work that had been ejected into the public domain.  *See Milton H. Greene Archives, Inc. v. BPI Communications, Inc.*, 378 F.Supp.2d 1189, 1197 (C.D.Cal. 2005) (publication of photographs in a magazine without proper notice "published" the underlying photographs and ejected them into the public domain); *Shea v. Fantasy Inc.*, 2003 WL 881006 at *4 (N.D.Cal. 2003) (underlying photograph that had been published as part of a derivative album which lacked a copyright notice was in the public domain); *Cordon Holding B.V. v. Northwest Publishing Corp.*, Not Reported in F.Supp.2d, 2002 WL 53099 at *5 (S.D.N.Y. 2002) (where derivative reproduction of unpublished drawings and models had been published without proper notice, underlying drawings and models were ejected into the public domain).

15

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

1    fails because the Ad communicates very little.  However, the Ad could just as well

2    have contained a full-blown color copy of the Cover.

3          Such a result would undermine the legislative objective of the Copyright Act's

4    termination provisions to relieve authors and their heirs from unremunerative grants,

5    by permitting grantees to use derivative works created under such grants to entangle

6    and divest the original recaptured work, even though such work remains protected by

7    a *statutory* copyright.  *See* 3 NIMMER § 11.01[A].[18]  Unlike the plaintiff in *Batjac*,

8    which improperly sought to control a work in the public domain by manipulating

9    copyright law, the Siegel heirs simply exercised their right under the Copyright Act

10   to recapture Siegel's statutory copyright in Superman for the remainder of its

11   extended statutory term.[19]  The policy concerns underlying *Batjac* (protecting the

12   public from extending copyrights through artifice) are simply not present here.

13   **IV.   PLAINTIFFS NEED NOT HAVE INCLUDED THE ADS IN THEIR
         TERMINATION NOTICES AS THE ADS WERE DETECTIVE'S
14       DERIVATIVE WORKS, NOT SIEGEL'S  WORKS**

15         Section 304(c) of the Copyright Act provides for the termination by an

16   author's statutory heirs of the author's copyright grants, not a grantee's rights in

17   derivative works which are protected under the "derivative works exception."  17

18   U.S.C. § 304(c)(6)(A).  Section 304(c) measures the permissible termination

19   "window" as commencing fifty-six years after *the author's work* first secured

20   statutory copyright because a key objective of section 304(c) is to enable author's

21   and their heirs to benefit from Congress' extension of the renewal copyright beyond

22   the copyright's fifty-six year term.  *See* H.R. Rep. No. 94-1476 at 140 (1976),

23   reprinted at 1976 U.S.C.CAN. 5654, 5756.  There is no requirement to list in a

24   _____

25   [18] *Nimmer* and *Patry*, both implicitly acknowledge that *Batjac* does not stand for a general principle that
     publication causes divestiture.  *See* 1 NIMMER §§ 4.12[A] at 4-60 (noting that the copyright in a pre-existing
26   common law copyright is only eliminated "if publication itself causes that result," as where publication is
     with an invalid notice or "publication is followed by the maximum length of time for copyright to subsist");
27   2 PATRY § 6:35 (2008) (noting that publication of a derivative work "does not mean, however, that all
     protection for the unpublished work is forfeited, only that any forfeiture due to publication of the derivative
28   work without notice or for lack of a timely renewal forfeits so much of the underlying work as is included
     with permission.")

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

termination notice derivative works owned by the grantee at inception and *not* subject to recapture.  17 U.S.C. § 304(c)(6)(A).

   As held by the Court, Plaintiffs properly terminated the March 1, 1938 grant with respect to Siegel's copyright in his work, Action Comics No. 1.  Order at 72. As joint owner's of the Action Comics, No. 1 copyright , Plaintiffs' have the non-exclusive right to exploit it, subject to a duty to account to Defendants.  *See Oddo v. Reis*, 743 F.2d 630, 632-33 (9th Cir. 1984).

## V.   PLAINTIFFS' FAILURE TO LOCATE THE OBSCURE ADS CONSTITUTES HARMLESS ERROR; THEIR TERMINATION NOTICES PROVIDED DEFENDANTS WITH AMPLE NOTICE

   Notwithstanding the above, the omission of the Ads and the mistake in setting the termination date mere days earlier to encompass the Ads qualify as inadvertent harmless error under 37 C.F.R. § 201.10(e)(1), and should have no effect on the application of the notices of termination to the Ads or the scope of copyright recaptured by the termination.  The omissions did not "materially affect the adequacy of the information in the notice."  *See* Order at 49.  The notice unambiguously terminated the operative grant of copyright in Superman to Defendants' predecessors and just as unambiguously provided notice of Plaintiffs' intent to include every even remotely relevant Superman works.  Defendants cannot reasonably claim that they were not given fair and comprehensible notice under section 304(c).  Given the scope and detail of their well researched termination notices, Plaintiffs clearly would have listed the Ads if they had known of their existence, and would have set the effective termination date to encompass the Ads.  If the former is considered harmless error under 37 C.F.R. § 201.10(e)(1), so should the latter.

   The authorities cited by Defendants and the Court regarding *renewal* notices are inapposite.  The harsh enforcement of deadlines for filing renewal applications derives directly from the statutory language for renewals, which differs significantly

17

from the statutory language for termination notices.[20]  *See* 3 NIMMER § 9.05[A][1] (The formality of renewal was hence an absolute condition to copyright subsistence past the 28th year. . .").  The termination provisions of the 1976 Act contain no such language.  Instead, section 304(c)(4)(B) delegates to the Register of Copyrights the responsibility of deciding the necessary content of termination notices which explicitly provided that harmless errors will not impair a termination.  37 C.F.R. § 210.10(e)(1).

Congress enacted the termination provisions of section 203 and section 304 in part to eliminate the harsh formalities of the renewal system, under which renewal applications often failed because of technical formalities.  2 W. Patry, PATRY ON COPYRIGHT ("PATRY") § 7:27. ("The complete loss of copyright under these circumstances was harsh and unnecessary.")  The past policy of enforcing strict compliance with provisions for renewal notices should not act as persuasive authority for undermining section 304(c)'s benefits to authors or curtailing the "harmless error" provision of 17 U.S.C. § 304(c)(4)(B) and 37 C.F.R. § 201.10(e)(1). *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-173 (1985) ("[t]he principal purpose of the amendments in § 304 was to provide added benefits to authors.")  The failure of Plaintiffs to take into account the promotional advertisements (which they had no possibility of ascertaining) in choosing a termination date in the notices should not result in the kind of prejudice associated with an untimely filing of a renewal notice.[21]

---

[20] Section 24 of the 1909 Copyright Act read:  "That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication."  Before 1992, Section 304(a) of the 1976 Act contained virtually the same language.

[21]  The sections from *PATRY*, NIMMER and *Dratler & McJohn* relied on by the Court do not vitiate the harmless error doctrine.  Instead, these authorities simply remind the reader to calculate the termination window for a work from the actual date of publication, and to not rely on the expiration of the 28-year renewal term at the end of the calendar year.  PATRY § 7:43; NIMMER § 11.05[B][1]; 3 DRATLER & MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008).

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

Defendants also make a hollow distinction between errors that render a notice *invalid* and errors that impair the *effect* of a notice, claiming that the language of 37 C.F.R. § 201.10(e)(1) precludes a harmless analysis.  Yet, when the meaning of statutory language is indeterminate or ambiguous, one should look at the context of the language.  PATRY §§ 2:17, 2:21.  The parallel provision, section 201.10(e)(2), offers clarification by providing that good faith errors in the description of the date or registration number of a work "shall not affect the *validity* of the notice . . ." presumably with respect to such work. (emphasis added).  The statute provides that such mistakes will not impair the effect of the notice upon the work, and does so by stating that such mistakes will not "affect the *validity* of the notice."  37 C.F.R. § 201.10(e)(2).[22]  The drafters of Section 201.10(e) did not recognize a distinction between errors that render a notice invalid and errors that render a notice invalid with respect to some works, but not others.  The drafters used the word "validity" to provide that harmless errors did not impair the effect or obvious objective of the termination notice.  As Sections 201.10(e)(1) and Section 201.10(e)(2) are parallel sections that together constitute the "harmless error" provision of Section 201.10, the use of the word "validity" in Section 201.10(e)(2) demonstrates the context of the use of the word "invalid" in Section 201.10(e)(1).  The drafters of Section 201.10(e)(1) clearly intended that harmless errors would not render a termination notice invalid with respect to particular works.[23]

---

[22] One could not credibly argue that this section operates only to protect an entire termination notice from being ruled invalid on the basis of one mistake in the description of the publishing date or registration number of one work.  Instead, the common sense construction of this section is that a good-faith mistake in the publishing date or registration number will not affect the application of the termination notice *to that work*.

[23] Defendants err in arguing that the "harmless error" clause of 37 C.F.R. § 210.10(e)(1) is inconsistent with the statutory language of the Copyright Act.  Nowhere in the Copyright Act does Congress require termination notices to list works on penalty of copyright forfeiture, or state that the "harmless error" doctrine does not apply.  17 U.S.C. § 304(c).  Indeed, Congress sets forth a broad description of termination notices and explains that termination notices "shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation."  17 U.S.C. § 304(c)(4)(B).

19

The Court acknowledged and applied this harmless error policy in rejecting Defendants' arguments regarding Plaintiffs' failure to list the 1948 consent judgment in their notices.  Order at 49:21-50:13.  The same reasoning should apply to the promotional announcement(s): Having terminated the operative March 1, 1938 grant, Plaintiffs failure to list the ads, due to their practical inability after diligent search to locate them, "did not diminish the notice defendants received regarding the nature of the grant that plaintiffs intended to terminate." *Id*.  The public policy of providing relief to authors and their heirs from unremunerative grants will be undercut if this Court rules that the harmless error doctrine cannot cure the Siegel heirs' inadvertent omission of the obscure "promotional announcement(s)."  Such would elevate Defendants' hyper-technical sophistry above the remedial policy objectives of the Copyright Act's termination provisions.

## VI.   THE ORDER'S HISTORICAL SUMMARY INCLUDES CONTESTED FACTS PROPERLY DECIDED AT TRIAL.

### A.   <u>The Order May Be Interpreted As "Ruling" on Issues of Fact Not Before the Court.</u>

In the historical background section of the Order, certain passages will be construed by Defendants as a "ruling" by the Court that various Superman elements are not included in Action Comics, No. 1 so as to restrict the Superman elements recaptured by Plaintiffs' termination notices.

> "Many of Superman's powers that are among his most famous today did not appear in Action Comics, Vol. 1, including his ability to fly…; his super-vision…; his super-hearing….The "scientific" explanation for these powers was also altered in ensuing comics…"

Order at 14:2-14.

Plaintiffs' understanding is that the Court was not ruling on such issues, but rather was providing historical background and orientation as to the Superman mythos.[24] Plaintiffs believe that certain "powers" described by the Court as not

---

[24]The part of the opinion listing the various literary elements largely follows Defendants' discussion of the "facts" in their opening papers at page 8:3-22, for which Defendants *solely relied* on paragraphs 6 and 7 of the declaration of Paul Levitz, President and Publisher of DC Comics to support these allegations. Plaintiffs strenuously objected to this testimony in paragraphs 38 and 39 (pages 22- 23) of their Evidentiary

present in Action Comics, No. 1 are, in fact, present in that work, and respectfully request that the Court clarify its ruling, as its statements, while arguably *dicta*, could be taken as conclusive findings with respect to the literary contents of Action Comics, No. 1.

**B.**   **The Disputed Contents of Action Comics, No. 1 Present Issues of Fact Inappropriate for Summary Judgment**

In a copyright action the content and associated elements of a literary work are questions of fact properly reserved for the ultimate trier of fact.  *See Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977) (claims for actual damages requiring apportionment between literary elements, involve matters of fact and implicate the constitutional right to jury trial.); *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 396-98 (1940) (trier of fact resolved dispute involving allotment of literary elements.)  An analysis of whether Superman's "super-hearing" or "telescopic vision" is found in the literary content of Action Comics No. 1 is a subjective analysis best left to a jury.  *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 487 (9th Cir. 2000) (affirming jury determination of the proportion of profits attributable to infringing musical elements); *Perry v. Sonic Graphic Sys.*, 94 F.Supp.2d 616, 623 (E.D.Pa. 2000) (apportionment of creative elements "an issue of fact that must be decided by a jury."); *Walker v. Forbes, Inc.*, 28 F.3d 409, 416 (4th Cir. 1994) (approving jury determination of infringing elements.)

---

Objections In Opposition to Defendants' Motion for Partial Summary Judgment as well as in paragraphs 14-18 (pages 11- 14) of their L.R. 56-2 Statement of Genuine Issues.  The Court also appeared to confirm the substance of Defendants' purported Superman trademarks without Plaintiffs having the opportunity to brief this important issue: "The most notable of these marks that are placed on various items of merchandise are 'Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases[,]" such as " 'Look! ... Up in the sky! ... It's a bird! ... It's a plane! ... It's Superman!'" Order at 14-15. The discussion of the trademarks similarly appears to be from Defendants' opening papers at pages 10:13- 11:16, in which Defendants solely relied on paragraphs 10 and 11 of the same declaration of Paul Levitz. Plaintiffs objected to this testimony as well, in paragraphs 42-48 (pages 25-29) of their Evidentiary Objections as well as in paragraphs 28-32 (pages 21-24) of their L.R. 56-2 Statement.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

In the closely related copyright infringement cases, which require an analysis of the "elements" of works and their similarity, it is well settled that "[s]ince substantial similarity is usually an extremely close question of fact," summary judgment is "disfavored." *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329-30 (9th Cir. 1983) (reversing grant of summary judgment); *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990) (summary judgment is "not highly favored" on substantial similarity of elements); *Levine v. McDonald's Corp.,* 735 F.Supp. 92, 96 (S.D.N.Y. 1990) (normally a jury question.)

Plaintiffs seek clarification that the Court in discussing Superman's historical background was not in fact ruling on such issues, as such subjects are properly reserved for the trier of fact.[25]

### C.   Even if the Court Were to Rule As to the Disputed Literary Elements in Action Comics No. 1, Due Process Requires Giving the Parties an Opportunity to Brief the Issues.

Plaintiffs respectfully submit that even if the Court had intended to "rule" as to the disputed literary elements contained in Action Comics No. 1, it lacked the power to do so, as due process requires that before the Court makes a *sua sponte* summary judgment ruling it give the parties a full and fair opportunity to brief the issues decided.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (Courts may enter judgment *sua sponte* if "the losing party was on notice that she had to come forward with all of her evidence.") [26]

---

[25] Whether Siegel's Superman works after Action Comics No. 1 (e.g., Action Comics No. 2-6, prior to Siegel entering into the September 22, 1938 "Employment Agreement") were also not "works-for-hire," presents genuine issues of material fact reserved for trial. This is strongly disputed by the parties as it has a direct impact on the Superman elements recovered by Plaintiffs.  The Court appeared to be giving an historical description of Action Comics No. 1 in its Order, rather than determining such work-for-hire issues, as such issues of fact were neither before the Court, nor conducive to summary judgment.  However, for the avoidance of doubt, Plaintiffs respectfully request that the Court confirm this point as well.

[26] *See also Greene v. Solano County Jail*, 513 F.3d 982, 990 (9th Cir. 2008) ("*Sua sponte* grants of summary judgment are only appropriate if the losing party has reasonable notice that the sufficiency of his or her claim will be in issue"); *Buckingham v. U.S.*, 998 F.2d 735, 742 (9th Cir. 1993) (*Sua sponte* summary judgment inappropriate where "facts remained in dispute" and where the litigant ruled against "did not receive sufficient notice of the district court's potential entry of summary judgment against it and therefore did not have the opportunity to present arguments."); *Scholastic Ent, Inc. v. Fox Ent. Group, Inc.*, 336 F.3d 982, 985 (9th Cir. 2003) (Due process requires "notice and an opportunity to respond" before claims are

22

1    As discussed below, the literary contents of Action Comics, No. 1 are hotly

2  disputed and involves genuine issues of material fact, inappropriate for summary

3  judgment, particularly *sua sponte* summary judgment, if that was even the Court's

4  intention.  Given that neither party had moved for summary judgment on this key

5  issue, presumably because it is an issue of fact for trial, Plaintiffs did not brief the

6  issue of whether Superman's "ability to fly … super-vision … "x-ray" vision …

7  "telescopic" vision …[and] super-hearing " were elements contained in Action

8  Comics No. 1.  Order at 14:4-8.  Plaintiffs had no notice that this issue was to be

9  determined on summary judgment, nor were they given the opportunity to present

10  evidence on this issue.

11
       **D.    Elements Listed in the Court Order as Being the Preserve of the**
12           **Defendants First Appeared in Action Comics No. 1**

13    Plaintiffs believe that some of the elements listed in the Court's order as

14  among "Supermans's powers … [that] did not appear in Action Comics, Vol. 1," in

15  fact did appear in that historic work, and are included in the copyrightable elements

16  recaptured by Plaintiffs' termination, notably Superman's "super-senses."  *See*

17  Toberoff Decl., Ex. A (Plaintiffs Expert Rebuttal Witness Disclosure of Mark

18  Evanier) at p. 25 (referring to "the array of superpowers with which Superman is

19  armed in Action No. 1" as including "super-senses."); Toberoff Decl., Ex. B

20  (Deposition of Mark Evanier).  Plaintiffs are not requesting that the Court rule on

21  these issues, but are merely providing this information to demonstrate genuine issues

22  of material fact.

23    For example, Superman's "super-hearing" is clearly depicted in panels 4-8 of

24  page 11 of Action Comics No. 1.  Superman is shown clinging to the outside of a

25  skyscraper, many floors above the street, listening to a conversation *inside* the

26

27
     dismissed *sua sponte* ); *Portsmouth Square, Inc. v. Shareholders Prot. Comm.*, 770 F.2d 866, 869 (9th
28   Cir.1985) (Courts must meet "the requirements of the Federal Rules and the demands of due process" in
     granting summary judgment *sua sponte*.)

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

building between Senator Barrows and Alex Greer, "the slickest lobbyist in Washington."  There is no depiction or indication of an open window.  Superman, in panel 4, is described as "an eavesdropper" who "listens in on an interesting conversation!"  The next three panels display the lobbyist and the Senator discussing their scheme and the financial kickbacks they will enjoy.  Senator Barrows says to the lobbyist "I suppose you're going to be well taken care of yourself," to which Superman, again *outside the building*, sarcastically rejoins to himself, "YOU BET HE WILL!" It is apparent from these panels that Superman has "super" hearing, as he is able to hear a conversation inside a skyscraper while he is outside, subject to the bustle and noise of the city.

Superman's "super-vision," whether described as "telescopic" or "X-ray" vision, also makes an appearance in Action Comics No. 1.  Lois and Clark's dinner is interrupted by some hoodlums who embarrass Clark.  *See* Action Comics No. 1 at p. 6 (panels 7-8)-7 (panels 1-6).  Lois slaps one of the thugs before making her exit in a cab. *Id*. at p. 7 (panels 3-6). The hoodlums decide they will "show that skirt she can't make a fool out of Butch Mason!" *Id*. at p. 7 (panel 7). The next panel shows Superman standing on what appears to be the top of a building, at night, staring down far below at a car driving past on the street.  *Id.* at p. 7 (panel 8).  As it would be from such a far away perspective, the car windows are depicted as opaque and the passengers are not discernable in the passing car.  Yet, the panel notes Superman is "observing" Butch and his fellow hoodlums, despite these figures not being distinguishable in the passing car *Id*. at p. 7 (panel 8).  The hoodlums subsequently force Lois' cab into a ditch and abscond with her in their car.  *Id*. at p. 8 (panels 1-3). The next panel shows Superman suddenly appearing in front of the speeding car, as he knows Lois is inside.  *Id.* at p. 8 (panel 5).  Superman seizes the car and rescues Lois.  *Id*. at p. 9 (panels 1-3).  Collectively, these panels plainly illustrate Superman's "super-vision" as he is apparently able to see over great distances into darkened cars; he is first able to discern that the hoodlums are in the car, and then he sees that the

1   hoodlums are holding Lois in the speeding car he stops.  In combination with the

2   "eavesdropping scene," Superman's "super-senses" are plainly evident, as without

3   them, his accomplishments would not be possible.[27]

4        Plaintiffs should be afforded the full and fair opportunity to present evidence,

5   including expert testimony, in open court as to the Superman elements recaptured by

6   Plaintiffs in Action Comics No. 1.

7   **CONCLUSION**

8        For the foregoing reasons, Plaintiffs' respectfully request that the Court grant

9   Plaintiffs' Motion for Clarification.

10   DATED: May 12, 2008            LAW OFFICES OF MARC TOBEROFF, PLC

11

12                             /s
                   By_____
                            Marc Toberoff

13                  Attorneys for Plaintiffs JOANNE SIEGEL

14                  and LAURA SIEGEL LARSON

15

16

17

18

19

20

21

22

23

24

25

26   _____

27   [27] In addition, whereas, some have opined that in Action Comics, No. 1, Superman "leaps" tall buildings and incredible distances, but does not yet "fly," this may be a distinction without a difference as he is seen

28   effortlessly soaring through the air.  The result is the same.  In fact, in certain panels of Action Comics, No. 1, Superman certainly looks like he is flying as he hovers effortlessly over the Capital dome, with a man tucked under his arm.  Action Comics No. 1, page 12, panels 3-5; page 13, panels 1-6.

25

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION