# EXHIBIT A



1   WEISSMANN WOLFF BERGMAN
    COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California 90212
4   Telephone: 310-858-7888
    Fax:      310-550-7191
5   TBENNETT@WWIP.com

    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6   Roger L. Zissu (Admitted *pro hac vice*)
    866 United Nations Plaza
7   New York, New York 10017
    Telephone: 212-813-5900
8   Fax:      212-813-5901

9   PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
10  1711 Route 9D
    Cold Spring, NY 10516
11  Telephone: 845-265-2820
    Fax:      845-265-2819

12

13  Attorneys for Defendants and Counterclaimant

14          UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

15  JOANNE SIEGEL and LAURA          ) Case Nos. [Consolidated for
    SIEGEL LARSON,                   ) Discovery]
16                                   ) CV 04-8400 SGL (RZx)
              Plaintiffs,            ) CV 04-8776 SGL (RZx)
17                                   ) Hon. Stephen G. Larson, U.S.D.J.
         vs.                         ) Hon. Ralph Zarefsky, U.S.M.J.
18                                   )
    TIME WARNER INC., WARNER         ) STIPULATION RE:
19  COMMUNICATIONS INC., WARNER      ) SCHEDULING ORDER AND
    BROS. ENTERTAINMENT INC.,        ) [PROPOSED] ORDER
20  WARNER BROS. TELEVISION          ) THEREON
    PRODUCTION INC., DC COMICS,      )
21  and DOES 1-10,                   )
                                     )
22            Defendants.            )
                                     ) NOTE CHANGES MADE BY THE COURT
23                                   )
24                                   )
25                                   )
26                                   )
27  AND RELATED COUNTERCLAIMS.       )
                                     )
28

         STIPULATION REGARDING SCHEDULING ORDER

Case 2:04-cv-08400-ODW-RZ   Document 337-2   Filed 07/21/08   Page 3 of 94   Page ID
#:1516
Case 2:04-cv-08400-SGL-RZ     Document 100     Filed 03/20/2007     Page 2 of 7

1    Plaintiffs/counterclaim-defendants Joanne Siegel and Laura Siegel Larson

2    (collectively "Plaintiffs"), and defendants Warner Bros. Entertainment Inc., Time

3    Warner Inc., Warner Communications Inc. and Warner Bros. Television

4    Production Inc. and defendant/counterclaimant DC Comics (collectively

5    "Defendants"), by and through their respective counsel of record, and subject to

6    the order of this Court, hereby stipulate and agree as follows:

7        WHEREAS, pursuant to the prior stipulation of the parties, and the orders of

8    this Court, the following trial and pre-trial dates have been set in these cases,

9    which have been consolidated only for purposes of discovery:

| | |
|---|---|
| 10    Non-expert discovery cutoff | November 17, 2006 |
| 11    Expert discovery cutoff | March 9, 2007 |
| 12    Motion cutoff | March 19, 2007 |
| 13    Pre-trial Conference | May 21, 2007 |
| 14    Trial | June 26, 2007 |

15    WHEREAS, the parties have diligently pursued discovery in these actions,

16   including written discovery, document productions, and depositions;

17    WHEREAS, the parties have exchanged moving and rebuttal expert reports,

18   but have not yet concluded expert depositions because of the number of experts

19   designated (twelve in total between Plaintiffs and Defendants) and the difficulty in

20   coordinating the experts' schedules and counsels' schedules in the short period of

21   time between the exchange of the reports and the expert discovery cutoff;

22    WHEREAS, the parties have met and conferred on certain discovery

23   disputes, and have initiated the joint stipulation process on four separate discovery

24   motions, the rulings on which may require additional discovery responses or

25   depositions;

26    WHEREAS, the parties have met and conferred on certain additional

27   motions, and anticipate filing cross-motions for partial summary judgment on

28   seven or eight separate issues and/or claims for relief in the two actions, which

2

**STIPULATION REGARDING SCHEDULING ORDER**

Case 2:04-cv-08400-ODW-RZ   Document 337-2   Filed 07/21/08   Page 4 of 94   Page ID
#:1517
Case 2:04-cv-08400-___L-RZ   Document 100   Filed 03/20/2007   Page 3 of 7

1   motions will require more than the minimum notice mandated by the Local Rules

2   for opposition and replies;

3       WHEREAS, the Court's determination on Defendants' Motion for

4   Reconsideration, which is currently under submission and is pending decision, may

5   potentially impact the partial summary judgment motions that the parties anticipate

6   filing, or may necessitate the filing of different or additional such motions;

7       WHEREAS, the Court's rulings on the parties' cross-motions for partial

8   summary judgment will materially impact the parties' preparations for trial, and

9   any settlement mediation efforts that the parties engage in;

10      WHEREAS, the current trial and pre-trial schedule, including the deadlines

11  imposed by the Federal Rules of Civil Procedure, the Local Rules, and this Court's

12  Standing Order, will require the parties to prepare their pre-trial materials prior to

13  the determination on their cross-motions for partial summary judgment, resulting

14  in potentially wasteful or duplicative effort;

15      WHEREAS, the parties believe that extending the trial and pre-trial dates, as

16  set forth below, will allow sufficient time for the conclusion of expert discovery

17  and the preparation and determination of motions, including potentially dispositive

18  motions, and will provide for the more orderly preparation and trial of this matter;

19      WHEREAS, counsel for each party certifies to the Court that the requested

20  extensions are essential to complete necessary expert discovery, are necessary to

21  the orderly preparation and trial of these matters, and are not sought for any

22  improper purpose;

23      NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED,

24  subject to the approval of the Court, that the following trial and pre-trial dates shall

25  be applicable to these matters:

26      Expert Discovery Cutoff                 March 30, 2007

27      Motion Filing Cutoff [All Motions]      April 23, 2007

28  ///

STIPULATION REGARDING SCHEDULING ORDER

| | |
|---|---|
| Opposition Briefs Due For Motions For Summary Judgment Or Partial Summary Judgment | May 21, 2007 |
| Reply Briefs Due For Motions For Summary Judgment Or Partial Summary Judgment | June 11, 2007 |
| Summary Judgment Hearing | June or July, 2007 |
| Mediation Deadline | September 24, 2007 |
| Jury Instructions Due | October 8, 2007 |
| Objections to Jury Instructions | October 15, 2007 |
| Local Rule 16 Conference | October 22, 2007 |
| In Limine Motions Due | November 5, 2007 |
| In Limine Oppositions Due | November 19, 2007 |
| In Limine Replies Due | November 30, 2007 |
| Memo of Contentions of Fact and Law Witness and Exhibit Lists Proposed Voir Dire Proposed Pretrial Conference Order | November 19, 2007 |
| Pre-trial Conference | December 3, 2007 |
| Trial Briefs Due | December 17, 2007 |
| Last Day to Seek Continuance | December 31, 2007 |
| Trial of Case No. CV 04-8400 | January 21, 2008 |
| Trial of Case No. CV 04-8776 | Thereafter, as set by Court |

/ / /
/ / /
/ / /
/ / /
/ / /

4

**STIPULATION REGARDING SCHEDULING ORDER**

1 | Respectfully submitted,

2 | DATED: March 3, 2007

WEISSMANN WOLFF BERGMAN
COLEMAN GRODIN & EVALL LLP

FROSS ZELNICK LEHRMAN & ZISSU,
P.C.

PERKINS LAW OFFICE, P.C.

By: _Michael Bergman_
Michael Bergman
Attorneys for Defendants

9 | DATED: March 17, 2007

LAW OFFICES OF MARC TOBEROFF,
PLC

By: _Marc Toberoff_
Marc Toberoff
Attorneys for Plaintiffs

5

STIPULATION REGARDING SCHEDULING ORDER

# ORDER

Based on the Stipulation of the parties, and for good cause shown,

**IT IS HEREBY ORDERED** that the following trial and pre-trial dates shall be applicable to these matters:

| | |
|---|---|
| Expert Discovery Cutoff | March 30, 2007 |
| Motion Filing Cutoff [All Motions] | April 23, 2007 |
| Opposition Briefs Due For Motions for Summary Judgment Or Partial Summary Judgment | May 21, 2007 |
| Reply Briefs Due For Motions for Summary Judgment Or Partial Summary Judgment | June 11, 2007 |
| Summary Judgment Hearing | June or July, 2007 |
| Mediation Deadline | September 24, 2007 |
| Jury Instructions Due | October 8, 2007 |
| Objections to Jury Instructions | October 15, 2007 |
| Local Rule 16 Conference | October 22, 2007 |
| In Limine Motions Due | November 5, 2007 |
| In Limine Oppositions Due | November 19, 2007 |
| In Limine Replies Due | November 30, 2007 |
| Memo of Contentions of Fact and Law Witness and Exhibit Lists Proposed Voir Dire Proposed Pretrial Conference Order | November 19, 2007 |
| Pre-trial Conference | December 3, 2007 @ 11:00 a.m. |
| Trial Briefs Due | December 17, 2007 |
| Last Day to Seek Continuance | December 31, 2007 |
| Trial of Case No. CV 04-8400 | January 22, 2008, @ 9:30 a.m. |
| Trial of Case No. CV 04-8776 | Thereafter, as set by Court |

Dated: _3 - 19 - 07._

S. Larson

Hon. Stephen G. Larson
Judge, United States District Court

NOTE CHANGES MADE BY THE COURT

6

**STIPULATION REGARDING SCHEDULING ORDER**

014

**PROOF OF SERVICE**

STATE OF CALIFORNIA                    )
                                       ) ss.
COUNTY OF LOS ANGELES                  )

     I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9665 Wilshire Blvd, Ninth Floor, Beverly Hills, California 90212.  On the date shown below, I served the documents described as:

1.    **STIPULATION RE: SCHEDULING ORDER AND [PROPOSED] ORDER THEREON**

on the interested parties in said action, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Marc Toberoff
Law Offices of Marc Toberoff, PLC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

____    **(FACSIMILE SERVICE)** I caused such document to be transmitted via facsimile to the offices of the addressees at the numbers listed above.

**XX**    **(PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the addressees above.

Executed on **March 14, 2007**, at Beverly Hills, California.

____    **STATE**    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**XX**    **FEDERAL**    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_Ticci Bennett_
Ticci Bennett

# EXHIBIT B

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 20 2007

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

1 | Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
3 | Los Angeles, CA 90067
Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101
   mtoberoff@ipwla.com
5 | Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL AND LAURA SIEGEL LARSON

6

7 | **UNITED STATES DISTRICT COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA**

9 | JOANNE SIEGEL, an individual; and        Case Nos. CV 04-8776 SGL (RZx)
10 | LAURA SIEGEL LARSON, an                              04-8400 SGL (RZx)
   individual,
11 |                    Plaintiffs,              [Consolidated for Discovery]
12 |         vs.
                                             Honorable Stephen G. Larson
13 | TIME WARNER INC., a corporation;         Honorable Ralph Zarefsky
   WARNER COMMUNICATIONS
14 | INC., a corporation; WARNER              **[PROPOSED] ORDER
   BROS. ENTERTAINMENT INC., a              GRANTING PLAINTIFFS' *EX
15 | corporation; WARNER BROS.                *PARTE* APPLICATION
   TELEVISION PRODUCTION INC.,               MODIFYING THE PARTIES'
16 | a corporation; DC COMICS, a general       SUMMARY JUDGMENT
17 | partnership; and DOES 1-10,               BRIEFING SCHEDULE**
18 |
19 |                    Defendants.
20 |
   DC COMICS,
21 |
22 |                    Counterclaimant,
   vs.
23 |
24 | JOANNE SIEGEL, an individual; and
   LAURA SIEGEL LARSON, an
25 | individual,
26 |
27 |                    Counterclaim Defendants.
28 |

DUPLICATE
ORIGINAL

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____     Send _____
Entered _____      Closed _____
JS-5/JS-6 _____    JS-2/JS-3 _____
Scan Only _____    Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

EASTERN DIVISION
BY                          DEPUTY

[PROPOSED] ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION

#122

017

1       Having considered Plaintiffs' *ex parte* application for an order

2 modifying the parties' summary judgment briefing schedule and good cause

3 existing therefore,

4       IT IS HEREBY ORDERED that the parties' summary judgment

5 schedule is hereby modified as follows:

6

7       Summary Judgment Filing Cutoff:              April 30, 2007

8       Summary Judgment Opposition Briefs Due:    May 28, 2007

9

10       Summary Judgment Reply Briefs Due:       June 18, 2007

11

12

13 DATED: April ___, 2007

14                           /s/

                          STEPHEN G. LARSON

                          Hon. Stephen G. Larson

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DUPLICATE

1

[PROPOSED] ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION

018

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3       I am employed in the County of Los Angeles, State of California. I am over the age of eighteen
        years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720,
4       Los Angeles, California 90067.

5       On April 17, 2007, I served the attached documents described as:

6              **Plaintiffs Joanne Siegel and Laura Siegel Larson's *Ex Parte* Application and**
               **Order Modifying the Parties' Summary Judgment Briefing Schedule**

7
               **Declaration of Marc Toberoff In Support of Plaintiffs' *Ex Parte* Application and**
8              **Order Modifying the Parties' Summary Judgment Briefing Schedule**

9              **[Proposed] Order Granting Plaintiffs' *Ex Parte* Application Modifying the Parties'**
               **Summary Judgment Briefing Schedule**

10
        as follows:
11
        [X]   :BY HAND:
12
               As follows:  I delivered to the address listed above by hand the documents listed herein.
13
               Michael Bergman
14             WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
               9665 Wilshire Boulevard, Ninth Floor
15             Beverly Hills, CA 90212

16      [X]   :BY MAIL:

17             As follows: I am "readily familiar" with the firm's practice of collection and processing
        correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on
18      that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of
        business. I am aware that on motion of the party served, service is presumed invalid if postal
19      cancellation date or postage meter date is more than one day after date of deposit for mailing in
        affidavit. I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed
20      as follows:

21             James D. Weinberger
               FROSS ZELNICK LEHRMAN & ZISSU, P.C.
22             866 United Nations Plaza
               New York, NY 10017
23
        [X]   :BY FACSIMILE:
24
               As follows: I caused the transmission of the above named documents to the fax number set
25      forth below, or on the attached service list.

26             James D. Weinberger
27             FROSS ZELNICK LEHRMAN & ZISSU, P.C.
               866 United Nations Plaza
28             New York, NY 10017

Facsimile No. 212-813-5901

1

Patrick T. Perkins
2    PERKINS LAW OFFICE, P.C.
1711 Route 9D
3    Cold Spring, NY 10516
Facsimile No. 845-265-2819
4

Michael Bergman
5    WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
6    Beverly Hills, CA 90212
Facsimile No. 310-550-7191
7

:(STATE) - I declare under penalty of perjury under the laws of the State of California that the
8    above is true and correct.

9    [X] :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at
whose direction the service was made.
10

I declare under penalty of perjury that the foregoing is true and correct.
11

EXECUTED on April 17, 2007, in Los Angeles, California.
12

13

14                                                   Nicholas C. Williamson

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

WWBCGE

Michael Bergman
a professional corporation
mbergman@wwllp.com

Our File No. 2231.811

VIA FACSIMILE (310) 246-3101
AND FIRST CLASS MAIL

January 10, 2008

Marc Toberoff, Esq.
Law Offices of Marc Toberoff
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

Re:     Superman Litigation
        Case No. CV 04-8400

Dear Marc:

I write to see if we can reach an agreement – or, if not, to initiate a meet and confer leading to a joint stipulation per the Court's December 12, 2007 Order – regarding certain substantive and procedural matters in the Superman case which we should discuss, and the Court should address and resolve, as soon as possible. The issues – all of which are premised on Plaintiffs prevailing on their termination claim – are as follows:

1.    Is the accounting issue – that is, the determination of the allocable share of post-termination Superman profits due to Plaintiffs – to be decided by the Court or by the jury?

2.    In determining the allocable share of the profits due to Plaintiffs, is Plaintiffs' interest limited to their share of the recaptured copyright in Action Comics No. 1, or are the copyrightable elements of Action Comics Nos. 2-61 also to be taken into account?

3.    Is the trier of fact (be it the Court or the jury), required to examine and consider each post-termination work separately and independently in making any allocation or apportionment determination?

4.    Do Plaintiffs or Defendants bear the burden of proof on the allocation and apportionment issues?

Each of these questions raises a fundamental issue, the determination of which will govern the way in which the trial is conducted, and accordingly will impact virtually all aspects of the parties' pre-trial preparations. Therefore, we think it

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 WILSHIRE BLVD, NINTH FLOOR, BEVERLY HILLS, CA 90212  T: 310.858.7888  F: 310.550.7191  WWW.WWLLP.COM
LAWYERS
337140v1

Received   Jan-10-08  11:42am    From-3105507191         To-              Page 002

022

Marc Toberoff, Esq.
January 10, 2008
Page 2

behooves both sides to have the Court focus on these issues now, and not wait
until the final pre-trial conference to raise them.

Defendants' position on each of these issues – in the event Plaintiffs' termination
claim is successful – is as follows:

1.   Plaintiffs' accounting claim, being a claim between co-owners of a
     copyright, lies in equity, not in law, and thus is not among the kinds of
     claims that fall within the Seventh Amendment right to trial by jury.
     Accordingly, the accounting claim is appropriately tried to and
     determined by the Court or a Court-appointed referee, sitting without a
     jury.

2.   Plaintiffs' recaptured copyright interest is limited to Action Comics No. 1,
     as each of Jerry Siegel's subsequent contributions to Superman was as
     a work made for hire, which subsequent works are not subject to
     termination and recapture. Accordingly, in determining the allocable
     share of post-termination Superman profits due to Plaintiffs, the Court's
     allocation must be based on a portion of those profits attributable to
     the copyrightable elements in Action Comics No. 1 only.

3.   Given the large and varied nature of the post-termination Superman
     works at issue (hundreds of comic books and graphic novels; scores of
     television episodes; and numerous other filmed media works as well as
     consumer products), the Court must review and consider each post-
     termination work separately and independently to determine what, if
     anything, in each such work can properly be attributable to the
     recaptured copyrightable elements in Action Comics No. 1, in order to
     arrive at an appropriate allocation of profits due to Plaintiffs.

4.   Since Plaintiffs' claim to a share of the post-termination Superman
     profits is based on a claimed co-ownership interest and is not based in
     any way on any claim of infringement, a traditional burden of proof
     analysis governs, and Plaintiffs, as claimants, bear the burden of
     establishing the appropriate equitable allocable share of profits due
     them.

I have no doubt you have previously considered these matters, and your
positions on them may be different from ours.  Accordingly, we should get
together or speak in the next week or so to see if we can reach a consensus
about one or more of these issues; for those issues about which we disagree, I
suggest that we alert the Court to them, and ask that the Court set a briefing
schedule on those matters so that issues and arguments can be fully briefed and

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

337140v1

023

Marc Toberoff, Esq.
January 10, 2008
Page 3

considered before the parties' jury instructions and Rule 16-4 Memorandum of Contentions of Fact and Law are due.

Please let me have your thoughts on the above, so that we can determine how best to handle the pre-trial preparation of the case.

Very truly yours,

Michael Bergman

MB/jra

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

337140v1

WWBCGE

# FACSIMILE TRANSMISSION

**Date:**  January 10, 2008

**From:**  Michael Bergman

**E-mail:**  mbergman@wwllp.com

**Pages:**  __4__  (including cover)

**Subject:**  *Siegel v. Time Warner*

**Recipient(s):**  **Fax Number(s):**  **Phone Number(s):**

Marc Toberoff  (310) 246-3101  (310) 246-3333

**Message:**

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD., NINTH FLOOR, BEVERLY HILLS, CA 90212 T: 310.858.7888 F: 310.550.7191 WWW.WWLLP.COM
LAWYERS

FEDERAL TAX ADVICE DISCLAIMER
We are required by U.S. Treasury Regulations to inform you that, to the extent this message includes any federal tax advice, this message is not intended or written by the sender to be used, and cannot be used, for the purpose of avoiding federal tax penalties.

ATTORNEY-CLIENT PRIVILEGE/ATTORNEY WORK PRODUCT
This fax is intended solely for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution, disclosure, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original fax to us at the above address. Thank you.

USER ID:  6865

CLIENT MATTER: 2231.811

# EXHIBIT D

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

### 2049 CENTURY PARK EAST, SUITE 2720
### LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

January 23, 2008

Via Facsimile and US Mail

Michael Bergman, Esq.
Weissmann Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Blvd., Ninth Floor
Beverly Hills, CA 90212

Re: Superman/Superboy Litigations, Case Nos. 04-CV-8400, 8776 SGL (RZx)

Dear Michael:

This letter is in response to your letter of January 23, 2008 proposing a status conference with the Court to schedule joint stipulations regarding certain issues alleged in your letter of January 10, 2008 (your January 18 and January 23, 2008 letters incorrectly refer to a "January 8" letter; I assume you are referring to your January 10, 2008 letter).

Your letter mistakenly implies that my January 21, 2008 letter suggests addressing these issues for the first time at the Final Pre-Trial Conference on April 28, 2008. In fact, my letter suggested addressing these issues at the parties' Local Rule 16 Conference on March 19, 2008 (or earlier) and thereafter by briefing to the Court, if the issues remained unresolved after the Rule 16 Conference.

Notwithstanding the above, and without prejudice to plaintiffs' positions on any of the alleged issues, plaintiffs are willing to stipulate to a status conference before the Court to schedule the submission and hearing of joint stipulations regarding these issues and potentially others.

I am currently out of the office recuperating from hernia surgery and do not anticipate being able to return to the office until Monday, January 28, 2008. I therefore suggest that we set a conference call for Monday to address the wording of the stipulation.

027

**LAW OFFICES OF MARC TOBEROFF**

Michael Bergman, Esq.
January 23, 2008
Page 2


I look forward to speaking with you.

Very truly yours,

Marc Toberoff

cc:  James Weinberger, Esq.(via Facsimile)
     Patrick Perkins, Esq. (via Facsimile)

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS

* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| **TO:** Michael Bergman<br>James D. Weinberger<br>Patrick T. Perkins | **FAX:** 310-550-7191<br>212-813-5901<br>845-265-2819 |
|---|---|
| **FROM:** Nicholas C. Williamson | **PAGES ( including cover ):** 3 |
| **DATE:** 1/23/2008 | **RE:** *Siegel v. Time Warner Inc.* |

**COMMENTS:**

Please find the attached correspondence re: Michael Bergman's January 23, 2008 letter.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS

* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: | Michael Bergman<br>James D. Weinberger<br>Patrick T. Perkins | FAX: 310-550-7191<br>212-813-5901<br>845-265-2819 |
|---|---|---|
| FROM: Nicholas C. Williamson | | PAGES ( including cover ): 3 |
| DATE: 1/23/2008 | | RE: *Siegel v. Time Warner Inc.* |

**COMMENTS:**

Please find the attached correspondence re: Michael Bergman's January 23, 2008 letter.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

# Group Send Report

```
                                    Page      : 001
                                    Date & Time: Jan-23-08  05:55pm
                                    Line 1    :
                                    Machine ID :
```

Job number          :   777

Date                :   Jan-23 05:52pm

Number of pages     :   003

Start time          :   Jan-23 05:52pm

End time            :   Jan-23 05:55pm

Successful nbrs.

    Fax numbers

       ☎13105507191
       ☎12128135901
       ☎18452652819

Unsuccessful nbrs.                                          Pages sent

LAW OFFICES OF
**MARC TOBEROFF**
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

Michael Bergman, Esq.
Weissman, Wolf, Bergman, Coleman
Grodin, & Evall LLP
9665 Wilshire Blvd, Ninth Floor
Beverly Hills, CA 90212

# EXHIBIT E

1  WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California  90212
4  Telephone:  310-858-7888
   Fax:        310-550-7191
5
   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6  Roger L. Zissu (Admitted *pro hac vice*)
   866 United Nations Plaza
7  New York, New York  10017
   Telephone:  212-813-5900
8  Fax:        212-813-5901

9  PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
10 1711 Route 9D
   Cold Spring, NY  10516
11 Telephone:  845-265-2820
   Fax:        845-265-2819
12
   Attorneys for Defendants and Counterclaimant
13
14            UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

15 JOANNE SIEGEL and LAURA        )  Case No. CV 04-8400 SGL (RZx)
   SIEGEL LARSON,                 )
16                                )  Hon. Stephen G. Larson, U.S.D.J.
                                  )  Hon. Ralph Zarefsky, U.S.M.J.
17        Plaintiffs,             )
                                  )  **STIPULATION REQUESTING**
18    vs.                         )  **STATUS CONFERENCE AND**
                                  )  **BRIEFING SCHEDULE**
19 TIME WARNER INC., WARNER       )  **REGARDING CERTAIN TRIAL**
   COMMUNICATIONS INC., WARNER    )  **AND PRE-TRIAL MATTERS**
20 BROS. ENTERTAINMENT INC.,      )
   WARNER BROS. TELEVISION        )
21 PRODUCTION INC., DC COMICS,    )
   and DOES 1-10,                 )
22                                )
          Defendants.            )
23                                )
                                  )
24                                )
                                  )
25                                )
                                  )
26 ─────────────────────────────  )
   AND RELATED COUNTERCLAIMS.     )
27                                )
28

1    Plaintiffs/counterclaim-defendants Joanne Siegel and Laura Siegel Larson

2 (collectively "Plaintiffs"), and defendants Warner Bros. Entertainment Inc., Time

3 Warner Inc., Warner Communications Inc. and Warner Bros. Television

4 Production Inc. and defendant/counterclaimant DC Comics (collectively

5 "Defendants"), by and through their respective counsel of record, hereby stipulate

6 and agree as follows:

7    WHEREAS, trial in this matter is presently set to commence on May 13,

8 2008, and the Final Pre-trial Conference is scheduled for April 28, 2008;

9    WHEREAS, the parties have identified certain issues for resolution after the

10 Court's pending ruling on the parties' cross-motions for summary judgment which

11 issues may substantially affect the conduct of the trial and the parties' pre-trial

12 preparations, as well as the length of the trial.  These issues are as follows:

13

14    1.    If Plaintiffs are successful in their Superman copyright termination claim,

15          is Plaintiffs' share of post-termination profits as a joint owner of the

16          recaptured Superman copyright(s) subject to reduction via an

17          "apportionment" analysis.

18

19    2.    If Plaintiffs are successful in their Superman copyright termination claim,

20          are the following to be determined by the Court or by the jury: (a) the

21          amount of post-termination Superman profits at issue and (b) the degree,

22          if any, to which Plaintiffs' share of such profits should be reduced by

23          "apportionment"?

24

25    3.    If an "apportionment" analysis is held to be appropriate, is the trier of

26          fact (be it the Court or the jury), required to make a separate and

27          independent apportionment determination, if any, for each post-

28          termination Superman work?

4.      Do Plaintiffs or Defendants bear the burden of proof on (a) the issue of
        Defendants' profits, and (b) the issue of the apportionment, if any, of
        those profits?

        WHEREAS, the parties believe that the forgoing issues are of sufficient
importance to the conduct of the trial such that these issues should be fully briefed
and argued and, for the sake of efficiency, addressed by the Court in advance of the
Final Pre-trial Conference;

        WHEREAS, the parties have identified the following additional issue, but
are not in agreement as to when it should be determined, in that Plaintiffs believe it
improperly presents an additional motion for partial summary judgment after the
dispositive motion deadline and, in any event, presents multiple issues of fact to be
determined at trial while Defendants believe that the issue is properly the subject of
a motion in limine, the import of which requires that it  should be determined
substantially prior to trial in that it is fundamental to the presentation of any
"apportionment" analysis:

5.      If Plaintiffs are successful in their Superman copyright termination claim,
        are Plaintiffs only entitled to profits derived from Plaintiffs' recaptured
        copyright interest in Action Comics No. 1; that is, was Jerome Siegel's
        contribution on all subsequent Superman works (within the termination
        "window") as a "work-made-for-hire" and accordingly not subject to
        termination?

        NOW THEREFORE, the parties respectfully request that the Court set a
status conference at its earliest convenience to set a briefing schedule for the
parties to brief the above issues after the Court's determination of the parties'

STIPULATION REGARDING SCHEDULING ORDER                                    036

1    pending motions for partial summary judgment so that they might be determined in

2    an orderly fashion.  The parties are concurrently submitting a stipulation regarding

3    the rescheduling of the trial and pre-trial dates in this matter in a manner that

4    would reasonably follow the Court's rulings on the parties' pending motions for

5    partial summary judgment; accordingly, the parties respectfully request that in the

6    event the Court does not grant that concurrent stipulation, those trial and pre-trial

7    scheduling matters also be discussed at the requested status conference.

8

9    Respectfully submitted,

10   DATED:   February 21, 2008          WEISSMANN WOLFF BERGMAN
                                         COLEMAN GRODIN & EVALL LLP
11
                                         FROSS ZELNICK LEHRMAN & ZISSU,
12                                       P.C.

13                                       PERKINS LAW OFFICE, P.C.

14
                                         By: _____
15                                           Michael Bergman
                                             Attorneys for Defendants
16

17   DATED:   February 21, 2008          LAW OFFICES OF MARC TOBEROFF,
                                         PLC
18

19                                       By: _____
                                             Marc Toberoff
20                                           Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

4
**STIPULATION REGARDING SCHEDULING ORDER**

# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| JOANNE SIEGEL, ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | NO. CV 04-08776-SGL |
| | ) | |
| TIME WARNER, INC., ET AL., | ) | |
| | ) | CROSS MOTIONS FOR |
| DEFENDANTS. | ) | PARTIAL SUMMARY JUDGEMENT |
| _____ | ) | |
| | ) | |
| AND RELATED CASES, | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, SEPTEMBER 17, 2007

1:38 P.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

1  APPEARANCES:

2  ON BEHALF OF THE PLAINTIFFS:

3
                         LAW OFFICES OF MARC TOBEROFF
4                        BY:  MARC TOBEROFF
                         BY:  NICHOLAS WILLIAMSON
5                        2049 CENTURY PARK EAST,
                         SUITE 2720
6                        LOS ANGELES, CALIFORNIA  90067
                         310-246-3333
7

8
   ON BEHALF OF DEFENDANTS:
9

10                       WEISSMANN WOLFF BERGMAN COLEMAN
                          GRODIN & EVALL LLP
11                       BY:  MICHAEL BERGMAN
                         9665 WILSHIRE BOULEVARD,
12                       NINTH FLOOR
                         BEVERLY HILLS, CALIFORNIA  90212
13                       310-858-7888

14

15 ON BEHALF OF DEFENDANTS:

16                       FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                         BY:  ROGER L. ZISSU
17                       866 UNITED NATIONS PLAZA
                         AT FIRST AVENUE & 48TH STREET
18                       NEW YORK, NEW YORK  10017
                         212-813-5900
19

20
   ON BEHALF OF DEFENDANTS:
21
                         PERKINS LAW OFFICE, P.C.
22                       BY:  PATRICK T. PERKINS
                         1711 ROUTE 9D
23                       COLD SPRINGS, NEW YORK  10516
                         845-265-2820
24

25

1            SO THEN THE QUESTION BECOMES WHETHER OR NOT THOSE

2  WORKS DO HAVE SUCH SUFFICIENT ORIGINAL CREATIVE ASPECTS TO WHAT

3  THE SCRIPT -- IN PARTICULAR, WHETHER IT HAS SUFFICIENT CREATIVE

4  ASPECTS TO IT AS TO CONSTITUTE A COPYRIGHTABLE WORK.

5            MR. BERGMAN:  IN THAT RESPECT, YOUR HONOR, IF I MAY,

6  I'D LIKE TO HAVE MR. ZISSU ADDRESS THAT POINT.

7            THE COURT:  VERY WELL.

8            AND I'LL CERTAINLY BE GIVING THE PLAINTIFF A CHANCE

9  TO FULLY ADDRESS THESE ISSUES.  I'M NOT ASSUMING THAT YOU AGREE

10 WITH ANY OF THIS AT THIS POINT.

11            MR. ZISSU:  GOOD AFTERNOON, YOUR HONOR.

12            THE COURT:  GOOD AFTERNOON, COUNSEL.

13            I GUESS I FRAMED THE OPENING QUESTION TO YOU.

14            I GUESS I'M HARD-PRESSED TO EVEN CONTEMPLATE THE

15 CONTENTION THAT THE SCRIPT, AS IT WERE, IS COMPLETELY LACKING

16 IN ANY KIND OF CREATIVE ORIGINAL WORK.  I WOULD ASSUME THAT YOU

17 WOULD BE WILLING TO CONCEDE, AND PERHAPS I'M MISTAKEN, THAT

18 THERE IS SOME ELEMENT OF CREATIVE ORIGINAL WORK.  PERHAPS THERE

19 MIGHT BE A DEBATE ON THE SCOPE OF THAT AND HOW BROAD THAT IS,

20 BUT IS IT REALLY YOUR CONTENTION THAT THERE IS NOTHING THERE?

21            MR. ZISSU:  NO.

22            YOUR HONOR, THE SCRIPT, IN A PURELY -- IF THE

23 QUESTION IS PURELY IF IT ISN'T COPYRIGHTABLE, YES, IT'S

24 COPYRIGHTABLE.

25            THERE ARE MANY ASPECTS OF OUR ARGUMENT THAT GO TO NOT

1 ONLY THE SCOPE OF WHAT'S PROTECTABLE, BUT THEN THE

2 ALL-IMPORTANT QUESTION OF WHO OWNS WHAT THE CONTRIBUTIONS ARE

3 THAT ARE PROTECTABLE, AND THE EXTENT OF THEM; SO WE AGREE WITH

4 YOUR HONOR ON THAT.

5          AND I MIGHT ADD THAT THE COPYRIGHTABILITY -- IF YOU

6 SENT THE SCRIPT TO THE COPYRIGHT OFFICE, THE QUESTION WOULD BE

7 PURELY, 'IS IT COPYRIGHTABLE?'  AND THEY WOULD RECEIVE IT, AND

8 THEY WOULD, IN MY VIEW, IN OUR VIEW, ISSUE A REGISTRATION.

9          THAT'S A DIFFERENT QUESTION FROM THE QUESTION YOUR

10 HONOR POSED, WHICH IS WHETHER, UNDER 103(B), THE EXTENT OF

11 OWNERSHIP IN THE NEW CONTRIBUTIONS VERSUS, REALLY, WHAT'S OWNED

12 IN THE ORIGINAL WORK, WHICH IS THE BASIS FOR THE DERIVATIVE

13 WORK.

14          SO WE THINK THE PLAINTIFFS REALLY HAVE ADDRESSED THE

15 WRONG QUESTION BY SAYING 'IS IT COPYRIGHTABLE?'

16          SURE, IT'S COPYRIGHTABLE.

17          THEN WE HAVE YOUR HONOR'S QUESTION, WHICH IS WHAT

18 103(B) REQUIRES.  AND WE'RE NOT STRICTLY SPEAKING IN THE

19 CONTEXT OF COPYRIGHTABILITY.  THE CONTEXT WE FIND OURSELVES IN

20 IS A LITIGATION, A DISPUTE, AND THERE ARE TWO ASPECTS OF THAT

21 DISPUTE.  THERE'S AN INFRINGEMENT CLAIM GOING ON, UNLESS IT'S

22 RENDERED MOOT.  BUT IN THAT CONTEXT, WE ARE IN THE CONTEXT OF

23 INFRINGEMENT; AND A CHALLENGE IS BEING MADE TO THE EXTENT OF

24 THE COPYRIGHT OWNERSHIP OF THE AUTHORS, OR THE CO-AUTHORS, OF

25 THE ORIGINAL WORK.  AND THAT, TOO, IS A DISPUTED CONTEXT,

Page 7

1 BECAUSE THERE'S A CHALLENGE AND THE DISPUTE AS TO THAT

2 COPYRIGHT OWNERSHIP.  SO IN THAT CONTEXT, WE'RE FORCED TO MOVE

3 AWAY FROM THE PURE QUESTION, 'IS IT COPYRIGHTABLE?'

4          IN ANSWERING THE QUESTIONS IN THEIR SUBMISSIONS, THE

5 PLAINTIFFS HAVE ANSWERED THE WRONG QUESTION, BECAUSE THEY'RE

6 REALLY ONLY GOING TO THE FIRST QUESTION, WHICH YOUR HONOR

7 ASKED, WHICH IS, WHERE DO WE START?  AND THEY SEEM TO THINK

8 FROM THAT THAT IT'S A VERY SIMPLE THING.

9          IF IT'S COPYRIGHTABLE, THEN THEY WANT TO REACH BACK

10 ON THE EXTENT OF THEIR OWNERSHIP AND WHAT'S BEEN NEWLY ADDED

11 AND REACH BACK AND SOMEHOW OWN THE UNDERLYING MATERIAL, WHICH

12 IS NOT NEWLY ADDED AND WHICH RESTS WITH THE AUTHORS, OR

13 CO-AUTHORS, OF THE ORIGINAL WORK.

14          THE COURT:  I UNDERSTAND THAT, AND I GUESS WHEN I

15 LOOK BACK THROUGH -- I THINK YOU REFER TO IT AS THE ORIGINAL

16 MATERIAL, PRESCRIPT MATERIAL, I'M REFERRED TO FRAMES, MOST

17 NOTABLY THE FRAME -- I'VE HAD SOME WONDERFUL BOOKS PROVIDED TO

18 ME HERE -- I GUESS THIS IS EXHIBIT 3 TO THE BERGMAN

19 DECLARATION, PAGE 9, WHERE I HAVE PROBABLY THE MOST DEVELOPED,

20 IF THAT'S THE RIGHT WORD TO USE, DEPICTION OF SUPERBOY IN THIS

21 KIND OF PRESCRIPT MATERIAL.

22          MR. ZISSU:  YES.

23          THE COURT:  AND ASSUMING ARGUENDO THAT THAT IS

24 CLEARLY NOT CAPTURED BY THE SCRIPT, THE QUESTION IS, HOW MUCH

25 OF THAT IS CAPTURED BY THE SCRIPT, OR HOW MUCH OF THE SCRIPT

1 DOES IT CAPTURE AND HOW MUCH DOES IT NOT?  THAT'S WHAT I'M

2 HAVING TROUBLE DOING, IS TRYING TO FIGURE OUT HOW MUCH OF THE

3 THEME, HOW MUCH OF THE CONCEPT, HOW MUCH OF THE DIALOGUE, HOW

4 MUCH HAS ALREADY BEEN COPYRIGHTED BY THAT EARLIER WORK AND HOW

5 MUCH IS COPYRIGHTABLE NOW BY THIS SCRIPT?  BECAUSE I THINK IT

6 IS PRETTY CLEAR THAT IT IS COPYRIGHTABLE.

7         THE QUESTION IS, WHAT DOES IT ADD?  WHAT IS SEPARATE

8 AND APART FROM WHAT WAS PREVIOUSLY DONE?  AND THAT'S NOT CLEAR.

9         MR. ZISSU:  IT'S NEVER GOING TO BE 100 PERCENT CLEAR.

10 IT JUST IS NOT SUSCEPTIBLE TO THAT.

11         THE PROBLEM, IF YOU WILL, WITH THE SCRIPT IS, IT'S

12 PURELY LITERARY, SO IT HAS SOME ISSUES AS TO THE EXTENT TO

13 WHICH VERBALLY COPYRIGHT PROTECTION WOULD BE AFFORDED FOR

14 WHATEVER IS NEW.

15         THE COURT:  YOU GET A PRETTY GOOD SENSE OF WHAT IT'S

16 ABOUT FROM READING THE SCRIPT.

17         MR. ZISSU:  RIGHT.  BUT IT HAS TO BE -- AND I WAS

18 GOING TO GET TO THIS -- TO JUST SAY IT'S COPYRIGHTABLE IS THE

19 BEGINNING OF THE QUESTION.  JUST TO SAY IT'S COPYRIGHTABLE

20 DOESN'T REALLY TAKE US VERY FAR IN TERMS OF --

21         THE COURT:  I UNDERSTAND.  I'M TRYING TO GET TO THAT

22 NEXT POINT.

23         MR. ZISSU:  THE PATRY TREATISE SAYS -- AND THIS IS,

24 WE THINK, THE WRONG APPROACH -- THAT ONE APPROACH IS TO SAY A

25 LIGHT IS TURNED ON -- IT'S LIKE A LIGHT SWITCH; IF THE LIGHT

044

1 SWITCH IS ON, THEN SOMEHOW THE -- IF THERE'S SOMETHING

2 COPYRIGHTABLE, THE NEW MATTER INCLUDES EVERYTHING AND THE

3 DERIVATIVE WORK OWNER OWNS EVERYTHING.

4           BUT PATRY SAYS IT'S REALLY LIKE A DIMMER; THE DEGREES

5 OF WHAT'S ADDED THAT WOULD BE RECOGNIZED AS OWNED ARE GRADUALLY

6 INCREASED ACCORDING TO WHAT'S CREATIVE OR THE LIGHT THAT'S

7 BROUGHT TO THINGS.

8           THE COURT:  I AGREE WITH THAT.

9           MR. ZISSU:  OKAY.  SO WE'RE WORKING ON THE CONCEPTS.

10          THERE IS A CASE WE WOULD LIKE TO BRING TO YOUR

11 ATTENTION, YOUR HONOR, WHICH ADDS, I THINK, A LITTLE BIT

12 EXACTLY ON YOUR QUESTION, AND IT'S A CASE -- IT'S

13 JUDGE WILSON'S DECISION IN 2003, IN A CASE CALLED SOBHANI

14 AGAINST RADICAL, MEDIA INC., IN WHICH --

15          THE COURT:  WHAT'S THE CITE, COUNSEL?

16          MR. ZISSU:  I'M SORRY.

17          THE CITE IS 257 F. SUPP. 2D 1234, AT 1239-40.

18          THE COURT:  YOU MEAN F.3D, I PRESUME?

19          MR. ZISSU:  I'M SORRY.  FED SUPP.

20          THE COURT:  OH, FED SUPP.  I'M SORRY.  THANK YOU.

21          MR. ZISSU:  FED SUPP.

22          AND THIS REALLY SPEAKS TO THIS.  HE HAD A SIMILAR

23 QUESTION TO YOUR HONOR'S, AND HE SAID, "HOWEVER, THERE IS AN

24 IMPORTANT LIMITATION SUGGESTED BY BOTH AUTHORITIES AND IGNORED

25 ENTIRELY BY PLAINTIFF.  COPYRIGHT PROTECTION DOES NOT EXTEND TO

1 DERIVATIVE WORKS IF THE PREEXISTING WORK TENDS TO PERVADE THE

2 ENTIRE DERIVATIVE WORK," AND HE CITES -- HE'S QUOTING FROM

3 NIMMER, AT SECTION 306.

4          THE COURT:  I THINK THAT'S VERY INSTRUCTIVE LANGUAGE,

5 LANGUAGE THAT I WOULD BE, PERHAPS, INCLINED TO ADOPT MYSELF.

6 BUT THAT GETS US THEN BACK TO THE QUESTION, HOW MUCH OF THIS

7 PERVADES THIS?

8          MR. ZISSU:  WE THINK, EXCEPT FOR AS WE ARGUED IN OUR

9 BRIEF, CERTAIN SEQUENCES, INCLUDING THE DIALOGUE AND THE

10 IN-HEIGHT VERBA TEXT, IS PRETTY LIMITED.  EVERYTHING ELSE IS

11 PERVADED BY THE PREEXISTING SUPERMAN WORKS, THE THEMES, BUT

12 MORE IMPORTANTLY, THE VISUAL DEPICTIONS SHOWING THE POWERS OF

13 SUPERMAN.

14          THE COURT:  YOU'RE TALKING ABOUT SUPERBOY HERE?

15          MR. ZISSU:  I AM.  BUT SUPERMAN THAT PERVADES -- THE

16 DESCRIPTIONS OF SUPERBOY IN THE SCRIPT ARE PERVADED BY;

17 DOMINATED BY; INFUSED, IF YOU WILL, BY THE SUPERMAN PREEXISTING

18 WORKS.  AND THAT'S THE ISSUE THAT THIS -- I'LL CALL IT A

19 PERVASION RULE APPLIES.

20          AND THE DIFFERENCE IN TYPES OF WORKS IS VERY

21 IMPORTANT HERE.  IN ONE OF THE CASES YOUR HONOR CITES ON THE

22 JOINT WORK ISSUE, JUDGE POSNER'S DECISION IN GAIMAN AGAINST

23 MCFARLANE, HE MAKES THE DISTINCTION IN THAT CASE THAT THE

24 REASON HE VIEWS THE WORK DONE BY GAIMAN AS A PROTECTABLE WORK

25 AND AS A COPYRIGHTABLE CONTRIBUTION, PUTTING ASIDE THE HANDS-ON

1 ISSUE, IS THAT IT'S BECAUSE IT'S DEPICTED VISUALLY.  HE DOES

2 NOT SAY, AS PLAINTIFFS ARGUE, THAT A STOCK CHARACTER -- YOU CAN

3 GET COPYRIGHT PROTECTION FOR A STOCK CHARACTER IN A LITERARY

4 WORK.  HE SAYS THE REASON IT BECAME PROTECTABLE IS IT WAS

5 MOVING FROM LITERARY TO DEPICTION SO THAT IT COULD BE

6 CONCRETELY SHOWN.  SO THAT IS AT, I THINK, 661 AND 662 OF

7 JUDGE POSNER'S DECISION.  BUT IT'S A VERY GOOD DISCUSSION OF

8 THIS ISSUE.

9            THE PERVASION IS THE PROBLEM.  IT'S SUBSTANTIALLY

10 PERVADED.

11            THE IDEA THAT THE PLAINTIFFS COULD, IN THIS CASE, OWN

12 THE THEMATIC INTERACTION BETWEEN THE PARENTS OF SUPERMAN, THE

13 KENTS, AND THE YOUNG MAN, OR THE BOY, REALLY -- AND OWN THAT

14 AND OWN THE THEME OF THE PARENTS TELLING THE BOY HE'S GOT TO

15 HIDE HIS POWERS SO THAT HE CAN USE THEM FOR HUMANITY -- THAT

16 SOMEHOW THAT'S SWEPT INTO WHAT CAN BE OWNED BY THE DERIVATIVE

17 WORK AUTHOR, IT DOESN'T MAKE ANY SENSE BECAUSE --

18            THE COURT:  BUT LET'S PUT THAT ASIDE.

19            LET'S SAY WE WERE TO PUT ASIDE THOSE TWO ELEMENTS,

20 BECAUSE ON THAT ONE FRAME, THAT'S EXACTLY WHAT IS DISCUSSED,

21 IS, 'YOU'VE GET TO HIDE YOUR SUPERPOWERS, OTHERWISE PEOPLE ARE

22 GOING TO MAKE FUN OF YOU OR HARASS YOU; AND WHEN YOU USE YOUR

23 POWERS, YOU'VE GOT TO USE THEM FOR THE BENEFIT OF HUMANITY.'

24            PUTTING ASIDE THOSE TWO ELEMENTS, THAT STILL LEAVES A

25 LOT OF DEVELOPMENT, CREATIVE DEVELOPMENT, MANIFESTED IN THE

1 13-PAGE SCRIPT THAT IS NOT CAPTURED BY THOSE TWO COMPONENTS, IF

2 YOU WOULD, OF THE FRAME.

3          MR. ZISSU:  THAT'S JUST ONE.

4          WE WENT THROUGH -- WE SUBMITTED A CHART WHERE WE

5 SHOWED A LOT OF THE PREEXISTING MATERIAL AND WHERE IT ENDED UP

6 IN THE SCRIPT.

7          AFTER YOU FINISH THE FIRST FIVE OR SIX PAGES OF THE

8 SCRIPT, YOU START TO GET OUTSIDE OF THE THINGS THAT ARE

9 LITERALLY TAKEN, BUT THEY'RE STILL PERVADED BY SUPERMAN, THE

10 PREEXISTING SUPERMAN CHARACTER.  ALL THAT'S BEEN ADDED --

11 EXCEPT FOR THESE PARTICULAR SEQUENCES, LIKE THE HAUNTED HOUSE

12 EPISODE -- WHAT'S BEEN ADDED IS, "IT'S A BOY."  AND IRONICALLY,

13 WHAT THE PLAINTIFFS SAY IS NEW ABOUT THE SUPERBOY IS THAT THEY

14 ARE PRESENTING THE CHARACTER FULLY DEVELOPED.

15          WELL, FULLY DEVELOPED MEANS SUPERMAN.

16          THE COURT:  WELL, FULLY DEVELOPED AS A BOY, AS

17 OPPOSED TO --

18          MR. ZISSU:  THEY SAY HIS POWERS ARE FULLY DEVELOPED.

19 THAT'S WHAT THEY SAY IS THE MOST IMPORTANT NOVELTY.  AND

20 NOVELTY, WE THINK, IS IRRELEVANT IN WHAT'S NEW, PUTTING THAT

21 ASIDE; SO YOU REALLY JUST HAVE -- IF YOU OR I SAT DOWN AND WE

22 SAID, 'I WANT TO PRESENT SUPERMAN AS A BOY,' WE WOULD COME UP

23 WITH DIFFERENT SCENARIOS.  WE MIGHT COME UP AS A BABY.  YOU'D

24 HAVE TO SHOW HIS INCREDIBLE STRENGTH AS A KINDERGARTNER; HIS

25 TOUGH SKIN; HIS IMPERVIOUSNESS TO A SPITBALL ATTACK.  YOU'D

048

Page 13

1 HAVE TO SHOW HIS STRENGTH.

2          THE COURT:  BUT YOU DON'T GET -- AS A COPYRIGHT

3 HOLDER, SUPERMAN AS A BOY, AND THEN THAT FREEZES THE FIELD.

4 THERE IS ROOM FOR CREATIVE DEVELOPMENT.

5          MR. ZISSU:  THERE IS.  BUT THE QUESTION IS, WHAT DO

6 WE FIND IN THE SCRIPT?  AND THERE ARE THREE OR FOUR OF THESE

7 KINDS OF SCENARIOS, WHICH, EXCEPT FOR THEIR LITERAL TEXT, ARE

8 SCENES A FAIRE.  AND SCENES A FAIRE ARE CONSIDERED IN THE

9 CONTEXT OF INFRINGEMENT.  THEY ARE CONSIDERED IN THE CONTEXT OF

10 THE 103(B) DISPUTE.  THERE IS A DISPUTE GOING ON.

11          COPYRIGHT OWNERSHIP OF THE OWNERS OF THE UNDERLYING

12 WORK, VERSUS THE DERIVATIVE WORK AUTHOR IS AT STAKE IN AN

13 ADVERSARY CONTEXT.  AND IT'S FOR THE PURPOSE OF MAKING AN

14 INFRINGEMENT CLAIM.  BECAUSE WHAT THE PLAINTIFFS ARE DOING

15 HERE, THEY'RE TRYING TO USE THE ALLEGED COPYRIGHT OWNERSHIP AND

16 WHAT THEY SAY THEY ADDED IN THE SCRIPT TO REACH BACK, SOMEHOW

17 OWN AND PREVENT THE OWNER OF THE UNDERLYING WORK FROM

18 CONTINUING TO EXPLOIT THAT WORK.

19          THAT'S EXACTLY THE DANGER THAT ENTERTAINMENT RESEARCH

20 TALKS ABOUT.  AND THAT DANGER EXISTS FOR TWO REASONS:  IT'S NOT

21 ONLY BECAUSE YOU DON'T WANT THE DERIVATIVE WORK AUTHOR TO END

22 UP DOING ANYTHING OR OWNING ANYTHING THAT WOULD UNDERMINE AND

23 ADVOCATE THE RIGHT OF THE COPYRIGHT OWNER OF THE ORIGINAL WORK.

24 THERE'S ANOTHER DIMENSION TO IT.

25          IF DERIVATIVE WORK OWNERSHIP COULD BE USED IN THAT

**049**

1 WAY, IT WOULD VIOLATE THE CONSTITUTIONAL AND BASIC PRECEPT OF

2 COPYRIGHT LAW THAT COPYRIGHT PROTECTION IS LIMITED FOR LIMITED

3 TIMES, BECAUSE -- AND THIS IS WHAT JUDGE POSNER TALKS ABOUT,

4 ALSO, IN GAIMAN AND HE DOES IT IN ANOTHER CASE HE CITES IN

5 GAIMAN CALLED PRINCE AGAINST PICKETT.  A DERIVATIVE WORK AUTHOR

6 COULD COME ALONG AND SAY, WELL, I USED SOMETHING PREEXISTING,

7 BUT I'M AN OWNER AND IT'S A COPYRIGHT THAT I HAVE; AND THEN THE

8 COPYRIGHT PROTECTION COULD BE EXTENDED ON THAT BASIS.  SOMEBODY

9 COULD KEEP MAKING DERIVATIVES SO THAT THERE WOULD BE NEW

10 COPYRIGHT, AND THE NEW COPYRIGHT WOULD END UP EXTENDING INTO

11 WHAT IS UNDERLYING, FOR WHICH PROTECTION HAS TO EXPIRE AT SOME

12 POINT.

13          SO THIS IS NOT A THEORETICAL THING.  YOU'LL FIND

14 JUDGE POSNER DISCUSSING THAT.

15          THE COURT:  BUT THAT'S NOT WHAT WE HAVE HAPPENING

16 HERE.

17          MR. ZISSU:  WELL, WE DON'T HAVE THE DURATION PROBLEM,

18 BUT WE DO HAVE THE PROBLEM OF -- WHAT THE PLAINTIFFS ARE TRYING

19 TO DO IS TO TAKE WHATEVER LITTLE THEY ADDED, TO SWEEP INTO THAT

20 THE PREEXISTING MATERIAL THAT'S GIVING THEM SOME POSITION.  AND

21 THE REASON THEY'RE DOING THAT IS SO THAT WHEN THEY GET TO

22 MORE FUN COMICS NUMBER 101, THEN THEY CAN SAY IT'S SIMILAR.

23          THE COURT:  I UNDERSTAND.

24          LET ME HEAR FROM THE PLAINTIFFS HERE.

25          MR. ZISSU:  I'M SORRY?

Page 15

1          THE COURT:  I'M GOING TO GIVE THE PLAINTIFFS A CHANCE

2 TO RESPOND TO THIS.

3          EVERYONE IS GOING TO HAVE PLENTY OF OPPORTUNITIES TO

4 TALK, BUT I DON'T WANT TO GIVE ANYONE TOO MUCH TIME.

5          MR. ZISSU:  THANK YOU, YOUR HONOR.

6          THE COURT:  THANK YOU, COUNSEL.

7          COUNSEL, IF YOU COULD BEGIN WITH MY INITIAL QUESTION

8 ABOUT --- YOU MAY HAVE A DIFFERENT TAKE ON THE MOOTNESS OF THE

9 CROSS MOTIONS AT THIS POINT, IN TERMS OF THE INFRINGEMENT

10 VERSUS AN ACCOUNTING ACTION, AND ALSO THIS ISSUE IN TERMS OF

11 THE DERIVATIVE WORKS.

12          MR. TOBEROFF:  IT'S NOT MOOT IN TERMS OF AN

13 ACCOUNTING ACTION, BECAUSE ONE OF THE MAJOR FACTORS THAT WILL

14 LATER BE DECIDED IN AN ACCOUNTING ACTION IS TO WHAT DEGREE THE

15 RIGHT TO PROFITS IS GOING TO BE APPORTIONED.  AND IN THAT

16 REGARD, DEFENDANTS WILL TAKE CERTAIN WORKS, LIKE "SUPERMAN

17 RETURNS TO SMALLVILLE," AND THEY WILL TRACE BACK ELEMENTS OF

18 THOSE WORKS TO PRIOR WORKS AND SAY, 'WE OWN THAT WORK WHICH

19 SHOWS HIM WITH HEAT VISION, AND WE OWN THIS WORK WHICH SHOWS

20 HIM WITH SOME OTHER POWER THAT'S NOT IN THE COPYRIGHTS THAT

21 PLAINTIFFS HAVE RECAPTURED,' AND THEREBY REDUCE THE PROFITS TO

22 WHICH PLAINTIFFS ARE ENTITLED.

23          WITH RESPECT TO SOMETHING LIKE SMALLVILLE, WHICH IT'S

24 OBVIOUS IT'S DERIVED FROM BOTH SUPERMAN AND, WE BELIEVE,

25 SUPERBOY, EVEN IF YOU MIGHT FIND AN INFRINGEMENT ACTION MOOT,

1                          CERTIFICATE

2

3  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
   STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
   ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
   THE UNITED STATES.

6

7  _____        _____
   THERESA A. LANZA, CSR, RPR                      DATE
8  FEDERAL OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT G

Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL AND LAURA SIEGEL LARSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>       Plaintiffs,<br><br>  vs.<br><br>TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>       Defendants.<br><br>DC COMICS,<br><br>       Counterclaimant,<br><br>  vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>       Counterclaim Defendants. | Case Nos. CV 04-8400 SGL (RZx)<br>          04-8776 SGL (RZx)<br><br>[Consolidated for Discovery]<br><br>Hon. Stephen G. Larson, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S INITIAL DESIGNATION OF EXPERT WITNESS JAMES STERANKO**<br><br>**[F.R.C.P. 26(a)(2) and Court's Order of November 15, 2006]** |

1    Pursuant to Rule 26 of the Federal Rules of Civil Procedure and the

2 Court's order of November 15, 2006, Plaintiffs and counterclaim defendants

3 Joanne Siegel and Laura Siegel Larson (collectively "Plaintiffs") hereby

4 designate James Steranko as an expert witness whose testimony Plaintiffs intend

5 to introduce at the trials of these matters.  A copy of Mr. Steranko's expert

6 report is attached hereto as Exhibit A.

7    Plaintiffs' foregoing initial designation does not include any expert whose

8 testimony may be offered solely for purposes of impeachment or rebuttal.

9 Plaintiffs reserve the right to amend and/or modify its expert witness designation

10 in accordance with the Federal Rules of Civil Procedure and the Local Rules of

11 this Court.

12

13

14    DATED: January 12, 2007          LAW OFFICES OF MARC TOBEROFF, PLC

15

16    By _____
                 Marc Toberoff

17    Attorneys for Plaintiffs JOANNE SIEGEL
       and LAURA SIEGEL LARSON

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## EXPERT REPORT OF JAMES STERANKO

### I.    INTRODUCTION

Warner Bros. Entertainment Inc. ("WB") and DC Comics ("DC") (collectively, "Defendants") are alleged to owe Joanne Siegel and Laura Siegel Larson (collectively, "Plaintiffs"), the widow and daughter of Superman co-creator and Superboy creator Jerry Siegel, significant profits from Defendants' ongoing exploitation of the original Superman and Superboy copyrights recaptured by Plaintiffs under the Copyright Act.  I have been asked to report on the import and impact of Jerry Siegel's original creations on Defendants' exploitations.

### II.    BACKGROUND QUALIFICATIONS

My involvement in the comic book industry encompasses more than 40 years.  In 1965, I entered the comic industry by working for Joe Simon, who assigned me to create a series of superheroic characters for Harvey Comics. Soon afterwards, I was hired by Stan Lee at Marvel Comics and began writing and illustrating the 1960s superspy series NICK FURY, AGENT OF S.H.I.E.L.D. in Marvel's **Strange Tales**.  Additionally, I wrote and illustrated many other top Marvel characters, including CAPTAIN AMERICA, THE HULK, THE X-MEN (for which I created the title logo), and, for DC Comics, SUPERMAN.  I generated more than 150 original storytelling innovations that changed the direction of the comics medium. **Wizard Magazine**, a comic industry publication, recently credited me as *The 5th Most Influential Comics Artist in the History of the Form.* Michael Chabon cited me as an inspiration for his Pulitzer Prize-winning novel, **The Amazing Adventures of Kavalier & Clay**.  I authored the two volume set **The History of Comics**, which have sold more than 100,000 copies each and remains the definitive resource of the four-color chronology in comic books.

In the film industry, I have written animation scripts and developed characters for Paramount, including working with animation giants Shamus

**057**

(BUGS BUNNY) Culhane and Ralph (FRITZ THE CAT) Bakshi.  I have also worked on feature film projects, including as a film production illustrator with directors such as Tim Burton, Oliver Stone, Francis Ford Coppola (serving as the project conceptualist for BRAM STOKER'S DRACULA, among other projects), George Lucas and Steven Spielberg (creating the initial production paintings visualizing Indiana Jones for RAIDERS OF THE LOST ARK).

I have illustrated numerous science fiction, heroic fantasy, Western, and adventure books written by such authors as Ray Bradbury, Mickey Spillane, Cornell Woolrich, Michael Moorcock, Raymond Chandler, John Jakes, Robert E. Howard, Harlan Ellison, and many others. In this respect, I have visualized a legion of classic fictional heroic characters, including Sherlock Holmes, Luke Skywalker, The X-Men, Mike Hammer, Batman, the Green Hornet, James Bond, Captain America, Han Solo, Sam Spade, Superman, Captain Kirk, Mr. Spock, Conan, Doc Savage, Buck Rogers, and The Shadow, for which I painted 30 book covers—in addition to a multitude of movie posters, record albums, and magazine illustrations.

In 1968, I established Supergraphics, a full-scale publishing organization, for the purpose of producing material related to contemporary culture in every medium. In 1970, I authored and published Volume 1 of **The History of Comics** through Supergraphics, and followed two years later with a companion volume. In 1972, I created and released **PREVUE**, an international newsstand entertainment magazine, which ran for 25 years and was the forerunner of similar titles such as **Premiere**, **Movieline**, and **Entertainment Weekly**. As its editor-publisher, I explored a multitude of on-set Hollywood productions, conducted hundreds of superstar interviews, and penned numerous articles.

In 1970, I produced a comic book addressing the problems of drug abuse among inner-city children which was distributed free as a teaching tool in schools

2

**058**

in major metropolitan cities from New York to Atlanta. The comic met with remarkable success and garnered critical acclaim that ranged from Manhattan Borough President Percy Sutton to **Sesame Street**'s Joan Ganz Cooney.

I continue to work in the comics medium and to lecture on popular culture. Recent works include an essay on narrative concepts in film, animated games, and comics in the Watson-Guptill instructional volume **The Art and Technique of Graphic Storytelling**; scriptwriting for Warner Bros. **Justice League** TV series; and serving as Creative Consultant for the History Channel's two-hour documentary **Comic Book Superheroes—Unmasked**.

From comic art to commercial design, I have won numerous awards in both Europe and America, and have exhibited my work at more than 250 international exhibitions, including in the Louvre in Paris. As the Guest of Honor at Spain's 2002 Semana Negra Cultural Festival, my work was the subject of a large one-man exhibition (160 works, sponsored by the Gijon Museum of Modern Art). I recently received the prestigious Julie Award for Lifetime Contribution to the Fantastic Arts (2003) and the Eisner Hall of Fame Award at the 2006 San Diego Comic Convention.

## III.    SCOPE OF ANALYSIS

I have been asked to analyze with respect to Superman: (a) how Jerry Siegel and Joe Shuster worked in creating the early Superman Comics to aid in a determination as to whether such comics and the elements contained therein were not "works for hire" and thus subject to recapture by the Plaintiffs and (b) the impact and prevalence of such recaptured Superman elements on Defendants' recent exploitations of Superman.

059

I have been asked to analyze with respect to Superboy whether the television series, Smallville, is derived from Jerry Siegel's original Superboy story and the line of Superboy comics to which it gave birth.

## IV.   ANALYSIS

SUPERMAN

A.   Work-for-Hire Issue

In 1933, Jerry Siegel conceived of an original cartoon strip featuring *Superman*, a unique character of superhuman strength and powers who would perform remarkable feats for the public good.  Siegel conceived, in essence, the first comic book superhero—an original concept that fused our national ideals with the highest Judeo-Christian ethics—and became an international cultural icon, spawning, what is today, a massive, thriving industry.

In or about 1934, Siegel authored twenty-four days (four weeks) of Superman comic strips intended for newspaper publication, a paragraph previewing future Superman exploits, and a nine-page synopsis covering approximately two months of daily newspaper comic strips (six days per week). The material was subsequently incorporated into the early Superman comic strips, thereafter published from on or about April 18, 1938 to April 13, 1943.

In 1934, Jerry Siegel and artist Joe Shuster ("Siegel and Shuster") co-authored a group of  daily Superman comic strips, consisting of one week (six days) of fully-inked daily strips and three additional six-day weeks in penciled form. Those strips were submitted to numerous publishers from 1934-1939.

Although Superman was not published for some time, Siegel and Shuster sold other comic-character features they created to the Nicholson Publishing Company, including Henri Duval and Dr. Occult. In a letter dated October 4,

1935, the company's owner, Malcolm Wheeler-Nicholson, expressed his interest in publishing Superman in comic book form, but Siegel and Shuster rejected his offer. Nicholson was, however, involved with a new comic-magazine company, Detective Comics, Inc., which published such Siegel and Shuster features as *Slam Bradley* and *Spy*, which appeared in **Detective Comics** 1 (3/1937).

Siegel and Shuster entered into a free-lance agreement with Detective Comics dated December 4, 1937 (the "1937 Agreement") to continue to produce the comic magazine features, Slam Bradley and Spy, which also provided that any new and additional features which they produced for use in a comic magazine would first be submitted to Detective Comics, which had 60 days to accept or reject it.

One of the entities to whom Siegel had submitted the Superman strip was The McClure Newspaper Syndicate. In early 1938, the head of the syndicate sought Siegel's permission to forward the comic strip material to Detective Comics for potential publication in its contemplated new magazine, **Action Comics**. By this time, Superman and his extraordinary powers had already been completely developed by Siegel and Shuster.

In or about January–February 1938, when Detective Comics expressed interest to Siegel and Shuster in publishing the Superman comic strip in comic magazine format, the writer and artist cut the strip into almost 100 separate panels, and re-pasted it to adapt it into comic book form.

In a grant prepared by Detective Comics, dated March 1, 1938, Siegel and Shuster agreed to the publication of their **Superman** comic strip in consideration for the sum of $130. Superman subsequently appeared as the cover subject on the June, 1938 issue of **Action Comics** 1, issued for sale on April 18, 1938. It became an unprecedented success and provided a powerful, thematic core for

**061**

the floundering comics form, one that was exploited by most, if not all, comics publishers of the period.

Between March, 1938 and September, 1938, Siegel and Shuster continued to create Superman strips, stories, and continuities. **Action Comics** 1 was followed by further issues published at regular intervals, with each subsequent issue containing Superman material created by Siegel and Shuster.

Detective Comics and Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate dated September 22, 1938 regarding the newspaper syndication of a **Superman** comic strip. Detective Comics and Siegel and Shuster therefore entered into an agreement also dated September 22, 1938 (the "1938 Agreement"), which for the first time provided that Detective Comics would "employ and retain" the writer and artist to produce the artwork and continuity for five comic strips, including **Superman**. Detective Comics and Siegel and Shuster then entered into a supplemental agreement dated December 19, 1939, which raised their page-rate compensation.

The scope of my analysis entails Siegel and Shuster's Superman as published in **Action Comics** 1 and their Superman works thereafter published in **Action Comics** 2-61 (copyright to no. 61 secured on April 13, 1943).

Prior to September 22, 1938, Siegel and Shuster solely produced six comic book issues featuring Superman at their own instance and expense which were published as **Action Comics** 1-6. Of these, **Action Comics** 1 through 5 were published prior to September 22, 1938 and **Action Comics** 6 was published four days later on September 26, 1938.

Although, the 1938 Agreement used for the first time the term "employ and retain" with respect to Siegel and Shuster's subsequent work on Superman, it does not appear that they were traditional employees of Detective Comics or worked in a way that even approximated a hierarchical employment relationship.

6

**062**

We know that Siegel and Shuster were not paid a salary, but were paid on a "per page" basis and they were only paid for pages actually delivered by them and eventually published by Detective Comics.  In paying them for their pages, Detective Comics did not treat such payments as employee salaries or fees: Detective Comics did not withhold or deduct payroll, nor did Detective Comics withhold or deduct social security and the other taxes normally associated with employee compensation. Detective Comics also did not provide any health benefits or any other employee benefits to Siegel and Shuster.  Detective Comics role appears to have been rather limited, paying Siegel and Shuster for finished comic-book product on a per-page basis for the right to publish such works.

Additionally, Siegel and Shuster did not work out of the Detective Comics' offices in New York, instead laboring in Cleveland, Ohio, first out of the respective homes, then from their own art studio.  (Conversely, all other "sweat shop" suppliers to the comics medium were in the New York/New Jersey area, relatively close to publishers' offices and their supervision). The writer and artist determined their own hours and days of work. They supplied, used, and paid for their own tools and materials, and hired and paid for their own assistants. As their business expanded, they employed artists who worked under their direction, instance, and expense, not that of Detective Comics.  Their payroll records—and subsequent interviews with their assistants—are ample evidence of Siegel and Shuster's independent work and primary guidance of the Superman property.

B.    Allocation Issue

**Action Comics** 1 featured virtually all the signature elements of the Superman mythology which continue to this day, constituting the definitive formula for the subsequent Superman comic books and exploitations in other media.  The magazine visualized the origin of the Superman character, in both a literary and pictorial manner, including his personality, habits, superhuman

063

powers, dual appearances, costume, secret identity, and attributes, and the ethical creed to which he aspired and heroically achieved.  Specifically, **Action Comics** 1 featured Superman's origin from a distant planet, his back-story, his basic physical and mental traits, and, as a champion of the oppressed, his mission to use his enormous powers to benefit mankind.  It also portrays Superman's secret identity as the mild-mannered newspaper reporter, Clark Kent, providing a full literary and pictorial delineation of the character, including his appearance, habits, persona, mannerisms, and clothing.

**Action Comics** 1 also portrays other key characters and their cardinal traits, including newspaperwoman Lois and the publication's editor, from whom Clark gets his assignments.  Clark's romantic interest in Lois is immediately established, including her rejection of him as a coward, while leaning passionately towards Superman. The classic image of Lois being swept into the sky held tightly in Supeman's embrace is also visualized.

All Superman-related stories, particularly the cinematic adaptations, movie serials, cartoon versions, and TV series —including the recent SUPERMAN RETURNS—draw heavily on the timeless dramatic formula created by Jerry Siegel in **Action Comics** 1. Regardless of a story's content and handling, audiences from comics to the cinema are ultimately attracted to the character for deeply-rooted psychological reasons, all of which were cleverly and succinctly detailed in Jerry Siegel's initial Superman adventure. Without those primary elements, the character, his universal appeal, and countless product incarnations would *never* have existed.

SUPERBOY

    A.    Jerry Siegel's Superboy

In or about 1938, Jerry Siegel conceived of a new comic strip series entitled Superboy. On November 30, 1938 he submitted to Detective Comics, a written summary of the character, concept, and plan for his **Superboy** comic strip series (the "Superboy Summary"), which Siegel suggested could run in Detective Comics' magazines **More Fun Comics** or **New Adventure Comics**.  His proposal, however, was rejected in a return letter dated December 2, 1938.

Two years later, on his own initiative, he authored a complete original Superboy story (the "Superboy Story"). For clarity, I will subsequently refer to the Superboy Story and Superboy Summary together as the "Superboy Material."  In or around December, 1940, Siegel again submitted Superboy to Detective Comics, which again rejected its publication and declined using it.

The Superboy Material contained in detail the unique conception and character of Superboy, the continuity and dialogue for the first presentation of Superboy, and the format for the future publication of a Superboy comic book series.

The Superboy Material firmly establishes the following:

>>Superboy's origins, character, family and social life as a youth growing up in rural America.

>>Although technically an alien, Superboy is raised in a small town environment as a human being by his adoptive parents, the Kents.

>> The Kents realize Superboy must restrain and conceal his extraordinary strength for fear that he will be treated as an outcast.

>> Superboy must also face the emotional challenges and social responsibilities of his extraordinary strength and emerging powers.

>>Superboy's dual dilemma is to conceal his true self, while exploiting his powers to help those in need.

>> Superboy is age eleven or twelve, constantly confronting the trauma of

adolescence, school cliques, assorted bullies, and bad guys.

>>Superboy ultimately protects his home town and its inhabitants from accidents

and evildoers, the basis of his earliest crime-fighting adventures.

By comparison, the Superman materials which pre-date Siegel's Superboy Story (**Action Comics** 1, 1939 newspaper strips and **Superman** 1) do <u>not</u> contain the same elements or focus.  In **Action Comics** 1, where Superman debuted in 1938, we see him as an infant in only one panel on the first page.  In the next panel, he is an adult with fully-developed superpowers. Superman was grounded in a very cosmopolitan environment, soon dubbed "Metropolis," and his adventures emanated from that urban setting and Clark Kent's job as a big-city reporter.  By contrast, Siegel's Superboy was set in a small town, where the young hero attends school while coming to grips with his emerging superpowers. Siegel's Superboy led to **Superboy** 2, christening his hometown – Smallville.

In July, 1943, Jerry Siegel entered the U.S. Army to fight in World War II. While he was stationed in the Pacific, Detective Comics, without giving notice or getting his consent, used his Superboy Material in the first Superboy story, in **More Fun Comics** 101 (November 18, 1944).

As DC Comics states in its book **DC Comics: A Celebration of the World's Favorite Comic Book Heroes** (Copyright 1995, 2003 DC Comics): "**More Fun Comics** 101...la[id] the groundwork for countless stories and new directions to come.  Superboy's learning experiences and the gentle guidance of Ma and Pa Kent become important touchstones in the character's development…"

Jerry Siegel set a startling, new precedent in comics with his Superboy premise, just as he did with Superman. By 1940, comics already embraced kid heroes (young Billy Batson became manly Captain Marvel; Supersnipe stayed a kid, but had no powers; Marvel Boy had plenty; the Young Allies featured a group

10

**066**

of kid superheroes; Kid Eternity; Golden Lad; etc) before Superboy debuted. About the closest in concept was Captain Marvel, Jr.; crippled newsie Freddie Freeman, who became a teen costumed tower of power after saying the word "SHAZAM!"

Siegel's concept, however, brilliantly spotlighted and examined an already-established superhero in his childhood, an area previously untapped in comics history. Perhaps it is still unique in that respect. Supergirl *is* Supergirl, with no adult precedent. Superboy, however, highlights an unexploited and highly-marketable area – the evolution of a hero – and might well be a one-of-a-kind phenomenon. There may be stories about Wonder Woman as a girl, for example, but no major series or titles are predicated upon that premise. The point is that with hundred of Golden Age writers and editors developing material for a voracious market, none had the originality or foresight to conceive and express the Superboy concept.

B.    The Derivative Superboy Works

"Superboy's" small town adventures were published in **More Fun Comics** 101-107 (1944-1945), **Adventure Comics** 103-503 (1946-1983), **Superboy** 1-235 (1949-1977), **The New Adventures of Superboy** 1-54 (1979-1984), and another series of comics entitled **Superboy** (aka **The Adventures of Superboy**) 1-100 (1989-2002), which were published at regular intervals, and in numerous other comic book publications (comic books featuring Superboy are sometimes referred to by me as the "Superboy Comic Books"). Superboy has also been exploited in several television series, including the animated **The Adventures of Superboy** (1966), the live action series **The Adventures of Superboy** (1988-1992), and **Smallville** (2001-ongoing).

11

067

C.    The "Smallville" Series

The **Smallville** television series debuted in October, 2001 and is currently in its sixth season. It is set in Superboy's hometown, from which the series takes its name, and focuses on a youth with extraordinary abilities, who must simultaneously face the challenges of adolescence and the responsibilities of his emerging powers. Like Siegel's Superboy Material, the **Smallville** series mirrors the youthful adventures of its superhero in the town he protects, while examining the character's social and family life.

Each of the following aspects of Siegel's Superboy Material is ubiquitous in **Smallville:**

1.    The character of Superboy-- a modest, sensitive young man—at times, a loner—who, while attending school in a small rural town, must confront the complexities of growing up, knowing he is physically and mentally superior to his peers—and all humans—yet forced to keep his powers a vital secret.

While the lead character in Siegel's Superboy Material is originally a few years younger than in **Smallville**, as originally conceived by Siegel, he was naturally mature. The Superboy Summary suggested starting with "characters...of about twelve years, rather than adults," while the story follows the young hero from a toddler through kindergarten to pre-junior high; the majority taking place in the fifth grade (age 11-12). The first appearance of Superboy in **More Fun Comics** 101 follows the same brisk age progression. The ensuing derivative **Superboy** comic books from 1945 to 1984 follow Superboy's adventures as he matures through age eighteen, with the majority depicting him as a teenager.

2.    The characters of Superboy's adoptive parents, the Kents, and their close relationship with Superboy. These characters are fleshed out for the first time in the Superboy Story and in **More Fun Comics** 101. They are earnest

12

**068**

and moral people who, above all, love and nurture their adopted son.  While simple country folk, they are quite aware and sensitive to Superboy's uniqueness and the challenges posed by his special predicament of growing up with unusual powers.  They also know that others will not understand or accept who he really is and that, if the truth be known, he will be treated as an outcast.  The Kents gently guide Superboy and counsel him on the need to restrain or conceal his powers.  Although he is from another world, the Kents raise him as a human and in every respect, as their *son.*  This is a central relationship in Siegel's Superboy Story.  Eight of its thirteen pages concern Superboy's relationship with his adoptive parents.

     3.    The setting of a small rural town where his social interactions and adventures take place and whose townspeople Superboy protects. The small town environment heightens the young hero's predicament of concealing his true identity and its simplicity provides a strong contrast to his supernatural powers.

     4.    The perspective of Superboy going to school and, like any other youth, forming friendships, dealing with school cliques and bullies, while he is completely different from everyone else by virtue of his supernatural powers and origin.

     5.    The core themes of Superboy coming to grips with who he really is and his purpose in life, while repressing his true self for fear that he will not be accepted – themes which amplify and reinterpret the dilemma of adolescence in a wish-fulfillment context, relatable themes for the target youth audience.

     6.    The evolution and coming-of-age of a young man who destiny is to become a superhero.

     In the **Superboy** comic books, the animated and live-action **Superboy** television series, the protagonist's adventures inevitably took place in Smallville. Superboy's fictional town was named in **Superboy** 2, published in 1949, and

has, for the following half century, been synonymous with Jerry Siegel's Superboy.

In the **Smallville** television series, the hero's best friend is Pete Ross and his high-school heartthrob is Lana Lang. The former first appeared in 1961 in **Superboy** 86, while the latter first appeared in 1950 in **Superboy**.

It is no surprise that the on-line Internet Movie Database (www.imdb.com), an industry resource regarding credits, lists Jerry Siegel as an author of *Smallville* as follows: "Jerry Siegel (**Superboy** comic book and characters)."

The Superman materials which pre-date the Superboy Material do <u>not</u> contain these elements.  A core relationship in **Smallville**, as in the Siegel's Superboy Story, is that between the young hero and his understanding parents, to whom he turns for guidance. The majority of Siegel's Superboy Story concerns Superboy's relationship with his earthly parents. Yet, of the Superman material which pre-dates the Superboy Story – i.e., **Action Comics**  1, 1939 newspaper strips, and **Superman** 1 – only the latter shows his foster parents with him as a boy and then, only in *one* panel.

Comics by definition are representational and will always appear simple in comparison to derivative works of much larger scale and budgets.  Nonetheless, **Smallville's** derivation and use of Siegel's Superboy is easily recognizable and qualitatively important.

## V.    CONCLUSIONS

### SUPERMAN

**Action Comics** 1 was clearly not a "work for hire" as it had been completely delineated by Siegel and Shuster prior to Detective Comics expression of interest in Superman.  **Action Comics** 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, were also not "works for hire," as no employment relationship existed between

14

Detective Comics and Siegel and Shuster when these works were created. The works were created at Siegel and Shuster's instance and expense and they, not Detective Comics, were the motivating force behind the creation of these works. Finally, the Superman works created by Siegel and Shuster after they entered into the 1938 Agreement with Detective Comics should also not be considered "works for hire."

The 1938 Agreement for the first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent work on Superman. Yet Siegel and Shuster independently created and produced the work and were not traditional employees of Detective Comics, nor did their relationship bear any of the usual indicia of employment. Siegel and Shuster's Superman Comics were not created at Detective Comics' instance and expense and Detective Comics exercised minimal to no control over their creative content.

With respect to all of the Superman comic books in question (**Action Comics** 1-61), Siegel and Shuster were not paid a salary, but were consistently paid on a "per page" basis for a finished product, and only for product actually delivered by them to Detective Comics and published by Detective Comics.  In compensating Siegel and Shuster, Detective Comics did not withhold or deduct payroll tax, social security and other taxes normally deducted from employee salaries; nor provide Siegel and Shuster with any employee benefits; Siegel and Shuster worked from their own premises (not Detective Comics' premises); determined their own hours and days of work; supplied, used and paid for their own tools and materials; and Siegel and Shuster hired and paid for their own employees.  Considering the totality of these circumstances, the Superman material created by Siegel and Shuster and published by Detective Comics in **Action Comics** 1 do not constitute "works made for hire."

071

The distinct foundational imprint created by **Action Comics** 1 is the heart and soul of a derivative motion picture such as **Superman Returns** and dictates that the profits from such classic "Superman" fare should not be minimized by "apportionment."  What matters to the public are the core elements comprising the indelible "Superman" character and story, the blueprint for which was delineated in **Action Comics** 1 and survived for seven decades.  The rest are really iterations of such elements.  The plots though often appealing are transient and essentially fungible.  To the unlikely extent that some allocation of Superman profits to elements not recaptured by the Siegels is deemed justified and even calculable, it would seem that the lion's share would have to go to the Siegels as Jerry and Joe's contribution to the success of their iconic character *is* their enduring character itself.

SUPERBOY-SMALLVILLE

It is beyond question that the **Superboy** comic books and television programs were derived from and are substantially similar to Siegel's Superboy Material. In turn, **Smallville** is substantially similar to and derived from Siegel's Superboy, the **Superboy** comic books, and the mythology to which it gave rise. If it were not for Siegel's creation of Superboy, there would be no **Smallville**.

While one might point to many differences in the big-budget, special effects-driven episodes of **Smallville** from a simple, if not primitive, comic book story, **Smallville** exploits the heart of Jerry Siegel's Superboy -- a superhero in the making as a powerful metaphor for adolescence.  It is this which I believe caused the enduring popularity of Superboy, exclusive and apart from Superman. The similarities are qualitatively important; for instance, the emphasis in both on the nurturing relationship between Superboy and his adoptive parents which shape his destiny and the man he was to become.

## VI.   COMPENSATION

I am not being paid for my services as an expert witness.

## VII.   PRIOR CASES

I have not served as an expert witness in any prior case.

## VIII.   PUBLICATIONS

I have authored the following publications:

GENII: THE CONJURERS MAGAZINE 12/1962

GENII: THE CONJURERS MAGAZINE 10/1964

THE STERANKO HISTORY OF COMICS V1 1970 (Supergraphics)

THE STERANKO HISTORY OF COMICS V2 1972 (Supergraphics)

RED TIDE Graphic Novel 1975 (Two Versions) (Pyramid Publications)

GRAPHIC NARRATIVE (Museum Catalog) 1977 Winnipeg Art Gallery

UNSEEN SHADOWS 1978 (Supergraphics)

THE BLOCK (anti-drug comicbook) 1971 (Various)

OUTLAND Graphic Novel 1982 (Coleccion Humanoides)

GRAPHIC PRINCE OF DARKNESS 1998 (Vanguard Publications)

THE ART AND TECHNIQUE OF GRAPHIC STORYTELLING (Essay) 2003 (Watson-Guptill)

NICK FURY: AGENT OF SHIELD (collection) 2000 (Marvel Comics)

NICK FURY: AGENT OF SHIELD (collection) 2002 (Marvel Comics)

MARVEL VISIONARIES: STERANKO 2002 (Marvel Entertainment Group)

VISUAL THEORY V1 2003 (Supergraphics)

100 GREATEST COMIC BOOKS (Two Essays) 2004 (Whitman Publishing)

COMIXSCENE / MEDIASCENE / PREVUE MAG. 1972-1996 (Supergraphics)

Hundreds of interviews and features in magazines internationally.

FROM :TYPESOURCE                           FAX NO. :610 3700867                    Jan. 12 2007 05:02PM P2

    Jan-12-07   12:31pm   From-                                          T-186  P.002/002  F-205

I reserve the right to amend and supplement this initial report.

Respectfully submitted,

James Staranko

18

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen

4

years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720, Los Angeles, California 90067.

5

On January 12, 2007, I served the attached documents described as **PLAINTIFFS JOANNE**

6

**SIEGEL AND LAURA SIEGEL LARSON'S INITIAL DESIGNATION OF EXPERT WITNESS JAMES STERANKO** as follows:

7

[X]   :BY FACSIMILE:

8

As follows: I caused the transmission of the above named documents to the fax number set

9

forth below, or on the attached service list.

10

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.

11

866 United Nations Plaza
New York, NY 10017

12

Facsimile No. 212-813-5901

13

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.

14

1711 Route 9D
Cold Spring, NY 10516

15

Facsimile No. 845-265-2819

16

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

17

9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

18

Facsimile No. 310-550-7191

19

[X]   :BY MAIL:

20

As follows: I am "readily familiar" with the firm's practice of collection and processing
correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on

21

that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal

22

cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.  I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed

23

as follows:

24

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.

25

866 United Nations Plaza
New York, NY 10017

26

27

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

28

9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

**075**

1    :(STATE) - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

2

3    [X]  :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

4    I declare under penalty of perjury that the foregoing is true and correct.

5    EXECUTED on January 12, 2007, in Los Angeles, California.

6

7    _____
     Alexander M. Merino

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT H

1 | Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
3 | Los Angeles, CA 90067
Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101

5 | Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL AND LAURA SIEGEL LARSON

6

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | Case Nos. CV 04-8400 SGL (RZx) 04-8776 SGL (RZx) |
| Plaintiffs, | [Consolidated for Discovery] |
| vs. | Hon. Stephen G. Larson, U.S.D.J. Hon. Ralph Zarefsky, U.S.M.J. |
| TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, | **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S INITIAL DESIGNATION OF EXPERT WITNESS MARK EVANIER** **[F.R.C.P. 26(a)(2) and Court's Order of November 15, 2006]** |
| Defendants. | |
| DC COMICS, | |
| Counterclaimant, | |
| vs. | |
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | |
| Counterclaim Defendants. | |

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Pursuant to Rule 26 of the Federal Rules of Civil Procedure and the

2  Court's order of November 15, 2006, Plaintiffs and counterclaim defendants

3  Joanne Siegel and Laura Siegel Larson (collectively "Plaintiffs") hereby

4  designate Mark Evanier as an expert witness whose testimony Plaintiffs intend

5  to introduce at the trials of these matters.  A copy of Mr. Evanier's expert report

6  is attached hereto as Exhibit A.

7    Plaintiffs' foregoing initial designation does not include any expert whose

8  testimony may be offered solely for purposes of impeachment or rebuttal.

9  Plaintiffs reserve the right to amend and/or modify its expert witness designation

10  in accordance with the Federal Rules of Civil Procedure and the Local Rules of

11  this Court.

12

13

14  DATED: January 12, 2007        LAW OFFICES OF MARC TOBEROFF, PLC

15

16  By _____

17        Marc Toberoff

18  Attorneys for Plaintiffs JOANNE SIEGEL
    and LAURA SIEGEL LARSON

19

20

21

22

23

24

25

26

27

28

1

# EXHIBIT A

# EXPERT REPORT OF MARK EVANIER

## I.

## INTRODUCTION

I am informed that Joanne Siegel and Laura Siegel Larson ("Plaintiffs"), the widow and daughter of Jerry Siegel, the co-creator of Superman and creator of Superboy, have recaptured Jerry Siegel's original copyright interests in these works under the Copyright Act. I am further informed that due to this recapture Warner Bros. ("WB") and DC Comics ("DC") (together, "Defendants") are alleged to owe Plaintiffs profits from their exploitation of these recaptured copyright interests.

I have been asked to analyze and give my opinions regarding the following issues:

The first is the manner in which the early Superman comics were created by Jerry Siegel and Joe Shuster, so as to inform us as to whether or not their early Superman material were created by them as "employees for hire."

The second is, to the extent the early Superman works were not "works for hire," and are therefore subject to recapture by the Siegels, to what degree do the elements portrayed in such works continue to be exploited in recent derivative works such as WB's feature-length motion picture, Superman Returns? I have been asked to discuss the extent to which such elements contribute to the financial returns of that and similar projects.

Lastly, I have been asked to analyze the extent to which WB's television series, Smallville, is derived from Jerry Siegel's original Superboy story and the line of Superboy comics which emerged from Siegel's original story.

**081**

## II.

## QUALIFICATIONS

I have been involved in the comic book industry for more than thirty years as a comic book writer, columnist and historian.  My first professional sale came in 1969 when I was 17 years old and soon after I was taken on as an assistant to the legendary comic artist Jack Kirby (*The Hulk, X-Men, Fantastic Four*).  While apprenticing under Kirby, I worked as a comic book writer for The Walt Disney Company and Gold Key Comics (*Bugs Bunny, Daffy Duck, Porky*, etc.).  Shortly after that, I was employed as the editor and head writer for the Edgar Rice Burroughs estate (*Tarzan*).  In 1974, I began writing for television.  My comedy writing experience includes working on *The Nancy Walker Show, Cheers, That's Incredible, Pryor's Place, Bob* (starring Bob Newhart as a comic book artist*)* and *Welcome Back, Kotter,* where I functioned as story editor.  I also wrote one episode of the *Superboy* TV series in 1988.

After leaving *Welcome Back, Kotter,* I began working for and eventually ran a comic book division for Hanna-Barbera Studios as editor and head writer.

My animated series writing experience includes television shows such as *Scooby Doo, Plastic Man, Thundarr the Barbarian, The ABC Weekend Special, CBS Storybreak, Richie Rich, The Wuzzles, Dungeons & Dragons* and *Garfield and Friends.* I also wrote for *Superman: The Animated Series.*  While I continue to work in film and television I have also written and produced a number of comic books, including scripts for DC Comics, including *Superman Adventures, The New Gods* and *Blackhawk.*  I was writer-editor of the last of these.  I have also written (and sometimes edited) numerous "creator-owned" comics, such as *Groo the Wanderer* (with Sergio Aragonés), *Crossfire, Hollywood Superstars* (with Dan Spiegle), and *The DNAgents* (with Will Meugniot).

I have been nominated for three Emmy Awards for my work in television on *Garfield and Friends* (two) and *Pryor's Place* (one). In 2003, the Animation Writers Caucus of the Writers Guild of America, west (WGAw) presented me with its Lifetime Achievement Award in the area of Animation Writing.

I have been a panelist or moderator at numerous comic book industry events including Comic-Con International in San Diego, WonderCon in San Francisco, the Los Angeles Comics and S-F Convention and the Mid-Ohio Con in Columbus, Ohio. The San Diego event is the largest of its kind in the world and each year, a special room is designated for panels and events on which I spend much of the convention interviewing the "greats" in the field of comic books about their past work. For my efforts in recording and preserving the history of the art form, the convention awarded me the prestigious Bob Clampett Humanitarian Award in 2001. In addition, the convention administers the industry's top award, the Will Eisner Award, which is given for excellence in the creation of comic books, and I have received six nominations, three of which I have won.

Furthermore, I am active as an author writing about comic books, having published four books on the subject, including the recent *Mad Art*, a history of the artists for *Mad* Magazine, tracing its evolution from a comic book into a magazine and other media. I have been called upon to write numerous forewords and introductory material for books about comics, including many reprint volumes published by DC and Marvel, and to appear on television programs and DVD supplemental materials dealing with animation and comics.

III.

**ANALYSIS**

<u>SUPERMAN</u>

<u>Work-for-Hire Considerations</u>

In 1933, long before he could possibly have been deemed an employee of DC Comics or its business antecedents -- indeed, before there was a DC Comics or even much of a comic book industry -- Jerome Siegel had a vision. It was a fantasy of the kind that he, as a budding fan of science-fiction and comics, longed to read himself. In it, a bespectacled, bookish weakling not unlike Siegel himself was actually living a dual life. Though others thought his everyday identity was that of a nondescript, non-heroic type, he was secretly Superman, the strongest and most heroic of all men to walk the planet.

Superman was powerful. But he was to be admired, not envied, for he used his powers to help people in trouble, stopping crime and warding off natural disasters.

He would go about his business as the shy, mild-mannered character that Siegel later designated as a newspaper reporter named Clark Kent. Then in times of need – as, when another reporter named Lois was in peril -- Kent would doff his reporter clothes, appear in the colorful costume of Superman and perform impossible feats to save the day. While Clark had a crush on Lois, but was virtually ignored by her, Lois had a crush on Superman, in an original alter-ego love triangle.

The above summary is the core of the Superman property. It has been the basis of every appearance of the character in every medium. Every comic book, every radio show, movie serial, TV show, motion picture, cartoon and story of

4

Superman that has ever existed is based in some way – and often, wholly -- on this original conception of Siegel and Shuster.

As is well known and presumably undisputed, Siegel began working with artist Joe Shuster around 1934 to turn this concept into a newspaper comic strip. Extensive samples were prepared by Siegel and Shuster in their homes in Ohio which formed the basis of the first Superman story and laid the groundwork for all that followed.

Soon after they prepared the Superman material, Siegel and Shuster began submitting it unsuccessfully to newspaper syndicates. However, in early 1938, McClure forwarded the comic strip to Detective Comics for its new magazine, Action Comics. Superman had been completely developed by Siegel and Shuster by this time.

In early 1938, when Detective expressed interest in publishing the Superman comic strip in comic magazine format, Siegel and Shuster re-cut the strip into separate panels and re-pasted it into comic book format.

In a 1938 grant Siegel and Shuster agreed to the publication of their Superman comic strip by Detective for $130. Superman subsequently appeared as the cover subject in "Action Comics No. 1," published on April 18, 1938. It was an instantaneous success whose popularity spread like wild-fire. Siegel and Shuster continued to create Superman strips, stories, and continuities. Detective Comics and Siegel and Shuster thereafter entered into an agreement with The McClure Newspaper Syndicate dated September 22, 1938 for the newspaper syndication of a Superman comic strip and a parallel agreement of the same date between Detective Comics and Siegel and Shuster, for Siegel and Shuster to produce five comic strips, including "Superman."

It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day. The earliest comic books consisted of reprints

of those newspaper strips, re-pasted into a comic book page format.  When
original material began appearing in comic book format, it was generally because
companies that wished to publish comic books were unable to procure reprint
rights to existing newspaper strips.  The solution to this, practiced by Wheeler-
Nicholson and others, was to hire young cartoonists to simulate the same kind of
newspaper strip material.

     Siegel and Shuster, as well as others who began to sell such work,
believed that they were following in the career and business models of
syndicated comic strip writers and illustrators, doing essentially the same job but
one in which their material was published and distributed via different means.
From the standpoint of these writers and artists, the experience was not
dissimilar.

     As with newspaper strip creators, they were expected to deliver a
finished, camera-ready work to their editors.  A syndicated comic strip creator
(or team) would decide on story content and write the material and illustrate and
letter it in their own studios, keeping their own hours and providing their own
art supplies.  If he (or they) deemed it necessary to be aided by assistants, the
creator(s) of the strip would select, hire, supervise and pay their own assistants.
The editor at the syndicate (or the editor at the comic book company) would
concern himself only with the purchase of material created outside his purview.

     In the case of Siegel and Shuster, they operated the same way on their
comic book material, including the early stories of Superman.   Their relationship
with Wheeler-Nicholson and then with Harry Donenfeld's company may have
had references to employment in some documents but the relationship did not
have the look or feel of an employer/employee association, nor did it have the
elements that traditionally indicate that work is being done at the instance and

expense, or under the supervision necessary to denote a "work for hire" relationship.

Siegel and Shuster did not work in the publisher's New York offices or even for a time in the same state, thereby making it impossible that the editor, even had he wanted to, was supervising or dictating the writing and drawing of the material.

The creation of their Superman was done in their own homes or studio. Siegel and Shuster set their own hours and working conditions. They purchased their own art supplies, including paper, pencils, ink, pens, brushes and other materials with which a comic book story is created. They selected, hired, supervised and paid their own assistants.

Siegel and Shuster were not paid a salary by Detective Comics. They were paid on a piecework basis -- a set amount for each page accepted for publication. If a page or story was rejected by the publisher, they were not compensated for it and personally withstood the financial loss for it. The page rate was fixed and did not depend on the amount of time that had been spent writing or drawing the pages.

The publisher, Detective Comics, did not make its payments to Siegel and Shuster in any form that indicates an employer/employee relationship. The publisher did not withhold payroll or any other form of taxes, nor did Siegel and Shuster receive any health benefits or insurance, nor did they receive any other traditional employee benefits such as sick pay or vacation pay.

The first editor of the Superman material was Vince Sullivan, who was employed by Detective Comics, Inc. and based in New York. Sullivan never visited the studios of Siegel and Shuster in Ohio and, as he explained when I interviewed him in 1998, his input was limited to accepting or rejecting the finished stories they submitted and the occasional proofreading. This was fairly

standard in the industry at the time.  For much of the period under discussion, Sullivan was concurrently editing the Batman stories that his company published.  As he admitted on several occasions, he never even met or spoke with Bill Finger, who was the writer of most of those stories.

Sullivan also had no contact with, and therefore no supervision of, the assistants employed by Siegel and Shuster to help them produce their Superman material.  Much later, commencing in or about 1946-1947 certain of these assistants were hired directly by Detective Comics.  It was only at that point that these artists began to receive direction and supervision from members of the publisher's editorial staff.

As I understand the nature of a "work for hire" relationship, there must be some strong sense in which the putative "employee for hire" is working for the putative "employer" as opposed to creating the material on his or her own, incurring the financial risk if the material is not purchased, and receiving some measure of supervision.  That does not seem to have been the case in the vast majority of known instances in the earliest days of comic books and certainly not in a case of Siegel and Shuster.  From all indications, they were self-employed and merely selling a finished product to Detective Comics for publication.

Apportionment Considerations

No expert testimony should be needed to say that Superman is one of the most iconic, recognizable characters in all of popular culture.  Not only is his image known the world over but people of all ages are familiar with his mythology, his particulars and the primal legend as created by Jerry Siegel and Joe Shuster.  The character has appeared in every entertainment medium invented and will certainly turn up in those yet to be invented.

The objective value of the property goes above and beyond the profits realized by the publication of comic books, the marketing of toys and

merchandise depicting the property and the production of motion pictures and television shows based on the character. Superman helps define and establish an environment through which other properties can be introduced, developed and exploited.

It has been a common practice to enhance the reputation and worth of other characters by teaming them with Superman in selected appearances or otherwise linking to the Superman's audience and fame. DC Comics has often launched new characters by inserting them into a comic book featuring Superman or by having Superman guest star in the book built around those new characters. When I was working on a DC comic introduced in 1970 called The Forever People, it was decided that Superman would appear in that comic's first issue to attract the Superman audience towards the new title and to hope that some of his "superstar" status would rub off on the new property.

In much the same way, any new entertainment venture -- a movie, a TV series, a videogame -- based on Superman is instantly considered a major, hot endeavor in the same way that the excitement and potential success of a new motion picture is enhanced by the signing of an established star with proven box office success. In the case of Superman, he is the established star with proven box office success. For a studio to establish the same kind of fame and recognition of a newly-created character would require an investment of countless millions of dollars with, of course, no guarantee of success.

Over the years, the many writers, editors and artists who have created or helped create Superman adventures in comics have expanded upon the groundwork laid by Siegel and Shuster, adding in new twists to keep the property relevant to a changing audience. However, they always retain and build upon the firm foundation laid down by Siegel and Shuster in that first Superman story in Action Comics No. 1.

9

**089**

Any Superman story is still about a man of dual identity, one being a seeming mortal who could not possibly be taken for the heroic Superman.  And the other is the heroic Superman, a man of tremendous strength and ability who uses his powers for good, fighting crime and saving lives in times of disaster.

He is forever lifting large objects that would be impossible for you or I to lift, just as he hoisted a car on the cover of Action No. 1.

He is constantly being shot at, only to have the bullets bounce off his skin, just as they did in Action No. 1.

He still smashes through doors or rips them effortlessly off their hinges, as he did in Action No. 1.

He still has knives crumple on his skin and he still outraces a speeding car or train, as he did in Action No. 1.

Other abilities have been added to Superman and the personality of Clark Kent has been modified, tweaked and then restored to the original classic traits. But he is still always Superman.

Except, of course, when he is Clark Kent.  The dual identity element is a key factor in the mythology and success of Superman.  The world may view us as a nondescript Clark Kent but there is (or we wish to fantasize that there is) a Superman in us all.  Every depiction of Superman since Action Comics No. 1 in any dramatic medium (television, film, animation, radio, etc.) has been built upon this duality.

The first story in the first issue of Action Comics introduces Lois, who is a key component in the Superman property, and who has been depicted -- sometimes with equal attention and billing -- in every TV show, radio program, cartoon or motion picture of Superman.  The first issue also introduces a newspaper editor who, though not then named Perry White, functions in a role indistinguishable from that of Perry White in later stories.

No one would deny that new elements have been introduced into
Superman over the years.  New elements were continually introduced during the
period when the feature was under the creative control of Siegel and Shuster.
But at the center of any project is the same character they introduced in Action
Comics No. 1...the same guy in tights with a cape and an "S" on his chest and
great strength and invulnerability and a girl friend named Lois and another
identity as the bespectacled reporter Clark Kent.  That's what Superman and
every derivative depiction of him is all about.

<u>SUPERBOY</u>

<u>Jerry Siegel's Superboy Material</u>

In 1938, Jerry Siegel conceived a new comic book series which he called
Superboy.  He submitted it to Detective Comics, Inc., initially in the form of a
written summary, but Detective rejected it.  Thereafter in 1940 he wrote a
complete Superboy story (on "spec"); however it was rejected again.
Subsequently in 1943, when Siegel was abroad in military service, during World
War II the publisher launched a Superboy feature under the byline of Siegel and
Shuster without Siegel's knowledge or consent.

The ongoing Superboy feature began in More Fun Comics No. 101 in 1944.
It immediately became the star feature in that comic which featured other
adventure strips, mostly of a superhero nature.  Superboy was the one depicted
prominently on most covers.

In 1946, Detective Comics, Inc. converted the format of More Fun to
humor strips and transferred the superhero strips to another of its going titles,
Adventure Comics.  Again, Superboy was featured on the covers and in the first
position in the magazine, attesting to its popularity with the readers.  In 1949, a

regular magazine composed of nothing but Superboy adventures was added to the publisher's line but the character continued to appear in the featured position and on all the covers in Adventure Comics.

Not only was Superboy among DC's most profitable characters but the property was used to generate "spin-off" properties as well, most notably the Legion of Super-Heroes. The Legion first appeared in a Superboy story published in 1958 and continued to appear intermittently in Superboy stories until 1962 when the property received its own ongoing strip in the rear of Adventure Comics. The Legion has become one of DC Comics' most celebrated and lucrative properties, appearing in ongoing comic books and a current animated TV series, and this feature came out of Superboy's comic book series and was bolstered by Superboy's frequent appearances as a member of the group. DC continued to publish Superboy in a wide variety of publications and formats, including frequent reprinting of earlier stories.

Superboy appeared on an ongoing basis in derivative television adaptations as well. The first were Superboy cartoons that appeared as part of a Superman-Aquaman cartoon show on CBS Saturday mornings. From 1988 to 1992, a live-action syndicated Superboy TV series was produced and in 2001, the current, ongoing TV series entitled "Smallville" debuted featuring substantially the same characters and premise.

All of these shows featured a youthful Clark Kent employing his developing powers in a small, rural town called Smallville. All of them highlight his relationship with his foster parents and with local characters his own age such as Lana Lang and Pete Ross.

Although the precise age of Superboy has fluctuated from time to time, certain themes resound in all of these comic books and television versions.

12

**092**

In all, including the current Smallville series, we witness the early development of a character destined to become a superhero but in many other respects a boy grappling with growing up.  The heart of all these depictions is that we, the readers or viewers, are witness to the development of the world's greatest hero.  We see him grow in every way -- physically, mentally, emotionally, etc. -- there is always a significant amount of foreshadowing of the career we know he will have ahead of him when he relocates to the city of Metropolis and becomes Superman.

We see him come to discover his powers and how to use them most effectively.  Again and again in the narratives, he must also come to grips with the fact that he is from another planet and therefore different from the other young men and women around him.  Protecting the secret -- that young Clark has amazing powers -- is a key component of many storylines. While some elements may parallel the Superman property, much of it is unique to the Superboy material.

Of special note in this focal area is his evolving relationship with the couple that adopted him, and who represent the only family he has ever known. Throughout the comic books and all television dramatizations, Jonathan and Martha Kent are portrayed as decent, Middle America citizens who are overwhelmed by the unique presence that has entered their lives.  If it is difficult to raise a child, it is exponentially more difficult -- and therefore, more dramatic for story purposes -- to raise a child who can bench-press a Buick or smash through a wall.  These story elements are notably unique to the Superboy property and pervade Jerry Siegel's first Superboy story.  I can think of nowhere else in popular fiction where anything similar has been seen unless it was a clear derivative of Superboy.

13

093

Closely allied is the function that the Kents play in the life of young Clark. In every comic book and television version of this material, they manage to instill their values in their adopted son, giving him his grass roots connection to his new homeland and humanity.

Also unique to Jerry Siegel's Superboy is the adolescent awakening and the awkward identity crisis that so many of us experience in the transition from child to adult. That personal search process takes on cosmic proportions and meaning in the case of this young man who is an alien from another planet who, while "human" in his outward appearance and upbringing, is uniquely different from everyone else. This also is part of the spine of the property and the template expressed in Jerry Siegel's first story.

<u>Smallville</u>

Smallville (the television series) premiered in October of 2001 and is currently in its sixth season. Even the very name of the series immediately associates it with decades of Superboy comic books and early adaptations of the property. The town in which young Clark Kent was raised was named Smallville in Superboy No. 2 (cover dated May-June, 1949) and that name became instantly identified with Superboy, just as people the world over associate Metropolis with Superman and Gotham City with Batman.

Anyone who has seen the adaptations or read the Superboy comics would immediately recognize the key elements, starting with the mid-western town of Smallville. In the Smallville series you have...

...the young Clark Kent, attempting to learn how to utilize his powers while concealing them and coming to grips with his true identity. He is like us in many ways, unlike us in many ways, and endowed with awesome powers and an equally awesome destiny.

...Ma and Pa Kent, who attempt to raise and steer a young man who has all of the problems of normal adolescence, many of them magnified to a cosmic scale because of his abilities, as well as a whole set of problems unique to him as an alien and burgeoning super-hero.

...Lana Lang, Pete Ross, the young Lex Luthor and many other supporting characters, initially established in the comic books and continued in the television dramatizations.

...the foreshadowing of the man Superboy will one day become.

As noted, every dramatic adaptation of the Superboy comic books derived from Jerry Siegel's Superboy material has incorporated most, if not all of these elements. The Smallville series is no exception.

## V.

## CONCLUSIONS

### SUPERMAN

I see no basis to believe that Action Comics No. 1 or subsequent work by Siegel and Shuster on the character fall into any established definition of work for hire. Clearly, Jerry Siegel and Joe Shuster created the material at their own instance and expense, on their own premises and with their own instrumentalities and materials, working their own hours and with their own assistants. They sold it to Detective Comics, Inc. on a piecemeal basis that carried with it none of the trappings of an employer/employee relationship: No insurance, no vacations, no withholding, etc. The first story, containing the key elements that made Superman the unique, successful property that it is, was not even done with any expectation of publication by Detective Comics and therefore could not possibly be a work for hire. The subsequent Superman comics independently created and produced by Siegel and Shuster were also not

"works for hire" for the reasons stated above.  They were neither created at the publisher's instance and expense nor in any way supervised or guided by the publisher.

ALLOCATION

The star of every Superman appearance is Superman, as created and defined in the original work by Siegel and Shuster.  This is a property of enormous fame and value.  Audience interest and expectation is created by the mere mention of the name.  When word gets out that a new Superman TV show or motion picture is in the works, customers are predisposed to interest because of the enduring character and conception, which Siegel and Shuster created.

All of the key elements that define this property -- the look and feel of the character, his extraordinary abilities, his role as a protector of the weak, his alternate role as the nondescript reporter Clark Kent, his relationship with the ambitious female reporter Lois, etc. -- were all set down in Siegel and Shuster's first Superman story, published in Action Comics No. 1 and developed further in Siegel and Shuster's early Superman comics.

For that reason, I believe there should be no apportionment of the value and profits under discussion in this case.  In the event some apportionment is found to be appropriate it should lean heavily in favor of the Siegel family as co-owners of the core Superman elements.

SUPERBOY/SMALLVILLE

As a longtime reader of Superboy comic books and follower of the character's other appearances, I see the totality of that work as a continuous line. Superboy was always a property defined as -- and often, explicitly subtitled as -- "The adventures of Superman as a boy."  That tagline is also a perfect description of the "Smallville" TV series.

As mentioned, even the name Smallville evokes the Superboy comic books, to say nothing of the common elements -- the evolution of Clark Kent, the discovery and mastery of his powers, the special relationship with his parents (and their problems, rearing an all-powerful adolescent from another planet), the supporting cast, the world of a young man as seen through the unique view of an alien with super-powers. All of this was established in the basic Superboy story and template created by Jerry Siegel. It is what defines the enduring Superboy property and what makes Smallville a unique television experience. It is all one concept and I see no basis on which to differentiate them.

What is critical to understand is that many of the key elements and themes in Smallville are present in Siegel's earliest conception of Superboy in his 1940 story. Here we have an alien child taken in by adoptive parents who appreciate just how special their child is, committing themselves to protecting him from the scorn his unique powers could subject him to in a small town. This is the most important relationship in the story – the raising of this child by simple, decent people who have been graced with someone extraordinary. The efforts to keep his abilities and nature a secret and, not to be understated, the numerous humorous possibilities to which this situation can lead, are present in Siegel's story. I point to the baby Clark hurting a boy much larger than he, and his father taking quiet pride in his son's unique abilities.

Most important is the struggle and pressure a young Clark faces like any other child growing up, only his journey is compounded by his superpowers. Siegel's "Superboy" story shows Clark subject to teasing, to being the "new kid" in school, to having to prove himself to bullies in order to gain acceptance. His superpowers could resolve his all-too-human struggles in an instant, but he chooses not to and instead reserve them for doing good. After saving the school

17

**097**

bullies from criminals, Clark, in Siegel's story, demurs, seeking neither fame nor leverage from his heroic deeds.

All of these essential elements and themes are central to the television show Smallville. Granted, Clark is portrayed as a highschooler, but the thematic trajectory remains the same: struggling with adolescence, acceptance and school in a small town, all the while coming to grips with his superpowers. The core relationship of the show, like in Siegel's Superboy story, is with his parents, whose unconditional acceptance and love helps Clark decide to use his powers for good and shapes the man he is to become.

## VI.

## COMPENSATION

I am not being paid for my services as an expert witness.

## VII.

## PRIOR CASES

I served as an expert witness in a 1997 lawsuit filed by writer Marvin Wolfman against Marvel Characters, Inc.

## VIII.

## PUBLICATIONS

I have authored the following publications:

*Comic Books and Other Necessities of Life* (TwoMorrow Publications, 2002)

*Wertham Was Right!* (TwoMorrow Publications, 2003)

*Mad Art* (Watson-Guptill Publishing, 2003)

*Super-Heroes In My Pants* (TwoMorrow Publications, 2004)

Respectfully submitted,

Mark Evanier

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On January 12, 2007, I served the attached documents described as **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S INITIAL DESIGNATION OF EXPERT WITNESS MARK EVANIER** as follows:

[X]   :BY FACSIMILE:

As follows: I caused the transmission of the above named documents to the fax number set forth below, or on the attached service list.

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Facsimile No. 212-813-5901

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Facsimile No. 845-265-2819

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile No. 310-550-7191

[X]   :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.  I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

100

1    :(STATE) - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

2

3  [X] :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

4    I declare under penalty of perjury that the foregoing is true and correct.

5    EXECUTED on January 12, 2007, in Los Angeles, California.

6

7             Alexander M. Merino

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

101