1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   E-mail:  MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              **UNITED STATES DISTRICT COURT**

8       **CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION**

| | |
|---|---|
| 9  JOANNE SIEGEL, an individual; and | Case No. CV 04-8400 SGL (RZx) |
| 10 LAURA SIEGEL LARSON, an individual, | [Honorable Stephen G. Larson] |
| 11                Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES FILED PURSUANT TO THE COURT'S JULY 3, 2008 ORDER** |
| 12        vs. | |
| 13 WARNER BROS. | |
| 14 ENTERTAINMENT INC., a | [Complaint filed: October 8, 2004] |
| corporation; TIME WARNER INC., a | |
| 15 corporation; DC COMICS, a general | Date:   August 11, 2008 |
| 16 partnership; and DOES 1-10, | Time:   3:00 p.m. |
| | Place:  Courtroom 1 |
| 17          Defendants. | [Declaration of Marc Toberoff, Notices of Lodging to the Declaration of Nicholas Williamson filed manually; Declaration of Nicholas Williamson and Declaration of Keith Adams filed electronically] |
| 18 | |
| 19 DC COMICS, | |
| 20 | |
| 21             Counterclaimant, | |
| 22        vs. | |
| 23 JOANNE SIEGEL, an individual; and | |
| 24 LAURA SIEGEL LARSON, an individual, | |
| 25 | |
| 26          Counterclaim Defendants. | |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

ARGUMENT..................................................................................................3

I.      UNDER APPLICABLE STATE LAW GOVERNING TENANCIES IN COMMON, DEFENDANTS MUST ACCOUNT FOR ALL PROFITS FROM SUPERMAN WITHOUT ANY "APPORTIONMENT"..............3

     A.   Plaintiffs' Accounting Claim Is Governed by State Law Re: Tenancies in Common, <u>Not</u> by Federal Copyright Law..................4

     B.   Under California Law Governing Tenancies in Common, Improvements Inures to the Benefit of All Co-Owners..................4

     C.   Defendants Cannot Use Federal Copyright Infringement Law to Reduce Defendants' State-Governed Accounting Obligations .......5

          1.   Apportionment Would Function Inequitably in this Action..................................................................................7

II.     DEFENDANTS BEAR THE BURDEN OF PROVING THE SCOPE OF ANY APPORTIONMENT APPLICABLE TO SUPERMAN PROFITS ....................................................................................8

III.    AN ACCOUNTING AND DEFENDANTS' AFFIRMATIVE APPORTIONMENT DEFENSE REQUIRE A JURY TRIAL ..............10

     A.   The Right to Jury Trial Attaches to an Accounting for Profits..........................................................................................10

          1.   In Federal Court the Fundamental Right to a Jury Trial Is To Be Liberally Construed in All Cases............................10

          2.   Federal Courts Apply Federal Law in Assessing the Right to a Jury Even When the Claim Arises Under State Law ...11

          3.   An Accounting for Profits Is Legal Both in Terms of the Relief Sought and its Historical Derivation........................11

          4.   Plaintiffs' Claim for Profits Is Functionally Equivalent to an Accounting of Profits in a Copyright Infringement Case to Which the Constitutional Right to a Jury Trial Applies ........................................................................13

     B.   The Right to Jury Trial Attaches to Defendants' Apportionment Defense, Imported From Section 504(b) of Copyright Act..........14

IV.     A WORK-BY-WORK APPORTIONMENT ANALYSIS IS PROCEDURALLY IMPROPER, PRACTICALLY UNWORKABLE, AND LEGALLY UNNECESSARY.......................................................15

i

A.   The Appointment of a Special Master to Conduct a Work-by-Work Apportionment Analysis Would Be Completely Improper ................................................................. 16

   1.   The Use of a Special Master to Conduct an "Apportionment" Analysis Would Improperly Intrude On The Role Of The Jury In Violation F.R.C.P. 53 ................. 16

   2.   The Appointment of a Special Master Would Exceed the Limitations of F.R.C.P. 53 .................................... 17

B.   A Work-by-Work Apportionment Is Unnecessary, Unworkable and Unduly Burdensome .............................................. 18

   1.   Defendants' Proposed Work-by-Work Analysis Would Result in a Tremendous Waste of Judicial Resources ......... 18

   2.   Defendants' Failure to Provide Financial Documents on Individual Works Renders A Work-by-Work Analysis Moot ................................................................. 19

   3.   Work-by-Work Apportionment Should Not Be Performed for Works Created by Licensees .......................... 20

C.   A "Template" Approach to Apportionment Is Appropriate ......... 21

   1.   A "Template" Approach Can Generate an Apportionment Figure That Can Properly Be Applied to Any Given Work ......................................... 21

   2.   The Iconic Core Elements of the Superman Character Have Remained Largely Unchanged Since Their Inception ........................................................ 23

   3.   Public Policy and the Legislative Objectives of the Termination Provision Militates Against a Work-By-Work Analysis ....................................................... 25

   4.   Plaintiffs Request that the Court Order the Use of a "Template" in Any Apportionment Analysis ................ 27

V.   DEFENDANTS IMPROPERLY SEEK SUMMARY JUDGMENT ON WORK FOR HIRE ISSUES PRESERVED FOR TRIAL ............... 27

A.   Defendants Improperly Seek Partial Summary Judgment on "Work for Hire" Issues Well After The Court-Imposed Deadline for Dispositive Motions ................................................. 27

B.   Defendants Err in Arguing That They May Move the Court on the "Work for Hire" Issue in the Form of a Motion *In Limine* ...... 29

C.   The "Works Made for Hire" Issues Implicate Numerous Genuine Issues of Material Fact That Prohibit Summary Judgment ........... 30

ii

TABLE OF CONTENTS

1. The "Instance" Component of the Test ..............................31

2. The "Expense" Component of the Test ..............................32

3. "Work for Hire" Turns on Mutual Intent of the Parties ......33

4. Summary Judgment on "Work for Hire" Defense Is Disfavored.......................................................................34

VI. DEFENDANTS MUST ACCOUNT TO PLAINTIFFS FOR PROFITS FROM ANY "PRE-TERMINATION" DERIVATIVE WORKS THAT ARE ALTERED POST-TERMINATION....................................35

A. Defendants May Not Create New Derivative Works on the Basis of Pre-Termination Works Without Accounting to Plaintiffs ......36

1. Defendants Must Account for any Derivative Work Completed After April 16, 1999, the Effective Termination Date................................................................36

2. Material Change to a Pre-termination Derivative Work Establishes a New Derivative Work for which Defendants Must Account.......................................................................37

B. Defendants Will Clearly Have to Account for Many Post-Termination Releases of Pre-Termination Superman Works........38

1. Common Changes In DVD Releases of Pre-termination Superman Works Result In New Derivative Works ..........38

a. Key Examples of DVD Releases of Pre-termination Works Resulting  in New Derivative Works ............41

2. The Court Should Set Forth Guidelines Governing The "Derivative Works Exception" On Which Defendants Bear the Burden........................................................................42

VII. DEFENDANTS CANNOT USE THEIR ALLEGED "TRADEMARKS" TO DEVALUE OR ENCUMBER PLAINTIFFS' COPYRIGHTS........43

A. Defendants Cannot Prevent Plaintiffs From Using The Name Superman In Exploiting *Action Comics No. 1* or Derivative Works .........................................................................47

VIII. DEFENDANTS MUST ACCOUNT TO PLAINTIFFS FOR THE USES OF COPYRIGHT THAT PERVADE DEFENDANTS' EXPLOITATION OF THEIR ALLEGED TRADEMARKS.................49

A. Defendants Must Account for "Mixed Uses" of Copyright and Trademark .........................................................................49

B. Defendants' Trademarks Are Derivative Works of *Action Comics No. 1*, Constituting a "Mixed Use" of Copyright and Trademark .........................................................................51

iii

TABLE OF CONTENTS

1. Defendants' Trademarks in Graphic Depictions of Superman Necessarily Constitute Derivative Copyrights and/or "Mixed Uses" ........................................52

2. The Telescoping "Superman" Moniker Comprises a "Mixed Use" of Trademark and Copyright.........................53

3. Defendants Superman "Crest" is a Copyrighted Derivative Work of Superman's "Crest" in *Action Comics No. 1* For Which Defendants Must Account ......................................55

4. Defendants' Merchandise Routinely Reflects Derivative Copyright Exploitation And/Or A "Mixed Use" of Copyright and Trademark...........................................57

C. The Court Should Rule That Defendants Must Account For Mixed Uses of Trademark and Copyright .....................................58

IX. DEFENDANTS' ADS HAVE NO EFFECT ON PLAINTIFFS RECAPTURED COPYRIGHT IN *ACTION COMICS NO. 1*................58

A. Plaintiffs' Recaptured Copyright In *Action Comics No. 1* Is Not Encumbered By The Ads................................................58

1. Publication of the Ads "Protected" the Underlying Graphic Elements in the Cover of *Action Comics No. 1* But Did Not Itself Convey An Exclusive Copyright in Such Underlying Elements ........................................................59

2. As the Ads Were Derivative Works of *Action Comics No. 1*, They Cannot Encumber It.................................................63

a. The Variations in the Advertisement are Trivial ......63

b. An Unwarranted Copyright In The Ad's "Cover Image" Improperly Threatens the Copyright in the Underlying Work......................................................65

c. Because Ownership of the Ads and *Action Comics No. 1* Has Diverged, A Derivative Works Analysis Must Apply ..............................................................66

B. Defendants May Exploit The Derivative Ads Which Were Never Subject To Recapture Under Section 304(C), But May Not Create New Superman Derivative Works Based On The Ads ......68

C. Defendants, At Best, Hold A Copyright In The "Image" Of The *Action Comics No. 1* Cover "As Depicted" In The Ad, Devoid Of Superman Context ................................................69

1. The Copyright In A Pictorial Work Protects Only Its Visual Content And Objective Appearance ........................70

2. Defendants Cannot Own The Basic Ideas Or Subject Matter Depicted In The Ad................................................70

iv

TABLE OF CONTENTS

3.    Publication of the Ad Did Not "Copyright" Superman
Elements ............................................................................71

D.    The Termination Notices Provided Defendants With
Ample Notice ..................................................................72

X.    THE ORDER'S HISTORICAL SUMMARY INCLUDES
CONTESTED FACTS FOR TRIAL ........................................74

A.    The Order Could Be Misinterpreted As "Ruling" on Genuine
Issues of Material Fact ....................................................74

B.    Elements Listed in the Order as Being the Preserve of the
Defendants First Appeared in *Action Comics No. 1* ...................75

C.    Plaintiffs Did Not Receive Adequate Notice ...............................77

D.    Defendants Failed to Offer Admissible Evidence Sufficient to
Meet Their Burden of Proof Regarding Superman's Powers ........78

CONCLUSION ..................................................................................80

v

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                          **Pages**

*Abkco Music, Inc. v. Harrisongs Music, Ltd.*,
508 F.Supp. 798 (S.D.N.Y. 1981) ...................................................................24

*Abli, Inc. v. Standard Brands Paint Co.*,
323 F.Supp. 1400 (C.D. Cal. 1970) ...............................................................56

*Aerospace Services Intern. v. LPA Group, Inc.*,
57 F.3d 1002 (11th Cir. 1995) .......................................................................22

*American Express Travel Related Servs. Co. v. Hashemi*,
104 F.3d 1122 (9th Cir. 1996) .......................................................................12

*Anderson v. Stallone*,
11 U.S.P.Q.2d (BNA) 1161 (C.D. Cal. 1989) ...............................................48

*Associated Press v. Dist. Court for Fifth Judicial Dist. of Col.*,
542 U.S. 1301 (2004) .....................................................................................29

*ATC Dist. Group v. Whatever It Takes Trans.& Parts*
402 F.3d 700 (6th Cir. 2005) .........................................................................65

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*,
369 U.S. 355 (1962).......................................................................................11

*Bank Melli Iran v. Pahlavi*
58 F.3d 1406 (9th Cir. 1995) .........................................................................78

*Bartlett-Collins Co. v. Surinam Nav. Co.*,
381 F.2d 546 (10th Cir. 1967) .......................................................................17

*Batjac Productions Inc. v. Goodtimes Home Video Corp.*,
160 F.3d 1223 (9th Cir. 1998) ................................................................*passim*

*Beacon Theatres, Inc. v. Westover*,
359 U.S. 500 (1959).......................................................................................10

*Beazer East, Inc. v. Mead Corp.*,
412 F.3d 429 (3d Cir. 2005) ..........................................................................17

*Berlin v. Lloyds Bank*
1989 U.S. Dist. LEXIS 18345 (C.D. Cal. 1989) ...........................................79

*Berkic v. Crichton*
761 F.2d 1289 (9th Cir. 1990) .......................................................................71

*Biggers v. Bankers Bond Co.*,
171 F.Supp. 94 (D.Ky. 1959) ........................................................................43

*Blackman v. Hustler Magazine, Inc.*,
620 F.Supp. 792 (D.D.C. 1985).....................................................................24

*Bose Corp. v. Jbl, Inc.*,
112 F.Supp.2d 138 (D. Mass. 2000).................................................39

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2003) ....................................................15

*Bouchat v. Bon-Ton Dep't Stores, Inc.*,
506 F.3d 315 (4th Cir. 2007) .....................................................8

*Boyle v. U.S.*,
200 F.3d 1369 (Fed. Cir. 2000) .................................................49

*Bradshaw v. Thompson*,
454 F.2d 75 (6th Cir. 1972) ......................................................17

*Bras v. Bras*,
463 F.2d 413 (10th Cir. 1972) .....................................................5

*Bridgeport Music, Inc. v. Dimension Films*,
410 F.3d 792 (6th Cir. 2005) ....................................................39

*Bryant v. Bell Atl. Md.*,
288 F.3d 124 (4th Cir. 2002) ....................................................79

*Buckingham v. U.S.*,
998 F.2d 735 (9th Cir. 1993) ....................................................77

*Bucklew v. Hawkins, Ash & Baptie, LLP*,
329 F.3d 923 (7th Cir. 2003) .....................................................8

*Burroughs v. Metro-Goldwyn Mayer, Inc.*,
683 F.2d 610 (2d Cir. 1982) .....................................................68

*Cambridge Lit. Properties, Ltd. v. W. Goebel Porzellanfabrik G.M.B.H. &
Co. KG.*,
510 F.3d 77 (1st Cir. 2007).....................................................40

*Camp Beverly Hills, Inc. v. Camp Cent. Park, Inc.*,
1982 U.S. Dist. LEXIS 10019 (S.D.N.Y. 1982) .................................54

*Car-Freshner Corp. v. Auto Aid Mfg. Corp.*,
461 F.Supp. 1055 (S.D.N.Y. 1978) ............................................52

*Carter v. Helmsley-Spear, Inc.*,
71 F.3d 77 (2d Cir. 1995) ......................................................34

*Cavalier v. Random House*,
297 F.3d 815 (9th Cir. 2002) ...................................................70

*Central Mills v. Iced Apparel*,
1998 U.S. Dist. LEXIS 1798 (S.D.N.Y. 1998) .................................56

*Cessna Air. Co. v. Hartford Accident & Indem. Co.*,
900 F.Supp. 1489 (D. Kan. 1995) .............................................43

vii

TABLE OF AUTHORITIES

*Chapman v. Pacific Tel. & Tel. Co.,*
613 F.2d 193 (9th Cir. 1979)...............................................................43

*Classic Film Museum, Inc. v. Warner Bros., Inc.,*
597 F.2d 13 (1st Cir. 1979)..................................................................62

*Classic Media, Inc. v. Mewborn,*
2008 U.S. App. LEXIS 14755 (9th Cir. July 11, 2008) .....................26

*Comedy III Prods. v. New Line Cinema,*
200 F.3d 593 (9th Cir. 2000) ......................................................... 44-45

*Community for Creative Non-Violence v. Reid,*
846 F.2d 1485 (D.C. Cir. 1988)..............................................................4

*Community for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989)..............................................................................32

*Cool Fuel, Inc. v. Connett,*
685 F.2d 309 (9th Cir. 1982) ...............................................................78

*Cordon Art B.V. v. Walker,*
40 U.S.P.Q.2d (BNA) 1506 (S.D. Cal. 1996) ......................................67

*Cordon Holding B.V. v. Northwest Publ. Corp.,*
63 U.S.P.Q.2d (BNA) 1013 (S.D.N.Y. 2002) ......................................67

*Corwin v. Walt Disney Co.,*
2004 WL 5486639 (M.D. Fla. 2004).....................................................70

*Cosmos Jewelry Ltd. v. Po Sun Hon Co.,*
470 F.Supp.2d 1072 (C.D. Cal. 2006) ..................................................64

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.,*
754 F.2d 826 (9th Cir. 1985) .................................................................9

*Dairy Queen, Inc. v. Wood,*
369 U.S. 469 (1962)......................................................................... 12-13

*Daisy Group v. Newport News,*
999 F.Supp. 548 (S.D.N.Y. 1998) ........................................................12

*Danjaq LLC v. Sony Corp,*
49 U.S.P.Q.2d (BNA) 1341 (C.D. Cal. 1998) ......................................47

*Darden v. Peters,*
488 F.3d 277 (4th Cir. 2007) ................................................................65

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003)........................................................................*passim*

*Davis v. Blige,*
505 F.3d 90 (2d Cir. 2007) ...................................................................21

*Dead Kennedys v. Biafra,*
37 F.Supp.2d 1151 (N.D. Cal. 1999).......................................................4

viii

TABLE OF AUTHORITIES

*Dielsi v. Falk*,
916 F.Supp. 985 (C.D. Cal. 1996) ..................................................................... 6

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ........................................................................... 29

*Donald v. Zack Meyer's TV Sales*,
426 F.2d 1027 (5th Cir. 1970) ......................................................................... 63

*Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.*,
375 F.2d 639 (2d. Cir. 1967) ........................................................................... 31

*Drop Dead Co. v. S.C. Johnson & Son, Inc.*,
326 F.2d 87 (9th Cir. 1963) ........................................................................ 54, 56

*Durham Industries, Inc. v. Tomy Corp.*,
630 F.2d 905 (2d Cir. 1980) ...................................................................... 10, 63

*Eales v. Environmental Lifestyles, Inc.*,
958 F.2d 876 (9th Cir. 1992) ........................................................................... 10

*Edward B. Marks Music Corp. v. Wonnell*,
61 F.Supp. 722 (S.D.N.Y. 1945) ...................................................................... 21

*Edgar Rice Burroughs, Inc. v. Manns Theatres*,
195 U.S.P.Q. (BNA) 159 (C.D. Cal. 1976) ....................................................... 47

*EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos, Inc.*,
228 F.3d 56 (2d Cir. 2000) .............................................................................. 44

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ..................................................................*passim*

*Eprad, Inc. v. Dolby Laboratories, Inc.*,
209 U.S.P.Q. (BNA) 238 (N.D. Ohio 1980) ..................................................... 39

*Ets-Hokin v. Skyy Spirits, Inc.*,
225 F.3d 1068 (9th Cir. 2000) ......................................................................... 44

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
193 F.2d 162 (1st Cir. 1951) ........................................................................... 71

*Feist Publ'ns, Inc v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ........................................................................................ 63

*Feltner v. Columbia Pictures, TV*,
523 U.S. 340 (1998) ........................................................................................ 14

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
807 F.2d 1110 (2d Cir. 1986) ............................................................................ 6

*Forward v. Thorogood*,
985 F.2d 604 (1st Cir. 1993) ........................................................................... 34

TABLE OF AUTHORITIES

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
772 F.2d 505 (9th Cir. 1985) ................................................................... 9

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) ............................................................ 4, 48

*Gamma Audio & Video v. Ean-Chea*,
11 F.3d 1106 (1st Cir. 1993) ................................................................. 40

*Gardenia Flowers, Inc. v. Joseph Markovits, Inc.*,
280 F.Supp. 776 (S.D.N.Y. 1968) ......................................................... 63

*Gaste v. Kaiserman*,
863 F.2d 1061 (2d Cir. 1988) ................................................................ 15

*General Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994) ............................................................ 9, 15

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131 (5th Cir. 2004) ................................................................ 45

*Goodis v. United Artists Tel., Inc.*,
425 F.2d 397 (2d Cir. 1970) ................................................................. 59

*Goodman v. Lee*,
1994 U.S. Dist. LEXIS 1846 (E.D. La. 1994) ..................................... 21

*Goodman v. Lee*,
78 F.3d 1007 (5th Cir. 1996) .................................................................. 4

*Gracen v. Bradford Exchange*
698 F.2d 300 (7th Cir. 1983) ................................................................ 65

*Granfinanciera v. Nordberg*,
492 U.S. 33 (1989) ................................................................................ 10

*Griesedieck Western Brewery Co. v. Peoples Brewing Co.*,
56 F.Supp. 600 (D. Minn. 1944) ........................................................... 56

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542 (9th Cir. 1990) .............................................................. 79

*Hamdad Trust v. Ajit Newspaper Adver., Mktg. & Communs., Inc.*,
503 F.Supp.2d 577 (E.D.N.Y. 2007) ..................................................... 49

*Harper House, Inc. v. Thomas Nelson, Inc.*,
1987 U.S. Dist. LEXIS 14132 (C.D. Cal. 1987) .................................. 15

*Harris Custom Builders, Inc. v. Hoffmeyer*,
92 F.3d 517 (7th Cir. 1996) .................................................................. 65

*Hearn v. Meyer*,
664 F.Supp. 832 (S.D.N.Y. 1987) .................................................. 64, 65

x

TABLE OF AUTHORITIES

*High Tech Gays v. Defense Indus. Sec. Clear. Office,*
895 F.2d 563 (9th Cir. 1990) ...................................................................79

*Hurd v. Williams,*
755 F.2d 306 (3d Cir. 1985) ...................................................................78

*In re Armco, Inc.,*
770 F.2d 103 (8th Cir. 1985) ...................................................................17

*Int'l Film Exchange, Ltd. v. Corinth Films, Inc.,*
621 F.Supp. 631 (S.D.N.Y. 1985) ...........................................................40

*James River Ins. Co. v. Hebert Schenk, P.C.,*
523 F.3d 915 (9th Cir. 2008) ...................................................................79

*Jarvis v. K2 Inc.,*
486 F.3d 526 (9th Cir. 2007) ...................................................................42

*JCW Investments, Inc. v. Novelty, Inc.,*
482 F.3d 910 (7th Cir. 2007) ...................................................................70

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,*
58 F.3d 27 (2d Cir. 1995) ........................................................................44

*Jerry Vogel Music Co. v. Warner Bros., Inc.,*
535 F.Supp. 172 (S.D.N.Y. 1982) ...........................................................60

*Jewelers' Circular Pub. Co. v. Keystone Pub. Co.,*
274 F. 932 (S.D.N.Y. 1921) ....................................................................49

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,*
322 F.3d 26 (1st Cir. 2003).................................................................21-22

*Johnson v. Jones,*
149 F.3d 494 (6th Cir. 1998) .....................................................................9

*Kenny v. Regis Co.,*
2008 U.S. Dist. LEXIS 18373 (N.D. Cal. Mar. 10, 2008) ......................79

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.,*
266 F.2d 541 (2d Cir. 1959) ....................................................................55

*L. Batlin & Son, Inc. v. Snyder,*
536 F.2d 486 (2d Cir. 1976) ...............................................................63-64

*La Buy v. Howes Leather Co.,*
352 U.S. 249 (1957)..................................................................................17

*Langman Fabrics v. Graff Californiawear, Inc.,*
160 F.3d 106 (2d Cir. 1998) ....................................................................35

*Lin-Brook Builders Hardware v. Gertler,*
352 F.2d 298 (9th Cir. 1965) ..............................................................31, 33

TABLE OF AUTHORITIES

*Livingston v. Morgan*,
2007 WL 2140900 (N.D. Cal. 2007) ............................................................29

*Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*,
456 F.Supp 531 (S.D.N.Y. 1977) ................................................................24

*Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*,
592 F.2d 651 (2d Cir. 1978) ................................................................... 9-10

*Luce v. United States*,
469 U.S. 38 (1984)........................................................................................29

*Magic Marketing, Inc. v. Mailing Services of Pittsburgh, Inc.*,
634 F.Supp. 769 (W.D. Pa. 1986) ...............................................................63

*Maljack Productions v. UAV Corp.*,
964 F.Supp. 1416 (C.D. Cal. 1997) ..................................................... 38-39. 65

*Manufacturing Co. v. Artic Int'l, Inc.*,
704 F.2d 1009 (7th Cir. 1983) ....................................................................38

*Marascalco v. Fantasy, Inc.*,
953 F.2d 469 (9th Cir. 1991) ........................................................... 20-21, 59

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*,
380 F.3d 624 (2d Cir. 2004) .............................................................. 31, 61

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) ........................................................................38

*May v. Morganelli-Heumann & Assoc.*,
618 F.2d 1363 (9th Cir. 1980) ............................................................ 33-35

*McEwen v. City of Norman, Okla.*,
926 F.2d 1539 (10th Cir. 1991) ..................................................................29

*McRoberts Software, Inc. v. Media 100, Inc.*,
329 F.3d 557 (7th Cir. 2003) ...............................................................9, 15

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)......................................................................................13

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) ....................................................................72

*Milgard Tempering v. Selas Corp. of Am.*,
902 F.2d 703 (9th Cir. 1990) ......................................................................80

*Mills Music Inc. v. Snyder*,
469 U.S. 153 (1985)...........................................................................*passim*

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
856 F.2d 1341 (9th Cir. 1988) ....................................................................38

TABLE OF AUTHORITIES

*Morrill v. Smashing Pumpkins,*
157 F.Supp.2d 1120 (C.D. Cal. 2001) ......................................................... 4

*Morris v. Bus. Concepts, Inc.,*
259 F.3d 65 (2d Cir. 2001) ......................................................................... 59

*Multitherm Corp. v. Fuhr,*
1991 U.S. Dist. LEXIS 10475 (E.D. Pa 1991) ........................................... 22

*Natural Resources Defense Council v. Rodgers,*
2005 WL 1388671 (E.D.Cal. 2005) ............................................................ 29

*Nelson-Salabes, Inc., v. Morningside Dev., LLC,*
284 F.3d 505 (4th Cir. 2002) ........................................................................ 9

*Neva, Inc. v. Christian Dupl. Int'l, Inc.,*
743 F.Supp. 1533 (M.D.Fla. 1990) ............................................................ 60

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
210 F.3d 1099 (9th Cir. 2000) .................................................................... 79

*O'Connor v. Cindy Gerke & Assoc.,*
300 F.Supp.2d 759 (W.D. Wis. 2002) ........................................................ 54

*Oddo v. Ries,*
743 F.2d 630 (9th Cir. 1984) .............................................................. *passim*

*Pacific Serv. Stat. Co. v. Mobil Oil Corp.,*
689 F.2d 1055 (Temp.Emer.Ct.App. 1982) ................................................. 79

*Pasillas v. McDonald's Corp.,*
927 F.2d 440 (9th Cir. 1991) ...................................................................... 70

*Patten v. Superior Talking Pictures, Inc.,*
8 F.Supp. 196 (S.D.N.Y. 1934) .................................................................. 48

*Pickett v. Prince,*
207 F.3d 402 (7th Cir. 2000) ...................................................................... 56

*Picture Music, Inc. v. Bourne, Inc.,*
314 F.Supp. 640 (S.D.N.Y. 1970) ................................................................ 6

*Polar Bear Prods. v. Timex Corp.,*
384 F.3d 700 (9th Cir. 2004) ................................................................ 14-16

*Polar Bear Prods. v. Timex Corp.,*
2004 U.S. App. LEXIS 22131 (9th Cir. 2004) .............................................. 9

*Qualitex Co. v. Jacobs. Prod. Co.,*
514 U.S. 159 (1995) .............................................................................. 45-46

*Quinn-Brown Pub. Corp. v. Chilton Co.,*
15 F.Supp. 213, 214 (S.D.N.Y. 1936) ........................................................ 60

*RDF Media Ltd. v. Fox Broad. Co.,*
372 F.Supp. 2d 556 (C.D. Cal. 2005) ........................................................ 44

xiii

TABLE OF AUTHORITIES

*Richlin v. Metro-Goldwyn Mayer Pictures, Inc.,*
2008 U.S. App. LEXIS 12917 (9th Cir. 2008) ............................................ 61-62

*Rondor Music Int'l, Inc. v. TVT Records LLC,*
2006 U.S. Dist. LEXIS 97118 (C.D. Cal. 2006) .................................................. 9

*Roulo v. Russ Berrie & Co., Inc.*
886 F.2d 931 (7th Cir. 1989) ...........................................................................22

*Runge v. Lee,*
441 F.2d 579, 581 (9th Cir. 1971) ............................................................. 59-60

*Roy Export Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v.
Columbia Broadcasting System, Inc.,*
503 F.Supp. 1137 (S.D.N.Y. 1980) ...................................................................38

*Satava v. Lowry,*
323 F.3d 805 (9th Cir. 2003) ............................................................................63

*Satyam Computer Services, Ltd. v. Venture Global Engineering, LLC,*
2007 WL 1806198 (E.D. Mich. 2007) ............................................................18

*Schoenthal v. Irving Trust Co.,*
287 U.S. 92 (1932)............................................................................................10

*Scosche Industries, Inc. v. Visor Gear Inc.,*
121 F.3d 675 (9th Cir. 1997) ...........................................................................78

*Sega Enters. v. Accolade, Inc.,*
977 F.2d 1510 (9th Cir. 1992)..........................................................................42

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
206 F.3d 1322 (9th Cir. 2000) ...............................................................*passim*

*Shapiro Bernstein & Co. v. Jerry Music Co.,*
221 F.2d 569 (2d Cir. 1955) .....................................................................31, 34

*Shaw v. Lindheim,*
919 F.2d 1353 (9th Cir. 1990) .........................................................................70

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
106 F.2d 45 (2d Cir. 1939) ......................................................................10, 24

*Sheldon v. Metro-Goldwyn Pictures, Corp.,*
309 U.S. 390 (1940)..........................................................................................13

*Sherry Manufacturing Co. v. Towel King of Florida, Inc.,*
753 F.2d 1565 (11th Cir. 1985) .......................................................................64

*Shoptalk, Ltd. v. Concorde-New Horizons Corp.,*
168 F.3d 586 (2d Cir. 1999) ............................................................................62

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,*
562 F.2d 1157 (9th Cir. 1977) ................................................................*passim*

xiv

TABLE OF AUTHORITIES

*Siegel v. National Periodical Publications, Inc.,*
508 F.2d 909 (2d Cir. 1974) ............................................................................77

*Simler v. Conner,*
372 U.S. 221 (1963)..........................................................................................11

*Silverman v. CBS Inc.,*
870 F.2d 40 (2d Cir. 1989) ..............................................................................63

*Sobhani v. @Radical.Media Inc.,*
257 F.Supp.2d 1234 (C.D. Cal. 2003) .............................................................66

*Spilman v. Mosby-Yearbook, Inc.,*
115 F.Supp.2d 148 (D. Mass. 2000)................................................................65

*Stewart v. Abend,*
495 U.S. 207 (1990)...................................................................................32, 60

*Swirsky v. Carey,*
376 F.3d 841 (9th Cir. 2004) ...........................................................................71

*Swofford v. B & W, Inc.,*
336 F.2d 406 (5th Cir. 1964) ...........................................................................12

*Taylor v. List,*
880 F.2d 1040 (9th Cir. 1989) .........................................................................78

*Teamsters v. Terry,*
494 U.S. 558 (1990)..........................................................................................11

*Three Boys Music Corp. v. Bolton,*
212 F.3d 477 (9th Cir. 2000) ...........................................9, 14-15, 24

*Toliver v. Sony Music Ent.,*
149 F.Supp.2d 909 (D. Alaska 2001) ..............................................................71

*Towers v. Titus,*
5 B.R. 786 (N.D. Cal. 1979) ............................................................................12

*Traffix Devices v. Mktg. Displays,*
532 U.S. 23 (2001)............................................................................................44

*Turtle v. Castle Records Inc.,*
2004 U.S. Dist. LEXIS 29124 (N.D. Cal. 2004) .............................................45

*Twentieth Century Fox Film Corp. v. Entertainment Distrib.,*
429 F.3d 869 (9th Cir. 2005) ....................................................................*passim*

*Twentieth Century Fox Film Corp. v. Marvel Enters.,*
220 F.Supp. 2d 289 (S.D.N.Y. 2002) ..............................................................54

*U.S. v. Higginbotham, Inc.,*
722 F.Supp. 283 (N.D. Miss. 1989) ................................................................13

*U.S. Dominator v. Factory Ship Robert E. Resoff,*
768 F.2d 1099 (9th Cir. 1985) .........................................................................28

xv

TABLE OF AUTHORITIES

*Universal City Studios, Inc. v. Kamar Industries, Inc.*,
217 U.S.P.Q. (BNA) 1162 (S.D. Texas 1982) ................................................48

*Walt Disney Prods. v. Air Pirates*,
581 F.2d 751 (9th Cir. 1978) ........................................................................70

*Wang v. Chinese Daily News, Inc.*,
435 F.Supp.2d 1042 (C.D. Cal. 2006) ..........................................................79

*Williams v. UMG Recordings*,
281 F. Supp. 2d 1177 (C.D. Cal. 2003) ........................................................45

*Wilkie v. Santly Bros., Inc.*,
139 F.2d 264 (2d Cir. 1943) ...........................................................................8

*Winfield Coll., Ltd. v. Gemmy Indus., Corp.*,
311 F. Supp. 2d 611 (E.D. Mich. 2004) ........................................................70

*Wooddell v. International Bhd. Of Elec. Workers, Local 71*,
502 U.S. 93 (1991) ........................................................................................11

*Woods v. Bourne Co.*,
60 F.3d 978 (2d Cir. 1995) .......................................................... 42, 49-50, 57

*Woods v. Universal City Studios, Inc.*,
920 F.Supp. 62 (S.D.N.Y. 1996) ..................................................................70

*Yang Ming Marine Transp. Corp. v. Oceanbridge Ship. Int'l, Inc.*,
48 F.Supp.2d 1032 (C.D. Cal. 1999) ............................................................78

*Zuill v. Shanahan*,
80 F.3d 1366 (9th Cir. 1996) .......................................................................4-5

**State Cases**

*Combs v. Ritter*,
100 Cal.App.2d 315 (1950) .............................................................................5

*Durgom v. Janowiak*,
74 Cal.App.4th 178 (1999) ..............................................................................4

*Gillmor v. Gillmor*,
694 P.2d 1037 (Utah 1984) ..............................................................................5

*Hermit's Glen Prods., Inc. v. Twentieth Century Fox Film Corp.*,
1997 WL 302292 (Cal. Super. Ct. 1997) ......................................................12

*Higgins v. Eva*,
204 Cal. 231 (1928) .......................................................................................4-5

*Michael v. Dyke*,
41 S.W.3d 746 (Tex. App. 2001) ..................................................................12

*Palmer v. Protrka*,
257 Or. 23 (Or. 1970) ......................................................................................5

*Perez v. Hernandez,*
658 S.W.2d 697 (Tex.App. 13 Dist. 1983).................................................5

*R&B Auto Center, Inc. v. Farmers Group, Inc.,*
140 Cal.App.4th 327 (2006) .........................................................29

## **Federal Authorities**

11 U.S.C. § 1111 .........................................................................13

17 U.S.C. § 7 (repealed) ..............................................................32

17 U.S.C. § 26 (repealed) ............................................................30

17 U.S.C. § 101 .....................................................................*passim*

17 U.S.C. § 102(a) .................................................................*passim*

17 U.S.C. § 102(b) .....................................................................70

17 U.S.C. § 103(a) .....................................................................40

17 U.S.C. § 103(b) ................................................................. 65-66

17 U.S.C. § 106 ...............................................................45-46, 48

17 U.S.C. § 114(b) ................................................................ 39-40

17 U.S.C. § 304(c) ................................................................*passim*

17 U.S.C. § 408(b) .....................................................................60

17 U.S.C. § 411(a) .....................................................................55

17 U.S.C. § 504(b) ................................................................*passim*

37 C.F.R. § 202.1(a) .............................................................47, 65

37 C.F.R. § 202.10(b) ...........................................................52, 68

Berne Convention, Art. 2(3) .........................................................64

F.R.C.P. 16(b) .......................................................................27, 30

F.R.C.P. 53(a) ..................................................................... 16-17

F.R.C.P. 56(e) ...........................................................................78

F.R.E. 901 ................................................................................79

H.R. Rep. No. 94-1476 (1976) ................................................*passim*

S.Rep. 94-473 (1976) ..................................................................37

TABLE OF AUTHORITIES

"Advisory Committee Notes to the 2003 amendment of Rule 53" ................... 16

*Compendium of Copyright Office Practices* § 5.03.02(a) (1984) ..................... 62

*Compendium II, Compendium of Copyright Office Practices* 910-04 .............. 65

**<u>Other Authorities</u>**

Dratler & McJohn,
3 *Intellectual Property Law: Commercial Creative and Industrial Property* §
6.04A[3][a] (2008) ................................................................................................. 73

Jones, Rosen, Wegner,
*Federal Civil Trials and Evidence* § 4:319 (2007) ............................................ 29

Jones, Rosen, Wegner,
*Federal Civil Trials and Evidence* § 4:46-54 (2007) ........................................ 29

H. Miller & M. Starr,
3D *Miller & Starr California Real Estate* § 12:8 (2007) .................................... 5

M Nimmer & D. Nimmer,
1 *Nimmer on Copyright* ("*Nimmer*") § 1.01 .................................................... 44

1 *Nimmer* § 2.03[D] ................................................................................. 70-71

1 *Nimmer* § 2.08[B] ...................................................................................... 53

1 *Nimmer* § 2.08[G] ................................................................................. 55-56

1 *Nimmer* § 2.12 ........................................................................................... 48

1 *Nimmer* § 3.01 ........................................................................................... 37

1 *Nimmer* § 3.03[A] ...................................................................................... 48

1 *Nimmer* § 3.04[A] ...................................................................................... 63

1 *Nimmer* § 3.06 ........................................................................................... 67

1 *Nimmer* § 5.03 ........................................................................................... 33

1 *Nimmer* § 6.03 ........................................................................................... 49

1 *Nimmer* § 6.10 ........................................................................................... 49

1 *Nimmer* § 6.12[B] ...................................................................................... 21

2 *Nimmer* § 7.16[B] ...................................................................................... 55

3 *Nimmer* § 9.05[A] ...................................................................................... 73

3 *Nimmer* § 10.01[C] ..................................................................................... 60

3 *Nimmer* § 11.02[B] ................................................................................. 37-38

xviii

TABLE OF AUTHORITIES

3 *Nimmer* § 11.02[C] ...................................................................................... 42

3 *Nimmer* § 11.05[B] ...................................................................................... 73

3 *Nimmer* § 12.01[A] ........................................................................................ 4

3 *Nimmer* § 12.10[A] ................................................................................. 33-34

3 *Nimmer* § 12.11[F] ........................................................................................ 9

3 *Nimmer* § 13.03[B] ...................................................................................... 71

3 *Nimmer* § 14.03[A] ...................................................................................... 15

4 *Nimmer* § 14.03[C] ........................................................................................ 8

3 *Nimmer* § 14.03[D] ........................................................................................ 5

3 *Nimmer* § 14.03[E] ...................................................................................... 14

W. Patry,
1 *Patry on Copyright* ("*Patry*") § 2:17 .......................................................... 73

1 *Patry* § 2:21 .................................................................................................. 73

2 *Patry* § 7:27 .................................................................................................. 73

2 *Patry* § 7:43 .................................................................................................. 73

6 *Patry* § 22:119 ................................................................................................ 9

6 *Patry* § 22:120 .............................................................................................. 10

6 *Patry* § 22:121 .............................................................................................. 10

Scwharzer, Tashima, Wagstaffe
*California Practice Guide: Federal Civil Procedure Before Trial*, § 14:64 ..... 28

B.E. Witkin *et. al.*,
4 *Summary of California Law*, § 270 (9th Ed. 1990) .......................................... 5

*Am.Jur. 2d Cotenancy and Joint Ownership* § 69 ............................................. 5

75 *Am.Jur.2d Trial* § 99 (2004) ......................................................................... 5

16 *Cal. Jur.3d Cotenancy and Joint Ownership* § 44 (2008) ............................ 5

*Corpus Juris Secundum Tenancy* § 92 ............................................................... 5

*Corpus Juris Secundum on Accounting* § 44 ...................................................... 9

*Corpus Juris Secundum on Accounting* § 52 ...................................................... 9

1 *Gilson on Trademarks* § 2A.10 ...................................................................... 44

3 *Gilson on Trademarks* § 8.06 ........................................................................ 58

xix

TABLE OF AUTHORITIES

1 *McCarthy on Trademarks and Unfair Competition* § 6:14 .............................49

1 *McCarthy on Trademarks and Unfair Competition* § 6:17.50 .......................44

8-38 *Moore's Federal Practice – Civil* § 38.10 .................................10

8-38 *Moore's Federal Practice – Civil* § 38.31 .................................12

31 *Trials Digest 2d* 10 .....................................................12

9C *Wright & Miller: Federal Prac. & Proc.* § 2604 .........................16

Lauren Beth Emerson, Note, *Termination of Transfer of Copyright: Able to Leap Trademarks in a Single Bound?* 75 FORDHAM L. REV. 207 at 250–51 (2006).....................................46

Laura A. Heymann, Article, *The Trademark/Copyright Divide,* 60 SMU L. REV. 55, 81 (2007) .............................................44

Sheldon W. Halpern, Article, *A High Likelihood of Confusion: Wal-Mart, Traffix, Moseley, and Dastar – The Supreme Court's New Trademark Jurisprudence,* 61 N.Y.U. ANN. SURV. AM. L. 237 ..................................46

Janine V. McNally, *Congressional Limits on Technological Alterations to Film: The Public Interest and the Artists' Moral Right,* 5 HIGH TECH. L.J. 129 (1990)..........................................39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES

# **INTRODUCTION**

The Court's March 26, 2008 order ("Order") on the parties' cross-motions for partial summary judgment upheld the validity of Plaintiffs Joanne Siegel and Laura Siegel Larson's ("Plaintiffs") Superman Notices of Termination and Plaintiffs' recapture pursuant to 17 U.S.C. § 304(c) of Jerome Siegel's co-authorship share of the original illustrated Superman story published in *Action Comics No. 1* ("*Action Comics No. 1*").  Defendants concede, as they must, that as joint copyright owners, Plaintiffs are entitled to an accounting from April 16, 1999, the effective termination date, seek to *substantially* encumber and reduce the Superman profits payable to Plaintiffs via a draconian  "apportionment" analysis, the "promotional announcements" ("Ads") and deflection to alleged trademarks.  In its March 31 and July 3, 2008 orders, the Court ordered briefing on the following issues:

**Apportionment**:  Firstly, no "apportionment" of profits should apply to Plaintiffs' accounting claim.  It is well settled that an accounting between copyright co-owners is *not* governed by federal copyright law, but by state law governing tenancies in common.  Under such law, co-tenants must account for *all* profits from a co-owned property; one co-tenant cannot be charged, directly or indirectly, for another's unilateral modifications or improvements to co-owned property.

Burden of Proof:  If "apportionment" is nonetheless applied, Defendants will bear the burden of proof on both "apportionment" and expenses to be deducted from post-termination Superman profits.

Jury Determinations:  Plaintiffs' claim for Superman profits, and "apportionment," if applicable, must be tried to a jury.  The calculation of money owed is "legal" in nature, both in terms of the relief sought and its historical derivation, and the Seventh Amendment guarantees the right to a jury trial on such claims.  Such accounting is *functionally* equivalent to an accounting for profits in a copyright infringement case, in which the determination of profits and any "apportionment" are always tried to a jury.  If Defendants are permitted to import

1

"apportionment" from such copyright infringement cases, they cannot "cherry pick" its application.

Special Master:  If "apportionment" applies, Defendants' proposal that a special master undertake a laborious work-by-work analysis of all post-termination Superman works is unnecessarily burdensome, unworkable and futile.  As Plaintiffs have the right to a jury trial, the appointment of any special master to decide profits and/or "apportionment" would also be constitutionally suspect.  Moreover, the trier of fact is not required to make a separate "apportionment" determination for *each* of the thousands of post-termination Superman products.  Instead, if "apportionment" applies, the parties should present to the jury a Superman template – weighing and comparing Plaintiffs' recaptured Superman elements with any Superman elements exclusively retained by Defendants – as together these elements comprise the Superman mythos that is licensed and exploited.  From this evaluation, a ratio (%) can rationally be determined and reasonably be applied to any Superman profits.

**Works-Made-For-Hire**:  Defendants are improperly moving for partial summary judgment on outstanding "work-made-for-hire" issues long after the dispositive motion deadline in the guise of a motion *in limine.*  These tactics run afoul of the Court's Standing and Scheduling Orders and ignore that such matters present multiple genuine issues of material fact that cannot be decided on summary judgment.

**Post-Termination Alterations To Pre-Termination Works**:  As a matter of law Defendants must account to Plaintiffs for any pre-termination Superman works that qualify as "new" derivative works due to a "distinguishable variation" that is more than "merely trivial."  Specifically, a post-termination DVD release of a pre-termination work with:  (a) new or edited footage; (b) new "pan-and-scan" reformatting; (c) new audio "mixes"; (d) new foreign-language subtitles or "dubbed" foreign language audio tracks; (e) new overlaid "commentary tracks"; or (f) other material modifications/additions to be determined at trial, would constitute, as a matter of law, a new derivative works, for which Defendants must account.

2

**Trademarks**:  Firstly, Defendants cannot use their alleged trademarks to devalue or encumber Plaintiffs' recaptured Superman copyrights.   The U.S. Supreme Court clearly held in *Dastar*, *infra*, that trademarks may not encroach on the constitutional domain of copyrights.  Secondly, Defendants must account for profits from any "mixed uses" of trademark and copyright, where a trademark itself constitutes copyrightable material derivative of *Action Comics No. 1*, and/or a trademark is used in conjunction with derivative copyrightable material.

**Ads**:  Plaintiffs' recaptured copyrights in *Action Comics No. 1* are not in any way encumbered by Defendants' retained copyright in the Ads.  Pursuant to well settled copyright precepts concerning "publication" and "derivative works," Defendants' first publication and protective statutory copyright in *the Ads* do not detract from or encumber Plaintiffs' statutory copyright in *Action Comics No. 1,* which was published and duly registered with the Copyright Office shortly thereafter.  Moreover, as the grantee's derivative works, not authored by Jerome Siegel, the Ads were never subject to recapture.  Under the "derivative works exception" in 17 U.S.C. § 304(c)(6)(a), Defendants may exploit the Ads themselves but may not exploit new Superman works based on the Ads without accounting to Plaintiffs.   To the extent that Defendants even hold a copyright in the Ads' entirely unoriginal reproduction of *Action Comics No. 1's* prior cover, such depiction is devoid of Superman context.  The Ads thus do not give Defendants exclusive ownership of any *Superman* elements.

**_Action Comics No. 1_**:  The historical background section of the Court's Order included a description of the contents of *Action Comics No. 1*, which Plaintiffs believe was provided as background to orient the reader.  Since Defendants misconstrue the Court's statements as a definitive "ruling," Plaintiffs seek confirmation that the Court did not render conclusive findings as to the disputed literary contents of *Action Comics No. 1,* which constitute genuine issues of material fact for trial.

# ARGUMENT

## I.   UNDER APPLICABLE STATE LAW GOVERNING TENANCIES IN COMMON, DEFENDANTS MUST ACCOUNT FOR ALL PROFITS FROM SUPERMAN WITHOUT ANY "APPORTIONMENT"

### A.   Plaintiffs' Accounting Claim Is Governed By State Law Re: Tenancies in Common, Not By Federal Copyright Law

The Court has ruled that Plaintiffs and Defendants jointly own at least the *Action Comics No. 1* copyright.  *See* Order at 72.   It is well settled that a copyright co-owner must account to other co-owners for profits derived from exploitation of the copyright pursuant to state common law governing tenancy in common.  *See Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984).[1]   Both federal and California courts have consistently held that such an accounting action is governed by *state law* and does not arise under copyright law.  *See* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 12.01[A][1][b] ("*Nimmer*")(As there can "be no copyright infringement between co-authors of a work, it follows that state courts have exclusive competence to determine the fact of co-authorship and the rights of …*accounting* that flow therefrom."); *Dead Kennedys v. Biafra,* 37 F.Supp.2d 1151, 1153 (N.D. Cal. 1999)("An action for an accounting or determination of ownership as between alleged co-owners is founded in state law and does not arise under the copyright laws."); *Durgom v. Janowiak,* 74 Cal. App. 4th 178 (1999)(same).

### B.   Under California Law Governing Tenancies in Common, Improvements Inure to the Benefit of All Co-Owners

Under California law governing tenancies in common, Defendants are not

---

[1] *Zuill v. Shanahan,* 80 F.3d 1366, 1369 (9th Cir. 1996)("duty to account to other co-owners for profits arises from…general [state] principles of co-ownership"); *Gaiman v. McFarlane,* 360 F.3d 644, 652 (7th Cir. 2004)("[A] joint copyright owner is a cotenant."); *Community for Creative Non-Violence v. Reid,* 846 F.2d 1485, 1498 (D.C. Cir. 1988)("Joint authors co-owning copyright in a work are deemed to be tenants in common."); *Goodman v. Lee,* 78 F.3d 1007, 1012 (5th Cir. 1996) ("Significantly, *'the duty to account does not derive from the copyright law's proscription of infringement.  Rather, it comes from '... general principles of [state] law governing the rights of co-owners.'"*), *citing Oddo,* 743 F.2d at 633; *Morrill v. Smashing Pumpkins,* 157 F.Supp.2d 1120, 1126 (C.D. Cal. 2001)(same); H.R. Rep. No. 94-1476, at 120 (1976)("Under the bill, as under the present law, co-owners of a copyright would be treated generally as tenants in common…").

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

entitled to any "apportionment" or adjustment for their modifications or purported improvements to the Superman character subsequent to *Action Comics No. 1*.  One tenant in common may not impose the financial burden of unilateral modifications or improvements on another nor withhold profits attributable to same.  *See Higgins v. Eva*, 204 Cal. 231, 238 (1928); *Combs v. Ritter*, 100 Cal.App.2d 315, 317 (1950); 4 B.E. Witkin *et. al.*, *Summary of California Law*, § 270 (9th Ed. 1990)(tenant in common "not ordinarily entitled to [contribution or] compensation for services rendered in care and management of the property").[2]  That state tenancies in common often arise in the real property context is of no legal consequence.[3]

As the Ninth Circuit has consistently held that an accounting between copyright co-owners is governed by "general principles [of state law] governing the rights of co-owners," the parties and this Court are clearly directed to apply such law, *not* federal copyright law.  *Oddo,* 743 F.2d at 633, *Zuill,* 80 F.3d at 1369.

## C.   Defendants Cannot Use Federal Copyright Infringement Law To Reduce Defendants' State-Governed Accounting Obligations

"Apportionment" has evolved over years of *federal copyright infringement* jurisprudence.  *See* 3 *Nimmer* § 14.03[D].  Defendants impermissibly seek to import this *federal* infringement doctrine to dilute Plaintiffs' *state-law* accounting claims.

Defendants cannot cherry-pick the application of law on a results-oriented

---

[2] *See also* 3D Harry D. Miller & Marvin B. Starr, *Miller & Starr California Real Estate* § 12:8 (2007)(In California,"in the absence of an authorization by the other cotenant or an agreement between the cotenants, one cotenant is not entitled to contribution and cannot recover … against a cotenant for improvements or repairs made on the common property."); 16 *Cal. Jur.3d Cotenancy and Joint Ownership* § 44 (2008) ("No personal judgment may be recovered against a cotenant for improvements or repairs made on the common property, in the absence of … proper authorization.").

[3] Non-California law governing tenants in common is the same. *See Bras v. Bras*, 463 F.2d 413, 415–16 (10th Cir. 1972)(no right of contribution from co-tenants when improvements were made with co-tenant's knowledge but without prior consent); *Palmer v. Protrka*, 257 Or. 23, 31–32, 476 P.2d 185 (1970)(same); *Perez v. Hernandez*, 658 S.W.2d 697 (Tex.App. 1983)(same); *Gillmor v. Gillmor*, 694 P.2d 1037 (Utah 1984)(same); *Am.Jur. 2d Cotenancy and Joint Ownership* § 69 ("Improvements made by one cotenant without the consent of all other cotenants inure to the benefit of all cotenants, but those cotenants cannot later be forced to contribute a part of the cost of improvements if they have not given their consent."); *Corpus Juris Secundum Tenancy* § 92 (same).

5

1    basis.  The Court may recall that on the issue of Plaintiffs' entitlement to foreign

2    profits, Defendants did not hesitate to distinguish the law governing Plaintiffs' state

3    accounting claim from copyright infringement jurisprudence.  Under the "predicate

4    act" doctrine, a prevailing plaintiff can recover profits earned abroad which flow from

5    acts of copyright infringement in the United States.  Defendants vigorously opposed

6    the application of such doctrine *on the basis that this is not a copyright infringement*

7    *action.* [4]  *See* Defendants' Motion for Partial Summary Judgment ("Defs. MSJ") at 25.

8    ("In *Oddo v. Reis*, *supra*, 743 F.2d at 633, the Court held that, as between co-owners

9    of a copyright, 'the duty to account does not derive from the copyright law's

10   proscription of infringement. Rather it comes from … general principles of law

11   governing the rights of co-owners.'")  Despite the analogous "predicate act" doctrine,

12   Plaintiffs were held not entitled to foreign profits from Superman works produced in

13   the United States.  *See* Order at 66:13-25.

14        Defendants obliquely argue that as they have the non-exclusive right to exploit

15   *Action Comics No. 1* they should not be treated worse than an infringer. Firstly,

16   *scienter* is not an element of copyright infringement, and even an innocent infringer is

17   liable under copyright law.  *See Dielsi v. Falk*, 916 F.Supp. 985, 992 (C.D. Cal.

18   1996)("copyright infringement…does not require scienter"); *Fitzgerald Pub. Co. v.*

19   *Baylor Pub. Co.*, 807 F.2d 1110, 1114 (2d Cir. 1986)("Even an innocent infringer is

20   liable for infringement.").  Secondly, the application of state substantive law is neither

21   governed nor avoided by analogizing to federal law.  The application of state law to a

22   tenancy in common does not turn on whether the parties are being treated "better" or

23

24   [4] However, the "predicate act" doctrine, like an accounting claim, is grounded in equitable principles of *constructive trust*.  *Compare* 3 *Nimmer* §11.02[B][2] ("When an infringing work is produced in the United States the copyright owner acquires an equitable interest

25   therein … [and] the work is thereafter impressed with a constructive trust so that plaintiff is entitled to profits accruing from the exploitation of the work anywhere in the world.") *with*

26   *Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 646-47 (S.D.N.Y. 1970)(holding, as between co-owners of music copyrights "compensation obtained from the unilateral

27   exploitation of the joint work by one of the co-owners without the permission of the others is held in a 'constructive trust' for the mutual benefit of all co-owners and there is a duty to

28   account therefore.")(citations omitted).

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

"worse" than under federal copyright law; the relationships and law are categorically "different." Here, under bedrock state law principles governing tenants in common, Plaintiffs cannot be held financially responsible via the reduction of their profits for Defendants' unilateral modifications or improvements to the Superman property.

*Defendants have not yet cited a single case allowing "apportionment" between tenants in common, whereas Plaintiffs cite clear state authority that such reductive allocations are never permitted.* The apportionment advocated by Defendants should be denied as without legal precedent and contrary to governing state law.

As the Court has noted, "Congress placed certain limitations on what authors (or their heirs) gained from exercising the termination right," in large part due to the "objections by publishers." Order at 63:12-17. As the express purpose of the termination provisions was to benefit and reward authors, *Mills Music Inc. v. Snyder*, 469 U.S. 153, 172 (1985), any balancing between authors and their grantees must be found in the statute itself, such as the grantee's ability to continue to exploit pre-existing derivative works (§304(c)(6)(A)) and the exclusion of rights arising under other laws (§304(c)(6)(E)). *See* Order at 68:13-25 (excluding foreign profits); 68:1-4 (excluding "pure" trademark uses and "unaltered" pre-existing derivative works). Defendants cannot import doctrines from non-governing copyright infringement law for self-serving "balancing," when the "balance" has already been struck by Congress.

### 1. Apportionment Would Function Inequitably in this Action

This Court should refrain from applying Defendants' proposed apportionment analysis for the additional reason that it is especially inappropriate in a dispute between joint owners of a copyrighted work, where joint owners are to share equally in all profits. *See Oddo*, 743 F.2d at 633 (A co-owner "can be required to account to [another co-owner] for any profits he has made from use of those copyrights.")

Defendants nonetheless seek to apportion profits for every new aspect of a Superman derivative work. For instance, with respect to a derivative Superman motion picture, Defendants advocate apportioning Plaintiffs' profit share for the plot,

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

the director's prowess, the stars, special effects and production values.  However, this makes no logical or economic sense, and the results would be extremely inequitable. As profits from a derivative work equals revenues minus expenses, Plaintiffs, as a 50% participant in its profits, if any, *effectively* "bears" 50% of its costs.  Therefore, Plaintiffs' profits already include an allocated share of the fixed and contingent (*i.e.*, "back-end") compensation for the story (screenwriters' compensation), direction (director's compensation), special effects and production values, which in Hollywood are very substantial.  Plaintiffs' co-ownership share of the profits from such Superman works thus inherently reflect and are already "apportioned" for such elements.

To further reduce Plaintiffs' profits by once again apportioning for such elements would be "double counting" or "double dipping," which is manifestly unfair.[5]  This problem is further exacerbated by Defendants' inflation of their alleged "expenses" by notorious "Studio accounting" practices and the deduction of imputed overhead, imputed interest, and imputed distribution fees (in addition to overhead).[6]

## II.   DEFENDANTS BEAR THE BURDEN OF PROVING THE SCOPE OF ANY APPORTIONMENT APPLICABLE TO SUPERMAN PROFITS

If Defendants are, contrary to governing state law,  allowed to apportion the

---

[5] Copyright law is quite concerned with "double-counting" profits in the calculation of remedies. *See, e.g.,* 17 U.S.C. § 504(b)("The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."); *Bouchat v. Bon-Ton Dep't Stores, Inc.,* 506 F.3d 315, 328 (4th Cir. 2007)("In deciding … profits… exclude certain amounts calculated as actual damages to avoid double counting."); *Bucklew v. Hawkins, Ash & Baptie, LLP,* 329 F.3d 923, 931 (7th Cir. 2003)(J. Posner)("That would be double counting.").  The same concern should apply with equal force to Defendants' deduction of massive expenses while advocating additional "apportionment" of profits for the expensed items.

[6] The unfairness of Defendants' position is especially heightened insofar as Defendants claim a right to "cross-collateralize" their losses – that is, they seek to charge inflated claimed losses on purportedly unprofitable projects (*e.g., Superman Returns*) against minimized gains on profitable projects (*e.g., Smallville*).  "Cross-collateralization" is improper in itself because Plaintiffs, as joint owners of the Superman copyright are not Defendants' partners, as a matter of law, nor accountable for Defendants' losses.  *See, e.g., Wilkie v. Santly Bros., Inc.,* 139 F.2d 264, 265 (2d Cir. 1943); 4 *Nimmer* § 14.03 [C][3].  When combined with apportionment, such "cross-collateralization" is particularly egregious, as it results in Plaintiffs, who had no say in Defendants' lavish spending, having to pay in full for half such losses while only joining in a reduced part of Defendants' gains.

8

profits payable to Plaintiffs Defendants would bear the burden of proof as to such "apportionment."  As noted above, "apportionment" is a product of copyright infringement cases.  When applied, the defendant clearly bears the burden of proving "apportionment" pursuant to 17 U.S.C. § 504(b):  "[I]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and elements of profit attributable to factors other than the copyrighted work."  Accordingly, all gross revenue is presumed to be profit "attributable to the infringement," unless the infringer can demonstrate otherwise.  *Nelson-Salabes, Inc., v. Morningside Dev., LLC*, 284 F.3d 505, 512 n.9 (4th Cir. 2002).

Thus, "the burden of proving apportionment…is the defendant's."  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985).  *See Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828 (9th Cir. 1985); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc*., 592 F.2d 651, 657 (2d Cir. 1978) ("[P]lacing the apportionment burden on defendants best comports with our admonition that in apportioning profits 'every indulgence should be granted plaintiff in an attempt to arrive at a sum which is assuredly adequate.'")(cit. om.); W. Patry, *Patry on Copyright* ("*Patry*") § 22:119("[S]ection 504(b) places the burden on defendant on apportionment and deduction of expenses.").[7]

Moreover, as "apportionment" is an affirmative defense raised by Defendants, they must bear the burden.  *See Polar Bear Prods. v. Timex Corp.*, 2004 U.S. App. LEXIS 22131 at *27, *32 (9th Cir. 2004); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 487 (9th Cir. 2000); 3 *Nimmer* 12.11[F] ("Of course, as a matter of

---

[7]  *See also McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003) ("[Defendant] had the burden of proving apportionment to the jury."); *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998)(same); *Rondor Music Int'l, Inc. v. TVT Records LLC*, 2006 U.S. Dist. LEXIS 97118 at *25-26 (C.D. Cal. 2006) (same); *General Corp. v. Grumman Sys. Support Corp*., 36 F.3d 1147, 1171, 1175 (1st Cir. 1994)("The defendant's burden under the apportionment provision of Section 504(b) is primarily to demonstrate the absence of a causal link between the infringement and all or part of the profits claimed by the plaintiff.").

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

definition, the defendant bears the burden of proof as to all affirmative defenses.").[8]
Defendants should also bear this burden "since in most cases all information regarding
profits is exclusively in the[ir] possession." *Lottie Joplin,* 592 F.2d at 657. *See Patry*,
§ 22:121("defendant has the best information about the effects of its own conduct").

Defendants must take the "good" with the "bad." They cannot import
"apportionment" from copyright infringement cases while ignoring the burden of
proof associated therewith.[9]

## III.   AN ACCOUNTING AND DEFENDANTS' AFFIRMATIVE APPORTIONMENT DEFENSE REQUIRE A JURY TRIAL

### A.   The Right to Jury Trial Attaches to an Accounting for Profits

#### 1.   In Federal Court the Fundamental Right to a Jury Trial Is To Be Liberally Construed in All Cases

Federal Courts view the right to a jury trial as a fundamental constitutional right
that must be *liberally construed. See Beacon Theatres, Inc. v. Westover*, 359 U.S.
500, 501 (1959) ("Maintenance of the jury as a fact-finding body is of such
importance and occupies so firm a place in our history and jurisprudence that any
seeming curtailment of the right to a jury trial should be scrutinized with the utmost
care."); *Granfinanciera v. Nordberg*, 492 U.S. 33, 48 (1989) ("[T]he long-settled rule
that suits in equity will not be sustained where a complete remedy exists at law . . .
serves to guard the right of trial by jury preserved by the Seventh Amendment and to
that end it should be liberally construed."); *Schoenthal v. Irving Trust Co.*, 287 U.S.
92, 94 (1932)("[T]he right of trial by jury … should be liberally construed.").

As such, federal courts *strongly* favor juries on disputed questions of fact:

---

[8] This also comports with the burdens in an accounting action. *See C.J.S. Accounting* § 44 ("[T]he party seeking to avoid the accounting has the burden as to matters of defense"); *C.J.S. Accounting* § 52 ("The burden of proving the correctness of an account rests on the party making it, and any doubt created by errors or omissions are resolved against that party…").

[9] Additionally, it must be noted that any doubt in assessing apportionment must be construed against the Defendants. *See Sheldon v. Metro-Goldwyn Pictures Corporation*, 106 F.2d 45, 51 (2d Cir. 1939)(J. Hand)("It is not our best guess that must prevail, but a figure which will favor the plaintiffs in every reasonable chance of error."). *See also* 3 *Nimmer* § 14.03[D][1]; *Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876 (9th Cir 1992); *Patry* § 22:120**.**

10

1
2
3

> "It has been held that the right to jury trial under the Seventh Amendment should be liberally construed, and that when there is doubt, the balance is tilted in favor of a jury trial.  The strong federal policy favoring jury trials provides the impetus for finding the right to jury trial in questionable cases.  When the court has discretion, it is 'very narrowly limited, and must, wherever possible, be exercised to preserve jury trial.' "

4   8-38 *Moore's Federal Practice – Civil* § 38.10[1][d], *quoting Beacon Theatres,* 359

5   U.S. at 510.  *See Simler v. Conner*, 372 U.S. 221, 222 (1963) ("The federal policy

6   favoring jury trials is of historic and continuing strength."); *Atlantic & Gulf*

7   *Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 360 (1962).

8
9

> 2.   Federal Courts Apply Federal Law in Assessing the Right to a Jury Even When the Claim Arises Under State Law

10   When litigants bring state-law claims in federal court, the court looks to

11   comparable federal law to determine whether the constitutional right to a jury trial

12   attaches.  *Simler*, 372 U.S. at 222.  The "characterization of that state-created claim as

13   legal or equitable for purposes of whether a right to jury trial is indicated must be

14   made by recourse to federal law," and is not dependent on whether the state law

15   characterizes the claim as "legal" or "equitable."  *Id.*  Thus whether or not California

16   law characterizes an accounting between co-owners as "equitable" is *not*

17   determinative of the right to a jury in federal court. [10]

18   For example, in *Simler* the U.S. Supreme Court ruled that the right to a jury trial

19   applied to a declaratory action in federal court between an attorney and a client over

20   fees, even though the claim arose under Oklahoma state law and the plaintiff would

21   not have enjoyed the jury-trial right in Oklahoma state court.  372 U.S. at 221–22.

22   The Supreme Court nonetheless ruled that the declaratory relief claim was effectively

23   "legal" in nature and that the Seventh Amendment right to a jury applied.  *Id.*

24
25

> 3.   An Accounting for Profits Is Legal Both in Terms of the Relief Sought and its Historical Derivation

26   _____

27   [10] The statement in *Oddo*, 743 F.2d at 633 ("[S]uch duty to account is derived from 'equitable doctrines relating to unjust enrichment and general principles of [state] law governing the rights of co-owners.'")(cit. om.) is descriptive of *state law* and by no means

28   constitutes a ruling regarding the Seventh Amendment right to a jury trial as to monetary damages, which is governed by federal law.

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

To determine whether the plaintiff has the right to a jury trial, the court looks to (i) the nature of the *relief* sought, *Wooddell v. International Bhd. Of Elec. Workers, Local 71*, 502 U.S. 93, 97 (1991); *Teamsters v. Terry*, 494 U.S. 558, 565 (1990), and (ii) comparable 18th century actions brought in the common law courts of England before the merger of law and equity. *American Express Travel Related Servs. Co. v. Hashemi*, 104 F.3d 1122, 1124 (9th Cir. 1996).

Here, Plaintiffs seek a calculation of their monetary damages (*i.e.*, the finder of fact determines the amount of money owed Plaintiffs by calculating Defendants' revenues and allocable expenses). *See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977)(federal courts should not "deprive the parties of a jury on what is basically a money claim for damages."). Plaintiffs' request for a profit "accounting" connotes a *remedy* more than a cause of action *per se*. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78 (1962); *Swofford v. B & W, Inc.*, 336 F.2d 406, 409–10 (5th Cir. 1964); *Towers v. Titus*, 5 B.R. 786, 793–94 (N.D. Cal. 1979); *Michael v. Dyke*, 41 S.W.3d 746, 754 (Tex. App. 2001). [11]

Moreover, accounting claims originated in the common law courts, not the courts of equity. 8-38 *Moore's Federal Practice – Civil* § 38.31. [12]  Plaintiffs' action is also similar to actions for money owed, which originated in the common law courts, not the courts of equity. *Id*. Plaintiffs' action arises from the duty owed between joint owners to account to one another for profits from the exploitation of their copyright. *Oddo*, 743 F.2d at 633.  Defendants therefore occupy a position similar to that of a guardian or receiver, whose duty to account was originally recognized in the common

---

[11] Moreover, juries routinely award damages in the form of the defendant's profits in disputes arising in the entertainment industry. *Hermit's Glen Prods., Inc. v. Twentieth Century Fox Film Corp.*, 1997 WL 302292 (Cal. Super. Ct. 1997), 31 Trials Digest 2d 10 (awarding filmmaker Ron Shelton and his company profit participation moneys for the motion picture "White Men Can't Jump").

[12] *See also Daisy Group v. Newport News*, 999 F. Supp. 548, 552 (S.D.N.Y. 1998) ("Indeed, the action for accounting originated in the <u>common law</u>, not in equity … A claim of accounting for profits … did not give rise to equity jurisdiction."); *Towers*, 5 B.R. at 793 ("Although an action for accounting originated in common law courts, its availability at law was short-lived.").

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

law courts.  8-38 *Moore's Federal Practice – Civil* § 38.31.  Accounting actions evolved into the action of general assumpsit for money had and received, in which all issues were tried by a jury.  *Id.*  Plaintiffs' action is in the nature of an action to collect a debt owed, rather than an action to enforce a fiduciary duty.  As courts have recognized, actions on debts have been routinely tried by the courts of law, not the equity courts.  *U.S. v. Higginbotham, Inc.*, 722 F. Supp. 283, 285 (N.D. Miss. 1989).

> 4.   Plaintiffs' Claim for Profits Is Functionally Equivalent to an Accounting of Profits in a Copyright Infringement Case to Which the Constitutional Right to a Jury Trial Applies

Defendants will contend that Plaintiffs are not entitled to a jury on the fact-intensive issue of profits by arguing that "accounting claims" *per se* are equitable, not legal.  Defendants' form over substance argument is inherently flawed in that it ignores the modern federal trend that rejects such formalistic distinctions, "favor[s] jury trials" and liberally construes the Seventh Amendment.  *Simler,* 372 U.S.at 222.

In both copyright and trademark infringement actions, the plaintiff is entitled to actual damages and defendant's profits.  *See* 17 U.S.C. § 504(b) and 15 U.S.C. § 1117(a), respectively.  Whereas money damages are legal, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) ("Money damages are, of course, the classic form of *legal* relief."),  Defendants will argue that a claim for "profits" is "equitable" as it requires defendants to disgorge profits to avoid unjust enrichment.  *Sheldon v. Metro-Goldwyn Pictures, Corp.*, 309 U.S. 390, 399–400 (1940) (prior to the 1909 Act copyright owners were awarded infringers' profits "in accordance with the principles governing equity jurisdiction … to prevent an unjust enrichment").  However, juries decide such accounting claims for *profits* in federal copyright, trademark and patent infringement cases in light of the modern trend.

In the seminal case of *Dairy Queen, Inc v. Wood*, the U.S. Supreme Court ruled that an accounting claim for profits from trademark infringement was legal.  Without dwelling on historical analogs, it reasoned that the claim resembled a common law action for debt despite the casting of the claim as an "accounting."  369 U.S. at 476–

13

77.[13]   Likewise, the Ninth Circuit in *Sid & Marty Krofft*, 562 F.2d at 1175, ruled that claims for profits in copyright infringement cases are "legal," *citing Swofford v. B & W, Inc.*, 336 F.2d 406, 410 (5th Cir. 1964)(holding that accounting claims for profits from patent infringement are legal).  The Ninth Circuit reasoned:

> "(A)n accounting for profits, although a creature of equity, is a rule of administration and not of jurisdiction. <u>The court of equity awarded compensatory damages incidental to an injunction to avoid multiplicity of suits and not because the jury lacked competence.</u> We do not believe that this practice in patent and copyright infringement cases, which was justified historically to avoid multiplicity of litigation in a divided procedure, should be continued in a merged system where such multiplicity can be avoided by one civil action. It is a well-settled doctrine that the distinction of jurisdiction, between law and equity, is constitutional, to the extent to which the Seventh Amendment forbids any infringement of the right of trial by jury, as fixed by the common law. To continue the past practice is to convert an administrative rule into a jurisdictional one so as to deprive the parties of a jury on what is basically a money claim for damages. . ."

562 F.2d at 1175.  The U.S. Supreme Court implicitly affirmed *Krofft* when it recently held that accounting for profits in copyright infringement cases "generally are thought to constitute legal relief."  *Feltner v. Columbia Pictures TV*, 523 U.S. 340, 346 (1998). *See Polar Bear*, 384 F.3d at 713, *Three Boys Music*, 212 F.3d at 487; 3 *Nimmer* § 14.03[E] ("Particularly after *Feltner* … the danger arises that denying trial by jury on this issue to a party who so requests will be deemed constitutionally suspect.").  Thus, modern federal law increasingly classifies previously "equitable" remedies for monetary relief as legal and within the Seventh Amendment right to a jury trial.

The determination of Plaintiffs' damages in the form of profits from their recaptured copyrights is *functionally equivalent* to the same determination in a copyright, trademark or patent infringement case.  Just as federal courts have looked in such cases past formalistic distinctions between law and equity, so should this Court focus on the practical implications of the monetary relief sought.

**B.    The Right to Jury Trial Attaches to Defendants' Apportionment Defense, Imported From Section 504(b) of Copyright Act**

---

[13] Similarly, courts have ruled that accounting claims are similar to common law claims when the claim is for a debt owed to the plaintiff by the defendant.  *See Higginbotham,* 722 F.Supp. at 285 ("In short, what this lawsuit is all about is whether or not a debt is owing … Such actions were routinely triable by juries at common law.").

14

The "apportionment" defense asserted by Defendants arises from 17 U.S.C. § 504(b).[14]  Under Section 504(b), apportionment is always performed by a jury, not the court.  *See Polar Bear*, 384 F.3d at 713 ("[W]e presume that the jury fulfilled its duty to apportion profits."); *Three Boys Music*, 212 F.3d at 487 (affirming "the jury's apportionment of the profits"); *Harper House*, 1987 U.S. Dist. LEXIS 14132 (affirming jury's apportionment of profits); 3 *Nimmer* § 14.03[A] ("It is up to the factfinder to weigh evidence about revenues and expenses.  Once the factfinder deducts appropriate expenses and apportions the amount due to the infringement, the balance represents defendant's profits.").[15]

As on the "burden of proof" discussed above, Defendants want the benefit of borrowing "apportionment" analysis from copyright infringement jurisprudence, while conveniently ignoring that *a jury* always decides "apportionment."  Defendants cannot "cherry pick" "apportionment," advocating those parts that support Defendants' objectives, while discarding those which may undermine them.  If Defendants insist on importing the "apportionment" defense, they cannot leave the jury behind.

Thus, as "apportionment" is clearly a jury issue, when claims for copyright profits entail "apportionment," both the accounting (*i.e.*, the calculation of profits) and apportionment aspects are routinely determined by the jury.  *See, e.g., Polar Bear,* 384 F.3d at 713 (upholding use of a jury to calculate copyright profits and

---

[14] Section 504(b) provides: "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."

[15] See *Gaste v. Kaiserman*, 863 F.2d 1061, 1070 (2d Cir. 1988)(upholding the jury's apportionment formula: "We find no grounds to reject the jury's decision to apportion no more than 12 percent for the lyrics"); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003)([Defendant] had the burden of proving apportionment to the jury."); *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 49 (1st Cir. 2003)(reversing jury's apportionment decision because of improper jury instructions).

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

apportionment).[16] It would make little practical sense to have a jury determine an "apportionment" of profits but not profits (*i.e*., revenues and allocable expenses).

## IV. A WORK-BY-WORK APPORTIONMENT ANALYSIS IS PROCEDURALLY IMPROPER, PRACTICALLY UNWORKABLE, AND LEGALLY UNNECESSARY

### A. The Appointment of a Special Master to Conduct a Work-by-Work Apportionment Analysis Would Be Completely Improper

Defendants propose the appointment of a special master to review each one of Defendants' tens of thousands of post-termination Superman works and "apportion" the elements in each work between *Action Comics No. 1* and other sources. The appointment of a special master, however, would encroach on the fact-finding role of the jury and violate the limitations in F.R.C.P. 53 to such appointments.

> 1. The Use of a Special Master to Conduct an "Apportionment" Analysis Would Improperly Intrude on the Role of the Jury in Violation F.R.C.P. 53

Rule 53(a)(1)(B) of the Federal Rules of Civil Procedure provides that a judge may appoint a master to "make or recommend findings of fact" without the parties' consent only "on issues to be decided without a jury." F.R.C.P. 53(a)(1)(A)-(B). The Advisory Committee Notes to the 2003 amendment of Rule 53 states that "[t]he use of a trial master without party consent is abolished as to matters to be decided by a jury unless a statute provides for this practice." *See also* 9C *Wright & Miller: Federal Prac. & Proc.* § 2604 ("Under the current version of Rule 53(a)(1)(A), which carries the 2003 amendment forward, masters now can be appointed in jury cases only when the parties have given their consent.")

As noted above, "apportionment," if applicable, is decided by a jury. *See Polar Bear*, 384 F. 3d at 713. Appointment of a master to "apportion" Superman elements in post-termination works would plainly intrude on the fact-finding role of the jury. As

---

[16] *See also Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525-26 (4th Cir. 2003)(upholding jury's determination of both copyright profits and the degree of "apportionment"); *McRoberts*, 329 F.3d at 567-69 (jury determined copyright profits including "apportionment" and "calculation of fixed and variable expenses, some of which are deductible and some of which are not"); *General Corp. v. Grumman Sys. Supp. Corp.*, 36 F.3d 1147, 1172-76 (1st Cir. 1994)(jury should have determined profits and apportionment).

16

Rule 53 and the Advisory Committee Notes state expressly that the court lacks power to appoint a master with regard to jury matters, appointment of a master to decide "apportionment" would be procedurally improper.

### 2. The Appointment of a Special Master Would Exceed the Limitations of F.R.C.P. 53

Furthermore, appointment of a special master would exceed the statutory restrictions governing masters even as to non-jury issues. Rule 53(a)(1)(B) provides that a court may appoint a master to make or recommend factual findings on non-jury issues only if "warranted by (i) some exceptional condition; or (ii) the need to perform an accounting or resolve a difficult computation of damages." F.R.C.P. 53(a)(1)(B). Neither exists with regard to apportioning elements in post-termination works.

The "exceptional condition" prong of Rule 53(a)(1)(B) is not satisfied by the time required to review the post-termination Superman works. *La Buy v. Howes Leather Co.*, 352 U.S. 249, 258–59 (1957)(ruling that docket congestion, complexity, or *length of time* required for trial do not constitute an "exceptional condition"). Nor can the "exceptional condition" prong be satisfied by the purported "complexity" of the apportionment issue. *Id.* at 258–59. In *La Buy*, the U.S. Supreme Court ruled that the district court judges in two antitrust cases with multiple plaintiffs and defendants abused their discretion in appointing special masters. *Id*. at 251–52. One case was so complicated that 27 pages of the record consisted of docket entries reflecting hearings on preliminary pleas and motions. *Id*. *See also Bartlett-Collins Co. v. Surinam Nav. Co.*, 381 F.2d 546, 550 (10th Cir. 1967)("That the case involves complex issues of fact and law is no justification for reference to a Master, but rather is an impelling reason for a trial before an experienced judge."). "The overall mandate of Rule 53(b) is that reference to a master is to be the exception and not the rule." *Bradshaw v. Thompson*, 454 F.2d 75, 80 (6th Cir. 1972).

Moreover, the "accounting" prong of Rule 53(b) does not encompass allocation analyses such as the "apportionment" of Superman elements in post-termination works. *Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 440–41 (3d Cir. 2005). The

17

"accounting" prong applies to the computation or calculation of damages, *after* the trier of fact determines accountability. *Id.* at 440–41. The "accounting" prong does not apply to difficult allocation analyses even when such is a "predicate" to the calculation of damages. *Id.* *See also In re Armco, Inc.*, 770 F.2d 103, 105 (8th Cir. 1985) ("Beyond matters of account, difficult computation of damages, and unusual discovery, it is difficult to conceive of a reference of a nonjury case that will meet the rigid standards of the *La Buy* decision."); *Sid & Marty Krofft*, 562 F.2d at 1163, n.22 ("it will be a 'rare case' where a jury could not adequately handle the [profits] issue").

The decision in *Beazer East* (brought under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA)) is instructive. There, the district court referred the apportionment of costs under CERCLA to a magistrate judge who determined the percentage of Beazer East's costs to be borne by each of the responsible parties, "and in doing so, essentially tried part of the case." *Beazer East*, 412 F.3d. at 431–32. The Third Circuit ruled that the district court improperly delegated its traditional adjudicatory function, holding that the appointment of a special master to perform an apportionment of Beazer East's costs without the parties' consent constituted an abuse of discretion. *Id.* at 440–42. "[The allocation of costs under CERCLA] involves discretion, judgment, and legal reasoning that simply is not connoted by the phrase 'difficult computation of damages,'" because accountings and other damages computations "generally do not call for any peculiar judicial talent or insight." *Id.* at 441. *See also Satyam Computer Services, Ltd. v. Venture Global Engineering, LLC*, 2007 WL 1806198, *2 (E.D. Mich. 2007)(allowing appointment of a special master to make factual findings only because the findings would address a party's compliance with the court's order, not the merits of the underlying action).

Here, the "apportionment," if any, of elements between Superman works recaptured by Plaintiffs and retained by Defendants cannot be construed as an "accounting" or a "difficult computation of damages," for the reason articulated in *Beazer East*. Such "apportionment" would necessarily involve the careful weighing

18

and evaluation of evidence and arguments, not mathematical computations.

**B.    A Work-by-Work Apportionment Is Unnecessary, Unworkable and Unduly Burdensome**

1.    Defendants' Proposed Work-by-Work Analysis Would Result in a Tremendous Waste of Judicial Resources

After April 16, 1999 (the effective termination date) Defendants have exploited Superman – one of the most valuable intellectual properties in the world – in a wide variety of media, from comic books and other publishing, to apparel and other merchandise, to animated and live action television series, motion pictures and computer games.  As such, Defendants' "work-by-work" "apportionment" proposal would prove unworkable in practice.  It would require examination, briefing, arguments, and decisions as to how to apportion literally tens of thousands of separate articles of merchandise, toys, games, articles of clothing, comic books (*e.g.,* there are over 300 post-termination Superman comic books), graphic novels and other publications, and individual episodes of multiple animated and live action television series (*e.g.*, *Smallville* alone has 152 post-termination episodes).  *See* IMDB webpage for *Smallville at* http://www.imdb.com/title/tt0279600/episodes.

Such analysis would consume hundreds of hours of the Court's time, and as apportionment is tried to a jury, Defendants' work-by-work approach would require the jury to review each comic book, item of merchandise, TV episode, etc. in a trial that would necessarily last several months.  Nor would this problem be alleviated by the Court or a special master[17] undertaking such analysis; *e.g.*, *Smallville*'s 152 episodes alone would require *at least* 100 hours (14 court days) to simply *watch* once.

2.    Defendants' Failure to Provide Financial Documents on Individual Works Renders A Work-by-Work Analysis Moot

Even if the fact-finder manage to wade through all of these Superman products, the problems with such analysis have just begun.  A work-by-work apportionment

---

[17] In addition, the use of a special master to separately analyze tens of thousands of individual works and products would impose an unwarranted, devastating financial burden on the Plaintiffs.

19

1   analysis is possible only if Defendants' profits can be ascertained for *each* such work

2   – *i.e.*, an apportionment ratio for a particular action figure has meaning, if any, only if

3   it can be applied to the *profits* from that item.  Defendants have <u>not</u> provided work-by-

4   work documentation of their Superman revenues and expenses for the vast majority of

5   their post-termination Superman products, despite Plaintiffs' discovery requests.[18]

6   Defendants produced WBCP statements that show only *aggregate figures* for the

7   sums remitted by WBCP to DC for thousands of new Superman merchandise, not for

8   individual products. [19]

9          In sum, Defendants' merchandising statements show aggregate revenue totals

10   on a by-vendor basis, while DC's documents similarly show only *aggregate* totals for

11   the character as a whole.  Because Defendants failed to produce documents showing

12   revenues or expenses for individual merchandising products, it will be impossible for

13   Defendants to conduct a product-by-product apportionment of profits.  In other words,

14   Defendants would be incapable of proving with any degree of accuracy how much

15   money a particular derivative product (*e.g.*, a Superman, or Lois Lane action figure)

16   generated, rendering a work-by-work apportionment analysis *moot*.[20]

17

---

18   [18]  There is a multitude of post-termination Superman merchandise, incorporating
19   copyrighted Superman elements.  *See* Section VIII, *infra.*  Generally, most such merchandise
     is produced by third-party licensees under a license from Warner Bros. Consumer Products
20   ("WBCP"), which in turn acts as a licensing agent for DC Comics.  *See* Declaration of Marc
     Toberoff in Support of Plaintiffs' Memorandum of Points and Authorities on Pre-Trial Issues
21   ("Toberoff Decl."), Ex. E.

22   [19] Defendants have produced consolidated statements indicating revenues from WBCP to DC
     by property (*i.e.*, DC Superman, Superman Returns, Smallville, etc.) but not by products.
23   Toberoff Decl., Ex. A.  Defendants have also produced a consolidated WBCP statement
     showing "earned royalties" by vendor, but this is not broken down by specific products.  *Id.*,
24   Ex. B.  DC produced monthly memoranda from WBCP showing revenues only by the total
     received for a given property, not by product or vendor.  Toberoff Decl., ¶ 4, Ex. C.  DC has
25   also produced "Blue Books," which are management reports, indicating DC Comics' profits
     for individual merchandise produced by DC as well as aggregate revenues/expenses for its
26   "Merchandising" and "Media" divisions, with revenue broken down only by property.  *Id.*,
     Ex. D.  The "Blue Books" do show figures by product for DC's limited "direct"
27   merchandising, but not for more prevalent third-party merchandising. *Id.*

28   [20] Defendants may purport to be able to demonstrate work-by-work revenues/expenses by
     evidence not produced during discovery.  Such would obviously be barred by a simple
     motion *in limine*.

20

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

### 3. Work-by-Work Apportionment Should Not Be Performed for Works Created by Licensees

Third-parties licensees which license the right from Defendants to exploit Superman usually pay an advance against a royalty, with the expense of developing and producing new derivative "elements" borne by the licensee.  *See Marascalco v. Fantasy, Inc.*, 953 F.2d 469, 475 (9th Cir. 1991)(noting usual practice of licensing copyrights in exchange for advances and royalties); H.R. Rep. No. 94-1476 at 159 (noting common practice of licensing copyrights "in exchange for percentage royalties based on sales or license fees"); 1 *Nimmer* § 6.12[B] at 6-38.5-38.6 ("The problem [of accounting between joint owners] is not here presented because [in licensing] it is the licensee and not the licensor who risks capital in exploiting the work.")

Accordingly, there should be no "apportionment" between co-owners for mere licensing of a joint work.  It would be nonsensical to examine the elements added by a *licensee* so as to apportion profits from its product, because DC's consideration is for the license, itself.  *See Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007)("[A] co-owner who grants a non-exclusive license is accountable to his co-owner for income gained by the grant of the license."); *Goodman v. Lee*, 1994 U.S. Dist. LEXIS 1846 at *23 (E.D. La. 1994)(awarding one-half of all licensing royalties to co-author of joint work) *aff'd* 78 F.3d 1007, 1011-12 (5th Cir. 1996); *Edward B. Marks Music Corp. v. Wonnell*, 61 F.Supp. 722, 729 (S.D.N.Y. 1945)(Co-owners "are entitled to share equally in the royalties which were due under the original copyright.").

For the same reason, if only DC is held accountable to Plaintiffs at trial, there should be no "apportionment" for elements attributable to Warner Bros. as the sharply reduced licensing royalty paid DC for Warner Bros.' film/television exploitation already reflects "apportionment" for the value of the intellectual property (allegedly) as opposed to the value added by Warner Bros.  *See* Toberoff Decl. Exs. F, G.

### C. A "Template" Approach to Apportionment Is Appropriate

#### 1. A "Template" Approach Can Generate an Apportionment Figure That Can Properly Be Applied to Any Given Work

21

1   Apportionment, by definition, is not an exact science, for "what is required is

2   not mathematical exactness but only a reasonable approximation." *Sheldon,* 309 U.S.

3   at 402. *See Frank Music*, 72 F.2d at 518 ("[M]athematical exactness is not

4   required."); *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26,

5   54 (1st Cir. 2003)("The Supreme Court held in [*Sheldon, supra*] that a 'reasonable

6   approximation' was enough if it allowed 'a rational separation of the net profits.'")

7   As apportionment requires only a "reasonable approximation," Defendants' insistence

8   on an unnecessary and largely unmanageable work-by-work analysis is little more

9   than a calculated attempt to delay the prosecution of this action by drowning the trier

10   of fact in petty segregated analyses of thousands of Superman products, and saddling

11   Plaintiffs with huge additional costs, litigating trivial issues.

12   In the event federal "apportionment" governing copyright infringement is held

13   to apply to this accounting governed by state law, Plaintiffs offer a far more rational

14   and manageable apportionment solution. The trier of fact can readily establish a

15   template that qualitatively evaluates and weighs Plaintiffs' recaptured "Superman"

16   elements against any additional elements exclusively owned by Defendants within the

17   overall "Superman" mythology. *See Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931,

18   941 (7th Cir. 1989)(upholding jury's application of a single apportionment figure to

19   line of greeting cards, rather than each card individually).[21] The Superman mythos

20   more closely resembles a unified property than a collection of unrelated works. From

21   this elemental comparison, a fair percentage (%) can be fixed by the jury that can

22   then be reasonably applied to the totality of Defendants' Superman profits. Such

23   methodology will fairly satisfy the requirement of a "reasonable approximation" for

24   apportionment purposes, *Sheldon,* 309 U.S. at 402.

25   Plaintiffs' "template" approach is particularly appropriate given that a large

---

26   [21] *See also Aerospace Services Intern. V. LPA Group, Inc.*, 57 F.3d 1002 (11th Cir. 1995)

27   (upholding apportionment of "total fees allocable to the use of these two [infringing] documents" rather than to each document); *Multitherm Corp. v. Fuhr*, 1991 U.S. Dist.

28   LEXIS 10475 at *45 (E.D. PA 1991)(applying single apportionment figure to profits from multiple infringing "bulletins").

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

portion of Defendants' Superman revenues are from *licensing* the Superman mythos. As set forth above, their licensing compensation already reflects an "apportionment" of the value of the Superman mythos to the product in question.  A "template" approach also more rationally and fairly reflects the fact that a derivative Superman work is imbued with the "core" Superman story from *Action Comics No. 1* (*e.g.*, Superman, Clark, Lois, "Champion of the Oppressed," etc.) whether or not each such element is present in that particular derivative work.  When the consumer buys, views and appreciates such derivative work , generating profits for Defendants, it is surely not in a vacuum, but in the context of this well-known and beloved Superman story.

2.   The Iconic Core Elements of the Superman Character <u>Have Remained Largely Unchanged Since Their Inception</u>

A template approach is further justified by the fact that derivative Superman products necessarily draw heavily on the iconic core of the Superman character, format and mythos recaptured by Plaintiffs in *Action Comics No. 1*:  "Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed [and] his heroic abilities in general," along with the "entire storyline from <u>Action Comics</u>, Vol. 1, Superman's distinctive blue leotard … a red cape and boots, and his superhuman ability to leap tall buildings, repel bullets, and run faster than a locomotive."  Order at 40:10-13, 40:25-41:2.  Elements as varied as Superman's origins on a doomed planet, his superpowers (super-strength, super-senses, invulnerability, and ability to soar through the air), his square-jawed good looks and dynamic costume, Clark's horn-rimmed classes, conservative dress and demeanor, Lois' feisty personality, and the setting of a large metropolis reminiscent of 1930s New York, were all originally established in *Action Comics No. 1*.  *See* Declaration of Keith Adams ("Adams Decl."), Ex. G at 7-8.

*Action Comics No. 1* contains the key thematic and literary format for further *episodic* Superman stories, particularly Superman's secret dual identity as Clark Kent, and "their" consequent "love triangle" with Lois.  *Action Comics No. 1* animates the

23

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

striking contrast between the awkward mild mannered reporter, with whom audiences can identify, and the masterful Superman – heroic "Champion of the Oppressed." *See id.* at 8. Clark and Lois' jobs as big city reporters and assignments from their gruff editor cleverly inform Superman of crimes and disasters as they happen and provide the framework for future adventures between the "three."

Every derivative Superman work is necessarily invested with this iconic Superman "core" from *Action Comics No. 1*.[22]  These essential visual, story, and thematic elements pervade the Superman mythos such that even the most humble use of Superman elements is associated therewith.  *See* Adams Decl., Ex. G at 8 ("All Superman-related stories … draw heavily on the timeless dramatic formula created by Jerry Siegel in *Action Comics No. 1*.  Regardless of a story's content and handling, audiences from comics to the cinema are ultimately attracted to the character for deeply-rooted psychological reasons, all of which were cleverly and succinctly detailed in Jerry Siegel's initial Superman adventure.").  Thus when the public views a Superman work, that work does not stand alone.  Rather, the audience brings to bear all of its pre-existing Superman associations which are largely derived from and driven by the iconic core of the Superman mythos established in *Action Comics No. 1*.

Despite the weight of Plaintiffs' recaptured copyrights, Defendants will repeat the mantra of "almost 70 years" of contributions to the Superman mythos to generate a more lopsided apportionment figure.  However, it is uncanny how little the core Superman elements have changed in 70 years.  Apportionment analysis is a two-way

---

[22] Given that *Action Comics No. 1* established the Superman core, any apportionment of profits will necessarily tip *heavily* in Plaintiffs' favor. *See Sheldon v. Metro-Goldwyn Pictures Corporation*, 106 F.2d 45, 51 (2d. Cir. 1939)(Hand, J.)("It is not our best guess that must prevail, but a figure which will favor the plaintiffs in every reasonable chance of error."); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 480 (9th Cir. 2000)(66% of profits from song attributed to infringing elements); *Abkco Music, Inc. v. Harrisongs Music, Ltd.*, 508 F. Supp 798 (S.D.N.Y. 1981), *aff'd*, 722 F.2d 988 (2d Cir. 1983)(apportioning 70% of profits from the song); *Blackman v. Hustler Magazine, Inc.*, 620 F. Supp. 792, 801 (D.D.C. 1985) *aff'd on this point, rev'd on other grounds*, 800 F.2d 1160, 1164-65 (D.C. Cir. 1986) (allocating 60% of profits from 136 page magazine based on infringing 6 pages); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F. Supp 531 (S.D.N.Y.), *aff'd*, 722 F.2d 9888 (2d Cir. 1983)(50% of profits to Plaintiff for one song on a 10-song album.)

24

street:  Defendants would have to show for each product which elements they have contributed into that product.  In so doing, Defendants will surely overstate the "bells and whistles" they have added to the core "Superman" character/format established in *Action Comics No. 1*.  Subsequent "Superman" elements added by Defendants (*e.g.*, "heat vision") were all derivative and, for the most part, are of lesser import.  In a vast array of Superman products such "elements" are not even present.  Try as Defendants might, Plaintiffs' recaptured Superman core will be difficult to water down.  If one strips away Defendants' additions, the "Superman" of today is still instantly recognizable because *Action Comics No. 1*'s "Superman" IS Superman.  *See* Adams Decl., Ex. H at 11.[23]

At the end of the day, an apportionment ratio arrived at through a comparative "template," weighing material elements within the Superman mythos, would reasonably approximate the average ratio arrived at through a laborious work-by-work analysis, while rationally crediting Defendants' contributions.

### 3.   Public Policy and the Legislative Objectives of the Termination Provision Militate Against a Work-By-Work Analysis

The clear legislative objectives and public policy goals behind the Copyright Act's termination provisions support Plaintiffs' "template" approach and militate against Defendants' "work-by-work" approach.  As noted by the U.S. Supreme Court in *Mills Music*, 469 U.S. at 172, "the concept of a termination right itself" was "obviously intended to make the rewards for the creativity of authors more substantial" by allowing authors and their heirs the opportunity to benefit from Congress' extension of the renewal copyright for pre-1978 works.  *See also* H.R. Rep.

---

[23] As noted by Jerome Siegel in his *Creation of a Superhero*: "It has been said that the 'Superman' comic strip has changed greatly through the years…. Has it really? Superman still is a being from another world who uses his super-powers, including super-strength, here on Earth to crusade against evil. When not attired in his famous colorful Superman costume, he masquerades in his secret identity of Clark Kent . He is still admired by reporter Lois Lane , who does not know that he is secretly Clark Kent . Superman still wears his costume. Clark Kent still wears glasses he really doesn't need. All the above was in the concept I dreamt up in the early 1930s, and it still appears in the comic strip today. This is the very guts, the backbone of the 'Superman' concept." Adams Decl., Ex. M

25

No. 94-1476, at 140 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5756  ("[T]he extended term represents a completely new property right and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it."). Indeed, the Supreme Court explained the central goals of the termination provisions as follows:

> More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

*Mills Music*, 469 U.S. at 172–73.

To safeguard this invaluable right, Congress provided a number of provisions to prevent publishers with superior economic power from thwarting it by forcing authors or their heirs to waive or pre-assign such rights.  *See* 17 U.S.C. § 304(c)(5) (termination rights exercisable "notwithstanding any agreement to the contrary"); § 304(c)(6)(D)(no assignment of termination expectancy until it vests).

In the recent decision, *Classic Media, Inc. v. Mewborn* , __ F.3d __, 2008 U.S. App. LEXIS 14755 (9th Cir., July 11, 2008), involving the recapture under 17 U.S.C. § 304(c) of co-ownership of *Lassie* by the daughter of author Eric Knight, the Ninth Circuit was substantially guided by the legislative objectives of the termination provisions which "were in large measure designed to assure that [the 1976 Act's] new benefits would be for the authors and their heirs," *quoting* H.R. Rep. No. 94-1476, at 140.[24] The Ninth Circuit emphasized throughout that the purpose of termination is to allow authors to reap the financial rewards of their creations:

> "Congress enacted the inalienability of termination rights provision in § 304(c)(5) to resurrect the fundamental purpose underlying the two-tiered structure of the duration of copyrights it originally adopted:  to award to the author, and not to the assignee of the right to exploit the copyright during its initial term, the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success."

---

[24] "Seventy years after Eric Knight first penned his tale of the devoted Lassie who struggled to come home, at least some of the fruits of his labors will benefit his daughter." *Id*. at 8548.

26

*Classic Media, slip. op.* at 8536.

These objectives militate against conducting a debilitating work-by-work apportionment analysis that is unnecessary, prohibitively expensive, largely unworkable and frustrates the central purpose of the termination statute.[25]

        4.    <u>Plaintiffs Request that the Court Order the Use of a "Template" in Any Apportionment Analysis</u>

As demonstrated above, Defendants' work-by-work apportionment by a special master:  (a) is procedurally improper, (b) would overburden the Court, the parties, and the jury; (c) would be futile absent parallel documentation of work-by-work profits that Defendants have not provided; (d) is inapplicable to licensing; and (e) is unjustified in light of the "reasonable approximation" standard.   In the event the Court orders an "apportionment," Plaintiffs respectfully request that it (1) denies Defendants' requests for a special master and a work-by-work analysis; (2) directs the parties to present to the jury a Superman "template" that qualitatively weighs and compares Plaintiffs' recaptured Superman elements with any elements exclusively retained by Defendants, and (3) directs the jury to arrive at a reasonable ratio (%) from this evaluation that can readily be applied to Defendants' Superman profits.

**V.  DEFENDANTS IMPROPERLY SEEK SUMMARY JUDGMENT ON WORK FOR HIRE ISSUES PRESERVED FOR TRIAL**

    **A.  Defendants Improperly Seek Partial Summary Judgment on "Work for Hire" Issues Well After The Court-Imposed Deadline for Dispositive Motions**

Plaintiffs objected in the parties' February 21, 2008 stipulation to Defendants' motion to determine that Siegel and Shuster's Superman stories after Action Comics No. 1 are purportedly not subject to Plaintiffs' termination under Section 304(c) as alleged "works for hire" because it (a) improperly constitutes a motion for partial

---

[25] Defendants' work-by-work approach frustrates the goals of recapture by both erecting impractical hurdles and "drowning" the core elements of an original creation in extraneous details.  Ironically, the more successful an author's creation is, the more a work-by-work apportionment functions to his/her detriment by allowing publishers to use their narrow, but numerous, additions to both dilute the value of the recovered copyrights and to erect unmanageable barriers to their enforcement.

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1  summary judgment well after the dispositive motion deadline in the Court's

2  scheduling order, and (b) presents genuine issues of material fact for trial, barring

3  summary judgment.  Adams Decl., Exs. C-E.

4          The Court set April 30, 2007 as the dispositive motion deadline in this matter.

5  Adams Decl., Exs. A, B. (March 19, 2007 Order).  A party cannot file a summary

6  judgment motion after the deadline set by the Court, unless the party shows good

7  cause and obtains the court's consent.  *See* F.R.C.P. 16(b)(3)(A), (b)(4).  Here,

8  Defendants improperly seek partial summary judgment on whether numerous

9  Superman stories created by Siegel and Shuster were "works for hire" well over a

10  year after the Court-ordered April 30, 2007 deadline for dispositive motions, despite

11  Defendants *never* requesting or showing good cause for the Court to modify its order.

12  *See U.S. Dominator v. Factory Ship Robert E. Resoff*, 768 F.2d. 1099, 1102 (9th Cir.

13  1985)("[T]he record reveals that the defendants never requested a modification of the

14  pretrial order to allow the filing of their [summary judgment] motion.  Accordingly,

15  we conclude that the district court properly denied the motion as untimely."); *see also*

16  Schwarzer, Tashima, Wagstaffe, *California Practice Guide: Federal Civil Procedure*

17  *Before Trial*, § 14:64.  Additionally, pursuant to paragraph 4(g)(1) of the Court's

18  Standing Order, "[n]o party may file more than one motion pursuant to [F.R.C.P.] 56,

19  regardless of whether such motion is denominated as a motion for summary judgment

20  or summary adjudication."

21          It would be manifestly unfair to allow Defendants to unilaterally ignore the

22  Court's scheduling order and Standing Order while holding Plaintiffs to same.

23  Defendants cannot offer any argument why the rules do not apply to them, or why

24  they did not bring a noticed motion to modify such orders.  Nor can they demonstrate

25  good cause for bringing a second dispositive motion so long after the Court's

26  deadline.  Due to Defendants' failure to file a proper noticed motion  to modify the

27  Court's orders, Plaintiffs are placed in the uncomfortable position of not having

28  proper notice as to the legal standards applicable to Defendants' *ad hoc* motion (*e.g.*,

28

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1  standards governing partial summary judgment or a motion *in limine*).

2      Both sides' pleadings contain detailed allegations as to post-*Action Comics No.*

3  *1* "work for hire" issues.  *See* Plaintiffs' First Amended Complaint, ¶ 32; Defendants'

4  First Amended Counterclaims, ¶ 17.  Defendants, like Plaintiffs, could have, but chose

5  not to move for partial summary judgment on these issues presumably because they

6  are brimming with genuine questions of material fact for the trier of fact, as further

7  discussed below.  *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429

8  F.3d 869, 874 (9th Cir. 2005)(reversing grant of summary judgment as inappropriate

9  because "work for hire" disputes present genuine issues of material fact).

10  Accordingly, these "work for hire" issues are properly reserved for trial.

11

12  **B.     Defendants Err in Arguing That They May Move the Court on the "Work for Hire" Issue in the Form of a Motion *In Limine***

13      Defendants stated in response to Plaintiffs' objections to their motion for partial

14  summary judgment that the "work for hire" issue is "properly the subject of a motion

15  *in limine*."  Adams Decl., Ex. E.  Motions *in limine* are appropriately used to

16  determine whether specific evidence should be admitted or precluded at trial.

17  *Associated Press v. Dist. Court for Fifth Judicial Dist. of Col.*, 542 U.S. 1301, 1303

18  (2004); Jones, Rosen, Wegner, Federal Civil Trials and Evidence § 4:319 (2007).[26]

19      Motions *in limine* "address evidentiary questions and are inappropriate devices

20  for resolving substantive issues."  *Natural Resources Defense Council v. Rodgers*,

21  2005 WL 1388671, *1 n.2 (E.D. Cal. 2005).  *See* 75 Am. Jur. 2d Trial § 99 (2004)

22  (motions *in limine* are improper vehicles to raise motions for summary judgment

23  because "[m]otions *in limine* are not to be used as a sweeping means of testing issues

24  of law"); *Prov. Life & Acc. Ins. v. Addie*, 176 F.R.D. 246, 250 (D. Mich.1997)(motion

25  _____

26  [26] For instance, a motion *in limine* is commonly "to exclude anticipated prejudicial evidence before the evidence is actually offered."  *Luce v. United States*, 469 U.S. 38, 40 (1984). Specifically, *in limine* practice prevents evidence from being submitted at trial as it is impossible to "unring the bell" when prejudicial evidence is offered and then stricken.  *See*

27  *Associated Press v. District Court for Fifth Judicial Dist. of Colo.*, 542 U.S. 1301, 1303 (2004); *McEwen v. City of Norman, Okla.*, 926 F.2d 1539, 1548 (10th Cir. 1991); Jones,

28  Rosen, Wegner, Jones, *Federal Civil Trials and Evidence* 4-46- 4-54 (2007).

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1   *in limine* cannot be used as a substitute for a motion for summary judgment).[27]

2          The absurdity of Defendants' tactic is underscored by the fact that "work for

3   hire" in a copyright action is an affirmative defense.  *See Dolman v. Agee*, 157 F.3d

4   708, 712 (9th Cir. 1998)("[Defendant] asserted the affirmative defense of work for

5   hire"); *Livingston v. Morgan*, 2007 WL 2140900, *3 (N.D. Cal. 2007)("'work for

6   hire' is an affirmative defense").  As such, *Defendants* have the "initial burden of

7   production on this issue," and must present "credible evidence" that the work at issue

8   was created at the "instance and expense" of their predecessor.  *Dolman*, 157 F.3d at

9   712.  A motion *in limine* is <u>not</u> the mechanism to meet such evidentiary burdens.

10          Finally, and perhaps most notably, this Court expressly admonishes that

11   "*summary judgment motions disguised as motions in limine will not be heard*."

12   Scheduling Order of the Hon. Stephen G. Larson under F.R.C.P. 16(b), ¶ 3 (emphasis

13   added).  Defendants' proposed briefing on this issue represents little more than an

14   end-run around the Federal Rules and this Court's Orders.

### C.   The "Works Made for Hire" Issues Implicate Numerous Genuine Issues of Material Fact That Prohibit Summary Judgment

16          Notwithstanding its fatal procedural defects, Defendants' dispositive motion

17   must fail because of the fact-heavy analysis such "work for hire" determinations

18   necessarily entail.  This is particularly acute with respect to the early Superman stories

19   created by Siegel and Shuster decades ago.  *By definition*, whether a work is "made

20   for hire" is a mixed question of fact and law.  *Twentieth Century,* 429 F.3d at 874-75.

21          As Siegel and Shuster's Superman stories were created before 1978, the

22   Copyright Act of 1909 governs.  *See Self-Realization Fellowship Church v. Ananda*

23   *Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000).  However the 1909

24   Act did not define the terms "work made for hire" or "employer."  *See* 17 U.S.C. § 26

---

27 California state law is in accord. A motion *in limine* is never an appropriate substitute for a
motion for summary judgment or summary adjudication.  *See R&B Auto Center, Inc. v.
Farmers Group, Inc.*, 140 Cal. App.4th 327, 371-372 (2006)(Rylaarsdam. J., concurring)("To
have the sufficiency of the pleading or the existence of triable issues of material fact decided
in the guise of a motion in limine is a perversion of the process … Motions in limine are
properly used to determine whether specific evidence should be admitted or precluded").

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

(repealed)("In the interpretation and construction of this title[,] … the word 'author,' shall include an employer in the case of works made for hire.").  In most cases under the 1909 Act, federal courts applied the work for hire doctrine *only* to traditional hierarchical employment relationships.  *Twentieth Century*, 429 F.3d at 877.  However, "[i]n the last decade of the [1909] Act the Courts expanded the doctrine somewhat to include less traditional relationships."  *Id., quoting Self-Realization*, 206 F.3d at 1331.  The Ninth Circuit eventually formulated an "instance and expense" test for "works for hire" under the 1909 Act:

> "[W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done."

*Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965).

Thus the Ninth Circuit has consistently required that the claimant come forth with "credible evidence that the work was done at the 'instance and expense' of the commissioning party."  *Self-Realization*, 206 F.3d at 1326, *quoting Dolman*, 157 F.3d at 711-712.  Work-for-hire analysis under the 1909 Act requires an evaluation of the "actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work."  *Marvel Characters v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002), *citing Donalson Pub. Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 640-42 (2d Cir. 1967).

### 1.    The "Instance" Component of the Test

The "instance" prong of the test inquires into "whether the motivating factor in producing the work was the employer who induced the creation."  *Twentieth Century*, 429 F.3d at 879.  This inquiry focuses not on generalities but on specific historical facts.  For instance, even a work created by a traditional employee "as a special job assignment, outside the line of the employee's regular duties" may not be a "work made for hire."  *Shapiro Bernstein & Co. v. Jerry Music Co.*, 221 F.2d 569, 570 (2d

31

1   Cir. 1955) ; *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Center of*

2   *Contemporary Dance, Inc.*, 380 F.3d 624, 635 (2d Cir. 2004).

3          The "instance" requirement is also "shaped in part by the degree to which the

4   hiring party had the right to control or supervise the artist's work," as reflective of the

5   work's creation within a defined "employment" relationship.  *Twentieth Century*, 429

6   F.3d at 879 (emphasis added).  This factual inquiry naturally focuses on the

7   contractual right to control and supervise the work's *creation*, not on the "employer's"

8   conduct. *See Martha Graham*, 380 F.3d at 635 ("The right to direct and supervise the

9   manner in which the work is created need never be exercised.") (emphasis in original).

10          The fact Defendants owned *Action Comics No. 1* or even *Superman* is not

11   dispositive, as under the 1909 Act the additional material contained in Siegel and

12   Shuster's subsequent Superman stories could be owned by them even though such

13   works were necessarily derivative.  17 U.S.C. §7 (repealed).  Thus, under the 1909

14   Act "[t]he aspects of a derivative work added by the derivative author are that author's

15   property, but the element drawn from the pre-existing work remains on grant from the

16   owner of the pre-existing work."  *Stewart v. Abend*, 495 U.S. 207, 223 (1990).

17          The right to control a work's creation then, as a matter of law and logic, refers

18   to a contractual *right* to control the *creative* process.[28]  Here, without limitation, other

19   than the March 1, 1938 grant of the *Action Comics, No. 1* story, Siegel and Shuster did

20   not enter into any agreement regarding further Superman works until their agreements

21   with Detective Comics and McClure Newspaper Syndicate, both dated September 22,

22   1938.  Adams Decl., Ex. L at ¶¶ 24, 39. In the interim, Siegel and Shuster created the

23   Superman stories published in Action Comics Nos. 2-6, from May 25, 1938 to

24   September 26, 1938.[29]

25   ──────────────
    [28] The "right to accept, reject or modify" a work necessarily refers to a work's creation, not
26   to a publisher's superior position once a work is substantially completed. *See Twentieth
    Century*, 429 F.3d at 880 (contrasting publisher's "typical process for most books [of]
27   waiting for the manuscript to be completed, and then discussing possible improvements with
    the author.")

28   [29] *Action Comics No. 2* was published May 25, 1938 (Copyright Reg. No. B379788); *Action
    Comics No. 3* was published June 25, 1938 (Copyright Reg. No. B385466); *Action Comics*

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

### 2. The "Expense" Component of the Test

A work is created at a party's "expense" if that party takes on "all the financial risk" of the creation. *Twentieth Century*, 429 F.3d at 881; *see also Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989). The publisher must be on the hook to pay a sum certain to the creator prior to creation *regardless* of whether the work is accepted or published. *Id*. The focus is not on whether the sum is "certain" (purchases of non-work for hire material are just as often for a "sum certain") but whether the putative employer must "certainly" pay the sum. [30] The Ninth Circuit, for example, found it critical that the author "had [not] begun drafting the [work] before he reached his agreement" with the publisher spelling out his compensation. *Twentieth Century*, 429 F.3d at 880.

### 3. "Work for Hire" Turns on Mutual Intent of the Parties

Whether a work was "made for hire" turns on the "mutual intent of the parties [] that the title of the copyright shall be in the person whose instance and expense the work was done." *Lin-Brook*, 352 F.2d at 300. As in this case, the parties' mutual intent often entails genuine issues of material fact for the trier of fact barring summary judgment. *See Twentieth Century*, 429 F.3d at 874-75(reversing summary judgment because "there were genuine issues of material fact as to [the parties'] intent on the work-for-hire issue."); *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1368 (9th Cir.1980) (reversing summary judgment due to "questions of fact as to the parties' intent"); 3 *Nimmer* 12.10[A] ("[Q]uestions … as to the parties' intent … are for the trier of fact."). *See also Self-Realization*, 206 F.3d at 1326 (reversing summary judgment "on the critical issue of intent" with respect to an assignment of copyright).

Under the 1909 Act, employment of a party to create an artistic work at the

---

*No. 4* was published July 25, 1938 (Copyright Reg. No. B387907); *Action Comics No. 5* published August 25, 1938 (Copyright Reg. No. B394784); *Action Comics No. 6* was published September 26, 1938 (Copyright Reg. No. B394886).

[30] The "sum certain" factor arose for purposes of contrasting such fixed payments with contingent "royalty" payments, the latter being held to "generally weigh against finding a work-for-hire relationship." *Playboy Enterprises v. Dumas*, 53 F.3d 549, 535 (2d Cir.1995); *see also Twentieth Century*, 429 F.3d at 881.

33

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

"instance and expense" of the employer gives rise to a *"presumption"* that the parties both intended that title to the copyright belong to the employer.  *See Lin-Brook*, 352 F.2d at 300; *May*, 618 F.2d at 1368.   However, such "work for hire" presumption is entirely rebuttable.  *Dolman*, 157 F.3d at 712 ("[E]ven if [defendant] had established that [plaintiff] created the songs at the instance and expense of [his employer]… [plaintiff] rebutted the work for hire presumption."); *Twentieth Century*, 429 F.3d at 874-75 (work for hire presumption may be rebutted "by evidence that the parties did not intend to create a work-for-hire."); *May*, 618 F.2d at 1368; 1 *Nimmer* § 5.03 ("The provision of former Section 26…must be read as creating a presumption of copyright in the employer, which may be rebutted").

It is "proper, then, for the trier of fact to consider extrinsic evidence to determine whether the parties intended to contract contrary to the presumption of the 'works for hire' doctrine" and "[s]uch evidence includes prevailing custom and usage" at the time the work in question was created.  *May*, 618 F.2d at 1368.  Thus courts have often refused to apply the work for hire doctrine even in the context of a traditional employer-employee relationship.  *See e.g.*, *Dolman*, 157 F.3d at 712 (no evidence that songs written within scope of author's employment); *Shapiro, Bernstein*, 221 F.2d at 570 (2d Cir. 1955)(same); *Forward v. Thorogood*, 985 F.2d 604, 606-7 (1st Cir. 1993) (plaintiff paid studio to create demo tapes but "neither employed nor commissioned the band members").

### 4.   Summary Judgment on "Work for Hire" Defense Is Disfavored

It is clear from all of the above that "work for hire" analysis is a particularly *fact intensive* inquiry that does <u>not</u> lend itself to disposition by summary judgment.  For this reason summary judgment is disfavored on "work for hire" issues.  As noted by *Nimmer* with regard to the analogous 1976 Copyright Act:

> "Most court cases present a battle between two versions of the events. It is for the jury to sort out the competing claims and determine where truth lies. Thus, even when the arena of battle arises over a distinctive policy of the Copyright Act – for example does a given work qualify as having been made for hire? – the questions of historical fact … are for the finder of fact. To the extent that questions arise as to the parties' intent,

34

credibility determinations again are for the trier of fact."

3 *Nimmer* § 12.10[A]. Such concerns are no different as to "work for hire" analysis under the 1909 Act.  *See Self-Realization*, 206 F.3d at 1330 (summary judgment is inappropriate for a work-for-hire determination under the 1909 Act); *Twentieth Century*, 429 F.3d at 874-75 (reversing summary judgment under the 1909 Act "because there were genuine issues of material fact"); *May*, 618 F.2d at 1368 (same); *Simon*, 310 F.3d at 292 ("[T]he district court's grant of summary judgment to Marvel was erroneous.  It will be up to a jury to determine whether Simon was the author of the Works and, therefore, whether he can exercise § 304(c)'s termination right.").[31]

Here, the parties will "battle" over Siegel and Shuster's creation of Superman works seventy years ago.  At trial Plaintiffs will present numerous exhibits, including voluminous correspondence, notes, business ledgers and receipts to counter Defendants' proffer of evidence in support of their affirmative defense.  Plaintiffs will also submit previous testimony from Jerome Siegel and Joseph Shuster.  Plaintiffs will also present live testimony from Joanne Siegel (the original model for Lois Lane) and experts Mark Evanier and James Steranko as to the circumstances under which Siegel and Shuster created Superman stories in the late 1930s and the 1940s and custom and usage at the inception of the comic book industry.  *May*, 618 F.2d at 1368 ("proper, then, to consider extrinsic evidence [as to] … prevailing custom and usage").

Genuine issues of material fact necessarily arise here, and the weighing of evidence and the credibility of witnesses must be undertaken by the trier of fact.  Plaintiffs have the inviolate right to cross-examine Defendants' witnesses and to test their credibility in the presence of a jury and vice versa.  It is likewise necessary and appropriate for the Court to hear disputed testimony live.  The parties' factual allegations concerning the critical "work for hire" issue must be tested in open court.

---

[31] *See also Dolman*, 157 F.3d at 712 (in light of issues of fact, previous summary judgment ruling on work-for-hire issue reconsidered and tried at trial); *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 87 (2d Cir. 1995)(noting that "work made for hire" analysis is "fact-dependent"); *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111, 113 (2d Cir. 1998)("Questions of historical fact relevant to applying each [work for hire] factor are for the finder of fact….").

35

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

# VI.   DEFENDANTS MUST ACCOUNT TO PLAINTIFFS FOR PROFITS FROM ANY "PRE-TERMINATION" DERIVATIVE WORKS THAT ARE ALTERED POST-TERMINATION

## A.   Defendants May Not Create New Derivative Works on the Basis of Pre-Termination Works Without Accounting to Plaintiffs

As Plaintiffs freely admitted and the Court has noted, Plaintiffs are not entitled to profits from unaltered pre-termination derivative works exploited post-termination. Order at 67; 17 U.S.C. § 304(c)(6)(A).  However, Defendants must account to Plaintiffs for profits from any new derivative works:

> "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant."

17 U.S.C. § 304(c)(6)(A).  *See Mills Music,* 469 U.S. at 174 n. 42 ("any remake rights covered by the contract would be cut off"), *citing* H. R. Rep. No. 94-1476, at 127.

The Court has therefore ruled that Defendants may exploit "unaltered pre-termination derivative works" without accounting to Plaintiffs, but has asked for additional briefing regarding the extent to which "[p]ost-termination alterations to pre-termination derivative works" trigger Defendants duty to account to Plaintiffs.  *See* Order at 68:1-4; March 31, 2008 Order at 2.

### 1.   Defendants Must Account For Any Derivative Work Completed After April 16, 1999, the Effective Termination Date

To begin, it is clear that Defendants must account to Plaintiffs for any "domestic exploitation of the Superman copyright" in any derivative work completed *after* April 16, 1999, the effective termination date.  Order at 66:24-25.  As *Action Comics No.1* constitutes the first appearance of Superman, including "Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed [and] his heroic abilities in general," along with "Superman's distinctive blue leotard … a red cape and boots, and his superhuman ability to leap tall buildings, repel bullets, and run faster than a locomotive," any post-termination Superman work

36

1   will be derivative, in whole or in part, of *Action Comics No. 1.*  Order at 40:10-13,

2   40:25-41:2.[32]  The exploitation of any derivative work "based upon the copyrighted

3   work [*Action Comics No. 1*] covered by the termination grant" requires an accounting

4   to Plaintiffs as its joint owner. 17 U.S.C. § 304(c)(6)(A); *see Oddo,* 743 F.2d at 633. [33]

5

6           2.      Material Change to a Pre-termination Derivative Work Establishes
                    a New Derivative Work for Which Defendants Must Account

7           While a pre-termination derivative work may "continue to be utilized under the

8   terms of the grant after its termination," Defendants may not exploit derivative works

9   "prepar[ed] after the termination" without accounting to Plaintiffs.  17 U.S.C. §

10  304(c)(6)(A).  The essential question, then, is at what point does the "utilization" of a

11  pre-termination derivative work amount to a new derivative work?  *Id.*

12          The Copyright Act defines a derivative work as follows:

13          "A work based upon one or more pre-existing works, such as a translation,
            fictionalization, motion picture version, sound recording, art reproduction,
14          abridgment, condensation, or any other form in which a work may be recast,
            transformed, or adapted. A work consisting of editorial revisions,
15          annotations, elaborations, or other modifications which, as a whole,
            represent an original work of authorship, is a 'derivative work.'"
16

17  17 U.S.C. § 101.  Plaintiffs are therefore entitled under 17 U.S.C. § 304(c)(6)(A) and

18  § 101 to receive profits from derivative works modifying, transforming, adapting or

19  recasting pre-termination Superman derivative works.  *See* 1-3 *Nimmer* § 3.01.

---

20  [32] Defendants clearly could not exploit "new" Superman derivative works based on prior
21  Superman *derivative* works (*e.g.*, the hundreds of Superman comics from April 17, 1943 to
    the present that naturally fall outside the termination window) without accounting to
22  Plaintiffs as such works are also necessarily derivative of *Action Comics No. 1*.

23  [33] The House Report on the 1976 Copyright Act describes the "derivative works exception":

24          "In other words, a film made from a play could continue to be licensed for
            performance after the motion picture contract had been terminated but any
25          remake rights covered by the contract would be cut off.  For this purpose, a
            motion picture would be considered a 'derivative work' with respect to every
26          'preexisting work' incorporated in it, whether the preexisting work was created
            independently or was prepared expressly for the motion picture."

27  H.R.Rep. No. 94-1476 at 127; S.Rep. 94-473 at 111 (same).  *See also* 3 *Nimmer* §
28  11.02[C][1] at 11-21 n.67.1 (a licensee "may not create further derivative works after
    termination").

The level of variation required to constitute a "new" derivative work under the Copyright Act is minimal: "[A]ll that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial variation'…." *Ent. Research Group*, 122 F.3d at 1221 *quoting Sid & Marty Krofft*, 562 F.2d at 1163 n.5.

Any "distinguishable variation" of a prior work will constitute a new derivative work, including translations, re-edited motion picture versions, reproductions, abridgments, condensations, and other recasting, transformation or adaptation. 17 U.S.C. § 101; 1-3 *Nimmer* § 3.01 ("In general, the applicable standard … is that of a 'distinguishable variation' that is more than 'merely trivial.'"). *See also* 3 *Nimmer* § 11.02[C][1] at 11-22 ("As with prints of old movies, new copies probably may be printed because this would not constitute 'the preparation after the termination of other derivative works,' but only of other copies of the same derivative work.").

As such, even minor alterations of pre-existing material in a new format are considered sufficient to create a derivative work. *See Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416, 1428 (C.D. Cal. 1997)(holding as a matter of law that "pan and scan" changes to a motion picture for its home video release constitute a new derivative work); *Manufacturing Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1013-14 (7th Cir. 1983)(speeded-up version of prior video games qualified as new derivative work); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988)(prior art prints encased in a black plastic border resulted in a new derivative work); *Roy Export Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1149 (S.D.N.Y. 1980)(compiling multiple scenes from prior Charlie Chaplin movies created new derivative work). Thus, any material alteration or addition to a pre-termination Superman work would trigger Defendants' duty to account to Plaintiffs.

**B.   Defendants Will Clearly Have to Account for Many Post-Termination Releases of Pre-Termination Superman Works**

38

1
        1.   <u>Common Changes in DVD Releases of Pre-Termination Superman Works Result in New Derivative Works</u>

2
     The release of pre-termination derivative works (e.g., Superman movies and

3
animated television series) in a new DVD format will almost invariably result in a

4
"new" derivative work due to the wide variety of changes to the work, including re-

5
editing, "panning-and-scanning," new audio tracks, the addition of subtitles/ foreign-

6
language translations, new commentary tracks, "featurettes," cover art and the

7
collective packaging of all such material associated with a DVD release.

8
     As noted above, even the standard "pan-and-scan" process by which the "wide

9
screen" aspect ratios of theatrical films are re-formatted on DVD for the home-video

10
television screen results in a new derivative work.[34] *Maljack Productions*, 964 F.

11
Supp. at 1427-28.

12
     Similarly to "pan-and-scan," DVDs contain new audio "mixes" of a film's

13
soundtrack which materially alter its creative impact and auditory effect.[35]  All of

14
---

[34] "Panning and scanning" is the process by which a feature film's "aspect ratio" (width in
15
relation to height) is reduced to account for the difference between theatre screens (which in
the United States have aspects ratios between 1.85:1 and 2.40:1) and television screens
16
(which, until quite recently, had aspect ratios of 1.33:1).  *See Maljack Productions,* 964
F.Supp. at 1418 (describing "aspect ratios"); Janine V. McNally, "Congressional Limits on
17
Technological Alterations to Film: The Public Interest and the Artists' Moral Right," 5 High
Tech. L.J. 129, 132-33 (1990)(describing "panning and scanning"); Adams Decl., Exs. O, P.
18
In order to "pan-and-scan" the images, at minimum, portions of the original film image are
cut-off to fit onto a television screen, materially affecting the work, itself.  *Id.*  In addition to
19
eliminating part of the picture, the "pan-and-scan process" will often involve creating camera
movement where none existed before:  for instance, in a "wide shot" in which two characters
20
appear within the frame at the same time, a "pan-and-scan" often "moves" back and forth
between the characters, whereas in the original version there was no such movement. *Id.*  A
21
pan-and-scan version can also result in a "cut" where none existed before.  All of these
decisions involve artistic skill and judgment, and are sufficiently "original" to result in the
22
creation of a new derivative work.  *See Maljack Productions*, 964 F.Supp. at 1427-28
("[M]aking artistic decisions about the composition of each frame of the 1963 picture,
23
determining which portions should stay and which should be 'chopped off'… are sufficiently
original to warrant copyright protection for the new pan and scan material.")

24
[35] For example, many films were originally released in "stereo" sound, which comprises two
25
separate audio "channels," but a DVD release of the film often contains a "Dolby 5.1" audio
track, in which there are six different audio "channels" all playing separate sounds that work
26
together to create a new audio effect on the audience.  *See Bose Corp. v. Jbl, Inc.*, 112 F.
Supp. 2d 138, 161 n.5 (D. Mass. 2000)(describing "surround sound"); *Eprad, Inc. v. Dolby*
27
*Laboratories, Inc.*, 209 U.S.P.Q. (BNA) 238, 1980 U.S. Dist. LEXIS 16640 at *9-
*13)(describing Dolby's advances in motion picture sound); Adams Decl., Ex. N.  Thus,
28
when films are released on DVD, they can and will often contain *multiple* new audio
"tracks."  *See* Williamson Decl., Exs. A (containing new soundtrack mix), B (containing new
"Dolby 5.1" soundtrack mix), C (new presentation in "Dolby Stereo" in English and "Dolby

39

1    these re-mixes and adjustments to a film's sound necessarily involve sophisticated

2    artistic decisions about the desired use and effect of the sound that result in the

3    creation of a new derivative work.  *See* 17 U.S.C. § 114(b)(a new derivative work

4    results if "the actual sounds fixed in the sound recording are rearranged, remixed or

5    otherwise altered in sequence or quality"); *Bridgeport Music, Inc. v. Dimension Films*,

6    410 F.3d 792, 804 (6th Cir. 2005)(re-mixes of audio recordings are derivative works);

7    *Maljack*, 964 F. Supp. at 1428 ("[Plaintiff] also digitized the soundtrack of the 1963

8    movie, remixed it, stereoized the previously monaural sound, and upgraded the quality

9    of the sound, all of which required a creative mixing and balancing of sounds"

10   creating a new derivative work as "[t]he Copyright Office accepts alterations such as

11   remixing and stereoizing as sufficiently original to constitute derivative works.").

12        Similarly, the DVD subtitles feature, which has a choice of several language

13   translations, also results in a "new" derivative work.  17 U.S.C. § 103(a) specifically

14   defines a "translation" of a pre-existing work as a derivative work.  The reason for this

15   is clear:  Any translation, especially of a creative work, will necessarily result in the

16   exercise of artistic skill and judgment in selecting the most accurate and/or appropriate

17   word to use, and thereby has sufficient originality to constitute a derivative work.  A

18   prior film translated in its DVD version thus constitutes a new derivative work by

19   definition.  *See* 17 U.S.C. § 103(a); *Int'l Film Exchange, Ltd. v. Corinth Films, Inc.*,

20   621 F. Supp. 631, 636 (S.D.N.Y. 1985)("[V]alid [derivative] copyrights may [] exist

21   with respect to any English-language, dubbed, or subtitled versions of the Film.");

22   *Cambridge Lit. Properties, Ltd. v. W. Goebel Porzellanfabrik G.M.B.H. & Co. KG.*,

23   510 F.3d 77, 89 n.11 (1st Cir. 2007)("As a translation, [it] is a derivative work.").[36]

24

---

25   Mono" in French), D (new Dolby soundtrack mix in re-edited film); Adams Decl., Ex. N.
     Even when the original "stereo" soundtrack is included, it can be and usually is upgraded or

26   otherwise altered during the process of converting it into a home video format.  *See Maljack*,
     964 F.Supp. at 1429.

27   [36] Similarly, a Superman film or television program "dubbed" in another language also

28   constitutes a new derivative work, as it incorporates both a translated script and
     performances.  *See Gamma Audio & Video v. Ean-Chea*, 11 F.3d 1106, 1109 (1st Cir.
     1993)(holding that dubbed television programs constitute new derivative works).

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1    Additionally, the common DVD addition of "director's commentary" over the

2    soundtrack of prior works will likewise result in a "new" derivative work.  In such

3    commentary, the director (or producer, star, writer, etc.) comments on the movie in a

4    separate audio track that may be played simultaneously with the film, constituting

5    both (a) editorial elaborations on the film itself and (b) a "remix" of the film's audio

6    track.  *See* 17 U.S.C. § 103(a)(original "editorial revisions, annotations, elaborations,

7    or other modifications" qualify as a derivative work); 17 U.S.C. § 114(b)(if "the actual

8    sounds … are rearranged, remixed or otherwise altered in sequence or quality," a new

9    derivative work results).  DVDs also commonly contain "featurettes" that include film

10   scenes which constitute new derivative works in and of themselves.

11   Any of the above, for the most part, qualitatively alters the film or television

12   program itself and does not exist independently of it.  Had Defendants merely

13   transferred their Superman films and television series directly to DVDs, without

14   material revisions or additions, the result may be different.  However, this clearly is

15   not the case:  Defendants' post-termination DVDs of pre-termination Superman films

16   and television series contain new edits (additions, deletions, rearrangements) of the

17   original material, new audio mixes, new foreign-language translations, and new

18   overlaid commentary, which clearly result in a "'distinguishable variation' that is

19   more than 'merely trivial'" and thus qualify as post-termination derivative work for

20   which Defendants must account.  1 *Nimmer* § 3.03[A] at 3-13 (cit. om.).

21

22              a.    Key Examples of DVD Releases of Pre-termination Works
                      Resulting  in New Derivative Works

23   The following notable examples of pre-termination Superman works

24   reconfigured for a DVD release amply qualify as "new" derivative works under the

25   legal standards discussed above.

26   • *Superman: The Movie* (2000):  This DVD of the film *Superman* (1978) features

27   *eight minutes* of additional footage directly incorporated into the DVD version of the

28   film, a restoration of the original footage and soundtrack, a re-mixing of the sound

41

into Dolby 5.1 sound, a commentary track from the director and a creative consultant, and three "featurettes" regarding the production of the film along with screen tests. *See* Williamson Decl., Exs. A, B; Adams Decl., Exs. Q, R.

- *Superman II: The Richard Donner Cut* (2006).  This revamped "cut" of the pre-termination film *Superman II* (1980) was edited by director Richard Donner ("Donner"), the original director of *Superman: The Movie* (1978).  *See* Williamson Decl., Ex. C, D; Adams Decl., Exs. S, T.  Donner was fired from *Superman II* and it was completed by another director, Richard Lester.  *See* Adams Decl., Ex.__.   This is essentially a different film than the original *Superman II*, using ample footage not used in the original theatrical release, with the scenes edited in a different order and containing a different ending.  *Id.* Exs. S-V.   This "new" version of the film changes the plot, ending, and many of the individual scenes contained therein.  Adams Decl., Ex. U at E1.  The DVD release also includes an introduction by Donner, a feature-length commentary track, a "featurette" on the making of the movie, deleted scenes, and subtitles in English, French and Spanish.  *Id.*; Williamson Decl., Exs. C, D.

- *The Adventures of Superman* (2005, 2006):  This television series originally ran on network television (1952-1958).  *See* http://www.amazon.com.  The DVD releases include commentary tracks, additional featurettes, "closed captioning" subtitles, and French and Spanish subtitles.  *Id*.

## 2.   The Court Should Set Forth Guidelines Governing The "Derivative Works Exception" On Which Defendants Bear the Burden

To the extent Defendants invoke the "derivative works exception" to reduce their accounting obligation, *Defendants* have the burden of proving that their post-termination exploitation of a Superman work falls under this statutory exception.  *See Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995) (burden of proving Section 304(c)'s "derivative works exception" falls on the grantee, under general rule that the burden falls on party claiming rights under a statutory exception); 3 *Nimmer* § 11.02[C][2] at 11-28 (2006) (The derivative works exception falls under "the general

1   rule that the burden falls on a party claiming rights under a statutory exception.");

2   *Mills Music*, 469 U.S. at 188 (White, J., dissenting)("In attempting to claim for itself

3   the benefits of the derivative-works exception, Mills bears the burden of proof.").

4       Given that Defendants have the burden of proving this statutory "derivative

5   works exception," Plaintiffs have not presented all post-termination alterations of pre-

6   termination derivative works that will be at issue at trial.  *Id*. However, as "the

7   question of whether [a work] is derivative is a mixed question of law and fact," the

8   Court should establish guidelines based on the implicated questions of law that will

9   govern and simplify the conduct of the trial.  *Jarvis v. K2 Inc.*, 486 F.3d 526, 531, n.5

10  (9th Cir. 2007).  *See Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)

11  ("[D]etermination of the correct legal standard to apply … is a question of law.");

12  *Cessna Air. Co. v. Hartford Accident & Indem. Co.*, 900 F.Supp. 1489, 1500 (D. Kan.

13  1995)(Court may rule on "purely legal issues" of a "mixed question of law and fact").[37]

14      Specifically, the Court should order Defendants to account to Plaintiffs for pre-

15  termination derivative works that have been modified post-termination when such

16  alterations constitute a "'distinguishable variation' that is more than 'merely trivial.'"

17  1 *Nimmer* § 3.01, *quoting Entertainment Research Group*, 122 F.3d at 1221.  The

18  Court should further order that, without limitation, Defendants must account to

19  Plaintiffs for profits from DVD releases of pre-termination Superman works that

20  contain one or more of the following, as such clearly results in a new derivative work

21  under this legal standard:  (a) new addition or editing of footage; (b) new "pan-and-

22  scan" reformatting; (c) new audio "mixes;" (d) new foreign-language subtitles or

23  "dubbed" foreign-language audio tracks; (e) new overlaid "commentary" track(s); and

24  (f) additional DVD modifications/features determined at trial.

25

26  [37] *See also Chapman v. Pacific Tel. & Tel. Co.*, 613 F.2d 193, 198 (9th Cir. 1979)(Courts
    may issue pre-trial order to "clarify and simplify the issues at trial"); *Biggers v. Bankers*

27  *Bond Co.*, 171 F.Supp. 94, 95 (D. Ky. 1959)(Court may issue ruling "to simplify the issues,
    eliminate from the controversy all questions of law and to clarify the questions of fact on

28  which proof is to be offered and which questions of fact are ultimately to be submitted to the
    jury for its determination.").

## VII.   DEFENDANTS CANNOT USE THEIR ALLEGED "TRADEMARKS" TO DEVALUE OR ENCUMBER PLAINTIFFS' COPYRIGHTS

As a preliminary matter, Defendants may not use their alleged "trademarks"[38] to prevent Plaintiffs' exploitation of their rights as a copyright co-owner, as that would improperly elevate their trademarks above Plaintiffs' copyright(s) in contravention of the U.S. Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33–34, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003).  In *Dastar*, the Supreme Court ruled that trademark owners could not use their trademarks to block others from exploiting a television series in the public domain, holding that trademark law is necessarily subsidiary to copyright law, and should not be construed so as to conflict with copyright law.  *Id.* at 29-31, 37, 38.  "The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and to 'protect persons engaged in….commerce against unfair competition.'"  *Id.* at 26 *citing* 15 U.S.C. § 1127.  *Dastar* holds that when extending trademark protection to communicative products one may not encroach on the constitutional domain of copyright law:

> "The problem with this argument according special treatment to communicative products is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically… Thus, in construing the Lanham Act, we have been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright."

*Id.* at 33–34 (cit. om.).  *See Traffix Devices v. Mktg. Displays,* 532 U.S. 23, 29 (2001).

Accordingly, if an assertion of trademark conflicts with copyright, trademark law must yield.  *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)("[C]ourts should proceed with caution in assessing [trademark] claims … so as not to undermine the objectives of [copyright law]."); 1 *Nimmer* § 1.01 ("[T]rademark law itself must be construed in such a way so as not to undermine copyright protection … Courts have long limited application of the Lanham Act so as

---

[38] Defendants have broadly claimed a trademark in the name "Superman" across most media and products, including but not limited to "Comic Magazines," "Books," "Motion Pictures, Television Programs, Animated Cartoon Films and Water Shows," and "Clothing."  *See* Declaration of Michael Bergman in Support of Defendants MSJ ("Bergman MSJ Decl.") Ex. P at 161, 165, 168-170.

44

1  not to encroach on copyright interests."); 1 *McCarthy on Trademarks and Unfair*

2  *Competition* § 6:17.50 (4th Ed.)("[T]rademark law cannot be used as a substitute for a

3  copyright."); 1 *Gilson on Trademarks* § 2A.10 (same); Laura A. Heymann, Article,

4  *The Trademark/Copyright Divide,* 60 SMU L. Rev. 55, 81 (2007)(*Dastar* "proceed[s]

5  from a belief that, as between the two, copyright law enjoys a natural preeminence

6  over trademark law.").[39]

7          Similarly, the Ninth Circuit ruled in *Comedy III Prods. v. New Line Cinema*,

8  200 F.3d 593, 595 (9th Cir. 2000) that the owner of trademark interests in the Three

9  Stooges could not use its trademark to block another party from exercising its right

10  under the Copyright Act to exploit a Three Stooges film clip in the public domain:

11          "[T]the footage at issue here was clearly covered by the Copyright Act,
           17 U.S.C. § 106, and the Lanham Act cannot be used to circumvent
12          copyright law. . . .Issues of secondary meaning are not the point here, but
           rather the question is whether Comedy III has articulated a trademark
13          interest in the clip which would prevent New Line from using it in a
           motion picture without Comedy III's permission."
14

15          While *Dastar* and *Comedy III* addressed situations in which copyrighted works

16  had entered the public domain, their holdings are no less applicable to copyright

17  interests recaptured under the Copyright Act.  17 U.S.C. § 304(c).[40]  Nothing in the

18  Copyright Act suggests that a recaptured copyright should be restricted by trademarks

19  ─────────────────────
   [39]   *See Ets-Hokin v. Skyy Spirits*, 225 F.3d 1068, 1080 (9th Cir. 2000)("For good reason, the
20  Supreme Court cautions against mixing the doctrines of trademark and copyright."); *EMI
   Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 63 (2d. Cir.
21  2000) (purported trademark use is an "unwarranted extension into an area already protected
   by copyright law."); *RDF Media Ltd. v. Fox Broad. Co*., 372 F. Supp. 2d 556 (C.D.Cal.
22  2005)("If …'visual expression' necessarily will form…the 'trade dress,' then every incident
   of visual expression would be subject to copyright and trademark protection and that
23  protection would last in perpetuity. This theory has been rejected on numerous occasions.").

24  [40] The reasoning of *Dastar* applies with equal force to works that continue to be protected by
   copyright. *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 148–49 (5th Cir. 2004)
25  (applying *Dastar* to a claim regarding a copyrighted computer program); *Williams v. UMG
   Recordings*, 281 F. Supp. 2d 1177, 1185 (C.D. Cal. 2003)("[T]he Supreme Court's holding
26  did not depend on whether the works were copyrighted or not. While the film footage at
   issue in *Dastar* was not copyrighted at the time of distribution by Dastar, the Court's holding
27  is in no way limited to uncopyrighted material."); *Turtle v. Castle Records Inc.*, 2004 U.S.
   Dist. LEXIS 29124 (N.D. Cal. 2004)("the broader principles discussed in *Dastar* make clear
28  that the Court's definition of 'origin' under the Lanham Act was not limited to cases
   involving [unprotected] work.").

45

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1  developed by a previous grantee.  *Id.*  Indeed, such a notion is antithetical to the strong

2  legislative policies behind the termination right; namely, to give authors an

3  opportunity to reap the financial rewards of their creations' eventual success, despite

4  their unequal bargaining position at the outset.  *See Mills Music*, 469 U.S. at 172-173

5  *citing* H. Rep. No. 94-1476, at 124 (1976).  Yet Defendants intend to use their alleged

6  trademarks to devalue the copyrights recaptured by Plaintiffs under the Copyright Act,

7  much as the trademark owners in *Dastar* and *Comedy III* tried to use their trademarks

8  to prohibit the rightful use of works in the public domain under the Copyright Act.

9         It bears emphasis that trademarks are meant to protect against consumer

10  confusion, not to grant proprietary monopolies in perpetuity.  *See Qualitex Co. v.*

11  *Jacobs. Prod. Co.*, 514 U.S. 159, 163–64 (1995)(Trademarks "reduce the customer's

12  costs of shopping and making purchasing decisions"); *Dastar*, 539 U.S. at 32-33.[41]

13         The clear legislative objectives of the Copyright Act's recapture right will be

14  thwarted if misconstrued to apply only to aspects of a copyright that had not been

15  trademarked by a prior grantee.  Defendants cannot use their trademarks to undercut

16  the economic benefits flowing from Plaintiffs' Section 304(c) termination by claiming

17  that an unspecified portion of Defendants' profits is "really" attributable to trademarks

18  rather than their jointly-owned Superman copyrights.  The Lanham Act may not serve

19  as an easy end-around the Copyright Act.[42]    *Dastar*, 539 U.S. at 29-31, 37, 38.

---

20  [41] *See also* Sheldon W. Halpern, Article, *A High Likelihood of Confusion: Wal-Mart, Traffix,*
21  *Moseley, and Dastar – The Supreme Court's New Trademark Jurisprudence*, 61 N.Y.U.
    ANN. SURV. AM. L. 237 (*Dastar* sought to "constrain trademark, or at least the expanding
22  Lanham Act 43(a) version of it, to its traditional consumer focus and away from proprietary
    interests.... The Court, in clearly restraining expansion of trademark law, seeks to redirect the
23  law's focus to its traditional consumer-related concerns and away from the development of
    proprietary rights; an attempt to reverse the drift of trademark rights toward a "property-like"
24  construct and away from a limited 'right appurtenant.'").

25  [42] *See* Lauren Beth Emerson, Note, *Termination of Transfer of Copyright: Able to Leap*
    *Trademarks in a Single Bound?* 75 FORDHAM L. REV. 207 at 250–51 (2006) (re: Plaintiffs'
26  Decl. Relief claim regarding Superman's "crest" in *Action Comics No. 1* (Plaintiffs' First
    Amen. Complaint, ¶¶ 60-64):

27         "… [the Court] should grant the Siegels the declaratory relief they seek….Where
           applying trademark law would necessarily conflict with provisions in the Copyright
28         Act, such as the termination provisions, trademark law must yield.  Though the
           Supreme Court [in *Dastar*] addressed this issue in a different context, the principle

46

1    Defendants' trademarked communicative works cannot prevent Plaintiffs from

2  exploiting derivative works based on its jointly owned Superman copyright(s) as

3  copyright ownership clearly entails the right to prepare and distribute derivative works

4  and/or to authorize others to do so.  17 U.S.C. § 106(2), (3).  A derivative work is a

5  work in any form in which the underlying work "may be recast, transformed, or

6  adapted."  17 U.S.C. § 101.  Plaintiffs, as co-owners of the *Action Comics No. 1*

7  copyright, therefore enjoy the full right to prepare and distribute, and to authorize

8  others to prepare and distribute, derivative works of *Action Comics No. 1*.

### A.   Defendants Cannot Prevent Plaintiffs From Using The Name Superman In Exploiting *Action Comics No. 1* or Derivative Works

11    The Court correctly ruled that "Superman's name…does not remain within

12  defendants' sole possession to exploit."  Order at 40:8-13.  Defendants were forced to

13  concede this point but continue to hedge:  "Plaintiffs as co-owners of [*Action Comics

14  No. 1*] are free to use the Superman name to accurately and truthfully identify any

15  future exploitation of their own, so long as such use (1) does not infringe any of the

16  unterminated copyrighted material still held by Defendants, and (2) does not cause a

17  likelihood of confusion as to source, affiliation or sponsorship of such a product *with

18  Defendants*, which would constitute a violation of the Lanham Act."  Defendants

19  Reply in Support of Motion for Clarification/Reconsideration ("Defs. Clr. Reply") at

20  11:21-12:3.  Previously, Defendants argued that names are "not the subject matter of

21  copyright protection" and that "the word 'Superman' has become a valuable

22  *trademark* <u>exclusively</u> owned by DC Comics."  Defendants Motion for

23  Clarification/Reconsideration ("Defs. Cl. Motion") at 19:25- 20:8.

---

as the Court articulated it is broad and equally applicable here.  Allowing trademark rights to trump the Copyright Act would render the termination of transfer provisions effectively futile…Trademark rights are granted not for the benefit of the commercial entities that exploit them, but for the benefit of the consumers who use trademarks to distinguish merchandise.  The scope of the copyright returned to the Siegels, therefore, must be limited only by the four corners of the comics themselves, and not by DC Comics' trademarks."

47

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

It is noteworthy that while copyright generally does not apply to names *per se*, or to the isolated use of names, courts have extended copyright protection to names *to the extent they serve to define well delineated copyrightable characters*.  "Superman" is plainly such a character.  *Compare* 37 C.F.R. § 202.1(a): "[The following are not copyrightable:] words and short phrases such as names, titles, and slogans; familiar symbols or designs...") *with Danjaq LLC v. Sony Corp*, 49 U.S.P.Q.2d (BNA) 1341 (C.D. Cal. 1998)( enjoining Sony from making its own James Bond movie :  "First and foremost, the Defendants intend to use the identical character name ('James Bond')..."); *Edgar Rice Burroughs, Inc. v. Manns Theatres*, 195 U.S.P.Q. (BNA) 159, 1976 U.S. Dist. LEXIS 11754 at *9 (C.D. Cal. 1976)("Famous character names in copyrighted works may not be used by others during the life of the copyright without the authorization of the copyright proprietor."); *Universal City Studios, Inc. v. Kamar Industries, Inc.*, 217 U.S.P.Q. (BNA) 1162 (S.D. Texas 1982)("'E.T.' actually constitutes the story being told.  The name 'E.T.' itself is highly distinctive and is inseparable from the identity of the character."); *Patten v. Superior Talking Pictures, Inc.*, 8 F. Supp. 196, 197 (S.D.N.Y. 1934)("[A] name which has become descriptive, and is closely identified in the public mind with the work of a particular author, may not, during the life of the copyright, be used…").[43]  Such holdings are consistent with the Court's recent ruling "that the name Superman, by itself, is [not] copyrightable," but the name "Superman" may be freely exploited by Plaintiffs is protected *within the context* of exploiting the copyrighted Superman character and story contained in *Action Comics No. 1.  See* July 8, 2008 Order at p.3, n.1.

For the reasons set forth above, Plaintiffs respectfully request a ruling that

---

[43] *See also Gaiman v. McFarlane,* 360 F.3d 644 (7th Cir. 2004)("Although Gaiman's verbal description of Cogliostro may well have been of a stock character, once he was drawn and named and given speech he became sufficiently distinctive to be copyrightable."); *Anderson v. Stallone,* 11 U.S.P.Q.2d (BNA) 1161 (C.D.Cal. 1989)("Rocky Balboa is such a highly delineated character that his name is the title of all four of the Rocky movies and his character has become identified with specific character traits..."); 1 *Nimmer* on Copyright § 2.12, at 2-178.30 (2007)("Although copying of a character's name is not in itself decisive, it is a factor to be considered in determining whether the character as appropriated is sufficiently distinctive to constitute an infringement.")

48

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

Defendants may not use their alleged trademark in the name "Superman" to prevent or discourage Plaintiffs from using Superman's name in connection with the exploitation of the Superman character and story in *Action Comics No. 1* and in works derivative of *Action Comics No. 1*.  *See* 17 U.S.C. § 106(2), (3).

## VIII. DEFENDANTS MUST ACCOUNT TO PLAINTIFFS FOR THE USES OF COPYRIGHT THAT PERVADE DEFENDANTS' EXPLOITATION OF THEIR ALLEGED TRADEMARKS

### A.   Defendants Must Account for "Mixed Uses" of Copyright and Trademark

Under the Copyright Act, the words and illustrations, including pictorial symbols which first appeared in *Action Comics No. 1* (e.g., the telescoping moniker "Superman," and the rendering of the hero in blue tights, red cape and trunks, with an triangulated "S" crest on his chest) are part and parcel of the copyrighted matter that Plaintiffs recaptured under the Copyright Act.  17 U.S.C. §304(c).  Plaintiffs are entitled to an accounting of profits from *any* exploitation by Defendants of any such copyrighted matter.  *See Oddo,* 743 F.2d at 632-633; 1 *Nimmer* §§ 6.03, 6.10 (2006). Plaintiffs are just as clearly entitled to an accounting for any "mixed use" of copyright and trademark featuring  text, pictures and/or illustrated symbols from or derivative of their copyright in *Action Comics No. 1*.  *Id.*

Defendants made the straw man argument that as a termination "in no way affects rights under any other Federal [or] State…laws," 17 U.S.C. §304(c)(6)(E), Plaintiffs cannot "recover a share of Defendants' profits attributable to DC's continuing use of the Superman trademarks."  *See* Defendants' Motion for Summary Judgment ("Def. MSJ") at 26:3-6.  This is not relevant to "mixed uses" of copyright and trademark as the federal Copyright Act also remains intact under Section 304(c)(6)(E).  A trademark does not bar the application of copyright law to a recaptured copyright.  For instance, a trademark would be no defense to copyright infringement.  *Boyle v. U.S.*, 200 F.3d 1369, 1373-74 (Fed. Cir. 2000) ("possession of

49

1    a service mark is not a defense to infringement of a valid copyright.")[44]

2         The Court ruled that "profits defendants garner from the use of Superman

3    trademarks that 'are purely attributable to [those] trademark rights'… are not subject

4    to accounting."  Order at 68:1-4, *quoting* Defendants' Motion for Summary Judgment

5    Reply ("Def. MSJ Reply") at 11.  Defendants carry the burden of proof in applying

6    this alleged statutory exception under Section 304(c)(6)(E).  *See Woods* 60 F.3d at

7    993; 3 *Nimmer* § 11.02[C][2] at 11-28 (2006). Yet, Defendants have never articulated

8    what, if anything, constitutes a "pure" trademark use.  Defs. MSJ Reply at 11.

9    Defendants essentially conceded that "mixed uses" of trademark and copyright are

10   subject to an accounting:  "'mixed use' of copyright and trademark rights…can be

11   dealt with by the Court either at trial or in a subsequent accounting."  *Id.* at 14:5-10.

12        A review of "The Official Warner Bros. Shop" website reveals that the vast

13   majority of Defendants' Superman merchandising constitutes derivative copyright

14   exploitation or at least a "mixed use" of copyright and trademark.  *See* Adams Decl.,

15   Ex. W.  For instance, all of the following clearly use and/or are derived from

16   copyrighted material in *Action Comics No. 1*, specifically the heroic Superman

17   character, Superman's costume, its color scheme, crest, telescoping moniker, Lois, or

18   a combination thereof:

19
20
21
22

|  |  |  |  |
|:---:|:---:|:---:|:---:|
| **Exhibit W(i)** | **Exhibit W(ii)** | **Exhibit W(iii)** | **Exhibit W(iv)** |

23

24   [44] *See also Hamdad Trust v. Ajit Newspaper Adver., Mktg. & Communs., Inc*, 503 F.Supp.2d

25   577, 582 n. 6 (E.D.N.Y. 2007)("Trademark protection is no defense to copyright infringement, because 'although the grant of a service mark registration entitles the registrant to certain rights and privileges under the Trademark Act . . . the right to infringe another's copyright is not one of those.'"); *Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F.

26   932, 935-36 (S.D.N.Y. 1921)(Hand, J.)("The fact that one owns a trade-mark gives him no

27   right to copy a picture of that mark, nor can he give another the right to use the picture's copy."); *McCarthy on Trademarks and Unfair Competition* § 6:14 ("When one is alleged to have

28   infringed another's copyright in a work … the fact that the defendant has acquired and registered valid trademark rights … is no defense to the copyright infringement charge.")

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES



Exhibit W(v)     Exhibit W(vi)     Exhibit W(vii)     Exhibit W(viii)

Exhibit W(ix)     Exhibit W(x)     Exhibit W(xi)     Exhibit W(xii)

Exhibit W(xiii)     Exhibit W(xiv)     Exhibit W(xv)     Exhibit W(xvi)

Exhibit W(xvii)     Exhibit W(xviii)     Exhibit W(xix)     Exhibit W(xx)

*See* Adams Decl., ¶ 24, Ex. W.

**B.    Defendants' Trademarks Are Derivative Works of *Action Comics No. 1*, Constituting a "Mixed Use" of Copyright and Trademark**

Defendants' Superman merchandising is arguably their most consistently lucrative exploitation of the character.  To avoid accounting for this profitable sector, Defendants will argue that Superman merchandising profits "are purely attributable to [their] trademark rights," rather than their jointly owned Superman copyrights, and that their trademarks and/or the material underlying their marks are not copyrightable.

Such arguments stray far from reality.  Defendants broadly claim trademarks in

51

1  the Superman crest, the telescoping Superman moniker, Superman's costume and

2  various graphic depictions of the Superman character across most media and products.

3  *See* Bergman MSJ Decl. Ex. P at pp. 161-218.  As explained in detail below, these

4  alleged "trademarks" are copyrighted derivative works based on their copyrighted

5  counterparts in *Action Comics No. 1.*[45]  Thus, such post-termination merchandise

6  necessarily constitute derivative works under the Copyright Act or derivative "mixed

7  uses" of copyright and trademark, for which Defendants must account.[46]  *See* 17

8  U.S.C. § 101 (derivative work is a work in any form in which the underlying work

9  "may be recast, transformed, or adapted").

10      A work's qualifications as a trademark and/or a copyright are <u>not</u> mutually

11  exclusive.  The Copyright Office "will register a properly filed copyright claim in a

12  print or label that contains the requisite qualifications for copyright even though there

13  is a trademark on it." 37 C.F.R. § 202.10(b).  *See, e.g., Car-Freshner Corp. v. Auto*

14  *Aid Mfg. Corp.*, 461 F. Supp. 1055, 1057 (S.D.N.Y. 1978) (recognizing in trademark

15  infringement action that defendant was also "the copyright owner of [the] logos and

16  designs.")  Thus, the mere fact that Defendants use or registered the Superman shield,

17  the telescoping Superman moniker or Superman action illustrations as trademarks

18  does not negate their derivative copyright status.

19

20      1.   <u>Defendants' Trademarks in Graphic Depictions of Superman</u>
            <u>Necessarily Constitute Derivative Copyrights and/or "Mixed Uses"</u>

21      Defendants have "trademarked" graphic illustrations of the Superman character

22

---

23  [45] The term "copyrighted" as opposed to "copyrightable" is used because under the 1976
    Copyright Act a copyrightable work secures a statutory copyright at inception.  17 U.S.C. §
24  102(a)("Copyright protection subsists … in original works of authorship fixed in any
    tangible medium of expression.")

25  [46] Defendants have stated that the "vast majority" of their uses of trademark "do not involve
26  mixed uses but only uses of the Superman word mark and the 'S' shield logo which is,
    similarly, not protected by copyright."  Defendants' Reply in Suppory of Motion for
27  Clarification ("Def. Clar. Reply") at 11:27-28.  Even a cursory review of Defendants'
    merchandising websites ("WB Shop" and "DC Direct"*at* http://www.wbshop.com/index.xml
28  and http://dccomics.com/dcdirect/, respectively) reveal that this is not true.  Moreover, the
    "S" shield and the telescoping "Superman" logo are both copyrightable and clearly
    derivative of the "S" crest and  telescoping "Superman" moniker in *Action Comics No. 1.*

in a wide variety of media and merchandise from clothing to kitchenware to clocks:

| | | | |
|---|---|---|---|
|  |  |  |  |
| No. 1178048 | No. 1180292 | No. 1200233 | No. 1200387 |
|  |  | |  |
| No. 1201149 | No. 1201167 | | No. 1235769 |

*See* Bergman MSJ Decl., Ex. P at pgs. 182, 184-189.  Clearly, these graphic depictions of Superman are also, by definition, derivative works under the Copyright Act of the illustrated Superman character in *Action Comics No. 1*.  *See* 17 U.S.C. § 102(a)(5)(pictorial works, including "works of graphic art, and illustration," are copyrightable); 1 *Nimmer* § 2.08[B][1] at 2-84 ("With respect to works of art [including illustrations] . . . the requirement of minimal creativity is applied not as a matter of policy, but rather as a matter of definition") and 2-85 ("[T]he courts are rightly inclined to accept as a work of art any work which by the most generous standard may arguably be said to evince creativity.")

2.   The Telescoping "Superman" Moniker Comprises a "Mixed Use" of Trademark and Copyright

The Court correctly ruled that "Superman's name…does not remain within defendants' sole possession to exploit" (Order at 40:8-13) and, as discussed above, courts have extended copyright protection to names to the extent they help define well delineated copyrightable characters.  *See* Section VII(A), *infra*.  Yet, while forced to concede that Plaintiffs may use the Superman name, Defendants continue to hedge.  *See* Def. Clr. Motion at 19:25- 20:8 and Def. Clr. Reply at 11:21-12:3.

1    Defendants have claimed two sets of trademarks with respect to the word

2  "Superman."   The first set relate to the use of the name (only) "Superman" with

3  respect to a wide variety of goods and services.  *See* Bergman MSJ Decl, Ex. P at 161-

4  174.  While Defendants may claim that the use of the "Superman" name, standing

5  alone, would constitute a "pure" trademark use for which Defendants would not have

6  to account to Plaintiffs, it is rarely exploited in this fashion.  Instead, Defendants

7  commonly use the name "Superman" in merchandise that constitutes a "mixed use" of

8  their alleged trademark and Plaintiffs' Superman copyrights (*e.g.*, on apparel that

9  resembles Superman's costume in *Action Comics No. 1* or by its color configuration

10  (yellow and red on a blue backgroun) "mimics" Superman's copyrighted costume.)[47]

11    The second set of trademarks involves the classic three-dimensional telescoping

12  "Superman" moniker.  *Id.,* Ex. X at 175-181, 183.  Whereas, a name or title alone may

13  not be copyrightable, the graphic depiction or illustration of a name or title *is*

14  copyrightable.  *See Twentieth Century Fox Film Corp. v. Marvel Enters.*, 220 F. Supp.

15  2d 289, 292 (S.D.N.Y. 2002)(finding logo consisting of an "X" inside a circle had

16  "the requisite degree of originality to be copyrightable as a derivative work").[48]

17  Defendants' illustrated telescoping 3-D "Superman" moniker is just as clearly

18  *derivative* of the illustrated telescoping 3-D "Superman" moniker that first appeared in

19  *Action Comics No. 1,* as demonstrated below.

---

[47] Of course, such use of the "Superman™" name is clearly a "mixed use" in any context in which elements of Superman's appearance, powers, or parts of the Superman story appear.

[48] *See also O'Connor v. Cindy Gerke & Assoc.*, 300 F.Supp.2d 759, 768 (W.D. Wis. 2002)(a corporate logo spinning onto the screen and coming to a stop in the middle of a red background, was copyrightable); *Camp Beverly Hills, Inc. v. Camp Cent. Park, Inc.*, 1982 U.S. Dist. LEXIS 10019, 2 (S.D.N.Y. 1982)(granting preliminary injunction in favor of plaintiff in action for infringement of copyright in a logo consisting of stylized version of "CAMP BEVERLY HILLS")

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES



Action Comics No. 1

No. 1181537 | No. 1108577

The illustrated "Superman" moniker in *Action Comics No. 1* is copyrightable as a stylized illustration evincing some originality in its design and appearance.  *See Drop Dead Co. v. S.C. Johnson & Son, Inc.*, 326 F.2d 87, 89 (9th Cir. 1963) (holding that when a label "has 'some value' as a composition, it is no longer a 'mere label'" and is copyrightable).   Specifically, the unique and striking appearance of the "Superman" moniker, including the stylized telescoping effect of the letters growing increasingly smaller, their "arching" alignment and their "blocky" three-dimensional effect, all evince sufficient originality to qualify for copyright protection.  Other logos or emblems have been held to be copyrightable, even when they consisted of little more than a letter within a common shape.  *See Marvel Enterprises*, 220 F. Supp. 2d at 292; 1 *Nimmer* § 2.08[G][3] at 2-137-38 (Courts have rejected the idea that labels or logos are not copyrightable, as "the originality required to support a copyright may be of a most minimal nature"; *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 543 (2d Cir. 1959)(holding an unimaginative chocolate cake label was sufficiently original).  Defendants must therefore account to Plaintiffs for any new post-termination exploitation of the telescoping "Superman" moniker, notwithstanding that Defendants have also trademarked this copyrighted material.

> 3.    Defendants' Superman "Crest" Is a Copyrighted Derivative Work of Superman's "Crest" in *Action Comics No. 1* for Which Defendants Must Account

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

Under the Copyright Act, Defendants' "S" crest or "shield" is also clearly derivative of Superman's "S" crest as it appeared in *Action Comics No.* 1, and such drawings are protected "under the general protection accorded to pictorial, graphic and sculptural works." 1 *Nimmer* § 2.08[G][1] at 2-133. *See* 17 U.S.C. § 102(a)(5)(works of authorship defined as including "pictorial, graphic and sculptural works"). Regardless of whether Defendants have separately registered their Superman shield with the Copyright Office, it is a derivative copyrighted work under the 1976 Act, where registration is not a prerequisite to copyright protection. *See* 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works."), § 102(a)("Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression."); § 411(a). *See also* 2 *Nimmer* § 7.16 [B][1][b][iii] ("[R]egistration is a formality…[not] a condition for copyright protection.").

The Superman crest in both *Action Comics No. 1*. and in its subsequent derivative form, with its unique and striking design and color combination, is clearly copyrighted material. 17 U.S.C. § 102(a)(5); *see* 1 *Nimmer* § 2.08[G][3] at 2-137-38. Provided that a logo or label "has 'some value' as a composition, it is no longer a 'mere label'" and is the proper subject of copyright protection. *Drop Dead Co.*, 326 F.2d at 89 (internal citations omitted). *See Pickett v. Prince*, 207 F.3d 402, 404 (7th Cir. 2000)(holding "Prince's" symbol is copyrightable).[49]

Moreover, Superman's crest as illustrated in *Action Comics No.1* forms part of Superman's copyrighted costume and character furthering his traits. The triangular design centered on Superman's muscular "V" chest accentuates his "Super-strength" and harks back to the crests of medieval knights, underscoring Superman as a "Champion of the Oppressed." *See Action Comics No. 1* at p. 2.

Defendants cannot seriously contend that their illustrated Superman crest is not

---

[49] *See also Abli, Inc. v. Standard Brands Paint Co.*, 323 F. Supp. 1400, 1403 (C.D. Cal. 1970) (label copyrightable as long as it "was more than merely descriptive and was dictated by more than functional considerations."); *Griesedieck Western Brewery Co. v. Peoples Brewing Co.*, 56 F. Supp. 600, 606 (D. Minn. 1944) ("Stag" brand beer logo showing a picture of a stag's head is copyrightable); *Central Mills v. Iced Apparel*, 1998 U.S. Dist. LEXIS 1798 at *3 (S.D.N.Y. 1998)(logos with a face and "tag line" protected by copyright).

derivative of the illustrated Superman crest in *Action Comics No. 1*.  Both originate in Superman's classic "blue tights" costume in the center of Superman's chest; both have an inverted triangular shape containing a "blocky" red "S" on a yellow background with a delineated black-lined border, where the "S" "pushes" against the triangulated shape that contains it (*see* diagram below). The essential difference is that the top two points of Defendants' crest are cropped and the border is colored red to match the red "S."  Thus, it constitutes a "derivative work" of Superman's crest in *Action Comics No.1*.  Just as later Superman "costumes" are clearly derivative of the original illustrated Superman costume found in *Action Comics No. 1,* so too are the subsequent variations of Superman's costume crests.  The derivative nature of Defendants' Superman crest is clearly demonstrated by the graph below comparing the "S" crest to Defendants' trademarked "S" crests.  *See* Bergman MSJ Decl., Ex. P at 190-99.

|  |  |  |  |
|---|---|---|---|
| *Action Comics No. 1* | *Action Comics No. 5* | *Action Comics No. 858* | No. 1140418 |

As the Defendants' Superman crest constitutes a derivative work under the Copyright Act, its exploitation in new post-termination works constitute a "mixed use" of copyright and trademark for which Defendants must account to Plaintiffs.[50]

4.  <u>Defendants' Merchandise Routinely Reflects Derivative Copyright Exploitation and/or a "Mixed Use" of Copyright and Trademark</u>

An examination of Defendants' Superman merchandise consistently reveals copyright exploitation derivative of *Action Comics No. 1*, alone or with "mixed uses" of copyright and trademark.  *See* Adams Decl., Exs. W.  Given that Defendants' "S" crest and telescoping "Superman" moniker are clearly the subject of copyright and

---

[50]  As with the telescoping "Superman" moniker, Defendants often depict their "S" crest against a bright blue background simulating Superman's copyrighted costume that is likewise derivative of that illustrated in *Action Comics No. 1.  See* Section VII(A), *infra*.

57

derivative of their counterparts in *Action Comics No. 1*, it is frankly, hard to imagine Superman merchandise that constitutes a "pure trademark use." Additionally, Defendants' merchandise often contains graphic depictions of the Superman character that are also derivative copyrights.  It is therefore unlikely that Defendants will be able to meet their burden of proving "pure trademark uses."

With respect to "mixed uses" of trademark and copyright, Defendants must also carry the burden of demonstrating to the jury that a portion of their profits are attributable to their alleged Superman trademarks rather than their jointly-owned Superman copyrights.[51]  *See Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995) (burden of proving statutory exception to termination provisions falls on the grantee, pursuant to general rule that the burden falls on party claiming rights under a statutory exception); 3 *Gilson on Trademarks* § 8.06 at 3-8 (Most "issues that arise in trademark [present factual issues for the jury]… including secondary meaning, descriptiveness, mark strength, and abandonment.").

### C.    The Court Should Rule That Defendants Must Account For Mixed Uses of Trademark and Copyright

To streamline the trial of this action, the Court should rule that Defendants must account to Plaintiffs for post-termination mixed uses of copyright and trademark in Superman merchandise and otherwise, including the following "mixed uses":  (a) the derivative Superman crest; (b) the derivative telescoping Superman moniker; (c) "trademarked" graphic depictions of Superman; (d) the use of any alleged trademark in conjunction with derivative copyrightable Superman material.

### IX.    DEFENDANTS' ADS HAVE NO EFFECT ON PLAINTIFFS RECAPTURED COPYRIGHT IN *ACTION COMICS NO. 1*

---

[51] This is a heavy, if not insurmountable burden, indeed because unlike situations where a trademark stands for the quality of a particular manufacturer and/or for service (e.g., BMW, Mercedes, Gucci) and, as such, attracts consumption, Defendants *license* Superman to different manufacturers all over the world.  The alleged Superman trademarks attract consumption because they stand for the copyrighted Superman character and story beloved the world over.  *See Dastar*, 539 U.S. at 32 (2003)("The words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers.").

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

### A.   Plaintiffs' Recaptured Copyright In *Action Comics No. 1* Is Not Encumbered by the Ads

Plaintiffs ask this Court to rule that the derivative "promotional announcements" ("Ads") do not limit Plaintiffs' recaptured copyright in *Action Comics No. 1*. If publication of the Ads gives Defendants an *exclusive* copyright in the Ads' graphic content (*e.g.*, the "image" of Superman from the cover and interior of *Action Comics No. 1*), then, contrary to the Court's apparent intent, Defendants might prevent Plaintiffs from effectively exploiting their recovered Superman copyrights. *See* Defs. Cl. Motion at 19:10-12 (Ads are the "first visual appearance of the Superman character in costume").

### 1.   *Publication* of the Ads "Protected" the Underlying Graphic Elements in the Cover of *Action Comics No. 1* But Did Not Itself Convey An Exclusive Copyright in Such Underlying Elements

It is a fundamental principle of copyright law that the simple act of *publication* does not alter the underlying ownership of a copyright. *See Runge v. Lee*, 441 F.2d 579, 581 (9th Cir. 1971)(although magazine held first publication rights, original author remained "the beneficial owner of the copyright"). Whereas publication "protects" a work from entering the public domain, it does not serve to assign the work or its component parts. *Id.*; *Morris v. Bus. Concepts, Inc.*, 259 F.3d 65, 67 (2d Cir. 2001)(author "retained ownership of the copyright in the articles" registered in magazine publisher's name); *Goodis v. United Artists Tel., Inc.*, 425 F.2d 397, 399 (2d Cir. 1970) ("[C]opyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor [of the work].").

It is often (if not usually) the case that *the publisher* will be the first to publish an unregistered work pursuant to a grant or license from the author. *See Marascalco v. Fantasy, Inc.*, 953 F.2d 469, 475 (9th Cir. 1991)(the "usual practice"); *Goodis,* 425 F.2d at 403 ("[S]erialization will often be the 'first publication' of a work, since much of the value …lies in reaching magazine readers before the complete book has been released.") Such a grant or license is just as frequently for limited rights (*e.g.*, publication, while reserving film rights) or a limited duration (*e.g.*, five years). *Id.* at

403 (author separately granted "first publication" and movie rights). Thus, the mere act of first publication of a work (*or its parts*) by a publisher could not possibly divest the author of his work or transform the publisher into the *exclusive* owner of the work's statutory copyright for the full duration of its term. Order at 38:13-19.

That Defendants' predecessor, at the time of the Ads' publication, solely owned the Ads, the periodicals in which they appeared and *Action Comics No. 1* does *not* alter applicable copyright principles. More importantly, Defendants *no longer* own *Action Comics No. 1* exclusively. As Plaintiffs now stand in the shoes of the original author, Jerome Siegel, ownership of *Action Comics No. 1* and the Ads diverge.

The "split" between the initial publisher of a copyrighted work and its author often arises in the context of first publication in "collective works," like the periodicals in which the Ads were published. 3 *Nimmer* § 10.01[C][2] at 10-13 ("[F]irst publication in a 'collective work,' such as a magazine or other periodical under a general copyright notice in the name of the periodical publisher, was found sufficient to secure the author's copyright in the work even though the author had reserved all [other] rights.")

In such cases, first publication of material protected by a common law copyright does not divest the author or owner of such material of the copyright therein. *Id*. *See also Stewart v. Abend*, 495 U.S. 207, 216 (1990)("no support" for the proposition "that the rights of the owner of the copyright in the derivative use of the pre-existing work are extinguished once it is incorporated into the derivative work"); *Runge*, 441 F.2d at 581 (author retained copyright where magazine first published and secured statutory copyright in work); *Goodis*, 425 F.2d at 402-03 (publication in periodical "is sufficient to secure the author's copyright in the underlying work," and "does not affect[] the validity or ownership of the copyright [in underlying work]").

Instead, the publisher is deemed to hold the statutory copyright in the underlying work "in trust for the benefit of the contributing author" or the author's successor. *See* 3 *Nimmer* § 10.01[C][2]; *Jerry Vogel Music Co. v. Warner Bros., Inc.*,

60

535 F. Supp. 172, 174 (S.D.N.Y. 1982)(whereas the publisher "held the copyright in trust for the author" when it first published the work, the author's successors controlled the copyright).[52]  In such a case, the author or his successor can freely register and/or renew the copyright to the underlying work in his name.  *See* 17 U.S.C. § 408(b)(4)(author of a component of a collective work may register an independent copyright by depositing "one complete copy" of the work); *Self-Realization*, 206 F.3d at 1329 (9th Cir. 2000)(holding that "authors [are free] to renew copyrights in periodical contributions even if the only initial copyright on the work existed by virtue of the publisher's blanket copyright").

Thus, while the statutory copyright, if any, in the Ads protected the component image of *Action Comics No. 1's* cover (the "Cover Image") from falling into the public domain, it did *not* establish a superior copyright in the actual cover ("Cover") or divest the *Action Comics No. 1* copyright of its Cover.  The statutory copyright protecting the Cover Image was held in trust for the authors and successors of the underlying work, *Action Comics No. 1*, who, in turn, were entitled to secure, and did in fact secure, a subsisting statutory copyright in the entirety of *Action Comics No. 1* via publication and registration with the Registrar of Copyrights.  *See Martha Graham*, 380 F.3d at 633 (2d Cir. 2004).

This result is also entirely consistent with *Batjac Productions Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998).  In *Batjac,* the derivative film in question "published" and secured statutory copyright *protection* for the elements of the unpublished underlying screenplay.  *Id.* at 1235.  The *first publication* of the movie did not vitiate Batjac's ability to obtain a separate statutory copyright in the screenplay; rather, "Batjac had the opportunity to secure [statutory] copyright in the screenplay separate from the movie but chose not to do so."  *Id.*  The published film

---

[52] *See Runge,* 441 F.2d at 581("[author] was the beneficial owner of the copyright" though granting magazine first publication rights); *Quinn-Brown Pub. Corp. v. Chilton Co.*, 15 F. Supp. 213, 214 (S.D.N.Y. 1936)("a [publisher that] take[s] out copyright in its own name… [is] treated as a trustee" for author.); *Neva, Inc. v. Christian Dupl. Int'l, Inc.*, 743 F. Supp. 1533, 1548 (M.D.Fla. 1990)("[P]ublication of [work] with the copyright notice of the [publisher] protected the true copyright owner: [the author].")

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

was thus the *only* source of statutory copyright protection and those portions of the underlying screenplay contained therein "fell into the public domain with the motion picture." *Id.* Similarly, the Ninth Circuit recently held in *Richlin v. Metro-Goldwyn Mayer Pictures, Inc.*, 2008 U.S. App. LEXIS (9th Cir. 2008) at *39, that a film treatment first published in a derivative film *could* have "become the subject of statutory copyright as a separate and independent work," but "[author] simply failed to secure federal copyright for it."

These rulings in *Batjac* and *Richlin* would make no sense if *first publication* in a derivative work somehow prevented the underlying work from independently securing a statutory copyright. This is not and has never been the law as it conflicts with basic copyright precepts governing derivative works and *protective* copyrights discussed herein. Here, unlike in *Batjac* and *Richlin*, a separate statutory copyright in the underlying work, *Action Comics No. 1*, *was secured* so the result is assuredly different.[53] The Cover Image first published in the Ads was "protected" from the public domain by the periodical's statutory copyright, *see id.* at *39, while the underlying work remained eligible for and secured an independent statutory copyright that was neither altered nor encumbered by the derivative Ads.[54]

---

[53] To impersonate *Batjac,* Defendants have previously argued that Plaintiffs seek to extend copyright beyond its permissible term. Defs. Cl. Opp. at 8:3-6. As the copyright term under the 1909 Act runs from the date of publication, the term of whatever minimal copyrightable "elements" are contained in the Ads would run from the Ads' publication, rather than that of *Action Comics No. 1*, days later.

[54] *Batjac* and other cases concerned and circumscribed their rulings to *unregistered* screenplays. *Batjac*, 160 F.3d at 1225 ("[A] common law copyright in the underlying screenplay does not survive the motion picture's loss of copyright and falls into the public domain due to a failure to renew the movie's copyright.")(cit. om.). *See also Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 591–93 (2d Cir. 1999)(motion picture had entered the public domain); *Classic Film Museum, Inc. v. Warner Bros., Inc.*, 597 F.2d 13 (1st Cir. 1979) (same). These cases can be explained by the fact that screenplays for published motion pictures are treated as a special case by the copyright office, as "[w]here a preexisting unpublished screenplay is embodied in a motion picture," those elements are published. *See* Compendium II, Compendium of Copyright Office Practices 910-04, cited in *Batjac*, 160 F.3d at 1230. Screenplays are given special attention when registered for copyright, as examiners are directed to "question an application for a feature film or a network television production which is limited to the authorship of the 'script,'" as the Office still regards a motion picture as an "integrated, single work, and [] it is unusual for separate claims in component parts of the motion picture to be submitted." Adams Decl., Ex. K, Copyright Office Board of Appeals decision re: "Husbands," May 14, 2002, at 5.

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

As the ownership of the Ads and *Action Comics No. 1* has now diverged, the statutory copyright in the earlier-published periodical in which the Ad's Cover Image appeared must be viewed as protecting this component of the underlying work for the benefit of the author and his successors, not as divesting it.  *See* Plaintiffs' Motion for Clarification and/or Reconsideration ("Pls. Cl. Mot.") at 11:8-12:10; 15:1-16:12.  A separate statutory copyright was secured soon thereafter for *Action Comics No. 1* and duly renewed.  As Siegel's March 1, 1938 grant of this underlying work was properly terminated by Plaintiffs pursuant to 17 U.S.C. § 304(c), Plaintiffs co-own the renewal copyright to *Action Comics No. 1* in its entirety.  Order at 72:2-4.

> 2. <u>As the Ads Were Derivative Works of *Action Comics No. 1*, They Cannot Encumber It</u>

It cannot be reasonably disputed that the Ads are plainly derived from the pre-existing *Action Comics No. 1* and are thus derivative works.  Order at 39:6.  The key issue is whether Detective Comics' protective copyright *in the Ads* gives Defendants a separate and exclusive copyright in the elements of the Cover Image that were incorporated in the Ads.  That issue turns on two prongs:  (i) whether the Cover Image was sufficiently "original," and (ii) whether such a copyright would impermissibly entangle or "affect the scope of copyright protection" in the underlying *Action Comics No. 1*.  *Ent. Research Group*, 122 F.3d at 1219.  This is the governing legal analysis that Defendants strenuously avoid because it undermines their entire Ads claim.

> a. The Variations in the Advertisement are Trivial

Plaintiffs submit that the differences between the Ad's Cover Image and the actual Cover of *Action Comics No. 1*, namely that it is in black and white, reduced and "fuzzy" do not constitute more than trivial variations of the prior Cover, and thus do not satisfy the fundamental "originality" prerequisite to copyright protection.  *Feist Publ'ns, Inc v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991).  Moreover, even if the variations in the Cover Image were viewed as sufficiently "original" to merit a copyright, as a matter of law such would extend only to the limited *visual differences*

63

1    between the Cover Image and the Cover itself.  1 *Nimmer* § 3.04[A].[55]

2         A trivial or "miniscule variation" between the underlying and derivative work

3    will not suffice.  *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir.

4    1980).  *See Satava v. Lowry*, 323 F.3d 805, 813 (9th Cir. 2003)("creative input by the

5    author required to meet the originality standard … is not negligible.")[56]

6         It is well accepted that reproductions, such as the Cover Image, even those

7    involving technical skill, do not merit copyrights.  *See Ent. Research Group,* 122 F.3d

8    at 1222 (even "quite difficult and intricate decisions" that "enable one to reproduce or

9    transform an already existing work into another medium or dimension" are

10   insufficient); *L. Batlin & Son*, 536 F.2d at 491-93 ("true artistic skill" required "to

11   make [a] reproduction copyrightable"); *Hearn v. Meyer*, 664 F.Supp. 832, 835-40

12   (S.D.N.Y. 1987)(No originality in reproductions of illustrations where one is "greener

13   than the original," and another "lighter than the original which has a bluer sky and a

14   deeper brown."); *Durham Industries,* 630 F.2d at 910 (no originality through "the

15   demonstration of some 'physical,' as opposed to 'artistic' skill.")

16        Derivative works are routinely denied copyright when they involve only minor

17   – even if perceptible – variations on the underlying work.  *See, e.g., L. Batlin & Son,*

18   536 F.2d at 489 (differences in the shape and elements of design were "minor" and not

19   sufficiently original to be afforded copyright protection).  The changes here, like those

20   of *Hearn*, *supra*, were trivial at best – "the cover is shown in black and white instead

21   of color, [and] the scale of the artwork itself is diminished…."  Order at 37:22-23.

22

23   [55] *See also Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) ("[C]opyrights in derivative works
     secure protection only for the incremental additions of originality contributed by the authors of the

24   derivative works.").

25   [56] *See also L. Batlin & Son, Inc. v. Snyder* 536 F.2d 486, 491 (2d Cir. 1976) ("there must be
     at least some substantial variation, not merely a trivial variation"); *Donald v. Zack Meyer's

26   TV Sales*, 426 F.2d 1027, 1030-31 (5th Cir. 1970) ("The variation must be meaningful and
     must result from original creative work," not a "mere copycat."); *Gardenia Flowers, Inc. v.

27   Josehp Markovits, Inc.*, 280 F.Supp. 776, 782 (S.D.N.Y. 1968) (no originality "[w]hen the
     copyright claimant has added nothing of his own to a work"); *Magic Marketing, Inc. v.

28   Mailing Services of Pittsburgh, Inc.*, 634 F.Supp. 769, 771 (W.D. Pa. 1986) (even
     "independent efforts" can be "too trivial" to be original).

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

The Cover Image makes little or no original contribution to the Cover and interior panel of *Action Comics No. 1* from which it is derived.  Given that more substantial differences in medium and dimensionality are insufficient for copyright protection, it can hardly be said that mere size reduction constitutes originality.[57]  Miniscule variations in spacing and position are also insufficient to establish originality.[58]  Nor does mere printing of the color Cover in black and white merit copyright protection. 37 C.F.R. §202.1(a) ("[M]ere variations …of coloring" "not subject to copyright.")[59]

That this purely derivative material was "published" first is beside the point: under the Copyright Act and prevailing case law the completely unoriginal Cover Image does not merit an independent copyright.

>           b.       An Unwarranted Copyright In The Ad's "Cover Image"
>                    Improperly Threatens the Copyright in the Underlying Work

The second prong of the "originality" analysis is necessary in order to avoid granting the owner of a derivative work a "*de facto* monopoly" in the underlying

---

[57] *See, e.g., Cosmos Jewelry Ltd. v. Po Sun Hon Co.,* 470 F.Supp.2d 1072, 1082 (C.D. Cal. 2006) (no originality in depiction of "flower as having five petals slightly overlapping, slightly longer than they are wide, and with slightly pointed tips," with different types of "finish"); *Past Pluto Prods. Corp. v. Dana*, 627 F.Supp. 1435, 1440-43 (S.D.N.Y. 1986) (no originality in soft foam sculpture of Statue of Liberty).

[58] *See Sherry Manufacturing Co. v. Towel King of Florida, Inc.*, 753 F.2d 1565, 1568-69 (11th Cir. 1985) (no originality where "variations…entail simple, but more obvious, changes in the spacing and dimensions of non-detailed features"); *L. Batlin & Son*, 536 F.2d at 489 (differences in shapes being "smooth" and "rough," a "fatter" base, holding arrows instead of leaves, the "shape" of a face, all insufficient to establish copyright protection).  Even noticeable differences are insufficient if "it cannot be said that such variances affect the arrangements of the components or the overall impression;" *Gardenia Flowers, Inc.*, 280 F.Supp. at 782 (denying copyright where author "did not create anything new" in floral arrangements).  *See ATC Dist. Group v. Whatever It Takes Trans.& Parts*, 402 F.3d 700, 712 (6th Cir. 2005) (no protection where "[t]he illustrations were…a form of slavish copying that is the antithesis of originality").

[59] *See Compendium of Copyright Office Practices* § 5.03.02(a) (1984)("[M]ere coloration cannot support a copyright even though it may enhance the aesthetic appeal or commercial value of a work."); *Darden v. Peters*, 488 F.3d 277, 287 (4th Cir. 2007)(no originality where derivative works made only slight color variations); *Spilman v. Mosby-Yearbook, Inc.*, 115 F. Supp. 2d 148 (D. Mass. 2000)(derivative book lacked minimum degree of originality when changes were only enhancements such as coloration of the text and variations in typographic ornamentation); *Hearn*, 664 F.Supp. at 835-40 (No originality in illustration reproductions where variations were in colors).

work, thereby foreclosing exploitation of the underlying copyright.  *See Ent. Research Group,* 122 F.3d at 1219 (protection for a derivative work "must not in any way affect the scope of any copyright protection in that preexisting material"); *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983)(requiring a "sufficiently gross difference between the underlying and the derivative work to avoid entangling subsequent artists depicting the underlying work in copyright problems").[60]  *See* 17 U.S.C. § 103(b) (A derivative work "does not imply any exclusive right in the preexisting material.  The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.")[61]

　　　　To grant a copyright in the derivative Cover Image would be contrary to well settled law and invite *precisely* the situation that the statute and case law governing derivative works are meant to avoid.[62]

---

[60] *See also Durham Indus.* 630 F.2d at 909 (copyright in derivative work "must not in any way affect the scope of any copyright protection in the preexisting work"); *Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir. 1996) (It is a fundamental precept of copyright law that "publication of a derivative work does not affect the validity of a copyright in the preexisting work, despite the incorporation of the underlying work into the derivative work."); *Gracen*, 698 F.2d at 304 (7th Cir. 1983)("[E]specially as applied to derivative works, the concept of originality …[has] a legal rather than aesthetic function – to prevent overlapping claims."); *Maljack Prods.*, 964 F.Supp. at 1422 ("[P]ublication of a derivative work does not affect the validity of the copyright in a preexisting work.").

[61] Section 103(b) of the 1976 Act parallels its predecessor, section 7 of the 1909 Act, 17 U.S.C. § 7 (repealed) ("[P]ublication of any such new [derivative] works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works..."); Berne Convention, Art. 2(3) ("[A]lterations of a literary or artistic work" are "without prejudice to the copyright in the original work.").

[62] Indeed, Defendants have made detailed arguments that derivative works cannot be allowed to interfere with underlying works, conceding the *Entertainment Research Group* standard. To counter Plaintiffs' infringement claim in the "Superboy" action, Defendants have argued pursuant to 17 U.S.C. § 103(b) that Siegel's 13 page Superboy story is derivative of Superman and thus cannot interfere with the Superman or *Smallville* copyrights.  *See* Defendants' Supplemental Memorandum of Points and Authorities of Derivative Work Issue Pursuant to Court's July 27, 2007 Order, filed September 10, 2007, at 15:18-21 ("[T]he courts must draw the line in such a way that the derivative work author will not be empowered to harass or interfere with the rights of the original work owner to use and license the underlying work through actual or threatened litigation.") and 16:4-6 ("In terms of methodology, to determine whether a derivative work possesses the requisite originality, courts must compare the derivative work to the pre-existing work.") Defendants counsel Roger Zissu furthered this entanglement argument at the hearing on the parties' cross

66

c.   Because Ownership of the Ads and *Action Comics No. 1* Has Diverged, A Derivative Works Analysis Must Apply

Defendants have previously claimed, without citation or support, that because the Ads and *Action Comics No. 1* <u>had</u> one owner at the time of publication the laws governing derivative works are inapplicable.  Defendants' Opposition to Plaintiffs' Motion for Clarification ("Defs. Cl. Opp.") at 10:19-11:7.  This entirely misses the real point.  Now that ownership of the original work (*Action Comics No. 1*) and the derivative Ads has diverged, the law governing derivative works must be properly applied.  Defendants have also inexplicably argued, again without any legal support, that because the Ads were published first, they are not derivative of the <u>pre-existing</u> *Action Comics No. 1*.  *Id.* at 5:23-6:19.  The implication of Defendants' position is that *Action Comics No. 1* is a derivative work of the Ads.  This is absurd: whether a work is original or derivative is determined *not* by time of publication but by a common-sense examination of which work is derived from the other.  *See* 1 *Nimmer* § 3.06 at 3-34.29.6 ("Note that the requirement [of a derivative work] is not that there be a subsisting copyright in that underlying work of authorship – it is enough it be capable of copyright protection.").  *See* Defs. Cl. Opp. at 5:23-6:2 (arguing, again without any legal authority, that the Ads' "colloquial or historical" derivation from *Action Comics No. 1* does "not matter in a copyright sense").[63]

---

motions for summary judgment, relying on *Sobhani v. @Radical.Media Inc.*, 257 F.Supp.2d 1234, 1239-40 (C.D. Cal. 2003). Adams Decl. Ex. F, 5:11-14:25.

[63]  The promotional announcements for the pre-existing *Action Comics No. 1* remain derivative of *Action Comics No. 1* even if published a few days prior. *Any* work that is "based upon one or more pre-existing works" is a derivative work.  17 U.S.C. §101.  Even if a derivative work is published *before* the pre-existing work is itself published, that first-published work is still a "derivative" work.  *See Cordon Art B.V. v. Walker*, 40 U.S.P.Q.2d 1506, 1996 WL 672969 at *5 (S.D. Cal. 1996)("The art reproductions that Defendant copied were prepared from and based upon the [unpublished] original drawings and master blocks; *as such, the copied works are derivative works* under § 101 of the 1976 U.S. Copyright Act.")(emphasis added).  *See also Batjac*, 160 F.3d at 1227 ("undisputed that the motion picture…qualifies as a derivative work of the [unpublished] screenplays.");  *Cordon Holding B.V. v. Northwest Publ. Corp.*, 63 U.S.P.Q.2d 1013, 2002 WL 530991 at *7 (S.D.N.Y. 2002)("case involve[d] works which were not directly published…and were the basis for a derivative work which was published").  *Richlin*, at *18 ("[W]e agree with the district court that when Richlin and Edwards conveyed all present and future interests in the Treatment and derivative works to Mirisch, the parties to the contract could not consistently entertain the intent that Richlin and Edwards would be coauthors of the Motion Picture.").

67

1  As the Cover Image makes no *original* contribution to the Cover from which it

2  is derived and a copyright therein would, in any event, impermissibly entangle, the

3  underlying *Action Comics No. 1* copyright, the Cover Image does not merit or sustain

4  a copyright.  *See Ent. Research Group*, 122 F.3d at 1219.  As such, the Ads give

5  Defendants no basis for asserting exclusive ownership of Superman elements, if any,

6  found in the Ads.

### B.   Defendants May Exploit The Derivative Ads Which Were Never Subject To Recapture Under Section 304(C), But May Not Create New Superman Derivative Works Based On The Ads

9  As set forth above Section 304(c) empowers an author's heirs to terminate a

10  grant of copyright in the *author's* works – not derivative works created by the grantee;

11  and measures the termination "window" as commencing fifty-six years after statutory

12  copyright was secured by the author's work – not by the grantee's derivative works.

13  17 U.S.C. §304(c)(3).  The grantee clearly may continue to exploit pre-termination

14  *derivative works* produced under the grant. 17 U.S.C. § 304(c) (6)(A).  Plaintiffs'

15  termination properly listed the operative March 1, 1938 grant and subject work,

16  *Action Comics No. 1.*  Jerome Siegel was not an author of the Ads, nor did he grant a

17  copyright in the Ads to Detective Comics. [64]  Moreover, it is legally irrelevant that

18  Plaintiffs did not list the derivative Ads in their termination notices because

19  Defendants could continue to exploit the Ads under the derivative works exception.

20  *Id*.  For these reasons Plaintiffs were not required to list the derivative Ads in their

21  termination notices or to set the termination date to encompass the Ads.[65]  17 U.S.C. §

22  304(c)(6)(A); 37 C.F.R. § 202.10(b).  The omission of the Ads and the setting of the

23  termination date therefore should have no effect on Plaintiffs' successful recapture of

---

[64] This bolsters Plaintiffs' argument that the Ads' omission from the termination notices is harmless error under 37 C.F.R. § 201.10(e)(1) as it did not "materially affect the adequacy of the information required to serve the purposes of …section 304(c)" 37 C.F.R. § 201.10(e)(1).

[65] It is true that Plaintiffs' termination notices, which were completed by prior counsel, listed numerous derivative works created by Defendants or their predecessors out of an abundance of caution. However, Plaintiffs were under no requirement to list derivative works, including the Ads.

68

1  Jerome Siegel's copyright in *Action Comics No. 1*.[66]

2      Defendants have taken the erroneous position that they can exploit new works

3  based on the derivative Ads without accounting to Plaintiffs.  Defs. Cl. Mot. at 20:11-

4  12; Def. Cl. Opp. at 6:7-7:3.  This position, however, ***directly conflicts with §***

5  ***304(c)(6)(a) of the Copyright Act*** ("[T]his privilege does not extend to the preparation

6  after the termination of other derivative works based upon the copyrighted work

7  covered by the terminated grant.").  *Accord* Order at 40:21-23.

8      The absurdity of Defendants' position is illustrated by the hundreds of

9  Superman derivative works that necessarily fall outside the termination window (April

10  16, 1938 - April 16, 1943), like Superman comics from 1944 to the present, yet these

11  works could no more be used by Defendants than the derivative Ads as the basis for

12  new derivative works (without a duty to account), or to disrupt Plaintiffs' recaptured

13  copyrights.  Defendants' claim is clearly incorrect, while the proper result is clear:

14  Defendants may continue to distribute the derivative Ads as they are, but *not* new

15  works based thereon without accounting to Plaintiffs; and Defendants may not use the

16  derivative Ads to diminish or encumber Plaintiffs' recaptured copyrights.

17      **C.  Defendants, At Best, Hold A Copyright In The "Image" Of The**
    **    *Action Comics No. 1* Cover "As Depicted" In The Ad, Devoid Of**
18  **    Superman Context**

19      By the Court's Order, Defendants have exclusively retained all rights to the Ad,

20  but not any part of the Superman story, character, themes or other *literary* elements

21  contained in *Action Comics No. 1*, which fell within Plaintiffs' termination.  Order at

22  39:26- 41:2.  Defendants are thus limited to the copyrightable material, *if any*,

23  conveyed by such publication.  The Ads' vague Cover Image is not *the* Cover of

24

---

25  [66] Defendants rely heavily on *Burroughs v. Metro-Goldwyn Mayer*, 683 F.2d 610 (2d Cir.
    1982) (Defs. Cl. Opp. at 11:25-28) which is plainly distinguishable.  In *Burroughs*, the grant
26  in question *listed* fourteen *Tarzan* novels, all of which had been *created and assigned by the*
    *author*.  In terminating this grant, the author's estate failed to list five of the novels *granted*,
27  as required by 37 C.F.R. § 201.10(b)(1)(ii).  *Burroughs*, 683 F.2d at 614.  The grantee thus
    remained free to exploit these five novels.  *Id.* at 622.  Here, Plaintiffs termination notice
28  listed the operative March 1, 1938 grant and *Action Comics No. 1* to which the grant applied.
    Unlike *Burroughs*, Siegel and Shuster did not create the derivative Ads. They just as clearly
    did not assign the Ads in the March 1, 1938 grant.

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

*Action Comics No. 1* (or the similar interior panel on page 8) nor is it imbued with any part of its Superman story. The undistinguished black and white Cover Image cannot be viewed in the context of the now famous Superman character and mythology thereafter published in *Action Comics No. 1*. Thus, as the Court noted, the Ad depicts "a person of extraordinary strength," but not Superman's Super-strength:

> "What remains of the Siegel and Shuster's Superman copyright that is still subject to termination (and, of course, what defendants truly seek) is *the entire storyline* from Action Comics, Vol. 1…, *none of which is apparent from the announcement*."

Order at 40:23-41:2 (emphasis added).

### 1.   The Copyright In A Pictorial Work Protects Only Its Visual Content And Objective Appearance

In copyright infringement cases involving pictorial works, the works are objectively compared in a side-by-side analysis of actual visual content, not literary or thematic elements subjectively invoked by the works. In *Cavalier v. Random House*, 297 F.3d 815, 826 (9th Cir. 2002), an infringement suit involving illustrated children's stories, the Ninth Circuit noted that the analysis for pictorial works differs from that of literary works in that it focuses *exclusively* on the objective appearance of the works:

> "The precise factors evaluated for literary works do not readily apply to art works. Rather a court looks to the similarity of the objective details in appearance. *See McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 319 (9th Cir. 1987) [citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)]."

The Ninth Circuit's methodology in *Cavalier* which considers only a pictorial work's objective appearance is amply supported.[67]

### 2.   Defendants Cannot Own The Basic Ideas Or Subject Matter Depicted In The Ad

---

[67] *See Pasillas v. McDonald's Corp.*, 927 F.2d 440, 441–42 (9th Cir. 1991) (Court analyzed similarity between man-in-the-moon masks by focusing only on their objective features); *Corwin v. Walt Disney Co.*, 2004 WL 5486639, at *15 (M.D. Fla. 2004) ("Court will focus on objective details in appearance."); *Winfield Coll., Ltd. v. Gemmy Indus., Corp.*, 311 F. Supp. 2d 611, 617 (E.D. Mich. 2004) (three-dimensional figures of witches "crashing" not substantially similar because witches did not look the same); *Woods v. Universal City Studios, Inc.*, 920 F. Supp. 62, (S.D.N.Y. 1996) (motion picture "12 Monkeys" copied plaintiff's drawing when comparison showed that film replicated drawing); *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 916 (7th Cir. 2007) (dolls are substantially similar as a matter of law when an objective observer would think they are the same).

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1    In line with the above case law governing pictorial works, the *ideas* or *subject*

2  *matter* depicted in the Ads – a person in black and white tights and cape, a person of

3  extraordinary strength, or a person lifting a car – are not copyrightable.  Order at

4  40:20-21.   *See* 17 U.S.C. § 102(b)("In no case does copyright protection for an

5  original work of authorship extend to any idea…concept, principle or discovery,

6  regardless of the form in which it is described, explained, illustrated, or embodied in

7  such work.")[68]  Thus, the Ad's depiction of a man with "extraordinary strength" does

8  not entitle Defendants to lay claim to this concept.  Order at 40:20-21.  *See Shaw v.*

9  *Lindheim*, 919 F.2d 1353 (9th Cir. 1990)("Copyright law protects an author's

10  expression; facts and ideas within a work are not protected."); 1 *Nimmer* § 2.03 [D]

11  ("Copyright may be claimed only in the 'expression' of a work of authorship, and not

12  in its 'idea.'")  *See also* 3 *Nimmer* § 13.03[B][2][a]; *Berkic v. Crichton*, 761 F.2d

13  1289, 1293 (9th Cir. 1990); *Swirsky v. Carey*, 376 F.3d 841, 845 n.4 (9th Cir. 2004).

14  "Extraordinary strength," outside of its special context in the Superman mythology, is

15  an idea that cannot be copyrighted.  *See Toliver v. Sony Music Ent.* 149 F. Supp. 2d

16  909, 919 (D. Alaska 2001) ("Were Plaintiff to own the copyright to all other songs

17  depicting the tale of a woman rejecting a man's dominance, she would most certainly

18  be among the wealthiest troubadours in the land.").

19    Therefore, the *subject matter* of the pictorial "image" in the Ad is unprotected

20  by copyright.  *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 193 F.2d 162, 164

21  (1st Cir. 1951) ("[C]opyright on a work of art does not protect a subject, but only the

22  treatment of a subject."); *Satava*, 323 F.3d at 810 (glass sculpture of jellyfish consists

23  of unprotectable elements and ideas).

24    As set forth above, Defendants as a matter of law do not own an exclusive

25  copyright in the derivative Cover Image.  However, even if Defendants owned an

26  interest in the Cover Image, it would necessarily be limited to the particular "image of

27

28  _____

[68] This provision merely "restate[s], in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged."  H.R. REP. NO. 94-1476, at 57 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670.

1   a person with extraordinary strength who wears a black and white leotard and cape"

2   depicted in the Ads.  Order at 40:20-21.  And that "person" is not Superman.

3                      3.      Publication of the Ad Did Not "Copyright" Superman Elements

4          The Court appears to clearly distinguish the vague black and white Cover

5   Image in the Ads from the Cover of *Action Comics No. 1*.  Order at 40:15-23.  The Ad

6   makes no reference to Superman, and the Ad's Cover Image could not serve, as matter

7   of law, to have conveyed or "published" any Superman element.

8          The Ad's stand alone, black and white Cover Image, diminished to the point of

9   illegibility, is a far cry from the well articulated color Cover which clearly depicts the

10  "Superman" character, his physical appearance, costume and "S" shield.  In contrast,

11  the Cover Image is "fairly limited."  Order at 40: 14-21.  The Cover, unlike the Cover

12  Image, is not viewed in a vacuum, but in the context of the *Action Comics No. 1* story.

13  The Cover no longer depicts "a person with extraordinary strength" (Order at 40:22-

14  23), but Superman's "Super-strength" as an inextricable part of Siegel and Shuster's

15  specific expression of the protectable Superman character.[69]

16         The Cover, like the interior panel it mimics, is part of *Action Comics No. 1*,

17  successfully recaptured on April 16, 1999.  Order at 72.  Superman's "Super-strength"

18  is inarguably featured on nearly every page of the *Action Comics No. 1* story,

19  essentially defining the character.  The "image" in the Ad clearly does not depict

20  Superman's "Super-strength" or any other Superman traits for the reasons set forth

21  above.  Superman's "heroic abilities in general, do not remain within defendants sole

22  possession to exploit."  Order at 40: 9-13; 40:23-41:2.

23         Plaintiffs respectfully ask the Court to confirm that Defendants do not

24  exclusively own *any* Superman elements by virtue of the Ad's slightly earlier

25  publication and specifically that Superman's "Super-strength" is part of the recaptured

---

26  [69] *See Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("[P]rotectable expression
27  includes the specific details of an author's rendering of ideas.")  *See Walt Disney Prods. v.
    Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) (comic book character more likely to contain
28  unique elements of expression, as the "plot of the piece not only centers around the character
    but is quite subordinated to the character's role"); 1 *Nimmer* § 2.12 (A character is more
    readily protectible when depicted in "cartoons …rather than 'word portraits.'")

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1   *Action Comics No. 1* character and story.

2       **D.    The Termination Notices Provided Defendants With Ample Notice**

3       As Plaintiffs were not required to list derivative works, Plaintiffs' omission of

4   the obscure Ads qualify as inadvertent harmless error under 37 C.F.R. § 201.10(e)(1),

5   and as such did not "materially affect the adequacy of the information in the notice"

6   *See* Order at 49.  The notice unambiguously terminated the operative grant of

7   copyright in Superman to Defendants' predecessors and just as unambiguously

8   provided notice of Plaintiffs' intent to list every even remotely relevant Superman

9   work.  Defendants cannot credibly claim that they were not given fair notice under

10  Section 304(c).  Given Plaintiffs' comprehensive termination notices, if the Ads had

11  shown up in their diligent search of the Copyright Office's records, Plaintiffs would

12  have listed the Ads and set the termination date to encompass them.  If the former is

13  harmless error under 37 C.F.R. § 201.10(e)(1), so should be the latter.

14      The authorities cited by Defendants regarding *renewal* notices are inapposite.

15  *See* Defs. MSJ at 36:3–10.  The harsh enforcement of deadlines for filing renewal

16  applications derives directly from the statutory language for renewals.[70]  The

17  termination provisions contain no such language.  Instead, section 304(c)(4)(B)

18  delegates to the Register of Copyrights to determine the form/content of termination

19  notices, which explicitly provided that harmless errors will not impair the validity of a

20  termination.  37 C.F.R. § 210.10(e)(1).[71]

---

21  [70] Section 24 of the 1909 Copyright Act read:  "That in default of the registration of such
22  application for renewal and extension, the copyright in any work shall determine at the
    expiration of twenty-eight years from first publication." Before 1992, Section 304(a) of the
23  1976 Act contained virtually the same language.  *See* 3 *Nimmer* § 9.05[A][1] ("The formality
    of renewal was hence an absolute condition to copyright subsistence past the 28th year….").

24  [71]  Prior enforcement of strict compliance with renewal applications is not persuasive
25  authority for undermining Section 304(c)'s benefits to authors, or curtailing 37 C.F.R. §
    201.10(e)(1)'s "harmless error" provision. *See* 2 *Patry* § 7:27 ("The complete loss of
26  copyright under these circumstances was harsh and unnecessary."); *Mills Music,* 469 U.S. at
    172-173 (1985) ("The principal purpose of the amendments in § 304 was to provide added
27  benefits to authors.")  Plaintiffs had little possibility of ascertaining the Ads.  Their failure to
    include the Ads in choosing a termination date should not result the kind of prejudice
28  associated with an untimely renewal. The sections from *PATRY*, *Nimmer* and *Dratler &
    McJohn* relied on by the Court do not vitiate the harmless error doctrine.  Instead, these
    authorities simply remind the reader to calculate the termination window for a work from the

73

Defendants rely on a hollow distinction between errors that render a notice *invalid* and errors that impair the *effect* of a notice, claiming that the language of 37 C.F.R. § 201.10(e)(1) precludes the latter.  Yet, when the meaning of statutory language is indeterminate, one should look at the context of the language.  1 *Patry* §§ 2:17, 2:21.  The parallel provision, Section 201.10(e)(2), offers clarification by providing that good faith errors in the date or registration number of a work will not "affect the *validity* of the notice."  37 C.F.R. § 201.10(e)(2).[72] As Sections 201.10(e)(1) and (2) together constitute the "harmless error" provision of Section 201.10, the use of  "validity" in (e)(2) demonstrates the context of the word "invalid" in (e)(1).  The drafters of Section 201.10(e)(1) clearly intended that harmless errors would also not render a termination notice invalid *as to particular works* as well.

The Court acknowledged and applied this harmless error policy in rejecting Defendants' arguments regarding Plaintiffs' failure to list the 1948 consent judgment in their notices.  Order at 49:21-50:13.  The same reasoning should apply to the Ads: Having terminated the operative March 1, 1938 grant, Plaintiffs failure to list the Ads, "did not diminish the notice defendants received regarding the nature of the grant that plaintiffs intended to terminate."  *Id*.

## X.   THE ORDER'S HISTORICAL SUMMARY INCLUDES CONTESTED FACTS FOR TRIAL

### A.   The Order Could Be Misinterpreted As "Ruling" on Genuine Issues of Material Fact

In their effort to restrict Plaintiffs' recaptured Superman elements, Defendants construe certain passages in the historical background section of the Order as a "ruling" by the Court that various Superman elements are not included in *Action Comics No. 1*.

---

actual date of publication, and to not rely on the expiration of the 28-year renewal term at the end of the calendar year. 2 *PATRY* § 7:43; *Nimmer* § 11.05[B][1]; 3 Dratler & McJohn, *Intellectual Property Law: Commercial Creative and Industrial Property* § 6.04A[3][a].

[72] The common sense construction is that a good-faith mistake in the publishing date or registration number will not affect the application of the termination notice *to that work*.

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1   "Many of Superman's powers that are among his most famous today did not appear in Action Comics, Vol. 1, including his ability to fly…; his super-vision…; his super-hearing….The "scientific" explanation for these powers was also altered in ensuing comics…"

2

3   Order at 14:2-14.

4   Plaintiffs' understanding is that the Court was not ruling on such factual issues,

5   but rather was providing historical background and orientation as to the Superman

6   mythos.[73]  Plaintiffs believe that certain "powers" described by the Court as not

7   present in Action Comics No. 1 are, in fact, present in that work, and respectfully

8   request that the Court clarify its ruling, so that its statements, while arguably *dicta*, are

9   not taken as conclusive findings as to *Action Comics No. 1's* literary contents.

10

11   **B.    Elements Listed in the Order as Being the Preserve of the Defendants First Appeared in *Action Comics No. 1***

12   Plaintiffs believe that some of the elements listed in the Court's Order as among

13   "Superman's powers … [that] did not appear in <u>Action Comics</u>, Vol. 1," in fact did

14   appear in that historic work, and are included in the copyrightable elements recaptured

15   by Plaintiffs' termination, notably Superman's "super-senses."  *See* Adams Decl., Exs.

16   I at p. 25 (referring to "the array of superpowers with which Superman is armed in

17   Action No. 1" as including "super-senses."), J.  Plaintiffs are not requesting that the

18   Court now rule on these issues, but are merely providing this evidence to demonstrate

19   genuine issues of material fact for trial.

20

21   [73]The part of the opinion listing the various literary elements largely follows Defendants'

22   discussion of the "facts" in their opening papers at page 8:3-22, for which Defendants *solely relied* on paragraphs 6 and 7 of the declaration of Paul Levitz, President and Publisher of DC

23   Comics who has not been designated by Defendants as an "expert." Plaintiffs objected to this testimony in paragraphs 38 and 39 (pages 22- 23) of their Evidentiary Objections In

24   Opposition to Defendants' Motion for Partial Summary Judgment as well as in paragraphs 14-18 (pages 11- 14) of their L.R. 56-2 Statement of Genuine Issues.  The Court similarly appeared to confirm the substance of Defendants' purported Superman trademarks without

25   Plaintiffs having the opportunity to brief this important issue: "The most notable of these marks that are placed on various items of merchandise are 'Superman's characteristic outfit,

26   comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases[,]' such as " 'Look! ... Up in the sky! ... It's a bird!

27   ... It's a plane! ... It's Superman!'" Order at 14-15.  The discussion of the trademarks also appears to be from Defendants' opening papers at pages 10:13- 11:16, in which Defendants

28   solely relied on paragraphs 10 and 11 of the same declaration of Paul Levitz.  Plaintiffs objected to this testimony as well, in paragraphs 42-48 (pages 25-29) of their Evidentiary Objections as well as in paragraphs 28-32 (pages 21-24) of their L.R. 56-2 Statement.

For example, Superman's "super-hearing" is clearly depicted in panels 4-8 of page 11 of *Action Comics No. 1*.  Superman is shown clinging to the outside of a skyscraper, many floors above the street, listening to a conversation *inside* the building between Senator Barrows and Alex Greer, "the slickest lobbyist in Washington."  There is no depiction or indication of an open window.  Superman, in panel 4, is described as "an eavesdropper" who "listens in on an interesting conversation!"  The next three panels display the lobbyist and the Senator discussing their scheme and the financial kickbacks they contemplate.  Senator Barrows says to the lobbyist "I suppose you're going to be well taken care of yourself," to which Superman, again *outside the building*, sarcastically rejoins, "YOU BET HE WILL!" It appears from these panels that Superman has "super-hearing , he easily hears a conversation inside a skyscraper while outside admidst the bustling noise of the city.

Superman's "super-vision," whether described as "telescopic" or "X-ray" vision, also makes an appearance in *Action Comics No. 1*.  Lois and Clark's dinner is interrupted by some hoodlums who embarrass Clark.  *See Action Comics No. 1* at p. 6 (panels 7-8)-7 (panels 1-6).  Lois slaps one of the thugs before making her exit in a cab.  *Id*. at p. 7 (panels 3-6). The hoodlums decide they will "show that skirt she can't make a fool out of Butch Mason!" *Id*. (panel 7).  The next panel shows Superman standing on what appears to be the top of a building, *at night*, staring down *far below* at a car driving past on the street.  *Id.* (panel 8).  As it would be from such a perspective, the car windows are depicted as opaque and the passengers are not visible in the passing car.  Yet, the panel notes Superman is "observing" Butch and his fellow hoodlums.  *Id*.  The hoodlums subsequently force Lois' cab into a ditch and kidnap her in their car.  *Id*. at p. 8 (panels 1-3).  In the next panel Superman suddenly appears in front of the speeding car, as he knows Lois is inside.  *Id.* (panel 5).  Superman seizes the car and rescues Lois.  *Id*. at p. 9 (panels 1-3).

Collectively, these panels plainly illustrate Superman's "super-vision" as he apparently able to see over great distances into darkened cars; he is first able to

1   discern that the hoodlums are in the car, and then he sees that the hoodlums are

2   holding Lois in the speeding car he stops.  In combination with the "eavesdropping

3   scene," Superman's "super-senses" are plainly evident, and without them, his

4   accomplishments would not be possible.[74]

5          **C.     Plaintiffs Did Not Receive Adequate Notice**

6          Defendants disingenuously claimed that the "question of what characters,

7   characteristics and elements were contained in *Action Comics No. 1* itself, and what

8   characters, characteristics and elements came later" was "squarely presented to the

9   Court via Defendants' Motion."  Defs. Opp. Cl. Mot. at 17:14-20.  Yet Defendants'

10  cross-motion for partial summary judgment neither advanced any arguments nor

11  sought any judicial relief as to these subjects, as they are rife with genuine issues of

12  material fact.  Defendants merely discussed the evolution of Superman in the

13  "background" section of their opening brief, citing only two self-serving paragraphs in

14  the declaration of DC Comics' President, Paul Levitz (Defs. MSJ Mot. at 7:18-8:22)

15  *and never mentioned these subjects again in their briefs.*

16         Notwithstanding that the issue of Superman's powers in *Action Comics No. 1*

17  may be resolved in Plaintiffs' favor by the doctrine of *res judicata* and collateral

18  estoppel,[75] the evolution of Superman's powers and attendant work-for-hire and

19  apportionment issues are riddled with questions of fact for the trier of fact, after

20  consideration of expert opinions and documentary evidence.[76]  Defendants' claim that

21  ───────────────

22  [74] Whereas, some have opined that in *Action Comics No. 1*, Superman "leaps" tall buildings and incredible distances, but does not yet "fly," this may be a distinction without a difference as he is seen effortlessly soaring through the air.  The result is the same.  In fact, in certain

23  panels of Action Comics, No. 1, Superman certainly looks like he is flying as he hovers effortlessly over the Capital dome, with a man tucked under his arm.  *Action Comics No. 1*,

24  p. 12 (panels 3-5); p. 13 (panels 1-6).

25  [75] *See Siegel v. National Periodical Publications, Inc.,* 508 F.2d 909, 914 (2d Cir. 1974)("In the case before us Superman and his miraculous powers were *completely developed* long

26  before the employment relationship was instituted.")(emphasis added).

27  [76] In a copyright action the content and associated elements of a literary work are questions of fact properly reserved for the ultimate trier of fact.  *See Sid & Marty Krofft*, 562 F.2d at

28  1175 (claims for actual damages requiring apportionment between literary elements, involve matters of fact and implicate the constitutional right to jury trial); *Sheldon*, 309 U.S. at 396-98 (1940) (trier of fact resolved dispute involving allotment of literary elements).  An

1   this was all "settled" by two inadmissible declaration paragraphs is ridiculous.

2          As Defendants did not move for summary judgment on these issues, *and* the

3   issues were not raised by the Court on oral argument, Plaintiffs did not receive

4   sufficient notice for due process to be satisfied.  *See Buckingham v. U.S.*, 998 F.2d

5   735, 742 (9th Cir. 1993)(*Sua sponte* summary judgment inappropriate where "facts

6   remained in dispute" or non-movant "did not receive sufficient notice of the district

7   court's potential entry of summary judgment against it and therefore did not have the

8   opportunity to present arguments.")  This is a far cry from both a notice and

9   evidentiary perspective from the "scope of the Ads" issue, where Defendants placed

10  this at issue, were queried by the Court at oral argument as to this issue, a full

11  evidentiary record was before the Court (including Defendants' expert opinions) and

12  there were no genuine issues of material fact.  *See Cool Fuel, Inc. v. Connett*, 685 F.2d

13  309, 312 (9th Cir. 1982)("The parties had every opportunity to explore and expound

14  the issues inherent in the prayer…. and did so to the extent they deemed advisable.")

15

16          **D.      Defendants Failed to Offer Admissible Evidence Sufficient to Meet
                        Their Burden of Proof Regarding Superman's Powers**

17          Notwithstanding that Defendants never articulated any argument regarding the

18  factual and legal (*e.g.*, work-for-hire) issues pertaining to ownership of Superman's

19  powers, they also utterly failed to proffer any admissible evidence to support their

20  phantom claim.  As noted, Mr. Levitz's statements are wholly inadmissible.  *See*

21  Plaintiffs' Evidentiary Objections in Opp. to Defs. MSJ at ¶¶ 38-39; Plaintiffs' L.R.

22  56-2 Statement of Genuine Issues at ¶¶ 12-18.  Declarations submitted in conjunction

23  with a summary judgment motion must be made on personal knowledge, set forth

24  facts that would be admissible in evidence, and show the affiant is competent to testify

25  as to such facts.  FRCP 56(e)(1); FRE 602.[77]  Mr. Levitz plainly lacks personal

26  ─────────────────────────────
    analysis of whether Superman's "super-hearing" or "telescopic vision" is found in the
27  literary content of *Action Comics No. 1* is a subjective analysis best left to a jury.
    [77]  *See Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995)(declarations on
28  "information and belief" entitled to "no weight" where declarant lacks personal knowledge);
    *Scosche Industries, Inc. v. Visor Gear Inc.*, 121 F.3d 675, 681 (9th Cir. 1997)("[H]earsay
    evidence in Rule 56 affidavits is entitled to no weight."); *Taylor v. List*, 880 F.2d 1040, 1045

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1    knowledge about events that took place 70 years ago, and thus offered an

2    impermissible lay opinion.  *Id*.  Defendants did *not* rely on their experts nor did they

3    submit any documentary evidence to support Mr. Levitz's bald assertions.  *Id*.

4         Moreover, none of the cases cited by Defendants in their Response to Plaintiffs'

5    Evidentiary Objections support the proposition that a corporate officer is deemed to

6    have "personal knowledge" of events taking place decades before his tenure.  An

7    officer's personal knowledge may be supported by inference *only* where his position,

8    responsibilities and involvement in the matter at issue are such that personal

9    knowledge could reasonably be inferred.  *See Wang v. Chinese Daily News, Inc.*, 435

10   F.Supp.2d 1042 (C.D.Cal. 2006)(Officer who "collects, coordinates, and analyzes

11   labor contracts" may attest to them.)[78]  Here, Defendants overreach, as there is no

12   indication that Mr. Levitz's corporate duties are such that he can speak with

13   particularity about the development of Superman 70 years ago.  Nor was Mr. Levitz

14   designated as an expert.  Defendants ask the Court to simply assume that their self-

15   serving view of history is unassailably "correct" without submitting a shred of

16   supporting evidence.  Defendants assembled several expert witnesses to discuss the

17   evolution of Superman, *Action Comics No. 1*'s contents, and the work-for-hire issue.

18   That their opinions were not submitted undercuts Defendants' position that such

19   issues were before the Court or that Mr. Levitz is competent to testify thereto.

20        Thus, even if the "powers" issue had been before the Court, Defendants

21

22   n.3 (9th Cir. 1989); *Hurd v. Williams*, 755 F.2d 306, 308 (3d Cir. 1985)(inadmissible lay
     opinion not considered); *Yang Ming Marine Transp. Corp. v. Oceanbridge Ship. Int'l, Inc.*,
23   48 F.Supp.2d 1032, 1039 (C.D.Cal. 1999).

24   [78] The case primarily relied on by Defendants, *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542 (9th Cir. 1990), is distinguishable as the corporate officer was at the
25   company during the events at issue. *Hal Roach* does not relieve Mr. Levitz of the burden
     under F.R.E. 901 of proving he has sufficient *personal knowledge* to make the detailed
26   statements in his declaration. All the cases cited by the Defendants stand for this exact same
     proposition.  *See Pacific Serv. Stat. Co. v. Mobil Oil Corp.*, 689 F.2d 1055, 1062
27   (Temp.Emer.Ct.App. 1982) (personal knowledge "inferred …only because as the 'in house'
     attorney [he was] responsible for compliance with the regulations"); *Bryant v. Bell Atl. Md,*,
28   288 F.3d 124, 135 n.4 (4th Cir. 2002)(the "affidavits contain sufficient information…to
     establish that the affiants' statements were made based on personal knowledge.")

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES

1   woefully failed to carry *their* "initial burden of production." [79] As such, Plaintiffs, "the

2   nonmoving party[,] ha[d] no obligation to produce anything" in response.  *Nissan Fire*

3   *& Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103-07(9th Cir. 2000).[80]

4         The Court's inclusion of portions of Mr. Levitz's inadmissible statements in the

5   "background" section of the Order also cannot reasonably be construed as "necessary"

6   to any of the Court's decisions on Defendants' or Plaintiffs' cross-motions and, as

7   *dicta*, may not be considered the "law of the case."  *See Milgard Tempering v. Selas*

8   *Corp. of Am.*, 902 F.2d 703, 716 (9th Cir. 1990)("Of course, the law of the case

9   doctrine gives no preclusive effect to dicta.").  Plaintiffs should be afforded the full

10  and fair opportunity to present evidence, including expert testimony, in open court as

11  to the Superman elements recaptured by Plaintiffs in *Action Comics No. 1*.

12                              **CONCLUSION**

13        For the foregoing reasons, Plaintiffs respectfully request that the Court grant

14  Plaintiffs' pre-trial motion in its entirety.

15  DATED:  July 21, 2008          LAW OFFICES OF MARC TOBEROFF, PLC

16                                 By _____/s/_____

17                                       Marc Toberoff
                                   Attorneys for Plaintiffs, JOANNE SIEGEL and
18                                 LAURA SIEGEL LARSON

19

---

20  [79] *See James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 924 n.4 (9th Cir. 2008)("Because [movant] did not satisfy its initial burden of production, [non-movant] was
21  not required to demonstrate a genuine issue of material fact."); *High Tech Gays v. Defense Indus. Sec. Clear. Off.,* 895 F.2d 563, 574 (9th Cir. 1990)("[N]o defense to an insufficient
22  showing is required."); *Berlin v. Lloyds Bank*, 1989 U.S. Dist. LEXIS 18345, *16 (C.D.Cal. 1989)("inconceivable that a summary judgment could be granted on the basis of speculation,
23  hearsay, or evidence lacking foundation"); *Kenny v. Regis Co.*, 2008 U.S. Dist. LEXIS 18373, *7 (N.D.Cal. Mar. 10, 2008)("[If moving party] does not satisfy its initial burden …
24  summary judgment must be denied.").

25  [80] Mr. Levitz's declaration, regardless of its admissibility, could not establish that Superman's "super-senses" are not present in *Action Comics No. 1* because its actual panels
26  are susceptible to differing reasonable interpretations as set forth above.  As this issue is *genuinely* and reasonably disputed by the parties, factual findings could not be made under
27  F.R.C.P. 56(d), which only permits a determination of facts "not genuinely at issue." It also remains an unresolved factual issue as to whether later *Action Comics* (e.g., Nos. 2-6) by
28  Siegel and Shuster depicting Superman's "super-senses" were "works-for-hire."  *See Order* at 13:23-14:26.

PLAINTIFFS' MEMORANDUM POINTS AND AUTHORITIES ON PRE-TRIAL ISSUES