Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
E-mail: MToberoff@ipwla.com

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>　　　　　Defendants. | Case No. CV 04-8400 SGL (RZx)<br><br>[Honorable Stephen G. Larson]<br><br>**PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF ON ADDITIONAL ISSUES**<br><br>[Complaint filed: October 8, 2004]<br><br>Date:　September 15, 2008<br>Time:　3:00 p.m.<br>Place:　Courtroom 1 |
| DC COMICS,<br><br>　　　　　Counterclaimant,<br>　vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>　　　　　Counterclaim Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

ARGUMENT............................................................................................2

I.    PLAINTIFFS PROPERLY OPPOSED DEFENDANTS' MOTION........2

    A.    Plaintiffs Were Not Required to Present Rebuttal Evidence in an Opening Brief Countering Defendants' Dispositive Motion and Affirmative Defense..........................................................................2

    B.    Defendants' "Motion in Limine" Arguments Are Unavailing ........3

II.   THE APPROPRIATE STANDARD OF REVIEW MUST APPLY.........5

III.  DEFENDANTS' WEAK REPLY AND DEFICIENT EVIDENCE ONLY BOLSTER PLAINTIFFS' WORK FOR HIRE ARGUMENTS .........................................................................................6

    A.    Defendants' Arguments Regarding the Newspaper Strips Are Unavailing ....................................................................................6

        1.    The Newspaper Strips Were Not Furnished at Detective's "Instance" ........................................................13

        2.    The Newspaper Strips Were Not Created at Detective's "Expense" ........................................................15

    B.    Pre-March 1, 1938 Works That Were Thereafter Published Are Not Works for Hire and Are Therefore Subject to Termination ................................................................................19

        1.    Pre-March 1, 1938 Material Published in *Action Comics Nos. 2, 3* and *5* ......................................................19

        2.    Pre-March 1, 1938 Material Published in *Superman No. 1* ..............................................................................21

IV.   DEFENDANTS' ACCUSATIONS BELIE THEIR OWN MISCITATIONS AND MISSTATEMENTS, ALL TO CONFUSE THE COURT ON CRUCIAL ISSUES ....................................................23

    A.    Defendants Repeatedly Misrepresent Exhibits Which Do Not Stand for the Propositions Cited ...................................................23

    B.    Defendants Misrepresent Caselaw to Bolster Their Erroneous Argument Re: the Copyrightable "S" Crest and "Superman" Logo ..........................................................................................23

    C.    Defendants Withheld That They Claim Copyright in the Analogous Batman Crest and Logo .............................................24

CONCLUSION........................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**                                                                                   **<u>Pages</u>**

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)................................................................................ 5-6, 23

*CDN Inc. v. Kapes*,
197 F.3d 1256 (9th Cir. 1999) ........................................................................21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................6

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989).........................................................................................16

*D.C. Comics, Inc. v. Bobtron, Int'l, Inc.*,
17 U.S.P.Q. 2d (BNA) 1404, 1990 U.S. Dist. LEXIS 9107 (S.D.N.Y. 1990)...25

*D.C. Comics, Inc. v. "John Doe" Nos. 1-25*,
1989 U.S. Dist. LEXIS 7398 (D.D.C. 1989) ...................................................25

*D.C. Comics, Inc. v. Mini Gift Shop*,
912 F.2d 29 (2d Cir. 1990) .............................................................................25

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ...............................................................2-3, 13-14

*Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.*,
375 F.2d 639 (2d Cir. 1967) .............................................................................8

*Drop Dead Co. v. S.C. Johnson & Son, Inc.*,
326 F.2d 87 (9th Cir. 1963) .............................................................................24

*E. & J. Gallo Winery v. EnCana Energy Servs.*,
2008 U.S. Dist. LEXIS 49367 (E.D. Cal. 2008) ...............................................6

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 US 451 (1992)..............................................................................................6

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
2002 U.S. Dist. LEXIS 4219 (S.D.N.Y. 2002) ...............................................16

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
 499 U.S. 340 (1991) ........................................................................................21

*Fournier v. McCann Erickson*,
242 F.Supp.2d 318 (S.D.N.Y. 2003) .................................................................4

*Gaste v. Kaiserman*,
863 F.2d 1061 (2d Cir. 1988) .........................................................................21

*Gomez v. Saddi*,
2007 U.S. Dist. LEXIS 44850 (E.D. Cal. 2007) ...............................................5

*High Tech Gays v. Defense Indus. Sec. Clear. Off.,*
895 F.2d 563 (9th Cir. 1990) ............................................................19

*James River Ins. Co. v. Hebert Schenk, P.C.,*
523 F.3d 915 (9th Cir. 2008) .............................................................19

*Johnson v. Mammoth Recreations, Inc.,*
975 F.2d 604, 610 (9th Cir. 1992) .......................................................5

*Kenny v. Regis,*
2008 U.S. Dist. LEXIS 18373 (N.D. Cal. 2008) ...............................19

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.,*
266 F.2d 541 (2d Cir. 1959) ..............................................................24

*Laurelle Manufacturing Corp. v. Truly Yours, Inc.,*
1991 U.S. Dist. LEXIS 1414 (S.D.N.Y. 1991) ....................................8

*Lin-Brook Builders Hardware v. Gertler,*
352 F.2d 298 (9th Cir. 1965) ....................................................... 11-13

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of*
*Contemporary Dance, Inc.,*
380 F.3d 624 (2d Cir. 2004) .......................................................*passim*

*Martin Family Trust v. NECO/Nostalgia Enters. Co.,*
186 F.R.D. 601 (E.D. Cal. 1999) .........................................................5

*May v. Morganelli-Heumann & Associates,*
618 F.2d 1363 (9th Cir. 1980) ..........................................................11

*Morse v. Fields,*
127 F.Supp. 63 (S.D.N.Y. 1954) .......................................................20

*Natural Resources Defense Council v. Rodgers,*
2005 WL 1388671 (E.D. Cal. 2005) ....................................................4

*New York Times v. Tasini,*
533 U.S. 483 (2001)...........................................................................19

*Niss v. Columbia Pictures Indus.,*
57 U.S.P.Q.2d (BNA) 1346, 2000 U.S. Dist LEXIS 18328 (S.D.N.Y. 2000)...16

*Nissan Fire & Mar. Ins. v. Fritz Cos.,*
210 F.3d 1099 (9th Cir. 2000) ..........................................................19

*Playboy Enters., Inc. v. Dumas,*
53 F.3d 549, 555 (2d Cir. 1995) ..................................................15, 18

*Playboy Enters., Inc. v. Dumas,*
960 F.Supp. 710, 715-16 (S.D.N.Y. 1997)................................... 17-18

*Playboy Enters., Inc. v. Dumas,*
159 F.3d 1347 (2d Cir. 1998) ...........................................................17

iii

TABLE OF AUTHORITIES

*Provenz v. Miller*,
102 F.3d 1478, 1483 (9th Cir. 1996) ....................................................... 2

*Sapon v. D.C. Comics*,
62 U.S.P.Q.2d 1691, 2002 U.S. Dist. LEXIS 5395 (S.D.N.Y. 2002) ............... 25

*Siegel v. Warner Bros. Entm't, Inc.*,
496 F.Supp.2d 1111 (C.D. Cal. 2007) ........................................... *passim*

*Siegel v. Warner Bros. Entm't, Inc.*,
542 F.Supp.2d 1098 (C.D. Cal. 2008) ........................................... *passim*

*Self-Realization Fellowship Church v. Ananda Church*,
206 F.3d 1322 (9th Cir. 2000) ............................................................. 20

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
221 F.2d 569 (2d Cir. 1955) ............................................................... 12

*Stewart v. Abend*,
495 U.S. 207 (1990) ............................................................................ 7

*Twentieth Century Fox Film Corp. v. Entertainment Distrib.*,
429 F.3d 869 (9th Cir. 2005) .................................................... *passim*

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
220 F.Supp.2d 289 (S.D.N.Y. 2001) ...................................................... 23

*Universal Pictures Co. v. Harold Lloyd Co.*,
162 F.2d 354 (9th Cir. 1947) ............................................................... 24

*Warner Bros. v. Rooding*,
1989 U.S. Dist. LEXIS 7728 (N.D. Ill. 1989) .......................................... 25

*Woods v. Bourne Co.*,
60 F.3d 978 (2d Cir 1995) ............................................................... 3, 6

*Yardley v. Houghton Mifflin Co.*,
108 F.2d 28 (2d Cir. 1939) ............................................................... 11

**State Cases**

*Dundes v. Fuersich*,
791 N.Y.S.2d 893 (N.Y. Sup. Ct. 2004) .................................................. 8

*Kraemer v. World-Wide Trading Co.*,
187 N.Y.S. 16 (N.Y. App. Div. 1921) .................................................... 8

*Penato v. George*,
388 N.Y.S.2d 900 (N.Y. App. Div. 1976) ................................................ 8

**Federal Authorities**

17 U.S.C. § 7 (repealed) ...................................................................... 7

17 U.S.C. § 209 (repealed) ................................................................ 14

iv

TABLE OF AUTHORITIES

17 U.S.C. § 304................................................................................*passim*

F.R.C.P. 16................................................................................... 4-5

F.R.C.P. 56...................................................................................4, 6

L.R. 56-1 ........................................................................................5

**Other Authorities**

L. Bender,
*Federal Civil Procedure Before Trial*, § 14:31 (2006) .......................................6

M. Nimmer & D. Nimmer,
1 *Nimmer on Copyright* ("*Nimmer*") § 4.12 ......................................................20

1 *Nimmer* § 5.03 .........................................................................12, 14

2 *Nimmer* § 7.12 ................................................................................20

Schwartzer, Tashima & Wagstaffe,
*Federal Civil Procedure Before Trial*, § 14.33 (The Rutter Group 2005)...........5

75 Am. Jur. 2d Trial § 99 (2004) .......................................................3

TABLE OF AUTHORITIES

1

**<u>INTRODUCTION</u>**

2   Plaintiffs hereby object to the improper reply brief filed by Defendants on

3 August 5, 2008 ("Defs. Reply") in clear violation of the Court's July 3, 2008

4 scheduling order regarding the parties' briefing of "additional issues."  Time and

5 again in this litigation, Defendants have shown little regard for the rules or the orders

6 of this Court.  Defendants do whatever they want, when they want:  they file a

7 dispositive motion on "work for hire" issues 15 months after the deadline, and then

8 complain of "sandbagging" when Plaintiffs rightfully oppose their improper motion

9 with hard evidence.  In its July 3, 2008 scheduling order, the Court clearly ordered the

10 parties to file an opening brief and an opposition only.  Yet Defendants submitted a

11 15-page *reply* brief with 18 *new* exhibits, cynically styled as an "objection," in clear

12 contravention of the Court's order.  Defendants do the very thing they unfairly accuse

13 Plaintiffs of (submitting *new evidence in a reply*) while claiming, with a straight face,

14 that they have been prejudiced by Plaintiffs holding "back for their *opposition* brief

15 certain evidence and agreements relating to work for hire."  Defs. Reply at 15:12

16 (emphasis added).  Unfortunately, Plaintiffs are obliged to respond.

17   Plaintiffs have not "sandbagged" anyone.  In the parties' February 21, 2008

18 stipulation, Plaintiffs clearly objected to Defendants' request to brief their "work for

19 hire" defenses as an improper dispositive motion disguised as a motion *in limine*, and

20 noted that the "work for hire" issues were preserved for trial.  Furthermore, as "work

21 for hire" is an affirmative defense and a statutory exception to a 17 U.S.C. § 304(c)

22 termination, Defendants clearly have the burden of initial production, which Plaintiffs

23 may oppose with evidence.  Plaintiffs were not required to "guess" in their opening

24 brief the form and contours of Defendants' "work for hire" motion, particularly when

25 it was not at all clear what type of motion Defendants would be bringing.  Once

26 Defendants served their motion and purported evidence, it was only reasonable for

27 Plaintiffs to oppose it with arguments and evidence of their own.

28   When Defendants' overbroad and unsupported "work for hire" arguments were

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1   punctured by Plaintiffs' detailed opposition, Defendants resorted to the desperate

2   pretext of falsely accusing Plaintiffs of filing a "reply" in a vain attempt to salvage

3   their deflated defense.  Such unbridled gamesmanship should not be tolerated.

4                                    **ARGUMENT**

5   **I.      PLAINTIFFS PROPERLY OPPOSED DEFENDANTS' MOTION**

6          **A**.     **Plaintiffs Were Not Required to Present Rebuttal Evidence in an
                       Opening Brief Countering Defendants' Dispositive Motion and
7                      Affirmative Defense**

8           Defendants disingenuously base their improper reply *attaching new evidence*

9   on the knowingly false premise that Plaintiffs' July 28 opposition was a "reply," and

10  gratuitously cite a phalanx of cases for the common principle that a "reply" should not

11  present new evidence.  Defs. Reply at 2:13-14.  As a matter of common sense,

12  Plaintiffs' *initial* July 28 opposition could logically not be a "reply."  The Court's July

13  3, 2008 scheduling order specifically only called for responses, but not replies.  By

14  Defendants' logic, their opposition to Plaintiffs' opening brief filed on July 28 is a

15  "reply," and thus the evidence filed in support thereof must be stricken because "new

16  evidence submitted in reply should not be considered."  Defs. Reply at 2:16, *citing*

17  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  Defendants' *actual* reply

18  improperly contains no less than 18 exhibits of new evidence.  *Id.*

19          Defendants erroneously argue that *Plaintiffs* had the burden to present evidence

20  in their opening brief.  However, as clearly noted in the parties' February 21, 2008

21  stipulation, Plaintiffs vigorously objected to Defendants' bringing of a dispositive

22  "work for hire" motion, 15 months after the deadline, on key factual issues reserved

23  for trial.  *See* Declaration of Keith Adams ("Adams Decl."), Ex. E.  Accordingly,

24  Plaintiffs' opening brief properly objected to Defendants' dispositive motion in the

25  guise of a purported motion *in limine*, and argued that such a fact-intensive work for

26  hire defense is for the trier of fact.

27          *Defendants*, not Plaintiffs, had the "initial burden of production on this issue,"

28  as "work for hire" is an affirmative defense.  *Dolman v. Agee*, 157 F.3d 708, 712 (9th

2

1    Cir. 1998)("[Defendant] asserted the affirmative defense of work for hire").

2    *Defendants*, not Plaintiffs, also had the initial burden of production as "work for hire"

3    is a statutory exception to termination under 17 U.S.C. § 304(c).  *See Woods v.*

4    *Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995)(burden falls on party claiming rights

5    under a statutory exception).  Thus *Defendants*, not Plaintiffs had the initial obligation

6    to submit "credible evidence" in their opening brief that (i) Siegel and Shuster had

7    been engaged to create the Superman works at issue, and (ii) that such works were

8    created at Detective Comics' ("Detective") "instance and expense."  *Dolman*, 157

9    F.3d at 712.  Plaintiffs, while objecting in their opening brief to Defendants' improper

10   dispositive motion, and offering legal standards governing work for hire analysis to

11   underscore its fact-intensive nature, were neither obliged nor able to substantively

12   counter Defendants' dubious "motion *in limine*"/summary judgment motion and

13   undisclosed arguments.  Plaintiffs' Opening Brief ("Pls. Brief") at 31:22-34:20.

14        There was no gamesmanship or "holding back" by Plaintiffs of evidence or

15   arguments.  Plaintiffs for the *first* time in their opposition were in a position to

16   reasonably oppose Defendants' "work for hire" arguments and proffer of evidence.

17        **B.     Defendants' "Motion *in Limine*" Arguments Are Unavailing**

18        In the parties' February 21, 2008 stipulation, Defendants disingenuously styled

19   their dispositive work for hire motion as merely a "motion *in limine*."  Adams Decl.,

20   Ex. E ("Defendants believe the issue is properly the subject of a motion in limine.").

21   However, the motion they filed is clearly a motion for partial summary judgment.  In

22   fact, the *only* reference in their opening 21 pages of briefing to a motion *in limine* was

23   a short footnote.  Defs. Opening Brief at 12:14-28, fn. 10.  In their July 28 opposition

24   to Plaintiffs' opening brief, Defendants nonetheless re-characterized their motion as *in*

25   *limine*, but finally conceded, as they must, that "this motion could otherwise be styled

26   as dispositive of [this work for hire] claim."  Defs. Opp. at 24:4.

27        Without citing a single case from this Circuit, Defendants claim that a motion *in*

28   *limine* can be used to dismiss claims "on the merits" in the interest of "managing"

3

1  trials.[1]  Defs. Opp. at 24:3-12.  Even the case on which they solely rely, *Fournier v.*

2  *McCann Erickson*, 242 F.Supp.2d 318, 334 (S.D.N.Y. 2003), acknowledges that

3  "dismissing claims is not the prototypical purpose of a motion *in limine*."  *Id.* at 334.

4  The court found it could not dismiss the defendants' fair use infringement defense on

5  the merits, and deferred the unresolved questions of fact to the jury.  *Id.* at 336.

6        Defendants' latest justification for their motion *in limine* is the alleged need for

7  the Court to exclude evidence of other Superman works and elements recaptured by

8  Plaintiffs because such evidence is purportedly "irrelevant" and "confuses" Plaintiffs'

9  accounting claim.  Defs. Opp. at 24:13- 25:8.  Defendants bizarrely insist that such an

10 accounting claim is solely limited to profits derived from *Action Comics No. 1*.  As

11 clearly set forth in their pleadings, Plaintiffs are entitled to profits from *any* Superman

12 works and elements they have recaptured via their termination.  Plaintiffs' FAC, ¶¶

13 26-34, 39-40, 44, 65-73.  Yet the full scope of Plaintiffs' termination has not yet been

14 litigated due to the fact-intensive nature of the work for hire analysis inherent therein.

15 *Id*.  No meaningful accounting can be made without first deciding *all* of the recaptured

16 works and elements for which Defendants must account.  Far from confusing the trier

17 of fact, this is precisely the type of analysis the jury must undertake.

18        No matter what label Defendants slap on their motion, it is a dispositive motion

19 that willfully defies or ignores the following rules of the Court:

20     •  That "summary judgment motions disguised as motions *in limine* will not be
21        heard."  *See* Court's F.R.C.P. 16(b) Scheduling Order;

22     •  That "[n]o party may file more than one motion pursuant to [F.R.C.P.] 56,
23        regardless of whether such motion is denominated as a motion for summary
           judgment or summary adjudication."  *See* Court's Standing Order,  ¶ 4(g)(1);

24     •  That the deadline for filing dispositive motions in this action was April 30,
25        2007 per the Court's Scheduling Order.  Adams Decl., Exs. A, B.

26

27 _____

[1] It is well settled that motions *in limine* "address evidentiary questions and are inappropriate
devices for resolving substantive issues."  *Natural Resources Defense Council v. Rodgers*,
28 2005 WL 1388671, *1 n.2 (E.D. Cal. 2005).  *See* 75 AM. JUR. 2D TRIAL § 99 (2004)
(motions *in limine* are improper vehicles to raise motions for summary judgment because
"[m]otions *in limine* are not to be used as a sweeping means of testing issues of law.").

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1

- That a party must show good cause to modify the Court's Scheduling Order. F.R.C.P. 16(b)(4).[2]

2

3

- That any dispositive motion must include a "Statement of Uncontroverted Facts and Conclusions of Law" and a proposed judgment. *See* L.R. 56-1.

4

- That the Court's July 3, 2008 scheduling order did not permit a reply.

5      Defendants make no attempt in any of their three rounds of briefing to explain

6  their calculated flouting of these rules other than to dismissively remark, "Plaintiffs'

7  procedural objections … are unfounded and make no sense."  Defs. Opp. at 23: 8-9.

8  By deliberately ignoring the Court's orders, Defendants have created a procedural

9  "black hole" for Plaintiffs and the Court for which they frivolously blame Plaintiffs.

10  Plaintiffs were improperly obliged to incur fees and costs:  first, to oppose

11  Defendants' unauthorized motion for partial summary judgment, and second, to

12  respond to Defendants' rogue reply.  Defendants' repeated disregard for the Court's

13  orders warrants sanctions.[3]

14  **II.     THE APPROPRIATE STANDARD OF REVIEW MUST APPLY**

15      No matter how it is styled, if Defendants' dispositive motion is entertained by

16  the Court, then Plaintiffs are entitled to the appropriate standard of review under

17  F.R.C.P. 56.  Rule 56 provides for summary judgment only when "there is no genuine

18  issue of any material fact and [] the moving party is entitled to judgment as a matter of

19  law."  The moving party bears the burden of identifying credible evidence that

20  demonstrates the absence of a genuine issue of material fact for trial.  *Anderson v.*

21  *Liberty Lobby*, 477 U.S. 242, 256 (1986).  Defendants clearly bear the burden of

22  proving their affirmative statutory "work for hire" defense to limit the scope of

23
24
25

[2] *See Gomez v. Saddi,* 2007 U.S. Dist. LEXIS 44850 (E.D. Cal. 2007)("Defendants were bound by the Court's [F.R.C.P. 16(b)] scheduling order, which set a date for filing pretrial dispositive motions.… Relief from the scheduling order requires a showing of good cause. Defendants have made no such showing.")(internal citations omitted).

26
27
28

[3] A scheduling order "'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (internal citations omitted).  *See* F.R.C.P. 16(f)(1)(C); *Martin Family Trust v. NECO/Nostalgia Enters. Co.,* 186 F.R.D. 601, 602-03 (E.D. Cal. 1999)("Rule 16(f) gives a federal judge authority to sanction a party or a party's attorney who fails to obey a scheduling order.")

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

Plaintiffs' termination. *See* 17 U.S.C. § 304(c); *Woods,* 60 F.3d at 993. *See E. & J. Gallo Winery v. EnCana Energy Servs.,* 2008 U.S. Dist. LEXIS 49367 (E.D. Cal. 2008)("When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party."). Rule 56 must be considered "with due regard … for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury…." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also Liberty*, 477 U.S. at 255; L. Bender, *Federal Civil Procedure Before Trial*, § 14:31 (2006)("Because summary judgment is a drastic remedy and deprives a party of the right to a jury trial, strict standards apply."). In reaching its decision, the court must assess whether there are any factual issues to be tried, while resolving all ambiguities and drawing reasonable inferences against the moving party. *See Liberty*, 477 U.S. at 249-50; *Eastman Kodak v. Image Tech. Serv.*, 504 U.S. 451, 456 (1992).[4]

## III. DEFENDANTS' WEAK REPLY AND DEFICIENT EVIDENCE ONLY BOLSTER PLAINTIFFS' WORK FOR HIRE ARGUMENTS

Defendants' Reply resoundingly fails to controvert the specific arguments and evidence in Plaintiffs' Opposition. Indeed, Defendants, by their unpersuasive arguments and deficient evidence, do more to bolster Plaintiffs' work for hire analysis than contradict it. Defendants are at a loss to even try to counter the bulk of Plaintiffs' detailed arguments and evidence, and rely instead on sweeping unsupported statements, ownership of underlying rights under the March 1, 1938 grant, and misleading quotations taken out of context from cases outside this Circuit.

### A. Defendants' Arguments Regarding the Newspaper Strips Are Unavailing

Defendants concede that the pre-April 16, 1943 Superman Newspaper Strips ("Newspaper Strips") created pursuant to the September 22, 1938 agreement between

---

[4] The standards and procedures regarding a motion for "partial summary judgment" on some but not all claims or issues within a claim are the same as those for summary judgment. Schwartzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*, § 14.33 (The Rutter Group 2005); F.R.C.P. 56(c), (d).

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1   the McClure Newspaper Syndicate ("McClure"), Jerome Siegel ("Siegel") and Joseph

2   Shuster ("Shuster") and Detective (the "McClure Agreement"), <u>were not works for</u>

3   <u>hire for McClure</u>.  Defs. Reply at 9, fn. 8 ("Defendants do not claim that McClure

4   owned anything on a work for hire basis.").  Defendants' work-for-hire argument

5   principally relies on the fact that Detective was an underlying rights holder pursuant to

6   its March 1, 1938 grant of rights to Superman ("March 1, 1938 Grant"), even though

7   such a "derivative works" argument has been roundly rejected by the Court, and is

8   contrary to well settled copyright law governing derivative works.  *See Siegel v.*

9   *Warner Bros. Entm't, Inc.,* 496 F. Supp. 2d 1111, 1142-43 ("*Siegel I*"); 17 U.S.C. § 7

10  (repealed); *Stewart v. Abend*, 495 U.S. 207, 223 (1990).

11          The weakness of Defendants' stance is epitomized by their statement that "the

12  []'McClure Agreement'[] was merely the outgrowth of Detective's business decision

13  on March 1, 1938 to acquire rights and thereafter publish all Superman works."   Defs.

14  Reply at 4:11-14.  Although of dubious relevance, the March 1, 1938 Grant reflects no

15  such "business decision"; rather it is a straightforward acquisition of Siegel and

16  Shuster's illustrated Superman story, published in *Action Comics No. 1* shortly

17  thereafter.  *See Siegel v. Nat'l Comics Publ's, Inc.*, No. 1099-1947 (Sup. Ct.

18  Westchester) Findings of Fact ("FOF") 25.  Additionally, the Newspaper Strips were

19  not "published" by Detective; they were published (or more specifically, 'syndicated')

20  by McClure, as later conceded by Defendants.  Defs. Reply at 5:7-8 ("'the newspaper

21  strip entitled "Superman"' *i.e.*, that [*sic*] to be published by McClure.")

22          More importantly, it is clear from the McClure Agreement itself and by the

23  nature of the newspaper syndication transaction that Detective's role in the McClure

24  was that of a rights holder and licensor.  Declaration of Marc Toberoff in Opposition

25  to Defendants' Brief on Additional Issues ("Tob. Opp. Decl."), Ex. Q.  Defendants

26  unwittingly concede this point as well.  Defs. Reply at 9, fn. 8 ("McClure became

27  Detective's licensee under the terms of Detective's September 22, 1938 agreement

28  with McClure…").   Detective did not supply the Superman strips to McClure as the

7

1  proprietor of "works-made-for-hire," but simply gave its *permission* as an underlying

2  rights holder for Siegel and Shuster to produce and supply such material to McClure

3  for syndication.  Tob. Opp. Decl., Ex. Q at 1 ("Detective agrees to permit …").

4  　　　In exchange, Detective had a 7.5% to 10% participation in the "net proceeds" –

5  the smallest participation – with Siegel and Shuster to receive 36% to 40% of net

6  proceeds, and McClure retaining the remainder from the strips' syndication.  *Id.  See*

7  *Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 642 (2d Cir.

8  1967)(That "the money arrangement was heavily weighted in [the creator's] favor"

9  "corroborate[s] the conclusion" that the work was not "made-for-hire.").  If Detective

10  was to supply newspaper strips as the proprietor of works-made-for-hire there would

11  have been no need for Siegel and Shuster to have been parties to a joint venture

12  agreement with McClure.[5]

13  　　　Even the largely irrelevant September 28, 1938 letter from Detective's J.S.

14  Liebowitz to Siegel, highlighted by Defendants, underscores this point.  Defs. Reply

15  at 4:18-23; Bergman Reply Decl., Ex. B ("As I pointed out to you many times, our

16  company has very little to gain in a monetary sense from the syndication ….

17  [W]ithout our consent this feature would not be syndicated ….  It is entirely up to you

18  and Joe … whether you wish the strip 'Superman' to be syndicated.")

19  　　　The McClure Agreement leads to the conclusion that the Newspaper Strips

20  were *not* Detective's "work for hire."  Thus, Defendants vaguely argue that

21  Detective's September 22, 1938 agreement with Siegel and Shuster (the "September

22  22, 1938 Agreement") "continued the parties' prior relationship [*sic*] expressly

23
24
25
26
27
28

[5] Defendants erroneously contend that a joint venture could not have existed under New
York law, because "[t]here is no evidence that any party, let alone Siegel and Shuster, agreed
to share losses."  Defs. Reply at 9:1–10.  Defendants, however, ignore the long-standing
principle in New York law that when joint venturers agree to contribute services to a venture,
and risk the loss of their expenses and the value of their services, such is construed as an
agreement to share in the losses of their venture.  *See Dundes v. Fuersich*, 791 N.Y.S.2d 893
(N.Y. Sup. Ct. 2004); *Kraemer v. World-Wide Trading Co.*, 187 N.Y.S. 16, 19 (N.Y. App.
Div. 1921)("[S]ince plaintiff took the risk of receiving nothing for his services and each of
the parties was to receive one-half of any commissions paid therefor, I am of opinion that a
joint adventure is shown . . .").  *See also Laurelle Manufacturing Corp. v. Truly Yours, Inc.*,
1991 U.S. Dist. LEXIS 1414, at *4 (S.D.N.Y. 1991)("The law will imply an agreement to
share losses."), *quoting Penato v. George*, 383 N.Y.S.2d 900, 904 (N.Y. App. Div. 1976).

8

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

encompassed not only Superman comic books but also the [Newspaper Strips]," rather than focus on Siegel and Shuster's creation of the Newspaper Strips for McClure *pursuant to the McClure Agreement*.  Defs. Reply at 5:5-8.

Defendants try to mislead the Court into believing that the September 22, 1938 Agreement governs Siegel and Shuster's creation of the Newspaper Strips, by selectively quoting from one of its paragraphs.  But the full paragraph acknowledges that the Newspaper Strips are governed by the McClure Agreement:

> "You shall furnish in sufficient time *to properly perform the terms of an agreement we are executing together with you with the McClure Newspaper Syndicate*, all of the art and continuity for the newspaper strip entitled 'Superman' *called for by said agreement*."

Tob. Opp. Decl., Ex. P at 1(emphasis added).

Later in the September 22, 1938 Agreement, Detective, in agreeing to collect and remit to Siegel and Shuster 80% of the royalties paid by McClure, again refers to "the McClure Newspaper Syndicate strips which you may hereafter furnish pursuant to the above-mentioned contract with McClure" – language which Defendants also omit.  *Id.* at 2.  As the parties are bound by this objective manifestation of their predecessors' intent, it is impossible to conclude that the Newspaper Strips were furnished by Siegel and Shuster pursuant to the September 22, 1938 Agreement.

In straining to apply Detective's September 22, 1938 Agreement, instead of the McClure Agreement, to the Newspaper Strips, Defendants also pretend that the use of the word "features" in the former applies to the Newspaper Strips.  Defs. Reply at 5:12-14; fn. 3.  While this would not materially advance Defendants' argument even if true, it is clear from the opening paragraphs of the September 22, 1938 Agreement that "features" refers to the comics published in Detective's magazines:

> "You agree that you will supply us each and every month hereafter, in sufficient time for publication in our monthly magazine, sufficient copy and art for each of said features each month hereafter.
>
> All of said comic features consist of approximately 46 pages per month. The standard of the said comics shall be equal to the present standards."

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1   Tob. Opp. Decl., Ex. P at 1.  The paragraph which directly follows is quoted above

2   and refers to the Newspaper Strips as the "newspaper strip called for by said

3   [McClure] agreement."  *Id.*  Elsewhere in the agreement, while referring to

4   Detective's magazine stories as "features" or "monthly feature[s]," the Newspaper

5   Strips are referred to as the "McClure Newspaper Syndicate strips" or as "syndicate

6   matter," but never as "features."  *Id.*  Defendants are particularly disingenuous in

7   claiming as to the Newspaper Strips that "Detective could terminate Siegel and

8   Shuster if any Siegel and Shuster 'features' were not up to standard and 'could

9   reasonably supervise the editorial matter of all features.'"  Defs. Reply at 5:12-14.  The

10  paragraph of the September 22, 1938 Agreement (which Defendants also omit) makes

11  clear that "features" refers to the comic *magazine* stories, not the Newspaper Strips:

12      "However, if at any time the art and continuity for any feature shall not
        be up to the standard required *for the magazines*, we at our option, then
13      may terminate this agreement as to and substitute other artists for the
        unsatisfactory feature or features but not otherwise."
14
    Tob. Opp. Decl., Ex. P at 2 (emphasis added).[6]

15      Defendants argue, without evidence[7] and despite the evidence to the contrary,

16

17  _____
    [6] It is of no moment that the McClure Agreement uses the term "feature" to refer to
18  "Superman" generally, or even to the Superman strips in places because in the McClure
    Agreement, unlike the September 22, 1938 Agreement, there is no need to distinguish
    between the magazine stories and the newspaper strips.

19  [7] Defendants cannot present any evidence of Detective's control and supervision regarding
20  the Newspaper Strips.  Firstly, none of the exhibits submitted with Mr. Bergman's reply
    declaration have been properly authenticated. *Beyene v. Coleman Security Services, Inc.*, 854
21  F.2d 1179, 1182 (9th Cir. 1988)("A writing is not authenticated simply by attaching it to an
    affidavit…").  Secondly, Defendants' purported evidence consists of letters from Detective
22  to Siegel concerning their Superman *magazine* stories <u>not</u> the McClure Newspaper Strips.
    Thirdly, such letters are evidence of Detective's frustrations *as to its lack of control or*
23  *supervision* over the Siegel and Shuster's creation of the magazine stories.
        For example, the April 21, 1939 letter from J.B. Liebowitz demonstrates Liebowitz's
24  concern over the quality of the Superman stories – and his inability to do anything about it.
    Bergman Reply Decl. Ex. D.  He reminds Siegel that he has not complied with Detective
25  "request" for advance submissions of continuity.  *Id.*  He offers the "suggestion" that Siegel
    move to New York and that *Siegel* should "invest now in building for the future."  *Id.*  He
26  ends by saying that he "would appreciate ….[Siegel's] reaction to [his] suggestions."  *Id.*
        The January 25, 1940 letter from Whit Ellsworth takes the same tone.  *Id.*, Ex. I.
27  Ellsworth notes his displeasure with the artwork, and offers the type of advice that passes
    between business owners.  He addresses Siegel not as an employee or independent contractor
28  under his control, but as an inexperienced partner or co-equal.  *Id.* ("Now, Jerry, I don't write
    you a piece like this so you can show it to the artist … Between you, you and Joe ought to be
    able to tell what's good and what isn't; and you ought to insist that you get nothing but good

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1  that Siegel and Shuster created the Newspaper Strips at Detective's "instance" and

2  "expense."  Defendants selectively quote from cases not from this Circuit concerning

3  clear-cut works for hire.  Defendants also misstate the law of the Ninth Circuit and the

4  parties' respective burdens on the work-for-hire issue.  Def. Reply at 3:15–20.

5  Contrary to Defendants' Reply, Plaintiffs do not have the burden to produce evidence

6  "to negate Defendants' work for hire contentions."  *Id.* at 3:15–17.  The burden shifts

7  only if Defendants succeed in establishing the "work for hire" presumption – which

8  they wholly fail to do.  If the presumption had been established, Plaintiffs also would

9  not have the burden "to establish 'an express contractual' agreement" reserving Siegel

10  and Shuster's copyrights, contrary to Defendants' misstatements.  *Id.* at 3:17–19.[8]

11       Firstly, because Defendants cannot surmount the first hurdle of demonstrating

12  that Siegel and Shuster were "engaged" by Detective to create the Newspaper Strips,

13  they never "get to" the instance and expense factors.  The "instance and expense" test

14  only has meaning within the context and confines of an artist being "engaged"

15  beforehand by a putative "employer" to create the work(s) in question.  *See Lin-Brook*

---

16  stuff…. If you treat your feature well, he'll probably take care of you for a long time….")

17       Similarly, in a January 25, 1940 letter, Liebowitz voices his displeasure over work done by artist Wayne Boring, but is unable to do anything about it.  *Id.*, Ex. E.  Ellsworth

18  adopts the same approach in his letter of March 18, 1940.  *Id.*, Ex. K.

19       Liebowitz's May 2, 1940 letter similarly indicates Detective's lack of control and supervision.  Liebowitz tells Siegel that "the last two releases are not at all to our liking," but can only offer advice about the rates *that Siegel pays his own employees*.  *Id.*, Ex. G.  "I

20  think your income at present is large enough to warrant … [this] very wise investment, if we are to perpetuate the Superman strip."  *Id.*  Again, Liebowitz speaks of Siegel's

21  "investment," and their working together to "perpetuate the Superman strip."  *Id.*  He closes with: "So put on your thinking cap and get us some real good stuff."  *Id.*  Again, this is not a

22  letter written by an employer with supervision or control.

23       Ellsworth's November 5, 1940 letter demonstrates the growth of Detective's anger over its *lack of* supervision and control over Siegel.  *Id.*, Ex. H.  As Ellsworth notes, Siegel

24  proceeds on his Superman works with or without the approval of Detective's staff.  *Id.*  Siegel also fails to tell Ellsworth which scripts he will use, even through Ellsworth has asked Siegel at least twice for that information.  *Id.*

25  [8] In *May v. Morganelli-Heumann & Associates,* 618 F.2d 1363 (9th Cir. 1980), the Ninth

26  Circuit held that *Lin-Brook's* phrase "express contractual reservation" was problematic because, if read literally, it would preclude extrinsic evidence.  It noted that the *Lin-Brook*

27  Court itself examined extrinsic evidence, and that the Second Circuit also holds that extrinsic evidence is admissible to rebut the presumption.  *Id.* at 1369 ("We think it proper, then, to

28  consider extrinsic evidence to determine whether the parties intended to contract contrary to the presumption of the 'works for hire' doctrine."), *citing Lin-Brook*, 352 F.2d at 300 and *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir. 1939).

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

*Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir. 1965)("[W]hen one person

engages another … to produce a work of an artistic nature…");  *Siegel I*, 496

F.Supp.2d at 1139 ("The critical question is whether an employment relationship …

existed between the parties beforehand and whether the work in question fell within

the scope of those job duties."), *citing Martha Graham Sch. & Dance Found., Inc. v.

Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 635 (2d Cir. 2004);

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir. 1955).

It is indisputable that Siegel and Shuster furnished the Newspaper Strips to McClure

pursuant to the McClure Agreement, not the September 22, 1938 Agreement.  The

McClure Agreement, if any, would be the engagement agreement; but, as discussed, it

simply does not read like one.  Defendants also concede the strips were not "works for

hire" for McClure.  Defs. Reply at 9, fn. 8.

     Secondly, the Newspaper Strips do not satisfy the "instance and expense" test

even if applied to Detective.  When carefully read and understood such standards are

damaging to Defendants' claim.  Detective is not "the employer who induce[d] the

creation of the work [Newspaper Strips]," nor did it "ha[ve] the right to direct and

supervise the manner in which the work is created,"  *Martha Graham,* 380 F.3d at

635, nor was it "the motivating factor in producing [Siegel and Shuster's Newspapers

Strips] as the employer who induced their creation."  *Siegel I*, 496 F.Supp.2d at 1139,

*quoting Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d 869,

879 (9th Cir. 2005).

     Siegel and Shuster's furnishing of the Newspaper Strips pursuant to the

McClure Agreement, at most, could be considered a special transaction or "special job

assignment, outside the line of [Siegel and Shuster's] regular duties" and not

Detective's "work made for hire."  *See Siegel I*, 496 F.Supp.2d at 1139 (*citing Martha

Graham*, 380 F.3d at 635 and *Shapiro, Bernstein,* 221 F.2d at 570) and 1141 (*citing* 1

*Nimmer* § 5.03[B][1][b]).

1.    The Newspaper Strips Were Not Furnished at Detective's "Instance"

It is uncontroverted that Siegel, on his own volition, wrote the continuity for the first two weeks of the Newspaper Strips as a sample that he submitted to multiple syndicators, including McClure, and that when he had a "nibble" from McClure, Shuster illustrated and inked the strips in their Cleveland "shop," all without the involvement of Detective.  Tob. Opp. Decl., Ex. R at 26-27; FOF 9, 10, 20.  When McClure dragged its feet, Siegel implored Detective to use its contacts to help close a deal.  *Id.*, Ex. S.  To evade this reality, Defendants weakly claim that McClure was "proactive" with regard to syndication and "instructed" Siegel and Shuster, while admitting one page later that the strips were *not* McClure's "work for hire."  Defs. Reply, at 7:15-8:5; 9, fn. 8.  For this Defendants cite solely to Siegel's April 18, 1938 letter, which refers to McClure's response to Siegel's consistent solicitations (commencing in 1933) and submission of the new continuity for the first two weeks of the strips in April 1938.  Tob. Opp. Decl., Exs. R, S; FOF 9, 10, 20.  When all else fails Defendants lamely resort to their rejected "derivative works" theory and oddly attempt to shift *their* burden of proving "instance."  Defs. Reply at 8:21-23 ("Siegel was not able to *legally* initiate the arrangement for newspaper syndication and thus instance cannot be met.")[9]

It is well settled that the "work for hire" presumption turns on the "mutual intent of the parties [] that the title of the copyright shall be in the person whose instance and expense the work was done."  *Lin-Brook*, 352 F.2d at 300.  *See also Dolman*, 157 F.3d at 712; 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 5.03.  The McClure Agreement expressly provided that the Superman

---

[9] Defendants also often resort to the erroneous "straw man" that Plaintiffs' analysis is based on traditional "master-servant" employment, by quoting Plaintiffs' use of the word "employment."  *See e.g.*, Defs. Reply at 8, fn. 7, 12:1-3, fn. 12.  Whereas, the work of a traditional employee within the scope of his/her employment is more readily "work for hire," Plaintiffs long ago acknowledged that in the last decade of the 1909 Act, commencing with *Lin-Brook, supra*, the work of an independent contractor hired to create an artistic work may under certain circumstances constitute "work for hire" under the 1909 Act, as under the 1976 Act.  Plaintiffs use "employment" in this broad sense to cover both traditional employees and independent contractors, as does this Court.  *Siegel I*, 496 F.Supp.2d at 1136.

13
PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

newspaper feature "will be copyrighted in [McClure's] name," not Detective's name. Tob. Opp. Decl., Ex. Q at 2. And the original copyright registrations for the Superman newspaper strips duly list the McClure Syndicate as the owner and Siegel and Shuster as the authors of the Newspaper Dailies. *Id.*, Ex. W. Defendants concede, as they must, that these copyright registrations constitute *prima facie* evidence of the facts stated therein. Defs. Reply at 9:10-11. *See Siegel v. Warner Bros. Entm't, Inc.,* 542 F.Supp.2d 1098, 1120 (C.D. Cal. 2008)("*Siegel II*") *quoting* 17 U.S.C. § 209 (repealed). Yet, Defendants contradictorily argue, without legal support, that the registration "by a third party, McClure - not Detective -...has no relevance." Defs. Reply at 9:12-14. No such exception regarding the *prima facie* impact of initial copyright registration certificates exists. Moreover, Defendants cannot get around the fact that in the McClure Agreement, Detective expressly agreed that the Newspaper Dailies should be copyrighted by McClure in their name. Tob. Opp. Decl., Ex. Q at 2.

Defendants attempt, but fail, to rebut this *prima facie* evidence that the Newspaper Dailies were <u>not</u> Detective's "works for hire" by attaching a select handful of *renewal* registrations of *The Milwaukee Journal*[10] from 1966-67, which listed Siegel and Shuster as "employees of a work made for hire" 28 years later. Defendants continue to flog their prior arguments that such renewal registrations are also *prima facie* evidence. However, this has been soundly rejected by this Court. *See Siegel II*, 542 F.Supp.2d at 1120, fn. 6 ("Defendants' suggestion... extending the *prima facie* imprimatur to renewals like those in this case is simply mistaken.").

The McClure Agreement *permitted* Detective to use the Newspaper Strips "six months after newspaper release *without charge*...." Tob. Opp. Decl., Ex. Q at 2 (emphasis added).[11] Neither the McClure Agreement nor the September 22, 1938

---

[10] The Superman strips were also syndicated to multiple newspapers, not simply *The Milwaukee Journal*. *See* Bergman MSJ Decl., Ex. X (Termination Notice) at 328, 334-35.

[11] If the strips were Detective's work for hire there would have been no need for Detective to insert such a provision. *See Dolman,* 157 F.3d at 712("Had the works been intended to be works for hire...there would have been no reason for... an invalid assignment of rights.")

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

Agreement gave Detective "the right to direct and supervise the manner in which the [Newspaper Dailies are] created." *Martha Graham*, 380 F.3d at 635 (em. added). *See also Siegel I*, 496 F.Supp.2d at 1139-40, *citing id*. and *Twentieth Century*, 429 F.3d at 879. The Newspaper Strips were to be furnished by Siegel and Shuster to McClure, not Detective. Tob. Opp. Decl., Ex. Q at 2 ("The Artists agree to supply the feature required for the newspaper syndicate publications to [McClure] …"). Detective was so far removed that it insisted in the McClure Agreement that *McClure* "provide Detective with all the original drawings of the Superman strip," not *vice versa*. *Id*.

Thus, the McClure Agreement, *signed by Detective*, McClure and the authors, consistently indicates from all angles that none viewed the McClure Newspaper Strips as Detective's "work for hire." The September 22, 1938 does nothing to contradict this and, in fact, affirms that "the McClure Newspaper Syndicate strips" are to be "furnish[ed] pursuant to the ... contract with McClure." *Id*., Ex. P at 2.[12]

2.   The Newspaper Strips Were Not Created at Detective's "Expense"

As set forth above, Siegel and Shuster were compensated for their creation of the Newspaper Strips just like McClure and Detective, by owning a percentage of "net proceeds," if any, from the syndication venture, and received the "lion's share" *vis à vis* Detective. *Id*., Ex. P at 1-2, Ex. Q at 1-2. Siegel and Shuster were also to receive a monthly profit statement from McClure, not from Detective, and had the independent right to "inspect [McClure's] books of account … at any reasonable time." *Id*., Ex. Q at 2. Such a contingent royalty interest is by no means a "sum certain" and militates against a finding of "work for hire." *Siegel I*, 496 F.Supp.2d at 1138, *citing Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995) and *Twentieth Century*, 429 F.3d at 881. Yet Defendants feebly argue that Siegel and

---

[12] Defendants cite to the September 22, 1938 Agreement's statement that "this agreement is one of the inducements for us [Detective] to execute the abovementioned McClure contract" (Defs. Reply at 5:14-15); however, this further supports the argument that Detective's role regarding the Newspaper Dailies was but that of an underlying rights holder/licensor and that it conditioned its permission for Siegel and Shuster to pursue their dream of syndicating newspaper strips on their agreement to furnish *magazine* stories to Detective.

15

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1  Shuster "were to be paid a fixed per page sum for their submissions *of comic books*,

2  and their compensation for newspaper strips was not a separate matter but part of the

3  same, single business relationship that began March 1, 1938."  Defs. Reply at 10:5-10

4  (emphasis added).  Defendants also try to tie-in Detective via the September 22, 1938

5  Agreement, but as the authors created and furnished the Newspaper Strips pursuant to

6  the McClure Agreement, this too is unavailing.  Tob. Opp. Decl., Ex. P at 2.

7  Defendants fumble regarding their prior admission that the "expense" factor is

8  closely linked to the putative employer taking on "all the financial risk" of a work's

9  creation.  Defs. Opp. Superboy MSJ at 17:12-14, *quoting Twentieth Century*, 429 F.3d

10  at 881, and *citing Community for Creative Non-Violence v. Reid* ("*Reid*"), 490 U.S.

11  730, 741 (1989).[13]  Defendants do not deny and thus concede that the "expense" factor

12  is informed by who bears the *financial risk* of creation.  Instead, Defendants argue that

13  an employer need not take on "*all*" the financial risk of a work's creation.  *See* Defs.

14  Reply at 11, fn. 11.  Here, it is clear that while McClure invested some overhead and

15  expenses in syndicating the completed Newspaper Strips, Siegel and Shuster invested

16  and took on 100% of the financial risk of *creating* the Newspaper Strips in their

17  Cleveland "shop" (employee salaries, paper, ink, equipment, rent, delivery costs,

18  *etc.*).[14]  Because Siegel and Shuster's compensation was *purely* in the form of a

_____

19  [13] Significantly, even as to the creation of Superman stories for magazine publication

20  pursuant to the September 22, 1938 Agreement, Detective did not bear the financial risk as it
   was only obligated to pay a per page rate "on publication, for any and all of said comics

21  published by [Detective] and supplied by Siegel and Shuster."  Tob. Opp. Decl., Ex. P at 2.

22  [14] Defendants primarily rely on *Hogarth* after misconstruing its facts and holding. The
   *Hogarth* court merely ruled that the licensor Edgar Rice Burroughs, Inc. paid almost all the

23  expenses for the Tarzan books and therefore prevailed on the "expense" factor.  *Hogarth,*
   2002 U.S. Dist. LEXIS 4219, at *58–60.  The "minimal" expenses incurred by the artist,

24  Burne Hogarth, were insufficient to sway the court's conclusion.  *Id.* at *59–60.  In this
   context the court stated that "[r]esearch has uncovered no case under the 1909 Act in which

25  an artist has managed unilaterally to disrupt a work for hire arrangement by paying certain
   costs of the project that he was not contractually bound to pay."  *Id.*  However, Siegel and

26  Shuster were required to speculatively incur and did incur virtually all the expenses of
   creating the Newspaper Strips (and magazine stories) without guaranteed compensation.

27  *Niss v. Columbia Pictures Indus.*, 57 U.S.P.Q.2d (BNA) 1346, 2000 U.S. Dist LEXIS 18328
   (S.D.N.Y. 2000) is also inapposite. There, screenwriter Niss had just previously been under

28  the employ of Columbia's predecessor, MGM; and after submitting a three-page outline on
   MGM stationery was once again employed by MGM to write a new screenplay in a classic
   work for hire agreement.  *Id.* at *3, *5, *32.

16

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

contingent share of "net proceeds" they, by definition, bore the cost and risk of the works' creation:  there was no guarantee that after deducting McClure's syndication expenses there would be "*net proceeds,*" or that Siegel and Shuster's share would exceed their costs of creating and supplying the works.  There is no evidence that Detective, who simply gave its "permission" as a rights holder for a small percentage of "net proceeds" (7.5-10%) invested any money in the venture; and, in any event, it had *no* financial risk as to Siegel and Shuster's creation of the Newspaper Strips.

Defendants disingenuously fudge this important point.  *See* Defs. Reply at 11:14-20.  Defendants' unsupported[15] statement that "Detective underwrote and took on the financial risk of publishing … all of the Superman works … whether published in comic books, newspapers or any other medium" is belied by the McClure Agreement and is simply untrue.  *Id.*

To evade this, Defendants further misleadingly state with respect to the Newspaper Strips that "[t]here is also evidence that Detective paid Siegel and Shuster in circumstances where their material was not actually used."  Defs. Reply at 5, fn. 4, and 11, fn 10.  In so doing Defendants underscore the relevance of guaranteed (as opposed to speculative) payment to the "expense" and even "instance" factors.  *See e.g.*, *id.*, *quoting Playboy Enters., Inc. v. Dumas*, 960 F.Supp. 710, 715-16 (S.D.N.Y. 1999)(on remand)("payments for unused work" show implicit requests and motivation), *aff'd without opinion,* 159 F.3d 1347 (2d Cir. 1998).  *Accord Siegel I*, 496 F.Supp.2d at 1138 (payment for work not published supports work for hire and *vice versa*).  As supposed evidence, Defendants misleadingly cite to only Bergman Reply Decl., Exs. P and Q.   Exhibit P, a February 5, 1947 letter from Detective's

---

[15]Defendants only cite to:  (i) FOF 40 from the 1947 Westchester action which refers solely to "the comic strip Superman," and (ii) a September 28, 1938 letter from Detective's Liebowitz to Siegel where in response to Siegel's request for increased compensation regarding *the comic books*, Liebowitz self-servingly states "when we decided to come out with Action Comics, we were taking a tremendous gamble….  We had no assurance that Action Comics would not be a losing proposition…." Bergman Reply Decl., Ex. B.  The letter says nothing about Detective paying any costs whatsoever with respect to the Newspaper Dailies, or for that matter bearing any of the costs or risks of *creating* the Superman magazine stories.

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1    Liebowitz to Siegel, is irrelevant and moot as it lies well outside Plaintiffs'

2    termination window (applicable to works securing statutory copyrights between April

3    16, 1938 and April 16, 1943).  17 U.S.C. § 304(c)(3), (c)(4)(A); Bergman MSJ Decl.,

4    Ex. X.  The letter refers to payments to Siegel for material he did not write *while he*

5    *was in the army* (July 1943 - January 1946) serving his country in World War II.  *See*

6    FOF 63, 83.  Exhibit Q is even more tenuous – an exhibit to the 1947 Westchester

7    action showing alleged total payments to Siegel and Shuster from 1937 to 1947, *with*

8    *no indication of any payment for works that were not published*.  The exhibits are also

9    not properly authenticated.

10        Defendants, therefore, cannot present *any* evidence that Siegel and Shuster were

11   paid for Superman works that were not published, and the objective manifestation of

12   Detective's and Siegel and Shuster's intent in the September 22, 1938 Agreement and

13   the McClure Agreement is that they were paid only on works accepted *and*

14   published.[16]  If guaranteed payment regardless of acceptance or use weighs heavily in

15   favor of finding "work for hire," then contingent payment subject to acceptance and

16   actual publication must weigh heavily against such a finding.  *See Siegel I*, 496 F.

17   Supp.2d at 1138 ("[t]he converse would be true"), *citing Playboy Enters.,* 53 F.3d at

18   555, *Twentieth Century*, 429 F.3d at 881; *see also Playboy*, 960 F.Supp. at 715-16.

19        Defendants close their Reply as to the Newspaper Strips by again arguing a "but

20

21   ───────────────────────
     [16] The September 22, 1938 Agreement makes no mention of guaranteed payment for works
22   furnished.  *On the contrary* Detective (i) only agrees to collect and remit to Siegel and
     Shuster their share of purely speculative McClure "net proceeds," if any, from syndicated
23   Newspaper Strips; and (b) agrees to pay solely for magazine stories accepted for publication
     and published.  Tob. Opp. Decl., Ex. P at 2.
24     In the Superboy action this Court mentioned that "the referee [in the 1947 action] found
     that Detective Comics would periodically pay Siegel and/or Shuster at their regular page rate
25   for editions of the Superman comic strip…even when neither of them had contributed any of
     the continuity (Siegel) or illustrations (Shuster) for the strip."  *Siegel I*, 496 F. Supp.2d at
26   1138.  However, for purposes of the Superman action, it must be noted that the referees'
     above findings *relate only* to the period "[f]rom June 1, 1943 to March, 1947" (FOF 92-95)
27   and to 1946 (FOF 126) and thus to works created after the applicable Superman termination
     window (4/16/38 to 4/16/43) pursuant to the express new terms of a March, 1943 agreement
     (FOF 58) a couple weeks prior to the end of the Superman termination window. 17 U.S.C.§
28   304(c)(3).  Additionally, for such post-March, 1943 payments Siegel and Shuster were not
     paid at their regular rate, but at approximately half their rate at that time.  *See* FOF 57, 58.

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1   for" test even though this was also rejected by this Court.  Defs. Reply at 12:7-8;

2   *Siegel I*, 496 F.Supp.2d at 1139 ("That the commissioning party be the motivating

3   factor is not a 'but for' test – that is, but for the artist's employment the work would

4   not have been created – but instead is a more narrow inquiry focused on the nature and

5   scope of the parties' business relationship.").  Thus Defendants woefully failed to

6   carry *their* "initial burden of production."[17]

7           **B.    Pre-March 1, 1938 Works That Were Thereafter Published Are Not
                    Works for Hire and Are Therefore Subject to Termination**
8

9           Defendants reluctantly concede, as they must, that "[t]o the extent that Plaintiffs

10  can, in fact, show that any post-March 1, 1938 new derivative work based on *Action*

11  *Comics #1* also makes use of *other* underlying pre-March 1, 1938 material that was

12  published so as to achieve statutory copyright status before January 1, 1978, then such

13  … underlying material is subject to recapture."  Defs. Reply at 15:2-7.

14

15          1.    Pre-March 1, 1938 Material Published in *Action Comics*
                  *Nos. 2, 3* and *5*

16          Defendants argue the "straw man" that Plaintiffs' claim regarding certain pre-

17  March 1, 1938 works circumvents the "status of all *post*-March 1, 1939 publications."

18  Defs. Reply at 12:13-15.  Plaintiffs' claim is far more reasoned and narrow.  Simply

19  put, Siegel and Shuster's pre-March 1, 1938 Superman material cannot be "work for

20  hire."  *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir.

21  1974); *Siegel II*, 542 F.Supp.2d at 1127-28.  Detective's *Action Comics* and *Superman*

22  periodicals are collective works.  *See New York Times v. Tasini*, 533 U.S. 483, 493

23  (2001); *see also* Defs. MSJ Opp. at 27:15-28.  To the extent such pre-March 1, 1938

24  material was published in Detective's periodicals within Plaintiffs' termination

25

26  [17] *See James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 924 n.4 (9th Cir. 2008)
    ("Because [movant] did not satisfy its initial burden of production, [non-movant] was not
27  required to demonstrate a genuine issue of material fact."); *High Tech Gays v. Defense*
    *Indus. Sec. Clear. Off.*, 895 F.2d 563, 574 (9th Cir. 1990)("[N]o defense to an insufficient
28  showing is required."); *Nissan Fire & Mar. Ins. v. Fritz Cos.*, 210 F.3d 1099, 1103-07 (9th
    Cir. 2000)(same); *Kenny v. Regis*, 2008 U.S. Dist. LEXIS 18373, *7 (N.D. Cal. 2008)(If
    movant "does not satisfy its initial burden … summary judgment must be denied.").

window (April 16, 1938 to April 16, 1943), it is well settled that such material was covered by the renewal copyright of such collective works and is subject to Plaintiffs' termination notices.  *See Self-Realization Fellowship Church v. Ananda Church*, 206 F.3d 1322, 1329 (9th Cir. 2000)(a blanket copyright on a periodical protects its constituent parts); *Morse v. Fields*, 127 F. Supp. 63, 64-65 (S.D.N.Y. 1954) (publication in a collective work will secure a copyright in all component parts); *see also* 2 *Nimmer* § 7.12 ("The rule with respect to collective works under the 1909 Act … provided that a single notice in the name of the copyright owner of the collective work was sufficient to protect each contribution contained therein.")

Plaintiffs' claim to a copyright in such constituent material via publication is no different than Defendants' claim to a copyright in the content of the "promotional announcements" ("Ads").[18]  *See* Defs. MSJ Opp. at 34:20-24; *Siegel II,* 542 F.Supp.2d at 1125.  Defendants' stock argument that the story elements contained in Siegel's 1934 preview of planned Superman stories (Tob. Opp. Decl., Ex. A at 12) are mere uncopyrightable "ideas" is unavailing.  Defendants oddly cite to "*Siegel II*, 542 F. Supp. 2d at 1125 (citing *Nimmer*)" (Defs. Reply at 13:10-13), which in fact supports Plaintiffs' position.  Therein, this Court noted that "[i]f only the broad outlines or other fragmentary portion of the pre-existing work are copied and published in the derivative work, then only to that extent is the pre-existing work published." *Siegel II*, 542 F.Supp.2d at 1125, *citing* 1 *Nimmer* § 4.12[A].

Contrary to Defendants' blithe characterizations, Siegel did not express generic ideas about someone "winning a war, battling an airplane or participating in sports." Defs. Reply at 13:6.  Siegel wrote about Superman, an alien with extraordinary

---

[18] With respect to the Ads, Defendants *admitted* (contrary to their current overreaching misconstruction of the Court's opinion in *Siegel II*) that their copyright in the Ads did not divest Plaintiffs of *any* part of their statutory copyright in *Action Comics No. 1*, but that the two copyrights were co-extensive.  *See* Defs. MSJ Opp. at 37:9-18 ("Contrary to Plaintiffs' assertions (Pl. Mem. at 46-48), Defendants have not contended that the publication of the Announcements…and failure of Plaintiffs to terminate DC's rights in these works 'divested' any copyright protection in any work.  The [Ads] …as well as *Action Comics No. 1* all contained the required copyright notice…and the registrations for these works were all timely and duly secured and renewed…On the contrary, Defendants maintain that the copyrights for these works will endure for their full 95 years term of protection.").

20

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

superpowers interacting with ordinary humans, who will "win a war *single-handed*," "battle an airplane *with his bare hands*," "swim *hundreds of miles and think nothing of it*," "participate in sports and astound a nation" and "*single-handed*, rescue a town *from a flood* through his super-strength." Tob. Opp. Decl., Ex. A at 12 (emphasis added). "He's different and sure to become the idol of young and old." *Id*. Such things are anything but generic, particularly in the context of Superman.

Such expression is sufficiently "original" to be copyrightable. *See Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 345 (1991) ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."); *CDN Inc. v. Kapes,* 197 F.3d 1256, 1260 (9th Cir. 1999)(same); *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)(originality requirement "is an extremely low threshold").

Siegel's Superman story elements were indisputably published in their Superman comics listed in Plaintiffs' termination notices and fall within the termination window.[19] In addition, an inference can be drawn from Siegel's specific 1934 preview of sequel Superman stories and the matching stories in Action Comics Nos. 2, 3 and 5, that Siegel had conceived and written the continuity for such stories prior to March 1, 1938. Tob. Opp. Decl., Exs. A, G, H, J.

## 2.   Pre-March 1, 1938 Material Published in *Superman No. 1*

Defendants similarly flog the "straw man" that Plaintiffs claim "the continuity for Superman #1 'was written by Siegel circa 1934.'" Defs. Reply at 13:15-17. Plaintiffs obviously never claimed this. Plaintiffs claim that the 1934 continuity

---

[19] The central plot of *Action Comics No. 2* (published on May 25, 1938) involves Superman intervening to single-handedly stop a war. Tob. Opp. Decl., Ex. G at 7-14. Therein Superman is depicted battling a fighter plane in mid-air with his bare hands. *Id.* at 11. Superman is also depicted swimming great distances in the ocean with ease. *Id.* at 5. The story in *Action Comics No. 3* (published on June 25, 1938) involves Superman interceding in a college football game and astounding the crowd. *Id.*, Ex. H at 5-13. In *Action Comics No. 5*, Superman rescues a town from a flood by using his super-strength to topple a mountain peak and divert the flood. *Id.*, Ex. J at 1-8.

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

written by Siegel and illustrated sample Superman newspaper strips created by Siegel and Shuster that were clearly not "work for hire" were later published in *Superman No. 1*.  Tob. Opp. Decl., Ex. U.

The Foreword, written by comics historian James Steranko (Plaintiffs' expert) to *Superman Archives, Volume I* (DC Comics 1989), confirms this in discussing the Superman newspaper strip material from which *Action Comics No. 1* was cut:

> "McClure Syndicate agent M.C. Gaines, an early comics pioneer, just happened to have the Siegel and Shuster submission [newspaper strip samples] on his desk when [Detective's] president Harry Donenfeld phoned, inquiring about original material to fill a new magazine he was assembling. . . . [Donenfeld] ordered the newspaper strip reposted into comic-page format, *with the first week eliminated* to accommodate available space in the magazine which was christened **Action Comics**. . . The opening tale was *reprinted in its entirety* in **Superman 1** as it is here." (Italics added.)

Declaration of Marc Toberoff in Support of Plaintiffs' Objection, Ex. A at 8.

Additionally, Plaintiffs provided close links between the story continuity written by Siegel for 15 Superman daily strips (1934) and material thereafter published in *Superman No. 1*, which are very similar, despite Defendants nit-picking.[20]  It seems clear that Siegel's 1934 continuity, along with the illustrated panels from Siegel and Shuster's pre-1938 newspaper strip samples, served as the

---

[20] For instance, while otherwise insisting that names are not copyrightable, Defendants harp that "[t]he woman's name is also different, 'Molly' versus 'Mary.'"  And Defendants claim "[t]he third *Superman #1* panel differs completely from the [1934] script." Defs. Reply at 14:2-4.  Yet Siegel's script called for the following:  "In the years that followed, Sam and Molly instilled in their adopted son the conviction that he must turn his titanic strength into channels that would benefit mankind. When Clark's beloved foster-parents passed away, he swore at their death beds a binding oath. And so was created <u>SUPERMAN</u>, the physical marvel who champions the oppressed!"  Tob. Opp. Decl., Ex. E at 33.  The fifth panel on page 1 of *Superman No. 1* states:  "The love and guidance of his kindly foster parents was to become an important factor in the shaping of the boy's future," and depicts his foster parents guiding a young Clark.  His foster father says, with his hand on Clark's shoulder:  "Now listen to me Clark that great strength of yours…," and his foster mother says:  "But when the proper time comes you must use it to assist humanity."  *Id.*, Ex. L. at 103.  (The Court may recall that Defendants made much ado over this single panel in the Superboy action.  *See* Defs MSJ Opp. at 24:17-25:13.)  The sixth panel on page 2 of *Superman No. 1* shows Superman at his foster parents' gravesite with an explanatory panel that reads:  "The passing away of his foster parents greatly grieved Clark Kent, but it strengthened a determination that had been growing in his mind."  The next panels read:  "Clark decided he must turn his titanic strength into channels that would benefit mankind. And so was created – SUPERMAN champion of the oppressed.  The physical marvel who had sworn to devote his existence to helping those in need!"  *Id.*, Ex. L at 104.  The other panels pointed to by Plaintiffs also match Siegel's 1934 continuity.

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1    basis for the expansion of *Action Comics No. 1* in *Superman No. 1*.

2          On summary judgment such evidence must be viewed in the light most

3    favorable to the non-moving party.  *Liberty*, 477 U.S. at 249-250.  At a minimum, it

4    raises a genuine issue of material fact as to the extent to which Siegel's pre-1938

5    continuity and Siegel and Shuster's pre-1938 sample newspaper strips, which were

6    not "works for hire," were, thereafter, published and subject to Plaintiffs' termination.

7    **IV.   DEFENDANTS' ACCUSATIONS BELIE THEIR OWN MISCITATIONS
8          AND MISSTATEMENTS, ALL TO CONFUSE THE COURT ON
           CRUCIAL ISSUES**

9          Defendants "protest too much" and, to distract and prejudice the Court,

10   frivolously demand that Plaintiffs be sanctioned for supposedly misrepresenting cases

11   and evidence.  Closer examination reveals that it is Defendants that have played fast

12   and loose with misleading representations to the Court, particularly in their Reply.

13

14         **A.    Defendants Repeatedly Misrepresent Exhibits Which Do Not Stand
                 for the Propositions Cited**

15         As noted in the work for hire section above, Defendants misleadingly

16   misrepresent or exaggerate the findings of fact in the 1947 action, and their exhibits,

17   which do not stand for the propositions for which they are cited.  *See infra* at 7:11-8:3,

18   8 fn. 5, 9:4-10:15, 10 fn .7, 11:3-10, 13:8-14, 15:24-16:4, 17:9-12, 17:23-18:6, 18:6-9.

19

20         **B.    Defendants Misrepresent Caselaw to Bolster Their Erroneous
                 Argument Re: the Copyrightable "S" Crest and "Superman" Logo**

21         Defendants also misleadingly claim in their response that in *Twentieth Century*

22   *Fox Film Corp. v. Marvel Enters.*, 220 F.Supp.2d 289 (S.D.N.Y. 2001), the court

23   treated the originality of Fox's "X-Man" logos as only a pleading requirement.  Defs.

24   Opp. at 39:1–13.  This is untrue.  In the predecessor decision in *Marvel,* 155 F.Supp.

25   2d 1, 15, 21, 24 (S.D.N.Y. 2001) the court described Fox's principal X-Men logo as

26   "a three-dimensional, metallic, futuristic letter 'X'" and refused to dismiss Fox's

27   copyright claim because Fox's X-Men logo "has the requisite degree of originality to

28   be copyrightable as a derivative work."  *Id.* at 24.  The court quoted this holding in its

23

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF

1    later decision, when it granted Fox's motion to dismiss Marvel's copyright

2    counterclaim.  *Marvel*, 220 F. Supp. 2d at 298, *quoting* 155 F. Supp. 2d at 15.

3           In their response brief, Defendants aggressively claim that Plaintiffs have "far

4    exceeded the bounds of zealous advocacy" in citing *Drop Dead Co. v. S.C. Johnson &*

5    *Son, Inc.*, 326 F.2d 87 (9th Cir. 1963) and *Kitchens of Sara Lee, Inc. v. Nifty Foods*

6    *Corp.*, 266 F.2d 541 (2d Cir. 1959) and misleadingly represent that such cases

7    preclude the conclusion that the "S" crest or the Superman logo are copyrightable.

8    Defs. Opp. at 38:2–39:1.  *Id*. at 1:17–20 & n.1.  In *Drop Dead*, the trial court ruled

9    that the label on defendant Drop Dead's aerosol furniture infringed the copyright in

10   the label of S.C. Johnson's aerosol furniture wax.  *Drop Dead*, 326 F.2d at 89–90.  On

11   appeal, Drop Dead challenged the validity of the copyright in S.C. Johnson's label,

12   arguing that the label was uncopyrightable because its language was "textual" and

13   used to "laud the product and instruct in its use."  *Id.* at 90-91.  The Ninth Circuit

14   quickly disposed of this:  "Originality was displayed in taking commonplace materials

15   and acts and making them into a new combination and novel arrangement which is

16   protectible by copyright."  *Id.* at 93, *quoting Universal Pictures Co. v. Harold Lloyd*

17   *Co.*, 162 F.2d 354 (9th Cir. 1947).  While the label's phrases alone were not

18   copyrightable, the original combination of words, common shapes and colors was

19   copyrightable.  *Id.*  ("[L]abels which go beyond a mere trademark are copyrightable; if

20   a label has 'some value' as a composition, it no longer is 'a mere label.'")

21          Similarly, in *Sara Lee*, the Second Circuit stated that a commercial label is

22   copyrightable so long as it contains "an appreciable amount of original text or

23   pictorial material." *Sara Lee*, 266 F.2d at 544.  These holdings support that the

24   original combination of text, shapes and colors in the "S" crest and the telescoping

25   Superman well deserve copyright protection.

26

27   **C.    Defendants Withheld That They Claim Copyright in the Analogous**
        **Batman Crest and Logo**

28   While insisting that the Superman "S" crest and logo are not copyrightable, the

24

same Defendants have brought numerous *copyright infringement* claims based on their logos.  Defs. Brief at 42:7–43:20.  In *D.C. Comics, Inc. v. Bobtron, Int'l, Inc.*, 17 U.S.P.Q. 2d (BNA) 1404, 1990 U.S. Dist. LEXIS 9107 (S.D.N.Y. 1990), DC Comics successfully sued for copyright infringement solely over watches whose bat image was similar to its copyrighted Batman logo.  *Id*. at *2–*4.  The court noted that "D.C. Comics owns the copyright to the Batman character – including the emblem, which is not only a significant part of the costume the character wears but also symbolic of the image the character chose in order to frighten malefactors."  *Id.* at *2–*3.

In *Sapon v. D.C. Comics*, 62 U.S.P.Q.2d 1691, 2002 U.S. Dist. LEXIS 5395 (S.D.N.Y. 2002), DC Comics counterclaimed against the plaintiff for his exploitation of Batman iconography.  *Id.* at *5.  The court stated that the "important iconographic features" of Batman's copyrightable costume include "a symbol of a bat on his chest."  *Id.* at *9.  The court added that "while Batman's costume and character have evolved over the years, he has retained unique, protectable characteristics, such as the iconographic costume elements and his unique life story."  *Id.* at *11.[21]

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their objection to Defendants' improperly filed reply brief be sustained and that Plaintiffs' motion as to the additional issues be granted.

DATED: August 11, 2008          LAW OFFICES OF MARC TOBEROFF, PLC

By: _____/s/_____
                         Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

---

[21] *See also D.C. Comics, Inc. v. "John Doe" Nos. 1-25*, 1989 U.S. Dist. LEXIS 7398 (D.D.C. 1989)(copyright infringement suit for merchandise with counterfeit Bat logos); *D.C. Comics, Inc. v. Mini Gift Shop*, 912 F.2d 29 (2d Cir. 1990) (DC Comics and Warner Bros. copyright infringement suit for merchandise infringing Batman copyrights including logo); *Warner Bros. v. Rooding*, 1989 U.S. Dist. LEXIS 7728, *4 (N.D. Ill. 1989)(DC Comics and Warner Bros. "filed with their verified complaint numerous registrations []of their trademarks and copyrights in and to the Batman character and logo").

PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANTS' IMPROPER REPLY BRIEF