Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
MToberoff@ipwla.com

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>　　　　　Defendants. | Case No: CV 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 2 TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERTS WILLIAM IMMERMAN AND RICHARD MARKS AT THE FEBRUARY 3, 2009 TRIAL**<br><br>[Plaintiffs' Motions *in Limine* Nos. 1, 3-4, Declaration of Marc Toberoff, Declaration of Keith Adams filed electronically; Declaration of Nicholas Williamson filed manually]<br><br>Date:　January 26, 2009<br>Time:　11:00 a.m.<br>Place:　Courtroom 1<br><br>Trial Date:　February 3, 2009 |
| DC COMICS,<br><br>　　　　　　Counterclaimant,<br><br>　　vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>　　　　　Counterclaim Defendants. | |

TO DEFENDANTS WARNER BROS. ENTERTAINMENT INC., A CORPORATION, TIME WARNER INC., A CORPORATION, DC COMICS, A GENERAL PARTNERSHIP, AND DOES 1–10, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at 11:00 a.m. on January 26, 2009, or as soon thereafter as the matter may be heard, in Courtroom 1 of the above-entitled Court, located at 3470 Twelfth Street, Riverside, CA 92501, before the Honorable Stephen G. Larson, Plaintiffs and Counterclaim Defendants Joanne Siegel and Laura Siegel Larson will appear and move the court for an order *in limine* precluding Defendants and Counterclaim Plaintiffs Warner Bros. Entertainment Inc., a corporation, Time Warner Inc., a corporation, DC Comics, a general partnership, and Does 1–10, and their attorneys and witnesses called on their behalf, from referring to, mentioning or introducing any opinion evidence or testimony from Defendants' designated expert witnesses, William Immerman and Richard Marks, at the February 3, 2009 trial of Plaintiffs' "alter ego" claim.

This motion is made pursuant to Rule 702 of the Federal Rules of Evidence on the grounds that both Mr. Immerman and Mr. Marks fail to provide sufficient facts, data, methods or principles to enable the Court to determine whether their testimony has sufficient reliability or relevance to be admitted at trial.  This motion is further made pursuant to Rule 402 of the Federal Rules of Evidence on the grounds that Mr. Immerman's and Mr. Marks' wholly conclusory "opinions" are not at all probative and therefore are irrelevant and inadmissible.

This motion will be made and is based on this Notice, the attached Memorandum of Points and Authorities, all of the records, pleadings and files herein, and such further oral and documentary evidence and argument as may be presented at or before the hearing on this motion.

1  DATED:  January 5, 2009          TOBEROFF & ASSOCIATES, P.C.

2

3                                   By_____
                                              Marc Toberoff
4
                                    Attorneys for Plaintiffs JOANNE SIEGEL
5                                   and LAURA SIEGEL LARSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE DEFENDANTS' EXPERTS

# **TABLE OF CONTENTS**

I.    INTRODUCTION AND FACTUAL BACKGROUND ...............................1

II.   ARGUMENT.....................................................................................1

   A.   Legal Standards ...........................................................................1

   B.   William Immerman's Testimony Must Be Precluded .........................3

      1.   Background to Immerman's Expert Report and Testimony.......3

         a.   Immerman's Initial Report ...............................3

         b.   Immerman's Deposition ...................................4

      2.   Immerman's Opinion Testimony Must Be Precluded Because Immerman Failed to Provide the Factual Basis and/or Methodology for His Mere Conclusory Opinions. ....................5

         a.   Immerman Fails to Present Any Information or Data to Support His Conclusions ...................6

         b.   Immerman Fails to Disclose Any Methodology in Arriving at His Conclusory Opinions............................9

         c.   Immerman's Failure to Disclose Highly Relevant and Available Evidence Suggests That Immerman's Opinion Is Incomplete or Misleading..............................9

   C.   Richard Marks' Testimony Must Be Precluded................................11

      1.   Marks' Expert Report and Testimony ....................................11

         a.   Marks' Expert Report Reflects Insufficient Data and Is Not Based on a Reliable Methodology......................11

         b.   Marks' Deposition Testimony Underscores That His "Opinion" Is Not Probative, Reliable, Nor Based on a Palpable  Methodology ...................................13

      2.   This Court Should Preclude Marks' Testimony Under F.R.E. 702 and *Daubert* as Based on Insufficient Facts and Lacking Any Reliable Methodology.......................................................14

         a.   Marks Fails to Provide Sufficient Information From Which to Gauge the Reliability of his Conclusory Statements........................................................14

         b.   Marks' Methodology, to the Extent One Even Exists, Is Flawed as Predicated on Unproven False Assumptions ..................................................16

III.  CONCLUSION ...................................................................................18

## TABLE OF AUTHORITIES

### Federal Cases

*Atmel Corp. v. Information Storage Devices, Inc.,*
189 F.R.D. 410 (N.D. Cal. 1999)...................................................................9

*Champagne Metals v. Ken-Mac Metals, Inc.,*
 458 F3d 1073 (10th Cir. 2006) ....................................................................9

*Coffey v. Dowley Manufacturing, Inc.,*
187 F.Supp.2d 958 (M.D. Tenn 2002)...........................................................8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)..............................................................................*passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
43 F.3d 1311 (9th Cir. 1995) .......................................................................7

*Domingo ex rel. Domingo v. T.K.,*
289 F.3d 600 (9th Cir. 2002) .......................................................................3

*Donnelly v. Ford Motor Co.,*
80 F.Supp.2d 45 (E.D.N.Y. 1999) ...............................................................2

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997)...............................................................................3, 16

*Jinro America Inc. v. Secure Investments, Inc.*
266 F.3d 993 (9th Cir. 2001) .......................................................................2

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999)......................................................................................2

*McGlinchy v. Shell Chem. Co,*
845 F.2d 802 (9th Cir. 1988) .....................................................................17

*Minasian v. Standard Chartered Bank, PLC,*
109 F.3d 1212 (7th Cir. 1997) .....................................................................8

*Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.,*
408 F.3d 410 (8th Cir. 2005) .....................................................................18

*O'Connor v. Commonwealth Edison Co,*
13 F.3d 1090 (7th Cir.) ......................................................................... 16-17

*Rogers v. Ford Motor Co.,*
952 F.Supp. 606 (N.D. Ind. 1997) ...............................................................2

*United States v. Figueroa-Lopez,*
125 F.3d 1241 (9th Cir. 1997) .....................................................................2

### Federal Authorities

F.R.E. 104 ....................................................................................................3

F.R.E. 402 ..................................................................*passim*

F.R.E. 403 .................................................................. 15-16

F.R.E. 702 ..................................................................*passim*

Advisory Committee to the 2000 Amendments to Rule 702...........................*passim*

TABLE OF AUTHORITIES

## I.   <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

On October 8, 2004, Plaintiffs commenced the instant action for declaratory relief as to the validity of their Superman Notices of Termination, and for an accounting and other relief regarding their recapture of the original Superman copyrights.  Plaintiffs alleged, *inter alia*, that, as of the April 16, 1999 Termination date, DC Comics ("DC") was effectively a controlled subsidiary of Warner Bros. Entertainment Inc. ("Warner Bros."), and that Warner Bros. owns and/or controls DC's most valuable Superman copyright rights pursuant to agreements which were not negotiated at arm's length in the open marketplace for "fair market value."  *See* Second Amended Complaint at ¶¶ 56-59; 65-73.   Plaintiffs further alleged that such intra-corporate dealings inequitably dilute the profits to which Plaintiffs are entitled as co-owners of the recaptured Superman copyrights.  *Id.*

On January 12, 2007, per the Court's scheduling order, Defendants disclosed as expert witnesses in this case:  William J. Immerman ("Immerman"), an attorney and an executive of the Yari Film Group, LLC; and Richard Marks ("Marks"), an attorney "of counsel" to The Point Media, LLC.  Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure ("F.R.C.P."), Defendants attached Immerman and Marks' respective expert reports to these disclosures.  *See* Declaration of Marc Toberoff in Support of Plaintiffs' Motions *in Limine* ("Toberoff Decl."), Exs. C, D. On February 9, 2007, Defendants submitted Immerman's supplemental expert report in response to the expert report of Plaintiffs' witness, Wayne Lewellen, the former President of Distribution of Paramount Pictures Corporation.  *Id.*, Ex. E.  Plaintiffs deposed Marks on February 23, 2007 and deposed Immerman on March 28, 2007.

## II.   <u>ARGUMENT</u>

### A.   Legal Standards

Pursuant to Federal Rule of Evidence 702, expert testimony is not admissible unless "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the

1   principles and methods reliably to the facts of the case." F.R.E. Rule 702. *Daubert*

2   *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) provides the analytic

3   framework for determining the admissibility of evidence under F.R.E Rule 702.

4         Rule 702 requires the trial court to act as "gatekeeper" to "ensure an expert's

5   testimony both rests on a reliable foundation and is relevant to the task at hand."

6   *Daubert*, 509 U.S. at 597. Fulfillment of this "gatekeeping" obligation requires an

7   assessment of the expert's reasoning and "whether the reasoning or methodology

8   underlying the [expert's] testimony [is] scientifically valid and … whether that

9   reasoning or methodology properly can be applied to the facts at issue." *Id*. at 592-

10  93. *See United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)

11  ("Trial courts must ensure that [the] expert['s] opinions…will assist the trier of

12  fact."). The expert's report must provide a tangible basis for assessing the reliability

13  of his/her opinion. *See Donnelly v. Ford Motor Co*., 80 F.Supp.2d 45, 50 (E.D.N.Y.

14  1999) ("Without some explanation of the data, studies or reasoning [an expert]

15  employed, [the expert's] conclusion is simply inadmissible *ipse dixit*."). An expert's

16  qualifications, conclusions and assurance of reliability are insufficient for an expert's

17  proffered opinion to be admissible. *See Rogers v. Ford Motor Co*., 952 F.Supp. 606,

18  615 (N.D. Ind. 1997) (expert testimony that offers nothing more than a bottom line

19  conclusion is inadmissible).

20        The Court's "gatekeeping" function "applies not only to testimony based on

21  'scientific' knowledge, but also to testimony based on 'technical' and 'other

22  specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141

23  (1999), citing *Daubert, supra*. *See also Jinro America Inc. v. Secure Investments,*

24  *Inc.,* 266 F.3d 993, 1001 (9th Cir. 2001) (noting the Supreme Court "expressly

25  extended *Daubert's* standard of 'evidentiary reliability' to all experts, not just

26  scientific ones.").[1]  Nothing in either *Daubert* or the Federal Rules of Evidence

27

28

---

[1] The Advisory Committee to the 2000 Amendments to Rule 702 further stated:

"While the relevant factors for determining reliability will vary from expertise to expertise, the amendment rejects the premise that an expert's testimony should be treated more

"requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). The proponent of an expert's testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Id.*, *citing* F.R.E. 104.

### B.   William Immerman's Testimony Must Be Precluded

#### 1.   Background to Immerman's Expert Report and Testimony

##### a.   Immerman's Initial Report

In his initial report, Immerman states that he was asked to render an opinion as to, *inter alia*, the reasonableness of the fees and royalty payable to DC pursuant to the exclusive Option Purchase Agreement between Warner Bros. and DC, dated as of November 6, 1999 (the "November 6, 1999 Agreement"), for Superman audiovisual rights, including Superman motion picture rights. Toberoff Decl., Ex. C at 1–2. *See also* Declaration of Nicholas Williamson in Support of Plaintiffs' Motions *in Limine* ("Will. Decl."), Ex. A. Immerman states that his opinion relied upon his review of *Action Comics No. 1*, a DVD copy of *Superman Returns*, the November 6, 1999 Agreement and his "experience of over 40 years in the motion picture industry." Toberoff Decl., Ex. C at 2.

Immerman's thin report simply renders his conclusions without any substantive discussion or analysis: "Based on my experience in the motion picture industry I am of the opinion that the terms of the [November 6, 1999] Agreement represent typical terms for the acquisition of a highly valued literary property, and

---

permissively simply because it is outside the realm of science." "An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist." *Id.* "Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." *Id.* "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Id.* "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.*

the Additional Payments[2] set forth therein reflect extremely reasonable terms for the licensor of such rights." *Id*. at 2–3. Immerman further asserts that the "amount of the Additional Payments in my opinion represent[s] a fair and reasonable allocation of the portion of the profits of the Picture attributable to [the Superman literary material] and the balance of the profits can be fairly allocated to the screenplay, actors, directors, special effects, publicity, distribution, etc." *Id*. at 3.

Surprisingly, Immerman's expert report provides *no* factual support, *no* principles or methods, and *no* analysis underlying these opinions. Immerman merely summarizes the financial terms of the November 6, 1999 Agreement and presents his unsupported conclusory opinion favoring Defendants.[3]

b.    Immerman's Deposition

At his deposition on March 28, 2007, Immerman repeatedly failed to support the naked opinions offered in his expert report with concrete comparisons to the terms of comparable underlying rights agreements:

> "Q.    If you look at the next paragraph, paragraph 6 [of your report], the fourth sentence down, it's towards the bottom of the page. You say, 'based on my experience in the motion picture industry I am of the opinion that the terms of the option agreement represent typical terms for the acquisition of a highly valued literary property.' Do you see that?
> A.    Yes.
> Q.    For which highly valued literary properties have you negotiated acquisition agreements?
> A.    Well, I think I've listed some of them.[4] Certainly the Sidney Sheldon books, the Clive Cussler books.
> Q.    Any others that you recall?

---

[2] "Additional Payments" are defined by Immerman as 5% of 100% of "Defined Gross of the Picture" derived from the entire world or 7.5 % of 100% of the "Defined Gross of the Picture" derived from the United States and Canada, whichever is the greater sum, as set forth in the November 6, 1999 Agreement. *See* Toberoff Decl., Ex. C at 2; Will. Decl., Ex. A at 2, ¶ 3.

[3] Immerman's rebuttal report tries to counter statements by Plaintiffs' expert witness Wayne Lewellen regarding the importance of *Action Comics No. 1* to the overall Superman mythology. *See* Toberoff Decl., Ex. E. As such, it does not address whether the November 6, 1999 Agreement was negotiated at arm's length for "fair market value," with the possible exception of tangential statements about the general value of movie franchises. The rebuttal report also does not discuss the value of the Superman mythology as a source for a film or television franchise.

[4] Immerman refers to a passing mention of these authors in his pre-existing biography attached to his expert report; no *analysis* or even mention of them is contained in the report.

4

A.   <u>I'd have to go back.</u>  I mean, there were numerous [*sic*] during my years at Fox and during the time I was at Cannon Pictures.  And as a lawyer representing clients there were numerous deals for these kind[s] of properties.

Q.   Do you recall whether the agreement for the Sidney Sheldon book gave him a percentage of gross from the film?

A.   As I recall, it did not.

Q.   Is it typical for the owner of [a] highly valued literary property to get a percentage of gross from a movie based on his property?

A.   It varies.  Most of the deals I've seen through the years basically give a percentage of the net, but I've also seen deals where there's a percentage of the gross, too.

Q.   Which deals have you seen where there's a percentage of the gross?

A.   <u>I can't recall off the top of my head</u>, but I know that I've seen them through the years.[5]

Q.   Have you ever been involved in or negotiated the acquisition agreement for a famous comic book property?

A.   I've been in negotiation.  I don't think I've ever concluded a deal for a famous comic strip property, but I've been in negotiations over some comic strip properties.

Q.   Which properties?

A.   As I recall when I was at Crusader Entertainment we were in negotiations to acquire "Veronica and Betty" which are part of the Archie comic strip empire.

Q.   Veronica and Betty were supporting characters in the Archie comic strip?

A.   I think they subsequently also had Veronica and Betty comic strips, too.

Q.   <u>And do you remember the terms of that offer?</u>

A.   <u>Not as I sit here, no.</u>

Q.   Was it an outright purchase or a license?

A.   It was a license for motion picture rights.

Q.   Do you remember whether they had a gross position in the offer, they had a gross participation in the movie or planning?

A.   <u>I'm not sure.</u>  I seem to remember at least in the negotiations that I was in we were talking about a net position.  We subsequently never closed the deal, so I don't know.  I think they made a deal with Miramax eventually, and I don't know what the final deal was."

Toberoff Decl., Ex. F at 55:1–57:11 (emphasis added).  In sum, Mr. Immerman's conclusory opinion rests solely and generally on his "experience in the motion picture industry"; neither his report nor deposition contain real facts, data or the application of any methodology regarding the matter to be tried on February 3, 2009.

2.   <u>Immerman's Opinion Testimony Must Be Precluded Because Immerman Failed to Provide the Factual Basis and/or Methodology for His Mere Conclusory Opinions.</u>

---

[5] One of the "gross" participations that Mr. Immerman failed to recall was author Clive Cussler's May 9, 2001 agreement to license the film rights to his "Dirk Pitt" series of books to Philip Anschutz's company, Crusader Entertainment, LLC.  Mr. Immerman testified that he had "negotiated" this deal. Toberoff Decl., Ex. F at 55:9-13.  The agreement provided Mr. Cussler with a $20 million advance against 10% of the gross receipts from any derivative motion picture.  *See* Toberoff Decl., Ex. G at 12-19.

1

2

a.    Immerman Fails to Present <u>Any</u> Information or Data to Support His Conclusions

3    Immerman's opinions clearly do not satisfy the first and third prong of Rule

4    702's admissibility test.  Immerman's report provides *no* information or data to

5    support his opinion that the terms of the November 6, 1999 Agreement "represent

6    typical terms for the acquisition of a *highly valued* literary property, and the

7    Additional Payments set forth therein reflect extremely reasonable terms for the

8    licensor."  Toberoff Decl., Ex. C at 2 (emphasis added).  Immerman expressly

9    "based" this conclusion merely on his "experience in the motion picture industry,"

10   and failed to provide the requisite information and analysis on the terms of

11   agreements and the fees paid for comparable "franchise" properties, with which he

12   purportedly has experience.  *Id.*  With respect to the issues to be tried on February 3,

13   2009, Immerman's report contains mere naked conclusions, devoid of any

14   information, analysis or methodology to enable Plaintiffs or the Court to assess

15   whether his conclusory opinion "rests on a reliable foundation and is relevant."

16   *Daubert*, 509 U.S. at 597.

17   In order to support his broad opinion, Immerman's report would have had to

18   compare the financial and other terms of DC's agreements with Warner Bros., both

19   to average literary properties as well as to "*highly-valued* literary properties."  In

20   Immerman's "biography," attached to his report, he lists his screen credits as an

21   "Executive Producer or Producer" on some motion pictures.  *Id.* at 3.  Most of these

22   are not based on prior "literary properties,"[6] and the few that are, are not based on

23   properties that are in any way comparable in "fair market value" to the Superman

24   franchise.[7]  *Id.* at 3-5.  Nor did Immerman establish, attempt to establish or even

25   ────────────────────

[6] *E.g.*, "Dirty Mary, Crazy Larry," "Legend of Hell House," "Race with the Devil,"
26   "Highpoint," "That's Panthertainment," "Take This Job and Shove It," "Southern
Comfort," "Hysterical," "Likely Stories," "Flashdance," "Mind Games," "Primal Rage,"
27   "Welcome to Spring Break," "The St. Tammany Miracle," "The Lost Treasure of Sawtooth
Island," "Bring Him Home," "Danny Deckchair," and "Sound of Thunder."

28   [7] *E.g.* "Where the Red Fern Grows," "Where the Red Fern Grows Part II," "Swimming
Upstream," "Sound of Thunder," "Game of Their Lives," and "Sahara."  Additionally,

6

contend that such are comparable.  There is also no indication in Immerman's report or attached biography that he negotiated or was familiar with the terms of the underlying rights agreements for the few films in his biography that are based on a relatively well known pre-existing property.

Immerman also entirely neglects to establish that the unidentified literary deals of which he is purportedly familiar are "typical."  Without information about "typical" terms or "reasonable" rates in the motion picture industry, much less the "typical" terms for highly-valued franchises such as Superman, the Court lacks the means to determine whether Immerman's testimony as to the reasonableness of the November 6, 1999 Agreement is reliable, probative or relevant to the case at bar.

Courts have consistently refused to admit or preclude such unreliable expert testimony.  In the Ninth Circuit's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995), on remand from the U.S. Supreme Court, experts for the plaintiffs offered the opinion testimony that the drug Bendectin caused limb reduction birth defects.  *Daubert*, 43 F.3d at 1313.  The Ninth Circuit noted that under the Supreme Court's decision in *Daubert*, 509 U.S. at 597, federal judges must perform their "gatekeeping" function by ensuring that evidence "meets a certain standard of reliability before it is admitted."  *Daubert*, 43 F.3d at 1316.[8]  "This means that the expert's bald assurance of validity is not enough."  *Id.* The excluded experts failed to produce objective, verifiable evidence that their testimony was based on valid principles.  *Id.* at 1316–18.  The experts also failed to explain precisely how they reached their conclusions.  *Id.* at 1319.  As the experts did not explain "the methodology the experts followed to reach their conclusions, nor point to any external source to validate that methodology," the court had "been

Immerman alleges he "arranged co-financing" for "Staying Alive" and "Star Trek II."  *See* Toberoff Decl., Ex. C at 4-5.

[8] The U.S. Supreme Court stated in *Daubert* that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one."  *Daubert*, 509 U.S. at 594.  "Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission."  *Id.* at 594–95.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 595.

1    presented with only the experts' qualifications, their conclusions and their assurances

2    of reliability [and].... [u]nder *Daubert*, that's not enough." *Id.*

3         The Advisory Committee Notes to the 2000 Amendments to Rule 702 further

4    emphasize the evidentiary problems of unsupported expert assertions, based solely

5    on their purported "experience":

6         "If the witness is relying solely or primarily on experience, then the witness
          must explain how that experience leads to the conclusion reached, why that
7         experience is a sufficient basis for the opinion, and how that experience is
          reliably applied to the facts. The trial court's gatekeeping function requires
8         more than simply 'taking the expert's word for it.'"

9    Here, Immerman proffers only his general experience in the entertainment industry

10   to support his bare statement that the November 6, 1999 Agreement is "extremely

11   reasonable."  There is little indication in either Immerman's report or his deposition

12   testimony that he has sufficient experience negotiating literary rights agreements for

13   "franchise" properties that are comparable, or even analogous, to Superman.  When

14   questioned on this point, Immerman could recall only "the Sidney Sheldon books

15   [and] the Clive Cussler books" from the biography attached to his report, but could

16   not recall contractual terms or *any* contract containing a "gross" profit participation.

17   Toberoff Decl., Ex. F at 55:11-13.  *See Minasian v. Standard Chartered Bank, PLC*,

18   109 F.3d 1212, 1216 (7th Cir. 1997) ("An expert's report that does nothing to

19   substantiate an opinion is worthless, and therefore inadmissible.").  *See also Coffey v.*

20   *Dowley Manufacturing, Inc*., 187 F.Supp.2d 958 (M.D. Tenn. 2002) (expert opinion

21   rejected because it is based on mere "guestimations").

22        Because Immerman does not provide any supporting information or analysis

23   for his mere conclusory opinion regarding the "reasonableness" of the November 6,

24   1999 Agreement, the Court should preclude Immerman from testifying under

25   *Daubert* and F.R.E. Rule 702.  As Immerman's naked opinion has no probative

26   value, it is also inadmissible on grounds of irrelevance.   F.R.E. Rule 402.

27

28

PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE DEFENDANTS' EXPERTS

b.     **Immerman Fails to Disclose Any Methodology in Arriving at His Conclusory Opinions**

Immerman's opinions also clearly fail the second and third prong of Rule 702's admissibility test because Immerman discloses *no* principles, methods or analysis, let alone "reliable principles and methods," and never applies *any* methodology or analysis, "reliably" or otherwise, "to the facts of the case."  F.R.E. Rule 702; Toberoff Decl., Ex. C at 2.

As Immerman does not provide *any* analysis or methodology for his naked opinion regarding the "reasonableness" of the November 6, 1999 Agreement, Immerman should be precluded from testifying.[9]  *See Daubert*, 509 U.S. at 592-93; *Atmel Corp. v. Information Storage Devices, Inc.*, 189 F.R.D. 410, 416 (N.D. Cal. 1999) (excluding expert testimony because methodology for conclusory statement was insufficient and unreliable);  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1079-1080 (10th Cir. 2006) (testimony properly excluded where expert failed to explain underlying methodology for conclusion).

c.     **Immerman's Failure to Disclose Highly Relevant and Available Evidence Suggests That Immerman's Opinion Is Incomplete or Misleading**

Significantly, Immerman did *not* discuss in his expert report one of the few deals he did work on involving the acquisition of film rights to a notable literary property – the "Dirk Pitt" series of novels, underlying the movie *Sahara* (the

---

[9] By contrast, the rebuttal report of plaintiffs' expert Wayne Lewellen presents concrete reasons and analysis why the terms of the key agreements between Warner Bros. and DC are not fair or reasonable. Toberoff Decl., Ex. H at 3-4.  Lewellen points out that the November 6, 1999 Agreement between Warner Bros. and DC is highly unfavorable to DC because it constitutes a sale, not a license, of exclusive worldwide motion picture and ancillary rights to Superman *for the remaining life of the Superman copyrights*, with no obligation on Warner Bros.' part to even exploit this valuable franchise.  *Id.*  This is particularly unfavorable to DC, as DC's compensation, for the most part, is comprised of a profit participation that is contingent on such exploitation.  *Id.*  Lewellen also points out that Warner Bros.' "defined gross" is defined in the Agreement to exclude eighty percent (80%) of Warner Bros.' massive home entertainment revenue, a point simply ignored by Immerman.  Finally, Lewellen points out that these one-sided terms favoring Warner Bros. are unsurprising, as vertically integrated agreements between corporate siblings will always be less advantageous to the licensor than agreements made and negotiated at arm's length in the open market.  *Id.*

"*Sahara* Agreement").  Toberoff Decl., Ex. G.  Immerman negotiated this agreement on behalf of Philip Anschutz's company, Crusader Entertainment, LLC, which financed the picture.  *Id*., Ex. I at ¶ 2.  The "Dirk Pitt" novels, though successful, could hardly be compared to Superman in terms of worldwide brand recognition and broad commercial value.  Yet the author, Clive Cussler ("Cussler"), was able to negotiate *with Immerman* a whopping ***$20 million*** payment and a ***ten percent (10%) worldwide gross participation*** – double the participation afforded DC by Warner Bros. for the world-renowned Superman franchise.  *Id*., Ex. G at  ¶ 7.[10]

Immerman's pointed failure to mention this relevant transaction in his expert report, and his deposition answer that he "*can't recall*" an instance where the owner of a literary property was provided a gross participation in exchange for the acquisition of film rights, underscore that he did not follow a probative or reliable methodology in his purported evaluation of the November 6, 1999 Agreement. Moreover, Immerman's unsupported opinion runs directly contrary to this evidence and to his own experience.[11]

In conclusion, Immerman's report and testimony are not based on sufficient facts or data, and are not the product of reliable principles, methods or the application of any discernable methodology to the specific facts underlying the claim to be tried on February 3, 2009.  *See* F.R.E. Rule 702; *Daubert,* 509 U.S. at 592-593. Accordingly, Immerman's opinions are not probative, are highly unreliable, and thus inadmissible.  *Id*.  Pursuant to this Court's important "gatekeeping" function under

---

[10] Moreover, in practice, the deal for "Dirk Pitt" also proved to be worth *double* that of DC's "sweetheart deal" with Warner Bros.  Under the terms of the *Sahara* Agreement, Cussler received a minimum of $20 million for *Sahara,* which grossed $119,269,486 at the worldwide box office. Toberoff Decl., Ex. J. Yet, according to Defendants' own financial expert, Franklin Johnson, DC has received only $10,867,659 in revenue for *Superman Returns,* which grossed $391,081,192 at the worldwide box office.  *See* Toberoff Decl., Ex. K; Will. Decl., Ex. G.

[11] Immerman's failure to recall that Cussler had a *major* gross participation in *Sahara* is particularly disturbing considering that he negotiated the *Sahara* Agreement, dated as of May 9, 2001 (Toberoff Decl., Exs. I at ¶ 2, G at 1) and that it was the subject of a recent highly publicized lawsuit (2004-2007) in which Immerman was a key witness.  *Id*., Ex. L. Despite the proximity of this very relevant transaction, Immerman ignores it in his report, underscoring the unsupported *ad hoc* nature of his opinion.

*Daubert, supra*, Immerman must be precluded from providing purported "expert" testimony at trial.

### C.   Richard Marks' Testimony Must Be Precluded

#### 1.   Marks' Expert Report and Testimony

##### a.   Marks' Expert Report Reflects Insufficient Data and Is Not Based on a Reliable Methodology

On January 12, 2007, Defendants disclosed Richard Marks as an expert witness, and attached Marks' expert report.  *See* Toberoff Decl., Ex. D.  Marks described himself as an attorney who has "acted in a legal and business affairs capacity at a literary agency, … production and distribution companies."  *Id.* at 1.

Marks' expert report is replete with bald statements and conclusions which have no probative value.  The thin report skims the surface of the "alter ego" issues to be tried on February 3, 2009, devoting a scant 1 ½ pages to the television agreement dated December 5, 2000 between DC and Warner Bros. (the "December 5, 2000 Agreement") underlying the *Smallville* television series.  Will. Decl., Ex. B.  Marks provides little or no facts, methodology or analysis to support his cursory conclusion that "[t]he consideration accorded to DC pursuant to the Smallville License Agreement, including the License Fee, is extremely fair and reasonable."  Toberoff Decl., Ex. D at 6.  Marks also fails to offer any context or way to assess the relevance of his broad claim that "[t]his License Fee to DC is the most lucrative such arrangement for such a licensor that I have ever seen."  *Id.* at 5.  Marks does not cite a single deal he has worked on, nor any deal involving branded "franchise" properties comparable to Superman.

Marks' sole attempt to support  his opinions with a modicum of information is entirely unsuccessful, as the scant data he provides is completely unsubstantiated.  In the short portion of  his report relating to the February 3, 2009 trial, Marks concludes that "[t]he economic arrangement between DC and WBTV in connection with 'Smallville' represents a considerably more advantageous arrangement for the

licensor, DC, than is customary within the television industry for a licensor of the

underlying concept or literary material." *Id*. at 5.  He thereafter states:

> "Typically, a literary property acquired in connection with a one-hour episodic series with a budget comparable to 'Smallville,' depending on its profile and many other factors, will be given a per episode royalty of $3,000 to $30,000 – an amount that is relatively minor when compared to a per one-hour episode budget that frequently approaches or exceeds $3 million. That per episode royalty is customarily in addition to a share of contractually 'defined proceeds' of the show, a financial interest that permits various deductions prior to the application of the participation.  Such contractually defined economic arrangements, arrived at as a result of arm's-length negotiations, are perhaps the best measure of a literary property's contribution to the profits of a television series."

*Id*. at 5.  Marks fails to give *any* concrete examples to support this claim, or to

compare the December 5, 2000 Agreement to *any* other agreements granting the

television rights to a pre-existing property, much less a branded "franchise" property

like Superman.  This unqualified information is therefore neither helpful nor

probative, given its broad range and the lack of *any* comparable information as to

extremely high-level properties like Superman.

Marks repeats in his report that the per-episode royalty was "extremely

generous." Yet, without any real foundation, analysis or baseline as to comparable

transactions for "franchise" properties, this, again, is empty hyperbole.

Finally, Marks gratuitously speculates as to the reason DC purportedly

obtained such a "generous" deal:

> "The enhanced consideration that DC receives on 'Smallville' is likely due to the almost seven decades of continuous stewardship and development of the Superman character by DC Comics and its predecessors, which is highly unusual if not unprecedented.  This has included continuous exploitation of Superman and its related materials and characters in multiple media platforms, creating not only instant public awareness, but also a vast body of characters and mythology on which to draw.  The consideration accorded to DC pursuant to the Smallville Licensing Agreement, including the Licensee Fee, is extremely fair and reasonable."

*Id.* at 5–6.  Essentially, Marks infers that DC got a good deal by opining that DC

deserves a good deal.  Such "cart before the horse" methodology is neither reliable

nor probative, particularly when examining an intra-corporate transfer.

More importantly, Marks *never* specifically opines in his expert report as to

DC's contingent gross participation in *Smallville* under the December 5, 2000 Agreement.

                b.     Marks' Deposition Testimony Underscores That His "Opinion" Is Not Probative, Reliable, Nor Based on a Palpable Methodology

At his deposition Marks could not articulate the methodology he used to evaluate DC's compensation in the December 5, 2000 Agreement.  Marks merely offered the circular rationale that the proper measure of a literary property's value is the "contractually defined economic arrangements arrived at as a result of [arm's]-length negotiations."  Toberoff Decl., Ex. D at 5.  Marks explained:

> "I am not an economist but ***value is what someone will pay***.  Value is what is in the eye of the beholder.  And if you think the car is worth a million and I will only pay 100,000 ***and you don't have another buyer,*** what is the value?
>
> You don't have to sell it to me, but once a transaction has occurred I think we know what the value is.  Again, earlier this morning we seemed to be going down parallel paths of some value other than what the market says the value is, and my belief and my experience in this industry is that the ultimate test of what something is worth is what somebody paid."

*Id.*, Ex. M at 130:9-20.  Thus, Marks' opinion is erroneously premised on DC having made Superman television rights available to other studios in the open market – which did not occur.[12]  *Id.*  Marks' opinion incorrectly presupposes that DC did not "have to sell" to Warner Bros.  *Id.*

Significantly, Marks admitted that the market value, arrived at through purported "arm's-length negotiations," is determined by "the competitive interest in the property" and "the degree of competition or competitive bidding" – which is contrary to the facts of this case.  *Id.*, Ex. M at 131:2-25; *see also* n.12 below.  Marks reiterated that "the deal arrived at as a result of arm's length negotiation is perhaps a

---

[12] *See* Will. Decl., Ex. D (memorandum from DC to Warner Bros containing "short descriptions of the properties we wish to formally shop outside WB"); E at 2, 5-6; Toberoff Decl., Ex. N at 159:12-21 (DC's President Paul Levitz admits DC first shops properties to Warner Bros. Television).  Gregory Noveck, Senior Vice President of Creative Affairs for DC Comics admits that DC properties must be "fully considered internally" before they can be shopped "outside the Warner Bros. family."  Will Decl., Ex. E at 2.  He further admits that DC needs to extend its "mandate of selling outside the studio to television entities as well … The initial part concerns the ability to pitch to other television studios projects that have been passed on by WBTV."  *Id.* at 6.

1    best measure of the value" (*Id.* at 133:4-6), expounding:

2       "You know, I operate in the real world with real fact patterns, not
3       hypotheticals. And people sit across the table with all these factors and they make a deal, and that's the world that I operate in and that's the value that I'm talking about. And when that value radically shifts with talent – let's say
4       there's a renegotiation and the contract expires, the parties, if they want to recontract, they have a chance to renegotiate. But ultimately this is not a
5       science. We're not weighing something on a scale. Value is determined by the two parties coming together and agreeing as to what one will pay and one will
6       accept."

7    *Id.* at 133:22–134:9.

8       When asked at his deposition if he was ever involved in negotiating the

9    television rights to a famous property or character, Marks could only recall a single

10    property – "John D. McDonald['s] Travis McGee novels" –  which is not the least bit

11    comparable to Superman in stature, brand recognition or value.  And Marks had no

12    recollection of the terms of this single transaction.  *Id.* at 110:15-23.

13       Marks was also unable to show at his deposition that he applied any

14    methodology or principles in quickly concluding that DC's episodic royalty was

15    "extremely generous."  *Id.*, Ex. D at 6; Ex. M at 159:12-14.  When asked how he

16    arrived at his evaluation, Marks responded:  "And, you know, as I have said, it's not

17    a science, it's an art.  But ultimately, if I am asked for my expert opinion, that's what

18    I came up with."  *Id.*, Ex. M at 159:12-14.   Such vagueness and lack of any real

19    methods or principles permeates Marks' deposition.[13]

20

21         2.    <u>This Court Should Preclude Marks' Testimony Under F.R.E. 702 and *Daubert* as Based on Insufficient Facts and Lacking Any Reliable Methodology</u>

22

23           a.    Marks Fails to Provide Sufficient Information From Which to Gauge the Reliability of his Conclusory Statements

24       The Court should exclude Marks' testimony as his opinion is based on

25    insufficient data to establish that DC's compensation in the December 5, 2000

26    _____

27    [13] For instance, when asked about an average baseline budget of television series episodes, which is relevant to the evaluation of baseline episodic royalties, Marks responds: "[I]t's sort of all over the map," and later:  "[T]here are so many factors that it's hard to tell…"

28    *Id.*, Ex. M at 127:15-128:2.  When asked how he knew that the purported budget for Smallville was in the $3 million range he responded, "As I sit here now I can't recall." *Id.* at 129:7-9.

PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE DEFENDANTS' EXPERTS

Agreement was the result of arm's length negotiation and constituted fair market value for the world famous Superman property.  Toberoff Decl., Ex. D at 5; *see* F.R.E. Rule 702; *Daubert*, 509 U.S. at 592-593, 597.  Marks claims that television licensing fees range from $3,000 to $30,000 per episode, but fails to offer a single example to substantiate this off-the-cuff statement.  Marks also provides no analysis or evaluation whatsoever of DC's contingent gross participation – the *key* component of DC's compensation in the December 5, 2000 Agreement.

Marks concludes that the "[December 5, 2000 Agreement] reflects a considerably more advantageous arrangement for the licensor, DC, than is customary within the television industry for a licensor of the underlying concept or literary material."  *Id.*  However, this unsupported "opinion," even if true, has no probative value or relevance because no one would expect to begin with that a world renowned "franchise" property like Superman would be licensed for "customary" consideration.  *See* F.R.E. Rules 402, 403.

Marks similarly proclaims, with no foundational context, that "[t]he License Fee to DC is the most lucrative such arrangement for such a licensor that I have ever seen."  Toberoff Decl., Ex. D at 5.  Even if this assertion were true, without any foundation or an understanding of the television transactions Marks *has* seen, his hyperbolic statement again has no probative value.  *See* F.R.E. Rules 402, 403.  Marks provides no foundation as to his familiarity with television agreements for the licensing of famous properties, let alone a proven "franchise" like Superman.

In light of Marks' alleged experience as an agent and as an executive for various film and television companies, he should at least have provided in his report some semblance of support for his position in the form of comparable television rights deals he is familiar with.  *Id.*, Ex. D at 1.  As noted above, Marks could only recall at his deposition *a single transaction* involving "John D. McDonald['s] Travis McGee novels," which is hardly comparable to Superman.  Moreover, Marks had no recollection of the terms of this isolated transaction.  *Id.*, Ex. M at 110:15-23.

In place of hard facts and data, Marks offered only self-serving speculation that the purportedly "enhanced consideration" in the December 5, 2000 Agreement was "*likely* due to the almost seven decades of continuous stewardship and development of the Superman character by DC Comics and its predecessors" and purports to testify as to this development.[14]  *Id.*, Ex. D at 5 (emphasis added).  *See* F.R.E. Rules 402, 403; *see also O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir.), *cert denied*, 512 U.S. 1222 (1994) (the court's foremost objective must be to rule out "subjective belief or unsupported speculation").

Without information or "comps" to support his evaluation, Marks simply reiterates that the December 5, 2000 Agreement is "advantageous" (Toberoff Decl., Ex. D at 5), "enhanced" (*id.* at 5), "extremely fair and reasonable" (*id.* at 6), "rich[]" (*id.* at 6) or "an extremely beneficial deal for DC" (*id.* at 6).  As noted in the Advisory Committee Notes to the 2000 Amendments to Rule 702, the trial court cannot simply take "the expert's word for it."  *See also Joiner*, *supra,* 522 U.S. at 146 ("the *ipse dixit* of the expert" does not amount to admissible opinion testimony).  Plaintiffs and the Court are left with no clue as to how or why Marks arrived as his conclusory "opinion."

Accordingly, Marks' expert testimony should be excluded for lack of foundation, probative value or relevance under F.R.E. Rules 402, 403, and 702; and *Daubert*, 509 U.S. at 597.

                b.    Marks' Methodology, to the Extent One Even Exists, Is Flawed as Predicated on Unproven False Assumptions

Marks' methodology to determine "market value" is inherently flawed as it

---

[14] Marks, an attorney, is not qualified to testify as to DC's "stewardship and development of the Superman character" or the literary contribution of the Superman mythology to *Smallville*.  Marks admitted that he possessed extremely limited knowledge, at best, of both the Superman "mythology" and DC's "stewardship." *Id*., Ex. D at 5.  Marks admitted that he had not read *Action Comics No. 1* or any Superman or Superboy literary work, other than Jerome Siegel's original Superboy materials (at the request of counsel).  *Id.* at 2.  Marks further admitted that in forming his opinion he relied only upon his "prior familiarity with the 'Superman'[] television series and several of the 'Superman' feature films."  *Id.* at 2.  Simply viewing some films and television series over the years does not qualify Marks as a Superman expert who may opine as to *DC's* "seven decades of continuous stewardship and development of the Superman character."

1  *assumes* the ultimate factual issue for trial – namely, whether the December 5, 2000

2  Agreement was negotiated by DC and WBTV "at arm's length."

3      According to Marks:  (a) the fair market value of a literary property is

4  determined by the terms of an agreement to license the property, resulting from

5  arm's length negotiation in the open market; (b) the December 5, 2000 Agreement

6  presumptively resulted from an arm's length negotiation in the open market;

7  therefore (c) the December 5, 2000 Agreement reflects the fair market value of

8  Superman in the television industry.[15]

9      Because Marks' tautological conclusion as to market value is constructed on

10  the unproven "arm's length" status of the contract's negotiation, Marks' analysis

11  necessarily falls apart.  Marks' definition of value is also useless:  "Value is

12  determined by the two parties coming together and agreeing as to what one will pay

13  and one will accept."  Toberoff Decl., Ex. M at 134:7-9.

14      A motion *in limine* should be granted where, as here, the expert's "opinion" is

15  based on unsupported assumptions, unproven facts or subjective speculation.  *See*

16  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-807 (9th Cir. 1988) (expert

17  opinion precluded as based on "unsupported assumptions"); *O'Connor* 13 F.3d at

18  1106 (Court must weed out "subjective belief or unsupported speculation").

19      Moreover, Marks' opinion and singular "methodology" are based on a

20  demonstrably false predicate – that the December 5, 2000 Agreement regarding

21  Superman was arrived at on the competitive open market.  Toberoff Decl., Ex. M at

22  129:15-130:20; 132:24-133:6.  When Marks circularly opines that the December 5,

23  2000 Agreement itself is the best indicia of fair market value, he erroneously

24  assumes that Superman was offered by DC to other competitive studios.  It is well

25  settled that an expert may not base an opinion on facts which are contrary to the

26

27  _____

[15] Marks emphasized in his expert report that "the best measure of a literary property's contribution to the profits of a television series," in this case *Smallville,* was the

28  "contractually defined economic arrangements, arrived at as a result of arm's-length negotiations."  Toberoff Decl., Ex. D at 5.  Marks seconded this falsely premised principle repeatedly during his deposition.  Toberoff Decl., Ex. M at 129:15-130:20; 132:24-133:6.

evidence and/or which ignore the evidence.  *See Nebraska Plastics, Inc. v. Holland Colors Americas, Inc*., 408 F.3d 410, 415-416 (8th Cir. 2005) (expert's testimony properly excluded where assumptions were invalid in view of facts of case); *Daubert*, 509 U.S. at 592-93 (Court's "gatekeeping" role requires assessment of expert's reasoning and "whether that reasoning or methodology properly can be applied to the facts at issue.").

In reality, DC did not make Superman live action television rights available to other studios and production companies outside the Warner Bros. family, as with DC's Superman motion picture and allied rights (Warner Bros. Pictures), DC's Superman animated television rights (Warner Bros. Animation) and DC's Superman merchandising/ licensing representation (Warner Bros. Consumer Products), etc.  *See* Will. Decl., Exs. C, EE (at 27:22-28:19); Toberoff Decl., Ex. N (159:22-160:3).  *See also* fn. 12, *supra*. WBTV exclusively licensed Superman television rights from its corporate sibling, DC, in a closed-end "vertically integrated transaction," with no competition or even the potential for competition.  *Id*.

Marks' "methodology" boils down to self-serving speculation:  "that *the parties' understanding* [was] that the underlying Superman literary property – the entire vast body of work – is itself a relatively minor contributor to the success of the 'Smallville' series…."  *Id*. at 6 (emphasis added).

As Marks' testimony regarding the December 5, 2000 Agreement is not the result of reliable principles or methods, and is predicated on false or un-established assumptions, his opinions and testimony must be precluded under F.R.E. Rule 702 and *Daubert*, 509 U.S. at 592-593, 597.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court grant this motion *in limine* excluding opinion testimony from Defendants' expert witnesses Richard Marks and William Immerman at the February 3, 2009 trial.

DATED:  January 5, 2009            TOBEROFF & ASSOCIATES, P.C.


By _____
                    Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE DEFENDANTS' EXPERTS