Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
MToberoff@ipwla.com

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, <br><br> Defendants. <br>─────────────────────── <br> DC COMICS, <br><br> Counterclaimant, <br> vs. <br><br> JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Counterclaim Defendants. | Case No: CV 04-8400 SGL (RZx) <br><br> Hon. Stephen G. Larson, U.S.D.J. <br><br> **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO LIMIT THE SCOPE OF TRIAL** <br><br> [Plaintiffs' Oppositions to Defendants' Motions *in Limine* Nos. 2-4, Declaration of Marc Toberoff filed electronically; Unredacted Opposition No. 4 and Declaration of Nicholas Williamson filed manually] <br><br> Date:   January 26, 2009 <br> Time:   11:00 a.m. <br> Place:  Courtroom 1 <br><br> Trial Date:  February 3, 2009 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION AND FACTUAL BACKGROUND ................................1

    A.      Procedural Background ..........................................................................1

    B.      Elements Required to Establish Plaintiffs' "Alter Ego" Claims...........2

    C.      Defendants' Motion *in Limine* No. 1 ...................................................3

II.     ARGUMENT.......................................................................................................3

    A.      Defendants Have Erroneously Interpreted the Scope of the Court's March 26, 2008 Order ..........................................................................7

    B.      Defendants Wish to Narrow the Scope of Trial Because the Evidence Overwhelmingly Reveals the Degree to which DC Is at the Mercy of Warner Bros..................................................................10

    C.      Plaintiffs' Witnesses and Exhibits Are Plainly Relevant to the Relative Concepts of Whether Negotiations Between DC and Warner Bros. Were at "Arm's Length" and for "Fair Market Value," and Place Such Determinations in the Proper Context.........10

        1.      Plaintiffs' Experts Mark Evanier & James Steranko................11

        2.      Ariel Emanuel .........................................................................12

        3.      Steven Sills..............................................................................13

        4.      Julie Spencer & Janice Cannon ..............................................14

        5.      Barry Meyer, Alan Horn,  Jeff Robinov & Kevin Tsujihara....15

        6.      Mike Edwards ..........................................................................16

        7.      Patrick Caldon & Reginald Harpur..........................................17

        8.      Peter Roth ................................................................................18

        9.      Exhibits ...................................................................................18

III.    CONCLUSION ................................................................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*International Financial Servs. v. Chromas Tech.*,
356 F.3d 731 (7th Cir. 2004) ........................................................................2

*Jahn v. Equine Services, PSC*,
233 F.3d 382 (6th Cir. 2000) ......................................................................12

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)....................................................................................12

*Nielson v. Union Bank of California, N.A.*,
290 F.Supp.2d 1101 (C.D. Cal. 2003) ........................................................3

*Siegel v. Warner Bros. Entertainment Inc. ("Siegel II")*,
542 F.Supp.2d 1098 (C.D. Cal. 2008) ..................................................*passim*

*United States v. Hankey*,
203 F.3d 1160 (9th Cir. 2000) ....................................................................12

*United States v. Lake*,
150 F.3d 269 (3d Cir. 1998) ........................................................................12

*Walker v. Soo Line R.R. Co.*,
208 F.3d 581 (7th Cir. 2000) ......................................................................12

## State Cases

*Sonora Diamond Corp. v. Superior Court*,
83 Cal. App. 4th 523 (2000) ........................................................................4

## Federal Authorities

17 U.S.C. § 304.............................................................................................1

F.R.E. 602 ...................................................................................................12

F.R.E. 702 ...................................................................................................11

## Other Authorities

Jones, Rosen, Wegner, Jones,
*Federal Civil Trial and Evidence* (2008) 8:1521 .....................................11

*Federal Civil Trial and Evidence* (2008) 8:1525.5 ..................................12

*Federal Civil Trial and Evidence* (2008) 11:37 .......................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   INTRODUCTION AND FACTUAL BACKGROUND

## A.   Procedural Background

Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel ("Siegel"), the co-author of the world renowned comic book hero, "Superman."  This case arises out of Plaintiffs' proper exercise of their right, under section 304(c) of the 1976 United States Copyright Act, 17 U.S.C. § 304(c), to recapture Siegel's original copyrights in "Superman." Plaintiffs served the required statutory notices on the defendants herein ("Defendants") on April 3, 1997, terminating Siegel's prior grant of rights in "Superman" (the "Termination") to Defendants' predecessor(s)-in-interest as of April 16, 1999.  On October 8, 2004, Plaintiffs commenced the instant action for declaratory relief as to the validity of the "Superman" Notices of Termination, and for an accounting and other relief with respect to "Superman."  Included in Plaintiffs' complaint was the claim that, as Defendants generally, and Warner Bros. Entertainment, Inc. ("Warner Bros.") specifically, are joint owners with Plaintiffs of the recaptured Superman copyrights, they have a duty to account to Plaintiffs.  *See* Plaintiffs' Second Amended Complaint, ¶¶ 65-73.

The parties filed substantial cross-motions for partial summary judgment on April 30, 2007.  Defendants moved for partial summary judgment that Plaintiffs are not entitled to the Superman related profits of Warner Bros. and Time Warner Inc. ("Time Warner") on the grounds that Warner Bros. is a mere "non-exclusive licensee" of Defendant DC Comics ("DC").  *See* Defendants' Motion for Partial Summary Judgment ("Defs. MSJ") at 76-96.   In opposing Defendants' motion, Plaintiffs argued: (1) that Warner Bros. had stepped into DC's shoes as the co-owner with Plaintiffs of the divisible film and television copyrights to Superman, and (2) that, in any event,  the duty of joint copyright owners to account to one another is based on state *equitable* principles of unjust enrichment and constructive trust, and it would be *inequitable* to permit Defendants to unfairly diminish through intra-

corporate dealings with DC the Superman profits payable to Plaintiffs, while unjustly enriching Warner Bros. and Time Warner. *See* Declaration of Marc Toberoff in Support of Plaintiffs' Motions *in Limine* ("Toberoff Decl."), Ex. A, at 29–43. On March 26, 2008 the Court *denied* Defendants' motion on this claim, preserving these issues for trial. *See Siegel v. Warner Bros. Entertainment Inc.* ("*Siegel II*"), 542 F.Supp.2d 1098, 1145 n.11 (C.D. Cal. 2008).

The Court rejected blind application of the "licensee rule" and instead rightly chose to focus on the equities and realities of this case:

> "Here, the realities of the transferor and the transferee entities cannot be ignored. The evidence before the Court reveals that the relevant entities are all closely related entities – parent corporations, wholly and partially owned subsidiaries, partners, sibling business entities (owned directly or indirectly by the same parent - although it is not entirely clear to the Court exactly what those relationships have been at all relevant times. This fact alone raises a specter of a "sweetheart deal" entered into by related entities in order to pay a less than market value fee for licensing valuable copyrights. If such were the case, the related entity might be able to exploit the copyrights without the responsibility of answering to the co-owner of a joint work, and the licensor co-owner would thereby be relieved of the responsibility of accounting for any profits (other than a greatly reduced licensing fee) to the non-licensor co-owner. This result would be inequitable."

*Id* at 1144.

**B.    Elements Required to Establish Plaintiffs' "Alter Ego" Claims**

The issue to be tried at the February 3, 2009 trial ("February 3 Trial"), as set forth by the Court in its March 26 and October 6, 2008 Orders, is whether "to pierce the corporate veil between defendant DC Comics and certain of its corporate siblings on the basis that they are 'alter egos' of one another." October 6, 2008 Order at 1. The Court noted that this "is not a cause of action unto itself; "it is merely a procedural means of allowing [or better said, expanding the scope of those ensnared in the net of] liability on a substantive claim." *Id.* at 8, citing *International Financial Servs. v. Chromas Tech.*, 356 F.3d 731, 736 (7th Cir. 2004). The Court identified the issue as requiring an "equitable assessment of whether maintaining the corporate form would be 'inequitable.'" *Id.* at 9.

The Court has identified the relevant "equitable" issue as being "[w]hether the

license fees paid represents the fair market value therefor, or whether the license for the works between the related entities was a 'sweetheart deal.'" *Siegel II,* 542 F.Supp.2d at 1145. As such, the elements that Plaintiffs need to prove at trial are that DC Comics was "closely related" (in fact, owned by) to the entities with which it was negotiating, and that the deal terms arrived at do not represent "fair market value."

### C.     Defendants' Motion *in Limine* No. 1

On December 3, 2008, the parties "met and conferred" regarding their respective motions in limine for the "alter ego" trial. At the meeting, and in a confirmatory letter sent December 9, 2008, Defendants stated that they believe the "Court's rulings make it clear that regardless of whether a traditional "alter ego" situation exists here, the Court is concerned with whether the particular deals between Warner Bros. and DC Comics that are at issue are "sweetheart deals." Toberoff Opp. Decl, Ex. B. Thus, Defendants moved to preclude Plaintiffs from calling several witnesses and submitting several exhibits that they view as irrelevant to what *they* believe should be the appropriate analysis. *Id.* In their motion *in limine*, Defendants narrowly characterized the scope of the trial as *solely* about "whether and to what extent any agreement between DC and WBEI in fact constitutes a 'sweetheart' deal." Defs. *Limine* No. 1 at 1:25-26.

## II.     ARGUMENT

### A.     Defendants Have Erroneously Interpreted the Scope of the Court's March 26, 2008 Order

Defendants improperly narrow the scope of the February 3 Trial in an effort to preclude plainly relevant testimony and evidence. Plaintiffs agree that the trial is not focused on a pure "alter ego" analysis, where such a "unity of interest and ownership" exists between the relevant entities that the "separate personalities of the [entities] do not in reality exist." *Nielson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1115 (C.D. Cal. 2003). Similarly, the focus is not strictly on

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

whether Warner Bros. and DC "commingle" funds and assets, use the same offices and employees, disregard corporate formalities and use "identical directors and officers." *Sonora Diamond Corp. v. Superior Court,* 83 Cal. App. 4th 523, 526 (2000).

However, to exclude relevant evidence, Defendants confuse ultimate issues with the scope of relevant evidence permitted to illuminate and determine such issues. Defendants contend that this trial solely concerns whether agreements between DC and Warner Bros. are "sweetheart deals." It is true that this trial does concern an analysis of whether the terms of DC's Superman agreements with Warner Bros. constitute "fair market value"; but that analysis neither exists, nor is arrived at in a vacuum. This is particularly true because the "fair market value" of a unique property like Superman is to some degree subjective as it was never properly determined and secured by DC on the competitive open market prior to assigning key rights to Warner Bros. in perpetuity. Thus we must look to and draw *inferences* from a variety of factors, influences and comparisons.

For instance, the close intra-corporate relationship, course of conduct and nature of the negotiations (or lack thereof) between DC and Warner Bros. all give rise to strong inferences that the relevant Superman agreements were not negotiated at "arm's length" for "fair market value." Defendants wish to ignore that the Court is clearly concerned with the scope and degree of DC's relationship with Warner Bros. its effective corporate parent: "The evidence before the Court reveals that the relevant entities are all closely related entities – parent corporations, wholly and partially owned subsidiaries, partners, sibling business entities (owned directly or indirectly by the same parent) - *although it is not entirely clear to the Court exactly what those relationships have been at all relevant times*." *Siegel II,* 542 F.Supp.2d at 1144 (emphasis added).

Thus, this trial is not a mere comparison of naked deal terms – a narrow "up or down" decision on whether a particular term is purportedly "fair" – because this

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

cannot be determined in the abstract.  The relevant deal terms must be placed in the
***proper context*** of the relationship between DC and Warner Bros. at the time the
deals were negotiated and executed.  Their contracts were not forged in a vacuum,
but as the product of the larger process that yielded them.  Whether the relevant
Superman deals represented "fair market value" can only be determined with an
understanding of all the "moving parts" that went into the deals.  The ***degree*** to
which DC was "closely related" to Warner Bros. has an obvious bearing on the
parties' negotiations and resulting deals.  Accordingly, the Court should hear
evidence describing the true nature of this intra-corporate relationship at "all relevant
times," how it affected the course of negotiations between DC and Warner Bros. and
how the resulting inclusion and *omission* of deal terms damage DC and thus
Plaintiffs, now and in the future. Then, and only then, as Defendants note, can the
Court "assure itself that Plaintiffs receive a fair share of the fair market value" for
Superman.  Defs. *Limine* No. 1 at 12:5-6.

It should also be borne in mind that Plaintiffs' claim encompasses declaratory
relief and Defendants' duty to account as of the effective date of Plaintiffs' statutory
Termination (April 16, 1999) with respect to Defendants' past and *future* Superman
exploitations.  Therefore, Defendants' vertically integrated relationship is critically
relevant, as it is *this* related structure between parents, subsidiaries and affiliates that
provides an easy framework, if not the recipe, for abuse and the inequitable dilution
of Plaintiffs' profit share.

Not surprisingly, Defendants want to preclude any evidence showing the
environment in which these deals were negotiated because the evidence reveals quite
plainly how Warner Bros. dictated terms to its supposed corporate "sibling" while
sitting on both sides of the bargaining table.  The evidence further reveals that DC is
effectively required to exploit its major characters through Warner Bros. and is not
free to realize their true value on the open market.  This is why Defendants have
"interpreted" the Court's March 26, 2008 order so narrowly.  Defendants simply

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

want to line up various underwhelming rights deals Warner Bros. has "cherry-picked" from their vast contract archives (*e.g.,* Robotech, Sgt. Rock)[1] and compare them to the relevant Superman deals. However, such self -serving analysis is incomplete and prevents the trier of fact from "playing with a full deck."

Firstly, as noted above, the degree of relatedness between DC and Warner Bros. during their Superman negotiations plainly impacts the determination of whether the resulting deals were "sweetheart" in nature. One simply cannot, as Defendants wish, divorce the final terms of the relevant deals from the process that lead to them.

As noted in Plaintiffs' *Limine* No. 4, Defendants purport to be submitting "similar motion picture and television agreements" when the deals they wish to submit are for properties that were not at all comparable to Superman *at the time such agreements were entered into*.[2] Defendants obviously offer the subject agreements for purposes of comparison, but, without evidence as to the commercial success of these properties *when the agreements were entered into,* there is no rational basis for comparison to Defendants' Superman agreements. Defendants improperly require this Court to assume, *on facts not in evidence*, that the agreements they have designated are comparable to Superman and thus relevant to a determination of "fair market value."

At the time DC's agreement with Warner Bros. dated November 6, 1999, regarding Superman audiovisual rights was "negotiated" (1999-2002) and executed (May, 2002), the Superman franchise *already* had a strong track record of success in

---

[1] The evidentiary problems with these documents are numerous and Plaintiffs have moved to exclude them. *See* Plaintiffs *Limine* No. 4. Defendants present contracts for deals that simply were not comparable to Superman at the time they were negotiated. In addition, Defendants failed to provide complete contracts.

[2] While Defendants have presented an early rights agreement underlying the hugely successful *Harry Potter* franchise, and an agreement concerning the rights to *Iron Man*, the current commercial success of films derived from such properties is irrelevant and intended to mislead. These properties had *not* achieved the fame and brand recognition they enjoy today until *after* the respective agreements had been entered into. *See* Plaintiffs *Limine* No. 4; Declaration of Keith Adams in Support of Plaintiffs' Motions *in Limine* Nos. 1-4 ("Adams Decl.") Exs. Z-CC.

6

films and television.  *See* Declaration of Nicholas Williamson in Support of Plaintiffs' Motions *in Limine* Nos. 1-4 ("Will. Decl."), Exs. A, S; Declaration of Marc Toberoff in Support of Plaintiffs' Motions *in Limine* Nos. 1-4 ("Toberoff Decl."), Exs. O at 4 ("Over the last 25 years, there has only been one year without original Superman programming on television (1987) and at no time did the consistent distribution of the Superman library pause."), FF at 11 (Warner Bros. describing Superman as "the most successful comics character ever").  Thus, this evidence, including expert testimony of Superman's commercial stature at the time the relevant agreements were entered into and at the time DC's prior agreements were entered into, will be very relevant to whether the terms "negotiated" constitute "fair market value." [3]

### B.    Defendants Wish to Narrow the Scope of Trial Because the Evidence Overwhelmingly Reveals the Degree to which DC Is at the Mercy of Warner Bros.

Warner Bros. must "pass" on any DC character or property before it is "shopped" or licensed outside the "family."  *See* Declaration of Nicholas Williamson in Opposition to Defendants' Motions *in Limine* Nos 1-4. ("Will. Opp. Decl.")  Ex. A ("Efforts to place properties passed on WB outside the Time Warner family have begun"); *see also* Will. Decl., Exs. E ("To successfully set up DC properties outside the Warner Bros. family once they have been fully considered internally."; "I would suggest we extend the mandate of selling outside the studio to television entities as well. This is a two pronged suggestion. The initial part concerns the ability to pitch to

---

[3]  The original *Superman* (1978) movie grossed $134 million domestically (**$394 million in current dollars**) while *Superman II* (1981) grossed $108 million domestically (**$267 million in current dollars**).  *See* Declaration of Keith Adams in Support of Plaintiffs' Motions *in Limine* ("Adams Decl."), Ex. A; Will. Decl., Ex. S.  Similarly, Superman formed the basis of the serialized *The Adventures of Superman* television series (1951-1957), the syndicated live action television series *Superboy* (1988-1992), and the prime-time live-action television series *Lois & Clark: The New Adventures of Superman* (1993-1997), and was an integral part of the animated "SuperFriends" cartoons (1973-1986). Finally, as of 2002, there were *four* ongoing, monthly Superman comic book series (*Action Comics, The Adventures of Superman, Superman (Vol. 2),* and *Superman: The Man of Steel*), and he was unquestionably one of DC's two "leading" properties (the other being Batman), if not *the* leading property, when the DC/Warner Bros. agreement was signed in May 2002.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

other television studios projects that have been passed on by WBTV…The second initiative would be to allow us to pitch directly to the cable networks without having to go to the studio first."); D ("Below please find short descriptions of the properties we with [sic] to formally shop outside WB.").

Warner Bros. rarely "passes" on these characters for development in film and television and certainly not on major characters such as Superman, Batman, Green Lantern and Wonder Woman.  All of these characters have been locked- up by the studio. Will. Decl., Exs. C ; F; Tob. Opp. Decl., Ex. C.  Warner Bros. Entertainment Inc.'s President and Chief Operating Officer Alan Horn has noted these superhero properties "can really be an evergreen source of enjoyment and income" for Warner Bros. and that Warner is committed to turning DC "properties into viable movie product in an intelligent way so that we introduce them like planes on a runway." Bergman Decl., Ex. 46.

These superhero properties are a central part of Warner's "tent-pole" strategy of releasing fewer, but larger "event" films with a global reach.  Though expensive, these "tent-pole" films offer larger worldwide box-office returns and opportunities for larger ancillary revenues such as merchandising and videogames.  *See* Bergman Decl., Ex. 12, Tob. Opp. Decl., Ex. D.  Jeff Robinov, the President of Production for Warner Bros. Pictures, has stated the "long-term goal of the studio is to take advantage of what has become a very global market by focusing on bigger films that require a bigger commitment," and that "[f]ilms with our DC properties have the opportunity to support other divisions in the company in a way that our other movies don't."  Tob. Opp. Decl., Ex. D.  DC's superheros are perfect for this tent pole strategy as noted by DC's President, Paul Levitz: "[s]uperheroes are more global than ever in today's commercial world, existing in 30 langauges and in more than 60 countries."  *Id.*

Regarding DC, Warner Bros. was recently quoted by the Hollywood Reporter trade paper as stating "…we're constantly looking at how best to exploit the DC

Comics characters and properties.  DC is an incredibly valuable asset to Warner Bros. and plays an important role across the entire studio by providing development and franchise opportunities for all media, including films, television, home entertainment, animation, consumer products, video games and digital platforms."  Bergman Decl., Ex. 22.  Diane Nelson, President of Warner Premiere has admitted, "DC Comics is arguably one of the most valuable stables of properties in the WB library."  *Id.*, Ex. 25.

It is apparent that DC is viewed as an IP "stable" or "farm" of Warner Bros., to be exploited at the time and manner of their choosing.  Defendants produced numerous documents evidencing the one-sidedness of this relationship.  In the "Warner Bros. Brand Council - Introduction to the DC Brands," DC is described as "home to some of WB's strongest brands" and possessing "[c]haracter brands that last lifetimes, and are constantly renewed and revitalized."  Toberoff Decl., Ex. FF at 2.  The evidence also shows that Superman is critically important to Warner Bros.' integrated strategies, which in turn are relevant to the negotiating history of the relevant Superman agreements and an analysis of the property's true "fair market value."  The "most critical potential contribution to the [Warner Bros.] corporation" DC can make is to demonstrate it "can consistently provide the basis for event films as well as enduring television programming and profitable consumer products."  *Id*. at 17.  Superman is described by Warner Bros. as "the most successful comics character ever" and "from the 1939 radio show to the current Smallville TV series, a virtually uninterrupted six decades as a major media and licensing property."  *Id*. at 11, 16.

In their "Warner Bros. Superman Cross-Divisional Meeting, September 19, 2005," Defendants admit "Superman has been and continues to be a staple for many businesses across the studio" and "with the release of a new film next year, Superman is poised to become the broadest reaching tent-pole property for the company, its partners and consumers."  Will. Opp. Decl., Ex. B at 2-3.  "Nearly

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

every division is gearing up on Superman activity… Coordinated planning across divisions now will help to optimize and protect opportunities for long term profitability beyond 2006….” *Id*. at 4. DC is described as a “pivotal part of Time Warner and Warner Bros.” where its “core line” of characters provides “a constant resource for film, tv & animation divisions” and “brands that drive a billion dollars of Time Warner sales in 2005 alone.” Tob. Opp. Decl., Ex. E at 9, 10, 15, 27, 36.

Not surprisingly, DC views itself this way as well: “Goals: Maximize DC’s effectiveness as a resource and partner for *the other WB divisions*.” Will. Opp. Decl., Ex. A (emphasis added). Warner Bros. executive Bruce Rosenblum has highlighted the benefits of this intra-corporate synergy: “[t]he ideal property to exploit for our studio is a franchise property like ‘Smallville.’ This takes advantage of our DC Comics division, our distribution strength via the WB, our top-supplier studio Warner Bros. TV and our homevideo operations, all working in concert together.” Bergman Decl., Ex. 45.

It is in this context that the deals for valuable Superman rights were negotiated. It is not enough to describe DC and Warner as “closely related” and then move on to the “fundamental ‘sweetheart deal’ issue.” Defs. *Limine* No. 1 at 11:11. It is obvious that DC has been “consumed” by Warner Bros and acts as one of its mere divisions to be mined for characters and content. This explains why Defendants are moving to have the scope of this trial improperly narrowed to take the spotlight off the true nature of the relationship between DC and Warner Bros. and the non-arm’s length aspects of their dealings. It is unimaginable that such an unevenly weighted relationship could give rise to a “fair market” deal.

**C.   Plaintiffs’ Witnesses and Exhibits Are Plainly Relevant to the Relative Concepts of Whether Negotiations Between DC and Warner Bros. Were at “Arm’s Length” and for “Fair Market Value,” and Place Such Determinations in the Proper Context**

After rejecting Defendants’ narrow interpretation of the scope of the February 3 Trial, it becomes apparent that the witnesses and exhibits Plaintiffs will submit are relevant, probative and necessary to determining whether DC was able to secure “fair

market" terms for its highly valuable Superman copyrights.  Such witnesses and exhibits will provide, in part, the proper *context* and information from which the trier of fact can arrive at this determination.

### 1.   Plaintiffs' Experts Mark Evanier & James Steranko

Messrs. Evanier and Steranko are recognized comic book experts, and both have extensive knowledge of the history of Superman, as well as other comic book heroes.  Mr. Evanier has been involved in the comic book industry for more than thirty years as an award-winning comic book writer, columnist and historian. Bergman Decl., Ex. 80 at 2-3.  Defendants have recognized Mr. Evanier's expertise, having him write numerous forwards and introductory material for books about DC Comics, including many reprint volumes.  *Id*. at 2-3.  Mr. Steranko has been involved in the comic book industry for over forty years as a writer, illustrator and historian. *Id*., Ex. 81 at 1-3.  His two-volume set *The History of Comics*, which have sold more than 100,000 copies each, remains a definitive resource.  *Id.* at 1.  Plaintiffs' experts are plainly qualified to discuss Superman's prominence in both comic book and media history, as detailed in their respective expert reports.  *Id*. Exs. 81 at 8-14; 80 at 8-15.

One of the key issues in determining whether the deals DC "negotiated" with its corporate parents/sibling were for "fair market value" is an understanding of Superman's historical development, popularity and commercial track record at the time various deals were negotiated.  Evanier and Steranko can offer this "specialized knowledge" to assist the trier of fact.  F.R.E. 702.  *See also* Jones, Rosen, Wegner, Jones, *Federal Civil Trial and Evidence* (2008) 8:1521 ("[A]n expert may be qualified on the basis of his or her experience alone.  Indeed, in certain fields experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"); 11:37 ("There is no hard and fast rule for qualification of experts. The determinative issue in each case is whether the witness has sufficient knowledge, skill or experience in the field so that his or her testimony would be likely to assist

the [trier of fact] in its search for the truth"); *Walker v. Soo Line R.R. Co*., 208 F.3d 581, 590 (7th Cir. 2000).

Their testimony need not relate to the ultimate issue to be resolved by the trier of fact; it need only be relevant to evaluating a factual matter in the case.  Jones, Rosen, Wegner, Jones, *Federal Civil Trial and Evidence* (2008) 8:1525.5; *Jahn v. Equine Services, PSC*, 233 F.3d 382, 392 (6th Cir. 2000).  Additionally, the trial court has wide discretion in determining the manner of testing expert reliability.  As "too much depends upon the particular circumstances of the particular case at issue,… the trial judge must have considerable leeway in deciding… how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  *See also United States v. Hankey*, 203 F.3d 1160, 1167-1168 (9th Cir. 2000).

### 2.   Ariel Emanuel

Mr. Emanuel is one of the founding partners of the Endeavor Talent Agency, one of the top three agencies in Hollywood.  He has decades of hands-on experience negotiating deals in the entertainment industry.  Tob. Opp. Decl., Ex. F.  Defendants themselves subpoenaed and deposed Mr. Emanuel on October 25, 2006, and can hardly claim surprise.  Moreover, Mr. Emanuel is not being proffered by Plaintiffs as an expert or to provide expert opinion as to what constitutes "fair market value" in the entertainment industry.  Instead, he will testify about television and film deal terms of which he has personal knowledge and the arm's length negotiating process by which such deal terms were arrived at.  *See* F.R.E. 602 (a witness may testify as to his/her personal knowledge); *United States v. Lake*, 150 F.3d 269, 273 (3d Cir. 1998).  Mr. Emanuel's testimony as to arm's length negotiations with major Studios, such as Warner Bros., and the comparable provisions actually sought and secured in the open market by a top negotiator are indeed relevant to a determination of whether the Superman agreements were entered into for "fair market value."

### 3.    Steven Sills

Plaintiffs' expert, Steven D. Sills ("Sills") is a leading entertainment industry forensic accountant, with over 20 years of experience auditing Warner Bros.  Sills has extensive knowledge, gleaned from his constant audits of Warner Bros. over the past 20 years, of the pertinent financial documents that Warner keeps in the ordinary course of business.  Mr. Sills' singular expertise and experience handling complex forensic accounting matters in the entertainment industry was expressly acknowledged by Mike Edwards, Warner Bros.' Senior Vice President, Financial Contract Reporting and Administration, during his November 13, 2006 deposition (Will. Opp. Decl., Ex. C at 86:9- 87:7):

> Q:    Do you know a gentleman by the name of Steven Sills?
> A:    I do know Steven. Yes…
> Q:    What's your opinion of his expertise and professionalism as an auditor?
> A:    I think I have said publicly on many occasions Steve is in my view the best of the bunch.
> Q:    Do you know how many times Mr. Sills has audited Warner Bros.?
> A:    Steve has been auditing Warners since his days at Laventhal & Horvath in the early 80's. And we're blessed or cursed, depending on how you look at it, to have Steve personally working at Warner at least two days a week. And so he's done probably hundreds of audits with us over the course the last 20-odd years…
> Q:    Do you charge him rent?
> A:    No, we gave him a nice audit room. He has two staff people that are in our building five days a week every week.

Plaintiffs intend to call their expert accountant Mr. Sills to testify as to how *in practice* DC's Superman agreements with Warner Bros. result in the dimunition of the *amount of money* paid and payable to DC and thus Plaintiffs.  There can be no question that this is precisely relevant to the equitable inquiry to be conducted at the February 3 Trial and within the scope of Mr. Sills' forensic accounting expertise and expert report.  Plaintiffs do not plan to call Mr. Sills for his opinion as to whether the agreements were negotiated at "arm's length" or for "fair market value."  Instead, Plaintiffs anticipate calling Sills to explain how the agreements allocate or divert money to/from DC from revenues generated by Warner Bros. from its film and

television exploitation of Superman.  This information is well within the domain of a

forensic accountant and will greatly assist the trier of fact to decide whether the DC

agreements constitute "fair market value" for Superman film and television rights or

are inequitable.  In fact, without an understanding of the financial implications of the

agreements in question, it would be difficult to make such a determination.

### 4.   Julie Spencer & Janice Cannon

Janice Cannon ("Cannon") is the Director of Legal Affairs for Time Warner

Inc.  She submitted a declaration dated April 27, 2007 in support of Defendants'

April 30, 2007 motion for partial summary judgment. Julie F. Spencer ("Spencer") is

the Director, Corporate Legal for Warner Bros. Entertainment Inc.  She also

submitted a declaration dated April 25, 2007 in support of Defendants' motion for

partial summary judgment.  Cannon and Spencer discussed the corporate history and

corporate relationships between Time Warner Inc. ("TWI"), Time Warner

Entertainment Company, L.P. ("TWEC"), Warner Communications Inc., Warner

Bros. Entertainment Inc. ("WBEI") and their various affiliates and subsidiaries.

Bergman Decl., Ex. 95-96.  Defendants relied on their respective testimony to argue

their motion for summary judgment that Plaintiffs were only entitled to Superman

profits from DC Comics.

As to DC's relationship with its corporate parents and/or siblings, the Court

specifically sought information as to "what those relationships have been at all

relevant times."  *Siegel II,* 542 F.Supp.2d at 1144.  Plaintiffs seek Ms. Cannon and

Ms. Spencer's testimony to help explain this "timeline" to the Court.  Plaintiffs also

wish to submit corporate organizational charts Defendants provided during

discovery, which Defendants now seek to exclude as "irrelevant."  Tr. Exs. 74

(Creation of Warner Bros. Entertainment Inc. Charts), 81 (DC Comics Executive

Management Charts), 109 (DC Comics Senior Management Charts), and 240 (Time

Warner Management Chart).  This relevant evidence will show that ***at the time*** DC

entered into the Superman agreements with TWEC, DC was a partnership co-owned

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

by TWEC and EC Publications, Inc., a wholly owned TWEC subsidiary.  Thus, TWEC (WBEI's predecessor) sat on both sides of the negotiating table when the relevant agreements were purportedly negotiated.  Not surprisingly, Defendants wish to prevent the Court from focusing on how little leverage or negotiating power DC had when assigning away its "core" superhero to its ***owner***.

### 5.    Barry Meyer, Alan Horn,  Jeff Robinov & Kevin Tsujihara

Barry Meyer is the Chairman and CEO of WBEI. Alan Horn is the President and COO of WBEI. Jeff Robinov is the President of Warner Bros. Picture Group, which "brings together the Studio's motion picture production, marketing and distribution operations into a single entity."  Tob. Opp. Decl., Ex. G.  Together these gentlemen decide and execute WBEI's strategies.  *Id.*, Ex. H ("The two engineers behind Warner's winning strategy, chairman Barry Meyer and president Alan Horn, rely on production president Jeff Robinov to make their slate hum."); G ("As Alan and I lead the company through the constantly evolving entertainment landscape, it's crucial that we have an executive of Jeff's caliber overseeing our feature film activities.").

Mr. Robinov maintains "oversight of all aspects of creative production" from "initial pitch to exhibition."  *Id.*, Ex. G.  He reports to Mr. Horn, who has "final greenlight approval."  *Id*.  Mr. Horn reports to Mr. Meyer, who oversees WBEI's "overall plan to strategically align all of Warner Bros.' major business units into operating groups in order to maximize their potential." *Id.*, Ex. C.  Without limitation, Mr. Horn has noted that DC's superhero properties "can really be an evergreen source of enjoyment and income."  Bergman Decl., Ex. 46.  Mr. Robinov has stated that "[f]ilms with our DC properties have the opportunity to support our other divisions in the company in a way that our other movies don't."  Toberoff Opp. Decl., Ex. D.

DC's senior Vice President of Creative Affairs, Gregory Noveck, has stated that Horn and Robinov are the "ultimate decisionmakers" regarding Warner Bros'

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

use of DC characters and properties.  Tob. Opp. Decl., Ex. C.

Kevin Tsujihara is the President of Warner Bros. Home Entertainment. He was formerly the Executive Vice President for Corporate Business Development & Strategy, where he "overs[aw] the DC business" and "manag[ed] the relationship between DC and Warner Bros.' film and television production operations."  Bergman Decl., Ex. 91.  He has stated in the past that "DC Comics is an unexplored jewel in the Warner Bros. crown" and that "the DC brand is a strategic asset and vital tool in our approach to creating and developing films, television, merchandising and games."  Tob. Opp. Decl., Ex. I; Bergman Decl., Ex. 18.  He has noted that "my increased involvement as a member of Warner Bros.' senior management team is no small indication of our company's recognition that DC Comics is an important part of our family and that we need to do a better job in translating its properties into successful feature films."  Bergman Decl., Ex. 91.

As the "ultimate decisionmakers," the testimony of these executives is essential to determining the true nature of the relationship between DC and Warner Bros. and how such relationship regarding a core franchise such as Superman fits within Warner Bros.' integrated media strategies.  Without limitation, the view of these key decision makers that DC is a key division of Warner Bros. – a "stable" of intellectual property – is relevant to placing in proper context the "negotiation" of the Superman agreements and their terms.

### 6.   Mike Edwards

Mike Edwards is the Senior Vice President of Financial Contract Reporting and Administration for Warner Bros., where he has worked for over 30 years.  In this capacity, he monitors and pays profit participants in films and television shows on the basis of their contracts with Warner Bros., including DC with regard to Superman.  In helping Warner Bros. execute its obligations under these agreements, he has developed tremendous knowledge of how these various material deal terms

operate in practice (*e.g.*, "defined gross,"[4] "audit rights,"[5] payments deemed "advances" against participations, and deductible expenses).  This knowledge can and will assist the trier of fact in determining what constitutes a favorable or disadvantageous deal term and which terms in the Superman agreements, in practice, favor or disfavor DC.  This, in turn, will assist the trier of fact in determining whether such terms constitute "fair market value" for a highly valuable property such as Superman.  Mr. Edwards can also speak to the relationship between DC and Warner Bros. from an accounting and accountability perspective.

### 7.   Patrick Caldon & Reginald Harpur

Patrick Caldon is the Executive Vice President of Finance and Operations for DC Comics.  He can speak to the corporate organization of DC Comics and its relationship with Warner Bros., and DC's accounting, audit and reporting functions relevant to that key relationship.  Reginald Harpur is the Senior Vice President/ Controller for Warner Bros. and is responsible for reporting functions and the "maintenance of the financial books and records of the company" pursuant to GAAP accounting principles.  He can speak to DC's corporate reporting to Warner Bros. and the way DC's profits vs. Warner Bros. profits are reported and reflected within Time Warner.  Without limitation, such testimony is relevant to the very different considerations applicable to transactions between related entities, such as DC and Warner Bros., as opposed to those that apply to arm's length transactions between unrelated parties on the open market.  Tob. Opp. Decl., Ex. D at 14:8-16; 16:15-20. *See* Joint Trial Witness Estimate Form filed concurrently.

---

[4] "The other end of the spectrum is what the industry calls gross participation.  Warner refers to it as defined gross. There are no distribution fees deducted.  The costs that are deducted are limited.  There is no recoupment or no deduction of the production costs, no deduction of overhead interest, and no deduction for any other person's gross participation." Will. Opp. Decl., Ex. C at 46:1-7.

[5] "Q: Any other variables in the negotiation of defined gross? A: Well, try to get more favorable audit provisions so they don't have to audit us frequently instead of – let's see what DC has.  DC has 24 months to audit.  So they should have asked for 36 or 48. Participants want to wait longer because then they can get more bang for the buck every time they do a review." Will. Opp. Decl., Ex._C at 95:7-14.

### 8. Peter Roth

Peter Roth is the President of Warner Bros. Television Inc. ("WBTV"). The television series *Smallville*, in many respects, was Mr. Roth's brainchild and long-time ambition. *See* Toberoff Opp. Decl., Ex. J. Mr. Roth can obviously testify as to the history of *Smallville* at WBTV, including DC/WBTV's negotiations of the Smallville Television Agreement, DC and WBTV's relationship regarding the series, WBTV's various negotiations and distribution deals comprising *Smallvill*e's commercial exploitation, and how these moving parts work together and affect DC's (and therefore Plaintiffs') financial participation in the series under DC's agreement with WBTV. Such an understanding is clearly relevant and will assist the trier of fact in assessing the merits and demerits of DC's Smallville Television Agreement.

### 9. Exhibits

Defendants' seek to exclude numerous exhibits based on their erroneous understanding of the scope of the February 3 Trial, as further discussed above. Defendants admit that Plaintiffs' exhibits 74, 81, 109, 124, 127, 240 speak to the "general relationship between DC, WBEI and TWI." Defs. *Limine* No.1 at 11:4-5. That is precisely why Plaintiffs have offered them: to show to the Court the degree to which DC was "closely related" to Warner Bros. when it assigned its Superman audiovisual rights. *See* Bergman Decl., Exs. 92-97.

These exhibits consist of management and reporting charts as well as the Declarations of Janice Cannon and Julie Spencer that discuss the corporate organizational history of DC and Warner Bros. As set forth above, the Court specifically sought information as to "what those relationships have been at all relevant times." *Siegel II*, 542 F.Supp.2d at 1144. This relevant evidence will show that *at the time* DC entered into the Superman agreements with TWEC, DC was a partnership co-owned by TWEC and EC Publications, Inc. a wholly owned TWEC subsidiary. *See* Bergman Decl., Exs. 95-96. Unsurprisingly, Defendants wish to exclude this relevant evidence that DC "negotiated" the Superman agreements with

its *owner*.

The remaining exhibits Defendants seek to exclude as purportedly irrelevant in their Motion *in Limine* No. 1 are the focus of Defendants' Motion *in Limine* No. 3. Accordingly, such exhibits are fully addressed in Plaintiffs' Opposition to Defendants' Motion *in Limine* No. 3 which is incorporated herein by this reference. These exhibits illuminate the nature and extent of the Defendants' "relatedness," which greatly influenced their "negotiations" and the consequent terms of their Superman agreements. From a more complete understanding of this relationship, powerful inferences naturally arise as to whether their Superman agreements were negotiated at "arms' length" and for "fair market value," which will assist the trier of fact in weighing these inherently relative concepts.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion *in limine* in its entirety.

DATED: January 12, 2009          TOBEROFF & ASSOCIATES, P.C.


By_____
                    Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON