1  Marc Toberoff (CA State Bar No. 188547)
2  Nicholas C. Williamson (CA State Bar No. 231124)
   TOBEROFF & ASSOCIATES, P.C.
3  2049 Century Park East, Suite 2720
   Los Angeles, CA 90067
4  Telephone: (310) 246-3333
   Facsimile: (310) 246-3101
5  E-mail: MToberoff@ipwla.com

6  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON

7

8                    UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION

10 | JOANNE SIEGEL, an individual; and | Case No. CV 04-8400 SGL (RZx)
   | LAURA SIEGEL LARSON, an |
11 | individual, | Hon. Stephen G. Larson, U.S.D.J.
12 |            Plaintiffs, | **PLAINTIFFS JOANNE SIEGEL**
   |       vs. | **AND LAURA SIEGEL LARSON'S**
13 | | **[REDACTED] LOCAL RULE 16-4**
   | WARNER BROS. | **MEMORANDUM OF**
14 | ENTERTAINMENT INC., a | **CONTENTIONS OF FACT AND**
   | corporation; TIME WARNER INC., a | **LAW [PHASE I]**
15 | corporation; DC COMICS, a general |
16 | partnership; and DOES 1-10, | [Unredacted version filed manually, redacted version filed electronically]
17 | | [Joint Witness List, Joint Exhibit List, Proposed Final Pre-Trial Conference Order, Objections to Exhibits, and Pre-Trial Exhibit Stipulation filed electronically]
   |            Defendants. |
18 | |
19 |_____ | **Final Pre-Trial Conference**
20 | DC COMICS, | Date:        January 26, 2009
   | | Time:        11:00 a.m.
21 | | Place:       Courtroom 1
   |            Counterclaimant, |
22 |       vs. | **Trial**
   | | Date:        February 3, 2009
23 | JOANNE SIEGEL, an individual; and | Time:        9:30 a.m.
24 | LAURA SIEGEL LARSON, an | Place:       Courtroom 1
   | individual, |
25 | | [Complaint filed: October 8, 2004]
26 |            Counterclaim Defendants. |
27 |_____ |

28

PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# TABLE OF CONTENTS

I.   SUMMARY OF CLAIMS AND DEFENSES ............................................. 1

   A.   Summary Statement of Plaintiffs' Claims ..................................... 1

   B.   Elements Required to Establish Plaintiffs' Claims ........................ 3

   C.   Summary of Key Evidence Supporting Plaintiffs' Claims ............ 4

      DC's Close Relationship With TWEC (WBEI's Predecessor) ............................................................................... 4

      Negotiations Between DC and Warner Bros. for Superman Copyrights ................................................................. 6

      Warner Bros. Superman Film and Television Agreements .......... 6

         a.   The Superman Film Agreement .................................... 8

         b.   The Superman Television Agreement .......................... 14

         c.   The Superman Animation Agreements ........................ 16

   D.   Affirmative Defenses .................................................................. 18

   E.   Elements Required to Establish Defendants' Affirmative Defenses ..................................................................................... 18

   F.   Summary of Evidence in Opposition to Defendants' Affirmative Defenses ................................................................. 18

   G.   Third Party Issues ....................................................................... 18

   H.   Evidentiary Issues ...................................................................... 18

   I.   Key Legal Issues ........................................................................ 19

      1.   Warner Bros. Must Account as the Co-Owner With Plaintiffs of Divisible Film and Television Rights to the Recaptured Superman Copyrights ............................................ 20

      2.   Defendants Should Bear the Burden of Proving That Their Non-Arm's Length Superman Deals Were For "Fair Market Value" ........................................................................... 22

      3.   The Non-Arm's Length Transactions Among Defendants Prevented the True "Fair Market Value" of Superman From Ever Being Determined .................................................... 23

      4.   Warner Bros. Sat On Both Sides of the Bargaining Table When It "Negotiated" the Superman Agreements with DC ...... 25

         a.   DC Must Obtain Warner's Approval for Major Decisions ..................................................................... 26

b. Negotiations Between Warner and DC Regarding the Superman Film Agreement Were Perfunctory ........... 27

5. The Deal Terms Arrived Do Not Constitute "Fair Market Value" for the Extremely Valuable Superman Copyrights ........ 29

 a. The "Superman" Franchise Was Historically Successful and Extremely Robust .................. 29

 b. Arm's Length Agreements for Well Known Properties Demonstrate that DC's Superman Agreements with Warner Bros. Were Below "Fair Market Value" ................................ 30

 c. The Agreements Produced by Defendants Do Not Assist the Trier of Fact As the Subject Properties Were Not Franchises at the Time the Agreements Were Entered Into ................................ 33

6. The Deal Terms in the Superman Film Agreement Do Not Constitute "Fair Market Value" .................. 35

 a. An Assignment of Overly Broad Rights ............. 35

 b. No Purchase Price and Limited Cash Compensation ....... 37

 c. Inadequate Contingent Participation ............... 39

 i. Amount of the Participation .............. 39

 ii. "Gross Receipts" Narrowed to Limited Entities ................................ 42

 iii. Too Many Deductions from Gross Revenues ...... 42

 d. Inadequate ▬▬▬ Video Royalty ............. 43

 e. Thirty-Three Years of Options Are Far Too Long ......... 45

 f. The Lack of Reversion for Failure to Exploit ........... 46

 i. No Reversion for Failure to Produce First Picture ................................ 46

 ii. No Reversion for Failure to Produce Sequels ....... 47

 iii. Damaging Effect of Lengthy Term and No Reversion ................................ 48

 g. The Merchandising Provisions ................. 49

 h. Illusory Creative Control and Input .............. 50

 i. Representations and Warranties ............... 52

 j. Allocation Issues and "Packaging" ............. 52

ii

TABLE OF CONTENTS

k.   Accounting and Audit Provisions ...................................... 54

l.   The Salkind Agreement Shows That the Superman Film Agreement Was a Non-Fair Market Deal .................. 55

m.   Summary and Chart ........................................................... 56

7.   The Superman Television Agreement Was Not Negotiated At Arm's Length ............................................. 60

8.   The Deal Terms in the Superman Television Agreement Do Not Constitute "Fair Market Value" ........................... 61

a.   The Rights Assigned ......................................................... 61

b.   The Option Fee ................................................................. 63

c.   The Per-Episode Royalty and Contingent Participation ..................................................................... 63

d.   The Video Royalty ............................................................ 65

e.   The Merchandising Provisions .......................................... 66

f.   Creative Control and Input ................................................ 66

g.   No Restrictions on Deals with Related Entities ................. 66

h.   Accounting and Audit Provisions ...................................... 67

i.   Summary ........................................................................... 68

9.   The Superman Animation Agreements Are Not For "Fair Market Value" ................................................................. 69

a.   The Standardized Superman Animation Agreements Reflect a Lack of Arm's Length Negotiation ..................................................................... 69

b.   The Superman Animation Agreements Contain Highly Unfavorable "Defined Proceeds" Participations ..................................................................... 70

II.   BIFURCATION OF ISSUES ....................................................... 72

III.   JURY TRIAL ............................................................................. 72

IV.   ATTORNEYS' FEES ................................................................. 72

V.   ABANDONMENT OF ISSUES .................................................. 72

iii
TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Federal Cases**                                                                     **Page**

*Ashton-Tate Corp. v. Ross,*
916 F.2d 516 (9th Cir. 1990) ........................................................... 2

*Broadcast Music, Inc. v. Roger Miller Music, Inc.,*
396 F.3d 762 (6th Cir. 2005) ........................................................ 22

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,*
140 F.2d 266 (2d Cir. 1944) ......................................................... 22

*Fogerty v. Fantasy, Inc.,*
94 F.3d 553, 557-58 (9th Cir. 1996) ............................................. 72

*International Financial Servs. v. Chromas Tech.,*
356 F.3d 731, 736 (7th Cir. 2004) .................................................. 4

*Oddo v. Ries,*
743 F.2d 630 (9th Cir. 1984) ................................................. 2-3, 22

*Siegel v. Time Warner, Inc.,*
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ........................................ 21

*Siegel v. Warner Bros. Ent., Inc.*
542 F.Supp.2d 1098 (C.D. Cal. 2008) .................................... *passim*

**State Cases**                                                                         **Page**

*Messler v. Bragg Management Co.,*
39 Cal.3d 290 (Cal. 1985) ............................................................. 4

*Sonora Diamond Corp. v. Superior Court,*
83 Cal.App.4th 523 (2000) ............................................................ 4

**Federal Authorities**                                                                 **Page**

17 U.S.C. § 101 ............................................................................ 21

17 U.S.C. § 201 ............................................................................ 21

17 U.S.C. § 304 .............................................................................. 3

17 U.S.C. § 505 ............................................................................ 72

F.R.C.P. 26 .................................................................................. 19

H.R. Rep. No. 94-1476, 1976 U.S.C.C.A.N. 5659, 5674 (1976) ............ 21

1   Plaintiffs Joanne Siegel and Laura Siegel Larson (collectively "Plaintiffs") hereby
2   submit their Memorandum of Contentions of Fact and Law pursuant to Local Rule 16-4.

3   **I.    SUMMARY OF CLAIMS AND DEFENSES**

4   **A.    <u>Summary Statement of Plaintiffs' Claims</u>**

5   Superman is uniquely valuable as one of the longest running "branded" franchise
6   properties, with a very successful track record in publishing, motion pictures, television,
7   and merchandising. After Plaintiffs' statutory Superman termination became effective on
8   April 16, 1999, DC Comics ("DC") exclusively *assigned* to its parent company/co-owner
9   Time-Warner Entertainment Company, LP, the predecessor-in-interest to Warner Bros.
10  Entertainment Inc. ("Warner Bros."), DC's motion picture and television rights to the
11  Superman copyrights. DC did *not* offer its "jewel in the crown" Superman property to
12  competing entertainment Studios, although presumably every single one would have
13  jumped at the opportunity. Without testing or securing Superman's unique value on the
14  open market, DC assigned extremely valuable rights to its parent for relatively modest
15  sums and disadvantageous terms that did not reflect the true "fair market value" of the
16  Superman copyrights. Unless Warner Bros. is required to account to Plaintiffs as the new
17  co-owner of these Superman rights, the value of Plaintiffs' copyrights will be severely
18  diminished by Defendants' intra-corporate dealings.

19  Warner Bros. exploited its Superman motion picture and television rights in the
20  feature film *Superman Returns*, the hit television series *Smallville*, and several animated
21  television series, and is planning subsequent derivative feature films and television
22  shows. Defendants moved for partial summary judgment to shelter their true profits by
23  artificially limiting their duty to account to DC's contractually diminished profits. To
24  shield Defendants' Superman profits, they invoked the so-called "licensee rule," insisting
25  that only DC, as the putative "co-owner" of the recaptured Superman copyrights, need
26  account to Plaintiffs, and not DC's supposed "licensee," Warner Bros., even though the
27  two are closely related parts of the same corporate family. *See Siegel v. Warner Bros.*
28  *Ent., Inc.* ("*Siegel II*"), 542 F.Supp.2d 1098, 1143-1145 (C.D. Cal. 2008); *Ashton-Tate*

1

1   *Corp. v. Ross*, 916 F.2d 516, 523 (9th Cir. 1990).

2   Plaintiffs countered firstly, that the "licensee rule" does not apply as *Warner Bros.*,

3   not DC, *co-owns* with Plaintiffs the divisible film and television rights to the relevant

4   Superman copyrights, with a consequent duty to account to Plaintiffs. *See Oddo v. Ries*,

5   743 F.2d 630, 632-33 (9th Cir. 1984); *see also* Plaintiffs' Motion *in Limine* No. 1.

6   Secondly, it would be inequitable to shield the lion's share of Defendants' Superman

7   profits when Warner Bros. is not a "third party licensee," but DC's effective parent.[1] To

8   artificially limit Plaintiffs to DC's profits would distort Superman's true profit picture,

9   and place Plaintiffs at the mercy of Defendants who, at will, have and will continue to

10  severely dilute Plaintiffs' profit share through self-serving vertically-integrated

11  transactions.

12  The Court denied Defendants' motion in its March 26, 2008 summary judgment

13  order.   It rejected blind application of the "licensee rule" and instead rightly chose to

14  focus on the equities and realities of this case:

15  > "Here, the realities of the transferor and the transferee entities cannot be ignored.
16  > The evidence before the Court reveals that the relevant entities are all closely
    > related entities – parent corporations, wholly and partially owned subsidiaries,
17  > partners, sibling business entities (owned directly or indirectly by the same
    > parent... This fact alone raises a specter of a "sweetheart deal" entered into by
18  > related entities in order to pay a less than market value fee for licensing valuable
    > copyrights. If such were the case, the related entity might be able to exploit the
19  > copyrights without the responsibility of answering to the co-owner of a joint work,
    > and the licensor co-owner would thereby be relieved of the responsibility of
20  > accounting for any profits (other than a greatly reduced licensing fee) to the non-
    > licensor co-owner. This result would be inequitable."

21  *See Siegel II*, 542 F.Supp.2d at 1144.

22  Even a cursory examination of DC's film and television assignments highlights the

23  extremely one-sided terms Warner Bros. easily extracted from its "comic book division"

24  for this one-of-a-kind property. DC could certainly have obtained far better terms on the

25  _____

26  [1] Defendants essentially admitted this in their papers: "[F]or financial reporting purposes, both
    [Defendants] DC and WBEI [Warner] fall within the "filmed entertainment" group of TWI
27  companies... and for operating management purposes, DC reports to its ultimate corporate
    parent through WBEI. Accordingly DC's President and Publisher reports to and obtains
28  approvals from WBEI's President and Chief Operating Officer...." <u>Tr. Exs. 124, 127.</u> This
    point was emphasized by the Court in denying Defendants' motion to limit their accounting to
    DC's profits alone. *See Siegel II, supra*, 542 F.Supp.2d at 1144.

2

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  competitive open market. A character like Superman is a member of an elite clique of
2  "evergreen" franchises for which licensors can demand an enormous premium. This
3  plainly was not the case when Warner Bros. sat down on both sides of the bargaining
4  table. Such negotiations, by definition, were not at "arm's length." The "fair market
5  value" for the unique Superman property was never tested or realized on the open market.
6  Instead, DC assigned to its effective parent the principal entertainment rights to its core
7  Superman character, for middling terms.
8  To avoid the inequitable diminution of Plaintiffs' profit share, now *and in the future*,
9  Warner Bros., the true co-owner of the Superman film and television copyrights, must
10 fairly account to Plaintiffs.

11         **B.   Elements Required to Establish Plaintiffs' Claims**

12         Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201(a) as: (1) an actual
13 controversy exists between the parties; (2) the controversy extends to the rights and
14 duties of the parties regarding Defendants' accounting to Plaintiffs for profits derived
15 from the Superman copyright interest recaptured by Plaintiffs' pursuant to 17 U.S.C.§
16 304(c) (the "Recaptured Copyrights"); and (3) a judicial declaration is necessary to
17 determine Plaintiffs' right to an accounting by WBEI and other TWI entities for their
18 exploitation of the Recaptured Copyrights after the effective date of Plaintiffs' statutory
19 termination (April 16, 1999) and in the future.

20         The Court has determined that Plaintiffs claim is for an "equitable" remedy arising
21 from the relationship of co-owners of "tenants in common." October 6, 2008 Order at 7.
22 *See Oddo*, 743 F.2d at 633 ("A co-owner of a copyright must account to other co-owners
23 for any profits he earns from licensing or use of the copyright … the duty to account….
24 comes from equitable doctrines relating to unjust enrichment and general principles of
25 law governing the rights of co-owners.").

26         With respect to Plaintiffs' so-called "alter-ego" claim, the Court noted that "the
27 alter ego doctrine, sometimes referred to as piercing the corporate veil doctrine, is not a
28 cause of action unto itself; 'it is merely a procedural means of allowing [or better said,

1  expanding the scope of those ensnared in the net of] liability on a substantive claim,'"

2  quoting *International Financial Servs. v. Chromas Tech.*, 356 F.3d 731, 736 (7th Cir.

3  2004).  October 6, 2008 Order at 8.  The Court identified the issue as requiring an

4  "equitable assessment… of whether maintaining the corporate form would be

5  'inequitable.'"  *Id.* at 9; *see also Siegel II*, 542 F.Supp.2d at 1145, citing *Sonora Diamond*

6  *Corp. v. Superior Court*, 83 Cal.App.4th 523 (2000) and *Messler v. Bragg Management*

7  *Co.*, 39 Cal.3d 290 (Cal. 1985) ("The essence of the alter ego doctrine, in which it is

8  claimed that an opposing party is using the corporate form unjustly, is that justice be

9  done.  What the formula comes down to, once shorn of verbiage about control,

10  instrumentality, agency and corporate entity, is that liability is imposed to reach an

11  equitable result.").

12       The Court held that the "fact alone" that "the relevant entities are all closely related

13  entities …. raises the specter of a 'sweetheart deal' entered into by related entities in

14  order to pay a less than market value fee for licensing valuable copyrights." *Siegel II*,

15  542 F.Supp.2d at 1145.

16       Accordingly, the elements that Plaintiffs shall prove at trial are:  (i) that DC and

17  Warner Bros. were very "closely related" when the relevant transactions were entered

18  into, and (ii) that the deal terms arrived at through their intra-corporate negotiations do

19  not constitute "fair market value" for the extremely valuable Superman copyrights.

20       C.    **Summary of Key Evidence Supporting Plaintiffs' Claims**

21              **DC's Close Relationship With TWEC (WBEI's Predecessor)**

22       1.    At the time DC negotiated the relevant Superman agreements with TWEC,

23  DC was "closely related" to TWEC.  Defendants have admitted that DC was co-owned

24  by TWEC at the time it entered both the November 6, 1999 Superman Film

25  Option/Purchase Agreement (the "Superman Film Agreement") (Tr. Ex. 232) and the

26  December 5, 2000 Smallville Television Agreement (the "Superman Television

27  Agreement") (Tr. Ex. 161) with this entity.  DC also entered into the *Superman Animated*

28  (September 21, 1995) (Tr. Ex. 46), *Justice League* (January 1, 2000) (Tr. Ex. 50), *Legion*

1  *of Super-Pets/Krypto* (January 1, 2004) (<u>Tr. Ex. 53</u>), and the *Legion of Super-heroes*

2  (June 1, 2004) (<u>Tr. Ex. 225</u>) Agreements (referred to individually by title, and

3  collectively as the "Superman Animation Agreements") with Warner Bros. affiliates and

4  subsidiaries.

5           <u>Key Evidence:</u>   Testimony of Janice Cannon and Julie Spencer.  <u>Trial</u>

6  <u>Exhibits ("Tr. Ex") 46, 50, 53, 124, 127, 225, 304.</u>

7      2.      Defendants have admitted the corporate history and ownership of DC, which

8  establishes that DC has been a Warner Bros. affiliate since at least 1973.

9           <u>Key Evidence:</u> Testimony of Paul Levitz.  <u>Tr. Ex. 129.</u>

10      3.      Defendants have admitted that, at all relevant times, both DC and the

11  Warner Bros. studio were part of Time Warner Inc. ("TWI") that TWEC was the

12  corporate parent of WBEI, as well as both one of the two partners of the DC partnership,

13  and the owner of the second partner, EC Publications, Inc.

14           <u>Key Evidence:</u>  Testimony of Janice Cannon, Julie Spencer and Paul Levitz.

15  <u>Tr. Exs. 124, 127, 129, 304.</u>

16      4.      Defendants have admitted that DC's President and Publisher "report[s] to

17  and obtain[s] approvals from WBEI's President and Chief Operating Officer before

18  making significant acquisitions or certain financial decisions or investments that are

19  outside the scope of DC's customary acquisitions and investments; before implementing

20  meaningful strategic changes; and before embarking on something substantially outside

21  DC's normal course of business."

22           <u>Key Evidence:</u> Testimony of Paul Levitz.  <u>Tr. Ex. 129.</u>

23      5.      Defendants have admitted that, for financial reporting purposes, DC and

24  WBEI both fall within TWI's "Filmed Entertainment Group" – which also includes New

25  Line Cinema Corporation and Castle Rock Entertainment – and for operating

26  management purposes, DC reports to WBEI, which, in turn, reports to TWI.

27           <u>Key Evidence:</u>  Testimony of Janice Cannon, Julie Spencer and Paul Levitz.

28  <u>Tr. Exs. 124, 127, 129.</u>

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

**Negotiations Between DC and Warner Bros. for Superman
Copyrights**

6.    The negotiations between Warner Bros. and DC of the Superman Film
Agreement were cursory and non-arm's length.

Key Evidence:  Testimony of Paul Levitz, John Schulman, Marsha Todd,
Jay Kogan, Wayne Lewellen, Steven Sills.  Tr. Exs. 25-29, 40, 41 70, 73, 136, 152-157,
173, 203, 204, 232, 247-252.

7.    DC must transact with Warner Bros. regarding DC's key characters.  The
film and television rights to DC's major characters invariably are assigned or licensed to
Warner Bros.  DC is only permitted to deal with third-parties when Warner Bros. clearly
has no interest in a property.

Key Evidence:  Testimony of Gregory Noveck, Paul Levitz, John Schulman.
Tr. Exs. 78, 93-108, 144, 186-187, 189-191, 228, 239, 272, 273, 276, 278, 279, 306.

8.    The Superman agreements were primarily negotiated by long term friends
and associates Paul Levitz for DC and John Schulman for Warner Bros. in a casual
uneven fashion well outside of industry norms.  Such agreements are generally worked
out by Studio business and legal affairs executives, on the one hand, with an
entertainment law firm specializing in complex industry transactions, on the other.

Key Evidence:  Testimony of Wayne Lewellen, Paul Levitz, John Schulman.
Tr. Exs. 27-29, 153-155, 157, 173, 232, 248, 249, 253.

**Warner Bros. Superman Film and Television Agreements**

9.    Superman is a unique, extremely valuable "evergreen" intellectual property.
It is the basis for a long-running major merchandising "brand," highly successful
publishing line, and *several* successful television series and films over seven decades.  As
such, Superman is one of the most valuable, branded entertainment franchises in
existence.

Key Evidence:  Testimony of Mark Evanier, James Steranko, Wayne
Lewellen, Paul Levitz, Gregory Noveck.  Tr. Exs. 29, 114, 147, 183, 228, 233, 278, 279,
293.

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1      10.   The terms of the Superman Film Agreement, Superman Television

2  Agreement and Superman Animation Agreements do not constitute "fair market value."

3  The "market value" of a unique property like Superman is subjective, and therefore

4  determined on the competitive open market. DC did not offer valuable Superman rights

5  to Warner Bros.' competitors – the other major Studios: it solely dealt with Warner Bros.

6      Key Evidence:  Testimony of Wayne Lewellen, Mark Evanier, Paul Levitz,

7  John Schulman. Tr. Exs. 78, 93-108, 144, 161, 186-187, 189-191, 228, 232, 239, 272,

8  273, 276, 278, 279, 306.

9      11.   The basic deal terms of the Superman Film Agreement were merely

10  imported from an old 1974 agreement, entered into when Superman was at a historic low.

11  DC suggested very limited changes, but the few changes that were made favored Warner

12  Bros.

13      Key Evidence:  Testimony of Mark Evanier, James Steranko, Paul Levitz,

14  John Schulman, Marsha Todd, Jay Kogan, Wayne Lewellen. Tr. Exs. 25-29, 40, 41 70,

15  73, 136, 152-157, 173, 203, 204, 232, 247-253.

16      12.   The basic deal terms of the Superman Television Agreement were merely

17  imported from an old 1991 agreement between DC and its affiliate, Lorimar Productions

18  (a division of Time Warner Entertainment Company, L.P.), when Superman was less

19  valuable, underlying the *Lois and Clark* television series. DC suggested very limited

20  changes, but the few changes made favored Warner Bros.

21      Key Evidence:  Testimony of Mark Evanier, James Steranko, Paul Levitz,

22  John Schulman, Marsha Todd, Jay Kogan, Wayne Lewellen. Tr. Exs. 51, 72, 115, 159-

23  161, 172, 174-177, 179, 181, 198, 200, 223.

24      13.   The terms of the Superman Film Agreement, Superman Television

25  Agreement and Superman Animation Agreements strongly favor Warner Bros. to the

26  detriment of DC, and are often onerous.

27      Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel,

28  Mike Edwards. Tr. Exs. 37, 48, 50, 53, 54, 121, 128, 141, 161, 179, 181, 186, 201, 218,

7

225, 232, 294-296, 300, 306-308, 315, 319, 321, 324, 325-327, 1037, 1038, 1083-86, 1092-1094, 1097, 1099, 1100, 1101, 1103-1108.

14.   The financial and other terms of the Superman Film Agreement, Superman Television Agreement and Superman Animation Agreements are less favorable to the rightsholder than comparable terms of option/purchase agreements for intellectual properties that were far less successful than Superman at the time such agreements were entered into.

Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel, Mike Edwards.  Tr. Exs. 37, 48, 50, 53, 54, 121, 128, 141, 161, 179, 181, 186, 201, 218, 225, 232, 294-296, 300, 306-308, 315, 319, 321, 324, 325-327, 1037, 1038, 1083-86, 1092-1094, 1097, 1099, 1100, 1101, 1103-1108.

15.   The Superman Film Agreement, Superman Television Agreement and Superman Animation Agreements omit terms that are commonplace in underlying rights agreements and that favor and/or protect the rightsholder.

Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel. Tr. Exs. 37, 48, 50, 53, 54, 121, 128, 141, 161, 179, 181, 186, 201, 218, 225, 232, 294-296, 300, 306-308, 315, 319, 321, 324, 325-327, 1037, 1038, 1083-86, 1092-1094, 1097, 1099, 1100, 1101, 1103-1108.

### a.   The Superman Film Agreement

16.   The rights assignment is overbroad and grants Warner Bros. too great an interest in the Superman property.  It grants "all rights," including broadly defined "audiovisual rights," subject to more narrowly defined rights reserved by DC.  Warner Bros. is granted all rights not expressly reserved by DC.  Any ambiguities inure to Warner Bros.' benefit, as *DC* is responsible for reserving rights.  By contrast, other agreements for valuable intellectual property consistently grant limited rights (*e.g.*, "live-action feature-length motion picture rights") and retain all rights not expressly granted.

Key Evidence:  Testimony of John Schulman, Wayne Lewellen, Ari Emanuel.  Tr. Exs. 121, 128, 232, 1084-1086, 1092-1094.

17.     The Superman Film Agreement contains no fixed cash purchase price payable upon exercise of the option, whereas nearly all other such agreements do, and well known properties commonly garner very large purchase prices.

Key Evidence:  Testimony of Wayne Lewellen, Ari Emanuel.  Tr. Exs. 121, 128, 186, 201, 232, ███████████████████████████████.

18.     The fixed cash compensation does not reflect market value, as inferior properties, ████████████████████, received larger upfront amounts.  The *Lord of the Rings, Sahara,* ████████████████████████ and *My Fair Lady* Agreements involved far greater up-front payments.  Even other DC properties, not nearly as valuable as Superman, have commanded equal or greater fixed compensation.

Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Gregory Noveck, Paul Levitz.  Tr. Exs. 121, 128, 186, 232, 300, ████████████████████ ████████.

19.     The contingent 5% gross participation does not reflect market value, as lesser properties have achieved much better or equal gross participations.  DC secured a 5% gross participation even at Superman's nadir in 1974.  For example, the *Lord of the Rings* Agreement contains a gross participation that rapidly escalates from 5% to 10%, the *Sahara* Agreement provides for a 10% gross participation; ████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████; and the *My Fair Lady* Agreement provides for an effective 27.5% gross participation up to $20 million in gross revenues and a 47.5% gross participation thereafter.

Key Evidence:  Testimony of Michael Edwards, Wayne Lewellen, Steven Sills.  Tr. Exs. 128, 201, 232, 291, 300, ████████.

20.     The lack of escalations in the participation payments is not a fair market term, as numerous other agreements increase participation levels (*e.g.*, to 10% or 15%) as

1 | revenue benchmarks are reached.  Such escalations reward and allow the rightsholder to

2 | participate in the success of the derivative film.

3 |      **Key Evidence:**  Testimony of Michael Edwards, Wayne Lewellen, Steven

4 | Sills, Ari Emanuel. Tr. Exs. 128, 232, 308, 315, 325-327, 1085-1086, 1093-1094, 1105-

5 | 1107.

6 |      21.    The lack of escalations in the fixed and contingent payments for each sequel

7 | is not a fair-market term, as other such agreements increase compensation with each

8 | sequel film.  Such escalations reward and allow the rightsholder to participate in the

9 | success of the derivative film.

10 |      **Key Evidence:**  Testimony of Michael Edwards, Wayne Lewellen, Ari

11 | Emanuel. Tr. Exs. 232, 1083.

12 |      22.    The limited recipients of gross revenues included in the definition of "gross

13 | receipts" is not a fair market term, as other such agreements contain broader definitions,

14 | resulting in the inclusion of more revenues in calculating the rightsholder's participation.

15 |      **Key Evidence:** Testimony of Michael Edwards, Steven Sills. Tr. Exs. 37,

16 | 48, 128, 203, 232, 308.

17 |      23.    The "gross receipts" definition provided is not a fair market term, as other

18 | such agreements include more generous definitions.  Notably, Warner's standard "rider,"

19 | which modifies its "gross receipts" definition in ways favorable to the participant, is

20 | absent from the Superman Film Agreement.

21 |      **Key Evidence:** Testimony of Michael Edwards, Steven Sills, Ari Emanuel.

22 | Tr. Exs. 232, 307, 1083, 1086, 1097, 1099, 1104.

23 |      24.    The inclusion in the "gross receipts" definition of only 20% of home video

24 | revenues is not a fair market term.  Every property can achieve this minimum video

25 | royalty as a default provision.  Lesser properties have achieved substantially better video

26 | royalties, and certain participants can secure 100% of video revenues in their "gross

27 | receipts" definition.

28 |      **Key Evidence:**  Testimony of Michael Edwards, Wayne Lewellen, Steven

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1 | Sills, Ari Emanuel, Paul Levitz.  Tr. Exs. 37, 48, 127, 201, 232, 307-308, 325, 1105-
2 | 1107.

3 |      25.    Whereas, DC secured a "most-favored-nation" provision with respect to its

4 | deficient 20% video royalty, DC and Warner Bros. failed to enforce it as 100% of video

5 | revenues are included in the "gross receipts" definition of at least one participant in the

6 | film *Superman Returns*.

7 |      Key Evidence:  Testimony of Michael Edwards, Wayne Lewellen, Steven

8 | Sills, Paul Levitz.  Tr. Exs. 37, 48, 232, 307.

9 |      26.    The length of the successive option periods for the life of the Superman

10 | copyright at the time (*i.e.*, 33 years) is not a fair market term, as virtually all other such

11 | agreements have much shorter terms (*e.g.*, 1 year, 1 year extension, or 18 months, 18

12 | months extension).  By the Superman Film Agreement Warner Bros. essentially locked-

13 | up Superman "audiovisual" and motion picture rights in perpetuity.

14 |      Key Evidence:  Testimony of Paul Levitz, Wayne Lewellen, Ari Emanuel.

15 | Tr. Exs. 128, 186, 201, 232, 306, 1085-86, 1104-1108, 1092-1094, 1097.

16 |      27.    The "lock-up" of all  Superman television rights for the life of the Superman

17 | copyrights, by requiring DC to solely exploit such rights through a company owned at

18 | least 50% by Warner Bros., is not a fair market term as other agreements for franchise

19 | properties do not contain such terms.

20 |      Key Evidence:  Testimony of Paul Levitz, Wayne Lewellen, Ari Emanuel.

21 | Tr. Exs. 128, 201, 232, 1085-1086, 1093-1094, 1105-1107.

22 |      28.    The absence of a significant "reversion" provision is not a fair market term,

23 | as most agreements for franchise properties provide for reversion of the property if it is

24 | not consistently exploited  (*e.g.*, a sequel film every 3-4 years).  Warner Bros. owns the

25 | franchise whether or not it continues to exploit Superman.  This is particularly

26 | unfavorable to DC, both because its compensation is heavily weighted on its contingent

27 | 5% gross participation in revenues from released films, and because periodic major film

28 | releases drive ancillary revenues (*e.g.*, merchandising, soundtrack, videogames,

1   publishing).  Other such agreements therefore commonly provide that benchmarks must

2   be reached (*e.g.*, principal photography started within 2 years of purchase, sequel

3   productions within a fixed number of years from the release of each prior film), or the

4   rights revert for failure to the original owner.

5          Key Evidence:  Testimony of Paul Levitz, Wayne Lewellen, Mark Evanier,

6   Steven Sills, Ari Emanuel.  Tr. Exs. 128, 186, 232, 306, 1085-1086, 1093-1094, 1097,

7   1099, 1104.

8          29.    The merchandising provision is not a fair market term.  When combined

9   with DC's exclusive merchandising agreement with Warner Bros. Consumer Products

10  ("WBCP"), DC must pay

11

12  WBEI).  Other such agreements set a "benchmark" by comparing merchandising

13  revenues prior to and during the distribution of a derivative film, and sharing only the

14  increase with the Studio.  In addition, as DC merchandises *all* of its characters through

15  WBCP for the same flat rate, it effectively "trades-off" Superman against its much less-

16  valuable properties, because DC could secure better deal terms for Superman alone.

17          Key Evidence:  Testimony of Paul Levitz, Nairi Gardinier, Wayne Lewellen,

18  Steven Sills.  Tr. Exs. 121, 178, 232, 294-296, 316, 319, 1083-1084, 1092-1094, 1105-

19  1107.

20          30.    The lack of meaningful creative control is not a fair market term for a

21  franchise property, as other such agreements provide for real creative input, "veto" rights

22  and significant restrictions on the transferee's exploitation of the property.  Warner Bros.

23  has the "final say" on every creative aspect and can essentially alter the property in any

24  way it wants to.  By contrast, DC had previously secured stringent creative rights

25  (effectively, a "veto") in prior third party agreements concerning Superman.

26          Key Evidence:  Testimony of Paul Levitz, Jay Kogen, Gregory Noveck

27  Wayne Lewellen, Ari Emanuel.  Tr. Exs. 128, 203-204, 232, 251-253, 308, 316, 1085-

28  1086, 1093-1094, 1105-1107.

31.    DC's representations, warranties and indemnifications for breach thereof are not fair market terms, as no exclusion is made for known prior rights claims such as the Plaintiffs' terminations.  Other such agreements exclude known rights claims so as to limit the rightsholder's exposure in the event of a lawsuit.

Key Evidence:  Testimony of Paul Levitz, John Schulman.  Tr. Exs. 128, 232, 307-308, 316, 1085-1086, 1093-1094.

32.    The accounting and audit provisions are not fair market terms, as evidenced by Warner Bros.' standard provisions and virtually all other agreements.  DC's accounting period (quarterly in the first 4 years and annually thereafter) and the limitations on the duration of a DC audit (to 30 days) are among the worst available.

Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Paul Levitz. Tr. Exs.128, 201, 232, 316, 325-327, 1083, 1085-1086, 1093-1094, 1097, 1104.

33.    That DC has never audited Warner Bros. is non-market behavior.  The industry standard is to audit at least occasionally.

Key Evidence:  Testimony of Paul Levitz, Patrick Caldon, Michael Edwards, Steven Sills, Wayne Lewellen.  Tr. Ex. 139.

34.    The "holdbacks" pertaining to DC's "reserved rights" are not fair market terms for a franchise property, as they seriously limit DC's ability to exploit its "reserved rights."

Key Evidence: Testimony of Wayne Lewellen, Ari Emanuel.  Tr. Exs. 128, 232, 1085-1086, 1093-1094.

35.    DC acquiesced to a provision which allows Warner Bros. to "package" "blockbuster" Superman movies with any other lesser films and to allocate revenues to the Superman movies at Warner Bros.' discretion, notwithstanding that such "packaging" results in the significant reduction of payments to the rightsholder.

Key Evidence:  Testimony of Wayne Lewellen, Ari Emanuel, Mike Edwards, Steven Sills.  Tr. Exs. 62-67, 123, 125-126, 232.

b.    The Superman Television Agreement

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

36.     The mere $10,000 option fee is not a fair market term.  Other television agreements for lesser properties, ███████████████ and DC's *Superboy* Agreement, provide for a greater option fee.

Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel. Tr. Exs. 15, 161, ███.

37.     The fixed purchase price, equal to a single episode fee, is not a fair market term, as other television agreements for lesser properties, such as DC's *Superboy* Agreement, provide for a greater purchase price.

Key Evidence:  Testimony of Ari Emanuel.  Tr. Exs. 15, 161, 320, 321, 324, 1037-1038.

38.     DC's contingent participation is not a fair market term for a property of Superman's magnitude, as evidenced by DC's prior agreements and its limited negotiations with Warner Bros. as to this term.  DC's participation is identical to DC's old 1991 agreement with Lorimar Productions, Inc. (a Warner Bros. affiliate) for the *Lois & Clark* television series, and worse than DC's *Superboy* Agreement with a third party.

Key Evidence:  Testimony of Wayne Lewellen, Ari Emanuel, Paul Levitz, Lillian Laserson, Brett Paul.  Tr. Exs. 15, 161, 181, 1037.

39.     The "gross receipts" definition provided is not a fair market term, as other such agreements include more generous definitions.  Notably, Warner Bros.' standard "rider," which modifies its "gross receipts" definition in ways favorable to the participant, is absent from the Superman Television Agreement.

Key Evidence:  Testimony of Michael Edwards, Steven Sills, Ari Emanuel. Tr. Exs. 15, 161, 181, 1083-1084, 1093-1094, 1097, 1104.

40.     The limited recipients of gross revenues included in the definition of "gross receipts" is not a fair market term, as it is unduly narrow and other agreements, such as the *Superboy* Agreement, contain broader definitions, resulting in the inclusion of more revenues in calculating the rightsholder's participation.

Key Evidence: Testimony of Michael Edwards, Steven Sills, Ari Emanuel,

14

1 Paul Levitz, Lillian Laserson, Brett Paul. <u>Tr. Exs. 15, 128, 161, 181, 201, 203-204.</u>

2     41.   DC's lack of meaningful creative control is not a fair market term for a

3 franchise property like Superman. WBTV has the "final say" on every creative aspect

4 and can essentially alter the property in any way it wants to. DC's limited creative input

5 is identical to DC's old 1991 agreement with Lorimar for the *Lois & Clark* television

6 series. By contrast, DC had previously secured stringent creative rights (effectively, a

7 "veto") in its *Superboy* Agreement with a third party. Other agreements similarly provide

8 for real creative input, "veto" rights and significant restrictions on the transferee's

9 exploitation of the property.

10     <u>Key Evidence:</u> Testimony of Paul Levitz, Jay Kogen, Gregory Noveck Ari

11 Emanuel. <u>Tr. Exs. 15, 161, 181, 203-204, 253, 308, 1084-1086, 1094-1094, 1105-1107.</u>

12     42.   The merchandising provision is not a fair market term for the same reasons

13 set forth in paragraph 29 above with respect to the Superman Film Agreement.

14     <u>Key Evidence:</u> Testimony of Paul Levitz, Nairi Gardinier, Wayne

15 Lewellen, Steven Sills, Ari Emanuel. <u>Tr. Exs. 15, 128, 161, 178, 294-296, 308, 319,</u>

16 <u>1083-1084, 1092-1094, 1105-1107.</u>

17     43.   The inclusion in the "gross receipts" definition of only 20% of home video

18 revenues is not a fair market term, for the same reasons as set forth in paragraph 24,

19 *supra*, with respect to the Superman Film Agreement. DC even failed to secure the

20 "most favored nations" provision it secured, but did not implement, in the Superman Film

21 Agreement (*see also* paragraph 25 above).

22     <u>Key Evidence:</u> Testimony of Michael Edwards, Wayne Lewellen, Steven

23 Sills, Paul Levitz, Ari Emanuel. <u>Tr. Exs. 37, 48, 128, 161, 201, 307-308, 316, 1105-</u>

24 <u>1107.</u>

25     44.   The audit and accounting provisions are not fair market terms, as evidenced

26 by Warner's standard provisions and virtually all other agreements, which contain

27 superior provisions.

28     <u>Key Evidence:</u> Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel,

1 | Paul Levitz. Tr. Exs. 128, 201, 232, 308, 1083, 1085-1086, 1093-1094, 1097, 1104.

2 |     45.    That DC has never audited Warner Bros. regarding *Smallville* is non-market

3 | behavior. The industry standard is to audit at least occasionally.

4 |     Key Evidence:  Testimony of Paul Levitz, Patrick Caldon, Michael Edwards,

5 | Steven Sills, Wayne Lewellen, Ari Emanuel. Tr. Ex. 139.

6 |         c.    The Superman Animation Agreements

7 |     46.    DC has a number of disadvantageous Superman television animation

8 | agreements with Warner Bros. ("Superman Animation Agreements") because as with live

9 | action television, DC may only exploit Superman animated television rights through

10 | Warner Bros.

11 |     Key Evidence:  Testimony of Mike Edwards, Steven Sills, Ari Emanuel. Tr.

12 | Exs. 46, 50, 53-54, 186, 225, 232, 306.

13 |     47.    In the Superman Animation Agreements, DC's participation is limited to a

14 | percentage of "Defined Proceeds," and the definition thereof is highly unfair on its face

15 | and does not reflect fair market value for the Superman franchise. Such "Defined

16 | Proceeds" are notorious Studio "net profits," known in the entertainment industry as

17 | "monkey points." Due to the high distribution fees, expenses, and production costs

18 | inflated through overhead, interest and other means, it is virtually impossible for "net

19 | profits" of any significance to be paid to DC, even for a successful animated series.

20 |     Key Evidence:  Testimony of Steven Sills, Wayne Lewellen, Ari Emanuel.

21 | Tr. Exs. 46, 50, 53-54, 226, 1084-1086, 1093-1094, 1097, 1104.

22 |     48.    The "Defined Proceeds" definition is inferior to the "Net Profits" definitions

23 | secured by third-parties, and lack the provisions found in many third-party agreements

24 | that limit the applicable distribution fees, expenses and production costs.

25 |     Key Evidence:  Testimony of Mike Edwards, Steven Sills, Wayne Lewellen,

26 | Ari Emanuel. Tr. Exs. 50, 53-54, 225, 1084-1086, 1104-1108.

27 |     49.    The "Defined Proceeds" definition is inferior to the "Net Proceeds"

28 | definitions in the television animation agreement that DC previously entered into with a

1  third party regarding Superman.  Notably, DC's prior agreements with Hanna-Barbera

2  were significantly more generous to DC than its animation agreements with Warner Bros.

3        Key Evidence:  Testimony of Steven Sills.  Superman Animation

4  Agreements.  Tr. Exs. 50, 53-54, 71, 141, 225.

5        50.    The terms of the Superman Animation Agreements strongly favor Warner

6  Bros. to the detriment of DC, and are often onerous.

7        Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel,

8  Mike Edwards.  Tr. Exs. 46, 50, 53-54, 71, 141, 225.

9        **D.    Affirmative Defenses and Relevant Counterclaims**

10        Defendants stated in the Pre-Trial Conference Order that they will <u>not</u> be asserting

11  any affirmative defenses or counterclaims in this phase of the trial.

12        Defendants' affirmative defenses in this action have all already either been:  (a)

13  rejected by the Court (*see Siegel II, supra*) or (b) are irrelevant to the issue of whether

14  intra-corporate transactions between DC and Warner Bros. were at "arm's length" and for

15  "fair market value."

16        Defendants' counterclaims for declaratory relief are essentially the "mirror image"

17  of Plaintiffs' claims.  Defendants' counterclaims are irrelevant to the February 3, 2009

18  first phase trial, *except* Defendants' sixth alternative counterclaim for declaratory relief.

19  This counterclaim asks, in part, for the following relief:  "Any accounting of recoverable

20  profits would be limited to profits of DC Comics, the sole owner of rights under any

21  purportedly terminated grants and the sole owner of copyright in Action Comics No. 1,

22  and the Siegels would not be entitled to any share of revenues earned by any third party

23  licensee of DC Comics including, but not limited to, any of the other defendants."  First

24  Amended Counterclaims at ¶137(e).

25        **E.    Elements Required to Establish Defendants' Counterclaim**

26        Defendants stated in the Pre-Trial Conference Order that they will <u>not</u> be asserting

27  any counterclaims in this phase of the trial.

28        **F.    Summary of Evidence in Opposition to Defendants' Counterclaim**

Not applicable.

## G.   Third Party Issues

There are no named third party defendants in this action.  Third-party subpoenas were issued by Plaintiffs regarding a number of high-level IP rights agreements in rebuttal to Defendants untimely production of third party IP rights agreements. Defendants have filed a motion *in limine* regarding such subpoenas.

## H.   Evidentiary Issues

Plaintiffs have filed four motions *in limine* as follows:

1)      Plaintiffs' first motion *in limine* is to preclude Defendants from introducing evidence that Warner Bros. purportedly paid DC "fair market value" for Warner Bros.' purchase of DC's Superman "audiovisual," motion picture and television rights, on the basis that such evidence is moot and irrelevant with respect to such Superman copyright interests as are now *co-owned* by Warner Bros. and Plaintiffs, not DC and Plaintiffs.

2)      Plaintiffs' second motion *in limine* is to preclude Defendants' experts, William Immerman and Richard Marks, from testifying on the grounds that the mere conclusory opinions expressed in their expert reports and deposition testimony, regarding to the issues to be tried on February 3, 2009, are not supported by sufficient facts or data and/or by any reliable or even discernable methodology.

3)      Plaintiffs' third motion *in limine* is to preclude Defendants from introducing into evidence documents and agreements produced for the first time at the parties' L.R. 16-2 Meeting of Counsel because Defendants failed to comply with their discovery obligations pursuant to F.R.C.P. 26.  Defendants were required to supplement their Rule 26(a) disclosures as well as their document production by November 21, 2008 pursuant to written agreement of the parties, but willfully failed to do so.  Plaintiffs have also moved (a) to preclude Defendants' percipient witnesses from testifying regarding agreements they did not negotiate, draft and/or directly participate in, and which were not produced prior to the agreed November 21, 2008 deadline; and (b) to preclude Defendants' non-expert witnesses from offering lay opinions about the purported "fairness" of the Superman agreements between DC and Warner Bros.

18

4)     Plaintiffs' fourth motion *in limine* is to preclude Defendants from introducing irrelevant, prejudicial and/or inadmissible documents at trial, including evidence of agreements regarding intellectual properties that were not of Superman's commercial stature, as a longstanding "franchise" property, at the time such agreements were entered into.

Defendants have filed four motions *in limine* as follows:

1)     Defendants' first motion *in limine* is to limit the scope of the trial solely to the ultimate issue of whether and to what extent any Superman agreement between DC and Warner Bros. constitutes a "sweetheart deal," and to exclude any evidence related to the traditional alter ego elements or to anything else.

2)     Defendants' second motion *in limine* is to exclude the testimony of the majority of the Warner Bros. witnesses designated by Plaintiffs, including any senior corporate officers as so-called "apex" witnesses; and all of Plaintiffs' experts, Wayne Lewellen, Mark Evanier, James Steranko and Steven Sills.

3)     Defendants' third motion *in limine* is to exclude a large number of Plaintiffs' proposed exhibits as purportedly irrelevant to what Defendants view as the very narrow scope of the February 3 Trial.

4)     Defendants' fourth motion *in limine* is to exclude Plaintiffs' exhibits produced after the parties' L.R. 16-2 Meeting of Counsel on December 3, 2008, in response to the twenty-eight contracts Defendants served on Plaintiffs for the first time at the L.R. 16-2 Meeting.

## I.     Key Legal Issues

### 1.     Warner Bros. Must Account as the Co-Owner With Plaintiffs of Divisible Film and Television Rights to the Recaptured Superman Copyrights

As set forth in detail in Plaintiffs' Motion *in Limine* No. 1, Warner Bros. has "stepped into DC's shoes" as the assignee of DC's entire proportional interest in the Superman film and television copyright rights. As the co-owner with Plaintiffs of such divisible copyright rights, Warner Bros. has a duty to account to Plaintiffs.

The November 6, 1999 Agreement (the "Superman Film Agreement") (Tr. Ex. 232) demonstrates that DC assigned its entire *proportional* copyright interest in its Superman "audiovisual" and motion picture rights to Warner Bros. as a matter of law. The December 5, 2000 Agreement (the "Superman Television Agreement") (Tr. Ex. 161) demonstrates that DC assigned its entire *proportional* copyright interest in its Superman television rights to Warner Bros. as a matter of law. The question is *who co-owns* Superman motion picture and television rights to the Recaptured Copyrights: Warner Bros and Plaintiffs, or DC and Plaintiffs? The answer is clearly Warner Bros. and Plaintiffs – with a consequent duty to account to one another for their exploitation of such rights.

It is well settled that *copyright is divisible* – each of the rights comprising a copyright may be separately owned or co-owned. 17 U.S.C. § 101 ("'Copyright owner,' with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right."); 17 U.S.C. § 201(d) ("The ownership of a copyright may be transferred *in whole or in part* by any means of conveyance or by operation of law....") (emphasis added); H.R. Rep. No. 94-1476, 1976 U.S.C.C.A.N. 5659, 5674 (1976) ("Each of the five enumerated rights [of Section 106] may be subdivided *indefinitely* and.... in connection with section 201, each subdivision of an exclusive right *may be owned and enforced separately.*") (emphasis added).

A proper analysis of whether Warner Bros. has "stepped into the shoes" of DC as the co-owner with Plaintiffs of divisible Superman audiovisual rights *focuses on the legal nature of the transfer*, *i.e.*, whether Warner Bros. is an "exclusive assignee" of DC or a "non-exclusive licensee" of DC, *not on the nature of the rights transferred*. The issue is whether *the transfer* is exclusive as to DC, not whether *the rights* transferred are non-exclusive.

Plaintiffs' permission was not required for DC to transfer its entire proportional share of Superman motion picture and television rights to Warner Bros. *See Siegel v. Time Warner, Inc.*, 496 F. Supp. 2d 1111, 1144 (C.D. Cal. 2007). *DC has a mere*

1   *passive financial interest and __no__ right to exploit Superman in audiovisual works – only*
2   *Warner Bros. and Plaintiffs do as the co-owners of such rights.*

3          Pursuant to the Superman Film Agreement and the Superman Television
4   Agreement, DC can no longer assign or license Superman motion picture or television
5   rights to a third party. If, as Defendants argue, DC had granted Warner Bros. a mere
6   "non-exclusive license" to produce Superman movies and television series, DC would be
7   free to license such rights to third parties as well, which DC can no longer do.

8          The fact that Warner Bros. was conveyed DC's proportional "non-exclusive" rights
9   does not negate Warner Bros' duty to account to Plaintiffs. Defendants have it
10  backwards. If Warner Bros. had been transferred "exclusive" Superman motion picture
11  and television rights, it would have *no* duty to account. It is precisely because the rights
12  are "non-exclusive," as the proportional interest of a co-owner, that Warner Bros. has a
13  duty to account to Plaintiffs. *See Oddo v. Ries*, 743 F.2d at 633. That DC's co-owned
14  *rights* are "non-exclusive," does not transform DC's *exclusive* transfer of its proportional
15  copyright interest into a "non-exclusive license." If it did, no co-owner could sell its
16  proportional copyright interest. This is not the law and makes no sense. *See Edward B.*
17  *Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944);
18  *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 764 (6th Cir. 2005).

19         The legal question is *not* whether Warner Bros. *exclusively* owns Superman
20  audiovisual rights, as Defendants misleadingly argued on summary judgment. Warner
21  Bros., like DC before it, clearly does not. *The real question* is whether Warner Bros.
22  owns the *entirety* of *DC's interest* in such divisible copyright rights (*i.e.*, whether DC's
23  *transfer* was *exclusive as to DC*). It clearly does. Warner Bros. thereby stepped into
24  DC's shoes as the co-owner with Plaintiffs of the divisible Superman copyright rights at
25  issue, and, as a co-owner, Warner Bros. must account to Plaintiffs.

26              **2.    Defendants Should Bear the Burden of Proving That Their Non-
                         Arm's Length Superman Deals Were For "Fair Market Value"**
27         Defendants should have the burden to establish their sixth alternative counterclaim
28  that their Superman agreements purportedly constitute "fair market value" for the

                                              21
                    PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   extremely valuable Superman copyrights. The Court ruled that "the relevant entities are

2   all closely related... and that this fact alone raises a specter of a 'sweetheart deal' entered

3   into by related entities in order to pay a less than market value fee for licensing valuable

4   copyrights." *See Siegel v. Warner Bros. Ent., Inc.* ("*Siegel II*"), 542 F. Supp. 2d 1098,

5   1144 (C.D. Cal. 2008). The Court further noted that the fact DC must report to and

6   obtain approvals from WBEI is "probative evidence of the relatedness of the licensee and

7   licensor that could result in an extremely favorable licensing arrangement that works to

8   the detriment of the non-licensor co-owner." *See id.* at 1143-44.

9          Black's Law Dictionary defines "arm's length transaction" as "a transaction

10   negotiated by *unrelated* parties, each acting in his or her own self interest; the basis for a

11   fair market value determination" (emphasis added). DC's close corporate relationship

12   with Warner Bros. is antithetical to an "arm's length" transaction for "fair market value."

13   Moreover, by preventing key Superman film and television rights from being offered to

14   the highest bidder in the competitive open market, *Defendants* prevented the "fair market

15   value" of such unique copyrights from properly being determined by market forces and

16   secured.

17          Accordingly, Defendants must rebut the strong inferences, if not presumption,

18   inherent in their closely related status and streamlined negotiations, that they had little

19   concern for "fair market value."

20          **3.    The Non-Arm's Length Transactions Among Defendants
               Prevented the True "Fair Market Value" of Superman From
21             Ever Being Determined**

22          A true "arm's length" negotiation is one between two independent entities, each

23   acting in its own self-interest and determined to maximize its benefits from the

24   transaction. An arm's length negotiation should present no conflicts of interest that

25   might prevent either party from negotiating the *best possible* deal in a particular

26   transaction.[2] The "fair market value" of a rare one-of-a-kind property like Superman, for

---

[2] Notably, as applied to Plaintiffs, deals that may be "equitable" to DC in the context of its overall relationship with Warner Bros. may still function "inequitably" with respect to Plaintiffs – as when "Superman" is packaged with the DC Universe as a whole.

22

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   which truly comparable transactions are not available, is inherently subjective.   The
2   "market value" of a unique property, by definition, is forged on the competitive *open*
3   market.

4       Unfortunately for Plaintiffs, DC did not offer the valuable Superman rights to
5   Warner Bros.' competitors, but dealt solely and exclusively with Warner Bros. – its
6   effective parent.   In fact, DC is not allowed to offer, sell or license its major characters to
7   Warner Bros.' competitors, for obvious reasons.   Tr. Ex. 191.   This alone bars the
8   conclusion that the Superman agreements were the product of arm's length negotiation
9   for "fair market value."   Even if a seller ultimately negotiates with one buyer, it is the
10   ability "to walk" and transact with the competition that enables the seller to secure "fair
11   market value" for a highly desirable property.   Without this, DC did not stand a chance.

12       In such vertically integrated transactions between closely related corporate entities,
13   "fair market value," unlike in the open market, is not a leading concern as the money
14   stays within the conglomerate.   In such circumstances, management is often motivated by
15   internal considerations that are neither relevant to nor dictated by the true market values
16   of the property in question.   Tr. Ex. 213.

17       On the open market, Warner Bros. would *never* have been able to close the same
18   expansive, one-sided agreements as it made with DC for the lucrative Superman film and
19   television franchises.   A proven commercial property like Superman is rarely, if ever,
20   offered to just one Studio, as it makes little economic sense to do so.   To maximize
21   revenues through competitive bidding (termed "bidding wars" in Hollywood), such
22   clearly desirable properties are naturally offered to all the major Studios.   *Id.*; *see also* Tr.
23   Ex. 201.   From this the "fair market value" of the property is properly determined and
24   secured.

25       Incredibly, the Superman Film Agreement gave Warner Bros. a *33-year* exclusive
26   option, exercisable by mere notice without payment of a fixed purchase price.   In
27   contrast, an "arm's-length" option to purchase motion picture rights to a top franchise
28   property usually runs for only 6-18 months, with the right to a single extension for the

1   same period. *See, e.g.,* Tr. Ex. 1094. While the Superman Film Agreement purports to

2   reserve Superman television rights to DC, it "locks-up" the rights by requiring DC to

3   only exploit them through a Warner Bros. "affiliate." DC then transferred Superman live

4   action television rights to Warner Bros. through the similarly unfavorable Superman

5   Television Agreement (Tr. Ex. 161) and exploited animated television rights through

6   Warner Bros. in exchange for unrealizable "net profits." Tr. Exs. 46, 50, 53, 225. These

7   Superman film and television agreements contain numerous terms favoring Warner Bros.

8   to DC's (and Plaintiffs') detriment.

9        The above terms would not be tolerated in an arm's length transaction for a

10  uniquely valuable property like Superman, hammered out in the open market between

11  unrelated parties. DC could easily have secured better deal terms on the open market,

12  including a much shorter option period, a hefty purchase price, a significantly higher

13  and/or escalating percentage of gross revenues, with a substantially greater participation

14  in revenues from the critical home video market (DVDs), real creative controls, more

15  favorable accounting and audit terms, and a clear reversion of rights in the event Warner

16  Bros.' failed to actively exploit Superman. *See, e.g.,* Tr. Ex. 307. For a detailed

17  contractual analysis, the Court is referred to Sections I.I.6, 8-9, *infra*.

18       It is evident from the one-sided nature of DC's intra-corporate Superman

19  agreements that the agreements were not negotiated at "arm's length" for "fair market

20  value," but were dictated largely by DC's relationship to Warner Bros. as a largely

21  captive stable of literary properties.

22
23
   **4.   Warner Bros. Sat On Both Sides of the Bargaining Table When It "Negotiated" the Superman Agreements with DC**

24       At the time DC "negotiated" the Superman Film Agreement, dated as of November

25  6, 1999, and the Superman Television Agreement, dated as of December 5, 2000, with

26  Time-Warner Entertainment Company, LP ("TWEC"), TWEC was DC's *de facto*

27  corporate parent. Tr. Exs. 124, 127, 129. Thus, when DC assigned its entire audiovisual

28  copyright interest in Superman to TWEC, and thereafter assigned its television copyright

1   interest to TWEC, DC was itself a partnership owned by TWEC and EC Comics, a

2   wholly-owned TWEC subsidiary. *Id.* TWEC is the predecessor in interest to Defendant

3   WBEI via a subsequent corporate re-restructuring. DC issues its financial reports not as

4   an independent entity, but as part of the "Filmed Entertainment Group" of Time-Warner,

5   Inc. Tr. Exs. 124, 127.

6        It is quite evident that a closed vertically integrated transaction moving assets,

7   between a wholly owned partnership and its owner, is not an "arm's length" transaction

8   negotiated for "fair market value."

9                    a.    DC Must Obtain Warner's Approval for Major Decisions

10       It is clear that DC takes its orders from Warner Bros. Tr. Exs. 35, 129. ("I [Paul

11  Levitz] report to and obtain approvals from WBEI's President and Chief Operating

12  Officer before making significant acquisitions or certain financial decisions or

13  investments that are outside the scope of DC's customary acquisitions and investments;

14  before implementing meaningful strategic changes; and before embarking on something

15  substantially outside DC's normal course of business."). Paul Levitz, DC's

16  President/Publisher, also periodically consults with John Schulman, Warner Bros.'

17  General Counsel, regarding DC management decisions –

18  the same person with whom Mr. Levitz "negotiated" the Superman Film Agreement. As

19  set forth above, DC may not sell or license its major franchise characters like Superman

20  and Batman to Warner Bros.' competitors, and must therefore exploit such characters

21  exclusively through Warner Bros. Tr. Ex. 144-145, 191. While relatively minor

22  characters or properties may be sold outside the Warner family once Warner Bros. has

23  *clearly* "passed," the film and television rights to all of DC's major characters, such as

24  Superman, Batman, Wonder Woman, the Flash, and Green Lantern, are invariably

25  assigned or licensed to Warner Bros., as shown by DC's "Media Deals Key List." Tr.

26  Exs. 186, 306.

27

28                   b.    Negotiations Between Warner and DC Regarding the Superman
                          Film Agreement Were Perfunctory

1   The actual "negotiations" between DC and Warner Bros. were not conducted at

2   "arm's length," as is unsurprising given their closely related corporate structure.  The

3   basic deal terms of the Superman Film Agreement were merely imported from an old

4   November 6, 1974 agreement between DC and Film Export, A.G., dated November 6,

5   1974 (the "Salkind Agreement") (Tr. Exs. 203-204), which was entered into when

6   Superman was at a historic low in terms of commercial popularity and before Superman

7   had successfully been exploited in any motion picture.[3]  Tr. Ex. 303.

8   The 'negotiations' of the mirror image Superman Film Agreement were

9   characterized by DC acceding to nearly all of Warner's material demands.  Those

10  changes to the Salkind Agreement that were made strongly favored Warner Bros.  The

11  basic deal was agreed upon by Paul Levitz, DC's Publisher and John Schulman, Warner

12  Bros.' General Counsel – which, in itself, suggests an imbalance.   John Schulman acted

13  as both the lead negotiator for DC in the 1999-2002 settlement negotiations with

14  Plaintiffs, and the lead negotiator for Warner Bros. of the Superman Film Agreement

15  with DC.



23

24  [3] In fact, the only reason that DC was even permitted to enter into the Salkind Agreement (see Section I.I.6.1, *infra*) was that Warner Bros. had no interest in Superman at this time.

25  [4]

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW



In substance, the final deal is the same as Warner Bros.' proposal, though there are certain changes

5.    **The Deal Terms Arrived Do Not Constitute "Fair Market Value"**

---

[5] For instance:
- Television rights are frozen:  DC can exploit only via a Warner Bros. entity;
- DC's participation is applicable indefinitely to the yearly option payments, whereas under DC's proposal it applied to just the first seven years;
- The definition of "audiovisual works" is broadened to include "all types known or hereafter devised . . . in any medium now known or hereafter devised;"

[6] Notably, the Batman Option Purchase Agreement is with few exceptions a carbon copy of the Superman Film Agreement including the freeze on television rights, which may only be exploited by through Warner Bros. Tr. Ex. 1.  Such substantively identical provisions for different properties are a hallmark of the cursory "negotiations" between DC and Warner.

**for the Extremely Valuable Superman Copyrights**

    a.    <u>The "Superman" Franchise Was Historically Successful and Extremely Robust</u>

The Superman franchise, as noted by the Court, is both world-famous and extraordinarily valuable. *See Siegel II*, 542 F.Supp.2d at 1102 ("iconic comic book superhero 'Superman'"), 1111 (Superman is a "super-salesman" for Defendants in "live action and animated motion pictures, television, ... [and] merchandis[ing]"). It is one of a handful of unique, extremely valuable "evergreen" intellectual properties, and is the basis for a long-running major merchandising "brand," a highly successful publishing line, and *several* successful television series and films over seven decades. <u>Tr. Ex. 114.</u> *See also* <u>Tr. Exs. 144-146, 205, 212.</u> As such, Superman is one of the most valuable branded entertainment franchises in existence.

At the time the Superman Film Agreement was "negotiated" (1999-2002) and executed (2002), the Superman franchise already had this commercial track record. Defendants' own internal statements describe Superman as "the most successful comics character ever." <u>Tr. Ex. 278.</u> *See also* <u>Tr. Ex. 212.</u> The prior *Superman* films had been extremely successful. For example, the original *Superman* (1978) movie grossed $134 million domestically (**$394 million** in current dollars) while *Superman II* (1981) grossed $108 million domestically (**$267 million** in current dollars). <u>Tr. Ex. 61.</u> Similarly, the derivative *The Adventures of Superman* television series (1951-1957), the syndicated live action television series *Superboy* (1988-1992), the prime-time live-action television series *Lois & Clark: The New Adventures of Superman* (1993-1997), and the animated "SuperFriends" cartoons (1973-1986) were all highly successful. By 2002, there were *four* ongoing, monthly Superman comic book series (*Action Comics, The Adventures of Superman, Superman (Vol. 2),* and *Superman: The Man of Steel*). Superman was unquestionably one of DC's two "leading" properties (the other being Batman), if not *the* leading property, when the Superman Film Agreement was signed in May 2002.

    b.    <u>Arm's Length Agreements for Well Known Properties Demonstrate that DC's Superman Agreements with Warner Bros. Were Below "Fair Market Value"</u>

1    Superman is a unique "evergreen" property.  Its true "market value" can only

2   objectively be determined in the competitive open market.   However, agreements entered

3   into for well known, albeit *less* prominent properties, on better terms than those entered

4   into by DC/Warner Bros. for Superman, provide a strong indication that the latter terms

5   do not constitute "fair market value."  To aid the trier of fact in assessing "fair market

6   value," Plaintiffs actively sought Studio agreements with non-affiliated rightsholders for

7   the rights to well known literary properties.  With great effort, Plaintiffs managed to

8   secure the option/purchase agreements pertaining to the film rights to the *Lord of the*

9   *Rings* books, the *Dirk Pitt* books by Clive Cussler, *Hannibal, My Fair Lady, Annie,* the

10   Tom Clancy novels, *Rainbow Six* and *Red Rabbit,* the Michael Crichton novel *Timeline,*

11   and *Terminator* – all of which were less prominent than Superman when such agreements

12   were made, but achieved *far* more lucrative terms than in the relevant Superman

13   agreements.  These third party contracts strongly indicate that DC's assignments to

14   Warner Bros. were *not* for "fair market value."

15    The rights agreements for the ***Lord of the Rings*** books by J.R.R. Tolkien (the

16   "*Lord of the Rings* Agreement") (Tr. Ex. 128) underlying the films, *Lord of the Rings*:

17   *The Fellowship of the Rings* (2001), *The Two Towers* (2002), and *The Return of the King*

18   (2003), is between Saul Zaentz Company ("Zaentz") and Miramax Productions, at that

19   time a subsidiary of the Walt Disney Company, with a later assignment to New Line

20   Cinema Corp. (a wholly owned subsidiary of Time-Warner, Inc.) which ultimately

21   produced the films, and is currently a division of Warner Bros.  Plaintiffs retrieved this

22   highly relevant contract and associated documents from the court file of *The Saul Zaentz*

23   *Co. v. New Line Cinema Corp.*, Los Angeles Superior Court, Case No. BC 320254.  This

24   agreement provides the rightsholder with fixed cash compensation of ***$4.75 million, plus***

25   ***a 5% gross participation*** above $40 million, ***escalating to 10% of gross revenues*** above

26   $60 million.  Tr. Exs. 121, 128.  Warner Bros. elected not to produce this agreement for

27   obvious reasons.

28    The agreement for film rights to the ***Dirk Pitt*** series of novels by **Clive Cussler,**

1   dated as of May 9, 2001 underlying the film, *Sahara* (the "*Sahara* Agreement") (Tr. Ex.

2   201), provides for a fixed cash fee of ***$20 million*** and a ***10% gross participation***.

3   Plaintiffs retrieved this highly relevant contract – negotiated by Defendants' own expert

4   William Immerman – from the court file of *Clive Cussler v. Crusader Entertainment,*

5   *LLC,* Los Angeles Superior Court Case No. BC 309114.  Significantly, Mr. Immerman

6   shied away from this well publicized deal in rendering his pro-Warner Bros. opinion.

7       Plaintiffs obtained a Warner Bros. agreement for the film rights to ***My Fair Lady***

8   from its archives at the University of Southern California, as Warner Bros. elected not to

9   produce it.  This 1962 agreement (the "*My Fair Lady* Agreement") (Tr. Ex. 300)

10   provided the licensor, Columbia Broadcasting System, Inc., with fixed compensation of

11   ***$5.5 million*** upfront (adjusted for inflation, ***$37.2 million*** in current dollars), ***plus 47.5%***

12   ***of Warner Bros.' gross receipts*** after $20 million.  In essence, this agreement provided

13   the rightsholder with a guaranteed 27.5% of the gross receipts up to $20 million (*i.e.*, $5.5

14   million), and 47.5% of the gross receipts thereafter.

15   Plaintiffs also obtained the film rights agreement, dated May 20, 1999, for the novel

16   ***Hannibal*** by Thomas Harris, underlying the movie, *Hannibal* (2001) (the "*Hannibal*

17   Agreement") (Tr. Ex. 307).  This sequel book concerns the "Hannibal Lecter" character

18   that appeared in the author's prior novel, *Red Dragon*, made famous by the film *The*

19   *Silence of the Lambs* (1991).  This character has also been depicted in the films, *Red*

20   *Dragon* (2002) and *Hannibal Rising* (2007).

21

22

23

24   Plaintiffs obtained an agreement, dated as of December 29, 1978, between Thomas

25   Meehan, Chicago Tribune-New York News Syndicate, Inc. and Columbia Pictures

26   pertaining to the film rights to the Broadway musical ***Annie*** (the *Annie* Agreement) (Tr.

27   Ex. 315).  *Annie* had enjoyed a very successful run in the theatres.

28



3  Plaintiffs also acquired two agreements relating to the *Terminator* franchise.

13  Plaintiffs also obtained the film rights agreements to two novels written by best-selling
14  author, **Tom Clancy**.  Mr. Clancy is known for his popular novels featuring the "Jack
15  Ryan" character underlying such films as *The Hunt for Red October* (1990), *Patriot*
16  *Games* (1992) and *Clear and Present Danger* (1994).

23  Plaintiffs also secured a purchase agreement dated October 22, 1999 for the motion
24  picture rights to the novel *Timeline* (the "*Timeline* Agreement") (Tr. Ex. 325) by **Michael**
25  **Crichton** (author of *Jurassic Park*, etc.).

31

c.     The Agreements Produced by Defendants Do *Not* Assist the Trier of Fact As the Subject Properties Were Not Franchises at the Time the Agreements Were Entered Into

Defendants seek to introduce improper "comparables" in order to falsely buttress their claim that the "sweetheart" Superman deals between DC and Warner Bros. were entered into at arm's length for "fair market value."[7] As thoroughly analyzed in Plaintiffs' Motion *in Limine* No. 3, the non-Superman agreements untimely produced by Defendants concern either properties that had not been previously exploited in film, television or the stage or; if they had, did not achieve anywhere near the broad commercial success and iconic appeal of Superman. None of them are comparable to Superman.

At the L.R. 16-2 Meeting of Counsel, Defendants disclosed for the first time and designated as exhibits a host of option/purchase agreements for literary properties that, unlike Superman, were not branded "franchise" properties *at the time* the agreements were concluded. Tr. Exs. 1028-1029, 1037-1038, 1083-1108. For instance, Defendants misleadingly presented early agreements for the film rights to the first two *Harry Potter* books, the comic book character *Iron Man*, and the graphic novel *300* – all of which are most famous for the "hit" films released *thereafter*. Warner Bros. hand picked these agreements for their now famous titles and the mediocre terms secured by the rightsholders. Yet these terms are not surprising as the properties had *not* achieved the

---

[7] The specific properties in question are: the Japanese anime series "Robotech" (the "*Robotech* Agreement") (Tr. Ex. 1083); the comic book property "300" (the "*300* Agreement") (Tr. Ex. 1084); the film rights to the literary property "Tarzan" (the "*Tarzan* Agreements") (Tr. Exs. 1084-1085); the television rights to "Tarzan" (Tr. Ex. 1102) (the "*Tarzan* Television Agreement") the property "G.I. Joe" (the "*G.I. Joe* Agreement") (Tr. Ex. 1092); the literary property "Conan" (the "2002 *Conan* Agreement" and "2000 *Conan* Agreement") (Tr. Exs. 1093-94); the literary property "Harry Potter" (the "*Harry Potter* Agreement") (Tr. Exs. 1097-1099); the literary property "How to Teach Filthy Rich Girls" (the "*How to Teach Filthy Rich Girls* Agreement") (Tr. Ex. 1100); the comic book property "Witchblade" (the "*Witchblade* Agreement") (Tr. Ex.1101); the literary property "Gossip Girl" (the "*Gossip Girl* Agreement") (Tr. Ex. 1103); the comic book property "Human Target" (the "*Human Target* Agreement") (Tr. Ex. 1104); the comic book property "Iron Man" (the "*Iron Man* Agreement") (Tr. Exs. 1105-1107); the literary property "Doc Savage" (the "*Doc Savage* Agreement") (Tr. Exs. 1108); comic book property "Watchmen" (the "*Watchmen* Agreement") (Tr. Exs. 1028-1029); the comic book property "Swamp Thing" (the "*Swamp Thing* Agreement") (Tr. Ex. 1036); the comic book property "Birds of Prey" (the "*Birds of Prey* Agreement") (Tr. Ex. 1037); and the comic book series "Global Frequency" (the "*Global Frequency* Agreement") (Tr. Ex. 1038).

1  fame and brand recognition they enjoy today until well *after* each agreement had been

2  executed.  In contrast, Superman was an evergreen "franchise" property with a proven

3  commercial track-record *at the time* that DC exclusively assigned Superman film and

4  television rights to Warner Bros.

5  Accordingly, the contracts produced by Defendants are misleading and not

6  probative.  As the properties in no way compare to Superman, at the time the agreements

7  were entered into, their terms should be viewed with extreme caution.  Perhaps more

8  significant are the agreements for famous works underlying Warner Bros. movies that

9  Defendants conspicuously did <u>not</u> produce.[8]

### 6.   The Deal Terms in the Superman Film Agreement Do Not Constitute "Fair Market Value"

12  The terms of the Superman Film Agreement, arrived at through cursory

13  negotiations, do not come close to the "fair market value" of DC's "jewel in the crown"

14  property – Superman.  The terms are severely one-sided, favoring DC's owner, TWEC, at

15  the expense of DC *and* Plaintiffs.  Most of the terms were worse than those found in other

16  high-level agreements, and, often, in agreements between Warner Bros. and *unrelated*

17  third-parties.

### a.   An Assignment of Overly Broad Rights

19  The Superman Film Agreement contains an overbroad assignment of rights that

20  grants Warner far too great an ownership interest in DC's purported property.  As noted

---

22 [8] Warner Bros. produced and distributed numerous other films based on well known works or best-sellers, for which they failed to provide the underlying rights agreements. For instance: *The Phantom of the Opera* (2004), based on the long running musical by Andrew Lloyd Webber; *The Green Mile* (1999), based on the 1996 best-seller by Stephen King; *Sweeney Todd* (2007), based on the celebrated 1979 Broadway musical; *The Pelican Brief* (1993), *The Client* (1994), and *A Time to Kill* (1996), based on the best-selling novels of John Grisham; *Contact* (1997) based on the best-selling book by Carl Sagan; *Disclosure* (1994), based on the 1994 novel by Michael Crichton, who reportedly receives multi-million dollar fees and gross participations for his works; and *Never Say Never Again* (1983), the remake of *Thunderball* (1965), based on Ian Fleming's "James Bond" character.  *See* Plaintiffs' Motion *in Limine* No. 4 at 13:15-14:8.  While Plaintiffs do not know the terms of the rights agreements underlying these films, Plaintiffs submit that such contracts are far more probative than, for instance, the contract for *How to Teach Filthy Rich Girls* untimely produced by Defendants.  The agreements Defendants deliberately failed to show us are far more telling than those that they did.

33

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    above, the Superman Film Agreement gave Warner Bros. an "exclusive and irrevocable

2    option to purchase all rights in the [Superman] Property as set forth in Paragraph 5

3    thereof." Tr. Ex. 232 at 1. Exhibit "A" of the Superman Film Agreement defines the

4    "Property" very broadly as:

5       "*All material tangible and intangible detailing the stories and adventures*
        *of the comic book character known as 'Superman'* as depicted in

6       publications and television series, together with associated characters which
        have appeared (or will appear) together with 'Superman' and all now and

7       hereafter existing rights of every kind and character whatsoever therein, *and*
        *the complete, unconditional and unencumbered title therein for all*

8       *purposes...*"

9    Paragraph 5 of the agreement, entitled "Grant of Rights," states:

10      "If the option is exercised, *Warner shall own*, and subject only to such
        exercise DC assigns and sells to Warner, *exclusively, in perpetuity and*

11      *throughout the universe, all rights, title and interest in the Property except*
        *for the Reserved Rights* set forth in Paragraph 6 hereof (the "Rights").

12      Without limiting the generality of the foregoing, the Rights
        herein granted include: ...

13

14      (a)   Audiovisual Works: *The right to produce audiovisual works of all*
        *types now known or hereafter devised*...and all other derivative works

15      based thereon, intended for exploitation in any medium now know or
        hereafter devised...

16      (b)   Copyrights/Exploitation Rights: With respect to works produced
        pursuant to the rights granted in Paragraph 5(a) hereof, *all copyrights*,

17

18

19      neighboring rights and any *and all other ownership and exploitation rights*
        *in the Property now or hereafter recognized in any and all territories and*

20      *jurisdictions...*"

21   *Id.* at 2-3 (emphases added). Thus, the language of the agreement ("all rights, title and

22   interest in the Property except for reserved rights") transfers *all rights* not expressly

23   reserved by DC to Warner Bros.[9] Moreover, while paragraph 6 purports to reserve to DC

24   certain rights, including publication, television and merchandising rights, it places severe

25   restrictions on DC's ability to exploit those rights.[10]

26   _____
     [9] Thus, any rights ambiguities inure to Warner Bros.' benefit, as DC is responsible for reserving
27   rights.

28   [10] For example, DC is forbidden to exploit television rights in the Property with any entity other
     than an "affiliate" of Warner." In 2002, DC thus assigned its remaining exclusive television
     rights to WBTV as set forth below. In addition, DC was forbidden to exercise its dramatic and

                                          34
     PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    By contrast, other agreements for valuable intellectual property consistently grant

2    limited rights, and retain rights not expressly granted.  For example, neither the lucrative

3    *Lord of the Rings* nor *Sahara* Agreements (*see* Section I.I.5.b, *supra*) provided for a

4    sweeping "right to produce audiovisual works of all types now known or hereafter

5    devised," as is found in the Superman Film Agreement.  Instead, both agreements

6    provided for the initial right to release a single, feature-length motion picture based on

7    each property, along with certain "ancillary" rights (*e.g.,* rights of publicize the movie).

8

9

10

11    Even the agreements produced and designated by Warner for the most part lack the

12    sweeping grant of "audiovisual rights" found in Superman Film Agreement.  The *300*

13    Agreement was limited to only motion picture and ancillary rights.

14

15

16

17

18

19

20

21

22

23

24

25    These agreements demonstrate that it is extremely rare for even limited rights in a

26    well known property to be transferred wholesale.  Instead, in arm's length negotiations,

27

28    radio rights until five years after the date of the agreement or three years after a film's release under the agreement (whichever is earlier), *and* from the start of principal photography until three years after the release of the film.

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

the owners of such properties carefully delimit the scope of the right(s) transferred, while reserving all other rights. In contrast, DC transferred the entire "audiovisual" copyright to one of its two most valuable characters and, in addition, was deemed to have sold all other rights not expressly reserved – hardly a "fair market" term.

b.    No Purchase Price and Limited Cash Compensation

In the Superman Film Agreement the initial fee for the exclusive option to purchase is $1.5 million for a 3-year term; and the option may be extended for $500,000 per year for *30 years* (*i.e.*, the option terms covered the remaining life of the Superman copyrights at the time of the agreement). *Incredibly, the option/purchase agreement, unlike nearly all such agreements, does not provide for a fixed cash purchase price upon exercise of the option.* Instead, the option is exercisable merely "by giving DC written notice of Warner Bros. commencement of principal photography of a feature-length motion picture based on the Property." Tr. Ex. 232. Instead of a fixed cash purchase price and contingent compensation, as is the norm, DC is only entitled to contingent compensation of 5% of defined gross receipts, based on feature films, if any, Warner Bros. chooses, *in its sole discretion*, to produce. Moreover, all option extension payments are treated as advances against DC's contingent compensation, which is also contrary to industry standards.

In comparison, the *Sahara* Agreement provides for a guaranteed purchase price of **$20 million**; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the *Lord of the Rings* Agreement provides for **$4.75 million** in fixed cash compensation (option fees plus purchase fees); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and the 1963 *My Fair Lady* Agreement provides for a fixed cash purchase price of $5.5 million (adjusted for inflation, **$37.2 million** in current dollars);

36

1   all with very significant contingent compensation terms as well. <u>Tr. Exs. 121, 128, 201,</u>

2   <u>300, 307, 315, 325-327.</u>

3   Many of the agreements produced by Defendants for lesser properties contain fixed cash

4   compensation equal to or greater than that the $1.5 million paid under the Superman Film

5   Agreement.  Such include ███████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████ Agreements.

10        Other, far less prominent, DC properties also secured from Warner Bros.

11   substantial purchase prices, close to, equal to, or greater than the $1.5 million paid for

12   Superman.  For example, the purchase prices for minor DC properties ███████████████

13   ████████████████████████████████████████████████████████████████████

14   were all $1 million; and the purchase prices for ████████████████████████████████

15   ███████████████████████████████████ were all $1.5 million.  <u>Tr. Ex. 306.</u>

16   Despite Superman's superior stature, the purchase prices for ███████████████████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████ exceeded the fixed $1.5 million paid for Superman. *Id.*

19        The mere $1.5 million paid for Superman in option fees, and the uncustomary

20   absence of a fixed purchase price, is inadequate, does not measure up to the fixed

21   compensation for lesser properties and thus, does not constitute "fair market value."

22   Were DC an independent company, it would and could have secured option extension

23   payments *non-applicable* to future compensation and a very large *fixed purchase price*

24   for film rights to the world renowned Superman property.  DC also could have secured

25   financial escalations for each successive sequel motion picture.  Instead, DC settled for

26   below-market fixed cash compensation ($1.5 million) that was fully applicable to its 5%

27   contingent participation, with no escalations for sequel films.

28              c.    <u>Inadequate Contingent Participation</u>

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

i.   *Amount of the Participation*

The Superman Film Agreement's gross participation does not reflect market value, as lesser properties have achieved better or equal gross participations. The Superman Film Agreement provided that *if* Warner Bros. produced "a feature-length motion picture based on the Property," DC would receive contingent compensation equal to the greater of 5% of Warner Bros.' defined gross receipts worldwide or 7.5% of defined gross receipts in the United States.[11] *Id.* at 2. However, other than for "feature-length motion picture[s]" there is no provision for any participation payment to DC for other Superman audiovisual exploitations by Warner pursuant to the broad rights assignment in the agreement.[12] Other agreements for lesser properties are significantly more lucrative for the rightsholder.

In the *Sahara* Agreement, the rightsholder received a $20 million advance against a *10% gross participation*. As such, the rightsholder was guaranteed a minimum of $20 million for *Sahara,* which grossed $119,269,486 at the worldwide box office. In contrast, DC has received only ██████████ in revenue for *Superman Returns*, which grossed $391,081,192 at the worldwide box office, to date.

---

[11] ████████████████████████████████████

[12] This means that for Warner Bros.' new "audiovisual" Superman programming (*e.g.*, virtual worlds ) for new media (*e.g.*, internet, mobile devices, etc.) now existing or developed through December 31, 2033, DC would have no contractual right to any money.

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

■

The *My Fair Lady* Agreement, provided the licensor with *$5.5 million* upfront, *plus 47.5% of the gross receipts* after $20 million.  Unlike in the Superman Film Agreement, the fixed compensation is non-applicable to the rightsholder's contingent compensation.  In essence, this agreement provided the rightsholder with 27.5% of the distributor's gross receipts up to $20 million (*i.e.*, $5.5 million), and a participation of 47.5% of the gross receipts thereafter.

The *Lord of the Rings* Agreement provides the following gross participation: *5% of the distributor's gross receipts* from $40 -$50 million, *7.5% of the distributor's gross receipts* from $50-$60 million, and *10% of the distributor's gross receipts* over $60 million.[13]  The *Lord of the Rings* films went on to gross over $1 billion worldwide at the theatrical box office.  In addition, the rightsholder is entitled to "bonus" payments equal to $1 million at $90 million in gross receipts, $1 million at $100 million in gross receipts, and $1.25 million at $125 million in gross receipts.  Tr. Ex. 128 at 12-13, ¶ 9.  *None* of the substantial option fees, purchase prices, and "bonus" payments are deemed advances against the "gross participation." *Id.* at 11-12, ¶¶ 8(b), 9(a)-(e).  By contrast, because the "Option Payment" of $1.5 million paid to DC in the Superman Film Agreement was deemed an "advance" against DC's contingent 5% gross participation, DC was paid *nothing* for the first $30 million in Warner Bros.' gross receipts for *Superman Returns*.

Each of the above arm's length agreements contain far more lucrative terms than

---

[13] The escalating payment structure found in the *Lord of the Rings, Timeline, Red Rabbit* and *Rainbow Six* deals are also not uncommon.  The *Tarzan, Iron Man,* and *Conan* contracts all provide for escalating payments as certain contractually-defined levels are reached.  This ensures that the licensor shares in the success of the derivative film.

the Superman Film Agreement.[14] The agreements clearly demonstrate that DC's 5% gross participation does *not* represent fair market value for the world renowned Superman franchise.[15]

        ii.    *"Gross Receipts" Narrowed to Limited Entities*

In contrast, the *Lord of the Rings* Agreement included the licensee and "without limitation, its parent, subsidiary, affiliated, associated, and sister companies and its sales

---

[14]

| Distributor's Gross | Superman | Lord of the Rings |
|---|---|---|
| $0 million | $1,500,000 | $4,750,000 |
| $10 million | $1,500,000 | $4,750,000 |
| $20 million | $1,500,000 | $4,750,000 |
| $30 million | $1,500,000 | $4,750,000 |
| $40 million | $2,000,000 | $4,750,000 |
| $50 million | $2,500,000 | $5,250,000 |
| $60 million | $3,000,000 | $6,000,000 |
| $70 million | $3,500,000 | $7,000,000 |
| $80 million | $4,000,000 | $8,000,000 |
| $90 million | $4,500,000 | $10,000,000 |
| $100 million | $5,000,000 | $12,000,000 |
| $125 million | $6,000,000 | $15,750,000 |
| For each additional $25 million | $1,250,000 | $2,500,000 |

[15]

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    agents, distributors and distributing licensees, agents, trustees, successors and assigns."

2    Even the Salkind Agreement included in the definition of gross receipts "all monies

3    derived by Purchaser or its subsidiaries or its distributing sub-licensees or agents."

4

5

6

7

8            iii.    *Too Many Deductions from Gross Revenues*

9

10

11

12

13

14    Furthermore, many of the "gross receipts" definitions found in agreements

15    between Warner Bros. and *third-parties* included standard contractual amendments called

16    "riders" (*see, e.g.*, the *Robotech, 300, Tarzan, Human Target, Conan,* and *Harry Potter*

17    Agreements), which serve to improve the definition of gross receipts in the rightsholder's

18    favor.[16]  No "rider" is included in DC's Superman agreement.

19

20

21

22

23    [16] For instance, such provisions:  include in Gross Receipts revenues from copyright and
     trademark infringement suits, subsidies, aid, prizes, and licensing of distribution rights; modify

24    the deduction of taxes from revenues so that rebates of taxes paid are "credited" against the
     taxes previously deducted; exclude participations from the "residuals" deducted from gross

25    revenues; eliminate the deduction for cooperative advertising expenses; require that reserves
     against returns (for inventory items such as home video) are "reasonable"; require any

26    "package" sales of the property with other properties to be "reasonably" allocated; and require
     any licenses for broadcast on television stations owned by Warner Bros. or Time Warner be

27    conducted on an "arms-length" basis; and recognizes revenues when they are either received in
     U.S. dollars, freely remittable in U.S. dollars, or used for any purpose where they were first

28    received.

41
PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW



1 

2     "Fair market value" for the Superman property would have included a

3 superior "gross receipts" definition.

4                    d.      Inadequate 20% Video Royalty

5

6

7

8

9

10

11     This results in significantly less money to DC, because DVD sales for successful

12 film franchises often exceed 100% of the theatrical box office gross.  Thus, the

13 "video royalty" for Superman translates to DC receiving only ▓ of the revenues from

14 this vital market.[18]  By excluding ▓ of Warner Bros.' home video revenues,

15 accounting for about ▓ of total worldwide revenues, DC essentially receives only ▓

16 of Warner Bros.' defined gross revenues, rather than 5%.  *Id.*

17     In contrast, other agreements provide markedly higher video royalties. ▓

18

19

20     The *Lord of the Rings* Agreement provides for a 40% video royalty

21 on wholesale rental income.  The *Sahara* Agreement includes 100% of home video

22

23

24 [17] This "video royalty" is an artifact of a period when "home video" was an emerging
    technology, and studios contracted with third-parties for home video distribution.  These third-
25 parties paid a "royalty" of ▓ of sales to the studios.  The studios, seeing how lucrative the
    home video market was, started their own home video divisions, which now handle their home
26 video distribution, while trying to maintain the vestigial ▓ royalty.

27 [18] For example, DC's June 30, 2008 participation statement for *Superman Returns* reports
    Warner Bros. "video" gross revenues as ▓.  This is only ▓ Warner Bros. actually
28 realized ▓ in revenue from this source, roughly equivalent to the ▓
    received by Warner Bros. from the theatrical distribution of the film.



1   revenue in gross receipts.[19]

2                                                              These deals clearly demonstrate that it is possible to

3   secure a home video participation greater than the lowest ▮▮▮ royalty in all of DC's

4   Superman film and television agreements with Warner Bros.  Warner Bros.' own

5   executives testified that its video royalties range from 20% to 40%.

6               Notably, DC's agreement included a

7

8

9

10

11

12               Tr. Ex. 232 at 19.  This broad definition encompasses

13

14

15

16

17

18

19                     e.       Thirty-Three Years of Options Are Far Too Long

20               The Superman Film Agreement has an initial three-year term, extendable *for thirty*

21   *years* (*i.e.*, the remaining life of the original "Superman" copyright at that time).  This is

22   *not* a fair market term.  Virtually all other such agreements have *much* shorter terms (*e.g.*,

23   _____

24   [19] The *Sahara* Agreement was with Philip Anschutz's company, Crusader Entertainment, LLC,
     which produced and financed the movie, but is not itself a distributor.  As the

25   financier/producer, Crusader would have received the lion's share of the video revenues, minus
     a reduced distribution fee (*e.g.*, 12.5-20%).  Thus, for purposes of determining the rightsholder's

26   10% gross participation, a large percentage (80-88.5%) of home video revenues would be
     included.

27   [20]

28

1  12-18 months, with an equal extension period).[21]  In fact, the original option term plus all

2  extensions rarely exceeds three years.[22]  The licensor limits the option term so as not to

3  unduly tie up its property, and to incentivize the licensee to actually produce a film so

4  that the fixed purchase price (non-extant in DC's Superman agreements) is paid and

5  contingent participations are payable.

6       For example, Warner Bros.' other agreements have the following option terms:

13       Even DC's Salkind Agreement, had a 6 month initial option period and

14  a three month extension period.[23]

15       f.     The Lack of Reversion for Failure to Exploit

16       Agreements for known properties, particularly "franchise" properties, typically

---

18  [21] For instance, the terms of Marvel's *Iron Man* Agreement are not particularly impressive, but

19  *because* the option term was limited, Marvel was able to regain its rights to *Iron Man*. After the
    popularity of the *X-Men* and *Spiderman* film franchises allowed Marvel to raise capital and co-

20  finance its films, Marvel was able to reap enormous profits from the recently successful *Iron Man* movie.  Even if Marvel had merely licensed the rights again, it would still be free to enter

21  into a transaction on whatever terms the market would bear.

22  [22] The Superman Film Agreement was dated "as of" November 6, 1999, but was only executed
    on May 9, 2002.  Thus, at the time the agreement was signed, two-and-a-half years of the three

23  year term – already a long option term for *any* property – had already passed with little progress
    to production of a actual Superman film.

24  [23] In third-party transactions, licensors are able to extract significantly better terms in renewed

25  deals once initial option terms expire.  For example,

26

27

28

1   have "reversion" provisions after an option to purchase the property is exercised – for

2   failure to exploit the property by producing derivative motion pictures.  This protects the

3   licensor because a good portion of the licensor's compensation is based on its

4   participation in such films.

10      i.    *No Reversion for Failure to Produce First Picture*

11      For example, the *Lord of the Rings* Agreement requires that principal photography

12   of the film commence within 18 months of the exercise of the option (subject a 6 month

13   extension for contingencies) and further requires that the film be *released* within 2 years

14   after the start of principal photography.  Any sequels optioned or purchased were subject

15   to the same provisions.

1    Warner Bros.' other third-party contracts indicate strongly that such reversion

2    rights are a "fair market" term – indeed, standard practice.  The *Robotech, Tarzan, Iron*

3    *Man, Doc Savage,* and *Harry Potter* Agreements all contain provisions for the reversion

4    of the properties if principal photography had not commenced within a specified length

5    of time.

6    Indeed, DC has reversion provisions, albeit diluted ones, in many of its *other*

7    contracts with Warner Bros.  For example, the ███████████████████████████████

8    ██████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   Agreements all provided for the reversion of rights if principal photography of the film

12   was not completed within 7 years of exercise of the option.[26]  Tr. Ex. 306.

13   ii.    *No Reversion for Failure to Produce Sequels*

14   Similarly, many of the contracts, particularly for "franchise" properties, also

15   contain "rolling" reversion provisions requiring that *sequel* motion pictures be

16   periodically produced, or else the rights revert to the original owner.  ████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   _____

[26] ████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

46

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    ███████████████████████████████ Under the *Lord of the Rings* Agreement, the

2    licensee must start principal photography of a sequel within 30 months of optioning such

3    sequel rights (subject to short extensions for contingencies) and that the underlying rights

4    would revert to the licensor five years after the release of the last picture produced.

5             iii.    *Damaging Effect of Lengthy Term and No Reversion*

6        Due to Warner Bros.' ability to extend its option for 33 years, with no obligation to

7    produce one or more Superman motion pictures, Warner Bros. has the right to essentially

8    sit on its hands, while a major source of Superman revenue lies idle, damaging DC and

9    Plaintiffs. Clearly these are not "fair market" terms. DC knew better than to accept a

10    deal for an indefinite length of time without any potential for reversion, especially as its

11    compensation was heavily weighted towards its gross participation, and as periodic major

12    film releases drive DC's ancillary revenues (such as from merchandising, video games,

13    and publishing). DC obviously had little choice in the matter.

14        Incredibly, DC entered into this disadvantageous arrangement in May, 2002 even

15    though Warner Bros., which had controlled valuable Superman film rights for the past

16    *nine* years, was still not close to *producing* a Superman movie.[27]

17             g.    The Merchandising Provisions

18

19

20

21    [28] and (2) the revenues from such

22

23    [27] Warner Bros. acquired control of the Superman film rights by assignment of the Salkind Agreement in 1993, and had engaged in continuous development of the property since that date,

24    with no film released until *Superman Returns* in 2006. Tr. Exs. 229-231, 234-237. Thus, Warner let *13 years* lapse before releasing a Superman motion picture.

25    [28] While DC conducts *limited* "collectible" merchandising itself (*e.g.,* to comic book stores), the vast bulk of its merchandising *for all DC properties* is exclusively conducted through Warner

26    Bros. Consumer Products ("WBCP").

27

28    Moreover, the same ███ fee is
applied to *all* of DC's properties, suggesting that DC is "trading-off" its more-valuable

1 | Superman merchandising are then split 50-50 with Warner Bros.[29]

2 | In contrast, other agreements have much more favorable merchandising provisions.



3 |

4 | The *Lord of the Rings* Agreement also

5 | reserves merchandising rights entirely to the licensor and handles them under a separate

6 | agreement.

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 | Other agreements where merchandising rights were reserved, such as

17 | , include a protective "Net Sales" provision wherein

18 | the licensee is only paid 50% on the *increase* in merchandising revenues from a defined

19 | period before the film is released to an equivalent period thereafter. This blocks the

20 | licensee from sharing in the "pre-existing" merchandising of the character.[30] Such

21 |

22 | merchandising properties, such as Superman and Batman, with its less-value properties, such as the Human Target, thereby foregoing the possibility of negotiating better terms for Superman alone.

23 |

24 | Furthermore, the *Iron Man* Agreement shows that DC's "outsourcing" its Superman merchandising to WBCP may be disadvantageous. Under the *Iron Man* Agreement, Marvel licenses merchandising directly and keeps a far greater share of merchandising revenues than DC does for Superman.

25 |

26 | [29]

27 |

28 |

[30] Such a provision could have benefitted DC because "film-related" Superman merchandising

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    provisions are absent from the DC's Superman agreements.

2             h.     Illusory Creative Control and Input

3        DC lacks any sort of meaningful creative control under the Superman Film

20       The *Sahara* Agreement also provides the licensor with *real* creative controls:  (a)

21   "sole and absolute" discretion over screenplay approval, with any changes in the

22   screenplay for the picture requiring express approval; (b) sole and absolute approval over

23   the screenwriters; (c) sole and absolute approval over the actors playing the two lead

24

25   often cannibalizes existing merchandising, without generating "new" revenues (*i.e.,* a Superman
     fan might buy a "*Superman Returns*" product rather than a generic "Superman" product, but

26   would have bought the latter regardless of the film).

27

28

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   roles; and (d) sole and absolute approval of the director.



32



13   cannot plausibly be considered a "fair market term."  Other agreements,

14   including those entered into by DC itself, provide for meaningful consultations and

15   approvals.

16                    i.       Representations and Warranties

17          DC failed to exclude from the warranty and indemnification provisions of the

18   Superman Film Agreement known prior rights claims, such as Plaintiffs' terminations.

19   The Superman Film Agreement is dated as of November 16, 1999 and was executed in

20   May 2002, both after Plaintiffs' termination became effective (April 1999).  Yet, Warner

21   Bros. *still* had DC warrant that it was "the sole proprietor of all rights in the Property,"

22   and that it owned Superman "free and clear of any liens, encumbrances, other third party

23   interests of any kind and free and clear of any claims or litigation, whether pending or

32

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   threatened," and DC agree to indemnify Warner Bros. for any breaches of such

2   warranties.  Thus, DC is contractually obligated to indemnify Warner Bros. for the instant

3   lawsuit even though at the time of the agreement both parties were well aware of the

4   potential for this litigation.  Accordingly, even though Plaintiffs' proper termination has

5   been upheld by the Court, Plaintiffs may be "charged" via Warner Bros.' accounting to

6   DC for Warner Bros.' legal fees, costs and even liability in this action.  This would surely

7   be inequitable.

8        In contrast, unrelated licensors with potential rights claims very carefully delimit

9   their warranties.[33]

10                    j.        Allocation Issues and "Packaging"

<br>

---

[33] In the *Lord of the Rings* Agreement, the rightsholder limited its warranties to statements that
there was "no known incompleteness" in the chain of title provided; that the documents the
rightsholder was a party to were genuine; and that it had no knowledge of any doubt as to a
document's genuineness.  Moreover, the *Lord of the Rings* Agreement's indemnification
provisions allowed the rightsholder to either conduct the defense of any claims itself, or leave
the defense to the licensee, in which case the licensor would still be consulted on "all
substantive matters."

[34]

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

This "usual practice," is a serious problem for participants dealing with vertically-integrated corporations that sell or assign "packages" to related entities, as evidenced by the large number of lawsuits filed over such allocations and related accounting issues. Tr. Exs.62-67, 123, 125-126, 163, 171, 219. *See also* Tr. Exs. 33, 59, 162, 257, 265, 275, 299. In fact, Warner Bros.' "usual practice" of dilutive "film packaging" was condemned in a recent case, *Ladd v. Warner Bros. Entertainment Inc.*, Los Angeles Superior Court Case No. BC 300043, in which Warner Bros.' current counsel, Michael Bergman, served as lead trial counsel. The *Ladd* jury found that Warner's practices breached the covenant of good faith and fair dealing implied in every contract, and that Warner Bros. had, from 1999 to 2007, systematically undervalued the license fees on twelve (12) films by a collective $97.3 million dollars, resulting in $3,190,623 in unpaid participations to the plaintiffs.

In contrast, the "riders" attached to numerous Warner Bros. agreements with third parties require that whenever Warner Bros. sells to television broadcast stations it owns it must do so on an "arm's length" basis — ███████████████████████████

███████████

k.    Accounting and Audit Provisions

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

In contrast, Warner Bros.' standard "rider," attached to its *Robotech, 300, Tarzan, Human Target, Conan,* and *Harry Potter* Agreements, has superior "audit" terms to those provided to DC. The rider provides for a 60 *business* day audit, and a thirty-six month

1   statute of limitations.  Thus, DC did not secure the "audit" provisions that Warner Bros.

2   customarily grants to third parties.

3       Other agreements provide even better terms to the rightsholder.  The *Lord of the*

4   *Rings* Agreement provides for *monthly* accountings for three years, quarterly accountings

5   for another three years after that, and then semi-annual accountings.

6

7   Such more frequent payments are obviously beneficial, as they allow

8   revenues to be realized more quickly.  The *Lord of the Rings* Agreement simply permits

9   audits to be "completed with reasonable expedition" with no fixed maximum, that audits

10  may be conducted *twice* per year; there is *no* internal statute of limitations period, and

11  audit costs are reimbursed if underpayment over $10,000 is uncovered.  The *Sahara*

12  Agreement similarly provides for audits *twice* per year, a 45-day maximum, and that

13  audit costs are reimbursed if underpayment over 5% is discovered.

14

15

16

17

18

19

20

21

22

23      1.    The Salkind Agreement Shows That the Superman Film
              Agreement Was a Non-Fair Market Deal

24      Warner Bros. will likely argue that the substantially identical economic terms of

25  the Superman Film Agreement and the third party Salkind Agreement show that the

26  Superman Film Agreement is for "fair market value."  While superficially appealing, this

27  point favors Plaintiffs.  In 1974, when the Salkind Agreement was made Warner Bros.

28  had little interest in Superman as it was at its nadir:  the George Reeves "Superman"

1  television series (1951-1958) was long gone, and the franchise had yet to be resurrected

2  by the Christopher Reeves films pursuant to the Salkind Agreement.  In fact, prior to the

3  Salkind Agreement, Superman did not have the proven track record in films that it had in

4  1999-2002 when the Superman Film Agreement was entered into.

5       Between 1989 and 1997, Warner Bros. released *four* major Batman movies.

6  Twentieth Century Fox's *X-Men* (2000) grossed $296 million at the worldwide box

7  office.  By the time the DC/Warner Superman agreements were made feature film

8  adaptations of comic book superheroes were "all the rage"; every Studio in Hollywood

9  was developing super-hero movies.  In fact, the Superman Film Agreement was quickly

10  signed on May 9, 2002, within days after the *Spider-Man* (2002) film opened with a

11  *weekend* domestic box-office gross of $114 million.   *Spider-Man* went on to gross $822

12  million at the worldwide box office.

13       The negotiating history between DC and Warner Bros., described in Section I.I.4,

14  *supra,* demonstrates that the terms of the Superman Film Agreement were not agreed to

15  because the 1974 Salkind Agreement represented current "market" value.  Instead, the

16  virtually identical provisions show an unwillingness to engage in "arm's length"

17  negotiations.  The fact that the economic terms of the Superman Film Agreement are

18  *identical* to those of the Salkind deal, despite the obvious increase in Superman's value as

19  a viable film franchise, indicates that the Superman Film Agreement was not for "fair

20  market value."

21       To the limited extent the Salkind Agreement is modified in the Superman Film

22  Agreement, *it is clearly in Warner Bros.' favor.*[35]

23                m.  <u>Summary and Chart</u>

[35] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

54

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

DC and Warner Bros. agreed to a multitude of non-fair market terms in the Superman Film Agreement, favoring Warner Bros. to DC (and Plaintiffs' detriment):

- Defendants agreed that DC was to assign all of its audiovisual rights to Warner Bros., and expressly grant Warner Bros. all rights not expressly reserved;
- Defendants agreed that DC was to accept much less in fixed compensation than third parties receive for lesser properties;
- Defendants agreed that DC was to accept a much lower gross participation than third parties receive for lesser properties;

- Defendants incredibly agreed upon an indefinitely-extendable option term for the remaining 33-year life of the Superman copyrights at the time;

- Defendants agreed that DC would warrant "clear title" to Superman and indemnify Warner Bros., after the effective date of Plaintiffs' terminations;

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    For the Court's convenience, Plaintiffs present the following chart, comparing the

2  non-market provisions in the Superman Film Agreement to those in true arm's length

3  agreements:

4

| Term | Superman Film Agreement | Lord of the Rings Agreement | Sahara Agreement | ██████ | Other Agreements |
|---|---|---|---|---|---|
| Rights Assignment | All rights not reserved, including all audiovisual rights and ancillary rights | Feature-length motion picture and ancillary rights | Feature-length motion picture and ancillary rights | ██████ | Numerous other agreements (300, Tarzan, Iron Man, G.I. Joe and Conan) are limited to theatrical motion picture rights |
| Fixed Compensation | $1.5 million | $4.75 million | $20 million | ██████ | My Fair Lady ($5.5 million); |
| Gross Participation Amount | 5% | 5% of gross starting at $40 million, escalating to 10% of gross at $60 million | 10% of gross | ██████ | My Fair Lady (47.5% of gross above $20 million); |

| Term | Superman Film Agreement | *Lord of the Rings* Agreement | *Sahara* Agreement | | Other Agreements |
|---|---|---|---|---|---|
| Entities Whose Receipts Count for Gross | | Licensee and *all* affiliated companies | Licensee and *all* affiliated companies | | |
| Video Royalty | | 40% of video rentals | 100% of video revenues | | |
| Option Length | 3 years, extendable for 30 years | 6 months, with limited extensions | Option to be exercised within 4 months of conclusion of union negotiations | | Other agreements provide for short option terms (3 to 24 moths) and short extensions |
| Reversion | | Rights revert if principal photography (p.p.) is not started within 18 months of option exercise, if film is not released within 2 years | N/A | | Most agreements contain "reversion" term, including other DC/Warner agreements. |

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

| Term | Superman Film Agreement | *Lord of the Rings Agreement* | *Sahara* Agreement | ██████ | Other Agreements |
|------|------------------------|-------------------------------|--------------------|--------|------------------|
| | | of start of p.p. with any sequels subject to the same provisions, and rights revert five years after last film. | | | ██████ |
| Merchandise | DC must pay ██████ WB 50% of net proceeds. | Reserved and subject to a separate agreement. | Included in gross receipts. | ██████ | Other agreements (██████) retain all rights. Other agreements allow licensor act as merch. licensing agent (██████). |
| Creative Control | ██████ | N/A | Author has sole approval rights over screenplay, writers, lead actors, director. | ██████ | ██████  DC's Salkind Agreement also gave it "sole and unrestricted" approval of screenplay. |
| Warranties | DC warranted it was the sole owner despite | Licensor made only very limited | N/A | ██████ | ██████ |

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

| Term | Superman Film Agreement | *Lord of the Rings Agreement* | *Sahara Agreement* | ▮ | Other Agreements |
|---|---|---|---|---|---|
| | Plaintiffs; Termination and agreed to indemnify Warner Bros. | warranties and retained controls in the event of litigation. | | ▮ | ▮ |
| Accounting Period | ▮ | Monthly | Quarterly | ▮ | Often monthly during initial 2-3 year period per Warner Bros. standard contract Rider |
| Audit Rights | ▮ | No limit on days to conduct audit, no statute of limitations, and audits may be twice a year. | 45 days to conduct audit; reimbursement if discrepancy over 5%. | ▮ | Warner Bros.' standard contract rider provides for 60 *business* days to conduct audit and 36-month statute of limitations. |

## 7. The Superman Television Agreement Was Not Negotiated At Arm's Length

Just as the Superman Film Agreement mirrored the earlier Salkind Agreement in financial terms, the Superman Television Agreement, granting exclusive live-action television rights to the Superman property, entered into between DC Comics and Warner Bros. Television Production ("WBTV"), a division of TWEC, and dated December 5, 2000, is on identical economic terms[36] to an old, September 30, 1991 agreement pertaining to the television series *Lois & Clark: The New Adventures of Superman*, entered into between DC and Lorimar Productions, then a subsidiary of TWEC (the "Lorimar Agreement"). Tr. Exs. 161, 181. There was also a previous agreement between DC and Cantharus Productions N.V., dated June 15, 1987, regarding the

---

[36] A $10,000 option fee, $45,000 per-episode royalty payable against a participation of 3% of gross revenues up to $1.5 million per episode and 5% of gross revenues above $1.5 million per episode.

59

1   syndicated live-action television series *The Adventures of Superboy* (1988-1992) (the

2   "*Superboy* Agreement") ("Tr. Ex. 15")

3       The first record of correspondence regarding the Superman television agreement

4   was an August 22, 2000 fax from Lillian Laserson, in-house counsel at DC Comics, to

5   Brett Paul, an executive at Warner Bros. Television, attaching the Lorimar Agreement

6   "as you requested." Tr. Ex. 115. Later, on December 5, 2000, a letter from Mr. Paul to

7   DC's Paul Levitz confirmed their agreement that "the same financial conditions

8   contained in that certain letter … relating to 'Lois & Clark,' shall apply to [*Smallville*]."

9   Tr. Ex. 174.

10       Shortly thereafter, on January 10, 2001, a draft of the agreement containing the key

11   economic terms found in the Lorimar Agreement was sent to Ms. Laserson. From that

12   point on, the

13

14

15

16

17

18

19

20

21       In essence, and as clearly reflected in the drafts, there were no significant

22   negotiations as to the Superman Television Agreement. Instead, the terms from the prior

23   Lorimar Agreement were simply "copied-and-pasted" into the new agreement. The few

24   changes that were made, favored Warner Bros.

25       **8.**    **The Deal Terms in the Superman Television Agreement Do Not Constitute "Fair Market Value"**

26

27       a.    The Rights Assigned

28   The Superman Television Agreement granted WBTV "an exclusive and

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   irrevocable option…to acquire from [DC] those rights set forth …in Exhibit 'A' … in

2   and to the Character." <u>Tr. Ex. 161.</u> Exhibit "A" is an assignment wherein:

3   "Detective Comics…(referred to herein as *"Assignor"*) does hereby **assign,**
    **grant, bargain, sell, transfer,** convey, and set over…*forever,* to Warner
4   Bros. Television Production…("*Assignee*") *the exclusive worldwide*
    *television production rights*…accruing in and to all literary material
5   described as follows: *All material tangible and intangible detailing the*
    *stories and adventures of the comic book character known as 'Clark Kent'*
6   *or 'Superman'* as depicted in publications and television series together
    with associated characters which have appeared (or will appear) together
7   with 'Clark Kent' or 'Superman' and all now and hereafter existing rights of
    every kind and character whatsoever therein, *and the complete,*
8   *unconditional and unencumbered title therein for all purposes*…"

9   *Id.* at 6 (emphasis added). In Paragraph 4 of the assignment, DC reserves certain rights

10  including theatrical film rights (separately assigned to Warner in the Superman Film

11  Agreement), animation rights (separately licensed to Warner in the Superman Animation

12  Agreements described *infra*) and merchandising rights (subject to the DC/WBCP

13  Agreement described *supra*). In sum, the agreement provides for WBTV's ownership of

14  all live action television rights to Superman.[37]

15      This option was exercised, and a *"Short Form Assignment"* to WBTV was

16  executed on February 12, 2001 by DC, in which DC "irrevocably sells, grants and

17  assigns" to WBTV "in perpetuity and throughout the universe, *all exclusive television*

18  *rights* in and to the literary work in the form of a comic book (the "Property") described

19  hereafter, including without limitation, all allied, ancillary and incidental rights…: Title:

20  'Superman' Author: Jerry Siegel and Joe Shuster …*including all …copyrights*

21  *therein*…."[38] <u>Tr. Ex. 161.</u> It further stated that: "Owner hereby acknowledges that

22

23  _____
    [37]
24

25

26

27  _____
    [38] DC reserved *animated* television rights. However, because of the provision in the Superman
28  Film Agreement providing that DC may only exploit Superman television rights through a
    Warner Bros. "affiliate," Warner retains control over animated television as well.

    61
    PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  Purchaser may freely assign this assignment or any of Purchaser's rights hereunder"

2  without DC's input or approval. *Id.*

3      In contrast, DC's aforementioned *Superboy* Agreement with *a third party* was

4  limited to a "license" to produce a single live action television series, and did *not* assign

5  television rights to the Superboy copyrights.

6

7

8

9

10             **b.**    <u>The Option Fee</u>

11      To DC's detriment, the Superman Television Agreement is highly favorable to

12  Warner Bros. and does not reflect the extraordinary value of the Superman franchise.

13  The option fee is a mere $10,000 for one year, extendable for an additional year for the

14  same paltry sum, and the "purchase price" is the payment of the $45,000 per-episode

15  royalty for the "pilot" episode.  Oddly, the purchase price is not payable upon exercise of

16  the option, but upon the pilot's start of principal photography.

17

18                          as it

19  did for the much more valuable Superman property, indicating that this payment does not

20  constitute "fair market value" for Superman.

21             **c.**    <u>The Per-Episode Royalty and Contingent Participation</u>

22      Under the Superman Television Agreement, DC receives a fixed royalty for a "live

23  action episodic television series" of $45,000 per episode, treated as an advance against a

24  contingent participation equal to 3% of defined receipts, escalating to 5% to the extent, if

25  any, receipts *per episode* exceed $1.5 million.

26

27

28



Notably, the contingent participation in the Superman Television Agreement is significantly less favorable to DC than its participation in the *third-party Superboy* Agreement, wherein DC was entitled to **7.5%** of *all* gross receipts, and to be paid directly by the distributor of the program. Moreover, in the Superman Film Agreement DC's contingent participation only applies to "gross revenues" "received" by "Warner Bros. Television Production, Warner Bros. Domestic Television Distribution, [or] Warner Bros. International Television Distribution," and no other other entity.  Tr. Ex. 161.  In contrast, in the *Superboy* Agreement, DC's gross participation applies more broadly to "all monies derived by Purchaser or its subsidiaries or its distributing sub-licensees, agents, and any subsidiary, or agents … from the sale, lease, rental, or distribution of the Superboy program."  Tr. Ex. 15.

The economic terms in the Superman Television Agreement are identical to those found in DC's agreement with TWEC subsidiary, Lorimar Productions, Inc., pertaining to the *Lois & Clark* series, even though that intra-corporate agreement had been entered into a decade earlier.[39]

---

[39] Inflation alone would have raised the 1991 episodic royalty of $45,000 in the 1991 Lorimar Agreement to $57,000 in 2000-2001 Superman Television Agreement; yet the royalty remained the same.

[40] Similarly, agreements for television "showrunners" (the head writer/producers) can be extremely lucrative. Because major franchises usually focus on theatrical film exploitation and are thus seldom licensed to television (which cannibalizes film revenues), much of the

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW



1

2                                                                This naturally

3  bonuses the rightsholder based on the success of the series, and would have been quite

4  significant for *Smallville*, currently in its *eighth season*.

5

6

7

8

9

10

11

12        The fact that the *Lois and Clark*,              and Superman Television

13  Agreements all share identical or near identical terms points towards the absurdity of

14  DC's cut-and-paste method of "negotiating" with its corporate "parent," as does the fact

15  that DC settled for a 3% gross participation (only potentially escalating to 5%) for

16  Superman, when DC had secured a 7.5% gross participation a few years earlier for

17  Superboy – a less valuable property.  Superman's "fair market value" in the television

18  market was thus never tested or secured by DC which merely "Xeroxed" a 10-year-old

19

20  "branding" in television relates to showrunners, as creators of highly-valued intellectual
    property.  As an example of the value placed on intellectual property in the television arena,
21  writer/creator Steven Bochco received recoupable fixed cash compensation of $45 million in a
    February 12, 1988 agreement with Twentieth-Century Fox to produce television series,
22  including *NYPD Blue* (Tr. Ex. 324). Bochco received a per-episode fee of $100,000, Fox paid
    most production expenses, and Bochco received 60% of the gross revenues after Fox had
23  recouped the money it had already paid.

24

25

26

27

28



1  intra-corporate deal with another TWEC subsidiary.

2              d.     The Video Royalty

3  The Superman Television Agreement provides

7  [41] In contrast under DC's

8  *Superboy* Agreement.

13              e.     The Merchandising Provisions

17  WBTV's 50% of merchandising

20              f.     Creative Control and Input

27  [41] For example, DC's June 30, 2008 participation statement for *Smallville* shows      in
28  (worldwide) "video cassette" gross revenues.  Because this is only    of the revenue , Warner Bros. actually realized        in revenue from this source, more than *any other source* except its "license fee" for network broadcast of the series.

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1     [REDACTED]

2         g.    No Restrictions on Deals with Related Entities

3     Under the Superman Television Agreement DC receives 3% of only WBTV's

4 defined revenues. [REDACTED]

5     [REDACTED]

6     This is a problem. Dilutive Studio self-dealing,

7 particularly with regard to television series has been much criticized, the subject of

8 numerous lawsuits (see Section I.I.6.j, Tr. Exs. 62-67, 123, 125-126) and proposed

9 California legislation.[42] Defendant Time-Warner, Inc., owns the broadcast network, the

10 WB (now the "CW," co-owned with Viacom) that broadcasts *Smallville*. Typically, in a

11 producer (WBTV)-broadcaster (WB/CW) relationship, the broadcaster pays a "licensee

12 fee" to air the program that constitutes a substantial portion of the producer's revenue.

13     [REDACTED]

14     [43] As such, DC and

15 Plaintiffs are completely at the mercy of Time-Warner and WBTV as to critical licensee

16 fees and other terms in such vertically integrated transactions.[44]

17         h.    Accounting and Audit Provisions

18     Much as in the Superman Film Agreement, [REDACTED]

19

20 [42] This legislation, called the "Fair Market Value Bill," demonstrates the growing community awareness of the danger of vertically integrated entertainment companies internally licensing rights for less than "fair market value." Tr. Exs. 163, 219. The bill, authored and introduced by California Senator Sheila Kuehl, would have prohibited companies from selling or licensing their rights for anything less than "fair market value" when third parties, such as Plaintiffs, participate in the proceeds of the sale or license. Warner Bros. opposed the bill. Tr. Ex. 280.

23 [43] [REDACTED]

24

25

26 [44] There is an obvious motivation for the WB/CW to pay below-market license fees: in launching the WB network in 1995, Time-Warner. attempted to muscle into television broadcasting. Time-Warner was/is incentivized to have its struggling new network (the WB merged with the also-struggling UPN Network in 1996 to form the "CW" network) to pay a lower license fee, and therefore show greater profit and viability.

1      [REDACTED]

2      In addition to the superior provisions described in Section

3 I.I.6.j, *supra*, other agreements provide for superior "audit" terms.  For instance, the

4 *Superboy* Agreement provides for a [REDACTED]

5

6           i.    Summary and Chart

7     DC and Warner Bros. agreed to a multitude of non-fair market terms in the

8 Superman Television Agreement, favoring Warner Bros. to DC's (and Plaintiffs')

9 detriment:

10     •  Defendants simply "Xeroxed" the old Lorimar Agreement without taking into

11       account the greatly increased value of superhero franchises;

12     •  Defendants provided a "token" option fee that was significantly smaller than in

13       DC's prior  Superman television agreements;

14     •  Defendants provided for a broad grant of all live-action television rights but

15       narrow payment terms limited to an episodic television series, meaning WBTV

16       could produce other forms of Superman live action television programming (*e.g.*,

17       Superman television "specials," "movies-of-the-week," documentaries, etc.) *for*

18       *free*;

19     •  DC's contingent compensation for Superman equals that for the far inferior DC

20       property, *Birds of Prey*, and is significantly lower than that in the prior third-party

21       series, *Superboy*;

22     [REDACTED]

23

24

25

26

27

28

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

9. **The Superman Animation Agreements Are Not For "Fair Market Value"**

   a. The Standardized Superman Animation Agreements Reflect a Lack of Arm's Length Negotiation

Since the expiration of its deals with Hanna-Barbera (a formerly independent company that produced Superman animated programming in the 1970s and 1980s) (the "Hanna-Barbera Agreement"), DC has exclusively licensed its rights to create "Superman" animated television to Warner Bros. entities at below-market rates, settling for highly unfavorable "net profits" definitions that basically ensure DC (and Plaintiffs) will never receive significant participation revenues from its valuable Superman animation rights. Tr. Exs. 50, 53, 225. Furthermore, under the November 16, 1999 Superman Film Agreement. ███████████████████████████ ████████████████████████ Finally, Warner Bros.' has consistently only licensed such animated programs for initial broadcast within the Warner Bros./Time Warner family. Tr. Exs. 46, 50, 60, 151.

The DC/Warner Bros. "Animation" Agreements in question – *Superman Animated* (September 21, 1995) (Tr. Ex. 46), *Justice League* (January 1, 2000) (Tr. Ex. 50), *Legion of Super-Pets/Krypto* (January 1, 2004) (Tr. Ex. 53), and the *Legion of Super-heroes* (June 1, 2004) (Tr. Ex. 225) (referred to individually by title, and collectively as the "Superman Animation Agreements") (Tr. Exs. 46, 50, 53, 225) – all contain substantively identical terms – indicating that the agreements were standardized and not separately negotiated.

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1

2

   **b.**   **The Superman Animation Agreements Contain Highly**
3        **Unfavorable "Defined Proceeds" Participations**

4    The "Defined Proceeds" definition in the Superman Animation Agreements

5 whittles down DC's participation to a virtual nullity. It operates by paying DC based on

6 the "net" result of artificially deflated revenues and artificially inflated expenses. It is a

7 classic example of "Hollywood accounting" and the "net profits" definition that ensure a

8 "net" participant will never receive significant money, no matter how successful the

9 project. For *Justice League, Krypto* and *Legion of Super-Heroes*, the "Defined Proceeds"

10 definition operates to reduce DC's participations as follows:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



5    Thus, under the *Justice League* agreement.

8    Because the revenues are artificially deflated, and expenses are artificially inflated, the chances of DC realizing significant revenues are remote to none from the outset.  In contrast, as to "net profits,"

In even starker contrast is *DC's* Hanna-Barbera Agreement(s), which while a "net" deal, was considerably more favorable to DC, and resulted in *actual* participation payments.  *See, e.g.,* Tr. Ex. 141.  While the Hanna-Barbera Agreement provides DC with 25% of "net profits" (versus the 30% of "Defined Proceeds" in the Superman Animation Agreements) the definition of "net profits" is much more generous.  The agreement provides that *all* monies received by the licensee, its subsidiaries, and from "all other sources in connection with all types of dealing," are included in gross revenues, with no distribution fees charged by Hanna-Barbera.  Notably, "net profits" are defined as gross receipts, less the "direct costs of production," *capped* at $92,000 per episode with no interest or expenses tacked on.

---

[46] DC did not even secure Warner's "Defined Proceeds" Rider found, for instance, in the ▮▮▮▮ which would have limited distribution expenses. Specifically, the Rider eliminates expenses for:  DVD manufacturing and distribution, prints for trailers, taxes other than on gross income; and payments to in-house counsel. Under the Rider salaries for Warner Bros. employees and facilities (*e.g.,* to use a "Warner" editing bay) are charged only at *cost to Warner,* rather than the billable rate.

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1

2

3                                         Given their invariably disadvantageous terms, the

4 Superman Animation Agreements are clearly not for "fair market value."

5 **II.   BIFURCATION OF ISSUES**

6         The February 3, 2009 trial is bifurcated from the remaining accounting trial

7 scheduled for on March 24, 2009.   Plaintiffs do not request bifurcation of the February 3,

8 2009 trial.

9 **III.   JURY TRIAL**

10         The Court previously ordered on October 6, 2008 that no right to a jury attaches to

11 Plaintiffs' "alter-ego" claim.

12 **IV.   ATTORNEYS' FEES**

13         17 U.S.C. § 505 authorizes the award of attorneys fees in actions arising under the

14 Copyright Act, stating that "the court in its discretion may allow the recovery of full costs

15 by or against any party," and that "[e]xcept as otherwise provided by this title, the court

16 may also award a reasonable attorney's fee to the prevailing party as part of the costs."

17 The criteria in awarding attorneys' fees under section 505 include frivolousness,

18 motivation, objective unreasonableness (both in the factual and the legal components of

19 the case), the need in certain situations to advance considerations of compensation and

20 deterrence, and whether an award will further the purposes of the Copyright Act. *See*

21 *Fogerty v. Fantasy, Inc.*, 94 F.3d 553, 557-58 (9th Cir. 1996).

22 **V.   ABANDONMENT OF ISSUES**

23         Plaintiffs have not abandoned any claims asserted in their Second Amended

24 Complaint.

25 DATED: January 12, 2008            TOBEROFF & ASSOCIATES, P.C.

26

27                 By _____

28                       Marc Toberoff

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Plaintiffs,
JOANNE SIEGEL and LAURA SIEGEL
LARSON

PLAINTIFFS' [REDACTED] MEMORANDUM OF CONTENTIONS OF FACT AND LAW