**EXHIBIT  1**

1  TOBEROFF & ASSOCIATES P.C.
2  Marc Toberoff (SBN 188547)
   Nicholas C. Williamson (SBN 231124)
3  2049 Century Park East, Suite 2720
   Los Angeles, California 90067
4  Telephone: (310) 246-3333
   Facsimile: (310) 24603101
5  MToberoff@ipwla.com

6  Attorneys for Plaintiffs

WEISSMANN WOLFF BERGMAN
   COLEMAN GRODIN & EVALL LLP
Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
Adam Hagen (SBN 218021)
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212
Telephone: (310) 858-7888
Fax: (310) 550-7191
mbergman@wwllp.com

FROSS ZELNICK LEHRMAN &
   ZISSU, P.C.
Roger L. Zissu (*pro hac vice*)
James D. Weinberger (*pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: (212) 813-5900
Fax: (212) 813-5901
rzissu@frosszelnick.com

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (*pro hac vice*)
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820
Fax: (845) 265-2819
pperkins@ptplaw.com

Attorneys for Defendants and
Counterclaimant

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>        Plaintiffs,<br><br>vs.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br><br>        Defendants. | Case No. SA CV 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**[PROPOSED] FINAL PRE-TRIAL CONFERENCE ORDER**<br><br>**Final Pre-Trial Conference**<br>Date:   January 26, 2009<br>Time:   11:00 a.m.<br>Place:  Courtroom 1<br><br>**Trial**<br>Date:   February 3, 2009<br>Time:   9:30 a.m.<br>Place:  Courtroom 1<br><br>[Complaint filed: October 8, 2004] |
| AND RELATED COUNTERCLAIMS | EXHIBIT __1__ |

# **TABLE OF CONTENTS**

1.  Parties ................................................................................................... 1

2.  Jurisdiction and Venue ......................................................................... 2

3.  Estimated Time of Trial ........................................................................ 2

4.  Non-Jury Trial ....................................................................................... 2

5.  Admitted Facts ...................................................................................... 2

6.  Facts Stipulated Without Prejudice to Evidentiary Objections ........... 4

7.  Claims and Defenses ............................................................................. 7

    Plaintiffs ................................................................................................ 7

    A.   Plaintiffs' Claims ......................................................................... 7

    B.   Elements of Plaintiffs' Claims .................................................... 7

    C.   Key Evidence ............................................................................... 8

         i.    DC's Close Relationship With TWEC (WBEI's
               Predecessor) ...................................................................... 8

         ii.   Negotiations Between DC and Warner Bros. for
               Superman Copyrights ........................................................ 9

         iii.  Warner Bros. Superman Film and Television
               Agreements ....................................................................... 10

    Defendants' Position ........................................................................... 12

8.  Issues to be Tried ................................................................................ 13

9.  Discovery ............................................................................................. 14

10. F.R.C.P. 26(a)(3) Disclosures ............................................................ 14

11. Witness Lists ....................................................................................... 14

12. Pending Motions .................................................................................. 15

13. Bifurcation ........................................................................................... 17

14. Conclusion ........................................................................................... 17

1    Following pretrial proceedings, pursuant to Rule 16, F.R.Civ.P. and L.R. 16, IT
2    IS ORDERED:

3        **1.    THE PARTIES ARE:**

4        Plaintiff and counterclaim defendant Joanne Siegel, an individual and plaintiff
5    and counterclaim defendant Laura Siegel Larson, an individual (collectively,
6    "Plaintiffs").

7        Defendant Warner Bros. Entertainment Inc. ("WBEI"), a corporation,
8    defendant Time Warner Inc. ("TWI"), a corporation and defendant and
9    counterclaimant DC Comics ("DC"), a general partnership (collectively,
10   "Defendants").

11       Each of these parties has been served and has appeared.  All other parties
12   named in the pleadings and not identified in the preceding paragraph are now
13   dismissed.

14       The pleadings which raise the issues are:

15           A.    Plaintiffs' Second Amended Complaint;

16           B.    Defendants' Answer and Affirmative Defenses to Plaintiffs'
17   Second Amended Complaint; and Defendants' Counterclaims against Plaintiffs.

18
19       **2.    FEDERAL JURISDICTION AND VENUE ARE INVOKED
         UPON THE FOLLOWING GROUNDS:**

20       This is a civil action seeking declaratory relief, accounting for profits and
21   related claims arising out of Plaintiffs' termination notices of prior grants of
22   copyright pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c).
23   The Court has subject matter jurisdiction over the claims set forth in Plaintiffs'
24   Second Amended Complaint pursuant to the United States Copyright Act
25   (hereinafter, the "Copyright Act"), 17 U.S.C. § 101 et al. and 28 U.S.C. §§ 1331,
26   1332, 1338(a) and (b).  This Court has supplemental jurisdiction over the related state
27   claims herein under 18 U.S.C. § 1367 in that these claims form part of the same case
28   and controversy as the federal claims herein.  This Court has personal jurisdiction

1   over the Defendants in that Defendants are regularly doing business in the State of

2   California and in this District, and because a substantial part of the relevant acts

3   complained of herein occurred in the State of California and this District.  Venue is

4   proper in the United States District Court for the Central District of California

5   pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because a substantial part of the

6   relevant acts that give rise to the claims herein below occurred in this district and

7   because Warner Bros. Entertainment Inc. has its principal place of business in this

8   district.  The facts requisite to federal jurisdiction are admitted.

9       **3.**    **ESTIMATED TIME OF TRIAL**

10      Plaintiffs estimate seven (7) trial days.

11      Defendants estimate four (4) trial days, if their motions in limine are granted.

12      **4.**    **THE TRIAL IS TO BE A NON-JURY TRIAL.**

13

14      At least fourteen (14) days prior to the trial date each party shall lodge and

15  serve by e-mail, fax, or personal delivery the findings of fact and conclusions of law

16  the party expects the Court to make upon proof at the time of trial as required by L.R.

17  52-1 and this Court.  At least seven (7) days prior to the trial date each party shall

18  lodge and serve by e-mail, fax, or personal delivery their responses to the findings of

19  fact and conclusions previously lodged by the opposing side.

20      **5.**    **THE FOLLOWING FACTS ARE ADMITTED AND REQUIRE NO PROOF:**

21

22      1.    DC Comics is in the business of creating, publishing and licensing

23  comic book stories and characters.

24      2.    The November 6, 1999 Superman Film Option/Purchase agreement

25  (Bates numbered WB004199-4231) between DC Comics and TWEC was fully

26  executed on May 9, 2002.

27      3.    The December 5, 2000 Smallville Television Agreement (Bates

28  numbered WB0135031-135051) between DC Comics and TWEC was fully executed

1  on February 12, 2001.

2      4.      The December 5, 2000 Smallville Television Agreement between DC

3  Comics and TWEC was amended by a written instrument dated September 5, 2002.

4      5.      The Batman Option Purchase Agreement dated as of May 31, 2002,

5  (Bates numbered WB004083-4120) between DC Comics and TWEC was fully

6  executed on February 3, 2004.

7      6.      Paul Levitz is the President and Publisher of DC Comics.

8      7.      Paul Levitz negotiated on behalf of DC Comics certain financial terms of

9  the Superman Option/Purchase agreement between DC Comics and TWEC dated as

10  of November 6, 1999 regarding Superman motion picture and other audiovisual rights

11  (the "Superman Film Agreement").

12      8.      Paul Levitz negotiated, on behalf of DC Comics, certain financial terms

13  of the Smallville Television Agreement between DC Comics and TWEC dated as of

14  December 5, 2000 regarding Superman television rights (the "Superman Television

15  Agreement.")

16      9.      Paul Levitz negotiated on behalf of DC Comics certain financial terms of

17  the September 5, 2002 Amendment to the Superman Television Agreement.

18      10.     The Superman Film Agreement applies to the 2006 feature motion

19  picture entitled *Superman Returns*.

20      11.     On or about May 22, 2002 Warner Bros. paid DC Comics the

21  $1,500,000 option fee pursuant to Paragraph 1(a) of the Superman Film Agreement.

22      12.     The Superman Television Agreement, as amended September 5, 2002,

23  applies to the *Smallville* television series.

24      13.     The agreement dated June 15, 1987, between DC Comics Inc. and

25  Cantharus Productions N.V. (Bates numbered WB016531-16549), applies to the

26  television series entitled *Superboy* (a.k.a *The Adventures of Superboy*) (1988-1992).

27      14.     The agreement dated September 21, 1995, between DC Comics Inc. and

28  Warner Bros. Animation (Bates numbered WB019605-19618) applies to the

3

1  animated television series entitled *Superman* (also known as *Superman: The*
2  *Animated Series*) (1996-2000).

3       15.   The agreement dated January 1, 2000, between DC Comics Inc. and
4  Warner Bros. Television Animation (Bates numbered WB019503-19526) applies to
5  the animated television series entitled *Justice League* (2001-2004).

6       16.   The agreement dated January 1, 2004, between DC Comics and Warner
7  Bros. Animation Inc. (Bates numbered WB019544-19566) applies to the animated
8  television series entitled *Krypto* (2005-2006).

9       17.   The unexecuted draft agreement dated June 1, 2004, between DC
10 Comics and Warner Bros. Animation Inc. (Bates numbered WB019575-19601)
11 applies to the animated television series entitled *Legion of Super Heroes* (2006-2008).

12 **6.   THE FOLLOWING FACTS, THOUGH STIPULATED, SHALL
       BE WITHOUT PREJUDICE TO ANY EVIDENTIARY
13     OBJECTION:**

14      18.   National Periodical Publications, Inc. ("National") is the successor in
15 interest to Detective Comics, Inc.

16      19.   In 1976, National's name was changed to DC Comics, Inc.

17      20.   In 1993, DC Comics, Inc. was dissolved and converted to a New York
18 general partnership.

19      21.   DC Comics has remained a New York general partnership from 1993
20 until the present.

21      22.   From 1993 until March 2003, the partners in DC Comics were WCI and
22 Time Warner Entertainment Company, L.P. ("TWEC").

23      23.   In 1992 Historic Time Warner Inc. formed TWEC with certain of its
24 affiliates, and third party investors.  The affiliated entities contributed various cable,
25 filmed entertainment and network programming assets to the TWEC partnership,
26 while the non-affiliated parties made substantial capital contributions in exchange for
27 limited partnership interests.

28      24.   Between 1993 and 2003 Historic Time Warner Inc. and its affiliated

4
FINAL PRE-TRIAL CONFERENCE ORDER

8

1 partners owned between approximately 70% and 75% of TWEC. During this time
2 TWEC held various cable, entertainment and network programming assets, including
3 Warner Bros., Warner Bros. Television Production, HBO and Time Warner Cable, all
4 of which were separate divisions of TWEC.

5      25.    In March 2003, Time Warner Inc. ("TWI") completed a restructuring of
6 TWEC. As a result of this restructuring, TWI acquired complete indirect ownership
7 of TWEC's filmed entertainment and network programming assets, including Warner
8 Bros., Warner Bros. Television Production, and certain other former divisions of
9 TWEC.

10      26.    EC is a direct wholly owned subsidiary of WCI.

11      27.    WCI is an indirect subsidiary of TWI.

12      28.    WBEI is a direct wholly owned subsidiary of WCI.

13      29.    In connection with the restructuring of TWEC, WCI contributed its 50%
14 interest in DC Comics to EC and TWEC distributed the assets of its content
15 businesses (i.e. the filmed entertainment and network programming assets), including
16 its partnership interest in DC Comics, to WCI.

17      30.    The partners in DC Comics are EC and WCI, each holding a one-half
18 interest in the partnership.

19      31.    The 2003 TWEC restructuring resulted in the formation of a number of
20 new corporations to hold and operate the content businesses formerly owned by
21 TWEC. These newly formed corporations included Warner Bros. Entertainment Inc.
22 ("WBEI"), which succeeded to TWEC's filmed entertainment businesses.

23      32.    WBEI is wholly owned by WCI, which is indirectly owned by TWI.

24      33.    Both DC Comics and WBEI are affiliates of TWI.

25      34.    For financial reporting purposes, DC Comics and WBEI fall within the
26 "filmed entertainment" group of TWI companies - which also includes New Line
27 Cinema Corporation and Castle Rock Entertainment - and for operating management
28 purposes DC Comics reports to its ultimate corporate parent through WBEI. (

1      35.    Because of that financial reporting structure, DC Comic's President and

2  Publisher reports to and obtains approvals from WBEI's President and Chief

3  Operating Officer before making significant acquisitions or certain financial

4  decisions or investments that are outside the scope of DC Comic's customary

5  acquisitions and investments; before implementing meaningful strategic changes; and

6  before embarking on something substantially outside DC Comic's normal course of

7  business.

8      36.    Warner Bros. began developing a Superman theatrical motion picture

9  entitled "Superman Reborn" in 1994.

10      37.    The feature film "Batman" was theatrically released in the United States

11  on June 23, 1989.

12      38.    The feature film "Batman Returns" was theatrically released in the

13  United States on June 19, 1992.

14      39.    The feature film "Batman Forever" was theatrically released in the

15  United States on June 16, 1995.

16      40.    The feature film "Batman & Robin" was theatrically released in the

17  United States on June 20, 1997.

18      41.    The feature film "The Matrix" was theatrically released in the United

19  States on March 31, 1999.

20      42.    The feature film "Harry Potter and The Sorcerer's Stone" was

21  theatrically released on November 16, 2001.

22      43.    The feature film "Lord of the Rings: Fellowship of the Ring" was

23  theatrically released on December 19, 2001.

24      44.    The feature film "Harry Potter and the Chamber of Secrets" was

25  theatrically released on November 15, 2002.

26      45.    The feature film "Lord of The Rings: The Two Towers" was theatrically

27  released on December 18, 2002.

28      46.    The feature film "The Matrix Reloaded" was theatrically released in the

1  United States on May 15, 2003.

2      47.   The feature film "The Matrix Revolutions" was theatrically released in

3  the United States on November 5, 2003.

4      48.   The feature film "Lord of the Rings: The Return of the King" was

5  theatrically released on December 17, 2003.

6      49.   The feature film "Harry Potter and the Prisoner of Azkaban" was

7  theatrically released on June 4, 2004.

8      50.   The feature film "Batman Begins" was theatrically released on June 15,

9  2005.

10     51.   The feature film "Harry Potter and the Goblet of Fire" was theatrically

11 released on November 18, 2005.

12     52.   The feature film "The Dark Knight" was theatrically released in the

13 United States on July 18, 2008.

14

15 **7.   CLAIMS AND DEFENSES TO BE PRESENTED AT TRIAL:**

16     **Plaintiffs:**

17

18     **A.   Plaintiffs plan to purse the following claims against
       Defendants at this phase of trial:**

19

20     Claim 1:  Declaratory Relief (Plaintiffs are entitled to an accounting of profits

21 by WBEI from Superman copyright interests co-owned by WBEI and Plaintiffs, not

22 DC and Plaintiffs.  It would also be inequitable to permit Defendants to dilute

23 Plaintiffs' profits through *non-arm's length* affiliated transactions that favor WBEI to

24 the detriment of Plaintiffs.)

25     **B.   The elements required to establish Plaintiffs' claims are:**

26 Declaratory Relief:

27 1)    An actual controversy exists between the parties;

28 2)    The controversy extends to the rights and duties of the parties with

7

1   respect to Defendants' accounting of profits from the Superman copyright interest

2   recaptured by Plaintiffs' pursuant to 17 U.S.C. § 304(c) ("Recaptured Copyrights");

3       3)    A judicial declaration is necessary to determine Plaintiffs' rights to an

4   accounting by Warner Bros. Entertainment Inc. and other Time Warner Inc. entities

5   for their exploitation of the Recaptured Copyrights.

6       *See* 28 U.S.C. §2201(a).

7       4)    Pursuant to the Court's March 28 and October 6, 2008 orders, Plaintiffs

8   are to prove the following ultimate facts:

9           a)    At the time DC negotiated the relevant agreements for Superman

10   copyright interests with Warner Bros. it was "closely related" to Warner Bros.

11           b)    The deal terms of such agreements, resulting from DC and Warner

12   Bros. intra-corporate relationship, do not constitute "fair market value" for the

13   valuable Superman copyright interests conveyed.

14

15           **C.**    **In brief, the key evidence Plaintiffs rely on for this claim is:**

16               **i.**    **DC's Close Relationship With TWEC (WBEI's Predecessor)**

17

18       1.    At the time DC negotiated the relevant Superman agreements with

19   TWEC, DC was "closely related" to TWEC.  Defendants have admitted that DC was

20   co-owned by TWEC at the time it entered both the November 6, 1999 Superman Film

21   Option/Purchase agreement ("Superman Film Agreement") and the December 5,

22   2000 Smallville Television Agreement ("Superman Television Agreement") with this

23   entity.

24       Key Evidence:   Testimony of Janice Cannon and Julie Spencer. Trial

25   Exhibits ("Tr. Ex") 124, 127, 304.

26       2.    Defendants have admitted the corporate history and ownership of DC,

27   which establishes that DC has been a Warner Bros. affiliate since at least 1973.

28       Key Evidence: Testimony of Paul Levitz. Tr. Ex. 129.

3.      Defendants have admitted that, at all relevant times, both DC and the Warner Bros. studio were part of Time Warner Inc. ("TWI"), that TWEC was the corporate parent of WBEI, as well as both one of the two partners of the DC partnership, and the owner of the second partner, EC Publications, Inc.

Key Evidence:  Testimony of Janice Cannon, Julie Spencer and Paul Levitz. Tr. Exs. 124, 127, 129, 304.

4.      Defendants have admitted that DC's President and Publisher "report[s] to and obtain[s] approvals from WBEI's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC's normal course of business. "

Key Evidence:  Testimony of Paul Levitz. Tr. Ex. 129.

5.      Defendants have admitted that, for financial reporting purposes, DC and WBEI both fall within TWI's "Filmed Entertainment Group" – which also includes New Line Cinema Corporation and Castle Rock Entertainment – and for operating management purposes DC reports to WBEI, which, in turn, reports to TWI.

Key Evidence:  Testimony of Janice Cannon, Julie Spencer and Paul Levitz.  Tr. Exs. 124, 127, 129.

ii.      **Negotiations between DC and Warner Bros. for Superman Copyrights**

6.      The negotiations between Warner Bros. and DC of the Superman Film Agreement were cursory and non-arm's length.

Key Evidence:  Testimony of Paul Levitz, John Schulman, Marsha Todd, Jay Kogan, Wayne Lewellen, Steven Sills. Tr. Exs. 25-29, 40, 41 70, 73, 136, 152-157, 173, 203, 204, 232, 247-252.

7.      DC must transact with Warner Bros. regarding DC's key characters. The film and television rights to DC's major characters invariably are assigned or

1   licensed to Warner Bros. DC is only permitted to deal with third-parties when

2   Warner Bros. clearly has no interest in a property.

3           <u>Key Evidence:</u>  Testimony of Gregory Noveck, Paul Levitz, John

4   Schulman.  Tr. Exs. 78, 93-108, 144, 186-187, 189-191, 228, 239, 272, 273, 276, 278,

5   279, 306.

6       8.     The Superman agreements were primarily negotiated by long term

7   friends and associates Paul Levitz for DC and John Schulman for Warner in a casual

8   uneven fashion well outside of industry norms.  Such agreements are generally

9   worked out by Studio business and legal affairs executives, on the one hand, with an

10  entertainment law firm specializing in complex industry transactions, on the other.

11          <u>Key Evidence:</u>  Testimony of Wayne Lewellen, Paul Levitz, John

12  Schulman.  Tr. Exs. 27-29, 153-155, 157, 173, 232, 248, 249, 253.

13         **iii.**    <u>**Warner Bros. Superman Film and Television Agreements**</u>

14

15      9.     Superman is a unique, extremely valuable "evergreen" intellectual

16  property.  It is the basis for a long-running major merchandising "brand," highly

17  successful publishing line, and *several* successful television series and films over

18  seven decades.  As such, Superman is one of the most valuable, branded

19  entertainment franchises in existence.

20          <u>Key Evidence:</u>  Testimony of Marc Evanier, James Steranko,Wayne

21  Lewellen, Paul Levitz, Gregory Noveck.  Tr. Exs. 29, 114, 147, 183, 228, 233, 278,

22  279, 293.

23      10.    The terms of the Superman Film Agreement, Superman Television

24  Agreement and Superman Animation Agreements do not constitute "fair market

25  value."  The "market value" of a unique property like Superman is subjective and

26  therefore determined on the competitive open market.  DC did not offer valuable

27  Superman rights to Warner Bros.' competitors – the other major Studios – it solely

28  dealt with Warner Bros.

14

1      Key Evidence:  Testimony of Wayne Lewellen, Marc Evanier, Paul
2  Levitz, John Schulman. Tr. Exs. 78, 93-108, 144, 161, 186-187, 189-191, 228, 232,
3  239, 272, 273, 276, 278, 279, 306.

4      11.   The basic deal terms of the Superman Film Agreement were merely
5  imported from an old 1974 agreement, entered into when Superman was at a historic
6  low.  DC suggested very limited changes, but the few changes that were made
7  favored Warner Bros.

8      Key Evidence:  Testimony of Mark Evanier, James Steranko, Paul
9  Levitz, John Schulman, Marsha Todd, Jay Kogan, Wayne Lewellen. Tr. Exs. 25-29,
10  40, 41 70, 73, 136, 152-157, 173, 203, 204, 232, 247-253.

11      12.   The basic deal terms of the Superman Television Agreement were
12  merely imported from an old 1991 agreement between DC and its affiliate, Lorimar
13  Productions (a division of Time Warner Entertainment Company, L.P.), when
14  Superman was less valuable, underlying the *Lois and Clark* television series.  DC
15  suggested very limited changes, but the few changes made favored Warner Bros.

16      Key Evidence:  Testimony of Mark Evanier, James Steranko, Paul
17  Levitz, John Schulman, Marsha Todd, Jay Kogan, Wayne Lewellen. Tr. Exs. 51, 72,
18  115, 159-161, 172, 174-177, 179, 181, 198, 200, 223.

19      13.   The terms of the Superman Film Agreement, Superman Television
20  Agreement and Superman Animation Agreements strongly favor Warner Bros. to the
21  detriment of DC, and are often onerous.

22      Key Evidence:  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel,
23  Mike Edwards.  Tr. Exs. 37, 48, 50, 53, 54, 121, 128, 141, 161, 179, 181, 186, 201,
24  218, 225, 232, 294-296, 300, 306-308, 315, 319, 321, 324, 325-327, 1037, 1038,
25  1083-86, 1092-1094, 1097, 1099, 1100, 1101, 1103-1108.

26      14.   The financial and other terms of the Superman Film Agreement,
27  Superman Television Agreement and Superman Animation Agreements are less
28  favorable to the rightsholder than comparable terms of option/purchase agreements

1  for intellectual properties that were far less successful than Superman at the time such
2  agreements were entered into.

3      <u>Key Evidence:</u>  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel,
4  Mike Edwards. Tr. Exs. 37, 48, 50, 53, 54, 121, 128, 141, 161, 179, 181, 186, 201,
5  218, 225, 232, 294-296, 300, 306-308, 315, 319, 321, 324, 325-327, 1037, 1038,
6  1083-86, 1092-1094, 1097, 1099, 1100, 1101, 1103-1108.

7      15.   The Superman Film Agreement, Superman Television Agreement and
8  Superman Animation Agreements omit terms that are commonplace in underlying
9  rights agreements and favor and/or protect the rightsholder.

10      <u>Key Evidence:</u>  Testimony of Wayne Lewellen, Steven Sills, Ari Emanuel. Tr.
11  Exs. 37, 48, 50, 53, 54, 121, 128, 141, 161, 179, 181, 186, 201, 218, 225, 232, 294-
12  296, 300, 306-308, 315, 319, 321, 324, 325-327, 1037, 1038, 1083-86, 1092-1094,
13  1097, 1099, 1100, 1101, 1103-1108.

14      **Defendants' Position re Plaintiffs' Claim:**

15      It is Defendants' position that the only claim that is to tried in this phase of the
16  trial is as follows:

17      That one or more of the agreements between WBEI and DC for the post April
18      16, 1999 exploitation of the "Superman" property is a "sweetheart deal" to the
19      detriment of DC; that is, one or more of such agreements provides for
20      compensation to DC that was below fair market value at the time the
21      agreement(s) was entered into.

22      The elements required to establish Plaintiffs' claim, as to each challenged
23  agreement, are as follows:

24      a.   That DC licensed to WBEI rights to exploit the "Superman"
25         property for a less than market fee at the time the deal was entered
26         into; and

27      b.   That the below market license resulted in damage to Plaintiffs in
28         the form of a calculable reduction in the profits of DC in which

1                    Plaintiffs are potentially entitled to share.

2          *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1144-45

3  (C.D. Cal. 2008) ("*Siegel II*").

4          Defendants object to the characterization of the purported "facts" preceding the

5  "key evidence" in support of Plaintiffs' claim as set forth by Plaintiffs above.

6  Defendants' key evidence in opposition to Plaintiffs' claim is set forth in Defendants'

7  Memorandum of Contentions of Fact and Law.  That evidence will establish that each

8  of the relevant agreements between DC and WBEI for the exploitation of the

9  Superman property was well within or above the range of fair market value at the

10  time it was entered into, and was not to the detriment of DC, and accordingly does

11  not constitute a "sweetheart deal."

12  **DEFENDANTS:**

13          Defendants will not be asserting any affirmative defenses or counterclaims

14  in this phase of the trial.

15

16  **8.    IN VIEW OF THE ADMITTED FACTS AND THE ELEMENTS REQUIRED TO ESTABLISH THE CLAIMS AND**

17  **COUNTERCLAIMS THE FOLLOWING ISSUES REMAIN TO BE TRIED:**

18  Plaintiffs contend the following issues remain to be tried:

19

20     1.    As Warner Bros. and Plaintiffs (not DC and Plaintiffs) *co-own* divisible

21  Superman film and television rights in and to the Recaptured Copyrights should not

22  Warner Bros. and Plaintiffs account to each other for their exploitation of the

23  copyright rights they co-own?

24     2.    At the time DC negotiated the relevant agreements for Superman

25  copyright interests with Warner Bros. was DC "closely related" to Warner Bros.?

26     3.    Do the deal terms of such agreements, resulting from DC and Warner

27  Bros. intra-corporate relationship constitute "fair market value" for the Superman

28  copyright interests conveyed?

          Defendants contend that the following issue remains to be tried in the instant

trial:

1.　　As to each agreement challenged by Plaintiffs, did DC license to Warner Bros. rights to exploit the "Superman" property for a less than market fee at the time the deal was entered into, and, if so, did such below market license result in damage to Plaintiffs in the form of a calculable reduction in the profits of DC in which Plaintiffs are entitled to share?

## 9.    DISCOVERY

<u>Plaintiffs' Position</u>:  Discovery regarding this first phase of trial is incomplete. Defendants' failure to fully supplement their production relevant to trial, pursuant to Fed. R. Civ. P. 26(e), is the subject of Plaintiffs' motion to compel filed in the form of a Joint Stipulation on December 30, 2008.  The motion is scheduled to be heard on January 14, 2009.

<u>Defendants' Position</u>:  Discovery regarding this first phase of the trial is complete. *See also* Section 12, *infra*.

## 10.    ALL DISCLOSURES UNDER FED.R.CIV.P. 26(A)(3) HAVE BEEN MADE

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6-1.  Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits objected to in the parties' Joint Exhibit Stipulation filed concurrently herewith.

## 11.    WITNESS LISTS OF THE PARTIES HAVE BEEN FILED WITH THE COURT

Only the witnesses identified in the parties' joint witness list will be permitted to testify (other than solely for impeachment).

Neither party is intending to present evidence by way of deposition testimony (other than for cross-examination or impeachment).

**12.   THE FOLLOWING LAW AND MOTION MATTERS AND MOTIONS *IN LIMINE*, AND NO OTHERS, ARE PENDING OR CONTEMPLATED:**

**Plaintiffs have moved *in limine* as follows:**

1)   Plaintiffs have moved to preclude Defendants from introducing evidence that Warner Bros. purportedly paid DC "fair market value" for Warner Bros. purchase of DC's Superman "audiovisual," motion picture and television rights on the basis that such evidence is moot and irrelevant with respect to such Superman copyright interests as are now *co-owned* by Warner Bros. and Plaintiffs, not DC and Plaintiffs.

2)   Plaintiffs have moved to preclude Defendants from introducing into evidence documents and agreements produced for the first time at the parties' L.R. 16-2 Meeting of Counsel because Defendants failed to comply with their discovery obligations pursuant to Fed. R. Civ. P. 26.  Defendants were required to supplement their Rule 26(a) disclosures as well as their document production by November 21, 2008 pursuant to written agreement of the parties, but willfully failed to do so.  Plaintiffs have also moved (a) to preclude Defendants' percipient witnesses from testifying regarding agreements they did not negotiate, draft and/or directly participate in and which were not produced prior to the agreed November 21, 2008 deadline; and (b) to preclude Defendants' non-expert witnesses from offering lay opinions about the purported "fairness" of the Superman agreements between DC and Warner Bros.

3)   Plaintiffs have moved to preclude Defendants' experts, William Immerman and Richard Marks from testifying on the grounds that, with regard to the issues to be tried on February 3, 2009, the mere conclusory opinions expressed in their expert reports and deposition testimony are not supported by sufficient facts or data and/or by any reliable or even discernable methodology.

4)   Plaintiffs have moved to preclude Defendants from introducing irrelevant, prejudicial and/or inadmissible documents at trial, including evidence of

1   agreements regarding intellectual properties that were not of Superman's stature as a

2   longstanding "franchise" property at the time the agreements were entered into.

3   **Defendants have moved *in limine* as follows:**

4   Defendants have filed four motions in limine to exclude certain of Plaintiffs'

5   proposed evidence:

6   1)   Defendants' first motion in limine is to limit the scope of the trial,

7   and the evidence introduced, to the issue of whether and to what extent any relevant

8   agreement between DC and WBEI constitutes a "sweetheart deal" such that DC

9   received less than fair market value for the license, and to exclude any evidence

10   related to the traditional alter ego elements or any other matters.

11   2)   Defendants' second motion in limine is to exclude the testimony

12   of certain witnesses, including senior corporate officers of Defendants (*i.e.* "apex"

13   witnesses), none of whom were identified in Plaintiffs' Rule 26 disclosures or were

14   deposed; and certain of Plaintiffs' "expert" witnesses who have no expertise on the

15   issues to be tried in this phase of the trial.

16   3)   Defendants' third motion in limine is to exclude a number of

17   Plaintiffs' proposed exhibits as being irrelevant to the issues to be tried in this phase

18   of the trial.

19   4)   Defendants' fourth motion in limine is to exclude any of

20   Plaintiffs' exhibits first identified and produced after the exchange of the parties'

21   Rule 16 exhibit lists on December 3, 2008, and any documents obtained by Plaintiffs

22   through improper document subpoenas served on third parties on December 22 and

23   23, 2008, in violation of the discovery cut off, and over two years after discovery

24   closed.

25   Additionally, even after the deadline to file motions in limine passed,

26   Plaintiffs have continued to conduct discovery and supplement their document

27   production with additional materials not produced or requested by Plaintiffs during

28   discovery, which they intend to use at trial.  Defendants will object to any use of such

16
FINAL PRE-TRIAL CONFERENCE ORDER

1   late-produced materials as they are introduced at trial.

2   **13.   BIFURCATION OF THE FOLLOWING ISSUES FOR TRIAL IS ORDERED:**

3   Pursuant to the Court's March 26, 2008 order granting in part and

4   denying in part the parties' respective motions for partial summary judgment, the

5   Court reserved for trial Plaintiffs' "accounting" claims arising out of their

6   termination of certain rights under copyright in literary work(s) including Superman

7   pursuant to 17 U.S.C. 304(c), including Plaintiffs' claim that Warner Bros.' profits

8   from the exploitation of certain Superman copyright interests should be included in

9   this calculation.  On October 6, 2008, the Court bifurcated these claims, with the

10  determination of whether Plaintiffs are entitled to share in Warner Bros.' profits to be

11  tried first on January 20, 2009.  The remaining accounting issues are set to be tried on

12  March 24, 2009.  On December 18, 2008, the Court continued the first trial until

13  February 3, 2009 and kept the second trial on its originally scheduled date of March

14  24, 2009.

15  **14.   CONCLUSION**

16  The foregoing admissions having been made by the parties, and the

17  parties having specified the foregoing issues remaining to be litigated, this Final

18  Pretrial Conference Order shall supersede the relevant pleadings relevant to the first

19  phase of trial on February 3, 2009 and govern the course of such trial, unless

20  modified to prevent manifest injustice.

21

22  Dated: January __, 2009

23

24  _____

25  UNITED STATES DISTRICT COURT JUDGE

26

27

28

17
FINAL PRE-TRIAL CONFERENCE ORDER

21

1  Approved as to form and content:

2  DATED: January 12, 2009          TOBEROFF & ASSOCIATES, P.C.

3

4                                   By _____

5                                            Marc Toberoff

6                                   Attorneys for Plaintiffs,
                                     JOANNE SIEGEL and LAURA SIEGEL
7                                   LARSON

8  DATED:  January 12, 2009

9                                   WEISSMANN WOLFF BERGMAN
                                        COLEMAN GRODIN & EVALL LLP
10

11                                  -and-

12                                  FROSS ZELNICK LEHRMAN & ZISSU, P.C.

13                                  -and-

14

15                                  PERKINS LAW OFFICE, P.C.

16

17                                  By: _____

18                                         Michael Bergman

19

20                                  Attorneys for Defendants and Counterclaimant

21

22

23

24

25

26

27

28

**18**
FINAL PRE-TRIAL CONFERENCE ORDER

**EXHIBIT 2**

ORIGINAL SHIPPED   NOV 0 9 2006

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA      )
SIEGEL LARSON,               )
                             )
          Plaintiffs,        )
                             )
     vs.                     )        No. 04-8400 (RSWL) (RZx)
                             )
WARNER BROS. ENTERTAINMENT )          -and-
INC., et al.,                )
                             )        No. 04-8776 (RSWL) (RZx)
          Defendants.        )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF ARIEL Z. EMANUEL

Beverly Hills, California

Thursday, November 2, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

EXHIBIT 2

1            Deposition of ARIEL Z. EMANUEL, taken

2       on behalf of Defendants and Counterclaimants,

3       at 9665 Wilshire Boulevard, 9th Floor, Beverly

4       Hills, California, beginning at 3:08 PM on

5       Thursday, November 2, 2006, before DAVID S.

6       COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs:

12          LAW OFFICES OF MARC TOBEROFF
            BY:   MARC TOBEROFF
13          Attorney at Law
            2049 Century Park East, Suite 2720
14          Los Angeles, California 90067
            310-246-3333
15

16

17   For Defendants and Counterclaimant:

18          WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
            BY:   MICHAEL BERGMAN
19                ADAM HAGEN
            Attorneys at Law
20          9665 Wilshire Boulevard, 9th Floor
            Beverly Hills, California 90212
21          310-858-7888
            mbergman@wwllp.com

22

23

24

25

                                                         2

```
 1   APPEARANCES (Continued):

 2

 3   For the Witness:

 4        ALSCHULER GROSSMAN STEIN & KAHAN
          BY:  MICHAEL J. PLONSKER
 5        1620 26th Street, 4th Floor - North Tower
          Santa Monica, California 90404-4060
 6        310-907-1000

 7

 8   ALSO PRESENT:  TOM McGUIRE

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2

 3

 4   WITNESS                EXAMINATION        PAGE

 5   ARIEL Z. EMANUEL

 6                          BY MR. BERGMAN     6

 7

 8

 9                          EXHIBITS

10   DEPOSITION                               PAGE

11   1    Subpoena to Ariel Emanual dated     13
          October 5, 2006, and attached
12        documents

13   2    Letter from Michael Plonsker to     14
          Michael Bergman dated October 30,
14        2006, and attached documents

15   3    Fax from Marc Toberoff to Ariel Z.  19
          Emanuel dated 6-3-02
16

17   4    Document from Marc Toberoff and Ariel  56
          Emanual to Joanne Siegel and Laura
18        Siegel Larson dated as of October 3,
          2002

19   5    Letter from Marc Toberoff to Joanne  60
          Siegel and Laura Siegel Larson dated
20        January 21, 2002

21   6    Letter from Ariel Emanuel to Bruce   70
          Rosenblum, undated
22

23   7    Document Bates No. EN00142          79

24   8    Letter from Marc Toberoff to Tom     80
          McGuire dated August 17, 2004
25
```

                                                          4

INDEX (Continued):

UNANSWERED QUESTIONS

| Page | Line |
|------|------|
| 9 | 12 |
| 11 | 18 |
| 23 | 18 |
| 27 | 8 |
| 29 | 6 |
| 32 | 3 |
| 33 | 8 |
| 35 | 7, 17 |
| 37 | 2, 20 |
| 38 | 17 |
| 39 | 11, 19 |
| 44 | 6 |
| 48 | 13 |
| 52 | 4, 8 |
| 69 | 11 |

5

1        Beverly Hills, California, Thursday, November 2, 2006

2                           3:08 PM

3

4                      ARIEL Z. EMANUAL,

5            having been first administered an oath,

6            was examined and testified as follows:

7

8                        EXAMINATION

9    BY MR. BERGMAN:

03:08 10       Q    Would you state your full name for the record,

03:08 11   please.

03:08 12       A    **Ariel Zev Emanuel.**

03:08 13       Q    Mr. Emanuel, have you had your deposition taken

03:08 14   before?

03:08 15       A    **Yes.**

03:08 16       Q    On how many occasions, approximately?

03:08 17       A    **I don't recall.**

03:08 18       Q    A number of them?

03:08 19       A    **I don't know how many.**

03:08 20       Q    Okay.  Let me just emphasize a few points.

03:09 21            I, of course, am here representing the DC

03:09 22   parties who are defendants and counterclaimants in this

03:09 23   action brought by Joanne and Laura Siegel.  I'll be

03:09 24   asking you questions, the reporter will take down

03:09 25   everything that is said verbatim and, at the conclusion

6

03:09 1    of the deposition, will prepare it in typewritten form,

03:09 2    submit a copy to you for any corrections that you may

03:09 3    have and your signature.

03:09 4           You have been placed under oath.  Your testimony

03:09 5    carries with it the same force and solemnity of testimony

03:09 6    given in open court.  For that reason, please listen

03:09 7    carefully to my questions.  Don't answer a question

03:09 8    unless you understand it.  If you want me to repeat a

03:09 9    question or rephrase it, just say so.

03:0910           Okay?

03:0911      **A**   **Yes.**

03:0912      Q   Do you understand?

03:0913      **A**   **Yes.**

03:0914      Q   Okay.  By whom are you employed and in what

03:0915    capacity?

03:0916      **A**   **Endeavor.  I'm self-employed.**

03:1017      Q   You are a theatrical agent?

03:1018      **A**   **I'm a talent agent.**

03:1019      Q   Okay.  And how long have you been a talent

03:1020    agent?

03:1021      **A**   **Approximately 15 years.**

03:1022      Q   Have you had any discussions with Marc Toberoff

03:1023    today?

03:1024      **A**   **No.**

03:1025      Q   What discussions, if any, have you had with

03:10 1    Mr. Toberoff concerning this action since the action was

03:10 2    filed approximately two years ago?

03:10 3         MR. PLONSKER:  Can we ask a yes or no question

03:10 4    first, because there may be privilege issues, and I just

03:10 5    want to make sure that we cover that?

03:10 6         MR. BERGMAN:  Sure.

03:10 7    Q    Have you had any conversations with Marc

03:10 8    Toberoff concerning any aspect of this case since it was

03:10 9    filed approximately two years ago?

03:1110    **A    Yes.**

03:1111    Q    Okay.  On how many occasions have you discussed

03:1112    this matter with Mr. Toberoff?

03:1113    **A    Can I ask?  I don't know what falls under**

03:1114    **client -- what the lawyer --**

03:1115         MR. PLONSKER:  He is asking you just how many

03:1116    times.  When he asks the substance, then I'll object if

03:1117    it's appropriate, but right now he is just laying a

03:1118    foundation, so you can answer how many times if you

03:1119    recall.

03:1120         THE WITNESS:  Maybe once or twice.

03:1121    BY MR. BERGMAN:

03:1122    Q    Okay.  Can you separate those -- if there were

03:1123    two conversations, can you separate one from the other?

03:1124    **A    I don't know when the first one happened.  The**

03:1125    **second one happened recently.  I don't remember.**

8

03:11 1      Q   Okay.  Can you tell me what do you recall being

03:11 2   said by you and Mr. Toberoff during the first

03:12 3   conversation?

03:12 4           MR. PLONSKER:  All right.  I need to object.  To

03:12 5   the extent that it relates to IP Worldwide business or

03:12 6   former business, then I'm going to instruct you not to

03:12 7   answer on the grounds of the attorney-client privilege.

03:12 8   To the extent that it's unrelated to that business, then

03:12 9   you can respond.  And if you can't make a distinction,

03:1210   then I'm going to have to instruct you not to answer the

03:1211   whole thing.

03:1212           (Instruction not to answer.)

03:1213           THE WITNESS:  I don't really recall, so I can't

03:1214   really make the distinction, so I'm not going to answer.

03:1215           MR. BERGMAN:  Okay.  May I ask, Mr. Plonsker,

03:1216   what the basis of the attorney-client privilege is?

03:1217           MR. PLONSKER:  Mr. Toberoff was general counsel

03:1218   for IP Worldwide, LLP, I think it was, or --

03:1219           MR. TOBEROFF:  LLC.

03:1220           MR. PLONSKER:  -- LLC, and Mr. Emanuel was a

03:1221   member, so when they were dealing with IP Worldwide, LLC

03:1222   business, it would be privileged because of the attorney-

03:1223   client relationship.

03:1224           MR. BERGMAN:  We're going to have a problem with

03:1225   that.

9

03:12 1          MR. PLONSKER:  Okay.

03:13 2          MR. BERGMAN:  And the problem, of course, is

03:13 3  that Mr. Toberoff and Mr. Emanuel were joint venturers.

03:13 4  They were in business together.  There is no indication

03:13 5  that there was an attorney-client relationship as opposed

03:13 6  to two entrepreneurs engaged in a joint venture.

03:13 7          MR. PLONSKER:  Okay, I understand your position.

03:13 8  We will just have to deal with it, but I need to protect

03:13 9  the privilege, and then we will have to figure out what

03:13 10  position IP Worldwide, LLC is going to take.

03:13 11          MR. BERGMAN:  Okay.

03:13 12          Mr. Toberoff, do you care to say what position

03:13 13  IPW, IP Worldwide, LLC is going to take?

03:13 14          MR. TOBEROFF:  I'm not here to testify.  They've

03:13 15  asserted the privilege.

03:13 16          MR. BERGMAN:  Okay.  I don't want to engage in

03:13 17  colloquy, but we will, of course, challenge the assertion

03:13 18  of that privilege and, if we prevail, bring Mr. Emanuel

03:13 19  back.

03:13 20          MR. PLONSKER:  Understood.

03:13 21          MR. BERGMAN:  Okay.

03:14 22          MR. TOBEROFF:  We should clarify for the record

03:14 23  when people use the term "IPW," they are referring to IP

03:14 24  Worldwide, LLC.

03:14 25          MR. PLONSKER:  That's the entity that I was

10

03:14 1    referring to.

03:14 2          MR. TOBEROFF:  Just to be clear.

03:14 3          MR. BERGMAN:  Very well.

03:14 4          MR. PLONSKER:  Okay.

03:14 5    BY MR. BERGMAN:

03:14 6      Q   Mr. Emanuel, in the first conversation that I

03:14 7    asked you about that you had with Mr. Toberoff, was he

03:14 8    giving you legal advice?

03:14 9      **A**   **I don't recall.**

03:1410      Q   Would you tell me then what was said in that

03:1411    first conversation by you and Mr. Toberoff?

03:1412          MR. PLONSKER:  I am going to have to object on

03:1413    the same grounds and instruct him not to answer until I

03:1414    know what was discussed, and if you would like me to go

03:1415    off the record and speak to the witness, I can do that,

03:1416    but I can't let him testify to the extent that it might

03:1417    be attorney-client communications.

03:1418          (Instruction not to answer.)

03:1419          MR. BERGMAN:  The choice is yours.  It might be

03:1420    easier.  We can save another trip --

03:1421          MR. PLONSKER:  Maybe do it during a break if

03:1422    you'd like.  It's your deposition.  Whatever you'd like

03:1423    me to do.

03:1424          MR. BERGMAN:  Okay.  Well, we are going to be

03:1525    dealing with this a great deal during the course of the

11

03:15 1     deposition.  Perhaps you and he should discuss it.

03:15 2            (Discussion off the record.)

03:15 3            MR. PLONSKER:  So you can tell him that.

03:15 4            THE WITNESS:  Let me check.

03:15 5            MR. PLONSKER:  You can say what you just said to

03:15 6     me in different words.

03:15 7            THE WITNESS:  I actually don't remember any of

03:15 8     the conversations, so it's not like you're gonna ask me

03:15 9     something and I'm going to recall you something.  You

03:1510     just asked me something.  I'm trying to recall it, and I

03:1511     don't recall any of the conversations.  So I'm not trying

03:1512     to -- I mean I don't know what --

03:1513            MR. PLONSKER:  That's okay.  You've answered.

03:1514     So it becomes irrelevant, because you can't recall.

03:1515     BY MR. BERGMAN:

03:1516        Q    What was discussed between you and Mr. Toberoff

03:1517     with respect to this lawsuit in the second conversation

03:1518     that you had with him?

03:1519            MR. PLONSKER:  Let me ask you, do you recall

03:1520     what was discussed during that conversation?

03:1521            THE WITNESS:  Only that Warner Bros. was

03:1522     coming -- you know, going to engage in some sort of

03:1623     lawsuit to try and figure out what was going on.

03:1624     BY MR. BERGMAN:

03:1625        Q    And do you recall anything else about that

                                                              12

03:16 1    conversation?

03:16 2         MR. TOBEROFF:  I would just like to make sure,

03:16 3    because we had this in another deposition, where we have

03:16 4    to make absolutely sure that if you're asserting the

03:16 5    privilege and then you are discussing it, that you are

03:16 6    not waiving the privilege.

03:16 7         MR. PLONSKER:  Can we agree -- I am letting him

03:16 8    answer because it seems like there is not much substance

03:16 9    that he remembers, but I want to make sure there is no

03:1610    waiver by me letting him respond.

03:1611         Is that acceptable?

03:1612         MR. BERGMAN:  I will stipulate that any

03:1613    responses regarding conversations with Mr. Toberoff will

03:1614    not constitute a waiver of any privilege.

03:1615         MR. PLONSKER:  Thank you.

03:1616         MR. BERGMAN:  Would the reporter mark as Exhibit

03:1617    1 a copy of the subpoena that was served upon

03:1618    Mr. Emanuel?

03:1619         (Deposition Exhibit 1 marked.)

03:1720         MR. PLONSKER:  Just so we're clear, you're

03:1721    taking his deposition today both individually and as the

03:1722    designee of Endeavor, because there were two subpoenas

03:1723    that were served?

03:1724         MR. BERGMAN:  That is correct, and so that

03:1725    Mr. Emanuel will be the witness representing Endeavor as

13

03:17 1    well.

03:17 2            MR. PLONSKER:   Yes.

03:17 3            MR. BERGMAN:   So we can do it all in one

03:17 4    deposition.

03:17 5            MR. PLONSKER:   Please.

03:17 6    BY MR. BERGMAN:

03:17 7        Q    Mr. Emanuel, did you look at the subpoena which

03:17 8    was served upon you?

03:17 9        **A    No.**

03:1710        Q    Did you have anyone go through the subpoena and

03:1711    determine what documents you had that were responsive to

03:1712    the subpoena?

03:1713        **A    It went to Tom McGuire.**

03:1714        Q    And to your knowledge did Mr. McGuire collect

03:1715    all of the documents that you had that were responsive to

03:1716    the subpoena?

03:1717        **A    You should ask Mr. McGuire.   I have no idea.**

03:1718        Q    Okay.

03:1819        **A    I don't want to assume anything.**

03:1820        Q    Okay.

03:1821            Would the reporter mark as Exhibit 2 a series of

03:1822    documents, the top sheet being an October 30, 2006 letter

03:1823    from Mr. Plonsker, a two-page privilege log, and

03:1824    documents which have been Bates stamped EN 1 through 142.

03:1825            (Deposition Exhibit 2 marked.)

                                                              14

03:18 1    BY MR. BERGMAN:

03:18 2        Q.   Mr. Emanuel, do you currently have any financial

03:18 3    interest in any rights that Joanne or Laura Siegel may

03:18 4    have in either the Superman or Superboy properties?

03:18 5            MR. PLONSKER:   Object.  Calls for a legal

03:18 6    conclusion.

03:18 7            You can answer.

03:19 8            THE WITNESS:   All I know is there was a -- say

03:19 9    the question again.  Excuse me.  I just want to make sure

03:1910    I can answer.

03:1911    BY MR. BERGMAN:

03:1912        Q    Do you currently have any financial interest in

03:1913    any portion of the Joanne or Laura Siegel interest in the

03:1914    Superman or Superboy properties?

03:1915            MR. PLONSKER:   Same objection.

03:1916            Go ahead.

03:1917            THE WITNESS:   I think so.

03:1918    BY MR. BERGMAN:

03:1919        Q    And could you tell me what that interest is?

03:1920        **A    I do not know.**

03:1921        Q    In what way does that financial interest arise?

03:1922            MR. PLONSKER:   Same objection.

03:1923            THE WITNESS:   In what interest does what?  What

03:1924    was the question?

03:1925    BY MR. BERGMAN:

15

03:19  1          Q    On what basis do you have such an interest?

03:19  2          A    I don't know.   I do believe I have, but I don't

03:19  3    know what it is.

03:19  4          Q    Is there any document you could refer to to

03:19  5    determine what your interest is?

03:19  6          A    I actually don't know, so I'm answering it as

03:20  7    best I can for you.

03:20  8          Q    Do you have any current financial interest in

03:20  9    any portion of the moneys that Mr. Toberoff may recover

03:2010    as a result of this action?

03:2011              MR. PLONSKER:   Object.   Legal conclusion.

03:2012              THE WITNESS:   I believe so.

03:2013    BY MR. BERGMAN:

03:2014          Q    And on what basis do you have such a financial

03:2015    interest?

03:2016              Do you have an agreement with Mr. Toberoff?

03:2017          A    I believe so.

03:2018          Q    And would you generally describe what that

03:2019    agreement is?

03:2020          A    I don't know what -- you asked me that question.

03:2021    I answered that.

03:2022          Q    Has Mr. Toberoff agreed to pay you any portion

03:2023    of the fees he receives in this action?

03:2024          A    I don't -- you're asking me for that answer

03:2025    again.   You're asking the same question over.   I answered

                                                                    16

03:19 1      Q   On what basis do you have such an interest?

03:19 2      A.   I don't know.  I do believe I have, but I don't

03:19 3  know what it is.

03:19 4      Q   Is there any document you could refer to to

03:19 5  determine what your interest is?

03:19 6      A   I actually don't know, so I'm answering it as

03:20 7  best I can for you.

03:20 8      Q   Do you have any current financial interest in

03:20 9  any portion of the moneys that Mr. Toberoff may recover

03:2010  as a result of this action?

03:2011          MR. PLONSKER:  Object.  Legal conclusion.

03:2012          THE WITNESS:  I believe so.

03:2013  BY MR. BERGMAN:

03:2014      Q   And on what basis do you have such a financial

03:2015  interest?

03:2016          Do you have an agreement with Mr. Toberoff?

03:2017      A   I believe so.

03:2018      Q   And would you generally describe what that

03:2019  agreement is?

03:2020      A.   I don't know what -- you asked me that question.

03:2021  I answered that.

03:2022      Q   Has Mr. Toberoff agreed to pay you any portion

03:2023  of the fees he receives in this action?

03:2024      A   I don't -- you're asking me for that answer

03:2025  again.  You're asking the same question over.  I answered

16

03:20 1    it.  I don't know, actually.  I believe that there's

03:21 2    something, but I don't know what it is.

03:21 3        Q    Who would know?

03:21 4        A    I believe Tom McGuire would know, so...

03:21 5            MR. BERGMAN:  Do you guys want to say something?

03:21 6            Off the record.

03:21 7            (Discussion held off the record.)

03:21 8    BY MR. BERGMAN:

03:21 9        Q    Do you, Mr. Emanuel, currently have any

03:2110    financial interest in any share of the moneys that IP

03:2111    Worldwide, LLC may derive from any Siegel interest in the

03:2112    Superboy or Superman properties?

03:2213        A    I --

03:2214            MR. PLONSKER:  Object.  Legal conclusion.

03:2215            Sorry.  Go ahead.

03:2216            THE WITNESS:  I do not know.  I believe so, but

03:2217    I do not know.

03:2218    BY MR. BERGMAN:

03:2219        Q    And again, would Mr. McGuire know?

03:2220        A    I believe so.

03:2221        Q    Aside from any financial interest that you might

03:2222    have in either IP Worldwide or Mr. Toberoff's fees, do

03:2223    you have any other financial interest in any share of

03:2224    moneys that any person or entity may derive from the

03:2225    Siegel interest in Superman and Superboy?

17

03:22 1           MR. PLONSKER:  Object.  Legal conclusion.

03:22 2    Overbroad.

03:22 3           THE WITNESS:  I have no idea what you just said.

03:22 4    BY MR. BERGMAN:

03:22 5      Q    Okay.  You want the reporter to repeat it and

03:22 6    perhaps --

03:22 7      A    That would be great.

03:22 8           (Record read as follows:

03:22 9             "Q    Aside from any financial

03:22 10            interest that you might have in either

03:22 11            IP Worldwide or Mr. Toberoff's fees,

03:22 12            do you have any other financial

03:22 13            interest in any share of moneys that

03:22 14            any person or entity may derive from

03:22 15            the Siegel interest in Superman and

03:22 16            Superboy?")

03:23 17          THE WITNESS:  Not that I know of.  I don't know.

03:23 18    BY MR. BERGMAN:

03:23 19      Q    Okay.  Has Mr. Toberoff ever acted as your

03:23 20    personal attorney?

03:23 21      A    Not that I recall.

03:23 22      Q    Has Mr. Toberoff ever acted to your knowledge as

03:23 23    counsel to the Endeavor agency?

03:23 24          MR. PLONSKER:  May call for speculation.  Fails

03:23 25    to lay a foundation.

                                                                    18

03:23 1          THE WITNESS:  I have no idea.  I believe so.

03:23 2     BY MR. BERGMAN:

03:23 3          Q    Did you have any business relationship with

03:23 4     Mr. Toberoff prior to the formation of IP Worldwide, LLC?

03:23 5          **A    I don't recall.**

03:24 6          MR. BERGMAN:   I will ask the reporter to mark as

03:24 7     Exhibit 3 the documents which have been Bates stamped EN

03:24 8     1 through 7.

03:24 9          (Deposition Exhibit 3 marked.)

03:24 10    BY MR. BERGMAN:

03:24 11         Q    Would you look at page 4 of that document,

03:24 12    Exhibit 3, Mr. Emanuel --

03:24 13         **A    Yes.**

03:24 14         Q    -- and tell me if that is your signature?

03:24 15         **A    Yes.**

03:24 16         Q    To your knowledge is Mr. Toberoff the sole owner

03:25 17    of the entity Pacific Pictures Corporation?

03:25 18         **A    I don't know.**

03:25 19         Q    Have you ever dealt with any other individual

03:25 20    other than Mr. Toberoff with respect to Pacific Pictures

03:25 21    Corporation business?

03:25 22         **A    Not that I recall.**

03:25 23         Q    What were the circumstances which led up to the

03:25 24    formation of IP Worldwide, LLC?

03:25 25         MR. PLONSKER:  Overbroad.

                                                              19

03:25 1          You can answer it if you understand it.

03:25 2          THE WITNESS:  What were the --

03:25 3    BY MR. BERGMAN:

03:25 4      Q   Okay, let me rephrase it for you.

03:25 5      A   **Okay.**

03:25 6      Q   You entered into Exhibit 3 --

03:25 7      A   **Right.**

03:25 8      Q   -- in October 2002 --

03:25 9          MR. PLONSKER:  Assumes facts not in evidence.

03:25 10         MR. BERGMAN:  I'm sorry.  February 2002.

03:25 11     Q   Prior to the formation of that LLC, did you

03:26 12   discuss the formation with Mr. Toberoff?

03:26 13     A   **I assume so.**

03:26 14     Q   What did he say, and what did you say?

03:26 15     A   **I don't recall.**

03:26 16     Q   Do you recall any of the conversations or facts

03:26 17   which led to the formation of this company?

03:26 18     A   **I remember that Mr. Toberoff had, as I recall**

03:26 19   **it, had read an article in I think Variety.  Mr. Toberoff**

03:26 20   **had got rights to properties.  I thought that was**

03:26 21   **interesting.  I called him in for a meeting, and I**

03:26 22   **thought that would be an interesting thing to get**

03:26 23   **involved with.  That's the kind of general basis of my**

03:27 24   **understanding.**

03:27 25     Q   Were there any further meetings with

                                                              20

03:27 1    Mr. Toberoff prior to approximately February 2002 when

03:27 2    the agreement was entered into?

03:27 3         **A    I don't recall.**

03:27 4         Q    Okay.  In the first conversation that you had

03:27 5    with Mr. Toberoff, was there any reference to the Siegel

03:27 6    interest in Superman or Superboy?

03:27 7         **A    Can you repeat the question?  I'm sorry.**

03:27 8         Q    Yes.

03:27 9              Would you repeat it, please.

03:2710              (Record read.)

03:2711              THE WITNESS:  Not that I recall.

03:2712    BY MR. BERGMAN:

03:2713         Q    Did you and he in that first meeting discuss any

03:2714    particular intellectual property that you sought to

03:2715    acquire?

03:2716         **A    Are you asking about acquiring?  I'm not sure**

03:2717    **what the question was.**

03:2718         Q    Well, the purpose of IP Worldwide was to acquire

03:2819    certain intellectual property, wasn't it?

03:2820         **A    I'm not -- not that I -- no.**

03:2821         Q    To your way of thinking --

03:2822         **A    That I understand that -- I mean you're drawing**

03:2823    **a conclusion that you think IP Worldwide was -- I'm not**

03:2824    **sure what your question is, but it doesn't make sense.**

03:2825    **You're drawing a conclusion.**

21

03:28 1     Q   Okay.  What was the business purpose of IP

03:28 2  Worldwide?

03:28 3     **A   Controlling rights.**

03:28 4     Q   What rights?

03:28 5     **A   Intellectual properties.**

03:28 6     Q   And were those rights in the possession of

03:28 7  Mr. Toberoff at the time?

03:28 8        MR. PLONSKER:  Calls for speculation.  Fails to

03:28 9  lay a foundation.

03:2810        THE WITNESS:  I don't recall.

03:2811  BY MR. BERGMAN:

03:2812     Q   Were you represented by counsel in the

03:2813  negotiation of Exhibit 3?

03:2914     **A   I think -- I don't recall.  It might have been**

03:2915  **Tom McGuire.**

03:2916     Q   And if it wasn't Mr. McGuire, would it have been

03:2917  no one, or was there someone else who might have been

03:2918  involved?

03:2919     **A   I don't recall.**

03:2920     Q   Was Endeavor represented by counsel in the

03:2921  negotiation of Exhibit 3?

03:2922        MR. PLONSKER:  Fails to lay a foundation.  Calls

03:2923  for speculation.

03:2924        Answer if you know.

03:2925        THE WITNESS:  I don't recall.

22

03:29 1    BY MR. BERGMAN:

03:29 2        Q.  Did you negotiate -- did you personally

03:29 3    negotiate any of the terms that are contained in Exhibit

03:29 4    3?

03:30 5        **A    It was a while -- I don't really recall.  I**

03:30 6    **might have.  I don't really recall.  I'm sorry.**

03:30 7        Q    If you'll notice at page 1 of the document in

03:30 8    paragraph A 2 under the heading "From AE," there is the

03:30 9    line that reads, "Annual overhead of $," and then that

03:3010    amount has been redacted out.

03:3011        What was the annual overhead you were to

03:3012    contribute to IP Worldwide?

03:3013        **A    I don't --**

03:3014        MR. PLONSKER:  I'm going to object to that on

03:3015    the grounds of privacy and confidentiality.  That's why

03:3016    we redacted it:  So we didn't have to share that

03:3017    information with you.

03:3018        (Unanswered question.)

03:3019        MR. BERGMAN:  My purpose was to ascertain the

03:3020    basis for the redaction.

03:3021        MR. PLONSKER:  There it is.

03:3022        MR. BERGMAN:  And the privacy concern is the

03:3023    privacy of?

03:3124        MR. PLONSKER:  Of Mr. Emanuel and Endeavor.

03:3125    BY MR. BERGMAN:

23

03:31 1      Q   Mr. Emanuel, paragraph A of Exhibit 3 provides

03:31 2   for an ownership of the company, 50 percent to PPC, 40

03:31 3   percent to you, and 10 percent for Endeavor.

03:31 4          Did you negotiate that division of ownership

03:31 5   with Mr. Toberoff?

03:31 6      **A   I believe Mr. McGuire did, but I don't recall**

03:31 7   **who did that.**

03:31 8      Q   If you turn, please, sir, to page 2, paragraph C

03:31 9   2, it provides in part that if AE, you, opts to invest

03:3110   additional money in Newco to acquire certain IP for a

03:3211   profit, you'd be entitled to recoup that investment plus

03:3212   a 20 percent share.

03:3213          Did you in fact invest additional money in Newco

03:3214   to acquire certain intellectual property?

03:3215          MR. TOBEROFF:  Objection.  Misstates paragraph

03:3216   2.  It says a "20% return."

03:3217          MR. PLONSKER:  I'll join in the objection.

03:3218          You can answer if you know.

03:3219          THE WITNESS:  I don't recall.

03:3220   BY MR. BERGMAN:

03:3221      Q   Have you in fact recouped all of your investment

03:3222   in IP Worldwide?

03:3223      **A   I do not know.**

03:3224      Q   At the present time are you to your knowledge

03:3225   entitled to any moneys pursuant to the termination of IP

                                                                    24

03:33 1    Worldwide?

03:33 2        **A    You asked --**

03:33 3        MR. PLONSKER:  Let me just object.  Assumes

03:33 4    facts not in evidence, but go ahead and answer.

03:33 5        MR. TOBEROFF:  Vague and ambiguous as to

03:33 6    "termination."

03:33 7        MR. PLONSKER:  And also calls for a legal

03:33 8    conclusion.

03:33 9        MR. TOBEROFF:  So we don't have to talk too

03:3310    much, unless I state otherwise, I'm going to concur in

03:3311    all his objections throughout this deposition.

03:3312        MR. BERGMAN:  Fine.

03:3313        THE WITNESS:  Repeat the question.

03:3314        MR. BERGMAN:  Would you, please?

03:3315        (Record read as follows:

03:3216            "Q    At the present time are you

03:3217        to your knowledge entitled to any

03:3218        moneys pursuant to the termination of

03:3319        IP Worldwide?")

03:3320        THE WITNESS:  I don't -- you've asked this

03:3321    question before.  I think I answered it before.  I don't

03:3322    actually recall, and I don't have knowledge of it.

03:3323    BY MR. BERGMAN:

03:3324        Q    At page 1, B 1 provides for the contribution

03:3325    from PPC to IP Worldwide of PPC's current IP business

25

03:34 1   subject to preexisting commitments and exclusions.

03:34 2        Were you aware at the time you entered into this

03:34 3   agreement that PPC had a joint venture agreement with the

03:34 4   heirs of Joe Shuster?

03:34 5     **A**   **I do not recall.**

03:34 6     Q   Do you know who Joe Shuster was?

03:34 7     **A**   **No.**

03:34 8     Q   He was the co-creator of Superman.

03:34 9        Do you know whether that joint venture agreement

03:3410   between PPC and the Shuster heirs was included or

03:3411   excluded from the IP Worldwide business?

03:3512     **A**   **I --**

03:3513        MR. PLONSKER:  Assumes facts not in evidence,

03:3514   fails to lay a foundation, and calls for speculation.

03:3515        THE WITNESS:  I don't recall.

03:3516   BY MR. BERGMAN:

03:3517     Q   Have you ever had any communications with the

03:3518   heirs of Joe Shuster?

03:3519     **A**   **What's their names?**

03:3520     Q   Ms. Peavy and Mr. Peary.

03:3521     **A**   **Not that I recall.**

03:3522     Q   Have you ever had any communications with any

03:3523   attorney for either of those two Shuster heirs?

03:3524     **A**   **Not that I recall.**

03:3525     Q   Did you ever discuss with Mr. Toberoff whether

26

03:35 1     IP Worldwide would attempt to obtain the rights of the

03:35 2     Shuster heirs to the Superman or Superboy properties?

03:35 3              MR. PLONSKER:  At what point in time?

03:35 4              MR. BERGMAN:  Any point.

03:35 5              MR. PLONSKER:  Then I'll object on the grounds

03:35 6     of the attorney-client privilege and instruct him not to

03:35 7     answer.

03:35 8              (Instruction not to answer.)

03:36 9     BY MR. BERGMAN:

03:36 10         Q    Prior to the formation of IP Worldwide, did you

03:36 11    discuss with Mr. Toberoff the acquisition of the rights

03:36 12    of the Shuster heirs in -- to the Superman or Superboy

03:36 13    properties?

03:36 14         **A    Not that I recall.**

03:36 15         Q    Subsequent to the winding up of IP Worldwide,

03:36 16    did you discuss with Mr. Toberoff the acquisition of any

03:36 17    of the Shuster interest to Superman or Superboy?

03:36 18              MR. PLONSKER:  I'm going to object in that I

03:36 19    believe it calls for a legal conclusion -- I'm sorry --

03:36 20    for an attorney-client privileged communication, but you

03:36 21    can answer yes or no if you know.

03:36 22              Do you recall?

03:36 23              THE WITNESS:  I don't.

03:37 24    BY MR. BERGMAN:

03:37 25         Q    What business activities did IP Worldwide engage

                                                                    27

03:37 1    in?

03:37 2         MR. PLONSKER:  Overbroad.  You mean generally,

03:37 3    specifically?

03:37 4    BY MR. BERGMAN:

03:37 5         Q    What did the business do?

03:37 6         MR. PLONSKER:  I think it's asked and answered,

03:37 7    but go ahead and tell him what the business was.

03:37 8         THE WITNESS:  We went after rights to

03:38 9    intellectual properties that were -- you know, that we

03:38 10   thought were available in the marketplace.

03:38 11   BY MR. BERGMAN:

03:38 12        Q    And did you obtain any such rights?

03:38 13        MR. PLONSKER:  You can answer yes or no.

03:38 14        THE WITNESS:  Yes.

03:38 15   BY MR. BERGMAN:

03:38 16        Q    In what intellectual properties?

03:38 17        MR. PLONSKER:  What's the purpose of this,

03:38 18   because that may not be public information?  It may

03:38 19   damage the business of IP Worldwide even as it's winding

03:38 20   up.  So why is that relevant to this lawsuit?

03:38 21        MR. BERGMAN:  Well, A, the business wound up a

03:38 22   couple of years ago.

03:38 23        MR. PLONSKER:  Not necessarily --

03:38 24        MR. BERGMAN:  -- and I believe it's relevant to

03:38 25   determine, among other things, the knowledge of the

28

03:38 1     witness concerning the value of intellectual properties.

03:38 2         MR. PLONSKER:  Well, you can ask him if he has

03:38 3     knowledge of that, but I'm going to instruct him not to

03:39 4     answer with respect to any properties other than the

03:39 5     Superman or Superboy properties.

03:39 6         (Instruction not to answer.)

03:39 7         MR. BERGMAN:  And the basis of that is?

03:39 8         MR. PLONSKER:  Privacy, privilege, trade secret.

03:40 9     BY MR. BERGMAN:

03:4010       Q    Would you look at Exhibit 3 once again --

03:4011       **A    Sure, no problem.**

03:4012       Q    -- Mr. Emanuel, and turn to page 3 --

03:4013       **A    Yes.**

03:4014       Q    -- paragraph H?

03:4015       **A    Yes.**

03:4016       Q    Could you read that to yourself?

03:4117       **A    Okay.**

03:4118       Q    During the term of the IP Worldwide agreement,

03:4119     did that entity acquire any interest in the Superman or

03:4120     Superboy properties?

03:4121         MR. PLONSKER:  Calls for a legal conclusion.

03:4122         You can answer if you know.

03:4123         THE WITNESS:  I don't recall.

03:4124     BY MR. BERGMAN:

03:4125       Q    Is there any document to which you could refer

29

03:41 1   to ascertain the answer to that question?

03:41 2       **A   You asked me before if I looked at -- I don't --**

03:41 3   **I didn't.   It went to Tom McGuire.   So I don't really --**

03:41 4   **I guess the answer would be no.   That -- my knowledge.**

03:41 5       Q   Is there any person you could speak with to

03:41 6   refresh your recollection concerning that matter before

03:41 7   the trial of this action in June of this year?

03:41 8       **A   Not that I know of.**

03:41 9       Q   June of next year.

03:41 10      **A   Not that I know of.**

03:42 11      Q   How active was your role in IP Worldwide?

03:42 12      **A   I don't know how you define "active."**

03:42 13      Q   Okay.   Could you estimate the amount of time you

03:42 14   devoted to the business?

03:42 15          MR. PLONSKER:   You mean compared to other things

03:42 16   that he was doing, or you mean -- how would you want him

03:42 17   to estimate?

03:42 18          MR. BERGMAN:   Any way the witness can answer

03:42 19   that question would be fine with me.

03:42 20          THE WITNESS:   Very limited.

03:42 21   BY MR. BERGMAN:

03:42 22      Q   Did you conduct certain meetings on behalf of IP

03:42 23   Worldwide?

03:42 24      **A   That I can recall, a few.**

03:42 25      Q   Aside from any meetings that you may have had

30

| | |
|---|---|
| 03:42 1 | regarding the Superman and Superboy properties, did you |
| 03:42 2 | engage in any meetings on behalf of IP Worldwide? |
| 03:43 3 | **A    There might have been a few.** |
| 03:43 4 | Q    Do you recall who any of those meetings were |
| 03:43 5 | with? |
| 03:43 6 | **A    Mr. Toberoff.** |
| 03:43 7 | Q    Aside from Mr. Toberoff? |
| 03:43 8 | **A    I don't recall.  I'm sorry.** |
| 03:43 9 | Q    Are you familiar with Kevin Marks? |
| 03:4310 | **A    I don't know who he is.** |
| 03:4311 | Q    Okay.  He's an attorney at Gang, Tyre who |
| 03:4312 | represented Joanne and Laura Siegel prior to |
| 03:4313 | Mr. Toberoff. |
| 03:4314 | **A    Okay.** |
| 03:4315 | Q    Have you ever spoken with Mr. Marks? |
| 03:4316 | **A    I don't recall.** |
| 03:4417 | Q    Mr. Marks was deposed by me in this matter, and |
| 03:4418 | he testified that on or about February 6, just about four |
| 03:4419 | days subsequent to the apparent formation of IP |
| 03:4420 | Worldwide, he received a phone call from Mr. Toberoff who |
| 03:4421 | expressed an interest in acquiring the Siegel interest in |
| 03:4422 | Superman and Superboy. |
| 03:4423 | Had you prior to February 6 discussed with |
| 03:4424 | Mr. Toberoff whether IP Worldwide would seek to acquire |
| 03:4425 | the Siegel interest in Superman and Superboy? |

31

03:44 1     MR. PLONSKER:  I'm going to instruct him not to

03:44 2  answer on the grounds of the attorney-client privilege.

03:44 3          (Instruction not to answer.)

03:44 4     MR. TOBEROFF:  Objection.  I don't believe

03:44 5  you've fairly reflected Mr. Marks' testimony.

03:45 6     MR. BERGMAN:  Is there an objection,

03:45 7  Mr. Toberoff?

03:45 8     MR. TOBEROFF:  I just made it.

03:45 9  BY MR. BERGMAN:

03:45 10    Q    Were you aware shortly after the formation of IP

03:45 11  Worldwide that Mr. Toberoff had contacted the attorney

03:45 12  for the Siegels to discuss the acquisition of the Siegel

03:45 13  potential interest in Superman and Superboy?

03:45 14    MR. PLONSKER:  I'm going to object on the

03:45 15  grounds that it may invade the attorney-client privilege

03:45 16  with respect to communications with Mr. Toberoff.

03:45 17       So to the extent that you can answer excluding

03:45 18  any conversations with Mr. Toberoff, you can answer that

03:45 19  question.  Otherwise, I'm instructing you not to answer.

03:45 20    THE WITNESS:  I don't really recall.

03:46 21  BY MR. BERGMAN:

03:46 22    Q    Had you as of February 6, 2002, taken any steps

03:46 23  to determine the value of the Siegel interest in Superman

03:46 24  or Superboy?

03:46 25    A    What was the date?

                                                          32

03:46 1      Q    February 6, 2002.

03:46 2      **A    I don't recall.**

03:46 3      Q    Prior to that date had you had any discussion

03:46 4  concerning the value of the Siegel interest with

03:46 5  Mr. Toberoff?

03:46 6           MR. PLONSKER:  Object on the grounds of the

03:46 7  attorney-client privilege and instruct him not to answer.

03:46 8           (Instruction not to answer.)

03:46 9           MR. BERGMAN:  Again, Counsel, I'm going to try

03:47 10  to avoid colloquy, but this is a matter that may

03:47 11  necessitate Mr. Emanuel coming back here.  The fact of

03:47 12  such a discussion doesn't disclose any privileged

03:47 13  communication.

03:47 14           MR. PLONSKER:  You're asking about the substance

03:47 15  of the communication also.

03:47 16           MR. BERGMAN:  Well, I'm going to ask about the

03:47 17  substance, but at this point I'm asking about the fact of

03:47 18  it, did it occur.

03:47 19           MR. TOBEROFF:  You actually described the

03:47 20  substance --

03:47 21           MR. PLONSKER:  Right.

03:47 22           MR. TOBEROFF:  -- and asked him did that

03:47 23  substantive conversation occur.  So just to be fair.

03:47 24           MR. PLONSKER:  Right.

03:47 25           MR. BERGMAN:  Your instruction stands?

33

03:47 1          MR. PLONSKER:  Of course.

03:47 2  BY MR. BERGMAN:

03:47 3     Q   And, Mr. Emanuel, when your counsel instructs

03:47 4  you not to answer, I presume you will not answer on that

03:47 5  basis?

03:47 6     **A**   **He's my counsel.**

03:47 7     Q   Okay.  Did there come any time after February 6,

03:48 8  2002, when Mr. Toberoff advised you of the fact that he

03:48 9  had had a conversation with the lawyer for Laura and

03:4810  Joanne Siegel concerning Superman?

03:4811          MR. PLONSKER:  I'm going to object on the

03:4812  grounds of the attorney-client privilege.

03:4813          You can answer that yes or no.

03:4814          THE WITNESS:  Say the question again.  I'm

03:4815  sorry.

03:4816          MR. BERGMAN:  Would you repeat it, please?

03:4817          (Record read as follows:

03:4718            "Q   Okay.  Did there come any

03:4719            time after February 6, 2002, when Mr.

03:4820            Toberoff advised you of the fact that

03:4821            he had had a conversation with the

03:4822            lawyer for Laura and Joanne Siegel

03:4823            concerning Superman?")

03:4824          THE WITNESS:  I don't recall.

03:4825  BY MR. BERGMAN:

34

| | |
|---|---|
| 03:48 1 | Q Did Mr. Toberoff at any time advise you that he |
| 03:49 2 | had asked Mr. Marks to discuss with him IP Worldwide's |
| 03:49 3 | possible acquisition of the Sup- -- of the Siegel |
| 03:49 4 | interest in the Superman property? |
| 03:49 5 | MR. PLONSKER: Object on the grounds of the |
| 03:49 6 | attorney-client privilege and instruct him not to answer. |
| 03:49 7 | (Instruction not to answer.) |
| 03:49 8 | BY MR. BERGMAN: |
| 03:49 9 | Q In or about February or March 2002, did |
| 03:4910 | Mr. Toberoff tell you that he had a conversation with |
| 03:4911 | Mr. Marks in which Mr. Marks told him that he, Marks, was |
| 03:4912 | very far along in his negotiations with DC and at a |
| 03:4913 | documentation phase for DC's acquisition of the Siegel |
| 03:4914 | interest? |
| 03:4915 | MR. PLONSKER: Object on the grounds of the |
| 03:4916 | attorney-client privilege and instruct him not to answer. |
| 03:5017 | (Instruction not to answer.) |
| 03:5018 | MR. TOBEROFF: Did you mention a time period in |
| 03:5019 | that question? |
| 03:5020 | MR. BERGMAN: Yes. |
| 03:5021 | And, Counsel, you understand that that question |
| 03:5022 | asked whether Mr. Toberoff told him that Mr. Marks had |
| 03:5023 | made a certain statement? |
| 03:5024 | MR. PLONSKER: I'm understanding all the |
| 03:5025 | questions. I mean, you understand the parameters that |

35

03:50 1    we've set, and I know you're going to ask the questions,

03:50 2    and I'm going to object, and then you may make a motion

03:50 3    to compel, and one of us will win, but we have to

03:50 4    establish the record now, so...

03:50 5         MR. BERGMAN:   Okay.

03:50 6      Q   During his deposition, Mr. Emanuel, Mr. Marks

03:50 7    testified to a second telephone call with Mr. Toberoff on

03:51 8    or about July 24, 2002.

03:51 9         At any time did Mr. Toberoff relay to you

03:51 10   anything that had been said by Mr. Marks during that

03:51 11   telephone conversation?

03:51 12        MR. PLONSKER:   I'll object on the grounds of the

03:51 13   attorney-client privilege, but you can answer yes or no.

03:51 14        THE WITNESS:   I don't recall.

03:51 15   BY MR. BERGMAN:

03:51 16     Q   During the period from --

03:51 17        MR. PLONSKER:   Hang on one second.

03:51 18        (Discussion off the record.)

03:51 19   BY MR. BERGMAN:

03:51 20     Q   During the period from February 6, 2002 until

03:51 21   approximately July 24, 2002, had you and Mr. Toberoff

03:51 22   discussed the possibility of IP Worldwide acquiring the

03:51 23   Siegel interest in Superman and Superboy?

03:52 24        MR. PLONSKER:   I'm going to object on the

03:52 25   grounds of the attorney-client privilege and instruct you

                                                              36

03:52 1    not to answer.

03:52 2            (Instruction not to answer.)

03:52 3    BY MR. BERGMAN:

03:52 4        Q    During the course of your association with

03:52 5    Mr. Toberoff and IP Worldwide, did he give you any legal

03:52 6    advice?

03:52 7            MR. PLONSKER:  Calls for a legal conclusion.

03:52 8    It's vague, overbroad.

03:52 9            THE WITNESS:  Not that I recall.

03:5210    BY MR. BERGMAN:

03:5211        Q    Had you as of July 24, 2002, taken any steps to

03:5212    determine the value of the Siegel interest in Superman

03:5213    and Superboy?

03:5214        **A    Not that I recall.  I don't remember.**

03:5315        Q    Between February 6, 2002 and July 24, 2002, did

03:5316    you and Mr. Toberoff have any discussions concerning the

03:5317    value of the Siegel interest in Superman and Superboy?

03:5318            MR. PLONSKER:  Object on the grounds of the

03:5319    attorney-client privilege and instruct him not to answer.

03:5320            (Instruction not to answer.)

03:5321    BY MR. BERGMAN:

03:5322        Q    During that same period of time, that is, from

03:5323    approximately February to July of 2002, had you discussed

03:5324    the value of the Siegel interest with anyone other than

03:5325    Mr. Toberoff?

37

03:53 1      **A      Not that I recall.**

03:53 2          Q      As of July 24, 2002, had you requested anyone

03:53 3      else to take steps to determine the value of the Siegel

03:54 4      interest in Superman and Superboy?

03:54 5              MR. PLONSKER:   Other than Mr. Toberoff, you

03:54 6      mean?

03:54 7              MR. BERGMAN:   Other than Mr. Toberoff.

03:54 8              THE WITNESS:   Not to my knowledge.  Not that I

03:54 9      recall.

03:5410      BY MR. BERGMAN:

03:5411          Q      Did Mr. Toberoff at any time prior to July 24,

03:5412      2002, tell you what he believed the value of the Siegel

03:5413      interest in Superman and Superboy to be?

03:5414              MR. PLONSKER:   Object on the grounds of the

03:5415      attorney-client privilege and instruct the witness not to

03:5416      answer.

03:5417              (Instruction not to answer.)

03:5418      BY MR. BERGMAN:

03:5419          Q      Did Mr. Toberoff at any time after July 24,

03:5420      2002, discuss with you any aspect of any conversation

03:5421      that he had had with Kevin Marks concerning the Siegel

03:5422      interest in Superman and Superboy?

03:5423              MR. PLONSKER:   Object on the grounds of the

03:5524      attorney-client privilege.

03:5525              You can answer yes or no.

38

| | |
|---|---|
| 03:55 1 | THE WITNESS:  I don't recall. |
| 03:55 2 | BY MR. BERGMAN: |
| 03:55 3 | Q   At any time after July 24, 2002, did |
| 03:55 4 | Mr. Toberoff tell you in substance that Mr. Marks had |
| 03:55 5 | declined to enter into negotiations with him concerning |
| 03:55 6 | the possible acquisition by IP Worldwide of the Siegel |
| 03:55 7 | interest in Superman and Superboy? |
| 03:55 8 | MR. PLONSKER:  I'm going to object on the |
| 03:55 9 | grounds of the attorney-client privilege and instruct you |
| 03:5510 | not to answer. |
| 03:5511 | (Instruction not to answer.) |
| 03:5512 | BY MR. BERGMAN: |
| 03:5613 | Q   Did Mr. Toberoff at any time subsequent to July |
| 03:5614 | 24, 2002, tell you that Mr. Marks had suggested that if |
| 03:5615 | he wanted to acquire the Siegel interest, he should make |
| 03:5616 | an offer? |
| 03:5617 | MR. PLONSKER:  Object on the grounds of the |
| 03:5618 | attorney-client privilege and instruct him not to answer. |
| 03:5619 | (Instruction not to answer.) |
| 03:5620 | BY MR. BERGMAN: |
| 03:5621 | Q   Were you aware as of July 2002 that Mr. Toberoff |
| 03:5622 | was negotiating or attempting to negotiate to acquire the |
| 03:5623 | Siegel interest in Superman and Superboy? |
| 03:5624 | **A   Not to my knowledge.** |
| 03:5625 | Q   When did you first become aware of that fact? |

39

03:56 1          **A    I don't recall.  I don't remember the dates.**

03:57 2          Q    During the months of July and August 2002, did

03:57 3     you and Mr. Toberoff, your joint venturer, have any

03:57 4     discussions concerning the value of the Siegel interest

03:57 5     in Superman and Superboy?

03:57 6               MR. PLONSKER:  I'm going to object that it's

03:57 7     vague and ambiguous and instruct him not to answer on the

03:57 8     grounds of the attorney-client privilege.

03:57 9               You know what?  Let me withdraw that

03:57 10    objection.

03:57 11              You can answer yes or no.  Did you have a

03:57 12    communication about that to your recollection?

03:57 13              THE WITNESS:  Not that I recall.

03:57 14    BY MR. BERGMAN:

03:57 15         Q    As of the summer of 2002, did you have any

03:57 16    knowledge that Mr. Toberoff was seeking to acquire the

03:57 17    Siegel interest?

03:57 18              MR. PLONSKER:  You can say yes or no.

03:57 19              THE WITNESS:  I'm going to come back to that.

03:57 20              (Discussion off the record.)

03:58 21              THE WITNESS:  I'm sorry.  Can you repeat the

03:58 22    question?

03:58 23              MR. BERGMAN:  Yes.

03:58 24              Would you, please?

03:58 25              THE WITNESS:  Sorry about that.

                                                                    40

03:58  1          MR. BERGMAN:   It's okay.

03:58  2          (Record read as follows:

03:57  3             "Q   As of the summer of 2002, did

03:57  4          you have any knowledge that Mr.

03:57  5          Toberoff was seeking to acquire the

03:57  6          Siegel interest?")

03:58  7          THE WITNESS:   The summer.   Which summer?

03:59  8  BY MR. BERGMAN:

03:59  9     Q   2002.

03:59 10     A   You're asking me specific dates that I don't

03:59 11  recall, so my answer is I don't recall on those specific

03:59 12  things.   I don't recall.

03:59 13     Q   When did you first become aware that

03:59 14  Mr. Toberoff was seeking to acquire the Siegel interest

03:59 15  for IP Worldwide?

03:59 16          MR. TOBEROFF:   Objection.   It assumes facts not

03:59 17  in evidence.

03:59 18          MR. PLONSKER:   I'll join.

03:59 19          Go ahead.

03:59 20          THE WITNESS:   I don't recall, first of all, that

03:59 21  he was attempting to acquire anything.   What I just said

03:59 22  to my lawyer --

03:59 23          MR. PLONSKER:   Don't tell him what you said to

03:59 24  me, but go ahead and answer the question.

03:59 25          THE WITNESS:   There was a meeting with the

                                                              41

03:59 1    Siegels. I just don't recall the dates.

03:59 2    BY MR. BERGMAN:

03:59 3      Q   The period that I'm inquiring about now is

03:59 4    before I believe you had your meeting with the --

03:59 5      **A**   **Then I don't recall.**

03:59 6      Q   -- Siegels. Okay.

03:59 7      Mr. Marks testified to a conference call that he

04:00 8    had with you and Mr. Toberoff on or about August 7 or 8,

04:00 9    2002. Do you have any recollection of such a conference

04:0010    call?

04:0011      **A**   **No, I do not.**

04:0012      MR. TOBEROFF: Actually, his testimony was there

04:0013    was a notation in his record on August 8th, and when

04:0014    asked whether a conversation occurred on August 8, he

04:0015    said no; that's a notation to set up a conference call,

04:0016    but I believe it happened a couple of days after that.

04:0017      MR. BERGMAN: That's incorrect, Mr. Toberoff.

04:0018      MR. PLONSKER: We are not going to solve that,

04:0019    so the question is, in early August do you remember

04:0020    having a conference call?

04:0021      THE WITNESS: No.

04:0022    BY MR. BERGMAN:

04:0023      Q   Okay. Do you remember participating in any

04:0024    conference call with Mr. Marks regarding the Siegel

04:0025    interest at any time?

42

04:00 1      **A    Not that I recall.**

04:00 2      Q    Prior to mid August 2002 had you taken any steps

04:01 3  to determine the value of the Siegel interest in Superman

04:01 4  or Superboy?

04:01 5          MR. PLONSKER:   Fails to lay a foundation.   May

04:01 6  call for speculation.

04:01 7          Go ahead.

04:01 8          THE WITNESS:   Wasn't that an asked and answered?

04:01 9          MR. PLONSKER:   You can answer it again.

04:0110          THE WITNESS:   I think my prior answer stands.

04:0111  BY MR. BERGMAN:

04:0112      Q    Well, the prior question dealt with a prior

04:0113  period of time.

04:0114      **A    I don't recall.**

04:0115      Q    Okay.   Do you recall making an offer to

04:0116  Mr. Marks to acquire the Siegel interest in Superman?

04:0117      **A    I don't recall.**

04:0118      Q    Do you recall offering Mr. Marks $15 million for

04:0119  the acquisition of the Siegel interest in Superman and

04:0120  Superboy?

04:0121      **A    I don't recall.**

04:0222      Q    Do you recall making any offer to Mr. Marks for

04:0223  the acquisition of that Siegel interest?

04:0224      **A    I don't recall.**

04:0225      Q    Prior to mid August 2002 did you have any

43

04:02 1    discussions with Mr. Toberoff concerning how much, if

04:02 2    anything, IPW, IP Worldwide should offer for the Siegel

04:02 3    interest in Superman?

04:02 4          MR. PLONSKER:  Object on the grounds of the

04:02 5    attorney-client privilege and instruct him not to answer.

04:02 6          (Instruction not to answer.)

04:02 7    BY MR. BERGMAN:

04:02 8     Q   To your knowledge, Mr. Emanuel, had Mr. Toberoff

04:02 9    taken any steps prior to mid August 2002 to determine the

04:03 10   value of the Siegel interest in Superman and Superboy?

04:03 11        MR. PLONSKER:  If you know other than from

04:03 12   communications with Mr. Toberoff, please respond.

04:03 13   Otherwise, I instruct you not to answer on the grounds of

04:03 14   the attorney-client privilege.

04:03 15        THE WITNESS:  I don't know.

04:03 16   BY MR. BERGMAN:

04:03 17     Q   And when you say you don't know, Mr. Emanuel,

04:03 18   are you -- is it that you don't know whether Mr. Toberoff

04:03 19   said that to you or whether some third party did?

04:03 20     **A**   **I don't know.  I don't know how to answer that**

04:03 21   **question because I have no -- I don't recall it, and I**

04:03 22   **don't know it.**

04:03 23        MR. PLONSKER:  From any source?

04:03 24        THE WITNESS:  From any source.

04:03 25   BY MR. BERGMAN:

44

04:03 1      Q   So as you sit here now, you have no recollection

04:03 2   whatever of any steps that were taken by IP Worldwide to

04:03 3   acquire the Siegel interest?

04:03 4         MR. PLONSKER:  I'm going to object.  It

04:03 5   misstates his testimony.  During this period of time, are

04:03 6   you saying?

04:03 7         MR. BERGMAN:  I'm not purporting to state -- to

04:04 8   characterize his testimony.  I'm just trying to wrap

04:04 9   up --

04:0410         THE WITNESS:  What was the question?

04:0411         MR. PLONSKER:  Go ahead and ask the question,

04:0412   and then I will object again.

04:0413         MR. BERGMAN:  Would you please, David?

04:0414         (Record read as follows:

04:0315             "Q   So as you sit here now, you

04:0316         have no recollection whatever of any

04:0317         steps that were taken by IP Worldwide

04:0318         to acquire the Siegel interest?")

04:0419         MR. PLONSKER:  Object.  Fails to lay a

04:0420   foundation.  May call for speculation.  Overbroad.

04:0421   Vague.

04:0422         You can answer if you know.

04:0423         THE WITNESS:  I don't recall any of this, so, I

04:0424   mean...

04:0425   BY MR. BERGMAN:

45

04:04 1    Q   Okay.

04:04 2    **A**   **I'm sorry.  You know, I...**

04:04 3    Q   Do you recall telling Mr. Marks in a telephone

04:04 4  conversation that you and Mr. Toberoff or some members of

04:05 5  Endeavor had set up a fund to acquire intellectual

04:05 6  property properties?

04:05 7    **A**   **No, I do not.**

04:05 8    Q   Had you in fact as of August 2002 set up a fund

04:05 9  with which to acquire intellectual property rights?

04:05 10    **A**   **I don't recall.**

04:05 11    Q   Did you at any point in time set up a fund with

04:05 12  which to acquire intellectual property rights?

04:05 13    **A**   **Not that I recall.**

04:05 14    Q   Had you at any time obtained investors or any

04:05 15  other source of funding for the purpose of acquiring the

04:05 16  Siegel interest in Superman and Superboy?

04:05 17       (Discussion off the record.)

04:06 18       MR. BERGMAN:  Why don't we take five minutes.

04:06 19       (Recess.)

04:14 20       MR. BERGMAN:  Back on the record.

04:14 21    Q   Mr. Emanuel, what, if anything, can you recall

04:14 22  about any effort made by you on behalf of IP Worldwide to

04:14 23  acquire the Siegel interest in Superman or Superboy?

04:14 24    **A**   **I don't recall any of that.**

04:15 25    Q   Do you recall having a conversation with any

46

04:15 1    lawyer representing the Siegels and making any offer to

04:15 2    him to acquire that interest?

04:15 3        A    I do not recall that.

04:15 4        Q    Do you recall meeting with Joanne and Laura

04:15 5    Siegel on several occasions?

04:15 6        A    Yes.

04:15 7        Q    And do you recall that the first such meeting

04:15 8    took place in late 2002 or early 2003?

04:15 9        A    I don't recall those dates.

04:15 10       Q    At the point in time that you first met with

04:15 11   Mrs. Siegel and her daughter, had you obtained any

04:16 12   information from any source as to the value of the Siegel

04:16 13   interest in Superman or Superboy?

04:16 14       A    Not that I recall.

04:16 15       Q    As of the point in time when you first met with

04:16 16   the Siegels, had you learned from any source the nature

04:16 17   of the offer that had been made by DC Comics to the

04:16 18   Siegels to acquire their interest?

04:16 19       A    Not that I recall.

04:16 20       Q    When you met with the Siegels on that first

04:16 21   occasion, do you recall telling them that the DC offer

04:16 22   was, quote, "ridiculously low," close quote?

04:16 23       A    I don't recall.

04:17 24       Q    Had you, at the time you first met with the

04:17 25   Siegels, gotten any information as to what the DC offer

                                                              47

04:17 1    had been?

04:17 2        A   Not that I recall.

04:17 3        Q   Or what the true value of the Siegel interest

04:17 4    was?

04:17 5            MR. PLONSKER:  Vague.

04:17 6            THE WITNESS:  Not that I recall.

04:17 7    BY MR. BERGMAN:

04:17 8        Q   On what basis then would you have told the

04:17 9    Siegels that the DC offer was ridiculously low?

04:1710            MR. PLONSKER:  Object and instruct him not to

04:1711    answer.  He just said that he doesn't recall saying that,

04:1712    so it assumes facts not in evidence.

04:1713            (Instruction not to answer.)

04:1714            THE WITNESS:  Thank you.

04:1715    BY MR. BERGMAN:

04:1716        Q   Do you deny saying that to them?

04:1717        A   I don't recall that I said it.

04:1718        Q   Does that mean that you don't deny it?

04:1719        A   It means I don't recall it.

04:1720        Q   I understand.

04:1721            Do you deny it?

04:1722        A   I said I don't recall it.

04:1723            MR. PLONSKER:  So you've asked it twice.  He's

04:1724    answered.  How can you say that you either admit or deny

04:1725    if he doesn't recall?  I'm unclear.

                                                              48

BY MR. BERGMAN:

Q   What do you recall of that first meeting with the Siegels?

A   That the older woman -- I don't recall her name right off the top of my head -- was talking about her husband, how he had created this property, and that Warner Bros. was trying to take away her pension, and she was very upset about it, and they had been through a long process with Warner Bros. and that she didn't feel that they were treating her properly.  That was the general gist of the conversation.

Q   What was the purpose of your meeting with the Siegels on that first occasion?

A   I think you would have to ask them that.

From my perspective or from the Siegels' perspective?

Q   From your perspective.

A   To represent the rights.

Q   And did you discuss in that first meeting your desire to represent the rights?

A   I don't remember if that was discussed, but I believe so.  I don't really recall exactly the words that we used.

Q   And did you have any discussion with them as to what the rights you were seeking to represent were worth?

49

04:19 1   **A** **Not that I recall.**

04:19 2   Q Did either Laura or Joanne Siegel ask you what

04:19 3 you thought their interest was worth?

04:19 4   **A** **Not that I recall.**

04:19 5   Q Do you recall either of them asking you what you

04:19 6 would -- how you would market their rights?

04:19 7   **A** **Not that I recall.**

04:20 8   Q Do you recall anything else that occurred in

04:20 9 that first meeting?

04:20 10   **A** **All that I recall was it a meet-and-greet, and**

04:20 11 **she was really mainly talking about her dissatisfaction**

04:20 12 **with Warner Bros., about their pension, about how long**

04:20 13 **her husband worked and how she didn't think that she was**

04:20 14 **being properly taken care of there and that they were not**

04:20 15 **caring about it.**

04:20 16   Q Was Mr. Toberoff present at that meeting?

04:20 17   **A** **I believe so.**

04:20 18   Q Do you recall anything he said to the Siegels at

04:20 19 that meeting?

04:20 20   **A** **No, I do not.**

04:20 21   Q How did the meeting end?

04:20 22   **A** **I think I just left because I had to go to**

04:20 23 **another meeting, so I don't know if it ended when I was**

04:20 24 **there.  I don't believe that it -- I think it might have**

04:20 25 **continued.  I probably went to another meeting.**

50

04:20 1      Q    At the conclusion of that meeting or at least

04:20 2   that part of it which you attended, had the Siegels

04:21 3   agreed that you would represent their interest?

04:21 4      **A    I don't recall.**

04:21 5      Q    Did the Siegels ever agree that you would

04:21 6   represent their interest?

04:21 7          MR. PLONSKER:  I'm going to object.  Vague.

04:21 8          Go ahead.

04:21 9          THE WITNESS:  I don't recall.

04:2110   BY MR. BERGMAN:

04:2111      Q    At that meeting did Mr. Toberoff make any

04:2112   statement to the Siegels as to what he believed their

04:2113   interest to be worth?

04:2114      **A    Not to my knowledge.**

04:2115      Q    To your knowledge did he make any statement to

04:2116   them regarding his opinion of the DC Comics offer?

04:2117      **A    Not to my recollection.**

04:2118      Q    By the time of your first meeting with the

04:2119   Siegels, were they represented by Mr. Toberoff?

04:2220      **A    I don't recall.**

04:2221      Q    Well, did you ask them whether they were

04:2222   represented by counsel?

04:2223      **A    I don't recall.**

04:2224      Q    Prior to that first meeting with the Siegels,

04:2225   did you have a discussion with Mr. Toberoff as to what

                                                              51

04:22 1    the purpose of the meeting was?

04:22 2         MR. PLONSKER: Object on the grounds of the

04:22 3    attorney-client privilege and instruct him not to answer.

04:22 4         (Instruction not to answer.)

04:22 5    BY MR. BERGMAN:

04:22 6      Q   Or what you or he should say to the Siegels?

04:22 7         MR. PLONSKER: Same objections and instruction.

04:22 8         (Instruction not to answer.)

04:22 9    BY MR. BERGMAN:

04:2210      Q   Did you have any pre-meeting discussion at all

04:2211    with Mr. Toberoff concerning what would occur at the

04:2212    meeting?

04:2213         MR. PLONSKER: You can answer yes or no.

04:2214         THE WITNESS: I assume yes, but I don't recall

04:2215    it.

04:2216    BY MR. BERGMAN:

04:2317      Q   Do you recall telling Laura and Joanne Siegel

04:2318    that you had made -- in this first meeting that you had

04:2319    made an assessment of the value of their interest?

04:2320      **A**   **I don't recall.**

04:2321      Q   Did you during that first meeting give them any

04:2322    estimate of what you thought the value of their interest

04:2323    was?

04:2324      **A**   **I don't recall.**

04:2325      Q   Was there any discussion at that first meeting

52

04:23 1   with the -- with Laura and Joanne Siegel with respect to

04:23 2   Michael Siegel?

04:23 3        A    I don't know who that is.

04:23 4        Q    Okay.

04:23 5        A    So no, I don't recall that.  Sorry.  Sorry about

04:24 6   that.

04:24 7        Q    Michael Siegel is another heir of Joe Siegel.

04:24 8        A    Whatever.

04:24 9        Q    You've never heard that name before?

04:24 10       A    Not to my knowledge.

04:24 11       Q    To your knowledge have you ever signed a

04:24 12  contract in which you agreed to purchase his interest?

04:24 13       A    Not to my knowledge.  Not to my understanding.

04:24 14       Q    Did you have any awareness prior to today as to

04:24 15  whether Laura and Joanne Siegel owned the complete Siegel

04:24 16  interest in the Superman and Superboy characters?

04:24 17            MR. PLONSKER:  Vague.

04:24 18            THE WITNESS:  I don't remember.

04:24 19  BY MR. BERGMAN:

04:24 20       Q    Do you have any recollection that there was a

04:24 21  third individual who was entitled to a share of their

04:24 22  interest?

04:25 23       A    Oh, there's that guy in Cleveland.

04:25 24            MR. PLONSKER:  I'm sorry.  What did you say?

04:25 25            THE WITNESS:  There's a gentleman in Cleveland.

                                                              53

04:25 1   That's all I remember, somebody in Cleveland.

04:25 2   BY MR. BERGMAN:

04:25 3       Q    Okay.  And what do you remember about that

04:25 4   person?

04:25 5       A    **That you just kind of -- I don't -- there's**

04:25 6   **somebody in Cleveland that owned something.  I don't**

04:25 7   **remember exactly what it was, to be candid.**

04:25 8       Q    Do you have any recollection of discussing with

04:25 9   Laura and Joanne Siegel that you would acquire or attempt

04:2510   to acquire the interest of that person in Cleveland,

04:2511   Ohio?

04:2512       A    **Not to my knowledge, no.**

04:2613       Q    During 2002 was it your practice to have any

04:2614   Endeavor employee present at meetings such as the one

04:2615   with Laura and Joanne Siegel taking notes?

04:2616       A    **Not to my knowledge.**

04:2617       Q    Was it your practice in 2002 to have another

04:2618   Endeavor employee monitor your telephone calls?

04:2619       A    **What do you mean by monitor my telephone?**

04:2620       Q    Listen in on the phone conversations and take

04:2621   notes or whatever.

04:2622       A    **Not to my knowledge.  I mean sometimes**

04:2623   **assistants take -- listen to phone calls.**

04:2624       Q    During 2002 did you maintain or have an

04:2625   assistant maintain a log of your phone calls?

                                                                54

04:27 1      **A   I don't know.  I don't know if that's a**

04:27 2  **practice.  I have no idea.**

04:27 3      Q   Well, does --

04:27 4      **A   I don't know.**

04:27 5      Q   Did you ever get a list of phone calls to be

04:27 6  returned?

04:27 7      **A   No.  It's on a computer.**

04:27 8      Q   What is on the computer?

04:27 9      **A   My phone calls.**

04:2710      Q   And are those computerized -- is that

04:2711  computerized data printed out --

04:2712      **A   No.**

04:2713      Q   -- for you?

04:2714      Do you search it on a computer?

04:2715      MR. PLONSKER:  Vague.

04:2716      THE WITNESS:  I have no idea what you --

04:2717  BY MR. BERGMAN:

04:2718      Q   How do you obtain that information?

04:2719      **A   It's on my computer.**

04:2720      Q   Okay.  How do you recall your first meeting with

04:2721  the Siegels ending?

04:2722      **A   I think I just got up and walked out because I**

04:2723  **had another meeting, as I recall.**

04:2724      Q   And Mr. Toberoff remained with them?

04:2725      **A   I believe so.**

55

04:28 1           MR. BERGMAN:  Would you mark as Exhibit 4,

04:28 2    please, a copy of an agreement dated as of October 3,

04:28 3    2002, Bates stamped 1878 through 1881.

04:28 4           (Deposition Exhibit 4 marked.)

04:29 5    BY MR. BERGMAN:

04:29 6    Q    My first question to you is whether you've ever

04:29 7    seen this document before.

04:29 8    **A    Not that I recall.**

04:29 9    Q    Is that your signature on the last page?

04:2910   **A    Yes.**

04:2911   Q    To your recollection did you read the agreement

04:2912   before you signed it?

04:2913   **A    Not to my knowledge.  Not to my recollection.**

04:2914   Q    Is that your general practice, Mr. Emanuel, not

04:2915   to read agreements before you sign them?

04:2916          MR. PLONSKER:  It's overbroad, vague, out of

04:2917   context.

04:2918          You can answer if you have a general practice.

04:2919          THE WITNESS:  I don't.

04:2920   BY MR. BERGMAN:

04:2921   Q    Why don't you continue looking at the agreement,

04:3022   and my question after you've done that will be whether

04:3023   you recall ever seeing this agreement before.

04:3024   **A    Didn't I just answer that?**

04:3025   Q    Well, I think you ought to read it before you

                                                          56

04:30 1    tell me that you haven't.

04:30 2         MR. PLONSKER:  Just review it, see if it

04:30 3    refreshes your recollection as to whether you've seen it.

04:30 4         THE WITNESS:  Okay.

04:31 5    BY MR. BERGMAN:

04:31 6    Q   Having reviewed the agreement, do you now recall

04:31 7    seeing this agreement before?

04:31 8    **A   Vaguely.**

04:31 9    Q   Was this agreement entered into following your

04:3110    first meeting with Joanne and Laura Siegel, or did it

04:3111    come after a second meeting that you had with them?

04:3112    **A   I don't recall.**

04:3113    Q   Do you recall having a second meeting with them?

04:3114    **A   Yes.**

04:3115    Q   Okay.  Would you tell me to the best of your

04:3116    recollection what subjects were discussed at that

04:3117    meeting?

04:3118    **A   A meeting that they wanted us to have at Warner**

04:3119    **Bros. to help kind of settle their rights with Warner**

04:3220    **Bros.**

04:3221    Q   And by that point in time had they agreed to pay

04:3222    you a 10 percent fee or pay IP Worldwide a 10 percent

04:3223    fee?

04:3224         MR. PLONSKER:  Vague.  Compound.

04:3225         THE WITNESS:  I don't recall.

                                                            57

04:32 1    BY MR. BERGMAN:

04:32 2        Q.  You'll notice in paragraph 6 there is a

04:32 3    provision --

04:32 4        **A    I am saying -- but you are asking me at that**

04:32 5    **point.  I don't recall at that point if they had done**

04:32 6    **that.  I don't recall.**

04:32 7        Q    Okay.  Do you recall why the term of the

04:32 8    agreement which is set forth in paragraph 5 was limited

04:32 9    to 18 months?

04:32 10       **A    I do not.**

04:32 11       Q    Prior to executing this agreement, Mr. Emanuel,

04:32 12   had you obtained any information as to the value of the

04:32 13   Siegel interest in Superman and Superboy?

04:32 14       **A    Not to my knowledge.  Not to my recollection.**

04:33 15       Q    Do you recall anything about your second meeting

04:33 16   with the Siegels other than the fact that they wanted you

04:33 17   to contact Warner Bros.?

04:33 18       **A    All I remember is -- the only thing I remember**

04:33 19   **is again she went into her pension discussion.  She went**

04:33 20   **into -- the daughter went into having gone into long**

04:33 21   **research about how many times Superman had appeared -- I**

04:33 22   **don't even remember in what context that was -- and**

04:33 23   **that -- on TV and all over the place, and that Warner**

04:34 24   **Bros. was being ridiculously tough on them, and they**

04:34 25   **didn't think that they were being treated fairly, and**

58

04:34 1    **they wanted help.**

04:34 2        Q   And what was the nature of the help that they

04:34 3    said they wanted from you?

04:34 4        **A    They wanted us to help facilitate a deal with**

04:34 5    **Warner Bros. and them that they would conclude would be**

04:34 6    **fair.**

04:34 7        Q   And did they ask you during that second meeting

04:34 8    what you thought would be fair for such a deal?

04:34 9        **A    Not to my recollection.**

04:34 10       Q   At any point in time up until the time that you

04:34 11   contacted Warner Bros., had you discussed with the

04:34 12   Siegels what you thought you could obtain for them from

04:34 13   Warner Bros.?

04:34 14       **A    Not to my recollection.**

04:34 15       Q   Do you have any recollection of telling them in

04:34 16   substance that you could obtain more for them than had

04:35 17   been offered previously?

04:35 18       **A    That would -- well...**

04:35 19           **(Discussion off the record.)**

04:35 20           MR. PLONSKER:  So then answer -- then that's the

04:35 21   answer.

04:35 22           THE WITNESS:  Well, that would conclude that I

04:35 23   knew what was offered before, which I stated that I

04:35 24   didn't recall, so I don't know.

04:35 25   BY MR. BERGMAN:

                                                                59

04:35 1      Q    And is it your testimony that when you did go to

04:35 2   Warner Bros., which we will get to in a minute, that you

04:35 3   had no idea of what it was that you would be asking for

04:35 4   from Warner Bros.?

04:35 5      **A    In -- my recollection is that -- and I'm not**

04:35 6   **sure I'm right.  My recollection is that Warner Bros.**

04:35 7   **wanted the meeting, my recollection of it.**

04:35 8      Q    Okay.  Well, you initiated the discussions with

04:35 9   Warner Bros., didn't you?

04:3510      **A    I don't recall that.  I thought they wanted it,**

04:3511   **so...**

04:3612            MR. BERGMAN:  Would you mark, please, as Exhibit

04:3613   5 a document dated January 21, 2002, Bates stamped 1888

04:3614   to 1890.

04:3615            (Deposition Exhibit 5 marked.)

04:3616   BY MR. BERGMAN:

04:3617      Q    Do you recall seeing this agreement before,

04:3618   Mr. Emanuel?

04:3619            MR. TOBEROFF:  I would just like to note for the

04:3620   record that the date January 21, 2002 I believe is

04:3621   supposed to be 2003.

04:3622            MR. BERGMAN:  That's correct.

04:3623            MR. TOBEROFF:  It says "January 21, 2002" on it.

04:3624            MR. BERGMAN:  I agree it's a typo.  It's a

04:3625   mis-type.

                                                              60

04:36 1        MR. PLONSKER:  On the front page?

04:36 2        MR. BERGMAN:  Yeah.

04:36 3        MR. PLONSKER:  Okay.

04:36 4        MR. TOBEROFF:  It's on every page at the top,

04:37 5    the wrong date.

04:37 6        MR. PLONSKER:  I see.  Okay.

04:37 7        THE WITNESS:  I don't really recall this, but...

04:37 8    BY MR. BERGMAN:

04:37 9        Q    Is that your signature on the page Bates stamped

04:37 10   1890?

04:37 11       **A    Yes.**

04:37 12       Q    In the first paragraph of Exhibit 5, there is a

04:37 13   reference to a recent -- quote, "recent discussion and

04:37 14   disclosure to you of various risks and potential problems

04:37 15   regarding Michael Siegel," close quote.

04:37 16       My first question to you is what was said in

04:38 17   those recent discussions with the Siegels?

04:38 18       MR. PLONSKER:  Fails to lay a foundation.  May

04:38 19   call for speculation.

04:38 20       THE WITNESS:  I don't recall, so I'm sorry.

04:38 21   BY MR. BERGMAN:

04:38 22       Q    Okay.  What were the various risks and potential

04:38 23   problems regarding Michael Siegel which had been

04:38 24   disclosed to Joanne and Laura Siegel?

04:38 25       MR. PLONSKER:  Fails to lay a foundation.  May

61

04:38 1    call for speculation.

04:38 2         THE WITNESS:  I don't recall.

04:38 3    BY MR. BERGMAN:

04:38 4    Q    The paragraph goes on to refer to, quote, "the

04:38 5    mitigation of possible conflicts of interest with respect

04:38 6    to the following proposed remedial actions."

04:38 7         Do you have any understanding of what is meant

04:38 8    by that phrase?

04:38 9    A    No.

04:3810    Q    Paragraph No. 1 states that you will, quote,

04:3911    "attempt to purchase all of Michael Siegel's rights,

04:3912    title and interest in Superman, Superboy and The Spectre

04:3913    ('MS Interests") to be financed by you [sic]."

04:3914         What was your purpose in attempting to purchase

04:3915    all of Michael Siegel's rights?

04:3916    A    I don't recall.

04:3917    Q    How much were you preparing to pay to purchase

04:3918    all of Michael Siegel's rights?

04:3919    A    I don't recall.

04:3920    Q    Did you have any discussion with Mr. Toberoff

04:4021    regarding how much money you should pay to purchase all

04:4022    of Michael Siegel's rights?

04:4023         MR. PLONSKER:  You can say yes or no.

04:4024         THE WITNESS:  Not to my knowledge.  Not that I

04:4025    remember.

                                                              62

04:40 1    BY MR. BERGMAN:

04:40 2        Q   Were you aware before you saw this contract

04:40 3    today, Mr. Emanuel, that you had agreed to attempt to

04:40 4    purchase all of Michael Siegel's rights?

04:40 5        **A   I didn't recall this contract until I just saw**

04:40 6    **it, and I don't remember that.**

04:40 7        MR. TOBEROFF:  I didn't want to interrupt, talk

04:40 8    over him.  I didn't get it in quick enough, but it

04:40 9    misstates -- this doesn't say he agrees to purchase the

04:4010    rights.  It sets forth conditions should he purchase.

04:4011        MR. BERGMAN:  Well, am I correct that paragraph

04:4112    1 says, "Ariel Emanuel...will attempt to purchase all of

04:4113    Michael Siegel's rights"?

04:4114        MR. TOBEROFF:  It's not an agreement where he's

04:4115    bound to purchase the rights.  It says "attempt to

04:4116    purchase."  That's my only point.

04:4117    BY MR. BERGMAN:

04:4118        Q   What, if anything, did you do to attempt to

04:4119    purchase Michael Siegel's rights?

04:4120        **A   Nothing that I recall.**

04:4121        Q   When you signed Exhibit 5, did you have any

04:4122    intention of attempting to purchase all of Michael

04:4123    Siegel's rights?

04:4124        MR. PLONSKER:  Fails to lay a foundation.

04:4125        THE WITNESS:  I don't recall.

                                                            63

04:41 1    BY MR. BERGMAN:

04:41 2        Q    Paragraph 3 of Exhibit 5 sets forth certain

04:41 3    provisions which would take effect in the event Michael

04:42 4    Siegel agrees to the above purchase and settlement.   One

04:42 5    of those provisions is subparagraph (d) on the next page,

04:42 6    which provides that you would reimburse the Siegels for

04:42 7    25 percent of any expenses paid by them after October 17,

04:42 8    2000, in connection with the Jerome Siegel copyright

04:42 9    termination interests.

04:4210            How did you arrive at that 25 percent figure?

04:4211            MR. PLONSKER:   I'm going to object that I think

04:4212    you didn't read the entire paragraph, and therefore it

04:4213    may be incomplete, and I think it's vague, but go ahead

04:4214    and answer if you --

04:4215            THE WITNESS:   I actually don't remember how it

04:4216    got there.

04:4217    BY MR. BERGMAN:

04:4218        Q    What was your purpose in agreeing to reimburse

04:4219    the Siegels for that 25 percent of their expenses?

04:4320        **A    I don't recall.**

04:4321        Q    The paragraph above that, subparagraph (c),

04:4322    provides in part that you will fully indemnify the

04:4323    Siegels and hold them completely harmless from any loss

04:4324    arising out of the purchase of the Michael Siegel

04:4325    interest.

                                                          64

04:43 1          Why were you prepared to do that?

04:43 2     A    I don't recall.

04:43 3     Q    Had the Siegels asked that you do that?

04:43 4     A    I don't recall.

04:43 5     Q    Do you recall any of the circumstances that led

04:43 6  up to your execution of this agreement?

04:43 7     A    All I recall is when you just stated this

04:43 8  gentleman and whatever he -- I just remember his name.  I

04:44 9  don't remember any of the circumstances surrounding him.

04:44 10     Q    And do you recall any of the circumstances which

04:44 11  led up to the creation of Exhibit 5?

04:44 12     A    Not that -- not to my knowledge, no, because I

04:44 13  didn't remember this at all.

04:44 14     Q    Did Mr. Toberoff discuss the contents of this

04:44 15  agreement with you prior to your execution of it?

04:44 16          MR. PLONSKER:  You can say yes or no.

04:44 17          THE WITNESS:  Not that I recall.  I don't

04:44 18  recall.

04:44 19  BY MR. BERGMAN:

04:44 20     Q    Did you have any employee or attorney at

04:44 21  Endeavor review this agreement prior to the time you

04:44 22  executed it?

04:44 23     A    Not to my knowledge.  I don't recall.

04:45 24     Q    Had the Siegels asked you to purchase the

04:45 25  Michael Siegel interest?

                                                              65

04:45 1       **A**    **I don't recall.**

04:45 2       Q   Are you aware of any problems that would have

04:45 3   been avoided had you purchased the Michael Siegel rights?

04:45 4       **A**    **I don't recall.**

04:45 5       Q   Subparagraph 3 (e) provides that in the event

04:45 6   that the purchase of Michael Siegel rights occurred, you

04:45 7   would pay 25 percent of various listed sums, including

04:45 8   any fees, commissions or settlement amounts to the law

04:45 9   firm of Gang, Tyre, Ramer & Brown.

04:46 10          Why were you agreeing to do that?

04:46 11      **A**    **I don't recall.**

04:46 12      Q   Do you now recall that Gang, Tyre, Ramer & Brown

04:46 13  were the attorneys who represented the Siegels prior to

04:46 14  Mr. Toberoff?

04:46 15      **A**    **No.**

04:46 16      Q   What was the consideration that flowed to you

04:46 17  for your obligations to indemnify the Siegels and to pay

04:46 18  25 percent of their legal fees and the other obligations

04:46 19  you incurred under this agreement?

04:46 20          MR. PLONSKER:  Calls for a legal conclusion.

04:46 21  Vague.

04:46 22          THE WITNESS:  I have no idea.

04:46 23  BY MR. BERGMAN:

04:46 24      Q   What was your reason for entering into it?

04:46 25          MR. PLONSKER:  Fails to lay a foundation.  Calls

66

04:46 1    for speculation.

04:46 2         THE WITNESS:   I don't even recall it, so then

04:46 3    you're asking me on something that I don't recall, to

04:46 4    then conclude what I don't recall it, so I can't really

04:47 5    answer that question.   I'm sorry.   I'm not trying to be

04:47 6    argumentative.   I just don't recall it, so you're asking

04:47 7    me a conclusion on a situation I don't remember.

04:47 8    BY MR. BERGMAN:

04:47 9         Q    Okay.   Following Exhibit 5 in which you agreed

04:47 10   to attempt to purchase all of Michael Siegel's rights,

04:47 11   did you take any steps to purchase all of Michael

04:47 12   Siegel's rights?

04:47 13        **A    Not to my knowledge.**

04:47 14        Q    Did you contact Michael Siegel?

04:47 15        **A    Not to my knowledge.**

04:47 16        Q    Did you contact any attorney representing him?

04:47 17        **A    Not to my recollection.**

04:47 18        Q    Does the name Bulson, B U L S O N, seem familiar

04:47 19   to you?

04:47 20        **A    No.**

04:47 21        Q    Do you recall ever speaking with an attorney by

04:47 22   the name of Bulson representing Michael Siegel?

04:47 23        **A    Not to my recollection.**

04:48 24        Q    Did you write any letters to Michael Siegel or

04:48 25   his representative attempting to purchase his rights?

                                                              67

04:48 1    **A    Not to my recollection.**

04:48 2        Q    Do you have any recollection as to why you

04:48 3    didn't attempt to purchase all of Michael Siegel's

04:48 4    rights?

04:48 5        MR. PLONSKER:   I think that that misstates his

04:48 6    testimony.  You asked him one way.  He said he didn't

04:48 7    remember.  So now you're asking him -- it doesn't make --

04:48 8    okay.  So --

04:48 9        THE WITNESS:   He's asking a point on something I

04:48 10   don't remember, so I don't remember.

04:48 11       MR. PLONSKER:   Okay.

04:48 12   BY MR. BERGMAN:

04:48 13       Q    Putting time completely out of the picture,

04:48 14   Mr. Emanuel, you entered into this contract.  That's your

04:48 15   signature at the back of it.

04:48 16       **A    Correct.**

04:48 17       Q    Did you at any point in time make any attempt to

04:49 18   purchase Michael Siegel's rights?

04:49 19       **A    Not to my knowledge.**

04:49 20       Q    Did you ever have any discussion with Laura or

04:49 21   Joanne Siegel with respect to your agreement in Exhibit 5

04:49 22   to attempt to purchase all of Michael Siegel's rights?

04:49 23       **A    I don't recall.**

04:49 24       Q    Did either of them ever call you up or meet with

04:49 25   you and ask how are the negotiations with Michael Siegel

68

04:49 1    going?

04:49 2        A    I don't recall.

04:49 3        Q    Did you ever purport to report to the Siegels as

04:49 4    to how the negotiations with Michael Siegel were going?

04:49 5        A    Not to my recollection.

04:49 6        Q    Did you ever discuss with Mr. Toberoff the

04:49 7    reason for your agreeing to attempt to purchase all of

04:50 8    Michael Siegel's rights?

04:50 9            MR. PLONSKER:  Object on the grounds of the

04:50 10   attorney-client privilege and instruct him not to answer.

04:50 11           (Instruction not to answer.)

04:50 12   BY MR. BERGMAN:

04:50 13       Q    Did you ever take any steps to determine what

04:50 14   Michael Siegel's rights in the Superman and Superboy

04:50 15   properties were worth?

04:50 16       A    Not to my recollection.

04:50 17       Q    Or what you should offer to Michael Siegel to

04:50 18   purchase his rights?

04:50 19       A    I don't even remember this Michael Siegel, so

04:50 20   you're asking me -- you keep on asking me the same

04:50 21   question.  I don't remember it.  I don't remember -- I

04:50 22   just remember this guy from Cleveland.  I don't -- I've

04:50 23   been answering I don't remember.  So it's not like --

04:50 24           MR. PLONSKER:  He's testing your memory, and --

04:50 25           THE WITNESS:  I know.  I appreciate that.

                                                              69

04:50 1   I'm -- you know, the -- and I appreciate it.  You brought

04:50 2   up -- it's the first time I remembered this thing from

04:50 3   Cleveland, but that's the -- I'll think about it some

04:51 4   more, but I don't think so.

04:51 5   BY MR. BERGMAN:

04:51 6       Q    Okay.  Thank you.  If you recall --

04:51 7       A    **I'll let you know.**

04:51 8       Q    -- during the course of the deposition, please

04:51 9   say so.

04:51 10           Okay?

04:51 11      A    **Sure.**

04:51 12      Q    Do you recall discussing the Laura and Joanne

04:51 13   Siegel interest in Superman with Bruce Rosenblum?

04:51 14      A    **No.**

04:51 15           MR. BERGMAN:  Would the reporter mark as Exhibit

04:51 16   6 a document that is undated.  It has previously been

04:51 17   introduced as an exhibit at a prior deposition and

04:51 18   purports to be from Mr. Emanuel.

04:52 19           (Deposition Exhibit 6 marked.)

04:52 20   BY MR. BERGMAN:

04:52 21      Q    Could you review that letter, Mr. Emanuel, and

04:52 22   tell me if it refreshes your recollection --

04:52 23           MR. PLONSKER:  Of -- I'm sorry.  I thought you

04:52 24   were done.  About?

04:52 25   BY MR. BERGMAN:

70

04:52 1      Q    -- about having any discussion with

04:52 2  Mr. Rosenblum concerning the Siegel interest?

04:52 3           THE WITNESS:  Repeat the question.  I'm sorry.

04:52 4           MR. BERGMAN:  Yes.  Could you repeat it, please.

04:52 5           (Record read as follows:

04:52 6               "Could you review that letter, Mr.

04:52 7           Emanuel, and tell me if it refreshes

04:52 8           your recollection about having any

04:52 9           discussion with Mr. Rosenblum

04:5210           concerning the Siegel interest?")

04:5211           THE WITNESS:  No, it does not.

04:5212  BY MR. BERGMAN:

04:5213      Q    And I asked you that, sir, because you realize

04:5314  you begin by saying, "As discussed"?

04:5315      **A    I appreciate that.**

04:5316      Q    I notice the initials above your name "dbnr."

04:5317  Does that have any meaning to you?

04:5318      **A    Since I was once a secretary, dictated not read.**

04:5319      Q    Thank you.

04:5320      **A    I was a good secretary.**

04:5321      Q    I'll bet you were.

04:5322      **A    I was.**

04:5323      Q    Now, subsequent to this letter, although it

04:5324  isn't dated, but you did in fact have a meeting with John

04:5325  Schulman and certain other parties concerning the Siegel

71

94

04:53 1    interest, didn't you?

04:53 2         A   I have no idea of the time frame.

04:53 3         Q   Okay.  At any point in time.

04:53 4         A   I did have a meeting with a large gentleman from

04:54 5    Warner Bros., a lawyer, and a person from DC Comics and

04:54 6    Mr. Toberoff and myself.

04:54 7         Q   Okay.

04:54 8         A   I mean you're asking me about names.  I don't

04:54 9    recall except his and mine.

04:54 10        Q   Mr. Schulman is a large gentleman.

04:54 11            MR. PLONSKER:  He will be happy to be described

04:54 12   that way.

04:54 13            MR. BERGMAN:  Yes.

04:54 14            THE WITNESS:  He's a nice guy.

04:54 15            MR. PLONSKER:  Yes, he is.

04:54 16   BY MR. BERGMAN:

04:54 17        Q   What do you recall saying at that meeting?

04:54 18        A   I don't recall much.  The main discussions I

04:54 19   think were between Mr. Toberoff and...

04:54 20            MR. PLONSKER:  Mr. Schulman?

04:54 21            THE WITNESS:  ...Mr. Schulman, and I think the

04:54 22   gentleman from DC who had flown in, I think he said he

04:54 23   had flown in for the meeting, as I recall, and all I

04:54 24   remember him saying is something to the effect that all

04:54 25   we have is -- Mr. Schulman said something to the effect

                                                              72

04:55 1    that -- something about DC being a sub something.  It was

04:55 2    so convoluted.  And DC saying all we really have is 5

04:55 3    percent of gross of Superman, and that's all I -- I mean

04:55 4    there was kind of back-and-forth between them, and I was

04:55 5    kind of just taking it in.  I don't remember what I said,

04:55 6    if I said anything at all.  And I'm sorry that's a little

04:55 7    convoluted, so...

04:55 8    BY MR. BERGMAN:

04:55 9        Q   During the course of the meeting, did either you

04:55 10   or Mr. Toberoff make an offer as to the amount of money

04:55 11   which the Siegels were prepared to accept in exchange for

04:55 12   their rights?

04:55 13       A   I don't recall.

04:55 14       Q   Do you recall any discussion as to the financial

04:55 15   basis upon which the matter could be resolved?

04:55 16       A   I'm assuming it might have happened.  All I

04:56 17   remember -- the only major financial kind of conclusion

04:56 18   of it I remember was the guy from DC saying that all they

04:56 19   had was 5 percent of gross, and it was a sub-company of

04:56 20   Warner Bros., and I really didn't remember why that had

04:56 21   anything to do with this situation, but that's what I

04:56 22   remember.

04:56 23       Q   Do you recall during the course of that meeting

04:56 24   offering to convey the Siegel rights to DC --

04:56 25       A   Actually, excuse me, I want to --

                                                              73

04:56 1      Q    Okay.

04:56 2      A    I do remember the large gentleman saying that he

04:56 3  thought that -- he did go over -- he did say -- he said

04:56 4  something about their pension and paying their pension,

04:57 5  and this whole pension thing came up a lot, and that he

04:57 6  thought they were being fair, and I think I made the

04:57 7  statement, my normal statement, that fair is where you

04:57 8  end up.  I think that's -- I think that was stated from

04:57 9  my side.  I do remember that.  And that's all I really

04:57 10 recall.

04:57 11     Q    Do you remember either you or Mr. Toberoff

04:57 12 stating in substance that the Siegels wanted to end up

04:57 13 with $50 million for their interest?

04:57 14     A    I don't recall that.

04:57 15     Q    Do you recall any figure being given to DC by

04:57 16 either you or Mr. Toberoff during that meeting?

04:57 17     A    Not...  I don't -- all I remember is them

04:57 18 talking about money.  I don't -- and I don't remember

04:57 19 what the numbers were.  I don't, really.  I'm sorry.

04:58 20     Q    Okay.  As you went into that meeting,

04:58 21 Mr. Emanuel, did you have in mind any particular amount

04:58 22 of money or objective that you wanted to achieve in that

04:58 23 meeting?

04:58 24     A    I was just there to kind of listen and take it

04:58 25 all in and see if I could -- you know, kind of in my head

74

04:58 1   just kind of take it all in and see where people stood.

04:58 2   I wasn't in there to negotiate, from my perspective going

04:58 3   in.

04:58 4       Q    Okay.  And was there any discussion as to the

04:58 5   amount of revenues that the Superman property was

04:58 6   generating at that time?

04:58 7       A    There might have been.  I don't recall.  There

04:58 8   might have been.

04:58 9       Q    Now, you say you weren't there to negotiate.

04:58 10   What was -- what were you there for?

04:58 11       A    Really I was there, you know, to -- I was

04:59 12   observing it, mainly.  I was kind of a presence.  I was

04:59 13   there to observe the parties.  I wasn't negotiating.

04:59 14       Q    Okay.  Was it discussed between you and

04:59 15   Mr. Toberoff that he would handle the negotiation at that

04:59 16   meeting?

04:59 17       A    I don't recall if there was a pre-meeting -- I

04:59 18   don't think there was a pre-meeting to that.

04:59 19       Q    Before you and Mr. Toberoff went into this

04:59 20   meeting with Mr. Schulman -- and the gentleman from DC

04:59 21   Comics is Paul Levitz, I believe.

04:59 22       A    Shorter gentleman.

04:59 23       Q    Yes.

04:59 24           Before going into that meeting, had you made any

04:59 25   determination in your mind as to the amount of money you

75

04:59 1    wanted to obtain for the Siegels?

04:59 2        A    Not to my knowledge.

04:59 3        Q    Did you ever reach that point where you decided

05:00 4    I want to get X dollars for their interest?

05:00 5        A    You know, in my other life as an agent, I never

05:00 6    determine value.  As -- again, as I said to you, fair is

05:00 7    where you end up so -- taught to me from a person from

05:00 8    Warner Bros., Art Stolnitz.

05:00 9            So when you say to me did I determine value, I

05:0010    never do that, because where we end up is where we end

05:0011    up.  That's where fair is from your side and from my

05:0012    side.  So I never -- when you ask me do you have this

05:0013    pre -- I don't.  I never do that.

05:0014        Q    But isn't where you end up --

05:0015        A    Is fair.

05:0016        Q    -- molded and shaped by where you start?

05:0017        A    No, not from my knowledge.  You should take some

05:0018    lessons.  I've done -- my father says I've done pretty

05:0119    well.

05:0120        Q    How did the meeting at Warner Bros. end?

05:0121        A    Schulman, the tall guy, I think said that, you

05:0122    know -- I think he ended it that there was nothing more

05:0123    to discuss or that we would -- I think that's what he

05:0124    said, something like that.

05:0125        Q    Did Mr. Schulman say that after a specific

                                                              76

05:01 1    figure had been raised by either Mr. Toberoff or by you?

05:01 2        A   Not to my knowledge.  I don't recall that.

05:01 3        Q   Did you report to Joanne or Laura Siegel

05:01 4    following that meeting as to what had transpired at that

05:01 5    meeting?

05:01 6        A   Did I?

05:01 7        Q   Yes.

05:02 8        A   I don't remember.

05:02 9        Q   Do you recall having a meeting with the two

05:0210    Siegel women following the Warner's meeting?

05:0211        A   I only remember four meetings with the Siegels.

05:0212        Q   Okay.  We've covered two.

05:0213        A   I don't remember in what timeline.

05:0214        Q   Okay.  What do you recall transpiring at the

05:0215    third meeting?

05:0216        A   I can't actually put it in context of a first,

05:0217    second and third meeting.  I know there was a third

05:0218    meeting because I remember there was four meetings.  I

05:0319    don't remember.  I'm sorry.

05:0320        Q   Okay.  Do you have any recollection at all as to

05:0321    what happened in either of the last two meetings that you

05:0322    had with the Siegels?

05:0323        A   I don't want to assume anything because I'm

05:0324    told -- I don't want to assume anything that then leads

05:0325    to more hours here.  I'm assuming something was said, but

                                                                    77

05:03 1  I don't remember, and I'm trying -- I'll try and think

05:03 2  about it.

05:03 3      Q   At any meeting that you had with the Siegels at

05:03 4  any time, did you advance an opinion as to what their

05:03 5  rights were worth?

05:03 6      A   Not to my knowledge and my recollection.

05:03 7      Q   At any meeting with the Siegels, did you state

05:03 8  to them in substance what you thought you could obtain

05:03 9  from DC for their rights?

05:04 10     A   Not to my knowledge.

05:04 11     Q   To your recollection did you ever state to the

05:04 12  Siegels that you could obtain more money than Warner

05:04 13  Bros. and DC Comics had previously offered to Mr. Marks?

05:04 14     A   Wasn't that asked and answered?

05:04 15         MR. PLONSKER:   In a different form.  And I'm

05:04 16  going to object --

05:04 17         THE WITNESS:   I'll stay with the same answer.

05:04 18         MR. PLONSKER:   I'm going to object on the ground

05:04 19  that it fails to lay a foundation that he has any

05:04 20  knowledge as to what was offered to them by DC or Warner

05:04 21  Bros.  I think he said that he didn't remember or didn't

05:04 22  know.

05:04 23  BY MR. BERGMAN:

05:04 24     Q   As you sit here now, is it your understanding

05:04 25  that you never knew what Warner Bros. or DC Comics had

78

05:04 1     offered to the Siegels?

05:04 2         A   No, I don't.

05:04 3         Q   And therefore you would not have told the

05:04 4     Siegels that the DC offer was ridiculously low?

05:05 5         A   I don't recall saying that.

05:05 6         Q   Did you ever attempt to characterize to either

05:05 7     Joanne Siegel or Laura Siegel your opinion of the DC

05:05 8     offer?

05:05 9         A   Not to my knowledge.  I don't recall.

05:05 10        MR. BERGMAN:  Off the record.

05:05 11        (Discussion held off the record.)

05:05 12        MR. BERGMAN:  Would you mark, please, as Exhibit

05:05 13    7 a document Bates stamped EN 142.

05:05 14        (Deposition Exhibit 7 marked.)

05:06 15        MR. TOBEROFF:  Are you sure we have the right

05:06 16    exhibit numbers, because I've been getting these in

05:06 17    sequence, and the other one was marked 6 in another case?

05:06 18        MR. BERGMAN:  Yes, and was 6 in this case as

05:06 19    well, Marc.

05:06 20        Q   Mr. Emanuel, Exhibit 7 is a document that was

05:06 21    produced by your counsel.  You'll notice that there is

05:06 22    writing in the upper left-hand corner saying "Toberoff."

05:06 23        A   Yeah.

05:06 24        Q   Is that your writing?

05:06 25        A   No.

79

05:06 1        Q    Do you recognize whose writing it is?

05:06 2        A.   No.

05:06 3        Q    Midway down the page over on the right-hand

05:06 4   side, there is handwriting that appears to say, "Superman

05:07 5   - may find problem now, but doesn't surface until after

05:07 6   the" I believe "term."

05:07 7             Is that your handwriting?

05:07 8        A    No.

05:07 9        Q    Do you recognize that handwriting?

05:0710        A    No.

05:0711        Q    Do you have any idea of what that notation

05:0712   refers to?

05:0713        A    No.

05:0714             MR. BERGMAN:  Would you mark as Exhibit 8 a

05:0715   document Bates stamped EN 8 through 19.

05:0716             (Deposition Exhibit 8 marked.)

05:0817   BY MR. BERGMAN:

05:0818        Q    Mr. Emanuel, would you look at page 5, please --

05:0819        A    Yes.

05:0820        Q    -- and tell me if that's your signature?

05:0821        A    Sorry.

05:0822             Absolutely, yes.  Signatures.

05:0823        Q    Yes.

05:0824             Do you recall seeing this agreement before?

05:0825        A    No.

                                                               80

05:08 1       Q.   Do you want to review it?

05:08 2       A    Okay.  Absolutely.

05:09 3            Okay.

05:09 4       Q    This agreement on its face provides for the

05:09 5  winding up, termination, conclusion of IP Worldwide --

05:09 6       A    Correct.

05:09 7       Q    -- LLC.

05:09 8            Can you tell me why the IP Worldwide, LLC

05:09 9  venture was terminated?

05:09 10      A    Because I didn't want to continue.

05:09 11      Q    And that was because of what?

05:10 12      A    I just didn't think it was worth my time

05:10 13  anymore.

05:10 14      Q    Paragraph 2 of the agreement at page 2 provides

05:10 15  for the assignment and transfer to IPW, LLC --

05:11 16      A    Yeah.

05:11 17      Q    -- certain rights.

05:11 18      A    Correct.

05:11 19      Q    Do you have any interest in IPW, LLC?

05:11 20      A    I don't remember any of this.  This was done by

05:11 21  Tom McGuire, this conclusion, so I don't really remember.

05:11 22  I just wanted out.  I told him to get me out.  So I don't

05:11 23  recall.

05:11 24      Q    The agreement provides for the recoupment of

05:11 25  certain invested funds.  It provides upon execution you

                                                              81

05:11 1    would reimburse to PPC a certain sum that has been

05:12 2    redacted.

05:12 3         What was the reason for you reimbursing funds to

05:12 4    Pacific Pictures in connection with the termination of

05:12 5    IPW Worldwide?

05:12 6    **A   You'll have to ask Tom McGuire.  I don't recall.**

05:12 7    **I truly said, "Just get me out of it, I want out of it,**

05:12 8    **and go negotiate the deal."**

05:12 9         MR. PLONSKER:  Okay.  Let's not get too much

05:1210    into communications with Tom because those would be

05:1211    privileged also.

05:1212         THE WITNESS:  Okay.

05:1213         MR. PLONSKER:  Next question, please.

05:1214         THE WITNESS:  That was a slap on the wrist.

05:1215         MR. PLONSKER:  That was.

05:1216    BY MR. BERGMAN:

05:1217    Q   At the top of page 3 the agreement provides that

05:1218    you would be solely responsible for payments, if any, to

05:1219    Endeavor arising under the joint venture agreement.

05:1320         Had Endeavor invested money in the joint

05:1321    venture?

05:1322    **A   No.**

05:1323    Q   Was Endeavor entitled to receive certain funds

05:1324    from the joint venture?

05:1325    **A   I don't recall.**

                                                              82

05:13 1  Q Aside from your desire to get out of the IP

05:13 2 Worldwide, did you have any discussion with Mr. Toberoff

05:13 3 regarding the reasons why IP Worldwide was being

05:13 4 terminated?

05:13 5  **A All I remember saying is I didn't want to**

05:13 6 **continue.  It wasn't worth my time.  I had -- it was a**

05:13 7 **distraction for me, and I needed to focus on the agency.**

05:14 8  Q To your recollection had Mr. Toberoff suggested

05:14 9 that IP Worldwide be terminated?

05:1410  **A I don't recall.**

05:1411  Q Did the winding up of Worldwide have anything to

05:1412 do to your knowledge with the initiation of legal

05:1413 proceedings concerning the Siegel interest?

05:1414  **A I don't recall.  All I recall is that I wanted**

05:1415 **out.**

05:1416  Q Having looked at these agreements, do you have

05:1417 any further understanding than you did at the outset of

05:1418 the deposition as to what your financial interest, if

05:1519 any, is in the Siegel Superman interest at this point?

05:1520  **A No.**

05:1521  Q Aside from this agreement winding up IP

05:1522 Worldwide, have you entered into any other agreement with

05:1523 Mr. Toberoff concerning the Siegel interest in Superman

05:1524 or Superboy?

05:1525  **A Not to my knowledge.**

83

05:15 1      Q   Do you have any oral understanding with him

05:15 2  regarding any moneys you might receive as a result of the

05:15 3  outcome of this litigation?

05:15 4      **A   Not to my knowledge.**

05:15 5      Q   Okay.  Thank you.  I have nothing further.

05:15 6         MR. PLONSKER:  Okay.  Stipulation?

05:15 7         MR. BERGMAN:  Mr. Toberoff?

05:16 8         MR. PLONSKER:  Do you have a typical stipulation

05:16 9  you're referring to?

05:16 10       MR. TOBEROFF:  What's your question?

05:16 11       MR. BERGMAN:  Whether you have any.

05:16 12       MR. TOBEROFF:  No, I do not.

05:16 13       MR. BERGMAN:  In that event, I'm prepared to

05:16 14  stipulate that the reporter will be relieved of his

05:16 15  statutory duties, that the transcript of the deposition

05:16 16  will be delivered to Mr. Plonsker, and that Mr. Emanuel

05:16 17  will have 15 days following that delivery within which to

05:16 18  execute and/or correct the transcript?

05:16 19       MR. PLONSKER:  Do you have a date coming up that

05:16 20  it needs to be done by?  Since we have Thanksgiving

05:16 21  coming up, I just want to make sure he has enough time to

05:16 22  look at it.

05:16 23       MR. BERGMAN:  30 days?

05:16 24       MR. PLONSKER:  That's fine.

05:16 25       MR. BERGMAN:  Is that agreeable?

84

05:16 1          MR. TOBEROFF:   Fine with me.

1

2

3

4

5

6

7

8        I, ARIEL Z. EMANUAL, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14        EXECUTED this _____ day of _____,

15   20____, at _____, _____.
                        (City)                (State)

16

17

18

19        _____
          ARIEL Z. EMANUAL

20

21

22

23

24

25

                                                        86

```
 1    STATE OF CALIFORNIA      )
                               )  ss
 2    COUNTY OF LOS ANGELES    )

 3

 4            I, DAVID S. COLEMAN, a Certified Shorthand

 5    Reporter, do hereby certify:

 6            That prior to being examined, the witness in the

 7    foregoing proceedings was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing

 9    but the truth;

10    That said proceedings were taken before me at

11    the time and place therein set forth and were taken

12    down by me in shorthand and thereafter transcribed

13    into typewriting under my direction and supervision;

14    I further certify that I am neither counsel

15    for, nor related to, any party to said proceedings,

16    nor in anywise interested in the outcome thereof.

17            In witness whereof, I have hereunto subscribed

18    my name.

19

20    Dated:    NOV 0 8 2006

21

22                     _____

23                     DAVID S. COLEMAN
                       CSR No. 4613
24

25
```

**EXHIBIT 3**

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL, an individual;     CERTIFIED COPY
    and LAURA SIEGEL LARSON, an
5   individual,                        )
                                       )
6                      PLAINTIFFS,    )
                                       )      CASE NOS.
7             VS.                     )      04-8400 SGL (RZx)
                                       )      04-8776 SGL (RZx)
8   TIME WARNER, INC., a corporation; )
    WARNER COMMUNICATIONS, INC.;   a  )
9   corporation; WARNER BROS.         )
    ENTERTAINMENT, INC., a corporation;)
10  WARNER BROS. TELEVISION PRODUCTION,)
    INC., a corporation; DC COMICS, a )
11  general partnership,              )
                                       )
12                     DEFENDANTS.    )
    _____)

13

14

15                   DEPOSITION OF

16                     PETER ROTH

17            LOS ANGELES, CALIFORNIA

18                 NOVEMBER 14, 2006

19

20

21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com
23

24  REPORTED BY:      CHRISTY A. CANNARIATO, CSR #7954

25  FILE NO.:         A009CB8
                             EXHIBIT 3

111
1

1          Q.    I'd like to show you three exhibits which have

2    been marked as Exhibits 1, 2, and 3 previously.  Exhibit 1

3    consists of an agreement between DC Comics and Warner

4    Bros. Television dated December 5, 2000.  And it's a

5    multi-page document Bate stamped 5809 to 5829.

6                Exhibit 2 is a document entitled Smallville

7    Rights Option and Assignment Agreement dated as of

8    December 5, 2000, as amended September 5, 2002.  It

9    appears to be an amendment of Exhibit 1.  And it's Bate

10   stamped 5670 to 5692.

11               And lastly Exhibit 3 is entitled Amendment to

12   Rights Agreement Smallville.  It's not dated.  It bears

13   bate stamps 5801 to 5803.

14               Have you seen these documents before today?

15               (Plf Exhs 1, 2, 3 marked for identification.)

16        A.    No.

17        Q.    Who at Warner Bros. Television negotiated this

18   agreement with DC?

19        A.    I don't know.

20        Q.    Do you have any belief one way or the other who

21   negotiated it?

22        A.    I'm not sure.

23        Q.    Do you know who negotiated it at DC?

24        A.    No.

25        Q.    Do you know who drafted the agreement at Warner

1  Bros. Television?

2      A.    No.

3      Q.    What about at DC?

4      A.    No.

5      Q.    Is it unusual that you've never seen this

6  document prior to today?

7      A.    No.

8      Q.    You don't generally review the documents --

9      A.    I do not.

10     Q.    -- the agreements of this nature?

11     A.    Never.

12     Q.    I'd just like you to take Exhibit 2, which is

13  the amended formal agreement.  And if you could turn to

14  Exhibit A on page 5677.  Exhibit A describes the property

15  that is being -- the television rights to which are being

16  assigned to Warner Bros. Television.  Paragraph 1, if you

17  go down to the seventh line, it describes that property as

18  "all material, tangible and intangible, detailing the

19  stories and adventures of the comic book character known

20  as Clark Kent or Superman, the Character."  Do you see

21  that?

22     A.    Mmh-hmm.  Yes.

23     Q.    And then as you read down it expands upon that

24  definition.  Do you see that?

25     A.    Yeah.

1  STATE OF _____ )
                                ) SS.
2  COUNTY OF _____ )

3

4

5

6

7          I, the undersigned, declare under penalty

8  of perjury that I have read the foregoing transcript,

9  and I have made any corrections, additions or

10  deletions that I was desirous of making; that the

11  foregoing is a true and correct transcript of

12  my testimony contained therein.

13          EXECUTED this _____ day of _____,

14  _____, at _____, _____.
                      (City)              (State)
15

16

17

18          _____
                      PETER ROTH
19

20

21

22

23

24

25

114

REPORTER'S CERTIFICATE

1
2
3
4        I, CHRISTY A. CANNARIATO, CSR #7954, Certified
5    Shorthand Reporter, certify:
6        That the foregoing proceedings were taken before
7    me at the time and place therein set forth, at which time
8    the witness was put under oath by me;
9        That the testimony of the witness, the questions
10   propounded, and all objections and statements made at the
11   time of the examination were recorded stenographically by
12   me and were thereafter transcribed;
13       That the foregoing is a true and correct
14   transcript of my shorthand notes so taken.
15       I further certify that I am not a relative nor
16   employee of any attorney of the parties, nor financially
17   interested in the action.
18       I declare under penalty of perjury under the laws
19   of California that the foregoing is true and correct.
20       Dated this 1ST day of December, 2006.
21
22
23
24   CHRISTY A. CANNARIATO, CSR #7954
25

**EXHIBIT 4**

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA          )
SIEGEL LARSON,                   )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )    No. 04-8400 SGL (RZx)
                                 )
WARNER BROS. ENTERTAINMENT        )         -and-
INC., et al.,                    )
                                 )    No. 04-8776 SGL (RZx)
          Defendants.            )
_____)
AND RELATED CROSS-ACTION.        )
_____)


VIDEOTAPED DEPOSITION OF MARC S. EVANIER

Beverly Hills, California

Friday, March 30, 2007


Reported by:

DAVID S. COLEMAN          EXHIBIT 4

CSR No. 4613

116

11:18 1        THE WITNESS: Let me have the question again

11:18 2 then. I'm sorry.

11:18 3        (Record read as follows:

11:18 4          "Q   So can you tell me what the

11:18 5        range is of what a copyright owner of

11:18 6        a comic book character would receive

11:18 7        in connection with exploitation of a

11:18 8        motion picture that includes his

11:19 9        character?")

11:19 10 BY MR. PERKINS:

11:19 11    Q  In a contract. Just to clarify --

11:19 12    A  I would have to see the contract. You would

11:19 13 have to be more specific.

11:19 14    Q  Well, are you familiar generally with any deals

11:19 15 that have taken place with respect to comic book

11:19 16 characters and motion picture exploitation?

11:19 17    A  I don't know how to answer that. I am familiar

11:20 18 with my own but not to the extent where I can quote

11:20 19 numbers to you.

11:20 20    Q  Well, are you familiar with the financial terms

11:20 21 of any motion picture deal for a copyright owner of a

11:20 22 comic book character?

11:20 23    A  The way you asked the question, no.

11:20 24    Q  Are you familiar at all with a range of

25 percentages that a copyright owner of a comic book

11:20  1 character would receive in connection with exploitation

11:20  2 of a motion picture?

11:20  3        MR. TOBEROFF:  Vague and ambiguous.

11:21  4        You can answer.

11:21  5        THE WITNESS:  I believe that the -- that it is a

11:21  6 very wide range, that by virtue of possessing the

11:21  7 copyright, the copyright owner has the right to negotiate

11:21  8 whatever deal they want.

11:21  9 BY MR. PERKINS:

11:21 10    Q   Are you familiar with any industry range that's

11:21 11 customary?

11:21 12    A   I don't know that there is a range that is

11:21 13 customary.

11:21 14    Q   Are you saying that there is not?

11:21 15    A   I --

11:21 16        MR. TOBEROFF:  Asked and answered.

11:21 17        THE WITNESS:  I believe my answer was explicit.

11:21 18 BY MR. PERKINS:

11:21 19    Q   Do you know whether or not there is a range of

11:21 20 percentages?

11:21 21    A   That is what?

11:21 22    Q   A range of percentages for owners of copyright

11:21 23 in a comic book character to receive in connection with a

11:21 24 motion picture.

      25    A   I do not believe that there is a customary --

11:21  1  you used the word "customary."  I do not believe that

11:21  2  there is a customary range.  I believe it is subject to

11:21  3  negotiation on an individual basis.

11:22  4      Q   And have you done a survey or reviewed any deals

11:22  5  to come to that conclusion?

11:22  6      A   No, I have not.  That is -- I have not done a

11:22  7  survey, no.

11:22  8      Q   Well, what is the basis for saying that there is

11:22  9  no range?

11:22  10     A   Years and years of hearing different rumors and

11:22  11 reports.  I don't trust -- I tend not to trust any

11:22  12 reports in the press of what people are getting on things

11:22  13 like that, completely.  I've heard a wide range over the

11:22  14 years of reports of what people got.

11:22  15     Q   And what is the --

11:22  16     A   And people do tend to lie about money sometimes.

11:22  17     Q   And what is the wide range that you've heard?

11:22  18     A   I've heard of cases where the copyright owner

11:22  19 reportedly -- I underscore the use of the word

11:22  20 "reportedly" -- gave the rights up for very little to

11:22  21 promote the property, and I've heard of cases where the

11:23  22 copyright owner received all or virtually all of the

11:23  23 profits.  I've heard -- it's -- it has run the gamut of

11:23  24 almost nothing to almost everything.

       25     Q   Can you give me the example of the cases in

1

2

3

4

5

6

7

8        I, MARK S. EVANIER, do hereby declare under

9 penalty of perjury that I have read the foregoing

10 transcript; that I have made any corrections as appear

11 noted, in ink, initialed by me, or attached hereto; that

12 my testimony as contained herein, as corrected, is true

13 and correct.

14        EXECUTED this _____ day of _____,

15 20____, at _____, _____.
                    (City)                (State)

16

17

18

19        _____

20        MARK S. EVANIER

21

22

23

24

25

Page 296

1  STATE OF CALIFORNIA      )
                           ) ss
2  COUNTY OF LOS ANGELES    )

3

4        I, DAVID S. COLEMAN, a Certified Shorthand

5  Reporter, do hereby certify:

6        That prior to being examined, the witness in the

7  foregoing proceedings was by me duly sworn to testify to

8  the truth, the whole truth, and nothing but the truth;

9  that said proceedings were taken before me at the time

10  and place therein set forth and were taken down by me in

11  shorthand and thereafter transcribed into typewriting

12  under my direction and supervision.

13        I further certify that I am neither counsel

14  for, nor related to, any party to said proceedings,

15  nor in any way interested in the outcome thereof.

16        In witness whereof, I have hereunto subscribed

17  my name.

18

19  Dated: _____

20

21

22              _____
                DAVID S. COLEMAN
                CSR No. 4613
23

24

25

**EXHIBIT 5**

Page 1

1

2                  UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
3                    EASTERN DIVISION

4                      _ _ _

5  JOANNE SIEGEL and              :
   LAURA SIEGEL LARSON,           :
6            Plaintiffs,          :
                                  :
7            vs.                  :
                                  : Case No. 04-8400
8  TIME WARNER INC.; WARNER       :
   COMMUNICATIONS INC.;           : Case No. 04-8776
9  WARNER BROS. ENTERTAINMENT:
   INC.; WARNER BROS.             :
10 TELEVISION PRODUCTION          :
   INC.; DC COMICS; and           :
11 DOES 1-10,                     :
            Defendants.          :
12                     _ _ _
13          Philadelphia, Pennsylvania
               Tuesday, March 6, 2007
14

                       _ _ _

15

16          Videotaped Deposition of JAMES
17 STERANKO held at Morgan, Lewis & Bockius, LLP,
18 1701 Market Street, on the above date,
19 beginning at 2:17 p.m., before Kimberly A.
20 Overwise, a Certified Realtime Reporter and
21 Notary Public.
22                     _ _ _
23
24                           EXHIBIT 5
25

Page 186

1          James Steranko

2          MR. TOBEROFF:  Misstates the

3     report, misstates his testimony.

4     A     No.

5     Q     Do you believe that some portion of

6 the profits should be paid to the Siegels?

7     A     Yes, one that's fair.

8     Q     What do you consider to be a fair

9 percentage of the profits from the motion

10 picture to the Siegels?

11    A     I'm not prepared to answer that

12 because I'm here as an expert witness about

13 pop culture and comics.  If I were -- if I had

14 your experience, for example, I might be

15 prepared to do that, but I think it would be a

16 substantial portion of the profits.

17    Q     Do you believe that any of the --

18 well, strike that.

19          Are there any elements in Superman

20 Returns that are not present in Action Comics

21 No. 1?

22    A     Any elements?

23    Q     Yeah.

24    A     Oh, there must be hundreds,

25 thousands perhaps.

123

Page 196

1          James Steranko

2          (The court reporter read the

3    preceding question.)

4          MR. TOBEROFF:  Objection.  He's

5    not a damages expert.  He's being offered

6    as to his expertise purely in

7    interpreting the history of these comic

8    books.

9          THE WITNESS:  I couldn't answer

10   that.  I couldn't answer that question.

11 BY MR. PERKINS:

12   Q    Well, but you do give an opinion as

13 to how profits should be apportioned; correct?

14   A    I think you were looking for a

15 certain percentage from me which I was unable

16 to deliver and I am unable to deliver without

17 knowing all the facts, without sitting down

18 with all the paperwork, doing all the

19 financial stuff, knowing everything there is

20 to know, which is way beyond me.  I couldn't

21 come up with that figure.  But what I am

22 interested in is a fair and judicious

23 settlement with both parties.  And I know

24 people in both of those areas, have known many

25 of them for a very long time.  I consider some

Page 251

1

2          I have read the foregoing

3     transcript of my deposition given on

4     March 6, 2007, and it is true, correct,

5     and complete, to the best of my

6     knowledge, recollection, and belief,

7     except for the corrections noted hereon

8     and/or list of corrections, if any,

9     attached on a separate sheet herewith.

10

11

12

13              JAMES STERANKO

14

15

16

17   Subscribed and sworn to

18   before me this _____ day

19   of _____, 2007.

20

21

22   _____

23   Notary Public

24

25

1

2                          CERTIFICATE

3                I HEREBY CERTIFY that the

4      proceedings, evidence, and objections are

5      contained fully and accurately in the

6      stenographic notes taken by me upon the

7      deposition of JAMES STERANKO taken on

8      March 6, 2007, and that this is a true

9      and correct transcript of same.

10

11                _____

                  Kimberly A. Overwise
12                Certified Realtime Reporter
                  Notary Public
13

14

15

16

17                (The foregoing certification of

18     this transcript does not apply to any

19     reproduction of the same by any means

20     unless under the direct control and/or

21     supervision of the certifying reporter.)

22

23

24

25

**EXHIBIT 6**

AO88  (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

SIEGEL et al.

     v.

WARNER BROS. ENTM'T INC. et al.

**SUBPOENA IN A CIVIL CASE**

Case No.:[1]    CV 04-8400, 04-8776 (C.D. Cal.)

TO:   Ariel Emanuel
      Endeavor Agency, LLC
      9601 Wilshire Boulevard, Third Floor
      Beverly Hills, California 90210

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

Pursuant to Fed. R. Civ. P. 30(b)(6), Ariel Emanuel will be deposed on the subject matter(s) set forth in the documents requested in Schedule A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212 | Oct. 25, 2006, 10:00am |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

    See Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212, Attn: Adam Hagen | Oct. 23, 2006, 12:00pm |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _[signature]_     Attorney for Defendants | October 5, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Michael Bergman, Esq., Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212, (310) 858-7888

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

EXHIBIT  6

127

AO88  (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a *person subject to that subpoena.* The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate *sanction which may include,* but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to *produce and permit inspection and copying may,* within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney *designated in the* subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to *compel the production.* Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense *resulting from the inspection and copying commanded.*

(3) (A) On timely motion, the court by which a *subpoena was issued shall* quash or modify the subpoena if it

(i)     fails to allow reasonable time for compliance,
(ii)    requires a person who is not a party or an officer of a

party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the *trial is held,* or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)    subjects a person to undue burden.

(B) If a subpoena

(i)     *requires disclosure of a trade secret or other confidential research, development, or commercial information,* or

(ii)    *requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party,* or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena. or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena *is addressed will be reasonably compensated.* the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

128

## SCHEDULE A

## DEFINITIONS

A.      As used herein, the terms "You" or "Your" mean Ariel Emanuel and/or Endeavor Agency, LLC, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by either of them.

B.      "Pacific" means Pacific Pictures Corporation, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by it.

C.      "Smashbox" means Smashbox Entertainment, LLC, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by it.

D.      "IPW" means IPW, LLC, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by it.

E.      "Plaintiffs" means, collectively and severally, Plaintiffs Joanne Siegel and Laura Siegel Larson and each of their past and present agents and representatives, and any entities owned or controlled by them.

F.      "Siegel" means Jerome (a.k.a. "Jerry") Siegel and each of his agents and representatives.

G.      "Shuster" means Joseph (a.k.a. "Joe") Shuster and each of his agents and representatives.

H.      The "Shuster Representatives" means, collectively and severally, Jean

Adele Peavy, Mark Warren Peary, all executors, administrators, heirs, and representatives of the estate of Joseph Shuster, and all of their respective agents and representatives.

I.      "Michael Siegel" means the late Michael Siegel the son of Jerry Siegel, and his estate, and each of his (or his estate's) past and present agents and representatives, and any entities owned or controlled by him.

J.      "Dennis Larson" means Dennis Larson, the current or former husband of Laura Siegel Larson and each of his past and present agents and representatives, and any entities owned or controlled by him.

K.      "Defendants" means, collectively and severally, Defendants Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., and Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC Comics, each of their affiliated companies and/or predecessors in interest, and all of their agents, employees, and representatives.

L.      "Marks" means Kevin S. Marks, Esq. and the law firm Gang, Tyre, Ramer & Brown, Inc., as well as their past and present employees, associates, partners, attorneys, representatives, predecessors and successors.

M.      The "Superman Action" means the case pending in the U.S. District Court for the Central District of California, Case No. 04-8400 (RSWL) (RZx).

N.      The "Superboy Action" means the case pending in the U.S. District Court for the Central District of California, Case No. 04-08776 (RSWL) (RZx).

O.      "Superman" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *Action Comics #1,*

W.      The "September 21, 2002 Letter" means the letter dated September 21, 2002 from Joanne Siegel and Laura Siegel Larson to Kevin S. Marks and Bruce M. Ramer, a copy of which is attached as Exhibit 5 hereto.

X.      "Concerning" means relating to, describing, evidencing, proving, tending to prove, referring to, comprising, constituting, disproving or tending to disprove.

Y.      Whenever the terms "and" or "or" are used they are to be construed both disjunctively and conjunctively as necessary to bring within the scope of these discovery requests responses that might otherwise be construed to be outside the scope.

Z.      The use of the singular form of any word includes the plural and vice versa.

AA.     "Document" means any tangible expression or communication -- printed or electronic -- however created, recorded, embodied, maintained, filed, or stored in any medium, mode, form, or technology, including, without limitation, as defined by Rule 1001 of the Federal Rules of Evidence, and includes every "original" and every "duplicate" of each such Document as defined, respectively, by Rules 1001(3) and (4) of the Federal Rules of Evidence.

## INSTRUCTIONS

You are to produce any and all Documents in Your possession, custody or control, or subject to Your control, including but not limited, in the possession of any of Your attorneys, agents, shareholders, officers, and representatives.  In the event that You cannot produce all of the Documents designated in a particular request, You shall produce those Documents which You can produce, and shall describe in detail each reason for Your failure or inability to produce each of the remaining Documents.

In the event that any Document called for by this subpoena has been destroyed, lost, discarded, or otherwise disposed of, any such Document is to be identified as completely as possible by providing, without limitation, the following information: the date of disposal; the manner of disposal; the reason for disposal; the person authorizing disposal; and the person who disposed of the Document.

If You contend that any responsive Document is privileged, You must identify each such Document by providing the following information: the date of the Document; a description of its nature and content; the name and capacity of the individual who originated the Document; the name and capacity of the individual to whom the Document is addressed and all individuals to whom it was circulated; and the privilege(s) asserted.

## DOCUMENT CATEGORIES

1.      All Documents Concerning Superman, Superboy, and/or Spectre.

2.      All Documents Concerning any communications between Plaintiffs, or either of them, and Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

3.      All Documents Concerning any relationship, business or otherwise, between Plaintiffs, or either of them, and Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

4.      All Documents Concerning any negotiations or agreements between Plaintiffs or either of them, Defendants, or any of them, the Shuster Representatives or

132

any of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

5.      All Documents Concerning any communications between Defendants or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

6.      All Documents Concerning any relationship, business or otherwise, between Defendants, or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

7.      All Documents Concerning any negotiations or agreements between Defendants or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

8.      All Documents Concerning any communications between the Shuster Representatives, or either of them, and Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

9.      All Documents Concerning any relationship, business or otherwise, between the Shuster Representatives, or either of them, and Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

10.     All Documents Concerning any negotiations or agreements between the Shuster Representatives or either of them, and Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

11.     All Documents Concerning any communications between Michael Siegel and Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

12.     All Documents Concerning any relationship, business or otherwise, between Michael Siegel and Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

13.     All Documents Concerning any negotiations or agreements between Michael Siegel and Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

14.     All Documents Concerning any communications between Dennis Larson and You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

15.     All Documents Concerning any relationship, business or otherwise, between Dennis Larson and You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

16.     All Documents Concerning any negotiations or agreements between Dennis Larson and You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

17.     All Documents Concerning any communications between Pacific and You, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

18.     All Documents Concerning any relationship, business or otherwise, between Pacific and You, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

19.     All Documents Concerning any negotiations or agreements between Pacific and You, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

20.     All Documents Concerning any communications between Pacific and You, Smashbox, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

21.     All Documents Concerning any relationship, business or otherwise, between Pacific and You, Smashbox, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

22.     All Documents Concerning any negotiations or agreements between Pacific and You, Smashbox, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

23.     All Documents Concerning any communications between Smashbox and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

24.     All Documents Concerning any relationship, business or otherwise, between Smashbox and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Specter.

25.     All Documents Concerning any negotiations or agreements between Smashbox and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

26.     All Documents Concerning any communications between Pacific and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

27.     All Documents Concerning any relationship, business or otherwise, between Pacific and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Specter.

28.     All Documents Concerning any negotiations or agreements between Pacific and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

29.     All Documents Concerning any communications between Toberoff and You, Marks, and or any other persons or entities Concerning Superman, Superboy and/or Spectre.

30.     All Documents Concerning any relationship, business or otherwise, between Toberoff and Marks, You, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

31.     All Documents Concerning any negotiations or agreements between Toberoff and Marks, You, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

32.     All Documents Concerning any communications between You and Marks, and or any other persons or entities Concerning Superman, Superboy and/or Spectre.

33.     All Documents Concerning any relationship, business or otherwise, between You and Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

34.     All Documents Concerning any negotiations or agreements between You and Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

35.     All Documents Concerning any communications between You and any other person or entity Concerning Superman, Superboy and/or Spectre.

36.     All Documents Concerning any communications between or among any persons or entities other than Plaintiffs, Defendants, the Shuster Representatives, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, IPW, or Marks Concerning Superman, Superboy and/or Spectre.

37.     All Documents Concerning any relationship, business or otherwise, between or among any persons or entities other than Plaintiffs, Defendants, the Shuster Representatives, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, IPW, or Marks Concerning Superman, Superboy, and/or Spectre.

38.     All Documents Concerning any negotiations or agreements between or among any persons or entities other than Plaintiffs, Defendants, the Shuster

Representatives, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, IPW, or Marks Concerning Superman, Superboy, and/or Spectre.

39.     All Documents Concerning any valuation of any historical, current, or potential ownership interest in Superman and/or Superboy.

40.     All Documents Concerning the letter of agreement dated August 1, 1992, signed by Paul Levitz, Frank Shuster, and Jean Shuster Peavy.

41.     All Documents Concerning the October 19, 2001 Letter.

42.     All Documents Concerning the October 26, 2001 Letter

43.     All Documents Concerning the Long Form Agreement.

44.     All Documents Concerning the September 21, 2002 Letter.

45.     All Documents Concerning the "redraft of the February 4, 2002 document which you sent to us on July 15, 2002" referenced in the September 21, 2002.

46.     All Documents Concerning the Draft Long Form Agreement.

47.     All Documents Concerning any August 7, 2002 conference call between You and Toberoff and/or Marks.

48.     All phone logs Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

49.     All calendars Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel,

Dennis Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or

entities Concerning Superman, Superboy, and/or Spectre.

50.     All notes Concerning any phone calls, telephone conferences, meetings,

and/or other communications between You and Plaintiffs, or either of them, Defendants,

or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis

Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or entities

Concerning Superman, Superboy, and/or Spectre.

51.     All memoranda Concerning any phone calls, telephone conferences,

meetings, and/or other communications between You and Plaintiffs, or either of them,

Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel,

Dennis Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or

entities Concerning Superman, Superboy, and/or Spectre.

**EXHIBIT 7**

·AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

SIEGEL et al.

v.

**SUBPOENA IN A CIVIL CASE**

WARNER BROS. ENTM'T INC. et al.

Case No.:[1]     CV 04-8400, 04-8776 (C.D. Cal.)

TO:   Endeavor Agency, LLC
     c/o Stephen Shaw
     9601 Wilshire Boulevard, Third Floor
     Beverly Hills, California 90210

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

Pursuant to Fed. R. Civ. P. 30(b)(6), Endeavor Agency, LLC will be deposed on the subject matter(s) set forth in the documents requested in Schedule A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212 | Oct. 25, 2006, 2:00 pm |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

· See Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212, Attn: Adam Hagen | Oct. 23, 2006, 12:00 pm |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Michael Bergman* by A.H.   Attorney for Defendants | October 5, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Michael Bergman, Esq., Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212, (310) 858-7888

. (See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

**EXHIBIT 7**

140

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | PLACE |
|---|---|---|---|
| | | | |

| SERVED | | | |
|---|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE | |

| SERVED BY (PRINT NAME) | | TITLE | |
|---|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                    DATE                                              SIGNATURE OF SERVER

                                                         _____
                                                         ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance,
(ii)  requires a person who is not a party or an officer of a

party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B) If a subpoena

(i).  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

141

## SCHEDULE A

## DEFINITIONS

A.     As used herein, the terms "You" or "Your" mean Endeavor Agency, LLC, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, including but not limited to Ariel Emanuel, and any entities owned or controlled by either of them.

B.     "Pacific" means Pacific Pictures Corporation, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by it.

C.     "Smashbox" means Smashbox Entertainment, LLC, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by it.

D.     "IPW" means IPW, LLC, as well as any past and present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by it.

E.     "Plaintiffs" means, collectively and severally, Plaintiffs Joanne Siegel and Laura Siegel Larson and each of their past and present agents and representatives, and any entities owned or controlled by them.

F.     "Siegel" means Jerome (a.k.a. "Jerry") Siegel and each of his agents and representatives.

G.     "Shuster" means Joseph (a.k.a. "Joe") Shuster and each of his agents and representatives.

H.     The "Shuster Representatives" means, collectively and severally, Jean

Adele Peavy, Mark Warren Peary, all executors, administrators, heirs, and representatives of the estate of Joseph Shuster, and all of their respective agents and representatives.

I.    "Michael Siegel" means the late Michael Siegel the son of Jerry Siegel, and his estate, and each of his (or his estate's) past and present agents and representatives, and any entities owned or controlled by him.

J.    "Dennis Larson" means Dennis Larson, the current or former husband of Laura Siegel Larson and each of his past and present agents and representatives, and any entities owned or controlled by him.

K.    "Defendants" means, collectively and severally, Defendants Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., and Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC Comics, each of their affiliated companies and/or predecessors in interest, and all of their agents, employees, and representatives.

L.    "Marks" means Kevin S. Marks, Esq. and the law firm Gang, Tyre, Ramer & Brown, Inc., as well as their past and present employees, associates, partners, attorneys, representatives, predecessors and successors.

M.    The "Superman Action" means the case pending in the U.S. District Court for the Central District of California, Case No. 04-8400 (RSWL) (RZx).

N.    The "Superboy Action" means the case pending in the U.S. District Court for the Central District of California, Case No. 04-08776 (RSWL) (RZx).

O.    "Superman" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *Action Comics #1.*

143

P.    "Superboy" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *More Fun #101*.

Q.    "Spectre" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *More Fun #52*.

R.    "Toberoff" means Marc Toberoff, Esq., the Law Office of Marc Toberoff, PC, current attorneys of record for Plaintiffs in the Superman Action and the Superboy Action, as well as their past and present employees, associates, partners, representatives, predecessors, successors, and agents, and any entities owned or controlled by either or both of them.

S.    The "August 1, 1992 Letter" means the letter of agreement dated August 1, 1992, signed by Paul Levitz, Frank Shuster, and Jean Shuster Peavy which is attached as Exhibit 1 hereto.

T.    The "October 19, 2001 Letter" means the letter dated October 19, 2001 from Kevin S. Marks to John A. Schulman, a copy of which is attached as Exhibit 2 hereto.

U.    The "October 26, 2001 Letter" means the letter dated October 26, 2001 from John A. Schulman to Kevin S. Marks, a copy of which is attached as Exhibit 3 hereto.

V.    The "Draft Long Form Agreement" means that draft long form agreement enclosed with the February 1, 2002 letter from Patrick Perkins to Kevin Marks, a copy of which is attached as Exhibit 4 hereto.

W.     The "September 21, 2002 Letter" means the letter dated September 21, 2002 from Joanne Siegel and Laura Siegel Larson to Kevin S. Marks and Bruce M. Ramer, a copy of which is attached as Exhibit 5 hereto.

X.     "Concerning" means relating to, describing, evidencing, proving, tending to prove, referring to, comprising, constituting, disproving or tending to disprove.

Y.     Whenever the terms "and" or "or" are used they are to be construed both disjunctively and conjunctively as necessary to bring within the scope of these discovery requests responses that might otherwise be construed to be outside the scope.

Z.     The use of the singular form of any word includes the plural and vice versa.

AA.     "Document" means any tangible expression or communication -- printed or electronic -- however created, recorded, embodied, maintained, filed, or stored in any medium, mode, form, or technology, including, without limitation, as defined by Rule 1001 of the Federal Rules of Evidence, and includes every "original" and every "duplicate" of each such Document as defined, respectively, by Rules 1001(3) and (4) of the Federal Rules of Evidence.

### INSTRUCTIONS

You are to produce any and all Documents in Your possession, custody or control, or subject to Your control, including but not limited, in the possession of any of Your attorneys, agents, shareholders, officers, and representatives.  In the event that You cannot produce all of the Documents designated in a particular request, You shall produce those Documents which You can produce, and shall describe in detail each reason for Your failure or inability to produce each of the remaining Documents.

In the event that any Document called for by this subpoena has been destroyed, lost, discarded, or otherwise disposed of, any such Document is to be identified as completely as possible by providing, without limitation, the following information: the date of disposal; the manner of disposal; the reason for disposal; the person authorizing disposal; and the person who disposed of the Document.

If You contend that any responsive Document is privileged, You must identify each such Document by providing the following information: the date of the Document; a description of its nature and content; the name and capacity of the individual who originated the Document; the name and capacity of the individual to whom the Document is addressed and all individuals to whom it was circulated; and the privilege(s) asserted.

### DOCUMENT CATEGORIES

1.      All Documents Concerning Superman, Superboy, and/or Spectre.

2.      All Documents Concerning any communications between Plaintiffs, or either of them, and Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

3.      All Documents Concerning any relationship, business or otherwise, between Plaintiffs, or either of them, and Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

4.      All Documents Concerning any negotiations or agreements between Plaintiffs or either of them, Defendants, or any of them, the Shuster Representatives or

146

any of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

5.      All Documents Concerning any communications between Defendants or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

6.      All Documents Concerning any relationship, business or otherwise, between Defendants, or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

7.      All Documents Concerning any negotiations or agreements between Defendants or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

8.      All Documents Concerning any communications between the Shuster Representatives, or either of them, and Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

9.      All Documents Concerning any relationship, business or otherwise, between the Shuster Representatives, or either of them, and Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

10. All Documents Concerning any negotiations or agreements between the Shuster Representatives or either of them, and Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

11. All Documents Concerning any communications between Michael Siegel and Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

12. All Documents Concerning any relationship, business or otherwise, between Michael Siegel and Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

13. All Documents Concerning any negotiations or agreements between Michael Siegel and Dennis Larson, You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

14. All Documents Concerning any communications between Dennis Larson and You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

15. All Documents Concerning any relationship, business or otherwise, between Dennis Larson and You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

16. All Documents Concerning any negotiations or agreements between Dennis Larson and You, Pacific, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

17.    All Documents Concerning any communications between Pacific and You, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

18.    All Documents Concerning any relationship, business or otherwise, between Pacific and You, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

19.    All Documents Concerning any negotiations or agreements between Pacific and You, Smashbox, Toberoff, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

20.    All Documents Concerning any communications between Pacific and You, Smashbox, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

21.    All Documents Concerning any relationship, business or otherwise, between Pacific and You, Smashbox, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

22.    All Documents Concerning any negotiations or agreements between Pacific and You, Smashbox, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

23.    All Documents Concerning any communications between Smashbox and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

24.     All Documents Concerning any relationship, business or otherwise, between Smashbox and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Specter.

25.     All Documents Concerning any negotiations or agreements between Smashbox and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

26.     All Documents Concerning any communications between Pacific and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

27.     All Documents Concerning any relationship, business or otherwise, between Pacific and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Specter.

28.     All Documents Concerning any negotiations or agreements between Pacific and You, Toberoff, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

29.     All Documents Concerning any communications between Toberoff and You, Marks, and or any other persons or entities Concerning Superman, Superboy and/or Spectre.

30.     All Documents Concerning any relationship, business or otherwise, between Toberoff and Marks, You, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

· 31.    All Documents Concerning any negotiations or agreements between Toberoff and Marks, You, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

32.    All Documents Concerning any communications between You and Marks, and or any other persons or entities Concerning Superman, Superboy and/or Spectre.

33.    All Documents Concerning any relationship, business or otherwise, between You and Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

34.    All Documents Concerning any negotiations or agreements between You and Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

35.    All Documents Concerning any communications between You and any other person or entity Concerning Superman, Superboy and/or Spectre.

36.    All Documents Concerning any communications between or among any persons or entities other than Plaintiffs, Defendants, the Shuster Representatives, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, IPW, or Marks Concerning Superman, Superboy and/or Spectre.

37.    All Documents Concerning any relationship, business or otherwise, between or among any persons or entities other than Plaintiffs, Defendants, the Shuster Representatives, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, IPW, or Marks Concerning Superman, Superboy, and/or Spectre.

38.    All Documents Concerning any negotiations or agreements between or among any persons or entities other than Plaintiffs, Defendants, the Shuster

Representatives, Michael Siegel, Dennis Larson, You, Pacific, Smashbox, Toberoff, IPW, or Marks Concerning Superman, Superboy, and/or Spectre.

39.     All Documents Concerning any valuation of any historical, current, or potential ownership interest in Superman and/or Superboy.

40.     All Documents Concerning the letter of agreement dated August 1, 1992, signed by Paul Levitz, Frank Shuster, and Jean Shuster Peavy.

41.     All Documents Concerning the October 19, 2001 Letter.

42.     All Documents Concerning the October 26, 2001 Letter

43.     All Documents Concerning the Long Form Agreement.

44.     All Documents Concerning the September 21, 2002 Letter.

45.     All Documents Concerning the "redraft of the February 4, 2002 document which you sent to us on July 15, 2002" referenced in the September 21, 2002.

46.     All Documents Concerning the Draft Long Form Agreement.

47.     All Documents Concerning any August 7, 2002 conference call between You and Toberoff and/or Marks.

48.     All phone logs Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smashbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

49.     All calendars Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel,

152

Dennis Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

50.     All notes Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

51.     All memoranda Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smahsbox, Toberoff, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

153

**EXHIBIT 8**

## James Weinberger

| | |
|---|---|
| **From:** | James Weinberger |
| **Sent:** | Wednesday, January 14, 2009 12:03 PM |
| **To:** | Nick Williamson |
| **Cc:** | keith adams; Adam Hagen |

**Subject:** Siegel Litigation

Dear Nick -

In light of the representations made in Plaintiffs' Opposition to Defendants' Motion in Limine No. 4, as well as the fact that
we are entitled it anyway, I write to request the following materials in connection with the 12/22-23 subpoenas served by
Plaintiffs: (1) all correspondence with the subpoenaed entities, including those relating to any withdrawn subpoenas, (2)
all documents produced by the various third parties as well as (3) any authentication declarations.  To the extent this has
already been produced, there is no need to resend anything, but we would appreciate the courtesy of letting us know what
is where.  Please forward these materials to me by fax or email by the end of the day today, as they bear on our reply
brief due on Friday.

Regards,
James

James D. Weinberger | Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza | New York, New York 10017
Tel: (212) 813-5952 | Fax: (212) 813-5901 | www.frosszelnick.com

**EXHIBIT** 8

## James Weinberger

| | |
|---|---|
| **From:** | James Weinberger |
| **Sent:** | Wednesday, January 14, 2009 8:29 PM |
| **To:** | James Weinberger; 'Nick Williamson' |
| **Cc:** | mtoberoff@ipwla.com; 'keith adams'; 'Adam Hagen' |
| **Subject:** | RE: Siegel Litigation |

Nick - Can you please let me know your position on this? - James

---

**From:** James Weinberger
**Sent:** Wednesday, January 14, 2009 12:03 PM
**To:** Nick Williamson
**Cc:** keith adams; Adam Hagen
**Subject:** Siegel Litigation

Dear Nick -

In light of the representations made in Plaintiffs' Opposition to Defendants' Motion in Limine No. 4, as well as the fact that we are entitled it anyway, I write to request the following materials in connection with the 12/22-23 subpoenas served by Plaintiffs: (1) all correspondence with the subpoenaed entities, including those relating to any withdrawn subpoenas, (2) all documents produced by the various third parties as well as (3) any authentication declarations. To the extent this has already been produced, there is no need to resend anything, but we would appreciate the courtesy of letting us know what is where. Please forward these materials to me by fax or email by the end of the day today, as they bear on our reply brief due on Friday.

Regards,
James

James D. Weinberger | Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza | New York, New York 10017
Tel: (212) 813-5952 | Fax: (212) 813-5901 | www.frosszelnick.com

## James Weinberger

| | |
|---|---|
| **From:** | Nick Williamson [nwilliamson@ipwla.com] |
| **Sent:** | Thursday, January 15, 2009 2:27 PM |
| **To:** | James Weinberger |
| **Cc:** | Marc Toberoff; 'keith adams'; 'Adam Hagen'; Nicholas Williamson |
| **Subject:** | RE: Siegel Litigation |
| **Importance:** | High |

James:

I would like to help you out but could you please provide the authority for your demands?

Regards,

Nick

**From:** James Weinberger [mailto:jweinberger@fzlz.com]
**Sent:** Wednesday, January 14, 2009 5:29 PM
**To:** James Weinberger; Nick Williamson
**Cc:** mtoberoff@ipwla.com; keith adams; Adam Hagen
**Subject:** RE: Siegel Litigation

Nick - Can you please let me know your position on this? - James

**From:** James Weinberger
**Sent:** Wednesday, January 14, 2009 12:03 PM
**To:** Nick Williamson
**Cc:** keith adams; Adam Hagen
**Subject:** Siegel Litigation

Dear Nick -

In light of the representations made in Plaintiffs' Opposition to Defendants' Motion in Limine No. 4, as well as the fact that we are entitled it anyway, I write to request the following materials in connection with the 12/22-23 subpoenas served by Plaintiffs: (1) all correspondence with the subpoenaed entities, including those relating to any withdrawn subpoenas, (2) all documents produced by the various third parties as well as (3) any authentication declarations. To the extent this has already been produced, there is no need to resend anything, but we would appreciate the courtesy of letting us know what is where. Please forward these materials to me by fax or email by the end of the day today, as they bear on our reply brief due on Friday.

Regards,
James

James D. Weinberger | Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza | New York, New York 10017
Tel: (212) 813-5952 | Fax: (212) 813-5901 | www.frosszelnick.com

The information contained in this email message may be privileged,
confidential, and protected from disclosure. Any unauthorized use,
printing, copying, disclosure or dissemination of this communication
may be subject to legal restriction or sanction. If you think that you
have received this email message in error, please reply to the sender.

## James Weinberger

| | |
|---|---|
| **From:** | James Weinberger |
| **Sent:** | Thursday, January 15, 2009 4:25 PM |
| **To:** | Nick Williamson |
| **Cc:** | Marc Toberoff; 'keith adams'; 'Adam Hagen' |

**Subject:** RE: Siegel Litigation

Nick -

I appreciate your willingness to help. Here is some authority on your obligation to share the documents received and correspondence with us.  See, e.g., *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 387 (7th Cir. 2008) (awarding sanctions where, *inter alia,* plaintiff began receiving documents in response to the subpoenas in October, it did not provide copies to the defendants until November 15, ten days after the last installment was received); *Murphy v. Board of Educ. of Rochester City School Dist.,* 196 F.R.D. 220, 226-227 (W.D.N.Y. 2000) (failure to share information obtained pursuant to subpoena weighed in favor of imposing sanctions).

As I'm sure you are aware, in addition to what we believe is a clear legal obligation, it is matter of common professional courtesy and practice among counsel to exchange these materials to avoid burdening third parties, which would occur were we to be forced to subpoena all the parties Plaintiffs subpoenaed to find out what they gave you.  We will do that if we must, but given the Court's comments at yesterday's hearing, we would expect that you will do so voluntarily.

What more, we don't have the time to deal with this: you have represented in your opposition to our motion in limine that some of the subpoenas have been complied with and the others have been withdrawn.  How are we supposed to tell the judge where we stand on the motion?  If you don't provide what we've asked for immediately, we will simply have to tell the judge that you refused to provide us with anything and ask him to order you to provide the materials.  You can explain yourself then.

- James

---

**From:** Nick Williamson [mailto:nwilliamson@ipwla.com]
**Sent:** Thursday, January 15, 2009 2:27 PM
**To:** James Weinberger
**Cc:** Marc Toberoff; 'keith adams'; 'Adam Hagen'; Nicholas Williamson
**Subject:** RE: Siegel Litigation
**Importance:** High

James:

I would like to help you out but could you please provide the authority for your demands?

Regards,

Nick

---

**From:** James Weinberger [mailto:jweinberger@fzlz.com]
**Sent:** Wednesday, January 14, 2009 5:29 PM
**To:** James Weinberger; Nick Williamson
**Cc:** mtoberoff@ipwla.com; keith adams; Adam Hagen
**Subject:** RE: Siegel Litigation

Nick - Can you please let me know your position on this? - James

**From:** James Weinberger
**Sent:** Wednesday, January 14, 2009 12:03 PM
**To:** Nick Williamson
**Cc:** keith adams; Adam Hagen
**Subject:** Siegel Litigation

Dear Nick -

In light of the representations made in Plaintiffs' Opposition to Defendants' Motion in Limine No. 4, as well as the fact that
we are entitled it anyway, I write to request the following materials in connection with the 12/22-23 subpoenas served by
Plaintiffs: (1) all correspondence with the subpoenaed entities, including those relating to any withdrawn subpoenas, (2)
all documents produced by the various third parties as well as (3) any authentication declarations. To the extent this has
already been produced, there is no need to resend anything, but we would appreciate the courtesy of letting us know what
is where. Please forward these materials to me by fax or email by the end of the day today, as they bear on our reply
brief due on Friday.

Regards,
James

James D. Weinberger | Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza | New York, New York 10017
Tel: (212) 813-5952 | Fax: (212) 813-5901 | www.frosszelnick.com

The information contained in this email message may be privileged,
confidential, and protected from disclosure. Any unauthorized use,
printing, copying, disclosure or dissemination of this communication
may be subject to legal restriction or sanction. If you think that you
have received this email message in error, please reply to the sender.

**James Weinberger**

| | |
|---|---|
| **From:** | Nick Williamson [nwilliamson@ipwla.com] |
| **Sent:** | Thursday, January 15, 2009 7:03 PM |
| **To:** | James Weinberger |
| **Cc:** | Marc Toberoff; 'keith adams'; 'Adam Hagen'; Nicholas Williamson |
| **Subject:** | RE: Siegel Litigation |
| **Importance:** | High |

James:

In response to your inquiry, the subpoenas to the William Morris Agency and Twentieth Century Fox have been withdrawn by Plaintiffs. As you know, Warner Bros. retained Caldwell Leslie (the same firm that represented Warner Bros. employees at their depositions) to object to the subpoena of John Wells Productions (which resides on the Warner Bros. "Lot") as to the requested "Writer's Co-Op Agreement" with Warner Bros. We will confer with Mr. Caldwell.

We have provided you with all authenticating declarations we have received to date. We expect additional declarations from T Asset Acquisition Company LLC and the Dino De Laurentiis Company and will provide copies to you promptly upon receipt. That should bring you up to date.

I've examined both of the cases you cite in your e-mail. Both *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec* and *Murphy v. Board of Educ. of Rochester City School Dist.* concern situations where the subpoenaing party failed to provide opposing counsel with *notice* of the subpoenas when they were issued. That is clearly not case here, as we promptly provided defendants with copies of the subpoenas. As you must be aware these cases do not stand for the proposition that somehow all "correspondence," e-mails, counsel's notes, etc., relating to the subpoenas must be turned over at the request of the non-subpoenaing party as you have demanded. If this were supported by authority we would, of course, comply, however, it is not.

Moreover, as this material has no relevance to the pending trial, it is hard to fathom why you would subpoena third parties for such information, as you have threatened.

Plaintiffs have turned over the documents they intend to use at trial, including subpoenaed documents in accordance with their obligations under FRCP 26(e). *See* SGL 5759-5988, 6059-6191. Such documents are also responsive to Defendants' Requests for Production Nos. 1 and 45, which request all "writings" Plaintiffs intend to rely on or which support their "sweetheart deal" claim. In contrast, none of Defendants' requests pertain to your current unsupported demand.

Regards,

Nick

---

**From:** James Weinberger [mailto:jweinberger@fzlz.com]
**Sent:** Thursday, January 15, 2009 1:25 PM
**To:** Nick Williamson
**Cc:** Marc Toberoff; keith adams; Adam Hagen
**Subject:** RE: Siegel Litigation

Nick -

I appreciate your willingness to help. Here is some authority on your obligation to share the documents received and

correspondence with us.  *See, e.g., Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhlmantec,* 529 F.3d 371, 387 (7th Cir. 2008) (awarding sanctions where, *inter alia,* plaintiff began receiving documents in response to the subpoenas in October, it did not provide copies to the defendants until November 15, ten days after the last installment was received); *Murphy v. Board of Educ. of Rochester City School Dist.,* 196 F.R.D. 220, 226-227 (W.D.N.Y. 2000) (failure to share information obtained pursuant to subpoena weighed in favor of imposing sanctions).

As I'm sure you are aware, in addition to what we believe is a clear legal obligation, it is matter of common professional courtesy and practice among counsel to exchange these materials to avoid burdening third parties, which would occur were we to be forced to subpoena all the parties Plaintiffs subpoenaed to find out what they gave you.  We will do that if we must, but given the Court's comments at yesterday's hearing, we would expect that you will do so voluntarily.

What more, we don't have the time to deal with this: you have represented in your opposition to our motion in limine that some of the subpoenas have been complied with and the others have been withdrawn.  How are we supposed to tell the judge where we stand on the motion?  If you don't provide what we've asked for immediately, we will simply have to tell the judge that you refused to provide us with anything and ask him to order you to provide the materials.  You can explain yourself then.

- James


**From:** Nick Williamson [mailto:nwilliamson@ipwla.com]
**Sent:** Thursday, January 15, 2009 2:27 PM
**To:** James Weinberger
**Cc:** Marc Toberoff; 'keith adams'; 'Adam Hagen'; Nicholas Williamson
**Subject:** RE: Siegel Litigation
**Importance:** High

James:

I would like to help you out but could you please provide the authority for your demands?

Regards,

Nick


**From:** James Weinberger [mailto:jweinberger@fzlz.com]
**Sent:** Wednesday, January 14, 2009 5:29 PM
**To:** James Weinberger; Nick Williamson
**Cc:** mtoberoff@ipwla.com; keith adams; Adam Hagen
**Subject:** RE: Siegel Litigation

Nick - Can you please let me know your position on this? - James


**From:** James Weinberger
**Sent:** Wednesday, January 14, 2009 12:03 PM
**To:** Nick Williamson
**Cc:** keith adams; Adam Hagen
**Subject:** Siegel Litigation

Dear Nick -

In light of the representations made in Plaintiffs' Opposition to Defendants' Motion in Limine No. 4, as well as the fact that we are entitled it anyway, I write to request the following materials in connection with the 12/22-23 subpoenas served by Plaintiffs:  (1) all correspondence with the subpoenaed entities, including those relating to any withdrawn subpoenas, (2) all documents produced by the various third parties as well as (3) any authentication declarations.  To the extent this has already been produced, there is no need to resend anything, but we would appreciate the courtesy of letting us know what is where.  Please forward these materials to me by fax or email by the end of the day today, as they bear on our reply

brief due on Friday.

Regards,
James

James D. Weinberger | Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza | New York, New York 10017
Tel: (212) 813-5952 | Fax: (212) 813-5901 | www.frosszelnick.com

The information contained in this email message may be privileged,
confidential, and protected from disclosure. Any unauthorized use,
printing, copying, disclosure or dissemination of this communication
may be subject to legal restriction or sanction. If you think that you
have received this email message in error, please reply to the sender.

The information contained in this email message may be privileged,
confidential, and protected from disclosure. Any unauthorized use,
printing, copying, disclosure or dissemination of this communication
may be subject to legal restriction or sanction. If you think that you
have received this email message in error, please reply to the sender.