WEISSMANN WOLFF BERGMAN
    COLEMAN GRODIN & EVALL LLP
Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
Adam Hagen (SBN 218021)
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212
Telephone: (310) 858-7888
Fax: (310) 550-7191

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
James D. Weinberger (Admitted *pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: (212) 813-5900
Fax: (212) 813-5901

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820
Fax: (845) 265-2819

Attorneys for Defendants and Counterclaimant

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>          Plaintiffs,<br><br>     vs.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br><br>          Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. SA CV 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Trial Date: February 3, 2009 |

# **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ..................................................................1

II.    PLAINTIFFS WILL NOT BE ABLE TO MEET THEIR
       BURDEN OF ESTABLISHING THAT ANY OF THE
       RELEVANT AGREEMENTS BETWEEN DC AND WBEI
       WERE "SWEETHEART" DEALS...............................................................3

       A.    The Elements of Plaintiffs' Claim ......................................................3

       B.    Plaintiffs Bear The Burden Of Proof To
             Establish by a Preponderance Of Evidence
             Each Element Of Their Claim...............................................................3

       C.    Fair Market Value Must Be Established By
             Objective Considerations Based On Admissible
             Evidence .............................................................................................4

       D.    Defendants' Objective Evidence Will Establish
             That The Relevant Agreements Between DC and
             WBEI Were For Fair Value To DC .....................................................6

III.   CONCLUSION .........................................................................................8

i

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Director, Office of Workers' Comp. Programs, Department of Labor. v.*

4

*Greenwich Collieries,*

5

    512 U.S. 267 (1994).......................................................................................3

6

*In re Exxon Valdez,*

7

    270 F.3d 1215 (9th Cir. 2001) ....................................................................3

8

*Fischl v. Armitage,*

9

    128  F.3d 50 (2d Cir. 1997) ........................................................................3

10

*Frank Music Corporation v. Metropolitan-Goldwyn-Mayer, Inc.,*

11

    772 F.2d 505 (9th Cir. 1985) .....................................................................4

12

*Jarvis v. K2 Corporation,*

13

    486 F.3d 526 (9th Cir. 2007) .....................................................................4

14

*Mackie v. Rieser,*

15

    296 F.3d 909 (9th Cir. 2002) .....................................................................4

16

*On Davis v. The Gap, Inc.,*

17

    246 F.3d 152 (2d Cir. 2001) ......................................................................4

18

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,*

19

    562 F.2d 1157 (9th Cir. 1977).....................................................................4

20

*Siegel v. Warner Brothers Entertainment Inc.,*

21

    542 F. Supp. 2d 1098 (C.D. Cal. 2008)................................................... 1, 3

22

*Stevison by Collins v. Enid Health Systems, Inc.,*

23

    920 F.2d 710 (10th Cir. 1990) ...................................................................3

24

25

26

27

28

ii

1   Defendants Warner Bros. Entertainment Inc. ("WBEI"), Time Warner Inc.

2   ("TWI"), and defendant and counterclaimant DC Comics ("DC") (collectively

3   "Defendants") respectfully submit the following trial brief in connection with the

4   first phase of this trial, scheduled for February 3, 2009.

5   **I.      PRELIMINARY STATEMENT**

6   The purpose of the initial phase of this equitable proceeding is quite simple:

7   It is to determine whether any relevant agreement[1] by which DC granted WBEI the

8   right to exploit any interest in the Superman property was below market at the time

9   it was entered into, and if so, by how much.[2] *Siegel v. Warner Bros. Entertainment*

10  *Inc.*, 542 F. Supp. 3d 1098, 1144-45 (C.D. Cal. 2008) ("*Siegel II*").  If any such

11  agreement is found to be below market − that is, if it is found to be a "sweetheart

12  deal" in favor of WBEI resulting from the companies' corporate relationship − and

13  if Plaintiffs can establish that the "sweetheart" nature of the deal resulted in a

14  calculable reduction in the profits of DC in which they are potentially entitled to

15  share, the Court could then exercise its equitable power to adjust the amounts

16  accountable to Plaintiffs accordingly.[3]  If there are no "sweetheart deals," then as a

17  matter of equity Plaintiffs are limited to an apportioned share of DC's actual

18  domestic profits from the exploitation of certain post-termination Superman works,

19  as will be determined at the second phase of the trial.

20  The bottom line, therefore, is whether Plaintiffs can prove that the terms of

21  any challenged DC/WBEI agreement are below the range of terms

22  contemporaneously negotiated in the market between similarly-situated parties, for

23  ───────────────

24  [1] A "relevant" agreement is one that provides for the preparation of new derivative works
based on "Superman" after April 16, 1999; that is, after the effective date of Plaintiffs'
termination notices.

25  [2] Plaintiffs have not identified any relevant agreement between DC and TWI, and it

26  appears that Plaintiffs are not alleging that any "sweetheart" deals exist between those
two entities.

27  [3] Defendants have located no applicable precedent for this type of equitable contractual
adjustment in a copyright co-ownership context, and it is uncertain by what means the

28  Court can proceed to make such a recalculation − through a hypothetical reformation of
the agreement in question or some other mechanism.

1

**DEFENDANTS' TRIAL BRIEF**

1   similar rights, to comparable properties – *i.e.,* the question before the Court is

2   should DC have received from WBEI more than it did for the rights it conveyed?

3   While the question presented is simple, its answer is not to be found in a one-

4   dimensional spread-sheet analysis of particular individual terms plucked from the

5   contract and considered in a vacuum.[4]  Thus, the negotiations between DC and

6   WBEI, and the way those parties have developed and exploited the Superman

7   property throughout the years, is relevant to the question of whether their ultimate

8   agreements were fair and reasonable to DC.

9         However, while this contextual evidence is relevant, it cannot substitute for

10  what is ultimately an *objective* consideration of the results of the parties'

11  negotiations – that is, the final terms of the deals themselves, considered in their

12  *entirety.*  It is those final terms – and how they stack up to objective considerations

13  of market value – that ultimately are the appropriate focus of this trial.  The Court

14  cannot – as Plaintiffs seem to suggest – rely on unsupported negative "inferences"

15  arising out of the relationship of the parties to conclude that the relevant

16  agreements are somehow unfair to DC, particularly when the terms of the

17  agreements themselves, when compared to other contemporaneous agreements in

18  the marketplace, say otherwise.

19        Defendants respectfully submit that, considering the *objective* evidence,

20  Plaintiffs simply will not be able to meet their burden of establishing that any of

21  the relevant agreements between DC and WBEI were "sweetheart deals" to the

22  detriment of DC.

23

24

25  [4] Plaintiffs have done precisely this in their various pre-trial filings, in an undisguised
    attempt to try to pre-condition the Court into believing – solely thorough counsel's
26  argument and based on snippets of documents – that the consideration received by DC
    from WBEI was below market.  Counsel's argument is not evidence, and at trial – when
27  lawyer argument must give way to actual evidence – Defendants will demonstrate that
    the selective terms Plaintiffs have extracted from other agreements provide at best an
28  incomplete picture, and at worst a highly deceptive one, of the applicable range of the
    market – assuming Plaintiffs can even establish what that range might be.

**DEFENDANTS' TRIAL BRIEF**

## II.   PLAINTIFFS WILL NOT BE ABLE TO MEET THEIR BURDEN OF ESTABLISHING THAT ANY OF THE RELEVANT AGREEMENTS BETWEEN DC AND WBEI WERE "SWEETHEART" DEALS

### A.   The Elements of Plaintiffs' Claim

In order to prevail in this first phase of the trial, Plaintiffs have the burden of establishing, as to each relevant agreement they choose to challenge as a "sweetheart deal," (1) that DC licensed to WBEI rights to exploit the Superman property for a less than market consideration at the time the deal was entered into; and (2) that the below-market license resulted in damage to Plaintiffs in the form of a calculable reduction in the profits of DC in which, depending on the work involved, Plaintiffs are potentially entitled to share. *Siegel II*, 542 F. Supp. 2d at 1144-45.[5]

### B.   Plaintiffs Bear The Burden Of Proof To Establish By A Preponderance Of Evidence Each Element Of Their Claim

Generally, the party asserting a claim or an affirmative defense has the burden of proving every essential element of its claim or defense. *Director, Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich Collieries*, 512 U.S. 267, 275 (1994). Thus, the burden of proof is placed on plaintiff to establish all the elements of each of its causes of action. *Stevison by Collins v. Enid Health Systems, Inc.*, 920 F.2d 710, 713 (10th Cir. 1990). In civil cases, the requisite degree of proof generally is a "preponderance of the evidence." *In re Exxon Valdez*, 270 F.3d 1215, 1232 (9th Cir. 2001). *See also Fischl v. Armitage*, 128

---

[5] Plaintiffs assert that they are also required to prove that DC and WBEI are "closely related," as a preliminary step to considering whether their deals are for fair market value. However, the Court has already found that Defendants are "closely related entities," *Siegel II* at 1144, and Defendants, who are under common ownership, do not dispute that fact. Defendants do, however, dispute that being closely related necessarily means that any agreements between the related entities are *ipso facto* "sweetheart deals." *See* section II.C, *infra*. Moreover, Plaintiffs ask the Court to act on the *assumption* that a "sweetheart deal" between the companies must necessarily be to the detriment of DC, and in favor of WBEI. But there is nothing to support that assumption; one could just as readily assume the opposite.

3

1  F.3d 50, 55 (2d Cir. 1997) ("To establish a fact by a preponderance of the evidence

2  means to prove that the fact is more likely true than not."). In this phase of the

3  trial, therefore, it is Plaintiffs' burden to establish, by a preponderance of the

4  evidence, both that one or more of the relevant agreements between DC and WBEI

5  were for below-market compensation to DC, and that the below-market

6  compensation resulted in a calculable reduction of the profits to DC in which

7  Plaintiffs are entitled to share.

8       **C.   Fair Market Value Must Be Established By Objective**

9            **Considerations Based On Admissible Evidence**

10       The touchstone of a fair market value determination is "what a willing buyer

11  would have been reasonably required to pay to a willing seller for plaintiffs'

12  work." *Jarvis v. K2 Corporation*, 486 F.3d 526, 533 (9th Cir. 2007); *Frank Music*

13  *Corporation v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985),

14  citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562

15  F.2d 1157, 1172 (9th Cir. 1977).[6] "Fair market value" for any given property is

16  usually not expressed as a specific number; rather, it is expressed as a range, such

17  that a price (or the terms of a license) falling within that range would be considered

18  fair. *See, e.g., Jarvis*, 486 F.3d at 534-35. Further, a "market value approach is an

19  objective, not a subjective, analysis," *Mackie v. Rieser,* 296 F.3d 909, 917 (9th Cir.

20  2002); *see also On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001) ("The

21  question is not what the owner would have charged, but rather what is the fair

22  market value."), and excessively speculative claims are to be rejected, *Frank*

23  *Music*, 772 F.2d at 513. *See also Jarvis*, 486 F.3d at 534.

24       In *Jarvis*, plaintiff photographer sued defendant corporation for using a

25  number of his copyrighted photographs without compensation on its on-line

26  marketing site. The Ninth Circuit affirmed the district court's copyright

27  _____

28  [6] Each of the cited cases was a copyright infringement case, where the court discussed fair market value in the context of determining the damages to be awarded against an infringer.

4

infringement damages award where the district court had based its damages calculations on objective considerations of market value, including the testimony of plaintiffs' expert as to market value, the testimony of defendant's senior executive as to what the corporation was willing to pay for on-line photographic images, and the previous dealings of the parties regarding the licensing of plaintiff's photographs:

> "The court's inquiry was objective, avoiding references to what Jarvis thought he should have earned or wished he had charged. The court also examined the financial perspectives of both the willing buyer (in the form of evidence about what K2 typically pays for images and what it specifically paid Jarvis in its prior dealings with him) and the willing seller (in the form of Jarvis' earlier deals with K2 and his revenue from image databanks) at the hypothetical time of sale."

*Id.*

Similarly here, the Court's inquiry – and thus the Plaintiffs' evidence – must avoid considering what Plaintiffs wished DC had charged, or hoped that DC had obtained. Rather, it must focus on the financial perspectives of both the willing buyer (WBEI) and the willing seller (DC), and, bearing in mind the custom and practice of the motion picture and television industries, what was common or typical in those industries at the time for comparable properties. If necessary, Defendants are prepared to establish this by (1) the documents and testimony about the negotiation of the relevant Superman agreements; (2) evidence regarding other related agreements and the relationship between the contracting parties concerning the exploitation of the Superman property; (3) evidence concerning the terms of comparable agreements in the marketplace at the time; and (4) expert testimony on the issue.

**D.  Defendants' Objective Evidence Will Establish That The Relevant Agreements Between DC and WBEI Were For Fair Value To DC**

Literary rights agreements in the motion picture and television industries often have several components to the compensation accorded to the rights holder (*e.g.* advance, fixed compensation, contingent compensation, etc.).  Additionally, the rights licensed may be granted through several separate agreements (*e.g.* film rights, publishing rights, merchandising, etc.), and these agreements, in turn, may be entered into in conjunction with other agreements relevant to the project.  Therefore, in order to assess whether any given license between DC and WBEI provides "market" compensation to the rights holder, it is necessary to look at the relationship and other related agreements between the contracting parties, in the context of the project *as a whole*.  Additionally, although each copyrighted property is unique, the Court may appropriately look to the compensation obtained for the license of similar rights to other properties, as well as to expert testimony, in order to establish the general parameters and range of the market at the time the relevant agreements were entered into.

As an initial matter, Defendants do not believe that Plaintiffs will be able to establish a *prima facie* case that any of the relevant agreements between DC and WBEI, when considered as a whole in the context of industry standards, were for below fair market value to DC at the time they were entered into:  Plaintiffs' proposed documentary evidence does not remotely support that conclusion, and their witnesses do not appear to be competent to testify on the matter.[7]  However, if Plaintiffs can overcome that initial hurdle, Defendants' responsive evidence will establish beyond a doubt that each of the relevant agreements was well within −

---

[7] Indeed, from Plaintiffs' flurry of last-minute designations of and subpoenas to witnesses that were never previously disclosed − including many employees and former employees of Defendants − it seems that Plaintiffs are intending to engage in on-the-witness-stand depositions, in the hope of uncovering something that might redound to their benefit at trial.  Defendants have moved to exclude a number of these witnesses, and they are the subject of Defendants' Motion in Limine No. 2.

**DEFENDANTS' TRIAL BRIEF**

1   and in fact was at or near the *high* end of – the admittedly broad spectrum of

2   literary rights agreements in the motion picture and television industries.[8]

3        That evidence will consist of the testimony of DC's executives Paul Levitz,

4   Lillian Laserson, and Cheryl Rubin, and WBEI executives (and former executives)

5   Brett Paul, John Schulman, Steven Spira, and Nairi Gardiner, who negotiated and

6   implemented the terms of the key Superman motion picture, television and

7   merchandising agreements, and who can also testify as to their respective

8   companies' standard practices and other agreements concerning comparable

9   properties and rights acquisitions.[9]  That evidence will also include the testimony

10  of Defendants' two experts, William Immerman[10] and Richard Marks[11], who will

11  testify without qualification that the film and television agreements between DC

12  and WBEI were well within market – and in some cases at the very top of the

13  market – for the compensation provided to DC for the Superman rights conveyed.

14       Finally, Defendants' evidence will include a sampling of other literary rights

15  agreements for comparable properties, such as *Iron Man*.  Those agreements will

16  demonstrate that there is a wide range in the market for literary rights agreements,

17  but that the terms, considered as a whole, of the relevant Superman agreements,

18  when compared to the terms, considered as a whole, of other comparable literary

19

20

---

21  [8] The only literary rights that appear to have fetched higher financial compensation terms

22  for motion pictures are those for best-selling novels and hit Broadway shows – both of
    which present very different circumstances (*e.g.* built in scripts) and opportunities for a

23  rights buyer.

    [9] The specific nature of each of these witnesses' testimony is set forth in Defendants'

24  Memorandum of Contentions of Fact and Law, previously filed with the Court.

25  [10] Mr. Immerman is a long-time film executive, with more than forty years of experience
    in the motion picture industry, including direct and supervisory experience negotiating

26  many production and distribution agreements, including intellectual property acquisition
    agreements.

27  [11] Mr. Marks has three decades of experience in the television and motion picture
    industry and has represented both buyers and sellers of literary properties. He has

28  negotiated numerous deals as a transactional attorney, and has been involved in valuing,
    negotiating and documenting hundreds of literary acquisition agreements.

1  rights agreements, fall comfortably within that market range – indeed at the very

2  high end – and that Plaintiffs' assertions to the contrary are supported. [12]

3  **III.    CONCLUSION**

4         As detailed above, the relevant objective, admissible evidence that is

5  properly considered by the Court will establish that none of the relevant

6  agreements between DC and WBEI were "sweetheart deals" to the detriment of

7  DC. Further, Plaintiffs will have *no* evidence of any relevant agreements between

8  DC and TWI, much less a "sweetheart" agreement. Accordingly, Plaintiffs will

9  not be able to meet their burden in this initial phase of the trial that they are entitled

10 to share in anything more than a properly apportioned amount of DC's domestic

11 ///

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18

19 [12] Plaintiffs' pre-trial submissions are replete with references to selected terms of other
    agreements that they hope to introduce (most of which are the subject of Defendants'
20 Motion in Limine No. 4, as the product of late-taken discovery), in the apparent hope that
    the Court will take Plaintiffs at their word, and consider the selected terms as indicative
21 of fair market value. At trial, Defendants will show that Plaintiffs' truncated references
    are repeatedly misleading and largely serve to disguise and not illuminate the range of
22 compensation accorded in these other agreements: For example, Plaintiffs' Proposed
    Finding of Fact #247, referencing an agreement between DC and a third party for the
23 production and distribution of a "Superboy" television series, states that "in the *Superboy*
    Agreement, DC's 7.5% gross participation broadly applies to 'all monies derived by
24 Purchaser or its subsidiaries or its distributing sub-licensees, agents, and any subsidiary,
    or agents … from the sale, lease, rental, or distribution of the Superboy program.'"
25 Plaintiffs presumably mean to contrast this provision with the 5% of gross receipts
    provided by WBEI on the *Smallville* Agreement. However, Plaintiffs have deliberately
26 left out the reference in the *Superboy* Agreement that the Gross Receipts in which DC is
    entitled to share are limited to the "Domestic Territory," even though the distribution
27 rights granted were worldwide. The true comparison should not be between 5% and
    7.5%, but between 5% of worldwide gross versus 7.5% of domestic gross. When the
28 comparable agreements are considered in their entirety, they will establish Defendants'
    position – that the relevant DC/WBEI are all within fair market range.

**DEFENDANTS' TRIAL BRIEF**

1   profits from the exploitation of post-termination Superman works, and Defendants

2   WBEI and TWI should therefore be dismissed from this action.

3

4   DATED:  January 23, 2009          Respectfully submitted,

5                                     WEISSMANN WOLFF BERGMAN
                                      COLEMAN GRODIN & EVALL LLP
6
                                      FROSS ZELNICK LEHRMAN & ZISSU, P.C.
7
                                            -and-
8
                                      PERKINS LAW OFFICE, P.C.
9

10

11                                    By: _____
                                          Michael Bergman

12                                    Attorneys for Defendants and Counterclaimant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

**DEFENDANTS' TRIAL BRIEF**