# EXHIBIT A

Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
E-mail:  MToberoff@ipwla.com

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>            Plaintiffs,<br><br>      vs.<br><br>WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>            Defendants.<br><br>_____<br><br>DC COMICS,<br><br>            Counterclaimant,<br><br>      vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>            Counterclaim Defendants. | Case No. CV 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Trial**<br>Date:         April 21, 2009<br>Time:         9:30 a.m.<br>Place:         Courtroom 1<br><br>[Complaint filed: October 8, 2004] |

Plaintiffs Joanne Siegel and Laura Siegel Larson (collectively "Plaintiffs") hereby submit their Findings of Fact and Conclusions of Law.[1]

## **FINDINGS OF FACT**

### **TWEC's (WBEI's Predecessor) Ownership of DC**

1. Joanne Siegel and Laura Siegel Larson are the Plaintiffs in this action.

2. National Periodical Publications, Inc. ("National") is the successor in interest to Detective Comics, Inc.

3. In 1976, National's name was changed to DC Comics, Inc.

4. In 1993, DC Comics, Inc. was dissolved and converted to a New York general partnership, DC Comics ("DC").

5. DC has remained a New York general partnership from 1993 to the present.

6. From 1993 until March 2003, the partners in DC were Warner Communications Inc. ("WCI") and Time Warner Entertainment Company, L.P. ("TWEC").

7. In 1992 Historic Time Warner Inc. formed TWEC with certain of its affiliates, and third party investors. The affiliated entities contributed various cable, filmed entertainment and network programming assets to the TWEC partnership, while the non-affiliated parties made substantial capital contributions in exchange for limited partnership interests.

8. Between 1993 and 2003 Historic Time Warner Inc. and its affiliated partners owned between approximately 70% and 75% of TWEC. During this time TWEC held various cable, entertainment and network programming assets, including Warner Bros., Warner Bros. Television Production, HBO and Time Warner Cable, all of which were separate divisions of TWEC.

9. In March 2003, Time Warner Inc. ("TWI") completed a restructuring of

---

[1] Plaintiffs submit these [Proposed] Findings of Fact and Conclusions of Law on the basis of the Court's orders and rulings to date in this case. Plaintiffs reserve all rights to appeal with respect to such orders and rulings.

TWEC.  As a result of this restructuring, TWI acquired complete indirect ownership of TWEC's filmed entertainment and network programming assets, including Warner Bros., Warner Bros. Television Production Inc., and certain other former divisions of TWEC.

10.     EC Publications, Inc. ("EC") is a wholly owned subsidiary of WCI.

11.     WCI is a subsidiary of TWI.

12.     Warner Bros. Entertainment Inc. ("WBEI") is a wholly owned subsidiary of WCI.  (WBEI, its corporate predecessors, subsidiaries and divisions are sometimes referred to herein as "Warner Bros.").

13.     Warner Bros. Television Production Inc. ("WBTV") is a wholly owned subsidiary of WBEI.

14.     Warner Bros. Animation Inc. is a wholly owned subsidiary of WBEI.

15.     Warner Bros. Consumer Products Inc. ("WBCP") is a wholly owned subsidiary of WBEI.

16.     In connection with the restructuring of TWEC, WCI contributed its 50% interest in DC to EC; and TWEC distributed the assets of its content businesses (*i.e.*, the filmed entertainment and network programming assets), including its partnership interest in DC, to WCI.

17.     The partners in DC since 2003 have been EC (WCI's wholly owned subsidiary) and WCI, each holding a one-half interest in the DC partnership.

18.     The 2003 TWEC restructuring resulted in the formation of a number of new corporations to hold and operate the content businesses formerly owned by TWEC.  These newly formed corporations included WBEI, which succeeded to TWEC's filmed entertainment businesses.

19.     Both DC and WBEI are subsidiaries/affiliates of TWI.

20.     For financial reporting purposes, DC and WBEI fall within the "filmed entertainment" group of TWI companies (which also includes New Line Cinema Corporation and Castle Rock Entertainment), and for operating management purposes

2
PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

DC reports to WBEI which, in turn, reports to TWI.

21.    DC's President and Publisher reports to and obtains approvals from WBEI's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC's normal course of business.

22.    DC is in the business of creating, publishing and licensing comic book stories and characters.

23.    The Superman Film Option/Purchase agreement (Tr. Ex. 232) between DC and TWEC, dated as of November 6, 1999, regarding Superman motion picture and other audiovisual rights ("Superman Film Agreement") was fully executed on May 9, 2002.

24.    The Smallville Television Agreement (Tr. Ex. 223) between DC and TWEC, dated as of December 5, 2000, regarding Superman live action television rights ("Superman Television Agreement") was fully executed on February 12, 2001.

25.    The Superman Television Agreement was amended by a written instrument dated September 5, 2002 (Tr. Ex 222).

26.    The Batman Option Purchase Agreement (Tr. Ex. 1) between DC and TWEC, dated as of May 31, 2002, regarding the Batman motion picture and other audiovisual rights ("Batman Agreement") was fully executed on February 3, 2004.

28.    Paul Levitz ("Levitz") is the President and Publisher of DC.

29.    Levitz negotiated, on behalf of DC, the basic financial terms of the Superman Film Agreement.

30.    Levitz negotiated, on behalf of DC, the basic financial terms of the

3

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Superman Television Agreement.

31. Levitz negotiated, on behalf of DC, the basic terms of the September 5, 2002 amendment to the Superman Television Agreement.

32. The Superman Film Agreement applies to Warner Bros.' 2006 feature motion picture entitled *Superman Returns*.

33. On or about May 22, 2002, Warner Bros. paid DC the $1,500,000 option fee, pursuant to Paragraph 1(a) of the Superman Film Agreement.

34. The Superman Television Agreement, as amended September 5, 2002, applies to Warner Bros.' *Smallville* television series.

35. The agreement dated June 15, 1987, between DC and Cantharus Productions N.V. (Tr. Ex. 15), applies to the television series entitled *Superboy* (a.k.a *The Adventures of Superboy*) (1988-1992).

36. The agreement dated September 21, 1995, between DC and Warner Bros. Animation (Tr. Ex. 54) applies to the animated television series entitled *Superman* (also known as *Superman: The Animated Series*) (1996-2000).

37. The agreement dated January 1, 2000, between DC and Warner Bros. Television Animation (Tr. Ex. 52) applies to the animated television series entitled *Justice League* (2001-2004).

38. The agreement dated January 1, 2004, between DC and Warner Bros. Animation Inc. (Tr. Ex. 53) applies to the animated television series entitled *Krypto* (2005-2006).

39. The unexecuted draft agreement dated June 1, 2004, between DC and Warner Bros. Animation Inc. (Tr. Ex. 225) applies to the animated television series entitled *Legion of Super Heroes* (2006-2008).

### **Relationship Between DC and Warner Bros.**

40. DC was owned by TWEC (WBEI's predecessor) at the time DC negotiated and entered into both the Superman Film Agreement (Tr. Ex. 232) and the Superman Television Agreement(s) (Tr. Exs. 222-223) with TWEC.

4

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

41.    DC entered into the *Superman Animated* Agreement (September 21, 1995) (Tr. Ex. 54), *Justice League* Agreement (January 1, 2000) (Tr. Ex. 52), *Legion of Super-Pets/Krypto* Agreement (January 1, 2004) (Tr. Ex. 53), and the *Legion of Superheroes* Agreement (June 1, 2004) (Tr. Ex. 225) (referred to individually by title, and collectively as the "Superman Animation Agreements") (referred to collectively with the Superman Film Agreement and the Superman Television Agreement as the "Superman Agreements") with Warner Bros.' subsidiaries, including Warner Bros. Animation Inc.

42.    DC must first offer its characters and stories to Warner Bros. for film and television productions before DC can offer its characters and stories to third parties.  Tr. Exs. 186-187, 190, 191.

43.    Superman is the basis for a long-running major merchandising "brand," highly successful publishing line, and several successful television series and films over the past seven decades.

44.    Since approximately 1987, DC has not offered Superman motion picture or television rights to any entity outside Warner Bros.

45.    Since approximately 1973, DC has not offered the rights to exclusively license Superman merchandising to any entity outside Warner Bros.

46.    Since approximately 1987, DC has not offered Batman motion picture or television rights to any entity outside Warner Bros.

47.    DC also exclusively licenses Batman merchandising through Warner Bros.

48.    The film, television and merchandising rights to most of DC's major characters are controlled by Warner Bros.  Tr. Exs. 186, 190.

49.    Forty to sixty percent (40-60%) of the film, television and merchandising revenues from Superman and the film and television industries as a whole are from foreign sources.

50.    Warner Bros. made an enormous post-Termination investment in the

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

production, marketing and distribution of *Superman Returns* and *Smallville* after and notwithstanding Plaintiffs' notices of termination.

### **Superman Motion Picture Rights**

51.    On November 6 1974, DC entered into an agreement with Film Export A.G. (the "Salkind Agreement") for the licensing of motion picture rights to Superman.  Tr. Ex. 203.

52.    At the time the Salkind Agreement was made, DC was an affiliate of Warner Bros.  However, Warner Bros. had little interest in Superman and "passed" on the property.

53.    Prior to the Salkind Agreement, Superman had been exploited in the "Superman" television series (1951-1958), starring George Reeves, but had never been exploited in a feature-length major motion picture.

54.    Pursuant to the Salkind Agreement, the major motion pictures *Superman I-IV* (1978-1987) were released worldwide.

55.    *Superman* (1978) had a total worldwide box office gross of $300 million, and $134 million domestic box office gross.  *Superman II* (1980) had a total domestic box office gross of $108 million, while *Superman III* (1983) had a domestic box office gross of $60 million.  Adjusted for inflation, the domestic totals are $367 million, $218 million, and $122 million, respectively.

56.    Pursuant to the Salkind Agreement, the syndicated live-action television series *The Adventures of Superboy* (1988-1992) was also successfully released.

57.    Between 1989 and 1997, Warner Bros. released *four* major Batman movies.  No live action Superman movies were released between 1987 and 2006.  Tr. Ex. 208.

58.    In 1993, Warner Bros. acquired the licensee's rights under the Salkind Agreement, which was to expire on November 5, 1999.

59.    In 1994, Warner Bros. began developing a Superman theatrical motion picture entitled "Superman Reborn."

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

60.   Since 1994, Warner Bros. has engaged in continuous development of a Superman theatrical motion picture, with no film released until *Superman Returns* in 2006.

61.   With the Superman film rights under its control, Warner Bros. let approximately thirteen (13) years lapse (1993-2006) before releasing a Superman motion picture.

### **Negotiation of the Superman Film Agreement**

62.   On or before November 4, 1999, DC and Warner Bros. began negotiating the Superman Film Agreement to succeed the Salkind Agreement.



64.   The Superman Film Agreement granted Warner Bros. an option to acquire from DC motion picture and additional "audiovisual" rights in Superman, in perpetuity.

65.   The Superman Film Agreement was primarily negotiated by long-term associates Levitz, DC's Publisher, and John Schulman ("Schulman"), Warner Bros.' General Counsel.

66.   The Superman Film Agreement was fully executed on May 9, 2002.

7

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

[redacted]

72.    During the course of negotiations of the Superman Film Agreement, 20th Century Fox's *X-Men* movie (2000) based on Marvel Comics' comic-book property "X-Men," successfully grossed $296 million at the worldwide theatrical box office.

73.    The success of the 1998 movie *Blade,* based on the Marvel comic book property of the same name, led to *Blade II* (2002), which grossed $155 million at the worldwide box office.

74.    Moreover, during this period most Hollywood studios were actively developing feature films based on comic book properties including but not limited to the feature films:  *Daredevil* (2002) (20th Century Fox), *Hellboy* (2004) (Columbia Pictures), *Hulk* (2003) (Universal Pictures), *The League of Extraordinary Gentlemen* (2003) (20th Century Fox), *Punisher* (2004) (Lionsgate/Columbia Pictures), *Road to Perdition* (2002) (Dreamworks/20th Century Fox), and *X2* (2003) (20th Century Fox).

75.    From November 6, 1999, when the Salkind Agreement had expired, until May 9, 2002, when the Superman Film Agreement was executed, DC did not offer Superman "audiovisual" or motion picture rights to any company other than Warner

8
PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bros.



81.    The *Spider-Man* (2002) film opened on May 2, 2002, with a weekend domestic theatrical box-office gross of $114 million.  *Spider-Man* went on to gross $822 million at the worldwide theatrical box office alone.

82.    One week later the Superman Film Agreement was executed.

**Negotiation of the Superman Television Agreement**

9



88.    The Superman Television Agreement was fully executed on February 12, 2001.  <u>Tr. Ex. 223</u>.

90.    The Superman Television Agreement was thereafter amended by letter-agreements in which DC granted Warner Bros. permission to exploit various non-Superman characters (*e.g.*, *Green Arrow, Flash, Aquaman*) in *Smallville* for no

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

additional compensation.  Tr. Exs. 175-177, 317.

**<u>Arm's Length Agreements for High-Level Literary Properties</u>**

91.     The rights agreement, dated August 8, 1997, for the *Lord of the Rings* books by J.R.R. Tolkien (the "*Lord of the Rings* Agreement") (Tr. Ex. 128) underlying the films *Lord of the Rings*: *The Fellowship of the Rings* (2001), *The Two Towers* (2002), and *The Return of the King* (2003), is between the Saul Zaentz Company ("Zaentz") and Miramax Productions, then a subsidiary of the Walt Disney Company.

92.     The *Lord of the Rings* Agreement was later assigned by Miramax to New Line Cinema Corp., a wholly owned subsidiary of TWI.  Tr. Ex. 121.

93.     The Memorandum of Agreement for Option and Purchase of Literary Material between Clive Cussler, Sahara Gold, LLC, Clive Cussler Enterprises, Inc., Sandecker, RLLLP and Crusader Entertainment, LLC, dated as of May 9, 2001, is for film rights to the *Dirk Pitt* series of novels by Clive Cussler, underlying the film *Sahara* (the "*Sahara* Agreement") (Tr. Ex. 201).

94.     The agreement between Columbia Broadcasting System, Inc. and Warner Bros. Pictures, Inc., dated January 19, 1962, is for film rights to the dramatic musical *My Fair Lady* (the "*My Fair Lady* Agreement") (Tr. Ex. 300).[2]

95.     The agreement between the Dino de Laurentiis Company and Yazoo

---

[2] Other Warner Bros. agreements, designated by Defendants, include the Japanese anime series "Robotech" (the "*Robotech* Agreement") (Tr. Ex. 1083); the comic book property "300" (the "*300* Agreement") (Tr. Ex. 1084); the film rights to the literary property "Tarzan" (the "*Tarzan* Agreements") (Tr. Exs. 1085-1086); the television rights to "Tarzan" (Tr. Ex. 1102) (the "*Tarzan* Television Agreement"); the property "G.I. Joe" (the "*G.I. Joe* Agreement") (Tr. Ex. 1092); the literary property "Conan" (the "2002 *Conan* Agreement" and "2000 *Conan* Agreement") (Tr. Exs. 1093-94); the literary property "Harry Potter" (the "*Harry Potter* Agreement") (Tr. Exs. 1097-1099); the literary property "How to Teach Filthy Rich Girls" (the "*How to Teach Filthy Rich Girls* Agreement") (Tr. Ex. 1100); the comic book property "Witchblade" (the "*Witchblade* Agreement") (Tr. Ex.1101); the literary property "Gossip Girl" (the "*Gossip Girl* Agreement") (Tr. Ex. 1103); the comic book property "Human Target" (the "*Human Target* Agreement") (Tr. Ex. 1104); the comic book property "Iron Man" (the "*Iron Man* Agreement") (Tr. Exs. 1105-1107); the literary property "Doc Savage" (the "*Doc Savage* Agreement") (Tr. Exs. 1108); the comic book property "Watchmen" (the "*Watchmen* Agreement") (Tr. Exs. 1028-1029); the comic book property "Swamp Thing" (the "*Swamp Thing* Agreement") (Tr. Ex. 1036); the comic book property "Birds of Prey" (the "*Birds of Prey* Agreement") (Tr. Ex. 1037); and the comic book series "Global Frequency" (the "*Global Frequency* Agreement") (Tr. Ex. 1038).

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Fabrications, Inc., dated May 20, 1999, is for the films rights to the novel *Hannibal* by Thomas Harris underlying the film *Hannibal* (the "*Hannibal* Agreement") (Tr. Ex. 307).

96.     The agreement between Thomas Meehan, Chicago Tribune-New York News Syndicate, Inc. and Columbia Pictures, dated as of December 29, 1978, is for the film rights to the Broadway musical *Annie* (the "*Annie* Agreement") (Tr. Ex. 315).

97.     The agreement between T Asset Acquisition Company, LLC ("T Asset") and AGV Productions, Inc., *et al.*, dated April 12, 2007, is for film, television and allied rights to the *Terminator* character (the "*Terminator* Rights Agreement") (Tr. Ex. 316).

98.     The agreement between T Asset and Warner Bros. Pictures, dated November 10, 2007, grants Warner Bros. domestic distribution rights to the pending film *Terminator: Salvation* (the "*Terminator* Agreement") (Tr. Ex. 308).

99.     The agreement between Jack Ryan Limited Partnership and Paramount Pictures Corporation, dated August 9, 2002, is for film rights to Tom Clancy's novel *Red Rabbit* (the "*Red Rabbit* Agreement") (Tr. Ex. 327).

100.    The agreement between Jack Ryan Limited Partnership and Paramount Pictures Corporation, dated July 7, 1999, is for the film rights to Tom Clancy's novel, *Rainbow Six* (the "*Rainbow Six* Agreement") (Tr. Ex. 326).

101.    The agreement between Michael Crichton and Paramount Pictures Corporation, dated October 22, 1999, is for the motion picture rights to Mr. Crichton's novel *Timeline* (the "*Timeline* Agreement") (Tr. Ex. 325).

**Terms of the Superman Film Agreement**

**Scope of Rights Grant**

102.    The Superman Film Agreement grants Warner Bros. an "exclusive and irrevocable option" ("Option") "to purchase all rights in the [Superman] Property," including broadly defined "audiovisual rights," and motion picture rights (the

12

"Rights"), subject to more narrowly defined rights reserved by DC ("Reserved Rights").  Tr. Ex. 232.  The Rights include all Superman rights not expressly reserved by DC.

103.   As defined in the Superman Film Agreement, the "Property" included "[a]ll material… detailing the stories and adventures of the comic book character known as 'Superman' as depicted in publications and television series, together with associated characters which have appeared (or will appear) together with 'Superman' and all now and hereafter existing rights of every kind and character whatsoever therein."

104.   As defined in the Superman Film Agreement, and pursuant to this Court's orders, the "Property" would include:  (i) the *non-exclusive* U.S. rights to *Action Comics No. 1*, and that of any other Recaptured Copyrights co-owned by Plaintiffs and Defendants pursuant to the Termination;  (ii) *exclusive* foreign rights to such Recaptured Copyrights; (iii) *exclusive* U.S. and foreign rights to the vast majority of Superman works/copyrights, which remain unaffected by Plaintiffs' Termination, and (iv) *exclusive* rights under trademark law.

105.   Upon exercise of the Option, Warner Bros. is assigned "exclusively, in perpetuity and throughout the universe, all rights, title and interest in the Property except for the Reserved Rights."

106.   The specific rights to be transferred to Warner Bros. include "[t]he right to produce audiovisual works of all types now known or hereafter devised…and all other derivative works based thereon" and "all copyrights, neighboring rights and any and all other ownership and exploitation rights in the Property."

107.   DC's Reserved Rights are publication, dramatic, radio, television, and merchandising rights.  However, strict limitations are placed upon DC's exploitation of its Reserved Rights.

108.   DC, in perpetuity, is forbidden to exploit its reserved television rights, except through an "affiliate of Warner."

13

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



110. Warner Bros. exercised its Option under the Superman Film Agreement.

111. Both the *Lord of the Rings* and *Sahara* Agreements grant the initial right to release a single feature-length motion picture based on each respective property, along with certain "ancillary" rights (*e.g.,* rights to publicize the film). All rights not specifically granted are deemed reserved.



113. Some of the agreements produced by Warner Bros.[3] support this, as they contain limited grants of rights.

---

[3] The agreements, designated by Defendants, include: the Japanese anime series "Robotech" (the "*Robotech* Agreement") (Tr. Ex. 1083); the comic book property "300" (the "*300* Agreement") (Tr. Ex. 1084); the film rights to the literary property "Tarzan" (the "*Tarzan* Agreements") (Tr. Exs. 1085-1086); the television rights to "Tarzan" (Tr. Ex. 1102) (the "*Tarzan* Television Agreement"); the property "G.I. Joe" (the "*G.I. Joe* Agreement") (Tr. Ex. 1092); the literary property "Conan" (the "2002 *Conan* Agreement" and "2000 *Conan* Agreement") (Tr. Exs. 1093-94); the literary property "Harry Potter" (the "*Harry Potter* Agreement") (Tr. Exs. 1097-1099); the literary property "How to Teach Filthy Rich Girls" (the "*How to Teach Filthy Rich Girls* Agreement") (Tr. Ex. 1100); the comic book property "Witchblade" (the "*Witchblade* Agreement") (Tr. Ex.1101); the literary property "Gossip Girl" (the "*Gossip Girl* Agreement") (Tr. Ex. 1103); the comic book property "Human Target" (the "*Human Target* Agreement") (Tr. Ex. 1104); the comic book property "Iron Man" (the "*Iron Man* Agreement") (Tr. Exs. 1105-1107); the literary property "Doc Savage" (the "*Doc Savage* Agreement") (Tr. Exs. 1108); the comic book property "Watchmen" (the "*Watchmen* Agreement") (Tr. Exs. 1028-1029); the comic book property "Swamp Thing" (the "*Swamp Thing* Agreement") (Tr. Ex. 1036); the comic book property "Birds of Prey" (the "*Birds of Prey* Agreement") (Tr. Ex. 1037); and the comic book series "Global Frequency" (the "*Global Frequency* Agreement") (Tr. Ex. 1038).

14

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



### **Option Term**

118.   The initial Option term of the Superman Film Agreement, dated "as of" November 6, 1999, is three years and by the time the agreement was executed on May 9, 2002, two-and-a-half years had already elapsed.

119.   The Option may be repeatedly extended for an additional thirty-one (31) years through 2033, by written notice and the payment to DC of $500,000/year, escalating to $600,000/year in the 15th year and $700,000/year in the 25th year.

120.   At the time the Superman Film Agreement was entered into, the copyright to the original Superman story published in *Action Comics No. 1* would expire in 2033.  Therefore, the Superman Film Agreement "locked-up" Superman film rights for the remaining life of the original Superman copyright at the time the agreement was made.

121.   Literary option/purchase agreements usually have shorter option terms, typically in the range of 12-18 months, with an equal or lesser extension period.



PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

[REDACTED]

124.   Agreements for high-level properties are often devoid of options. [REDACTED]

[REDACTED] Instead, the licensor must commit to and pay a much larger guaranteed cash purchase price for the right to produce a derivative motion picture.

**Fixed Cash Compensation**

125.   The Superman Film Agreement provides for a fixed cash fee of $1.5 million for a three (3) year Option.  Tr. Ex. 232.

126.   The Option is exercisable by written notice to DC, without the payment of any fixed cash purchase price, as the agreement contains no purchase price.

127.   The initial and all extension Option payments are deemed "advances," fully applicable to DC's contingent compensation described *infra*.

128.   In contrast, option payments are usually *non-applicable* to the contingent compensation in such literary option/purchase agreements.  Additionally, whereas initial option fees are usually applicable to the purchase price (absent in the agreement), option extension payments are commonly non-applicable to the purchase price in literary option/purchase agreements.

129.   The [REDACTED] *Sahara,* [REDACTED] *My Fair Lady* Agreements provide for the payment to the rightsholder of substantial fixed cash purchase prices upon execution of the agreements, not for mere option fees.

130.   The *Sahara* Agreement provides for a guaranteed fixed cash purchase price of $20 million.  Tr. Ex. 201.

131.   The 1963 *My Fair Lady* Agreement provides for a fixed cash purchase price of $5.5 million (adjusted for inflation, $37.2 million in current dollars), non-applicable to the licensor's contingent compensation.  Tr. Ex. 300.

16
PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

132.   The *Lord of the Rings* Agreement provides for $4.75 million in fixed cash compensation (option fees plus purchase prices), non-applicable to the licensor's contingent compensation.  Tr. Ex. 121, 128.

138.   Warner Bros. option/purchase agreements for other DC properties provide for substantial purchase prices

140.   Other Warner Bros. option/purchase agreements relating to third party properties also provide for

17

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

[REDACTED]

**Contingent Compensation**

141.    The Superman Film Agreement provides that if Warner Bros. produces "a feature-length motion picture based on the Property," DC is entitled to 5% of Warner Bros.' defined gross receipts ("Gross Receipts") from the picture worldwide. Tr. Ex. 232.

[REDACTED]

143.    The Option fee and any extension payments are all deemed an advance against DC's contingent compensation.  Therefore, DC would not be entitled to any contingent compensation until Warner Bros.' Gross Receipts equaled at least $30 million.

[REDACTED]

145.    The *My Fair Lady* Agreement provides the licensor with $5.5 million upfront, *plus* 47.5% of Warner Bros.' gross receipts after $20 million.  Adjusted for inflation, the *My Fair Lady* purchase price is approximately $37.2 million in today's dollars.  Tr. Ex. 300.

146.    The *Lord of the Rings* Agreement provides the licensor with the following gross participation:  5% of the distributor's gross receipts from $40-$50 million, 7.5% of gross receipts from $50-$60 million, and 10% of gross receipts over $60 million, *plus* "bonus" payments of $1 million at $90 million in gross receipts, $1 million at $100 million in gross receipts, and $1.25 million at $125 million in gross

receipts.  The option fees are not applicable to this contingent compensation.  Tr. Exs. 121, 128.

147.   The *Sahara* Agreement provides the licensor with a 10% gross participation.  Tr. Ex. 201.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

154.    The *Lord of the Rings* Agreement includes in its definition of gross receipts the licensee and, "without limitation, its parent, subsidiary, affiliated, associated, and sister companies and its sales agents, distributors and distributing licensees, agents, trustees, successors and assigns."



158.    Many of the "gross receipts" definitions found in agreements between Warner Bros. and third parties include standard contractual amendments called "riders."

159.    Said "riders" improve the definition of gross receipts in the rightsholder's favor.  Such provisions direct Warner Bros. to include in "gross receipts" revenues from copyright and trademark infringement suits, subsidies, aid, prizes, and licensing of distribution rights; modify the deduction of taxes from revenues so that rebates of taxes paid are "credited" against the taxes previously deducted; exclude participations from the "residuals" deducted from gross revenues; eliminate the deduction for cooperative advertising expenses; require that reserves against returns (for inventory items like home video) are "reasonable"; require any "package" sales of the property with other properties to be "reasonably" allocated; require any licenses for broadcast on television stations owned by Warner Bros. or Time Warner be conducted on an "arms-length" basis; and recognize revenues when they are either received in U.S. dollars, freely remittable in U.S. dollars, or used for

any purpose where they were first received.

█████████████████████████████

█████████████████████████████

161.    DC's contingent participation applies to only ███ of Warner Bros.' worldwide revenues from home entertainment media (DVDs).

162.    This ███ video royalty is a default minimum provision in the entertainment industry.

163.    This "video royalty" is an artifact of a period when "home video" was an emerging technology, and studios contracted with third-parties for home video distribution.  These third-parties paid a "royalty" of 20% of their sales to the studios. Warner Bros. has long handled its own home video distribution, but still maintain the fiction of a home video royalty.

164.    The ███ "video royalty" for Superman translates to DC receiving only 1% of the revenues from this vital market.

165.    DVD revenues comprise a significant portion of a film's revenue and often exceed a film's theatrical box office gross.

166.    Other literary rights agreements provide for 30-40% video royalties, and some agreements include 100% of home video revenues in gross receipts.

█████████████████████████████

█████████████████████████████

169.    The *Lord of the Rings* Agreement provides for a 40% video royalty on wholesale rental revenues.

170.    The *Sahara* Agreement includes 100% of home video revenue in gross receipts.

█████████████████████████████

21
PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



**Reversion of Rights Granted**

177.    The *Lord of the Rings* Agreement requires that principal photography of a derivative film commence within 18 months of the exercise of the option, and

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

further requires that the film be released within 2 years after the start of principal photography.  The option/purchase of sequel film rights are subject to the same reversion clause.  Tr. Ex. 128.

[REDACTED]

180.  [REDACTED]  Agreements all contain provisions for the reversion of the properties if principal photography has not commenced within a specified length of time.  Tr. Ex. 1083, 1085-1086, 1093-1094, 1097-1099, 1105-1108.

181.  DC has reversion provisions in many of its other contracts with Warner Bros. [REDACTED]

182.  Many of the contracts, particularly for "franchise" properties, also contain "rolling" reversion provisions requiring that sequel motion pictures be periodically produced, or else the rights revert to the original owner.

[REDACTED]



187. The *Lord of the Rings* Agreement requires that principal photography on a sequel commence within 30 months of optioning such sequel rights or the rights revert to the licensor, and that the rights revert to the licensor five years after the release of the last picture produced. Tr. Ex. 128.

**Merchandising**

188. DC conducts limited "collectible" merchandising itself through the direct market (*e.g.*, to comic book stores).

189. The bulk of DC's merchandising for all DC properties, including Superman, is exclusively conducted through Warner Bros. Consumer Products ("WBCP").



193.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

 Warner Bros. receives another 50% of the licensing revenues from "film-related" Superman merchandising.

194.    "Film-related" merchandising is any merchandising

197.    The *Lord of the Rings* Agreement reserves merchandising rights entirely to the licensor.  Tr. Ex. 128.

199.    Other agreements allow the *licensor*, not the licensee Studio, to act as the merchandising agent, and to retain a 25% fee for such services and other deductions before allocating "film-related" merchandising revenues.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



**Creative Controls**

207.   The *Sahara* Agreement provides the licensor with the following creative controls:  (a) "sole and absolute" discretion over screenplay approval, with any changes in the screenplay for the picture requiring express approval; (b) sole and absolute approval of the screenwriters; (c) sole and absolute approval of the actors playing the two lead roles; and (d) sole and absolute approval of the director.  Tr. Ex.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

201.

[text redacted]

**Warranties and Indemnification**

210.   DC and Warner Bros. entered into the Superman Film Agreement after they were served with Plaintiffs' Superman notices of termination under 17 U.S.C. § 304(c), and after April 16, 1999, the effective date of such termination.

211.   Prior to negotiating the Superman Film Agreement, DC's Levitz and Warner Bros.' John Schulman had previously acknowledged to Plaintiffs that their statutory termination was effective.

212.   DC nonetheless warranted in the Superman Film Agreement that it is "the sole proprietor of all rights in the Property," and that DC owns Superman "free and clear of any liens, encumbrances, other third party interests of any kind and free and clear of any claims or litigation, whether pending or threatened," and DC agreed to indemnify Warner Bros. for any breaches of its warranties.

213.   DC is obligated to fully indemnify Warner Bros. for this lawsuit.

214.   In the *Lord of the Rings* Agreement, the licensor limited its warranties to "no known incompleteness" in the chain of title documents provided; that the chain of title documents to which the licensor was a party were genuine; and that it had no knowledge of or any doubt as to any other document's genuineness.

27

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

215.   The indemnification provision in the *Lord of the Rings* Agreement allowed the rightsholder to either conduct the defense of any claims itself, or leave the defense to the licensee, in which case the licensor must be consulted on "all substantive matters."



**Package Sales**

**Accountings and Audit Rights**

28

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

223.    Warner Bros.' standardized "rider,"

224.    Other rights agreements provide for monthly accounting statements, allow longer audits, allow audits to be conducted *twice* a year, provide longer "statute of limitations" periods or no such period, and/or provide for reimbursement if an audit uncovers material underpayment.

225.    More frequent accounting statements and payments permit revenues to be realized more quickly by the licensor.

226.    The *Lord of the Rings* Agreement provides for *monthly* accounting statements for 3 years, quarterly accounting statements for 3 years thereafter, and then semi-annual accountings.  Tr. Ex. 121, 128.

227.    The *Lord of the Rings* Agreement permits audits to be "completed with reasonable expedition" with no maximum duration, conducted twice per year without an internal "statute of limitations," and that audit costs are reimbursed by the licensee if underpayment over $10,000 is discovered.

229.    The *Sahara* Agreement provides that audits may be conducted *twice* per year, a 45-day maximum duration, and that audit costs are reimbursed by the licensee if underpayment over 5% is discovered.  Tr. Ex. 201.

**Co-financing Option**

29

231.   The Superman Film Agreement does not permit DC to co-finance any Superman films for the 34-year term of the Agreement.

███████████████████████████████████

## **Superman Television Agreement**

233.   The Superman Television Agreement, dated as of December 5, 2000, is between DC and WBTV, a division of TWEC, and currently a division of TWEC's successor WBEI.  The Agreement provides WBTV with an exclusive and irrevocable option to purchase DC's live-action television rights to the Superman property.  Tr. Ex. 223.

234.   The Superman Television Agreement contains economic terms identical to DC's 1991 Lorimar Agreement pertaining to the television series *Lois & Clark: The New Adventures of Superman*.  Tr. Exs. 181, 223.

235.   Both the Superman Television Agreement and the Lorimar Agreement provide for a $10,000 option fee, $45,000 per-episode royalty that is applicable to contingent participation of 3% of gross revenues up to $1.5 million per episode and 5% of gross revenues above $1.5 million per episode.

236.   The Superman Television Agreement grants WBTV "an exclusive and irrevocable option…to acquire from [DC] those rights set forth …in Exhibit 'A' … in and to the Character."  Tr. Ex. 223.

237.   Exhibit "A" is an assignment wherein "Detective Comics… (referred to herein as 'Assignor') does hereby assign, grant, bargain, sell, transfer, convey, and set over…forever, to Warner Bros. Television Production…('Assignee') the exclusive worldwide television production rights…accruing in and to all literary material described as follows:  All material tangible and intangible detailing the stories and

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

adventures of the comic book character known as 'Clark Kent' or 'Superman.'"

238. As defined in the Superman Television Agreement, and pursuant to this Court's orders, the "Property" would include: (i) the *non-exclusive* U.S. rights to *Action Comics No. 1*, and that of any other Recaptured Copyrights co-owned by Plaintiffs and Defendants pursuant to the Termination; (ii) *exclusive* foreign rights to such Recaptured Copyrights; (iii) *exclusive* U.S. and foreign rights to the vast majority of Superman works/copyrights, which remain unaffected by Plaintiffs' Termination, and (iv) *exclusive* rights under trademark law.

239. In Paragraph 4 of this assignment, DC reserves certain rights, including theatrical film rights (separately assigned to Warner Bros. in the Superman Film Agreement), animation rights (separately licensed to Warner Bros. in the Superman Animation Agreements described *infra*) and merchandising rights (subject to the DC's exclusive agreement with WBCP described *supra*).

240. On February 12, 2001 Warner Bros. exercised its option and DC executed a "Short Form Assignment" to WBTV in which DC "irrevocably sells, grants and assigns" to WBTV "in perpetuity and throughout the universe, all exclusive television rights in and to the literary work in the form of a comic book (the 'Property') described hereafter, including without limitation, all allied, ancillary and incidental rights…: Title: 'Superman' Author: Jerry Siegel and Joe Shuster …including all …copyrights therein...."

241. The assignment further states that: "Owner hereby acknowledges that Purchaser may freely assign this assignment or any of Purchaser's rights hereunder," without DC's input or approval.

242. A prior agreement between DC and a third party, Cantharus Productions N.V., dated June 15, 1987, concerned the syndicated live-action television series *The Adventures of Superboy* (1988-1992) (the "*Superboy* Agreement"). Tr. Ex. 15.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

[REDACTED]

**Fixed Cash Compensation**

246.   The Superman Television Agreement's option fee is $10,000 for one year, extendable for one year for the same sum.  The option fees are applicable to DC's contingent episodic royalty.  The option may be exercised by written notice. The "purchase price" is $45,000, payable upon start of principal photography of a pilot.  The purchase price is applicable to DC's contingent participation.

[REDACTED]

**Contingent Compensation**

249.   Under the Superman Television Agreement, DC receives a royalty for a "live action episodic television series" of $45,000 per episode, which is an advance applicable to a contingent participation equal to 3% of defined receipts, escalating to 5%, if defined receipts per episode exceed $1.5 million.

250.   Under the Superman Television Agreement, no royalty or participation is payable to DC for WBTV's production of other forms of Superman live action television programming based on the broad rights assigned (*e.g.*, a Superman television "special," "movie-of-the-week," documentary, game show, etc.).

[REDACTED]

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

255.   The Superman Television Agreement does not ████████████

258.   DVD revenues are a major source of income for a television series.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

[REDACTED]

**Merchandising**

259.    The "merchandising" terms in the Superman Television Agreement are [REDACTED] effectively provide Warner Bros. with [REDACTED] of all series-related Superman merchandising.

**Creative Rights**

[REDACTED]

**Affiliated Transactions**

[REDACTED]

263.    Defendant TWI owns the broadcast network the WB (now the "CW," co-owned with Viacom) that broadcasts *Smallville*.

264.    The broadcaster of a television series pays a substantial per episode "licensee fee" to the producer of the series for the right to broadcast the program that usually constitutes a substantial portion of the producer's revenue and cost of producing the series.

[REDACTED]

**Accounting and Audit**

[REDACTED]

34
PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

[REDACTED]

### The Superman Animation Agreements

269. DC's television animation agreements with Warner Bros., namely the *Superman Animated*, *Justice League*, *Legion of Super-Pets/Krypto*, and the *Legion of Superheroes* Agreements (the "Superman Animation Agreements"), [REDACTED]

270. As defined in the Superman Animations Agreements, and pursuant to this Court's orders, the "Property" would include:  (i) the *non-exclusive* U.S. rights to *Action Comics No. 1*, and that of any other Recaptured Copyrights co-owned by Plaintiffs and Defendants pursuant to the Termination;  (ii) *exclusive* foreign rights to such Recaptured Copyrights; (iii) *exclusive* U.S. and foreign rights to the vast majority of Superman works/copyrights, which remain unaffected by Plaintiffs' Termination, and (iv) *exclusive* rights under trademark law.

271. Previously, DC had entered into an agreement with then third party Hanna-Barbera Productions, Inc., dated November 29, 1973 and as subsequently amended (the "Hanna-Barbera Agreement") (Tr. Exs. 69, 141, 184) to produce Superman animated programming.

272. Since the Hanna-Barbera Agreement, DC has exclusively licensed the rights to create Superman animated television to Warner Bros. entities.

[REDACTED]

274. Warner Bros., in turn, has only licensed to affiliated entities the initial broadcast rights to Superman animated programs produced under the Superman Animation Agreements.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



283.   The Hanna-Barbera Agreement provides DC with 25% of "net profits," consisting of revenues less expenses.  The agreement provides that *all* monies

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

received by the licensee, its subsidiaries, and from "all other sources in connection with all types of dealing," are included in gross revenues. No distribution fees are charged by the licensee. Expenses are *capped* at $92,000 per episode, and additionally limited to the "direct costs of production" plus an overhead fee, with no interest or other expenses.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over the claims set forth in Plaintiffs' Second Amended Complaint pursuant to the United States Copyright Act (hereinafter, the "Copyright Act"), 17 U.S.C. §§ 101 *et al.* and 28 U.S.C. §§ 1331, 1332, 1338(a) and (b).

2. This Court has supplemental jurisdiction over the related state claims herein under 18 U.S.C. § 1367 in that these claims form part of the same case and controversy as the federal claims herein.

3. This Court has personal jurisdiction over the Defendants in that Defendants are regularly doing business in the State of California and in this district, and because a substantial part of the relevant acts complained of herein occurred in the State of California and this district.

4. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because a substantial part of the relevant acts that give rise to the claims herein occurred in this district and because WBEI has its principal place of business in this district.

5. Plaintiffs are entitled to declaratory relief pursuant to 28 U.S.C. § 2201(a) as: (1) an actual controversy exists between the parties; (2) the controversy extends to the rights and duties of the parties regarding Defendants' accounting to Plaintiffs for profits derived from the Superman copyright interests recaptured by Plaintiffs' pursuant to 17 U.S.C.§ 304(c) (the "Recaptured Copyrights"); and (3) a judicial declaration is necessary to determine Plaintiffs' right to an accounting by

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

WBEI and other TWI entities, now and in the future, for their exploitation of the Recaptured Copyrights after April 16, 1999, the effective date of Plaintiffs' statutory termination.

### **Defendants' Exclusive and Non-Exclusive Superman Rights**

6.     In the Superman Agreements, DC intended to transfer to Warner Bros. the film and television rights to all Superman works/copyrights.

7.     DC's intent is not abrogated to the extent it can be fulfilled.  *See* Cal. Civ. Code § 1641 (contract should be considered "so as to give effect to every part, if reasonably practicable"); *Jones v First American Title Ins. Co.*, 107 Cal.App.4th 381, 388-89 (2003) (The power of reformation has a "broad reach" and is to be used to "reflect the intent of the parties."); *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 124 (2000) ("[R]estriction" is an appropriate remedy to contractual provision contrary to law); Dan B. Dobbs, Law of Remedies §§ 4.3(7) and 11.6(3) (2d. ed. 1993) ("A court may reform a contract to … to bring it within minimum legal standards, or to comply with legal restrictions.").

8.     Pursuant to the Superman Film Agreement (Tr. Ex. 232) and the Superman Television Agreement (Tr. Exs. 161, 222-223), DC exclusively transferred to Warner Bros. DC's Superman film and television rights, to the full extent of DC's ownership of such rights.

9.     Therefore, DC exclusively transferred to Warner Bros. the film and television rights to Superman works which were not recaptured under Plaintiffs' Termination and which DC continues to own exclusively.

10.     With respect to the Recaptured Copyrights, the rights co-owned by DC and licensed to Warner Bros. are non-exclusive by operation of law.  The Superman Agreements are reformed, but only to the extent necessary to comport with the law.

11.     As such, any license by DC of copyrights co-owned by Plaintiffs and Defendants is on a *non-exclusive* basis.  Any license or assignment of copyrights not subject to recapture under Plaintiffs' Termination and solely owned by DC remains

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

on an *exclusive* basis.

### "Sweetheart Deal" Claim

12. Plaintiffs' declaratory relief claim that Warner Bros. must directly account to Plaintiffs for their profits from Superman exploitations seeks an "equitable" remedy arising from the relationship of co-owners as "tenants in common." *See Siegel II,* 542 F.Supp.2d at 1144-45 (C.D. Cal. 2008). *See Oddo v. Ries,* 743 F.2d at 633 ("A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright … the duty to account…. comes from equitable doctrines relating to unjust enrichment and general principles of law governing the rights of co-owners.").

13. With respect to Plaintiffs' so-called "alter-ego" claim, the "the alter ego doctrine, sometimes referred to as piercing the corporate veil doctrine, is not a cause of action unto itself; 'it is merely a procedural means of allowing [or better said, expanding the scope of those ensnared in the net of] liability on a substantive claim.'" October 6, 2008 Order at 8, quoting *International Financial Servs. v. Chromas Tech.*, 356 F.3d 731, 736 (7th Cir. 2004).

14. The issue requires "equitable assessment… of whether maintaining the corporate form would be 'inequitable.'" October 6, 2008 Order at 9. *See also Siegel II,* 542 F.Supp.2d at 1145, citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523 (2000) and *Messler v. Bragg Management Co*., 39 Cal.3d 290 (1985) ("The essence of the alter ego doctrine, in which it is claimed that an opposing party is using the corporate form unjustly, is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result.").

15. The "fact alone" that "the relevant entities are all closely related entities … raises the specter of a 'sweetheart deal' entered into by related entities in order to pay a less than market value fee for licensing valuable copyrights." *Siegel II,* 542 F.Supp.2d at 1145. *See* Black's Law Dictionary, 7th Ed. (An "arm's length

transaction" is "a transaction negotiated by unrelated parties, each acting in his or her own self interest; the basis for a fair market value determination.")

16. As such, "[w]hether the license fees paid represents the fair market value therefor, or whether the license for the works between the related entities was a "'sweetheart deal,'" as a matter of equity, must be determined. *Siegel II,* 542 F.Supp.2d at 1145.

17. A true "arm's length" negotiation is one between two unrelated entities, each acting in its own self-interest to maximize its respective benefits. An arm's length negotiation should present no conflicts of interest that might prevent either party from negotiating the *best possible* deal for itself.

18. Superman needs no introduction. Superman is a unique world famous franchise property with a long-term successful track record in publishing, feature films, live action and animated television, and merchandising. *See Siegel II,* 542 F. Supp. 2d at 1102, 1111 (Superman is a "super-salesman" for Defendants.)

19. By definition, the "market value" of a unique property like Superman is determined on the competitive open market.

20. DC failed to determine or secure Superman's "fair market value" on the open market, rendering a determination of "fair market value" subjective.

21. Without offering Superman film and television rights to any other entertainment studios, DC assigned such rights to Warner Bros. in perpetuity.

22. At the time the Superman Agreements were negotiated and entered into with TWEC (WBEI's predecessor), DC was half-owned by TWEC and half-owned by TWEC's wholly owned subsidiary, EC.

23. TWEC therefore sat at both sides of the negotiating table with respect to the Superman Agreements, giving rise to an inference that the terms of such agreements favored TWEC over DC, and constituted less than "fair market value" for Superman.

24. As copyright co-owners are entitled to share equally in the profits from

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

co-owned copyrights, and both Superman Agreements were entered into *after* the effective date of Plaintiffs' Termination, TWEC and DC also had ample motivation to hedge against the effects of the Termination by reducing the compensation of DC, the putative copyright co-owner, to less than "fair market value."

25. The "fair market value" determination, though difficult, may be assisted through comparisons to the terms of other agreements for comparable literary properties.

26. The comparability of the properties to Superman must be assessed as of the time such agreements were entered into.

27. The terms at issue are not merely pure financial terms, as most other terms in such agreements (*e.g.*, duration, scope of the rights grant, reversion clauses, accounting and audit provisions, and even creative approvals) have economic impact.

28. Defendants could have attempted to show "fair market value" by arm's length agreements for *comparable or more valuable* properties, measured at the time the agreements were made, on equal or worse terms than the Superman Agreements. Defendants failed to designate such agreements.

29. Instead, the Warner Bros. agreements, which appear to have been selected by Defendants for their unimpressive terms, concern properties that appear to have been clearly less prominent than Superman, and, for the most part, with unproven film and television track records, at the time the agreements were entered into.[4]

30. Defendants' agreements only served to demonstrate that properties less prominent than Superman received *inferior* terms to those in the Superman Agreements.

31. Additionally, the sample agreements between Warner Bros. and DC for non-Superman properties are agreements between the same closely related entities as

---

[4] The specific properties in question are: "Gossip Girl," "Witchblade," "Robotech," "Conan," "300," "Birds of Prey," "G.I. Joe," "Global Frequency," "Tarzan," "How to Teach Filthy Rich Girls," "Harry Potter," "Human Target," "Iron Man," "Doc Savage," "Watchmen," and "Swamp Thing." <u>Tr. Exs. 1037-1038, 1083-1108</u>.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

the Superman Agreements and, as such, are of diminished comparative value.

32.    Plaintiffs showed that the terms of the Superman Agreements do not constitute "fair market value" in two ways.  The first way was to show that the terms of arm's length agreements for comparable properties are superior.

33.    The second way was to show that less-prominent properties received equal or superior terms in arm's length transactions.  The latter agreements are probative because they support an inference that better terms could have been achieved for a more prominent property, like Superman.

34.    The agreements designated by Plaintiffs accomplish both of the above.

35.    The financial and other terms of the Superman Film Agreement, Superman Television Agreement and Superman Animation Agreements are less favorable to the rightsholder than comparable terms of option/purchase agreements for intellectual properties that were far less successful than Superman at the time such agreements were entered into.

36.    The Superman Film Agreement, Superman Television Agreement and Superman Animation Agreements also omit terms that are commonplace in underlying rights agreements (even Warner Bros.' own third party agreements) that favor and/or protect the licensor.

37.    The terms of the Superman Film Agreement, Superman Television Agreement and Superman Animation Agreements do not constitute "fair market value."

### The Superman Film Agreement

38.    The rights assignment in the Superman Film Agreement, granting all rights not expressly reserved by DC, is overbroad and not a "fair market" term for a successful franchise property like Superman.  Comparable agreements for established properties consistently grant limited rights (*e.g.,* "live-action feature-length motion picture rights") and retain all rights not expressly granted.

39.    These agreements demonstrate that it is extremely rare for even limited

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

rights in a well known property to be transferred wholesale. Instead, in arm's length negotiations, the owners of such properties carefully delimit the scope of the right(s) transferred, while reserving all other rights.

40. In contrast, DC transferred the entire "audiovisual" copyright to one of its two most valuable characters and, in addition, was deemed to have sold all other rights not expressly reserved.

41. The Superman Film Agreement contains no fixed cash purchase price payable upon exercise of the option, whereas nearly all other such literary option/purchase agreements do, and well known properties commonly garner very large multi-million dollar purchase prices.

42. The fixed cash compensation (amounting solely to the $500,000/year option fees) does not reflect market value, as commercially less prominent properties garnered much larger upfront cash payments in arm's length agreements. The *Lord of the Rings, Sahara,* ████████████████████████ and *My Fair Lady* Agreements involved far greater up-front payments ranging from $5 million to $20 million, or even more if one adjusts the amounts paid in the 1962 *My Fair Lady* and ████████████████ for inflation. Even other DC properties, not nearly as valuable as Superman, have commanded equal or greater fixed compensation from Warner Bros.

43. The applicability in the agreement of the option payments to DC's 5% contingent compensation is also not a "fair market" term. Option payments are usually non-applicable to the contingent compensation in such agreements. Whereas, initial option fees are often applicable to the purchase price (absent in the agreement) in literary option/purchase agreements, option extension payments are commonly non-applicable to the purchase price.

44. DC's contingent 5% participation in defined "gross receipts" also does not reflect market value, as lesser properties have achieved much better or equal gross participations.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

█████████████████████████████████████████████████████

█████████████████████████████████

46.    The *Lord of the Rings* Agreement contains a gross participation that rapidly escalates from 5% to 10%, while the *Sahara* Agreement ████████████ ████████████ provide for a 10% gross participation.

47.    Other agreements for high-level literary properties also provide for a 10% gross participation.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

49.    Warner Bros.' *My Fair Lady* Agreement provides for an effective 27.5% gross participation up to $20 million in gross revenues and a 47.5% gross participation thereafter.

50.    The lack of escalations in the participation payments is not a fair market term, as numerous other agreements for high-level properties increase participation levels (*e.g.,* to 10%, 15% or even 20%) as revenue benchmarks are reached.  Such escalations reward the licensor and enhance its participation in a successful derivative motion picture.  No such escalations are contained in the Superman Film Agreement.

51.    The lack of escalations in the fixed and contingent payments for each sequel is not a fair-market term, as other such agreements increase such compensation with each sequel film.  Sequels are generally not produced unless the immediately prior film was successful.  Such escalations enhance the licensors participation due to the success of the prior derivative film.

█████████████████████████████████████████████████████

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



55.    Other literary rights agreements provide for 30-40% video royalties, and some agreements include 100% of home video revenues in gross receipts.

56.    DC's minimal participation in the lucrative home video market is not a fair market term.

57.    The length of the successive option periods for thirty-four (34) total years – the remaining  life of the Superman copyright at the time – is not a fair market term, as virtually all other option/purchase agreements have terms ranging from 12 to 18 months with a single similar or shorter extension period.

58.    Moreover, many agreements for high-level properties are devoid of options.  Instead, the licensor must commit to and pay a much larger guaranteed purchase price for the right to produce a derivative motion picture.



60.    The absence of a significant "reversion" provision is not a fair market term, as most agreements for franchise properties provide for reversion of a popular property if it is not consistently exploited.

61.    Other such agreements commonly provide that benchmarks must be reached (*e.g.*, principal photography started within 2 years of purchase, sequel

productions within a fixed number of years from the release of each prior film), or the rights revert to the licensor due to the licensee's failure to exploit the franchise.

62.     The absence of a significant reversion provision is particularly unfavorable to DC, both because its compensation is heavily weighted on its contingent 5% participation in revenues from released films, and because periodic major film releases drive ancillary revenues (*e.g.*, merchandising, soundtrack, videogames, and publishing).

63.     The merchandising provision is not a fair market term.



66.     DC's representations, warranties and indemnification for breach thereof are not fair market terms, as no exclusion is made for known prior rights claims such as the Plaintiffs' Superman termination.  Other such agreements exclude known rights claims so as to limit the rightsholder's exposure in the event of a lawsuit.

67.     DC and Warner Bros.' failure to exclude Plaintiffs' statutory termination from DC's warranties and indemnification could well result in Plaintiffs being indirectly "charged" by Warner Bros. for this lawsuit regardless of the validity of

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs' notices of termination, which would be inequitable.

68.    The accounting and audit provisions are not fair market terms



71.    The "holdbacks" pertaining to DC's "reserved rights" are not fair market terms for a prominent franchise property like Superman, as they seriously limit DC's ability to exploit its "reserved" Superman rights.

### The Superman Television Agreement

72.    DC's negotiation of the Superman Television Agreement was even more perfunctory than its negotiation of the Superman Film Agreement. This is not surprising as under the Superman Film Agreement DC is forbidden to exploit Superman television rights except with a Warner Bros. affiliate.

73.    For the Superman Television Agreement, DC and Warner Bros. merely imported the economic terms from the 1991 Lorimar Agreement.  Notably, the Lorimar Agreement was also with a TWI affiliate.

74.    The mere $10,000 option fee is not a fair market term.

75.    The fixed purchase price, equal to a single episodic royalty, is also not a fair market term, as other television agreements for lesser properties provide for a greater purchase price.

47



76. As with the Superman Film Agreement, DC's contingent participation is not a fair market term for a property of Superman's commercial magnitude. DC accepted, without any negotiation, the same terms as in the decade-old Lorimar Agreement with another affiliate, namely 3% of defined gross receipts, with a potential escalation to 5% to the extent receipts exceed $1.5 million.

80. The "gross receipts" definition is also not a fair market term, as other such agreements include more generous definitions that result in more revenue and fewer expenses being included in gross receipts.

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

**The Superman Animation Agreements**

87.    DC has a number of disadvantageous Superman Animation Agreements with Warner Bros.

49

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW



92.    DC's Hanna-Barbera Agreements were significantly more generous than its Superman Animated Agreements with Warner Bros.



94.    The terms of the Superman Animation Agreements strongly favor Warner Bros. to the detriment of DC, and are often onerous.

### The Effect of Non-Exclusive Rights

95.    DC's license of certain domestic Superman copyrights on a non-exclusive basis does not have a material impact on the equitable determination of whether the overall Superman Agreements were for "fair market value."

96.    The vast majority of the Superman copyrights conveyed were exclusive, with the exception of certain early copyrights recaptured by Plaintiffs, and DC retained exclusive foreign copyrights to even those.

97.    DC expressly warranted the exclusivity of the rights conveyed and agreed to indemnify Warner Bros. for anything less, contractually providing Warner Bros. with the economic equivalent of exclusive Superman rights.

50

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

98.    Warner Bros. has consistently held itself out in the entertainment industry as controlling exclusive Superman film and television rights, notwithstanding Plaintiffs' Termination.  Warner Bros. has a *de facto* monopoly in the entertainment industry on Superman film and television exploitation through DC's conveyance of primarily *exclusive* Superman copyrights, trademarks, and exclusive foreign rights to any Recaptured Copyrights.

99.    Foreign revenues are essential to the viability of a feature motion picture or television project because a major portion of their total revenues are derived from foreign sources.  Given the risks inherent in a film or television project distributed on even a *worldwide* basis, it is highly unlikely that any major competitor would or could launch a competing Superman film or television project based solely on non-exclusive U.S. rights to the recaptured Superman copyrights.

100.    Warner Bros. actions objectively comport with these conclusions, including Warner Bros.' investment of considerable sums in the development, production, distribution and marketing of *Superman Returns* and *Smallville* <u>after</u> the effective date of Plaintiffs' Termination.

### The Superman Agreements Are Not For Fair Market Value

101.    The sheer number of non-fair market terms, the perfunctory negotiations by which such terms were arrived at and the non-arm's length nature of the transactions, all lead to the conclusion that DC's Superman agreements with Warner Bros. do not constitute "fair market value."

102.    To avoid the inequitable diminution of Plaintiffs' profit share from their recaptured Superman copyrights, now and in the future, Warner Bros. must account directly to Plaintiffs for its exploitation of Superman film and television rights.

IT IS SO ORDERED.

DATED: _____  __, 2009            _____

UNITED STATES DISTRICT JUDGE

51
PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Approved as to form and content:

DATED: April 7, 2009                    TOBEROFF & ASSOCIATES, P.C.


By_____
                    Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW