1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7  JOANNE SIEGEL and            )
   LAURA SIEGEL LARSON,         )
8                  Plaintiffs,  )
                                )
9          vs.                  )  No. CV 04-08400-SGL
                                )
10 WARNER BROTHERS ENTERTAINMENT INC.;)
   TIME WARNER, INC.; DC COMICS;    )
11 and DOES 1-10,               )  Trial Day 1
                  Defendants.   )  A.M. Session
12 _____)  Pages 1-66

13

14

          Reporter's Transcript of Court Trial Proceedings
15
               Riverside, California
16
             Tuesday, April 28, 2009
17
                  9:51 A.M.
18

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24          3470 12th Street, Rm. 134
          Riverside, California  92501
25               (951) 274-0844
               WWW.THERESALANZA.COM

```
 1      APPEARANCES:
 2
 3      On Behalf of Plaintiffs:
 4
                            LAW OFFICES OF MARC TOBEROFF
 5                          BY:  Marc Toberoff
                            BY:  Nicholas C. Williamson
 6                          2049 Century Park East,
                            Suite 2720
 7                          Los Angeles, California  90067
                            310-246-3100
 8
 9
        on behalf of Defendants/Counterclaimant:
10
11                          WEISSMANN WOLFF BERGMAN COLEMAN
                             GRODIN & EVALL LLP
12                          BY:  Michael Bergman
                            BY:  Anjani Mandavia
13                          9665 Wilshire Boulevard,
                            Ninth Floor
14                          Beverly Hills, California  90212
                            310-858-7888
15
16
        On Behalf of DC Comics:
17
                            PERKINS LAW OFFICE, P.C.
18                          BY:  Patrick T. Perkins
                            1711 Rt. 9D
19                          Cold Spring, New York  10516
                            845-265-2820
20
21
22
23
24
25
```

Tuesday, April 28, 2009                    Trial Day 1, AM Session

```
 1                        I N D E X

 2                                              Page

 3   Opening Statement - Plaintiff.................   6

 4   Opening Statement - Defense..................  16

 5   Plaintiff Case...............................  30

 6

 7

 8   PLAINTIFF
     WITNESS        DIRECT     CROSS     REDIRECT     RECROSS
 9   MARK EVANIER

10   By Mr. Toberoff

11

12

13        EXHIBITS        RECEIVED

14        (None.)

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, April 28, 2009                 Trial Day 1, AM Session

```
 1        Riverside, California; Tuesday, April 28, 2009; 9:51 A.M.

 2                                -oOo-

 3        THE CLERK:  Calling item No. 1 on calendar, case

 4   No. CV 04-08400-SGL, Joanne Siegel, etc., versus Warner Bros.

 5   Entertainment, Inc., etc.                                        09:51

 6        Counsel, please state your appearances for the

 7   record.

 8        MR. TOBEROFF:  Good morning, Your Honor,

 9   Marc Toberoff, attorney for plaintiffs.

10        THE COURT:  Mr. Toberoff.

11        Counsel?

12        MR. BERGMAN:  Good morning, Your Honor,

13   Michael Bergman for the defendants.  My colleagues will

14   introduce themselves, but if Your Honor pleases, I'd like to

15   introduce Mr. Paul Levitz, who is the president and publisher  09:51

16   of DC and who will be DC's designated representative at the

17   trial.

18        THE COURT:  Good morning.

19        MR. PERKINS:  Patrick Perkins for the defendants,

20   Your Honor.  Good morning, Your Honor.                          09:51

21        MS. MANDAVIA:  Anjani Mandavia for defendants.

22        THE COURT:  Good morning.

23        And Counsel, go ahead just for the record, if you

24   would.

25        MR. WILLIAMSON:  Nicholas Williamson for plaintiffs,  09:51
```

```
 1   Your Honor.  Good morning.

 2          MR. ADAMS:  Keith Adams for plaintiffs, Your Honor.

 3   Good morning.

 4          THE COURT:  Good morning to you all.

 5          The Court wants to proceed with the trial              09:51

 6   momentarily, but I first want to take up this plaintiffs'

 7   ex-parte application concerning the authentication of documents

 8   pursuant to 90211.

 9          Plaintiffs are certainly correct that pursuant to

10   90211, the formal procedure is that the documents are          09:52

11   self-authenticating.  Of course, if there's an objection, the

12   defense has an opportunity to bring in and cross-examine the

13   declarant; which is why I said before, it's easier if we just

14   have a stipulation, if not a stipulation, bring the witness in

15   because I assume there's not a stipulation if there's an        09:52

16   objection.

17          But procedurally, you are correct.  They do

18   technically come in, and then it's up to the defense to

19   cross-examine the declarant if they wish.  I think the better

20   practice is simply just to have this worked out in advance.  If  09:52

21   there is a stipulation, let me know.  If there's going to be an

22   objection and a request to cross-examine the declarant, have

23   the declarant available.  It does save you the time, of course,

24   though, of actually examining on direct examination the

25   declarant.  You can simply submit the declaration.             09:52
```

1          Understood.

2          **MR. BERGMAN:**  Yes, Your Honor.

3          **MR. TOBEROFF:**  Yes, your Honor.

4          **THE COURT:**  So the ex-parte application is granted.

5          The Court is prepared to listen to opening                    09:52

6  statements.

7          Counsel?

8                    **OPENING STATEMENTS - PLAINTIFFS**

9          **MR. TOBEROFF:**  Plaintiffs, as co-owners of the early

10  *Superman* copyrights, are entitled to a pro rata share of all       09:53

11  profits derived from those copyrights.

12          Defendants entered into a number of internal *Superman*

13  agreements after they had clear notice of plaintiffs'

14  termination and clear knowledge that plaintiffs would be

15  entitled to a very significant share of *Superman* proceeds as of   09:53

16  April, 1999.

17          It would not be equitable for plaintiffs' revenue

18  share to be diluted by defendants' internal dealings.  And that

19  is why we're here today to take a closer look at those

20  arrangements.                                                        09:53

21          Our focus will be on whether or not the *Superman*

22  agreements constitute fair market value for an extremely

23  valuable intellectual property.  We will see whether the terms

24  of those *Superman* agreements measure up to agreements for other

25  high-level properties negotiated at arm's length in the             09:54

1    competitive open market.

2              However, we cannot view these contractual terms in a

3    vacuum without taking into consideration the value of the

4    properties to which those terms apply.

5              First, we need to understand the market value of          09:54

6    *Superman* in 2001, 2002 when the *Superman* agreements in question

7    were entered into.

8              Plaintiffs will therefore call their expert comic

9    book historian, Mark Evanier, to briefly take us through

10   *Superman*'s commercial track record of over 70 years of          09:55

11   exploitations from comic books to radio to television to film

12   and ubiquitous merchandising throughout.

13             We will better understand through Mr. Evanier's

14   testimony what we already sense; that everybody knows who

15   Superman is.  They not only know who he is, but everyone on the    09:55

16   planet even knows his story; his alter ego, Clark Kent; his

17   love interest, Lois Lane; his arrival from a doomed planet.

18             The evidence will show that in 2001 through 2002,

19   when defendants entered into the Superman film agreement, that

20   they essentially copied the economic terms of an old 1974 film     09:55

21   agreement entered into three decades earlier.

22             Through Mr. Evanier and other evidence, we will show

23   that in 1974, as opposed to 2002, *Superman* was at its virtual

24   low point in terms of popularity due to the counterculture

25   movement in the '60s and other factors.                           09:56

1          By contrast, plaintiffs will show *that* *Superman*, as a

2    branded franchise property, was of particular value in 2002

3    when defendants entered into the *Superman* film agreement.

4          Comic books and super heroes, in particular, had

5    become hot properties for big-budget, special-effects-driven          09:56

6    franchise films with plenty of action.

7          By this time in 2002, as opposed to 1974, *Superman*

8    and *Batman* had already proven themselves as major film

9    franchises.

10         Recent hits starting in 1997; like, *Men in Black*,          09:57

11   *X-Men* and *Spider-Man* that came out shortly before the *Superman*

12   film agreement created a situation where every studio in town

13   was scrambling to develop superhero films.  It is in this

14   heightened market that defendants' internal deals were made and

15   should be judged.          09:57

16         In making this analysis, we need to understand the

17   contours of fair market value; and in so doing, understanding

18   that these literary properties are essentially unique by

19   definition.

20         Of these, *Superman* is particularly unique.  Few, if          09:58

21   any, properties have reached the iconic status of *Superman* and

22   have its long-term continuous commercial track record spanning

23   70 years.

24         The only real way to determine the fair market value

25   of a particular property at a particular time is to test that          09:58

1  value in the open market, in the competitive open market,

2  through arm's length negotiations.

3          We will show that DC failed to ever test the market

4  before assigning away valuable *Superman* assets to Warner Bros.

5          At this point, therefore, the only thing we can do in          09:58

6  testing the fair market value of their agreements is to

7  simulate fair market value by analyzing rights' agreements for

8  high-level properties, that unlike *Superman*, the *Superman*

9  agreements were negotiated at arm's length for fair market

10 value.          09:59

11          Plaintiffs have developed what we believe is a simple

12 and logical methodology for looking at comparable agreements.

13 Deals for better terms that concern properties of equal or

14 lesser value would demonstrate that the *Superman* film

15 agreements do not constitute fair market value, and plaintiffs          09:59

16 will show you today, and in this coming week, a number of such

17 agreements.

18          Conversely, deals with lessor or equal terms to the

19 *Superman* agreements concerning properties of equal or greater

20 value to *Superman* would tend to prove that the *Superman*          10:00

21 agreements are for fair market value.  And I submit that

22 defendants will be unable to show you agreements for properties

23 of equal or greater value to *Superman* that have lesser or equal

24 terms to their *Superman* film agreements.

25          Instead, defendants will show you agreements with          10:00

1  lesser terms for properties that are less valuable to *Superman*.

2  And we submit that such agreements are irrelevant and do not

3  aid in the analysis because, of course, the terms would be less

4  than the terms in the *Superman* agreements because they deal

5  with lesser property.                                          10:00

6           In locating comparable agreements, plaintiffs are

7  somewhat at a disadvantage to defendants who have decades of

8  archived rights' agreements at their disposal.  Despite this

9  handicap, plaintiffs were still able in a short time to find

10  numerous rights' agreements with terms far superior to the     10:01

11  *Superman* agreements, even though they concern properties not

12  quite as valuable to *Superman*, or obviously less valuable to

13  *Superman*.

14           For instance, the *Superman* film agreement contains a

15  guaranteed payment of a million-five upon signing.  This        10:01

16  payment is deemed applicable to what we call a back-end

17  participation of 5 percent of Warner Bros. Worldwide gross.

18           Plaintiffs will show you agreements that were

19  negotiated at arm's length in the open market with guaranteed

20  payments of 5 million, 7 million, 10 million, even $20 million  10:02

21  compared to the million-five in the *Superman* film agreement,

22  and back-end gross participation, instead of 5 percent, which

23  equals 10 percent to 20 percent of gross.

24           These agreements were negotiated at arm's length in

25  the open market.  They demonstrate the tremendous leverage of   10:02

1  prominent intellectual property in the entertainment

2  marketplace, and they lie in sharp contrast to defendants'

3  casual perfunctory agreements.

4         As another example, the scope of the rights' grant in

5  defendants' *Superman* agreements is far broader than defendants'        10:02

6  obligation to pay DC.  The agreements are written in such a way

7  that defendants need only pay for a feature-length motion

8  picture or for an episodic television series while obtaining

9  all audiovisual rights.

10         This means that defendants could exploit movies of        10:03

11  the week, television specials, documentaries, all sorts of new

12  media types of exploitation on the Internet without having to

13  pay DC a penny.

14         The term of the agreements extends -- the option term

15  of the agreements extends for 34 years.  Plaintiffs will show        10:03

16  that it is customary for options to be for 18 months with a

17  single renewal term of 18 months, as opposed to the renewals in

18  the *Superman* film agreement, which go on for 34 years and

19  essentially tie up film and TV rights for that lengthy time

20  period.        10:04

21         It is customary in agreements for franchise

22  properties, since a franchise property generates a consistent

23  cash flow and since a good portion of the compensation, these

24  agreements, is contingent compensation, the form of

25  participation in the revenues from the exploitation of the        10:04

1    property, it is, therefore, customary for the licensee to have

2    to exploit the property on a continuous basis; otherwise, the

3    licensor will be cutoff from receiving a lucrative cash flow.

4          Most agreements for franchise properties have

5    reversion terms stating that if a new film is not released          10:04

6    every three or four years, the rights will revert to the

7    licensor.  And we found this even in agreements that defendants

8    have produced in this case, Warner Bros.' agreements.  No such

9    perversion takes place in the *Superman* film agreement.  This is

10   particularly onerous when you understand that DC's compensation    10:05

11   is primarily weighted to its gross participation in revenues

12   from a produced film.

13         Essentially, Warner Bros. could not make another TV

14   series or film for 34 years, and DC and plaintiffs would not be

15   able to do anything about that and would be cutoff from            10:05

16   receiving revenues for a very valuable asset.

17         Ever since this Court recently uttered the adjective,

18   'non-exclusivity,' defendants have glommed onto this word,

19   where previously, in four years of litigation, they never so

20   much as came close to making any arguments about how              10:06

21   retroactive non-exclusivity affected the value of their

22   agreements.  They now attempt to retroactively transform what

23   we belief are sweetheart deals into fair market deals by

24   harping on exclusivity.

25         It's apparent that the vast majority of DC's *Superman*      10:06

1    copyrights are unaffected by plaintiffs' termination.  Only

2    those recaptured copyrights that are co-owned by DC and

3    plaintiffs would bring into effect non-exclusivity.

4         DC assigned rights in numerous *Superman* copyrights on

5    an exclusive basis undisturbed by the termination.  In addition    10:07

6    to that, DC assigned rights in exclusive trademarks, Warner

7    Bros. has its own exclusive trademarks based on *Superman* works

8    it's been involved in over the years.

9         And in addition to that, and most importantly, DC

10   retained exclusive foreign rights to even the recaptured    10:07

11   copyrights.  Given this exclusivity and its hold on all these

12   rights and the nature of the entertainment industry, Warner

13   Bros. has de facto exclusivity with respect to film and

14   television rights.  And we will show that it has an

15   insignificant bearing on the value of the agreements in    10:08

16   question.

17        In addition to that fact, Warner Bros. received the

18   contractual equivalent of exclusivity through a very specific

19   warranty and indemnification in the agreements in which DC,

20   after both Warner Bros. -- excuse me, after both DC and Warner    10:08

21   Bros. had received notice of the terminations and entered into

22   the agreements, they had DC warrant and represent that it had

23   exclusive rights to everything being transferred to Warner

24   Bros.  And it agreed to indemnify Warner Bros. for any loss,

25   damage, costs, including this lawsuit, resulting from anything    10:08

```
 1    less than non-exclusivity.
 2           It is undisputed that at the time the Superman
 3    agreements were entered into, and they were entered into with
 4    the predecessor called Time Warner Entertainment, LP, we'll
 5    call it TWEC, that DC was negotiating with its owner.  TWEC      10:09
 6    owned 50 percent of DC, and the other 50 -- and owned
 7    100 percent of EC Publications, which owned the other
 8    50 percent of DC.  Thus, TWEC sat on both sides of the
 9    negotiating table when entering into these agreements.
10           In addition, this Court has ruled on summary             10:09
11    judgment, and it was noted in Paul Levitz's declaration, that
12    DC must report to and obtain approvals from Warner Bros. on key
13    decisions.  And we would submit that the transfer of film and
14    television rights to one of its core properties is a key
15    decision.                                                       10:10
16           It is counterintuitive and improbable that such a
17    vertically-integrated, non-arm's length transaction would
18    result in fair market terms, though it remains a mathematical
19    possibility.
20           MR. BERGMAN:  Your Honor, if I may, this is becoming     10:10
21    a closing statement.
22           THE COURT:  Just so we get this straight from the
23    beginning, if you're going to make an objection, you need to
24    stand.
25           MR. BERGMAN:  Yes, Your Honor.  I'm sorry.               10:10
```

1          **THE COURT:**  That's all right.

2          **MR. TOBEROFF:**  Nonetheless --

3          **THE COURT:**  I'll hear you both out, and the Court is

4    mindful of its rulings.

5          **MR. TOBEROFF:**  We will show -- even though it remains          10:10

6    a mathematical possibility for these terms to be fair market

7    terms, and we will engage in an objective analysis, of course.

8    Strong inferences can still be drawn from this relationship

9    that are relevant to this case.  We will show that DC functions

10   as Warner Bros.' IP division, as an IP stable, as a source of          10:11

11   franchise properties for the exploitation in multiple media and

12   multiple divisions of Warner Bros.

13         We will show that DC's most valuable comic book

14   properties, *Superman* and *Batman*, are captive assets of Warner

15   Bros.  And what is missing from the negotiations of the          10:11

16   relevant *Superman* agreements is the most important thing:  The

17   ability to walk -- which defines every negotiation, any real

18   negotiation -- the ability to walk and transact with the

19   competitor.

20         It is not surprising that given this relationship and          10:12

21   the arm's length negotiations that resulted from this

22   relationship, that the terms of the agreement were not for fair

23   market value.

24         We will show, in fact, that under this integrated

25   structure, no meaningful negotiations of the agreements took          10:12

1    place.  As I said earlier, the *Superman* film agreement merely

2    copied the economic terms of a 1974 *Superman* film agreement

3    when *Superman* was at its lowest point, rather than reflect the

4    value of *Superman* in 2002.

5              In 1974, we will show that even Warner Bros., which          10:12

6    at the time Warner Communications owned DC, had little interest

7    in developing *Superman* and left *Superman* to an outsider to

8    develop and produce as a motion picture.  Yet defendants used

9    the same 1974 terms in 2002 when superheroes were going through

10   the roof in Hollywood.                                                 10:13

11             We will show that for the *Smallville* television

12   agreement, defendants followed the same pattern of simply

13   Xeroxing a 1991 television agreement with another Warner

14   company called Lorimar Productions, and that there was

15   virtually no negotiation of this agreement.                           10:13

16             Plaintiffs will submit that defendants' casual and

17   perfunctory negotiation comport with the fact that the terms of

18   these agreements were well below market value.

19             Thank you, Your Honor.

20             **THE COURT:**  Counsel.                                     10:13

21        **MR. BERGMAN:**  Thank you, Your Honor.

22                     **OPENING STATEMENTS - DEFENSE**

23        **MR. BERGMAN:**  Your Honor, we will, of course, during

24   the course address Mr. Toberoff's statements concerning the

25   relationship of the parties and the effect of that.  And, of          10:14

```
 1   course, we do not dispute that DC and Warner Bros. are
 2   affiliates; they have a close working relationship that they've
 3   had for 30 years; yes, no one's stormed out of any
 4   negotiations; no one banged their shoe on a table; no one
 5   walked.  And they didn't walk because this was a relationship       10:14
 6   that had been extremely beneficial to DC for 30 years.
 7            But the relationship, and the point Mr. Toberoff is
 8   attempting to emphasize, is of little probative value within
 9   the context of this proceeding.  It doesn't matter how close or
10   friendly these parties may have been; it does not matter if the     10:15
11   agreements were Xeroxed, which they were not; it doesn't matter
12   if they were negotiated in two days or in two weeks.
13            All that matters is whether the agreements were for
14   fair market value.  And whatever the relationship may be,
15   Your Honor, the Court has defined the precise question to be        10:15
16   answered:  Has DC received fair market value for the
17   nonexclusive *Superman* rights it transferred to Warner Bros.?
18            And in response to Mr. Toberoff's statement,
19   Your Honor, of course, it was only relatively recently that
20   Your Honor ruled that the agreements were, in fact,                 10:15
21   nonexclusive.  And before that, we did not argue that.
22            But the whole notion of non-exclusivity assumes that
23   there was a market for nonexclusive rights in 2002.
24   Defendants' experts question whether such a market exists in
25   either film or television.  They can state only that if there      10:16
```

1    was such a market, the value of nonexclusive rights would be

2    significantly lower than the value of the corresponding

3    exclusive rights; and that is because studios invest a great

4    deal of money in producing and marketing a movie.  And the

5    uncertainty and potential for competition from another rights'          10:16

6    holders, such as the Siegels, who have the right to grant

7    nonexclusive film rights in Action Comics No. 1, is not a risk

8    that the studios are willing to bear.

9            And plaintiffs' expert, Mr. Halloran, can't answer

10   Your Honor's question as to the value of nonexclusive rights          10:16

11   either.  When I asked him at deposition that precise question:

12   "What was the fair market value of the nonexclusive rights?"

13           He responded:  "I have not formulated that opinion."

14   That was with respect to the film.

15           I then asked him with respect to the television          10:17

16   series:  "What was the fair market value of nonexclusive rights

17   in 2002?"

18           And he responded:  "I have not formulated that

19   opinion."  This was at his deposition a few weeks ago.

20           As a result, the experts can't offer any credible          10:17

21   evidence as to the fair market value of those nonexclusive

22   rights.  None of the other agreements being offered in

23   evidence, regardless of who offered them or regardless of

24   whether they are comparable or not, all involve exclusive

25   rights.          10:18

1            So they failed to provide any evidentiary basis of

2    the Court's perception as to what is the pertinent question.

3    And plaintiffs have no other documentary evidence as to market

4    value among their listed exhibits.  Nor do they have any other

5    witness who can competently testify on the question that                10:18

6    Your Honor has posed as to the value of the nonexclusive

7    rights.

8            The failure of such evidence should, as we state in

9    our trial brief, be dispositive.  Plaintiffs have the burden of

10   showing the fair market value of these nonexclusive rights, and      10:18

11   they simply have no evidence with which to do so.

12           Now, while we view this failure of proof as

13   unavoidable, the defendants have, of course, prepared for the

14   eventuality that the plaintiffs are permitted to introduce

15   evidence which show what the rights would be worth had they          10:19

16   been exclusive.

17           As we'll demonstrate, Your Honor, permitting

18   plaintiffs to do so, as inappropriate as it may be, doesn't

19   change the result.  The agreements in question are clearly at

20   or above market, even if viewed as granting exclusive rights.        10:19

21           There are basically only two agreements that are in

22   question:  The film agreement, pursuant to which *Superman*

23   *Returns* was produced, and the television agreement, pursuant to

24   which *Smallville* is being produced.  The Warner Bros. consumer

25   products merchandising agreement doesn't appear to be contested      10:19

1    by the plaintiffs, and the animation agreements are clearly at

2    or above market and they involve very little money.

3            As for the television agreement, Your Honor, the

4    evidence will show that DC has earned over $23 million from the

5    *Smallville* series.  That's with no investment whatsoever.          10:20

6            The evidence will also show that the TV agreement is

7    far more economically beneficial to DC than any agreement that

8    is going to be offered in evidence to Your Honor to indicate

9    fair market value of television agreements.  It is at the very

10   top of the market, even perceiving it as granting exclusive          10:20

11   rights.

12           And the same is true of the film agreement.  That

13   agreement, which was finally executed in 2002, is simply the

14   most advantageous rights' acquisition agreement of any

15   agreement, with the exception of the half-century-old *My Fair*      10:21

16   *Lady* agreement which the plaintiffs are offering, the most

17   beneficial agreement to the licensor of any other agreement

18   that will be introduced in evidence.

19           And the proof is in the pudding, Your Honor.  The

20   evidence will demonstrate that DC Comics has made $42 million        10:21

21   from the release of *Superman Returns*, again, without any

22   investment whatsoever.

23           In fact, Your Honor, again with the single exception

24   of *My Fair Lady*, defendants will prove that DC Comics made more

25   money from the release of *Superman Returns* under the terms of      10:22

```
 1   the film agreement, than DC Comics would have made from
 2   Superman Returns under the terms of any other agreement to be
 3   introduced in evidence.  The evidence, the actual agreements,
 4   will demonstrate that they are not only at fair market value,
 5   they're above fair market value.                              10:22
 6            And I don't mean to imply by that, Your Honor, that
 7   that's defendants' obligation.  We don't have to prove that the
 8   agreements are at the very highest level.  Fair market value is
 9   necessarily a range.  All defendants have to do, assuming that
10   defendants have to do anything, is show that the agreements in  10:22
11   question fall within the fair market range.
12            It just so happens, Your Honor, based on my
13   calculations, that the amounts paid for the rights in question
14   turned out to be the very highest on the leader list.
15            Mr. Toberoff's opening continues what he had done in  10:23
16   his contentions of fact and law and what his expert,
17   Mr. Halloran, has done in his report.  Rather than looking at
18   the agreements in their entirety, what they do is they look
19   through all the agreements and they find the highest option
20   price paid by any agreement.  And then they compare that to an  10:23
21   option price in one of the agreements in question.  Then they
22   look through all of the agreements, and they find the highest
23   purchase price, usually, almost invariably, in a different
24   agreement.  And they compare that to one of the agreements in
25   question.                                                      10:23
```

1              Obviously, that is inappropriate.

2              You must look at the agreement in its total.

3              Mr. Toberoff, in his trial brief and in his

4    contentions, keeps working at these little provisions in

5    comparing one to another, and referring to terms in a contract,

6    any contract, as being fair market terms.  There are no fair

7    market terms.  There are fair market agreements.  Because one

8    thing we're going find out about how studios, all studios,

9    operate, Your Honor, is that they operate within parameters.

10   They run various analyses before they acquire properties, all

11   designed to find out 'are we going to make money out of this

12   movie?'

13             And if a participant negotiates something more than

14   usual in one provision, like an option, like a purchase price,

15   the participant pays for it in another provision, such as a

16   contingent compensation.

17             You cannot look at one isolated term of an agreement

18   and then compare it to another and assert one as fair market

19   value.  The test, as Mr. Halloran, their expert, testified at

20   deposition, is how much sticks to the ribs?  What does the

21   licensor walk away with?

22             And as we'll demonstrate, through Mr. Levitz'

23   testimony; through the testimony of Brett Paul, the executive

24   vice president of business affairs at Warner Bros. and through

25   the experts, is that the deal that DC was able to achieve; in

1    particular, getting a piece of what is called first-dollar

2    gross, has set it aside from any other television agreement

3    ever entered into by Warner Bros.

4         We'll be explaining to Your Honor that there are

5    forms of contingent participation which range all over the map.    10:26

6    At the very height of the pyramid is something called

7    first-dollar gross, where virtually nothing is deducted from

8    the monies that the distributor receives from the exhibitors

9    and then puts into the gross pot to share with participants.

10        We will see, the evidence will show, that Warner    10:26

11   Bros. has never given a first-dollar gross participation to any

12   television participant, whether it be a TV star, a director,

13   producer or a rights' grantor, other than DC Comics.  They are

14   the only one who ever before and ever since has received a

15   gross participation.    10:27

16        And it was at gross participation, Your Honor, as

17   you'll see, that earned DC Comics $23 million from the TV show,

18   an amount which is greater than any expert will testify he is

19   aware of.  And as I noted, Your Honor, the film itself brought

20   in $42 million to DC.    10:27

21        And we submit to Your Honor that, while Mr. Toberoff

22   argues -- and while we certainly agree, that Superman is a

23   terrific iconic character, is he more iconic than Batman or

24   Tarzan or Ironman or Watchmen?  I don't know.  Seems to me that

25   once you become an icon, you're an icon.    10:28

Tuesday, April 28, 2009                    Trial Day 1, AM Session

1           In any event, Superman, as much as it means to the

2     defendants, as well as the plaintiffs, has to be viewed in an

3     objective way, because fair market value is indeed objective.

4           The evidence will show that Mr. Toberoff is

5     180 degrees off, Your Honor.  The evidence will show that in     10:28

6     1974, *Superman* sat at the top of the comic book sales; that

7     *Superman* was a virgin territory; there had never been a feature

8     film made of *Superman*, and he stood at the very height of his

9     value.

10          And DC made a deal with an independent producer by          10:28

11    the name of Salkind, who had very bad bargaining power.  They

12    made a phenomenal agreement with him.  And pursuant to that

13    agreement, Mr. Salkind made four *Superman* movies starring

14    Christopher Reeves and one *Supergirl* movie.

15          The problem, Your Honor, in 2002, when the deal was         10:29

16    consummated, the film agreement, was that *Superman* had fallen

17    from his perch.  The first *Superman* movie and the second

18    *Superman* movie did rather well.  The first one did very well.

19    The second one fell off about 20 percent.  The third one

20    dropped precipitously by about 50 percent.  And *Superman IV*      10:29

21    stands out in cinematic history as one of the biggest bombs

22    ever made.  It is a film, again starring Christopher Reeves,

23    the last one made, that had a domestic box office gross of

24    $17 million, which the evidence will show was an absolute

25    disaster.                                                         10:30

1          And that 1987 *Superman* film marked the end of

2     *Superman* as a film star for 20 years.  Nobody touched him.

3     Warner Bros. didn't.  No third party did.  From the very time

4     that the last *Superman* movie was shown until this very date, no

5     one else has come to DC and said, "Gee, we'd like to license          10:30

6     *Superman*."

7          We'll see, Your Honor, that in that context, the

8     *Superman* film agreement was negotiated.  And Mr. Toberoff makes

9     much of the fact and he keeps saying that notwithstanding the

10    termination, notwithstanding our knowledge that they were          10:30

11    terminating their interests, we went ahead and made this grant.

12         Well, Your Honor will find, and the evidence will

13    show, that at the time we made the grant and executed the

14    agreement, the dispute had ended.  I understand that Your Honor

15    has ruled that there was no settlement agreement.  But the fact          10:31

16    of the matter is, Your Honor, from October 19th, 2001, until

17    the middle of May of 2002, during which period the *Superman*

18    agreement was finalized and executed, DC and Warner Bros.

19    believed that they had reached an agreement.

20         We'll also see, Your Honor, that the film was          10:31

21    financed -- not nearly by Warner Bros., but by a financing

22    partner called Legendary Pictures and that the producers spared

23    no expense in making the movie.  You'll see, Your Honor, that

24    the production cost of the film -- often referred to as

25    negative costs because it's the cost of getting the film's          10:32

```
 1   negative into the can -- that cost alone was $242 million.

 2            As of last year, the interest on that negative cost

 3   was $39 million.  And the cost of marketing the film, what they

 4   refer to in the business as prints and advertising, P and A,

 5   was $143 million.                                              10:32

 6            The bottom line is that the film, Superman Returns,

 7   cost $424 million to make and to market.  And you'll hear from

 8   the defendants' witnesses that spending a lot of money on a

 9   movie doesn't necessarily mean the movie will break even.

10            But it does mean one thing:  It means that anybody    10:33

11   who is fortunate enough to have a first-dollar gross

12   participation in the film will walk away with a great deal of

13   money.  Because when you spend that much money, $140 million,

14   promoting a movie, it invariably brings in large grosses.  The

15   film may lose money, but the people who participate in the     10:33

16   first-dollar gross, the very finical of participants, they're

17   going to make a lot of money.  And in terms of contingent

18   compensation, even though the film didn't break even, DC made

19   from its contingent compensation alone, $12 million.  And

20   that's only a portion of what DC received under the film       10:33

21   agreement.

22            As Your Honor will see, under the film agreement, DC

23   reserved all to itself all the merchandising rights for

24   Superman.  DC makes a great deal of money from merchandising.

25   And it purposely negotiated a deal where it retained all of the  10:34
```

1  merchandising revenue under the film agreement and then merely

2  paid 25 percent to Warner Consumer Products under a separate

3  agreement for actually doing the merchandising.

4        And the result, Your Honor, will be that the evidence

5  will show that DC retains 75 percent of every merchandising

6  dollar earned by *Superman Returns*.

7        The evidence will also show that that amount that

8  *Superman Returns* generated was in excess of $40 million; that

9  DC, therefore, received $30 million simply as its merchandising

10  share under the agreement.  Hence, $42 million profit from the

11  film.

12        As far as the other agreements go, Your Honor, we

13  will show that none of the agreements, which are truly

14  comparable to *Superman's* film agreement, come even close to the

15  value that DC received.  Not *Conan*; not *Tarzan*; not *Watchmen*;

16  *300; Robotech*; not even *Ironman*.  And our expert, Mr. Gumpert,

17  who will be shown to be a true expert, will refer to other

18  agreements for iconic characters, like *The Lone Ranger*, *The

19  Green Lantern*, and *Flash Gordon*, all of which agreements pale

20  by comparison.

21        The plaintiffs have introduced other agreements.

22  They haven't introduced a single comic book character

23  agreement.  What they have done is they have produced an

24  agreement for the extremely successful trilogy, and even more

25  successful film, *Lord of the Rings*, which is, indeed, a very

10:34

10:35

10:35

10:36

10:36

1    rich agreement.  It's a very rich agreement.  But it's not

2    quite as rich as the *Superman Returns*' agreement.

3              They've submitted these agreements, which

4    Mr. Toberoff referred to where one of what is called a marquee

5    author -- a Michael Crichton, a John Grisham, a Tom Clancy --    10:37

6    receives an enormous amount of money upfront; 5 million,

7    7 million, $10 million, all of which is an advance against a

8    contingent compensation and which agreements contain very low

9    unappealing merchandising provisions.

10             We will, once again, show, Your Honor, with respect    10:37

11   to all of the novels which have been written by these marquee

12   authors that DC Comics made more money from *Superman Returns*

13   under the terms of the film agreement than it would have made

14   from *Superman Returns* under the terms of any of these

15   best-selling novels.  The facts, the mathematics, speaks for    10:37

16   itself.

17             Again, Your Honor, I've made some very far-reaching

18   and absolute statements.  I'm just excluding *My Fair Lady*,

19   which, as the evidence will show, was made under a financial

20   structure, which is of historical value only.  Like *The Great*    10:38

21   *Train Robbery*, it just doesn't apply to today's film world.

22   With that exception, you will find, as I say, that no one would

23   have made more money from *Superman Returns* than DC did under

24   the settlement agreement.

25             And as I indicated to Your Honor, we don't have to    10:38

```
 1   show that it's the highest agreement, it just worked out that

 2   way.

 3          Thank you, Your Honor.

 4          THE COURT:  Thank you, Counsel.

 5          Plaintiff may call their first witness.                    10:38

 6          THE CLERK:  Do you solemnly swear that the testimony

 7   you are about to give in the cause now pending before this

 8   court shall be the truth, the whole truth, and nothing but the

 9   truth, so help you God?

10          THE WITNESS:  I do.

11          THE CLERK:  Please state your full name and spell

12   your last name for the record.

13          THE WITNESS:  My name is Mark Evanier.  Evanier is

14   spelled E-v-a-n-i-e-r.

15          MR. PERKINS:  Your Honor, the defendants interpose an    10:39

16   objection to Mr. Evanier.  As Your Honor will recall, we moved

17   to exclude Mr. Evanier because the description of his testimony

18   that was given was not within the parameters of his actual

19   expert report.  Your Honor ruled that he would take that up at

20   the trial.                                                       10:40

21          THE COURT:  Why don't we do this.  Why don't we go

22   ahead and begin with laying the foundation.  I'll give you an

23   opportunity to voir dire, and I'll take up the objection after

24   I've had a chance to hear this play out.

25          That's kind of what I meant by that ruling, was          10:40
```

```
 1   let's -- let me hear some of the testimony.  I'll give you both
 2   a chance to conduct voir dire, and we'll see where we're at.
 3             MR. PERKINS:  If he makes statements that are not
 4   within the parameters of his --
 5             THE COURT:  Don't worry, Counsel.  We don't have a      10:40
 6   jury.  I appreciate that.
 7             MR. PERKINS:  Okay.
 8             MR. TOBEROFF:  And Your Honor, just to note, we have
 9   a pocket brief on this subject, anticipating defendants'
10   objection.                                                       10:40
11             THE COURT:  Let's go ahead and start with some
12   examination on both sides, and we'll go from there.
13                       DIRECT EXAMINATION
14   BY MR. TOBEROFF:
15   Q    Mr. Evanier, could you please tell us what you do for a     10:40
16   living.
17   A    I'm a writer.  I also sometimes produce TV shows.  I also
18   voice direct cartoon shows.
19   Q    And how long have you been involved in the comic book
20   industry?                                                        10:41
21   A    Since 1969.
22   Q    Have you worked for any notable comic book creators?
23   A    For creators?  In 1969, I was hired by a man named
24   Jack Kirby, who is considered one of the preeminent comic book
25   creators of all time.  I was his assistant for awhile.          10:41
```

```
 1   Q    What comics, if any, did Mr. Kirby help create?
 2   A    Mr. Kirby was the creator or co-creator of
 3   Captain America, The Fantastic Four, The Hulk, Ironman, The
 4   Avengers, Thor, Challengers of the Unknown, The New Gods,
 5   Kamandi; it's quite a long list.                              10:41
 6   Q    Have you worked for any companies in the comic book
 7   industry?
 8   A    I've worked for most companies in the comic book industry.
 9   I've worked for DC Comics; I've worked for Marvel Comics; I've
10   worked for Dark Horse Comics; Pacific Comics; Western           10:41
11   Publishing; Ed Rice Burroughs Company; Hanna-Barbera; Archie;
12   Eclipse.  There's probably others.  Image.
13   Q    That's fine.
14        When did you first work for DC Comics?
15   A    1970.                                                      10:42
16   Q    What work did you do for DC Comics?
17   A    I was assisting Mr. Kirby.  He was doing a series of books
18   with them; Jimmy Olson, The New Gods, The Forever People,
19   Mister Miracle.
20        THE COURT:  Excuse me.  Will you slow down.  She is        10:42
21   trying to write down everything.
22        THE WITNESS:  I'm sorry.
23        Jimmy Olson, The New Gods, The Forever People,
24   Mister Miracle.
25   / / /                                                          10:42
```

```
 1   BY MR. TOBEROFF:

 2   Q    And how long did you work for DC?

 3   A    Well, I had worked for DC intermittently since that time.

 4   I still do work for them occasionally.

 5   Q    What was your position at Hanna-Barbera?          10:42

 6   A    I started as a writer there; Then I was made the editor of

 7   the comic book department.

 8   Q    Any other comic book experience that you can think of?

 9   A    Lots of it.  Actually, the same time I was working for

10   Mr. Kirby -- in 1969, I began working for Marvel running part   10:43

11   of their fan operation, editing their official fan magazine.

12          Subsequently, I worked for just about every company

13   off and on.  I don't know what else to tell you.

14   Q    Did you work for the Edgar Rice Burroughs estate?

15   A    I was the editor of the Edgar Rice Burroughs' comic book   10:43

16   department in the 1970s.

17   Q    Have you ever worked in animation?

18   A    I've worked extensively in animation, yes.

19   Q    What animated shows have you worked on?

20   A    Well, I was the producer and writer of the show, *Garfield*   10:43

21   *and Friends* for eight years on CBS.  I'm currently producing

22   and writing a new *Garfield* series.

23          For Hanna-Barbera, I wrote *Scooby-Doo*.  I wrote

24   *Richie Rich*.  I wrote *Yogi Bear*.  I wrote a lot of the ABC

25   Weekend Specials.  I wrote *Plastic Man*, *Thundarr the Barbarian*,   10:44
```

```
 1   that was first called Ruby-Spears.
 2           I did the show Dungeons & Dragons for Marvel
     Productions.  I did the show, The Wuzzles for Disney.  I did a
 3
 4   show called Mother Goose and Grimm for CBS.
 5   Q    Have you ever worked on any animated shows for DC Comics?      10:44
 6   A    Well, Plastic Man was based on a DC property.  And then I
 7   also wrote Superman: The Animated Series for Warner Animation.
 8   Q    Did you participate in writing the pilot for any animated
 9   shows?
10   A    I wrote the pilot for Dungeons & Dragons; I wrote the        10:44
11   pilot for The Wuzzles; I wrote the pilot for The Littles on
12   ABC; I wrote the pilot for Garfield on CBS; I wrote the pilot
13   for Mother Goose and Grimm.  I've written a few pilots.  Those
14   are all shows that have sold.  I've written a dozen pilots that
15   haven't sold.                                                     10:45
16   Q    Have you ever worked in live-action television?
17   A    Yes, I have.
18   Q    In what capacity?
19   A    Writer, story editor, head writer.  I was the -- I wrote
20   for Welcome Back, Kotter; I wrote Love Boat; I wrote That's      10:45
21   Incredible!; I wrote one episode of Cheers; I wrote a lot of
22   variety specials.  I wrote one of the unsuccessful Bob Newhart
23   Show, the one where he played a comic book artist.  I wrote an
24   episode of the Superboy show, the one they did in 1988.
25   Q    Have you ever been nominated for any awards for your work    10:45
```

1   in television?

2   A     I've been nominated three times for Emmy awards, yes.

3   Q     For which shows?

4   A     Two for *Garfield and Friends*, and one for *Pryor's Place*,

5   which was a -- and that was another live-action show; that was                    10:46

6   a show starting Richard Pryor on Saturday morning.

7   Q     Have you ever received any awards for your work in

8   animation?

9   A     Yes.  The Writers Guild of America Animation Writers

10  Caucus gave me the Lifetime Achievement Award a few years ago.          10:46

11  Q     Do you teach any courses based on your experience?

12  A     I teach comedy writing at USC from time to time, yes.

13  Q     Do you participate in any conventions related to the comic

14  book industry?

15  A     Many of them.  I've been attending the comic convention in      10:46

16  San Diego for 40 years now.  Actually, this year will be the

17  40th year.  It will be the 40th convention and the 40th that

18  I've attended.  I appear at other conventions.  I was a

19  frequent guest of honor at WonderCon in San Francisco.  Other

20  conventions -- I just, last weekend, was a guest of honor at a       10:46

21  convention in Calgary.

22  Q     What was the name of the first comic convention you

23  mentioned?

24  A     Well, the San Diego convention is now called the Comic-Con

25  International.                                                         10:47

```
 1   Q     Please describe to me what goes on at Comic-Con.
 2   A     Well, the Comic-Con in San Diego is an annual event in a
 3   convention center that holds 125,000 people, so it contains --
 4   it's filled to capacity.  In fact, they're almost sold out for
 5   this year's convention, which is in July.  There are -- it's a          10:47
 6   giant hall full of comic books and exhibit books for sale,
 7   animation, video games, science fiction, promotion of current
 8   motion pictures.  There are panel discussions; there are award
 9   shows; there are previews of forthcoming motion pictures.
10   Q     And what do you do at Comic-Con?                                   10:47
11   A     Mostly I moderate panels that are there.
12   Q     How many panels do you moderate?
13   A     It's crept up on me.  I think I'm up to an average of 14 a
14   year now.  I'll probably do -- I did 14 last year.
15   Q     And what do you at these panels?  You say "you moderate          10:47
16   them."  What do the panels concern?
17   A     Well, in some cases, the panels are one-on-one interviews
18   with me interviewing one or two people who are notable in the
19   field of comics; usually, for historical purposes, people who
20   have had great experience in comics.                                    10:48
21         There are other panels.  We do an annual thing called
22   the Golden Age Panel where we get six-or-so veteran comic book
23   writers or artists, and I interview them and then take
24   questions from the audience.  Sometimes I do one-on-one
25   interviews; sometimes we do -- I also do -- some of these               10:48
```

```
 1   panels are about animation, also.
 2   Q    What year did you first begin hosting panels at Comic-Con?
 3   A    I hosted one, I think, in 1972, and I hosted two in 1973,
 4   and it kind of crept up on me to doing all of these.
 5   Q    And since 1973, have you been hosting panels at Comic-Con      10:48
 6   on an annual basis?
 7   A    I probably missed a few years in there, but for the last
 8   10 or 15 years, I haven't.  I haven't missed in the last 10 or
 9   15 years.
10   Q    Have you ever moderated any events at comic book               10:49
11   conventions at the request of DC Comics?
12   A    Well, a lot of the panels we do are about DC Comics.  One
13   year they asked me to moderate a panel on Mad Magazine, the
14   history of Mad Magazine, which is a DC publication.
15   Q    Have you ever received any awards for your work at             10:49
16   Comic-Con?
17   A    Well, I've received awards -- for my work at Comic-Con,
18   one year, they gave me what's called the Bob Clampett
19   Humanitarian Award, which is an award for service to the
20   industry.                                                          10:49
21         And then they also have -- the convention gives an
22   award called the Inkpot Award, which is for being a -- it's
23   kind of a lifetime achievement award.  I received that.  They
24   have an award called Friend of Fandom Award, which I think
25   they've now discontinued, I received that.  Then they have a       10:50
```

1    thing called the Eisner Awards, which are a comic book

2    equivalent of the Oscars or Emmy's, and I received several of

3    those.

4    Q    Are you involved in choosing the recipient of any awards

5    at Comic-Con?                                                    10:50

6    A    Yes.  There's an award that's presented each year called

7    the Bill Finger Award, which is named in honor of a man named

8    Bill Finger, who was instrumental in the creation of *Batman*.

9    It is a lifetime achievement award for writing, and I am

10   presently the administrator.  I put together a blue ribbon       10:50

11   committee each year to select the recipient of that award.

12   Q    Have you ever written any books on comic books?

13   A    Yes.  My most recent was a book called *Kirby: King of*

14   *Comics*, which was an illustrated biography of Jack Kirby, the

15   man I mentioned earlier.  I did a book called *Mad Art* on the   10:50

16   history of *Mad Magazine*, which was done at the behest of

17   DC Comics.  And then I've done several books -- we've done

18   several collections publishing -- collecting columns and

19   articles I've written over the years about comic books.

20   Q    Have you ever written any introductions or prologues for    10:51

21   books on comic books?

22   A    Dozens of them, yes.

23   Q    Have you ever written any such introductions for

24   DC Comics -- or DC Comics' publications?

25   A    Yes.  Quite a few, yes.                                     10:51

```
 1   Q    Have you appeared on television to discuss comics ever?

 2   A    Yes.  I was on the TV show, Biography when they did a

 3   portrait of Stan Lee, the head of Marvel Comics; I was

 4   interviewed on that.

 5   Q    Have you ever appeared on DVD's to discuss comic books?    10:51

 6   A    Yes.  I'm on about a dozen DVD's.

 7        Do you want me to go into the list?

 8   Q    You can mention a few.

 9   A    I'm on The Flinstones' DVD, discussing the history of The

10   Flinstones.  I'm on a lot of Yogi Bear DVD's.  I'm on a       10:52

11   Huckleberry Hound DVD.  I'm on one of the seasons of the

12   Superman TV show.  I'm on a couple of the Looney Tunes, Bugs

13   Bunny DVD's.  I'm on the DVD for Turok: Son of Stone discussing

14   the history of the Turok comic book.  I'm on a couple of

15   Scooby-Doo DVD's.                                             10:52

16   Q    Were any of these Warner Bros.' DVD's?

17   A    All of the ones I just mentioned, except for Turok, were

18   Warner Bros., Warner Home Video.

19        I'm on the Dungeons & Dragons DVD, but that's not

20   Warners.                                                      10:52

21   Q    Have you ever provided consulting services to museums

22   regarding comic books or pop culture?

23   A    Yes.  There's an exhibit currently at the Skirball

24   Cultural Center in Los Angeles on the history of superheroes

25   and comics.  And I was employed as a consultant to that       10:52
```

```
 1   exhibit.

 2   Q    Are you currently working on any projects for DC Comics?

 3   A    I just finished a run on a comic book for DC.  I'm not

 4   working on anything right this minute for them.

 5           MR. TOBEROFF:  Your Honor, Mr. Evanier's report has        10:53

 6   been marked for identification as Exhibit 215.

 7           THE COURT:  Could I see that?

 8           MR. TOBEROFF:  It contains an even more-detailed list

 9   of his qualifications.  Rather than take up more valuable time

10   going through all of Mr. Evanier's qualifications, I would like   10:53

11   to offer Exhibit 215 into evidence at this time.

12           THE COURT:  Any objection?

13           MR. PERKINS:  Yes, Your Honor.

14           THE COURT:  State your objection, Counsel.

15           MR. PERKINS:  It's irrelevant.  Mr. Evanier is not --     10:53

16   none of the areas in his testimony on his report have anything

17   to do with the issues in this phase of the trial.  There is no

18   discussion of fair market value.

19           THE COURT:  Well, Counsel, are you seeking to

20   introduce the qualifications or the conclusions of the report?    10:54

21           MR. TOBEROFF:  The qualifications, Your Honor.

22           THE COURT:  It's qualifications, Counsel.

23           MR. PERKINS:  Well, it's not clear to me what the

24   qualifications have to do with --

25           THE COURT:  We're getting ahead of ourselves.  Do you     10:54
```

```
 1    have any objections -- is there any question that these are or
 2    are not his qualifications?
 3              MR. PERKINS:  I have no objection to the
 4    qualification.
 5              THE COURT:  Very well.  The qualifications come in,        10:54
 6    Counsel.  Move along.
 7              MR. TOBEROFF:  Your Honor, we tender Mr. Evanier at
 8    this time as an expert in the field of comic books and their
 9    history.
10              THE COURT:  Comic books and what?                         10:54
11              MR. TOBEROFF:  Their history as it bears on the
12    history of Superman in this case, which is relevant to valuing
13    Superman, which is relevant to determining whether agreements
14    were for fair market value.
15              THE COURT:  Very well.                                    10:54
16              Is there any objection to this witness's
17    qualifications as an expert on comic books and their history?
18              MR. PERKINS:  If he's admitted for that, no
19    objection, Your Honor.
20              THE COURT:  Very well.                                    10:55
21              You may proceed, Counsel.
22                   DIRECT EXAMINATION (continued)
23    BY MR. TOBEROFF:
24    Q   Mr. Evanier, could you please tell the Court how much you
25    have charged plaintiffs to provide your expert opinion in this     10:55
```

1   matter.

2   A    Nothing.

3   Q    Were you offered a fee for your services in this case?

4   A    I was told one could be arranged; I declined.

5   Q    Why did you refuse to be paid for your expert opinion?    10:55

6   A    I felt uncomfortable about taking money directly or

7   indirectly from the Siegel family.

8        **THE COURT:**  That is a first in my courtroom.

9        Carry on.

10  **BY MR. TOBEROFF:**    10:55

11  Q    Why is that?

12  A    Because of how much Jerry Siegel gave to the industry and

13  how little he received from it.  I've built my life around this

14  industry, and I think most people in this industry owe him an

15  enormous debt of gratitude.    10:55

16  Q    Let's talk about the comic book character Superman.

17       Who created Superman?

18  A    Jerome Siegel and Joseph Shuster.

19  Q    When was the character first published?

20  A    It was first published in *Action Comics No. 1*, which was    10:56

21  published on April 18, 1938, I believe.

22  Q    In what form was it published?

23  A    I'm not sure I follow the question.

24  Q    The first story was ...

25  A    Superman was on the cover, and he was the lead story in    10:56

1    *Action Comics No. 1.*

2    Q    Thank you.

3        Who published *Action Comics No. 1*?

4    A    The company which we now refer to as DC Comics.  At the

5    time, it was called Detective Comics, Incorporated; and also          10:56

6    there were a couple of other shell companies or other corporate

7    names.  The publisher was a man named Harry Donenfeld.

8    Q    When *Action Comics No. 1* hit the stand, was it well

9    received?

10    A    It was phenomenally well received.  It is still the          10:56

11    greatest success story in the history of comics.

12    Q    Did this become apparent to DC immediately or later on?

13    A    Well, some people at DC claim that they knew it from the

14    start.  It is said that Mr. Donenfeld, the publisher, was the

15    last one to pick up on this.  When he saw the first cover, he          10:57

16    thought it was outrageous and that the book wouldn't sell.  He

17    had ordered subsequent issues to not feature Superman so

18    prominently; so Superman was on the cover of *Action Comics*

19    *No. 1*, but he was not on the cover of *Action No. 2* or *3* or *4* or

20    *5*, or I think *6*.          10:57

21        There's a lead time in doing comics.  By the time

22    No. 1 hits the stands -- actually, by the time you get some

23    distributor or retailer reaction to a comic, you've already got

24    the next three or four issues well under way or off to the

25    printer.          10:57

1   Q     How popular did Superman comics become?

2   A     *Superman* was the best selling comic book of its time, of

3   the earlier 1940s.  Superman immediately was featured in other

4   media.  They immediately spun off a solo comic book called

5   *Superman*, completely comprised of his adventures.  He was the          10:58

6   first character really honored that way.

7   Q     When was that?

8   A     That was 1939.

9         **MR. PERKINS:**  Your Honor, I need to interpose an

10  objection.  This is well beyond what was in his report.  We did          10:58

11  not have an opportunity to depose him with respect to his

12  expertise in comics.  He was not presented as an expert in the

13  history of comics.  It's simply not within the four corners of

14  his report.

15        **THE COURT:**  Counsel, a few minutes ago, you told me            10:58

16  you didn't object to him being designated as an expert in the

17  history of comics.

18        **MR. PERKINS:**  I was discouraged because -- he is an

19  expert in comics, but he --

20        **THE COURT:**  No, no.  The specific question was,                10:58

21  'Do you object to him being designated as an expert in comic

22  books and their history'; and you said, 'No objection.'

23        **MR. PERKINS:**  I have no objection, but, Your Honor, I

24  have an objection to the testimony.  He is undoubtedly an

25  expert, but at the prior hearing, when we talked about these            10:58

```
 1   motions, Your Honor made it clear that if it's not in their
 2   report, they will not be permitted to testify.
 3          THE COURT:  Counsel, is this in the report?
 4          MR. TOBEROFF:  Your Honor, Yes, it is.
 5          I'd like to read you a quote from defendants' reply      10:59
 6   in support of their motion in limine number two.
 7          THE COURT:  Not the reply, the report.
 8          Where in the report is it?
 9          MR. TOBEROFF:  I'll get that in a moment, but if I
10   can -- defendants have acknowledged that it cannot be disputed   10:59
11   that Mr. Evanier's report deals largely with the "history of
12   the Superman character," quote, end quote.  They have
13   acknowledged this to the Court.
14          Page 8 of his report --
15          THE COURT:  I'm looking at the report.              10:59
16          Here, Counsel, he does seem to go in great detail
17   into the history in the report.
18          MR. PERKINS:  Well, he goes into detail about how the
19   comics were created.  There's nothing in his report other than
20   some general comments about popularity, but he gives no opinion   10:59
21   with respect to where Mr. Toberoff is going, for example, which
22   is that it was at its nadir in 1974.  There's no analysis;
23   they're not permitted to examine him about that.
24          His report outlines on the first page the three areas
25   of analysis or opinion that he was going to give, and those    11:00
```

```
 1   three areas are, the manner in which the earlier Superman

 2   comics were created by Jerry Siegel --

 3            THE COURT:  That's what we're hearing about right

 4   now.

 5            MR. PERKINS:  The last answers that he gave talked    11:00

 6   about how popular Superman was when it was released, that it

 7   was phenomenally popular, that there was a new title that was

 8   created as a result, that there were people within DC who

 9   thought that it would and it wouldn't be.  None of that is in

10   this report.  The report was very focused, Your Honor.  It was  11:00

11   focused on work-for-hire issues, and it was focused on the

12   Smallville issues that were in the case when there was a

13   copyright infringement claim.  The first page outlines the

14   three areas of testimony that he was to give.

15            THE COURT:  Counsel?                                  11:01

16            MR. TOBEROFF:  Your Honor, his testimony is clearly

17   within the scope of the report.  It's been admitted by

18   defendants in their earlier statements, and, as I mentioned, in

19   the reply.  I could quote you paragraphs of the report that

20   goes to the value, the effect of Superman's history and        11:01

21   popularity on the value.  Mr. Evanier says on Page 9 of his

22   report, quote, "Any new entertainment venture, a movie, a TV

23   series, a video game, based on Superman is instantly considered

24   a major hot endeavor in the same way that the excitement and

25   potential success of a new motion picture is enhanced by the    11:01
```

```
 1   signing of an established star with proven box-office success."

 2           THE COURT:  Let's move along.

 3           The objection is overruled.

 4   BY MR. TOBEROFF:

 5   Q    Did Superman remain popular in the 1940s?                    11:02

 6   A    Very popular, yes.

 7   Q    Throughout what period did he remain very popular?

 8   A    Superman was popular in the 1940s.  He was popular in the

 9   1950s.  He was popular throughout the '60s.  There was a

10   decline in the late '60s and so on.                              11:02

11   Q    How many comic books was Superman selling per month by the

12   late 1950s?

13   A    By the late 1950s, Superman was in comics each month,

14   totalling sales of approximately 4 million copies.

15   Q    That's 4 million copies per month?                          11:02

16   A    4 million copies per month.

17   Q    Is Superman still published today?

18   A    Yes, it is.

19   Q    How many different comic book lines is Superman published

20   in?                                                              11:02

21   A    I don't know if I can even keep track.  There's a Superman

22   comic.  There's an Action Comics.  There's a book called

23   All Star Superman.  There's a book called Superman & Batman.

24   There are many miniseries.  They have an ongoing series of

25   reprinting old Superman comics.  They keep the old ones in       11:03
```

```
 1   print, which is unprecedented.  That was not done in the old

 2   days.

 3   Q    What did Detective do once they realized what they had in

 4   Superman?

 5   A    They began exploiting him in other fields.             11:03

 6   Q    What other fields?

 7   A    Within the first couple of years of Superman's existence,

 8   he was quickly spun off into a syndicated newspaper strip; a

 9   very popular radio program; and a series of theatrical

10   cartoons, distributed by Paramount Pictures.                11:03

11   Q    In what other media, other than what you've just

12   mentioned, has Superman been exploited?

13   A    Well, the radio show went on for a long time.  When the

14   cartoon -- around the time -- the next notable appearance of

15   Superman in other media would be in 1949.  Columbia Pictures  11:04

16   produced the first of two motion picture serials.  It was so

17   popular -- Superman was so popular as a serial, they did

18   another one the following year.

19   Q    And these are animated shows featuring Superman?

20   A    The two Columbia serials were live action.             11:04

21   Q    And prior to that, there were animated shows?

22   A    Yes.  As I mentioned, Paramount purchased a license to

23   turn Superman into an animated character; and they produced 17,

24   I believe, theatrical shorts, one of which was nominated for an

25   Oscar.  They were very popular.  They're still very popular.  11:04
```

1    They just came out on DVD again.

2    Q    Has Superman continued to be exploited in animation

3    throughout the years?

4    A    Yes.  There have been a half dozen different Superman

5    cartoon shows over the years.  If you'd like, I can go through    11:04

6    them individually.

7    Q    You can go through some of them briefly.

8    A    There was a Superman-animated series done in 1966, I

9    believe, or '67, produced by Filmation; that was on for a

10   couple of years.  Then, in 1973, Hanna-Barbera produced a show    11:05

11   called *Super Friends*, which featured Superman, Batman,

12   Wonder Woman, and a core of other DC characters; but Superman

13   was the lead character in that.

14        Then the next Superman-animated appearance --

15   Super Friends went off and on for a number of years.  The next    11:05

16   animated Superman show would have been 1988.  That was a show

17   produced by a studio called Ruby-Spears.  Then there would have

18   been the show that I worked on, *Superman: The Animated Series*,

19   which was done in the '90s.  And that was followed by a series

20   that Warner Animation also produced, the *Justice League of*    11:05

21   *America*, with Superman prominent in that.

22        I think that's all of them, but I may have missed

23   one.

24   Q    Has Superman appeared in any live-action television shows?

25   A    Well, in 1951 -- the Columbia serials were done in 1949    11:06

1    and 1950.  In 1951, DC Comics themselves produced a theatrical

2    film that was also intended as a pilot for a television series.

3    The theatrical film was called *Superman and the Mole Men;* that

4    was used a vehicle to set up a Superman live-action TV show.

5            Sorry.  I'm giving this lady so much trouble.

6            I apologize.

7            *Superman and the Mole Men* was produced in 1951.  That

8    was a pilot for a TV series.  And then they started in '51 the

9    Superman series that starred George Reeves as Superman.  And

10   that was done for 104 episodes throughout the 1950s, ending in          11:06

11   1957.  It would have gone on longer except for the untimely

12   death of Mr. Reeves.

13   Q    Any other live-action Superman television series or

14   Superman-derived television series?

15   A    The next time Superman was in live action on television,        11:07

16   apart from little cameos and guest appearances, would have been

17   1975.  On ABC, there was a special, based on an earlier-failed

18   Broadway musical of Superman; that was in '75.  It was run late

19   night once, in the middle of the night.  Almost no one saw it.

20   And then I don't think there was another Superman, a live            11:07

21   action -- the next time Superman was in live action, if you

22   counted it, it would be the *Superboy* 1988 series.

23   Q    And after that?

24   A    After that, the next one would be *Lois & Clark*, which was

25   in '93, I believe, which was on ABC.                                  11:07

1   Q    And after *Lois & Clark*?

2   A    After *Lois & Clark*, I think the next one would be the

3   *Smallville* show in 2001.

4   Q    Has Superman appeared in -- I think you interspersed in

5   your testimony, you mentioned, I believe, theatrical short      11:08

6   films.  I'd like you to take us through Superman's history in

7   live-action theatrical films.

8   A    Live-action theatrical films -- well, there were the two

9   serials.  There was the *Superman and the Mole Men* pilot.  And

10  then the next time Superman was done theatrical in live action   11:08

11  would have been in the 1978 movie starring Christopher Reeve.

12  Q    That was just called *Superman*?

13  A    That was just called *Superman*.  It was followed by three

14  sequels.

15  Q    What were the sequels called, and when were they released?   11:08

16  A    *Superman II* was released in 1980; *Superman III* was 1984, I

17  believe; and *Superman IV* was released in 1986.

18  Q    You mention Superman's exploitation early on in

19  merchandising.

20       Has that merchandising continued to this day?              11:09

21  A    Definitely.

22  Q    For 70 years, he's been continuously exploited in

23  merchandising?

24  A    Yes.

25  Q    Was Superman ever adapted for the stage?                    11:09

1    A    Yes.  As I mentioned a moment ago, there was a musical

2    comedy version of *Superman*, called *It's a Bird, It's a Plane,*

3    *It's Superman*, which was done in -- it opened in March of 1966.

4    I believe most of the history books say '65, but it was '66.

5    And it was not a success.                                          11:09

6    Q    You testified earlier that in the 1940s and 1950s,

7    Superman was extremely popular.

8         Did that popularity remain, or did it wane?

9    A    There have been periods when the sales on Superman were

10   down, when the merchandising was down, and Superman was not        11:10

11   quite the superstar that we generally think of him as.

12   Q    When did Superman's popularity decline?

13   A    There was a diminution on the sales of the comic and a

14   drop in the merchandising in the late '60s, which continued

15   through the early '70s; and didn't, by my reckoning, really        11:10

16   reverse itself until the Christopher Reeve movie in '78.

17        **MR. PERKINS:**  Move to strike, Your Honor.  That's not

18   in his report at all.  Those conclusions are not in his report.

19        **THE COURT:**  Counsel?

20        **MR. TOBEROFF:**  Your Honor --                              11:10

21        **THE COURT:**  Where in the report?

22        **MR. TOBEROFF:**  Every single thing that he says on the

23   stand is not going to be in his report, but the scope -- the

24   idea of having these matters in the report is to give the other

25   side fair notice.                                                  11:11

1          **THE COURT:**  Yes, Counsel.  But a particular question,

2   like a "why," goes to the heart of an opinion; that is the type

3   of thing that needs to be disclosed.  You're absolutely right,

4   a report does not have to include every single thing that is

5   being said on the stand.  But a question -- you're asking why,          11:11

6   now; you're asking for his opinion.

7          Has that opinion been disclosed?  Has he disclosed

8   the answer that he's about to give?

9          **MR. TOBEROFF:**  He hasn't disclosed specifically

10  the --                                                                  11:11

11         **THE COURT:**  If he hasn't, then it's not coming out

12  now.

13         **MR. TOBEROFF:**  I don't know the precise answer.

14         **THE COURT:**  You answered the question.

15         I sustain the objection.                                         11:11

16         Opinions need to be disclosed.  The filler, I

17  certainly will give you leeway on that, and your notice is

18  correct; but an actual 'why' question, or 'do you have an

19  opinion as to why' or 'how' or 'who' or 'what,' those types of

20  things need to be disclosed.                                            11:11

21  **BY MR. TOBEROFF:**

22  Q    How was Superman viewed in the late 1960s?

23         **MR. PERKINS:**  Again, objection.  That opinion was not

24  elicited in this report.

25         **THE COURT:**  This is more of that historical.                 11:12

```
 1            I'll allow you to continue.

 2            Overruled.

 3            THE WITNESS:  Could I have the question again.

 4   BY MR. TOBEROFF:

 5   Q    The question was, how was Superman viewed in the late      11:12

 6   1960s?

 7   A    In the late 1960s, Superman was kind of out of sync with

 8   his times.  The readership did not really like the comic book

 9   that DC was producing.  The long-time editor of it was

10   terminated.  He was allowed to quit, but it was clear that he   11:13

11   was ousted.

12            The character got the first of many makeovers, to try

13   and bring it back into favor.  The character was kind of

14   stodgy; he had become kind of a self-parody, I think.  And the

15   late '60s was a time when authority figures had a little        11:13

16   trouble in this country, and Superman had gone too far in the

17   wrong direction.  He had become kind of pompous and lecturing.

18   I felt the character was not speaking to the audience at the

19   time.  His sales were significantly eclipsed by Marvel Comics

20   of the day, which did reach out to the audience, reached them   11:13

21   on a more basic level.

22   BY MR. TOBEROFF:

23   Q    Any other reasons for the sharp decline in Superman's

24   popularity in the 1970s?

25   A    I think that there was a consensus that the comic book was  11:14
```

1    not very good.  They were demeaning the character a lot, for

2    gimmicks.  They were trying very hard to find something that

3    would sell, and I think they went in the wrong direction.  They

4    kept doing covers to show him weak and frail and humiliated;

5    and people don't want to see a weak, frail, humiliated                    11:14

6    Superman.

7    Q    How else was Superman portrayed in this time period?

8    A    Well, there were things that I thought were wrong in the

9    fundamental way they were approaching the comics.  There was a

10   period in the early '70s when they took Clark Kent out of being           11:14

11   a news reporter.  He was no longer a mild-mannered reporter.

12   They essentially turned him into Walter Cronkite.  He was a

13   star anchorman on TV.  And it was illogical.  Readers didn't

14   like it.  It didn't make sense to them for Superman --

15   Clark Kent is supposed to be -- in every appearance that's been           11:15

16   successful, the template has been that Clark Kent is this shy,

17   bumbling person, who -- first of all, it makes sense for

18   Superman to hide himself that way.  He doesn't have to be

19   heroic in both of his identities.  Otherwise, he doesn't need a

20   super identity if he's heroic in both.  And it didn't make                11:15

21   sense for him to be so visible.

22          If you look at the Christopher Reeve movie, for

23   example, the first time in 1978 -- the first time you see

24   Clark Kent, he's bumbling, he's bumping into doors, he's inept.

25   That's the way Clark Kent has traditionally been.  DC, for some           11:15

```
 1   reason in the early '70s, thought, 'Let's turn him into a TV
 2   superstar reporter'; and I think that contributed to the
 3   decline of the comics.
 4   Q    What role, if any, did DC's management have in this
 5   decline in the late '60s, early '70s?                          11:16
 6   A    DC's management was calling the shots on this.  They were
 7   the ones making the decisions, that I happen to think were bad
 8   ones.  And I think the company ultimately felt that.  They got
 9   rid of that management; they fired them.
10   Q    When was that?                                             11:16
11   A    '75.
12   Q    Given this decline you just testified to, what was the
13   lowest point in Superman's popularity historically?
14        MR. PERKINS:  I object to the question.  That opinion
15   is not rendered in the report.                                 11:16
16        THE COURT:  Overruled.  I think all of this -- I
17   mean, clearly this witness is qualified to describe the
18   history, and he indicated that he would be covering the
19   history.  This is not opinion as much as it is --- I'll
20   overrule the objection.                                        11:17
21        You may answer.
22        THE WITNESS:  Could I have the question, please, one
23   more time.
24   BY MR. TOBEROFF:
25   Q    Historically, what was the lowest point in Superman's     11:17
```

```
 1   popularity?
 2   A    The early '70s, '73 through '75, in there.
 3           THE COURT:  What is that based on?
 4           THE WITNESS:  Sales.  Books weren't selling very
 5   well.  The character was kind of -- comic fans get very          11:17
 6   possessive about the characters they love.  Readers were
 7   starting to protest the way Superman was being depicted.  They
 8   were not getting a Superman that they felt good about.  There
 9   was one issue that had a cover of Superman bowing down and
10   kissing the foot of an Amazon alien invader; and everybody        11:17
11   protested it.  They said, 'You guys don't understand Superman;
12   you're ruining this character.'
13           Superman is not subservient.  Superman is -- hey, I
14   can do that.  I don't need Superman to be humiliated.
15           And sales were down.  I was working on and off for        11:17
16   DC Comics at the time.  We had meetings.  We had to reinvent
17   Superman.  They didn't know what to do with it.
18           The man I mentioned earlier, Jack Kirby, who was a
19   superstar of -- probably the most successful comic creator who
20   ever lived, they brought him into meetings, and I went with him   11:18
21   as his assistant; and the publisher of the company sat there
22   and said, 'Help us figure out what to do with Superman; we
23   don't know.'  Some of their other books were thriving.  The
24   company was not completely incompetent at the time.  They had
25   some very good comics.  They were actually doing a good job       11:18
```

1    with Batman.  And Batman was becoming more popular than

2    Superman.

3              THE COURT:  Again, based on sales?

4              THE WITNESS:  Yes, based on sales.  And on industry

5    reaction, awards.  I mean, Superman never stopped selling.                    11:18

6              THE COURT:  When you say "industry reaction," that's

7    what you observed when you attended these conventions?

8              THE WITNESS:  Yeah.  Conventions and awards.  And

9    there were all of these magazines, people who do reviews.  I

10   was writing for a lot of them at the time.                                     11:18

11             I'm giving you a consensus of what I perceived as the

12   readership from the only measures we have, which is the buzz,

13   the panel discussions, what we know of sales.  You can also

14   track the popularity of these characters frequently with what

15   the company does.  When they start putting Superman on the                     11:19

16   cover of lots of comics, it's because they perceive that he is

17   a saleable commodity; that his presence on the cover helps the

18   comics sell.  When they start hiding him, then you say, well --

19   cutting back the comics, featuring him less often.

20             In the 1960s --                                                      11:19

21             THE COURT:  Let me stop you there.

22             Your next question.

23   BY MR. TOBEROFF:

24   Q    Does DC agree with this conclusion, that Superman was at

25   the lowest point in his popularity in the early '70s?                          11:19

1          **MR. PERKINS:**  Objection.  Hearsay.  And, also, it's

2     well beyond the --

3          **THE COURT:**  Sustained.

4     **BY MR. TOBEROFF:**

5     Q    Did Superman appear in any live-action films or television    11:20

6     shows during the early '70s?

7     A    Live-action films in the early '70s?

8          No.  The first one I know of would have been the 1975

9     adaptation of the Broadway show I mentioned.

10    Q    The 1975 late-night special on ABC?    11:20

11    A    Correct.

12    Q    Could you tell me about that late-night special again,

13    please.

14    A    ABC was at that time doing a series called *ABC's Wide*

15    *World of Entertainment*, which was on opposite Johnny Carson;    11:20

16    and it was a series of different shows in different forms.  And

17    they took the Superman Broadway show from '66, and they did a

18    very cheap, shoddy adaptation of it, very campy, low budget.

19    It was a horrifying show.  It is generally mocked by those --

20    not that many people saw it, but those who did still jest about    11:21

21    how bad it was.

22    Q    After Superman's popularity hit rock bottom in the early

23    1970s, did his popularity ever rebound?

24          **MR. PERKINS:**  Objection, Your Honor.

25    Mischaracterizes Mr. --    11:21

1          **THE COURT:**  As to the form of the question,

2    sustained.

3    **BY MR. TOBEROFF:**

4    Q    Did Superman's popularity rebound after it had declined in

5    the early 1970s?                                                    11:21

6    A    Yes, it did.

7    Q    Can you describe to me how it rebounded.

8    A    Well, in 1978, there was a *Superman* movie starring

9    Christopher Reeve which was phenomenally successful.  It

10   reinvigorated the character.  It certainly reinvigorated the        11:21

11   merchandising.  There were hundreds and hundreds of Superman

12   toys and games and T-shirts.  There was Superman -- I started

13   eating Superman peanut butter about the time they started

14   bringing it out.  The character suddenly had a new life at that

15   point, because that movie was so successful.                        11:22

16   Q    Did that movie influence other forms of Superman

17   programming?

18   A    Yes.  Well, there were the sequels, as I mentioned.  The

19   *Super Friends* animated show, which had kind of been on its last

20   leg, was reborn.  It ended up changing formats a few times, but     11:22

21   it began featuring Superman more prominently; and it stuck

22   around for quite a few years after that.  I think it ended

23   in '86, or thereabouts, which is a very long run.  It's a very

24   long run for a show that was cancelled when it was originally

25   put on the air, to come back like that and be successful.           11:22

```
 1              I don't think there were any other adaptations in

 2   motion pictures or television until after the fourth -- the

 3   Superman features with Christopher Reeve.

 4   Q    Were the sequels, Superman II and Superman III, you

 5   mentioned released in 1980, and the other was 1983 -- I believe   11:23

 6   you said --

 7   A    I said '84.

 8   Q    Superman II and Superman III, were they successful as

 9   well?

10   A    Two was a little less successful than one, and three was a   11:23

11   little less successful than two.

12   Q    And how would you describe the last sequel, Superman IV?

13   A    I think it was viewed by about as many people who are in

14   this courtroom at the moment.  It was not successful at all.

15   Q    Did that have any effect on the popularity of Superman?     11:23

16              MR. PERKINS:  Objection, Your Honor.  That is an

17   opinion that's not provided in his report.

18              THE COURT:  Now we're getting into causality again,

19   Counsel.  I'm permitting the witness to testify as to his

20   understanding of what was happening as opposed to why it was     11:24

21   happening.

22   BY MR. TOBEROFF:

23   Q    In terms of Superman's historic popularity, did

24   Superman IV have any effect on his historic popularity?

25              MR. PERKINS:  Same objection, Your Honor.            11:24
```

```
1              THE COURT:  Sustained.  That's the same question in a

2     different form.

3     BY MR. TOBEROFF:

4     Q    Did Superman IV have any historic effect on Superman's

5     popularity?                                                        11:24

6              THE COURT:  Counsel, every time you're using the word

7     "effect," you're asking for him to assess causality; and unless

8     that's set forth in the expert report, I'm going to keep

9     sustaining the objection.

10             MR. TOBEROFF:  I have it.                                 11:24

11    BY MR. TOBEROFF:

12    Q    How popular was Superman after Superman IV?

13    A    I think Superman was still very popular.  I just think

14    people didn't like that movie.

15    Q    Are you saying they blamed the movie rather than Superman?    11:24

16    A    No.

17             MR. PERKINS:  Objection, Your Honor.

18             THE COURT:  Sustained.

19    BY MR. TOBEROFF:

20    Q    Returning to Superman, how was Superman exploited in the      11:25

21    late 1980s through the 1990s?

22    A    Exploited in other media besides comics, you mean?

23    Q    Exploited in any media.

24    A    The comic books were very successful at the time.  DC

25    added new titles.  They did a couple of reboots in there, where    11:25
```

1   they reinvented the character, cleaned out some of the dead

2   wood; and the comic book sales went up considerably.  It became

3   a much more prominent, successful comic than it had been at

4   certain times in the past.

5           In '88, you had both the new Saturday morning show          11:25

6   and the *Superboy* show going on the air.

7           Next thing after that, I don't know -- did I answer

8   your question?

9   Q    Yes.

10          Can you tell me about *Superman No. 75*.                     11:25

11  A    Well, *Superman No. 75* -- in 1993, DC did a story arc

12  called *The Death of Superman*, which stunned everyone by how

13  much attention it got.  It was a phenomenon in the industry.

14  It was unprecedented.  And it was not just a matter of --

15  *Superman No. 75*, which was the issue in which Superman actually  11:26

16  died in the story line, sold 3 million copies.  This is at a

17  time when a good-selling comic book might be selling 30,000.

18  So 3 million was astronomical.  It was not just that one issue;

19  it was all of the issues leading up to it.  And the death of

20  Superman story line was interwoven in all of the DC comics for   11:26

21  several months; so readers were picking up all of the different

22  DC titles in record numbers.  And then when the issue *75* came

23  out with the actual death of Superman, it hit the mainstream

24  press like some beloved real person had died.  It was covered

25  on the evening news; it was covered in headline stories.  And   11:27

```
 1   then the subsequent issues, which featured Superman's funeral,
 2   and then later, his return, were also selling well, well above
 3   any expectations of the time.
 4   Q    Thank you.
 5        Can you describe to me the differences in comic book      11:27
 6   sales in different periods and how that was viewed by the comic
 7   industry as either being successful or unsuccessful.
 8        Do you understand my question?
 9   A    I think so.
10        THE COURT:  I'm not sure if I do, Counsel.               11:27
11        Why don't you rephrase it.
12        MR. PERKINS:  To the extent I understand it, I
13   object.
14        THE COURT:  He's rephrasing it, Counsel.
15        MR. PERKINS:  Thank you.                                 11:27
16   BY MR. TOBEROFF:
17   Q    You mentioned, when you were talking of the death of
18   Superman, that that sales figure was phenomenal for that
19   particular time period.
20        Did the amount of comics an issue had to sell to be       11:27
21   considered successful differ from one period to another in the
22   comic book industry, and why?
23   A    I think I've got that.
24        Yes.  Yes.  The answer is, the standards changed over
25   the years.                                                     11:28
```

1          Prior to about 1980, comic books were distributed by

2     a term that is frequently called the "independent distribution

3     method."  This is the way most magazines were and most still

4     are distributed, which is that they are sold on a returnable

5     basis to wholesalers and then on to retailers throughout the          11:28

6     country.

7          Around 1980, that method of distribution atrophied,

8     for reasons that will probably get us 23 objections here; so I

9     won't go into them.  But the business changed over to a

10    direct -- a thing where the comics were sold direct, primarily       11:28

11    to comic book shops which bought them for higher prices on a

12    nonreturnable basis.

13         Prior to about 1980, this cutoff point I'm

14    mentioning, if a comic book sold under 150,000, it was

15    considered a failure.  I did comics at that time that were sold       11:29

16    under -- when you fell under 150,000, you were probably going

17    to get cancelled.  A good sale would be 200,000 and up.  A

18    great sale would be 300,000 to 500,000.  There were occasional

19    exceptions selling into the millions.

20         Since 1980, it is profitable now to do a comic that            11:29

21    sells 30,000 copies.  Last month, there was no comic book

22    published in America that sold over 100,000.  The number one

23    selling comic last month sold 97,000 copies.

24              **THE COURT:**  How did the distribution change?

25              **THE WITNESS:**  Well, what happened was, you used to go    11:29

1   to your corner newsstand, buy a comic book for a dime,

2   15 cents.  The newsstand would get 25 copies.  If they sold

3   ten, the other 15 would go back to be pulped, the copies would

4   be destroyed, or they would be returned; so the publisher would

5   rebate the distributor.  So to sell ten copies when you're     11:30

6   destroying 15 is not profitable.  To sell 25 when you're

7   destroying five could be profitable.  It was a measure of

8   copies sold versus copies returned.

9          In the current method, we have comic book shops all

10  over the country.  They're the primary means of distribution.   11:30

11  Your local comic shop orders 100 copies of the new issue of

12  *Superman*.  They pay for them in full.  They're $2.95 to $3.95.

13  They get them for a reduced price, but once they buy them,

14  they're not returnable; so there's no spoilage.  And they're

15  sold; so you can make money selling a comic book that sells     11:30

16  20,000 copies these days.

17          **THE COURT:**  Let's take our lunch break at this time.

18  We'll resume at 1:00.

19          Court is in recess.

20          (A.M. session concludes.)

21

22

23                          CERTIFICATE

24

25  I hereby certify that pursuant to Section 753, Title 28, United
    States Code, the foregoing is a true and correct transcript of



1   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
2   conformance with the regulations of the judicial conference of
    the United States.

3

4   _____            _____
    THERESA A. LANZA, CSR, RPR                          Date
5   Federal Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tuesday, April 28, 2009                    Trial Day 1, AM Session