```
1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7   JOANNE SIEGEL and              )
    LAURA SIEGEL LARSON,           )
8                    Plaintiffs,   )
                                   )
9          vs.                     )  No. CV 04-08400-SGL
                                   )
10  WARNER BROTHERS ENTERTAINMENT INC.;)
    TIME WARNER, INC.; DC COMICS;   )
11  and DOES 1-10,                 )  Trial Day 2
                     Defendants.   )  A.M. Session
12  _____)  Pages 171-249

13

14

15        Reporter's Transcript of Court Trial Proceedings

16                  Riverside, California

17               Wednesday, April 29, 2009

18                     9:33 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24           3470 12th Street, Rm. 134
            Riverside, California  92501
25              (951) 274-0844
               WWW.THERESALANZA.COM
```

```
 1
        APPEARANCES:
 2

 3      On Behalf of Plaintiffs:

 4
                             LAW OFFICES OF MARC TOBEROFF
 5                           BY:  Marc Toberoff
                             BY:  Nicholas C. Williamson
 6                           BY:  Keith Adams
                             2049 Century Park East,
 7                           Suite 2720
                             Los Angeles, California  90067
 8                           310-246-3100

 9

10      on behalf of Defendants/Counterclaimant:

11
                             WEISSMANN WOLFF BERGMAN COLEMAN
12                            GRODIN & EVALL LLP
                             BY:  Michael Bergman
13                           BY:  Anjani Mandavia
                             9665 Wilshire Boulevard,
14                           Ninth Floor
                             Beverly Hills, California  90212
15                           310-858-7888

16

17      On Behalf of DC Comics:

18                           PERKINS LAW OFFICE, P.C.
                             BY:  Patrick T. Perkins
19                           1711 Rt. 9D
                             Cold Spring, New York  10516
20                           845-265-2820

21

22

23

24

25
```

Wednesday, April 29, 2009                    Trial Day 2, AM session

```
1                        I N D E X

2                                              Page

3   Plaintiff case (cont'd)........................  175

4

5

6   PLAINTIFF
    WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
7   GREGORY NOVECK

8   By Mr. Toberoff    175                    207
    By Mr. Bergman                 202
9

10
    PLAINTIFF
11  WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
    PAUL LEVITZ
12
    By Mr. Toberoff  212                     245
13  By Mr. Bergman                 242

14

15

16
             EXHIBITS          RECEIVED
17
             (None.)
18

19

20

21

22

23

24

25
```

```
 1      Riverside, California; Wednesday, April 29, 2009; 9:33 A.M.

 2                              -oOo-

 3           THE CLERK:  Calling item number one on calendar,

 4   Case Number CV 04-08400-SGL, Joanne Siegel, etc., versus

 5   Warner Bros. Entertainment, Inc., etc.                          09:33

 6           Counsel, please state your appearances for the

 7   record.

 8           MR. BERGMAN:  Good morning, Your Honor.

 9   Michael Bergman for the defendants.

10           MR. PERKINS:  Patrick Perkins for the defendants,      09:33

11   Your Honor.

12           MS. MANDAVIA:  Anjani Mandavia for defendants.

13           THE COURT:  Good morning.

14           MR. TOBEROFF:  Good morning, Your Honor.

15   Marc Toberoff for plaintiffs.                                  09:33

16           MR. ADAMS:  Good morning, Your Honor.  Keith Adams

17   for plaintiffs.

18           MR. WILLIAMSON:  Good morning, Your Honor,

19   Nicholas Williamson for plaintiffs.

20           THE COURT:  Good morning to you all.                   09:33

21           The plaintiffs may call their next witness.

22           MR. TOBEROFF:  Plaintiffs call Gregory Noveck.

23           THE CLERK:  Do you solemnly state that the testimony

24   you may give in the cause now pending before this Court shall

25   be the truth, the whole truth, and nothing but the truth, so
```

1    help you God?

2              THE WITNESS:  I do.

3              THE CLERK:  Please state your full name for the

4    record and spell your last name.

5              THE WITNESS:  Gregory Noveck, N-o-v-e-c-k.          09:35

6              THE COURT:  Counsel?

7                        DIRECT EXAMINATION

8    BY MR. TOBEROFF:

9    Q    Good morning, Mr. Noveck.

10   A    Good morning.

11   Q    You're currently employed by DC Comics?

12   A    That's correct.

13   Q    And your position is senior vice president in creative

14   affairs?

15   A    Yes.

16   Q    Your offices are on the Warner Bros. Studio lot?

17   A    Correct, primarily.

18   Q    In your position as senior vice president in creative

19   affairs, you act as a liaison between DC and Warner Bros.; is

20   that right?                                                  09:35

21   A    And the outside community as well.

22   Q    You help Warner Bros. find and develop DC properties to

23   adapt as motion pictures and television shows?

24   A    Correct.

25   Q    Who did you report to at DC?                            09:35

Wednesday, April 29, 2009                Trial Day 2, AM session

```
 1   A      Paul Levitz.

 2   Q      Who do you report to at Warner Bros.?

 3   A      I don't report to anyone at Warner Bros.

 4   Q      Who do you deal with primarily at Warner Bros., if anyone?

 5   A      I mean, virtually everybody, you know, I mean, within my     09:36

 6   rank and file; but, as well, you know, the creative community,

 7   et cetera, as well.

 8   Q      I'd like to show you what has previously been admitted as

 9   Exhibit 187.  It's a document entitled "Media Development

10   Creative Affairs Department First Annual Status Report."           09:36

11            I'd like you to turn for a moment to the last page of

12   the document, Bates No. DCC-134329, which closes with, "Thanks

13   as always for your time and attention, Gregory Noveck."

14            Do you see that?

15   A      Yep.                                                         09:37

16   Q      This document was, I assume, presented by you?

17   A      Yes.

18   Q      Or drafted by you?

19   A      Yes.

20   Q      And it was drafted for an oral presentation?                 09:37

21   A      No.

22   Q      This was the presentation?

23   A      Correct.

24   Q      Now, on the last page of the document -- excuse me, I'll

25   direct you to the page.  It's DCC-134329.  It states towards       09:37
```

```
 1   the top of the page "Goals for 2005."

 2           Does this mean this document was likely written in

 3   late 2004?

 4   A    I believe that's correct.

 5           MR. BERGMAN:  Your Honor, in light of the fact that      09:38

 6   the document was written two years after the last document was

 7   executed, I don't see the relevance of this document.

 8           THE COURT:  I'll give you some latitude, Counsel.

 9   I'm not really sure what it is either, but let's see.

10   BY MR. TOBEROFF:

11   Q    To whom was this presentation directed?

12   A    To my direct report, Paul Levitz, my boss.

13   Q    On Page 1 of the presentation, DCC-134324, second

14   paragraph, you write as follows:  "The media department at DC

15   officially launched November 1, 2003, almost exactly one year      09:38

16   ago."

17           Do you see that?

18   A    Yes.

19   Q    Does this refresh your recollection that this presentation

20   was written in late October of 2002 or November 1, 2002?      09:39

21           MR. BERGMAN:  Objection, Your Honor.  It's clear it

22   was written in late 2004.

23           THE COURT:  Counsel?

24           If November 1, 2003 was a year ago, it looks like it

25   was written in November 2004.      09:39
```

```
1            MR. TOBEROFF:  Excuse me.  I'm thinking backwards
2    instead of forwards.  I apologize.
3            THE COURT:  Very good.
4    BY MR. TOBEROFF:
5    Q    Does this refresh your recollection that this presentation        09:39
6    was written in late October or early November 2004?
7    A    Yeah.  That's about right.
8    Q    I'd like to draw your attention to Page 1 of Exhibit 187,
9    where you state before Paragraph 1, towards the bottom of the
10   page, "Now, the areas targeted for development..."                     09:40
11           Do you see that?
12   A    Yes.
13   Q    And then it follows from Page 1 to the next page, "These
14   are your goals..."
15           Correct?                                                       09:40
16   A    Yeah.  I mean, these were areas that I had identified as
17   things to focus on.
18   Q    Turning to Page 2 of the document, Bates No. 134325,
19   one of your targeted areas is set forth in Paragraph 7,
20   entitled "Outside the box."                                            09:40
21           Do you see that?
22   A    Yes.
23   Q    And in Paragraph 7, you state the following:
24   "To successfully set up properties outside the Warner Bros.
25   family, once they have been fully considered internally, this         09:41
```

 1   includes trying to expand our horizons and set up feature

 2   projects with other studios."

 3            Now, by "other studios," you mean studios other than

 4   Warner Bros.; correct?

 5   A    Yeah, correct.                                         09:41

 6   Q    Part of your job duties at DC was to address this issue;

 7   correct?

 8   A    Yes.

 9   Q    Moving to Page 4 of the document, which is Bates-stamped

10   134327; if you'd turn to Paragraph 5, starting with the second    09:41

11   sentence, you state the following:  "A year ago, both studio

12   executives and the creative community were generally at a loss

13   when considering how to approach DC with questions.  Studio

14   executives would often just call the president of the company,

15   since that is DC's most public face, though they would often    09:42

16   proceed without informing anyone.  Outside entities often

17   contacted the studio directly or walked in with comic books

18   they bought off the shelf, assuming the rights were available.

19   In all cases, there was very little thought given to any

20   concerns DC may have regarding the properties under           09:42

21   consideration."

22            Did I read that correctly?

23   A    Yes.

24   Q    When you say "Studio executives would often just call the

25   president, though they would often proceed without informing    09:42

1  anyone," you're referring to Warner Bros. executives?

2  A    No, actually.  I'm referring to all studios and all studio

3  executives.

4  Q    So executives at other studios would proceed with DC's

5  properties without ever informing DC they had developed

6  projects based upon DC comic books without ever informing DC?

7  A    Well, they wouldn't be developing them.  What would

8  happen, and happens often, is that producers or other creative

9  entities will find a comic book, whether it's ours or another

10  publisher's, and go to a studio and say, 'I found this great

11  comic; I want to develop it,' and then they'll get all excited;

12  and at some point, someone will start looking at the rights and

13  realize that it actually belongs to someone and that they have

14  to get into it.

15  Q    The first sentence says "studio executives," and then you

16  describe how they act; and then the second sentence begins with

17  "outside entities," and you describe how they act.

18       I know this document was written a few years ago, but

19  wouldn't you say that in the first sentence, you're

20  differentiating the behavior of the studio executives at

21  Warner Bros. from the second sentence, where you're talking

22  about executives at outside entities?

23  A    No.  I mean, I don't think it's exclusive to Warner Bros.

24  Q    On Page 5, Bates No. 134328, Paragraph 7 is entitled

25  "Selling elsewhere."  You state the following in Paragraph 7:

09:42

09:43

09:43

09:43

09:44

1   "This has been the hardest area to crack.  While this has been

2   a primary goal, a number of different factors have conspired to

3   prevent true success in this area.  Uncontrollable aspects

4   include matching the right properties with the right talent and

5   getting a pitch together that is exciting enough to be bought,            09:44

6   yet is passed on by the various arms of Warner Entertainment.

7   The most important part of the process, however, is the ability

8   to extract properties from the studio in a timely manner."

9           Did I read that correctly?

10  A    I think it actually says "hardest arena to crack."                   09:45

11  Q    Okay.

12          When you say "the ability to extract properties from

13  the studio in a timely manner, you're referring to DC's

14  properties; correct?

15  A    Yeah.                                                                 09:45

16  Q    I'd like you turn to the last page of Exhibit 187,

17  entitled "Goals for 2005."  The second paragraph, third

18  sentence under that section, begins as follows:  "First, I

19  would suggest that we extend the mandate of selling outside the

20  studio to television entities as well.  This is a two-prong          09:46

21  suggestion.  The initial part concerns the ability to pitch to

22  other television studios projects that have been passed on by

23  Warner Bros. Television (reserving for them the same right as

24  the feature division to buy into the project at a later date).

25  The second initiative would be to allow us to pitch directly to     09:46

```
 1    the cable networks without having to go through the studio

 2    first."

 3              The reference in this paragraph to the feature

 4    division means that even when Warner Bros. passes on a DC

 5    project, they would still retain the rights to co-finance, and      09:46

 6    therefore have distribution rights, even if the project was

 7    thereafter set up and developed by another studio; is that

 8    correct?

 9    A    It's more reserving the right to negotiate for that.

10    Q    Reserving the right to --                                      09:47

11    A    To negotiate.  They can choose not to.

12    Q    Warner Bros. can choose not to?

13    A    Uh-huh.

14    Q    But the question is, can the other studio developing a

15    DC product choose not to?                                          09:47

16    A    It's negotiation.

17    Q    I understand that, but when you say reserving for

18    Warner Bros. Television the same right as Warner Bros. feature

19    division to buy into the project at a later date, you expressed

20    that as a right which they could choose to exercise or not          09:47

21    exercise; is that correct?

22    A    Yeah.  I mean, we have --

23    Q    Speaking of Warner Bros.?

24    A    Yes, speaking of Warner Bros.  We have a first-look deal.

25    Q    So if you went to another studio, Warner would have the        09:47
```

Wednesday, April 29, 2009                    Trial Day 2, AM session

1    right, if it so chooses, to co-finance a project and then

2    negotiate with the other studio how distribution rights to the

3    film and television project would be divided between them; is

4    that correct?

5    A    Yes.                                                              09:48

6    Q    You write on the last page -- if we could turn to the last

7    page --

8           **THE COURT:**  Before we go on, that second initiative

9    that you referred to there, "The second initiative would be to

10   allow us to pitch directly to the cable networks without having   09:48

11   to go through the studio first."

12          If you recall, what do you mean by "the studio"?

13          **THE WITNESS:**  I'm referring to Warner Bros.

14   television in that instance.

15   **BY MR. TOBEROFF:**                                                  09:48

16   Q    Now, still on the last page of this document, 134329, if

17   you could go, please, to the second line of the third full

18   paragraph, excluding your 'thank you' at the end, the second

19   line begins with the word "tangentially."  It reads as follows:

20   "Tangentially, I would use the anticipated success of           09:49

21   *Batman Returns* and *Constantine*, along with the unique situation

22   of DC properties being the top revenue creators for virtually

23   all Warner Bros. Entertainment divisions this year, as a

24   rallying cry that DC is indeed Time Warner's crown jewel, and

25   thus should drive the train on its own success."               09:49

1              "TW" refers to Time Warner; is that correct?

2     A     Correct.

3     Q     Now, I'd like to show you what has previously been

4     admitted as Plaintiffs' Exhibit 191.  Exhibit 191 is a

5     memorandum from you to Courtney Armstrong, dated May 2, 2006.      09:50

6              MR. BERGMAN:  Objection; same objection.  This

7     document post dates any contract by four years.

8              THE COURT:  It does, Counsel.  I think that goes to

9     the weight of its relevance.  You can certainly examine that on

10    cross-examination, whether or not -- the Court will consider      09:50

11    that in assessing its weight.

12             MR. BERGMAN:  Very well, Your Honor.

13             MR. TOBEROFF:  Your Honor, I would like to point out

14    that --

15             THE COURT:  Counsel, the objection was overruled.        09:51

16             You may ask your next question.

17             MR. TOBEROFF:  I understand.

18    BY MR. TOBEROFF:

19    Q     Courtney Armstrong, to whom this memo is directed, was a

20    Warner Bros. employee at the time you wrote this memorandum;      09:51

21    correct?

22    A     I believe so.

23    Q     If you turn to the first paragraph of the memo, you write,

24    "Courtney, per your discussion with Paula Lowitt, please find

25    short descriptions of the properties we with {sic} to formerly    09:51

```
 1    shop outside Warner Bros."
 2           I take it that was a typo and you meant "which"?
 3    A    Correct.
 4    Q    Who is Paula Lowitt?
 5    A    At the time, she was our SVP of legal and business affairs       09:51
 6    at DC Comics.
 7    Q    If you leaf through the document, you'll see that after
 8    each character, you'll have the words "pitch to" or
 9    "submitted to."
10           Do you see that?                                               09:51
11    A    Correct.  On most of them, yes.
12    Q    Now, that means film projects based on that particular
13    DC character was pitched to Warner Bros. as of that date, and
14    that in response, Warner Bros. rejected the project or failed
15    to license it for development; is that correct?                      09:52
16    A    They either passed or failed, yeah; or failed to respond;
17    or we hadn't gotten anywhere, really.
18    Q    So, for instance, let's turn to Page 2 of the document,
19    Bates No. DCC-134334, of this Exhibit 191.
20           So this would mean that a movie project based on --           09:52
21    what is Adam Strange?  Is it a comic book character?
22    A    Correct.
23    Q    So this would mean that a movie project based on
24    Adam Strange was pitched to Warner Bros. executives on
25    January 16, 2005; and then it was pitched again ten months           09:53
```

1    later on October 27, 2005; is that correct?

2    A    Correct.

3    Q    So by May 2, 2006, when you wrote this memo, looking at

4    the date on the first page of the memo, DC had still not

5    approached any other studios with the *Adam Strange* project,        09:53

6    even though Warner Bros. had passed on the project back on

7    January 16, 2005; is that correct?

8    A    Well, the first part of your question is accurate, in that

9    we had not approached other studios.  But they hadn't passed.

10   The reason that we had pitched twice officially, and multiple       09:53

11   times unofficially, to the studios was because they actually

12   were interested in the property and wanted -- we were just

13   creatively trying to figure out how to crack it.

14   Q    So you pitched it the first time on January 16th, and they

15   didn't like the pitch.                                              09:54

16   A    Correct.

17   Q    They rejected the pitch.

18   A    Parts of it, if I remember.  It's been awhile.  But, yeah,

19   it was, like, 'We like this; we don't like that; keep working

20   on it.'                                                             09:54

21   Q    And then nine or nine and a half months went by, and you

22   pitched it again.

23   A    Uh-huh.

24   Q    Correct?

25   A    Correct.                                                       09:54

1  Q    But by May 2nd, when you wrote this memo, you still had

2  not pitched the product to a competing studio; is that right?

3  A    Yeah, that's correct, to the best of my recollection.

4  Q    Let's turn to Page 3 of the document, Bates No. 134335.

5        Look at the comic book *Metal Men*.                          09:54

6        This shows that DC pitched a *Metal Men* movie to

7  Warner Bros. back on September 21, 2004; is that correct?

8  A    Correct.

9  Q    And then you subsequently pitched it a second time;

10 correct?                                                           09:55

11 A    Correct.

12 Q    But like with the other project, *Adam Strange*, that we had

13 previously spoken about, by May 2, 2006, DC had still not

14 approached a competing studio with the project.

15 A    That would be correct.                                        09:55

16 Q    And you were asking permission from Warner Bros.,

17 on May 2, 2006, nearly two years after the original pitch, for

18 permission to pitch *Metal Men* to another studio.

19 A    Correct.

20 Q    Now, I realize you would have enthusiasm for the comic        09:55

21 *Metal Men* because you were pitching it as a motion picture, but

22 in the scale of things, would you regard *Metal Men* as a major

23 DC comic character or a less major DC comic book character?

24 A    Well, it's not, you know, on the level with the Batmans

25 and characters like that, but it's not at the bottom of the       09:56

 1  heap either; it's somewhere in the middle.

 2  Q    Is it on the level of a Green Hornet?

 3  A    I'd say it's definitely on the level of a Green Hornet.

 4  Green Hornet is not our character, so...

 5  Q    I understand.                                            09:56

 6         On the level of a *Green Arrow*?

 7  A    Probably not; probably a little less than that, a little

 8  smaller.  But, I mean, they've been around just as long.  With

 9  comic books, you have people -- you can find people that will

10  tell you that *Metal Men* is the greatest comic known to man.   09:56

11  Q    But you'd agree that most people who would be familiar

12  with that -- if you went to a cocktail party with a hundred

13  people at it, probably nobody would know the name *Metal Men*.

14  A    They were a comic book --

15         **MR. BERGMAN:**  Objection, Your Honor.  That's totally  09:56

16  irrelevant and speculative.

17         **THE COURT:**  Rephrase, Counsel.  Lay a foundation for

18  the question.

19  **BY MR. TOBEROFF:**

20  Q    You would agree that outside of people who are comic book  09:57

21  fans, most people would not know the comic titled *Metal Men*?

22  A    Yeah, I would agree with that.

23  Q    Now, this delay on *Metal Men*, from 9-21-04, when it was

24  originally pitched, to May 2, 2006, when you were asking

25  permission to take it to another studio, is this the type of   09:57

```
 1   delay you were referring to when you wrote in your first annual
 2   status report we previously reviewed, Plaintiffs' Exhibit 187,
 3   where you wrote in November 2004 that the most important part
 4   of the process is the ability to extract properties from the
 5   studio in a timely manner?                                        09:58
 6   A    No.  I mean, you know, with Metal Men, Adam Strange, it
 7   was really -- the length of time had to do with getting the
 8   pitch right, finding the right writers, finding the right
 9   creative auspices.  That's why you have that kind of length of
10   time.  I'm trying -- when I wrote the memo, we are trying to     09:58
11   figure out, you know, what a formal process would be that would
12   be efficient, in terms of informing the studio, 'Okay, we feel
13   we've run our course on this one; let's move on.'  That was --
14   you know, when I started my job, it was one of these evolving
15   kinds of things that I had to figure out.                        09:59
16   Q    We spoke about Metal Men.  Regarding the other properties
17   in Exhibit 191, Kid Eternity, Adam Strange, Doctor Thirteen,
18   Ghost Breaker, et cetera, these properties are nowhere near in
19   the league of a Superman, a Batman, a Wonder Woman; correct?
20   A    Yeah, that's correct.                                       09:59
21   Q    And do you agree that with respect to the other properties
22   here, outside the cadre of a comic book fan, these titles are
23   not well known?
24   A    That's generally correct, yes.
25   Q    I'd like to now show you what has been previously admitted  10:00
```

```
 1    as Plaintiffs' Exhibit 92.  If you would turn to the last page

 2    of this document, Bates No. DCC-88439, the document closes by

 3    saying, "Thank you for your time and consideration.

 4    Gregory Noveck."

 5              Do you see that?                                        10:00

 6    A    Yes, I did.

 7    Q    You drafted this document as well?

 8    A    That's correct.

 9    Q    This document also reads like a presentation.

10              Was this simply a written presentation in the form of  10:00

11    this document, or was it an oral presentation?

12    A    This was a written presentation.

13    Q    And it was a presentation to Paul Levitz as well?

14    A    That is correct.

15    Q    In the first paragraph, third sentence, on Page 1,          10:01

16    Bates No. 88435, you describe Superman as a core DC property;

17    correct?

18    A    I'm looking for the sentence here.

19              Third sentence?

20    Q    Third sentence, first paragraph.                            10:01

21              It reads, "Another argument is that they are

22    continually updating and judiciously exploiting our core

23    properties, i.e. Batman, Superman, et cetera."

24    A    Correct.

25    Q    Now, DC's two most important properties are Batman and      10:01
```

1  Superman; correct?

2  A    It depends on what you mean by "important."  It's

3  certainly up there.  I would add Wonder Woman to that

4  triumvirate.

5  Q    Okay.                                                          10:02

6         Now, if you move to Paragraph 2 on Page 1, you

7  describe Superman as a "big brand."

8         Do you see that?

9  A    On the same page, where it says, "We are now only in

10 preproduction"?                                                     10:02

11        **THE COURT:**  It's blocked off a little bit,

12 unfortunately.

13 **BY MR. TOBEROFF:**

14 Q    I'm sorry.  It's the second paragraph.  It says, "First,

15 let us deal with the big brands"; and then it says Batman and    10:02

16 then Superman.

17 A    Oh, I see where you're saying.  Okay.

18        **THE COURT:**  I'm sorry, Counsel.  I'm not there yet.

19        What page?

20        **MR. TOBEROFF:**  Bates No. 88435, the first page of the    10:02

21 document, second paragraph, "First, let us deal with the big

22 brands."

23        **THE COURT:**  Okay.  Yes.  That intro line.

24 **BY MR. TOBEROFF:**

25 Q    By "big brand," I assume that you mean that due to the        10:03

```
1    long-term commercial success of Superman, it's name alone

2    evokes a great deal of preawareness in the public.

3    A    Yeah.  I also had Constantine on this list, I think, at

4    that time.

5    Q    Now, also in the first paragraph, on Page 1, the sixth          10:03

6    sentence from the bottom of the paragraph begins with, "The

7    below is with...".

8         You state, "The below is with the understanding that

9    we would distribute through WHV, but that we would be in charge

10   of controlling content.  In fact, for this to work at all, I      10:04

11   would suggest that DC have control over its own pipeline."

12        Do you see that?

13   A    Yes.

14   Q    "WHV" refers to Warner Home Video?

15   A    That is correct.                                              10:04

16   Q    And Warner Home Video, the correct name for the company is

17   Warner Home Entertainment?

18   A    Good question.

19   Q    This proposal refers to made-for-DVD programming?

20   A    Yes.  Correct.                                                10:04

21   Q    As opposed to a theatrical feature film?

22   A    That's correct.

23   Q    Why is it in DC's economic interest to control its own

24   content?

25   A    Well, you can make an argument either way whether it's in     10:04
```

193

```
 1   our economic interest.  I firmly always believed it's in our
 2   creative interest, you know; someone who's passionate about the
 3   properties and wants to see them done right.  I will, to my
 4   detriment, often argue that we should be, you know, as
 5   in-charge of the process as humanly possible.              10:05
 6   Q    You refer to Superman and Batman and other top DC comics
 7   as "big brands."
 8   A    Uh-huh.
 9   Q    Isn't it also in the economic interest of DC to protect
10   those brands?                                              10:05
11   A    Yeah, absolutely.
12   Q    And to help protect those brands by exercising some
13   creative control to make sure that Superman, Batman, and some
14   of the other characters are being portrayed consistent with a
15   DC comic?                                                  10:05
16   A    Yeah, absolutely.  To have input, yes.
17   Q    I'd like to talk to you for a moment about DC's comic
18   Justice League of America.
19          In addition to Superman, what other DC characters are
20   in the Justice League?                                     10:06
21   A    Well, I mean, a lot.  But if you look at the core seven,
22   you're talking about Superman, Batman, Wonder Woman, Aquaman,
23   Hawkman, Green Lantern, and The Flash.
24   Q    I'd like to mark for identification, as Plaintiffs'
25   Exhibit 334, an oversized DC comic book entitled JLA: Secret  10:06
```

```
 1   Origin.

 2          MR. BERGMAN:  Objection, Your Honor.  This was not on

 3   the exhibit list.

 4          MR. TOBEROFF:  Your Honor --

 5          THE COURT:  Was it, Counsel?                          10:06

 6          MR. TOBEROFF:  No, it's not on the exhibit list.  I'm

 7   just using it as a visual aid so I can ask him questions about

 8   who these characters are, so we get a sense of what they look

 9   like.

10          THE COURT:  Have you had a chance to look at it,       10:06

11   Counsel?

12          MR. BERGMAN:  No, I haven't, Your Honor.

13          THE COURT:  Why don't you look at it.

14          MR. TOBEROFF:  I'm really just focusing on the first

15   page of the document, the cover.                             10:06

16          MR. BERGMAN:  I have no objection to the cover,

17   Your Honor.

18          THE COURT:  Very good.  It's kind of a cool cover.

19          Fair enough.

20   BY MR. TOBEROFF:                                             10:07

21   Q    Mr. Noveck, have you seen this DC comic before?

22   A    Yes.

23   Q    "JLA" stands for Justice League of America?

24   A    That's correct.

25   Q    In order to date this, we would just need to turn to the 10:07
```

```
 1   last page.  It's dated November 2002.  Actually, it must be the
 2   third to the last page.  Excuse me.
 3            It says, "JLA: Secret Origin, November 2002."
 4            Do you see that?
 5   A    Yes.                                                          10:08
 6   Q    That's approximately when this was published?
 7   A    I wasn't there at the time.
 8   Q    Do you believe, by that date and your experience in comic
 9   books, that this was approximately when this was published?
10   A    Yeah.  But I don't know if the book was a collection or     10:08
11   not.  But that's probably right.
12   Q    I'd like to go through these characters with you.
13            The big guy front and center is obviously Superman.
14            On either side of him is Batman and Wonder Woman;
15   correct?                                                          10:08
16   A    That's correct.
17   Q    As we descend, on the right is the character Flash.
18   A    Correct.
19   Q    And on the left is the character Aquaman.
20   A    That's correct.                                              10:08
21   Q    And then further down the line on the right is the
22   Green Arrow.
23   A    Uh-huh.
24   Q    And on the left is the character Black Canary.
25   A    That's correct.                                              10:09
```

1  Q    Now, behind Batman, in the background, is that the

2  Green Lantern?

3  A    Yeah, just above Batman's head.

4  Q    Who are the smaller characters in the background, if you

5  can identify them for me?                                    10:09

6  A    Above Flash's head is Plastic Man.  Above him is

7  Martian Manhunter.  Standing on Superman's shoulder is

8  The Atom.  Flying above Wonder Woman is Hawkman.  Hawkgirl is

9  kind of above Aquaman's head.  And to the extreme left, you

10 have Captain Marvel/Shazam.                                  10:09

11 Q    Together, do these characters comprise DC's better-known

12 characters?

13 A    Yes.  I mean, there are others as well; but, yeah, it's a

14 good selection.

15 Q    Now, none of these characters are the basis for film or    10:09

16 TV projects and development at any studio other than

17 Warner Bros.; is that correct?

18 A    Well, Captain Marvel had been at New Line for a long time.

19      Other than that, that's correct.

20 Q    When was Captain Marvel at New Line?                     10:10

21 A    I don't know the exact date under which it started being

22 an option, but it continued up until New Line was folded into

23 Warner Bros. recently.

24 Q    New Line was a Time Warner entity that has since been

25 folded into Warner Bros.; correct?                           10:10

```
 1   A     I believe that's correct.

 2             MR. TOBEROFF:  Your Honor, I'd just like to offer

 3   this into evidence, just for the cover, as a visual aid, to

 4   track his testimony.

 5             MR. BERGMAN:  No objection to the cover, Your Honor.      10:10

 6             THE COURT:  Very well.

 7   BY MR. TOBEROFF:

 8   Q     I'd now like to show you what's been previously admitted

 9   as Plaintiffs' Exhibit 189.  Exhibit 189 is a memo dated

10   August 12, 2005, from DC Comics to a number of different          10:11

11   executives.

12             Do you see that in the two column, third line down,

13   you are listed as one of the recipients of this document?

14   A     Yes, I do.

15   Q     Do you have any reason to believe you did not receive this  10:11

16   document?

17   A     No.

18   Q     Do you receive these media status reports periodically?

19   A     Yes.

20   Q     I'd also like to show you a second media status report,     10:12

21   which has been admitted as Plaintiffs' Exhibit 190.

22             Do you help produce these media status reports?

23   A     I do, generally.

24   Q     I'm sorry?

25   A     Yes, generally, I do.                                       10:12
```

1   Q    I'd like to go through with you some of the Warner Bros.

2   executives that appear in the two column, and ask for you to

3   identify, as best you can, who they are, and what their

4   position is at Warner Bros.

5            Barry Meyer?                                              10:12

6   A    I think he's a co-CEO or COO of Warner Bros.

7   Q    Alan Horn.

8   A    The other co-CEO or COO of Warner Bros.

9   Q    Jeff Robinov?

10  A    I forget the official title, but essentially, president of   10:13

11  production of the theatrical group.

12  Q    Peter Roth?

13  A    Head of Warner Bros. Television.

14  Q    Kevin Tsujihara?

15  A    Head of Warner -- I guess that would be Warner Home          10:13

16  Entertainment.  But certainly, all home video and games and

17  things like that.

18  Q    And he used to be in charge of new media?

19  A    I believe that's correct.

20  Q    Bruce Rosenbloom?                                            10:13

21  A    Head of television, above Peter Roth, I believe.

22  Q    Patty Conley?

23  A    Warner Bros. legal.

24  Q    Now, on Page 2 of the document, New Line Cinema is

25  referenced.                                                       10:14

```
 1              At the time this was written, New Line Cinema had not

 2    yet been absorbed into Warner Bros., but was a company owned by

 3    Time Warner; is that correct?

 4    A    I believe that's correct.

 5    Q    I'd like to show you what's been previously admitted as        10:14

 6    Plaintiffs' Exhibit 278.  It's a document entitled

 7    "Warner Bros. Brand Council, Introduction to the DC Brands";

 8    and it's dated May 2003.  I'd like to draw your attention to

 9    Page 16 of the document; it's Bates No. DCC-88490.

10              Do you see the DC logo in the center, and that it's      10:15

11    surrounded by various Warner Bros. companies?

12              These are all of the entities in Warner Bros. that DC

13    works with to exploit DC's properties; correct?

14              MR. BERGMAN:  Objection.  Lack of foundation.  No

15    indication of when --                                              10:15

16              THE COURT:  Sustained.  Lay a foundation.

17    BY MR. TOBEROFF:

18    Q    You work as a liaison between DC and Warner Bros.;

19    correct?

20    A    And the rest of the town; correct.                           10:15

21    Q    And in that capacity, you work with various different

22    divisions at Warner Bros.; correct?

23    A    Correct.

24    Q    And this document shows the number of different divisions

25    of Warner Bros. that you work with in your capacity as VP         10:15
```

```
 1   creative affairs for DC.
 2   A    Yes.  Though I would point out that New Line Cinemas was
 3   not at the time a Warner Bros. Entertainment company.  It was a
 4   Time Warner company.
 5           THE COURT:  At what time?                                  10:16
 6           THE WITNESS:  I think whenever this was generated, in
 7   2003.
 8           MR. TOBEROFF:  May of 2003.
 9           THE COURT:  When did New Line become part
10   of Warner Bros.?                                                   10:16
11           THE WITNESS:  Within the last nine, ten months.
12   BY MR. TOBEROFF:
13   Q    But at this time, it was a part of Time Warner; correct?
14   A    That's correct.
15   Q    Do you know how long New Line was a part of Time Warner?      10:16
16   A    No.  I want to -- I can't say specifically.  Sometime in
17   the '90s, but I could be wrong.
18           THE COURT:  So it's no longer part of Time Warner?
19           THE WITNESS:  I think it's been folded into
20   Warner Bros. Entertainment.  New Line is still a distinct         10:16
21   company.
22           THE COURT:  I'm sorry.  I'm confused.
23           Was it or was it not part of Time Warner --
24   Warner Bros. back in 2003?
25           THE WITNESS:  It was part of Time Warner in 2003.         10:17
```

```
 1            THE COURT:  Okay.
 2   BY MR. TOBEROFF:
 3   Q    Finally, I'd like to show you what has been previously
 4   admitted as Plaintiffs' Exhibit 306.
 5            This document, which was produced by DC, reflects all    10:17
 6   film and television deals based on DC properties as of
 7   December 8, 2008, the date in the lower left-hand corner of the
 8   document.
 9            Do you see that?
10   A    Yes.                                                          10:18
11   Q    Do you recognize this document?
12   A    Yes.  I mean, I don't know if it's this specific one that
13   I recognize, but I've seen documents like this.
14   Q    And do you participate in providing some of the
15   information that goes into a document like this?                  10:18
16   A    Yeah.  I mean, not on the deal stuff, but on the creative
17   aspect, yes.
18   Q    Now, if you go through this document, it shows that the
19   vast majority of DC's projects, based on its properties, are
20   set up at Warner Bros., or their contracts at Warner Bros.       10:18
21   covering those properties.
22            Does that comport with your experience?
23   A    Yes, generally.
24            MR. TOBEROFF:  Thank you.  I have no further
25   questions.                                                       10:19
```

1          **THE COURT:**  Cross examination?

2          **MR. BERGMAN:**  Thank you, Your Honor.

3                          **CROSS-EXAMINATION**

4    BY MR. BERGMAN:

5    Q    First of all, we see that you started at DC sometime in          10:19

6    2003.

7    A    Correct; late 2003.

8    Q    Could you describe to the Court what you were doing in the

9    entertainment industry before you came to DC.

10   A    My background has been as a creative executive and a           10:19

11   producer since I came to L.A. in '91.  I started off as an

12   assistant many years ago and worked my way up, and worked with

13   various production companies.

14   Q    Could you identify the companies that you worked with.

15   A    Sure.                                                          10:19

16          I started off at CBS in 1992.  I was then at a

17   company called Reeves Entertainment.  '93ish, I worked at a

18   company called Gaumont, a French company, production company.

19   I was at a company called Rysher and a company called

20   Platinum Studios for a while.  And then just prior to being at     10:20

21   DC Comics, I was with Silver Pictures.

22   Q    What were your duties at CBS?

23   A    I was an assistant in business affairs at the time.

24   Q    Business affairs with respect to television?

25   A    Correct.  That's correct.                                      10:20

Wednesday, April 29, 2009                    Trial Day 2, AM session

1   Q    While you were at CBS in business affairs, did you

2   encounter any television series where CBS paid a portion of

3   gross to the licensor?

4          **MR. TOBEROFF:**  Objection, Your Honor.  This is

5   outside of the scope of direct testimony.                    10:20

6          **THE COURT:**  Counsel?

7          **MR. BERGMAN:**  I believe it's related, Your Honor, to

8   what the witness testified to in direct.  I'm just trying to

9   establish his background and the parameters of the projects

10  that he dealt with.                                           10:21

11         **THE COURT:**  I'll give you some leeway.

12         **THE WITNESS:**  It was a long time ago, but I don't --

13  if we're talking licensor in terms of underlying rights, I

14  don't remember any deals like that.

15  **BY MR. BERGMAN:**                                           10:21

16  Q    Okay.  And what did you do at Gaumont?

17  A    At Gaumont, I ran television for Gaumont in the U.S.

18  Q    And when you say you ran television, did you make pitches

19  to different studios?

20  A    Yes, studios; and television producers and networks.    10:21

21  Q    When you came over to DC, was the position that you were

22  given a new position for DC?

23  A    Yes.  That's my understanding.

24  Q    Okay.

25         Had anyone at DC been doing the activities that you    10:22

```
 1  were charged with doing before you arrived?
 2  A    My understanding was that prior to my arrival, Paul Levitz
 3  was doing the majority of what I was doing, in that capacity.
 4  Q    Okay.
 5           And how would you characterize the objective of what      10:22
 6  you were assigned to do when you came to DC?
 7  A    You know, the objective was really to expose the vast
 8  majority of our properties to the creative community, and to
 9  create an efficiency of communication between the creative
10  community, DC, and the buyer.                                      10:22
11  Q    And by the "creative community," are you including
12  entities and producers outside of the Time Warner family?
13  A    Sure.  Absolutely.
14  Q    Mr. Toberoff kept referring to you and asking you whether
15  you were acting as a liaison between DC and Warner Bros.           10:23
16           What was your particular function?  What was it that
17  you were supposed to do when it came down to Warner Bros.?
18  A    Well, I work for DC, so my job is to develop, package, and
19  sell DC Comics' properties, in film, television, animation,
20  what have you; so, you know, my job is to pitch Warner Bros.       10:23
21  executives and other executives and producers and writers and
22  directors and try to get them as excited about the properties
23  as I am.
24  Q    So would it be accurate to say that your job for DC is to
25  pitch projects to Warner Bros. and to other production            10:23
```

1   entities?

2   A    Yeah, that's accurate.

3   Q    How many properties would you estimate DC has available

4   for production as either a television show or a motion picture?

5   A    Available for development?  My guess is thousands.                    10:24

6   Q    And without going into details, because I'm not sure if we

7   have a closed courtroom, are you presently involved in any

8   activities in which you are pitching television shows or

9   motions pictures to studios and producers other than

10  Warner Bros.?                                                              10:24

11  A    Yes.

12        THE COURT:  Counsel, don't be too concerned.  Besides

13  your people from Warner Bros., that's my parents in the

14  background.

15        MR. BERGMAN:  Very well, Your Honor.                                 10:24

16        THE COURT:  Not to worry.

17  BY MR. BERGMAN:

18  Q    If you could, could you identify some of those projects.

19  A    Sure.

20        We have a project called Red that's set up at Summit              10:24

21  Entertainment.

22  Q    And is that a feature motion picture?

23  A    That would be for a future motion picture, hoping to go

24  into production this summer.

25  Q    And that company has -- does it have any relationship with        10:25

1  Warner?

2  A    Not to my knowledge.  Not any more than any other studio

3  would.

4  Q    Any others?

5  A    We have a project called Uncle Sam and the Freedom                10:25

6  Fighters that we're trying to get set up at Disney.  We have a

7  project called Welcome to Tranquility that we're working on

8  with a couple of outside producers.  We have a project called

9  The Demon, which we're working on.

10        There's a couple of dozen, probably, that we're in          10:25

11  the process of either developing with outside producers or

12  trying to talk to other studios about, predominantly on the

13  feature film side.

14  Q    In terms of delay, when you pitch a project -- and am I

15  correct that pitching means trying to sell?                         10:26

16  A    Correct.

17  Q    Okay.

18        In terms of delay, do you find that there is

19  frequently, at any studio, with any producer, a significant

20  delay from the time of your pitch until the time you get a         10:26

21  final answer one way or the other?

22  A    Absolutely.  I mean, yeah.

23  Q    Can that length of time at studios and producers, other

24  than Warner Bros., exceed a year?

25  A    Yeah.  I think so.                                              10:26

1  Q    Has it, in fact, in the past?

2  A    Yes.  What happens is that a studio exec will say, 'I like

3  it, but I don't know if I can sell it internally,' or 'I don't

4  like this aspect,' or 'Can you find a different writer?'  So

5  you're basically kind of unofficially working with that                    10:26

6  executive to get the project to a point where they feel they

7  can buy it.

8          And that's the same at every studio, because it's one

9  of those things where you feel like you kind of have a fish on

10 the hook, so you're hoping to reel it in; so you kind of focus           10:27

11 your energies in that direction.  Sometimes it takes a really

12 long time.

13 Q    Has the first-look relationship between DC and

14 Warner Bros. helped or hindered you in the performance of your

15 responsibilities?                                                          10:27

16 A    I think it's helped.  We have a massive amount in

17 development.  We have a lot that's, you know -- it's helped, in

18 every aspect.

19         **MR. BERGMAN:**  Thank you.

20         I have nothing further, Your Honor.                               10:27

21         **THE COURT:**  Plaintiff, redirect?

22                   **REDIRECT EXAMINATION**

23 BY MR. TOBEROFF:

24 Q    Previously, we spoke about a statement you had made, that

25 one of your goals is to have the ability to extract projects            10:27

```
 1   from Warner Bros. in a timely manner.
 2            Do you recall that?
 3   A    Yes.
 4   Q    Has your ability to do that improved since the time you
 5   wrote that memo?
 6   A    Yes.
 7   Q    And as a result of that, when you were speaking about
 8   current projects you have in development, you've been able to
 9   set more projects up at other studios.
10   A    Yes.
11   Q    But previously, when you wrote the memo in 2004, it was a
12   greater problem than it is today, since you just said that the
13   problem improved.
14   A    It wasn't a problem.  It was just a process that needed to
15   be launched.  When I wrote that memo, I was in the first year
16   of my job, so I spent a lot of it just learning the parameters
17   of DC Comics and what our properties were and what was
18   available that we had; so I wouldn't categorize it as a problem
19   so much as let's understand what -- let's create a process
20   whereby we can do this.
21   Q    One of the reasons you want to extract a property in a
22   timely manner from Warner Bros. is because you have a writer or
23   a director attached to that project; correct?
24   A    Not necessarily, no.  I mean, it's really about whether
25   the property -- whether we think that the studio will buy the
```

10:28
10:28
10:28
10:29
10:29

```
1   property, whether or not they've indicated that they really

2   have interest in it or not.  Sometimes we may have an element

3   with which we've developed a pitch, and sometimes it's just a

4   clean property.

5   Q    But on some of the projects, you do have attachments of        10:29

6   writers or directors.

7   A    When we're pitching to -- under our first-look deal, we

8   don't officially attach creative elements.  We may be working

9   with people, but it's not like an official attachment.  If we

10  extract the property, if we get a pass from the studio and we        10:29

11  choose to go elsewhere, then we may at that time decide to

12  officially attach a producer or a director or what have you.

13  Q    Now, you've worked at producing or setting up film

14  projects or TV projects prior to your work at Warner Bros.;

15  correct?                                                             10:30

16  A    That's correct.

17  Q    And have you worked in situations where you didn't have an

18  obligation for a studio to first pass on the project before you

19  could take it elsewhere?

20  A    Yes.                                                            10:30

21  Q    In that situation, when you incur a delay of a year or two

22  years, when a studio is still making up its mind, you would go

23  to other studios to see if they're interested; correct?

24  A    You would generally do it right at the beginning, and then

25  you'd sort of -- you'd end up at one place and you would keep        10:30
```

Wednesday, April 29, 2009                     Trial Day 2, AM session

```
 1   working with that person.
 2   Q    But you wouldn't wait two years for one studio to make up
 3   its mind before you would approach another studio with a
 4   project; correct?
 5           MR. BERGMAN:  Objection, Your Honor.  Incomplete          10:30
 6   hypothetical.
 7           THE COURT:  Sustained.  Rephrase.
 8   BY MR. TOBEROFF:
 9   Q    In a situation when you were pitching projects in the open
10   market, and one studio was waiting two years to pass on a        10:31
11   project, you would go to other studios to see if they were
12   interested; correct?
13           MR. BERGMAN:  Same objection, Your Honor.
14           THE COURT:  What elements are missing, Counsel?
15           MR. BERGMAN:  We're missing who are the actors, what     10:31
16   is the property, what is the interest of the studio, if the
17   studio --
18           THE COURT:  I guess what it is, it's too broad a
19   question, Counsel.
20           MR. TOBEROFF:  He spoke broadly about his experience     10:31
21   at five different companies, pitching projects, developing
22   projects; and I'm talking about his general experience when he
23   is not subject to a first-look deal or an obligation for one
24   studio to pass on a project before he can take it to another
25   studio.  I'm asking, in that instance, when he's not subject to  10:32
```

```
 1   that obligation, would he or would he not wait two years before

 2   offering it to other studios in the open marketplace.

 3          THE COURT:  It's too broad a question, Counsel.

 4   BY MR. TOBEROFF:

 5   Q   On the project Red that you mentioned that is set up in          10:32

 6   another studio, Warner passed on that project.

 7   A   Yes, they did.

 8   Q   You were obligated to pitch it to Warner Bros. before you

 9   could set it up at another studio.

10   A   Under the terms of the first look, yes.                          10:32

11          MR. TOBEROFF:  No further questions.

12          THE COURT:  Anything further?

13          MR. BERGMAN:  Nothing further, Your Honor.

14          THE COURT:  You're excused, sir.  Thank you.

15          Plaintiffs' next witness?                                     10:32

16          MR. TOBEROFF:  Plaintiffs call Paul Levitz.

17          THE CLERK:  Do you solemnly state that the testimony

18   you may give in the cause now pending before this court shall

19   be the truth, the whole truth, and nothing but the truth, so

20   help you God?

21          THE WITNESS:  I do.

22          THE CLERK:  Please state your full name and spell

23   your last name for the record.

24          THE WITNESS:  Paul Levitz, L-e-v-i-t-z.

25   / / /
```

1                          **DIRECT EXAMINATION**

2       **BY MR. TOBEROFF:**

3       Q      Good morning, Mr. Levitz.

4              You currently serve as the president and publisher of

5       DC Comics.                                                              10:33

6       A      I do.

7       Q      And how long have you worked at DC Comics?

8       A      Depending on how you measure it, about 36 years.

9       Q      You were deposed in this action on November 6th and

10      November 7th, 2006; correct?                                            10:34

11      A      I don't remember the dates, but I remember the deposition.

12      Q      In my offices.

13      A      Correct.

14      Q      At that time you testified under oath, just as you're

15      testifying under oath here today; correct?                             10:34

16      A      Yes, sir.

17      Q      As president of DC Comics, you report to Alan Horn at

18      Warner Bros.

19      A      That's correct.

20      Q      I'd like to now show you what's been admitted as              10:34

21      Plaintiffs' Exhibit 254.

22             Exhibit 254 is a document produced by your company,

23      DC Comics, in this case.  It's untitled.  The document states,

24      "Since his debut in 1938, DC has made *Superman* the star of more

25      original media exposure than any other cartoon character."            10:35

Wednesday, April 29, 2009                    Trial Day 2, AM session

```
 1              Did I read that correctly, Mr. Levitz?
 2    A    No.  Actually it says "original major media exposure";
 3    but, yes, the rest is the same.
 4    Q    Thank you.
 5              I'd like to now show you what's been previously     10:35
 6    admitted as Plaintiffs' Exhibit 278.
 7              THE COURT:  How long have you been president of
 8    DC Comics?
 9              THE WITNESS:  I've had this title since 2002.
10              THE COURT:  What were you before that?           10:35
11              THE WITNESS:  I started at the company on the
12    editorial side as a freelance writer; I was an assistant
13    editor; editorial coordinator, which was basically sort of the
14    administrative side of the creative publishing; manager of
15    business affairs; vice president of operations; executive vice  10:35
16    president; and then executive vice president and publisher for
17    about 16 years prior --
18              THE COURT:  To becoming president.
19              THE WITNESS:  Yes.
20    BY MR. TOBEROFF:                                          10:36
21    Q    Mr. Levitz, I neglected to ask you.  When did you start
22    working at DC Comics?
23    A    Unfortunately, it kind of depends on your definition of
24    work.  I began freelancing for them in December 1972; I began
25    doing some part-time per diem work before that in July of 1973;  10:36
```

Wednesday, April 29, 2009                    Trial Day 2, AM session

1    and I became a regular employee of the company in March of

2    1976.

3    Q    Turning to Plaintiffs' Exhibit 278, it's the document

4    entitled "Warner Bros. Brand Council Introduction to the DC

5    Brand, May 2003."                                                    10:36

6           Have you ever seen this document before?

7    A    I'd have to look at it to familiarize myself to see if I

8    remember.  If you would like me to, I will.

9           Yes.  I believe I remember this document when we

10   produced it.                                                         10:37

11   Q    On Page 11, Bates No. DCC-88485, it states, "Superman is

12   the most successful comics character ever."

13          Do you see that?

14   A    Yes.

15   Q    If you could turn to Page 11 of the document.                   10:38

16   A    That is Page 11.

17   Q    Excuse me.

18          In the middle of the same page, Page 11, it states

19   "From the 1939 radio show to the current *Smallville* TV series,

20   a virtually uninterrupted six decades as a major media and          10:38

21   licensing property."

22          Do you see that?

23   A    Yes.

24   Q    Is Warner Bros. statement accurate -- or DC's statement?

25   A    I believe it was DC's statement, and I believe that to be      10:38

1   accurate.  It depends on how you define an interruption; there

2   obviously are some small gaps in those decades.

3   Q    I'd like to show you what's been previously admitted as

4   Plaintiffs' Exhibit 150.

5   A    Yes.                                                          10:39

6   Q    This document is entitled "Superman Returns Press Junket,

7   dated June 9, 2006, round table interview with Paul Levitz."

8         Do you recall giving this interview, Mr. Levitz?

9         **MR. BERGMAN:**  Objection, Your Honor.  The document is

10  hearsay and irrelevant.                                           10:39

11        **THE COURT:**  Let's lay a foundation first of all, and

12  then I'll look at what it's being introduced for.

13        **MR. TOBEROFF:**  Your Honor, defendants have stipulated

14  to the admission of this document; in the objection column,

15  they write "none."                                                10:39

16        **THE COURT:**  Let's make sure this witness has some

17  understanding about what this document is, counsel.

18  **BY MR. TOBEROFF:**

19  Q    You recall giving this interview; correct?

20  A    I'm not familiar with the document, I'm afraid, offhand;     10:40

21  but I participated in the press junket for *Superman Returns* and

22  in the course of that junket, there was what was called a round

23  table interview with a group of press.

24        **MR. BERGMAN:**  Excuse me --

25        **MR. TOBEROFF:**  And that occurred on about June 9,        10:40

1    2006.

2            **THE COURT:**  Counsel, this is a statement of a party

3    opponent.  This is his statement.  There's not a hearsay

4    objection to it.

5            **MR. BERGMAN:**  I just wanted to correct something,                    10:40

6    Your Honor.  I just looked at Exhibit 22 in the right-hand

7    corner, and that was something we had objected to.  I didn't

8    notice that we were up to 150.

9            My apologies to the Court and to counsel.

10           **THE COURT:**  No worries.                                              10:40

11           You may proceed, counsel.

12           **MR. TOBEROFF:**  No problem.  Thank you.

13   **BY MR. TOBEROFF:**

14   Q    On page Bates No. 1898, if you would turn to that page,

15   please.                                                                         10:41

16   A    Yes.

17   Q    The press asked you the question:  "I realize you are

18   prejudiced, but you're also a guy who can answer this question.

19   Why is the character worth six films, cartoon series, TV

20   series, comic books, everything else, enduring?"                               10:41

21           Now, the press is referring to *Superman*; correct?

22   A    I would assume so.  We're in the middle of a *Superman*

23   *Returns* junket.  I'm rereading it now.

24   Q    And your answer is "I think there's a prejudice and an

25   objective answer.  If you look back over the last 65 years or                   10:41

```
 1   so, I guess Superman has now been out 67 years.  Out of those
 2   67 years, there have only been about 15 where there has not
 3   been a new Superman creative work in whatever the dominant
 4   media of the time was.  He was a radio show for 11 or 12 years;
 5   he was a television series for about 9; the serials; the          10:41
 6   theatrical cartoons.  Objectively speaking, you have at least
 7   three generations that love Superman when he had done well, and
 8   starting on the fourth."
 9          You gave this statement on or about June 9th;
10   correct?                                                           10:42
11   A    If it's dated that, that's a plausible date.  I don't
12   remember the date.
13   Q    But you have no reason to believe you did not make this
14   statement.
15   A    It sounds like me; it sounds like something I would say; I    10:42
16   would assume it's mine.
17   Q    Now I'd like to show you what has been admitted as
18   Plaintiffs' Exhibit -- pardon me.
19          Do you agree, Mr. Levitz, without equivocation that
20   Superman is an enduring cultural icon of extraordinary value;      10:42
21   is that correct?
22   A    Absolutely.
23   Q    Now I'd like to show you Plaintiffs' Exhibit 228; it's
24   been admitted.
25          Exhibit 228 is a document produced by DC Comics             10:43
```

```
 1   entitled "Superman Brand Merchandising."  If you could turn to

 2   the page marked DCC-89115, it says, "1968 DC Joins the Family."

 3           Do you see that?

 4   A   Yes.

 5   Q   By the family, it's referring to the Warner Bros. family;   10:44

 6   correct?

 7   A   Yes.

 8   Q   Now if you would turn to Page 89116, it states, "DC today

 9   is a pivotal part of Time Warner and Warner Bros."

10           Do you see that?                                        10:44

11   A   I do.

12   Q   Now please turn to Page 89142.  It reads "Combined power!

13   Brands That Drive a Billion Dollars of Time Warner Sales in

14   2005 alone."

15           Now, this is referring to DC's brands; correct?        10:45

16   A   I believe so.  I've not reread the document, but if I'm

17   recognizing it correctly.

18   Q   Or DC's characters or properties; is that right?

19   A   Yes.

20   Q   Mr. Levitz, are you aware of the Internet site Newsarama?   10:45

21   A   Yes.

22   Q   Do you recall being interviewed by Newsarama?

23   A   I've been interviewed by Newsarama several times over the

24   years.

25   Q   I'd like to show you what's been previously marked for      10:46
```

1    identification only as Plaintiffs' Exhibit 8.

2           Plaintiffs' Exhibit 8 is a Newsarama interview with

3    you, dated January 1st, 2003, entitled "Looking Back and

4    Forward With Levitz."

5           Turn, please, to page Bates No. 1909.          10:47

6           **MR. BERGMAN:**  Objection, Your Honor.

7           Once again, this agreement post-dates any of the

8    agreements in question, and it's also hearsay.

9           **THE COURT:**  Well, if it's Mr. Levitz, it's an

10   admission of a party opponent; so it's not hearsay.       10:47

11          **MR. BERGMAN:**  Well, there's been no indication that

12   it's an admission against interests, Your Honor.

13          **THE COURT:**  The Court overrules the hearsay

14   objection.

15          As far as the relevancy objection, let me take a look    10:47

16   at what it is.

17          **MR. BERGMAN:**  Very well.

18   **BY MR. TOBEROFF:**

19   Q    Look at Bates No. 1909.  At the bottom of the page, you're

20   quoted by Newsarama as saying the following:  "We're coming to   10:47

21   a point where the interest in comics by other media is probably

22   higher than it has ever been.  Last year, comic book properties

23   did about twice the box office that they have ever done,

24   between the success of *Spiderman*, *Road to Perdition*, and *Men in*

25   *Black II*."          10:48

1           Do you see that?

2    A    Yes, sir.

3    Q    So by last year, since this was an interview dated

4    January 1st, 2003, you're referring to 2002; correct?

5    A    I believe that's correct.                                    10:48

6    Q    Do you have any reason to believe you did not make this

7    statement in Newsarama?

8    A    No.

9           **MR. TOBEROFF:**  Your Honor, I'd offer Plaintiffs'

10   Exhibit 8 into evidence as admission of a party opponent.  It     10:48

11   is an admission to the extent that plaintiffs are alleging here

12   that at the time the Superman agreements were entered into in

13   2002, comic book properties were considered extremely "hot" in

14   the entertainment industry, particularly by the movie business.

15          **MR. BERGMAN:**  Objection, Your Honor.  That is not      10:49

16   inconsistent with anything that Mr. Levitz has stated, and we

17   have not placed the dates --

18          **THE COURT:**  Counsel, this is going to be a real long

19   trial if you make these speaking objections.

20          Just state your objection.                                 10:49

21          **MR. BERGMAN:**  Yes, sir.

22          My objection is that it's hearsay; it's not an

23   admission against him.

24          **THE COURT:**  Overruled on those grounds.

25          **MR. TOBEROFF:**  Switching subjects now --               10:49

1          **THE COURT:**  And just for the record, that's the only

2     portion of Exhibit 8 that comes in is the statement that was

3     identified.

4          **MR. TOBEROFF:**  Thank you, Your Honor.

5     BY **MR. TOBEROFF:**                                                10:49

6     Q    I'd like to talk to you briefly about the *Superman* film

7     option purchase agreement that was entered into by DC Comics in

8     1974.

9          In 1974, DC Comics licensed its *Superman* film and

10    television rights to an independent producer named               10:49

11    Elia Salkind; correct?

12    A    No; That was Alexander Salkind's father who was running

13    the entity at the time.  Elia was a young man working with his

14    father.

15    Q    Thank you for that correction.                              10:50

16         I'd like to show you what's been previously admitted

17    as Exhibit 203.

18         **THE COURT:**  Counsel, we're going to take a brief

19    break for the court reporter at this time.  We'll resume at

20    11:00.                                                           10:50

21         (Whereupon a brief recess was held.)

22         **THE COURT:**  Counsel?

23         **THE CLERK:**  Mr. Levitz, please be advised you're

24    still under oath.

25         **THE WITNESS:**  Thank you.                                11:06

**BY MR. TOBEROFF:**

1

2  Q    I'd like to refer back to what we were just speaking

3  about, Exhibit 203, which is the agreement between DC Comics'

4  predecessor, National Periodicals Publications and Film Export

5  AG, dated November 6, 1974.                                          11:07

6          Mr. Levitz, have you seen this agreement before?

7  A    Yes.  This appears to be the original Salkind contract.

8  Q    And Film Export AG is Mr. Salkind's company; correct?

9  A    I would refer to it as that; he operated through a wide

10  variety of business entities and peculiar self-dealing            11:07

11  structures; so at different times, it's film export or

12  Cantharus or other entities.  But from a practical standpoint,

13  I would think of it as our deal with Alex Salkind.

14  Q    How would you characterize Mr. Salkind?

15  A    An entrepreneurial movie producer.                           11:08

16  Q    He's what you would call an independent movie producer.

17  A    He certainly -- he was not a part of any larger corporate

18  entity.  Independent producer, I think, is a term of art in the

19  movie business, and I'm not enough of a movie guy to

20  necessarily know if he would fully qualify.  But he was         11:08

21  certainly not affiliated with any larger corporate entity.

22  Q    Do you know whether at the time he entered into this

23  agreement he was affiliated with any particular studio?

24  A    I believe he was not.

25  Q    Now, before DC licensed *Superman* film and television      11:08

 1   rights to Salkind, DC had offered these rights to Warner Bros.;

 2   correct?

 3   A    I was not involved in that, but I believe that would be

 4   the case.

 5   Q    In 1974 when this agreement was entered into, DC was owned    11:08

 6   by Warner Communications?

 7   A    Correct.

 8   Q    I'd like to refer you back to the exhibit we previously

 9   discussed, Plaintiffs' Exhibit 150, the *Superman Returns* press

10   junket, dated June 9, 2006, in which you participated.    11:09

11   A    Yes, sir.

12   Q    If you go to the third paragraph from the bottom --

13   A    Which page, please.

14   Q    Bates number 1895 on the first page.

15   A    Yes.    11:09

16   Q    Could you read your response where it begins 'oh,

17   absolutely.'

18   A    Yeah.

19         'Oh, absolutely.  I have a lovely note in my file

20   somewhere from --    11:09

21         **THE COURT:**  Slow down, please; she has to take down

22   every word.

23         **THE WITNESS:**  'Oh absolutely.  I have a lovely note

24   in my file somewhere from Warner Bros. turning down producing

25   *Superman* in the early 1970s and saying, "go license it out to    11:09

```
 1   Alex Salkind; we don't think anyone will care," (laughter.)
 2   BY MR. TOBEROFF:
 3   Q    Do you recall making this statement?
 4   A    I'm sure I did.  I don't recall it.
 5   Q    Mr. Levitz, are you familiar with a recent Warner Bros.      11:10
 6   documentary that bears the DC logo regarding Superman which is
 7   entitled, "Look, Up in the Sky; The Amazing Story of Superman?
 8   A    I'm reasonably familiar with it.
 9   Q    And you were interviewed for this documentary; correct?
10   A    Yes.                                                         11:10
11   Q    I'd like to show you what's been marked for identification
12   only as Exhibit 303.  This documentary traces the history of
13   Superman from its origins in the 1930's up through 2006, with
14   the Superman Returns movie; correct?
15   A    I believe so.                                                11:11
16   Q    And DC provided information regarding Superman and also
17   provided Superman materials to the film makers who made this
18   documentary; correct?
19   A    Yes.
20   Q    And DC's and Warner Bros.' logo appears on the DVD of this   11:11
21   documentary; correct?
22   A    I would assume so.
23        Yep.
24   Q    And DC was provided with rough cuts of this documentary to
25   review it for accuracy before it was finalized; correct?         11:11
```

```
 1   A    We would be reviewing it for our brand management process
 2   which would address how we wanted the material to be portrayed.
 3   Q    The documentary was financed by Warner Bros.?
 4   A    Technically, I believe it might have been financed by
 5   Warner Home Video with one of its corporate entities, rather
 6   than Warner Bros. pictures or Warner Bros. corporately.  But
 7   I'm not sure.
 8   Q    But Warner Bros. Home Video is a division of Warner Bros.;
 9   correct?
10   A    I'm not sure how it is structured legally; functionally,
11   it is.
12   Q    And this Superman documentary was also distributed by
13   Warner Bros.
14   A    I believe the principal distribution of it was the home
15   video distribution.  It may have been distributed in some other
16   form by some other Warner Bros. entity.
17             THE COURT:  May I see that Exhibit?
18             THE WITNESS:  Sure.
19             THE COURT:  Thank you.
20             THE WITNESS:  We would probably have attempted to get
21   it distributed as widely as possible; so there may be many
22   other companies that contributed to the process.
23             MR. TOBEROFF:  Thank you.
24             Your Honor, I would just point out that we have
25   provided you with a copy in your bench book.
```

11:12
11:12
11:12
11:12
11:12

 1              **THE COURT:**  Thank you.  I just wanted to take a look.

 2    **BY MR. TOBEROFF:**

 3    Q    I'd like to show you now some clips from this Warner Bros.

 4    DVD.

 5              **MR. BERGMAN:**  Objection, Your Honor.  This document      11:13

 6    was produced beyond the court-mandated timeline.

 7              **MR. TOBEROFF:**  Your Honor --

 8              **THE COURT:**  In terms of -- you disclosed it as an

 9    Exhibit?

10              **MR. BERGMAN:**  Yes, Your Honor.                          11:13

11              **MR. TOBEROFF:**  That's incorrect, Your Honor.

12              **THE COURT:**  When was it produced?

13              **MR. TOBEROFF:**  We produced the document on January 7,

14    2009, and you had set a cutoff date of January 14, 2009; you

15    said after that, no other exhibits will be admitted.               11:13

16              **THE COURT:**  I recall that.  And you have a letter

17    indicating that it was produced on January 7th?

18              **MR. TOBEROFF:**  Yes, Your Honor, we do.

19              **THE COURT:**  Counsel, I'll certainly accept

20    Mr. Toberoff's proffer, unless there's a reason not to.            11:13

21              Are you suggesting it was produced some time after

22    that date?

23              **MR. BERGMAN:**  I believe so, Your Honor.

24              I believe that the 14th was the deadline for

25    Warner Bros. to produce; I don't believe it applied to             11:14

Wednesday, April 29, 2009                    Trial Day 2, AM session

```
 1    Mr. Toberoff.
 2            MR. TOBEROFF:  Your Honor, I believe it was dated
 3    with regard to both parties.  I don't see the --
 4            THE COURT:  Let's produce it.  I'll allow later the
 5    parties an opportunity later today to present the Court with      11:14
 6    the orders and the letters, and we can resolve this at that
 7    time.
 8            MR. BERGMAN:  Very well, Your Honor.  Thank you.
 9            THE COURT:  Counsel, proceed.
10            Why don't you meet and confer among yourselves,          11:14
11    because I'm hearing, 'I think,' or 'we think.'  Let's pin this
12    down.
13            Counsel, proceed.
14            MR. TOBEROFF:  We're playing clips from the video,
15    Your Honor.                                                       11:14
16            (Video clip plays.)
17            THE WITNESS:  I can't understand the audio.
18            (Video clip plays again. )
19            MR. TOBEROFF:  Now, we couldn't hear the sound at
20    some points.  At the 45-minute mark, the DVD states, "by the     11:18
21    1970's, the future looked bleak for the Man of Steel."  Also at
22    the 45-minute mark, the DVD states that Superman had become,
23    "by the 1970's, Superman had become 'a figure of fun.'"
24            Finally, at the 48-minute mark, it states that
25    "during the 1970's, one could not dispel the notion that         11:18
```

1    Superman's best years were behind him."

2    **BY MR. TOBEROFF:**

3    Q    Now, do you have any idea why the old note in your file

4    from Warner Bros. that you had previously referred to, turning

5    down Superman in the 1970's said, "go license it out to                    11:18

6    Alex Salkind.  We don't think anyone will care"?

7            **MR. BERGMAN:**  Objection.  All of those statements,

8    there's no indication who made them, when they were made.

9    There's no indication on the outside of the book and certainly

10   none in anything we've seen.                                                11:19

11           Who made those statements?

12           **THE COURT:**  I understand, Counsel.

13           The statement that is being asked about is the

14   statement that was made that he's already testified that he

15   believes that he may have made or did make.  That's the                    11:19

16   statement in evidence.

17           That's what he's being questioned about.

18           **MR. BERGMAN:**  And those are statements by Mr. Levitz?

19           **THE COURT:**  No, Counsel.

20           I'm not going to make the argument for you.  I'll let              11:19

21   you respond, Mr. Toberoff.

22           **MR. BERGMAN:**  Thank you.

23           **THE COURT:**  Clarify for the record and for counsel

24   what statement you're referring to.

25           There's only one statement in there that's being                   11:19

 1    attributed to this witness.

 2          MR. TOBEROFF:  I'm referring to the statement in your

 3    interview during the press junket where you mention you have an

 4    old note in your file from Warner Bros. turning down producing

 5    Superman in the early 1970s which says, "go license it out to        11:19

 6    Alex Salkind.  We don't think anyone will care."

 7          Do you have any idea now why Warner Bros. said this

 8    at this time?

 9          THE COURT:  That's the statement that's being

10    attributed to him.  Not the other statement.                        11:20

11          MR. BERGMAN:  I thought it was an earlier statement,

12    Your Honor.  I apologize.

13          THE COURT:  No worries.

14          You may answer the question, if you can.

15          THE WITNESS:  Thank you.                                       11:20

16          Because they were foolish creative executives.  Most

17    creative executives in film at some point or another in their

18    careers turn down properties that turn out to be terrifically

19    successful.  We have similar notes in the file for Batman, and

20    I suspect there would be an army of such notes available for        11:20

21    pretty much any property that's been around a long time.

22          MR. TOBEROFF:  I'd just like to show you a second

23    brief clip from the same Warner documentary regarding a 1975

24    late-night television special on ABC that Mr. Evanier referred

25    to in his testimony as having been financed or partly financed     11:21

```
 1    by DC.  It's entitled, "It's a Bird, It's a Plane, It's
 2    Superman."
 3              (Video clip plays. )
 4    BY MR. TOBEROFF:
 5    Q    When did you first learn about this documentary?        11:22
 6    A    I believe I watched it when it first aired.
 7            MR. TOBEROFF:  Your Honor, plaintiffs would like
 8    to -- actually before I do so -- when we took the deposition of
 9    Bryan Singer two years ago, we discussed at length this
10    documentary; he was the director of the documentary and he was   11:23
11    also the director of Superman Returns, and this documentary was
12    financed and distributed by Warner Bros. in conjunction with
13    its marketing of Superman Returns.  I'd like to offer this
14    documentary into evidence at this time.
15            MR. BERGMAN:  Objection.  Mr. Toberoff is purporting    11:23
16    to state what Mr. Singer stated.
17            THE COURT:  Counsel, if you're objecting there's no
18    foundation, just say that.  The Court understands what a
19    foundational objection is.
20            Sustained.                                              11:23
21            MR. BERGMAN:  Thank you.
22            MR. TOBEROFF:  My purpose was just to explain
23    something to address the prior objection regarding this
24    documentary in that --
25            THE COURT:  Counsel, the objection is sustained.       11:23
```

```
 1            You can bring in Mr. Singer; you can lay the

 2   foundation; we'll bring it into evidence if that foundation is

 3   laid.  Preferably we work these things out or we do not bring

 4   in needless witnesses.  But based on the record before me,

 5   there's no foundation.  And you cannot lay that by all of the      11:24

 6   explaining in the world.

 7            MR. TOBEROFF:  Your Honor, I'm not trying to

 8   introduce any evidence.  I was actually just trying to point

 9   something out to the Court about --

10            THE COURT:  I thought you were trying to move this        11:24

11   into evidence.

12            MR. TOBEROFF:  No.  I'm trying to move the

13   documentary into evidence, and in so doing, I just want to

14   point out, we had taken the deposition of Bryan Singer, and in

15   that deposition we thoroughly discussed the documentary to       11:24

16   point out that defendants have had notice that this documentary

17   was an issue in this case two years ago; that was the sole

18   reason I was pointing it out.

19            THE COURT:  I just gave an instruction about

20   five minutes ago for you to meet and confer during lunch to       11:24

21   discuss this and then come back if there was another issue.

22            We're not going to have this throughout the trial,

23   little interspersions like this.

24            MR. TOBEROFF:  I understand.  I apologize.

25            THE COURT:  Very well.  Move along.                       11:25
```

1          Your next question.

2    **BY MR. TOBEROFF:**

3    Q    I now turn to DC's Superman option purchase agreement with

4    Time Warner Entertainment, dated as of November 6, 1999.  And

5    for simplification, I'll refer to this as the *Superman* film                    11:25

6    agreement.

7          The *Superman* film agreement was previously admitted

8    as Plaintiffs' Exhibit 232.

9          Please turn to Bates number WB-4215.

10   A    Yes, sir.                                                                    11:26

11   Q    Is that your signature on this page?

12   A    Yep.

13   Q    This *Superman* film agreement between DC and Time Warner

14   Entertainment company essentially copied the basic financial

15   terms of the 1974 Salkind agreement, Exhibit 203, we discussed          11:26

16   previously.

17   A    The most critical terms, the contingent compensation, were

18   driven by the Salkind agreement.  The option structure

19   financially is somewhat different; and, of course, many of the

20   other elements were significantly different based on the                11:26

21   changes in the parties and the changes in the times.

22   Q    But the economic terms were substantially the same;

23   correct?

24   A    The most critical economic terms were the same.

25   Q    Now, Warner Bros. succeeded to the 1974 Salkind agreement          11:27

```
 1   in approximately 1993; correct?

 2   A    I'm not sure of the exact date, but that sounds like the

 3   right time.

 4   Q    The Salkind agreement, the 1974 Salkind agreement, was set

 5   to expire on November 5, 1999; correct?                              11:27

 6   A    Yes, I believe so.

 7   Q    That's why this *Superman* film agreement is dated as of

 8   November 6, 1999; correct?

 9   A    Yes.

10   Q    In November 1999, the *Superman* rights that had been           11:27

11   granted to Salkind were going to revert to DC at the end of the

12   Salkind agreement; is that correct?

13   A    Can you restate the question.

14   Q    If this option purchase agreement, dated as of November 6,

15   1999, had not been entered into, the *Superman* film and           11:28

16   television rights that had been licensed to Salkind would have

17   reverted to DC; correct?

18   A    Yes.

19   Q    At the time on or around the time that these rights were

20   going to revert, did you ask Warner Bros. for permission to        11:28

21   shop *Superman* outside Warner Bros. to another studio?

22   A    I did not ask Warner Bros. for permission, nor would I

23   have had to.

24   Q    Did you shop Warner Bros. at this time to another studio?

25            **THE COURT:**  You mean Superman.                          11:28
```

1          **MR. TOBEROFF:**  Superman, excuse me.

2          **THE WITNESS:**  No.

3    BY MR. TOBEROFF:

4    Q    Did you retain a top entertainment agency like Creative

5    Artist Agency or the William Morris Agency to represent DC with          11:28

6    respect to the licensing of *Superman* film and television

7    rights?

8    A    We never have; we do not think that's a useful strategy.

9    Q    Did you retain any agency at that time, any talent agency?

10   A    I think that's the same question.          11:29

11         We never have; we don't believe it's a useful

12   strategy.

13   Q    Did you retain any one of the entertainment law firms that

14   specialize in the negotiation of transactions with the studios

15   to assist you in your negotiations with Warner Bros.?          11:29

16   A    No.

17   Q    I'd like to talk to you briefly about the DC/Warner Bros.

18   relationship.

19         You're both part of one large corporation; correct?

20   A    Correct.          11:29

21   Q    And whether DC makes money or Warner Bros. makes money,

22   there's a beneficial effect to Time Warner; correct?

23   A    Correct.

24   Q    In such a relationship, cash does not transfer in the same

25   way as it does in the competitive open market, does it?          11:29

```
 1   A    I'm not sure what you mean by 'cash does not transfer.'

 2   Q    In your deposition, you made this statement.  I'd like to

 3   read to you a portion of your deposition.

 4   A    I'm just asking for clarification.

 5   Q    In the deposition, my question -- actually, I'd just like        11:30

 6   to provide the witness with a copy.

 7             THE COURT:  Very well.  You may.

 8             Where are you reading from?

 9             MR. TOBEROFF:  Page 300, line 19.

10   BY MR. TOBEROFF:                                                      11:31

11   Q    In my question on line 19, I refer to a question I asked

12   you by the press in an interview as follows:

13             Press:  "Are these economic windfalls for DC in the

14   same way as Marvel has generated a lot of revenue for itself,

15   or does it kind of fall under just Time Warner?"                     11:31

16             Do you see that?

17   A    Yes.

18   Q    And by 'economic windfall' they are referring to money

19   received for films like Superman Returns, Batman Begins.

20             Do you understand that?                                    11:31

21   A    Yes.

22   Q    And if you turn to your answer --

23             THE COURT:  Counsel, if you're going to read from the

24   deposition, read the entire question that is set forth in the

25   deposition; read the entire answer.  Don't just take excerpts        11:32
```

 1    out of it, just for the record.

 2              **MR. TOBEROFF:**  Thank you, Your Honor.  I'll reread

 3    it.

 4              **THE COURT:**  Indicate the page you're starting at, the

 5    line you're starting at, to the line that you're ending at and        11:32

 6    the line that you're ending at, and then read it.

 7              **MR. TOBEROFF:**  Okay.

 8    **BY MR. TOBEROFF:**

 9    Q    On Page 300, line 15.

10              QUESTION:  "Coming out or have come out based on DC          11:32

11    characters, *Superman Returns*, *Batman Begins*, *V For Vendetta*,

12    *Constantine*; and then on Page 1897, do you see where it says

13    "Press:  Are these economic windfalls for DC in the same way as

14    Marvel that's generated a lot of revenue for itself?  Or does

15    it kind of fall under just Time Warner?"                              11:32

16              Do you see where it says that?

17    A    Yes, sir.

18    Q    ANSWER:  "I do."

19              QUESTION:  "Your answer.  Well we're owned by

20    Time Warner, so it's all a piece of the same thing."                  11:33

21              "What do you mean by that statement?"

22    A    If a corporation --

23    Q    Excuse me.  I'm just reading from this.

24              ANSWER:  "I mean that as distinct from the Marvel

25    situation where they have separate stockholders and there's           11:33

Wednesday, April 29, 2009                    Trial Day 2, AM session

237

```
 1   cash accruing directly to the individual stockholders, and in
 2   many cases in the Marvel situation, individual directors for
 3   their particular participation, we're part of a large
 4   corporation, so it's a transaction between the units.  And
 5   whether DC makes money on something or Warner Bros. makes money        11:33
 6   on something, there's a beneficial effect for Time Warner that
 7   balances out.  Cash doesn't transfer in the same way."
 8           THE COURT:  What did you mean by 'cash doesn't
 9   transfer in the same way'?
10           THE WITNESS:  What I meant was that if you're dealing         11:34
11   with a transaction between unrelated parties, then if the money
12   doesn't get paid to Marvel, the owners of Marvel don't benefit
13   at all.  If you're dealing with two related entities,
14   regardless of whether DC is successful or Warner Bros. is
15   successful, the owner benefits, obviously.                            11:34
16   BY MR. TOBEROFF:
17   Q    I'll now show you Plaintiffs' Exhibit 223, previously
18   admitted.  Turn, please, to Page 5 of the document that is
19   Bates stamped WB-135035.
20   A    Yes, sir.                                                        11:35
21   Q    As well as Page 9, Bates stamp WB-135039 of the agreement.
22   A    Yes.
23   Q    Is that your signature?
24   A    Yes.
25   Q    I'd like to show you what's been previously admitted as         11:35
```

238

```
 1    Plaintiffs' Exhibit 174.  Exhibit 174 is a letter dated

 2    December 5, 2000, from Brett Paul to you.

 3              Who's Brett Paul?

 4    A    Brett Paul is a business executive with Warner Bros.

 5    television.                                                    11:36

 6    Q    He writes to you, "DC Comics and Warner Bros. television

 7    has agreed that in connection with the caption project in

 8    development as a prime time television series for the WB

 9    Network, the same financial conditions contained in that

10    certain letter dated as of September 30, 1991 from Lorimar    11:36

11    Productions to DC, relating to, 'Lois & Clark' shall apply to

12    the captioned project, mutatis mutandis."

13              Did you receive this document?

14    A    I don't remember it offhand, but I would believe I did.

15    It looks real.                                                 11:36

16    Q    You have no reason to believe you did not receive it;

17    correct?

18    A    No.

19    Q    The caption project is Smallville; correct?

20    A    Correct.                                                  11:37

21    Q    It's your understanding that the Superman television

22    agreement, Plaintiffs' Exhibit 223, contains the same financial

23    terms as DC's 1991 Lorimar agreement regarding the television

24    series Lois and Clark; correct?

25    A    I believe that the significant financial terms were the   11:37
```

1    same.

2    Q    By 1991, Lorimar productions had been purchased by Warner

3    Communications and folded into Warner Bros. television;

4    correct?

5    A    I believe Lorimar was in 1989, and I don't know at what          11:37

6    point it was functionally folded into Warner Bros. television.

7    They ran as a separate divisions within Warner Bros. for some

8    period of time.

9    Q    It was purchased by Warner Bros. communications by that

10   time; correct?  By 1991?                                             11:37

11   A    By Warner Bros., yes, I believe so.

12   Q    And it sometime thereafter folded into Warner Bros.

13   television; you're just not sure when.

14   A    I'm not sure of the dates.

15   Q    If you would turn to Page 6 of this Exhibit, WB-134.           11:38

16          Excuse me.  It's the first page of the Exhibit,

17   WB-134867.

18   A    Yes.

19   Q    Pardon me.  I have the wrong Bates number.

20          THE COURT:  Which Exhibit are you referring to?             11:38

21   223 or 174?

22          MR. TOBEROFF:  I'm referring to 174.

23   BY MR. TOBEROFF:

24   Q    If you would turn to Page 6, Bates number 134875.

25          Is that your signature?                                     11:38

240

```
 1   A     Yes.
 2   Q     Now, this is the 1991 Lorimar agreement referred to in
 3   Mr. Paul's letter; correct?
 4   A     It appears to be, yes.
 5   Q     I'd like to show you what's been previously admitted as      11:39
 6   Plaintiffs' Exhibit 175.
 7   A     Okay.
 8   Q     Exhibit 175 is a letter agreement dated November 1, 2006,
 9   between Warner Bros. television and DC Comics.
10         Is that your signature on the agreement?                     11:40
11   A     Yes.
12   Q     It's your understanding this agreement gives Warner Bros.
13   television the right to use the DC character Martian Manhunter
14   in the television show Smallville; correct?
15   A     Yes, as provided herein for, I guess, one episode or one     11:40
16   episode and a cameo.
17   Q     And according to this agreement, DC receives no
18   compensation for the inclusion of Martian Manhunter in
19   Smallville; correct?
20   A     No compensation in addition to what we're already            11:40
21   receiving for Smallville.
22   Q     I'm referring to compensation for the use of the character
23   Martian Manhunter; there's no additional compensation; correct?
24   A     There's no additional compensation.
25   Q     Thank you.                                                   11:40
```

241

```
 1          Showing you what's been previously admitted as
 2  Plaintiffs' Exhibit 176.  Exhibit 176 is a letter agreement
 3  dated September 22, 2006, between Warner Bros. television and
 4  DC Comics.
 5          Mr. Levitz, is that your signature on the Exhibit?    11:41
 6  A    Yes.
 7  Q    It's your understanding that like the prior Exhibit, this
 8  agreement gives Warner Bros. the right to use a DC character in
 9  the television show Smallville; correct?
10  A    Correct.                                                 11:41
11  Q    This is a different character by the name of the
12  Green Arrow; correct?
13  A    Correct.
14  Q    Is the Green Arrow one of DC's more important characters?
15  A    Second or third tier, I would say.                       11:41
16  Q    This gives Warner Bros. the right to use the Green Arrow
17  in Smallville, as indicated in the agreement.
18  A    Correct.
19  Q    And DC received no additional compensation for licensing
20  the use of that character to Warner Bros. television for       11:42
21  inclusion in Smallville; correct?
22  A    Correct.
23  Q    Showing you what's been previously admitted as Plaintiffs'
24  Exhibit 177.  Exhibit 177 is a letter agreement dated 2006
25  between Warner Bros. television and DC Comics.                 11:42
```

1          Is that your signature on the Exhibit?

2    A    Yes, sir.

3    Q    And it's your understanding that this agreement gives

4    Warner Bros. television the right to use the DC characters

5    *Flash*, *Aquaman*, and *Cyborg* in the television show *Smallville*;                11:43

6    correct?

7    A    Correct.

8    Q    There appears in this agreement to be no additional

9    compensation for the licensing of those characters to

10   Warner Bros. television for use in the television show                               11:43

11   *Smallville*; correct?

12   A    Correct.

13         **MR. TOBEROFF:**  No further questions.

14         **THE COURT:**  Cross-examination?

15         **MR. BERGMAN:**  Your Honor, I will be calling                                 11:43

16   Mr. Levitz during our own examination, but I just want to touch

17   on this last point that Mr. Toberoff made, if I may.

18         **THE COURT:**  You may.

19                        **CROSS-EXAMINATION**

20   BY MR. BERGMAN:                                                                        11:43

21   Q    Mr. Levitz, is it in DC's interest to have *Smallville* stay

22   on the air, continuing to attract audiences?

23   A    It's tremendously in our interest, because we receive very

24   substantial fees for that show and have a very significant

25   participation in it.                                                                  11:44

Wednesday, April 29, 2009                    Trial Day 2, AM session

1   Q     And is it your opinion or was it your belief at the time

2   you gave these rights for one-segment appearances that the

3   characters who would be appearing as guests might increase the

4   popularity of the show?

5   A     You face two sets of positive opportunities here.  One is      11:44

6   that, as I just said, you have a tremendous incentive to keep a

7   show like *Smallville* alive, and any program over a period of

8   time essentially becomes boring because you've now had

9   everybody fall in love with everybody and everybody hate

10  everybody and move around.  If you think of the show ER, which     11:44

11  just ended and there's been a lot of coverage, by the time it

12  had finished, some of the women in the show had slept with

13  every man of an appropriate age, almost in rotation.  You run

14  out of Peyton Place.  So one of the ways you deal with that is

15  you provide fresh material to enhance it and continue it and      11:45

16  keep it fresh.  That's one of our motivations for doing these

17  deals with no additional consideration.

18          The second motivation is that for most of these

19  properties, giving them an opportunity to be exposed in this

20  fashion enhances their value.  In the case of *Aquaman*           11:45

21  specifically, we were discussing with the producers of

22  *Smallville* the possibility of developing an *Aquaman* television

23  show as a spin-off program from *Smallville* as a companion show.

24  We did, in fact, shortly after this, option them and they

25  produced a pilot for an *Aquaman* show to be a companion show      11:45

1    based on what they had developed here.  It was not successful;

2    it was not picked up by the network.  But that's part of what

3    you're trying to do also; you're trying to create future value.

4              **THE COURT:**  A movement of placements, of sorts.

5              **THE WITNESS:**  Absolutely.                                    11:46

6              And the weaker the character, the more the

7    promotional value.  If you take *Cyborg*, who is one of the

8    members of the Teen Titans, again, sort of a third-tier

9    character in our world, you're able to build the value of the

10   character by his having been there.                              11:46

11   **BY MR. BERGMAN:**

12   Q    So that one of the possibilities that may exist is that

13   Warner, or some other studio, might say, Gee, *Flash* was great

14   in that *Smallville* episode.  Why don't we give them a pilot?

15             **MR. TOBEROFF:**  Objection.  Since he is the president   11:46

16   of DC comics, I don't believe he should be allowed to ask him

17   leading questions.

18             **THE COURT:**  Fair enough.  Sustained.

19             Rephrase.

20   **BY MR. BERGMAN:**                                               11:46

21   Q    Does the appearance in a cameo appearance, such as the one

22   being made by *Cyborg* or *Green Arrow*, does that enhance the

23   possibility that another show starring that particular

24   character might be made?

25   A    In the case of *Aquaman*, it very specifically worked that   11:47

```
 1   way.  And in most of the cases, we feel that at the very least,
 2   it enhances public awareness of the character.  And if you're
 3   lucky, maybe that leads somewhere.
 4            MR. BERGMAN:  Thank you, sir.
 5            I'll continue during our case.                        11:47
 6            THE COURT:  Anything further?
 7            MR. BERGMAN:  Nothing further, Your Honor.
 8                    REDIRECT EXAMINATION
 9   BY MR. TOBEROFF:
10   Q    Mr. Levitz, have you ever licensed the right to exploit   11:47
11   Flash, Aquaman, Cyborg, Green Arrow, or Martian Manhunter in
12   film or television to a company other than Warner Bros. for
13   zero compensation?
14   A    We probably have for some minor use somewhere along the
15   way.  Not for any major project.  Certainly not to make a film  11:48
16   or a television show around the character, but to appear in it.
17            I think there was a Flash appearance in a motion
18   picture -- God, what was the name of it -- about a guy who
19   continually assumed other people's identities and pretended --
20   it was a live-action motion picture -- he pretended to be other  11:48
21   people.  And at one point, the screenwriter had him give
22   Barry Alan, Flash, his real identity as the name he was
23   operating under.  'Stop me if you can,' or something like that.
24   And they had approached us and said 'can we do this,' and we
25   either charged them nothing or an absolutely trivial fee to get  11:49
```

1    some exposure at the time, after some debate.

2              There have been instances over the years where we

3    have licensed characters -- definitely including the *Flash;* I

4    think including *Aquaman* -- to television programs for

5    appearances where someone was going dressed to a Halloween                 11:49

6    party as the character.  I know there were several *Flash*

7    instances like that, and we either charged them nothing or a

8    nominal fee.

9    Q    Other than these nominal uses or references to the

10   character, have you ever permitted these characters to appear            11:49

11   as the characters themselves in a television program or movie

12   produced by another studio other than Warner Bros.?

13   A    I believe we have.

14   Q    Can you tell me what that belief is based on?

15   A    Virtually all of our characters at some point in their             11:50

16   history have done some form of cameo appearance in something by

17   somebody else.  We used a number of the characters, for

18   example, many years ago in Sesame Street, where we allowed them

19   to incorporate them as guest stars because we felt it was good

20   publicity in that situation.                                            11:50

21             They are not frequent situations.  In most

22   situations, you're looking at what the consideration is for

23   what you're doing.  The best case consideration you've got is

24   what we had here with *Smallville* where DC is already receiving

25   a significant income stream, has a significant incentive for            11:50

```
 1    the program's success and continued health.

 2            And then on top of that, like the cherry on the

 3    sunday, you're getting a little added exposure and excitement

 4    for the character.  But there are occasions where you settle

 5    for the cherry, and you just do that.  But you'll be much less      11:51

 6    incentivized to do that; so you'll only do that if that's a

 7    Sesame Street or something that you feel has the auspices that

 8    will add significant value to your character, even if they are

 9    not paying you what you think you would ideally like to get.

10    Q   My question, Mr. Levitz, was not whether you've licensed        11:51

11    the appearance of these characters as cameos in other

12    television shows.  My question was whether you've licensed the

13    actual appearance of these characters, whether as cameos or

14    otherwise, for zero compensation to a nonWarner Bros. company?

15            MR. BERGMAN:  Objection.  Asked and answered.              11:51

16            THE COURT:  I think it has been.

17            I am not seeing the fine point that you are alluding

18    to, Counsel.  I think he has answered the question.

19            MR. TOBEROFF:  In his answer, Your Honor --

20            THE COURT:  As I understand it -- and maybe I'm            11:52

21    mistaken -- these were essentially cameo appearances; *The Green

22    Arrow*, *Flash*, *Aquaman*; these were single --

23            THE WITNESS:  Single episodes or short arts;

24    basically, supporting characters.

25            THE COURT:  That's what you're asking about; has that      11:52
```

1   happened with anyone outside of Warner Bros.

2        **MR. TOBEROFF:**  I'm asking whether it's happened where

3   DC has not been compensated for that license, even if it's a

4   minimal license.

5        **THE COURT:**  I think he's answered that question.                    11:52

6        **THE WITNESS:**  I believe -- if you read back my

7   previous answer -- I believe there have been cases where we

8   have charged no fee, as well as cases where we've charged a

9   nominal fee.

10  **BY MR. TOBEROFF:**                                                         11:52

11  Q   What are the cases where you have charged no fee?

12  A   Sesame Street is the one I remember offhand.  Because they

13  are not economic projects, they don't have significant bottom

14  line or no bottom line implications; and because cameos are

15  intrinsically a transient thing, I don't remember across the   11:52

16  many many years which of them we've done.  But it would be our

17  practice to have done things like that.

18  Q   Isn't it a fact that *Green Arrow*, one of the characters

19  licensed in one of the exhibits I just pointed to, is now a

20  regular on the *Smallville* TV series?                           11:53

21  A   We have since added *Green Arrow* to more episodes.  I don't

22  know if he's a full regular or not.  Frankly, I don't follow

23  the show that closely at this point; but it worked creatively

24  and it added value to the show, so we're thrilled to have him

25  there if it has helped us get to our eighth season now.          11:53

1  Q     And he has appeared on multiple episodes; correct?

2  A     Correct, yes.

3  Q     And DC is not receiving compensation for that appearance;

4  correct?

5  A     We're receiving considerable compensation for it in the      11:53

6  form of our share of the revenues from *Smallville*.

7  Q     But DC is not receiving separate compensation for the use

8  of the *Green Arrow* in multiple *Smallville* episodes; correct?

9  A     I don't remember, but I don't think so.

10           **MR. TOBEROFF:**  Thank you.                              11:54

11           **THE COURT:**  Anything further?

12           **MR. BERGMAN:**  Nothing further, Your Honor.

13           **THE COURT:**  Thank you.

14           All right.  It's about five minutes before the noon

15  hour.  Let's break for lunch at this time.                        11:54

16           (A.M. session concludes. )

17

18                         CERTIFICATE

19

20  I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
21  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
22  conformance with the regulations of the Judicial Conference of
    the United States.

23

24  _____        _____
    THERESA A. LANZA, CSR, RPR                      Date
25  Federal Official Court Reporter