```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4                        - - -

 5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                        - - -

 7  JOANNE SIEGEL and              )
    LAURA SIEGEL LARSON,           )
 8                   Plaintiffs,   )
                                   )
 9          vs.                    )  No. CV 04-08400-SGL
                                   )
10  WARNER BROTHERS ENTERTAINMENT INC.;)
    TIME WARNER, INC.; DC COMICS;  )
11  and DOES 1-10,                 )  Trial Day 4
                     Defendants.   )
12  _____)  Pages 449-580

13

14

         Reporter's Transcript of Court Trial Proceedings

15
                    Riverside, California
16
                    Friday, May 1, 2009
17
                       9:15 A.M.
18

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24          3470 12th Street, Rm. 134
          Riverside, California  92501
25              (951) 274-0844
            WWW.THERESALANZA.COM
```

```
 1     APPEARANCES:

 2

 3    On Behalf of Plaintiffs:

 4
                          LAW OFFICES OF MARC TOBEROFF
 5                        BY:  Marc Toberoff
                          BY:  Nicholas C. Williamson
 6                        BY:  Keith Adams
                          2049 Century Park East,
 7                        Suite 2720
                          Los Angeles, California  90067
 8                        310-246-3100

 9

10    on behalf of Defendants/Counterclaimant:

11
                          WEISSMANN WOLFF BERGMAN COLEMAN
12                         GRODIN & EVALL LLP
                          BY:  Michael Bergman
13                        BY:  Anjani Mandavia
                          9665 Wilshire Boulevard,
14                        Ninth Floor
                          Beverly Hills, California  90212
15                        310-858-7888

16

17    On Behalf of DC Comics:

18                        PERKINS LAW OFFICE, P.C.
                          BY:  Patrick T. Perkins
19                        1711 Rt. 9D
                          Cold Spring, New York  10516
20                        845-265-2820

21

22

23

24

25
```

Friday, May 1, 2009                    Trial Day 4

```
1                        I N D E X

2                                              Page

3    Plaintiff case (cont'd)......................   453

4


5    PLAINTIFF
     WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
6    MARK HALLORAN

7    By Mr. Toberoff   453

8

9


10
              EXHIBITS           RECEIVED
11
              326                 467
12            316                 486
              331                 503
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Riverside, California; Friday, May 1, 2009; 9:15 A.M.

 2                              -oOo-

 3         THE CLERK:  Calling item one on calendar, Case Number

 4    CV 04-08400-SGL(RZx), Joanne Siegel, et al., versus Warner

 5    Brothers Entertainment Inc., et al.                              09:12

 6         Counsel, please state your appearances for the

 7    record.

 8         MR. TOBEROFF:  Marc Toberoff for the plaintiffs.

 9         MR. ADAMS:  Keith Adams for the plaintiffs.

10         MR. WILLIAMSON:  Nicholas Williamson for the             09:12

11    plaintiffs.

12         MR. BERGMAN:  Michael Bergman for the defendants.

13         MR. PERKINS:  Patrick Perkins for the defendants.

14         MS. MANDAVIA:  Anjani Mandavia for defendants.

15         THE COURT:  Good morning to you all.                     09:12

16         Counsel, you may proceed.

17         MR. TOBEROFF:  Thank you, Your Honor.

18         THE COURT:  We'll go from now until about 10:30.  I'm

19    going to take a half hour break to get some other matters done.

20    Then from 11:00 to 12:30, take another half hour, and then    09:12

21    we'll finish up from 1:00 to 2:00.  So we'll have three

22    smaller, shortened sessions, and at 2:00, or shortly

23    thereafter, we'll adjourn for the weekend, and then resume on

24    Tuesday.

25              Counsel.                                            09:12
```

1          **THE CLERK:**  Mr. Halloran, please be advised you're

2    still under oath.

3          **THE WITNESS:**  I acknowledge that.

4                    **DIRECT EXAMINATION** (cont'd)

5    BY MR. TOBEROFF:

6    Q    Mr. Halloran, yesterday you testified as to DC's warranty

7    and indemnification of Warner Bros., as set forth in

8    Exhibit 232 on Page 11, Paragraph 9, and Page 12, Paragraph 9,

9    continuing on Page 12.

10          Under the indemnification and warranty provision,          09:13

11   would Warner Bros. be obligated to indemnify DC for attorney's

12   fees, costs, and any damages in connection with this lawsuit

13   and/or the termination, or not?

14   A    Actually, DC would be obligated to indemnify Warner Bros.

15   from any cost of the litigation.                                  09:13

16   Q    And would those costs, attorney's fees, or damages be

17   deducted from any monies due DC under the *Superman* film

18   agreement?

19          **MR. BERGMAN:**  Objection.  Calls for speculation,

20   Your Honor.                                                       09:13

21          **THE COURT:**  Lay a foundation.

22          If you can determine that under the terms of the

23   agreement itself, you can testify to that.

24   BY MR. TOBEROFF:

25   Q    Under the terms of the agreement, does the agreement call   09:14

1    for the deduction of such attorney's fees, costs, damages in

2    connection with the warranty and indemnification provision from

3    any monies that would be due and owing to DC under the

4    agreement?

5    A    Yes.  Under the indemnity provision.                          09:14

6    Q    Now, if plaintiffs, as co-owners of the original Superman

7    copyright, were accounted to by DC, what effect would that have

8    on plaintiffs?

9    A    It would reduce the amount of proceeds that any

10   participation would be subject to; so, in effect, they would     09:14

11   pay for part of the damages caused by the lawsuit, because it

12   would reduce the amount that the participation would be

13   calculated on.

14   Q    Under those indemnification and warranty provisions,

15   plaintiffs, if accounted to by DC, would essentially have to     09:15

16   pay their pro rata share of Warner Bros.' attorney's fees,

17   costs, damages in connection with this lawsuit or any damages

18   in connection with their termination?

19   A    Exactly.

20           MR. BERGMAN:  Objection.  Leading.                        09:15

21           THE COURT:  It is leading, Counsel.

22           Have him explain it.

23   BY MR. TOBEROFF:

24   Q    Could you explain to me the effect on those warranty and

25   indemnification provisions on plaintiffs if accounted to.        09:15

1           **THE COURT:**  Your understanding.

2           **THE WITNESS:**  I can make it simple.

3           If there were $100 in proceeds that a gross proceeds

4    participation would be calculated on, if there were $50 in

5    costs, legal fees, damages, that would reduce the amount to $50    09:16

6    that the participation would be payable -- calculated on.  So

7    it reduces -- so it, in essence, does reduce the amount that

8    would be payable to profit participation -- profit

9    participants.

10   **BY MR. TOBEROFF:**    09:16

11   Q    What effect would it have on plaintiffs?

12   A    It would reduce their share of their contingent

13   compensation.  It would reduce their share of the profits.

14   Q    I'd like to show you what's been marked for identification

15   as Plaintiffs' Exhibit 315.    09:16

16           Exhibit 315 is an agreement dated December 29, 1978,

17   between Thomas Meehan; Chicago Tribune - New York News

18   Syndicate, Inc.; and Columbia Pictures pertaining to the film

19   rights of the musical *Annie.*

20           Do you recognize this exhibit?    09:17

21   A    I do.

22   Q    Did you review this agreement when writing your report and

23   reaching your conclusions in this case?

24   A    Yes.

25           **MR. BERGMAN:**  Objection, Your Honor.  This is one of    09:17

```
 1   those documents that came in subsequent to the deadline.

 2              THE COURT:  When was this produced?

 3              MR. BERGMAN:  It was certainly after December 3rd,

 4   Your Honor, when we had --

 5              THE COURT:  Was it after January -- you've never come    09:17

 6   back to this issue with the Court on whether or not the

 7   January 14th or 15th cutoff was mutual or not.  You disagree on

 8   that.  I asked you to talk amongst yourselves.  You haven't

 9   come back to the Court, so I'm not prepared to rule on that.

10              MR. BERGMAN:  Very well, Your Honor.  We'll talk.        09:17

11              THE COURT:  If you want that to be a demarcation,

12   then you're going to have to address this issue, as I indicated

13   when we brought this up a few days ago.

14              MR. BERGMAN:  Thank you, Your Honor.

15              THE COURT:  Otherwise, I'm going to overrule the         09:18

16   objection.

17              Proceed, Counsel.

18   BY MR. TOBEROFF:

19   Q    I'd like to draw your attention to Page 26, Paragraph 5-A

20   of Exhibit 315.                                                    09:18

21              What does this paragraph provide?

22   A    It provides for a purchase price of $9.5 million.

23   Q    How is the $9.5 million paid under the agreement?

24   A    I can't read the whole thing on the screen, so...

25              It's paid out over time, so it's $1,425,000 on          09:18
```

1    execution, $712,500 on January 15, 1980.

2    Q    What is the rough span of years, if you could tell me?

3    A    About six years.

4    Q    What, if any, does this payment schedule have on the value

5    of the $9.5 million purchase price?  In other words, what would    09:19

6    be the net present value in 1978 dollars?

7    A    I believe about $7 to $8 million.

8    Q    In today's dollars, adjusted for inflation, could you give

9    me a rough idea of what the value of that $7 million would be.

10           MR. BERGMAN:  Objection, Your Honor.  Lack of    09:19

11    foundation.  This witness has not demonstrated that in his

12    report or in his experience.

13           THE COURT:  The Court has previously permitted this

14    testimony, and it hasn't been objected to concerning the

15    present value calculation.  Based on his experience in this    09:19

16    business, I can't imagine that he has made it this far without

17    being able to calculate present value.

18           So I'm going to overrule the objection.

19           THE WITNESS:  Approximately $20 million in today's

20    dollars.    09:19

21    BY MR. TOBEROFF:

22    Q    In 1979, do you have an idea of how prominent *Annie* was

23    compared to the prominence of Superman in 2002?

24    A    I think Superman was more prominent in 2002, but *Annie*

25    certainly was a spectacularly successful musical; but it    09:20

1  certainly didn't have the 70 years of continuing success and

2  exploitation that Superman had.

3          MR. BERGMAN:  Objection.  Lack of foundation,

4  Your Honor.

5          THE COURT:  Well, my follow-up question kind of goes          09:20

6  to this, because I'm curious as to how you make that assessment

7  and that comparison.  That's one of the difficult issues this

8  Court is going to have to grapple with in this trial.

9          THE WITNESS:  Right.

10          THE COURT:  So I would appreciate your thoughts, and          09:20

11  I'll certainly be hearing from the plaintiffs' expert on this

12  as well.

13          In comparing something like *Annie* to *Superman*, and

14  saying that *Superman* is more popular, what are you saying in

15  terms of the --          09:20

16          THE WITNESS:  Let me tell you my methodology.

17          THE COURT:  It seems like apples and oranges.

18          I would like to hear your methodology in terms of how

19  you make this comparison, and also, precisely, what comparison

20  you're making.          09:21

21          THE WITNESS:  The methodology was, I looked at the

22  agreement; but I also did research, primarily through

23  Wikipedia, in terms of the history of *Annie*, how successful it

24  was on the stage; and in doing that, I could sort of gauge the

25  awareness.  And I also put it in the context of, at that time,          09:21

1    what was bringing the top dollar in terms of the purchase of

2    franchise properties by studios.

3            Then, in terms of Superman, I would gauge, in 2002,

4    how popular it was, and what I thought the value would be had

5    it been on the open market and a studio -- there had been                  09:22

6    competitive bidding among studios for it.  So that's how I

7    looked at it.

8            It is a little bit apples and oranges, but one of the

9    things you have to keep in mind is that back in 1978, this was

10   sort of the end of the purchase of big musicals.  Later on --             09:22

11   what I tried to do is put in context, in 2002 -- you know, we

12   had rise of the comic book franchises, with the exception of

13   *A Chorus Line*, which was, I guess in the '80s, a diminution of

14   musicals.  So *Annie* was sort of the equivalent of a comic book

15   franchise back in the '70s.                                               09:22

16           **THE COURT:**  But, again, when we start talking about

17   the end of an era, we can only say that an era has ended after

18   that era has passed; right?

19           **THE WITNESS:**  That's true.

20           **THE COURT:**  Okay.  Very good.                                  09:22

21           Counsel?

22   **BY MR. TOBEROFF:**

23   Q    You testified yesterday with regard to the *My Fair Lady*

24   agreement that at that particular time period, musicals were

25   very hot as source materials for films, and you mentioned                 09:23

1    *The Sound of Music.*

2    A    Right.

3    Q    At this particular period of time, the end of 1978, when

4    this agreement was entered into, were musicals still hot as

5    source materials for motion pictures?                              09:23

6    A    They were a lot less hot than they were in the '60s.

7            **MR. TOBEROFF:**  Your Honor, plaintiffs would like to

8    offer Exhibit 315 into evidence at this time.

9            This is one of the subpoenaed documents that in a

10   prior motion, you ruled was timely and you did not quash the      09:23

11   subpoenas.

12           **THE COURT:**  Is there any further objection, other

13   than the one you stated, Counsel?

14           **MR. BERGMAN:**  Yes, there is, Your Honor.

15           The agreement reflects that there was a separate           09:24

16   merchandising agreement that was entered into concurrently, and

17   it has not been provided.

18           **THE COURT:**  Your objection is that it's incomplete?

19           **MR. BERGMAN:**  Incomplete.

20           **MR. TOBEROFF:**  We're not offering the merchandising    09:24

21   agreement into evidence --

22           **THE COURT:**  I understand that.

23           **MR. TOBEROFF:**  -- or commenting on any of the

24   merchandise terms.

25           **THE COURT:**  I think the objection, though, is that     09:24

1    for this to be a complete document and to make a comparison, it

2    would need to include all of its components.

3              The theory, as I understand it, of Warner Bros. --

4    this is something which really needs to be explored; I suspect

5    it will be on cross-examination -- is that you need to --                  09:24

6    there's different approaches here.  We either look at the

7    individual components of the agreement, or we look at the

8    overall effect of the agreement.  Warner Bros. is taking the

9    position that the overall effect of the agreement places the

10   *Superman* agreement much more favorably than an individual              09:24

11   dissection of key components.  Whether that's true or not, I

12   don't know, and I won't be able to decide until I hear all of

13   the evidence.  But if the Court is going to be considering, for

14   example, *Annie*, we need to have the entire agreement going

15   forward.                                                                  09:25

16             Is that something that you can include?

17             I mean, I understand you don't want to include it,

18   but is that something that we have?

19             **MR. TOBEROFF:**  I would be happy to include it.  We

20   subpoenaed it, and they didn't have that merchandising                    09:25

21   agreement.  Very often, parties will engage in business in the

22   entertainment industry and have a core agreement, and then, for

23   instance, have a producer agreement, where the rights holder

24   will also be a producer.

25             **THE COURT:**  I'm not going to have you testify on            09:25

```
 1   this, Counsel; but what I will have is -- this is how I'm going
 2   to deal with this objection:  I'm going to admit this.  The
 3   Court is mindful that there is a missing portion of it.  You
 4   can examine that on cross-examination, and the Court will
 5   consider that in the context of this agreement.                    09:25
 6          MR. BERGMAN:  My motion, of course, Your Honor, is
 7   under F.R.E. 106, because I believe that without -- as
 8   Your Honor noted, without the merchandising agreement, there's
 9   no way for us to do what we want to do.
10          THE COURT:  Well, you can examine that on               09:26
11   cross-examination.  I'm not accepting either of your testimony
12   right now.  That's not affecting the Court.  I'm only
13   considering the evidence that I'm hearing.  I will admit this.
14   I understand that it does not have all of the agreements that
15   are referenced therein.  And we'll take that up after I've      09:26
16   heard the evidence.
17          MR. BERGMAN:  Very well.
18          MR. TOBEROFF:  Thank you, Your Honor.
19          THE COURT:  Proceed, Counsel.
20   BY MR. TOBEROFF:                                                 09:26
21   Q   I'd like to show you what's been marked for identification
22   as Plaintiffs' Exhibit 326.
23          Exhibit 326 is an agreement dated July 7, 1999,
24   between Jack Ryan, Limited Partnership, and Paramount Pictures
25   Corporation, pertaining to the film rights to the novel         09:26
```

```
 1   Rainbow Six by Tom Clancy.
 2           Do you recognize this exhibit?
 3   A    I do.
 4   Q    Did you review this agreement when reaching your opinions
 5   and writing your expert report in this case?              09:27
 6   A    Yes.
 7   Q    I'd like to draw your attention to Page 1, Paragraph 1.1,
 8   this rights agreement, Bates No. 6118.
 9           MR. BERGMAN:  Your Honor, if I may.
10           I have the same objection to this document; namely,  09:27
11   that there is no provision provided for merchandising.
12           THE COURT:  Counsel, again, I think this is
13   ultimately going to go to the weight of the evidence.  They're
14   introducing their agreements.  They may or may not be relevant
15   based on how the testimony comes out.  I'm going to        09:27
16   provisionally admit these and allow you to examine at length
17   about what is and what is not included.  I understand your
18   position.
19           MR. BERGMAN:  Thank you, Your Honor.
20           MR. TOBEROFF:  Your Honor, I need to point out that  09:27
21   merchandising is spoken for in this agreement.  That's
22   incorrect.
23           THE COURT:  Then --
24           MR. TOBEROFF:  I understand.
25           THE COURT:  -- you can ask that.  I don't accept     09:27
```

```
 1   anything you say, not because I don't trust you, not because I
 2   don't believe that you're telling me the truth, but the way we
 3   conduct trials in this country is that we have the witnesses
 4   testify and the lawyers ask questions.
 5            So ask your next question.                              09:28
 6        MR. TOBEROFF:  Thank you.
 7   BY MR. TOBEROFF:
 8   Q    I'd like to draw your attention to Page 1, Paragraph 1.1
 9   of the agreement.  The Bates number is 6118.
10            What does this paragraph provide?                       09:28
11   A    It provides for a purchase price of $5 million for the
12   motion picture rights to the property Rainbow Six.
13   Q    At what point in time is the $5 million purchase price
14   payable?
15   A    When Tom Clancy signed and delivered the contract to       09:28
16   Paramount.
17   Q    I'd like to draw your attention to the first page of the
18   exhibit, Bates No. 6115.
19   A    Yes.
20   Q    What is 6115?                                               09:29
21   A    It's a so-called side letter, where it's, in essence, a
22   producer agreement.  It's a producer agreement signed letter.
23   Q    What does this producer agreement provide?
24   A    It provides that if Paramount makes a picture, Tom Clancy
25   will receive an additional million dollars for his services as  09:29
```

1    an executive producer.

2    Q    Based on your knowledge of the motion picture industry, in

3    such a situation where an author granting rights also receives

4    a producer agreement, is the author expected to actually render

5    producer services?                                                    09:29

6            MR. BERGMAN:  Objection.  Lack of foundation.

7            THE COURT:  Sustained.

8            Lay a foundation.

9    BY MR. TOBEROFF:

10   Q    Are you familiar with producer agreements that are entered    09:29

11   into in conjunction with literary rights agreements?

12   A    Yes.

13   Q    When those producer agreements are entered into, does the

14   rights holder actually render producer services, in your

15   experience?                                                          09:30

16   A    Not the producer services that are traditionally rendered.

17           Typically, the agreements are nonexclusive, and from

18   the studio perspective, they're always treated as, essentially,

19   part of the purchase price, the price to get the rights.  They

20   don't really look to the rights holder to be a producer.             09:30

21           Now, they may look to the -- on this, for example,

22   Tom Clancy had certain approval rights, so they would look to

23   work with him in rendering his approvals.

24   Q    How is this additional million dollars viewed?

25   A    I didn't hear that.

1   Q    How is the additional million dollars viewed in addition

2   to the $5 million purchase price for the literary rights?

3   A    It's viewed as a rights payment.

4   Q    What is the total compensation, then, under this agreement

5   for the rights to produce a film based on a single novel                    09:31

6   *Rainbow Six*?

7   A    $6 million.

8   Q    I'd like you to turn to Page 21 of the agreement.  It's

9   Bates No. SGL 6158.  It's not on the screen; it's a hard copy.

10  A    What's the Bates number, again?                                         09:31

11  Q    6158.

12  A    Okay.

13  Q    Looking at Paragraph 2-A, what does this paragraph

14  provide?

15  A    It provides for the inclusion of merchandising receipts.               09:32

16        Yeah, it provides for the inclusion of merchandising

17  receipts into gross, after Paramount takes a 50 percent fee in

18  their costs.

19  Q    Thank you.

20        Now, in 1999, how would you view the prominence or                    09:32

21  value of a novel by Tom Clancy?

22  A    I viewed it in relation to Superman.  And certainly, the

23  character Jack Ryan, which was depicted in a series of books by

24  Tom Clancy, would be less valuable than Superman at that time.

25  Q    Had film adaptations of Tom Clancy's novel been successful            09:33

1    prior to 1999?

2    A    Yes.  There were a series of three Jack Ryan movies,

3    starting with *Hunt for Red October*, and also *Patriot Games* and

4    *Clear and Present Danger*.  Those pictures grossed in sort of

5    the $80 to $130 million range at the domestic box office.          09:33

6    Q    How does that compare to the grosses of the *Superman* film

7    back in 1978 and the *Superman Returns* film?

8    A    They were less.  The *Superman* film, in '78, on an

9    inflation-adjusted basis, did almost $400 million.  So they are

10   a lot less than *Superman* in 1978, on an inflation-adjusted      09:34

11   basis.

12         **MR. TOBEROFF:**  Your Honor, plaintiffs offer

13   Exhibit 326 into evidence at this time.

14         **THE COURT:**  Any objection?

15         **MR. BERGMAN:**  Only the one I made, Your Honor.          09:34

16         **THE COURT:**  Very well.

17         It's overruled.

18         It's admitted.

19         (Exhibit 326 is received.)

20   **BY MR. TOBEROFF:**                                              09:34

21   Q    I'd now like to show you what's been marked for

22   identification as Plaintiffs' Exhibit 327.  It's an agreement

23   between Jack Ryan, Limited Partnership, and Paramount Pictures

24   Corporation, dated August 9, 2002, pertaining to the film

25   rights to the novel *Red Rabbit* by Tom Clancy.                   09:34

1          Do you recognize this exhibit, Mr. Halloran?

2    A    I do.

3    Q    Did you review this agreement when reaching opinions and

4    writing your report in this case?

5    A    I did.                                                         09:34

6          **MR. BERGMAN:**  Your Honor, on this agreement, there

7    again is something missing; and it's quite vital.

8          What's missing from this agreement is what's called

9    the adjusted gross receipts exhibit, which defines how adjusted

10   gross receipts are treated.                                        09:35

11         **THE COURT:**  Again, I think that goes to the weight of

12   the evidence, Counsel.  The objection is overruled.

13         You're seeking to admit it, Counsel?

14         **MR. TOBEROFF:**  Yes.  I'd like to -- prior to that, I

15   have some questions that address that issue.                       09:35

16         **THE COURT:**  Very well.

17   **BY MR. TOBEROFF:**

18   Q    I'd like to draw your attention to Page 1, Paragraph 1.1,

19   of this rights agreement, Exhibit 327.

20         What does this paragraph provide?                            09:35

21   A    It provides for a purchase price of $7 million.

22   Q    When is the $7 million payable?

23   A    It's due on execution of the agreement and delivery to

24   Paramount.

25   Q    I draw your attention to the first page of the exhibit,       09:35

1  Bates number 6163.

2          What is this exhibit?  What is this page?

3  A    This is, again, an executive producer side letter that's

4  virtually identical to the *Rainbow Six* side letter; and it

5  provides for payment to Clancy of a million dollars.                09:36

6  Q    What is the total payment to Tom Clancy in the event the

7  movie is made under this agreement?

8  A    $8 million.

9  Q    I'd like to draw your attention to the page of this

10 document Bates-numbered 6186.  It's the rider to exhibit,          09:36

11 quote, GRP.

12          What is meant by "GRP"?

13 A    Gross receipts.

14 Q    What is this rider?

15 A    It's a rider to a definition of "gross."  So it's clear to    09:36

16 me -- even when I reviewed this, I did notice that the

17 "gross receipts" definition was missing.  But since there was

18 this rider, this rider could not have existed without a

19 definition of "gross receipts."

20          **MR. BERGMAN:**  Your Honor, I don't want to press the    09:37

21 question.  But what possible relevance can a rider to a

22 nonexistent agreement have?  If we don't have the GRP schedule,

23 what difference does it make what the rider does to that

24 schedule?  There's no way to tell its significance.

25          **MR. TOBEROFF:**  Your Honor, the witness will answer;    09:37

```
 1    and I was about to ask him a question.
 2              THE COURT:  Let's give some leeway on this, Counsel.
 3    This is a bench trial; this is not a jury trial.  If at the end
 4    of the day, you're able to expose this as not being relevant,
 5    the Court can strike it from its consideration.                      09:37
 6              MR. BERGMAN:  Very well.
 7              THE COURT:  Proceed, Counsel.
 8    BY MR. TOBEROFF:
 9    Q    Mr. Halloran, do you deal with Paramount in your work as a
10    transactional attorney?                                             09:38
11    A    Yes, I do.
12    Q    Does Paramount have what's called a standard gross
13    definition?
14    A    Yes, they do.
15    Q    Is that standard gross definition used by Paramount          09:38
16    whether or not a particular rider applies to modify that
17    definition?
18    A    Yes.
19    Q    Is the standard gross definition found in this document?
20    A    It's referenced in 3.2, but it makes specific reference to   09:38
21    Exhibit GRP, gross receipts definition.
22    Q    Now --
23    A    But it wasn't attached.  But it's specifically referenced,
24    and there's a rider.  It's clear to me, from looking at this,
25    that there was an Exhibit GRP.                                     09:38
```

1    Q    Now, if you look at Exhibit 326, the *Rainbow Six* agreement

2    between Tom Clancy and Paramount, does that contain Paramount's

3    standard GRP definition?

4    A    I was distracted for a second, because I was looking at

5    these.                                                              09:39

6    Q    If you look at Exhibit 326, which is the prior exhibit we

7    looked at --

8    A    This is *Red Rabbit*?

9    Q    The *Rainbow Six*.

10            **THE COURT:**  Is there an objection, Counsel?            09:39

11            **MR. BERGMAN:**  Yes.  It's lack of foundation,

12    Your Honor.

13            **THE COURT:**  He hasn't really asked a question yet.

14            **MR. BERGMAN:**  He asked if it represented the standard

15    Paramount rider, and my objection is that this witness hasn't      09:39

16    demonstrated that --

17            **THE COURT:**  Sustained as to that question.

18    **BY MR. TOBEROFF:**

19    Q    Have you conducted negotiations with Paramount --

20    A    Yes.                                                          09:39

21    Q    -- which resulted in signed agreements with Paramount?

22    A    Yes.

23    Q    In those signs agreements, did those agreements contain

24    what's called Paramount's standard gross definition?

25    A    Yes.                                                          09:39

1    Q    Please look at Plaintiffs' Exhibit 326.

2    A    Okay.

3    Q    The Bates number is 6139.

4         Is this Paramount's standard gross definition?

5    A    Yes.                                                        09:40

6    Q    Do you have any reason to believe that between July 7,

7    1999, and August 9, 2002, Paramount changed its standard gross

8    definition?

9         **MR. BERGMAN:**  Objection.  Lack of foundation.

10        **THE COURT:**  Overruled.                                  09:40

11        What's your answer to that?

12        **THE WITNESS:**  My answer is that I have no reason to

13   believe that Paramount changed their exhibit between 1999 and

14   2002.

15        **THE COURT:**  How many Paramount agreements of this       09:41

16   nature did you have an opportunity to review for that time

17   period?

18        **THE WITNESS:**  The only agreements that I reviewed in

19   conjunction with my analysis here were these two agreements.

20        **THE COURT:**  Not with respect to your analysis.          09:41

21   In general.  I'm trying to see if you have foundation to make

22   this opinion, to say that there has not been a change, you

23   would have had to have looked at other agreements.

24        **THE WITNESS:**  I don't have a present recollection

25   that I negotiated a Paramount agreement between 1999 and 2002.   09:41

1          **THE COURT:**  I'll sustain the objection, on

2    foundation.

3    **BY MR. TOBEROFF:**

4    Q    Look at the bottom of Page 6139.

5          What does it say under the word "confidential"?                09:41

6    A    It says "Exhibit GRPV1," and then there's a --

7    Q    That's okay.

8          Based on your experience in the motion picture

9    industry, do studios frequently change their standard gross

10   definitions, or not?                                                 09:42

11   A    Very infrequently.

12   Q    Going back now to the *Red Rabbit* agreement, Exhibit 327,

13   from looking at the rider to Paramount's standard gross

14   definition, are you able to determine that the gross definition

15   that it amends is the same as the gross definition contained in      09:42

16   the *Rainbow Six* agreement?

17          **MR. BERGMAN:**  Objection.  Lack of foundation.

18          **THE COURT:**  Sustained.

19          Just lay a foundation for the particular question,

20   Counsel.                                                             09:43

21          **THE WITNESS:**  I think the objection was sustained.

22   **BY MR. TOBEROFF:**

23   Q    Have you negotiated agreements where you've asked for a

24   studio's standard rider to be attached to modify their standard

25   gross definition?                                                    09:43

1    A    Yes.

2    Q    And in looking at a standard rider, would a transactional

3    attorney be able to tell from the rider itself what gross

4    definition its modifying?

5    A    Sometimes when reading the footer, you would know.    09:44

6    Q    Does this document inform you as to that?  Does the rider

7    inform you as to that, in the *Red Rabbit* agreement?

8    A    No.  Because it references the Paramount lawyer Heppel,

9    *Red Rabbit* writes Clancy agreement of 2003.

10   Q    Based on the provisions amending Paramount's gross    09:44

11   definition, are you able to link what you're looking at, the

12   rider, to the gross definition contained in the *Rainbow Six*

13   agreement, or not?

14             **MR. BERGMAN:**  Same objection.

15             **THE COURT:**  Overruled.    09:44

16             You may answer.

17             **THE WITNESS:**  Okay.

18             In *Rainbow Six*, could you show me where the rider is.

19   I assume it's at the end of the document.

20   **BY MR. TOBEROFF:**    09:45

21   Q    Bates No. 6136.  And in the *Red Rabbit* agreement, it is

22   6186.

23   A    There is a link here, because if you look at the footer,

24   it's Heppel too; and I know Heppel to be a lawyer at Paramount.

25   And the path is the same.  It's rights Clancy -- this is    09:45

1    actually agreement 04, and this is agreement 03.  But based on

2    this, in my knowledge of the way these are generated, in my

3    review, there was indeed a link here.

4              So I can tell from this rider for *Red Rabbit* that the

5    gross receipts definition was the same as -- or should have                09:46

6    been the same as on *Rainbox Six*.

7    Q    Is the rider in the *Rainbox Six* agreement identical to the

8    rider in the *Red Rabbit* agreement?

9    A    It's exactly identical.

10   Q    So if the rider is identical, can you infer from that that    09:46

11   the gross definition that it applies to is also identical?

12              **MR. BERGMAN:**  Objection.  Leading.

13              **THE COURT:**  Sustained.

14              **THE WITNESS:**  Yes.

15   **BY MR. TOBEROFF:**                                                         09:46

16   Q    What are you able to tell from the fact that the two

17   riders are identical?

18   A    Well, if you -- this is a little reverse engineering, but

19   you can tell if there's a rider which is identical and which

20   modifies the gross receipts definition -- if the two riders are    09:46

21   identical, then the two definitions were identical.

22   Q    Now, in comparing the value or prominence of *Red Rabbit,*

23   a novel by Tom Clancy, to the value of Superman in the motion

24   picture industry in 2002, which is more valuable?

25              **MR. BERGMAN:**  Objection.  Lack of foundation.              09:47

```
 1              THE COURT:  I'll overrule the objection, but I want a

 2    follow-up question to explain what he means by "valuable."

 3    This gets back to the issue that I raised previously.

 4              MR. TOBEROFF:  Okay.

 5    BY MR. TOBEROFF:                                                    09:47

 6    Q    What was your answer?

 7    A    Superman, at that time, was more valuable.

 8    Q    What is the basis for your opinion?

 9    A    It's the same basis as I stated for the other Tom Clancy

10    book, which was -- Superman had the history over 70 years, and    09:47

11    certainly, if a Tom Clancy novel were in the open market and

12    Superman was in the open market, I'm highly confident, in fact

13    sure, that Superman would command a higher price than a

14    Tom Clancy novel.

15              THE COURT:  Besides history, are there any other         09:48

16    factors?  You've mentioned history several times.  Anything

17    else?

18              THE WITNESS:  One of the things you have to keep in

19    mind about Superman is that it's an evergreen character.  It

20    has 70 years of uninterrupted success.  The problem with          09:48

21    novels, especially in this time period, is that they really

22    don't have the -- A, because they're newer, they don't have the

23    history of success that you could look to.  Remember, we talked

24    about predicting, looking at success and trying to look

25    forward; and Superman also -- you can't really novelize          09:49
```

```
 1   Jack Ryan.  So Superman and ancillary markets, especially
 2   merchandising, is way --
 3          THE COURT:  You talk about these evergreen
 4   characters.
 5          In your experience, have you ever seen one of these     09:49
 6   evergreen characters reaching, or perceived to have reached, a
 7   saturation point, where their history is actually a negative as
 8   opposed to a positive?
 9          THE WITNESS:  I think Tarzan may well be at that
10   saturation point at this time.  I think that's probably a good     09:49
11   example.
12          THE COURT:  And that would certainly factor someone's
13   evaluation of --
14          THE WITNESS:  Right.  Right.  But one of the things
15   you have to keep in mind, Your Honor, is there's this recent     09:49
16   phenomenon of rebooting, where -- it just happened with
17   The Fast and the Furious.  It certainly happened -- Batman has
18   been rebooted.  And, basically, what happens is, there's a
19   release of a series of pictures that decline in value, and then
20   there's a waiting period; so the anticipation builds, and then     09:50
21   you start again; and, hopefully, it goes up.  That's a recent
22   phenomenon.
23   BY MR. TOBEROFF:
24   Q   Do you believe the climate as it existed in 2002 -- we've
25   heard testimony regarding the climate in the entertainment     09:50
```

1    industry in 2002.  Do you believe Superman had reached its

2    saturation point?

3    A     No, not at all.

4    Q     I'd like to show you what's been marked as Plaintiffs'

5    Exhibit --                                                              09:50

6            **THE COURT:**  What do you base that on?

7            **THE WITNESS:**  Well, Superman had continuing success

8    in merchandising, in comics, and the like.  It hadn't -- there

9    were the series of movies that had sort of diminishing returns

10   in the '70s to early '80s, but that was really to be expected.    09:51

11   At this time, I think there was the anticipation, certainly in

12   the marketplace, for a reboot of Superman; and Warner was

13   indeed working on it; and it ended up with the release of

14   *Superman Returns* in 2006.

15           **MR. TOBEROFF:**  Your Honor, plaintiffs offer          09:51

16   Exhibit 327 into evidence at this time.

17           **MR. BERGMAN:**  Your Honor, defendants object to that,

18   for the reason previous stated.  And the additional reason is

19   that this is one of the agreements that we're challenging the

20   authentication on, and have subpoenaed the witness to attend    09:51

21   court.  This is one of the agreements that we asserted that

22   Mr. Toberoff had not supplied to us, the documents he received

23   from the subpoenaed person; had not --

24           **THE COURT:**  So this is one of authentication issue

25   documents?                                                         09:52

 1          **MR. BERGMAN:**  Yes.

 2          **THE COURT:**  Where are we now on your efforts to bring

 3   in that witness to cross-examine?  Because I'll certainly give

 4   you leave to do that.

 5          **MR. PERKINS:**  We've served a subpoena on them, and          09:52

 6   we're waiting to go.

 7          **THE COURT:**  What I'll do is, I'll conditionally admit

 8   this, obviously subject to that examination.  If at the end of

 9   the day, there's no authentication, or if you're able to

10   successfully challenge that, then the agreement and the          09:52

11   evidence related to it goes out.

12          **MR. BERGMAN:**  Thank you, Your Honor.

13          **MR. TOBEROFF:**  Thank you, Your Honor.

14          **THE COURT:**  Very well.

15   **BY MR. TOBEROFF:**          09:52

16   Q    I'd now like to show you what's been marked as Plaintiffs'

17   Exhibit 316 for identification.  It is an agreement between

18   T Asset Acquisition Company, LLC, and AGV Productions, Inc.,

19   et al., dated April 12, 2007, pertaining to the Terminator

20   character.          09:53

21   A    Yes.

22   Q    Do you recognize this exhibit?

23   A    I recognize this exhibit.

24   Q    Did you review this agreement when reaching your opinions

25   and writing your expert report in this case?          09:53

1   A    Yes.

2          **MR. BERGMAN:**  Your Honor, defendants object to the

3   introduction of this agreement, because it has nothing to do

4   with the acquisition of the literary rights an underlying

5   property.  It is a purchase out of bankruptcy of an entire      09:53

6   business involving the Terminator, various films, various

7   television shows in development, various other things.  It is

8   not an agreement for the purchase of literary rights to an

9   underlying property.

10         **THE COURT:**  Very well.                                09:53

11         Counsel, all of this, I think, goes to the weight of

12  the evidence.  I'm not discounting these arguments, because I

13  think they may very well be critical arguments to make.  But I

14  am going to permit these agreements to come in, and then afford

15  you opportunity to cross-examine this witness and then make     09:54

16  whatever arguments to distinguish these agreements from -- I

17  think the better course, given that this is a bench trial, is

18  simply to consider the various agreements that both sides are

19  offering; consider which ones are comparable, which ones are

20  not, which ones are apples, which ones are oranges; and go from 09:54

21  there.  These arguments go more to the weight of the evidence,

22  so I'll overrule the objection.

23         **MR. BERGMAN:**  Thank you, Your Honor.

24         **THE COURT:**  Continue, Counsel.

25  **BY MR. TOBEROFF:**                                            09:54

1  Q    Mr. Halloran, I'd like to draw your attention to Page 5,

2  Paragraph 1.4 of Exhibit 316.  That's Bates No. 5957.

3  A    Yes.

4  Q    What does this paragraph provide?

5  A    It provides for a purchase price of $25 million.        09:54

6  Q    Now, what was being purchased under this agreement?

7  A    The main asset that was being purchased were the sequel

8  and remake rights to the Terminator character.

9  Q    What does this agreement provide for?

10 A    Well, it is styled as a sale and transfer of assets.    09:55

11 There's a list of the assets.  And the first thing that's

12 referenced are the sequel and remake rights to the motion

13 picture *The Terminator*.  Next is sequel and remake rights to

14 *Terminator 2*.  Next is sequel and remake -- recapture rights to

15 *Terminator 3*, and then the motion picture project entitled     09:55

16 *Terminator 4*, which is about --

17 Q    Looking at all of these assets --

18 A    In fairness, there are some additional assets.

19 Q    Looking at all of these assets, is there one asset that

20 you view as the core asset that's acquired under this        09:56

21 agreement?

22         **MR. BERGMAN:**  Objection.  Lack of foundation.

23         **THE COURT:**  Sustained.

24         Lay a foundation for the question.

25 **BY MR. TOBEROFF:**                                          09:56

```
 1   Q     Did you review all of the assets that are being acquired

 2   under this agreement?

 3   A     Well, I think what's telling is, typically in this sort of

 4   agreement, you list the assets in order of priority.  And the

 5   first assets that are referenced are the sequel and remake        09:56

 6   rights to the prior pictures and the motion picture project

 7   Terminator 4.  So, in reading this, I would conclude, without

 8   knowing more, that the most important part of it were the

 9   remake and sequel rights to the Terminator character.

10   Q     When is the $25 million payable under this agreement?       09:56

11   A     It says upon closing; so that means signature of the

12   various documents.

13   Q     Have you seen The Terminator motion pictures?

14   A     Yes, I have.

15   Q     Do you have a sense of the value of Terminator in the       09:57

16   motion picture industry in 2007?

17   A     In 2007?  Yes.

18   Q     The date of this agreement?

19   A     Yes.

20         MR. BERGMAN:  Objection, Your Honor.  Irrelevant.          09:57

21   It's five years after the last agreement in question.

22         THE COURT:  Counsel, it does seem to be -- what was

23   the date of this one?

24         THE WITNESS:  The date is April 12, 2007.

25         THE COURT:  We seem to be getting a little bit out of      09:57
```

```
 1   the -- you're going to have to reduce this, I suppose, back to
 2   some value commensurate with -- go ahead.  I'll overrule the
 3   objection on that basis.
 4   BY MR. TOBEROFF:
 5   Q    When you analyze these agreements, do you look at the            09:58
 6   value of the character at the time the agreement was entered
 7   into?
 8   A    Absolutely.  That's the core of the analysis.
 9   Q    And do you take that in consideration with making a
10   relative evaluation of the terms of the agreement?                   09:58
11   A    Yes.
12   Q    So based on your familiarity with the industry and with
13   Terminator, in 2007, how do you view the value of the
14   Terminator character for motion picture and television
15   exploitation?                                                        09:58
16   A    I thought it was --
17            MR. BERGMAN:  Objection.  Lack of foundation.
18            THE COURT:  You asked him how; right?
19            MR. TOBEROFF:  Yes.
20            THE COURT:  He's getting to that, Counsel.                  09:58
21            You may answer.
22            How do you do it?
23            THE WITNESS:  I think Terminator --
24            THE COURT:  Maybe I misunderstood the question.
25            Are you asking him how he goes about doing it?              09:59
```

```
 1              MR. TOBEROFF:  Yes.

 2              THE COURT:  Or are you asking him to actually do the

 3    evaluation?

 4              MR. TOBEROFF:  Both.

 5              THE COURT:  Let's start with the first.            09:59

 6    BY MR. TOBEROFF:

 7    Q    How did you go about valuing the Terminator character in

 8    2007?

 9    A    You would look at the general awareness regarding the

10    character; you would look at the history and timing of the     09:59

11    success of the Terminator character.  I think one of the things

12    that added to the value at this time was that Terminator, in my

13    view, was positioned for a reboot.  There had been a series of

14    films, but there hadn't been a Terminator film in at least a

15    decade or so.  So this was, I think, a situation where the      09:59

16    rights were valuable, because it was ready for a reboot.  And,

17    in fact, part of what was purchased was a project *Terminator 4*,

18    which is the reboot picture.

19    Q    Did you compare the value of Terminator in 2007, when

20    these terms were agreed to in this agreement, to the value of   10:00

21    Superman in 2002, when the terms were agreed to in the *Superman*

22    film agreement?

23    A    Yes.

24              MR. BERGMAN:  Objection, Your Honor.  Relevance and

25    lack of foundation.                                            10:00
```

```
 1              THE COURT:  Overruled.
 2   BY MR. TOBEROFF:
 3   Q    What was your conclusion?
 4   A    My conclusion was that Superman was more valuable than
 5   Terminator.                                                    10:00
 6              THE COURT:  And what is that based on?
 7              THE WITNESS:  That's based on what I think the price
 8   would be, based on, predominantly on, the estimated future
 9   value of the proceeds from the exploitation of the character.
10   Certainly, when you bought Terminator, you would think that    10:00
11   there would be probably a series of pictures, certainly a
12   Terminator 4 and maybe 5 and 6.  But in 2002, when you bought
13   Superman, not only did you have a more successful history, but
14   in terms of projecting future revenues, especially
15   merchandising revenues, they would be a lot higher.  Basically, 10:01
16   when a studio looks at a property, what they do is they project
17   future revenue, and then they discount it to a present value,
18   and they try to pay less than that, so they have a profit from
19   those future cash flows.
20              When I was at Universal, that's how we would -- you  10:01
21   know, we would do Excel models and project future income, and
22   then try to buy the discount to a net present value of the
23   future income.  That's the basis analysis.
24              THE COURT:  Counsel.
25              MR. TOBEROFF:  Your Honor, plaintiffs offer 316 into 10:01
```

```
 1   evidence at this time.

 2          THE COURT:  Any further objection?

 3          MR. BERGMAN:  No, Your Honor.

 4          THE COURT:  Very well.

 5          It's admitted.                                        10:02

 6          (Exhibit 316 is received.)

 7   BY MR. TOBEROFF:

 8   Q    We've just gone over the purchase prices in a number of

 9   different agreements.

10          Are you aware, based on your experience in the        10:02

11   entertainment industry, of any other agreements that contain

12   substantial purchase prices for underlying literary rights?

13   A    Yes.

14   Q    Underlying film rights, I should say, to intellectual

15   property.                                                    10:02

16   A    Yes.

17   Q    What other agreements are you aware of?

18   A    I'm aware of the Chorus Line agreement.

19   Q    How did you become aware of the Chorus Line agreement?

20   A    I followed Chorus Line quite closely.  It was a phenomenal 10:02

21   musical that originally came out in 1975, and I saw the musical

22   in San Francisco and Los Angeles, and in London; and by

23   coincidence, my ex-wife's uncle, Gordon Stalberg, was the

24   executive producer of the film.  He once headed Fox Studios;

25   so, obviously, we've talked about it.  And then, subsequently, 10:03
```

1  I became aware of the terms of the agreement.

2  Q    When you say "the terms of the agreement," are you

3  referring to the rights agreement underlying the film

4  *Chorus Line*?

5  A    Yes.

6  Q    How did you become aware of the terms of that agreement?

7  A    Well, I followed it in the trades when it was done, but I

8  didn't remember it exactly, so I reviewed some documentation

9  that reflected what the deal was, including a State of New York

10  report for nonprofits that set forth the agreement.                10:04

11  Q    What were the terms of the *Chorus Line* agreement based on

12  the State of New York report?

13  A    It was a purchase price of $5.5 million and 20 percent of

14  the gross in excess of $30 million of gross.

15  Q    What other agreements are you aware of in the              10:04

16  entertainment industry for high-profile intellectual

17  properties?

18  A    I'm aware of the Hasbro agreement.

19  Q    What is the Hasbro agreement?

20  A    It's a recent agreement that Universal made with has      10:04

21  Hasbro Toys.

22  Q    Can you tell me more about the agreement?

23  A    Yes.

24         The agreement provides for the production of four

25  pictures over six years.  It covers Monopoly, Candy Land, and I   10:04

1    think Ouija.  And the per-picture price is a total of

2    $6 million, which is allocated $5 million to the rights and

3    $1 million to a producer fee.  And that's applicable against

4    5 percent of the gross until cash break-even with a 0 percent

5    fee, at which point, it escalates to 7½ percent.  And then at          10:05

6    cash break-even with a 10 percent fee, it escalates to

7    10 percent of the gross, and then a cash break-even with a

8    25 percent fee.  Essentially, it's 15 percent of the gross.

9    Q    How did you become aware of the terms of the Hasbro

10    agreement?                                                             10:05

11    A    I discussed them with Tom McGuire, who's the general

12    counsel of Endeavor Agency.

13    Q    What is the Endeavor Agency?

14    A    The Endeavor Agency just merged with William Morris.  It's

15    one of the top four agencies in the world, talent agencies.           10:06

16    Q    Now, you've testified to the purchase price of

17    $4.5 million in the *My Fair Lady* agreement; $4.75 million in

18    *The Lord of the Rings* agreement; $5 million in the *Rainbox Six*

19    agreement; $7 million in the *Red Rabbit* agreement; $9.5 million

20    in the *Annie* agreement, not adjusted for inflation; $10 million    10:06

21    in the *Hannibal* agreement; $20 million in the *Sahara* agreement;

22    and an asset purchase of $25 million in the *Terminator*

23    agreement.

24            What is the purchase price in the *Superman* film

25    agreement?                                                            10:06

```
 1   A     Zero.

 2   Q     You testified earlier that DC's contingent gross

 3   participation in the *Superman* film agreement was 5 percent of

 4   Warner Bros.' worldwide gross revenues from a new *Superman*

 5   film.                                                              10:07

 6         I'd like to discuss with you now gross

 7   participations, if any, in other agreements that you reviewed

 8   in arriving at your expert opinion in this case.

 9   A     In fairness, the participation of Superman is the higher

10   of 7½ percent of domestic or 5 percent worldwide, but we did     10:07

11   discuss the 5 percent worldwide would likely be the higher

12   amount.

13   Q     Okay.

14         Moving on to the term "gross participation," I'd like

15   to show you what was previously identified as Plaintiffs'         10:07

16   Exhibit 307, the *Hannibal* agreement.

17         Actually, we already gave you that exhibit.  It's

18   307.

19   A     What property does it concern?

20   Q     *Hannibal*.                                                 10:08

21         I'd like to draw your attention to Page 1,

22   Paragraph 3 of the *Hannibal* agreement.  It's Bates No. 5760.

23   A     Okay.

24   Q     What does this paragraph provide?

25   A     It provides for a gross participation of 10 percent,        10:08
```

1   payable to the author of *Hannibal*, Thomas Harris.

2   Q    Does this refer to gross revenues of the distributor of

3   the film?

4   A    Yes.

5   Q    You previously testified that this agreement involved a          10:08

6   $10 million purchase price.

7          What effect, if any, does the purchase price have on

8   the gross participation?

9   A    Well, the $10 million is applicable against the 10 percent

10  of the gross; so it would reduce the 10 percent gross               10:09

11  participation.  So what the author would receive would be

12  $10 million and then 10 percent of the gross after there was

13  $100 million of gross.

14  Q    And this is for the film rights to the novel *Hannibal*?

15  A    Yes.                                                            10:09

16  Q    I draw your attention to Page 2, which is the continuation

17  of Paragraph 3 of the agreement.  It's Bates No. 5761.

18  A    I have it.

19  Q    What is the effect of this provision?

20  A    There's a separate paragraph in Paragraph 3.                    10:09

21         What language are you looking at?  Are you looking at

22  the video royalty?

23  Q    At the top of the page --

24  A    Okay.

25  Q    -- where Paragraph 3 continues.                                 10:09

1    A    Okay.

2    Q    What does this provide?

3    A    It provides that the definition of "gross proceeds" will

4    be the domestic distributor's customary definition, subject to

5    good faith negotiation within the distributor's customary          10:10

6    parameters.

7    Q    If another participant in the film receives a more

8    favorable definition, does the rights holder benefit from the

9    more favorable definition, or not?

10   A    Yes, he does.  There's a so-called most-favored nations       10:10

11   sentence.  It says, "In no event shall such definition be less

12   favorable to the rider than that provided to any other gross

13   participant."

14   Q    You referred to that as the "most-favored nations clause"?

15   A    That's what it's called in the industry.                      10:10

16   Q    How would you compare this gross participation to the

17   gross participation found in the *Superman* film agreement?

18   A    This is much more valuable.

19   Q    How much more valuable?

20   A    Twice as valuable.                                            10:11

21   Q    I'd like to show you what's previously been identified

22   Plaintiffs' Exhibit 326.  Excuse me.  You have 326.  It's the

23   *Rainbow Six* agreement.

24   A    Okay.

25   Q    Please look at Page 3, Paragraph 3.1, Bates No. 6120.         10:11

1    A    Okay.

2    Q    What does this paragraph provide?

3    A    It provides for gross receipts participation of

4    10 percent, in excess of $60 million.

5    Q    I'd appreciate it, when you describe these 10 percent, if      10:11

6    you'd tell us 10 percent of what.

7    A    Okay.

8          10 percent of adjusted gross receipts, in excess of

9    $60 million.

10   Q    Is that the same as 10 percent of worldwide distributor's      10:12

11   gross after $60 million?

12   A    Yes.  Exactly the same.

13   Q    Now, you previously testified that this agreement involved

14   a $5 million purchase price and a $1 million producing fee.

15        Is the $6 million in fixed compensation in the             10:12

16   *Rainbow Six* agreement applicable or nonapplicable to this

17   10 percent gross participation?

18   A    I believe it's applicable.

19   Q    Could you please check that in the agreement.

20   A    Oh, I misspoke.  It's exactly -- it's not applicable.  So      10:12

21   the $6 million is in addition to the 10 percent, in excess of

22   $60 million; but the net effect, as in the *Hannibal* agreement,

23   is that it's 10 percent of gross from the first dollar.  And

24   there's a prepayment of $6 million.  So the net effect is the

25   same as the *Hannibal* agreement.                               10:13

1  Q    How would you compare this effect of 10 percent gross

2  participation to the 5 percent gross participation in the

3  *Superman* film agreement?

4  A    This is twice as good.

5  Q    I draw your attention now to Plaintiffs' Exhibit 327.                10:13

6  It's the *Red Rabbit* agreement you previously looked at.

7           I draw your attention to Page 5, Paragraph 3.1,

8  Bates No. 6168.

9  A    Okay.

10 Q    What does this paragraph provide?                                   10:13

11 A    This provides that Clancy was to receive 10 percent of the

12 adjusted gross receipts in excess of $80 million of gross

13 receipts.

14 Q    Is that the equivalent of worldwide distributor's gross

15 after $80 million in worldwide distributor's gross is achieved?   10:14

16 A    Could you restate that question.

17 Q    When you say 10 percent of adjusted gross after

18 $80 million, is that the equivalent of 10 percent of

19 distributor's worldwide gross after worldwide gross equals

20 $80 million?                                                       10:14

21 A    Yes.

22 Q    You previously testified that this agreement involved a

23 $67 million purchase price and a $1 million producer fee.

24           Is the $8 million fixed compensation in the

25 *Rainbox Six* agreement that you previously testified to          10:14

```
 1   applicable or nonapplicable to this 10 percent gross

 2   participation?

 3   A     Yes.

 4   Q     Is it applicable or nonapplicable?

 5   A     It's applicable.                                          10:14

 6   Q     Could you take a look at the provision specifically,

 7   please.

 8   A     I'm sorry.  Again, I have it backwards.  It's

 9   nonapplicable.

10   Q     Which is it?                                              10:14

11   A     There's no provision for it to be applicable.

12   Q     So is it nonapplicable, then?

13   A     It is nonapplicable.  So it's $8 million, plus 10 percent

14   after $80 million.

15           But the net effect is 10 percent participation from     10:15

16   the first dollar.

17   Q     Why do you say the net effect?  What's the rationale for

18   that?

19   A     The rationale is that if you have 10 percent of the gross

20   from zero to $80 million, that equals $8 million.  So that      10:15

21   amount is essentially prepaid as the purchase price.

22   Q     Is that what you mean by an effective 10 percent gross

23   participation from first dollar?

24   A     Exactly.

25   Q     How would you compare this effective 10 percent gross to   10:16
```

1    the 5 percent gross participation in the *Superman* film

2    agreement?

3    A    It's twice as good.

4    Q    Yesterday, you commented on Plaintiffs' Exhibit 201, the

5    *Sahara* agreement.  If you can find Exhibit 201.                    10:16

6            I'd like to draw your attention to Page 16,

7    Paragraph 7.

8            What does this paragraph provide the author

9    Clive Cussler?

10   A    He receives 10 percent of producer's gross receipts.           10:17

11   Q    Is this worldwide gross revenues?

12   A    Yes.

13   Q    You testified that this agreement involved a $20 million

14   purchase price, with a net present value in the range of

15   $17 million.                                                          10:17

16           Is this purchase price applicable or nonapplicable to

17   the gross participation?

18           And please look at the agreement before you respond.

19   A    It's applicable.

20   Q    It's applicable or nonapplicable?                               10:18

21           **MR. BERGMAN:**  Leading.

22           **THE COURT:**  It is, Counsel.  Be careful what you're

23   doing.  You loose credibility when you --

24           **MR. TOBEROFF:**  I apologize.

25   **BY MR. TOBEROFF:**                                                 10:18

1    Q    Can you please read the agreement before --

2    A    It says, "10 percent of producer's gross from each

3    theatrical picture is defined as the gross sums received by

4    purchaser from the various distributors and licensees of the

5    rights in the theatrical pictures....without any set-off          10:18

6    between individual theatrical pictures, except for purchaser's

7    right to recoup the initial fixed purchase price and second

8    fixed purchase price from the contingent compensation otherwise

9    payable to owner from producer's gross receipts."

10   Q    So that would be applicable?                                  10:19

11   A    So it would be applicable, yes.

12   Q    You testified that in the *Superman* film agreement, the

13   *Superman* film agreement provided for 5 percent of distributor's

14   gross.

15         I'd like to talk to you about the differences between        10:19

16   the percentage of producer's gross contained in this agreement

17   and the percentage of distributor's gross contained in the

18   *Superman* film agreement.

19         Essentially, I'd like you to compare producer's

20   gross, as it would be for this agreement, to the distributor's     10:19

21   gross in the *Superman* agreement.

22   A    Okay.

23         Under this agreement, Mr. Cussler got 10 percent of

24   the money that was remitted to Anschutz, which owned the rights

25   and which financed the film and then licensed the film to          10:20

1    Paramount for domestic distribution.  And they also sold the

2    rights overseas, I think through Summit.  So what would happen

3    is that on the foreign side, the theatrical film agent would

4    take out a fee, a very low fee in this case, and some minor

5    expenses, and remit the foreign sums to Anschutz.                10:20

6            Philip Anschutz was the producer.  He's most

7    well-known for *Chronicles of Narnia*.  His company did those

8    pictures.

9            So that's the foreign agreement.

10           On the domestic side, they license the distribution     10:20

11   rights to Paramount, but Anschutz paid not only for the

12   production costs but the releasing costs.  So under the deal

13   with Paramount, Paramount would take a modest distribution fee,

14   probably -- I don't know the exact the number, but probably in

15   the range of 10 to 15 percent, and they would remit the balance  10:21

16   to Anschutz.  So that was the pot the 10 percent would be

17   calculated based on.

18           One thing that you have to keep in mind is that

19   because Anschutz financed the film at 100 percent, home video

20   revenue would be included in the amounts that would fall to the  10:21

21   bottom line that the percentage would be calculated based on.

22           So, certainly, potentially, this 10 percent -- and I

23   think it was likely in -- 10 percent, actually -- if it was

24   based on distributor's gross, it would be, I believe, at least

25   10 percent, if not more.                                         10:21

```
1    Q    Were you an expert in the Sahara case?

2    A    Yes.

3    Q    Do you have particular familiarity with the workings and

4    the financing of the Sahara film, due to your work in that

5    case?                                                          10:22

6    A    Yes.

7    Q    Leaving aside for a moment video royalties, how would you

8    compare the economic value received by the seller in the Sahara

9    agreement to the economic value received by DC in the Superman

10   film agreement?                                                10:22

11        MR. BERGMAN:  Objection.  Incomplete hypothetical.

12        THE COURT:  What elements need to be added, Counsel,

13   from your perspective?

14        MR. BERGMAN:  Well, there's no reference to

15   merchandising, for example.                                    10:22

16        MR. TOBEROFF:  I did not exclude merchandising.

17        THE COURT:  Overruled.

18        Be sure to lay out exactly how you're doing the

19   comparison.

20   BY MR. TOBEROFF:                                               10:23

21   Q    How would you compare the economic value received by the

22   licensor in the Sahara agreement to the economic value received

23   by DC in the Superman film agreement?

24        I'm just speaking about the actual terms of the

25   agreement.                                                     10:23
```

A    Cussler's agreement was more advantageous in that he received a very high purchase price per picture.  He also received a gross participation higher than the Superman participation per picture.

Q    When you say "purchase price," is that the $20 million you testified to previously for the right to make films from two Dirk Pitt novels?

10:23

A    Yes, it was.  A $20 million purchase price, spread out over time; but it applied to two pictures.  So it's basically $10 million per picture.  And then this participation also applies per picture.

10:24

So it's more advantageous to Cussler than the *Superman* agreement is to DC.

Q    I'd like to show you what's been marked for identification as Plaintiffs' Exhibit 325.  It's an agreement between Michael Crichton and Paramount Pictures Corporation dated October 22, 1999, pertaining to the film rights to the novel *Timeline* by Michael Crichton.

10:24

A    Okay.

Q    Do you recognize this exhibit?

10:25

A    I do.

Q    Did you review this agreement in reaching your opinions and writing your report in this case?

A    I did.

Q    Does this agreement contain a purchase price?

10:25

1   A      No, it does not.

2   Q      I draw your attention Page 3, Paragraph 3.1 of the

3   agreement.

4          What does this paragraph provide?

5   A      It provides that Crichton would get 10 percent of the      10:25

6   adjusted gross receipts until he receives $10 million, and then

7   additional gross receipts participations, ultimately escalating

8   to a much higher amount.  You actually have to read on to 3.2.

9   Ultimately, it goes to 20 percent of the gross receipts.

10  Q      Now, you mentioned "adjusted gross."                       10:25

11         Why did you say "adjusted"?  Is it first-dollar gross

12  or adjusted gross?

13  A      Well, adjusted gross receipts and gross receipts are

14  interchangeable.

15         This is first-dollar gross.  So what this would mean       10:26

16  is, in lieu of the purchase price, Crichton was to receive

17  10 percent of the gross from the first dollar until he received

18  $10 million.  So he gets 10 percent of the first $100 million

19  of gross receipts.

20  Q      And after that, it escalates up to 20 percent?            10:26

21  A      Ultimately to 20 percent of the gross.

22         MR. TOBEROFF:  Your Honor, plaintiffs offer

23  Exhibit 325 into evidence at this time.

24         THE COURT:  Any objection?

25         MR. BERGMAN:  No, Your Honor.                             10:26

```
 1              THE COURT:  It's admitted.

 2              (Exhibit 325 is received.)

 3    BY MR. TOBEROFF:

 4    Q    I'd like you to turn to the My Fair Lady agreement, which

 5    is Exhibit 300.                                              10:26

 6    A    This is the one that's really hard to read.

 7    Q    I draw your attention to Pages 32 and 33, Paragraph 28-B

 8    through C.  I'd like you to tell me what these subparagraphs

 9    provide.

10    A    I didn't catch your reference there.                    10:27

11    Q    Pages 32 to 33 --

12    A    Right.

13    Q    -- Paragraph 28-B through C.  The Bates numbers are 5542

14    to 5543.

15    A    I'm with you.                                           10:28

16    Q    What do these terms provide the rights holder?

17    A    They provide the rights holder would receive 50 percent of

18    the distributor's gross, to the extent the gross exceeded

19    $20 million.

20    Q    So after $20 million in distributor's gross, 50 percent of 10:28

21    distributor's gross is received?

22    A    Correct.

23    Q    Now, is there a payment to the estate of

24    George Bernard Shaw provided for in the agreement?

25    A    Yes.  My recollection is, it's a very complicated        10:28
```

```
 1   scenario, and that ultimately, the amount of gross receipts

 2   that were payable to the licensor was around 47½ percent.

 3   There were some reductions, because there were some payments to

 4   the estate of George Bernard Shaw.

 5   Q    And that's the author of the underlying *Pygmalion* --        10:29

 6   A    Yes.  I believe there's a schedule that --

 7   Q    I draw your attention to Page 32, Paragraph 28,

 8   Bates No. 5542, of the *My Fair Lady* agreement.

 9   A    Okay.

10   Q    You previously testified that the rights holder in the      10:29

11   *My Fair Lady* agreement received $5.5 million in installments

12   upon execution of the agreement.

13   A    Commencing execution, yes.

14   Q    Right.

15        Is the $5.5 million that's payable in the                    10:29

16   *My Fair Lady* agreement applicable or nonapplicable to the

17   47½ percent gross participation?

18   A    It's nonapplicable.  In Paragraph B, it says "in addition

19   to the payments referred to in subdivision A."  So it's

20   nonapplicable.                                                     10:30

21        THE COURT:  Counsel, let's take our break before we

22   get to this next exhibit.  We'll break for about a half hour.

23        MR. TOBEROFF:  Thank you.

24        (Whereupon, a brief recess was held.)

25        THE COURT:  Counsel.                                         11:05
```

1          **MR. TOBEROFF:**  I'd like to mark for identification as

2    Plaintiffs' Exhibit 331 an agreement regarding the property

3    Neo-Pets, dated as of August 31st, 2004, between Neo-Pets, Inc.

4    and Warner Bros. Pictures, Inc.

5          Let the record show I'm providing a copy of                    11:06

6    Plaintiffs' Exhibit 331 to opposing counsel.

7    **BY MR. TOBEROFF:**

8    Q    Mr. Halloran, have you seen this exhibit before today?

9    A    Yes.

10   Q    What do you recognize this exhibit to be?                       11:06

11   A    It's an agreement I negotiated with Warner Bros. regarding

12   the motion picture rights to a property on a web site called

13   Neo-Pets.

14   Q    Did you review this agreement when reaching your opinions

15   in this case and writing your report?                                11:06

16   A    Yes.

17          **MR. TOBEROFF:**  Your Honor, I would now offer what's

18   been marked for identification as Plaintiffs' Exhibit 331, as

19   Plaintiffs' Exhibit 331.

20          **THE COURT:**  Any objection?                                11:07

21          **MR. BERGMAN:**  The agreement is incomplete, but I will

22   complete the agreement on my examination.  I have no objection.

23          **THE COURT:**  It's admitted.

24          (Exhibit 331 is received.)

25   **BY MR. TOBEROFF:**                                                 11:07

```
 1   Q     Mr. Halloran, what are Neo-Pets?

 2   A     Neo-Pets are virtual pets that are created by children

 3   when visiting the Neo-Pets web site.

 4   Q     Does this agreement contain a gross participation,

 5   first-dollar gross participation, for the licensor of Neo-Pets?    11:07

 6   A     Yes.

 7   Q     What is that first-dollar gross participation?

 8   A     It's the same as Superman; it's 5 percent from the first

 9   dollar.

10   Q     How would you compare Neo-Pets to Superman in terms of the   11:07

11   relative value of the properties?

12   A     I think there's no -- with all due regard to my client,

13   Neo-Pets, I think there's no comparison.  Superman is the most

14   well known comic book character in the history of the world,

15   and Neo-Pets was a relatively new web site; so I think Superman   11:08

16   was way, way, way more well known and valuable at the time than

17   Neo-Pets was.

18   Q     Earlier on, you were asked regarding your assessment of

19   the high value of Superman, and what was the basis of that.

20         I'd like you to fill us in further as to why you            11:08

21   value Superman so highly.

22   A     Well, I think it's one thing to come to the conclusion

23   that every knows Superman, and I think that's really really an

24   important part of the analysis, because when a studio is

25   looking to acquire a piece of intellectual property, whether     11:08
```

```
 1   it's a comic book character or a video game or a character in a
 2   book, what they are looking at is what is the awareness in the
 3   public and how can we leverage that awareness into a successful
 4   film and successful merchandising.  And using that analysis,
 5   the Superman character would be worth a multiple of Neo-Pets.      11:09
 6   Q    Did you do any research in your process of valuing
 7   Superman?  Other than researching the different media in which
 8   Superman had been exploited over the years, did you do any
 9   other research?
10   A    Yes.  I reviewed several times the "Look Into the Sky,"       11:09
11   which was the Warner-produced homage to Superman.  I recently
12   read in -- Entertainment Weekly recently did a poll of their
13   readers for most popular comic book character of all time.
14   Superman was No. 1.  So I tried to bring some objective
15   measures in addition to the universally held notion that         11:10
16   Superman is the most well known comic book character in
17   history.  And certainly in the world of intellectual property
18   beyond just comic book characters, it's still, in my
19   estimation, the most valuable and well known intellectual
20   property in the world.                                           11:10
21   Q    Did you happen to review a People magazine survey
22   regarding brands?
23   A    Yes, I did.
24   Q    What did that show?
25        MR. BERGMAN:  Objection, Your Honor.  People Magazine       11:10
```

```
 1   is hearsay.
 2           MR. TOBEROFF:  I'm asking what he reviewed for
 3   preparing his reports.
 4           THE COURT:  Overruled.
 5           THE WITNESS:  Yes, I did.  And it listed Superman, I    11:10
 6   believe, as number six or seven of cultural icons of all time,
 7   ahead of any other comic book character.
 8   BY MR. TOBEROFF:
 9   Q    Where were the other known comic characters or animated
10   characters listed in that survey?                              11:11
11   A    They were further down the list.
12   Q    Do you know where on the list?
13   A    They were substantially further down the list.  I don't
14   have a present recollection of exactly where, but Superman was
15   far and away the top character.                                11:11
16   Q    Turning to Plaintiffs' Exhibit 128, the Lord of the Rings
17   agreement which you previously examined, it's on your desk and
18   it's also on the screen, Page 12, Paragraph 9, the Bates No.
19   04601, what does this paragraph provide?
20   A    It provides for a participation in gross receipts.        11:12
21   Q    Is that distributors' gross receipts or producers' gross
22   receipts?
23   A    It's Miramax gross receipts; so it's distributors' gross
24   receipts.
25   Q    Could you describe for me that gross participation.        11:12
```

```
 1   A    Yes.  From the first dollar, zero to $40 million, there's

 2   no payment because there had been prior payments for the

 3   purchase of the rights; and then, from 40 to $50 million, the

 4   payment is 5 percent; and then from 50 to $60 million, it

 5   escalates to 7-1/2 percent; and then from $60 million and       11:12

 6   beyond, it escalates to 10 percent.

 7   Q    So after $60 million in distributors' gross, the retailer

 8   receives 10 percent of gross.

 9   A    Correct.

10   Q    Could you describe the effective gross participation under  11:13

11   this agreement?

12   A    Yes.

13        You need to read down a bit more, because in addition

14   to the gross receipts participations at their various levels,

15   there are bonuses of $1 million once gross receipts equal       11:13

16   $90 million; a million dollars once gross receipts reach $100

17   million; and then, next page, there's a payment of

18   $1.25 million when adjusted gross receipts reach $125 million.

19        So what you do is if you add the previous payments

20   that have been paid, $4.5 million, and those bonuses, the       11:13

21   effect is that this is a 10 percent from dollar-one gross

22   participation.

23   Q    Now, is it fair to compare this effective gross

24   participation of 10 percent in the Lord of the Rings agreement

25   to the 5 percent gross participation set forth in the *Superman*  11:14
```

1    film agreement, or not?

2    A    Yes.

3    Q    How is that?

4    A    The effective gross receipts participation for Lord of the

5    Rings is 10 percent of distributors' gross, which is twice the          11:14

6    participation for *Superman*.

7    Q    Now, are the option fees applicable in *Superman* agreement

8    to the 5 percent gross participation?

9    A    Yes.

10   Q    Is the 4.75 million option and purchase price combined in       11:14

11   the Lord of the Rings agreement applicable to the -- is the

12   4.75 million combined option and purchase price in the Lord of

13   the Rings agreement, is that inapplicable to the gross

14   participation?

15   A    Yes.  It's inapplicable; so those payments are plus the        11:15

16   participation.  But if you add them both up, it equals

17   10 percent from the first dollar.

18   Q    Mr. Halloran, you've testified that the Hannibal agreement

19   provides a 10 percent gross participation; that the time

20   timeline agreement provides a complicated 10 percent gross       11:15

21   participation escalating to 20 percent; that the *Red Rabbit* and

22   *Rainbow Six* agreement both provide an effective 10 percent

23   gross participation; that the Lord of the Rings agreement

24   provides for an effective 10 percent gross participation.

25            What is the gross participation again in the *Superman*   11:16

```
 1   film agreement?
 2   A    It's half; it's 5 percent.
 3   Q    I'd like now to discuss briefly with you a new provision,
 4   and that's the terms dealing with what's called the home video
 5   royalty.  You testified earlier that a 20-percent video royalty    11:16
 6   was considered a default or a minimum standard term.  I'd like
 7   you to refer to Exhibit 325, which is the timeline agreement,
 8   the Michael Crichton timeline agreement, and I draw your
 9   attention to Page 4, Paragraph 3.3.; the Bates numbers start on
10   6.64 and go to Bates number 6065.                                  11:17
11   A    I'm with you.
12   Q    What does this paragraph provide?
13   A    It provides that in lieu of the standard 20 percent home
14   video royalty, it would be increased to 35 percent.
15   Q    I'd like you to turn now back to the Hannibal agreement,      11:17
16   Plaintiffs' Exhibit 307, and I draw your attention to Page 2,
17   Paragraph three, Bates number 05761.  It's continued from the
18   previous page.
19   A    Okay.
20   Q    What does this paragraph provide?                             11:18
21   A    It provides for a 35-percent royalty.
22   Q    Home video royalty?
23   A    Yes.
24   Q    If there are other gross participants in a film based on a
25   Hannibal property, what is the home video royalty?                 11:18
```

```
 1   A     The way it works is if there are other gross participants,

 2   then the video royalty is not computed on a 35-percent basis,

 3   but, rather, it would be computed based on the distributors'

 4   customary definition but subject to good faith negotiation, and

 5   it would be favored nations with the other gross participants.      11:18

 6   Q     I'd like to show you what's been previously marked for

 7   identification as Defendants' Exhibit 101, and I'd ask the

 8   clerk to please provide Defendants' Exhibit 101 to the witness.

 9         MR. PERKINS:  There is no Defendants' 101.

10         MR. TOBEROFF:  1101, excuse me.                               11:19

11   BY MR. TOBEROFF:

12   Q     Are you familiar with this document?

13   A     Yes.

14   Q     Did you review this document in writing your expert report

15   and rendering your opinion in this case?                            11:20

16   A     Yes.

17   Q     I draw your attention to Page 1 of the rider to the

18   defined gross receipts definition in this agreement; it's Bates

19   number 136436.  What is the effect of the bolded paragraph near

20   the top of the page in the Harry Potter agreement?                  11:20

21   A     I think there is some confusion here.

22         I was handed the Witchblade agreement; and now this

23   is Harry Potter.

24   ▮      ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

25          ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                                     11:21
```



11:22

11:22

11:22

11:22

18  Q    Switching now to the topic of reversion that you alluded

19  to earlier in this case.

20          I'd like you to go over and explain to us the               11:23

21  reversion of rights provision that appears in various

22  agreements that you compared to the *Superman* film agreement.

23  A    As I discussed, the basic notion was what I perceived as a

24  fundamental failing and not consistent with the value of the

25  Superman property was that there was no real mechanism for --      11:23

1    you either get back the rights if Warner stops making *Superman*

2    movies.  And I reviewed a multitude of agreements that provided

3    that if after a period of time, a studio like Warners stopped

4    making movies, then the owner of the intellectual property

5    would have the ability to get those rights back and exploit                11:23

6    them themselves or license them to third parties.  The effect

7    of these reversions is it forces the studio to keep making

8    movies.  In effect, under the *Superman* agreement, would have

9    been that had Warners kept making movies, that even though it's

10   relatively low gross participation, that there would be                    11:24

11   payments, continual payments, made to DC.  It would increase

12   the value of the asset to DC.

13   Q    I'd like to show you what's been marked for identification

14   as Defendants' Exhibit 1105.

15          **MR. TOBEROFF:**  If I could ask the clerk, please, to            11:24

16   provide that to the witness.

17   **BY MR. TOBEROFF:**

18   Q    Exhibit 1105 is an agreement produced by Warner Bros.;

19   it's between Katja Motion Picture Corp. and Marvel Characters,

20   Inc., dated August 2, 2001, pertaining to the comic book                   11:25

21   character *Ironman*.

22          Do you recognize this exhibit?

23   A    I do.

24   Q    Did you review this agreement when reaching your opinions

25   and writing your expert report?                                           11:25

1    A    Yes.

2    Q    I draw your attention to Page 18, paragraph 8-A, it's on

3    Bates No. 136615.  It's also on your screen.

4         What does this paragraph 8-A provide?

5    A    It provides that -- first of all, I want to point out that    11:25

6    Katja Motion Picture Corp. was a New Line company, just to make

7    that clear.

8              **THE COURT:**  Yes.

9              **THE WITNESS:**  It provided that in order to avoid

10   reversion of the rights, that New Line had to commence    11:25

11   principal photography of a feature within 12 months of date of

12   a payment and to affirmatively initially release that picture

13   theatrically within two and a half years from commencement of

14   principal photography.

15   **BY MR. TOBEROFF:**    11:26

16   Q    I draw your attention to paragraph 8-B on Page 18 of the

17   Exhibit, Bates 136615 going on to Page 19, 136616, and I'd ask

18   you, what does this paragraph provide?

19   A    It has to do with subsequent productions; that would be

20   sequels to the first picture.  This clause obligated New Line    11:26

21   to start development and hire a writer within one year from the

22   date of the initial theatrical release of the immediately prior

23   picture; so what that means is after the first *Ironman*,

24   New Line could not sit on the rights to the detriment of

25   Marvel; they had to start developing and hiring a writer within    11:26

1    one year after the release of the picture, the immediate

2    succeeding picture.

3    Q    Is this what's called in the entertainment industry as a

4    rolling reversion right?

5    A    Yes, it is.  And by 'rolling' that means that the                    11:27

6    provisions apply to each subsequent sequel.  So for example,

7    here, we have the first *Ironman*; that's released.  For picture

8    two, they have to start to development and hire a writer to

9    write a screenplay within one year; and if there's a picture

10   two, it rolls, and there's the same rule.  After picture two is   11:27

11   released, within one year they have to hire a writer and

12   commence development.

13          What it does is it forces the studio to continue to

14   develop and produce and release pictures.  And if they don't do

15   that, then the rights come back.                                   11:27

16   Q    And they have one year to commence development.

17          How long do they have to actually release a second,

18   third or fourth picture?

19   A    You'd have to add up the periods, but they -- let me

20   see -- they have to release a picture within three years.          11:28

21   Q    Are you familiar with the comic book character *Ironman*?

22   A    I am.

23   Q    Do you have preexisting knowledge of the character and did

24   you research it in connection with this case?

25   A    Yes, I did.                                                    11:28

1  Q    Can you assess or evaluate the worth of film rights to

2  *Ironman* in 2001 in comparison to the value of the film rights

3  to *Superman* in 2002?

4  A    Yes.  *Ironman* was a Marvel comic book character that was

5  not terribly well known as of 2001.  *Superman* in 2001 was an        11:28

6  incredible success as a comic book character and universally

7  known; so *Superman* would be much, much more valuable in 2001

8  than *Ironman*.

9  Q    Did *Ironman* subsequent to this agreement increase in

10 value?                                                                11:29

11 A    Yes.  It has increased in value substantially because of

12 the success of the recent film.

13 Q    But was that after the time of this agreement?

14 A    Yes.  This was after the time this agreement was entered

15 into.                                                                 11:29

16 Q    Did you review the Warner Bros. agreements, the agreements

17 produced by Warner Bros., regarding the film rights to the

18 character *Tarzan* and to the character *Conan*?

19 A    Yes.

20 Q    Did either of these agreements contain reversion clauses      11:29

21 for failure to continue to exploit the character or not?

22 A    They both did.

23 Q    Does the *Superman* film agreement Exhibit 232 contain any

24 such reversion provisions?

25 A    No.                                                              11:30

516

1   Q    If Warner Bros. failed to release another *Superman* film

2   after *Superman Returns* for the remaining 27-year term of the

3   agreement, would the *Superman* property revert to DC prior to

4   the expiration of 27 years at any point?

5   A    No.                                                        11:30

6   Q    Is DC's gross compensation in the *Superman* film agreement

7   dependent on Warner Bros. periodically releasing *Superman* films

8   or not?

9   A    Absolutely.  It's meaningless unless they release films.

10  Q    Why do you say that?                                      11:30

11  A    Because there's no purchase price, and the only way

12  participation is calculated and paid is based on proceeds that

13  emanate from the release of the picture; so by definition there

14  wouldn't be any gross proceeds if there aren't pictures that

15  are developed, produced and released.                          11:31

16  Q    And who has the discretion to decide to develop or release

17  pictures under the *Superman* film agreement?

18  A    It's completely Warner Bros.' discretion.

19  Q    Did you review the merchandising provisions implicated by

20  the gross definitions in the *Red Rabbit*, *Rainbow Six* and       11:31

21  timeline agreements that we have discussed?

22  A    Yes.

23  Q    Were the merchandising provisions less advantageous to the

24  rights holder than those in the *Superman* agreement?  I'm not

25  asking if they were less advantageous to the rights holder.    11:31

1    A    They were less advantageous.

2    Q    Why were the provisions less advantageous on paper?

3    A    They were less advantageous because for novels, like the

4    Tom Clancy novels, or especially Hannibal, the value of the

5    merchandising rights would not be an important component of the        11:31

6    anticipated income for the rights holder.

7             So, for example, you would not anticipate under

8    Hannibal that it would be important to Thomas Harris that he

9    have a participation in the Hannibal Lecter dolls.  It's very

10   different if you have a property like Neo-Pets or *Superman*,        11:32

11   where there's previous merchandizing activities and where you

12   anticipate that those rights will be valuable.

13          **THE COURT:**  So sometimes merchandising agreements are

14   very valuable, and sometimes they are not.

15          **THE WITNESS:**  Yes.  It depends on the character.        11:32

16   **BY MR. TOBEROFF:**

17   Q    When a property has previously shown itself to be

18   lucrative in a particular media, is the tenancy for rights

19   holders to attempt to reserve that right or to have special

20   provisions applicable to that right?        11:32

21   A    Yes.

22   Q    When a property has no prior exploitation or does not lend

23   itself to exploitation in a particular medium, let's say

24   merchandising, is the tendency not to reserve those rights and

25   to throw it into gross receipts?        11:33

```
 1   A    Yes.  The tendency is to grant the rights and throw it
 2   into grant receipts and leave it to the studio, if they can, to
 3   maximize the value of those granted rights.
 4   Q    Did you recall whether any of the agreements you looked at
 5   involved properties that had prior video game exploitation?          11:33
 6   A    Yes.
 7   Q    Which agreement was that?  Which property was that?
 8   A    I believe it was Rainbow Six.
 9   Q    And how were video games handled in the Rainbow Six
10   agreement?                                                           11:33
11   A    If you could point me to the provision, that would be
12   helpful.
13   Q    It's Exhibit 326.
14   A    Okay.
15   Q    I believe it's on the first page of the agreement.             11:34
16        Actually, it's the second page, Bates number SGL
17   06119.
18   A    Okay.
19   Q    Paragraph 1.4.
20   A    Yes.                                                            11:34
21   Q    Are video game rights reserved or not reserved by the
22   rights holder?
23   A    They are reserved.
24   Q    And do you believe that's because there were prior video
25   games exploiting that property?                                     11:34
```

1  A    Yes.  Because there's an expressed acknowledgment they had

2  already been licensed and have been exploited.

3  Q    I'd like to turn back to the subject which we discussed

4  regarding the *Superman* film agreement of creative controls.

5           You testified earlier that DC's creative controls          11:35

6  were extremely week, you used the term illusory, in the

7  *Superman* film agreement regarding the Superman character.

8           I'd like you to turn back to the *Ironman* agreement,

9  Defendants' Exhibit --

10  A    Defendants' 1105.                                             11:35

11  Q    Yes.  Exhibit 1105.  I'd like to draw your attention to

12  Page 19, Paragraph 9 of Exhibit 1105, Bates No. 136616.  It's

13  also on your screen.

14  A    Right.

15  Q    What does this paragraph provide?                            11:35

16  A    It provides for some detailed approval rights that Marvel

17  would exercise with respect to the character.

18  Q    Give me a better understanding of what those creative

19  controls consist of.

20  A    Initially, they had treatment approval, which is the sort    11:36

21  of basic outline for where the story is going to go.  They

22  also, I think, approved the -- there was a handbook -- this is

23  very typical for characters; DC has them, I'm sure, for

24  *Superman* and *Batman* -- there's a handbook as to exactly how the

25  character could be portrayed and not portrayed; basically what    11:36

```
 1   you can do and not do.  And what's important about that

 2   handbook is the licensor wants to make sure the character as

 3   depicted in the film doesn't detract from the previously

 4   valuable property.

 5   Q    Does that mean if New Line produced a film using Ironman,   11:37

 6   the character would have to comport to the descriptions in that

 7   handbook?

 8   A    Yes.

 9   Q    Turning back to Plaintiffs' Exhibit 201, the Sahara

10   agreement.  I draw your attention to Page 21, paragraph 10-A    11:37

11   through B.  It's Bates No. 4904.

12   A    Okay.  This one is the one that's --

13   Q    What does this paragraph provide in the Sahara agreement?

14   A    It provides that Clive Cussler would have screenplay

15   approval.                                                       11:37

16   Q    What other creative approvals is the author given in the

17   Sahara agreement?

18   A    He's given approval over the writers, the director and the

19   actors.

20   Q    Does the writer have complete veto authority with respect   11:38

21   to these elements under the agreement, or not?

22   A    Cussler had essentially complete veto over the screenplay.

23   There's a mechanism for directors and writers and actors where

24   there's an exchange of lists that went back and forth, and that

25   effectively gave him approval.                                  11:38
```

1    Q    I'd like to turn now to the subject of warranties.  You

2    previously note that after DC and Warner Bros. had received

3    plaintiffs' termination notices, that Warner had DC nonetheless

4    warrant in the DC film agreement that DC held exclusive film

5    and television rights and was not subject to any inconsistent          11:38

6    claims and that DC agreed to indemnify Warner for any loss

7    resulting from any breach of its warranties.

8            What warranty provisions, if any, do rights holders

9    generally include in film rights agreements?

10   A    The basic ones are they warrant they are the sole owner of       11:39

11   the property; that the exploitation of the property will not

12   infringe any rights of third parties; that there are no liens

13   or claims by third parties against the property that might

14   interfere with the rights of the studio.  Those are the basic

15   ones.                                                                  11:39

16   Q    What things are excluded from such warranties?

17   A    What are excluded is if there are claims that are

18   inconsistent with those warranties, then typically, those

19   claims are scheduled and excluded from the warranties, since if

20   they were to sign the agreement and these claims were -- they          11:40

21   would be immediately breached and they would have to indemnify

22   the studio.

23   Q    I'd like you to turn back to the Lord of the Rings

24   agreement, Exhibit 128.  I'd like you to turn, please, to

25   Page 14, Bates No. SGL 4603, paragraph 12 and paragraph 13.           11:40

1    Can you please tell me what these paragraphs provide.

2    A    I think the focus is on 13.  12 just lists some documents

3    that are going to be delivered.  But 13 references a schedule

4    which includes a list of documents that show the chain of title

5    to the work and basically there's an exclusion of the typical    11:41

6    'we own all of the rights because of the complexities and

7    potential problems with the Lord of the Rings chain of title.'

8    Q    What is the purpose of this exclusion with regard to the

9    licensor?

10        Strike that?    11:41

11        What is the benefit of such exclusion to the

12   licensor, if any?

13   A    Licensor is not put in breach of the warranties because

14   it's disclosed the problems to the studio ahead of time.  And

15   basically the way it works is the studio takes the risk of    11:42

16   these imperfections.

17   Q    Please turn back to the *Annie* agreement, which is

18   Exhibit 315.

19   A    Now, one of the things I noticed in E was there were some

20   claims referenced in E; so there were not only potential    11:42

21   problems but there were some claims outlined in E.

22   Q    I didn't know you were continuing.

23        Would you turn now to Exhibit 315, the *Annie*

24   agreement.  First page.

25        I draw your attention to Page 5, Paragraph 2 of    11:42

1    Exhibit 315, Bates 5781.

2            What does this agreement provide?

3    A    Well, it provides for qualifications to the

4    representations and warranties that were made by the owners of

5    *Annie*.                                                                11:43

6    Q    Can you tell me what those are?

7    A    Yes.  There was exclusions of certain comic strips for

8    *Lil' Orphan Annie*.  There had been some *Lil' Orphan Annie*

9    picture produced by RKO.  There was an exclusion as to the

10   status of the copyright in certain foreign territories.  There    11:43

11   was a reference to an agreement with RKO radio pictures.  There

12   was a reference to trademark rights.

13   Q    Thank you.  I think we get the picture.

14   A    Okay.

15   Q    I'd like you to turn back to the Hannibal agreement,         11:43

16   Exhibit 307.  When we turn back to an agreement, we're going to

17   show you the first page; so we'll show you what it looks like,

18   to make it easier for you to find it.

19   A    Okay.

20   Q    Please look at Paragraph five on Page 3 of the agreement,    11:44

21   subject paragraph C.

22   A    I'm having difficulty on the screen, so I have to

23   reference --

24   Q    It's Bates No. 5762.

25   A    Right.                                                        11:44

1  Q    What does this subject paragraph C provide?

2  A    Well, the parties acknowledge that Thomas Harris had

3  written a book called Red Dragon that Warner Bros. had acquired

4  under a literary purchase agreement, and that this agreement is

5  subject to that.                                                                    11:45

6  Q    Is this similar to an exclusion?

7  A    Yes.  It's effectively an exclusion.

8         I believe the Hannibal Lecter character was in

9  Red Dragon and there was a Red Dragon film; then subsequently

10 there was a Silence of the Lambs picture that O'Ryan did, and   11:45

11 then Hannibal was after that; so the parties had to make sure

12 that everyone understood the status of the various books that

13 contained the Lecter character; so they were taking care of

14 that in this provision.

15 Q    Briefly, I'd like to turn to the subject of cofinancing of  11:45

16 films by a rights holder.

17        What's meant by the term cofinancing?  Although it

18 might be self-explanatory, what is meant by the term

19 cofinancing in the film industry?

20 A    Basically, it's an agreement between the studio and a       11:46

21 third party to share the costs, sometimes development

22 production and releasing of a motion picture, and to share the

23 proceeds from the exploitation of the picture as equity

24 partners.  That's probably the easiest way of looking at it.

25 Q    What if anything are the benefits of a rights holder        11:46

```
 1   having the ability to cofinance films based on the rights
 2   holders' intellectual property?
 3   A    It's a great advantage, because, by definition, it's an
 4   option.  We did this in the Neo-Pets agreements.  It gives the
 5   licensor the ability to look at the project and to run numbers        11:47
 6   and assess whether it would be a good idea to cofinance.  They
 7   don't have to do that, but if they want to, they can.
 8            If they do cofinance and it's a hit picture, they
 9   could make a huge multiple of what they would get under a
10   typical literary purchase agreement.                                  11:47
11   Q    When a rights holder has a cofinancing option, can it wait
12   and see how a first film does to see whether it wants to
13   finance a second or third time?
14   A    Depends whether that cofinancing option is rolling or not.
15   But, yes, they could do that.                                        11:47
16   Q    And under a rolling cofinancing option, can you do that?
17   A    Yes.
18   Q    Other than the Neo-Pets agreement, are you familiar with
19   other agreements that have a cofinancing or co-fi option?
20   A    Yes.  I believe there was one other that I -- I don't           11:47
21   remember the name of it right now.  If you could remind me,
22   that would be helpful.
23   Q    Did you investigate the terms of an agreement between
24   Universal and Hasbro pertaining to board games?
25   A    Yes.                                                            11:48
```

1  Q    Did that agreement have a cofinancing option or not?

2  A    Yes, it did.

3  Q    Under that agreement did Hasbro have the ability to choose

4  to cofinance with Universal Films based on Hasbro board games?

5  A    Yes.                                                           11:48

6  Q    In reaching your opinion and conducting your analysis of

7  various comparable agreements, for instance, the Lord of the

8  Rings agreement, did you look at the revenues of *Superman*

9  *Returns* and the money actually made by DC under the *Superman*

10 film agreement and compare it to the amount of money DC would    11:49

11 have received with respect to *Superman Returns* if it had, for

12 instance, the terms that the rights holders had in the Lord of

13 the Rings agreement?  Did you conduct that sort of analysis?

14 A    No, because I thought it was irrelevant.

15 Q    Why is it irrelevant?                                         11:49

16 A    It's irrelevant because when you look at the agreements,

17 you look at them as of the time they were entered, and the

18 subsequent performance doesn't -- as we discussed the other

19 day, you try to predict the future and look into the big

20 future.  But doesn't affect the evaluation as of the time of    11:49

21 entering the agreement by definition.

22 Q    ████████████████████████████████████████████

23 █████████████████████████████████████████████████████

24 █████████████████████████████████████████████

25 ██████████████████████████████████████████████        11:50

527



Q    At the time the Harry Potter agreement was entered into in

June 1998, what did your research show was the extent of the

exploitation of Harry Potter as a novel at the time this

agreement was entered into in June of 1998?

         MR. BERGMAN:  Objection.  The Harry Potter agreement

is an agreement extremely confidential agreement and was

submitted on that basis by Warner, and I don't think it should

be discussed in this proceeding.  We are not relying on the

Harry Potter agreement.

         MR. TOBEROFF:  We have a protective order in this

case which specifically states that the parties will hold

documents stamped "confidential" as confidential, but we can

use them at trial.

         MR. BERGMAN:  May we just...

11:50

11:50

11:51

11:51

11:51

1          **MR. TOBEROFF:**  If I may continue.

2          And an issue recently came up regarding

3    confidentiality and marking certain documents that had not been

4    marked "confidential."  And we stipulated to mark those

5    additional documents as "confidential," at which point in time          11:52

6    Defendants' reiterated that documents marked "confidential" can

7    still be used at trial.

8          And this is a document produced by Warner Bros. in

9    this case, and it's listed as one of their exhibits in this

10   case.          11:52

11          **MR. BERGMAN:**  May we simply provide that the

12   transcript relating to "Harry Potter" be sealed.

13          **THE COURT:**  I'll give you leave to apply for that.

14   I'm very reluctant at a public trial to place anything under

15   seal.  Discovery is one thing; the trial is something else.          11:52

16          However, for good cause, the Court will consider

17   that.  But I think that should be applied in writing so there's

18   a clear record in case, down the road, there's any question as

19   to why the Court placed something in a public trial under seal;

20   so for First Amendment purposes, I'd ask that you go through          11:52

21   the process to make an application for that.

22          Right now there's nobody in the courtroom other than

23   your clients and associated staff.  But absent an order from

24   the Court, all of this is public; so go ahead and apply for

25   that.          11:53





9  **BY MR. TOBEROFF:**

10  Q    Can you describe to me, what do you mean by net profits?

11  A    By net profits, in the spectrum of valuable participation

12  to participants, the single most valuable participation is the

13  first-dollar gross, and then at the other end of the spectrum,

14  the least available is net profits.

15  Q

16

17

18

19

20

21

22

23

24

25  Q    Turning now to the *Superman* television agreement

11:54

11:54

11:55

11:55

11:56

1    underlying the series *Smallville*.

2              **THE COURT:**  The Exhibit number, Counsel?

3              **MR. TOBEROFF:**  223, Your Honor.

4              **THE COURT:**  Is this a specific agreement to

5    *Smallville*?                                                        11:56

6              **MR. TOBEROFF:**  It's the rights agreement, DC

7    Warner Bros. underlying *Smallville*.  I'll refer to this as the

8    *Superman* television agreement, *Smallville* agreement.

9    **BY MR. TOBEROFF:**

10   Q    In general, how are valuable franchise properties --       11:56

11   strike that.

12              Are valuable franchise properties with a prior

13   commercial track record customarily exploited in television?

14              **MR. BERGMAN:**  Objection.  Lacks foundation.

15              **THE COURT:**  Sustained.                                 11:57

16              Lay foundation for this.

17   **BY MR. TOBEROFF:**

18   Q    Are you familiar, based on your transactional work and

19   work on the studios, with how the television industry operates?

20   A    Yes.                                                          11:57

21   Q    Are you familiar with the type of programming that appears

22   on television?

23   A    Yes.

24   Q    Is it customary in the television industry to exploit

25   valuable pre-established franchise properties?                     11:57

1    A    In television?

2    Q    Yes.

3    A    Rarely.

4    Q    Why do you say that?

5    A    I say that because if you look at the marketplace, with          11:57

6    respect to the top Superman and Batman and equivalent

7    properties, most of the time but not all of the time, the

8    studios prefer and see it more valuable to continue to make big

9    budget tent pole movies and use that as a way to generate

10   income, but, probably more importantly, to keep awareness          11:58

11   going.  There are exceptions to that, but typically, today,

12   with this success of Harry Potter, you probably would not see a

13   Harry Potter television series; given the recent success of

14   *Batman*, you're not going to see a *Batman* television series;

15   you're probably not going to see a Pirates of the Caribbean          11:58

16   television series because the studios perceive it much more

17   valuable to keep them on the tent pole track.

18   Q    Can films generate revenue more quickly if they succeed

19   than a television series?

20   A    Yes.                                                            11:58

21   Q    Why is that?

22   A    Because a television series typically only generates a

23   license fee and modest amounts from foreign and video over

24   time.  One of the great advantages of the film model is that

25   you can get that immediate hit of the opening weekend and          11:59

1    massive amounts of film rental that come from the box office;

2    so they can be more immediately profitable, typically, than a

3    television series.

4    Q    For how long would a television series be on the air

5    before it can recoup its production budget, approximately?    11:59

6    A    A rule of thumb is that it takes approximately 85 to 100

7    episodes in order to get the aggregate amount of episodes so

8    you can enter syndication.  And most often you don't -- the

9    budgets for the television programs are run at a deficit up

10   until that time, and you try to hit the home run of    12:00

11   syndication.  And it's only at that time after many seasons

12   that the program becomes profitable.  That's typical.

13   Q    During the approximate 30 years you've been in the

14   entertainment industry, can you think of any television series

15   based on a preestablished franchise property, other than    12:00

16   *Smallville*?

17   A    Well, I'm certainly aware of, in the old days, the Batman

18   television series and the *Superman* television series.  But

19   certainly, since the rise of the tent pole, with the exception

20   of a *Smallville* -- I'm sure we'll talk about that -- there    12:00

21   hasn't really been a series based on an iconic property that is

22   still being exploited theatrically.

23   Q    What about the *Sarah Conner Chronicles*?

24   A    Well, that is an exception.  *Sarah Conner* is part of the

25   Terminator franchise.    12:01

1    Q    Would that be considered what they call a spin-off?

2    A    Yes, it is a spin-off because it's not the Terminator

3    character; it was a character included in the movie, but not

4    the main-branded character.  But that series -- it's not clear

5    whether that series is still going, and it's only had limited                12:01

6    success.

7    Q    Due to the fact that such franchises are rarely exploited

8    in television, did you find it difficult to locate comparable

9    agreements to the *Superman* television agreement?

10   A    Yes, because they don't exist.                                          12:01

11   Q    I'd like you to walk us through the *Superman* television

12   agreement quickly, the way you did with the *Superman* film

13   agreement.  Go to Exhibit 223.

14        Do you recognize this agreement?

15   A    I do.                                                                   12:02

16   Q    And you reviewed it and analyzed it in rendering your

17   opinion and in writing your expert report in this case?

18   A    Yes.

19   Q    I draw your attention to Page 9, which is the signature

20   page, Bates number 135039.                                                  12:02

21        When was this agreement executed?

22   A    (No audible response.)

23   Q    Drawing your attention to the bottom left hand --

24   A    The footer says February 5th, 2001.

25   Q    As connoting the last draft of the agreement?                          12:02

1    A    Yes.  So it had to have been signed no earlier than that

2    date.

3    Q    Or it could have been signed after that date?

4    A    Yes.  But certainly no earlier.

5    Q    I draw your attention to what's called the short form          12:03

6    option which is attached to the agreement on the page Bates No.

7    WB-135048.  If you could tell me when the short form was

8    signed.

9    A    February 12, 2001.

10   Q    I show you what was previously admitted as Exhibit 222;        12:03

11   this is an agreement between DC Comics and Warner Bros., a

12   division of Time Warner Entertainment Company LP, dated as of

13   December 5th, 2000, as amended September 5, 2002, regarding the

14   television rights to Superman underlying the series *Smallville*.

15   A    222?                                                           12:04

16   Q    Yes.  Did you review this agreement as well?

17   A    Yes, I did.

18   Q    Can you summarize briefly the nature of the amendments

19   that were made to the *Smallville* television agreement on

20   September 5, 2002, pursuant to Exhibit 222?  Or if you recall      12:04

21   what they relate to.

22   A    I looked at this entire agreement.  This was basically the

23   operative agreement.  I don't remember separately analyzing

24   the --

25   Q    We can move on.                                               12:04

1          I draw your attention to paragraphs one and two of

2     page one of Exhibit 222.

3          MR. BERGMAN:  Objection, Your Honor.  The witness

4     just testified he didn't analyze Exhibit 222.

5          MR. TOBEROFF:  He didn't say that, Your Honor.          12:05

6          THE WITNESS:  I didn't say that.

7          THE COURT:  Don't speak out.  It really messes up the

8     record.

9          Reask the question, Counsel.

10    BY MR. TOBEROFF:                                             12:05

11    Q    Did you analyze Exhibit 222 in the process of forming your

12    opinions in this case prior to writing your expert report?

13    A    Yes.

14    Q    I draw your attention to paragraph one and two, Page 1 of

15    the agreement.                                               12:05

16          Your Honor since this is amended -- this amendment

17    is -- this is the last agreement which contains an amendment to

18    the prior *Smallville* television agreement.  I think we'll work

19    off the most recent *Smallville* television agreement in

20    analyzing the terms.                                         12:06

21          THE COURT:  Just refer to it by exhibit to make it

22    clear.

23    BY MR. TOBEROFF:

24    Q    Does Exhibit 22, the *Smallville* television agreement,

25    contain an option fee or not?                               12:06

1    A    It does.

2    Q    What is the option fee?

3    A    $10,000.

4    Q    What is the option term?

5    A    The option term is one year; an initial one year and right        12:06

6    to extend for an additional one year.

7    Q    What does it cost to extend the option for an additional

8    one year?

9    A    It's another $10,000.

10   Q    Showing you Plaintiffs' Exhibit 181, previously admitted;        12:06

11   it's an agreement between DC Comics and Lorimar Productions,

12   Inc.  Exhibit 181 concerns *Superman* television rights as well,

13   and these are the rights which underlie the television series

14   *Lois & Clark* in 1993.  For ease of reference, I'll refer to

15   this agreement as the Lorimar agreement.        12:07

16           Please look at Page 1, paragraphs one and two, of the

17   Lorimar agreement.  It's Bates No. 134886.

18           Did you review the Lorimar agreement in reaching your

19   opinions in this case?

20   A    Yes.        12:07

21   Q    Did you have the opportunity to compare the terms of the

22   Lorimar agreement to the terms of the *Smallville* television

23   agreement?

24   A    Yes.

25   Q    What did that comparison tell you?        12:07

1    A    That they were essentially the same economically.

2    Q    What is the option fee in this agreement?

3    A    It's $10,000.

4    Q    And the option term?

5    A    Initial one year with an extension for another year.    12:08

6    Q    In accordance with rendering your opinion, did you

7    research the company Lorimar Productions?

8    A    I didn't do a separate research, but I was aware that

9    Lorimar was a television production company that was owned by

10   Warners.    12:08

11   Q    At the time of this agreement?

12   A    At the time of the agreement, yes.

13   Q    Showing you what's been previously admitted as Plaintiffs'

14   Exhibit 15; it is an agreement between DC Comics and Cantharus

15   Productions, dated June 15, 1987, referencing licensing rights    12:08

16   underlying the *Superboy* television series.

17        Did you review this agreement in reaching your

18   opinion in this case?

19   A    Yes.

20   Q    For ease of reference, I'll refer to this agreement as the    12:09

21   *Superboy* agreement.

22        Are you familiar with the company Cantharus

23   Productions?

24   A    Yes.

25   Q    Who owned that company?    12:09

```
 1   A    Elia Salkind.

 2   Q    What does this 1987 Superboy agreement concern?

 3   A    It concerns the license by DC to Cantharus of television

 4   rights to the character Superboy.

 5   Q    And did the Superboy television series result from this          12:09

 6   agreement?

 7   A    Yes.

 8   Q    How long did the Superboy series stay on the air?

 9   A    I don't recall exactly how long; but for a period of time,

10   it was a successful series.                                           12:10

11   Q    I'd like to draw your attention to Page 5, Paragraph 4-A,

12   Roman numerate iiii of the Superman agreement; it appears on

13   Bates No. 13565.  What does that paragraph provide?

14   A    Could you tell me the paragraph reference again.

15   Q    Roman numeral IV-A and then iiii.                                12:10

16   A    It provides for a payment on execution of $800,000.

17   Q    What are the other terms controlling this payment?

18   A    Well, the reference in paragraph B -- basically this

19   payment was a prepayment of potential revenue that DC would

20   receive from Superman IV.                                             12:11

21   Q    When you say 'prepayment of potential revenue,' what do

22   you mean by potential revenue?

23   A    That was not a fixed amount at the time, and DC, as you

24   recall under the Salkind agreement, had a gross participation;

25   so this was a payment to DC in lieu of that participation.           12:11
```

1    Q    Was DC guaranteed to receive $800,000 in connection with

2    *Superman IV* in the form of contingent compensation or not?

3    A    No.

4          **MR. BERGMAN:**  Objection.  Lacks foundation.

5          **THE COURT:**  Lay foundation, Counsel.                    12:11

6    **BY MR. TOBEROFF:**

7    Q    Are you familiar with the terms of DC's agreement which

8    relate to *Superman IV*, namely the 1974 Salkind agreement?

9    A    Yes.

10   Q    Are you familiar with the contingent compensation          12:12

11   provision in the 1974 Salkind agreement?

12   A    Yes.

13   Q    Pursuant to that contingent compensation provision, is DC

14   guaranteed to receive $800,000 from the exploitation of

15   *Superman IV* or not?                                            12:12

16   A    No.

17          **MR. BERGMAN:**  Objection.  Lacks foundation.  The

18   provision makes it clear that it is not referring to an earlier

19   agreement with the 74 agreement but, rather, to an agreement

20   with Cannon Films.                                               12:12

21          **MR. TOBEROFF:**  Pardon me.  I was referring to the

22   wrong agreement, Your Honor.

23          **THE COURT:**  Very well.

24   **BY MR. TOBEROFF:**

25   Q    Are you familiar -- strike that.                            12:12

1          Is it in the nature of a contingent compensation that

2    it is guaranteed?

3          **MR. BERGMAN:**  Objection.  Vague and ambiguous.

4          **THE COURT:**  Counsel, this is the problem with leading

5    questions.  If you just let the witness speak what he knows,          12:13

6    you wouldn't find yourself in this type of situation.

7          Sustain the objection.

8    **BY MR. TOBEROFF:**

9    Q    Can you describe to me what you believe from your analysis

10   in this case DC was entitled to with respect to the *Superman*          12:13

11   *IV*?

12   A    DC was --

13         **MR. BERGMAN:**  Objection.  Lacks foundation.  There's

14   no evidence of any --

15         **THE COURT:**  He's already indicated his basis for          12:13

16   understanding what DC comments would receive in *Superman IV*;

17   it's disconnected from the earlier question, but --

18         You're just asking about *Superman IV* right now?

19         **MR. TOBEROFF:**  I'm asking about *Superman IV*.

20         **THE COURT:**  Based on what he testified that he's          12:13

21   reviewed?

22         **MR. TOBEROFF:**  Correct.

23         **THE COURT:**  Overruled.

24         **MR. TOBEROFF:**  And based on that, was DC guaranteed

25   $800,000.          12:14

 1          **THE COURT:**  Counsel, I overruled the objection to the

 2    last question.  Don't ask another question now.

 3          If you need to have it reread, the court reporter

 4    will do that.

 5    **BY MR. TOBEROFF:**                                    12:14

 6    Q    You can answer.

 7          **THE COURT:**  Are you mindful of the question?

 8          **THE WITNESS:**  I am.

 9          **THE COURT:**  Very well.

10          **THE WITNESS:**  Under the provisions applicable to the    12:14

11    payment to DC of its participation for the license of the

12    *Superman* character, those payments would be contingent upon

13    release of the picture and generation of proceeds and the

14    credit worthiness of Cannon Films.

15    **BY MR. TOBEROFF:**                                    12:14

16    Q    I'd like to move now to the subject of options, option

17    fees and the *Superman* television agreement, and compare that to

18    other agreements briefly.

19          Did you review any other underlying rights agreements

20    for television series that had option fee payments?         12:15

21    A    Yes.

22    Q    Did you review an agreement that was produced by

23    Warner Bros. for the rights to a book called "How to Teach

24    Filthy Rich Girls"?

25    A    Yes.                                               12:15

1  Q    And how did the option payment in that agreement -- the

2  option fee compare to the option fee in the *Superman* film

3  agreement --

4  A    I believe --

5  Q    The *Superman* television agreement?                    12:15

6  A    -- it was greater.

7  Q    Do you recall what that provision --

8  A    If I could see the agreement, I could tell you

9  immediately.

10        **MR. TOBEROFF:**  May I ask the clerk to please provide   12:16

11  the witness with Exhibit 1100.

12        **THE WITNESS:**  I stand corrected.  It's equivalent.

13  Even though it's -- it's "How to Teach Filthy Rich Girls," but

14  it's $10,000; so it's the same option for a lesser property.

15  **BY MR. TOBEROFF:**                                         12:16

16  Q    I'd like to now turn to the subject of episodic royalty

17  and gross participation in the *Superman* film agreement, which

18  is Exhibit 222.  I draw your attention to paragraph two of

19  Exhibit A, which is located on Page 8 of Exhibit 222, Bates

20  No. 135006.                                                  12:17

21  A    Okay.

22  Q    What television rights are granted to Warner Bros.

23  pursuant to this provision?

24  A    Exclusive worldwide television production rights, except

25  for television animation rights.                             12:17

1    Q    What do you call those in the television industry if --

2    strike that.

3              What are live action television rights?

4    A    Live action rights, as opposed to animation rights, you

5    have live human characters; animation, you, by definition, have    12:18

6    drawings of characters.

7    Q    Is this a license for all live action television rights to

8    the Superman character?

9    A    Yes.

10   Q    And does this definition include Internet rights and    12:18

11   allied rights?

12   A    Yes.

13   Q    I draw your attention to Page 2, paragraph seven of the

14   Exhibit Bates No. 135006.  I ask you what this paragraph

15   provides to DC?    12:18

16   A    It provides an episodic royalty of $45,000.

17   Q    What is meant by an episodic royalty in the television

18   industry?

19   A    That's an amount that's payable for each episode that's

20   produced.    12:19

21   Q    Is that considered a contingent payment, contingent or

22   not?

23   A    It's not contingent.  Well, the only contingency is that

24   the episode be produced.

25   Q    So if you produce two episodes, you receive $90,000.    12:19

```
 1   A    Correct.
 2   Q    But if you didn't produced any more after that, that would
 3   be it.
 4   A    That would be it.
 5   Q    Now, what form of television -- for what television -- I'd      12:19
 6   like you to turn to Page 2, paragraph seven of the exhibit.
 7   And I'd ask you what triggers payment to DC under this
 8   paragraph.
 9   A    Well, it would trigger payment would be collection of
10   gross receipts based on exploitation of the series.                  12:20
11   Q    Do the payments provision solely apply to episodic
12   television series?
13   A    No.  It's both for the pilot and the series.
14   Q    But it applies to exploitation of an episodic television
15   series.                                                              12:20
16   A    Yes.
17   Q    Are the rights granted under this agreement broader than
18   episodic television series, or not?
19   A    They are broader.
20   Q    Are there any form of television that you can think of to      12:20
21   which Warner Bros. would have the right to exploit but no
22   obligation whatsoever to pay DC for that exploitation?
23   A    A series of Webisodes.
24   Q    On the Internet?
25   A    Yes.  I don't think that would fall under this definition.     12:21
```

1    Q    Is that because they have Internet rights?

2    A    Yes.

3    Q    And what about broadcast television?  Can you think of

4    forms of television exploitation excluding episodic series

5    covered by the rights grant?                                    12:21

6         Is a movie of the week considered an episodic

7    television series?

8    A    No.

9    Q    Is what they call a 'television special' considered an

10   episodic television series?                                    12:21

11   A    No.

12   Q    Is a documentary considered an episodic television series?

13   A    No.

14   Q    If Warner Bros. exploited any of those forms, a movie of

15   the week, a TV special, a documentary or Webisodes on the      12:21

16   Internet or some form of new television media, would they have

17   an obligation to pay DC under this agreement?

18   A    No.

19   Q    Turning back to Page 2, paragraph seven of the *Superman*

20   television agreement, what is the amount of the royalty?       12:22

21   A    The amount of royalty is 3 percent of the first 1,500,000

22   of gross receipts and it's --

23   Q    Excuse me.

24   A    There is no royalty.

25        **THE COURT:**  Counsel, you cannot interrupt your         12:22

```
 1   witness in the middle of an answer, even if you don't like the
 2   answer he's giving.
 3           Do you understand that?
 4           MR. TOBEROFF:  I'm sorry.  My associate was -- I
 5   apologize.                                                    12:22
 6           THE COURT:  Very well.
 7           MR. TOBEROFF:  It wasn't that I didn't like the
 8   answer.  It's that --
 9           THE WITNESS:  The royalty is in Paragraph six.  The
10   contingent compensation is in paragraph seven.  That's not an  12:22
11   episodic royalty, it's a participation in the gross from the
12   exploitation of the pilot and series.
13   BY MR. TOBEROFF:
14   Q    Moving back to the episodic royalty you mentioned, what
15   was the amount of the episodic royalty?                        12:23
16   A    45,000 per episode.
17   Q    Does this royalty apply or not apply against DC's gross
18   participation?
19   A    It applies.
20   Q    Now, turning to Page 2, paragraph seven, of the *Superman*  12:23
21   television agreement, what does that paragraph provide?
22           Is that the gross participation you were just
23   speaking about?
24   A    Yes.
25   Q    What is the amount of that gross participation?           12:23
```

1    A    If you apply the 45,000 against the 3 percent, it is

2    5 percent in excess of $1.5 million gross receipts.

3    Q    Do you have an idea why the $1.5 million figure is in the

4    agreement?

5            **MR. BERGMAN:**  Objection.  Calls for speculation.      12:24

6            **MR. TOBEROFF:**  I'll rephrase; that was poorly

7    phrased.

8    **BY MR. TOBEROFF:**

9    Q    What is the significance of the $1.5 million figure in the

10   agreement?                                                       12:24

11   A    My understanding is that the 1.5 million was the

12   approximate starting budget of *Smallville*.

13            **THE COURT:**  What's that based on?

14            **THE WITNESS:**  Well, I certainly know that shows like

15   *Smallville* -- actually I discussed this with one of my         12:24

16   partners, Wayne Alexander, the television expert, and he

17   explained to me that *Smallville* probably started out with a

18   budget in the 1.5 to 2 range, and it's gone up; but I

19   understand now that it's about $3 million.  But I think the

20   calculation that was probably made was that the budget was       12:24

21   about 1.5 and they took 3 percent of that and came up with a

22   45,000 royalty.

23   **BY MR. TOBEROFF:**

24   Q    What is the effect of the applicability of the $45,000

25   episodic royalty to the 3-percent gross participation?           12:25

```
 1   A     It eliminated it, because there was an advance of the
 2   episodic royalty.
 3   Q     To the first million five per episode of Smallville, does
 4   DC actually receive any participation?
 5   A     No.                                                            12:25
 6   Q     If the budget of each episode, was in fact, a million five
 7   -- and I understand we don't know what the exact budget was --
 8   how would this -- what effect would this have on DC?
 9   A     It means that -- assuming that the license fee from
10   Warners to produce the picture was equivalent to a million       12:26
11   five, it means that it was likely they would not get any more
12   revenue until there had been exploitation other than the
13   broadcast of the film on the WB.
14   Q     I'd like to try and quantify this.
15         If Warner Bros. made -- if the budget was two million      12:26
16   per episode, how much additional revenue would DC receive for
17   its 3 percent going to 5 percent gross participation?
18   A     $15,000.  They would receive 5 percent of $500,000 which
19   is $25,000.  Sorry.
20   Q     Do you have an understanding -- you may not have this but   12:27
21   if you do -- do you have an understanding of what that equates
22   to as an effective gross participation?
23   A     I didn't --
24   Q     That $25,000, what does that mean?  How does that equate
25   to the gross participation?                                       12:27
```

1  A    Well, it means $25,000 payable over two million; so it

2  would be slightly in excess of 1 percent.

3  Q    If Warner Bros. budget was three million -- you mentioned

4  that -- your information is that the budget may have escalated

5  to $3 million -- if it was three million per episode, how much    12:28

6  additional revenue would DC receive for its gross

7  participation?

8  A    It would be 5 percent of $1.5 million, which is $75,000.

9  Q    And do you have an understanding of how that 75,000

10  translates to an effective first-dollar gross participation?    12:28

11  A    Slightly in excess of 2 percent.

12  Q    I'd like to turn to what we call the Lorimar agreement,

13  which is Exhibit 181.  Drawing your attention to Page 3,

14  paragraphs six through seven, of the Lorimar agreement.

15        What do these paragraphs provide for in general?    12:29

16  A    They provide for payments based on Lorimar producing a

17  2-hour pilot or MOW based on the character, and also an

18  episodic television royalty.

19  Q    You testified earlier that the Lorimar agreement was

20  substantially identical to the *Superman* television agreement.    12:29

21  What is the per-episode royalty in the Lorimar agreement?

22  A    Episodic television is $45,000, which is the same as the

23  *Smallville* agreement.

24  Q    And is it deemed in advance against the back-end

25  participation?    12:29

```
 1   A    Yes, it is.

 2   Q    Is the back-end participation the same in the Lorimar

 3   agreement as in the Smallville agreement?

 4   A    Yes.

 5        THE COURT:  Counsel, it's 12:30.  Let's take our      12:30

 6   second break today.

 7        MR. TOBEROFF:  Thank you, Your Honor.

 8        (Whereupon a brief recess was held.)

 9        THE COURT:  We're back on the record.

10        Counsel.                                              01:11

11   BY MR. TOBEROFF:

12   Q    Mr. Halloran, I'll now show you what's been marked for

13   identification as Defendants' Exhibit 1037.  It's an agreement

14   between DC Comics and Warner Bros. Television Productions dated

15   January 20, 2002.                                          01:11

16        Mr. Halloran, do you recognize this exhibit?

17   A    I do.

18   Q    Did you review this agreement in preparing your expert

19   report and formulating your opinion in this case?

20   A    Yes.                                                  01:12

21   Q    What does this agreement pertain to?

22   A    It pertains to the television rights for a property called

23   Birds of Prey.

24   Q    I draw your attention to Paragraph 6 on Page 2 of the

25   agreement, and ask you to tell me what it provides.        01:12
```

1    A    It provides for an episodic payment of $33,000 for each

2    episode.

3    Q    Is there a gross participation in the agreement as well?

4    A    Yes, there is.

5    Q    Is this episodic royalty applicable to DC's gross                    01:12

6    participation?

7    A    Yes.

8    Q    I draw your attention to Paragraph 7 on Page 2 of this

9    agreement, and ask you what that paragraph provides for.

10   A    It provides for a gross participation which is identical    01:12

11   to the gross participation under the *Superman* agreement.

12   Q    In connection with this case, did you research the

13   *Birds of Prey* property?

14   A    Yes.

15   Q    Can you tell me a little about it.                          01:13

16   A    It's a relatively unknown property owned by DC, that

17   doesn't compare at all to the notoriety or value of Superman.

18   Q    Was the television series based on the *Birds of Prey*

19   property?

20   A    There was a pilot and then a few episodes, and then the    01:13

21   series was cancelled.

22   Q    Let's turn now to the *Superboy* agreement, Exhibit 15.

23   Briefly look at Page 4, Paragraph Roman Numeral IV,

24   Subparagraph A, Romanette ii; so IV(A)(ii) of the *Superboy*

25   agreement.                                                      01:14

1    A    Okay.

2    Q    What does this provide?

3    A    It provides for an episodic royalty of $12,500.

4    Q    Is this episodic royalty applicable or nonapplicable to

5    any gross participation of DC under the agreement?                      01:14

6    A    It's nonapplicable.

7    Q    When the episodic royalty is nonapplicable, is that more

8    favorable or less favorable to the rights holder?

9    A    It's much more favorable to the rights holder, because it

10   doesn't reduce the gross participation.                                 01:14

11   Q    So does that mean it's in addition to the gross

12   participation?

13   A    Yes.

14   Q    I'd like you to look, please, at Page 4,

15   Paragraph IV(A)(iii) of the *Superman* agreement, Bates No.            01:15

16   16534.

17           What does that provide?

18   A    It provides for a gross participation of 7½ percent with

19   respect to the domestic territory.

20   Q    Is that a first-dollar gross participation?                        01:15

21   A    Yes.

22   Q    And the domestic territory refers to what?

23   A    United States and Canada.

24   Q    Is this money in addition to the $12,500 per episode, or

25   not?                                                                    01:15

```
 1   A    Yes, it's in addition to.

 2   Q    I'd like you to try to compare the 7½ percent of domestic

 3   gross receipts in this agreement to the 3 percent, increasing

 4   to 5 percent after $1.5 million per episode in the Smallville

 5   television agreement, and in doing so, take into account that    01:15

 6   the 7½ percent of the Superboy agreement applies to the

 7   domestic territories, whereas the 3 percent, escalating to

 8   5 percent, in the Smallville agreement applies to worldwide

 9   gross?

10   A    What you would do is, you would take the 7½ of domestic    01:16

11   and then estimate the ratio of the domestic receipts to the

12   worldwide receipts.  So my calculation was that this would be

13   equal to approximately 6 percent of worldwide gross.

14   Q    How did you arrive at that calculation?

15   A    Based on the result of Smallville, approximately 1/3 of    01:16

16   the revenue, according to Mr. Sill's report, was attributable

17   to foreign; and since this was an earlier agreement and the

18   trend was for more receipts to come from foreign, I discounted

19   it a little bit further and came up with 6 percent.

20   Q    Do you believe in 1987 foreign revenues were the same or    01:17

21   smaller than in 2001, as a portion of worldwide television

22   revenues?

23   A    Smaller.

24   Q    How does the Superboy character licensed in this 1987

25   Superboy agreement compare, in your opinion, to Superman in    01:17
```

1    terms of prominence and value?

2    A    Certainly, the Superboy character was a lot less

3    prominent, a lot less valuable than Superman.

4    Q    Did you research the history of Superboy and its

5    exploitation before coming to that conclusion?                01:17

6    A    Yes.

7    Q    Was Cantharus Productions the licensee in the *Superboy*

8    agreement, an independent third-party, or was it owned by

9    Warner Bros. at the time the agreement was entered into?

10   A    It was a third party.                                    01:18

11   Q    Switching subjects, what is a royalty escalation in the

12   television business?

13   A    A royalty escalation is designed to reward success; so

14   it's typically per season, and the royalty goes up with

15   succeeding seasons, to reward success of the television series. 01:18

16   Q    Is success in television measured by longevity?

17   A    Yes.

18   Q    Does that relate to what you spoke of earlier, which was a

19   need to have at least 85 or 100 episodes before a television

20   series is profitable?                                         01:18

21   A    Yes.

22   Q    Are royalty escalations customary or uncustomary in the

23   television business?

24   A    They're very common and customary.

25   Q    Does the *Superman* television agreement contain any royalty 01:19

Friday, May 1, 2009                    Trial Day 4

 1  escalations?

 2  A    No.

 3  Q    What season is *Smallville* in currently?

 4  A    It's in its eighth, and the ninth season has just been

 5  ordered.                                                          01:19

 6  Q    When you say "ordered," does that mean they will proceed

 7  with the ninth season?

 8  A    It means that Warners is committed to producing the ninth

 9  season.

10  Q    Based on the agreement, has DC's royalty ever increased    01:19

11  with the longevity and success of the *Smallville* television

12  series?

13  A    No, it has not.

14  Q    Now, Warner Bros. produced television rights agreements

15  for the following properties:  *Tarzan*, *Global Frequency*,     01:19

16  *Gossip Girl*, and *How to Teach Filthy Rich Girls*.

17          Did you review those agreements in writing your

18  report and rendering your opinion in this case?

19  A    Yes.

20  Q    Did any of these contain royalty escalations key to the    01:20

21  longevity of derivative television series?

22  A    I believe they all did.

23  Q    How do you view the value of these properties in

24  comparison to *Superman* at the time the agreements were entered

25  into?                                                            01:20

```
 1   A     Much, much less valuable.

 2   Q     I'd like to return to the Superman television agreement,

 3   Exhibit 222, and draw your attention to Exhibit B, Page 13,

 4   Paragraph 1(A)(i)1 of the television agreement.

 5             What does this paragraph provide?                        01:21

 6   A     It provides for a 20 percent home video royalty.

 7   Q     Is there a most-favored nations provision in the

 8   television agreement like there was in the -- that you

 9   testified to in the Superman film agreement?

10   A     I don't see one.                                            01:21

11   Q     How significant is home video exploitation of a television

12   series?

13   A     It's become very, very significant.

14   Q     Do you believe home video exploitation of a television

15   series was significant in 2001 when this agreement was entered    01:21

16   into?

17   A     Yes.

18   Q     I'd like to draw your attention to Paragraph 3 of

19   Exhibit A on Page 9 of the Smallville television agreement,

20   Bates No. WB-135013.                                              01:22

21             What does this paragraph provide?

22   A     This paragraph provides for representations and warranties

23   and indemnity.

24   Q     What is the effect of this provision?

25   A     The effect of this provision is the same as the effect     01:22
```

```
 1   under the Superman film agreement, which was DC was giving
 2   Warner Bros. a guarantee that they were the sole owner and that
 3   there were no claims that would interfere with the rights.  And
 4   it further provides that DC would be responsible as to
 5   indemnify Warners for any damages that Warners might be caused       01:23
 6   by the representation and warranty.
 7   Q    And this agreement was entered into after Warner Bros.'
 8   receipt of the termination notices and the effective date of
 9   the termination?
10   A    Yes.                                                            01:23
11   Q    I draw your attention to Page 4, Paragraph 9 of the
12   Smallville television agreement, and ask you what this term
13   provides.
14   A    This is a so-called creative controls and approvals
15   paragraph.                                                          01:23
16   Q    Does this provision give DC any actual creative controls
17   regarding Smallville?
18   A    Not really.
19   Q    Why do you say "not really"?
20   A    If you look at it, it starts out -- and it does say that       01:23
21   the depiction of the character will be consistent with the
22   property, but there are no specific approvals such as the ones
23   that were in the Superboy agreement.
24   Q    Now, in the event of a creative disagreement between DC
25   and Warner Bros., whose decision controls?                          01:24
```

```
 1   A     Warner Bros.

 2   Q     I'd like you to compare the 1991 Lorimar agreement, which

 3   is Exhibit 181.  I direct your attention to Page 4, Paragraph 9

 4   of the Lorimar agreement, Bates WB-134889.

 5   A     It appears this is an identical provision.              01:24

 6   Q     Does DC have any rights of approval as to the pilot script

 7   and casting of the lead roles in the Lorimar agreement?

 8   A     None that I see.

 9         Excuse me.  There is a right of approval with respect

10   to the pilot script and the roles of Superman and Lois Lane.  01:25

11   Q     The roles of Superman and Lois Lane?

12   A     Yes.

13   Q     And are these real rights of approval, or are they

14   illusory, as you've described in the *Superman* film agreement

15   and *Superman* television agreement?                          01:25

16         **MR. BERGMAN:**  Objection.  Leading.

17         **THE COURT:**  It is.

18         Please, Counsel.

19   **BY MR. TOBEROFF:**

20   Q     How would you characterize these rights of approval?    01:25

21   A     These are actual approval rights, whereas the approval

22   rights in the *Smallville* agreement was only consultation.  So

23   in this agreement, DC would have the ultimate right to approve

24   the pilot script and the actors for Superman and Lois Lane in

25   the *Smallville* agreement that was watered down to consultation. 01:26
```

```
 1   Q    So is the 1991 Lorimar agreement, which DC and

 2   Warner Bros. uses as a template for the Smallville agreement,

 3   more favorable in this respect to DC than the Smallville

 4   agreement?

 5   A    Yes.                                                      01:26

 6   Q    I'd like you to turn back to the Superboy agreement,

 7   Exhibit 15 for a moment.

 8        I direct your attention to Page 7, Paragraph 7 of the

 9   Superboy agreement.

10   A    Okay.                                                     01:27

11   Q    What, if any, creative approvals are found in this

12   agreement?

13   A    There's a multitude of creative approvals that DC had in

14   this agreement.

15   Q    Could you please walk us through those approvals.  .      01:27

16   A    It's hard to do it on the screen.

17        Should I try doing it on the screen?

18   Q    Whatever is best for you.

19   A    These approvals essentially track the approvals that were

20   worked out between DC and the Salkinds with respect to the     01:28

21   Superman film agreement.  They are very strong.

22   Q    What approval rights does DC have under the Superboy

23   agreement, Page 7, Paragraph 7?

24   A    Right.

25        Well, first of all, the licensee can only depict the     01:28
```

1    program consistent with the character, and there could be no

2    new characters.  The programs could not be satirical or

3    obscene.  There's approval of the treatment and plot outline

4    treatment and teleplay.  There was a mechanism for approval

5    over changes to the teleplay.  There was approval over the role        01:29

6    of Superboy.  There was approval over the Superboy costume.

7    There was approval over the title.

8    Q    How do these approvals compare to the approvals that you

9    spoke of earlier that are in the 1974 third-party Salkind

10   agreement?                                                            01:29

11   A    They are very much analogous.

12   Q    How would you compare the creative approvals found in the

13   *Superboy* agreement with those found in the *Smallville*

14   agreement?

15   A    The agreements are much, much stronger in this third-party      01:30

16   agreement than they are with the internal agreement regarding

17   *Smallville*.

18   Q    I'd like to turn now to a different set of agreements, and

19   show you what's been previously admitted as Exhibit 52, an

20   agreement between DC Comics and Warner Bros. Television               01:30

21   Animated, dated January 1, 2000, regarding the television

22   animation rights to *Justice League of America*, which includes

23   *Superman*.

24            Mr. Halloran, did you review this agreement in

25   connection with this case?                                           01:30

1    A    Yes, I did.

2    Q    I'd like you to turn to Page 2, Paragraph 6 of this

3    Exhibit 52.

4         What does this paragraph provide?

5    A    It provides that DC would receive 30 percent of the          01:31

6    defined proceeds from the series and a direct video program.

7    And defined proceeds are essentially a net profits definition.

8    By most measures, they are meaningless.

9    Q    Well, turn to Page 13, entitled Exhibit B of this exhibit.

10        I believe the definition of "defined proceeds" --          01:31

11   that's the definition of "defined proceeds"?

12   A    Yes.

13   Q    First of all, walk us through -- how do you arrive at

14   defined proceeds?  In other words, how are defined proceeds

15   calculated pursuant to this agreement?          01:32

16   A    Do you want me to talk in general how they're done or --

17   Q    In general, to your knowledge of the agreement.

18   A    The way it works, both in the film business and the

19   television business, is that you have -- initially, you start

20   with the amounts of money that are included in gross receipts.          01:32

21   And one important measure there is how much of the video money

22   is being included.  And once you take that amount, that's on

23   the plus side of the ledger, and then you go to the minus side

24   of the ledger, which you take out distribution fees, which are

25   an artificial profit center.  They're usually in excess of the          01:32

1    actual costs of distribution.  And then you take out the cost

2    of distributing the picture and the cost of producing the

3    picture and any gross payments to gross participants, and then

4    the balance is so-called defined net proceed; and that's what's

5    divvied up.                                                          01:33

6    Q    Is imputed interest and imputed overhead added to the

7    cost, the net calculation --

8    A    That's an additional profit center.

9    Q    Is it deducted from revenues?

10   A    It is deducted from revenues.                                   01:33

11        Typically, the cost of production is -- there's an

12   overhead component, and there's usually interest charged on the

13   production costs, which is an artificially high rate.

14   Q    In a typical net profits definition like this, what are

15   the distribution fees?                                              01:33

16        **MR. BERGMAN:**  Your Honor, lack of foundation.

17   There's no evidence that this man has any animation experience

18   at all.

19        **THE COURT:**  Lay a little foundation, Counsel.

20   **BY MR. TOBEROFF:**                                                01:33

21   Q    Do you have experience with animation agreements in your

22   30 years of working in the entertainment industry?

23   A    Yes.

24   Q    Do you believe that, in the net profits definition in

25   animation agreements the distribution fee is the same or           01:34

1    different than in the net profits definition --

2              THE COURT:  This is what you need to lay a foundation

3    for, for him to know things like this.

4    BY MR. TOBEROFF:

5    Q    Are you aware of the terms of animation agreements?          01:34

6    A    Yes.

7    Q    Are you aware of the way net profits are defined in

8    animation agreements?

9    A    Yes.

10   Q    Would you be able to tell me what the typical distribution   01:34

11   fee would be for domestic territories and foreign territories

12   and those net profit definitions?

13   A    Yes.

14   Q    What are they?

15   A    They are typically 10 to 20 percent for -- they're usually  01:34

16   10 percent for major networks.  They're a lot higher, 30 to

17   40 percent, outside of the United States.  That's basically how

18   they work.

19   Q    Are those the distribution fees in this agreement?

20   A    Yes.                                                         01:35

21   Q    You said the profits under this definition would be -- I

22   think "meaningless" was the word you chose.

23              Why did you say "meaningless"?

24   A    Because if you take the anticipated revenue and put that

25   on the plus side and then you take the series of deductions,     01:35

1    the net amount that the participation that would apply to would

2    be zero.

3    Q    Did you review the profit participation statements that

4    have been produced by Warner Bros. in this case pursuant to

5    this agreement regarding the *Justice League of America*?          01:35

6    A    I don't recall reviewing them.

7    Q    Did you review the profit participation statements

8    coinciding with the various television animation agreements

9    that you reviewed?

10    A    I don't remember reviewing them.          01:36

11    Q    Does this "net profit" definition as contained in the

12    *Justice League of America* animation agreement favor

13    Warner Bros. or favor DC?

14    A    It favors Warner Bros.

15    Q    Did you review, in connection with this case, DC's          01:36

16    television animation agreements with Warner Bros. for the

17    *Superman* derivatives the *Legion of Super-Heroes* and the

18    *Legion of Super-Pets*?

19    A    Yes.

20    Q    Did that contain the same 30 percent of defined proceeds,          01:36

21    or net profits, as you called them?

22    A    Yes.

23    Q    Based on the way defined proceeds are defined in these

24    agreements, would you expect or not expect DC to receive money

25    through their participation?          01:37

```
 1              MR. BERGMAN:  Objection.  Leading.

 2              THE COURT:  Sustained.

 3   BY MR. TOBEROFF:

 4   Q    If you were representing DC with regard to these

 5   agreements, would you advise your client that they should      01:37

 6   expect to receive money as a result of their net profit

 7   participation?

 8              MR. BERGMAN:  Same objection.

 9              THE COURT:  Rephrase your question, Counsel.

10              MR. TOBEROFF:  It's a hypothetical.               01:37

11   BY MR. TOBEROFF:

12   Q    If you were representing DC with respect to these

13   agreements, before signing these agreements, if you were asked

14   whether or not they could expect to receive money under these

15   agreements, how would you advise your client?                01:38

16   A    I would advise them they should not expect to receive any

17   money under this definition.

18   Q    Is that based on the way the "net profits" is defined in

19   the agreements?

20   A    Yes.                                                    01:38

21   Q    I'd like to turn now back to a subject we touched upon in

22   the *Superman* film agreement.  And it was the home video

23   royalty.

24              I'd like you to turn to Paragraph 19 of the *Superman*

25   film agreement, Exhibit 232.  Turn your attention to Page 19,   01:39
```

1    Paragraph 1(D)(a).

2    A    Okay.

3    Q    I believe you testified that pursuant to the *Superman* film

4    agreement, DC had the minimum 20 percent home video royalty.

5             Does this paragraph provide what you referred to                01:40

6    earlier as a most-favored nations provision?

7    A    No.

8    Q    What agreement are you looking at?

9    A    I'm looking at the *Superman* film agreement; and I'm

10   looking at the video royalty.                                             01:40

11   Q    Page 19, Paragraph (D)(a)?

12   A    Yes.

13            Oh, I stand corrected.  There is a favored nations in

14   here.

15   Q    I'm sorry?                                                           01:40

16   A    There is a favored nations clause in here, because it says

17   on a picture-by-picture basis, they'll include a defined gross,

18   no less than what they pay to other participants.

19   Q    How is "other participants" defined in the *Superman* film

20   agreement for the most-favored nations provision relating to             01:41

21   the 20 percent minimum video royalty?

22   A    It says "any party entitled to share in the revenues of

23   the picture."

24   Q    Are there any qualifications to the definition of

25   "any party"?                                                             01:41

1    A     No.

2    Q     How does this most-favored nation provision work in

3    practice?

4    A     The way it works in practice is that if there's any other

5    party that participates in the proceeds from the picture and                01:41

6    they get an amount greater than 20 percent of the home video

7    royalty, the participant who has the most-favored nations

8    clause gets the advantage of that.  So there's a step up of the

9    royalty equal to the highest royalty among the people who are

10   participating in the home video.                                            01:42

11   Q     Does this provision favor DC?

12   A     Yes.

13   Q     If any other participant receives a higher percentage of

14   home video revenues in their participation definition, would DC

15   be entitled to the same percentage of home video revenues in                01:42

16   DC's definition of "gross receipts" under the *Superman* film

17   agreement?

18   A     Yes, they would.

19   Q     What if the participants differed in some respect?  Let's

20   say one is an actor or a director, or one is a financier of the             01:42

21   picture.  Would that make a difference in the application of

22   this most-favored nations provision, as written?

23   A     No.  It's broadly drafted.  It says "any party entitled to

24   a share in the revenues of the picture."

25   Q     Now, when a studio such as Warner Bros. makes                         01:43

1    participations to participants and renders them an accounting

2    statement, do they strictly follow the terms of the

3    participations as defined in the applicable contracts?

4         MR. BERGMAN:  Objection.  Lack of foundation.

5         THE COURT:  Sustained.                                01:43

6    BY MR. TOBEROFF:

7    Q    Are you familiar with the practices of Warner Bros. with

8    respect to rendering account statements?

9    A    I'm very familiar with the way that studios render

10   statements.  When I was at Universal and I did deals, the     01:43

11   participation/accounting department would bring to me the

12   participation, and I would check and make sure that it

13   absolutely conformed with the agreement; and I think Warners

14   does the same thing.

15        MR. BERGMAN:  Same objection.  He's speculating as to  01:44

16   what Warner does.

17        MR. TOBEROFF:  Your Honor, if I may.

18        THE COURT:  Withdraw?

19        MR. TOBEROFF:  He's not a percipient witness.  He can

20   draw from his experience in the entertainment industry.       01:44

21        THE COURT:  But he can't attribute that to

22   Warner Bros., Counsel.  He can state what his experience is.

23        Move along.

24        We can't attribute that to Warner Bros. without

25   further foundation.                                          01:44

Friday, May 1, 2009                    Trial Day 4

**BY MR. TOBEROFF:**

Q    Do you have any reason to believe that Warner Bros. would account to participants as a major studio differently than Universal would account to participants?  In your experience, do you have any reason to believe they would account differently, or not?

      **MR. BERGMAN:**  Same objection.

      **THE COURT:**  I'll overrule the objection.

      That now goes to the weight of the evidence.

      **THE WITNESS:**  Could you repeat the question.

**BY MR. TOBEROFF:**

Q    You said you had experience at --

      **THE COURT:**  The court reporter will read back the question.

      (Whereupon, the last question was read back.)

      **THE WITNESS:**  No.  And I'd also like to add that I see participation statements from all different companies and check them against contracts, and I'm involved in audits and the like; so it's a very precise process.

**BY MR. TOBEROFF:**

Q    And with respect to those participation statements that you've seen, do they precisely track the participation terms of the relevant contracts they're rendered pursuant to?

A    Usually on the face of them they do.  But sometimes there's audits where there's adjustments made.  But I've never

01:44

01:44

01:45

01:45

01:46

1    seen it where it doesn't track how the contract works.

2    Q    Do you believe the most-favored nations provision is

3    ambiguous or unambiguous as drafted?

4              THE COURT:  You're asking about most --

5              MR. TOBEROFF:  The most-favored nations provision.    01:46

6              THE COURT:  In this particular --

7              MR. TOBEROFF:  Yes.

8              THE COURT:  I misunderstood the question.

9              THE WITNESS:  I think it's very unambiguous.

10   BY MR. TOBEROFF:                                                01:46

11   Q    Have you seen most-favored nations provisions with

12   expressed limitations as to their applicability?

13   A    Yes, I have.

14   Q    Do those most-favored nations provisions ever exclude

15   certain types of participants?                                 01:46

16   A    Yes, they do.  They typically will exclude financiers.

17   Q    When financiers are excluded, is that expressly stated in

18   the most-favored nations provisions you've seen, or not?

19   A    Yes.  It's an expressed exclusion.

20   Q    Is there any such exclusion of financiers in the *Superman*    01:47

21   film agreement's most-favored nations provision applicable to

22   the home video royalty?

23   A    No, there's not.

24   Q    I'd like to show you what has previously been identified

25   as Plaintiffs' Exhibit 48.  It's an agreement between          01:47

```
 1   Warner Bros. Pictures and Legend Pictures.

 2   A    It's Legendary, I believe.

 3   Q    Actually, it's Legend Pictures, LLC.

 4           THE COURT:  Gentlemen, stop that.

 5           Wait until he's finished his question.  Don't correct   01:47

 6   him.  When his question is done -- the court reporter just

 7   can't listen to both of you at once.  She's having an

 8   understandably difficult time.

 9           THE WITNESS:  I understand.  I'm sorry.

10   BY MR. TOBEROFF:                                                 01:48

11   Q    Plaintiffs' Exhibit 48 is an agreement between

12   Warner Bros. Pictures and Legend Pictures, LLC, dated June 10,

13   2005.

14           I'd ask that the clerk please provide a copy to the

15   witness.                                                         01:48

16           Did you review this agreement in connection with your

17   analysis in this case?

18   A    Yes.

19   Q    What does this agreement relate to?

20   A    It relates to a co-financing agreement between Warners and  01:49

21   Legend Pictures, which is known as Legendary.

22   Q    Did Legend Pictures co-finance *Superman Returns* pursuant

23   to this agreement?

24           MR. BERGMAN:  Objection.  Lack of foundation.

25           MR. TOBEROFF:  Strike that.                              01:49
```

1    **BY MR. TOBEROFF:**

2    Q    This agreement you mentioned provides for Legend's

3    co-financing of films based on the *Superman* character?

4    A    I believe it does.

5    Q    Please turn to Page 12 of Exhibit 48.          01:50

6    A    Okay.

7    Q    Please provide a general description of what Page 12

8    provides.

9    A    What paragraph are you talking about?

10   Q    Page 12?                                        01:50

11   A    Okay.

12   Q    Does Page 12 describe how revenues from co-financed films

13   are shared between Legend and Warner Bros.?

14   A    Page 10 does, I believe.

15   Q    I'm sorry.  My notation --                      01:51

16   A    Without looking at it, I can describe how it works.

17   Q    This is Exhibit 37.

18   A    I'm looking at Exhibit 48.  I was handed Plaintiffs'

19   Exhibit 48.

20   Q    I understand.  It's my mistake.  I apologize.  01:51

21   A    They are virtually identical, so it's understandable.

22   Q    Exhibit 37 should now be the correct exhibit, the

23   agreement between Warner Bros. Pictures and Legend Pictures,

24   LLC, dated June 10, 2005.

25            I'd like you to turn to Page 12, and I'll ask you  01:52

1    about the provision on Page 12.

2    A    This is a co-financing agreement between Warners and

3    Legendary, and this provision talks about how the -- the

4    preference of payments and -- first, what goes into gross, and

5    then who gets what when.

6    Q    How are home video revenues treated in the Legendary

7    agreement?  Are they treated under a royalty basis, or not?

8    A    They are treated on a so-called 100 percent basis, not on

9    a royalty basis.

10   Q    So as opposed to 20 percent of home video revenues being

11   included in Legend's participation definition, 100 percent are

12   included?

13   A    Yes.

14           **MR. BERGMAN:**  Objection.  Leading.

15           **THE COURT:**  Sustained.

16   **BY MR. TOBEROFF:**

17   Q    What do you mean by 100 percent basis?

18   A    In contrast to the 20 percent of wholesale, most

19   financiers, virtually all financiers, are entitled -- instead

20   of 20 percent of the revenue going into the pot, they get

21   100 percent going into the pot.  Of course, there are also

22   expenses related to the home video distribution which dilute

23   that 100 percent, so it's not quite apples to apples; it's not

24   100 percent royalty.  There's no such thing.  As we know in the

25   top end, home video royalties were in the 35 to 40 percent

1    range.  The whole notion of a co-finance agreement is, your

2    money is as good as my money, and they're treated the same.

3    Q    Now, under Paragraph 1(D)(a) of the *Superman* film

4    agreement, which contains the most-favored nations provision,

5    would Legend Pictures, LLC, be deemed a participant based upon    01:54

6    your reading of that contract?

7    A    Yes.

8    Q    What is the effect of the applicability of this

9    most-favored nations provision to the amount of home video

10   revenues included in the Legend Pictures agreement?    01:54

11   A    Enforcing the most-favored nations provision, it would

12   mean that DC would be entitled to the benefits that Legendary

13   was entitled to under this co-financing agreement.

14   Q    More specifically, what does that mean?

15   A    That means that rather than a 20 percent royalty, there    01:55

16   would be 100 percent put into the gross receipts, minus

17   expenses.

18   Q    Based upon your review of the record in this case, was

19   there anything to suggest that DC had ever enforced this

20   most-favored nations provision with respect to the    01:55

21   Legend Pictures agreement that has a more favorable definition?

22         **MR. BERGMAN:**  Objection.  Lack of foundation.

23         **THE COURT:**  Based on what the witness has reviewed.

24         Overruled.

25         **THE WITNESS:**  I've not seen participation statements    01:55

```
 1   that would give me that answer, but that doesn't change my

 2   opinion, which is that the most-favored nations clause would

 3   apply based on my reading of the contract.

 4   BY MR. TOBEROFF:

 5   Q    I understand.                                            01:55

 6        If you had been retained by DC Comics as their

 7   representative to bring the *Superman* film agreement into the

 8   open market, what do you believe you would be able to obtain in

 9   specific agreement terms, based on your analysis of these

10   various comparable agreements in this case, based on your       01:56

11   experience as to the marketplace, and based on your analysis of

12   the marketplace for comic book characters in the time period

13   1999 to 2002?  What terms do you believe, as a transactional

14   attorney, you would be able to obtain for DC?

15        MR. BERGMAN:  Objection.  Incomplete hypothetical;        01:56

16   calls for speculation.

17        THE COURT:  It's a very interesting question,

18   Counsel.

19        I'm just trying to think if it really is too

20   speculative.  You're asking the witness to put himself in the   01:57

21   shoes of a hypothetical entertainment lawyer that would have

22   been hired by DC Comics to negotiate with somebody other than

23   Warner Bros. for the sale of the rights.

24        Is that what you want to ask?

25        MR. TOBEROFF:  With only one change.                      01:57
```

1          He's not a hypothetical entertainment lawyer; he is

2    an entertainment lawyer.

3          THE COURT:  Right.  The hypothetical is him being

4    retained by Warner Bros. for DC Comics.

5          MR. TOBEROFF:  Yes.                                    01:57

6          THE COURT:  I'm aware that the witness is an

7    entertainment lawyer, and a very prominent one at that.

8          Well, he's testified at length as to why he thinks

9    the deal is not -- I'll conditionally overrule the objection.

10   I want to hear the answer and the basis for the answer.       01:58

11         MR. TOBEROFF:  Thank you, Your Honor.

12   BY MR. TOBEROFF:

13   Q    Do you understand the question?

14   A    Yeah, I do.

15         THE COURT:  I suspect this is not the first time he's   01:58

16   heard it, Counsel.

17         THE WITNESS:  If I had the opportunity and the honor

18   in 2002 to have gone and been able to put the *Superman*

19   property, film rights, to bid, or even a property equivalent to

20   *Superman* -- we don't have to say *Superman*, but if you had a  01:58

21   *Superman*-quality character, I'm confident that I'd be able to

22   achieve -- I'd probably be able to get a purchase price, and

23   not necessarily have to have it optioned, of $10 million per

24   film.

25         If I did do an option, it would be for 12 to 18         01:59

1    months for each period, and I would get at least 10 percent of

2    the option price.  So that would be a million -- of the

3    purchase price, rather -- so it would be a million.  I'd be

4    able to get a dollar-one gross participation.  The purchase

5    price would be applicable to 10 percent from dollar one, which      01:59

6    would escalate based on the success of the film; ultimately, I

7    think, to the level of approximately 20 percent, as was in the

8    timeline agreement.

9            Very importantly, I would be able to get the sort of

10   creative controls that DC had enjoyed in prior agreements and      01:59

11   the sort of creative controls that companies like Marvel insist

12   on.  I think I definitely would have been able to get a very

13   strong merchandising deal, where the film-related merchandising

14   would be shared at least on a 50/50 basis, and I think with a

15   fee less than the Warners' 25 percent fee, because of the          02:00

16   history of the success of *Superman* merchandising.  I think I

17   would be able to get a producer deal for Mr. Levitz, like I got

18   in the Neo-Pets agreement, which we saw in the various other

19   agreements, which would augment that purchase price.  And on

20   that previous deal, I think I'd be able to get an additional       02:00

21   participation.

22           I most certainly would get a reversion right.

23   There's no way a property like *Superman* would go on the market

24   in 2002 and there wouldn't be a provision where the company

25   purchasing the rights could sit on the rights.  That's just --     02:00

1    there's no way that I would allow DC to do something like that.

2            And I think lastly, I would insist on a co-financing

3    opportunity for DC.  So if, in fact, they wanted to bet on the

4    property, they would be able to do that.  I know Marvel does

5    that now for *Ironman*.  They have a multi-picture deal; and      02:01

6    they, in fact, finance their pictures and make a -- based on

7    the structure, they make a multiple of what they would

8    otherwise get based on a traditional structure.

9            So I would go for all of these things.

10           Oh.  And I would also exclude from any sort of          02:01

11   warranty a claim akin to the claim that was brought in this

12   case, to make sure that DC would not be potentially responsible

13   for millions of dollars of legal fees and damages.

14           **MR. TOBEROFF:**  Thank you.  I have no further

15   questions at this time.                                         02:02

16           **THE COURT:**  Very well.

17           We will pick up with the cross-examination on Tuesday

18   morning at 9:00.

19           I trust you'll be prepared, Counsel.

20           **MR. BERGMAN:**  Indeed I will, Counsel.               02:02

21           **THE COURT:**  Have a great weekend.  I look forward to

22   seeing you all next week.

23           (Trial Day 4 concludes.)

24   / / /

25   / / /

1

2

3                              CERTIFICATE

4

5   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
6   the stenographically recorded proceedings held in the
    above-entitled matter and that the transcript page format is in
7   conformance with the regulations of the Judicial Conference of
    the United States.

8

9

    _____          _____
10  THERESA A. LANZA, RPR, CSR                         Date
    Federal Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25