UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

```
JOANNE SIEGEL and              )
LAURA SIEGEL LARSON,           )
                   Plaintiffs, )
                               )
            vs.                )   No. CV 04-08400-SGL
                               )
WARNER BROTHERS ENTERTAINMENT INC.;)
TIME WARNER, INC.; DC COMICS;  )
and DOES 1-10,                 )   Trial Day 5
                   Defendants. )
_____)   Pages 581-639
```

Reporter's Transcript of Court Trial Proceedings

Riverside, California

Tuesday, May 5, 2009

9:33 A.M.

THERESA A. LANZA, RPR, CSR
Federal Official Court Reporter
3470 12th Street, Rm. 134
Riverside, California  92501
(951) 274-0844
WWW.THERESALANZA.COM

1   APPEARANCES:

2

3   On Behalf of Plaintiffs:

4
                        LAW OFFICES OF MARC TOBEROFF
5                       BY:  Marc Toberoff
                        BY:  Nicholas C. Williamson
6                       BY:  Keith Adams
                        2049 Century Park East,
7                       Suite 2720
                        Los Angeles, California  90067
8                       310-246-3100

9

10  on behalf of Defendants/Counterclaimant:

11
                        WEISSMANN WOLFF BERGMAN COLEMAN
12                       GRODIN & EVALL LLP
                        BY:  Michael Bergman
13                      BY:  Anjani Mandavia
                        9665 Wilshire Boulevard,
14                      Ninth Floor
                        Beverly Hills, California  90212
15                      310-858-7888

16

17  On Behalf of DC Comics:

18                      PERKINS LAW OFFICE, P.C.
                        BY:  Patrick T. Perkins
19                      1711 Rt. 9D
                        Cold Spring, New York  10516
20                      845-265-2820

21

22

23

24

25

```
1                        I N D E X

2                                              Page

3   Plaintiff case (cont'd)........................  586

4


5


6   PLAINTIFF
    WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
7   MARK HALLORAN (cont'd)

8   By Mr. Toberoff
    By Mr. Bergman            586
9


10
                EXHIBITS          RECEIVED
11
                 (None.)
12


13


14


15


16


17


18


19


20


21


22


23


24


25
```

```
 1          Riverside, California; Tuesday, May 5, 2009; 9:33 A.M.

 2                              -oOo-

 3          THE CLERK:  Calling item No. 2 on calendar, case

 4    No. CV 04-08400-SGL, Joanne Siegel, etc., versus Warner Bros.

 5    Entertainment, Inc., etc.                                        09:33

 6          Counsel, please state your appearances for the

 7    record.

 8          MR. TOBEROFF:  Good morning, Your Honor,

 9    Marc Toberoff for plaintiffs.

10          MR. WILLIAMSON:  Good morning, Your Honor,            09:33

11    Nicholas Williamson for plaintiffs.

12          MR. ADAMS:  Keith Adams for plaintiffs.

13          MR. BERGMAN:  Michael Bergman for the defendants.

14          MR. PERKINS:  Patrick Perkins for the defendants.

15          MS. MANDAVIA:  Anjani Mandavia for the defendants.   09:34

16          THE COURT:  Good morning to you all, Counsel.  The

17    Court is ready to resume with the trial.

18          I did receive the plaintiff's motion in limine to

19    exclude new documents subpoenaed by defendants on May 1, 2009.

20          I trust that an opposition is being prepared for    09:34

21    this, or not?

22          MR. PERKINS:  We will, Your Honor.  We don't have a

23    document yet.  We've served the subpoena.

24          THE COURT:  Okay.

25          MR. PERKINS:  But we can address it, if you would    09:34
```

1    prefer.

2         **THE COURT:**  Are you planning to file an opposition to

3    this?

4         **MR. PERKINS:**  Well, we just got it this morning.

5         We didn't know whether Your Honor was going to try to    09:34

6    address it orally or whether you'd prefer a written response.

7         **THE COURT:**  I'd prefer a written response.

8         **MR. PERKINS:**  We will do that, Your Honor.

9         **THE COURT:**  By tomorrow morning?

10        **MR. PERKINS:**  Certainly.    09:34

11        **THE COURT:**  And you won't be planning to use the

12   subpoena documents until then?

13        **MR. PERKINS:**  Correct.

14        **THE COURT:**  Very well.

15        Mr. Toberoff.    09:34

16        **MR. TOBEROFF:**  I was prepared to be heard regarding

17   the subpoena.

18        **THE COURT:**  Let's give them a chance to respond.

19        Counsel, I think you're going to begin with your

20   cross-examination this morning?    09:34

21        **MR. BERGMAN:**  That's correct, Your Honor.  Thank you.

22        **THE CLERK:**  Mr. Halloran, please be advised you're

23   still under oath.

24   / / /

25   / / /

1                        CROSS-EXAMINATION

2       BY MR. BERGMAN:

3       Q    Good morning, Mr. Halloran.

4       A    Good morning, Mr. Bergman.

5       Q    Mr. Halloran, I couldn't help but notice this morning that     09:35

6       as you were sitting in the back row, one of counsel came back

7       and gave you a document, and then Mr. Toberoff came back and

8       talked to you, and then you came over to counsel table a couple

9       of times with the document in your hand and talked to them.

10              What was that document?                                    09:35

11      A    It's a chart that I prepared over the weekend of the

12      various documents.

13      Q    Is there a copy of that that we can have?

14              (Document provided.)

15              MR. BERGMAN:   Thank you.                                  09:36

16      BY MR. BERGMAN:

17      Q    This morning I'd like to look a little further into your

18      background and your experience as an entertainment lawyer.

19              Okay?

20      A    That's fine.                                                  09:36

21      Q    You graduated Hastings Law School in what year, sir?

22      A    1978.

23      Q    And am I correct that from that time, before you went to

24      Orion, in those two years, that you were at two different law

25      firms?                                                            09:36

```
 1   A    Well, you're assuming two different -- you're saying

 2   two years.

 3   Q    You were at one law firm in 1979; correct?

 4   A    Yes.

 5   Q    And then you went to another law firm in 1980; correct?     09:36

 6   A    That's correct.

 7   Q    And then in 1981, you went for the first time to Orion.

 8   A    Filmways Orion, yes.

 9   Q    I understand that Filmways became Orion, so I'm just going

10   to refer to it as Orion.                                        09:37

11   A    That's fine.

12   Q    You'll understand I mean both?

13   A    I will.

14   Q    During those two years before you got to Orion, you didn't

15   do any entertainment practice, did you?                         09:37

16   A    I did some entertainment practice.

17   Q    What kind?

18   A    Well, I was active in the Beverly Hills Bar Committee for

19   the Arts, and I put together a book called *The Musicians*

20   *Business and Legal Guide*.  And I also did a little bit of music  09:37

21   law.

22   Q    In your Exhibit B, I believe to your report -- or I think

23   it's Exhibit A, you refer to the type of work that you did.  It

24   isn't Exhibit A, it's in your resume.

25   A    Could I take a look at that?                               09:38
```

1    Q    Sure.  Go ahead.

2    A    It's in my expert report; correct?

3    Q    That's correct, sir.

4    A    Do we have my expert report?

5    Q    You indicated that, at the first firm that you were          09:38

6    employed at, you did some insurance defense --

7    A    That's correct.

8    Q    -- coverage work; is that correct?

9    A    That is correct.

10   Q    And then the second firm you were employed at, you did       09:38

11   some business litigation with an emphasis on real estate and

12   breach of contract; correct?

13   A    That is correct.

14   Q    Now, at the time you joined Orion, who was the head of

15   business affairs there?                                           09:38

16   A    The ultimate head of business affairs was Bill Bernstein.

17   Q    Okay.  And --

18   A    The person who I --

19   Q    Who was the second in command?

20   A    Second in command was Bob Geary.                             09:39

21   Q    Bob who?

22   A    Geary.

23   Q    G-e-a-r-y?

24   A    Exactly.

25   Q    And under Mr. Geary?                                         09:39

```
 1  A    Under Mr. Geary, there was me and some other lawyers.

 2  Q    Who were the other lawyers?

 3  A    Stuart Boros was one.  Orion was a bi-coastal company, so

 4  there were lawyers in New York as well; so the lawyers in

 5  New York were John Logican, John Hester.  There was a        09:39

 6  Mr. Schwartz.

 7  Q    Is that Jerry Schwartz?

 8  A    No, that was not Jerry Schwartz.  Jerry Schwartz was at

 9  Filmways.

10  Q    Okay.                                                   09:39

11  A    And then on the West Coast, in addition to Stuart Boros,

12  there were a few other lawyers; including, Rochelle Blackman.

13  Q    And when you say -- three, four, five lawyers?

14  A    Yeah, in that range.

15  Q    So two years out of Hastings when you got to Orion, you  09:40

16  were the low man on the totem pole, were you not?

17  A    I wouldn't -- I don't think I was.  Within the confines of

18  the lawyers below Bob Geary, I was the head person on the music

19  side.  But I was parallel to the other lawyers on the film

20  side.                                                        09:40

21  Q    How much of your time at Orion was spent in the music

22  area?  What portion of your time?

23  A    I'd probably say a quarter or so.

24  Q    Now, am I correct, Mr. Halloran, that at your deposition,

25  you could only recall two literary acquisitions; X-Men and The  09:41
```

1  *Cotton Club*, that you had any involvement with at all; is that

2  correct?

3  A    At the deposition, that's what I may have recalled.  But I

4  obviously was involved in more than what I recalled at the

5  deposition.                                                          09:41

6          **MR. BERGMAN:**  Move to strike everything after

7  "recalled," Your Honor.

8          **THE COURT:**  It's stricken.

9  **BY MR. BERGMAN:**

10  Q    Now, *X-Men* was in 1982 or 1983; correct?                     09:41

11  A    That's my recollection.

12  Q    And at your deposition, you told me, didn't you, that you

13  negotiated a rights' acquisition on *X-Men* from Marvel Comics;

14  correct?

15  A    That's my recollection.                                        09:41

16  Q    Do you recall that as clearly as you recall all of your

17  other experience?

18  A    I recall my other experience much more clearly.

19  Q    And you understand, Mr. Halloran, that when I talk in this

20  case about underlying literary properties, I'm referring to        09:42

21  works that have been previously published in one form or

22  another as opposed to a screenplay that someone has written or

23  something of that nature.

24          Do you understand that?

25  A    I understand the distinction, yes.                            09:42

1   Q    Okay.

2        Now, with respect to the *X-Men* agreement that you

3   negotiated with Marvel, you don't recall the option price of

4   that agreement, do you?

5   A    No.                                                          09:42

6   Q    And you don't recall the exercise price.

7   A    No, I don't.

8   Q    You don't recall the contingent compensation amount.

9   A    No.

10  Q    You don't recall the merchandising split.                   09:42

11  A    I don't.

12  Q    The only thing that you recall is that the licensor's

13  contingent compensation was not first-dollar gross; correct?

14  A    That is correct.

15  Q    Isn't it a fact, Mr. Halloran, that you had nothing         09:43

16  whatsoever to do with the acquisition of the literary rights to

17  *X-Men* while you were at Orion?

18  A    I do remember -- what I remember specifically was I dealt

19  with the Marvel option purchase.  My best recollection was that

20  it was *X-Men*, but I remember I did do a Marvel deal.          09:43

21  Q    Isn't it a fact that the Marvel deal for the acquisition

22  of *X-Men* had been negotiated, agreed upon and executed before

23  Orion had even gotten involved?

24  A    That may well have been true.

25        As we know, oftentimes, producers will acquire rights     09:44

1    and then set them up with a studio.  That happened in *Hannibal*;

2    it happened with -- it happens very frequently.

3            **MR. BERGMAN:**  Move to strike everything after "true."

4            **THE COURT:**  It's nonresponsive.

5            Mr. Halloran, during cross-examination, it's going to        09:44

6    be a little different than it was during direct examination.

7    Plaintiffs' attorney is going to have a chance to get up and

8    clarify any of these questions.

9            **THE WITNESS:**  Okay.

10           **THE COURT:**  But it's going to be important, so we        09:44

11   don't keep going through this, that you just answer the

12   question being asked and leave it to Mr. Toberoff to

13   re-examine.

14           **THE WITNESS:**  Okay.

15   **BY MR. BERGMAN:**                                                  09:44

16   Q    Mr. Halloran, isn't it a fact that the acquisition of the

17   *X-Men* rights from Marvel occurred by an agreement executed and

18   dated as of April 14, 1982, between a company called Nelvana,

19   N-e-l-v-a-n-a, Limited and Marvel Comics?

20   A    I don't have that specific recollection right now.  If you     09:45

21   showed me the document, I could verify it.  But I don't have

22   personal knowledge that that is, indeed, how the transfer

23   happened.

24           **MR. BERGMAN:**  Your Honor, may I approach.

25           **THE COURT:**  You may.                                     09:45

1           I assume you've provided a copy to counsel?

2           **MR. BERGMAN:**  Unfortunately, Your Honor, I just got

3   these documents this morning.  We have not copied them yet.  We

4   will at the first break, and we'll provide it counsel.

5           **THE COURT:**  Have him take a look at it to start with.      09:45

6           **MR. BERGMAN:**  Sure.

7           **MR. TOBEROFF:**  Your Honor, if I may, is it possible

8   that he waits with this line of questioning until we can

9   receive a copy?  I don't know --

10          **MR. BERGMAN:**  I'm not going --                            09:46

11          **MR. TOBEROFF:**  -- how far into the document the

12  questions will go.

13          **MR. BERGMAN:**  It will not go far at all, Your Honor.

14  It will not go beyond the fact that it was executed at a

15  certain time.                                                        09:46

16          **THE COURT:**  With that foundation, I'll allow you to

17  go forward, and then we'll make copies during the break.

18          (Document is provided to witness.)

19  **BY MR. BERGMAN:**

20  Q    Is the agreement executed, Mr. Halloran?                        09:48

21  A    It is.

22          **THE COURT:**  Counsel?

23          **MR. TOBEROFF:**  There's been no authentication of this

24  document.  We have no idea how defendants got this document.

25          **MR. BERGMAN:**  I'd be glad to explain.                    09:48

```
 1              MR. TOBEROFF:  It's not an Exhibit.  It was not
 2    produced in this case.
 3              THE COURT:  Counsel, is this for impeachment?
 4              MR. BERGMAN:  Yes, it is, Your Honor.
 5              MR. TOBEROFF:  Still, there's no authentication even      09:48
 6    for impeachment.
 7              THE COURT:  Lay a foundation.
 8              This is kind of difficult without copies.  I
 9    understand that you said you just got this moments ago and
10    didn't have a chance to copy.                                      09:48
11              Cindy, would you please make copies of this.
12              And then lay an authentication, lay a foundation and
13    then proceed forward.
14              MR. TOBEROFF:  Thank you, Your Honor.
15    BY MR. BERGMAN:                                                    09:48
16    Q    Mr. Halloran, when I took your deposition and you
17    testified that you negotiated the Marvel X-Men acquisition, I
18    asked you who you negotiated it with; correct?
19    A    Yes.
20    Q    And who did you identify?                                     09:48
21    A    I believe I identified Linda Lichter.
22    Q    Okay.
23              Are you aware that in 1982 and 1983 Ms. Lichter was a
24    member of my law firm, a partner of mine?
25    A    I am aware of that.                                           09:49
```

1          **MR. BERGMAN:**  May I proceed, Your Honor.

2          **THE COURT:**  Proceed on something else until we get

3    the copy of the document.

4    **BY MR. BERGMAN:**

5    Q    Putting aside whether or not you were involved at all in          09:49

6    that underlying agreement, am I correct that the agreement,

7    which is dated '82, didn't make its way to Orion and

8    Bill Bernstein until 1983?

9    A    I don't have a specific recollection of exactly when it

10   got there.                                                             09:50

11   Q    And am I correct that Nelvana and its financing partner

12   approached Orion with the rights, asking for a deal for the

13   making of a movie?

14         **MR. TOBEROFF:**  Objection, Your Honor.  Calls for

15   speculation.                                                           09:50

16         **THE COURT:**  If you know.

17         **THE WITNESS:**  My recollection is that Nelvana did

18   come to Orion and submit that agreement as part of a proposal.

19   **BY MR. BERGMAN:**

20   Q    Okay.                                                             09:50

21         And am I correct, sir, that at some point in time,

22   Orion made an offer to Nelvana and its financing partner for

23   such a film?

24   A    I was not involved in that.

25   Q    You were not involved at all; correct?                           09:50

1   A    No.  That's not true.  I wasn't involved in the offer, if

2   any, that was made to Nelvana.  I was the lawyer on the

3   project.

4   Q    And as the lawyer on the project, you didn't negotiate the

5   agreement between Orion and Nelvana and its financing partner,          09:51

6   did you?

7   A    No.

8   Q    Do you recall who the financing partner of Nelvana was at

9   the time?

10  A    No.                                                                09:51

11  Q    The other film that you identified having done work on at

12  Orion during the course of your deposition was *The Cotton Club*;

13  correct?

14  A    Correct.

15  Q    Okay.                                                             09:51

16        And am I correct that you had no involvement at all

17  in the acquisition of the literary rights for Cotton Club?

18  A    That's not accurate.

19  Q    You didn't negotiate the agreement; correct?

20  A    I didn't negotiate the agreement, but I vetted it.                09:52

21  Q    And when you say you "vetted it," by that, do you mean

22  that you did the chain of title work on the film?

23  A    Yes.

24  Q    And just so the Court has an understanding of what that

25  entails, am I correct that when a lawyer at a studio does a           09:52

1    chain of title, the first thing he does is get a copyright

2    report, or the second thing he does?

3    A    It is certainly one of the initial things that's done in

4    conjunction with assessing the chain of title.

5    Q    When you get the copyright report, the next thing you do          09:52

6    is you look to see if there are any problems with the title;

7    correct?

8    A    Yes.

9    Q    And if there's a document identified in the title report

10   that shows that there may be a problem, you send for a copy of       09:53

11   that document; correct?

12   A    Yes.

13   Q    And then you analyze that document and see whether you

14   have, in fact, obtained the appropriate exclusive rights to do

15   a film; correct?                                                      09:53

16   A    Well, you assess it in the context of all of the

17   agreements.  But yes, that certainly is the goal to make sure

18   that you have the rights to make the film.

19   Q    And you don't recall what the terms of The Cotton Club

20   agreement were, do you?                                               09:53

21   A    Not off the top of my head, no.

22   Q    On direct examination, Mr. Toberoff asked you what films

23   you worked on at Orion.

24         Do you recall that?

25   A    Yes.                                                             09:54

1   Q    And you identified a number of films; including,

2   *Breathless*, *Cotton Club*, *The Falcon and the Snowman*, *The Hotel*

3   *New Hampshire*, *Amadeus* and *The Woman in Red*; correct?

4   A    Yes.

5   Q    Now, you weren't suggesting that you handled the                    09:54

6   negotiations for the acquisition of the rights to any of those

7   films, were you?

8   A    Typically, Orion would rely on the producer to do that,

9   but I would check it as part of vetting the chain of title.

10  Q    Could you answer my question?                                       09:54

11  A    I believe I did.

12  Q    You're not suggesting, are you, that you handled the

13  negotiations for the acquisition of the underlying literary

14  rights for those films, are you?

15  A    Not -- I don't think I did.  I vetted them, and I checked           09:54

16  them.  I didn't necessarily negotiate them because we relied on

17  the producers to do that.

18  Q    Okay.

19       And you didn't do anything to determine the market

20  value of the rights underlying any of those films, did you?            09:55

21  A    At that point, I was a lawyer, and I wasn't involved

22  really in assessing market value.  I was concerned with the

23  chain of title aspects.

24  Q    I understand.  Thank you.

25       After four years at Orion, you moved on to Universal,             09:55

1  I believe, as you've testified, where you were from '85 to '90;

2  correct?

3  A    That is correct.

4  Q    And what was your first position at Universal?

5  A    I was business affairs' counsel.                                09:56

6  Q    Could you explain how business affairs' counsel differs,

7  if at all, from business affairs' executive?

8  A    Yes.

9         The distinction is that business affairs' counsel

10 would sometimes actually draft the documents.  It's a hybrid         09:56

11 position.  The notion of business affairs is that you actually

12 negotiate the upfront deal points to an agreement.  If you're

13 business affairs' counsel, you have a hybrid role and you not

14 only negotiate, but you document, depending on the particular

15 deal.                                                                09:56

16 Q    Okay.  Thank you.

17        If you could put yourself back in 1990, as we all

18 wish we could, who was the head of Universal business affairs

19 at the time you joined in '85?

20 A    Mel Sattler.                                                    09:57

21 Q    Mel Sattler at that time was an experienced, accomplished

22 business affairs' executive, wasn't he?

23 A    He absolutely was.

24 Q    And below Mr. Sattler, who was number two in the

25 department?                                                         09:57

1    A    Jerry Barton.

2    Q    And was Mr. Barton a business affairs' executive?

3    A    I believe he had the title of vice president.

4    Q    And who acted under Mr. Barton?

5    A    I did.                                                    09:57

6    Q    When did Mr. Sattler leave Universal?

7    A    I believe he left Universal in the mid-to-late '80s.

8    Q    '87, '88?

9    A    That would be a good estimate.

10   Q    Now, did there come a time when you were promoted from   09:58

11   business affairs' counsel to some form of business affairs

12   executive at Universal?

13   A    I was promoted to vice president of business affairs.

14   Q    And when was that, sir?

15   A    1986.                                                     09:58

16   Q    Did anybody share that title in business affairs?

17   A    Jerry Barton may have shared that title for a while.

18   Q    Was it the same title, or was it a senior VP, an executive

19   VP?

20   A    I'm not sure of his exact title at the time.             09:59

21   Q    Who did you report to until Mr. Sattler left?

22   A    In 1986, when I was promoted, I began answering to

23   Tom Pollock.

24   Q    Am I correct that, when Mr. Pollock took over, he advised

25   -- strike that.                                               09:59

```
 1              Did Mr. Pollock, at some point, terminate
 2   Mr. Sattler, or did Mr. Sattler leave?
 3   A    Mr. Sattler retired, as I recall.
 4   Q    And what year was that again?
 5   A    We just --
 6   Q    '87 or '88?
 7   A    That is our best estimate.
 8   Q    And when Mr. Sattler retired, am I correct that
 9   Mr. Pollock told both you and Mr. Barton that you would be
10   co-heads of the business affairs department?
11   A    That's not my recollection of what I was told.
12   Q    What do you recall being told?
13   A    Basically, when I was promoted to vice president, I was
14   told by Tom that I would be running the day-to-day affairs of
15   business affairs, and, indeed, I would run the meetings.  And
16   Tom asked me to actively reorganize the business affairs and
17   legal departments, which is what I did.
18              At the time, Jerry might have had a nominal title
19   that was the same as mine.  But in terms of the actual
20   reporting lines and scope of responsibility, I was running
21   business affairs, not Jerry.
22   Q    And you did that until Mr. Pollock became dissatisfied
23   with your services; correct?
24   A    That's not a fair characterization of -- I'm unaware that
25   Mr. Pollock was dissatisfied with my services.  He never told
```

10:00

10:00

10:00

10:01

10:01

1   me such a thing.

2   Q    There came a point in time when Mr. Pollock brought in

3   someone to take over the business affairs department, which you

4   say you were running; correct?

5   A    That's accurate, yes.                                        10:01

6   Q    And that someone who was brought in to head the business

7   affairs department was Jon Gumpert; correct?

8   A    That is correct.

9   Q    And because Mr. Gumpert was brought in to assume the job

10  that you wanted, you left Universal; correct?                     10:01

11  A    That's not a job I wanted; it's a job I had.  But it is

12  true that Jon coming on board was one of the factors that led

13  to me negotiating a settlement of my contract.

14  Q    Didn't you testify at deposition that it was a job that

15  you were promised and were hoping to get?                         10:02

16  A    Well, what I was promised was a title of senior vice

17  president of business affairs.

18  Q    And that would come with being the head of business

19  affairs; correct?

20  A    No. No. It was just an additional title, but my function     10:02

21  would not have changed.  I was told I would be senior vice

22  president.  And then sometimes studios don't keep their word,

23  and I did not get the title.

24  Q    So is it your testimony that you left Universal because

25  your VP stripes weren't made senior VP stripes?                   10:02

1  A    That was one of the things that precipitated my leaving,

2  yes.

3  Q    Wasn't the actuality of the situation that you left

4  because you were not the head of the department?

5  A    No; that's absolutely wrong.                                        10:03

6  Q    When Mr. Gumpert came in, he was a head of the business

7  affairs department, was he not?

8  A    I was the head of the business affairs department, and

9  then Mr. Gumpert came in and I left.

10 Q    And Mr. Gumpert came in as the head of the business        10:03

11 affairs department, didn't he?

12 A    Yes.

13 Q    And it was because he came in as head of the business

14 affairs department that you decided to leave.

15 A    That was one of the factors, yes.                          10:03

16 Q    Okay.

17        Now, while you were at Universal, you told me that at

18 your deposition, you could recall only two literary

19 acquisitions that you had anything whatever to do with at

20 Universal, and that was *The Flintstones* and the uncompleted    10:04

21 *Dr. Seuss'* project; is that correct?

22 A    At my deposition when you said "literary projects," we

23 were talking about pre-existing major intellectual properties.

24        **MR. BERGMAN:**  Move to strike, Your Honor.  It's

25 nonresponsive.                                                  10:04

1              **THE COURT:**  Next question, Counsel.

2    **BY MR. BERGMAN:**

3    Q    On *The Flintstones*' deal, one of the two deals you've told

4    me about at your deposition as being the only deals you could

5    recall, you don't recall the approximate terms of that deal, do          10:04

6    you?

7    A    One of the things I remember very clearly is that we

8    negotiated the merchandising provisions quite thoroughly.  And

9    I remember spending a lot of time working on a mechanism

10   whereby Universal would share in the so-called uplift of          10:05

11   increased merchandising that would be triggered by the possible

12   production of *The Flintstones*' film by Universal.  That's the

13   part that I remember most distinctly, because that was the part

14   that was very complicated.

15            In terms of the option price and the purchase price          10:05

16   and contingent compensation, I don't have a present

17   recollection of those terms.

18   Q    You certainly didn't recall that at your deposition, did

19   you?

20   A    No.  I recall a lot more now than I did then.          10:05

21   Q    Do you recall that at the time of your deposition, which

22   was just March 5, 2009 --

23            **MR. BERGMAN:**  And I'm referring, Your Honor, to

24   page 31, commencing at line 19 and ending at page 32, line 3.

25

1  / / /

2  BY MR. BERGMAN:

3  Q    Do you recall being asked this question, Mr. Halloran, and

4  giving this answer:

5          "QUESTION:  And what terms do you recall of *The*    10:06

6  *Flintstones*' deal?

7          "ANSWER:  I don't remember specific terms.  I

8  remember that the structure was that it was -- there was an

9  option payment paid, there was a purchase price, it was

10  contingent compensation, and there was some merchandising    10:06

11  split, but I don't remember the exact terms.

12          "QUESTION:  Do you remember the approximate terms of

13  each or any?

14          "ANSWER:  No."

15  BY MR. BERGMAN:

16  Q    Do you recall giving that answer?

17  A    Yes.

18  Q    Okay.

19          And among the other things you don't remember about

20  *The Flintstones*' deal was that you don't recall the names of    10:07

21  the representatives of the right holders with whom you were

22  negotiating, do you?

23  A    I believe that's correct.

24  Q    And you certainly weren't in charge of *The Flintstones*'

25  literary acquisition agreement, were you?    10:07

```
 1   A     I'm not sure what you mean by "in charge."

 2   Q     Were you the individual who made the decision as to the

 3   amount of money that Universal would pay for The Flintstones'

 4   rights?

 5   A     My recollection is that I negotiated the agreement in          10:07

 6   tandem with Bill -- with Fred Bernstein.

 7   Q     With who?

 8   A     Fred Bernstein.

 9   Q     And who is Fred Bernstein?

10   A     Fred Bernstein was a senior executive at Universal.          10:07

11   Q     And it was Mr. Bernstein who made the decision, to the

12   extent there was one, as to what Universal would pay for The

13   Flintstones; correct?

14   A     We worked on the agreement as a whole, and we worked in

15   tandem.  But in terms of the -- he probably had seniority to me   10:08

16   in terms of the actual price that was being paid.

17            MR. BERGMAN:  Move to strike as nonresponsive,

18   Your Honor.

19            THE COURT:  It's stricken.

20            Just answer the question, if you can.                     10:08

21            THE WITNESS:  Okay.

22   BY MR. BERGMAN:

23   Q     Mr. Bernstein was a person who made the determination as

24   to what Universal would pay for The Flintstones' rights; isn't

25   that true?                                                         10:08
```

1  A    I believe that's true.

2  Q    Now, who made the determination as to what Universal would

3  pay for the *Dr. Seuss*' literary rights that you said you were

4  involved with?

5  A    I worked in tandem with Mr. Bernstein on that deal, and    10:09

6  Mr. Bernstein would make the ultimate decision on that.

7  Q    You don't recall any of the terms of that *Dr. Seuss*' deal

8  that was under negotiation, do you?

9  A    I do remember some of the terms, yes.

10  Q    You didn't remember any at the time of your deposition,    10:09

11  did you?

12  A    My recollection is clearer now.

13  Q    How much work have you done since the time of your

14  deposition on this matter, sir?

15  A    A substantial amount.    10:09

16  Q    Could you quantify that in terms of hours for me, please.

17  A    Maybe 40 to 50 hours.

18  Q    Forty to 50 hours since your deposition?

19  A    Yes.

20  Q    And how many of those hours were spent with Mr. Toberoff    10:10

21  or someone in his office?

22  A    Probably 10 to 15.

23  Q    And before you testified, Mr. Halloran, did you receive

24  any written communications from Mr. Toberoff regarding

25  questions that would be asked of you on the stand?    10:10

1   A     Excuse me?  I didn't hear what you said.

2   Q     What I said, sir, was: Prior to the time you began

3   testifying --

4   A     Testifying in the deposition, or here now?

5   Q     Give me a chance to ask my question, please.                    10:10

6          From the time you testified at your deposition until

7   this morning, putting aside the document that's in front of you

8   now, have you received any written communications from

9   Mr. Toberoff?

10  A     Yes.                                                            10:11

11  Q     And what type of communications were they?

12  A     They were communications regarding documents that I should

13  look at.

14  Q     What documents did he want you to look at?

15  A     I remember I was to sort of focus on certain documents.  I     10:11

16  was sent, you know, certain agreements.  That was the main

17  thing.  It was just -- you know, 'it's a good idea to refresh

18  your recollection and look at this.'

19  Q     Well, you had received all of the documents that you

20  referred to in your report prior to your deposition, hadn't       10:11

21  you?

22  A     Correct.

23  Q     So what further documents did you receive from

24  Mr. Toberoff before you took the witness stand?

25  A     I don't have a specific recollection of any specific thing   10:12

1    that was sent to me.

2    Q    Do you have any specific recollection of anything that may

3    have been said to you by Mr. Toberoff concerning any of the

4    agreements of which you have no specific recollection?

5    A    I don't have a particular recollection, as I sit here.          10:12

6    Q    At any time prior to the time you took the stand,

7    Mr. Halloran, did you have a meeting with Mr. Toberoff in which

8    he advised you of certain questions he would be asking you on

9    the stand?

10   A    We discussed, you know, in general, what the scope of the      10:12

11   questions would be, but we didn't go, 'it's going to be this;

12   it's going to be this; it's going to be this.'

13   Q    I didn't hear that last part.

14   A    I said we talked in general about the scope of what I

15   would be discussing, but I don't recall, as I sit here, any        10:13

16   specific, 'you have to talk about this; you have to talk about

17   this; you have to talk about this.'

18   Q    I see.

19        But were there any times when Mr. Toberoff would open

20   up that notebook that he used when he was questioning you and      10:13

21   ask you a question and say, 'how would you answer that?'

22   A    No.

23   Q    None of that at all?

24   A    Again, we discussed things that would be -- you know,

25   would be discussed, and we would talk about the concepts and       10:13

1    the like.  But it wasn't like, 'when I ask this, you say this.'

2    We didn't do any of that.

3    Q    Was it like if I ask you the following question -- da, da,

4    da, da, da -- what would your answer be?

5    A    It wasn't that specific.                                    10:13

6    Q    That specific?

7    A    No, it wasn't that specific.

8    Q    I see.

9         Now, at the time that you gave your deposition, and

10   we're talking about the *Dr. Seuss*' deal, you didn't remember    10:14

11   what it was that Universal offered, did you?

12   A    No.

13   Q    And you still don't remember what it was Universal

14   offered.

15   A    I remember part of it.                                       10:14

16   Q    What caused you to remember that since the time of your

17   deposition?

18   A    In the context of looking over the creative controls that

19   are customarily asserted by, you know, well-known intellectual

20   properties and looking at them, it occurred to me; the           10:14

21   negotiations that we had with *Dr. Seuss* came back to my memory.

22   Q    I see.

23        And now that it's come back to your memory, what was

24   it that Universal offered on the *Dr. Seuss*' deal?

25   A    The part that I recall, and the ultimate deal breaker, was   10:15

1  that *Dr. Seuss* wanted creative controls that Universal chose to

2  not live with.

3  Q   And why did Universal choose to not live with those

4  controls?

5  A   They wanted the ultimate creative control over the movie,          10:15

6  and *Dr. Seuss* was asserting controls that could have stopped

7  the movie.  And he also was known to be a very cantankerous and

8  uncooperative elderly gentleman.

9  Q   Generally speaking, in your experience at the major

10  studios, Mr. Halloran, studios don't give ultimate creative         10:16

11  control to any licensor or grantor, do they?

12         **MR. TOBEROFF:**  Vague and ambiguous, Your Honor.

13         Which studio is he talking about?

14         **MR. BERGMAN:**  If I may, Your Honor.

15         **THE COURT:**  Yes.  Rephrase your question.                 10:16

16  **BY MR. BERGMAN:**

17  Q   Mr. Halloran, at your deposition, you and I went through a

18  list of what we both referred to as "major studios"; is that

19  correct?

20  A   Yes, we did.                                                     10:16

21  Q   Okay.

22         And am I correct, that list consists of Warner Bros.,

23  Paramount, MGM, Disney, Sony, Fox -- and I'm forgetting

24  somebody, aren't I?  There's one more?  Did I say MGM?

25  A   Yes, you did.  I think you got the list.                         10:17

1    Q    Okay.

2          Can you take a crack at it for me, the major studios.

3          We know that it's Paramount, Warner.  It's

4    Universalthat  we forgot.

5    A    Yes, we did.                                              10:17

6    Q    Now, those are the seven major studios; correct?

7    A    Correct.

8    Q    And when I refer in this examination to "major studios,"

9    you'll understand that I'm referring to those studios; correct?

10   A    That's fine.                                              10:17

11   Q    Okay.

12         Now, it's correct, isn't it, that no major studio

13   would give any licensor the ultimate creative control over a

14   film?

15   A    You'd have to define what "ultimate" is.  There are      10:17

16   various gradations of control.

17   Q    Okay.

18         In your answer, you made reference to the fact that

19   the *Dr. Seuss*' people wanted ultimate creative control.

20         What was it that they wanted?                           10:18

21   A    I remember they wanted -- they certainly wanted screenplay

22   approval.

23   Q    What else?

24   A    I don't recall specifically what further controls they

25   wanted, but I remember it was at least screenplay approval.    10:18

1   Q    Now, screenplay approval isn't ultimate creative control

2   by any means, is it?

3   A    Well, it's a very strong part of creative control because

4   what you do is, in the screenplay, you map out the story, and

5   traditionally in these sort of agreements, the studio cannot          10:18

6   materially deviate from that screenplay, so it's very, very

7   important.

8          MR. BERGMAN:  Your Honor, move to strike everything

9   after "control" as being nonresponsive.

10         THE COURT:  It is nonresponsive.                                10:18

11  BY MR. BERGMAN:

12  Q    Now, putting aside what it was that the *Dr. Seuss*' people

13  wanted in terms of creative control, Mr. Halloran, what did

14  they want in terms of money?  What was the fair market value

15  that the *Dr. Seuss*' people placed on that property?                 10:19

16  A    I don't remember.

17  Q    What was the fair market value that Universal placed on

18  that property?

19  A    Are you talking about *Dr. Seuss*?

20  Q    Yes, sir.                                                        10:19

21  A    The deal didn't close.

22  Q    I understand that, sir.

23         What was the fair market value, if any, that

24  Universal placed on that property?

25  A    I don't recall.                                                  10:19

```
 1   Q    Okay.  Universal did place some value on it in your
 2   internal discussions, didn't they?
 3   A    Yes.
 4   Q    But you don't recall what that was?
 5   A    No.                                                    10:20
 6   Q    So if you look at what you have told me about your
 7   experience at Universal and your experience at Orion, you were
 8   not directly involved, were you?
 9        And by "directly involved," I mean, you were the man
10   who determined the fair market value of any motion picture     10:20
11   rights that were acquired by Universal or Orion during that
12   nine years; correct?
13        MR. TOBEROFF:  Objection, Your Honor.  Vague,
14   compound.  Vague and ambiguous as to "the man."
15        THE COURT:  It is compound, Counsel.                   10:20
16        MR. BERGMAN:  Okay.
17   BY MR. BERGMAN:
18   Q    There was no motion picture at Universal that you
19   determined for Universal what price to pay for underlying
20   literary rights, were there?                                10:21
21   A    That's not true.
22   Q    What film did you determine what price to pay for?
23   A    On both *Flintstones* and *Dr. Seuss*, I was involved in the
24   analysis of what offer Universal wanted to make.
25   Q    Okay.                                                   10:21
```

1  A    I don't remember the exact terms of those offers, but I

2  was certainly involved in assessing what an appropriate offer

3  would be to make.

4  Q    So is it your testimony, then, that Mr. Bernstein turned

5  to you at some point and said, 'How much should I pay for                    10:21

6  this?'

7  A    No.

8  Q    Okay.

9       Now, after leaving Universal, you went into private

10  practice; correct?                                                          10:22

11  A    Yes.

12  Q    And you practice at the Halloran Law Corporation.

13  A    Yes.

14  Q    And how many lawyers are members of the Halloran Law

15  Corporation?                                                                10:22

16  A    One.

17  Q    That is you?

18  A    Yes.

19  Q    Do you have any associate lawyers who help you?

20  A    No.                                                                    10:22

21  Q    So you're a solo practitioner?

22  A    I am.

23  Q    And the majority of your practice, Mr. Halloran, involves

24  representing individuals and companies involved in the

25  production and distribution of so-called independent films;                 10:22

```
 1   correct?

 2   A    That is correct.

 3   Q    And am I correct that independent films are pictures

 4   designed for release in movie theaters that are not produced,

 5   not financed and not distributed by one of the major studios?    10:23

 6   A    That's not accurate.

 7         MR. TOBEROFF:  Compound, Your Honor.  Objection,

 8   compound.

 9         THE COURT:  Well, it's more a definitional-type

10   question, which he said is not accurate, so it will force       10:23

11   counsel to break it up a bit.

12         MR. TOBEROFF:  Very well, Your Honor.

13         MR. BERGMAN:  Let me make it a little simpler.

14   BY MR. BERGMAN:

15   Q    Isn't it true that independent films are pictures designed  10:23

16   for release in movie theaters that are not produced, financed

17   and distributed by one of the major studios?

18   A    That's generally accurate.  However, there are

19   so-called -- one of the features of an independent film is what

20   it is creatively.  And over the last ten years or 15 years,     10:23

21   what the studios did was they acquired -- they went into the

22   independent film business within the umbrella of studios.

23         So at Warner, for example, you had Warner independent

24   pictures.  At Sony, even today, they have Sony classics.  So

25   it's -- you know, it's -- one part of the definition of         10:24
```

```
 1   independent film is what kind of film it is.
 2            MR. BERGMAN:  Move to strike, Your Honor, everything
 3   after "generally true" as nonresponsive.
 4            THE COURT:  I'm going to overrule the objection,
 5   Counsel.  Overruled.                                              10:24
 6   BY MR. BERGMAN:
 7   Q    Am I correct, Mr. Halloran, that the new media, the
 8   Internet and webisodes and all of that, that's about 10 percent
 9   of your practice; correct?
10   A    I don't recall the exact percentage, but, yes, I am         10:24
11   involved in new media and the creation and distribution of
12   webisodes.
13   Q    At your deposition, you remember that it was about
14   10 percent of your practice, didn't you?
15   A    That sounds accurate.                                       10:25
16   Q    Okay.
17            And you also told me at your deposition that work
18   involving network television is between 5 percent and
19   15 percent of your practice; correct?
20   A    That sounds about right.                                    10:25
21   Q    And your film work involving clients doing business with
22   the major studios, as we've defined them, is somewhere between
23   20 and 35 percent of your practice; correct?
24   A    That sounds accurate.
25   Q    At your deposition you told me that your major studio       10:26
```

1    practice was 20 to 25 percent; and then you corrected your

2    deposition, did you not, afterwards, to make it 30 to

3    35 percent?

4    A    I believe I did.

5    Q    My rough math tells me that, at the highest, that comes to    10:26

6    about 110 percent.

7            Can you reduce any one of those categories?

8    A    No.  One thing that you have to keep in mind is that the

9    percentages are certainly not absolute, and they change from

10   time to time; so I just gave my best rough estimate.    10:26

11   Q    And is it correct that you've acted as an expert in

12   30 cases?

13   A    That is accurate, yes.

14   Q    What is your fee as an expert witness, generally?

15   A    It's $500 an hour.    10:26

16   Q    And in total, from the time you were first retained, how

17   many hours, approximately, have you devoted to this case?

18   A    I'd say in the range of 150 hours.

19   Q    Is that about average for all your expert cases?

20   A    That's a little higher than most.  This is a very    10:27

21   complicated case with a lot of documents and other materials to

22   absorb.

23           **MR. BERGMAN:**  Move to strike everything after "most"

24   as being nonresponsive.

25           **THE COURT:**  It is stricken.    10:27

1    **BY MR. BERGMAN:**

2    Q    What would you estimate the total amount of fees that

3    you've collected in these 30 cases in which you've acted as an

4    expert witness?

5    A    I'd say the average is around $10,000, maybe $15,000.    10:28

6    Q    Ten to 15,000 in the average case?

7    A    It's in that range.

8    Q    So this is about five times the average -- no, ten times

9    the average?

10   A    It could be.    10:28

11   Q    And in private practice, Mr. Halloran, you charge either

12   an hourly rate or make some other sort of arrangement with your

13   clients; correct?

14   A    Yes.

15   Q    And what is the hourly rate you charge as an attorney.    10:28

16   A    Anywhere from 250 to $500 an hour.

17   Q    Now, we started to talk about the independent film

18   industry.

19         You're a specialist within the independent film

20   industry, aren't you, sir?    10:29

21   A    Yes.

22   Q    And, in fact, you even coauthored a book about the

23   independent film industry; correct?

24   A    I did.

25   Q    And that book is titled *The Independent Film Producers*    10:29

1  *Survival Guide;* correct?

2  A    It is.

3  Q    Now, the independent producers that you refer to in the

4  title of your book, those are the independent producers who

5  make independent films; correct?                                    10:29

6  A    Yes.

7  Q    They are not the kind of independent producers like

8  Dino De Laurentiis or Jerry Bruckheimer who produce films for

9  the major studios; correct?

10  A    That's correct.                                               10:29

11  Q    You've never represented Mr. De Laurentiis or

12  Jerry Bruckheimer, have you?

13  A    No.

14  Q    Or Brian Glazier or John Peters?

15  A    No, I have not.                                               10:30

16  Q    And the course that you give once a year at Southwestern

17  is limited to the independent film industry, isn't it?

18  A    No, it's not.

19  Q    What is the title of the course?

20  A    The title is "Financing and Distributing Independent         10:30

21  Films," but it's not limited to independent films.

22          One of the most important things that you --

23          **THE COURT:**  You were just asked for the title.

24          **THE WITNESS:**  I'm sorry.

25          That was the title.                                       10:30

1    BY MR. BERGMAN:

2    Q    Now, as your survival guide points out, Mr. Halloran,

3    there are numerous differences between how one operates within

4    the independent film industry and how one operates within the

5    major studio industry; isn't that correct?                    10:30

6    A    That is correct.

7    Q    There are differences in how the films are developed;

8    right?

9    A    Yes.

10   Q    And differences in how they are financed.               10:31

11   A    Yes.

12   Q    And differences in how they are produced.

13   A    Yes.

14   Q    And differences in how they are distributed, if they are

15   disributed at all.                                            10:31

16   A    Sometimes there are differences in how they are

17   distributed.  Typically, yes.

18   Q    Okay.

19        Now, the average major studio film has a negative

20   cost these days approaching $100 million, doesn't it?        10:31

21   A    It exceeds $100 million.

22   Q    Pardon me?

23   A    It exceeds $100 million by a slight amount.

24   Q    The MPAA average negative cost exceeds $100 million?

25   A    Yes.                                                     10:31

```
 1              Well, I take that back.
 2              The average aggregate negative and releasing costs
 3   exceeds $100 million.
 4   Q    Just so we're talking about the same thing, the negative
 5   cost is the cost of actually producing the picture; correct?    10:32
 6   A    That's accurate.
 7   Q    And it's called a negative cost because it refers to the
 8   film negative that is put into the can, the finished product;
 9   right?
10   A    That is accurate.                                          10:32
11   Q    Okay.
12              And what would you estimate, sir, is the current
13   print and advertising cost for major films?
14   A    For major tent pole films?
15   Q    Let's start with major studio films.                      10:32
16   A    The average P and A?
17   Q    Yes, sir.
18   A    It can be, easily, $100 million.
19   Q    And in the case of tent pole films, the figures could sky
20   rocket; correct?                                               10:33
21   A    They could go much higher.
22   Q    Negative costs of a tent pole picture could be well over
23   $200 million; correct?
24   A    It could exceed $200 million.
25   Q    And P and A could exceed $100 million in a major tent pole 10:33
```

1    picture; right?

2    A     Yes.

3    Q     Okay.

4           By comparison, the vast majority of independent films

5    are produced for $200,000 to $10 million; right?          10:33

6    A     Yes.

7    Q     Are you familiar with the independent film Spirit awards?

8    A     Yes.

9    Q     Okay.

10          And am I correct that that's sort of the equivalent     10:33

11   for the independent film industry of the Academy awards?

12   A     That's an accurate way to look at it.

13   Q     And in fact, the the independent film Spirit awards are

14   always held on the Saturday immediately preceding the Sunday of

15   the Academy awards; correct?                               10:34

16   A     That's the tradition.

17   Q     Were you at the Spirit awards this year?

18   A     No, I was not.

19   Q     Were you at the Academy awards?

20   A     No, I was not.                                       10:34

21   Q     Am I correct, sir, that in order to qualify for the

22   independent film Spirit awards, the negative cost of the film

23   cannot exceed $20 million; correct?

24   A     I don't know that for a fact.

25   Q     You're not familiar with the rules of the independent film   10:34

```
 1   association?

 2   A    Not specifically, no.

 3   Q    Okay.

 4        Now, the practice of law within the independent film

 5   industry is a subspecialty, isn't it, of the entertainment    10:35

 6   industry?

 7   A    I don't know what you mean by subspecialty.

 8   Q    Well, in fact, you describe what practicing law within the

 9   independent film industry is in your book, don't you?

10   A    Yes, I do.                                                10:35

11   Q    And in your book, you say that --

12        MR. TOBEROFF:  Excuse me, Your Honor.  We should have

13   a copy of the book if he's reading from it.

14        THE COURT:  You don't have a copy of your client's

15   book?                                                         10:36

16        MR. BERGMAN:  No, Your Honor.  It is his book.

17        THE COURT:  I'm asking Mr. Toberoff.

18        You don't have a copy of your client's book?

19        MR. TOBEROFF:  I do not have a copy of his book here.

20        THE COURT:  We're not going to copy his whole book       10:36

21   here.  It's fair game for rebuttal information.

22        I would have assumed, counsel, that you would have

23   taken a look at his book.

24        MR. TOBEROFF:  I took a look at it, but I'd like to

25   follow along when he's reading.  And we've been supplying --  10:36
```

 1              **THE COURT:**  Then stand next to Mr. Bergman when he's

 2    reading.

 3              **THE WITNESS:**  Where's my copy?

 4              **THE COURT:**  I assume you would know what you wrote.

 5              **THE WITNESS:**  I better.                                        10:36

 6    **BY MR. BERGMAN:**

 7    Q    You describe lawyers who practice within the film industry

 8    as being subspecialists within a small legal specialty.

 9              **THE COURT:**  Sound familiar?

10              **THE WITNESS:**  That does sound familiar.                        10:37

11    **BY MR. BERGMAN:**

12    Q    And is it a fact?

13    A    It's a fact that there are very few lawyers who are in

14    sort of the premier echelon of representing independent film

15    makers; so it's a relatively small group of people.                         10:37

16    Q    And, in fact, sir, you state in your book, and again, I'm

17    quoting from page seven of your book:  "There are only a tiny

18    number of entertainment lawyers in the entire world who have

19    both the experience and connections to be able to do a first

20    class job for an independent film producer."                                10:37

21    **BY MR. BERGMAN:**

22    Q    Is that correct?

23    A    That's absolutely correct.

24    Q    And you consider yourself one of those lawyers; right?

25    A    I do.                                                                   10:38

1  Q    And you consider yourself one of those lawyers by virtue

2  of your experience within the independent film industry; isn't

3  that right?

4  A    That's part of it.

5  Q    And your connections within the independent film industry;    10:38

6  correct?

7  A    Correct.

8  Q    Okay.

9         With respect to the last 19 years, Mr. Halloran, in

10 which you've been in private practice, the only literary    10:38

11 acquisition agreement you can recall negotiating with a major

12 studio was your Neo-Pets agreement with Warner Bros.; correct?

13 A    That is correct.

14 Q    And you've never been on either side of the table in

15 negotiation for literary rights underlying a scripted network    10:39

16 television series, have you?

17 A    That's correct.

18 Q    In fact, you've never represented a company producing a

19 scripted network television series like *Smallville*, have you?

20 A    That's correct.    10:39

21 Q    The 5 to 15 percent of your practice relating to

22 television has involved primarily so-called movies of the week

23 and reality programming, hasn't it?

24 A    That's true.

25 Q    Are you familiar with the television term "show runner"?    10:39

```
 1   A     I am.
 2   Q     Could you explain to the Court, please, what a show runner
 3   is.
 4   A     A show runner in network television is someone who
 5   typically comes up with the idea and pilot script for a           10:40
 6   proposed series, and the pilot is shot.  If the show is picked
 7   up, then the show runner runs the writing and production of the
 8   season for the network.  Typically, show runners will stay on a
 9   network television series for a series of years and then it's
10   not unusual for them to sort of move off and do other things.     10:40
11   Q     You sound very experienced at that, Mr. Halloran.
12         Have you ever represented the show runner of a
13   scripted network television series?
14   A     No.
15   Q     And you've never represented the rights holder of rights    10:40
16   to a comic book hero, have you?
17   A     No, I've not.
18   Q     It's hard, isn't it, Mr. Halloran, for a solo practitioner
19   seeking to represent clients in the major studio film business,
20   to compete with the major firms like Ziffren Brittenham, Hansen   10:41
21   Teller, Gang Tyre, or Bloom Hergott; correct?
22         MR. TOBEROFF:  Objection, Your Honor.  Assumes facts
23   as to the practice of these other firms.
24         THE COURT:  Rephrase your question, Counsel.
25         MR. BERGMAN:  Indeed, Your Honor.                           10:41
```

1    **BY MR. BERGMAN:**

2    Q    Are you familiar with the firm of Ziffren Brittenham?

3    A    Yes.

4    Q    Am I correct that they are one of the, if not THE most

5    powerful transactional law firms in the entertainment industry?    10:41

6    A    That's an accurate description.

7    Q    And are you familiar with the firm of Hansen Teller?

8    A    I believe it's Hanson Jacobson; yes, I am familiar with

9    the firm.

10   Q    And you are, of course, familiar with the firm of    10:42

11   Gang Tyre.

12   A    Yes, I am.

13   Q    That's one of the oldest, most established law firms in

14   the business, isn't it?

15   A    It is.    10:42

16   Q    And they represent people like Steven Spielberg and

17   Clint Eastwood and Dreamworks and that level of clients; right?

18   A    They do.

19   Q    They were also the attorneys who represented the Siegels

20   prior to Mr. Toberoff, aren't they?    10:42

21   A    I'm not aware of that.

22   Q    You're not aware that the Siegels were represented by

23   Gang Tyre from 1999 until 2002?

24   A    I'm not aware of that.

25   Q    Have you read the record in this case?    10:43

1 A  I have, but I have no present recollection of that fact.

2 Q  You're aware, are you not, that at some point, the parties

3 thought they had a settlement agreement between them; correct?

4 A  I don't think that's accurate.  I think Warner Bros.

5 thought they had a settlement.  10:43

6 Q  What makes you think that the plaintiffs didn't think they

7 had a settlement?

8 A  Because this Court has ruled that there was no settlement.

9 Q  Well, I understand what the Court has ruled.

10 A  Right.  10:43

11 Q  My question to you is, during the period prior to the

12 middle of May, 2002, the plaintiffs also thought they had a

13 settlement, didn't they?

14 A  I'm now recollecting that the record reflects that at one

15 point they did believe that they had a settlement. But  10:43

16 ultimately the settlement fell apart.

17 Q  In fact, the record discloses, does it not, that on

18 October 19, 2001, Kevin Marks.  Partner at Gang Tyre --

19 A  You're walking away, so I can't hear you.

20 Q  In fact, the evidence shows, does it not, that on  10:44

21 October 19, 2001, Kevin Marks of Gang Tyre wrote a letter to

22 the defendants in effect accepting an offer that had been made.

23 You're aware of that, aren't you?

24    **MR. TOBEROFF:**  Objection, Your Honor, to this line of

25 questioning, based on relevance.  This is not the scope of his  10:44

1    expert testimony, what happened or didn't happen in the

2    settlement negotiations.

3           THE COURT:  It ordinarily would be.  Where I think

4    counsel is using this for impeachment at this point.  It's not

5    going for actually the matter itself or to impeach the witness          10:44

6    in terms of his earlier statement.

7           MR. BERGMAN:  Thank you, Your Honor.

8    BY MR. BERGMAN:

9    Q    So are you aware of that fact, sir?

10   A    I'm aware that, based on my reading of the record, that          10:45

11   there was a confirmation from a law firm on behalf of the

12   Siegels at some point; and there was, I believe, an

13   understanding that there was some sort of settlement.

14          But again, ultimately, it fell apart.

15   Q    And do you understand from the record that after the          10:45

16   letter from Kevin Marks was sent, that a long form agreement

17   was prepared by the defendants and then sent to the plaintiffs?

18          MR. TOBEROFF:  Same objection, Your Honor, as to the

19   machinations of the settlement agreement, each step of the

20   settlement process.          10:45

21          THE COURT:  Overruled.  The Court is not considering

22   it for the substance being referenced, but, rather, for the

23   impeachment value that counsel is attempting to establish.

24   BY MR. BERGMAN:

25   Q    Sir?          10:46

1   A    My recollection is that there was a formal settlement

2   agreement prepared on behalf of Warner Bros.

3   Q    And do you also understand, sir, that in approximately

4   January or February 2002, that the plaintiffs' then-counsel,

5   Kevin Marks, prepared a revised version of the long form          10:46

6   settlement agreement?

7   A    I don't remember the exact details.  I understand that

8   there was a back and forth and ultimately there was a

9   disagreement as to the material terms of the settlement

10  agreement, and I understand that Warners has been trying to      10:46

11  enforce it.  And ultimately, the judge found it was not

12  enforceable and there was not a meeting of the minds.

13          I don't remember each and every back and forth and

14  who said what.  But from reading the record, I'm aware of the

15  back and forth and the fact that ultimately, there was no        10:47

16  settlement.

17  Q    Okay.

18          But getting back to what started all of this, your

19  statement that during this period of time from October 2001

20  until May of 2002, you stated that you know that defendants      10:47

21  believed they had a settlement agreement.

22          Isn't it a fact that based on your review of the

23  record during that same period of time, the plaintiffs thought

24  they had an agreement?

25  A    I think the plaintiffs did think that there was a           10:47

```
 1   settlement.
 2   Q    Okay.
 3         So we've got this window of time, don't we, from mid
 4   October of 2001 until mid May of 2002, when all is well within
 5   the world; right?  The dispute has been resolved; correct?          10:47
 6         MR. TOBEROFF:  Objection, Your Honor.  Misstates the
 7   record.
 8         THE COURT:  Sustained.
 9         Rephrase.
10         I wish all was well within the world.                         10:48
11         MR. BERGMAN:  I apologize, Your Honor.  So much for
12   poetic license.
13   BY MR. BERGMAN:
14   Q    Mr. Halloran, isn't it correct that from mid October of
15   2001 until May of 2002, based upon your review of the record,       10:48
16   that the parties were acting as if the matter had been
17   resolved?
18         MR. TOBEROFF:  Objection, Your Honor.  He's laid no
19   foundation for May of 2002.
20         THE COURT:  It's based on his review of the record,           10:48
21   and that's the focus here.
22         Overruled.
23         You may answer.
24         THE WITNESS:  I need the question repeated, if you
25   would be so kind, because of the interruption.                      10:48
```

```
 1              (Last question reread.)
 2              THE WITNESS:  I have -- I don't know that to be a
 3    fact.
 4    BY MR. BERGMAN:
 5    Q    Okay.                                                      10:49
 6              Let's go back, then, to your practice as a solo
 7    practitioner and how that interacts within the major studio
 8    film business.
 9              Am I correct that the leading film and television
10    producers tend to be represented by the major firms, such as   10:49
11    the firms that I have listed?
12    A    That is --
13              MR. TOBEROFF:  Objection, Your Honor.  Assumes facts
14    as to -- its also vague as to the leading film.  We don't know
15    what he's talking about as to leading film producers.           10:50
16              THE COURT:  The leading film and television -- are
17    you referring to the major producers that you referred to
18    earlier?
19              MR. BERGMAN:  Yes, sir.
20              THE COURT:  Let's use the same terminology, then.     10:50
21    BY MR. BERGMAN:
22    Q    Like every other business, Mr. Halloran, there are
23    producers who command the highest possible fees and producers
24    who command the lowest possible fees, and a lot of people
25    in-between; correct?                                            10:50
```

```
1   A    Are you talking about in the studio world now?

2   Q    Yes, sir.

3   A    Yes.

4   Q    Okay.

5            Now, isn't it a fact that at a certain level in that      10:50

6   continuum, at the level where the producer gets the best deals,

7   the highest compensation, the most shows, those producers tend

8   to be represented by the firms such as the firms that I've

9   listed who have large entertainment departments?

10  A    That's true.                                                    10:51

11  Q    And it's true, is it not, with respect, again, to the

12  major film business, that the so called A-list directors also

13  tend to be represented by those large firms?

14  A    They tend to be, yes.

15  Q    And that's certainly true of the highest paid actors and       10:51

16  actresses, is it not?

17  A    Generally it's true, yes.

18  Q    Who are the highest paid or most important, however you

19  want to characterize it, major studio film producers who you

20  presently represent?                                                 10:52

21  A    I represent Bob Ducsay, and I represent Barnett Bain.

22  Q    Bob, how do you spell his last name?

23  A    D-u-c-s-a-y.

24  Q    And who was the other person?

25  A    Barnett Bain, B-a-i-n.                                          10:52
```

1  Q    Who are the most important network television producers

2  you represent?

3  A    At present I do not represent any important or high-level

4  network television producers.

5  Q    Do you presently represent any A-list film directors?    10:53

6  A    I represent Hector Babenco, and I represent Jim Toback.

7  Q    Could you spell the last name of the gentleman you named

8  as Hector?

9  A    B-a-b-e-n-c-o; he's an Academy award nominated director,

10 and Mr. Tobeck is an Academy award nominated screen writer    10:53

11 director; he's the director of a film recently released called

12 "Tyson."

13 Q    Recently called what?

14 A    Tyson.

15 Q    That's a documentary?    10:53

16 A    Yes, it is.

17 Q    What did Mr. Babenco do, a film?

18 A    He's best known for directing *Kiss of the Spider Woman*; he

19 was nominated for an Academy award for that film.

20 Q    And did you represent him in connection with that film?    10:54

21 A    No, I did not.

22 Q    With respect to either Mr. Tobeck or Mr. Babenco, have you

23 been involved in negotiating the acquisition of any underlying

24 rights for films?

25 A    Yes.    10:54

1    Q    Which ones?

2    A    For Mr. Babenco, we acquired the rights to a book called

3    Carandiru; that was written by a Brazilian doctor who was

4    treating AIDS patients in a Brazilian prison.  We acquired the

5    motion picture rights to that book.                                 10:55

6    Q    What were the terms of that agreement, sir?

7    A    They were -- I don't remember specifically, but they were

8    very modest.  In the Brazilian film industry, they don't pay

9    the kind of dollars that we pay here.

10   Q    More specifically, do you remember any of the terms?         10:55

11   A    I don't remember the specific terms.  There was a payment

12   of, you know, a license fee to produce the film, and there may

13   have been a small contingent compensation.

14   Q    When you say a small contingent compensation, are you

15   referring to some form of defined proceeds, net proceeds?         10:55

16   A    There was probably produced in some form of participation

17   and producers' proceeds or producers' gross, but I don't

18   remember exactly.

19   Q    How long ago did you negotiate that agreement?

20   A    2003, 2004.                                                   10:56

21   Q    Who are the most important actors and actresses who you

22   presently represent?

23   A    I currently do not represent any prominent actors or

24   actresses, but I hire them every day on behalf of my clients.

25        **MR. BERGMAN:**  Move to strike everything after          10:56

```
 1    "actresses" as nonresponsive.

 2              THE COURT:  It's stricken.

 3    BY MR. BERGMAN:

 4    Q    In your report, Mr. Halloran, and in your trial testimony,

 5    you refer to several book deals involving best --                    10:56

 6              THE COURT:  Let me go back to my objection.

 7              When you say you hire them every day, do you

 8    represent them, then?

 9              THE WITNESS:  I'm representing the production

10    companies who hire them.                                             10:57

11              THE COURT:  But they are represented by somebody

12    else.

13              THE WITNESS:  Correct.

14              THE COURT:  It's stricken.

15    BY MR. BERGMAN:                                                      10:57

16    Q    Your report and testimony as referred to various book

17    deals by best selling authors, like John Grisham,

18    Michael Crichton and Tom Clancy; correct?

19    A    Correct.

20    Q    Those authors and maybe a handfull of others form a very       10:57

21    elite club, don't they?

22    A    It is an elite club.

23    Q    I believe in the expert testimony you gave in the Sahara

24    trial, you referred to them as marquee authors; correct?

25    A    That is correct.                                               10:57
```

1   Q    And their names on the marquee mean something, don't they?

2   A    Certainly their marquee status means something to the

3   person who's acquiring the right to make motion pictures out of

4   their books.

5   Q    And they mean something to the theater goers too, don't          10:58

6   they?

7   A    In some cases, yes.

8   Q    You've never represented a marquee author, have you?

9   A    No.

10  Q    And except for whatever limited experience you've had with      10:58

11  *Dr. Seuss* at Universal, you've never represented a buyer of a

12  marquee author's work, have you?

13  A    No, I've not.

14  Q    What is the most expensive motion picture literary rights

15  acquisition agreement you've negotiated with a major studio on      10:59

16  either side of the table during the past 19 years?

17  A    The Neo-Pets deal.

18  Q    Neo-Pets?

19  A    Yes.

20          **THE COURT:**  Counsel, it's 11:00.  Before we get into      10:59

21  this, we're going to stop at this point.

22          The Court has an 11:00 and an 11:30 matter in

23  chambers.  We'll then break for a lunch, and I'm attending an

24  FBA lunch this afternoon from 12:00 until about 1:30.  I should

25  be back at 1:40 or so, and I'd like to start up again at that       10:59

```
 1  time.

 2          MR. BERGMAN:  Very well, Your Honor.  Thank you.

 3          THE COURT:  We'll recess until that time.

 4

 5

 6

 7

 8

 9

10                       CERTIFICATE

11

12  I hereby certify that pursuant to section 753, title 28, united
    states code, the foregoing is a true and correct transcript of
13  the stenographically recorded proceedings held in the
    above-entitled matter and that the transcript page format is in
14  conformance with the regulations of the judicial conference of
    the united states.

15

16

17  _____          _____
    THERESA A. LANZA, RPR, CSR                      Date
18  Official COURT Reporter

19

20

21

22

23

24

25
```