UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| JOANNE SIEGEL and | ) | |
| LAURA SIEGEL LARSON, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. CV 04-08400-SGL |
| | ) | |
| WARNER BROTHERS ENTERTAINMENT INC.; | ) | |
| TIME WARNER, INC.; DC COMICS; | ) | |
| and DOES 1-10, | ) | Trial Day 6 |
| Defendants. | ) | A.M. Session |
| _____ | ) | Pages 640-707 |

Reporter's Transcript of Court Trial Proceedings

Riverside, California

Wednesday, May 6, 2009

9:51 A.M.

THERESA A. LANZA, RPR, CSR
Federal Official Court Reporter
3470 12th Street, Rm. 134
Riverside, California  92501
(951) 274-0844
WWW.THERESALANZA.COM

```
 1     APPEARANCES:

 2

 3     On Behalf of Plaintiffs:

 4
                        LAW OFFICES OF MARC TOBEROFF
 5                      BY:  Marc Toberoff
                        BY:  Nicholas C. Williamson
 6                      BY:  Keith Adams
                        2049 Century Park East,
 7                      Suite 2720
                        Los Angeles, California  90067
 8                      310-246-3100

 9

10     on behalf of Defendants/Counterclaimant:

11
                        WEISSMANN WOLFF BERGMAN COLEMAN
12                       GRODIN & EVALL LLP
                        BY:  Michael Bergman
13                      BY:  Anjani Mandavia
                        9665 Wilshire Boulevard,
14                      Ninth Floor
                        Beverly Hills, California  90212
15                      310-858-7888

16

17     On Behalf of DC Comics:

18                      PERKINS LAW OFFICE, P.C.
                        BY:  Patrick T. Perkins
19                      1711 Rt. 9D
                        Cold Spring, New York  10516
20                      845-265-2820

21

22

23

24

25
```

```
 1                        I N D E X

 2                                             Page

 3   Plaintiff case (cont'd)........................  644

 4


 5


 6   PLAINTIFF
     WITNESS         DIRECT       CROSS      REDIRECT      RECROSS
 7   MARK HALLORAN (cont'd)

 8   By Mr. Bergman               644

 9


10


11


12           EXHIBITS           RECEIVED

13               B                 672

14


15


16


17


18


19


20


21


22


23


24


25
```

```
 1        Riverside, California; Wednesday, May 6, 2009; 9:51 A.M.

 2                              -oOo-

 3        THE CLERK:  Calling item No. 1 on calendar, case

 4   No. CV 04-08400-SGL, Joanne Siegel, et. al., versus Warner

 5   Bros. Entertainment, Inc., et. al.                            09:51

 6        May we have counsel please come forward and state

 7   your appearances for the record.

 8        MR. TOBEROFF:  Marc Toberoff for plaintiffs.

 9        MR. WILLIAMSON:  Nicholas Williamson for plaintiffs.

10        MR. ADAMS:  Keith Adams for plaintiffs.              09:51

11        MR. BERGMAN:  Michael Bergman for the defendants.

12        MR. PERKINS:  Patrick Perkins for the defendants.

13        MS. MANDAVIA:  Anjani Mandavia.

14        THE COURT:  Good morning to you all, counsel.

15        I presume that it's Mr. Bergman's cross-examination?   09:51

16        MR. BERGMAN:  Thank you, Your Honor.

17        THE COURT:  Have you filed that opposition to the

18   ex-parte that was submitted?

19        MR. PERKINS:  Yes, we have, Your Honor.  We have

20   another copy.                                             09:51

21        THE COURT:  Would you provide that please to the

22   courtroom deputy.

23        THE CLERK:  Mr. Halloran, please be advised you're

24   still under oath.

25        THE WITNESS:  I acknowledge that.                    09:52
```

```
 1              CROSS-EXAMINATION (cont'd)

 2   BY MR. BERGMAN:

 3   Q    Mr. Halloran, had you ever met Mr. Toberoff prior to your

 4   retention as an expert in this case?

 5   A    No, I had not.                                          09:52

 6   Q    Have you ever worked on any motion picture that he was

 7   associated with?

 8   A    No.

 9   Q    I'd like to look, if I may, at that period of time from

10   the time you were first contacted by Mr. Toberoff until the   09:52

11   time that you prepared and submitted your report.

12         At what point in time, in terms of days, after you

13   were first contacted by Mr. Toberoff did he tell you what it

14   was that he wanted you to testify concerning in this case?

15   A    Well, he told me about what was at issue at the case from 09:53

16   the beginning.  This was late January.  And we had a personal

17   meeting, and we sort of outlined what would be covered in my

18   report.

19   Q    And what was said at that meeting, in substance?

20   A    Basically, he gave me an outline of the issues.  We      09:53

21   discussed an outline of the issues and discussed what documents

22   I would have to review.

23   Q    He decided what documents you would have to review?

24   A    Not entirely, no.  At the beginning, he said, 'You're

25   going to have to look at this.'  And then I took it upon myself 09:53
```

1    to do further research.

2    Q    Well, at some point in time, Mr. Toberoff sent you a group

3    of documents, agreements; correct?

4    A    Yes.

5    Q    Who decided which of the agreements would be sent to you                09:54

6    and which would not?

7    A    I requested that I see, you know, all of the documents

8    that were germane to my opinion, that they're actually sent

9    over by Mr. Toberoff.

10   Q    And did you identify the particular documents that you                 09:54

11   considered germane to your opinion?

12   A    Early on, I identified the Neo-Pets' agreement as an

13   agreement I thought would be germane to my opinion.

14   Q    And aside from the Neo-Pets' agreement, did you designate

15   any other agreements that you thought would be germane to your             09:54

16   opinion?

17   A    Not that I remember.  We talked about a couple agreements

18   where we didn't have the actual document; one was the Hasbro

19   deal, and one was the *Chorus Line* deal; but that, at that time,

20   was the universe of documents.                                             09:55

21   Q    So at that point in time, Mr. Toberoff had the discretion

22   as to which documents, which agreements to send to you;

23   correct?

24   A    Not entirely.

25   Q    In what way is it incorrect?                                          09:55

1   A    Again, I had the Neo-Pets' agreement, which he did not

2   have, which I negotiated.

3   Q    I see.

4   A    But it's fair to say that the majority of the documents

5   that I reviewed were sent to me by Mr. Toberoff.                    09:55

6   Q    And did you, at any point in time, ask Mr. Toberoff

7   whether he had sent you all of the agreements that he had

8   compiled for use in this case?

9   A    I don't know if I said it in exactly those words, but I

10  made it clear to Mr. Toberoff that I wanted to see the entire       09:55

11  universe of agreements that was at issue in the case.

12  Q    And did he ever identify any documents that he had not

13  given to you?

14  A    Never.

15  Q    Did you ever ask, 'Are there any documents that you          09:55

16  received that you haven't given to me?'

17  A    I didn't think it was necessary to pose that question.

18  Q    The answer is no?

19  A    I did not ask Mr. Toberoff that question.

20  Q    Okay.                                                         09:56

21       At the point in time that you were retained, did you

22  ask Mr. Toberoff whether you were free to retain other people

23  to assist you in any research or in connection with forming

24  your opinion?

25  A    We didn't have that particular discussion, but I know from    09:56

1  my experience as an expert that we are free to consult others.

2  And I think other experts in this case have taken advantage of

3  that latitude.

4          **MR. BERGMAN:**  Move to strike everything after

5  "discussion" as being nonresponsive.                          09:56

6          **THE COURT:**  Stricken as nonresponsive.

7  **BY MR. BERGMAN:**

8  Q    Did you commission any survey at the outset of your

9  retention or at any other time to determine what other

10  individuals at the major studios considered to be the fair    09:57

11  market value of the *Superman* rights in 2002?

12          **MR. TOBEROFF:**  Objection, Your Honor, as to "survey."

13  It's vague and ambiguous.

14          **THE COURT:**  Rephrase.

15  **BY MR. BERGMAN:**                                           09:57

16  Q    After you got the assignment, Mr. Halloran, did you put

17  together a list of your major studio business affairs' friends

18  or business affairs' associates to ask them or discuss with

19  them what the fair market value of these rights might have been

20  in 2002?                                                      09:57

21  A    No, I did not.

22  Q    Did you call up any studio executive to get their opinion?

23  A    No, I did not.

24  Q    Did you call anyone at the William Morris' literary

25  department to ascertain what they thought about the fair market  09:58

1   value?

2   A    No, I did not.

3   Q    Did you call anyone at the literary rights' department at

4   Creative Artists Agency for that same purpose?

5   A    No, I did not.                                        09:58

6   Q    Or did you call anyone at the United Talent Agency or at

7   ICM or at any of the other major talent agencies?

8           **MR. TOBEROFF:**  Objection, Your Honor.  Compound.

9           **THE COURT:**  Break it up.

10  **BY MR. BERGMAN:**                                        09:58

11  Q    Did you call anyone at ICM to ascertain what they thought

12  the fair market value of these rights were?

13  A    No.

14  Q    Or did you call anyone at United Talent Agency for that

15  purpose?                                                  09:58

16  A    No.

17  Q    Did you call anyone at any of the specialized literary

18  rights' agencies that exist in Los Angeles for the handling of

19  these kind of rights?

20  A    I'm not aware of any specialized literary agencies in    09:59

21  Los Angeles that specialize in the handling of these kind of

22  rights, so I did not make a call to any such agency.

23  Q    You're not aware of any such individual agent or any

24  such agency that specializes in the representation of literary

25  rights in Los Angeles?                                    09:59

1    A    You keep changing what you are talking about.

2              As I understood your question, we went through the

3    list of the major agencies, and then you asked me whether I

4    talked to an agency that specializes in these sort of rights.

5    And I said I was unaware of any such agency.                    09:59

6              It's certainly true within the major agencies they

7    have people who specialize in valuation of literary rights.

8    But I'm unaware of any agency that's just in the business of

9    doing it.  There might be a few small ones, but they're not

10   widely known.                                                   10:00

11   Q    Very well.

12             Did you confer with anyone, any attorney who actually

13   handles these kind of clients and these kinds of properties,

14   with respect to the value of the property?

15             **MR. TOBEROFF:**  Objection, Your Honor.  This line of   10:00

16   questioning is vague and ambiguous.  He's now talking about

17   'these' kinds of rights and 'these' kinds of properties.

18             Is he referring to comic books?  Is he referring to

19   rights in general?  It's too open-ended.

20             **THE COURT:**  Fair enough.                             10:00

21             **MR. BERGMAN:**  Indeed, Your Honor.

22   **BY MR. BERGMAN:**

23   Q    Mr. Halloran, did you speak with any person who -- any

24   attorney, who represents marquee authors and ask them what

25   their opinion was as to the value in 2002 of the *Superman*      10:01

1    nonexclusive rights?

2    A    No.

3    Q    Did you consult with anyone engaged in the acquisition on

4    either side of the table of major literary rights as to the

5    value in 2002 of the *Superman* film rights?                              10:01

6         **MR. TOBEROFF:**  Objection, Your Honor.  Also vague and

7    ambiguous.  We don't know what he means by "acquisition on

8    either side of the table."  There's a seller and there's a

9    buyer; there's a licensor and there's a licensee.

10        **THE COURT:**  I'm going to overrule the objection to          10:02

11   the question.  But you can certainly follow up along those

12   lines, as appropriate, to break it down.

13   **BY MR. BERGMAN:**

14   Q    Mr. Halloran, when you and I had our deposition, you used

15   phrases like "both sides of the table," didn't you?              10:02

16   A    I may well have, yes.

17   Q    And by that, you mean a buyer and a seller; right?

18   A    That's what I mean by that.

19   Q    Okay.

20        During the course of forming your opinion in this          10:02

21   case, did you confer with anyone concerning the fair market

22   value of the nonexclusive *Superman* rights, anyone who's

23   involved in the acquisition of these rights, these kinds of

24   high-level film rights?

25   A    I didn't think it was necessary, so I didn't.              10:02

1   Q    Do you recall telling me at your deposition that you had,

2   throughout your career, discussed issues regarding the rights

3   to comic book franchises with executives at many major studios?

4   A    Yes.

5   Q    And you had a statement to that effect in your report, did          10:03

6   you not?

7   A    I did.

8   Q    And when I inquired about who those people were at the

9   deposition, you told me that you haven't discussed issues

10  regarding the rights to comic book franchises with such              10:03

11  executives since you had left Universal; correct?

12  A    That's correct.  But I now have recollection that I did

13  have a discussion regarding that with an executive.

14          MR. BERGMAN:  Move to strike everything after

15  "correct," Your Honor.                                                10:04

16          THE COURT:  It was nonresponsive.  Yes.

17  BY MR. BERGMAN:

18  Q    Now, you reached a point where you formed an opinion;

19  correct, sir?

20  A    My opinions have been ongoing.  But yes, as of the time          10:04

21  that I had prepared the report, I had reached some opinions,

22  yes.

23  Q    And you submitted that report to the plaintiffs and the

24  defendants; correct?

25  A    Yes.                                                             10:04

1  Q      Okay.

2          Before you submitted that report, after you had

3  prepared it, what, if anything, did you do to test any of the

4  opinions that you expressed in your report or to test any of

5  the opinions you expressed here in court?                          10:04

6  A    Well, it's been an ongoing process.  And as you know,

7  there's a vast amount of material that I had to digest very

8  quickly, I think.

9          You have to recall that, unfortunately, the original

10 expert for the plaintiffs took ill, so I came into the case in   10:05

11 very late January and I prepared my report on February 16th.

12         And, you know, since then -- you know, as of that

13 time, I had a lot of data that I've analyzed, and I did

14 independent research.  And since that time I've continued to

15 absorb the information and do Internet research and the like.      10:05

16         **MR. BERGMAN:**  Move to strike as nonresponsive,

17 Your Honor.

18             **THE COURT:**  What's that, Counsel?

19             **MR. BERGMAN:**  The entire answer.

20             **THE COURT:**  No.  Actually, part of the answer is --  10:05

21 we're getting into this area where you really need to listen to

22 what the question is, and --

23             **THE WITNESS:**  I appreciate that.

24             **THE COURT:**  Mr. Toberoff is going to be up, and he'll

25 immediately followup and --                                        10:05

1          **THE WITNESS:**  Right.  The problem is, I don't want to

2    mislead in my answers.

3          **THE COURT:**  I have extraordinarily sophisticated

4    attorneys in front of me who will not be misled by anything

5    that you say or --                                            10:06

6          **THE WITNESS:**  I gather you won't either.

7          **THE COURT:**  Why don't you ask the question again.

8    There are portions of the question which are responsive; he

9    talks about the process.

10          **MR. BERGMAN:**  I'll try to make it clearer,          10:06

11    Your Honor.

12          **THE COURT:**  Thank you.

13          **MR. BERGMAN:**  You're welcome, sir.

14    **BY MR. BERGMAN:**

15    Q    After you formed the opinions and expressed them in your  10:06

16    report, did you do anything to verify that your opinions have

17    any weight within the major studio film community?

18    A    I had, in my estimation, sufficient evidence from the

19    contracts that came from major studios that showed that my

20    evaluation was consistent with their evaluation, so I didn't   10:06

21    feel compelled to do a survey since I already had the answer in

22    documents.

23          **MR. BERGMAN:**  Move to strike as nonresponsive.

24          **THE COURT:**  It's a yes or no question.

25          Did you do anything?                                     10:07

1          **THE WITNESS:**  Well, I kind of feel like these are,

2    you know, 'when did you stop beating your wife' type questions,

3    so I'm trying to be as clear as I can.

4          **THE COURT:**  Let your attorney -- or the attorney that

5    puts you on the stand make the objections.                          10:07

6          **THE WITNESS:**  Okay.

7          **THE COURT:**  Don't overrule your own objections.

8          **THE WITNESS:**  Okay.

9          **THE COURT:**  Evidence which assumes facts not in

10   evidence, Mr. Toberoff knows how to make that objection.           10:07

11         **THE WITNESS:**  Okay.

12         **THE COURT:**  I know you're an attorney, as well.

13         **THE WITNESS:**  Yes.  It's hard.

14         **THE COURT:**  It's hard, but you've got to just kind of

15   go with the system here.                                           10:07

16         **THE WITNESS:**  I understand.

17         **THE COURT:**  It's stricken, Counsel.

18         **MR. BERGMAN:**  Thank you, Your Honor.

19   **BY MR. BERGMAN:**

20   Q    Following the preparation of your report, Mr. Halloran,       10:07

21   did you circulate that report to anybody at any studio to test

22   the voracity of your report?

23   A    No.

24   Q    Did you circulate your report to any attorney involved in

25   the actual negotiation of rights' agreements for high-level        10:08

1    rights?

2    A    No, I did not.

3    Q    Did you circulate your opinion to anyone within the motion

4    picture industry to find out or to at least get a reaction from

5    that person to the substance of your opinion?                    10:08

6    A    No, I did not.

7    Q    Now, in your direct examination, sir, you testified to an

8    opinion as to the terms that you believe would have been the

9    fair market value of the film agreement, assuming it conveyed

10   exclusive rights; correct?                                       10:08

11   A    That's correct.

12   Q    The opinion that you testified to on the witness stand as

13   to the fair market value of the *Superman* rights in 2002 was

14   quite different from the same opinion that you expressed at

15   your deposition, was it not?                                     10:09

16   A    I don't recall that it was inconsistent.

17          MR. BERGMAN:  Your Honor, this may take a few minutes

18   because I've got to read some of the background, but I'm going

19   to start at page 287, line 5, and it will continue until, I

20   believe --                                                       10:10

21          THE COURT:  You're reading from the deposition here;

22   correct?

23          MR. TOBEROFF:  I'm sorry, Counsel, give me the page

24   numbers again.

25          MR. BERGMAN:  It will begin at page 289, line 5, and     10:10

```
 1   it will continue to portions on page 289.
 2   BY MR. BERGMAN:
 3   Q    Mr. Halloran, listen, please, to the questions.
 4        My question to you is going to be whether you recall
 5   being asked those questions and giving those answers.          10:11
 6        Do you understand that?
 7   A    I understand.
 8   Q    And you were under oath when you gave this deposition;
 9   correct?
10   A    Just as I am now, yes.                                     10:11
11   Q    And after you were given a copy of this transcript, you
12   had an opportunity to -- and, in fact, you took advantage of
13   correcting any mistakes or misstatements that may have been
14   made; correct?
15   A    That is correct.                                           10:11
16   Q    Okay.
17        MR. BERGMAN:  Resuming now?
18        THE COURT:  You may.
19   BY MR. BERGMAN:
20   Q    To your deposition.                                        10:11
21        "QUESTION:  Mr. Halloran, let me be clear.  I want to
22   get specific figures, if you can give me specific figures, as
23   to what the elements of a fair market deal for the *Superman*
24   film rights in 2002 would have been if DC had gone to a
25   competing studio.                                               10:12
```

1              Now, is it your opinion that the option exercise

2    price in that situation would have been $30 million?

3              "ANSWER:  At a minimum."

4    **BY MR. BERGMAN:**

5    Q    Do you recall giving that answer?                              10:12

6    A    That answer was regarding a buyout of the rights, not for

7    a single picture.  So I do recall giving that answer, but based

8    on the question you asked me, this was if someone wanted to

9    just buy *Superman*, what would that be, and I said at a minimum

10   $30 million, and I stick with that.                                 10:12

11             The fair market value opinion I've given in this case

12   applies on a one picture by one picture basis.

13   Q    I think your next answer may make that clearer.

14             **MR. BERGMAN:**  And here, Your Honor, I'm reading from

15   page 289, line 1.                                                   10:13

16             "QUESTION:  In your opinion, if a deal were

17   structured as an option agreement and DC had gone to a

18   competing studio to convey the film rights to *Superman* that it

19   purported to convey to Warner Bros., is it your testimony that

20   the deal would have included option payments of at least          10:13

21   $3 million a year?

22             "ANSWER:  Yes.

23             "QUESTION:  Is it your testimony that the exercise

24   price of the option would have been at least $30 million?

25             "ANSWER:  Had there been an exercise price included     10:14

1    as part of the deal?  Yes.

2            "QUESTION:  Is it your opinion that the gross

3    participation from dollar one would start at 10 percent and

4    escalate to 20?

5            "ANSWER:  No, I'm not saying that.  What I stated was    10:14

6    that the -- I didn't necessarily state that.  The participation

7    would be fixed in the range of 10 to 20 percent of gross.  It

8    may have escalations; it could have been just a straight -- the

9    more -- if, in fact, it was at 10 percent, it certainly would

10   have escalations, given the comparable participations that have    10:14

11   been paid on the agreements that I saw."

12           And that ends at line 22, page 289.

13   **BY MR. BERGMAN:**

14   Q    Do you recall giving that answer, sir?

15   A    Yes, I do.    10:15

16   Q    And that related to an option agreement, did it not?

17   A    It related to an option agreement to purchase the entire

18   *Superman* rights for multiple pictures; so the $3 million was

19   based on 10 percent of my $30 million figure.

20   Q    Have you asked any person, any person involved in the    10:15

21   major motion picture industry, on either side of the table,

22   buyer or seller, anyone in an agency, whether they agree with

23   your deposition testimony that a fair market deal for the

24   *Superman* rights, if they were exclusive, would have been

25   $3 million annual options, a $30 million purchase price and    10:15

```
 1    somewhere between 10 and 20 percent of first-dollar gross?
 2           MR. TOBEROFF:  Objection, Your Honor.  The question
 3    is compound.  In addition, it's been asked and answered.  We've
 4    been through a whole line of questions about whether after
 5    rendering his opinion he consulted with others in the           10:16
 6    entertainment industry as to his opinions.
 7           He already answered that question.
 8           THE COURT:  I don't think this specific one has been
 9    asked and answered.  Overruled.
10           You may answer the question.                              10:16
11           THE WITNESS:  The answer is no.
12    BY MR. BERGMAN:
13    Q   Let's focus, then -- since based on your direct testimony,
14    you seem focused on particular elements, let's look first at
15    the option.                                                      10:17
16           Have you ever represented a rights holder in a
17    negotiation or represented the person buying those rights on an
18    agreement that involved a $3-million-a-year yearly option?
19    A   No, I've not.
20    Q   Or a $2-million-a-year annual option?                        10:17
21    A   No.
22    Q   Or a $1-million annual option?
23    A   Not that I recall.
24    Q   How about $900,000 a year?
25    A   No.                                                          10:17
```

1    Q    800,000 a year?

2    A    No.

3    Q    700,000 a year?

4    A    No.

5    Q    600,000 a year?                                              10:17

6    A    No.

7    Q    500,000 a year?

8    A    No.

9    Q    In the film agreement that you have argued is below fair

10   market value, DC got escalating annual payments of from 500,000   10:18

11   to $700,000 a year, didn't it?

12   A    This was for *Superman*.  I've never represented the

13   *Superman* rights, but what you said was true.

14         **MR. TOBEROFF:**  Objection, Your Honor.  The question

15   misstates the record, and the contract agreement.                 10:18

16         **THE COURT:**  Fair enough.

17         Rephrase that question, then.

18   BY MR. BERGMAN:

19   Q    Does the film agreement for *Superman*, of course, involve

20   escalating option payments, annual option payments, escalating    10:18

21   from $500,000 a year to $700,000 a year?

22   A    It does.

23   Q    Okay.

24         **THE COURT:**  Is that what you're objecting to,

25   Counsel?                                                          10:19

1          **MR. BERGMAN:**  Pardon me?

2          **THE COURT:**  I'm sorry.  Mr. Toberoff?

3          **MR. TOBEROFF:**  Yes, Your Honor.

4          **THE COURT:**  You're saying that that's not accurate?

5    Your witness just indicated that --                              10:19

6          **MR. TOBEROFF:**  Excuse me, Your Honor.  I'm no longer

7    objecting to the question.  The way it was phrased originally

8    was --

9          **THE COURT:**  Very well.  I misunderstood your

10   objection.                                                       10:19

11         You may proceed, Counsel.

12   **BY MR. BERGMAN:**

13   Q    Given the fact that you have never had annual options of

14   500,000 to $700,000, on what basis, in direct testimony, did

15   you describe the *Superman Returns*' option payments as          10:19

16   "relatively modest option payments"?

17   A    You have to, as I testified in my deposition, be -- and I

18   think it's generally held to be true, the initial option

19   payment for most properties is 10 percent of the purchase

20   price.                                                           10:20

21         By definition, the *Superman* purchase price would be

22   an extraordinarily high number.  And if you applied that

23   10 percent, then it would -- the option price would be higher.

24         I think you have to keep in mind that the option

25   price is -- one thing that's missing from the *Superman*         10:20

1    agreement is a reversion, and that's more important than the

2    option price.  The escalating option price, in addition, are

3    illusory because contingent compensation is a credit against

4    them.  So you have to look at it in the context of the whole

5    agreement, not just --                                          10:20

6           **MR. BERGMAN:**  Your Honor, I ask that the answer be

7    stricken and that the witness be cautioned not to seize upon a

8    question to give a lecture advocating his position.

9           **THE COURT:**  The answer's stricken.  Let's move along.

10   **BY MR. BERGMAN:**                                             10:21

11   Q    When you say that the 500,000 to $700,000 a year option

12   payments are relatively modest option payments, to what

13   agreements are they relatively modest by comparison?

14   A    Well, let me consult the chart here.

15          **MR. BERGMAN:**  And, Your Honor, if I may, the witness  10:21

16   has this cheat sheet.  I'd prefer that he --

17          **THE COURT:**  Counsel, let's not refer to it as a cheat

18   sheet.

19          **MR. BERGMAN:**  I'm sorry.  Forgive me, Your Honor.

20   The witness has this chart.                                     10:21

21          I would prefer when I ask him a question, if he can

22   answer the question, fine.  If he can't answer the question and

23   says so, that he can then look at the chart.

24          **THE COURT:**  That's a fair request, Counsel.

25          **THE WITNESS:**  Okay.                                  10:21

```
 1              So your question was?
 2   BY MR. BERGMAN:
 3   Q    My question was, when you speak of the 500,000 to $700,000
 4   annual payments that the Superman Returns' agreement provides
 5   as being relatively modest, to what specific agreements are you      10:22
 6   relating them to?
 7   A    I would have to consult my chart in order to give you a
 8   complete answer to that.
 9   Q    Then would you please consult your chart and show me what
10   agreement has a higher annual option than 500- to $700,000.         10:22
11   A    Conan has an option fee of a million dollars.  And I think
12   Conan was a lesser property than Superman.  In fairness, that
13   was for 18 months, but then there was an additional million
14   dollars for 12 months.
15   Q    Any others?                                                    10:23
16   A    Lord of the Rings had a $2.5 million option fee.
17   Q    How much?
18   A    I believe $2.5 million in total.
19   Q    For how many pictures?
20   A    I believe that's for three.                                   10:23
21   Q    Go on.
22   A    Those are the ones that I see.
23   Q    Those are the ones that you could what?
24   A    Those are the ones that I could see.
25   Q    I see.                                                        10:23
```

1              Aside from the ones that you see on that list, do you

2    have any personal experience, however tangential or slight,

3    with any rights' acquisition that had anywhere near a

4    $3 million annual option?

5    A    No.                                                                    10:24

6    Q    Have you ever heard or read in the trades of any rights'

7    acquisition that had anywhere near a $3 million option?

8    A    I don't believe so.

9    Q    Okay.

10             Let's look at the exercise price of $30 million.         10:24

11             Have you ever represented a client, any client,

12   whether a star, director, writer, producer or rights holder,

13   who received a $30 million fixed payment from a studio for

14   their rights or services?

15   A    No, I have not.                                                        10:24

16   Q    25 million?

17   A    No.

18   Q    20?

19   A    No.

20   Q    15 million?                                                           10:25

21   A    No.

22   Q    10 million?

23   A    No.

24   Q    5 million?

25   A    No.                                                                    10:25

1  Q    Have you ever represented a client -- again, any client,

2  any category, who received a first-dollar gross share from a

3  studio as high as 20 percent?

4  A    No, I've not.

5  Q    15 percent?                                          10:25

6  A    No.

7  Q    10 percent?

8  A    No.

9  Q    And you haven't authored or coauthored any books on

10 acquiring pre-eminent film properties, have you?          10:25

11 A    No, I've not.

12 Q    You don't contend, do you, or do you, that your expertise

13 as to the fair market value of the *Superman* rights in 2002

14 finds any basis in the *Daily Trades*, *Daily Variety* or *Hollywood*

15 *Reporter*?                                                10:26

16 A    The trades report on significant deals all the time.  As

17 you know, the problem we're dealing with here is that, the

18 value of the rights has not been tested in the market, and the

19 universe of branded comic book characters is controlled by

20 two companies who own them and don't go to third parties;  10:26

21 namely, DC and Marvel; so that makes it more difficult.

22         **MR. BERGMAN:**  Move to strike the answer as being

23 nonresponsive, Your Honor.  The question asked is whether he

24 contends.

25         **THE COURT:**  I see what you asked, Counsel.  I'm   10:26

```
 1    just -- you're asking him what he contends.  I'm going to

 2    overrule the objection.

 3            Next question.

 4            MR. BERGMAN:  Very well, Your Honor.

 5    BY MR. BERGMAN:                                          10:27

 6    Q    So is the gist of the answer that you just gave,

 7    Mr. Halloran, that you haven't gotten that information from the

 8    trades because these contracts are controlled by Marvel and DC,

 9    and they don't give out that information?

10            Is that what you're saying?                      10:27

11    A    That's part of the problem, certainly.

12    Q    Okay.

13            So you haven't drawn any expertise as to the fair

14    market value of these type of agreements from the trade papers

15    or from *People* magazine or from Wikipedia --            10:27

16    A    You're misstating my testimony.

17    Q    -- for the very reason --

18            THE COURT:  Counsel?

19            MR. TOBEROFF:  Misstates his testimony.

20            THE COURT:  Rephrase the question.                10:28

21    BY MR. BERGMAN:

22    Q    Isn't it true that you haven't obtained any expertise as

23    to the fair market value of *Superman Returns* in 2002 from the

24    daily entertainment trades?

25    A    That's not true.                                     10:28
```

1  Q    Well, you just told me that that information is not

2  printed in the trades.

3  A    You're talking about two different things.

4        Certainly, in terms of the value and recognition, I

5  immerse myself every day with the trades and reports and

6  television and online.  And so in terms of awareness, you know,

7  the universe of what I considered is very broad.

8        In terms of the exact deals, which is different from,

9  you know, notoriety, those deals, although I have plenty to

10  look at here, are not reported specifically in the trades.

11        I can tell you one agreement that was reported.

12        **MR. BERGMAN:**  Your Honor, there has to be some limit

13  to this.  There must be some limit to this.

14        **THE WITNESS:**  He's asking me why --

15        **THE COURT:**  Stop, stop.  Don't talk over me.  You

16  talk over counsel, that's one thing.

17        **THE WITNESS:**  Excuse me.

18        **THE COURT:**  You cannot talk over me.

19        **THE WITNESS:**  Okay.

20        **THE COURT:**  Counsel, sit down.

21        This is cross-examination.  I know you're a lawyer

22  and understand what cross-examination is.  This isn't direct

23  examination.  Counsel is allowed to ask pointed questions to

24  elicit, and you have to respond to the question asked.  Your

25  attorney, the attorney representing plaintiffs, will be able to

10:28

10:29

10:29

10:29

10:29

```
 1   ask open-ended direct questions that will allow you to expand.
 2           THE WITNESS:  Can I ask a question though?
 3           When he misstates my testimony to me, then --
 4           THE COURT:  It's your attorney's responsibility to
 5   stand up and make an objection.                                    10:29
 6           THE WITNESS:  Okay.  I understand.  Thank you.
 7           THE COURT:  Counsel?
 8           MR. BERGMAN:  Thank you, Your Honor.
 9           THE COURT:  Let's take the question from the top.
10   BY MR. BERGMAN:                                                    10:30
11   Q   Mr. Halloran, just to place my questions in context, these
12   questions are based on the economics of the deal.  That's what
13   I'm concerned about, where you get your information that makes
14   you an expert as to how much money should have been paid for
15   this property.                                                     10:30
16           We've gone over your experience; we've gone over
17   whatever you've done to form your opinion.
18           THE COURT:  Now, Counsel, I have to caution you.
19           Just ask a question.
20           MR. BERGMAN:  Yes, sir.                                    10:30
21   BY MR. BERGMAN:
22   Q   At this point, I'm simply asking one question:  Have you
23   obtained any knowledge, any details as to the terms of any
24   other deals for the acquisition of valuable comic superhero
25   characters from the daily trade papers?                           10:30
```

1   A     I believe the *Chorus Line* deal was in the trades.

2   Q     Aside from the *Chorus Line* deal, did you get the economic

3   data of any other deal from the trade papers?

4   A     I believe -- well, I believe I was aware of *The Terminator*

5   agreement because it was reported.  But I have the actual

6   agreement; but that, I believe, was in the trades, as well.

7   Q     Are you referring --

8   A     But I'm not relying on what was in the trades, but I'm

9   relying on the agreement.

10  Q     Okay.

11        Are you relying on anything that you read in

12  Wikipedia in determining the fair market value of the *Superman*

13  rights in 2002?

14        **MR. TOBEROFF:**  Objection; overbroad, Your Honor.

15        **THE COURT:**  Not as a foundational question,

16  Mr. Toberoff.  Overruled.

17        **THE WITNESS:**  I consulted Wikipedia just with respect

18  to the history and background and iconic nature of *Superman*.  I

19  didn't use Wikipedia to set the value of the rights, which I

20  think is buttressed by the agreements that are in evidence.

21  **BY MR. BERGMAN:**

22  Q     Okay.

23        And am I correct that -- of the expert witness'

24  cases, these 30 cases that you have testified in, am I correct

25  that only the *Sahara* case involved, even tangentially, the

1   question of the fair market value of important underlying

2   literary rights for a film?

3   A    I don't think that's necessarily accurate.  Certainly, in

4   the *Spiderman* case, which I was involved in, which was a battle

5   between Paramount and Fox, the value of those rights, as          10:32

6   apparent from, you know, the fight to get them.

7         In that case, there wasn't a specific point as to the

8   valuation of rights.  What was at issue was who actually owned

9   the rights.

10  Q    Okay.                                                        10:33

11        As an experienced witness, you're aware, are you not,

12  that Federal Rule 26 requires you to list all of the cases in

13  which you've testified at either deposition or in trial as an

14  expert?

15  A    Those within the last four years, yes.                      10:33

16  Q    Yes, sir.  You're aware of that?

17  A    I'm aware of that.

18  Q    And your Exhibit B to your report, which supposedly

19  identifies all those cases, has been introduced into evidence,

20  hasn't it?                                                        10:33

21  A    I don't know whether it's been introduced or not.

22  Q    I believe it has.

23        In preparing Exhibit B -- did you prepare Exhibit B,

24  by the way?

25  A    I prepared Exhibit B, and I had some assistance from my      10:34

1   paralegal in preparing it, as well.

2   Q    Okay.

3        And after you had prepared the list of cases during

4   the past four years in which you've testified, did you then

5   transmit that to Mr. Toberoff?                                    10:34

6   A    Yes, as part of the expert report.

7   Q    And did Mr. Toberoff eliminate any case from that list?

8   A    Absolutely not.

9   Q    And you didn't purposely eliminate any case from the list,

10  did you?                                                          10:34

11  A    No.

12  Q    But you did omit a case, didn't you?

13  A    I'm not aware that I omitted a case.

14  Q    Okay.

15       Didn't you --                                               10:34

16       **MR. TOBEROFF:**  Point of clarification, Your Honor,

17  Exhibit B has not been admitted into evidence.  Exhibit A, the

18  resumes, have been admitted.

19       **THE COURT:**  Has it not been admitted into evidence,

20  Counsel?                                                         10:34

21       **MR. BERGMAN:**  Apparently Mr. Toberoff is correct,

22  Your Honor.  I confused A and B.

23       **THE COURT:**  Very well.

24       **MR. BERGMAN:**  B is a list of the cases that he has

25  appeared in as a witness in past four years, and I respectfully  10:35

1    move that be introduced in evidence.

2              **THE COURT:**  Very well.

3              Any objection?  I assume there's no objection?

4         **MR. TOBEROFF:**  No objection, Your Honor.

5         **THE COURT:**  It's admitted now in evidence.                10:35

6              (Exhibit B is Received.)

7    **BY MR. BERGMAN:**

8    Q    Am I correct, Mr. Halloran, that you testified in the case

9    of Trademark Properties versus A&E Television Networks, a

10   South Carolina District Court case?                                10:35

11   A    I testified at deposition in that case.

12   Q    Okay.

13             And you were, therefore, under Rule 26, required to

14   identify that case, weren't you?

15   A    Yes.                                                          10:35

16   Q    And that deposition testimony was less than a year ago in

17   June of 2008; wasn't it?

18   A    That's generally accurate.

19   Q    Why didn't you list that --

20   A    I'm not --                                                    10:36

21   Q    -- in Exhibit B?

22   A    I'm not aware that I didn't list it.

23   Q    Well, I'll represent to you, and counsel can tell me if

24   I'm wrong, that on Exhibit B you did not.

25   A    Well, that was inadvertent.  It should have been there.      10:36

1    Q    I'll presume that Mr. Toberoff agrees that you did not.

2         Did you omit the Trademark Properties' case from your

3    Rule 26 disclosure because all three of your expert reports

4    were excluded by the judge in that case?

5    A    No.  I made a mistake.                                      10:36

6         And I don't know for a fact that all three were

7    excluded.

8    Q    Isn't it a fact that all three were excluded?

9    A    I don't know whether that's true or not.

10        **MR. BERGMAN:**  Your Honor, I respectfully refer the     10:36

11   Court and opposing counsel to that case, a citation of which is

12   2008, U.S. District, Lexis 87731.

13        **THE COURT:**  Do you have a copy, Counsel?

14        **MR. BERGMAN:**  Yes.

15        (Brief pause.)                                              10:38

16        **THE COURT:**  The Court has read the opinion.

17        You may proceed.

18        **MR. BERGMAN:**  May I approach the witness with a copy

19   of the opinion, Your Honor.

20        **THE COURT:**  I'll hand him mine.                         10:39

21        **THE WITNESS:**  I've not seen this, so...

22        (Brief pause.)

23   BY MR. BERGMAN:

24   Q    You also omitted this case from your similar Exhibit in

25   the *Watchmen* case, didn't you?                                 10:40

```
 1   A    I'm unaware that I did.  I keep them on an ongoing sort of

 2   rolling basis, and once they are put in, then I amend them; so

 3   apparently this didn't get in the grid.

 4   Q    You agree that it didn't get into the Watchmen --

 5              THE COURT:  Stop.                                          10:41

 6              Where is this Exhibit B?  What Exhibit number is it

 7   attached to?

 8              MR. BERGMAN:  It is part of the report, which was

 9   offered in evidence by Mr. Toberoff.

10              THE COURT:  Right.  What's the Exhibit number.  I          10:41

11   want to take a look at it.

12              MR. TOBEROFF:  It's 332, Your Honor.

13              THE COURT:  Thank you.

14              MR. WILLIAMSON:  It's 332, Your Honor.

15              THE COURT:  This took place in 2008?                       10:42

16              THE WITNESS:  Yes.

17              THE COURT:  Was that before the Fox Vs. Warner Bros.'

18   Testimony?

19              THE WITNESS:  Yes.

20              THE COURT:  Yes?                                           10:42

21              THE WITNESS:  Yes.

22              THE COURT:  Why exactly didn't -- you say it was

23   inadvertent that you did not include that?

24              THE WITNESS:  Yes.  Absolutely inadvertent.  I would

25   never deliberately leave out a case.                                 10:42
```

1          **MR. TOBEROFF:**  Your Honor, the implication is that

2     the case we're talking about was within four years of the --

3     excuse me.

4          **THE COURT:**  I'm sorry, counsel?

5          **MR. TOBEROFF:**  I'm correcting myself and sitting                    10:43

6     down.

7          **THE COURT:**  Very well.

8          Counsel, you may proceed.

9  **BY MR. BERGMAN:**

10  Q    Am I correct, Mr. Halloran, that the report that you          10:43

11     submitted in the case that Your Honor referred to, the *Fox Vs.*

12     *Warner Bros.'* case, which is the *Watchmen* case, also omitted to

13     cite this rule, this South Carolina case?

14  A    I don't know that for a fact.

15          **MR. BERGMAN:**  Your Honor, we would like to mark for          10:43

16     identification Exhibit A to the resume of Mark Halloran

17     submitted in the Fox case.

18          **MR. PERKINS:**  Plaintiffs' Exhibit 1117, Your Honor.

19          **THE COURT:**  Your next question, Counsel?

20          **MR. BERGMAN:**  Thank you, Your Honor.          10:44

21  **BY MR. BERGMAN:**

22  Q    Am I correct, Mr. Halloran, that in that South Carolina

23     case, the judge rejected one of your supplemental reports

24     because the opinion in it was based on an article in the

25     *New York Times* and computer research; correct?          10:44

```
 1  A    No.  The main reason he rejected it was -- and I think he
 2  was right, was that -- the main thing I did in my report was to
 3  take some joint venture numbers that were given by A&E, and I
 4  divided them in half; and he said any juror could do that.
 5  That was the main reason.                                            10:45
 6  Q    Mr. Halloran, that was the reason why the judge --
 7            THE COURT:  Let's cut this short.  The Court has just
 8  read the opinion.  I know why the judge did what he did.
 9            Let's move along.
10            MR. BERGMAN:  Very well, Your Honor.                       10:45
11  BY MR. BERGMAN:
12  Q    Now, you were also an expert witness in the *Sahara* case,
13  weren't you, sir?
14  A    Yes.
15  Q    Okay.                                                          10:45
16            And I'm going to go into that case in some detail.
17  But one of the issues raised in the *Sahara* case against the
18  person who retained you, the author, Clive Cussler --
19  A    Actually, I was not.  I was retained by Greenberg Glusker
20  Fields.                                                             10:46
21  Q    You were retained by Bert Fields at Greenberg Glusker;
22  correct?
23  A    Yes.
24  Q    And Mr. Fields represented Clive Cussler; correct?
25  A    He did.                                                        10:46
```

1    Q    And you were testified to act -- you were paid to act as

2    an expert witness on behalf of Mr. Cussler, were you not?

3    A    Yes.

4    Q    One of the issues in that case was whether Mr. Cussler's

5    disparaging remarks made in public, in newspapers and on the          10:46

6    radio, about the film made the property less successful, made

7    the film less successful, hurt the box office gross.

8           Do you recall that?

9    A    That was an issue, yes.

10   Q    And on that issue that you gave an expert opinion that          10:46

11   such disparaging remarks didn't hurt the picture and may even

12   have increased the grosses due to the controversy; is that

13   correct?

14   A    That is accurate.

15   Q    But when you made that opinion, when you did your report,       10:47

16   when you testified at your deposition, when you testified at

17   trial, you still hadn't read any of the statements, any of the

18   disparaging statements, that had been made by Mr. Cussler in

19   print or on the radio, had you?

20   A    That's not accurate.  Can I amend that?                          10:47

21          I was certainly -- my recollection is, I was -- there

22   was no controversy, whatsoever, in the *Sahara* case that

23   Mr. Cussler had issued disparaging statements about the movie.

24   In fact, he filed the lawsuit --

25          **THE COURT:**  This is not the answer to the question.       10:47

1    The question is whether you had read them.

2              **THE WITNESS:**  I certainly was aware of them, and I

3    have a recollection of reading them, but I don't have a

4    specific recollection that I read, he said "X," and he said

5    "Y."                                                              10:48

6              **THE COURT:**  Let's wait for the next question.

7              **THE WITNESS:**  Okay.

8    **BY MR. BERGMAN:**

9    Q    During the course of your trial testimony, did

10   Marvin Putnam of O'Melveny ask you the following question, and   10:48

11   did you give the following answer --

12             **MR. BERGMAN:**  And I'm referring, Your Honor, to

13   page 4569, lines 19 through 23 of the transcript of that trial.

14             "QUESTION:  Do you know what disparaging comments

15   Mr. Cussler made about the film?                                  10:48

16             "ANSWER:  Actually, I do not.

17             "QUESTION:  And, in fact, in offering the opinion,

18   you have no idea what he said, do you?

19             "ANSWER:  I -- my opinions did not go -- I did not

20   apply the facts of this case to that.  What I was talking about   10:49

21   was the general proposition as to whether a negative remark

22   could -- the effect of negative remarks by an author -- a word

23   is missing here -- could not -- I did not study Mr. Cussler's

24   remarks, nor render an opinion the effect of Mr. Cussler's

25   remarks in this case."                                            10:49

1    BY MR. BERGMAN:

2    Q    Do you recall giving that answer to that question?

3            **MR. TOBEROFF:**  I would appreciate it if the

4    defendants would provide us with copies of what they're

5    reading, so I can verify and read along with them.                    10:49

6            We've done that with them throughout the case.

7            **THE COURT:**  That's a fair request, Mr. Toberoff.

8            Counsel, I trust you probably anticipated --

9            **MR. BERGMAN:**  Yes, we did, Your Honor.

10           **THE COURT:**  And I know you had time yesterday to work   10:50

11   on this, so let's try to make sure that we have that.

12           **MR. BERGMAN:**  Okay.  We will give a full set to

13   Mr. Toberoff for his review.

14           **THE COURT:**  For right now, Mr. Toberoff, you may,

15   once again, join Mr. Bergman at the lectern.  It is the Court's   10:50

16   ongoing resolution to bring resolution to this matter.

17           **MR. BERGMAN:**  This is the portion that I read.  The

18   question is:  Did I read it correctly?

19           **THE COURT:**  Let's take a brief morning recess here

20   while you're arranging this.                                          10:50

21           **MR. BERGMAN:**  Very well, Your Honor.

22           In the meanwhile, we'll give a copy of the trial

23   testimony to Mr. Toberoff.

24           (Whereupon a brief recess was held.)

25           **THE COURT:**  Counsel, you may proceed.                     11:15

1          **MR. BERGMAN:**  Thank you, Your Honor.

2          Your Honor, I think I may have garbled the last quote

3     that I gave the witness, so I would like to repeat the question

4     and answer so that the record is clear.

5          **THE COURT:**  You may.                                    11:16

6          **MR. BERGMAN:**  Thank you, Your Honor.

7          And I'm beginning again at Page 4569 of the March 14,

8     2007 trial transcript in the <u>Sahara</u> case.

9          QUESTION:  "Do you know what disparaging comments

10    Mr. Cussler made about the film?"                               11:16

11         ANSWER:  "Actually, I do not."

12         QUESTION:  "And, in fact, in offering this opinion,

13    you have no idea what he said, do you?"

14         ANSWER:  "My opinion did not go -- I did not apply

15    the facts of the case to that.  What I was talking about was    11:16

16    the general proposition as to whether a negative review could

17    -- the effect of negative remarks by an author.  I did not

18    study Mr. Cussler's remarks, nor render an opinion" -- I

19    believe there's a word "on," but it's missing here -- "did not

20    render an opinion on the effect of Mr. Cussler's remark in this  11:17

21    case.  I was not -- that's outside the scope of what I was

22    engaged to give an opinion on."

23    **BY MR. BERGMAN:**

24    Q    Do you recall giving that answer, sir?

25    A    Yes.                                                        11:17

```
 1   Q    Now, the issue in the case was whether these particular
 2   disparaging remarks affected the gross of Sahara, wasn't it?
 3   One of the issues.
 4   A    I don't think that's accurate.
 5   Q    Didn't Crusader Pictures make a claim that Mr. Cussler had       11:17
 6   disparaged the film and that, therefore, the grosses of the
 7   film had declined?
 8   A    They certainly alleged that he had disparaged the film.
 9   The way I was looking at it was in the context of whether he
10   breached his contract by saying that.                                11:18
11   Q    And --
12   A    They may well have alleged that they were damaged by that,
13   but my focus was on, under the contract, and just in general,
14   how controversies affect grosses.  That's what I was focusing
15   on.  I didn't testify as to anything as to the damages that         11:18
16   might have been caused to Crusader by those remarks.
17   Q    So your testimony was just in general and didn't apply to
18   the specific facts of the case.
19             MR. TOBEROFF:  Objection.  Misstates his testimony.
20             THE COURT:  It's a question.                               11:18
21        You may answer.
22             THE WITNESS:  As I stated in my testimony, what I was
23   engaged to opine as to was how controversy builds -- even if a
24   negative can build awareness of the film, and that can actually
25   sometimes help the grosses, because the awareness is raised.        11:19
```

1    That's what I was testifying to.  As I testified, I didn't go

2    and render an opinion as to the exact effect that there was in

3    the Sahara case.  I was just speaking in general.

4    **BY MR. BERGMAN:**

5    Q    Okay.                                                              11:19

6         And do you recall after the quote that I read to you,

7    Mr. Putnam actually read to you and played the audio of various

8    disparaging comments made by Mr. Cussler concerning the film?

9    A    I remember that.

10   Q    And do you recall that the essence of what Mr. Cussler was    11:19

11   saying to his fans was, 'Don't go see this movie; it's

12   terrible'?

13   A    Unfortunately, I think that's an accurate characterization

14   of what he was saying.

15   Q    And after hearing all of that, I'm going to ask whether       11:19

16   you recall giving the following answers to the following

17   questions, which are contained, again, in the March 14, 2007

18   trial transcript, at Page 4608, beginning at Line 10, ending at

19   Line 28.  This is Mr. Putnam talking:

20        QUESTION:  "Now I'll ask the same question that I            11:20

21   keep asking:  Does this change your opinion in any way as to

22   whether or not this would have an impact on whether -- take

23   Mr. Cussler's fans, would want to go see the film?"

24        ANSWER:  "No.  It's consistent with -- his radio

25   interview is consistent with what he said in the articles I       11:20

1  looked at before.

2          "So I think that there's the same range of

3  possibilities in terms of reaction of a Cussler fan.  It's just

4  this is Clive" -- it says "Clive" -- "just this is Clive

5  stating it live on the radio, as opposed to having the words

6  transcribed and read in the newspaper."

7          QUESTION:  "Is there no cumulative effect?"

8          ANSWER:  "There might be a cumulative effect, yes;

9  and that cumulative effect, again, may well -- in my

10  estimation, would have engendered an increased controversy and

11  helped the financial performance of the film."

12          QUESTION:  "So the more bad that's out there, the

13  more likely someone is going to see this film?"

14          ANSWER:  "It may seem strange, but I think that

15  statement is true."

16  **BY MR. BERGMAN:**

17  Q    Do you recall giving that answer to that question, sir?

18          **MR. TOBEROFF:**  Your Honor, objection.  When he read

19  that, there were various words that he read incorrectly.

20          **THE COURT:**  I'm sorry?

21          **MR. TOBEROFF:**  There were various words, when I

22  followed in the transcript, that he --

23          **THE COURT:**  Well, I don't have a copy of the

24  transcript in front of me, I don't think.

25          Do I?

11:21

11:21

11:21

11:22

11:22

1          Counsel, did you read it accurately?

2          **MR. BERGMAN:**  I sure did my best, Your Honor.

3    Although, I have to admit that at the end of each line in this

4    transcript, there is sometimes a word missing.

5          **THE COURT:**  Refer me to the page again.                    11:22

6          **MR. BERGMAN:**  The page is 4608, which is from 314,

7    and the line begins --

8          **THE COURT:**  Hold on.  Let me get to 4608.

9          Why don't you consult with your colleagues there.

10         **MR. BERGMAN:**  The line begins at Line 10, Your Honor.   11:23

11         **THE COURT:**  Right.  Line 8, you said, "Now I'll ask

12   the same question that I keep asking."

13         **MR. BERGMAN:**  Yes.

14         **THE COURT:**  And you read down through what line?

15         **MR. BERGMAN:**  Line 28, Your Honor.                        11:23

16         **THE COURT:**  Line 28?

17         **MR. BERGMAN:**  Yes, sir.

18         **THE COURT:**  Take a look at that (Speaking to the

19   witness).

20         **THE WITNESS:**  (Witness responds.)                         11:23

21         Okay.

22   **BY MR. BERGMAN:**

23   Q    Mr. Halloran, based on your reading, did I read that

24   correctly?

25   A    The gist of what you said was accurate.                        11:24

1    Q    Let's move to some general principles.

2         Do you agree, Mr. Halloran, that in determining the

3    value received by a licensor for a literary property, you have

4    to look at the entirety of the deal, not isolated provisions?

5    A    I think in general that's true.                          11:24

6    Q    Am I correct, sir, that you can't determine the fair

7    market value of a contract or the amounts paid for that

8    contract without including all of the financial terms?

9    A    I think that's accurate.

10   Q    And those basic financial terms which have to be         11:25

11   considered in tandem include the option; correct?

12   A    Yes.

13   Q    The purchase price, if any?

14   A    Yes.

15   Q    Any bonuses?                                             11:25

16   A    Yes.

17   Q    The merchandising split?

18   A    Yes.

19   Q    The contingent compensation?

20   A    Yes.                                                     11:25

21   Q    And the video royalty; correct?

22   A    Yes.  But you also have to look at other things like

23   reversion, to see how that impacts.  But in terms of the

24   financial stuff on the face of the contract, that's accurate.

25   Q    And is it true, sir, that some elements may be more      11:25

686

```
 1   important in one type of contract than they are in another type

 2   of contract?

 3   A    That's true.

 4   Q    For example, the manner in which merchandising is

 5   accounted for is an essential part of any superhero film deal,    11:26

 6   isn't it?

 7   A    That's true.

 8   Q    When a studio looks at a deal for literary rights, part of

 9   the math as to what they're prepared to pay on the front and

10   back end is an estimate as to how much of the merchandising       11:26

11   revenue will fall to the studio's bottom line; isn't that

12   correct?

13   A    That's not completely correct, because oftentimes, the

14   merchandising number, for pictures like Hannibal and Timeline,

15   is zero.  So I think you have to make the distinction between a   11:26

16   comic book, where there's either preexisting merchandising or a

17   potential for merchandising revenue, and a literary work, where

18   there's really no potential for merchandising.  Those are two

19   different animals.

20   Q    When you say the merchandising number for pictures like      11:27

21   Hannibal and Timeline, is zero, what do you mean?

22   A    Well, that number would be negligible, if not zero.

23   Q    You mean the amounts received for merchandising by the

24   studio or whoever is doing the merchandising?

25   A    Well, both the number that's projected by the studio and     11:27
```

1    the number that's actually received.

2    Q    Okay.

3         Is that because more people put *Superman* on

4    lunch pails than put *Timeline* on lunch pails; right?

5    A    That's accurate.                                    11:28

6    Q    But the statement that I made, which, I'll be frank with

7    you, was a direct quote from your deposition, is correct, is it

8    not, that when a studio looks at a deal for literary rights,

9    part of the math as to what they're prepared to pay on the

10   front and back end is an estimate as to how much of the       11:28

11   merchandising revenue will fall to the studio's bottom line;

12   right?

13   A    That's accurate.

14   Q    And, of course, when the licensor does its math, it's also

15   concerned with how much will fall to its bottom line; correct?  11:28

16   A    Yes.

17   Q    And if you were valuing *Superman* on either side of the

18   table, you would certainly consider the merchandising value,

19   wouldn't you?

20   A    You would.                                          11:29

21   Q    And how merchandising is treated in a particular contract

22   is part of each side's analysis of the price that's paid;

23   correct?

24   A    The price that's paid in the context of potential value,

25   yes.                                                      11:29

1   Q    Now, at the time of your deposition, which was after, of

2   course, the preparation of your report, you didn't have a

3   precise recollection of how merchandising was treated in the

4   film agreement, did you?

5   A    No, I didn't.                                                    11:29

6   Q    And you weren't aware at that time, after you had prepared

7   your report, of the merchandising split, the actual split, in

8   the film agreement, were you?

9        **MR. TOBEROFF:**  Objection, Your Honor.  The question

10  is vague and confusing.  He says "you weren't aware at that       11:30

11  time," meaning at his deposition --

12       Strike that, Your Honor.

13       **THE COURT:**  Rephrase the question.

14       **THE WITNESS:**  I think I may have misspoke.

15       **THE COURT:**  Rephrase the question.                        11:30

16       He objected.  Counsel, rephrase the question.

17       **THE WITNESS:**  Okay.

18  **BY MR. BERGMAN:**

19  Q    At the time of your deposition, Mr. Halloran, you weren't

20  aware of the precise split between DC on the one hand and          11:30

21  Warner Bros. Consumer Products on the other hand, under the

22  Warner Bros. Consumer Products merchandising agreement, were

23  you?

24  A    I think I was aware of it.  And I think it's in my report.

25       It's a little complicated, because there's the film          11:30

```
 1   agreement and then there's a separate merchandising agreement.
 2   And under the film agreement, there's a 50/50 split.  But
 3   what's not reflected in the film agreement is that there's an
 4   outside agreement with Warner Consumer Products, where they
 5   take a fee for the administration of the merchandising.  So I    11:31
 6   put those two together.
 7           MR. BERGMAN:  Move to strike everything after "I
 8   think I was aware of it" as nonresponsive.
 9           THE COURT:  Yes.  Well, "And I think it's in my
10   report"; I'll let that in as well.                              11:31
11           MR. BERGMAN:  Pardon me, Your Honor?
12           THE COURT:  I'll let "And I think it's in my report"
13   in as well.
14   BY MR. BERGMAN:
15   Q   Do you recall at your deposition, Mr. Halloran -- and I'm   11:31
16   referring to Page 199, Lines 5 through 8 -- I asked you the
17   following question and you gave the following answer:
18           QUESTION:  "What was the merchandising split under
19   the consumer products agreement between DC and Warner Bros.
20   Consumer Products?"                                             11:32
21           ANSWER:  "I don't know the exact terms of that
22   agreement."
23   BY MR. BERGMAN:
24   Q   Do you recall giving that answer to that question?
25   A   I don't recall that specifically at the time.  As you      11:32
```

1  know, I came in very late; I had a mass of data, so it may have

2  been at that deposition that the consumer deal was not in my

3  head at that time.

4          **MR. BERGMAN:**  Move to strike everything after the

5  word "specifically."                                          11:32

6          **THE COURT:**  It is stricken.

7  **BY MR. BERGMAN:**

8  Q    And at the time of your deposition, Mr. Halloran, you had

9  no estimate of the actual merchandising revenues that were

10 generated by *Superman Returns*, did you?                      11:32

11 A    I believe that's correct.

12 Q    But your report states unequivocally that Warner Bros.

13 received 62.5 percent of the *Superman Returns* merchandising

14 revenues, doesn't it?

15 A    You're mixing apples and oranges here.                    11:33

16          I did say that in my report, but that was based on

17 the contracts.  As of that time, I was not aware of the exact

18 amount of merchandising revenue that was paid or retained by DC

19 with respect to *Superman Returns*.

20          **MR. BERGMAN:**  Move to strike everything after the  11:33

21 word "report."

22          **THE COURT:**  Given the question, though, it's

23 overruled.

24 **BY MR. BERGMAN:**

25 Q    Did you state unequivocally in your report, sir -- and I'm  11:33

1   quoting from Page 19, Paragraph 5.6.2.10 -- "As a result,

2   Warner received 62.5 percent of merchandising rights [sic]"?

3   A    I think you've misquoted the transcript.

4   Q    Let me try again.

5        I'm quoting from the fourth line down from the top of        11:34

6   the paragraph numbered 5.6.2.10:  "As a result, Warner received

7   62.5 percent of merchandising receipts."

8        Do you recall making that statement in your report?

9   A    That was with respect to the contracts that I reviewed;

10  and I did say that, and it's true.                               11:34

11  Q    And in your direct testimony, you made the same

12  contention, that Warner received 62.5 percent of something you

13  referred to as, quote, film-related, closed quote,

14  merchandising; correct?

15  A    If you take the contracts and read them, Warner Bros. was   11:35

16  entitled to retain 62.5 percent of the film-related

17  merchandising revenue.

18        **MR. BERGMAN:**  Move to strike as being nonresponsive.

19        **THE COURT:**  It's stricken.

20        **MR. BERGMAN:**  May the reporter repeat my question,      11:35

21  Your Honor?

22        **THE COURT:**  Yes.

23        (Whereupon, the last question was read back.)

24        **THE WITNESS:**  There's a mix-up here.  And it's a

25  continuing problem, which is, there's what the contract says,    11:36

1   and then there's the downstream, whatever the financial results

2   are.   Okay.

3           What I know is, under the contracts, Warner Bros. was

4   entitled to retain 62.5 percent of the film-related

5   merchandising revenue.   That's what the contract said.                        11:36

6           **MR. BERGMAN:**   Could you place Exhibit 1041, a copy of

7   the film agreement, before the witness, please.

8           (Document provided.)

9   **BY MR. BERGMAN:**

10  Q    Do you have your chart right under that?                                    11:37

11  A    Yep.

12  Q    Could you, without reference to --

13  A    We should, in fairness, look at the agreement, shouldn't

14  we?

15  Q    I'm sorry, sir?                                                             11:37

16  A    I'd like to look at the agreement.

17  Q    Oh, I thought the agreement had been placed in front of

18  you.

19  A    Yeah, I have it here.

20  Q    Oh.  Well, by all means.  And let me try to focus you at       11:37

21  least a little bit.

22  A    Fine.

23          **THE COURT:**  Let him take a minute with it.

24          **MR. BERGMAN:**  Okay.

25          (Brief pause.)                                                          11:37

 1              THE WITNESS:   Okay.

 2    BY MR. BERGMAN:

 3    Q    To begin with, would you point out to me, please, the

 4    provision that refers to the phrase, quote, film-related

 5    merchandising.                                                    11:39

 6    A    Well, it's "reserved merchandising rights related to new

 7    characters, additional characters, and new elements."

 8    Q    Is there any place in the contract where the phrase

 9    "film-related merchandising" is utilized?

10    A    No.  But that's what this means.                            11:39

11              MR. BERGMAN:   Move to strike everything after "no,"

12    Your Honor.

13              THE COURT:   It is what it is.

14              Yes, it's appropriate to strike that.

15              Point to what you're referring to.                     11:40

16              THE WITNESS:   I was referring to the language "new

17    characters, additional characters, and new elements."

18              THE COURT:   Do you have that, Counsel?

19              MR. BERGMAN:   Yes, I do, Your Honor.  And I'll follow

20    through with the witness.                                        11:40

21              THE COURT:   You may.

22    BY MR. BERGMAN:

23    Q    By using the phrase "film-related merchandising," you're

24    using your own phrase, one that you use to characterize a

25    provision of the agreement, do you not?                          11:40

1  A    Yes.

2  Q    And you are purporting to characterize, are you not,

3  Subparagraph 6-C, which appears at Bates-stamped Page 4205 of

4  1041; correct?

5  A    Yes.  But I need to finish the line.  I need to broaden          11:40

6  the definition to make it more accurate.  I didn't finish

7  reading it.

8         It talks about reserve merchandising rights relating

9  to the "new characters"; the "additional characters"; the "new

10 elements"; the "additional elements" from logos or titles of          11:41

11 any motion picture produced hereunder and the performers

12 appearing in any such motion pictures.

13 Q    What are new characters, as used within that provision?

14 A    They are in quotes, but I don't see them as being defined

15 terms here.  They may be defined elsewhere in the contract, but      11:41

16 they're not defined here in 6-C.

17 Q    You didn't notice them being defined when you reviewed

18 these contracts before?

19 A    I know what they -- I'm confident there was a definition

20 someplace else, and I can tell you that a new character would        11:42

21 be a character that was added that was not within the rights

22 that were granted by DC to Warner Bros.

23 Q    Are you referring to a general definition of a new

24 character or a specific one as applied to *Superman Returns*?

25 A    Yeah, that's my general understanding.  I could go back         11:42

```
 1  and look -- if you would be so kind, if you wanted to show me

 2  the agreement where it defines "new characters," I'd be happy

 3  to discuss that with you.

 4  Q    I'd be pleased to, sir.

 5  A    Okay.                                                       11:42

 6  Q    Turn to the page that's Bates-stamped 4209, which is

 7  Paragraph 8.

 8  A    Okay.

 9  Q    Can you see that the term new characters "shall mean any

10  fictional character or characters newly created by Warner       11:43

11  having no similarity to any of the characters contained in the

12  property and incorporated into any motion picture produced

13  hereunder"?

14          Do you see that, sir?

15  A    I do.                                                       11:43

16  Q    Do you have any knowledge whether there were any such new

17  characters in Superman Returns?

18  A    I don't.

19  Q    Do you have any knowledge whether, even if there were such

20  new characters in Superman Returns, those new characters were,  11:43

21  in fact, merchandised?

22  A    I don't.

23  Q    Do you have any knowledge whether, if there were such new

24  characters in Superman Returns and they had been merchandised,

25  it's Warner Bros. or DC's policy to keep any records of whether  11:44
```

1    any revenue had been obtained from the merchandising of such

2    new characters?

3    A    I don't have specific knowledge that DC separately

4    accounts for these, but they should, certainly.

5    Q    Is that a moral judgment, they should?                    11:44

6    A    Well, I guess it's a moral judgment, but it's based on my

7    knowledge of how contracts and accounting work.  People try to

8    account in conformity with contracts.

9    Q    You have no knowledge, do you, sir, of whether any prior

10   understandings had been reached between these two companies to   11:45

11   the effect that even if we released any of these new characters

12   or new elements, we can't tell how much a licensor is paying

13   for them as opposed to Superman or Lois Lane, and, therefore,

14   we're not going to keep any record of it?

15        You don't know what the parties had agreed to, do         11:45

16   you?

17   A    I don't know if DC and Warner Bros. had such an

18   understanding.  I've seen no evidence of it.

19   Q    Okay.

20        And, sir, if you would look down again at Page 4209,      11:45

21   at the definition of "additional characters."

22        Am I correct that an additional character means,

23   quote, any fictional character or characters newly created by

24   Warner, and which, but for the operation of this agreement,

25   would constitute an infringement of the copyright or trademark   11:46

1    of DC in or to any of the characters constituting the property,

2    closed quote?

3              Do you see that?

4    A    Yes.

5    Q    Are you aware, sir, as to whether there were any such,    11:46

6    quote, additional characters in *Superman Returns*?

7    A    I'm not aware that there were any such characters.

8    Q    Or whether, if there were any such additional characters,

9    such additional characters were merchandised at all?

10   A    I don't know.    11:46

11   Q    You saw the movie; right?

12   A    I did.

13   Q    Can you think, as you review the movie in your mind's eye,

14   of any new or additional character contained in those movies?

15   A    Not that was prominently featured.    11:46

16   Q    How about any that were not prominently featured?

17   A    I can't think of those either.

18   Q    Okay.

19             And even if there had been any merchandising of those

20   additional characters, you don't know what prior agreements,    11:47

21   understandings, or practices had been developed between DC and

22   Warner Bros. regarding the accounting for that merchandising,

23   do you?

24   A    No.

25   Q    Okay.    11:47

1          Now, the fact is, Mr. Halloran, isn't it, that your

2    opinion as to the market value of *Superman Returns* in 2002 is

3    predicated, at least in part, on your assumption that

4    Warner Bros. received 62.5 percent of merchandising receipts;

5    correct?                                                          11:48

6    A    That's correct.

7    Q    And if the evidence were to demonstrate, Mr. Halloran,

8    that contrary to your report and your testimony, DC received

9    75 percent of every merchandising dollar generated by

10   *Superman Returns*, would that change your opinion that the film   11:48

11   agreement was at fair market value?

12   A    It would be something that I would have to consider in the

13   context of the entire agreement.

14   Q    Okay.

15          If the evidence demonstrated that DC's share of the        11:48

16   *Superman Returns* merchandising revenue was in excess of $30

17   million, would that change your opinion that the film agreement

18   was a below-market deal?

19   A    As I've testified, the proper way to analyze this is to

20   look at the value as of the date of the agreement and to not      11:49

21   consider the estimated downstream revenues.  So, in terms of

22   valuing as of 1999 to 2002, I disregarded what the actual

23   revenues were, as one would do, because as I explained before

24   in my direct testimony, when you actually value the property,

25   you don't know what the revenues are going to be.  You make a     11:49

```
 1    projection, but you don't know what they're going to be.
 2              MR. BERGMAN:  Move to strike as being nonresponsive,
 3    Your Honor.
 4              THE COURT:  Overruled.
 5              I take it from that, your answer is no?              11:50
 6              THE WITNESS:  You'd have to --
 7              THE COURT:  You're incapable of rendering an opinion?
 8              THE WITNESS:  No, no, I'm not incapable of rendering
 9    an opinion.  But I just wanted to --
10              THE COURT:  The question was whether or not it would  11:50
11    change your opinion.
12              THE WITNESS:  It was one of the things I'd have to
13    consider, but I don't think it would change my opinion as to --
14              THE COURT:  So the answer is no?
15              THE WITNESS:  You have to consider it in the entire   11:50
16    context.  But as to my basic opinions, the most important one
17    being reversion, it wouldn't change my opinion at all.
18              THE COURT:  So the answer is, no, it would not change
19    your opinion; is that correct?
20              THE WITNESS:  I don't think it would.                11:50
21              THE COURT:  I take it from your answer that you're
22    essentially saying no.  If that's not correct, I think counsel
23    is entitled to an answer.
24              Does it or does it not change your opinion?
25              THE WITNESS:  It does not -- well, I have many        11:50
```

1    opinions, but in toto, it does not change my opinion as to the

2    market value of the *Superman* property in 2002.

3              **THE COURT:**  Very well.

4    **BY MR. BERGMAN:**

5    Q    Mr. Halloran, isn't it a fact that the fair market value                    11:51

6    of an agreement such as this is determined at the time that the

7    contract is entered into, but that the terms are meaningless,

8    have no significance, are incomparable from one agreement to

9    another, until you interpret them in terms of dollars?

10   A    That's not true.                                                           11:51

11             **MR. TOBEROFF:**  Vague and ambiguous as to "interpret

12   them in terms of dollars."

13             **THE COURT:**  I think I understand what you're saying,

14   Counsel, but why don't you just rephrase it to make it clear

15   for the record.                                                                11:51

16             **MR. BERGMAN:**  Okay.  And perhaps I can do it,

17   Your Honor, with this line of questioning.

18             **THE COURT:**  All right.

19   **BY MR. BERGMAN:**

20   Q    Mr. Halloran, what do you understand that His Honor has                    11:51

21   determined is the question to be answered in this case?

22   A    Basically, what we're doing in this phase is trying to

23   determine the fair market value of the rights that were

24   transferred from DC to Warner Bros. We're trying to put that in

25   context and understand it.                                                     11:52

1   Q     Okay.

2          In particular -- and I'm quoting here from

3   His Honor's final order after the pretrial conference -- this

4   is what the Court has said is the question, quote:  Given the

5   nature and characterization of the property in question, the                11:52

6   trial shall determine whether the value of the various *Superman*

7   option and assignment agreements between DC Comics and -- I'm

8   going to abbreviate that to "Warner" if I may, Your Honor --

9   and the amounts paid to DC Comics by Warner reflect the fair

10  market value of the nonexclusive rights that the Court has               11:53

11  determined were transferred from DC Comics to Warner.  And if

12  not, what accounting shall be required of Warner to ensure an

13  equitable result.

14         Does that sound familiar to you?

15  A     Yes.                                                               11:53

16  Q   So we have to determine, pursuant to the Court's order,

17  not merely whether the terms of the agreement were fair market

18  value, but whether the amounts that were paid were fair value

19  as well; correct?

20  A     I didn't do a financial calculation as to a fair market          11:53

21  deal and what that would have yielded given *Superman Returns*.

22  My understanding is that that's a matter that will be

23  determined pursuant to the equitable power of the Court in

24  terms of an accounting.  That's my understanding as to how this

25  was supposed to work.                                                   11:54

1    Q    Do you recall, Mr. Halloran -- because this is an

2    important point -- do you recall at your deposition giving the

3    following answer to the following question.  And I'm quoting

4    from Page 217, Line 22, to Line 218, Line 4.  And we were

5    talking about the *Terminator* agreement at the time, and I asked        11:54

6    you the following question:

7              QUESTION:  "Is it your testimony, Mr. Halloran, that

8    the *Terminator* agreement that you reviewed for your report is

9    more economically favorable to the licensor than the *Superman*

10   agreement was to DC?"        11:55

11             ANSWER:  "You'd have to know -- because of the

12   structure of the *Superman* deal, you would have to know the

13   performance of the film to characterize them.  The *Terminator*

14   agreement is for $25 million, guaranteed."

15   **BY MR. BERGMAN:**        11:55

16   Q    Do you recall giving that answer to that question?

17   A    I do recall that, yes.

18   Q    Okay.

19             In fact, you emphasized that point, namely, that you

20   have to look at the aggregate dollars rather than the bare        11:55

21   terms, when I asked you at your deposition to compare the

22   *Ironman* deal to the *Superman* deal, didn't you?

23   A    When we're talking about dollars, we're talking about the

24   projected dollars that -- in terms of valuation, it's projected

25   dollars.  You could, downstream, take, you know, Agreement A        11:56

```
 1   and do an accounting and Agreement B and do an accounting, and

 2   compare what happened ultimately.  But, again, that can be

 3   misleading.  What determines the value is the value at the time

 4   of entering the agreement.

 5           MR. BERGMAN:  Your Honor, move to strike as being        11:56

 6   nonresponsive.

 7           THE COURT:  It's stricken.

 8   BY MR. BERGMAN:

 9   Q    Here's my question to you, Mr. Halloran --

10           THE COURT:  Mr. Toberoff?                                11:56

11           MR. TOBEROFF:  My objection to this line of

12   questioning is that when we're talking about dollars or amounts

13   paid, or even the statement in your order, Your Honor, it's

14   vague and ambiguous to the extent.  Are we talking about

15   revenues ten years down the line?  Two years down the line?  Or 11:57

16   are we talking about amounts payable in contracts, which is

17   when Mr. Halloran is referring to?  And he's crossing over

18   between the two.

19           THE COURT:  Fair enough objection.

20           Let's specify, Counsel.                                  11:57

21           MR. BERGMAN:  With all respect, Your Honor, I

22   disagree.

23           THE COURT:  I've stricken the answer.  The answer is

24   stricken.

25           MR. BERGMAN:  Yes, sir.                                  11:57
```

1          **THE COURT:**  You need to rephrase your question.

2          **MR. BERGMAN:**  I will, indeed.

3          **THE COURT:**  Very well.

4    **BY MR. BERGMAN:**

5    Q    Mr. Halloran, didn't you look at the aggregate dollars          11:57

6    paid over time for a film, rather than to the bare terms of the

7    contract for a film, when I asked you at your deposition to

8    compare *Ironman* to *Superman*?

9          **MR. TOBEROFF:**  Objection.  Vague and ambiguous as to

10   "for a film," "aggregate dollars for a film," "terms of the          11:58

11   contract for a film."

12         Which film?

13         **THE COURT:**  Overruled.  I think it's quite clear.  He

14   specifies the film in question.

15         **THE WITNESS:**  Because of that, could I have the          11:58

16   question read back so it's fresh in my head?

17         **THE COURT:**  Yes.

18         (Whereupon, the last question was read back.)

19         **THE WITNESS:**  Well, if I said that, I may have been a

20   little confused and misspoke.          11:58

21         **THE COURT:**  He's not asking for an elaboration at

22   this point.  You've answered the question.

23         Next question.

24         **THE WITNESS:**  Okay.

25   / / /          11:59

**BY MR. BERGMAN:**

1

2  Q   You told me, did you not, Mr. Halloran, that I had to look

3  to the aggregate number of dollars that were, in your words,

4  sticking to the ribs of Warner Bros.?

5  A   Again, there's confusion here.                                    11:59

6        What you have to do is look at the fair market value,

7  what that contract should have been, and what the contract --

8  what dollars should -- you're talking about Warner Bros. --

9  it's what dollars should have gone to DC.  It should have been,

10  in my estimation, at least double what the projected dollars    11:59

11  were, from the documents that I saw.

12        **MR. BERGMAN:**  Move to strike as nonresponsive.

13        **THE COURT:**  Why don't you refer to the actual

14  testimony and base your question off of that.  I think that

15  would be clearer for the witness, and that would satisfy       11:59

16  Mr. Toberoff's objection on vague and ambiguous.

17        **MR. BERGMAN:**  Thank you, Your Honor.

18  **BY MR. BERGMAN:**

19  Q   I'm going to refer to Page 249 of your deposition.  I'm

20  going to commence reading at Line 3 and end at Line 13.  And we  12:00

21  had been talking about Warner Bros. Consumer Products'

22  commission, the 25 percent; and I asked the following question

23  of you, sir:

24        QUESTION:  "And 25 percent, based on some other

25  agreement that you're familiar with, is not a very high fee, is  12:00

 1 | it?"

 2 |          Objection by Mr. Toberoff.

 3 |          THE WITNESS:  "Well, it's akin to a distribution fee.

 4 | And what you have to look at is what are the aggregate dollars

 5 | that are sticking to the ribs of Warner Bros.  And in this     12:00

 6 | case, it's 62.5 percent.

 7 |          "Can I finish?

 8 |          "And *Ironman* was zero.  So you have to look at that

 9 | fee in the context of the total revenues that are sticking to

10 | the ribs of the company."                                      12:01

11 | **BY MR. BERGMAN:**

12 | Q    Do you recall giving that answer to that question?

13 | A    I meant projected revenues when I said revenues, not

14 | actual revenues.

15 | Q    Well, we weren't talking about projected revenue, were we, 12:01

16 | Mr. Halloran?

17 | A    You'd have to put it in the context of what we were

18 | talking about.

19 | Q    Well, how are you putting it into the context of what we

20 | were talking about?                                            12:01

21 |          **MR. TOBEROFF:**  Your Honor, objection.  When

22 | Mr. Bergman said, "We weren't talking about projected

23 | revenues," they were -- if you look -- it misstates the

24 | deposition record.  If you look back in the deposition, they're

25 | talking about the payments payable in the contract, not to what 12:01

1   happened after the contract.

2          And "sticking to the ribs" refers to the contract.

3          **THE COURT:**  Counsel, I'm going to certainly afford

4   you an opportunity to flesh this out on redirect.  However,

5   this is an expert deposition.  The expert has had an          12:02

6   opportunity to correct mistakes that were made in it.  I'm not

7   going to allow that objection to change this at this point.

8   But I'll certainly afford you the opportunity to flesh it out

9   and explore this with your witness.

10         **MR. TOBEROFF:**  Thank you, Your Honor.              12:02

11         **THE COURT:**  It's past the noon hour.  Let's take our

12  lunch break at this time.

13         I'll see counsel at 1:30, and we'll resume at that

14  time.

15         (Day 5 morning session concludes.)                    12:02

16

17                        CERTIFICATE

18

19  I hereby certify that pursuant to Section 753, Title 28, United
    States Code, the foregoing is a true and correct transcript of
20  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
21  conformance with the regulations of the judicial conference of
    the United States.

22

23  _____          _____

    THERESA A. LANZA, CSR, RPR                      Date
24  Federal Official Court Reporter

25