UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

```
JOANNE SIEGEL and                )
LAURA SIEGEL LARSON,             )
                  Plaintiffs,  )
                                 )
          vs.                    )  No. CV 04-08400-SGL
                                 )
WARNER BROTHERS ENTERTAINMENT INC.;)
TIME WARNER, INC.; DC COMICS;    )
and DOES 1-10,                   )  Trial Day 7
                  Defendants.  )  A.M. Session
_____)  Pages 802-875
```

Reporter's Transcript of Court Trial Proceedings

Riverside, California

Thursday, May 7, 2009

9:45 A.M.

THERESA A. LANZA, RPR, CSR
Federal Official Court Reporter
3470 12th Street, Rm. 134
Riverside, California  92501
(951) 274-0844
WWW.THERESALANZA.COM

```
 1
       APPEARANCES:
 2

 3     On Behalf of Plaintiffs:

 4
                         LAW OFFICES OF MARC TOBEROFF
 5                       BY:  Marc Toberoff
                         BY:  Nicholas C. Williamson
 6                       BY:  Keith Adams
                         2049 Century Park East,
 7                       Suite 2720
                         Los Angeles, California  90067
 8                       310-246-3100

 9

10     on behalf of Defendants/Counterclaimant:

11
                         WEISSMANN WOLFF BERGMAN COLEMAN
12                        GRODIN & EVALL LLP
                         BY:  Michael Bergman
13                       BY:  Anjani Mandavia
                         9665 Wilshire Boulevard,
14                       Ninth Floor
                         Beverly Hills, California  90212
15                       310-858-7888

16

17     On Behalf of DC Comics:

18                       PERKINS LAW OFFICE, P.C.
                         BY:  Patrick T. Perkins
19                       1711 Rt. 9D
                         Cold Spring, New York  10516
20                       845-265-2820

21

22

23

24

25
```

```
1                          I N D E X

2                                                    Page

3      Plaintiff case (cont'd)........................  844

4

5

6      DEFENSE
       WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
7      JAMES HAYES ELLIS

8      By Mr. Perkins       805
       By Mr. Toberoff                835
9

10

11     PLAINTIFF
       WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
       MARK HALLORAN  (Continued)
12
       By Mr. Bergman                 844
13

14

15

16              EXHIBITS           RECEIVED

17              (None.)

18

19

20

21

22

23

24

25
```

```
 1         Riverside, California; Thursday, May 7, 2009; 9:45 A.M.

 2                              -oOo-

 3         THE CLERK:  Calling case No. CV 04-08400-SGL,

 4    Joanne Siegel, et. Al., versus Warner Bros. Entertainment,

 5    Inc., et. Al.                                              09:45

 6         (Counsel make appearances as before.)

 7         THE COURT:  Good morning to you all.

 8         Mr. Halloran, would you come forward.

 9         MR. PERKINS:  Your Honor, we have another witness.

10         THE COURT:  Oh, that's right.                          09:45

11         MR. PERKINS:  We'd like to call James Ellis to the

12    stand.

13         THE CLERK:  Do you solemnly state that the testimony

14    you may give in the cause now pending before this court shall

15    be the truth, the whole truth, and nothing but the truth, so

16    help you God?

17         THE WITNESS:  Yes.

18         THE CLERK:  Please state your full name and spell

19    your last name for the record.

20         THE WITNESS:  My name is James Hayes Ellis.  Last     09:46

21    name is spelled E-l-l-i-s.

22                      DIRECT EXAMINATION

23    BY MR. PERKINS:

24    Q    By whom are you employed?

25    A    CKE Associates, LLC.                                   09:46
```

1    Q    What is your title there?

2    A    General counsel.

3    Q    And how long have you been at CKE?

4    A    Almost exactly ten years.

5    Q    Mr. Ellis, what is Artists' Management Group, LLC?        09:46

6    A    It was a large talent management company in Beverly Hills

7    that CKE and two other partners owned.  We took over the entire

8    ownership of it in connection with the sale of assets and a

9    wind down of the business six or seven years ago.

10   Q    Mr. Ellis, I'd like you to take a look at, if you would,   09:47

11   Plaintiffs' Exhibit 322, and it should be right there in front

12   of you.

13   A    Yes.

14   Q    It's entitled "Declaration of James Ellis."

15        On the second page of the document, is that your          09:47

16   signature?

17   A    Yes, it is.

18   Q    And do you recall executing this declaration?

19   A    Yes.

20   Q    And who prepared the declaration, if you know?            09:47

21   A    I don't know who prepared the declaration personally.

22   Q    Who furnished it to you?

23   A    Mr. Marc Toberoff.

24   Q    Now, in the first paragraph, you identify yourself as the

25   custodian of records of both CKE -- or of CKE and of Artists'   09:47

```
 1   Management Group.
 2           Is that accurate?
 3   A    Yes, it is.
 4   Q    And the second paragraph makes reference to a subpoena
 5   that was served on -- I'm going to call Artists' Management     09:48
 6   Group AMG; is that all right?
 7   A    Yes.
 8   Q    -- that a subpoena was served on AMG by the plaintiffs on
 9   December 22, 2008.
10           Is that accurate?                                       09:48
11   A    Yes.
12   Q    And did AMG produce documents in response to that
13   subpoena?
14   A    Yes, it did.
15   Q    Further on in Paragraph 2, it makes reference to           09:48
16   three separate agreements.
17           Do you see that?
18   A    Yes.
19   Q    Now, I'd like you to take a look, if you would, underneath
20   your declaration, there are three exhibits there:  Exhibit 325, 09:48
21   326 and 327.
22           Do you see those?
23   A    Yes.
24   Q    Could you briefly identify what Exhibit 325 is.
25   A    Exhibit 325 is an agreement between Michael Crichton and   09:49
```

1    Paramount about the rights to a book called *Timeline*, which

2    became a movie, *Timeline*.

3    Q    And what is 326?

4    A    Exhibit 326 is an agreement between a limited partnership

5    owned primarily by Tom Clancy, the author, and Paramount for      09:49

6    the rights to produce a movie out of a book/video game called

7    *Rainbow 6*.

8    Q    And what about 327, could you please identify that.

9    A    It's yet another agreement between a limited partnership

10   controlled by Tom Clancy and Paramount for the rights to         09:49

11   produce a movie out of a novel called *Red Rabbit*.

12   Q    Now, Mr. Ellis, in response to the subpoena, did you

13   produce any literary purchase agreements in addition to those

14   that are reflected there?

15       **MR. TOBEROFF:**  Objection, Your Honor.  Pursuant to      09:50

16   the Court's order, my understanding is that the calling of this

17   witness, because it's way after discovery period, is limited to

18   authentication of the three contracts that plaintiffs have used

19   in this case and that they cannot go outside of that.  Because

20   to do so, would fall -- they should have done that within the    09:50

21   discovery period.

22       In other words, in December when we served them with

23   these documents, they could have subpoenaed and got additional

24   information regarding our subpoena.  A fishing expedition into

25   the subpoena is not --                                           09:50

```
 1              THE COURT:  I understand your objection, Counsel.

 2    I'm going to overrule the objection.  I'm not necessarily going

 3    to let any other documents come in.  We're not going to expand

 4    discovery at this point.  But this goes to other issues besides

 5    simply seeking additional documents, I think.                      09:50

 6              I'm going to give you some latitude on these

 7    question.

 8              I'll certainly allow you to renew your objection

 9    before any of these other agreements were to come in.

10              MR. TOBEROFF:  Very well, Your Honor.                     09:51

11    BY MR. PERKINS:

12    Q    Mr. Ellis, did you produce any documents to the plaintiffs

13    in addition to those that are identified in the declaration?

14    A    Yes.

15    Q    Can you tell me what you produced?                            09:51

16    A    I produced an additional rights' agreement that was in

17    AMG's files between one of the Tom Clancy entities and

18    Paramount for *The Sum of All Fears* that predated our management

19    relationship, but had been in our files; and a contemporaneous

20    agreement between Michael Crichton and Paramount Pictures         09:51

21    related to *Timeline*.

22              MR. PERKINS:  May I approach the witness, Your Honor.

23              THE COURT:  You may.

24    BY MR. PERKINS:

25    Q    Mr. Ellis, I've placed before you what is marked for         09:51
```

```
 1   identification as Defendants' Exhibit 1119.
 2          Do you have that before you?
 3          THE COURT:  We don't have a question yet, Counsel.
 4          THE WITNESS:  Yes.
 5          THE COURT:  Is there an objection?
 6          MR. TOBEROFF:  With the permission of the Court, I'd
 7   like to have a standing objection, my same objection as before
 8   to this line of questioning, just for the record, as to
 9   questions about this contract.
10          THE COURT:  He hasn't asked any questions about this
11   contract yet.  He's just identifying a document for the record.
12          Sit down.  Thank you.
13   BY MR. PERKINS:
14   Q   Mr. Ellis, could you take a look at the first page of this
15   document that I have provided to you.
16   A   Yes.
17   Q   Do you recognize what that is?
18   A   Yes.
19   Q   Could you tell the Court, please.
20   A   It's a copy of a responsive e-mail that I sent to
21   Mr. Toberoff, you know, in relation to complying with the
22   document subpoena back in January.
23   Q   What is it that's attached to the e-mail?
24   A   The original e-mail attached a copy of *The Sum of All*
25   *Fears*' rights agreement between Clancy and Paramount.
```

09:52
09:52
09:52
09:53
09:53

1   Q    And is *The Sum of All Fears*' agreement that you --

2        **MR. TOBEROFF:**  My objection is, with permission of

3   the Court, I'd like to have a standing objection to all

4   questions regarding *The Sum of All Fears*' agreement and this

5   production as --

6        **THE COURT:**  Counsel, again, this is a bench trial.

7   You've got to keep in mind, for the record, the record that you

8   are desperately trying to preserve right now.  Let the question

9   come out.  You'll be much better on appeal if the Ninth Circuit

10  can at least see the question that you're objecting to.  Let

11  him ask his question, and then make the objection.

12       **MR. TOBEROFF:**  Thank you, Your Honor.

13  **BY MR. PERKINS:**

14  Q    The attachment to this e-mail that's a PDF, *The Sum of All*

15  *Fears*, is that document a true copy of what was in AMG's files?

16       **THE COURT:**  Now you can make your objection, Counsel.

17       **MR. TOBEROFF:**  Thank you, Your Honor.

18       I'd like to have a standing objection.

19       **THE COURT:**  We're not having standing objections.

20  Make your objection to this question.

21       **MR. TOBEROFF:**  The objection is, is that defense are

22  engaging in discovery after discovery cutoff.  They could have

23  subpoenaed this witness during the discovery period.

24       The cases that they've cited state that trial

25  subpoenas can not be used for discovery.  They can be used for

```
 1   refreshing recollection or authenticating or --
 2           THE COURT:  For impeachment.
 3           MR. TOBEROFF:  Or for impeachment.
 4           THE COURT:  Right.  Or rebuttal.
 5           MR. TOBEROFF:  Actually, the cases --                    09:54
 6           THE COURT:  Do you have any authority which says you
 7   cannot use a trial subpoena for a rebuttal, to obtain rebuttal
 8   documents?
 9           MR. TOBEROFF:  We cited -- both sides cited cases in
10   common.  The nSight v. PeopleSoft case, which quotes heavily    09:55
11   from the Integra LifeSciences' case, 190 FRD 556 at 562
12   Southern District California, 1999, that "trial subpoenas may
13   be used to secure documents only in narrow circumstances, such
14   as for the purpose of memory refreshment, or to ensure
15   availability at trial.  The regional absent one of these narrow 09:55
16   circumstances for" --
17           THE COURT:  Counsel, she can't keep write -- again,
18   for your record, you need to have this stuff written down.
19           MR. TOBEROFF:  I'm very sorry.
20           "Absent one of these narrow circumstances, the          09:55
21   subpoena for documents under Rule 45 constitutes a pretrial
22   discovery must be served within the designated discovery
23   period."
24           THE COURT:  Okay.
25           Again, do you have any authority which says that a       09:56
```

 1  trial subpoena cannot be used to obtain rebuttal documents as

 2  part of those narrow circumstances referred to in the case that

 3  you just cited?

 4      **MR. TOBEROFF:**  The authority is when they list the

 5  narrow circumstances, they don't list rebuttal.                    09:56

 6      **THE COURT:**  Well, in that case, they gave two

 7  illustrative examples.

 8      Is there any authority which suggests -- the nature

 9  of rebuttal is you don't know until you get to trial what

10  you're going to rebut; so logic would seem to dictate that if     09:56

11  something comes up which you cannot fairly anticipate during

12  the discovery process, then you should be able to use a trial

13  subpoena to obtain information to rebut it.

14      As bright as these attorneys are at Warner Bros.,

15  they can't see the future.                                         09:56

16      **MR. TOBEROFF:**  And our argument is that when they

17  were served with it back in December, months ago, they did see

18  the future.  They asked for all documents received by subpoena.

19  And we said that, as far as we know, we're not under

20  obligation --                                                      09:57

21      **THE COURT:**  You were asked for all documents that you

22  received by the subpoena?

23      **MR. TOBEROFF:**  They asked for any correspondence in

24  connection with parties we subpoenaed --

25      **THE COURT:**  Did you turn these over?                       09:57

```
 1              MR. TOBEROFF:  We're not under an obligation to turn

 2   over --

 3              THE COURT:  Did you --

 4              MR. TOBEROFF:  We turned over the agreement that we

 5   intend to rely on at trial, Your Honor.                          09:57

 6              THE COURT:  Did you turn over all -- did they request

 7   these documents?

 8              MR. TOBEROFF:  They asked for the documents.

 9              THE COURT:  And you didn't turn them over?

10              MR. TOBEROFF:  We didn't turn over all documents and  09:57

11   all correspondence because there was no discovery request

12   pending for that.

13              THE COURT:  Well, I can certainly see the relevance

14   of this.  They should have been turned over.  They weren't

15   turned over.  They're going to come in now.                      09:57

16          Why didn't you turn them over?

17              MR. TOBEROFF:  Because we weren't subject to any

18   discovery request, and we weren't relying on them at trial, and

19   we weren't using our correspondence.  And with the --

20          They haven't turned over documents that they've         09:57

21   subpoenaed to us.

22              THE COURT:  We're not going to play that --

23              MR. TOBEROFF:  Okay.  But I --

24              THE COURT:  Don't speak over me, Counsel.  All right?

25              MR. TOBEROFF:  I apologize, Your Honor.               09:58
```

```
 1              THE COURT:  Thank you.

 2              If they violated the rule, and if they didn't turn

 3   over something that they should have turned over, I'll take

 4   that up with them.

 5              If you didn't turn over something that you were        09:58

 6   supposed to turn over, I'm going to take that up with you.

 7              Pointing the finger to the other side of the

 8   courtroom does not resolve this issue in any way.

 9              Do you understand that?

10        MR. TOBEROFF:  I understand, Your Honor.                     09:58

11        THE COURT:  Were you requested to turn over these

12   documents?

13        MR. TOBEROFF:  Yes.  Defendants asked us to turn over

14   any documents, any correspondence, anything that has to do with

15   any of the subpoenas.                                             09:58

16        THE COURT:  And you did not do so?

17        MR. TOBEROFF:  We didn't turn -- we turned over all

18   contracts that we intended to use as exhibits at trial.

19        THE COURT:  That's not the question.  And I will

20   spend all morning until I get an answer to --                     09:58

21        MR. TOBEROFF:  No, we didn't turn over every

22   document.

23        THE COURT:  You're speaking over me again, Counsel.

24              Do I need to take a recess?

25        MR. TOBEROFF:  Excuse me, Your Honor.  I thought you          09:58
```

```
 1   had finished.  I'm sorry.
 2          THE COURT:  Answer my question.
 3          You were asked to turn over these documents.
 4          Did you?
 5          MR. TOBEROFF:  No, I did not.                   09:58
 6          THE COURT:  Why not?
 7          MR. TOBEROFF:  Because we weren't subject to a
 8   discovery request to turn over these documents, and we didn't
 9   intend to rely on our correspondence regarding the subpoenas at
10   trial.                                                 09:59
11          THE COURT:  I guess I'm confused.
12          You say you're not subject to a discovery request,
13   but you just said that you were asked to turn -- that it was
14   subject to discovery.
15          MR. TOBEROFF:  There's no -- discovery had ended, and   09:59
16   we weren't subject to a pending of any kind of discovery
17   request.  And there was no formal discovery request for
18   production.  They sent an e-mail saying, we want everything
19   having to do with any of your subpoenas, supply the documents
20   to us.                                                 09:59
21          And I said, under what request for production?  Can
22   you tell me why we would be obligated to turn over any e-mail
23   or anything having to do with these subpoenas over to you?
24          And they never got back to me.
25          THE COURT:  So when you said earlier it was         09:59
```

1    requested, it wasn't formally requested as a discovery request?

2            **MR. TOBEROFF:**  Correct, Your Honor.

3            **THE COURT:**  Okay.

4            Counsel?

5            **MR. PERKINS:**  Well, Your Honor, two things:                    10:00

6            This is our opportunity to cross-examine their

7    witness.  Under Rule 902, we have some latitude to do that.

8    There is an impeachment purpose here.

9            In addition, Your Honor, these subpoenas were served

10   well after the close of discovery, so there would not have been    10:00

11   an opportunity to serve a formal discovery request.  Once the

12   subpoenas were served, then we were made aware of that.  We

13   made a request that all documents that had been produced by

14   this witness --

15           **THE COURT:**  Let me stop you here.                           10:00

16           Mr. Toberoff, I took from what you said that these

17   documents had already been obtained prior to the close of

18   discovery.

19           Did you obtain these documents after the close of

20   discovery, as counsel just represented?                             10:00

21           **MR. TOBEROFF:**  Remember the rebuttal subpoenas where

22   you allowed this in for rebuttal?  There were subpoenas after

23   the LR 16 where they delivered 23 contracts for the first time.

24           And then in response, we subpoenaed some additional

25   contracts.  And you said those can come in for rebuttal.           10:00

        And then at the start of this trial, or at the last

conference before the trial, defendants said, we would prefer

that they just put the documents in as part of their case in

chief.  That's what this subpoena is.

        **THE COURT:**  So the answer is, these were documents          10:01

that were obtained after the close of discovery?

        **MR. TOBEROFF:**  Yes, these were and that's correct.

        **MR. PERKINS:**  Your Honor, the subpoena was served on

December 22, 2008.

        **THE COURT:**  Did you ever make a formal request for          10:01

these documents?

        **MR. PERKINS:**  Well, we didn't make a discovery

request, Your Honor, because discovery was closed.  We wrote to

opposing counsel and requested that they turn them over.

        **THE COURT:**  From your perspective, how did               10:01

Mr. Toberoff respond to that request?

        **MR. PERKINS:**  He refused.

        **THE COURT:**  Did you ever bring it to the Court's

attention at that time?

        **MR. PERKINS:**  We did not, Your Honor.                   10:02

        I take it back.  We did bring it to Your Honor's

attention in connection with our motions in limine.

        As part of our motion in limine, we made the point

that we had requested these documents and they had refused to

turn them over.                                                    10:02

1          **THE COURT:**  That was months later?

2          **MR. PERKINS:**  Well, it was weeks later, Your Honor.

3          **THE COURT:**  Oh, that's right, because the motions in

4   limine were held initially in January.

5          **MR. PERKINS:**  That's correct, Your Honor.                    10:02

6          **THE COURT:**  Well, this is a close call.

7          There's no question, if these documents -- the

8   problem is that they were obtained after the close of

9   discovery, so they're in this kind of -- these were documents

10  that, Mr. Toberoff, you obtained after discovery had closed.   10:02

11         But then, on the other hand, is it fair to say that

12  there's no request for discovery, as Mr. Toberoff suggests,

13  that directly addresses these documents?

14         **MR. PERKINS:**  No.  There wouldn't -- going back to

15  Your Honor's prior comment about seeing the future, I think   10:03

16  there wasn't an ability to do that.

17         If I could just be heard on this, Your Honor.  The

18  purpose of putting this in really, Your Honor, is two-fold.

19  One is to show that the plaintiffs have really cherry picked --

20         **THE COURT:**  I get where this is going.                       10:03

21         **MR. PERKINS:**  Right.

22         **THE COURT:**  I assume where this is going.

23         **MR. PERKINS:**  Right.  And the evidence will show that

24  the terms in this agreement are really far less favorable than

25  the terms of the agreements that they have chosen to put into  10:03

 1    evidence.  And that's the purpose.

 2         **THE COURT:**  Well, I'm assuming that's what you're

 3    attempting to show.  Whether you've showed that or not remains

 4    to be seen.

 5         But I'm just trying to get -- I need to get an

 6    understanding of whether -- I understand Mr. Toberoff's

 7    objection.  The problem I'm having with that is that -- and

 8    ordinarily, a post-discovery request that would have been

 9    subject to a request for document production before the close

10    of discovery, that would be an easy case.  Those would have to

11    be turned over.

12         Mr. Toberoff's argument, as I now understand it, is

13    that, even if these subpoenas had been served during the

14    discovery period, they would not have been subject to any of

15    the requests that you made.

16         Now, while you can't see the future, you certainly --

17    you never requested, I take it, all agreements that you have

18    received?

19         **MR. PERKINS:**  Your Honor, you know what, we may have.

20    I don't want to say absolutely not.  We have hundreds of

21    documents and discovery requests in the case, and I don't

22    recall, to be honest.

23         But I'm not going to sit here and represent to you

24    that I have one and that this is responsive to it.

25         **THE COURT:**  Well, maybe the answer goes back to this

10:03
10:04
10:04
10:04
10:04

```
 1   whole notion where I started from; that this is rebuttal
 2   evidence.  These were documents that were obtained after the
 3   close of discovery by the plaintiff, a group of documents.
 4            The defense's argument is that by only using a
 5   portion of the documents and not all of the documents, it                  10:05
 6   reveals that plaintiff is, as you say, cherry picking which
 7   agreements.
 8            Why shouldn't Mr. Toberoff, under those
 9   circumstances, out of equity, should not the defendants be able
10   to now introduce the full panoply of documents that you                    10:05
11   subpoenaed?
12        MR. TOBEROFF:  And the answer is, is that when we
13   turned over documents pursuant to that subpoena and we gave
14   them a copy of our subpoena and we gave them the documents we
15   intended to use at trial, number one, when they requested all              10:05
16   documents, all correspondence relating to the subpoena,
17   everything we received, I wrote back and I said, I don't
18   believe we're under an obligation to do that and can you please
19   cite me the authority, and they never cited any authority.  So
20   I didn't do it.                                                            10:06
21            But number two, at that point in time, they could
22   have subpoenaed Mr. Ellis.  They didn't have to wait until
23   trial.  They could have actually sent a subpoena to all the
24   parties that we subpoenaed asking for any correspondence with
25   Mr. Toberoff or any agreements that the parties sent pursuant              10:06
```

1    to the subpoena, and they failed to do that.

2         **THE COURT:**  But they still would have been doing so

3    after the close of discovery.  So if your argument is valid

4    with respect to doing it now, it would have been equally valid

5    with respect to doing it in January, when we actually thought

6    the trial was going to proceed.

7         If you're saying that it would have been okay for

8    them to subpoena those documents in January, why isn't it okay

9    for them to subpoena those documents in May?

10        **MR. TOBEROFF:**  Because I believe the cases recognize

11   the difference between trial subpoenas after one side has put

12   in, for example, their case in chief or the majority of their

13   case in chief, to wait to do things after that point, it

14   doesn't put things on the same even keel as doing it before

15   trial and putting down who you're going to call at trial as a

16   witness and what exhibits you're going to use at trial.

17        So if they had subpoenaed this prior --

18        **THE COURT:**  I think you're right.  And I could

19   definitely see the point in the case where they were

20   subpoenaing something new and different after your case in

21   chief that wasn't properly rebuttal; that is something they

22   should have obtained beforehand.

23        But in this case, as I understand it, they are simply

24   subpoenaing documents that you've already subpoenaed.

25        Correct?

10:06

10:06

10:07

10:07

10:07

1          **MR. TOBEROFF:**  Yes.

2          **MR. PERKINS:**  Your Honor?

3          **MR. TOBEROFF:**  May I --

4          **MR. PERKINS:**  If I could make one --

5          **THE COURT:**  Let Mr. Toberoff finish, and then I'll          10:07

6   give you a chance to respond.

7          **MR. PERKINS:**  Yes, Your Honor.

8          **MR. TOBEROFF:**  I understand we can do this from the

9   evidence, but I need to respond to the comment that we are

10  cherry picking -- they're actually using our argument which we          10:07

11  mentioned regarding Warner Bros. since Warner Bros. has a big

12  archive of contracts and only submitted contracts with inferior

13  terms.

14          The reason we didn't submit this contract is very

15  simple:  You've heard the objection of defendants as to          10:08

16  incompleteness.  *The Sum of All Fears'* contract is very

17  incomplete.  It's not a question of a schedule or a GRP

18  definition you can figure out.  It says on the face on page 1

19  that it is amending another agreement.

20          And the witness has testified that he happened to          10:08

21  have this in his files, but that his company wasn't involved in

22  this agreement, they didn't have the agreement it was amending.

23          So it was exceedingly incomplete.  And it's for that

24  reason we didn't -- the terms aren't bad at all.  It's for that

25  reason we didn't use this document.          10:08

1          **THE COURT:**  That's a different argument altogether.

2          **MR. TOBEROFF:**  I understand.

3          **THE COURT:**  That's a response to the claim that this

4     is cherry picking, but that goes to the weight of this evidence

5     and whether or not this really is impeachment or not.  That          10:08

6     doesn't go to whether or not -- the limited legal issue that I

7     want to decide right now is whether or not it's proper, at this

8     point, for the defense to introduce agreements that you

9     subpoenaed after the close of discovery that they requested

10    that you denied that was raised in the motion in limine.          10:09

11         I mean, there's really no notice issue, because

12    everybody on both sides has notice of these documents.

13         You indicated a few moments ago that they should have

14    subpoenaed them back in January.  The only reason why we're

15    here in May and not January is because, unfortunately, your          10:09

16    first expert witness, got sick, and we had to continue the

17    trial.

18         I guess I'm not seeing the material difference.  But

19    let me hear from Warner Bros.' counsel.

20         **MR. PERKINS:**  I guess the only other point that I          10:09

21    would make, Your Honor, is that we didn't know about these

22    agreements until we served the subpoena.  And if Your Honor

23    will recall, until we got to trial last week, we were under the

24    impression that the plaintiffs were going to be bringing

25    Mr. Ellis in.          10:09

1          If you recall, Your Honor's ruling was that if there

2    was no stipulation, there would have to be a witness.  It was

3    only after the plaintiffs argued that it really was our burden

4    to serve a subpoena, that we served the subpoena.

5          And as part of that, asked for all documents that                10:10

6    were produced by AMG.

7          **THE COURT:**  And that's when you found out about these

8    other documents?

9          **MR. PERKINS:**  And that's when we found out about

10   these other documents.                                                 10:10

11         **THE COURT:**  So you didn't know about these other

12   documents back in January?

13         **MR. PERKINS:**  We did not know about them, Your Honor.

14         **THE COURT:**  Anything further, Mr. Toberoff?

15         **MR. TOBEROFF:**  No, Your Honor.                               10:10

16         Just that there was no formal request for production

17   of these documents at any time, nor was this dialog that we're

18   entering into here ever set forth in any respect by the

19   defendants.

20         Just as they've subpoenaed Fox recently, they could             10:10

21   have sent out a subpoena.  When they sent me a request by

22   e-mail that you need to turn everything over, your e-mails, and

23   I said please cite the authority, and they didn't cite the

24   authority, and I didn't send it over, they should have sent a

25   subpoena out at that point and then mark this as an Exhibit on        10:11

 1    their exhibit list or put down Mr. Ellis as a witness that they

 2    would call at trial.

 3              **THE COURT:**  Very well.

 4              It's a close call, but I'm going to overrule the

 5    objection given the circumstances, all of the circumstances.        10:11

 6              Mr. Toberoff, I apologize for raising my voice.  But

 7    the Court has to maintain order in this proceeding.  And I'm

 8    doing it as much for your benefit as for anybody else's.

 9    You've got to wait for the question to be out before the

10    objection is made.  Otherwise, you're not going to have a           10:11

11    record to explain what it was you were objecting to.  I know

12    you know where he's going, but the record looks terrible when

13    you have objections halfway through a sentence and you don't

14    have the entire sentence out.

15              And this court reporter cannot take down more than        10:12

16    one person at a time.  And if there's anyone she's going to

17    take down, she's going to take down what I'm saying, and that's

18    going to leave you off the record.  So I'm doing this really

19    for your own good and preserving your own record.  I hope you

20    appreciate that.                                                    10:12

21              **MR. TOBEROFF:**  I do, Your Honor.  And I apologize

22    because I should know that.

23              **THE COURT:**  I understand this is an emotional case.

24    This is a very important case for both sides.  I want both

25    sides to have their full say here.  It's a difficult case, and     10:12

 1    the Court is mindful of that.

 2              But I am going to overrule the objection.  I think

 3    that given the entire history of how this played out from

 4    December to the present, that justice requires that the

 5    documents come in.  And then of course we can -- you know,                10:12

 6    whether or not this is evidence of cherry picking or not will

 7    be flushed out through examination and cross-examination.

 8              The objection is overruled.

 9              Counsel, you may proceed.

10              **MR. TOBEROFF:**  Thank you, Your Honor.                        10:13

11              **MR. PERKINS:**  Thank you, Your Honor.

12    **BY MR. PERKINS:**

13    Q    Mr. Ellis, looking at Defendants' Exhibit 1119, is this a

14    true copy of what resides in the records of AMG?

15    A    I can't really tell.  The scanned document that was                  10:13

16    attached to the e-mail, that was the true copy.  And if this

17    document is a printout of that exact e-mail, then yes.  Looking

18    at it, it appears to be, but I just cannot tell.

19    Q    Well, I will represent to you that it is, in fact, a

20    printout.

21              If that were the case, would you feel comfortable

22    authenticating that?

23    A    Yes.

24              **MR. PERKINS:**  At this point, Your Honor, I'd move

25    this into evidence.                                                       10:13

1          **THE COURT:**  Aside from the earlier objection, which

2     was overruled, is there any other objection?

3          **MR. TOBEROFF:**  My objection is the document is

4     incomplete, as I mentioned earlier.  If you look at page 1 --

5          **THE COURT:**  I'll sustain that objection.  Let's          10:14

6     address this completeness issue at this point.

7          Counsel, a foundation.

8          **MR. TOBEROFF:**  Thank you, Your Honor.

9  **BY MR. PERKINS:**

10  Q   Mr. Ellis, if you would take a look at what's been marked          10:14

11  for identification Exhibit 1119, can you tell me whether this

12  document is incomplete?

13  A   I'm having trouble with the question.  This was what was

14  in our files responsive to the subpoena.

15  Q   To your knowledge, was there any other document that          10:14

16  accords with that?

17  A   I don't understand the question still.

18          **MR. PERKINS:**  Your Honor, this is the custodian of

19  records.  He has no knowledge of whether it is or is not

20  incomplete.  I don't think there's any evidence that it is          10:14

21  incomplete at this point.

22          I'd request that the document come in subject to a

23  showing later on that it's incomplete.

24          **THE COURT:**  That's a foundational objection, Counsel.

25  If you're attempting to -- if we're going to be going down the          10:15

1  road of trying to compare this to other agreements, we must, as

2  we have in all the other agreements that we've been trying to

3  compare, make sure that we have a complete agreement.  And

4  that's in question at this point.

5          **MR. PERKINS:**  Well, it's in question based on          10:15

6  Mr. Toberoff's objection.  We don't have any evidence in the

7  record that it is incomplete.

8          **THE COURT:**  Why don't I do this.  What I will do is

9  delay ruling on the objection subject to cross-examination by

10  Mr. Toberoff.  I'll take it up at that time.          10:15

11          **MR. PERKINS:**  Thank you, Your Honor.

12          **THE COURT:**  You'll have a chance to...

13          Anything further on this document?

14          **MR. PERKINS:**  No, Your Honor.

15          **THE COURT:**  Very well.          10:15

16          We'll put it aside for the moment.

17          **MR. PERKINS:**  May I approach, Your Honor?

18          **THE COURT:**  Yes.

19  **BY MR. PERKINS:**

20  Q   Mr. Ellis, I've placed before you the document that's been          10:16

21  marked as Defendants' Exhibit 1120 solely for identification at

22  this point.

23          Mr. Ellis, can you identify what this document is?

24  A   It's a copy of another one of the e-mails I sent in

25  response to the document subpoena in January.          10:16

1   Q    And what does the attachment purport to be, Mr. Ellis?

2   A    An executed rights' agreement between Michael Crichton and

3   Paramount Pictures for the novel, *Timeline*.

4   Q    If I could ask you to take out Exhibit 325 and lay that

5   next to 1120, please.                                        10:16

6   A    (Witness complies.)

7   Q    Now, Exhibit 1120, is that the literary purchase agreement

8   for the *Timeline* motion picture?

9   A    Yes.

10  Q    And does Exhibit 325 also purport to be the motion picture   10:17

11  Exhibit for *Timeline*?

12  A    It appears to be, yes.

13  Q    Now, Exhibit 1120, is that document in the form that it

14  resided in the files of AMG as you produced it to the

15  plaintiffs?                                                   10:17

16  A    This e-mail?  Yes.

17  Q    Yes.

18       I'd like you to turn to Exhibit 325 to the Bates

19  No. SGL 06094.

20  A    Okay.

21  Q    And 06094 through 0611 (sic).  Will you take a look at

22  those pages, please.

23  A    06111?

24  Q    Yes.

25  A    (Perusing document.)  Okay.                              10:18

1    Q    Do the pages SGL 06094 through 06111 that are in

2    Exhibit 325, are those anywhere in Defendants' Exhibit 1120?

3    A    Just one minute (perusing document).

4         Okay.  111 is in both agreements and the subsequent

5    pages.  And then the prior ones, 94 through 110 are not; it                10:18

6    skips from the notary page to the rider.

7    Q    Do you recognize the documents that are in 325 that have

8    Bates Nos. 06094 through 06111?

9    A    Generally, yes.

10   Q    Were those pages part of the document that is 1120 as kept    10:19

11   in the files of AMG?

12   A    Not in this particular file, no.

13   Q    Now, Mr. Ellis, did you produce the documents that are

14   06094 through 06111 to plaintiffs' counsel?

15   A    Yes.                                                           10:19

16   Q    And what did you produce that with, if anything?

17   A    Within half an hour or so after I produced the rights'

18   agreement, Mr. Toberoff contacted me and inquired as to that

19   Exhibit.  And I said I'll go look for it, and I found it in an

20   adjacent folder, in another contemporaneous Michael Crichton       10:20

21   agreement.

22   Q    Okay.  But it was not in the file part of the motion

23   picture agreement; correct?

24   A    It was in the larger file; it wasn't in this particular

25   rights' agreement folder.                                          10:20

```
 1              MR. PERKINS:  May I approach, Your Honor?

 2              THE COURT:  You may.

 3  BY MR. PERKINS:

 4  Q    Mr. Ellis, I've given you what's been marked for

 5  identification as Defendants' Exhibit 1121.                    10:21

 6              Could you identify what this document is?

 7  A    Yes.  It's an e-mail I sent to one of your co-counsels

 8  about forwarding a copy of an e-mail that I sent to

 9  Mr. Toberoff in response to his inquiry about the gross

10  receipts definition.                                          10:21

11  Q    And what is the document that is actually attached to this

12  e-mail?

13  A    It's the contents of that other folder, the Crichton

14  producer agreement folder.

15  Q    And within that agreement, are the pages that are         10:21

16  SGL 06094 through -06111 found in the document that's attached

17  to 1121?

18  A    That's my recollection.  I had to go in and match them up.

19  It appeared to be.

20  Q    Now, are those pages at the end of the agreement that's    10:23

21  1121?

22  A    No.  They are additional pages.

23  Q    After the end of that rider; correct?

24  A    Yes.

25  Q    Now, Mr. Ellis, when you executed your declaration in this 10:23
```

```
 1  case for the plaintiffs' counsel, were you aware that

 2  plaintiffs had taken the documents SGL 06094 from the producer

 3  agreement and inserted it into the literary purchase agreement?

 4           MR. TOBEROFF:  Objection, Your Honor.  Assumes facts.

 5           THE COURT:  The way it's phrased it does.

 6           Sustained.

 7  BY MR. PERKINS:

 8  Q    Going back to Exhibit 325, did you testify earlier that

 9  when you produced the copy of the Timeline motion picture

10  agreement, that it did not contain the rider at SGL 06094

11  through -06111?

12  A    My testimony is that, whatever e-mail was -- I didn't read

13  the documents; I just scanned the folders and shot them over;

14  so whatever was attached to that e-mail was exactly what was in

15  our files.

16  Q    And that e-mail is Defendants' 1120; correct?

17  A    Yes.

18  Q    And do you know how the rider that's SGL 06094 through

19  -06111 got to be inserted into the motion picture agreement?

20  A    I do not.

21  Q    When you executed your declaration, did plaintiffs'

22  counsel inform you that he was going to be inserting that

23  document, that rider, into the motion picture agreement?

24  A    There was never any discussion of anything like that.

25  Q    Going back to Exhibit 1121.
```

10:23

10:24

10:24

10:25

10:25

1          Is Exhibit 1121, to the best of your knowledge, a

2     true and correct copy of the documents that reside in the AMG

3     files?

4     A    The e-mail that was attached to it, yes, was whatever was

5     in the Crichton producer folder.                                    10:25

6     Q    If I could have you turn to the second page of the

7     Exhibit, the first page of 1121.

8          Could you read for the Court Paragraph 3.2 on that

9     first page.

10    A    Section 3.2 is entitled "Compensation."                        10:26

11         And it reads, "Lender and producer acknowledge that

12    the compensation payable pursuant to the agreement dated as of

13    October 22, 1999, between producer and PPC for the motion

14    picture and allied rights in and to the novel, *Timeline*,

15    written by producer ('rights' agreements') shall be deemed to       10:26

16    include the compensation for producers' services pursuant to

17    this agreement."

18    Q    And the rights' agreement that's referred to in 3.2, is

19    that Plaintiffs' Exhibit 325?

20    A    Yes.                                                           10:26

21         **MR. PERKINS:**  Your Honor, I have nothing further for

22    this witness.

23         **THE COURT:**  Cross examination.

24    / / /

25    / / /

1                             **CROSS-EXAMINATION**

2   **BY MR. TOBEROFF:**

3   Q    Mr. Ellis, Defendants' Exhibit 1119, which is the *Clear*

4   *and Present Danger* agreement -- excuse me, *The Sum of All*

5   *Fears*' agreement, I'd like to draw your attention to the first    10:27

6   paragraph.

7           If you look four lines down, do you see where it

8   says, "And amending the agreement dated May 21, 1990, as later

9   amended, (including without limitation pursuant to an amendment

10   dated as of June 17, 1992, between JRE and PPC in connection    10:28

11   with the motion picture and other rights of the novels, *Clear*

12   *and Present Danger* and *Patriot Games* and amending the

13   agreements in connection with the motion picture and other

14   rights of the novel, *The Hunt for Red October*, consisting of

15   the agreement dated May 7, 1985, between JRE's predecessor and    10:28

16   interest, The Red October Company, and the PPC's predecessor

17   and interest, The U.S. Naval Institute, the agreement dated

18   July 31, 1986, between U.S. Naval Institute and PPC in the

19   agreement dated May 2, 1989, between JRE and PPC collectively

20   The Hunt agreement.)"    10:29

21           Do you see all those agreements referenced in this

22   paragraph as being amended?

23   A    Yes.

24   Q    Did you turn over, pursuant to the subpoena, all of those

25   agreements?    10:29

```
 1   A     No.

 2   Q     And what is the reason why you didn't turn over all those

 3   agreements pursuant to the subpoena?

 4   A     I'd have to go back and look at the subpoena to see if

 5   they were asked for.  But if they weren't covered by the          10:29

 6   subpoena, then I don't have them.

 7          The Artists' Management Group didn't start

 8   representing Tom Clancy until after this agreement.

 9          THE COURT:  So you don't even know if you have all

10   those agreements?                                                  10:30

11          THE WITNESS:  I do not know.

12   BY MR. TOBEROFF:

13   Q     And you mentioned that you happen to have a copy of that

14   agreement in your file, even though Artists' Management Group

15   did not represent the author at the time this agreement was        10:30

16   entered into.

17   A     Yes.

18   Q     And that's the same for all the other agreements mentioned

19   in this first paragraph of the document.

20   A     Artists' Management Group wasn't even formed at the time     10:30

21   all these other agreements were dated.

22   Q     I understand.

23          Now, referring to what we call the Timeline

24   agreement, which was Plaintiffs' Exhibit 325 and Exhibit 1121,

25   which is Michael Crichton's producer agreement, is it, in your     10:31
```

1    experience, common for very important rights holders to

2    simultaneously enter into executive producer or producer

3    agreements in connection with licenses of film rights to their

4    works?

5         **MR. PERKINS:**  Objection, Your Honor.  Foundation.    10:31

6         **THE COURT:**  Sustained.

7    **BY MR. TOBEROFF:**

8    Q    You testified that you have been working with AMG and

9    Mr. Ovitz for ten years, approximately ten years; is that

10   correct?                                                  10:32

11   A    I testified I've been working for CK Associates for

12   ten years.  AMG, I started working for in 1999 and really wound

13   it down by 2003.  I've done work for it since, but it's not a

14   hotbed of activity as of this time.

15        I represented the principles of Artists' Management    10:32

16   Group prior to taking this job when I was in private practice.

17   And Michael Ovitz is the principal of CKE, so yes.

18   Q    And during that time period, have you had experience in

19   both reviewing and negotiating rights' agreements for marquee

20   authors, well-known authors?                              10:32

21        **MR. PERKINS:**  Objection, Your Honor.  This is going

22   well beyond the scope of cross, and Mr. Ellis is not an

23   expert witness.

24        **THE COURT:**  I'm going to give you some latitude,

25   Mr. Toberoff.  Overruled.                                 10:33

1          **THE WITNESS:**  I've had some experience in that

2    regard, yes.

3    **BY MR. TOBEROFF:**

4    Q    And based on that experience, is it common for high-level

5    rights holders to receive additional compensation in the form          10:33

6    of an executive producer or producer agreement in conjunction

7    with the rights' agreement?

8          **MR. PERKINS:**  Same objection, Your Honor.

9          **THE COURT:**  Sustained.  Now this is going beyond

10   foundational.  I didn't know definitely where you were going          10:33

11   with that.

12   **BY MR. TOBEROFF:**

13   Q    The *Timeline* rights' agreement makes reference to a

14   producer agreement; correct?

15   A    Could you -- I -- I'm trying to remember.                        10:33

16   Q    The *Timeline* rights' agreement was Exhibit 325 --

17   A    Right.  I just don't see where it makes reference to it.

18   Q    I'd like you to turn to page 4 of the agreement.

19          Do you see the reference on page 4 to Exhibit GRP,

20   gross rights definition?  It says "adjust shall be in              10:35

21   accordance Paragraph 1 of Exhibit GRP."

22   A    Down at the bottom?

23   Q    Yes.

24   A    Yes.

25   Q    And in your files, did the *Timeline* rights' agreement have    10:35

1    GRP attached to it?

2    A    It had the rider attached to it, to the GRP.

3    Q    But not the GRP?

4    A    Not the GRP definition.

5    Q    Now, if you go to Defendants' Exhibit 1121, did that have    10:36

6    Paramount standard GRP definition attached to it?

7    A    As of this date, yes.

8         MR. PERKINS:  Objection, Your Honor.  Leading;

9    foundation.

10        THE COURT:  Overruled.    10:36

11        MR. TOBEROFF:  It's cross, Your Honor.  I think I can

12   lead.

13        THE COURT:  It's not a hostile witness, but in this

14   context, I'm going to overrule it.

15        MR. PERKINS:  Your Honor, for the record, this is    10:36

16   plaintiffs' witness.  My examination --

17        THE COURT:  I'm aware of that, Counsel, but thank

18   you, though, for pointing that out.

19        MR. PERKINS:  Just for the record --

20        THE COURT:  Thank you for pointing that out.    10:36

21        Overruled.

22   BY MR. TOBEROFF:

23   Q    Do you have any reason to believe that the GRP standard

24   Paramount GRP definition attached to the *Timeline* producer

25   agreement is different than the standard GRP definition    10:37

1    referenced at the bottom of the page of the rights' agreement

2    that we previously spoke about?

3              MR. PERKINS:  Objection, Your Honor.  Foundation as

4    to characterizing it as a standard.

5              THE COURT:  Sustained.                              10:37

6         I'm allowing leading questions simply because this is

7    a witness authenticating a document; he's not offering opinions

8    thereon.

9    BY MR. TOBEROFF:

10   Q    Based on your experience, do you know that the standard   10:38

11   Paramount GRP definition attached to the producer agreement is

12   the same standard Paramount GRP definition referred to in the

13   rights' agreement?

14             MR. PERKINS:  Same objection, Your Honor.

15             THE COURT:  Sustained.                              10:38

16             MR. TOBEROFF:  Your Honor, may I comment on the

17   objection?

18             THE COURT:  I've sustained the objection, Counsel.

19             Move along.

20             MR. TOBEROFF:  I have no further questions.         10:38

21             THE COURT:  Very well.

22             Anything further?

23             MR. PERKINS:  No, Your Honor.

24             THE COURT:  I'm going to sustain the foundational

25   objection by plaintiffs to Exhibit 1119.  This agreement just  10:38

1    incorporates too many other agreements for which this witness

2    cannot lay an adequate foundation.  I note page 7, Paragraph 5

3    of the agreement, there's language that "wherever provisions of

4    this agreement, namely 1119, conflicts with any provisions of

5    the prior agreements, the provision of this agreement shall          10:39

6    prevail."  But without having those prior agreements, it's

7    really hard to come up with an integrate agreement.

8            So the Court will sustain the foundational objection

9    to that.

10           MR. PERKINS:  In light of Your Honor's ruling, we            10:39

11   then ask that both Exhibits 326 and 327 be excluded as well,

12   Your Honor.  Those both make reference to the definitions from

13   *The Sum of All Fears*' agreement; 326, at page SGL 6121.  It

14   relies on a definition from *The Sum of All Fears*, as does 327,

15   SGL 06169, again, refers to the definition from *The Sum of All*    10:40

16   *Fears*.

17           THE COURT:  Mr. Toberoff, your response to that?

18           MR. TOBEROFF:  My response, Your Honor, is when these

19   agreements were referred to a studio's standard GHP

20   definition -- we've heard testimony that these standard            10:40

21   definitions rarely, if ever, change.  And it's usually not a

22   major point since both sides are aware what that standard

23   definition is based on practice, and the studio has it readily

24   available.

25           The main focus is usually on the riders.  And in           10:40

1    these agreements, if the only thing missing is the standard GRP

2    definition, but the riders are exactly the same.  And you

3    have -- it means that the GRP --

4         So I think this goes to weight rather than

5    admissibility.  It's not a contract which you're incapable of

6    understanding; it's used for making deals and for comparison

7    purposes due to the fact that in one Exhibit, the standard GRP

8    definition happens to be missing.

9         **THE COURT:**  Perhaps the best thing is to permit

10   Exhibit 1119 to be introduced for the purpose of providing the

11   definitions being referred to therein, but not permit it to be

12   introduced for the purpose of evaluating the overall agreement,

13   because that's what I'm not clear that I have before me is the

14   overall agreement.

15        Do you understand what I'm saying?

16        **MR. TOBEROFF:**  Yes, Your Honor.

17        **MR. PERKINS:**  I would object to that, Your Honor.

18        It's not clear to me that what Mr. Toberoff is saying

19   is actually in evidence or in the record.  And I'm hearing for

20   the first time that this is the justification for not having

21   some of *The Sum of All Fears* in, so I have not had a chance to

22   review --

23        **THE COURT:**  That's my tentative ruling.  If you want

24   to, after you've had a chance -- these agreements are

25   complicated enough, but that's my inclination at this point is

10:41

10:41

10:41

10:41

10:42

1    to allow 1119 in only for the purpose as serving the reference

2    point to the to extent of it, or a definition in it is

3    incorporated into the other.

4         I want to have foundation as to yet another agreement

5    for points of comparison on fair market value issue without          10:42

6    knowing that we have the full agreements before us.

7         **MR. TOBEROFF:**  Your Honor, relative to this point,

8    I'd like to point out that actually what I was referencing was

9    326 and 327 are both contracts for the film rights to the

10   Tom Clancy novel with the same company, Paramount.  They refer        10:42

11   -- one has the standard GRP definition and the standard rider

12   amending that GRP definition.

13        The other one has an identical rider, identical terms

14   in -- for instance that the GRP definition is the same.  So

15   reading those two agreements together, you get a sense of what        10:43

16   the GRP definition is.  It's not a type of incompleteness which

17   renders the agreement incomprehensible.

18        **THE COURT:**  I'm permitting it for the limited purpose

19   to the extent this is referred to.  But we're not going to use

20   this as basis for the Court's ruling.  Move along.                    10:43

21        If there's no further questions of the witness, you

22   may be excused.

23        Let's take our morning break, and then we'll call

24   Mr. Halloran back up to the stand.

25        (Whereupon a brief recess was held.)                             10:43

1          **THE COURT:**  Counsel.

2          Mr. Halloran.

3          **THE CLERK:**  Mr. Halloran, please be advised you're

4    still under oath.

5                    **CROSS-EXAMINATION(Cont'd)**                          11:05

6    **BY MR. BERGMAN:**

7    Q    Good morning again, Mr. Halloran.

8    A    Good morning, Mr. Bergman.

9    Q    Mr. Halloran, on direct testimony, you were referring to

10   the fact that there's a provision in the *Superman* film          11:05

11   agreement which basically requires DC to make any television

12   programming with the Warner Bros. affiliate.

13             Do you recall that testimony?

14   A    You have to look at both the film agreement and the

15   television agreement together, but I understand the net effect   11:06

16   is that, yes.

17   Q    Now, it's customary, is it not, when a studio acquires

18   film rights to a particular project, that it also, in one

19   manner or another, obtains a hold on the television rights to

20   that property; isn't that correct?                               11:06

21   A    In general, that's true.

22   Q    I mean, there are different ways of doing it.  You can

23   purchase both film and television rights at the same time,

24   can't you?

25   A    You can, but, you know, again, when you have a              11:06

```
 1   previously-exploited property, it's unusual.  Usually, when

 2   there's a purchase of film and television rights, the

 3   anticipation is the film be done first, and then there's

 4   television rights after that.  But if there's been

 5   previously-exploited television rights, I don't think it is          11:07

 6   typical to get the television rights at the same time.

 7            So I think that's demonstrated by the fact that in

 8   this case, there's a separate film and separate television

 9   agreement.

10            MR. BERGMAN:  Your Honor, move to strike everything        11:07

11   after "you can."

12            THE COURT:  Stricken.

13   BY MR. BERGMAN:

14   Q    Now, there are examples, are there not, Mr. Halloran,

15   where the studio purchases both film and television rights         11:07

16   together; correct?

17   A    There are those examples, yes.

18   Q    We saw that in the Watchmen, didn't we?

19   A    I think that's correct.

20   Q    Okay.  And we saw it in Human Target?                          11:07

21   A    I'd have to look at the actual agreements.

22   Q    I see.  Well, does that --

23   A    I'd like to look at Watchmen.  They vary, depending on a

24   lot of factors.

25   Q    So does your chart reflect --                                  11:08
```

1          **THE COURT:**  Is there an objection?

2          **MR. TOBEROFF:**  I want to point out, the witness, I

3   don't believe, has the *Human Target* agreement; and I would also

4   appreciate it if counsel could name the exhibits numbers, so we

5   can follow --                                                                11:08

6          **THE WITNESS:**  Right.

7          **MR. TOBEROFF:**  -- pull these agreements and follow

8   the testimony.

9          **THE COURT:**  Sure.  That's a good point.

10         Please, Counsel.                                                       11:08

11         **MR. BERGMAN:**  Okay.

12  **BY MR. BERGMAN:**

13  Q    When I referred, Mr. Halloran, to the *Watchmen* agreement,

14  I was referring to Exhibit 1029.

15         Do you have that, sir?                                                 11:08

16  A    I do.

17  Q    Am I correct that the studio acquired both film and

18  television rights in that agreement?

19  A    It talks about all motion picture analogous and allied

20  rights, as defined in the exhibits.                                          11:09

21         It was defined in the standard terms.

22         **THE COURT:**  Is there --

23         **THE WITNESS:**  I have a definition of "net profits,"

24  but I don't seem to have --

25         **THE COURT:**  Is there an objection, Counsel?                       11:10

1          **MR. TOBEROFF:**  I object to the *Watchmen* exhibit on

2     the basis of taking the page, no pun intended, from defendants'

3     objection.  It refers to a standard definition -- it refers to

4     the standard terms and conditions, which is a lot broader than

5     defined gross definition.  And those are missing from the                    11:10

6     agreement.

7          **THE COURT:**  What's your legal objection, though?

8          **MR. TOBEROFF:**  Incomplete exhibits.  Excuse me,

9     Your Honor.

10          **THE COURT:**  Why don't you rephrase your question,                    11:11

11     Counsel.

12          **MR. BERGMAN:**  Okay.

13          **THE COURT:**  Mr. Bergman is more than capable of doing

14     this, Counsel.

15          **MR. BERGMAN:**  Your Honor, my good friend,                            11:11

16     Mr. Perkins, points out that plaintiffs have already stipulated

17     to the admission of this agreement and that it is in evidence.

18          **THE COURT:**  So it is in evidence, Mr. Toberoff?

19          **MR. TOBEROFF:**  No.  That's incorrect.

20          Exhibit 1029, if you look at objections, we have a                       11:11

21     whole list of objections under "witness stipulation."

22          **MR. BERGMAN:**  Mr. Toberoff is correct, Your Honor.

23          **THE COURT:**  Very well.

24          **MR. BERGMAN:**  I'll rephrase the question.

25     / / /                                                                         11:11

BY MR. BERGMAN:

Q    Would you turn, please, Mr. Halloran, to Paragraph 9-D of this Exhibit 1028.

A    Now, is this the option agreement or the purchase agreements?

Q    These are purchase agreements; I believe it's 1029; it's at Page 6.  The Bates stamp is 7451.

A    I'm there.

Q    And am I correct that that talks about the theatrical motion picture rights that are being acquired; Paragraph 9, studio sequels, theatrical motion pictures?

A    No.  This is not a rights acquisition paragraph.  This is a paragraph having to do with how much money is paid if, in fact, there is a sequel made after the first picture.  So this is not a rights paragraph.

Q    Would you turn to the next page, Subparagraph D. It would be Bates-stamped 7452.

A    Okay.

Q    Am I correct that it talks about the acquisition and payment for television pictures?

A    You're incorrect.  It doesn't talk about acquisition.  It only talks about sums that would be paid.

Q    Is it your testimony, Mr. Halloran, that the *Watchmen* agreement does not provide for the acquisition of film and television rights?

A    There's -- I'm constrained by what I have.  In Paragraph 2

of the purchase agreement, it refers to motion picture,

including "all motion picture analogous and allied rights in

the literary property of *Watchmen*, as more particularly

described in the standard terms and conditions."  And those

aren't attached.  So it's difficult, if not impossible, for me

to tell you exactly what rights were, in fact, acquired by Fox

under this agreement.

Q    You're unable to answer the question?

A    No.  I think I did answer the question.

     Can I finish?

Q    Surely.

A    The answer is, based on my study of this document, there's

a reference in the grant of rights to all motion picture

analogous and allied rights, but it's as more particularly

described in the standard terms.  And I don't have the standard

terms.  So I would have to look at the agreement as a whole,

and I would have to read what the actual definition of the

rights that were granted were.

Q    Okay.  Let's not take the time to do that.

     Could you look, sir, please, at Exhibit 1097, the

*Harry Potter* agreement.

A    This is Defendants' 1097?

Q    That's correct.

A    Okay.

1    Q    Am I correct that this agreement provides for the

2    acquisition of both film and television rights?

3    A    It does provide for the grant of theatrical and television

4    rights.

5    Q    Would you look, please, sir, at Exhibit 315, the *Annie*                11:16

6    agreement.

7             Exhibit 315, the *Annie* agreement, provides for the

8    acquisition by Columbia of both film and television rights.

9    A    (Witness reviewing documents).

10            Sorry.  This is a long agreement.                                    11:17

11            Well, it's a little complicated, but there's a

12   general grant of television rights in Paragraph 1.  But then

13   further on down, there's references to existing contractual

14   commitments that you cannot judge from the base of this exactly

15   what they are.  And then there's some hold-back provisions.     11:18

16   Q    Whatever may be the other provisions, sir, isn't it a fact

17   that the grant of television rights is contained in that

18   agreement?

19   A    That's an incomplete analysis, because a lot of times, the

20   way these work is, there's a general grant, and then there are    11:18

21   reserve rights and carveouts.  It's an incomplete analysis to

22   just look at the first paragraph and say television rights are

23   granted, because that's the set of rights, and then the subset

24   is usually dealt with later in the contract.

25            **MR. BERGMAN:**  Move to strike as nonresponsive,               11:19

1    Your Honor.

2           **THE COURT:**  Overruled.

3           **THE WITNESS:**  So my answer is that there's a general

4    grant of television rights, but then there are references

5    further down to existing contractual commitments.  So it's          11:19

6    really impossible for me to --

7           **MR. BERGMAN:**  Very well, sir.

8           **THE COURT:**  Wait for the next question.

9           **THE WITNESS:**  I'll need to finish my answer, which

10   is that --                                                          11:20

11          **THE COURT:**  No.  We're going to wait for the next

12   question.  There was no question pending.

13          **THE WITNESS:**  No.  I was --

14          **THE COURT:**  There was a question.  There was an

15   answer.  There was a motion to strike.  The motion to strike        11:20

16   was denied.  And then you started just giving another answer

17   out of nowhere.  So there was no question pending, so it can't

18   be an incomplete answer.  There should not have been --

19          **THE WITNESS:**  I understand, Your Honor.

20          **THE COURT:**  You really need to listen to the             11:20

21   question, answer it, and wait for the next question.

22          **THE WITNESS:**  Okay.

23          **THE COURT:**  Counsel, your next question.

24   BY MR. BERGMAN:

25   Q    In addition to acquiring television rights in conjunction      11:20

```
 1  with film rights, Mr. Halloran, it's often done by studios, is
 2  it not, that certain rights, including television rights, are
 3  what is referred to as "frozen" during specified times during
 4  which a film is being made?
 5          MR. TOBEROFF:  Objection, Your Honor.  Vague and          11:20
 6  ambiguous as to "certain rights."
 7          THE COURT:  Sustained.
 8          Rephrase your question.
 9  BY MR. BERGMAN:
10  Q   Is it not common, Mr. Halloran, for the exercise of          11:21
11  television rights by the grantor to be frozen; that is, held in
12  place, without anyone doing anything, absent mutual agreement,
13  during the period of time that a film is being developed and
14  distributed?
15  A   That is common, but there are exceptions.                    11:21
16  Q   Okay.
17          We saw that, did we not, in the Conan agreement,
18  Exhibit 1094?
19  A   Let me look at the Conan agreement.
20          I don't have the Conan agreement.                        11:21
21  Q   And you don't remember?
22  A   I would have to refresh my recollection.  I don't remember
23  each and every provision of each and every one of these
24  documents.  If I could see the document, I could quickly tell
25  you the answer.                                                  11:22
```

1          **MR. BERGMAN:**  May I ask that that document,

2     Exhibit 1094, be placed in front of the witness.

3     A    (Witness reviewing document).

4          Yes.  There is a provision to that effect in

5     Paragraph 4-A, Sub B, on Page 7.                        11:23

6     **BY MR. BERGMAN:**

7     Q    Okay.  And am I correct, sir, that with respect to

8     *Ironman*, Exhibit 1105, there is also a freeze placed on the

9     exploitation of television rights?

10    A    I'm just trying to get the paragraph number for you.   11:24

11         On Page 16, among the reserved rights that Marvel had

12    in *Ironman* were both animated direct to home video rights, in

13    Subparagraph G on Page 17, subject to a freeze, and also in

14    Sub H, live-action television, live-action direct to home

15    video, live-action Internet, and live-action productions and   11:25

16    other media were reserved to Marvel but subject to a freeze

17    while movies were being actually produced.

18         Excuse me.  One second.

19         During the time that New Line had the rights to

20    produce a motion picture, there was a freeze.            11:25

21    Q    Thank you.

22         And without referring to any agreement, is it not

23    also customary that in situations where a studio doesn't

24    acquire the rights by an absolute grant, or provide for a

25    freeze, that studios often provide for their having a first   11:26

```
 1    refusal, or first refusal and last refusal, on the exercise of

 2    reserve television rights?

 3              MR. TOBEROFF:  Objection, Your Honor.

 4              Compound; and also vague and ambiguous as to the

 5    rights.                                                        11:26

 6              THE COURT:  Sustained.

 7    BY MR. BERGMAN:

 8    Q    With respect to television rights, sir, is it not often

 9    the case that studios, if they don't have a grant of the

10    rights, and if they don't have a freeze on the rights, will    11:26

11    negotiate a first refusal on any utilization of those

12    television rights?

13    A    That's a common provision.

14    Q    Okay.

15              We spoke a lot yesterday and the day before about    11:27

16    comic books and positions of different comic book heroes.

17              Are you a comic book collector?

18    A    I am not a comic book collector.

19    Q    Have you ever been?

20    A    Not really.  I mean, I would occasionally look at the     11:27

21    comics in the daily newspaper, but I wasn't a comic book

22    collector of specific comic books.

23    Q    In connection with your assignment in this matter, sir,

24    did you read any treatises on comic books?

25    A    No, I did not.                                            11:27
```

1   Q    Did you read any historical accounts of the development of

2   the comic book business?

3   A    I certainly examined the utilization of comic books in

4   connection with *Superman* and *Batman* and properties like that,

5   but I didn't read a general treatise about the comic book                11:28

6   business.

7   Q    Putting general treatises aside, what type of publications

8   did you read with respect to *Superman*?

9   A    It wasn't just publications.  I reviewed several times the

10  documentary that was produced by Warner Bros., "Up In The Sky."          11:28

11  I did research on the Internet and read various articles on the

12  Internet.  I found articles in -- I was provided with a bunch

13  of materials that I reviewed, and I found information in, you

14  know, the normal publications that I read.

15          I read the trades every day, and have for 25 years,             11:28

16  so I'm cognizant of this stuff.  Beyond that, I didn't do sorts

17  of -- I didn't intimately become an expert on the history of

18  the comic book business.

19  Q    Have you found that the trade papers have extensive

20  coverage with respect to comic book characters?                          11:29

21  A    Yes.

22  Q    Comic book characters who haven't been incorporated into

23  films or television shows?

24  A    They focus on comic book characters that are incorporated

25  in film or television shows, or Broadway plays.                          11:29

1    Q    What, to the best of your knowledge, was the ranking of

2    *Superman*, in terms of the sales of comic books, in 1972?

3    A    I'm not aware of a year-by-year ranking of comic book

4    sales for *Superman*.  I know that in the aggregate, from 1938

5    through 2002, which is what we would be looking at, that it is          11:30

6    one of, if not "the" top-selling comic book in the history of

7    the world.  That's my understanding.

8          As far as little tranches, little slices, per year,

9    per year, I'm not familiar with those.  And I think, in 2002,

10   if you were to evaluate the value of *Superman* -- if I was         11:30

11   selling *Superman* to a studio, I doubt that they would do the

12   research to know what *Superman* comic sales were in 1972.

13         **MR. BERGMAN:**  Your Honor, move to strike everything

14   after the first sentence, "I'm not aware of a year-by-year

15   ranking of comic book sales for *Superman*."                           11:30

16         **THE COURT:**  There's no foundation thereafter.

17         It's stricken.

18   **BY MR. BERGMAN:**

19   Q    Mr. Halloran, do you have any idea of what the ranking of

20   *Superman* in terms of comic book sales was during the year 1987?     11:31

21   A    Again, you know, I'm -- I was aware of the general success

22   from 1938 to 1987.  I don't have a specific number for 1987.

23   Q    And are you aware of the ranking of *Superman* in comic book

24   sales in the year 1990?

25   A    It's exactly the same answer.  I'm aware of the                   11:31

1    overwhelming success of the comic book sales from 1938 to 1990,

2    but I don't know the specific number for 1990.

3    Q    How many comic book sales has *Superman* made from 1938 to

4    1990?

5    A    I don't know the exact number, but I do know that it is          11:31

6    one of, if not "the" top comic book seller in the history of

7    the world.  That's my understanding.

8           I don't have -- again, you have to look at the

9    history, the aggregate history.  I don't know a per-year comic

10   book sale.                                                            11:32

11          MR. BERGMAN:  Move to strike everything after "I

12   don't know the exact number."

13          THE COURT:  Sustained.

14          That was simply the question, How many comic book

15   sales?                                                                11:32

16          Listen to the question.

17          THE WITNESS:  Okay.

18   BY MR. BERGMAN:

19   Q    Just a couple more, Mr. Halloran.

20   A    Okay.

21   Q    Are you aware of the ranking of *Superman* in terms of

22   comic book sales in the year 2000?

23          MR. TOBEROFF:  Your Honor, this objection, though

24   it's vague and ambiguous, is really asking for clarification.

25   When we speak about *Superman* comic book sales -- we had heard      11:32

```
 1   testimony from Mr. Evanier that the way the comic book industry

 2   looks at it, they look at all Superman derivative comic books,

 3   like Lois Lane, Jimmy Olson, things of that nature.

 4           Is counsel referring to --

 5           THE COURT:  I'll sustain the objection.                11:33

 6           Are you talking about all potentially-derivative

 7   Superman --

 8           MR. BERGMAN:  I'll take them all, Your Honor.

 9           THE COURT:  The whole thing?

10           MR. BERGMAN:  The whole thing.                          11:33

11           THE COURT:  With that clarification, do you know the

12   number?

13           THE WITNESS:  I don't know the exact number, no.

14   BY MR. BERGMAN:

15   Q    Finally, are you aware of the ranking of Superman and all  11:33

16   of the Superman-related comic books in 2002?

17   A    Same answer.  I don't know that exact year, the number.

18   Q    At your deposition, Mr. Halloran, you told me that the

19   studio received a zero share of merchandising under the Ironman

20   agreement.                                                      11:33

21           Do you recall that testimony?

22   A    I don't remember it specifically as we sit here.

23   Q    Let me refer you, sir, to some deposition testimony, and

24   inquire as to whether you recall the question and answer.  I'm

25   referring to Page 249, Lines 3 through 13.                      11:34
```

1   A    I'd like to have reference to the agreement.

2   Q    You want to know what exhibit?

3   A    Yeah, that we're talking about.

4   Q    Okay.  It is Exhibit 1105.

5         You have your chart there, don't you, sir?                    11:34

6   A    I find that the chart is a guideline.  I'd like to look at

7   the specifics of the agreement.

8   Q    Of course.

9         But the chart gives the exhibit number, doesn't it?

10  A    Could you just -- I'm looking for -- I've now found it --     11:35

11  I don't use the chart to find the exhibits.

12        We're talking about the *Ironman* agreement between

13  Marvel and Katja Motion Picture Corp, Exhibit 1105; correct?

14  Q    Correct.  And I'm about to read certain testimony from

15  your deposition and ask if you recall giving it.  Okay?         11:35

16        **THE COURT:**  Proceed, Counsel.

17  **BY MR. BERGMAN:**

18  Q    QUESTION:  "And 25 percent" -- we were talking about the

19  commission on Warner Bros. Consumer Products -- "and 25

20  percent, based on some other agreements that you're familiar    11:35

21  with, is not a very high fee, is it?"

22        ANSWER:  "Well, it's akin to a distribution fee.  And

23  what you have to look at is, what are the aggregate dollars

24  that are sticking to the ribs of Warners?  And in this case,

25  it's 62.5 percent -- can I finish? -- and *Ironman* was zero.  So   11:35

1    you have to look -- you have to look at that fee in the context

2    of the total revenues that are sticking to the ribs of the

3    company."

4    **BY MR. BERGMAN:**

5    Q    Do you recall that question and answer?                    11:36

6    A    I do.

7    Q    Now, am I correct that you refer to the fact that in the

8    *Ironman* agreement, the studio received zero?

9    A    Let me review the agreement.

10        Are you talking about general merchandising of the        11:36

11   *Ironman* character or film-related?

12   Q    Sir, I just read to you a statement where you said "and

13   *Ironman* was zero."

14        What I would like to know is what basis you had for

15   making that statement.                                          11:36

16   A    Well, I'm sorry.  I need to know whether we were talking

17   about nonfilm-related merchandising or merchandising.  It's not

18   clear to me from what you read from the deposition what we were

19   talking about.  And I need to know that to answer the question.

20        **MR. BERGMAN:**  Your Honor, I'm not sure I can explain    11:37

21   to the witness what he meant by what he said.

22        **THE COURT:**  Why don't we provide a copy of the

23   deposition that you just read, so he can see a few paragraphs

24   before and a few paragraphs after, to put it in context.

25        **THE WITNESS:**  That would be appreciated.               11:37

1          (Document is provided.)

2          **MR. BERGMAN:**  Your Honor, may I refer the witness to

3     a specific page to see if we can move this along quicker?

4          **THE WITNESS:**  Well, this is a very, very complicated

5     agreement, so I need to familiarize myself in order to give you

6     an accurate answer.

7     **BY MR. BERGMAN:**

8     Q    Have you looked at 6606?

9     A    Yes, I have.

10    Q    And given the provisions of Subparagraphs 1 and 2 on

11    Page 6606 of Exhibit 1105, is it not untrue that *Ironman* was

12    zero; isn't it a fact that the studio made a share of

13    merchandising in *Ironman*?

14    A    They didn't.

15         **MR. TOBEROFF:**  Objection, Your Honor.  Compound, and

16    vague and ambiguous.

17         **THE COURT:**  Break it up.  Rephrase it.

18    **BY MR. BERGMAN:**

19    Q    Am I correct, Mr. Halloran, that the agreement determines

20    what the lift in merchandising as a result of *Ironman* is?

21    A    When I was talking about *Ironman* in the deposition, I

22    wasn't talking about this agreement.  This agreement expired.

23    The *Ironman* movie was not made based on this agreement.

24         I was talking about *Ironman* that was financed by

25    Marvel and distributed by Paramount.  This is an agreement with

11:40

11:40

11:40

11:41

11:41

```
 1   New Line.  Ironman was never made by New Line.
 2   Q    Is it your testimony, Mr. Halloran, that when you
 3   testified at Page 249, you were not talking about Exhibit 1105?
 4   A    Correct.  I said like Marvel did on Ironman.  I meant the
 5   actually reproduced picture that they self-financed, not the        11:42
 6   agreement with New Line where the option expired.  I know for a
 7   fact that the option has expired, and I know for a fact that
 8   the rights went back to Marvel, and I know for a fact that
 9   Marvel produced the picture based on the rights that reverted
10   back to them under this agreement.                                  11:42
11   Q    Okay.  And under that agreement that you know about, did
12   the studio receive a percentage of merchandising?
13   A    It's my understanding, based on my review of the 10-K from
14   Marvel for 2005, filed in 2006, that they reserved
15   merchandising rights under -- it's my understanding they         11:42
16   reserved merchandising rights under their agreement with
17   Paramount.
18   Q    And you're talking about an Ironman agreement that is not
19   in evidence in this case; correct?
20   A    Yes, I am.                                                     11:43
21   Q    And you're talking about an Ironman agreement that you
22   hadn't reviewed in connection with your report; is that
23   correct?
24   A    I have not had an opportunity -- I had two weeks to look
25   at this mass of documents.  I did look at this, but I              11:43
```

1    subsequently found out that this agreement expired.

2    Q    Yes, sir.  But when you gave your deposition, the only

3    *Ironman* agreement that you had looked at at that point was

4    1105.

5    A    No, no.  That's not true.                                    11:43

6          Well, if you're talking about looking at an

7    agreement, you're right.  But at the time of the deposition, I

8    knew about the *Ironman* -- the Marvel agreement on *Ironman*,

9    where they themselves owned the rights and self-financed.

10   Q    Okay.                                                        11:44

11         Have you read the Steven Sills' audit in this matter?

12   A    I've skimmed it.  I haven't read it in detail.

13   Q    Have you read what Mr. Sills stated following an audit

14   with respect to the amount of money, if any, that Warner Bros.

15   has received from merchandising on *Superman Returns*?           11:44

16         **MR. TOBEROFF:**  Objection.  Vague and ambiguous as to

17   'Have you read the Steven Sills' audit, what Mr. Sills stated?'

18         Is he referring to Mr. Sills' expert report?

19         **MR. BERGMAN:**  I'll rephrase, Your Honor.

20         **THE COURT:**  Why don't you do that.  Good idea.         11:44

21         **MR. TOBEROFF:**  And, also, which report?  Because

22   there were two reports submitted by Mr. Sills.

23         **MR. BERGMAN:**  Okay.

24         **THE COURT:**  Thank you, Counsel.

25   / / /                                                            11:44

BY MR. BERGMAN:

Q    In your Exhibit B, you list two reports by Mr. Sills;

correct?

A    If Exhibit B is the documents that I considered, correct.

Q    Did report number one contain any substantive conclusions?    11:45

A    There were conclusions in that report, yes.  It was, in

effect, an audit report.  So there were conclusions that were

made, in what I saw, yes.

Q    Didn't that report simply state that Mr. Sills couldn't

state an opinion because he had not yet conducted an audit?    11:45

A    Well, I don't have clear exactly in my head number one and

number two.  I'm aware that Warners is alleging that there were

substantial sums generated, but I think what's a little

confusing is, are you talking about DC or Warner?

Q    I'll try to be clearer, Mr. Halloran.    11:45

       Isn't it a fact that Mr. Sills states in his

supplemental report, the one conducted after his audit, that

Warner Bros. received zero from merchandising in connection

with *Superman Returns*?

A    Well, you have to -- I'm going to take you at your word    11:46

that he said that.  But, again, that's --

       THE COURT:  I'm going to stop you.  There's no

foundation.  He doesn't recall whether he read it or not, to

answer your question, based on that.

       Let's move on.    11:46

```
 1              MR. BERGMAN:  Okay.

 2              THE COURT:  You don't recall whether he stated that

 3    or not, because you said you're taking him at his word.

 4              THE WITNESS:  That's correct, Your Honor.

 5              THE COURT:  There's no foundation for the question.   11:46

 6         Let's move along.

 7    BY MR. BERGMAN:

 8    Q    Do you have any information at all, sir, that Warner Bros.

 9    received any money in connection with the merchandising of

10    Superman Returns?                                               11:46

11    A    It is my understanding that DC -- that sums from the

12    film-related merchandising, with respect to Superman Returns,

13    were generated to DC.  I'm not exactly sure what the

14    intercorporate shiftings of that money were.  I'm not familiar

15    with that.                                                      11:47

16    Q    Okay.

17              In your report, sir, you state your belief that the

18    Superman films had a proven track record of success as of 2002;

19    correct?

20    A    That's correct.                                            11:47

21    Q    And you believe that Superman's proven track record of

22    success as of 2002 is one of the things that influenced your

23    opinion that the film deal was not a fair market deal; correct?

24    A    That is correct.

25    Q    In fact, throughout your direct testimony, you kept        11:47
```

1  referring to *Superman*'s proven track record of success;

2  correct?

3  A    I did.  It exists.

4  Q    Let's look at what the track record of *Superman* films in

5  2002 was.                                                              11:48

6        The first *Superman* film was released when, sir?

7  A    In 1978.

8  Q    At the time of your deposition, you thought it was '85 or

9  '86, didn't you?

10 A    I was -- I was just -- as I explained in my deposition, I   11:48

11 was just coming out of *Watchmen*, and I was confusing the dates

12 with the *Watchmen* agreement.  So I was confused about that in

13 the deposition, as I stated in the deposition.

14 Q    Okay.

15       What was the approximate domestic theatrical gross of    11:48

16 *Superman I*?

17 A    Are you talking about then or today's dollars?

18 Q    I'm talking about then, at that time, those dollars.

19 A    My recollection is that -- well, first of all, let's put

20 this in context.  It was the biggest hit of the year.  And it   11:49

21 was -- to my best recollection, it was approximately $140

22 million in domestic box office.  But that's the range.

23       In today's dollars, it would exceed, I think,

24 $400 million.

25 Q    When you say "biggest hit of the year," are you suggesting  11:49

1    that *Superman* was the number one grossing film of 1978?

2    A    If not the top, certainly in the top few.

3    Q    And what is your estimate of the theatrical gross of

4    *Superman II*?

5    A    My recollection is that it decreased by about 20 percent    11:49

6    from *Superman I*, so I think it was in the neighborhood of

7    $104 million domestic box office, in nominal 1978 dollars.

8    Q    Okay.

9          And, once again, at the time of your deposition, you

10   didn't know any of those facts, did you?    11:49

11   A    I knew the facts.  I just wasn't able to spout them off

12   off the top of my head, since I had only been in the case for a

13   short while, and I was sort of suffering from data overload.

14   So I wasn't able to --

15         **THE COURT:**  I know the feeling.    11:50

16         **THE WITNESS:**  But the more important -- well, we'll

17   talk about the concepts.

18   **BY MR. BERGMAN:**

19   Q    And what would be your estimate as to the domestic box

20   office gross of *Superman III*?    11:50

21   A    It was less than *II*.

22   Q    It was much less than *II*, wasn't it?

23   A    I believe it was much less than *II*.  I don't know the

24   exact number.

25   Q    And regarding *Superman IV*, you know that film was    11:50

```
 1   catastrophic, don't you?

 2   A    I believe the revenue was $17.8 million in domestic box

 3   office gross, or something to that effect.  I think we took

 4   judicial notice that it was not a successful film.

 5   Q    So, from I through IV, the pictures kept going down, down,    11:50

 6   down; correct?

 7   A    The domestic box office gross, as was common at the time

 8   when you had sequels, did continue to go down.

 9   Q    In fact, Superman II grossed 62 percent of what number one

10   grossed; correct?                                                 11:51

11          MR. TOBEROFF:  Objection.  Misstates his testimony.

12          THE COURT:  I don't think he's -- you weren't

13   attributing that to the witness, were you?

14          MR. BERGMAN:  No, Your Honor.  I was asking a

15   question.                                                         11:51

16          He had testified 20 percent.  I wanted to clarify

17   that it was closer to 40 percent.

18          THE COURT:  Overruled.

19   BY MR. BERGMAN:

20   Q    Am I correct, sir, that Superman II, the domestic gross      11:51

21   was 62 percent of what number one was?

22   A    Well, my recollection is that the first one was

23   $141 million or so, and the second was, like, $104 million,

24   something like that; so there was a decrease.  I don't know the

25   exact number, but I did testify that it was common at that time   11:52
```

```
 1   for the second picture in a series of sequels to decrease.  The
 2   rule of thumb was, it would go down by a third, and the next
 3   sequel and each succeeding sequel would go down by a third.
 4   Q    You mentioned $101 million on the first picture.
 5        Isn't it true that the domestic box office on number        11:52
 6   one was $79.8 million?
 7        MR. TOBEROFF:  Objection, Your Honor.  Misstates what
 8   he said.  He didn't say $101 million.
 9        THE WITNESS:  Overruled.
10        Do you remember the question?                               11:52
11 BY MR. BERGMAN:
12   Q    Is that correct, sir?  $79.8 million for number one?
13   A    Was that the box office gross?
14   Q    I'm asking you, sir.
15   A    That's not consistent with my testimony before.            11:53
16   Q    Do you understand that number two was $62.7 million?
17        THE WITNESS:  He keeps mixing them up, Your Honor.
18        MR. TOBEROFF:  Objection.  Vague and ambiguous as to
19   what we're actually talking about.
20        Is he talking just strictly film rentals or box            11:53
21   office --
22        THE COURT:  Sustained.
23 BY MR. BERGMAN:
24   Q    I'm sorry.  I thought I had indicated, sir, that I was
25   referring to domestic box office.                               11:53
```

```
 1              Do you understand that, Mr. Halloran?
 2    A    But you're mixing context, and you keep restating numbers
 3    back to me that I don't --
 4              THE COURT:  Let's spell out the questions, Counsel.
 5              MR. BERGMAN:  Thank you.                          11:53
 6    BY MR. BERGMAN:
 7    Q    What is your best understanding, Mr. Halloran, as to the
 8    domestic gross of Superman I?
 9    A    As I stated, I thought it was in the range of $140
10    million.                                                   11:53
11    Q    What is your best understanding, sir, as to the domestic
12    box office of Superman II?
13    A    I remember it decreased by roughly a third, and I believe
14    it was $104 million, in that range.
15    Q    What is your best understanding as to the domestic box    11:54
16    office of Superman III?
17    A    It was less than II, but I don't know the exact number on
18    that.
19    Q    And what is your understanding as to the domestic box
20    office of Superman IV?                                     11:54
21    A    That it was approximately $17.8 million.
22    Q    Do you recall what Superman IV did on its opening weekend?
23    A    No, I do not.
24    Q    Okay.
25              You testified to this trend that you just mentioned,   11:54
```

```
 1   of films going down after the first film to the second film, in

 2   the '70s and '80s.

 3           That happens some of the time; correct?

 4   A    It was -- as I testified, when I was at Universal, that

 5   was the rule of thumb, that we had aggregated from the            11:55

 6   performance of various series of movies.  Obviously, that

 7   changes from film to film.

 8   Q    With numerous exceptions?

 9   A    There are exceptions, but the trend was held to be

10   commonly believed.  And the Superman trend, as I see it,          11:55

11   conformed with that.

12           It was a very different world in 2002 than 1978.

13   Q    What do you recall or believe, if you have any information

14   at all, was the domestic box office of the first Dirty Harry

15   movie in 1971?                                                    11:55

16   A    I don't have a specific recollection of what the  --

17   Q    Do you recall that Dirty Harry II had a domestic box

18   office gross of several times the amount of number one?

19   A    I'm not aware of that.

20   Q    Do you deny it?                                              11:56

21   A    I'm not -- I'm not denying.  I'm unaware of it.

22   Q    Are you aware that the second Lethal Weapon film did about

23   twice, two-and-a-half times what the first Lethal Weapon film

24   did?

25           MR. TOBEROFF:  Objection to this line of questioning.     11:56
```

1    It assumes facts, and it's also not terribly relevant.

2            THE COURT:  It's not terribly relevant, but it's

3    relevant enough.

4            I mean, he's assuming that one did better than the

5    other, but I thought we already heard testimony to that effect.    11:56

6            MR. TOBEROFF:  The question assumes facts as to the

7    actual performance of these various *Dirty Harry* films.  And

8    there's no foundation regarding these films.

9            THE COURT:  Foundation is based on the foundation for

10   all of the other testimony that he's given.    11:57

11           The objection is overruled.

12           You can answer if you can.  If you don't know, that's

13   fine too.

14           THE WITNESS:  Okay.

15           I don't know.    11:57

16   BY MR. BERGMAN:

17   Q    Just to finish this up, let's look at *Die Hard*.

18           Number one, in 1988, did $83 million.

19           Do you have any estimate as to what number two did?

20   A    No.  But *Die Hard* was a successful series of films.  But I    11:57

21   don't have the exact number.

22   Q    In all three of those instances, the second film did

23   better than the first film, didn't it?

24   A    That's -- I don't know those facts.  You're telling me

25   that.  I'm unaware of that.    11:57

```
 1   Q    Okay.

 2          We've discussed before, and you've mentioned, have

 3   you not, how important the opening weekend of a film is in

 4   terms of its subsequent earnings?

 5   A    Yes, I have.                                              11:58

 6   Q    Okay.

 7          Do you have any estimate of what the opening weekend

 8   was for Superman IV on the five-day 4th of July weekend?

 9   A    I have a sense that it was abysmal, but I don't know the

10   exact number.                                                 11:58

11   Q    Am I correct that the five-day 4th of July weekend is

12   about one of the best, if not the best, weekends for film

13   distribution?

14   A    It's hard for me to argue that you're wrong on that.

15   Q    And am I correct that Superman IV, on that five-day      11:58

16   weekend, grossed $5.7 million?

17   A    I don't know the exact number.  That would not be a

18   surprising number, given the overall performance of the film.

19   Q    Do you recall, at the time of your deposition,

20   Mr. Halloran, that you couldn't identify a single superhero   11:59

21   agreement that you had reviewed that was more economically

22   beneficial to the licensor than the film agreement was to DC?

23   A    I think when that was in my head, I wasn't -- I was

24   just -- because you --

25          THE COURT:  The question is whether or not you could   11:59
```

```
 1    identify at your deposition, not whether you can identify now.

 2            THE WITNESS:  Okay.

 3            I couldn't at that time.

 4    BY MR. BERGMAN:

 5    Q    At the present time, having done whatever you've done        12:00

 6    since the time of your deposition, can you identify for me a

 7    single comic superhero agreement that you believe was more

 8    economically beneficial to the licensor than the film agreement

 9    was to DC?

10    A    I believe I testified, when we went through the chart        12:00

11    yesterday, that there were some agreements that would have been

12    more beneficial to DC.

13    Q    What comic superhero agreement do you contend is more

14    beneficial to the licensor than the film agreement is to DC?

15    A    Certainly, the Robotech agreement, which is an agreement     12:01

16    between Warners and Harmony Gold.

17    Q    And is it your belief, Mr. Halloran, that DC would have

18    made more money from Superman Returns under the terms of the

19    Robotech agreement than it did, in fact, make under the terms

20    of the film agreement?                                           12:01

21    A    You're comparing apples and oranges here.

22            I can explain.

23            MR. BERGMAN:  If I may, Your Honor.  Robotech is not

24    a comic superhero agreement, but I'll --

25            THE WITNESS:  You're looking --                          12:02
```

1    **THE COURT:**  Mr. Toberoff will be able to clarify this

2    question in terms of, did one make more money than the other.

3        Give your answer and allow the process to take its

4    course.

5    **THE WITNESS:**  Okay.                                          12:02

6        If you were assessing the potential net present value

7    of the *Superman* agreement and plugging that into the *Robotech*

8    agreement, the *Robotech* agreement is more favorable than the

9    film agreement.

10   **THE COURT:**  We're at the noon hour.  Why don't we go      12:02

11   ahead and take our recess from this trial.  The Court has

12   another matter to call up at this time.

13   **MR. BERGMAN:**  Very well, Your Honor.

14   **THE COURT:**  We'll resume at 1:30, or as soon after as

15   we can.                                                        12:03

16       (A.M. trial session concludes.)

17

18                          CERTIFICATE

19

20   I hereby certify that pursuant to Section 753, Title 28, United
     States Code, the foregoing is a true and correct transcript of
21   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
22   conformance with the regulations of the judicial conference of
     the United States.

23

24   _____           _____
     THERESA A. LANZA, CSR, RPR                    Date
25   Federal Official Court Reporter                              12:03