UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | |
|---|---|
| JOANNE SIEGEL and | ) |
| LAURA SIEGEL LARSON, | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) No. CV 04-08400-SGL |
| | ) |
| WARNER BROTHERS ENTERTAINMENT INC.; | ) |
| TIME WARNER, INC.; DC COMICS; | ) |
| and DOES 1-10, | ) Trial Day 8 |
| Defendants. | ) A.M. Session |
| _____ | ) Pages 973-1047 |

Reporter's Transcript of Court Trial Proceedings

Riverside, California

Friday, May 8, 2009

9:41 A.M.

THERESA A. LANZA, RPR, CSR
Federal Official Court Reporter
3470 12th Street, Rm. 134
Riverside, California  92501
(951) 274-0844
WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2

 3    On Behalf of Plaintiffs:

 4
                            LAW OFFICES OF MARC TOBEROFF
 5                          BY:  Marc Toberoff
                            BY:  Nicholas C. Williamson
 6                          BY:  Keith Adams
                            2049 Century Park East,
 7                          Suite 2720
                            Los Angeles, California  90067
 8                          310-246-3100

 9

10    on behalf of Defendants/Counterclaimant:

11
                            WEISSMANN WOLFF BERGMAN COLEMAN
12                           GRODIN & EVALL LLP
                            BY:  Michael Bergman
13                          BY:  Anjani Mandavia
                            9665 Wilshire Boulevard,
14                          Ninth Floor
                            Beverly Hills, California  90212
15                          310-858-7888

16

17    On Behalf of DC Comics:

18                          PERKINS LAW OFFICE, P.C.
                            BY:  Patrick T. Perkins
19                          1711 Rt. 9D
                            Cold Spring, New York  10516
20                          845-265-2820

21

22

23

24

25
```

```
 1                        I N D E X

 2                                              Page

 3   Plaintiff case (cont'd).......................  976

 4   Defense Case..................................  1015

 5

 6

 7   PLAINTIFF
     WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
 8   MARK HALLORAN (CONT'D)

 9   By Mr. Toberoff                         976

10

11   DEFENSE
     WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
12   PAUL LEVITZ

13   By Mr. Bergman    1015

14

15

16        EXHIBITS          RECEIVED

17        1118              982
          1122              982
18        1123              982
          1124              982
19         325              985
           326              985
20         303              982

21

22

23

24

25
```

```
 1              Riverside, California; Friday, May 8, 2009; 9:41 A.M.

 2                                -oOo-

 3         THE CLERK:  Calling item number one on calendar,

 4   Case Number CV 04-08400-SGL(RZx), Joanne Siegel, et al., versus

 5   Warner Bros. Entertainment Inc., et al.

 6         Counsel, please state your appearances for the

 7   record.

 8              (Counsel state appearances as before.)

 9         THE COURT:  Good morning to you all.

10         Mr. Halloran, good morning.                          09:41

11         THE WITNESS:  Good morning.

12         THE COURT:  Counsel.

13         MR. TOBEROFF:  Thank you, Your Honor.

14         THE CLERK:  Mr. Halloran, please be advised you're

15   still under oath.                                          09:41

16         THE WITNESS:  I acknowledge that.

17                   REDIRECT EXAMINATION (cont'd)

18   BY MR. TOBEROFF:

19   Q   Mr. Halloran, you testified last week that you were aware

20   of the Court's rulings, so far at least, that Action Comics    09:41

21   No. 1 is co-owned by the Siegels and DC, and that

22   notwithstanding the wording of the *Superman* agreement, DC, as

23   co-owner, could only have transferred nonexclusive film and

24   television rights in Action Comics No. 1 to Warner Bros.

25              Did you consider this in writing your expert report?   09:41
```

1              **MR. BERGMAN:**  Objection.  Leading.

2              **THE COURT:**  Overruled.

3              **THE WITNESS:**  Yes, I did.

4    BY MR. TOBEROFF:

5    Q    How much of your report was devoted to this issue?                09:42

6    A    I recall it was about a page of the report.  And,

7    basically, my conclusion was that the fact that the transfer of

8    rights was nonexclusive was not material because of the

9    inability of the Siegels to compete with Warners.

10   Q    Switching to the subject of merchandising, when performing        09:42

11   your analysis of the *Superman* agreements, did you assume that

12   DC and Warner Bros. were acting according to the expressed

13   terms of the agreement in question, or not?

14             **MR. BERGMAN:**  Objection.  Leading.

15             **THE COURT:**  Sustained.                                    09:42

16   BY MR. TOBEROFF:

17   Q    Did you base your analysis on the expressed terms of the

18   agreements?

19   A    Yes, I did.

20   Q    Now, Mr. Bergman repeatedly, when he questioned you, read         09:43

21   into the record that portion of the Court's pretrial conference

22   order that stated, in effect, that the trial is to assess the

23   fair market value of the film and television rights

24   "transferred" by DC to TWEC, Time Warner Entertainment Company,

25   pursuant to the *Superman* agreements.                                 09:43

1          Did DC "transfer" its *Superman* merchandising rights

2    to TWEC in the *Superman* film agreements?

3          **MR. BERGMAN:**  Objection.  Leading.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  No.  It reserved them.                    09:43

6    **BY MR. TOBEROFF:**

7    Q    Under the merchandising terms of the film and TV

8    agreements, is Warner being paid by DC for the use of the

9    title, logo, or any elements from Warner Bros.' *Superman* films?

10         **MR. BERGMAN:**  Objection.  Lack of foundation, and    09:44

11   leading.

12         **THE COURT:**  Sustained.

13   **BY MR. TOBEROFF:**

14   Q    Did you review the *Superman* film and television

15   agreements?                                                    09:44

16   A    Yes, I did.

17   Q    Are you familiar with the merchandising provisions in the

18   *Superman* film and television agreements?

19   A    Yes, I am.

20   Q    Under those merchandising terms, is Warner being paid by  09:44

21   DC for the use of the title, logo, or any elements from

22   Warner Bros.' *Superman* films?

23         **MR. BERGMAN:**  Same objection.  That is leading.

24         **THE COURT:**  You've laid the foundation, but you've

25   turned it from a nonleading question to a leading question.  I  09:44

```
 1   sustaining the objection on foundation before, not leading,

 2   because you did say, "What is your understanding?"  Now you've

 3   turned it into a leading question.  So go back --

 4   BY MR. TOBEROFF:

 5   Q    What is your understanding of those merchandising          09:44

 6   provisions?

 7   A    My understanding is that the basis is that DC reserves the

 8   rights; however, if Warner Bros. chooses to produce either a

 9   film or television program, the merchandising revenue that DC

10   gets from those rights will be -- 50 percent of that will be    09:45

11   paid to Warner Bros.

12   Q    Of the revenues DC receives through Warner Bros.

13   Consumer Products' merchandise licensing, is DC obligated to

14   pay Warner Bros. 50 percent?

15   A    50 percent with respect to so-called film-related          09:45

16   merchandising, yes.

17   Q    Under your reading of the agreement, would this be a cost

18   to DC?

19   A    Yes -- well, "a cost to DC," I'm not quite sure what you

20   mean.                                                           09:45

21   Q    In other words, DC is obligated to pay Warner Bros..

22   A    Yes.  Yes.

23   Q    Is this 50/50 merchandising split for film-related

24   merchandising an unusual provision, in your opinion?

25         MR. BERGMAN:  Objection.  Lack of foundation, and        09:46
```

| | |
|---|---|
| 1 | assumes a fact not in evidence that there was a 50/50 split. |
| 2 | **THE COURT:**  Sustained. |
| 3 | **BY MR. TOBEROFF:** |
| 4 | Q    You just testified to a 50/50 split in the merchandising |
| 5 | agreements that you reviewed. |
| 6 | Is such a split common or uncommon in rights |
| 7 | agreements of this nature? |
| 8 | A    It's common. |
| 9 | Q    Do owners of valuable IP with a prior merchandising track |
| 10 | record sometimes retain a greater than 50 percent portion of |
| 11 | the film-related merchandising, or not? |
| 12 | **MR. BERGMAN:**  Objection.  Leading. |
| 13 | **THE COURT:**  Overruled. |
| 14 | You may answer. |
| 15 | **THE WITNESS:**  Sometimes they do, especially -- |
| 16 | **THE COURT:**  You've answered the question. |
| 17 | **BY MR. TOBEROFF:** |
| 18 | Q    Do you recall, through your review and knowledge of rights |
| 19 | agreements, any examples where greater than 50 percent of |
| 20 | film-related merchandising was retained by a licensor? |
| 21 | A    I believe Hasbro. |
| 22 | Q    Any others? |
| 23 | A    That's the one that I remember. |
| 24 | Q    Would DC receive any boost to its merchandising under the |
| 25 | *Superman* film agreement with Warner Bros. if Warner Bros. never |

09:46

09:46

09:46

09:47

09:47

```
 1   released a Superman film?

 2   A     No.  They would not get a boost.

 3         MR. TOBEROFF:  Thank you.  I have no further

 4   questions at this time.

 5         THE COURT:  Redirect?                                  09:47

 6         MR. BERGMAN:  I have no further questions,

 7   Your Honor.  But I do move that certain exhibits be introduced

 8   into evidence, and those are numbers 1118, 1122, 1123, and

 9   1124.

10         THE COURT:  Any objection?                             09:47

11         MR. TOBEROFF:  If I may just review those exhibits,

12   please.

13         THE COURT:  Sure.

14         (Brief pause.)

15         MR. TOBEROFF:  Your Honor, if I may.                   09:49

16         1118, which is the transcript from the Sahara case,

17   we have no objection to those portions that have been placed

18   into the record; but I believe it should only be in the record

19   for that purpose.

20         THE COURT:  Any other objections?                      09:49

21         MR. TOBEROFF:  1119 --

22         THE COURT:  He didn't ask for 1119.  He said 1118,

23   1122, 1123, and 1124.

24         Correct?

25         MR. BERGMAN:  Correct, Your Honor.                     09:49
```

1              **THE COURT:**  I've already ruled on 1119, I think.

2              **MR. TOBEROFF:**  Thank you, Your Honor.

3         I just need to look at 1123 and 1124, please.

4         (Brief pause.)

5              **MR. TOBEROFF:**  No objection, Your Honor.                    09:51

6              **THE COURT:**  Very good.

7         As far as 1118, only those portions that were read,

8    is that what you're seeking to introduce, or you're seeking to

9    introduce the entire transcript?

10             **MR. BERGMAN:**  That's acceptable, Your Honor.              09:51

11             **THE COURT:**  Very well.

12        You'll work on the redaction thereof.

13        All four are admitted.

14        (Exhibits 1118, 1122, 1123, and 1124 are received.)

15             **MR. TOBEROFF:**  Before we close our portion, I'd like      09:51

16   to address some evidentiary issues on our side as well.

17        We'd like to have admitted into evidence -- I think

18   you've already ruled on 326.

19             **THE COURT:**  What is 326?

20             **MR. TOBEROFF:**  The *Rainbow Six* agreement,               09:51

21   Exhibit 326.  We'd like that to be admitted into evidence.

22        And Exhibit 327 and Exhibit 325.

23             **THE COURT:**  Any others?

24             **MR. TOBEROFF:**  The documentary, the Warner Bros./DC

25   documentary, "Look Up In The Sky."                                     09:52

1          **THE COURT:**  And what number is that?

2          **MR. TOBEROFF:**  Exhibit 303, Your Honor.

3          **THE COURT:**  Any other exhibits?

4          **MR. TOBEROFF:**  Yes, Your Honor.

5          Pursuant to Paragraph 13 of the Court's schedule

6    order, the parties submitted a joint exhibit stipulation on

7    January 13th.  All exhibits to which there is no objection

8    should be deemed admitted.  We want to confirm on the record

9    that all of plaintiffs' exhibits in the stipulation, to which

10   defendants did not object, are, indeed, admitted.

11         **THE COURT:**  Well, if they're set forth in the

12   stipulation, then they are admitted, yes.

13         All right.

14         With respect to 326, 327, 325, and 303, are there any

15   objections?

16         **MR. PERKINS:**  Yes, Your Honor.

17         With respect to 327, which is the *Red Rabbit*

18   agreement, this suffers from the same defect as

19   *The Sum of All Fears* agreement.  Paragraph 1.4 of that

20   agreement makes reference to agreements for *The Hunt for Red*

21   *October*, *Clear and Present Danger* --

22         **THE COURT:**  Why don't you approach the lectern.

23         **MR. PERKINS:**  Paragraph 1.4, Exhibit 327, has the

24   same defect as *The Sum of All Fears* agreement.  It refers to

25   prior agreements that are not in the record.  And, therefore,

09:52

09:53

09:53

09:53

09:54

1    it's incomplete.

2          THE COURT:  Does it incorporate those agreements in

3    the same fashion as *The Sum of All Fears* agreement?

4          MR. PERKINS:  It does, Your Honor.  Paragraph 1.4 --

5    and I'll read it to the Court slowly -- "PPC shall retain its          09:54

6    right pursuant to the prior agreements to produce

7    studio-generated sequels, but PPC shall not initiate or develop

8    any studio-generated sequel, i.e. any theatrical or television

9    motion picture, using characters or materials from the novels

10   *The Hunt for Red October*, *Clear and Present Danger*,               09:54

11   *Patriot Games*, *The Sum of All Fears*, or the work or the motion

12   pictures produced by PPC based thereon, but not following the

13   same story line while PPC is actively developing as such term

14   applies."

15          It then goes on to make reference in Paragraph 3.1,            09:54

16   in talking about the "adjusted gross receipts" definition, 3.1,

17   at Pages 5 and 6 -- it says -- and I'll quote the bottom of the

18   page, "Adjusted gross receipts payable at any time prior to

19   cash-break even, as such term is defined in the agreement made

20   on November 18, 1998, between PPC and Jack Ryan Enterprises,          09:55

21   Limited, relating to the motion picture project *The Sum of All

22   Fears*, and which definition is calculated with no distribution

23   fee," and so on.

24          THE COURT:  Well, the first quote you made just made

25   reference to the movies without incorporating anything, but the      09:55

1    second one does seem to incorporate the prior agreements.

2            I'll hear from the plaintiff on this.

3            Did you have any other objections to any of the other

4    documents?

5            **MR. PERKINS:**  I did, actually, Your Honor.                    09:55

6            **THE COURT:**  Let's get them all.

7            **MR. PERKINS:**  Exhibit 303, which is the documentary,

8    we object to the admission of that document, except for the

9    portion that was played for Mr. Levitz during his testimony.

10   It's a hearsay document, Your Honor; and although Warner Bros.   09:56

11   was the producer, it is not the speaker of the commentary

12   that's in that actual document.

13           **THE COURT:**  Very well.

14           Any other objections?

15           **MR. PERKINS:**  No, Your Honor.                         09:56

16           **THE COURT:**  Very well.

17           325 and 326 are admitted.

18           (Exhibits 325 and 326 are received.)

19           **THE COURT:**  Let me hear from the plaintiff on the

20   other two objections.                                            09:56

21           **MR. TOBEROFF:**  Regarding 327, this whole paragraph, I

22   understand from the Court, the Court just said that the issue

23   is 3.1 it does refer to *The Sum of All Fears* agreement, but we

24   now have *The Sum of All Fears* agreement.

25           **THE COURT:**  I excluded *The Sum of All Fears* agreement   09:56

1    at your request.

2         **MR. TOBEROFF:**  No.  Respectfully, Your Honor --

3         **THE COURT:**  Did I not?

4         **MR. TOBEROFF:**  -- I believe you admitted it for the

5    purpose of looking at a particular provision.  There was a

6    particular definition provision that you admitted in

7    *The Sum of All Fears* agreement.  And I would say that if the --

8    since we now have *The Sum All of Fears* agreement -- and this is

9    only a single provision among multiple provisions in this

10   agreement which we're primarily looking to for the basic deal

11   terms -- that any alleged incompleteness would be resolved by

12   the fact that we now have *The Sum of All Fears* agreement.

13        **THE COURT:**  What was the agreement that we kept out

14   yesterday morning?

15        **MR. PERKINS:**  *The Sum of All Fears*, Your Honor.

16        **THE COURT:**  I thought so.

17        **MR. TOBEROFF:**  You admitted it for the purpose of the

18   "GRP" definition, I believe, that's in *The Sum of All Fears*.

19        May I read from the transcript?

20        **THE COURT:**  Please.

21        Refresh my recollection.

22        **MR. TOBEROFF:**  (Reading.)  "Perhaps the best thing is

23   to permit Exhibit 1119 to be introduced for the purpose of

24   providing the definitions being referred to therein, but not

25   permitted to be introduced for the purpose of evaluating the

```
 1   overall agreement, because that's what I'm not clear that I
 2   have before me, is the overall agreement."
 3           THE COURT:  Counsel?
 4           MR. PERKINS:  Your Honor, that was your ruling.  I
 5   don't know that the same provisions match up here.  I don't
 6   think there's been an evidentiary showing of that.  He had the
 7   witness --
 8           THE COURT:  That was my final ruling on that?
 9           MR. PERKINS:  Your Honor also allowed us to come back
10   if we found something in the agreement to reargue this.
11           THE COURT:  Well, neither side has moved 1119 into
12   evidence, that I've heard.
13           Warner Bros. moved 1118, 1122, 1123, and 1124, and
14   all of the ones that are stipulated to.
15           You moved 326, 327, 325, and 303.
16           MR. TOBEROFF:  If it would help, I would move 1119
17   into evidence.
18           I understand that we opposed the subpoena in the
19   process, but now that defendants have brought it in front of
20   the Court, I believe we're entitled to use it in the case.
21           I don't believe that this reference renders this
22   agreement incomprehensible.  It might go to the weight --
23           THE COURT:  That was their argument yesterday,
24   Counsel, that the references and the incorporations didn't
25   render the agreement incomprehensible either.
```

09:58

09:58

09:59

09:59

09:59

1     **MR. TOBEROFF:**  I never argued the incomprehensible of

2  the agreement.  They accused me of withholding *The Sum of All*

3  *Fears* because they claimed that it wasn't good for our case,

4  which is not true.  And I merely explained that I didn't use

5  it.  Because unlike the other agreement that makes reference,

6  it amends a number of -- it speaks that it amends a number of

7  agreements, so I thought it was problematic to that extent.

8          But I would move that it be admitted solely for

9  purposes of being able to refer to any paragraphs that are

10  referred to in another agreement, not for purposes of its

11  financial terms.

12          **THE COURT:**  I'm going to take another look -- I'm

13  going to have to hold off on this.  I want to take a look at

14  the transcript, because I don't remember letting in 1119 for --

15  I know we discussed that at some point, but let me take a look

16  at where we are on that.  Otherwise, it's kind of a

17  goosey-gander rule here that may keep this one out.

18          As far as the tape, 303, your response there?

19          **MR. TOBEROFF:**  My response is that the defendants' --

20  admission of a party opponent -- that the defendants'

21  fingerprints are all over it.  They financed it; they

22  distributed it.

23          **THE COURT:**  It comes in.  I think I already overruled

24  the hearsay objection on that.

25          The question is whether it's the portions that you

09:59

10:00

10:00

10:00

10:00

10:01

1    played, as opposed to portions that you didn't play.

2           MR. TOBEROFF:  And I'm addressing the entire

3    documentary.  I believe it should come in so that one can see

4    the history of *Superman* in context of the dip in the 1970's in

5    the portion that we played, because at issue in this case as

6    well is that they claim that in the late '90s, *Superman* was a

7    dying character due to the fact that the final film is --

8    people take pleasure in recognizing *Superman IV* as a flop.  So

9    their fingerprints are all over it.  It's an admission of a

10   party opponent, and it should come in.

11          In addition, Mr. Levitz was interviewed in that.

12   Mr. Wade, their expert, was interviewed in that.  The whole

13   thing is an admission of a party opponent.

14          **THE COURT:**  Very well.

15          Did you have something further on this 1119, Counsel?

16          **MR. ADAMS:**  Yes, Your Honor.

17          Before the break, you said, "I'm permitting it for

18   the limited purpose to the extent that this is referred to, but

19   we're not going to use this as a basis for the Court's ruling.

20   Move along."  And then a recess was held.

21          **THE COURT:**  So, then, the agreement is not in in its

22   entirety.

23          **MR. TOBEROFF:**  *The Sum of All Fears* agreement.

24          **THE COURT:**  Right.

25          **MR. TOBEROFF:**  And I would ask that it's in solely

10:01
10:01
10:01
10:02
10:02

1   for reference purposes, and since we can make reference, the

2   other agreement, 326, should be admitted, because it's not

3   incomplete, since we can make reference to *The Sum of All Fears*

4   agreement.  That would be our position.

5           **THE COURT:**  Very good.                                    10:02

6           Is there anything further on the 303?

7           **MR. PERKINS:**  Yes, Your Honor.

8               There is no evidence in the record from any competent

9   witness that, quote, unquote, "DC's fingerprints are all over

10  that documentary."  That just simply is not the case.  There    10:02

11  was no foundation laid for that.  And that does not make it a

12  statement of a party opponent.  If a studio produces a

13  documentary, the statements in the documentary do not become

14  the statements of the studio.

15          **THE COURT:**  What about statements by the president of  10:03

16  DC Comics in the documentary?

17          **MR. PERKINS:**  Absolutely, Your Honor.  We don't

18  dispute that, which is why we're not seeking to exclude the

19  portion where Mr. Levitz was interviewed, his words.  What we

20  object to is the narration that's being attributed to the       10:03

21  defendants, which we think there's been no foundation for that;

22  and it's frankly not accurate.

23          **THE COURT:**  Yes?

24          **MR. TOBEROFF:**  I'd like to read from a portion of

25  Mr. Levitz's deposition regarding this -- it's from the trial    10:03

1   transcript, at 224, Line 11, to 225, to Line 15:

2           QUESTION: " I'd like to show you what was previously

3   marked for identification only as Exhibit 303.  This

4   documentary traces the history of Superman from its origin,

5   from the 1930s up through 2006, with respect to the                    10:04

6   *Superman Returns* movie; correct?"

7           ANSWER:  "I believe so."

8           QUESTION:  "And DC provided information regarding

9   Superman and also provided Superman materials to the filmmakers

10  who made this documentary; correct?"                                    10:04

11          ANSWER:  "Yes."

12          QUESTION:  And DC and Warner Bros.' logo appears on

13  the DVD of this documentary."

14          ANSWER:  "I would assume so.  Yep."

15          QUESTION:  "And DC was provided with rough cuts of         10:04

16  this documentary to review it for accuracy before it was

17  finalized; correct?"

18          ANSWER:  "We would be reviewing it for our brand

19  management process, which would address how we wanted the

20  materials to be portrayed."                                             10:05

21          QUESTION:  "The documentary was financed by

22  Warner Bros."

23          ANSWER:  "Technically, I believe it might have been

24  financed by Warner Bros. Home Video -- excuse me -- Warner Home

25  Video, with one of its corporate entities, rather than Warner          10:05

1    Bros. Pictures or Warner Bros. corporately.  But I'm not sure."

2          QUESTION:  "This Superman documentary was also

3    distributed by Warner Bros.?"

4          ANSWER:  "I believe the principal distribution of it

5    was home video distribution."    10:05

6        **THE COURT:**  All right.  This is what I'm going to do:

7    I'm going to sustain the objection to 327.  I'm going to

8    overrule the objections to 326, 325, and 303.

9          Certainly, in reviewing the documentary, if the Court

10    cannot attribute any particular statements made in the    10:05

11    documentary to anybody, that will go to the weight of the

12    evidence in a very substantial way.  But I think it's probably

13    best just to introduce the entire documentary, and then let

14    both sides argue as to what weight the Court should assign to

15    various statements made in the course of the documentary.    10:06

16          (Exhibit 303 is received.)

17        **MR. PERKINS:**  Thank you, Your Honor.

18        **THE COURT:**  I'm going to keep 327 out.  I'll sustain

19    the objection on that.

20          Any further questions of this witness?    10:06

21        **MR. TOBEROFF:**  No, Your Honor.

22          Just one last housekeeping matter.

23        **THE COURT:**  Okay.

24        **MR. TOBEROFF:**  I'm referring to the stipulated facts

25    appearing on Page 4, Line 16, to Page 7, Line 18, Facts 18    10:06

1    through 52 from the final pretrial conference order.  I'd like

2    to move that those facts be stipulated without objection.

3    There are certain objections that were made.  They simply go to

4    the corporate relationship and the fact that DC was owned

5    directly and indirectly by TWEC at the time the agreements in          10:07

6    question were entered into.

7            **THE COURT:**  What page of the pretrial conference

8    order?

9            **MR. TOBEROFF:**  Page 4, Line 16, through Page 7,

10   Line 18.                                                               10:07

11           **THE COURT:**  Does this relate to this witness?

12           **MR. TOBEROFF:**  It's before we close our

13   case-in-chief.

14           **THE COURT:**  Okay.

15           "The following facts so stipulated shall be without        10:07

16   prejudice to any evidentiary objection."

17           Okay.  So there's no dispute between the parties as

18   to these facts.  I take it both sides -- the way I read this

19   was that both sides were reserving potential objections to

20   these facts.                                                          10:08

21           **MR. TOBEROFF:**  That's correct.  That's why I'm

22   bringing it up.

23           **THE COURT:**  And you want to introduce all of them,

24   labeled Paragraphs 18 through 52, on Pages 4 through 7; is that

25   correct?                                                              10:08

 1          **MR. TOBEROFF:**  Yes.

 2          **THE COURT:**  So I guess what we would do at this point

 3   is give Warner Bros. an opportunity to object to any of these,

 4   because you've stipulated to the facts; you reserved your

 5   objections.

 6          I know there's a lot of facts, so take your time to

 7   go through them, please.

 8          **MR. PERKINS:**  Thank you, Your Honor.

 9          **MR. TOBEROFF:**  Your Honor, we have no further

10   questions of Mr. Halloran.  You had asked me if this has to do

11   with Mr. Halloran.

12          **THE COURT:**  You may step down.

13          **THE WITNESS:**  Thank you, Your Honor.  It's been a

14   pleasure.

15          **MR. TOBEROFF:**  Thank you, Your Honor.

16          (Brief pause.)

17          **MR. PERKINS:**  Your Honor, we've reviewed these, and

18   we have no objection, except for Paragraphs 41, 46, and 47.

19   These are three stipulated facts that reference the *Matrix*

20   motion pictures.  We object on relevance grounds.  There's been

21   no testimony in plaintiffs' direct case regarding those.

22          **THE COURT:**  Very well.

23          **MR. TOBEROFF:**  We don't need those facts.

24          **THE COURT:**  Very well.

25          Then all are stipulated, except 41, 46, and 47 are

10:08

10:09

10:09

10:11

10:11

1   out.

2          Very well.

3          The plaintiffs' next witness?

4          **MR. TOBEROFF:**  Plaintiffs rest, Your Honor.

5          **THE COURT:**  Very well.                           10:11

6          Defense's first witness?

7          **MR. PERKINS:**  Your Honor, before calling our first

8   witness, defendants at this time would like to make a motion

9   for judgment on partial findings pursuant to Federal Rule

10  52(c).                                                      10:12

11         We would move specifically as to the following:

12         First, that Time Warner, Inc., be dismissed from the

13  case.  There has been no evidence as to any contract to which

14  it was a party.

15         We would move for judgment, Your Honor, as to the     10:12

16  animation agreements.  There has been no evidence adduced of

17  the fair market value of the nonexclusive rights at issue for

18  animation, let alone a showing that the animation agreements

19  were not for fair market value.

20         **THE COURT:**  That would be what you'd be asking the  10:13

21  Court to find, that there's no evidence -- that they're not for

22  fair market value?

23         **MR. PERKINS:**  Correct.

24         **THE COURT:**  Right.

25         **MR. PERKINS:**  We would make the same motion with    10:13

1   respect to the television agreement, that there has been no

2   showing that there was no fair market value for the

3   nonexclusive television rights granted thereunder.

4          And we would make the same motion with respect to the

5   film agreement, that there has been no showing that we did not          10:13

6   receive fair market value for the nonexclusive film rights that

7   were granted.

8          **THE COURT:**  Thank you, Counsel.

9          **MR. PERKINS:**  Thank you, Your Honor.

10         **THE COURT:**  Mr. Toberoff?          10:13

11         **MR. TOBEROFF:**  Regarding Time Warner, Your Honor, we

12   haven't -- I understand their argument -- we haven't heard all

13   of the evidence, and we haven't heard all of it in the process

14   of cross-examining their witnesses.  Evidence may be elicited

15   as to how and to what extent Time Warner is involved.          10:14

16         **THE COURT:**  That's not the standard, Counsel.

17         Your case is done.  You just rested.  Your case is

18   done.  We could walk away right now.  The question is, walking

19   away right now, you have to establish, as the plaintiff,

20   certain elements with respect to this.          10:14

21         **MR. TOBEROFF:**  I understand.

22         **THE COURT:**  Obviously, the Court will consider any

23   evidence, but Warner Bros. could walk out of the courtroom

24   right now.  That's what they're saying, that if they walked

25   away right now, is there sufficient evidence?          10:14

1           Start with the first one.

2           Time Warner International.

3           **MR. TOBEROFF:**  I understand.

4           As you know, the heart of plaintiffs' case is a claim

5    for declaratory relief.  And declaratory relief claims are                10:14

6    viewed quite broadly, and they encompass -- the claim would not

7    only encompass what Warner Bros. and DC are currently doing,

8    but I believe any ruling should encompass and limit what

9    Warner Bros. and DC can do in the future.

10           For instance, if you found that the covenant             10:15

11   agreement was for -- one of the covenant agreements was for

12   fair market value, since DC, Warner Bros., and Time Warner --

13   they're all part of Time Warner -- we would ask for a ruling in

14   the case that they could not, within the Time Warner family,

15   change the elements of those agreements in such a way to             10:15

16   further dilute --

17           **THE COURT:**  What I'm looking for right now, Counsel,

18   is -- point to the Court to evidence in this trial that

19   supports your contentions with respect to the four areas that

20   the defense has sought partial judgment on.                          10:15

21           **MR. TOBEROFF:**  I understand.  But what I'm arguing

22   is, the evidence that we present in this case would be viewed

23   in the context of our pleadings and the ultimate relief in this

24   case; and if Time Warner is let out in the case, there would be

25   a gap in any ultimate rulings by the Court, because the parties      10:16

1    are all part of Time Warner.  And the evidence has shown that

2    the parties are vertically integrated as part of the

3    Time Warner family.

4            **THE COURT:**  What evidence is that?

5            **MR. TOBEROFF:**  That they are part of the Time Warner    10:16

6    family?

7            **THE COURT:**  Yes.

8            **MR. TOBEROFF:**  They just stipulated to it.  The

9    stipulated evidence shows that these parties are owned,

10   indirectly owned, but they're owned by Time Warner.    10:16

11           **THE COURT:**  Now you're making an argument, Counsel,

12   citing evidence in this case.

13           **MR. TOBEROFF:**  Thank you, Your Honor.

14           I believe that if Time Warner is let out, there would

15   be a hole in the effectiveness of any rulings of the Court,    10:16

16   because it's been established that the companies are owned by

17   Time Warner and are integrated within the Time Warner

18   conglomerate.

19           **THE COURT:**  Anything further on this point, Counsel?

20           **MR. TOBEROFF:**  That's the gist of it, Your Honor.    10:17

21           **THE COURT:**  Okay.

22           Anything on the second point, with respect to the

23   animation agreements?

24           **MR. TOBEROFF:**  The animation agreements, there has

25   been -- first of all, the animation agreements themselves are    10:17

 1    admitted into evidence.  The animation agreements show that

 2    there are very small amounts of money paid to DC under the

 3    animation agreements.  The agreements, to a large degree, speak

 4    for themselves.  They also show that the agreements are

 5    weighted heavily to DC's contingent compensation, but that that        10:17

 6    contingent compensation, which is roughly 30 percent of defined

 7    proceeds -- the evidence has shown that "defined proceeds" is a

 8    fancy name for what used to be called "net profits," which are

 9    the net profits that received such a bad reputation, because

10    they rarely, if ever, result in any money to the participant        10:18

11    due to the way they're defined.

12         Mr. Halloran did give testimony as to that specific

13    point, so there is record evidence, in terms of the agreement

14    itself, that the terms of the animation agreements are not

15    favorable to DC, are detrimental to DC, to the benefit of        10:18

16    Warner Bros.

17         Similarly, with respect to the TV agreements, the

18    agreements themselves are in the record.  The live-action

19    television agreement of the *Smallville* television agreement,

20    the testimony has shown that that agreement is weighted, as        10:18

21    well, towards a contingent participation of 3 percent, going to

22    5 percent of the gross; that the film agreement and the freeze

23    on television and the film agreement, which -- we've also

24    introduced evidence in the film agreement where -- and pointed

25    to the paragraph in the film agreement which essentially        10:19

freezes all TV rights for the remaining life of the copyright

at that time, 34 years, and with no obligation to exploit the

TV rights.  So, even though under the TV agreement, the rights

would come back after *Smallville*, DC could not exploit those

rights unless Warner Bros. felt like doing another TV series.          10:20

And they're not obligated to do another TV series.  So, in many

respects, the TV provisions in the film agreement hang like a

dark cloud over the TV agreement.

        In addition, we've submitted evidence of the

*Birds of Prey* agreement, which is in the record.  And the          10:20

*Birds of Prey* agreement -- again, using the analogy, if you

have a hundred people at a cocktail party, every single one

would know *Superman* and the story; it's doubtful how many

people would even have heard of *Birds of Prey.*  Yet,

*Birds of Prey,* we showed, received the exact same contingent          10:20

gross participation as what we would view as a much more

valuable property, *Superman*.

        When a much lesser property receives the same

compensation as a much more valuable property, the inference is

that the valuable property did not get fair market value.          10:21

        We also have in evidence the *Superboy* agreement.  The

*Superboy* agreement is interesting, because it's a true

third-party agreement, and it's between DC and one of the

Salkind companies.  Excuse me, I'm not -- I don't have the name

of the company; I'm not positive it's one of the Salkind          10:21

1    companies.  I believe it was one of the many Salkind companies.

2         The *Superboy* agreement was entered into in the

3    1980's, when superheroes were not hot entertainment properties

4    the way they were in 2001 when the *Smallville* agreement was

5    entered into.  Yet, the *Superboy* agreement provides a gross          10:22

6    participation -- not of 3 percent, going to 5 percent of

7    worldwide gross -- it provides a gross participation of

8    7½ percent of domestic gross.  And we heard testimony that at

9    that time, foreign revenues accounted for less than a third of

10   worldwide revenues.  And from there, our expert articulated         10:22

11   that the 7½ percent of worldwide gross in the *Superboy*

12   agreement is comparable to roughly 6 percent, nearly double the

13   3 percent, up to $1.5 million.

14        On the TV side, we also heard evidence from the

15   witness that much of defendants' case is based on                   10:23

16   nonexclusivity, and we heard repeated evidence that although

17   Action Comics No. 1 is nonexclusive, that due to plaintiffs

18   inability to effectively compete without foreign rights -- and

19   you get people to finance a movie of the week, or any other

20   television exploitation, that there's no -- the devaluation of       10:23

21   the television agreement due to plaintiffs' inability to

22   effectively compete.

23        We also heard evidence that, like in the film

24   agreement, where defendants simply adopted, in a rather

25   perfunctory manner, the basic deal points of a 1974               10:24

1    agreement -- that with the TV agreement, there was a similar

2    casual and perfunctory negotiation, where I established with

3    Mr. Levitz's testimony that they simply Xeroxed a 1991

4    agreement relating to Lois & Clark, where two points are of

5    interest; one, the fact that they didn't actively negotiate        10:24

6    something and just use the prior agreement, it's rather

7    perfunctory; and, two, that the parties adopted an agreement

8    from 1991, where we presented evidence to show that in 1991,

9    superheroes, as a valuable commodity in Hollywood, had not

10   reached the point as in 2001, after very successful films like     10:25

11   *Men in Black* and *X-Men* had come out.

12           **THE COURT:**  Anything further, Counsel?

13           **MR. TOBEROFF:**  Just in addition on the nonexclusivity

14   issue, as with regard to TV and film as well, we heard evidence

15   that due to the -- and the document speaks for itself -- that      10:25

16   due to DC's warranty and indemnification, it held exclusive

17   rights to Warner Bros., and that after the termination, to the

18   extent Warner did receive any less value or damage by the

19   termination, DC has essentially provided the economic

20   equivalent to Warner Bros. of exclusivity by warranting and        10:26

21   prompting to indemnify them for any loss or damage for anything

22   less than exclusivity.

23           Moving on to the film agreement, the record is filled

24   with evidence regarding the fact that the film agreement was

25   really not for fair market value.  We have evidence -- well,       10:26

1   first in this task, we looked towards the question of, How do

2   you value *Superman*?  We know it's very famous; we know it's

3   been around for a long time; but how do you value it?

4       And to aid the Court in that evaluation, we heard

5   expert testimony, from both Mark Evanier and from Mr. Halloran,          10:27

6   that there was a convergence of several important trends in

7   2002:  The rise of franchise motion pictures, the rise of

8   tent pole pictures, the importance of what is called

9   pre-awareness or branded properties, so as to ensure a large

10  opening weekend and how that large opening weekend of a film is          10:27

11  seen as a barometer for the success of the film, being able to

12  open big, and how that pre-awareness is so important for that.

13      We additionally had extensive evidence that in 2002,

14  comic book properties had really become a hot commodity in

15  Hollywood.  I think that's fairly incontrovertible.                      10:28

16      We also supplied evidence that by comparison, in

17  1974, when they simply adopted the economic terms of the 1974

18  agreement, even Warner Communications, which owned DC, had no

19  interest whatsoever in exploiting *Superman*.  They didn't even

20  have interest in exploiting *Batman*.  We established that as            10:28

21  well.  So DC went and made a deal with a third party.

22      Now we're in 2002, where every studio in town was

23  developing comic book properties.  They simply adopt terms from

24  the 1974 agreement, where we presented evidence that *Superman*

25  was at its lowest point on the nadir in its commercial history.          10:28

1    We've also shown that the fact that the *Superman*

2 film, the first one, did extraordinarily well and was widely

3 recognized as a big hit -- the fact that the second, third, and

4 then the fourth declined did not devalue the property

5 significantly, because we showed that the same thing happened          10:29

6 roughly with *Batman*.  And Warner Bros. has essentially taken

7 the position with these projects, even if they decline, part of

8 the value of a Superman or a Batman is that they can be

9 rebooted, because the pre-awareness is so strong and such a

10 part of our public consciousness that they can be rebooted and         10:29

11 re exploited; and that, in fact, goes to their value.

12      Warner Bros. very successfully rebooted Batman, in a

13 film called *Batman Begins* in 2005; and then *The Dark Knight,*

14 which was a huge success.  And their intention in 2002, when

15 they made the film agreement, was to reboot Superman.  And the         10:30

16 evidence shows -- Alan Horn -- that they plowed millions of

17 dollars into development.  We showed, in fact, that they had

18 started developing the project in 1994.  And there's evidence

19 in the record of scripts that were written for Warner Bros. in

20 1994.  So, from 1994 to 2006, they plowed millions into a              10:30

21 property which they now claim was a devalued or a dying

22 character, and proceeded to spend -- our evidence is

23 approximately $400 million.  You don't do that with a property

24 that you think is in decline and not valuable.  You do that

25 with a property that you think has tremendous pre-awareness.           10:30

1    When you put $400 million into something, you expect to make a

2    big property.  So they were betting heavily on *Superman*, which

3    is a recognition that when they entered into the transaction in

4    2002, they greatly valued it, for the reasons we've mentioned.

5           We also have in the record -- not one, not two, but                10:31

6    multiple agreements for properties, unlike *Superman*, where you

7    have $1.5 million up front, you have multimillion-dollar

8    purchase prices.  Holders of high-level intellectual property,

9    we've shown by the evidence, not only want a lot of money for

10   their properties, they don't want to mess around with options        10:31

11   and what we've described as "development hell".  They want a

12   commitment; they want a guarantee that they will receive money

13   for their valuable property.  And these agreements show $6

14   million, $7 million, $10 million up front for properties.

15          You don't have to be an expert to look at those                10:31

16   properties and recognize that a single novel, even by a

17   well-known author, is less valuable than Superman that has such

18   strong branded pre-awareness and a consistent track record in

19   merchandising, radio, film, television, for 70 years.  You

20   don't have to be an expert to realize that.  Yet, we have            10:32

21   expert testimony as to each of these various properties and as

22   to the properties that defendants are using in their

23   comparison.

24          So we have effectively shown that if we come forth

25   with multiple agreements, where the properties are valuable --       10:32

```
1   we don't dispute that Hannibal is valuable.  We don't dispute a
2   Tom Clancy novel is valuable.  But if you come forward with
3   agreements that are of equal value or a lesser value than
4   Superman, with much better terms, that is evidence that the
5   terms of the Superman film agreement was not for fair market     10:32
6   value.  And we've done that.  And the key points are --
7   reversion is a key point, locking up the property for 34 years.
8   But we must not forget that we also have strong evidence that
9   we have contingent compensation that is double and more,
10  10 percent, and in some cases, the Timeline agreement, going to  10:33
11  20 percent.  We have up-front payments, as I said, of $10
12  million or $7 million.
13         When you combine the evidence with the fact that they
14  essentially use the economic terms for a 1974 agreement, when
15  Superman was at its low point, and use that, oddly, at a time    10:33
16  when Superman was at its high point, and you combine that with
17  the agreements that have been negotiated in the open market,
18  and then you take into consideration that the agreement they
19  entered into in a rather perfunctory fashion was in the context
20  of a vertically-integrated relationship, where DC was            10:34
21  essentially negotiating with its owner, you have a situation
22  that, to me, screams that this was not a fair market deal, when
23  judged in terms of the deals that are entered into in the open
24  market.
25         And the agreements that are in the record, which          10:34
```

1  Your Honor will see in the record, they have -- when you look

2  at them and you look at the detail in which the terms have been

3  negotiated, and you look at all of the provisions -- and

4  they're very complicated -- which are essentially meant to stop

5  the studio from taking advantage of the rights holders and to          10:34

6  protect the rights holders' interest, and to protect creative

7  controls, which go to economic interest when you're dealing

8  with a pre-banded property, and to make sure that they are paid

9  on time, and audit provisions that are exercised --

10         All of the things that go into an arm's length              10:35

11  agreement, they have a -- I don't know what the word is -- a

12  smell to them of highly-negotiated, arm's length, fair market

13  deals.  The properties have been put up in the open market.

14  They've negotiated.  Both parties have the ability to say no,

15  to walk away.  The agreements have that kind of                     10:35

16  fully-negotiated smell to them.

17         When you look at the *Superman* film agreements and the

18  *Superman* television agreements, they have a completely

19  different smell.  And I don't believe that -- I believe that

20  this is clear from what we've shown in the record.  Certainly,      10:35

21  it doesn't support the motion -- the evidence certainly defeats

22  the motion by defendants at this time.

23             **THE COURT:**  Thank you, Counsel.

24         Any further response?

25             **MR. PERKINS:**  Thank you, Your Honor.                  10:36

```
 1              Going back to Time Warner, Inc., for a moment,

 2    Time Warner, Inc., is a defendant in this case solely by virtue

 3    of an alter-ego claim that was made.  And the Court effectively

 4    disposed of the alter-ego claim on summary judgment.  In lieu

 5    of that, it made a finding that there was a concern,                    10:36

 6    specifically about the fair market value of these agreements

 7    that had been entered into, which is why this portion of the

 8    trial is going forward.

 9              It's clear, Your Honor, that the plaintiffs have

10    shown no evidence that Time Warner, Inc., belongs in this case.         10:36

11    There's no evidence that they are a party to any of these

12    agreements.

13              It appears that the plaintiffs are seeking --

14         THE COURT:  What specifically are you asking, though,

15    Counsel?  Are you suggesting that they have no portion in this          10:36

16    particular aspect of the case, or the entire case?

17         MR. PERKINS:  I think the entire case, Your Honor,

18    because Your Honor's summary judgment ruling made it clear --

19    there was a footnote in that ruling that made it clear that

20    there's been no evidence shown that they really belong in the          10:37

21    case.  And the only way that Time Warner -- and, frankly,

22    Warner Bros. -- belongs in the case is if Your Honor finds that

23    somehow they have an accounting responsibility by virtue of

24    these agreements not being for fair market value.

25              Here, Time Warner is not -- they are not a signatory         10:37
```

1   to any of these agreements.  So the chain really has been

2   broken, Your Honor.  The moment that the alter-ego claims went

3   by the wayside, Time Warner, Inc., really no longer should be

4   in the case.  There's no evidence that's been presented on

5   their case at this point.                                    10:37

6          So, yes, we would move that they be dismissed from

7   the case entirely, because this question is really the only

8   thing that's keeping anyone other than DC Comics in this case.

9          **THE COURT:**  As I understand it, based on the

10  relationship, WCI is an indirect subsidiary of Time Warner and  10:37

11  WCI basically owns Warner Bros. and DC Comics.

12         **MR. PERKINS:**  Correct, Your Honor.

13         **THE COURT:**  So, theoretically, Time Warner could sell

14  that WCI to somebody else tomorrow.

15         **MR. PERKINS:**  That's right.                        10:38

16         **THE COURT:**  And your position is, this case would be

17  of no moment.

18         **MR. PERKINS:**  That's correct, Your Honor.

19         There just simply hasn't been a showing that these

20  entities are alter egos of each other.  They are separate     10:38

21  entities, and there's been no evidence to the contrary.

22  Arguments about vertical integration aside, the way that they

23  may interact with one another in terms of whether or not there

24  is an alter ego here, that's simply not been shown.  I

25  believed, by Your Honor's last ruling on summary judgment, that  10:38

1    that claim really had been dismissed, and that this is really

2    an equitable proceeding to deal with the narrow issue that

3    Your Honor was concerned about after the summary judgment

4    motions were briefed.

5           THE COURT:  Very good.

6           As for the other three agreements, the Court is

7    definitely going to take those under submission at this time.

8    You'll have an opportunity for further argument later.

9           MR. PERKINS:  Thank you, Your Honor.

10           THE COURT:  I'll hear further argument on this

11    Time Warner issue, Counsel.  I understand you're making a

12    practical argument.  I just am not seeing the legal argument at

13    this time.

14           I understand the relationship, but I'm not cognizant

15    of any evidence.  If you can point to something in the

16    stipulations or in this trial which indicates that Time Warner,

17    as opposed to Warner Bros. and DC Comics -- I can see your

18    argument, based on the evidence in this trial -- certainly, I

19    have yet to make a decision on this, because there's a lot more

20    evidence to consider.

21           You can make the argument that Warner Bros., for the

22    reasons I stated in my summary judgment order, may very well be

23    involved in this.  But where is the evidence that Time Warner

24    is involved in this deal in any way?

25           MR. TOBEROFF:  I would refer the Court to the

10:38

10:39

10:39

10:39

10:39

1    stipulated facts, particularly 31, 32, 33, 34, and 35.  Among

2    those facts, one of the important facts is that DC, in looking

3    at the vertical --

4              **THE COURT:**  Let's not go to conclusions.

5              35 talks about DC Comics' relationships with                    10:40

6    Warner Bros.  That's not what I'm talking about here.

7              Right?

8              **MR. TOBEROFF:**  The reason I pointed to 35 is because

9    it's based on the declaration of Paul Levitz, where they say

10   they report to Time Warner, Inc., through Warner Bros.            10:40

11   Entertainment.  It's just one of the facts.  I'm not saying

12   that fact is dispositive.

13             We also have in evidence that Warner Bros. -- that

14   New Line Cinema, which was formerly a separate company owned by

15   Time Warner -- there were two companies that basically          10:41

16   consistently exploited DC comic book properties; one was

17   Warner Bros. Entertainment, Inc., and the other was New Line

18   Cinema.

19             We had testimony that New Line -- and, basically,

20   it's the same.  They don't go outside the Time Warner family in   10:41

21   exploiting these properties.  We've shown evidence of that.

22   And Time Warner -- and New Line was owned, at the time of

23   certain agreements, by Time Warner, and then absorbed into

24   Warner Bros. Entertainment.

25             **THE COURT:**  I understand these companies are related.   10:41

1  I understand they're very related.  That's not the issue.

2      MR. TOBEROFF:  Based on the relatedness, plaintiffs

3  have a concern that these assets, just as if they were

4  transferred by DC to Warner Bros., could then be retransferred,

5  kept within the Time Warner family.                        10:42

6      THE COURT:  That's a judgment issue, Counsel.  That's

7  an issue that we'll take up if -- at the end of the day -- at

8  the end of the case, if there's a judgment against DC Comics

9  and/or Warner Bros., and you believe that the money has been

10 pushed off to Time Warner, I suspect you'll know how to address  10:42

11 that at that time.

12      But the question here is, could there be, based on

13 the evidence, a judgment against Time Warner itself?

14      Counsel is saying, no, there's no evidence of that.

15 All you're responding to is that from a pragmatic standpoint,  10:42

16 because they're related and because the money goes back and

17 forth, we should just keep Time Warner in the case.  That's not

18 a sufficient argument.  It's not a sufficient legal argument.

19     MR. TOBEROFF:  I think, just to put a cap on it and

20 then -- the concern is that part of your ruling in this case  10:42

21 would have prospective implications, and there's -- because,

22 basically, the task -- what you've set out as your task is to

23 make sure the agreements are equitable.  We're talking about

24 equity.  And in that, there's broad discretion.  And the

25 concern is that there may be a prospected portion to any  10:43

1    judgment or any ruling, and we would want to make sure that the

2    ruling sticks and is not circumvented by, for instance,

3    transferring Superman assets to another Time Warner entity.  So

4    if Time Warner is not a party to the agreement, then it

5    wouldn't be bound by -- it may not be bound by your rulings.          10:43

6    That's our -- I'll have more clarity in the future as to why

7    I'm concerned about it.

8           **THE COURT:**  This Court certainly is mindful of the

9    importance of enforcing its orders and enforcing its rulings.

10   And as attorneys in other cases have found out recently, the        10:43

11   Court will go to great lengths to make sure that what you're

12   worrying about does not happen.

13          However, the question remains.  At this point, we're

14   talking about liability.  We're talking about whether or not a

15   judgment can be entered against a particular entity.  And I'm       10:44

16   straining at this point, given the Court's earlier ruling,

17   given the evidence in this case, to see how judgment could be

18   imposed directly on Time Warner, given the evidence so far.

19          Outside of your practical concerns, is there any

20   other evidence that you would point the Court to at this time?      10:44

21          **MR. TOBEROFF:**  No, Your Honor.

22          **THE COURT:**  Very well.

23          **MR. TOBEROFF:**  Thank you.

24          **THE COURT:**  I'm going to take this under submission

25   as well, but the Court may very well rule on this point            10:44

```
 1    separate and apart from the other three.

 2            Anything further on this?

 3            MR. BERGMAN:  My colleague, Mr. Perkins, has argued

 4    the point ably.

 5            Could I put in one minute on the overall question of    10:44

 6    whether judgment should be answered?

 7            THE COURT:  You may.

 8            MR. BERGMAN:  Your Honor, we have heard an enormous

 9    amount of evidence.  We have seen a lot of agreements; 20, 25,

10    30.  Not one of the agreements deals with nonexclusive rights.   10:45

11    Not one shred of evidence deals with nonexclusive rights.

12            Your Honor has made it clear, and has withstood

13    several motions for reconsideration on this point, there has

14    been no proof on the very question that Your Honor has made

15    this trial rotate about.  That is, has there been any evidence   10:45

16    as to the fair market value of the nonexclusive rights that

17    were transferred and the amounts paid thereunder?

18            And with all due respect, Your Honor, there hasn't

19    been any.

20            Thank you.                                               10:45

21            THE COURT:  Thank you, Counsel.

22            Let's take a brief recess.  When we come back out,

23    the defense may call their first witness.

24            (Whereupon, a brief recess was held.)

25            THE COURT:  Counsel.                                     11:05
```

1          **MR. BERGMAN:**  Your Honor, the defendants will call

2    Mr. Paul Levitz as our first witness.

3          **THE CLERK:**  Do you solemnly state that the testimony

4    you may give in the cause now pending before this Court shall

5    be the truth, the whole truth, and nothing but the truth, so

6    help you God?

7          **THE WITNESS:**  Yes, I do.

8          **THE CLERK:**  Please state your full name and spell

9    your last name for the record.

10         **THE WITNESS:**  Paul Levitz, L-e-v-i-t-z.                    11:05

                              **DEFENSE CASE**

11

                          **DIRECT EXAMINATION**

12

13   **BY MR. BERGMAN:**

14   Q    What is your occupation, Mr. Levitz?

15   A    I'm the president and publisher of DC Comics.              11:06

16   Q    And how long have you been employed in one capacity or

17   another by DC Comics or its predecessor, National Periodical

18   Publications?

19   A    I've been working with or for DC Comics since the end of

20   1972; so approximately 36 years.                               11:06

21   Q    How old were you when you started working with DC?

22   A    Sixteen.

23   Q    Am I correct that in those years, you have occupied a

24   number of positions?

25   A    Yes, sir.                                                  11:06

1  Q    Could you briefly describe what those positions were,

2  giving us some rough time period.

3  A    Certainly.

4        I began working for DC as a freelance writer,

5  originally doing things like text pages and letter columns in        11:07

6  the comics.  My freelance writing continued from 1972 to

7  approximately 1989, overlapping many of the other positions,

8  during the course of which I did a fair amount of writing of

9  the actual comic books themselves.

10        I began to work a more "staff" job as an assistant        11:07

11  editor in the summer of 1973, and I did that through the

12  beginning of 1976.  At the beginning of 1976, I came on staff

13  full-time as an editor and what was defined as editorial

14  coordinator, which was basically a position responsible for the

15  administrative side of the editorial process; schedules, talent        11:08

16  relationships, payments, things like that.

17  Q    Okay.

18  A    I served in that capacity beginning of 1976 to the fall of

19  1980.  In the fall of 1980, I became the manager of business

20  affairs, and in January of 1981, I received a much broader        11:08

21  range of responsibility and basically, although the title

22  didn't initially change, as manager of business affairs, I

23  became responsible for the business side of the company,

24  reporting to the president of the company.

25  Q    At that point, Mr. Levitz, could you describe what it was        11:08

1    you were actually doing in that position commencing in January

2    of '81?

3    A    It was a very diverse set of responsibilities that evolved

4    over time, but it included overseeing the existing financial

5    department of the company, the existing, rather rudimentary                    11:09

6    sales and marketing functions of the company and building that

7    into a more sophisticated operation; becoming the contract

8    signatory and reviewer for virtually everything that the

9    company entered into as an agreement; setting up a business

10   affairs department or contract department for the company;                     11:09

11   setting up a licensing department for the company to work with

12   the corporate ancestor of Warner Bros. Consumer Products, which

13   was our agent at the time; devising new forms of ways of

14   working with freelance talent contractually; generally,

15   anything that was on the business side.                                         11:10

16           As we began to do more film and television work

17   through that period, I began to assume responsibility for

18   negotiating those contracts as well and started to negotiate

19   basically any major agreements that the company had.

20   Q    Thank you.                                                                11:10

21           What position did you move on to next at DC?

22   A    The responsibilities remained relatively similar, but the

23   title changed in 1982 to vice president of operations,

24   recognizing that I essentially was functioning as chief

25   operating officer of the company; and in 1985 to executive vice               11:10

1   president.  The next significant change in the responsibilities

2   of the position was in 1989, when the title was changed to

3   executive vice president and publisher to acknowledge that I

4   additionally had the responsibility for the editorial

5   departments, shared with the president of the company who was          11:11

6   then president and editor in chief.

7   Q     And what was that person's name?

8   A     Jeanette Kahn.

9   Q     And when did you move from executive VP and publisher and

10  president to publisher?                                                 11:11

11  A     In 2002, we went through a transition process where

12  Jeanette left to become an independent producer, and my title

13  changed to president and publisher, and I assumed some of her

14  previous responsibilities and rearranged other things in the

15  process.                                                               11:12

16  Q     You mentioned that you were a freelance writer as late as

17  1989.  Do you mean that you actually wrote comic books?

18  A     Yes.  It was custom and practice in the comic book

19  industry from its earliest days that the salary structure for

20  creative individuals was somewhat underpaid, and we were              11:12

21  encouraged to make up the economic difference by writing as

22  well and billing for that, doing that on an independent

23  contract basis on the side.

24         MR. TOBEROFF:  Objection as to the testimony being

25  nonresponsive as custom and practice in the comic book               11:12

1    industry.

2              **THE COURT:**  Overruled.

3              Next question.

4  **BY MR. BERGMAN:**

5  Q    Could you briefly name some of the comic series that you          11:13

6  have written for.

7  A    The longest run I did, and probably most the noteworthy,

8  was on a strip called *Legion of Superheroes*, but over the

9  years, I've probably written every major DC character; work on

10 Superman; a little bit of work on Batman; Wonder Woman; Aquaman          11:13

11 for a long stretch; and many characters and properties that are

12 less noteworthy.

13 Q    What writing did you do in connection with the *Superman*

14 property?

15 A    I wrote probably a dozen or 15 *Superman* stories for          11:13

16 publications like DC Comics Presents, which typically featured

17 Superman with other DC characters; I wrote some Lois Lane

18 stories; and most notably, I did a two-year run on the *Superman*

19 newspaper strip from approximately 1979 to 1981, I think.

20 Q    Have you achieved any recognition in the comic book          11:14

21 industry in connection with your writing activities?

22 A    One of my stories for the Legion of Superheroes, a story

23 entitled *The Great Darkness Saga*, was recognized by the readers

24 of a trade publication, the *Comic Book Buyers Guide*, as being

25 one of the dozen best stories of the 20th century.          11:14

1    Q    Have you published any articles or given any interviews in

2    comic trade publications?

3    A    I've published numerous articles in comic trade

4    publications, going back to my time as an editor and publisher

5    of one of the early comic trade publications, The Comic Reader,    11:15

6    before I joined DC.  I've written for publications as diverse

7    as the Comics Journal; the different program books for the

8    different major comic book conventions in New York and

9    Pittsburgh and San Diego Comic-Con.  Over the course of my

10   writing, I've written for everything from Seventeen magazine to    11:15

11   the Monster Times, pretty much always about comics.

12   Q    Okay.

13        We heard earlier from Mr. Evanier about the Comic-Con

14   International Exposition in San Diego.

15        Are you a regular attendee at that convention?    11:15

16   A    I've attended Comic-Con since the first one Mark drove me

17   to, I think in 1974; and I've probably attended 30 of the 40

18   Comic-Cons that have gone on in San Diego.

19   Q    When you said 'that Mark drove you to,' were you referring

20   to Mr. Evanier?    11:16

21   A    Yes.

22   Q    Do you have a good relationship with Mr. Evanier?

23   A    Mark and I have been friends since I was a kid putting out

24   fanzines, and I published some of his columns in my fanzine.

25   Q    Can you describe within the context of Comic-Con what it    11:16

1    is that DC does at Comic-Con each year.

2    A    Certainly.

3         Comic-Con is a unique event in that it is

4    simultaneously a trade event and a consumer event; so during

5    the course of the five or six days, we meet with the general

6    public, put on panels to promote our projects or to recognize

7    individual artists; we put up a booth that is probably roughly

8    the size of this courtroom that people pour into over the

9    course of the entire weekend to meet the writers and artists,

10   occasionally the actors and directors from the films that we're

11   doing.  We will have displays there of upcoming material, video

12   monitors showing trailers, clips, other sorts of promotional

13   material.

14        Simultaneous with all of this, there's also a series

15   of business events going on where you'll have meetings with

16   everyone from printers, suppliers, international publishers of

17   our material, writers and artists about prospective deals.

18   It's not unusual to ceremonially sign a contract for a new

19   project at Comic-Con.  You may meet with a lawyer for a writer,

20   an artist, in the course of the convention, or conduct any

21   other form of negotiation or discussion.

22        It's a very important event to us, both for the

23   contact with the consumers, but also for showing our writers

24   and artists that we support their work appropriately and for

25   the opportunity to meet with them, since they are scattered all

11:17

11:17

11:17

11:18

11:18

1    over the world and it's a rare case where a large number of

2    them are gathered together.

3    Q    We heard from Mr. Evanier that he was active in the area

4    of artists' rights.

5            Do you share that activity?                          11:18

6    A    Mark and I have a great deal of common history in that

7    area, including both having been on the editorial board of the

8    first Who's Who of American Comic Books, which is one of the

9    pioneering efforts simply to get the artists' work attributed

10   to them.  The early days of comics were not particularly kind   11:19

11   to writers and artists in all situations, and even the mere

12   acknowledgment the work was theirs was very important.  I'd

13   like to think that I have done quite a number of things over

14   the years in my time at DC to work in favor of writers' and

15   artists' rights, and I have been active in a number of ways     11:19

16   outside of DC.

17   Q    Have you or did you over the years, until his untimely

18   passing, did you have a relationship with Jerry Siegel?

19   A    Jerry was a friend of mine for about 30 years.

20   Q    Have you personally won any awards, Mr. Levitz, at         11:19

21   Comic-Con?

22   A    I received the Ink Pot Award, I believe, in 2002, which is

23   an award basically for your lifetime participation in the field

24   and your frequent participation at the convention.  I very

25   proudly received last year the Bob Clampett Humanitarian Award   11:20

1   of the convention, which was presented to me by Clampett's

2   daughter, he's a famous puppeteer and animator, and Ruth's

3   presentation of it to me acknowledged my work on behalf of the

4   writers and artists of the field.

5   Q    Aside from Comic-Con, have you had other speaking                11:20

6   engagements at comic publishing events?

7   A    I've spoken at a wide variety of events in my career, from

8   the earliest days of the New York comic convention, before the

9   San Diego comic convention became the sizable destination, when

10  that was the original large one, or the modern incarnation of    11:21

11  the New York Comic-Con.  Or things that are related to comics,

12  such as when the Frankfurt book fair added a comics pavilion

13  some years ago, they asked me to come out and deliver the

14  keynote speech to celebrate the opening.

15  Q    I think you mentioned a few minutes before that you were    11:21

16  working on a magazine or a fanzine even before you went to work

17  for DC; is that correct?

18  A    That's correct.  I entered the comic book field at age 14,

19  publishing what was one of the early fan magazines about the

20  field; it was sort of the first TV guide for the field.  In     11:22

21  those days, as I said, the attribution was fairly poor, so

22  writers and artists often didn't know when their own work was

23  going to be published.  My publication was one of the first

24  things that regularly provided that information, and that gave

25  me entree to relationships with the writers and artists in the  11:22

```
 1   field.  And I built that into a small business that I

 2   ultimately sold when I was 16, after having two years

 3   consecutively won the best fanzine award in the comic art fan

 4   awards for its work.

 5   Q    I have a feeling I know the answer, but do you have a        11:22

 6   personal collection of comic books?

 7   A    Yes, sir.

 8   Q    And that's independent of what DC has in their enormous

 9   collection; correct?

10   A    I'd like to think it's a little better organized than the   11:22

11   DC collection.

12   Q    And how large is your personal collection, sir?

13   A    My collection is approximately 40,000 comics and related

14   items.

15   Q    What kind of comic books do you collect?                    11:23

16   A    My collection is substantially driven by superhero

17   material in the older material; so I go back and I have the

18   first 30 years of Marvel comics superhero material that I

19   enjoyed greatly; and then I have a collection of DC Comics that

20   dates to material as early as about 1945, and becomes           11:23

21   relatively complete by the mid 1970's onward.

22   Q    Thank you.

23        I'd like to turn now to some sort of a broad

24   understanding of what it is that DC does.

25        Can you describe the major areas of DC's activity?         11:24
```

1    A    Certainly.

2         We categorize our business as being broken into three

3    broad categories, for simplicity of explanation.  The core of

4    our business is our publishing business.  We publish probably

5    1,200 comics and graphic novels each year which circulate          11:24

6    largely in the U.S., Canada and England but then have secondary

7    circulations scattered throughout the world and are then

8    republished by licensees in, in any given year, probably

9    something like 60 different countries and probably a similar

10   number of languages.                                               11:25

11        We also produce ourselves a line of merchandise known

12   as DC Direct for our collectors, which is anything from

13   high-end bookends to sculptural shelf art to fancy action

14   figures; things, if you were serious comic book fan, you might

15   go to a comic book store to buy to display along with your        11:25

16   collection.

17        The secondary of our business is to license the

18   rights to the properties that were developed or created as part

19   of our publishing business for media; anything from film,

20   television, animation, to the experimental new media.             11:25

21        The third area of our business, which has dominated

22   by those properties which we have brought out in media, is the

23   merchandising of those properties for all variety of products

24   produced by licensees cross the world.

25   Q    Can you just, by way of illustration, differentiate          11:26

1  between the last kind of merchandising that you spoke of and

2  the direct form of merchandising that DC does.

3  A    Certainly.

4        The distinction is best made by saying that when

5  you've got a successful film or a well-known property, you            11:26

6  build up a great deal of public awareness, and people want to

7  wear a T-shirt or have -- I believe someone referred to the

8  lunchbox earlier in the course of the trial, or a toy, even if

9  you're a fairly casual fan of it.  Our characters are so well

10  known that even in foreign countries, with relatively            11:26

11  undeveloped economies, there are some people with money who

12  would like to wear a *Superman* S-shield T-shirt, and affiliate

13  with a character they may not know a lot about.  So that tends

14  to be the merchandising that we do through licensees, because

15  they have a very broad range of distribution; and usually, they            11:27

16  have a very particular expertise in knowing, for their market,

17  the appropriate form of manufacture, quality of goods, prices;

18  and we want to cover the world very, very thoroughly through

19  all of this, so it's a very large network of licensees.

20        On the opposite end of the spectrum, the DC direct            11:27

21  merchandise that we create and manufacture and market ourselves

22  is intended for our most avid readers, the kind of people who

23  might recognize my name, certainly would recognize a particular

24  artist's name, and know that they would love to have a Jim Lee

25  Superman statue and not necessarily a George Perez Superman            11:28

statute, or vice versa, depending on their preference, and are

prepared to pay very significant amounts.  There are not that

many of those people in the world, and they are concentrated

very heavily in the U.S. and Canada, a little bit in England.

We know how to reach them through the comic book stores, where          11:28

we're already selling a great deal of merchandise.  So that

work we feel comfortable doing ourselves.

Q    Can you give us any approximation of the percentage of

merchandising revenue that's due to what you would call the

mass merchandising, as opposed to the percentage on the direct          11:28

to collectors?

A    It obviously varies year to year with the things that are

going on.  Merchandising is a highly variable business.  But in

a normal, quote, unquote, normal year, we would expect to

generate anywhere from 5 to 10 times the gross revenues in mass          11:28

merchandising, as opposed to the direct merchandising.  That

further understates the relative profitability of the two

businesses, because in the direct merchandising, we have to pay

the costs of the objects, their distribution, often a form of

royalty to the sculptor or other contributor to it.  So the          11:29

mass merchandising is vastly more profitable, because you're

sitting there receiving royalty checks, basically.

Q    And who acts as the agent for DC on the mass

merchandising?

A    Our agent is Warner Bros. Consumer Products, which, if you          11:29

1  trace historically, was created as a spin-off from DC back when

2  we were a family company in the 1950s, to reach out to

3  merchandise our rights; and then over the years evolved to

4  become a very broad-based licensing agency, at different times

5  having represented things like James Bond, at the peak of his          11:30

6  popularity in merchandising in the 1960s, or sports leagues;

7  and then eventually became a part of Warner Bros. and

8  concentrated much more heavily on film- and television-related

9  licensing, though they still do some other kinds of properties

10  from time to time.                                                    11:30

11  Q    And what is the fee arrangement between DC and

12  Warner Bros. Consumer Products for that merchandising?

13  A    For the last couple of decades, I think the fee basis has

14  been a 25 percent fee.

15  Q    Mr. Levitz, you've been sitting here in the courtroom and       11:30

16  you've heard testimony of interpretations of contracts and

17  statements made regarding --

18          THE COURT:  May I interrupt you for a second.

19          You said something that struck me.

20          You mentioned that the James Bond merchandising            11:31

21  reached its peak in the 1960s.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Even though I think we've heard earlier

24  testimony about James Bond being one of these franchise films

25  that we probably all know continues to be successful to this        11:31

1     day.

2            Based on your experience in this area, how common or

3     uncommon is it to see that kind of disconnect between the

4     merchandising and the franchise film itself?

5            Does that make sense?                                    11:31

6            **THE WITNESS:**  I understand your question, Your Honor.

7     I'm trying to think of the best way to answer it.

8            Certain kinds of franchise motion pictures are very

9     susceptible to merchandising; and particularly, when those

10    motion pictures are distributed by a company that has a great   11:32

11    deal of sophistication in merchandising, there's an enormous

12    effort to bring as much success as you can out of the venture.

13    The public ultimately makes its own decisions.

14           One would logically think that *Star Wars* and

15    *Star Trek*, both being science-fiction motion pictures about    11:32

16    complex universes with interesting spaceships and

17    different-looking creatures and various aliens, would be

18    equally susceptible potentially to merchandising.  The early

19    *Star Trek* motion pictures did some reasonable business in

20    merchandising; but over time, Paramount Pictures, which is a    11:32

21    very sophisticated company, developed an understanding that the

22    ceiling was pretty low on this working.  *Star Wars*, on the

23    other hand, was considered unsalable for merchandising when it

24    was originally released.  There were no toys put out with the

25    first film initially.  They had been unable to get a licensee.  11:33

1    And when the film succeeded so phenomenally, Kenner Toys signed

2    on; and that first Christmas, if you wanted to buy a *Star Wars*

3    toy, you bought an empty box with a promise that you could

4    bring it in and redeem it as soon as the figures arrived.

5            And it went on to become a phenomenal merchandising      11:33

6    success that has sustained without end, and often in between

7    the motion pictures.

8            James Bond became an enormous merchandising fad based

9    on the early motion pictures, and particularly based on the car

10   and the spy gimmicks, which were about as high tech as anything   11:33

11   could be in the mid 1960s.  And children of my generation

12   responded to that enormously.

13           The car is not so cool anymore.  The little gimmicks

14   that he comes up with seem much more commonplace to many

15   different pictures.  So the merchandising opportunities for       11:34

16   James Bond for, I would say, the last 20 years, maybe 25 years,

17   have been very minor.  They will do some merchandising as part

18   of it.  I'm sure they would like to do more.

19           But you combine an issue of public taste -- I believe

20   the James Bond pictures were released, through most of those      11:34

21   years, through MGM and UA, which are not particularly

22   first-rank merchandising companies, due to the mixture of

23   properties they own.  And all of those things put together

24   means that the magic hasn't happened.  I'm sure they would love

25   to have that happen, and they may occasionally attempt it on      11:34

1   one basis or another.

2        **THE COURT:**  Conversely, you take something like

3   Mickey Mouse, which is a self-evidently iconic figure to

4   Americana.  A tremendous amount of merchandising is centered

5   around Mickey Mouse, but you haven't seen a Mickey Mouse film       11:35

6   in years.

7        **THE WITNESS:**  Disney has a unique strategic advantage

8   in this.  One of the things to really focus on on this

9   question, Your Honor, is that the parties have different

10  advantages.  Because of the theme park business, Disney is able    11:35

11  to manufacture merchandise and sell it in captive retail

12  outlets that they control.

13       When we want to do a merchandising program, a fair

14  level of our success will be based on, particularly today,

15  whether or not we can persuade a few key retailers like            11:35

16  Wal-Mart to devote an adequate amount of space to offering our

17  merchandise to the public, and promoting it in their

18  environment.

19       Disney has an enormous captive audience through the

20  theme parks, unparalleled by any other licensor, and as a          11:36

21  result, has a unique set of business strategies, where their

22  film slate is much more kid-oriented than any of the other film

23  studios; part of the reason why they made the very expensive

24  acquisition of Pixar Pictures a couple of years ago, to bring

25  those properties in to refresh the theme parks, refresh the        11:36

exhibits, keep people going to them, and raise the mix of

merchandising that they can do there.

Warner Bros., for example, does a reasonable business

in Looney Tunes, because we're a very effective licensing

operation at Warner Bros. Consumer Products, but not home-run

business every year.  We don't have the same set of theme parks

to push things and the same set of tools.  Disney has managed

to keep Mickey Mouse going with very little comparative stimuli

over the years, based on the particular mix of assets they have

to offer.

THE COURT:  So amongst the variables, then, you would

agree, I take it, that in terms of evaluating how profitable an

arrangement involving intellectual property can be, it's not

just the terms of the agreement, but in whose hands that

agreement is?

THE WITNESS:  Absolutely.  It's critical in looking

at the arrangement, at the mix that you have.

A further example, if I may, Your Honor, is in terms

of the distribution mix you have available.  Warner Bros.

Consumer Products, on the licensing business I was discussing,

has a vast array of worldwide offices, either that they own or

where they control the relationship with a local agent who has

clout.

You're often in there negotiating, with respect to an

individual property, with a prospective licensee who has four

1    or five licenses from a company.  And when you're going in to

2    say, 'This movie will be the exciting movie for next year; I'd

3    like you to take a license for it," if you're MGM/UA, in the

4    example Your Honor was asking about, and Bond, and your

5    licensing agent has not sold anything to that particular                    11:38

6    licensee for many years, he probably doesn't have the best

7    entrée, and he probably doesn't have the strongest negotiating

8    ability or knowledge to extract the best deal.  If you're a

9    company that has a very wide range of skill in the area, you're

10   going to be able to extract a better deal.                                  11:38

11           **THE COURT:**  All right.

12           Sorry, Counsel.

13           **MR. BERGMAN:**  Thank you.

14           **MR. TOBEROFF:**  Your Honor, as a matter of

15   procedure -- and I'm proceeding with grave caution in making               11:38

16   this objection very respectfully -- I have to object for the

17   record to his testimony, even though it was an answer to

18   Your Honor's question, because it is essentially -- if you read

19   it, expert testimony, when it refers to Bond, DC, MGM, other

20   studios than the relationship with Warner, and you'll notice              11:39

21   that in the background questions, he was being set up with --

22   there were background qualification questions of the sort you

23   ask for an expert.  It's improper under Rule 702 and 703.

24           He was never designated as an expert, and he very

25   well could have been.  This is not a comment on his knowledge,             11:39

```
 1   because he is certainly --
 2           THE COURT:  Counsel, why don't you just state your
 3   objection, and let's get to the point here.
 4           MR. TOBEROFF:  My objection is that he's giving
 5   expert testimony and was never designated as an expert.        11:39
 6           THE COURT:  Your objection is overruled.
 7           The Court asked him based on his experience in the
 8   area.  He basically is qualified, at least with respect to
 9   these questions, on lay expertise and not as an expert
10   designated by one of the parties.                              11:39
11           The objection is overruled.
12           MR. TOBEROFF:  Very well, Your Honor.
13           THE COURT:  Counsel.
14           MR. BERGMAN:  Thank you, Your Honor.
15   BY MR. BERGMAN:                                                11:40
16   Q    To wrap up the question of the merchandising split on the
17   mass merchandising, Mr. Levitz, you testified to a 75/25 split.
18           Is there any exception at all to that?
19   A    There are minor costs that they're entitled to deduct for
20   certain actions they take on our behalf.  They're not material.  11:40
21   Q    Okay.
22           Does DC Comics receive 75 percent of every
23   merchandising dollar received by Warner Bros. from
24   Superman Returns?
25   A    Yes, sir.                                                 11:40
```

1  Q    Can you describe, from your perspective, the relationship

2  between DC and Warner Bros.

3  A    We are -- Warner Bros. is both a term used for

4  Warner Bros. Filmed Entertainment, and you'll also hear it used

5  for individual companies like Warner Bros. Pictures,          11:41

6  Warner Bros. Television.  There are a number of Warner Bros.

7  companies within Warner Bros. Filmed Entertainment.  We are

8  affiliated with all of them, as we are with all of the

9  Time Warner companies.

10 Q    And does that affiliation go beyond the                 11:41

11 corporate-structured affiliations?  Is there some other

12 affiliation between the two companies that may not necessarily

13 reflect their common ownership?

14 A    Because of the nature of our business, we have an

15 extraordinary number of ordinary business relationships with   11:42

16 different companies that we are affiliated with.  We have

17 licensed film rights to Warner Bros. Pictures.  We have

18 licensed television rights to Warner Bros. Television.  We will

19 produce a customized comic book to promote a Warner Bros.

20 project on a fee basis.  We will make toys for Warner Home     11:42

21 Video to sell in Best Buy, along with a video unit that they're

22 selling.  Each of these relationships are structured on an

23 individual business deal, and as close as we can to normal open

24 market kinds of relationships between the parties, creating

25 significant business partnerships, in many cases, that have    11:43

1 lasted many years.

2 Q    Okay.

3        Let's turn now, if we can, to the issue of the fair

4 market value of the post-1999 *Superman* agreements between DC

5 and Warner Bros.                                              11:43

6        To what extent, Mr. Levitz, if at all, is achieving

7 the fair market value for DC properties an important goal for

8 you?

9 A    It's a very important goal for me, because it's one of the

10 places where doing the right thing is also very good business.   11:43

11 If we're to continue to attract good, creative people to work

12 for us, we have to do business on a basis where they will get a

13 fair stream of revenue from licenses that we grant to other

14 parties.  And if there's a general perception that they will

15 not be properly compensated, we're not going to be able to get   11:44

16 them to create new things for us.

17        **MR. TOBEROFF:**  Objection to the question.  No

18 foundation is laid as to the witness's understanding of fair

19 market value or analysis of fair market value.

20        **THE COURT:**  He's the president of the company.        11:44

21        **MR. TOBEROFF:**  I understand, but the objection is

22 that no specific foundation has been laid for the question.

23        **THE COURT:**  Overruled.  I trust the president of a

24 company understands basically -- overruled.

25 / / /                                                        11:44

1    BY MR. BERGMAN:

2    Q    In fact, Mr. Levitz, has DC Comics instituted, at some

3    earlier point in its history, a royalty plan for creators?

4    A    One of the things I'm proudest of in the course of my

5    career is that I was one of the key people involved in putting    11:45

6    in place the first broad-based royalty plan for our own

7    publishing business that all creative people could participate

8    in with enough success in 1981.

9    Q    Okay.

10            THE COURT:  Mr. Toberoff, just to go back to your    11:45

11   last objection, you can certainly examine him as to what he

12   means by "fair market value."  But I've got to assume that

13   basic terms like "profitability," or whatever, "fair market

14   value," these are terms that any president of a company has

15   some understanding of, at least in terms of how they conduct    11:45

16   their business.

17            You can examine him on that during cross.

18            MR. TOBEROFF:  Thank you.

19   BY MR. BERGMAN:

20   Q    Mr. Levitz, as the executive guiding DC, do you have any    11:45

21   basic principles that you follow in approaching a possible

22   license or other transaction with Warner Bros.?

23   A    Certainly.  You approach a license with Warner Bros. the

24   same way that you would a license with anyone else.  When you

25   look to grant a license for any category of goods, you look at    11:46

```
 1   it through a very specific lens; first, who the other party is;
 2   what their place in the marketplace where you're doing business
 3   is, whether that's defined as market share or specific
 4   competency.
 5           Going back to my merchandising example, at one point      11:46
 6   there were different licensees with different competencies in
 7   different thread-count T-shirts for different levels of the
 8   market.  I'm not enough of a fashionista to know what those
 9   thread counts were; under a certain quality level, they were a
10   good licensee for Bloomingdale's, and under another, they were     11:47
11   a good one for K-mart.  So you look to those characteristics
12   first:  Is this a good company at what you want them to do?
13           The second thing you look at, in dealing with it, is
14   the position your project or property is going to bring within
15   that company and what kind of creativity they're going to bring    11:47
16   to it, which people they're going to assign to manage it, which
17   creative people are going to be working on the project.  That
18   really works the same whether you're looking at a toy sculptor
19   or whether you're looking at a motion picture director.  Who
20   will be available to actually do the work?                         11:47
21           The third lens, which is a very easy test, obviously,
22   for Warner Bros., is the issue of credit worthiness and whether
23   you think they will be a workable party to actually collect
24   from and be accounted to from.  Obviously, when you're looking
25   in the open market, you want to make sure that the deal that       11:48
```

1  you're being offered, you'll actually get.  And then, of

2  course, you look to the terms of the deal itself.

3        **THE COURT:**  Let me stop you there, because this is

4  something which obviously was a sticking point for me in my

5  previous order.                                                    11:48

6        I suppose there's something almost counterintuitive

7  that you would approach a deal with someone who Mr. Toberoff

8  described as vertically integrated, the same way you would

9  someone who is a competitor outside the corporate world in

10  which you operate.                                                 11:48

11        **THE WITNESS:**  There are some ways in which you have

12  to approach it exactly the same way, Your Honor.  And there are

13  some where it's radically different.

14        You have the advantage, when you're dealing with

15  someone that you're affiliated with, that you know you're       11:49

16  unlikely to be litigating against them, for example.  So you

17  may not boilerplate with the same level of energy about arguing

18  about what state laws are applicable in the fashion.

19        On the other hand, you know you're going to be able

20  to do the equivalent of an audit without having formal audit   11:49

21  rights, because, first of all, you believe you're going to be

22  accounted to honestly; but second of all, you have the ability

23  to access the common levels of management and say, 'I think

24  there's a problem here.  Let's try to figure out what it is,

25  and let's look at the real numbers.'                            11:49

1        I have, in those instances, for example, accessed the

2   numbers and information that I would never have with an outside

3   party.

4        Where you have to do it on exactly the same basis is

5   on the flow of the income coming through, because if you don't          11:49

6   treat that on a true fair market value, then you destroy your

7   relationships with your participants, and your market dries up

8   for your ability to deliver creative goods.

9        **THE COURT:**  Is that the same case even when the

10  participant has been a member of the fold for generations?              11:50

11       In the case of Superman, you're not worrying about

12  bringing somebody in recently, and then turning around and

13  negotiating to distribute that.  Superman had been in the fold

14  for years.

15       **THE WITNESS:**  Actually, that's not completely               11:50

16  accurate, Your Honor, because the properties are cumulative.

17       For instance --

18       **THE COURT:**  Fair enough.

19       **THE WITNESS:**  -- you heard reference in the

20  discussion to *Birds of Prey* to the Huntress character.  The          11:50

21  value of the *Birds of Prey* contract is largely driven by the

22  fact that these were *Batman* characters.  However, I created the

23  Huntress character in a story I wrote some 30 years ago, and I

24  have a contract under which I receive a royalty based on her

25  exploitation, and benefit from that deal to a very, very minor         11:51

1  point.

2        There are writers and artists working on *Superman*

3  today who are creating new pieces of the mythology and were

4  paid for a share of *Superman Returns* based on the appearance

5  of, for instance, the bartender in the scene with Jimmy Olsen          11:51

6  and Clark Kent.

7        **THE COURT:**  So that's the incentive for you to ensure

8  that you're doing a fair deal?

9        **THE WITNESS:**  It is one of the very significant

10 incentives.                                                            11:51

11       **THE COURT:**  Counsel.

12       **MR. BERGMAN:**  Thank you, Your Honor.

13 **BY MR. BERGMAN:**

14 Q   You mentioned, Mr. Levitz, that it's one of the

15 incentives.                                                            11:51

16       What are the others?

17 A   One of the incentives is that I'm measured on DC's

18 revenues and profitability; and I, therefore, have an incentive

19 to achieve what I feel is at least a fair market deal, if not

20 the best deal that I possibly can in each situation.                   11:52

21 Q   Approximately how many employees are employed directly by

22 DC Comics?

23 A   DC has probably 280 salaried employees.

24 Q   To what extent, if any, does the continued employment and

25 welfare of those employees depend upon obtaining fair market           11:52

1  value?

2  A    It's the nature of corporate life that the corporation

3  allocates resources and rewards based on the revenues and

4  profits generated by different divisions.

5          If I made a practice of not maximizing DC's potential    11:53

6  income, the ability to keep those employees would diminish, and

7  to reward those employees or provide resources to them.

8  Q    There's even a possibility it might affect your continued

9  employment, is there not?

10         **MR. TOBEROFF:**  Leading, Your Honor.                  11:53

11         **THE COURT:**  Sustained.

12  **BY MR. BERGMAN:**

13  Q    In any event, Mr. Levitz, am I correct that you follow a

14  policy of giving a first look to Warner Bros. on various

15  properties?                                                     11:53

16         **MR. TOBEROFF:**  Objection, Your Honor.  Leading.

17         **THE COURT:**  Sustained.

18         Rephrase, Counsel.

19  **BY MR. BERGMAN:**

20  Q    Do you, Mr. Levitz, treat Warner any differently than any  11:53

21  other production entity, insofar as submitting works to them?

22  A    We always look first to see if we can bring our creative

23  properties to the Warner Bros.-affiliated companies.

24         **THE COURT:**  Why is that?

25         **THE WITNESS:**  We believe they are extraordinarily    11:54

```
 1   good at what they do.  We believe we have an unusual ability to

 2   work constructively with them, because our interests are

 3   aligned in so many fashions.  We also believe very firmly,

 4   Your Honor, that there's a theory of what you might class as

 5   cumulative or network value.  When you place the majority of      11:54

 6   your library in one place, you're able to do things that you

 7   would not if it was split.

 8          For example, DC will be celebrating its 75th

 9   anniversary next year.  We will be funding the activities of

10   that and the promotion of that largely off what we believe will   11:54

11   be increased sales opportunities for our old video library, the

12   old films and television shows, that Warner Home Video will

13   bring to market and pay royalties to us on.  We're able to do

14   that because virtually our entire library is with one party.

15   We've watched our principal competitor, Marvel Comics,            11:55

16   licensing its library properties to many different parties.

17   They're unable to do things like that and unable to

18   cross-market their properties effectively, because they don't

19   have it all in one place.

20          In that regard, it doesn't matter whether it's an          11:55

21   affiliated relationship or an unaffiliated relationship.

22   There's simply a value in the size and scope of the partnership

23   relationship.  You want to keep working with your partner as

24   broadly as you possibly can.

25   /  /  /                                                           11:55
```

1  **BY MR. BERGMAN:**

2  Q    Mr. Levitz, have you, in the course of the past 30 or 40

3  years, had occasion to familiarize yourself with the way that

4  different motion picture companies deal with comic book

5  superheroes?                                                         11:56

6  A    Yes, sir.

7  Q    And have you formed any opinion as to what studio deals

8  best with such major tent pole pictures?

9          **MR. TOBEROFF:**  Objection, Your Honor.  Again, it's a

10  lay witness who's giving expert testimony based on specialized    11:56

11  knowledge.  It's not percipient as to the contract at issue in

12  this case.  He's talking about the industry in general.

13          **THE COURT:**  I agree, as framed, Counsel.

14          Rephrase this based on his particular experience.

15          He can certainly offer an opinion based on the          11:56

16  particular contracts that he's worked, the experience that he's

17  had.

18          Rephrase the question.

19  **BY MR. BERGMAN:**

20  Q    Can you give us an example, Mr. Levitz, of the performance 11:56

21  of a contract which has led you to believe that Warner Bros.

22  may or may not be better than other competing studios with

23  respect to the development of films based on comic book heroes?

24  A    I believe Warner's success, most extraordinarily with

25  Batman over the years, is a demonstration of their unparalleled  11:57

1    success at exploiting comic books, and particularly comic book

2    superheroes in film.  And their success with Superman, although

3    a much more mixed history, still demonstrates the same thing.

4    There have been any number of specific instances through the

5    process of working with them closely on that where I've seen          11:57

6    them able to do things that I did not observe competitors being

7    able to do in the same situation.

8    Q    Have one or more of DC's visual properties been

9    distributed on DVD by anyone?

10   A    Yes.                                                              11:58

11   Q    By whom have they been distributed?

12   A    The vast majority of our library has been distributed by

13   Warner Bros.  We have also had material distributed by

14   20th Century Fox.  There are some things that I believe are

15   still controlled by Sony, as part of their library, though          11:58

16   they're very minor.  And there is at least one project that's

17   distributed by Paramount.

18   Q    In your dealings with Warner regarding the production and

19   distribution of video products, have you formed an opinion as

20   to the quality with which they do so?                                 11:59

21   A    Yes, sir.

22   Q    And could you tell us what that opinion is.

23   A    I have observed that Warner Home Video, as the consistent

24   largest market-share player in the business, has developed a

25   set of tools and resources that I believe are not comparable at      11:59

1    any of the other distributors.

2    Q    In the course of your various dealings with Warner Bros.,

3    have you made any determination as to Warner's willingness to

4    invest whatever money may be required to do a particular

5    project well?                                                    11:59

6           **MR. TOBEROFF:**  Objection.  Vague and ambiguous,

7    Your Honor.

8           **THE COURT:**  This is a foundational question.

9           Have you made such a determination?

10          **THE WITNESS:**  I have never found --                   12:00

11          **THE COURT:**  The question is, have you made --

12          **THE WITNESS:**  Yes.

13   **BY MR. BERGMAN:**

14   Q    Would you tell me what you found in that respect.

15          **THE COURT:**  Let's lay a foundation for that.          12:00

16   **BY MR. BERGMAN:**

17   Q    Can you describe for us how you formed whatever belief you

18   have in that respect.

19   A    I formed my beliefs in that respect by watching Warner's

20   typical behavior patterns in the development of projects and     12:00

21   the production of projects and in the marketing of projects.

22   You measure, in a situation like this, basically, incremental

23   willingness to spend to achieve quality.

24          When an animation director wants another set of

25   retakes of a scene in order to get it better, it's a very        12:01

1    arguable proposition whether the consumer will ever know the

2    difference, or whether there will be any direct -- certainly,

3    short-term economic reward to it.

4            And then there's a spectrum of behavior exhibited in

5    the marketplace between production companies that will always          12:01

6    say no to the incremental spending and say, 'If I'm not sure

7    I'm going to make more money as a result of this, I don't want

8    to do it'; companies that measure, 'How much better will this

9    be creatively?  How important is it to you if I spend this

10   money?'; and companies that at another extreme may be foolish         12:01

11   enough to just say, 'Oh, you want more money to do whatever you

12   want creatively?  Please go ahead."  The tap will just run

13   endlessly.

14           **THE COURT:**  Let's go ahead and take our lunch break

15   at this time.  We'll resume at 1:30.                                   12:02

16           (Day 8 morning session concludes.)

17

18                           CERTIFICATE

19

20   I hereby certify that pursuant to Section 753, Title 28, United
     States Code, the foregoing is a true and correct transcript of
21   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
22   conformance with the regulations of the judicial conference of
     the United States.

23

24   _____          _____
     THERESA A. LANZA, CSR, RPR                  Date
25   Federal Official Court Reporter