1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3        EASTERN DIVISION

4        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6        - - -

7    JOANNE SIEGEL and            )
     LAURA SIEGEL LARSON,         )
8                      Plaintiffs, )
                                  )
9           vs.                   )   No. CV 04-08400-SGL
                                  )
10   WARNER BROTHERS ENTERTAINMENT INC.;)
     TIME WARNER, INC.; DC COMICS; )
11   and DOES 1-10,               )   Trial Day 9
                      Defendants.  )   A.M. Session
12   _____)   Pages 1111-1174

13

14

15        Reporter's Transcript of Court Trial Proceedings

16        Riverside, California

17        Tuesday, May 12, 2009

18        10:09 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24        3470 12th Street, Rm. 134
          Riverside, California  92501
25        (951) 274-0844
          WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2

 3    On Behalf of Plaintiffs:

 4
                          LAW OFFICES OF MARC TOBEROFF
 5                        BY:  Marc Toberoff
                          BY:  Nicholas C. Williamson
 6                        BY:  Keith Adams
                          2049 Century Park East,
 7                        Suite 2720
                          Los Angeles, California  90067
 8                        310-246-3100

 9

10    on behalf of Defendants/Counterclaimant:

11
                          WEISSMANN WOLFF BERGMAN COLEMAN
12                         GRODIN & EVALL LLP
                          BY:  Michael Bergman
13                        BY:  Anjani Mandavia
                          9665 Wilshire Boulevard,
14                        Ninth Floor
                          Beverly Hills, California  90212
15                        310-858-7888

16

17    On Behalf of DC Comics:

18                        PERKINS LAW OFFICE, P.C.
                          BY:  Patrick T. Perkins
19                        1711 Rt. 9D
                          Cold Spring, New York  10516
20                        845-265-2820

21

22

23

24

25
```

```
 1                        I N D E X

 2                                                    Page

 3   Defense case (cont'd)...........................   1130

 4

 5   DEFENSE
     WITNESS            DIRECT      CROSS      REDIRECT      RECROSS
 6   PAUL LEVITZ (Cont'd)

 7   By Mr. Bergman     1130

 8

 9

10

11           EXHIBITS          RECEIVED

12             60               1132
     1027                       1147
             1040               1149
13           1015               1169
             1026               1169
14           1067               1169

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, May 12, 2009                    Trial Day 9, AM Session

1           Riverside, California; Tuesday, May 12, 2009; 10:09 A.M.

2                                  -oOo-

3           **THE CLERK:**  Calling case number CV 04-08400-SGL,

4      Joanne Siegel, et. al., versus Warner Bros. Entertainment Inc.,

5      et. al.

6           May we have counsel please come forward and state

7      your appearances for the record.

8           **MR. TOBEROFF:**  Marc Toberoff for the plaintiffs.

9           **MR. WILLIAMSON:**  Nicholas Williamson for plaintiffs.

10          **MR. ADAMS:**  Keith Adams for plaintiff.

11          **MR. BERGMAN:**  Michael Bergman for the defendants.

12          **MR. PERKINS:**  Patrick Perkins for the defendants.

13          **MS. MANDAVIA:**  Anjani Mandavia for defendants.

14          **THE COURT:**  Good morning to you all.

15          Before we resume with the trial, there's a couple of

16     issues that I want to take up.

17          First of all, I received yesterday, plaintiffs' trial

18     brief regarding impermissible expert testimony and request for

19     continuing objection thereto from the plaintiffs.

20          Do the defense have a response to this?  I trust you

21     received this, as well?

22          **MR. PERKINS:**  We did.  We filed a response this

23     morning, Your Honor.

24          **THE COURT:**  Do you have a copy of your response?  It

25     hasn't made its way into my hands yet.

1    (Document provided.)

2   **THE COURT:**  Yes.

3    Mr. Toberoff, the argument analysis being made by the

4 defense, which basically tracks the Court's thoughts the other

5 day, is exactly the Court's position.  You've made your

6 objection.

7    Mr. Levitz is in a very unique role.  He negotiated

8 the deal.  The Court's inquiry and counsel's inquiry and, I

9 trust, your inquiry focuses on his state of mind and his

10 analysis in entering the deal, which is highly relevant to

11 placing the deal in context.  It's not like he's being brought

12 in -- as a witness, been brought in from the outside to

13 evaluate a deal; he's a percipient witness -- he is a

14 percipient player in the deal itself.  And that's where his

15 understanding of the deal, and how the deal was made, and how

16 the deal was structured, and why it was structured the way it

17 was, is relevant.

18    The Court is well aware -- and as I indicated, this

19 is not a jury trial, this is a bench trial -- the Court is well

20 aware of the nature of the testimony and the proper purposes

21 for which it can be used and for which it can't be used.

22    But your objection is noted.  It's overruled for the

23 reasons I stated previously, as well as the well-articulated

24 Warner Bros. brief, so we'll move along on that.

25    The other concern I had is with respect to this issue

10:10

10:11

10:11

10:11

10:12

1    regarding the Harry Potter video rates.  I've received the

2    declaration of Steven Ames Brown.

3              Who is this Katherine Chilton?

4          **MR. PERKINS:**  She's a lawyer for Warner Bros.,

5    Your Honor, and she is actually here today.                    10:12

6          **THE COURT:**  She's in-house?

7          **MR. PERKINS:**  Yes.

8          **THE COURT:**  Okay.

9          **MR. PERKINS:**  She's an in-house lawyer.

10         **THE COURT:**  The declaration from Mr. Brown indicates   10:12

11   that Ms. Chilton revealed the information concerning

12   Ms. Rowling in response to a general question -- what's the

13   highest percentage ever reported -- spontaneously in advance of

14   any discussion that would have taken place with Mr. Halloran.

15             Is that true?                                         10:13

16         **MR. PERKINS:**  That is true, Your Honor.  And that is

17   what we represented to the Court on Friday.

18         **THE COURT:**  So then there's no issue here.

19         **MR. PERKINS:**  Well, the issue that we had,

20   Your Honor, and why we came in, was simply to get a sealing     10:13

21   order with respect to these things.

22             What the declaration Mr. Brown indicates is

23   consistent with what I said on Friday, which is that he

24   reported to Ms. Chilton that this information had been

25   testified to in open court; that is public.                    10:13

1           He goes to great pains in his declaration to explain

2    that Mr. Halloran said to him that he couldn't discuss the

3    testimony; that there was a provisional sealing order, but that

4    the Court had first amendment concerns.

5           But he didn't report any of that to Ms. Chilton, so          10:13

6    Ms. Chilton came away with the following information:  That

7    Mr. Halloran had testified about this in open court, and that

8    the deal terms were public.

9           That's what drove us to come here, Your Honor, on

10   Friday simply to get Your Honor to provisionally seal this        10:14

11   information until such time as we can make a formal

12   application.

13           **THE COURT:**  Have you made that formal application?

14   It's now been several days since this happened.

15           **MR. PERKINS:**  Your Honor, when we discussed this on     10:14

16   Friday, we indicated that we were going to make one omnibus

17   application at the conclusion of the trial so that we could

18   make an application with respect to all of the confidential

19   information at one time.

20           **THE COURT:**  I understand that.  But given the          10:14

21   particular concerns that you have about this particular piece

22   of testimony --

23           **MR. PERKINS:**  Your Honor, we will have it on file by

24   tomorrow morning.

25           **THE COURT:**  Let's address it so that we can put this    10:14

1    to rest.

2         **MR. PERKINS:**  Yes, Your Honor.

3         **THE COURT:**  I think that's probably the better

4    course.

5         Counsel?                                                    10:14

6         **MR. TOBEROFF:**  Your Honor, may I be heard on this

7    issue, please.

8         **THE COURT:**  Yes.

9         **MR. TOBEROFF:**  It is incorrect that defense counsel

10   Mr. Perkins represented to the Court on Friday what's stated in    10:14

11   his declaration.

12         What prompted the Court to seriously order this seal

13   provisionally was the distinct impression that Mr. Halloran had

14   provided confidential information to Steven Brown in the other

15   case; and that, due to these leaks, a red scare was created to     10:15

16   prompt the Court to seal the record.

17         That was not the case.

18         I would ask that defendants provide the Court with a

19   transcript, which will show everything that's being said in

20   this declaration is correct.                                       10:15

21         If it does show that it's correct, I believe that

22   defendants should reimburse Mr. Halloran for his time in coming

23   out here due to their misrepresentation as to what he had done.

24         Steven Ames, by the way, does not go to great pains

25   in his declaration to say that Mr. Halloran told him he            10:15

    1    couldn't speak because --

    2            THE COURT:  Do you have a copy, Mr. Toberoff, of the

    3    statements -- I mean, I recall the statements, but I'd like to

    4    see them exactly -- from Friday?

    5            MR. TOBEROFF:  Yes.                                    10:16

    6            (Document provided.)

    7            THE COURT:  What page?

    8            MR. TOBEROFF:  Starts on Page 2, line 2.

    9            THE COURT:  Here it is.

   10            (Brief pause.)                                         10:17

   11            THE COURT:  Well, reading all of the pages in

   12    context, Mr. Perkins did indicate that the lawyer for Warner

   13    Bros., this Ms. Chilton -- she's not identified by name, but I

   14    assume that's who we're talking about -- was asked about the

   15    video royalty in the Harry Potter case, and she said that's     10:19

   16    confidential.

   17            Then she was asked what's the highest rate that's

   18    ever been given, and she gave the testimony indicated.

   19            Mr. Brown says that he did not ask her about

   20    Harry Potter or Ms. Rowling; that he simply asked what's the    10:19

   21    highest percentage ever reported, and she identified

   22    Ms. Rowling.

   23            So there's some inconsistency, but I don't know if it

   24    really rises to the level of a material inconsistency that

   25    you're suggesting, Counsel.                                     10:20

1      This is why we try to get to the bottom of things,

2  and this is why we need to use transcripts and get the

3  witnesses, the people who are in here, themselves.

4      I can certainly see how one thing gets told to

5  another and the concern comes out the way it did.        10:20

6      **MR. PERKINS:**  I would just make one other point,

7  Your Honor.  And that is that Ms. Chilton's deposition was

8  pursuant to protective order.

9      Again, notwithstanding the concern that whether she

10  said it or when she said it during deposition, under --    10:20

11  Mr. Brown concedes that was under protective order.  The

12  concern, again, arose after the deposition testimony.

13      **THE COURT:**  But the problem is, Counsel, the way you

14  presented this to the Court -- and I'm not saying -- beginning

15  with your first explanation to the Court, you say -- this is on  10:20

16  Page 2 -- you say, "Unfortunately, today, Your Honor, we

17  received a call from another lawyer at Warner Bros. who was

18  being deposed in a case involving the Orson Welles' estate.

19  The lawyer for the other side has told her that Mr. Halloran,

20  who is engaged by the Welles' estate, disclosed to the lawyer  10:21

21  the video royalty rate for Ms. Rowling in that agreement."

22      Now, when you first said it, you did not indicate

23  that that was after Ms. Chilton had already voluntarily

24  disclosed the rate in the deposition.

25      You do, later on, clarify that that took place.  But  10:21

1    you indicate in the record, and this is on Page 3, that it was

2    in response to a specific question about the Harry Potter case.

3            Mr. Brown says that it was not.

4            So what that left the Court with the impression on

5    Friday was that Mr. Halloran allegedly had disclosed to his                    10:21

6    lawyer, that had retained him as an expert, that asked about

7    the Harry Potter rate -- because that's the highest rate --

8    that was what was implicitly -- that was the understanding of

9    the Court.

10           I can see this is a subtlety, so I'm not -- you know,    10:22

11   at the same time, I understand Mr. Toberoff's position that --

12   you know, that's why we have a hearing on these things, to kind

13   of get to the bottom of it.

14           Mr. Toberoff?

15           **MR. TOBEROFF:**  Yes, Your Honor.                      10:22

16           The key phrase, as you noted, is on page -- the key

17   section is at the bottom of Page 3, and I'd like to point out

18   something specific to the Court.

19           Mr. Perkins says, "And the way it came out was that,

20   at the deposition, the Warner Bros.' attorney asked, 'What was  10:22

21   the video royalty in the Harry Potter case?'"

22           **THE COURT:**  I just said that.  I see that, Counsel.

23           **MR. TOBEROFF:**  Suggesting that he had information

24   from Mr. Halloran.

25           And then he misrepresented.  She said, "That's          10:22

```
 1  confidential."

 2          Then when later asked what's the highest that's ever

 3  been paid, she gave the testimony.

 4          THE COURT:  I understand.  That's what I think I just

 5  said.                                                          10:23

 6          MR. TOBEROFF:  And then at the end on Page 4, and to

 7  prompt you to seal the record, he says, "So it's out there,

 8  Your Honor.  So it's out there."  Meaning, this is being leaked

 9  by Mr. Halloran.

10          I don't see this, from my perspective, as accidental.  10:23

11  And it worked.  And I just think under the circumstances, the

12  defendants should supply the transcript from that case so the

13  Court can see in black and white what actually happened.

14          THE COURT:  Well, they're not disputing that

15  Mr. Brown's representations are correct.                       10:23

16          Are you?

17          MR. PERKINS:  At this point, Your Honor, I'm not

18  going to stand behind any third party's representation.

19          THE COURT:  Okay.

20          MR. PERKINS:  However, Your Honor, Ms. Chilton is      10:23

21  here if the Court wishes to inquire of her.  We brought her in

22  this morning for that very purpose, if Your Honor would like to

23  hear about it.

24          THE COURT:  Well, I trust you've shown her this

25  declaration of Mr. Brown, have you not?                        10:24
```

1    **MR. PERKINS:**  Yes, we have.

2    **THE COURT:**  Does she agree that Mr. Brown's

3    declaration is accurate?

4    **MR. PERKINS:**  Not entirely, Your Honor.  She stands

5    by her recollection of her testimony.

6         Apparently, there was --

7    **THE COURT:**  Why don't you proffer for the Court.

8    What's her recollection?

9    **MR. PERKINS:**  Well, her recollection is that there

10   was, in fact, a question asked about the Harry Potter royalty,

11   and that she said that it was confidential.

12        And that later he asked her a question, "What's the

13   highest you've ever paid?"

14        At which point there was a -- she says, in colloquy

15   with counsel, "Look, I've already told you who got the highest.

16   If I tell you what the number is, you're going to know."

17        Eventually, she did testify, as I mentioned, that the

18   deposition is pursuant to protective order.

19        But, again, the impression that she came away with in

20   this conversation, after having testified and what was

21   represented to us, was that Mr. Brown knew that.

22        Your Honor, Mr. Brown is an officer of the court;

23   he's put in a declaration under oath; we drew a conclusion

24   based on the information that we had.

25        I would point out, I did not come in, Your Honor, and

10:24

10:24

10:24

10:24

10:25

1    ask for sanctions against Mr. Halloran for him to be held in

2    contempt.  Our concern was, we just want to ensure that there

3    was no confusion as a result of what was said when we objected

4    to it in the beginning; and that perhaps this provisional

5    sealing would be the way to go.                                        10:25

6           And that was our entire objective, Your Honor, in

7    bringing this to the Court's attention.

8           Again, I represented to the Court, to the best of my

9    knowledge, what I had been told; the conclusion that had been

10   drawn by the Warner Bros.' lawyer.  And I reported that to the         10:25

11   Court.

12          To the extent that Mr. Halloran has been unfairly

13   impugned in this matter, I apologize.  It was certainly not the

14   intent.  Again, we did not come in asking for contempt

15   citations.  We wanted to keep the genie in the bottle and make         10:25

16   sure --

17          **THE COURT:**  The Court has its own responsibilities

18   when an allegation of this nature is made against an officer of

19   the court; he's a member of the bar.  Whether he's in this

20   court as a witness or as a litigant, the Court has its                 10:26

21   obligations to make sure that orders are being abided by.

22          Who's this Welles v. Turner Entertainment?  Who is

23   that before?  What court is that before?

24          **MR. PERKINS:**  Your Honor, I don't know actually.  I

25   can find out.  I don't know.                                           10:26

1       **THE COURT:**  Is it a state court case?

2       **MR. PERKINS:**  I don't even know the answer to that.

3       **THE COURT:**  Do you know, Counsel?

4       **MR. TOBEROFF:**  I believe it's the United States

5  District Court for Central District, Western Division.  The

6  case number is CV 08-01399-JFW.

7       **THE COURT:**  Okay.  That's Judge Jack Walter.

8       Maybe I should just send everyone over there.

9       **MR. TOBEROFF:**  Your Honor, if I may, at least now

10  that everyone's curiosity is raised, I think defendants should

11  produce the transcript.

12      **THE COURT:**  Well, it's not a matter of just

13  curiosity, but I do think I probably should take a look at the

14  transcript and that would probably resolve it.

15      You know, if this did come out from the Warner Bros.'

16  attorney in response to general questioning, without a specific

17  prompt in Harry Potter, that does lesson, significantly I

18  think, the concern here.

19      At the same time, Mr. Halloran -- even if it had come

20  out from Warner Bros., just because one person does

21  something -- releases information, indicates that it's

22  confidential, that still doesn't fully explain why Mr. Halloran

23  would have said what he said during the break.

24      **MR. TOBEROFF:**  We don't know what he said until we

25  question him.  But, Your Honor, what has been relayed to me was

1   that when -- he's the expert in that case, so naturally he

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████████    10:28

6   ██████████████████

7            That's hardly disclosing confidential information in

8   violation of protective order, by confirming that you've

9   testified on the same thing in open court today.

10           He did tell him that there was a pending motion to    10:28

11  seal the record.

12           Also, Your Honor, I would like to --

13           **THE COURT:**  Well, that's what I just meant.

14           I mean, I'm accepting Mr. Brown's testimony as to

15  what Mr. Halloran said, so you've just confirmed.  So we do    10:29

16  know, at least from your prospective, what he did say.

17           **MR. TOBEROFF:**  Yes.

18           **THE COURT:**  When you're subject to a protective

19  order -- as you well know, Counsel -- you discuss neither the

20  content nor the subject of the matter that is subject to the    10:29

21  protective order.

22           **MR. TOBEROFF:**  Yes.  But it -- I understand.

23           **THE COURT:**  You're back in -- and I don't need to use

24  a silly example, but you understand that simply disclosing the

25  subject matter of that which is the subject of the protective    10:29

1    order is a violation of a protective order.

2            **MR. TOBEROFF:**  I understand that.

3            **THE COURT:**  I wouldn't necessarily expect a lay

4    witness to understand that, perhaps; but certainly a lawyer

5    would understand that.  When you've been ordered not to discuss          10:29

6    something that's been basically sealed or provisionally sealed

7    in a courtroom, you can't even say what the subject was in the

8    courtroom.

9            So that's why I made the comment that I did.  Even

10   accepting your proffer and Mr. Brown's proffer of what                    10:29

11   Mr. Halloran said, he's not off scot clean on this.  But it

12   certainly lessens the Court's concern that he provided --

13   because quite frankly, what I thought, based on the statements

14   that Mr. Perkins made, was that essentially Mr. Halloran fed

15   Mr. Brown a question to ask the Warner Bros.' attorney.  And             10:30

16   that appears, no matter whose version I accept, that that's not

17   the case.

18           And now we're more on a level where I think simply an

19   admonition to everybody to be quiet about this until the Court

20   has considered the application, responds to it, and issues an           10:30

21   appropriate order, we should leave well enough alone.

22           But as far as people paying for -- I mean, both of

23   you brought out witnesses this morning.  It sounds like nobody

24   is entirely -- there was some miscommunication, apparently, to

25   counsel here.  Mr. Halloran probably went into a subject that          10:30



       1   he shouldn't have.  You know, perhaps this is one of those

       2   things that we all walk away from.

       3

       4

       5                                                                  10:31

       6

       7

       8

       9

      10                                                                  10:31

      11            **THE COURT:**  I understand that.  And that's an

      12   argument that I want to have briefed.  That's why I'm

      13   encouraging Warner Bros. to submit that brief soon.  I'll

      14   certainly urge you to respond to it.  And the Court will make a

      15   decision.                                                      10:31

      16            I'm more concerned about basically the provisional

      17   sealing that I did until we could get to this point of

      18   resolving it.  It sounds like the issue is not as egregious as

      19   the Court understood it to be based on counsel's remarks last

      20   week.                                                          10:32

      21            I think it's probably best that we just move forward

      22   at this time.  I'll accept Mr. Brown's -- I'll credit

      23   Mr. Brown's declaration.  There's no objection to it from the

      24   defense.

      25            On further reflection, I don't think there's any need  10:32

1    for the Court to look at that transcript.  I'll leave it to

2    you, Mr. Toberoff, to advise Mr. Halloran not to discuss either

3    the contents or even the subject matter of the

4    Rowling/Harry Potter agreement until the Court has issued a

5    further order on this.                                          10:32

6            **MR. TOBEROFF:**  Very well, Your Honor.

7            **THE COURT:**  And I'll advise your client just to -- I

8    suppose they can disclose it to whoever they want.  I mean,

9    that's not a problem.  But obviously, there was some

10   miscommunication here, and it's just a good lesson in making   10:32

11   sure that we have all the facts straight.

12           **MR. PERKINS:**  Thank you, Your Honor.

13           **THE COURT:**  Very well.

14           **MR. TOBEROFF:**  Very well, Your Honor.

15           **THE COURT:**  Let's proceed.                          10:32

16           You should all be thankful that this did not unfold

17   before another judge.

18           **THE CLERK:**  Mr. Levitz, please be advised you're

19   still under oath.

20           **THE WITNESS:**  Thank you.                            10:33

21           **MR. BERGMAN:**  Your Honor, may I approach to show the

22   witness an Exhibit book.

23           **THE COURT:**  Yes.

24   / / /

25   / / /

```
1                    DIRECT EXAMINATION (cont'd)

2    BY MR. BERGMAN:

3    Q    Good morning, Mr. Levitz.

4    A    Good morning.

5    Q    Sir, I've placed before you a book which contains      10:34

6    four exhibits; 1003 through 1006.

7              Could you briefly look at those documents and

8    identify what they are.

9    A    Certainly.

10              MR. TOBEROFF:  Excuse me, Your Honor.  May we have   10:34

11   copies of these exhibits.

12              THE COURT:  I'm sorry?

13              MR. TOBEROFF:  I would just request a copy of these

14   exhibits to be able to follow.

15              THE COURT:  Does counsel not have these?           10:34

16              MR. BERGMAN:  Don't you have copies of our exhibits?

17              THE COURT:  Do you have them, Mr. Toberoff?

18              MR. TOBEROFF:  Yes, now we do.

19              THE COURT:  Very well.  Proceed.

20   BY MR. BERGMAN:                                              10:34

21   Q    Would you tell us what those documents are, sir?

22   A    These appear to be copies of the statements from Warner

23   Bros. with regard to Superman I, II, III and IV for DC's

24   participation from our files.

25   Q    Can you tell me, sir, as of what date those participation  10:35
```

1    reports reflect the income of those four films?

2           Why don't you turn, for example, in Exhibit 3 to

3    Page 5409.

4    A    They appear all to be as of March 31, 2002.

5    Q    And that was prior to the time you entered into the          10:35

6    agreement?

7    A    Prior to the time I executed the agreement.  We probably

8    received the -- we received these statements just after I

9    executed the agreement, judging by the date of the check on the

10   second one.  They would be essentially identical to the           10:36

11   previous quarter.  There was no great activity for any of these

12   four films at that point.

13   Q    And do these documents reflect the total income that had

14   come in on the respective pictures from their first date of

15   release until that date in 2002?                                   10:36

16   A    Yes; there's a cumulative number on each.

17   Q    Looking, sir, to 5409, which is *Superman I*, what were the

18   reportable gross receipts from that picture as of that date?

19   A    Approximately $92 million.

20   Q    And looking to Exhibit 1004 at Page 5505, can you tell me     10:36

21   what the total gross receipts on *Superman II* were as of that

22   date?

23   A    Comparable numbers, approximately 78 million.

24   Q    And looking at 1005, Page 7703, can you tell me what the

25   comparable gross receipts was on *Superman III* as of that date?   10:37

1    A    Approximately $49 million.

2    Q    And looking, sir, to Exhibit 60 at Page 7776, can you tell

3    me what the reportable gross receipts were for *Superman IV* as

4    of that date?

5    A    Approximately $17 million.

6    Q    Okay.

7         MR. BERGMAN:  Your Honor, I would move these

8    documents into evidence.

9         MR. TOBEROFF:  Your Honor, objection to these numbers

10   on the basis of relevance since they are in nominal -- The bulk

11   of the revenues in a '78 release film is in nominal dollars in

12   '78, which is then reflected here in nominal dollars; so it

13   lacks real relevance to probative value.

14        Also, he's looking at a statement and he's asking

15   him, 'can you tell me what the revenues, in fact, were,' and

16   he's giving an answer.  When essentially he's just reading from

17   the document, and the document speaks for itself.

18        THE COURT:  The document does speak for itself.

19        I'll overrule the relevancy objection.  Your argument

20   goes to the weight of the evidence being submitted.

21        The document is admitted.

22        MR. BERGMAN:  Thank you, Your Honor.

23        (Exhibit 60 is received.)

24   BY MR. BERGMAN:

25   Q    Mr. Levitz, there was some testimony in the case last week

10:37

10:37

10:38

10:38

10:38

1    about the purported value of reversion rights.

2              To what extent has reversion rights provisions been

3    generally important to you when you're negotiating a rights

4    license on behalf of DC Comics?

5    A    Reversion rights are relevant depending on the type of                    10:38

6    contract and the type of contracting party.

7              In cases where we are not expecting the contracting

8    party to be making a significant investment or long-term

9    commitment, like a T-shirt license at one extreme, we would go

10   for a very short term and a very, very quick reversion, if they   10:39

11   don't act in the marketplace.

12             That scales up to categories like the motion picture

13   industry, where it's very difficult, in my experience, to get

14   reversion terms.  And, again, it measures with who the party

15   is.  We would be more concerned about that with a party where    10:39

16   we felt we had no other negotiating leverage to go back and

17   adjust the relationship if production were abandoned or

18   development were abandoned than with a party where we have

19   numerous other bases of relationships, where we would have the

20   strength to solve it, other than by operation of the contract    10:40

21   itself.

22   Q    Okay.

23             Was there a reversion provision in the *Watchmen*

24   agreement that you negotiated with Fox?

25   A    There was no reversion provision once the purchase price     10:40

1   was paid, and you went option, option; and then if the purchase

2   were exercised, regardless of whether they made a film or not,

3   they held the rights perpetually.

4   Q    To what extent was the reversion provision important to

5   you in negotiating the *Superman* film agreement?                    10:40

6   A    I was not particularly concerned about reversion as a

7   priority item in the film agreement, because I was negotiating

8   with Warner Bros. and I had past experience of being able to

9   resolve problems of -- or opportunities to recapture rights

10  with Warner Bros. to do other things.                                10:41

11  Q    We also heard testimony, sir, regarding co-financing

12  provisions.

13          **THE COURT:**  Before you move on past reversion,

14  Counsel.

15          The length of the agreement, without reversion, would     10:41

16  that not give you some concern?

17          **THE WITNESS:**  In my experience in the motion picture

18  industry, a motion picture licensee generally tries to capture

19  rights in perpetuity.  They feel they're investing so much

20  money that they have to have the right to exploit it              10:41

21  indefinitely.  The length of time that you would expect to be

22  working together on *Superman* films, in a success scenario,

23  would naturally be for decades.  It's a very natural kind of

24  process.

25          **THE COURT:**  But this is 34 years.                     10:42

 1        **THE WITNESS:**  Correct, Your Honor.  We survived

 2   25 years under the previous agreement.  And our *Batman*

 3   agreement, which was done with third parties initially, as long

 4   as option payments continued to be made, or films, but option

 5   payments were sufficient to keep it going, they could continue          10:42

 6   it perpetually.

 7        Functionally, in success, these agreements tend to go

 8   on for decades and decades.  Marvel, as we saw from their deal

 9   with Fox, has a much inferior deal, but as long as Fox

10   continues to make a movie every certain number of years, they          10:42

11   get to keep it forever, and they get to continue paying Marvel

12   a nonadjusted-for-inflation price that rolls on.

13        **THE COURT:**  Counsel, do you have an objection?

14        **MR. TOBEROFF:**  Yes, I do, Your Honor.

15        And I'd like to request a standing objection on this,          10:42

16   so as not to disrupt the flow.

17        I object to the testimony as expert testimony based

18   on special knowledge at the points where he was speaking about

19   Marvel deals and what's generally done in the motion picture

20   industry.                                                             10:43

21        **THE COURT:**  The Court has ruled on this objection,

22   Counsel.  You have sustained it for the record.  You've

23   provided it for the record.  You've submitted a brief on it.

24        Counsel, this is a bench trial.  The Court is only

25   eliciting this for the purpose of his state of mind.                  10:43

1  **MR. TOBEROFF:**  I understand, Your Honor.  I'm just

2  asking, may I have a standing objection to this type of

3  testimony, so I don't have to keep popping up, for the record?

4          I need to object for the record.

5  **THE COURT:**  You have made your objection, Counsel,                    10:43

6  several times now.

7          The Court has overruled your objection.

8  **MR. TOBEROFF:**  May I have a standing objection, under

9  Rule 103, to this line of testimony?

10  **THE COURT:**  I don't know what "this line of                          10:43

11  testimony" means, so I'm not going to accept that.

12          Make your objection.  Don't make it a speaking

13  objection.

14  **MR. TOBEROFF:**  I understand, Your Honor.

15  **THE COURT:**  All right.                                              10:43

16          Overruled.

17          Please continue.

18  **THE WITNESS:**  I'm sorry.  Could the reporter give me

19  my last sentence.

20  **THE COURT:**  The problem that I'm having is trying to                 10:44

21  identify what you got for a 34-year turnover.  You speak about

22  what you would get assuming success, but I'm more concerned

23  about the opposite scenario.  If there's 34 years --

24  essentially, you're held hostage by Warner Bros. for 34 years,

25  at their whim; and you have nothing for that except the                  10:44

1    relatively small payment for the option.

2         THE WITNESS:  Well, Your Honor, if they had done

3    nothing throughout the entire time, we would have earned over

4    $20 million in option payments over the entire period.  And we

5    would have known -- for instance, we already had the *Smallville*          10:44

6    deal in place, so they had already given us back, quote,

7    unquote, a piece of rights that has, in fact, earned us

8    separately another over $20 million.  So had they never made a

9    *Superman* movie, we would have found ourselves with well over

10   $40 million in place.                                                     10:45

11        And I believe, and certainly it was my judgment at

12   the time, rightly or wrongly, that in the event that

13   Warner Bros. would abandon development or would not pursue a

14   movie ultimately for one reason or another, I would not have an

15   obstacle in getting those rights back to exploit in some other         10:45

16   fashion, regardless of what the contract provision said.

17        THE COURT:  Thank you.

18        Counsel?

19        MR. BERGMAN:  Thank you, Your Honor.

20   BY MR. BERGMAN:                                                          10:45

21   Q    In the event that --

22        THE COURT:  I'm sorry.

23        How would you do that?

24        THE WITNESS:  How would I do that?

25        THE COURT:  Yes.                                                    10:46

 1          **THE WITNESS:**  I would first go to Warner Bros.

 2    Pictures, as a starting point, and say -- I'll make up a

 3    hypothetical set of circumstances.

 4          **THE COURT:**  But if they had taken the position that

 5    they didn't want this film produced and they wanted to keep the     10:46

 6    rights, there's nothing you could have done, is there?

 7          **THE WITNESS:**  Yes, Your Honor, there is.  Because we

 8    are both part of the same corporation, I have access to people

 9    whose responsibilities don't simply include the film division.

10          **THE COURT:**  So you would have to go, essentially,         10:46

11    over their heads?

12          **THE WITNESS:**  I would have to go over their heads to

13    our common owners and say, 'This isn't good for the business

14    overall.  DC Comics can make money by getting a *Superman* movie

15    made.  I believe there's an opportunity, and' --                    10:46

16          **THE COURT:**  So that's part of what --

17          **THE WITNESS:**  That's part of what I'm expecting.

18          I have experience, Your Honor, in my dealings that

19    Warner Bros. Pictures doesn't always determine what we do.  If

20    Warner Bros. Pictures' interests were being served, then they       10:47

21    would automatically have rights to everything DC had ever done,

22    and they wouldn't have to pay for it.  But our more senior

23    management has said, 'You must do this at a measure of fair

24    market arm's length dealing.'  And in certain circumstances, we

25    support DC in going outside and licensing properties like           10:47

*Watchmen* elsewhere, when that's the right opportunity to be

pursued.

     **THE COURT:**  How would they automatically have rights

if they wanted to?

     **THE WITNESS:**  If they had their ideal fantasy, the

pictures division would say, 'DC is an affiliated company.  Why

can't we just do anything that they have the rights to without

compensating them?'

     **THE COURT:**  So, theoretically, they didn't have to

negotiate with you, if they would have gone over your head?

     **THE WITNESS:**  If they had gone over my head and been

sustained that fair market value didn't matter, then they

wouldn't have had to negotiate with us at all.

     **THE COURT:**  Counsel.

     **MR. BERGMAN:**  Thank you.

**BY MR. BERGMAN:**

Q    If they had gone over your head with such a request, what

would the response, in your experience, have been?

A    The response has always been that you have to do it on

fair market terms.

Q    Okay.

     If there was a reversion of the DC rights, would DC

get, for example, ownership of the *Superman* theme?

A    Not in an ordinary reversion.

Q    Would it, under the ordinary circumstances, get back any

10:47

10:47

10:48

10:48

10:48

1    of the rights that Warner Bros. had acquired in the derivative

2    films and television shows?

3    A    Not in any ordinary reversion.

4    Q    Okay.

5         Have you ever had an experience with Warner Bros.                    10:49

6    regarding any property where they have taken the position they

7    want to simply take it off of the market, whether they exploit

8    it or not?

9         **MR. TOBEROFF:**  Objection.  Leading, Your Honor.

10        **THE COURT:**  Sustained.                                           10:49

11   **BY MR. BERGMAN:**

12   Q    To what extent have you had any experience in which

13   Warners has taken a position that it would not exercise rights

14   but would not release them?

15   A    The only circumstance in which we've had a situation like          10:49

16   that is where Warners felt they had a right to that piece of

17   property under a previously-existing agreement, and they read a

18   grant broadly.

19   Q    Let me continue, then, to the issue of a co-financing

20   opportunity.                                                             10:50

21        As you may recall, plaintiffs' expert asserted that

22   such provisions could be important.

23        Has DC ever sought such co-financing opportunities

24   from any party?

25   A    Not on our own behalf.                                             10:50

1  Q    Why not?

2  A    DC's business model is not to invest in film or television

3  production.  That's a particularly sophisticated task that

4  requires building considerable expertise in those situations,

5  and we've never felt inclined to move into that business.          10:50

6  Q    Have you ever invested $100 million or $150 million in the

7  development of any project?

8  A    No.

9  Q    Would you do that under your business model?

10 A    I don't believe that it works under our business model or    10:51

11 that the staff of DC Comics has the appropriate competency for

12 that.

13 Q    At the time you signed the film agreement, Mr. Levitz,

14 what was your understanding, what was your state of mind, as to

15 whether or not the parties -- DC, Warner, and the Siegels --      10:51

16 had reached a settlement of their dispute?

17 A    At the time that I signed the film agreement in April or

18 May of 2002, I believed that we had agreement on settlement

19 terms.

20 Q    At that time, what was your understanding as to the amount  10:51

21 of the participation that the Siegels would have in the

22 *Superman Returns* revenues?

23 A    They would participate in a percentage of DC's revenues

24 from *Superman Returns*, and they would receive -- 6 percent, I

25 believe, was the number at the time, of DC's revenues.  So if     10:52

```
 1  you assume that we get 5 percent of world, then it's 6 percent
 2  to 5 percent.
 3          MR. TOBEROFF:  Objection on the basis of best
 4  evidence rule.  The settlement documents are the best evidence
 5  for the terms discussed in the settlement, and that's not been   10:52
 6  presented.
 7          THE COURT:  Overruled.
 8  BY MR. BERGMAN:
 9  Q    Does that book in front of you, Mr. Levitz, go up to
10  Exhibit 1027?                                                    10:52
11  A    Yes.
12  Q    Could you look at Exhibit 1027, please.
13  A    Certainly.
14  Q    Would you identify what Exhibit 1027 is.
15  A    This is the report from Warner Bros. Pictures, on          10:53
16  Superman Returns, as of June 30, 2008.
17  Q    And looking at that document, sir, how much money has DC
18  received from Superman Returns, pursuant to the film license,
19  as contingent compensation?
20  A    As of the date of this, $11,600,000 and change.            10:53
21  Q    And as of that date, how much money had DC received,
22  pursuant to the film agreement's reservation of rights, from
23  Superman Returns merchandising?
24  A    I believe we had earned, by approximately that date, some
25  $30 million.                                                    10:54
```

1  Q    To what extent have you found, in your experience at DC,

2  Mr. Levitz, that merchandising revenue is or is not dependent

3  upon the performance of the film?

4  A    A successful film generally has a very positive effect on

5  merchandising usually for a couple of year's period thereafter,          10:54

6  in my experience.

7           **THE COURT:**  Is there an objection to the question?

8           **MR. TOBEROFF:**  Same objection as to specialized

9  knowledge expert testimony, Your Honor.

10          **THE COURT:**  Overruled.                                       10:54

11          **THE WITNESS:**  An unsuccessful film will still

12 increase merchandising revenue, because you will generally have

13 managed to sell some into the stores, and you'll have some

14 retail space because a film exists.  But it will have a vastly

15 smaller effect, because it won't motivate people to go and be          10:55

16 excited by the film.  It's, to some extent, proportionate to

17 the type of failure.

18          A film that is unsuccessful in the ways that, for

19 example, *Supergirl* was, where there was very little support

20 from the motion picture studio advertising and promoting it in        10:55

21 advance, and very little word of mouth built up, and then

22 nobody ultimately cared about the movie, will have an

23 extraordinarily bad effect on merchandising.  A film like

24 *Superman IV* will come close to that, where you have some

25 marketing, some promotion, somebody looking forward to it; so          10:55

1    you might get some retail space, but very little buyer

2    excitement.

3    **BY MR. BERGMAN:**

4    Q    Okay.  At what point in time in the development or release

5    of a motion picture like *Superman Returns* -- and let's look at          10:56

6    *Superman Returns* -- at what point in time does merchandising

7    revenue begin coming into DC?

8              **MR. TOBEROFF:**  Same objection, Your Honor, to the

9    extent that he's not specifically talking about *Superman*

10   *Returns*.                                                                 10:56

11             **THE COURT:**  What's your objection, Counsel?

12             **MR. TOBEROFF:**  The question was his expert testimony

13   based on specialized knowledge.

14             **THE COURT:**  Overruled.  It goes to his state of mind.

15             **THE WITNESS:**  You generally will begin selling            10:56

16   merchandising deals, based on a film, prior to the film

17   actually commencing production.  It will usually -- in our

18   practice, we'll begin selling merchandising rights as much as

19   18 months or two years prior to a film's actual release date.

20   Some money comes in as you do those deals.  Some value comes in       10:57

21   in excess of the actual cash that comes in, because you're

22   generally entering into contractual relationships that have

23   significant guarantees.  And the majority of the money from

24   many films' merchandising programs, in my experience, will be

25   booked by opening day.  A film that motivates an unanticipated       10:57

```
 1   high level of retail action going on in retail sales may have
 2   continuing overages that benefit you for the next year or two
 3   years thereafter.
 4   BY MR. BERGMAN:
 5   Q    To what extent, if any, was the merchandising split under      10:57
 6   the film agreement a factor in your decision to enter into that
 7   agreement?
 8   A    The merchandising split is --
 9            MR. TOBEROFF:  Lacks foundation, Your Honor.
10            THE COURT:  Overruled.                                      10:58
11            You may answer.
12            THE WITNESS:  The merchandising split is a critical
13   term for us, particularly with a property like Superman, where
14   we know it has a long history of successful merchandising, and
15   we know we have the ability to generate historically large       10:58
16   sums.  And in the marketplace as it existed at the time that we
17   were doing the Superman Returns deal, we would have hoped to
18   have done at least as much in merchandising as we would from
19   the film itself, and possibly more.
20   BY MR. BERGMAN:                                                   10:58
21   Q    Okay.
22            Plaintiffs' expert testified that it was his reading
23   of the film agreement that Warner Bros. could make a number of
24   different types of audio visual works based on Superman, but
25   would only have to compensate DC for the theatrical motion      10:59
```

1    pictures that were released under that.

2            Does DC and Warner Bros. have a customary way of

3    dealing with audio visual *Superman* works other than feature

4    films?

5    A    Yes.                                                           10:59

6    Q    Can you tell us what that is.

7    A    Yes.  Consistently, when there's been an opportunity to

8    exploit the property in a different form, we either look to the

9    contractual formula for the film agreement to see if that's

10   appropriate for that property, in that form -- for instance, we   10:59

11   did, I believe, two *Superman*-directed video projects, where we

12   agreed that the compensation would flow on the gross formula in

13   the film agreement -- or we look to see if there is a new form

14   or new formula that's appropriate for that form of

15   exploitation, to more closely approximate the fair market        11:00

16   value.

17   Q    And did you, in fact, agree upon the more appropriate

18   terms?

19   A    We've done that with -- *Smallville* is the clearest

20   example, and we continue to do that with a variety of different  11:00

21   projects that we've done or have under discussion.

22   Q    Okay.

23            Does that book go up to 1040?

24   A    It does not.

25            **MR. BERGMAN:**  May I approach, Your Honor?           11:00

```
 1              THE COURT:  You may.

 2              (Document provided.)

 3              MR. BERGMAN:  Before I move on to that, Your Honor,

 4    may I offer into evidence Exhibit 1027 that the witness has

 5    testified concerning?                                          11:01

 6              THE COURT:  Any objection?

 7              MR. TOBEROFF:  No objection, Your Honor.

 8              THE COURT:  It's admitted.

 9              (Exhibit 1027 is received.)

10    BY MR. BERGMAN:                                                11:01

11    Q    Would you turn, sir, to Exhibit 1040.

12    A    Yes.

13    Q    Would you identify what that document is.

14    A    This is the 2002 Batman film agreement that replaced and

15    restated the Bat Film agreement of -- I think it was 1979 or  11:01

16    1980.

17    Q    That was the one with an unaffiliated party?

18    A    Yes.

19              MR. TOBEROFF:  Leading, Your Honor.

20              THE COURT:  Sustained.                               11:02

21    BY MR. BERGMAN:

22    Q    The earlier agreement you referred to, sir, with whom was

23    that with?

24    A    It was negotiated with a company called Bat Film, which

25    was controlled by Ben Melnicker, who was a former general     11:02
```

```
 1    counsel of MGM in the 1950's, and Michael Uslan, who had been

 2    an Orion Picture's lawyer.  The two of them had formed Bat Film

 3    as a motion picture production company.

 4    Q    And did Bat Film, the production company, have any

 5    relationship, corporate relationship, with any Time Warner                11:02

 6    company?

 7    A    No.

 8    Q    What is the contingent compensation provision in

 9    Exhibit 1040, the 2002 Batman agreement?

10    A    I believe it's basically the same Salkind formula;                   11:02

11    5 percent of world gross, or 7½ percent of domestic gross,

12    either from the first dollar.

13    Q    And are there annual options within that Batman agreement?

14    A    The Batman agreement operated on a slightly different

15    structure, where a new film had to be released every three                11:03

16    years, or in the absence of a film being released, there was a

17    $175,000 option payment, or rights continuance payment.

18    Q    And if that $175,000 payment were made, would Warner

19    continue to have the rights?

20    A    Yes.                                                                  11:03

21    Q    Okay.

22            What films, if any, have been produced pursuant to

23    that 2002 Batman agreement?

24    A    Batman Begins and The Dark Knight.

25            MR. BERGMAN:  I'd offer Exhibit 1040 into evidence,               11:04
```

```
 1    Your Honor.

 2              THE COURT:  Any objection?

 3              MR. TOBEROFF:  No objection.

 4              THE COURT:  It's admitted.

 5              (Exhibit 1040 is received.)                      11:04

 6    BY MR. BERGMAN:

 7    Q    Turning now to the television licensing of the Superman

 8    property.

 9              Was there a television component of DC's agreements

10    with Mr. Salkind's company?                                11:04

11    A    I believe the television component of the film export was

12    a blackout provision, where we were unable to exploit those

13    rights ourselves.

14    Q    Did any of the Salkind companies exercise those television

15    rights?                                                    11:04

16    A    Ultimately, I believe it was Cantharus, another Salkind

17    entity, that he had assigned the rights to that produced a

18    syndicated Superboy television program.

19    Q    Is the full title of that program The Adventures of

20    Superboy?                                                  11:05

21              MR. TOBEROFF:  Leading.

22              THE COURT:  Sustained.

23    BY MR. BERGMAN:

24    Q    What is the full title of that series?

25    A    I don't remember.  It may have been The Adventures of   11:05
```

1150

1    *Superboy.*

2    Q    Okay.

3         Was that a network television show?

4    A    No.  As I described it, it was a syndicated program.  It

5    was designed basically to be syndicated to second-tier      11:05

6    television stations for play Saturdays at 4:30 in the

7    afternoon.  It was a niche that a couple of different

8    syndicators prospered in for a couple of years.

9    Q    What was the compensation payable to DC under that

10   *Superboy* agreement?                                        11:06

11   A    I believe that it was negotiated as 7½ percent of the

12   domestic revenues.  We operated under several different

13   agreements over the short life of the show, as Salkind moved in

14   and out; and ultimately, Viacom took control of the program.

15   Q    Was there an episodic fee on the *Superboy* show?       11:06

16   A    I believe there was.

17   Q    And do you recall what that amount of the episodic fee

18   was?

19   A    I think it was $12,000, $12,500.

20   Q    And how was the 7½ percent of domestic gross arrived at?  11:07

21   A    My memory is that those programs were produced under a

22   particularly byzantine set of deal structures between Salkind

23   and various partners, where he had sold rights in many places;

24   and we had no confidence, at that point in the relationship, in

25   collecting from him or his likely partners.                 11:07

```
 1              MR. TOBEROFF:  Move to strike, as it lacks foundation

 2   that he was involved in the negotiation of that agreement.

 3              THE COURT:  Sustained.

 4   BY MR. BERGMAN:

 5   Q    During the course of time at DC, have you become familiar      11:07

 6   with the terms of the Superboy agreement?

 7   A    Yes.

 8   Q    Did you have any involvement in the negotiation of that

 9   agreement?

10   A    I believe I had some involvement in it.                        11:08

11   Q    Why was DC's interest in the Superboy television show

12   limited to an interest in domestic as opposed to foreign

13   revenues?

14              MR. TOBEROFF:  Assumes facts, and leading.

15              THE COURT:  As phrased.                                   11:08

16              Rephrase, Counsel.

17   BY MR. BERGMAN:

18   Q    Under the terms of the Superboy agreement, does DC receive

19   any share whatsoever of the revenues from the foreign

20   territories?                                                        11:08

21   A    I believe we did not during the original production of the

22   show.

23   Q    Okay.  And how did that come about?

24   A    The set of deal structures to create the financing to

25   allow the show to be produced fractured the rights between a        11:09
```

1152

```
 1   number of parties; and by that point, we had had significant
 2   challenges collecting from Salkind, so we wanted to be assured
 3   that if the show was going to go forward, a more responsible
 4   party would be paying us.  So the deal was structured so that
 5   the domestic financing partner, Viacom, would pay us directly,      11:09
 6   and we could be assured that we would get our income stream
 7   properly.
 8   Q    Okay.
 9          MR. BERGMAN:  May I approach again, Your Honor?
10          THE COURT:  You may.                                          11:09
11          (Document provided.)
12   BY MR. BERGMAN:
13   Q    I'm going to ask, sir, that you turn to Exhibit 1015,
14   which is a copy of the agreement we've been discussing; is it
15   not?                                                                 11:10
16   A    This is a copy of the Smallville agreement.
17   Q    I'm sorry.
18          Exhibit 1015?
19   A    Yes.
20          MR. BERGMAN:  May I approach, Your Honor?                     11:11
21          THE COURT:  You may.
22          (Document provided.)
23   BY MR. BERGMAN:
24   Q    Would you turn in that book to Plaintiffs' Exhibit 15 and
25   identify that agreement, please.                                     11:11
```

Tuesday, May 12, 2009                    Trial Day 9, AM Session

1   A    This appears to be the agreement covering the *Superboy*

2   television program we were discussing.

3   Q    Okay.

4        Were you present in the courtroom, Mr. Levitz, when

5   Mr. Halloran made reference to that agreement as providing an          11:12

6   $800,000 option fee?

7   A    Yes.

8   Q    Does that agreement provide an $800,000 option fee for the

9   *Superboy* property?

10  A    Let me refresh myself with this for a moment, please.            11:12

11  Q    Would you look, please, sir, at Page 6535.

12          THE COURT:  Counsel, do you have an objection?

13          MR. TOBEROFF:  Objection.  Misstates the record,

14  where he says the testimony -- there's an $800,000 option fee.

15          THE COURT:  I'm sorry, Counsel.  So Mr. Halloran did          11:12

16  not indicate that there was an $800,000 option fee?

17          MR. TOBEROFF:  No.  He indicated there's simply an

18  $800,000 payment.  That's not stated in the agreement as an

19  option.

20          THE COURT:  Very well.                                         11:13

21          That testimony speaks for itself, but you may explore

22  the issue with proper characterization of the $800,000.

23          MR. BERGMAN:  Thank you.

24          THE WITNESS:  Yes, sir.

25  / / /                                                                  11:13

BY MR. BERGMAN:

Q    There is a provision in this agreement for the payment of $800,000 to DC, is there not?

A    There is.

Q    Does the agreement reflect what that $800,000 was for?    11:13

A    Yes.  It's in exchange for $800,000, payable from Warner Bros. to DC, in regard to *Superman IV*.

Q    And in exchange, was that $800,000 payment made for the *Superboy* property?

A    No.    11:13

Q    Prior to entering into this *Superboy* agreement, was DC entitled to an $800,000 payment pursuant to the *Superman IV* agreement?

A    My memory is that we were entitled to $800,000 that was due us with regard to *Superman IV*.    11:14

Q    In connection with receiving that $800,000 under the *Superboy* agreement, what, if anything, did DC do with its contractual right to receive that $800,000?

A    We waived the right to recover it in the other fashion.

Q    Was that right, in fact, assigned to the Cantharus    11:14
company?

A    Yes.

Q    What was the net effect of that $800,000 payment?

A    The net effect of the $800,000 payment in the *Superboy* agreement was to enable DC to collect that money that was owed    11:15

1    us on the Salkind films, which had not previously been paid us

2    because the film had not been successful enough to be liquid

3    enough to enable that payment; and the Salkind parties had not

4    previously paid what was due in that circumstance.

5    Q    Okay.                                                          11:15

6         And why was the $800,000 payment included within the

7    *Superboy* agreement?

8    A    Before we were willing to proceed with new business, we

9    wanted to be made whole on previous business.

10   Q    Approximately, how much money did DC earn from that          11:15

11   *Superboy* exploitation?

12   A    I don't remember off hand.  A couple of million dollars.

13   Q    With what entity did DC contract regarding the television

14   series *Lois & Clark*?

15   A    I believe the original contract was with Lorimar, which      11:16

16   was then a separate television unit of Time Warner and

17   Warner Bros.

18   Q    Prior to entering into that contract for *Lois & Clark*,

19   were those television rights available to DC under the Salkind

20   agreement?                                                        11:16

21   A    No.  For a very long time, we had been frustrated that our

22   television rights had been tied up and all we had actually been

23   able to do was the *Superboy* series, which had been very

24   trivial, in both economic effect and in any ability to affect

25   any licensing or other forms of our business.                    11:17

1    Q    And how were those rights freed up?

2    A    Over the period of a couple of years, Jeanette Kahn, who

3    was then the president of the company and our primary creative

4    person on film and television projects at that period, spoke to

5    Warner Bros. executives and said that she had developed an idea          11:18

6    for a way to do a successful network, a *Superman* television

7    show.  At that point, the obstacle to doing *Superman* in

8    prime time network exploitation had been a feeling that the

9    movies had set a generally high standard of special effects

10   that wouldn't be duplicatable in a prime time show, so no one          11:18

11   would be interested.

12        Jeanette had come up with the concept of taking the

13   style of a then-popular television program *Moonlighting* and

14   applying it to the relationship between Lois & Clark, setting

15   most of the show at the Daily Planet, with only a little touch         11:18

16   of superhero action.  She convinced the Warner Bros. executives

17   that this might be a viable prospect, and as a result,

18   motivated them to go in and buy out those rights, and

19   ultimately buy out the film rights, from Salkind.

20   Q    Did they, in fact, buy out those rights?                          11:19

21   A    They did.

22   Q    Did that enable the production of *Lois & Clark*?

23   A    That enabled us to go in and pitch *Lois & Clark*, develop

24   it for network; and we were successful in selling it, so the

25   show was able to be produced.                                          11:19

1    Q    What involvement did you have, if any, Mr. Levitz, with

2    the negotiation of the *Lois & Clark* agreement with

3    Warner Bros.?

4    A    I believe I was our primary negotiator for that agreement.

5    Q    With whom did you negotiate it?                                11:19

6    A    Bruce Rosenbloom, who was their business affairs guy at

7    the time.

8    Q    What were the primary issues in that negotiation?

9    A    The primary issues were, first, that it was very rare to

10   do a television deal and retain the right to exploit the same    11:20

11   property on film at the same time.  Lorimar was concerned that

12   they would be unable sell the show to a network under those

13   conditions, because the network might insist on, I guess, the

14   blackout on film rights during the same period, DC's creative

15   involvement, and the economics of the deal itself.               11:20

16   Q    What were the economic issues, if any, that were discussed

17   in the course of negotiating the *Lois & Clark* agreement with

18   Mr. Rosenbloom?

19   A    I took the position in the negotiation that DC and the

20   *Superman* property deserved a gross participation in the        11:21

21   program.  That was unprecedented, according to Mr. Rosenbloom,

22   and he resisted that energetically.  And then we had a number

23   of discussions, as well, in shaping the per-episode fee and the

24   form of participation, as well as all of the other reserved

25   rights that we wished to have.                                   11:21

1  Q    Ultimately, did you obtain a first-dollar gross

2  participation on *Lois & Clark*?

3  A    We did.

4  Q    And what was that participation on an episodic basis?

5  A    I believe the participation was structured as 3 percent on    11:22

6  the first million and a half dollars, and then 5 percent

7  thereafter.

8  Q    And what were the episodic fees paid to DC pursuant to

9  that agreement?

10         MR. TOBEROFF:  Leading.  There's no testimony there    11:22

11  were episodic fees.  Lacks foundation.

12         THE COURT:  Sustained.

13  BY MR. BERGMAN:

14  Q    Were there episodic fees under the agreement?

15  A    Yes.                                                    11:22

16  Q    What were they?

17  A    I believe they were $45,000 an episode.

18  Q    At the time the deal was concluded for *Lois & Clark*

19  between DC and Warner Bros. Television, what network, if any,

20  had the *Lois & Clark* series been scheduled for broadcast on?    11:22

21  A    The program ultimately ran on ABC television.  My memory

22  doesn't go to the synchronicity of when the agreement was

23  concluded versus when ABC picked it up.  I believe that ABC

24  picked it up very early in the process, but it may have been

25  before or after the agreement was actually signed.    11:23

```
 1              MR. TOBEROFF:  Move to strike as nonresponsive.

 2          He simply asked what network it ran on.

 3              THE COURT:  There's no foundation, given that he

 4  can't remember.

 5          Sustained.                                              11:23

 6  BY MR. BERGMAN:

 7  Q    Do you recall, sir, whom Lois & Clark agreement was

 8  "pitched" by Warner Bros. Television?

 9              MR. TOBEROFF:  Lacks foundation, Your Honor.

10              THE COURT:  Overruled.  It is a foundational       11:23

11  question.

12          Do you recall?

13              THE WITNESS:  Yes.

14  BY MR. BERGMAN:

15  Q    And what network was that, sir?                           11:24

16  A    I believe it was ABC.

17  Q    Was that pitch, to your best recollection, made before or

18  after the consummation of the Lois & Clark agreement between

19  Warner and DC?

20  A    I don't remember with certainty.  I think it was very     11:24

21  early on.

22  Q    Okay.

23          Was the Lois & Clark series an economic success for

24  DC?

25  A    Yes.                                                      11:24
```

1          **MR. BERGMAN:**  May I approach again, Your Honor?

2          **THE COURT:**  You may.

3          (Document provided.)

4    BY MR. BERGMAN:

5    Q    I'd like to call your attention, Mr. Levitz, to                    11:25

6    Exhibit 1015, which is the *Smallville* agreement.

7    A    Yes, sir.

8    Q    How did the idea for *Smallville* originate?

9    A    Warner Bros. Television, working with a production company

10   named Tollin-Robbins, had developed a young Batman television        11:25

11   idea that we were unwilling to proceed with.  When that got

12   turned down, they came up with the idea for *Smallville* as an

13   interesting way of doing a young part of the Superman legend.

14   Q    And what was DC's reaction to that concept?

15   A    DC was pleased, because it looked like an opportunity to        11:26

16   exploit a different part of the Superman mythology effectively.

17   Q    At the time of entering into that contract, did you

18   consider the effect, if any, that the *Smallville* series would

19   have upon any prospective *Superman* film?

20   A    Yes.                                                             11:26

21   Q    And what, if anything, did you conclude in that regard?

22   A    We concluded that there was some possibility of a positive

23   effect in continuing to keep the awareness of Superman out

24   there, and that because the boundaries, if you will, for the

25   program creatively were going to be no large-scale superheroics      11:26

1    and no use of the Superman costume, that it wouldn't be

2    preemptive of a film, because it would not satisfy the same

3    creative desires that ultimately we would hope to reach with a

4    film project.

5    Q    Was there an expression that the people associated with        11:27

6    the program used to convey the fact that there would be no

7    major superhero adventures and no costume?

8              **MR. TOBEROFF:**  Objection.  Leading.

9              **THE COURT:**  Sustained.

10   **BY MR. BERGMAN:**                                                   11:27

11   Q    Do you recall how the people involved in the show

12   described the concept which you have just described?

13   A    One of the phrases they used to describe it was

14   "no flights, no tights."

15   Q    Okay.                                                           11:27

16              What involvement, if any, did you have in the

17   negotiation with Warner Bros. Television for the acquisition of

18   the right to produce a *Smallville* series?

19   A    I believe I was the primary negotiator.

20   Q    With whom did you conduct the negotiations?                     11:27

21   A    I think Brett Paul was the primary business affairs person

22   on the Warner Bros. TV side.

23   Q    And what position did DC take in connection with the

24   economic basis for that agreement?

25   A    We believed that our precedent from *Lois & Clark* should       11:28

1    govern this.

2    Q    What, if anything, had you done in the intervening years,

3    between *Lois & Clark* and the time that you entered into the

4    *Smallville* agreement, to monitor the market for live-action

5    television rights to comic superheroes?                          11:28

6    A    We had done a number of deals in the marketplace during

7    the intervening years for other properties, and I continued to

8    pay attention to any deals for comic book properties that were

9    being done, either to discuss them with the other companies

10   that had licensed rights or other lawyers [sic] who had been    11:29

11   active in the field.

12          Not other lawyers; lawyers for other parties.

13   Q    What, in essence, did you learn as a result of that

14   analysis concerning the value of the *Smallville* rights?

15   A    My investigation of the marketplace for comic book rights  11:29

16   for television continued to show that the deals were typically

17   for royalties of between $5,000 and, perhaps, $7,000 an

18   episode, and back-end participations that were denominated in

19   net-profits structures that could pay off in success of a very

20   successful television show, but most often did not.             11:30

21          **MR. TOBEROFF:**  Objection, Your Honor.  Expert

22   testimony based on specialized knowledge.

23          **THE COURT:**  Goes to his state of mind.  Overruled.

24   BY MR. BERGMAN:

25   Q    What was Mr. Paul's response to your position that the     11:30

1   *Smallville* deal adhere to the *Lois & Clark* precedent?

2   A    I think he started with the fact that that was a Lorimar

3   deal and they were crazy, and this was Warner Bros. Television

4   and they were unwilling to pay that kind of money.

5            **MR. TOBEROFF:**  Objection.  Move to strike as hearsay.   11:30

6            **THE COURT:**  Sustained.

7            Counsel, the appropriate time to make the objection

8   is after the question but before the answer; so if you have an

9   objection to the answer, you can stand up right away.

10           **MR. TOBEROFF:**  Thank you, Your Honor.   11:31

11  **BY MR. BERGMAN:**

12  Q    Did Mr. Paul accept your position that the deal adhere to

13  the *Lois & Clark* precedent?

14  A    Not initially.

15  Q    What were the reasons for that failure?   11:31

16  A    He maintained that Warner Bros. Television --

17           **MR. TOBEROFF:**  Objection.  Calls for hearsay.

18           **THE COURT:**  Counsel?

19           **MR. BERGMAN:**  I don't believe it's hearsay,

20  Your Honor.  It's not being introduced for the truth of the   11:31

21  matter asserted.  It's just to find out what the negotiation

22  was and what it consisted of.

23           **THE COURT:**  If you're introducing it to find out what

24  the negotiation was, as opposed to what his state of mind was

25  in the negotiation, then it is being introduced for the truth   11:31

```
 1    of the matter asserted.

 2            Sustained.

 3    BY MR. BERGMAN:

 4    Q    In resisting the adherence to the Lois & Clark precedent,

 5    what was Warner Bros.' justification for that resistance?            11:32

 6            MR. TOBEROFF:  Objection.  Assumes facts.

 7            THE COURT:  Lay a further foundation.

 8    BY MR. BERGMAN:

 9    Q    Did Warner Bros. resist your request that the Lois & Clark

10    precedent be adhered to?                                             11:32

11    A    Yes.

12    Q    What was Warner Bros.' basis for doing so?

13    A    First, that Warner Bros.' precedence did not include

14    paying those size fees per episode or gross participations;

15    and, second, that in their view, this was a less valuable           11:33

16    program than Lois & Clark, because we were not giving them the

17    rights to portray Superman in costume.

18            MR. TOBEROFF:  Move to strike as hearsay.

19            THE COURT:  Counsel?

20            MR. BERGMAN:  Again, Your Honor, it's hard to express       11:33

21    what the negotiation back and forth was without understanding

22    what positions --

23            THE COURT:  Make it clear, then, in your questions

24    that you're asking his understanding, as opposed to the way

25    it's being asked and answered in terms of, in fact, what did       11:33
```

 1   happen.

 2              **MR. BERGMAN:**  Thank you.

 3              **MR. TOBEROFF:**  Defendants can also show us documents

 4   that show the declaration and the objected manifestation of the

 5   parties' intent.                                                    11:34

 6              **THE COURT:**  The documents could be helpful, but I

 7   will permit this witness's understanding of the agreement, just

 8   as I permitted, extensively, your expert to testify as to his

 9   understanding of numerous agreements.  This witness's

10   understanding is much more closely tied as the person who          11:34

11   actually engaged in the negotiations, than your witness's

12   understanding, who did not engage in the negotiations and

13   simply read the documents.

14              **MR. TOBEROFF:**  Very well.

15              **THE COURT:**  I'll overrule the objection.            11:34

16              But let's make it clear going forward, Counsel, that

17   you're eliciting his understanding.

18              **MR. BERGMAN:**  Certainly, Your Honor.

19              **THE COURT:**  Very well.

20   **BY MR. BERGMAN:**                                                11:34

21   Q    Mr. Levitz, based on your understanding of the

22   negotiation's progress, what was the basis for Warner Bros.'

23   refusal to adhere to the *Lois & Clark* precedent?

24   A    I understood their position to be that Warner Bros.

25   Television did not customarily pay gross participations on         11:35

1  anything to intellectual property licensors, nor fees as large

2  as $45,000 an episode; and further, that they felt that

3  *Lois & Clark* was an inappropriate precedent, since in this

4  case, we weren't going to allow them to use the Superman

5  costume as part of the material.                                    11:35

6  Q   And what was your understanding at the time, sir, of

7  the respects in which Warner wanted to deviate from the

8  *Lois & Clark* precedent?

9        **MR. TOBEROFF:**  Objection.  Assumes facts, and

10 leading.                                                            11:35

11       **THE COURT:**  Establish the fact of deviation.

12 **BY MR. BERGMAN:**

13 Q   Did Warner Bros. initially agree to the adherence under

14 the *Smallville* agreement of the precedent established in

15 *Lois & Clark*?                                                     11:36

16 A   No.

17 Q   What was your understanding, sir, of how Warner Bros.

18 wanted to change that *Lois & Clark* precedent?

19 A   I no longer remember the specifics of their first offer,

20 but I believe it was a much smaller per-episode royalty against    11:36

21 a more traditional net-profits position.

22 Q   Okay.

23       Did you agree to lower the episodic fees?

24 A   No.

25 Q   Did Warner Bros. ultimately accept your position on the        11:36

1    episodic fees for *Smallville*?

2    A    Yes.

3    Q    What were the, and what are the, episodic fees for

4    *Smallville*?

5    A    $45,000 an episode.                                          11:36

6    Q    Did Warner Bros. ultimately agree to apply the same

7    first-dollar gross participation to *Smallville* as was provided

8    for in *Lois & Clark*?

9            **MR. TOBEROFF:**  Leading, Your Honor.

10           **THE COURT:**  Sustained.                                 11:37

11   **BY MR. BERGMAN:**

12   Q    What does the agreement, Exhibit 1015, reflect in terms of

13   the contingent participation agreed to by Warner Bros.

14   Television?

15           **MR. TOBEROFF:**  Objection to Exhibit 1015.  It's not    11:37

16   the signed agreement.  It's an agreement sent out for signing,

17   but it's not the fully executed agreement that plaintiffs have

18   provided.

19           **THE COURT:**  Foundation objected to.

20           Sustained.                                                 11:38

21   **BY MR. BERGMAN:**

22   Q    Does that book have Exhibit 1043, sir?

23   A    No.

24           **MR. BERGMAN:**  May I approach, Your Honor?

25           **THE COURT:**  You may.                                   11:38

```
 1              (Document provided.)
 2   BY MR. BERGMAN:
 3   Q    Is Exhibit 1043 a copy of the final amended, executed
 4   Smallville agreement, sir?
 5   A    It appears to be.                                          11:39
 6   Q    Okay.
 7              Pursuant to the terms of Exhibit 1043, what is the
 8   contingent compensation earned by DC Comics under the
 9   Smallville agreement?
10   A    3 percent of the first $1.5 million, and 5 percent        11:39
11   thereafter.
12   Q    Over what period of time did your discussions with
13   Mr. Paul, regarding the Smallville agreement, continue?
14   A    A month or two.
15        MR. BERGMAN:  May I approach again, Your Honor?           11:40
16        THE COURT:  You may.
17              (Document provided.)
18   BY MR. BERGMAN:
19   Q    Would you identify what Exhibit 1067 is, Mr. Levitz.
20   A    1067 is a letter from Brett Paul discussing Smallville,   11:40
21   establishing that we've approved the name, specifying some
22   approval stages, and making reference to the Lois & Clark
23   agreement as the financial basis for the Smallville agreement.
24   Q    Do you have Exhibit 1026 in that book?
25   A    Nope.  It's the one you just took back.                   11:41
```

1        **MR. BERGMAN:**  May I approach again, Your Honor?

2        **THE COURT:**  You may.

3        (Document provided.)

4  **BY MR. BERGMAN:**

5  Q    Would you turn, please, to Exhibit 1026 and identify, if       11:41

6  you can, what that document is.

7  A    This is the participation statement for *Smallville* as of

8  June 30, 2008.

9  Q    And as of June 30, 2008, what was DC's share of its

10  contingent compensation under the *Smallville* agreement?       11:42

11  A    Approximately $24 million.

12        **MR. BERGMAN:**  Your Honor, I offer Exhibits 1015,

13  1026, and 1067 in evidence.

14        **THE COURT:**  Any objection?

15        **MR. TOBEROFF:**  No objection, Your Honor.       11:42

16        **THE COURT:**  All three are admitted.

17        (Exhibits 1015, 1026, and 1067 are received.)

18  **BY MR. BERGMAN:**

19  Q    Please turn briefly, Mr. Levitz, to the animation

20  agreements.       11:42

21        In terms of the intended markets, what demographic

22  are the DC animation agreements aimed at?

23  A    Different programs have varied somewhat over the years.

24  The core of the animation business generally is very young

25  children.       11:43

1   Q     Okay.

2         What similarity, if any, do these animated programs

3   bare to prime-time animated shows like *The Simpsons* or

4   *Family Guy*?

5         **MR. TOBEROFF:**  Vague and ambiguous; lacks foundation          11:43

6   as to what animated programs he's referring to.

7         **THE COURT:**  Overruled.

8         **THE WITNESS:**  Animated programs like *The Simpsons* or

9   *Family Guy*, or even if you go back in history to the

10  *Flintstones* in its original incarnation, were designed as          11:43

11  situation comedies for the usual adult audience.  The programs

12  that we've produced under these agreements were intended for

13  children on production budgets for the kinds of sizes of

14  audiences that were available for them.

15        **MR. TOBEROFF:**  Objection, Your Honor, to the first          11:44

16  half of the answer as expert testimony based on specialized

17  knowledge.

18        **THE COURT:**  Overruled.

19  **BY MR. BERGMAN:**

20  Q     Has DC, over the years, negotiated these types of          11:44

21  animation agreements with entities that were not affiliated

22  with Time Warner?

23  A     Yes.

24  Q     Can you identify any of those?

25  A     During the period prior to 1989, when Warner Bros.          11:44

Tuesday, May 12, 2009                    Trial Day 9, AM Session

1    Animation entered the business, we negotiated agreements like

2    this with Hanna-Barbera, Ruby-Spears.  We had agreements with

3    Nelvana, though nothing was produced under them, as I remember.

4    And I certainly negotiated towards deals that were never

5    consummated with DIC.  Pretty much anyone who was in the game.    11:45

6    Q    Over the course of your years at DC Comics, have you

7    become familiar with the television animation business?

8    A    Yes.

9    Q    Has that business changed in any way from the '70s and

10   '80s to today?    11:45

11          **MR. TOBEROFF:**  Objection.  Lacks foundation, and also

12   calls for expert testimony based on specialized knowledge.

13          **THE COURT:**  It's fairly broad, Counsel.

14          Rephrase the question.

15          I'll overrule those objections.    11:46

16   **BY MR. BERGMAN:**

17   Q    From your personal view, your understanding, Mr. Levitz,

18   what changes, if any, have occurred in the animation business

19   from the '70s and '80s to today?

20          **MR. TOBEROFF:**  Same objection as to expert testimony.    11:46

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  The critical driving force in how we

23   could exploit the animation business is the shift from their

24   being a model that was based on three networks with Saturday

25   morning, and generally afternoon syndication on secondary    11:46

```
 1   markets, to a cable-driven marketplace today.  There was a very
 2   significant opportunity to generate income from the programming
 3   itself when we were in the earlier business model, and we could
 4   get the networks occasionally to bid against each other for the
 5   rights to put our programs on Saturday morning, and build up a        11:47
 6   library that could generate some significant revenue from being
 7   exploited in afternoon -- what's called strips -- running five
 8   days a week.  When the afternoon strips disappeared, the
 9   networks fairly quickly got out of the Saturday-morning
10   business, and the economic opportunity for animation became           11:47
11   converted to simply supporting your merchandising business.
12   BY MR. BERGMAN:
13   Q    In addition to the animation agreements that you've
14   discussed with Hanna-Barbera and Ruby-Spears and the others,
15   have you personally negotiated animation agreements with             11:47
16   Warner Bros. Animation?
17   A    Yes.
18   Q    I'd like you to take all of the agreements, the animation
19   agreements, that you've negotiated with the other parties as
20   one group, and the animation agreements that you've negotiated       11:48
21   with Warner Bros. Animation as another group.
22          How, if at all, do you compare the two groups?
23   A    The fees per episode that we would receive on production
24   are generally higher in Warner Bros. agreements.  The
25   possibility of earning anything in the net-profits statements,       11:48
```

1    or net-profit formulas, varied in the first group with the

2    success of the program.  Some of them were very successful.

3    Most of them were not and didn't earn anything out.  By the

4    time of the Warner Bros. Animation agreements, there was

5    relatively little possibility to earn out under a net-profits                11:49

6    basis.

7    Q    In today's television animation market intended for young

8    children, what's the economic driver behind those programs?

9           **MR. TOBEROFF:**  Objection.  Expert testimony based on

10   specialized knowledge.                                                       11:49

11          **THE COURT:**  Overruled.

12          The Court is just considering it for his state of

13   mind.

14          **THE WITNESS:**  We do television animation these days

15   to get kids to buy toys.                                                     11:49

16          **MR. BERGMAN:**  Thank you, Mr. Levitz.

17          I have nothing further.

18          **THE COURT:**  Very well.

19          Let's take our break at this time.  We'll begin with

20   cross-examination at 1:30.                                                   11:50

21          Court is in recess.

22          (A.M. session concludes.)

23

24   / / /

25   / / /

1                              CERTIFICATE

2

3    I hereby certify that pursuant to Section 753, Title 28, United
     States Code, the foregoing is a true and correct transcript of
4    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
5    conformance with the regulations of the judicial conference of
     the United States.

6

7    _____          _____
     THERESA A. LANZA, CSR, RPR                        Date
8    Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tuesday, May 12, 2009                    Trial Day 9, AM Session