1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7    JOANNE SIEGEL and                )
     LAURA SIEGEL LARSON,             )
8                    Plaintiffs,  )
                                      )
9            vs.                      )    No. CV 04-08400-SGL
                                      )
10   WARNER BROTHERS ENTERTAINMENT INC.;)
     TIME WARNER, INC.; DC COMICS;    )
11   and DOES 1-10,                   )    Trial Day 10
                     Defendants.  )    A.M. Session
12   _____)    Pages 1271-1348

13

14

         Reporter's Transcript of Court Trial Proceedings

15
                     Riverside, California

16
                 Wednesday, May 13, 2009

17
                     9:37 A.M.

18

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24            3470 12th Street, Rm. 134
            Riverside, California  92501
25                (951) 274-0844
              WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2

 3    On Behalf of Plaintiffs:

 4
                        LAW OFFICES OF MARC TOBEROFF
 5                      BY:  Marc Toberoff
                        BY:  Nicholas C. Williamson
 6                      BY:  Keith Adams
                        2049 Century Park East,
 7                      Suite 2720
                        Los Angeles, California  90067
 8                      310-246-3100

 9

10    on behalf of Defendants/Counterclaimant:

11
                        WEISSMANN WOLFF BERGMAN COLEMAN
12                       GRODIN & EVALL LLP
                        BY:  Michael Bergman
13                      BY:  Anjani Mandavia
                        9665 Wilshire Boulevard,
14                      Ninth Floor
                        Beverly Hills, California  90212
15                      310-858-7888

16

17    On Behalf of DC Comics:

18                      PERKINS LAW OFFICE, P.C.
                        BY:  Patrick T. Perkins
19                      1711 Rt. 9D
                        Cold Spring, New York  10516
20                      845-265-2820

21

22

23

24

25
```

Wednesday, May 13, 2009                    Trial Day 10, AM Session

1                          I N D E X

2                                                    Page

3    Defense case (cont'd)......................  1275

4

5

6    DEFENSE
     WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
7    **STEVEN SPIRA (Cont'd)**

8    By Mr. Bergman    1275                   1311
     By Mr. Toberoff              1293
9

10

11   DEFENSE
     WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
     **JOHN GUMPERT**
12

     By Mr. Bergman    1313, 1338
13
     By Mr. Toberoff (Voir Dire)    1331
14

15

16

17

18
              EXHIBITS          RECEIVED
19
                 (None.)
20

21

22

23

24

25

```
 1        Riverside, California; Wednesday, May 13, 2009; 9:37 a.m.
 2                              -oOo-
 3        THE CLERK:  Calling Case Number CV 04-08400-SGL,
 4  Joanne Siegel, et al., versus Warner Bros. Entertainment, Inc.,
 5  et al.                                                              09:37
 6        (Counsel make appearances as before.)
 7        THE COURT:  Good morning to you all.
 8        I've received the defendants' application to have
 9  certain Phase 1 trial exhibits and related testimony placed
10  under seal.                                                         09:38
11        Should I anticipate an opposition?
12        MR. TOBEROFF:  Yes, Your Honor.
13        THE COURT:  When do you think you can get that in?
14        MR. TOBEROFF:  What's the deadline, Your Honor?
15        THE COURT:  I haven't set one.                                09:39
16        How much reasonable time do you need, Counsel?
17        MR. TOBEROFF:  Next week, the following week,
18  Tuesday.
19        THE COURT:  This is an ex-parte application.  This is
20  something which we need to address sooner as opposed to later.      09:39
21  The Court's standing order requires 24 hours, but I'm willing
22  to give you some additional time; but not a week's time or so.
23        MR. TOBEROFF:  Friday?  Is Friday good?
24        THE COURT:  Let's get this, so that I can -- before
25  the trial ends, and the closing arguments end, we can get this     09:39
```

1    under seal, or not, or partly under seal, whatever we're going

2    to do.

3              MR. BERGMAN:  Your Honor, don't we have closing

4    argument on Tuesday?

5              THE COURT:  Tuesday, right.  And he said Friday, this    09:39

6    week.

7              MR. BERGMAN:  Okay.  Thank you.

8              THE COURT:  So then I can decide it on Tuesday at the

9    closing argument.

10             Provisionally, until Tuesday, it's under seal.    09:39

11             MR. TOBEROFF:  Very well, Your Honor.

12             MR. BERGMAN:  Thank you.

13             THE COURT:  Let's continue with the examination.

14             If the witness would come forward.

15             THE CLERK:  Mr. Spira, please be advised you're still    09:40

16    under oath.

17             THE WITNESS:  Yes.  Thank you.

18                     DIRECT EXAMINATION(cont'd)

19    BY MR. BERGMAN:

20    Q    Good morning, Mr. Spira.    09:40

21             Mr. Spira, prior to the time that the business

22    affairs department gives the go-ahead on an acquisition to

23    creative or to whoever it does give it to, does it go through

24    any sort of an analysis or projection as to costs?

25    A    Are you referring to production or development?    09:40

```
 1              Can I ask that?

 2   Q    Yes.

 3              THE COURT:  If there's an objection, Counsel, please

 4   state it before the answer.

 5              MR. TOBEROFF:  Vague and ambiguous as to time.      09:40

 6              THE COURT:  Sustained.

 7   BY MR. BERGMAN:

 8   Q    Prior to the time that the business affairs department

 9   gives a green light to production, does business affairs go

10   through an analysis, an economic analysis, based on            09:41

11   projections, of a film?

12   A    Business affairs doesn't green-light films.

13              MR. TOBEROFF:  Objection, Your Honor.

14              THE COURT:  Overruled.

15              You may answer.                                      09:41

16              THE WITNESS:  Business affairs provides financial

17   data to management, who actually green-lights the films.  We

18   are part of a process where we do financial analysis and then

19   the management of the company, who actually green-lights the

20   films, analyzes it together and makes a decision as to whether 09:41

21   or not it is an acceptable risk that they're willing to take.

22   BY MR. BERGMAN:

23   Q    But as an initial matter, that's done by business affairs?

24   A    Yes.

25   Q    As a result of those kinds of analyses, Mr. Spira, does a  09:41
```

1   5 percent of first-dollar gross on a deal that is budgeted at,

2   let's say, $40 million have a different financial impact upon

3   Warner Bros. with respect to a picture that's budgeted at

4   $200 million?

5            MR. TOBEROFF:  Objection.  Lacks foundation;                    09:42

6   incomplete hypothetical.

7            THE COURT:  Sustained on foundation.

8   BY MR. BERGMAN:

9   Q    As part of the analysis that you have just testified to,

10  that you make in turning the financial data over to the         09:42

11  creative department, does the business affairs department

12  actually look to the terms of the contract, an acquisition

13  agreement, and attempt to determine what the financial impact

14  of that agreement will be?

15           MR. TOBEROFF:  Same objection, Your Honor.              09:42

16           THE COURT:  You're asking, in his role, given his

17  background --

18           MR. BERGMAN:  Precisely.  I'm just concerned with

19  what Warner Bros. Television does.

20           THE COURT:  Very well.                                  09:43

21           Overruled.

22           MR. TOBEROFF:  Warner Bros. Pictures.

23           MR. BERGMAN:  Warner Bros. Pictures does.

24           THE COURT:  Right.

25           THE WITNESS:  Yes.                                      09:43

1        It might be helpful if I go through the green-light

2   process a little bit, to explain what we do.

3   **BY MR. BERGMAN:**

4   Q    Please do.

5        **THE COURT:**  And, perhaps, that's part of the                    09:43

6   foundation that we need to lay, Counsel.  I'll let you do that

7   through questions.

8   **BY MR. BERGMAN:**

9   Q    As part of that analysis, do you go through what is

10  called, in the business, in Warner Bros. in particular, a        09:43

11  "green light analysis"?

12       **MR. TOBEROFF:**  Leading.

13       **THE WITNESS:**  Yes.

14       **THE COURT:**  It is leading.

15       Just ask him to explain the process, Counsel.                       09:44

16  **BY MR. BERGMAN:**

17  Q    Would you explain the green-light process.

18  A    Yes.

19       Once there's a script that the creative department is

20  comfortable with, and they believe that management is            09:44

21  comfortable with, and there's a director attached, and there

22  are either actors attached or identified actors with whom you

23  don't have deals, you put together a financial model.  In that

24  model, you obviously have the cost of the picture; and as part

25  of the cost of the picture, you will know what the deals are            09:44

1    and what the participations are or what monies will be paid out

2    to the talent pursuant to their deals.

3        The creative material is usually circulated, but not

4    always, to the distribution people, the marketing people, the

5    video people, and to a lesser extent, the television people,    09:44

6    because those prices are usually based on a contract that has a

7    formula that's tied to some film performance.

8        They will then give their best-case low, medium, and

9    high estimates for how they feel the film will perform; and the

10   marketing people will put a number on what they think that    09:45

11   needs to be, to be spent in marketing the film, to achieve

12   certain levels.

13       At those points, we are able to calculate at

14   different film performances what, if anything, the individual

15   participants in the film would be entitled to be paid.  If they    09:45

16   are gross-from-first-dollar players, there's usually an advance

17   against it, but at some point, it kicks in and pays them more

18   money.  And we're able to then calculate all of the costs and

19   all of the revenue and see, at those levels, how the film would

20   perform financially.    09:45

21       They're, obviously, people's best guesstimates.  We

22   sometimes green-light a film based on those numbers.  We

23   sometimes go back and try to reduce the budget of the film in

24   those numbers.  We sometimes go back and try to renegotiate the

25   deals, to make it an acceptable bet.  We sometimes go back and    09:46

Wednesday, May 13, 2009                    Trial Day 10, AM Session

1    rewrite the script to make it cheaper.  Anything can happen.

2    And we will sometimes say -- not we, but management people who

3    make these decisions, primarily Mr. Horn and Jeff Robinov, will

4    figure out whether they want to actually pull the trigger and

5    make the film, go back to the drawing board, maybe with                  09:46

6    different actors or with a different ending, or rewrite it, or

7    frankly, not make the film, or go forward.

8            **THE COURT:**  Counsel.

9            **MR. BERGMAN:**  Thank you, Your Honor.

10   **BY MR. BERGMAN:**                                                        09:46

11   Q    Mr. Spira, as a result of making those financial models as

12   part of the green-light analysis at Warner Bros., does

13   5 percent of first-dollar gross granted by Warner Bros. on a

14   $50 million budgeted film, as compared to 5 percent on a

15   $200 million budgeted film, have a financial impact on the               09:47

16   studio?

17           **MR. TOBEROFF:**  Lacks foundation.

18           **THE COURT:**  Limited to Warner Bros.

19           **MR. BERGMAN:**  As I indicated, Your Honor.

20           **THE COURT:**  With that understanding, overruled.              09:47

21           **THE WITNESS:**  Yes.

22   **BY MR. BERGMAN:**

23   Q    Can you tell me what that impact is.  How would you

24   explain that?

25   A    Obviously, the goal is to have all of the money that you            09:47

```
 1   spend on marketing and on the film, and any other money that
 2   you pay out, be recovered and have a profit and a reasonable
 3   rate of return under normal film performance.  Obviously, there
 4   are average performances that are lower and higher, but in your
 5   best guesstimate of what you think it's going to do -- the        09:47
 6   economic impact on a $40 million film is that obviously, the
 7   5 percent of the gross will be worth far fewer gross dollars in
 8   a situation where you're recovering the $40 million that you
 9   spent, plus your marketing costs, plus that 5 percent of the
10   gross.  You will achieve a profit sooner, and it adds less        09:48
11   gross-dollar element to your risk that you need to recover in
12   order to hopefully get a return and have a profitable film.
13        MR. TOBEROFF:  Move to strike as expert testimony
14   based on specialized knowledge.
15        THE COURT:  Overruled.                                       09:48
16   BY MR. BERGMAN:
17   Q   Mr. Spira, what is Warner Bros.' policy, if any, regarding
18   the share of royalty, video royalties, that it will grant to
19   participants?
20   A   With very rare exceptions, participants receive a            09:48
21   20 percent royalty into the overall pot of revenue into which
22   their participation will be calculated based upon.
23   Q   Does Warner Bros. make any exceptions to that policy?
24        MR. TOBEROFF:  Objection.  This line of questioning
25   lacks foundation as to whether we're talking about television,    09:49
```

```
 1  film, animation.
 2         THE COURT:  Sustained.
 3  BY MR. BERGMAN:
 4  Q    Mr. Spira, you're not involved in television, are you?
 5  A    No, sir.                                                    09:49
 6  Q    And you're not involved in animation; correct?
 7  A    Film animation, we are.
 8  Q    Your past years at Warner Bros. have been addressed
 9  primarily to what sort of audio visual works?
10  A    Live-action and animated motion pictures.                  09:49
11  Q    Okay.
12         Now, with respect to live-action motion pictures,
13  what is Warner Bros.' policy, if any, regarding the share of
14  video royalties that it will share with participants?
15  A    We include 20 percent of the gross video amount into the   09:49
16  into pot as a royalty, and out of our 80 percent, we absorb the
17  costs and retain the rest.
18  Q    Now, are there any exceptions, in your experience at
19  Warner Bros., to the policy that you have just expressed?
20  A    Well, the policy -- again, it's all about bargaining        09:50
21  strength; so the A, A+ actors, the ones who command a large
22  amount of first-dollar gross, can typically get 35 percent of
23  the video included into the pot of revenue upon which we're
24  going to calculate their participation.  And in the rarest of
25  rarest of A+++ directors, we may make exceptions.                09:50
```

1    Q    Are you aware, sir, of the contingent compensation that's

2    been paid to each of the participants in the *Superman Returns*

3    film?

4    A    Yes.

5    Q    Okay.                                                          09:51

6              Does any participant in *Superman Returns* receive more

7    than a 20-percent video royalty?

8    A    No.

9    Q    Are you familiar with the terms of the Warner Bros.'

10   Legendary deal?                                                     09:51

11   A    Yes.

12   Q    What is Legendary's role in connection with the film

13   *Superman Returns*?

14   A    Legendary is a co-financier of the film, which means that

15   they invest side-by-side with us in the negative costs of the      09:51

16   film.  We advance on behalf of both parties all of the

17   marketing costs, which is typically done because they are

18   returned first and not perceived to be at risk.

19   Q    In accounting to financiers such as Legendary, to what

20   extent, if at all, are they treated differently than              09:51

21   individuals such as producers, actors, rights holders, and the

22   like?

23   A    They are treated like the studio and not like the people

24   who have worked on the film, but not invested in taking any

25   risk.                                                              09:52

1284

1       **MR. TOBEROFF:**  Lacks foundation.

2       **THE COURT:**  Sustained.

3       Lay a foundation, Counsel.

4   BY MR. BERGMAN:

5   Q    Let me ask you, are you familiar with various deals at

6   Warner Bros. entered into with co-financiers?

7   A    Yes.

8   Q    Can you name a few of those deals.

9   A    We have a co-financing arrangement with an Australian

10  company called Village Roadshow.  We have an overall

11  co-financing arrangement with a company called

12  Legendary Pictures.  We have an output distribution deal with a

13  company called Alcon, A-l-c-o-n, Pictures.  We do one-off

14  individual co-finance pictures with a number of individual

15  co-financiers, including -- I'm blanking out; I apologize --

16  Gary Barbara's company; I forgot the name; it will come to me

17  in a second -- and other one-off individual co-financing

18  arrangements.

19  Q    Have you personally been involved in the negotiation of

20  such agreements?

21  A    Yes.

22  Q    In accounting to financiers such as the ones you've

23  indicated, to what extent, if at all, are they treated

24  differently by Warner Bros. than individuals such as producers,

25  rights holders, and other people involved in the picture?

09:52

09:52

09:53

09:53

09:53

1  A    They are not paid a salary, and they do not receive a

2  participation.  They are side-by-side with the studio in

3  funding the production costs, and risking the production costs,

4  and, therefore, participating or sharing in the success or

5  failure of the film as a partner.                                09:54

6         **MR. TOBEROFF:**  Move to strike, Your Honor.  Hearsay.

7         **THE COURT:**  The Court won't be considering that for

8  the truth of the matter asserted.

9         Overruled.

10 **BY MR. BERGMAN:**                                              09:54

11 Q    Mr. Spira, based upon your negotiation of these

12 co-financing agreements, are financiers paid a salary?

13 A    No.

14 Q    Based upon your negotiation of these agreements, do

15 co-financiers receive a participation?                           09:55

16 A    No.

17        **MR. TOBEROFF:**  Same objection, Your Honor.  Hearsay.

18 He's speaking about out-of-court documents and the contents.

19        **THE COURT:**  Let me make sure that I'm correct,

20 Counsel.                                                         09:55

21        What is the purpose that you're introducing this for,

22 Mr. Bergman?

23        **MR. BERGMAN:**  My purpose is to establish, Your Honor,

24 that there is a difference between a co-financier and what is

25 referred to in the *Superman* agreement as a participant, a point  09:56

```
1   which counsel has been making in saying that we didn't give DC

2   the benefit of the favored-nations provision that is contained

3   in the film agreement.

4          THE COURT:  Then let's tie this to that agreement,

5   Counsel.  Let's make this more explicit, and let's a lay          09:56

6   foundation for it.

7          MR. BERGMAN:  Okay.

8          MR. TOBEROFF:  Your Honor, if I may.

9          The Legendary Pictures' co-financing agreement with

10  Warner Bros., I believe, is an exhibit in this case, and they    09:56

11  could offer that to the witness and have him explain the terms

12  of it.

13         THE COURT:  That would be part of the foundation that

14  I would anticipate being laid.

15         MR. TOBEROFF:  Thank you, Your Honor.

16         THE COURT:  Let's tie this into where you're going,

17  Counsel, because that wasn't clear to the Court.  Frankly, if

18  it's not clear to the Court, then it really doesn't help you in

19  any event.

20  BY MR. BERGMAN:                                                  09:57

21  Q    Are you familiar with the terms of the Superman Returns

22  agreement?

23  A    Generally, yes.

24  Q    And are you familiar with the fact that it contains what

25  is commonly referred to as a "favored-nations provision"?       09:57
```

1    A    Yes.

2    Q    And are you familiar that the favored-nations provision in

3    the agreement refers to DC getting the same video treatment as

4    any, quote, participant, closed quote, in the film?

5            **MR. TOBEROFF:**  Leading.                                    09:57

6            **THE COURT:**  Sustained.

7            Let's go back to the foundation.

8            How are you familiar with the *Superman Returns*

9    agreement?

10           **THE WITNESS:**  I'm familiar with it generally from its      09:57

11   history, and from our trial preparation.

12           **THE COURT:**  What do you mean "from its history"?

13           **THE WITNESS:**  Well, when it was originally

14   negotiated and when it --

15           **THE COURT:**  Were you involved in those original           09:57

16   negotiations?

17           **THE WITNESS:**  As I think I said yesterday, in

18   John Schulman's role as the general counsel, he doesn't do

19   business deals; and I don't do, thank God, paperwork, or legal

20   work.  So we don't draft -- the way business affairs is          09:58

21   designed, business affairs executives negotiate the

22   transaction, send a memo to the legal department with the basic

23   deal terms, and they turn two pages into 80 pages.  Go figure.

24           So while we do the transactions, the lawyers paper

25   the transactions and then interact with us to the extent that   09:58

```
 1   the issues that come up are, quote, unquote, deal related.  And
 2   that's sort of a subjective area.  But they always err on the
 3   side of wanting us to make the decisions, as it were.  So we
 4   represent the creative department in terms of making the deal,
 5   quote, unquote; the legal department services us in terms of      09:58
 6   doing the paperwork; and we collectively negotiate its
 7   conclusion.  But the setting of a price or a value is a
 8   business affairs function, which is why I said yesterday that
 9   we would go to John Schulman and say -- he would say, 'What do
10   you think the value or the price would be?'  And we would say    09:59
11   to him, 'We would attempt to make it different or better or a
12   smaller deal on it.'
13          THE COURT:  All right.
14          MR. TOBEROFF:  Objection.  Move to strike as
15   nonresponsive to your question, Your Honor.                       09:59
16          THE COURT:  No.  Actually, it was very responsive and
17   illustrated that he has no foundation to discuss the agreement
18   itself.
19          I'll sustain your earlier objection on foundation,
20   unless you want me to strike it, Counsel, and disregard it and   09:59
21   start all over.
22          MR. TOBEROFF:  No, Your Honor.
23          THE COURT:  Thank you.
24   BY MR. BERGMAN:
25   Q    At Warner Bros., Mr. Spira, does the word "participant"     09:59
```

1    have a customary meaning?

2    A    Yes.

3    Q    What is that meaning, sir?

4    A    It is someone who has worked on the film and in

5    consideration, or as part of the consideration for their        09:59

6    services, is entitled to an additional payment based on the

7    performance of the film and a calculation of its revenues at a

8    given point in time based on a formula.

9         **MR. TOBEROFF:**  Objection, Your Honor.  Specialized

10   knowledge expert testimony.                                      10:00

11        **THE COURT:**  It's not.  And that objection really

12   doesn't apply.

13        But there is a foundational concern here, Counsel.

14        I just heard from this witness that he's not involved

15   in putting together the agreement, the legal agreement itself.   10:00

16   So you're not going to be able to use this witness to examine

17   the terms of the legal agreement.

18        If you want to use this witness to examine what went

19   into that, what was sent over, that might be something else.

20   But I really think there's a foundational problem here.          10:00

21        **MR. BERGMAN:**  And I, of course, accept that,

22   Your Honor.  I was just asking whether the term had a meaning

23   within the --

24        **THE COURT:**  But what's the foundation for him to know

25   that?                                                            10:00

1          **MR. BERGMAN:**  Among the foundation, Your Honor, this

2    man has been in charge of worldwide business affairs, and must

3    necessarily, in that role, have gained an understanding as to

4    how a term is utilized within the studio.

5          **THE COURT:**  That's not clear.  It may very well be          10:01

6    the case, but there seems to be this distinction that's being

7    drawn between drafting up the legal agreement itself and

8    working out the business terms.  And the focus that I believe,

9    based on your proffer, that you're trying to rebut is an

10   explication offered by Mr. Halloran concerning the agreement          10:01

11   itself.  And there's a fundamental foundational defect here

12   with this witness to address that.

13          I've given you a lot of latitude in this trial to

14   allow, for example, Mr. Levitz, who was involved in particular

15   agreements, to explicate their understanding of the agreements       10:01

16   that they were involved in.

17          I understand that this witness was involved in the

18   deal in general terms, but not specifically in the agreement in

19   particular terms, as I understand his explanation.

20          If I'm misunderstanding his explanation, then the          10:02

21   burden is on you, through questions, to establish the

22   foundation.  Otherwise, I'm sustaining a foundational

23   objection.

24          Frankly, this nonsense about the expert testimony,

25   Counsel, you can continue to make this objection, but this is          10:02

```
 1    going nowhere with this Court.  These are percipient witnesses.
 2    Given the nature of this case, I am permitting this testimony,
 3    not necessarily for the truth of the matter asserted, not as I
 4    would an expert witness, but to express their understanding of
 5    the terms of the agreement.  And you can impeach them through      10:02
 6    cross-examination, given the fact that they are, in fact,
 7    Warner Bros. speaking.  And I heard he is from Warner Bros.
 8    people, and I understand that.  But I am not viewing this as
 9    expert specialized knowledge.  Rather, this is reflecting their
10    understanding.                                                     10:03
11         Do you understand the Court's position?
12         And I'm not asking for further argument.  You have
13    briefed the issue.  You have made the objection a lot of times.
14    I just want to make sure you understand the Court's position.
15         MR. TOBEROFF:  I understand the Court's position,            10:03
16    Your Honor, but if I may.
17         This is not further argument on this topic in
18    general, but specifically, with this witness, if he's not
19    involved with the negotiation and the terms of this particular
20    agreement, then his state of mind --                              10:03
21         THE COURT:  And I'm sustaining a foundational
22    objection on that basis.
23         Counsel, you're winning.  Don't talk me out of it.
24         MR. TOBEROFF:  I'm not trying to, Your Honor.
25    Very well, Your Honor.                                            10:03
```

1    **MR. BERGMAN:**  Your Honor, in the interest of time,

2    I understand Your Honor's position.  I'll address it with the

3    expert and move on to another topic, the final topic with

4    Mr. Spira.

5         **THE COURT:**  Very well.                                    10:03

6    **BY MR. BERGMAN:**

7    Q    Mr. Spira, there's been testimony in this case by an

8    expert witness that the fair market value of the *Superman*

9    exclusive rights in 1999 to 2002 consisted of a

10   $1-million-a-year option, a $10-million-per-picture purchase     10:04

11   price; 10 to 20 percent of first-dollar gross, and a readjusted

12   merchandising provision.

13        I'd just like to ask you, sir, to your knowledge, in

14   all of the time that you've been at Warner Bros., to what

15   extent, if any, have underlying rights holders been paid as      10:04

16   much as a $10 million purchase price?

17        **MR. TOBEROFF:**  Objection.  Lacks foundation.

18        **THE COURT:**  You're simply asking him, based on his

19   experience at Warner Bros., has anyone else been offered, to

20   his knowledge?                                                    10:04

21        **MR. BERGMAN:**  Precisely, sir.

22        **THE COURT:**  Overruled.

23        You may answer.

24        **THE WITNESS:**  We have never made a deal, to my

25   knowledge, with a $10 million purchase price.                    10:04

**BY MR. BERGMAN:**

1

2   Q    Looking again solely to Warner Bros., and to the amount of

3   time in which you've been involved in business affairs, to what

4   extent, if any, has Warner Bros. paid as much as 10 percent of

5   first-dollar gross for the acquisition of literary rights?      10:05

6   A    Never.

7   Q    How does that suggested deal, based on your experience at

8   Warner Bros., compare with the value placed upon the *Superman*

9   rights by your department in the 1999-2002 period?

10  A    I think I testified yesterday that for a number of      10:05

11  reasons, we would have hoped and attempted to actually

12  renegotiate the Salkind deal downward.

13  Q    Okay.  Thank you, sir.

14          **MR. BERGMAN:**  I have nothing further, Your Honor.

15          **THE COURT:**  Cross-examination.      10:06

16                    **CROSS-EXAMINATION**

17  **BY MR. TOBEROFF:**

18  Q    Mr. Spira, you did not negotiate the *Superman* film

19  agreement with DC, did you?

20  A    No.      10:06

21  Q    You also did not negotiate the *Smallville* television

22  agreement with DC?

23  A    Correct.

24  Q    You also did not negotiate any of the *Superman* animation

25  agreements with DC?      10:07

```
 1   A      That's correct.

 2   Q      Warner Bros.' then general counsel, John Schulman,

 3   negotiated the Superman film agreement?

 4   A      I believe so.

 5   Q      Mr. Schulman and Mr. Levitz agreed to adopt the economic      10:07

 6   terms of the 1974 Salkind agreement?

 7   A      I believe so.

 8   Q      You testified that you did not recommend doing this;

 9   correct?

10   A      Yes.                                                          10:07

11   Q      Obviously, Mr. Schulman did not follow your

12   recommendation; correct?

13   A      Correct.

14   Q      He just as clearly did not follow your valuation on what

15   your recommendations were based.                                    10:07

16   A      I guess that's a question.

17          Correct.

18   Q      You did not determine any of the terms of the Superman

19   film agreement, did you?

20   A      No.                                                           10:07

21   Q      Nor the Smallville television agreement?

22   A      No.

23   Q      Nor the Superman animation agreement?

24   A      That's correct.

25   Q      Animation agreements.  Excuse me.                             10:07
```

1        The business affairs valuation was that the 5 percent

2   of worldwide gross payable under the Salkind agreement should

3   be reduced, as you just testified.

4   A    Yes.

5   Q    Mr. Schulman ultimately agreed to a deal in which DC was        10:08

6   paid 5 percent of worldwide gross for the rights to *Superman*;

7   correct?

8   A    Yes.

9   Q    So Mr. Schulman ultimately concluded the agreement he did

10  not follow any of your suggestions.        10:08

11  A    That's correct.

12        **MR. TOBEROFF:**  Plaintiffs move to strike Mr. Spira's

13  testimony regarding the *Superman* agreements, as his state of

14  mind and lay opinions regarding *Superman* and the valuations of

15  *Superman* are irrelevant since he did not negotiate or determine        10:08

16  any of the terms of the agreements in question in this case.

17        **THE COURT:**  The Court addressed the objections and

18  sustained various foundational objections while the testimony

19  was being made, Counsel.

20        The Court will be mindful of this foundational        10:08

21  evidence, as well, in evaluating any of the testimony made by

22  this witness.

23        **MR. TOBEROFF:**  Thank you, Your Honor.

24  **BY MR. TOBEROFF:**

25  Q    Mr. Spira, after you conduct an evaluation of an        10:09

```
 1   underlying property's worth, based on comps or precedent, has

 2   your division ever ended up agreeing to pay a lot more for a

 3   property than it initially wanted to?

 4   A    I don't think there's an "initially wanted to" involved.

 5   Q    What do you mean by that?                                    10:09

 6   A    What I mean is, there's a process.  And if you would like,

 7   I can go through the process.

 8        I can go through the process.  That's not really the

 9   question.

10   Q    Please.                                                      10:09

11   A    Negotiations are common in the business.  As I think I

12   stated yesterday, there's first and foremost the creative

13   department's appetite, desire for things; there are the factors

14   that the seller imposes on the property; and then there are all

15   sorts of factors that come into play all the time.  I don't      10:10

16   think -- we, obviously -- anytime you conclude a transaction,

17   at the end of that process, you decided if that's what you want

18   to pay.

19        So there is no number -- there's a number which you

20   won't go beyond, and you may have an instinct or an appetite --  10:10

21   and that appetite can decrease or increase, depending, again,

22   on the passion of the creative people or new elements or more

23   information or good negotiating.  You don't go in with -- you

24   know, it's a negotiating process, and it evolves based on the

25   dialogue and based on, sometimes, changing factors or            10:10
```

1   educational factors; you're educated about something; or

2   because we are not the end user, the creative people may

3   persuade us to do things that we are not entirely comfortable

4   with.  We are charged with acquiring the things they want and

5   that they need so that we can get films developed and films        10:11

6   made.  We have a little joke in our department, because there's

7   an inherent tension between commerce and creativity and their

8   wanting and needing the things they need to do their jobs, that

9   if we can hold them down to a misdemeanor and not a felony,

10  we've done a good job.                                             10:11

11  Q   Mr. Spira, if Warner Bros. has a strong appetite for a

12  property and other studios are competing for the acquisition of

13  the same property, that would naturally increase the

14  negotiating leverage of the rights holder, wouldn't it?

15  A   Sometimes.                                                     10:11

16          THE COURT:  When would it not?

17          THE WITNESS:  A lot of times it will depend on who

18  the competition is.

19          THE COURT:  Why would that matter?  If there were

20  other people competing for the same property, why wouldn't that    10:11

21  necessarily increase the bargaining position of the rights

22  holder?

23          THE WITNESS:  Because all buyers are not equal.

24  You may choose a studio over an independent because you believe

25  the studio will generate way more revenue, and the smaller deal    10:12

1   at a studio will be more valuable than a larger deal at an

2   independent.  You may decide that one studio has particular

3   strengths for your film that another studio doesn't, whether

4   they have a strong foreign distribution, a strong video

5   distribution.  Some studios are perceived, rightfully or                    10:12

6   wrongfully, to do better with big action movies and others with

7   comedies.

8           THE COURT:  I certainly understand why, in the final

9   analysis, you might choose one studio over another, or why one

10  studio over another might be in a better position; but why       10:12

11  wouldn't the introduction of a competing studio, even if they

12  were in an inferior position to one of the other

13  already-competing studios -- not in the marketplace, at least

14  enhance on some level -- we haven't quantified what that is --

15  the bargaining position of the rights holder.                    10:13

16          THE WITNESS:  I didn't hear the question studio, but

17  even in the cases of studios -- for instance, there are weak

18  studios and there are strong studios.  Today, there are studios

19  that don't have the financial capacity to finance a lot of

20  expensive films because they are financially handicapped; and    10:13

21  we like to think of ourselves as a valuable buyer.  So,

22  obviously, competition is a factor and can increase the price.

23  But it's not always the case.

24          THE COURT:  Okay.

25  / / /                                                            10:13

1    BY MR. TOBEROFF:

2    Q    My question, Mr. Spira, was limited to studios, not

3    independents.

4    A    Well, again, all studios are not equal, but it can, of

5    course, have an impact on the price.                           10:13

6    Q    The interest of competing studios in the same property

7    also serves to validate Warner Bros.' interest in that

8    property, wouldn't it?

9    A    I think we often buy properties that other studios have

10    passed on and are not interested in, so not necessarily.      10:13

11    Q    I'm addressing a situation where multiple studios are

12    interested in the same property as Warner Bros.

13         Doesn't that also serve to validate Warner Bros.'

14    interest in the property as a valuable property?

15    A    Not Warner Bros.' interest.  The owner's interest,        10:14

16    perhaps.

17    Q    And if a bidding war ensues between competing studios,

18    that would tend to drive up the costs of the property to

19    Warner Bros., wouldn't it?

20    A    To some extent, yes.                                      10:14

21    Q    Ultimately, the market value of a property is determined

22    by offering it for sale in the competitive open market; isn't

23    that correct?

24    A    Yes.

25    Q    Can you give me some examples of bidding wars in which    10:14

1300

```
 1   you've been involved in regarding underlying property rights?

 2   A    There are so many, it's actually hard.  But, yes.

 3   Q    What's a good example?

 4   A    Every few years, Roland Emmerich, who is a very popular

 5   director and writer, will, on spec, which means for his own          10:14

 6   account, write a script, do a budget, and then offer it to

 7   studios as a 'go' film and have the studios bid to have a film.

 8   Q    Any other good examples you can think of?

 9   A    Every meaningful author of a current best seller, whether

10   it's John Grisham or Michael Crichton, will try to create an        10:15

11   auction of their property.

12   Q    Do you recall an auction for the Michael Crichton novel

13   Timeline?

14   A    Not specifically Timeline, but pretty much every

15   Michael Crichton book had an auction.                                10:15

16   Q    Do you recall an auction for Microsoft's property Halo?

17   A    Yes.

18   Q    Was Warner Bros. involved in that auction?

19   A    I believe so.

20   Q    What studio ended up with the property?                         10:15

21   A    I want to say Fox.

22   Q    And Warner Bros. did not end up with the property because

23   the price became too high as a result of that bidding?

24   A    I don't remember specifically, but I'm sure that's the

25   case.                                                                10:16
```

Wednesday, May 13, 2009                    Trial Day 10, AM Session

1  Q    Ultimately, when Warner Bros. acquires film rights to a

2  property on the open market, whether it be a comic book or a

3  novel, the price and other terms are ultimately determined by

4  Warner Bros.' appetite for the property and what it must agree

5  to in order to induce the licensor to license the rights to the          10:16

6  property; is that fair to say?

7  A    What we're willing to agree to.

8  Q    Is that fair to say?

9  A    The difference between "must" and "willing to," yes,

10 because oftentimes, they will actually accept our counteroffer          10:16

11 and our terms.

12 Q    When Warner Bros. ends up paying big money for an

13 underlying property, and agreeing to a number of terms that

14 actually favors the rights holder in a rights acquisition, and

15 then proceeds to invest heavily in that property, it's because          10:17

16 Warner Bros. believes it has the potential to make a very large

17 profit on that property; isn't that correct?

18            **MR. BERGMAN:**  Objection.  Incomplete hypothetical.

19            **THE WITNESS:**  No.

20            **THE COURT:**  Wait one second.          10:17

21       What do you believe is missing, Counsel?

22            **MR. BERGMAN:**  What kind of film it is.  Is it a

23 novel?  Is it a comic book superhero property?  Are there

24 directors who are interested?  Producers?  Actors?

25            **THE COURT:**  At least with respect to genre, I think          10:17

1    that's a fair request, Counsel.

2          I'll sustain the objection.

3    **BY MR. TOBEROFF:**

4    Q    When Warner Bros. ends up paying big money for the film

5    rights to a novel, and agrees to a number of terms that protect          10:17

6    or favor the author, I take it it does so because it believes

7    that it can make money with that property; correct?

8    A    No.

9    Q    Why do you say no?

10   A    Because what we are doing in the first instance is          10:18

11   acquiring it, and our motivation is that we think there's a

12   reasonable, and hopefully decent, likelihood that we can

13   develop it into a packageable film.  When we make the decision

14   whether or not to make the film, we have to face whether or not

15   we think we can make money with it.          10:18

16          The first part of the process is development, and

17   development is -- I don't have a scientific number, but

18   usually, the odds are against you.  Many prominent novels don't

19   get produced.  You asked me about Halo, which was a very big

20   bidding war, but the movie didn't get made.  And many of the          10:18

21   Crichton books haven't gotten made.  So our goal is to acquire

22   something that we believe we have the ability to package into a

23   film that we then hope will green-light.

24   Q    Warner Bros. is in the business to make money, is it not?

25   A    Absolutely.          10:19

1  Q    And when you spend money in acquiring property, your

2  ultimate goal -- I'm not referring to every step in the

3  process -- but your ultimate goal is to make money from the

4  acquisition of that property?

5  A    From the acquisition, the aggregate amount of things we      10:19

6  put into development -- it would be nice if you could make

7  every single one, but the odds are always against you.

8  Q    You're not spending money on a particular property because

9  you think you're not going to make money on that property;

10 isn't that right?                                                 10:19

11 A    We make money for the opportunity to make money.  We spend

12 money for the opportunity to try to make money.

13 Q    Are you aware that participants in a film or in TV series

14 sometimes complain about transactions between related companies

15 as reducing their participations?                                 10:20

16         **MR. BERGMAN:**  Objection.  Lack of foundation.

17         **THE COURT:**  Sustained.

18         **MR. TOBEROFF:**  I'm trying to ask -- it's a

19 foundational question.

20         **THE COURT:**  You need to rephrase it if it's a         10:20

21 foundational question, because you have the conclusion built in

22 there.

23 **BY MR. TOBEROFF:**

24 Q    Are you aware of an issue in the motion picture and

25 television industry regarding transactions between affiliated     10:20

```
 1   companies where the claim of participants is that such
```

```
 2   transactions tend to reduce the amount of their participations?
```

```
 3           MR. BERGMAN:  Objection.  Lack of foundation; calls
```

```
 4   for an expert opinion.
```

```
 5           THE COURT:  As a yes or no question, you may answer      10:20
```

```
 6   the question.
```

```
 7           THE WITNESS:  Yes as to film.
```

```
 8   BY MR. TOBEROFF:
```

```
 9   Q   Are you aware that legislation was introduced in the
```

```
10   California State Senate, supported by the AFLCIO and the WGA   10:21
```

```
11   and other unions, called the Fair Market Value Bill?
```

```
12           MR. BERGMAN:  Objection.  Beyond the scope of direct.
```

```
13           THE COURT:  Sustained, on relevancy grounds;
```

```
14   relevancy as to whether this witness is aware of it.
```

```
15           MR. TOBEROFF:  Your Honor, if I may.                    10:21
```

```
16           The witness has testified at length regarding a
```

```
17   number of factors, in a very broad sense, that go into the
```

```
18   decision-making process regarding films, how much money to
```

```
19   spend, the green-light process, the development process.  And
```

```
20   I'm asking -- that's the basis on my cross for asking him this 10:22
```

```
21   question.
```

```
22           THE COURT:  I don't see where this is going, Counsel.
```

```
23   Proffer to the Court.
```

```
24           Whether he's aware of something before in Sacramento,
```

```
25   how does that affect his -- are you asking whether that affects 10:22
```

1  his decision-making?

2      **MR. TOBEROFF:**  He's opined regarding issues pertinent

3  to fair market value and assessing fair market value, and the

4  bill that was introduced in Congress is called the Fair Market

5  Value Bill, which contains a very interesting definition for                10:22

6  "fair market value."  I want to ask this witness about that,

7  and I'm laying the foundation as to his awareness of this issue

8  in Hollywood.

9      **THE COURT:**  That would go to exactly what you have

10  sought and successfully kept out, his testimony as an expert on   10:22

11  fair market value.  I'm not considering any of his testimony as

12  expert testimony concerning what is or what should be fair

13  market value, what is or what should be fair terms for a deal.

14      He's testifying as to what he has done at

15  Warner Bros., much like Mr. Levitz testified what he has done   10:23

16  at Warner Bros.

17      I understand the similarity between the questions,

18  for example, that you asked Mr. Halloran, and Mr. Bergman asked

19  Mr. Levitz, or this witness.  But the Court is considering them

20  for different purposes.  And what you're now seemingly trying   10:23

21  to get into is exploring objectively a definition of "fair

22  market value."

23      Now, that doesn't seem relevant to the Court.

24      If you want to ask him about his decisions in any of

25  these movies or any of these films for which he has been        10:23

```
 1   involved in the business end, how he has negotiated them or how

 2   the market has operated in those particular deals, that's fair

 3   game, and you can get into any of that.

 4            I don't see the relevancy, though, of exploring a

 5   definition that is in some piece of legislation pending in        10:24

 6   Sacramento, for its own sake.

 7            Objection sustained.

 8   BY MR. TOBEROFF:

 9   Q   Mr. Spira, you've testified at great length about the

10   process of valuing comic books in connection with rights         10:24

11   acquisitions by Warner Bros.

12            What comic book properties were you specifically

13   referring to?

14            MR. BERGMAN:  Objection.  Misstates the testimony of

15   the witness; lacks foundation.                                    10:24

16            THE COURT:  Rephrase your question, Counsel.

17            You can inquire as to what comic book properties he

18   was referring to in his previous answers.

19   BY MR. TOBEROFF:

20   Q   In your previous answers, what comic book properties were     10:25

21   you referring to, Mr. Spira?

22   A   We have, you know, lists of our rights, writers,

23   producers, directors; and we'll go back and refer to those

24   lists.

25            If you're asking me for titles, they all kind of come    10:25
```

```
 1   together.  But it would have been anything in the last 25 years

 2   that we negotiated with DC Comics and any other comic books or

 3   anime or animated things that we've done.

 4   Q    I was asking specifically what comic book property

 5   acquisitions you were referring to.                                    10:25

 6   A    Well, again, the titles are a little bit elusive, and --

 7   there's an old -- I mean, the one that I think back a million

 8   years, there was a thing called Blackhawk, and there's Wonder

 9   Woman and Justice League and Flash.  I mean, most of it is DC,

10   but there are some others that don't come to mind at the               10:26

11   moment.

12   Q    Was Blackhawk a comic book acquisition?

13   A    I don't remember.  It's one of the earliest ones, from,

14   maybe, 20, 25 years ago.  I remember it because my boss had the

15   poster on his wall.                                                    10:26

16   Q    Other than Blackhawk and acquisitions of DC comics, can

17   you tell me of any other comic book acquisitions you had in

18   mind when you were testifying?

19   A    Well, we were involved over the years in a number of

20   negotiations with Marvel where we did not acquire the                  10:26

21   properties.  Again, the titles, they don't come to mind.  I

22   apologize.  I'm not a comic book person.  I'm more of a sports

23   guy.

24   Q    Switching to a different subject, are you familiar with

25   the litigation between 20th Century Fox and Warner Bros. over         10:27
```

1   the underlying rights to the comic book/graphic novel *Watchmen*?

2   A    Yes.

3   Q    What was your involvement in that litigation?

4   A    I don't remember if I was a witness.  I certainly was part

5   of the studio side of the litigation team, as it were.                    10:27

6   Q    Did your department oversee the acquisition of underlying

7   rights to the *Watchmen* comic book?

8   A    My department negotiated the acquisition of the overall

9   package of rights from Paramount, which had green-lit a movie

10  and shut it down; and we bought from Paramount -- or made a               10:27

11  deal with Paramount for the aggregate project, not the

12  underlying rights.

13  Q    And producer Larry Gordon, were his rights part of the

14  rights acquired by Warner Bros. to the underlying *Watchmen*

15  rights?                                                                    10:28

16       **MR. BERGMAN:**  Objection, Your Honor.  This does go

17  beyond the scope of the direct examination and is totally

18  irrelevant.

19       **THE COURT:**  Where are you going with this, Counsel?

20       **MR. TOBEROFF:**  If I tell you where I'm going, then it            10:28

21  will sort of give the answers to the cross.

22       **THE COURT:**  If you can give me a general -- what

23  issue of the case is this relevant to?

24       **MR. TOBEROFF:**  Generally, it's to illuminate issues

25  regarding indemnification provisions and how the studio                   10:28

```
 1   operates.

 2            THE COURT:  How Warner Bros. operates?

 3            MR. TOBEROFF:  Yes.

 4            THE COURT:  I'll give you some latitude.

 5            MR. TOBEROFF:  Thank you, Your Honor.           10:28

 6   BY MR. TOBEROFF:

 7   Q    Was the producer Larry Gordon part of the rights

 8   acquisition package, if you will?

 9   A    Yes.

10   Q    And in his agreement, did he warrant and represent certain   10:29

11   rights to Warner Bros.?

12            MR. BERGMAN:  Objection.  Lack of foundation.

13            THE COURT:  Are you familiar with the agreement?

14            THE WITNESS:  Again, in the same way that I testified

15   before, I didn't negotiate it.  I've never read it.  I've   10:29

16   never -- we don't draft them.  We do the material deal terms.

17   This is a contract or legal term.

18            THE COURT:  This is going to be the flip-side,

19   Counsel, of the objection that went in your favor during

20   direct.                                                    10:29

21            Sustained.

22   BY MR. TOBEROFF:

23   Q    From your knowledge of this lawsuit, you're aware, aren't

24   you, that Larry Gordon had warranty and representation

25   provisions in his agreement relating to the *Watchmen* rights;   10:29
```

1    correct?

2         **MR. BERGMAN:**  Same objection.

3         **THE COURT:**  Counsel, I stopped Mr. Bergman from going

4    into the agreement, based on the lack of foundation of the

5    witness, based on your objection.  I think it's only fair that

6    I do the same thing here.

7         **MR. TOBEROFF:**  Your Honor, he testified that he's

8    aware of the *Watchmen* case.  It was a highly-publicized case.

9    It was also highly publicized that Warner Bros. is seeking

10   indemnification for Larry Gordon based on warranty and

11   representation provisions in his agreement.  And he said he's

12   very familiar with the case.  That's the foundation for my

13   asking him questions.

14         I'm just inquiring as to what he knows.

15         **MR. BERGMAN:**  May I ask a question of the witness on

16   voir dire, Your Honor?

17         **THE COURT:**  You may.

18                    **VOIR DIRE EXAMINATION**

19   BY MR. BERGMAN:

20   Q    Mr. Spira, the knowledge that you have concerning the

21   *Watchmen* agreement and matter, have you obtained that from any

22   source other than counsel employed by Warner Bros.?

23   A    No.

24         **MR. BERGMAN:**  Thank you, sir.

25         **THE COURT:**  Move along.

10:30 (lines 5, 10, 15, 20, 25)

1    **MR. BERGMAN:**  I object on that basis.

2    **THE COURT:**  Let's move along.

3    **MR. TOBEROFF:**  No further questions, Your Honor.

4    **THE COURT:**  Anything further, Mr. Bergman?

5    **MR. BERGMAN:**  Just a couple, Your Honor.                 10:31

6                    **REDIRECT EXAMINATION**

7    BY MR. BERGMAN:

8    Q    Mr. Spira, with respect to bidding wars, you testified on

9    cross that you've participated with respect to novels and with

10   respect to spec scripts.                                     10:31

11        Have you ever participated in a bidding war with

12   respect to a comic book property?

13   A    I don't recall.

14        That's not the same as "no," to be honest.

15   Q    In response to Mr. Toberoff's question, in essence as to  10:31

16   whether competition might drive up the price, you answered,

17   quote, to some extent, closed quote.

18        Could you explain what you mean by that.

19   A    Well, our appetite or desire to do something is primarily

20   driven by our internal factors.  We obviously negotiate and try  10:32

21   to make the best deal that we can.  And that is determined by

22   the willingness of the seller to sell something.  There are

23   sellers who come in and say, 'Look, these are my five red

24   lines, and I won't cross them; I must have complete control

25   over the final script,' or 'I must get X dollars,' or 'I must  10:32

1   get something,' and then we have a decision to make, even in

2   the absence of competition.

3          So there are a lot of factors that can determine what

4   you will or won't spend.

5   Q    And in addressing those five lines of what the seller

6   wants, if they are granted to the seller, is there any

7   compensation made in other terms of the agreement?

8   A    You try to look at the entire agreement comprehensively.

9   There are financial elements.  There's a certain amount of

10  cash, but maybe you'll give them more gross, or maybe you'll

11  give them more cash and less gross or a different royalty.  It

12  all comes down to sort of one aggregated deal, and in your best

13  judgment, whether you want to develop it under those

14  circumstances, or hire the person, if, in fact, you're talking

15  about production, under those circumstances.

16  Q    And in the bidding wars that you've been involved with,

17  has the price, the economic price being paid for any of the

18  options, been the decisive factor in where the picture

19  ultimately wound up?

20  A    You'd have to ask the sellers, but I know that one of our

21  frequent tactics is to match the highest bid and let them

22  choose between, in effect, the prettier studio.

23  Q    Thank you.

24          **MR. BERGMAN:**  I have nothing further, Your Honor.

25          **THE COURT:**  Mr. Toberoff?

10:32

10:33

10:33

10:33

10:34

```
 1          MR. TOBEROFF:  Nothing further, Your Honor, of this

 2    witness.

 3          THE COURT:  Very well.

 4          You're excused.  Thank you, sir.

 5          THE WITNESS:  Thank you very much, Your Honor.        10:34

 6          THE COURT:  Let's go ahead and take a break.

 7          You have one more witness, Mr. Bergman?

 8          MR. BERGMAN:  Yes, Your Honor.

 9          THE COURT:  We'll take a brief break before we call

10    that next witness.                                          10:34

11          (Recess taken.)

12          THE COURT:  Counsel, you may call your next witness.

13          MR. BERGMAN:  Thank you, Your Honor.

14          We call John Gumpert.

15          THE CLERK:  Do you solemnly state that the testimony  10:51

16    you may give in the cause now pending before this court shall

17    be the truth, the whole truth, and nothing but the truth, so

18    help you God?

19          THE WITNESS:  Yes.

20          THE CLERK:  Please state your full name and spell

21    your last name for the record.

22          THE WITNESS:  John Gumpert, G-u-m-p-e-r-t.

23                        DIRECT EXAMINATION

24    BY MR. BERGMAN:

25    Q    Good morning, Mr. Gumpert.                             10:52
```

```
 1              What is your occupation, sir?
 2    A    At the moment, I am a motion picture consultant and I'm
 3    also a principal in a company that's negotiating to acquire a
 4    film library, and hopefully future film libraries as well.
 5    Q    Have the defendants retained you to testify as an expert        10:52
 6    witness in this matter?
 7    A    Yes, they have.
 8    Q    Are you being compensated for the time that you have put
 9    into this matter?
10    A    Yes, I have.                                                     10:52
11    Q    At what rate have you been compensated?
12    A    At the rate of $500 an hour.
13    Q    Are you also a lawyer, sir?
14    A    Yes, I am.
15    Q    And what state are you admitted to?                             10:52
16    A    I'm admitted to the bar for the state of New York.
17    Q    How long have you been involved, if at all, as a film
18    business affairs executive?
19    A    Essentially 35 years, going back to 1974, when I joined
20    Columbia Pictures.                                                   10:53
21    Q    Let's start there.
22              What was your title at Columbia Pictures in 1974?
23    A    I was assistant general counsel.
24    Q    And can you briefly explain, sir, what your
25    responsibilities were in that position.                             10:53
```

Wednesday, May 13, 2009                    Trial Day 10, AM Session

1    A    A broad range of responsibilities, ranging from some

2    corporate matters, because Columbia Pictures was a public

3    company at that point, to financing transactions, to talent

4    deals and acquisitions of literary properties basically when

5    the key players were based in New York.                          10:53

6    Q    When did you leave Columbia?

7    A    1980.

8    Q    And when did you join Universal Pictures?

9    A    1990.

10   Q    From 1980 to 1990, can you describe what you were doing,   10:54

11   and where, during that ten-year period.

12   A    Yes.  I bounced between coasts.

13        I started off at Time Life Films in New York, which

14   was a short-lived motion picture company, at that point in

15   time, incorporated.  That company morphed into Home Box Office, 10:54

16   and I worked at Home Box Office essentially what's called

17   pre-buying films for exhibition on pay television; generally

18   the script stage.  And then I moved over to MGM/UA, first in

19   New York and then in Los Angeles.  And then I worked at

20   Warner Bros. for about a year, always in business affairs.  And  10:55

21   finally, I went back to New York and worked as president of a

22   company called World Film Services which was an independent

23   production company with offices in New York and London.

24   Q    In 1990, sir, when you joined Universal pictures, what was

25   your title?                                                      10:55

1  A    My title was senior vice president of legal and business

2  affairs.

3  Q    What were your responsibilities in that position?

4  A    I was in charge of both the legal department and the

5  business affairs department, as well as being the principal                10:55

6  negotiator for the studio with respect to talent deals and

7  rights acquisitions.

8  Q    And did there come a time after 1990 when you were

9  promoted to a different position at Universal?

10 A    First, the promotion was just an increase in title, not               10:56

11 really so much in responsibilities, from senior vice president

12 to executive vice president of legal and business affairs.  And

13 then in 1996, I was promoted to executive vice president of the

14 motion picture group where I had a broader range of

15 responsibilities involving lots of areas of the studio.                    10:56

16 Q    And did those areas include the acquisition of literary

17 properties?

18 A    Yes, it did.  I always continued to supervise both the

19 legal department and the business affairs department throughout

20 my entire tenure at Universal.                                             10:56

21 Q    When did you leave Universal, sir?

22 A    2001.

23 Q    During the 11-year period in which you were at Universal,

24 who was the primary Universal negotiator for the acquisition of

25 film rights to important literary properties?                             10:57

1   A    That would be me.

2   Q    On what percentage of Universal's important literary

3   property acquisitions during those years were you the primary

4   negotiator?

5        **MR. TOBEROFF:**  Objection.  Lacks foundation; vague          10:57

6   and ambiguous as to important literary properties.

7        **THE COURT:**  Sustained on the vagueness and ambiguity.

8   **BY MR. BERGMAN:**

9   Q    Were you responsible at Universal for the negotiation of

10  all properties?                                                   10:57

11  A    Yes, I was.

12  Q    Including the unimportant ones?

13  A    Yes.

14  Q    During the 11-year period, sir, on what percentage of

15  Universal's literary acquisitions were you the primary            10:57

16  negotiator?

17  A    Well, subject to occasional absences for illness,

18  essentially 100 percent.

19  Q    From 1990 to 2001 while you were at Universal, who was the

20  individual at Universal in the business affairs department who    10:58

21  determined the value to be paid by the studio for literary

22  properties?

23  A    That would be me.

24  Q    And in what percentage of the cases?

25  A    Again, 100 percent, when I was there.                        10:58

Q    What did you do when you left Universal in 2001, sir?

A    I joined a large independent production company called

Intermedia Films which was a German public company and had

access to film financing funds through German tax shelters.

Q    And what was your title at Intermedia?                    10:58

A    I was the vice chairman and head of motion picture

operations.

Q    How long were you at Intermedia?

A    From 2001 through 2006.

Q    During that five-year period, sir, how many films did    10:59

Intermedia, approximately, negotiate for the acquisition of?

A    Well, I think you might have asked me two different

questions.

        We produced about ten films.

        In terms of how many properties we acquired during    10:59

that period?  Could be as many as 50.

Q    Among the ten films that you have produced at Intermedia,

can you identify some of them?

A    The highest profile films would be *Terminator III*, with

Arnold Schwarzenegger and Oliver Stone's *Alexander*.          10:59

Q    Now, what type of a film company was Intermedia?

A    I'm not sure I understand that question.

Q    Was it a production entity?  A distributor?

A    It was a production entity.  At one point we also had a

foreign sales operation where we would sell the foreign rights  11:00

1    to the films, territory by territory, to local distributors.

2    But after awhile, we gave that up and used an outside sales

3    agent.

4    Q    So what was it that Intermedia actually with respect to

5    the production of the film?                                          11:00

6    A    We developed the scripts; we assembled the package of

7    talent; and we physically produced the film.  And then we

8    sought distribution through the majors for domestic

9    distribution.

10   Q    What were your responsibilities during this five-year          11:00

11   period at Intermedia?

12   A    I was the chief business officer, so I had less to do with

13   the creative side of it but everything to do with the business

14   side of it.

15   Q    With respect to all of the acquisitions made by Intermedia     11:01

16   during that period of literary properties, were you the primary

17   negotiator?

18   A    Yes, I was.

19   Q    And while at Intermedia, did you bear the ultimate

20   responsibility for determining how much to pay for the rights       11:01

21   you were acquiring?

22        **MR. TOBEROFF:**  Leading, Your Honor.

23        **THE COURT:**  Sustained.  Rephrase.

24   **BY MR. BERGMAN:**

25   Q    Can you describe for us, sir, what role you played, if         11:01

1    any, in determining the value of the rights that were being

2    acquired by Intermedia?

3    A    Basically, it would be my --

4            **MR. TOBEROFF:**  Objection.  Lacks foundation.

5            **THE COURT:**  You're asking for what role, if any, he          11:01

6    played.

7            Overruled.

8            **THE WITNESS:**  May I answer?

9            **THE COURT:**  Yes.

10           **THE WITNESS:**  Basically, it would be my          11:02

11   responsibility to assess the value of the property and

12   ultimately to either make the deal or supervise the deal and

13   bless it.

14   **BY MR. BERGMAN:**

15   Q    Did you have any involvement while at Intermedia in          11:02

16   negotiating with distributors for distribution agreements?

17   A    Yes, I did.

18   Q    Are you a member of any major motion picture

19   organizations?

20   A    Yes.  I'm a member of the Academy of Motion Picture Arts          11:02

21   and Sciences.

22   Q    The people who give out the Academy Awards?

23   A    Yes.

24   Q    Have you previously testified as an expert in motion

25   picture cases?          11:02

1   A    Not in court, but I have testified; I have acted as an

2   expert witness.

3   Q    Can you identify those cases within the past four years in

4   which you have acted as an expert?

5   A    This is now a memory test.                                    11:03

6         One of the more recent ones was the *Watchmen* where I

7   acted for Warner Bros. in a lawsuit brought by 20th Century

8   Fox; it was a copyright infringement action which was

9   ultimately settled before trial.

10        I'm presently serving as an expert witness for a            11:03

11  writer/director named Paul Haggis who directed the film *Crash*;

12  and in an accounting lawsuit against a production company where

13  the production company is trying to deduct the payments made to

14  its financing partner, as if Warners would deduct the payments

15  made to Legendary in accounting to a participant in *Superman*    11:03

16  *Returns*.

17        I have been an expert witness for the Walt Disney

18  company in connection with the *Roger Rabbit* lawsuit which,

19  again, involved an accounting where the issue was whether or

20  not the nonmonetary value of certain promotional activities     11:04

21  that Disney entered into, particularly with McDonald's, that

22  put the *Roger Rabbit* characters on millions of cups, whether

23  the benefits of those arrangements should be included in gross

24  receipts.  And again, that case went to trial, but I did not

25  testify at trial.                                                11:04

1        I was an expert witness for a company called River

2   Road Entertainment in connection with a case brought by a

3   former executive of the company claiming that she was deprived

4   of executive/producer credit.  That case was settled.

5        And I know I'm missing a couple.                        11:05

6   Q    Were you involved as an expert for Paramount on *No Country*

7   *For Old Men*?

8   A    Yes.  Thank you.

9        I am currently an expert witness, because it's a case

10  brought by the actor Tommy Lee Jones against Paramount claiming   11:05

11  that he had taken a much-reduced fee for the film *No Country*

12  *For Old Men* that ultimately won an academy award, in the belief

13  that it was a very small art film, and it turned out to be a

14  film with a reasonable sized budget and a very high marketing

15  spend, particularly the academy award campaign.  It was a case   11:05

16  that was removed to Texas state court, but then Paramount

17  successfully moved it back to an arbitration tribunal in

18  Los Angeles.

19  Q    And finally, were you involved for Mr. Zaentz in the case

20  against New Line involving *Lord of the Rings*?                  11:06

21  A    Yes.  New Line has a practice, as did its predecessor

22  Miramax in *Lord of the Rings*, of not accounting for foreign

23  receipts at the source; rather, they presale the foreign rights

24  to territorial distributors, as I described something that

25  Intermedia did.                                                 11:06

1    Mr. Zaentz complained that despite New Line's

2 practice, he was entitled under his contract to gross at the

3 source rather than the gross that New Line received, the gross

4 at the distributor level.  That case, again, was settled.

5 Q    So when you draw those distinctions between the source and    11:06

6 the amounts received by New Line, sir, could you describe the

7 process from the first dollar that's earned in foreign and how

8 it works its way, if at all, to the producer, Mr. Zaentz?

9 A    Sure.  It's a very important --

10        MR. TOBEROFF:  Lacks foundation; vague and ambiguous.    11:07

11        THE COURT:  In this particular deal, Counsel?

12        MR. BERGMAN:  Yes, Your Honor.

13        THE COURT:  Overruled.

14        THE WITNESS:  It's a very important distinction.

15 What companies like New Line and Miramax and other independent    11:07

16 producers do is they hire a foreign sales agent that takes a

17 commission and then goes to individual distributors in

18 individual territories and licenses the distribution rights in

19 exchange for typically a minimum guarantee.

20        If you look at it from the licensee's point of view,    11:07

21 the local distributor, they would not be paying that minimum

22 guarantee unless they believed that they could recoup the

23 distribution fee, recoup all of their distribution costs,

24 recoup the advance that they have been given plus interest, and

25 make a profit.    11:08

1       So, clearly, what's going into the gross and coming

2   back to the gross to a participant in that film is far less

3   than in a case with just Warner Bros. which distributes at the

4   source; and therefore, 100 percent of the distributors' gross

5   gets into the pot.                                            11:08

6       In the case with New Line, what they put into the

7   pot, the minimum guarantees they receive and any overages they

8   receive.  But again, because there is another party, the local

9   distributor, earning a profit, as well as a sales agent earning

10  a commission, clearly less than 100 percent is going into the   11:08

11  gross.

12      **MR. TOBEROFF:**  Objection.  Lacks foundation; the

13  answer lacks foundation.

14      **THE COURT:**  Lay some further foundation on that last

15  point, Counsel.                                               11:09

16  **BY MR. BERGMAN:**

17  Q   The information that you have just given us, sir,

18  regarding what New Line did and how the pre-payments were

19  handled, is that material that you gathered from your services

20  as an expert in that case?                                    11:09

21  A   Oh, also from my 35 years of being in the business, yes.

22  Q   Is it experience that you gathered as vice counsel of

23  Intermedia?

24  A   Vice chairman.

25  Q   Vice chairman.                                            11:09

1   A      In part, yes.

2   Q      And from your participation at Universal Pictures?

3   A      Correct.

4           **MR. BERGMAN:**  Is that a sufficient foundation for

5   that, Your Honor?                                                    11:09

6           **MR. TOBEROFF:**  He's talking about Warner Bros. and

7   New Line, and there has not been a foundation laid for that.

8           **THE COURT:**  Overruled.

9   **BY MR. BERGMAN:**

10  Q      What has been your experience, if any, as a major speaker    11:10

11  or panelist at entertainment symposiums, sir?

12  A      I've spoken at the USC entertainment symposium; at the

13  UCLA law symposium; at the Beverly Hills Bar Association; at

14  various symposiums put together by law firms in Los Angeles;

15  and symposiums conducted by a firm called Kagen & Associates.       11:10

16  Q      And have you served as a guest lecturer at any law

17  schools?

18  A      Yes.  I've served as a guest lecturer at USC Law School

19  and at Southwestern Law School.

20  Q      Mr. Gumpert, in connection with your report that was filed    11:11

21  in this case, under your qualifications, you listed what must

22  be approximately 20, 25 cases of films that you have had

23  involvement with.

24          Are those cases that you, in fact, negotiated the

25  acquisition of rights to?                                           11:11

1    A    Yes.

2    Q    I know this is a hard question.  Can you name some of

3    those films?

4    A    I could name some of them.  I think I gave you a

5    representative sample and I focused on preexisting characters,    11:11

6    because that seemed to be the most relevant, and they included

7    characters such as *Rocky and Bullwinkle*, *Ritchie Ritch*, *Dudley*

8    *Do-Right, Alvin and the Chipmunks*, *Little Rascals*, the

9    *Flintstones*, on and on and on.

10            Universal had a particular agenda while I was there,    11:12

11    because of its ownership of theme parks, which was to acquire

12    characters which hopefully could be used as a basis for a

13    successful movie and then be the basis of a ride or an

14    attraction at a theme park.

15            Universal competed head to head with Disney, both in    11:12

16    Hollywood and in Orlando, and unlike Disney, we did not have

17    Mickey Mouse so we had to create our own characters.

18    Q    Was that part of the reason why you were also involved in

19    *Casper the Friendly Ghost*, *The Cat in the Hat*, *Flipper*, and *The*

20    *Grinch Who Stole Christmas*?    11:13

21            **MR. TOBEROFF:**  Leading.

22            **THE COURT:**  Sustained.

23            **MR. BERGMAN:**  Your Honor, may I place the report

24    before the witness to refresh his recollection?

25            **THE COURT:**  You may.    11:13

1      **MR. BERGMAN:**  Thank you.

2    **BY MR. BERGMAN:**

3    Q    Look at the list and see if it refreshes your

4    recollection.

5    A    Yes, it does.                                              11:13

6         Additional properties that I negotiated the

7    acquisition of includes --

8         **THE COURT:**  Wait a minute.

9         You've refreshed your recollection.

10        **THE WITNESS:**  I apologize.                             11:13

11        **THE COURT:**  You still have to testify from your

12   recollection.

13   **BY MR. BERGMAN:**

14   Q    As your recollection has been refreshed, Mr. Gumpert, can

15   you name any additional pictures that you were involved in the   11:13

16   acquisition of?

17   A    Yes.

18        *The Grinch Who Stole Christmas*, *The Cat in the Hat*,

19   *The A-Team*.  Again, there were just so many.

20   Q    Okay.                                                      11:14

21        Have you, sir, reviewed each of the contracts, the

22   other agreements for other rights, that were offered in this

23   case by the plaintiffs?

24   A    Yes, I have.

25   Q    Have you reviewed each of the agreements that were offered   11:14

```
 1   by the defendants in this case?
 2   A    Yes, I have.
 3   Q    And have you made any attempts since you were retained to
 4   obtain the studio data concerning other comic superhero
 5   characters?                                                      11:14
 6            MR. TOBEROFF:  Leading.
 7            THE COURT:  Overruled.  Foundation.
 8            It's yes or no.
 9            THE WITNESS:  Yes.
10   BY MR. BERGMAN:                                                  11:15
11   Q    Can you describe what you've done in that regard, sir.
12   A    I spoke to the business affairs executives at Columbia
13   Pictures to find out the essential deal terms for such
14   properties as the Lone Ranger, Green Hornet, Ghost rider, and
15   Flash Gordon.                                                    11:15
16   Q    Did you disclose that additional research that you had
17   done to the plaintiffs counsel at your deposition?
18   A    Yes, I did.
19   Q    Had you, in fact, prepared a chart of that data?
20   A    Yes.                                                        11:15
21   Q    And did you produce that chart to counsel?
22   A    Yes, I did.
23   Q    Okay.
24            What have you been retained to do by the defendants,
25   Mr. Gumpert?                                                     11:16
```

```
 1   A     I've been retained to assess the post-termination licenses

 2   between DC and Warner Bros. with respect to the *Superman* film,

 3   television shows, and merchandising arrangements, to determine

 4   whether or not those arrangements are fair market value.

 5   Q     For what rights?                                              11:16

 6   A     The film rights, television rights, and the merchandising

 7   rights.

 8   Q     Does your opinion include the fair market value of the

 9   nonexclusive rights determined by the Court?

10           MR. TOBEROFF:  Objection.  Leading.                        11:16

11           THE COURT:  Overruled.  But let's let the witness

12   explain what he means by that.

13           THE WITNESS:  Yes.

14           THE COURT:  What do you mean by that?

15           THE WITNESS:  The basis is that I have read              11:17

16   Your Honor's decision and I'm aware that the Court has ruled

17   that with respect to Action Comics No. 1, the rights are

18   co-owned between DC Comics on the one hand and the heirs of

19   Mr. Siegel on the other hand.

20   BY MR. BERGMAN:                                                     11:17

21   Q     And in what way, to your expert understanding, does that

22   render the rights that DC transferred to Warner Bros.

23   nonexclusive?

24   A     I think, as a matter of law, because the two parties are

25   co-owners, one party can only grant nonexclusive rights.           11:17
```

1  Q    Did you, in fact, formulate an opinion as to the fair

2  market value of the terms of the agreements and the amounts

3  received thereunder by DC in connection with the film

4  agreement?

5  A    Yes.                                                          11:18

6  Q    Before we get to that opinion, could you describe what you

7  did to formulate your opinion?

8  A    Well, as a matter of methodology, I based my opinion on my

9  own personal experience with respect to rights acquisitions

10 that I had been involved with.  I reviewed the contracts          11:18

11 produced by both parties in this matter.  I did a fair amount

12 of research on the *Superman* property in particular and

13 superhero properties in general.  And I obtained some

14 information regarding comparable properties that had been

15 acquired that had not been involved with, such as the ones I     11:19

16 mention where I got the information from Columbia Pictures.

17          **MR. BERGMAN:**  Thank you.

18          Your Honor, based on the witness's experience and the

19 analysis, that he said he's done, I move that he be recognized

20 as an expert witness on this.                                    11:19

21          **THE COURT:**  Designated in what area, Counsel?  For

22 what purpose?

23          **MR. BERGMAN:**  For two purpose.  One, for the purpose

24 of giving an expert opinion on the fair market value of the

25 nonexclusive film rights that were transferred by DC to          11:19

```
 1   Warner Bros. and the amounts received by DC thereunder; that's
 2   one.
 3           And the second is as a rebuttal witness to certain of
 4   the statements offered by Mr. Halloran.
 5           THE COURT:  Counsel?                                        11:20
 6           MR. TOBEROFF:  Permission to voir dire the witness,
 7   Your Honor?
 8           THE COURT:  You may.
 9                       VOIR DIRE EXAMINATION
10   BY MR. TOBEROFF:                                                   11:20
11   Q    Mr. Gumpert, you recently had a deposition taken in my
12   offices on April 3, 2009.
13   A    Yes.
14   Q    At that time you were deposed under oath.
15   A    Yes.                                                          11:20
16   Q    After the deposition, you reviewed your deposition
17   transcript and provided us with any changes you wished to make
18   of that transcript; correct?
19   A    Yes.
20   Q    You've never been involved in the stand-alone acquisition    11:20
21   of television rights to a literary work, have you?
22   A    That's correct.
23           MR. BERGMAN:  Objection.  That's improper voir dire.
24   I'm not asking this witness anything regarding television.
25           THE COURT:  Overruled.                                     11:21
```

```
 1              THE WITNESS:  That's correct.

 2   BY MR. TOBEROFF:

 3   Q     You've never negotiated television series agreement with a

 4   broadcast network; correct?

 5   A     That's correct.                                              11:21

 6   Q     You've also never worked as a television executive at a

 7   studio.

 8   A     Correct.

 9   Q     You've never worked for a television company in any

10   capacity, in fact.                                                 11:21

11   A     Other than Home Box Office, to the extent it's a pay

12   television company.

13   Q     And that was for less than a year.

14   A     That was for a little more than a year; but yes, in that

15   range.                                                             11:21

16   Q     You've never been involved in the development of a

17   television series.

18   A     Correct.

19   Q     Nor have you been involved in the production of a

20   television series.                                                 11:21

21   A     Correct.

22   Q     And you've never been retained as a television industry

23   expert in any case, have you?

24   A     No.

25   Q     You've also never been involved in the negotiation of a     11:22
```

```
 1    stand-alone animated television rights agreement, have you?

 2    A     That's correct.

 3          MR. TOBEROFF:  Your Honor, Plaintiffs move to

 4    preclude Mr. Gumpert from offering any testimony regarding the

 5    Smallville television agreement or the Superman animation          11:22

 6    agreements as he does not qualify as a television industry

 7    expert nor an expert in television transactions.

 8          Defendants designated a separate expert,

 9    Mr. Richard Marks, to opine as to the Smallville television

10    agreement, and he is a television industry expert.                 11:22

11          THE COURT:  Counsel?

12          MR. BERGMAN:  As I indicated, Your Honor, I'm not

13    going to be asking this witness to express any opinion on the

14    Smallville agreement or on the animation agreement.

15          THE COURT:  Very well.                                       11:23

16          So the Court will grant the request by the defense to

17    designate this witness as an expert regarding the fair market

18    value of those rights as indicated.

19          MR. BERGMAN:  That is agreeable, Your Honor.

20          THE COURT:  Those agreements containing those rights        11:23

21    in exchange for the value.

22          MR. TOBEROFF:  I have a little bit left of my voir

23    dire, Your Honor.

24          THE COURT:  Oh, I'm sorry.

25          Let's wait until you are completely done then, before       11:23
```

1    you make your request.

2    **BY MR. TOBEROFF:**

3    Q    While at Universal, you were senior vice president of

4    legal and business affairs from 1990 to 1992; correct?

5    A    Yes.                                                        11:23

6    Q    And then executive vice president of legal and business

7    affairs from 1992 to 1996, and executive VP of the motion

8    picture group from 1996 through 2001.

9    A    Correct.

10   Q    Throughout your career in the entertainment industry,    11:24

11   you've served in a business affairs capacity; correct?

12   A    Except when I was executive vice president of the motion

13   picture group at Universal, my responsibilities expanded beyond

14   business affairs.

15   Q    You've never served as a creative production executive,   11:24

16   have you?

17   A    No, I have not.

18   Q    And you've never served as a distribution executive, have

19   you?

20   A    Only in the sense that at Intermedia we had a foreign     11:24

21   sales distribution operation, and I was involved with that.

22   Q    You've never served as a creative development executive,

23   have you?

24   A    No.

25   Q    Never served as a marketing executive.                    11:24

```
 1   A    No.

 2   Q    As head of business affairs at Universal, it was not

 3   within the scope of your duties to decide which films to green

 4   light for production, was it?

 5   A    That's not the case.  At Universal, decisions to green      11:24

 6   light films was done by a committee of which I was a member,

 7   and I spoke at those meetings from a business and financial

 8   point of view which I would suggest to you is equally important

 9   as what a creative executive might say at those meetings or

10   what a marketing executive might say at those meetings.          11:25

11   Q    Mr. Gumpert, is it correct to say you have no opinion as

12   to the comparative value of Superman film rights?

13              MR. BERGMAN:  Objection.  Vague and ambiguous,

14   Your Honor.

15              THE COURT:  Rephrase.                                 11:25

16   BY MR. TOBEROFF:

17   Q    Part of the reason we're here is to value Superman; is

18   that correct?

19   A    Well, not really.  We're here to determine whether or not

20   the licensing arrangements between DC and Warner Bros. were of   11:25

21   fair market value or not.

22   Q    Do you believe the value of Superman is relevant to that

23   determination?

24   A    In part.

25   Q    But you have no opinion as to the comparative value of      11:26
```

1    *Superman* compared to other properties, do you?

2    A    Actually, I do.  As a motion picture executive of

3    35 years, I absolutely have an opinion.

4    Q    I'd like to read a section from your deposition, starting

5    on Page 38 at line 10 and going to line 19 on Page 38.          11:26

6         "QUESTION:  Based on that experience, I'd like you to

7    make your best approximation on a scale from 1 to 10 of the

8    value of *Superman*.  You spoke at great lengths that it's a

9    declining character.  You mentioned things like that.  That

10   would lead me to believe that your answer would be one to       11:26

11   three."

12        "I'd like to clarify that portion in your report."

13        "ANSWER:  I wish I could do that for you,

14   Mr. Toberoff.  I just can't.  They are undoubtedly valuable.

15   How valuable they are, I don't know, and I'm really not sure."  11:27

16        "QUESTION:  Okay --"

17        **MR. TOBEROFF:**  Actually I read beyond; I ended at

18   line 19.

19        **MR. BERGMAN:**  Your Honor, that is not voir dire.

20   It's cross-examination, and that doesn't go to the witness's    11:27

21   qualifications.

22        **THE COURT:**  I appreciate that, Counsel.  This goes to

23   his foundation, though, in terms of his ability to offer an

24   opinion and be designated as an expert in this area.

25        It may very well, at the end of the day, turn on          11:27

1   weight, but the Court needs to determine, from a <u>Daubert</u>

2   perspective, whether or not there's a basis to give the opinion

3   before I assess the weight of that opinion.

4           **MR. BERGMAN:**  Yes, sir.

5           **MR. TOBEROFF:**  Your Honor, I reassert that the                   11:28

6   witness be precluded from testifying as to the television

7   agreements.  We had covered that earlier.

8           **THE COURT:**  We've already gotten through that.

9           The record could not be clearer that he's not going

10  to be talking about television agreements.                               11:28

11          **MR. TOBEROFF:**  Fine.

12          Your Honor, based on the questions and answers I read

13  from the witness's deposition, I also move to preclude

14  Mr. Gumpert from offering expert testimony as to the

15  comparative value of *Superman* to any other literary character,         11:28

16  since he answered that he could not answer that question and

17  did not have an opinion as to that.

18          **THE COURT:**  Let me hear from Mr. Bergman on that.  I

19  don't know if you want to ask further questions or just argue,

20  but I do need a response to this.                                        11:28

21          **MR. BERGMAN:**  Your Honor, I don't believe that

22  question related to the exclusive rights on the film, the value

23  of the exclusive rights.

24          The witness has stated in his report that for reasons

25  which he's going to bring out in his testimony, he can't              11:29

1  compare the value of the nonexclusive rights of *Superman*.  He

2  doesn't know.  And he will explain why he doesn't know.

3          **THE COURT:**  All right.

4          Well, I think this is probably best something to be

5  played out.  I'll be mindful of his testimony, Counsel, in          11:29

6  terms of a foundational challenge to any opinions that are

7  predicated on the value of *Superman*, which clearly the witness

8  has indicated that he does not know.  And we'll see how that

9  plays out.

10         **MR. TOBEROFF:**  Thank you, Your Honor.          11:29

11         **THE COURT:**  Thank you.

12         You may proceed, Counsel.

13         **MR. BERGMAN:**  Thank you.

14                 **DIRECT EXAMINATION** (Cont'd)

15  **BY MR. BERGMAN:**          11:30

16  Q   Mr. Gumpert, as a result of the investigation and the

17  analysis and the reading that you have done, can you tell me

18  what the fair market value of the nonexclusive rights conveyed

19  by DC to Warner Bros. is?

20  A   I believe --          11:30

21         **MR. TOBEROFF:**  Objection, Your Honor.

22         As Your Honor pointed out earlier in the case, that's

23  an ultimate question for the court.

24         **THE COURT:**  I tend to agree, Counsel.

25         Unless you're asking him to identify what rights he          11:30

```
 1   isn't going to attempt to place a value on.

 2           Maybe you should rephrase your question.

 3           MR. BERGMAN:  Yes, Your Honor, I will.

 4   BY MR. BERGMAN:

 5   Q    Are you going to give an opinion, sir, as to the dollar      11:30

 6   value of the nonexclusive rights transferred by DC to

 7   Warner Bros. in 2002 under the film agreement?

 8   A    Yes, I am.

 9   Q    What is that dollar value?

10   A    Well, it's very difficult.                                   11:31

11           I guess what I'm trying to say is that the dollar

12   value of a nonexclusive rights is less than what Warners

13   actually paid.

14   Q    Can you, by virtue of all of the work you've done, all

15   your experience, give me the dollar amount of the value of the   11:31

16   nonexclusive rights as of 2002?

17   A    No.  I cannot do that.

18   Q    Why can't you do that?

19   A    Because there's a very limited market for nonexclusive

20   rights.  And in my experience, I've never acquired nonexclusive  11:32

21   rights.

22   Q    Can you give me an opinion as to the value of the *Superman*

23   rights that were conveyed, had they been exclusive rights?

24   A    Well, I can certainly say that they would be more

25   valuable.                                                        11:32
```

1  Q    Can you compare, on the basis of what you've done, the

2  value of the exclusive rights in *Superman*, had they been

3  exclusive, to the exclusive rights in the other agreements?

4  A    Yes, I can.

5           **MR. TOBEROFF:**  Lacks foundation.                          11:32

6           **THE COURT:**  I don't know, counsel, because I have not

7  heard the opinion and the basis for it.

8           What I'm going to do, I'm going to be mindful of your

9  objection, as well as the voir dire that you have just

10 conducted.  I'm going to permit the testimony to proceed, and   11:33

11 then I'll reevaluate your objection after I've heard the

12 testimony and your cross-examination.

13          I'll take your objection under submission.

14          **MR. TOBEROFF:**  Very well, Your Honor.

15          **MR. BERGMAN:**  Thank you, sir.                             11:33

16 **BY MR. BERGMAN:**

17 Q    Mr. Gumpert, I'm going to be referring to the Court's

18 final pretrial conference order, beginning at Page 7, and I'm

19 going to abbreviate some of the terms that His Honor used; that

20 is, I'm going to change TWEC, Warner Bros. entertainment's       11:33

21 predecessor in interest, to Warner; so that's abbreviated.

22          Have you, sir, formed an opinion as to the value of

23 the various *Superman* option and assignment agreements between

24 DC Comics and Warner Bros., and the amounts paid to DC Comics

25 by Warner Bros., reflects the fair market value of the          11:34

1    nonexclusive rights that the Court has determined were

2    transferred from DC Comics to Warner Bros.?

3            **MR. TOBEROFF:**  Vague; ambiguous.  Also, the question

4    solicits an answer that would refer by definition to the

5    television agreements.                                              11:34

6            **THE COURT:**  He's basically already given the answer

7    to this.

8            I'm going to overrule the objection subject to the

9    same foundational concern the Court has previously expressed.

10           Let's get to the basis of his opinion.  That's what    11:34

11   matters to the Court.

12           **MR. BERGMAN:**  Okay.

13           **THE COURT:**  That's what I don't know.

14           **MR. BERGMAN:**  May I ask what the opinion is,

15   Your Honor?                                                        11:34

16           **THE COURT:**  Go ahead.

17           I've already heard it, counsel, but you can lay it

18   out, if you want.

19   **BY MR. BERGMAN:**

20   Q    What is your opinion, sir, as to the value of those        11:34

21   nonexclusive film rights that were transferred to Warner Bros.

22   in 2002?

23   A    Certainly a lot less than if the rights were exclusive.

24   Q    And have you reached an opinion as to whether the rights,

25   if exclusive, were for fair market value in 2002?                 11:35

1    A    Yes.

2    Q    What is the opinion you've reached on that question?

3         MR. TOBEROFF:  Same objection as to the ultimate --

4         THE COURT:  I understand.  That's the part of the

5    objection that's under submission.                          11:35

6         THE WITNESS:  May I answer?

7         THE COURT:  Please.

8         THE WITNESS:  I concluded that the agreement

9    reflected an above-fair-market-value arrangement.

10   **BY MR. BERGMAN:**                                          11:35

11   Q    For exclusive rights?

12   A    For exclusive rights, yes.

13   Q    Now, what are the bases of that opinion, sir?

14   A    Apart from my own experience, I compared the terms of the

15   *Superman* film agreement, for example, with about five other   11:35

16   agreements that I considered to be comparable, that if I was a

17   business affairs executive, I would refer to, in trying to

18   figure out what to pay for the *Superman* film rights.

19   Q    Okay.

20        To what extent is your opinion based on the             11:36

21   nonexclusivity of the rights?

22        THE COURT:  Wait a second.

23        There's two opinions that you elicited from him.  The

24   only parties at the time thought they were exclusive rights.

25   That's what the Court is interested in at this point.        11:36

1      Let's stay focused on that for the time being.

2           I understand the nonexclusive rights.  I understand

3  that's been ruled by the Court post hoc; that really wasn't in

4  the minds of the people negotiating the agreement.  Let's focus

5  on the second opinion that you elicited from him with respect       11:36

6  to the fair market value of what the parties believed they

7  negotiated at that time.

8           We'll eventually, of course, have to cross this

9  bridge of the actual value of the nonexclusive rights that were

10  in fact transferred, but let's keep it focused on this for the    11:37

11  time being, and let's get the basis out.

12           **MR. BERGMAN:**  Certainly, Your Honor.

13           **THE COURT:**  You've got less than an hour.

14           **MR. BERGMAN:**  Yes, sir.

15  **BY MR. BERGMAN:**                                               11:37

16  Q    What is the basis of your opinion that, even if exclusive,

17  the rights transferred were transferred at or above fair market

18  value?

19  A    Well, in part, I looked at the prior performance of the

20  four *Superman* films and the one *Supergirl* film:  I looked at   11:37

21  the fact that the property had been exploited in a number of

22  television series over the years.  I particularly focused on

23  the first four *Superman* films which had significantly declining

24  box office results, with the most recent one, the fourth one,

25  being pretty much catastrophic.  And then I also focused on        11:38

 1    other agreements for what I regarded as comparable situations,

 2    as I said, that I would have looked at if I was a business

 3    executive trying to determine what to pay.

 4    Q    One of the factors that you have identified is the prior

 5    performance of the prior *Superman* films.                                    11:38

 6              How does that figure into your evaluation of the

 7    exclusive rights for *Superman Returns*?

 8              **MR. TOBEROFF:**  Leading.  He did not mention --

 9    misstates the testimony.  He did not mention the prior

10    performance of the *Superman* films; he just said he looked at     11:38

11    them.

12              **THE COURT:**  Rephrase the question.

13              **MR. BERGMAN:**  Yes, sir.

14    **BY MR. BERGMAN:**

15    Q    When you say that you looked at the four prior films,          11:38

16    sir --

17              **MR. BERGMAN:**  As a matter of fact, my associate

18    points out to me that the answer to the question, Your Honor,

19    was, 'well, I partly looked at the prior performance of the

20    four *Superman* films.'                                             11:39

21              The witness did actually testified to that.  But let

22    me ask you once again.

23    **BY MR. BERGMAN:**

24    Q    When you looked at the four *Superman* films, did you mean

25    that you viewed the four *Superman* films or that you analyzed      11:39

1  the agreements?

2  A    I meant that I looked at the box office results of the

3  four films; and in terms of domestic box office, the first film

4  did about $138 million at the domestic box office; the second

5  film did, I think, $108 million; the third film did                11:39

6  $160 million; and the fourth film did about 15, $16 million,

7  which is an enormous drop off from the first film.

8  Q    What does that prior performance demonstrate to you as a

9  buyer of *Superman* rights in 2002?

10        **MR. TOBEROFF:**  Lacks foundation and misstates.  He's    11:40

11  not a buyer.

12        **THE COURT:**  Overruled.

13        **THE WITNESS:**  It demonstrates to me, in part, the

14  property was damaged goods; that you really had to reinvent the

15  property if you were going to have a successful film.            11:40

16  **BY MR. BERGMAN:**

17  Q    There's been some testimony in this case, sir, that the

18  sort of downward spiral trend reflected by the four *Superman*

19  films is somehow customary, and was customary during the '70s

20  and '80s.                                                        11:40

21        Does that comport with your understanding?

22        **MR. TOBEROFF:**  Misstates the record; leading as to

23  downward spiral trends.

24        **THE COURT:**  It is leading, Counsel.  Let's avoid

25  this.  This is the problem we had earlier in the trial with      11:41

1    Mr. Toberoff with Mr. Halloran.

2            Let these experts speak for themselves.

3    **BY MR. BERGMAN:**

4    Q    Does that performance that you just described of those

5    four *Superman* films, how does that factor into your expert                    11:41

6    opinion as to fair market value in 2002?

7    A    I give it a great deal of weight.

8    Q    Can you explain why?

9    A    Sure.

10           The first thing you learn in business affairs is that      11:41

11   there are no rules, and you cannot say, as a rule of thumb,

12   that if film number one did X amount of business, that film

13   number two will do some percentage of that business.  There are

14   examples after examples of franchises, such as *Lethal Weapon*,

15   for example, *X-Men*, for example, where the sequels did better       11:42

16   than the original film; so when I see a trend which starts at

17   $138 million at the domestic box office and ends up at

18   something like $16 million at the domestic box office,

19   obviously it affects my view as to the value of the property

20   after those four films had been released.                            11:42

21   Q    Does the fact that Warner Bros. holds some copyright

22   interests in the prior films and television shows affect in any

23   way your evaluation as to the fair market value of the DC

24   rights that were transferred to Warner?

25   A    Yes.                                                            11:42

1   Q    In what way does that figure in, sir?

2   A    Because of the copyrights held by Warners with respect to

3   the prior films, it would be very difficult to find a

4   substantial buyer, a studio for example, for the *Superman*

5   rights after the fourth film had been released.                    11:43

6   Q    Why is that?

7   A    Because you run the risk of infringing on Warner Bros.

8   rights.  You have to be very careful about that.  And Warners

9   could always come up with a competing product using the

10  copyrights that they control.                                      11:43

11  Q    Was your opinion as to the fair market value of the

12  exclusive rights of *Superman* in 2002 affected in any way by any

13  trends that seem apparent to you in terms of superheroes at the

14  time?

15  A    Yes.  I think I quoted in my report from an article in      11:43

16  Time Magazine, the basic premise of which *Superman* was not

17  cool.

18          **MR. TOBEROFF:**  Lacks foundation as to trends.

19          **THE COURT:**  Let's lay a foundation for that.

20          We're going to take our lunch break at this time.        11:44

21  When we resume, let's spell out the trend there.

22          Counsel, just to make sure that I did not misinstruct

23  you concerning the opinion, as you're doing now, as you're

24  going through his opinion with respect to the exclusive rights

25  that the parties believed, I will certainly permit you, as I     11:44

Wednesday, May 13, 2009                    Trial Day 10, AM Session

```
 1   will permit the plaintiff, to explore the value of the

 2   nonexclusive rights that the Court has found was, in fact,

 3   transferred.  I just don't want them mixed up, going back and

 4   forth between the two.

 5           MR. BERGMAN:  I understand, Your Honor.  Thank you.      11:44

 6           THE COURT:  Just making that clear.

 7           We'll take our lunch recess.  We'll resume at 1:30.

 8           MR. BERGMAN:  Thank you, Your Honor.

 9           MR. TOBEROFF:  Thank you.

10

11

12

13

14

15

16                            CERTIFICATE

17

18   I hereby certify that pursuant to Section 753, Title 28, United
     States Code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the judicial conference of
     the United States.

21

22   _____        _____
     THERESA A. LANZA, CSR, RPR                    Date
23   Federal Official Court Reporter

24

25
```

Wednesday, May 13, 2009                  Trial Day 10, AM Session