```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     EASTERN DIVISION

 4                         - - -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                         - - -

 7   JOANNE SIEGEL and              )
     LAURA SIEGEL LARSON,           )
 8                   Plaintiffs,    )
                                    )
 9           vs.                    )   No. CV 04-08400-SGL
                                    )
10   WARNER BROTHERS ENTERTAINMENT INC.;)
     TIME WARNER, INC.; DC COMICS;  )
11   and DOES 1-10,                 )   Trial Day 11
                     Defendants.    )   A.M. Session
12   _____)   Pages 1450-1507

13

14

15        Reporter's Transcript of Court Trial Proceedings

16                   Riverside, California

17                   Tuesday, May 19, 2009

18                       10:08 A.M.

19

20

21

22

23             THERESA A. LANZA, RPR, CSR
               Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                   (951) 274-0844
                  WWW.THERESALANZA.COM
```

```
 1     APPEARANCES:

 2

 3     On Behalf of Plaintiffs:

 4
                           LAW OFFICES OF MARC TOBEROFF
 5                         BY:  Marc Toberoff
                           BY:  Nicholas C. Williamson
 6                         BY:  Keith Adams
                           2049 Century Park East,
 7                         Suite 2720
                           Los Angeles, California  90067
 8                         310-246-3100

 9

10     on behalf of Defendants/Counterclaimant:

11
                           WEISSMANN WOLFF BERGMAN COLEMAN
12                          GRODIN & EVALL LLP
                           BY:  Michael Bergman
13                         BY:  Anjani Mandavia
                           9665 Wilshire Boulevard,
14                         Ninth Floor
                           Beverly Hills, California  90212
15                         310-858-7888

16

17     On Behalf of DC Comics:

18                         PERKINS LAW OFFICE, P.C.
                           BY:  Patrick T. Perkins
19                         1711 Rt. 9D
                           Cold Spring, New York  10516
20                         845-265-2820

21

22

23

24

25
```

Tuesday, May 19, 2009                    Trial Day 11, AM Session

1    I N D E X

2                                                    Page

3    Plaintiff Closing Arguments..................... 1453

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Riverside, California; Tuesday, May 19, 2009; 10:08 A.M.

2                                  -oOo-

3          **THE CLERK:**  Calling calendar item number two,

4    Case Number CV 04-08400-SGL, Joanne Siegel, et al., versus

5    Warner Bros. Entertainment, Inc., et al.

6          Counsel, please state your appearances for the

7    record.

8          **MR. TOBEROFF:**  Marc Toberoff for plaintiffs.

9          **MR. WILLIAMSON:**  Nicholas Williamson for plaintiffs.

10         **MR. ADAMS:**  Keith Adams for plaintiffs.                    10:27

11         **MR. BERGMAN:**  Michael Bergman for the defendants.

12         **MR. PERKINS:**  Patrick Perkins for the defendants.

13         **MS. MANDAVIA:**  Anjani Mandavia for the defendants.

14         **THE COURT:**  Good morning to you all.

15         We're on calendar this morning for closing arguments    10:27

16   in this trial.

17         Mr. Toberoff, you may proceed first.

18         **MR. TOBEROFF:**  Thank you, Your Honor.

19         Before I begin, I'd just like to take this

20   opportunity to introduce the Court to the plaintiffs in this   10:27

21   case, Jerry Siegel's widow, Joanne Siegel; and his daughter,

22   Laura Siegel Larson, who are here today with us.

23                    **CLOSING ARGUMENT - PLAINTIFFS**

24         **MR. TOBEROFF:**  In this first phase trial, the issue

25   before us is whether equity shall permit defendants to shield a  10:27

1  large portion of their profits derived from their *Superman*

2  copyrights based on corporate formalities, when in practice, DC

3  and Warner Bros. comprise and function as a closely-knit,

4  integrated entity.

5          The objective test, fashioned by this Court, is          10:28

6  whether the *Superman* film and TV agreements entered into in

7  2001 and 2002 by DC, with its owner, Time Warner Entertainment

8  Company, TWEC, reflect fair market value for the rights, quote,

9  transferred from DC Comics to TWEC, end quote, order Page 8,

10  Line 23.          10:28

11          Plaintiffs' objective analysis, as presented at

12  trial, is comprised of three basic parts;

13          First, an analysis of the tremendous market value of

14  *Superman* film and television rights in 2001 and 2002, when the

15  agreements were entered into;          10:28

16          Second, an analysis of the terms in the *Superman*

17  agreements, which tend to greatly favor Warner Bros. to DC's

18  detriment, and failed to comport with industry custom and

19  practice;

20          Third, a detailed comparison of the terms in the          10:28

21  *Superman* agreements to the terms of arm's length transactions

22  for other high-profile properties to demonstrate custom and

23  practice and what buyers will indeed pay in the competitive

24  open market for valuable intellectual properties.

25          First I'll turn to the market value of *Superman*          10:29

1  rights in 2001 and 2002, as demonstrated at trial.

2           Plaintiffs showed that *Superman* has unparalleled

3  value.  Plaintiffs' comic book historian Mark Evanier first

4  walked us through Superman's history of near continuous

5  commercial exploitation, over seven decades, from comic books          10:29

6  to radio to television to films, and throughout ubiquitous

7  merchandising, to give the Court an overall sense of *Superman*'s

8  demonstrable market power and status as a highly-branded

9  franchise property.  I refer the Court to the transcript at

10 Page 46, Line 5, to Page 50, Line 24:                                   10:30

11          In the course of trial, defendants had to concede

12 that in entering into the *Superman* film agreement, they not

13 only adopted the financial terms of the 1974 Salkind agreement,

14 but they proceeded to lock those terms in for 34 years, until

15 2033.                                                                   10:30

16          Plaintiffs' comic book historian Mark Evanier,

17 therefore, contrasted the waning popularity of *Superman* in

18 1974, when *Superman* was at its nadir, to *Superman* in 2001-2002,

19 when interest in comic books and superheroes was sky-rocketing

20 due to the enormous success of major films based on comic               10:30

21 books.

22          I refer the Court to the transcript at Page 55,

23 Line 25, to Page 57, Line 2.

24          Mr. Evanier's detailed account of Superman's waning

25 popularity due to the counter-culture revolution in the late            10:31

1    '60s and mismanagement by DC was not only credible, it

2    comported with the statements and images in defendants' own

3    *Superman* documentary, 'Look Up In The Sky,' which is

4    Exhibit 303.

5    　　　　　Defendants, at trial, attempted to distance          10:31

6    themselves from this documentary, but such attempts were

7    unconvincing, as their fingerprints are all over the

8    documentary.  Warner Bros. financed and distributed the

9    documentary.  DC and Warner Bros.'s logos appears on the cover.

10   It contains interviews with Paul Levitz.  And even defendants'   10:31

11   designated comic book expert, Mark Wade, is interviewed in the

12   documentary.  Mr. Levitz admitted all of this at trial, and

13   even that DC supplied materials for the documentary and was

14   submitted rough cuts of the documentary for substantive review.

15   　　　　　Though, perhaps, a cliché, the phrase 'actions speak   10:31

16   louder than words' reverberates through this case, when

17   defendants' actual conduct is compared to the many

18   after-the-fact rationalizations advanced by them at trial.

19   　　　　　Here, Mr. Levitz admitted that from 1974, he, quote,

20   had a lovely note in my file from Warner Bros. turning down     10:32

21   *Superman* in the early 1970s and saying, quote, "go license it

22   out to Alex Salkind; we don't think anyone will care."

23   　　　　　That's Exhibit 150, and at the transcript at

24   Page 223, Line 23, to Page 224, Line 4.

25   　　　　　Mr. Levitz also testified that Ilya Salkind, the      10:32

1  independent producer DC ended up transacting with in 1974, had

2  a particularly unsavory reputation due to many alleged

3  improprieties, including a prior litigation involving a film

4  based on *The Three Musketeers*.

5       If *Superman* film rights were so valuable in 1974, as    10:33

6  defendants contend, why would DC have transferred their rights

7  to Mr. Salkind of all people?

8       In 1974, not only had *Superman* reached a low point,

9  but comic books unfortunately had no track record whatsoever as

10 source material for films.    10:33

11      By contrast, in 2002, when defendants' *Superman* film

12 agreements were entered into, *Superman* and *Batman* had already

13 proven themselves as major film franchises, and the first

14 *Superman* film in 1978 and the first *Batman* film in 1989 were

15 huge hits.    10:33

16      Moreover, plaintiffs showed that by 2002, a string of

17 recent hits based on comic books, such as *Men in Black*, *Blade*,

18 *X-Men*, and the phenomenally successful *Spider-Man*, had been

19 released.

20      At trial, we walked through with Mr. Levitz the huge    10:34

21 worldwide box-office grosses of these films and their admitted

22 success.

23      I refer the Court to the transcript at Page 1194,

24 Line 1, to Page 1198, Line 6; and to Exhibits 61 and 335.

25      Mr. Levitz himself said in 2003, quote, we're coming    10:34

1    to a point where the interest in comics by other media is

2    probably higher than it has ever been.  Last year, comic book

3    properties did about twice the box office that they had ever

4    done before.

5            I refer you to the transcript at Page 219, Line 20 to    10:34

6    Line 25, quoting Exhibit 8.

7            At this period, when the *Superman* agreements were

8    entered into, every studio in Hollywood was literally

9    scrambling to develop superhero films.  Yet, DC refused to

10   enter this booming marketplace before signing the *Superman* film    10:35

11   and television agreements.  It is in this climate that DC, as

12   of November 1999, when the 1974 Salkind agreement had finally

13   ended, and it fortuitously had the rights back to *Superman*,

14   admits this booming marketplace.  And in their hands was

15   arguably the most famous and lucrative comic book superhero of    10:35

16   all time.

17           What did DC do?  Did it solicit a single offer from

18   any of the other major studios; Sony, Disney Paramount

19   Universal?

20           No.    10:35

21           Did it test the value of *Superman* in the open market,

22   trying to create a bidding war while offering Warner Bros. a

23   right of first refusal?

24           Not a chance.

25           Warner's witness Steve Spira testified that every    10:36

1459

1   meaningful author of a best-selling novel will try to create an

2   auction for the film rights to that novel.

3           That's at Page 1300 of the transcript, Line 9 through

4   25.

5           Instead of putting the property out to bid, or even            10:36

6   just testing the property in the market where superheroes were

7   now worth big money, DC and Warner Bros. proceed in 2002 to

8   lock up *Superman* film and television rights for 34 years at

9   1974 Salkind rates; low upfront payment and no obligation to

10  even exploit the property, instead of testing the property on       10:36

11  the open market.

12          Defendants' anti-market behavior reflects their

13  closely-affiliated corporate structure.

14          Paul Levitz is clearly an intelligent man, so what

15  does this counterintuitive anti-market behavior really mean?        10:37

16          It means what we already suspect from the fact that

17  DC is owned by and reports to TWEC:  At the end of the day, DC

18  and Mr. Levitz could have conversations with Warner Bros., even

19  negotiations of sorts, but they obviously did not call the

20  shots.  Warner Bros. did; and their lopsided arrangement with       10:37

21  Warner Bros., in an internal transfer of valuable corporate

22  assets, has little to do with fair market value.

23          From 2002, *Spider-Man* grossed $820 million worldwide,

24  and a string of successful superhero films followed, with

25  *Men in Black II* in 2002, *Blade II* in 2002, *Ex-Men II* in 2003,   10:37

1    and *Spider-Man 2* in 2004.

2         I refer the Court to Exhibit 335.

3         To put this heightened marketplace in perspective

4    from the vantage point of DC and Warner Bros., plaintiffs

5    showed that development of a major feature film takes                10:38

6    approximately, at a minimum, three to five years, if not

7    longer.

8         Alan Horn, Warner Bros. president and chief operating

9    officer, testified that studios like Warner Bros. closely

10   tracked development at other studios, and through release          10:38

11   schedules, are aware of competitive releases 6 to 24 months in

12   advance.

13        I refer the Court to the transcript at Page 131,

14   Lines 7 through 18.

15        This means that in forming a conception of the              10:38

16   marketplace, not only do we look at the films that were

17   released prior to the entering into of the *Superman* film and TV

18   contracts in 2001 and 2002, we look at the films that came out

19   afterwards, because the studios, in tracking each other's

20   development and in looking at these release schedules, are         10:39

21   aware of the upcoming competition and the appetite in the

22   marketplace for this type of product.

23        Plaintiffs' industry expert Mark Halloran confirmed

24   the same, adding that competing studios' awareness of upcoming

25   films is heightened by advanced screenings, marketing, and word    10:39

```
 1   of mouth.
 2            Transcript at Page 311, Line 19, to Page 312, Line 6.
 3            Mr. Evanier testified to the excitement and
 4   expectation of upcoming superhero movies years in advance at
 5   Comic-Con, the annual comic book convention attended by over      10:39
 6   150,000 people, and testified to Hollywood's increasing
 7   presence at Comic-Con since the mid 1990s, due to the rise of
 8   comic book-based movies.
 9            I refer the Court to the transcript at Page 35,
10   Lines 1 through 9; Page 74, Line 13, to Page 77, Line 5.          10:40
11            Mr. Levitz himself confirmed DC' extensive presence
12   at Comic-Con each year.
13            Transcript, Page 1020, Line 25, to Page 1022, Line 1.
14            Thus, in 2002, DC and Warner Bros. were not only well
15   aware of the successful comic book adaptations released before    10:40
16   they fully executed the *Superman* film agreement on May 9,
17   2002 -- the date of that is stipulated fact number two -- but
18   were well aware of the highly-anticipated sequels
19   *Men in Black II*, *Blade II*, *X2*, *The Hulk*, *Spider-Man 2*, and
20   *Fantastic Four* in 2005.                                         10:41
21            After the tremendous success of these additional
22   movies, particularly *Spider-Man*'s unbelievable grosses, DC
23   proceeded in February of 2004 to enter into its *Batman*
24   agreement, which is Exhibit 1, assigning therein DC's audio
25   visual rights to *Batman* for the remaining life of any *Batman*  10:41
```

1    copyrights, again at 1979 rates, with no obligation on Warner's

2    part to exploit the *Batman* franchise.

3        Mr. Levitz testified that in 1999 to 2004, although

4    Superman was valuable, Batman was even more valuable.  Yet, the

5    *Batman* agreement is for an even longer duration than the

6    *Superman* agreement, and is for even less money than the

7    *Superman* agreement, $175,000-a-year option versus a

8    $500,000-a-year option, as an advance against the same

9    5 percent contingent gross participation in the *Superman*

10   agreement.

11       Now, in stricken nonresponsive testimony, Mr. Levitz

12   alluded to DC being locked into disadvantageous terms pursuant

13   to a prior agreement that Warner Bros. succeeded to; but then

14   why a new agreement from DC in 2004, which, as Mr. Levitz

15   admitted, superseded the prior 1979 agreement?

16       A closer comparison of the 1979 *Batman* agreement to

17   the 2004 *Batman* agreement, Exhibit 1, gives us the answer.

18       The 1979 *Batman* agreement is Exhibit 1030.  And when

19   you compare it to Exhibit 1, the 2004 *Batman* agreement, it

20   reveals that DC's rights grant in 1979 only pertained to *Batman*

21   feature-length films, and that the rights grant in 2004, in the

22   *Batman* agreement, were of all audio visual rights and the grant

23   is far broader, mirroring the broad grant in the 2002 *Superman*

24   agreement.

25       Moreover, pursuant to the 1979 *Batman* agreement,

10:41

10:42

10:42

10:42

10:43

10:43

1   100 percent of video revenues would be included in gross

2   revenues for purposes of DC's 5 percent gross participation, as

3   there is no provision in the 1979 *Batman* agreement for video

4   royalties.

5        The 2004 *Batman* agreement includes a 20 percent video    10:43

6   royalty, like the one in the 2002 *Superman* agreement,

7   effectively reducing DC's 5 percent gross participation in the

8   1979 *Batman* agreement to 3 percent, since video royalties

9   amount to roughly 50 percent of worldwide revenues.

10       The 1979 *Batman* agreement contains a holdback on DC's    10:44

11  exploitation of *Batman* television rights during production of a

12  *Batman* film, and for just three years after the release of the

13  film.

14       This equals roughly four years.  That's it.

15       The 2004 *Batman* agreement, like the 2002 *Batman*    10:44

16  agreement, freezes television rights during the lengthy term of

17  the agreement, so that such rights can only be exploited with

18  Warner Bros.

19       What did DC get in 2004 when superheroes were all the

20  rage for this much broader *Batman* grant, including valuable new    10:44

21  media and Internet rights to *Batman*, and their agreement to a

22  reduced 20 percent video royalty, which reduced their 5 percent

23  gross participation to effectively 3 percent?

24       They got a $25,000 raise in the yearly option

25  payment.  In the 1979 agreement, it's $150,000.  In the 2004    10:45

1    agreement, it's $175,000.  That's it.

2        Warner Bros. obviously needed to redo the *Batman*

3    agreement so the rights transfer comported with the multiple

4    new media platforms in which Warner Bros. exploits intellectual

5    property, and to make sure that a 20 percent video royalty

6    appeared in the agreement.

7        But where was DC's purported internal ability to

8    fairly simply work things out with Warner Bros. in 2004, or

9    2002, for that matter, as testified to by Mr. Levitz?

10       After all, *Batman* and *Superman*, at this point in

11   time, were DC's jewels in the crown; and DC, in large, paid a

12   very large part in branding these properties, through 70 years

13   of exploitation.

14       Where in 2004 was DC's ability to achieve fair market

15   value for the many participants who helped make *Batman* what it

16   was, as testified to by Mr. Levitz?

17       Again, I have no doubt that Mr. Levitz has the best

18   intentions.  I have no doubt that he tried his hardest to

19   achieve the best terms he could under the affiliated structure

20   with Warner Bros.

21       But unfortunately, the *Batman* agreement, like the

22   *Superman* agreement, demonstrates that it is simply not his

23   call.

24       We showed at trial that DC's library is a captive

25   asset of Warner Bros.  Defendants implied, but never stated,

10:45
10:45
10:46
10:46
10:46

1    that Mr. Levitz was somehow free to take *Superman* where he

2    pleased.  However, the evidence proffered by plaintiffs paints

3    a very different picture.

4          Gregory Noveck, DC's senior vice president for

5    creative affairs, admitted that DC has a first-look deal with    10:47

6    Warner Bros. -- at Page 182, Lines 17, to Page 183, Line 5 --

7    in that Warner Bros. must completely pass on a property before

8    DC can offer it to a competing studio.

9          Several internal memos that Mr. Noveck wrote, and

10    which are admitted into evidence, including Exhibits 92, 187,    10:47

11    and 191, specifically describe how DC must first pitch its

12    products to Warner Bros. before it can take them elsewhere.

13          It's more than that.  DC must wait for a final

14    rejection before it goes outside the Warner Bros. family, a

15    process that often takes several years.  Mr. Noveck confirmed    10:48

16    that DC has to shop to Warner Bros. with respect to even its

17    most minor characters.

18          I refer to Exhibit 191, and to the transcript at

19    Page 187, Line 4, to Page 189, Line 23.

20          If they have such a stranglehold even on DC's minor    10:48

21    characters that we've never heard of, one can just imagine

22    Warner Bros.' unspoken restrictions with respect to DC's major

23    characters like Superman, Batman, and Wonder Woman, and DC's

24    leading characters comprising that *Justice League of America*

25    cover that we looked at, Exhibit 334.    10:48

1        As Mr. Levitz testified at Page 1204, Lines 3 to 23;

2   and Mr. Noveck testified at Page 196, Line 11 to 19; and

3   Page 201, Lines 3 to 23; and as shown by DC's media status

4   report admitted into evidence as Exhibit 306, every notable DC

5   character is covered and bound by an agreement with                    10:49

6   Warner Bros.  In fact, Mr. Levitz reluctantly agreed that

7   roughly 90 percent of DC's properties in development are under

8   agreement with Warner Bros.

9        Transcript, Page 1204, Lines 3 to 23.

10       In practice, there can be no doubt about it, DC          10:49

11  functions as Warner Bros.' IP stable.  DC's media status

12  reports date back to at least 2002; and they have all been

13  admitted into evidence as Exhibits 93 to 108.

14       Mr. Noveck discussed in Exhibit 191 how the character

15  Metal Man was first pitched to Warner Bros. in 2004, and by      10:50

16  2006, two years later, DC had still not gotten a response from

17  Warner Bros. one way or the other.

18       Transcript 187, Line 4 through 19.

19       He admitted in Exhibit 187 that if DC takes a project

20  to another studio, even after waiting two or three years,        10:50

21  Warner Bros. would still have the right, if it so chooses, to

22  co-finance the project and then negotiate with the other studio

23  how distribution rights to the film and television project

24  would be divided between them.

25       Transcript 182, Line 25, to 183, Line 5.               10:50

1       This sort of encumbrance obviously gravely devalues

2  the property in the open market.

3       Turning back to Superman's extraordinary value.

4       Let there be any doubt that Superman is an incredibly

5  valuable property, plaintiffs had Mr. Levitz admit this at his         10:51

6  deposition, and thus at trial.  When asked at trial whether

7  *Superman* is an enduring cultural icon of extraordinary value,

8  Mr. Levitz responded, quote, absolutely.

9       Transcript 217, Lines 19 through 22.

10       But plaintiffs did not stop at that.  Plaintiffs            10:51

11  demonstrated step by step that through the convergence of a

12  number of trends, comic book superheroes in general, and

13  *Superman* in particular, have become extraordinarily valuable in

14  2001-2002, when the relevant *Superman* agreements were entered

15  into.                                                               10:51

16       The first trend, demonstrated by plaintiffs, is the

17  rise of the tent pole picture, a phenomenon for which

18  Warner Bros. is particularly well known.  As Warner Bros.

19  president and COO Alan Horn explained, quote, tent pole

20  pictures, end quote, hold up the studios entire annual slate of     10:52

21  pictures; appealed to a broad, quote, four-quadrant audience,

22  end quote, young, old, male, female; are usually very expensive

23  and are aggressively marketed for release during a period like

24  summer where people can attend.

25       I refer the Court to the transcript at Page 121,             10:52

1    Line 8, to Page 122, Line 3; Page 133, Line 12 to Line 23.

2         Mr. Horn admitted what was obvious, that the

3    unusually expensive and ubiquitously-marketed film

4    *Superman Returns* was intended as a big summer tent pole

5    picture.                                                    10:52

6         I refer the Court to the transcript at Page 121,

7    Lines 20 through 21; and to Exhibits 233 and 279, documents

8    produced by the defendants which say exactly that.

9         The second converging trend in the period in which

10   these agreements were entered into was the rise of the     10:53

11   franchise picture phenomenon, where sequels dominate the film

12   marketplace.  Although franchises have existed before, any

13   movie-goer will know that one movie after another today is a

14   franchise, whether it's *Shrek 5* or *Spider-Man 3*.

15        The *Superman* property, which was episodic in nature,   10:53

16   and which existed as a branded franchise character for decades,

17   was particularly well suited for exploitation in a string of

18   franchise motion pictures like *Batman*, *X-Men*, and *Spider-Man*.

19        Mr. Horn also admitted that *Superman* was viewed as a

20   major franchise film property, as is clear from Warner Bros.'  10:53

21   marketing study introduced into evidence, and from Mr. Horn's

22   testimony that reinvigorating the franchise was one of his key

23   objectives when he came to Warner Bros.

24        Transcript, Page 114, Line 21 through 24;

25   Exhibits 233, 279, 293.                                     10:54

1  The third converging trend demonstrated by plaintiffs

2  is the focus by studios on what are known as "branded

3  properties"; namely, underlying properties that have instant

4  recognition and goodwill attached to them.

5  Through the testimony of Alan Horn and plaintiffs'     10:54

6  industry expert Mark Halloran, plaintiffs showed the essential

7  importance and value of this pre-awareness in anticipation in

8  an industry where the fate of a $300 to $400 million investment

9  in a major motion picture often depends on its opening weekend

10 grosses.     10:55

11  I refer the Court to Exhibit 233, 293, and the

12 transcript at Page 126, Line 22, to Page 127, Line 16.

13  This pre-awareness was so strong that dozens of

14 Fortune 500 companies signed up to be a part of

15 *Superman Returns*, as demonstrated by Exhibit 233 and noted by     10:55

16 Mr. Horn in his testimony.

17  The fourth converging trend, already alluded to, is

18 the rise of comic books as the source material for franchise

19 motion pictures.  Plaintiffs demonstrated through expert

20 testimony that this was no accident.     10:55

21  Transcript, Page 313, Line 15, to Page 314, Line 6.

22  Comic books, due to their inherent visual qualities,

23 export well and are very well suited to branding and ancillary

24 exploitation, such as video games, merchandising, and new

25 media.     10:56

1     Transcript, Page 291, Lines 7 through 18.

2     Comic books are also naturals for franchise motion

3   pictures because they are episodic in nature.

4     Transcript, Page 291, Lines 19 through 24.

5     The subject and story lines of comics are also                    10:56

6   naturals for commercial action-driven films.  Moreover, the

7   advanced special effects technology has made it finally

8   possible to realize the fantastical characters and story line

9   in comics in a market where special effects themselves have

10  become a major star component of a film.                            10:56

11    Transcript, Page 297, Lines 7 to 14.

12    Finally, in a world where top movie stars command a

13  fee of $20 million against 20 percent of first-dollar gross,

14  the current perception is that special effects-driven superhero

15  movies do not need movie stars in the lead, as demonstrated by     10:56

16  all of the *Spider-Man*, *X-Men*, and current *Batman*, and the

17  *Superman* films in this decade.

18    Transcript, Page 292, Lines 14 to 23.

19    However, when looking at the value of comic book

20  properties, DC looked at a 1993 *X-Men* agreement underlying the   10:57

21  successful films in order to find a market -- rather than to

22  find a market by the tremendous success of the films before it

23  in 1999 and 2002.

24    It makes no sense that you would look at old

25  contracts underlying successful films in 1999 and 2002, and        10:57

1    then proceed to lock in 1974 terms rather than measure the

2    market leverage by the success of recent films.  It just

3    doesn't add up.

4            Defendants engaged in a series of rationalizations

5    regarding the *Superman* films.  Defendants insisted that due to          10:58

6    the declining box-office returns of the sequel to the first

7    hit, 1978 *Superman* film starring Christopher Reeve, that

8    *Superman* was not valuable.

9            First, as I've said, it is undisputed that the 1974

10   *Superman* film was a major, major hit.  The figures show that          10:58

11   the gross of the first sequel, *Superman II*, of $108 million was

12   only 20 percent less, and that *Superman III* was about half of

13   that.

14           Exhibit 61.

15           Plaintiffs' expert Mr. Halloran testified that when          10:58

16   he worked at Universal in the 1985-1990 period, it was expected

17   that sequels would do about 1/3 of the business of the

18   preceding film, a trend which differs greatly from today, when

19   sequels like *The Dark Knight* actually exceed the grosses of

20   preceding films.          10:58

21           Transcript, Page 279, Line 11, to Page 281, Line 7.

22           Finally, I think the Court can take judicial notice

23   of the fact that the anti-nuclear film *Superman IV* was a flop,

24   and that it is universally accepted as one of the worst movies

25   ever made.          10:59

1    I believe most people are smart enough in such an

2  instance to blame the movie, not Superman.

3    Batman exhibited the same downward spiral in the

4  1980s.  The four *Batman* movies followed a similar trend in the

5  1980s and 1990s, what defendants dramatically dubbed a downward    10:59

6  spiral.

7    Transcript, Page 1345, Line 17 to Line 20.

8    In fact, the last film, *Batman & Robin*, in 1997 was

9  also a critical and financial flop, although it failed to

10  topple *Superman IV*'s blooper status.    10:59

11    I refer the Court to the transcript at Page 130,

12  Lines 3 through 8.

13    The downward trend in Batman did not stop

14  Warner Bros. from rebooting the Batman franchise with

15  *Batman Begins* in 2004 and *The Dark Knight* in 2008, which had a    11:00

16  staggering worldwide gross of over $1 billion.

17    Exhibit 335.

18    In fact, the ability to reboot is part of the value

19  of an evergreen franchise property like Batman and Superman.

20    In apparent desperation, defendants have disparaged    11:00

21  their own property, arguing that in 2002, Superman was a dying

22  character, and that Superman was a tired character, and that he

23  just wasn't cool.  Well, I think Superman is cool.  However, I

24  have serious doubts whether I, Mr. Bergman, Mr. Spira, or

25  Mr. Gumpert are qualified on the subject of coolness.    11:01

1    I refer the Court to the transcript at Page 1405,

2  Lines 7 through 14.

3    What we do know is that Superman is a beloved

4  cultural character, and that there is tremendous affection and

5  goodwill associated with the character and his story.  You can                    11:01

6  clearly see that on the faces of Paul Levitz, Mark Evanier, and

7  Alan Horn when at the end of Alan Horn's testimony, he

8  confessed, quote, I happen to love the Superman character

9  myself, so I have a kind of bias in favor of Superman; I like

10  Superman.                                                                          11:01

11    Transcript, Page 153, Lines 20 through 21.

12    Defendants' own actions -- and this is the most

13  important part -- demonstrate Superman's value in the

14  marketplace.  Superman's purported downward spiral didn't seem

15  to stop Warner Bros. in 1993 from seeking out and buying the                      11:02

16  remainder of the 1974 Salkind agreement.  In Mr. Levitz's own

17  words, quote, it was our belief and Warner Bros. belief that

18  there was still significant opportunities to exploit the

19  *Superman* rights that had been granted to Salkind, end quote.

20    I refer the Court to the transcript at Page 1077,                               11:02

21  Lines 10 through 12.

22    Warner Bros. didn't hesitate in investing an

23  unprecedented $60 million into tenaciously developing a new

24  *Superman* film based on this "tired" character.  From 1994, and

25  continuing, despite repeated setbacks, until the release of                       11:02

*Superman Returns* in 2006, Warner Bros. continued to tenaciously

develop the property and spend a fortune on it.

It is admitted that Warner Bros. spent at least

$400 million on the production and marketing of

*Superman Returns*.  Mr. Bergman, after proclaiming that, quote, 11:03

Superman had fallen off his perch, at Page 24, Lines 16 through

17, announces a moment later, to support his merchandising

argument, that Warner Bros. proceeded to invest a staggering

$424 million to make and market *Superman Returns*, oblivious to

the contradiction. 11:03

Transcript, Page 26, Lines 6 and 7.

Again, the cliché is ringing in our ears, 'actions

speak louder than words.'

With a $60 million and extra in development costs,

that brings Warner Bros.' investment to nearly half a billion 11:03

dollars in *Superman Returns*.  In addition to that, commencing

in 2001, Warner Bros. has spent roughly a half a billion

dollars on the production of the *Smallville* television series.

It is axiomatic that studios are in the business to make money;

and in hearing Steve Spira, that Mr. Brett Paul's bottom line, 11:04

we know this is true.

I refer the Court to the transcript at Page 1303,

Lines 8 through 12.

Studios do not invest a half a billion dollars in

downward spirals or tired characters.  They invest in things 11:04

1    when they believe they have incredible value, or as Mr. Levitz

2    agreed, quote, extraordinary value, end quote.

3              Transcript Page 217, Lines 17 to 22.

4              Even Mr. Spira acknowledged that Superman, quote,

5    obviously could have led to a series of films, end quote, and          11:04

6    would list all boats in the company, including the licensing

7    and publishing boats.

8              Transcript, Page 1260, Lines 7 through 15.

9              If Superman could elicit this degree of tenacious

10   investment by Warner Bros., just think of what the underlying        11:05

11   rights would have gone for in the competitive open market.

12             Mr. Halloran's opinion of $10 million per film

13   against an escalating 10 percent of the gross starts to come

14   into focus as we see the big picture.

15             Please excuse the pun.                                        11:05

16             In comparing the terms of other rights agreements, we

17   must engage in a comparative analysis of the nature and the

18   value of the properties in question.  The best comparisons are

19   to other high-profile properties negotiated at arm's length in

20   the competitive open market.                                           11:05

21             Plaintiffs informed the Court of their objective

22   methodology from the start.  Deals with better terms for

23   properties of equal or less value than Superman will squarely

24   demonstrate that the *Superman* agreements were not for fair

25   market value.                                                          11:06

1   Plaintiffs have offered numerous such agreements into

2   evidence on properties ranging from *Hannibal* to

3   *Lord of the Rings*.  Deals with equal terms, for properties of

4   considerably less value, will also tend to show that the

5   *Superman* agreements were not for fair market value.  Plaintiffs    11:06

6   offered into evidence deals for properties ranging from

7   Neo-pets to Hasbro board games, to *Steel* and *Birds of Prey*,

8   none of which even come close in the value to *Superman*, but had

9   the same terms in their agreements as in the *Superman* film and

10  television agreements, respectively.    11:06

11  Conversely, defendants would need to point to arm's

12  length deals with lesser or equal terms for properties of equal

13  or greater value to Superman, something that they absolutely

14  never even came close to doing.

15  Defendants offered no such agreements.  Instead, they    11:07

16  have offered agreements for *Tarzan*, *Conan*, and *Ironman*.  These

17  deals for properties far less valuable to *Superman* at the time

18  they were entered into shed no light whatsoever on the fair

19  market value of the *Superman* agreements in question, as their

20  lesser terms are only to be expected.    11:07

21  Before turning to the *Superman* agreements in

22  question, let's dispel the straw man advance by Mr. Bergman in

23  his opening statement.

24  In analyzing whether DC received fair market value

25  for the *Superman* rights transfer to Warner Bros., plaintiffs    11:07

indeed looked to the entire agreement as a whole.  After making

this accusation, it is defendants that ignore key terms of the

agreement, dubiously claiming that provisions of obvious

economic imports, such as the lack of any reversions for

failure to exploit Superman, or the illusory creative control                    11:08

provisions that fail to protect the Superman brand, are of no

economic consequence whatsoever; nor do plaintiffs cherry-pick

terms from the rights contracts of other properties, another

straw man argument made by defendants.  The record reflects one

agreement after another presented by plaintiffs that contain in                  11:08

the same agreement multi-million dollars purchase prices and

high first-dollar gross participations of 10 percent or greater

in the same agreement.

      Plaintiffs presented evidence regarding numerous

high-level contracts negotiated at arm's length for the film                     11:08

rights to desirable properties.  These deals squarely show what

studios and other buyers will pay for the rights to properties

which they believe are valuable and will generate profits for

them, whether it be a novel by a branded best-selling author; a

famous, successful musical; a branded board game title like                      11:09

Monopoly or Candy Land; the remake and sequel rights to a

popular film franchise like *Terminator*; a popular video game

like Halo; or even virtual Internet pets.

      These lucrative agreements and the details of their

highly-protected provisions demonstrate the leverage of                          11:09

1    valuable IP rights in the competitive open marketplace.

2         The agreements generally follow the same contractual

3    structure comparable to that in the *Superman* film agreement,

4    although the terms are far more favorable to the rights holder.

5         Whether option purchase agreements are outright                11:09

6    licenses, these agreements can cover the same recurring

7    variables.  The agreements apply for a term.  They have fixed

8    compensation in the form of option fees and purchase prices,

9    and contingent back-end participations in the form of a

10   percentage of the first-dollar gross from derivative films.        11:10

11        For defendants to dismissively claim with a wave of

12   the hand that these agreements for novels and musicals are

13   absolutely irrelevant as apples and oranges is disingenuous and

14   just a little bit too convenient.

15        Apples and oranges is an old studio negotiating             11:10

16   tactic, at best.  The comparison here is not comics versus

17   novels, but branded properties versus nonbranded properties.

18        Brett Paul, head of business affairs for Warner Bros.

19   Television, testified, as we would expect, that Warner Bros.

20   indeed looks at, quote, other literary properties, end quote,      11:11

21   characters that were well known, quote, and, quote, a broad

22   panoply of underlying rights, end quote, when evaluating

23   comparable deals.

24        Transcript, Page 1216, Lines 14 through 20.

25        Defendants themselves listed as trial exhibits             11:11

1  23 contracts for properties, as wide-ranging as radio serials,

2  to vintage movies, to novels, to comic books, to

3  Saturday-morning cartoons, which they asserted were comparable.

4  The only thing these projects had in common, however, were that

5  they had been cherry-picked from Warner Bros.' vast contractual       11:11

6  archives for their inferior terms.

7         Plaintiffs did not have this luxury, and were at a

8  decided disadvantage in coming up with comparable agreements.

9  It took tremendous efforts to ascertain the generally

10  confidential terms of high-level rights deals in Hollywood and       11:12

11  then to go out and actually obtain those contracts.  Yet,

12  defendants came up with multiple contracts, six or seven

13  contracts, and additional information, on rights deals to prove

14  a point.

15         All literary properties are unique and can be                 11:12

16  distinguished from one another, particularly by a savvy

17  negotiator like Mr. Spira, whether it be a spy novel, a

18  science-fiction trilogy like *Lord of the Rings*, a graphic

19  novel, or a comic book.

20         Such precedent language and quotes are commonly used          11:12

21  as a negotiating tactic.  Brett Paul, head of Warner Bros.

22  business affairs, testified that comps are, quote, a very

23  important factor to consider, and when they are expensive, we

24  try to ignore them, and when they are not, we try to enforce

25  them.                                                                 11:13

1        Transcript, Page 1217, Lines 14 through 17.

2        Defendants attempt, in their apples-and-oranges

3  arguments, to ignore or trivialize the obvious market forces

4  that forged the prices in the contracts plaintiffs brought to

5  trial:  Leverage, the ability to walk, competition, and bidding  11:13

6  wars.  Yet, it seeped out in the testimony from their

7  executives.  Steve Spira, head of business affairs for

8  Warner Bros. Pictures, said of bidding wars that, quote, there

9  are so many, it's actually hard to think of examples.

10       Transcript, Page 1299, Lines 25, to Page 1300,  11:14

11 Line 2.

12       Mr. Spira also said Warner Bros. pays gross when

13 they, quote, can't convince someone we won't pay it to them,

14 suggesting how deals are really done in the competitive

15 marketplace.  11:14

16       Transcript, Page 1265, Line 21.

17       At the end of the day, once studio negotiating

18 rhetoric is put aside, it's clear that the terms of such arm's

19 length agreements reflect the buyer's ultimate assessment of

20 how profitable the rights acquired will be for it, the  11:14

21 competition for such rights, and the greed to which buyers are

22 willing to go to acquire such rights.

23       A buyer does not pay $10 million up front against

24 10 percent of the gross because it's acquiring a novel versus a

25 musical or some other type of property.  It pays it because it  11:14

1    must acquire the property in the open market and believes that

2    despite the lucrative terms of that acquisition, it will be

3    very profitable for the studio.

4              A buyer does not pay $6 million per film against

5    5 percent of the gross for the film rights to Battleship or          11:15

6    Monopoly because it's a Hasbro board game.  It pays this money

7    because it must, in an arm's length negotiation, acquire these

8    branded titles, and rightly or wrongly believes it will greatly

9    profit from the brand recognition and pre-awareness the

10   properties entail.                                                    11:15

11             After attempting to distinguish agreements for the

12   rights to novels by best-selling authors, defendants admit that

13   top dollar is paid for the film rights to the next

14   Michael Crichton, Tom Clancy, or John Grisham novel, due to the

15   fact that they are, quote, very popular, end quote, and that         11:16

16   translates into built-in pre-awareness and a fan base that

17   these branded authors evoke.

18             I refer the Court to the transcript at Page 1254,

19   Lines 13, to Page 1255, Line 2.

20             In the case of a Tom Clancy novel, *Red Rabbit*, which     11:16

21   is in evidence, the brand is both the author, Tom Clancy, and

22   the Jack Ryan character he created, as personified by

23   Harrison Ford.  Paramount agreed to pay big money for this

24   pre-awareness because the prior Jack Ryan films based on Clancy

25   books, like *The Sum Of All Fears* and *Clear and Present Danger*,   11:16

1    had been successful.

2         In the case of the novel *Hannibal*, Universal agreed

3    to pay big money in the rights contract because it was an

4    adaptable -- not because it was simply an adaptable novel, but

5    because the prior film, starring Anthony Hopkins as                    11:17

6    Hannibal Lecter, was a huge success, and as a result Hannibal

7    had become a branded character.  Defendants themselves elicited

8    this very testimony at Page 888, Line 22, to Page 889, Line 4.

9         It's the same with Microsoft's popular Halo video

10   game, *Terminator*, Disney's branded Pirates of the Caribbean      11:17

11   theme ride, a Monopoly board game, or a branded comic book

12   franchise like *Superman* and *Batman*.  These properties have

13   tremendous value in the film business due to their branded

14   pre-awareness and the goodwill they evoke.  And that's worth a

15   lot to a studio as a source for tent pole films, where the            11:17

16   average marketing budget is north of $100 million.

17        The studios pay big money for these rights because

18   it's a hedge against risk, and it gives them an advantage on

19   opening weekend right out of the starting gate.

20        Defendants proceeded to bend over backwards to               11:18

21   advance the dubious notion that a single novel by a

22   best-selling author is much more valuable than the entire

23   brand*ed Superman* or *Batman* franchises, arguing that a novel

24   with a fully-realized character is much easier to adapt to film

25   than comic books.  As they say in the South, that dog don't           11:18

1    hunt.

2         Major studios don't appear to have any problem

3    successfully adapting comic books to film, as demonstrated by

4    the recent unprecedented success of the *X-Men*, *Spider-Man*,

5    *Ironman*, and *Batman* films.  Moreover, anyone who has read          11:18

6    Robert Ludlum's Cold War novel, *The Bourne Identity*, will tell

7    you that the only thing it has in common with the movie is it's

8    basic hook or premise, a CIA assassin with amnesia, not its

9    detailed characters or story line.  In fact, Hollywood is

10   famous for taking great liberties with underlying works.  The         11:19

11   versatility of a long-run comic book and the studio's ability

12   to tailor that franchise to its current marketplace and target

13   an audience demographic is a major plus, not a minus.

14        Defendants, in rebuttal, rely on only five agreements

15   to argue that the terms of the *Superman* agreement are for fair       11:19

16   market value.  And for two of these, we don't even have the

17   agreements.  All we have is hearsay from a studio assistant

18   about the supposed terms of these rights deals.

19        The five deals are for *Tarzan*, *Conan*, *Ironman*, and

20   then *The Lone Ranger* and *The Green Hornet*, based on hearsay.       11:20

21   However, none of those five properties are in *Superman*'s

22   league.  Even though it's obvious, defendants provided

23   extensive testimony, both from our comic book expert

24   Mr. Evanier and our industry expert Mr. Halloran, on that

25   subject.                                                               11:20

1       The Lone Ranger, Tarzan, Conan, and The Green Hornet

2   may be old and known, but that does not translate to the

3   goodwill associated with a famous cultural icon like Superman.

4       I don't want to disappoint Mr. Bergman, but these are

5   not cultural icons in any respect.                          11:20

6       With respect to *Ironman*, as Mr. Evanier testified,

7   when the agreement was entered into in 2001, Ironman was a,

8   quote, lower-tier, end quote, comic book character with no

9   history of significant media exploitation.

10      I refer the Court to the transcript at Page 84,        11:21

11  Line 21, to Page 85, Line 15.

12      Now, after the successful release of the 2008 film

13  *Ironman*, created under an entirely separate agreement not

14  produced by defendants, Ironman is a much more valuable

15  property.                                                   11:21

16      Defendants attempt to use the awareness of Ironman

17  today to mislead the Court into thinking Ironman was comparable

18  to Superman in 2001, when it was nowhere even close to

19  Superman's league prior to the release of the 2008 film.

20      As to *Tarzan*, we know of Tarzan.  It's been          11:21

21  established in the record that there were around 20 Tarzan

22  stories published before 1922, all of which are now in the

23  public domain.

24      I refer the Court to the transcript at Page 91,

25  Line 11 through 15.                                         11:22

1           The fact the entire character is in the public domain

2    certainly would affect its value and be reflected in the lesser

3    terms of the *Tarzan* agreement.  Moreover, as testified to by

4    Mr. Evanier, Tarzan declined in the 1960s, and hasn't really

5    recovered since.  As Mr. Evanier further testified, Tarzan just          11:22

6    doesn't have anywhere near the track record of success that

7    Superman has.

8           I refer the Court to the transcript at Page 91,

9    Line 24, to Page 93, Line 4.

10          Turning to *Conan*, Conan is principally known for a          11:22

11   couple of Arnold Schwarzenegger films in the 1980s.

12   Mr. Evanier testified that Conan has nowhere near the iconic

13   stature or successful track record of Superman.

14          Transcript, Page 93, Line 5 through 12.

15          Defendants' own expert was not even aware of *Conan*'s          11:23

16   author, Robert Howard, and the copyright status of the many

17   early *Conan* works, which are widely known to also be in the

18   public domain.

19          Transcript, Page 1424, Lines 10 through 12.

20          Turning to *The Green Hornet*, *The Green Hornet*, as          11:23

21   Mr. Evanier testified, has neither remained popular, nor had

22   the sustained success of Superman.

23          I refer the Court to Page 81, Line 25, to Page 82,

24   Line 19.

25          Finally, there is simply no comparison between          11:23

1   The Loan Ranger and Superman.  As Mr. Evanier testified, and

2   this Court rightly noted, The Lone Ranger really hasn't been

3   around for a while.

4           Transcript, Page 80, Line 25, to Page 82, Line 12.

5           Defendants offer no real evidence that any of these                    11:23

6   properties were even remotely comparable to Superman when the

7   agreements in question were entered into.

8           *The Lone Ranger* and *The Green Hornet* agreements are

9   not in evidence.  As mentioned, Mr. Gumpert solely relied on

10  information relayed over the phone and a short e-mail by an        11:24

11  assistant at Columbia Pictures in characterizing the terms of

12  the underlying rights agreements.

13          I refer the Court to Page 1361, Line 16, to

14  Page 1362, Line 22.

15          Mr. Gumpert did not offer any testimony as to the        11:24

16  merchandising terms of either of these agreements, which

17  defendants have consistently stated are crucial with respect to

18  the *Superman* agreements.  Moreover, while Mr. Gumpert was

19  purportedly able to assess the terms for properties like

20  *The Green Hornet* and *The Long Ranger*, he didn't retrieve or        11:24

21  relay the terms of the rights agreements for Columbia's

22  *Spider-Man* movies, either before or after the highly-successful

23  *Spider-Man* films, which renders his conversations with Columbia

24  somewhat suspect, and suggests that what he asked for was their

25  better known properties with the worst terms.        11:25

1       The Court must also keep in mind that while valuing

2  defendants' agreements, defendants produced agreements for all

3  manner of properties, comic books, children's novels, animated

4  television series, and serialized novels; however, defendants

5  did not produce agreements for the film rights to novels by      11:25

6  John Grisham testified to by Mr. Spira, nor did they produce

7  agreements for their 2004 film based on the incredibly

8  successful Phantom of the Opera, nor did they produce their

9  agreements with Stephen King for the underlying rights to

10  *The Green Mile*, which was a best seller and resulted in the   11:26

11  1999 film.

12       I suggest that these agreements were not produced

13  because they show vastly superior terms than those in the other

14  Warner Bros. contracts that were produced.

15       With these market forces and converging trends and        11:26

16  the tremendous value of Superman in mind, we turn to the terms

17  under which Warner Bros. acquired *Superman* film and television

18  rights, for what was at that time, the remaining life of the

19  original *Superman* copyright.

20       The *Superman* film agreement is Exhibit 232, and it       11:26

21  has the following key terms:

22       A 34-year term with no reversion, even if

23  Warner Bros. fails to exploit *Superman* film or television

24  rights.  A fixed initial option payment of $1.5 million for a

25  three-year term, with no other guaranteed payment.              11:27

Discretionary annual option extension fees of $500,000 a year,
escalating to $600,000 in year 14 and $700,000 a year in
year 24.  A contingent participation equal to 5 percent of
Warner Bros.' worldwide gross, but computed with a video
royalty of only 20 percent, meaning that only 20 percent of
video revenues are included in worldwide gross for purposes of
computing DC's 5 percent participation.

        DC reserved television rights in the agreement, but
for the entire 34-year term could only exploit those rights
with a Warner Bros. company.  DC reserved merchandising rights
subject to a 50/50 split with Warner Bros. for any film-related
merchandising revenues, and also subject to DC's long-standing
exclusive agreement with Warner Bros. Consumer Products, which
gives Warner Bros. an off-the-top fee of an additional
25 percent.

        There are also issues in the agreement regarding the
creative control provisions and the warranty and
indemnification provisions.

        As we go along, I'll be comparing these terms to the
terms found in the arm's length agreements that we have in
evidence, and examined in great detail.

        When you look at the arm's length agreements that we
have placed into evidence, keeping in mind the nature of the
properties, each of those agreements are for far better terms
than those contained in the *Superman* film agreements, for the

1    *Superman* property.

2            This brings us to another important point.

3    Mr. Bergman stressed in his opening statement and throughout

4    defendants' case-in-chief the large amounts of money that DC

5    actually received under their agreements from *Superman Returns*    11:29

6    and *Smallville*.  This is clearly intended to prejudice the

7    trier of fact and is not probative.  As explained by

8    Mr. Halloran, and seemingly acknowledged by this Court, the

9    only objective way to judge the fair market value of a property

10   and the terms of an agreement pertaining to that property is at    11:29

11   the time the agreement was entered into.

12           I refer the Court to the transcript, Page 325,

13   Lines 11 through 20.

14           You do not judge the terms of these agreements in

15   hindsight, depending on whether Warner Bros. actually made a    11:30

16   film or TV series, on how successful it happened to be or

17   unsuccessful it happened to be, or in what respect it was

18   followed by another film or not followed by another film.

19           One can only assume that if DC has only a 5 percent

20   gross participation, and the market for a branded franchise of    11:30

21   Superman's value would be at least 10 percent, that DC would

22   have ended up making twice as much money.

23           For the same reason, defendants exercise of having

24   both Mr. Halloran and Mr. Gumpert plug in the financial results

25   from the single 2006 *Superman Returns* movie into agreements for    11:30

1    other properties is unbelievable, even if we accepted the

2    $30 million figure that they say DC received from

3    merchandising, which does not comport with the objective terms

4    of the *Superman* agreements in question.

5            I'd like to examine that $30 million figure for a                11:31

6    moment.

7            The foundation for defendants' hindsight argument

8    rests on its claim that DC kept twice as much film-related

9    merchandising revenue than it was permitted to keep under the

10   *Superman* film agreement, again replacing the objective terms of    11:31

11   the agreement in question with an unverifiable, intracorporate

12   deal, testified to by Mr. Levitz.

13           Again, we need to objectively value the agreements'

14   terms at the time the agreements were entered into.  There is

15   no objective way to value the agreements depending on what         11:32

16   defendants do or don't do after this lawsuit was commenced in

17   internal arrangements that are unverifiable by the Court.

18           Turning to the option term and the issue of

19   reversion, the option and renewal option terms of the film

20   agreement are for 34 years.  This lengthy term ties up *Superman*  11:32

21   film and television rights for what at the time was the

22   remaining life of the original *Superman* copyright.

23           As Mr. Halloran testified, option agreements tend to

24   be for two consecutive 18-month periods, totalling only three

25   years.                                                              11:32

1           I refer the Court to the transcript at Page 382,

2    Line 25, to Page 383, Line 4.

3           Mr. Gumpert, defendants' expert, confirmed, both in

4    court and at his deposition, that option terms are generally

5    three years and could not think of a single agreement with an        11:33

6    option term greater than five years.

7           I refer the Court to the transcript at Page 1399,

8    Lines 8 through 22.

9           Mr. Gumpert further confirmed that a studio will try

10   to get as long an option term as possible for as little money         11:33

11   as possible, once again bringing into focus the market forces

12   that are at play in the real open market.

13          Transcript, Page 1400, Lines 7 through 11.

14          It became clear at trial that under the *Superman* film

15   agreement, Warner Bros. is under no obligation to exploit the         11:33

16   Superman franchise by releasing either a Superman film or

17   television series.  So if Warner Bros. never made a film or

18   television series in 34 years, all DC would have is relatively

19   modest option payments.  The continuing exploitation of a

20   franchise property which has a history of throwing off annual         11:34

21   income is, indeed, an exceedingly important economic term.

22          The owner of a branded franchise property like

23   Superman, with an historic cash flow over seven decades, and

24   the potential to generate considerable money from film and

25   television, would never agree in an arm's length transaction to       11:34

1    tie up such assets for 34 years, for minimal fixed compensation

2    and no obligation on the licensor to exploit.

3              As Mr. Halloran testified, this would have a

4    devastating impact on DC, because much of the continuing value

5    of Superman is tied up in having the character remain in the          11:34

6    public eye.  And this is fueled by the continuing release of

7    major motion pictures or TV series.

8              Defendants unwittingly confirmed the vital importance

9    of such ongoing exploitations themselves when making their

10   merchandising argument.                                               11:35

11             Mr. Levitz testified about the tremendous uplift in

12   DC's Superman merchandising due to *Superman Returns*.

13             I refer the Court to the transcript at Page 1061,

14   Lines 15 through 2.

15             However, if no films are released, DC will not            11:35

16   receive that boost in its merchandising revenues.  If it had

17   made a deal on the open market, where after a certain number of

18   years a studio had not released a picture and it was able to

19   develop a picture at another studio, it could do something

20   about this to ensure a continuing uplift to its merchandising        11:35

21   revenues.

22             As Mr. Spira testified, a major *Superman* film, quote,

23   floats all boats, improving Superman publishing and

24   merchandising and the value of the Superman asset in general.

25             Transcript, Page 1260, Lines 7 through 15.                 11:36

1          Owners of branded properties, branded franchise

2    properties, know this very well.  That's why it is absolutely

3    customary in rights agreements for branded franchise properties

4    to have detailed reversion provisions, to make sure that either

5    films are periodically produced and released or that the rights          11:36

6    revert to the licensee, so it can set up a film project with

7    another studio.

8              Transcript, Page 405, Line 24, to Page 407, Line 12.

9              These important reversions mean that the buyer has

10   three years to make a film, then three to four years after that          11:36

11   to make a sequel, or the rights go back to the seller.

12             Transcript, Page 406, Line 24, to Page 407, Line 12.

13             A reversion provision should have been especially

14   important to DC.

15             To put this in perspective, Warner Bros. had been          11:36

16   developing a *Superman* film since at least 1994; stipulated fact

17   number 36.  And as testified to by Mr. Spira and Mr. Horn, such

18   development had been plagued by delays and commercial setbacks.

19             I refer the Court to Page 146 of the transcript,

20   Line 25, to Page 150, Line 3; and Page 1258, Line 3, to          11:37

21   Page 1259, Line 11.

22             So, in 2002, after eight years of such frustrated

23   film development, what did DC do?  It handed over Superman to

24   Warner Bros. for another 34 years, with no obligation

25   whatsoever to release a single picture.          11:37

1       The reversion provisions that are absent in the

2    *Superman* agreement are common in the real competitive

3    marketplace.

4       Mr. Levitz testified, however, that it's, quote, very

5    difficult to get a reversion provision and that he didn't view          11:38

6    reversions as particularly useful.

7       Transcript, Page 1133, Line 2, to Page 1134, Line 7.

8       There are two major problems with this statement.

9    The first problem is that reversions are not hard to get in an

10   arm's length negotiation.  The three main agreements              11:38

11   Warner Bros. relies on, the *Ironman*, *Tarzan*, and *Conan*

12   agreements, all deal with potential franchises, through for

13   lesser properties.  And because of that, all have what's called

14   "rolling reversion provisions," where a studio not only has to

15   make one film within a short period of time, but has to keep        11:38

16   making films or the rights return to the owner.

17       I refer the Court to Exhibits 1085, 1086, 1094, 1095;

18   and Exhibits 1005, 1106, and 1107.

19       As both Mr. Halloran and Mr. Gumpert testified, these

20   important reversion provisions operate even if the purchase        11:39

21   price is paid to the licensor.

22       Transcript, Page 513, Line 16, to Page 514, Line 20;

23   Page 515, Lines 16 to 22; and Page 1435, Line 4 to Line 15.

24       If you look at the *Lord of the Rings* agreement,

25   Exhibit 128, on Pages 5 through 7, you'll see extremely            11:39

1    dirt-detail reversion provisions as well.  It's a common term,

2    particularly for franchise-type properties and those properties

3    capable of being sequelized like Superman or Batman.

4          However, it's absent from the *Superman* and *Batman*

5    agreements entirely.                                              11:40

6          The second problem with Mr. Levitz's statement is

7    that DC's own agreements frequently have such reversion

8    provisions.  If you look at Exhibit 306, which a summary in

9    grid form of the film and television deals DC has entered into,

10   there is even a separate column for reversion provisions.  In    11:40

11   fact, many of DC's agreements with Warner Bros. even have

12   reversions.  But not *Superman* or *Batman*.

13         We ask why.

14         And the answer is obvious.  In the market, as it

15   existed in 2002 and 2004, the Superman and Batman assets were    11:40

16   far too valuable for Warner Bros. to ever let them go to a

17   competitor.

18         DC engaged in one rationalization after another to

19   try to justify a 34-year term with no reversions.  DC claimed

20   that a 34-year term is justified because it takes a long time    11:41

21   to develop a good film, and that a bad film can be damaging to

22   Superman.  These are mere hindsight rationalizations.

23   Warner Bros. seems to be able to launch *Batman Begins* in 2005,

24   and just three years later, *The Dark Knight*, in 2008, with

25   tremendous success.  *Men in Black I* was followed by           11:41

1   *Men in Black II* in five years.  *Spider-Man 1, 2,* and *3* were

2   released over just a six-year period.  *X-Men I, II, III,* and *IV*

3   were all released over just eight years.

4           I refer the Court to Exhibits 61 and 335 as proof of

5   this.                                                          11:41

6           DC's new rationalization, as articulate by

7   Mr. Gumpert, was that due to a termination filed by

8   Joseph Shuster, with an effective date of 2013, moots the

9   34-year term and moots out the problem with not having a

10  reversion provision.                                           11:42

11          Firstly, the Shuster termination was served in

12  November of 2003, after the *Superman* film and television

13  agreements were entered into.  Secondly, the Shuster

14  termination has not been litigated, and we expect that it will

15  be an equally long six- or seven-year war of attrition before  11:42

16  it's ever decided whether that termination is effective.

17          Again, you look to the value of the agreements at the

18  time the deals were entered into, not retroactively in terms of

19  post-deal pictures, performance, or post-deal legal

20  developments.                                                  11:43

21          Mr. Bergman also offered a straw man argument

22  regarding waste, which goes like this:

23          If DC as a copyright co-owner has no obligation to

24  exploit *Superman*, then why should Warner Bros., its licensee,

25  have a contractual obligation to exploit *Superman*?           11:43

1    If DC can sit on the property, then why can't

2  Warner Bros.?

3    The natural extension of this argument, however, is

4  that DC could make any deal they want to with Warner Bros.,

5  even a 1 percent deal, because they have no obligation to            11:43

6  exploit Superman.  However, DC's transfer of Superman rights to

7  Warner Bros. for compensation itself constitutes an

8  exploitation of Superman copyrights, triggering DC's duty to

9  account to plaintiffs.

10    Market forces and DC's self-interest would tend to            11:43

11  dictate favorable terms in DC exploited the valuable Superman

12  franchise property at arm's length in the open market.  Since

13  DC never even offered the rights in the open market in the

14  period in question, and instead entered into an affiliated

15  transaction, tieing up the rights for 34 years, and since they   11:44

16  have a duty to account under that agreement, equity requires

17  that their deal be for fair market value.  Otherwise, the

18  transaction transfers the valuable Superman asset in a way that

19  unfairly dilutes plaintiffs' profit share, while shifting and

20  retaining the profits inside the Warner Bros. family.            11:44

21    The *Superman* film agreement unusually has a rights

22  grant that is far broader than the exploitation provisions that

23  trigger payments to DC.  The *Superman* agreement, Exhibit 232,

24  transfers all audio visual rights in the Superman property to

25  Warner Bros., subject to reservation of rights by DC.  At the    11:45

1    same time, under Paragraph 3, DC receives participation only in

2    pictures which are defined as feature-length motion pictures

3    under the agreement.

4         There are no other provisions for the payment to DC

5    for new media exploitations and all sorts of other forms of        11:45

6    exploitation that falls under the broad definition of "audio

7    visual works" in the agreement.

8         As such, Warner Bros. is unfairly free to exploit

9    audio visual Superman copyrights without accounting to DC.

10        Now, Mr. Levitz claimed that if the Superman property    11:45

11   was being exploited, and they weren't being paid for that

12   exploitation, he would simply work it out at Time Warner at a

13   higher level and somehow get the rights back, or he would get

14   them to pay for this use.  He similarly testified that if

15   Warner Bros. exploited Superman audio visual rights in new        11:46

16   media, and that if this fell within the broad rights grant in

17   the agreement, that even though Warner Bros. had no contractual

18   obligation to pay DC, DC and Warner Bros. would reach some sort

19   of fair arrangement based on their closer relationship.

20        I refer the Court to the transcript at Page 1142,         11:46

21   Line 2 through 16, and Page 1136, Line 20, to Page 1138, Line

22   15, regarding the reversion problem and Mr. Levitz's solution

23   that he would simply work it out.

24        Unfortunately, these terms are not arm's length terms

25   and they are not fair market terms.  They are completely         11:47

1   dependent on the relationship that DC has with Warner Bros. and

2   Time Warner.  We can't judge these rationalizations in any

3   verifiable extent, simply based on Mr. Levitz's testimony that

4   he feels he could work it out at a higher level with

5   Time Warner.                                                    11:47

6           What's more, and even more important, Mr. Levitz

7   confirmed that Warner Bros. is able to freely assign its rights

8   under both the film and television agreements.

9           I refer the Court to the transcript at Page 1183,

10  Line 14, to Page 1184, Line 3; and to Exhibit 232, Paragraph 14  11:47

11  on Page 14; and Exhibit 223, Paragraph 13 on Page 4, both of

12  which demonstrate that under the *Superman* film agreement and

13  *Superman* television agreement, DC at any time can freely assign

14  all or any part of its rights under that agreement to another

15  studio or financially-responsible entity.                       11:48

16          If it did that, DC would have no recourse whatsoever

17  and could not simply, quote, work things out with a new studio

18  by going over the heads of Warner Bros. Entertainment to

19  Time Warner, something that I find dubious to begin with.  In

20  fact, Warner Bros. could simply act as a broker of the rights   11:48

21  in the agreement as it exists.  They could sell the rights to

22  another studio for a much higher rate, say 10 or 20 percent of

23  the gross, and keep the difference as a reported mere licensee

24  of DC.  That would be very inequitable to plaintiffs.  One part

25  of the Time Warner corporation profits greatly from the sale of  11:49

```
 1    the same exploitation of the same Superman rights, while
 2    plaintiffs get a mere smidgen based on a reduced deal with DC.
 3    If any of these things happen, all of the problems that
 4    Mr. Levitz says he could simply work out within the company
 5    would remain, and DC would have no recourse under the agreement   11:49
 6    or any leverage to fix such problems.
 7            Moreover, where was DC's ability to fairly work
 8    things out when it entered into the Batman and Superman
 9    agreements with Warner Bros. in the first place?
10            These agreements, in most respects, favor DC's owner    11:49
11    to DC's and plaintiffs' detriment.
12            Defendants made much of the fact that the overall
13    relationship between DC and Time Warner and DC and Warner Bros.
14    is a valuable term in and of itself.
15            First of all, Warner Bros., although it's a great and   11:50
16    powerful company and has a great merchandising division, is
17    matched by Paramount, which is owned by Viacom, which also owns
18    CBS; Sony, which is a worldwide conglomerate that puts out one
19    hit picture after another; Universal, which also owns NBC;
20    20th Century Fox; and Disney.                                   11:50
21            While these studios are better sometimes at one thing
22    than another, they are all competitors, with great resources.
23    I don't buy the argument that Warner Bros. itself is a term of
24    the agreement.  And, again, under the agreements, Warner Bros.
25    can simply assign its rights in Superman to another studio, and 11:51
```

1    that's supposed term of the agreement, meaning the value of

2    Warner Bros. and DC's relationship with Warner Bros., would

3    evaporate.  There's another disturbing asset to the focus on

4    DC's overall favorable relationship with Warner Bros.

5         If we look at the Warner Bros. Consumer Products                11:51

6    agreement, which is in evidence, the same 25 percent

7    off-the-top fee charged to huge franchises like Superman and

8    Batman apply to all of DC's characters, even very minor

9    characters.

10        In an economic sense and to anyone savvy in the                  11:52

11   motion picture business, it would appear that DC essentially

12   uses these big-branded franchises with a consistent, enormous

13   merchandising cash flow to carry all of its lesser properties.

14   Now, while this might be good for DC as a company, and as a

15   whole, it certainly doesn't benefit plaintiffs, who only            11:52

16   participate in the profits from Superman.

17        What guaranteed sum did DC receive in return for

18   giving Warner Bros. control over *Superman* film and television

19   rights for 34 years?

20        $1.5 million.                                                   11:52

21        There is no purchase price in the film agreement,

22   which, as both Mr. Halloran and Mr. Gumpert testified, is

23   highly unusual.

24        I refer the Court to Page 387, Lines 16 through 18;

25   and Page 1396, Line 20, to Page 1397, Line 7.                       11:53

1       This lack of a purchase price becomes even more

2   unusual once you look at the other agreements that are in

3   evidence and realize that sellers of valuable intellectual

4   properties routinely secure purchase prices of $5 million to

5   $10 million per film.                                          11:53

6       For example, *Sahara* has a guaranteed purchase price

7   of $20 million spread out over seven years, with a net present

8   valve of approximately $16 million.

9       I refer the Court to Exhibit 2001 and to the

10  transcript at Page 433, Line 9, to Page 434, Line 25.          11:53

11      The *Hannibal* agreement shows a purchase price of

12  $10 million on signing.

13      I refer the Court to Exhibit 307 and the transcript

14  at Page 444, Line 24, to Page 445, Line 15.

15      The *Red Rabbit* agreement has a purchase price of      11:54

16  $7 million guaranteed, plus a $1 million nominal producer fee

17  that in the business is considered part of a rights

18  transaction.

19      I refer the Court to Exhibit 327 and the transcript

20  at Page 468, Line 18, through Page 469, Line 8.               11:54

21      *Rainbow Six* had a purchase price of $5 million, plus

22  a $1 million producer fee.

23      I refer the Court to Exhibit 326 and the transcript

24  at Page 464, Line 8, through Page 466, Line 7.

25      And Mr. Halloran testified the Hasbro agreement for    11:54

1  film rights to its board games like Monopoly and Battleship

2  provided a $5 million purchase price and a $1 million nominal

3  producer fee for each film based on its board games.

4          Transcript, Page 488, Line 15, to Page 489, Line 8.

5          *Lord of the Rings* had a $4.75 million total purchase    11:55

6  price, including the nonapplicable option payments.  Most

7  option payments are applicable.

8          I refer the Court to the transcript at Page 441,

9  Line 9, to Page 443, Line 9.

10         As to the musicals, *My Fair Lady* had a purchase price   11:55

11 of $5.5 million, which is over $30 million once you adjust for

12 inflation.

13         I refer the Court to Exhibit 300 and the transcript

14 at Page 430, Lines 3 through 25.

15         *Annie* had a purchase price of $9.5 million in 1978,     11:55

16 over $20 million when adjusted for inflation.

17         I refer the Court to Exhibit 315 and the transcript

18 at Page 456, Line 19, to Page 457, Line 20.

19         *A Chorus Line* had a $5.5 million purchase price in

20 the late 1970s.                                                   11:56

21         Transcript, Page 487, Lines 11 through 14.

22         By the way, with respect to these musicals, the

23 notion that you pay multi-million dollar purchase prices

24 because they are musicals, and not comic books or novels, is

25 ludicrous.  Those prices were paid because of the prior success  11:56

1    of those musicals and the goodwill associated in the public

2    mind with those titles and the pre-awareness they evoke, which

3    helps the studio hedge against the risk of releasing and

4    investing in a major motion picture.

5            Many of these agreements reflect that when an owner

6    of a high-level property goes into the marketplace, they won't

7    even accept option payments or option terms.  They won't wait

8    for the studio to make up its mind to make a film.  They want a

9    multi-million dollar purchase price guaranteed up front.

10   Notably, in the *Red Rabbit*, *Hannibal*, and *Rainbox Six*

11   agreements, the licensor is paid the guaranteed purchase price

12   on signing the agreement, avoiding the speculation involved

13   with development and the lack of certainty.

14           Such guaranteed fixed compensation is cash in hand.

15   It's better to have guaranteed $10 million now than a possible

16   $15 million sometime in the future, if and when the film is

17   actually made and released.

18           Plaintiffs are not cherry-picking.  Each of these

19   agreements, with the exception of the *Annie* agreement, also has

20   a substantial first-dollar gross back-end participation which

21   equals 10 percent of first-dollar gross or higher.

22           Even the lesser *Tarzan* and *Conan* agreements relied on

23   by defendants had purchase prices ranging from $1.5 million to

24   $2.7 million.

25           I refer the Court to Exhibits 1085 and 1086, 1093 and

11:56

11:57

11:57

11:57

11:58

1    1094.

2         If we look at Exhibit 306, even DC's film and

3    television deals for lesser properties with Warner Bros. have

4    very substantial purchase prices:  *Aquaman*, $2 million; *Flash*,

5    $3 million; *Green Lantern*, $2.25 million; Justice League,    11:58

6    $3 million.  None of this appears in the *Superman* or *Batman*

7    agreements.

8         Turning to the issue of gross participation, DC's

9    contingent or back-end participation in the *Superman* film

10   agreement is 5 percent of distributors worldwide gross, what    11:59

11   Mr. Bergman is fond of calling "first-dollar gross."  When

12   Mr. Bergman asked Mr. Spira how often Warner Bros. awarded

13   first-dollar gross to rights holders, Mr. Spira responded,

14   quote, reasonably, not infrequently, when appropriate.

15        Transcript, Page 1266, Line 4.    11:59

16        **THE COURT:**  Counsel, I'm sorry to interrupt you, but

17   we've reached the 12:00 hour.  I'm going to need to give the

18   court reporter a break at some point in time.

19        How much longer do you think you have at this point?

20        I'm asking whether we should take our break or    11:59

21   continue.

22        **MR. TOBEROFF:**  Do you know how long I've been going

23   so far?

24        **THE COURT:**  We started about an hour and a half ago.

25        **MR. TOBEROFF:**  I think an hour and a half.    12:00

```
 1              THE COURT:  Another hour and a half?

 2              MR. TOBEROFF:  Yes.  Based on my --

 3              THE COURT:  Keep in mind that you're trying to

 4    persuade the Court.  My attention span is long, but it's not

 5    indefinite.                                                        12:00

 6              MR. TOBEROFF:  I understand.  During the break, I'll

 7    try and --

 8              THE COURT:  Why don't you do that.

 9              Why don't we go ahead and take our break.  We'll

10    resume at 1:15.                                                    12:00

11              I'll give you 45 minutes, Counsel, but you're going

12    to have to wrap this up in 45 minutes.  The Court has heard a

13    three-week trial.  I'm well aware of the issues and the

14    evidence in this case.

15              I want to afford you an opportunity to summarize that   12:00

16    for the Court.

17              MR. TOBEROFF:  I understand, Your Honor.

18              THE COURT:  But a three-hour closing for a three-week

19    trial is a little much.  We talked about two hours.  That's

20    what you indicated last week.  So I'll give you more than that;   12:00

21    I'll give you 45 minutes.  But work on wrapping it up in

22    45 minutes.  We'll get back at 1:15, and then I'll give

23    Mr. Bergman an opportunity to address the Court as well.

24              MR. TOBEROFF:  Very well, Your Honor.

25              THE COURT:  Have a good lunch.                          12:00
```

1        (A.M. session is concluded.)

2

3

4                        CERTIFICATE

5

6   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
7   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
8   conformance with the regulations of the Judicial Conference of
    the United States.

9

10  _____        _____
    THERESA A. LANZA, CSR, RPR                      Date
11  Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25