1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4        **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                        ---

6    JOANNE SIEGEL, etc.,          :  PAGES 67 - 170
                                   :
7              PLAINTIFF,          :
                                   :
8        VS.                       :  NO. CV 0408400-SGL(RZx)
                                   :
9    WARNER BROTHERS               :
     ENTERTAINMENT, INC., etc.     :
10                                 :
              DEFENDANT.           :
11   _____:

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               COURT TRIAL - DAY 1

17              RIVERSIDE, CALIFORNIA

18            TUESDAY, APRIL 28, 2009

19               AFTERNOON SESSION

20

21

22

                        MARK SCHWEITZER, CSR, RPR, CRR
23                      OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
24                      181-H ROYBAL FEDERAL BUILDING
                        255 EAST TEMPLE STREET
25                      LOS ANGELES, CALIFORNIA 90012
                        (213) 663-3494

68

**Appearances of Counsel:**


For the Plaintiff:

        TOBEROFF AND ASSOCIATES
        By Marc Toberoff, Esq.
           Nicholas Williamson, Esq.
           Keith Adams, Esq.
        2049 Century Park East
        Suite 2720
        Los Angeles, CA 90067
        (310) 246-3333



For the Defendant:

        BERGMAN COLEMAN GRODIN & EVALL, LLP
        By Michael Bergman, Esq.
           Anjani Mandavia, Esq.
        9665 Wilshire Boulevard
        Ninth Floor
        Beverly Hills, CA 90212
        (310) 860-3346

            -and-

        LAW OFFICES OF PATRICK T. PERKINS
        By Patrick T. Perkins, Esq.
        1711 Route 90
        Cold Spring, NY 10516
        (845) 265-2820

1                          **I N D E X**

2

3    MARK EVANIER, PREVIOUSLY SWORN.......................... 70

4    DIRECT EXAMINATION (CONTINUED) BY MR. TOBEROFF.......... 70

5    CROSS-EXAMINATION BY MR. PERKINS....................... 95

6    REDIRECT EXAMINATION BY MR. TOBEROFF....................112

7    RECROSS-EXAMINATION BY MR. PERKINS......................112

8    ALAN FREDERIC HORN, SWORN...............................113

9    DIRECT EXAMINATION BY MR. TOBEROFF......................113

10   CROSS-EXAMINATION BY MR. BERGMAN.......................163

11   REDIRECT EXAMINATION BY MR. TOBEROFF....................167

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>**Riverside, California; Tuesday, April 28,2009**</u>

2                          **1:20 P.M.**

3              THE COURT:  Counsel, you may proceed.

4                  **MARK EVANIER, PREVIOUSLY SWORN.**

5                  **DIRECT EXAMINATION (CONTINUED)**

6   BY MR. TOBEROFF:

7   Q.   Mr. Evanier, you testified earlier that in the late

8   1950's, Superman was selling 4 million copies per month.  Was

9   that one Superman magazine or all Superman comics combined?

10  A.   That was the amalgam of all the comics Superman was

11  featured in at the time.  He was in action comics.  He was in

12  adventure comics.  He was in Superboy, the Lois Lane comic

13  book.  There was the Jimmie Olson -- I'm not quite sure which

14  ones they were counting, but collectively, that's the number.

15           When you hear them say 4 million, they are referring

16  to the group of all the titles that featured the character.

17  Q.   Now, in the early 1970's, what was the status of these

18  collective Superman comics in terms of sales?

19  A.   I don't know the exact number.  They were selling

20  substantially less.  There were fewer of them at the time.

21  Quite a few of those books had been discontinued or

22  substantially altered.  When I was assisting the editor of

23  Jimmie Olson in 1970 or '71, that had become a very low

24  selling title for DC.  A few years later it was canceled.  The

25  Lois Lane comic, which at one point had been DC's best selling

1    in the 50's or 60's, it had been canceled.

2              THE COURT:  That was a separate?

3              THE WITNESS:  Yes, it was called Superman Lois Lane,

4    with a character like Superman, and this is true of something

5    like Archie, the character is in a group of comics.  They are

6    timed to come out every week.  One week Action Comics comes

7    out featuring Superman.  So that every week the kids can go to

8    the rack and buy one or two comics that feature Superman.

9              Superman was always prominent on the cover of Jimmie

10   Olson and prominent on the cover of Lois Lane.  It's the same

11   with the Archie line of comics.  It's Archie and the Betty and

12   Veronica and the Jughead and the Reggie comics.  There are all

13   these ancillary titles.  Archie's friends and Archie's enemies

14   and Archie's toothbrush and such.  So when --

15             THE COURT:  Very well.

16             THE WITNESS:  So when they talk about Archie sales,

17   they mean all the Archie titles.

18   Q.   BY MR. TOBEROFF:  What was the reason why these Superman

19   comic books were being canceled?

20   A.   The only reason that you have for canceling comics is

21   that people aren't buying them.

22   Q.   And how did the Superman comic itself, the comic called

23   Superman, how did that fare in the early 1970's?

24   A.   It had declined in sales from the 60's, if that's what

25   you're asking.

72

1    Q.    That's just looking at the Superman comic itself?

2    A.    Yes, that's right.

3    Q.    In the comic industry, when you are judging the success

4    of a comic, you just look at the Superman comic itself?

5    A.    No.  That would be misleading about the strength of the

6    property.  You would -- it would not tell you, you know, is

7    this character capable of -- you're looking at the franchise.

8    The value of the Superman, the value of an Archie is that you

9    can do a lot of comics of them.  You're not limited to one

10   every month.  The Bugs Bunny comic book, and the Yosemite Sam

11   and Porky Pig comic books, we find different ways to put out a

12   comic book that had Bugs Bunny's face on the cover.

13   Q.    You mentioned that DC Comics financed the 1951 feature

14   film Superman Versus the Moleman.  Did DC also finance the TV

15   series starring George Reeves?

16   A.    Yes, they did.

17   Q.    Did DC finance the Superman film starring Christopher

18   Reeves that appeared in 1978?

19   A.    No, they did not.

20   Q.    Did they participate financially in any way in that?

21   A.    I assume they received some fee for that.

22   Q.    But did they invest in the film in any way?

23   A.    To the best of my knowledge, they did not.

24   Q.    Did DC finance Super Friends that appeared in the 70's as

25   you testified or any other TV or film derivatives in the 70's?

1    A.    I know of no project in the 70's that DC put their own

2    money into.

3    Q.    Now, you previously mentioned that there was continuous

4    merchandising in the 1980's through the 1990's.  Focusing now

5    on the 1990's, was Superman exploited in other media in

6    addition to publishing and merchandising?

7    A.    In the 1990's?

8    Q.    In addition to merchandising in the 1990's, merchandising

9    and publishing, how was Superman exploited?

10   A.    Well, the biggest would have been the Lois and Clark

11   television show on ABC, which was on, I believe, in '93

12   through '97 or thereabouts.  That was very successful, a prime

13   time show.

14         There was the Superman animated series that was done

15   during that time period.  I'm blanking on something else.

16   There was another one.

17   Q.    I believe earlier you testified to Superboy.  Was that in

18   this period?

19   A.    The Superboy show went on in 1988, and it was on into the

20   90's.  Yes, that was successful for a while.

21   Q.    Now, in the 1990's --

22   A.    I forgot the show I worked on.  I'm sorry.

23   Q.    In the 1990's, was a new Superman theatrical film being

24   developed?

25   A.    We heard there was.  That was the word around

74

1    conventions.  There were articles in the fan press and various

2    magazines that a Superman movie was coming.

3    Q.    And what did you hear?

4    A.    I heard a lot of different things.  We heard various

5    stars.  At one point Nicholas Cage was allegedly going to star

6    in a Superman movie.  At one point Tim Burton, who had very

7    successfully directed the Batman franchise.  He was going to

8    direct it.  There were outlines and scripts bootlegged around

9    the convention market, and people were alternately horrified

10   or encouraged.  There were fans very worried.  They assumed a

11   Superman film was coming and they were worried that the

12   character would not do him justice.

13   Q.    What was the reaction at Comicon to this anticipated film

14   starting in the mid-1990's?

15   A.    Well, the entirety of the Comicon, the character of

16   Comicon shifted in the 1990's.  Previously it had been

17   basically a convention about comic books and publishing.  In

18   the 1990's, the Comicon evolved into a place where the major

19   stars would appear to promote their films.  One of those

20   panels that I got kicked out of the room one time was around

21   Schwarzenegger wanted to promote another Terminator movie.  He

22   was going to make a sudden appearance.

23          So there were all these panels suddenly showing

24   clips of previews of upcoming films or panels discussing --

25   studios would fly in their directors and their executives and

1    their stars to promote.  There was an awful lot of merchandise

2    handed out at the convention.  When you got to the convention,

3    you got your badge and a goodie bag full of merchandise and

4    promotional items.  And sometimes you'd get T-shirts and

5    fliers and pins saying, you know, these movies are coming.

6           So -- the Superman -- the Superman movie was one of

7    the main ones that people were excited about.  Because it was

8    Superman.

9    Q.   And this started in the mid 90's and continued until what

10   time?

11   A.   It's continuing today.  The fervor about the upcoming

12   movies.  There's a convention in July, the Comicon for this

13   year.  A lot of that convention is going to be about what

14   movies are coming out.  What movies are in development now.

15   What movies had just come out.  What movies are coming on DVD

16   now.  It's -- there are people who actually complain that the

17   convention is too much about the next big superhero movie

18   that's coming out.

19   Q.   So Hollywood's participation in Comicon, would you say,

20   commenced in the mid-1990's?

21   A.   Again, it was a slow process.  It -- I can find isolated

22   incidents before then, but it was an avalanche in the 90's of

23   all of a sudden these big stars are there.

24   Q.   And what was the status of superhero films starting in

25   the late 90's?

76

```
 1   A.    Superhero films, there were some very successful ones.  I

 2   can't think of the first one right off.  Men in Black came out

 3   in, I think, '97.  Blade in '98.  Those are both very

 4   successful films about relatively minor properties, characters

 5   that had very little track record and weren't known

 6   characters.

 7         Then you suddenly started seeing movies like --

 8   there was a big explosion of excitement in 2000 when the first

 9   X Men movie came out.  That was huge.  And they started

10   talking about the sequel and the upcoming Spiderman movie,

11   which I think came out in 2002.

12   Q.    The Spiderman movie that I came out in 2002, when at

13   Comicon did you start hearing about that movie?

14   A.    Well, we'd been hearing about Spiderman movies for some

15   time before that.  There were scripts circulated.  There were

16   talks of different directors and stars attached to it.

17   Q.    But specifically, the movie that came around --

18   A.    Excuse me.  The specific movie that came out, I think we

19   started hearing about it around 1999.  It's like a two- or

20   three-year lag on all these things before they come out.  One

21   year you hear the movie is in heavy development and names are

22   being attached to it.  The next year you hear that it's got a

23   start date, when they start promoting it, putting out kind of

24   generic advertising, key art that they are showing you.

25   Possible poster, a possible logo type.  They try to get some
```

1    advance merchandise out, and then you have, you know, the next

2    year the movie is out.  Or it is about to come out, and they

3    come and show the trailer, and people cheer it or shrink away

4    in disgust, whichever is applicable.  Then usually a year or

5    so later, they are promoting the DVD's coming out.

6    Q.   And how did this focus on comic books and superheroes in

7    particular in the movies occur?

8    A.   I'm sorry?

9    Q.   I'm sorry.  I phrased that poorly.

10              What was the cause of this sudden focus on comic

11   books and superheroes part starting in the mid-1990's?

12              MR. PERKINS:  Objection, your Honor.  It goes beyond

13   the --

14              THE COURT:  Sustained.  Rephrase, Counsel.

15   Q.   BY MR. TOBEROFF:  What connection do you see between

16   comic books and films?

17              THE COURT:  Overruled.

18              THE WITNESS:  Well, they are merging together as

19   forms, if that's what you're asking me.  The comic books are

20   increasingly becoming a template for movies, not only in terms

21   of content but in terms of trying to replicate the excitement

22   that was established in the comic book to replicate it on the

23   screen.  It's a kick start for a movie.  You have a successful

24   comic book.

25              People love the comic book, and now that generates

78

```
 1   heat for the project before it turns into a multimillion

 2   dollar movie.  And at the moment, practically every comic book

 3   is a potential movie.  There are people creating comic books,

 4   hoping they will become movies.

 5   Q.   Is there anything about comic books in particular that

 6   lends itself to exploitation in the film?

 7            THE COURT:  Counsel, now we're getting into an area

 8   where -- is this covered in the disclosure?

 9            MR. TOBEROFF:  The cover.

10            THE COURT:  Now you're going beyond that.  Again,

11   I -- I have no doubt that this witness is more than qualified

12   to answer these questions.  It is all about the disclosure

13   that was given to the other side.

14            MR. TOBEROFF:  I understand.

15            THE COURT:  So don't take this -- you are

16   consummately qualified on this.  It's beyond the scope of the

17   expert disclosure.  So I'll sustain the objection.

18   Q.   BY MR. TOBEROFF:  In the comic book industry, what are

19   the -- what are DC's core comic book properties?

20   A.   Superman and Batman are the top tier.

21   Q.   And where in your opinion does Superman rank in the

22   hierarchy of comic book superheroes in terms of sustained

23   popularity?

24   A.   I think Superman is number one.

25            MR. PERKINS:  Objection.  That opinion was not in
```

79

1   his disclosure.

2          MR. TOBEROFF:  Actually, I think he goes on and on

3   about the attributes, the key attributes and popularity of

4   Superman.  On page 9 he speaks about Superman being an

5   established star with a proven box office success.  For a

6   studio to establish the same kind of fame and recognition of a

7   newly created character would require an investment of

8   countless millions of dollars with, of course, no guarantee of

9   success.

10         MR. PERKINS:  The objection was to the specific

11  question, which was how does it rank, and the answer being

12  it's number one, which was not opined upon, and I didn't have

13  a chance to --

14         THE COURT:  It's a closer call, but I'll overrule

15  the objection.  You have answered.

16         Next question, Counsel.

17  Q.  BY MR. TOBEROFF:  Now, switching gears.  Mr. Bergman in

18  his opening mentioned a character by the name of the Lone

19  Ranger.

20         Are you familiar with the character?

21  A.  Yes, I am.

22  Q.  Did this character appear in comic books?

23  A.  It has appeared in comic books intermittently.

24  Q.  When?

25  A.  I'm not prepared to tell you the exact dates.  A company

80

called Western published the Lone Ranger comic under the Dell

imprint from around 1942.  I'm guessing at this, but it was

throughout much of the 40's, much of the 50's and became more

spotty.  They were canceling it in the 60's.  And I think it

was published briefly in the 70's, and there have been a few

intermittent.  It has not been a continuously published comic.

Q.    How popular was the Lone Ranger in comic books compared

to Superman?

A.    It was much less popular.

Q.    What other media did that -- did the Lone Ranger appear?

A.    The Lone Ranger was a radio show, very popular radio show

in the 30's and 40's.  There were a series of monthly serials

made in the 40's.  There was a television show in the 50's.

There have been a couple of movies that have not done well.

There was a -- a chain of Lone Ranger restaurants.  There was

one near my house in the 70's.  It hasn't been around a lot.

Q.    Has the Lone Ranger remained popular?

A.    I don't see it being published as a successful comic book

or -- it was an animated show very briefly at one point.  I

have not seen any sustained indicator or popularity of the

character.

Q.    Does the Lone Ranger have the sustained success of

Superman since the 1930's?

A.    Not even close.

Q.    Another character I believe was mentioned was the Green

```
 1   Hornet.  In what media format did this character first appear?
 2   A.    It was a radio show.
 3   Q.    Do you know when it first appeared?
 4   A.    In the mid-30's.
 5   Q.    Was the Green Hornet popular?
 6   A.    The radio show was popular for an extended time, yes.
 7   Q.    And in the 1930's and 40's?
 8   A.    30's and 40's, yes.
 9   Q.    After that?
10   A.    It lost popularity.  There was a brief revival in the
11   60's on a TV show that I think only lasted a short time.
12   Q.    Did the Green Hornet appear in comic books?
13   A.    Western Publishing published, I think, three issues
14   before it was canceled.
15   Q.    Has the Green Hornet remained popular?
16   A.    No, I don't think so.
17   Q.    Has the Green Hornet had the sustained success of
18   Superman since the 1930's?
19   A.    Even less than Lone Ranger.
20            MR. PERKINS:  Your Honor, I'm going to object to
21   this line of questioning.  There was nothing in his report
22   regarding any character other than Superman.  There was no
23   discussion of Green Hornet, Lone Ranger.
24            THE COURT:  Is there, Counsel?
25            MR. TOBEROFF:  Not specifically, your Honor.  I'm
```

1   responding to characters mentioned by Mr. Bergman in his

2   opening statement.

3           THE COURT:  Well, I know what you're doing.  The

4   question is whether or not there was any grounds for the

5   disclosure of this.

6           MR. TOBEROFF:  To a certain extent, this is also

7   anticipatory rebuttal.

8           THE COURT:  And as rebuttal, it would probably be

9   proper.  Counsel, is there any -- quite frankly, some of this,

10  as interesting as it is, is not exactly earth-shaking.  I

11  mean, I -- the Lone Ranger, it's been a while since we've seen

12  the Lone Ranger.

13          MR. PERKINS:  Your Honor, as long as it's going on

14  Mr. Toberoff's clock, I think I shouldn't complain.

15          THE COURT:  I think out of judicial efficiency, some

16  of the stuff could be addressed now.  Let's move along.

17          MR. TOBEROFF:  It would be so he didn't have to come

18  back in rebuttal.  All the characters that I'm mentioning are

19  the subject of contracts that have been produced and will be

20  used by defense at trial, I believe.

21          THE COURT:  Very well.

22          MR. TOBEROFF:  That's the relevance.

23          THE COURT:  I understand the relevance.  Again, the

24  issue is not relevance.  It's disclosure.  But I view it as

25  essentially rebuttal, given the statements that were made by

83

1    counsel in his opening.  Let's just do this now.

2    Q.   BY MR. TOBEROFF:  Tell me about the character Flash

3    Gordon.

4    A.   Flash Gordon was a syndicated newspaper strip, very

5    popular syndicated newspaper strip.  There were a series of

6    serials starring a character called Buster Crabbe.  There was

7    a radio show for a time that was very popular, mostly in the

8    1940's.

9    Q.   And when did the comic strip first appear?

10   A.   The comic strip first appeared in the late 30's.

11   Q.   And over what period was the comic strip exploited?

12   A.   Well, the comic strip is still going today.  It's in

13   about four newspapers.  It used to be in about 600.

14   Q.   Has Flash Gordon been exploited outside of comic strips?

15   A.   I mentioned the radio show.  There was a Flash Gordon

16   serial.  There was a Flash Gordon TV show briefly in the 50's.

17   There have been some -- there was a Flash Gordon animated

18   series done by Filmation in the 8 -- in the mid-70's, I would

19   say.

20   Q.   So has the exploitation --

21   A.   There was a feature film in the 70's.

22   Q.   Would you characterize the exploitation as intermittent

23   or continuous?

24   A.   It's certainly tapered off the last 20 years.  I would

25   say it's intermittent.

84

```
 1   Q.   Is Flash Gordon popular?

 2   A.   It's a known character.  I wouldn't say it's very popular

 3   these days.

 4   Q.   Has Flash Gordon had the sustained success of Superman

 5   since the 1930's?

 6   A.   Not at all.

 7   Q.   Tell me about the character Government Writer?

 8   A.   Government Writer, if you're referring -- there have been

 9   a number of characters named Government Writer.  If you're

10   referring to the one that was a motion picture, that was a

11   Marvel comic that was introduced in the early 70's.  The comic

12   book has been published intermittently.  It had a successful

13   run for a few years.  They stopped it and brought it back.

14   There was a successful motion picture a few years ago.

15   Q.   Was Government Writer popular?

16   A.   Briefly here and there at times.

17   Q.   Has Government Writer been exploited -- excuse me.  Has

18   Government Writer had the sustained success of Superman since

19   the 1930's?

20   A.   Not even close.

21   Q.   Are you familiar with the character Ironman?

22   A.   Yes, I am.

23   Q.   Tell me about Ironman's exploitation.

24   A.   The exploitation -- well, Ironman was first in comics in

25   1963.  He was in a comic, Tall Tales of Suspense.  He was a
```

85

```
 1   minor Marvel hero in the 60's.  There was a bad, low budgeted
 2   cartoon show, and they stuck Ironman in that.  His comic book
 3   did not do very well for a time.  He was canceled a couple of
 4   times and brought back, I believe.  More recently, there was
 5   an Ironman animated series and a very successful Ironman
 6   motion picture a few years ago.
 7   Q.    You're referring to the Ironman film that came out in
 8   2008?
 9   A.    Yes, I am.
10   Q.    Prior to the release of the Ironman film, would you
11   describe Ironman as successful?
12   A.    No.  I would describe it as a lower tier Marvel
13   character.
14   Q.    Has Ironman had the sustained success of Superman?
15   A.    No.
16   Q.    Have you heard of the graphic novel entitled 300?
17   A.    Yes, I have.
18   Q.    Could you describe for me what this consists of?
19   A.    It was a series of comic books done -- published by Dark
20   Horse around '98.  I'm not sure of the year.  And then they
21   collected it into a graphic novel, published it as a collected
22   work.  And the motion picture was made out of it that I'm told
23   was very successful.
24   Q.    Was it what they call a miniseries?
25   A.    Yes, that's right.
```

86

1    Q.    Do you know how many issues were released by Dark Horse

2    in the 1990's?

3    A.    It's either four or six.  I'm sorry.  I don't know the

4    exact number.

5    Q.    And outside of those four or six issues and then being

6    bound together in a graphic novel, has 300 been exploited

7    outside of publicly?

8    A.    Just that movie.

9    Q.    What you say that movie, you're referring to the 2007

10   movie entitled 300?

11   A.    Yes.

12   Q.    Other than the publishing you mentioned on 300 and the

13   movie released in 2007, are there any other exploitations?

14   A.    Not that I know of.

15   Q.    Has Ironman had anywhere near the sustained success of

16   Superman?

17   A.    Are you asking me about Ironman or --

18   Q.    Excuse me.  300?

19   A.    No, not at all.

20   Q.    Are you familiar with the character Swamp Thing?

21   A.    Yes, I am.

22   Q.    In what media did it first appear?

23   A.    It first appeared in House of Secrets No. 92 in 1971.

24   Q.    And after that?

25   A.    Shortly after that, it got its own comic.  And it was

1    very successful for a short time period, and then they

2    canceled the book.

3    Q.    Has Swamp Thing had the sustained success of Superman?

4    A.    No, it hasn't.

5    Q.    Have you heard of the character Human Target?

6    A.    Yes, I have.

7    Q.    When did this character first appear?

8    A.    I think 1971 as a backup feature in Action Comics.

9    Q.    And after that?

10   A.    I think DC brought it back intermittently here and there.

11   It was only in Action Comics for a short period of time.  It

12   was not considered a successful character.  And then at some

13   point, I'm sorry, I can't tell you the year.  There was a

14   short-lived television series.  I think it lasted like seven

15   episodes.

16   Q.    Has the Human Target appeared in any other medium?

17   A.    I don't know of any.

18   Q.    Has the Human Target in any way, shape, or form -- strike

19   that.

20           Has the Human Target -- is it comparable to

21   Superman?

22   A.    I can't think of too many characters less known these

23   days than the Human Target.

24   Q.    Are you familiar with a character Doc Savage?

25   A.    Yes, I am.

88

1    Q.    When did he first appear?

2    A.    I think 1933, I believe, as a pulp character.

3    Q.    And from its first appearance in 1933, when did it appear

4    thereafter?

5    A.    There was a radio show.  I don't think there was ever --

6    there was a very short-lived newspaper strip.  I think it

7    lasted less than a year.  There was a -- boy, I can't tell you

8    too many appearances.  There was a motion picture made in 1975

9    of Doc Savage that was not very successful.

10   Q.    And the radio show?

11   A.    And there was a comic book -- there was a comic book in

12   the 40's briefly, and then there was a comic book in '75 to

13   tie in with the motion picture, and there have been -- been

14   occasional comic book appearance.

15   Q.    When did the radio show --

16   A.    The radio show was in the 40's sometime.

17   Q.    Has Doc Savage had anywhere near the sustained success of

18   Superman?

19   A.    Not at all.

20   Q.    Are you familiar with G.I. Joe?

21   A.    Yes, I am.

22   Q.    When did G.I. Joe first appear?

23   A.    G.I. Joe was a -- debuted as a toy from the Hasbro

24   company in the early 60's.  It was produced for a while as

25   strictly a toy.  In the early 80's, Hasbro resurrected the toy

```
 1   and also promoted an animated series and a comic book to
 2   expand the franchise to add ancillary characters and promote
 3   the name of G.I. Joe.
 4   Q.   When did the antimated series G.I. show appear?
 5   A.   Mid-80's.  I can't tell you the exact year.
 6   Q.   And this was like a Saturday morning cartoon?
 7   A.   It was a syndicated series.  Hasbro, the toy company
 8   themselves, produced it.  They financed it, promoted it.  They
 9   were the advertiser.  It was on many stations in the
10   syndicated marketplace.
11   Q.   Has G.I. Joe ever been exploited as a theatrical film to
12   date?
13   A.   I don't think so.
14   Q.   Has G.I. Joe had the sustained success of Superman?
15   A.   No.
16   Q.   Have you heard of the comic book Watchmen?
17   A.   Yes, I have.
18   Q.   When was it first released?
19   A.   Oh, I think '86.  There was a 12 issue -- they call it a
20   maxiseries if they go over 4 or 6 issues.  It was 12 issues.
21   It was a comic book published by DC, and then they collected
22   those 12 issues into a trade paperback and a hard cover and a
23   trade paperback and -- and other formats.
24   Q.   Other than the printing and reprinting of these 12 issues
25   in different formats, was it -- were there other issues that
```

1    were published?

2    A.    Other issues of Watchmen?  I don't believe so.  There

3    were some distant spin-offs, I believe.

4    Q.    Did Watchmen appear in any other media?

5    A.    There was a motion picture released recently.  A very big

6    budget movie after the graphic novel.

7    Q.    Other than the motion picture you just mentioned, has

8    Watchmen been exploited in any other media?

9    A.    There's been a few merchandise items promoted in

10   conjunction with the motion picture.

11   Q.    Was the film successful, the recent Watchmen film?

12   A.    The word is not successful.

13   Q.    Has Watchmen had the sustained success of Superman?

14   A.    Not at all.

15         THE COURT:  What do you mean by "sustained success"?

16         THE WITNESS:  Well, Superman --

17         THE COURT:  No, what do you mean by the phrase?

18         THE WITNESS:  There's no track record.  When they

19   say sustained success, more than a couple of months in the

20   spotlight.  More than six months of heat.  Sustained success

21   means more than one success.

22         THE COURT:  Very good.

23   Q.    BY MR. TOBEROFF:  You are familiar with Tarzan?

24   A.    Yes, I am.

25   Q.    When did Tarzan first appear?

1  A.   Tarzan first appeared in 1912 in pulp magazines.

2  Q.   Was this pulp magazine publication a serialized magazine

3  of the Edgar Rice Burroughs books?

4  A.   Yes.

5  Q.   How many books did Edgar Rice Burroughs write?

6  A.   I'm sorry.  I don't know the answer to that.

7  Q.   Do you have an approximation?

8  A.   I think 30 or something like that.  I don't know.  I used

9  to work for the company, and I don't know the answer to that.

10  I'm sorry.

11  Q.   Do you know -- I finally found a question you didn't know

12  the answer to.

13        Do you know how many Tarzan stories were published

14  prior to January 1, 1922?

15  A.   Around 20, I believe.

16  Q.   Has Tarzan been consistently exploited since its

17  publication in serialized form in 1912?

18  A.   Relatively consistently.  It always seems to be around in

19  some form.

20  Q.   Are you familiar with Tarzan's exploitation in film?

21  A.   Reasonably so, yes.

22  Q.   How many films were produced based on Tarzan?

23  A.   I'm sorry.  I can't give you the -- about 20 or 25.

24  Q.   How would you characterize those films in terms of their

25  success?

92

1  A.   Well, they were low budget films.  They were successful

2  as low budget films.  You know, shooting stuff in the jungle

3  is real cheap.

4  Q.   During what period?

5  A.   Mostly in the 50's, early 60's.  They did -- the

6  franchise declined in the 60's.

7  Q.   And in publishing, how did -- how would Tarzan compare to

8  Superman?

9  A.   Superman -- Tarzan was very popular -- you're talking

10  about in publishing comic books.  Tarzan was very popular

11  in -- let me start over.

12         In terms of publishing, if you're talking about

13  publishing anything, the Tarzan novels were very popular for

14  many years.  If you're talking about the comic book, the comic

15  book was very successful throughout the 50's and 60's, and it

16  declined rapidly in the 70's.

17  Q.   How would you compare the success of Tarzan in publishing

18  to that of Superman?

19  A.   In terms of comic books or in terms of all publishing?

20  Q.   All publishing.

21  A.   I -- I don't know what the sales of the Tarzan books have

22  been like for the last couple years.  I'm so doing a Tarzan

23  comic book project right now, and they are warning me it's not

24  going to sell very well.  But I don't -- I don't have any

25  information on the current sales of the books.

```
 1    Q.   How do you believe Tarzan stacks up against Superman in

 2    terms of a sustained commercial track record?

 3    A.   I don't think he's as popular as Superman.  I don't think

 4    he has the same track record as Superman.

 5    Q.   Are you aware of the character Conan the Barbarian?

 6    A.   Yes.  I'm doing a Conan project for the same publisher.

 7    Q.   When did Conan first appear?

 8    A.   In the 30's in a comic called -- in a magazine called

 9    Weird Tales, and it was serializing pulp novels written by a

10    man named Robert E. Howard.

11    Q.   Has Conan had the sustained success of Superman?

12    A.   No.

13    Q.   Are you familiar with Marvel comics?

14    A.   Yes, I am.

15    Q.   How would you compare Marvel comics to DC Comics in terms

16    of their -- the success of their characters in the comic book

17    industry?

18              MR. PERKINS:  Objection.  Relevance, and again, not

19    in the report.

20              THE COURT:  Where are you going with this in

21    comparison to Marvel and DC Comics, Counsel?

22              MR. TOBEROFF:  I don't want to testify for the

23    witness, but we believe that Superman at DC had two core

24    characters.  Superman and Batman, and that Marvel, which

25    really dominated the comic book industry for quite some time,
```

```
 1   and Marvel had an assortment of characters, some of which were
 2   popular, but essentially DC for a very long time dominated the
 3   industry with Superman and Batman.
 4            This is relevant to valuing Superman as the basis
 5   for film and television --
 6            THE COURT:  Okay.  Overruled.
 7            THE WITNESS:  May I have the question again?
 8            (Record read.)
 9            THE WITNESS:  Both characters have had some
10   tremendous successes.  Marvel seems to have its successes over
11   a greater range of characters.  DC has very valuable
12   properties in Superman and Batman.  And then they have another
13   tier of characters that are not quite as successful.  There
14   have been times when each company dominated the industry.  I'm
15   not sure what else to say.
16   Q.   BY MR. TOBEROFF:  Can you tell me about Marvel's business
17   going back to the 1970's up to the present?
18   A.   How successful the company was?
19   Q.   Yes.
20   A.   Well, Marvel throughout the 60's, 1960's in comics was
21   kind of a case of how long will it take Marvel to overtake DC.
22   DC was the number one company in the 60's, and at one point by
23   a very wide margin, and over the years, Marvel chipped away at
24   their success to the point where -- it's arguable at what
25   point they actually passed them because there's different
```

95

1    measures, but certainly by the early 70's, Marvel had eclipsed

2    DC and was the dominant company in the marketplace.

3    Q.    Did Marvel go bankrupt at one period of time?

4    A.    Marvel at one point had a bankruptcy, yes.

5    Q.    When was that?

6    A.    Late 80's, early 90's.  I'm not sure.

7    Q.    What is the stature of Marvel in the industry -- the

8    entertainment industry today?

9    A.    It's a very healthy company as far as I can determine.

10   Very successful.  They are dominating a lot of the publishing.

11   They are dominating much of the media.  They are producing

12   their own motion pictures, and they have quite a few of them

13   coming out based on their properties.  Seems to be a very

14   successful company now.

15           MR. PERKINS:  Objection, your Honor.  Foundation.

16           MR. TOBEROFF:  I have no further questions.

17           THE COURT:  Very well.

18           Counsel, cross-examination.  And I will sustain your

19   objection on foundation on the health of the company.

20           MR. PERKINS:  Thank you.

21                         **CROSS-EXAMINATION**

22   BY MR. PERKINS:

23   Q.    Good afternoon, Mr. Evanier.  This morning when you went

24   through the list of your credits and the characters that you

25   worked on, you omitted a character, didn't you?

```
 1   A.   I omitted lots of characters.

 2   Q.   You omitted the character Groo, G-R-O-O, the Wanderer; is

 3   that correct?

 4   A.   Yes.

 5   Q.   And that's a character that you co-created; isn't that

 6   right?

 7   A.   No, I did not.

 8   Q.   You did some writing on that character?

 9   A.   I write on -- I contribute to the character, yes.

10   Q.   And as a result of your involvement with Groo the

11   Wanderer, you also have a business relationship with

12   Mr. Toberoff and his film company; isn't that correct?

13   A.   Not with -- I don't think Mr. Toberoff has a film

14   company.

15   Q.   Do you have a relationship, a business relationship with

16   the company called IPW?

17   A.   I don't think so.  I don't think you'd call it a business

18   relationship.

19   Q.   Mr. Evanier, you recall having your deposition taken on

20   March 30, 2007?

21   A.   Yes, I did.

22   Q.   When you were having your deposition taken, did you

23   testify under oath?

24   A.   Yes, I did.

25   Q.   And when you were testifying, did you testify truthfully?
```

```
 1  A.   I believe I did.

 2  Q.   At page 37, beginning at line 3 of your deposition, do

 3  you recall making the following statement and then answering

 4  the following questions?

 5           THE COURT:  Wait.  You said page 37 --

 6           MR. PERKINS:  Line 4:

 7               "And then, as you know, Mr. Toberoff and I had

 8           a relationship relating to the comic book character Groo

 9           the Wanderer that I'm involved with.

10               "QUESTION:  What was that relationship?

11               "ANSWER:  Well, at the moment we are developing

12           a screenplay with a company that Mr. Toberoff is

13           affiliated with."

14           Do you recall that testimony?

15  A.   I believe I do, yes.

16  Q.   Was it truthful?

17  A.   Yes.

18  Q.   There is in fact an agreement between a company

19  affiliated with Mr. Toberoff and the rights relating to Groo

20  the Wanderer for exploitation of motion pictures; isn't that

21  correct?

22  A.   Yes, there is.

23  Q.   And you stand to benefit financially if the motion

24  picture is exploited; isn't that correct?

25  A.   If the motion picture is made, yes.
```

1    Q.    And you know the financial terms under which the Groo the

2    Wanderer comic book character is to be exploited; isn't that

3    correct?

4    A.    I actually don't remember the exact terms.

5    Q.    Well, is there an option payment?

6    A.    Yes.

7    Q.    What is it?

8    A.    I don't know.  I don't remember.

9    Q.    Is there a purchase payment in the event a motion picture

10   goes forward?

11   A.    I don't know.

12   Q.    In the event a motion picture is made, is there a gross

13   first dollar participation in that agreement?

14   A.    I don't know the answer to that.

15   Q.    Now, Mr. Evanier, you consider yourself an advocate for

16   comic creators' rights; isn't that correct?

17   A.    I would say so, yes.

18   Q.    And on occasion, you've taken it upon yourself to right

19   perceived wrongs that have taken place in the comic book

20   community; is that right?

21            MR. WILLIAMSON:  I'm going to object, your Honor.

22   Vague and ambiguous.

23            THE COURT:  Do you understand the question?

24            THE WITNESS:  I'm not a hundred percent sure I do.

25            THE COURT:  Why don't you rephrase, Counsel.

1  Q.    BY MR. PERKINS:  Mr. Evanier, do you recall at page 70 of

2  your deposition being asked the following question and giving

3  the following answer?  Page 70, line 5:

4              "QUESTION:  Have you in the past taken it upon

5        yourself to right wrongs that you perceive to have taken

6        place in the comic book community?

7              "ANSWER:  Occasionally, yes."

8              Do you recall that testimony?

9  A.    Yes, and phrased that way, the answer to the question is

10 yes.

11 Q.    Were you testifying truthfully?

12 A.    Yes.

13 Q.    You've given some testimony today, Mr. Evanier,

14 concerning what I think you termed the decline of popularity

15 of the Superman character in the 1970's.

16              Do you recall that testimony?

17 A.    Yes.

18 Q.    And your testimony with respect to the popularity of

19 Superman has been limited to his popularity in comic book

20 sales; isn't that correct?

21 A.    Yes.  Well, no.  I take that back.  I mentioned the -- I

22 talked about the decline of the motion pictures.  Are you

23 talking about a specific time period?

24 Q.    I'm talking about the 1970's.

25 A.    Well, okay.  In the 70's, I did talk about the additional

100

```
1   failure of the Super Friends cartoon show.  And I talked about

2   the bad reception for the 1975 Superman television special.

3   Q.   Now, in 1972, do you know how many Superman titles were

4   being published by DC Comics?

5   A.   I can figure it out if you give me a minute.  They were

6   publishing Superman.  They were publishing Action Comics.

7   They were publishing ad -- '72.  Superman -- Supergirl was in

8   adventure comics in '72.  Jimmie Olson was still being

9   published.  Lois Lane was still being published.  There was

10  a -- World's Finest comics was being published, and that was

11  featuring Superman every month.

12          I can't -- I can't swear that's a complete list.

13  Q.   What about Superboy?

14  A.   Superboy was being published in '72, yes.

15  Q.   How about Justice League?

16  A.   Justice League was being published in '72, yes, I

17  believe.

18  Q.   Do you know, as you sit here today, what the average

19  monthly sales combined of these Superman titles were in 1972?

20  A.   I can't give you a number.

21  Q.   How about 1971?

22  A.   I can't give you a specific number, no.

23  Q.   How about 1973?

24  A.   No.  I don't have a specific number.

25  Q.   1970?
```

1    A.    No.

2    Q.    You are aware, aren't you, that notwithstanding your

3    testimony of decline, in 1972, the Superman titles were still

4    outselling the Batman titles; is that right?

5    A.    There were a lot fewer Batman titles.

6    Q.    Were the Superman titles outselling the Batman titles?

7    A.    The seven or eight Superman titles were outselling the

8    three or so Batman titles, yes.

9    Q.    Right.  So the market was able to sustain seven or eight

10   Superman titles; correct?

11   A.    In '73, they were still publishing, yes.

12   Q.    And in 1972, the Superman titles were outselling the

13   X Men titles; isn't that correct?

14   A.    In '72, yes.  Well, X Men was in one comic, but yes.

15   Q.    And it was also outselling Ironman; is that correct?

16   A.    Could I have the whole question?

17   Q.    The Superman titles were outselling the Ironman titles?

18   A.    The Ironman was in one comic, and Superman was in

19   multiple comics.

20   Q.    What comic titles were outselling Superman in 1972?

21   A.    I believe the Richey Rich line was outselling --

22         THE COURT:  I'm sorry.  What?

23         THE WITNESS:  Richey Rich.  I believe the Archie

24   line was outselling Superman in 1972.  Casper the Friendly

25   Ghost may have been also.

```
 1   Q.   BY MR. PERKINS:  Caspar the Friendly Ghost -- was that a
 2   popular comic book character?
 3   A.   For many years it was, yes.
 4   Q.   And Mr. Toberoff didn't ask you about that.  Well, let me
 5   ask you.
 6            Do you compare that favorably in terms of sustained
 7   success to Superman?
 8   A.   I don't think it's anywhere in Superman's league.  It's
 9   had its moments of success.  It hasn't been published as a
10   comic book in a long time.
11   Q.   Now, are you familiar with the expression or the phrase
12   Q rating?
13   A.   Yes.
14   Q.   Can you explain to the Court what that is?
15   A.   Well, I know it mostly in conjunction with television
16   networks.  They will do surveys to determine the popularity of
17   characters, how familiar people are.  They also do this with
18   celebrities.  There are Q stores for various actors,
19   franchises, shows, products.  They -- it's a survey that
20   attempts to determine two things.  It determines how
21   well-known something is and how favorably disposed the general
22   public is towards it.
23   Q.   Now, in opining on the declining popularity of Superman
24   in 1972 -- in the early 1970's, did you take into
25   consideration Superman's Q rating?
```

103

1   A.   I consider Q ratings to be bogus, snake oil.

2   Q.   Is that a "no"?

3   A.   I did not take it into account, no.

4   Q.   Regardless of what you think of Q ratings, media

5   exploiters, companies that exploit characters in television

6   and motion pictures look at Q ratings, do they not?

7   A.   I guess some do.  I think most of them do not these days.

8   Q.   How about in 1972?

9   A.   I wasn't in the industry -- in the television industry in

10  '72.  So I'd have no experience for that.

11  Q.   In 1973, are you familiar with how many weekly viewers

12  were tuning in to the Super Friends animated series?

13  A.   I can't give you a number.  I know that ABC was very

14  unhappy with the show.

15  Q.   What's the basis for that statement?

16  A.   People at ABC telling me that years later.

17  Q.   But as you sit here today, you don't know what the

18  percentage share of televisions tuning in on Saturday morning

19  when Super Friends was showing, was being -- was tuned in to

20  Super Friends?

21  A.   No.  I'm assuming it was low because they canceled the

22  show.

23  Q.   When did they cancel the show?

24  A.   Well, they canceled it almost -- well, they canceled it

25  almost immediately.  They ran the entirety of the first 12

1    that were made.  Or there may have been 18 at the time.  They

2    ran it for one season, and they stopped production on it.

3    Q.    So in 1973, do you know how many homes were tuning in?

4    A.    No, I don't know the number.

5    Q.    Mr. Toberoff took you through a list of comic book

6    characters or comic book properties that he asked you to

7    compare to Superman.  And I wanted to ask you a couple

8    questions about a couple of them.

9          You testified, I believe, that Men in Black was not

10   a very popular comic book title; is that correct?

11   A.    I believe I testified that it was not well-known at that

12   time.  It was a relatively new property at the time.

13   Q.    And are you familiar with whether or not it was a

14   successful motion picture?

15   A.    I believe it was a successful motion picture.

16   Q.    And you testified that Ironman in your opinion was not

17   well-known when the Ironman motion picture came out recently;

18   is that correct?

19   A.    Could I have that one more time, please?

20   Q.    Is it your opinion that the Ironman property was not

21   well-known when the most recent motion picture came out?

22   A.    It was not that well-known compared to the other

23   properties -- some of the other properties we've been talking

24   about like Superman and Batman.

25   Q.    Are you familiar with how Ironman did at the box office?

```
 1   A.   I can't give you the numbers, but I heard it did very

 2   well.

 3   Q.   With respect to Lois and Clark, do you know how many

 4   episodes of Lois and Clark were produced?

 5   A.   There were four seasons, I believe.  So you're talking

 6   about roughly 20 episodes per season.

 7   Q.   Do you have any knowledge based on your experience as to

 8   how in 1997 television producers gauged the success of their

 9   programs?

10   A.   Yes.

11   Q.   And how did they gauge its success?

12   A.   They look at ratings and the demographics of the audience

13   and the ratings.  They look at the profitability of the show.

14   Q.   Do you know what the Lois and Clark ratings were in the

15   first season?

16   A.   No, but it was renewed.  So they can't have been too bad.

17   Q.   How about the second season?

18   A.   I don't know the specific ratings.

19   Q.   Do you know the ratings in any season of Lois and Clark?

20   A.   No, I don't.

21   Q.   So your assessment that Lois and Clark was successful was

22   based upon information that does not include the ratings;

23   correct?

24   A.   It's based on the assumption that the ratings had to be

25   good enough to get it renewed year after year.
```

1    Q.    Now, you have not, in connection with formulating

2    opinions in this case, performed any formal audience surveys

3    to determine what creates interest in a Superman motion

4    picture; correct?

5    A.    None.

6    Q.    And your opinion in this regard is based solely on your

7    anecdotal interactions with people in the comic book

8    community; isn't that right?

9    A.    Could I have the whole question again?  Let me have the

10    first part and the second part which referenced the first

11    part.

12            (Record read.)

13            THE WITNESS:  The answer to your question is I

14    formulate my opinions based on observation of the industry,

15    what they are publishing, what they publish more of.  Yes,

16    there is anecdotal information involved, but it's also reading

17    articles about the success of things.  I don't have to -- I

18    don't have to conduct a survey to know that a very successful

19    movie was very successful.

20    Q.    BY MR. PERKINS:  When you are referring to the industry,

21    you mean the comic book industry; correct?

22    A.    Not necessarily.  I'm talking about the -- depends on the

23    question.  In some questions I'm talking about the

24    entertainment industry.  When I'm talking about the success of

25    a motion picture, I'm not talking about the comic book

1    industry exclusively.

2    Q.   Well, what about with respect to your opinion as to the

3    recognition amongst the public of Superman's popularity?

4    A.   That's observation from appearances.  That's seeing how

5    the character appears in various media.  That's anecdotal as

6    well.  I think it's kind of well-known that people know who

7    Superman is.

8    Q.   Now, in your experience has popularity of a given title

9    or character in the comic book industry automatically

10   translated into popularity outside of the comic book

11   community?

12        MR. WILLIAMSON:  I'm going to object, your Honor.

13   Vague and ambiguous, time and place.

14        THE COURT:  Overruled.

15        THE WITNESS:  Could I have the question again, then.

16        (Record read.)

17        THE WITNESS:  Automatically, no.

18   Q.   BY MR. PERKINS:  Sometimes it does, and sometimes it

19   doesn't; is that right?

20   A.   Yeah, it's like, you know, you could have, say, a big

21   movie star.  People love him.  They want to see his movie.

22   That doesn't mean they will see every single movie he's in.

23   Q.   Now, you have not reviewed the terms, the financial terms

24   of any Superman motion picture agreement that's at issue in

25   this case; correct?

1  A.   That's correct.

2  Q.   So with respect to, for example, the 1974 motion picture

3  agreement between DC Comics and the Salkheim (phonetic) folks,

4  you have no idea how much value DC comic was able to obtain

5  for its license of Superman motion pictures; correct?

6  A.   That's correct.

7  Q.   And similarly, you have no idea how much the DC Comics

8  was able to obtain in value from Warner Brothers in connection

9  with the more recent motion picture agreement?

10  A.   I have not seen those contracts, correct.

11  Q.   And your opinion, therefore, as to the alleged declining

12  value of Superman in the early 1970's does not purport to

13  opine as to whether that decline in value in any way affected

14  the financial terms in the 1974 motion picture agreement;

15  correct?

16  A.   I don't believe I said anything to that effect.

17  Q.   This morning, before the lunch break, I believe you

18  testified that in your view, one of the reasons for the

19  alleged decline of the Superman franchise in comic books in

20  the early 1970's was that some of the actual issues were not

21  very good; isn't that correct?

22  A.   That's my opinion, yes.

23  Q.   And isn't it fair to say that if a bad motion picture

24  starring Superman were produced, that that also would have a

25  deleterious affect on the value of Superman?

1    A.    No, I don't think that follows logically at all.

2    Q.    Now, do you know what the grosses were --

3    A.    Excuse me.  May I amend something I just said a minute

4    ago?  Is that all right?  Am I allowed to go back?  I said

5    that I felt that the comic books were not very good.  I also

6    said that I think -- I emphasize I felt that the comic books

7    were missing the point of the character for a time there.

8    They were -- they were not being true to the soul and core of

9    the character.  And they were demeaning the character in many

10   ways.

11         THE COURT:  You've testified that there have been

12   comic books that have not done well in terms of popularity

13   that have translated well to the screen as movies.

14         THE WITNESS:  Yes, there's no automatic formula

15   here.

16         THE COURT:  And now you've just testified that a use

17   of a bad movie, but a poorly received movie does not

18   necessarily affect the followship of the comic strip?  Am I

19   understanding you correctly?

20         THE WITNESS:  I'm sorry.  If you could ask that one

21   more time.

22         THE COURT:  I guess what I'm gathering from your

23   testimony is that you are suggesting that there is not

24   necessarily a correlation between the success or popularity of

25   the comic strip and the success and popularity of the movie

1    and vice versa.

2          THE WITNESS:  No, I'm not testifying to that.  I

3    believe that if you base a movie on a very popular comic book,

4    you'll have a greater chance of success.  That doesn't mean

5    it's guaranteed to be a success.  You can take a best-selling

6    novel and turn it into an unsuccessful movie.  But to start

7    with a best-selling novel gives the motion picture a better

8    chance of success.

9          THE COURT:  And is there any formula or calculus

10   that you are aware of using empirical data that can measure

11   this, or is this kind of anyone's guess?

12          THE WITNESS:  If I could figure out a formula, I'd

13   be running a studio right now.

14          THE COURT:  Fair enough.  You and me both.

15          So I guess the bottom line is there is no such

16   formula.

17          THE WITNESS:  One of the interesting things about --

18   well, comic books and movies, is that there's a certain amount

19   of crap shoot involved in this.  You're putting out your best

20   efforts.  You put in the best elements and get the best script

21   you can.  You get the best stars you can, and you get the best

22   underlying property, and you hope to succeed with it.  And if

23   you do a bad job, people don't go see it.  I've done shows

24   that people didn't watch because we didn't do as good as

25   possible a job on it.  And I've done shows that people have

1  liked and enjoyed because somehow we locked into the right

2  elements, or somebody was skillful.

3          THE COURT:  Or you got lucky.

4          THE WITNESS:  Yeah, we got lucky.

5          THE COURT:  All right.

6  Q.   BY MR. PERKINS:  Mr. Evanier, going back to your comment

7  about some of the comic book titles in the early 70's having

8  missed the point of the character, is it your opinion that

9  Superman 4 missed the point of the character?

10 A.   I think Superman 4 was just a bad movie.  And I have to

11 honestly tell you that when it first came out, everybody told

12 me not to go see it.  I didn't watch it until a year or two

13 later.  I saw it at a screening at a convention a few years

14 later, and it's kind of let's all go laugh at that movie.

15 They all thought it was corny.  And it probably missed the

16 point of the character in the sense of being preachy and

17 making Superman kind of an unpleasant character.

18          So I guess yes, in that context it did miss the

19 point of the character.

20          MR. PERKINS:  I have nothing further, your Honor.

21          THE COURT:  Very well.

22          Redirect.

23 ///

24 ///

25                    **REDIRECT EXAMINATION**

1    BY MR. TOBEROFF:

2    Q.    You mentioned that having a famous comic book character

3    in a movie did not necessarily guarantee success in the movie.

4    Does it, in your opinion, dramatically improve your chances of

5    success?

6    A.    Certainly.

7            MR. TOBEROFF:  I have no further questions on

8    redirect.

9            MR. PERKINS:  I have just one cross on that, your

10    Honor.

11                    **RECROSS-EXAMINATION**

12    BY MR. PERKINS:

13    Q.    Mr. Evanier, in your years as a comic book expert, have

14    you ever done any formal study of what comic book characters

15    have and have not been successful in a motion picture?

16    A.    A formal study? I don't know what that means.  Can you

17    ask a more specific question?

18            Can you -- I don't know what that means exactly.  A

19    formal study?  I don't know if there have been any formal

20    studies.

21            MR. PERKINS:  I have nothing further.

22            THE COURT:  Very well.  You are excused.

23            Plaintiff's next witness.

24            MR. TOBEROFF:  Plaintiffs call Alan Horn.

25            THE CLERK:  Please come forward and stop next to the

1   court reporter.  Please raise your right hand.

2                    **ALAN FREDERIC HORN, SWORN.**

3           THE CLERK:  Please take the stand.  Please state

4   your full name for the record and spell your last name.

5           THE WITNESS:  Alan Frederic Horn, H-O-R-N.

6           THE COURT:  Counsel.

7                    **DIRECT EXAMINATION**

8   BY MR. TOBEROFF:

9   Q.   Good afternoon, Mr. Horn.  You serve as the president and

10  chief operating officer of Warner Brothers Entertainment?

11  A.   Yes.

12  Q.   And you have held that position since October of 1999

13  when you began that position?

14  A.   Yes.

15  Q.   Did you recently renew your contract with Warner

16  Brothers?

17  A.   It's not signed yet, but yes.

18  Q.   Now, you oversee all of the studio's theatrical film

19  operations?

20  A.   I do.

21  Q.   Do you oversee Warner Brothers Pictures Group, which

22  includes worldwide motion picture production, distribution,

23  and marketing?

24  A.   Yes.

25  Q.   Your oversight also includes new line cinema?

1    A.    Yes.

2    Q.    You also oversee all the studios home entertainment

3    operations?

4    A.    Yes.

5    Q.    In terms of motion pictures, you oversaw Warner Brothers'

6    successful Harry Potter films; is that correct?

7    A.    Yes.

8    Q.    And you also oversaw the 2005 Warner Brothers movie

9    Batman Begins and the 2008 movie The Dark Knight?

10    A.    Yes.

11    Q.    You also oversaw the 2006 Warner Brothers film Superman

12    Returns?

13    A.    Yes.

14    Q.    And you are hands on with respect to these movies?

15    A.    I am.

16    Q.    You are involved with the development of these movies?

17    A.    At a certain stage, yes.

18    Q.    And you are involved with the choice of talent or leading

19    talent to direct and act in such movies?

20    A.    Yes.

21    Q.    Now, when you joined Warner Brothers in 1999, one of your

22    key objectives was to reboot the Batman and Superman film

23    franchises.  Isn't that so?

24    A.    Yes.  One of them.

25    Q.    You viewed Batman and Superman as two of Warner Brothers'

115

1    key properties?

2    A.    Yes.

3    Q.    I'd like to show you what has previously been admitted as

4    Plaintiff's Exhibit 279.

5            MR. WILLIAMSON:  I've got copies.

6    Q.    BY MR. TOBEROFF:  I'd like to draw your attention to

7    Bates marked DCC 52118.

8    A.    I have it.

9    Q.    If you see the third bullet point, it says, quote, Batman

10   and Superman are the most famous and valuable superhero brands

11   in the world, unquote.

12           Do you see that, Mr. Horn?

13   A.    I do see it, yes.

14   Q.    What does Warner Brothers mean in calling Superman a

15   valuable brand?  What's meant by that?

16   A.    Well, I didn't write this and have not seen it, but

17   Superman is one of the iconic brands that belonged to DC

18   Comics along with Batman and a number of others.

19   Q.    What does it mean when you refer to a literary property

20   as brands?

21   A.    It means there's a public awareness of it.  An awareness

22   out there that means that if we were to exploit the property,

23   that there would be some understanding of it, knowledge of it,

24   perhaps anticipation of it.

25   Q.    And how does that preawareness help you when you exploit

1    a property as a film or TV show?

2    A.    Well, when we introduce a film or TV show into the

3    marketplace, we have to first get awareness that it exists in

4    the first place, and then interest in seeing it if it were to

5    be property to the screen or to television, and then, you

6    know, hopefully it would be a first choice or second choice

7    among those who would go and see such a movie or television

8    show.

9            So if a property is already known, it helps us in

10   gaining the first objective, which is awareness.

11   Q.    I'd like to turn your attention to another page in this

12   document, Bates No. DCC 52089.

13           Do you see the heading, it says classic brands,

14   Superman?

15   A.    I'm not there yet.  Yes.

16   Q.    I'm giving you a copy of the document as a whole so you

17   have it in paper form.  But then when we turn to a page, we're

18   putting it up on your screen automatically to make it easy for

19   you.

20   A.    I see.  Thank you.

21   Q.    Underneath the title Theatrical Brands, Superman, it says

22   theatrical, dash, brands.  Now, when it says

23   theatrical-brands, does this mean a brand for film

24   exploitation?

25   A.    Well, I assume so.

1          MR. PERKINS:  Your Honor, objection.  The witness's

2   answer indicates that he may not have read this document.  And

3   that should be established.

4          THE WITNESS:  I have never seen this document.

5          THE COURT:  Let's lay a foundation.

6   Q.   BY MR. TOBEROFF:  The foundation is that --

7          THE COURT:  Not with me, with the witness.

8   Q.   BY MR. TOBEROFF:  Excuse me.  I thought you asked me what

9   the foundation was.

10         THE COURT:  Right.

11  Q.   BY MR. TOBEROFF:  This is a Warner Brothers document.

12  Correct?

13  A.   Well, it has the Warner Brothers logo on it.  I have

14  never seen it.

15  Q.   Do you have any reason do believe that it is not a Warner

16  Brothers document?

17  A.   No.

18  Q.   Do you have any reason to believe that this document was

19  not prepared by Warner Brothers employees?

20  A.   No.

21  Q.   Looking at this document, you might at this point want to

22  look at the document as a whole.  What division of Warner

23  Brothers do you believe prepared this document?

24  A.   I don't know.  It could be prepared by someone in the

25  theatrical group.  It could be prepared by someone at -- in

```
 1   our public relations group or communications group.  Corporate

 2   communications.

 3   Q.   The chances are either the theatrical film department or

 4   the promotions department?

 5             MR. BERGMAN:  Objection.  Leading.

 6             THE COURT:  I wouldn't describe this exactly as a

 7   friendly witness, Counsel.  Overruled.  No offense.  But from

 8   a legal perspective.

 9             THE WITNESS:  May I have some water, please?

10             THE COURT:  Of course.

11   Q.   BY MR. TOBEROFF:  So my question is that this would

12   likely either have been prepared by, based on your testimony,

13   the theatrical film department or a marketing arm of Warner

14   Brothers?

15   A.   Or the corporate communications group.

16   Q.   Thank you.  I'd like to show you what has been previously

17   admitted as Exhibit 293.  It's a document entitled Warner

18   Brothers Superman Cross-Divisional Meeting, September 19,

19   2005.  What would be meant by the title Warner Brothers

20   Superman Cross-Divisional Meeting?

21             MR. BERGMAN:  Objection.  Foundation.

22             THE COURT:  Sustained.  Let's make sure the witness

23   is familiar with the document that you're showing him.

24   Q.   BY MR. TOBEROFF:  Are you familiar with the document that

25   I'm showing you?
```

```
 1   A.   No, I'm not.

 2          MR. TOBEROFF:  Your Honor, I'd like to ask the

 3   witness questions about information contained in this document

 4   as the head of the studio.  He may not see every document at

 5   the studio, but it's a Warner Brothers document produced by

 6   defendants in this case.

 7          THE COURT:  You can ask him about the document.  But

 8   in terms of the meaning of it, if he doesn't have a

 9   foundation, he doesn't know.

10          MR. TOBEROFF:  I'm not asking what was intended by

11   the author of the document as opposed to what these various

12   statements mean in terms of Warner Brothers's business.

13          THE COURT:  That, you have to have a foundation for,

14   Counsel.  You can ask him if these statements are true, if he

15   would adopt them as his own.  You can use anything to do that.

16   But without a foundation, without establishing that he

17   understands what this document is, even, I can't have you

18   question him on the document itself.

19          If you want to use it as a guide to go through and

20   ask him some other questions, that's fine.

21          MR. BERGMAN:  Also, if your Honor please, the

22   document is dated September 2005.  Which is three years after

23   the agreement.

24          THE COURT:  I'm mindful of that as well.  Although

25   that would go to the weight of the evidence of whether it's
```

1    still a true statement, et cetera.

2            Go ahead, Counsel.

3    Q.   BY MR. TOBEROFF:  Now, I'd like you to turn to the page

4    Bates No. DCC 52118, entitled DC Comics History and Worldwide

5    Reach.

6            THE COURT:  Counsel, this must be a new document

7    that you're looking at.  This document only goes up to 51711.

8            MR. TOBEROFF:  Pardon me.  Page 2 of the document,

9    Bates No. DCC 51692.

10            THE WITNESS:  Okay.

11            THE COURT:  And just for the record, we're referring

12    to Exhibit 293 here; is that correct?

13    Q.   BY MR. TOBEROFF:  It states --

14            THE COURT:  Counsel, is that correct?  293?

15            MR. TOBEROFF:  Yes.

16    Q.   DCC 51692 contains a statement:  "Superman has been and

17    continues to be a staple for many businesses across the

18    studio."

19            As of 2005, would you agree with this statement?

20    A.   No.

21    Q.   So in 2005, when this was written by Warner Brothers, it

22    was incorrect?

23    A.   I'm just saying I wouldn't agree with it.  I don't know

24    who wrote it, and I have never seen this.

25    Q.   Okay.  Now, if you'd turn to the next page, which we'll

```
 1    bring to your attention on the screen.  It's DCC 51693.  It

 2    states at the top of the page:  "With the release of the new

 3    film next year, Superman is poised to become the broadest

 4    reaching tent-pole property for the company, its partners, and

 5    consumers."

 6              Do you see that?

 7    A.    I do.

 8    Q.    What is meant by a tent-pole property?

 9    A.    A tent-pole property is one that is -- it's one of four

10    or five a year that the studio hopes will be large enough and

11    significant enough and profitable enough that it will be a,

12    you know, of very, very significant importance to the company.

13    It usually refers to a film.  A tent-pole film.  And that's a

14    film that would resonate globally and would be what we call a

15    four quadrant film, which would be young, old, male, and

16    female so that it would resonate across different quadrants

17    and appeal to an audience on a worldwide basis.

18    Q.    And an anticipated film in 2005 was Superman Returns?

19    A.    Yes.

20    Q.    And the tent-pole property was Superman?

21    A.    Yes.

22    Q.    And why, again, do they call it a tent-pole picture?

23    A.    Well, again, this was written before the picture was

24    released, but the anticipation evidently, and I've never seen

25    this, was that Superman would qualify as a tent-pole property,
```

122

1    which would mean it would have -- it would command a global

2    audience and appeal to a very, very broad and diverse

3    audience, including, as we say, young, old, male, and female.

4    Q.    You are familiar with the trade paper Variety?

5    A.    Yes.

6    Q.    And you've been interviewed by Variety's long time but

7    now former editor, Peter Bart?

8    A.    From time to time, yes.

9    Q.    Why are you referred to as the Titan of Tent Poles by

10    Mr. Bart?

11             MR. BERGMAN:  Objection.  Hearsay.

12             THE COURT:  I don't know if it's going to the truth

13    of the matter asserted, but we'll see.

14             THE WITNESS:  Well, Peter, who I think was trying to

15    be amusing and alliterative at the same time, called me that

16    because when I came to Warner Brothers in 1999, the company

17    had not done many tent-pole movies as I've just loosely sort

18    of defined them.  So in 2000, for example, we had one

19    tent-pole movie, The Perfect Storm.  And in 2001 we had two,

20    Harry Potter and Skooby Doo.  In 2003, we had three.  Matrix,

21    Terminator, Matrix.

22             So I've been trying for my part of it to build the

23    studio to a place where we would have four or five such movies

24    a year.

25    Q.    BY MR. TOBEROFF:  It's your objective, when you joined

1  the studio, to focus more on tent-pole pictures; correct?

2  A.    No, my intention was to come up with a balanced release

3  slate that would include four or five tent poles a year.  We

4  have 27 releases this year, for example.  So we have a lot of

5  movies.  But I wanted to, if I could, provide for a slate that

6  would include four -- three, four, five a year of tent poles.

7  Q.    Is Warner Brothers making fewer and bigger movies?  Would

8  that be a fair characterization?

9  A.    No, sir.  As I said, we have 27 releases this year.  So I

10  wouldn't say -- there has been an objective to make fewer

11  movies and perhaps bigger movies.  It does feel like that's a

12  direction in which to go, given the competitive environment.

13  But when New Line was merged into Warner Brothers, we found

14  ourselves with another sort of mini studio merged into us.  So

15  we found that it's a little hard to get below roundly 25 a

16  year.

17  Q.    And you had an independent film division, I believe it's

18  called Warner Independent?

19  A.    Warner Independent Pictures, yes, sir.

20  Q.    And that was recently closed?

21  A.    Yes.

22  Q.    And you had another independent film company?

23  A.    Picture House.

24  Q.    Picture House Entertainment?  Was that closed also?

25  A.    Yes.

1    Q.    When was Warner Independent and Picture House closed?

2    A.    In early 2008, I believe.

3    Q.    And was that part of a strategy to make fewer and bigger

4    pictures?

5    A.    Not really.  If those pictures had been incrementally

6    profitable to our overall objectives or our overall movie

7    slate, we would not have closed them down.  But we found that

8    the business of being an independent film, that is, small

9    film, pictures with budgets of 10 million or less, let's say,

10   was proving to be not profitable for us.  We just couldn't

11   justify it.

12   Q.    Now, prior to its -- the release of Superman Returns in

13   2006, going in, you viewed Superman Returns as a major

14   tent-pole picture; is that correct?

15   A.    I had hoped it would be, yes.

16   Q.    And you had authority -- you have authority to green

17   light Warner Brothers' tent-pole pictures?

18   A.    I do.

19   Q.    And to green light a picture, means to decide to actually

20   make the movie?

21   A.    It does.

22   Q.    And you decided to make Superman Returns for a 2006

23   release?

24   A.    Yes.

25   Q.    What was the approximate budget of Superman Returns when

1    you green lit the picture?

2    A.    Approximately $200 million.

3    Q.    Are you aware that defendants hired a financial expert in

4    this case by the name of Franklin Johnson?

5    A.    No.

6    Q.    Are you aware that Mr. Johnson served a rebuttal report

7    in which he concluded, based on your financials, that the

8    budget of the actual amount of money invested in the Superman

9    Returns negative was $225 million?

10    A.    No.

11    Q.    Do you have any reason to believe that that -- your

12    expert's finding is incorrect?

13    A.    I don't recall the exact number, but my recollection is

14    it was roundly $200 million.

15    Q.    And what was the approximate expenditure on prints and

16    advertising in connection with Superman Returns?

17    A.    I don't recall the exact number, but my guess, given

18    the -- given the magnitude of the negative cost, would be

19    roundly a hundred million to 110- worldwide.

20    Q.    Again, Mr. Johnson pegged the total print and advertising

21    cost of the figure at 147 million.  Do you have any reason to

22    believe that that -- his assessment is incorrect?

23    A.    It sounds a little high to me, but it's possible.

24    Q.    For a tent-pole picture, what is the average budget?

25    A.    I would say $150 million or more.

1    Q.    And what would be an average print and advertising

2    expenditure for such a picture?

3    A.    Roundly a hundred million dollars.

4    Q.    Now, you oversaw the development of a new Superman movie

5    from 1999, when you joined Warner Brothers, to 2006, when

6    Superman Returns was released; is that correct?

7    A.    There were a number of drafts of -- a number of

8    approaches to reintroducing the Superman character.  I oversaw

9    them, yes.

10    Q.    And you oversaw them during the period you arrived at the

11    studio to the release of Superman Returns?

12    A.    Yes.

13    Q.    In green lighting Superman Returns and spending the money

14    that was spent on both development, production, and in

15    marketing, you viewed Superman as a prime candidate for a new

16    film franchise; is that correct?

17    A.    So I had hoped, yes.

18    Q.    In fact, Superman is what you would call a -- Superman

19    Returns going in was what you would call a big franchise event

20    movie; is that correct?

21    A.    I would call it a tent-pole movie.

22    Q.    What is meant by franchise event movie?

23    A.    Well, an event movie and a tent-pole movie in my view are

24    synonymous.  A franchise movie would be one that would be

25    potentially sequelable.  For example, Troy was a tent-pole

1  movie, but we don't see it as being -- as having sequel

2  potential.  But The Dark Knight and Batman, you know, Batman

3  Begins are part of a franchise that may be replicated or have

4  different incarnations of them.

5  Q.    So a tent-pole movie -- tent-pole movies are often

6  franchises, but not necessarily?

7  A.    Yes.

8  Q.    And a franchise is a movie that can also hopefully be

9  exploited by Warner Brothers on multiple additional platforms

10  by its various other divisions, including new media,

11  merchandising, and other forms of exploitation in addition to

12  the film itself?

13  A.    Along with other tent poles, yes.

14  Q.    Now, comic book franchises like Batman and Superman

15  already enjoy significant brand awareness?

16  A.    Yes.

17  Q.    1978 to 1986, four Superman films were released; correct?

18  A.    I know there were four prior to Superman Returns, yes.

19  Q.    And the first Superman movie, starring Dick Donner --

20  excuse me.  Directed by Dick Donner and starring Christopher

21  Reeves is considered a huge hit; correct?

22  A.    I wasn't at the studio then.  I don't -- I don't recall

23  the numbers.  It was certainly -- it's certainly thought to be

24  a successful movie, sure.

25  Q.    And before you invested the money in Superman Returns,

1    did you look at the success of the prior Superman movies?

2    A.   I looked at the last one, Superman 4, and was frankly

3    daunted by the fact that it had done something like

4    $15 million in the entire U.S. and Canadian box office, and I

5    thought that was frightening.

6    Q.   And Superman 4 is widely considered one of the worst

7    movies ever made; correct?

8    A.   Well, again, you have to ask people, but I know that the

9    box office results were a little scary for me.

10   Q.   Did you see the movie?

11   A.   Yes, I did.

12   Q.   What's your opinion about the caliber of that movie?

13   A.   It's been a while since I've seen it.  I think it was

14   over 20 years ago.  But I don't recall thinking it was going

15   to make the time capsule or anything.

16   Q.   And based on your review, green lighting Superman

17   Returns, your understanding was that Superman 1 was extremely

18   successful.  Superman 2 was also successful but a little less

19   than the first Superman movie.  And that Superman 3 was less

20   successful than Superman 2; is that correct?

21   A.   I think that's a fair relative ranking of the movies.  I

22   just felt that the franchise had gone downhill, and I thought

23   that it was a little scary.

24   Q.   Between 1989 and 1997, Warner released four Batman films;

25   is that correct?

1  A.  Well, now, I'm not sure.  But if that's the fact, it's

2  the fact.  I don't recall.  I know there were a number of

3  Batman films, yes.

4  Q.  But you are aware that the first Batman movie in 1989 was

5  extremely successful.

6  A.  I'd have to see the numbers, but I don't have any reason

7  to doubt that.

8  Q.  And that the second two Batman films after that were less

9  successful than the first but also profitable?

10  A.  I don't recall the Batman movies as well in terms of

11  their relative ranking, and I can't address their

12  profitability because I don't know.  I wasn't there and didn't

13  know the cost structure at all.  I don't know what they cost

14  or any of that.

15  Q.  And what was the fourth Batman movie in that franchise in

16  the late 80's?

17  A.  I don't recall.  But I know there was -- there was a

18  Batman movie also, and I will say that in green lighting a new

19  Batman movie and a new Superman movie, I had similar concerns

20  with each, that the franchises had been played out, and I

21  considered each to be challenging for that reason.

22  Q.  And to refresh your -- in an attempt to refresh your

23  memory, the title of the fourth Batman movie was Batman and

24  Robin, which was released in 1997?

25  A.  Was that the George Clooney one?

130

1   Q.   Yes.

2   A.   Yes.

3   Q.   Now, the George Clooney one was also widely considered a

4   flop like the fourth Superman movie; is that correct?

5   A.   Well, I was just trying to identify it.  I know that the

6   results for the last Batman or two were like Superman,

7   disappointing, but I was not at the studio.  I haven't seen

8   the numbers or any of that.

9   Q.   Are you aware that Batman and Robin was panned by the

10  critics?

11  A.   I don't recall.

12  Q.   Are you aware that it was financially unsuccessful?

13  A.   I have not seen the numbers.  It would not surprise me.

14  Q.   Now, Sony released a picture called Men in Black in 1997.

15  Are you familiar with that picture?

16  A.   I saw that move.

17  Q.   And you are aware that was based on the comic book;

18  correct?

19  A.   I'm not even aware of that.  I'm sorry.

20  Q.   You are aware that it was a very big hit; is that

21  correct?

22  A.   Yes.

23  Q.   And then in 2000, Fox released X Men, and that's also --

24  you're aware that's based on a comic book?

25  A.   Yes.

1   Q.    And that was extremely successful as well?

2   A.    Yes.  I can't address profitability, but I think it

3   justified sequels.  They have one coming out this Friday.

4   Q.    And in May of 2002, Sony released Spiderman, and that was

5   a huge hit; correct?

6   A.    Yes.

7   Q.    Now, do studios track each other's development of films?

8   A.    Yes.

9   Q.    So at what point was Warner Brothers aware that Sony was

10  developing a Spiderman movie to be released in 2002?

11  A.    I can't address when Warner Brothers became aware of it.

12  I wasn't aware of it until it appeared on -- maybe it was

13  brought up at a development meeting or something, but I really

14  became aware, I'm sorry to say, when I saw it on a release

15  schedule.  I'm -- we sort of operate, you know, independently.

16  Sony's decision would not really influence -- would not have

17  influenced our decision about whether or not to make any

18  movie.

19  Q.    And when you said you saw it on a release schedule, how

20  much in advance -- how long in advance of the film's release

21  does a release schedule come out?

22  A.    It depends.  With a tent-pole movie, a studio might try

23  to stake out the date and announce in advance that they were

24  going to take, you know, July of 2011, for example, and

25  hopefully, because it would be the kind of movie that would

1   have a broad and diverse appeal and global appeal, that it

2   might scare away the other studios from trying to have another

3   tent-pole or one of their tent poles on the same date.

4           So I'm sorry to not answer this directly.  So it

5   could be as brief a period of time as six months or as long a

6   period of time as two years.

7   Q.   You track these release schedules so you can better

8   decide when to release competitive movies?

9   A.   People who report to the person who now reports to me do

10  that.  They have what they call daily meetings, and I attend

11  many of them.  They go through competitive release schedules

12  and try to figure out a way to put a movie out on a date where

13  there's either the, you know, the least competition possible

14  or counter programming, a movie that might appeal to an older

15  female audience as opposed to one that might appeal to a young

16  male audience.

17  Q.   So we have Men in Black coming out in '97 and then

18  there's another one I didn't mention, Blade came out in -- it

19  was a new line film, which was part of the Time Warner Company

20  at the time and now absorbed in Warner, released Blade

21  successfully and X Men in 2000 and Spiderman in 2002.

22          Why do you think the studios were so keen on comic

23  book characters at the time?

24          MR. BERGMAN:  Objection.  Calls for speculation,

25  your Honor.

```
 1            THE COURT:  Let's lay a foundation.
 2   Q.    BY MR. TOBEROFF:  Well, when you develop movies, you are
 3   developing movies to appeal to the public; correct?
 4   A.    Yes.
 5   Q.    And you do certain demographic studies as to what people
 6   are interested in?
 7   A.    Yes.  Sometimes.
 8   Q.    And you formulate strategies for developing what you
 9   believe will be successful movies at one particular time as
10   compared to another particular time?
11   A.    That's fair.
12   Q.    So given that, why do you think the studios at this
13   period were so keen, including Warner Brothers, on developing
14   movies based on comic books?
15   A.    Well, I can only speak for Warner Brothers.  And I will
16   say that we are keen to develop tent-pole movies in the number
17   that I have already mentioned, four or five a year.
18            By the way, the reason it's not more than five a
19   year is that it's not like you can just do ten.  It's because
20   to spend that kind of money on a negative cost and on the
21   releasing cost, it's helpful to have an audience available to
22   see them.  And the time to do that is usually May, June, July,
23   November, and Christmas.
24            So it's hard to find a time when there's a big
25   enough audience available to go and see any movie.  But
```

1   speaking for ourselves, we, in the quest to find tent-pole

2   movies as I've defined them, we look at all resources,

3   including properties that have potential for a tent-pole

4   acceptance.

5          For example, we're developing a Tarzan movie now,

6   which would satisfy the criteria we've been discussing, and

7   likewise, a comic book character that has a built-in

8   awareness, like Batman carries with it an appeal because that

9   initial threshold of getting an audience to even be aware that

10   it exists would be largely satisfied.

11          So comic books are one of those things.  I mean,

12   Harry Potter has nothing to do with a comic book, but it was

13   widely known and qualified as a property that contained

14   built-in awareness because the books had exploded in the

15   public consciousness.

16          THE COURT:  What did you mean by negative costs?

17          THE WITNESS:  I'm sorry?

18          THE COURT:  Did you say "negative costs"?

19          THE WITNESS:  Negative costs is the cost of making

20   the movie.  And releasing costs is the print and advertising

21   costs associated with that.

22          THE COURT:  Very good.  Counsel.

23   Q.   BY MR. TOBEROFF:  Do you believe that starting in the mid

24   to late 90's and moving into 2000, 2001, there was an increase

25   in focus on producing and releasing what you would call

135

1    franchise films?

2    A.    I don't know from my memory what the other studios

3    strategies or philosophies have been.  But I think it's fair

4    to say that with the emergence of the international component

5    of the marketplace as being more important with the -- the

6    emerging of it as being more important, and with the number of

7    movies made and released each year, having a movie that

8    strongly resonates in the marketplace, like one of these

9    tent-pole movies, is a desirable objective if it works.

10           I mean, you could also do Speed Racer, which we

11   thought would be one of those and lost a fortune.

12   Q.    And again, to focus on franchise films, why during this

13   period were studios focusing more on franchise films or

14   franchisable properties?  Was it because of the preawareness

15   in the foreign market?

16   A.    I wouldn't say because of preawareness in the foreign

17   market.  I would just say that the foreign market is a

18   component of the potential audience that became increasingly

19   important as time went on.  I mean, it just -- we're looking

20   to do as well as we can.  And again, I can't speak for other

21   studios.  I can only speak for ourselves.

22   Q.    When I'm asking about other studios, I'm asking about

23   your perception as to other studios, not the fact of what's

24   going on --

25   A.    My perception is that every studio has recognized the

136

1    importance of so-called tent-pole properties and as part of a

2    release schedule.  As I say, we're talking about four or so a

3    year.

4    Q.   And as part of this focus is a -- there is a focus on

5    properties as source material for tent-pole firms that have

6    built in preawareness; is that correct?

7    A.   It's helpful to have that, yes.

8    Q.   Are you familiar with the term promotional tie-in?

9    A.   Yes.

10   Q.   What does that term mean?

11   A.   Well, it means that in connection with the release of a

12   motion picture, we can have different kinds of promotional

13   tie-ins.  Perhaps an advertiser like -- I'll use an example.

14        For example, Coca-Cola might say look, we'll do a

15   promotional tie-in and do ads that will promote your movie and

16   at the same time sell our Coca-Cola.  This was a big thing

17   with Cadillac in the Matrix.  The Matrix movies used Cadillac

18   as a vehicle.  And most of the vehicles were Cadillacs and/or

19   General Motors cars, and then General Motors would do a

20   promotional tie-in with that to have an advertisement, a

21   30-second spot or something.  They said if you -- we'll give

22   you some free cars, and we'll do some spots that will

23   advertise your movie, and at the same time showcase our car.

24        So that's what I think of as a promotional tie-in.

25   And sometimes there will be a product placement where -- on

137

1    Speed Racer, for example, we had hoped this would be the case.

2    It wasn't as big as we'd like, but there were manufacturers,

3    Mattel would make cars, and they would say okay, maybe we can

4    sell some of these cool-looking cars which will be showcased

5    in your movie.

6    Q.    Now, on Superman Returns, Warner Brothers arranged for

7    numerous promotional tie-ins; is that correct?

8    A.    I know we had promotional tie-ins.  I don't know how

9    many.

10   Q.    Who were Warner Brothers' major promotional partners for

11   Superman Returns?

12   A.    Who what?

13   Q.    Who were the major promotional partners of Warner's

14   Superman Returns --

15   A.    I'm sorry.  I don't recall.

16          THE COURT:  Counsel, why don't we go ahead and take

17   our afternoon break here.  About 10 minutes.

18          (Recess taken.)

19          THE COURT:  Counsel.

20   Q.    BY MR. TOBEROFF:  Mr. Horn, I'd like to show you what has

21   previously been admitted as Plaintiff's Exhibit 233.  It's a

22   document entitled Superman Property Overview, dated April 7,

23   2007.  I draw your attention to the first page, which is on

24   the screen, DCC 121077, and to the section entitled Theatrical

25   Promotions, Domestic and International.

138

```
 1            Do you see that?

 2   A.    I do.

 3   Q.    And underneath it says national promotions.

 4   A.    Yes.

 5   Q.    And then underneath that it says confirmed partners.

 6   These would appear from a document to be Warner's confirmed

 7   promotional partners in Superman Returns; correct?

 8   A.    Yes, they seem to be, yes.  Uh-huh.

 9   Q.    Now, on this page, it lists Pepsi, Quaker, and Frito-Lay

10   as Warner Brothers' promotional partners on Superman Returns.

11   A.    Yes.

12   Q.    We turn to the next page, DCC 001210778, it lists Burger

13   King, Samsung, Duracell, Quaker State, Perfectmatch.com,

14   People Magazine, and Pepsico.

15            Do you see that?

16   A.    Yes.

17   Q.    And then if we go to the next page, DCC 00121079,

18   Wal-Mart, Albertsons, Kroger, and Heb are all listed as

19   domestic promotional partners in Superman?

20   A.    Yes.

21   Q.    I'd like to draw your attention to the heading on the

22   bottom of this page that says international promotions.

23            Do you see that?

24   A.    Yes.

25   Q.    Now, these would appear to be Warner Brothers'
```

1    international promotional partners on Superman Returns?

2    A.    Yes.

3    Q.    These pages, as we go through them, list such major

4    partners as Pepsi, Frito-Lay, Kellogg's, Burger King, KFC,

5    Engergizer, Hershey's, Coca-Cola, Woolworths, Proctor and

6    Gamble, Colgate Palmolive, FedEx, L'Oreal, Matsushita, and a

7    number of other foreign entities.

8              Do you see that?

9    A.    Yes, I do.

10   Q.    Does that refresh your recollection -- unfortunately, my

11   question came right before the break, but I'd asked you who

12   were Warner's promotional partners on Superman Returns.  Does

13   this refresh your recollection as to Warner's promotional

14   partners --

15   A.    Yes, it's helpful, sure.

16   Q.    Warner Brothers is reported in fact to have secured over

17   $280 million in promotional tie-ins for Superman Returns.

18              Does that figure sound correct to you?

19   A.    Well, I don't know if that figure is correct or not.  I'm

20   also not sure what it means.  They value these things

21   sometimes oddly.  So I don't know what that means, but it

22   doesn't sound long.  I don't know.

23   Q.    How do they value promotional tie-ins when they put a

24   dollar figure on --

25   A.    Well, my understanding is that they will say well, we

140

1   have a billboard up, or we have an image on a package, and we

2   have -- there's so much foot traffic in a store, this is how

3   many people see that.  And therefore, that translates to an

4   advertisement that you'd have to buy that would get you the

5   same kind of exposure.  I mean, it's that kind of thing.

6   There are people at the company that really understand this

7   better than I, I'm sorry to say.

8   Q.   I see.  Now, switching to a different subject.  You green

9   lit Warner Brothers film Batman Begins in 2005?

10  A.   Yes.

11  Q.   And in green lighting this film, you viewed the Batman

12  character as a prime candidate for a multiple film franchise;

13  right?

14  A.   Hopefully, yes.

15  Q.   And Batman Begins was quite successful?

16  A.   It was moderately successful.

17  Q.   And it served to revive the Batman film franchise?

18  A.   Yes, it did.

19  Q.   Now, to your credit, you also green lit the Batman movie

20  The Dark Knight released in 2008; correct?

21  A.   Yes.

22  Q.   And that was phenomenally successful?

23  A.   Yes.

24  Q.   And the defendants are hoping to do another Batman movie?

25  A.   We'd like to, yes.

```
 1   Q.   Now, Superman Returns, looking at what they call the
 2   distributor's gross, the gross revenues received by Warner
 3   Brothers, grossed a bit more money at the worldwide box office
 4   than Batman Begins; is that correct?
 5   A.   My recollection is that they were about the same, but it
 6   may have grossed a bit more.  They were both under 400 million
 7   worldwide box office, I think.
 8             MR. TOBEROFF:  I'd like to mark for identification
 9   as Plaintiff's Exhibit 333, marking this for identification
10   purposes only, pages from the website Box Office Mojo that
11   tracks the performance at the box office of films.
12   Q.   Are you familiar with the website Box Office Mojo?
13   A.   No.
14             MR. BERGMAN:  Objection, your Honor.  This was not
15   on the witness list -- on the exhibit list, rather.
16             THE COURT:  Counsel?
17             MR. TOBEROFF:  Refreshing recollection, your Honor.
18             THE COURT:  Well, let's establish that he's
19   forgotten something first.
20             MR. TOBEROFF:  Well, he had a --
21             THE COURT:  Lay a foundation, Counsel.  Establish
22   that he's forgotten something.
23   Q.   BY MR. TOBEROFF:  Do you know what the box office return
24   was for Superman Returns, the worldwide box office?
25   A.   I don't know exactly.  My recollection is that it was
```

1  something in the neighborhood -- a little under $400 million

2  worldwide box, I think.  I think that's roundly correct.

3          MR. TOBEROFF:  This has an exact figure.

4          THE COURT:  It may or may not, Counsel.  But you'd

5  have to lay a foundation that this document would help refresh

6  his recollection of exactly what it is.  That's up to you, not

7  me.

8  Q.  BY MR. TOBEROFF:  If I showed you the Box Office Mojo

9  figure for Superman Returns, both the domestic and abroad,

10 would that serve to refresh your recollection as to what the

11 figure is?

12 A.  I don't know what Box Office Mojo is, but my source is

13 usually Variety.  But I have no reason to doubt you, Counsel.

14 I'm just -- unless -- if Mojo is accurate, and it's a truthful

15 depiction of what the box office was, it sort of was what it

16 was.

17 Q.  Well, Box Office Mojo reports that for the film Superman

18 Returns, it did $200 million at the domestic box office and

19 $391 million worldwide.

20 A.  That sounds about like my recollection, yes, sir.

21 Q.  And Box Office Mojo also reports that for the film Batman

22 Begins, that film generated 205 million domestically and 167

23 million worldwide -- excuse me.  167 foreign for a total of

24 372 million.

25 A.  That also sounds correct, yes.

1    Q.    So Box Office Mojo did a total for Superman Returns,

2    391-, and for Batman Begins was approximately 20 million less.

3    A.    Okay.

4              THE COURT:  Counsel, I'm confused.  In your

5    statement there you referred to worldwide the first time 391-.

6    Is that including domestic?

7              MR. TOBEROFF:  Yes.

8              THE COURT:  Okay.  So you didn't specify out what

9    the foreign was for Superman Returns.

10             MR. TOBEROFF:  Yes, in my notes I hadn't broken it

11    down.

12             THE COURT:  So 391- total for Superman Returns

13    and --

14             MR. TOBEROFF:  Versus Batman Begins would be 372

15    million worldwide.

16             THE COURT:  You believe that's accurate?

17             THE WITNESS:  Yes, sir.

18    Q.    BY MR. TOBEROFF:  I'd like to talk to you about Warner's

19    attempts to develop a new Superman movie prior to the release

20    of Superman Returns in 2006.

21             Warner Brothers began developing a Superman film

22    called Superman lives commencing in approximately 1994.  Does

23    that comport with your understanding?

24             MR. BERGMAN:  Objection, your Honor.  Lack of

25    foundation.

144

```
 1           THE COURT:  Sustained.
 2   Q.   BY MR. TOBEROFF:  In working on Superman Returns starting
 3   in 1999, when you came to Warner Brothers, did you familiarize
 4   yourself with past attempts to develop the Superman film?
 5   A.   Yes.  I was given different drafts of screenplays that
 6   tried to reintroduce the character, yes.
 7   Q.   Now, do you recall when approximately the development
 8   from the dates of those screenplays started at Warner
 9   Brothers?
10   A.   I have no idea.  Sorry.
11   Q.   Do you have the ability to approximate whether it was a
12   year before you arrived in 1999 or a few years before?
13   A.   I don't know.
14   Q.   Now, from the time Warners started developing a new
15   Superman movie to the production of Superman Returns, I'd like
16   you to confirm that Warner Brothers hired the following top
17   directors.
18           Tim Burton.
19   A.   Well, I don't believe Tim Burton was hired subsequent to
20   my joining Warner Brothers, no.  And when you say hired, you
21   don't mean committed to.  I think you mean entered into a
22   development deal with.  They are different because you can
23   attach a director to a project, pay a nominal fee, which, for
24   example, $25,000, and have the director develop the piece.  As
25   opposed to committing to that director with a real belief that
```

145

1    that screenplay is going to be made, which means you might

2    lock up that director, and that might mean a bigger

3    commitment.

4            So I'm not aware of -- I'm not aware of any

5    commitment to Tim Burton on Superman.

6    Q.    When you lock up a director, is that what's called a pay

7    or play deal?

8    A.    Ultimately, yes.

9    Q.    And how does a pay or play deal work?

10   A.    It means we say to the director we are so sure we're

11   going to make this that we want you to reserve this time in

12   your life to make this movie, and in return for that, we'll

13   guarantee you that whether, even if we don't make the movie,

14   we'll pay you your fee, which means pay or play.

15   Q.    And is that the full fee that the director would receive?

16   A.    Well, the director's fee can include two components.  A

17   fee for making it as against a percentage of the gross

18   receipts.  It would not include gross receipts should the

19   movie be subsequently made by another director or something

20   like that.  But it would include that director's fee.  But the

21   cash up front fee.  But these are negotiable things.

22           So they say may still pay you half of your fee or

23   something like that.

24   Q.    And for a top director, how high can that percentage of

25   gross be?

1   A.   The percentage of the gross?  Well, Spielberg gets 20

2   percent of the gross.  But an established first rate director,

3   especially in this economic climate, might get 5 percent of

4   the gross.  So I would say 5 to -- Peter Jackson's quote is 20

5   percent, for example.  We don't normally pay that kind of

6   money.

7   Q.   Peter Jackson's quote is 20 percent of gross?

8   A.   That's what we hear.

9   Q.   And before this economic climate hit earlier on in 2000,

10  2002, at that time period, what would a top director receive?

11  A.   The same numbers I've quoted, but Warner Brothers, I

12  can't remember paying a director more than 10 percent of the

13  gross, if that's helpful.

14  Q.   Okay.  So going back to my list, I used the word hired.

15  When I go through these list of directors, I'll replace my

16  word hired with attached.  And I'd like you to tell me whether

17  they were attached in the more casual sense that you mentioned

18  or put on a pay or play basis.

19            Tim Burton.

20  A.   Not to my knowledge.

21  Q.   Was he attached?

22  A.   I understand what you're saying, Counselor.  Not to my

23  knowledge.

24  Q.   Brent Ratner.

25  A.   Yes.

147

1  Q.   Pay or play?

2  A.   No.

3  Q.   J.J. Abrams?

4  A.   I don't think so.

5  Q.   He was attached, but not pay or play?

6  A.   No, no, I understand.  I don't think he was either

7  attached or pay or play.  In the sense that I don't believe

8  anyone paid J.J. to enter into any any development work on

9  Superman.  But I may be wrong because we have other levels at

10  the company that normally do this kind of stuff.  And I would

11  get more involved when it comes to the bigger commitment,

12  which is when we want to lock in this person or we'd like you

13  to green light the movie or this is who we'd like to play

14  Superman.  You know, I would --

15  Q.   I understand.  McG?

16  A.   Yes.

17  Q.   And was he pay or play on the film?

18  A.   No.  But he was -- well, he may have been pay or play,

19  but he himself withdrew, which obviated our need to pay him.

20  He was unable to continue.

21  Q.   So the circumstances of his withdrawal did not trigger

22  the pay or play provision?

23  A.   No.

24  Q.   Brian Singer?

25  A.   Yes.

148

1    Q.    And he was made pay or play as well?

2    A.    Yes.

3    Q.    And at one point the actor Nicholas Cage was attached to

4    star in Superman; is that correct?

5    A.    Not under my regime, but -- I'm sorry I said regime.  In

6    my tenure.  But I know that Nick was attached to play Superman

7    and very much wanted to.

8    Q.    Was he attached on a pay or play basis?

9    A.    I think he was prior to my coming to Warner Brothers,

10   yes.

11   Q.    Do you have an awareness of how much money was spent on

12   developing Superman Returns prior to the start of principal

13   photography?

14   A.    I don't know the exact number, but I know it was a lot of

15   money, more than $10 million.  More than $15 million.  But

16   not -- I think that's the ballpark.

17   Q.    Does $30,000 sound correct to you based on your

18   knowledge?

19   A.    I can't confirm that.

20   Q.    During the same period when you were continuing to

21   develop a new Superman film, Warner Brothers was also

22   developing a Superman versus Batman film; is that correct?

23   A.    That is correct.

24   Q.    How many different Superman films were being developed at

25   the same time?

149

```
 1   A.   The way it works is we have a president of production
 2   who is responsible for development, and that person reports to
 3   the president of the motion picture group, who then -- I don't
 4   even like the word reports, but he hierarchly reports to me.
 5        So they could have a number of screenplays in
 6   development on Superman that I would not even be aware of.
 7   But I know -- I don't wish to be unhelpful.  I just say that I
 8   know that there's a Batman versus Superman screenplay being
 9   developed and a Superman lives screenplay that was still
10   floating around.
11   Q.   And Wolfgang Peterson was hired to direct the Superman
12   versus Batman picture?
13   A.   He wasn't hired.
14   Q.   Attached?
15   A.   He was attached, yes.
16   Q.   Do you know whether that was on a pay or play basis?
17   A.   I'm sure it was not.  Well, I'm sorry.  But I know that
18   Wolfgang then segued into Troy, and because he did Troy, he
19   and we agreed that any work he was doing with respect to
20   Superman would be discarded.
21        So I don't know if he was pay or play and then that
22   was switched over to Troy or whether we hadn't gotten to pay
23   or play with him yet, and we just stopped his work on Superman
24   and then went to Troy.  I just don't recall.
25   Q.   Ultimately, it was decided in 2002 not to make Superman
```

1  versus Batman and to focus instead on the Superman film;

2  correct?

3  A.   That's correct.

4  Q.   Now, switching gears a little bit, is it fair to say that

5  you viewed Superman -- you viewed Superman -- strike that.

6            Is it fair to say that you view Superman even today

7  as an evergreen source of income for Warner Brothers?

8  A.   For different components of the character.  I can't speak

9  for the television people or for the merchandising people, for

10  kids that want to dress up on Halloween.  But I can say that

11  my view of Superman as an evergreen theatrical motion picture

12  property is that it is viable but not -- but challenged.

13  Q.   I'd like to show you what's been marked as -- strike

14  that.

15            I'd like to show you what's been marked for

16  identification purposes only as Exhibit 276.  We have it on

17  the screen.  Exhibit 276 is a <u>Wall Street Journal</u> article

18  dated August 22nd, 2008, entitled Warners bets on fewer bigger

19  movies.  The article contains quotes from interviews with

20  Warner Brothers Picture Group President Jeff Robinov and DC

21  Comics President Paul Levitz.  I'd like to focus on a

22  statement in the article --

23            MR. BERGMAN:  Your Honor, before Mr. Toberoff does

24  that, the document is hearsay, and it's irrelevant.

25            THE COURT:  Well, I'm not really sure -- it may very

1   well be, I just don't know what statement he's identifying and

2   for what purpose he wants to introduce.

3            MR. BERGMAN:  You don't know whether there's an

4   admission against interest?

5            THE COURT:  Okay.  Let's see where it is, Counsel.

6   What are you referring to?

7            MR. BERGMAN:  Thank you, sir.

8   Q.   BY MR. TOBEROFF:  I'm referring to -- it's highlighted on

9   the screen.  If you could zoom in.

10           On the second page of the article, in the middle of

11  the page, it says it, meaning Warner Brothers, is focused on

12  releasing four comic book films in the next three years,

13  including a third Batman film, a new time reintroducing

14  Superman, and two more films focusing on other DC Comics

15  characters.

16           THE COURT:  What paragraph, Counsel?

17           MR. TOBEROFF:  Second to last paragraph -- third

18  page.  I'm sorry.

19           THE COURT:  I see it.

20  Q.   BY MR. TOBEROFF:  Is this statement true or false?

21           MR. BERGMAN:  Same objection, your Honor.

22           THE COURT:  Well, the statement is not being

23  offered.  He's just being asked whether or not the statement

24  is true or false.  So we could do it without the document if

25  he wants.

```
 1          THE WITNESS:  Sure, that's fair.  It is true that we
 2   are planning to utilize the DC library as a resource to
 3   develop new movies that hopefully will be franchising
 4   tent-pole movies as we are with other things also, may I say,
 5   but it is not true that the -- that the timing to movies
 6   focusing on other DC Comics.
 7          For example, it says Green Lantern -- Green Arrow,
 8   Wonder Woman are all in active development.  For a movie that
 9   would qualify as a tent pole, since I have the ultimate
10   authority to green light it, any screenplay for a movie like
11   that would be given to me, and I would -- you know, I would
12   involve myself earlier than I might on other kinds of movies
13   that would be less expensive.
14          So, for example, I have seen a screenplay on Green
15   Lantern, and we are getting close to going ahead with the
16   Green Lantern movie.  But I haven't seen anything on Flash.  I
17   saw something on Green Arrow that I threw out.  And I haven't
18   seen anything on Wonder Woman.  So I'm not -- the timing isn't
19   right.
20   Q.   BY MR. TOBEROFF:  I was actually focusing within that
21   paragraph, they speak about Green Lantern and other
22   characters.  I wasn't really focusing on those characters.  I
23   was focusing on the statement that Warners is focused on
24   releasing four comic book films in the next three years,
25   including a third Batman.  That's correct?
```

1   A.   Well, a third Batman -- let's see.  This is 2008.  So 9,

2   10, 11.  We might have a third Batman sometime in 2011, or it

3   might be in the summer of 2012.

4   Q.   And the next one, a new film reintroducing Superman?

5   A.   Well, we had hopes to keep the character alive and to

6   once again reinvent Superman.  We are -- our hope is to

7   develop a Superman property and to try again.  What hurt us is

8   that the reviews and so on for the Superman movie, which did

9   outperform Batman by, as you point out, something like $20

10  million worldwide box office, did not get the kind of critical

11  acclaim that Batman got, and we have other issues with

12  Superman that concern us.  So we are -- but we will try again.

13  I'd love to see a great screenplay.

14  Q.   Are you anxious to bring Superman back?

15  A.   I'm anxious to have tent-pole movies.  Anxious, may I say

16  respectfully, however you characterize it, we have a number of

17  properties that qualify as these tent poles as we've been

18  discussing.  Superman is certainly among them.  And I happen

19  to, because of my particular vintage, I grew up with Superman,

20  and so I happen to love the Superman character myself.  So I

21  have kind of a bias in favor of Superman.  I like Superman.

22  Q.   You'd like to bring him back?

23  A.   I would, yes.

24  Q.   I'd like to show you what's been previously admitted as

25  Plaintiff's Exhibit 313.  Exhibit 313 is entitled 2008

1   Business Review.  2009 budget, and it's dated December 10,

2   2008.  I'd like to turn your attention to page 17 of the

3   exhibit entitled -- excuse me -- 13, entitled Media.

4           MR. BERGMAN:  Objection, your Honor.  Lack of

5   foundation.

6           THE WITNESS:  Okay.

7   Q.   BY MR. TOBEROFF:  Right-hand column is entitled

8   Theatrical Development.  Excuse me.  Under the heading

9   Theatrical, the second bullet point states Warner Brothers

10  Pictures states --

11          MR. BERGMAN:  What page are we on?

12          MR. TOBEROFF:  It's page 13, it's on your screen.

13          THE WITNESS:  I have it.

14  Q.   BY MR. TOBEROFF:  Second bullet point reads Warner

15  Brothers Pictures looking to reshape process of development of

16  DC projects to accelerate and take advantage of our rich

17  source material.

18          Is that statement accurate?

19  A.   I think is, yes.

20  Q.   Are you overseeing this reshaping process?

21  A.   I'm not overseeing the development of it, but I'm

22  overseeing the green lighting of the movies.

23  Q.   Now, the third bullet point states major projects include

24  2010 Green Lantern, and close behind, the Flash, the Losers,

25  Lobo, and Superman.

155

1          Do you see that?

2    A.    Yes.

3    Q.    When it says close behind, does this mean that the next

4    Superman film, if it is indeed released, would take place in

5    about 2011?

6    A.    I don't see that happening in 2011.  By the way, and to

7    be fair, I think it is true for Green Lantern where we are

8    planning a 2010 movie, if we can get it together in time.

9    These movies because of the special effects complexity, have

10   generally longer lead times than a smaller movie that has no

11   special effects component.

12          But this -- I've seen nothing on the Flash, nothing

13   on the Losers.  There was a screenplay on that which I hated.

14   I've seen nothing on Lobo.  So I don't know what close behind

15   means here.

16   Q.    What would be the target year to launch a new Superman

17   film if you launched one?

18   A.    I would say 2012.

19   Q.    I'd like to draw your attention to page 17 of this

20   exhibit.

21          The right-hand column is entitled, quote, Theatrical

22   Development, paren, WB, close paren, close quote.  I take it

23   WB stands for Warner Brothers?

24   A.    Yes.

25   Q.    And listed in a long list is Superman with an asterisk.

1          Do you see that?

2    A.    Yes.

3    Q.    And then it says at the bottom the asterisk indicates

4    active development work in 2008.

5    A.    Well, Counsel, I didn't -- are you asking me a question?

6    Q.    The question is was there any development in 2008 of a

7    new Superman movie?

8    A.    Not that I'm aware of.  I'm very screenplay driven when

9    it comes to any of these properties, and I have not seen a

10   screenplay in 2008 or in 2009 for Superman.

11   Q.    Earlier you testified that the -- when I asked you about

12   your oversight of development, you testified that as you

13   oversee the development process, there are many things that

14   are developed that you don't have specific knowledge of; is

15   that correct?

16   A.    That's correct.  But for a tent-pole movie, a movie that

17   would cost, as we've discussed, around $150 million or even

18   more, they would not, if they were in active development, I'd

19   be aware of it.  I'd be very surprised if there's a Superman

20   screenplay floating around that I'm not aware of.

21   Q.    Now, it's been reported that Warner Brothers in 2008 were

22   hearing various pitches for a new Superman movie; is that

23   correct?

24   A.    I wouldn't know.  But that may be true.  I don't hear

25   pitches myself.

```
 1   Q.   I'd like to turn to the subject of DC Comics for a

 2   moment.  DC Comics provides Warner Brothers with a large

 3   library of characters for potential tent-pole pictures;

 4   correct?

 5   A.   Yes.

 6   Q.   And DC Comics also provides Warner Brothers with a stable

 7   of characters for potential franchise motion pictures?

 8   A.   Hopefully, yes.

 9   Q.   Warner Brothers can exploit DC's stable of characters in

10   television?

11   A.   Yes.

12   Q.   Home entertainment?

13   A.   Yes.

14   Q.   Animation?

15   A.   Yes.

16   Q.   Consumer products?

17   A.   Yes.

18   Q.   Video games?

19   A.   I would think.

20   Q.   And news media?

21   A.   Yes.

22   Q.   I'd like to talk to you briefly about the Siegels'

23   Superman termination notices.  When you joined the company in

24   1999, you were made aware that the widow and daughter of Jerry

25   Siegel, the creator of Superman, had filed notice of
```

158

1    termination in 1997, claiming co-ownership in Superman under

2    the Copyright Act; is that correct?

3    A.    It is correct that I get a litigation summary from our

4    general counsel that tells me what litigation --

5            MR. BERGMAN:  Objection.  I don't think he should be

6    speaking about what you've heard from counsel.

7    Q.    BY MR. TOBEROFF:  You were made -- without giving me the

8    substance --

9            THE COURT:  Very well.  Rephrase the question,

10   Counsel.

11   Q.    BY MR. TOBEROFF:  I simply asked whether he was aware --

12   was made aware, when he joined the company in 1999, not the

13   substance of the communication, whether -- that the Siegels

14   had filed notices of termination under the Copyright Act in

15   1997 claiming co-ownership rights in Superman?

16   A.    I do not recall being made aware of it when I joined the

17   company in 1999, but that was such a blur of --

18           THE COURT:  I'm going to stop you.  There was a

19   question.

20           Next question, Counsel.

21   Q.    BY MR. TOBEROFF:  When were you first made aware of that?

22   A.    I don't recall when.  But I was -- at some point I became

23   aware of the fact that there was a -- an effort to disengage

24   or whatever the legal terms are.

25   Q.    Do you believe it was -- that you were made aware before

159

1    2002?

2    A.    I don't recall when, Counselor.

3    Q.    You were made aware before green lighting Superman

4    Returns in 2006?

5    A.    Well, express it differently, if I may, and that is that

6    no one told me when I green lit the movie in 2005 -- nor the

7    2006 release, and the green light would have been a year

8    earlier, or eight months earlier.  Something like that.  At

9    least a year earlier actually before the release.  No one said

10    you may not do that.

11              I mean, I rely on other people, business affairs and

12    so on to advise me if there's something I'm planning to do.

13    The head of business affairs is in our production meetings,

14    and if there was some reason that I didn't have the right or

15    the company didn't have the right to do something, he would

16    say well, wait a minute, you can't do that.

17              So I always assumed that we had the right to make

18    the movies and someone has to advise me if that's not the

19    case.

20    Q.    Just to put you at ease, no one is claiming that you

21    didn't have the right to release that movie.  I'm just -- I

22    just would like to establish that you were aware that they had

23    filed termination notices prior to green lighting the picture.

24    Not as to the --

25    A.    I don't remember when I was made aware.

160

1    Q.   In 2005, do you believe you green lit Superman Returns in

2    2005?

3    A.   Or even earlier, but yes, 2005 sounds okay.

4    Q.   And you're unable to tell me whether you had heard

5    anything about -- not the substance, just the fact that

6    whether you've heard about it, the Siegels' termination prior

7    to that?

8    A.   The only thing I can say is that I was aware that -- or I

9    was told that the company had clear right to make the movie

10   that I was green lighting.

11   Q.   And when you were told that, without giving me the

12   substance of the conversation, was the subject of the Siegel

13   termination ever discussed with you, or were you begin notice

14   of the Siegels' termination?

15          MR. BERGMAN:  Objection.  Privileged.

16          THE COURT:  Sustained.  I assume you're asking in

17   terms of discussion with counsel?

18          MR. TOBEROFF:  I'm just asking whether he was

19   aware -- made aware of the termination notices themselves.

20          THE COURT:  You're going to have to exclude counsel

21   from that question if you want me to overrule the objection,

22   Counsel.  Otherwise, it's sustained.

23   Q.   BY MR. TOBEROFF:  Were you made aware that the Siegels

24   filed the present lawsuit in October of 2004?

25   A.   Not that I recall.

1  Q.    When is the first time you learned about this lawsuit as

2  best you can recollect?

3  A.    The claim or the lawsuit?

4  Q.    The lawsuit.

5  A.    I really don't recall, but I'm sure it's months and

6  months ago.

7  Q.    Do you believe it was as far back as 2004?

8  A.    I don't recall.  I'm sorry.

9  Q.    Do you recall hearing anything about the lawsuit in 2005?

10  A.    I don't recall when I heard about it.  But I was advised

11  that there was a lawsuit filed.  I just don't recall when.

12  Q.    Do you recall reading about this lawsuit in _Variety_?

13  A.    Well, no.  But _Variety_ prints a lot of things.  No.  I

14  just don't want to appear to be evasive.  I get this

15  information from counsel.  From my head of business affairs or

16  our general counsel.  And I honestly operate on an exception

17  basis.  I -- we have a lot of movies, as we've discussed.  25

18  a year or so.  And it's just a lot of movies.  And I rely on

19  them to tell me when I may not do something or if there's a

20  problem that would prohibit me from doing something.  And I

21  was not so advised with respect to the green lighting of this

22  movie we're talking about.

23  Q.    Do you read what they call the trades?

24  A.    Yes.

25  Q.    And do you read those on a regular basis?

```
 1   A.   Yes, I do.

 2   Q.   And those are Variety and Hollywood Reporter?

 3   A.   Yes.

 4   Q.   And is there a particular time of day that you like to

 5   read the trades?

 6   A.   Seven o'clock in the morning with coffee.

 7   Q.   So at breakfast you read Variety and you read the

 8   Hollywood Reporter?

 9   A.   I read them.  I skim them.

10   Q.   On a daily basis?

11   A.   Yes, I do.

12   Q.   Do you also have people that break down for you articles

13   that appear in the press?

14   A.   Yes.

15   Q.   Regarding Warner Brothers' pictures or projects?

16   A.   Yes.  Regarding the whole company.

17   Q.   And Warner Brothers characters?

18   A.   Well, it's a clipping service that clips out information

19   that pertains to the company.  This is really Time Warner, not

20   just Warner Brothers.  So there will be a sheaf of articles

21   relating to the overall activities of the company.  So that

22   comes in daily.

23   Q.   Do you receive that on a daily basis?

24   A.   Yes, sir.

25             MR. TOBEROFF:  I have no further questions.
```

```
1                THE COURT:  Very well.  Cross-examination?

2                MR. BERGMAN:  Just a few, your Honor.

3                       CROSS-EXAMINATION

4    BY MR. BERGMAN:

5    Q.    Mr. Horn, have you ever given instructions to any

6    executive at Warner Brothers or Warner Brothers Television to

7    attempt to obtain any DC property at below fair market value?

8    A.    No.

9    Q.    To your knowledge, has Warner Brothers acquired any DC

10   property at below fair market value?

11   A.    No.

12   Q.    Was Superman Returns a successful film?

13   A.    I would call it a modestly successful film for us and an

14   unsuccessful film for our partner, as best I can tell.  In

15   other words, if we had owned 100 percent of Superman and were

16   not able to charge a distribution fee to the entity Legendary

17   that put up half the money enabling us to get more money off

18   the top before the split, I think the picture would have been

19   roughly a break even.

20               THE COURT:  Who was your partner in that?

21               THE WITNESS:  Legendary Pictures.

22   Q.    BY MR. BERGMAN:  And were they an equal financing

23   partner?

24   A.    Yes.

25   Q.    And did they in fact supply not only half of the negative
```

1  costs but half of the prints and advertising?

2  A.   Yes.

3  Q.   And have you done business with financing partners on

4  that basis for some time?

5  A.   Yes.

6  Q.   And is that time of sharing of responsibility and budget

7  something that is customarily done by Warner Brothers with

8  respect to what we've been calling tent-pole pictures?

9  A.   Yes.

10  Q.   And can you briefly state the reason for that?

11  A.   Well, I will exclude Harry Potter.  In deciding to make a

12  tent-pole picture, we know that we are committing very

13  substantial resources of the company towards the cost of the

14  negative and the prints and ads.  That cost cumulatively or

15  totally aggregates to really a very substantial amount of

16  money.  And by bringing in a partner, we understand that if

17  the picture is a blow-out success, e.g., The Dark Knight, we

18  would in retrospect acknowledge that we would have made more

19  money had we not had a partner.

20           On the other hand, if the picture is a disaster,

21  e.g., Speed Racer, we're happy we had a partner.  So in an

22  environment when -- in an environment where there's inherent

23  volatility in our business practice, especially as it relates

24  to these extremely expensive movies, we know that by bringing

25  in a partner, we can compress the high points but also protect

165

1    ourselves from the low points and have a narrower band, if you

2    will, in which to operate, which gives us a little more

3    comfort when we sleep at night.

4            Now, we charge a fee.  The partner might say why do

5    you charge a fee?  And my answer would be we have offices in

6    every country.  If you want to pay the overhead for marketing

7    and distribution and for offices around the world, it would

8    cost you a lot more than that 10 percent or 11 percent or 12

9    or whatever it is that we take off the top before splitting

10   with you.

11           So that is our argument for having a partner.  And

12   that's, by the way, why we rarely try to find a studio

13   partner.  Because then nobody gets a distribution fee and you

14   just divide the world in terms of distribution, and everything

15   goes in the pot.  We did that with Benjamin Button, for

16   example.

17   Q.   I see.  And am I correct that a distribution fee that is

18   charged with a participating partner like Legendary Pictures

19   is just a fraction of the normal distribution fee that would

20   be charged by the studio on a studio finance and distributed

21   picture?

22   A.   Yes.  Yes.

23   Q.   Would you in fact say that the financing partner gets as

24   best a deal on the distribution fee as anyone would get?

25   A.   There's no question.

1   Q.    Does Warner Brothers presently, at this point in time,

2   have any Superman film that it is developing as a tent-pole

3   picture?

4   A.    Not to my knowledge.

5   Q.    Does Warner Brothers, on the other hand, have other

6   properties that it is presently developing or considering as

7   tent-pole pictures?

8   A.    Yes.

9   Q.    Could you identify some of those, please?

10  A.    Well, we have Scooby Doo.  We've had two movies.  We'd

11  like to bring Scooby Doo back.  We have Looney Tunes.  We have

12  Tarzan.  I've looked at four drafts of a Tarzan screenplay.

13  We have The Jetsons.  We have the Hobbit.  We have a very

14  exciting property called Guardians of Gahool (phonetic), which

15  is being directed by Jack Snyder.  It's a family movie, very

16  exciting picture.

17          We have Happy Feet.  We're working on Happy Feet 2.

18  We have Looney Tunes, but there's no screenplay written yet.

19          So there's a number of them.

20          MR. BERGMAN:  Very good.  Thank you, sir.

21  Appreciate your being here.

22          THE COURT:  Any redirect?

23          MR. TOBEROFF:  Just a couple questions.

24  ///

25                        **REDIRECT EXAMINATION**

1    BY MR. TOBEROFF:

2    Q.    What division at the studio negotiates the deals for the

3    acquisitions of underlying literary rights?

4    A.    The business affairs.  If it's for literary rights and

5    the acquisition for purposes of having the theatrical motion

6    picture, it would be the business affairs division of our

7    motion picture group.

8    Q.    So the business affairs division essentially negotiates

9    the deal, and the legal affairs division papers the deal; is

10   that correct?

11   A.    Yes.

12   Q.    Now, are you involved in setting the fixed and contingent

13   compensation of pay in a literary rights acquisition

14   agreement?

15   A.    No.

16   Q.    Were you involved in the underlying rights agreement,

17   film agreement between DC and Warner Brothers that was

18   executed in 2002 underlying the Superman film?

19   A.    No.

20          MR. BERGMAN:  Your Honor, objection.  That goes well

21   beyond my cross.

22          THE COURT:  Seems to, Counsel.

23          MR. TOBEROFF:  He asked questions whether you have

24   ever -- he asked a question whether you have ever paid less

25   than fair market value.

168

```
 1              THE COURT:  Okay.  Briefly.

 2   Q.   BY MR. TOBEROFF:  Your answer was no?

 3   A.   No.

 4   Q.   You heard my last question, and your answer was no;

 5   correct?

 6   A.   Yes, but would you repeat it, please, just to be sure.

 7   Q.   My question was whether you were involved in negotiation

 8   of the underlying literary rights agreement in 2002 for

 9   Superman rights?

10   A.   No, I was not.

11   Q.   Now, just moving for a moment to Legendary Pictures.  You

12   testified that a co-financier like Legendary Pictures receives

13   a sharply reduced distribution fee; is that correct?

14   A.   Yes.

15   Q.   What is the distribution fee charged to Legendary

16   Pictures on the Superman films?

17   A.   I think it's 11 percent or 10 percent.  They renegotiated

18   their deal a few times.  So I'm not sure.

19   Q.   What would you say would be the range for a partner that

20   either finances the entire film or co-finances half the film?

21   What would be the range of the distribution fee?

22              MR. BERGMAN:  Objection.  Compound.

23              THE COURT:  Break it up, Counsel.

24   Q.   BY MR. TOBEROFF:  What would be the range for a financing

25   partner that co-finances a film, the range of the distribution
```

1    fees charged?

2    A.    I would -- I'm sure this is -- I'm sure there are

3    exemptions, but I would put the bulk of the bell curve, if you

4    permit that, from 10 to 15 percent.

5    Q.    And what would be the range for a financier that financed

6    the entire negative cost and the marketing costs of the

7    picture?

8    A.    It could be as low as, I'd say, 8 percent, but we don't

9    go below 10 percent.  I can't recall one below 10 percent.

10   Q.    And a co-financier would receive a hundred percent of --

11   in calculating the revenues received by a co-financier in

12   connection with a co-financed film, a hundred percent of video

13   revenues would be included minus certain expenses; is that

14   correct?

15   A.    Yes.

16             MR. TOBEROFF:  Thank you.

17             THE COURT:  Anything further?

18             MR. BERGMAN:  Nothing further, your Honor.

19             THE COURT:  Very well.  You are excused.  Thank you,

20   Mr. Horn.

21             THE WITNESS:  Thank you, your Honor.

22             MR. TOBEROFF:  Thank you.

23             THE COURT:  Counsel, we're going to conclude for the

24   day.  We'll resume tomorrow morning at 9:00 sharply.  See you

25   in the morning.

1

2           (Proceedings concluded at 4:05 P.M.)

3

4          **C E R T I F I C A T E**

5

6

7        I hereby certify that pursuant to Title 28,

8  Section 753 United States Code, the foregoing is a true and

9  correct transcript of the stenographically reported

10  proceedings in the above matter.

11        Certified on April 28, 2009.

12

13

               _____

14             **MARK SCHWEITZER, CSR, RPR, CRR**
             Official Court Reporter

15             License No. 10514

16

17

18

19

20

21

22

23

24

25