1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4      **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                        ---

6    JOANNE SIEGEL, etc.,          :  PAGES 250 - 354
                                    :
7             PLAINTIFF,           :
                                    :
8       VS.                        :  NO. CV 0408400-SGL(RZx)
                                    :
9    WARNER BROTHERS               :
     ENTERTAINMENT, INC., etc.     :
10                                  :
             DEFENDANT.            :
11   _____:

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               COURT TRIAL - DAY 2

16              RIVERSIDE, CALIFORNIA

17            WEDNESDAY, APRIL 29, 2009

18               AFTERNOON SESSION

19

20

21

22                       MARK SCHWEITZER, CSR, RPR, CRR
                         OFFICIAL COURT REPORTER
23                       UNITED STATES DISTRICT COURT
                         181-H ROYBAL FEDERAL BUILDING
24                       255 EAST TEMPLE STREET
                         LOS ANGELES, CALIFORNIA 90012
25                       (213) 663-3494

1    **Appearances of Counsel:**

2

3    For the Plaintiff:

4        TOBEROFF AND ASSOCIATES
         By Marc Toberoff, Esq.
5            Nicholas Williamson, Esq.
             Keith Adams, Esq.
6        2049 Century Park East
         Suite 2720
7        Los Angeles, CA 90067
         (310) 246-3333
8

9

10   For the Defendant:

11       BERGMAN COLEMAN GRODIN & EVALL, LLP
         By Michael Bergman, Esq.
12           Anjani Mandavia, Esq.
         9665 Wilshire Boulevard
13       Ninth Floor
         Beverly Hills, CA 90212
14       (310) 860-3346

15           -and-

16       LAW OFFICES OF PATRICK T. PERKINS
         By Patrick T. Perkins, Esq.
17       1711 Route 90
         Cold Spring, NY 10516
18       (845) 265-2820

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    MARK EDWARD HALLORAN, SWORN............................. 253

4    DIRECT EXAMINATION BY MR. TOBEROFF..................... 253

5    VOIR DIRE EXAMINATION BY MR. BERGMAN................... 268

6    DIRECT EXAMINATION (RESUMED) BY MR. TOBEROFF........... 271

7

8                            **E X H I B I T S**

9

10   Exhibit 332 for identification......................... 267

11   Exhibit A received.................................... 267

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>Riverside, California; Wednesday, April 29, 2009</u>

2                              **1:35 P.M.**

3          THE COURT:  Good afternoon, Counsel.  Plaintiffs may

4     call their next witness.

5          MR. TOBEROFF:  Good afternoon.  Plaintiffs call

6     their expert, Mark Halloran.

7          THE CLERK:  Please come forward and stop next to the

8     court reporter.  Please raise your right hand.

9                    **MARK EDWARD HALLORAN, SWORN.**

10         THE CLERK:  Please take the stand.  Please state

11    your full name for the record, and spell your last name.

12         THE WITNESS:  Mark Edward Halloran, H-A-L-L-O-R-A-N.

13                        **DIRECT EXAMINATION**

14    **BY MR. TOBEROFF:**

15    Q.   Good afternoon, Mr. Halloran.

16    A.   Good afternoon.

17    Q.   Can you please tell us what you do for a living.

18    A.   I'm a transactional entertainment lawyer, author, and

19    teacher.

20    Q.   How long have you been working in the entertainment

21    industry?

22    A.   Approximately 28 years.

23    Q.   And in those 28 years, have you ever worked for a major

24    studio?

25    A.   Yes.

```
1   Q.    Which studio?

2   A.    I worked for Orion Pictures and for Universal Pictures.

3   Q.    What is the time period during which you worked for Orion

4   Pictures?

5   A.    1982 to 1985.

6   Q.    And what was your position at Orion?

7   A.    I was business affairs counsel.

8   Q.    And in that position, what was the scope of your duties?

9   A.    I did a whole host of things.  I -- the basic two

10  categories were that I was counsel with respect to projects

11  that were developed, produced, and distributed by Orion, and I

12  was also music counsel.

13  Q.    And what was the other studio that you worked at?

14  Universal?

15  A.    Yeah, MCA Universal.

16  Q.    What was your title there?

17  A.    It was initially business affairs executive, and then in

18  1986 I got promoted to vice-president of business affairs.

19  Q.    And you were at MCA Universal for what time period?

20  A.    From 1985 to 1990.

21  Q.    And what were the scope of your duties in business

22  affairs at MCA?

23  A.    Well, initially, when I was business affairs executive, I

24  was predominantly a -- the primary duty would be to document

25  deals on a project basis, including deals for rights,
```

1    acquisition, writers, actors, producers, and the like, and

2    then when I was promoted to vice-president, assumed a more --

3    my predominant job was to negotiate the deal points, the

4    up-front deal points, specially money for deals involving

5    rights acquisition, writers, directors, actors, producers, and

6    also negotiating deals for the acquisition of the distribution

7    rights to motion pictures.

8              I also spent a fair amount of time actually both at

9    Orion and at Universal working at financing transactions with

10   banks whereby both -- the studios would be able to raise

11   financing from a bank in order to finance the production of

12   their pictures.

13   Q.    What films did you work on at Orion?

14   A.    At Orion I worked on --

15   Q.    Just some examples?

16   A.    Okay.  I worked on the Richard Gere movie Breathless.  I

17   worked on Cotton Club, which was directed by Francis Coppola

18   and starring Richard Gere.

19             I worked on a picture called Falcon and the Snowman,

20   which started Sean Penn and was directed by John Schlesinger.

21   I worked on the Hotel New Hampshire, based on a John Irving

22   book.  I worked on Amadeus.  I worked on the Woman In Red,

23   which had a Stevie Wonder sound track.

24   Q.    That's fine.  At MCA Universal, what pictures were you

25   involved with?

1    A.    I worked on Out of Africa, which won the Academy Award

2    for Best Picture in 1985 and starred Robert Redford and Meryl

3    Streep.  I worked on the Back to the Future 2 and 3, starring

4    Michael J. Fox.  I worked on Twins, which starred Arnold

5    Schwarzenegger and Danny DeVito.  I worked on Kindergarten

6    Cop, which again starred Arnold Schwarzenegger.  Both are

7    illustrative.  I also worked on Dark Man.

8    Q.    Please describe your television experience, if any, at

9    Orion.

10   A.    At Orion, when I -- I documented and negotiated rights

11   acquisition and writer deals.  As part of the agreements, I

12   would negotiate royalties, grant of rights, and also royalties

13   for television MOW's and -- excuse me.  Movies of the Week,

14   miniseries, and television series.  Both network and

15   non-network.

16   Q.    Could you please describe your television experience at

17   MCA Universal?

18   A.    It was essentially the same.  I would negotiate the

19   acquisition of television rights and rights acquisition and

20   writer agreements and specifically negotiate the royalties

21   that would be payable to the -- the rights on it or the writer

22   for movies of the week, miniseries, and episodic television,

23   including for network and cable and the like.

24   Q.    After working at the studios, what have you done since

25   1991?

1  A.    I have been in private practice as a transactional

2  entertainment lawyer.

3  Q.    And in private practice, can you please describe to me

4  your work?

5  A.    My work in private practice has been a little more broad

6  based than at the studio.  I've worked in the film business on

7  both studio deals and independent deals.  I've represented

8  television companies and television content creators.  I've

9  represented stage authors, companies that -- more lately

10  companies that are producing so-called webisodes, which is

11  essentially television series that are intended to be

12  initially broadcast on the Internet rather than through

13  traditional broadcast.

14         I've also acted as an expert witness in

15  approximately 30 cases.

16  Q.    Were you involved -- at the studios, you were involved

17  with respect to intellectual property on the buy side; is that

18  correct?

19  A.    Correct.

20  Q.    And in private practice, you are more involved in

21  representing the seller in dealing with intellectual property?

22  A.    Well, vis-a-vis the studios, I'm on the selling side from

23  the -- when I represent intellectual rights holders.  When I

24  represent independent producers, I'm on the buying side.

25  Because I am involved in the optioning of books, plays, and

1   other types of intellectual property to be used as the basis

2   for theatrical motion pictures and television motion pictures.

3   Q.   Could you provide some examples of work you've done in

4   private practice regarding entertainment projects that are

5   based on pre-established intellectual properties?

6   A.   Yes.  In the 90's, I was counsel to a company called

7   Require Cinema.  And that was a joint venture between Random

8   Productions and Amblin, Stephen Spielberg.  And the company

9   developed and produced for initial broadcast on Turner Network

10  television a series of movies of the week that were based on

11  writings of well-known authors.

12          I believe there were about six.  Three were based on

13  plays, and three were original screenplays written by famous

14  authors.  And three of the plays were -- one was written by

15  Arthur Miller.  One by David Manet, M-A-N-E-T, and one by

16  Horton Foot.

17  Q.   And you worked on all six of these television MOW's?

18  A.   Yes.  I also at that time represented a company called

19  Handmade Pictures, and I licensed the television motion

20  picture rights to part of their library, a picture called Time

21  Bandit.  Also during that time I represented a company called

22  Neopets, and I negotiated a possible animation joint venture

23  with Hasbro.

24  Q.   Now, getting back to my focus on working on entertainment

25  projects regarding pre-established properties.  You mentioned

259

1   representing Cinema, Inc.

2   A.    Writers Cinema.

3   Q.    Writers Cinema, Inc.  Can you give me other examples of

4   work you've done in private practice regarding entertainment

5   products based on pre-established properties?

6   A.    Well, I have represented producers of studio films that

7   were based on existing properties.  I represented and continue

8   to represent Bob Doucet, who did Mummy, Mummy 1, 2, and 3 for

9   Universal.  He's just finishing G.I. Joe for Paramount right

10  now.  I also represented -- I think that's it.

11  Q.    Did you represent a gentleman by the name of Cavandra?

12  A.    It was actually Jonathan Cavandish.  He's the producer

13  for Bridget Jones.

14  Q.    Both the original and sequel?

15  A.    Yes.  I believe that was based on a book.

16  Q.    And what other entertainment projects have you

17  represented Handmade Films on?

18  A.    I represented Handmade Films in the acquisitions to the

19  television and merchandising rights to a children's comic --

20  excuse me -- a well-known children's series of books called

21  Eloise, and what we did was we purchased the Simon and Shuster

22  and the estate of the writer owned the rights, and we

23  purchased everything but the publishing rights, and then we

24  arranged with ABC to produce a series of Eloise movies of the

25  week.

1          So I negotiated -- after acquiring the television

2    rights, I negotiated a deal with ABC on behalf of the

3    Handmade -- excuse me -- whereby they received a license fee

4    from ABC to enable them to produce the MOW's for ABC.  And

5    also there was a merchandising component in that deal and also

6    a separate home video component in that deal with ABC.

7          Most recently, I have been in negotiations with

8    Lionsgate to possibly license the Handmade television rights

9    to Lionsgate for the Handmade library.

10   Q.   So although your practice includes a great deal of film

11   work, you also have television experience; correct?

12          MR. BERGMAN:  Objection.  Leading, your Honor.

13          THE COURT:  It's foundational.  Overruled.

14   Q.   BY MR. TOBEROFF:  Can you give me some more examples of

15   your experience in television and private practice?

16   A.   Yes, I've acted as an expert witness in the television

17   area.

18   Q.   I'll get to that in a moment.

19          Other than expert witness, focusing on your

20   transactional work, could you give me some more examples of --

21   you mentioned representing Cinema, Inc.

22   A.   Right.  I also have represented a company called

23   Trademark Properties, the principals of which are Richard

24   Davis and Ginger Alexander.  And I negotiated -- they

25   developed a real estate format which was originally exploited

1    on A and E.  And then subsequently I made a deal with Fox,

2    which didn't go through, and then ultimately went to the

3    Discovery Channel, and they are currently shooting a show

4    called The Real Estate Pros.

5    Q.    When you say real estate format, you're referring to a

6    format for a reality television series?

7    A.    Yes.

8              In addition, I represent two companies that, as I

9    mentioned before, were involved in the webisode business,

10   which is a conjunction of the web and episode.  One of them is

11   called Ms. Sheila.  They have a very prominent website, and

12   they option content and create consent for that site.

13             I also represent a company called Ten Thousand Days,

14   LLC.  The two people who own that are Erica Lockridge and Eric

15   Small.  And they are doing a series of webisodes called Ten

16   Thousand Days, which stars John Schneider from Smallville.

17             So I also negotiated the deal with John Schneider to

18   star in that webisode series.

19   Q.    When you refer to webisodes, is this essentially

20   programming that is like television programming except that

21   rather than being broadcast on a network, it's distributed

22   over the Internet.

23   A.    Yes.

24             MR. BERGMAN:  Objection.  Leading.

25             THE COURT:  Sustained.  Why don't you describe what

262

1   webisode is.  You're the expert.

2           THE WITNESS:  Okay.  I'll be happy to tell you.

3           Webisode is very much like -- the companies that are

4   in the webisode business essentially have adopted the

5   television way of doing business except instead of the episode

6   being broadcast initially over television, it's broadcast

7   through a computer.  One of the features, though, the

8   so-called webisodes, are typically only three to six minutes

9   long.  They are very short.  I guess it's because the

10  attention span of those who use computers is very short.

11  These are sometimes -- oftentimes designed to be the launching

12  pad, hopefully, for a network television series.  So those are

13  webisodes.

14          Is that clear?

15  Q.   BY MR. TOBEROFF:  Did you represent a company by the name

16  of Citadel Entertainment?

17  A.   Yes.  I represented them in the 90's, and their principal

18  was David Ginsberg.  And I had represented a woman by the name

19  of Lee Ann Moore, who was their producer.  Lee Ann and I met

20  at Universal when we worked on Back To The Future together.

21          So -- for Citadel, I worked on the development and

22  production of a series of, I think, four to six television

23  movies of the week as well.  And they were licensed to various

24  cable companies for initial release.  Initial broadcast,

25  rather.

1    Q.    And are you familiar with a TV producer by the name of

2    John Leboff?

3    A.    Yes.   I currently represent John Leboff.   He is

4    developing a television series called The Spirit of Man.   The

5    basic notion is that he will be going around the world and

6    interviewing famous sports figures and showing the good deeds

7    that they do in their countries, for example, a famous

8    Brazilian soccer player and the like.

9            I recently negotiated an agreement with a company

10   called Fremantle -- that only has one E, but it's pronounced

11   free -- and they produce Person Idol, and Fremantle is going

12   to handle the foreign distribution of the program.   And my

13   clients essentially partnered with Fremantle in terms of doing

14   a deal with them at U.S. network.

15   Q.    Mr. Halloran, have you ever been retained as an expert

16   witness in a case involving the television industry?

17   A.    Yes.

18   Q.    Can you run me through the cases very briefly?

19   A.    Yes, very briefly.   Actually, my first engagement, after

20   I left Universal, was a case called Max Baer versus ABC, as

21   most people know, who starred in the Beverly Hillbillies,

22   involving a dispute over the option to make a television movie

23   out of the Madonna song Like a Virgin.

24           I was subsequently engaged in a case on behalf of

25   George Wendt and John Ratzenberger, who were two of the stars

1    of Cheers.  There was a dispute over the unauthorized use of

2    their likeness as the basis for some animated robots.  Pretty

3    famous case.

4    Q.    The animated robots appeared in?

5    A.    Animatronic Robots.  They appeared in bars at airports.

6    Q.    On television?

7    A.    No.  The dispute arose out of the license by Paramount,

8    which was producing Cheers to Host International to

9    merchandise and depict robots that looked like George Wendt

10    and John Ratzenberger.  And the contracts I was dealing with

11    were the contracts for Cheers.

12         More recently, I worked on a case called Smitt

13    versus Gurney, which involved a dispute over fees payable for

14    footage and producing services on a reality television

15    program.  And I also was engaged in a case called Fraser,

16    F-R-A-S-E-R, versus NBC, which involved a dispute over the

17    alleged appropriation of a format idea by NBC and a company

18    called Reveille.

19    Q.    Other than your work at the studios and in private

20    practice, what other positions have you held relevant to the

21    entertainment industry?

22    A.    Since 1987 or so, I have worked on the USC Beverly Hills

23    Bar Association Institute on Entertainment Law and Business.

24    That's probably the premiere entertainment law seminar in the

25    world.  I initially was on the syllabus committee that we put

1   together the materials, and then I graduated to the planning

2   committee, which puts together the programs.  Since 1994.  So

3   I've been co-chair of the institute.  And we put on an annual

4   program.  Last year, for example, it was called Your

5   Television Is Ringing.  It was about the migration of

6   television into mobile devices and the like.

7   Q.   Have you received any awards or -- excuse me.  Have you

8   received any awards in connection with your work with the

9   Beverly Hills Bar Association Institute on Entertainment Law?

10  A.   I received the Lewis B. Fox distinguished award a few

11  years ago for my work with the Beverly Hills Bar Association

12  and specifically, the book that I co-wrote for the Bar

13  Association called Musicians, Business, and Legal Guide.

14         MR. BERGMAN:  Excuse me, your Honor.  May I ask that

15  the witness speak a little bit louder, please?

16         THE WITNESS:  Sure.

17         MR. BERGMAN:  Thank you.

18  Q.   BY MR. TOBEROFF:  Have you written any other books

19  related to the entertainment industry?

20  A.   Yes, I've written two other books.  One is called

21  Musicians Guide to Copyright, which I co-wrote while I was at

22  Hastings Law School and which was published by Charles

23  Scribner & Sons and was on the U.S. Copyright Office

24  recommended reading list.

25         My latest book is called The Independent Film

1    Producers Survival Guide.  And it's published by Schirmer

2    Books.

3    Q.    Have you written any articles related to the

4    entertainment industry?

5    A.    Yes, I've written numerous articles.

6    Q.    Have you given any talks or lectures relating to the

7    entertainment industry?

8    A.    Yes.  I've given two within the last month.  I speak

9    frequently.

10   Q.    Have you given any lectures regarding intellectual

11   property rights?

12   A.    Yes.

13   Q.    Can you please describe those for me.

14   A.    Yeah.  For two years a lawyer -- a trademark lawyer who I

15   work with by the name of Ken Feinsloff (phonetic) asked me to

16   talk about protection of intellectual property at his class at

17   UCLA Extension.

18   Q.    Have you taught any courses related to the entertainment

19   industry?

20   A.    Yes.  I taught a course on motion picture finance in the

21   mid-80's at UCLA Extension.  And since 2004 I've been teaching

22   a class at Southwestern Law School called Financing and

23   Distributing Independent Films.

24   Q.    I'd like to mark for identification as Plaintiff's

25   Exhibit 332 Mr. Halloran's expert report in this case.

1              **(Exhibit 332 for identification.)**

2    Q.   BY MR. TOBEROFF:  Your resume is attached as Exhibit A.

3    Strike that.

4              I'd like you to turn to Exhibit A.  Is that your

5    resume?

6    A.   It is.

7              MR. TOBEROFF:  Your Honor, I'd like to offer

8    Plaintiff's Exhibit 332 into evidence solely for the purposes

9    of Mr. Halloran's resume.

10             THE COURT:  Let me take a real quick look at it,

11   Counsel.  I haven't received a copy yet.

12             Where is the resume within this, Counsel?

13             MR. TOBEROFF:  It's Exhibit A.

14             THE COURT:  And that's all you're seeking to

15   introduce at this time?

16             MR. TOBEROFF:  That's correct.

17             THE COURT:  Any objection?

18             MR. BERGMAN:  No objection for that limited purpose.

19             THE COURT:  Very well.  It's admitted.

20             **(Exhibit A received.)**

21             MR. TOBEROFF:  Your Honor, at this time I'd like to

22   tender Mr. Halloran as plaintiff's expert witness in this

23   case.

24             THE COURT:  For what purpose?

25             MR. TOBEROFF:  For the purpose of reviewing a number

1   of agreements relevant to an analysis of the fair market value

2   of the Superman film and television agreements between DC and

3   Warner Brothers and for the purpose of speaking of the value

4   of Superman to the entertainment industry as a branded

5   franchise.

6           THE COURT:  Any objection?

7           MR. BERGMAN:  Yes, your Honor.  I do object at least

8   insofar as the witness would testify as to the question your

9   Honor posed, namely, were the rights that are were transferred

10  from DC to Warner Brothers, the nonexclusive rights

11  transferred fair market value.

12          THE COURT:  You may conduct voir dire, if you wish.

13          MR. BERGMAN:  Pardon me?

14          THE COURT:  You may conduct voir dire, if you wish.

15          MR. BERGMAN:  Okay.  Thank you.

16                    **VOIR DIRE EXAMINATION**

17  **BY MR. BERGMAN:**

18  Q.   Mr. Halloran, I took your deposition recently, didn't I,

19  on March 5?

20  A.   Yes.

21  Q.   And at that deposition, sir, did I ask you -- and I'm

22  referring Mr. Toberoff to page 262 -- commencing at line 23

23  and ending at line -- page 263, line 3.

24          Did you -- were you asked the questions, and did you

25  give the following answer:

1          "My question to you, sir, is what would a fair

2      market contract be in 2002 for the nonexclusive rights

3      that -- film rights that the Court has determined were

4      transferred from DC to Warner Brothers?

5          "ANSWER:  I have not formulated an opinion as to

6      that value."

7          Did you give that answer to that question?

8   A.   I think I did.

9          MR. BERGMAN:  And down at page 263, your Honor, I'll

10  be referring to lines 19 through 24:

11         "QUESTION:  Okay.  Let me ask you this, then.

12     Moving over now to the television license, do you have an

13     opinion as to what the fair market value in 2002 was of

14     the nonexclusive television rights that the court has

15     determined were transferred from DC to Warner Brothers?

16         "ANSWER:  I have not formulated that opinion."

17  Q.   Did you give that answer, sir?

18  A.   You are reading from my deposition.  I gather that I did.

19         MR. BERGMAN:  Okay.  On that basis, your Honor,

20  since the witness did not give a fair market value in his

21  report, and since he had not devised one as of the time of his

22  deposition, I believe he's precluded from offering such

23  evidence at trial.

24         THE COURT:  Well, he's certainly precluded from

25  answering those questions, and that is correct.  I think he is

1    clearly an expert on these various financing agreements, and

2    he may be able to provide pertinent relevant information.  I

3    don't know.  We'll have to see.  But you're correct with

4    respect to those two particular questions.  This witness did

5    not formulate an opinion in advance of trial, and so he will

6    not be called upon to give one, nor would the Court consider

7    his opinion at trial.

8              MR. BERGMAN:  Okay.  Thank you, your Honor.

9              THE COURT:  Very well.  If that's all, Counsel, you

10   may proceed.  The witness is so designated as an expert on --

11   you said reviewing agreements.  I assume you mean the

12   formulation and the details and the creation of these various

13   financing agreements?

14             MR. TOBEROFF:  That's correct, and in valuing the

15   terms in comparison to other terms for agreements.

16             THE COURT:  We'll see the foundation of what you're

17   specifically talking about.  There may be limitations to it in

18   light of that deposition testimony.

19             MR. TOBEROFF:  Certainly, your Honor.  I would like,

20   if I may, to -- may I comment on that?

21             THE COURT:  Save your comments for closing argument.

22   We're in the trial at this point and eliciting evidence.  I'm

23   going to give you all the time in the world to make

24   commentary, make arguments, and --

25             THE WITNESS:  Is there something I can add?

1        THE COURT:  Not until a question has been asked.

2        THE WITNESS:  Okay.

3        THE COURT:  You may proceed, Counsel.

4                  **DIRECT EXAMINATION (RESUMED)**

5    **BY MR. TOBEROFF:**

6    Q.   Before we get into the details of your opinion, in your

7    opinion, do the terms of DC's Superman film agreement with

8    Warner Brothers, dated November 6, 1999, constitute fair

9    market value?

10        MR. BERGMAN:  Same objection, your Honor.

11        THE COURT:  Sustained.

12        MR. TOBEROFF:  Your Honor, if I may, the witness is

13   here to analyze what this Court has asked, whether these

14   agreements constitute fair market value.

15        THE COURT:  Then let's analyze it.  In light of

16   those questions, Counsel, in light of his stated indication

17   that he does not have an opinion with respect to the

18   particular rights that this Court has found were transferred,

19   you are going to have to get into those nuts and bolts before

20   you get to the ultimate question.  You are putting the cart

21   before the horse.  I'll certainly permit you to go through

22   this deal with this witness.

23        But let me -- educate me, Counsel.  Use your expert

24   witness to educate me.  That's the purpose of an expert

25   witness.  It's not to answer the ultimate question.

1              I will determine whether or not there was a fair

2    market value, not this witness and not any other witness.  Use

3    this witness to educate me.  He sounds like a very intelligent

4    man who has a tremendous amount of experience in this area,

5    and I suspect he has a lot to offer.  A conclusory opinion

6    does not advance the ball at all.

7              MR. TOBEROFF:  Thank you, your Honor.

8              THE COURT:  Very well.

9    Q.  BY MR. TOBEROFF:  I'd like to turn to the subject of

10   Superman in general and its value in the entertainment

11   industry.

12             How valuable was Superman as a film property in the

13   late 1990's and the early 2000's?

14             MR. BERGMAN:  Objection.  Lack of foundation.

15             THE COURT:  Sustained.  Lay a foundation, Counsel.

16   Q.  BY MR. TOBEROFF:  Are you familiar with the character

17   Superman?

18   A.  I am.

19             THE COURT:  That's a good first question.  Now we're

20   going in the right direction, Counsel.

21             MR. TOBEROFF:  Thank you.

22             THE WITNESS:  I've known Superman since I was yea

23   high.

24   Q.  BY MR. TOBEROFF:  And have you seen the Superman

25   television series starring George Reeves?

1  A.    Yes.  Many, many, many times.

2  Q.    Are you familiar with the Superman feature film starring

3  Christopher Reeve?

4  A.    Yes, I saw it, I think, the first weekend it came out.

5  Q.    Are you familiar with the recently released film Superman

6  Returns, released in 2006?

7  A.    Yes.  Again, I think I saw it the first weekend it came

8  out.

9  Q.    What is your assessment of the value of Superman as an

10  underlying film property in the late 90's and early 2000's?

11          MR. BERGMAN:  Objection, your Honor.  Unless we're

12  speaking about exclusive rights to Superman.

13          THE COURT:  I'd be curious to know, Counsel, before

14  we get to these conclusory questions, how it is that this

15  expert makes these valuations and what these valuations are

16  based on.  Again, if there's going to be any value to an

17  expert witness, whether it's before a judge or a jury, it's to

18  educate the judge or the jury.  And simply having a -- someone

19  who is, again, obviously well-qualified, obviously intelligent

20  give me a conclusion doesn't really help me at all.

21          MR. TOBEROFF:  I'll walk him through it before we

22  ask any ultimate questions.

23          THE COURT:  Thank you, Counsel.  Because we also

24  want to make sure that we're talking about what he is valuing

25  is in fact what the Court has found was what was transferred.

1    Q.   BY MR. TOBEROFF:  Have you reviewed an agreement between

2    DC and Warner Brothers dated as of November 1999?

3    A.   Yes.

4    Q.   And do you recall when that agreement was executed

5    approximately?

6    A.   Yes, it was executed in 2002.  I believe May of 2002.

7    Q.   And did you also review, in preparing your expert report,

8    a Superman television agreement between DC and Time Warner

9    Entertainment Company, a division of Warner Brothers?

10   A.   Yes.

11   Q.   And do you recall when that agreement was entered into?

12   A.   I believe 2001.

13   Q.   As of 2002, what media, if any, had Superman been

14   exploited in?

15   A.   I believe Superman had been exploited in virtually every

16   then extant medium.  Started out as a comic book and

17   subsequently was a television series, merchandise, successful

18   film, television program.  Virtually I can't think of any

19   media that it wasn't exploited in at that time.

20   Q.   Was it exploited in radio?

21   A.   Yes, radio as well.

22   Q.   And prior to 2002, what was Superman's track record in

23   film?

24          MR. BERGMAN:  Objection.  Lack of foundation, your

25   Honor.

275

```
1            THE COURT:  I'm not sure what you mean, "track

2   record."  Why don't you rephrase your question, Counsel.

3   Q.   BY MR. TOBEROFF:  You described to me that you are

4   familiar with Superman films starring Christopher Reeve;

5   correct?

6   A.   Yes.

7            MR. BERGMAN:  Excuse me.  May I ask what the witness

8   is looking at at the witness table?

9            THE COURT:  I'm not really sure, Counsel.

10           THE WITNESS:  I have my expert report.  I was just

11  looking through.

12           THE COURT:  Just put it aside for the time being.

13  If you need the report, let us know.

14           THE WITNESS:  Okay.

15           THE COURT:  It creates the mistaken impression that

16  somehow this is scripted.  I have every confidence that it is

17  not.  But appearance is sometimes very important.

18           THE WITNESS:  I see.

19  Q.   BY MR. TOBEROFF:  And how would you assess those

20  Christopher Reeve films?  Would you assess those films as

21  being successful or unsuccessful?

22  A.   Depends which one you're talking about.  Certainly the

23  original 1978 film was a huge success.  And most people think

24  that it created the tent-pole comic book franchise big budget

25  blockbuster movie phenomenon that certainly was with us in the
```

```
 1   late 90's, early 2000's, and is with us today.  And my

 2   recollection is that it did.  About $134 million domestic box

 3   office, and in today's dollars, that would be $400 million.

 4              So that was -- and it was the number one movie of

 5   the year.  So it was a huge success.

 6              Shall I go on to the other movies?

 7   Q.   You may.

 8              THE COURT:  Why don't you ask a question, Counsel.

 9   Q.   BY MR. TOBEROFF:  Well, I'll stop you there.  We can talk

10   about the other movies later.

11   A.   Okay.

12   Q.   In valuing intellectual property, what is the

13   significance, if any, of that property having a prior

14   successful commercial track record?

15   A.   It's usually -- it's a huge part of the analysis.

16   Because what you're trying to -- if you take a snapshot in

17   1990, 2002, you certainly look at the prior track record of

18   Superman over the course of 60 years, 65 years, and see that

19   it had a continuing record of being exploited and for the most

20   part being very successfully exploited.  That would, in

21   analyzing the value in 1999 to 2002, that would be

22   extraordinarily important because you'd use that as a basis

23   for looking forward and trying to capture that value on a

24   going forward basis.

25   Q.   Are properties that have only been intermittently
```

1    exploited considered to be more or less valuable than

2    properties that have been consistently exploited?

3    A.    For the most part, less.  Excuse me.  More valuable if

4    they have been consistently exploited rather than

5    intermittently.

6    Q.    And in -- how would you assess properties that have no

7    track record in commercial exploitation, or limited track

8    record in commercial exploitation?

9    A.    They are less of a value.  Because there's not as much of

10   a track record in assessing the value in a certain time

11   period, would be more risky, and thus, you would have to

12   discount what you would pay because there wasn't the sort of

13   track record of success in the past, and the public awareness

14   that was created from that track record.

15   Q.    Let's now go back to the Superman sequels that followed.

16   The first Christopher Reeve movie that followed in 1978, the

17   Superman 2, how successful was that?

18   A.    It was successful, but not as successful as Superman 1.

19   I believe it did about 80 percent of the box office that

20   Superman 1 did.  But it was still, I think, the No. 3 movie of

21   the year at the box office.  So it was still successful.

22   Q.    And Superman 3?

23   A.    Superman 3 was not as -- it was less successful than

24   Superman 2, but still, I think, relatively successful.

25   Q.    And Superman 4?

1    A.    Superman 4 was a disaster.  Superman 4 was produced by a

2    company called Cannon Pictures that was known for sort of,

3    shall we say, sloggy films, and apparently they cut the budget

4    from 35 million to 17 million.  And they made a really bad,

5    bad movie, and it did not perform well.

6         MR. BERGMAN:  Objection, your Honor.  There -- the

7    witness wasn't asked that question and certainly hasn't shown

8    any foundation for making that statement.

9         THE COURT:  I don't think anybody is contending that

10   Superman 4 was a good movie at this point.  I think --

11        MR. BERGMAN:  You are certainly right, your Honor,

12   but the question of describing it, as Mr. Halloran did, and

13   who distributed the film and how they distributed the film

14   wasn't asked --

15        THE COURT:  Fair enough.  Let's -- just listen

16   carefully to the question and just answer the question being

17   asked.  I'm almost prepared to take judicial notice that

18   Superman 4 was not a very good movie, based on what I've heard

19   so far.

20        MR. BERGMAN:  If not, your Honor, we may have to

21   show it to you.

22        THE COURT:  Proceed, Counsel.

23   Q.    BY MR. TOBEROFF:  Which company produced Superman 4?

24   A.    I believe it was Cannon Films.

25   Q.    And did they also distribute the picture?

1    A.    No.  I don't think so.

2    Q.    Do you know who distributed the picture?

3    A.    I think Warner distributed it.

4    Q.    And what was the budget of the picture?

5    A.    I understand it to be 17 million or so.

6    Q.    As a whole, did these Superman movies, some more

7    successful than others, have a positive or negative impact on

8    Superman's value in the entertainment industry?

9    A.    An extraordinarily positive impact.  Notwithstanding

10   Superman 4.

11   Q.    And why did you say notwithstanding Superman 4?

12   A.    I said that because the consensus is -- two things in

13   mind.  Back in the 70's, the trend was that sequels, rather

14   than becoming more successful over time, as they sometimes do

15   now with, say, for example and Dark Knight, where it was --

16   the arc was going up with respect to box office.  In those

17   days, the consensus that most people shared was that the --

18   there would be sort of a continuing downward pitch of box

19   office.

20          So if picture one was a hundred million dollars in

21   the box office, the next one would do two thirds of that and

22   two thirds of that and would go down.  And it was the

23   experience with film franchises like Jaws.

24          Now, that's changed in the 90's.  There was also

25   that trend from my analysis, similar trend in the 80's with

1    the Batman movies, which started out and then went down and

2    down.

3              MR. BERGMAN:  Objection, your Honor.  The witness

4    hasn't shown any foundation for making a statement as to the

5    trend generally or what most people thought at the time.

6              THE COURT:  Okay, Counsel.  We've talked about the

7    speaking objections.  Just object on foundation.

8              I'm going to overrule it.  I think this witness is

9    qualified to testify on this.

10             Proceed, Counsel.

11             THE WITNESS:  On this one third --

12             THE COURT:  Well, there's no question.  You've

13   answered the question.

14             THE WITNESS:  Okay.  I can explain where I got that

15   in particular if I --

16             THE COURT:  Wait for the question.

17             Counsel.

18   Q.   BY MR. TOBEROFF:  Can you explain to me further how you

19   arrived at those proportions, please?

20   A.   In my discussions with executives at MCA, we did

21   financial modeling of movies, and by that I mean to say we

22   would use Excel spreadsheets and put the budget in and project

23   a release cost and try to predict what the performance of the

24   film would be.  And it was our experience, based on both our

25   films and films generally in the marketplace that -- actually,

1    excuse me, this was in the 70's.  It was the rule in both the

2    70's and the 80's that there was that diminution.  And

3    ultimately, that rule got put on its head in the late 90's.

4    And we had specific discussions about that, and when we would

5    model our discussions on a sequel, we would predict that if

6    picture one did a hundred dollars, that the first sequel would

7    do $67.

8    Q.    Skipping to May 9, 2002, when the Superman film agreement

9    was entered into, who were the two highest grossing comic book

10   movies at that point in time?

11   A.    At 2002?

12   Q.    May 9, 2002.

13   A.    If you're talking about inflation adjusted dollars, it

14   was the first Superman and Batman.

15   Q.    And Batman, you're referring to the Batman movie released

16   in the 1980's?

17   A.    1985, I believe.  Right around that time was when

18   Spiderman came out, which had even a higher gross, I believe.

19   Q.    How does the success of the first Superman movie starring

20   Christopher Reeve, released in 1978, compare to the success of

21   other comic book movies released after 2002?

22   A.    It's on a par and as successful as virtually any other

23   comic book based movie.  I think the only one -- it's on a par

24   with Batman and only slightly less than the first Spiderman on

25   an inflation adjusted basis.

282

1   Q.   In 1978, when the first Superman movie was released, were

2   films released on more or less screens than in this decade?

3   A.   Fewer in 1978 than now.  If you were to look at a graph

4   from 1978 to now, I would estimate there's at least twice as

5   many theaters in the United States as there were then, and

6   also what the studios have done is they now book theaters, you

7   know, say, 3,500 in a weekend, which was very unusual in the

8   late 70's.

9          They also spend a lot more to get the opening

10  weekend gross.

11  Q.   How do the marketing dollars spent in 1978 compare to the

12  marketing dollars spent in this decade on releasing major

13  films?

14  A.   The marketing dollars have gone up substantially, both on

15  an absolute basis and an inflation adjusted basis since 1978.

16  Q.   What impact, if any, does this differential in the number

17  of theaters the film is released in and the marketing dollars

18  spent have on your analysis when comparing the success of

19  Superman -- the first Superman movie to other more recent

20  comic book movies?

21  A.   It makes it look even more successful.

22  Q.   Why is that?

23  A.   And standing out even more.  Because back in the late

24  70's, they weren't spending either as much to produce or to

25  market the movie.  So if you take the inflation adjusted $410

283

1   million that stands out in domestic box office, it stands out

2   even more now because there weren't as many theaters and there

3   wasn't as much money spent in either production or

4   distribution of the film.

5           So it stands out even more, and I would draw the

6   conclusion to that that it's an even more valuable property

7   looking at it in that context.

8   Q.   What was the next movie -- Superman movie developed after

9   Superman 4?

10  A.   Well, ultimately it was called Superman Returns.

11  Q.   When did that development of Superman Returns or whatever

12  its predecessor title was to the next Superman movie commence?

13  A.   I understand it commenced in 1995 or so.

14  Q.   Do you have an understanding of how much money was spent

15  by Warner Brothers on the development of a new Superman film

16  from 1995 to releasing or commencing production on Superman

17  Returns?

18  A.   I understand it's in the neighborhood of $30 million.

19  Q.   When was Superman Returns released?

20  A.   2006.

21  Q.   Do you know what time period in 2006?

22  A.   Well, I -- it would have been either summer or Christmas.

23  It was, I think, more likely summer.

24  Q.   And how much was Warner Brothers reported to have spent

25  on the Superman Returns production?

1    A.    225 million.

2    Q.    And how much was Warner Brothers reported to have spent

3    on prints and advertising in connection with Superman Returns?

4    A.    Approximately 140 million, I believe.

5    Q.    Does this expenditure by Warner Brothers impact your

6    analysis of Superman's value in 2002?

7    A.    Yes.

8    Q.    In what respect?

9    A.    Well, putting into context both the money that was spent

10   on development and production and release, and, you know,

11   Warner is certainly one of, if not the top distributors in the

12   world, they must have thought that it was -- that spending the

13   money was a rational investment and that the property was a

14   valuable basis for this movie, for Superman Returns.

15   Q.    How did Superman Returns perform at the box office?

16   A.    It did very well.  It did approximately 400 million

17   worldwide.  My recollection is that breaks down to a little

18   bit over 200 domestic and I think 190 and change foreign.

19   Q.    How does the actual box office performance of Superman

20   Returns, released in 2006, impact your analysis of the

21   Superman film agreement entered into in 2002, if at all?

22   A.    It impacts it because if you look at the period of time

23   necessary to develop, produce, and release a film as of 2006,

24   it means that the deal would have been made in, you know, late

25   90's, early 2000.  And so it was obviously when that deal was

285

1    made in that window, Warner Brothers must have thought that it

2    was an extremely valuable property to spend the money on

3    development and production and release of that film.

4            THE COURT:  I don't know if that answers the

5    question, though.  I can certainly see where the money being

6    outlaid before the deal was consummated, as reflecting the

7    owner's understanding of the value, or the confidence.  But

8    how does the ultimate success of the movie -- we heard

9    testimony yesterday from one of the plaintiff's witnesses that

10   there really is no way of knowing for sure what movie is going

11   to succeed or what movie is not going to succeed.  I would

12   assume you would agree with that?

13           THE WITNESS:  As an absolute statement, yes, but I

14   certainly think that sophisticated studios like Warners place

15   good bets.

16           THE COURT:  Okay.

17           THE WITNESS:  For example, with Harry Potter, that

18   had not had a track record of success as a movie, and it's

19   been wildly successful.

20           THE COURT:  I understand that.  But the problem I'm

21   having is using, you know, ultimate success as a way -- as a

22   factor in assessing value to something which took place in the

23   creation stage.  You believe that does have a --

24           THE WITNESS:  Well, let's break it into two halves.

25   Maybe I can be helpful here.  Because when I was at Universal,

286

1    we would do this analysis.  There's two parts of it.  One is

2    let's look at the past performance of this intellectual

3    property, both commercially and in terms of awareness, you

4    know, the so-called brand.

5          So we would look at -- and the brand awareness is --

6    doesn't directly correlate with success necessarily.

7          THE COURT:  No, but I can see how that has a role in

8    the negotiator's assessment of the value.

9          THE WITNESS:  Yes.  So -- but what we try to do, of

10   course, is to -- what you try to do is to look forward and try

11   to predict as best you can what additional value to a project

12   having the license that the intellectual property would have.

13         For example, take Superman Returns and take

14   Superman.  You have the relatively unknown actors and maybe a

15   little action.  I have to believe that the contribution of the

16   Superman name and character added enormously to the

17   performance of that film.

18         THE COURT:  Well, fair enough.  And that's all

19   what's known previously.  And I even understand how the

20   projected or the expected returns figure into the value.

21         THE WITNESS:  Hm-hm.

22         THE COURT:  But what I'm struggling with

23   understanding is what the movie actually does, how does that

24   change what the value was under -- what the value actually was

25   back in 2000.  If I'm negotiating with you on the sale of

1    anything, any commodity, I place a value on it.  You place a

2    value on it.  We negotiate it, and we come up with a deal.  I

3    give you the commodity.  You give me money.

4            THE WITNESS:  Correct.

5            THE COURT:  Certainly my assessment of the value of

6    that commodity is based on historical factors, how the

7    commodity has done in the past, and how I expect it to do in

8    the future.

9            THE WITNESS:  Hm-hm.

10           THE COURT:  Now, what direction the commodity

11   ultimately takes after the transaction is interesting.  I'm

12   not clear -- I'm not sure how that's relevant to determining

13   what the value really was back in --

14           THE WITNESS:  No, it's not relevant because you

15   didn't have the performance numbers.

16           THE COURT:  You didn't know.

17           THE WITNESS:  You didn't know.

18           THE COURT:  I agree.  All right.  That's what I

19   thought.

20           THE WITNESS:  Fair enough.

21   Q.   BY MR. TOBEROFF:  When we are valuing intellectual

22   property rights in connection with an agreement, is it correct

23   or incorrect that you look at the value as of the date that

24   the agreement was entered into?

25   A.   Absolutely.

1  Q.   Absolutely correct?

2  A.   Absolutely, yes.

3  Q.   Thank you.  When did the Smallville television series

4  first appear?  When was the pilot released?

5  A.   It was October 2001, right after 9/11.

6  Q.   I should say broadcast.

7  A.   Yeah, broadcast.

8  Q.   And did the release of the Smallville television series

9  have any effect on your value analysis regarding Superman

10 prior to May 2002, when the Superman film agreement was

11 entered into?

12 A.   Yes.  Smallville was and continues to this day to be a

13 very successful show for Warner Brothers.  It's my

14 understanding it debuted as the number one top show in the

15 history of the WB network at the time, and I understand it's

16 in its eighth season, and they have just ordered a ninth

17 season.

18       So it continues to be successful, and I've seen

19 financial documents that reflect its continuing success.

20 Q.   And did you believe that had a positive impact on the

21 value of Superman as a whole prior to the May 2002 film

22 agreement?

23 A.   Yes.

24 Q.   Switching to a somewhat different subject.  If you were

25 representing DC in 1999 to 2002, with respect to the sale or

1  license of Superman film rights, what factors or trends would

2  you consider in assessing the value of the Superman film and

3  television rights?

4  A.    The factors or the trends, not the general factors and

5  trends affecting the marketplace, not the specifics of the

6  Superman character?

7  Q.    I'd like to start with general trends affecting value of

8  a property of this nature.

9  A.    Sure.  Well, the general trends at that time were that

10 the studios were more and more looking towards building

11 franchises.  Franchises can be based on intellectual property

12 with prior success, like Superman, or they can be new.  Like

13 Star Wars was new.  But they tend to be based on intellectual

14 property that had prior success.

15         Also at that time there was the rise of the

16 so-called tent-pole strategy, where companies, especially

17 companies like Warners, would sort of double down their bets

18 on movies and spend enormous amounts on both production costs

19 and releasing costs and place those films in typically

20 Christmas or summer, where the movie going audience tends to

21 go.  Those were the macro trends.

22         Also at the time the studios, even though they were

23 spending more money, they thought -- one of the reasons that

24 really gave rise at that time to the value of the intellectual

25 property was they thought they were limiting their risk and

```
 1   buying -- they were -- what they were essentially buying was
 2   what I guess we call prebranded awareness.  And especially in
 3   a -- in a world where there's competition for eyeballs.  Back
 4   in the 20's, there was like baseball and radio and horse
 5   racing and boxing.  I guess that was about it.  By the 90's,
 6   you had, you know, television.  You had the Internet.  Sports.
 7   All these competing things.  And it just became a lot more
 8   expensive for the studios to create the awareness.
 9           What they tried to do was buy awareness, and that
10   became a lot more valuable.  That was sort of the macro trend.
11   And I think it continues to this day.
12   Q.   And how do comic books fit or not fit within these trends
13   that you've mentioned?
14   A.   Well, comic books --
15           MR. BERGMAN:  Objection, your Honor.  Lack of
16   foundation.
17           THE COURT:  Sustained as to comic books.
18   Q.   BY MR. TOBEROFF:  Do you have a familiarity with comic
19   books as the source material for film and television
20   programming?
21   A.   Yes, I do.  And I've had particular experience.  I was an
22   expert in the Spiderman case and the Watchmen case and also in
23   the Sahara case where we looked at, you know, comic book
24   franchises and how they worked and the value and the like.  So
25   I have a particular sort of knowledge of this area.
```

1   Q.   And the Watchmen case you're referring to, the recent

2   federal action between Warner Brothers and Fox?

3   A.   Yes, I was an expert for Fox in that action.

4   Q.   How do comic books factor in or not factor into your

5   analysis of the trends that were converging in the 1999, 2002

6   period?

7   A.   Well, they certainly lent themselves to the trends that I

8   described, and they -- additionally, they had some other

9   unique properties that made them even more valuable.  The most

10  fundamental one is that unlike a novel, you actually had a

11  visual depiction of a character that was emblazoned into the

12  mind of the public.  I don't know anyone who doesn't know of a

13  Superman costume, the Superman S.

14         So that's -- so they have a visual image which also,

15  you know, they are going to see on the screen that hopefully

16  brings them into the theaters.  And also with the rise of

17  special effects in the late 90's with Jurassic Park and the

18  like, it was easier to create these comic book worlds.

19         Another great thing about comic books is that the

20  awareness is so strong, that they are not so reliant on story

21  lines.  The buyers of the IP are free to, you know, change the

22  story lines, make people -- they can be darker or lighter.

23  You can change different love interests.  You have all sorts

24  of freedom there.

25         It would be virtually impossible to do that if you

1    had a book, you know, because the fans would think, you know,

2    there's always been controversy about changing the books.  And

3    that was the main thing that was at issue in the Sahara case.

4    Clive Cussler had written a series of books based on Dirk

5    Pitt, and he had licensed one that had not been a success,

6    and -- and he insisted that he approve the screenplay.  So the

7    comic book, you don't have that problem.

8            Another problem you don't have, which can be a huge

9    problem, is stars.  You know, if you have a star who is

10   Batman, and he gets too expensive, then you get rid of him.  I

11   mean, Michael Keaton was a Batman.  And I think there was a

12   money dispute.  I'm not quite sure.  But it ended up being

13   Christian Bayle, of course, who was relatively unknown at the

14   time.  Certainly in Superman Returns, the star was an unknown.

15           A great thing about that is that we know that,

16   you know, some stars, like Will Smith and the like, get

17   $20 million.  Well, you don't have to pay that $20 million.

18   You can get an unknown star and save $20 million.  So the

19   comic books have all sorts of pluses.

20           One other thing is that because they're visual, they

21   tend to do well overseas.  They have international appeal.

22   That's a big plus, too.

23   Q.   You mentioned -- you mentioned movie stars, Will Smith

24   receiving a cash salary of $20 million.

25   A.   Yeah.

1   Q.   What kind of contingent compensation does a top movie

2   star receive?

3            MR. BERGMAN:  Objection.  Lack of foundation, your

4   Honor.

5            THE COURT:  Overruled.  Based on his experience.

6            THE WITNESS:  The sort of standard triple A deal for

7   an actor is $20 million against 20 percent of the gross.

8   Q.   BY MR. TOBEROFF:  20 percent of the gross?

9   A.   Yes.  So that means that the actor would get $20 million

10  to -- during production of the movie and then 20 percent of

11  the gross after a hundred million dollars of gross.

12  Q.   And do superhero movies customarily star -- have big

13  movie stars in the lead roles of the superhero?

14  A.   They customarily don't.  And in addition to the financial

15  reason, there is a creative reason for that, which is the

16  real, real star is the character, Superman.  The real star is

17  not Michael Keaton in Batman.

18            So that's the thinking.  That doesn't mean that

19  there aren't, you know, good actors that have these roles.

20  Obviously, if you look at Ironman, there are good actors, but

21  certainly -- remind me of the star of Ironman.  Robert Downey,

22  Jr.  He's certainly not in that 20 million against 20 percent

23  gross category at all.

24  Q.   And prior to Superman, was the first Superman movie in

25  1978 was Christopher Reeves --

1          THE COURT:  It's Christopher Reeve, isn't it?

2          THE WITNESS:  Everyone gets confused because it's

3    George Reeves, plural, who was the star of the TV series, and

4    it's Christopher Reeve, singular.

5    Q.   BY MR. TOBEROFF:  Was Christopher Reeve a very well-known

6    star or an unknown star before he starred in the Superman

7    movies?

8    A.   He was completely unknown and fresh out of school.  I

9    think he was 23 years old.  Subsequently, he became a big star

10   based on the success of the films.  And that often happens.

11         So you have to keep in mind, you know, well, you

12   know, he became a big star, but as of the time that the deal

13   was made, he wasn't a big star.  And another thing you should

14   keep in mind is that, you know, smart studios will make a

15   multi-picture deal.  They will get opposites for future

16   pictures that don't get held up, for example.

17         When I was at Universal, we did Back to the Future.

18   We were highly confident that there would be sequels.  So we

19   did a three-picture deal with Michael J. Fox.

20         MR. BERGMAN:  Your Honor, I object.

21         THE COURT:  Your objection is well taken.  Just be

22   careful.  I know we don't have a jury and it's a little less

23   formal, but just try to answer the question.

24         THE WITNESS:  I was just trying to draw some

25   parallels.

```
 1              THE COURT:  Next question, Counsel.
 2   Q.    BY MR. TOBEROFF:  Superman Returns, who was the star of
 3   that movie?
 4   A.    His name is Brandon.  I want to say Routh.
 5   Q.    And was he a major movie star before appearing in
 6   Superman Returns?
 7   A.    No, he wasn't.
 8   Q.    And how many different actors -- are you familiar with
 9   the Batman movies that appeared in the late 80's?
10   A.    Yes.
11   Q.    How many Batman movies were there?
12   A.    I believe there were four.
13   Q.    And more recently how many Batman movies have there been?
14   A.    Two.
15   Q.    You look at those six Batman movies, how many different
16   actors have played Batman over that relatively short period?
17   A.    The last two were both Christian Bayle.  And before that
18   it was Michael Keaton, and oh, boy, was George Clooney Batman?
19   I don't know.  It's not stuck in my head.  But there were
20   various Batmans.
21   Q.    Christian Bayle, would he be considered a big movie star
22   before his appearance in Batman Begins?
23   A.    No.
24   Q.    Now, you mentioned the rise of the tent-pole strategy
25   during the period in question in the late 90's and early 2000.
```

1    And you mentioned tent poles are becoming increasingly

2    important.  Can you describe for me what you mean by a

3    tent-pole film?

4    A.    A tent-pole -- you got to understand because it literally

5    holds up the distribution and release schedule for a studio.

6    These are the most important films.  They tend to be based on

7    sort of prebranded properties like Superman and Batman, and

8    they almost always have huge budgets both for the production

9    cost and the releasing costs.

10            They are typically in the summer or Christmas when

11   most people go to the theaters, and they are typically booked

12   in, you know, 3,500-plus theaters.  And they are almost

13   without fail, there are huge amounts of money spent for media

14   ads in conjunction with the opening weekend.

15   Q.    And what types of films are usually chosen to serve as

16   tent-pole films?

17   A.    They are typically films that have prior awareness.  They

18   are typically franchise films.  And within the franchise film

19   arena, most of those films, not all of them.  There are

20   exceptions, like Star Wars, that are based on what we call

21   prebranded properties, whether they are comic books or novels

22   or video games or the like.

23   Q.    Are tent-pole films very action-driven films?

24   A.    They typically are action oriented.  Again, because among

25   the advantages of the action movies is they export well, and I

1  think the American and international public has gotten used to

2  going to a theater and having an experience where there's

3  another world out there and, you know, I don't know about you,

4  but I can't fly.

5  Q.    And are tent-pole films often, very often special

6  effects-driven films?

7  A.    Yes.  Especially after the -- you know, the mid-90's with

8  Jurassic Park and Men in Black and the like, they became more

9  special effects driven.  And one thing that was -- another

10 trend is that the cost of the special effects, even though the

11 cost of the movie is going up, the actual cost of the special

12 effects with the start of computer-generated imaging started

13 coming down.  So you could do bigger, greater visual effects

14 for less money.  So that was another trend.

15 Q.    And how important or unimportant are special effects

16 today in major film releases?

17          MR. BERGMAN:  Objection.  Relevance.

18          THE COURT:  Sustained.

19 Q.    BY MR. TOBEROFF:  Do superhero films require a large

20 amount of special effects to be realized?

21 A.    Yes.  Because the superheroes are exercising sort of by

22 definition powers that humans can't do.  And so if you've got

23 Spiderman or Batman or Superman, you know, jumping around

24 buildings and fast cars.  I mean, there's all this stuff that

25 needs to be done within a superhero film that you don't have

298

```
 1   to take care of necessarily in a film like Out of Africa.
 2   Q.   And are special effects important to the target audience
 3   of a superhero film?
 4   A.   Absolutely.  The superhero, the sort of core fan or the
 5   people who tend to be the comic readers and their -- they
 6   become comfortable with that visual other world as depicted in
 7   the comics, and they want to see that replicated at least in
 8   part in the film.  So it's required.
 9   Q.   Have tent-pole films, as you have described them, become
10   more important or less important to studios over time?
11   A.   They have become increasingly more important.
12   Q.   In what ways have tent-pole films become more important?
13   A.   I think they dominate now more than ever the distribution
14   strategies of the studios.
15   Q.   And what do you believe is the reason for that?
16   A.   The -- I think the clear reason is that the studios want
17   to take advantage of the trends that I described that were
18   extant in the late 90's and early 2000's, which I think play
19   more now, which is the competition for the eyeballs.  You have
20   the expectations of these huge movies, and they want to limit
21   their risk by investing in properties that can be, you know,
22   visually depicted in a grand manner and that aren't relying on
23   stars and aren't relying on necessarily a specific story line,
24   but which can sell like crazy all over the world.
25   Q.   Are any studios known more than other studios for
```

299

1    focusing on big action-driven tent-pole movies?

2    A.   Warners is probably the number one, but certainly all the

3    other studios are not far behind in seeking to produce these

4    movies.  But they do it better than anybody, I think.

5    Q.   Now, you mentioned the term pre-awareness and a trend

6    towards focusing on properties with built-in pre-awareness.

7    What does the term branded property mean in that respect?

8    A.   A brand is something that people immediately associate

9    with.  Something like -- certainly Superman is a brand.

10   Coca-Cola is a brand.  And I think what owners of intellectual

11   property try to do is to move as much as they can towards

12   Coca-Cola.  They would love it if people would buy, you know,

13   brown water with sugar in cans.

14          But, you know, intellectual property is usually more

15   complicated than that.  But what you want to do is sear into

16   the consciousness of the public the visual images that are in

17   your intellectual property.  And comic books do great at that.

18   They are not the only ones.  Certainly there's Star Wars and

19   James Bond and other things that are brands that aren't comic

20   books, but certainly in the world of brands, comic books are

21   very important.

22   Q.   What effect does a pre-established property have on the

23   studio's willingness to take risks in investing in that

24   property as a feature film or television show?

25   A.   Well, there's sort of two things going on at one time.

1   Because the perception is they have less risk going forward

2   because of the track record and the contribution that the

3   intellectual property will make, they are willing to take more

4   risk by paying more.

5           So if you look at a property and you say okay, well,

6   going forward because it's, say, Superman, among the factors

7   is it has this prebranded awareness.  I don't have to pay a

8   star.  The -- it has a great track record going forward.  I

9   can -- basically the tradeoff in my mind would be I don't have

10  to pay a star.  I can pay that money for the intellectual

11  property, and I can increase my chances of success, and I can

12  limit my chances of a Superman 4.

13  Q.   You testified earlier, you used the phrase a film's

14  opening weekend.  What is the relevance of a film's opening

15  weekends in the film industry?

16  A.   Well, the opening weekend is kind of the whole ball game.

17  And certainly I've noticed over the last 10 or 15 years, and

18  I'm sure others have, that opening weekend, it's on the news

19  on Sunday night.  It's everywhere.  But the significance

20  economically is that for the tent poles, the big bet is

21  spending all the money in production and then huge money on

22  releasing and what do we do that first weekend.

23          I'll never forget when Superman came out in 2002.  I

24  think it did 114 million at the box office, and it just blew

25  everyone's mind.

1             Opening weekend is also important because there's a

2    strong correlation between opening weekend and the ultimate

3    financial success of the film.  I remember when we did

4    financial models at Universal, we would -- we would try to

5    predict the -- you know, the domestic box office gross and the

6    correlations between that and the main component in predicting

7    the domestic box office gross with what we were going to do

8    the opening weekend.

9    Q.   What effect, if any, does a branded property with

10   pre-awareness have on this vital opening weekend?

11   A.   Well, it has a great influence because the studio can

12   sort of build on the preexisting awareness and try to leverage

13   that into even higher awareness and hopefully translate that

14   into ticket sales.

15   Q.   Does pre-awareness mean that a studio must spend less on

16   marketing?

17   A.   Not necessarily.  They -- well, certainly they get more

18   bang for their buck from the marketing because they can again

19   leverage the preexisting awareness, but if you look at the --

20   I mean, I represented Bob Doucet who, you know, has --

21             MR. BERGMAN:  Objection, your Honor.  The witness

22   has gone way beyond the question.

23             THE COURT:  Actually, let's go ahead and take our

24   afternoon break at this time and pick up with a fresh question

25   when we start.  Thank you.

302

```
 1              (Recess taken.)

 2              THE COURT:  Counsel.

 3              MR. TOBEROFF:  Thank you, your Honor.

 4   Q.   BY MR. TOBEROFF:  Now, you mentioned that there was an

 5   increasing interest among the studios in franchise films.

 6   What is a franchise property?

 7   A.   A franchise property is a property that lends itself to a

 8   series of pictures, sequels.  They may be prequels.

 9   Q.   Can you give me some examples of well-known franchise

10   properties that have been exploited in film?

11   A.   The most famous is James Bond.  There's been over 20

12   James Bond movies, and they continue to be produced as movies

13   with even more and more success.  Star Wars is a great

14   example.  And then I think you have Superman and Batman in

15   that league as well.

16   Q.   Of the 10 top grossing films of all time, how many, if

17   any, are based on franchise -- underlying franchise

18   properties?

19   A.   I believe it's nine out of ten, if I'm not mistaken.  I

20   think the exception is Titanic.

21   Q.   Nine out of ten of the top ten grossing films are based

22   on underlying franchise properties?

23   A.   Are based on underlying --

24   Q.   No, no.  I'm just --

25   A.   You're repeating what I said?
```

```
1   Q.   Yes.

2   A.   Yeah, I believe that's true.

3   Q.   Why are franchise properties so important to studios?

4   A.   They are the bedrock to their, you know, production and

5   distribution strategy.  They are -- typically, the franchise

6   properties are developed and produced with the intention of

7   them acting as tent poles for the studio's distribution slate.

8           THE COURT:  Let me stop you for a second, Counsel.

9           I'm sorry, Counsel.  You may proceed.

10          THE WITNESS:  And when they hit, they can be

11  fantastically profitable.

12  Q.   BY MR. TOBEROFF:  You mentioned sequels.  Why does a

13  studio care about a property having strong sequel potential?

14  A.   Well, what they'd like to do is create a franchise from

15  the beginning.  So certainly they are going to make a -- if

16  they are going to place their bet and spend a lot of money on

17  development, production, and releasing a film, they typically

18  don't want that to be a one shot.  They want to build

19  something that can serve as the basis for a series of films.

20          So what they try to do is build the brand awareness

21  or leverage -- if there's a preexisting property, they try to

22  leverage it.  If it's not preexisting, they try to create it,

23  and then they seek to continue to profit from their investment

24  by having subsequent films, and hopefully not only subsequent

25  films, but the sort of spinoff merchandise and the like that
```

304

```
 1   is generated by those sequels.
 2   Q.   Are franchise films often episodic in nature?
 3   A.   Sometimes, yes.
 4   Q.   And are comic books episodic in nature?
 5   A.   Yes.
 6   Q.   How has the studio interest in franchise films increased
 7   or decreased in -- strike that.
 8            Has studio interest in franchise films increased or
 9   decreased in the last decade?
10   A.   I think it's increased.
11   Q.   Has studio interest in tent-pole films increased or
12   decreased in the last decade?
13   A.   Increased.
14   Q.   Switching back to comic books again.  Do you have
15   knowledge of the primary demographic of comic book readers?
16   A.   I think they are predominantly young men.
17   Q.   And what is the target audience for tent-pole films?
18   A.   Young men and young women that hopefully go together to
19   the movie.
20   Q.   Is it one or the other?
21   A.   I think it's predominantly young men.  Especially young
22   men that will keep going back again and again to a movie.
23   Q.   Now, I'd like to go back to the period in the film
24   industry of 1974, early 1970's.  In formulating your expert
25   opinion in this case, did you review a film agreement between
```

```
 1   DC Comics and a company owned by the Salkinds, or Alexander
 2   Salkind?
 3   A.    Yes.
 4   Q.    In 1974 were comics and/or superhero -- strike that.
 5         Were comics important in 1974 to the film industry
 6   or unimportant?
 7         MR. BERGMAN:  Objection, your Honor.  Lack of
 8   foundation.
 9         THE COURT:  Well, you know, why don't you rephrase
10   the question.  When you say whether they are important, in
11   what sense, Counsel?  And then I can better assess whether or
12   not there's foundation.  If it's in terms of valuing them or
13   evaluating a particular industry.  Let's rephrase your
14   question.
15         MR. TOBEROFF:  Certainly.
16   Q.    Prior to the release of the first Superman film in 1978
17   starring Christopher Reeves, had any comic --
18   A.    Reeve.
19   Q.    Reeve.
20         -- had any films to your knowledge been released
21   prior to that based on a comic book superhero?  Had any films
22   been released prior to 1978?
23   A.    None that I'm aware of.  None that had the success that
24   the first Superman did.
25   Q.    Are you aware of any films prior to 1974 that were based
```

```
 1   on comic books?

 2          MR. BERGMAN:  Objection, your Honor.  Lack of

 3   foundation.  The witness was in high school or college in '74.

 4          THE COURT:  Given his familiarity with the industry,

 5   I suspect he might be aware of this.

 6          Are you aware of any films before 1974?

 7          THE WITNESS:  Absolutely.  I was in college, but I

 8   certainly went to the movies a lot.  I'm in the movie

 9   business.

10   Q.   BY MR. TOBEROFF:  When you worked for -- how many years

11   did you work at the studios?

12   A.   Roughly 10.

13   Q.   And when you worked at the studios, how old were you?

14   A.   I was 33 to -- I was 29 to 28, something like that.

15   Q.   And at that time, when you were evaluating projects for

16   acquisition, did you go back in history and see whether or not

17   similar projects had been exploited?

18   A.   That was absolutely part of our analysis.

19   Q.   And did you place a value on those prior exploitations?

20   A.   Absolutely.

21   Q.   Based on your review of numerous documents in this case,

22   how do you believe Warner Brothers viewed Superman as the

23   basis for film and television exploitation in or about 1974?

24   A.   It was a lot less important to them than after the

25   success of Superman, and the thing that was most telling to me
```

307

1    was that DC would license the production rights to a third

2    party, to the Salkinds or --

3    Q.    You're referring to the fact that they didn't exploit the

4    film rights with Warner Brothers.  They exploited it with the

5    Salkinds pursuant to the 1974 --

6             THE COURT:  Counsel, let him testify.  This is your

7    expert.  You don't need to lead your expert.  He's capable of

8    answering these questions.

9             THE WITNESS:  What I'm saying is that --

10             THE COURT:  No.  Ask a question and give an answer.

11    Q.    BY MR. TOBEROFF:  What is your opinion based on?

12    A.    It was clear to me, from my review of the documents, that

13    in 1974, the fact that DC Comics would agree to license the

14    film production rights to a third party for 25 years was very

15    telling of the value that Warners was putting on the property

16    at the time.  They were willing to -- one would think that if

17    they highly valued it, they'd want to keep it to themselves

18    and exploit it themselves.

19    Q.    Do you have a basis for evaluating how Warner Brothers

20    viewed the other major DC superhero, Batman, as the basis for

21    film exploitation in the early 70's?

22    A.    Yes.

23    Q.    How did they -- how do you believe they viewed Batman as

24    a film property in the early 1970's?

25    A.    Well, I think they had a view of Batman very similar to

1   Superman.  They entered into an agreement with a third party

2   to grant them the production rights to Batman for a period of

3   time.

4   Q.    You say they entered an agreement.

5   A.    "They" being DC.  I think it was with Melnick Productions

6   regarding Batman.

7   Q.    And was that agreement with a Warner Brothers company?

8   A.    No.

9   Q.    Who was that agreement with?

10  A.    It was a third party.  And then ultimately, I believe

11  that agreement ended up with Casa Blanca films and at

12  Universal.

13  Q.    Do you believe that, given the various trends you

14  discussed, would Warner Brothers and DC treat Superman and

15  Batman as film properties the same way in 2002 as they would

16  in 1994?

17  A.    They treat them very differently.

18  Q.    And why is that?

19  A.    Things have changed.  There was a convergence of the sort

20  of macro trends that I talked about before, and then there was

21  the sort of immediate sort of comic book superhero explosion

22  in terms of both development and success in the marketplace.

23        The benchmark that most people use, I think, is Men

24  in Black in 1997.  After that, there was a series of very

25  successful comic book based films, and then certainly with the

309

1    success of Spiderman 2002, it really took off then.

2    Q.    What is meant in the motion picture industry when one

3    refers to a property as being a hot property?

4    A.    A hot property is a property that is in demand by a

5    multiple of people and therefore has a higher value.  Because

6    lots of people want to buy it.

7    Q.    Do you regard studios as being competitive with one

8    another?

9    A.    Yes, very.

10   Q.    What are the major studios?

11   A.    Major studios are Universal, Fox, Time Warner, Disney,

12   some people would say MGM, and Sony.

13   Q.    Is Paramount a major studio?

14   A.    Yes, I neglected to mention it.  I'm sorry.

15   Q.    Do studios track each other's development of projects?

16   A.    Yes.

17   Q.    Do they closely track each other's development?

18            MR. BERGMAN:  Objection.  Lack of foundation.

19            THE COURT:  Foundation.  Sustained.

20   Q.    BY MR. TOBEROFF:  When you worked at a studio, did you

21   become aware of whether or not the studio would track the

22   development of other studios' projects?

23   A.    Well, certainly on the business side we didn't track them

24   quite as closely, but we read the trades every day.  I think

25   on the creative side they paid more attention, and certainly

1    on the marketing and distribution side they paid enormous

2    attention because they were seeking to, you know, set aside

3    slots, you know, release slots for their pictures years and

4    years ahead of time.

5    Q.   Based on your experience in the motion picture and

6    television industry, how do studios know what the competition

7    is developing?

8              MR. BERGMAN:  Objection.  Lack of foundation, your

9    Honor.

10             THE COURT:  Sustained.

11   Q.   BY MR. TOBEROFF:  How many years did you work at a motion

12   picture studio?

13   A.   At Orion and Universal, about 10 years.

14   Q.   And in your private practice, do you often deal with

15   motion picture studios and motion picture developments?

16   A.   Yes.

17   Q.   Do you talk to motion picture studio executives and

18   television executives as to what their habits are in keeping

19   track of what the competition is doing?

20   A.   I don't think I talk to them about their habits so much

21   as we typically talk -- people know about it, and they talk

22   about it all the time.  They don't talk to us about how you

23   found out about that, but we talk about it.  One thing that

24   has changed, though, is there are now, you know, computer

25   systems, I.M.D., B Pro, Film Tracker.  There's a lot of

1    information that's publicly available via computer now.

2    Q.    But based on your relationships with studios and your

3    having worked at the studios, have you become aware of how

4    studios function both in terms of deciding what projects to

5    develop and deciding what projects to acquire and in

6    evaluating those projects?

7    A.    Yes.

8    Q.    And when studios make this decision, do they apprise

9    themselves of what the competition is doing?

10   A.    Absolutely.

11   Q.    And does that include tracking the development of films

12   before they are released by other studios?

13   A.    Yes.  Especially in the franchise area, you certainly

14   want to look at, you know, what the next Bond is going to be,

15   what the next Spiderman is going to be.  Especially the big

16   ones are very closely tracked, again, with a view of looking

17   to develop and produce and release competing franchise movies

18   that don't bump up exactly but compete with those pictures.

19   Q.    Do studios anticipate the success of their competition --

20   the movies of the competition before they are released?

21   A.    There certainly is a sort of buzz and awareness that's

22   commonly held about what the big movies are going to be.  Both

23   in the press and among studios.

24   Q.    Do studios hold audience test screenings of their films

25   before they release the films?

312

```
 1   A.   Yes.
 2   Q.   Does that lead to the buzz or anticipation in the
 3   entertainment industry of those films?
 4   A.   It certainly contributes to it, but they also hold the
 5   screenings to test and perhaps make changes that will make the
 6   pictures even more effective, but yes.
 7   Q.   How long does it generally take from the start of
 8   production of a film to the release of a film?
 9           MR. BERGMAN:  Objection.  Lack of foundation.
10           THE COURT:  Overruled.  You may answer, based on
11   your experience.
12           THE WITNESS:  If you're talking about, you know, big
13   movies, you're talking about probably 18 to 24 months.
14   Q.   BY MR. TOBEROFF:  And how long does it generally take
15   from the start of development of a film to a film -- strike
16   that.
17           What does it mean when a film is being fast tracked
18   by a studio?
19   A.   It means that they are accelerating development, and even
20   though they haven't officially green lit or said they are
21   going to make the movie, the odds are that they will.  So when
22   it's -- okay.
23   Q.   Now, even with respect to a film that has been fast
24   tracked, what is the development time period from start of
25   development to a film's release?
```

313

1   A.   I would think two to three years.  On the super fast

2   track, not on a typical basis, even more.

3   Q.   And on a typical basis, I understand some films may never

4   be produced.

5   A.   Correct.

6   Q.   But on a typical basis, looking at films that are

7   developed and produced and then released, what generally is

8   the period of time between start of development and release of

9   the film?

10  A.   I'd say three to five or three to six years.

11  Q.   I'm sorry?

12  A.   We're talking about from development to release?

13  Q.   Yes.  So you said three to five or six years?

14  A.   Yes.

15  Q.   Fine.  Now, turning back to comic books in the film

16  industry.  As of 2002, May 2002, when the Superman film

17  agreement in question was entered into, how important were

18  comic books as the basis for films?

19  A.   Extraordinarily important.

20  Q.   Can you tell me the basis for that opinion?

21  A.   Well, it was basically the convergence of the factors

22  that I talked about.  The franchises, the comic books as

23  franchises, the comic books having the special attributes that

24  were important to studios, including the prebrandedness, the

25  ability not to have to pay for a star, and in the late 90's

314

1  and early 2000's what was happening was there had been sort of

2  the Superman success of the 70's that had dissipated, the

3  Batman success of the 80's that had dissipated, and now you

4  had another sort of, you know, the situation where beginning

5  with Men in Black and with X Men and Spiderman, it -- the

6  trajectory had gone up again.

7  Q.    So Men in Black came out in 1997, I believe you said?

8  A.    Correct.  And then there was a Men in Black 2.

9  Q.    And the first Men in Black, was that successful?

10 A.    Very, very successful.

11 Q.    And what movie based on comic books came out right after

12 Men in Black?

13 A.    I think Blade came out in '98.

14 Q.    Was -- in 1998.  Was that successful?

15 A.    Yes.

16 Q.    And what was the next major film that came out based on a

17 comic book?

18 A.    Well, the one I remember is X Men in 2000, and there was

19 the Men in Black 2 in 2001, and there was Spiderman in 2002.

20 So there was a succession.

21 Q.    And when was the first Spiderman movie released?

22 A.    2002.

23 Q.    And do you know what month, perhaps?

24 A.    Yes, I do know.  I think it was May.  It was almost

25 contiguous with the actual signature of the DC Comics-Warner

1    Brothers film agreement.  In fact, it came out a week before,

2    as I recall.

3    Q.   So Spiderman came out a week before the Superman film

4    agreement was executed?

5    A.   Yes.

6    Q.   And was it successful?

7    A.   It was mammothly successful.  It did $114 million its

8    first weekend, which was absolutely unprecedented.

9            THE COURT:  How much again?

10           THE WITNESS:  $114 million the first weekend.

11   Q.   BY MR. TOBEROFF:  The first weekend?

12   A.   Yes.

13   Q.   And you mentioned Men in Black 2 as coming out in 2002.

14   When did that come out?  What month approximately?  Do you

15   have any idea?

16   A.   I don't have the exact --

17   Q.   Do you believe it was a summer release?

18   A.   That's my recollection, yes.

19   Q.   Do you believe that Warner Brothers was aware or not

20   aware of Sony's development of Spiderman before it was

21   released?

22           MR. BERGMAN:  Objection.  Calls for speculation.

23           THE COURT:  Would you lay a foundation for that.

24   Q.   BY MR. TOBEROFF:  Well, you testified earlier that

25   studios are aware of other studios' film development; correct?

1    A.   I did.

2    Q.   And you also testified that studios anticipate a way --

3    anticipate the success of their competitors' films before

4    those films are released; is that correct?

5    A.   That is correct.

6    Q.   Do you believe that was the case with Warner Brothers

7    with respect to Sony's development and anticipated success

8    with Spiderman?

9    A.   Well, I don't have any personal knowledge of exactly what

10   Warners' executives knew, but I paid close attention to

11   Spiderman because I was an expert in the litigation starting

12   in 1999, and the whole town was aware of Spiderman and its

13   history and the fact that it was designed to be a big huge

14   success, and indeed it was.

15          So one would assume with high confidence that the

16   Warner executives knew about it.

17   Q.   Based on your knowledge of the way the entertainment

18   industry works, do you believe that Warner Brothers would have

19   been aware of Sony's development of a Men in Black sequel

20   after the success of the first Men in Black movie in 1997?

21          MR. BERGMAN:  Same objection.

22          THE COURT:  Overruled.  Explain your understanding.

23   You are not so much asking about the -- obviously, it would be

24   speculation as to what Warner Brothers knew or didn't know,

25   and in that respect, the objection is well taken.  You are

1    describing what was known in the industry at the time, and the

2    Court will consider the evidence.

3              MR. TOBEROFF:  Yes.

4              THE COURT:  You may answer.

5              THE WITNESS:  Everybody in Hollywood knew that a Men

6    in Black sequel was in development.

7              THE COURT:  How is that?

8              THE WITNESS:  It would be reported in the trades,

9    and virtually everyone who -- in the industry reads the

10   trades.

11   Q.   BY MR. TOBEROFF:  Now, when studios track each others'

12   development, do they also track the anticipated release dates

13   of competing films?

14   A.   Absolutely, yes.  Because they are booking their own

15   release dates, and they try not to bump up too closely against

16   one another, to leave some room to grab more audience in the

17   opening weekend.

18   Q.   You also testified earlier that development of a film

19   that actually gets made can be a process of between three to

20   five or six years.

21   A.   Or even longer.

22   Q.   Right.  And so as of May 2002, what major comic book

23   films do you believe would have been in development that came

24   out after that?

25   A.   Superman, Batman.

1    Q.    Batman Begins?

2    A.    Batman Begins, yes.

3    Q.    You can try and give the dates that these movies were

4    released, that would be helpful as well.

5    A.    Okay.  Where were we?  Okay.  So --

6    Q.    Why don't we start chronologically in 2002.

7    A.    Okay.  Okay.  Certainly Batman Returns would have been in

8    development.

9    Q.    Batman Begins?

10    A.    Batman Begins.  Sorry.

11          Certainly the X Men would have been in development.

12    Q.    And when was that actually released?

13    A.    2000.  And then there was a sequel in development after

14    that.

15    Q.    When was the sequel released?

16    A.    Oh, I believe 2002.

17    Q.    Continue.

18    A.    Okay.  So there were at least four big comic book movie

19    franchises that were in development at that time, and studios

20    were certainly looking to -- looking to acquire comic book

21    based superhero properties.

22    Q.    Was there -- you mentioned a Blade movie released in

23    1998.

24    A.    Yes.

25    Q.    Was there a sequel to that movie released after May of

1    2002?

2    A.    Yes.

3    Q.    Do you know the year by chance?

4    A.    I don't know the exact year, but it would have been in

5    development as well in that window.

6    Q.    And are you familiar with a movie based on the comic book

7    The Hulk?

8    A.    Yes.

9    Q.    Was a movie released based on The Hulk?

10   A.    Yes.  Actually, there's been two movies based on The

11   Hulk.

12   Q.    When was the first movie released?

13   A.    I believe in 2002 by Universal, was directed by Ang Lee,

14   and subsequently a Marvel version.  So Hulk was in that

15   window.  I think Hulk would have been in development at

16   Universal.

17   Q.    And you mentioned the Spiderman movie released in May of

18   2002.  Was a sequel released after that?

19   A.    Yes.  So in addition to the Spiderman movie, they would

20   have -- it's quite likely that there was a sequel in

21   development at the same time.

22   Q.    Well, when was the Spiderman sequel released?

23   A.    I believe there were two.  So 2005, I want to say, in

24   that range.

25   Q.    Are you familiar with the comic book series Fantastic

1    Four?

2    A.    Yes.

3    Q.    That's also a Marvel series?

4    A.    Yes.

5    Q.    Was a movie ever made based on that comic book?

6    A.    Yes.

7    Q.    Do you have any idea when that was released?

8    A.    Right now I don't remember exactly when it was released.

9    Q.    Do you have any idea, the range?

10   A.    It was certainly in the '97 to, I think, 2002 window.

11   Q.    We're speaking of the money Fantastic Four.

12   A.    Okay.

13   Q.    If you don't know --

14   A.    Yeah, I would be guessing.  I'm sorry.

15   Q.    What value, if any, would this development of other comic

16   book films released after May 2002 but developed prior to

17   May 2002 have on the value of comic book properties as of

18   May of 2002?

19   A.    Well, it would be important and add to the value of comic

20   book intellectual property in 1999 to 2002.  There was

21   certainly a competition among the studios to acquire and

22   develop and release these sort of properties, and based on

23   the, you know, historical success of, you know, Superman in

24   '78 and Batman in the 80's and Men in Black, studios were

25   looking at this as a way to -- they wanted to take advantage

```
 1    of the trend towards creating franchises based on comic book

 2    intellectual property.

 3              THE COURT:  I guess I don't understand that.

 4              THE WITNESS:  Okay.

 5              THE COURT:  We went through this before, of this

 6    idea of using future success of the value to what people knew

 7    at the time that they were negotiating.

 8              THE WITNESS:  Right.

 9              THE COURT:  How would a future release of a comic

10    related feature film or a sequel affect the value that

11    individuals placed on a contract prior to that?

12              THE WITNESS:  Okay.  I'll explain that to you.

13              THE COURT:  And make that consistent with your

14    earlier answer, where you conceded awareness of Superman

15    Returns was not relevant to that valuation earlier, because

16    this seems to be at odds with that testimony.

17              THE WITNESS:  Well, I think what I testified to

18    before was that with respect to a particular IP, you would

19    look to the past and try to predict the future.

20              THE COURT:  Right.

21              THE WITNESS:  Right.  In --

22              THE COURT:  What we're trying to do here is value --

23    I need to determine that as of, for example, May 2002 --

24              THE WITNESS:  Right.

25              THE COURT:  Was that a fair market value transaction
```

1    based on the information that was known at that time?

2                THE WITNESS:  Yes.

3                THE COURT:  I don't know how anything beyond that

4    time, as you just testified to, could be relevant to knowing

5    whether or not at that point in time was a fair market value.

6                THE WITNESS:  Let me explain.  What was happening at

7    that time is that there had been this big success of comic

8    books, and everyone was trying to get in the game and acquire

9    the right to develop for future release comic book properties.

10               THE COURT:  I get all of that.

11               THE WITNESS:  So that would increase the value.  If

12   I own a comic book property --

13               THE COURT:  I understand that.

14               THE WITNESS:  Okay.

15               THE COURT:  I'm talking about future sequels that

16   you wouldn't know whether -- we don't know what's going to

17   happen tomorrow.

18               THE WITNESS:  We don't.

19               THE COURT:  How does what in fact happens tomorrow

20   affect our valuation of something today?

21               THE WITNESS:  Well, what you do when you're valuing

22   the property is try to project as best you can.

23               THE COURT:  Fair enough.  So projections known to

24   people in May 2002 were certainly a factor.

25               THE WITNESS:  Yes.

```
 1              THE COURT:  How is what actually happens in 2004

 2    relevant?

 3              THE WITNESS:  Well, it's certainly relevant for your

 4    next sequel.

 5              THE COURT:  Down the road.

 6              THE WITNESS:  I'm not talking about the next sequel.

 7    I'm talking about what happened in May 2002.  By definition,

 8    May 2002, you wouldn't know.

 9              THE COURT:  Right.

10              THE WITNESS:  But you would certainly know that

11    there was all sorts of competition, and based on that

12    competition, other studios were competing with you.  These are

13    rational studios.  Their projections were something that they

14    had a high confidence that these would do well.  So that would

15    bring up the value.

16              THE COURT:  I agree.

17              THE WITNESS:  And ultimately, the marketplace in

18    these films confirmed it.

19              THE COURT:  That's not what we're interested in.

20              THE WITNESS:  I understand that.

21              THE COURT:  And in terms of your expertise, though,

22    I'm trying to reconcile this with my own understanding of

23    economic valuation.

24              THE WITNESS:  Yes.

25              THE COURT:  A future result does not -- are you
```

324

1    testifying, because it seems that you just did, that a future

2    result somehow reflects the value of a historical agreement?

3           THE WITNESS:  Well, again, I think the easiest thing

4    to do is -- let's bifurcate it, okay?

5           You own Superman, and you bring it to me in 1999.

6    Okay?  You are DC, and I look at it.  I look backwards.  I

7    look at its history.

8           THE COURT:  Yes.

9           THE WITNESS:  And then I try to look forward.

10          THE COURT:  Projection.

11          THE WITNESS:  Using projections of performance, and

12   then what I do is I take those projections, and I do a net

13   present value calculation.

14          THE COURT:  Yes.

15          THE WITNESS:  And if it's plus --

16          THE COURT:  You go for it.

17          THE WITNESS:  And if it's minus, you don't go for

18   it.  And that helps me --

19          THE COURT:  I understand all of that.

20          THE WITNESS:  Right.

21          THE COURT:  So now we're ten years later, and we're

22   trying to determine what was in the minds of those people back

23   then.

24          THE WITNESS:  Right.

25          THE COURT:  Certainly the projections that were

```
 1    existent at that time were relevant as you've explained.

 2              THE WITNESS:  Yes.

 3              THE COURT:  But unless they had a crystal ball or

 4    unless they consulted with the right astrologer on Hollywood

 5    Boulevard, they wouldn't know what in fact was going to happen

 6    two years later, would they?

 7              THE WITNESS:  That is true, but let me tell you what

 8    we used to do at Universal.  Do you mind if I tell you the

 9    story on how people approach?  I mean -- just in general, no

10    one can predict the future, but you hedge your bet; all right?

11              THE COURT:  I understand that.  And what I'm trying

12    to look for from you and I'll be looking for from Warner

13    Brothers' experts are the factors used in valuing a deal.  All

14    of the factors that you've talked about, looking backwards,

15    projecting ahead, the understanding, that makes sense to me.

16              THE WITNESS:  Hm-hm.

17              THE COURT:  What doesn't make sense to me as a

18    relevant factor in this consideration is what something

19    actually did post hoc, after the event.

20              THE WITNESS:  It doesn't matter.

21              THE COURT:  All right.  So we're back to that again.

22              THE WITNESS:  But it does matter for the next sequel

23    when you're doing a deal.

24              THE COURT:  That's a later discussion.

25              MR. TOBEROFF:  I think we're all saying the same
```

1    thing.

2              THE COURT:  Good.

3    Q.   BY MR. TOBEROFF:  My question is focusing on the

4    awareness in May of 2002 that these films which came out

5    afterwards, regardless of their ultimate success, were in the

6    pipeline and were anticipated at the time that the Superman

7    agreement was entered into; is that correct or incorrect?

8    A.   That's correct, and that would be part of the analysis in

9    assessing the value of the property at the time.

10   Q.   Thank you.  Now, you mentioned a number of -- you

11   testified to a number of -- I think it's almost four

12   converging trends.  The rise of the tent-pole films as a

13   motion picture strategy, the rise of franchise films, a

14   greater focus on preexisting branded properties with

15   pre-awareness, and finally, the rise in the entertainment

16   industry of comic books and superheroes in particular as a

17   source of films.

18             Does Superman, looking at it as a property, fit or

19   not fit within these four trends you have just discussed?

20   A.   It fits perfectly.

21   Q.   Could you expound on that opinion?

22   A.   Well, certainly in terms of franchise, Superman had

23   proved in the past that it was a franchise, and you could

24   build not only future motion picture projects but also, you

25   know, television.  You had a history of both successful

1    television show, when Smallville turned out to be successful.

2    And in the window from '99 to 2002, if I were valuing

3    Superman, I would consider the merchandise value as well.  So

4    there's the ancillary rights.  So there's franchise.

5    There's --

6    Q.    Thank you.

7    A.    Okay.

8    Q.    And would you consider Superman good source material for

9    a big tent-pole movie or not?

10   A.    Absolutely, yes.  It's --

11   Q.    Why is that?

12   A.    Well, it has all the attributes of a potentially

13   successful tent-pole in that it has preexisting awareness.  It

14   lends itself to a big production budget and a big releasing

15   budget and the potential at opening weekend.

16   Q.    And would you consider Superman to be what you called a

17   branded property or branded character or not?

18   A.    It's probably -- in my mind it's the best example of a

19   branded character in the history of the world.

20   Q.    And among comic books, which you testified have become

21   very popular in the -- into the late 1990's to early 2000

22   period, would you consider Superman to be a top comic book

23   property or not?

24   A.    Absolutely, yes.

25   Q.    What is the total effect of these converging trends on

328

1  Superman's value as of 1999, 2002, when the Superman film

2  agreement and the Superman television agreement was entered

3  into?

4  A.   They all point to the value being higher.

5  Q.   Do you believe that the keen interest in superhero films

6  and the actual success of comic book films released prior to

7  2002, such as Men in Black and X Men, had an effect on the

8  perceived value of Superman for television even though those

9  were film releases?

10 A.   Yes.

11 Q.   Can you tell me why?

12 A.   Studios look at properties both in terms of exploitation

13 about the film and TV side.  And certainly, as evidenced by

14 Smallville, there are instances where you have a prebranded

15 property, and you can use it as the basis for a television

16 show.

17       Now, those are unusual circumstances because most

18 studios at this point are focusing on the tent-pole strategy

19 as opposed to the television series strategy.

20 Q.   And during the period 1999 to 2002 -- strike that.

21       When was Smallville released?

22 A.   The first season started in October 2001.

23 Q.   And do you believe the rise of importance of superheroes

24 in comics in film would have influenced Warner Brothers'

25 decision to produce Smallville?

```
 1   A.   Yes.

 2             MR. BERGMAN:  Objection.  Leading, your Honor.

 3             THE COURT:  Sustained.

 4   Q.   BY MR. TOBEROFF:  Do you have an opinion as to whether

 5   Warner Brothers' decision to green light a Smallville

 6   television series was affected or not affected by the rise of

 7   importance of comic books to films during that period?

 8   A.   As I discussed before, Warner Brothers would have, in

 9   terms of exploiting certainly both the film character and TV

10   character, they certainly would have looked at the phenomenon

11   of the success of the prebranded comic characters in the film

12   world as influencing, you know, the value of the property and

13   how they wanted to exploit it.

14   Q.   Now, between October 2001, when Smallville first aired,

15   and May 2002, when the Superman film agreement was entered

16   into, was Smallville considered in the industry to be

17   successful or unsuccessful?

18             MR. BERGMAN:  Objection.  Lack of foundation.

19             THE COURT:  Overruled.  Just make sure you provide a

20   basis for that.

21             THE WITNESS:  It was perceived to be a hit

22   television show and a very important show for the WB network,

23   their sort of flagship show.

24             THE COURT:  What is that based on?

25             THE WITNESS:  That's based on my review of the
```

1   Smallville ratings and performance, and I did some Wikipedia

2   research and watched, and I've spoken with people.

3   Q.   BY MR. TOBEROFF:  Do you follow the ratings received by a

4   television series?

5   A.   Yes.

6   Q.   Do you read reviews of new television series that appear

7   in Variety and Hollywood Reporter, the trade papers to the

8   entertainment industry?

9   A.   And Entertainment Weekly, yes.

10  Q.   And did Smallville receive high ratings at the period

11  between October 2001 and May 2002?

12  A.   It received very high ratings.

13  Q.   Did it receive critical praise or not?

14  A.   It was critically successful as well, as I recall.

15  Q.   Moving to the subject of fair market value in general,

16  how would you define fair market value?

17  A.   Actually, I think the best definition of -- the

18  definition in the bill that was introduced by Sheila Kuehl.

19  Could I have reference to that?

20          THE COURT:  Whatever your definition is.

21          THE WITNESS:  Okay.  My definition is fair market

22  value is determined by an open negotiation in the marketplace

23  between disinterested parties who know what they are doing and

24  who have time to make a marketplace deal.

25          THE COURT:  Hold on one second.  Open negotiation in

```
 1   the marketplace?

 2             THE WITNESS:  Yes.  Unrelated parties.

 3             THE COURT:  That know what they are doing.

 4             THE WITNESS:  Know what they are doing.

 5             THE COURT:  That's your definition of the fair

 6   market value?

 7             THE WITNESS:  And had a reasonable period of time to

 8   make a deal.

 9             THE COURT:  That's your definition of fair market

10   value?

11             THE WITNESS:  Yes.

12             THE COURT:  Counsel.

13   Q.   BY MR. TOBEROFF:  Could you actually repeat that

14   definition?  Because it got split up into separate words in

15   the process.  Just take your time.

16             MR. BERGMAN:  Objection, your Honor. I don't

17   understand that.  We all got what the definition was.  Why

18   should the witness repeat?

19             THE COURT:  Did you not get it down, Counsel?

20             MR. TOBEROFF:  I felt that it got -- no, I didn't

21   actually.

22             THE COURT:  The court reporter can repeat the

23   answer.

24             (Record read.)

25             MR. TOBEROFF:  It's okay.  I don't want to take up
```

332

```
 1   the time.  I'll move on.
 2           THE COURT:  Otherwise, I'll sustain the objection.
 3   Asked and answered.
 4   Q.  BY MR. TOBEROFF:  IF you were representing DC in 1999,
 5   2002, the period in question, how would you have gone about
 6   establishing the fair market value of Superman in television
 7   and film rights?
 8           MR. BERGMAN:  Objection.  Lack of foundation.
 9   Irrelevant.
10           THE COURT:  Overruled.  How would you have gone --
11   overruled.
12           MR. TOBEROFF:  Shall I repeat the question?
13           THE COURT:  No.  I have it right in front of me,
14   Counsel.  I'm considering the objection.  The lack of
15   foundation is overruled.  The relevancy question is, I think,
16   a problem with the way you phrased the question.  It's rather
17   broadly stated.  The question is what rights are you referring
18   to, Counsel.  I suppose if this is a foundational question,
19   are you asking just generally how one would go about the
20   factors that one would consider in assessing fair market
21   value?  Let me just sustain the objection instead of asking a
22   question.  Rephrase it.
23   Q.  BY MR. TOBEROFF:  I'm asking if you were representing DC
24   during this time period in question, 1999 to 2002, and they
25   expressed an interest in licensing their Superman film and
```

1  television rights for exploitation in the entertainment

2  industry, how would you go about assessing or, I use the word

3  establishing, the fair market value of the Superman property

4  during that time period?

5         MR. BERGMAN:  Same objection.

6         THE COURT:  I want to sustain the objection,

7  Counsel, based on your expert's definition of fair market

8  value.  His definition of a fair market value is that it must

9  take place between unrelated parties.  We don't have unrelated

10  parties here.  So by definition, this expert is concluding

11  that it's not fair market value.

12  Q.    BY MR. TOBEROFF:  Do you believe that the only way that

13  you can have an agreement between -- that constitutes fair

14  market value is between unrelated parties?

15  A.    No.  There's a mathematical possibility that you could

16  have a fair market value deal between related parties.

17  Q.    And how would you arrive at that?

18  A.    How would they arrive at that deal?

19  Q.    How would you arrive, if the parties were related, how

20  would you arrive at a fair market deal?

21  A.    Well, I -- with the parties, I think what we'd seek to do

22  is try to emulate the analysis that someone like me would do.

23  We would look at the past performance, try to look at the

24  potential performance in the future.  We would look at

25  analogous deals.  If there was a property that was worth less

1  than our property and it got a big deal, we'd try to get that

2  deal.  We would seek to -- we're in the -- still in the

3  related parties?  You'd probably talk to someone like me or an

4  agency to say what do you think this is worth in the open

5  market.  That would be the test.  What would this be worth in

6  the open market even though by definition DC is owned by

7  Warner.

8        So it would be a related transaction.  But there

9  still is a methodology that you would use to try to do a

10 marketplace deal within the confines of the ownership

11 structure.

12       THE COURT:  What is that methodology?

13       THE WITNESS:  Well, the methodology is you look at

14 the past performance of the Superman character.  Both in terms

15 of financial and in terms of something that's hard to measure,

16 which is awareness and consciousness.  Then you --

17       THE COURT:  Financial value?

18       THE WITNESS:  Yeah.  Well, the financial value would

19 be on the open market, what would the most aggressive

20 potential buyer pay for these rights.  And that would -- you

21 know, the highest bidder wins.  So then what would you do is

22 you would, you know, basically, you know, you are selling.  So

23 you would -- someone like me or an agent -- let's say you're a

24 potential buyer, and we'd go to you, and you'd have a unique

25 opportunity.  You can buy Superman.

1           This is the most famous prebranded comic book

2     superhero franchise in the history of the world.  We're

3     bringing this to you in the context of this recent phenomenon

4     of, you know, Men in Black and X Men and Fantastic Four.  And

5     there's this whole phenomenon that everyone is jumping on this

6     comic book train.  And we're giving you the opportunity to buy

7     this.

8           So we would set a very high price.  We would

9     legitimize that price in the context of what other properties

10    had gotten.

11          THE COURT:  So the second factor would be comparison

12    to other properties?

13          THE WITNESS:  Yes, you would compare it to other

14    properties.

15          THE COURT:  Other similar properties.

16          THE WITNESS:  Well, not necessarily similar

17    properties.

18          THE COURT:  You tell me.  You're the expert.

19          THE WITNESS:  No, no.  You look at it as

20    intellectual property.  You don't look at it as just comic

21    books.

22          THE COURT:  You said comparison.  To compare you've

23    got to compare to something.  What would you compare it to?

24          THE WITNESS:  You would compare it to option and

25    purchase agreements.

```
 1              THE COURT:  Of what?
 2              THE WITNESS:  Of well-known intellectual property.
 3    And that can be well-known in the context of a comic book,
 4    well-known as a novel, well-known as a -- if it was a movie
 5    before.  Well-known for all sorts of reasons.  Because the way
 6    studios think, they don't look so much at the form of it as
 7    much as we're buying this awareness and trying to leverage and
 8    convert that into a movie and get the audience to come in.
 9              So -- and you know, there's been a recent phenomenon
10    of --
11              THE COURT:  You're going beyond the question.
12              THE WITNESS:  Okay.
13              THE COURT:  What other factors are part of this
14    methodology?
15              THE WITNESS:  Comparable deals.  You know, pitting
16    people against each other as best you can, trying to create a
17    bidding war.
18              THE COURT:  Comparable deals.  Comparable to what?
19              THE WITNESS:  We own a unique property; all right?
20    So we -- you would say Superman should be worth more than a
21    Michael Creighton novel or a Dirk Pitt book or a Jack Ryan, or
22    worth more than a Chorus Line, and you look at deals -- you
23    might even go back to My Fair Lady.  I know that's in evidence
24    here.
25              But you look at the -- what studio has been paying
```

1    for these prebranded properties.  And some are musicals; some

2    are books; and some are comic books.  But certainly in your

3    analysis you don't limit it to something that's exactly like

4    Superman because there -- another thing I'd like to point out

5    is that --

6            THE COURT:  Well, you've got to respond to the

7    questions.  We've got to keep the format in a trial.  We're

8    going through my question to you of what methodology.  You've

9    identified past performance of the Superman character and

10   comparable deals or comparisons to option and purchase of

11   well-known intellectual property.

12           Anything else?

13           THE WITNESS:  I mean, the main thing would be to try

14   to -- and it's very challenging.

15           THE COURT:  I know that.  That's why I'm asking the

16   questions.

17           THE WITNESS:  Trying to create what you would think

18   the marketplace would bear to buy Superman.

19           THE COURT:  How do you figure what the marketplace

20   would bear in your opinion?

21           THE WITNESS:  I think you would talk to agents and

22   lawyers who were -- who knew the marketplace, who knew the

23   history, had a broad-based understanding of the business, and

24   knew the sort of competitive nature of studios bidding against

25   each other and the particular special features that had

1    converged in the late 90's, early 2000's and use that to try

2    to figure out what the value would be.

3              THE COURT:  Anything else?

4              THE WITNESS:  That's the basic methodology.

5              THE COURT:  Very well.

6              Counsel?

7    Q.   BY MR. TOBEROFF:  In determining the fair market value of

8    a property, is -- strike that.

9              Is the fair market value of a property more easily

10   determined simply by offering it to bid in the open market

11   than in a closed non-arm's length transaction?

12   A.   It's much easier.

13   Q.   And why is that?

14   A.   It's really easy because you have the marketplace

15   operating and objectively valuing the asset.  Rather than you

16   having to, as one person, as the judge and I just went

17   through, you know, trying to create that marketplace in our

18   brains.  It's very difficult.

19             Right now I'm selling a movie, and we have competing

20   bids.  If we show the movie at the Tribeca Film Festival and

21   invited everyone to come, and now we're getting bids, that's

22   the easy way to do it.

23   Q.   Now, when you don't do it that way and you have an

24   internal transaction, like a transaction between closely

25   related entities, is it correct or incorrect that the only way

1   to determine fair market value would be try and analyze what

2   it might be?  Is that correct or incorrect?

3   A.    Well, I certainly think that in an internal transaction,

4   you would want to go through the methodology that I just

5   described and not only look at an internal calculation of what

6   the value is but also what at that time would the marketplace

7   pay for Superman or an asset like Superman.

8           It's very difficult to do it just in that sort of

9   structure and put an appropriate value on it in my estimation.

10  Q.    To your knowledge, based on your review of the record,

11  did DC ever offer Superman in the open market during this time

12  period?

13  A.    No.

14  Q.    Did DC ever -- strike that.

15          Do you consider literary properties in general to be

16  unique or not unique?

17  A.    Unique.

18  Q.    And of these --

19          THE COURT:  What does that mean?  I know what it

20  means in the sense -- the common vernacular sense that

21  everything is different.  And if it's copied, then that raises

22  a whole separate issue.  But if it's unique, say that it's

23  different in the context of what we're discussing here in

24  trying to value fair market value, does that mean it can or

25  cannot be compared?  Because it's so unique that it can be

1    compared, or does the uniqueness just complicate it --

2              THE WITNESS:  Well, if you treat everything as

3    completely unique, you could never have a marketplace.

4              THE COURT:  That's my point.

5              THE WITNESS:  So what you have to do is say it's

6    like this, but it's unlike this, and then draw comparisons.

7    It's not easy.

8              THE COURT:  So it's matters of degree?

9              THE WITNESS:  It is matters of degree, yes.

10   Q.   BY MR. TOBEROFF:  But no two -- sorry.

11             But generally, is one literary property identical to

12   another literary property?

13   A.   No, if they are identical, they would have no value.

14   Q.   So they have similarities, but they can also have many

15   differences?

16   A.   Correct.

17   Q.   Now, of these literary properties, would you regard

18   Superman as unique or not unique?

19   A.   Unique.

20   Q.   Would you regard it as particularly unique or not?

21   A.   It's -- well, the particular uniqueness about it in my

22   estimation is the degree of awareness that people have about

23   Superman, and that separates it in large part.  He has some

24   unique features and the like, but I think in valuing, you

25   know, if you try to compare it to Spiderman, for example, you

1    say well, Spiderman does this, and Superman does this.  I

2    think what you really look at is okay, what sort of awareness

3    is there at the time of the transaction and what is it worth,

4    and, if we could, you know, bid this out.

5    Q.    Does this uniqueness of a property have any bearing or

6    not on your testimony that the best way to determine the fair

7    market value of the property is by offering it on the

8    competitive open market?

9    A.    Well, it impacts it a lot.  It -- you know, I recently

10   bought a car for my daughter, and, you know, we went on the

11   Internet and called a bunch of different dealers, and that was

12   the same car.  Had we -- had there been only one car in the

13   world that we were looking for, we would have paid a heck of a

14   lot more.

15          So I agree.  Superman is absolutely unique, but

16   that's not to limit that -- Spiderman is unique.  They are all

17   unique in their ways.

18   Q.    If you had the ability to offer Superman in the open

19   market, what would you do?  How would you go about it to

20   achieve the best price for the property?

21          MR. BERGMAN:  Objection, your Honor.  Relevant.

22          THE COURT:  Sustained.  It's completely irrelevant.

23   The question is not what could have happened.  The question is

24   what did happen and whether or not what did happen reflects a

25   fair market value.

1          I understand that this would be a much easier trial.

2    There never would have been a trial on this issue if there

3    would have been a much different case.  It's a unique case.

4          MR. TOBEROFF:  May I respond as to my intention for

5    this line of questioning, your Honor?

6          THE COURT:  Proffer your relevance, Counsel, yes.

7          MR. TOBEROFF:  The relevance is I'm trying to

8    establish the way value is usually determined for a unique

9    property like Superman in the entertainment industry.  And to

10   contrast that to what did or did not take place in this case,

11   even though --

12         THE COURT:  That's not in dispute, Counsel.  I

13   understand that this is not happening as things normally

14   happen.  We all understand that.  That's a given here.

15         MR. TOBEROFF:  I understand --

16         THE COURT:  And it complicates it and makes it very

17   challenging, as the witness indicated.  But the limited issue

18   in this trial, in some way I would have been able to resolve

19   this back on the summary judgment motion.  The reason I

20   couldn't was for the very reason that the witness here just

21   pointed out.  It's a challenge.

22         And at some point in time, in this trial, you're

23   going to have to get into the agreement itself and start

24   exploring it and giving me the tools from both sides to make

25   an assessment as to whether or not this was in fact a deal

1    that reflects fair market value.

2            MR. TOBEROFF:  Yes, your Honor.  I fully intend to

3    do that.

4            THE COURT:  Excellent.  But I understand, Counsel.

5    I'm willing to find at this point that it was not subjected to

6    fair market value in the sense that it was not on the open

7    market.  It wasn't between nonparties.  We know all that.

8    I'll even find that it's a unique product.  It was a well

9    branded product.

10           None of this is in dispute, Counsel.  You've spent a

11   tremendous amount of time so far in this trial covering ground

12   that quite frankly, I think we all basically understand.

13           Let's get to the deal in question and into the

14   mechanics of it and utilize your expert witness here, as I'm

15   sure Warner Brothers will utilize theirs, to evaluate this

16   particular deal.

17           MR. TOBEROFF:  Your Honor, I fully intend to do

18   that.

19           THE COURT:  Let's go.

20           MR. TOBEROFF:  Your Honor, if I may, I'd like to ask

21   my witness questions about various matters before we start

22   examining contractual terms which do have relevance on the --

23           THE COURT:  I will be the judge of that.  But I may

24   ask the next question.

25   Q.   BY MR. TOBEROFF:  Are you familiar with the term vertical

```
 1    integration?
 2    A.    Yes.
 3    Q.    What does that term mean?
 4    A.    In the entertainment business, vertically integrated
 5    companies are companies that are in a variety of product lines
 6    at the same time.  Typically, the big vertically integrated
 7    companies have motion picture and television arms, on-line
 8    merchandising, book publishing, newspapers, broadcast
 9    stations.  They are in a panoply of product lines within the
10    entertainment business.
11    Q.    Was MCA Universal, when you worked there, a vertically
12    integrated company?
13    A.    Yes, it was.
14    Q.    How do vertically integrated companies view
15    [inaudible] --
16          MR. BERGMAN:  Objection, your Honor.  No foundation
17    for that and how all companies view is irrelevant.
18          THE COURT:  There's a foundation for him to describe
19    how MCA as a vertically integrated company operated.  He may
20    testify.  He has foundation to testify to that.  It does not
21    necessarily apply to all companies.  You can't take your
22    experience from one, unless you can lay the foundation to
23    that.  But you may proceed.
24          MR. TOBEROFF:  Thank you, your Honor.
25    Q.    Did MCA have an intellectual property library?
```

1    A.    Yes, they did.

2    Q.    And how did they view their intellectual property

3    library?

4    A.    We viewed it as the most important asset of the company.

5    Q.    Why is that?

6    A.    Because that was -- those were the assets that were the

7    basis of -- our exploiting those assets were the basis for our

8    cash flow and profits and the existence of the company.

9    Q.    And when you worked at Orion, did Orion have an

10   intellectual property library?

11   A.    Yes.

12   Q.    How did Orion view its intellectual property library?

13   A.    The same way.

14   Q.    Same answer as --

15   A.    Same answer as for MCA.

16   Q.    Is DC part of a vertically integrated company or not?

17   A.    Yes.

18   Q.    What is that company?

19   A.    Time Warner.

20   Q.    Based on your experience at two studios, MCA and Orion,

21   how do you believe Warner Brothers would view DC's

22   intellectual property?

23         MR. BERGMAN:  Objection, your Honor.  Calls for

24   speculation.

25         THE COURT:  As phrased, yes.  No foundation.

346

1   Q.   BY MR. TOBEROFF:  How important or unimportant do you

2   believe DC's intellectual property is to a vertically

3   integrated company like Warner Brothers?

4   A.   I'm sure that Warner Brothers views intellectual property

5   the same way that MCA and Orion and other studios do.  It's

6   their most important asset.  And one they want to protect.  I

7   know at MCA we had an absolute rule that we would not license

8   our intellectual property to third parties.

9   Q.   Did that rule apply at Orion as well?

10  A.   Yes.

11  Q.   Why won't studios license their intellectual property to

12  third parties?

13          MR. BERGMAN:  Lack of foundation, your Honor.

14          THE COURT:  Rephrase it.  You're going from MCA to

15  all studios, Counsel.  That's the objection.  I'll sustain it

16  as phrased.  Rephrase.

17  Q.   BY MR. TOBEROFF:  Why were Universal and Orion so

18  restrictive with regard to licensing intellectual property in

19  their libraries to third parties?

20  A.   Again, the -- well, two fundamental reasons.  One was

21  those properties were the life -- the financial and creative

22  lifeblood of the companies.  At Universal, for example, we had

23  the Mummy and King Kong and Jurassic Park and, you know, all

24  these terrific properties.

25          The second thing and maybe even more important is

```
 1   that under no circumstances does a studio want a competing
 2   studio to have a success with their intellectual property.
 3   That is -- studios just won't let that happen.
 4   Q.   I'd like to turn to the issue of agreements between
 5   affiliated or vertically integrated entities within the same
 6   conglomerate.
 7          Your Honor, if I may, I'd like to ask this witness
 8   some questions regarding the way that entertainment industry
 9   functions as a whole, not simply his percipient experience at
10   Orion and Universal because he is an expert in the
11   entertainment industry, having been a practitioner in the
12   entertainment industry both in the studio buy side and in
13   private practice.
14          He's here as an expert, not just simply as a
15   percipient witness.
16          THE COURT:  Counsel, you may ask your next question.
17   Q.   BY MR. TOBEROFF:  Looking at the --
18          THE COURT:  Counsel, we went back to the beginning
19   when you laid the foundation for his expertise.  I have the
20   two points that you indicated he was being designated as an
21   expert.  And what you indicated just now is not what you
22   designated him.  I'm not suggesting for a moment that he might
23   not be designated for that, but you haven't done so yet, and
24   there's a process here.
25          This isn't a free-wheeling trial.  You have him
```

1    designated as an expert in reviewing financial agreements

2    regarding fair market value, and secondly, although this was

3    challenged, was the values of Superman.  And those were the

4    two areas that he was designated as an expert.  If there's a

5    third area, proffer.

6             MR. TOBEROFF:  I'd like to proffer Mark Halloran as

7    an expert as to the practices -- customs and practices within

8    the entertainment industry of both the major studios where

9    he's worked and also on the level of nonaffiliated entities

10   and talent.  Entities or persons --

11            MR. BERGMAN:  That was not the subject of his

12   report, your Honor.

13            THE COURT:  Was it?

14            MR. TOBEROFF:  Yes, it was.  His report did

15   encompass in the -- the custom and -- did definitely encompass

16   custom and practice in the entertainment industry.

17            THE COURT:  Refer me to the report, Counsel.

18            MR. TOBEROFF:  It's Exhibit 332.

19            THE COURT:  What page, Counsel?

20            MR. BERGMAN:  Perhaps I can help, your Honor.

21   There's a section designated virtual integration at page 10.

22            MR. TOBEROFF:  If we look at the section on vertical

23   integration on page 10, he's not simply referring to Orion or

24   Universal.  He's referring to trends among the major studios,

25   including Warner Brothers.  Throughout his report he refers to

1    custom and practice in the motion picture and television

2    industry.

3              On page 12, the first full paragraph again is the

4    custom and practice in the motion picture and television

5    industry.

6              THE COURT:  Right.  And, in fact, on page 2 is the

7    indication that the opinion was being offered in support of

8    his expertise on vertical integration.

9              So I'll permit -- I will so designate him as an

10   expert on that, on vertical integration.

11             MR. TOBEROFF:  I would like to designate him as an

12   expert as to custom and practices in the film and television

13   industry during the period in question.

14             THE COURT:  Mr. Bergman?

15             MR. BERGMAN:  Your Honor, the only thing I see in

16   the report about that is in the valuation -- is a sentence

17   that says at page 12, the custom and practice in the motion

18   picture and television industries is that the valuation of an

19   asset is most often determined by arm's length negotiations in

20   the open marketplace.  And as your Honor has noted, we've

21   conceded, we recognize this is not an arm's length deal.  The

22   question is is it a fair market deal.

23             THE COURT:  Right.

24             MR. TOBEROFF:  Your Honor, I object to Mr. Bergman's

25   speaking objection.

1          THE COURT:  Well, there's been a lot of speaking on

2     both sides, Counsel.

3          The custom and practice within the entertainment

4     industry certainly forms the basis of the opinions that this

5     witness is offering.  He has extensive understanding of both

6     the custom and the practice of the industry.  I'm not going to

7     give a full-wheeling or free-wheeling designation at this

8     point.  But within the context of valuation, within the

9     context of vertical integration, you may ask him questions,

10    Counsel, based on his custom and practice.

11         We've reached 4:45.  The Court has a 5:00 matter

12    that I need to attend to, and I need some prep time on that.

13    Let's resume tomorrow morning.

14         Actually, tomorrow morning we're resuming with the

15    closing arguments in the last trial.  We're going to resume

16    tomorrow at 1:30 in this trial.  You'll have the afternoon

17    tomorrow.  So I will see you then.

18         Any other matters we need to take up briefly at this

19    time?

20         MR. TOBEROFF:  One brief matter, your Honor.

21    Dealing with the authentication issue in granting plaintiff's

22    ex parte, I believe you stated that the declaration of

23    Mr. Ellis would be sufficient to authenticate under rule -- I

24    believe it's 902.  But you said notwithstanding that,

25    defendants would have the right to ask Mr. Ellis questions.

351

```
 1              THE COURT:  Right.  Well, 902.11 specifically
 2    provides that if the declaration is objected to, that the
 3    opposing party has a right to cross-examine the declarant.
 4              MR. TOBEROFF:  So my question is whether 902.11
 5    would have no purpose if -- what I'm getting at is therefore,
 6    wouldn't defendants have the responsibility of subpoenaing
 7    Mr. Ellis to question him since we've already met our burden
 8    of authenticating pursuant to declaration in 902.11?
 9              THE COURT:  The way it's worded is a party intending
10    to offer a record into evidence under this paragraph must
11    provide written notice of that intention to all adverse
12    parties and must make the record and declaration available for
13    inspection sufficiently in advance of their offer into
14    evidence to provide an advert party with a fair opportunity to
15    challenge them.
16              I trust, based on Mr. Toberoff's statement, that you
17    wish to challenge the authenticity, Counsel?
18              MR. PERKINS:  We do, your Honor, and we've made that
19    position clear from the outset.  We really relied on your
20    Honor's ruling in the last hearing.
21              THE COURT:  Right.  And the ex parte application
22    just came in.
23              When was that filed, Mr. Toberoff?
24              MR. TOBEROFF:  Approximately a week ago.  April 6th,
25    your Honor.
```

```
 1              THE COURT:  April 6th.  Okay.  And the Court just
 2     ruled.  I don't understand what the issue is.  Let's get the
 3     witness in here.
 4              MR. TOBEROFF:  The issue is --
 5              THE COURT:  What's the real problem?
 6              MR. TOBEROFF:  Well, the issue is that the
 7     defendants, would it be their responsibility to subpoena the
 8     witness and organize it as a rival here, not plaintiff's.
 9              THE COURT:  That's true.
10              MR. PERKINS:  In fairness, your Honor, at the last
11     hearing, your Honor said either there's a stipulation or a
12     witness.  Bring in a witness.
13              THE COURT:  I understand, and I granted the ex parte
14     application.  I was mistaken on the law, Counsel.
15              MR. PERKINS:  Okay.  But now we are into the second
16     day of trial.
17              THE COURT:  We're not going to stop.  This trial
18     won't end.  You'll have your opportunity to cross-examine this
19     witness.  Don't worry.  This is a bench trial, Counsel.
20     You're going to have your time to bring your witnesses in and
21     cross-examine them.
22              MR. PERKINS:  We'll serve a subpoena, your Honor.
23              THE COURT:  Serve it.  And who is the witness in
24     question?
25              MR. TOBEROFF:  James Ellis.
```

```
 1              THE COURT:  Who is?

 2              MR. TOBEROFF:  He's a --

 3              THE COURT:  The name doesn't mean anything to me

 4  either.

 5              MR. TOBEROFF:  He is a Custodian of Records for a

 6  company called AMG.

 7              THE COURT:  And they are located where?

 8              MR. TOBEROFF:  He's here, right here in Los Angeles.

 9              THE COURT:  Okay.  So this shouldn't be too much of

10  a problem.

11              MR. PERKINS:  We'll take care of it, your Honor.

12              THE COURT:  Take care of it.  We can break up the

13  phase if we have to to accommodate him since this is kind of a

14  last-minute thing.

15              All right.  Very good.  I will see you tomorrow at

16  1:30.

17

18              (Proceedings concluded at 4:50 P.M.)

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8                        **C E R T I F I C A T E**

9

10

11          I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above matter.

15          Certified on April 29, 2009.

16

17

18                    _____
                      **MARK SCHWEITZER, CSR, RPR, CRR**
19                    Official Court Reporter
                      License No. 10514

20

21

22

23

24

25