1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   ---

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                   ---

6  JOANNE SIEGEL, etc.,    :  PAGES 355 - 448
                     :
7        PLAINTIFF,    :
                     :
8    VS.           :  NO. CV 0408400-SGL(RZx)
                     :
9  WARNER BROTHERS     :
  ENTERTAINMENT, INC., etc., :
10                    :
        DEFENDANT.    :
11  _____:

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           COURT TRIAL - DAY 3

16           RIVERSIDE, CALIFORNIA

17          THURSDAY, APRIL 30, 2009

18

19

20

21

22            MARK SCHWEITZER, CSR, RPR, CRR
            OFFICIAL COURT REPORTER
23            UNITED STATES DISTRICT COURT
            181-H ROYBAL FEDERAL BUILDING
24            255 EAST TEMPLE STREET
            LOS ANGELES, CALIFORNIA 90012
25            (213) 663-3494

1    **Appearances of Counsel:**

2

3    For the Plaintiff:

4        TOBEROFF AND ASSOCIATES
         By Marc Toberoff, Esq.
5            Nicholas Williamson, Esq.
             Keith Adams, Esq.
6        2049 Century Park East
         Suite 2720
7        Los Angeles, CA 90067
         (310) 246-3333
8

9

10   For the Defendant:

11       BERGMAN COLEMAN GRODIN & EVALL, LLP
         By Michael Bergman, Esq.
12           Anjani Mandavia, Esq.
         9665 Wilshire Boulevard
13       Ninth Floor
         Beverly Hills, CA 90212
14       (310) 860-3346

15           -and-

16       LAW OFFICES OF PATRICK T. PERKINS
         By Patrick T. Perkins, Esq.
17       1711 Route 90
         Cold Spring, NY 10516
18       (845) 265-2820

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    MARK EDWARD HALLORAN, PREVIOUSLY SWORN.................. 358

4    DIRECT EXAMINATION (CONTINUED) BY MR. TOBEROFF......... 358

5

6                            **E X H I B I T S**

7

8    Exhibit 201 for identification......................... 432

9    Exhibit 128 received.................................. 435

10   Exhibit 201 received.................................. 436

11   Exhibit 300 received.................................. 436

12   Exhibit 128 received (above).......................... 444

13   Exhibit 307 received.................................. 446

14

15

16   Per order of the Court, Page 402:12-18 has been placed under
     seal and is not contained herein.
17

18

19

20

21

22

23

24

25

1          <u>Riverside, California; Thursday, April 30, 2009</u>

2                              **1:48 P.M.**

3              **WHEREUPON THE CASE HAVING BEEN CALLED**

4              **AND APPEARANCES GIVEN, THE FOLLOWING**

5              **PROCEEDINGS WERE HELD:**

6              THE COURT:  Good afternoon to you all.  Counsel, you

7     may continue with your examination.

8              **MARK EDWARD HALLORAN, PREVIOUSLY SWORN.**

9              THE CLERK:  Mr. Halloran, please be advised you are

10    still under oath.

11             **DIRECT EXAMINATION (CONTINUED)**

12    **BY MR. TOBEROFF:**

13    Q.   Mr. Halloran, I'd like to ask you some questions about

14    your answer to Mr. Bergman's questions at the deposition that

15    he read into the record yesterday.  I'm referring to page 262

16    of your deposition, commencing at line 23 and ending at page

17    263, line 3:

18             "QUESTION:  My question to you, sir, is what would a

19         fair market contract be in 2002 for the nonexclusive

20         rights that -- film rights that the court has determined

21         were transferred from DC to Warner Brothers?

22             "ANSWER:  I have not formulated an opinion as to

23         that value."

24             And then referring to page 263, lines 19 through 24:

25             "QUESTION:  Okay.  Let me ask you this, then.

1              Moving over now to the television license, do you have an

2         opinion as to what the fair market value in 2002 was of

3         the nonexclusive television rights that the Court has

4         determined were transferred from DC to Warner Brothers?

5              "ANSWER:  I have not formulated that opinion."

6              When Mr. Bergman asked you whether you had formed an

7    opinion as to the value of the nonexclusive film and

8    television rights transferred to Warner Brothers and you

9    answered that you had not formed an opinion as to that, what

10   nonexclusive rights were you referring to?

11   A.   I was referring to the rights in Action Comics 1.

12   Q.   Why do you believe only Action Comics No. 1 was

13   implicated by Mr. Bergman's question?

14   A.   I understand that the Court in this matter has determined

15   that the termination is only effective so far with respect to

16   the rights to Action Comics 1.

17   Q.   And what effect does that have on Action Comics No. 1?

18   What is your understanding of the effect that that has on

19   Action Comics No. 1?

20   A.   As to the Action Comics 1 copyright, the rights are

21   not -- there's co-ownership as between the Siegels and DC

22   Comics, and the rights are nonexclusive as between them.

23   Q.   Now, moving to the Superman film and television

24   agreements that you analyzed with regard to this case, what is

25   the scope of the rights grant in those agreements?

360

```
 1   A.   Well, first of all, you start with the description of the
 2   property.  And the description of the property in both is very
 3   broad.  For example, in the film agreement, it's all material
 4   owned by DC, and then subsequently, there's a very broad grant
 5   of rights --
 6            MR. BERGMAN:  Excuse me, your Honor.  May I ask what
 7   the witness is looking at?
 8            THE WITNESS:  Yes.  This was put in front of me.
 9            THE COURT:  Not until --
10            THE WITNESS:  Okay.  I'm sorry.  It was just there.
11            THE COURT:  Don't worry.
12            THE WITNESS:  So the grant of rights in both the
13   film and television agreements was with respect to the entire
14   universe of the Superman property.  Including --
15            THE COURT:  Excuse me.
16            Okay.  Continue.
17   Q.   BY MR. TOBEROFF:  Mr. Halloran, what is the scope of the
18   rights grant in the Superman film and television agreements
19   that you analyzed?
20   A.   Both of them were quite broad and included the Superman
21   property, including, I understand, thousands of copyrights
22   which would include DC Comics 1, but then there's a lot of
23   additional copyrights and other material that was granted
24   under both the film and television agreements.
25   Q.   Is the compensation to DC and other terms in those
```

361

 1    agreements in consideration for the film and television rights

 2    to Action Comics No. 1 alone?  Or to Action Comics No. 1 as

 3    part of the thousands of Superman copyrights owned by DC?

 4              MR. BERGMAN:  Objection.  Compound.

 5              THE COURT:  Break it up.

 6    Q.   BY MR. TOBEROFF:  Is the compensation to DC and the other

 7    terms of the agreements offered to DC in consideration for the

 8    film and television rights to just Action Comics No. 1?

 9    A.   No.

10              MR. BERGMAN:  Same objection, your Honor.

11              THE COURT:  Your objection to the compound nature of

12    the --

13              MR. BERGMAN:  Film and -- and television.  Separate

14    agreements.

15              THE COURT:  Break it up, Counsel.

16    Q.   BY MR. TOBEROFF:  Is the compensation to DC and other

17    terms in the film agreement in consideration for the film

18    rights to Action Comics No. 1?

19    A.   Yes.

20    Q.   Yes?

21              THE COURT:  He said "yes."

22              THE WITNESS:  Yes, including it's part of the -- I'm

23    sorry.  There's no --

24              THE COURT:  Next question, Counsel.  He answered

25    "yes."

```
 1              THE WITNESS:  Well, wait, wait.

 2              MR. TOBEROFF:  It's okay.  I'll re-ask.

 3    Q.   Is the compensation to DC and other terms of the

 4    agreement in consideration for the film rights to thousands of

 5    Superman copyrights owned by DC?

 6    A.   Yes.

 7    Q.   And is Action Comics No. 1 included amongst those

 8    thousands of Superman copyrights?

 9    A.   Yes.

10    Q.   Moving to the television -- Superman television

11    agreements.  Is the compensation and other terms offered in

12    consideration for television rights to the Superman property

13    for only Action Comics No. 1?

14    A.   No.

15    Q.   Is it for the thousands of Superman copyrights owned by

16    DC?

17    A.   Yes.

18    Q.   Other than Action Comics No. 1 -- pardon me.  Other than

19    Action Comics No. 1, which you've testified that you

20    understood DC only to have nonexclusive rights to, did you

21    construe DC as exclusively owning and transferring to Warner

22    Brothers exclusive film rights to these other thousands of

23    Superman copyrights?

24              MR. BERGMAN:  Objection.  Leading.

25              THE WITNESS:  Yes.
```

363

```
1              THE COURT:  What's the objection?

2              MR. BERGMAN:  Pardon me, your Honor.  Leading.

3              THE COURT:  Sustained.  Let's have him testify,

4   Counsel.

5              MR. TOBEROFF:  I'm sorry.

6              THE COURT:  Let's have him testify.

7              MR. TOBEROFF:  I'm going to rephrase the question.

8              THE COURT:  Please.

9   Q.   BY MR. TOBEROFF:  Did you view DC as exclusively owning

10  or nonexclusively owning the film rights to the thousands of

11  Superman copyrights implicated in the film agreement?

12  A.   Exclusively --

13  Q.   Minus Action Comics No. 1?

14  A.   Exclusively only.

15  Q.   And in rendering your opinion, did you view DC as

16  exclusively owning the thousands of Superman copyrights

17  implicated in the Superman television agreement minus Action

18  Comics No. 1?

19  A.   Yes.

20  Q.   Why is that, Mr. Halloran?

21  A.   It's for various reasons.  If you look at the contract,

22  the grant of rights is for the entire property, and in

23  addition, DC warranted to Warner Brothers that they had all

24  the rights to grant under both the film and television

25  agreements.
```

```
 1   Q.   And what is your understanding of the Court's ruling to

 2   date as to the issue of co-ownership of Superman copyrights

 3   between DC and the Siegels?

 4   A.   I understand that the Court has held that the termination

 5   was only with respect to DC -- excuse me, to Action Comics

 6   No. 1.

 7   Q.   So getting back to your answer in the deposition

 8   regarding both film and television, where you said you did not

 9   form an opinion as to the value of the nonexclusive film and

10   the value of the nonexclusive television rights transfer to

11   DC, why did you not form an opinion as to that specific value?

12   A.   First of all, there was no separate consideration for the

13   transfer of that in the agreements, transfer of the Action

14   Comics only within the agreements, and I also thought, given

15   the transfer of the thousands of copyrights, that it wasn't

16   material to my analysis.

17   Q.   In forming your opinion as to the fair market value of

18   the Superman film agreement and the Superman television

19   agreement, did you take into consideration that DC transferred

20   to Warner Brothers only nonexclusive rights to Action Comics

21   No. 1?

22   A.   Yes.

23   Q.   Did you address this in your expert report?

24   A.   Yes.

25   Q.   Does the fact that the film rights and television rights
```

365

```
 1   to Action Comics No. 1, does the fact that that -- that DC
 2   held only nonexclusive rights and therefore could only have
 3   transferred nonexclusive rights to Warner Brothers alter your
 4   opinion as to whether the relevant agreements were for fair
 5   market value?
 6   A.    No.
 7              MR. BERGMAN:  Objection.  Argumentative.
 8              THE COURT:  Overruled.
 9   Q.    BY MR. TOBEROFF:  Why is that?
10   A.    Again, because there was no separate consideration in the
11   agreement and the description of the property was very broad.
12   The transfer was very broad; there was a transfer of literally
13   thousands of copyrights.  Action Comics was just one out of
14   that universe of copyrights that was being transferred under
15   both the film and the television agreement.
16   Q.    What was the quantitative impact, if any, on Warner
17   Brothers of certain rights, in this case, Action 1, turning
18   out to be nonexclusive based on the Court's recent ruling?
19   A.    I don't believe there's been any quantitative impact at
20   this point.
21              MR. BERGMAN:  Objection.  Lack of foundation.
22              THE COURT:  Ask him why.  Why is that?
23              THE WITNESS:  Warner has acted -- once you get past
24   the transfer on the face of the contract, Warner post notice
25   of termination went ahead and produced the movie, produced the
```

```
 1   television series, and has held themselves out to the public

 2   and acted as if they were the exclusive owner.

 3           THE COURT:  So that's what you mean by not having a

 4   quantity quantitative impact?

 5           THE WITNESS:  That's part of the analysis, yes,

 6   because they have gone ahead and exploited the property,

 7   including the thousands of copyrights in the marketplace.

 8   Q.   BY MR. TOBEROFF:  Do you believe that Warner Brothers has

 9   de facto exclusivity pursuant to its ownership of thousands of

10   Superman copyrights that remain exclusive or not?

11   A.   Yes, it does have de facto, and, in fact, it's acted as

12   if it were the exclusive owner.  I understand both in terms of

13   its representations to the public and also in terms of its

14   production of film and other audiovisual product.

15   Q.   Why else do you believe that Warner Brothers has de facto

16   exclusivity of the Superman film and television rights?

17   A.   I think I've gone through the analysis.

18   Q.   Do any specific terms of the Superman film and television

19   rights affect your opinion that Warner Brothers has de facto

20   exclusivity?

21   A.   Well, the terms are the broad grant of rights and the

22   warranties.  If you look at the face of the agreement, it's

23   the grant of all rights.  It doesn't make -- there's no carve

24   out for Action Comics 1 in the agreement.

25   Q.   Could you explain to me more specifically what you mean
```

1   by the warranties?

2   A.   Yes.  May I make reference to the agreement or just talk

3   about it?  I can do either.

4   Q.   Look at Exhibit 232.  It's before you.

5   A.   Okay.  Okay.  The representations and warranties are on

6   page 11.  So, for example, paragraph 9 says DC hereby

7   represents and warrants that, A, DC is the sole proprietor of

8   all rights in the property.

9   Q.   Was this warranty and representation made after the

10  termination notices were served or after the date of the

11  termination or after?

12  A.   After.  My understanding is that the notices of

13  termination were served in 1997.  And these warranties were

14  made by DC to Warner Brothers effective November 1999.

15  Q.   And what is the -- should it turn out as it did, that DC

16  did not hold exclusive rights to all the copyrights

17  transferred, what would the effect be under the agreement?

18  A.   The effect would be that DC would be in breach of its

19  representation of the warranty to Warner Brothers.

20  Q.   And that therefore --

21  A.   Therefore, they would be responsible in damages for the

22  breach of that representation and warranty.

23  Q.   Would DC, under your reading of the agreement, have to

24  make Warner Brothers whole for any loss, damage, or cost

25  resulting from plaintiffs' termination?

1  A.    Yes.  There's an indemnity provision that's included in

2  paragraph 9 that would cover that, I believe.

3  Q.    Now --

4  A.    Yes.

5  Q.    Going back to Warner Brothers for a moment, we spoke

6  earlier about Superman 1 through 4 and Superman Returns.

7           Do you recall that?

8  A.    Yes.

9  Q.    What is your view as to whether Warner Brothers owns

10  exclusive rights to any new Superman elements in those films?

11  Do you believe it owns exclusive rights to any new Superman

12  elements in those films or not?

13  A.    Yes.

14  Q.    What about trademarks?

15  A.    I believe they would own the trademarks emanating from

16  those as well.

17  Q.    And do you believe that DC's Superman trademarks were

18  affected by the termination under the Copyright Act?

19  A.    No, they weren't.

20  Q.    Now, you spoke that Warner Brothers has held itself out

21  as the -- has continued to hold itself out as the exclusive

22  owner of Superman.  How about DC?

23  A.    I believe DC has as well.

24  Q.    Now, what is your -- who do you believe owns the -- what

25  is your understanding as to who owns the foreign rights to

1    Action Comics No. 1, based on your review of the record in

2    this case?

3    A.    I understand that the Court has determined that the

4    termination, since it's under United States copyright law,

5    only applies to the United States.  So the foreign rights --

6    the rights to the foreign distribution with respect to Action

7    Comics 1 continue to be owned by Warners.

8    Q.    And those would be exclusive?

9    A.    Yes.

10   Q.    Or nonexclusive?

11   A.    My understanding is that they would be exclusive.

12   Q.    Do you believe that plaintiffs owning nonexclusive

13   rights, so far as determined to Action Comics No. 1, would be

14   in a position to compete with Warner Brothers regarding the

15   exploitation of Superman film and television rights or not?

16   A.    No.

17   Q.    Why is that?

18   A.    The most fundamental reason is that it is very difficult

19   to make deals where you are granting nonexclusive rights only,

20   and it would be particularly difficult if you could only grant

21   rights for the United States.  In my estimation, that would

22   make it virtually impossible to raise the financing to create

23   the audiovisual product based on those rights.

24   Q.    Why would it make it so difficult?

25   A.    Well, the entertainment business is an international

1    business at this time.  And the trend certainly has been that

2    more and more of the income that is generated from film and

3    television is coming from outside the United States.

4             So it logically follows from that that the financing

5    would be looking to a smaller and smaller pie, if they were

6    just limited to the United States, and that would make it

7    difficult to raise the financing.

8             In addition, I would think that if the rights were

9    nonexclusive, that the company receiving the rights would

10   worry about competition from Warners and the thousands of

11   copyrights that they held and the difficulty of separating out

12   the nonexclusive rights from the Superman property in whole.

13   Q.   Why would they be worried about the exclusive rights that

14   would continue to be owned by DC and Warner Brothers?

15   A.   Well, as I said, there's the 70 years of Superman.  And

16   it consists of literally thousands of works.

17   Q.   But why would they be worried is my question?

18   A.   They would be worried because they would be taking the

19   chance that their work might somehow infringe on an

20   exclusively owned Warner copyright or trademark.

21   Q.   That they may be -- I'm sorry?

22   A.   Again, they could be sued and -- for either damages or

23   perhaps for an injunction that would -- that would stop the

24   distribution of the product, and that's not a risk that

25   rational investors in audio-visual works like to take.

371

```
 1  Q.   Now, unlike the case of the Siegels, if you assume that a
 2  party has exclusive worldwide rights to exploit a property,
 3  would you -- how would you characterize investment in the film
 4  business even with exclusive rights?  Would you characterize
 5  it as risky or not risky?  Exclusive worldwide rights, I
 6  should say.
 7  A.   Even assuming that you could overcome the hurdle of
 8  nonexclusivity in the United States, even if you had rights
 9  throughout the world in general, the production and
10  distribution of films and television programs is very risky
11  and very capital intensive, very expensive.
12  Q.   Same question for the television industry.
13  A.   It applies in the same way.  It's very -- it's very
14  expensive to launch a television series, and you want to
15  look -- A, you don't want competition; B, you don't want to
16  get sued; and, C, you want to look to the world to get back
17  your investment.
18  Q.   Even with exclusive worldwide rights to a property, do
19  the majority of TV shows developed succeed, or do they fail?
20  A.   They fail.
21  Q.   What about a Superman MOW for distribution in the United
22  States only?  Why couldn't the Siegels get somebody to produce
23  a Superman MOW, Movie of the Week, and distribute it only in
24  the U.S.?
25  A.   They would have the same difficulties that I just
```

1   outlined before, which is the financiers could only look to

2   nonexclusivity.  They would be worried about getting sued.

3   They could only look to the United States.  It's the same

4   analysis for film.

5   Q.    What about a Superman low -- low budget Superman direct

6   to DVD movie for distribution only in the United States?

7   A.    Well, it's the same analysis.  And it's even more

8   difficult today, given the home video market, which is

9   increasingly dominated by films that have large theatrical

10  production budgets and releasing costs, and that's an engine

11  to get them into Wal-Mart.

12          So to even -- even direct to DVD would be very, very

13  difficult.

14  Q.    Based on what you've just said, what impact do you

15  believe the fact that the rights to Action Comics No. 1 are

16  nonexclusive, what impact do you believe that has on Warner

17  Brothers and the value of the Superman film and television

18  rights they obtain from DC?

19          MR. BERGMAN:  Objection.  Relevance.

20          THE COURT:  I thought it was compound.  But it's

21  relevant.  Overruled.

22          MR. BERGMAN:  May I be heard on that point?

23          THE COURT:  Counsel.

24          MR. BERGMAN:  The plaintiffs have no right to share

25  in the exclusive rights that DC may have conveyed.

1          THE COURT:  I understand.  I understand your

2    position, Counsel.  This is just going to the valuation.

3    We're not making any -- I understand what this is being

4    introduced for.  I understand your position on their right to

5    share or not share.

6          MR. BERGMAN:  Thank you, sir.

7          THE COURT:  Overruled.  You may proceed.

8          THE WITNESS:  It would be helpful if I could hear

9    the question again.

10   Q.   BY MR. TOBEROFF:  What impact, if any, do you believe

11   that all of this has on the value of the Superman film and

12   television rights that were transferred by DC to Warner

13   Brothers in the relevant Superman agreements?

14   A.   Based on the analysis, it's not material to my opinion as

15   to the fair market value of the transfer of rights.  It's

16   something I considered, but given what we discussed and the

17   fact that there's no way to separately value it, it's not

18   material.

19         THE COURT:  It's not material to valuing the

20   transfer of rights?

21         THE WITNESS:  Correct.

22   Q.   BY MR. TOBEROFF:  When you say material, you mean --

23   strike that.

24         Let's look at Warner Brothers' conduct with respect

25   to these agreements.

1          After Warner Brothers received notice of the

2    termination in 1997, effective 1999, how did they proceed with

3    respect to film rights to Superman?

4          MR. BERGMAN:  Objection.  Lack of foundation.

5          THE COURT:  Lay some foundation, Counsel.  Fair

6    enough.

7    Q.    BY MR. TOBEROFF:  Did you review the record in this case?

8    A.    Yes.

9    Q.    And in writing your expert report, did you review the

10   development of Superman films by Warner Brothers?

11   A.    Yes.  I also consulted some Internet resources as well.

12   But I did see post-termination notice writer agreements that

13   clearly reflected that Warners was continuing to develop the

14   Superman project that ultimately became Superman Returns.

15   Q.    Did you take into consideration as well Warner Brothers'

16   production of the Smallville television series?

17   A.    Yes.

18   Q.    Describe to me Warner Brothers' conduct after receiving

19   the termination notices in 1997 with respect to Superman?

20         MR. BERGMAN:  Objection.  No foundation.

21         THE COURT:  Sustained.

22   Q.    BY MR. TOBEROFF:  Are you aware of the action taken by

23   Warner Brothers with respect to the development of the

24   Smallville television series?

25   A.    Yes.

1    Q.    Are you aware of the actions taken by Warner Brothers

2    with respect to the development of a new Superman movie?

3    A.    Yes.

4    Q.    Could you describe to me that development and the

5    investment on Warner Brothers in that development?

6    A.    As I described on the film side, I reviewed various

7    writer agreements and other industry sources that describe the

8    continual development of the project.  I also reviewed Up in

9    the Sky, which was the Warner produced description, homage to

10   the Superman character, and was clear that Warners continued

11   to develop what ultimately became Superman Returns post 1997.

12   Q.    What was their investment in development leading up to

13   Superman Returns after their receipt of the termination

14   notice?  What is your understanding of that have?

15   A.    My understanding is that it's at least $30 million.

16   Q.    And what is your understanding of the amount invested by

17   Warner Brothers in the production and marketing of Superman

18   Returns after they had notice of plaintiffs' termination?

19   A.    I reviewed expert reports by accounts, and I also

20   reviewed Internet sources, and the reported budget was $225

21   million for the production costs, and I believe the releasing

22   costs were about $141 million.

23   Q.    And as part of your analysis, did you take into account

24   that Warner Brothers, after receiving the termination notices,

25   has spent approximately -- I can't do the math, $375 million?

```
 1              MR. BERGMAN:  Objection.  Leading.

 2              THE COURT:  Sustained.  Ask him what he took into

 3    account.  Don't tell him.

 4    Q.   BY MR. TOBEROFF:  What did you take into account in

 5    arriving at your analysis on that issue of nonexclusivity not

 6    having a material impact?

 7    A.   Well, I think actions speak louder than words.  So I

 8    looked at the fact that after the notice was served in 1997,

 9    that Warners continued to develop what ultimately became

10    Superman Returns.  That they green lit the project, spent

11    $375 million exploiting Superman Returns, which was released

12    in 2006.  And I looked at the television side Smallville and

13    that it, you know, commenced, I guess, release in 2001.

14              I've seen financial statements that showed that

15    Warners has invested in excess of a half a billion dollars in

16    the program through its other eight seasons that account for

17    it and continues to invest in the production and release of

18    Smallville.

19    Q.   Did Warner Brothers act or not act as if they were

20    concerned with this nonexclusivity issue in your opinion?

21              MR. BERGMAN:  Objection.  Calls for speculation.

22              THE COURT:  You're asking about their actions.  Why

23    don't you rephrase your question, Counsel.

24    Q.   BY MR. TOBEROFF:  In your opinion, did Warner Brothers

25    act or not act as a studio, concerned about nonexclusivity
```

1   when green lighting these projects and spending these amounts

2   of money?

3           MR. BERGMAN:  Same objection.

4           THE COURT:  It's the same question.  It's just the

5   cloak all act.  What do you mean by act?  Rephrase your

6   question.  Are you asking -- I'm not clear what you're asking,

7   Counsel.

8   Q.   BY MR. TOBEROFF:  What is the import of these large

9   expenditures by Warner Brothers in film and television after

10  the termination?

11  A.   Well, the import is that rational studios don't typically

12  spend hundreds and hundreds of millions of dollars and

13  release, you know, a tent-pole movie and have a hit series and

14  are acting like they had the exclusive rights and going into

15  the marketplace and licensing the exploitation of these works

16  as if they were the owner.

17  Q.   Are you aware that in this case that a settlement between

18  DC and plaintiffs was attempted by the parties back in 2001

19  and 2002?

20  A.   Yes.

21  Q.   And are you aware that those settlement negotiations did

22  not result in a settlement?

23  A.   I am aware of that.

24  Q.   Are you aware that the settlement entailed essentially a

25  buyout of plaintiffs?

1    A.    The proposed settlement did, yes.

2    Q.    And did you find anything in the record to suggest that

3    Warner Brothers ever -- in addition to making a deal with DC,

4    ever approached plaintiffs to make a deal with them before

5    investing millions in Smallville and Superman Returns?

6              MR. BERGMAN:  Objection.  Lack of foundation, and

7    what record are we talking about?

8              MR. TOBEROFF:  I'm referring to the court record,

9    which he reviewed.

10             THE COURT:  Overruled.  You may answer.

11   Q.    BY MR. TOBEROFF:  Did you find anything in the record to

12   suggest that?

13   A.    If you'd repeat the question.  I got interrupted.

14   Q.    You reviewed the court record in this case?

15   A.    Yes, I did.

16   Q.    Did you find anything in the court record to suggest that

17   after settlement talks aimed at buying out the Siegels

18   entirely failed, did you see anything to indicate that Warner

19   Brothers, in addition to making a deal with DC, tried to

20   license plaintiffs' share of Action Comics No. 1 from

21   plaintiffs?

22   A.    Yes, I believe that was part of the settlement talks.

23   Q.    But after the --

24             THE COURT:  Wait a second.  Where in the court

25   record is that?

1           THE WITNESS:  Your opinion, your Honor.

2           THE COURT:  Very well.

3    Q.   BY MR. TOBEROFF:  I'm not referring to the discussions

4    about buying out the plaintiffs entirely in the settlement

5    negotiations that you just testified you are aware of.

6    A.   Right.

7    Q.   I'm referring to after settlement failed, are you aware

8    of any attempt by Warner Brothers to enter into a separate

9    license with the Siegels for their share of Action Comics

10   No. 1?

11   A.   No.

12   Q.   I'd like to turn now, finally, to the Superman film

13   agreement and go through the terms.

14          THE COURT:  That's Exhibit 232?

15   Q.   BY MR. TOBEROFF:  You have a copy of Exhibit 232.  Bates

16   numbers WD 4199 to 4231.

17          Do you recognize this agreement, Mr. Halloran?

18   A.   Yes.

19   Q.   Did you analyze this agreement in the process of forming

20   your expert opinion in this case?

21   A.   Yes.

22   Q.   For ease of reference, I'll refer to it as the Superman

23   film agreement or the film agreement.

24          I'd like to show you what's previously been admitted

25   as Exhibit 203.  I believe you have a copy provided yesterday.

```
 1    Exhibit 203 is an agreement dated November 6, 1974, between DC

 2    and Film Export AG.  And I'll refer to this as the Salkind

 3    agreement.

 4    A.    Right.

 5    Q.    Had you seen the 1974 Salkind agreement before today?

 6    A.    Yes.

 7    Q.    And did you review it in connection with your report?

 8    A.    Yes.

 9    Q.    What does this agreement concern, very generally

10    speaking?

11    A.    It concerns the film rights to the Superman property.

12    Q.    It's a license of those film rights to film export?

13    A.    Yes.

14    Q.    How does the 1974 Salkind agreement compare to the 2002

15    Superman film agreement?

16    A.    In terms of the --

17    Q.    I'm speaking in general.

18    A.    General.  Well, in general, the 1974 agreement was an

19    arm's length transaction between DC and a predecessor to DC

20    and the Salkind Company.  And the 2002 agreement was an

21    agreement between DC and Warner.  So this was a third party

22    agreement, and this was not an arm's length agreement.

23          In terms of the -- my analysis, it was clear that

24    the Superman 2002 agreement, at least as far as the basic

25    participation terms, mirrors the Salkind agreement.  In many
```

 1   other ways, however, it's not as advantageous to DC as -- this

 2   agreement was more advantageous to DC than the 2002 agreement

 3   in general.

 4              THE COURT:  The 1974 agreement.

 5              THE WITNESS:  This was better for DC.  This was not

 6   as good for DC.

 7   Q.   BY MR. TOBEROFF:  Okay.  I'd like you to walk us through

 8   DC's Superman film agreement, Exhibit 232, and help us to

 9   understand the terms of that agreement for your expert

10   testimony.  I direct your attention to page 1, paragraph 1-A,

11   Bates No. WB 4199 of the film agreement.

12   A.   Okay.

13   Q.   And to make this easier, we're bringing up on your screen

14   the actual provision we're focusing on, and we can zoom in on

15   it.  So you tell me which is easier for you.

16   A.   Well, I have my reading glasses.  So I have to -- this

17   is -- okay.  If I can -- maybe somebody can help me here.  If

18   you can move this screen over here, that would be great.

19   Q.   I'd like to draw your attention to page 1, paragraph 1-A,

20   on Bates No. 4199.

21              You see it on the screen?

22   A.   I see it.

23   Q.   What is the effect of paragraph 1-A?

24   A.   The effect of 1-A is that --

25              MR. BERGMAN:  Objection, your Honor.  The agreement

1    speaks for itself.

2    Q.   BY MR. TOBEROFF:   What does this provision deal with?

3    A.   This provision deals with the period of time during which

4    Warners would control the rights granted in the agreement.   It

5    sets forth the option period and the payment of the option

6    fee, and it sets forth an option period until 2033, which I

7    understood was the expiration of the Superman copyright.

8          So it effectively gave Warners control of the

9    Superman property for 30 years.   It gave it effective control

10   of the property -- what this option did was give effective

11   control to Warners of the Superman property for, I guess, 34

12   years.

13   Q.   And what is the initial option fee in the Superman film

14   agreement?

15   A.   It's a million and a half dollars.

16   Q.   And what is the initial option term?

17   A.   I believe it was three years.

18   Q.   And after the first three-year period, you mentioned 34

19   years.  Does that mean there are extensions of the three-year

20   option for an additional 31 years?

21   A.   Yes.

22   Q.   Is it customary in the film industry to have option

23   periods totaling 34 years?

24   A.   I've never seen it, ever.  It's uncustomary.

25   Q.   What would be a customary initial option period in an

1   option purchase agreement for underlining film rights to a

2   property?

3   A.   Customarily, it's an initial 18 months and then an

4   extension for 18 months for a total of three years.

5   Q.   Now, these various option renewal payments, are those

6   mandatory payments, or are they discretionary?

7   A.   They are by definition discretionary.

8   Q.   So those payments are made at the discretion of Warner

9   Brothers?

10  A.   Correct.

11  Q.   Does this 34-year extendable option period favor DC or

12  favor Warner Brothers?

13  A.   It obviously favors Warners to the detriment of DC.

14  Q.   And why is that?

15  A.   Because DC is giving up for an unprecedented period of

16  time the right to exploit Superman in film.  And what's more

17  customary is for there to be a mechanism for a reversion of

18  those rights if the studio like Warner Brothers does not

19  continue to develop and produce and release those films.  That

20  is much more customary.

21  Q.   Now, what effect, if any, do these option fees have on

22  DC's participation in the agreement?

23  A.   My understanding is that these option payments are not

24  only credited against the contingent compensation but the

25  contingent compensation when earned as credit against the

1    option fees.

2    Q.    Is that customary or uncustomary in the motion picture

3    industry?

4    A.    It's uncustomary.

5    Q.    Have you ever seen in your work as a transactional

6    attorney or your work at the studios, have you ever seen an

7    option fee that is applicable to a rights holder's back end

8    contingent compensation?

9    A.    No.

10   Q.    Does the -- does this cross-applicability of the option

11   extension payments to DC's contingent compensation and the

12   applicability of the contingent compensation to DC's option

13   fees favor Warner Brothers or favor DC?

14   A.    Warners to the detriment of DC.

15   Q.    And why is that?

16   A.    Warners -- well, the -- what's customary is the owner of

17   a property, whether it be Superman, but specifically Superman,

18   would make sure, in granting the option to acquire the film

19   rights, that there be constraints on the period of time during

20   which the option was extant, during which the picture would be

21   developed, and typically there would be a purchase price which

22   would, you know, make the studio more pregnant and make it

23   more likely that the picture would be produced.

24            Then what's very unusual here is that the option is

25   typically deemed exercised after the option -- the three-year

1  period would go, the option would be exercised, and a payment

2  would be made, and there wouldn't be these option extension

3  payments.  At that point --

4  Q.   Excuse me, Mr. Halloran.  I'd like to refocus you.  I'm

5  referring only to the applicability.

6  A.   Okay.

7  Q.   So my first question is why does the purported

8  applicability of the contingent compensation to the option

9  extension payments disfavor DC?

10  A.   Because it -- I'm sorry.  If you could rephrase that.

11  Q.   Do you understand my question?

12  A.   No, I don't understand.

13  Q.   You mentioned that the contingent compensation -- DC

14  receives contingent compensation of $2 million.

15  A.   Right.

16  Q.   For example.  You testified that under the agreement,

17  that would be applicable to the option extension payments.

18  A.   Right.

19  Q.   And you mentioned that is unfavorable to DC and favors

20  Warner Brothers.  And my question is why.

21          MR. BERGMAN:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  It would reduce the amounts payable to

24  DC.

25  Q.   BY MR. TOBEROFF:  Would it serve also to extend the

1    option for numerous years or not?

2    A.    Yes, at the same time it would automatically extend the

3    option to the extent that contingent compensation was earned

4    upon the release of the money.  So, for example, if the

5    contingent compensation on Superman Returns exceeded these

6    amounts, there would be no further option payments.  They

7    would all be credited based on that contingent compensation,

8    which is very -- I've never seen it.

9    Q.    Now, turning to page 2, paragraph 2, of Exhibit 232, the

10   same exhibit, it's on your screen.

11   A.    Okay.

12   Q.    What does this provision provide?

13   A.    We're talking about paragraph 2?

14   Q.    Paragraph 2 on page 2.

15   A.    It provides that Warner would exercise its option by

16   giving DC written notice of commencement of principal

17   photography.

18   Q.    So the option is exercised merely by written notice?

19   A.    It would have to start the movie.

20   Q.    Now, is this a customary way that options are exercised

21   in the film industry?

22   A.    No.  What's customary is that the person taking the

23   option has to exercise the option on or before the expiration

24   of the option period.  So traditionally, Warners would have

25   three years to pay DC the option price.

```
 1   Q.    But how do you -- other than giving written notice of the
 2   exercise of the option, how do you exercise an option
 3   traditionally in the film industry?
 4   A.    You pay a purchase price.
 5   Q.    Is there a purchase price in this agreement?
 6   A.    No.
 7   Q.    Is there any fixed cash purchase price or exercise price
 8   for the transfer of Superman film rights in this agreement?
 9   A.    No.
10   Q.    What money is guaranteed, if any, under this agreement?
11   A.    The only money that's guaranteed is the option fee.
12   There's no guarantee as to a purchase price or the amount of
13   the contingent compensation.
14   Q.    That's the million five you spoke of earlier?
15   A.    Correct.
16   Q.    Does the -- is the lack of a purchase price customary or
17   uncustomary?
18   A.    Very uncustomary.
19   Q.    Does the lack of a purchase price favor DC or favor
20   Warner Brothers?
21   A.    It favors Warner Brothers.
22   Q.    How does it favor Warner Brothers?
23   A.    They don't have to write a check as a purchase price
24   within a stated period of time.  They can continue to develop
25   the film by just paying these relatively modest option
```

1    payments.  They don't have to pay a substantial purchase

2    price, which is certainly more customary for properties of

3    this type.  It's also good for Warner Brothers because if

4    they -- I mean, the contingent compensation is only based on

5    the release of the movie.  So they don't have to pay the

6    amount until a later date.

7            And also conceivably, Warners could not release the

8    picture.  They could make the picture based on the rights and

9    not release it and not have any further obligations, which is

10   very unusual.

11   Q.   Normally under an option purchase agreement for

12   underlying rights, once you exercise the option, what effect,

13   if any, does that have on the obligation to renew the option?

14   A.   Well, the option is extinguished because the option has

15   been exercised.

16   Q.   So once Warner Brothers exercised the option solely by

17   commencing production of a film, are they or are they not

18   obligated to continue to make those option renewal payments?

19   A.   It's a little confusing.  Traditionally, they would not

20   be obligated to make those payments.  But the operative effect

21   is when they release a film and it generates contingent

22   compensation to DC, that amount is applied against the option

23   payment.  So that helps distinguish that obligation.

24   Q.   But as written, does Warner Brothers have any obligation

25   to continue making those option renewal payments, which they

1  call option renewal payments, once the option is exercised?

2  A.    No, they don't have an obligation to pay them.

3  Q.    As written in the contract?

4  A.    Correct.

5  Q.    What does the term net present value mean?

6  A.    Net present value means that a bird in the hand is worth

7  two in the bush.  Basically, it's a financial calculation

8  where there are future cash flows that are discounted to a

9  present value based on a discount factor.

10         So the easiest way that I look at it is if you win

11  the lottery, they give you a choice.  You can get $10 million

12  now or 30 million over 30 years.  So net present value is what

13  it's worth today.

14  Q.    Now, you testified that Warner Brothers need not make

15  those 31 option extension payments because you stated they

16  were discretionary.  And you also testified that once they

17  exercised their option, the option would be extinguished and

18  they need not renew the option.  But assuming for purposes of

19  my question that they actually made each of those payments,

20  did you do a net present value calculation of what the net

21  present value of those payments would be?

22         MR. BERGMAN:  Objection, your Honor.  There was no

23  such thing in the report, nor any indication of it.

24         THE COURT:  Counsel?

25         MR. TOBEROFF:  Their witness, Mr. Gumpert, in his

1    report referred to a -- these option payments as if they were

2    a cash payment of $20 million.  And my question addresses

3    that.

4            THE COURT:  So you are offering this as rebuttal at

5    this point?

6            MR. TOBEROFF:  Yes.  Anticipatory rebuttal.

7            THE COURT:  The Court will consider it as such and

8    conditionally admit it.

9            You may answer.

10           THE WITNESS:  Yes, the value, rather than the

11   nominal approximately $20 million would be closer to

12   $20 million on the net present value basis.

13   Q.   BY MR. TOBEROFF:  And what discount rate did you employ

14   in reaching that result?

15   A.   The 30-year bond rate.

16   Q.   I'd like to draw your attention to paragraph 4 on page 2

17   of the film agreement, Bates No. WB 04200.

18           I'm sorry.  I think we already covered this.  I

19   think we can move on.

20           Now, we spoke about option purchase agreements,

21   what's customary for option purchase agreements in the film

22   industry with respect to underlying rights to intellectual

23   properties.

24           Are all underlying rights agreements option purchase

25   agreements, or are they sometimes flat out purchase

1   agreements?

2   A.    They sometimes are so-called straight purchase

3   agreements.  There's no option period.  You write a big check.

4   So, for example, if I looked at the Hand agreement and the

5   Sahara agreement, and those are both purchases.

6   Q.    We'll get to those specific agreements.

7   A.    Okay.

8   Q.    But when, in your experience in the film industry, would

9   rights holders tend to demand an up-front commitment in the

10  form of a purchase as opposed to an option purchase of rights?

11  A.    Someone who has a powerful property and a hot property

12  that's in the marketplace and where they could demand --

13  rather than having an option structure, that somebody write a

14  check for the entire purchase price in order to get the

15  property.

16  Q.    And other than receiving a greater amount of cash in hand

17  from an agreement, which is the straight purchase as opposed

18  to an option purchase, are there any other benefits to a

19  straight up purchase?

20  A.    Well, the main benefit of it is that it gets the

21  financier pregnant, as it were, and makes it more likely that

22  in fact the film would be produced and released rather than

23  just receiving a cash payment and not having the movie

24  actually be produced and released.  That's the -- that's the

25  biggest advantage other than just, you know, getting a check.

1  Q.   In addition to receiving the cash up front?

2  A.   Yeah, it's -- well, the effect of the financier handing

3  over, say, $10 million to purchase rather than option is that

4  it makes it highly likely that the studio is going to make the

5  movie.  Studios are not in the business of writing $10 million

6  checks and then not making movies.  Not to say that's never

7  happened in history, but it's certainly very atypical.

8  Q.   I'd like to draw your attention to page 2, which is Bates

9  No. WB 04200, paragraph 3.

10          What does paragraph 3 relate to?

11  A.   It relates to the contingent compensation Warners would

12  pay DC for the exploitation of the films based on the rights.

13  Q.   Now, you've used the term "contingent" a couple times.

14  You've now just said contingent compensation.  Other times you

15  said contingent participation.

16          What is it contingent on?

17  A.   It's contingent on release of the movie.  And the

18  performance of the movie.  And the creditworthiness of the

19  person paying.

20  Q.   Is that because the participation is a participation of

21  revenues from the movie?

22  A.   Yes.  Distinguished from the purchase price, which is

23  paid irrespective of the revenues of the film.

24  Q.   What was DC's participation in the film agreement?

25  A.   DC received 5 percent of --

1    Q.    Excuse me.  We're just talking about the agreement.

2    A.    What was DC's participation?

3    Q.    In the agreement.

4    A.    It was a participation of the proceeds from the --

5    Q.    No, I'm sorry.  You said "received."  What is DC entitled

6    to receive under the agreement?

7    A.    They are entitled to receive a participation in the

8    revenues from the films that are released based on the grant

9    of rights under the agreement.

10   Q.    And what is that participation?

11   A.    It's 5 percent of what they call a defined gross from the

12   world or 7 1/2 percent of domestic gross, whichever is higher.

13   Q.    And what does domestic refer to?

14   A.    Domestic refers to the United States and Canada.

15   Q.    Now, would you expect 5 percent of a studio's worldwide

16   gross to be greater than or less than 7 1/2 percent of its

17   domestic gross from a film?

18   A.    I would expect the 5 percent to be greater.

19   Q.    Why is that?

20   A.    Because sort of the rule of thumb at this point is

21   approximately two thirds of the revenue from pictures is

22   generated outside the United States and Canada.

23   Q.    Where do you get that statistic from?

24   A.    From the MPAA.

25   Q.    What is the MPAA?

1   A.   The MPAA is a trade group that represents the studios,

2   and among the things they do is they compile and make

3   available to the public statistics regarding films, their

4   costs, and the relative revenue that is generated from the

5   films from the group that are members of the MPAA.

6   Q.   Now, if Warner Brothers under this agreement, given what

7   you said previously about how the option is exercised, if

8   Warner Brothers produced and released only one Superman film

9   under the agreement, but no Superman films thereafter for the

10  next 30 years, what would be -- would DC have any recourse

11  under the agreement?

12  A.   No, they wouldn't have the traditional right to get back

13  the film rights.

14  Q.   And would DC's gross compensation be limited solely to

15  the one film that Warner Brothers had produced?

16  A.   Yes.  Because it only kicks in when Warners actually

17  produces and releases a film.

18  Q.   And how is DC's compensation weighted in the agreement?

19  Is it weighted to guarantee cash, which I believe you

20  testified was a million five?  Or was it weighted towards its

21  gross compensation?

22  A.   It's weighted towards the gross compensation.

23  Q.   Now, if Warner Brothers only made one film, since making

24  a film exercises the option, would Warner Brothers need to

25  continue making those option renewal payments?

1  A.    I don't believe so.

2  Q.    How does the 5 percent that DC is entitled to receive of

3  Warner's worldwide gross from films -- in Superman films,

4  compare to contingent compensation and other agreements for

5  prominent properties that you reviewed in general?

6  A.    In general, it was less than many properties that were

7  not as valuable as Superman.

8  Q.    How much less?

9  A.    Half, less than half.

10  Q.    Now, were you able to find any agreements for the film

11  rights to a famous comic book character where the rights

12  holder received contingent compensation greater than 5 percent

13  of distributor's gross?

14  A.    No, I was not able to.

15  Q.    Why do you believe you were not able to?

16  A.    Well, the most prominent comic book characters are

17  controlled by two companies, DC Comics and Marvel.  And DC

18  Comics does not put out their properties into the open market

19  in a manner which I think would generate participations in

20  other provisions that would be better than this intercompany

21  agreement.

22       The other big comic book properties that Marvel

23  owns, like Ironman, it was not -- the Ironman agreement I saw

24  was prior to Ironman becoming a big hit property, and I also

25  understand that the agreement for Ironman that I saw expired,

1    and Marvel now, rather than licensing their lead comic book

2    properties, finances them and has them distributed on their

3    behalf.

4    Q.    Until this decade, with release of Ironman movie and

5    Spiderman movie and X Men movie, prior to the release of those

6    movies, what were the two most prominent superheroes --

7    superhero characters in your opinion?

8    A.    Superman and Batman.

9    Q.    And those were controlled by what company?

10   A.    By DC Comics.

11   Q.    And was Ironman, prior to the release of the recent hit

12   film, was that a property that was well-known, or was it a

13   property that was not well-known?

14          MR. BERGMAN:  Objection.  No foundation.

15          THE COURT:  I'll sustain it.  You can rephrase your

16   question, but let's do it after the break.  We'll take about a

17   15-minute break.

18          (Recess taken.)

19          THE COURT:  Counsel.

20   Q.    BY MR. TOBEROFF:  Mr. Halloran, I'd like to show you

21   what's been previously admitted as Plaintiffs' Exhibit 1.

22   Exhibit 1 is an agreement between DC Comics and Time Warner

23   Entertainment Company, LP.  Regarding the film and

24   audio-visual rights to the Batman character and property.

25          How is the agreement dated?

1   A.   It's dated as of May 31, 2002.

2   Q.   I draw your attention to page 18 of Exhibit 1.  When was

3   this agreement executed?

4   A.   The execution date was February 3, 2004.

5   Q.   I'd like to draw your attention back to page 1.  Excuse

6   me.  Page 2, paragraph 1-A, of Exhibit 1.  The page is Bates

7   No. WB 4084.

8          Under this paragraph, what is the option payment?

9   A.   $175,000.

10  Q.   For what period of time?

11  A.   It's from the initial date until June 20, 2003.

12  Q.   What period of time is that?

13  A.   Approximately a year.

14  Q.   And is this option payment -- option term renewable as

15  under the Superman film agreement?

16         MR. BERGMAN:  Objection, your Honor.  There was no

17  reference in the report of the witness to the Batman agreement

18  or its provisions.

19         MR. TOBEROFF:  I believe that's incorrect, your

20  Honor.  Attached to the witness's report is a very lengthy

21  list of all of the documents that he reviewed in arriving at

22  his opinions in this case, and the Batman agreement is

23  included in that list.

24         THE COURT:  Is that the case, Counsel?

25         MR. BERGMAN:  It's included in the list but not

1    referred to in the report.

2          THE COURT:  Well, the list, Counsel, has been

3    incorporated in the report.  The objection is overruled.  You

4    may proceed.

5    Q.   BY MR. TOBEROFF:  My question was whether this agreement

6    provides for renewable option terms like in the Superman

7    agreement or not.

8    A.   Yes, it does.

9    Q.   And are those renewable option terms -- is it your

10   understanding that those renewable option terms are for the

11   remaining life of the Batman copyright at the time or not?

12   A.   Yes.

13   Q.   I draw your attention to page 3, paragraph 3-B of

14   Exhibit 1.

15          What does this paragraph provide?

16   A.   This is the contingent compensation paragraph which

17   mirrors the contingent compensation payable to DC under the

18   Superman film agreement.

19   Q.   Is it the same gross participation as in the Superman

20   film agreement?

21   A.   Yes.

22   Q.   Now, you mentioned this agreement was entered into in

23   2004.  Between May of 2002, when the Superman film agreement

24   was entered into, and 2004, when the Batman agreement was

25   entered into, had there been any further releases of films

1  based on comic book superheroes?

2  A.    Yes.   The one being the release of the second X Men

3  movie.   And there was a Spiderman movie which was about to be

4  released about this time or certainly was in the works and

5  people knew it was going to be released.

6  Q.    When you refer to a Spiderman movie, are you referring to

7  Spiderman 2?

8  A.    Yes.

9  Q.    Were those movies successful or not successful?

10  A.    They were both extremely successful.

11  Q.    I'd like to draw your attention to page 18, moving back

12  to the Superman film agreement with Exhibit 232.   Page 18 is

13  actually labeled Exhibit B to the Superman film agreement.

14  It's on your screen as well.

15          What does Exhibit B provide?

16  A.    Exhibit B is the gross receipts definition that sets

17  forth the amounts that the contingent compensation

18  participation applies to.

19  Q.    In your experience, are these defined gross definitions

20  ever modified by amendments?

21  A.    They typically are modified by amendments.

22  Q.    What form do those amendments take?

23  A.    They are called riders.

24  Q.    R-I-D-E-R?

25  A.    Yes.

1  Q.   Does Warner Brothers have a rider that modifies its

2  defined gross definition in favor of a participant or not?

3  A.   Yes.

4  Q.   Is that rider included in DC's Superman film agreement?

5  A.   Surprisingly not.

6  Q.   Is the failure to include that rider in Warner Brothers'

7  benefit or in DC's benefit?

8  A.   Warner Brothers' benefit.

9  Q.   How does it benefit Warner Brothers in general?

10  A.   Well, the notion of the rider is that it modifies the

11  basic gross receipts definition to the -- so that the gross

12  receipts definition is better for the participant.  So that by

13  definition is because it's better to the participant, it's

14  worse for the studio.

15  Q.   So not having a rider is --

16  A.   Is detrimental to the participant.  In this case, it's

17  detrimental to DC.

18  Q.   I'd like to move on to the subject of home video.  What

19  is a home video royalty in the film and television industry?

20  A.   Home video royalty typically is a percentage of the

21  wholesale price that is credited to the gross receipts upon

22  which the percentage is then applied.  And the range is here,

23  20 percent, which is a minimum.  And it can go up in some

24  cases to 35 or 40 percent.

25  Q.   You say it's a minimum.  Do you mean that's an industry

1    minimum of the 20 percent home video royalty?

2    A.    Yes, and it's the minimum here in the Warners definition.

3    Q.    And in your experience, what kind of participant would

4    negotiating leverage receive in terms of a home video royalty?

5    A.    Objection.  Lack of foundation.

6              THE COURT:  Lay a foundation for that.

7    Q.    BY MR. TOBEROFF:  Do you have experience negotiating a

8    wide variety of agreements in the entertainment industry?

9    A.    Yes.

10   Q.    Do you have experience negotiating underlying rights

11   transactions in the film and television industry?

12   A.    Yes.

13   Q.    In your experience, when a participant has negotiating

14   leverage, what can the range of the home video royalty be as

15   opposed to the minimum 20 percent?

16             MR. BERGMAN:  Objection.  Lack of foundation.  No

17   indication he's done these provisions.

18             THE COURT:  Counsel.

19   Q.    BY MR. TOBEROFF:  Do the agreements in the entertainment

20   industry always contain provisions dealing with home video?

21   A.    Yes.

22   Q.    Do you have experience in negotiating these provisions?

23   A.    I have experience negotiating these provisions, and I've

24   also reviewed numerous documents in connection with my work in

25   this case where there are such provisions and amounts in

1    excess of 20 percent.

2    Q.    Now, when a participant has leverage, can you give me an

3    idea of the range that that participant might negotiate in the

4    form of a home video royalty?

5         MR. BERGMAN:    Objection.    Lack of foundation.

6         THE COURT:    What's your particular concern, Counsel?

7    He clearly has experience dealing with these types of --

8         MR. BERGMAN:    My concern, your Honor, based on my

9    deposition of the witness, he has never negotiated a video

10   provision more than 20 percent.    In fact, the witness has only

11   negotiated one acquisition agreement in the past 19 years.

12   ██████████████████████████████████████████████████████

13   ██████████████████████████████████████████

14   ████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████

18   █████████████████████████████

19   Q.    BY MR. TOBEROFF:    Now, Mr. Halloran, given the comments

20   of Mr. Bergman, is your experience solely limited to

21   agreements that you have actually negotiated?

22   A.    No.

23   Q.    Give me an idea of why it's not solely limited to

24   agreements you have negotiated in connection with your opinion

25   in this case.

A.    Well, in the first place, these sort of gross definitions

from the definition of home video is not only in rights

agreements.  It's in virtually every agreement in connection

with the motion picture, be it a rights agreement, a writer

agreement, a director agreement, an actor agreement.  And also

in distribution agreements.

So I've seen thousands and thousands of agreements

that have had video royalties, and I've negotiated them

hundreds of times.

Q.    But your experience is not simply limited to those

agreements you've negotiated?

A.    Correct.

Q.    Is it, or is it not?

A.    No, of course not.

Q.    In the course of rendering your opinion in this case, did

you only look at agreements you've negotiated?

A.    No.  I certainly looked at the Neopets case -- Neopets

agreement, which I negotiated, but the vast majority were

agreements I hadn't negotiated in reviewing for my work on

this case.

Q.    That was for the purpose of comparing the terms of those

agreements to the Superman film agreements at issue in this

case?

A.    Precisely.

Q.    I'd like to turn to page 19 of Exhibit B in the Superman

1    film agreement and draw your attention to paragraph 1-D.

2              What does this paragraph provide?

3    A.   This is the typical minimum 20 percent home video royalty

4    paragraph.

5    Q.   I'd like you now to turn to page 12, paragraph 13, of the

6    Superman film agreement.  It's on your screen as well.

7              THE COURT:  Page 12?

8              MR. TOBEROFF:  Page 12, Bates No. WB -- excuse me.

9    I have it the other way.  It's paragraph 12 on page 13, your

10   Honor.

11             THE COURT:  Very good.

12             MR. TOBEROFF:  WB 4211.

13             THE COURT:  I see it.

14   Q.   BY MR. TOBEROFF:  What does this provision provide?

15   A.   Looking at paragraph 12?

16   Q.   Yes.

17   A.   It provides for a reversion of the film rights if Warners

18   fails to make certain payments.

19   Q.   Is there any -- when you say certain payments, are you

20   referring to the payments Warner Brothers would be obligated

21   to make under the agreement?

22             MR. BERGMAN:  Objection.  Leading.

23             THE COURT:  Sustained.

24   Q.   BY MR. TOBEROFF:  When you say certain payments, what are

25   you referring to, Mr. Halloran?

1  A.   I think this goes to the option payments.  So if they

2  fail to make the option payments, then there's a mechanism for

3  DC to give Warners notice that they haven't made the payment

4  and to give Warners the option to make the option payment.

5  Q.   But as you testified earlier, once they exercise the

6  option by starting production of a single film, the option

7  would be extinguished, and you'd no longer renew it.

8       Is that your testimony?

9  A.   That's correct.

10      MR. BERGMAN:  Objection.  Leading.

11      THE COURT:  Sustained.  Let the witness testify,

12  Counsel.

13  Q.   BY MR. TOBEROFF:  What is the effect, if any, of the

14  commencement of principal photography on the requirement that

15  Warner Brothers make future option payments or else the

16  property reverts to DC?

17  A.   As I testified, the exercise of the option would

18  extinguish the obligation to make those payments.  I think it

19  would make -- with that in mind, that would make this

20  paragraph 12 illusory.

21  Q.   Now, are there any other reversion provisions in the

22  Superman film agreement that would permit DC to get back its

23  Superman film rights once Warner exercised the option by

24  producing a single film?

25  A.   No.

1    Q.    If Warner Brothers only made one Superman film and did

2    not make another Superman film for the remainder of the 34

3    year -- strike that.

4              If Warner only made one Superman film and did not

5    make another Superman film, would the Superman film rights

6    revert to DC under the agreement as written?

7    A.    No.

8    Q.    What would be the effect of this on DC and therefore on

9    plaintiffs by extension if Warner Brothers only made one

10   Superman film under the agreement?

11   A.    It would be devastating.  Devastating both financially,

12   because there would be no additional payments made, and it

13   also would be devastating to the continued awareness of the

14   Superman character, which emanates from the production and

15   release of, you know, tent-pole films.

16   Q.    Under the agreement, is it in Warner Brothers' sole

17   discretion or not in its sole discretion whether it makes more

18   than one Superman film in 34 years?

19   A.    It's completely within their discretion to the detriment

20   of DC.

21   Q.    Are you familiar with reversion provisions contained in

22   other film rights agreements?

23   A.    Yes.

24   Q.    What is the typical reversion provision in a film rights

25   agreement for a well-known underlying literary property?

 1   A.    Typically it would provide that notwithstanding that the

 2   option had been exercised or a picture produced and released,

 3   that after a period of time, that if the studio was not

 4   continuing to produce one of these pictures, that the film

 5   rights would come back to the grantor, and that period is, for

 6   a high-end property is, let's say, in that sort of three- to

 7   five-year range.  Sometimes less.

 8          The notion behind it is if the studio is not going

 9   to continue to exploit the property that has been granted to

10   them, that the rights would come back, and the owner would

11   have the opportunity to go into the marketplace and perhaps

12   have someone else continue to produce pictures for them.

13   Q.    And does that sort of customary provision -- strike that.

14          Who does that customary reversion provision benefit?

15   The rights holder or the film studio?

16   A.    It benefits the rights holder.

17   Q.    I'd like to draw your attention to page 7, Bates No. WB

18   4205, paragraph 6-C.

19   A.    Yes.

20   Q.    What does this provision concern?

21   A.    This has to do with the treatment of the merchandising

22   rights that emanate from the new elements that are added in

23   conjunction with a film that's produced under the agreement.

24   Q.    And what is the -- what does paragraph 6-C provide with

25   reference to sharing revenues from the film-related

1    merchandising?

2          MR. BERGMAN:  Objection.  The agreement speaks for

3    itself.

4    Q.   BY MR. TOBEROFF:  What is your understanding of what the

5    agreement provides with reference to the sharing of

6    merchandising -- film-related merchandising revenues?

7    A.   I understand they were going to be shared 50/50.

8    Q.   And what is encompassed in the term film-related

9    merchandising?

10   A.   The motion, especially when you have a character like

11   Superman that has had previous merchandising that's been in

12   the marketplace and continues to be in the marketplace, you

13   want to be -- it's customary that prior merchandising can

14   continue and that the rights holder continues to own the

15   proceeds from that.

16          However, there may be new things that are created --

17   that are specific only to the picture, and then the

18   merchandising of those elements which are distinguished from

19   the old elements.  There's typically a split of the revenue

20   from the merchandising of those new characters which are

21   merchandised, which are specific to the film.

22   Q.   Now, under this provision in this agreement, what would

23   be included in film-related merchandising?  Can you give me an

24   example of the type of merchandising that would fall under

25   this provision?

```
 1   A.   It would be merchandising that could be identified as

 2   emanating from the movie.  So it might --

 3   Q.   I'll break it down.

 4   A.   Okay.

 5   Q.   If merchandising included the images of actors in the

 6   movie, let's say the actor playing Superman, in your opinion,

 7   would that fall under this agreement as film-related

 8   merchandising?

 9   A.   Yes.

10   Q.   If it included the logo of the film, would that be

11   film-related merchandising?

12   A.   Sure.

13   Q.   The title of the film?

14   A.   Sure.

15   Q.   New elements appearing in the Superman film that weren't

16   in the underlying Superman comic books?

17   A.   Yes.

18   Q.   Additional characters in the film that are not in the

19   comic books?

20   A.   Good example.

21   Q.   I'd like to draw your attention to -- strike that.

22            Now, how is merchandising licensed with respect to a

23   Superman film produced by Warner Brothers?

24            MR. BERGMAN:  Objection.  Lack of foundation.

25            MR. TOBEROFF:  Your Honor, may I?
```

1              THE COURT:  You may.

2              MR. TOBEROFF:  The foundation is that he's reviewed

3      a vast number of documents in this case.  He's an expert in

4      the entertainment industry.  He's reviewed the agreements in

5      question.  And he's rendered an opinion, and I'm now asking

6      him --

7              THE COURT:  Why don't you lay that foundation,

8      Counsel, instead of just saying it.

9              MR. TOBEROFF:  We have.

10             THE COURT:  That he's reviewed the agreements

11     related to the merchandise licensing by Warner Brothers?

12             MR. TOBEROFF:  I apologize, your Honor.

13             THE COURT:  Okay.  I didn't think I had heard that.

14     Q.   BY MR. TOBEROFF:  Did you review an agreement between DC

15     and Warner Brothers pertaining to the licensing of Superman

16     merchandise?

17     A.   Yes.

18     Q.   And how are revenues dealt with under that agreement?

19     A.   I believe Warners is acting as an agent, takes a 25

20     percent fee on the gross merchandising receipts that are

21     received.  And then that amount net of that fee is divided

22     50/50 as between DC and Warner Brothers.

23     Q.   So with respect to film-related merchandising, when you

24     combine these two agreements, how much of every dollar would

25     be kept by Warner Brothers, and how much would DC receive?

```
 1   A.   Warners would keep 62 -- let's take a dollar.  It would
 2   be 62.5 cents to Warner's and 37.5 cents to DC.  The math
 3   being a dollar comes in.  You take out a quarter to the Warner
 4   merchandising arm.  There's 75 cents left.  And you divide
 5   that 50/50.
 6   Q.   I'd like to draw your attention now to page 2, which is
 7   Bates No. WB 4200.  It's paragraph 5 of the Superman film
 8   agreement, which continues on to page 6, 4201.
 9        What does this paragraph concern?
10   A.   It's the grant of rights from DC to Warner.
11   Q.   What rights are granted from DC to Warner in the Superman
12   property as a whole?
13   A.   All rights subject only to the reserved rights that are
14   enumerated.
15   Q.   Is this typical or atypical for a prominent intellectual
16   property that's being licensed for film exploitation?
17   A.   Atypical.  Very unusual.
18   Q.   What is more customary?
19   A.   What is much more customary is that rather than granting
20   all rights subject to enumerated reserve rights, it's the
21   opposite.  The grantor grants specific rights, and to the
22   extent that those rights are not granted, they are reserved to
23   the grantor.
24   Q.   And why -- does the more typical provision benefit the
25   rights holder or benefit the licensee?
```

1    A.    It's very much to the benefit of the rights holder.

2    Q.    And why does it benefit the rights holder?

3    A.    It benefits the rights holder because it carves out

4    those -- it makes it clear that the only rights that the

5    studio would have are the ones that are enumerated, and it

6    means all other rights, including rights that might be more

7    valuable in the future, would be continued to be owned by the

8    licensor.  It increases the economic value to the licensor

9    because as those rights come into existence, they have the

10   right to license them.

11   Q.    Is that what was done in the Superman film agreement?

12   A.    No.

13   Q.    Is the provision in the Superman film agreement regarding

14   the scope of the rights grant and the reversion of rights more

15   favorable to Warner Brothers or more favorable to DC?

16   A.    More favorable to Warner Brothers.

17   Q.    And how does that favor Warner Brothers over DC?

18   A.    It allows Warner Brothers to -- they end up owning more

19   rights.

20   Q.    How is that?

21   A.    Because they get all rights only subject to the reserved

22   rights.  And typically the reserved rights are rights that are

23   in existence as of the time of the agreement.  So as

24   additional -- so if there's ever any doubt or if there are

25   additional rights that come into existence, Warner would take

1    the position under the contract, that they own those rights

2    and that the licensor did not own the rights.

3    Q.    And how important are new media rights to the

4    entertainment industry as it exists today?

5    A.    They are incredibly important.  We've seen first there

6    were theaters and then television, and then home video, and

7    now Internet and mobile devices, and there continue to be

8    rights that are more and more valuable as time goes by, and

9    technology makes things more complicated.

10    Q.    Now, I'd like to draw your attention to paragraph 3

11    on page 2 of the Superman agreement, which is again Bates

12    No. 4200.

13            And I want to get a sense of what DC's gross

14    participation that you described, what is that applicable to?

15    A.    It's applicable to the option payments.

16    Q.    Does Warner Brothers receive a broader grant of rights

17    under the agreement than feature motion pictures?

18    A.    Yes.

19    Q.    Must it pay for the exploitation of Superman rights in

20    any form of audio-visual works other than feature length

21    motion pictures under the agreement?

22    A.    No.

23    Q.    So in your opinion, is the grant of rights broader or

24    narrower than the payment obligation of Warner Brothers?

25    A.    The grant of rights is broader than the payment

1    obligation.  The payment obligation is restricted to the gross

2    receipts as defined in the exhibit.

3    Q.   What is the net effect of that?

4    A.   The net effect of that is that there may -- there's

5    potentially exploitation based on the granted rights for which

6    there would be no accounting to DC for that -- the revenue

7    that comes from that exploitation.

8    Q.   When you say no accounting, does that mean DC would get

9    zero for its gross participation regardless of that

10   exploitation?

11   A.   Absolutely.  If it -- by definition, if it doesn't go

12   into the pot to be divided, there's no division.

13   Q.   I'd like you now to turn, please, to paragraph E on page

14   8 of the Superman film agreement, Bates No. WB 4206.

15            What does paragraph E concern?

16   A.   It concerns the television rights in the pictures

17   produced by Warner.  Excuse me.  It talks about television

18   rights other than the rights to the pictures -- the television

19   rights in the pictures produced by Warner.

20   Q.   What does it provide regarding that?

21   A.   Well, interestingly, it provides that even though DC has

22   on the face of the agreement reserved the television rights,

23   that they only can exploit those through an affiliate of

24   Warner.  This is highly unusual.  Because typically, when you

25   grant rights and you reserve television rights, you want the

1    ability to put those rights into the open marketplace and get

2    the highest value for the rights.  So if you're -- in an

3    agreement like this, if you can only have it exploited through

4    a Warner company, then by definition, it makes it virtually

5    impossible to get fair market value for those rights.

6    Q.    Is Warner Brothers obligated to exploit Superman

7    television rights during the 34 years?

8    A.    No.

9    Q.    They are not obligated.

10   A.    No.

11   Q.    If Warner Brothers exercises the option under the

12   agreement but doesn't feel like exploiting television rights,

13   does DC have any recourse?

14   A.    None.  It's analogous to the reversion on the film side.

15   So typically in these sorts of agreements, you not only have a

16   right to get the film rights back if there's not succeeding

17   pictures that are produced, but you reserve the television

18   rights as well.  So you can exploit those.

19   Q.    And with a well-known property like Superman, why would

20   it be important to a rights holder to continue to -- for the

21   licensee to continue to exploit the property?

22   A.    Well, in an agreement like this, it would be especially

23   important because since there's no obligation for Warners to

24   continue to produce and release films, the property may just

25   lie out there unexploited.  So certainly you would want -- it

1  would be especially important in an agreement like this to be

2  able to exploit the television rights if Warners wasn't

3  continuing to produce and release films.

4  Q.   I'd like to turn to a new subject, the subject of

5  artistic approvals or creative controls of a rights holder.

6  I'd like to draw your attention to page 9, Bates No. 4207,

7  paragraph 7-C of the Superman film agreement.

8          Does this paragraph provide for DC with creative

9  approval rights?

10          MR. BERGMAN:  Objection.  Relevance, your Honor.

11          THE COURT:  I'll give you some latitude.  Overruled.

12  Q.   BY MR. TOBEROFF:  Before we get into the actual

13  provision, do you believe that the creative approval rights of

14  a rights licensor has an economic impact on the rights

15  licensor?

16  A.   Absolutely.

17  Q.   Why do you -- why is that your opinion?

18  A.   It's my opinion because as an owner of a highly valued

19  property, the last thing you want to do is to have it be

20  diluted in a film where it is not true to that character and

21  where you don't have controls as to how it's depicted, you

22  know, as far as the screenplay, actors, director, and other

23  approvals.

24          You want to control it to make sure that it conforms

25  with the look and the spirit of the character and to try to

1    increase the likelihood that in fact it will be successful.

2    The worst possible scenario for a high-end rights holder is

3    that you don't have these approvals and the movie is not true

4    to the character, and it's a fiasco, and it's a bomb.

5    Q.    And how does that have a negative economic impact on a

6    rights holder, if any?

7    A.    It can have a huge impact.  You know, the value of a

8    character is based on how it's been exploited in the past, and

9    people looking forward into the future as to its performance.

10   And if in fact based on these -- if there are no approvals and

11   the movie bombs, that can have a catastrophic economic effect

12   to the value of the property going forward after that.

13   Q.    You testified earlier that comic books are interesting

14   among literary property as being highly visual.

15   A.    Yes.

16   Q.    How does that aspect relate to the subject we're

17   currently discussing?

18   A.    Well, approvals for a comic book character are even more

19   important than to a, say, novel writer, because in addition

20   to -- or the story elements, there's the physical depiction.

21   So if I'm DC, I want Superman to look like Superman.  And

22   again, since there's both the sort of story character parts

23   and also the visual parts, then it's even more compelling for

24   a -- for the owner of a comic book character to have controls

25   as to depiction.  So when you have these -- you don't see

1    these -- typically you don't see these sort of controls if

2    it's just a book.  But you certainly see these sort of

3    controls if it's a comic because it's even more important to

4    the rights holder.

5    Q.   Now, turning back to the agreement, paragraph 7-C on page

6    9, does DC have actual creative approvals regarding the

7    exploitation of the Superman character pursuant to the

8    agreement?

9    A.   I think they have illusory approvals.

10   Q.   Why do you say they are illusory?

11   A.   Well, I've never seen anything like this.  There's a

12   two-tiered provision where one, for example, so long as DC is

13   a Warner affiliate, it's clear from here that Warner has the

14   financial say no matter what DC thinks.  And then in sub 2,

15   it's the exact opposite.  If DC is no longer owned by Warners,

16   then they do get the final say, for example, over the

17   screenplay.

18   Q.   In the event of a creative disagreement between Warner

19   Brothers and DC as to how Superman is being depicted in a

20   Superman film, whose decision would control under your reading

21   of the agreement?

22   A.   Warners.

23   Q.   Do you recall any creative approval provisions in the

24   1974 Salkind agreement upon which you testified this agreement

25   was modeled?

1   A.   Yes, there were many.

2   Q.   And back in 1974, what was -- what, if any, were DC's

3   creative approvals under the Salkind agreement?

4   A.   If you could -- I had difficulty reading this because it

5   wasn't reproduced very well.

6              THE COURT:  I did, too.

7              THE WITNESS:  And it's a long agreement.  So if you

8   could point me to the paragraph, I'd be happy to describe

9   them.

10             THE COURT:  Let me ask you this, because I have a

11  quick telephone conference that I need to take up on an

12  unrelated matter.  How much longer do you think you have?

13  Will you be going for a while?

14             MR. TOBEROFF:  Yes.

15             THE COURT:  Let's take a brief recess here.  I've

16  got to take up another matter with the receiver.

17             (Recess taken.)

18             THE COURT:  Counsel, you may proceed.

19             MR. TOBEROFF:  Thank you, your Honor.

20  Q.   Mr. Halloran, I'd like to draw your attention to what we

21  call the 1974 Salkind agreement.  Exhibit 203.  I draw your

22  attention to page 26, WB 8606.

23             Does the Salkind agreement provide DC with any

24  creative approvals regarding derivative Superman film?

25  A.   Yes.

420

1    Q.    What are those approvals?

2    A.    The approvals are extraordinarily detailed and completely

3    consistent with the sort of approvals that the owner of a

4    preexisting value of a property would seek to get and

5    characteristically gets.

6          So, for example, it has to conform with -- it has to

7    be consistent with the depiction in the comic books.  The

8    picture can't be satirical or obscene.  It has to be rated G

9    or PG.  The picture has to be shot in a manner consistent with

10   the screenplay which has been approved by DC, it even has a

11   mechanism for someone to be on the set so when there are

12   changes, that there would be approval on the set by DC's

13   representative.

14         There's a mechanism whereby even after the picture

15   is shot, that the DC representative can review it, and if it

16   is found inconsistent with the approvals that have been made,

17   that there would be an arbitration to determine whether in

18   fact the film as ultimately shot conforms with the approvals.

19         There's a provision whereby if they don't, an

20   extraordinary provision where if the film does not conform

21   with the approvals, that it cannot be released.

22         There's an approval over the actors that portray the

23   main roles in the film.  There's approval over the design of

24   the Superman costume.  There's approval over the title.

25   Q.    Now, you mentioned that the 2002 Superman film agreement

421

1    adopted the economic terms of the 1974 Salkind agreement.  Did

2    they adopt these creative approvals that favored DC?

3    A.    No, they did the exact opposite.  They gave all the

4    creative approvals to Warners and stripped DC of those

5    approvals.

6    Q.    I'd like to draw your attention now back to the Superman

7    film agreement to page 11, which is Bates No. WB 4209.  I'd

8    like you to take a look, please, at paragraph 9.  What does

9    paragraph 9 concern?

10   A.    It concerns the representations and warranties that DC

11   was making to Warners, and it has a provision for an indemnity

12   in case DC were to breach the representations and warranties

13   that it made to Warners.  So it would -- the effect is that DC

14   is financially responsible if in fact the guarantees as to the

15   status of the rights and other things made turned out to be

16   incorrect.

17   Q.    Now, were these warranties made after both Warner

18   Brothers and defendants had received the plaintiffs' notices

19   of termination?

20   A.    Yes, they were.

21   Q.    As well after the effective date of the Siegels'

22   termination?

23   A.    Yes.

24   Q.    I'd like to draw your attention to -- it's right after

25   paragraph 9-E on page 11.  Strike that.  It is paragraph 9-E

1    on page 11.  And that's Bates No. WB 4209.

2    A.    I see it.

3    Q.    What does that paragraph provide?

4    A.    DC owns all rights assigned to Warner free and clear of

5    any liens, encumbrances, other third party interests of any

6    kind, and free of any claims or litigation, whether pending or

7    threatened.

8    Q.    I'd like to draw your attention now to page 12 of the

9    Superman film agreement to a section that appears immediately

10   after paragraph 9-H.

11   A.    I see it.

12   Q.    What does this part of the paragraph provide?

13   A.    It provides that if DC were in breach of the

14   representations and warranties that were made, that it would

15   indemnify or pay back Warner for the loss that Warner may

16   incur based on the breach of the representation or warranty.

17   Q.    Including the representation and warranty that there are

18   no other third party interests of any kind and that the

19   exclusive Superman rights being purportedly conveyed are free

20   of any claims?  Is that correct or incorrect?

21   A.    That is correct, yes.

22   Q.    Now, in an underlying rights agreement of this kind, when

23   there is a preexisting dispute, as there was in this case, how

24   is that customarily dealt with in a rights agreement?  In the

25   warranty and indemnification clause?

1          MR. BERGMAN:  Objection.  Lack of foundation.

2          THE COURT:  Sustained.  And it's a little broad,

3    Counsel.  Just rephrase your question.

4    Q.   BY MR. TOBEROFF:  In a rights agreement, when you have a

5    preexisting dispute or claim, how does the warranty and in --

6    let me start from the beginning.

7          Are you familiar with the warranty and

8    indemnification provisions in a variety of other underlying

9    rights agreements?

10   A.   Yes.

11   Q.   And how do those warranty and indemnification conditions

12   deal with a preexisting claim or dispute?

13   A.   No licensor who has a claim that's extant when they are

14   entering into an agreement and that would make them

15   immediately in breach of an agreement -- breach of the

16   agreement would sign something like this without carving out

17   what the claim was and disclosing it and dealing with it.

18          Based on what I can see, as soon as DC signed this,

19   they were in breach of the agreement.  So what's customarily

20   done is if there is a claim or an underlying dispute that is

21   dealt with in the agreement, it's disclosed in the face of the

22   agreement.  So typically, it would be excluded from the

23   warranties and indemnities because, you know, at that time it

24   would -- it's not carved out, it would mean that DC was

25   immediately in breach of this agreement and would be

424

1    responsible for any damages that Warners would incur.

2    Q.   And does the failure to exclude plaintiffs' notice of

3    termination and termination claim in these provisions favor

4    Warner Brothers or favor DC?

5    A.   It favors Warner Brothers.

6    Q.   How does it favor Warner Brothers?

7    A.   It favors Warner Brothers because they are getting a

8    fuller -- they are getting indemnity as to the possible damage

9    that may be caused based on that claim.  The risk is kept with

10   DC.

11   Q.   Earlier you testified that -- to the effect that when we

12   were dealing with the exclusivity versus nonexclusivity issue,

13   you testified that Warner has the contractual equivalent of

14   exclusivity.

15        Was this the provision you were referring to, these

16   warranty indemnification provisions or not?

17             MR. BERGMAN:  Objection, your Honor.  Leading.

18             THE COURT:  I'm sorry.  What was the objection?

19             MR. BERGMAN:  Leading, your Honor.

20             THE COURT:  Yes, sustained.

21   Q.   BY MR. TOBEROFF:  When you were previously testifying

22   that Warner has the contractual equivalent of exclusivity,

23   what provision were you referring to?

24   A.   I was looking both at the broad grant of rights and also

25   to this representation warranties and indemnity provision.

```
 1   Q.   I'd like to now draw your attention to -- strike that.

 2          I'd like to switch topics now to your analysis of

 3   other underlying rights agreements as part of your expert

 4   evaluation in this case.

 5          In forming your opinions regarding the Superman film

 6   agreement, did you analyze other rights acquisition and

 7   license agreements?

 8   A.   Yes, many.

 9   Q.   You don't have to give me the names, but just in general,

10   how many agreements did you analyze?

11   A.   Well, I think it's easier if we can put them into

12   categories.  There were the agreements that plaintiffs

13   provided.  There were agreements that Warners provided, and

14   there was at least one agreement that, the Neopets agreement,

15   that I had myself negotiated.

16          So it was -- I took the entire universe of the

17   rights agreements that were submitted by the parties and added

18   the agreement that I myself had negotiated.

19   Q.   When you compared these various rights agreements and the

20   terms of these various rights agreements, did you or did you

21   not take into account the overall value or prominence of the

22   properties that each of the agreements concerned that?

23   A.   Was crucial in my analysis.

24   Q.   Did you attempt to compare that value to your perceived

25   value of Superman?
```

1    A.    Yes.

2    Q.    And in so doing, did you look at the value of such

3    properties today, or did you look at the value of such

4    properties as of the date such contracts were entered into?

5    A.    My analysis was what were the properties worth in the

6    window from 1999 to 2002, when the film agreement was

7    negotiated, and with respect to Smallville, what it was worth

8    in 2001, which is the same period.

9    Q.    But that answers the question as to the Superman

10   agreements.  When you looked at each of the other agreements,

11   for example, the Ironman agreement produced by Warner

12   Brothers, did you look at the value of what Ironman is today

13   as a result of the successful film, or did you look at the

14   value of Ironman at the time the contract was entered into?

15            MR. BERGMAN:  Objection.  Leading.

16            THE COURT:  Sustained.

17   Q.    BY MR. TOBEROFF:  When analyzing the value of properties

18   that other agreements concerned, did you look at the value at

19   the time the contract was entered into?

20   A.    Yes.

21   Q.    Did you take into consideration increased value due to

22   subsequent success of some film?

23   A.    No.

24   Q.    Now, I'd like to get a better understanding of the

25   methodology you used in comparing the contract terms to --

427

 1   strike that.

 2           I'd like to get a better understanding of the

 3   methodology you used when you compared the contract terms of

 4   these various agreements to the terms of the Superman film and

 5   television agreements.

 6           How did the terms of an agreement for a less

 7   valuable property than Superman impact your analysis, if at

 8   all?

 9   A.   I obviously reviewed many, many agreements for

10   intellectual property less valuable than Superman, and not

11   surprisingly, the terms of these agreements were less

12   favorable than the terms of the marketplace agreement for

13   Superman in 2002.

14   Q.   If you review an agreement for a property that you

15   believe is less, let's say, far less valuable than Superman,

16   that has lesser terms than the Superman agreement, would you

17   consider that relevant to your overall analysis?

18   A.   Not particularly.

19   Q.   What is the impact of an agreement which concerns a less

20   valuable property that receives equal or better terms than the

21   terms in the Superman film and television agreements?

22   A.   That would indicate that the Superman agreement was

23   indeed for the fair market value.

24   Q.   If the property is a less valuable property and it

25   gets  --

1    A.    Excuse me.  If it's a less valuable property and it got

2    better terms, it would show that the Superman agreements were

3    not for fair market value.  If it were a -- if it were a

4    property that was equal to Superman, and it got less valuable

5    terms, then that would indicate that in fact the Superman

6    agreement was for fair market value.

7    Q.    So if you have a -- I'd like to make sure that's clear.

8                  If you have a less valuable property that's getting

9    equal or better terms in an underlying rights agreement than

10   the terms in Superman, less valuable property, the terms are

11   equal or better, what do you believe that would tend to show?

12   A.    That would tend to show that the Superman agreements were

13   not for fair market value.

14   Q.    And what agreements would tend to show that the Superman

15   agreements were for fair market value?

16   A.    If there were agreements where there was a property equal

17   to or more prominent than Superman that had less favorable

18   terms than the agreements I reviewed, then that would indicate

19   that indeed that the deals were for fair market value.

20   Q.    Did you find any such agreements in your review?

21   A.    No.

22   Q.    I'd like to turn now to your analysis of some of these

23   agreements, your comparative analysis.  I'd like to first

24   focus on purchase prices as a term in an underlying rights

25   transaction.  I show you what has previously been marked for

1    identification as Plaintiffs' Exhibit 300.  Exhibit 30 is an

2    agreement between Columbia Broadcasting System, Inc., and

3    Warner Brothers Pictures.

4              Do you recognize this exhibit?

5    A.    Yes, I do.

6    Q.    What does -- the agreement concerns film rights to which

7    property?

8    A.    It's a very well-known musical based on Pygmalion.

9    Q.    What is the name of that musical?

10             THE COURT:  It's My Fair Lady.

11             THE WITNESS:  I said Pygmalion, which is the --

12             MR. BERGMAN:  No.  And that that fact has come out

13   to the fore, your Honor, we object to the introduction or the

14   use of My Fair Lady agreement.  It's a 47-year-old agreement.

15   And I believe I explained to your Honor that it just bears no

16   relationship to today's film world.

17             THE COURT:  I understand your argument.  That goes

18   to the weight of the evidence, and I'll consider it in that

19   context.  Thank you, Counsel.

20   Q.    BY MR. TOBEROFF:  Did you review this agreement as part

21   of your expert analysis in this case?

22   A.    Yes.

23   Q.    What is the date of this agreement?

24   A.    January 19, 1962.

25   Q.    What is the difference in years between this 1962

1    agreement and the 1974 Salkind agreement?

2    A.    12.

3    Q.    I'd like to draw your attention to page 32 of the

4    agreement in paragraph 28-A.

5    A.    Okay.

6    Q.    What does this paragraph provide?

7    A.    This provides for the purchase price for the rights.

8    Q.    What is that purchase price?

9    A.    $5,500,000.

10   Q.    And how is that $5.5 million paid?

11   A.    It's paid in four installments, four equal installments

12   of 25 percent of $5,500,000.

13   Q.    What would $5.2 million be in 2009 dollars if adjusted

14   for inflation?

15            MR. BERGMAN:  Objection.  Relevance.

16            THE COURT:  Overruled on that basis.

17            MR. TOBEROFF:  I'm sorry, your Honor?

18            THE COURT:  Overruled.

19            THE WITNESS:  You could calculate what the

20   5 million -- well, first you would take the 5,500,000 and

21   discount it because the payments were over a period of time.

22   And then you would take that amount as of 1962 and adjust it

23   based on inflation in 2002 dollars.  Or if you wanted to

24   conceptually put it in today's dollars, I think it would be in

25   excess of $30 million.

1        MR. BERGMAN:  May I say, your Honor, that none of

2    that was discussed in the report of Mr. Halloran.

3        THE COURT:  You mean the present value calculation?

4        MR. BERGMAN:  Yes, your Honor.

5        THE COURT:  Overruled.  Let's move along.  It's

6    really of no great moment.

7    Q.  BY MR. TOBEROFF:  Hew would the value of film rights to

8    My Fair Lady in 1962 compare to the value of minimum rights to

9    Superman in 2002 in general?

10   A.   Just in general, if you look at 1962, at the purchase

11   price, I believe at that time companies were paying very big

12   dollars for musicals.  And I think it would reflect even at a

13   later date what studios were willing to pay for very famous,

14   you know, prebranded properties of which there was a high

15   awareness.

16        So I think it's probative of the value even at a

17   later date to show what people are willing to pay for a unique

18   property like My Fair Lady.

19   Q.   And in the 60's, are you familiar with other successful

20   musicals that were turned into films?

21   A.   In the 60's?  Yes.

22   Q.   What was the Julie Andrews musical?  The Sound of Music.

23   There was a bunch of them.  But that was -- musicals in that

24   day were sort of the equivalent of comic books as of 2002.  I

25   could sing you a tune, but I don't want to be accused of being

1    leading.

2              I'd like to now mark for identification, and we're

3    still on the subject of purchase price, Plaintiffs'

4    Exhibit 201.  Specifically, the pages marked Bates numbered

5    4884 to 4919.

6              **(Exhibit 201 for identification.)**

7    Q.   BY MR. TOBEROFF:  The agreement is entitled Memorandum of

8    Agreement for Option and Purchase of Literary Agreement, and

9    it's between Clive Cussler, Sahara Gold, LLC, Clive Cussler

10   Enterprises, Inc., Sandecker, LLP, and Crusader Entertainment

11   LLC.

12             Do you recognize this agreement, Mr. Halloran?

13   A.   Yes, and I've seen it before.

14             MR. BERGMAN:  For record, your Honor, we object as

15   hearsay and irrelevant.

16             THE COURT:  I'm not really sure what he's trying to

17   introduce quite yet.  So let's hold that thought.

18             Counsel?

19             THE WITNESS:  Can you repeat the question, please?

20   I'm familiar with this agreement.

21             THE COURT:  The only question is are you familiar

22   with the agreement.

23   Q.   BY MR. TOBEROFF:  You mentioned you had seen it before.

24   What did you mean by that?

25   A.   I was an expert for Clive Cussler in his dispute over the

1    movie Sahara.

2    Q.    Did that case concern this agreement?

3    A.    Yes, it did.

4    Q.    Did you review this agreement in connection with your

5    expert report and reaching your conclusions in this case?

6    A.    Yes.

7    Q.    What is the date of this agreement?

8    A.    May 9, 2001.

9    Q.    I'd like to draw your attention to page 12, Paragraph 6-A

10   of this Exhibit 201.  Page 12 is Bates No. SGL 4895.

11            THE COURT:  I'm sorry.  This is the option to

12   purchase what?

13            THE WITNESS:  Okay.  This is an option to purchase

14   the right to produce films based on the character Dirk Pitt.

15            THE COURT:  Dirk Pitt.

16            THE WITNESS:  And it's confusing because Dirk Pitt

17   was a character that was in a long series of Clive Cussler

18   books, and Sahara was the picture that was produced based on

19   these grant of rights that included the Dirk Pitt character.

20            THE COURT:  Very well.

21            THE WITNESS:  Okay.

22   Q.    BY MR. TOBEROFF:  Looking to paragraph -- I'm sorry.  Did

23   you tell me the date of the agreement?

24   A.    Yes, May 9, 2001.

25   Q.    I'd like to draw your attention to Paragraph 6-A on page

434

1   12 of Exhibit 201, Bates No. 4895.

2   A.   What was the page again?

3   Q.   Page 12.  Bates No. 4895.  It's on your screen as well.

4   A.   Right.

5   Q.   What does this paragraph provide for?

6   A.   It provides for a purchase price of $20 million.

7   Q.   20 million?

8   A.   Yes, $20 million.

9   Q.   Now, is that money guaranteed under the agreement?

10  A.   Yes.  Well, it's subject to the exercise of the option.

11  It's guaranteed.  But I --

12  Q.   At the point where the licensor exercised the option, is

13  the licensor obligated to pay the $20 million?

14  A.   Yes.

15  Q.   Over what period of time?

16  A.   It's payable in seven equal annual installments over a

17  period of seven years.

18  Q.   And again, looking at that $20 million payment, what

19  would be the net present value in your opinion of that

20  $20 million payment payable over the time period as set forth

21  in the agreement?

22  A.   The net present value as of the date of the agreement?

23  Q.   We can use that.

24  A.   Less than $20 million certainly.  I think it would be in

25  the range of $17 million.

1    Q.    Now, how prominent was Sahara in 2001 compared to

2    Superman in 2002 in your opinion?

3    A.    It was much less prominent.

4    Q.    I'd like to turn now to Plaintiffs' Exhibit 128.

5    Exhibit 128 is an agreement dated August 8, 1997.  It's

6    between the Saul Zaentz Company and Miramax Productions.  The

7    Bates numbers are SGL 4590 to 4608.

8              Do you recognize this exhibit?

9    A.    Yes.

10   Q.    What is this agreement for?

11   A.    This is an agreement whereby the Saul Zaentz Company,

12   which had acquired the rights to Lord of the Rings, was

13   granting the film rights to Miramax.

14   Q.    Did you review this agreement in rendering your -- in

15   reaching your opinions in this case?

16   A.    Yes.

17             MR. TOBEROFF:  Your Honor, I'd like to move -- I'd

18   like to move Exhibit 128 into evidence at this time.

19             THE COURT:  Any objection?

20             MR. BERGMAN:  No objection, your Honor.

21             THE COURT:  It's admitted.

22             **(Exhibit 128 received.)**

23             MR. TOBEROFF:  And, your Honor, I neglected to do

24   this.  I apologize.  I'd also like to move the Sahara

25   agreement, which is Plaintiffs' Exhibit 201, into evidence at

1    this time.

2             MR. BERGMAN:  No objection to that, your Honor.

3             THE COURT:  Very well.  They are both admitted.

4             **(Exhibit 201 received.)**

5             MR. TOBEROFF:  And, your Honor, as well, I'd like to

6    move Plaintiffs' Exhibit 300, the My Fair Lady agreement, into

7    evidence at this time.

8             MR. BERGMAN:  There is indeed an objection to that.

9             THE COURT:  I understand.  They are admitted.

10            **(Exhibit 300 received.)**

11            MR. BERGMAN:  Pardon me?

12            THE COURT:  They are all admitted.

13   Q.   BY MR. TOBEROFF:  Now, going back to the Lord of the

14   Rings agreement, I'd like to draw your attention to page 4 of

15   Exhibit 120, paragraphs 13 through 15.

16   A.   What's the page number again?

17   Q.   I'm sorry.  Just one moment.  I'm sorry.  Apparently the

18   agreement is in multiple parts.  I'd like to now show you

19   what's been marked as Plaintiffs' Exhibit 120.  It's been

20   marked as Plaintiffs' Exhibit 120 for identification.

21            Mr. Halloran, do you recognize this exhibit?

22   A.   I do.

23   Q.   What is this exhibit?

24   A.   This is -- this exhibit is a declaration from Albert

25   Bendich, who was a vice-president of the Saul Zaentz Company

1    that was filed in an action of Zaentz Company against Newline

2    relating to Lord of the Rings.

3    Q.    Relating to the Lord of the Rings agreement?

4    A.    Yes.

5    Q.    What was the declaration set forth?

6    A.    It sets forth the negotiation history and also sets forth

7    some option amounts that were paid to the Zaentz Company by

8    Miramax.

9    Q.    Did you take this document into consideration when

10    writing your expert report and reaching your opinions in this

11    case?

12    A.    Yes.

13    Q.    I'd like to draw your attention to page 4 of Exhibit 120.

14    A.    I'd like to modify.  These amounts included both option

15    amounts and purchase amounts.  It's a little difficult to deal

16    with because it's not an agreement.  It's a declaration.

17    Q.    I understand.  I'd like to draw your attention to

18    paragraphs 13 through 15 of the declaration.

19            What do these paragraphs describe?

20            MR. BERGMAN:  I'm sorry, your Honor.  But there's

21    hopeless disconnect between the declaration contained in

22    Exhibit 120 and the exhibits.  They don't correspond.

23            THE COURT:  Counsel?  That appears to be the case.

24    I don't know if it's hopeless.

25            MR. TOBEROFF:  I'm looking at a copy of the

1    Exhibit 120 that was handed to Mr. Bergman.  And the first

2    page is -- it's duplicated for purposes of putting the exhibit

3    stamp, and then afterwards the Bates numbers are from the case

4    in which this declaration was filed, and they follow

5    sequentially 4411, 4412, 4413, 4414, and they continue to the

6    signature page of the declaration, which ends on 4416, and

7    then 4417 is the title page to the exhibit, and --

8              THE COURT:  I'm sorry.  Where is that?  That's what

9    I didn't have.

10             MR. TOBEROFF:  And 44 --

11             THE COURT:  My last page is 4416.  I don't have it.

12             THE WITNESS:  Your Honor, I can be helpful to you in

13   analyzing this, if you like.

14             THE COURT:  What is that?

15             THE WITNESS:  This is a license agreement that

16   references an option agreement.  And we don't have the option

17   agreement.  We just have the license agreement.  But the

18   mechanism of the option agreement is described in this

19   declaration.  It's -- as in other agreements, like Watchmen,

20   there's a separate option and separate purchase agreement.

21             So apparently here there was an option agreement

22   that's not public record that's described by Mr. Bendich.  And

23   what is public record is the license agreement.  So there --

24   and if you look at paragraph 1, it's dependent on the exercise

25   of the option.  But I don't believe we have the option

1    agreement itself.

2         THE COURT:  All right.

3         MR. BERGMAN:  Also, if I may, your Honor, the

4    declaration is hearsay.

5         THE COURT:  That's the problem.  Because we don't

6    have the option agreement.

7         Counsel, your response to the hearsay objection?  It

8    does seem to me that you are attempting to introduce this for

9    the truth of the matter, I assume.

10        MR. TOBEROFF:  The agreement would be introduced and

11   is not hearsay because it has independent legal significance.

12        THE COURT:  I agree.  It's just this out-of-court

13   declarant's description of what the agreement says.  That's

14   what counsel is objecting to.

15        MR. TOBEROFF:  It is an authenticated declaration

16   under penalty of perjury.

17        THE COURT:  I understand that.  Most declarations

18   are.  That leaves it with the description of the out-of-court

19   declaration.

20        MR. TOBEROFF:  Your Honor, we would not move for

21   this particular Exhibit 120 into evidence.

22        THE COURT:  Very well.

23        MR. TOBEROFF:  But as an expert, I believe

24   Mr. Halloran would be entitled to take a certain amount of

25   hearsay into consideration.

1              THE COURT:  If it was part of the group of documents

2     that he read and it's disclosed in his expert report and

3     counsel has an opportunity to cross-examine and it was made as

4     part of his basis.  We're just not introducing this document.

5     That objection is sustained.

6              THE WITNESS:  May I point one thing out?  What I

7     was --

8              MR. TOBEROFF:  Wait, wait.

9              THE COURT:  Wait for a question.

10             THE WITNESS:  Okay.

11    Q.   BY MR. TOBEROFF:  I'd like to draw your attention to page

12    4 of Exhibit 120, paragraphs 13 through 15.

13    A.   Okay.

14    Q.   What do these paragraphs describe?

15    A.   Paragraph 13 describes a million dollar option payment

16    that was made by Miramax to Zaentz Company.  And on August 11,

17    1997, it talks about how on February 5, 1998, Miramax

18    exercised its option to acquire the Lord of the Rings rights

19    by paying another $750,000.

20             MR. BERGMAN:  Objection, your Honor.  I understand

21    that an expert can testify based on hearsay.  But to sit there

22    and read from a document that is hearsay, I think, is quite

23    different.

24             THE WITNESS:  Can I point something out?  There

25    were -- in what I reviewed, there were the actual letters that

441

1   transmitted the payments that were exhibits to this as well.

2   That buttressed what is being said here, that I reviewed, I

3   remember those specifically.

4            THE COURT:  I understand it's unusual, Counsel.  But

5   we can go through the exercise of him refreshing his

6   recollection, and let's just move among.

7            MR. BERGMAN:  Very well, your Honor.

8            THE COURT:  Okay.

9   Q.   BY MR. TOBEROFF:  What is the total option fee for the

10  Lord of the Rings trilogy when you add these figures together?

11  A.   Well, there were a series of three pictures, and I

12  believe the --

13  Q.   For the three books in the Lord of the Rings trilogy,

14  what is the combined total option fee?

15  A.   $4,750,000.

16  Q.   Does that --

17  A.   Excuse me.

18  Q.   I'm focusing just on the option payments.

19  A.   Okay.  So it's a million, and purchased options were --

20  that's two million five.

21  Q.   And what is the purchase price in the Lord of the Rings

22  agreement?

23  A.   Well, for the first book, it was 750,000, and for the

24  second book -- for the second and third books, it was a

25  million five.  So it was $750,000 per book.  So a total of

1   $2,225,000.

2   Q.   And when you add that to the 2.5 million, what do you

3   get?

4   A.   Excuse me?

5           THE COURT:  Counsel?

6           MR. BERGMAN:  Your Honor, I understand your ruling,

7   but the witness is adding up figures that come from a hearsay

8   document.  It isn't as if the expert has acquired this hearsay

9   knowledge in his experience.  You could take any hearsay

10  document, put it in front of an expert, and say what does it

11  say.

12          THE COURT:  Have you previously reviewed this

13  document?

14          THE WITNESS:  Yes.  It's just a little unwieldy

15  because I'm used to looking at documents that have, you

16  know -- and in this declaration, he's mixed the option

17  payments with the purchase payments.  So it's unwieldy.

18          THE COURT:  I'll allow you to refresh your

19  recollection.  Overruled.  Let's move along.

20  Q.   BY MR. TOBEROFF:  When you add the 2.5 million to the

21  2.2 -- first of all, are the option payments, you can refer to

22  the agreement itself as well --

23  A.   Okay.

24  Q.   -- as well as the declaration.  In fact, I'd like you to

25  refer to the agreement, to the extent things in the

1    declaration are also contained in the agreement, I'd like you

2    to refer to the agreement.  But are the option payments

3    applicable or nonapplicable to the purchase payments in the

4    Lord of the Rings agreement?

5    A.    They do not appear to be applicable.

6    Q.    So if the options are exercised for the Lord of the Rings

7    trilogy, what is the total amount that Saul Zaentz would

8    receive?

9    A.    I believe it's $4.75 million.

10   Q.    How prominent -- now, this is a 19 -- strike that.

11          How prominent was Lord of the Rings in 1997 compared

12   to the prominence enjoyed by Superman in 2002?

13   A.    Much less prominent.

14   Q.    And was this before the famous Lord of the Rings movies

15   had been released?

16   A.    Yes.

17   Q.    What was the Lord of the Rings trilogy?

18   A.    It was a series of three films based on --

19   Q.    No, I'm referring to the books.

20   A.    To the books.  It was three books.  It was the Hobbit --

21   excuse me.  It was Fellowship of the Ring, Two Towers, and the

22   Return of the King.

23   Q.    And these were best selling novels or not best selling

24   novels?

25   A.    I believe they were best selling.  Certainly well-known.

1        MR. TOBEROFF:  Your Honor, I'd like to admit -- move

2   for -- I'd like to offer Plaintiffs' Exhibit 128, which is the

3   agreement itself, into evidence.  But not the declaration.

4        THE COURT:  128?

5        MR. BERGMAN:  No objection, your Honor.

6        THE COURT:  It's admitted.

7        **(Exhibit 128 received [above].)**

8   Q.   BY MR. TOBEROFF:  I'd now like to show you what's been

9   marked for identification as Plaintiffs' Exhibit 307.  The

10  first page of the exhibit bears the Bates No. SGL 5760.  This

11  is an agreement between the Dino De Laurentis company and

12  Yazoo Fabrications, Inc., concerning the novel Hannibal?

13  A.   Yes.

14  Q.   Mr. Halloran, did you review this agreement when reaching

15  your opinions in this case?

16  A.   Yes.

17  Q.   What is the date of this agreement?

18  A.   May 20, 1999.

19  Q.   What is the date this agreement was entered into?

20  A.   It doesn't appear to differ.  So it was effective May 20,

21  1999.

22  Q.   Does it contain the date that it was signed?

23  A.   Not that I see.

24  Q.   I'd like to draw your attention to page 1, paragraph 2,

25  of Exhibit 307.  Bates numbers SGL 5760.

```
 1              What does this paragraph provide?
 2   A.    It provides for a purchase price of $10 million.
 3   Q.    How was this purchase price payable to the rights holder?
 4   A.    10 days following signing of the agreement.  Excuse me.
 5   Half of $5 million payable 10 days after the contract was
 6   signed, and the other half on the earlier of -- start of
 7   commencement of principal photography or 12 months following
 8   the execution of the agreement.
 9   Q.    Commencement of principal photography of what?
10   A.    Of the film based on the novel Hannibal by Thomas Harris.
11   Q.    Did you do a net present value calculation with respect
12   to this $10 million?
13   A.    As of what time?
14   Q.    Due to the fact that it's paid in installments?
15   A.    It would be de minimis.  So I didn't do a calculation.
16   Q.    What is the -- do you have a sense of what -- strike
17   that.
18              How prominent was Hannibal in 2001 compared to the
19   prominence of Superman in 2002?
20              MR. BERGMAN:  Objection.  Lack of foundation.
21   Q.    BY MR. TOBEROFF:  Are you familiar with the property
22   Hannibal?
23              THE COURT:  Very well.  I guess it's sustained then.
24              MR. TOBEROFF:  I'm sorry.
25   Q.    Are you familiar with the property in Hannibal?
```

```
 1   A.    I am.

 2   Q.    How prominent was Hannibal in 2001 compared to the

 3   prominence of Superman in 2002?

 4   A.    It was less prominent.  Hannibal was the sequel to

 5   Silence of the Lambs.  So it was certainly known, but it

 6   wasn't a property that was nearly as valuable as Superman at

 7   that time.

 8           MR. TOBEROFF:  Your Honor, I would like to offer

 9   Exhibit 307 into evidence at this time.

10           THE COURT:  Any objection?

11           MR. BERGMAN:  No objection.

12           THE COURT:  Very well.  Let's call it a day,

13   Counsel.

14           (Exhibit 307 received.)

15           THE COURT:  Tomorrow we're going to do a 9:00 to

16   2:00 session.  The Court has to go to Los Angeles late

17   afternoon.  So what I'd like to do is get as much time in as

18   we can between 9:00 and 2:00.  Maybe take two 20-minute

19   breaks.  So --

20           MR. TOBEROFF:  Have a good breakfast.

21           THE COURT:  Yes, and bring some snacks.

22           MR. BERGMAN:  Your Honor, one, you advised us that

23   you were keeping track of time.  How are we doing?

24           THE COURT:  They are using up a lot of time.  I got

25   to check with the court reporter, but you've used about 10
```

1   hours.

2          MR. BERGMAN:  Okay.  And also, your Honor, we have

3   not received any notification as to what tomorrow's witnesses

4   or the next day's witnesses are going to be.

5          THE COURT:  Counsel, what are tomorrow's witnesses?

6          MR. TOBEROFF:  Mr. Halloran is the witness for

7   tomorrow.  We will provide you with the 48, 72-hour advance

8   notice that we promised to provide.

9          MR. BERGMAN:  Well, that was for --

10         THE COURT:  Counsel, the question -- I'm asking the

11  question.  Who are your witnesses tomorrow?

12         MR. TOBEROFF:  Mr. Halloran.

13         THE COURT:  That's it?

14         MR. TOBEROFF:  I believe, given the time.

15         THE COURT:  Very good.  So Mr. Halloran will go for

16  five hours?

17         MR. TOBEROFF:  Potentially Mr. Sills.

18         THE COURT:  Who is Mr. Sills?

19         MR. TOBEROFF:  Mr. Sills is the accounting expert.

20         THE COURT:  Very well.  So you'll have him on

21  standby in case we finish up with Mr. Halloran.

22         MR. BERGMAN:  And one more thing, your Honor.  Will

23  there be a trial on Monday?

24         THE COURT:  Monday is the Court's motion day.  So

25  we'll resume on Tuesday at 9:00.

1          Good night, Counsel.

2

3          (Proceedings concluded at 5:15 P.M.)

4

5

6                    **C E R T I F I C A T E**

7

8

9          I hereby certify that pursuant to Title 28,

10    Section 753 United States Code, the foregoing is a true and

11    correct transcript of the stenographically reported

12    proceedings in the above matter.

13          Certified on April 30, 2009.

14

15

16    _____
      **MARK SCHWEITZER, CSR, RPR, CRR**
      Official Court Reporter
17    License No. 10514

18

19

20

21

22

23

24

25