1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                          ---

4        **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                          ---

6    JOANNE SIEGEL, etc.,          :   PAGES 708 - 801
                                    :
7            PLAINTIFF,             :
                                    :
8        VS.                       :   NO. CV 0408400-SGL(RZx)
                                    :
9    WARNER BROTHERS               :
     ENTERTAINMENT, INC., etc.,    :
10                                  :
             DEFENDANT.            :
11   _____:

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                COURT TRIAL - DAY 6

16                RIVERSIDE, CALIFORNIA

17            WEDNESDAY, MAY 6, 2009

18                AFTERNOON SESSION

19

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

**Appearances of Counsel:**


For the Plaintiff:

        TOBEROFF AND ASSOCIATES
        By Marc Toberoff, Esq.
            Nicholas Williamson, Esq.
            Keith Adams, Esq.
        2049 Century Park East
        Suite 2720
        Los Angeles, CA 90067
        (310) 246-3333



For the Defendant:

        BERGMAN COLEMAN GRODIN & EVALL, LLP
        By Michael Bergman, Esq.
            Anjani Mandavia, Esq.
        9665 Wilshire Boulevard
        Ninth Floor
        Beverly Hills, CA 90212
        (310) 860-3346

            -and-

        LAW OFFICES OF PATRICK T. PERKINS
        By Patrick T. Perkins, Esq.
        1711 Route 90
        Cold Spring, NY 10516
        (845) 265-2820

710

**I N D E X**

MARK EDWARD HALLORAN, PREVIOUSLY SWORN................. 711

CROSS-EXAMINATION (CONTINUED) BY MR. BERGMAN.......... 711

Per order of the Court, Pages 771:18-773:22 have been placed under seal and are not contained herein.

1          <u>Riverside, California; Wednesday, May 6, 2009</u>

2                          **1:50 P.M.**

3          THE COURT:  Counsel, you may resume.

4          MR. BERGMAN:  Thank you, your Honor.

5          **MARK EDWARD HALLORAN, PREVIOUSLY SWORN.**

6                  **CROSS-EXAMINATION (CONTINUED)**

7    BY MR. BERGMAN:

8    Q.   Mr. Halloran, I'm going to return to where we left off

9    before the break.  But before the break, you said something a

10   couple times which I'd like to ask you about, and that deals

11   with reversion.  You have stated twice this morning, have you

12   not, that reversion is the most important provision in the

13   film agreement, haven't you?

14   A.   It's certainly one of the most important.

15   Q.   And why is it one of the most important?

16   A.   Because the holder of intellectual property rights by DC

17   wants to make sure that -- and this is true throughout the

18   agreements I've looked at.  They want to make sure that their

19   property remains constantly exploited, whether it's on the

20   film side or the television side.

21          If a studio or the network is not continuing to

22   exploit, they want to get the rights back so they can then put

23   those rights in the marketplace and set them up in a place

24   where they will continue to be exploited and revenues will

25   continue to be received.

1          The problem under both the film agreement and the

2     television agreement, the way I read them, is that there is --

3     that Warner Brothers has essentially locked both the film and

4     television rights essentially in perpetuity without a

5     continuing obligation to develop, produce, and exploit motion

6     pictures and television programs.

7          So certainly setting aside exactly what the

8     participation is, if it's not -- if the product is not in the

9     marketplace, the participation is zero.  It's meaningless.  So

10    that's why it's so important.

11    Q.   Okay.  Without accepting any portion of what you've just

12    said, am I correct that that is only important to DC?

13    A.   Well, it would be important to DC or anyone generating

14    revenues from DC.

15    Q.   It would be important to DC because it is DC's exclusive

16    rights which are under your interpretation being held by

17    Warner Brothers; correct?

18    A.   Well, it's certainly important to DC, but again, it would

19    be important to those people who might derive an economic

20    benefit from their exploitation of the motion pictures and the

21    television programs.

22    Q.   Well, it certainly isn't important to the plaintiffs, is

23    it?

24    A.   Assuming that the Court makes an equitable allocation of

25    profits, it could be important to the plaintiffs how much

1  money is generated.

2  Q.   The plaintiffs have no right to share in DC's exclusive

3  rights, do they?

4  A.   I believe their interest post-termination is nonexclusive

5  at this point.  But what we're trying to do is make a

6  determination of the fair market value of the rights that were

7  in fact transferred which were exclusive rights.

8  Q.   Am I correct, sir, that the reversion or nonreversion of

9  rights doesn't have any consequence whatsoever to the

10  plaintiffs' northern exclusive rights in Action Comics No. 1?

11       MR. TOBEROFF:  Your Honor, the question is vague and

12  ambiguous and confusing as phrased.

13       THE COURT:  Overruled.  You may answer.

14       THE WITNESS:  Well, I think that's more a legal

15  question than an expert question.  But could you read it back?

16  Q.   BY MR. BERGMAN:  Put on your legal hat.

17  A.   Well, I don't think that's my job here.

18  Q.   Am I correct, sir --

19       MR. TOBEROFF:  Objection, your Honor.  He's not

20  hired to give ultimate legal conclusions.

21       THE COURT:  I agree.  And this goes beyond the

22  purview.

23  Q.   BY MR. BERGMAN:  Am I correct, sir, that Mrs. Siegel

24  could leave her home today and assign to Paramount Pictures

25  her nonexclusive film rights in Action Comics No. 1?

1    A.    Yes, I think that's a legal issue.

2    Q.    It's a what?

3    A.    I believe that's a legal issue, is it not?

4    Q.    What's your best answer?  You answered that question at

5    deposition, didn't you?

6    A.    Well, could she go to Paramount and sell her nonexclusive

7    rights.  I explained how difficult that would be, to make it

8    virtually impossible.

9    Q.    Forgetting the difficulty, am I not correct that she

10   could go out today and purport to sell her nonexclusive film

11   rights in Action Comics No. 1?

12   A.    I think your question is much too broad.  I don't know

13   exactly how to answer.  If you want to parse that out.

14   Q.    I don't know how to parse it out, sir.  Does Mrs. Siegel

15   have a right to convey to a third party the film rights in her

16   nonexclusive -- her nonexclusive film rights in Action Comics

17   No. 1?  Forgetting the consequence, does she have that right?

18   A.    And forgetting that I think it is really a legal issue, I

19   believe that she theoretically could.

20   Q.    She could; correct?

21   A.    That is my understanding -- again, it's a legal issue,

22   but I think theoretically she could.  But we've discussed -- I

23   have discussed how it's, you know, in a practical world

24   impossible.

25   Q.    Just as Mrs. Siegel could go out and sell her

1    nonexclusive rights in Action Comics No. 1 today, she could do

2    so five years from now, couldn't she?

3    A.    Again, that's a legal question, and I understand there's

4    a -- another termination of the co-owner that may be effective

5    2013.  That may affect it.  Again, that's a legal issue that I

6    haven't -- it's not within the purview of what I'm testifying

7    to.

8    Q.    Putting that aside.  Between DC and Mrs. Siegel, there is

9    nothing at all in the reversion provision which prevents

10   Mrs. Siegel from doing anything that she has a right to do, is

11   there?

12   A.    I'm not sure what you mean by in the reversion provision.

13   Are you talking about a contract, or are you talking about a

14   right of law under the copyright act to get rights back?  They

15   are two different concepts.

16   Q.    Why don't you turn to the reversion provision in the

17   contract that you testified to is the most important provision

18   in the entire contract?

19           THE COURT:  Which exhibit are you referring to for

20   the record, Counsel?

21           MR. BERGMAN:  I'm sorry, sir?

22           THE COURT:  What exhibit are you referring to?

23           MR. BERGMAN:  I'm referring to 1041, your Honor.

24   And I believe the reversion provision is paragraph 12 at Bates

25   No. 4211.

1              THE COURT:  Counsel, your objection?

2              MR. TOBEROFF:  Objection.  Misstates his testimony.

3      He did not state it's the most important provision in the

4      entire contract.

5              THE COURT:  The Court will disregard the editorial

6      in the question.  He's asking him to return to the exhibit at

7      this time.

8      Q.   BY MR. BERGMAN:  Do you see that provision, Mr. Halloran?

9      A.   Yes, I do.

10     Q.   And am I correct, sir, that if Warner Brothers failed to

11     make certain payments, then DC could elect to have its rights

12     revert; correct?

13     A.   Reading this just alone and not in the context of all the

14     agreements, that's what this says.

15     Q.   Well, that's what you're doing, isn't it?  You're not

16     reading this provision in the context of any other agreements,

17     are you?

18     A.   No, but I think it's crucial to understand that the

19     payments of the continued compensation are applicable against

20     these payments.  So at this point there are no payments, and

21     this reversion clause is very, very different from the

22     customary reversion clauses that don't go to payments but go

23     to actual developments, production, and distribution of the

24     audiovisual work.

25              MR. BERGMAN:  Move to strike everything after the

1    word "no," your Honor.

2          THE COURT:  Well, it goes back to the question.

3    Your question was you're not reading this provision in the

4    context of any other agreements, are you.  I'm not really sure

5    what you mean when you're asking whether he's reading it or

6    you're asking him on his testimony.  So let's strike all of

7    that and rephrase the question.

8          MR. BERGMAN:  Will do, your Honor.  Thank you.

9    Q.   Mr. Halloran, as long as Warner Brothers continues to

10   either make movies or pay the 500-, 600-, or $700,000-a-year

11   options, the rights stay with Warner Brothers; correct?

12   A.   That is correct.

13   Q.   And the rights that stay with Warner Brothers are DC's

14   exclusive rights; correct?

15   A.   Again, you're getting into a legal area.  But Warner

16   Brothers has the rights that DC conveyed.  And DC warranted

17   that those were exclusive rights.  So to the extent that DC

18   could do that, and I'm not so sure they could, given the

19   extant reversion, but to the extent they did that, then Warner

20   Brothers would succeed to their rights.

21   Q.   And Warner Brothers would succeed to DC's exclusive

22   rights; correct?

23   A.   What Warner would succeed to was the rights that were

24   transferred by DC.

25   Q.   And those were DC's exclusive rights, were they not?

1    A.    DC represented in the agreements that those rights were

2    exclusive.

3    Q.    Okay.  The reversion provision does not apply to

4    Mrs. Siegel's nonexclusive rights, does it?

5    A.    I believe under the contracts that it does.

6    Q.    Under copyright law, sir, Mrs. Siegel has the right at

7    any time under the Court's ruling to convey her nonexclusive

8    rights to anyone she chooses, doesn't she?

9    A.    Well, again, that's a legal issue, and what I'm doing is

10   looking at these contracts in the context of 2002 and the fair

11   market value and how they operate in a way that is not

12   consistent with fair market value.

13   Q.    Okay.  Explain to me, please, how the reversion right in

14   any way affects Mrs. Siegel's rights under the law?

15   A.    Again, we just talked about that, and that's a legal

16   issue.

17         THE COURT:  You are asserting an objection that your

18   client is not.  You have been called as an expert to interpret

19   rights.

20         THE WITNESS:  Yes.

21         THE COURT:  And how these rights are negotiated.

22         THE WITNESS:  Hm-hm.

23         THE COURT:  You are a lawyer.

24         THE WITNESS:  Yes.

25         THE COURT:  If you are taking the position that you

1    are not qualified to opine on these, then state that.  But the

2    Court is not accepting a legal objection from the witness.

3              THE WITNESS:  Okay.

4              THE COURT:  Just for the record.

5              THE WITNESS:  Okay.  I'm not saying that.

6              MR. BERGMAN:  May I have my question repeated, your

7    Honor?

8              THE COURT:  The last question was explain to me,

9    please, how the reversion right in any way affects

10   Mrs. Siegel's rights under the law.  And here you're talking

11   about the reversion clause in the contract between Warner

12   Brothers and DC.

13             MR. BERGMAN:  That is correct.

14             THE COURT:  This is a part of what was negotiated.

15   This is part of what you've evaluated.

16             THE WITNESS:  Right.

17             THE COURT:  If you don't understand how that would

18   have operated, say it.  If you do understand it, say it.

19   Counsel?

20             MR. TOBEROFF:  Objection, your Honor, to the use of

21   the words "Mrs. Siegel's rights."  Is he speaking about her

22   copyright interest?  Is he speaking about her right to receive

23   money?

24             THE COURT:  Fair enough.

25             MR. TOBEROFF:  What right is he speaking about?

```
 1              THE COURT:  Fair enough.
 2              Counsel, if you'd clarify that.
 3   Q.   BY MR. BERGMAN:  Am I correct, Mr. Halloran, that
 4   Mrs. Siegel at the present time holds an interest in -- a
 5   copyright interest in Action Comics No. 1?
 6   A.   That is correct.
 7   Q.   In what way is that copyright interest affected, if at
 8   all, by the reversion provision in the film agreement?
 9              THE COURT:  In your opinion.
10              THE WITNESS:  Okay.  Well, you have to look at what
11   was conveyed by DC.  DC conveyed not only an interest in
12   Action 1 but in other copyrights and trademarks and the like.
13   There was -- that whole thing was transferred to Warner
14   Brothers.  The copyright law would supersede, obviously, that
15   contract, and the Siegels could, it's my understanding, the
16   Siegels could under copyright law, and has been found, have an
17   ownership interest within their share of Action Comics 1.
18              I understand it's still sort of elastic as to how
19   broad that's going to be.  So it's very hard to measure
20   exactly what that is.  And the contracts don't give you the
21   answer to that.
22              THE COURT:  But the question focuses on what you
23   just identified, in your opinion, does the reversion clause --
24   the Court is interested in this question as well.
25              THE WITNESS:  Yeah.
```

```
 1            THE COURT:  Does the reversion clause have any
 2   impact on that right, that right that you have just defined?
 3   I understand it may very well be in flux.
 4            THE WITNESS:  Well, if the right was in fact
 5   transferred and that was part of the universe of rights that's
 6   subject to reversion, then it would impact on it.
 7   Q.   BY MR. BERGMAN:  Yes, but DC has no right to transfer to
 8   Warner Brothers Mrs. Siegel's nonexclusive rights in Action
 9   Comics No. 1, does it?
10   A.   Well, it purported on the face of these contracts to
11   transfer exclusive rights, and it warranted that it was the
12   sole owner and there were no claims.  So unlike what is
13   traditional, and things -- actually, I've done this with
14   Warners in the Neopets case.  Typically, if there's a claim
15   that's uncertain, you schedule that, and you exclude it from
16   the warranty.  Warners and DC chose not to do that here.
17   Q.   Warner Brothers did not have the power to transfer to --
18   strike that.
19            Given the Court's ruling in this case, that
20   Mrs. Siegel owns an interest in the copyright in Action Comics
21   No. 1, Warner Brothers -- DC had no right, regardless of what
22   it warrantied or indemnified, to deprive her of that right and
23   transfer to Warner Brothers, did it?
24   A.   That's not accurate.  Because as of 2002, if I read the
25   Court's -- as of 2002, it was still in flux as to whether
```

1    that -- whether the termination of the Copyright Act was

2    indeed effective.  So it wasn't determined by Judge Larson

3    until 2007, 2008.  I don't know the exact date that in fact

4    the termination was effected.  And in reading the judge's

5    opinion, it appears that Warner fought tooth and nail and took

6    the position that in fact the termination was not effected.

7    That's my understanding.

8              MR. BERGMAN:  Move to strike everything after 2002,

9    your Honor.  That's not accurate.

10             THE COURT:  Overruled.  The question was whether.

11             THE WITNESS:  I --

12             THE COURT:  I can handle this myself.  I appreciate

13   your assistance.

14             You asked whether DC had no right regardless of

15   whether it warrantied or indemnified to deprive her of that

16   right and transfer it to Warner Brothers, did it?  That's not

17   accurate, and he explained why.  I'm going to let the answer

18   stand.

19             Going back to your earlier question, you said

20   assuming that they did not -- that they had the right to

21   transfer it.  The reversion has no impact.  If they did not

22   have the right, the flip side of that, then the reversion

23   clause does not impact it; correct?

24             THE WITNESS:  I believe that's true, yes.

25             THE COURT:  But at the time --

```
 1              THE WITNESS:  It's complicated because we're trying
 2    to, you know, retroactively --
 3              THE COURT:  Counsel, your next question.
 4              MR. BERGMAN:  Thank you, your Honor.
 5    Q.   So as far as you know, Mr. Halloran, now that you
 6    understand the Court's ruling on this matter, do you agree
 7    with me that Mrs. Siegel could go out today and sell to a
 8    third party for whatever she could get her nonexclusive film
 9    rights in Action Comics No. 1?
10    A.   Assuming that the Court's determination overcomes this
11    reversion provision, then I believe, again, it's a legal
12    question.  But from my understanding, she could be able to, to
13    the extent that she could try, to sell her nonexclusive
14    rights.
15    Q.   Okay.  And doesn't that mean, therefore, that the
16    reversion provision affects only DC's exclusive rights and has
17    no consequence whatsoever upon the plaintiffs' rights?
18              MR. TOBEROFF:  Same objection, your Honor, as
19    before.  When he's referring to the rights, copyright or
20    accounting?  We don't know.
21              THE COURT:  Counsel, why don't you clarify what
22    rights you're referring to.  I think I understand, and I think
23    the witness understands, but just for the record.  I think
24    this is an important point.
25              MR. BERGMAN:  Thank you, your Honor.
```

1   Q.   Will you agree with me that Mrs. Siegel, by virtue of his

2   Honor's ruling and the application of the Copyright Act, has

3   the right to sell or license her nonexclusive film rights in

4   Action Comics No. 1?

5   A.   As we sit here today?  I'm just trying to put this in

6   time context.  We're looking at this contract that was in 2002

7   before the Court's ruling.  So are we talking about --

8   Q.   Mr. Halloran, I'm speaking as we sit here today.

9   A.   Okay.  I believe they do have that right.

10  Q.   Okay.  Now, because Mrs. Siegel has that right today,

11  there is nothing at all in the reversion provision which

12  limits her right, does it?

13          MR. TOBEROFF:  Same objection.  If he was referring

14  to the right in the prior question, then there's no objection.

15  If he's referring to the right to an accounting, there's an

16  objection.  We don't know.

17          THE COURT:  I trust you're referring to the same

18  right --

19          MR. BERGMAN:  I certainly am, your Honor.

20          THE COURT:  For the record.

21          You may answer.

22          THE WITNESS:  The Copyright Act would supersede --

23  supersede this provision.

24  Q.   BY MR. BERGMAN:  Okay.  So that the reversion provision,

25  whether it's the most important provision in the contract or

1    not, is important only insofar as DC's exclusive rights are

2    concerned, isn't that true?

3    A.    I think you have to look at not only the rights but the

4    accounting provision.  You have to keep those separate.

5    Insofar as DC's rights under this, it would only -- the only

6    rights that Warner's got were the rights that they got from

7    DC.  So to the extent it applies to DC, then it applies to the

8    Siegels as part of the rights -- if their rights were indeed

9    part of the grant, then it would affect them.

10   Q.    At the time that you -- strike that.

11            In 2002, if you were at a competing studio in the

12   business affairs position and DC came to you and offered the

13   rights, the precise rights with which his Honor has found were

14   conveyed to Warner Brothers, what projections would you make

15   based on those rights?

16   A.    Customarily the rights are acquired prior to the

17   projections that are done by the studios.

18   Q.    Correct.

19   A.    So there may or may not have been projections, but the

20   most important projections that are done is once you know all

21   the components of the movie, then that's when you do a

22   projection and decide whether or not you're going to make the

23   movie.

24   Q.    Right.  Once you -- I'm sorry, sir.

25   A.    Okay.  But you certainly, in assessing the rights, what

1    you would do is look at the marketplace and look at similar

2    deals but also look at the unique factors of Superman and try

3    to estimate the future value of the worth of the audiovisual

4    works that you would get.

5    Q.    But in terms of just having that bare property in front

6    of you, not knowing the budget or location or potential stars

7    or potential director, there's no projection to make, is

8    there?

9    A.    If you make a projection without putting on an Excel

10   spreadsheet, what you would do is assess the rights and look

11   at the universe of Superman and what that potentially could

12   mean for the exploitation of the rights that you might

13   acquire.

14   Q.    So that when I asked you those questions this morning

15   dealing with Ironman and dealing with terminator, where you

16   testified that that position, that you had to look at the

17   money that stuck to the ribs of the companies, you said it was

18   due to a projection, but there was no projection at that point

19   in time, was there?

20   A.    I'm not sure what point in time you're referring to.

21   Q.    I'm referring to the point in time that you first get a

22   proposal, for example, from Ironman.  There's no projection

23   that you make ahead, well, how much money am I going to make

24   on this property.  You have to know other facts; correct?

25   A.    No, you can certainly do a -- the final projection is

1  done once you have all the elements put together.  But

2  certainly if you have a property of the value of Superman, you

3  know that it's going to be of enormous value without looking

4  at an Excel spreadsheet.  With its history and -- Superman is

5  essentially in our cultural DNA.  You know that, in the

6  various ways that you're going to do it, that there is a --

7  and I talked about this the other day.  You can use that too,

8  and look into the future and try to leverage that awareness

9  into profitability and various product lines.

10         So you have a very good sense of how valuable it is

11 even though you might not have just a specific Excel

12 spreadsheet doing, quote, projections.

13 Q.  That being the case, let's go back to the question that I

14 referred you to earlier in your deposition at page 249, lines

15 3 through 14.  I was asking you at the time about the 25

16 percent return that Warner Brothers consumer products gets for

17 the merchandising, and I asked you this question:

18         "QUESTION:  And 25 percent, based on some other

19     agreements that you are familiar with, is not a very high

20     fee, is it?

21         "ANSWER:  Well, it's akin to a distribution fee, and

22     what you have to look at is what are the aggregate

23     dollars that are sticking to the ribs of Warner Brothers,

24     and in this case, it's 62 1/2 percent.  Can I finish?

25 And Ironman was zero.

1          "So you have to look.  You have to -- at that fee --

2    you have to" --

3          A word was left out in the transcript.  I presume it

4    was "look."

5          "So you have to look, you have to look at that fee

6        in the context of the total revenues that are sticking to

7        the ribs of the company."

8          Do you recall giving that testimony?

9    A.   Yes.

10   Q.   When you gave that testimony, you were talking about the

11   amount of money that sticks to the ribs of the studio when the

12   money starts coming in, weren't you?  And Mr. Toberoff should

13   not be shaking his head no, no, no, no.

14         MR. TOBEROFF:  Pardon me?

15         MR. BERGMAN:  You --

16         MR. TOBEROFF:  Your Honor I was not shaking my head

17   no, no, no, no.  I was looking at the screen.

18         MR. BERGMAN:  That is an untruth.

19         THE COURT:  Let's move along.  I didn't see.

20         THE WITNESS:  When you talk about stick to the ribs,

21   you make the determination based on reading the contract and

22   at the time of the contract.  And the stick to the ribs is

23   oftentimes -- what I was discussing is the potential stick to

24   the ribs based on projected revenue.  It's not a hindsight

25   looking back what happened.  It's at the time, let's say, you

1    know, DC, I was negotiating with DC when I was at a studio.  I

2    would -- the terms of our contract that we were in

3    negotiation, we would know at the time.  We'd do our best to

4    sort of see the future profitability.  But it's not a -- it's

5    stick to the ribs based on the negotiations then and the

6    contract now, not stick to the ribs downstream because we

7    don't know what would stick to the ribs.

8    Q.   BY MR. BERGMAN:  That's a very important point, isn't it,

9    Mr. Halloran?  Let me ask you this.

10              THE COURT:  Counsel, next question.

11              MR. BERGMAN:  Sorry, sir?

12   Q.   When you negotiate the Sahara agreement and you agree

13   that the rights holder will receive 10 percent of the

14   producer's share, you don't know what that producer's share is

15   going to be, do you?

16   A.   Are you talking about me personally or a hypothetical

17   person?

18   Q.   I'm talking about you personally.  Let's say you're the

19   one who is there, and I come to you, and I offer you the

20   property.  And I tell you I want 10 percent of the producer's

21   share.  Do you know what 10 percent of the producer's share

22   from Sahara will be before you even buy the property?

23   A.   Now, who are you and who are you representing, and who am

24   I and who am I representing?

25              THE COURT:  Try to answer the question.  Do you

1    know?

2             THE WITNESS:  Well, just as with the gross

3    participation, you're not going to know exactly what it is.

4    It's producer's share, you're not going to know exactly what

5    it is.  But what you would do is, you know, look at the

6    contract and try to estimate what it might be.  But certainly

7    when you are negotiating a contract, you are dealing with a

8    contract then and there, and that's when you determine fair

9    market value.

10   Q.   BY MR. BERGMAN:  Yes, sir, and when you agree to 5

11   percent of the distributor's gross in the film agreement, you

12   don't know what that's going to be either, do you?

13   A.   You don't know what that ultimately is going to be.

14   Q.   So tell me, what's more valuable to the licensor?  10

15   percent of the producer's gross or 5 percent of the

16   distributor's gross?

17            MR. TOBEROFF:  Vague and ambiguous as to what

18   contract he's referring to.

19            THE COURT:  With all other factors being the same?

20            MR. BERGMAN:  If I may, your Honor, that's precisely

21   the point I'm trying to make.

22            THE COURT:  I understand.  I think I have it.

23   Overruled.  He's not referring to any particular contract.

24            MR. BERGMAN:  Yes, sir.

25            THE WITNESS:  It depends on the contractual

1    definition of producer's gross and distributor's gross.  It is

2    generally true that distributor's gross is more valuable based

3    on the percentage, but there are times, depending on what

4    gross is going in, where the 10 percent of producer's gross

5    would exceed 10 percent of distributor's gross.

6    Q.    BY MR. BERGMAN:  Mr. Halloran, in trying to determine

7    which is more valuable, 10 percent of producer's gross or 5

8    percent of distributor's gross, you must have actual numbers,

9    must you not?

10   A.    No.

11   Q.    Don't you have to know, for example, on the distributor's

12   gross, A, what is the distributor's gross; B, what is the

13   distributor charging as a fee; and, C, what is the distributor

14   paying as prints and advertising?  All of which must be

15   deducted from gross before you reach producer's gross;

16   correct?

17   A.    That's not true.

18   Q.    And in what way is that not true?

19   A.    In some definitions of producer's gross, P and A is not

20   necessarily deducted.  I think -- there's no provision, for

21   example, in Sahara for the deduction of prints and ads.

22   Q.    Did you say Sahara?

23   A.    There's no provision in Sahara that provides for --

24   Q.    I'm afraid you're very mistaken --

25              THE COURT:  Counsel?

732

```
 1              MR. BERGMAN:  I'm sorry, your Honor.
 2   Q.   Would you please point out the provision in the Sahara
 3   agreement to which you are referring?
 4              THE COURT:  Refer for the record the exhibit number
 5   so it's clear.
 6   Q.   BY MR. BERGMAN:  Would you turn, please, to Exhibit 201.
 7   A.   I found it.
 8   Q.   Do you have it, sir?
 9   A.   I do.
10   Q.   Would you turn to paragraph 7 at page 4899.
11   A.   I'm with you.
12   Q.   Have you read that paragraph, sir?
13   A.   Yes.
14   Q.   Isn't it a fact that that paragraph permits the deduction
15   of prints and advertising before producer's gross is reached?
16   A.   That's not the way I read it.
17   Q.   Pardon me?
18   A.   That's not the way I read it.  I don't see a provision
19   for the deduction of prints and ads.
20   Q.   Do you see about 12 lines down in paragraph 7 where the
21   line begins, "and all rights granted to purchaser hereunder"?
22              Do you see that line?
23   A.   Yes.
24   Q.   All rights granted to purchaser hereunder in the literary
25   material from all sources, uses, and media, except as
```

1  otherwise provided hereinafter deductioning, after deduction

2  of only applicable taxes, other than income taxes, out of

3  pocket transmittal and collection costs paid to third parties,

4  sales, agents -- here comes the language I'm referring to --

5  and distributors' fees and out-of-pocket expenses paid to

6  third parties, close quote.

7          Does that not permit the deduction of prints and

8  advertising before producer's gross is reached?

9  A.   That's not necessarily how I read it.  It talks about

10  distributor's fees.  It doesn't talk about prints and ads.

11  Q.   Is that the way you remembered it in the Sahara case

12  itself?

13  A.   In the Sahara case, I don't remember actually that we

14  went into the interpretation of this.

15  Q.   Do you remember in the Sahara case whether or not you

16  testified that Paramount deducted prints and advertising

17  before remitting money to the producer?

18  A.   That's different, okay?  That's the agreement between

19  Anschutz and Paramount.  My recollection is that Paramount, if

20  in fact they put up prints and ads, could take them out before

21  there was money remitted to Anschutz.  But that's an agreement

22  the licensee had.  That's not -- under this agreement, the

23  licensee would only be entitled to deduct those things under

24  this contract.

25  Q.   Can you identify for me any motion picture that you can

1    think of which was produced by an independent producer and the

2    prints and advertising were financed by a distributor where

3    the distributor did not deduct prints and advertising and a

4    fee before remitting money to the producer?

5    A.    I can't think of one.

6    Q.    That's because there is none, is there?

7    A.    But that's -- again, that's the agreement between the

8    producer who holds the rights and the distributor.  You have

9    to look at the agreement.

10   Q.   Mr. Halloran, are you testifying as an expert in this

11   area, that this Sahara contract does not permit the

12   distributor to deduct its prints and advertising and

13   distribution fees prior to remitting money to the producer?

14           MR. TOBEROFF:  Objection.  Argumentative and asked

15   and answered.

16           THE COURT:  Overruled.

17           THE WITNESS:  The distributor is not a party to this

18   agreement.  The distributor is not a party to this agreement.

19   Q.   BY MR. BERGMAN:  Mr. Halloran, it doesn't matter whether

20   the distributor is a party to this agreement.  The author and

21   producer are parties to this agreement, are they not?

22   A.    They are.

23   Q.   And does this agreement not permit the deduction by the

24   distributor, whoever that distributor may be, even if an

25   affiliate of the producer to deduct distribution fees and

1  costs?

2  A.    It is clear that distribution fees vis-a-vis in the

3  definition of producer's gross, there is a provision whereby

4  it anticipates that the distributor will take out distribution

5  fees.  It's not clear from here that they are entitled to take

6  out P and A.  It doesn't say that here.  I acknowledge that in

7  the contract between the distributor and the licensee that

8  it's customary for prints and ads to be deducted, but

9  that's -- I don't see it here.

10        One would expect to see it here.

11  Q.    It's invariable, is it not, for the distribution fees and

12  prints and advertising to be deducted by the distributor

13  before remitting money to the producer?

14  A.    As I just testified, in the agreement between the

15  distributor and the producer, it is, as far as I know,

16  invariable that before remitting sums, the distributor takes

17  distribution fees and their costs.  There are so-called

18  rent-a-studio type deals where the prints and ads are put up

19  by a third party or the producer, and in that case typically

20  there's just a distribution fee taken off.  And that's not,

21  you know, legislated in here.

22        I would expect that if Anschutz was entitled to

23  deduct prints and ads before determining the producer's pool,

24  that that would be clear from this agreement, and it's not

25  clear at all.  Distributor fees, yes.  But not prints and ads.

736

```
 1   Q.   So you are suggesting, as someone who is an expert in the

 2   motion picture industry, that it's possible, under the Sahara

 3   agreement, that Paramount expended a hundred million dollars

 4   in prints and advertising and didn't deduct that from its

 5   agreement with the producer?

 6   A.   For the fourth time, Paramount is not a party to this

 7   agreement.

 8   Q.   Why is it, then, that the agreement refers to the

 9   deduction of distributor's fees and out-of-pocket expenses

10   paid to third parties?

11   A.   This is an agreement between Anschutz and Cussler.  It

12   talks about out-of-pocket expenses paid to third parties.

13        I would read this as out-of-pocket expenses that the

14   producer had, not that the distributor had.  So if the P and A

15   was put up by the producer -- excuse me, by the studio, like

16   Paramount, they would deduct those sums before you got to the

17   gross receipts.

18   Q.   Let's read the provision one more time, okay?  Let's

19   start at the top.

20   A.   Okay.

21   Q.   Owner shall be entitled to receive as contingent

22   compensation an amount equal to 10 percent of the, quote,

23   producer's gross receipts, from each theatrical picture

24   produced hereunder.  Producer's gross receipts is defined as

25   the gross sums received by purchaser from the various
```

1    distributors and licensees of rights to the theatrical

2    pictures produced hereunder from the revenues derived from the

3    distribution and exploitation of the theatrical pictures.

4          Now skip down through the parenthesis five or six

5    lines to where it says after deduction of only applicable

6    taxes other than income taxes, out-of-pocket transmittal and

7    collection costs paid to third parties, sales agents, and

8    distributor's fees and out-of-pocket expenses paid to third

9    parties.  Close quote.  Those out-of-pocket expenses paid to

10   third parties by distributor are prints and advertising costs,

11   are they not?

12         MR. TOBEROFF:  Your Honor, this is the fourth time

13   he's asked the same question.  And the witness has been

14   consistent in his answer.  I don't think he can just keep

15   asking it because he doesn't like the witness's answer.

16   That's the objection.

17         THE COURT:  He has given the answer you're going to

18   get, Counsel.

19   Q.   BY MR. BERGMAN:  Would you be surprised if, when I call

20   Steve Spira to the stand and ask him if under this provision a

21   distributor is entitled to deduct not only his fees but also

22   his print and advertising costs, that he would say of course?

23         MR. TOBEROFF:  Objection to the extent he's not

24   permitted to ask a percipient witness questions such as this

25   that goes to expert testimony based on specialized knowledge

738

 1    since this contract is not at issue in this case.

 2            THE COURT:  It's an argumentative question.  I'm not

 3    really sure about what -- I'm not going to rule on the

 4    question as to a witness who is not before me.  So that's way

 5    premature, but it's argumentative as to form, Counsel.  Ask

 6    the next question.

 7    Q.   BY MR. BERGMAN:  Have you ever had the experience of a

 8    distributor under a deal where the producer finances the

 9    picture and the distributor finances the prints and

10    advertising?  Do you know of a single instance in the history

11    of motion pictures where the distributor hasn't deducted from

12    gross receipts not merely his distribution fees but all prints

13    and advertising costs?

14            MR. TOBEROFF:  Objection, your Honor.  That exact

15    question was already asked as well of the witness.

16            THE COURT:  It was, and he said he was not aware.

17            MR. BERGMAN:  Thank you.

18            THE COURT:  I assume that hasn't changed.

19            THE WITNESS:  It hasn't changed, but there's this

20    constant confusion.  This is not an agreement with Paramount

21    and distributor where they are taking the --

22            THE COURT:  We're not talking about this agreement.

23    He's asking in the agreement are you aware of any agreement in

24    which that has happened.

25            THE WITNESS:  I'm not --

1          THE COURT:  I'm going to overrule the objection.

2     I've got enough of a change now that he may answer your

3     question.  Counsel, I had thought the question was answered

4     unequivocally, but apparently it's not.

5          MR. BERGMAN:  Let me see if I can ask it again.

6     Q.   Have you ever had the experience of a distributor under a

7     deal where the producer finances the picture and the

8     distributor finances the prints and advertising, do you know

9     of a single instance in the history of motion pictures where

10    the distributor has not deducted from gross receipts not

11    merely his distribution fees, but all prints and advertising

12    costs?

13    A.   No.

14    Q.   Let's stay with the Sahara agreement for a while.  Am I

15    correct that that's an agreement for the purchase of two

16    motion pictures?

17    A.   Two and possibly more.

18    Q.   But putting aside options, in terms of immediacy, it's

19    two pictures; right?

20    A.   It's the right to produce two pictures based on the Dirk

21    Pitt character.

22    Q.   And in your report, you make the statement that the terms

23    of the Sahara agreement -- and this is a quote from page 26 of

24    your report -- quote, are far superior to the Superman film

25    agreement, close quote.

1          Do you recall making that statement in your report?

2     A.    I do, and it's accurate.

3     Q.    And I think, then, that you still have that expert

4     opinion?

5     A.    Yes.

6     Q.    Then what precisely do you mean, Mr. Halloran, when you

7     say that the terms of the Sahara agreement are far superior to

8     the Superman film agreement?

9     A.    The Sahara agreement provides for the -- there's no

10    option provision.  There is a purchase where Cussler receives

11    $20 million for two films and $10 million a film.  And I

12    acknowledge that that is spread out a bit over time.

13          So in a present value basis, it was more like 17.

14    He was also entitled to receive 10 percent of the producer's

15    gross, which I think can exceed 5 percent of distributor's

16    gross.

17    Q.    Do you believe it does exceed 5 percent producer's gross?

18    A.    It can exceed.

19    Q.    Do you believe that it does?

20    A.    I'm not sure what you mean by does exceed.

21    Q.    Do you believe that 10 percent of the producer's gross of

22    Sahara exceeds 5 percent of the distributor's gross of

23    Superman Returns?

24    A.    I haven't -- I haven't done the comparison or the

25    analysis, but again, you need to look at, you know, at the

1    time the agreement was made, was this 10 percent, you know,

2    potentially superior to 5 percent of Superman.  You don't look

3    at just that.  Perhaps the most important -- if you look at

4    the entire agreement, in many ways it was superior to the

5    Superman agreement, but you also have to keep in context that

6    you have to compare Superman with Dirk Pitt and look at it in

7    that context as well.

8              MR. BERGMAN:  Your Honor, I move to exclude

9    everything after "I haven't" -- "I haven't done a comparison

10   or the analysis."

11             THE COURT:  There's no foundation for anything after

12   that.

13   Q.  BY MR. BERGMAN:  In your expert opinion, Mr. Halloran,

14   did DC make more money from the -- from Superman Returns under

15   the terms of the film agreement than DC would have made from

16   Superman Returns under the terms of the Sahara agreement?

17             MR. TOBEROFF:  Objection, your Honor.  Calls for

18   speculation --

19             THE COURT:  There's no foundation for it,

20   particularly in light of his last answer, Counsel.

21   Q.  BY MR. BERGMAN:  Did you attempt any analysis other than

22   looking at the specific terms of the agreement to figure out

23   how that equates to what sticks to the ribs of DC?

24             THE COURT:  Of which agreement?

25             MR. BERGMAN:  Of the Sahara agreement, your Honor.

1    I'm sorry.

2            THE WITNESS:  Again, in determining fair market

3    value, I looked at the universe of these agreements, and I

4    made judgments as to the relative strength of the character

5    and tried to put the agreement in context.  And again, that

6    calculation is made -- my view in generating my opinion as to

7    fair market value is made on the face of the contract.  I

8    found it stunning that there was no purchase price in the

9    Superman agreement, and, in fact, for two pictures for Dirk

10   Pitt, Mr. Cussler was guaranteed, you know, essentially

11   $20 million among other things.

12           So viewed in that context, that's what my opinion

13   was based on.

14           MR. BERGMAN:  I move to strike that as

15   nonresponsive, your Honor.

16           THE COURT:  Mr. Toberoff, your response to that?

17           MR. TOBEROFF:  He is asking precisely the basis of

18   his opinion in a prior question which was echoed in this

19   question.  So the witness should be allowed to explain the

20   basis of his opinion.

21           THE COURT:  Well, cut this in half here.  I'm going

22   to strike he does explain his fair market value, what he did.

23   When he goes beyond it to describe something that is being

24   stunning, that clearly goes beyond what the question is being

25   asked for.

```
1            So I will strike everything from that point forward.
2            MR. TOBEROFF:  Very well, your Honor.  So counsel, I
3    assume, asked him, and he's answered what analysis he did on
4    the Sahara agreement.
5    Q.    BY MR. BERGMAN:  As you sit here now, Mr. Halloran, do
6    you have an opinion, sir, as to whether DC made more money
7    from Superman Returns under the terms of the Sahara agreement
8    than DC would have made under the terms of the -- than DC did
9    make under the terms of the film agreement?
10           Do you have an opinion?
11   A.    Again, the focus has to be as of the time of the
12   agreement, what these terms were.  You keep making allusions
13   to --
14           THE COURT:  As of the time.  Answer the question as
15   of the time --
16           THE WITNESS:  No.
17           THE COURT:  -- of the agreement.
18   Q.    BY MR. BERGMAN:  Now I would like you to put aside as of
19   the time of the agreement and look at the reality, as it
20   exists now, that the Sahara picture has been distributed, now
21   that the Superman picture has been distributed.
22           Do you currently have an opinion as to whether DC
23   made more money from the release of Superman Returns under the
24   film agreement than it would have made from Superman Returns
25   under the terms of the Sahara agreement?
```

744

```
 1              MR. TOBEROFF:  Objection, your Honor.  Irrelevant.

 2              THE COURT:  Overruled.  You may answer.

 3              THE WITNESS:  I would have to line up the contracts

 4    and line up the accounting statements to make a comparison.

 5    As I sit here, I can't make a comparison.  You have to know

 6    the actual results.  I know Mr. Sills was engaged to do

 7    some --

 8              THE COURT:  This lineup that you're talking about.

 9    In reaching your earlier conclusions in response to

10    Mr. Toberoff's questions, did you do that same lineup?

11              THE WITNESS:  The same lineup?

12              THE COURT:  You have previously offered opinions in

13    this court comparing different agreements as to whether one is

14    more favorable than the other.

15              THE WITNESS:  Right.

16              THE COURT:  Did you do that same lineup of terms

17    comparing an overall agreement to another overall agreement?

18              THE WITNESS:  Yes, absolutely.

19    Q.   BY MR. BERGMAN:  And when you made that comparison, what

20    did you find out?

21    A.   The comparison between Sahara and Superman?

22    Q.   Yes, sir.

23    A.   I found that the purchase price -- well, first of all,

24    there's no purchase price whatsoever in the film agreement.

25    And the purchase price in the Cussler agreement was
```

1    $20 million guaranteed.  Guaranteed.

2              So the problem with the film agreement is, as of

3    2002, DC had zero guarantee that any film would ever be made.

4    Q.   Now let's look at it, if we may, from the reality of what

5    has happened.  What was the option price for Sahara under the

6    Sahara agreement?

7    A.   There was no option price.  It was a purchase.

8    Q.   What was the option price that DC received for Superman

9    Returns?

10   A.   It was initially $1,500,000 for approximately three

11   years, roughly $500,000 a year.

12   Q.   Okay.  So if you look at the screen --

13   A.   Could I please have a paper copy of this?  It would be

14   helpful.

15             MR. TOBEROFF:  Your Honor, I object.  The

16   defendants -- this is demonstrative evidence in connection

17   with testimony of a witness.  Under the rules, they have to

18   present this to the other side 11 days before trial or it's

19   not -- they can't use it, and they never presented this

20   demonstrative evidence to us ahead of time so we could prepare

21   for it.

22             THE COURT:  I'm not sure what this is.  Is this

23   something that you should have shared with opposing counsel?

24             MR. BERGMAN:  No, I haven't shown this to opposing

25   counsel, your Honor.

```
 1              MR. TOBEROFF:  This is a continuing trend on

 2    defendant's side --

 3              THE COURT:  I don't need the editorial, Counsel.

 4              Mr. Bergman, your response?

 5              MR. BERGMAN:  Your Honor, all it does is translate

 6    numbers that I'm going to get from the witness onto a piece of

 7    paper.  I don't need to show the piece of paper.  I'm doing it

 8    as a tool to facilitate your view.

 9              THE COURT:  Well, generally what the Court does with

10    this, certainly if we put up a piece of paper over here and

11    counsel went up and wrote down numbers, I'll permit counsel to

12    write down whatever they wanted just to kind of help us

13    through this.  If that's essentially what he's done by writing

14    down numbers on a piece of paper in advance and there's no

15    objection so that, for the sake of judicial expediency, it

16    seems to make sense to proceed.

17              Could you at least take a look at this,

18    Mr. Toberoff, and see if this is something that Mr. Bergman or

19    Mr. Halloran could get up and write on the board over here?

20              MR. TOBEROFF:  If it's merely giving a few --

21              THE COURT:  I understand your position.  I just

22    explained the Court's position.  So let's take a recess.  Look

23    at it, and let me know if you have an objection to it.

24              (Recess taken.)

25              THE COURT:  Okay.  Did we get this worked out on the
```

1    document?

2              MR. BERGMAN:  I think we did.  But before we get to

3    it, I have some more questions I want to ask, which may make

4    everything a little clearer as we go along.

5              THE COURT:  Thank you.

6              MR. TOBEROFF:  Thank you for the opportunity to

7    review this, but no, we did not work it out.  Upon studying

8    this, Mr. Bergman's representations are incorrect, that this

9    is merely putting up a few contract terms.  This is actually a

10   fairly complicated financial analysis.

11             There are five footnotes at the bottom, numerous

12   financial assumptions, running purported revenues from

13   Superman Returns through the Sahara deal and at times adopting

14   portions of legendary pictures co-financing arrangements with

15   Warner Brothers.

16             It's very complicated, and the rules say that they

17   cannot ambush the other side with this at trial.  There's also

18   no foundation for it.

19             THE COURT:  Let's move on with your questions,

20   Counsel.

21             MR. BERGMAN:  Yes, your Honor.

22   Q.  Mr. Halloran, let's assume that you were, as you were, in

23   private practice in 2002, and DC Comics came to you and said

24   they wanted to license the rights that his Honor has held that

25   they had available and in fact licensed to Warner Brothers.

1    And they asked you whether you would recommend that they enter

2    into the Sahara or the film agreement, what would you have

3    advised?

4    A.    I would advise neither.  Your choice is not limited to

5    two imperfect agreements.  I would have said neither.

6    Q.    And as between the two of them, you're not prepared to

7    say which one you would have recommended?

8    A.    They both have pluses and minuses.  So --

9         THE COURT:  Let me ask you about this, though.  The

10    Sahara agreement, you defined at the beginning of this trial a

11    fair market value, you defined it in terms of an agreement

12    reached at arm's length between individuals who had an

13    opportunity to go away --

14         THE WITNESS:  And intelligent individuals.

15         THE COURT: -- were intelligent individuals who had

16    the ability to walk away involved in creating the Sahara

17    agreement?  Essentially what I'm asking is was that a fair

18    market value agreement?

19         THE WITNESS:  It was certainly a third party

20    agreement.  Certainly Clive Cussler had the ability to walk

21    away.

22         THE COURT:  Okay.

23    Q.    BY MR. BERGMAN:  If DC advised you, Mr. Halloran, that

24    they were going to enter into one of those two contracts,

25    which one would you advise them to enter into?

1    A.    Probably the Sahara agreement.

2    Q.    And why is that?

3    A.    The main reason being that they would have the -- the way

4    the Sahara agreement is set up, it was for book 1 and 2, and

5    there were options for further books.  So Anschutz, if he

6    didn't continue to make Dirk Pitt movies, would have lost the

7    rights.

8         So that was the -- also another thing that's really

9    important in the Sahara agreement was there were very strong

10   creative controls for the screenplay and actors and director

11   and the like.  So I would have recommended the imperfect

12   Sahara agreement.

13   Q.    Okay.  And if DC, when they came to you, said we

14   appreciate all your expertise, Mr. Halloran, but we're only

15   concerned with money, we have no concern other than getting

16   the most money we can for our exclusive rights, which of the

17   two contracts under those circumstances would you advise them

18   to enter into?

19   A.    Again, the Sahara agreement.

20   Q.    And why is that?

21   A.    Because it would have guaranteed $20 million up front.

22   They could take no risk as to whether Warners would in fact

23   ever develop, ever produce, or ever release the movie.  So it

24   would eliminate that risk and get an up-front payment.  They

25   also would have a participation in 10 percent of producer's

1   gross, which could be potentially greater than distributor's

2   gross because it would include a hundred percent home video,

3   for example, and, you know, if, in fact, there was not a

4   deduction for P and A, it would be increased.  Although that's

5   relatively unlikely, but the important thing is it would be a

6   hundred percent home video, and it would be a higher number.

7          But looking at the whole agreement, the single most

8   important advice I would give to DC is you want to make sure,

9   DC, that the Superman movies continue to be developed,

10  produced, and exploited.  And that has repercussions not only

11  to just the financial returns on the film side, but as to the

12  overall value of your character.

13         THE COURT:  The reversion is something you cite to

14  repeatedly.  From your perspective, how do you in negotiating,

15  to use counsel's example, how do you value that in a

16  particular negotiation?

17         THE WITNESS:  From --

18         THE COURT:  How do you assign a value to that

19  reversion element?

20         THE WITNESS:  Right.  The way you would assign the

21  value of it would be to -- you'd have to do it over a long

22  period of time, and the difficulty with the Superman agreement

23  is you have 31 years, and as of 2002, you'd have to value it

24  at potentially zero.  You'd have to value -- the reversion

25  clause would be extraordinarily important because in 2002 the

 1    potential revenues were apparent.

 2           So what you would do is you'd say you have a

 3    reversion, and you know with certainty that there would be

 4    pictures produced, or that if they are not produced, we'll

 5    have the ability to go into the open marketplace and sell the

 6    rights.

 7           I'm absolutely convinced that if there had been a

 8    fair market value Superman deal in 2002, that it would have

 9    had a reversion in it, and that if --

10           THE COURT:  We're going beyond my question now.

11           Counsel?

12    Q.    BY MR. BERGMAN:  Once again, that reversion that it would

13    have would be of no benefit whatever to the Siegels, would it?

14           THE COURT:  You've asked that question, Counsel, and

15    the Court is mindful of the answer.

16           MR. BERGMAN:  Thank you, your Honor.

17    Q.    Let's assume that DC came to you in 2002, sir, and again

18    had a choice between two agreements.  And we're concerned only

19    with economic terms.  And the two agreements were the

20    agreement for Time Line and the agreement for Superman

21    Returns.  Time Line is Exhibit 325, sir.

22           What would you advise them to do as between those

23    two contracts?  Enter into Time Line or enter into the film

24    agreement?

25    A.    What was the Time Line number?

```
 1  Q.    325, sir.

 2  A.    We're comparing these two agreements?

 3  Q.    Time Line and the film agreement.

 4  A.    Well, again, there are pluses and minuses.  What you have

 5  to keep in mind is that time line was not a -- the

 6  merchandising was not worth of anything --

 7        THE COURT:  Before we get into the reasoning, why

 8  don't you just answer the question.

 9        THE WITNESS:  Okay.  In terms of the financial?

10  Q.    BY MR. BERGMAN:  Yes, sir.

11        THE COURT:  He's asking you to think of a

12  hypothetical situation where Warner Brothers is only concerned

13  about money.

14        THE WITNESS:  Well, what you'd have to do is,

15  certainly, the 10 percent of gross escalating to 20 percent of

16  gross for the film revenue is attractive.  But the distinction

17  is that in time line, the -- instead of having a separate pot

18  and a split, that money was included in gross.  So, you know,

19  as I sit here, I would have to do a calculation of the

20  projections of what that ultimately, you know, might be worth.

21        So I can't, you know, as I sit here, you know, run

22  the numbers in my head and say well, this is clearly better

23  than this.  This is clearly better than this.

24  Q.    BY MR. BERGMAN:  In reaching your opinion, Mr. Halloran,

25  did you do any of those analyses?
```

1    A.   Well, I didn't run the -- I didn't plug, because I didn't

2    think it was necessary or appropriate.  I didn't plug Superman

3    Returns numbers into all these deals and do Excel

4    spreadsheets, but I certainly considered what, if you looked

5    at the contracts, what the most advantageous -- the test was

6    if I represented DC in the open market, what would a deal look

7    like, and these agreements, I thought, were compelling that,

8    in fact, the fair market value exceeded that under the

9    Superman agreement.

10   Q.   Okay.  And therefore, you would advise DC under those

11   circumstances to enter into the time line agreement?

12   A.   Again, it's -- it would depend on what we thought the

13   projected revenues were.  And again, it's impossible to leave

14   out the fact that if time line wasn't made, that the rights

15   would revert.

16   Q.   Do you have an answer as to the specific question, sir,

17   of which of these two agreements you would advise a client who

18   was concerned only with money to enter into?

19        MR. TOBEROFF:  Your Honor, objection.  Vague and

20   ambiguous unless he's clarifying, like he did before, that DC

21   can only enter into one or the other.

22        THE COURT:  I think that's pretty clear from the

23   question, Counsel.  That's my understanding.

24        MR. TOBEROFF:  Thank you.

25        THE WITNESS:  You know, if DC was only interested in

money, and they thought that the 10 percent participation --
which is twice as much under the film agreement -- would
exceed the aggregate that they might make, then you would go
to the time line agreement.  But again, you know, you have to
keep in mind the distinction between the fact that, you know,
time line did not include that merchandisable property.

Q.   BY MR. BERGMAN:  But you would nonetheless recommend the
time line agreement?

A.   For those reasons, yes.

Q.   Okay.  Using the same basic principles, DC comes to you.
Its interest is only money, and it comes to you in 2002, and
they ask you which of the Hannibal or the film agreement they
should enter into.

        What would you recommend?

A.   Well, Hannibal has some features that are far superior to
the Superman film agreement.

Q.   As you're saying that, you're looking at your chart, are
you not?

A.   Yes, because I'm trying to put the whole thing into my
brain so I can look at it.  As you, yourself, have stated, you
have to look at something in the whole.  So I'm trying to look
at best I can at the -- without having to go through 50 pages
and distill the economics.

Q.   Okay.

A.   So what was your question again?

1    Q.    My question is, as between Hannibal and the film

2    agreement, which of those two agreements would you advise DC

3    to enter into in 2002 where they were concerned just with

4    money.

5          MR. TOBEROFF:  Objection, your Honor, to the

6    ambiguity of concerned just with money.  Are we talking with

7    solely financial terms like payment of 20 million?  Are we

8    talking about other terms that don't give a financial figure

9    but have long-term economic implications?  The question is

10   unclear.

11         THE COURT:  I really didn't discern a legal

12   objection.  I heard more of an argument there, Counsel.

13         MR. TOBEROFF:  The objection is vague and ambiguous.

14         THE COURT:  Overruled.  You may answer the question.

15         THE WITNESS:  Certainly the purchase price, the

16   guaranteed $10 million is much more advantageous than the

17   Superman agreement which has no purchase price whatsoever.

18   The participation of 10 percent is double from what's in the

19   Superman agreement.  The video royalty exceeds the video

20   royalty under the Superman agreement.  But again, the

21   merchandising is included in gross rather than being, you

22   know, separate.

23   Q.    BY MR. BERGMAN:  And therefore, what would you advise,

24   sir?

25   A.    If they wanted the money now and they had no concern

1  about future revenues, they would take the Hannibal agreement.

2  Q.   Assuming the same facts and circumstances, if DC came to

3  you asking which of the Lord of the Rings deal or the Superman

4  Returns deal should they take, which would you advise?

5  A.   Well, the Lord of the Rings deal had more up-front money.

6  The participation was more advantageous than under the

7  Superman agreement.  The video provision was more advantageous

8  than under the Superman agreement.  And the merchandising is

9  very, very complicated.  But again, if they needed the money

10  now, now, now, they didn't care about anything, they would go

11  with the Lord of the Rings agreement.

12         Also, if you know, the participation is higher on

13  the Lord of the Rings agreement.  And the merchandising is

14  slightly less advantageous.

15  Q.   And therefore, you would recommend?

16  A.   Well, it also has a reversion.  So I'd recommend Lord of

17  the Rings.

18  Q.   Are any of the agreements that have touched upon thus

19  far, Sahara, Time Line, Hannibal, or Lord of the Rings, did

20  any of them also include television rights?

21  A.   I'd have to go back and look at them.

22  Q.   Without doing that, do you know?

23  A.   I believe some of them did grant television rights.  But

24  I'd have to go back and look.

25  Q.   Television rights are worth money as well as film rights,

1    aren't they?

2    A.    Sometimes.    Sometimes the television rights are not as

3    valuable as they would be under the Superman agreement.

4    Q.    And perhaps I didn't make this point clear, but when I

5    said DC was interested only in money, I didn't mean that they

6    needed money or they had to get the money right away.    I'm

7    talking about their long-term economic benefits under the

8    respective contracts.

9              Does that change any of your prior answers in any

10    way?

11    A.    Well, you look at, you know, how much people want now and

12    how much people want later, and that does change your analysis

13    of the agreement.    If you're not interested in money now, but

14    long term, agreements look different.

15    Q.    Well, just so the record is clear, sir, assuming that DC

16    told you I'm only concerned with the overall amount of money I

17    receive over the length of the contract, would you still

18    recommend Sahara over the film agreement?

19              THE COURT:    All other things being equal?

20              MR. BERGMAN:    All other things being equal.

21              THE WITNESS:    I would recommend the Sahara

22    agreement.

23    Q.    BY MR. BERGMAN:    And all other things being equal but

24    this latest wrinkle, that it doesn't matter how quickly the

25    money comes in, would you still recommend Time Line over the

1    film agreement?

2    A.   It would depend on what the projection was on the

3    merchandising gross.  But if you're just looking at, you

4    know -- it's virtually impossible to do just looking at this

5    paper.  But setting aside merchandising gross, certainly Time

6    Line would be more favorable.

7    Q.   How would you project the merchandising gross?

8    A.   In representing DC?

9    Q.   Yes, sir.

10   A.   You would look at the prior performance of the Superman

11   merchandise.  You would look at other, you know, analogous

12   properties and how their merchandising had done.

13   Q.   Well, you would try to anticipate, would you not, what is

14   called the lift or the rise or the bump in advertising in

15   merchandising revenue in conjunction with the release of the

16   picture, wouldn't you?

17   A.   Well, that's a little bit of a different concept,

18   but what you would do is you'd look at the value of the

19   film-related merchandising.

20   Q.   Okay.  And would you still recommend the Hannibal

21   agreement under those circumstances?

22   A.   It would depend on what the projections on that would be.

23   But just on the face of this, the Hannibal agreement is much

24   more advantageous than the Superman agreement.

25   Q.   And when you say on the face of this, do you mean on the

1    face of the contract?

2    A.    Yes.  It provides a $10 million purchase price and 10

3    percent of the gross and a higher video royalty.

4    Q.    Okay.  And the -- let's ask the same question with

5    respect to the Lord of the Rings agreement.  Assuming that it

6    doesn't matter to DC how quickly the revenue comes in, which

7    would you recommend?  The Lord of the Rings agreement or the

8    film agreement to DC in 2002?

9    A.    The Lord of the Rings agreement.

10   Q.    And why is that, sir?

11   A.    There's a guaranteed option fee.  There's a purchase

12   price before they make the movie.  There's a 10 percent of

13   gross participation, which is twice what's under the Superman

14   agreement.  There's a higher video royalty.  And there's a

15   reversion if there's not a continuing production of the

16   pictures under the agreement.

17   Q.    And what's the merchandising?

18   A.    The merchandising on Lord of the Rings was very

19   complicated because there were various people who were

20   participating.  I understand even now the Tolkien family is

21   making a claim.  So the merchandising is very complicated, and

22   it's hard to compare it to the Superman agreement.

23   Q.    And why is that?

24   A.    Pardon?

25   Q.    Why is it hard to compare the merchandising to the

1  Superman agreement?

2  A.   Well, there's various levels.  There's various --

3          THE COURT:  Levels of what?

4          THE WITNESS:  Various levels of participation in the

5  merchandising.  And with DC, apparently Lord of the Rings, if

6  you look at DC and Lord of the Rings, there were a lot of DC's

7  that would come together, various rights holders.

8  Q.   BY MR. BERGMAN:  Well, as between Mr. Zaentz, the

9  licensor, and Miramax, the licensee, what was the

10 merchandising split on Lord of the Rings?

11 A.   I'd have to look at the agreement.  Another thing to keep

12 in mind, as I recall on Lord of the Rings, is I think on top

13 of this 10 percent, Miramax had an additional 5 percent.  So

14 the aggregate was 15 percent for the rights rather than 10

15 percent.

16          But if someone would show me the agreement, I would

17 look at it.

18 Q.   Well, the licensing agreement, which I believe you

19 indicate in your report that you read -- you did read the

20 licensing agreement, did you not?

21 A.   Yes.

22 Q.   That is Exhibit 128, sir.  That merchandising split is

23 not part of the chart you prepared, sir?

24 A.   It is part of the chart.  If you could point me to the

25 merchandising part of this, that would be helpful.

1    Q.    Well, I'd like you to point me to the merchandising part

2    that you read in forming your opinion.

3    A.    Apparently there's a separate merchandising agreement.

4    Q.    What did that provide, sir?

5    A.    I gather that provided the split of merchandising on the

6    chart.

7    Q.    Do you consider the merchandising provision in Lord of

8    the Rings to be superior to or inferior to from the licensor's

9    point of view, the film agreement?

10   A.    I think it's just looking at this in context, I believe

11   it's inferior.

12   Q.    If DC came to you in 2002 with a choice of selecting to

13   execute either the Annie agreement or the Superman Returns

14   agreement under the terms that we've stated and indicated, the

15   concern with economic interest over the long run, which

16   agreement would you advise DC to enter into?

17   A.    I think the Superman agreement.

18   Q.    And what would be your reason for that, sir?

19   A.    Well, keep in mind what the long-term value of the

20   character, even though it was a higher purchase price, the

21   gross participation was not a dollar one gross participation.

22   It was commenced at break even levels starting at two and a

23   half times the negative cost.

24          So that would be a lot less advantageous, and there

25   was additionally no reversion.

1  Q.   If the same question were put to you, sir, under the same

2  circumstances with respect to the Red Rabbit agreement, which

3  one would you advise DC to enter into?  It's No. 327 for

4  identification.

5  A.   The Red Rabbit agreement falls into the same category as

6  Time Line and the other agreement we talked about before where

7  the purchase price is superior.  The gross participation is

8  superior, but the merchandising is including gross because the

9  underlying property is not merchandisable.  So looking at long

10 term, I would recommend the Red Rabbit agreement.

11 Q.   And would your answer be the same if the agreement being

12 contrasted to the Superman agreement was Rainbow 6?

13 A.   Yes, because I think the long-term financial benefit

14 under Rainbow 6 would be better than under the Superman

15 agreement.

16 Q.   What would your advice be if, under the same

17 circumstances we've been talking about, your client DC asked

18 whether they should in 2002 enter into the terms of the

19 Watchmen agreement or the film agreement?

20 A.   I think the film agreement -- certainly the financial

21 terms, the film agreement is superior to the Watchmen

22 agreement.  But again, you'd have to look at the reversion

23 under the Watchmen agreement.  Because the most important

24 thing, again, is that if the picture doesn't get produced, it

25 would come back.

1          MR. TOBEROFF:  Your Honor, may I ask what the

2     exhibit number is of the Watchmen so we can follow that?

3          MR. BERGMAN:  Certainly.  It's Exhibits 1028 and

4     1029.

5          THE WITNESS:  Could someone show me that?  It would

6     be helpful.

7          Your question again?

8  Q.   BY MR. BERGMAN:  My question, sir, was comparing those

9     two agreements, the Watchmen on the one hand and the film

10    agreement on the other hand, in 2002 on behalf of DC Comics,

11    which was concerned only with the financial returns that would

12    gain over the long run with the picture, which of those two

13    contracts would you recommend?

14 A.   Probably the Superman contract.

15 Q.   And what would be your reason for doing that, sir?

16 A.   Well, the Superman contract is much more advantageous in

17    terms of the moneys that would be generated, assuming a film

18    were produced, than the Watchmen agreement.  Again, the

19    problem with the Superman agreement as opposed to the Watchmen

20    agreement is when DC made the Watchmen agreement, they would

21    get it back if the film weren't produced.  Under the Superman

22    agreement, there's no such provision.  But if you apply --

23    well, that's my answer.

24 Q.   If the reversion agreement and the Superman agreement

25    said that these rights, DC, will never revert to you, they are

1   ours forever, does that affect in any way the plaintiffs'

2   rights to sell their nonexclusive rights in Action Comics

3   No. 1?

4          MR. TOBEROFF:  Objection, your Honor.  It's -- the

5   reversion agreement and the Superman agreement.  I don't know

6   whether he's referring to the reversion clause in the Superman

7   agreement or another agreement or if it's just an error.

8          THE COURT:  Sustain the objection under vagueness.

9   Just rephrase.

10          THE WITNESS:  Could I look at the reversion

11   agreement?

12          THE COURT:  Wait a second.  There's no question.

13   He's going to rephrase the question.

14   Q.   BY MR. BERGMAN:  In looking at the reversion agreement in

15   the Superman -- I'm sorry -- the reversion provision in the

16   Superman agreement, which is Exhibit 1041 --

17   A.   Could you give me a Bates stamp number?

18   Q.   You've got the provision?

19   A.   Yes.

20   Q.   Let's assume that provision, instead of saying you'll get

21   your rights back if I stop paying you, DC, let's say that

22   provision said you will never get your rights back under any

23   circumstances, DC.  Okay?  There is no reversion under this

24   agreement.

25          Is that understood?  Mr. Halloran?

1    A.    I think there's an objection.

2            MR. TOBEROFF:  Objection, your Honor.  Misstates the

3    reversion provision.  It doesn't say you'll get your rights

4    back if we stop paying you.

5            THE COURT:  It's a question.  You may answer.

6            THE WITNESS:  Okay.  Could I have that read back?

7    Q.    BY MR. BERGMAN:  Let's assume that the reversion

8    provision in the Superman agreement says to DC you will never

9    get your rights back under any circumstances.  I don't care

10   what you do.  Doesn't matter what I do, they are mine.  Does

11   that in any way damage the plaintiffs' ability to license in

12   any way they choose their nonexclusive rights in Action Comics

13   1?

14   A.    This is a reversion where the rights go back to DC,

15   right?

16   Q.    Yes, sir.

17   A.    Okay.  So the plaintiffs -- it's my understanding that

18   the --

19           THE COURT:  We're not going to go through this

20   again.  You asked this question earlier, Counsel, and he

21   answered it.

22           MR. BERGMAN:  Very well, your Honor.

23           THE COURT:  It was tortured the first time.  I just

24   don't have the patience to go through this again.

25           MR. BERGMAN:  I can well appreciate that, Judge.

1          THE COURT:  Let's move forward.

2     Q.    BY MR. BERGMAN:  Let's just finish this analysis that

3     we're making in what appears to be the key agreements.

4          Assuming that DC came to you in 2002 and showed you

5     the Robotech agreement, which is Exhibit 1083, and the

6     Superman Returns agreement, 1041, made the usual statements

7     that I have been suggesting.  They are concerned only with

8     economic opportunity but over an extended period of time,

9     which agreement would you recommend to DC that it enter into?

10    A.    The Robotech agreement.

11    Q.    And why would do you that, sir?

12    A.    Because even though the Robotech agreement provides for

13    participation that's only half under the Superman agreement,

14    what's more important is that there would be a reversion.  And

15    so there would be more pictures that the participation would

16    apply to.

17         So under this -- if you go back to the Superman

18    agreement, even if it provided for 20 percent of the gross, if

19    the pictures were never made and there was no -- there's no

20    mechanism to force Warner to make pictures under the

21    agreement, 20 percent of zero is zero.  So if I have a

22    Robotech agreement and there's a provision whereby I can make

23    sure that either Warners continues to produce the pictures or

24    if I don't want to, I can get someone else to do it, then it's

25    2 1/2 percent of something.  And the merchandising would be

1    magnified by that as well.

2            So I would take the Robotech agreement.

3    Q.    Okay.  Let's look at the same question as between

4    Superman Returns under the film agreement and the Tarzan film

5    agreement, which is Exhibit 1085.  It goes all the way through

6    Exhibit 1091.  1085 through 1091.  There are various

7    amendments that we separately marked.

8    A.    Yes.  I was waiting for you.

9    Q.    I was waiting your answer.

10            THE COURT:  Why don't you state the question.

11    Q.    BY MR. BERGMAN:  Assuming that DC came to you,

12    Mr. Halloran, in 2002 and told you that they had a choice

13    between entering into the Tarzan agreement or the Superman

14    agreement under the film agreement, and they said to you that

15    they were concerned about how much money they would make, what

16    would stick to their ribs over a long period of time, which of

17    the two agreements would you recommend they execute?

18    A.    The Tarzan agreement.  The main reason being that, again,

19    as with the Robotech agreement, DC would have the ability to

20    get the rights back after a period of time, and they would,

21    once they got them back, they would be able to -- if there was

22    a reversion, they would be able to test the value of those

23    rights in the market.

24    Q.    What rights would they get back?

25    A.    Well, if you are applying Tarzan, whatever rights were

1    transferred to -- were transferred under the Tarzan agreement

2    would come back to the Edgar Rice Burroughs estate if, in

3    fact, Warner Brothers did not make the movie or continue to

4    make the movies.

5            So the rights would go back under the Tarzan

6    agreement, and then DC would own Tarzan and would be able to,

7    you know, if Warners didn't continue to make movies, they

8    would be able to own the rights and then put the rights out to

9    companies that would make --

10   Q.   In other words, DC could do whatever it wanted with its

11   exclusive rights.

12   A.   DC could do with whatever rights that came back to DC,

13   they could do.   I looked at -- whatever rights were

14   transferred, they came back to DC, and then DC would have the

15   ability to license those rights.

16   Q.   Okay, sir.   Assuming the same exact factors, and they

17   came to you, DC did, and asked you to advise them as to which

18   of the Ironman or the film agreement they should execute,

19   given the considerations that they had, which would you

20   recommend?

21   A.   The Ironman agreement.

22   Q.   And why would you do that, sir?

23   A.   For the same reasons that are applied to the other

24   agreements.   The important thing was -- and actually -- excuse

25   me.   It's an excellent example.   Under this agreement, there

1    was an option, and again, DC would have the ability, if the

2    option weren't exercised and the picture not made, they would

3    have the ability to get the rights back and to continue to own

4    and be able to license those rights over a long period of

5    time.

6              One thing you have to keep in mind is that -- well,

7    excuse me.  That's it.

8              The -- if I were representing DC, I would recommend

9    that they take the Ironman deal because I think on a long-term

10   basis, it would be more valuable than the Superman deal.

11   Q.   How would you determine that?

12   A.   You would determine it by looking at the potential

13   revenue that Superman would generate if, in fact, unlike the

14   Superman film agreement with Warners, there was a mechanism

15   for third parties to develop, produce, and exploit continuing

16   motion pictures based on the Superman character.

17             And unfortunately, one thing that -- unfortunately,

18   under the Superman film agreement, there's no mechanism

19   whatsoever for DC to get the rights back or to force Warner

20   Brothers to make any movies, and that's absolutely crucial to

21   a rights holder.  Potentially if you are to do a projected

22   revenue under the Superman agreement over 33 years, the

23   projection could be zero.

24   Q.   Okay.  And in that event, DC would be out of luck;

25   correct?

770

```
 1   A.   They'd be out of luck.  They'd have a Superman character

 2   that under any set of circumstances my estimation would be

 3   extraordinarily valuable in the marketplace, and they would

 4   have gotten nothing for it, with the exception of the modest

 5   option payments, which are insignificant compared to the value

 6   of the property.

 7   Q.   But at the same time I could, if I chose, go to

 8   Mrs. Siegel and buy her rights to Action Comics No. 1,

 9   couldn't I?

10   A.   As we sit here, I think we discussed that.

11             THE COURT:  And the answer is?

12             THE WITNESS:  Pardon?

13             THE COURT:  And the answer was?

14             THE WITNESS:  The answer was, you know, I think it's

15   a legal thing, but in theory, you could go to the Siegels and

16   buy those nonexclusive rights.

17   Q.   BY MR. BERGMAN:  Okay.  As we --

18   A.   Wait, wait, wait, wait, wait.  We have to think this

19   through.  The nonexclusive rights are jointly held by the

20   Siegels and DC.  So you'd also have to deal with DC.

21   Q.   And the effect of that is what?

22   A.   I doubt that DC would be interested in selling the rights

23   that might -- I don't think they'd be interested in --

24   Q.   DC would not be interested.  I'll stipulate to that.  But

25   that wouldn't prevent the Siegels from licensing their rights,
```

1    would it?

2    A.    To licensing their interest?

3    Q.    Action Comics No. 1.

4    A.    They could license nonexclusive rights.

5    Q.    For whatever that would be worth?

6    A.    Yes, they could license the nonexclusive rights.

7    Q.    Let's say DC came to you and said gee, here's this Harry

8    Potter agreement that I could sign, or I could sign the

9    Superman agreement.  Which one, sir, should I sign, given the

10    objectives that I'm seeking, the most money over the longest

11    period of time?

12            MR. TOBEROFF:  Objection.  Vague as to which Harry

13    Potter agreement.  If you're referring to a specific

14    agreement, ask the exhibit number.

15    Q.    BY MR. BERGMAN:  I'm referring to the Harry Potter

16    agreement as amended, which would be 1097 through 1099.

17    A.    Okay.

18    ████  ████████████████████████████████████████████████

19    ██████████████████████████████████████████████████████████████

20    ██████████████████████████████████████████████████

21    ████  ████████████████████████████

22    ████  ██████████████████████

23    ████  ████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████

25    ██████████████████████████████████████████████████████████████





23    Q.    Let's go back a little bit, if I may, to the question of

24    producer's gross.  Okay?

25    A.    Okay.

```
 1   Q.   In the traditional situation where a producer brings a

 2   film to a studio, a film like Time Line, let's say, the studio

 3   finances the production of the negative cost, does it not?

 4   A.   It does.

 5   Q.   And it also finances the production of what are called

 6   the prints and advertising.

 7   A.   That's true.

 8   Q.   And prints and advertising can be a very substantial

 9   figure, can it not?

10   A.   Yes, it can.

11   Q.   If you exhibit a picture in 3,000 theaters, you've got to

12   provide 3,000 prints; correct?

13   A.   You do.

14   Q.   And prints today of a full length feature film must be

15   about 2,000, $2,500 each?

16   A.   That's a very accurate estimate as far as I know.

17   Q.   And we know prints and advertising can be from a low

18   amount to an extraordinary amount; correct?

19   A.   I don't know exactly what that means.  Certainly there

20   are lower amounts and higher amounts.

21   Q.   Okay.  Would you characterize the Superman Returns prints

22   and advertising of $143 million to be a very large amount?

23           MR. TOBEROFF:  Objection.  Assumes facts.

24           THE COURT:  Rephrase, Counsel.

25   Q.   BY MR. BERGMAN:  Are you aware of what the prints and
```

1    advertising were for Superman Returns?

2    A.    Yes.

3    Q.    And how much were they, sir?

4    A.    I believe they are approximately the number that you just

5    stated to me.

6    Q.    Okay.  Now, does 10 percent of distributor's gross ever

7    equal 10 percent of producer's gross?

8    A.    You mean exactly equal?

9    Q.    Yes, sir.

10   A.    That is possible.

11   Q.    And under what circumstances is it possible?

12   A.    It's possible if the -- if the percentage is applied to

13   the same pool of money.

14   Q.    I understand that mathematically, sir, but under what

15   circumstances in the production and distribution of a motion

16   picture is that possible?

17   A.    If you have a definition of producer's gross where you

18   have a company like Anschutz or like Marvel or like a Lucas

19   film, where the producer's gross would be measured just after

20   limited distribution fees and perhaps P and A, then that

21   number potentially could be bigger.

22   Q.    Can there be situations where 5 percent of the

23   distributor's gross is greater than 10 percent of the

24   producer's gross?

25   A.    There are situations where that could be true.

1  Q.   And those situations would apprise most commonly, would

2  you not agree, where the distributor, where the producer has

3  paid for the cost of the negative film, but the distributor

4  has paid for prints and advertising?

5  A.   You'd have to look at the specific agreement, but, you

6  know, sometimes that would be true.  But it's -- the flip side

7  is that typically the person who is financing the production

8  cost will get a hundred percent of home video.  So the pool is

9  customarily bigger.

10  Q.   Is it your testimony that it is customary, within the

11  motion picture industry, that a producer who finances the

12  negative cost will get a hundred percent of home video?

13  A.   They typically will get a hundred percent of home video

14  revenue, but there is deducted from that revenue sometimes a

15  sort of cost distribution fee and manufacturing cost.

16  Q.   It would be deducted from all the costs; correct?

17  Manufacturing, distributing, making the special material that

18  goes on the DVD, all of that would be deducted; right?

19  A.   Those costs are typically deducted.

20  Q.   Whether all of those costs are deducted and the video

21  distributor's fee is deducted, what is left becomes added to

22  the gross in which the producer's -- producer shares; correct?

23  A.   That is correct.

24  Q.   And in the situation like one of the films where there is

25  in fact a share of the producer's gross of all video, the

777

1    assignor, the author, would then take his percentage share, 10

2    percent, whatever it is, from that additional money from

3    video; correct?

4    A.    Yes.

5    Q.    Okay.  Now, when the production entity has not financed

6    the negative cost of the film, then a typical distribution fee

7    is charged by the distributor, is it not?

8    A.    Yes.

9    Q.    Okay.  And that typical distribution fee can be 30, 35

10   percent?

11   A.    That's the common range in the net profits deal, yes.

12   Q.    Okay.  And in those situations where the producer has

13   financed the film or there is, as in the case of Legendary, a

14   co-financier, the distribution fee is greatly reduced;

15   correct?

16   A.    Vis-a-vis Legendary and a studio, the distribution fee is

17   reduced from that 30 to 35.

18   Q.    And the same would be true vis-a-vis the studio and the

19   producer; correct?  He would also, having financed the

20   picture, he's entitled to a lower distribution fee, isn't he?

21   A.    No.  The way the -- the way these co-financing deals

22   typically work is they are just -- it's a definition as

23   between the co-financier and the studio.

24   Q.    I'm sorry.  I think I confused you.  I was referring to

25   two situations, Mr. Halloran.  One situation is where the

1    producer pays the entirety of the cost of making the film,

2    turns it over to a distributor who does the distribution, pays

3    a P and A.  In that situation, am I correct that the producer,

4    with respect to at least the theatrical distribution, gets a

5    lower fee than normal charged by the distributor?

6    A.    That is accurate.

7    Q.    And another situation in which the co-financier is

8    operating and is paying for half of the cost of the picture

9    and half of the cost of the P and A, he would also get a

10   reduced distribution fee; correct?

11   A.    By "he," you mean a company like Legendary?

12   Q.    Yes, sir.

13   A.    Yes, there would be a reduced distribution fee.

14   Q.    And would you say that those two distribution fees would

15   be about the same?

16   A.    They would be in the range of being the same.

17   Q.    They would be in the range of somewhere between 11 and 15

18   percent?

19   A.    8 to 15 percent, the more common, 10 to 15.  11 to 15 is

20   in the range.

21   Q.    What pictures are you familiar with that has an 8 percent

22   distribution fee?

23   A.    Star Wars and Indiana Jones.

24   Q.    And am I correct that in both of those instances, the

25   producer not only financed the production of the film, but

1    also financed the prints and advertising of the film and in

2    effect just rented the distribution facilities of the studio

3    for 8 percent?

4    A.   I think that's -- as far as I know, that is accurate.

5    Q.   So in the ordinary situation, the producer's gross is

6    less than the distributor's gross, even where the producer has

7    financed the film, the production of the film, the distributor

8    has financed the P and A, the producer's gross will be the

9    distributor's gross less a low distribution fee, as you've

10   indicated, less whatever prints and advertising the

11   distributor has expended; correct?

12        MR. TOBEROFF:  Your Honor, this line of questioning

13   is vague and ambiguous, and I'd have to explain why.  Are we

14   speaking about money coming into an entity, i.e., a certain

15   distributor, a certain producer?  Is that how we're speaking

16   about distributor's gross versus producer's gross, or are we

17   talking about a specific contractual definition of producer's

18   gross versus distributor's gross, which would then bring into

19   play how much home video goes in, what's deducted?

20        Those are two separate and distinct concepts, and

21   they are being conflated here in the questions.

22        THE COURT:  I thought adequate foundation had been

23   laid for this.  Mr. Toberoff, would you respond?  I understand

24   these terms are negotiable and vary from deal to deal, but

25   Mr. Bergman did lay a series of foundational questions

1    establishing certain -- familiar with the general range was

2    the one that he used.  I'd have to find it here.  The common

3    range.  We went through a series and set this up.

4            MR. TOBEROFF:  I understand, your Honor, we're

5    speaking about a range.  What I'm focusing on is whether we're

6    talking about just money coming into an entity or definitions

7    of producer's versus distributor's gross in a participant's

8    agreement, and those are two completely different things.

9            THE COURT:  Let's clarify that in the question,

10   Counsel.

11           MR. BERGMAN:  Yes, your Honor.

12   Q.   I was not speaking, Mr. Halloran, about any specific

13   contractual provision.  I'm talking about custom and practice

14   in the industry.  You are familiar with custom and practice in

15   the television industry, are you not, sir?  In the motion

16   picture industry?

17   A.   Yes.

18   Q.   In the motion picture industry, when a producer pays the

19   costs of producing the film and a distributor pays the cost of

20   distributing the film, am I correct that the producer's gross

21   equals the distributor's gross less the distribution fee

22   that's been agreed upon and the distributor's prints and

23   advertising?

24   A.   That doesn't give a complete picture.  Typically, using

25   the Marvel model, for example, the -- they have a domestic

1    distribution agreement whereby Paramount takes a distribution

2    fee and, I believe, their P and A.  But on the foreign side,

3    they bifurcate the rights on the foreign side and receive

4    payments from foreign distributors.  They are typically lump

5    amounts that include a hundred percent home video.

6         So you have to -- unfortunately, you have to take

7    the further step of analyzing how the foreign is treated as

8    well as the domestic.  On the domestic side, it's true that it

9    is traditional that the sums that are included in producer's

10   gross are the sums less a distribution fee and the P and A

11   that's put up.

12        It's also true on that side that home video is

13   treated on a so-called hundred percent basis, which does mean

14   a hundred percent minus typically a small distribution fee and

15   the actual home video costs.  So you have to be really careful

16   about what goes into gross.

17   Q.   Okay.  On the average situation, you would agree with me,

18   would you not, that the producer's gross is lower than the

19   distributor's gross on a particular film?

20   A.   That's impossible to say.  That's impossible to say.

21   Q.   Why is that impossible to say?

22   A.   Because what you have to do is compare apples to apples.

23   Q.   Right.

24   A.   Right.  So --

25   Q.   How would you do that?

1  A.    Well, I pointed out that on the foreign side,

2  producer's gross typically includes, in a situation

3  where the producer puts up the money, sums that are paid

4  on a territory-by-territory basis.

5  Q.    Okay.

6  A.    And what you would have to do is compare that to what

7  distributor's gross would be had the studio distributed the

8  film.  And that's very difficult, if not impossible, to do.

9  Q.    How would you go about doing it?

10 A.    What you would have to do is take the definition of --

11 the contractual definition of gross proceeds and apply it to

12 each distributor in each territory and calculate what it would

13 be.

14 Q.    And when you say you would have to apply it to each

15 distributor, don't you mean that you would have to apply it to

16 the dollars earned by each distributor?

17 A.    Yes.

18 Q.    Putting aside foreign for a moment.  And I know how

19 important that can be.

20        THE COURT:  Counsel --

21 Q.    BY MR. BERGMAN:  If we're just looking at domestic

22 revenues, isn't it always true except in the case of George

23 Lucas, where he pays the entire bill.  Isn't it always true

24 that producer's gross will be less than distributor's gross?

25 A.    No.

1  Q.   Why isn't that true?

2  A.   You -- well, you have to keep in mind that it's not

3  necessarily true that -- you could have a situation, and my

4  memory is a little bit foggy, but I think it may well be true

5  on Sahara that Anschutz actually put up P and A as well as the

6  production cost.

7           So if you have a situation where the producer puts

8  up both production cost and P and A and you have a hundred

9  percent home video, the producer's gross number could

10  exceed -- could exceed distributor's gross.  And we had a

11  great debate, as you know, earlier today about whether under

12  the Sahara agreement Anschutz was entitled to deduct the P and

13  A that he may have put up, and my reading of the contract is

14  that he would not have been able to do that.

15  Q.   And did you testify in the Sahara case that Paramount

16  advanced the prints and advertising for Sahara?

17  A.   I might have.  It's a little bit foggy, but even had they

18  done that, you could have a contractual provision whereby the

19  10 percent of producer's gross, if you have a producer who is

20  putting up both production costs and P and A, and there's a

21  hundred percent home video, that 10 percent of that amount

22  could exceed 5 percent of distributor's gross.

23  Q.   Do you recall that at the March 19, 2007, trial of the

24  Sahara case --

25           THE COURT:  Exhibit number, Counsel?

784

```
 1              MR. BERGMAN:  Pardon me?

 2              THE COURT:  What exhibit are you at?

 3              MR. BERGMAN:  1118, your Honor.  I'm sorry.

 4              THE COURT:  It's all right.  For the record.

 5              MR. PERKINS:  This is the stack of transcripts that

 6    was marked this morning.

 7              THE COURT:  I have it.  Do you have that in front of

 8    you?

 9              THE WITNESS:  No, I don't.

10              THE COURT:  I think I handed you one.

11              THE WITNESS:  Are we talking about a transcript?

12              THE COURT:  Yes.  I handed you one.

13              THE WITNESS:  And I handed it back to you.

14              THE COURT:  I have it here.

15              THE WITNESS:  Do you mind if I read this transcript?

16              MR. BERGMAN:  You can read the entire transcript,

17    and I'm sure we'll wait for you.

18              THE COURT:  If that's going to happen, I'm going to

19    have to switch the time over.

20    Q.   BY MR. BERGMAN:  I am referring, sir, to the testimony

21    that begins at page 4912 on March 19 at line 20 and --

22    A.   4912?

23    Q.   Yes, sir.

24    A.   Okay.

25    Q.   I want to ask you, do you recall being asked this
```

1   question and giving this answer?

2   A.   Exactly what page are you on?

3   Q.   4912, line 25, Mr. Halloran.

4   A.   Okay.

5   Q.   Okay.

6        "QUESTION:  And you said that's the same as

7   Mr. Cussler.  So under Mr. Cussler's deal, he gets a

8   percentage of every dollar when it comes in regardless of

9   who he paid, the actors, the writers, et cetera, first?

10        "ANSWER:  Well, he's paid based on every dollar

11   that Crusader gets.

12        "QUESTION:  Well, that's not the same as first

13   dollar gross, though, is it?

14        "ANSWER:  It's described in the contract as first --

15   it's first dollar gross measured at the producer level as

16   opposed to the distributor level.

17        "QUESTION:  Let me ask again.

18        "ANSWER:  Yeah.

19        "QUESTION:  Is that first dollar gross?

20        "ANSWER:  It's first dollar gross based on the

21   producer's share of income as opposed to the

22   distributor's share of income.

23        "QUESTION:  So then is it the same as you said it

24   was, as the Neopetspets deal?

25        "ANSWER:  It's the same in the sense of what you're

786

1          doing is measuring at a certain point that someone will

2          get a percentage of the money that comes in at that

3          point.  It is true that based on the arrangements that

4          were made by Crusader or Bristol Bay, that there were

5          deductions made by distributors before the money got to

6          them.  So, for example, under the Paramount deal,

7          Paramount took a distribution fee and distribution

8          expenses before they remitted sums to Crusader."

9               Do you recall giving that testimony?

10   A.   I do.  But the -- when you talk about the Paramount

11   distribution expenses, then the issue is look at the contract,

12   they were certainly entitled to do it.  But then the issue is

13   what distribution expenses did they in fact incur that they

14   reduced.  What distribution expenses did they in fact expend

15   and deduct before they remitted the sums to Crusader.

16          MR. BERGMAN:  Move to strike everything after "I do"

17   as being nonresponsive.

18          THE COURT:  Right.  The question was simply do you

19   recall giving the testimony.

20          THE WITNESS:  Okay.  I recall giving the testimony.

21   Q.   BY MR. BERGMAN:  So am I correct, Mr. Halloran, that in

22   the Sahara agreement, anyone participating in a share of the

23   producer's gross is sharing in a pot that is considerably

24   smaller than the distributor's gross; correct?

25   A.   That's not necessarily correct.  Because you have to look

```
 1   at what reduced distribution fee was taken out by the
 2   distributor, what distribution expenses, if any, were taken
 3   out.  We know from the Lucas film deal, for example, that they
 4   put that up.  So if the contractual definition applied to a
 5   structure where the producer was putting up both producer
 6   and -- producer's gross and P and A, then that would be --
 7   there wouldn't be a deduction at the distributor level, and
 8   that wouldn't dilute the gross.
 9   Q.   Were you through, sir?
10   A.   Yeah, I'm finished.
11   Q.   With the exception of George Lucas and Stephen Spielberg,
12   does any producer put up the cost of financing the film and
13   the prints and advertising for the film?
14   A.   Yes.  Michael Bloomberg.
15   Q.   Who?
16   A.   Michael Bloomberg.
17   Q.   Michael Bloomberg?
18   A.   Michael Bloomberg.
19   Q.   Who is Mr. Bloomberg?  What films has he done?
20   A.   He did a picture called Focus that I worked on.
21   Q.   Focus?
22   A.   Yes.
23   Q.   When was that released?
24   A.   I believe in 2002.
25   Q.   And what was the budget of that film?
```

788

```
 1   A.   It was about $8 million, I believe.

 2   Q.   8?

 3   A.   Yes.

 4   Q.   So you wouldn't consider that a major studio film, would

 5   you?

 6   A.   It was released by Paramount.

 7   Q.   Was it released by Paramount, major Paramount, or by one

 8   of its independent film arms?

 9   A.   It was released by Paramount Classics.

10   Q.   And that's one of its subdivisions that deals with

11   independent films; correct?

12   A.   Predominantly, yes.

13   Q.   When you discussed the Sahara agreement, and you made

14   several references to it, Mr. Halloran, you didn't note that

15   there was in very substantial difference between it and the

16   film agreement, did you?

17   A.   Substantial difference between?

18   Q.   Producer's gross and distributor's gross.

19   A.   I don't think I necessarily distinguished them in my

20   report.

21   Q.   In fact, in your report you would refer to Sahara and the

22   percentage that Sahara got of gross as demonstrating the

23   inadequacy of the percentage of gross that DC received under

24   the Superman agreement, didn't you?

25   A.   That's true.  It's a number that's double, and in
```

```
 1    addition --

 2              THE COURT:  It's double what?

 3              THE WITNESS:  5 percent of the Superman, 10 percent

 4    under Sahara.  And, as we've discussed, even with the

 5    reductions that might be made on the domestic side in

 6    distribution fees and P and A, the aggregate producer's gross

 7    worldwide could exceed distributor's gross.  So it could be

 8    even better.

 9    Q.   BY MR. BERGMAN:  How could the producer's gross possibly

10    exceed the distributor's gross?

11              THE COURT:  In what movie?

12              MR. BERGMAN:  In any movie.

13              THE WITNESS:  Again, if you're looking at --

14              THE COURT:  Counsel, your question is inviting the

15    same answer that was given before.  You're excluding movies in

16    which the producer is in fact essentially --

17              MR. BERGMAN:  I'm excluding movies made by Mr. Lucas

18    and Mr. Spielberg and --

19              THE COURT:  And Mr. Bloomberg.

20              THE WITNESS:  That fellow, Mr. Bloomberg, is the

21    Mayor of New York.

22              MR. BERGMAN:  I'm not denigrating him, sir.  I just

23    didn't know what film he had produced.

24              THE WITNESS:  Okay.

25    Q.   BY MR. BERGMAN:  So your answer to the question is what?
```

1    A.   The answer to the question is that 10 percent of

2    producer's gross can sometimes exceed 10 percent of

3    distributor's gross.

4    Q.   Okay.  Would you give me an example of how that could

5    possibly happen?

6    A.   It could happen in a situation where the gross receipts

7    received by the producer -- the percentage applies to a pool

8    of money; correct?  That's the definition of gross.  So if

9    that definition of -- if the producer receives more in gross

10   than the distributor credits to gross under the defined

11   definition, then the 10 percent of producer's gross would

12   exceed -- it would exceed 10 percent of distributor's gross

13   and in some situations it certainly could exceed 5 percent of

14   distributor's gross, which is half of 10 percent.

15   Q.   A distributor always deducts a distribution fee, does it

16   not?

17   A.   No, not with respect to gross receipts.  One of the

18   essences of first dollar gross is there is no distribution fee

19   that's taken.

20   Q.   If a distributor in France distributes a film, does he

21   take a distribution fee before he remits it to the U.S.

22   distributor?

23   A.   Not necessarily.  Typically when you sell a motion

24   picture territory by territory, you get an advance amount, and

25   there's no fee taken out of that.  It's a flat amount.  And

1    that's the amount that's put into gross.  The distribution fee

2    only applies to future revenues that are calculated under a

3    definition that exceed the amount of the advance.

4            So typically on the foreign side, what goes into

5    gross are the flat payments that are made by the foreign

6    distributors.

7            Now, if you're dealing with a gross definition for a

8    studio, the studio distributes in most major territories.  So

9    the amount of gross under a studio definition is the amount

10   received by that distributor.

11   Q.   Would you name a major studio film in which producer's

12   gross has been greater than distributor's gross?

13   A.   Sure.  Comparing apples and oranges.  Major studios don't

14   give percentages of producer's gross.  They give percentages

15   based on distributor's gross.

16   Q.   When a studio agrees with a producer, just as Paramount

17   agreed with the producer of Sahara, to distribute a film,

18   Sahara, doesn't it always provide for a distribution fee?

19   A.   Yes.

20   Q.   And isn't that distribution fee always taken out of the

21   money that is remitted to the producer?

22   A.   It is a deduction.

23   Q.   Invariably a deduction?

24   A.   It is a deduction invariably.

25   Q.   And to the extent that the distributor has incurred

1    prints and advertising, he deducts that amount from what he

2    remits to the producer, does he not?

3    A.    If in fact he has incurred it and the producer or Lucas

4    or Spielberg hasn't paid for it, it is deducted.

5    Q.    I'm assuming that when a distributor charges a producer

6    for prints and advertising, that the distributor has in fact

7    incurred those costs.  If that is in fact the situation, those

8    costs are deducted before the producer's gross, are they not?

9    A.    They are deducted before the amount which is credited to

10   producer's gross goes into producer's gross.  But again, the

11   producer's gross, you have to look at the whole world.

12   Q.    So in that situation, how could a producer's gross on a

13   picture that the producer financed and an American distributor

14   distributed in the U.S., and you are suggesting that there are

15   foreign distributors that distribute to foreign?

16   A.    Yes.

17   Q.    Under those circumstances, how could producer's gross

18   conceivably be greater than distributor's gross?

19   A.    It can exceed.

20   Q.    It can exceed?

21   A.    Yes, yes, it can exceed.

22   Q.    Under what circumstances?

23   A.    I did sketch out some numbers on Sahara.  Assuming that

24   Anschutz put up the P and A and there was a hundred percent

25   home video, and that number exceeded 10 percent.  And

1   certainly even if, assuming that Paramount put up some P and

2   A, potentially that could be a greater amount.  With that

3   being said, we have to keep in mind that Sahara, that number

4   is 10 percent, which is twice the amount than under the

5   Superman agreement.

6   Q.   Yes, sir, I understand that.  And as far as Sahara goes,

7   you testified at the Sahara trial that Paramount advanced the

8   prints and advertising, didn't you?

9   A.   No, I did not.  You have to separate what the contract

10  says and what happened in contract.  I knew that the Paramount

11  contract provided they took a distribution fee and they took

12  the distribution expenses to the extent they put them up.  So

13  I was looking at what the contract said, not what the actual

14  mechanics were.

15  Q.   Well, let's look at actualities, okay?  Didn't you

16  testify in the Sahara case that Paramount took a distribution

17  fee and distribution expenses before they remitted sums to

18  Crusader?

19  A.   Well, you left out line 23, which says so, for example,

20  under the Paramount deal.  So I was talking about what the

21  Paramount contract said.

22  Q.   Mr. Halloran, a producer enters into a contract with a

23  rights holder as in the Sahara case; correct?

24  A.   Okay.

25  Q.   Crusader entered into a contract with Cussler.

1    A.    Correct.

2    Q.    Crusader doesn't have distribution facilities, does it?

3    A.    No, I think it relies on third parties to distribute --

4    Q.    It relies on third parties.

5    A.    Yes.

6    Q.    And knowing that it's going to be relying on a third

7    party to distribute its picture, everybody knows, going into

8    the Cussler/Crusader agreement, that there is going to be a

9    distributor, don't they?

10    A.    Well, certainly when you enter a deal, you have to

11    understand the distribution structure of the company and where

12    in terms of the contractual definition of gross, where the

13    dollars are going to be measured from.  I can't testify as to

14    what Clive Cussler and his representatives knew about how

15    Cussler distributed pictures before they entered in the

16    agreement.

17    Q.    You can testify about your own experience in the

18    industry; correct?

19    A.    I can.

20    Q.    And had Mr. Cussler distributed pictures prior to

21    Sahara -- not Mr. Cussler.  I'm sorry.  Crusader distributed

22    pictures prior to Sahara?

23    A.    They were most well known for the Chronicles of Narnia

24    series.

25    Q.    And what studio distributed that film?

 1   A.   Well, again you have to distinguish the domestic from

 2   foreign.  I know it was a major studio.  I want to say

 3   Paramount, but I'm not a hundred percent sure.

 4   Q.   So let me repeat a question.  When a producer or when an

 5   author like Mr. Cussler makes a sale of his rights to a

 6   producer like Crusader that does not distribute films,

 7   everybody has the expectation, does it not, that Crusader will

 8   in turn retain distributors to distribute the film to

 9   theaters?

10   A.   That's usually true, yes.

11   Q.   And that expectation also includes the expectation that

12   the distributor will charge a distribution fee, does it not?

13   A.   Again, that's incorrect.  Because you have to separate

14   foreign and domestic.  Because it is traditional on the

15   domestic side, and Canada, for the distributor to take a

16   distribution fee and P and A to the extent that they put it up

17   per their contract.

18            But the very common structure, and it's a structure

19   that Marvel uses, used on Ironman, for example, is that they

20   presold the rights in specific territories.  And so under

21   the -- what Marvel did on Ironman, the amount of the moneys

22   paid by the foreign distributors, a hundred percent of that

23   would go into gross without a distribution fee and without the

24   deduction of prints and ads.

25   Q.   I see.  Well, in this case we're concerned with domestic

1    revenues.  You are advised of that.  You know that, don't you?

2    A.   We're concerned with both domestic and foreign revenues.

3    Q.   Have you had any discussion with Mr. Toberoff as to

4    whether the Siegels have any entitlement to participate in the

5    foreign revenues of Superman Returns?

6    A.   It's my understanding, based on reading the judge's

7    opinion, that he has made a determination that the Siegels'

8    termination is only with respect to the United States.

9    Q.   Okay.  When an author like Mr. Cussler makes an agreement

10   with a producer like Crusader for domestic distribution, does

11   it not assume that the domestic distributor will take a

12   distribution fee?

13           MR. TOBEROFF:  Vague and ambiguous and misstates the

14   record.  The agreement shows that the author did not make

15   agreement with Crusader for domestic distribution.  The Sahara

16   agreement does not show that.

17           THE COURT:  Counsel, your response?

18           MR. BERGMAN:  Your Honor, I'm attempting to convert

19   apples to apples.

20           THE COURT:  I understand that.  It's a foundational

21   argument suggesting that you don't have an apple.

22           MR. BERGMAN:  I'll try and make one.

23           THE COURT:  Very well.  Sustained.

24   Q.   BY MR. BERGMAN:  You are familiar, are you not,

25   Mr. Halloran, that this case and any recovery to be made by

1    the plaintiffs in this case applies to only domestic revenues;

2    correct?

3    A.    I think that's much too narrow.  What we're looking at is

4    contracts that apply to the world and looking to see whether

5    the agreements that DC entered into with the Warner affiliates

6    were for fair market value.  And, you know, there's no -- I

7    know it's difficult, but there are no domestic deals, separate

8    foreign deals.

9          So what I've looked at and what I've been giving my

10   opinions to are deals that cover the world.  Those are the

11   sort of deals that DC made with Warners.  Why are you

12   smirking?

13         THE COURT:  Let's stop.  I think it's probably best

14   to take a break for the day at this point.  And we'll resume

15   with this in the morning.  According to the Court's clock, we

16   have about 16 hours of testimony left.  About 5 hours for the

17   plaintiff, about 11 hours for the defense.  Assuming that we

18   can continue to get through five hours of testimony a day, we

19   have all day tomorrow, all day Friday, and all day Tuesday.

20         That should account for that time, which means we

21   could have closing arguments on Wednesday, which is what the

22   Court would prefer.  I have Ninth Circuit matters up in

23   San Francisco on Thursday and Friday.  So if we don't do that

24   on that Wednesday, it pushes it over.  And I've got to get

25   another trial started that week.

1          So that's the plan.  All day tomorrow, all day

2     Friday, all day Tuesday.  Closing arguments on Wednesday.

3          What the Court is going to be planning to do is

4     devoting all of its spare time between now and then, most

5     notably this weekend, to not only working up a resolution in

6     this trial, as the evidence is coming in, but also finish up

7     my order on the outstanding issues that the Court has under

8     submission so that we can on Wednesday -- the Court can give

9     the parties a pretty definitive understanding of what is left

10    for the accounting trial.

11          MR. BERGMAN:  Thank you, your Honor.  Is this

12    witness, Mr. Halloran, going to be plaintiffs' last witness?

13    Are there more witnesses?

14          THE COURT:  I don't think so.  The plaintiff has a

15    good five hours left.  I suspect they will want to reserve

16    some time to cross-examine your witnesses.  So that's up to

17    the plaintiff.  They have a few more witnesses on their

18    witness list.

19          Mr. Toberoff, are you planning to call any

20    additional witnesses?

21          MR. TOBEROFF:  I'd like to reserve that ability.

22    We're --

23          THE COURT:  Well, if you're planning to call another

24    witness tomorrow, you need to let Mr. Bergman know now.

25          MR. TOBEROFF:  First, I would do redirect, and after

 1   that, if I plan to call --

 2          THE COURT:  Let me make it clear.  Let me know now,

 3   who is your next witness, Counsel?

 4          MR. TOBEROFF:  We may be calling Mr. Sills.

 5          THE COURT:  That's the same person we identified

 6   last week.  So be prepared for Mr. Sills.

 7          You are not obligated to call him.  I just want to

 8   make sure we're not left in a situation where the other side

 9   is saying we weren't prepared for him.

10          MR. PERKINS:  Your Honor, one housekeeping matter.

11   The subpoenaed witness --

12          THE COURT:  Oh, yes.  That ex parte application.

13   I've considered that, and I've considered the opposition to

14   it.  Is that the one you're referring to?

15          MR. PERKINS:  It wasn't, actually.

16          THE COURT:  Well, let me deal with that first.  I'm

17   going to deny the motion in limine; however, the subpoenaed

18   documents could only be used for the purposes of refreshing

19   recollection and proper rebuttal.  For no other purpose.

20          Refreshing recollection, obviously the evidence is

21   not coming in.  Rebuttal, it might depend upon whether or not

22   you can lay a foundation for proper rebuttal.  But I'm not

23   going to exclude it as improper discovery because the cases

24   that you cite, I've taken a look at them, and I think they

25   stand for the proposition.

1          But for refreshing recollection, that's something

2     which the courts pretty consistently seem to allow in.  But

3     the evidence will be the refreshed recollection, not the

4     documents themselves.

5          MR. PERKINS:  Thank you, your Honor.

6          THE COURT:  Understood?

7          MR. TOBEROFF:  Yes, your Honor.

8          THE COURT:  Very well.  There's another subpoenaed

9     witness.

10          MR. PERKINS:  Yes, your Honor.  You'll recall that

11     the plaintiffs had tendered the declaration to authenticate

12     three agreements.

13          THE COURT:  Yes, and you subpoenaed --

14          MR. PERKINS:  He is available to come in tomorrow

15     morning at 9:30, and we were hoping to be able to take him out

16     of order, to put him on the stand and send him on his way.  We

17     think it will take 15 or 20 minutes.

18          THE COURT:  That sounds reasonable.  Very well.

19     We'll start with that at 9:30, and then we'll resume with

20     Mr. Halloran's marathon examination.

21          Very well.  See you in the morning.

22

23          (Proceedings concluded at 4:54 P.M.)

24

25

1

2

3

4

5

6

7                        **C E R T I F I C A T E**

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14               Certified on May 6, 2009.

15

16

17                    _____
                      **MARK SCHWEITZER, CSR, RPR, CRR**
                      Official Court Reporter
18                    License No. 10514

19

20

21

22

23

24

25