1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4       **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                        ---

6    JOANNE SIEGEL, etc.,          :  PAGES  881 - 972
                                   :
7              PLAINTIFF,          :
                                   :
8       VS.                        :  NO. CV 0408400-SGL(RZx)
                                   :
9    WARNER BROTHERS               :
     ENTERTAINMENT, INC., etc.,    :
10                                 :
               DEFENDANT.          :
11   _____:

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              COURT TRIAL - DAY 7

16              RIVERSIDE, CALIFORNIA

17              THURSDAY, MAY 7, 2009

18              AFTERNOON SESSION

19

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

1   **Appearances of Counsel:**

2

3   For the Plaintiff:

4        TOBEROFF AND ASSOCIATES
         By Marc Toberoff, Esq.
5            Nicholas Williamson, Esq.
             Keith Adams, Esq.
6        2049 Century Park East
         Suite 2720
7        Los Angeles, CA 90067
         (310) 246-3333
8

9

10  For the Defendant:

11       BERGMAN COLEMAN GRODIN & EVALL, LLP
         By Michael Bergman, Esq.
12           Anjani Mandavia, Esq.
         9665 Wilshire Boulevard
13       Ninth Floor
         Beverly Hills, CA 90212
14       (310) 860-3346

15           -and-

16       LAW OFFICES OF PATRICK T. PERKINS
         By Patrick T. Perkins, Esq.
17       1711 Route 90
         Cold Spring, NY 10516
18       (845) 265-2820

19

20

21

22

23

24

25

1                                    **I N D E X**

2

3    MARK EDWARD HALLORAN, PREVIOUSLY SWORN................... 884

4    CROSS-EXAMIATION (CONTINUED) BY MR. BERGMAN............. 884

5    REDIRECT EXAMINATION BY MR. TOBEROFF.................... 923

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

884

1        **Riverside, California; Thursday, May 7, 2009**

2                        **1:51 P.M.**

3            THE COURT:  Okay, Counsel.  You may proceed.

4            MR. BERGMAN:  Thank you, your Honor.

5            **MARK EDWARD HALLORAN, PREVIOUSLY SWORN.**

6                **CROSS-EXAMINATION (CONTINUED)**

7    BY MR. BERGMAN:

8    Q.   Mr. Halloran, going back, if I may, to the question of

9    the performance of the four Superman films that were

10   distributed between 1978 and 1987.

11           Do you recall, sir, that after we had reviewed that

12   performance at your deposition, you suggested that the poor

13   performance of those films might have made the rights even

14   more valuable in 2002?

15   A.   If I could look at the deposition transcript, that was

16   quite helpful last time.  When you repeat things to me out of

17   context, it makes it difficult for me to give the best answer

18   I can give.

19   Q.   So what is it you would like to do?  Would you like to

20   look at your deposition?

21   A.   Just as we did with -- made it clear what I was talking

22   about with Ironman, if I could see the deposition transcript,

23   it would be helpful.

24   Q.   Well, perhaps I can abbreviate that because time is

25   awasting.

1              Do you recall being asked this question -- these

2    questions and giving these answers at page 210 of your

3    deposition, commencing at line 1?

4    A.    Okay.  I'm with you.

5    Q.    (Reading.)

6              "QUESTION:  Is it your opinion that in 2002, the

7         Superman character had greater potential and greater

8         value, economic value, for a studio in 2002 than the

9         Batman character?"

10             And, your Honor, I'm going to skip objections.

11   Shall I do that?

12             THE COURT:  You may.

13             THE WITNESS:  I think I testified to that.

14             MR. BERGMAN:  (Reading.)

15             "QUESTION:  You put your money on Batman; right?

16             "ANSWER:  No."

17             THE WITNESS:  Just the opposite.

18             MR. BERGMAN:  (Reading.)

19             "QUESTION:  You put your money on Superman?

20             "ANSWER:  I put my money on Superman.

21             "QUESTION:  Even though the four pictures before it

22        had basically tanked?

23             "ANSWER:  Well, one way of looking at the tanking of

24        those pictures" --

25             THE WITNESS:  I think there's a correction to

1    Superman 4 in what I have.

2  Q.    BY MR. BERGMAN:  Okay.  You mean that after you gave your

3  deposition, you made a correction and struck those pictures

4  and inserted Superman 4?

5  A.    Yes.

6  Q.    Okay.  So let me go back to the question and your answer:

7          "Even though the four pictures before it had

8          basically tanked?"

9          "THE WITNESS:  Well, one way of looking at the

10         tanking of Superman 4 was that was good as of 2002

11         because the appetite in the marketplace for the Superman

12         films wasn't diminished that much or gobbled that --

13         gobbled up that much."

14         Do you recall giving that answer, sir?

15 A.    Yes.

16 Q.    Turning to the film Hannibal.  Hannibal was the sequel to

17 the Silence of the Lambs, was it not?

18 A.    It was.

19 Q.    And that film, Silence of the Lambs, was an extremely

20 successful film, wasn't it?

21 A.    It wasn't an extraordinarily financially successful film,

22 but it won an Oscar as a very critically acclaimed film.  And

23 the character Hannibal Lecter was well known.

24 Q.    What do you estimate was the worldwide gross box office

25 of Silence of the Lambs?

1    A.    I don't know exactly.  But in terms of box office, my

2    guess would be 150 to 200 range.  That's just very rough.

3    Q.    Okay.  Now, the starring role of Hannibal Lecter was

4    played by Anthony Hopkins, was it not?

5    A.    Indeed it was, for which he won an Oscar.

6    Q.    Pardon me, sir?

7    A.    For which he won an Oscar.

8    Q.    Did the film Silence of the Lambs win any other Oscars?

9    A.    Yes.

10   Q.    Which ones did it win?

11   A.    I know it won best picture.  Anthony Hopkins won best

12   supporting actor.  Jody Foster won best actress.  I forget the

13   name of the director.  He won an Oscar, had won multiple

14   Oscars.  Jonathan Demme was the director.

15   Q.    And Jody Foster won the Academy Award as best actress,

16   not supporting actress?

17   A.    That is correct.

18   Q.    So Silence of the Lambs, the prequel to Hannibal, swept

19   all five of the most important Academy Awards, didn't it?

20   A.    Well, most people think of the Academy Awards as --

21   there's really six.  It's picture, director, and the four

22   acting.  That's how most people think of it.

23   Q.    Let's do it this way.  It won best picture?

24   A.    It did.

25   Q.    It won best actor?  Mr. Hopkins won actor?

1    A.    Was it actor or supporting actor?

2    Q.    Actor.

3    A.    Okay.

4    Q.    And Ms. Foster won best actress?

5    A.    Correct.

6    Q.    Jonathan Demme won best director?

7    A.    Yes.

8    Q.    And a gentleman whose name I forget won best adaptation

9    of a screenplay; correct?

10    A.    That is probably true.

11    Q.    Now, following Silence of the Lambs, the character

12    Hannibal Lecter had built up great public awareness, hadn't

13    he?

14    A.    I think you're missing part of the -- Hannibal Lecter was

15    originally the Red Dragon, not Silence of the Lambs.

16            MR. BERGMAN:  Your Honor, I move to strike as being

17    nonresponsive.

18            THE COURT:  I know you're trying to be helpful, but

19    it's an adversarial process that we've had for now.  And we

20    just have to go with it.

21            It's stricken, Counsel.

22    Q.    BY MR. BERGMAN:  Following Silence of the Lambs, the

23    release of that picture, the character of Hannibal Lecter

24    gained great public awareness?

25    A.    I think that's fair to say.

1    Q.    He was spoofed on television and caricatured in

2    magazines; correct?

3    A.    I remember him being caricatured on the Academy Awards by

4    Billy Crystal.

5    Q.    How did Hannibal the motion picture perform on its

6    opening weekend?

7    A.    I think it did pretty well.

8    Q.    As a matter of fact, didn't it do sensationally?

9    A.    It did very well.  But then it tailed off, as I recall,

10   relatively quickly.

11   Q.    Do you agree that Hannibal was, as of the time that it

12   opened, that the film had the third biggest opening weekend of

13   all time at the time it opened?

14   A.    I don't have that specific recollection.  It wouldn't

15   shock me if that were true.

16   Q.    Would it surprise you if it came in third after Jurassic

17   Park, Star Wars, and then Hannibal?

18   A.    At the time that would not shock me, but you have to look

19   at that in the context that it had a very -- I saw the movie.

20   It was not a great movie.  It had a pretty quick drop-off.

21          MR. BERGMAN:  Move to strike everything after

22   "shocked me," your Honor.

23          THE COURT:  Stricken.

24   Q.    BY MR. BERGMAN:  To go back to something that we

25   discussed a little earlier, Mr. Halloran.  We were talking

1    about the fair market value that you had attributed or said

2    you would attribute in 2002 to the Superman rights during your

3    deposition, and you spoke about a $3 million annual option, a

4    $30 million purchase price, and a percentage of gross

5    somewhere between 10 and 20 percent; correct?

6    A.   We have to, again, as I discussed, you have to put this

7    in context.  If someone was going to do a Terminator type

8    agreement where they would buy the right for multiple

9    pictures, then a $3 million option and a $30 million purchase

10   price would be appropriate.  That's not on a per picture

11   basis.  That was on an aggregate, we're going to buy the

12   Superman character for film basis.

13            So you have to understand it in that context.

14            MR. BERGMAN:  Your Honor, I move to strike the

15   answer as being nonresponsive.

16            THE COURT:  Overruled.

17   Q.   BY MR. BERGMAN:  Have you ever encountered any agreement,

18   Mr. Halloran, that included $3 million for each annual option,

19   $30 million for a purchase price, and 10 to 20 percent of

20   first dollar gross?

21   A.   I've not seen a Superman agreement that I'm confident

22   would show that.  But I've not seen a -- again, you have to

23   put it in context.  Because the superheroes are controlled by

24   essentially two companies, Marvel and DC.  There are no third

25   party agreements that you would see.  But it is true that I

```
 1  haven't seen a $3 million option and a $30 million purchase

 2  price.

 3  Q.   Have you seen any agreement which contained all three of

 4  those elements?

 5  A.   No, I have not.

 6  Q.   Who are the characters in Birds of Prey?

 7  A.   The characters in Birds of Prey are characters that DC

 8  owns.  I don't know -- quite frankly, I don't know exactly who

 9  they are.  I believe one's a female and somehow distantly

10  related to Batman.

11  Q.   Are you aware that one of the Warner Brothers by the name

12  of Huntress, H-U-N-T-R-E-S-S, is Batman's daughter?

13  A.   That is consistent with what I stated.  I'm not

14  specifically aware of that.

15  Q.   And are you familiar with the fact that one of the other

16  leading characters by the name of Oracle was formerly named

17  Batgirl?

18  A.   I don't have a present awareness of that.

19  Q.   And are you aware of the fact that the character Huntress

20  was not merely the daughter of Batman.  She was the daughter

21  of Batman and Catwoman?

22  A.   I'm not aware of that.

23  Q.   Are you aware of any other Batman characters that are

24  included in the Birds of Prey property?

25  A.   Not as I sit here, no.
```

```
1   Q.   Are you aware of the fact that the Joker is in the Birds
2   of Prey property?
3   A.   No, I'm not.
4   Q.   Are you aware of the fact that Alfred, Mr. Wayne's
5   butler, is in the Birds of Prey?
6           MR. TOBEROFF:  Objection.  I think there's confusion
7   and ambiguity as to what is meant by the Birds of Prey
8   property.  Is it a recurring character?
9           THE COURT:  Sustained.  Just clarify what you mean
10  by that, Counsel.
11  Q.   BY MR. BERGMAN:  You've referred throughout your
12  testimony to the Birds of Prey, haven't you?
13  A.   The Birds of Prey agreement, yes.
14  Q.   Yes.  And that's the one Birds of Prey agreement that you
15  read; correct?
16  A.   That is correct.
17  Q.   Okay.  And you understand from my questions that I'm
18  referring to the program reflected in the Birds of Prey
19  agreement that you read?
20  A.   I understand that.
21          MR. TOBEROFF:  Objection.  Misstates the Birds of
22  Prey agreement.
23          THE COURT:  It may misstate, Counsel, but the
24  witness understands what he's referring to, and it is set
25  forth on the record.
```

1            MR. TOBEROFF:  Very well.

2            THE COURT:  Next question, Counsel.

3            MR. BERGMAN:  May I approach the witness, your

4    Honor?

5            THE COURT:  You may.

6    Q.    BY MR. BERGMAN:  You've worked with Box Office Mojo in

7    connection with this case?

8    A.    I have.

9    Q.    I'm going to show you the Box Office Mojo list of the top

10   100 domestic grosses, and I'll have a question to ask you

11   about that.

12           Are there any Superman films -- whether it's one,

13   two, three, four, or five -- in this list of the top 100 films

14   of all time?

15   A.    I need to ask you one clarification.

16   Q.    Of course.

17   A.    The lifetime gross, this is nominal unadjusted for

18   inflation gross?

19   Q.    That is correct, sir.  These are unadjusted for gross.

20   A.    Unadjusted for inflation.

21   Q.    I believe when you testified on direct, you referred to

22   the films on an unadjusted gross, didn't you, when you talked

23   about the top 10 films of all time?

24   A.    We talked about, I think, the top ten weekends.  Let me

25   think about this.  Well, we've been dealing with both

894

1    unadjusted and adjusted.  So it's been back and forth.

2              THE COURT:  Gentlemen, your next question.  These

3    are unadjusted for inflation.  Let's go to the next question.

4              MR. BERGMAN:  May I approach the witness again?

5              THE COURT:  You may.

6    Q.   BY MR. BERGMAN:  I'm going to give you a similar report

7    from Box Office Mojo, which adjusts for the increase in box

8    office.

9              Looking, sir, at the --

10   A.   It would be helpful if I could have a pen.  Would someone

11   give me a pen?

12             Thank you.

13             MR. BERGMAN:  For the record, your Honor, the

14   unadjusted exhibit was -- has been marked as Exhibit 1122 for

15   identification.  The adjusted for ticket price inflation has

16   been marked 1123 for identification.

17             THE COURT:  Thank you.

18   Q.   BY MR. BERGMAN:  Looking, Mr. Halloran, to --

19   A.   I need to look at this.  Because I haven't seen this.

20   Q.   Go right ahead, sir.

21             Okay?  Do you notice, Mr. Halloran, first of all,

22   what the highest rated Superman movie is on the adjusted

23   domestic grosses worldwide?

24   A.   By rated, you mean that with the highest adjusted gross?

25   Q.   Which one, sir?

895

1    A.    You said rated.

2    Q.    Which Superman film, Mr. Halloran, stands highest on this

3    list of 100 top films?

4    A.    It appears that the highest one is Superman.

5    Q.    And what number is that, sir?

6    A.    Number 61, and it did, with an inflation adjusted basis,

7    $411 million.

8    Q.    Of course, with a similar adjustment, Gone with the Wind

9    did a billion and a half dollars; correct?

10   A.    That's true, because it was adjusted since 1939.  But

11   you're correct.

12   Q.    And Star Wars, which, of course, was only adjusted since

13   1977, am I correct?

14   A.    That is correct.

15   Q.    That shows almost $1.3 billion; right?

16   A.    That is correct.

17   Q.    In fact, sir, none of the top 10 films on the adjusted

18   ticket price exhibit were franchise films at the time they

19   were made, were they?

20   A.    I disagree.

21   Q.    Which film was a franchise picture at the time it was

22   made?

23   A.    How about Star Wars?

24   Q.    Well, how about it?  It was the first one, was it not?

25   A.    Well, I stand corrected.  It depends on your definition

896

1    of franchise.  If you're looking at something, if you look at

2    the overall performance as a franchise, it's a franchise.  But

3    you're right.  It was a franchise that was created based on

4    the success of the films.

5    Q.   Okay.  And then you have to go down at least to No. 12,

6    another Star Wars movie, The Empire Strikes Back, to see

7    another franchise film; correct?

8    A.   Your definition of franchise is it was based on a

9    preexisting property?

10   Q.   Yes, sir.

11   A.   Well, Gone with the Wind was based on a best-selling

12   book; right?

13   Q.   I understand that, sir, but Gone with the Wind was not a

14   franchise picture, was it?

15   A.   There was no such thing in 1939, I don't believe.

16   Q.   Okay.  Well --

17   A.   I'm unaware.

18   Q.   If one were describing Gone with the Wind in 1939, one

19   would not call it a franchise picture, would it?

20   A.   I don't have an opinion as to what people in 1939 would

21   be calling --

22          THE COURT:  Let's move along.  This is starting to

23   break down here.

24          MR. BERGMAN:  Very well, your Honor.  I'm going to

25   move all along to Mr. Halloran's Neopets agreement, which he

1    has referred to numerous times in his report and in his

2    testimony.

3              THE WITNESS:  What number is that?

4    Q.   BY MR. BERGMAN:  The Neopets agreement was admitted by

5    you -- admitted by Mr. Toberoff.  Perhaps he can tell us what

6    exhibit that was.

7              MR. TOBEROFF:  I believe it's 331.

8              THE WITNESS:  331.

9    Q.   BY MR. BERGMAN:  Now, Mr. Halloran, when you were

10   negotiating --

11   A.   Would you be so kind?  I don't have it in front of me.

12   Q.   Okay.  Let me know when you're ready, sir.

13   A.   It's not in this stack.  Do we have an exhibit number?

14             THE COURT:  331.

15             THE WITNESS:  331.

16   Q.   BY MR. BERGMAN:  Do you have it now, sir?

17             THE COURT:  You may proceed.

18   Q.   BY MR. BERGMAN:  Do you recall that, when you were

19   negotiating the Neopets deal with Warner Brothers, you were

20   attempting to find out the highest price that Warner had paid

21   anyone?

22   A.   The highest price that Warners had paid anyone for --

23   Q.   Did you, for example, ask anyone in business affairs at

24   Warner Brothers what was the highest price they had ever paid

25   for a motion picture?

1    A.    I know I had conversations with Warners' business affairs

2    when we discussed the highest contingent compensation that

3    they had given out and specifically referenced Superman.  But

4    I don't remember having a discussion, as I sit here, as to the

5    highest price they had paid.  Are you talking about the

6    purchase price or the contingent compensation?

7    Q.    Do you recall, sir, at the Sahara trial you were talking

8    about having found out that Harry Potter was obtained for a

9    low price in your opinion at Warner Brothers; correct?

10   A.    That is correct.

11   Q.    I'm now going to read you some testimony, sir, which

12   begins at page 4906 of that trial transcript.

13   A.    Again, if I could look at the transcript as we're going

14   along, it would help my answer.  I think I have it right here.

15   But if you want to give me a page number.  There's four

16   volumes.  Five volumes.

17          THE CLERK:  Where is it at?

18          MR. BERGMAN:  4906.  It would be in the last volume

19   of the trial.

20          THE WITNESS:  Got it.  Okay.  I'm with you.

21   Q.    BY MR. BERGMAN:  Do you recall being asked this question

22   and giving this answer, commencing at line 14 of that page:

23          "QUESTION:  And did they, meaning 'Warner Brothers,'

24      say how many books they got for that good price?  Did

25      they say they got all of the Harry Potter books both then

1      written and yet to be written?

2          "ANSWER:  No, we didn't have that discussion, but I

3      do remember that it was in the context of my -- when I

4      was representing Neopets and negotiating the underlying

5      rights to Warner Brothers, I was seeking to find the

6      highest price that Warner had paid.

7          "QUESTION:  Did you get that?

8          "ANSWER:  My understanding was that the highest

9      price they had paid was for Superman.  And it was based

10     on a percentage of the gross.  And then based on that,

11     I -- that was one of the things that influenced me to

12     pattern the Neopets deal after that deal, because that

13     was based on the success of the film, that was

14     potentially the highest amount that Warner Brothers had

15     ever paid."

16         Do you recall giving that answer to that question?

17  A.   Yes.

18  Q.   Okay.  Now, in the Neopets deal, you made a pitch to

19  Warner Brothers; correct?  You were the individual who was

20  trying to sell Neopets to Warner Brothers?

21  A.   I was that individual, yes.

22  Q.   Okay.  And in connection with that pitch that you were

23  making to Warner Brothers, you emphasized the attributes of

24  Neopets; correct?

25  A.   We had lengthy discussions as to the attributes of

1    Neopets.

2    Q.    And am I correct that at that time you represented to

3    Warner Brothers that the Neopets site had 70 million

4    registered accounts worldwide; correct?

5    A.    I have no present recollection of that.  Whatever

6    information I got as to how many registrations came from

7    Neopets.  My recollection is that those sort of

8    representations were not made by me, but rather were based on

9    discussions that Neopets was having with Warner Brothers.

10              I certainly don't have a recollection of

11   representing to them that they were 70 million users.

12   Although in assessing the popularity of Neopets, we did talk

13   about -- there were discussions about registered users.

14   Q.    Do you recall, sir, that you initiated the Neopets

15   discussions by sending a letter dated June 9, 2004, to Dan

16   Fury, senior vice-president of Warner Brothers?

17   A.    If you'd show me the document, I can verify the document.

18   Q.    I'll be glad to.

19              May I approach, your Honor?

20              THE COURT:  You may.

21              THE WITNESS:  Can I have a moment to review this?

22              THE COURT:  You may.

23              THE WITNESS:  There is a reference in paragraph 1.1

24   of the June 9, 2004, letter from me to Dan Fury, which states

25   Neopets is a youth-oriented Internet entertainment company

1    with over 70 million registered accounts in its website

2    worldwide.

3    Q.    BY MR. BERGMAN:    And wherever you got that representation

4    from, you passed it along to Warner Brothers -- correct? --

5    as part of the pitch?

6    A.    That information absolutely came from my client Neopets

7    and was given to me.

8    Q.    You wrote it in your letter?

9    A.    I wrote it in my letter based on what my client told me.

10   Q.    Did you believe it when you wrote it?

11   A.    I had no reason to disbelieve it.

12   Q.    Did you take any steps to ascertain it?

13   A.    Neopets was a company that was known for impeccable

14   integrity.    And everything they ever told me in the course of

15   my representation was absolutely accurate insofar as I knew.

16   I did not make an independent research as to whether this

17   statement was true.

18   Q.    Did you not say in paragraph 1.1, which is addressed to

19   Dear Dan, Dan Fury, quote, Neopets is a youth-oriented

20   Internet entertainment company with over 70 million registered

21   accounts to its website worldwide, unquote?

22          You said that; correct?

23   A.    I just read those exact words to you.    I'm not denying

24   that I said that.    It's here in black and white.

25   Q.    What is it you're denying you don't know?    You don't know

1    if you believed it?

2    A.    I'm not -- I will repeat to you what I told you before.

3    The -- I wrote this sentence based on information that was

4    given to me by my client Neopets, which, based on its general

5    reputation and my personal dealing with them, had impeccable

6    integrity as to the information that they provided regarding

7    their site.

8           They told me this, and, in fact, I'm highly

9    confident that they signed off on a draft of this before I

10   sent it to -- to Dan Fury.  I had no reason whatever to

11   believe that this statement was untrue.

12   Q.    Okay.  But you didn't see any evidence that it was true,

13   did you?

14   A.    I saw what to me was perfectly fine evidence, which was

15   that my client represented to me that this was true.  That was

16   more than enough for me.

17   Q.    Have you ever had a client misrepresent a fact to you?

18   A.    Unfortunately, I have.

19   Q.    Haven't we all.

20           THE COURT:  Present company excluded, of course.

21           MR. BERGMAN:  Indeed, your Honor.

22   Q.    Am I correct, Mr. Halloran, that in 2003, at the time you

23   negotiated the Neopets agreement, Neopets led all websites in

24   the amount of time, four hours and 47 minutes per month spent

25   on the site by the average user?

1    A.    Well, you just referenced 2003.

2    Q.    Yes, sir.

3    A.    And I know what you're talking about is called

4    stickiness.  It's a very important concept in the Internet.

5    Stickiness means when people go to your site, how long do they

6    stay?  That's very important in terms of looking at how

7    successful a site is.  It's called stickiness.

8    Q.    Okay.  And am I correct that from the period 2004 to

9    2006, Neopets was consistently rated as one of the top ten

10   stickiest sites on the Internet?

11   A.    I believe -- I don't have the exact numbers, but I

12   believe that Neopets was known for its stickiness, and it

13   would not surprise me at all that it was in the top ten.

14   Q.    And Neopets was one of those sites which applied appeal

15   primarily to children under 14; correct?

16   A.    I think that's a fair statement.

17   Q.    And it appealed primarily to young girls under 14; right?

18   A.    I think there were more girl than boy users.

19   Q.    And the film that you were proposing to Warner Brothers

20   at the time was designed to appeal to that particular

21   audience, wasn't it?

22   A.    It was.

23   Q.    And as you were negotiating the agreement with Mr. Fury

24   and others, you demonstrated to Warner Brothers, did you not,

25   how the growth of the Neopets site had increased exponentially

1    over the years almost in a 45 degree ascension; right?

2    A.    My recollection -- in general, you are correct.  At the

3    time I was negotiating this agreement with Warner Brothers,

4    the website had experienced exponential growth.

5    Q.    Okay.  So that when you were trying to sell Neopets to

6    Warner, you identified all of its strengths and notoriety in

7    an effort to gain the best deal you possibly could; correct?

8    A.    Indeed I did.

9    Q.    Okay.  However, in the report that you filed in this

10   case, Mr. Halloran, when you were attempting to denigrate the

11   fair market value of the film agreement by comparing it to

12   Neopets, you referred to Neopets as a, quote, virtually

13   unknown property, didn't you?

14   A.    If you'll show me where I said that.

15   Q.    I'll be glad to, sir.  I believe it's at page 8, second

16   line from the top over at the right-hand side of the margin.

17   A.    Page 8 of?

18   Q.    Page 8 of your report.

19   A.    Would someone show it to me?

20   Q.    I may be wrong.

21   A.    Well, I want to see it in the context.

22   Q.    I'll show it to you, sir.  I'm sorry, sir.  The page is

23   18, second line from the top over on the right-hand side?

24   A.    I don't have that in front of me.

25             MR. BERGMAN:  May I ask that this exhibit, which I

```
 1   believe, gentlemen, is exhibit what?  332.  May that be shown
 2   to the witness?
 3            THE COURT:  Yes.
 4   Q.   BY MR. BERGMAN:  The sentence begins at page 17.  You
 5   were talking about the contingent compensation, your opinion
 6   as to the contingent compensation on Superman Returns, and you
 7   say, quote, the amount is much too low when compared to deals
 8   for less valuable rights and is essentially the same as a
 9   client of mine received from Warner for a virtually unknown
10   property, Neopets, in 2004, end quote.
11            Do you recall making that statement?
12   A.   Yes.
13   Q.   Neopets was not a virtually unknown site in 2004, was it?
14   A.   Well, again, you have to read the whole sentence.  I was
15   putting it in the context of it's too low when it's compared
16   to deals for less valuable rights.  I think it's
17   uncontroverted that Superman was, in 2002, was way more well
18   known than Neopets.  Virtually unknown was in relation to
19   Superman.
20   Q.   Mr. Halloran, I read the whole sentence.  The whole
21   sentence begins at page 17.  Quote, the amount is much too low
22   when compared to deals for less valuable rights, and it is
23   essentially the same as a client of mine received from Warner
24   for a virtually unknown property, Neopets, in 2004, period.
25            Did you make that statement?
```

```
 1   A.    I made that statement, and I wrote that statement.  I'd
 2   like to tell you what I meant.
 3   Q.    You can tell that to Mr. Toberoff.
 4   A.    Okay.
 5   Q.    Before you entered into the deal with Warner Brothers for
 6   Neopets, how many different studios did you submit the Neopets
 7   deal to?
 8   A.    The Neopets deal was at Disney for a while.
 9   Q.    Was what?
10   A.    At Disney.  Disney.  Walt Disney.
11   Q.    And when was it submitted to Disney?
12   A.    I believe in -- well, prior to Warner Brothers.  I
13   believe in 2003 or so.
14   Q.    And what was the response at Disney?
15   A.    There were negotiations, and the terms were not
16   acceptable to my client.  So we walked away.
17   Q.    The terms were lower than the terms offered by Warner
18   Brothers?
19   A.    I believe they were.
20   Q.    Now, the Neopets picture was an animated picture, was it
21   not?
22   A.    Well, so far, we don't have a Neopets picture.  But it
23   was intended to be an animated picture, yes.
24   Q.    The contract refers to it as an animated picture, does it
25   not?
```

1    A.    It does.  Well, you're using the singular.  It was

2    anticipated that there would be animated pictures based on the

3    website.

4    Q.    The budget that was originally set for the Neopets film

5    was $40 million; correct?

6    A.    That's incorrect.  As I recall -- let me look at it.

7    Q.    What was the minimum budget under the Neopets --

8    A.    The devil is in the details.  The minimum was at 40-.  It

9    wasn't set at 40-.  It could have been a lot more.

10   Q.    Now, you set the minimum budget that you wanted, did you

11   not?

12   A.    Pardon?

13   Q.    It was you on behalf of Neopets that established the

14   $40 million minimum budget, was it not?

15   A.    That was an important part of the agreement to my client,

16   and in the negotiations, we mutually agreed to that budget

17   amount with Warner Brothers.

18   Q.    Why was it important to your client that it have a

19   minimum budget of $40 million?

20   A.    We wanted to make sure that this animation picture would

21   be of very high quality, and it was especially important to

22   us, given that we had the right to co-finance the picture,

23   that it be a studio level picture that would potentially

24   become a successful film.

25   Q.    Okay.  Now, $a 40 million budget is a very low budget in

```
 1   2004 for a major motion picture, is it not?
 2   A.   Well, this was for an animated motion picture.  So it
 3   was -- what we were trying to do with Warner Brothers was to
 4   join forces and make relatively modestly budgeted animated
 5   pictures, not Pixar $200 million pictures, but we certainly
 6   didn't want to make low quality pictures.  That's certainly
 7   not the business that Warners is in.
 8              MR. BERGMAN:  Your Honor, I move to strike
 9   everything after the word "picture."  Well, this was for --
10              THE COURT:  It is stricken.  It was a yes or no
11   question.
12   Q.   BY MR. BERGMAN:  Now, wasn't the average studio negative
13   cost as of 2004 approximately 75- or $80 million?
14   A.   No.
15   Q.   What was it in 2004, the afternoon MPAA budget?
16   A.   2004.  In the range of 60 to 70, I believe.  That's my
17   best estimate.  So --
18   Q.   Could have been 80; right?
19   A.   I think that's highly unlikely.
20   Q.   Now, following the agreement that you made with Warner
21   Brothers on Neopets, that agreement was amended, wasn't it?
22   A.   I'm unaware that it was amended.
23   Q.   You produced the Neopets agreement, didn't you?
24   A.   I did, but I didn't produce an amendment.  I didn't
25   negotiate an amendment that I remember.
```

1    Q.   I'm sorry, sir.

2    A.   I don't remember negotiating an amendment to this

3    agreement.

4    Q.   Were you still representing Neopets when it amended the

5    Neopets agreement?

6    A.   I was not -- Neopets was sold to Viacom.  And after that

7    time, I did not represent them.

8    Q.   I see.  So you're not aware that the Neopets budget was

9    ultimately reduced $28 million, are you?

10   A.   I'm absolutely unaware of that.

11   Q.   Okay.  Am I correct that the Neopets agreement that you

12   negotiated required your client to finance half of the

13   development costs of the film?

14   A.   That is accurate.

15   Q.   Okay.  And am I correct that --

16   A.   To a cap.

17   Q.   Am I correct that the Neopets agreement that you

18   negotiated did not contain an option fee?

19   A.   That is correct.  But it had a reversion.

20        MR. BERGMAN:  Your Honor, I move to strike

21   everything after --

22        THE COURT:  It's stricken.

23   Q.   BY MR. BERGMAN:  Ultimately, Warner Brothers passed on

24   the picture, did it not?

25   A.   I don't know the status.  I know that the picture went

1    into development, and I don't know what happened after that

2    because I ceased representation of Neopets when they were

3    acquired by Viacom.

4    Q.    Am I correct, Mr. Halloran, that the -- that your client

5    did not earn a dollar from the Neopets agreement you

6    negotiated?

7    A.    I have no knowledge of what they made -- have made from

8    the agreement.

9    Q.    Under the contract, what would they have made had the

10   exercise price not been executed?

11   A.    They wouldn't have made any money.

12   Q.    And the exercise price was not executed, was it?

13   A.    I have no knowledge whether or not Neopets was paid the

14   million dollar purchase price.

15   Q.    Okay.  And if Neopets was not paid the exercise price,

16   would it be accurate to say that they did not earn a dollar

17   under the contract?

18   A.    That would be accurate.

19   Q.    And would it also be accurate to say that in addition to

20   not earning any money, they had to pay a portion of the

21   development cost?

22   A.    That's accurate.

23   Q.    And am I correct that as a result of the Neopets

24   agreement, the rights to Neopets were tied up for

25   approximately three years?

```
 1  A.   By -- what rights are you talking about?  I'm talking
 2  about --
 3  Q.   I'm sorry?
 4  A.   A lot of rights were reserved.  There were limited rights
 5  and many reserved rights.  So you have to parse out the two.
 6  Q.   Mr. Halloran, putting aside the reserved rights, looking
 7  to the rights that were purportedly granted by Neopets to
 8  Warner Brothers, am I correct that your client did not earn
 9  anything from those rights?
10  A.   Well, the rights were not granted to Warners because the
11  option was never exercised.  The only right that Warner's had
12  was to develop a picture for a period of time, and if they
13  didn't make that picture, it went back to Neopets.
14  Q.   Right.  And those rights were held for three years by
15  Warner Brothers, were they not?
16  A.   Let me look.  You can't tell on the face of the document.
17  There is an initial period of 12 months, and Warner Brothers
18  could only extend if they in fact received a first draft
19  screenplay of the picture.  We wanted to make sure that they
20  would not sit on the rights.  So it was an initial 12 months.
21  But then, if they didn't move and have a screenplay written
22  based on the property, then there was no transfer of rights.
23        So I can't say on the face of this -- on the face of
24  the document, the option lasted 12 months.
25  Q.   Do you recall that a screenplay was in fact written for
```

1    Neopets?

2    A.    I wasn't -- I was involved in the deal and not in the

3    development.  My last recollection is that the parties were

4    working together to mutually approve a writer to write the

5    screenplay.  But beyond that, I sort of lost touch with the

6    Neopets development at Warner.

7    Q.    Does that mean, sir, that your services were terminated

8    by Neopets?

9    A.    My services were never terminated by Neopets.  The

10   company was sold to Viacom.

11   Q.    Am I correct, sir, that your rights in connection with

12   Neopets were terminated by Viacom?

13              MR. TOBEROFF:  Objection.

14              THE WITNESS:  I'm sorry.  I have to laugh.

15              THE COURT:  Counsel.

16              MR. TOBEROFF:  Objection.  The question is vague and

17   ambiguous.  He asked whether his rights in connection with

18   Neopets were terminated.

19              MR. BERGMAN:  That's correct, your Honor.  I

20   misspoke.  May I rephrase?

21              THE COURT:  Please rephrase.

22   Q.    BY MR. BERGMAN:  Am I correct that your services in

23   connection with Neopets were terminated by Viacom?

24   A.    You are absolutely incorrect.

25   Q.    How did your services terminate?

```
 1   A.   Well, to this day I represent the principals of Neopets
 2   at the time.  Specifically, Doug Dohring, D-O-H-R-I-N-G.  Doug
 3   sold the company, I believe, in 2005, 2006 and formed a
 4   company called the Dohring Company, and I currently represent
 5   the Dohring Company, and I've continued my relationship with
 6   him.
 7           There's never been a hint that I -- that he would
 8   terminate my services.  The company -- he sold the company in
 9   2005 to Viacom.  I've not had one discussion with Viacom as to
10   either this agreement or the development of the project or my
11   projects being terminated.
12           So I think -- I'm sorry if I feel insulted by the
13   inference which I think you're trying to draw that somehow I
14   was fired because I screwed this up.
15   Q.   No, that certainly was not my inference --
16   A.   I --
17           THE COURT:  Next question.
18   Q.   BY MR. BERGMAN:  Have you rendered any services in
19   connection with an attempt to sell motion picture rights to
20   Neopets at any time since Viacom took the rights over?
21   A.   No.
22   Q.   Okay.  Now, in the Sahara case, Mr. Halloran, am I
23   correct that one of the expert opinions that you rendered was
24   that poor performance of the film Sahara, which was based on
25   one of the so-called Dirk Pitt novels, for which there were 17
```

 1    other Dirk Pitt novels, you expressed the opinion that before

 2    Sahara was exhibited on the screen, the rights were worth

 3    $30 million.  And that once Sahara was released, the rights

 4    became worthless; is that correct?

 5    A.   I do -- well, again, if you would show me the testimony,

 6    I'd be happy to --

 7    Q.   Don't you recall that testimony, sir?

 8    A.   Again, there's been a pattern of you misstating things

 9    and me not being able to look at my testimony.  And I don't

10    want to give an opinion that might be misleading.

11         So I would beg your forbearance, and I'd like to

12    look at the testimony that you are reading to me.

13    Q.   I'll be glad to show that to you.  But am I correct that

14    you were cross-examined on that specific opinion for three

15    trial days?

16    A.   I may well have been.

17    Q.   And that you kept maintaining the position throughout

18    three days of testimony, which I'm not going to read, that the

19    performance of the Sahara film rendered the rights in the

20    remaining 17 films in the franchise, in your words, quote,

21    worthless, quote, zero?  Do you recall that?

22         MR. TOBEROFF:  Objection to the question.  Vague and

23    ambiguous as to remaining 17 films in the franchise.

24         Are you referring to the novels?

25         THE COURT:  Do you understand the question?

1           THE WITNESS:  In general I understand.

2           THE COURT:  Then answer the question as best you

3    can.

4           THE WITNESS:  I will do it as best I can.

5    Q.   BY MR. BERGMAN:  Let me read you some questions and

6    answers and see if it refreshes your recollection.

7    A.   Okay.  That would be useful.  Again, I have the

8    transcript here --

9           THE COURT:  He's going to read the questions.

10          THE WITNESS:  Well, can I read along with him?

11          MR. BERGMAN:  Yes, sir, you can.

12          THE WITNESS:  Okay.  What pages?

13          MR. BERGMAN:  I'm going to be reading from page

14   4527, which is a portion of the trial testimony you gave on

15   March 14, 2007.

16          THE WITNESS:  Okay.  Which volume is this in?

17          MR. BERGMAN:  It is from the March 14 session.  It

18   looks like it is the second to last of your appearances.  But

19   each page is marked, sir.

20          THE WITNESS:  Okay.  4527.  Okay.  I'm with you.

21   Q.   BY MR. BERGMAN:  Let's look at 4527, lines 7 through 24.

22   And this is Bert Fields, who was the attorney who represented

23   you, asking you --

24   A.   Well, he didn't represent me.  He retained me.

25   Q.   Retained you.  Asking you on direct examination the

1    following question:

2            "QUESTION:  As of September 2nd of 2003, what in

3        your opinion was the market value of the film rights of

4        Cussler's book?

5            "ANSWER:  $30 million.

6            "QUESTION:  Would you explain how you get that?

7            "ANSWER:  Yeah.  Basically a film author in selling

8        his motion picture rights typically gets an up-front cash

9        fee.

10           "QUESTION:  Uh-huh.

11           "ANSWER:  And then some contingent compensation.

12           "QUESTION:  Before we get into your methodology --

13           "ANSWER:  Uh-huh.

14           "QUESTION:  What is the value of those same film

15       rights today as a result of the financial failure of

16       Sahara?

17           "ANSWER:  Unfortunately, it is zero.

18           "QUESTION:  You could not get anything for them?

19           "ANSWER:  Nothing."

20           Do you recall giving that answer to that question?

21   A.   I not only recall it, I think it is absolutely accurate

22   as I sit here.

23   Q.   So it's your testimony, sir, that one disastrous film

24   ruined an 18-book franchise?

25   A.   There were two disastrous films.  Sahara was not the

```
 1   first Dirk Pitt movie.  There were two disastrous films, and

 2   the consensus as of the debacle of Sahara is that Dirk Pitt,

 3   after two disasters, was completely dead and had no future

 4   value.  And I believe that's true right now.  I would

 5   wonder -- I would be shocked if any studio would offer a

 6   nickel for a Dirk Pitt -- for a Clive Cussler novel right now.

 7   And certainly since this case, I'm unaware that any studio has

 8   bid a nickel for the right to make a Dirk Pitt movie.

 9           What I also testified was that -- well, okay.  I

10   wanted to again put this in context.

11           MR. BERGMAN:  Your Honor, I move to strike as

12   nonresponsive.

13           THE WITNESS:  Okay.

14           THE COURT:  The portion --

15           THE WITNESS:  You know, it's a --

16           THE COURT:  Please, I can do this.  I don't know

17   where to begin at.  What were the two movies?

18           THE WITNESS:  The first one was called Raise the

19   Titanic.  It was a bomb --

20           THE COURT:  What was the first one?

21           THE WITNESS:  Raise the Titanic.

22   Q.  BY MR. BERGMAN:  Now, Raise the Titanic had been produced

23   many years before, hadn't it?

24   A.  It had, yes.

25   Q.  And it was a relatively low budget picture?
```

1    A.    I believe it was.

2    Q.    Okay.  And it was -- performed badly; correct?

3    A.    It did perform badly because the -- in Clive Cussler's

4    mind, he did not have creative control over the picture, and

5    it was not true to his book.

6    Q.    And, in fact, Mr. Cussler, because of the performance of

7    that earlier film, refused to sell any of his books for film

8    purposes for many, many years after that; correct?

9    A.    I think that is correct.

10   Q.    But when you were testifying to Bert Fields on direct --

11   A.    To Bert Fields?  Oh, okay.  I'm sorry.

12   Q.    In response to Mr. Fields, to support his position, you

13   didn't refer to Raise the Titanic, did you?  You didn't refer

14   to Raise the Titanic until a hundred or so pages later, when

15   Mr. Putnam was cross-examining you; correct?

16   A.    I'd have to go back and go through.  I mean, I testified

17   for six days as evidenced by this.  And I can't tell exactly

18   what -- where in the transcript or the trial I talked about

19   Raise the Titanic.

20   Q.    Let me read you one more question, one more answer that

21   Mr. Fields asked of you, and the answer that you gave --

22   A.    You want to guide me to the page?

23   Q.    Pardon me, sir?

24   A.    Would you be so kind as to guide me to the page?

25   Q.    Yes, I was about to do that.

```
 1  A.    Thank you.
 2  Q.    The page is 4537.  And I'm beginning at line 14 and
 3  ending at page 4538, line 14.
 4            Talking about the value of the franchise:
 5            "QUESTION:  Okay, and that is what is zero today?
 6            "ANSWER:  That is what is, unfortunately, zero
 7       today, yes.
 8            "QUESTION:  And why is that zero?
 9            "ANSWER:  Because Mr. Cussler cannot go into the
10       marketplace and sell the motion picture rights to a
11       production company or a studio for the Dirk Pitt
12       character.
13            "QUESTION:  Why?
14            "ANSWER:  Because of the catastrophic financial
15       failure of Sahara.  The perception among potential buyers
16       is that it would not be a prudent investment to invest
17       more -- to invest money in a Dirk Pitt movie.
18            "QUESTION:  How does the studio go about making that
19       decision?
20            "ANSWER:  I think I talked about that a little bit
21       before, where a production company or a studio will look
22       at a property like Dirk Pitt or James Bond, and they
23       will, especially when it is in book form, they will try
24       to assess whether the story and character in that book
25       can be translated into a film that will be profitable in
```

1          the marketplace.  If one applies that analysis at this

2          point to Dirk Pitt, unfortunately, the analysis is

3          worthless because no one is going to invest a substantial

4          amount of money to produce and distribute a film based on

5          the Dirk Pitt character when everybody knows that Sahara

6          was a disaster."  Close quote.

7               Do you recall giving that answer to that question?

8    A.    Indeed I do.

9    Q.    Okay.  How much did Sahara gross at the domestic box

10   office?

11   A.    I remember it had a decent opening weekend.  But it was

12   based on the public knowledge of the cost, it was viewed as

13   very disappointing.  I believe it was disappointing to both

14   the production company and the studio.  My best estimate is it

15   did somewhere between 60- and 80- or $90 million domestic.

16   Q.    And, in fact, it did $68 million; correct?

17   A.    Not bad.  That sounds about right.

18   Q.    Here's my question to you.

19   A.    Yes.

20   Q.    If the Sahara film, which had domestic box office of

21   $68 million was a disaster, a catastrophe that rendered the

22   performance of the franchise worthless, how can you testify in

23   this case that the performance of Superman 4, which had a much

24   smaller domestic box office of $17 million, had no negative

25   effect at all upon the value of the Superman rights in 2002?

```
 1    A.    There's lots of reasons.

 2            First of all, you have to look at what happened to

 3    Dirk Pitt, the character, and as opposed to Superman, the

 4    character.  Today if you have a very valuable franchise, it

 5    can survive disappointing box office.  As I recall, Batman and

 6    Robin was very disappointing, did about $103 million or so.

 7    Not withstanding that disappointment, Warners was able to

 8    reboot Batman.

 9            There is, as we sit here, Star Trek is opening

10    tomorrow, and the anticipation in the industry is that it will

11    probably do a hundred million dollars this weekend.  The last

12    Star Trek movie did $43 million.

13            Very strong properties like Superman and like Batman

14    survive disappointment at the box office.  Dirk Pitt, however,

15    was a completely different situation.  Dirk Pitt, unlike

16    Superman, didn't have 70 years of extraordinary success in

17    various media and comic books, on television, in film, and the

18    aggregate.  Dirk Pitt was completely, completely different.

19    Q.    It did sell --

20    A.    I don't think I'm finished.

21            And understanding Dirk Pitt was -- or Sahara was

22    2004, and it's publicly known that Anschutz spent, I believe,

23    $170 million on the picture, it did a very disappointing

24    $78 million.  And the consensus in the motion picture business

25    after that was that Dirk Pitt was dead, and I am unaware of
```

1    anyone -- any bids or anyone trying to invest money now in

2    Dirk Pitt.  I would be flabbergasted if Warner Brothers were

3    to make a Superman type deal for Dirk Pitt at this point.

4              THE COURT:  We're getting beyond the question.

5              THE WITNESS:  Okay.  Okay.

6    Q.   BY MR. BERGMAN:  Are you aware of anybody making an offer

7    to purchase the Superman rights from 1987 until today other

8    than Warner Brothers?

9    A.   The Salkinds in 1974 made a deal with DC.

10             MR. BERGMAN:  Move to strike as nonresponsive.

11             THE COURT:  He indicated from 1987 to the present.

12   1974 is before.

13             THE WITNESS:  Right.  I'm unaware -- basically since

14   1987, I understand that DC -- excuse me.  After the Salkinds

15   had the rights and then they came back to Warners, and the

16   Salkind agreement ended the -- the Salkind agreement amended,

17   like a day later, after the expiration of the Salkind

18   agreement, about a day later, there was the film agreement.

19   And since that film agreement tied up the DC-owned film rights

20   with Warners, I'm unaware that DC had the ability to put the

21   property out to bid.

22             So I don't know of any offers that were made to

23   Superman.

24             MR. BERGMAN:  Move to strike the answer as being

25   nonresponsive, your Honor.

```
 1          THE COURT:  Well, everything except the last
 2   sentence.  "I don't know of any offers that were made to
 3   Superman."
 4          MR. BERGMAN:  That's the bottom line.
 5          THE COURT:  That's the bottom line.  Everything else
 6   is stricken.
 7          We'll take it up after the recess.
 8          MR. BERGMAN:  Your Honor, I don't need a recess.  I
 9   thank Mr. Halloran for his help, and I have no further
10   questions.
11          THE COURT:  Very well.  We'll start with redirect
12   after the break.
13          (Recess taken.)
14          THE COURT:  Counsel.
15                    REDIRECT EXAMINATION
16   BY MR. TOBEROFF:
17   Q.   Mr. Halloran, you testified earlier, when Mr. Bergman was
18   going over your background, that after leaving Universal, you
19   went into private practice and that you currently work at the
20   Halloran Law Corporation.
21   A.   That's accurate.
22   Q.   And after leaving Universal, but prior to forming the
23   Halloran Law Corporation, did you work as a partner in any
24   entertainment law firms?
25   A.   Yes.  Initially, for a short while, at a firm called
```

```
1   Halloran and Howell.  And then after that, a firm called

2   Alexander, Halloran, Nau, N-A-U, and Rose, from 1992 to 1997.

3   And in 1997 I formed a firm with my partner Gunnar Erickson,

4   that was known as Erickson and Halloran.  And then in 2001,

5   when Gunnar retired, I went to the successor firm, to

6   Alexander, Halloran, Nau, and Rose, and I'm officed and

7   essentially of counsel at this point.

8           They are now known as Alexander, Nau, Lawrence,

9   Frumes and Lebowitz.

10          So in essence I came back to the firm that I

11  co-founded in 1992 after my -- Erickson, Haw, and Small

12  dissolved.

13  Q.   And your offices are located in the same offices as

14  before?

15  A.   Yes.

16  Q.   Why are you of counsel?  Why aren't you simply acting as

17  a partner as before?

18  A.   I decided to have a separate legal existence and a

19  separate pension fund.  I wouldn't be tied to the pension plan

20  that the firm has.

21  Q.   Now, Mr. Bergman mentioned a number of prestigious law

22  firms, such as Gang, Tyre, T-Y-R-E, Sifran, and Brittenham.

23  And the other was Hansen, Jacobson.

24          Would you or would you not consider the firm of

25  Bloom Hergott to be at least as prominent as some of the firms
```

1    mentioned by Mr. Bergman?

2    A.    They are in the same league.

3    Q.    Have you ever been -- have you ever been engaged by Bloom

4    Hergott to work on a project involving a preexisting literary

5    property?

6    A.    Yes.

7    Q.    What was the nature of that engagement?

8    A.    Bloom Hergott represented Bruce Willis, and he was

9    putting together a movie based on a book called Breakfast of

10   Champions, and I co-represented Bruce Willis and Bloom Hergott

11   in putting together the financing for that film.

12   Q.    Did your engagement also involve the acquisition of film

13   rights to that Kirk Vaughn book?

14   A.    It did in the sense that I was responsible in dealing

15   with the banks to make sure that the chain of title was

16   appropriate.  I didn't actually negotiate the terms of the

17   Breakfast of Champions deal, but I was involved in its terms.

18   It's similar to what I would do at Orion.

19   Q.    Mr. Bergman also mentioned the law firm of Gang, Tyre,

20   Ramer and Brown as a very prestigious entertainment law firm.

21   Have you ever been engaged by Gang Tiree to work on a project

22   involving preexisting literary project?

23   A.    Yes, I was co-counsel with Gang Tyre for a company called

24   Writers Cinema, Inc., that I described in my direct testimony.

25   Writers Cinema, Inc., had a joint venture with Amblin

1  Entertainment, Stephen Spielberg, to produce and license to

2  the Turner Network Television network a series of plays and

3  books which famous playwrights had written, and as I think I

4  said before, included Foot, Arthur Miller, and David Mamet.

5  Q.   Do you work in any other capacity with Bruce Ramer, one

6  of the lead partners of Gang, Tyre, Ramer and Brown?

7  A.   Yes, I do.

8  Q.   What is that?

9  A.   I work with Bruce on an almost daily basis.  We are on

10  the executive committee together for the USC Beverly Hills Bar

11  Association, Institute of Entertainment Law and Business.  And

12  we put on an annual entertainment law program, and actually

13  I'm in the middle of a series of meetings in designing a

14  program with Bruce right now.

15  Q.   Now, I noticed that Mr. Bergman limited his questions as

16  to your clients to those clients you currently represent.  Is

17  your experience in private practice limited to clients you

18  currently represent or not?

19  A.   No.  Since I have been in private practice, going on 20

20  years, you know, I have represented many clients and been

21  involved in many transactions where I don't currently

22  represent the client.  And that's also especially true with me

23  because oftentimes I'm brought in as special counsel on a

24  particular project as opposed to continuing.

25  Q.   I'd like to move back to your studio experience.

927

```
 1   Mr. Halloran, you testified as to your experience with studio

 2   films, and I'd like to expand that and contrast that a bit to

 3   your testimony regarding independent films.

 4            Were you counsel to the 1994 Polygram spelling film

 5   called the usual suspects directed by Brian Singer and

 6   starring Kevin Spacey?

 7   A.   Yes, I was.

 8   Q.   What other films did Brian Singer direct?

 9   A.   Superman Returns, X Men.

10   Q.   And what work did you do on that film?

11   A.   I was production counsel, and so I negotiated and

12   documented the agreements for Brian Singer, Kevin Spacey, and

13   the rest of the cast.  And I also did the screenplay option

14   purchase agreement with Brian McCorey, who wrote the

15   screenplay and I believe won the Academy Award.  And, as you

16   know, Ken Spacey (sic) won the Academy Award for that film as

17   well.

18   Q.   Were you also counsel to the 1995 film entitled True

19   Romance?

20            MR. BERGMAN:  Objection.  Leading, your Honor.

21            THE COURT:  Sustained.

22   Q.   BY MR. TOBEROFF:  Are you familiar with the film -- the

23   1999 film True Romance?

24   A.   Yes, I am.

25   Q.   Have you had any involvement in that film?
```

```
 1   A.   Yes.

 2   Q.   Was that film directed by Tony Scott and written by

 3   Quentin Tarantino and starring Christian Slater, Patricia

 4   Arquette, Dennis Hopper, and Christopher Walken?

 5              MR. BERGMAN:  Objection.  Leading.

 6              THE COURT:  Sustained.

 7   Q.   BY MR. TOBEROFF:  Who directed that film?

 8   A.   Tony Scott.

 9   Q.   Do you remember the writer of that film?

10   A.   Quentin Tarantino.

11   Q.   Were the usual -- was the film The Usual Suspects and

12   True Romance, which I'm using as examples of independent films

13   you've worked on, were those films -- strike that.

14              Were the usual -- were the films The Usual Suspects

15   and True Romance independent films?

16   A.   Yes.

17   Q.   Were they independently distributed, or were they

18   distributed by one of the major motion picture studios?

19   A.   The Usual Suspects was distributed by Polygram, which was

20   not a major, and I don't -- I don't believe True Romance

21   was -- well, let me see.  True Romance.  As I sit here, I'm

22   not a hundred percent sure whether -- I believe True Romance

23   was distributed by a major.  But Usual Suspects was not.  It

24   was Polygram.

25   Q.   Are you familiar with a 2006 film called American
```

1   Pastime?

2   A.    Yes.

3   Q.    Did you work on the film?

4   A.    Yes.

5   Q.    Do you recall who distributed that film?

6   A.    Warner Brothers Home Video.

7   Q.    Would you call that an independent film?

8   A.    Yes.

9   Q.    Now, Mr. Halloran, you mentioned that you represent the

10  A-list film producer Bob Doucet.  In connection with what

11  films have you represented him?

12  A.    In chronological order, I represented him on Mummy 2, Van

13  Helsing, Mummy 3, Night at the Museum, and G.I. Joe, which

14  he's in the process of delivering to Paramount right now.

15  Q.    Would you or would you not consider those movies to be

16  franchise movies?

17  A.    I would consider all of them to be franchise movies.

18  Q.    Would you or would you not consider those movies to be

19  tent-pole movies?

20  A.    Yes, each of them is a tent-pole movie.

21  Q.    Are any of those movies based on well-known preexisting

22  properties?

23  A.    Certainly the Mummy is based on the Universal owned

24  character the Mummy.  Van Helsing was sort of interesting

25  because what Universal did was they put a lot of their

1   preexisting characters, the Mummy and others, into it.

2   Obviously G.I. Joe is based on the board game, the Hasbro

3   board game.

4          So these were all based on previously exploited

5   properties.

6   Q.   Now, in your practice representing independent films, is

7   there any overlap between your -- pardon me.  You testified

8   that you -- your practice involves to a certain degree

9   independent films but that 25 to 30 percent of your practice

10  involves work with the major studios.  Is there any overlap

11  between the two?

12  A.   Yes, because sometimes films that are independently

13  developed or produced can be distributed by major studios, and

14  what's always in my mind, when I'm representing an independent

15  producer, is that ultimately when we want to do is make a film

16  that's of sufficient quality such that a studio would want to

17  distribute.  And sometimes in good cases that happens.

18         Certainly the -- in representing independent film

19  producers, I've hired actors like, you know, Robin Williams

20  and Susan Sarandon and Kevin Spacey and, you know, what you

21  try to do in the independent world is design a project so

22  ultimately it becomes distributed by the studio, although the

23  studio might not necessarily develop or produce it.

24         MR. BERGMAN:  Your Honor, move to strike everything

25  after "yes."

```
 1              THE COURT:  It was a leading question.  Yes, the

 2   answer.  Everything else is stricken.

 3   Q.   BY MR. TOBEROFF:  Is there overlap between your work in

 4   independent films and your work in representing your 25 to 35

 5   percent of your practice that involves the major studios?

 6   A.   There is overlap.

 7   Q.   And I ask you to describe that overlap to me.

 8   A.   Yes, the overlap is that even though initially a film may

 9   be a so-called independent film, because it's not -- the

10   development and production is not financed by a studio, it may

11   be ultimately distributed by a studio.

12   Q.   Now, do you recall that you and Mr. Bergman listed the

13   major studios.  Do you recall listing those?

14   A.   Yes.

15   Q.   Have you ever been retained by a major studio as an

16   expert in a case involving the acquisition of film rights to a

17   comic book property?

18   A.   Yes.

19   Q.   Which case or cases?

20   A.   I was engaged by Paramount Viacom in the Spiderman case.

21   I was engaged by Fox in the Watchmen case.

22   Q.   Just in general, did the Spiderman case involve the

23   analysis of the terms in a rights acquisition agreement for

24   the film rights to Spiderman?

25   A.   Yes.
```

1  Q.   Did the Watchmen case involve an analysis of contractual

2  provisions as they pertain to underlying intellectual

3  property?

4  A.   Yes.

5         MR. BERGMAN:  Objection.  Leading.

6         THE COURT:  Sustained.

7  Q.   BY MR. TOBEROFF:  In a nutshell, what did the Watchmen

8  case concern, broadly speaking?

9  A.   Okay.  The Watchmen case concerned a dispute as between

10  Fox and Warner Brothers over the distribution rights to the

11  picture Watchmen.  And what was specifically at issue was

12  whether the rights that DC had granted to Fox had ultimately

13  gone via the chain of title to Warners in a manner that would

14  enable Warners to distribute the film without claim of

15  copyright infringement by Fox.

16  Q.   You've also spoken at great length about the Sahara case,

17  and you testified that you were retained by Bert Fields at

18  Greenberg Glusker.  Would you add Greenberg Glusker to that

19  list of prominent entertainment law firms or not?

20  A.   I would add them to the list.

21  Q.   And who was considered the prominent lawyer at Greenberg

22  Glusker, if there is one?

23  A.   Bert Fields.

24  Q.   Did he retain you?

25  A.   Yes.

933

1    Q.    Mr. Halloran, have you recently been engaged as an expert

2    on behalf of any famous literary estate?

3    A.    Yes.

4    Q.    What estate is that?

5    A.    Well, I've been engaged by the estate of Orson Wells in a

6    case involving Citizen Kane.  I've been engaged regarding a

7    dispute involving distribution rights to the Little Prince

8    literally within the last couple days.

9    Q.    Do both of those cases involve intellectual property?

10   A.    Yes.

11   Q.    Now, skipping to your -- back to your time at Universal.

12         Did you or did you not value underlying rights when

13   evaluating film projects at Universal?

14   A.    I did.

15   Q.    Was that a commonplace part of your duties or not?

16   A.    Very commonplace.

17   Q.    And in valuing underlying intellectual property rights,

18   did you create any sort of financial models to do so or not?

19         MR. BERGMAN:  Objection.  Leading.

20         THE COURT:  Sustained.

21   Q.    BY MR. TOBEROFF:  How did you evaluate underlying

22   intellectual property rights in connection with your duties at

23   Universal?

24   A.    We usually didn't necessarily rely on Excel in our

25   projections.  As I explained to you, we do those projections

1    later.  But what we typically do is look at the marketplace

2    and estimate what we would pay for the intellectual property

3    by looking at the potential profitability of audiovisual works

4    that we might produce based on those properties.

5            The single most important thing was, you know, was a

6    property well known.  You know, the template was Superman.

7    But we didn't have Superman.  So we pursued things like the

8    Flintstones and Finger Guy, sell Dr. Suess books and the like.

9    Q.   Now, in your current practice, when you work on

10   independent film, do you try to ensure that the deals you

11   enter into are consistent with the studio practice on --

12   strike that.

13           In your current practice, does it matter to you

14   whether or not the deals that you entered into for literary

15   rights are consistent with studio practices, or does it

16   matter?

17   A.   It does matter.

18   Q.   Why is that?

19   A.   It does matter because, as I mentioned before, ultimately

20   the projects that I'm working on may end up at a studio.  And

21   I want to make sure that when I deliver the chain of title to

22   the studio, that the underlying agreement for the acquisition

23   of the intellectual property is -- they find suitable and

24   appropriate.

25   Q.   Jumping now to your testimony regarding the 2008 film

1   Ironman and your separate testimony regarding an Ironman

2   agreement that's been marked as an exhibit between Cache-a

3   Motion Picture Corp. and Marvel Characters, Inc.

4           Was the 2008 Ironman film -- is there any connection

5   between the physical agreement that's marked as an exhibit and

6   the 2008 Ironman film that you are aware of?

7           MR. BERGMAN:  Objection.  Leading.

8           THE COURT:  Sustained.

9   Q.  BY MR. TOBEROFF:  Are you aware of any connection between

10  the agreement -- strike that.

11          Was the 2008 Ironman film produced pursuant to the

12  Ironman agreement which is an exhibit?

13  A.  No.

14          MR. BERGMAN:  Objection.  Lack of foundation.

15          THE COURT:  Lay a foundation for that.

16          THE WITNESS:  It would be helpful to me to look at

17  the agreement.  Do you have the number?

18          MR. TOBEROFF:  Actually, I'm not questioning you.

19  It's general questions.  I'm not --

20          THE WITNESS:  Okay.  Fine.

21  Q.  BY MR. TOBEROFF:  I believe you testified that you have

22  had conversations with the former COO of Marvel, and in those

23  conversations, were you given an understanding as to how the

24  2008 Ironman film was produced and under what agreement?

25          MR. BERGMAN:  Objection.  Leading.

```
 1              THE COURT:  Sustained.
 2   Q.   BY MR. TOBEROFF:  Did you have conversations recently
 3   with the --
 4              THE COURT:  You know, actually, overruled.  That's a
 5   foundational question.  You may answer that question.
 6              THE WITNESS:  Could you restate it?
 7              THE COURT:  Do you have an understanding as to how
 8   29008 Ironman film was produced and under what agreement.
 9              THE WITNESS:  Yes, I do.
10              THE COURT:  Ask a question, Counsel.  Don't
11   encourage him.  He does not need any encouragement.
12   Q.   BY MR. TOBEROFF:  Can you please tell us what that
13   understanding is?
14   A.   I had a conversation with the former COO of Marvel, and
15   he told me that the agreement between Marvel and Cache-a
16   Motion Pictures, the option expired, and the rights reverted
17   to Marvel.
18              Is there -- he told me that -- and that the basic
19   structure of the terms upon which Marvel produced the hit
20   Ironman were in public documents.
21              MR. BERGMAN:  Move to strike.  Hearsay.
22              THE COURT:  Well, there's really no -- it's not
23   being introduced for the truth of the matter asserted but
24   rather as foundation.  There's no substance to that answer.
25              Counsel, you may proceed.
```

937

```
 1   Q.   BY MR. TOBEROFF:  Are you aware of the studio which

 2   distributed the 2008 Ironman film?

 3   A.   Yes.

 4            THE COURT:  Wait a second.  There was.  The option

 5   expired.  The rights reverted.  I'm sorry.  Revisiting that

 6   last answer.  So that was based on a conversation with

 7   someone -- the COO of --

 8            THE WITNESS:  The former COO of Marvel.  He's a good

 9   friend of mine.  I can make it easier, your Honor.

10            THE COURT:  I'm sure you could make it easier.  But

11   I'm not going to bite right now.

12            Counsel, I'm going to sustain the objection.  If

13   we're going to get into the terms of the agreement, given all

14   of your earlier objections earlier, I think it's important

15   that we have the agreement.  You succeeded in keeping out an

16   agreement.  We had the agreement.  We just didn't have all of

17   it.  Now he's trying to get into the terms of the agreement

18   that he had a conversation with the COO.

19            So I don't think, given that record, this is fair

20   game.  I sustain the objection.

21            MR. TOBEROFF:  Very well.

22   Q.   Are you familiar with the studio?  I just previously

23   asked this, but I'm going to ask it again.  Are you familiar

24   with the studio which distributed -- are you familiar with

25   which studio distributed the 2008 Ironman film?
```

```
 1   A.   I believe it was Paramount.

 2   Q.   And the agreement that we spoke of earlier, was that with

 3   Paramount?

 4   A.   No, it was with a company called Cache-a Motion Pictures

 5   which, based on my experience, I know to be a division of New

 6   Line.

 7   Q.   Now, Mr. Halloran, switching to another subject, can you

 8   name any intellectual property franchises that existed in

 9   2008, big franchises, when the Superman film agreement was

10   entered into but that were not owned by a major studio?  Any

11   franchises?

12   A.   By major studio, you mean a major studio or its

13   subsidiaries like DC?

14   Q.   Yes, I'm referring to big movie franchises for which the

15   underlying intellectual property in or about 2002 was not

16   owned by a major studio or a subsidiary.

17   A.   As of 2002, my understanding is that the universe of

18   major comic book franchises was --

19   Q.   Excuse me.  I'm not limiting my question specifically.

20   I'm not talking about comic book franchises.  I'm talking

21   about major film franchises.  I'm not focusing on comic book

22   franchises?

23   A.   Thank you.

24   Q.   So the question is --

25             MR. BERGMAN:  Your Honor, I object.  This is leading
```

```
 1    all the way.
 2              THE COURT:  Let's watch the leading, Counsel.  If
 3    you're starting with the word did, it's probably a leading
 4    question.  Who, where, why, what, and how.  One of those five
 5    words should begin your sentence.
 6              MR. TOBEROFF:  I wasn't --
 7              THE COURT:  Rephrase your question.
 8              MR. TOBEROFF:  I'll rephrase it.
 9    Q.   Can you think of any --
10              THE COURT:  Who, where, what, why, and how, Counsel.
11              MR. TOBEROFF:  This is a who.
12              THE COURT:  Okay.  Who.  We got our first word.
13    What's the next one?
14              MR. TOBEROFF:  Or what.
15    Q.   In 2002, what to your knowledge are major intellectual
16    property-driven franchises that have made -- that have been
17    turned into major film franchises?
18    A.   As of 2002, there certainly was James Bond.  There
19    certainly was Star Wars.
20    Q.   Now, who owns the underlying rights to the Star Wars
21    property?
22    A.   George Lucas.
23    Q.   And does George Lucas have the studios finance films
24    based on Star Wars?
25    A.   No.  I believe --
```

1          MR. BERGMAN:  Objection.  Leading, your Honor.

2          THE COURT:  You had two in a row there, Counsel.

3    You were right on track.

4    Q.    BY MR. TOBEROFF:  Who finances George Lucas's films?

5    A.    George Lucas.

6          THE COURT:  He knows the stuff.  You just got to --

7    Q.    BY MR. TOBEROFF:  Who finances the James Bond films?

8    A.    I know that Cubby Broccoli has in the past financed or

9    co-financed the James Bond films.  I don't think it's public

10   exactly, the MGM-Cubby Broccoli deal.  But it's my

11   understanding that Cubby Broccoli financed the Bond films.

12   Q.    Can you generally describe to me how a film deal works

13   when a rights holder finances or co-finances a film based on

14   their rights?

15   A.    It's very different from the option purchase model that

16   predominates what we've looked at.  In fact, you don't need an

17   option purchase agreement because like Marvel and Ironman,

18   since they own the rights, they were free to produce the

19   picture since they own the rights, and they were free to make

20   whatever distribution arrangements they wanted.

21          Under that model, which George Lucas uses and which

22   Marvel uses, the -- and also I think under the Universal -- I

23   want to make it simple.  Under the Star Wars -- under the

24   Lucas model and the Marvel model, rather than relying on a

25   studio such as Warners to develop and produce the pictures,

1    the owner of the intellectual property, in order to maximize

2    control and potential profitability, actually makes the movie

3    themselves.  They actually finance the production of the

4    movie.  And then they license the distribution of the movie

5    around the world.  So that's -- that basic model.

6         I know that, you know, I was -- Marvel just reported

7    $90 million in quarterly profits based on the Hulk and

8    Ironman.  So what you try to do is, you know, they built

9    companies based on the value of these intellectual property

10   assets and the fact that they can make potentially a lot more

11   money rather than on a royalty basis, on a basis where they

12   actually own the property, produce the picture, and then

13   license it around the world on advantageous terms.

14   Q.   Now, is it common or is it uncommon for the holders of

15   rights, intellectual property rights at the highest end of the

16   spectrum to finance or co-finance films based on their rights?

17   A.   It's --

18        MR. BERGMAN:  Objection.  Lack of foundation.

19        THE COURT:  Foundation.  I'll let you answer the

20   question, but follow up with the basis for that.

21        THE WITNESS:  It would be helpful if you would ask

22   me the question slightly differently.

23   Q.   BY MR. TOBEROFF:  For intellectual property rights or for

24   film rights to intellectual properties at the highest end of

25   the value spectrum, is it common or uncommon for the holder of

942

1  such rights to finance or co-finance films based on such

2  rights?

3  A.   Well, sort of two universes.  There's the universe of DC,

4  where, you know, DC does not finance their films.  And then

5  there's the universe of Marvel in the old days, where they

6  didn't finance the film.  So now it's Marvel in the new days,

7  where they do.  And then Star Wars, George Lucas, they finance

8  it, but it's -- in terms of its -- in terms of that universe,

9  it's only the people who actually own the properties that can

10  do it.

11  Q.   Now, maybe I should -- I phrased that poorly.  I want to

12  refocus my question.

13  A.   Okay.

14  Q.   The subject is intellectual property rights at the

15  highest end of the spectrum.

16  A.   Okay.

17  Q.   Not all intellectual property rights.

18  A.   Okay.

19  Q.   And my question is is it common or uncommon for the

20  owners of those intellectual property rights at the highest

21  end of the spectrum to finance their own films, finance or

22  co-finance their own films, or is it common, or is it

23  uncommon?

24       THE COURT:  He gave you two choices, common or

25  uncommon.

943

```
 1              THE WITNESS:  It's common.

 2              THE COURT:  What's the basis of that answer?

 3              THE WITNESS:  Well, what we talked about, Star Wars.

 4              THE COURT:  No, no.  How do you know that?

 5              THE WITNESS:  How do I know that?

 6              THE COURT:  Yes.

 7              THE WITNESS:  I've -- I go back to the George

 8    Lucas -- I worked on Howard the Duck in 1986 with George

 9    Lucas.  I know him a little bit.  But it's commonly known --

10    it's been reported for a very long time how Lucas Film in fact

11    owns their intellectual property and produces the movies based

12    on their intellectual property and licenses them for a very

13    low distribution fee to the studio.  That's commonly known.

14              THE COURT:  Beyond the Lucas Film empire, any

15    others?

16              THE WITNESS:  Yes, Marvel.  I'm aware of that

17    through my discussions with the former COO and what's been

18    reported in the trades and what's in the public documents that

19    describes exactly how they do it, and that's their -- that's

20    their business model.

21    Q.   BY MR. TOBEROFF:  And you testified just previously to

22    the James Bond films.  Are those also -- do you believe those

23    are also financed by the family that controls the rights or

24    co-financed?

25    A.   Well, I read a case in which Cubby Broccoli testified
```

1    that he had invested over a billion dollars in the James Bond

2    movies.  I don't know the exact structure of the MGM-Cubby

3    Broccoli.  But it apparently includes a financing component.

4    Q.   Now, in your opinion --

5            MR. BERGMAN:  Excuse me, your Honor.  Move to

6    strike.  Hearsay.

7            THE COURT:  Well, an expert has some latitude in

8    this regard, Counsel.  As long as the basis is there.  You can

9    follow up, Counsel, how he knows this.

10   Q.   BY MR. TOBEROFF:  Now, you mentioned regarding James

11   Bond, you were mentioning the basis for your knowledge.  Could

12   you elaborate on that, please?

13   A.   Yes, there was --

14           THE COURT:  You say you read a case.  What do you

15   mean?

16           THE WITNESS:  I was doing some research on James

17   Bond on the Internet, and I ran into a case that apparently

18   there was a dispute between MGM and a gentleman named

19   McClorey.  And there was sort of a bifurcation of the James

20   Bond rights and the competing --

21           THE COURT:  So it's from a lawsuit.

22           THE WITNESS:  Yes, and from a reported case I found

23   on the Internet.  And there was testimony that was in the

24   opinion from Cubby Broccoli in which he stated that he

25   invested over a billion dollars in the Bond movies.  That's

1    where I knew that from.

2    Q.    BY MR. TOBEROFF:    Now, why do you believe rights holders

3    at the highest end of the spectrum finance or co-finance their

4    films?

5    A.    They believe -- they are confident that they are

6    extraordinarily -- we're talking about the super high end,

7    right?

8    Q.    Yes.

9    A.    They have confidence that -- with A, they want to control

10   their property as best they can.    They don't want to give up

11   control of the property.    That's very important.    They don't

12   have to worry about not being -- about the rights sitting

13   dormant.    They can make movies whenever they want.

14          We've got an Ironman 2 that's coming up.    They also,

15   from an economic standpoint, they obviously think that it's

16   more advantageous to them to take the risk, and you have to

17   take the risk of producing films and then making distribution

18   arrangements in order for them to maximize their profits for

19   that property as opposed to just getting a royalty from a

20   studio which has no contractual obligation to produce

21   anything.

22   Q.    Under the Superman film agreement, Exhibit 232, does DC

23   have the option to finance or co-finance films over the

24   next -- well, as of 2002, over the 34-year term of the

25   agreement?

946

1    A.    No, they do not.

2    Q.    Just briefly, you testified -- Mr. Bergman asked you

3    questions regarding the purported settlement agreement or

4    settlement negotiations between plaintiffs and defendants in

5    this action.

6              Do you recall that?

7    A.    I do.

8    Q.    And you gave some opinions about that.  Other than

9    reading this court's summary judgment order, did you review

10   any other documents pertaining to the parties' settlement

11   negotiations?

12   A.    None.

13   Q.    Switching subjects.  Are your opinions in this case

14   solely based on agreements you personally negotiated?

15   A.    No.

16   Q.    What are your opinions generally speaking -- excuse me.

17   What agreements -- in addition to the agreements you

18   personally negotiated, what are your opinions based on?

19   A.    My personal negotiations are just a part of relatively --

20   relatively minor part of the universe of knowledge I have.  I

21   wrote my first book on copyright while I was in law school.

22   Now I've written three books.  I've been in -- a business

23   affairs executive and a lawyer for approximately 30 years.  I

24   teach.  I taught at UCLA and Southwestern.  And actually, I

25   have learned from my students.

1        I've been involved in numerous transactions,

2   including intellectual property transactions.  I've also, as

3   you know, been an expert in approximately 30 cases in various

4   industries, but oftentimes including intellectual property.

5   I -- one of the things that I do virtually every day is

6   valuing properties.  I'm in the midst of a negotiation right

7   now where I'm selling Andy Garcia a movie, and I do financial

8   projections all the time.

9        I read the -- I'm immersed in the motion picture

10  business and the television business, the entertainment

11  business in general.  I read it every day, look at the

12  product.  I'm one of the co-chairs of the Institute on

13  Entertainment Law and Business.  We put on seminars.

14       So I take -- what I did in this case is I took the

15  aggregate of that experience.  I sort of left out my studio

16  persons.  At the studio, not only did I do Flintstones deals

17  and negotiate Dr. Suess, but I also negotiated agreements on

18  Back to the Future with Michael J. Fox, Born on the Fourth of

19  July with Oliver stone, Tom Cruise starring, Arnold

20  Schwarzenegger for Twins, and Kindergarten Cop.

21       So I took the aggregate of that experience, and I

22  was given this homework to assess.  And so I looked at these

23  agreements in the context of all of those things.

24  Q.  Now, in addition to the Superman film agreement, the

25  Superman television agreement, and a number of Superman

1  animation agreements between DC and Warner Brothers, how many

2  other agreements approximately did you look at in connection

3  with your opinion in this case -- did you analyze?

4  A.   Well, the agreements on this chart, there must be 30.

5  Q.   Now, you testified earlier that based on this court's

6  ruling so far, the Siegels and DC co-own Action Comics No. 1

7  and that DC has a duty to account to the Siegels for any

8  profits derived from Action Comics No. 1.

9        You also testified that under the Superman film

10  agreement, Warner Brothers has the discretion not to produce

11  any films or TV series or any other further films or TV series

12  and that there was no provision for the Superman rights to

13  revert free and clear to DC.

14        My question is --

15        MR. BERGMAN:  Objection.  Leading.

16        THE COURT:  Overruled.

17  Q.   BY MR. TOBEROFF:  My question is what impact, if any,

18  does this have on the Siegels' right to receive a share of

19  DC's profits?

20        MR. BERGMAN:  Objection.  Leading.

21        THE COURT:  Overruled.

22        THE WITNESS:  It has --

23        THE COURT:  You don't have any objection to his

24  assertion.

25        MR. BERGMAN:  My objection, your Honor, was to the

1    entire question, including the introduction to the question.

2              THE COURT:  Well, that's the assertion I was

3    referring to.  The preamble, as it were.  The question itself

4    is not leading.  Overruled.  You may answer.

5              THE WITNESS:  It has a -- okay.

6    Q.   BY MR. TOBEROFF:  With that foundational part, let me

7    rephrase the question.

8              What impact, if any, did these nonexclusive rights

9    have on the Siegels' right to receive a share of DC's profits?

10              MR. BERGMAN:  Objection.  Vague and ambiguous.

11              THE COURT:  Yes, but in light of your questioning,

12   Counsel, I think it's fair game.  You can explore it on

13   recross.  I think this opens up a can of worms, but if that's

14   what the plaintiff wants to do, I'll overrule the objection.

15              THE WITNESS:  Since DC and the Siegels are

16   co-owners, by hand there's a duty to account as between

17   co-owners of a copyright.  The fact that DC is in my

18   estimation not getting fair market value for the film and

19   television rights, and handing them to Warner Brothers under

20   agreements where there's no obligation for the entire term of

21   the copyright to produce audiovisual works, has a devastating

22   financial impact on DC and the plaintiffs as co-owners.

23              MR. BERGMAN:  Objection, your Honor.  There's a lack

24   of foundation to show any duty to exploit.

25              THE COURT:  I understand your objection, Counsel.

950

```
 1   It's a conclusionary statement which essentially wraps up his
 2   testimony.  It's only as good as the underlying foundation
 3   that he's elicited.  It's basically an articulation of the
 4   plaintiff's theory of the case.  The Court will consider
 5   that --
 6            MR. BERGMAN:  It's also an expression of a waste
 7   argument, a claim that has been abandoned by the plaintiffs in
 8   this case.
 9            THE COURT:  Permit you to examine him on that.
10            You may proceed, Counsel.
11   Q.   BY MR. TOBEROFF:  You also testified with regard to the
12   impact of plaintiffs' nonexclusive rights in Action Comics
13   No. 1, that it would be extremely difficult, if not
14   impossible, for plaintiffs on their own to receive an income
15   by licensing their nonexclusive rights.
16            Do you recall that?
17   A.   I do.
18   Q.   Why is that?
19   A.   As I testified, the nonexclusive rights, they are
20   co-owned with DC.  And just based on that co-ownership, if the
21   Siegels wanted to go out and license their share, it would,
22   since the termination is under the U.S. Copyright Act, they
23   would only be able to license the U.S. rights, not the foreign
24   rights.  And the Siegel rights are a part of the ethos that is
25   owned by Warner Brothers.
```

951

```
 1            So it would be difficult for them to transfer those

 2     rights without someone thinking, and especially since they are

 3     co-owned by DC to think oh, well, I need Warners to be

 4     involved as well.  And Warners has the film and TV rights.

 5            So there's just -- as we discussed, there may be a

 6     little direct to video or Movie of the Week or something like

 7     that, but since the rights are nonexclusive, since they are

 8     only in the United States, as I discussed, a potential buyer

 9     or financier would be reticent, to say the least, to acquire

10     those rights.

11     Q.   Now, aside from the relevance of this point to analyzing

12     the impact of nonexclusivity on the value transferred to

13     Warner Brothers in the form of Superman film and television

14     rights, in your understanding, is this trial about how much

15     money the Siegels can independently get for their rights, or

16     is this trial about whether the Siegels' right to an

17     accounting is negatively affected by DC and Warner Brothers'

18     internal agreements?  Which is it?  I'm asking you to choose.

19            MR. BERGMAN:  Objection.  Leading.

20            THE COURT:  It is.  And the Court understands what

21     the trial is about.  Sustained.

22     Q.   BY MR. TOBEROFF:  Mr. Halloran, what is your

23     understanding as to what this first phase trial is about?

24            MR. BERGMAN:  Objection.  Relevance.

25            THE COURT:  Sustained.
```

1           THE WITNESS:  What the trial is about, the first

2    phase is set forth in the pretrial conference order.

3    Q.  BY MR. TOBEROFF:  To be clear, Mr. Halloran, when you

4    testified that the Superman film rights -- what the Superman

5    film rights would be worth, what the film and television

6    rights would be worth on the open market, did you take into

7    consideration the fact that the Court had ruled that Action

8    Comics No. 1 is co-owned by the Siegels and DC and that

9    accordingly, DC could only have transferred nonexclusive film

10   and television rights to Action Comics No. 1 to Warner

11   Brothers?

12   A.   What I --

13           MR. BERGMAN:  Objection.  Leading.

14           THE COURT:  It is, but it only goes to the

15   foundation of his opinion.  I will overrule it.

16           You may answer.

17           THE WITNESS:  What I looked at was on the face of

18   the film and television agreements, the rights that were

19   transferred by Warners under those agreements.  And that's

20   what I assessed.

21   Q.   BY MR. TOBEROFF:  And what rights were transferred?

22   A.   The rights that were transferred basically were film

23   rights, the television rights were frozen under the film

24   agreement, and merchandising rights were reserved by DC.

25   Q.   And of those rights, which rights were exclusive -- in

1    your understanding, which rights were exclusive and which

2    rights were nonexclusive?

3    A.    All the rights that were -- the film and television

4    rights -- well, under the film agreement, the film agreement

5    rights were exclusive.  And under the television rights, the

6    television rights were exclusive.

7    Q.    Of the --

8    A.    I understand.  It's a little tricky because under the

9    film agreement, the television rights were frozen.

10   Q.    I'm actually referring to the issue of exclusivity and

11   nonexclusivity.

12   A.    Right.

13   Q.    As brought up by this court in reforming those

14   agreements.

15   A.    Right.

16   Q.    You understand?

17   A.    I do.

18   Q.    And you gave testimony earlier as to your understanding

19   that only Action Comics No. 1 had been ruled to be co-owned

20   and was therefore nonexclusively owned between DC and

21   plaintiffs.

22          Do you recall that?

23   A.    Yes, that's accurate.

24          MR. BERGMAN:  Objection.  Leading.

25          THE COURT:  Sustained.

1          MR. TOBEROFF:  I'm sorry, your Honor?

2          THE COURT:  It's sustained.

3     Q.   BY MR. TOBEROFF:  Do you remember your earlier testimony

4     on this subject?

5     A.   Yes.

6     Q.   What impact, if any, does the nonexclusivity of Action

7     Comics No. 1 have on the overall value of the film and

8     television rights that were transferred by DC to Warner

9     Brothers in the relevant agreements?

10         MR. BERGMAN:  Objection.  Lack of foundation, your

11    Honor.

12         THE COURT:  I'll permit you to get your opinion, but

13    I want to hear the basis for it so I can evaluate whether

14    there's foundation for it.

15         You may answer the question.

16         THE WITNESS:  Well, it's easier -- okay.  You want

17    to repeat the question?

18         (Record read.)

19         THE WITNESS:  If you could -- I'm a little bit tired

20    or confused.  If you could restate that.  That would make it

21    easier for me.

22    Q.   BY MR. TOBEROFF:  Let me go back to the subject.

23    A.   Okay.  I'm just a little tired.

24    Q.   Yesterday Mr. Bergman took you through a number of

25    agreements, and he asked you whether you would enter into

1    those agreements or the Superman film agreement.

2    A.    I remember that, yes.

3    Q.    In terms of licensing the film rights to Superman.

4    A.    Correct.

5    Q.    You remember that line of questioning?

6    A.    Yes, I do.

7    Q.    He looked at the Superman film agreement.  And then he

8    would take a Hannibal agreement and another film agreement and

9    said would you license Superman under the Hannibal agreement.

10   A.    Right.

11   Q.    Were any of those agreements actually for the property

12   Superman?

13   A.    No.

14   Q.    Were any of those agreements in your opinion for a

15   property as prominent or valuable as Superman?

16   A.    No.

17   Q.    If you were representing DC and the rights to be licensed

18   with the film and television rights to Superman, would you or

19   would you not have entered into any of those agreements

20   mentioned by Mr. Bergman without further negotiation?

21   A.    No.

22          MR. BERGMAN:  Objection.  Leading.

23          THE COURT:  Overruled.

24   Q.    BY MR. TOBEROFF:  Why is that?

25   A.    Well, basically, my approach had -- the two most

1    important things, one was looking at the value of Superman

2    relative to the underlying properties of the other agreements,

3    and then look at the sort of the value in the marketplace that

4    agreements received based on the agreements that I looked at.

5            So what I would do is think okay, if I was

6    representing Superman, and there was a fair market deal in an

7    independent marketplace, what sort of terms would you be able

8    to achieve.  So that's the way I looked at it.

9    Q.    Now, with the benefit of hindsight, we could

10   theoretically plug in the actual revenues from Superman

11   Returns into the various agreements you discussed with

12   Mr. Bergman.  Would you consider that a useful exercise in

13   your analysis or not a useful exercise?

14           MR. BERGMAN:  Objection.  Leading.

15           THE COURT:  Overruled.

16           THE WITNESS:  That would not be a useful exercise

17   since you'd have to look at the deals made and evaluation of

18   the properties done as of the date of the agreement.

19   Q.    BY MR. TOBEROFF:  Why must you look at the date of the

20   agreement?

21   A.    Because, as we've discussed, you don't -- you don't look

22   at whether agreements are fair market value based on hindsight

23   because remember we had the discussions you can't look at the

24   future.  You don't know what the future will be.  Investors,

25   whether it's a stock, we try to look at future and try to

 1    predict as best we can what it will be.  But as of 2002, there

 2    was no Superman Returns.  And under the agreements, the film

 3    agreement that was entered into, there was absolutely no

 4    guarantee, as is customary and as reflected in these massive

 5    documents, that if a motion picture based on Superman was not

 6    developed and produced and distributed, that DC would get the

 7    rights back.

 8            And even if -- and even if in the future someone

 9    thought there would be a Superman Returns, there would be no

10    way of knowing whether there would be, you know, another

11    Superman movie after that.  I mean, we've had one Superman

12    movie since 1987.

13            And as of 2002, there hadn't been a Superman movie

14    in quite a long time.  And there was -- from the DC

15    perspective, I -- and under these agreements, there was no way

16    for DC to force the traditional mechanisms that make studios

17    develop, produce, and release motion pictures based on

18    intellectual property.

19            I think it's especially egregious here because you

20    have a property of a massive value of Superman that, at least

21    as far as motion picture distribution, which most people now

22    think is the real engine to the value of these very highly

23    valued properties --

24            THE COURT:  Counsel, ask your next question.

25    Q.   BY MR. TOBEROFF:  If you did take into -- if you did

 1    judge value in terms of actual performance, how would you know

 2    where to draw the line in time?

 3    A.    Well, the --

 4    Q.    Would you be able to know where and when to draw the line

 5    in terms of future performance?

 6    A.    You wouldn't because you would have no way of knowing

 7    what movies would be produced and when they would be released.

 8    So it would be impossible, virtually impossible to predict the

 9    value that one would predict at the time under the agreements

10    that were actually entered into.  That applies to both the

11    film and the television agreement.  Under neither was there

12    any sort of guarantee, nor were there traditional mechanisms

13    that I know from my experience if in fact the studio was not

14    going to exploit, that the rights would come back.

15            So the rights holder could seek to magnify the value

16    of those rights as Marvel has done and others that I've

17    described.

18    Q.    Moving on to a different subject, the subject of

19    reversions.  You testified regarding the tremendous importance

20    of reversion provisions to the owner of a franchise property

21    with a proven track record and that it is customary to include

22    such provisions in licenses for such properties.

23            My question is how do such reversion provisions

24    usually function?

25            MR. BERGMAN:  Objection.  Leading.

1            THE COURT:  Sustained.  Rephrase.

2    Q.    BY MR. TOBEROFF:  You spoke -- you testified at length

3    about the tremendous importance of reversion provisions.  How

4    do those reversion provisions usually function?

5    A.    Well, you have to look at the reversion in the context of

6    the agreement.  The way these usually work is there's an

7    option period when the rights are not really -- the production

8    distribution rights are not granted, but the studio has a

9    short period of time, typically two to three years, to develop

10   the property and then make the decision whether it wants to

11   purchase the motion picture rights.

12            What a reversion does is once -- typically once they

13   have exercised that option and paid the money, if they don't

14   make the picture, after a period of time, even though they

15   have exercised the option, those rights will come back to the

16   rights holder, and it's out of fairness because the rights

17   holder wants to do -- wants the -- the value that they are

18   getting from the deal is the fact that the studio actually

19   produces and distributes the film.

20            So if they don't distribute the film, then the

21   rights come back.  So the rights holder has a second bite at

22   the apple, typically in the marketplace, you know, if, say,

23   Warners doesn't want to do it, the rights will go back to DC,

24   and then DC could go to Fox and say do you want to make the

25   Superman movie or go to Universal and say do you want to make

1  the Superman movie.

2  Q.   What effect, if any, do such reversion provisions have on

3  the right or obligation to making sequels based on the

4  underlying property?

5           MR. BERGMAN:  Objection.  Lack of foundation.

6           THE COURT:  Overruled.

7           THE WITNESS:  Especially because with high end

8  properties, you want to make sure that there is continuing

9  movies made.  You know, a good example is Harry Potter.

10  There's been, you know -- there's going to be eight movies in

11  like 11 years.  You want to make sure that once a movie is

12  made, that subsequent movies, if they are not made within a

13  period of time, that right comes back, and then you could have

14  a different studio make the sequels.

15           What you don't want to do is have just one picture

16  made and then have a deal where there may never be another

17  picture.  So DC right now, Superman Returns is made, but

18  there's absolutely no assurance under the film agreement that

19  there will ever, ever be another Superman movie at any time.

20  Q.   BY MR. TOBEROFF:  Does the Superman film agreement have a

21  provision that's called a reversion provision?

22  A.   It does.

23  Q.   What does that reversion provision provide?

24  A.   That reversion is entirely uncustomary.  What it provides

25  is that so long as --

```
 1   Q.    Actually, I'll direct your attention to --

 2   A.    Can I look at it?

 3   Q.    -- paragraph 12 of Exhibit 232.  It's located on page 13.

 4   The Superman film agreement.  I believe it's in your pile to

 5   your left.

 6   A.    Okay.  It's a defendant or plaintiff exhibit?

 7         MR. TOBEROFF:  May we approach, your Honor?

 8         MR. BERGMAN:  Your Honor, I don't know the name or

 9   the title of the objection.  But stopping the witness in the

10   middle of an answer to ask another question has to be wrong.

11         THE COURT:  Yes, well, it's not really another

12   question.  You're asking to look at the exhibit, as I

13   understand it.

14         MR. TOBEROFF:  I'm just trying to help him --

15         THE COURT:  It's the same question.

16         MR. TOBEROFF:  Same question.  I'm trying to help

17   him locate the exhibit to speed things along.

18         THE COURT:  Okay.  I'm not going to comment on that.

19   Bring forth the exhibit.

20   Q.    BY MR. TOBEROFF:  I draw your attention to page 12.

21   Excuse me.  Paragraph 12 on page 13, Bates No. WB 4211.

22   A.    Okay.

23   Q.    What does that provision provide?

24   A.    It provides that if Warners fails to make a -- the

25   so-called option payment, which, as we discussed, were
```

1    basically 500,000, escalating to 600,000, escalating to

2    700,000 over time.  If Warners failed to make one of those

3    payments, then DC could notify Warner in writing that it

4    desired a reversion.  And then Warners would have a cure

5    period of three months to make that payment, which would

6    defeat the right to reversion.

7           This is very untypical because there's no mechanism

8    here other than the payment of these -- in the context of

9    Superman, very modest sums to allow DC, the rights holder, to

10   get the rights back.  What it means is that Warners can pay

11   these modest sums for a period of time and completely lock up

12   the Superman film and television rights and deprive DC of the

13   obligation that even much lesser rights holders, including

14   rights holders who have dealt with Warners themselves.  They

15   have the right to get it back if Warners doesn't keep going.

16          THE COURT:  Let me ask you about this reversion

17   issue.  Does the fact that DC Comics and Warner Brothers are

18   affiliates or related change your analysis in terms of the

19   necessity for a reversion or the significance of a reversion

20   contract of the type that you commonly find in these

21   agreements?

22          THE WITNESS:  The fact that they are affiliated,

23   they should have this sort of agreement.  If DC had an arm's

24   length deal, they absolutely would have this sort of

25   agreement, have these sort of mechanisms.

```
 1              THE COURT:  That's not my question.

 2              THE WITNESS:  Okay.  Okay.

 3              THE COURT:  I certainly understand if one studio is

 4   dealing with a competing studio --

 5              THE WITNESS:  Right.

 6              THE COURT:  -- that the reversion agreement takes on

 7   certain significance.  Because the competing studio may not

 8   have the same economic interest but have cross-economic

 9   interest vis-a-vis the studio they are entering into the

10   agreement with.

11              Does the analysis change when you have affiliates of

12   the same company, where they are essentially working for the

13   same boss, as it were?  Noting the divergence of the economic

14   interest you have.  What the competing does, does that change

15   the analysis at all?

16              THE WITNESS:  I think you have to start at the DC

17   level and look at what's best for DC.  The fact that --

18              THE COURT:  So your answer is no, it does not change

19   the analysis?

20              THE WITNESS:  No.

21   Q.  BY MR. TOBEROFF:  Mr. Halloran, are you familiar with the

22   entertainment industry term, quote, development hell, end

23   quote?

24   A.  I've been -- clients of mine have been stuck in it many

25   times.  I know what it is, yes.
```

```
1    Q.   What does this refer to?

2    A.   Development hell is the place that you are in when you're

3    dealing with a studio and you have a property that's in

4    development.  The screenplay is being written, and it never

5    gets made.  That's development hell.  And from a rights

6    holder, that's where you don't want to be.  You don't want to

7    get stuck in development hell.

8    Q.   Now, from the record that you reviewed, how long did it

9    take Warner Brothers to develop a new Superman film resulting

10   in the 2006 film Superman Returns?

11   A.   My recollection was approximately 10 years.

12   Q.   Moving on to a new subject.  A great deal of time was

13   spent the other day on the issue of producer's gross versus

14   distributor's gross.

15            Are you aware of the approximate portion of total

16   film revenues generated from the home video market?

17   A.   As of 2002?

18   Q.   As of the date of the Sahara agreement.

19   A.   Okay.  Approximately 50 percent.

20   Q.   In the typical distributor's gross definition, what

21   portion of home video revenues are included in distributor's

22   gross?

23   A.   20 percent.

24   Q.   If videos account for half of all revenues and the

25   distributor's gross definition only includes 20 percent of
```

1    home video revenues, approximately what percentage of actual

2    revenues are going into distributor's gross if you can do the

3    math?

4    A.    I think the easiest way to look at it is half or so --

5               Just to make it easy, your Honor, the two basic

6    models are a hundred percent of gross minus a small

7    distribution fee minus expenses, and what's left goes into

8    gross.  The other model is that it's a percentage of that

9    wholesale price.  There are a lot of variables, but basically

10   if you have a 20 percent royalty, that is likely at least only

11   half of what would you get if you had either all the gross

12   receipts minus the cost coming in or a 40 percent of wholesale

13   royalty.

14   Q.    What percentage of video revenues are typically included

15   in a financing producer's definition of producer's gross?

16   A.    It's typically a hundred percent of the total revenue

17   received less a reduced distribution fee, say, 10 to 15

18   percent, less the actual costs of manufacturing and

19   advertising of the DVD's and a hundred percent of the revenue

20   that's left goes into the gross pot.

21   Q.    Did Phillip Anschutz finance the film produced under the

22   Sahara agreement?

23   A.    Yes.

24   Q.    On a different topic, Mr. Bergman questioned you on your

25   testimony in another case regarding how negative publicity or

```
 1   controversy could actually benefit a film.
 2            Do you recall that?
 3   A.   I do.
 4   Q.   Can you think of any films where negative publicity or
 5   controversy benefited the financial bottom line of the film?
 6   A.   I can think of a couple.  The Passion of Christ certainly
 7   was aided in large part by the publicity about the controversy
 8   of the Catholic church and its -- and the interview lent
 9   feeling among many Catholics, especially conservative
10   Catholics, that the Passion of Christ portrayed Jesus Christ
11   in a very unflattering way.
12            And, as you know, Passion of Christ was an
13   independent film, so I think it's even more telling that it
14   performed the way it did, given that controversy.
15   Q.   Who directed that film?
16   A.   Mel Gibson.
17   Q.   Was there any controversy regarding Mel Gibson in that
18   film to your knowledge?
19   A.   You mean Mel Gibson surrendering that film?
20   Q.   Mel Gibson with respect to the Passion of Christ?
21   A.   There was a lot of controversy because Mel is a very
22   devout Catholic.  So there was the controversy about, you
23   know, a devout Catholic against the Catholic church -- a
24   devout Catholic financing and producing a film that many
25   Catholics perceived as being not really respectful of Jesus
```

1    Christ.

2            So there was that tension going on.  And it got all

3    sorts of controversy, and I think it, you know, certainly the

4    Passion of Christ is, as commonly known, is driven by

5    religious people who were interested, you know, in that

6    controversy and otherwise.

7            There was a very large awareness which was

8    attributed to by the controversy.

9    Q.   Moving on to a new subject.  You testified the other day

10   and at your deposition that the Superman film rights could

11   secure a purchase price of $30 million for an up-front

12   purchase of the rights to make multiple Superman films.  Is

13   that your only opinion as to what the purchase price of the

14   film rights would be on the open market or not?

15           MR. BERGMAN:  Objection.  Mischaracterizes the

16   testimony and is leading.

17           THE COURT:  Rephrase your question, Counsel.

18   Q.   BY MR. TOBEROFF:  Is your testimony regarding a

19   $30 million purchase price, does that relate to the right to

20   make a single film or the right to make multiple films?

21   A.   The right to make multiple films.

22   Q.   And is that your only opinion as to what the purchase

23   price of the film rights to Superman would be on the open

24   market or not?

25   A.   No.  That's actually the exception to what I think it

1    would be.  I think what DC would want to do as of 2002 would

2    be to have the ability to license the picture on a one-picture

3    basis with a customary reversion if the buyer did not continue

4    to make motion pictures.

5         The $30 million came up in the context of the

6    Terminator agreement, which is in evidence here, where the

7    company that bought the terminator rights paid $25 million,

8    but they bought the rights for Terminator 4, 5, and 6.  I was

9    trying to make it -- in the deposition what was happening was

10   that -- when I was testifying, Mr. Bergman seemed to be trying

11   to lead me to the opinion that it was $30 million for one

12   picture, when that was never my intention.

13        So I think there was some confusion there.  But

14   certainly my opinion remains unchanged that in the unlikely

15   event that DC would have gone to the marketplace in 2000 and

16   sold all the movies, it would have been that price.

17        My opinion now is that it should have been at least

18   $10 million on a per picture basis with the right to get it

19   back.

20   Q.   Now, you also mentioned an option payment as high as

21   3 million, using, you testified, a 10 percent norm.

22   A.   Right.

23   Q.   Is 3 million -- how do you arrive at the 3 million?

24   A.   3 million, assuming a $30 million purchase price,

25   3 million is 10 percent of $30 million.

1   Q.   Do you believe if Superman was -- Superman film rights

2   were offered in the open market, that it would entail an

3   option?

4   A.   That's highly unlikely.

5   Q.   Why do you say that?

6   A.   Given the universe of my knowledge of the industry and

7   the universe of the agreements that I've seen, highly valued

8   intellectual property oftentimes there's no option period.

9   The rights holder does not want to get stuck in development

10  hell.  Rather, there is an immediate purchase.  That was done

11  in Hannibal, and it was done, I believe, in the Red Rabbit and

12  Rainbow 6 agreements, among others.

13  Q.   Moving on to the Lord of the Rings agreement.  You

14  testified the other day that the Lord of the Rings

15  merchandising rights were, quote, complicated, end quote.

16  What is your understanding of the scope of the licensor's

17  merchandising rights in that agreement?

18          MR. BERGMAN:  Objection, your Honor.  In his report,

19  Mr. Halloran did not mention or list the merchandising

20  agreement in Lord of the Rings.

21          THE COURT:  Counsel?

22          MR. TOBEROFF:  I know we listed the Lord of the

23  Rings agreement.  I want to check whether he listed the

24  merchandising aspect as well.

25          THE COURT:  How much longer do you think you have at

```
 1    this point?

 2              MR. TOBEROFF:  I don't think I'd be finished by

 3    5:00.

 4              THE COURT:  You don't think so?

 5              MR. TOBEROFF:  I think I need another half hour or

 6    so.

 7              THE COURT:  Okay.  Well, in that case, I was hoping

 8    to get through with Mr. Halloran today.  But we're going to

 9    have to come back tomorrow morning.

10              THE WITNESS:  That's fine.  What time, your Honor?

11    9:30?

12              THE COURT:  9:30.  Counsel, just be mindful that the

13    time is running out.  You have about two hours and 20 minutes

14    left.

15              MR. TOBEROFF:  Oh, yesterday you mentioned -- you

16    said five hours.

17              THE COURT:  Right.  The time has been going today.

18              MR. TOBEROFF:  Did I use two hours today?

19              THE COURT:  That's what I have here, Counsel.

20              MR. BERGMAN:  May I ask, your Honor, what I have

21    left?

22              THE COURT:  You have eight hours and 20 minutes

23    left.

24              MR. BERGMAN:  Thank you, sir.

25              THE COURT:  I don't recall what I said last night,
```

```
 1    Counsel.
 2              MR. TOBEROFF:  I'm not quibbling.  I just want to
 3    clarify the time.
 4              THE COURT:  According to this, you have two hours
 5    and 20 minutes left.
 6              MR. TOBEROFF:  We started after the break.  It's
 7    been cross-examination most of the day.  So we were told
 8    yesterday five hours.  And --
 9              THE COURT:  I may have misspoken yesterday when I
10    looked at the clock, Counsel.
11              MR. TOBEROFF:  With your permission, your Honor,
12    could I try and wrap this up today, then?
13              With your permission, I need to -- if that's the
14    case, I need to --
15              THE COURT:  I suspect Mr. Bergman has some follow-up
16    as well.  So we'll pick up tomorrow morning.  But I -- I said
17    18 hours of cross-examination.  And according to the chess
18    clock, we're at 3:40.  I may have given you the wrong number
19    yesterday.  I may have been looking at it.  Because you've
20    only gone this afternoon, and you went this morning.
21              MR. TOBEROFF:  We started after the break this
22    afternoon.
23              THE COURT:  Right.  At 3:15.
24              MR. TOBEROFF:  It was about 3:40.
25              THE COURT:  So an hour and 20 minutes, and then
```

1   about 40 minutes this morning.  So it's only been about two

2   hours.  So there's 40 minutes -- all right.  I'll give you

3   back those 40 minutes.  I must have let the clock run during a

4   break or something.  But that's three hours.

5           MR. TOBEROFF:  I appreciate that, thank you.

6           MR. BERGMAN:  Thank you.

7           THE COURT:  All right, very good.  I'll see you

8   tomorrow morning at 9:30.

9

10                      C E R T I F I C A T E

11

12

13           I hereby certify that pursuant to Title 28,

14   Section 753 United States Code, the foregoing is a true and

15   correct transcript of the stenographically reported

16   proceedings in the above matter.

17           Certified on May 7, 2009.

18

19

20   _____
     **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
21   License No. 10514

22

23

24

25