1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6    JOANNE SIEGEL, etc.,          :  PAGES 1048 - 1110
                                   :
7            PLAINTIFF,            :
                                   :
8        VS.                       :  NO. CV 0408400-SGL(RZx)
                                   :
9    WARNER BROTHERS               :
     ENTERTAINMENT, INC., etc.,    :
10                                 :
             DEFENDANT.            :
11   _____:

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            COURT TRIAL - DAY 8

16            RIVERSIDE, CALIFORNIA

17           FRIDAY, MAY 8, 2009

18            AFTERNOON SESSION

19

20

21

22              MARK SCHWEITZER, CSR, RPR, CRR
                OFFICIAL COURT REPORTER
23              UNITED STATES DISTRICT COURT
                181-H ROYBAL FEDERAL BUILDING
24              255 EAST TEMPLE STREET
                LOS ANGELES, CALIFORNIA 90012
25              (213) 663-3494

**Appearances of Counsel:**

For the Plaintiff:

    TOBEROFF AND ASSOCIATES
    By Marc Toberoff, Esq.
        Nicholas Williamson, Esq.
        Keith Adams, Esq.
    2049 Century Park East
    Suite 2720
    Los Angeles, CA 90067
    (310) 246-3333


For the Defendant:

    BERGMAN COLEMAN GRODIN & EVALL, LLP
    By Michael Bergman, Esq.
        Anjani Mandavia, Esq.
    9665 Wilshire Boulevard
    Ninth Floor
    Beverly Hills, CA 90212
    (310) 860-3346

        -and-

    LAW OFFICES OF PATRICK T. PERKINS
    By Patrick T. Perkins, Esq.
    1711 Route 90
    Cold Spring, NY 10516
    (845) 265-2820

1

**I N D E X**

2

3    PAUL LEVITZ, PREVIOUSLY SWORN........................ 1055

4    DIRECT EXAMINATION (CONTINUED)....................... 1055

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       **<u>Riverside, California; Friday, May 8, 2009</u>**

2                              **2:45 P.M.**

3              THE COURT:  Counsel.

4              MR. BERGMAN:  Thank you.

5              MR. TOBEROFF:  Your Honor, before we begin, with a

6      procedural matter.  Lillian Laser, general counsel of DC, is

7      listed in an exhibit for defendants.  I would ask that she be

8      sequestered pursuant to Federal Rule of Evidence 615 if, in

9      fact, defendants intend to call her.

10             MR. BERGMAN:  Well, your Honor, the plaintiffs have

11     put on their case.  They haven't called her.  They were going

12     to call her.  We are not going to call her.  I will represent

13     that to the Court.

14             MR. TOBEROFF:  Then there's no problem, your Honor.

15             MR. BERGMAN:  Okay.

16             THE COURT:  I love when this resolves itself.  You

17     may proceed.

18             MR. PERKINS:  Your Honor, I'm sorry.  I had another

19     matter.

20             THE COURT:  Let's see if this one resolves as

21     quickly.  You are allowed to talk to each other, Counsel,

22     during the breaks.

23             MR. BERGMAN:  Yes, sir.

24             THE COURT:  Okay.  Just wanted to make sure you are

25     aware of that.

1        MR. PERKINS:  Your Honor, last Friday, as you may

2   recall, there was testimony Friday morning concerning the

3   Harry Potter agreement, J.K. Rowling, and we made an

4   application, if you will, or made it clear to the Court that

5   this information in that deal is highly sensitive.

6        THE COURT:  Right.

7        MR. PERKINS:  Your Honor told us that down the road

8   we could make a written application to seal that, making the

9   point that no one was in the courtroom so that we could just

10  do that down the road.

11       Unfortunately, today, your Honor, we received a call

12  from another lawyer at Warner Brothers who is being deposed in

13  a case involving the Orson Wells estate.  And the lawyer for

14  the other side has told her that Mr. Halloran, who has been

15  engaged by the Wells estate, disclosed to the lawyer the video

16  royalty rate for Ms. Rowling in that agreement.  And, your

17  Honor, Mr. Halloran received these materials pursuant to a

18  protective order.

19       He signed a document agreeing to keep those

20  things under seal.  I don't know whether there was confusion

21  based on what happened in the courtroom.

22       THE COURT:  Well, the Court certainly did nothing to

23  undo the protective order.

24       MR. PERKINS:  Well, we didn't think so either, your

25  Honor, but I guess we would ask for two things at this point.

1   The first would be that the three documents -- the Harry

2   Potter documents 1097, 1098, and 1099 -- be provisionally

3   sealed until such time as we can make a formal application.

4   And the second, that the plaintiffs be ordered to call

5   Mr. Halloran and remind him that the information in the Harry

6   Potter agreements is highly confidential and that he is under

7   obligation not to share that with third parties.

8            THE COURT:  So the report is that after -- he was in

9   the room when that testimony was made?  Who made that

10  testimony?

11           MR. PERKINS:  He did, your Honor.  He reviewed

12  those --

13           THE COURT:  He reviewed the documents.

14           MR. PERKINS:  And he was on the stand on Friday

15  morning.  It's at pages 527 or so of the transcript.  So

16  that's our application, your Honor.

17           THE COURT:  And this person indicates that it was

18  Mr. Halloran who provided that information to him?

19           MR. PERKINS:  Yes, your Honor.  He's actually the

20  lawyer who has hired Mr. Halloran.  And the way that it came

21  out was that at the deposition the Warner Brothers attorney

22  was asked what was the video royalty in the Harry Potter case.

23  She said that's confidential.  Then was asked -- she was asked

24  later what's the highest that's ever been given.  She gave

25  that testimony.  And then on the break, he went to her and

1054

```
 1    said, you know, you don't have to say this is confidential.
 2    Mr. Halloran told me these numbers.  So it's out there.
 3              THE COURT:  And when did this take place?
 4              MR. BERGMAN:  This took place today, your Honor.
 5              THE COURT:  Do you know anything about this,
 6    Mr. Toberoff?
 7              MR. TOBEROFF:  I know absolutely nothing.  And it
 8    may or may not -- we're getting something sort of third hand.
 9    So I know nothing about it, but I'd be happy to remind
10    Mr. Halloran.  He did sign a protective order in this case.
11    And I'd be happy to remind him of that and inquire into it.
12              THE COURT:  Mr. Halloran is a lawyer; right?
13              MR. TOBEROFF:  Yes.
14              THE COURT:  I'll see Mr. Halloran on Tuesday.
15              MR. PERKINS:  Thank you, your Honor.
16              THE COURT:  And provisionally the exhibits are
17    placed under seal.
18              Counsel, can you make arrangements for Mr. Halloran
19    to be here?
20              MR. TOBEROFF:  I'll inform him that you've ordered
21    him here on Tuesday.
22              THE COURT:  Thank you.  And just so he has notice,
23    I'll be inquiring as to this information, when, if, who.
24              MR. TOBEROFF:  I'll let him know, your Honor.
25              THE COURT:  All kinds of non-leading questions.
```

1       MR. TOBEROFF:  Thanks.

2       THE COURT:  All right.  Let's proceed.

3       MR. BERGMAN:  Thank you, your Honor.

4                 **PAUL LEVITZ, PREVIOUSLY SWORN.**

5                 **DIRECT EXAMINATION (CONTINUED)**

6   BY MR. BERGMAN:

7   Q.   Mr. Levitz, in the years subsequent to 1978 and the

8   release of the first Superman film, did you have an

9   opportunity to determine the extent to which Warner Brothers

10  was effectively distributing the various Superman motion

11  pictures and television series?

12  A.   Yes.

13  Q.   Okay.  What did you determine in that regard, sir?

14  A.   I observed that generally Warner Brothers had an

15  extraordinarily effective distribution mechanism for

16  exploiting the film in pretty much any marketplace

17  internationally or domestically where there were revenues

18  available to be derived from it.

19  Q.   Okay.  Were you aware, in the years 1999 through 2002,

20  that Warner Brothers owned any copyrights in any of the

21  materials contained in Superman 1 through 4?

22  A.   Yes.

23  Q.   And did your knowledge of that fact impact in any way

24  upon your inclination to enter into the 1999 agreement?

25       MR. TOBEROFF:  Objection.  Leading, your Honor.

1          THE COURT:  It's a foundational question.

2    Overruled.

3          THE WITNESS:  Yes.

4    Q.   BY MR. BERGMAN:  Can you explain why, sir?

5    A.   When you allow a licensee to create material that they

6    can have copyright or trademark rights, you are essentially

7    giving hostages to the future.  If you want to use that

8    material again and import it in other forms and fashions of

9    exploitation, then you have to work with them again or reach

10   some other accommodation with them again.

11         In specific to Superman, for example, the simplest

12   example to me is the John Williams theme music, which is

13   extraordinarily familiar, a great signature tune for Superman

14   and not anything that DC intrinsically has any control over

15   itself without Warner Brothers' consent.

16   Q.   Prior to the break, Mr. Levitz, I had asked you a

17   question about whether obtaining fair market value for the

18   Superman property was important to you as an executive of DC.

19   Was it important to you as an individual?

20   A.   Yes.

21   Q.   Can you explain in what way?

22   A.   I grew up in this business believing that the entire

23   industry I was in had been damaged by writers and artists not

24   getting a fair share of the proceeds of their work and have

25   worked most of my career to remedy those situations and

1  structures.  I think ultimately that was the cause of a great

2  deal of the problems the comic book industry had through the

3  1950's and the 1960's.  And I believe a great deal of the

4  resurgence of the comic book industry and the growth of the

5  graphic novel business has come off giving writers and artists

6  a good shake in their work.  If you don't work to a fair

7  market standard, you defeat the purpose of participations that

8  you give out, and you begin backsliding back to where the

9  whole field that I've grown up in and love ceases to be viable

10 and healthy.

11 Q.   You mentioned earlier the number of permanent employees

12 that DC has.  How many writers, approximately, does DC employ

13 each year?

14 A.   I don't get a separate tally of writers.  I would guess

15 that it's probably 100 to 200 writers.

16 Q.   And are there other artists who also receive -- strike

17 that.

18      Do the artists -- do the writers receive generally

19 royalties on their work?

20 A.   The vast majority of things that we create, produce, or

21 license have writers and artists as participants in some

22 fashion.

23 Q.   Are there other individuals besides artists who receive

24 royalties from work they do for DC?

25 A.   The majority of the participants are writers or artists.

1  There are situations in which participations are either being

2  paid to other forms of crafts people, like colorists in

3  particular deals, and, of course, there are many situations on

4  the older material where the work is being paid in some

5  fashion or other to an estate.

6           I believe we have an orchestra in Arizona that

7  benefits from the work of Dick Sprang somewhere.

8  Q.   Have you ever received any guidance or instructions from

9  any senior Time Warner executive as to how DC should conduct

10  business dealings with Warner Brothers or other affiliated

11  companies?

12  A.   Among other instances, I attended a Time Warner executive

13  conference this year at which Jeff Bucus, who is the current

14  Chairman and Chief Executive Officer of Time Warner, delivered

15  to -- I guess it was a group of about 40 of us -- a brief

16  speech in which he said that he wanted us always to work to

17  fair market value in transactions for our divisions, and that

18  if that was a burden to any division, what they should do is

19  go to him and ask for relief on the financial goals that were

20  being set for them but not to disturb the fair market standard

21  because it was important to the company.

22           MR. TOBEROFF:   Objection, your Honor, on the basis

23  of relevance since he's talking about a recent conference.

24  We're talking about the time here between 1999 and 2002.  It's

25  irrelevant what's said today.

```
 1              THE COURT:  I'm going to overrule the objection and
 2   also consider that in the context of evaluating the
 3   significance of the evidence.  Thank you.
 4              Counsel.
 5   Q.   BY MR. BERGMAN:  Measured by comic book sales,
 6   Mr. Levitz, who is currently DC's most popular comic book
 7   hero?
 8   A.   Generally, Batman.
 9              THE COURT:  That's in terms of sales?
10              THE WITNESS:  Collective sales of titles featuring
11   Batman.
12   Q.   BY MR. BERGMAN:  Using that same standard, can you tell
13   us who DC's most popular comic book hero property was during
14   the period from 1999 to 2002?
15   A.   Generally, Batman.
16   Q.   Where did Superman rank among DC's properties and comic
17   sales during that 1999 to 2002 period?
18   A.   Probably second for most of that time.
19   Q.   And measured by comic book sales, who was DC's most
20   popular comic book hero character in 1973-74, when you were
21   negotiating the Salkind film agreement?
22   A.   Superman.
23              MR. TOBEROFF:  Objection.  The record -- I don't
24   believe he negotiated that agreement when he was 16.  The
25   Salkind agreement.
```

1           THE COURT:  Assumes facts not in evidence, Counsel.

2           MR. BERGMAN:  I'll rephrase that question, your

3    Honor.

4    Q.   Are you aware, Mr. Levitz, of who DC's most popular comic

5    book hero character was in 1973 and '74?

6    A.   Yes, sir.

7    Q.   And who was that, sir?

8    A.   Superman.

9    Q.   Again, looking to the same measure of comic book sales,

10   and this time looking to the comic book industry as a whole,

11   who would you say was the most popular comic book character in

12   and around 1974?

13   A.   The most popular heroic character at that time by sales

14   would have been Superman.  It's possible that either Archie or

15   Richie Rich had more unit sales on the humor side.

16           MR. TOBEROFF:  Objection.  Lacks foundation.

17           THE COURT:  Overruled.

18           MR. BERGMAN:  May someone place 1041 in front of

19   Mr. Levitz.  That is the Superman agreement.

20   Q.   Do you have that, sir?

21   A.   Yes, sir.

22   Q.   I'd like to refer you to paragraph 6-C, which is found at

23   page Bates stamped 4205.  Titled Merchandising List.

24   A.   Yes, sir.

25   Q.   In your dealings with Warner Brothers concerning Superman

1   Returns, have any Superman Returns merchandise revenues been

2   deemed to fall under this provision?

3   A.   I don't believe so.

4   Q.   Did the promotion and release of Superman Returns have

5   any effect on the Superman merchandising revenues?

6   A.   Yes.

7   Q.   What is it called in the industry, Mr. Levitz, when the

8   release of a film impacts the merchandising receipts of an

9   existing property?

10  A.   You'll frequently hear that referred to as the uplift,

11  basically the delta between some calculated average of prior

12  years and the results during the year, two years, three years

13  around the film where you capture the effect of the film's

14  marketing promotional dollars on the merchandising sales.

15  Q.   I see.  To what extent, if at all, did the promotion,

16  release of Superman Returns affect the Superman merchandising

17  revenue lift?

18  A.   There was a tremendous effect from Superman Returns on

19  our merchandising revenues.  For Superman, I've not calculated

20  a lift -- an uplift per se versus any specific prior period,

21  but we believe we received approximately $40 million worth of

22  merchandising revenue at the WBCP source.

23  Q.   And by that, do you mean, sir, that WBCP received a gross

24  total of $40 million from the uplift?

25  A.   The uplift or the --

1  Q.   Brought in.

2  A.   Yes.

3  Q.   Of that $40 million in merchandising revenue generated by

4  Superman Returns, how much did DC receive?

5  A.   Approximately $30 million.

6  Q.   Okay.  Are you familiar with the role of Legendary

7  Pictures in connection with Superman Returns?

8  A.   Reasonably.

9  Q.   How did you gain your knowledge of that relationship,

10  sir?

11  A.   Discussions with both Warner Brothers pictures executives

12  and Legendary Pictures executives.

13  Q.   Are you aware of how Warner Brothers accounts to

14  Legendary regarding merchandising revenues for Superman

15  Returns?

16  A.   Reasonably familiar with it.

17  Q.   Can you tell us how that is done?

18  A.   What's done is a pro forma calculation is created as

19  though Warner Brothers pictures got the benefit of both the

20  Warner Brothers consumer products fees and the moneys received

21  by DC comics for the property during a relevant period of

22  time.  And that's added to the revenue side of the equation

23  for the calculation of Legendary's earn out or return on their

24  investment in the picture.

25  Q.   Are you aware of how that arrangement was reached?

1   A.    Yes.

2   Q.    Could you tell us what happened?

3   A.    At some point after, I believe, Batman begins, which

4   Legendary was also a co-financier of, Legendary asked Warner

5   Brothers pictures for the benefit of merchandising.  Warner

6   Brothers pictures turned to DC and said our partner wants to

7   share in this.  Can you give us back the money or give us back

8   some of the money.  We declined and instead worked out a

9   system to help them with the pro forma accounting for it.

10          MR. TOBEROFF:  Objection, your Honor.  Hearsay as to

11   what these third party statements -- these parties.

12          THE COURT:  Counsel?

13          MR. BERGMAN:  They are not being introduced for the

14   truth of the matter asserted, your Honor.  Merely how the

15   arrangement that Mr. Levitz has already testified to came

16   about.

17          THE COURT:  What's it being introduced for?

18          MR. BERGMAN:  It's being introduced, among other

19   things, to demonstrate that the merchandising provision for DC

20   comics was a superior merchandising provision.

21          THE COURT:  Right.  But this testimony itself was

22   being introduced for -- that's assuming that this is true.

23   The statement itself is being introduced for its truth?

24          MR. BERGMAN:  Yes, sir, it is.

25          THE COURT:  Sustained.

1  Q.   BY MR. BERGMAN:  Are you aware, at this point in time,

2  Mr. Levitz, after having received various accounting

3  statements as to how Warner Brothers accounts to Legendary

4  Pictures for the merchandising revenue from Superman Returns?

5         MR. TOBEROFF:  Objection, your Honor.  Leading in

6  the phrase after having received various Warner Brothers

7  accounting statements.  Also lacks foundation.

8         THE COURT:  You're simply asking if he's aware.

9  I'll overrule the objection as to this question, but then

10 you'll need to lay a foundation as to how he was aware.

11 Q.   BY MR. BERGMAN:  Do you regularly receive, on behalf of

12 DC, accounting statements from Warner Brothers on Superman

13 Returns?

14 A.   Yes.

15 Q.   And have you from time to time seen similar accounting

16 statements issued by Warner Brothers to Legendary Pictures?

17 A.   No, I have not.

18 Q.   When you were asked to agree to an adjustment regarding

19 Legendary Pictures and the merchandising revenue, were you

20 given any document at that time to demonstrate what the

21 problem was?

22 A.   I believe I had an opportunity to read the relevant

23 paragraph of the Warner/Legendary agreement.

24 Q.   Okay.  And as a result of reading that paragraph and

25 comparing it to the participation statements you received on

1  behalf of DC, do you have an understanding as to how Warner

2  Brothers accounts to Legendary Pictures for merchandising on

3  Superman Returns?

4          MR. TOBEROFF:  Objection, your Honor.  Leading.

5          THE COURT:  Overruled.  It's foundational.  Just a

6  yes or no question.

7          THE WITNESS:  Yes.

8  Q.  BY MR. BERGMAN:  Okay.  Can you explain how it was done?

9  A.  I believe that they take a pro forma document that we

10  supply estimating our receipts for merchandising, and they add

11  that back to the consumer products fees in their accounting to

12  Legendary.

13  Q.  Does any of the money that is added by Warner to that pro

14  forma account come out of DC's pocket?

15  A.  No.

16  Q.  So that whatever the relationship between Warner Brothers

17  and Legendary may be, does that have any impact upon DC's

18  revenues?

19  A.  We do not get the direct benefit of any money from

20  Legendary, nor do we pay out any money that goes directly to

21  Legendary.

22  Q.  Mr. Levitz, are you familiar with the agreement between

23  DC Comics and the Salkind companies entered into in 1974

24  regarding the rights to Superman?

25  A.  Yes.

1066

```
 1    Q.   And with whom did DC contract in those 1974 agreements?

 2    A.   The corporate entity on the other side was at the time

 3    entitled Film Export.  The functional owner who controlled

 4    that entity and a number of subsequent entities that the

 5    agreements passed through the hands of was Alexander Salkind.

 6    Q.   To your knowledge, Mr. Levitz, did Mr. Salkind or any of

 7    his companies have any relationship, corporate relationship,

 8    or ownership relationship with any Time Warner entity?

 9    A.   Not at any time.

10    Q.   Okay.  What films, if any, had Mr. Salkind produced prior

11    to 1974?

12              MR. TOBEROFF:  Objection.  Lack of foundation.  He's

13    testifying as a percipient witness --

14              THE COURT:  Sustained.  Lay a foundation.

15    Q.   BY MR. BERGMAN:  Okay.  Did you in your negotiations with

16    Mr. Salkind and his representatives -- strike that.

17              Did you become aware in any way of pictures that

18    Mr. Salkind had produced prior to Superman?

19    A.   Yes.

20    Q.   How did you become aware of those, sir?

21    A.   There was a considerable controversy over a set of

22    pictures that Salkind had produced.  The Three Musketeers and

23    the Four Musketeers because he had made the two films

24    simultaneously under the guise of making one film and paying

25    the actors and other participants the fees appropriate for one
```

1  film.  That became the subject of negotiation, litigation,

2  controversy, and had a significant effect on Superman because

3  he proposed to make Superman 1 and Superman 2 in the same

4  fashion.

5        So I was more conscious of it than I might have been

6  on a more civilian basis.

7  Q.  Okay.

8        MR. TOBEROFF:  Objection, your Honor.  The prior

9  testimony shows that in this time period, he was 16 or 18

10  years old.  And he's purporting to testify as a percipient --

11        THE COURT:  Lay some further foundation as to how

12  and when he came into possession of this knowledge.

13  Q.  BY MR. BERGMAN:  How did you become aware of those facts,

14  Mr. Levitz?

15  A.  It was common knowledge at the time of anyone who was

16  interested in either the film business in general or who was

17  interested very specifically in the process of the making of

18  Superman 1 and Superman 2.  Certainly those of us who were

19  working for the company were very intimately aware of what was

20  going on with the evolution of Superman 1 and Superman 2

21  because the company was so small.  It was playing out before

22  our eyes.

23  Q.  Were the facts of the Musketeer movies and the process

24  that you described to us publicized in newspapers?

25  A.  I believe you can find all of that in newspapers at the

```
 1   time.
 2   Q.   Do you know whether DC offered the film rights to Warner
 3   Brothers prior to making the deal with Mr. Salkind?
 4   A.   Yes.
 5   Q.   And did it?
 6   A.   Yes, it did.
 7   Q.   And do you have any information as to why Warner didn't
 8   agree to license the Superman film rights at that time?
 9            THE COURT:  Just a yes or no question.
10            THE WITNESS:  No personal knowledge.
11   Q.   BY MR. BERGMAN:  What were the key financial terms of the
12   Salkind agreement?
13   A.   The critical financial term of the Salkind agreement was
14   that DC would receive a participation in a true first dollar
15   gross of 5 percent of worldwide or 7 1/2 with domestic,
16   whichever was larger.
17   Q.   And do you recall, sir, what the term of the Salkind 1974
18   agreement was?
19   A.   I believe it was 25 years.
20   Q.   Until 1999?
21   A.   That's correct.
22   Q.   And what is your understanding, sir, as to when, as of
23   1974, the copyright in Superman would have terminated?
24   A.   As of 1974, the copyright in the first Superman story,
25   the one in Action 1 that is the core of this action, would
```

1    have terminated in April 1994.

2    Q.    Okay.  Did Mr. Salkind or his companies retain a

3    distributor to distribute any of the four Superman films?

4    A.    Yes.

5    Q.    And with what distributor or distributors did it enter

6    into such agreements?

7    A.    The majority of the distribution rights to Salkind's four

8    Superman movies went through Warner Brothers because Salkind

9    tended to do business in extraordinarily complicated and

10   convoluted fashions.  There were individual countries on

11   individual films that for some period of time were licensed to

12   other parties.

13          Many of his licenses -- many of his rights to

14   produce Superman 4 he subcontracted to Cannon Films, which

15   contracted both with Warner Brothers domestically and then

16   with individual distributors in individual -- certain

17   individual foreign territories or for some segments of

18   television rights.  And Supergirl is a fairly complex separate

19   story.

20          MR. TOBEROFF:  Your Honor, move to strike as

21   nonresponsive.  He simply asked what distributor or

22   distributors did it enter into agreements with.

23          THE COURT:  I'll strike the fairly complex separate

24   story of Supergirl, but the rest seems rather responsive.

25   Overruled.

```
 1   Q.   BY MR. BERGMAN:   What was Supergirl?

 2   A.   Supergirl was the fifth film produced under the Salkind

 3   agreement.

 4   Q.   And what was the performance theatrically of the

 5   Supergirl film?

 6   A.   I believe the performance was quite poor.  I don't

 7   remember the dollar gross figures.

 8   Q.   Do you recall who financed Supergirl?

 9   A.   The production of the Supergirl film was financed by

10   Warner Brothers.  But prior to release, Warner Brothers'

11   interest was bought out by Tristar Pictures and again with

12   certain individual television rights being sold separately.

13   Q.   At that point in time, and let me ask you what point in

14   time that was.  Approximately when was Supergirl released?

15   A.   I believe Supergirl was released in 1985, 1984.

16   Q.   Okay.  And the company that you identified as Tristar,

17   were they -- what type of company was that at the time?

18   A.   At the time I believe Tristar was a joint venture of

19   Coca-Cola Company, Time, Inc., acting through its Home Box

20   Office subsidiary, and Columbia Pictures founded as a new

21   motion picture studio, and they had not at the time they did

22   the deal to acquire Supergirl, they had not yet released their

23   first motion picture.

24   Q.   Okay.  Did there come a point in time when Mr. Salkind or

25   his companies conveyed his Superman rights prior to 1999 to
```

1   some third party?

2   A.   Yes.

3   Q.   And to whom did he convey those rights?

4   A.   As asked, that's a complex question because he had

5   conveyed many individual portions of his rights on different

6   occasions to parties such as Cannon Films for making Superman

7   4 and to various distribution parties in different fashions.

8   Q.   Did there come a point in time when Warner Brothers

9   succeeded to the rights of Mr. Salkind's company in the

10  Superman property?

11  A.   Yes.

12  Q.   And can you tell me when that was, sir?

13  A.   I believe it was approximately 1991 when Warner Brothers

14  essentially bought out the Salkind contract.

15  Q.   Superman 4 was released in what year, Mr. Levitz?

16  A.   '84, '85.

17  Q.   Between 1984 and '85 and 1999, was any other Superman

18  related motion picture released by Warner Brothers?

19  A.   I'm sorry.  Between what dates?

20  Q.   From 1987 through the end of that decade, 1999.

21  A.   Following Superman 4 and Supergirl, which I don't think

22  you're referring to, the only Superman related motion picture

23  that Warner Brothers released was Steel.

24  Q.   Can you tell us what Steel, the motion picture, was?

25  A.   Yes, in 1993 in the comics, when we did a successful

1072

```
 1   story about the death of Superman and his return, there was a
 2   period in the story line in which there were multiple heirs to
 3   Superman running around in his absence.  One of them was a man
 4   named John Henry Irons.  Who built himself a set of metallic
 5   armor to a giant sort of hammer-shaped weapon to try to fill
 6   the gap that Superman's death or disappearance had caused and
 7   began calling himself Steel.
 8   Q.   And was that picture actually released?
 9   A.   Yes.
10   Q.   And do you recall approximately what the domestic box
11   office was?
12   A.   I believe it was a million or $2 million.
13   Q.   Following Superman 4 in 1987, Supergirl, and Steel, did
14   you receive on behalf of DC any inquiry from anyone to
15   purchase any rights in Superman?  Film rights?
16   A.   Not film rights that I recall.
17   Q.   Did DC have -- strike that.
18        How would you characterize the extent of DC's
19   creative controls under the Salkind agreement?
20   A.   I would categorize them as being extraordinary by the
21   standards of the film industry.
22        MR. TOBEROFF:  Objection.  This is expert testimony.
23   He's applying a specialized knowledge, it characterizing terms
24   and agreements, something the experts have been doing.  And
25   they have experts to do that.
```

1          THE COURT:  I don't know if this is expert testimony

2    or not.  Depends what it's based on.  Why don't you rephrase

3    your question, Counsel, and make sure it's clear what he's

4    basing his testimony on.

5    Q.   BY MR. BERGMAN:  Are you familiar with the extent of

6    creative controls that DC had under the Salkind agreement?

7    A.   Yes.

8    Q.   Are you familiar with the extent to which DC had creative

9    controls on Supergirl?

10   A.   Yes.

11   Q.   And are you familiar with the extent to which DC had

12   creative controls on Steel?

13   A.   Yes.

14   Q.   Did DC exercise its creative controls on any of those

15   films?

16   A.   DC exercised many measures of creative controls on all of

17   those films.

18   Q.   Was the creative control that DC exercised adopted by

19   Mr. Salkind's companies?

20          MR. TOBEROFF:  Vague and ambiguous.

21          THE COURT:  Sustained.

22   Q.   BY MR. BERGMAN:  When DC, Mr. Levitz, made

23   recommendations or attempted to exercise their approvals under

24   their agreements with Mr. Salkind, were those agreements

25   honored by giving DC the controls to which it was

1  contractually entitled?

2  A.   I believe we were ultimately able to enforce every

3  control that we tried to exercise under the contract.

4  Q.   Now, if you exercised all those controls, sir, how would

5  you explain the performance of Superman 4, Supergirl, and

6  Steel?

7  A.   The level of creative controls are different for Steel,

8  which is post the Salkind agreement, than the other movies.

9  But lumping them together as you asked, the creative controls

10  that you achieve as an intellectual property licensor enable

11  you to defend your property against certain types of ills.

12  The methodology being mangled, the costume being redesigned to

13  be something stupid, a completely inappropriate actor being

14  cast for the role, and in some cases it even enables you to

15  have a very significant role in script development.

16          Ultimately, they are not in my experience adequate

17  to make a film good.  Whether a film is going to be good or

18  not is largely driven by the director's vision and their

19  ability to achieve it.  And no amount of backseat driving or

20  backseat controls can remedy that failure.

21  Q.   How would you characterize DC's working relationship with

22  Mr. Salkind?

23          THE COURT:  At what time period, Counsel?

24          MR. BERGMAN:  From 1974 until approximately 1993,

25  your Honor, when the rights went to Warner Brothers.

1          THE COURT:  Let's lay a foundation for him having an

2   understanding of DC's working relationship.

3          MR. BERGMAN:  Thank you, sir.

4   Q.   From the time that you became involved in business

5   affairs at DC until the expiration of Mr. Salkind's rights,

6   did you have an occasion to observe -- be involved with the

7   various dealings that DC had with Mr. Salkind?

8   A.   Yes.

9   Q.   And as a result of those various dealings that you had

10  occasion to be involved with, how would you characterize the

11  working relationship between DC and Mr. Salkind?

12         MR. TOBEROFF:  Objection to the extent that we're

13  talking about any time prior to 1981 when Mr. Levitz started

14  in business affairs.  No foundation.

15         THE COURT:  I'll sustain the foundational objection.

16         MR. BERGMAN:  My question was prefaced on when he

17  started.

18         THE COURT:  So from 1981, then?

19         MR. BERGMAN:  Yes, sir.

20         THE COURT:  Very well.  With that in mind.

21         THE WITNESS:  I would describe the relationship as

22  challenging, contentious, and frequently litigious or near

23  litigious.

24  Q.   BY MR. BERGMAN:  Were DC and/or Warner Brothers to your

25  knowledge made parties to various lawsuits brought by

1  individuals against Mr. Salkind in connection with the

2  Superman films?

3           MR. TOBEROFF:  Leading, your Honor.

4           THE COURT:  Sustained.

5  Q.  BY MR. BERGMAN:  To your knowledge did Mr. Salkind's

6  production and distribution of any of the Superman 1 through 4

7  films result in any litigation?

8  A.   I believe Alex Salkind was sued by virtually everyone he

9  did business with, including his son.

10 Q.   And did that include the screenwriter, Mr. Peusot

11 (Phonetic)?

12          MR. TOBEROFF:  Objection, your Honor.  Leading.

13          THE COURT:  Given its nature, overruled.  You may

14 answer.

15          THE WITNESS:  I don't know whether Peusot was a

16 litigant.

17 Q.   BY MR. BERGMAN:  Okay.  Who do you remember being

18 litigants against Mr. Salkind?

19 A.   Marlon Brando, a list of parties whose names I don't

20 recall who were rights purchasers or who had some form of

21 financial interest in some fashion or another in the films.

22 As I say, his son Ilia.  I believe there were other actors and

23 writers and participants at different points.

24 Q.   Are you familiar with the circumstances which resulted in

25 Warner Brothers acquiring the balance of Mr. Salkind's rights

1    in 1993?

2    A.    Reasonably.

3    Q.    Could you explain what you know in that regard, sir?

4    A.    Yes.  From the conclusion of Superman 4, the Salkind

5    production entities had made repeated attempts to develop a

6    script and what's termed package of elements that would be

7    acceptable to DC as the licensor under its creative controls

8    and to Warner Brothers or an alternate financial and

9    distribution partner.  They had proved unable to do so for

10   whatever reasons.  It was our belief and Warner Brothers'

11   belief that there were still significant opportunities to

12   exploit the Superman rights that had been granted to Salkind

13   and that, at that point, the problem was intrinsically a

14   Salkind problem and that there would be an opportunity if

15   those rights could move from Salkind to Warner Brothers to do

16   something with Superman.

17          In particular, at that point Jeanette Kahn, when I

18   mentioned earlier as the then president of the company, who

19   was devoting much of her time to working in film and

20   television, had come up with a concept for being able to do a

21   Superman television series for network that could be done

22   within affordable network budgets by using the kind of

23   tonality that was popular at the time on a show called

24   Moonlighting, the very much flirtatious byplay between the

25   protagonists in an adventure environment with a little bit of

1  comedic taste to it.  She felt that if it were applied to

2  Superman and the action were centered not on Superman's heroic

3  adventures but on the adventures at the Daily Planet between

4  Lois Lane and Clark Kent, that that had the potential to

5  capture the interest of the marketplace at the time.

6         And for a period of, I believe, a couple of years,

7  she energetically importuned the Warner Brothers executives

8  with whom she worked to buy out Salkind and free up those

9  television rights so that we could try to get that show on the

10 air.

11 Q.   Did Warner Brothers ultimately do so?

12 A.   Yes.

13 Q.   And did that show become Lois and Clark?

14 A.   Yes.

15 Q.   During the term of the Salkind agreement, again, after

16 you became in 1981 or the early 80's involved in business

17 affairs, did you have occasion to work with various Warner

18 Brothers personnel in connection with different aspects of the

19 Superman films?

20 A.   Yes.

21 Q.   And with whom did you frequently interact at Warner

22 Brothers during this period of time?

23 A.   From somewhat before this time I began to interact with

24 John Schulman with regard to his work for Warner Brothers

25 originally as an outside attorney and then later as an

1    executive of the company in regard to Salkind matters.

2    Q.   And when you refer, sir, to Mr. Schulman in his

3    individual capacities as an attorney, was that in connection

4    with litigation involving Alex Salkind?

5    A.   When I first met John, he was an outside attorney

6    retained by Warner Brothers and Warner Communications in some

7    fashion to deal with some of the many issues relating to

8    Salkind, and he was given me as one of the Superman experts to

9    educate him on the character.

10          MR. TOBEROFF:  Objection, your Honor.  I didn't want

11   to interrupt.  Leading.

12          THE COURT:  Overruled.

13   Q.   BY MR. BERGMAN:  Mr. Levitz, after Warner Brothers

14   acquired the Salkind film rights in or about 1993, did you

15   have any conversations at that point in time with anyone at

16   Warner Brothers concerning what would happen upon the

17   expiration of those rights in 1999?

18   A.   Yes.

19   Q.   And with whom did you have those conversations?

20   A.   I probably had those conversations with several people,

21   but the majority of them were with John Schulman.

22          THE COURT:  Counsel, I need to take a wiretap for a

23   few moments.  We're going to take about a 15-minute break.

24          (Recess taken.)

25          THE COURT:  Counsel.

1080

```
1              MR. BERGMAN:  Thank you, your Honor.
2    Q.   Mr. Levitz, I have a few more questions about the comic
3    superheroes.  As of 1973, what was Superman's ranking in terms
4    of all comic books, not just those made by DC?
5    A.   The Superman titles had the largest sales of any heroic
6    or adventure kind of character.  As I think I said, it's
7    possible Archie or Richey Rich might have equaled or surpassed
8    him on the humor side.
9    Q.   And what was the relative ranking of Superman throughout
10   the industry during the period 1997 through 2002?
11   A.   On a good day, he might have hit number four.  He didn't
12   consistently hold -- necessarily hold that place.
13   Q.   And who were the comic book characters who occupied one,
14   two, and three?
15   A.   Generally through that period, X Men, Spiderman, Batman,
16   in that order.
17   Q.   Okay.  And who is the leading comic book seller from the
18   period, oh, from 1978 to date?
19   A.   Throughout that period the X Men franchise has been by
20   far the best selling comic book franchise.
21   Q.   Okay.  Beginning in 1981, did you undertake any efforts
22   to inform yourself about the market for film and television
23   licenses to comic properties?
24   A.   Yes.
25   Q.   And could you tell us what you did, sir?
```

1    A.    The baseline was conversation with other people engaged

2    in that marketplace, either working at competitive comic book

3    companies or lawyers or agents who were particularly

4    interested in the field.

5    Q.    Okay.  As a result of those activities, did you consider

6    yourself experienced in negotiating film and television

7    licenses for such properties?

8              MR. TOBEROFF:  Objection, your Honor.  Leading.

9              THE COURT:  It's kind of a -- rephrase your

10   question.  You're asking what he considers himself?  Let's lay

11   a foundation another way, Counsel.

12   Q.    BY MR. BERGMAN:  To what extent do you believe that your

13   experience has given you a good appraisal of the comic book

14   market as of 2000?

15             THE COURT:  Sustained.  His self-assessment is not

16   relevant, Counsel.

17   Q.    BY MR. BERGMAN:  What steps have you taken from 1981

18   until 2000, if any, sir, to apprise yourself of the activities

19   in the comic book market?

20   A.    Comic book market for sales of comic books themselves?

21   Q.    And their value for film?

22   A.    With respect to their value for film, I had continual

23   conversations with other people involved in that area, either

24   as buyers or sellers.  I personally was involved in the

25   negotiation of probably 15 or 20 agreements during that time,

1   which is probably more than any other single individual, with

2   the possible exception of Michael Uslan.

3   Q.   Can you identify some of the agreements that you were in

4   the process of negotiating?

5   A.   Black Hawk, Plastic Man, Watchmen, Green Lantern

6   agreement during that time, agreements for television, for

7   Superman, Plastic Man, Batman, many, many others.

8   Q.   When was the Watchmen deal entered into?

9   A.   I believe we made the essential deal in 1986 around the

10  time the third issue of the comic was published.

11  Q.   And who handled those negotiations for DC?

12  A.   I did.

13  Q.   Following the negotiation of the Watchmen agreement, did

14  you take any other steps prior to 2002 to ascertain market

15  value for comic book heroes?

16  A.   Yes.

17  Q.   Could you identify what it was you did, sir?

18  A.   Again, continuing conversations on the subject and

19  awareness of what the other deals in the field were.

20  Q.   Did you gain any awareness, for example, as to Marvel's

21  deals?

22  A.   Yes.

23  Q.   Could you tell us how you gained that experience and what

24  it was you learned as a result of that?

25  A.   Because of the nature of Marvel's ownership, I had at

1   least two opportunities, I believe in 1989 and in the

2   mid-1990's to examine their deals.  The first case, when the

3   company was up for sale and we were being invited to bid.  In

4   the second case, when they were bankrupt, and we were being

5   invited to either bid for the company or bid for its assets,

6   and at that point I had a thorough opportunity to look at

7   pretty much any agreement they had ever done.

8   Q.   And what Marvel agreements did you become aware of at

9   that time?

10  A.   I saw a wide variety of their film and television

11  agreements at the time as well as many agreements for other

12  aspects of the company's business, distribution agreements,

13  rental agreements.

14          MR. BERGMAN:  Your Honor, may I approach the

15  witness?

16          THE COURT:  You may.

17          MR. BERGMAN:  Your Honor, I have given the witness

18  and opposing counsel a copy of the document which has been

19  marked as Exhibit 1125 for identification.  This agreement has

20  been produced by Fox pursuant to a confidentiality agreement,

21  and I ask that, of course, that the provisions of that

22  agreement be maintained by counsel.

23          THE COURT:  This will be a further exhibit, I take

24  it, that you'll be seeking to place under seal?

25          MR. BERGMAN:  Yes, your Honor.

1     THE COURT:  I'll provisionally place this under seal

2  at this time.

3     MR. BERGMAN:  Thank you, sir.  Is there any

4  objection to the exhibit itself?

5     MR. TOBEROFF:  Yes.  The exhibit has not been

6  admitted.  This is one of the exhibits that you specifically

7  ruled earlier that can only be used to refresh the witness's

8  recollection.

9     THE COURT:  Oh, this is the --

10     MR. BERGMAN:  I merely said it was being marked for

11  identification.  I'm going to --

12     THE COURT:  Very good.  Excellent.  Well, lay the

13  foundation for need for recollection before we get into it.

14     MR. BERGMAN:  I will.

15     THE COURT:  Fair enough.

16  Q.   BY MR. BERGMAN:  Mr. Levitz, do you recognize this

17  exhibit, 1125?

18  A.   Yes, sir.

19  Q.   And is this the agreement that you reviewed in the

20  mid-1990's?

21  A.   I believe this is the agreement I saw in the offices of

22  Marvel's bankruptcy attorneys in Newark when I reviewed their

23  documents.

24  Q.   Has looking at the document refreshed your recollection

25  as to what the terms were?

1  A.   Yes, it has.

2  Q.   With that refreshed recollection, can you identify what

3  the terms are?

4        MR. TOBEROFF:  Objection.  Now that his recollection

5  has been refreshed, I believe the document should be withdrawn

6  from the witness.

7        THE COURT:  Well, he should be testifying from his

8  refreshed recollection.  Although there is no limit on the

9  number of times that the document can be given to him to

10  refresh his recollection.  Once you have it refreshed, why

11  don't you just testify as to what you remember.  What we don't

12  want is you simply to be reading from the document.

13        THE WITNESS:  I won't.  But if I could look at one

14  more provision.

15        THE COURT:  Please.  If it will help refresh your

16  recollection.

17        THE WITNESS:  Yes.

18        THE COURT:  You may proceed, Counsel.

19  Q.   BY MR. BERGMAN:  Having refreshed your recollection, sir,

20  what were the terms, the economic terms, of the X Men

21  agreement?

22  A.   The key terms that I recall and that I've been refreshed

23  on are an initial option of $150,000 against a purchase price

24  of a million five and a contingent compensation formula that

25  basically began to be effective after some form of artificial

1    break even.

2    Q.    Okay.  Did you do any other analysis of the comic book

3    market other than what you've told us about during the period

4    1999 to 2002?

5    A.    Yes.

6    Q.    Could you tell us what else you've done?

7    A.    I looked for any confirmation that was available to me

8    that the numbers that we had achieved on the Superman deal and

9    the negotiation that was going on, continued to represent the

10   top of the market.

11   Q.    And conducting that analysis, did you consider the then

12   existing market for any books by best selling novelists, such

13   as Michael Creighton or John Grisham?

14   A.    I believe the market for novels was fundamentally

15   different.  So I did not.

16   Q.    Okay.  As part of that analysis -- well, strike that.

17             Can you tell us why you considered them to be

18   fundamentally different?

19   A.    Yes.  If you look at the history of film making, you

20   would find that novels exhibit several very different

21   characteristics than comic books.  A novel represents

22   generally a very specific story textbook for doing a film as

23   it's adapted.  Either it works as a film or doesn't.  Michael

24   Creighton is an excellent example of an author who is well

25   acknowledged to write novels that are intended to be easily

1087

```
 1   adapted into screenplays and have frequently been very

 2   commercial.

 3              THE COURT:  I'm sorry?

 4              MR. TOBEROFF:  Objection.  This is sounding

 5   identical to expert testimony.

 6              THE COURT:  I'm going to overrule these objections,

 7   Counsel.  The witness is being asked to describe his process

 8   and the analysis he used in working out the deal in question.

 9   That's fair game, Counsel, in a case like this.

10              MR. TOBEROFF:  Thank you, your Honor.

11              THE COURT:  You can fully cross-examine him on this.

12   But given his position as president of DC Comics and given his

13   position over the agreement in question here, his entire

14   thought process and how he reached the agreement and why is

15   all fair game for both sides.

16              MR. TOBEROFF:  Very well, your Honor.

17              THE COURT:  So just to make this clear.  These

18   objections concerning his expertise, I know it sounds like an

19   expert witness, but he's testifying as the president of DC

20   Comics, as essentially the defendant in this case.

21              Overruled.

22              MR. BERGMAN:  Thank you, your Honor.

23   Q.   Had you concluded your answer?

24   A.   No, I had not.

25   Q.   Could you continue to do so.
```

```
 1   A.    In addition to my perception of that, in my experience

 2   negotiating, the parties on the other side were not ever

 3   willing to look at novels or musicals or even children's books

 4   as appropriate precedent in an argument about the price they

 5   were willing to pay for comic book rights.

 6              Generally, the fact that comic books, because we

 7   were generally licensing a character where multiple stories

 8   could be created around the character, created an opportunity

 9   for the licensee to hopefully develop a more ongoing series of

10   stories than they might off a finite novel.  But at the same

11   time they viewed it, they argued that there was less value

12   inherent in it because they did not have as clear a road map

13   to it.  So never mind what we paid for that.  This is what we

14   paid for comic books.

15   Q.    Mr. Halloran, plaintiff's expert, cited a number of

16   superhero films to support a statement that comic book

17   properties were, quote, extremely hot during the 1997 to 2002

18   period.

19              Do you agree with that statement?

20   A.    I believe there was more activity in comic book rights in

21   that period than there had been in the previous years.  There

22   had yet to be a string of particularly successful movies that

23   enabled the overall pricing structure to move massively beyond

24   where it was.

25              The X Men price that I just cited was at the time
```

1   the highest price that I believe anyone had achieved for a

2   comic book property other than our Superman and Batman deals,

3   and that was better than had existed four or five years

4   previously, certainly, but it still had not moved the market

5   into the territory it would go into five or six years later.

6   Q.   Okay.   Plaintiff's expert also testified about what he

7   termed the recent phenomenon of rebooting in connection with

8   comic book or literary characters in film.

9        Do you know what it means to reboot a comic

10  character in a film?

11  A.   The term rebooting comes out of the comic book industry

12  where it originally acquired its meaning in essentially

13  throwing out the history of the character.   We are now going

14  to retell the story of Superman from Krypton to Earth.   None

15  of his previous adventures count.   He's going to meet Lois

16  Lane for the first time.   Fact that he fell in love with her

17  last time doesn't mean that this time he will fall in love

18  with her.   There may be a new visual look.

19       We did that very famously with Superman and the

20  comics in 1985 and very successfully.   It's been done with

21  other characters going back as early probably as the classic

22  case of the Flash in 1956 when a new costume, a new secret

23  identity, a new origin for the character was invented and the

24  consistent pieces were simply the name Flash, the fact that it

25  was a character who had super speed powers, and a lightning

1    bolt as part of the insignia, though the insignia had changed

2    radically.

3            THE COURT:  From your perspective, is there any

4    limit to how much of a fundamental redesign you can do in a

5    rebooting effort?

6            THE WITNESS:  It peculiarly goes to sort of your fan

7    sensibility, your Honor.  You have to preserve the essence of

8    the property, or there is nothing there.  What that essence

9    is, you probably could get many fans lined up, and if you took

10   a survey of them, I suspect you'd find a remarkably consistent

11   central set of conclusions.  Superman comes from Krypton.

12   Krypton blows up.  He wears a red and blue costume.  He has an

13   S on his chest.

14           The further out you get in the stories, the more

15   willing fans are to look at what might change in that process

16   and the less well known or less beloved a character is, the

17   more willing they are to see the things change.

18           THE COURT:  Counsel.

19   Q.   BY MR. BERGMAN:  Did you execute the film agreement, sir,

20   all at once -- strike that.

21           Did you execute it all at once?

22   A.   I don't believe so.

23   Q.   When did you execute, to the best of your recollection,

24   the main license agreement?

25   A.   I believe it was March or April of 2002.

1   Q.   Did there come a time when you were later informed that

2   something was missing?

3   A.   Yes.

4   Q.   What was missing?

5           MR. TOBEROFF:  Objection.  Leading, your Honor.

6           THE COURT:  Well, not the last question, what is

7   missing.  That's clearly a non-leading question.  The previous

8   one was foundational.  Overruled.

9           THE WITNESS:  I believe I had forgotten to sign some

10  portion of the agreement or a copy of the agreement, as

11  happens from time to time in the stack of documents I sign.

12  Q.   BY MR. BERGMAN:  Okay.  And did you subsequently sign it?

13  A.   Yes.

14  Q.   In the late 1990's and early 2000's, when you were

15  negotiating the Superman film agreement, were you aware of any

16  comic book based film that did not have a top dollar actor

17  which had succeeded in reaching a hundred million in gross or

18  more, domestic gross?

19  A.   I believe the only comic book based film that did not

20  have expensive film talent that reached that kind of number

21  was Teenage Mutant Ninja Turtles.  The first film.

22  Q.   What did you conclude, Mr. Levitz, as a result of your

23  market analysis prior to executing the Superman film agreement

24  in 2002?

25  A.   I concluded that the deal that we were proposing to do

 1    was still by far the best deal that had been done for a comic

 2    book superhero property.

 3    Q.    Prior to executing the agreement, did you take any

 4    further action to test the conclusion that you had reached as

 5    to the fair market value of the Superman rights?

 6    A.    Yes.

 7    Q.    Did anyone else evaluate the then fair market value of

 8    the prior Lois and Clark agreement or the prior Salkind

 9    agreement for you?

10    A.    Yes.

11    Q.    And what did that evaluation show, if anything?

12    A.    That evaluation showed that they felt that it was a fair

13    level for a deal even though it was between related parties.

14    Q.    And who were the individuals who reached that conclusion?

15    A.    Bruce Ramer and Kevin Marks.

16    Q.    And can you explain the circumstances under which

17    Mr. Ramer and Mr. Marks concluded that and expressed it to

18    you?

19    A.    Yes.  As part of our discussions of a resolution to the

20    Siegel claims, we produced and were negotiating a set of

21    terms.  As part of that process, Bruce Ramer, Kevin Marks, and

22    their colleagues examined our proposal to dub the existing

23    deals' safe harbors that would be acceptable in future

24    situations to base such deals on and not be challengeable by

25    them.

1  Q.   And did they in fact confirm that they would indeed be

2  safe harbors?

3  A.   Yes.

4  Q.   And was that in fact confirmed in the October 19 letter?

5  A.   I believe that was the date of their letter.

6  Q.   Mr. Halloran, plaintiff's expert, testified that in the

7  license of literary rights, quote, the highest bidder wins.

8          Do you agree with that statement?

9  A.   No.

10  Q.   In what ways do you disagree with it?

11  A.   At the very least, if you're going to conduct an auction

12  for literary rights, whether it's a novel being offered to

13  multiple publishers or film rights being offered to multiple

14  producers, you want to confirm the bona fide nature of the

15  possible bidders, and at the best case, you want to place your

16  property with the best partner for that particular property

17  because in many cases, as I talked about earlier today, a

18  particular partner will either have complementary rights to

19  offer, as Warner Brothers does in the case of Superman, or

20  particular expertise at one marketplace or another.

21          If you feel the property is a good merchandising

22  property, for example, you would be foolish to value a bid

23  from Paramount equally to a bid from Warner Brothers or

24  Disney, for example.  It doesn't mean that Paramount is a

25  worse movie studio necessarily, but their expertise doesn't

1    weigh as heavily in that particular direction.

2    Q.    Is there a difference for DC in having a major studio as

3    a partner in the making of a film as opposed to an independent

4    producer?

5    A.    There's an enormous difference.

6    Q.    And what are those differences, sir?

7    A.    When you're dealing with an independent producer, you not

8    only have the question of whether the project can be assembled

9    with all of the correct elements, but whether ultimately the

10   financing will be available or whether the entire thing will

11   be revised when it goes to a major studio or distribution

12   partner.

13         It's not dissimilar to what Mr. Halloran commented

14   on in the independent film business, where if you're putting

15   together an independent film, one of your ideals is that

16   ultimately you would like to have a major studio distribute

17   it.  If you're going to one independent producer, he may put

18   together the actor and the director and the screenplay, but

19   then go to a major studio to get distribution for it, and the

20   studio may say that's really close, but could you just change

21   everything that's green to blue.

22         You lose a year, and you're back to square one.

23   Q.    Putting economic terms aside, might there also be a

24   difference in making a film with one studio as opposed to

25   another studio, regardless of who is bidding the most money?

```
 1          MR. TOBEROFF:  Objection.  Leading.

 2          THE COURT:  Sustained.

 3   Q.   BY MR. BERGMAN:  In your experience, Mr. Levitz, are

 4   there different ways in which different major studios handle

 5   the production and distribution of films based on comic book

 6   heroes?

 7   A.   Absolutely.

 8   Q.   Okay.  And do those differences have an impact upon the

 9   quality or performance of the picture?

10   A.    In my experience, different studios have different

11   appetites for how much they are willing to finance projects

12   like this.  What types of marketing skills they bring to bear

13   and how they manage the process which gives you an utterly --

14   a -- not only a better or worse chance of success, but

15   different kinds of opportunities of success.

16          One will be better internationally than another at a

17   given point.  One will be, as I've said, better at

18   merchandising.  One will be better at home video.  Frequently

19   you can make a distinction between the studios in terms of

20   what age consumer they are good at reaching.  I don't believe

21   there's any argument that Disney's skill at reaching young

22   children and cross-marketing to them is equaled by any of the

23   other studios at any given time.

24          So if you were going for a property that you felt

25   dead centered on six year olds, a bid from Disney would be
```

1   vastly more valuable than a bid from another studio perhaps.

2   Q.   What was your primary goal while you were negotiating the

3   film agreement?

4   A.   My primary goal in negotiating the Superman film

5   agreement was to extend the constructive partnership that we

6   had with Warner Brothers pictures in a way that would maximize

7   the long-term return to DC Comics for the health of our

8   business and of the property that we were working with.

9   Q.   Were there particular terms that were of particular

10  importance to you in that effort?

11  A.   The gross participation terms were disproportionately

12  important in their economic effect.  The ability to not only

13  free the television rights for exploitation but to exploit

14  them on highly profitable terms for DC was of tremendous

15  economic effect, and the general structure being at a full

16  fair market value was, of course, a primary consideration.

17  Q.   Do you recall the initial negotiating position that you

18  took on the Superman Returns film deal?

19  A.   The negotiations happened over a very extended period of

20  time.  So it's hard for me to recall each of the positions

21  that either I took or Warners took specifically in order.

22          In general, my approach was to try to continue the

23  key terms from the Salkind agreement because I had found them

24  to still be top of the market.

25  Q.   And generally speaking, what was Mr. Schulman's initial

1  negotiating position?

2  A.    That since we were no longer negotiating with a

3  fly-by-night independent producer who caused him more grief

4  than anybody else in his life, we should be thrilled to accept

5  lesser consideration, lesser controls, and be deeply grateful

6  for being in Warner Brothers' presence.

7            MR. TOBEROFF:  Objection.  Hearsay, your Honor.

8            THE COURT:  It's not being introduced for the truth

9  of the matter asserted but rather the position being taken in

10  the negotiation conduct of the negotiator.

11            Overruled.

12  Q.    BY MR. BERGMAN:  Mr. Levitz, were you in the courtroom

13  when Alan Horn testified regarding his appraisal of the value

14  of Superman in 2002, that he considered it to be, quote,

15  viable but challenging, close quote?

16  A.    I think it was viable but challenged.  But yes.

17  Q.    Did you take the declining performance of the four prior

18  films into consideration?

19  A.    Yes.

20  Q.    Did you also take into consideration the safe harbor

21  discussions that you had with Mr. Ramer and his partner?

22            MR. TOBEROFF:  Objection, your Honor.  Both these

23  questions are leading.

24            THE COURT:  Sustained.

25  Q.    BY MR. BERGMAN:  Can you tell us, Mr. Levitz, among other

1    things, what considerations, what matters you took into

2    consideration in determining to execute the 2002 film

3    agreement that we have introduced in evidence?

4    A.   I took into consideration the virtues that I perceived

5    Warner brought to the table, including the continual efforts

6    and investments that they had been willing to make in

7    developing the Superman film while we were going through this

8    negotiating process.

9         They went through several very expensive scripts and

10   preparatory commitments that showed the kind of film that they

11   were anxious to make.  I took into consideration the fact that

12   it would still be the premiere deal for the category in the

13   marketplace, and when that time period was reached, that in

14   fact I had my presumption there accepted or confirmed by the

15   reaction of as tough a negotiator as Bruce Ramer and his firm.

16        I measured the likelihood of future success based on

17   the agreement as I had achieved it.

18   Q.   Thank you.  How long did the negotiation of the Superman

19   Returns film agreement continue?

20   A.   I think it depends on the definition of negotiation.  We

21   began talking about the fact that we would need to either

22   extend the Salkind agreement or negotiate a new agreement to

23   replace it pretty much as soon as Warner Brothers took

24   Salkind's place on the pictures.  You don't spend tens of

25   millions of dollars to develop a film, much less the quarter

1    of a billion dollars you can spend producing and releasing one

2    unless you have some confidence that you're going to be able

3    in success to amortize that and amortize that over a series of

4    pictures.

5             So you need a number of years ahead to look.  So

6    discussions probably began as early as perhaps 1994 or 1995 in

7    a very informal fashion, and the heart of the negotiations

8    probably took place over a three- or four-year period,

9    commencing in the late 1990's.

10   Q.   With respect to the basic issue of the gross

11   participation, how was that resolved in the agreement?

12   A.   It was resolved by sticking with the formula from the

13   Salkind agreement.

14   Q.   With respect to the size and frequency of the option

15   payments, how was that resolved in the film agreement?

16   A.   I had tried to negotiate for an inflation driven COLA

17   system on the option payments, given the length of the

18   agreement.  And we resolved it instead with a simpler schedule

19   of escalating option payments over the life of the agreement.

20   Q.   And am I correct that there were -- I'm sorry.  I'm not

21   correct in saying that.

22             In terms of developing a film like Superman Returns,

23   in your experience how long does that take?

24   A.   It's been the nature of comic book properties

25   historically that the development process is extraordinarily

1    long.  The first of the Tim Burton Batman films was the

2    culmination of a nine-and-a-half-year process where we went

3    through three or four directors and three or four finished

4    scripts.

5            The process on Superman between the failed

6    development efforts by the Salkinds, the failed development

7    efforts at Warner Brothers, and then ultimately Superman

8    Returns goes over a period of, depending on how you want to

9    measure it, perhaps 15 years.

10           On the other hand, if you measure the period between

11   Brian Singer walking in with the idea for Superman Returns and

12   going into production, it was a matter of months.  Because at

13   that point he had an idea that the studio instantly bought

14   into, felt the time was right for, his qualifications were

15   right and appropriate.

16           So it really can vary enormously until the lightning

17   strikes.

18   Q.   Did you at any point in your negotiations with Warner

19   take the position you must make this picture within a year, or

20   you must make this picture within two years, or it will

21   revert?

22   A.   In my experience, that's a completely counterproductive

23   position to take.

24   Q.   And why do you say that, sir?

25   A.   I have seen at an extreme case --

1        THE COURT:  Let me stop you there.  The question was

2   whether or not did you that.

3        THE WITNESS:  I'm sorry.  Can you repeat the

4   question?

5   Q.   BY MR. BERGMAN:  The question was and why do you say

6   that, sir?  The prior question had been did you at any point

7   in your negotiations with Warner take the position that you

8   must make this picture within a year, or you must make this

9   picture within two years, or it will revert?

10       The witness said in my experience, that's a

11  completely counterproductive position --

12       THE COURT:  That was nonresponsive.  The question

13  was did you ever at any point take that position.

14       THE WITNESS:  No.

15  Q.   BY MR. BERGMAN:  Why didn't you take that position, sir?

16  A.   In my experience that's totally a counterproductive

17  maneuver.  I observed Marvel, for example, find itself in a

18  position where there was a limited amount of time left on one

19  of their film licensees, time to either make a movie or allow

20  the rights to revert and find themselves with a Fantastic Four

21  move that I kept them from making, a good Fantastic Four movie

22  for over a decade thereafter.

23       Making a bad movie is a significant detriment to the

24  value of a property.  And you can't force a good movie to

25  happen in a certain time, or certainly I don't have the

1102

1    expertise, nor do I believe any combination of my predecessors

2    had the expertise to independently judge all the elements that

3    would make a movie successful in a way to say this is

4    absolutely right.  You must make this film.

5    Q.   How was the issue of the escalating annual options

6    resolved in the film agreement?

7    A.   I believe it works as a schedule that escalates from

8    500,000 a year to 700,000 a year over the life of the

9    agreement.

10   Q.   And finally, what was done with respect to any issues

11   regarding the video royalty in the film agreement?

12   A.   I had taken the position in negotiating the agreement

13   that I desired an increased video royalty.  Warners took the

14   position that at that time they never gave a greater video

15   royalty.

16           We resolved it with language that addressed a couple

17   of circumstances in which if Warner's position changed, either

18   because they gave another individual specifically on a

19   Superman film a higher video royalty or if their general

20   practice in the business went to a higher number, that we

21   would get the benefit of that higher calculation.

22   Q.   Do you have a copy of 1041 in front of you, sir?

23   A.   Which is 1041?

24   Q.   1041 is the Superman agreement.

25   A.   Yes.

```
 1   Q.   Would you turn to the favored nations provision, which is

 2   found, I believe, at Bates stamped page 4218.

 3   A.   Yes, sir.

 4   Q.   Do you see, sir, in subparagraph DA there is a reference

 5   to a term, quote, other participant, close quote?

 6   A.   Correct.

 7   Q.   And do you see the definition that is drafted here of

 8   other participant?

 9   A.   Yes.

10   Q.   Is it your understanding that Legendary Pictures is a

11   participant in the film Superman Returns?

12   A.   No.

13   Q.   What is your understanding, sir?

14   A.   I understand that they are an investor, a co-financier of

15   the film.

16   Q.   Have you ever said to Warner Brothers, look, the contract

17   says other participants shall mean any party entitled to share

18   in the revenues of the picture?  Doesn't that include

19   Legendary?

20   A.   I have discussed Legendary with Warner Brothers in that

21   connection.  But it was quickly clear to me, when the

22   Legendary deal was explained to me, that in very basic

23   accounting terms the definition here says a participant in the

24   revenues of the picture.  Legendary is a participant in the

25   profits of the picture as an investor.  It's a different
```

1    category.

2    Q.    While you have the agreement out, could you please turn

3    to page 8 of that agreement, which is Bates stamped 4206, and

4    in particular, sir, I want to refer you to paragraph 7

5    entitled character integrity/consultations.

6    A.    Yes, sir.

7    Q.    Do you see that?

8    A.    Yes, sir.

9    Q.    Were the approval rights that DC obtained in the film

10    agreement less than the approval rights they had obtained in

11    the Salkind agreement?

12    A.    Yes.

13    Q.    Was that purposeful?

14    A.    Yes.

15    Q.    Could you tell us what the purpose was?

16    A.    Certainly.   In the circumstance where you are working

17    with -- I'd make three distinctions.

18          One, an independent producer who may basically

19    assign the project to anyone in the world to actually make.

20          Two, a party to whose interests are not in any way

21    aligned with yours other than with regard to the picture, they

22    may decide that they can best monetize their rights by doing

23    something you find completely contrary to the long term value

24    of the property.

25          And, three, you require a layer of assurances

1   because the course of actions of that party are far from

2   predictable.  They may want to make a very cheap film.  They

3   may want to make a pornographic film.  They may want to make a

4   film that's suitable only for home video distribution.  That

5   wouldn't have been the case in the Salkind era.  That didn't

6   exist.  But analog.

7          So you go into that situation, first of all, with

8   greater leverage, because they know that they are a weaker

9   party, but second of all, with more confidence in your own

10  judgment relative to the person who is making it.  And more

11  need to protect yourself.

12         When you go into an agreement where many of the

13  fundamental interests of the party are aligned, the behavior

14  pattern of the other party is extremely well known and to a

15  very good standard.  You know, Warner Brothers is not going to

16  make a cheap, junky picture.  They will make a picture that

17  can fail.  They certainly have done that in their history, but

18  it will not be for lack of effort or lack of investment

19  generally.  They are not going to make an X-rated movie, for

20  example.  Then you can go to a much lesser level of control.

21         We addressed some of that in this agreement because

22  of the long length of it by saying that in the event that DC

23  and Warner's interests ever became unaligned, that they were

24  no longer affiliated companies, that our controls would be

25  strengthened to a level more comparable to what they had been

1    with Salkind.  It was not reasonable to get them to the --

2    what I would categorize as extraordinary level we had with

3    Salkind because no one in their right mind would have

4    committed to make a motion picture with the level of controls

5    that we had in place with Salkind, most of which simply were

6    not practical to actually exert.

7    Q.   Very good, sir.

8             THE COURT:  You mentioned that in negotiating with

9    somebody else other than Warner Brothers, they would be in a

10   weaker position.

11            What do you mean by that?

12            THE WITNESS:  First of all, if you separate the

13   categories of independent producer versus a studio, an

14   independent producer is fundamentally in a weaker position

15   because he does not bring all the assets necessary to

16   consummate the deal.  He's coming in generally without the

17   financial financing, without the distribution.  So there will

18   be really a second negotiation to follow.  So that weakens his

19   position.

20            When you're measuring studio versus studio, then

21   it's a combination of three things in terms of the negotiating

22   position.  The skill sets they bring to bear for the category

23   of project that you want to do, as I illustrated before, I

24   would argue that Warners would be in a better negotiation

25   position for a film that was heavily merchandisable than

1  Paramount.

2        Second, in this very peculiar case, the hostages we

3  had already given to fate, that Warners had a set of

4  complementary copyrights and trademarks that had great value

5  to us to incorporate in a sequel motion picture or a sequel

6  television series that we would either have to buy from them

7  or be working with them to have access to, everything from the

8  John Williams score to the crystal structure of the planet

9  Krypton and the crystals that Superman uses in the course of

10  it, which were invented during the movies that Warner Brothers

11  had rights to, and the copyrights in those elements to the

12  extent that they are separately copyrighted were never

13  transferred to DC by operation of any of the agreements that

14  we had.

15        Third, you have the cumulative value of working

16  together.  It would only be, for example, with Warner Brothers

17  that we could offer a boxed set of Superman 1 to 4 plus

18  Superman Returns as a home video product or cross-sell those

19  things for distribution or theatrical exhibition because they

20  would continue to hold the rights to those negatives.

21        I've watched many times in my career Marvel be

22  placed at a severe competitive disadvantage, because, for

23  example, 20th Century Fox, with their successful X Men motion

24  picture, was unable to market the many volumes of X Men

25  animated cartoons that had been produced because they were

1    produced by three or four different entities.  Marvel didn't

2    control any of those libraries.

3         MR. PERKINS:  So they were disadvantaged.  In case

4    of negotiating with Warner versus negotiating with Universal,

5    Warner was able to say well, if you give us the rights in the

6    future to the Superman movie, we will be able to make more

7    money for you on the Superman material that we already have

8    because we will be able to do a coordinated marketing program.

9         THE COURT:  Very good.

10        Counsel, we're at the five o'clock hour.  Why don't

11   we go ahead and conclude for this week.  You may step down.

12        MR. BERGMAN:  Thank you, your Honor.  It's clear,

13   given the amount of time that's left, that we're not going to

14   be able to conclude the testimony on Tuesday, as I was hoping,

15   and it will spill onto Wednesday.  But we will definitely have

16   the testimony wrapped up by Wednesday.

17        THE COURT:  The Court has -- I have to attend a

18   Ninth Circuit jury instructions committee.  I'm on the

19   Ninth Circuit jury instructions committee redoing the criminal

20   instructions this year, and we're meeting Thursday and Friday

21   in Pasadena.  So I only have the two days next week.

22        So what I'm going to do is we are going to wrap up

23   the trial on Wednesday, and I don't want to go straight from

24   the last witness, though, to closing arguments.  So I'm going

25   to schedule on Wednesday a date for the closing arguments the

1  following week.  Given that you have the transcripts and

2  everything, that will give you an opportunity to really have

3  outstanding closing arguments with pinpoint cites and all the

4  rest.

5          So in any event, I just wanted to give you a heads

6  up so you're not spending this weekend working on your closing

7  arguments.  Next week we'll finish up the trial Tuesday and

8  Wednesday, and then I'll carve some time out of the trial,

9  just like time was carved out of this trial for closing

10  arguments the following week.

11          MR. BERGMAN:  Thank you.

12          MR. TOBEROFF:  Thank you.

13          THE COURT:  Have a good weekend, everybody.

14

15          (Proceedings concluded at 5:00 P.M.)

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                              **C E R T I F I C A T E**

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on May 8, 2009.

15

16

17          _____
            **MARK SCHWEITZER, CSR, RPR, CRR**
18          Official Court Reporter
            License No. 10514

19

20

21

22

23

24

25