1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5    ---

6    JOANNE SIEGEL, etc.,              :    PAGES 1175 - 1270
                                       :
7              PLAINTIFF,              :
                                       :
8        VS.                           :    NO. CV 0408400-SGL(RZx)
                                       :
9    WARNER BROTHERS                   :
     ENTERTAINMENT, INC., etc.,        :
10                                     :
               DEFENDANT.              :
11   _____:

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   COURT TRIAL - DAY 9

16                   RIVERSIDE, CALIFORNIA

17                TUESDAY, MAY 12, 2009

18                   AFTERNOON SESSION

19

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
23                        UNITED STATES DISTRICT COURT
                          181-H ROYBAL FEDERAL BUILDING
24                        255 EAST TEMPLE STREET
                          LOS ANGELES, CALIFORNIA 90012
25                        (213) 663-3494

1    **Appearances of Counsel:**

2

3    For the Plaintiff:

4         TOBEROFF AND ASSOCIATES
          By Marc Toberoff, Esq.
5            Nicholas Williamson, Esq.
             Keith Adams, Esq.
6         2049 Century Park East
          Suite 2720
7         Los Angeles, CA 90067
          (310) 246-3333

8

9

10   For the Defendant:

11        BERGMAN COLEMAN GRODIN & EVALL, LLP
          By Michael Bergman, Esq.
12           Anjani Mandavia, Esq.
          9665 Wilshire Boulevard
13        Ninth Floor
          Beverly Hills, CA 90212
14        (310) 860-3346

15            -and-

16        LAW OFFICES OF PATRICK T. PERKINS
          By Patrick T. Perkins, Esq.
17        1711 Route 90
          Cold Spring, NY 10516
18        (845) 265-2820

19

20

21

22

23

24

25

1                            **I N D E X**

2

3    **PAUL LEVITZ,** PREVIOUSLY SWORN......................... 1178

4    CROSS-EXAMINATION BY MR. TOBEROFF...................... 1178

5    REDIRECT EXAMINATION BY MR. BERGMAN.................... 1208

6    **BRETT PAUL,** SWORN.................................... 1213

7    DIRECT EXAMINATION BY MR. BERGMAN...................... 1213

8    CROSS-EXAMINATION BY MR. TOBEROFF..................... 1239

9    **STEVEN SPIRA,** AFFIRMED.............................. 1244

10   DIRECT EXAMINATION BY MR. BERGMAN..................... 1244

11

12                          **E X H I B I T S**

13

14   Exhibit 1126 received................................. 1212

15   Exhibit 335 received................................. 1212

16   Exhibit 1037 received................................ 1243

17

18

19

20

21

22

23

24

25

1          **Riverside, California; Tuesday, May 12, 2009**

2                          **1:55 P.M.**

3          THE COURT:  Mr. Toberoff, you may conduct your

4     cross-examination.

5          MR. TOBEROFF:  Thank you, your Honor.

6          **PAUL LEVITZ, PREVIOUSLY SWORN.**

7                     **CROSS-EXAMINATION**

8     BY MR. TOBEROFF:

9     Q.   Good afternoon, Mr. Levitz.

10    A.   Good afternoon.

11    Q.   Mr. Levitz, you testified with respect to the Superman

12    film agreement, which is Plaintiffs' Exhibit 232, regarding

13    creative controls that you had negotiated, much stronger

14    creative controls in the event DC is no longer a Warner

15    Brothers affiliate.

16          Is that basically correct?

17    A.   I don't know whether it was a Warner Brothers affiliate

18    or a Time Warner affiliate.

19    Q.   I'll represent to you it's a Warner Brothers affiliate.

20    A.   Okay.

21    Q.   However, there is no reversion provision over 34 years in

22    the agreement for lack of exploitation if DC is no longer a

23    Warner Brothers affiliate, is there?

24    A.   I believe that's correct.

25    Q.   You also did not negotiate stronger accounting and audit

1  provisions if DC is no longer an affiliate; correct?

2  A.    Correct.

3  Q.    You would also expect Warner Brothers to collect its 50

4  percent of film-related merchandising if DC was no longer an

5  affiliate under the strict terms of the agreement, wouldn't

6  you?

7        MR. BERGMAN:  Objection, your Honor.  I think that

8  question is internally inconsistent.

9        THE COURT:  Rephrase your question, Counsel.

10 Q.    BY MR. TOBEROFF:  You would also expect Warner Brothers

11 to collect from DC 50 percent of film-related merchandising

12 pursuant to the terms of the agreement in the event DC was no

13 longer an affiliate, wouldn't you?

14       MR. BERGMAN:  Objection.  Vague and ambiguous as to

15 film-related merchandising.

16       THE COURT:  Do you understand the question?

17       THE WITNESS:  I think I understand the question.

18       THE COURT:  Why don't you rephrase, Counsel, just to

19 make it clearer.

20 Q.    BY MR. TOBEROFF:  Do you understand what I mean by

21 film-related merchandising under the Superman film agreement?

22 A.    I understand the paragraph you are referring to.

23 Q.    You can answer the question.

24 A.    I think it would depend on several circumstances.  If we

25 were no longer affiliates because the contract had been

1   assigned away from Warner Brothers, which is one of the

2   circumstances contemplated in the agreement, then obviously

3   Warner Brothers would not collect.  Some successor in interest

4   might.  It would also depend on whether, prior to the

5   agreement either being assigned or the companies becoming

6   unaffiliated, the agreement was amended to adjust anything.

7   And it would depend on the cumulative pattern of how the

8   companies had worked to the time when they became

9   unaffiliated.

10  Q.   You also did not negotiate payment for -- strike that.

11           Earlier on, you testified that there was in

12  effect -- I'm not trying to quote you, but in effect you

13  testified that as to -- since there was a broad grant in the

14  agreement of audiovisual rights, but that the payment was

15  purely for feature films, that you would expect that you would

16  work out with Warner Brothers certain payment schedules for

17  audiovisual works that were exploited which fall through the

18  cracks of the agreement.

19           Do you recall testimony to that effect?

20  A.   I don't believe I testified to that effect.

21  Q.   Okay.  Do you recall testimony regarding how you would

22  expect to in the future negotiate payment for a certain type

23  of audiovisual works?

24  A.   Yes.

25  Q.   Okay.  And do you understand in the agreement there's a

1    broad grant of audiovisual rights subject to the reservations

2    of rights, like the reservation of TV rights?

3    A.    I don't agree with your characterization of the

4    agreement.

5    Q.    Do you agree that the agreement purports to grant

6    audiovisual rights to Superman subject to DC's reserved

7    rights?

8    A.    I'd have to examine the specific language of the

9    agreement.

10   Q.    I see.  And do you negotiate any special provisions

11   regarding any other audiovisual works in the event DC was no

12   longer an affiliate of Warner Brothers?

13   A.    No.

14   Q.    Now, you testified, and I'm speaking broadly and only

15   summarizing here, that with respect to terms in the Superman

16   film agreement, like the 34-year term with no reversions, that

17   you and DC had a certain degree of comfort or a large degree

18   of comfort due to DC's close relationship with Warner Brothers

19   and because in your opinion Warner Brothers does a good job.

20   Is that basically correct?

21           MR. BERGMAN:  Object to the question, your Honor.

22   It mischaracterizes the witness's testimony.

23           THE COURT:  Rephrase, Counsel.

24   Q.    BY MR. TOBEROFF:  I'm attempting only to summarize your

25   testimony, not to quote you.  And that summary is that with

1182

1   respect to terms of the Superman film agreement, in the

2   Superman film agreement that might appear disadvantageous,

3   like the 34-year term with no prospect of reversions in the

4   event Superman is not exploited, that you had a large degree

5   of comfort due to DC's close relationship with Warner

6   Brothers, and because in your opinion Warner Brothers does a

7   good job.

8          Is that basically correct?

9   A.   No, sir, I think that's an inadequate summary of what I

10  said.

11  Q.   How is it incorrect?

12  A.   It's incorrect, first, in that I pointed out that we had

13  confidence that we would have continuing negotiating leverage

14  to resolve problems that would continue to -- could continue

15  to come up over the life of the agreement irrespective of our

16  corporate affiliation because it would be an ongoing process.

17         Second, because there is a continuing income stream

18  to us through that time which provides further opportunity for

19  resolution of any of the problems or further evidence of the

20  continuing desire of the licensee to work on the projects.

21         And, third, because I believe I gave a more nuanced

22  and complicated set of answers to the questions that I can't

23  replicate from memory.

24  Q.   I wasn't attempting to get every point.  I was basically

25  summarizing.

1          THE COURT:  Counsel, I'm going to stop this.  Just

2    ask another question.

3    Q.   BY MR. TOBEROFF:  Do you have a large degree of comfort

4    from the fact that DC has a close relationship with Warner

5    Brothers?

6    A.   I have a large degree of comfort that the complexity of

7    our business relationship will always give me the opportunity

8    to solve problems constructively.

9    Q.   And do you also take comfort in the fact that Warner

10   Brothers in your experience does a very good job?

11   A.   I take a great deal of comfort in the fact that in most

12   of the areas where we work with Warner Brothers, they do an

13   exemplary job.

14   Q.   But, Mr. Levitz, you were aware that under the Superman

15   film agreement, Warner Brothers has the right to assign all or

16   part of the Superman film agreement and its rights under the

17   Superman film agreement to another major studio or any

18   financially responsible party.

19          You are aware of that; correct?

20   A.   I'm aware they have the right to assign in certain

21   circumstances.

22   Q.   And you are also aware under the Smallville television

23   agreement, Warner Brothers Television has the same right to

24   assign the Superman television rights it's received under that

25   agreement?

1    A.    My memory is the rights to assign are not identical

2    between the two agreements but that they -- there is certainly

3    a right to assign in certain circumstances.

4    Q.    And what are those circumstances?

5    A.    I don't remember, sir.  I'd have to look at the agreement

6    to get --

7    Q.    Aren't the circumstances that the assignee must be a

8    major film studio or other financially responsible party?

9    A.    As I just said, I don't remember.  I'd have to look at

10   the agreement.  If you want to furnish it to me, I would be

11   happy to review it and tell you.

12   Q.    I'd like you to -- I'll show you the agreement.

13             May we approach, your Honor?

14             THE COURT:  What exhibit number is it?

15             MR. TOBEROFF:  Exhibit 223.

16             THE COURT:  You may approach.

17   Q.    BY MR. TOBEROFF:  Turn to page 4, paragraph 13, which is

18   Bates No. 135034 of the exhibit we've just handed you, Exhibit

19   223, which is the Smallville television agreement.

20             Could you just read what that says regarding

21   assignment, please?

22   A.    I'm sorry.  Which paragraph are you suggesting?

23   Q.    Paragraph 13.

24   A.    Thank you.

25   Q.    Page 4.

1   A.   Right.  This is, I believe, different than the one in the

2   film agreement.

3   Q.   What does it say, please?

4   A.   "The agreement is fully assignable and shall be binding

5   upon and inure to the benefit of each party's respective

6   successors and assigns.  In no event shall Warner have any

7   fewer rights by reason of this agreement than any member of

8   the public may now or hereafter have.  All notices and

9   payments to owner hereunder shall be sent to owner at DC

10  Comics, 1700 Broadway, New York, New York" --

11  Q.   I just meant the first sentence, not the notice and

12  payment provision.  I'm sorry.

13  A.   That's okay.

14  Q.   Would you turn, please, to the Superman film agreement.

15  You have it up there, Exhibit 232, paragraph 14, which is on

16  page 14.

17  A.   Yes.

18  Q.   Could you please read the relevant assignment sentence.

19  A.   "Warner shall have the right to assign any and all of its

20  rights under this agreement to any person, and upon such

21  assignment, Warner shall have no further obligations to DC

22  hereunder, provided, however, that unless such assignment is

23  to a so-called major motion picture company or other

24  financially capable party which assumes such obligations in

25  writing, such assignment shall not relieve Warner of its

1   payment obligations to DC under this agreement, except with

2   regard to -- with respect to percentage participations, under

3   paragraph 3 hereof, if any."

4   Q.   Thank you.  I'd like to turn to a different subject, the

5   subject of Batman.  You view Batman as an extremely valuable

6   property; correct?

7   A.   Yes, sir.

8   Q.   In fact, in 1999, 2002 when the Superman film agreements

9   were negotiated, Batman was a more popular property than

10  Superman; is that right?

11  A.   Correct.

12  Q.   The same is true after 2002?

13  A.   Generally speaking, I'd say Batman has been a more

14  valuable property during the last decade.

15  Q.   My question is whether the same is true after 2002.

16  A.   Generally.

17  Q.   I'd like you to turn to Exhibit 1, the Batman agreement,

18  which is in front of you.

19  A.   Yes.

20  Q.   Is that your signature on the page Bates stamped WB 4101?

21  A.   It appears to be.

22  Q.   Is that your signature?

23  A.   I think so.

24  Q.   You signed this agreement on February 3rd, 2004?

25  A.   I don't know the date I signed it on.  Is there a marked

1  date on it at some point?

2  Q.   If you look to Bates No. WB 4101.  It says date of

3  execution, February 3, 2004.

4       Do you see that?

5  A.   I'm sorry.  It could say that.  It's fairly unreadable on

6  this copy.  But I'll stipulate that that was the date.

7  Q.   Now, the Batman agreement in paragraph 1-A contains

8  successive option terms which run until the end of any

9  Superman copyrights; correct?  Batman copyrights; correct?

10  Excuse me.

11  A.   I don't remember them having any end date.  It's

12  possible.  Let me take a look.

13  Q.   Let me draw your attention to the second sentence in

14  paragraph 1-A on Bates stamp 4084.  It reads, quote, the

15  initial option period shall commence on the date hereof and

16  continue until and including June 20, 2003, open paren,

17  initial period, close paren, and may be extended by Warner for

18  successive option periods of 12 months each through duration

19  of a copyright thereof, including without limitation all

20  renewals and extensions.

21       Do you see that?

22  A.   Yes.

23  Q.   So the Batman agreement may be extended for successive

24  option terms for the duration of any Batman copyrights.  Is

25  that your understanding of the agreement?

```
 1   A.   Yes.  I would say this is -- this is essentially

 2   perpetual as long as there's new Batman material coming out.

 3   Q.   And that would include any extensions of copyright by

 4   Congress; correct?

 5   A.   Correct.

 6   Q.   The Superman film agreement contains successive option

 7   terms amounting to 34 years; correct?

 8   A.   Correct.

 9   Q.   So the term of the Batman agreement is potentially

10   considerably longer, isn't it?

11   A.   Yes.

12   Q.   The Batman agreement contains the same contingent

13   compensation equal to 5 percent of Warner's worldwide gross

14   revenues as is in the Superman film agreement; correct?

15   A.   Correct.

16   Q.   The Batman television rights are also frozen for the

17   entire term of the agreement and can only be exploited with a

18   Warner brother affiliate; is that correct?

19   A.   Correct.

20   Q.   The option fee on page 2 is an annual fee of 175,000

21   without escalations; is that correct?

22   A.   Correct, except I don't believe it has to be paid in the

23   years when there is a film or immediately following the film.

24   Q.   The option payments in the Superman agreement of 500,000

25   escalate after a certain number of years.
```

1           Is that your understanding?

2    A.    Correct.

3    Q.    But even the 500,000 option payment is nearly three times

4    the 175,000 of the Batman agreement; correct?

5    A.    Correct.

6    Q.    And that's even though Batman was more valuable than

7    Superman at the time the Batman agreement was signed?

8    A.    No, I don't think that's the reason for it.  The Superman

9    agreement represented a renegotiation of an agreement that was

10   lapsing where we had certain levels of leverage.  The Batman

11   agreement that this replaced had not expired.  So we had

12   different level of leverage.

13          There really was no opportunity to set any new

14   financial terms in the process.  We were simply moving it to a

15   new forum.

16          MR. TOBEROFF:  Your Honor, I move to strike as

17   nonresponsive after the word "no."

18          THE COURT:  Sustained.  Stricken.

19   Q.    BY MR. TOBEROFF:  Now, you testified on direct at length

20   that prior to entering into the Superman film and television

21   agreements with Warner Brothers, you conducted extensive

22   research into the market in Hollywood for rights to comic

23   books.

24          Do you recall that?

25   A.    Yes.

1190

1    Q.    You also testified that you communicated with a number of

2    different people regarding your market analysis.

3              Do you recall that?

4    A.    Yes.

5    Q.    In connection with plaintiffs' request for all documents

6    relevant to DC's negotiation of the Superman film and

7    television agreements, why did you not produce a single

8    document evidencing any such market analysis?

9    A.    I like using the phone.

10   Q.    So it's your testimony that there is not a single written

11   document reflecting this market analysis?

12   A.    I can't testify whether there are or there aren't.  If

13   there were, they would have been turned over.

14   Q.    Other than what would have been turned over, you are not

15   aware of any documents in your possession, written documents

16   reflecting the market analysis you conducted; is that correct?

17   A.    I believe we did a very thorough search of the files to

18   try to turn over any responsive documents.

19              MR. TOBEROFF:  Move to strike as nonresponsive.

20              THE COURT:  It was an awkward question, Counsel.

21   Other than what you would have -- what would have been turned

22   over.  He said he turned over everything.  Were there any

23   other documents.  It's all getting a little tangled up.  Let's

24   go on to your next question.

25   Q.    BY MR. TOBEROFF:  Are you aware of a single document

1    evidencing your market analysis that you testified to?

2    A.    I don't remember preserving anything like that in my

3    files.

4    Q.    I'd like to talk to you about the Steel character.   In

5    the period 1993 to 1997, would you agree that -- strike that.

6              In 1993 to 1997, comic books were not as valuable in

7    Hollywood as in -- excuse me -- as in 2004 after hit films

8    like Men in Black, X Men, Spiderman, and X Men 2 had been

9    released; correct?

10   A.    I would agree that comic book rights grew more valuable

11   in Hollywood post the first Spiderman movie, 2002, I believe.

12   Q.    And also after Men in Black, X Men, and X Men 2; correct?

13   A.    I don't believe Men in Black had any positive effect on

14   the pricing of comic book film rights in Hollywood because it

15   was not perceived that the film was based on a comic book.

16   The success of the second X Men film probably was helpful to

17   the price of comic book rights.

18   Q.    But in 1993 and 1997, comic books were not as valuable in

19   Hollywood as in 2004; correct?

20   A.    Correct.

21   Q.    I'd like you to turn to Exhibit 226, which is in front of

22   you.  It's the Steel purchase agreement dated August 2, 1996,

23   between Warner Brothers and DC.

24   A.    Correct.

25   Q.    Is that your signature on page DCC 66044?

```
 1   A.    I think so.  Looks like it.

 2   Q.    This exhibit has been admitted into evidence.

 3         The alter ego of the DC superhero Steel is a man

 4   named Dr. John Henry Adams; correct?

 5   A.    No.

 6   Q.    Is Dr. John Henry Adams Steel?

 7   A.    No.  That's not the correct name.

 8         THE COURT:  What is the name?

 9         THE WITNESS:  John Henry Irons.

10   Q.    BY MR. TOBEROFF:  Steel swings a big sledgehammer like

11   the folk hero John Henry; right?

12   A.    Right.

13   Q.    I'd like to draw your attention to page 1, paragraph 2,

14   of Exhibit 226.

15   A.    Okay.

16   Q.    Under the heading Purchase Price.  The gross

17   participation described in this paragraph -- DC's gross

18   participation as described in this paragraph is the same gross

19   participation that DC has in the Superman film agreement and

20   in the Batman agreement; correct?

21   A.    Correct.

22   Q.    But the film rights to Steel are not nearly as -- were

23   not nearly as valuable when you entered into this agreement as

24   the film rights to Batman and Superman, are they?

25   A.    They were not granted at that time.
```

1193

1    Q.   Does this agreement convey film rights to Steel?

2    A.   This agreement conveys rights that Warner Brothers

3    already possessed.

4    Q.   Does this agreement convey any rights DC may have in

5    Steel?

6    A.   None that Warner Brothers did not already possess.

7    Q.   So Warner Brothers already possessed the rights to Steel?

8    A.   Correct.

9    Q.   But DC received the same compensation -- the gross

10   participation under this agreement that it received for Batman

11   and Superman; correct?

12   A.   They possessed the rights to Steel under the Superman

13   agreement.  So the compensation was the same as in the

14   agreement that granted it to them.

15            MR. TOBEROFF:  Move to strike as nonresponsive.

16            THE COURT:  It's stricken.

17   Q.   BY MR. TOBEROFF:  Could you answer my question, please?

18   A.   Could you repeat it, please?

19            THE COURT:  Mark?

20            (Record read.)

21            THE WITNESS:  Yes.

22   Q.   BY MR. TOBEROFF:  And that's despite the fact that Steel

23   is a far less valuable character than Batman and Superman;

24   correct?

25   A.   Yes.

1   Q.   I'd like to show you what's been marked for

2   identification as Plaintiffs' Exhibit 335.

3               May we approach, your Honor?

4               THE COURT:  You may.

5               THE WITNESS:  Yes, sir.

6   Q.   BY MR. TOBEROFF:  May I draw your attention -- pardon me.

7   Plaintiffs' Exhibit 335 is a printout from the Internet site

8   Box Office Mojo --

9               THE COURT:  Is this any different?  There was a

10  similar listing worldwide grosses No. 1 through a hundred.  Is

11  this the same or different?

12              MR. TOBEROFF:  I was just about to --

13              THE COURT:  I'm sorry.

14              MR. TOBEROFF:  It's similar to Defendants' Exhibit

15  1122.  However, instead of showing domestic theatrical box

16  office figures, this shows worldwide theatrical box office

17  figures.  I would like to point out that Box Office Mojo does

18  not have an adjusted for inflation column under its worldwide

19  figures as it does for its domestic printouts.

20              THE COURT:  Very well.

21  Q.   BY MR. TOBEROFF:  I'd like to draw your attention to

22  No. 200 regarding Superman in 1978.  It shows a worldwide box

23  office gross of 300.2 million unadjusted for inflation; is

24  that correct, Mr. Levitz?

25  A.   That's what it says.

```
 1   Q.   Number 200.  Do you see that?

 2   A.   Yes, sir.  I said that's what it says.

 3   Q.   Adjusted for inflation using the Consumer Price Index,

 4   that figure would be over $900 million today.

 5           Does that sound about right to you, Mr. Levitz?

 6   A.   At least, I think.  That might be a little low for

 7   inflation.

 8   Q.   The exact figure is 978 million.

 9           Does that sound right to you?

10   A.   Sounds closer.

11   Q.   Please look at item No. 101.  It shows Batman released in

12   1989 as a worldwide box office gross of 411.3 million

13   unadjusted for inflation.

14           Do you see that?

15   A.   Yes, sir.

16   Q.   Now, if you adjusted that for inflation under the

17   Consumer Price Index, that figure would be 705 million.

18           Does that sound right to you?

19           MR. BERGMAN:  Objection.  Lack of foundation.

20           THE COURT:  Sustained.

21   Q.   BY MR. TOBEROFF:  Are you familiar with adjusting dated

22   nominal financial amounts for inflation?  Are you familiar

23   with that process?

24           THE COURT:  I seem to recall you objected on

25   foundational grounds to a similar question by Mr. Bergman that
```

```
 1   I sustained.

 2            MR. TOBEROFF:  That's why I'm rephrasing it, your

 3   Honor.

 4            THE COURT:  All right.

 5            THE WITNESS:  I'm familiar with the process.

 6   Q.   BY MR. TOBEROFF:  And are you familiar with the fact that

 7   oftentimes one uses the Consumer Price Index to adjust

 8   financial figures for inflation?

 9   A.   I'm familiar with how to do that.

10   Q.   Does the $705 million figure that I mentioned sound right

11   to you for adjusting a 1989 $411.3 million figure?

12            MR. BERGMAN:  Objection, your Honor.  That's really

13   asking an expert question, something to which Mr. Toberoff has

14   objected.

15            THE COURT:  Overruled.

16            THE WITNESS:  It --

17            THE COURT:  If you're able to.

18            THE WITNESS:  It happens that I don't offhand

19   remember the conversion from the late 80's as well as I do

20   from the late 70's.  I apologize.

21   Q.   BY MR. TOBEROFF:  Please look at No. 46.  Men in Black.

22   It shows Men in Black 1997.  It shows a worldwide box office

23   gross of 589.4 million.

24            Do you see that?

25   A.   Yes.
```

1197

```
 1  Q.   Men in Black was extremely successful; correct?

 2  A.   More the motion picture studio, yes.

 3  Q.   Now, look at item No. 207, X Men released in the year

 4  2000, showing a worldwide box office gross of 296 million

 5  unadjusted for inflation.

 6            Do you see that?

 7  A.   Yes, sir.

 8  Q.   X Men was also very successful for the studio, wasn't it?

 9  A.   Yes, sir.

10  Q.   Now look at item No. 18, Spiderman released in 2002,

11  showing a staggering worldwide box office gross of 821.7

12  million.

13            Spiderman was a huge success; correct?

14  A.   Absolutely.

15  Q.   Now, look at item No. 89, Men in Black 2, released in

16  2002, showing a worldwide box office gross of 441.8 million.

17            Again, Men in Black 2 was very successful; correct?

18  A.   I'm looking at it.  I'm not offhand particularly familiar

19  with the film's numbers.  Looks like a very positive number.

20  Q.   And finally, if you look at item No. 104, the film X 2, X

21  Men United released in 2003 shows a worldwide box office gross

22  of 407.7 million.

23            This film was also very successful; correct?

24  A.   Looks like a good number to me.

25  Q.   Would you agree that the film was very successful?
```

```
 1   A.   I don't know what any of these films cost.  So I don't

 2   know -- in a case like this, I don't know if it was successful

 3   for the studio or not.  It was a box office success,

 4   certainly.

 5   Q.   Do you view the X Men sequel as a successful film?

 6   A.   I think it was written up as a successful film.

 7   Q.   Now, you and Warner Brothers adopted the 1974

 8   compensation figures from the Salkind agreement when you

 9   entered into the Superman film agreement in 2002; correct?

10   A.   Correct.

11   Q.   And at this time many studios were developing major films

12   based on comic books; is that right?

13   A.   I believe so.

14   Q.   After 1974, the first Superman film in 1978 and the first

15   Batman movie in 1986 had each proved to be huge successes;

16   correct?

17   A.   The first Batman film was 1989, but I would categorize

18   them both as great successes.

19   Q.   And as we just noted, starting with Men in Black in 1997

20   and X Men in 2000, successful films based on comic books had

21   more recently been released at the time you entered into the

22   Superman film agreement; is that right?

23   A.   I believe there were successful films based on comics,

24   certainly going back straight through the Batman films,

25   including the ones you mentioned.
```

1    Q.   But in 2002, with all of this activity, not only did you

2    use the 1974 compensation terms in the Salkind agreement, you

3    proceeded to lock those 1974 rates in for 34 years until 2033;

4    isn't that right?

5    A.   Yes.

6    Q.   And then after the successful Men in Black, X Men, Men in

7    Black 2, and X 2, and after the staggering success of the 2002

8    Spiderman movie, which grossed 821.7 million worldwide, you

9    then executed the Batman agreement with Warner Brothers in

10   2004; correct?

11   A.   Correct.

12   Q.   But despite all of this success, you locked in the 1974

13   Salkind rights in the 2004 Batman agreement for the remaining

14   life of the Batman copyrights; is that right?

15   A.   I believe the Batman agreement did not change in any way,

16   shape, or form the already existing expiration date of the

17   Batman rights grant that Warner had.

18   Q.   Did you lock in the 1974 Salkind rates in the Batman

19   agreement for the remaining life of the Batman copyrights?

20              MR. BERGMAN:  Objection.  Asked and answered.

21              THE COURT:  Not fully.  Overruled.

22              THE WITNESS:  I believe they were already locked in.

23   Q.   BY MR. TOBEROFF:  Did the agreement lock them in?

24   A.   No.  It was already done, sir.  I don't think it changed

25   anything.

1    Q.    And when, according to you, were these 1974 Salkind

2    rights locked in for the remaining life of the Batman

3    copyrights?

4    A.    I believe they were locked in in the Bat film agreement.

5    I think it's a 1979 document.

6    Q.    And Warner Brothers was simply assigned that agreement?

7    A.    They were a successor in interest ultimately to it.

8    Q.    Did it require your consent?

9    A.    No.

10   Q.    Then why did you enter into a Batman film agreement if

11   Warner simply -- all Warner had to do was be assigned the

12   prior agreement?

13   A.    Warner already had been assigned a prior agreement over a

14   decade previously.  We entered into this agreement to clean up

15   language for administrative purposes.

16   Q.    Does this agreement amend the prior agreement?

17   A.    Not in any of the material terms.

18   Q.    Does it supersede the prior agreement?

19   A.    I believe it does.

20   Q.    Now, at the time you entered into the 2002 Superman

21   agreement and the 2004 Batman agreement, agreements with

22   rights to comic book properties had gotten consistently better

23   over the years; is that correct?

24   A.    Yes.

25   Q.    When you entered into the Superman film agreement, you

1  viewed any comic book characters other than Batman to be --

2  pardon me.

3           When you entered into the Superman film agreement,

4  you did not view any comic book characters other than Batman

5  to be of the same order of magnitude as Superman; correct?

6  A.   It depends on what you're looking at them for.

7  Q.   I'm talking generally.

8  A.   For purposes of selling or marketing comics, I would

9  think either Spiderman or X Men would be superior properties

10  to Superman or Batman at that time, and for purposes of

11  licensing film rights, I believe that if I were representing

12  Marvel at the time, I would have made an argument that either

13  of them were more valuable properties to make a deal on than

14  Superman or Batman.

15           MR. TOBEROFF:  Move to strike as nonresponsive.  I

16  said I was speaking generally.

17           THE COURT:  Rephrase your -- go to your next

18  question, Counsel.

19           MR. TOBEROFF:  I think I'll clear it up when I read

20  from his deposition.

21           THE COURT:  Very well.

22  Q.   BY MR. TOBEROFF:  I'd like to read from your deposition,

23  which you previously testified that had been taken under oath

24  on November 6, 2006.  Starting on page 204, line 24, going to

25  page 205, line 10:

1      "QUESTION:  So you tried to find characters that had

2      been licensed that were of the magnitude of a Superman?

3      "ANSWER:  Of the magnitude or simply of the

4      significant worth as literary property?

5      "QUESTION:  In the comic area, did you look at

6      comics for any characterization in the USA on the

7      magnitude of Superman?

8      "ANSWER:  I'm not sure at that point we would have

9      perceived there to be a comic book character that was

10      ultimately of the magnitude of Superman, but we certainly

11      did all the deals that we were able to identify."

12          Did I ask you those questions and you give those

13  answers at your deposition?

14  A.   I believe I did.  You're reading it out loud to me.

15  Q.   Since 1997, what are the five best known DC -- I'm moving

16  on to a new subject.

17          Since 1997, what are the five best known DC

18  properties that are being developed at a studio other than

19  Warner Brothers or Warner Brothers affiliate?

20  A.   Since 1997, Watchmen would certainly have been the best

21  known one that was developed completely outside Warner

22  Brothers during that time.

23  Q.   Actually, let me strike that question.

24          My question was really since 1997, what are the five

25  best known DC properties that have been licensed by DC to a

1    studio other than Warner Brothers or a Warner Brothers

2    affiliate?

3           MR. BERGMAN:  Objection, your Honor.  After a

4    witness answers a question and counsel doesn't like the

5    answer, I don't think you can move to strike it.

6           THE COURT:  The only person in this room that can

7    strike an answer, Counsel, is the Court.  The fact that

8    Mr. Toberoff or anybody else is suggesting that an answer be

9    stricken has no effect on the record.

10          MR. BERGMAN:  Thank you, sir.

11          THE WITNESS:  I believe the properties that we have

12   published that have been licensed to other studios include

13   Red, Preacher, Ocean.  Probably a couple others.  I don't keep

14   the list carefully in my head.

15   Q.   BY MR. TOBEROFF:  And those are the five best known DC

16   properties you can think of that have been licensed to other

17   studios since 1997?

18   A.   You're asking with regard to -- film rights to film

19   studios?

20   Q.   Yes.

21   A.   Yes.

22   Q.   Earlier in this case we went through the cover of a

23   Justice League of America comic book featuring most of DC's

24   better known characters.  Since 1997, none of these characters

25   have been licensed for film and television development outside

1   the Warner family; correct?

2   A.   Correct.

3   Q.   In fact, the vast majority of DC's active film and TV

4   licenses are to Warner Brothers; is that right?

5   A.   Correct.

6   Q.   According to Plaintiffs' Exhibit 306, which has been

7   admitted, 130-page status report of DC's film and television

8   projects in development, over 90 percent of DC's products are

9   with Warner Brothers or Warner Brothers affiliates.

10           Does that sound right to you?

11  A.   I'm not familiar with the exhibit you're referring to.

12  Do you want to show it to me?

13  Q.   I'll show it to you.

14           May we approach, your Honor?

15           THE COURT:  You may.

16           THE WITNESS:  Okay.  What was your question?  I'm

17  sorry.

18  Q.   BY MR. TOBEROFF:  Pursuant to that document, we

19  calculated that over 90 percent of DC's products are with

20  Warner Brothers or a Warner Brothers affiliate.

21           Does that sound right to you?

22  A.   It's possible.  I've never calculated it.  This document

23  incorporates material that goes back to the 1940's.

24  Q.   I'd like to turn to the topic of the alleged settlement

25  agreement with plaintiffs.  DC and Warner Brothers claim a

1  settlement was reached with the Siegels on October 19, 2001,

2  based on a letter of this date from the Siegels' attorney,

3  Richard Marks; is that correct?

4  A.    Correct.

5  Q.    I'd like to look at Plaintiffs' Exhibit 223, the

6  Smallville television agreement, dated as of December 5, 2000.

7  A.    Yes.

8  Q.    This agreement, dated December 5, 2000, contains warranty

9  and indemnification provisions as to DC's exclusive ownership

10 of Superman; correct?

11 A.    Without checking, I can't tell you for sure, but I would

12 assume so.

13 Q.    When you entered into this agreement in early 2001, you

14 were aware of plaintiffs' Superman notices of termination; is

15 that right?

16 A.    Yes.

17 Q.    You also understood at that time that plaintiffs -- that

18 if plaintiffs' termination was effective as to certain early

19 Superman works, that the Siegels would co-own the copyrights

20 to such works with DC after the termination had become

21 effective in 1999?

22 A.    Can you repeat the question, please?  I'm sorry.  There

23 was a nuance in there I didn't manage to hear.

24 Q.    You also understood at the time that if plaintiffs'

25 termination was effective as of certain early Superman works,

1    that the Siegels would co-own the copyrights to such works

2    with DC once the termination became effective in 1999.

3    A.    Yes.

4    Q.    You further understood that in such event, DC would own

5    only nonexclusive rights to such recaptured Superman works;

6    right?

7    A.    Yes.

8    Q.    You also understood that pursuant to DC's warranty and

9    indemnification provisions in the Superman television

10   agreement, DC would be obligated to indemnify Warner for their

11   attorney's fees, costs, and any damages in connection with the

12   Siegels' termination; correct?

13   A.    Absolutely.

14   Q.    And even defendants do not claim that DC had a settlement

15   agreement with plaintiffs by December 5, 2000.

16   A.    By December 5, 2000?

17   Q.    The date of this agreement.

18   A.    I don't remember the status of our settlement discussions

19   at that point.  But we certainly hadn't reached a final

20   handshake with them by that point.

21   Q.    Had defendants claimed that they had a settlement

22   agreement prior to October 19, 2001?

23   A.    I don't believe we've made such a claim.

24   Q.    I'd like you to turn now to Plaintiffs' Exhibit 41.  It

25   should be in front of you.  It's comprised of a cover letter

1    dated February 26, 2001, from Jay Kogan of DC to John Schulman

2    of Warner Brothers, enclosing the then latest draft of what

3    became the Superman film agreement.

4    A.    I see it.  Plaintiffs' 154 here with something from Jay.

5    I don't see anything else from Jay in this stack.

6              MR. TOBEROFF:  May we approach, your Honor?

7              THE WITNESS:  I'm sorry.  It's here.  I apologize.

8    Q.    BY MR. TOBEROFF:  I draw your attention to paragraph 9 on

9    page 11 of the agreement.  Bates No. WB 6406 of Exhibit 41.

10   The paragraph is entitled Representations and Warranty.

11   A.    Yes, sir.

12   Q.    Warranties.  Excuse me.  Now I'd like you to turn to

13   Plaintiffs' Exhibit 232, which is the executed Superman film

14   agreement.

15   A.    Yes.

16   Q.    I draw your attention to paragraph 9 of that agreement.

17   The warranty and indemnification provisions.

18   A.    Yes, sir.

19   Q.    Do you see that paragraph 9 in Exhibit 41 dated by the

20   cover letter as February -- as that being a February 26, 2001,

21   is identical to paragraph 9 in the final executed Superman

22   film agreement?

23   A.    No.

24   Q.    In what respect do they differ?

25   A.    The Exhibit 41 includes a footnote referring to the

1  Siegel termination.

2  Q.   Other than that footnote.

3  A.   Other than that footnote, without reading them very

4  slowly against each other, they appear to be identical.  If

5  you'd like me to check the wording word by word, I certainly

6  could do that.

7          MR. TOBEROFF:  I have no further questions, your

8  Honor.

9          THE COURT:  Any further direct?

10          MR. BERGMAN:  Just a couple, your Honor.

11                    **REDIRECT EXAMINATION**

12  BY MR. BERGMAN:

13  Q.   Mr. Levitz, on cross-examination Mr. Toberoff asked you

14  whether any of you had produced any of the documents that you

15  analyzed in reaching your conclusion as to the value of the

16  Superman rights in 2002.

17          Do you recall that testimony?

18  A.   Yes.

19  Q.   Okay.  Did you in fact rely upon the Marks letter of

20  October 19, 2001, in reaching that conclusion?

21  A.   Yes.

22  Q.   And did you in fact produce that letter to Mr. Toberoff?

23  A.   I assume we did.  I didn't see the document production

24  myself.

25          MR. BERGMAN:  Your Honor, now that Mr. Toberoff has

1    opened the door to this letter, I would like to offer it as

2    defendants' next exhibit in order.

3            THE COURT:  What number would that be?

4            MR. BERGMAN:  That would be 00975, your Honor.  I'm

5    sorry.  Exhibit 1126.

6            THE COURT:  1126.

7            MR. TOBEROFF:  May I see a copy of the exhibit,

8    please?

9            THE COURT:  You may.  And the Court would like to

10   see it as well.

11           MR. BERGMAN:  Of course.

12   Q.  Now, you were asked questions, Mr. Levitz, with respect

13   to the television agreement, whether you had consummated the

14   settlement agreement with the plaintiffs by that time.  And

15   your answer was no.

16           Had you by that time discussed with Mr. Ramer and

17   with Mr. Marks precisely what the terms of the Salkind

18   agreement were, what the terms of the Lois and Clark agreement

19   were, what the terms of the Warner Brothers consumer product

20   agreements were, and what the terms of the animation

21   agreements were?

22           MR. TOBEROFF:  Objection, your Honor.  Compound.

23           THE COURT:  Sustained.

24   Q.  BY MR. BERGMAN:  Had you by that point in time,

25   Mr. Levitz, discussed with Mr. Ramer and Mr. Marks what the

1    terms of the Salkind film agreement had been?

2    A.    Yes.

3    Q.    And did they in fact agree with you, sir, that the

4    recurrence of those terms in the future would be what they

5    termed in their discussions as well as in Exhibit 1126, a,

6    quote, safe harbor, close quote, for future deals?

7                MR. TOBEROFF:  Objection, your Honor.  The question

8    calls for hearsay.

9                THE COURT:  The Court will not consider it for the

10   truth of the matter asserted.  You may proceed, and you may

11   answer the question.

12               MR. BERGMAN:  May I approach the witness, your

13   Honor?

14               THE COURT:  You may.

15   Q.    BY MR. BERGMAN:  I've placed before you, Mr. Levitz, a

16   copy of Exhibit 1126.  Would you turn, sir, please, to

17   paragraph 10, which is found at page 979.

18   A.    Yes.

19   Q.    Would you read, please, the first full sentence of

20   paragraph 10 aloud?

21   A.    "Siegel family to have full audit rights.  Intercompany

22   transactions will be covered by, quote, safe harbors, unquote,

23   established at a level consistent with the Salkind Superman

24   theatrical motion picture deal, the Lois and Clark television

25   program deal, the WB television animation deal, and the

 1   existing fee arrangements with Warner Brothers consumer

 2   products."

 3   Q.   Thank you, sir.  Is the Steel character related in any

 4   way to the Superman universe?

 5   A.   Yes.  The Steel character --

 6           MR. TOBEROFF:  Objection.  Leading, your Honor.

 7           THE COURT:  Rephrase it.  What, if any, relation.

 8   Q.   BY MR. BERGMAN:  What, if any, is that relationship?

 9   A.   The Steel character is a derivative character introduced

10   in the Superman comics.

11   Q.   Does the fact that you obtained the same terms for Steel

12   as you did with Superman and Batman demonstrate to you that

13   Warner Brothers underpaid for Superman and Batman or that it

14   overpaid for Steel?

15           MR. TOBEROFF:  Objection.  Leading, your Honor.

16           THE COURT:  Sustained.

17   Q.   BY MR. BERGMAN:  What does the fact that you obtained the

18   same terms for Steel as for Superman and Batman reveal to you?

19           THE COURT:  If anything.

20           THE WITNESS:  What it reveals to me is that I was

21   able to maintain the price of a good that I had already sold

22   and simply give away essentially an extended term on the good.

23   We had sold Steel as part of the Salkind deal, which Warners

24   was successor to by that point.  The only thing that the Steel

25   agreement granted them transactionally was the term to exploit

1212

```
 1    the term in, which would otherwise have ended with the Salkind

 2    term because we had not yet extended that.

 3              MR. BERGMAN:  Thank you.

 4              No further redirect, your Honor.

 5              THE COURT:  Anything further from the plaintiff?

 6              MR. TOBEROFF:  No, your Honor.  Thank you.

 7              THE COURT:  Very well.  The defense's next witness.

 8              MR. BERGMAN:  Your Honor, has 1126 been put in

 9    evidence?

10              THE COURT:  1126.  Any objection?

11              MR. TOBEROFF:  Yes, your Honor.  1126 is hearsay

12    except to the fact it's introduced for Mr. Levitz's state of

13    mind.

14              THE COURT:  It will only be considered for that

15    purpose.  It's admitted for that purpose, Counsel.

16              (Exhibit 1126 received.)

17              MR. BERGMAN:  Thank you.

18              THE COURT:  You may step down.  Thank you very much.

19              MR. TOBEROFF:  If I may, your Honor, I neglected to

20    ask that the Box Office Mojo be moved into evidence.

21              THE COURT:  Any objection to that, Counsel?

22              MR. BERGMAN:  No, your Honor.

23              THE COURT:  Very well.  It's admitted as well.

24              (Exhibit 335 received.)

25              MR. BERGMAN:  Shall I call my next witness?
```

1          THE COURT:  You may.

2          MR. BERGMAN:  Defendants call Mr. Brett Paul.

3          THE CLERK:  Please raise your right hand.

4                    **BRETT PAUL, SWORN.**

5          THE CLERK:  Please take the stand.  Please state

6     your full name for the record, and spell your last name.

7          THE WITNESS:  Brett Paul.  B-R-E-T-T, P-A-U-L.

8                    **DIRECT EXAMINATION**

9     BY MR. BERGMAN:

10    Q.   What is your present occupation and title?

11    A.   I am the executive vice-president of Warner Brothers

12    Television Production.

13    Q.   And in that capacity, what are your primary

14    responsibilities?

15    A.   I have a general oversight responsibility for the

16    business operations of the production division.  I oversee the

17    business affairs department, our finance department,

18    production, legal, and certain other administrative functions.

19    Q.   When were you first employed by Warner Brothers?

20    A.   September 1995.

21    Q.   And in what capacity was that, sir?

22    A.   I was a vice-president of business affairs.

23    Q.   Have you been involved in one aspect or another of

24    business affairs at Warners, then, for the past 14 years?

25    A.   Yes.

1  Q.   Can you explain briefly what it is that business affairs

2  does at Warner Brothers Television?

3  A.   Sure.  Business affairs is essentially the department

4  that is responsible for the negotiating function of the

5  business terms on both the buy and acquisition side of our

6  business and on the licensing side of our business to our

7  first-run network broadcast partners.  Sort of generally

8  speaking.

9  Q.   Over those 14 years, sir, do you have any estimate of how

10  many underlying rights acquisition agreements you've either

11  negotiated or supervised the negotiation of?

12  A.   I would say dozens.  It would be hard for me to give you

13  an exact number.

14  Q.   When a business affairs executive looks at a particular

15  property for acquisition, are there certain factors you take

16  into consideration regarding the value of that property?

17  A.   Yes, there are.

18  Q.   Can you identify what those factors are?

19  A.   In terms of valuing the property, very often we look at

20  sort of the marketplace, the precedential marketplace for

21  similar properties.  We look at the -- quite honestly, the

22  desire of our creative executives to develop a property.  We

23  look at whether or not the property has been previously

24  exploited, and we try to do a comparative analysis to other

25  properties in the marketplace that you could argue are similar

1    in certain ways.

2          MR. TOBEROFF:  Your Honor, I'm lodging my

3    specialized knowledge expert opinion objection.

4          THE COURT:  Overruled.  The witness is testifying as

5    to his understanding, his state of mind in negotiating deals

6    on behalf of Warner Brothers.  The Court will consider the

7    evidence for that purpose.

8    Q.    BY MR. BERGMAN:  When you say, sir, that you look to the

9    marketplace for similar properties, can you explain what you

10   consider to be similar properties, giving us an example?

11   A.    It really depends on the nature of the particular rights.

12   If it's a literary property, we may look at the number of

13   books sold or whether or not, you know, something appeared on

14   the New York Times best-seller list.  If it's a -- if it's an

15   underlying format, we may look at -- television format, how

16   many episodes were done.  If it's a movie, we may look at the

17   performance of the feature.

18          So it really kind of depends on the particular

19   rights that we're talking about.

20   Q.    What if we're talking about comic superhero rights?

21          MR. TOBEROFF:  Objection.  Lacks foundation.

22          THE COURT:  Sustained.

23   Q.    BY MR. BERGMAN:  Have you been involved in the

24   acquisition of the television rights for comic superhero

25   characters?

1   A.   Yes.

2   Q.   In those acquisitions, have you looked to the marketplace

3   for similar properties?

4   A.   Yes.

5   Q.   When considering the value --

6            THE COURT:  I'm sorry.  Is there an objection?

7            MR. TOBEROFF:  Objection, your Honor.  The questions

8   are soliciting specialized knowledge.  It's expert testimony.

9            THE COURT:  Overruled.

10  Q.   BY MR. BERGMAN:  When considering the value of a comic

11  superhero, what similar properties would you look to?

12  A.   Well, when you say a comic superhero, we would probably

13  look at, if we've done other deals that are similar based on

14  comics, but that's probably a limited universe.

15           So we would try to look at maybe literary properties

16  or properties that were based on characters that were well

17  known potentially in other media.  I mean, we would look at a

18  broad panoply of underlying rights with an eye towards

19  maintaining a certain line item for rights within our overall

20  production budgets.

21  Q.   When you're dealing in instances where you're dealing

22  with the same party, whether it's a rights holder, an actor,

23  producer, or anyone else, to what extent, if any, do you often

24  use a prior contract with that party as the basis for a new

25  deal?

1    A.    That's pretty common practice.  We rely on precedent, and

2    there's a quote system that is very prevalent, and so if

3    there's a preexisting course of dealing between the parties

4    with respect to, you know, it's not just with respect to

5    rights, but it sort of extends to most of the talent or

6    writers, the precedent is a major piece of how we determine

7    market value.

8              MR. TOBEROFF:  Move to strike for the same reasons.

9    The answer regarding custom and practice.

10             THE COURT:  Am I correct that Mr. Paul negotiated

11   the Smallville practice for Warner Brothers?

12             MR. BERGMAN:  He did, your Honor.

13             THE COURT:  Very well.  Overruled.

14   Q.    BY MR. BERGMAN:  In terms of precedents, Mr. Paul, how

15   important a factor are precedents for television when

16   negotiating for rights?

17   A.    They are a very important factor to consider.  And when

18   they are expensive, we try to ignore them.  When they are not,

19   we try to enforce them.  But they are definitely a -- an

20   important factor in considering a new deal.

21   Q.    Now, what involvement, if any, did you have in the

22   negotiation of the Smallville deal points?

23   A.    The basic arrangement essentially was -- I was working

24   with someone else who at that time was head of the business

25   affairs department, who I reported to, and so I was sort of

1  sitting second chair, I would say, and when the deal was

2  initially conceived, my direct involvement was when we started

3  to put our production budgets together and the show was

4  actually licensed to the particular broadcast network where I

5  ended up, which was the WB, I attempted to renegotiate

6  downward some of the components of the deal.

7  Q.   You referred to someone else who had started the

8  negotiation?

9  A.   Yes.

10  Q.   Who was that?

11  A.   His name is Craig Hunigs.

12  Q.   Did there come a time when he in turn asked you to become

13  involved?

14  A.   Yes.

15  Q.   What were the circumstances under which he asked you to

16  get involved?

17  A.   Well, it wasn't so much that he was asking me to get

18  involved.  What happened was we ended up licensing the project

19  to the WB, and the WB was a fledgling network, and we were

20  putting together our production budget for the show.  When we

21  knew how much the initial license fee was, I was concerned,

22  given some of the other participants in the show, that we were

23  being stretched pretty thin on the production budget.

24       So I initiated a conversation with DC Comics to

25  attempt to renegotiate certain components of the acquisition

1  price.

2  Q.   And with whom did you attempt to renegotiate those

3  aspects of it?

4  A.   Paul Levitz was one.  And there may have been -- and I'm

5  just forgetting a name.  There may have been another woman

6  lawyer there at the time.  But I had several conversations

7  with Paul about it.

8  Q.   Were the conversations that you had with Mr. Levitz in

9  person or on the telephone?

10  A.   On the telephone.

11  Q.   And generally speaking, at Warner Brothers what

12  percentage of your rights acquisition agreements are made over

13  the telephone?

14  A.   Oh, 98 percent.

15  Q.   All in all, how many conversations did you have with

16  Mr. Levitz before a deal was reached?

17  A.   Well, I was actually unsuccessful.  So we just lived with

18  the deal that had been structured.  I would say I spoke to

19  Paul four or five times over the course of a few weeks.

20  Q.   And when you say you were unsuccessful, what specifically

21  were you attempting to do?

22  A.   I was trying to reduce the episodic fee that we were

23  paying.

24  Q.   And how much was that episodic fee?

25  A.   It was -- well, structured as a percentage of the initial

1220

1     license fee, but actually, it was a dollar amount, $45,000,

2     and it was against a certain percentage of the license fee,

3     but the percentage of the license fee was lower.  So it was

4     actually a $45,000 per episode fee.

5     Q.    At the time that you were negotiating with Mr. Levitz,

6     were you familiar with the terms of the Lois and Clark

7     agreement?

8     A.    I was aware of them, yeah.

9     Q.    And what do you recall of your discussions with

10    Mr. Levitz concerning the reduction of the episodic fees?

11    A.    Well, I remember explaining to Paul that we anticipated

12    that, given some of the production values that we anticipated

13    for the show, given the fact that we had a -- what we call a

14    pod production company, a nonwriting production company

15    involved, and we had certain high level show runners, it's

16    really the combination of all of those factors.

17           I was concerned that we wouldn't have enough money

18    to produce the show within the traditional ways that we

19    produce.  So I suggested to Paul that we try to come up with

20    an arrangement where some of that money that was being paid to

21    DC would either be reduced or deferred so that we'd have more

22    money to produce the show.

23    Q.    Okay.  And what was Mr. Paul's -- Mr. Levitz's position?

24    A.    He didn't want to do that.  He rejected it basically.

25    Q.    And how was the difference of opinion between the two of

1  you resolved?

2  A.    We lived by the terms of the deal that had been struck.

3  We didn't get a reduction.

4  Q.    So that you applied the same terms as had been applied in

5  Lois and Clark?

6  A.    Yes.

7  Q.    We just recently saw the letter that you sent to

8  Mr. Levitz confirming that Lois and Clark would control the

9  deal.  Following that letter, who was it who actually prepared

10  the long form agreement?

11  A.    It would have been someone from the Warner Brothers legal

12  department.  I don't remember or know off the top of my head

13  who that was.

14  Q.    Okay.  Is it customary for legal affairs at Warner

15  Brothers to take -- bring the finalization of an agreement

16  after the deal points have been agreed to over to the legal

17  department?

18  A.    Yes.

19  Q.    And they actually draft the agreement?

20  A.    Yes.

21          MR. TOBEROFF:  Objection, your Honor.  Leading.

22          THE COURT:  Sustained.

23  Q.    BY MR. BERGMAN:  What is the normal procedure that you

24  follow at Warner Brothers after business affairs has

25  negotiated the book deal points?

1222

```
 1   A.   Well, it does vary depending upon the nature of the deal,

 2   but typically what happens is the negotiator in the business

 3   affairs department will negotiate the sort of broad stroke

 4   economic deal points, either send a short form memo to the

 5   legal department or send a short form memo to the client

 6   representatives simultaneously, sending that memo to the legal

 7   department, and then the legal department will draft the long

 8   form agreement.

 9        It's far more common, particularly in the rights

10   category, for us to do it that way since it's important for us

11   to attempt to get some sort of writing.  And that's the

12   procedure we typically follow.

13   Q.   Okay.  I'd like to -- strike that.

14        What are the key deal points in any Warner Brothers

15   Television acquisition agreement?

16   A.   I would say -- the key deal points?

17   Q.   Yes.

18   A.   From an economic point of view?

19   Q.   Yes, sir.

20   A.   I would say the episodic fee, which is --

21        THE COURT:  Counsel, is there an objection to the

22   question?

23        MR. TOBEROFF:  Yes, the question solicits expert

24   testimony based on specialized knowledge, your Honor.

25        THE COURT:  Overruled.
```

1           You're referring to the particular agreement in

2    question, Counsel?

3           MR. BERGMAN:  Yes, your Honor.

4           THE COURT:  You may answer.

5           THE WITNESS:  I would say the episodic fee and

6    the -- if there is a back end participation, the equity

7    participation.

8    Q.   BY MR. BERGMAN:  And when you use the term back end

9    participation, are you referring to contingent compensation?

10   A.   Yes.

11   Q.   To what extent, if any, does Warner Brothers Television

12   typically grant option fees on television deals?

13   A.   We pay option prices.  I just -- that's not typically one

14   of the points I would describe as material.  They tend to

15   be --

16          THE COURT:  What's the objection?

17          MR. TOBEROFF:  Same objection.  He's asking what

18   they do typically.  He's not speaking to the agreement in

19   question.  So the objection is solicits expert opinion based

20   on specialized knowledge.

21          THE COURT:  I'll overrule that objection.  But there

22   is a foundational question I suppose with respect to that.

23   It's not clear to the Court the scope of the question.  It may

24   implicate some foundational issues.

25          MR. BERGMAN:  Very well, your Honor.

```
 1   Q.    Let's focus in, then, on the episodic fees and the

 2   contingent compensation.

 3              Are you familiar, Mr. Paul, with the episodic fees

 4   paid by Warner Brothers Television for literary rights

 5   acquisitions for television series?

 6   A.    Am I familiar with them generally?

 7   Q.    Yes, sir.

 8   A.    Yes.

 9   Q.    What is the usual range of fees paid by Warner Brothers

10   Television to rights holders?  Range of episodic fees?

11              MR. TOBEROFF:  Same objection, your Honor.

12              THE COURT:  I'm going to overrule the objection,

13   Counsel.  Your obsession with that particular objection may be

14   blinding you to other objections that are appropriate.  That

15   objection on that basis is overruled.

16              You may answer the question.

17              MR. TOBEROFF:  Lack of foundation.

18              THE COURT:  You may answer the question.

19              THE WITNESS:  I would say generally speaking, and

20   again, rights can sort of fall into various different kinds of

21   categories; so I'm going to try to give you a general answer.

22   Somewhere between 5,000 -- royalty of $5,000 an episode to

23   15,000 an episode.

24   Q.    To your knowledge what are the highest episodic fees that

25   Warner Brothers Television has ever paid to any rights holder
```

```
 1   other than DC Comics?

 2           MR. TOBEROFF:  Lack of foundation, your Honor.

 3           THE COURT:  Sustained.

 4   Q.   BY MR. BERGMAN:  Are you aware, Mr. Paul, of the episodic

 5   fees that are paid by Warner Brothers Television to various

 6   rights holders?

 7   A.   Yes.

 8   Q.   Is that a matter that falls under your supervision?

 9   A.   Yes.

10   Q.   And is it a matter that is discussed at regular meetings?

11   A.   Yes.

12   Q.   To your knowledge, sir, what are the highest episodic

13   fees that Warner Brothers Television has ever paid to any

14   rights holder other than DC Comics?

15   A.   I want to -- that we ever paid?  I sort of want to

16   distinguish a little bit between rights, formats, books.  I

17   mean, I want to -- go ahead.

18   Q.   Let me try to focus that.

19           THE COURT:  Are you withdrawing the question?

20           MR. BERGMAN:  Pardon me?

21           THE COURT:  Are you withdrawing the question?

22           MR. BERGMAN:  Yes, the question is withdrawn.

23           THE COURT:  Very well.

24   Q.   BY MR. BERGMAN:  With respect to underlying literary

25   properties, such as a comic character, what are the highest
```

1    episodic fees that Warner Brothers Television has ever paid to

2    any rights holder other than DC Comics?

3    A.    For underlying literary rights, I would say probably --

4    that we've contracted for, probably $25,000 an episode.

5    Q.    And do you recall --

6    A.    The reason I'm expressing some reluctance is that I'm

7    thinking it's some, but they weren't actually paid.  They were

8    deals that were made where the series might not have gone

9    forward.

10   Q.    Let's look at the broader question.

11   A.    Okay.

12   Q.    Whether the series was made or not, what to your

13   knowledge, sir, are the highest episodic fees that Warner

14   Brothers Television has ever paid for an underlying literary

15   property?

16        MR. TOBEROFF:  Vague and ambiguous as to the word

17   paid and whether the series was made or not, because if it

18   wasn't a series made, there would be nothing paid.  I think he

19   means payable.

20        THE COURT:  Rephrase your question, Counsel.

21        MR. BERGMAN:  Yes, your Honor.

22   Q.    What are the highest per-episode fees that Warner

23   Brothers Television has ever agreed to, to your knowledge, for

24   the acquisition of television rights to an underlying literary

25   property?

1    A.    I would say somewhere between 20- and $25,000 per episode

2    in the first series year.

3    Q.    Can you think of a particular series that had that

4    highest fee?

5    A.    Well, the one that occurs to me is the Tarzan franchise.

6    That did go forward to series, and I believe it was in the 20-

7    to $25,000 per episode range in the first series year.

8    Q.    Are you familiar with the contingent compensation terms

9    utilized by Warner Brothers Television for various

10   participants, particularly holders of underlying literary

11   rights?

12   A.    I am.

13   Q.    Of the various forms of contingent compensation that are

14   available to be used by Warner Brothers Television, what is

15   the form that is most favorable to any participant?

16   A.    Well, any formula that doesn't charge any form of fees,

17   any distribution fees or any overhead charges that require

18   recoupment of any production costs would be most favorable.

19   It's commonly known as a gross participation.  Warner Brothers

20   Television doesn't typically pay for those participations.

21        MR. TOBEROFF:  Objection, your Honor.  Specialized

22   knowledge.

23        THE COURT:  Overruled.

24   Q.    BY MR. BERGMAN:  What form of contingent compensation is

25   given to DC Comics pursuant to the Smallville agreement?

1228

1   A.    That was a gross participation.

2   Q.    Pardon me?

3   A.    That was a gross participation.

4   Q.    Is that something that is referred to within the company

5   as first dollar gross?

6   A.    You could call it first dollar gross, yes.

7   Q.    What is the amount of first dollar gross paid to DC for

8   Smallville?

9   A.    I believe it was a percentage that increased when certain

10  revenue thresholds were achieved.  And I believe it was 3

11  percent against a million five in revenue and had bumped up

12  to, I think, 5 percent.

13  Q.    Okay.  To what extent, if at all, has Warner Brothers

14  Television given first dollar gross deals to any literary

15  rights holder other than DC Comics?

16  A.    I'm not aware of us having done that with any other

17  underlying literary rights holders.

18  Q.    Excluding the deals with DC, but including all forms of

19  participants, whether a director, actor, producer, whatever,

20  how many first dollar gross deals have you negotiated for

21  Warner Brothers Television?

22  A.    Zero.

23  Q.    Have there, in your experience over the past 14 years,

24  been any first dollar gross deals paid by Warner Brothers

25  Television to any participant?

```
 1   A.    No.

 2   Q.    Other than DC.

 3   A.    There have not.

 4   Q.    Are there other participants aside from DC in the

 5   Smallville series?

 6   A.    Yes.

 7   Q.    And do any of those other participants in Smallville

 8   receive a share of first dollar gross?

 9   A.    No.

10   Q.    What forms of contingent compensation are paid to the

11   other participants in Smallville?

12   A.    We refer to it as a modified adjusted gross

13   participation.  Technically, that means that there are

14   distribution fees that apply to the revenue.  There are

15   overhead charges that are applied to production costs, and

16   production costs and interest costs need to be recouped by the

17   studio before any profit participation becomes due.

18   Q.    So with respect to every other participant in the show,

19   the studio must first recoup the costs of making the show,

20   overhead charges, and a distribution fee?

21   A.    And certain interest charges on production costs, yeah.

22         MR. BERGMAN:  May I approach the witness?

23         THE COURT:  You may.

24   Q.    BY MR. BERGMAN:  Would you turn, please, to Exhibit 1103.

25   Can you tell us what show that agreement pertains to, sir?
```

1    A.    Gossip Girl.

2    Q.    What involvement, if any, did you have with the

3    negotiation of the Gossip Girl rights acquisition agreement?

4    A.    It was done under my supervision by someone in my

5    department.

6    Q.    And what is the Gossip Girl show based on?

7    A.    It's based on a series of books.

8    Q.    And is the show, to your knowledge, a commercially

9    successful show on the CW?

10   A.    Yes.  We like to think it is commercially successful.

11   Q.    How do the terms of the Gossip Girl agreement compare to

12   the average terms agreed to by Warner Brothers Television?

13   I'm trying to place it in terms of whether it's at the low

14   end, the high end, or the middle.

15          MR. TOBEROFF:  Objection.  Specialized knowledge,

16   expert testimony.

17          THE COURT:  Overruled.

18          THE WITNESS:  I know the deal pretty well and am

19   familiar with it.  I would say it's at the upper end of the

20   spectrum of rights deals.

21   Q.    BY MR. BERGMAN:  Okay.  Could you look, please, sir, and

22   tell me what the exercise price of that agreement is?

23   A.    It's -- the purchase price is a hundred thousand dollars.

24   Q.    And what are the episodic fees under that agreement?

25   A.    There's also production bonuses of $50,000, which is

1    considered part of the purchase price.

2    Q.   The episodic fees?

3    A.   The episodic fees start with $4,000 per episode in the

4    first and second years, increased to 5,000 for the third year,

5    and increased further to 6,000 for the fourth and all

6    subsequent production seasons.

7    Q.   And what is the form of contingent compensation that is

8    payable -- I think you'll find that on page 8 of the

9    agreement, which is Bates stamped 6537.

10   A.    It's a 5 percent of defined proceeds.

11   Q.    Now, what are defined proceeds?

12   A.    Well, defined proceeds are -- as I was describing

13   modified adjusted gross, defined proceeds typically have

14   slightly higher distribution fees than do the typical modified

15   adjusted gross definition.  And so again, there would be a

16   distribution charge.  There's production cost recoupment.

17   There is an overhead charge on production costs, and there's

18   interest associated on the recouped production costs as well.

19   Q.   How would you compare 5 percent of the net profits to 5

20   percent of the gross above 1.5 million an episode?

21          MR. TOBEROFF:  Objection, your Honor.  The question

22   calls for expert testimony based on specialized knowledge.

23          THE COURT:  Within the context of this particular

24   deal, overruled.

25          THE WITNESS:  How would I compare them?  I would

1  compare them by saying that the 5 percent on gross is a more

2  favorable definition than 5 percent on defined proceeds.

3  Q.   BY MR. BERGMAN:  Do you have any opinion as to the extent

4  to which it's more favorable?

5  A.   It's significantly more favorable.

6  Q.   I believe you referred earlier to the Tarzan agreement as

7  containing the highest episodic fees paid to anyone other than

8  DC.  Would you turn to Exhibit 1102 in that book, which is the

9  Tarzan television agreement.

10       Is this an agreement that was negotiated under your

11  supervision?

12  A.   It was not.  It was negotiated while I was a member of

13  the department, and I was familiar with it.  But it was

14  negotiated by someone who at the time was of similar stature

15  in our department as I was at the time.

16  Q.   What involvement, if any, did you have with the Tarzan

17  acquisition agreement?

18  A.   Well, we would consult with each other.  We're sort of a,

19  you know, a collegial group and share information.  And we met

20  a couple times a week to talk about deals we were working on.

21       I did have some informal conversations with the

22  woman that negotiated this deal and probably was helpful in

23  her clarifying certain positions she took.  But I didn't

24  negotiate it directly myself.

25  Q.   Based on your review in connection with this matter, sir,

1233

```
1    is the Tarzan agreement the most beneficial, economically
2    beneficial agreement to the rights licensor other than the
3    Superman Smallville agreement?
4            MR. TOBEROFF:  Objection.  The question is vague and
5    ambiguous as phrased.
6            THE COURT:  I'll sustain that objection.
7    Q.   BY MR. BERGMAN:  Is there any agreement that you are
8    aware of that Warner Brothers Television has entered into,
9    other than its agreements with DC, that is more beneficial to
10   the licensor than the Tarzan agreement?
11   A.   I'd say not for an underlying literary rights property,
12   no.
13   Q.   Okay.  I notice that this exhibit is addressed to a
14   person by the name of David Nochimson at the Ziffren
15   Brittenham firm.  Are you familiar with David Nochimson?
16   A.   Yes.
17   Q.   Are you familiar with the Ziffren Brittenham firm?
18   A.   Yes.
19   Q.   How would you characterize the stature of that firm
20   within the television community?
21           MR. TOBEROFF:  Leading, your Honor.
22           THE COURT:  Overruled.
23           THE WITNESS:  I would describe them as one of the
24   most influential entertainment law firms in town.
25   Q.   BY MR. BERGMAN:  Okay.  Could you turn, please, to the
```

1234

1    contingent compensation provision of this agreement, which is

2    paragraph 7, found at page 6506.

3              It reads, quote, 7.5 percent of MAG reducible by the

4    total points over 25 percent MAG for all third parties to a

5    floor of 6.25 percent MAG.

6    A.    Yes.

7    Q.    Let's start first with what is MAG?

8    A.    Well, again, in order to fully flesh out what MAG refers

9    to in this case, you need to look at the last sentence which

10   talks about distribution fees and overhead percentages.  So

11   MAG is a percentage of the back end revenue after certain

12   deductions and charges.

13   Q.    Would you please turn in that exhibit to a page Bates

14   stamped 6525.  Could you read into the record the definition

15   provided in this agreement for modified adjusted gross?

16   A.    Sure.

17   Q.    Paragraph 1-A.

18   A.    "Modified adjusted gross means the excess, if any,

19   remaining after deducting from gross receipts the aggregate of

20   the following in the following order of priority:

21   Distribution fees, distribution expenses, production costs,

22   and interest thereon, all contingent deferments and other

23   contingent amounts approved by Warner excluding only other MAG

24   participations or defined proceeds participations which are

25   not advanced or guaranteed.  If pursuant to the agreement

1235

```
 1   participant receives advances of participant's share of
 2   modified adjusted gross, such advances shall be applied
 3   against any reduction of participant's share of modified
 4   adjusted gross."
 5   Q.   And what is meant, sir, by a floor of 6.25 percent?
 6              MR. TOBEROFF:  Objection.  Specialized knowledge,
 7   expert testimony.
 8              THE COURT:  Sustained.  Counsel, I'm giving you free
 9   leeway in terms of any agreement that has been negotiated by
10   the witness as to his understanding.  You don't have an
11   adequate foundation with this witness.
12              MR. BERGMAN:  I understand.
13   Q.   Are you familiar with Warner Brothers Television's use of
14   the term, quote, floor, close quote?
15   A.   Yes.
16   Q.   Can you tell us what that term generally refers to within
17   Warner Brothers?
18   A.   It's a -- it's a calculated amount by which the profit
19   participant's share will not be reducible.
20              THE COURT:  Counsel, I'm going to take a brief
21   afternoon break to take up some matters in chambers.  We'll
22   resume around 4:00.
23              (Recess taken.)
24              THE COURT:  Counsel.
25              MR. BERGMAN:  Thank you, your Honor.
```

1    Q.    Mr. Paul, prior to the break, we were discussing the

2    Tarzan television agreement and were looking at Exhibit G,

3    which is page 6525 of Exhibit 1102.

4              Do you still that have open before you?

5    A.    Yes.

6    Q.    Looking to paragraph 1(b)(1), can you just tell us what

7    the video royalty is under the Tarzan agreement?

8    A.    That is a 20 percent royalty.

9    Q.    To what extent is a 20 percent video royalty customary at

10   Warner Brothers Television?

11   A.    That's pretty much across-the-board royalty that is

12   payable to the modified adjusted gross pot.

13   Q.    Has Warner Brothers Television to your knowledge ever

14   negotiated a television literary rights agreement in which the

15   video royalty is more than 20 percent of wholesale?

16   A.    No.

17   Q.    How many networks does Warner Brothers Television sell

18   shows to?

19   A.    Currently five.

20   Q.    And how many shows do you currently have on the air?

21   A.    Approximately 14 to 15.  I will know in a week whether or

22   not that has increased or not.

23   Q.    Are you generally aware of the efforts Warner Brothers

24   Television made to pitch or sell the Smallville show to a

25   network?

1  A.   Yes.

2  Q.   Before the show was pitched to or bought by the WB, which

3  is now called the CW, was Smallville offered by Warner

4  Brothers Television to any other network?

5          MR. TOBEROFF:  Assumes facts.

6          THE COURT:  Sustained.

7  Q.   BY MR. BERGMAN:  How many networks was the Smallville

8  series offered to?

9  A.   I'm aware of at least one other.

10 Q.   One other than the WB?

11 A.   Correct.

12 Q.   And what was that one other, sir?

13 A.   Fox.

14 Q.   And to whom did Warner Brothers offer Smallville to

15 first?  Fox or the WB?

16 A.   I believe it was offered to -- actually, you know, I

17 can't speak to that.  I can't tell you who it was offered to

18 first.  I'm not sure.

19 Q.   Did Fox want the show?

20 A.   Yes.

21 Q.   Why wasn't it sold to Fox?

22 A.   Ultimately, I believe it came down to a difference in the

23 initial commitment that was made by the WB.

24 Q.   How would you compare the commitments that were being

25 made by the WB to the commitment being offered by Fox?

1  A.   Well, at the time the WB extended a very large

2  commitment.  It was a series commitment, on-air series

3  commitment of 13 episodes, and Fox's commitment was to a

4  pilot, just to produce a pilot.

5  Q.   And when you say just to a pilot, does that mean that --

6  what happens if Fox doesn't like the pilot?

7          MR. TOBEROFF:  Objection.  Hearsay as to what Fox's

8  offer was.  Lacks foundation.

9          THE COURT:  Lacks foundation.  Let's establish that.

10  Q.   BY MR. BERGMAN:  In the various discussions that you had

11  with other business affairs executives, was there a discussion

12  of what the negotiations with Fox had been?

13  A.   I'm aware of what the Fox offer was by virtue of

14  conversations that I've had internally with other executives

15  at Warner Brothers, yeah.

16  Q.   And are those conversations consistent with the fact that

17  Fox was only offering a pilot?

18  A.   Yes.

19          MR. TOBEROFF:  Objection.  Hearsay.

20          THE COURT:  What are you introducing this for,

21  Counsel?

22          MR. BERGMAN:  Pardon me, your Honor?

23          THE COURT:  I'm sorry.  What are you introducing

24  this for?

25          MR. BERGMAN:  I am introducing this simply to show

1  that there was another network that was interested in the

2  property and that the property did not go to them.

3          THE COURT:  Okay.  Then it's being introduced for

4  the truth of the matter asserted.  Objection sustained.

5  Q.   BY MR. BERGMAN:  To your knowledge, Mr. Paul, does Warner

6  Brothers Television ever share in any of the advertising

7  revenues earned by any network that broadcasts any of its

8  series?

9  A.   No, we do not.

10          MR. BERGMAN:  Thank you, sir.  I have nothing

11  further.

12          THE COURT:  Cross-examination.

13                    **CROSS-EXAMINATION**

14  BY MR. TOBEROFF:

15  Q.   Mr. Paul, do you recall being deposed in this action on

16  November 3rd, 2006?

17  A.   I do.

18  Q.   And you testified under oath at that time?

19  A.   I did.

20  Q.   I'd like to read from a portion of your deposition,

21  starting on page 115, line 17, then going to line 21.  In

22  speaking of the Smallville agreement, I asked you the

23  following question:

24          "QUESTION:  What do you recall about the

25      negotiation?

1240

```
 1          "ANSWER:  I recall it being concluded.

 2          "QUESTION:  Right.

 3          "ANSWER:  I really don't remember much about the

 4     negotiation itself."

 5          Did I ask you those questions and you give me that

 6   answer?

 7   A.   I'll take your word for it.

 8   Q.   Warner Brothers Television is not currently -- strike

 9   that.

10          Warner Brothers Television is not developing a live

11   action Harry Potter television series, is it?

12   A.   No, I don't believe we are.

13   Q.   Warner Brothers Television is also not developing a live

14   action television Batman television series, is it?

15   A.   Currently?

16   Q.   Yes.

17   A.   No.

18   Q.   Are you aware of any live action James Bond television

19   series?

20   A.   No.

21   Q.   Are you aware of any live action Spiderman television

22   series after the success of the first Spiderman film in 2002?

23          MR. BERGMAN:  Objection, your Honor.  I was confined

24   to asking only about Warner Brothers.  And counsel is going

25   well beyond that.
```

1          THE COURT:  Let's lay a foundation for this,

2    Counsel.

3    Q.   BY MR. TOBEROFF:  Are you aware, in addition to those

4    shows being developed at Warner Brothers or produced at Warner

5    Brothers Television, are you aware of what shows are -- have

6    been produced by other studios?

7    A.   Am I aware of what shows have been produced?  For the

8    most part.

9    Q.   And do you keep yourself abreast of what television shows

10   are being developed by competing TV studios?

11   A.   Usually it's --

12         THE COURT:  Counsel, you asked about shows that have

13   been produced, and now you're asking a question about shows

14   that are being developed.

15         MR. TOBEROFF:  Correct.  I'm laying the foundation

16   for both.

17         THE COURT:  Well, you haven't laid the foundation

18   for the ones that are being developed.

19         MR. BERGMAN:  Your Honor, I also object on the

20   grounds that it goes far beyond the scope of --

21         THE COURT:  I don't know where he's going with this.

22   So I'm not in a position to rule on that.

23         Counsel.

24   Q.   BY MR. TOBEROFF:  Do you keep abreast of what shows are

25   developed at other television studios?

```
 1   A.   I'm going to have to say generally the answer is no.  I'm

 2   aware of what shows have been developed which are produced,

 3   but because it's competitive information, typically I don't

 4   have access to that information until things become public

 5   and/or are produced and licensed.

 6   Q.   Sticking to just shows that have actually been produced,

 7   are you aware of any live action James Bond television series

 8   that have ever been produced?

 9        MR. BERGMAN:  Same objection, your Honor.

10        THE COURT:  Overruled.

11        THE WITNESS:  No.

12   Q.   BY MR. TOBEROFF:  Are you aware of any live action

13   Spiderman television series that have been produced after the

14   success of the first Spiderman movie in 2002?

15   A.   Neither before nor after, no.

16   Q.   Are you aware of a Pirates of the Caribbean television

17   series that has been produced?

18   A.   That is produced?  I'm not.

19   Q.   Are you aware of any Pirates of the Caribbean television

20   series that are in the works?

21   A.   No.

22   Q.   I'd like to show you what's been marked as

23   Defendants' Exhibit 1037.

24        May we approach, your Honor?

25        THE COURT:  You may.
```

1   Q.   BY MR. BERGMAN:  Exhibit 1037 is the agreement between DC

2   Comics and Warner Brothers Television for the TV rights to the

3   Birds of Prey property.

4           Are you familiar with this agreement?

5   A.   I am aware of it.  I haven't looked at it in a while.  So

6   I'm not intimately familiar with it, but I could be if I had a

7   chance to look at it.

8   Q.   Would you please turn to page 2, paragraph 7.

9   A.   Yes.

10  Q.   Bates number -- the page is 147541.  That paragraph

11  provides the identical gross participation to DC Comics as the

12  gross participation in the Smallville television agreement;

13  correct?

14  A.   It looks like it's the same, yeah.

15          MR. TOBEROFF:  Your Honor, I'd like to offer to move

16  Exhibit 1037 into evidence at this time.

17          THE COURT:  Any objection?

18          MR. BERGMAN:  No, sir.

19          THE COURT:  Sustained.

20          **(Exhibit 1037 received.)**

21          MR. TOBEROFF:  No further questions.

22          THE COURT:  Anything further from the defense?

23          MR. BERGMAN:  Nothing further, your Honor.  Shall I

24  call our next witness?

25          THE COURT:  Yes.

1    THE CLERK:  Please come forward and stop next to the

2    court reporter.

3                    **STEVEN SPIRA, AFFIRMED.**

4    THE CLERK:  Please take the stand.  Please state

5    your full name for the record, and spell your last name.

6    THE WITNESS:  My name is Steven Spira, S-P-I-R-A.

7                    **DIRECT EXAMINATION**

8    BY MR. BERGMAN:

9    Q.   Mr. Spira, by whom are you employed?

10   A.   Warner Brothers.

11   Q.   What is your present title?

12   A.   I am president of worldwide business affairs.

13   Q.   Can you basically describe for us what your

14   responsibilities are as president of worldwide business

15   affairs.

16   A.   I am responsible for and supervise a team of people who

17   are involved with the business side of the motion picture

18   business in terms of film production.  It's limited to the

19   so-called above the line transactions, which means writers,

20   producers, directors, actors, rights holders, and things of

21   that nature.

22   Q.   And when did you join Warner Brothers, sir?

23   A.   1985.

24   Q.   And what was your title when you first joined?

25   A.   I was actually untitled.  I was an entry level business

1  affairs executive.

2  Q.    And did there come a point in time where you received a

3  title?

4  A.    Yes.

5  Q.    What was that first title?

6  A.    In 1986, less than a year later, I was promoted to

7  vice-president.

8  Q.    Okay.  Can you describe generally what your duties were

9  in that capacity.

10  A.    I was part of a group of executives who were again

11  responsible for servicing the creative department, which I'm

12  sure you've heard testimony are the people who find the

13  material and choose the actors and writers and directors and

14  other elements in the production of a film.

15  Q.    And during the course of your employment at Warner

16  Brothers, without going into the specific titles, did you keep

17  moving up until your present position?

18  A.    Yes.

19  Q.    How many literary properties would you estimate Warner

20  Brothers options or purchases in any given year?

21  A.    Several dozen.

22  Q.    To what extent, if any, are those acquisitions made under

23  your supervision?

24  A.    Well, I'm responsible for the entire group.  So all of

25  them.

1  Q.   Do you conduct regular meetings of the business affairs

2  executives at Warner?

3  A.   Yes.

4  Q.   And at those meetings, are all the deals discussed?

5  A.   Most of the deals that have material things happening

6  around them.

7  Q.   And with respect to any and all major or important

8  acquisitions, are they subject to your final approval?

9  A.   It's sort of a collective process, but yes.

10 Q.   Okay.  How do you go about determining how much Warner

11 Brothers will pay for a literary property?

12 A.   We actually respond or react to the seller.  The seller

13 sets a price on the script or book or idea or treatment or

14 property, and we react to that, as it were.

15 Q.   And unless I indicate otherwise, when I refer to literary

16 properties, I'm going to be speaking about properties that

17 were previously published in one form or another.

18         Do we understand that?

19 A.   Yes.

20 Q.   Okay.  What factors do you look to?

21 A.   Well, again, responding to the priorities set by the

22 seller, we will go back to our creative executives and gauge

23 their appetite, try to get an understanding of what the

24 project actually is, and then depending on how they feel about

25 something, in our general experience we will try and respond

```
 1  to the seller's priorities and sort of take our collective
 2  experience and bring it to the table.
 3          There are factors internally that involve our own
 4  development budgets because there's a finite amount of money
 5  that you can spend from year to year.  There are factors that
 6  include how likely is this thing to become a movie, because
 7  many projects are developed over a year, and few of them, the
 8  vast minority of them actually mature into actual movies.
 9  It's really -- development is really an R & D process and kind
10  of hit and miss.
11          We will, of course, talk about how recognizable it
12  is, what do we think has anyone paid the price they are
13  asking, for what types of things have they paid that price,
14  have we ever paid that price, what types of things have we
15  paid that price for, and what is the collective appetite of
16  the creative group, because we're not the consumer.  We're
17  sort of their advocator, their representative.  And things of
18  that nature.
19  Q.   You made reference, Mr. Spira, to budgetary
20  considerations.  Can you explain what you mean by that?
21  A.   Each creative group is charged with coming up with a
22  slate of films.  Different studios have different size and
23  scale.  So one studio might try to make 12 pictures a year,
24  and one might try to make 20 pictures a year.  They need to
25  get those films out of their development slate so that when
```

1    they have a group of executives whose job it is to find

2    material, develop the material, meaning write a screenplay,

3    hopefully attract an appropriate director, hopefully attract

4    actors, hopefully write a screenplay that that group feels is

5    compelling enough to try to make it to a film, and that's an

6    R & D process that they are charged with.

7            They have a finite amount of resources with which to

8    do that, so towards the end of the year, sometimes, they will

9    be running out of money.  At the beginning of the year, that

10   will be a factor.  And how much of any of that resource they

11   want to allocate to the individual project will limit the

12   amount of money they will have left to get into an entire

13   slate.

14           MR. TOBEROFF:  Objection, your Honor.  Lacks

15   foundation and also veers into verbalized knowledge and expert

16   testimony as to the industry as a whole, what other studios

17   do.

18           THE COURT:  Are you speaking just about Warner

19   Brothers, or the industry as a whole?

20           THE WITNESS:  I was speaking about the industry, but

21   it's true about Warner Brothers as well because they are all

22   more or less comparable.

23           THE COURT:  Okay.  I'm going to sustain the

24   objection.

25           Counsel, make it clear that he's speaking with

1249

```
 1    Warner Brothers unless you lay a foundation.

 2              MR. BERGMAN:  I will, your Honor.

 3              THE COURT:  Thank you.

 4    Q.   BY MR. BERGMAN:  Just so the record is clear, the

 5    statements that you just made concerning the budgetary

 6    considerations, do they apply to Warner Brothers as well?

 7    A.   Yes.

 8    Q.   As Warner Brothers treats these budget considerations,

 9    what happens if, by a point in the year, the development fund

10    has been completely used up?  Can you still acquire

11    properties?

12    A.   I would have to get dispensation, as it were, from your

13    people you report to, management.

14    Q.   And at what point does the cost of a film move from the

15    development area into the production area?

16    A.   Well, if the creative group is satisfied with the script,

17    meaning they like the beginning, the end, the middle, the

18    characters, and think that it's compelling enough to try to

19    put together, they will try to add a director.  That can

20    happen at any point.  It can happen in the beginning, the

21    middle, or later.

22              All along there's an ongoing dialogue with

23    management where they sort of get a sense of direction that

24    the project is taking in the hopes that they are going down

25    the direction that will be acceptable as an end product to
```

1250

1    finance a film.  And if they get a script that they like and a

2    director that they like, they try to find the appropriate

3    actors for the project and at the same time figure out what an

4    appropriate cost for the film would be that makes it an

5    acceptable risk.

6    Q.   What would you estimate, Mr. Spira, are the number of

7    active development projects at Warner Brothers at any given

8    time?

9    A.   Development is a very broad term, but we have active in

10   any year probably 150 to 200 plus projects out of which we

11   hope to make our production slate every year.

12   Q.   Recognizing the distinction you draw at Warner Brothers

13   between development and production budgets, from what budget

14   would an option payment come?

15   A.   That would come from the development budget.

16   Q.   You also mentioned the element of risk, development risk,

17   production risk.  What do you mean by that?

18   A.   Well, some literary properties are more challenging than

19   others.  Less formed and more difficult to adapt.

20   Q.   And the implications of those that are less difficult to

21   adapt are what?

22   A.   They are -- you are more easily to visualize the end

23   product and what that movie would be, what the story is and

24   the characters are, and its ultimate general cost or

25   approximate cost.

1   Q.    Within that context, Mr. Spira, at Warner Brothers how

2   would you distinguish risk between a project based upon a

3   comic superhero on the one hand or a project based on a novel

4   by John Grisham?

5           MR. TOBEROFF:  Objection.  Lacks foundation.

6           THE COURT:  Overruled.

7           THE WITNESS:  We have developed and made a number of

8   John Grisham novels.  And not just -- a general principle,

9   whether it's John Grisham or a novel in general, when you read

10  it, you know the entire story.  You know the beginning, the

11  middle, and the end.  You have an idea if it's satisfying or

12  unsatisfying.  You have the right when you buy it to tinker

13  it.

14          So you can fix an ending if you don't think it's

15  satisfying, but you can visualize the size and sale of the

16  movie and what it would potentially cost within a reasonable

17  range.  You can visualize who you want to put in it, and you

18  don't have to, quote, unquote, crack the story.

19          What was the second part of the question?  I'm

20  sorry.

21  Q.    BY MR. BERGMAN:  It was a question of distinguishing the

22  risk between a project based upon a comic superhero and one

23  based upon a novel by a leading author.

24  A.    Well, with a comic superhero, you obviously have the main

25  character.  The challenge, of course, is to figure out what

1252

1    story to tell, who the villain will be, and it could go in any

2    number of directions.  You have a lot of information, but you

3    don't have the movie in front of your face.

4            MR. TOBEROFF:  Objection.  Expert testimony as to

5    the development challenges of various forms of literary

6    properties.

7            THE COURT:  Overruled.

8    Q.   BY MR. BERGMAN:  With respect to the distinction that you

9    just drew between the comic character and the novel, which one

10   of those poses less of a development risk to Warner Brothers?

11   A.   The novel.

12   Q.   And why is that?

13   A.   Because before you decide to acquire it, you have a

14   greater idea of what you're trying to assemble and what it

15   will be and what it will look like and whether that would

16   ultimately be something you think, if everything came together

17   properly, you would make into a film or be willing to risk

18   being made into a film and gamble on it, as it were.

19   Q.   Because of that or in light of that lesser risk, is there

20   any difference in the basic approach that Warner Brothers

21   takes to how it acquires a novel by a Creighton or a Grisham

22   or a Clancy as compared to how it acquires an interest in a

23   comic book superhero property?

24   A.   Well, the three authors that you specifically mentioned

25   are obviously high profile authors, and their material is

1   usually very, very expensive.  And more often than not, it is

2   brought to you with a director attached, but not always, and

3   you would be willing to spend more money, and we've acquired

4   books from at least two of them.  Grisham, Creighton, and I

5   forgot who the third one was, but we have acquired books from

6   each of them in the seven figure range and produced every one

7   of those films, I believe.

8   Q.   And why is Warner Brothers more likely to purchase a

9   novel than it is to purchase a superhero property?

10  A.   Well, in the case of those particular authors --

11           MR. TOBEROFF:  Objection.  Assumes facts.

12           THE COURT:  Sustained.

13  Q.   BY MR. BERGMAN:  Based on your experience, Mr. Spira, is

14  Warner more likely to purchase a novel outright --

15           MR. TOBEROFF:  Objection.  Leading.  Excuse me.  I

16  thought you finished.

17  Q.   BY MR. BERGMAN:  -- or to purchase a comic superhero

18  property outright?

19           THE COURT:  Is there an objection or not?

20           MR. TOBEROFF:  No.

21           THE COURT:  Okay.

22           THE WITNESS:  I don't think I can actually answer

23  that question the way it was asked.

24           THE COURT:  I guess there is an objection.

25           THE WITNESS:  I'm not objecting.  It's a perfectly

1254

 1    fine question.

 2              THE COURT:  Why don't you rephrase, Counsel.  Just

 3    when I thought we had navigated through.

 4              THE WITNESS:  Sorry.

 5    Q.   BY MR. BERGMAN:  With respect to these novels by the

 6    leading authors, does Warner Brothers customarily obtain any

 7    rights regarding the use of their name and likeness in

 8    connection with publicity for the picture?

 9              MR. TOBEROFF:  Objection.  Leading.

10              THE COURT:  Overruled.

11              THE WITNESS:  Yes.

12    Q.   BY MR. BERGMAN:  And why is that, sir?

13    A.   In the case of the authors we've just discussed, their

14    books tend to be current.  They tend to be very popular.  And

15    you are acquiring them because you know at least there is a,

16    quote, audience or fan base, a minimal amount that you could

17    expect would want to see your film so long as you have the

18    sort of author's Good Housekeeping Seal OF Approval.

19              If you have a prominent author and he were to reject

20    or disavow your adaptation of his work, you would undermine

21    the one audience you can expect to get.  As you develop a

22    movie, you hope to attract people beyond that audience, but as

23    sort of an insurance policy or sort of as a minimum threshold,

24    you expect the people who are familiar with it and have great

25    affection for it to want to see it adapted, and if the author

1    were not on board, it would lose that foundation for the

2    audience.

3    Q.   If the property that you are trying to evaluate at Warner

4    Brothers is a comic superhero property, what kinds of

5    properties would you look to for comparables?

6    A.   They would be the superheroes that we have acquired over

7    the years as well as our knowledge of competition and others

8    in the industry who have acquired comic properties.

9          MR. TOBEROFF:  Vague and ambiguous as to the extent

10   there's no sense of time, what time period we're talking

11   about.

12         THE COURT:  Sustained.  Are you talking about the

13   entire period of time or a particular period?

14         MR. BERGMAN:  Yes, your Honor.

15   Q.   Throughout the period of your employment at Warner

16   Brothers, during the course of your analyses of how much you

17   would pay for a comic book property, what types of comparables

18   would you look to?

19   A.   We would look to other comic books and comic book-like

20   material.

21   Q.   Would you under those circumstances look to the prices

22   paid for, for example, a Creighton novel?

23   A.   No.

24   Q.   Why not?

25   A.   Because it's apples and oranges.

1  Q.    You also made a reference earlier, when we were talking

2  about factors, to appetite.

3          Do you recall that?

4  A.    Yes.

5  Q.    Can you explain what you mean by that?

6  A.    We are the advocates for or representatives of the

7  creative department.  And they have an enormous amount of

8  pressure to execute a film program.  And there are times where

9  they are convinced that it's the most valuable, most important

10  thing, and they know what to do with it, and that it has value

11  beyond what we, you know, lowly business people might

12  attribute to it.

13  Q.    What was the extent of your involvement, Mr. Spira, in

14  the acquisition of the Superman property for the film

15  agreement?

16  A.    My department is responsible for the acquisition of all

17  literary material.  The Superman property was a bit unique

18  because of its legal history and because of the multiple

19  pictures we had parts of and the Salkinds and the whole long

20  tortured history, which I suspect you know a whole lot more

21  about than I do.

22          So we were in effect consulting with John Schulman,

23  who is the general counsel, who is not charged with doing

24  business transactions and does not otherwise do them,

25  ultimately did the transaction.  But we were consulted as to

1    our perception of its value.

2    Q.    And did you, together with other members of Warner

3    Brothers business affairs department, consider during the 1999

4    to 2002 period what the value of the Superman property was to

5    Warner Brothers?

6    A.    Yes.

7    Q.    And can you describe what you concluded?

8    A.    We internally had hoped that we could get a reduction of

9    the deal that had previously been made to the Salkinds.

10    Q.    And why was that, sir?

11    A.    A number of factors.  The creative department or creative

12    people, as it were, were concerned that Superman was very

13    unhip.  It was very particularly American in an environment

14    where the foreign marketplace was becoming more and more

15    important for you to recover your costs and hopefully make

16    money.  It was perceived as damaged goods because of the

17    failure of the last two sequels, and even Supergirl.  And I

18    think they had been excoriated by the critics.

19              THE COURT:  Counsel?

20              MR. TOBEROFF:  Objection.  Hearsay as to what the

21    creative department, how it viewed Superman.

22              THE COURT:  Okay.  Again, this is not going to state

23    of mind.  This is not going to the truth of the matter

24    asserted.  This is going to his state of mind in negotiating

25    the deal.

```
 1          MR. BERGMAN:  Correct.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  And finally, we had been developing

 4   Superman from the mid-90's -- I don't have the exact date --

 5   with Tim Burton and six well regarded writers, respected

 6   writers, and attempted to make a movie with Nick Cage.  And by

 7   the time this negotiation came around, we had had an aborted

 8   $30 million miss because of what we perceived, its difficulty

 9   to reintroduce and adapt.  In order to overcome those

10   problems --

11          THE COURT:  What do you mean by aborted $30 million

12   miss?

13          THE WITNESS:  We had hired six writers.  We had

14   hired Tim Burton.  We had hired Nick Cage.  And we had

15   vigorously tried to mount a film.

16          THE COURT:  That cost $30 million?

17          THE WITNESS:  We shut that effort down and started

18   over.

19          THE COURT:  And that cost $30 million?

20          THE WITNESS:  Plus or minus $30 million.  Plus,

21   actually.

22   Q.   BY MR. BERGMAN:  Now, Mr. Spira, after you had that

23   involvement on that film with Mr. Burton and those six

24   writers, did Warner Brothers continue to try to develop a

25   Superman film?
```

1  A.    Yes.

2  Q.    And in addition to the $30 million that you've just

3  referred to on the Tim Burton film, how much more, sir, did

4  Warner Brothers spend in trying to develop a Superman film?

5  A.    An additional 30-plus million dollars.

6  Q.    So in total Warner spent $60 million trying to develop a

7  film prior to 2002?

8  A.    Not prior to -- that was from 2002 -- from 1990 something

9  until finally we got the movie that got made by Brian Singer.

10          THE COURT:  You spent over $30 million?

11          THE WITNESS:  We spent $60 million.

12  Q.    BY MR. BERGMAN:  Was that $60 million added to the cost

13  of Superman Returns?

14  A.    No.

15  Q.    What was done that that 60 million?

16  A.    It was written off.

17  Q.    Now, you made reference, sir, to a perception of Superman

18  in 2002 as damaged goods.

19          Can you explain what you meant by that?

20  A.    Yes.  We had, as I said, the history of the last several

21  sequels, which were creative and financial disasters.  We had

22  the feeling that he was kind of unhip and uncool in a world

23  where teenagers were the biggest element, movie-going element.

24  We had the unsuccessful attempt with one of the coolest,

25  hippest directors at the time, Tim Burton, who had

1   successfully reintroduced the Batman series for us, and we had

2   failed to come up with a movie that we were willing to make.

3   And I think that the frustration trying to crack it and its

4   recent commercial and critically sort of panned nature left it

5   sort of damaged in our mind.

6           THE COURT:  Then why pursue it?

7           THE WITNESS:  Because if you could do it, it was an

8   asset that we owned with Time Warner, or AOL Time Warner -- I

9   forget -- but it obviously could have led to a series of

10  films.  And if you made a film, it raised the licensing boat

11  which was out there, the publishing boat and everything else,

12  it was worth doing because if you did it successfully, you'd

13  have a series of films, and it would enhance or reinvigorate

14  the value of an asset that had been in the company for a long

15  time.

16  Q.  BY MR. BERGMAN:  Following up with that, Mr. Spira, if

17  the film was successful, as you were viewing it in the 1999 to

18  2002 period, would it have an effect upon the other films that

19  Warner owned, Superman 1 through 4?

20          MR. TOBEROFF:  Lacks foundation.

21          THE COURT:  Sustained.

22  Q.  BY MR. BERGMAN:  When you say, sir, that a successful

23  picture would lift the boat, why does that happen?

24  A.   Well, again, it creates a positive -- it reintroduces it

25  to a new group of people.  It creates a positive image around

1   it, and in the same way that we had successfully reintroduced

2   Batman to the world at one point, it increased the

3   merchandising, increased the value of -- to some limited

4   degree anything we had in our inventory, whether it be in

5   video or publishing or licensing.

6   Q.   To what extent, if at all, does the likely cost of a

7   prospective film play a role in Warner's determination as to

8   its value?

9           MR. TOBEROFF:  Objection.  Lacks foundation.  Vague

10  and ambiguous.

11          THE COURT:  I suppose as phrased.  You're talking

12  about his particular assessment?

13          MR. BERGMAN:  Yes, sir.

14          THE COURT:  With that clarification, you may answer.

15  Why don't you rephrase and make it clear.  You're asking for

16  his assessment.

17  Q.   BY MR. BERGMAN:  At the point that you were determining,

18  discussing the value of the Superman film agreement during the

19  1999 to 2002 period, did the consideration of what that film

20  might cost the studio to produce play any role in your

21  determination as to its value?

22  A.   When you say value, do you mean ultimate purchase price

23  you would pay?

24  Q.   That's correct.  What you would pay for it.

25  A.   Yes.

1   Q.   And can you explain in what way that occurs?

2   A.   Well, at the time we were developing with Tim Burton, we

3   already had a prominent producer attached who got first dollar

4   gross.  We had a prominent director, Tim Burton, who also got

5   first dollar gross, and we were attempting to make a movie

6   with Nick Cage, who also got first dollar gross.

7          In any construct of what the purchase price was,

8   gross participation will be, you are hoping to design it in a

9   way that doesn't make it prohibitive to make the film.

10  Because if it's too much or too expensive, if they

11  successfully develop it, you've created a new hurdle, which is

12  it doesn't make sense to make the movie.  It's too expensive.

13  The price is too high.  There's too much gross out the door,

14  which is incremental cost before you get paid back and have a

15  return on your risk.

16         So you have to have one eye on the ultimate

17  production of the film while separately considering what's

18  appropriate to spend and develop.

19  Q.   In that regard, Mr. Spira, we've heard testimony in this

20  case that a studio can afford to give more money to a rights

21  holder in a comic superhero situation because you don't need

22  big stars to perform in the film.

23         Has that been your experience at Warner Brothers

24  with respect to Superman and/or Batman?

25         MR. TOBEROFF:  Misstates the testimony.

1          THE COURT:  Why don't you rephrase the question,

2    Counsel.

3          MR. BERGMAN:  Yes, sir.

4    Q.   Are you familiar with the various Superman films that

5    have been made?

6    A.   The ones from the early 70's, not as much.

7    Q.   Are you familiar with the Batman films that have been

8    made?

9    A.   Yes.

10   Q.   Are you familiar with the actors who have been retained

11   to render services in those films?

12   A.   Yes.

13   Q.   Have you negotiated many of those agreements?

14   A.   Yes.

15   Q.   Is it true, with respect to Superman or Batman, that you

16   don't have to hire important, expensive stars in connection

17   with those pictures?

18          MR. TOBEROFF:  Lacks foundation and vague and

19   ambiguous.

20          THE COURT:  Overruled on those two objections.  You

21   may answer.

22          THE WITNESS:  Well, you don't have to do anything.

23   Our history on the Batman, Batmans, plural, is that we were

24   very villain conscious.  Actually, Michael Keaton, the first

25   Batman, was a gross from first dollar player, I believe.  We

1264

1    had Arnold Schwarzenegger, we had Danny DeVito, we had Jim

2    Carrey.  We had Jack Nicholson as the original Joker.  We had

3    Michelle Pfeiffer as the Catwoman.

4            All of these people are gross from first dollar

5    players.  And many times the villain in a superhero film is

6    the interesting component that you would cast to be someone

7    spectacular to sort of enhance the profile of the film.

8            But some superheroes are gross players, and some

9    aren't.  I don't think there's a rule of thumb.  And I think,

10   frankly, when you develop something, you don't know until you

11   come out the other end what you can do.

12           MR. TOBEROFF:  Objection.  Move to strike as

13   nonresponsive.  He simply was asked whether it was true that

14   for a Batman or Superman film, you don't have to hire

15   expensive stars.

16           THE COURT:  I suspect Mr. Bergman will have no

17   objection to striking the answer.  At the end of the day,

18   you're saying that these are expensive stars?

19           THE WITNESS:  Yes.

20           THE COURT:  Yes.

21   Q.   BY MR. BERGMAN:  Have you negotiated with Paul Levitz for

22   DC properties other than Superman?

23   A.   Not directly with Paul that often, but yes.

24   Q.   In those negotiations that you have had with Mr. Levitz,

25   how do you characterize his negotiation posture vis-a-vis

 1  Warner Brothers?

 2  A.   Okay.  He's a terrific guy.  We'll start with that.  But

 3  he's tenacious, strong willed, and I dare say stubborn.

 4         MR. TOBEROFF:  Vague and ambiguous as to the

 5  negotiation posture.

 6               THE COURT:  Overruled.

 7  Q.   BY MR. BERGMAN:  Have you found him to be submissive to

 8  the will of Warner Brothers?

 9  A.   Sadly, no.

10         MR. TOBEROFF:  Objection.  Leading.

11         THE COURT:  Overruled.

12  Q.   BY MR. BERGMAN:  Do the majority of rights agreements

13  have contingent compensation agreements of one kind or another

14  at Warner Brothers?

15  A.   Yes.

16  Q.   And what is a form of contingent compensation at Warner

17  that is most favorable to the participant?

18  A.   First dollar gross or gross from first dollar.

19  Q.   Under what circumstances, if any, does Warner Brothers

20  grant a rights holder a share of first dollar gross?

21  A.   When you can't convince someone we won't pay it to them.

22  That's the truth.

23  Q.   Aside from the Superman property and aside from the DC

24  agreements, can you think of any rights acquisition agreement

25  that Warner Brothers has made within the past 10 years where

1266

1    first dollar gross was paid to the rights holder?

2    A.    I'm unclear on time periods, but it has happened, yes.

3    Q.    Frequently?

4    A.    Reasonably.  Not infrequently.  When appropriate.

5    Q.    On those occasions, when a share of first dollar gross

6    has been paid to a rights holder, what is the typical

7    percentage of first dollar gross?

8    A.    It can range from 1 percent to 5 percent.

9    Q.    Does a first dollar gross deal entered into by Warner

10   Brothers in 2002 have a different financial impact on Warner

11   Brothers than the same gross deal made in 1974?

12   A.    Yes.

13   Q.    Can you explain how?

14   A.    Yes.  In two ways.  One, because of the change in the

15   motion picture business, the growth of the foreign

16   marketplace, the growth of the worldwide television market,

17   the growth of videocassette revenue, and the way in which

18   pictures are released, there is likely to be considerably more

19   revenue on the initial release of the film than there would

20   have been, I guess it's 30 some odd years ago.

21         And secondarily, the cost of the films to us are

22   exponentially greater.  The marketing costs are exponentially

23   greater.  So that amount of money that we are adding to pay

24   out will add to -- will push back the point in time where we

25   actually are whole and hopefully making money.

1267

```
1              THE COURT:  Counsel?

2              MR. TOBEROFF:  The objection is the question lacks

3    foundation, particularly as to 1974, and that the answer is

4    also based on specialized ex -- expert testimony based on

5    specialized knowledge of financial equivalents.

6              THE COURT:  I will sustain the objection on the

7    former part in terms of his understanding of the 1974, in that

8    time period, Counsel.  I'll overrule the latter part of the

9    objection.

10   Q.   BY MR. BERGMAN:  Let me confine myself to the period from

11   1985.  Would a first dollar gross deal entered into by Warner

12   Brothers in 2002 have a different impact upon Warner Brothers

13   than the same gross deal made in 1985?

14             MR. TOBEROFF:  Lacks foundation.

15             THE COURT:  '85, '86, when he became vice-president.

16   Overruled.

17             THE WITNESS:  My answer is the same.  The gross

18   dollars that it would cost us obviously are higher because of

19   the extreme growth in new markets, videocassettes, growth in

20   the television market, growth in the international markets

21   where they have a lot more theaters and we generate a lot more

22   revenue.

23             THE COURT:  From your vantage point at Warner

24   Brothers, when did you see that growth?  When did that growth

25   take place?
```

1          THE WITNESS:  It's actually now just recently sort

2     of leveled off and started to diminish.  But consistent almost

3     throughout the period.  We've had spikes.  In the earlier

4     period it would be larger.  But more or less with very little

5     flattening out.  There's a trajectory, both domestically and

6     internationally in terms of the revenue.

7          So the value of the growth dollars is more

8     expensive, and the impact to us, because of the increased cost

9     of the films in the marketing, means that it adds to our cost

10    of the film extensively, and adds to our risk profile.

11         THE COURT:  Counsel?

12         MR. TOBEROFF:  Objection as to specialized

13    knowledge, expert testimony.

14         THE COURT:  Overruled.

15    Q.   BY MR. BERGMAN:  Mr. Spira, does a 5 percent of first

16    dollar gross deal on a film budgeted at $40 million have a

17    different financial impact on Warner than the same 5 percent

18    deal on a $200 million picture?

19         MR. TOBEROFF:  Objection, your Honor.  This is

20    specialized testimony, expert testimony.  The cases

21    specifically hold that you don't ask percipient witnesses

22    hypotheticals.

23         THE COURT:  I'm going to overrule that objection.

24    But I sua sponte have to raise a foundational objection,

25    Counsel.  Lay some foundation for this.

1           MR. BERGMAN:  Very well, your Honor.

2    Q.   As part of your function as worldwide head of business

3    affairs, Mr. Spira, are you called upon to determine the

4    impact of various forms of compensation upon the studio?

5    A.   Yes.

6    Q.   And would you describe that as a science, an art, or

7    something else?

8           MR. TOBEROFF:  Leading.

9           THE COURT:  Sustained.

10          Counsel, it's five o'clock.  Why don't we pick up

11   with this tomorrow morning.  It will give both sides a chance

12   to think about this overnight.

13          Both sides are about down to a couple hours each.

14   So we should be able to wrap this up tomorrow.  And just given

15   the number of hours that we have, how many more witnesses

16   after this witness do you anticipate?

17          MR. BERGMAN:  We will only have one more witness,

18   your Honor.

19          THE COURT:  And who would that be?

20          MR. BERGMAN:  That would be John Gumpert.

21          THE COURT:  Very good.  All right.  And then the

22   plaintiff may call, if they have time remaining, any rebuttal

23   witnesses that they feel are appropriate.  And then we'll hear

24   a surrebuttal, and that will wrap up the testimony tomorrow.

25   And then next Tuesday we'll have the closing arguments.

1          MR. BERGMAN:  Very good, your Honor.

2          THE COURT:  Any other matters that we need to take

3   up at this time?

4          MR. TOBEROFF:  No, your Honor.

5          THE COURT:  Very well.  Have a good evening.

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on May 12, 2009.

15

16

17          _____
            **MARK SCHWEITZER, CSR, RPR, CRR**
            Official Court Reporter
18          License No. 10514

19

20

21

22

23

24

25