1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4      **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6   JOANNE SIEGEL, etc.,          :  PAGES 1349 - 1449
                                  :
7           PLAINTIFF,            :
                                  :
8      VS.                        :  NO. CV 0408400-SGL(RZx)
                                  :
9   WARNER BROTHERS               :
    ENTERTAINMENT, INC., etc.,    :
10                                :
            DEFENDANT.            :
11  _____ :

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              COURT TRIAL - DAY 10

16              RIVERSIDE, CALIFORNIA

17            WEDNESDAY, MAY 13, 2009

18              AFTERNOON SESSION

19

20

21

22              MARK SCHWEITZER, CSR, RPR, CRR
                OFFICIAL COURT REPORTER
23              UNITED STATES DISTRICT COURT
                181-H ROYBAL FEDERAL BUILDING
24              255 EAST TEMPLE STREET
                LOS ANGELES, CALIFORNIA 90012
25              (213) 663-3494

**Appearances of Counsel:**

For the Plaintiff:

TOBEROFF AND ASSOCIATES
By Marc Toberoff, Esq.
    Nicholas Williamson, Esq.
    Keith Adams, Esq.
2049 Century Park East
Suite 2720
Los Angeles, CA 90067
(310) 246-3333

For the Defendant:

BERGMAN COLEMAN GRODIN & EVALL, LLP
By Michael Bergman, Esq.
    Anjani Mandavia, Esq.
9665 Wilshire Boulevard
Ninth Floor
Beverly Hills, CA 90212
(310) 860-3346

        -and-

LAW OFFICES OF PATRICK T. PERKINS
By Patrick T. Perkins, Esq.
1711 Route 90
Cold Spring, NY 10516
(845) 265-2820

1

**I N D E X**

2

3  **JOHN GUMPERT**, PREVIOUSLY SWORN......................... 1356

4  DIRECT EXAMINATION (CONTINUED) BY MR. BERGMAN.......... 1357

5  VOIR DIRE EXAMINATION BY MR. TOBEROFF.................. 1361

6  DIRECT EXAMINATION (RESUMED) BY MR. BERGMAN............ 1364

7  CROSS-EXAMINATION BY MR. TOBEROFF..................... 1395

8  REDIRECT EXAMINATION BY MR. BERGMAN................... 1435

9  RECROSS-EXAMINATION BY MR. TOBEROFF................... 1438

10

11  **E X H I B I T S**

12

13  Exhibit 121 received.................................. 1392

14  Exhibits 1026, 1027, 1028, 1029, 1030
    1085, 1086, 1093, 1094, 1095, 1096, 1102,
15  1103, 1104, 1105, 1106, and 1107 received.............. 1444

16  Exhibits 327 and 1119 received........................ 1447

17

18

19

20

21

22

23

24

25

<u>**Riverside, California; Wednesday, May 13, 2009**</u>

**1:30 P.M.**

THE COURT:  Counsel, there was some issue relating to time raised with my court reporter or something?

MR. PERKINS:  Yes, your Honor.  We have been keeping track, and our records show that we have an hour and 53 minutes left.

THE COURT:  And hour and how much?

MR. PERKINS:  53.  And I think I have an explanation as to where the time has gone.

THE COURT:  Where the missing hour is because according to her, it's about 50 or 51 minutes.

MR. PERKINS:  On Friday during the -- we had a 45-minute pause during -- in Paul Levitz' testimony.  And Mr. Levitz indicated, when he got back on the stand, he heard the clock was still ticking during that 45-minute break.  So --

THE COURT:  That could very well have been.  Is there any -- I have an hour and 16 minutes for the plaintiff.  Does that sound about right on your end?

MR. TOBEROFF:  Yes, your Honor.

THE COURT:  Plus or minus a few minutes.  All right.  Well, as long as we make sure the plaintiff gets all of their time, and the big thing is to finish this afternoon.  So let's make sure we get through it.  I'm not going to give the

1    plaintiffs a hard time if they go over or the defendants a

2    hard time.  As long as the plaintiffs get all of their time.

3    That's the critical thing and most importantly, that we finish

4    today.

5              All right.  Very well.  Let's proceed.

6              MR. BERGMAN:  Your Honor, in the voir dire that

7    Mr. Toberoff conducted, he read a small portion of

8    Mr. Gumpert's deposition.  I believe he started at page 38,

9    line 10.

10             THE COURT:  That's correct.

11             MR. BERGMAN:  I would like, if I may, to read a few

12   pages prior to that, or either refer your Honor to reading it,

13   whatever you would prefer.

14             THE COURT:  Well, why don't you go ahead and read

15   and make sure it's all part of the record.

16             MR. BERGMAN:  Okay.  I'm going to start, please, at

17   page 35, line 17.

18             THE COURT:  Through?

19             MR. BERGMAN:  Through 38, 19, where Mr. Toberoff

20   stopped.

21             THE COURT:  I see.

22             MR. BERGMAN:  Beginning at line 17:

23             "QUESTION:  Do you believe that the DC Superman

24       rights, as they exist today, have tremendous value?"

25             Objection.

1      "THE WITNESS:  I don't know what you mean.  I'm

2   sorry.

3      "QUESTION:  Very valuable, very valuable."

4   Objection.

5      "THE WITNESS:  I can only answer by saying they are

6   valuable.  I don't know the degree to which they are

7   valuable.

8      "QUESTION:  Well, there's not very valuable, there's

9   valuable, and there's very valuable.  In what spectrum,

10  how would you describe the Superman rights?"

11     Objection.

12     "THE WITNESS:  The reason for any hesitancy is that

13  there haven't -- before Superman Returns, before the

14  Superman movies with declining box office results and

15  Superman Returns itself, despite what might appear to be

16  impressive gross was deemed to be a failure.  It just may

17  be from a movie point of view a played out character.

18     "QUESTION:  Based on your -- I would take your

19  decision what -- that would take your last statement, in

20  your opinion, you do not believe DC Superman rights are

21  very valuable?

22     "ANSWER:  No, I didn't say that.

23     "QUESTION:  Well, again --

24     "ANSWER:  Again, I don't know how to define

25  valuable.  I did say that they were valuable.  That was

1    my answer to your first question.  I don't know what very

2    valuable, highly valuable.  I don't know how to answer

3    that.

4        "MR. TOBEROFF:  Let's try it this way.  On a scale,

5    you understand that people use the word terms very

6    valuable all the time in normal conversation to describe

7    something.  So on a scale from one to ten, how would you

8        describe the value of DC's Superman rights as they

9 exist    today?"

10       Objection.

11       "THE WITNESS:  Well, even if I knew the answer to

12   that, I would have a hard time quantifying it that way.

13   I just couldn't.

14       "QUESTION:  The answer to the objection, what's one,

15   what's ten?  It's a given that the rights are valuable;

16   correct?

17       "ANSWER:  I believe I indicated that, yes.

18       "QUESTION:  Okay.

19       "ANSWER:  I believe they are valuable.

20       "QUESTION:  One to ten, as a spectrum as to value.

21       "ANSWER:  Um-hm.

22       "QUESTION:  If three or four or five would be more

23   valuable than one, ten would be the most valuable on the

24   spectrum of value.  If you -- I'd like you to try and

25   give your best estimate of your belief as to the value on

1       a scale from one to ten."

2            Question by me.

3            "THE WITNESS:  Forgive me.  One of your early

4       admonitions was not to speculate.  That would be purely

5       speculating.

6            "QUESTION:  That fits into -- you've had vast

7       experience in the entertainment industry, have you not?

8            "ANSWER:  Yes, I have.

9            "QUESTION:  In fact, this is basis in which you are

10      testifying as an expert in this case; correct?

11           "ANSWER:  Yes.

12           "QUESTION:  Based on that experience, I'd like you

13      to make your best approximation on a scale from one to

14      ten of the value of Superman.  You've spoken at great

15      length that it's a declining character.  You've mentioned

16      things like that.  That would lead me to believe that

17      your answer would be one to three.  I'd like to clarify

18      that portion in your report.

19           "ANSWER:  I wish I could do that for you,

20      Mr. Toberoff.  I just can't.  They are undoubtedly

21      valuable.  How valuable they are I don't know, and I'm

22      really not sure."

23                    **JOHN GUMPERT, PREVIOUSLY SWORN.**

24   ///

25   ///

1        **DIRECT EXAMINATION (CONTINUED)**

2    BY MR. BERGMAN:

3    Q.   Mr. Gumpert, with all of the agreements you've reviewed

4    in this case or referred to in your report --

5              THE COURT:  Counsel, wait until he gets his question

6    out.

7              MR. TOBEROFF:  I'm very sorry to interrupt.  We just

8    have a technical problem.

9              (Pause.)

10   Q.   BY MR. BERGMAN:  So my question to you, Mr. Gumpert, is

11   of all the agreements you've reviewed in this case or referred

12   to in your report, which ones would you, wearing your buyer's

13   hat, consider to best reflect on the fair market value of the

14   Superman rights in 2002 had they been exclusive?

15   A.   Right.  I considered three agreements, and then two

16   transactions where I didn't actually have the agreement.  The

17   three agreements were Conan, Tarzan, and Ironman.  And in

18   addition, I was able to ascertain the terms of Columbia

19   Pictures' acquisition of the rights to Green Hornet and

20   Columbia and Disney's acquisition of the rights of the Lone

21   Ranger.

22   Q.   Okay.  The first agreement that you mentioned was the

23   Conan agreement.  Can you tell me, first of all, is it your

24   opinion that the Conan agreement provides a more beneficial

25   economic return to the licensor than the film agreement

1    provides to DC?

2            MR. TOBEROFF:  Leading, suggests the answer.

3            THE COURT:  Asked and answered with this witness?

4            MR. TOBEROFF:  And lacks foundation.

5            THE COURT:  Well, it's leading, and I'm not really

6    sure.  Let's present the foundation for this.

7            MR. BERGMAN:  He did represent that he reviewed

8    these agreements.

9            THE COURT:  Okay.  I'm sorry.  Did he?

10   Q.   BY MR. BERGMAN:  Let me ask you again.

11           Mr. Gumpert, to what extent did you review the five

12   agreements that we are referring to in this phase?

13   A.   I reviewed three of the five agreements:  Conan, Tarzan,

14   and Ironman.  And I reviewed the terms of two other

15   transactions, which were the Lone Ranger and Green Hornet.

16   Q.   Okay.  Let's turn first to the Conan agreement.  How do

17   the economic terms of the Conan agreement compare to the

18   economic terms of the film agreement insofar as the licensor

19   of the exclusive rights is concerned?

20   A.   In my view, the more favorable deal for the licensor is

21   the Superman Returns agreement.

22   Q.   Can you explain briefly why?

23   A.   Yes.  Well, let's start backwards.  When your -- in a

24   rights transaction like this, the most important

25   considerations for a licensor are really two.  One is the

1359

1    gross, and the other is the merchandising.  In terms of the

2    gross, in the case of Superman Returns, it's 5 percent of the

3    gross in excess of $30 million.  In effect, because a million

4    five is advanced against that.

5            In the case of Conan, it was 2 1/2 percent of the

6    gross with an advance of $2.75 million after the deal was

7    amended, which means that the licensor would not see any

8    further money until $110 million of gross as compared to

9    $30 million of gross.

10   Q.   Okay.  With respect to the Tarzan agreement, how do you

11   compare the economic benefits of Edgar Rice Burroughs to those

12   obtained by DC under the film agreement?

13   A.   Again, I believe that the terms of the Superman Returns

14   agreement are much superior to the terms of the Tarzan

15   agreement.

16   Q.   And why is that, sir?

17   A.   The Tarzan agreement had a relatively low option payment,

18   a purchase price of a million and a half dollars that was

19   subsequently amended to 1,750,000 and a gross participation

20   that was nowhere year 5 percent of the gross from first

21   dollar.

22   Q.   Okay.  If I may go back briefly to the Conan agreement.

23   A.   Sure.

24   Q.   Did the merchandising provision of the Conan agreement

25   have an impact on your opinion, and if so, why?

1360

1    A.    Yes, it did.  I'm aware that in the Superman Returns

2    transaction, when you cut through it all, the licensor

3    receives 75 percent of every merchandising dollar.  While in

4    the case of Conan, the split was much more in favor of the

5    licensee than the licensor.

6    Q.    Okay.  The third agreement that you identify in your

7    report is the Ironman agreement.  Can you compare for us the

8    economic benefits to the licensor in the Ironman agreement as

9    compared to those of the licensor in the film agreement?

10   A.    Sure.  The Ironman agreement contained a guaranteed

11   payment of $900,000 as compared to a million and a half

12   dollars in the Superman agreement.  And in terms of the gross

13   participation in the Ironman agreement, it was, I believe, 5

14   percent of the gross after break even.

15   Q.    Okay.  Can you define for the Court what break even means

16   within the film industry?

17   A.    Yes.  Break even is the point in time in which a studio

18   has recouped its production costs, its marketing costs, very

19   often a distribution, and any what I'll call prebreak

20   participations to third parties.

21   Q.    And by comparison, how is the 5 percent of gross dollar

22   gross compute?

23   A.    As the name implies, it's from the very first dollar

24   without any deductions.

25   Q.    The fourth agreement you identified is one that I believe

1   you obtained subsequent information about, and that is the

2   Lone Ranger.

3           Can you tell us in what ways -- can you compare for

4   us the economic benefits to the licensor in the Lone Ranger

5   agreement as opposed to those to DC in the film agreement?

6           MR. TOBEROFF:  Your Honor, with your permission, I'd

7   like to voir dire the witness as to the basis under which he's

8   received this information.

9           THE COURT:  The Lone Ranger information?

10          MR. TOBEROFF:  The Lone Ranger and the other --

11  there's another agreement he mentioned as well, the Green

12  Hornet.

13          THE COURT:  You may.

14                      **VOIR DIRE EXAMINATION**

15  BY MR. TOBEROFF:

16  Q.   Earlier on in this -- earlier on in your testimony, you

17  testified that you received information from business affairs

18  executives, plural, at Columbia.

19          Do you recall that?

20  A.   I do.  That was not an accurate statement.  Forgive me.

21  Q.   How was it inaccurate?

22  A.   I received it from a single business affairs source who

23  is an assistant to my son who works at Columbia Pictures.

24  Q.   So the sole source of this information was a secretary or

25  assistant at Columbia?

1    A.    Correct.

2    Q.    Is that right?

3    A.    Correct.  It is common practice --

4    Q.    Let me ask the next question, please.

5              And that information you received solely over the

6    phone?

7    A.    It was received, I believe, in an e-mail.  Well, two

8    separate -- you're asking two separate topics.  I don't know

9    whether you're referring to the Lone Ranger or Green Hornet.

10   Q.    I'm asking you as to the information that you received as

11   to the purported terms of the Lone Ranger agreement.  Was that

12   in a telephone conversation with this assistant?

13   A.    No.  It was in an e-mail.

14   Q.    An e-mail from the assistant?

15   A.    Yes, I believe so.

16   Q.    And the information as to the Green Hornet was in a

17   telephone conversation?

18   A.    Was in a telephone conversation, yes.

19   Q.    Other than that telephone conversation and the e-mail, is

20   there any other information that you received regarding those

21   two properties?

22   A.    No.

23             MR. TOBEROFF:  Your Honor, I'd like to move for the

24   exclusion of testimony regarding the Lone Ranger and Green

25   Hornet under rule -- Federal Rules of Evidence 703.  An expert

1    may rely on facts or data only if the facts or data are of a

2    type reasonably relied on by experts in the particular field

3    in forming opinions.  That's a quote.  No expert in this field

4    would or could reasonably rely on the information received

5    over the phone or in an e-mail from an assistant or secretary

6    at a studio.

7            THE COURT:  What's the basis for that, Counsel?

8            MR. TOBEROFF:  Federal Rule of Evidence 703.

9            THE COURT:  No, that last statement there.  I'm

10   familiar with Rule 703.  But there was a statement that you

11   made that I don't think is included in 703, the part about no

12   reasonable expert could rely on that.

13           What is your basis for that?

14           MR. TOBEROFF:  The basis for it is that experts in

15   the industry would rely on information from colleagues,

16   business affairs executives like themselves who would rely on

17   actual contracts.  But a random phone conversation from a

18   secretary at a studio, the key basis, he said he relied on

19   five agreements, and two of them are based on hearsay over the

20   phone from an assistant at a studio.  He doesn't have the

21   reasonable indicia of reliability that an expert would rely

22   on.

23           THE COURT:  Mr. Bergman?

24           MR. BERGMAN:  Yes, your Honor.

25           THE COURT:  You may question and/or argue this

1    point.

2            MR. BERGMAN:  Yes.

3                    **DIRECT EXAMINATION (RESUMED)**

4    BY MR. BERGMAN:

5    Q.   Mr. Gumpert, when you obtained this information, you said

6    from your son's assistant, what position does your son hold at

7    Columbia?

8    A.    President of Business Affairs AND Administration.

9    Q.   And is his assistant properly referred to as the

10   secretary or within a broader meaning of assistant as used in

11   the film industry?

12   A.   He's an assistant who has been with my son for 10 years

13   now.

14           MR. TOBEROFF:  Objection.  Leading.

15           THE COURT:  Overruled.

16   Q.   BY MR. BERGMAN:  And when the assistant gave you that

17   information, did he give it to you from his memory, or did he

18   say he would look it up on the computer system?

19           MR. TOBEROFF:  Calls for speculation.

20           THE COURT:  Well, there may not be sufficient

21   foundation for that.  Why don't you ask him what he knows

22   about where the earlier information came from.

23   Q.   BY MR. BERGMAN:  How did you go about finding the

24   information that you got from Columbia?

25   A.    First and foremost, there's a practice in the industry of

1   obtaining quotes from other business affairs departments.  And

2   because business affairs executives typically are busy, it's

3   their assistants that you deal with.  So the process was I

4   called on the phone.  I spoke to Jason, which is his name.  I

5   said, "Can you please get me the quote for the Lone Ranger,

6   and by the way, I understand that after you, Columbia, dropped

7   the option, it was picked up by Disney.  Could you get me that

8   quote as well?"

9           He called me back or sent me an e-mail, two separate

10  e-mails actually, one with the Columbia quote and one with the

11  Disney quote.  In deal making, I would rely on that all the

12  time.  There's no distinction between the business affairs

13  executive and his assistant.

14  Q.   And following that, did you put that information into a

15  chart?

16  A.   Not the Lone Ranger.

17  Q.   Did you put the information regarding Green Hornet into a

18  chart?

19  A.   Yes, I did.

20  Q.   And did you show that chart to Mr. Toberoff in your

21  deposition?

22  A.   Yes, I did.

23          MR. BERGMAN:  Your Honor, I believe there's a

24  sufficient foundation.

25          THE COURT:  I'm going to deny the motion to exclude;

1366

```
1   however, all of this will go to the weight the witness is

2   testifying on and the opinion that it's based on those

3   agreements.

4            MR. BERGMAN:  Thank you.

5   Q.   Could you then for us, Mr. Gumpert, compare the economic

6   benefit received by the licensor under the Lone Ranger

7   agreement to the economic benefit received by DC under the

8   film agreement?

9   A.   The economic benefits received by DC under the film

10  agreement are far superior.  The terms of the Lone Ranger

11  agreement at Columbia was an option payment of $375,000

12  against I believe 1,750,000.  At Disney, it was $500,000, I

13  think, against two and a half million.  But in both cases the

14  gross participation was a post break even gross participation,

15  not a first dollar gross participation.

16  Q.   When you say post break even --

17  A.   After the studio has recouped its production costs, its

18  marketing cost, prebreak gross participations and sometimes a

19  distribution fee.

20  Q.   And by the way, and he'll get into this if we have time

21  further, have you reviewed documents which show you whether or

22  not Superman Returns has hit break even?

23  A.   Yes, I have.  I've reviewed the participation statement

24  issued by Warner Brothers to Legendary Pictures.

25  Q.   And what does that statement demonstrate?
```

1367

1    A.    It shows that the film is seriously in a deficit position

2    at the moment.

3    Q.    Can you estimate how much of a deficit position?

4    A.    Roughly about 160-, $170 million deficit.

5    Q.    If a film released in 2006 is in $175,000 deficit --

6    A.    Million.

7    Q.    175 million -- forgive me.  I don't think along those

8    lines.  If it's in a 175 million deficit in 2009, will it ever

9    break even?

10   A.    It's difficult to say.  But given where it is in the

11   spectrum of exploitation, which is basically it's been through

12   theatrical release, it's been through video release, it's been

13   through pay television and first run syndication, and it's now

14   in a situation where the grosses are ever diminishing, if it

15   breaks even at all on a 10-year ultimate basis, which is the

16   way studios look at things, it would just break even.  It

17   certainly wouldn't result in --

18              MR. TOBEROFF:  Lacks foundation, your Honor.

19              THE COURT:  Overruled.

20   Q.    BY MR. BERGMAN:  Finally, with respect to the Green

21   Hornet agreement, terms of which you reviewed, how would you

22   compare the economic benefit to the licensor in that agreement

23   as compared to the benefit to DC under the film agreement?

24   A.    Again, I would think that the benefit to DC under the

25   film agreement was far superior.

1   Q.   And can you explain why?

2   A.   Sure.  The Green Hornet transaction at Columbia, there

3   was a $250,000 option payment against the $2.5 million

4   purchase price, but the gross participation of the licensor

5   again was post break even.  Rather than from first dollar.

6   Q.   In determining comparable agreements, I notice you

7   haven't selected any novels.  Is there a reason for that?

8   A.   In my view, they are totally different animals.  A novel

9   is a story written in three acts with defined characters.  A

10  property like Superman is totally different because you buy

11  the property, and then you have to sit down with a blank piece

12  of paper and come up with a story line, which you don't have

13  to do in the case of a novel or a play for that matter, which

14  is why the novels typically get high purchase agreements.

15          The more prominent ones, the ones written by John

16  Grisham or Tom Clancy or Michael Creighton are not optioned.

17  They are purchased outright because you know what you're

18  buying.  You're buying a store.  You're buying these

19  characters.  All you have to do is adapt it into a screenplay

20  format.

21  Q.   Okay.  The plaintiffs' expert in this case gave testimony

22  at the conclusion of his opinion, of his testimony, as to what

23  he would, if he had the honor of representing DC Comics, would

24  have obtained for Superman Returns.

25          And with your Honor's permission, I'd like to read

1    what Mr. Halloran said as a prelude to my questions to

2    Mr. Gumpert.

3          THE COURT:  You may.

4          MR. BERGMAN:  And I'm beginning to read at page 577,

5    which was Trial Day 4, May 1, and the testimony begins at line

6    17 of page 577:

7          "THE WITNESS:  If I had the opportunity and the

8          honor in 2002 to have gone and been able to put the

9          Superman property film rights to bid, or even a property

10         equivalent to Superman, we don't have to say Superman,

11         but if you had a Superman quality character, I'm

12         confident that I'd be able to achieve -- I'd probably be

13         able to achieve a -- to get a purchase price and not

14         necessarily have to have it optioned of $10 million

15         per film."

16   Q.   Would you just make a notation, sir, of purchase price,

17   $10 million.

18         THE COURT:  I'm not sure what the question is.

19   Q.   BY MR. BERGMAN:  All I'm asking you to do is to place on

20   a pad or in your head that $10 million purchase price that

21   Mr. Halloran referred to.

22         THE COURT:  Is there an objection, Mr. Perkins?

23         MR. PERKINS:  I was just going to approach the

24   witness with a pad and paper.

25         THE COURT:  That's fine.

1370

1          THE WITNESS:  Thank you so much.

2    Q.    BY MR. BERGMAN:  Mr. Halloran continues with his

3    definition of what he would get as a fair market value at line

4    25 of page 577:

5               "If I did do an option, it would be for 12 or 18

6          months for each period, and I would get at least 10

7          percent of the option price.  So that would be a million

8          of the purchase price."

9          So enter that onto your pad, please, too, as well.

10         He goes on at line 3:.

11         "I'd be able to get a dollar one gross

12         participation.  The purchase price would be applicable to

13         10 percent from dollar one, which would escalate based on

14         the success of the film ultimately, I think, to the level

15         of approximately 20 percent as was in the time line

16         agreement."

17         You read the time line agreement, didn't you, sir?

18   A.    Yes, I did.

19   Q.    Mr. Halloran goes on to continue at line 9:

20         "Very importantly, I would be able to get the sort

21         of creative controls that DC had enjoyed in prior

22         agreements and the sort of creative controls that

23         companies like Marvel insist on.  I think I definitely

24         would have been able to get a very specific merchandising

25         deal where the film-related merchandising would be shared

1          at least on a 50/50 basis, and I think with a fee less

2          than Warner's 25 percent fee because of the history of

3          the success of Superman's merchandising."

4                 So would you put down a fee of less than 25 percent?

5     What's the lowest fee that you have come across on a

6     merchandising deal where there's a 50/50 split?

7     A.   Probably a 15 percent fee.

8     Q.   Okay.  Would you put down 15 percent fee, please.

9                 He goes on, line 16:

10               "I think I would be able to get a producer deal for

11          Mr. Levitz like I got in the Neopets agreement which we

12          saw in the various other agreements which would augment

13          that purchase price."

14               Do you recall what the producer's payment was in the

15    Neopets agreement?

16    A.   No, I don't.

17    Q.   Okay.  I'm going to represent to you that it was

18    $625,000.  So would you put that down as additional

19    compensation.

20               And Mr. Halloran goes on to say:

21               "And on that previous deal" --

22               I think he meant the producer's deal --

23               "I think I'd be able to get an additional

24          participation."

25               Let me ask you, sir, based on all of your experience

1    in the industry, when a producer, when someone gets a producer

2    fee in a film deal like this, not an author or owner, when

3    does that film deal kick in?  When does the interest kick in?

4    A.    It would typically be post break even.

5    Q.    Okay.  And then finally, Mr. Halloran says:

6                "I most certainly would get a reversion right."

7                And then over at page 579, line 2, Mr. Halloran

8    says:

9                "When I think lastly, would I insist on a

10        co-financing opportunity for DC."

11               That is the fair market deal that Mr. Halloran has

12   promoted.  And what I would like you to do, sir, is I would

13   like you to compare that fair market deal that Mr. Halloran

14   has proposed to the actual deal that was obtained by DC on

15   Superman Returns.

16               THE COURT:  Counsel?

17               MR. TOBEROFF:  Objection, your Honor.  Mr. Bergman

18   skipped over on page 578, line 22, through line 1 on page 579.

19   May I read it?

20               THE COURT:  Is there a term there that needs to be

21   included?

22               MR. BERGMAN:  I'm sorry, sir.  Let me look at it.

23               THE COURT:  What term are you referring to,

24   Mr. Toberoff?

25               MR. TOBEROFF:  Starting at 578, line 22:

```
 1          "I most certainly would get a reversion right.

 2      There's no way a property like Superman would go on the

 3      mark net 2002 and there wouldn't be a provision where the

 4      company purchasing the rights could sit on the rights.

 5      That's just -- there's no way that I would allow DC to do

 6      something like that."

 7          MR. BERGMAN:  My omission was because it didn't

 8  apply to the --

 9          THE COURT:  I understand that.

10  Q.   BY MR. BERGMAN:  Mr. Gumpert, given the standards set by

11  the plaintiffs' expert, how does it compare to the actual deal

12  that DC got on Superman Returns?

13  A.   We're going to have to go through the math.

14  Q.   Please do.

15  A.   But as a preamble, I don't believe any licensor of a

16  Superman property could get these terms.

17  Q.   Putting that aside, sir --

18          THE COURT:  That's not responsive, and the Court

19  will strike it on its own.

20  Q.   BY MR. BERGMAN:  I just want you to compare what the two

21  deals would actually yield.

22  A.   Okay.  So we need to know first of all what the gross

23  pool was.

24  Q.   The gross pool was $220 million without video.

25          MR. TOBEROFF:  Objection.  Leading, lacks
```

1374

```
 1   foundation.
 2           THE COURT:  Well, actually there was a question from
 3   the witness.  So if anyone was leading, the witness was
 4   leading.
 5           MR. TOBEROFF:  Objection.  Mr. Bergman's testifying.
 6           THE COURT:  The defense has conducted a very proper
 7   hypothetical for the purposes of expert examination.  If there
 8   are any other elements that should be in here, let's get them
 9   out on the table now.  Is there any other elements that the
10   plaintiff believes needs to be before this witness to properly
11   make this comparison?  Because I think it's a very legitimate
12   comparison to make.
13           MR. BERGMAN:  I have read everything that
14   Mr. Halloran --
15           THE COURT:  No, I understand that.  But now the
16   witness has indicated that he needed the gross -- what did you
17   need?
18           THE WITNESS:  I need to know the amount of gross
19   that we're talking about in order to apply the percentage to
20   it.
21           THE COURT:  Right.
22           Anything further from the plaintiff?
23           MR. TOBEROFF:  The gross figure that Mr. Bergman
24   mentioned does not include video revenues.
25           MR. BERGMAN:  As I said.
```

1375

1           MR. TOBEROFF:  Which is a major component of gross

2    for a studio.

3           THE COURT:  Very well.  Noted for the record.

4           MR. BERGMAN:  The reason why I didn't include it was

5    Mr. Halloran hadn't included it, but I'm going to cover it,

6    your Honor.

7           THE COURT:  I understand.  All right.

8    Q.    BY MR. BERGMAN:  Would you turn to the exhibits that are

9    before you to Exhibit 292, page 5885, which is the

10   participation statement given by Warner Brothers to its

11   partner Legendary Pictures.

12   A.    I'm there.

13   Q.    Would you exclude video for the moment, as this excludes

14   video, and do you see the figure of total defined gross of

15   244?

16   A.    Yes.

17   Q.    And do you see defined gross after distribution fee, 219?

18   A.    Yes, I do.

19   Q.    And am I correct that the distribution fee that was

20   applied was 11 percent?

21   A.    That's correct, yes.

22   Q.    And how would you compare an 11 percent distribution fee

23   to the ordinary distribution fee?

24   A.    That's extremely low because an ordinary distribution fee

25   ranges from 30 to 35 percent.

1376

```
1   Q.   Okay.  Since no distribution fee was taken out on the
2   Superman deal -- it's a pure gross deal -- let's take out that
3   distribution fee, okay?
4   A.   Okay.
5   Q.   And figure out, without a distribution fee, without any
6   video, what the total worldwide gross was for Superman based
7   on Exhibit 282, which is in evidence.
8   A.   The distribution fee was roughly $25 million as I read
9   this.  24.8.  I'm rounding it up to 25.
10  Q.   And that is what reduces -- am I correct?
11  A.   With deducting that from $220 million.
12  Q.   Isn't that deducted from 244 million?
13  A.   Oh, yes, yes, it would be.  Sorry.  That would be the
14  right way to do it.
15           MR. TOBEROFF:  Objection, your Honor.  Leading.
16           MR. BERGMAN:  We're just --
17           THE COURT:  Overruled.
18  Q.   BY MR. BERGMAN:  Looking to the document.  After you
19  deduct the distribution fee, am I correct that there's
20  $219,621,253?
21  A.   That's correct.
22           MR. TOBEROFF:  Leading, your Honor.
23           THE COURT:  Sustained.  You'll have to have the
24  witness do this, Counsel.
25  Q.   BY MR. BERGMAN:  Would you look at the line designated
```

1    defined gross after distribution fee and tell us what that

2    amount is?

3    A.    Yes.  On a cumulative basis the amount is 219,621,253.

4    Q.    Would you round it out to 220 million and proceed with

5    your comparison, please.

6    A.    So 10 percent of that is $22 million.

7    Q.    Yes, sir.  So they would have received a $10 million

8    purchase price, which is -- is that purchase price applicable

9    to the contingent compensation?

10   A.    Yes, it is.

11   Q.    And they would have received another $12 million under

12   Mr. Halloran's concept as their share of gross; correct?  At

13   10 percent.

14   A.    10 plus 12 is 22.

15             MR. TOBEROFF:  Objection.  Leading.  The witness is

16   very capable of making his own calculations.

17             THE COURT:  Sustained.

18             Counsel, your expert needs to be able to do this on

19   his own.

20             MR. BERGMAN:  Okay, your Honor.

21   Q.    Would you then, Mr. Gumpert, run through your analysis

22   from top to bottom comparing these two, the proposed Halloran

23   and the actual agreement?

24   A.    Okay.  So sticking to the Halloran formula, the gross

25   participation was worth $22 million.  There would be no

1    escalation because the film never reached break even.  The

2    merchandising in Mr. Halloran's example was $40 million of

3    merchandising, and he's saying take 15 percent off, and then

4    split it 50/50.  So we're dealing with 42 1/2 percent of

5    $40 million, which is $17 million if this calculator is

6    correct.  Plus a producer deal of $625,000.

7    Q.   Is the 17 added to gross?

8    A.   I've added the 17 to gross, yes.  As a -- as the

9    merchandising deal.

10   Q.   Okay.

11   A.   So I've come up with 17, 22, and .65.  $39,650,000.

12   Q.   Okay.  Now let's give --

13        THE COURT:  Counsel, is there an objection?  You've

14   got to speak up.

15        MR. TOBEROFF:  I understand.  I wanted to let him

16   finish his analysis before I made an objection as to this line

17   of questioning.

18        He's being asked based on the actual results of the

19   particular film under a -- an agreement that was made in 2002.

20   He's being asked based on the actual --

21        THE COURT:  What's your legal objection?

22        MR. TOBEROFF:  My legal objection is, as the Court

23   has noted, relevance.  As the Court has noted, these

24   agreements are being valued at the time they are made, not due

25   to one particular film or another particular film breaking

```
 1    even or not breaking even.
 2            THE COURT:  I understand that argument, and we'll
 3    see how that plays out.  I'm going to overrule the objection
 4    as far as the testimony is concerned, but we'll take up the
 5    relevance of the evidence, the applicability of the evidence
 6    to the underlying issues in this case at a later time.
 7            MR. TOBEROFF:  Thank you.
 8    Q.  BY MR. BERGMAN:  Mr. Halloran also mentioned a producer's
 9    fee for Mr. Levitz.
10    A.  Which I included in my calculation.  The $625,000 fee.
11    Q.  So we had 22 million gross, 17 from the merchandising?
12    A.  Correct.  And six and a quarter.  I think I said six
13    fifty.  Which is -- whoops.  Sorry.  39,625,000.
14    Q.  Okay.  Now, Mr. Halloran did not mention a video revenue.
15    A.  Right.
16    Q.  But we've heard evidence in this case of, at the highest
17    being paid to a participant, 35 percent of gross as a video
18    royalty.
19            MR. TOBEROFF:  Objection.  Misstates the record.  I
20    think we now all know what the highest video royalty is.
21            THE COURT:  Counsel, we've had quite an issue over
22    the highest.
23            MR. TOBEROFF:  That we're not allowed to talk about.
24    Q.  BY MR. BERGMAN:  Mr. Gumpert, let's give him 40 percent.
25    A.  40 percent?  Okay.
```

```
1   Q.   And would you explain how that works?

2   A.   So as I read this accounting statement, the video gross

3   is after distribution fee and expenses, which would always be

4   applicable, is roughly $87 million, rounding up.

5            THE COURT:  Roughly $34 million?

6            MR. TOBEROFF:  Objection, your Honor.  That figure

7   only counts domestic --

8            THE COURT:  Counsel, you're going to have a

9   cross-examination, and if you want to rip him to shreds, you

10  can.  But I want to finish this testimony, or I'm going to

11  start crediting this to your time.  It's his calculation.  If

12  his calculation is wrong, that's your cross-examination.

13           THE WITNESS:  $35 million, and 10 percent of that is

14  $3.5 million, which would be added to what would go to the

15  licensor.

16           THE COURT:  So your calculation is three and a half

17  million dollars for the video.

18           THE WITNESS:  Correct.

19           THE COURT:  At 40 percent?

20           THE WITNESS:  At 40 percent, assuming a 10 percent

21  gross participation.  So we add 3.5 million, and we get a

22  grand total of 43,125,000.

23  Q.   BY MR. BERGMAN:  43,125,000 with the increased 40 percent

24  fee and the producer's fee?

25  A.   40 percent video royalty.
```

1    Q.    40 percent video royalty.

2    A.    Yes.

3    Q.    Now let's figure out what DC made under the agreement.

4    A.    Okay.  DC made $11 million out of the gross because it's

5    5 percent of 220-.  DC made, as I understand it, $30 million

6    in merchandising.  So that takes you to $41 million.

7    Q.    Did you include merchandising?

8    A.    I said $30 million for merchandising.

9    Q.    And video, sir?

10   A.    Video I haven't done yet.

11   Q.    Pardon me?

12   A.    Video I haven't done yet.  Video, they have 20 percent

13   royalty.  So going back to my number of $87 million, 20

14   percent of that is 87.2 times .05.  They would get another

15   4. --

16   Q.    They only got 5 percent.

17   A.    They would get $4.36 million.  Let me try again just to

18   make sure.  87 million --

19   Q.    Are you using -- the gross video figure is, I believe,

20   170 million.

21   A.    Well, you're right.  I'm using the one after distribution

22   fee --

23   Q.    But they don't pay distribution fees, DC; correct?

24   A.    Correct.

25            MR. TOBEROFF:  Objection.  Leading, your Honor.

```
 1              THE COURT:  Sustained.
 2   Q.   BY MR. BERGMAN:  Could you proceed with your calculation
 3   of the proper video --
 4   A.   If I use the --
 5              THE COURT:  What are you using?  You're starting to
 6   confuse me.  You've got to use the same thing you used with
 7   Mr. Halloran's --
 8              THE WITNESS:  No, I can't -- well, you're right.  In
 9   one case we were losing video gross less a distribution fee
10   and video costs.  So I think you're right, your Honor, we have
11   to use the same number.
12   Q.   BY MR. BERGMAN:  Then proceed to use the same number if
13   that's your best opinion.
14   A.   Yes.  So it's 87 million, 20 percent video royalty.
15   17.4.  And 5 percent of that -- I'm not sure that's right.
16   Sorry.  It's $870,000.  So roughly $42 million.
17   Q.   BY MR. BERGMAN:  Comes to exactly $41,870,000?
18   A.   Correct.
19   Q.   So that the difference between Mr. Halloran's fair market
20   value agreement and the money actually received by DC is how
21   much, sir?
22   A.   It's a little over a million dollars.
23              THE COURT:  Well, I've got to interject here.
24   Because I want this to be helpful to the Court.  This is a
25   bench trial.  There are other elements of Mr. Halloran's
```

1383

1   agreement.

2           THE WITNESS:  To the economic terms, you mean?

3           THE COURT:  Not in terms of money, but, for example,

4   the reversion provided.

5           MR. BERGMAN:  Very good point.

6           THE COURT:  Do those have value?

7           THE WITNESS:  Not in this context, I don't believe.

8           THE COURT:  I'm sorry?

9           THE WITNESS:  They may have value in certain

10  contexts, but not in the context of Superman.

11          THE COURT:  That needs to be explored, Counsel, one

12  way or the other by both sides.

13  Q.   BY MR. BERGMAN:  Why do you say that the reversion right

14  has no value in the terms in the context of the Superman

15  agreement?

16  A.   Well, two principal reasons.  One is because Warner

17  Brothers already owns the copyrights to four films which

18  diminishes the value because you need to be careful not to

19  infringe upon Warner Brothers's rights.  And the other reason

20  is, as I understand it, the heirs of the co-creator have

21  noticed a termination which becomes effective in 2013.  So

22  that there's a limited period of time.

23          In effect, since the agreement was effective in

24  1999, it's a 13-year license.

25  Q.   Rather than a 40-year license?

1384

1    A.    Rather than, yes.

2    Q.    Was there any other factor of economic value besides

3    reversion to the incident it has any economic value in

4    Mr. Halloran's estimate?

5    A.    I don't regard the creative controls as having economic

6    value.  And the co-financing opportunity, whether it's in an

7    agreement or not, always exists in the sense that every studio

8    wants a co-financing partner.  And had DC co-financed Superman

9    Returns, they would be in the same deficit position that

10   Legendary finds itself in now, which is $174 million.

11   Q.    To what extent at all has your opinion of the fair market

12   value of the nonexclusive rights been affected by the fact

13   that they are indeed nonexclusive?

14   A.    I took that into consideration.

15   Q.    And what was the impact of taking that into

16   consideration?

17   A.    I think there was a material impact because I don't

18   believe there is a significant market for nonexclusive rights.

19   There is a market among bottom feeders who want to jump on the

20   back of a major studio and put out an inexpensive Movie of the

21   Week or direct to video.

22          But in terms of traditional studios, other studios,

23   I think they would shy away from acquiring nonexclusive

24   rights.  I know I certainly would have.

25   Q.    By virtue of your experience in the industry, sir, what

1    is your opinion as to whether or not there are individuals out

2    there, not major studios or reputable producers, who would buy

3    the Siegel rights, the nonexclusive film rights to Action

4    Comics No. 1 and seek to exploit them?

5    A.   Oh, sure.  They are opportunists.  I call them bottom

6    feeders.  But they see an opportunity to, again, ride the back

7    of Superman and get out a direct to video, even if they can

8    only exploit it domestically in the United States because of

9    the Court's ruling.

10            Still, they could do it for under a million dollars

11   and make some money.  You know, these kind of people, if they

12   can make a million dollar investment, if they can make

13   $250,000, they love it.

14   Q.   Have you, Mr. Gumpert, at my request, made an analysis of

15   certain novel agreements which have been mentioned in this

16   case -- Time Line, Hannibal, Sahara, and Lord of the Rings --

17   and made a determination, sir, as to whether DC would have

18   made more money from the exploitation of Superman under the

19   film agreement than it would have made from the exploitation

20   of Superman Returns under the Time Line, Hannibal, Sahara, and

21   Lord of the Rings agreement?

22            MR. TOBEROFF:  Same objection, your Honor.  The

23   question elicits irrelevant testimony as to the after-the-fact

24   performance, and it's an unfair comparison because you're

25   comparing an agreement that was negotiated based on the

1386

1    relative value and leverage of Superman to agreements that

2    were negotiated relative to the value of a different property.

3           THE COURT:  Counsel, there's plenty of testimony

4    from both sides in this case trying to compare what some might

5    argue are apples and oranges.  That's not unique to Warner

6    Brothers' position.

7           MR. TOBEROFF:  My objection is that --

8           THE COURT:  I don't necessarily disagree with you on

9    that point.

10          MR. TOBEROFF:  My objection is that what they are

11   doing is running Superman revenues through an agreement that

12   pertained to a novel.  So in addition to them engaging in

13   after-the-fact hindsight analysis --

14          THE COURT:  I tend to agree with you, Counsel, that

15   all of the testimony concerning these novels and the

16   agreements reached in these novels is probably not relevant,

17   frankly.

18          MR. TOBEROFF:  That's not my objection.

19          THE COURT:  I know it's not.  You want the benefit

20   of being able to compare the novel agreement but not see the

21   effect of running the Superman numbers through the novel

22   agreement.

23          MR. TOBEROFF:  Actually, the novel agreements are

24   presented to show what a rights holder with leverage in a

25   valuable property can get in an arm's length negotiation with

1  a studio.  That's it.

2         THE COURT:  I understand the importance, Counsel, of

3  placing this in the context of what was negotiated at the time

4  and not whether the agreement was successful or not.  But to

5  many respects, running the numbers through the agreement, as

6  the exercise that we're doing now, gives some indication, I'm

7  not sure how much, but some indication of what the agreement

8  was designed to do, how it actually functioned in the real

9  world.

10        So I could see potentially some relevance from this.

11  I'll certainly give you leave to argue in closing what level

12  of weight the Court should put on any of this.  And as I just

13  indicated, I'm somewhat circumspect of all of these agreements

14  that are from novels and outside the area that we're talking

15  about here.  I mean, this was a very unique agreement that was

16  negotiated.  It's part of the difficulty of evaluating the

17  fair market value of this agreement because it is almost sui

18  generis.

19        Having said that, I've given you a lot of latitude,

20  and I'm now giving Mr. Bergman latitude in trying to test this

21  market.

22        MR. BERGMAN:  I appreciate that, your Honor.  And if

23  I might just add a couple of words to that to explain why I'm

24  doing this.  We're in an equitable proceeding here.  The

25  purpose of this trial is to determine at the end of it whether

1388

1    any more money, dollars, should be put into the DC pot that

2    the Siegels are going to share in.  Well, in order to

3    determine that, we have to have dollars.

4            THE COURT:  I understand.  And just for the record,

5    if I didn't say this, the objection is overruled.

6    Q.    BY MR. BERGMAN:  Based on your analysis, would DC Comics

7    have made more money from the release of Superman Returns

8    under the terms of the film agreement than it would have made

9    from Superman Returns under the terms of the Time Line

10   agreement?

11   A.    Yes.

12   Q.    Would your answer be any different with respect to the

13   Hannibal agreement?

14   A.    No, it would not.

15   Q.    Incidentally, on the Hannibal agreement, sir,

16   Mr. Halloran referred to it as providing for a 35 percent

17   video royalty.

18            Have you examined that agreement?

19   A.    Yes, I have.

20   Q.    Okay.  Is there really a 35 percent video royalty?

21   A.    It's a bit illusory because what the provision says is

22   that it's a 35 percent royalty unless there is another gross

23   participant.  And, in fact, as everyone knew, there was going

24   to be another gross participant, namely, Anthony Hopkins, who

25   was a first dollar gross actor.

```
 1   Q.    In fact, in the agreement, in the paragraph that
 2   immediately follows the statement that it will be 20 percent
 3   unless there's a third party gross participant, in which event
 4   it will be 35 percent, does the very next paragraph require
 5   the producer to utilize his best efforts to obtain the
 6   services of Anthony Hopkins to play the role of Hannibal
 7   Lecter at his customary rate?
 8                 MR. TOBEROFF:  Objection.  Leading.
 9                 THE COURT:  Sustained.
10   Q.    BY MR. BERGMAN:  Okay.  Would you turn, please, sir, to
11   the Hannibal agreement which --
12   A.    Which exhibit is that?
13   Q.    Exhibit 307 in the book before you.
14                 Do you have that agreement, sir?
15   A.    I do.  It's the last one in the book.
16   Q.    Okay.  Would you turn, please, to page 5761 of
17   Exhibit 307.
18   A.    Yes, I'm there.
19   Q.    Okay.  Could you read the paragraph that begins, the
20   first full paragraph on that page that reads -- begins with
21   notwithstanding.
22   A.    "Notwithstanding anything herein to the contrary, in the
23   event there is no other gross participant, the parties agree
24   that in defining gross proceeds, the video royalty should be
25   computed on the basis of 35 percent of wholesale."
```

1    Q.    Okay.  Would you now read the very next paragraph.

2    A.    "Captioned services of Hopkins."  And it reads:

3    "Producer shall use its best efforts to engage the services of

4    Anthony Hopkins on the picture to perform the role of Hannibal

5    Lecter, taking into account Mr. Hopkins' customary motion

6    picture deal terms."

7    Q.    Do you know Mr. De Laurentiis?

8    A.    Yes, I do.

9    Q.    And do you know who Mr. Janko (phonetic) is?

10    A.    Yes, I do.

11    Q.    In your opinion, would anybody with experience in the

12    motion picture industry assume that Anthony Hopkins in the

13    role of Hannibal Lecter would not be a gross participant?

14    A.    No.  In fact, there is no movie Hannibal without Anthony

15    Hopkins.  Anthony Hopkins is Hannibal.

16              MR. TOBEROFF:  Leading.

17              THE COURT:  Let's stop the leading, Counsel.

18    Q.    BY MR. BERGMAN:  If you were acting as the buyer in this

19    agreement, and you read that provision, what would your

20    conclusion be as to the video royalty?

21    A.    My conclusion would be it is in essence a 20 percent

22    video royalty.

23    Q.    And did you -- have you taken any steps to ascertain, as

24    a matter of fact, whether Anthony Hopkins received a gross

25    participation on Hannibal?

1   A.    Yes, I know it from my personal knowledge, but yes.

2   Q.    And the answer is?

3   A.    The answer is he's a first dollar gross participant.

4   Q.    Finally, -- first, let me ask you, before we get to the

5   Lord of the Rings, if I may, your Honor, Mr. Toberoff

6   introduced the Lord of the Rings license agreement.  That

7   license agreement refers to a contemporaneously executed

8   merchandising agreement.

9          In Exhibit 121, which Mr. Toberoff submitted but

10  didn't offer, there was a redacted copy of the licensing

11  agreement.  When I discovered that a couple of months ago, I

12  got an unredacted copy, gave the copy to Mr. Toberoff, and I

13  would like to have that unredacted copy of the Lord of the

14  Rings agreement entered into evidence as Exhibit 1127.

15         THE COURT:  Any objection, Counsel?

16         MR. TOBEROFF:  The exhibit they are referring to was

17  produced by defendants after the January 14th deadline and

18  with quite a long period of delay after we actually had

19  produced the Lord of the Rings agreement.  Your Honor ruled

20  that anything coming in after January 14 is not coming in.

21         THE COURT:  But the -- it's simply an unredacted --

22  is it in fact what counsel represents, an unredacted version

23  of a document that you have introduced into evidence?

24         MR. BERGMAN:  It was in --

25         MR. TOBEROFF:  I believe it is an -- I haven't

1    compared it personally, but I believe it was an unredacted

2    version.

3              THE COURT:  Okay.  Very well.  Then it's coming in.

4              **(Exhibit 121 received.)**

5    Q.   BY MR. BERGMAN:  When you made your analysis, did you use

6    the unredacted merchandising agreement for Lord of the Rings?

7    A.   Yes, I did.

8    Q.   And, sir, have you reached a conclusion as to whether the

9    licensor under the Lord of the Rings deal made more money or

10   less money than the licensor DC under the film agreement for

11   Superman?

12   A.   The merchandising arrangements for Superman are vastly

13   superior to the Lord of the Rings agreement.

14   Q.   And the impact of that --

15             THE COURT:  I'm sorry?

16             MR. TOBEROFF:  Vague and ambiguous.  I'm unclear now

17   whether we're running revenues from Superman Returns to the

18   Lord of the Rings agreement, or are we talking about the Lord

19   of the Rings merchandising?

20             THE COURT:  Clarify, Counsel.

21   Q.   BY MR. BERGMAN:  Utilizing the merchandising royalty

22   that's payable under the Lord of the Rings agreement, have you

23   reached an opinion as to whether DC Comics made more money

24   from Superman Returns under the terms of the film agreement

25   with Warner than DC Comics would have made from Superman

1  Returns under the terms of the Lord of the Rings agreement?

2          MR. TOBEROFF:  Objection, your Honor.  This

3  testimony is not anywhere in Mr. Gumpert's expert report.

4          THE COURT:  Counsel?

5          MR. BERGMAN:  Well, he certainly, to the same extent

6  as Mr. Halloran, listed the agreements in his report.

7          THE COURT:  Are these listed in --

8          MR. BERGMAN:  Pardon me, sir?

9          THE COURT:  Are these listed in his report?

10         MR. BERGMAN:  Yes, sir.

11         THE COURT:  Counsel?

12         MR. TOBEROFF:  The agreements are listed.  I was

13 referring to him -- the exercise and the opinions he's

14 rendering here.  They are not in the report.

15         THE COURT:  Given the latitude that I afforded to

16 Mr. Halloran and given the notice that -- of what was going to

17 be used in this trial, the Court think it's sufficient.

18 Objection is overruled.

19         MR. TOBEROFF:  Very well, your Honor.

20 Q.   BY MR. BERGMAN:  Your answer to the question, sir?

21 A.   My answer to the question would be that the licensor

22 would be better off under the terms of the Superman Returns

23 agreement than under the terms of the Lord of the Rings

24 merchandising agreement.

25 Q.   Thank you.  We have -- in connection with the various

1   film agreements that you've negotiated, sir, are there any

2   restrictions customarily placed on film agreements regarding

3   television?

4   A.   Yes, there are.

5   Q.   And what form do those restrictions customarily take?

6   A.   They run the gamut.  In some cases the film company

7   acquires all rights and all media, including television

8   rights, and in that case there's a prenegotiated episodic

9   royalty for the licensor.

10        In some cases there's a hold-back which generally

11  runs through the entire period of first run exploitation of

12  the film.  In some cases there's simply a freeze, which means

13  that neither party can exploit the rights without the consent

14  of the other.  And when you cut through it, it really means

15  that the licensor can exploit the television rights without

16  doing it through the licensee.

17  Q.   In your report, Mr. Gumpert, you refer to the Superman

18  Returns film agreement as being in a sense a purchase

19  agreement, do you not?

20  A.   Correct.

21  Q.   Why do you say that?

22  A.   Because the way the agreement is structured, the

23  $20 million, which is the full amount that would be payable

24  for the 34-year term of copyright, seems to me to represent a

25  purchase price.  And, in fact, if the agreement is treated as

1    a purchase price in the sense that the gross participation, or

2    it is -- I'm sorry.  The $20 million is an advance against the

3    gross participation to the extent it is fully paid.

4    Q.   In agreements where properties are purchased by the

5    studio, does the grantor have a reversion right?

6    A.   No.  Not in a purchase situation.

7    Q.   So that if the -- what happens if the studio decides to

8    never make a movie out of that purchase?

9    A.   If they never make a movie after spending $20 million,

10   they ought to be fired.  But they have the right to do that.

11          MR. BERGMAN:  Thank you very much, Mr. Gumpert.

12          I have no further questions, your Honor.

13          THE COURT:  Very well.

14                          **CROSS-EXAMINATION**

15   BY MR. TOBEROFF:

16   Q.   Mr. Halloran, you are familiar with the four Batman films

17   that were produced and distributed by Warner Brothers from

18   1989 to 1997?

19   A.   First I'd like to correct the record.  My name is

20   Gumpert, not Halloran.

21   Q.   Excuse me.  I apologize.  Good afternoon, Mr. Gumpert.

22   A.   Good afternoon.

23   Q.   You are familiar with the four Batman films produced and

24   distributed by Warner Brothers from 1989 to 1997?

25   A.   Generally familiar with them, yes.

1396

1   Q.   From the first of these films to the last of these Batman

2   films in the series, the box office revenues decreased

3   substantially; isn't that correct?

4   A.   I don't remember offhand, no.

5   Q.   Are you aware that the last film, Batman and Robin, was

6   critically panned and financially unsuccessful?

7   A.   I'm not aware of that, no.

8   Q.   No knowledge of that whatsoever?

9   A.   Sorry.

10  Q.   Are you aware that Warner Brothers very successfully

11  rebooted the Batman film franchise with the film Batman Begins

12  in 2005 and then the hugely successful film The Dark Knight in

13  2008?

14  A.   Yes, I am.

15  Q.   In fact, that's one of the virtues of a branded franchise

16  property like Batman is, that it can be rebooted, isn't it?

17  A.   That is one, yes.

18  Q.   Moving to the Superman film agreement, there's no fixed

19  purchase price in the Superman film agreement, is there?

20  A.   Well, I mean, I view the ongoing option payments as a

21  purchase price.  You may disagree, but that's how I view it.

22  Q.   Putting aside the way you view it, is there a purchase

23  price in the Superman agreement, or is there not?

24  A.   There's no option defined as a purchase price.

25  Q.   There's no amount designated as the purchase price in the

1  agreement; correct?

2  A.    Correct.

3  Q.    Isn't it very unusual for an option purchase agreement to

4  have no purchase price?

5  A.    It's unusual but not unheard of.

6  Q.    But it's usual, isn't it?

7  A.    It is, yes, I agree.

8  Q.    You testified that looking at comps or comparable

9  agreements is a valid test of an intellectual properties value

10  and that this is just as valid as offering it on the open

11  market; isn't that right?

12  A.    I didn't hear the last part.  I'm sorry.

13  Q.    You testified at your deposition that looking at

14  comparable agreements is as valid a test of an intellectual

15  properties value as offering it on the open market; isn't that

16  right?

17  A.    Yes, I did.

18  Q.    You also testified that the way studios test the value of

19  a property they wish to buy or sell is by looking at

20  precedents and comps; correct?

21  A.    Correct.

22  Q.    But neither Warner nor DC provided you with any

23  precedents or comps that they looked at, actually looked at in

24  arriving at the terms of the Superman film agreement, did

25  they?

1    A.    No, they did not.

2    Q.    And you were unaware of any precedents or comps that

3    Warner Brothers or DC looked at in arriving at the terms of

4    the Superman film agreement?

5    A.    I'm unaware of the process they went through in arriving

6    at those terms, yes.

7    Q.    And you never asked Warner Brothers or DC what process

8    they went through, did you?

9    A.    No, because there is a generally accepted process.

10              MR. TOBEROFF:  Strike after "because," your Honor.

11              THE COURT:  As?

12              MR. TOBEROFF:  Move to strike after "because."

13              THE COURT:  As?  For what reason?

14              MR. TOBEROFF:  As nonresponsive, excuse me.

15              THE COURT:  Okay.  It's stricken.

16    Q.    BY MR. TOBEROFF:  Now, moving to the option term of the

17    Superman film agreement, the consecutive option terms in the

18    Superman film agreement, Exhibit 232, run for 34 years; isn't

19    that right?

20    A.    Yes.  Three years plus successive three-year options.

21    Q.    And you reviewed the Batman agreement as well,

22    Plaintiffs' Exhibit 1?

23    A.    I did.

24    Q.    The Batman agreement is structured along similar lines

25    with consecutive option terms through the life of the Batman

1399

1    copyright; correct?

2    A.    Correct.

3    Q.    But the custom in the industry is for the consecutive

4    option periods in a rights option purchase agreement to run

5    for just three years; isn't that correct?

6    A.    You mean the initial term of option?  Is that what you're

7    asking?

8    Q.    The initial and the renewal term for a total of three

9    years.  Isn't that the norm?

10    A.    Not necessarily.

11    Q.    I'd like to read from a portion of your deposition

12    transcript, on page 129, lines 1 through 4:

13           "QUESTION:  Other than the Batman and the Superman

14       agreements, what's the next longest consecutive option

15       period you've seen in an option purchase agreement?

16           "ANSWER:  We've seen three years, and I'm struggling

17       to remember if I've seen five years, but that's the

18       range."

19    A.    Correct.

20    Q.    So at the top of that range would be five years; is that

21    correct?

22    A.    In my experience, yes.

23    Q.    And the combined total of -- if you look at the combined

24    total of an initial term and the renewal term, the norm is

25    more like three years; is that correct?

1400

```
1              MR. BERGMAN:  Objection.  Asked and answered.
2              THE COURT:  Sustained.
3    Q.   BY MR. TOBEROFF:  Mr. Gumpert, outside the Superman film
4    agreement and the Batman agreement, are you aware of any
5    option terms that run as long as 34 years?
6    A.   No, I'm not.
7    Q.   Now, your opinion is that a studio executive in
8    negotiating an option purchase agreement will try to get as
9    long an option term as possible for as little as possible;
10   isn't that correct?
11   A.   Yes.
12   Q.   Your opinion is also that if a studio executive has
13   leverage, they may indeed use it to make a rights deal on
14   terms less favorable to a rights holder than another studio
15   would have without leverage; correct?
16   A.   Well, I hear you, but I'm not sure what you mean by
17   leverage.
18   Q.   Negotiating leverage.
19   A.   I don't know how to answer that.  I mean, to the
20   extent -- a party has leverage, obviously they can make a
21   better deal.  But I'm not sure how leverage fits into this
22   context.
23   Q.   Well, at your deposition, you seemed to understand what's
24   meant by leverage.  I'd like to read from your deposition at
25   page 90, lines 9 through 16:
```

1          "QUESTION:  Isn't it true that deals will be made in

2      the ordinary course in the open market that are less than

3      what a typical deal would be for underlying rights?

4          "ANSWER:  Well, again, you mentioned before, it

5      depends on the leverage of the parties.  If the studio

6      has enormous leverage, they may indeed make a deal that

7      probably is less favorable to the owner of the rights

8  than perhaps another studio would have made."

9          Do you recall that question and making that answer?

10  A.   I do, yes.

11  Q.   Outside of the Batman and Superman agreements, you are

12  not aware of any agreements with an option term longer than

13  five years; correct?

14          MR. BERGMAN:  Asked and answered.

15          THE COURT:  Sustained.

16  Q.   BY MR. TOBEROFF:  You are familiar with 20th Century

17  Fox's rights agreement for the comic strip entitled the Wizard

18  of Id?

19  A.   No, I'm not.

20  Q.   I'd like to read a portion of your deposition starting at

21  page 17, line 12, and running to 19:

22          "QUESTION:  What rights agreement have you been

23      involved with that have a first dollar gross

24      participation on 5 percent?

25          "ANSWER:  Several.  I'm not sure I can tick them off

1402

1        for you, but the one I do remember which I mention in my

2        expert report was Wizard of Id, which is a million dollar

3        and a half purchase price against 5 percent of the gross.

4        No film ever came of it."

5   A.   That's correct.  That was a deal with Universal.  You

6   asked me whether I was familiar with the Wizard of Id deal at

7   20th Century Fox, which is why I said no.

8             MR. TOBEROFF:  Move to strike as nonresponsive.

9             THE COURT:  It's stricken.  We can deal with this in

10  further direct.  There's no question pending.

11  Q.   BY MR. TOBEROFF:  The Wizard of Id agreement was entered

12  into in the late 1990's; correct?

13  A.   Yes, Universal.

14  Q.   The Wizard of Id agreement contained a fixed purchase

15  price of a million five; correct?

16  A.   Yes.

17  Q.   And also provided for 5 percent of first dollar gross as

18  you testified to in your deposition?

19  A.   Correct.

20  Q.   DC received the same 5 percent of first dollar gross in

21  the Superman agreement as the licensor of the Wizard of Id

22  rights; correct?

23  A.   Yes.

24  Q.   But DC received no purchase price per se?

25  A.   Well, they received a guaranteed amount of a million and

1403

```
1   a half dollars, the same amount as Wizard of Id.
2   Q.   Was that designated as an option payment in the
3   agreement?
4   A.   Yes.
5   Q.   Then it's not a purchase price, was it?
6   A.   I didn't say it was.  I said it's a guaranteed amount.
7            MR. TOBEROFF:  I move to strike as nonresponsive the
8   answer to my question that DC received no --
9            THE COURT:  It's stricken.  Just listen carefully to
10  the questions.
11  Q.   BY MR. TOBEROFF:  You also referred in your deposition to
12  a rights agreement for a property called Revisited; correct?
13  A.   I've never heard of that.  Forgive me.  Revisited?
14  Q.   Yes.
15  A.   I'm blanking.
16  Q.   I'd like to read from your deposition at page 83, lines 9
17  through 18:
18            "QUESTION:  What do you believe the back end would
19       be?
20            "ANSWER:  Probably 5 percent of gross of first
21       dollar.
22            "QUESTION:  Even though an option payment would only
23       be for -- strike that.
24            "Even though an option payment would only be
25       $150,000 or a purchase price would be a million or a
```

1404

```
 1        million and a half?

 2             "ANSWER:  I've done that very deal.

 3             "QUESTION:  For what property?

 4             "ANSWER:  Revisited.  Just to mention one that comes

 5        to mind."

 6   A.   Someone -- I just missed it when I reviewed my testimony.

 7   I've never heard of a project called Revisited.

 8             THE COURT:  That wasn't a question that he asked

 9   you.

10             THE WITNESS:  I'm sorry.

11             THE COURT:  There's no question pending.  So there's

12   nothing to object to.

13             Your next question.

14   Q.   BY MR. TOBEROFF:  Did you have the opportunity to review

15   the transcript of your deposition?

16   A.   Yes, I did.

17   Q.   After you participated in the deposition?

18   A.   Yes, I did.

19   Q.   And to make all corrections you saw fit to make?

20   A.   Yes, I did.

21   Q.   And was there any reason at that deposition -- excuse me.

22   The questions that I just asked you, did you understand those

23   questions at the time you were deposed?

24   A.   I promise you I didn't use the word Revisited.  I

25   understood the question.  But the stenographer clearly took
```

1405

1    down something wrong, and I missed it in reviewing it.

2              MR. TOBEROFF:  Move to strike as nonresponsive.

3              THE COURT:  The question was did you understand the

4    questions at the time you were deposed?

5              THE WITNESS:  Yes, I understood the questions.

6              THE COURT:  Everything else is stricken.

7    Q.   BY MR. TOBEROFF:  The rights holder -- strike that.

8              Now, your opinion, as set forth in your report, is

9    that the property the Green Hornet is as valuable a property

10   as Superman was in 2002; is that correct?

11   A.   Correct.

12   Q.   And this is based solely on your personal point of view

13   that Green Hornet is a, quote, cooler character, end quote,

14   than Superman; correct?

15   A.   And also based on my experience at Universal in

16   developing the Green Hornet character as a film that we almost

17   made at Universal.

18   Q.   I'd like to read from your deposition at page 168, line

19   25, through page 169, line 2.

20             And this was regarding testimony as to the Green

21   Hornet.

22             "QUESTION:  What is the basis of your pain?

23             "ANSWER:  My own point of view.  I think the Green

24        Hornet is a cooler character than Superman.  Period."

25             The Green Hornet was a basis for a television show

1406

1   that was canceled after just one season in 1966-1967; correct?

2   A.   I don't know if it was one season, but it didn't run very

3   long, yes.

4   Q.   Yet your opinion is that the Green Hornet character is

5   iconic based on this short-lived television series; correct?

6   A.   In part, yes.

7   Q.   Other than the film rights to Action Comics No. 1, which

8   have been so far held to be -- to have been nonexclusively

9   transferred to Warner Brothers, the remaining of the Superman

10  copyright interest transferred to Warner Brothers in the

11  Superman film agreement were exclusive in your opinion;

12  correct?

13  A.   Yes.

14  Q.   So you would agree, then, that the vast majority of the

15  rights licensed to Warner Brothers in the Superman film

16  agreement remained exclusive to Warner Brothers; correct?

17  A.   Correct.

18  Q.   In your opinion is that in 1999, 2002, Superman was not a

19  good candidate for a franchise movie; is that right?

20  A.   Yes.

21  Q.   Did you consult --

22       MR. BERGMAN:  Excuse me, Mr. Toberoff.  May I just

23  ask the witness to speak up.

24       THE WITNESS:  Oh, I'm sorry.

25  Q.   BY MR. TOBEROFF:  Did you consult with Alan Horn, who

1407

1    green lit the development of the Superman move and Superman

2    Returns before forming your opinion?

3    A.    No, I did not.

4    Q.    Did you consult with Paul Levitz before forming your

5    opinion?

6    A.    No, I did not.

7    Q.    Did you review the Warner Brothers documents dated

8    between 1999 and 2006, which state that Superman was viewed by

9    Warner Brothers as the basis for a, quote, tent-pole picture,

10   end quote?

11   A.    I have not seen those documents.

12   Q.    Did you review the Warner Brothers documents dated

13   between 1999 and 2006, which stated that Superman was viewed

14   by Warner Brothers as the basis for a franchise motion

15   picture?

16   A.    I did not see any such documents.

17   Q.    You nonetheless opine in your report that it would have

18   been a stretch to assume that a new Superman movie would be a

19   tent-pole movie; isn't that right?

20   A.    Correct.

21   Q.    Superman Returns was in fact a big summer tent-pole

22   movie, wasn't it?

23   A.    In the sense that a lot of money was spent on the

24   production and marketing of the movie, yes.

25   Q.    Warner Brothers spent over $400 million on producing and

1    marketing the film; correct?

2    A.   Yes.

3    Q.   And starting in the mid-1990's, Warner Brothers invested

4    tens of millions of dollars.  We heard testimony that it in

5    fact spent $60 million developing a new Superman movie; is

6    that right?

7    A.   Correct.

8    Q.   But Superman was not a highly valuable franchise property

9    in your opinion?

10   A.   I believe my opinion was that it was a valuable property.

11   And beyond that, I didn't know how to quantify that.

12   Q.   How it's not a franchise property.  That would be a

13   stretch; correct?

14   A.   At the time.  In view of the four previous Superman

15   films, my view is that it would be a stretch.

16   Q.   Switching to the subject of comic books.  You're not

17   particularly familiar with the comic book industry, are you?

18   A.   No, I'm not.

19   Q.   In forming your opinion about the supposed unpopularity

20   of Superman between 1999 and 2002, you did not view a single

21   demographic study as to Superman's popularity, did you?

22   A.   No, I didn't find that relevant.

23           MR. TOBEROFF:  Move to strike after "no."

24           THE COURT:  It's stricken after "no."

25   Q.   BY MR. TOBEROFF:  Yet you opined that the Superman

1    character appeals principally to middle-aged men and women;

2    isn't that right?

3    A.    Yes.

4    Q.    You did not conduct any demographic research to support

5    this conclusion, did you?

6    A.    No, I did not.

7    Q.    You did not review any demographic evidence to support

8    this conclusion either, did you?

9    A.    No.

10    Q.    You did not ask defendants for any such evidence, did

11    you?

12    A.    No.

13    Q.    And defendants did not provide you any such demographic

14    studies or evidence, did they?

15    A.    They did not.

16    Q.    You also did not ask defendants for any marketing

17    information regarding Superman before forming your opinions,

18    did you?

19    A.    Correct.

20    Q.    Defendants never provided you with any?

21    A.    Did not, yes.

22    Q.    You testified in your deposition that comic books are

23    less valuable to film studios as underlying material for a

24    film because they lack well delineated story lines; is that

25    correct?

1410

```
1   A.   Correct.
2   Q.   Now, you served as an expert on behalf of Warner Brothers
3   in the recent lawsuit between 20th Century Fox and Warner
4   Brothers over the film rights to the comic book Watchmen;
5   right?
6   A.   Yes.
7   Q.   Are you familiar with the film Watchmen?
8   A.   Yes, I am.
9   Q.   Didn't the Watchmen film in fact follow the graphic
10  Watchmen story line almost panel by panel?
11  A.   I'm not familiar with the novel.  So I can't answer that
12  question.
13  Q.   You also testified in your deposition that comic books
14  are less valuable to film studios because comic books
15  purportedly lack fully realized characters.
16        Do you recall that?
17  A.   Yes, I do.
18  Q.   Batman and his alter ego Bruce Wayne is not a fully
19  realized character?
20  A.   Not in the sense of what I was referring to.
21  Q.   Superman and his alter ego Clark Kent are not fully
22  realized characters?
23  A.   Again, not in the sense that I was referring to.
24  Q.   You are familiar with Universal made a very lucrative
25  deal with Hasbro over the film rights to five or six board
```

```
 1   games, are you not?

 2           MR. BERGMAN:  Objection.  Assumes a fact not in

 3   evidence.

 4           THE WITNESS:  I've never --

 5           THE COURT:  Wait a second.  It's a question.  Are

 6   you familiar with this?

 7           THE WITNESS:  Not at all.

 8           THE COURT:  Move along.

 9   Q.   BY MR. TOBEROFF:  Regardless of your familiarity with

10   that agreement, do board games like Battleship have well

11   delineated story lines and characters?

12           MR. BERGMAN:  Objection.  Lack of foundation.

13           THE COURT:  Sustained.

14   Q.   BY MR. TOBEROFF:  Are you familiar with the board game

15   Battleship?

16   A.   Yes.

17   Q.   Does Battleship have well delineated story lines and

18   characters?

19   A.   Not necessarily, no.

20   Q.   Does Monopoly have well delineated story lines and

21   characters?

22   A.   No.

23   Q.   If I told you that Universal made a very lucrative deal

24   for Hasbro in which they licensed the film rights to Monopoly

25   and Battleship, what in your opinion would be the reason
```

1    Universal was making that deal?

2            MR. BERGMAN:  Objection.  Assumes a fact not in

3    evidence and calls for speculation.

4            THE COURT:  I assume the reason they are doing the

5    deal is because they want to make money.  Counsel, I don't

6    know what --

7            MR. TOBEROFF:  I'm asking for his perception of

8    value in acquiring --

9            THE COURT:  There's no foundation for him to assess

10   that value.  Objection sustained.

11   Q.   BY MR. TOBEROFF:  You are aware that the Disney film

12   franchise Pirates of the Caribbean comes from a Disney theme

13   park ride, are you not?

14   A.   Yes, I am.

15   Q.   Do theme park rides such as Disney's Pirates of the

16   Caribbean have well delineated story lines and characters?

17   A.   Not typically.

18   Q.   You are an expert in the -- on behalf of the producer

19   Saul Zaentz in his case against Newline involving the Lord of

20   the Rings film series; correct?

21   A.   Yes.

22   Q.   In that case Newline contended that for purposes of Saul

23   Zaentz's gross participation, you cannot include the amounts

24   of money received by Newline's foreign subdistributors;

25   correct?

1    A.    Correct.

2    Q.    However, your opinion on behalf of Mr. Zaentz was that

3    for purposes of Mr. Zaentz's gross participation, gross should

4    include what Newline sub distributors received at the source;

5    isn't that correct?

6    A.    Based on my clear reading of the agreement, yes.

7    Q.    Now, you testified that Superman Returns is in a serious

8    deficit position for both Legendary and Warner Brothers.

9    A.    Based on the participation statements that I've received,

10   yes.

11   Q.    And that participation statement was particularly a

12   participation statement from Warner Brothers to Legendary

13   Pictures dated March 31, 2008; correct?

14   A.    I believe so, yes.

15   Q.    And based on that participation statement, your

16   opinion is that the worldwide gross of the picture inuring

17   to Warner Brothers, quote, from all sources, end quote, was

18   $220 million; correct?

19   A.    I think that's --

20            MR. BERGMAN:  Objection.  Misstates the testimony.

21            THE WITNESS:  I just don't remember the --

22            THE COURT:  Wait.  I'll sustain the objection.  And

23   go ahead and read the testimony if you have that.  That would

24   be helpful, Counsel.

25            MR. TOBEROFF:  I'm reading from your expert report

1    at page 7 first.

2              "According to the participation statement as of

3    March 31, 2008, issued by Warner to Legendary Pictures in

4    respect of Superman Returns, the worldwide gross of the

5    picture inuring to Warner from all sources as distinguished

6    from the theatrical box office gross which Warner shares with

7    exhibitors, as of that date amounted to $220 million.

8              Do you recall writing that in your report?

9    A.   Yes, I do.  I would have to review the participation

10   statement to remember my methodology.

11   Q.   I'd like to show you what's been previously admitted by

12   plaintiffs -- previously been admitted as Plaintiffs'

13   Exhibit 292.  It's the March 31, 2008, participation statement

14   from Warner Brothers to Legendary.

15             THE COURT:  Counsel, how much longer do you have

16   with your examination approximately?

17             MR. TOBEROFF:  I'd say about 50 minutes, your Honor,

18   45 minutes.

19             THE COURT:  Okay.  Why don't we go ahead and take

20   our break at this time.  We'll come back in about 15 minutes.

21             You have no further witnesses after this witness; is

22   that correct?

23             MR. BERGMAN:  That's correct.

24             THE COURT:  Very well.  All right.

25             (Recess taken.)

1          THE COURT:  Counsel, you may proceed.

2          MR. TOBEROFF:  Thank you, your Honor.

3  Q.   Do you have in front of you Plaintiffs' Exhibit 292,

4  participation statement from Warner Brothers to Legendary?

5  A.   Yes, I do.

6  Q.   This is the participation that you reviewed in forming

7  your opinion that the gross of Superman Returns for Warner

8  Brothers was $220 million; right?

9  A.   It is the statement I reviewed, yes.

10 Q.   I'd like to direct your attention to the line located on

11 the page Bates numbered WB 135885.  That says, quote, defined

12 gross after distribution fee, end quote.

13 A.   Correct.

14 Q.   And what's that number?

15 A.   219,6000,000.

16 Q.   Is this the source of your opinion that the worldwide

17 gross of the picture inuring to Warners from all sources was

18 $220 million?

19 A.   Yes, although I intended to say excluding video, as I see

20 what the error was.

21         MR. TOBEROFF:  Move to strike after "yes."

22         THE COURT:  It's stricken.

23 Q.   BY MR. TOBEROFF:  The line above says distribution fee in

24 the amount of 24,842,742.

25         Do you see that?

1    A.    Yes, I do.

2    Q.    And that distribution fee would be paid to Warner

3    Brothers, wouldn't it?

4    A.    Yes, for service.

5    Q.    You neglected also to include this nearly $25 million

6    figure in the gross inuring to Warner's benefit, didn't you?

7    A.    Yes, because I believe that Warner Brothers cost based

8    distribution fee is roughly 11 percent so that it was a wash.

9    And I just factored it out.

10              MR. TOBEROFF:  Move to strike after "yes."

11              THE COURT:  It is.  Just answer the question.  Your

12   Warner Brothers attorney will be up and will ask you some

13   follow-up questions.

14              THE WITNESS:  I see.  Thank you.

15   Q.    BY MR. TOBEROFF:  I'd like to draw your attention,

16   please, to the lines above the distribution fee where the

17   statement lists the sources of revenues.

18   A.    Yes.

19   Q.    None of these sources include video revenues; correct?

20   A.    That's correct.

21   Q.    Video revenues typically comprise nearly 50 percent of

22   worldwide revenues, don't they?

23   A.    Could be, yes.

24   Q.    You nonetheless based your opinion that Warner Brothers

25   was in a serious deficit position on Superman Returns without

1417

1    including Warner Brothers distribution fee or video revenues;

2    is that correct?

3    A.    That's incorrect.

4    Q.    Did you include the video revenues in your determination

5    that Warner Brothers was in a serious deficit position?

6    A.    Yes, I did.

7    Q.    Is that in your expert report?

8    A.    I'm not sure that it is, but it's on the face of the

9    participation statement that I had reviewed which shows a

10   deficit of $174 million.

11   Q.    But it's not in your expert report, is it?

12   A.    Well, forgive me.  I referred to distribution expenses

13   of $165 million and an investment and negative cost of

14   $242 million.

15   Q.    But you don't refer to the video -- revenues of Warner

16   Brothers, do you?

17   A.    That's correct.

18   Q.    And you also don't refer to the money Warner Brothers

19   makes from its distribution fee in your report?

20   A.    Which I did not regard as exploitation proceeds, yes, I

21   did not.

22          MR. TOBEROFF:  Strike as nonresponsive everything

23   before "yes."

24          THE COURT:  Stricken.

25   Q.    BY MR. TOBEROFF:  Now, Mr. Gumpert, your opinion is that

1418

1    the first Superman movie released in 1978 was the 196th

2    highest grossing film of all time; isn't that correct?

3    A.    It was based on research that I had done, I believe, on

4    the -- on the Box Office Mojo website.

5    Q.    This ranking is not adjusted for inflation, is it?

6    A.    That's correct.

7    Q.    And are you aware that Box Office Mojo website actually

8    has figures adjusted for inflation?

9    A.    Yes, I do.

10   Q.    But you chose not to use those figures; correct?

11   A.    I don't know their methodology.  So I chose not to use

12   it.

13   Q.    In fact, throughout your report in mentioning figures and

14   comparing figures of various films, you never adjust for

15   inflation; isn't that right?

16   A.    Just as any business affairs executive doesn't adjust for

17   inflation, yes.

18           MR. TOBEROFF:  Move to strike everything before

19   "yes" as nonresponsive.

20           THE COURT:  Granted.  Just try to answer the

21   question.

22           THE WITNESS:  I apologize.

23   Q.    BY MR. TOBEROFF:  In fact, defendants introduced into

24   evidence Exhibit 1123 showing that the 1978 Superman film was

25   actually number 61 with a box office of nearly 412 million

1419

```
1   once adjusted for inflation.  Are you aware of that?
2   A.    No, I'm not.
3   Q.    And in 1978, major films were released in not nearly as
4   many theaters as the 3500 theater releases would have; isn't
5   that correct?
6   A.    Probably correct, yes.
7   Q.    Nor do they spend nearly as much money marketing such
8   films, did they, back in 1978, when compared to today?
9   A.    That's correct.
10  Q.    You believe that $10 million in 1970 has a much greater
11  value than in 2008; correct?
12  A.    Are you saying $10,000 in 1970 versus $10,000 today?
13  $10 million dollars today?
14  Q.    $10 million in 1970 has a much greater value than in
15  2008?
16  A.    Yes.
17  Q.    Nonetheless, in writing your expert report, you did not
18  account for inflation when computing box office results across
19  time, did you?
20  A.    That is correct.
21  Q.    You also did not adjust for inflation when comparing the
22  economic terms of agreements, did you?
23  A.    I'm not sure what you mean, but I did not adjust for
24  inflation.
25  Q.    Did you adjust for inflation when comparing financial
```

1  terms in agreements?

2  A.    No, did not.

3  Q.    You also did not do any net present value analysis when

4  speaking of the payment of the annual option renewal fees in

5  the Superman film agreement which you have now testified to as

6  being for $20 million; isn't that correct?

7  A.    Yes.

8  Q.    Even though those payments are spread out over 34 years?

9  A.    Correct.  Possibly, I should add.

10  Q.    Your opinion is that in -- strike that.

11        Your opinion is that under the Superman film

12  agreement, Warner's option payments aggregating $20 million

13  over a 34-year period are the equivalent of a $20 million

14  purchase price; is that right?

15  A.    Yes.

16  Q.    Warner is not under any obligation to make any payment

17  other than the initial million five option payment under the

18  Superman film agreement, is it?

19  A.    They are under no obligation, but they run the risk of

20  losing the rights, yes.

21        MR. TOBEROFF:  Move to strike as nonresponsive after

22  "obligation."

23        THE COURT:  Stricken.

24  Q.    BY MR. TOBEROFF:  And you did not consider the net

25  present value of the $20 million payments in 2002 when the

1421

1    parties entered into the agreement, did you?

2    A.    No.  Because it is --

3            THE COURT:  I'll stop you there.  It's a yes or no

4    question.  It's cross-examination.

5            THE WITNESS:  No.

6    Q.    BY MR. TOBEROFF:  Switching to the topic of Tarzan.  You

7    reviewed the Tarzan rights agreement, Defense Exhibit 1085, to

8    1086?  Did you review it in connection with your expert report

9    in rendering your opinion in this case?

10   A.    Which one was that dated?  There were several Tarzan

11   agreements.

12   Q.    I'm referring to all the Tarzan agreements.

13   A.    I looked at all the Tarzan agreements, and, as I said in

14   my report, I decided to exclude the 2006 agreement as not

15   being within the time period.

16           MR. TOBEROFF:  Move to strike after "agreement."

17           THE COURT:  Your question was I'm referring to all

18   the Tarzan agreements.  I'm not sure what your question was.

19   So I'm not going to strike the question or the answer.  Your

20   next question.

21           MR. TOBEROFF:  Very well.

22   Q.    In reviewing the Tarzan agreements, did you check when

23   the first Tarzan book by Edgar Rice Burroughs was published?

24           MR. BERGMAN:  Objection.  Relevance.

25           THE COURT:  I'm not sure what the relevance is,

1422

```
 1   Counsel.  Where is this going?
 2             MR. TOBEROFF:  Its relevance is to valuation of
 3   Tarzan.
 4             THE COURT:  I'll overrule it and give you some
 5   latitude.  Overruled.
 6             THE WITNESS:  I believe I did some Internet
 7   research.  I indicated that the first Tarzan publication was
 8   early in the 20th Century.
 9   Q.   BY MR. TOBEROFF:  Are you aware that the first Tarzan
10   book was published in 1912 to be exact?
11   A.   I believe so.
12   Q.   Are you also aware that works published before 1923 are
13   in the public domain?
14   A.   Yes.
15   Q.   And that if -- were you aware that there were a total of
16   approximately 40 Tarzan stories by Edgar Rice Burroughs?
17   A.   I believe that was an exhibit to one of the agreements
18   that I saw, yes.
19   Q.   Of these first 20 Tarzan stories published before 1923 in
20   the public domain -- you're aware of that fact?
21   A.   If they were published before 1923, I'm aware that they
22   were in the public domain.
23   Q.   In analyzing and comparing the terms of the Tarzan
24   agreement to the terms of the Superman agreement, you did not
25   take into effect the fact that the Tarzan character itself was
```

1    in the public domain, did you?

2    A.    The Tarzan character itself?

3    Q.    Yes.

4    A.    It may be the case.  I'm just unaware that the Tarzan

5    character itself is in the public domain.  I'm aware that

6    certain of the prior works are in the public domain.

7    Q.    Are you aware that the Tarzan character appeared in the

8    first 22 Tarzan stories?

9    A.    I assume so, but I don't really know.  Never read them.

10   Q.    You also reviewed the Conan agreements in connection with

11   your analysis, Defense Exhibits 1093 to 1094; correct?

12   A.    Yes.

13   Q.    Do you know who created Conan?

14   A.    As a matter of fact, I don't.

15   Q.    Do you know when Conan was first created?

16   A.    I'm not sure.

17   Q.    Did you investigate whether any of the Conan works were

18   in the public domain like the Tarzan works?

19   A.    I did not, no.

20   Q.    In valuing the terms of the Conan agreement, did you take

21   into account that the Conan stories created between 1932 and

22   1963 were in fact in the public domain due to the failure to

23   renew the copyright to those stories?

24            MR. BERGMAN:  Objection.  Assumes facts not in

25   evidence.

```
 1              THE COURT:  As phrased.  Rephrase, Counsel.
 2   Q.   BY MR. TOBEROFF:  Were you aware that whether or not --
 3   did you investigate whether or not the Tarzan stories were
 4   under copyright -- excuse me.
 5              Were you aware as to whether Conan stories created
 6   between 1932 and 1963 were in the public domain?
 7              MR. BERGMAN:  Same objection, your Honor.
 8              THE COURT:  It does assume a fact not in evidence as
 9   phrased.
10   Q.   BY MR. TOBEROFF:  Were you aware as to the copyright
11   status of the Conan stories created between 1932 and 1963?
12   A.   No, I'm not.
13   Q.   Moving to a new topic.
14              You negotiated the co-financing and distribution
15   agreement between Universal and Warner for the movie Twister
16   on behalf of Universal; correct?
17   A.   Yes.
18   Q.   And as the chief negotiator for Universal, you were
19   concerned with whether Warner's intercorporate agreement with
20   HBO was for fair market value.
21              Isn't that so?
22   A.   Correct.
23   Q.   You raised this issue with Warner -- you raised the issue
24   of Warner's internal arrangements with HBO with your
25   counterpart at Warner; correct?
```

1425

1   A.   Yes.

2   Q.   In fact, Warner's arrangements with HBO were more

3   favorable to Warner Brothers than Universal's comparable

4   arrangements with Starz Encore; is that correct?

5   A.   Yes, it is.

6   Q.   This would mean that such arrangements were less

7   favorable to HBO and more favorable to Warner Brothers;

8   correct?

9   A.   I don't know how to answer that question.  All I can say

10  is that the amount of license fees paid by HBO to Warner

11  Brothers were greater than what would have been paid by Starz

12  Encore to Universal.

13  Q.   So since the amount of fees were greater for Warner

14  Brothers, that term was more favorable to Warner Brothers and

15  less favorable to HBO; correct?

16  A.   I don't know how to answer that.  HBO has a far greater

17  subscriber base than Starz Encore.

18  Q.   The Warner executive you dealt with regarding that

19  transaction informed you that Warner had a strict policy of

20  ensuring that transactions between affiliates were at the top

21  of the market; correct?

22  A.   Yes.

23  Q.   My question is if a transaction is at the top of the

24  market for one affiliate, isn't it naturally at the bottom of

25  the market for the other affiliate?

1426

1   A.    It would be pure speculation on my part.

2   Q.    Now, you worked at Universal Pictures from 1990 until

3   2001; correct?

4   A.    Yes.

5   Q.    During that time, isn't it true that the novel Time Line

6   by Michael Creighton, Plaintiffs' Exhibit 325, was subject to

7   a bidding war amongst multiple studios while you were at

8   Universal?

9   A.    I'm not sure if I'd described it as a bidding war, but

10  the novel was offered to Universal as well as to Paramount, I

11  guess, that ultimately acquired it.

12  Q.    I'd like to read your answer from your deposition at page

13  102, line 21, to page 103, line 6:

14         "QUESTION:  Do you recall any bidding wars for the

15      next work by a best selling author?

16         "ANSWER:  Yes.  For the John Grishams and Tom

17      Clancy's of this world.

18         "QUESTION:  Which bidding wars do you recollect

19      regarding John Grisham and Tom Clancy?

20         "ANSWER:  Michael Creighton, one.  Airframe and Time

21      Line, which I think is also Michael Creighton."

22         Did I ask those questions and did you give those

23  answers at your deposition?

24  A.    Yes, I did.

25  Q.    While you were at Universal, Universal was also involved

1    in a bidding war for the Thomas Harris novel Hannibal;

2    correct?

3    A.    No, it's not.

4              THE COURT:  You understand what a bidding war means?

5              THE WITNESS:  Yes.  Universal didn't acquire the

6    Thomas Harris novel.  Dino De Laurentiis did.

7              MR. TOBEROFF:  Move to strike the last sentence.

8              THE COURT:  Well, there was no --

9              MR. TOBEROFF:  As nonresponsive.  There's no

10   question pending.

11             THE COURT:  There's no question pending.  Stricken.

12   Q.    BY MR. TOBEROFF:  When Universal acquired the rights to

13   Hannibal, being the successor of the Hannibal agreement, which

14   is Exhibit 307; isn't that correct?

15   A.    That is correct.

16   Q.    And Universal did not object to the terms in that

17   agreement.  They accepted them and succeeded to the agreement?

18   A.    They accepted the terms, but they weren't happy about

19   them.

20   Q.    Did they object to the terms?

21   A.    No.  What they did was bring in a financing partner, MGM,

22   because there was so much gross out.

23             MR. TOBEROFF:  Move to strike after "no" as

24   nonresponsive.

25             THE COURT:  Stricken.

```
 1   Q.   BY MR. TOBEROFF:  Now, agents representing high end

 2   literary properties usually offer their clients works to more

 3   than one studio, don't they?

 4   A.   What sort of literary properties are we talking about?

 5   Q.   Well-known literary properties?

 6   A.   On the contrary, with respect to novels and what I'll

 7   call spec screenplays, typically that is the case, where

 8   agents offer them to a variety of studios.

 9        With respect to characters, which I think is what

10   we're talking about, that's hardly ever the case.  Generally

11   the agent picks a studio that they want to do business with on

12   that character for whatever reason they have, and that's --

13   and the negotiation is between two parties.

14   Q.   But according to you, they don't do that with novels or

15   screenplays?

16   A.   That's correct.

17   Q.   Just with everything else.

18   A.   Generally, yes.

19   Q.   Are you familiar with the bidding war that occurred over

20   Microsoft's game Halo?

21   A.   Not at all.

22   Q.   Was -- do you know what Halo is?

23   A.   I know what it is.

24        MR. BERGMAN:  Objection.  Assumes facts not in

25   evidence and goes beyond the direct.
```

1429

```
 1              THE COURT:  Overruled.  Do you know what Halo is?
 2              THE WITNESS:  Halo, as I understand it, is a
 3    Microsoft game.
 4    Q.   BY MR. TOBEROFF:  Did Universal bid on Halo?
 5    A.   I wasn't there at the time.  I don't know.
 6    Q.   Are you aware otherwise?
 7    A.   I believe that Universal and 20th Century Fox jointly
 8    acquired the rights.
 9    Q.   Was Halo a novel or spec screenplay?
10    A.   No.
11    Q.   Are you aware whether Hasbro, after the success of the
12    Transformer movie, are you aware that Hasbro offered the film
13    rights to board games to a number of different studios, and it
14    ended up at Universal?  Are you aware of that?
15              MR. BERGMAN:  Objection.  Assumes facts not in
16    evidence.
17              THE WITNESS:  No, I'm not.
18              THE COURT:  As phrased, sustained.
19    Q.   BY MR. TOBEROFF:  Now, when an agent offers a property to
20    various studios, as you've testified, they normally do it at
21    the highest end of the market.  They normally set the price at
22    the highest end of the market, don't they?
23    A.   I assume so, yes.
24    Q.   Mr. Gumpert, you testified that Warner Brothers'
25    copyright interests from the prior Superman films would make
```

1430

1    it, quote, very difficult, end quote, to find a buyer for DC's

2    rights because of the possibility that Warner Brothers launch

3    a competing product based on the copyrights Warner Brothers

4    already controlled.

5            Do you recall that testimony?

6            MR. BERGMAN:  Objection.  Misconstrues and misstates

7    the testimony.

8            THE COURT:  Rephrase your question, Counsel.

9    Q.   BY MR. TOBEROFF:  Mr. Gumpert, do you recall testifying

10   that Warner Brothers copyright interest from the prior

11   Superman films 1 through 4 would make it, quote, very

12   difficult, end quote, to find a buyer for DC's rights because

13   Warner Brothers could purportedly launch a competing product

14   based on the Superman copyrights they control?

15           Do you recall that testimony?

16           MR. BERGMAN:  Same objection.  Misstates the

17   testimony.

18           THE COURT:  Sustained.

19   Q.   BY MR. TOBEROFF:  The testimony is on --

20           THE COURT:  If you have it, Counsel, let him read

21   the testimony.

22           MR. TOBEROFF:  I'll retrieve it.  It's on page 81,

23   lines 7 through 21.

24           THE COURT:  81, lines 7 through 21.

25           MR. TOBEROFF:  Your Honor, may my colleague read it

1    into the record?

2              THE COURT:  Yes.

3              MR. ADAMS:  And this is from the rough from this

4    morning.

5              "Does the fact that Warner Brothers holds some

6         copyright interest in the prior films and television

7         shows affect any way your evaluation as to the fair

8         market value of the DC rights that were transferred to

9         Warner?

10             "ANSWER:  Yes.

11             "QUESTION:  In what way does that figure in, sir?

12             "ANSWER:  Because of the copyrights held by Warner

13        Brothers with respect to the prior films, it would be

14        very difficult to find a substantial buyer, a studio, for

15        example, for the Superman rights after the fourth film

16        had been released.

17             "QUESTION:  Why is that?

18             "ANSWER:  Because you run the risk of infringing on

19        Warner Brothers's rights, you have to be very careful

20        about that.  And Warner Brothers could always come up

21        with a competing product based on the copyrights that

22        they control."

23             THE COURT:  And your question with respect to that

24    testimony, Counsel?

25    Q.  BY MR. TOBEROFF:  My question is other than distributing

1432

```
 1    the old Superman films, Warner Brothers could not launch a
 2    competing product without a license from DC, could it?
 3    A.    I'm not sure that they couldn't do a remake of one of the
 4    prior films without a new license from DC.  I'm just not sure.
 5    Q.    Do you know one way or another?
 6    A.    I think they could until somebody shows me evidence of
 7    the contrary.
 8    Q.    Even though they don't have a license of the underlying
 9    Superman copyrights of which the films are derivative works,
10    you believe they could go and make more Superman derivative
11    works?
12    A.    That's not what I said.  I said they could do a reprice
13    remake of the films to which they own the copyrights.
14    Q.    Even though they wouldn't have underlying rights to the
15    Superman copyright?
16    A.    I think that --
17              MR. BERGMAN:  Objection.  That question assumes
18    facts not in evidence.
19              THE COURT:  Sustained.
20              MR. BERGMAN:  And is argumentative.
21    Q.    BY MR. TOBEROFF:  Now, in your expert report at page 9,
22    the middle of the page, quote, if Warner had, quote, dark, end
23    quote, motives, its motivation might have been to skew the
24    licensing arrangements in favor of DC due to the trend towards
25    co-financing.
```

1433

```
 1              Do you recall that?
 2   A.    Yes, I do.
 3   Q.    Are you familiar with co-financing agreements?
 4   A.    Yes, I am.
 5   Q.    A co-financing arrangement is generally between a studio
 6   and a financing partner; correct?
 7   A.    Correct.
 8   Q.    And those financing partners are made aware of gross
 9   participation before they agree to co-finance; correct?
10   A.    Typically.
11   Q.    All the other factors being equal, financing partners
12   would prefer a lower level of gross participations before
13   financing a film, wouldn't they?
14   A.    Yes.
15   Q.    Gross participations on DC -- on Superman would include
16   DC; isn't that right?
17   A.    Yes.
18   Q.    And would also include the plaintiffs to the extent they
19   participated in the profits of DC, wouldn't it?
20   A.    Yes.  Wouldn't add to the -- to the gross participations.
21   But they may be two participants instead of one.
22   Q.    And Legendary in financing, co-financing Superman Returns
23   would consider DC, of course, to be an affiliate of Warner
24   Brothers?
25   A.    It is --
```

1434

1    MR. BERGMAN:  Objection as to what they would

2  consider.

3    THE COURT:  Sustained.  Foundation.

4  Q.  BY MR. TOBEROFF:  DC is an affiliate of Warner Brothers,

5  isn't it?

6  A.  As I understand it, yes.

7  Q.  Do you believe that a financing partner financing a

8  Superman film would understand that any gross participations

9  paid by Warner Brothers to DC would essentially be paid to the

10 benefit of Time Warner?

11    MR. BERGMAN:  Objection.  Calls for speculation.  No

12 foundation.

13    THE COURT:  Sustained.

14 Q.  BY MR. TOBEROFF:  Do you believe that a gross

15 participation of -- paid to DC would be viewed by a financing

16 partner as inuring to the benefit of Time Warner?

17    MR. BERGMAN:  Objection.  Lack of foundation.

18    THE COURT:  These questions concerning his belief of

19 what somebody else would think are speculation.  No

20 foundation.  Sustained.

21 Q.  BY MR. TOBEROFF:  Do you view that the gross

22 participations paid by Warner Brothers to DC inure to the

23 benefit of Time Warner?

24 A.  I have no idea how internally Time Warner accounts for

25 these things.  No idea at all.

1435

```
1    Q.   Turning to a different subject.  You testified that you

2    reviewed the Conan, Tarzan, and Ironman agreements; correct?

3    A.   Yes.

4    Q.   The Tarzan agreement contains reversion provisions that

5    operate even if a purchase price is paid, even if the option

6    is exercised and the purchase is made; correct?

7    A.   Correct.

8    Q.   The Conan agreement also contains reversion provisions

9    that operate even if the option is exercised and the purchase

10   price is paid; correct?

11   A.   Correct.

12   Q.   And finally, the Ironman agreement contains reversion

13   provisions that operate even if a purchase price is paid and

14   the option is exercised; correct?

15   A.   Correct.

16             MR. TOBEROFF:  I have no further questions at this

17   time, your Honor.

18             THE COURT:  Very well.

19             Redirect?

20             MR. BERGMAN:  Yes, just a bit, your Honor.

21                     REDIRECT EXAMINATION

22   BY MR. BERGMAN:

23   Q.   Does a reversion right have any economic value,

24   Mr. Gumpert?

25   A.   Not really.  Not in this context, no.
```

```
 1   Q.   Did Universal enter into a so-called bidding war for the
 2   Grisham novel as Mr. Toberoff suggested?
 3   A.   No.
 4   Q.   Did it make an offer for the Grisham novel?
 5   A.   I'm not sure which Grisham novel we're talking about.
 6   The one that Universal acquired during my tenure was The
 7   Chamber, and my recollection is there was no bidding war.  It
 8   was a situation where Ron Howard, the director, came to
 9   Universal indicating an interest in directing the film.  And
10   that's the reason we bought it.
11   Q.   If Warner Brothers, after exercising its option under the
12   Superman agreement, doesn't make any further option payments,
13   what happens?
14   A.   It loses its rights under the Superman Returns agreement.
15   Q.   In the film business, Mr. Gumpert, when you talk to other
16   people in the business, when you send offers back and forth
17   and you refer to a film's performance, do you adjust it for
18   inflation?
19   A.   No.  That's not the methodology that business affairs
20   executives at studios use.
21   Q.   To clear up the great mystery of Revisited, have you ever
22   heard of a movie called Revisited?
23   A.   I have not, no.
24   Q.   Have you heard of a movie called Wizard of Id?
25   A.   Well, I've heard of a property called Wizard of Id.
```

1437

```
 1   Q.    And was that Wizard of Id deal with 20th century Fox, as
 2   Mr. Toberoff suggested?
 3   A.    No.
 4   Q.    Who was it with?
 5   A.    With Universal Pictures.
 6   Q.    And as you review that deposition page, does it appear to
 7   you that the stenographer wrote Revisited when you wrote
 8   Wizard of Id?
 9   A.    Yes, I think too many Z's.
10   Q.    Okay.  Does the fact that you didn't include or
11   separately determine the video revenue when you were analyzing
12   Exhibit 292, does that affect in any way the bottom line that
13   the report shows the picture to be at $174 million deficit?
14   A.    No, it does not.
15   Q.    Finally, when you compare comic book heroes, one to
16   another, what basis do you use?
17   A.    Well, there are a number of factors.  One is obviously
18   the prior performance of productions in which the characters
19   have been exploited, such as in Superman's case, the four
20   prior films that would carry a lot of weight.  The other is
21   what I'll call the adaptability of the character to a film.
22   What is the film?
23         Third, and I think very importantly, is the notion
24   of whether or not the character is a movie star.  I guess
25   that's the best way to put it.  As prominent as a character
```

1    may be, it doesn't necessarily mean that it translates into

2    the basis for a successful movie.

3              The current trend, and the trend that's been in

4    existence at least since 2002 and maybe earlier, maybe 2000,

5    starting with X Men, 2002 is when Spiderman -- the first

6    Spiderman was released, is that audiences are interested in

7    characters with flaws, darker characters than Superman.

8    Superman is flawless except for his -- except for kryptonite.

9    And that's, I guess, why the creators of Superman Returns used

10   kryptonite as their plot device, and now that's been done.

11             So I don't know how you now make a film about

12   Superman that fits in with the current trend for what

13   audiences are interested in.

14             MR. BERGMAN:  Thank you, sir.

15             Your Honor, I just have a few exhibits to enter into

16   evidence, and at that point we will rest.

17             THE COURT:  Very well.  Why don't we have some

18   further foundation with Mr. Toberoff.

19             MR. TOBEROFF:  I just have some questions.

20             THE COURT:  Some questions.  You may proceed.

21                       **RECROSS-EXAMINATION**

22   BY MR. TOBEROFF:

23   Q.   Mr. Gumpert, you mentioned that the Shuster termination

24   relating to the Superman copyright interests of the other

25   co-author of Superman, Joseph Shuster, would be effective as

1439

1    of 2013.

2              Do you recall that?

3    A.    Yes.

4              MR. BERGMAN:  Objection.  Beyond the scope of the

5    redirect.

6              THE COURT:  Sustained.

7              MR. TOBEROFF:  No further questions, your Honor.

8              THE COURT:  I take it there's nothing further for

9    the witness?

10             MR. BERGMAN:  Nothing further of the witness.

11             THE COURT:  You are excused, sir.  Thank you.

12             THE WITNESS:  Thank you very much.

13             THE COURT:  All right.  As far as exhibits?

14             MR. BERGMAN:  The additional exhibits we'd like to

15   offer in evidence, your Honor, are Exhibits 1002, 1026, 1027,

16   1028, 1029, 1030, 1085, 1086, 1093, -94, and -95, and -96, all

17   relating to Conan.  And 1102, 1103, 1104, 1105, 1106, and

18   1107.

19             THE COURT:  They relate to what?

20             MR. BERGMAN:  To go back to the beginning, the 1002

21   relates to Justice League of America.

22             1026 and -27 are participation return statements

23   from Warner Brothers to DC regarding the agreements in

24   question.

25             Exhibits 1028 and 1029 relate to the Watchmen

1   agreements we've been discussing.

2           1030 relates to the 1979 Batman agreement.

3           Exhibits 1085 and 1086 relate to Tarzan.

4           Exhibits 1093 through 1096 relate to Conan.

5   Exhibits 1102 relates to the Tarzan agreement.

6           1103, to Gossip Girl.

7           1104, to Human Target.

8           1105 through 1107 relates to Ironman.

9           THE COURT:  Any objections?

10          MR. TOBEROFF:  Your Honor, may I have a moment to

11  review these exhibits?

12          THE COURT:  Yes.

13          MR. TOBEROFF:  Thank you.

14          Your Honor, regarding 1026 to 1027, no objection.

15          1030 --

16          THE COURT:  What about 1002?

17          MR. TOBEROFF:  I was going to do the no objections.

18  You want me to do them in order?

19          THE COURT:  Please.

20          MR. TOBEROFF:  Okay.

21          THE COURT:  And state the objection.

22          MR. TOBEROFF:  1002, there's been no testimony

23  whatsoever on either side regarding that agreement.  So the

24  objection is lack of relevance.  No foundation for the

25  agreement.

```
 1              1026 and 1027, no objection.

 2              1028, the Watchmen agreement, and if I may just skip

 3     over one for a moment.  1085 to 186, the Tarzan agreement,

 4     1093 to 1096, the Conan agreement.  1102, again, Tarzan.

 5     1103, Gossip Girl.  1104, Human Target.  And 1105 to 1107, the

 6     Ironman agreements, the objection is relevance.  Plaintiffs

 7     offered testimony in the form of expert opinion of Mark

 8     Evanier that none of these properties are anywhere near

 9     comparable to Superman in stature, commercial track order,

10     literary or cultural prominence.

11              We presented the expert testimony of Mr. Halloran,

12     who opined similarly to Mr. Evanier from the perspective of an

13     entertainment industry executive and expert of the defendants

14     offered no evidence whatsoever to rebut that, offered no

15     evidence whatsoever as to whether these characters or

16     properties are anywhere as comparable to Superman.

17              So if they are not comparable to Superman and they

18     contain -- and we have evidence saying they contain lesser

19     terms to the Superman agreement, they have no relevance

20     because the lesser property with lesser terms can only be

21     expected and doesn't shed light on the issue before the Court.

22              The Exhibit 1030, the 1979 Batman agreement, no

23     objection to that.

24              THE COURT:  Mr. Bergman?

25              MR. BERGMAN:  Your Honor, all of the agreements to
```

1442

1    which counsel is objecting were all discussed during the

2    course of the trial.  Our witnesses made reference to their

3    comparability.  Mr. Gumpert just made references to

4    comparability.  We have admitted in without any objection all

5    of the agreements that the plaintiffs have offered.

6         Obviously, the weight to be given to any of these

7    agreements is a matter for your Honor to determine, just as

8    the relevance of them is for your Honor to determine.  To

9    argue that Ironman and these other agreements aren't relevant

10   to the issue is to ignore what we've been doing for the past

11   two weeks.

12        THE COURT:  What about 1002?  Counsel, there's no

13   testimony as to the Justice League action heroes.

14        MR. BERGMAN:  That may be true, your Honor.  We had

15   a tendency throughout the proceeding to deal with the

16   animation agreements as a group.  And that is one of the

17   animation agreements, and I won't represent to the Court, but

18   I believe I asked Mr. Levitz about it, but I don't make that

19   representation.

20        THE COURT:  Anything further?

21        MR. BERGMAN:  Nothing, your Honor.

22        THE COURT:  All right.  With respect to

23   Exhibit 1002, I'll sustain the objection.  With respect to

24   1026 and 1027, they are admitted without objection.  With

25   respect to 1028 and 1029, the objection is overruled.  The

1    argument goes to the weight to be assigned to the evidence.

2    1030 is admitted without objection.  1085, 1086, 1093, 1094,

3    1095, 1096, 1102, 1103, 1104, 1105, 1106, and 1107, the

4    objection is overruled.  They are admitted.  The argument goes

5    to the weight to be assigned to the evidence.

6              Anything further from the defense?

7              MR. BERGMAN:  No, your Honor.

8              THE COURT:  You rest?

9              MR. BERGMAN:  We rest.

10             THE COURT:  Any rebuttal from the plaintiff?

11             MR. TOBEROFF:  Our only rebuttal, your Honor, is we

12   would also, in light of your Honor's ruling just now regarding

13   the admission of these exhibits, we'd ask for admission of the

14   Harry Potter agreements that have been consistently referred

15   to in this case, which are Exhibits 1097 to 1099.  Defendants

16   offer those exhibits, and we have no objection.

17             THE COURT:  Counsel?

18             MR. BERGMAN:  Your Honor, we have the same sealing

19   issue with respect to those agreements, your Honor.  But given

20   that there is this provisional order, I have no objection.

21   But I would like to reserve the right to withdraw them if they

22   are not going to be put under seal.

23             THE COURT:  Very well.  They are admitted.  1097 and

24   1098 and 1099, the provisional sealing applies to those

25   exhibits.

1          **(Exhibits 1026, 1027, 1028, 1029, 1030, 1085,**

2          **1086, 1093, 1094, 1095, 1096, 1102, 1103,**

3          **1104, 1105, 1106, and 1107 received**

4          **in evidence.)**

5          THE COURT:  We'll take up the issue of sealing as

6     soon as I receive the opposition from the plaintiffs.

7          MR. TOBEROFF:  And the only thing left in rebuttal

8     is I would respectfully ask your Honor to revisit one exhibit

9     in which there was a certain amount of confusion in discussing

10    it relating to your Honor's prior testimony regarding that

11    exhibit and relate exhibits.  And that is Exhibit 327.  It was

12    the Red Rabbit agreement.

13          And the reason I believe your Honor did not admit it

14    was because of an argument by defense -- defendants that a

15    certain paragraph which made reference to the Sum of All Fears

16    agreement, which your Honor also has before it, without the

17    Sum of All Fears agreement, it would be rendered incomplete.

18          THE COURT:  Right.

19          MR. TOBEROFF:  And plaintiffs would submit that your

20    initial ruling regarding the Sum of All Fears agreement was

21    that it would be admitted for reference purposes.  And given

22    that you have it and you can refer to it and would like these

23    agreements before you, I believe it's -- if the Sum of All

24    Fears agreement is looked at for reference purposes, there's

25    no problem remaining regarding the Red Rabbit agreement.  And

1445

1    I would ask that that be admitted along with these other

2    agreements.

3              THE COURT:  Counsel?

4              MR. PERKINS:  Your Honor, we have a different view

5    of that.  We don't believe that the Sum of All Fears

6    agreement, first of all, should be looked at for reference.

7    It is incomplete.  And second of all, we don't believe that it

8    cures the problem with Red Rabbit.  It's simply incomplete.

9    They are both incomplete, and we respectfully request that

10   they not be admitted.

11             THE COURT:  How is the Sum Of All Fears that we have

12   here for reference incomplete?

13             MR. PERKINS:  Well, if you'll recall, your Honor, we

14   tried to put the Sum of All Fears agreement into evidence, and

15   Mr. Toberoff objected strenuously to that.  And he said that

16   the reason he hadn't put it in was not because the terms were

17   less favorable as we had posited, but rather that there were a

18   number of pieces missing to that document.

19             THE COURT:  Fine.

20             MR. TOBEROFF:  Your Honor, if I may, using an

21   agreement for reference purposes --

22             THE COURT:  I don't understand this for reference

23   purposes.  Either an exhibit is in, and I take the exhibits, I

24   go back in my chambers, and I have the exhibit.  I don't have

25   some document out here for reference purposes.  It's either in

1    or it's out.  And the Sum of All Fears is out.  On your

2    objection; correct?

3           MR. TOBEROFF:  Actually, the Court's response was

4    that you were going to -- I may not be using the --

5           THE COURT:  You objected to the Sum of All Fears

6    being introduced; correct?

7           MR. TOBEROFF:  I objected.  And over that objection,

8    the Court -- we read from the record -- stated that it would

9    take the Sum of All Fears agreement for purposes of -- maybe

10   reference is the wrong word.  But my memory was that something

11   was stated to the effect of you were going to use it because

12   the other agreements that were in evidence or that had been

13   identified for admission into evidence would make reference to

14   it.

15          THE COURT:  Let's do it one way or the other.  Is it

16   going to come in, or is it going to come out from your

17   perspective?

18          MR. TOBEROFF:  In.

19          THE COURT:  I'm not going to refer to something

20   that's outside the record.  It's either in or it's out at this

21   point.  Now that the trial is over.

22          MR. TOBEROFF:  I think at this point --

23          THE COURT:  Do you withdraw your objections?

24          MR. TOBEROFF:  Yes, I do, your Honor.

25          THE COURT:  All right.  Let's bring the Sum of All

1    Fears in and Red Rabbit.  They are both in.  Let's move

2    forward.  What exhibit is the Sum of All Fears?

3            327 is in.  The Sum of All Fears is in.

4            **(Exhibits 327 and 1119 received.)**

5            MR. PERKINS:  Your Honor, the defendants introduced

6    it, and we gave it a number, and I left that piece of paper at

7    the hotel.  I apologize.

8            MR. TOBEROFF:  We can find it in the transcript if

9    we have a moment.

10            THE COURT:  Find it in the transcript and the record

11    is clear that that document is coming in.  Just be sure to let

12    the courtroom deputy know what that document number is.

13            Is there anything further from the plaintiff?

14            MR. TOBEROFF:  No, your Honor.

15            THE COURT:  Very well.  Anything further from the

16    defense?

17            MR. BERGMAN:  No, your Honor.

18            MR. PERKINS:  Actually, yes, your Honor.  I have two

19    questions about the argument.

20            THE COURT:  Yes.

21            MR. PERKINS:  What time on Tuesday, and how much

22    time are the parties being allotted?

23            THE COURT:  Well, let me ask you this.  It now turns

24    out that the trial that we thought we were going to have next

25    week has been continued.  So I don't have trial on the 26th,

1   which means you don't get a week to argue this case next week

2   because I have a lot of work to catch up on and a few other

3   matters to turn my attention to.  But I will give you a

4   reasonable amount of time on Tuesday.

5          How much time do you need for your -- do you

6   anticipate needing for your closing argument?

7          MR. BERGMAN:  An hour and a half at the outside.

8          THE COURT:  And Mr. Toberoff?

9          MR. TOBEROFF:  Within two hours, your Honor.

10         THE COURT:  Okay.  That sounds reasonable.  What

11  we'll do is we'll start at 10:00.  And I'll hear the closing

12  argument from the plaintiff, and then we'll take lunch, and

13  I'll hear the closing argument from the defense.  And then

14  you'll have a brief period of rebuttal.

15         Counsel?

16         MR. BERGMAN:  And may I assume, your Honor, that

17  even though we underbid by half an hour, that we would have an

18  equal time if necessary.

19         THE COURT:  Thank you, Counsel.  I will have a

20  hearing on an ERISA matter at 9:00, but that should definitely

21  be done by 10:00.  Thank you all, and let's just make sure

22  that we have this exhibit number to the courtroom deputy and

23  there's agreement on what's in.  I think there is.

24         The record should be clear, but let's make sure we

25  have that agreement before we leave the courtroom tonight.  I

1    look forward to seeing you next Tuesday.

2

3             (Proceedings concluded at 4:20 P.M.)

4

5

6

7

8              **C E R T I F I C A T E**

9

10

11       I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above matter.

15       Certified on May 13, 2009.

16

17

18          **MARK SCHWEITZER, CSR, RPR, CRR**
            Official Court Reporter

19           License No. 10514

20

21

22

23

24

25

