1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6    JOANNE SIEGEL, etc.,          :  PAGES 1510 - 1600
                                   :
7              PLAINTIFF,          :
                                   :
8        VS.                       :  NO. CV 0408400-SGL(RZx)
                                   :
9    WARNER BROTHERS               :
     ENTERTAINMENT, INC., etc.,    :
10                                 :
               DEFENDANT.          :
11   _____  :

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              COURT TRIAL - DAY 11

16              RIVERSIDE, CALIFORNIA

17             TUESDAY, MAY 19, 2009

18               AFTERNOON SESSION

19

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

**Appearances of Counsel:**

For the Plaintiff:

    TOBEROFF AND ASSOCIATES
    By Marc Toberoff, Esq.
        Nicholas Williamson, Esq.
        Keith Adams, Esq.
    2049 Century Park East
    Suite 2720
    Los Angeles, CA 90067
    (310) 246-3333

For the Defendant:

    BERGMAN COLEMAN GRODIN & EVALL, LLP
    By Michael Bergman, Esq.
        Anjani Mandavia, Esq.
    9665 Wilshire Boulevard
    Ninth Floor
    Beverly Hills, CA 90212
    (310) 860-3346

            -and-

    LAW OFFICES OF PATRICK T. PERKINS
    By Patrick T. Perkins, Esq.
    1711 Route 90
    Cold Spring, NY 10516
    (845) 265-2820

1

# **I N D E X**

2

3    CLOSING ARGUMENT BY COUNSEL FOR THE
PLAINTIFFS (CONTINUED)................................1513
4

5    CLOSING ARGUMENT BY COUNSEL FOR THE DEFENSE.......... 1535

6    REBUTTAL ARGUMENT BY COUNSEL FOR THE PLAINTIFFS....... 1581

7

8

9
Per order of the Court, Pages 1514:24-1513:3 and
10    1578:16-1579:4 have been placed under seal and are
not contained herein.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 __Riverside, California; Tuesday, May 19, 2009__

2                              **1:30 P.M.**

3           THE COURT:  Counsel, you may proceed.

4           MR. TOBEROFF:  Thank you, your Honor.

5      **CLOSING ARGUMENT BY COUNSEL FOR THE PLAINTIFFS (CONTINUED)**

6           MR. TOBEROFF:  DC's -- to put DC's 5 percent first

7    dollar gross participation in perspective, Superman, a world

8    famous, highly branded franchise property, with a successful

9    commercial track record in multiple media over 70 years,

10   receives the same 5 percent gross participation as

11   Mr. Halloran was able to negotiate with Warner Brothers at

12   arm's length for something called Neopets, virtual pets

13   created by kids on the Internet.

14           Transcript 503, line 8, 504, line 9, Exhibit 331.

15   It just doesn't add up.

16           DC receives 5 percent of distributor's worldwide

17   gross in the Superman film agreement, and by contrast, the

18   Hannibal, Rainbow 6, Red Rabbit, and Lord of the Rings

19   agreement all receive 10 percent of distributor's gross double

20   that in the Superman agreement.  Exhibits 307, 326, 327, 128,

21   transcript pages 491 to 508.

22           The agreement for My Fair Lady has 5.1 million paid

23   plus a 47 1/2 percent of gross after the first $20 million,

24   which effectively equates to 27 1/2 of first dollar gross.

25   Exhibit 300, transcript 501, 4, 502, 4.

1           A Chorus Line got 5.5 million plus 20 percent of the

2    gross after $30 million, which effectively translates to 18

3    percent of first dollar gross, transcript page 47, lines 11

4    through 14.

5           The Sahara agreement provides the licensor with a 10

6    percent gross participation in the producer's gross which --

7    but the producer financed the production, and most of the

8    marketing costs of the film, and because of that, there was a

9    reduced distribution fee charged in that case ranging from 10

10   to 15 percent and, as Mr. Halloran testified, producer's gross

11   can equate or exceed distributor's gross, particularly as in

12   the case of Sahara, a hundred percent of videos included in

13   the definition of gross as opposed to only 20 percent.

14          Turning to the 20 percent video royalty in the

15   Superman agreement, both Mr. Halloran and Mr. Spira testified

16   that a 20 percent video royalty is the basic minimum and that

17   larger video royalties can indeed be negotiated.

18          If we look at the Timeline agreement, Exhibit 325,

19   transcript 509, 2 to 14, it contains a 35 percent video

20   royalty.  Hannibal also secured a 35 percent video royalty if

21   there are no other gross participants and a most favored

22   nations provision if there were other gross participants.

23   Exhibit 307, transcript 509, line 15, to 510, line 5.

24

25

1

2

3

4          In addition, DC's Superman agreement contains a most

5     favored nations provision which says if any other participant

6     in the revenues of the film receives a better video royalty,

7     DC would get the benefit of that greater amount of video

8     revenues he included in his gross definition; however, DC

9     never enforced that provision, which is another problem that

10    we have with the affiliated nature of their relationship.  We

11    show from Exhibit 37, page 12 and page 41, Legendary in its

12    definition of defined gross gets a hundred percent of video

13    revenues included.

14          There is no carve-out for financing participants or

15    any other kind of participants in the film agreement.  It

16    simply says participation -- a participant in the revenues.

17    Yet DC never got the benefit.  Mr. Levitz testified that DC

18    accepted Warner's fast style explanation that Legendary was a

19    participant in, quote, profits, not revenues, and therefore

20    excluded from the most favored nations provisions.

21          Transcript page 1103, line 7, to 1104, line 1.

22          As we all know, a profit participant participates in

23    revenues after revenues exceed costs.  And absolutely they

24    should have the benefit of a hundred percent of video revenues

25    in their gross definition, but they don't because due to their

1    affiliated relationship, that provision was never enforced.

2         Defendants have made much of the fact, in fact they

3    base their entire case on the fact that DC reserved

4    merchandising rights to Superman in the film agreement.  They

5    attempt to salvage this entire agreement based on this

6    reservation of rights.

7         Firstly, the coordinates pretrial order at page 8,

8    lines 2 through 3, stated that the trial is to examine whether

9    DC received fair market value for the rights, quote,

10   transferred from DC comics to Time Warner Entertainment

11   Company, end quote.  As DC retained the Superman merchandising

12   rights, they are not at issue in this trial.  DC remains the

13   co-owner of such rights with the Siegels and will simply

14   account directly to the Siegels for their merchandising

15   revenues.

16        We should be looking at the fair market value of the

17   rights that were transferred, not the value of the rights that

18   were not transferred.  If Superman merchandising rights are

19   indeed value, as they are, DC, not Warner Brothers, deserves

20   the benefits of the owner and manager of this property for 70

21   years, including any increase in merchandising due to a

22   Superman film released by Warner Brothers.

23        It's DC who is obligated under the agreement to pay

24   Warner Brothers 50 percent of merchandising revenues related

25   to the film, not the other way around.  This would show up in

1    their statements as a cost to DC, not a cost to Warner

2    Brothers.

3         Moreover, and this is the most important point,

4    reservation of merchandising rights by the owner of a property

5    that has a preexisting history of merchandising revenues or of

6    a property that is susceptible to merchandising is absolutely

7    standard and common in the industry.  Transcript 980, lines 4

8    to 15.

9         When there is preexisting merchandising like there

10   is with Superman, Batman, or any other comic book character,

11   the norm is to reserve merchandising rights and split

12   film-related merchandising 50/50 or some approximation

13   thereof.  Transcript 980, lines 4 through 15.

14        Even the film deals that Warner Brothers relies on

15   in this case -- Tarzan, Conan, Ironman, and DC's old Watchmen

16   agreement with Fox -- all reflect this customary reservation

17   of merchandising and split of the film-related merchandising

18   revenues 50/50 because all of these properties are susceptible

19   to merchandising.  Those are Exhibits 1085, 1086, 1105, 1106,

20   1107, 1028, and 1029.

21        Even if one looks at Exhibit 306, which tracks all

22   of DC's film and television deals for its properties,

23   merchandising is always reserved by DC even for properties of

24   minor value that don't compare to Superman or Batman.  It's

25   absolutely standard in the industry.

1          Now, if you look at some of the novel agreements for

2    the Tom Clancy novels and for Hannibal, they didn't receive

3    merchandising, not because there was a trade for the large

4    up-front purchase prices or the 10 percent of gross figures

5    that appear in those agreements.  They didn't reserve

6    merchandising because nobody is about to merchandise a

7    Hannibal Lecter doll.  The properties themselves are not

8    susceptible to merchandising.  If they were, they would have

9    been dealt with in the agreement and reserved.

10         Transcript 516, line 19, to 518, line 3.  Transcript

11   686, line 8, to 687, line 13.

12         Notably, since Red Rabbit had been previously

13   exploited as a video game, video game rights in the agreement

14   for that novel are reserved.  Transcript 518, line 4, to 518,

15   line 2.

16         In addition, for Warner Brothers and DC to claim

17   that the merchandising benefits to DC make up for the

18   deficiencies in the agreement is far too speculative because,

19   as I said before, if Warner Brothers is not compelled to make

20   a film, there will be no bumps in merchandising, and you have

21   to value the agreements as of the time they are entered into.

22         Finally, DC's entire merchandising argument rests on

23   an unverifiable fact, which could be fiction, that DC keeps 75

24   cents on every dollar of merchandising.  This does not comport

25   with the terms of the agreement.

1           If you look at paragraph 6-C on page 7 of

2   Exhibit 232, it says plain as day that Warner Brothers keeps

3   50 percent -- that Warner Brothers must be paid by DC 50

4   percent of any film related merchandising, and when you

5   combine that with Warner Brothers consumer products, 25

6   percent off the top fee in Exhibit 319, you are left with a

7   figure not of 75 cents on every dollar, but 37 1/2 cents on

8   every dollar.  Yet Paul Levitz says that Warner Brothers

9   apparently doesn't enforce the 50/50 provision in the film

10  agreement.  Transcript 1060, 25, to 1061, 3.

11          After all, they are related companies, and as

12  Mr. Levitz testified, whether Warner Brothers or DC benefits

13  from a deal, the ultimate owner, Time Warner, quote, benefits

14  obviously, end quote.  Transcript 237, 10 through 11.

15          However, there is no verifiable documentary evidence

16  anywhere in this case to show that DC is entitled to keep all

17  of film related merchandising instead of splitting it 50/50

18  pursuant to the terms of the agreement.

19          Another issue in the agreement are the warranty and

20  indemnification provision in the agreement.  DC said it was

21  the exclusive owner of Superman rights free and clear of any

22  claims whether it entered into the film agreement and when it

23  entered into the television agreement.  And DC must indemnify

24  Warner Brothers for any damages arising from the breach of

25  that warranty.

1          Paul Levitz admitted that DC is, quote, absolutely,

2     end quote, obliged to indemnify Warner Brothers for any costs

3     or attorneys' fees resulting from a breach of that warranty,

4     transcript 1206, lines 8 through 13.

5          Yet this is highly uncustomary, as Mr. Halloran

6     testified, the standard practice is to specify any problems

7     with the rights and to avoid indemnification for known

8     problems.  Transcript 423, 4, to 424, 1.

9          And this is exactly what was done in the Hannibal

10    agreement, the Annie agreement, and the Lord of the Rings

11    agreement.  Exhibits 128, 307, and 308, transcript 521, 23, to

12    524, 14.

13         DC's uncustomary warranty and indemnification

14    provisions entered into after they had full notice of

15    plaintiffs' claims to termination and the effective date of

16    the termination in 1999 detract from its compensation as any

17    damages, costs, or attorneys' fees associated with plaintiffs'

18    claims would be deducted from DC's compensation under the

19    agreement implicating any fair market value analysis.

20         But it's worse than that.  And this is an important

21    point when dealing with equity.  If plaintiffs are solely

22    limited to a share of what DC receives from Warner Brothers,

23    then pursuant to DC's warranty indemnification provisions in

24    the film and television agreements, plaintiffs in effect will

25    be unfairly charged for a pro rata portion of Warner Brothers

1    legal fees and costs in connection with plaintiffs'

2    termination in this lawsuit.

3            Moving to the television agreement, we cannot look

4    at the television agreement, a Smallville television

5    agreement, Exhibit 222, in a vacuum.  We must keep in mind

6    that under the film agreement, television rights to Superman

7    can only be exploited through Warner Brothers over 30 years

8    with no obligation whatsoever to exploit.  If Warner Brothers

9    does not feel like exploiting Superman television rights for

10   the remaining 27 years of the agreement, DC is stuck.

11           If Warner Brothers does feel like exploiting TV

12   rights, DC ultimately will have to accept whatever Warner

13   Brothers is willing to offer if it wants to exploit Superman

14   television rights, or those rights will not be exploited at

15   all.

16           As such, the television terms of the Superman film

17   agreement hang like a dark cloud over any analysis of whether

18   DC received fair market value for the transfer and encumbrance

19   of Superman television rights.

20           Now, if we look at the Smallville agreement, whereas

21   the film agreement simply copied the basic economic terms of

22   the 1974 Salkind agreement, the 2001 Smallville agreement

23   simply copied or xeroxed the terms of the 2001 television

24   agreement between DC and another Warner affiliate, Lorimar,

25   relating to the series Lois and Clark.  The 1991 Lorimar

1    agreement is Exhibit 181.

2         So despite the fact that in 2001 comic books had

3    gone through the roof in the entertainment industry, again,

4    Warner Brothers decided to simply copy the terms in a

5    perfunctory fashion of an agreement entered into a decade

6    earlier.

7         Now, we don't have many comparable agreements in the

8    television area pertaining to big branded franchise

9    properties, and there's a very good reason for this.  When a

10   property is capable of being exploited in film, because

11   film -- a big opening on a film gives rise to a lot of cash

12   quickly as opposed to the TV industry, where you have to wait

13   at least four years before a TV show can be profitable,

14   studios always tend to reserve for film the big branded

15   properties.  Smallville was an exception.  But because of

16   that, comparable agreements are not readily available.

17        We do have one comparable open market agreement, and

18   that's the agreement DC entered into in the open market for

19   Superboy.  The Superboy agreement has a $12,500 per payment,

20   but unlike the -- payment in the Smallville agreement, it is

21   in addition to the gross participation, not an advance against

22   the gross participation, and that gross participation is 7 1/2

23   percent of all domestic gross, which was, as indicated by

24   Mr. Halloran's unrebutted testimony, would be the equivalent

25   of roughly 6 percent of worldwide receipts today, exceeding

1    the 3 percent up to a million five per episode, going to 5

2    percent in the Smallville agreement.

3            The Superboy agreement is Exhibit 15.  I refer to

4    the transcript at 554, lines 10 through 14.

5            The Superboy agreement demonstrates the leverage

6    possessed by a rights holder of a valuable property in the

7    open market, even though I think we all agree that Superboy is

8    not anywhere nearly as valuable as Superman.

9            In that agreement, DC also secured $800,000 up

10   front, which defendants say is illusory because it waived the

11   right to receive $800,000 in connection with Superman 4.

12   That's incorrect.  They also testified that due to

13   Mr. Salkind, there was tremendous insecurity regarding getting

14   any money out of Superman 4, and for that reason, an agreement

15   to get paid $800,000 up front is a meaningful term.

16           We also have another DC property, Birds of Prey,

17   which until today I never heard of, and I doubt many people in

18   this court had heard of except in connection with this case.

19   Yet Birds of Prey for TV receives the exact same gross

20   compensation as Superman, which makes no sense.

21           Nor does the television agreement contain any

22   royalty escalations with the success of the show, whereas in

23   the TV business, participants are rewarded for the success of

24   a show which is measured by the longest a show is on the air.

25   So DC receives the same royalty for season 1 as it does for

1    season 9, and Smallville, a big success, is currently in its

2    ninth season with no royalty escalations.

3            Regarding television, DC offered no substantive

4    evidence or expert testimony.  Instead of expert testimony of

5    Richard Marks, who they designated as a TV industry expert,

6    they offered only the testimony of a Warner Brothers

7    executive, Brett Paul, which the Court limited to Brett Paul's

8    state of mind.

9            Firstly, Brett Paul testified that he only partially

10   negotiated the Smallville TV agreement after it had already

11   been agreed between Paul Levitz and another Warner Brothers

12   executive to simply adopt the terms of the 1991 Lorimar

13   agreement.

14           Mr. Paul testified they tried to change those terms

15   but was unable to.  So effectively, his participation didn't

16   affect any of the terms of the agreement.  Transcript 1218,

17   line 7, to 1210, line 19.

18           It sounds similar -- I mean it sounds familiar.

19   Mr. Spira testified to the same thing with the film agreement,

20   where he, quote, consulted with the general counsel of Warner

21   Brothers, but was unsuccess in attempting to modify the

22   Superman film agreement and did not participate in the

23   negotiation of that agreement.

24           Warner Brothers did introduce two television

25   agreements, and that's it.  No expert testimony, just two

1    television agreements.  And all Brett Paul testified to was

2    what Warner Brothers customarily does, but what Warner

3    Brothers customarily does does not define the market for

4    purposes of a fair market value analysis.  You need an expert

5    to talk about what all the studios do, which Warner Brothers

6    failed to put into evidence.

7          The two television agreements they did offer in

8    television was one for Tarzan, which we've already spoken

9    about, and one for Gossip Girl, Exhibits 1102 and 1103

10   respectively.

11         Mr. Evanier testified that Tarzan was in its decline

12   in the 1960's and hasn't really recovered since and doesn't

13   have anywhere near of a track record or prestige of Superman,

14   transcript 912, 4.  As to Gossip Girl, I don't think anybody

15   would claim that Gossip Girl is a comparable franchise

16   property to Superman.

17         Mr. Halloran confirmed at trial that Gossip Girl was

18   nowhere near comparable in value to the Superman property,

19   transcript 556, 23, 556, 1, and defendants offered no rebuttal

20   evidence regarding the value of Gossip Girl or Tarzan.

21         As to the animation agreements, we heard

22   Mr. Halloran's testimony that those agreements all contain

23   substantively identical net profit definitions.  Transcript

24   561, 18, to 562, 8, 565, lines 15 to 22.

25         And we heard Mr. Halloran testify that these net

1526

1    profit definitions were unlikely to show any proceeds to the

2    licensor.  Even Paul Levitz confirmed this, saying there was

3    little possibility of ever earning a participation under any

4    of the animation agreements even if the programs were

5    successful.  Transcript 117 -- excuse me.  1172, line 23, to

6    1173, line 6.

7         Mr. Levitz further confirmed that there was indeed a

8    possibility of earning a participation under prior agreements

9    that they had entered into in the open market, which are in

10   evidence as well.  Exhibits 69, 141, and 184.

11        Turning briefly to the subject of nonexclusive

12   rights, Mr. Bergman has made tremendous fuss in this case over

13   the fact that DC is the co-owner of these -- of the copyright

14   to Action Comics No. 1 could convey only nonexclusive film and

15   television rights in the works to Warner Brothers.

16        It was admitted, however, by Mr. Gumpert and seemed

17   clear from the evidence at trial and from what we know as a

18   matter of law that DC was able to convey exclusive film and

19   television rights to the vast majority, to thousands and

20   thousands of Superman works and copyrights comprising the

21   Superman mythos, all of which were conveyed exclusively to

22   Warner Brothers.  In addition, Warner Brothers has acted and

23   held itself out to the world as though they had an exclusive

24   exploiting the copyrights and holding themselves out as an

25   exclusive holder of Superman film and television rights,

1    transcript 366, lines 5 through 14.

2          The Superman film agreement and television

3    agreements each contain short form option and assignment forms

4    at the end of the agreements that summarize the terms of these

5    agreements.  These forms are for filing with the U.S.

6    Copyright Office and state unequivocally that Warner Brothers

7    was transferred exclusive film and television rights

8    respectively in both the film and television agreement.

9    Exhibit 232 at pages WB 4229 to 4330, Exhibit 223, pages WB

10   135050 to 135051.

11         In addition, as part of the Superman film agreements

12   and TV agreement, DC warranted that they were granting

13   exclusive film and television rights and agreed to indemnify

14   Warner Brothers.  DC would therefore be responsible for any

15   loss caused Warner Brothers by such nonexclusivity.

16         DC thereby gave Warner Brothers the contractual

17   equivalent of exclusivity even if certain rights were

18   nonexclusive.

19         This, given the fact Warner Brothers exclusively

20   controls film and television rights to the vast majority of

21   Superman works, has an additional effect even if the unlikely

22   event that plaintiffs found someone willing to exploit their

23   limited nonexclusive rights, where they only had U.S. rights

24   and couldn't exploit in the foreign territories, which is

25   necessary to make such exploitations economically viable, that

1    party would be greatly dissuaded by the fact that by doing so,

2    they would expose themselves to a potential lawsuit for

3    unknowingly infringing some element or some story line found

4    somewhere in the thousands of Superman comics exclusively

5    owned by DC and Warner Brothers.  Transcript 370, 18 to 25.

6         Testimony was admitted into evidence regarding the

7    fact that since plaintiffs do not have foreign rights and

8    since these entertainment projects -- the investment in these

9    projects are only justified if you can exploit foreign rights,

10   that they would not be able to launch even a direct to video

11   movie or a Movie of the Week for television.  Transcript 379,

12   lines 12 through 23, 369, lines 18 to 370, line 12.

13        Even Mr. Spira testified that the film business has

14   become an increasingly international film marketplace

15   dominated by the foreign revenues.  Transcript 1257, lines 11

16   to 18.

17        And again, to evoke the cliche, actions speak louder

18   than words.  It is hard to imagine that Warner Brothers would

19   have invested half a billion dollars in Superman Returns if it

20   felt that it was at risk through competition from the Siegels,

21   based on their nonexclusive ownership of just U.S. rights to a

22   single comic.

23        Defendants' own actions contradict their claim that

24   the Superman rights were devalued by plaintiffs' termination.

25        Defendants have massive evidentiary problems in this

1    case.  Defendants did not present sufficient evidence to rebut

2    plaintiffs' evidence that the Superman agreements were for

3    less than fair market value.  The defendants' April 10, 2009,

4    trial brief states that the Court must look at, quote,

5    objective results of the parties' negotiations.  It is those

6    final terms and how they stack up to objective considerations

7    of market value that ultimately are the appropriate focus of

8    this trial, end quote.  Trial brief at page 3, lines 4 through

9    8.

10            And yet defendants have not focused on an objective

11   marketwide analysis of what the market would bid for Superman

12   film and television rights but instead have focused their

13   defense on DC and Warner Brothers' subjective state of mind in

14   entering into those agreements and what Warner Brothers does

15   or does not do in film and television.

16            As noted earlier, fair market value is not what

17   Warner Brothers alone would give for Superman rights but is

18   what the market would pay when given the chance to bid on the

19   Superman franchise.

20            Every contract defendants have offered, and they

21   haven't offered many into evidence, involves Warner Brothers

22   or an affiliate, such as Newline, with the sole exception of

23   Mr. Gumpert's hearsay deals for the rights to the Lone Ranger

24   and Green Hornet.

25            In contrast, plaintiffs provided contracts -- one

1    other.  The 1986 Watchmen agreement with Fox.

2              In contrast, plaintiffs provided contracts from

3    Columbia, Universal, Paramount, and Warner Brothers to show

4    what the fair market value of Superman was -- is, or what

5    could be achieved in the open market.

6              Plaintiffs offered -- also offered extensive expert

7    testimony from Mr. Halloran, who provided an industry-wide

8    analysis, not analysis that focused solely on what Warner

9    Brothers does or does not do.

10             Defendants also shied away from objectively focusing

11   on the operative agreements on their face because they know

12   these agreements do not reflect fair market value.

13             Instead, they argued away the negative terms,

14   claiming, based on their affiliated relationship, that in

15   practice they either don't follow the deals, or that if a

16   problem arose, they could supposedly work out the negative

17   implications.

18             This is not the objective analysis defendants

19   insisted must be used at this trial.  There is no way to value

20   these deals based on what defendants purportedly do in

21   practice behind closed doors.  The vast bulk of the evidence

22   presented by defendants has focused on the state -- on their

23   state of mind in entering into the agreements.  However,

24   there's a big problem.

25             Scienter and intent or ill motive is not an element

1    of plaintiffs' case.  We are ascribing no ill motives to

2    Warner Brothers or DC, and therefore, their state of mind is

3    marginally relevant at best to an objective analysis of

4    whether the terms in their agreements constitute fair market

5    value when measured against the agreements negotiated in the

6    open market and when measured against the custom and practices

7    of other studios in the open market.

8         Mr. Levitz testified purportedly not as an expert

9    but what his state of mind was when he negotiated the Superman

10   film and television agreements, transcript 1135, 24 to 25.

11        Mr. Levitz, however, did not discuss in any detail

12   his dealings with licensing to other studios largely because

13   the overwhelming majority of DC's characters are controlled by

14   Warner Brothers, and all of the major ones are controlled by

15   Warner Brothers.  Exhibit 306.

16        The same reasoning applies to Brett Paul, who

17   negotiated the TV deal with Mr. Levitz or who claims to have

18   negotiated the TV deal with Mr. Levitz.  Mr. Paul's state of

19   mind when negotiating this deal is largely irrelevant because

20   no scienter element -- there's no scienter element in this

21   case.

22        Mr. Paul testified about what was customary at

23   Warner Brothers regarding video royalty and the usual range of

24   episodic fees at Warner Brothers.  But as I said, Warner

25   Brothers is not the test, and Warner Brothers is not the only

1    game in town.

2            In fact, this focus on Warner Brothers supports

3    plaintiffs' conclusion.  If Warner Brothers will only pay 5

4    percent for film or will only pay a certain royalty or certain

5    gross, all the more reason for DC to offer these rights in the

6    open market.

7            As for Mr. Spira, as pointed out to the Court, he

8    admitted finally that he did not negotiate the Superman film

9    agreement and thus there was no foundation for his testimony.

10   Transcript 1288, 16 through 19, 1289, 11 through 20, 1290, 5

11   through -- excuse me.  1290, line 5, through 1291, line 23,

12   1289, lines 13 through 17.

13           Additionally, Mr. Spira admitted that any advice he

14   gave to Mr. Schulman, who did negotiate the deal, was ignored.

15   Transcript 1294, 2 through 20.  Mr. Spira also admitted that

16   he did not negotiate the Superman film television agreement or

17   animation agreements.  1295 -- excuse me.  1294, lines 18

18   through 24.

19           So all three of defendants' lay witnesses' testimony

20   is limited to their state of mind, which is largely -- which

21   is of only marginal relevance to an objective determination of

22   whether the terms of the agreements were for fair market

23   value.

24           To the extent it is relevant, and Mr. Spira's

25   testimony is plainly not because he was not involved in the

1    negotiation, their lay testimony focuses only on Warner's

2    internal dealings, which does not rebut the marketwide

3    analysis offered by plaintiffs into evidence.

4           Defendants also, as I said, provided no expert

5    testimony in the fair market value of the Superman television

6    agreement when they could have.  The only testimony about

7    Mr. Paul's state of mind at the time of the deal.

8           They also do not provide any expert testimony in the

9    fair market value of the Superman animation agreements, only

10   brief state of mind testimony by Mr. Levitz.  Transcript 1173,

11   lines 12 through 13.

12          The one expert defendants did offer, Mr. Gumpert,

13   was found not qualified to discuss television or animation and

14   was not offered for that purpose.  Transcript 1333, lines 3

15   through 15.

16          In contrast, plaintiffs' expert, Mr. Halloran,

17   offered extensive expert testimony on the deficiency with the

18   television agreement, transcript 531, line 18, through 563,

19   line 13, Exhibits 222 and 223, and the animation agreement,

20   transcript 563, line 21, to 567, line 1, Exhibits 52 to 54 and

21   Exhibit 225.

22          Accordingly, with respect to television and

23   animation, plaintiffs' evidence and testimony is unrebutted

24   and plaintiffs should prevail.

25          As far as the film agreement is concerned, neither

1    Mr. Spira nor Mr. Paul provided admissible evidence regarding

2    the fair market value of the terms of the agreements

3    themselves.

4          Warner Brothers -- strike that.

5          Neither Warner Brothers' state of mind nor its

6    business practices are on trial.  The issue is whether the

7    deal terms of the Superman agreements reflect fair market

8    value for the rights transferred.

9          Amidst this lengthy adversarial contest and the

10   practical rigors of this case, it is all too easy to lose

11   sight of why we are here in the first place.  We are here

12   because Congress shows to relieve authors and their families

13   of the inequities which result from their unequal bargaining

14   power and thereby strengthen a fundamental purpose of the

15   copyright act, to provide financial incentives to authors to

16   create, as this is beneficial to both our culture and our

17   economy.

18         This concerted Congressional objective was recently

19   stressed by the Ninth Circuit in an appeal I successfully

20   handled in the case of Classic Media versus Newborn, 532 F.3d

21   978 at page 983, Ninth Circuit 2008.

22         But if there was ever a case that fell squarely

23   within the legislative purpose of the Copyright Act's

24   termination provisions, it is that of Jerry Siegel and his

25   family.  As a young high school student in Cleveland, Ohio,

1    growing up during the depression, Mr. Siegel created Superman

2    with his buddy, Joe Schuster.  They naively signed a

3    publishing release for $130 and were later held to have signed

4    away their copyright in their favorite comic book character

5    forever.  The devastating effect these events had on Jerry

6    Siegel coupled with the financial difficulties that he

7    incurred dominated his life and the life of his family and

8    continues to this day, given defendant's ongoing war of

9    attrition.

10           Yet when comic book expert Mark Evanier sat in this

11   courtroom and said that he owes a debt of gratitude to Jerry

12   Siegel, it struck a cord.  When we think of all the kids who

13   from the late 1930's to this day have jumped off their beds

14   with towels wrapped around their necks yelling look at me, I'm

15   Superman, you realize we all share this debt.  Congress got it

16   right, designing this very special law to benefit authors like

17   Jerry Siegel and their families.

18           This Court should not permit the emasculation of

19   plaintiffs' statutory rights and profit participation by

20   severe dilution of its clearly intended financial benefits.

21           THE COURT:  Thank you, Counsel.

22           **CLOSING ARGUMENT BY COUNSEL FOR THE DEFENSE**

23           MR. BERGMAN:  Good afternoon, your Honor.

24           THE COURT:  Good afternoon.

25           MR. BERGMAN:  Your Honor, I found Mr. Toberoff's

1    closing to be noteworthy indeed.  Not for what he said, but

2    for what he didn't say.

3           Once again, as was true throughout the trial,

4    Mr. Toberoff failed to identify a single agreement, film or

5    television, which, taken as a whole, is more economically

6    beneficial than the film or television agreements are to DC.

7    The evidence, not the argument, has shown that there are no

8    such agreements.

9           Secondly, Mr. Toberoff did not once address the fact

10   of plaintiffs' burden of proof, let alone refer to any

11   evidence which might satisfy.

12          And finally, Mr. Toberoff did not once mention the

13   fair market value of the nonexclusive rights which this trial

14   was convened to evaluate.

15          And Mr. Toberoff says that I've been fussing about

16   those nonexclusive rights from the very beginning.  I'm going

17   to continue to do so, your Honor.

18          In our last two hearings before trial, your Honor

19   went to great lengths to frame the precise question that this

20   trial was to determine.  You gave it once.  You then revised

21   it slightly, gave it again, and then you put it into the final

22   pretrial conference order.

23          And what you said, your Honor, was not what

24   Mr. Toberoff began his closing with, namely the value of the

25   rights transferred to TWEC.  On the contrary, your Honor

1  stated, and I'm again quoting, just abbreviating the

2  references to Warner Brothers and its successor, quote, given

3  the nature and the characterization of the property in

4  question, the trial shall determine whether the value of the

5  various Superman option and assignment agreements between DC

6  Comics and Warner Brothers and the amounts paid to DC Comics

7  by Warner Brothers reflect the fair market value of the

8  nonexclusive rights that the Court has determined were

9  transferred from DC Comics to Warner Brothers.

10          And the Court's emphasis upon the value of the

11  nonexclusive rights has been maintained over at least two

12  motions for reconsideration, however those motions were

13  denominated.

14          And as we all know, the Court's final pretrial

15  conference order regarding those nonexclusive rights

16  supersedes the pleadings and defines with legal certainty the

17  issue to be tried.  That horse cannot be changed in midstream

18  because the plaintiffs realize that they cannot meet the

19  resulting burden.  And that burden was clearly defined by your

20  Honor at our January 26, 2009, hearing, namely, that

21  plaintiffs have the burden of proving that one or more of

22  these agreements is below fair market value for those

23  nonexclusive rights.

24          That burden necessarily carries with it the

25  obligation of showing the amount of dollars by which the

1    agreements allegedly fell below that market value.  That's

2    necessary so that the Court could show if it deemed it to be

3    appropriate, how much to equitably add to DC's revenues.

4            Plaintiffs have done nothing to meet their burden as

5    designated by the Court.  Mr. Toberoff has no page or line

6    citations to demonstrate any such evidence.  And since

7    hackneyed phrases appear to be the style, may I say that there

8    is not a shred of evidence in this record to show what the

9    fair market value of those nonexclusive rights were in 2002.

10           The only witness who even addressed this question on

11   plaintiffs' behalf was Mr. Halloran.  And he still hasn't

12   expressed an opinion on that critical specific question.  He

13   didn't have an opinion as to the fair market value of the

14   nonexclusive rights in his report.  He hadn't formulated an

15   opinion as to the nonexclusive film or television rights at

16   his deposition, and on the witness stand, despite all his

17   excuses as to why he couldn't do so, how difficult it is to

18   obtain agreements, Mr. Halloran still didn't offer any

19   evidence upon which your Honor could determine the fair market

20   value of the nonexclusive rights transferred in either of

21   those agreements.

22           Unable to offer any evidence on the issue the Court

23   has mandated, the plaintiffs have decided by their own fiat to

24   change the issue.  Refusing to recognize the Court's prior

25   findings and orders re nonexclusivity, plaintiffs challenged

1539

 1    those findings for the third or fourth time and argued

 2    throughout the trial that the rights were almost exclusive,

 3    that they were for the most part exclusive, that the grants

 4    included thousands of copyrights owned by DC and only one

 5    co-owned by the plaintiffs.

 6             But that totally misconstrues the issue before your

 7    Honor.  The plaintiffs have no right to benefit from the

 8    revenues derived from DC's exclusive rights.  The value of

 9    those rights belongs to DC alone.  Plaintiffs can't use the

10    existence of defendants' exclusive rights to prove the value

11    of their nonexclusive rights.

12             Plaintiffs have no right to complain even if DC gave

13    away its exclusive rights.  It simply doesn't affect the

14    plaintiffs.

15             The plaintiffs have their rights.  Congress in its

16    wisdom has bestowed those rights on the plaintiffs.  They are

17    free to exercise them today, tomorrow, and 30 years from now.

18             But we have to bear in mind that by filing their

19    notices of termination, the plaintiffs created a critical

20    defect in the rights to this property.  Their actions were the

21    direct cause of the nonexclusivity that hangs over these

22    rights.

23             Plaintiffs had an obligation, a burden of proof to

24    persuade the Court as to the fair market value of what they

25    had by their own actions created, but they failed to present

1    any evidence upon which the Court could determine what the

2    fair market value of those nonexclusive rights were.

3           The whole purpose of this phase of the trial was to

4    determine if a fair amount of money had been paid by Warner

5    Brothers to DC.  Well, you have to look to the money that was

6    paid.  And you have to look to what that money was paid for.

7           Having failed to demonstrate what the fair market

8    value of their nonexclusive rights are, plaintiffs can't prove

9    that any of the agreements in question were below that

10   unknown, undesignated, unascertained fair market value.

11          What was it?  Where does the Court begin its

12   computations?  There is no starting place.  There's no

13   evidence of it.  There's no evidence to support the Court in

14   making the determination that has brought us together for all

15   these weeks.

16          And rather than attempting to address that issue,

17   the issue that we're here for, the plaintiffs have attempted

18   to deal with the contracts in question as if they transferred

19   exclusive rights.  But that evidence is irrelevant.  That's

20   not the issue which the Court has ordered answered, and it's

21   not the question properly addressed in this proceeding.

22          The Court's unambiguous order has been ignored by

23   the plaintiffs, and the absence of any evidence as to the fair

24   market value of these nonexclusive rights establishes that

25   plaintiffs have failed to meet their burden.  And that failure

1    is, I respectfully submit, your Honor, case dispositive.  Your

2    Honor's reminded all of the counsel in this case that we are

3    engaged in a process here.  There are rules to be met,

4    requirements to be adhered to.  The Court defines the issues.

5    The parties address them with competent evidence.  And the

6    Court determines, based upon that evidence alone, whether the

7    plaintiffs have met their burden.  That process has to be

8    applied in this case as in all others.

9         Nonetheless, as I mentioned in my opening argument,

10   the defendants have prepared for the approach that the

11   plaintiffs were clearly going to take.  And we have

12   demonstrated by testimony and agreement after agreement that

13   the DC Warner Brothers' Superman agreements are at the very

14   top of the market, even if they were to be considered as

15   transferring exclusive rights.

16        And before reviewing that evidence with you, your

17   Honor, I believe it warrants noting that virtually all of

18   plaintiffs' substantive testimony in this case has been given

19   by their designated expert, Mr. Halloran.  And with all due

20   respect to Mr. Halloran, I submit that he lacks the

21   qualifications to support the testimony he has given.

22        On the contrary, the evidence shows that over the

23   length of Mr. Halloran's private practice, a period of almost

24   20 years, he simply hasn't conducted a legal practice at this

25   level of deal making.  He is not testifying from personal

1    experience, and his testimony is not the product of reliable

2    principles or methods.

3          Mr. Halloran, aided by trade papers and the

4    Internet, is testifying to deals that he has never made, terms

5    he has never achieved, and a level of legal practice that he

6    has never attained.  For example, in the television area, as

7    to which he was the sole witness on behalf of the plaintiffs,

8    Mr. Halloran has never represented a company producing a

9    scripted network television series.  He's never represented

10   the show runner of such a network series.  He's never been

11   involved on either side of the table in the negotiation of

12   underlying literary rights for such a television series.  And

13   by his own admission, he doesn't represent any important or

14   high level network television producers.

15         On the film side, in private practice Mr. Halloran

16   has never represented any rights holder of a comic book hero.

17   He has never represented a marquis author.  He has never

18   represented a buyer of a marquis author's work.  He doesn't

19   represent any prominent actors or actresses, and in 19 years,

20   he has only negotiated one literary rights acquisition

21   agreement with a major studio, one agreement in 19 years.  And

22   that was the Neopets agreement with Warner.

23         I'm going to talk about that agreement later, but it

24   should be borne in mind that this was a $40 million small

25   picture, that Mr. Halloran made a deal where he got no option,

1  where his client is obligated to pay half the development

2  costs of the film, where no exercise was ever made of the

3  rights, and no film was ever made.  His client had his rights

4  tied up for three years and didn't earn a penny from it.

5         And in addition, before forming his opinions,

6  Mr. Halloran did not confer with any studio executive, did not

7  confer with any agent at any of the major talent agencies, did

8  not speak with any attorney who represents marquis authors,

9  did not speak with anyone actually involved in the acquisition

10 of high level film rights.

11        Once he formed his opinions and prepared his report,

12 Mr. Halloran didn't distribute those opinions or report to any

13 studio executive to test their veracity.  He didn't circulate

14 it to any attorney actually involved in the negotiation of

15 these high level agreements.  He didn't circulate his opinions

16 to anyone within the motion picture industry to get any

17 reaction to those opinions.

18        In short, defendants question whether Mr. Halloran's

19 qualifications even meet the requirements of Rule 702.

20        But in any event, your Honor, I respectfully submit

21 that his testimony should be viewed in the framework of his

22 obvious lack of personal experience or other substantive real

23 world bases for his opinions.

24        Before turning to the agreements that are truly at

25 issue in this case, the film agreement and the television

1    agreement, I'd like to renew defendants' pending Rule 52

2    motions regarding TWI, the Warner Brothers consumer products

3    agreement, and the animation agreements.

4           With respect to TWI, your Honor, there has simply

5    been no evidence whatever of any contractual dealings between

6    TWI and DC concerning the Superman property.  TWI simply has

7    no involvement in this matter.  It is not implicated in any

8    way in this phase of the case.  It did not produce or

9    distribute any of the works that will be involved in the next

10   phase of this case.  And it doesn't bear any liability for any

11   award that may be made against DC or Warner Brothers, both of

12   whom are quite capable of satisfying any award that your Honor

13   might decide upon.

14          As for the merchandising agreement, the Warner

15   Brothers consumer products agreement, it has become apparent

16   from the evidence, or accurately from the lack of evidence,

17   that plaintiffs have offered no challenge to the fair market

18   value of the Warner Brothers consumer products agreement

19   pursuant to which Warner Brothers consumer products acts as

20   DC's merchandising agent for a 25 percent fee, with DC keeping

21   75 percent of all merchandising revenues.

22          And while I have determined, your Honor, not to

23   respond to each and every one of Mr. Toberoff's charges, I was

24   offended personally by his reference to the fact that this 75

25   percent could be a fiction.  It could be a fiction if

1  Mr. Levitz committed perjury repeatedly.  It could be a

2  fiction if Mr. Sills, the plaintiffs' accountant, had not

3  reflected in his report that Warner Brothers didn't receive

4  any money from the merchandising of Superman Returns.  It

5  could be a fiction if Warner Brothers wasn't compelled out of

6  fairness to establish a phantom merchandising fund for

7  Legendary Pictures, its partner, in order to give Legendary a

8  decent share of the merchandising revenue, failing which there

9  would have been no share of the merchandising revenue going to

10 Legendary.

11      So this notion that the 75 percent might be a

12 fiction is not only without any basis in fact, it is offensive

13 and should not have been made.

14      The Warner Brothers consumer products agreement

15 which charges 25 percent is clearly within fair market value.

16 Many agreements, such as the Sahara agreement, charge 25

17 percent.  Some, like Rainbow 6, charge 30 percent.  Neopets

18 charged 30 percent.

19      Moreover, the undisputed evidence demonstrates that

20 no participant in any of the agreements in evidence receives

21 as much as the 75 percent of every dollar that DC receives.

22      And finally, with respect to the animation

23 agreements, I heard what Mr. Toberoff said in his closing

24 argument.  I listened carefully to what Mr. Halloran said

25 while he was on the stand, and I heard nothing which would

1    show or have a hearing upon whether these animation agreements

2    received fair market value.  It simply wasn't the subject of

3    testimony.

4         All Mr. Halloran did was take these agreements,

5    without identifying one or the other, and simply say that they

6    favored Warner Brothers.  We saw no evidence as to what the

7    fair market value of those agreements were.  And we certainly

8    saw nothing to show that their value was below fair market.

9         On the contrary, Mr. Levitz identified several third

10   party agreements with Hanna Barbera, Ruby Spears, and Novana,

11   in which the episodic fees were all less than the episodic

12   fees in the Warner agreements.

13        Moreover, the exhibits in evidence demonstrate that

14   DC received a higher percentage of net proceeds under the

15   Warner Brothers agreements than it did under the third party

16   agreements.  It received 30 percent versus 25 percent.

17        The fact that those net proceeds definitions don't

18   throw off a lot of money is true whether you're getting 25

19   percent of nothing or 30 percent of nothing.  These agreements

20   are not designed, as Mr. Levitz testified, to generate profit

21   today.  They don't generate profit.  They are designed to sell

22   merchandise.

23        For all those reasons, your Honor, we once again ask

24   that those particular agreements be the subject of a Rule 52

25   partial finding by your Honor.

1    But I'd like to move on now to the television

2    agreement.  It can be stated unequivocally, your Honor, that

3    the evidence leaves no doubt but that the television

4    agreement, even if considered exclusive, stands at the very

5    top of the market.  Plaintiffs failed to offer a single

6    television literary rights acquisition agreement in an effort

7    to show market value.  Rather, they attempted, just as

8    Mr. Toberoff just has, to derive the value of the Smallville

9    television agreement by pointing to the Salkind Superboy

10   agreement for a 1987 show that was syndicated locally in the

11   afternoon, a show that by Mr. Levitz's testimony produced

12   virtually no profit, yielding only a fraction of what was

13   earned by DC from Smallville.

14   And as for this $800,000, Mr. Toberoff has once

15   again misstated what that agreement unequivocally clearly

16   says, just as Mr. Halloran did.  Mr. Halloran at his

17   deposition pointed to the Superboy agreement as being the only

18   television agreement that was superior to the Smallville

19   agreement, and he rested that opinion on the fact that it

20   contained an alleged $800,000 option payment.

21   At trial Mr. Halloran abandoned that contention

22   because the contract leaves no question but that that $800,000

23   was received for a payment that was due under a different

24   contract for Superman 4.  So instead of waiting for somebody

25   to pay it $800,000, DC used the opportunity of that agreement

1    to get $800,000 from Salkind and to give Salkind the right to

2    receive the $800,000.  It had nothing whatsoever to do with

3    the Superboy agreement.  Again, that was a syndicated show.

4    They are made for a fraction of the budget of a network show.

5    They produce a fraction of the gross, and they run for a year,

6    two years.  This may have run for three.

7         The only other supposed evidence relied upon by

8    plaintiffs in connection with the television agreement, again

9    referred to by Mr. Toberoff in his closing, the plaintiffs

10   haven't changed their position one whit from their contentions

11   of fact and law, to their expert's report, through the trial,

12   through the closing.  Same argument.

13        They argue that the fact that DC was able to obtain

14   a similar contingent compensation, not episodic fee, but

15   contingent compensation for this Batman-related series somehow

16   indicates that they got less than fair market value for

17   Smallville.  And that simply doesn't make any sense.

18        If anything, it may show that the parties overvalued

19   Birds of Prey.  It doesn't indicate in any way whether the

20   value received by DC under the Smallville agreement was or was

21   not fair market value.  That question has been answered

22   unequivocally by the defendants' testimony.

23        Mr. Levitz first testified to obtaining an

24   unprecedented first dollar gross participation when he

25   negotiated the Lois and Clark agreement.  It had never been

1    done before, according to Mr. Levitz and to the executive who

2    represented that fact to him.

3         Mr. Levitz testified to the economic benefits that

4    that gross share in Lois and Clark threw off to DC, and he

5    testified to his determination to maintain that precedent in

6    connection with Smallville.  Maintaining precedence is by all

7    of the experts' testimony very important.  But to

8    Mr. Toberoff, it's xeroxing a prior agreement.  To

9    Mr. Halloran, it's, quote, mimicking, close quote, a prior

10   agreement.

11        But to the people who were actually involved, to the

12   people who negotiated those agreements, that precedent was

13   vitally important to DC and resisting as much as it could by

14   Warner Brothers.

15        As the Court will recall, the television agreement

16   provides on a per episode basis for DC to receive 3 percent of

17   the first $1.5 million of gross and 5 percent of all

18   subsequent gross.  And after explaining the enormous fans and

19   economic desirability of a first dollar gross participation,

20   as compared to other forms of contingent compensation,

21   Mr. Paul testified that the television agreement is the only

22   first dollar agreement that Warner Brothers Television has

23   made with any other rights holder or participant than DC of

24   any kind.

25        No producer, no writer, no lead actor, no one gets a

1    first dollar gross participation.

2           And the result of that exceptional gross

3    participation is hardly open to dispute.  Exhibit 1026, which

4    is a participation report dated as of June 30, 2008, shows

5    that this first dollar gross participation had already yielded

6    almost $24 million to DC.  There has been no testimony of any

7    exclusive television agreement that even comes close to that

8    first dollar gross position, that even comes close to the

9    $45,000 per episode that was paid to DC under the film

10   agreement, and certainly none that comes close to the actual

11   amounts earned by DC, namely $24 million.

12          Closest agreement, according to Mr. Paul's testimony

13   and according to the absence of any other agreement, is the

14   Tarzan agreement.  That was a deal negotiated between Warner

15   Brothers Television and Edgar Rice Burroughs at the same time

16   basically as the television agreement.  It was negotiated in

17   2002.  The TV agreement was negotiated first in 2001 and then

18   amended in 2002.

19          The Edgar Rice Burroughs company was represented in

20   this negotiation by the Cipherin Brittenham firm, a firm

21   recognized by Mr. Halloran as one of the, if not the, most

22   powerful law firms in the entertainment industry.  And that

23   Tarzan agreement, which is Exhibit 1102, is a very poor second

24   indeed to the Smallville agreement.  This third party

25   agreement negotiated with one of the biggest licensors in the

1   list, represented by one of the leading law firms in the

2   country, has an option fee of $10,000, a $150,000 exercise

3   price, episodic fees that begin at $20,000 per episode for the

4   first year, go to 25,000 per episode for the second, and then

5   30,000 per episode forever as compared to the 45,000 which

6   began on the first program on Smallville.

7          And the Tarzan agreement provides for a contingent

8   compensation interest, not of gross, not of first dollar

9   gross, but 7 1/2 percent of something called modified adjusted

10  gross, which is a figure arrived at by first deducting all

11  distribution fees, all distribution costs, all production

12  costs, and interest.

13         The plaintiffs haven't disputed the superiority of

14  the Smallville agreement over this Tarzan agreement or any

15  other television agreement as a whole, nor could they.

16         And, as your Honor may recall, Mr. Paul testified

17  that he attempted to reduce the richness of the deal.  He

18  didn't want to xerox the Lois and Clark deal.  He didn't want

19  to mimic the Lois and Clark deal.  Instead, he wanted to

20  reduce the Lois and Clark precedent in arriving at the

21  Smallville deal.

22         The testimony of both Mr. Paul and Mr. Levitz

23  demonstrates that Mr. Levitz successfully resisted breaking

24  the Lois and Clark precedent, and the evidence has disclosed

25  at least one of the reasons why Mr. Levitz refused to do so.

1   And that is because plaintiffs' then lawyers, Bruce Ramer and

2   Kevin Marks, eminent partners in one of the finest

3   entertainment law firms in the country, who were then

4   representing the plaintiffs, had reviewed the Lois and Clark

5   agreement and had communicated to Mr. Levitz that it

6   represented a safe harbor within which to license the TV

7   rights once again and that the plaintiffs would not object to

8   a license on those terms.

9          And, as Mr. Levitz testified, that safe harbor

10  assurance was one of the factors that he relied upon in

11  entering into the television agreement.

12         In short, there's no evidence to show that the

13  television rights, even if they were exclusive, did not obtain

14  fair market value from Warner Brothers.  On the contrary,

15  there is overwhelming evidence, none of it disputed, that the

16  television agreement and the amounts paid thereunder to DC,

17  $24 million, are and were in 2001 at the top of the market.

18  And there is no testimony to challenge that statement.

19         Turning to the film agreement, your Honor, the

20  evidence has shown that in considering the value of film

21  rights to an underlying literary property, there are a number

22  of factors that are typically considered by studios.  Primary

23  among these are the prior film performance of the property,

24  comparable deals, public awareness, and the precedence between

25  the parties.

1         The evidence as to each of these customary factors

2    demonstrates the economic superiority of DC's rights and the

3    amounts they received thereunder, even if those rights be

4    considered exclusive, which they should not be.

5         Insofar as prior film performance is concerned, the

6    evidence painted a very vivid picture of the situation as it

7    existed during the 1999 to 2002 period.

8         The first performance of the -- the performance of

9    the four prior Superman films had demonstrated a steady

10   downward spiral.  Exhibits 1003 through 1006 are participation

11   statements delivered by Warner Brothers to DC at the time that

12   the film agreement was entered into.  And those participation

13   statements show that the cumulative earnings of each of those

14   pictures, like their box office revenues, just went down,

15   down, down, down.

16        The third film did less than half of what the first

17   film did.  And the release of that third Superman film was

18   followed by the release of Supergirl, an undisputed bomb that

19   earned nothing but critical and audience contempt.

20        And immediately following Supergirl, there was the

21   catastrophic failure on every level of Superman 4.  The

22   evidence shows that the box office of Superman 4 was only

23   about 10 percent of the box office of Superman 1.  And that

24   abysmal 1987 failure marked the end of Superman's film career

25   for almost 20 years.

1          Plaintiffs attempted to dismiss this critical

2    decline and public interest in the film property through

3    Mr. Halloran's testimony that such steep box office declines

4    were simply part of a trend that studios expected.  As if any

5    studio would make a sequel that it expected to earn 10 percent

6    of the original.

7          And if Mr. Halloran's trend argument didn't hold

8    water, as I demonstrated, it did not through examples like

9    Dirty Harry, Die Hard, and Lethal Weapon, then Mr. Halloran

10   had another thought.

11         He suggested that the complete failure of Superman 4

12   may have actually stimulated the market for Superman Returns.

13   You'll recall his testimony that, quote, one way of looking at

14   the tanking of Superman 4 was that was good as of 2002 because

15   the appetite in the marketplace for the Superman films wasn't

16   diminished that much or gobbled up that much.  That's at page

17   886, lines 9 through 13.

18         That may be Mr. Halloran's way of looking at the

19   failure of S4 in this case.  It certainly wasn't the mean he

20   expressed when he testified in the Sahara case.  In that case,

21   where he had been retained by the author, Mr. Halloran

22   testified that one disastrous film, the first in a series of

23   18 books featuring the Dirk Pitt character, had rendered the

24   entire franchise, all 17 remaining books, quote, worthless,

25   unquote.

1          In that case Mr. Halloran testified that the

2    $68 million box office that Sahara earned reduced a franchise

3    that was previously worth $30,000 to, quote, zero, close

4    quote.  But in this case he refused to acknowledge that

5    Superman 4's $17 million box office reduced the value of the

6    Superman property at all.  Consistency was not one of

7    Mr. Halloran's attributes.

8          Perhaps the most credible testimony concerning the

9    value of the Superman film rights following Superman 4 came

10   from the people in the best position to know its value to

11   Warner Brothers.  The company's chief executive officer, Alan

12   Horn, and the worldwide head business affairs, Steve Spira.

13         Mr. Horn was as forthright and honest a witness as

14   you could imagine.  He answered every question without

15   hesitation, without self-censorship.  When Mr. Toberoff asked

16   if Mr. Horn had looked at what Mr. Toberoff referred to as

17   the, quote, success, close quote, of the prior Superman films

18   before he invested Warner's money in Superman Returns,

19   Mr. Horn responded at pages 127 and 128, quote, I looked at

20   the last one, Superman 4, and was frankly daunted by the fact

21   that it had done something like $15 million in the entire U.S.

22   and Canadian box office.  And I thought that was frightening,

23   close quote.

24         He later added, quote, I just felt that the

25   franchise had gone downhill, and I thought that it was a

 1    little scary, close quote.

 2              And when Mr. Toberoff asked Mr. Horn whether today

 3    he still considered Superman as an evergreen source of

 4    revenue, Mr. Horn responded, quote, my view of Superman as an

 5    evergreen theatrical motion picture property is that it is

 6    viable but not -- but challenged.  That's at page 150, lines 6

 7    through 12.

 8              Mr. Spira testified to conferring with Mr. Schulman

 9    regarding the value of the Superman property in 1999 to 2002,

10    and having considered the value of that property with other

11    members of Warner Brothers' business affairs department.

12    Mr. Spira explained that business affairs hoped to get a

13    reduction of the deal that had been made with Salkind based on

14    the following factors.  Quote, the creative department or

15    creative people, as it were, were concerned that Superman was

16    very unhip.  It was very particularly American in an

17    environment where the foreign marketplace was becoming more

18    and more important for you to recover your costs and hopefully

19    make money.  It was perceived as damaged goods because of the

20    failure of the last two sequels and even Supergirl.  And I

21    think they had been excoriated by the critics.

22              That's at page 1257, lines 7 through 18.

23              That, then, is how Warner Brothers viewed the prior

24    performance of the Superman films during this period.  It was

25    frightening and scary to Mr. Horn, and it was viewed as

1   damaged goods by Warner Brothers' business affairs.  That, by

2   the way, is precisely the same term, damaged goods, that

3   Mr. Gumpert used in talking about the value of the Superman

4   property as a film property in 2002.

5         But notwithstanding that appraisal, Mr. Spira and in

6   turn Mr. Schulman were unsuccessful in convincing Mr. Levitz

7   to depart from the Salkind precedent.  And once again, one of

8   the primary reasons why Mr. Levitz resisted such attempts was

9   because he knew, and indeed relied on the fact that the

10  sequel's own attorneys, Mr. Ramer and Mr. Marks, had analyzed

11  the Salkind deal and communicated directly to DC and Warner

12  Brothers that future deals entered into at the same level as

13  the Salkind deal would not be challenged.

14        Specifically, Mr. Marks wrote in his October 19,

15  2001, letter, and I quote, intercompany transactions will be

16  covered by safe harbors established at a level consistent with

17  the Salkind Superman theatrical motion picture deal, the Lois

18  and Clark television program deal, the Warner Brothers

19  Television animation deal, and the existing fee arrangements

20  with Warner Brothers consumer products, close quote.

21        The evidence shows that another key factor looked to

22  by studios to determine the fair market value of an underlying

23  property is what it and others have paid for comparable deals.

24  And we had a great deal of discussion at the trial, your

25  Honor, with respect to what were comparable deals.

1           The defendants offered what they believed to be

2     comparable deals.  And those were agreements for various

3     superheroes, including Tarzan, who Mr. Horn testified they are

4     going to be making a tent-pole picture of -- Ironman, Conan,

5     Watchmen -- and then defendants over plaintiffs' opposition,

6     introduced an X Men agreement.  And in addition, Mr. Gumpert

7     provided details of agreements for three additional comic

8     characters:  Flash Gordon, the Lone Ranger, and the Green

9     Hornet.

10          And by the way, when Mr. Toberoff refers to the

11    agreements testified to by Mr. Gumpert that aren't physically

12    in evidence, they are hearsay.  But when he refers to the

13    agreements that Mr. Halloran spoke of, such as this Hasbro

14    Monopoly game, whatever that is, suddenly it isn't hearsay.

15    It's gospel.  The fact is, either expert has a right to

16    testify based on hearsay evidence.

17          And what Mr. Gumpert had done was he had obtained

18    from Columbia Studios data as to what those three -- Flash

19    Gordon, Lone Ranger, and Green Hornet -- deals showed.

20    Mr. Toberoff suggests we should have found out what Spiderman

21    provided.

22          Mr. Toberoff should have found out what the

23    Spiderman agreement provided.  It's been four years since

24    Mr. Toberoff and plaintiffs first alleged that there was a

25    sweetheart deal between Warner Brothers and DC.  They have had

1    four years within which to collect every comic book superhero

2    agreement they could possibly have.  They used the subpoena

3    power of this court to acquire novel agreements, to acquire

4    musical comedy agreements, but not a single comic superhero

5    agreement ever.

6            They have never submitted a single superhero

7    agreement for comparison to the film agreement so that your

8    Honor might have some basis on which to determine whether

9    these exclusive agreements, because all of these agreements

10   are exclusive agreements, has any hearing on the fair market

11   value of the nonexclusive agreements that we're here to

12   determine.

13           Plaintiffs issued 16 subpoenas to studios and

14   production entities, but not a single one sought a superhero

15   property.  They have actively avoided, they have actively

16   resisted any attempt to introduce superhero agreements.

17   Whereas we raised no objection, in fact waived our objection

18   to having all of their agreements come in at one time so that

19   we could deal with it in an orderly fashion.

20           Our agreements were met with relevancy objections,

21   with objections that oh, no, Ironman is incomparable to

22   Superman so you can't even admit the Ironman agreement.

23   There's been no attempt to provide a basis, a context within

24   which the Court could determine fair market value of even

25   exclusive rights for the only properties that are comparable

1    to Superman.  Novels are not comparable to Superman.  My Fair

2    Lady, which is almost as old as I am, is not comparable to

3    Superman.  Mr. Spira, Mr. Gumpert, Mr. Levitz have all

4    testified that these are different types of agreements,

5    novels, musical comedies.  They have different economic

6    structures.

7           And, of course, the evidence demonstrates why

8    plaintiffs have not introduced any superhero agreements than

9    those introduced by the defendants, and that is because those

10   superhero agreements on their face, without injecting any

11   figures into them, are each less economically beneficial to

12   the licensor than the film agreement is to DC.

13          Mr. Gumpert testified to that fact at great length,

14   and plaintiffs have not offered any testimony to the contrary.

15   Indeed, it appears that the financial superiority of the

16   superhero agreements has been conceded by plaintiffs.  Rather,

17   their response to defendants' reliance on this group of

18   agreements is that none of these characters are equal to

19   Superman.  Superman is incomparable.  He is, according to

20   Mr. Halloran, the most valuable and important intellectual

21   property in the world.  Wow.  That's a mouthful.

22          Superman is a very important valuable property.  He

23   represents values that are -- that this country holds dear.

24   He has been an active icon in this country for 70 years due to

25   DC's activities, by the way.  But he's not incomparable.  He's

1    just a character.

2          And how do you distinguish between the value of

3    Superman and the value of Batman as film properties?  How do

4    you distinguish between Ironman and Spiderman?  Is there a

5    formula?  Is there some basis upon which to draw those fine

6    distinctions?  Or should the Court properly conclude that once

7    a character has reached a certain level of public awareness,

8    the public is aware of them?  The public is as aware of

9    Spiderman as they are of Superman.  The public knows as much

10   and has as much familiarity with Batman as Spiderman or

11   Ironman or Watchmen or Superman.  They are all well known.

12   They are all part, as Mr. Halloran referred to Superman, of

13   our DNA.

14          The novels, on the other hand, have no bearing upon

15   the market for superheroes.  As I noted, they are just

16   different animals.  The pictures are different.  They are half

17   the budget, half the gross.  And they have got an author whose

18   name can be plastered above the title and who brings people

19   in.

20          To eliminate any question that the Court may have

21   had on this issue, however, Mr. Gumpert demonstrated by his

22   testimony that the DC film agreement was more economically

23   beneficial to DC than any of those novel agreements would have

24   been.

25          Mr. Gumpert testified that he worked out the numbers

```
 1   on the deals for Hannibal, Lord of the Rings, Sahara, and

 2   Timeline, utilizing the actual cost and performance figures of

 3   Superman Returns, and concluded that DC made more money from

 4   Superman Returns under the terms of the film agreement than DC

 5   would have made from Superman Returns under the terms of

 6   Hannibal, Lord of the Rings, Sahara, or Timeline.  He didn't

 7   just rely on the superior value of the five superhero

 8   agreements, all of which he testified had greater value -- had

 9   lesser value than the D C agreement.

10           He looked to these other agreements, and he looked

11   to them in the only way they could be meaningfully looked at.

12   And I know that this issue concerned your Honor.  You asked

13   several questions about it.  Several questions about whether

14   the performance of the film at the box office affects the

15   value that was agreed to at the time of contracting.

16           And the answer is that it doesn't affect the value

17   but that the box office can certainly be plugged into the deal

18   to give economic meaning to the bare terms that had previously

19   been agreed to.

20           And that's how the defendants have used the actual

21   performance of Superman Returns and the cost.  They have used

22   it only when it was necessary to translate some of the other

23   contracts' terms into meaningful comparable factors.

24           To do so in those cases, to truly compare apples to

25   apples, you have to convert the terms into some common
```

1    denominator.  Some actual costs and revenues, in order to

2    ascertain the value that those terms bring.

3              For example, if you wanted to compare the Sahara

4    agreement to the film agreement to determine which one most

5    favored the licensor, you have to convert producer's gross

6    into actual dollars in order to compare it to distributor's

7    gross.  And, your Honor, to expand on that distinction just

8    one bit, the statement made by Mr. Toberoff built on the

9    statements by Mr. Halloran, that producer's gross can

10   sometimes be as high or higher than distributor's gross, is

11   sheer absolute nonsense.  If you told that to anyone in the

12   film business, they would say you're crazy.  Because the way

13   it works, as Mr. Gumpert testified, and he ran the biggest

14   independent production company for five years, is that a big

15   production company will finance the production of the picture.

16   And because they finance the production of the picture, they

17   get a sharply reduced distribution fee from whoever is going

18   to distribute it.

19             Instead of 30 or 35 percent, they pay anywhere from

20   10, 11, to 15 percent.

21             But nobody, none of these independent producers, no

22   one except Stephen Spielberg and the producer of Star Wars,

23   George Lucas, no one else finances the prints and advertising

24   for the picture.  That's always done by the distributor.  So

25   the distributor takes in a million dollars.  He deducts his 10

 1   or 11 percent or 12 percent distribution fee, and he deducts

 2   every dime he spent on prints and advertising.  And in the

 3   case of Superman, if we were dealing with a producer, before

 4   that producer who had financed the picture, the production,

 5   received a dime, Warner Brothers or any other studio would

 6   recoup its distribution fee, and in the case of Superman

 7   Returns, the $142 million that it spent on prints and

 8   advertising.

 9        As a matter of fact, if you were to take pencil to

10   paper and figure out the difference between the distributor's

11   gross on Superman and what the producer's gross from that same

12   film would be, it's approximately one third of the amount.

13        Those are the only instances in which we've used

14   actual figures to make that determination.  Is 10 percent of

15   producer's gross worth more than 5 percent of distributor's

16   gross?  The answer is no, it is not.  But you can't find that

17   answer.  You can't reach that answer without knowing what the

18   distribution fees were and what the prints and advertising

19   costs were that were charged and recouped by the distributor.

20        Is Timeline's $10 million purchase price, 10 percent

21   of gross, and 30 percent of 75 percent of merchandising better

22   than the film agreement's zero purchase price, 5 percent of

23   gross, and a hundred percent of 75 percent on merchandising?

24        Well, you have to figure that out.  When you did,

25   you find that it's not.  You'd find that DC makes out better

1    financially than Timeline does, even though Timeline has a

2    $10 million purchase price, which is always applied against

3    the contingent compensation, and twice as much of the gross

4    participation, but less than half as much of the merchandising

5    revenue.

6              So it's to make those points, your Honor, that we

7    actually utilized the real figures from Superman in comparing

8    some of these agreements.  Most of them, as Mr. Gumpert

9    testified, are so obviously inferior, that no such translation

10   is necessary.  You look at Tarzan, and you say well, it got

11   whatever it got.  I think 7.5 percent of modified adjusted

12   gross.  Anyone who knows anything about the business knows

13   immediately that that cannot begin to compare to 5 percent of

14   first dollar gross.

15             THE COURT:  Counsel, why don't we go ahead and take

16   our afternoon break right now.  10 or 15 minutes, and we'll

17   resume.

18             (Recess taken.)

19             THE COURT:  Counsel, you may continue.

20             MR. BERGMAN:  Thank you.

21             Your Honor, if I may, one final point on the issue

22   of public awareness, which we all understand is important.

23   But what is it that is important?  The question is not who

24   sells the most comic books or who is the individual character

25   who is most easily recognized by the most people.  The

1    question is who sells the most theater tickets?  Who brings

2    the most people into the theater to generate money for

3    everyone?  And the evidence is demonstrated, for one reason or

4    another, that it is not Superman.  Superman is not the movie

5    star that Spiderman is, the three Spiderman movies being among

6    the top five movies, I believe, of the box office.

7           He's not the kind of movie star that Batman is.  A

8    billion dollar worldwide gross income for The Dark Knight.  It

9    is not just a question of is Superman known.  Is Superman

10   known and attractive enough to people who go to movie theaters

11   to go and buy their tickets.

12          Mr. Toberoff referred to an exhibit that none of us

13   have referred to during the course of the trial, and I regret

14   not having done so, and that is Exhibit 182, I believe, which

15   is a market research report commissioned by Warner Brothers

16   prior to the release of Superman Returns.

17          It demonstrates, surprisingly enough, that the group

18   of people most interested in the anticipation of seeing the

19   Superman movie were not the tweens and the teens who go to

20   theaters and see movies time and time again, but rather were

21   middle-aged women, of all things, who remember the Christopher

22   Reeve movies and who thought the most of the property because

23   of those.

24          It's a very interesting report.  I've been through

25   it a couple of times.

1        Another thing that contributes to the value of film

2    rights in a property are precedents.  Everyone has testified

3    to that.  And the testimony of Mr. Levitz made it clear that

4    based on his analysis of the property's value in the late

5    90's, an analysis to which he testified at great length, he

6    concluded that the essential terms of the Salkind film deal

7    continue to be the best market terms available for the

8    property.

9        Yes, they were terms entered into 25 years ago with

10   a rather questionable independent producer who had no

11   leverage.  They were 25-year-old terms, but 5 percent of 2002

12   dollars is a lot more than 5 percent of 1974 dollars.  There's

13   a built-in standard of living increase between those two.

14       And in any event, it was determined that was the

15   best price he could get.  And he maintained that precedent

16   over the arguments of Spira and Schulman.  With all his years

17   at DC, he's been there for 35 years, he's watched every

18   animation property go through the mill, comic book,

19   television, and film.  He knew where the money was, and the

20   money was in merchandising and in a share of gross, and he

21   made sure that when he entered into the film agreement, he

22   reserved merchandising rights, and that, of course, affects

23   the value of that agreement.

24       It's very cute to say well, if you reserve

25   something, you're not transferring it.  Well, that's true, but

1    the question is what is the value of the deal.  And if I hold

2    on to something that's going to bring me $30,000 rather than

3    splitting it with the next guy, that affects the value of the

4    deal.

5            Another interesting thing that we've had very little

6    comment about is that in addition to reserving the

7    merchandising rights under the film agreement, DC reserved the

8    television rights.

9            Now, Mr. Toberoff properly states that they were

10   obligated, DC, to do television in connection with Warner

11   Brothers Television.  But this is the only agreement that

12   we've seen where you have money coming in from the movie

13   theaters and at the same time money coming in from television.

14   $66 million from the two.

15           And it all resulted from the fact that DC reserved

16   those rights, and Warner Brothers permitted it for its own

17   reasons, of course, to exercise those rights at the same time

18   that the movies were being developed.  $66 million.  And

19   there's no amount of cherry-picking that can be done by the

20   defendants that negates the fact that the agreement as a whole

21   is more financially lucrative to DC than any other agreement,

22   excluding My Fair Lady, taken as a whole.

23           It doesn't matter, and it's been going on --

24   Mr. Toberoff did it in his contests of fact and law.

25   Mr. Halloran did it in his report, did it throughout the

1    trial.  And this morning Mr. Toberoff did the same exact

2    thing.  This contract has an $8 million purchase price.  This

3    contract has no purchase price.  Yeah, but this contract

4    doesn't have any merchandising right, and this one has 75

5    percent.

6         You cannot take contracts apart and say because it

7    has this term, it's better than this contract.  You have to

8    look at the thing as a totality.  How much money is DC going

9    to make from the contract?  Not from the term but from the

10   contract.  DC is not going to be sharing any terms with the

11   Siegel heirs.  It's going to be herring money.  And it's the

12   money that it makes that counts.

13        It doesn't matter that in one case a film has a

14   purchase price of $10 million which is applicable to the

15   gross.  And in another case no purchase price and a gross of a

16   hundred million dollars.  It's the same thing.

17        If it's a $200 million gross, as in Superman

18   Returns, it's twice as good.

19        We've been challenging the plaintiffs to consider

20   the entirety of one agreement to the entirety of another

21   agreement for months.  Our trial brief, my opening statement,

22   everything that we've done has been to try to focus the

23   plaintiffs upon looking at the totality of what a licensor

24   earns under an agreement.  And they have refused to do that.

25        And in a further attempt to obfuscate matters, the

1    plaintiffs have placed their emphasis on non-monetary terms

2    such as creative control, or the absence of a provision

3    whereby the rights would revert to DC in the event Warner

4    Brothers decided for some inexplicable reason not to make any

5    more Superman movies.

6              And the latter point, your Honor, as I listened to

7    the questions that you posed, was of concern to you, or

8    appeared to be of concern to you.  I realized that -- I think

9    Mr. Toberoff realized it, too, because halfway through

10   Mr. Halloran's testimony, suddenly, out of nowhere, the

11   reversion provision became the most important provision in any

12   acquisition agreement.  He actually said that.

13             And he said that because your Honor showed some

14   concern about it.  And it's a red herring.  It has no bearing

15   whatever upon the economics of the deal.  And I'd like to take

16   a few minutes to demonstrate why.

17             First of all, there is a reversion provision in the

18   contract.  It's a reversion provision that if Warner Brothers

19   doesn't make the $20 million worth of option payments, then

20   the film returns -- the rights return to DC.

21             More importantly, the plaintiffs have failed to show

22   how the lack of a reversion provision tied to the production

23   and release of future pictures actually economically impacts

24   DC or the plaintiffs.

25             What difference does it make in terms of the money

1   that we're looking at?  That's what the trial is all about.

2   How much money did DC receive, how much money, if any, does

3   Warner Brothers have to add to the pot.  How much money will

4   the Siegels get.

5           And your Honor wanted to know the answer to what the

6   value of reversion was, and you asked Mr. Halloran

7   point-blank -- this is at page 750 -- the Court, the reversion

8   is something you cite to repeatedly.  From your perspective,

9   how do you in negotiating, to use counsel's example, how do

10  you value that in a particular negotiation?  How do you assign

11  a value to that reversion element?

12          And as an examination of Mr. Halloran's answer will

13  show, your Honor never got an answer to that.  No value is

14  placed on it.  He didn't tell you how any value is placed on

15  it.  He just kept repeating that the reversion right was

16  extremely important, perhaps the most important term in any

17  rights deal.

18          Mr. Halloran said that he would actually advise DC

19  to pick any agreement over the actual Superman film agreement

20  as long as there was a reversion right, even if the economic

21  terms were otherwise less favorable.  But there's no logic to

22  that at all.  Nor is there any evidence as to how much that

23  supposedly missing reversion right was worth.

24          What was it worth in terms of dollars to DC or

25  plaintiffs?  What does your Honor do with it?  How does it

1    figure into the entire problem that your Honor has to resolve

2    before October?  Mr. Gumpert, defendant's expert, who I think

3    was indeed by virtue of experience a qualified expert,

4    testified that in this case he didn't think the reversion

5    right had any value at all.  And he had a couple of reasons.

6          The first dealt with the difficulty, even if there

7    had been a reversion, of DC going to another studio to sell

8    those rights.  Because that studio would have to consider and

9    deal with not merely the termination of the Siegel heirs'

10   rights, but also the fact that Warner Brothers had its own

11   copyrighted interests in the Superman property.

12         Warner Brothers has copyrights in various films,

13   television shows, and other audiovisual presentations of the

14   Superman character.  A studio, another studio considering

15   buying DC's rights in 2002 would recognize that, of course,

16   and would recognize that they would have to skirt anything

17   that was contained in the Warner Brothers own Superman films

18   that wasn't in the DC-owned rights.  And there's a great deal

19   of it.

20         Mr. Halloran also testified to precisely the same

21   thing.  At page 370, he said that there would always be the

22   concern at another studio about potentially infringing on

23   exclusively owned Warner copyrights or trademarks.

24         The second reason why Mr. Gumpert determined that

25   the reversion right had no real value was the fact that the

1    heirs of Joseph Schuster had noticed a termination of his

2    copyright grant effective in 2013.  When that happens, your

3    Honor, the entire Superman situation shifts drastically.  At

4    that point any Superman derivative works, certainly any major

5    feature films, will be severely curtailed, if not entirely

6    eliminated in 2013, provided the Schusters' termination is

7    record as proper, just as your Honor has approved the

8    termination of the Siegels'.

9            THE COURT:  That wasn't known at the time the DC

10   Comics deal was worked out with Warner Brothers.

11           MR. BERGMAN:  Well, your Honor, we -- it certainly

12   was the law at that time.  The Schusters hadn't exercised

13   their termination right yet, but no one had any doubt that

14   they would.  That they are, after all, represented by

15   Mr. Toberoff.  It's the same situation.  So that while there

16   had been no actual filing of the termination notice, no one

17   doubted for a moment that it was coming.  And when it comes,

18   you have a situation where the Siegels and the Schusters own

19   100 percent of Action Comics No. 1.

20           But there's not much they can do with it.

21           DC owns thousands of Superman properties, but they

22   can't make a movie without infringing on No. 1.  So for all

23   practical purposes, Superman doesn't fly after 2013.

24           For another reason, a reversion prior to 2013 would

25   essentially be meaningless.  And that is this, your Honor.  If

1    you recall, plaintiffs' expert, Mr. Halloran, testified as to

2    what typically happens with the reversion provision when there

3    is one.  The studio has a two- or three-year option period

4    within which to develop a picture and decide whether to

5    purchase the rights and proceed with production.

6            Then the studio has another period of time to

7    actually produce and release the picture.  Mr. Halloran

8    testified that it's typically 18 to 24 months.

9            Then after the release of the first picture, the

10   studio has a period of time to release the next picture in

11   order to avoid reversion.

12           Mr. Halloran testified that the typical reversion

13   period is three to five years after the first picture is

14   released.  That is, that the rights revert unless a second

15   picture is produced and released within three to five years of

16   the release of the first picture.

17           Now, putting those time periods into the context of

18   the Superman film agreement, the agreement was executed in

19   2002.  Superman Returns went into production by 2005, and the

20   movie was released in 2006.  So far, all of these time periods

21   fall within what Mr. Halloran testified is typical.  So no

22   reversion would have been appropriate prior to the time of the

23   release of the picture, even if there had been a reversion

24   provision.

25           And since it's now been less than three years since

1    Superman Returns was released, what Mr. Halloran refers to as

2    a typical three- to five-year window to make and release a

3    second film also hasn't expired yet.

4         So the earliest the Superman film rights would

5    revert to DC under what Mr. Halloran describes as a typical

6    time frame is this coming summer, the summer of 2009.

7         But DC can't do anything with those Superman rights

8    if it got them back this summer, and the reason why it can't

9    do anything is that that leaves a period of less than four

10   years until the rights evaporate.  There's no studio that is

11   going to buy the rights to Superman with four years left.

12   Because as Mr. Halloran testified, the whole idea in buying

13   these kinds of properties is that you have a franchise, one

14   picture after another.  That can't happen anymore.  There is

15   just no time left for that.

16        And that's the cold reality.  And there's one more

17   point about reversion, your Honor.  I tried to make this when

18   Mr. Halloran was on the stand.  I don't know if it came out

19   clearly.  It didn't appear to me that it came out

20   convincingly.  And that is that Mr. Halloran testified that

21   the reason reversion provisions are important is because a

22   rights holder wants to make sure that there's a continuing

23   exploitation of the rights and that they are not being tied up

24   with a studio just sitting on them doing nothing.

25        But that concern has no application here.  Even if

1    we're looking at the full 34-year term through 2033.  Nothing

2    in the Superman film agreement constitutes an impediment to

3    the exercise of the plaintiffs' recaptured rights in Action

4    Comics No. 1 whenever and wherever and however they deem fit.

5         Since your Honor has ruled that termination

6    effective, DC's license of any interest in Action Comics No. 1

7    is necessarily nonexclusive, and plaintiffs, as a matter of

8    law, can fully exploit Action Comics No. 1 today, or anytime

9    in the future, and gain whatever financial benefit they can

10   from it subject only to their obligation to account, like DC

11   to its co-owner.

12        DC may not be able to exploit its exclusive rights

13   until the end of that 34-year term.  DC may have locked up its

14   exclusive rights for 34 years.  But that doesn't do any damage

15   to the plaintiffs.  The plaintiffs have no right to share in

16   defendants' exclusive rights.  So whether defendant tied up

17   their rights for three years or 300 years is irrelevant to the

18   plaintiffs' bottom line, to the money they might be entitled

19   to in the accounting phase of this trial.

20        In short, your Honor, the plaintiffs' expressed

21   concerns about the lack of a reversion provision in the

22   Superman film agreement are entirely speculative and

23   unsupported by any evidence in the record, and in any event,

24   they haven't shown to be of any value.  And if they are of

25   value, and one can hypothetically think gee, that's some

1577

1    value, your ability to take your picture back, how much is it?

2    Is your Honor going to determine based on this record what the

3    reversion value is?  I doubt that.  You certainly have no

4    basis on which to draw.

5            And, you know, ironically it was Mr. Halloran's

6    testimony that dealt the death knell to plaintiffs' claim that

7    the film agreement was below market value.  At the conclusion

8    of plaintiffs' direct examination, Mr. Toberoff asked

9    Mr. Halloran what terms he would have been able to obtain for

10   DC had he been its representative in bringing the film rights

11   into the open market.

12           Mr. Halloran responded in detail, listing the

13   elements that he believed he would be able to get or would at

14   least, quote, go for, close quote.  And that was all contained

15   at pages 576 through 579 of the transcript.

16           And he listed the elements of his dream contract ala

17   carte, picking the best purchase, the best option, the best

18   this, the best that.

19           During the direct examination of plaintiffs' expert,

20   Mr. Gumpert, I laid each of those elements out, quoting

21   directly from the official transcript of Mr. Halloran's

22   testimony, and asked Mr. Gumpert in essence to quantify

23   Mr. Halloran's fair market value deal and compare it to the

24   deal DC actually made.

25           And after I did so, your Honor addressed both

1    Mr. Toberoff and I, and you stated, quote, if there are any

2    other elements that should be in here, let's get them out on

3    the table now.  Is there any other elements that the plaintiff

4    believes needs to be before the witness to properly make this

5    comparison?  Because I think it's a very legitimate comparison

6    to make.

7            And that, your Honor, was at page 1374 of the

8    transcript, lines 6 through 12.

9            And in response to your Honor's question,

10   Mr. Toberoff added the element of a TV royalty -- a video

11   royalty, an element that Mr. Halloran had not included.  In

12   other words, Mr. Halloran didn't say I could get more than 20

13   percent.  He didn't say anything.  Mr. Toberoff raised the

14   video issue.  And I said okay, let's give them the highest.

15   And I thought 35 percent was the highest.

16

17

18

19

20

21

22

23

24

25

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████████████

5  video revenue to the question posed to Mr. Gumpert.  That is,

6  take this money and figure out how much they get under this

7  agreement, how much they get under Mr. Halloran's a la carte

8  fair market value agreement, and let's compare them.

9       Mr. Gumpert itemized the value of the Halloran fair

10  market value agreement as follows:  22 million for the gross

11  participation.  There was a gross of 220 million other than

12  video.  17 million for the merchandising share.  A $625,000

13  producer's fee for Mr. Levitz.  When Mr. Halloran described

14  it, he said as in Neopets, and in Neopets, they got a $625,000

15  producer's fee.  And a three and a half million dollar video

16  fee computed at that highest rate of 40 percent.

17       Mr. Gumpert accurately calculated those revenues to

18  total $43,125,000 as the amount of money that would result

19  from his ala carte fair market value agreement that he would

20  obtain or would at least go for if he, in his words, had the

21  honor of representing DC in the negotiations.

22       I then asked Mr. Gumpert, as your Honor will recall,

23  to compute by way of comparison the moneys that were actually

24  earned by DC from Superman Returns under the film agreement.

25  And he calculated an $11 million share of gross, which is 5

1    percent of the 220 million, 30 million for merchandising,

2    which is the undisputed testimony, and $870,000 for the video

3    royalty.  Figures which came to a total of $41,870,000.

4         In short, after ten trial days, we found that

5    plaintiffs' version of a fair market value film agreement,

6    $43,125,000, resulted in only $1,255,000 more than the

7    41,870,000 actually received by DC under the film agreement, a

8    difference of less than 3 percent.

9         And I submit, your Honor, that it hardly needs

10   saying that if the film agreement is within 3 percent of the

11   best fair market value deal that could be constructed by the

12   plaintiffs' own expert, then it certainly is itself a fair

13   market value deal.

14        The fact is that each of the agreements in question

15   have been shown to be at fair market value even treating them

16   as conveying exclusive rights, which they do not.  Moreover,

17   these agreements, each and every one of them, had in 2001,

18   according to the testimony of Mr. Levitz, been expressly

19   approved as being within safe harbors established by

20   plaintiffs' prior counsel, Mr. Ramer and Mr. Marks.

21        And given the reliance placed by defendants upon the

22   guidance of plaintiffs' prior lawyers, plaintiffs' present

23   lawyer can hardly be heard to now complain that such reliance

24   was misplaced.

25        Based on the evidence the Court has heard over the

1   past 10 trial days, equity neither requires or permits any

2   addition from Warner Brothers to the $66 million thus far

3   received by DC under these agreements.

4          Rather, your Honor, with all due respect, I say

5   this.  It's time to move on with the case to determine what

6   portion of those revenues the plaintiffs are entitled to share

7   in.

8          Thank you.

9          THE COURT:  Thank you, Counsel.

10         Mr. Toberoff, I will give you 30 minutes for

11  rebuttal.

12         MR. TOBEROFF:  Thank you, your Honor.

13         **REBUTTAL ARGUMENT BY COUNSEL FOR THE PLAINTIFFS**

14         MR. TOBEROFF:  Mr. Bergman's closing argument seems

15  to be based on what defendants wanted to get into evidence as

16  opposed to what they actually got into evidence.  The Court

17  noted that we had a week to do our closing arguments and ask

18  for pinpoint cites, and defendants shied away from this.  The

19  large majority of the closing argument only gave pinpoint

20  cites for actual quotes.  And there's good reason for this.

21         The majority of Mr. Bergman's closing statement is

22  not supported by the record.  It's not supported by admissible

23  evidence or admitted evidence.

24         An example, just to throw out one, is he puts great

25  emphasis on the hearsay statements of Ramer and Marks during

1582

1    the settlement negotiation and reads from an actual letter,

2    which is Exhibit 1126.  Exhibit 1126 is not in evidence.

3         Plaintiffs did indeed address the minimal impact of

4    the nonexclusivity of Action Comics No. 1 at trial.  I refer

5    the Court to the transcript at page 358, line 13, to 379, line

6    11.  When plaintiffs brought up this issue of exclusivity, not

7    asking for reconsideration, but really asking for

8    clarification, and discussed it in front of the Court, the

9    Court then turned to Mr. Bergman, after I made my statement

10   that it really applies to action 1 and the rest of the

11   copyrights transferred were exclusive, and Mr. Bergman

12   restated essentially what I had just said.  And then the Court

13   looked at both of us and said, "I think we're all talking

14   about the same thing here."  And we are indeed all talking

15   about the same thing.

16        The agreement, while it would have conveyed only

17   nonexclusive rights to Action 1, conveyed exclusive rights to

18   all the other copyrights comprising the Superman mythos.  The

19   compensation in the agreement was for the entire Superman

20   mythos, not just Action 1.  So there's no basis to -- it

21   doesn't further the analysis to value the nonexclusive rights

22   to Action Comics No. 1 because even if you were able to do so,

23   you'd have nothing to compare it to in the agreement in order

24   to assess whether the agreement was for fair market value,

25   since the compensation for the agreement is for the entire

1    Superman mythos, the vast majority which was exclusive.

2           We also address in great detail why because you

3    don't have foreign rights and because essentially Warner

4    Brothers preempts the marketplace with all these exclusive

5    rights, how there's no risk of competition, and the risk of

6    competition from the Siegels is the only thing that could

7    possibly devalue the rights.

8           We show that obviously Warner Brothers actions show

9    that they didn't consider these rights devalued, or they

10   wouldn't have plowed half a billion dollars into them with the

11   Superman Returns movie and another half a billion dollars into

12   Smallville.

13          As far as Mr. Halloran's expertise is concerned, the

14   foundation was laid for his expertise at page 253, line 15, to

15   267, line 19.  With regard to TV, the foundation for his

16   expertise was laid at 259, line 16, to 264, line 18.

17          In addition, at page 259, 6 through 10, Halloran

18   shows that he indeed engages in major film business with all

19   the studios he represents, a big producer that has produced

20   many franchises, including Mummy and now G.I. Joe.

21          In addition, this expert is not limited to those

22   agreements that he has actually negotiated.  And yes, he

23   negotiated the Neopets transaction with Warner Brothers.  An

24   expert obviously takes into account the knowledge and

25   education and experience that he's gleaned over his entire

1    life.  And in this case, we show that, as an executive at the

2    studios for 10 years and afterwards, he certainly qualifies as

3    an expert.

4            But just as importantly, defendants did not voir

5    dire Mr. Halloran or move to exclude any of his testimony as

6    plaintiffs did with Mr. Gumpert with regard to television.

7            We voir dired Mr. Gumpert specifically as to his

8    lack of television experience.  We asked for exclusion, and

9    defendants conceded that they could not -- would not offer

10   Mr. Gumpert for TV.  Defendants did not do this.

11           Defendants complain that Mr. Halloran did not

12   distribute or circulate his opinions to distributors and other

13   people in town while making him a scapegoat under his

14   protective order regarding the Harry Potter matter.

15           I think it's plain that Mr. Halloran could not offer

16   his opinions around town because such opinions naturally deal

17   with whether the Superman film agreement was for fair market

18   value, and the terms of that agreement are confidential.

19           It's almost conceded that -- turning to the TV

20   agreement, it's almost conceded that Birds of Prey is a much

21   less valuable property than Superman.  Yet it got the same 3

22   to 5 percent gross participation in TV as Superman.  This

23   is -- when you have a much more valuable property like

24   Superman, getting the same participation as a much less

25   valuable property, plaintiffs submit it is indeed evidence

1   that the more valuable property did not get major market

2   value, not that they simply got lucky with a less valuable

3   property.

4           Mr. Paul did not testify at trial that no one gets

5   first dollar gross.  He testified that he personally had not

6   negotiated a first dollar gross deal.  And I'll represent to

7   the Court that at his deposition he clearly stated that their

8   first dollar TV gross participation is at Warner Brothers

9   Television.

10          MR. BERGMAN:  Object to that reference.  It is not

11  only improper, it's inaccurate.

12          THE COURT:  Sustained.

13          MR. TOBEROFF:  Regarding the Tarzan agreement --

14          THE COURT:  On the improper part.  It's not before

15  the Court.

16          MR. TOBEROFF:  I understand.

17          Regarding the Tarzan agreement, there is evidence in

18  the record that indeed the Tarzan character is in the public

19  domain.  The estate holds in later stories and elements which

20  allows it to enter into these agreements, and the estate has

21  made it much cheaper to get an inexpensive license from them

22  rather than to litigate with them over possible infringement

23  of later stories.

24          The record -- turning to the value of Superman, the

25  record reflects that Warner Brothers started to vigorously

1    develop Superman in 1994, which is only seven years after the

2    flop Superman 4, and proceeded to plow $60 million into it.

3    We submit that that's evidence that Superman 4 did not have

4    the devastating effect on the value of Superman that

5    defendants suggest.

6            Horn may have testified that Superman is viable but

7    challenged.  Yet we know that despite this, he green lit the

8    expenditure of $60 million in development and $400 million in

9    production and marketing.

10            Why we ask?  And the answer is because it's

11   Superman.  And the value in these properties has demonstrated

12   with Batman lies in the ability to reboot these properties

13   because of the evergreen nature of the properties.  They are

14   so much a part of our culture, both in terms of their story

15   lines and their imagery, that people will allow you to make up

16   for an isolated failure with a new film.  And the studios are

17   demonstrating this, and, as Halloran testified to this, not

18   just with Superman, but with Batman, with Star Trek, with all

19   sorts of other properties where they are rebooting the

20   properties based on the branded nature of the properties,

21   which is a hedge against risk.

22            The defendants -- Mr. Bergman spoke at great length

23   about Mr. Levitz's negotiation of the Superman film agreement

24   and how he insisted that Warner Brothers could not depart from

25   1974 precedent, and the question is why can't they exceed 1974

1    precedent?  Why are we stuck in 1974 in 2002, when comic

2    books, as the source of films, are going through the roof?

3          The goal is not to maintain 1974 rates.  The goal is

4    to maximize a core asset of DC based on the current market.

5    And in doing that, you don't go to the 1993 X Men agreement

6    underlying a successful 2000 X Men film.

7          You look at the success of the X Men film.

8          We know that Mr. Levitz was not allowed to test the

9    market for Superman.  While claiming that novels are

10   noncomparable and relying on what is in this case I don't

11   believe state of mind testimony but expert testimony,

12   Mr. Levitz, Spira, the only expert there would be Gumpert.

13         The next line from Mr. Bergman is novels have

14   authors whose names can be plastered above the title and bring

15   people in.

16         What this means to me, and I think to everyone else

17   in this courtroom, is that the names of these authors have

18   branded titles, which is exactly why you compare novels to

19   Superman, to board games, to a theme park ride.  Because it's

20   the brand.  It's the preawareness that the studio is paying

21   for, not because they can adopt the novel.

22         Mr. Bergman referred to Mr. Gumpert's five superhero

23   agreements.  Mr. Gumpert did not have five superhero

24   agreements.  He had an old agreement for Ironman, before

25   Ironman became a household name, due to the success of a film

1    made years later on a completely different agreement.

2           And he had information regarding the Green Hornet.

3    None -- neither of these properties are at all comparable to

4    Superman, and, in fact, the deals have inferior terms is only

5    to be expected.

6           In talking about the Sahara agreement, Mr. Bergman

7    mixes distributor's gross in the pure sense, which means all

8    the money made by the actual distributor, with distributor's

9    gross referred to by Mr. Halloran and saying producer's gross

10   can be greater than distributor's gross.  When Mr. Halloran

11   refers to a distributor's gross, and I'm referring to a

12   distributor's gross, we're referring to the gross that only

13   adds 20 percent of video -- worldwide video revenues included

14   in distributor's gross as opposed to a hundred percent of

15   worldwide video revenues in a world where video accounts for

16   50 percent of the worldwide marketplace.

17          It's in that respect that when producer's gross

18   includes a hundred percent of video, even with a distribution

19   fee of 10 to 15 percent, which is reduced due to the financing

20   of the producer, that indeed distributor's gross -- we're

21   talking here about defined terms, not civilian terms.  In

22   fact, Sahara, which was financed by the billionaire Phillip

23   Anschutz, who in fact put up marketing money for the movie,

24   contrary to Mr. Bergman's statements.

25          MR. BERGMAN:  That's contrary to the evidence, your

1   Honor.

2          THE COURT:  Sustained.  You may continue.

3          MR. TOBEROFF:  Mr. Bergman referred to Timeline as

4   having a $10 million purchase price and other terms in his

5   closing statement.  Timeline, Exhibit 325, doesn't have any

6   purchase price.  That's the agreement that in lieu of up-front

7   money, the author negotiated a 10 percent of first dollar

8   gross participation escalating to 20 percent of first dollar

9   gross.

10          Again, engaging in post-2002 hindsight

11  rationalizations, Mr. Bergman refers to the actual performance

12  of Superman Returns, the movie, which actually did better, we

13  showed at trial, than the first Batman reboot film, Batman

14  Begins, in 2002.  Excuse me -- in 2004.

15          But he refers to that to say Superman is not the

16  movie Spiderman or Batman is.  It's not the movie star

17  Spiderman or Batman is.  Well, if Batman is such a movie star,

18  then why did DC get less for the Batman agreement for Batman

19  than it did even for the Superman agreement?  Again, it makes

20  no sense and there's no rhyme nor reason to these affiliated

21  transactions but for the fact that they are affiliated

22  transactions.

23          And again, defendants' arguments are belied by their

24  own conduct.  After the $1 billion theatrical gross of The

25  Dark Knight in 2008, you can be sure that Warner Brothers is

1    anxious to bring Superman back, and Mr. Horn testified to that

2    fact.  The reason is, when you look at each of these studios,

3    if you look at Sony, which is Columbia, they have Spiderman.

4    And they make a lot of movies with Will Smith.  In an industry

5    where you're supposed to drop names, I forgot the name.

6              THE COURT:  Both sides have dropped a sufficient

7    number of names.

8              MR. TOBEROFF:  Sony has Spiderman.  Universal, which

9    lacked these branded characters had to go back to their

10   archives and pulled out the Mummy.  Fox has X Men.  Paramount

11   now has Ironman.  What does Warner Brothers have?  It has

12   Batman, Harry Potter, and Superman, all three of which are now

13   of tremendous value.

14             The question is how did Mr. Levitz know what the

15   market was for Superman rights if, as he admitted on the

16   record, he never shopped the rights to another studio, he

17   never hired a top talent agency, nor did he hire the

18   Brittenham firm or the Ramer firm or all the other top

19   entertainment firms Mr. Bergman keeps complimenting.

20             He functioned solely within the closed Warner

21   Brothers universe and did the best he could given that

22   affiliated relationship.

23             But there is no doubt that the agreements in

24   question are not agreements that were pinned to a fair market

25   value or any fair market value analysis.  They are asset

1    transfers within a closely held corporation.  They are asset

2    transfers from a company where the record shows is essentially

3    an IP stable for Warner Brothers to Warner Brothers.  And when

4    Warner Brothers saw the tremendous value after 2000 of these

5    superhero brands in the marketplace, they made sure to lock up

6    these properties with no chance of reversion, notwithstanding

7    whether they made a movie or a TV series or sat on the

8    property.  They wanted to control this asset.

9            That brings us back to reversion.  Mr. Bergman asked

10   what difference does it make anyway, reversion.  Who cares

11   about reversion.  What's the economic importance of reversion.

12           In fact, Mr. Halloran did answer the Court and did

13   testify at page 406, lines 8 through 15, that reversion has

14   tremendous economic importance.  But even without that

15   testimony, it's obvious.  If you have a property like Superman

16   and you are sitting watching while Spiderman and all these

17   other movies make money, and you can't do anything about it to

18   launch a movie and must simply wait for the parent studio to

19   make a movie, and for year after year they don't make a movie,

20   it has tremendous economic impact.

21           THE COURT:  Let me give you an opportunity, Counsel,

22   to answer the question that I don't think Mr. Halloran has

23   answered, and perhaps I missed it.  But the Court's question

24   is how do I value it quantitatively?  If, at the end of the

25   day, I'm left with a situation that I believe the absence of

1592

1    that reversion clause, the one that you're referring to, as

2    opposed to one that actually does exist in the agreement, is

3    of significance to evaluating the fair market value of the

4    rights transferred, how do I quantify that?  That is the

5    question that -- my question to you is is there evidence in

6    the record as to that quantification as opposed to a more

7    general sense that it's of value?

8                MR. TOBEROFF:  First, and I say this with -- I will

9    try and answer that question as to quantification.  But first,

10   and with due respect, the mission before us is to decide

11   whether or not an internal affiliated agreement was made for

12   fair market value.  If you see that something has devastating

13   economic impact, the fact you can't put a dollar figure on

14   that because to do so involves all sorts of different

15   potential scenarios doesn't mean that you don't take that into

16   account when judging whether the agreement as a whole was for

17   fair market value.

18               Remember, defendants keep saying we look at the

19   agreement as a whole.  This is a part of the agreement as a

20   whole.  What plaintiffs need to show is that it has

21   devastating economic impact.  But I'm going to offer some

22   things to quantify it.

23               If you have an agreement with only a million five of

24   fixed compensation up front where other agreements have 8, 9,

25   10 million of guaranteed compensation, even $20 million, and

1    it's weighted -- the entire agreement is weighted to a 5

2    percent contingent gross participation, that means if they

3    don't make any films for 34 years or make only one film, you

4    are going to get a fraction of the money you could get if you

5    were in the marketplace and making deals with studios where

6    they have three or five years to make a movie, and then after

7    that movie, they have to make another movie within three or

8    four years or it goes back to you, allowing you to set up the

9    movie at another studio who will make the movie in three to

10   four years.

11           THE COURT:  And that analysis assumes that you could

12   make a movie at another studio?

13           MR. TOBEROFF:  Yes, and with Superman I believe

14   there's no question that every studio in town would be

15   chomping at the bit.  Because like I said, a lot of these

16   studios don't own a DC.  They don't have the luxury of having

17   Superman and Batman already owned by the conglomerate.  That's

18   why I mentioned that Universal had to go back into its

19   archives and revive the old Mummy character from one of its

20   old films.  That's why Universal had to make a deal with

21   Hasbro, which is all over the trades, to make movies based on

22   branded board games, which is a far cry from a Batman or a

23   Superman, because they don't have that.

24           Every studio in town would jump at the chance to

25   make Superman movies.  As evidenced by the amount of money

1594

```
 1    Warner Brothers plowed into Superman in both the film and TV.
 2              Now, Mr. Bergman referred to, well, why wouldn't
 3    Warner Brothers make Superman movies?  Of course, they
 4    continue to make Superman movies, but with the same breath he
 5    says Superman is not the movie star Spiderman and Batman is.
 6    Superman is a tired character.  It's not hip.  The two --
 7    those two arguments completely fight each other.
 8              The point is when you make a deal that's weighted to
 9    a contingent participation, you don't leave yourself at the
10    mercy of the licensee for 34 years.  It could have devastating
11    economic impact.  If you want to actually quantify it with a
12    number, you can look at the returns of Superman Returns.  You
13    can look at the revenues from Superman Returns.  You can look
14    at the revenues which are in the record of the other superhero
15    films.  And you can develop the mean average for superhero
16    movies and figure out what that 5 percent would be if they
17    made a movie every five years.
18              The other studios are making movies, not only every
19    five years, they are making -- a Spiderman movie has come out
20    something like every two and a half or every three years.
21    Same with the X Men franchise I referred to earlier, and same
22    with Batman.  The time between the first Batman Begins movie
23    in 2004 and The Dark Knight was four years.
24              So they have the ability to crank out these movies
25    every four years, and the failure to do so and every time they
```

1    don't do that, you are losing a fortune in revenues.  That's

2    how you can quantify it if you need to put a number on it.

3    But I submit that -- the fact that you can surmise a

4    devastating economic impact is enough to show the agreement is

5    not for fair market value, particularly when you look at the

6    fact that of the five agreements offered by Warner Brothers in

7    this case, three of them, these rolling reversion periods for

8    lack of exploitation -- we don't know what the reversion terms

9    are in the Green Hornet and Lone Ranger deals that Mr. Gumpert

10   got over the phone because he never told us.

11        As far as the ultimate hindsight argument of

12   defendants, which is the Schuster termination, as the Court

13   noted, the Schuster termination wasn't served until after the

14   agreements were entered into.  It was served in November 2003.

15   It's too speculative to take that into account.  We don't know

16   if the Superman termination will be upheld.  We don't know to

17   the extent it will be litigated.  There are too many unknowns.

18        To be able to say in retrospect that the reversion

19   has no impact because if it turns that the Schuster

20   termination is upheld, then the term we're left with is only

21   up to 2013, then what does it matter?  Defendants insisted

22   that we objectively analyzed these agreements.

23        When we focused on the internal relationship or the

24   cozy relationship and the inferences that can be drawn from

25   that and how that's counter intuitive, defendants kept

1    slamming us, saying you have to look at the objective terms of

2    the agreement.  Yet at trial, they didn't do so.  They spoke

3    about their best intentions and what they were thinking when

4    they negotiated it, and what Warner Brothers does and doesn't

5    do.  They didn't give us the objective evidence regarding the

6    marketplace.

7              And I submit that plaintiffs did do that.  And that

8    was their focus.  And all of these hindsight rationalizations

9    about how Superman Returns happened to do and how it happened

10   to make money in this way or that way or if you run the

11   Superman figures through other agreements, these are all

12   hindsight rationalizations.

13             You can't make an objective judgment with this kind

14   of after-the-fact -- these kinds of after-the-fact numbers,

15   because where do you draw the line?  Do you draw it after one

16   film that was successful or another film that is more

17   successful or a third film that's less successful?

18             Where do you draw the line if you're going to

19   determine whether an agreement in 2002 was for fair market

20   value by looking into the future of how movies actually turned

21   out or what their revenues are?

22             I understand that running those numbers can

23   explicate some of the terms and give the Court a better

24   understanding, but it's not the basis of an objective

25   analysis.

1    The argument that -- it took me a while to even

2  understand the argument, that plaintiffs can exploit Action 1

3  and therefore the reversion provisions do not affect them does

4  not make any sense.

5    DC's Superman film agreement transferring rights for

6  money constitutes an exploitation of the Superman mythos

7  triggering a duty to account.  The Superman Returns that is

8  produced pursuant to that agreement and for which defendants

9  must account constitutes a post-termination derivative work

10  for which defendants must account.

11    Thank you.

12    THE COURT:  Thank you, Counsel.

13    Just to clarify the record, you seem to raise

14  another objection concerning Mr. Levitz's testimony concerning

15  the comparability of novels as expert testimony.  Just so the

16  record is clear on that, I thought we resolved this issue

17  during the trial.

18    The Court is not considering that evidence as expert

19  testimony but basically, as you indicated moments after that,

20  how would Mr. Levitz know what fair market value was, it's

21  precisely for his state of mind that the Court is considering

22  that testimony.

23    All right.  The Court has heard closing arguments.

24  And I've also obviously considered the evidence carefully over

25  the last three weeks.  Three things are clear to me at this

1    point.

2              First of all, the motion with respect to Time

3    Warner, Inc., is granted.  Time Warner is out at this stage.

4              The Warner Brothers consumer products agreement, the

5    merchandising agreement, there is certainly insufficient

6    evidence to establish that it is not a fair market agreement

7    or within that ballpark, and the same can be said of the

8    animation agreement.  The film agreement I need to think about

9    some more in light of the arguments that were made this

10   afternoon.  But I do hope to get a decision out on that

11   promptly.  But that's where I'm at at this point.

12             And I will get that decision out, along with my

13   order regarding briefs on additional issues together, and that

14   will tee up our next phase of this trial.

15             There is a motion, an ex parte application to have

16   certain Phase 1 trial exhibits and related testimony placed

17   under seal.  The Court has read both the application and the

18   opposition.  I grant the application.  The proposed order

19   needs to be modified to further include references to the

20   under seal testimony that were made by both sides in the

21   closing argument.

22             So I'll ask counsel for the defense to resubmit an

23   amended proposed order on the application.

24             Any other matters that we need to take up at this

25   time?

1          MR. BERGMAN:  Your Honor, just to clarify the

2     record, Exhibit 1126, the letter from which I quoted, was

3     admitted into evidence.  It was admitted into evidence for the

4     purpose of Mr. Levitz's state of mind.  And that's found at

5     page 1212, line 16, of the transcript.

6          THE COURT:  Mr. Toberoff?

7          MR. TOBEROFF:  Originally Exhibit 1126 was to

8     refresh the recollection of Mr. Levitz.

9          The objection was Mr. Bergman was reading from the

10    letter itself, not from Mr. Levitz's testimony.  1126 --

11         THE COURT:  But the testimony came in.

12         MR. TOBEROFF:  The testimony came in, but

13    Mr. Bergman in his closing argument was reading from the

14    letter itself.  He was quoting the letter itself.  That was

15    the objection.  The letter was --

16         THE COURT:  Is there anything that Mr. Bergman

17    quoted that was at odds or at variance from the testimony

18    given by Mr. Levitz?

19         MR. TOBEROFF:  I'd have to go back and study.

20         MR. BERGMAN:  I can't answer that off the cuff.

21         THE COURT:  Very well.

22         MR. TOBEROFF:  Thank you.

23         MR. BERGMAN:  One final question.  You didn't

24    mention the Smallville television agreement.  Is that also

25    under submission?

```
 1              THE COURT:  Yes.

 2              MR. BERGMAN:  Thank you, sir.

 3              MR. TOBEROFF:  Thank you, your Honor.

 4              THE COURT:  All right.  Court is in recess.

 5

 6              (Proceedings concluded at 4:45 P.M.)

 7

 8                 C E R T I F I C A T E

 9

10

11         I hereby certify that pursuant to Title 28,

12    Section 753 United States Code, the foregoing is a true and

13    correct transcript of the stenographically reported

14    proceedings in the above matter.

15              Certified on May 19, 2009.

16

17

18              _____
                MARK SCHWEITZER, CSR, RPR, CRR
19              Official Court Reporter
                License No. 10514

20

21

22

23

24

25
```