1
2
3
4
5
6
7
8
9
10                    **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

12

13  JOANNE SIEGEL and LAURA          )    Case No. CV-04-8400-SGL (RZx)
    SIEGEL LARSON,                   )
14                                   )
                   Plaintiffs,       )    ORDER RESOLVING ADDITIONAL
15                                   )    ISSUES
            v.                       )
16                                   )
    WARNER BROS.                     )
17  ENTERTAINMENT INC.; TIME         )
    WARNER INC.; and DC COMICS,      )
18                                   )
                   Defendants.       )
19  _____ )

20        The 1976 Copyright Act contains many intricate formalities that an author

21  (or his or her heirs) must navigate to successfully terminate the grant to the

22  copyright in an original work of authorship, but perhaps none is more fundamental

23  an impediment than the one excluding from the reach of termination the copyright

24  "in a work made for hire." 17 U.S.C. § 304(c); see 1 MELVILLE B. NIMMER, NIMMER

25  ON COPYRIGHT § 5.03[A] at 5-12 (2008) (commenting that the exclusion "relating to

26  termination of transfers is probably the most important feature of the work for hire

27  doctrine with respect to works created at present"); 3 WILLIAM F. PATRY, PATRY ON

28  COPYRIGHT § 7:42 (2008) (labeling as a "significant exclusion" to the right to

1    terminate the grant in "work-for-hire creations").  The complexity of the 1976 Act's

2    termination procedures stems as much from the fact that those provisions

3    intersect with and must be construed in light of the body of copyright law that

4    existed at the time the works were created (here, the 1909 Copyright Act) as from

5    the intricacies set forth in the 1976 Act itself.

6         This is particularly true when applying the "work made for hire" bar to works

7    created under the auspices of the 1909 Act, as the law developed by the courts

8    under the Act was oftentimes confused and not well-delineated, with its dimension

9    continuing to evolve long after the effective date of the 1976 Act.  See Easter Seal

10   Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,

11   815 F.2d 323, 325 (5th Cir. 1987) (commenting that the term "work for hire" was

12   undefined in statute, and that a "substantial body of cases developed as courts

13   worked out the definition").

14        Having previously addressed the iconic superhero Superman's first

15   appearance in Action Comics No. 1 in its earlier decision, the Court now considers

16   the myriad relationships and contractual arrangements surrounding the published

17   works of Superman by his creators Jerome Siegel and Joseph Shuster for the

18   years 1938 to 1943.  The task of disentangling these relationships and

19   agreements, and giving legal meaning to them, lies at the heart of this case.

20                              **I. FACTUAL BACKGROUND**

21        When the Court last left Superman, the copyright in the earliest published

22   version of the character, as depicted in the comic book Action Comics No. 1, had

23   been reunited with the heirs of one of his creators, Jerome Siegel.  See Siegel v.

24   Warner Bros. Entertainment Inc., 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008).

25   One might have thought that with the extensive discussion of Superman's creation

26   and development therein, little more would be left to be said about Superman's

27   first years in print; as the Court has since learned, there is more to the story.

28

1    Like the arc of a comic book serial, there has been an unfolding of

2  evidence regarding the creation and subsequent publication of Superman.  The

3  parties have presented to the Court previously undisclosed evidence surrounding

4  the back story to Superman's creation before 1938, the character's publication for

5  the years 1938 to 1943 in comic books published by Detective Comics after <u>Action</u>

6  <u>Comics</u> No. 1, and in the syndication of daily newspaper comic strips through the

7  McClure Newspaper Syndicate.

8  **A.    Pre-1938 Years:  Superman's Initial Creation and Development**

9    As recounted in the Court's earlier Orders, the development of Superman

10  evolved, with the character being re-worked by Siegel and Shuster over a period

11  of years.  However, missing from that account and now disclosed is the existence

12  of another collaborator.

13    The story picks up with Siegel dramatically rescuing from the flames the

14  cover art work from the pair's initial version of the Superman character in heroic

15  form (as a hulking strong man, sans super-human powers or alien origin, in the

16  fashion of Flash Gordon) after Shuster grew despondent when the publisher to the

17  comic book <u>Detective Dan</u> rescinded its offer to publish the material.  <u>See</u> <u>Siegel</u>,

18  542 F. Supp. 2d at 1103.  This led to a split of sorts with Siegel, with Shuster

19  apparently deciding he was no longer interested in continuing to illustrate

20  Superman, and Siegel apparently concerned that the character was going

21  nowhere under Shuster's artistic direction.  As Siegel later recounted, after the

22  debacle with <u>Detective Dan</u>, Shuster became "very discouraged" and decided that

23  he "did not want to work on Superman anymore."  (Decl. Marc Toberoff, Ex. F at

24  45).  Undeterred, Siegel sought out other artists to illustrate his scripts as he

25  continued to flesh out the Superman character.  <u>See</u> <u>Siegel</u>, 542 F. Supp. 2d at

26  1103 ("Undaunted, Siegel continued to tinker with his character, but decided to try

27  a different publication format, a newspaper comic strip").

28

Notably, Siegel approached illustrator Russell Keaton, who at that time was providing the art work for the Buck Rogers Sunday newspaper strips.  For a few months spanning the summer and fall of 1934, the pair exchanged correspondence and scripts for Superman.  This activity culminated with Siegel and Keaton producing a week's worth of newspaper comic strips (or nine horizontal strips, each containing four panels, with dialogue and illustrations), and Siegel drafting for Keaton's consideration three scripts (for which no illustrations were ever created) for Superman that, taken together, demonstrated the evolving nature of the character.

The story portrayed in the scripts and the week's worth of illustrated material was devoted exclusively to Superman's upbringing as a child by a couple known only as Sam and Molly Kent, and included the first inklings of a science fiction aspect to the character, albeit with a much different take on Superman's now well-familiar origins.

In this earlier version, Siegel conceived of Superman as having been sent as an infant back in time, to then-present day America (circa 1935), in a time machine created by "the last man on Earth" before the planet's destruction.  The story is also notable as it contained the first expression of Superman's now familiar super-human powers:  That he had a "physical structure millions of years advanced from" those living in 1935, leading him to possess "colossal strength," the ability to "leap over a ten story building," "run[] as fast as an express train," and stated that "nothing less than a bursting shell could penetrate his tough skin." Upon his arrival, Superman spoke a language that his adoptive parents did not understand, and the secret of his origins was tied to a cryptic mystery note accompanying him in the time machine.  When, as an adult, Clark Kent was presented with the mystery note, he could not understand the words written on it. Both the illustrated strips and the scripts contain the by-line crediting its authorship to "Jerome Siegel and Russell Keaton."  (Decl. Marc Toberoff, Exs. C, D & E).

1    Keaton eventually chose not to take a chance on someone with such little

2  experience writing comics; by sometime in the first half of 1935, Siegel and

3  Shuster resumed their creative partnership and were again working together on

4  Superman, with the pair poised at the tipping point that would lead them to create

5  the version of the character that would transform the comic book industry.  In fact,

6  it was shortly thereafter that Siegel would have his breakthrough moment,

7  conceiving of the now-familiar Superman story on a "hot summer night."  It was

8  then that Siegel combined his now developed Superman character as a mythic

9  superbeing capable of fantastic feats with a new pseudo-scientific explanation for

10  those feats to make them more plausible — the character's extra terrestrial origin.

11  Shuster then went about creating a graphical representation of Siegel's character,

12  replete with costume and distinctive physical features:

13              The two then set about combining Siegel's literary
                material with Shuster's graphical representations.
14              Together they crafted a comic strip consisting of
                several weeks' worth of material suitable for newspaper
15              syndication.  Siegel typed the dialogue and Shuster
                penciled in artwork, resulting in four weeks of
16              Superman comic strips intended for newspapers.  The
                art work for the first week's worth of "daily comic strips
17              was completely inked" and thus ready for publication.
                The "three additional weeks of 'Superman' newspaper
18              comic strip material" differed from the first week's
                material "only in that the art work, dialogue and the
19              balloons in which the dialogue appeared had not been
                inked," instead consisting of no more than black-and-
20              white pencil drawings.

21  Siegel, 542 F. Supp. 2d at 1105.[1]  Much of this four weeks' worth of material was

22  later re-cut and re-pasted into a comic book format and published in the first

23  installment of Detective Comics' comic book magazine Action Comics.  Not widely

24  known is the amount of material, beyond that published, the pair had created

25  during these formative years, outside the watchful eye of any publisher.

26  _____

27      [1]  In its March 26, 2008, Order, the Court describes this "hot summer night"
        moment as occurring in 1934; however, the undisputed evidence now points to an
28  undefined date in the summer of 1935.

1    To begin, not <u>all</u> of the four weeks of pre-existing Superman material

2  created by Siegel and Shuster found its way into print in <u>Action Comics</u> No. 1.

3  During the editing process, Detective Comics decided to exclude the first weeks'

4  worth of material in order to accommodate space for other features in the comic

5  book.  As later explained by noted comic artist/writer/historian James Steranko in

6  his 1989 forward to DC Comics publication of <u>Superman Archives, Volume 1</u>:

> McClure Syndicate agent M.C. Gaines, an early comics
> pioneer, just happened to have the Siegel and Shuster
> submission on his desk when president Harry
> Donenfeld [of Detective Comics] phoned, inquiring
> about original material to fill a new magazine he was
> assembling. . . .   Donenfeld recognized the material's
> appeal and ordered the newspaper strip repasted into
> comic-book format, <u>with the first week eliminated to
> accommodate available space in the magazine</u>, which
> was christened **Action Comics**. . . .  The opening tale
> was reprinted <u>in its entirety</u> in **Superman** 1 . . . .

13  (emphasis added).

14    Indeed, if one compares the material published in <u>Superman</u> No. 1 with that

15  in <u>Action Comics</u> No. 1, the two mirror one another in every respect except that

16  <u>Superman</u> No. 1 contains an additional six pages (the first six pages in the comic)

17  filling in more details about Superman's formative years as well as providing the

18  prologue to the story told in <u>Action Comics</u> No. 1 (<u>see</u> Addendum A for the first six

19  pages of <u>Superman</u> No. 1).  Included in the famous first edition re-publication of

20  <u>Superman</u> No. 1 is a forward by Siegel himself, which gives the following

21  description of the origins and time of creation for these first six pages of material:

> M.C. Gaines became involved in this enterprise[, the
> publication of <u>Superman</u> No. 1].  Readers may be
> especially interested in the letter he wrote to me on
> March 27, 1939 on Detective Comics, Inc. stationary:
> "With further reference to the SUPERMAN book . . . we
> have decided . . . that for the first six pages of the
> SUPERMAN book that we would like you to take the
> first page of SUPERMAN, which appeared in ACTION
> COMICS #1, and by elaborating on this one page,
> using different ideas than those contained on this
> page, work up <u>two</u> introductory pages, the last panel of
> this second page to consist of the panel marked 'X' on
> the enclosed sheet.  On these two pages, you will of

1
2
3
4
5

course leave out the scientific explanation of Clark Kent's amazing strength, as we want a separate page on that item to use further back in the book with the heading as follows:  'Scientific Explanation of Superman's Amazing Strength', in which you will incorporate five or six various explanations, which we discussed while you were here in New York several days ago.

6    (Decl. Marc Toberoff, Ex. GG).

7         Thus, the first two pages in <u>Superman</u> No. 1 was composed of material

8    created by Siegel and Shuster in 1939 when the comic book was published, but

9    the following four pages in the comic (pages three through six) represent the first

10   week of Superman material the pair had crafted in 1935.

11        Beyond this first four weeks of material (containing Siegel's dialogue and

12   Shuster's illustrations) that was later re-cut and re-pasted in comic book format,

13   Siegel also had written Superman material to which Shuster provided no

14   illustrations.

15        For example, Siegel wrote a paragraph previewing future Superman

16   exploits which was contained at the end of a "nine-page synopsis of the storyline

17   appearing in the three weeks of penciled daily Superman newspaper comic

18   strips."  542 F. Supp. 2d at 1105.  The paragraph Siegel wrote previewing future

19   Superman exploits has now been produced in this case:

20
21
22
23
24
25
26
27
28

This ends the first month's release and yet the potentialities of the character, SUPERMAN, has barely been scratched.  He's headed for the most exciting and yet humorous adventures this world has even seen. He will win a war single-handed, battle an airplane with his bare hands, swim several hundred miles and think nothing of it, etc.,.  He's <u>different</u> and sure to become the idol of young and old.  He'll participate in sports and astound the nation; he'll single-handed rescue a town from a flood through his super-strength.  Unlike most adventure strips the scene of the story will not be laid in some fantastic, unknown jungle or planet or country, but will be all the more astounding for having its locale on familiar streets.  SUPERMAN will operate against a background of America's most well-known cities, buildings, and pleasure-spots.

1  (Decl. Marc Toberoff, Ex. A at 12 (emphasis in original)).

2  These broad outlines later found expression in the plot in <u>Action Comics</u>

3  No. 2, which involved Superman single-handedly averting a war brewing in the

4  fictional country of San Monte that had been instigated by a corporate war

5  profiteer.  In that comic book, there is a series of panels revealing Superman

6  battling a fighter plane in mid-air with his bare hands, and there is also a series of

7  panels depicting Superman swimming a great distance in the ocean.  <u>Action</u>

8  <u>Comics</u> No. 4 similarly gives concrete expression to the idea pitched in Siegel's

9  paragraph, telling the story of Superman interceding in a college football game

10  and using his superpowers on the field to astound the crowd.  Finally, in <u>Action</u>

11  <u>Comics</u> No. 5, Superman is shown saving a town from a flood after a huge dam

12  breaks.

13  Moreover, even with the renewed partnership with Shuster, Siegel still

14  looked to and would lift material he had created while corresponding with Keaton,

15  and use it for publications of his newly conceived Superman character.   Thus, in

16  November, 1934, Siegel sent to Keaton, a nine-page "synopsis of what will occur

17  during the next two months" to convince a potential publisher to bring the extant

18  version of Superman to print.  The synopsis submitted by Siegel is of the college

19  football story alluded to a year later in Siegel's "future exploits" paragraph and

20  tracks almost precisely the storyline, both the dialogue and the action direction,

21  that was later published by Detective Comics in <u>Action Comics</u> No. 4.[2]  The

22  _____

23  [2] Plaintiffs also assert that there are additional pre-1938 Superman

24  material, in the form of scripts, or synopses for daily newspaper strips, that were created.  (Pls.' Opp. at 6 ("scripts (continuity) for 15 Superman daily comic strips (created by Siegel c. 1934) and a 9 page synopsis covering 2 months of daily (at 6

25  days per week) comic strips of Superman (created by Siegel c. 1934)")).  This reference to additional newspaper comic strip material is misleading.  The material

26  in question is nothing more than a reference to the newspaper strips that were later repackaged and published in <u>Action Comics</u> No. 1.  (<u>See</u> Decl. Marc

27  Toberoff, Ex. B ("The drawn daily strips of Superman, herein described, were later cut up, pasted onto pages, and reproduced together with the art of daily strip week

28  one and two in ACTION COMICS No. 1, June, 1938 issue"); Ex. X at 176 ("In

(continued...)

following example, comparing Siegel's 1934 script with a portion of the published material found in <u>Action Comics</u> No. 4, is typical of this near seamless interweaving between these two items.  The narrative from Siegel's script is followed by the embodiment thereof in <u>Action Comics</u> No. 4:

<u>Script</u> (page 6)

The coach says:  "This is going to be good!  The sap is running for a goal, with everyone on the field trying to stop him.  There goes Martin for him.  Watch Burke come down faster than a window-shade!"

Martin is the first to reach SUPERMAN.  As he dives for a tackle he says:  "This is for poking into my locker!"  SUPERMAN's outhrust arm connects with Martin's face, thrusting off the tackler. "And this," says SUPERMAN,"is for busting me on the jaw!"

Three more players close in on SUPERMAN, from all sides.  The coach says to his assistant:  "He'll have to be a superman to get by them."  SUPERMAN leaps to the shoulder of one of the three oncoming players, and springs on over the other two.  The coach's assistant replies:  "There's your superman!"

SUPERMAN is already half-way down the field.  The coach's assistant says:  "I believe he's going to make it!"  To which Coach Oliver replies: "Just fool's luck so far.  Wait until he meets our 'unbeatables' — Stevens, Burns, and Dennis." The entire remaining team piles onto SUPERMAN.  The coach yells:  "They've got him!"

<u>Action Comics</u> No. 4 (page 8):

---

[2](...continued)
addition, I prepared a synopsis of the story continuity appearing in the three weeks of penciled daily strips.  Because we did not want to risk the loss of all the art work we had done, either through the mails or a failure to return it, the synopsis was sent to prospective out-of-town newspaper syndicates and publishers, in lieu of the three weeks of penciled strips, together with the first week of inked strips")).  Plaintiffs have not come forward with evidence to refute the fair inference of the evidence that is of record, that the "synopsis" mentioned is nothing more than what was later re-cut and re-pasted in <u>Action Comics</u> No. 1.



**B.**    **Superman's Publication in Comic Books and Newspaper Strips**

Siegel and Shuster's well-traveled Superman concept was eventually published by Detective Comics in the premiere issue of its comic book magazine Action Comics in April, 1938, becoming an almost instant success whose popularity endures to this day and whose depiction has been transferred to various media formats.  It is in this transfer to different formats that yet another portion of the untold history of Superman's first years in print takes shape.

Shortly before the publication of Action Comics No. 1, Siegel and Shuster signed a grant of their rights in the copyright to the Superman material contained therein to Detective Comics.  This assignment was executed on March 1, 1938, giving to Detective Comics "such work and strip, all good will attached thereto and

1   exclusive right[s] to the use of the characters and story, continuity and title of strip

2   contained therein . . . to have and hold forever," in exchange for $130.  In the

3   grant, Siegel and Shuster further agreed that they would "not employ said

4   characters or said story in any other strips or sell any like strip or story containing

5   the same characters by their names . . . without obtaining [Detective Comics']

6   written consent therefore."

7        Superman's appearance in <u>Action Comics</u> No. 1 was followed by

8   subsequent installments, "published at regular intervals, each succeeding issue

9   having a SUPERMAN comic strip prepared by [Siegel and Shuster], who

10  continue[d] to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10

11  per page."  (April 20, 2007, Decl. Bergman, Ex. S at 282 (Westchester referee's

12  Finding of Fact No. 36)).[3]  Thus, <u>Action Comics</u> No. 2 was published on May 25,

13  1938; <u>Action Comics</u> No. 3 was published on June 25, 1938; <u>Action Comics</u> No. 4

14  was published on July 25, 1938; <u>Action Comics</u> No. 5 was published on August

15  25, 1938; and <u>Action Comics</u> No. 6 was published on September 26, 1938.

16       It is apparent from the undisputed evidence that publication of Superman

17  as a continuing feature in <u>Action Comics</u> was part of a pre-arranged, implicit

18  understanding between the artists and Detective Comics.  For instance, before

19  Superman was accepted for publication in the first issue of <u>Action Comics</u>,

20  Detective Comics' editor, in a letter dated January 10, 1938, voiced concerns to

21  Siegel about Shuster's ability to handle such a continuing "feature" given his pre-

22  existing commitments to doing the art work for other regularly appearing comics

23  for the publisher.  (Decl. Michael Bergman, Ex. A ("With all the work Joe is doing

24  now . . . could it be possible for him to still turn out 13 pages of this new feature?

25  . . . if it were humanly possible I'd like to have him turn out this 'Superman' for the

26  new magazine. . . .   It strikes me that adding another 13 pages to his already filled

27  _____

28       [3]  The Court previously held that the referee's factual findings are binding in
     this litigation.  <u>Siegel</u>, 496 F. Supp. 2d at 1136.

1  schedule is loading him up to the neck.  Please let me know <u>immediately</u> whether

2  or not he can do this extra feature" (emphasis in original))).

3       Similarly, correspondence from another Detective Comics' editor to the pair,

4  <u>shortly before</u> Superman's initial appearance in <u>Action Comics</u> No. 1, also

5  suggested that the Superman comic was envisioned by the publisher to be a

6  regular feature in its <u>Action Comics</u> comic book for which the pair would provide

7  continuing material.  On April 8, 1938, Detective Comics sent a check in payment

8  for their "July material," and enclosed was a letter to Siegel remarking that the

9  publisher had "loaded [them] up with 43 pages a month" in material to produce,

10  and expressing concern with the pair's ability to handle such a monumental task,

11  but also reminding the pair that their "chances of . . . making more money is

12  bound up with the success of the magazine."  (Decl. Michael Bergman, Ex. B).

13       Superman's acceptance for publication in comic book format apparently

14  rekindled Siegel's interest in seeing his character syndicated in daily newspaper

15  strips.  As later explained by Shuster during the bench trial in the 1947

16  Westchester litigation, even with Superman's publication in <u>Action Comics</u> No. 1,

17  he and Siegel still "wanted to see Superman in the newspapers, not in the

18  magazines."  (Decl. Marc Toberoff, Ex. N at 118).  Their motive was an economic

19  one:  At this time, "black-and-white newspaper comic strips . . . were" not only "the

20  most popular medium for comics," but were also potentially the most lucrative.

21  <u>Siegel</u>, 542 F. Supp. 2d at 1103.  Toward that end, Siegel, initially without either

22  the approval of or notice to Detective Comics, began shopping around the now

23  accepted, but as yet unpublished, Superman character to various newspaper

24  publishers seeking syndication in or around March or early April, 1938.  That

25  Siegel did not first approach Detective Comics about syndicating Superman in

26  newspapers was understandable given that, in Shuster's words, Detective Comics

27  "wasn't running a newspaper."  (Decl. Marc Toberoff, Ex. N at 118).  As Siegel

28  later explained in an unpublished memoir titled "Creation of a Superhero":

1
2
3
4
5
6
7

> I continued attempting to break into newspaper syndication. On April 8, 1938, an employee in the Business Department of the McClure Newspaper Syndicate wrote to me asking if I would be agreeable to working out two weeks of "Superman" newspaper strips at no obligation to them: "You should get a letter from the publisher of these magazines before we can get down to brass tacks on Superman." He was referring to "Action Comics." He added, "The early panels describing the birth of SUPERMAN and how he came to this planet could well be expanded into several weeks releases, we think."

8
9

> On April 13, 1938, he suggested that I submit the two-weeks' sample releases of SUPERMAN around July 1st.

10
11
12
13
14

> I wrote a detailed two weeks "Superman" daily strip continuity account of Superman's origin on the planet Krypton; how his father and mother placed their infant child in a rocket ship and sent him to Earth, moments before Krypton exploded. And how, upon reaching Earth, the infant was rescued from the flaming space craft and grew up to become crusading SUPERMAN.

> I sent the script to McClure Syndicate.

15 (Decl. Marc Toberoff, Ex. R).

16    Just before he submitted the script to McClure, Siegel wrote the following

17 letter to Detective Comics' president, J.S. Liebowitz, on April 18, 1938:[4]

18
19
20
21
22

> Regarding SUPERMAN. In their latest letter, McClure has instructed us to draw up the two weeks release of SUPERMAN and get them submitted on July 1st. This, Joe and I will do. When we submit the drawn up strip to them, I'll inform you at once. I've no doubt but that if you drop in on the McClure Newspaper Syndicate at that time to discuss matters, that your presence will aid materially in the selling of the strip.

23 (Decl. Marc Toberoff, Ex. S).

24    Siegel's unpublished memoir recounts what transpired thereafter:

25
26
27

> On April 21, 1938, McClure responded that they preferred waiting until July 1: "Enclosed we return your continuity for your safe-keeping. Thank you for your energetic cooperation."

28

[4] Incidentally, the same day that <u>Action Comics</u> No. 1 was first published.

1       I knew that periodical publishers often returned to
contributors, upon request, the rights other than first
2       serial rights.  Wheeler-Nicholson had written to me that
this was our arrangement.  I wrote to Liebowitz [at
3       Detective Comics] that I had a newspaper syndicate
interested in syndicating "Superman," and I requested
4       that newspaper syndication rights to "Superman" be
returned to Joe [Shuster] and me.

5

6       In his letter to me dated June 9, 1938, Liebowitz
replied, "While it is not our intention to hold you back in
7       any way from a possible newspaper syndication of
'Superman', we are not in a position to give you what
8       you ask for, that is a complete release.  If and when a
syndicate makes a definite offer for the use of
9       'Superman', we can get together so that all of us will
benefit."

10      On June 13, 1938, M.C. Gaines of McClure wrote to
me that since I had already completed the first two
11      weeks of the SUPERMAN strip, I should now send the
material to him.  "I will take this matter up at the first
12      opportunity and let you know what we decide to do."

13      Joe did a terrific art job of illustrating my script for these
two weeks of the daily "Superman" strip.  I mailed the
14      strips to McClure Syndicate.

15  (Decl. Marc Toberoff, Ex. R).

16       While waiting to hear back from McClure, Siegel pursued other newspaper

17  syndicators to see if they might be interested in distributing a Superman

18  newspaper comic strip, submitting with his pitch a copy of the two weeks' worth of

19  material concerning Superman's origins.  One other newspaper syndicator that

20  expressed some positive feedback was The Register and Tribune Syndicate.

21  Again, as explained by Siegel in his memoir:

22      Chas. E. Lounsbury of the Register and Tribune
Syndicate wrote to me on August 10, 1938, in
23      response to my letter of August [sic] 26, "We are
impressed with your outline and especially your
24      enthusiastic approach.  We read with interest the
optional two weeks' releases.  They do strike us as
25      exciting and original."  He noted I had a proposal
elsewhere, and said they could not give me a quick
26      decision.  But if I was still in the clear after Labor Day,
they would be glad to hear from me.

27

28      On September 7, 1938, he again wrote that "such
matters necessarily move rather slowly here. . . .

1
2
3
4

> Personally I like SUPERMAN very much and believe
> that with a few changes it has very good possibilities."
> He stated that if McClure Syndicate was in a position to
> take on the strip, he presumed I would go ahead.  I
> informed Liebowitz [at Detective Comics] of these
> developments.

5   (Decl. Marc Toberoff, Ex. R; see also Decl. Marc Toberoff, Ex. T (September 7,

6   1938, letter from Managing Editor Chas Lounsbury to Jerome Siegel)).

7        Shortly thereafter, progress was made on the McClure front.  In early

8   September, 1938, Liebowitz summoned Siegel to New York City to discuss the

9   McClure newspaper syndication proposal.  (Decl. Marc Toberoff, Ex. R ("In early

10  September, Liebowitz asked me to come to New York to discuss the matter of

11  McClure's interest in syndicating 'Superman'")).  What happened during this early

12  September meeting is later related in the June, 1941, Saturday Evening Post

13  story, "Up, Up and Awa-a-y!":

14
15
16
17
18

> From the fall of '38 on, it was all sail and no anchor.
> Amid the piteous sounds of syndicate editors kicking
> themselves, McClure negotiated with Donenfield [at
> Detective Comics] to handle the newspaper rights,
> Donenfield to receive 40 per cent.  Superman was
> eventually placed in 230 daily and Sunday newspapers
> scattered throughout the Western Hemisphere.
> Donenfield's 1940 cut was $100,000.

19
20
21

> The McClure negotiations were perceived by
> considerable unhappiness for the partners.  They
> sensed — correctly — that syndicate editors, who had
> once turned Superman down, would soon come to
> them, hat in hand.  They begged Donenfield to give
> back the syndicate rights.

22
23

> "We can't do that," he replied, "but if one of you will
> come to New York, I'm sure we can work something
> out."

24
25
26
27
28

> Sitting up all night in the coach for lack of sleeper fare,
> Siegel arrived, rumpled and yawning, to receive the
> proposition: If the partners would confine all their
> services to Donenfield for ten years, he would permit
> them to do strips for McClure, himself retaining an
> agent's 10 per cent — of McClure's gross, however,
> not his own 40 per cent.  In the heat of discussion
> Siegel was frequently reminded that Donenfield owned
> all rights and could freeze the partners out.  The boys

1    signed a contract, which for the first year brought them
2    an increase of less than $100 a month.

3    (Decl. Marc Toberoff, Ex. M).

4    The transaction was structured into two separate contracts, executed by

5    the parties on approximately September 22, 1938:[5]  An employment agreement

6    between Detective Comics, on one hand, and Siegel and Shuster, on the other

7    hand; and a newspaper syndication agreement among all three:  Detective

8    Comics, Siegel and Shuster, and McClure.

9    The newspaper syndication agreement gave McClure an eight-month

10   option for a "six days a week" Superman "daily strip."  If exercised, Detective

11   Comics agreed "to permit [Siegel and Shuster] to supply 'Superman' strip

12   exclusively to [McClure] for syndication in newspapers [throughout the world], for a

13   minimum period of five years from June 1, 1939," with an option for McClure to

14   "renew the agreement for a further period of five years."  "[I]n consideration,"

15   McClure agreed to pay "Detective . . . forty (40%) per cent of the net proceeds

16   from such syndication during the first year, forty-five (45%) per cent during the

17   second year and fifty (50%) per cent thereafter."  (Decl. Marc Toberoff, Ex. Q).

18   Payment to Siegel and Shuster for their "work" created under the contract was to

19   be done "solely" through Detective Comics.

20   The syndication agreement provided that Siegel and Shuster were to

21   supply said material to McClure "on an advanced schedule of at least six weeks"

22   so as to "insure ample time for distribution prior to release dates."  If Siegel and

23   Shuster failed to furnish said material in time, the agreement allowed Detective

24   Comics to substitute "other artists to do the feature and strip."  As to the

25   Superman newspaper strip material supplied to it by Siegel and Shuster, the

26   
_____

27   [5]  The agreements are dated September 22, 1938 (before the publication of
     Action Comics No. 6); however, correspondence between the parties establishes
28   that Siegel and Shuster did not return the signed agreements to Detective Comics
     until September 30, 1938.  (See Decl. Bergman, Ex. C).

1    syndication agreement provided that McClure, not Detective Comics, would have

2    "reasonable editorial supervision of the feature," which Siegel and Shuster

3    promised to maintain "at the standard shown in the sample submitted."  (Decl.

4    Marc Toberoff, Ex. Q).

5         The syndication agreement also provided that monthly statements of

6    McClure's net proceeds would be sent to "Detective and a copy to" Siegel and

7    Shuster.  Furthermore, both Detective Comics and Siegel and Shuster were given

8    the right to inspect McClure's books and records "in reference to the feature, at

9    any reasonable time."  (Decl. Marc Toberoff, Ex. Q).

10        As to the copyright in the material published in the newspaper comic strips,

11   the syndication agreement provided that it would be in McClure's name, with a

12   "reversionary" interest in favor of Detective Comics at the conclusion of the

13   contract's term.  (Decl. Marc Toberoff, Ex. Q ("The material contained in the

14   feature which we syndicate will be copyrighted in our name, but copyright reverts

15   to Detective at the termination of this contract")).  Toward that end, the syndication

16   agreement made clear that "the title 'Superman' shall always remain the property

17   of Detective," and that Detective Comics retained the copyright in Superman in all

18   other media "except daily or weekly newspaper publication."  (Decl. Marc

19   Toberoff, Ex. Q ("Our agreement covers newspaper rights only.  Radio, motion

20   picture, silent and talkie, book and all other rights are retained and owned by

21   Detective")).  Finally, McClure agreed to provide to Detective Comics free of

22   charge "all the original drawings of the 'Superman' strip, so that said drawings may

23   be used by Detective in the publication" of its comic book magazines, but only "six

24   months after [the] newspaper [strip's] release."

25        The employment agreement notably differentiates provisions relating to

26   newspaper strips and those concerning comic books.  The agreement contained

27   an opening declaration broadly asserting Detective Comics' rights to, among

28   others, the Superman copyright.  (Decl. Marc Toberoff, Ex. P ("We, Detective

1  Comics . . ., are the exclusive owners of comic strips known by the titles

2  'Superman'")).  The employment agreement further noted up front that Siegel and

3  Shuster had, up to that time, been doing the "art work and continuity for [the

4  Superman] comic[] for [Detective, and that Detective] wish[ed] [for them] to

5  continue to do said work and hereby employ and retain you for said purposes for

6  the period of this contract."  The following sentence then recited Siegel and

7  Shuster's agreement to "supply [Detective] each and every month hereafter, in

8  sufficient time for publication in our monthly magazines, sufficient copy and art for

9  each of said features each month hereafter."  The agreement distinguished this

10  duty from Siegel and Shuster's further duty under the syndication agreement: "You

11  shall also furnish in sufficient time to properly perform the terms of an agreement

12  we are executing together with you with the McClure Newspaper Syndicate, all of

13  the art and continuity for the newspaper strip entitled 'Superman' called for by said

14  agreement."  (Decl. Marc Toberoff, Ex. P).

15  　　　The employment agreement then spelled out the per page compensation

16  rate Detective Comics would pay Siegel and Shuster for the respective comic

17  book characters they had been supplying to the publisher at that time (Superman

18  receiving the highest rate of $10 per page).  Again, the agreement then

19  distinguished this payment scheme with that for the artists' creation of the

20  Superman newspaper strips:

21  　　　　We further agree to pay you for the McClure
　　　　Newspaper Syndicate strips which you may hereafter
22  　　　　furnish pursuant to the above-mentioned contract with
　　　　McClure, on the following basis:
23
　　　　　　When we receive payment from McClure on the
24  　　　　　　40% basis mentioned in the contract, we shall
　　　　　　retain 7½% and pay you 32½% of the "net
25  　　　　　　proceeds" as defined in the McClure contract.

26  　　　　　　When we receive payment from McClure on the
　　　　　　45% basis mentioned in the contract, we shall
27  　　　　　　retain 9% and pay you 36% of the "net proceeds"
　　　　　　as defined in the McClure contract.

28

> When we receive payment from McClure on the 50% basis mentioned in the contract, we shall retain 10% and pay you 40% of the "net proceeds" as defined in the McClure contract.

(Decl. Marc Toberoff, Ex. P).

As for ownership in the copyright to the newspaper strips, the employment agreement provided that Detective Comics would own "all" such "material" and, at Detective Comics' option, it could be "copyrighted or registered in [Detective's] name or in the names of the parties designated by us."

The employment agreement further provided that Detective Comics had the right to "reasonably supervise the editorial matter of all features" and the right to terminate Siegel and Shuster's employment if "the art and continuity of any feature shall not be up to the standard required for the magazines."

Moreover, the employment agreement provides that, should Detective Comics decide to re-print some of the Superman newspaper strips in its "magazines," Detective Comics would compensate the pair "at the above-mentioned page rate less the percentage which McClure receives for said syndication."

The employment agreement also contained a global (literally and figuratively) prohibition against Siegel and Shuster "hereafter" furnishing to anyone Superman material, whatever its form be it as a "comic" book, a "newspaper" strip, or something else; instead, the artists agreed that they "shall furnish such matter exclusively to [Detective Comics] for the duration of this agreement as such matter may be required by us or as designated by us in writing."

Around the time the syndication and employment agreements were signed by all the parties concerned, Liebowitz wrote a letter on September 28, 1938, to Siegel, commenting upon said agreements. In the course of his lengthy correspondence, Liebowitz reminded Siegel that, "[a]s I have pointed out to you

1   many times, our company has very little to gain in a monetary sense from the

2   syndication of this material.  Also bear in mind, that we own the feature

3   'Superman' and that we can at any time replace you in the drawing of that feature

4   and that without our consent this feature would not be syndicated and therefore

5   you would be the loser in the entire transaction. . . .  It is entirely up to you and

6   Joe, whether you wish our pleasant relationship to continue and whether you wish

7   the strip 'Superman' to be syndicated." (Decl. Michael Bergman, Ex. B).  Siegel

8   quickly responded that both he and Shuster "are anxious and ready to do our best

9   on SUPERMAN so that all parties concerned will profit."  (Decl. Michael Bergman,

10  Ex. C).

11         With that, Siegel and Shuster produced daily newspaper strips for McClure

12  under the terms of the September 22, 1938, syndication agreement from

13  1939 through 1943; the first daily newspaper strip (depicting the first day's worth

14  of the two weeks of material created by Siege and Shuster in the spring of 1938)

15  appearing in the Milwaukee News Journal on January 16, 1939:

16

17  

26  The applications submitted by McClure (and, when approved, the certificates) for

27  the original copyright term registration for the Superman newspaper strips

28  (identified as a "PERIODICAL CONTRIBUTION") created and published from

1939 to 1943 listed "McClure Newspaper Syndicate" as the claimant and "Jerry

Siegel and Joe Shuster" as the authors of the newspaper strips. (Decl. Michael

Bergman, Ex. C). No effort was made by any party throughout the initial term of

the Superman newspaper strips published through 1943 to file a supplemental

registration to make changes to the information contained in the original

registrations.

Two applications for renewal term registrations were, however, submitted

for the Superman newspaper strips in question during the 1960s: First, National

Periodical Publications Inc., as successor in interest to Detective Comics,

submitted applications for a renewal registration claiming as proprietors in the

copyright of the renewable matter in "a work made for hire," noting that said work

was a "contribution to periodical or other composite work," namely, the specific

newspaper issue in question. (Decl. Michael Bergman, Ex. C). Second,

applications for a renewal registration were also made by Siegel and Shuster,

listing themselves as authors of the renewable matter. (Decl. Marc Toberoff, Ex.

A (Thomson & Thomson copyright report noting that "the copyrights in the

[newspapers strips] originally published through 1943 were renewed . . . in the

names of Jerome Siegel and Joe Shuster, claiming as authors")).

Not long after Superman entered into newspaper syndication, it became

apparent that McClure could not provide the editorial supervision over the material

submitted by Siegel and Shuster as called for in the syndication agreement.

Correspondence between the artists and their magazine editor at Detective

Comics, J.S. Liebowitz, recount this increasingly rocky relationship. (Decl.

Michael Bergman, Ex. D (April 21, 1939, letter from Liebowitz in which he notes

"[e]very morning it seems to me I receive copies of criticisms and complaints sent

to you by Miss Baker of McClure" and that "Mr. Nimis of McClure was here today

and he stated that they definitely do not intend to go on as they are . . . they feel

1  that the time and effort and aggravation encountered in getting this thing going

2  properly is not worthwhile because of your lack of cooperation")).

3      Eventually, by January, 1940, it was clear that McClure had outsourced its

4  editorial supervision over the newspaper strips to editors at Detective Comics.

5  (Decl. Michael Bergman, Ex. I (January 22, 1940 letter commenting that "[w]e've

6  been having considerable talk about the daily releases on SUPERMAN, and I

7  believe Jack [Liebowitz] is writing to you to have you send all the material here

8  before it goes to the syndicate for release"); Ex. E (January 25, 1940 letter from

9  Liebowitz reminding Siegel that "all copy must clear through our office"); Ex.  F

10  (February 8, 1940 letter remarking on the "present arrangement" of Detective

11  Comics "editing of the strip")).  The substance of the editorial comments contained

12  in the correspondence from Detective Comics (both as to the Superman comic

13  book and later also the newspaper strips), pertained for the most part to

14  complaints about the pair's failure to follow its editorial directions and to submit

15  material on time, leaving the publisher to have to quickly scramble to get the

16  material to the printer to meet its deadlines.

17      There were, however, more substantive criticisms of both the script and

18  artwork supplied by the pair, with specific changes either made to yet-to-be

19  released material or suggested for later releases. (Decl. Michael Bergman, Ex. E

20  (noting that it was "unwise" to depict Clark Kent flying in the air without wearing

21  Superman's costume, as had been done with "the last daily release"); Ex. H

22  (returning 26-page script and suggesting that it be re-written for a 13-page story as

23  "there is nothing important enough about the story to justify its going to such

24  length"); Ex. I (cataloging critiques of specific artwork of "sketches" submitted by

25  Shuster); Ex. M (complaining "that a great deal hasn't been done to make Lois

26  look better," giving specific examples in which the artwork is deficient, and then

27  drawing an image of Lois on the correspondence that the editor suggests "Shuster

28  and his lads" use as an exemplar).

1    During the term of the syndication agreement, problems also arose with

2    Siegel and Shuster's ability to supply newspaper strips in a timely fashion to

3    McClure.  As a consequence, McClure turned to Detective Comics for "filler"

4    material for "newspapers which carried the comic strip SUPERMAN in order to

5    prevent said newspapers from terminating their syndication agreements with"

6    McClure.  Notably, Detective Comics did not supply in-house Superman

7    newspaper strips, as was its right under the terms of the syndication agreement.

8    Instead, Detective Comics "supplied" to McClure a Superman spin-off, the "comic

9    strip LOIS LANE, GIRL REPORTER, . . . without charge for use."  In fact,

10   Detective Comics and McClure entered into a side agreement in September,

11   1943, with reference to the Lois Lane newspaper strip's impact on the

12   computation of the net proceeds to be divided among the parties.  In the

13   agreement, the two "agreed that . . . 'net proceeds' for the purposes of computing

14   [Siegel and Shuster's] return from the newspaper publication of Superman should

15   be the entire gross receipts" from the same, "deducting therefrom only the cost of

16   cuts and proofs."  Detective Comics and McClure further agreed that "the

17   compensation of the [in-house] artists engaged by Detective Comics to draw the

18   releases of Lois Lane, Girl Reporter . . . furnished by Detective Comics to McClure

19   for newspaper syndication was to be deducted from the gross receipts of the

20   Superman syndication as 'mechanical costs' in computing 'net proceeds.'"  Siegel

21   and Shuster were not parties to (nor were they apparently aware of) this

22   arrangement between McClure and Detective Comics.

23       Later, McClure notified Detective Comics of its election to extend for five

24   years (beginning from June 1, 1944) the term of the 1938 syndication agreement.

25   Contemporaneously, McClure "assigned to Detective Comics . . . all its rights, title

26   and interest in all copyrights in [the] Superman" newspaper strips created during

27   the preceding five years, "including all renewals and extensions thereof."  (Decl.

28   Toberoff, Ex. A at 5 (Thomson &Thomson copyright report, dated Feb. 29, 1996)).

1    During the same time period, the pair produced, under the terms of the

2    employment agreement, Superman material for various comic book magazines

3    published by Detective Comics, first in its serialized magazine <u>Action Comics</u>, then

4    as a stand-alone feature in the self-titled comic book magazine <u>Superman</u>.  The

5    terms contained in the 1938 employment agreement were later altered in a

6    modification agreement entered into between Detective Comics and the artists on

7    December 19, 1939.  In this modification agreement it was noted that, "while both

8    [the artists] have continued to furnish art work and continuity for 'SUPERMAN,' . . .

9    Mr. Shuster no longer furnishes the art work" for the other strips to which the pair

10   were under contract to produce, such as "Slam Bradley" or "Spy."  The parties

11   therefore agreed that, in exchange for Detective Comics being "free to make other

12   arrangements" for "furnishing [the] art work" for these other comics, Siegel and

13   Shuster's compensation for Superman comic book material (which the pair

14   reaffirmed that they would "continue to furnish all [the] art and continuity" thereof)

15   would be increased to $20 per page, and Detective Comics would pay the pair 5%

16   of the net proceeds derived from the commercial exploitation of Superman outside

17   that from comic books and newspaper syndication, and into such other mediums

18   as "radio, motion pictures, [and] the toy and novelty field."  (Decl. Michael

19   Bergman, Ex. A).

20   Detective Comics re-asserted that it had "the unrestricted right to adapt,

21   arrange, change, transpose, add to and otherwise deal with [the Superman] comic

22   strip . . . as [it] in [its] sole discretion . . . deem[ed] necessary."  The agreement

23   further contained Siegel's and Shuster's re-affirmation that Detective Comics was

24   the "sole and exclusive owners of the comic strip entitled 'Superman' . . . and to all

25   rights of reproduction . . . , including but not limited to the fields of magazine or

26   other book publications, newspaper syndication, radio broadcasts, television, [and]

27   motion pictures . . . ."  It was also acknowledged by the pair that Detective Comics

28   held "all right of copyright and all rights to secure copyright registration in respect

1 of all such forms of reproduction either in [its] name or others at [its] exclusive

2 option."

3       Not all the Superman comic book material supplied by Siegel and Shuster

4 after the September, 1938, employment agreement was published by Detective

5 Comics, although it remains unclear whether the pair was nonetheless paid for

6 such material.  For instance, plaintiffs have brought to the Court's attention the

7 curious tale of "K-Metal from Krypton."  In August, 1940, Siegel submitted a 26-

8 page script, accompanied by multiple pages of illustrations (mainly pencil

9 drawings, but some that had been inked) created by artists working in Shuster's

10 studio that, in the words of comic writer and historian Mark Waid, "would have . . .

11 radically" altered the then established Superman story line:  Lois Lane learns that

12 Clark Kent is Superman and the two agree to become partners and confidants;

13 the first appearance of the kryptonite concept (referred to in the material as K-

14 Metal derived from meteorite debris from the planet Krypton) and its debilitating

15 effects on Superman's powers; and Superman first learning of his Kryptonian

16 origins.  Although the material was not published when initially submitted by

17 Siegel, upon later being unearthed in DC Comics' library vault in 1988, copies of

18 the material were circulated among the top brass at the company in the hopes of

19 "obtaining Siegel's blessing to have the story re-illustrated and released . . . , but

20 for whatever reason, nothing ever came of it."  (Decl. Marc Toberoff, Ex. BB).

21       Eventually, disputes between Detective Comics and Siegel and Shuster led

22 to the pair leaving the employ of Detective Comics in 1947, ending involvement by

23 this talented pair in the further development of the Superman character.

24                    **II. WORK MADE FOR HIRE UNDER THE 1909 ACT**

25       Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

26 prior grant in the copyright to his or her creation does not apply to a "work made

27 for hire" because the copyright in such a creation never belonged to the artist in

28 the first instance to grant; instead, it belonged at the outset to the party that

1  commissioned the work.  See 17 U.S.C. § 304(c).  This absolute bar to

2  termination brings into sharp focus a question that has figured prominently

3  throughout the parties' papers:  Whether any of the vast body of Superman

4  material created up to 1943 by Siegel, with either the assistance of Shuster, with

5  the assistance of others, or alone, was a "work made for hire."  If so, then plaintiffs

6  (as Siegel's heirs) cannot terminate his grant of the copyright in that material, such

7  a grant being merely a superfluous act that did not alter the pre-existing ownership

8  rights to that copyright.  See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554

9  (2d Cir. 1995) ("Once it is established that a work is made for hire, the hiring party

10  is presumed to be the author of the work").

11      Resolution of the work made for hire nature of this material is controlled by

12  the governing body of law in existence at the time Siegel crafted this Superman

13  material, that is, the 1909 Act and the precedent developed thereunder.  See Self-

14  Realization Fellowship v. Ananda Church, 206 F.3d 1322, 1325 (9th Cir. 2000)

15  ("Because all of the copied works were created before 1978, the Copyright Act of

16  1909 governs the validity of the initial copyrights"); Twentieth Century Fox Film

17  Corp. v. Entertainment Distributing, 429 F.3d 869, 876 (9th Cir. 2005) ("We first

18  consider Twentieth Century Fox Parties' infringement claims under the now

19  repealed Copyright Act of 1909 because [the work] was published before the . . .

20  effective date of the 1976 Copyright Act").

21      The 1909 Act provided that, "[i]n the interpretation and construction of this

22  title[,] . . . the word 'author' shall include an employer in the case of works made

23  for hire."  17 U.S.C. § 26 (repealed).  "Thus, with respect to works for hire, the

24  employer is legally regarded as the 'author,' as distinguished from the creator of

25  the work, whom Learned Hand referred to as 'the "author" in the colloquial

26  sense.'"  Martha Graham Sch. and Dance Foundation, Inc.v Martha Graham

27  Center of Contemporary Dance, Inc., 380 F.3d 624, 634 (2d Cir. 2004).  Nowhere,

28  however, did the 1909 Act define what was meant by "work made for hire" or

1    "employer"; only the consequences flowing from such a designation were spelled

2    out.  The task of giving meaning to these terms was left to the courts.  "Although

3    for most of its life Section 26 was construed to extend work-for-hire status only to

4    traditional employer-employee relationships," by way of demonstration that the

5    work was done within the scope of one's job duties with their employer, "in the late

6    1960s, in limited circumstances, some courts began expanding the definition of

7    'employee' to cover authors outside the traditional employment relationship," to

8    those involving "an independent contractor," but only if it could be shown that "the

9    work was made at the hiring party's 'instance and expense.'"  2 PATRY ON

10   COPYRIGHT § 5:84. [6]

11        However, in 1965, the Ninth Circuit was the first court to utilize the

12   "instance and expense" test to determine whether works created either by

13   independent contractors or employees were ones made for hire.  See Lin-Brook

14   Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965).[7]  Said inclusion was

15   done by the court formulating an across-the-board presumption in favor of finding

16   work-for-hire ownership whenever a work is produced at the "instance and

17   expense" of the hiring party, said presumption only subject to being overcome by

18   evidence that the parties did not intend for such a result:

19              [W]hen one person engages another, whether as
             employee or as an independent contractor, to produce
20

21   _____

22        [6]  Prior to this expansion, invocation of the instance and expense test to
     independent contractors only resulted in a determination that the commissioned
     party had assigned to the commissioning party the copyright for the initial term,
23   leaving the renewal term in the work with its creator.  See Estate of Burne Hogarth
     v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 160 (2d Cir. 2003).

24        [7]  Plaintiffs object to the across-the-board application of the "instance and
25   expense" test set forth in Lin-Brook for determination of the for-hire status of all
     the works at issue in this case, arguing that at the time the works were created in
26   the late 1930s and early 1940s, the law governing work for hire extended only to
     the traditional employer-employee relationship.  Whatever appeal plaintiffs'
27   argument may otherwise have, it has been rejected by the Ninth Circuit.  See
     Twentieth Century, 429 F.3d at 877 (holding that rejection of the retroactive
28   application of Lin-Brook to evaluating works created by independent contractors
     would "overturn forty years of established case law within this circuit").

a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

Lin-Brook, 352 F.2d at 300 (noting that the presumption was not overcome because there was no evidence "as to the circumstances or intendment" of the parties); see also Twentieth Century, 429 F.3d at 881 ("[t]he presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire"). The test sought to match the concept of a work made for hire with the purpose of the Copyright Act, that is, to "promote" the creation of "useful Arts." U.S. Const. Art. 1, § 8. As one court explained:  "[T]he law directs its incentives towards the person who initiates, funds and guides the creative activity, namely, the employer, but for whose patronage the creative work would never have been made. Copyright law 'is intended to motivate the creative activity of authors . . . by the provision of a special reward,'" namely, the legal protection afforded to such creative property through copyright. Estate of Hogarth v. Edgar Rice Burroughs, Inc., 62 U.S.P.Q.2d 1301, 1316 (S.D.N.Y. 2002) (quoting Sony Corp v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984)).  Toward that end, the instance and expense test requires the evaluation of three factors: (1) At whose instance the work was prepared; (2) whether the hiring party had the power to accept, reject, modify, or otherwise control the creation of the work; and (3) at whose expense the work was created.  See Twentieth Century, 429 F.3d at 879, 881.

The "expense" requirement is met where a "hiring party simply pays an [employee or] independent contractor a sum certain for his or her work." Playboy Enterprises, 53 F.3d at 555.  Such regular, periodic payments of a sum certain bear the hallmark of the wages of an employee required to produce the work in question for his or her employer, and not that of a party who is free to engage with those other than the commissioning party in marketing his or her work.  See

1  Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 642-43

2  (2d Cir. 1967).  "In contrast, where the creator of a work receives royalties as

3  payment, that method of payment generally weighs against finding a work-for-hire

4  relationship."  Playboy Enterprises, 53 F.3d at 555; see also Twentieth Century,

5  429 F.3d at 881 (finding that "expense" requirement met when publisher agreed to

6  pay the creator "a lump sum for writing the book, instead of negotiating a royalty

7  deal").

8        Finally, in speaking of the expense in the creation of the work, the focus is

9  not on who bore the costs or expense in physically creating the work itself (the

10 money spent to purchase the paper on which the dialogue and story elements was

11 printed, the typewriter used to put into concrete form the author's concepts of the

12 same, and the pencils and ink needed to draw the illustrations, etc.).  That

13 particular consideration relates to the question of whether "an artist worked as an

14 independent contractor and not as a formal employee," a distinction, as made

15 clear after the Ninth Circuit's decision in Lin-Brook, that has "no bearing on

16 whether the work was made at the hiring party's expense."  Playboy Enterprises,

17 53 F.3d at 555.  Instead, the focus is on who bore the risk of the work's

18 profitability.  See Twentieth Century, 429 F.3d at 881 ("there is little doubt that the

19 book was authored at [the publisher's] expense.  [The publisher] took on all the

20 financial risk of the book's success, agreeing to pay [the writer] a lump sum for

21 writing the book, instead of negotiating a royalty deal"); Picture Music, Inc. v.

22 Bourne, Inc., 314 F. Supp. 640, 651 (S.D.N.Y. 1970) (noting that "the fact that the

23 author was obliged to repay advances on royalties which were never accrued is an

24 indication that the relationship was not an employment for hire").

25       The "instance" component of the test inquires into "whether 'the motivating

26 factor in producing the work was the employer who induced the creation.'"

27 Twentieth Century, 429 F.3d at 879; see also Picture Music, Inc. v. Bourne, Inc.,

28 457 F.2d 1213, 1217 (2d Cir. 1972) (concluding that the fact the employer took the

1 "initiative in engaging" the author to create the work rendered it as one made for

2 hire).  That the commissioning party be the motivating factor is not a "but for" test

3 — that is, but for the artist's employment the work would not have been created —

4 but instead is a more narrow inquiry focused on the nature and scope of the

5 parties' business relationship.  As one court explained:

> No doubt Graham was a self-motivator, and perhaps she would have choreographed her dances without the salary of Artistic Director, without the Center's support and encouragement, and without the existence of the Center at all, but all that is beside the point.  The fact is that the Center did employ her to do the work, and she did the work in the course of her regular employment with the Center.  Where an artist has entered into an explicit employment agreement to create works, works that she creates under that agreement cannot be exempted from the work-for-hire doctrine on speculation about what she would have accomplished if she had not been so employed.

> . . . .

> There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment.  Many talented people . . . are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project.  "Instance" is not a term of exclusion as applied to specific works created within the scope of regular employment.  It may have more significance in determining whether an employee's work somewhat beyond such scope has been created at the employer's behest or to serve the employer's interests . . . .

21 Martha Graham Sch., 380 F.3d at 640-41.

22      Thus, "under the 1909 Act[,] a person could be an employee yet create a

23 work 'as a special job assignment, outside the line of the employee's regular

24 duties.' In that event, the work is not a work for hire."  Id. at 635 (citing Shapiro

25 Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (2d Cir. 1955)).  The

26 critical factor is what was the nature of the creator and publisher's business

27 relationship (be it as an employer-employee or an commissioner-independent

28 contractor) at the time of the work's creation, and whether the work in question

falls within the scope of those job duties.  It is for this reason that courts concern

themselves with "the degree to which the hiring party had the right to control or

supervise the artist's work," as its presence would reflect a circumstance found

when the work being created was done so within the confines of the pre-existing

employment relationship.  Twentieth Century, 429 F.3d at 879; see also

Donaldson, 375 F.2d at 643 (labeling as an "essential element" the "power to

direct and supervise the manner in which the writer performs his work"); Picture

Music, 314 F. Supp. at 650 ("The existence of an arrangement going beyond an

assignor-assignee relationship prior to the undertaking of the particular work.  The

antithesis of such an arrangement is a case where an author creates a work of his

own volition and then sells it to a proprietor").  Although it is not critical that the

commissioning party actually exercise its right of control and supervision in the

creation of the work in question, it is necessary that the party have the right to

direct, control, or otherwise shape the artist's work.  See Martha Graham Sch.,

380 F.3d at 635 ("The right to direct and supervise the manner in which the work

is created need never be exercised" (emphasis in original)); Picture Music, 314 F.

Supp. at 651 (labeling as "crucial" whether the hiring party had "[t]he right . . . to

direct and supervise the manner in which work is performed").

     Moreover, there are certainly gradations of control a publisher could and

may have exerted in the creation of the work, and the greater the extent of such

supervision the "more likely it is that the work was created at the commissioning

party's instance."  Twentieth Century, 429 F.3d at 880.  Thus, a publisher

providing suggestions and comments on galleys to a novel, for instance, may

move into the realm of that associated with a work made for hire depending on the

degree and pervasiveness of said interaction.  Id. (labeling "the degree of in-

person supervision was much greater than" what the publisher "usual[ly]" did,

including utilizing the services of fact-checker and "regular face-to-face meetings"

1  by the author "with [the publisher's] editorial board" at which the author was

2  "provided . . . with extensive notes and comments").

### III. APPLICATION OF THE WORK FOR HIRE DOCTRINE

### TO THE RELEVANT WORKS

5      There are four major categories of Superman works over which the parties

6  are contesting the work for hire nature:  (A) Superman material created by Siegel

7  before the March 1, 1938, grant (including <u>Action Comics</u> No. 4 and portions of

8  <u>Superman</u> No. 1);[8] (B) Superman <u>comic book</u> material published in the interim

9  period after the March 1, 1938, grant but before the execution of the September

10 22, 1938, employment and syndication agreements (namely, the material

11 appearing in <u>Action Comics</u> Nos. 2-3 and 5-6);[9] (C) the remaining Superman

12 <u>comic book</u> material created by Siegel and Shuster beginning immediately after

13 the execution of the September, 1938, employment and syndication agreements

14 and continuing until the close of the five-year termination window on April 16, 1943

15 (namely, <u>Action Comics</u> Nos. 7-61 and <u>Superman</u> Nos. 1-23); and (D) Superman

16 <u>daily newspaper comic strips</u> published beginning in January, 1939 (under the

17 auspices of the September 22, 1938, syndication agreement) and continuing

18 through April 16, 1943 (the close of the five-year termination window).

19 **A.    Pre-March, 1938, Superman Material (Action Comics No. 4 and**

20 **portions of Superman No. 1)**

21     Beginning with the earliest Superman comic book material, there seems

22 little doubt that any Superman material that Siegel created by himself or with the

23 assistance of others prior to the March 1, 1938, grant, and that was later

24

25 _____

26     [8]  The Court previously considered the issue of whether <u>Action Comics</u> No. 1 was a work made for hire.  <u>See Siegel</u>, 542 F. Supp. 2d at 1126-28.  Nothing contained in this Order is meant to supersede that Order.

27     [9]  Although <u>Action Comics</u> No. 4 was <u>published</u> during this period, given that the dialogue thereto was arguably <u>created</u> during the pre-March, 1938,

28 period, the Court will treat its work for hire nature there.

1    published, is not a work made for hire.  That was a core holding in this Court's

2    March 26, 2008, Order, which itself was built upon the finding the Second Circuit

3    made during the parties 1970s' litigation over the renewal term rights to the

4    Superman copyright.  See Siegel, 542 F. Supp. 2d at 1126-28 ("Accordingly, . . .

5    all the Superman material contained in Action Comics, Vol. 1, is not a work-made-

6    for-hire and therefore is subject to termination."); Siegel, 508 F.2d at 914.

7    Adapting the language from the Second Circuit decision, the Superman material in

8    question had been crafted by the artists years before the relationship between its

9    authors and its ultimate publisher existed.  The creation of this material was not

10   done at the instance and expense of anyone other than the artists themselves.

11          The dispute is thus not with the work for hire nature of this material, but

12   rather over whether any of the following material either contains copyrightable

13   elements or suffers from some other defect preventing termination from occurring:

14   (1) The "future Superman exploits" paragraph written before the publication of

15   Action Comics No. 1; (2) the Superman material found in Action Comics No. 4,

16   which was based on Siegel's 1934 script and the other 1934 material created by

17   Siegel and Keaton; and (3) the first six pages of Superman No. 1.

18          **1.    Paragraph on Superman's Future Exploits**

19          As for the one paragraph concerning future exploits, there is no doubt that

20   the concepts embodied in that paragraph later found concrete expression in some

21   of the earliest Superman material published in Action Comics.  Plaintiffs' counsel,

22   however, would have the Court conclude that, based on this one scant paragraph

23   and its later fuller expression of the concepts contained therein, the Superman

24   materials found in Action Comics Nos. 2, 4, and 5 were created prior to the March

25   1, 1938 grant.  The problem with this argument is that the paragraph itself

26   constitutes mere ideas for future works rather than expressions of those ideas,

27   and thus contains no copyrightable material, which, of course, bars any effort at

28

1  termination.  See 17 U.S.C. § 304(c) (limiting termination to the grant in the

2  "copyright" to a work).

3      "A copyright never extends to the 'idea' of the 'work,' but only to its

4  'expression,' and that no one infringes, unless he descends so far into what is

5  concrete as to invade that 'expression.'"  National Comics Publications, Inc. v.

6  Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) (L. Hand, J.).  Aside

7  from the addition of a few adjectives, Siegel's one paragraph of future Superman

8  exploits has much more in common with Judge Learned Hand's conception of the

9  general idea of a play about "a riotous knight who kept wassail to the discomfort of

10 the household, or a vain and foppish steward who became amorous of his

11 mistress" than with its concrete expression in the form of Shakespeare's play

12 "Twelfth Night."  See Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.

13 1930).  To turn Judge Hand's phrase, Siegel's one paragraph of future exploits

14 was little more than a generalized description of Superman performing an

15 unelaborated task or heroic feat, the precise details of which were left to be

16 sketched out at a later time, as later occurred, around the time the comic books

17 were published during 1938.[10]  Here, Siegel did little more than sketch the idea of

18 his superhero doing some broad-brushed act, the details being left to be filled in

19 later, as they were when he put the idea into concrete form by writing a script

20 setting down precisely how and why Superman "battles an airplane with his bare

21 hands."  In this sense the one paragraph sets out little more "than the most

22 general statement of what the [comic] is about."  Id.  The generalized description

23 Siegel put down to paper concerning Superman's "exploits" did not cross the line

24

25      [10]  For instance, in the story in Action Comics No. 2,  Superman thwarts the
26  efforts of an industrialist war profiteer who is secretly funding both sides in a war in
    a far-off land ("Superman will win a war single-handed"), that leads to Superman
27  battling aircraft ("battle an airplane with his bare hands"), swimming great
    distances in the ocean (he'll swim several hundred miles and think nothing of it"),
28  rescuing Lois Lane from being executed by a firing squad, and ending with the
    industrialist repenting his actions.

1  into something to which copyright protection applies and, accordingly, to which no

2  right to termination attaches.

3      **2.    Superman Material Created while Siegel Was Collaborating with**

4          **Keaton**

5      As far as the Superman material created by Siegel during his collaboration

6  with Keaton is concerned, save for one important exception, that material never

7  acquired statutory copyright protection under the 1909 Act, as it was either never

8  published with the requisite notice or registered as an unpublished work.  The

9  termination provisions apply only to a work for which the "copyright [therein was]

10  subsisting in either its first or renewal term on January 1, 1978."  17 U.S.C.

11  § 304(c).  Unless the material had been registered as unpublished works under

12  section 12 to the 1909 Act, copyright protection could be achieved only by

13  publication of the material, before January 1, 1978, bearing the requisite copyright

14  notice.  See Siegel, 496 F. Supp. 2d at 1150; 3 PATRY ON COPYRIGHT § 7:42

15  ("Section 304(c) . . . by its own terms covers only works in either their first or

16  renewal term on January 1, 1978.  The section thus does not cover works that

17  were unpublished" on that date); 3 NIMMER ON COPYRIGHT § 11.02[A][1] at 11-12

18  ("the termination provisions of Section 304(c) apply only if the work in question

19  was the subject of statutory copyright prior to the effective date of the current

20  Act").  There has been no evidence presented that any of the Siegel/Keaton

21  material was registered as an unpublished work under the 1909 Act, nor is there

22  any indication that any portions of the Siegel/Keaton material (other than that

23  appearing in Action Comics No. 4) was ever published with the requisite notice

24  before 1978.  Thus, although not works made for hire, most of the Siegel/Keaton

25  material is not subject to termination.

26      The same, however, cannot be said of the 1934 Superman football story

27  script written by Siegel and sent to Keaton.  Defendants do not dispute that the

28  storyline contained in Action Comics No. 4 published nearly verbatim the entirety

1  of the script, as it surely did.  <u>See</u> generally <u>Siegel</u>, 496 F.Supp.2d at 1150-51

2  (discussing what was sufficient to demonstrate "publication" of material for

3  purposes of the 1909 Act).

4         Instead, defendants object to the Court's consideration of the script on

5  evidentiary grounds, complaining that the script had never been produced in

6  discovery, that it has not been authenticated, and that plaintiffs have failed to

7  provide the source of the material and how they came into possession of it.

8  (Defs.' Obj. to Pls.' Sept. 22, 2008 ¶ 7).  None of these evidentiary objections are

9  well-taken.  Plaintiffs have submitted declarations evidencing that the script in

10 question was in the possession of Russell Keaton's widow who turned it over,

11 along with other materials, to the family's literary and marketing agent, Denis

12 Kitchen, in 1993.  Mr. Kitchen thereafter on August 21, 2008, posted a comment

13 in response to a blog story titled "Russell Keaton, Superman's Fifth Beatle,"

14 wherein he disclosed that, in addition to the subject of the story (which concerned

15 the illustrated strips, but not the scripts, Siegel and Keaton had created

16 concerning the version of Superman as someone from Earth's future), "there's

17 LOTS more correspondence and scripts."  Plaintiffs' counsel thereafter ran across

18 Kitchen's post while searching the Internet, and after contacting him obtained a

19 copy of the script, which he then promptly produced. (Sept. 23, 2008 Decl.

20 Toberoff; Sept. 23, 2008 Decl. Joanne Siegel; Sept. 29, 2008 Decl. Denis

21 Kitchen).

22        Defendants also apparently argue that plaintiffs should be precluded from

23 acquiring any ownership stake in the artwork found in <u>Action Comics</u> No. 4, as no

24 artwork was contained in Siegel's 1934 script.  As stated in their papers:  "Even if

25 accepted in evidence . . . , the allegedly pre-existing continuity pertaining to <u>Action</u>

26 <u>Comics</u> #4 would not signify that the artwork and any new text in this comic book

27 were pre-existing as opposed to being prepared after March 1, 1938 as work for

28 hire."  (Defs.' Obj. to Pls.' Sept. 23, 2008, filing ¶ 4).  The record is devoid of any

1  evidence indicating when the artwork later found in <u>Action Comics</u> No. 4 was

2  created.  However, also missing is what specific legal argument defendants seek

3  raise based on that silence in the record.  For instance, the Court is left to wonder,

4  whether their challenge is based on an assertion that Shuster's artwork appearing

5  in <u>Action Comics</u> No. 4 is a work made for hire on the basis that it was created

6  following the March 1, 1938 grant; or are they asserting that Siegel's script lacks

7  sufficiently originality as to preclude any effort by plaintiffs to recapture the

8  copyright  in the artwork contained in <u>Action Comics</u> No. 4 as part of a joint work;

9  or is it for some other unarticulated reason?  Defendants have had ample time

10 and opportunity to precisely articulate their legal argument flowing from this factual

11 assertion, and they have failed to do so.  The Court has permitted defendants to

12 file four post-hearing briefs related to any of the issues raised at oral argument or

13 in opposing counsel's papers that were filed following the hearing.  Accordingly,

14 being unable to discern the legal basis for defendants' argument, the Court

15 declines to address the significance of defendants' unelaborated observation.

16 <u>See</u> <u>Greenwood v. FAA</u>, 28 F.3d 971, 977 (9th Cir. 1994).

17      This is not to say, however, as plaintiffs would have the Court find, that

18 Siegel writing in 1934 the script ultimately published in <u>Action Comics</u> No. 4 (that

19 was but an expression of one of the ideas found in his "future Superman exploits"

20 paragraph) likewise means that Siegel also wrote the other Superman material

21 that are expressions of these ideas found in that one paragraph (such as that

22 found in <u>Action Comics</u> Nos. 2 and 5) during the same time frame.  There is no

23 evidentiary basis to support such an inference.  The evidence surrounding the

24 1934 football story script gives no indication that, other than the script in question,

25 Siegel had written or planned on writing more Superman scripts.  The one future

26 Superman exploits paragraph itself makes no mention that scripts for the ideas

27 therein had been or were in the process of being crafted by Siegel.  The cover

28 letter Siegel submitted to Keaton with the enclosed football story script likewise

1  contains no indication that Siegel had or was planning on writing more scripts.

2  Rather, the evidence supports the inference that the script was created as a

3  discrete project to woo a prospective publisher.

4        Accordingly, because, as illustrated herein, the material appearing in <u>Action</u>

5  <u>Comics</u> No. 4 is based almost verbatim on Siegel's pre-1938 script, the Court

6  finds that the Superman material appearing therein was not a work made for hire

7  and is subject to termination.

8        **3.     Superman No. 1, pages 1-6**

9        This leaves the question of whether the first six pages in <u>Superman</u> No. 1,

10  which in all other respects consist of nothing more than a reprint of the Superman

11  comic from <u>Action Comics</u> Nos. 1-4, contains within it any additional pre-March 1,

12  1938, material.

13        Defendants label as "grossly exaggerated" the notion that the continuity to

14  these first six pages were written by Siegel in 1934.  (Defs.' Obj. to Pls.' July 28,

15  2008 Opp. Br. at 13).  To this end, defendants point to the fact that Siegel wrote in

16  his memoir, "<u>The Story Behind Superman No. 1</u>," that a Detective Comics' editor,

17  M.C. Gaines, wrote a letter to the pair on March 27, 1939, "specifying in detail

18  [what] the contents of [those] 'first six pages' [should entail], including specific

19  headings and panels." (<u>Id</u>.)  It is defendants' factual characterization, not

20  plaintiffs', that exaggerates.  The  letter referenced by defendants makes clear

21  that it was the first <u>two</u> pages of the six at issue that was created at and the

22  subject of Mr. Gaines editorial direction.  Mr. Gaines remarked that insofar as the

23  "first six pages" of <u>Superman</u> No. 1 was concerned, the publisher would like the

24  pair to take the first page from <u>Action Comics</u> No. 1, "and by elaborating on this

25  one page," "work up <u>two</u> introductory pages" for <u>Superman</u> No. 1.  (Decl. Marc

26  Toberoff, Ex. GG (emphasis in original)).[11]  However, as to pages three through

27  _____

28        [11]  Plaintiffs' argument that the first two pages in <u>Superman</u> No. 1 were
                                                                    (continued...)

1  six in Superman No. 1, there is nothing in Mr. Gaines' letter indicating that the

2  material was created contemporaneously with Superman No. 1's publication in

3  1939.  Quite the opposite is true.

4      Specifically, Mr. Steranko's forward to DC Comics' 1989 re-printing of

5  Superman No. 1 recounts the origins of pages three through six as consisting of

6  the first week of material Siegel and Shuster had created in 1935.  It had been

7  intended by the artists to be part of Action Comics No. 1, but it was "eliminated" by

8  Detective Comics from inclusion in Action  Comics No. 1 in order to make more

9  space available for other comics.  Given that no evidence has been submitted to

10 rebut Mr. Steranko's statement (contained in one of defendants' publications, no

11 less), the Court finds that pages three through six of Superman No. 1 is material

12 created by Siegel and Shuster in 1935 and thus was not a work made for hire.[12]

13     Thus, in addition to that set forth in the Court's earlier orders, the

14 uncontroverted evidence establishes that the following works were not works

15 made for hire and are thus subject to termination:  Action Comics No. 4 and

16 Superman No. 1, pages three through six.

17

18

19

20  ─────────────────

21  [11](...continued)
    created before the March 1, 1938, grant is equally unconvincing.  Plaintiffs point to

22  various scripts Siegel wrote to Keaton in 1934 to support this claim; however, too
    many discrepancies exist between those scripts and the two published pages in

23  Superman No. 1 to support the conclusion sought by plaintiffs.  Moreover, this
    argument is in direct contradiction to Siegel's own account, set forth in his memoir,

24  of the date the first two pages of Superman No. 1 was created, which he places
    squarely in 1939.

25
    [12]  Defendants conclusorily argue that the contents of the story line (but not

26  the illustrations) contained in pages three through six of Superman No. 1 are
    nothing more than "de minimis" elements, to which no copyright would attach.

27  Other than offering this legal conclusion, nowhere have defendant provided any
    specific factual argument directed to what or how this continuity is defective.

28  Defendants have had ample opportunity to elaborate on this argument, but have
    not.  Accordingly, the Court declines to consider it.

1   **B.      Post-March 1, 1938, Superman Comic Book Materials Published Prior**
2   **to September, 1938, Employment Agreement (Material Appearing in**
3   **Action Comics Nos. 2-3 and 5-6)**

4       With respect to the comic books containing Superman material that were

5   published by Detective Comics in the interim period after the March 1, 1938, grant

6   and the September, 30, 1938, employment agreement, namely <u>Action Comics</u>

7   Nos 2-3 and 5-6, defendants' principal argument for why the instance test was met

8   is because Detective Comics was the rights holder in the underlying Superman

9   material contained in <u>Action Comics</u> No. 1 by virtue of the March 1, 1938, grant,

10  and thus its consent was required before any derivative Superman material could

11  be published.  In essence, defendants once again lean heavily on the derivative

12  nature of the work itself to demonstrate they had the right to control its creation.

13  As the Court remarked in resolving the work for hire status of the Superboy script

14  created by Siegel in 1940, the fact that a work is a derivative of another does not

15  automatically translate into it being considered a work for hire or as being

16  produced at the instance of the owner of the pre-existing work; something more is

17  required.  <u>Siegel</u>, 496 F. Supp. 2d at 1142-43.

18      Here, however, there is more than just a naked argument regarding the

19  derivative status of the works in question.  There is correspondence from

20  Detective Comics to Siegel and Shuster noting the publisher's expectation that the

21  pair would continue to generate derivative works of Superman for further

22  publication in its comic book magazines even after the character's initial release in

23  <u>Action Comics</u> No. 1.  In an April 8, 1938, letter, Detective Comics executive J.S.

24  Liebowitz remarked that the company had "loaded [the pair] up with 43 pages a

25  month [said sum including the pair's work on other comic book features for the

26  publisher such as "The Spy" and "Slam Bradley" as well as Superman]," noting

27  that "the success of the magazine is dependent on the type of work done by

28  yourself," and then concluding that he was "looking for your complete cooperation

for our mutual benefit."  (Decl. Michael Bergman, Ex. B).  Likewise, the January

10, 1938, letter from Detective Comics' editor refers to Superman as a "new

feature" that could overburden Shuster's time.

This correspondence certainly suggests that the Superman material after

Action Comics No. 1 was provided pursuant to an implicit agreement between the

artists and the publisher to furnish said material on a regular basis for the

publisher.  In essence, Detective Comics had already set aside space in its comic

book publications to accommodate the artist's Superman material even before the

character's first appearance in Action Comics No. 1.  This point is reenforced by

the fact that in every succeeding monthly issue of Action Comics for the period in

question there appeared a feature of Superman.  Indeed, at trial in the 1947

Westchester suit Shuster testified that in accepting Detective Comics' offer, the

pair anticipated that they would see Superman's publication in Action Comics.

(Decl. Marc Toberoff, Ex. N).  Furthermore, the referee in the 1947 Westchester

suit made a factual finding that the artists were regularly paid for the material

created during this interim period at the rate of $10 per page.

Given this correspondence, the regular appearance of the Superman

feature in subsequent publications, and the general understanding of the artists

themselves, the evidence leads the Court quite naturally to the conclusion that the

creation of the Superman material appearing in Action Comics Nos. 2-3 and 5-6

was solicited by and done at the instance of defendants.  See Playboy

Enterprises, Inc. v. Dumas,  960 F.Supp. 710, 715 (S.D.N.Y. 1997) (holding that

fact that paintings were furnished and published on a regular basis, and that they

were described as a "regular feature," "suggest[ed] that the magazine had an

implicit agreement with [the painter]" to produce those works, which was, in turn,

"persuasive proof of [the publisher's] role" in the works' creation), aff'd without

published opinion, 159 F.3d 1347 (2d Cir. 1998).

1    Plaintiffs seek to undermine such an impression by making much of the fact

2    that there was no written agreement between the parties following the March 1,

3    1938, grant wherein Detective Comics specifically commissioned the pair to create

4    subsequent Superman comic book stories.  (Pls.' Opp. at 8 (noting that the March

5    1, 1938 grant "could have but did not provide for the employment of Siegel and

6    Shuster to create subsequent Superman stories")).  In plaintiffs' view, the entire

7    relationship between the parties for this six-month period following the grant is

8    akin to that of a screenwriter submitting a "spec screenplay" to a studio with the

9    hopes that it would be purchased.  (Pls.' Opp. at 5).  Such a characterization of

10   the parties' relationship fails to weave in all aspects of that relationship.

11   Undoubtedly plaintiffs are correct that, in creating this material, there was

12   no guarantee by Detective Comics that it would accept it and thereby pay Siegel

13   and Shuster for their work. The first issue of Superman could have been a

14   commercial flop, leading the publisher to reconsider whether to continue to publish

15   such material or to place the character in the hands of different comic book artists.

16   Because there was no guarantee of success, continuation of the parties' business

17   relationship could have ended abruptly and early, thus placing Siegel and

18   Shuster's role with Detective Comics further afield than under the traditional

19   employee-employer scenario.  That said, the pair's business connection to their

20   "employer" (in the colloquial sense) was much stronger and closer to that of other

21   admitted work for hire scenarios (e.g., an independent contractor) given the nature

22   of the project and the material they were supplying to Detective Comics.  Cf. Self-

23   Realization Fellowship Church, 206 F.3d at 1326-27 (noting that a monk's writings

24   and religious lectures created while the monk was supported by the church was

25   not a work made for hire as the monk had less of a connection to the church than

26   another would have had in a traditional employment setting).

27   To begin, Siegel and Shuster were not simply creating some random work

28   and submitting it to a number of publishers for consideration; the comic book

1    material was for a character to which the publisher to whom it was submitted

2    owned the pre-existing rights, rendering Siegel and Shuster's material as but a

3    derivative thereof.  Moreover, the material was submitted at the request of

4    Detective Comics.  Again, the letters from Detective Comics' executives in

5    January and April, 1938, indicate that the Superman material first published in

6    <u>Action Comics</u> No. 1 was not intended to be a one-shot deal, but rather was

7    conceived of as an ongoing "new feature" to which sequels would need to be

8    fashioned; hence, the Detective Comics executives' reference in the April 8, 1938,

9    letter to the "43 pages a month" the pair had been "loaded up" with by the

10    publisher, a page computation that included within it the 13-page Superman comic

11    book, and the January, 1938, letter voicing concerns regarding the possibility of

12    placing undesirable constraints on Shuster's time.  Perhaps the best way of

13    envisioning the parties' business relationship at this time was one in which the

14    artists were given a trial period of sorts to see whether their creation would be

15    commercially successful enough to warrant further formal action by the publisher.

16    Thus, the material over this six-month period was not sent on spec to see whether

17    the publisher would like it, but rather was sent as requested for publication in a

18    monthly feature in the hopes that the publisher would eventually decide to formally

19    pick up the feature on a long-term basis.

20       This characterization of the parties' relationship during this period is

21    confirmed by the September, 1938, employment agreement's recital that Siegel

22    and Shuster "have been doing the art work and continuity for us" and that

23    Detective wanted the pair "to continue to do said work and hereby employ and

24    retain you for said purpose."  In essence, the September, 1938 employment

25    agreement formalized what had informally been ongoing beforehand.  That

26    Detective Comics' requests were made on an informal basis before the written

27    agreements were executed does not detract from the fundamental fact that Siegel

28    and Shuster's creation of the derivative Superman material was done at the

1    request and instance of Detective Comics.  That Detective Comics waited six

2    months before more formally "employing" the pair to "continue" to do just that

3    does not detract from the core point that such production by Siegel and Shuster

4    was again done at the instance of Detective Comics; it simply shows that by that

5    point Superman had so proven itself a commercial success that the publisher

6    desired a more formalized arrangement to be placed down in writing to ensure

7    that the pair would continue to produce such material for it (rather than going on to

8    create other comic book characters for other publishers).

9       When these facts are considered in toto, it is easy to conclude that creation

10    of the works in question lie further along the spectrum from that found in a more

11    traditional employment relationship, as is the case for the comic books created by

12    in-house employees of the publisher.  The lack of any long-term guarantee or

13    commitment by the publisher to the business enterprise itself, however, is not

14    something which is atypical in an independent contractor situation.  That the pair

15    functioned in such a looser employment relationship with the hiring party is not

16    critical.  What is important is the existence of an engagement to create the works,

17    and the level of control and direction the commissioning party thereafter had over

18    creation of the works in question.  And in that regard, the fact that Siegel and

19    Shuster were commissioned by the publisher to create specific material to which

20    the publisher had the statutory right to exert control over its creation, and for which

21    they were paid upon the material's publication, is dispositive as to the instance

22    prong.

23       In short, Detective Comics, as the copyright holder of the pre-existing work,

24    approached the artists and asked that they create works derived from that pre-

25    existing material on a regular basis, and then paid the artists for that derivative

26    work.  As such, the material would fall within the category as a work made for hire.

27    Burroughs, 342 F.3d at 163; Picture Music, 457 F.2d at 1216.  Accordingly, the

28    Court finds that the Superman material in Action Comics Nos. 2-3 and 5-6, which

1   were published in the interim period after the March 1, 1938, grant but before the

2   execution of the September 22, 1938, employment agreement were works made

3   for hire.  The Superman material appearing in <u>Action Comics</u> No. 4, although

4   <u>published</u> during this same interim period, was not a work made for hire because it

5   consisted of material <u>created</u> in 1935.  <u>See supra</u> III.A.2.

6   **C.**    **<u>Post-September, 1938, Superman Comic Book Material (Action</u>**

7         **<u>Comics Nos. 7-61 and Superman Nos. 1-23)</u>**

8       It is clear to the Court that all of the <u>comic book</u> material produced by

9   Siegel and Shuster <u>after</u> they signed the employment agreement with Detective

10  Comics were works made for hire.  The employment agreement makes plain that

11  the pair were specifically "employ[ed] and retain[ed]" by Detective Comics for a

12  period of five years (with an option to extend for an additional five years) to

13  produce, on an ongoing basis, the comic book magazines for certain characters,

14  including Superman, in return for payment of a sum certain upon that materials'

15  publication.  Such an arrangement has all the elements of a relationship leading to

16  the creations of works made for hire.

17       Plaintiffs' argument regarding the "instance" prong of the test centers upon

18  the contention that, although Detective Comics <u>retained</u> a great deal of editorial

19  control over Siegel and Shuster's comic books, it actually <u>exercised</u> very little.

20  That the two were permitted to exercise their creative talents largely, or even

21  exclusively, in the manner they chose is not dispositive of whether the comics

22  were prepared at Detective Comics' instance.  <u>See</u> <u>Martha Graham Sch.</u>, 380

23  F.3d at 640-41 ("There is no need for the employer to be the precipitating force

24  behind each work created by a salaried employee, acting within the scope of her

25  regular employment.  Many talented people, whether creative artists or leaders of

26  major corporations, are expected by their employers to produce the sort of work

27  for which they were hired, without any need for the employer to suggest any

28  particular project").  "Complete control over the author's work is not necessary" to

1  meet the instance test,  Twentieth Century, 429 F.3d at 880, all that is required is

2  the right to direct and supervise the manner in which the work is created, and

3  even then, "the right to direct and supervise . . . need never be exercised."  Martha

4  Graham Sch., 380 F.3d at 635 (emphasis in original).

5      Here, Detective Comics contractually reserved for itself the right to

6  "reasonably supervise the editorial matter of all features," a right which in some

7  instances it did exercise to provide editorial supervision over that material before it

8  was published, suggesting changes to the art work and the continuity submitted by

9  the pair.  While this supervision perhaps did not rise to the level the publisher in

10  Twentieth Century exercised over the author's manuscript, see 429 F.3d at 880

11  (explaining that "the degree of in-person supervision was much greater than usual,

12  including regular face-to-face meetings between General Eisenhower and

13  Doubleday . . . where the editorial board provided him with extensive notes and

14  comments" as opposed to the normal process of "waiting for the manuscript to be

15  completed, and then discussing possible improvements with the author"), nowhere

16  did the Ninth Circuit suggest that such heightened supervision was necessary to

17  demonstrate that the work was produced at the instance of the publisher.

18      Magnifying the extent of Detective Comics' right to control the Superman

19  comic books' creation is the fact that it was also the holder of the underlying

20  material from which the later Superman comic books were derived.  The fact that

21  Detective Comics approached Siegel and Shuster and, in a written agreement,

22  specifically engaged (and paid) for them to create comic book material derived

23  from the underlying Superman material it already owned, lends strong support to

24  the conclusion that said comic books were made at its instance.  See Burroughs,

25  342 F.3d at 163; Picture Music, 457 F.2d at 1217; Siegel, 496 F. Supp. 2d at 1143

26  ("It was these additional elements of requesting and paying for specific derivative

27  works that served to demonstrate that the creation of the derivative work was at

28  the instance of the commissioning party").

1       In this respect, the circumstances of this case are not all that different from

2  those in <u>Martha Graham School</u>.  Before being hired by a dance center, the artist

3  had created/choreographed various dances.  Later she was hired as the artistic

4  director (receiving a regular salary) for the dance center and charged with

5  choreographing new dances, which she did to great success.  In her position as

6  director of the dance center, the artist had nearly free reign in the type and

7  manner of the dances she created.  Nonetheless, the Second Circuit held that,

8  because the works in question fell specifically within the class of duties for which

9  the artist was hired to perform (the creation of dances), those works were made

10  for hire.  This case is no different.  Siegel and Shuster were undisputedly charged

11  after September 22, 1938, with supplying Detective Comics "each and every

12  month" the comic book material for Superman.  The works in question fall

13  precisely into the duties the employment contract called on Siegel and Shuster to

14  perform, thus meeting the "instance" prong of the work made for hire test.

15       As for the "expense" prong, the plaintiffs argue that the contingent nature of

16  Detective Comic's obligation to make payment for the material created (upon its

17  acceptance for publication), coupled with the fact that Siegel and Shuster had to

18  bear up-front costs (in more of an independent contractor role than a traditional

19  employee), negates this element.  This method of payment, plaintiffs argue,

20  renders the present case distinguishable from other "sum certain" cases where

21  the artist were paid regardless of whether their work was accepted for publication.

22  However, plaintiffs have failed to present evidence that Siegel and Shuster were

23  not, in any given instance, paid for their work.  Although there is evidence that at

24  least one of the works produced by Siegel and Shuster, "K-Metal from Krypton,"

25  was not accepted for publication by Detective Comics, nowhere have plaintiffs

26  pointed to any direct evidence indicating that the pair were not paid for this

27  rejected submission.  Plaintiffs speculate, rather than substantiate, this point.

28

1    Plaintiffs attempt to fill this vacuum by pointing to declarations from comic
2  book historians who state that the industry practice at the time was for artists only
3  to be "paid for pages actually delivered by them and eventually published by" the
4  comic book publisher.  (Pls' Opp. at 20).  As the Court noted previously, appeals
5  to expert opinion of industry custom and practice are of "dubious evidentiary
6  value" owing to the fact that the expert in question is not venturing any opinion as
7  to what actually occurred with respect to the specific business relationship
8  between Detective Comics and Siegel and Shuster.  Siegel, 542 F.Supp.2d at
9  1130.

10    Moreover, the language in the parties' December, 1939, modification
11  agreement creates the strong inference that Shuster had been paid by Detective
12  Comics for all or a portion of that prior year's artwork for comic strips (other than
13  Superman) that he did not supply.  Furthermore, as disclosed in the 1947
14  Westchester action, Detective Comics decided near the end of the five-year
15  period in question to pay Siegel and Shuster for Superman material that neither
16  had contributed in creating.  See Siegel, 496 F.Supp.2d at 1138.  These instances
17  of payment for material not created by the artists establishes that the parties'
18  business relationship was anything but that fitting within the industry norm of
19  which the experts opine.  It also demonstrates that, despite plaintiffs' appeal to the
20  "possibilities" of payment given the contractual terms, the parties' actual business
21  relationship belied those terms.  In the end, the parties' actual pattern and practice
22  under the terms of the agreement speaks louder on the expense prong of the
23  work for hire question than such textual contingencies; all the Court has been
24  presented with in this regard are appeals to such possibilities and contingencies
25  that could, but for which there is no evidence ever did, take place.

26    Plaintiffs also emphasize all the costs, expenses, and overhead Siegel and
27  Shuster incurred in running their own artists' studio (payments to assistants,
28  payment of rent, purchasing art tools and supplies, etc.,) in producing the material

1  they then supplied to Detective Comics, as demonstrating that the expense prong

2  has not been met.  In the end, this evidence suggests that the artists' relationship

3  with Detective Comics, even when under contract to produce the material in

4  question, was more distant from that of traditional employees and closer to that of

5  independent contractors; however, as noted above, the instance and expense test

6  under the 1909 Act also applied to independent contractors.  See Siegel, 496 F.

7  Supp. 2d at 1138 ("[C]ourts employing the instance and expense test have

8  discounted reliance on the circumstances and the cost borne for the production of

9  the work.  Such consideration relates to the question of whether 'an artist worked

10  as an independent contractor and not as a formal employee,' a distinction that has

11  'no bearing on whether the work was made at the hiring party's expense.'")

12  (quoting Playboy Enterprises, 53 F.3d at 555)).  The "expense" prong of the test is

13  therefore met.

14      Accordingly, applying the "instance and expense test," the undisputed

15  evidence establishes that the Superman materials created by Siegel and Shuster

16  during the term of their employment agreement (namely, Action Comics Nos. 7-

17  61, and to Superman Nos. 1-23) were works made for hire.[13]

18  **D.    Superman Newspaper Strips Published from 1939 to 1943**

19      This leaves the last and most difficult category — the newspaper strips for

20  the period 1939 to 1943 — which the Court further subdivides into two categories:

21  (1) the two weeks' worth of newspaper strip material Siegel and Shuster created

22  before the syndication agreement was executed and (2) the remaining newspaper

23  strips the pair created thereafter under the aegis of that agreement.  Because the

24  Court's ruling regarding the first two weeks' worth of newspaper strips implicates

25  more far-reaching issues, which are discussed in subsequent sections, the two

26

27      [13]  The material appearing on pages three through six of Superman No. 1 is

28  the single exception to this conclusion.  See supra section III.A.3 (holding that
    these pages were not works for hire).

sub-categories are addressed in reverse chronological order.  However, before the Court may address the work for hire aspect of the newspaper strip materials, it is necessary to discuss the significance of McClure's role in the September 22, 1938, agreements.

The complexity of the work for hire question on this last category of material is due in large measure to the added dimension of McClure's presence in the newspaper syndication endeavor, which altered and rearranged Detective Comics' and the artists' then-existing business relationship.  To be sure, McClure has served as the proverbial elephant in the room in this case, an elephant whose significant impact on the business relationship created through the September 22, 1938, employment agreement and newspaper syndication agreement both sides have sought to either ignore or diminish.  Defendants seek to relegate McClure to the role of a mere licensee of the newspaper strips for which it owned nothing, lest the material be injected into the public domain because McClure's listing itself as the proprietor in the copyright notice and registration would arguably violate the prohibition on divisibility of copyright in the 1909 Act.[14]  For their part, plaintiffs

_____

[14]  As noted by Professor Nimmer, under the 1909 Act, "it was inferred" by the courts that because the 1909 Act "referred in the singular to the 'copyright proprietor' . . . the bundle of rights which accrued to a copyright owner," such as the right to reproduce the material on the stage or in books, "were 'indivisible, 'that is, incapable of assignment in parts."  3 NIMMER ON COPYRIGHTS § 10.01[A] at 10-5.  Absent the complete assignment of rights commanded by the copyright, the transfer was considered to be a license, with the transferor maintaining ownership in all the rights to the copyright in the material.  Id. Given this, any publication of the material by the transferee was required to contain a copyright notice in the name of the copyright owner (that is, the transferor); other actions, such as the transferee's publication of the material carrying a notice only in its name, would result in publication without proper notice, thereby injecting the material into the public domain.  3 NIMMER ON COPYRIGHTS § 10.01[C][2] at 10-12 to 10-13.  In light of the rapid development of different forms of media in which material could be reproduced, pressure began to build against continued adherence to the doctrine of indivisibility, resulting in the creation of various judge-made exceptions to its application.  Id. at 10-6 to 10-7.  One such exception crafted by some courts was conceptualizing "such rights" conveyed as being "held in trust for the benefit of the" transferor but with "legal title" resting in the name of the transferee thereby allowing for the publication with notice thereto in the name of the transferee.  Id. at 10-13 to 10-14; see also Runge v. Lee, 441 F.2d 579 (9th Cir. 1971).  As

(continued...)