1  contend that, in light of defendants' concession, McClure's role as a prospective

2  hiring party for a work made for hire may be ignored, but thereafter structure their

3  analysis of the relevant agreements to reach their desired conclusion that the

4  creation of the newspaper strips enured solely (and was so intended to enure

5  solely) to McClure's benefit.  Such an analysis is favored by plaintiffs because it

6  seemingly forecloses a conclusion that the newspaper strips were made at

7  Detective Comics' instance and expense.

8         Although each side frames the issue differently, both do so in a manner

9  that limits the analysis of the work for hire issue to the artists and Detective

10  Comics.  (Pls.' Opp. to Defs.' Sur-Reply at 6; Defs.' Reply at 9 n.8).  However

11  tempting it is to follow suit, the Court cannot so easily unburden itself from

12  confronting the relevant evidence in the record and is instead tasked with

13  attempting to give legal meaning to that evidence.

14         In determining the significance of McClure's role, the Court does not write

15  on an empty slate.  The significance from a copyright perspective of the terms in

16  these very agreements was previously litigated and adjudicated by the courts, a

17  fact which neither party brought to the Court's attention in their briefs, at oral

18  argument, or in the numerous unsolicited post-hearing briefs submitted.

19         In 1941, Detective Comics filed suit against Fawcett Publications, alleging

20  that Fawcett's comic book character Captain Marvel, a character who possessed

21  super strength and super speed, who wore a skin-tight costume with a cape, and

22  who hid his superhero identity by way of a radio-reporter alter ego, infringed the

23  copyright to Superman.  Thus began a twelve-year legal battle.  As a defense to

24  the action, Fawcett argued that the copyright to Superman had entered the public

25  domain due to asserted defects in the manner and form in which McClure had

26  _____

27  [14](...continued)
   Professor Nimmer observed, such judge-made exceptions effectively

28  "administered a death blow" to the doctrine "even under the 1909 Act." 3 NIMMER ON COPYRIGHT § 10.01[B] at 10-9.

1   affixed copyright notices on the publications of the Superman newspaper strips.

2   See National Comics Publications, Inc. v. Fawcett Publications, Inc., 93 F. Supp.

3   349, 356 (S.D.N.Y. 1950) (cataloguing the various forms to which McClure affixed,

4   or in some cases did not even attempt to affix, a copyright notice for the

5   newspaper strips).  Detective Comics' response was that it could not be charged

6   with any defects in the copyright notice as those "were errors and omissions of

7   McClure, by which it is not bound, for McClure was merely a licensee, and a

8   licensee cannot relinquish or abandon the rights of his licensor."  Id. at 357.  Thus,

9   the relationship of the parties to one another in the 1938 newspaper syndication

10  agreement vis-à-vis ownership of the copyrights to the Superman newspaper

11  strips assumed critical importance in resolving the case.  See Detective Comics,

12  Inc. v. Fawcett Publications, Inc., 4 F.R.D. 237, 239 (S.D.N.Y. 1944) (noting that

13  Fawcett's defense would render "the status of McClure, insofar as 'Superman' is

14  concerned, and the validity of its copyrights relating thereto, . . . a material

15  inquiry").[15]

16       At trial, the district court rejected Detective Comics' argument that McClure

17  was merely a licensee.  Instead, the district court determined that the arrangement

18  put in place by the newspaper syndication agreement was in the nature of a joint

19  venture.  See Fawcett Publications, 93 F. Supp. at 357 ("I think that this

20  contention is unsound, as the agreement with McClure was not a mere license to

21  use the strips but an agreement of joint adventure").  As explained by the district

22  court:

23            The agreement with McClure contains all the
              elements of a joint adventure.  The subject matter of
24            the joint enterprise was the use of the "Superman"
              strips for the sole purpose of newspaper syndication.
25            The artists agreed to create and draw the strips,
              Detective agreed to pay them for their work and to
26            furnish the strips to McClure, and McClure agreed to

27  _____

28       [15] When Detective Comics later merged into and became National Comics
     Publications, Inc., the latter was substituted as plaintiff.

1
2

> sell the strips to newspapers.  Both the artists and Detective agreed to cooperate with McClure.  The proceeds of the sales (there could be no losses) were to be divided between Detective and McClure.

3
4

Id.  The district court held that McClure took a valid copyright to the newspaper

5

strips, but not because it was an "author, . . . proprietor, . . . [or] an assign"; rather,

6

the district court held that the agreement's provision permitting McClure to

7

copyright the strips in its name (which later reverted to Detective Comics) was a

8

permissible manner by which a valid copyright could be taken.  Id. at 358.

9

In light of this finding, the district court determined that "the errors and

10

omissions of McClure" were indeed "chargeable to Detective," observing that "the

11

rights and obligations of joint adventurers are substantially those of partners, and

12

each participant in a joint adventure is an agent for the other."  Id. The district

13

court thereafter found that "with few exceptions," the newspaper strips were

14

published without proper copyright notices and therefore the copyrights in the

15

material for the same were abandoned into the public domain.  Id.

16

On appeal, the Second Circuit, in a decision by none other than Judge

17

Learned Hand, reversed and remanded.  At the outset, the court noted that

18

although characterizing the parties' agreement as one of joint venture would have

19

"the same effect upon the copyrights in suit as though McClure were the

20

proprietor," it found it unnecessary to decide whether that characterization was

21

correct (although not without Judge Hand making the astute observation that the

22

entire concept of joint venture is "one of the most obscure and unsatisfactory of

23

legal concepts") as it concluded that "McClure was indeed the 'proprietor' of the

24

copyrights" in the Superman newspaper strips and not a licensee of the same.[16]

25
26
27
28

---

[16]  It was noted, however, that insofar as McClure simply borrowed existing Superman comic book material published previously by Detective Comics and then reprinted it for newspaper syndication then "at best 'McClure' could have become no more than a licensee."  Id. at 600.  McClure's copyright proprietor position with respect to the newspaper strips was for that material "which were produced and published under the contract of September, 1938."  Id. at 601.

(continued...)

1   National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 599

2   (2d Cir. 1951) ("We agree with the result, but because we think that 'McClure' was

3   indeed the 'proprietor' of the copyrights, and for that reason we do not find it

4   necessary to decide whether the contract constituted a 'joint venture'").  Thus, as

5   a matter of copyright law, the acts and omissions of McClure vis-à-vis the

6   copyright notices affixed to the material when it was published were chargeable to

7   Detective Comics.

8        Judge Hand noted that his conclusion was compelled by both the statute

9   and from construing the parties' intent as revealed in the agreements.  Only if

10  McClure was determined to be a "proprietor" could its publication of the

11  newspaper strips be done in such a manner that would secure copyright

12  protection under the 1909 Act.  Id. ("it is only on the assumption that 'McClure'

13  was the 'proprietor' of the 'work' — i.e., of the 'strips' prepared by the 'Artists'

14  under the contract — that any valid copyrights could be secured by publication in

15  the 'syndicated' newspapers").  Under Section 9, only "author[s] or proprietor[s]"

16  were entitled copyright a work; section 10 provided that an author or proprietor

17  could obtain copyright "by publication" with the "required" notice affixed; and

18  section 19 detailed the required contents of that notice.  Thus, unless "McClure

19  was a 'proprietor' of the 'strips' the purpose of the parties to copyright them was

20  defeated," a result to be avoided if it is possible to construe the words of the

21  agreement to effectuate that purpose.  Id.

22       Judge Hand found that the text of the syndication agreement compelled

23  such a construction.  Id.  ("we say that the text [of the agreement] itself comports

24

25          [16](...continued)

26  Nowhere have the parties in the instant case sought to delineate which of the strips (outside the first two weeks of strips, which no one suggests was borrowed

27  material) fall into these respective categories.  Given the Court's ultimate disposition of the work for hire nature of the newspaper material produced after

28  the September, 1938, agreement is concerned, the Court declines to address this issue.

1   only with the conclusion that 'McClure' was to be the 'proprietor'").  Toward that

2   end, the agreement was read as in effect placing ownership of the copyright with

3   McClure to be held in trust for its intended beneficiary — Detective Comics.  As

4   Judge Hand ably explained:

5               [T]he "material" — the "strips" — is to be
    copyrighted in 'McClure's' name, but the copyright
6   "reverts to Detective at the termination of this contract."
    That necessarily meant that, until the contract came to
7   an end, "McClure" was to have the "title" to the
    copyrights, for property cannot "revert" from one
8   person to another unless the person from whom it
    "reverts" holds title to it.  Even though he holds it in
9   trust, its fate depends upon his acts, not upon his
    beneficiary's.  The sentence which immediately follows
10  reinforces this conclusion; it reads: "The title
    'Superman' shall always remain the property of
11  Detective."  That disclosed a plainly deliberate
    distinction between the word, "Superman," used as a
12  "title," and the "works" which were to be produced in
    the future and published by "McClure" in the
13  "syndicated newspapers":  the title was to remain
    "Detective's" "property"; the copyrights were only in the
14  future to become its "property."  In final confirmation of
    this interpretation is the clause in which "McClure"
15  assumed "to provide Detective with all the original
    drawings . . . so that said drawings may be used by
16  Detective in the publication 'Action Comics' six months
    after newspaper release."  That is the language of a
17  "proprietor," who assumes power to license another to
    copy the "works."  Since for these reasons "McClure"
18  became the "proprietor" of any copyrights upon "strips"
    published under the contract, in so far as it failed to
19  affix the "required" notices upon the first publication of
    a "strip," and upon each copy published thereafter, the
20  "work" fell into the public domain.

21  Id.

22          As a result of this conclusion, Judge Hand determined that insofar as

23  McClure sent out "mats" to newspapers without any notice at all for the strips, the

24  copyrights in those strips were indeed lost to the public domain.  Id. at 601.  The

25  matter was remanded to the district court to conduct a new trial, in light of the

26  court's narrowing of the class of strips that could be considered abandoned, on

27  whether any newspaper strips placed at issue were validly copyrighted, and, if so,

28  whether Fawcett's Captain Marvel character infringed the copyright contained

1   therein.  See National Comics Publication, Inc. v. Fawcett Publications, Inc., 198

2   F.2d 927 (2d Cir. 1952).  Thereafter, the parties settled their dispute.

3          Accordingly, defendants' characterization of McClure as nothing more than

4   a mere "licensee" of the newspaper strips with no legal title to the copyright in

5   question was raised and rejected by the Fawcett decision.  Defendants are bound

6   by that judgment.

7          Applying Fawcett to the terms in the syndication agreement, the Court finds

8   that, in essence, McClure and/or Siegel and Shuster (depending on whether the

9   work was made for hire) obtained a grant (the "permission" noted in the

10  agreement) from Detective Comics to the newspaper rights in the underlying, pre-

11  existing Superman material; that permission was provided so that the both could

12  engage in the creation of a separably copyrightable derivative work (the

13  newspaper "strips" referenced by Judge Hand of which McClure was the

14  "proprietor") based on said pre-existing material owned by Detective Comics.

15         In this sense, discussion of divisibility is misplaced.  As Professor Nimmer

16  has noted by way of illustration strikingly similar to the circumstances presented in

17  this case, even under the 1909 Act a party could hold the separate copyright

18  contained in a derivative work, the pre-existing material of which was owned by a

19  third party, without transgressing notions of indivisibility:

20              [T]he producer of a motion picture . . . is
            undoubtedly the proprietor of the copyright in the
21          resulting film.  The film itself may be a derivative work
            based for example upon a novel.  In order that the
22          [film] not constitute an infringement of the novel the
            producer must obtain a grant of "motion picture rights"
23          in the novel.  However, because he was the proprietor
            of the final film did not under the 1909 Act render him
24          the "proprietor" of the motion picture rights [in the
            novel].  He was the licensee of the motion picture rights
25          in the novel but the proprietor of the derivative work
            motion picture.
26

27  3 NIMMER ON COPYRIGHT § 10.01[B] at 10-9 n.30.  The same holds here.  McClure

28  was the licensee of the "newspaper right" in the underlying Superman copyright

1  held by Detective Comics, but was an owner of the copyright in any of the new

2  material found in the derivative newspaper strips.

3        Therefore, McClure's position as a "proprietor" and holder of legal title to

4  the separate copyright in these derivative newspaper "strips" renders it

5  conceivable that the creation of those strips were made at its "instance and

6  expense" (and thus a work for hire).[17]  Thus, as alluded to earlier, although

7  plaintiffs would prefer otherwise, the Court cannot escape consideration of the

8  issue of whether the newspaper strips were works made for hire for McClure

9  (rather than Detective Comics).

10        **1.    Post-September,1938, Newspaper Strips**

11        In order to evaluate whether the post-September, 1938, newspaper strips

12  were made for hire, the Court first considers how the terms in the agreements

13  themselves should be construed as a matter of contract law.  Plaintiffs urge the

14  Court to look at the terms in each agreement separate and apart from those

15  contained in the companion agreement, treating the two agreements as standing

16  alone as separate business deals.  Defendants characterize the agreements as

17  but sub-parts in a "total transaction" such that the terms contained therein "run

18  together because this whole thing is one business."  In defendants view, McClure

19  was "just the . . . agent or the syndication arm of [an] arrangement" that "centered

20  around Detective" Comics, and thus the terms in the agreements should be

21  construed in conjunction with and as applying to those in the other agreement.

22        The Court finds both characterizations partly accurate.  The terms in each

23  agreement do overlap with, make reference to, and fill gaps in the other.

24

25        [17]  "[T]he term 'proprietor' [was] used by the 1909 Act and case-law under it
26  to refer" not only to those who are owners by assignment, but also "to employers
   who induce the creation of a work made for hire and thus own the copyright in it."
27  Burroughs, 62 U.S.P.Q.2d at 1320 (citing Shapiro, Bernstein & Co. v. Bryan, 123
   F.2d 697, 700 (2d Cir. 1941) ("[W]hen the employer has become the proprietor of
28  the original copyright because it was made by an employee 'for hire,' the right of
   renewal goes with it, unlike an assignment")).

1    However, there are areas in each agreement which are self-contained and
2    unaffected by terms contained in the other agreement.
3        The employment agreement, for instance, bolsters the provision in the
4    newspaper syndication agreement wherein the artists agreed "to maintain [the
5    newspaper strips they submitted] at the standard shown in the sample submitted"
6    by containing a provision within it that requires the artists to "properly perform the
7    terms" in the newspaper syndication agreement.  Likewise, the employment
8    agreement fills in the blanks from the newspaper syndication agreement as to how
9    and in what manner the artists would be compensated.  The employment
10   agreement also added a further dimension to a term in the syndication agreement
11   by describing how the artists will be paid if, under the syndication agreement,
12   Detective Comics later used the newspaper strips in its comic books (paying the
13   artists at their normal "page rate less the percentage which McClure receives for
14   said syndication").  Similarly, the newspaper syndication agreement expressly
15   notes that payment for the artists' work would be addressed in the employment
16   agreement.
17       In contrast, the self-contained aspects of the agreements are best
18   illustrated by those relating to the hiring parties' <u>contractual</u> right to control and
19   supervise the creation of the material crafted by the artists.  Thus, for instance, the
20   employment agreement provided Detective Comics a <u>contractual</u> right (as
21   opposed to right to control inherent in fact that material was derivative of that to
22   which Detective Comics held the rights to the underlying work) to control or
23   supervise creation of "features."  It is clear in reading the employment agreement
24   that when it used the term "features" it did so solely in reference to the artists'
25   production of a comic book, describing the same as a "monthly feature," "monthly
26   magazine," or "magazine." In contrast, when the employment agreement made
27   reference to the artists' production of newspaper strips it employed terms such as
28   "newspaper strips," "McClure Newspaper Syndication strip," "material furnished for

1  syndicate purposes," and "syndicate matter."  Just as importantly, in the one

2  paragraph in the employment agreement that prohibited the artists from exploiting

3  Superman with anyone else save Detective Comics and McClure, the agreement

4  separately identifies each class of works rather than through use of defendants'

5  purported global term "feature."  (See Decl. Marc Toberoff, Ex. P ("You agree that

6  you will not hereinafter at any place . . . furnish to any other person, firm,

7  corporation, newspaper or magazine any art or copy for any comics to be used in

8  any strip or comic or newspaper or magazine containing [Superman]")).

9       In applying the "instance and expense" test, the crucial question for the

10  Court is how Siegel and Shuster fit into the scheme devised by the publisher and

11  the newspaper syndicator.[18]

12       The Court begins with evaluating the expense element, which is made

13  more complicated due to the method by which the pair were paid for the strips in

14  question.  Rather than being paid a salary or a sum certain for the newspaper

15  strips, the artists were paid only a percentage of any "net proceeds" that their

16  strips generated, that is, a royalty payment.  Generally, this manner of payment

17  tends to rebut the notion that the newspaper strips were made for hire.  See

18  Martha Graham Sch., 380 F.3d at 641 (noting that "evidence that Graham

19  personally received royalties for her dances . . . may rebut[]" the notion that the

20  dances were made for hire); Playboy Enterprises, 53 F.3d at 555 ("in contrast,

21  where the creator of a work receives royalties as payment, that method of

22  payment generally weighs against finding a work-for-hire relationship"); Twentieth

23  Century, 429 F.3d at 881 (finding that expense requirement met when publisher

24  agreed to pay the author "a lump sum for writing the book, instead of negotiating a

25  _____

26  [18]  Fawcett left unanswered the question of how McClure acquired
   ownership of the copyright in these derivative newspaper strips.  Was it acquired
27  by assignment from the artists or by their creation of the material as a work for
   hire?  Or was it acquired through an assignment from Detective Comics, who
28  initially owned the copyright in the works at their inception as works made for hire?
   For the Court's purposes, this distinction is not of particular importance.

1  royalty deal"); 2 PATRY ON COPYRIGHT § 5:61 ("Where payment is solely by

2  royalties, this fact weighs against an employment relationship").

3          The fact that payment of a sum certain might be forthcoming to the pair for

4  their work six months later if Detective Comics decided to reprint those newspaper

5  strips in its comic books does not detract from the fundamental nature of the

6  transaction as being geared toward a profit-sharing arrangement as the principal

7  method of compensation for all involved.  Moreover, defendants have not offered

8  any evidence to show whether or to what extent Detective Comics actually

9  exercised this option to reprint the newspaper strips, thus obligating Detective

10  Comics to pay Siegel and Shuster a sum certain for those works.

11          Indeed, the ongoing and extent of the financial risk assumed by Siegel and

12  Shuster with regards to the newspaper strips was significantly higher than they

13  had borne in any of their other business dealings involving Superman.  With

14  respect to the comic book strips, any financial risk assumed by the pair for the

15  expenses incurred in creating the material would be quickly ameliorated by the

16  publisher's decision to publish or not (a process taking only a matter of days or

17  perhaps weeks).  With respect to the newspaper strips, in contrast, such

18  expenses could be borne for months or even longer depending entirely on the

19  material's commercial success.

20          Admittedly, questions concerning the particular method of payment for the

21  work have lessened in importance over the years in determining whether it was

22  one made for hire.  As Patry has written in his treatise, "[b]oth the Second and

23  Ninth Circuits have taken a nuanced look at compensation," allowing courts to turn

24  aside or otherwise diminish the importance that receipt of payment was in

25  royalties has insofar as whether something was a work for hire.  2 PATRY ON

26  COPYRIGHT § 5:61 (citing Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136,

27  1142 (9th Cir. 2003) ("That some royalties were agreed upon in addition to this

28  sum is not sufficient to overcome the great weight of the contractual evidence

1 indicating a work-for-hire relationship") and <u>Playboy Enterprises</u>, 53 F.3d at 555

2 (wherein the court observed that royalty payments are not conclusive)).

3        Diminishing the importance of this evolution, however, is the fact that, in

4 nearly all of these cases, the authors of the works in question were paid a salary

5 or some other sum certain in addition to the receipt of royalties.  <u>See</u> <u>Estate of

6 Hogarth</u>, 62 U.S.P.Q.2d at 1317 ("Where, as here, the creator receives both a

7 fixed sum <u>and</u> royalties, the fact that the creator received a fixed sum is sufficient

8 to meet the requirement that the works be made at the employer's expense");

9 <u>Warren</u>, 328 F.3d at 1142 (creator received a fixed sum in addition to royalties).

10 Here, Siegel and Shuster were paid only royalties.  Such a financial arrangement,

11 especially when viewed through the realities of the parties' relationship, places this

12 case on the outer edges of the work for hire doctrine.

13        There are, however, other features present related to the works creation

14 (factors centered on the instance prong) that go to the core of what is envisioned

15 by a work made for hire relationship.  Clearly, Siegel and Shuster were engaged

16 (however viewed, by McClure or by Detective Comics, or by both) to create the

17 material.  They were clearly done at the instance of <u>either</u> McClure or Detective

18 Comics.  The syndication agreement (reinforced by the employment agreement)

19 tasked the pair as part of their job duties with the creation of the works in question.

20 Siegel and Shuster could be replaced if they did not submit their work on time.

21 Just as critically, the right to control the process in creating the work was doubly

22 reinforced between the pair's employers:  McClure possessed the contractual right

23 to supervise the artists' work (which it in fact exercised for a period of time) and

24 Detective Comics possessed the additional right to supervise and control the work

25 as the rights holder of the pre-existing Superman material utilized in the creation

26 of the derivative newspaper strips.  This engagement to create and this right of

27

28

1  control over the artist's creation of the work is not indicative of a joint venture with

2  the artists; rather, it is reflective of a more traditional employment engagement.[19]

3        In essence, read together, the syndication agreement and employment

4  agreement is suggestive of a loaned employee arrangement (although the

5  "employees" were more accurately viewed as independent contractors).  See 2

6  PATRY ON COPYRIGHT § 5:79 n.1.  Detective Comics retained a measure of control

7  over the artists; McClure retained control over the works those artists created and

8  that it intended to exploit for the benefit of Detective Comics, McClure, and the

9  artists themselves.  However those duties were conceived and to whomever they

10  were owed, the fundamental point remains that the instance in creating those

11  newspaper strips rested with someone other than Siegel and Shuster.

12        In this respect, the Second Circuit's decision in Picture Music, which

13  applied the instance and expense test,[20] is eerily similar to the facts presented

14  here.[21]  There, the issue presented was whether the adaptation of the musical

15  score, "Who's Afraid of the Big Bad Wolf," from the Walt Disney cartoon, "The

16  Three Little Pigs," into a song was a work made for hire.

17        Walt Disney and Irving Berlin, Inc. (apparently the author of the musical

18  score), believed that the score from the movie could be made into a popular song.

19  _____

20  [19]  Moreover, the arrangement lacks some of the key elements for a joint
     venture to be found under New York law:  A sharing of some degree of control
21  over the venture and a sharing of the losses (as well as the profits) from the
     venture. See Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd., 909
22  F.2d 698, 701 (2d Cir. 1990) (setting forth test under New York law for joint
     venture); Dinaco Inc., v. Time Warner, Inc., 346 F.3d 64, 68 (2d Cir. 2003)
23  (holding for a joint venture the parties "must submit to the burden of making good
     the losses" of others to the venture); In re PCH Associates, 949 F.2d 585, 602 (2d
24  Cir.1991)  (right to inspect books and records not sufficient control for purposes of
     establishing a joint venture).

25  [20]  Although not expressly discussing the two separate prongs of the
26  instance and expense test, Picture Music clearly applied both, as the Court does
     here.  See Burroughs, 342 F.3d at 160 (2d Cir. 2003).

27  [21]  The Ninth Circuit has on more than one occasion cited approvingly to the
28  Second Circuit's decision in Picture Music.  See Twentieth Century, 429 F.3d at
     880; Warren, 328 F.3d at 1142.

1   With Disney's approval, Berlin engaged Ann Ronell, an apparent freelancer, to

2   assist in the adaptation; "she did so, rearranging the musical themes in

3   collaboration with an employee of Berlin, and arranging the existing lyrics and

4   adding new ones of her own."  457 F.2d at 1214.

5        Disney thereafter agreed that, "[i]n exchange for an agreement to pay

6   certain royalties[, it would] assign all its rights in the new song to Berlin," and

7   further agreed that "either one-third or one-fourth of its royalties should be paid to

8   Miss Ronell for her services."  Id.  The copyright in the song was subsequently

9   registered in Berlin's name, with a credit of authorship to Ronell and Frank

10  Churchill, the Disney employee who had composed the original score for the film.

11  Id. at n.1.

12       Thereafter, when the right to seek the renewal term accrued, Ronell

13  claimed that she owned a one-half interest in the song.  Berlin's successor in

14  interest defended by asserting that Ronell's contribution to the song was a work

15  made for hire.  Notwithstanding that Ronell was paid only royalty payments (and

16  not a "fixed salary"), the Second Circuit agreed.

17       Much like the present case, the Picture Music case involved three parties,

18  not the usual two parties to an employer-employee relationship.  In Picture Music,

19  an artist freelanced with another party (Berlin) to adapt a score owned by a third

20  party (Disney) into a song.  The Second Circuit was unconcerned with this

21  variation on the more ordinary dyad business relationship and method of payment:

22  "The purpose of the statute is not to be frustrated by conceptualistic formulations

23  of the employment relationship."  Id. at 1216.

24       Also much like the present case, the Second Circuit found a right to control

25  the artist's work on the part of both of the other parties, although one party had

26  more direct control than the other:  "[T]he trial court found that employees of Berlin

27  did in fact make some revisions in Miss Ronell's work.  Moreover, since Disney

28  had control of the original song on which Miss Ronell's work was based, Disney

1  (and Berlin, with Disney's permission), at all times had the right to 'direct and

2  supervise' Miss Ronell's work."  Id.

3       Although certain initial copyright registrations designated Siegel and

4  Shuster as the "authors" of the newspaper strips, the registration certificates in

5  Picture Music listing the artist as the song's "author" was disregarded in favor of

6  the realities of the parties' relationship; so too, here, the fact that McClure took it

7  upon itself to list Siegel and Shuster as the "author" of the newspaper strips is

8  effectively rebutted when one looks to the realities of the parties' actual business

9  relationship.  See Burroughs, 342 F.3d at 166-67 ("A certificate of registration

10  creates no irrebuttable presumption of copyright validity . . . [w]here other

11  evidence in the record casts doubt on the question, validity will not be assumed").

12       Finally, and for the Court's current purpose, most importantly, the court

13  clearly considered the method of payment for Ronell's work — solely by way of

14  royalties — not dispositive of whether the song was made for hire:  "The absence

15  of a fixed salary, however, is never conclusive, nor is the freedom to do other

16  work, especially in an independent contractor situation."  Picture Music, 457 F.2d

17  at 1216.

18       As the Picture Music court summed up its holding:  "In short, the 'motivating

19  factors' in the composition of the new song, 'Who's Afraid of the Big Bad Wolf,'

20  were Disney and Berlin.  They controlled the original song, they took the initiative

21  in engaging Miss Ronell to adapt it, and they had the power to accept, reject, or

22  modify her work.  She in turn accepted payment for it without protest . . . .  That

23  she acted in the capacity of an independent contractor does not preclude a finding

24  that the song was done for hire."  Id. at 1217.

25       The Court can here sum up its ruling in an almost identical manner.  After

26  the execution of the syndication and employment agreements, the artists did not

27  independently decide to create the newspaper strips; rather, they did so because

28  they were contractually obligated to do so and because they expected to receive

compensation for their creations.  McClure retained editorial supervision rights over the material; it could "accept, reject, or modify [the pair's] work."  Detective Comics owned the original work from which the derivative newspaper strips were created; it agreed to allow Siegel and Shuster to continue to create derivative works based upon it.  Siegel and Shuster assented to this arrangement.  That they did so in the capacity of independent contractors, like the artist in Picture Music, "does not preclude a finding that [the newspaper strips] were done for hire."

Thus, the Court concludes that the expense prong is met, and that the newspaper strips were works made for hire.  However the duties of the artists were conceived, and to whomever they were owed, the fundamental point remains that the instance in creating those newspaper strips Siegel and Shuster rested with someone other than themselves.  Such indicia of a work for hire relationship insofar as the creation of the newspaper strips is concerned is reflected in the facts that the employment agreement obligated them to timely supply — "shall furnish" — the necessary material to McClure; the syndication agreement specified that the copyright in that material belonged to McClure, not Siegel and Shuster; and the syndication agreement noted that, if the pair did not meet their obligation of timely supplying such material to McClure, Detective Comics could appoint someone else to create the Superman newspaper strip.  Far from suggesting that the creation of the material fell outside the scope of the pair's rights and duties under the auspice of their employment with Detective Comics, the agreements demonstrate how deeply enmeshed and integral the creation of such newspaper strips were to Siegel and Shuster's job.

Of course, the splitting of the employer role between McClure and Detective Comics makes the characterization of that role (i.e., whether the true employer was McClure or Detective Comics, or both) a much more difficult question, but that difficulty is easily surmounted for purposes of the present

1   inquiry:  Whether the artists' created the newspaper strips within the scope of their
2   job duties.  This they clearly did.

3       Moreover, although in some circumstances the royalty payments could lead
4   to a conclusion (as suggested by plaintiffs) that the parties entered into a joint
5   venture, here, the peculiar structure of the arrangement does not (as it did not in
6   Picture Music) alter the core nature of the relationship.  Specifically, the
7   arrangement "employ[ed]" the artists to provide art work and continuity to
8   Detective Comics and to "furnish," as part of their duties, the newspaper material
9   to McClure.  The arrangement allowed the artists to be replaced by other artists if
10  they failed to do so in a timely manner.  Thus, as in Picture Music, the fact that the
11  pair were paid in royalties rather than a sum certain does not alter the relationship
12  in such a fashion as to lead to the conclusion that the works were not made for
13  hire.  Indeed, the parties' arrangement left no doubt that Siegel and Shuster's role
14  in creating the material could be (and was in fact) substituted by other artists
15  should they fail to timely supply such material.  In this respect, Siegel and
16  Shuster's role was much like that of an employee or independent contractor
17  retained to perform a job, not that of a partner to a joint venture.

18      In sum, this case, much like Picture Music, lies on the outer boundaries of
19  what would constitute a work made for hire, but given that the core elements
20  sought to be captured and addressed by the doctrine are present, the Court finds
21  that the newspaper strips created by Siegel and Shuster after September, 1938,
22  were works made for hire and accordingly the termination notices submitted by
23  plaintiffs do not reach the grant to those works.

24      Thus, because the Court finds that the newspaper strips created by Siegel
25  and Shuster after September 22, 1938, were works made for hire, the right to
26  terminate does not reach the grant to those works.

27

28

1           **2.      Pre-Syndication Agreement Newspaper Strips**

2           In stark contrast to the post-syndication agreement newspaper strips, it is

3    clear from the record that the initial two weeks' worth of newspaper strips were not

4    created at the instance of either Detective Comics or McClure; instead, a wholly

5    different "motivating factor" instanced their creation by Siegel and Shuster during

6    the spring of 1938.

7           The sequence of events surrounding these two weeks' worth of newspaper

8    strips is telling:  It began with Siegel soliciting interest in Superman for newspaper

9    syndication in March or early April, 1938.  McClure expressed some interest,

10   telling Siegel to draft two weeks' worth of material for syndication and suggesting

11   that the material fill in the background of Superman's origins and arrival on Earth.

12   Siegel and Shuster created the material, focused on Superman's origin and

13   arrival, and submitted it to McClure.  McClure then <u>returned</u> the material to Siegel

14   pending its decision whether it wished to proceed with syndication efforts.  In the

15   meantime, Siegel submitted the material to <u>other</u> newspaper syndicators for their

16   consideration.  Eventually, McClure, not any other newspaper syndicator, entered

17   into a syndication agreement with Detective Comics and the artists.[22]

18          It is clear to the Court that the initial two weeks' worth of newspaper

19   material Siegel and Shuster created in the spring of 1938, well <u>before</u> the

20   syndication agreement, was not made at the instance or expense of anyone but

21   the artists.  Admittedly, McClure did ask for the material to be created and did

22

23   _____

        [22]   Both sides make attempts at historical revisionism of this record.
24   However, viewed in light of this record, plaintiffs' contention that Siegel had written
     the script for the two weeks of material "on his own volition," before soliciting
25   McClure's interest is unsupported.  (Pls.' Obj. Defs.' Reply at 13).  Siegel's own
     recounting of how and when the material was created contradicts this contention.
26   Defendants' characterization of the facts fares no better.  They assert that Siegel's
     solicitations for Superman's appearance in newspaper strips was at Detective
27   Comics' direction or, at least, with Detective Comics' approval.  (Defs.' Obj. to Pls.'
     July 28, 2008 Opp. at 8).  The evidence clearly shows that Siegel first approached
28   McClure, then <u>later</u> sought to bring Detective Comics into the fold <u>after</u> receiving a
     positive response from McClure.

1   make suggestions as to its subject matter, but such requests were done outside

2   the confines of any business relationship between the parties and, more

3   importantly, other circumstances rebut the importance of this fact.   Moreover, the

4   work was created without any discussion of, much less any guarantee of,

5   compensation and without any commitment from McClure that it would ever

6   publish the material.

7        Defendants place great weight on the fact that the two weeks' worth of

8   newspaper strips were derivative in nature, arguing that such status forecloses the

9   work's creation from being done in the instance of anyone but the owner of the

10  underlying material — Detective Comics.  However, the cases defendants cite to

11  for this proposition, as noted by the Court in its prior order in the Superboy matter,

12  require that the rights holder to the underlying material actually be the one that

13  sought out and engaged the artists to create the derivative work beforehand.  See

14  Siegel, 496 F. Supp. 2d at 1142-44.  Here, creation of the first two weeks' worth of

15  newspaper strips were not commissioned by Detective Comics, but, at most, were

16  commissioned by McClure, who at the time held no rights to the underlying

17  Superman copyright.

18       Following up on that point, defendants next seek to label Siegel's

19  interaction with McClure as little more than "an inchoate solicitation requesting an

20  opportunity to perform a work," which it is argued is insufficient to rebut a finding

21  that the matter was done at the instance of the artists.   For this proposition,

22  defendants rely on the district court's opinion in Burroughs.  In that case, the noted

23  illustrator Burner Hogarth approached the owner of the copyright in the character

24  Tarzan, Edgar Rice Burroughs, Inc. ("ERB"), suggesting that the company "take

25  up the illustration of the Tarzan Sunday Color Page," which could be reproduced

26  in "hard cover book."  ERB later replied that the company's comic book properties

27  were in flux and that the two would have to "suspend our discussions temporarily."

28  Undeterred, Hogarth wrote back six months later, noting his availability to create

1   the Tarzan artwork.  At that point, ERB wrote a series of letters (dated in July,

2   1970) inquiring whether Hogarth could produce "a quality, high priced edition of an

3   adult version Tarzan of the Apes in graphic form," "described in detail" what it

4   envisioned the book to be, and "proposed terms for the project" (including

5   compensation) that ultimately found there way into the parties' written agreement.

6   Id. at 1303-04.  Thereafter, Hogarth set about creating the work requested.

7        With this factual backdrop, the district court concluded that Hogarth's early

8   contacts with ERB were not sufficient to demonstrate the book was made at his

9   instance, commenting "not every solicitation requesting an opportunity to perform

10  work constitutes an instancing."  Id. at 1316.  Instead, the district court found the

11  book project was "first 'instanced' by [ERB] in [its July, 1970] . . . letters, which

12  predicted all of the principal terms for production of the . . . Books."  Id.  The

13  district court further found significant the fact that because Hogarth was dealing

14  directly with the owner of the underlying Tarzan material of which the book

15  solicited would be derivative:  "[I]t would be 'beyond cavil that [he] would  . . . have

16  undertaken production of artwork for the Books [or] brought [it] to publication,

17  without receiving the assignment from ERB to do so."  Id. at 1317.

18       In contrast, here, the uncontroverted evidence shows that Siegel and

19  Shuster did just that:  Siegel created the script and Shuster created the artwork for

20  the first two weeks of newspaper strips without any indication that they received

21  permission to do so beforehand from Detective Comics.  Admittedly, both Siegel

22  and McClure understood such permission from Detective Comics would ultimately

23  have to be forthcoming before the material could be published,[23] but that is a far

24  cry from the notion that Detective Comics engaged Siegel and Shuster to create

25  the material at its instance.  To the contrary, the clearly defined (and expressed)

26

27  ───────────────

28   [23]   This is evidenced by McClure's admonition in its correspondence with
     Siegel that he "should get a letter from [Detective Comics] before [the parties
     could] get down to brass tacks on SUPERMAN."

1  understanding that an artist must eventually obtain from a copyright holder

2  approval of his or her actions in creating a derivative work before that work may

3  be published is fundamentally incompatible with the notion that the copyright

4  holder tasked that artist with creating the derivative work in the first instance.

5  Unlike the artist in Burroughs, Siegel did not solicit from the underlying rights

6  holder an opportunity to create a derivative work; he instead solicited a third party

7  who at the time held no rights.

8          Nor does the fact that Siegel and Shuster were engaged by Detective

9  Comics for creating Superman material necessarily lead to the conclusion that the

10  newspaper strips were done at Detective Comics' instance.  Such material did not

11  fall within the scope of what Detective Comics had (at the time) commissioned

12  them to produce — comic books.  This fact was reinforced by Detective Comics

13  letter after the execution of the syndication agreement that it did not view creation

14  of the newspaper material as giving it "little to gain in a monetary sense" and by

15  Siegel and Shuster's later testimony during the 1947 Westchester litigation that

16  the impetus to seeking such newspaper syndication material after the March 1,

17  1938, grant was precisely because Detective Comics was not in the business of

18  syndicating newspaper comic strips.

19          Nor ultimately does the Court conclude that the material was prepared at

20  McClure's instance.  The fact that the material was created only after Siegel

21  approached McClure and Mcclure suggested a specific subject for the material

22  (Superman's origin and arrival on Earth) would normally lead to the conclusion

23  that the work was done at McClure's instance.  See  2 PATRY ON COPYRIGHT § 5:74

24  ("whether the hiring party is the motivating factor for the creation of the work, a

25  very important, and usually determinative factor is whether the work was

26  substantially completed at the time it was allegedly specially ordered . . . .   If the

27  work has not been begun before the parties meet, this fact weighs in the hiring

28  party's favor").  That McClure did not involve itself in supervising the creation of

1  the artists' work is likewise unimportant.  Id. ("the 'status of a work created by an

2  independent contractor as a specially ordered . . . work made for hire has nothing

3  to do with whether the commissioning party exercise any . . . supervision and

4  control over the independent contractor's work.'  Instead, it is sufficient that the

5  hiring party request a specific type of work without having to be involved in the

6  details of its creation").  There is, however, one complicating wrinkle that

7  distinguishes this case from all the other cases where a work is made by request

8  as a condition for obtaining employment — when presented with the works

9  reflecting the suggested storyline, McClure promptly returned it, commenting that

10  it would defer making a decision on the matter.

11      On this point, the Court finds the events that occurred after the materials'

12  return of great significance:  Siegel and Shuster attempted to sell this same two

13  weeks' worth of newspaper strips to another syndicator (The Register and Tribune

14  Syndicate), a fact which they publicized to Detective Comics and McClure without

15  objection from either.  If the material was intended by the parties to be a work

16  made for hire owned by McClure, such an act would be completely contrary to

17  such ownership.  That the artists nonetheless openly engaged in such efforts to

18  sell the work to others weighs heavily against creation of that material being

19  treated as a work for hire.  See Martha Graham Sch., 380 F.3d at 638 (finding

20  significant in conclusion that works (choreographed dances) were not made for

21  hire the fact that even after employing the artist to teach she "continued to receive

22  income from other organizations for her dance teaching and choreography").

23      Furthermore, the comment in the correspondence from the other syndicator

24  — that "[a]ny action on our part should not conflict with your progress in dealing

25  with the McClure Syndicate[; i]f they are in a position to take on your strip,

26  naturally I presume you will want to go ahead" — gives the impression that

27  ownership in the material was still, at that time, up for bid, with McClure, at most,

28  operating under the auspices of an informal right of first refusal and not under the

1  assumption that the rights belonged to any particular syndicator from its inception.

2  Such a "right of first refusal . . . is fundamentally incompatible with a finding that a

3  work . . . is . . . made for hire."  Siegel, 496 F. Supp. 2d at 1141.  Cf. 1 NIMMER ON

4  COPYRIGHT § 5.03[B] [2][D] at 5-56.8 ("[A] commission relationship may not exist,

5  even if the work is prepared at the request of an other, and even if such other

6  person bears the costs of its creation, where the person requesting the work is

7  expressly granted only a one-time use").

8         This leads to the next significant factor:  That the creation of the material

9  occurred without any mention or provision for compensation (either a fixed sum or

10  a percentage royalty) for the artists.  Even after creating the material, Siegel and

11  Shuster's efforts went unpaid for at least five months.  This distinguishes the

12  present case from Burroughs where the commissioning party's suggestion for the

13  creation of the work contained within it a recital of the basic financial terms of the

14  engagement.  Simply stated, there is no evidence that the material in question

15  was made at the expense of anyone save for the artists that created the material,

16  and who in turn shopped it to multiple syndicators looking for any takers to its

17  publication.

18         Accordingly, the Court finds that the two weeks' worth of newspaper comic

19  strip material created by Siegel and Shuster during the spring of 1938, before the

20  execution of the syndication agreement were not works made for hire.

21         **IV. ASSIGNMENT OF THE FIRST TWO WEEKS' WORTH**

22  **OF NEWSPAPER STRIPS AND TERMINATION NOTICE DEFICIENCIES**

23         As with all the Court's findings regarding work-for-hire status, this

24  conclusion has certain legal ramifications that necessarily flow from it which raise

25  secondary legal arguments concerning the plaintiffs' ability to terminate the grant

26  of these two weeks' worth of newspaper strips.  Thus the Court must address

27  whether all of the rights to the first two weeks' worth of newspapers strips were

28  assigned, the failure to serve McClure with the termination notice, and the failure

1  to identify the first two weeks' worth of newspaper strips among the works subject

2  to termination in the notice.

3  **A.**     **Assignment of the First Two Weeks' Worth of Newspaper Strips**

4          Because the initial two weeks' worth of newspaper strips were not works

5  made for hire, when those strips were created, the copyright in them belonged at

6  its inception to Siegel and Shuster.  That copyright was protected under state

7  common law until the works were published in January, 1939, at which time

8  federal statutory copyright protection may have attached, depending upon

9  compliance with certain statutory formalities.  See Siegel v. Time Warner Inc., 496

10 F. Supp. 2d 1111, 1130 n.7 (C.D. Cal. 2007).  As Professor Nimmer explains in

11 his treatise: "As to a work created and the subject of statutory copyright prior to

12 [the 1976 Act], such copyright did not subsist from the moment of creation.

13 Rather, it became effective either upon publication with notice . . . .  Prior to such

14 publication . . . , a work created before [the 1976 Act] was protected from its

15 creation under the state law of common law copyright.  Common law copyright in

16 a work initially vested in the author or authors thereof."  1 NIMMER ON COPYRIGHT

17 § 5.01[B] at 5-6.  Because the Court has found that the two weeks' worth of

18 newspaper strips are not works made for hire, the "author" of those strips would

19 be Siegel and Shuster, not Detective Comics or McClure.  This designation is

20 important because it impacts who may claim ownership of the works when

21 published, the required contents of the copyright notice affixed to the works when

22 published, and the contents of the registration certificate that was issued.

23        The 1976 termination provisions are limited only to grants in federally

24 copyrighted works, meaning works subsisting in a statutory initial or extended

25 renewal term as of the 1976's effective date.  The right to terminate does not

26 apply to unregistered copyrights protected at common law or copyrights to works

27 that have fallen into the public domain as of the time of the 1976 Act.  See PATRY

28 ON COPYRIGHT § 7:42.  Thus, for termination notice to be effective to reclaim the

1  rights to the newspaper strips, the newspaper strips must have obtained proper

2  federal statutory copyright protection and maintained that protection up through

3  the time of the 1976 Act.  This then raises the question of whether and how Siegel

4  and Shuster did obtain such statutory copyright protection of the material in their

5  newspaper strips under the 1909 Act; any defect in the process would call into

6  question plaintiffs' ability to terminate the grant to the copyright in those works.

7  Again as Professor Nimmer explains:

8          However, the subsequently obtained statutory
   copyright [upon publication with notice] vested in such

9  author or authors only if prior thereto, there had not
   been a transfer of the common law copyright . . . .  In

10 the event of such disposition, it was the transferee and
   not the original author or authors in whom statutory

11 copyright initially vested.  The determination of the
   proper person initially to claim statutory copyright under

12 the 1909 Act remains of more than antiquarian interest,
   as an improper claim under the 1909 Act could have

13 injected a published work into the public domain.

14 1 NIMMER ON COPYRIGHT § 5.01[B] at 5-6.

15      The question of assignment is highly significant because, under the 1909

16 Act, agents and licensees could not claim such statutory copyright ownership, but

17 an assignee could.  "The assignee of an author's common law copyright might, by

18 virtue of such assignment, claim statutory copyright."  Id. at 5-7.

19      The pertinent facts are reiterated for purposes of this discussion:  The first

20 two weeks of newspaper strips were first published on January 16, 1939, in the

21 Milwaukee News Journal, which contain the following notice affixed thereto

22 "Copyright, 1939".  The initial copyright registration is treated as having been

23 registered in the name of McClure Newspaper Syndicate, listing as the works

24 authors "Jerry Siegel and Joe Shuster, of United States."[24]  Later on July 3, 1944,

25 _____

26    [24]  Defendants state that the copyright notice under which the material was
   first published was "in the name of McClure," (Defs.' Obj to New Arguments at

27 Hearing at 1), but as noted by the Court, the notice affixed thereto actually did not
   list McClure, or anyone, as the copyright proprietor.  Such a designation in the

28 notice was required by § 19 under the 1909 Act, but this defect is of no
                                   (continued...)

1  McClure "assigned to Detective Comics, Inc. all its rights, title and interest in all

2  copyrights in SUPERMAN, including the copyrights and all renewals and

3  extensions thereof."[25]

4      As the facts are presented in this case, an assignment by Siegel and

5  Shuster to McClure must have occurred before publication of the initial two weeks'

6  worth of newspaper strips; otherwise, the copyright notice on the works when first

7  published was inadequate to comply with the statutory formalities, and the works

8  have fallen into the public domain.  (Defs.' Obj and Response New Arguments at 2

9  (assuming "Siegel and Shuster owned the copyright of these works from

10  inception, there would need to have been an assignment from them of their entire

11  copyright rights to McClure before the strips appeared, in order to avoid loss of

12  copyright")).

13      Plaintiffs argue that the parties' course of conduct in conjunction with

14  various terms in the syndication agreement itself clearly imply that such an

15  assignment of the artists' rights in the newspaper strips to McClure occurred.  As

16  explained by plaintiffs:

17          While there is no express mention of a sale or
           transfer, under the [syndication] agreement Siegel and
18          Shuster delivered the newspaper strips, protected by

19  _____

20      [24](...continued)
   consequence as the Second Circuit's decision in Fawcett held that such a defect
21  in the notice was saved by virtue of § 21 except in those instances in which
   McClure "sent out 'mats' [of the strips to newspapers] without any notice at all"; in
22  such a situation "the copyrights on those 'strips' were lost, regardless of
   § 21."  191 F.3d at 601.

23
       [25]  Two years after this assignment from McClure, Detective Comics was
24  consolidated into other companies into a company called National Comics
   Publications, Inc., which in turn was later consolidated in 1961 into the
25  aforementioned National Periodical Publications, Inc.  In the 1961 consolidation
   agreement it was represented that the new company had become "vested with all
26  the properties of Detective Comics, Inc., and National Comics Publications, Inc.,"
   including that it was "the owner of and is vested with title to all of the copyrights
27  (and renewals and extensions thereof) in the artistic and literary works consisting
   of newspaper cartoon strips or continuities entitled SUPERMAN which the
28  McClure Newspaper Syndicate had from the first day of publication to July 3,
   1944."

common law copyright, to McClure.  McClure then
copyrighted the material in its own name [(which the
syndication agreement clearly provided was
permissible for them to do)], listing Siegel and Shuster
as the 'authors.'  McClure then granted an exclusive
license to Detective with respect to the non-syndication
rights [(namely, allowing Detective Comics to use the
strips in its comic book magazines free of charge six
months after the strips first publication in the
newspapers)], and later on July 3, 1944 assigned the
entire copyright [in the newspaper strips] to Detective
per the term of the [syndication] agreement.

(Pls.' Opp and Response to Defs.' Sur-reply at 11)

Defendants respond by arguing that an assignment must be supported by a

clear, unambiguous, written instrument, and that such instrument is lacking here.

(Defs.' Obj. and Response to New Arguments at 2-3 & n.5 ("there is no question

that neither of the September 22, 1938 agreements include such an assignment

. . . There is no language of copyright assignment" and further commenting that

"any assignment of common law copyright would have to have been in writing

under the statute of frauds").  This argument does not withstand scrutiny.

At the outset, the Court notes that an assignment of a common law

copyright was not subject to a requirement of writing.  To the contrary, during the

time the 1909 Act was in effect, at common law, a copyright was capable of

assignment so as to completely divest the author of his rights, "without the

necessity of observing any formalities."  Urantia Foundation v. Maaherra, 114 F.3d

955, 960 (9th Cir. 1997); accord Epoch Producing Corp. v. Killiam Shows, Inc.,

522 F.2d 737, 747 (2d Cir. 1975) (noting that assignment need not be in writing);

3 NIMMER ON COPYRIGHT § 10.03[B][2] at 10-56.3 ("it appears that an assignment

of common law copyright was not within the Statute of Frauds").  Other case law

further demonstrates that such an assignment could be oral or could be implied

from the parties' conduct.  See Jerry Vogel Music Co. v. Warner Bros., Inc., 535 F.

Supp. 172 (S.D.N.Y. 1982); Van Cleef & Arpels, Inc. v. Schechter, 308 F. Supp.

674 (S.D.N.Y. 1969).

1    Having rejected the notion that any writing is required, the Court

2  nevertheless concludes that the parties' syndication and employment agreements,

3  as well as their actions, make clear that the requisite complete assignment of both

4  the initial and the renewal term occurred.

5    Although the words "assign" or "transfer" do not appear in the syndication

6  agreement, such an intent was demonstrated by other language contained in the

7  agreement, as well as by Siegel and Shuster's delivery of newspaper strip material

8  to McClure. The syndication agreement provided that McClure would hold "all the

9  original drawings of the 'Superman' strip," which it would later provide to Detective

10 Comics on license for publication in its comic books.  Such expressed receipt of

11 the "original" material in question and the ability to license that material is not the

12 language used to describe the recipient of a mere license to the material in

13 question, but as one of an assignee.  As Judge Hand remarked, "[t]hat is the

14 language of a 'proprietor,' who assumes power to license another copy the

15 'works.'"  Fawcett, 191 F.2d at 599; see also Urantia, 114 F.3d at 960 (noting that

16 language in trust instrument declaring that transferee "retain[ed] absolute and

17 unconditional control of all plates . . . for the printing and reproduction . . . thereof"

18 was indicative of an "intent to transfer the common law copyright").

19    Defendants also argue that there could have been no assignment to the

20 two weeks' worth of newspaper strips through the syndication agreement because

21 that agreement indicated that at the time of the document's execution Siegel and

22 Shuster "had already created 'the sample submitted' and that the subject 'daily

23 strip . . . entitled 'Superman' . . . was owned by Detective."  (Defs.' Obj. and

24 Response to New Arguments at 3).  This argument selectively pieces together

25 different portions of the agreement as if they were written as a single whole, when

26 in fact those sections, read in the context, clearly indicate that the parties were not

27 speaking specifically to the initial two weeks of newspaper strips.  Rather, they

28 were speaking more generally to all newspaper strips published pursuant to the

1   agreement.  Similarly, the reference defendants make to the agreement noting

2   Detective Comics' ownership to the title "Superman" does not necessarily apply to

3   the strips themselves, a distinction which Judge Hand also drew when construing

4   these same agreements.

5         Moreover, Siegel and Shuster not only allowed McClure to syndicate the

6   Superman newspaper strips, they gave McClure the original manuscript and

7   artwork to the same to McClure to hold in its possession.  "It has been held that

8   delivery of a manuscript suffices" for the purpose of establishing an assignment —

9   "so long as the intent to pass title in the common law copyright is likewise

10   present."  NIMMER ON COPYRIGHT § 10.03[B][2] at 10.56.3.  Such an inference is

11   particularly apt when "over a long period of time, the author and other interested

12   parties had acquiesced in the putative assignee's ownership."  Urantia, 114 F.3d

13   at 960.  Here, not only did the parties acquiesce in the agreement to McClure

14   receiving the originals to the strips but the parties' agreement stated that the

15   copyright notice in said material was to be made in McClure's name, something

16   which under the 1909 Act could not be undertaken by a mere licensee but only

17   "the author or proprietor" of the work.  Sanctioning such conduct clearly

18   constitutes an acquiescence on Siegel and Shuster's part to McClure's ownership

19   in the copyright to these newspaper strips, and is perhaps the clearest evidence in

20   the syndication agreement itself to an assignment being made in favor of McClure

21   by the artists.

22         Such language in the syndication agreement, and such action by the

23   parties clearly demonstrate at minimum an intent to transfer the initial copyright

24   term in the newspaper strips to McClure, see Urantia, 114 F.3d at 960, but there is

25   other language in the parties' September 1938 agreements that demonstrate an

26   intent by the authors to transfer the renewal term to those strips as well.

27         Not surprisingly, defendants contend that there was no such language of

28   complete assignment from Siegel and Shuster in the newspaper syndication or

1    employment agreements.  However, when one surveys the agreements as a

2    whole, it becomes readily apparent that there is language of assignment not just

3    of the authors' rights to the initial term, but also (as held by and argued to the

4    Second Circuit's during the litigation surrounding the rights to the Superman

5    renewal term in the 1970s) the renewal term as well.  Notably, the one paragraph

6    in the employment agreement that makes reference to and separately identifies

7    the artists' creation of both newspaper strips and comic books also contained

8    language whereby the artists agreed that they were "furnishing" this global

9    category of material "exclusively" to Detective Comics or to whomever else

10   Detective Comics might designate, an obvious reference to McClure.  (See Decl.

11   Toberoff, Ex. P ("[Y]ou shall furnish such matter exclusively to us . . . as such may

12   be required by us or as designated by us in writing.")).

13         Likewise, the concluding sentence to the paragraph in the employment

14   agreement which spells out the royalty payment terms for the newspaper strip

15   material created by the artists, contains an acknowledgment by the artists that "all

16   [such] material, art and copy shall be owned by" Detective Comics or whomever

17   Detective Comics permits (undoubtedly a reference to the derivative nature of the

18   work) the title in the same to be "copyrighted or registered in our name or in the

19   names of the parties designated by us" (another clear reference to McClure).

20         Despite this language, defendants argue that it is not sufficient, as "there is

21   no question that neither of the September 22, 1938 agreements include such an

22   assignment.  The agreements speak for themselves — they are not assignments

23   from Siegel and Shuster to anyone."  (Defs.' Obj. and Response to New

24   Arguments Made at Hearing at 3).  However, defendants' position is completely

25   contrary to that which its predecessors in interest have taken in the seven

26   decades since those agreements were executed.  It has been the position of

27   defendants and its predecessors in interest (made manifest during the 1970s

28   litigation surrounding the rights to the Superman renewal term) that the March 1,

1    1938, grant as well as the other agreements the parties entered into (up to and

2    including the 1948 stipulated judgment concluding the Westchester action), that

3    the artists in each instance effectuated a complete assignment of both the initial

4    and renewal terms to the Superman character.

5         Under the 1909 Act, general words of assignment can include renewal

6    rights if the parties had so intended.  See Venus Music Corp. v. Mills Music, Inc.,

7    261 F.2d 577 (2d Cir. 1958); cf. Fred Fisher Music Co. v. M. Witmark & Sons, 318

8    U.S. 643, 653 (1943) (observing that a specific intent to transfer the renewal term

9    must be present).  Following this line of authority, the Second Circuit in the 1970s

10   Superman litigation held that evidence of the parties' conduct and iterations of

11   their various contractual arrangements, which included language acknowledging

12   that the publisher would hold title to the copyright in the character "forever" and

13   prohibiting the artists' from exploiting Superman "at any time hereafter" except

14   with the character's publisher, indicated not simply an assignment of the artists'

15   initial term in the Superman character, but the renewal term as well.  Siegel, 508

16   F.2d at 913-914 (stating that "[t]he ready answer to this argument is that the state

17   court action determined that the agreements conveyed all of the plaintiffs' rights in

18   Superman to the defendants and not just the original copyright term" and noting

19   that the presence of such general terms of conveyance in the parties' agreements

20   such as "hold[ing] forever" a given right and agreeing not to use Superman in any

21   other strip "hereafter" connoted an assignment to the entirety of the copyright in

22   that material (emphasis added)).

23        This is the same language contained in the employment agreement

24   ("owned by us" or McClure, "will not hereafter" exploit Superman character except

25   with either Detective Comics or McClure, and shall provide such material

26   "exclusively to us" or McClure), whose terms apply, in this context at least, to the

27   syndication agreement.  Defendants, having relied on that judgment for over thirty

28   years to exploit Superman to the exclusion of any rights held by the artists, cannot

1   at this late date be heard to complain that a court will likewise rely on that

2   judgment as a basis to permit those artists to reclaim, under the statutorily

3   provided termination scheme, the rights transferred in those much-hailed grants.

4   Defendants are thus precluded both as a matter of judicial estoppel and as a

5   matter of res judicata from contesting whether there was "language of [complete]

6   copyright assignment" to both the initial and renewal term to the Superman

7   material at issue in the employment and newspaper syndication agreements.

8         Thus, the Court rejects the notion that the initial two weeks' worth of

9   newspaper strips is not subject to termination on account of the lack of any

10  assignment by Siegel and Shuster to the entire copyright in that material to

11  McClure prior to the material's publication.

12  **B.    Failure to Serve McClure with Termination Notice**

13        Defendants contend that, if there was such an assignment from Siegel and

14  Shuster to McClure, plaintiffs' failure to serve a copy of the termination notice on

15  McClure's successors renders the termination notice invalid.  (Defs.' Obj and

16  Response to New Arguments at 3 n.6).  Because all of McClure's rights in the

17  material were assigned to Detective Comics in 1944, and Detective Comics'

18  successors were served with the termination notice, the Court rejects this

19  argument.

20        The 1976 Copyright Act provides that the termination notice must be served

21  upon the "grantee or the grantee's successor in title."  17 U.S.C. § 304(c)(4).

22  Moreover, the regulations provide that an investigation will satisfy this notice

23  requirement in the context of termination of rights to works created before the

24  effective date of the 1976 Act.  37 C.F.R. § 201.10(d)(2) states that section

25  304(c)(4)'s service requirement is met if there has been a "reasonable

26  investigation" as to the current ownership of the rights to be terminated and

27  service has occurred on the person or entity "whom there is reason to believe" is

28  the current owner by transfer from the grantee.

1    Soon after the 1976 Act became effective, courts were faced with the

2    question of whether this provision, stated in the disjunctive, meant that a notice

3    served upon the immediate grantee would suffice, so that such grantee's current

4    successor in title need not be notified of the termination of its rights; the reverse

5    situation from that found in the present case.

6    In Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 633 (2d Cir.

7    1982), the district court held that failure to serve the current successor in title

8    rendered ineffective a purported termination, notwithstanding service on the

9    original grantee.   On appeal, although the Second Circuit found it unnecessary to

10   decide that particular issue, Judge Newman addressed it in a thoughtful

11   concurring opinion.  Acknowledging that it was "not clear from the statute or the

12   regulations who [as between the 'grantee' and 'the grantee's successor in title']

13   must receive notice of termination, and the legislative history offer[ed] no

14   guidance," id., Judge Newman construed the statutory provision as "sensibly read

15   to mean that notice is to be served (a) on the grantee, if the grantee has retained

16   all rights originally conveyed, (b) on the transferee, if the grantee has conveyed all

17   rights to the transferee, or (c) if some rights have been conveyed, on the grantee

18   or the transferee (or both) depending upon which rights are sought to be

19   terminated." Id. at 634 n.5.  In Judge Newman's view, the statute was written to

20   require service on only those entities that currently hold a right to be terminated; it

21   was not meant to require a mad dash to serve everyone and anyone who may

22   have been involved in the chain of title to the copyright (but who possess no

23   present right to the same), as suggested here by defendants.  "Whatever the

24   meaning of 'grantee' and 'successor in title' in the notice termination provision, it

25   seems evident that their expression in the disjunctive was intended to cover

26   various contingencies, not to afford those exercising termination rights a choice as

27   to whom to serve." Id.

28

1    As explained by Professor Nimmer, "It follows that if the grantee has

2   transferred some but not all of the rights that he acquired under the grant, whether

3   the original grantee, his successor with respect to some of the rights, or both,

4   must be served will turn on which rights are purportedly terminated under the

5   termination notice.  If all rights are being terminated, all of the persons who own

6   any portion of such rights must be served in order to effectuate the termination, as

7   the district court concluded."  3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.20.

8    The Court finds Judge Newman's concurring opinion in Burroughs to be

9   persuasive, and adopts the reasoning contained therein.  As summarized by

10  Professor Nimmer, "[i]t follows, then, that service of the termination notice need

11  only be made upon the last grantee in the chain of title of which those serving the

12  notice are reasonably aware."  3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.18 -

13  11-40.21.

14   This is exactly what occurred here.  Plaintiffs served the notice on the

15  newspaper strips' most current owner — Detective Comics' successors in interest,

16  DC Comics.  Defendants try to diminish the significance of the 1944 assignment

17  from McClure to Detective Comics of all its (McClure's) rights in the newspaper

18  strips as nothing but a meaningless gesture.[26]  But if Siegel and Shuster had, in

19  _____

20  [26]  The argument is built largely on the assumption that Detective Comics
    never received the ownership to the renewal term copyright by way of a "grant of a

21  transfer or license" from McClure.  17 U.S.C. § 304(c).  Such an argument seeks
    to make much of the fact that the first proviso to section 24 of the 1909 Act,

22  provided that the right of renewal for a "periodical" work is given to "the proprietor
    of such copyright." Barbara A. Ringer, Study No. 31 Renewal of Copyright (1960),

23  reprinted in 1 Studies on Copyright at 524.  As explained by Ringer, "the
    'proprietor' in this context means the owner of the copyright at the time renewal

24  registration is made, and not the first or original proprietor.  In other words, a
    'proprietor' claim [to the renewal right] follows the ownership of the copyright, and

25  is not a personal right like the claim of an author under the second proviso." Id.
    Thus, when McClure secured the original copyright for the newspaper strips, it

26  was the first proprietor and therefore entitled thereto to the renewal copyright in
    the same.  Defendants argue that when ownership was transferred in this

27  copyright from McClure to Detective Comics, that the renewal term, rather than
    being transferred by agreement, was transferred by way of an automatic function

28  of the statute.  (Defs.' Obj. to New Arguments at Hearing at 2 n.4).  This

(continued...)

1  fact, assigned their copyright in the newspaper strips to McClure, then the transfer

2  would be deeply meaningful as it is a clear and unambiguous grant of both the

3  initial and the not-yet-vested renewal term to the copyright in those strips, thereby

4  rendering Detective Comics (as its immediate successor National Periodical

5  Publications, Inc., would proclaim a few years afterwards) sole owner of the

6  entirety in the copyright to those newspaper strips owing entirely to McClure's later

7  assignment.  Indeed, defense counsel conceded during oral argument that if

8  McClure held the copyright to the newspaper strips in trust for Detective Comics,

9  then it would have required a "reassignment" for the copyright to be transferred to

10  Detective Comics.  Given that Judge Hand held that the right in the material was

11  indeed held "in trust" for Detective Comics, such an assignment was anything but

12  a meaningless gesture.

13       No party disputes that the termination notice was served on DC Comics,

14  the successor to Detective Comics and current holder of all the copyright in the

15  newspaper strips.  Accordingly, the termination notice complied with section

16  304(c)(4), and is not defective based on plaintiffs' failure to serve McClure.

17

18

19

20       [26](...continued)
distinction, however, is mistaken.
21       The second proviso to section 24 noted that "in the case of any other
copyrighted work, including a contribution by an individual author to a periodical or
to a cyclopedic work or other composite work, the author of such work" was
22  entitled to the renewal term.  Judge Learned Hand later defined the term,
"composite work," for purposes of the first proviso in section 24, as limited to
works "to which a number of authors have contributed distinguishable parts, which
23  they have not, however, 'separately registered.'"  Shapiro, 123 F.2d at 699.  Here,
however, the newspaper strips were separately registered in the name of their
24  individual authors after the publication of the composite work in question, the
newspaper.  Indeed, the two weeks' worth of newspaper strips themselves bear a
25  separate copyright notice on them.  In such an instance, the author of the work
was entitled to the renewal in the separately registered copyright, and hence,
26  Detective Comics' receipt by way of assignment from McClure to said renewal
term was not effectuated automatically by way of statute.  See Self-Realization
27  Fellowship v. Ananda Church, 206 F.3d 1322, 1329 (9th Cir. 2000) (holding that
proprietor entitled to renewal term in composite work unless the individual
28  contribution was separately registered).

**C.      Failure to Include Strips in Notice as Works Affected by Termination**

Having found that the initial two weeks' worth of newspaper strips created in the summer of 1938 were not works made for hire, having concluded that Siegel and Shuster assigned all their rights in the copyright to those two weeks' worth of strips to McClure (which later assigned all its corresponding statutorily protected copyright to Detective Comics), and having determined that plaintiffs' failure to serve McClure or its successor does not invalidate the termination notice as to these newspaper strips, the Court is confronted with one final question: Whether the failure to list in the termination notice the initial two weeks' worth of newspaper strips, first published in the <u>Milwaukee News Journal</u> in January, 1939, invalidates the termination notice as to these newspaper strips.  (Decl. Michael Bergman Summ. J. Mot., Ex. X at 325 (complete termination notice reprinted)).  In the end, the Court determines it does not.

A fact not lost on either party or the Court is that potentially valuable copyright elements subsist in this material, as it is the first material in which Superman's home planet of Krypton is named, Superman's Krypton name is revealed, and the circumstances surrounding Krypton's destruction are revealed. Plaintiffs, to their credit, candidly admit that the first two weeks' worth of newspaper strips are not listed in the termination notice; but they point to the fact that the notice did contain the following catch-all clause:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, . . . the planet Krypton . . . .  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

(Decl. Bergman, Ex. X at 3 n.1).

1    Defendants, for their part, advocate a harsh rule:  A mistake, even one of

2    omission, is a mistake of consequence; where such a mistake is made, the

3    authors and their heirs must suffer whatever consequences that flow from the

4    resulting invalidity of the copyright notice.  The Court cannot countenance such a

5    harsh, per se rule that is divorced from the underlying facts.

6    Although there is no approved form for termination notices, the Copyright

7    Office has promulgated regulations specifying the required contents of a

8    termination notice:  It must contain a "complete and unambiguous statement of

9    facts . . . without incorporation by reference of information in other documents or

10   records," 37 C.F.R. § 201.10(b)(2), and it must  include the following:

11       1.    the name of each grantee whose rights are
               being terminated or the grantee's successor in
12             title, and each address at which service is made;

13       2.    the title and the name of at least one author of,
               and the date copyright was originally secured in,
14             each work to which the notice applies (including,
               if available, the copyright registration number);
15
         3.    a brief statement reasonably identifying the
16             grant being terminated;

17       4.    the effective date of the termination; and

18       5.    the name, actual signature, and address of the
               person executing the termination.
19

20   37 C.F.R. §§ 201.10(b)(1)-(1), (c)(1), and (c)(4).  The regulations promulgated by

21   the Register of Copyrights also contain a safety valve that "[h]armless errors in a

22   notice that do not materially affect the adequacy of the information required to

23   serve the purposes of [the statute] shall not render the notice invalid." 37 C.F.R.

24   § 201.10(e)(1).

25   In support of their position, defendants rely on Burroughs v. Metro-

26   Goldwyn-Mayer, Inc., 683 F.2d 610 (2d Cir. 1982).  In that case, the author's heirs

27   attempted to terminate the grant to the copyright in all the books written by Edgar

28   Rice Burroughs featuring the character Tarzan.  In the termination notice,

1   however, the author's heirs mistakenly listed only 30 of the 35 Tarzan books

2   written by Burroughs.  In considering whether the termination notice was effective

3   in recapturing the copyright in those five omitted books, the Second Circuit held

4   that the omission, although inadvertent, rendered the termination notice invalid as

5   to those omitted works.  Id. at 622 (noting that "the omission of the five titles" left

6   the grant "in those five books . . . intact" and unaffected by the termination notice).

7   In reaching this conclusion, the Second Circuit did not discuss section

8   210.10(a)(1)'s harmless error provision; rather, the court simply noted that the

9   regulations required identification of the title and date of original copyright for each

10  work sought to be recaptured, observed the omission in the termination notice,

11  and held that therefore the termination notice was invalid as to the omitted works.

12      Defendants thus vastly overstate the holding of Burroughs as supporting

13  the proposition that plaintiffs' "failure to identify [the newspaper strips] is fatal to

14  their purported termination and their omission cannot be mere 'harmless error.'"

15  (Defs.' Obj. to New Argument at Hearing at 7 (emphasis added)).  Its failure to

16  discuss the harmless error rule makes Burroughs of limited persuasive value to

17  the Court's current analysis.

18      On this point, the Court has discovered only one court decision that

19  considered whether omissions or defects in the termination notice were "harmless

20  errors" such that the termination notice was effective.  See Music Sales Corp. v.

21  Morris, 73 F. Supp. 2d 364 (S.D.N.Y. 1999).  There, the termination notice

22  consisted merely of a bland boilerplate statement:  "Grant or transfer of copyright

23  and the rights of copyright proprietor, including publication and recording right."

24  Although finding that the generic statement would not "reasonably identify[] the

25  grant," the district court nonetheless upheld its adequacy on the basis that "it

26  appears to be boilerplate on termination notices customarily accepted by the

27  Register of Copyrights."  Id. at 378.

28

1    Leading commentators have differing views on <u>Music Sales Corp</u>, and by

2    extension, differing views on how stringent courts should be in applying the

3    harmless error safety valve.  Professor Nimmer, on one hand, is much more

4    formalistic on this point, cautious of the proverbial slippery slope.  As Professor

5    Nimmer explained in response to the <u>Music Sales</u> decision:

6        [T]he Register of Copyrights does not pass judgment
         by accepting notices of termination, so that the
7        ministerial act of filing them connotes no approval of
         their verbiage.  On that basis, the court's citation to
8        authority allowing agencies to interpret statutory
         requirements is inapposite.  But the court also cites
9        unspecified custom of the industry as validating the
         boilerplate approach.  It remains to test what that
10       custom might be.

11   3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.22 - 11.40.22(1).

12       Patry, on the other hand, praised the <u>Music Sales</u> decision as bringing the

13   formalities contained in the regulations into conformity with the realities of how

14   those regulations are actually administered by the agency that was charged with

15   crafting them.  <u>See</u> 3 PATRY ON COPYRIGHT § 7:45 ("In <u>Music Sales Corp. v. Morris</u>,

16   the requirement of a 'brief statement reasonably identifying the grant to which the

17   terminated grant applies' was reviewed, with the court wisely accepting industry

18   custom and Copyright Office practices as indicating compliance").

19       The dearth of case law, along with the divergence of opinion between

20   these two leading commentators, presents the Court with an apparent choice:  On

21   the one hand, the Nimmer approach, <u>i.e.</u>, an insistence on rigid adherence to the

22   formalities specified in the regulations or, on the other hand, the less formalistic

23   (but more practical), lax approach set forth in <u>Music Sales</u> and endorsed by Patry,

24   <u>i.e.</u>, acceptance of industry and agency custom.  The Court declines to choose

25   one extreme or the other, applying instead a middle path that requires a more

26   fact-intensive inquiry in applying the harmless error safety valve.

27       Here, it is clear to the Court that plaintiffs undertook enormous effort to

28   comply with the overly formalist requirements of the termination provisions,

1   literally providing 546 pages' worth of works subject to the termination notice.  The

2   purpose of the regulations is to give the recipient of the termination notice

3   sufficient information to understand what rights of theirs may or may not be at

4   stake.  Here, any recipient of the termination notice would quickly understand that

5   the plaintiffs have sought to reclaim the copyright in any and all Superman works

6   ever created.  Indeed, any publisher receiving the notice would be foolish to

7   believe otherwise. That the termination notice included a broad and

8   comprehensive catch-all clause only reinforces that which the 546-page listing of

9   titles of works subject to the notice makes painfully obvious.

10      This reasoning is all the more sound because what was sought to be

11   recaptured involved the rights to works involving a particular character that has

12   been continuously exploited for decades.  It is this peculiar nature of the subject

13   matter of the termination notice that makes rigid adherence to the regulatory

14   formalities particularly inapt:

15      In the case of works consisting of a series or
        containing characters requiring the terminating party to
16      list separately each work in the series or all works in
        which the character appears would render the
17      termination right meaningless. Instead, notice that
        reasonably puts the terminated party on notice of the
18      character being terminated is sufficient.

19   3 PATRY ON COPYRIGHT § 7:45.  There is little doubt that plaintiffs' termination

20   notice satisfies this concept of reasonable notice that the copyright in the entire

21   body of works to the Superman character was sought to be recaptured.

22      The commentary accompanying adoption of the regulation buttresses this

23   view that such a reasonable notice test is particularly apt with respect to

24   copyrights in characters appearing in thousands of works in countless media over

25   many decades.  In that commentary, the Register of Copyrights (Barbara Ringer),

26   observed that the Copyright Office "remained convinced that the required contents

27   of the notice must not become unduly burdensome to grantors, authors, or their

28   successors, and must recognize that entirely legitimate reasons may exist for

1  gaps in their knowledge and certainty." Termination of Transfers and Licenses

2  Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

3  Such a conclusion does not necessarily conflict with the Second Circuit's

4  decision in Burroughs.  There was a plausible evidentiary basis upon which the

5  court in Burroughs could have reached the outcome it did, even with consideration

6  of the harmless error safety valve as articulated here.  There were only thirty-five

7  Tarzan books that were possibly subject to termination.  In such a case, with a

8  more finite universe of works possibly at issue, the omission of a few of those

9  works in the termination notice would comprise a significant level of exclusion

10  (roughly 15%).  Thus, the works' exclusion could quite legitimately be viewed as a

11  more meaningful act by the recipient of the notice.  Stated differently, in such a

12  situation, there is simply less of a chance for a mistake or oversight occurring in

13  identifying works in the notice, and thus more probable that the recipient would

14  reasonably believe the omission to be intentional, thereafter acting accordingly

15  when contracting with other parties regarding the copyrights to the omitted works.

16  If the terminating party later declares its intention to recapture the omitted works, it

17  is more likely that the notice's recipient will suffer some prejudice beyond the

18  simple reclamation of the rights to the omitted works.  Such a circumstance is not

19  present in a case where, as here, there is a universe of literally thousands of

20  possible works.

21  In the end, the Court finds that some consideration must be given to the

22  nature of the copyrights sought to be recaptured.  In a case involving thousands of

23  works, to insist on literal compliance with the termination notice regulations sets

24  up a meaningless trap for the unwary without any meaningful vindication of the

25  purpose underlying the regulation at issue, a result that the Register expressly

26  disavowed as the intent of the regulations.  Even the most cautious cataloguer

27  could easily overlook a stray work or two among the many thousands at issue

28  here.  The existence of the catch-all provision, while not always necessarily

1  dispositive, clearly and expressly evinces an attempt by the authors to recapture

2  the rights to all the Superman works they authored, and the failure to expressly list

3  the initial two weeks' worth of newspaper strips among those works is harmless

4  error.

5       Having said that, the Court does not hold that all termination notices with

6  similar catch-all provisions will necessarily be sufficient as to inadvertently omitted

7  works.  However, when the notice evidences a demonstrable effort at cataloguing

8  all the relevant and related works, where the universe of those works is large (and

9  certainly larger than the universe of thirty-five works at issue in Burroughs), and

10 where the number of omitted works is minute relative to the included works, the

11 presence of a comprehensive catch-all provision such as that found here leads to

12 the conclusion that the relevant omission was harmless error and the termination

13 notice should be found to be effective even as to the omitted works.

14      Here, the near-Herculean effort and diligence then-plaintiffs' counsel,

15 Arthur J. Levine, placed on cataloging the works and drafting the termination

16 notice, and the inclusion of the express catch-all provision in the termination

17 notice, put to rest any reasonable doubt defendants may have had that plaintiffs

18 sought to recapture all, not just some, of the copyright in the Superman character.

19 In short, if receipt of the nearly six-pound, 546-page termination notice was not

20 enough to convey this message, it was made plain by the explicit statement

21 expressing plaintiffs' intent to terminate the copyrights in all the Superman works.

22      Accordingly, the Court finds that failure to list the two weeks' worth of

23 newspaper strips was harmless error that does not effect the validity of the

24 termination notice to the first two weeks' worth of Superman newspaper strips.

25                          **V. CONCLUSION**

26      At the conclusion of this final installment regarding the publication history of

27 and the rights to the iconic comic book superhero Superman, the Court finds that

28 plaintiffs have successfully recaptured (and are co-owners of) the rights to the

following works:  (1) <u>Action Comics</u> No. 1 (subject to the limitations set forth in the Court's previous Order); (2) <u>Action Comics</u> No. 4; (3) <u>Superman</u> No. 1, pages three through six, and (4) the initial two weeks' worth of Superman daily newspaper strips.  Ownership in the remainder of the Superman material at issue that was published from 1938 to 1943 remains solely with defendants.[27]

Dated:  August 12, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

---

[27]   Although raised by the parties, the Court declines to address, and preserves for consideration <u>in limine</u> of trial, the remaining issues raised in the parties' briefs, including the mechanics of how such an accounting would be performed (should the concept of apportionment used in the infringement context be applied and, if so, who bears the burden of proof, and whether such apportionment should be done on a work-by-work or template basis), questions on how and to what extent to divide up profits generated from so-called "mixed use" trademark/copyright, and whether and to what extent pre-termination derivative works were published <u>after</u> the termination date into post-termination derivative works subject to an accounting of profits.

**ADDENDUM A**










































































