# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>Plaintiffs,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS<br><br>Defendants, | CASE NO.  CV-04-8400-SGL (RZx)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION; ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION; ORDER AMENDING COURT'S AUGUST 12, 2009, ORDER** |

## DEFENDANTS' MOTION FOR RECONSIDERATION

Despite having been passed more than thirty-three years ago, the termination provisions in the 1976 Copyright Act have been little utilized by authors or their heirs and, consequently, little explored by the courts.  *See* William F. Patry, *The Failure of the American Copyright System: Protecting the Idle Rich*, 72 NOTRE DAME L. REV. 907, 922 (1997) ("by not making termination automatic and requiring authors to jump through hoops even more formidable than those renewal presented" under the 1909 Act, the consequence is that, "in practice, the termination right has" been "barely used," with "approximately 0.72% of [termination] transfers hav[ing] been recorded, as required, with the Copyright Office"); *see also* Decl. Jeremy N. Williams ¶ 6 (noting that even for a company with as diverse and

1   large a catalog of copyrighted properties as Warner Bros., it has only received 65

2   termination notices since the late 1980s, or roughly only three termination notices a

3   year).

4          This is also true of the limited case law construing the regulations

5   promulgated by the Copyright Office to govern the exercise of the statutory

6   termination right.

7          It is in this context that the Court has explored the harmless error rule

8   contained in 37 C.F.R. § 201.10(e)(1).  This provision was promulgated by the

9   Copyright Office to address missteps made in complying with regulatory

10  requirements specifying the "form, content, and manner of service" for termination

11  notices under the 1976 Copyright Act.  In this case, the regulatory requirement in

12  question is the one requiring identification of the "title, . . . the name of at least one

13  author . . . , and the date copyright was originally secured in, each work to which the

14  notice of termination applies; and, if possible and practicable, the original copyright

15  registration number."  37 C.F.R. § 201.10(b)(1)(iii).  The termination notices served

16  by the plaintiffs, the widow and daughter to Jerome Siegel the co-creator of the

17  iconic comic book superhero Superman, failed to provide the "title," the "name of

18  one author," "date copyright was originally secured," or the "original copyright

19  registration number" for the first two weeks of Superman newspaper comic strips

20  that were published in the Milwaukee Journal beginning on January 18, 1939, and

21  concluding on January 28, 1939.[1]

22         Instead, the termination notices stated that, in addition to all the other works

23  that were so identified by title, registration number, *etc.*, (spanning some 546 pages

24

_____

25         [1]  These newspaper strips first relayed the story concerning the
26  circumstances leading to the destruction of Superman's home planet Krypton, the
    identity of his Kryptonian parents (Jor-L and Lora), and Superman's Kryptonian
27  name (Kal-L).  Certain aspects of the story were altered when another version of
    Superman was created decades later in a universe known as Earth-1 (as
28  distinguished from the earlier version consigned to Earth-2), notably the names
    were changed to Jor-El, Lara, and Kal-El.

and concerning literally tens of thousands of Superman works published from 1938 to 1997, including Superman newspaper strips published in the Milwaukee Journal from February 20, 1939, and onward, *see* April 30, 2007, Decl. Michael Bergman, Ex. X at 325), it also applied to:

> [E]ach and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK . . ., Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

*Id.* at 3 n.1.

No one disputes that such information is insufficient to meet the regulatory command to provide a "complete and unambiguous statement . . . without incorporation by reference of information in other documents or records" that clearly identifies the title, date on which copyright was originally secured, and registration number for the work in question.  Although works concerning the Superman character and the planet Krypton is mentioned, no title or other concrete identifying information (such as registration numbers or date the copyright was originally secured) is provided.  Thus presented for the Court was the question of whether, under these circumstances, this non-compliance with the regulatory requirements was nonetheless harmless so as not to affect the validity of plaintiffs' termination notice from applying to those first two weeks' worth of Superman newspaper strips.

In its August 12 decision, the Court answered in the affirmative.  Noting that consideration of whether an error in meeting the formalities called for in the regulations is harmless is a "fact-intensive inquiry," the Court reasoned that, given the nature of the property at issue (an iconic comic book superhero character exploited continuously in every form of media imaginable for the past seventy

years), the amount of effort Siegel's heirs took in carefully cataloging and identifying the vast universe of works potentially at issue, the minuscule number of works that were not so specifically identified in the notice, and the presence of the catch-all clause itself, the error committed in this particular case, under these particular circumstances, was indeed harmless. *See Siegel v. Warner Bros. Entertainment Inc.*, - F. Supp.2d -, 2009 WL 2512842, at *49-53 (C.D. Cal. Aug. 12, 2009).

After having subjected the issue through the crucible of defendants' arguments in their motion for reconsideration and further elucidation of the relevant facts both in this case and in those other cases referenced in the earlier Order, the Court reaffirms its earlier disposition of the question and finds that the error in question was in fact harmless.

Accordingly, defendants' motion for reconsideration is **DENIED**.

**A.** *Construction of Relevant Statutory and Regulatory Language*

The Court begins by looking to the language in the statute and the regulation itself.  Section 304(c) of the 1976 Copyright Act governs the termination of grants to works created under the auspices of the 1909 Copyright Act.  Among the litany of provisos erected in effectuating such a termination of transfer is that a notice be prepared and served upon certain entities, during a five-year fixed window measured from the date the copyright in the work(s) in question was originally secured, and, most importantly for purposes of the present motion, that said notice must "comply, in form, content, and manner of service, with requirements" prescribed by "the Register of Copyrights."  17 U.S.C. § 304(c)(4)(B).  The statute thus requires that a termination notice be filed that meets certain requirements as to its form, content, and service, but is silent as to what those precise requirements are, instead leaving that to be completed by the relevant agency.  Toward that end, shortly after the 1976 Act's passage, the Register (Barbara Ringer) promulgated regulations seeking to fill in these gaps in how parties were to go about preparing such termination notices.  Among the litany of formalities eventually required to be

observed with respect to the "content" in the termination notice was that it "must

include a clear identification" of the following:

> (I) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

> (ii) The title and the name of at least one author of, and the date copyright was originally secured in, *each work to which the notice of termination applies*; and, if possible and practicable, the original copyright registration number;

> (iii) A brief statement  reasonably identifying the grant to which the notice of termination applies;

> (iv) The effective date of termination; and

> (v) In the case of a termination of a grant executed by a person or persons other than the author, a listing of the surviving person or persons who executed the grant.  In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author [and then

37 C.F.R. § 201.10(b)(1)(I)-(v) (1977) (emphasis added).[2]

Recognizing the intricacies of the formalities being established and the potential for gaps in the terminating parties' (especially in the case of an author's heirs) knowledge of the information sought by those formalities due to the long passage of time that may have occurred since the grant and works in question were executed and published,[3] the Register also placed a safety valve that could operate to relieve terminating parties from mistakes or other traps for the unwary that would be created by requiring strict conformance to the regulation's requirements.  Section

---

[2]  The regulation was subsequently amended to take account of changes to the duration of copyrights and their effects on the termination right enacted by the Sonny Bono Copyright Term Extension Act of 1998.

[3]  *See* 42 F.R. 45916, 45917 ("Under section 304(c) of the Act, the preparation of notice of termination will be occurring at a time far removed from the original creation and publication of a work and, in many cases, will involve successors of original authors having little, if any, knowledge of the details of original creation or publication").

201.10(e)(1) to the regulations, titled "Harmless errors," declares that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of section 304(c) of title 17, U.S.C., shall not render the notice invalid."  Thus, by the regulation's own formulation, an error's "materiality," and hence its "harmlessness," was to be viewed through the prism of the information needed to adequately advance the purpose sought by the statutory termination provisions themselves.

This "safety valve" also contained subsection (e)(2), which provided a litany of examples of errors that the Register sought to make clear were never to be viewed as harmful so long as certain conditions were met.  *See* 74 F.R. 12554, 12555 (section (e) gives "examples of forgivable, harmless error").  Specifically, "errors made in *giving* the date or registration number referred to in paragraph (b)(1)(ii), or in *complying* with the provisions of paragraph (b)(1)(v) of this section, or in *describing* the precise relationships under clause (2) of paragraph (c) of this section[, the signature provisions thereto]," were all excused so long as the commission of the error was done "in good faith and without any intention to deceive, mislead, or conceal relevant information."  37 C.F.R. § 201.10(e)(2) (emphasis added).  This subsection to the harmless error rule is the source of the first point of disagreement between the parties in terms of how to construct the more general harmless error rule set forth in (e)(1).

From the nature of the admitted "examples" set forth in (e)(2) and the fact that (e)(1) states that the errors in question must be "in a notice," defendants extrapolate that the Register sought to limit application of the general rule set forth in (e)(1) to the same universe of types or "kinds" of errors specified in (e)(2), and even then, the errors must be ones concerning information that was actually conveyed rather than omitted.  In other words, defendants' construction of the regulation posits that only scrivener or other such "typographical" errors (presumably meaning misspellings of the title to a work, mistakes as to a numeral(s)

used for a registration number or a date) could ever qualify for consideration as being harmless; or, in the context of the present case, the rule would never apply unless the "work is otherwise properly identified."  (Defs' Mot Recon. at 3; Defs' Reply at 2).  As explained by defense counsel:

> The harmless error exception [in (e)(2)] does not provide *any* example involving an outright *omission* of the required information.  Rather, it allows for *errors* within required information that has actually been provided (*e.g.*, an incorrect date, or an incorrect description of the relationship between the terminating and filing party), all of which must be accompanied by a *justifiable and legitimate explanation.* . . . [I]t cannot be disputed that on its face section 210.10(e)(1) makes exceptions for 'harmless errors,' not 'harmless omissions,' a distinction fully borne out by the examples in 201.10(e)(2).

(Defs' Sur-sur-reply at 1 (emphasis in original)).

As set forth below, defendants reading of the harmless error rule is both incomplete as a general matter, but also misdirected in terms of the specifics of this case.  The harmless error rule applies to much more than simple clerical or typographical errors, but at the same time, this is *not* a case where the termination notice was completely absent of *any* information regarding the works in question.

To begin, defendants read subsection (e)(2) backwards.  The Register made clear that the examples contained in (e)(2) were *not* meant to define or otherwise delimit the general class of errors to which the harmless error rule in general would apply.  Instead, the Register expressly stated that the *only* reason for the inclusion of the specific examples in (e)(2) in the first instance was so that, by their recitation, "disputes" would be avoided that those particular errors could ever be considered harmful.  *See* 42 F.R. 45916, 45919 ("the final regulation requires specific items of information that, in some cases, were not in our [initial] proposal.  We do not intend that the validity of notices of termination *should be subject to disputes* over whether errors concerning these specific items are 'harmless.' Accordingly, we have added a new paragraph (e)(2) to make clear that errors made in connection with this information will not affect the validity of the notice" (emphasis added)).

Thus, subsection (e)(2) was meant to create a safe harbor for which no "dispute" would arise as to the harmless error rule's application, thereby staving off the need for judicial decision-making.  Far from seeking to constrain application of the harmless error rule, those examples in (e)(2) were only meant to foreclose disputes as to a certain narrow class of errors; the inference being that the Register was cognizant that there would be occasion for further disputes concerning errors outside the kinds contained in (e)(2) that would be left for courts to decide in applying the general rule found in (e)(1).

Lest there be any doubt on the point, the Register placed a proviso at the beginning of subsection (e)(2) that specifically reminds the reader that the litany of examples that followed were to be read "*without prejudice* to the general rule provided by paragraph (e)(1) of this section."  (emphasis added).  Far from suggesting the principle of *expresio unius est exclusion alterius* ("the expression of one thing is the exclusion of another"), or that subsection (e)(2) somehow contained a clear and "specific rule" to be applied against the general harmless error provision found in (e)(1), this proviso recognizes that the reach of the harmless error safety valve is *broader* than the specified class of examples listed in subsection (e)(2).  Nowhere in defendants' papers have they acknowledged, much less attempted to square, this opening proviso to (e)(2) with their proposed construction of the regulation.

The Court's reading is consistent with another regulation promulgated by the Register respecting content formalities for filing a notice of intent to obtain a compulsory license (sometimes referred to as a mechanical license) to reproduce non-dramatic musical works (meaning, a song's words and music) in phonorecords. 37 C.F.R. § 201.18(d)(v)(A), like its regulatory cousin, section 201.10(b), requires that the notice for a compulsory license provide a "clear statement of . . . the title of the non-dramatic musical work" affected thereby.  Section 201.18(g) also provides a harmless error provision that, like in 201.10(e)(1), is keyed to whether the error in

question "materially affects the adequacy of the information required to serve the purposes of" the relevant statutory section giving rise to the right to file said notice. In the accompanying commentary to the proposed regulation, the Register noted that the required information in the notice was meant to "help the copyright owner identify which of his or her works are being used under the license." 66 F.R. 45241, 45243. Nonetheless, the Register recognized that "errors may occur," and that "potential licensees should not be denied use of the license" on account of these errors when it does "not affect the legal sufficiency of notice." *Id.* However, unlike with the termination notice regulation, the Register decided against providing a safe harbor provision, observing that "the Office does not anticipate that it will have any role in resolving disputes about whether an error in a notice as harmless." *Id.* Instead, "such disputes will have to be adjudicated in the courts." *Id.*

Thus, a general harmless error rule, unadorned, anticipates and invites disputes as to its application to arise and be resolved by the courts. This is the same principle underlying a section like section 201.10(e)(1), and the proviso placed in front of the safe harbor language in 201.10(e)(2) affirms that this general principle governs: Outside that safe harbor, the harmless error rule continues to apply, leaving it for courts to resolve any and all the other disputes, covering many different potential situations and categories of errors, that may arise.

Having addressed the limited safe harbor provision of (e)(2), the Court returns to consideration of the language set forth in the harmless error rule in (e)(1) to determine when an admitted error other than as listed in (e)(2), is harmless. The language the Register used in (e)(1) expressly ties the determination of the "harmlessness" of any error in question with the adequacy of the information needed to "serve the purposes of . . . section 304(c)." Thus, the regulatory language directs the court to examine the purpose of the termination right contained in section 304(c), and what information is needed to adequately fulfill that purpose. In short, that purpose, as set forth below, is to provide authors or their heirs a

meaningful opportunity to recapture the right to the extension in the copyright term afforded to such earlier works by the 1976 Act, while at the same time ensuring that reasonable notice is given to grantees (or their successors) and to the public so as to identify what work(s) are affected.

The termination provisions initially proposed by the Copyright Office during the 1960s revision process to the 1909 Act were much different than that which was ultimately enacted by Congress in 1976.  The Office's initial proposal was that the termination of transfer right would take effect automatically, without authors being required to fulfill certain procedural steps to effectuate their right.  This proposal was "strongly objected to by distributors and strongly defended by authors, and became, in the words of the Copyright Office, 'the most explosive and difficult issue in the revision process'" of the 1909 Act.  Patry, 72 NOTRE DAME L. REV. at 921.  In the end, a "practical compromise" was reached by Congress that was designed to "further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved," notably the possible disruption such exercise of the termination right might bring to long-established business dealings and the chains of title involving affected properties.  *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 n.39 (1985).  Amongst the compromise reached was the deletion of the termination right's automatic nature, in favor of "the burden [being] placed on [authors or their heirs] to file a notice of intent to terminate the transfer."  Patry, 72 NOTRE DAME L. REV. at 921; *see* 17 U.S.C. § 304(c) (noting that the copyright in a pre-1978 work (other than one "made for hire"), "the exclusive or nonexclusive grant" to which (other than one made "by will") was "subject to termination" so long as certain "conditions" were met).

Thus, among the competing objectives and interests sought to be achieved through section 304(c) was not only affording authors or their heirs a meaningful

opportunity to benefit from the newly extended copyright term,[4] but also for the existing assignee to receive reasonable notice of what rights of theirs are being affected through the exercise of the author's (or heirs') termination right.  This compromise "purpose" behind section 304(c) was given concrete expression by the Register in the commentary accompanying the final adoption of 201.10, wherein it was observed that "the proposed regulation" was meant to "attempt[] to avoid the imposition of costly or burdensome requirements [on authors or their heirs], while, at the same time, giving the grantee and the public a reasonable opportunity to identify the affected grant and work from the information given in the notice."  42 F.R. 45916, 45918; *see also* 41 F.R. 50300, 50300 (making the same observation as the purpose of "[t]he proposed new § 201.10").  The Register thus recognized that the grantee's and the public's need for a "reasonable" chance to identify the "grant and work" at stake (which speaks to notions of actual and constructive notice) must be balanced against ensuring that the opportunity for authors or their heirs to actually share in the new right be meaningful by avoiding needlessly burdensome requirements.  In this respect, therefore, careful consideration of the nature of the property at issue is necessary to assess this balance between providing reasonable notice to the grantee (or its successors) and the public, and avoiding undue burdens on authors or their heirs.

---

[4]  *See Classic Media*, 532 F.3d at 984 ("The 1976 Act, and in particular its . . . termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs.  . . . As stated in the 1976 Act House Report: 'The extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it" (quoting H.R. Rep. No. 94-1476, at 140 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5659, 5756)); *see also Music Sales Corp. v. Morris*, 73 F. Supp.2d 364, 372 (S.D.N.Y. 1999) ("The 1976 Act created an additional opportunity for the author or the author's heirs to extract the fair value of the work"); 73 F.R. 3898, 3898 (labeling "termination provisions . . . set forth in section[] 304(c)" as "hav[ing] an equitable function; they exist to allow authors or their heirs a second opportunity to share in the economic successes of their works" for that extension in the duration of the copyright to the same put into place by the 1976 Act).

**B.** **_Was Adequate Notice Given to the Recipient of the Notice?_**

To begin, the Court agrees with defendants that, for any error in question to be considered harmless, its existence must be disclosed "in the notice" itself; complete omissions without _any_ other information touching on the subject matter of the error in the notice will not suffice to trigger the rule's possible application. This construction is not only found in the regulation's command for the vast swath of information required to actually be set forth in the notice ("must include"), but also in (e)(1)'s description of the errors affected by it as those found "in a notice." The Register, when commenting upon harmless error, speaks of the "errors'" being "in a notice of termination." 42 F.R. 45916, 45919.

Such a construction is also consistent with one of the purposes underlying section 304(c), which was to provide "the recipient of the termination notice [with] sufficient information to understand what rights of theirs may or may not be at stake." _Siegel_, - F. Supp.2d. -, 2009 WL 2512842, at *52. The absence of _any_ information in the notice about the work in question, for instance, would thwart a recipient's ability to be so apprised. As previously noted, the Register in her commentary accompanying the regulation, observed that § 201.10 attempts to require identification of the "the affected grant and work _from the information given in the notice_." 41 F.R. 50300, 50300 (emphasis added). The complete lack of any information "in the notice" is not the "giving" of information.

Plaintiffs' argument that the regulation also states without equivocation that other items, other than those relating to the identification of the work, "must" also be "included" but are nonetheless found in (e)(2)'s safe harbor as errors that are subject to harmless error, misses the point. Those other examples in (e)(2) concern errors regarding the information actually _contained_ in the notice. Thus, (e)(2) speaks of "errors made in _giving_ the date or registration number" or in "_describing_ the precise relationships" of the terminating parties to the author. Those are words connoting errors in information actually found within the notice. Moreover, the

1   multiplicity of information that must be included in the notice only underscores that

2   much information is required, not that *complete* omissions in conveying that

3   required information may be excused.

4        The Court emphasizes the word "complete," because it is also clear that, for

5   some of the regulatory commands, more than one piece of information is called for

6   in meeting that particular requirement.  For example, with respect to the particular

7   regulatory requirement at issue here, the regulation not only requires the title of the

8   work at issue, but also the date that the copyright in the same was originally

9   secured, the name of at least one of the authors of the work, and, if practical, the

10  original registration number.  Thus, there are multiple pieces of information that are

11  sought by this single requirement.  Omissions of some or parts of that information

12  might still be considered harmless so long as there are other pieces of information

13  sufficient to satisfy the particular requirement present in the notice.  The pertinent

14  question at that point would be whether that partial set of information is enough to

15  meet the purpose sought to be filled overall by the particular requirement.

16       Assume, for example, that in a termination notice, for whatever reason, no

17  title for a particular work is given, the author's name for that work is missing, and no

18  date is provided as to when copyright in that particular work was secured, *but* a

19  valid initial registration number for the work standing by itself is provided.[5]  In such a

20  circumstance there are clearly omissions of information required by 201.10(b)(1)(iii),

21  thus creating an error in the notice; however, it can hardly be disputed that the

22  information that is contained in the notice is nonetheless adequate for the recipient

23  to have a "reasonable opportunity to identify the . . . work."  As the Register noted,

24  much of the litany of information called for in (b)(1)(iii) (notably, the registration

25  number and the complete set of the authors to a work) was "intended to serve only

26  as a means of possible assistance to persons receiving a notice of termination in

27

28          [5]  The same example would equally apply if instead the title and author of
     the work are given, but the registration number and date the copyright in the work
     was originially secured was omitted.

13

identifying the work to which the notice applies.  It is not itself a substantive

condition of termination . . . ."  42 F.R. 45916, 45917.  In this example, possessing

the correct registration number by itself affords the recipient a "reasonable

opportunity" to identify the work placed at issue by the termination notice.  In

contrast, where no mention of the title, the date copyright was secured, the

registration number, the author's name *or anything else* about the work in question

is made, no such opportunity can be said to exist.  This is the circumstance that

confronted the district court in *Burroughs v. Metro-Goldwyn-Mayer, Inc.* (a case

discussed in more detail below) where the notice omitted altogether five Tarzan

works without *any* other information respecting those works in the notice itself.  In

such a circumstance, it can hardly be said that the notice recipient would be given a

"reasonable opportunity" to discover the work affected by the notice; the notice is

completely devoid of any information disclosing that the work was ever at issue,

much less providing a means upon which a recipient could begin an inquiry into

identifying it.

 Here, however, the circumstance in the present case lies between these two

examples.  As in *Burroughs*, there is no mention in plaintiffs' termination notices of

the initial registration number, the title, the author, or the date on which the

copyright was originally secured in the first two weeks' worth of Superman

newspaper strips.  On the other hand, there is, as in the first example, *some*

information that points to the works in question, contained within the catch-all

clause.  Defendants offer scant argument about the catch-all in their briefs, instead

labeling its informative value as "absurd," one that only "invites an examination of a

70-year span" of works.  A more careful reading suggests otherwise.

 At the outset, the Court acknowledges that the catch-all, as written, does not

speak in terms of the regulation's specific litany of information for identifying works;[6]

_____

 [6]  Such would be the case, if, for instance, the catch-all was drafted to state
that the termination notice applied to "each and every Superman work by Jerome

a different lexicography is used for that purpose.  Instead, the catch-all was written in terms that define certain attributes in the copyright of the Superman character, including his planet of origin:  "[E]ach and every work . . . that includes or embodies the character, story element or indica reasonably associated with SUPERMAN . . . such as . . . the planet Krypton . . . ."[7]  No doubt utilization of a formulation based on the specific categories of information set forth in 210.10(b)(iii) would have been more useful, providing the recipient information that could be directly and readily checked against the records in the Copyright Office; the approach used instead required more familiarity by the recipient with the character itself to assist in searching the records in the Copyright Office.  That said, what plaintiffs' formulation lacks in terms of the specific form of information called for in (b)(iii), it makes up for in more precisely identifying the particular work that is put into question by the notice.

Defendants take issue that the catch-all notifies the recipient of the heirs intent to recapture "all the works" with the "planet Krypton" unadorned with any

_____

Siegel and Jospeh Shuster during the five-year termination window beginning with April 18, 1938, with the title Action Comics, Superman, World Finest (Best) Comics, All-Star Comics," all the latter having been listed in the notice as actual titles to the other Superman works, including the newspaper strips (again all published under the title "Superman")).

[7]  To the extent it could be argued that the catch-all also applied to character attributes aside from those explicitly mentioned (notably, through its reference to "without limitation"), such an argument may well run full square into the category of complete omissions discussed earlier.  Given that the catch-all is written in the language of copyright in a particular character, the mention that the notice applies to "all works" where the character appears adds nothing.  The character exists and is composed of specific attributes that are delineated on a work-by-work basis.  Accordingly, without mention of the specific attribute sought to be recaptured, it could be argued that the catch-all does not direct the receipient to know what in particular to look for in identifying the work(s) in question, a circumstance not all that different from when a termination notice is completely devoid of *any* information of the specific work affected.  In such a circumstance, the receipient would have to hazard a guess as to what are the attributes of the character and then act accordingly.  Given that this circumstance is not present in this case, the Court need not further address it.

information about the particular works put in issue, which will necessarily require

them to plough through seventy years worth of Superman works, "some of which

are ancient and difficult to even locate," to compile a list of all those with Krypton in

it. (Defs' Mot. Recon. at 5). Defendants overstate their plight, ignoring a "basic

principle" of copyright law in reviewing the catch-all clause. (Defs' Reply at 3). As

ably demonstrated in defendants' own papers, and, more importantly, as explained

in Judge Newman's concurring opinion in *Burroughs*, the copyrightable aspects of a

character — the thing for which a notice is designed to declare its intent to

recapture — are protected only to the extent the work in which that particular aspect

of the character was first delineated remains protected, but not in the subsequent

sequels in which that attribute is later repeated or used. (*See* Defs' Reply at 3

("copyright protection and termination only exist work-by-work and characters are

protected only as delineated in specific works"); Defs' Partial Mot. Summ. J. at 7-8

("the presentations of Superman since 1938 . . . were not a static depiction but an

ever-evolving portrayal, featuring new super powers, new villains, and new

components to the Superman universe and back story. Indeed, the Superman story

and characters evolved on an episode-by-episode basis," including "reference to

some of the more famous story elements now associated with Superman" like "the

name of Superman's home planet 'Krypton'"); *Burroughs v. Metro-Goldwyn-Mayer,

Inc.*, 683 F.2d 610, 631 (2nd Cir. 1982) (Newman, J., concurring) ("On the

assumption that the character Tarzan is sufficiently delineated to support a

copyright, there is no dispute that the delineation was complete upon the 1912

appearance of the first Tarzan title *Tarzan of the Apes.* Subsequent titles, including

the omitted five, contained original exploits of Tarzan, but were not original with

respect to the character itself. As to the character Tarzan, the subsequent titles

were sequels, 'subsequent stories employing the same character'"); *see also* 1

MELVILLE NIMMER, NIMMER ON COPYRIGHT § 2.12 at 2-178.31 to 2-178.32 (rev. ed.

2009) ("Subsequent works in a series (or sequels) are in a sense derivative works,

1  while the characters which appear throughout the series are a part of the underlying

2  [initial] work upon which the later works are based. . . .  So copyright in a particular

3  work in a series will not protect the character as contained in such series if the work

4  in the series in which the character first appeared has entered the public domain[;

5  instead,] protection for the character extends only to those . . . elements added in"

6  the sequel).

7       Thus understood, there can be only one work upon which plaintiffs could

8  ever seek to recapture the copyright to "the planet Krypton" aspect of the

9  "Superman character" — the work or series in which that aspect of the character

10  was first explored.  Far from telling defendants "nothing," (Defs' Reply at 3), the

11  catch-all, thus understood, in a very real sense, pointed them to a precise and

12  notable work.  Admittedly, this information did not also point defendants to a specific

13  place in the Copyright Office's records to investigate that particular work, such as

14  would be the case if they had received the title of the work where Krypton was first

15  explored, or the date the copyright in the same was first secured, but that raises

16  questions as to the adequacy of the information — it cannot be said that there is a

17  complete lack of any information being provided on the matter, as argued by

18  defendants.

19       This then brings to the fore whether the information that was provided in the

20  notice — that the termination notice applied to the work in which the "planet

21  Krypton" aspect of the "Superman character's" copyright was first secured — was

22  adequate for defendants to have had a "reasonable opportunity to identify" the

23  "work."  In answering this question, the case of *Music Sales Corp. v. Morris*, 73 F.

24  Supp.2d 364 (S.D.N.Y. 1999), provides useful insight.  In that case, which

25  concerned the termination of the grant to various musical compositions by noted

26  jazz composer and performer Billy Strayhorn, the question presented was whether

27  the termination notice, whose description of the grant consisted merely of a

28  boilerplate statement, "Grant or transfer of copyright and the rights of copyright

proprietor, including publication and recording right," was sufficient to meet section 201.10(b)(iv)'s regulatory requirement that the notice "must include . . . a brief statement reasonably identifying the grant to which the notice applies." The description of the grant was important because there were multiple potential grants to the compositions at issue. *Id.* at 367-68 (noting execution of three different agreements by Strayhorn, his heirs, and/or his estate relating to assignments in the musical works in question). The district court admitted at the outset that said description in the notice did not "reasonably identify the grant," *id.* at 378, and hence an error was committed in that regard in the notice. Nonetheless, the court found the information "adequate," meaning that the admitted error was harmless, noting that "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights." *Id.* This approach — reference to industry and agency custom — in judging the "adequacy" of the information provided for purposes of harmless error is the source of a dispute between the two leading commentators on copyright (Nimmer and Patry), and continues to be, viewed by this Court as overly "lax" and untethered to any consideration of the dual purposes underlying section 304(c). *See Siegel*, - F. Supp.2d -, 2009 WL 2512842, at *51. That said, *Music Sales* remains as a beacon on the legal landscape demonstrating how little concrete information need be conveyed and yet still be considered adequate for purposes of section 304(c).

Defendants understandably seek to diminish the significance of *Music Sales*, correctly noting that it concerned the adequacy of information related to the grant, not identification of the work, at issue. From there defendants note that the more forgiving result in *Music Sales* can be explained as the product of the lesser "standard of adherence" called for in the regulation for identifying the grant (the terminating party need only "reasonably identify" it), as opposed to here, where the standard of adherence for identifying works is much higher ("must identify" the title, date copyright was originally secured, *etc.*). No doubt such a difference is manifest

in the regulation itself, but the problem with this argument is that it ignores that, in *Music Sales*, the district court found that the information in the termination notice did not even meet this lesser standard of adherence.  That the regulation required a less specific, itemized menu of information was not a factor in the court's appraisal of adequacy of the information in the notice.  Such differences in levels of adherence are taken into consideration in determining whether an error first occurred; once it is determined an error occurred, whether the information that was provided is nonetheless adequate is an altogether separate inquiry.

*Music Sales* demonstrates in broad strokes the extent to which less than precise information may nonetheless be excused through the harmless error rule.[8] Such allowance is explained in the commentary to those portions of the regulation requiring identification of both the grant and the work, in which the Register expressed her concern regarding the terminating parties' ability to access information regarding both the grant and the work.  42 F.R. at 45917 (observing in the context of the identification of the work that "the preparation of notice of termination will be occurring at a time far removed from the original creation and publication of a work and, in many cases, will involve successors of original authors having little, if any, knowledge of the details of original creation or publication) & at 45918 (noting in context of identification of the relevant grant that "it will commonly be the case that the terminating author, or terminating renewal claimant, widow, widower, children or grandchildren of a deceased author, will not have a copy of the grant or ready access to a copy").

---

[8] It should be noted that identification of the grant, however amphorously allowed under the pertinent regulatory requirement, was nonetheless something that "must be" clearly "included" and "identified" in the notice.  It decidedly was not viewed as some "lesser" form of information.  When speaking of what was sought to be achieved behind the regulations the Register specifically pointed to two pieces of information as lying at the center of the purpose of section 304(c) — "giving the grantee and the public a reasonable opportunity to identify the affected *grant and work.*"  41 F.R. at 50300 (emphasis added); 42 F.R. at 45918.

Thus, some consideration must be given to this circumstance in judging the adequacy of the information provided as to a work (or a grant), as it goes to another core purpose of section 304(c) — providing authors or their heirs a meaningful opportunity to recapture the right to the newly provided extended copyright term in works which were long ago assigned away by them.  This is especially true in a case such as this involving an author's heirs seeking to recapture the rights to a long-ago created character exploited in literally thousands of works (even as measured by the five-year window) in various different formats.  In such circumstances more leeway should be afforded in terms of the adequacy of the information contained in the notice.

The Court is mindful that the information that was actually conveyed in the notice did not touch upon the specific types of information called for in the regulation.  This fact has given the Court some pause, but in the end it is clear that recital of the precise incantation of information in (b)(iii) is not as important as whether the information (whatever it may be) that is contained in the notice in that regard serves to apprise the recipient of the work affected.  Indeed, a court would not be looking to the harmless error rule if the information recited correctly and in full the entire menu of information called for in 201.10(b)(iii).  Again, as the Register noted, much of the litany of information in (b)(iii) was not itself considered a substantive condition of termination, but simply "as a means of possible assistance . . . in identifying the work."  42 F.R. at 45917.  It is this factor  — whether the information provided is of such assistance — that lies at the core of (b)(iii) and forms the basis for the inquiry into the adequacy of the information provided. Indeed, the Register repeatedly recognized that there may exist good reasons for the absence of much of this litany of information in 201.10(b)(iii) concerning the identification of the work and yet said errors could still be considered harmless.  *See* 42 F.R. at 45917, 45918.  As the Register observed: "[W]e remain convinced that the required contents of the notice must not become unduly burdensome to

grantors, authors, or their successors, and must recognize that entirely legitimate reasons may exist for gaps in their knowledge and certainty."  42 F.R. at 45918.

Thus, in setting forth the notice's intent to recapture that portion of the Superman character's copyright concerning "the planet Krypton," the only work(s) in which such a copyright would subsist was the first one(s) in which that aspect of the character was explored.  Such information is of much more assistance, as it focused defendants' inquiry to narrow and targeted work, than if the notice had instead relayed some of the menu of information in 201.10(b)(iii) by simply identifying the title and author of the strips.  Literally thousands of Superman works (be it as comic books or newspaper strips) were published under the title "Superman," all of whom were created by Siegel and Shuster.  With that understanding, the Court concludes that defendants were given information that the notice sought to terminate the first Superman work in which "the planet Krypton" appears; information which was of assistance in locating the actual work itself.

The Court begins with a practical observation: Despite efforts to vouch for their inability to know what to do when in receipt of this information (defendants claim that, in the absence of the particular litany of information in 201.10(b)(iii), they are powerless to divine on how to go forward), it is clear to the Court that a "reasonable opportunity" existed to identify a work utilizing this information.   When viewed in a real world setting, a declaration that the notice applied to the first work in which the planet Krypton was featured is not as unilluminating as defendants suggest.  This notice is directed to a world-famous character for which vast literature has been written concerning its publication history (as demonstrated by defendants' recital to various court cases, publications, and noted experts who understood the information as to Krypton first appearance).  Add to this milieu the fact that the recipients of the notice are the ones in possession of all the information related to the character's appearance in various mediums since his first appearance in *Action Comics* No.1, and it becomes quite clear that the recipient in this case

1   would know, fairly quickly, which work the planet Krypton first appeared in the

2   Superman character's literary universe.  Whether such identification would be

3   sufficient in other circumstances, this Court cannot and does not say.  What makes

4   this case unique is the nature of the particular property being terminated.

5       Defendants argue that the contents of the termination notice must be such as

6   "to provide advance notice of each affected work without need for investigation [by

7   the grantee]."  (Defs' Mot. Recon. at 5).  Such a standard asks too much from the

8   termination notice; the Register clearly contemplated that recipients of the

9   termination notice would conduct their own investigation based on the information

10  contained therein.  *See* 42 F.R. at 45918 ("There is no real reason to believe that

11  recipients of termination notices will rely on such statements [concerning whether a

12  particular work was one made for hire or that the grant in question was not made by

13  will] rather than on their own review of the nature of the work and grant").  What is

14  required is sufficient information to assist a grantee in having a "reasonable

15  opportunity" to identify the work.  That it is an opportunity that is called for certainly

16  evinces an expectation that some action will be taken on the recipient's part to

17  actually identify the work using the information relayed even after receipt of the

18  notice.

19      Tellingly in this regard is the fact that, after receipt of the termination notice,

20  defendants did in fact conduct such an investigation into the early Superman

21  newspaper strips.   (Defs' Obj. and Response to New Arguments at 6 & n.10) ("In

22  early 2006, defendants obtained the copyright registrations for such Early Strips and

23  compared those registrations to the works identified in the 1997 termination notices

24  and concluded that the strips had not been identified").  Thereafter, defendants

25  served requests for admission related to those first two weeks of newspaper strips.

26  (Sept. 18, 2008, Decl. Michael Bergman, Ex. B).  At no point did defendants seek

27  admissions from plaintiffs for the second two weeks' worth of Superman newspaper

28  strips (published in the Milwaukee Journal from January 30, 1939, to February 18,

1939) that likewise were not identified in the termination notice by reference to title, author, registration number or date in which the copyright was originally secured. Those strips tell an alternative version of the story from *Action Comics* No. 1 and *Superman* No. 1 about how Clark Kent came to be hired as a newspaper reporter for the Daily Star, a story that contains *none* of the character attributes identified in the catch-all clause save for those (Lois Lane, Clark Kent, and Superman) that were developed (and the copyright for which were first secured) through earlier works.

Defendants also argue that allowing such a "catch-all" to satisfy the actual notice function, runs afoul of the regulations' admonishment that "the information specified in paragraphs (b)(1) . . . requires a complete and unambiguous statement of facts in the notice itself, without incorporation by reference of information in other documents or records." 37 C.F.R. § 201.10(b)(3). But here the clause at issue does not make reference to information in other documents or records; rather, it clearly identifies, *within the notice itself*, that the terminating party seeks for the notice to apply to that work in which the "planet Krypton" aspect of the "Superman character's" copyright was first secured. Far from a reference to something else, the clause serves as a declaration within the notice of what it sought to accomplish. Again, the defect with this clause (what renders it as an error for which the "harmless error" analysis is applied) is not its attempt to include something by reference outside the notice, but in the fact that the language in the catch-all fails to specify the title, author, date copyright was secured, and registration number for the particular work it is seeking to give notice of its recapture. There is no "speculation" to be engaged in by the notice's recipient, no guessing as to what was the terminating party's "subjective intent."

## C.   *Inadvertence*

Finally, defendants contend that the reason for the failure to provide the title, registration number, or date the copyright was originally secured to these first two weeks' worth of newspaper strips was *not* an inadvertent oversight on plaintiffs'

part, but instead was done for some unknown "strategic reason." (Defs' Mot. Recon. at 7). They note that plaintiffs and their first attorney, Mr. George Zadorozny, were made aware of these two weeks' worth of newspapers strips when they (with their then counsel) commissioned a Thomson & Thomson copyright records search report in 1997, wherein the fact was noted that the first newspaper strip where Superman appeared was published on January 16, 1939. (Sept. 22, 2008, Decl. Marc Toberoff, Ex. A at 2 ("The character SUPERMAN made its debut as a daily comic strip on January 16, 1939, and as a Sunday strip on November 5, 1939. It was distributed by and registered for copyright in the name of the McClure Newspaper Syndicate, through September 30, 1949")). The argument does not withstand scrutiny.

At the outset the Court wishes to clear up a mistake in the prior order that was made in assigning to plaintiffs' former counsel, Mr. Arthur Levine, the credit for actually cataloguing the list of works contained in the termination notice — such credit should instead go to Jerome Siegel's daughter, Laura Siegel Larson. As relayed in great detail in a declaration she submitted in 2007 (and which is reproduced in pertinent part hereafter) Ms. Larson tirelessly labored searching the Copyright Office's registration records located in the Los Angeles Central Library to compile said list, and then her work was later merged with information uncovered by the Thomson & Thomson copyright records search:

> In connection with the preparation of plaintiffs' notices of termination . . . regarding 'Superman,' our attorney, George Zadorozny commissioned a full Thomson & Thomson report pertaining to 'Superman' based on the records at the U.S. Copyright Office. In addition, I personally conducted extensive research and investigation regarding all 'Superman' works going [as far] back as 1933, particularly the original 'Superman' works by Jerry Siegel and Joe Shuster.
>
> I conducted a very thorough search of the copyright registration records of the U.S. Copyright Office at the Los Angeles Central Library downtown. These records consist of numerous volumes titled 'Library of Congress Copyright Office --- Catalog of Copyright Entries.'

1

2

3

4

5

6

        The bound volumes were published by the Library of Congress through 1978.  For registrations after 1978, the U.S. Copyright Office and Library of Congress has made this information available online.

        The copyright registration volumes are segregated by categories, such as 'Periodicals,' etc.,. Each volume bears a volume number and the year covered (either by full year or, in years with many copyright registrations, the volumes covered 6 months each).

7

8

9

10

11

12

        Different categories of items in the 'List of Works' section of the notices of termination had to be researched in separate category volumes for each and every year.  For instance, the copyright date and registration number of comic books were listed in the 'Periodicals' volumes.  In the 1938 volumes, comic books were listed by the TITLE of the comic book. Therefore, the research required *prior knowledge of the title of the periodical in which the 'Superman' property appeared.*

13

14

        In other words, to find the first copyrighted appearance of 'Superman' in comics I had to know the name of the comic book it appeared in. . . .

              . . . .

15

16

17

18

        There are also U.S. Copyright Office volumes for the category 'Books.'  The listings (for such things as novels, coloring books, etc.,.) are arranged alphabetically by the author's last name or, if anonymous, by title.  I searched such volumes under the names Jerome (or Jerry) Siegel and Joseph (and Joe) Shuster, together and separately and found a number of registrations through the years in the 'Books' catalogs.

19

20

21

        I also thoroughly searched additional volumes for categories such as Motion Pictures, Music, Art, etc.,. which had their own peculiarities in the ways the properties were listed.

22

23

24

25

        As one might imagine from the above description, my research literally entailed hundreds of hours and took weeks to complete.  The results of my extensive investigation, complimented by the Thomson and Thomson report, are reflected in the detailed 'List of Works' contained in each of the notices of termination.

26

(May 29, 2007, Decl. Laura Siegel Larson ¶¶ 2-5, 7-8, 10-12 (emphasis in original)).

27

      The termination notice lists hundreds of Superman newspaper strips,

28

including ones from as early as February 20, 1939, published in the Milwaukee

Journal.  (*See* Decl. Michael Bergman, Ex. X at 325).  That such great lengths were taken to include all the other newspaper strips created only reinforces that the failure to include those strips from January, 1939, was an inadvertent oversight on their part.[9]  None of these "failures" in any way suggests that the failure to include the two weeks of newspaper strips was done other than in good faith with no intent to mislead or conceal.

Indeed, a plausible explanation exists for why the strips noted in the Thomson & Thomson report were not merged with Ms. Larson's voluminous compilation of works.  The first two weeks of newspaper strips in question were all registered in 1944 (five years after having been published in the Milwaukee Journal beginning on January 16, 1939, through January 28, 1939) as prints or pictorial illustrations (administrative class K under the 1909 Act, *see Compendium of Copyright Office Practices* Index at 10 (July 1973 revisions)) under the title of "Superman"; the registration numbers thereto being K5-55490, K5-55491, K5-55492, K5-55493, K5-55494, K5-55495, K5-55496, K5-55497, K5-55498, K5-55499, K5-55500, and K5-55501.  (Sept. 18, 2008, Decl. Michael Bergman, Ex. C). Interestingly, the remainder of the Superman newspaper strips appearing in the Milwaukee Journal and in other newspapers from February 20, 1939, going forward were all registered as either a periodical work (administrative class B under the 1909 Act, *see id.* at 10) or as a book (administrative class A under the 1909 Act, *see id.* at 5, 9).  (April 30, 2007, Decl. Michael Bergman, Ex. X).  This difference in

---

[9]  That the comic book expert (Mr. James Steranko) plaintiffs later retained *long after* the termination notices were served (and this litigation commenced) noted the existence of the January, 1939, newspaper strips in his expert report, or that there existed a Second Circuit decision from the 1950s to which Siegel and Shuster were not even a party that also mentioned the fact of these January, 1939, strips, *see National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 191 F.2d 594 (2nd Cir. 1951), cannot be used to impute a finding that the strips were purposefully omitted by plaintiffs.  All that these facts show is that the January, 1939, strips could have been discovered had plaintiffs interviewed Mr. Steranko during the preparation of the notices or had better researched case law beforehand.

the administrative class of works under which the first two weeks of the Superman newspaper strips were registered *may* explain why it was missed when Ms. Larson compiled her exhaustive list of works.

Moreover, although defendants make much of the fact that the commissioned Thomson & Thomson copyright records search report made mention of Superman's first appearance in a newspaper strip in the Milwaukee Journal on January 16, 1939, glaringly absent from that report is any mention of the registration number under which that strip (and those that immediately followed) was registered under in the Copyright Office.  Removing any doubt on this point is the fact that the catch-all in the termination notice itself expressly represents that "[e]very reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary."

The Court thus finds that plaintiffs' failure to specifically list the title, original registration number, or date copyright was originally secured in the first two weeks' worth of newspaper strips was indeed inadvertent and not some intentional act by plaintiffs done as part of some secret, but heretofore not understood, strategy. Although defendants have shown that discovery of this information was possible, there is simply nothing to suggest that the failure to include those strips was purposeful when the termination notices were put together.  Inadvertent mistakes happen, and that is what this Court finds occurred here.

**D.    *Constructive Notice***

Finding as the Court does that the termination notice provided the recipient sufficient information upon which to have a "reasonable opportunity" to identify the work affected does not address the complementary question of whether the notice, notwithstanding the error, fulfills the other purpose of providing notice to the public. In this regard, it is important to bear in mind that, for a termination notice to be recorded against a particular work, it is the Copyright Office's practice and

procedure to rely solely on the information found in the notice.  "The document, or material attached to it, must identify the work to which it pertains so that, after the document is indexed by the Copyright Office, it would be revealed by a reasonable search under the title or registration number of the work."  Compendium II: Copyright Office Practice 1608.01.  Because the termination notice, even with the catch-all clause, does not identify the first two weeks' worth of newspaper strips in this particular manner, the Copyright Office did not index plaintiffs' termination notice against those strips in its records.  Thus, were one to search only for the records to those two weeks' worth of strips, no mention of the termination notice would appear in the Copyright Office's records for the copyright to those works.  This, of course, raises concerns over the adequacy of the information in the termination notice to apprise the public that those strips were affected by the notice.

But once again, the Court must consider the *nature* of the property that is the subject of the termination notice – the copyright to a character continuously exploited in numerous works for over seven decades.  Although, as previously noted, each incremental expansion, refinement in, or further elucidation of the copyright in a character such as Superman is protected only through the copyright contained in the individual work or series in which that expansion was first relayed, the effective licensing of the character itself in the commercial setting generally requires rights to its complete library, not a discrete, narrow subpart to the same.

As plaintiffs have proffered, and which defendants have not sought to rebut, it is unlikely that these two weeks' worth of newspaper strips would be "licensed — or even used — separately from the remaining Superman mythos," the overwhelming majority of which works were in fact specifically listed in the termination notice in complete compliance with 201.10(b)(iii)'s requirements.  (Pls' Opp. at 7 n.15).  In short, plaintiffs' termination notices more or less papered over the copyright in the Superman character and the world built around him.  Moreover, as plaintiffs have represented, and again as defendants have not challenged, if one

were to search the records of the Copyright Office for works, such as the two

weeks' worth of strips (and indeed for *all* the newspapers strips published through

McClure), with the title of "Superman," one would not only come across the two

weeks' worth of strips in question but also references to other Superman newspaper

strips with the same title whose plaintiffs' termination notices were in fact indexed

against by the Copyright Office.[10]

This underscores and provides support for Patry's comment (and the Court's

adoption thereof) that, "In the case of works consisting of a series or containing

characters requiring the terminating party to list separately each work in the series

or all works in which the character appears would render the termination right

meaningless.  Instead, notice that reasonably puts the terminated party on notice of

the character being terminated is sufficient." PATRY ON COPYRIGHT § 7:45.[11]  Patry's

_____

[10]  Although admitting that the notices themselves are meant to assist the
"grantee" whose rights are affected by the termination, recordation of the notice
itself (as is called for in section 304(c)(4)(A) ("A copy of the notice shall be
recorded in the Copyright Office before the effective date of termination, as a
condition to its taking effect")) is also designed to "notify the public."  (Mot.
Reconsideration at 1 n.1 (citing 17 U.S.C. § 205(c)).  Interestingly, however,
among the examples of errors that the Register already recognizes as being
"harmless" are those relating to the date or registration number of the works
affected by the notice itself.  One would presume that if affording notice to the
broader public was such an insurmountable obstacle to application of the harmless
error rule, mistakes in the registration numbers given or the dates upon which the
copyright was secured in said works would not be allowed as those are quite
material impediments in the Copyright Office's ability to index the notice to affected
works and thus undermines the public's ability to correctly identify whether a
particular work was subject to separate ownership chain.  Indeed, the Register
recognized that the notice portion of the compromise's calculus was not to be one
of absolute notice, but only sufficient information in the notice to give the public a
"reasonable opportunity" to identify the work.

[11]  Although defense counsel brushes aside Patry's comments as signifying
nothing but some "commentator's observations," (Defs' Reply at 3), such was not
counsel's assessment of Patry's work when reviewing his treatise now cited to by
the Court.  *See* Roger L. Zissu, Lawyer's Bookshelf, New York Law Journal (April
11, 2007) (reviewing WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007) (observing
that Patry "is already a legend as a prolific author and active lawyer and teacher"
whose earlier copyright works are "highly regarded" and whose treatise "surpasses
not only the length of the multivolume works of Nimmer and Goldstein but also

formulation is consistent with the Register's call that all the grantee and the public are entitled to is a "reasonable opportunity to identify" that which is being terminated.

To require complete or perfect constructive notice (as advocated by defendants by reference to 17 U.S.C. § 205(c)) would provide authors or their heirs an illusory "opportunity" to recapture the extended copyright to property such as Superman, whose very success has led to its consistent appearance in print and other media for seventy years, leading to the creation of a large library of works in which constructive notice would have to be given.  It is in the context of such iconic characters that defendants' insistence on "certainty" and strict compliance would saddle authors and their heirs with having to conform to an overly "burdensome," "ritualistic formality" that does little, if anything, to advance the purpose of ensuring that the public (or the grantee) will receive a "reasonable opportunity" to identify the works affected "from the information given in the notice."  Indeed, if perfect constructive notice was an impediment to the harmless error analysis, it is curious that among the examples found in the safe harbor at (e)(2), the Register would have made allowance for mistakes as to the registration number or date on which the copyright was originally secured.  Such mistakes would undermine the very notice requirements of § 205(c) that defendants have held up as a reason not to find the error in this case harmless.  *Cf.* 17 U.S.C. § 205(c)(1) (labeling as necessary for a "reasonable search" of the Copyright Office's records one done "under the title or registration number of the work").

---

their scope and is destined to join these . . . as another staple in the field")).  That said, Patry's present position on this point has evolved.  In a 1996 law review article, Patry advocated the position now being advanced by defendants. *See* William F. Patry, *The Copyright Term Extension Act of 1995: Or How Publishers Managed to Steal Bread from Authors*, 14 CARDOZO ARTS & ENT. L.J. 661, 684 (1996) ("In the case of works consisting of a series or containing characters, special care has to be taken to list separately each and every work in the series, or all works in which the character appears").

To that end, this "constructive notice" effect so touted by defendants is not a concept to be bandied about in the abstract, as if it were an end unto itself.  Such notice is informed largely by its purposes — it is a means to an end.  To posit that any member of the public who was interested in exploiting Superman would somehow confine their review of the lengthy registration of the works in that character in the records of the Copyright Office to but a couple weeks' worth of newspaper strips in January, 1939, is, from a practical business perspective, nonsense.  Instead it would transform the harmless error inquiry into an entirely wooden enterprise, shaped entirely by and made subservient to the formalities of the rule itself.  Should any third party be interested in exploiting those original copyrightable elements found in those strips, they would have also searched other works to successfully utilize them (works that were in fact listed in the termination notices), and upon doing so discover the termination notice (and the catch-all clause contained therein), putting them on inquiry notice that the termination notice also applied to those strips.  The valuable copyrightable story elements to the Superman character contained in those strips (Krypton, Jor-L, *etc.*) do not exist in a vacuum.  As defendants have repeatedly noted to the Court throughout this litigation, Superman is comprised of many different elements which, but for the results of this litigation itself, are considered and marketed part of an aggregate whole, not as tiny individual copyrightable bits (a red cape here, a particular villain there, x-ray vision and the ability to fly over here, an alter ego personality to peruse around the corner, or a far away doomed planet over the horizon).  The copyright in the Superman character exists as a conglomerate representing the story that has been told of him through seventy years of exploitation.

Nowhere do defendants come to grip with this fundamental quality of the copyrighted property at issue.[12]  Instead, now that it does not suit them, they seek to

---

[12]  The only concession defendants in this regard is that perhaps Patry's formulation "might be justified where an author wrote *all* works featuring a character."  (Defs' Reply at 3 n.4 (emphasis in original)).  Why such a variance

press upon the Court that the entire argument that there is a "Superman 'mythos' or character" is but an "effort to circumvent the rules and overreach" by reference to "amorphously recapture[d] rights." (Defs' Reply at 2).  To begin, the copyrightable nature of the Superman character was long ago recognized by the Second Circuit (a panel composed of Judge Learned Hand and his cousin Augustus Hand), *see Detective Comics, Inc. v. Burns Publications, Inc.*, 111 F.2d 432, 433 (2nd Cir. 1940), and is not some recent product of either plaintiffs or this Court.  Even more glaring is the fact that, throughout this litigation, defendants themselves have spoken of the "Superman "character" and the surrounding "mythology" built around the character as being at stake in the notices filed by plaintiffs.  To that end, they have sought to profit from that fact as a means to limit the scope and value of any copyrights plaintiffs eventually recaptured through the same.  (Defs' Mot. Partial Summ. J. at 1, 2, 5-8).

Richly, defendants argue that the Court must follow the regulation's formalities "strictly," and that the Court's failure to do so in the August 12 Order "allow[ed] the 'harmless error' exception to swallow them whole."  (Mot. Rec. at 2).  Of course, the same could be said of defendants' proposition that the Court should so narrowly interpret the harmless error rule as to render it largely meaningless.  The Court, however, is mindful that the Register put the harmless error rule into the regulations when they were first promulgated --- a safety valve which has not been changed despite numerous other changes to the 1976 Act and the regulations there under.  The very presence of a harmless error rule demonstrates that the formalities that defendants so desire to be strictly enforced need not be followed to the letter;

would be justified in that particular factual circumstance, but not one where, as here, thousands of works of a character are in fact written by a single creative pair, is nowhere explained, nor does it appear to the Court to be a distinction of any substance (save for the fact that it would preclude a finding of harmless error in this case).

that is the very purpose for such a rule, allowing variances from otherwise

mandated requirements.

However, perhaps the most puzzling aspect of defendants' position on this

entire question is that not only do they fault plaintiffs for doing too little (namely,

omitting the title, registration number, *etc.*, to the first two weeks' worth of

newspaper strips), but, at the same time, fault them for doing too much (identifying

within the notice reference to title, registration number, *etc.*, all the Superman

works, even those outside the five-year termination window).  Although defendants

now assert that such over-inclusion amounted to "flooding notices with irrelevant

works," it is quite clear that the reason such additional works were listed in the

notices was to satisfy the very constructive notice arguments defendants have now

so relentlessly required be served.  By having the termination notice spread over

such a large number of works, plaintiffs ensured that the impact of any missing gaps

that may arise would be alleviated.  The fact that the defendants seek to fault

plaintiffs for being overly conscientious of the constructive notice quality provided by

their termination notices is simply misguided.[13]

_____

[13]   However, picking up on defendants' suggestion to simply look to the
works from the relevant five-year window that were created by Siegel and Shuster
and then compare them to those Tarzan works created by Burroughs does nothing
to advance their cause.  As admitted in Mr. Zissu's declaration (who represented
Burroughs' heirs in the 1980s Second Circuit litigation), Burroughs himself only
wrote 40 books (although it is undoubtedly true that thousands of other derivative
Tarzan works were created by others).  On the other hand, from the Court's review
of the termination notice, of the 546 pages in the notice, 94 pages were directed to
over 2,959 works created by Siegel and Shuster for the five-year period from 1938
to 1943, of which, again, but 14 works (the first two weeks of Superman
newspaper strips) are in question here (comprising but .47%).  (April 30, 2007,
Decl. Michael Bergman, Ex. X at 4-6, 24-25, 40, 71, 195-215, 222, 224-236, 325-
377, 450, and 478).  As a final point the Court takes exception to defendants'
implicit efforts to relegate Siegel's role in the development of the Superman
character to nothing more than an insignificant player who did little more after
Superman's initial success in *Action Comics* No. 1 :  "Jerry Siegel's termination
right allows recapture of only a handful out of *thousands of Superman works that
he did not create to which his family has no legal right whatsoever.* "  (Defs' Reply
at 3 (emphasis added)).  Defendants are advised that, for the period of 1938 to
1943, Siegel and Shuster *created* nearly all of the 2,959 Superman works noted by

The Court thus concludes that the information in the catch-all was adequate to give the public a "reasonable opportunity" to identify the affected works.

**E.    *Prior Case Law***

Defendants' last point is that the Court's "new rule" contradicts, misreads, and "overlooks" the case law directly on point, "judicial precedent" which defendants contend support their position.  (Defs' Reply at 2).  In this Court's view, defendants continue to misread that "precedent."  Only *one* other court has even touched upon application of the harmless error safety valve to errors committed in meeting 201.10(b)(iii)'s requirements.

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*, dealt with the status of Edgar Rice Burroughs' well-known character Tarzan, whose first appearance in print was in *Tarzan of the* Apes, published and copyrighted in 1912.  Eleven years later, in 1923, Burroughs transferred all his rights in that novel and all his subsequent works to Edgar Rice Burroughs, Inc., a family corporation.  In April, 1931, an agreement was

the Court (of which over 1,100 are Superman newspaper strips, *see* SUPERMAN: THE DAILIES 1939 - 1942 at  (1988) (noting that during this three-year period, "Jerry Siegel and Joe Shuster" created 966 Superman newspaper strips) and SUPERMAN: SUNDAY CLASSICS 1939 -1943 at vii - viii (1999) (noting that during this four-year period "Jerry Siegel and Joe Shuster" created 183 Sunday newspaper strips), and 85 of which were Superman comic books, *see* April 30, 2007, Decl. Michael Bergmann, Ex. X at 5-6, 24-25).  Indeed, were the Court to look to the entire period in which the pair created Superman material for Detective Comics (that is, until 1947), the number of Superman works would only increase to many thousands more.  Although it is true that Siegel's termination right does not extend to the overwhelming majority of these works he and Shuster in fact created, this is only so because those works were made by the pair for hire (a conclusion which the Court itself noted was a close call with respect to the newspaper strips), not because the pair did not in fact actually create them.  Moreover, if anyone overstates the case it is defendants, who seek to equate the size of the universe of Tarzan works created by Burroughs as "similar" to that for Superman.  (Decl. Zissu ¶ 9).  Burroughs actually only created the forty books (some of which were first printed in magazine serial form before being collected into book format); the remainder of the Tarzan works that defense counsel references, be it Tarzan movies, comic books, or newspaper strips, were not done by the hand of Mr. Burroughs but were derivative works created by others.  As noted earlier, the universe of Siegel and Shuster created Superman material is "certainly larger" than that at issue in *Burroughs.*

34

executed between the corporation and MGM whereby the film studio was granted

the right to make a movie, based not on any of Burroughs' literary works, but rather

on its own original screenplay, employing as characters Tarzan and other creatures

from Burroughs' works.  The agreement also permitted MGM to remake its Tarzan

film as often as it chose, provided that each remake was based substantially on the

first film.   In 1932, MGM released its hugely popular *Tarzan, The Ape Man* film.

During the 1970s, the Burroughs corporation licensed Warner Bros. to make

a new Tarzan film to be based on the 1912 book *Tarzan of the Apes*.  In order to

avoid possible competition between Warner Bros.' film project and any further MGM

remakes, Burroughs' heirs (Mr. Burroughs having died in 1950) served a

termination notice pursuant to section 304(c).  The heirs, however, did not serve the

notice on MGM, but only on the family corporation; they also served the notice in

December, 1977, three weeks before the 1976 Act became effective.  In 1980, while

the Warner Bros. film was in production, MGM announced plans for yet another

*Tarzan, The Ape Man* film remake.  Burroughs' heirs quickly filed suit for copyright

infringement against MGM, contending that the film studio's remake rights had been

terminated, prompting MGM to argue that the heirs' termination notice was

ineffective for a number of reasons, including one related to defects in the contents

of the notice.

The district court was presented with a preliminary injunction motion by

Burroughs' heirs to block the soon to be released *Tarzan* movie by MGM, arguing

that such a movie would infringe the copyrights to the 35 Tarzan works which they

alleged to have successfully recaptured upon the filing of a termination notice.  In

the course of an order denying plaintiffs' preliminary injunction, the district court

proffered *five* alternative rationales, each sufficient on its own to justify the court's

conclusion, for why the heirs were unlikely to prevail on the merits.  Among those

rationales was that the termination notice did not conform to the regulations

promulgated by the Register because it failed to list five other Tarzan works (the

termination notice was literally blank with regards to these works, there was no catch-all clause, no generalized reference to other works, nothing).  The question was then raised whether such a complete omission was somehow salvageable by reference to the harmless error rule.

In the course of two sentences the district court in *Burroughs* inquired into, analyzed, and concluded that it was not:  "Since the Notice did not include these five titles, . . . the Notice is deficient as to these five titles.  Such a deficiency is not 'harmless error'; it undoubtedly 'materially affects' the adequacy of the Notice."  491 F. Supp. 1320, 1326 (S.D.N.Y. 1980).  Other than this singular item, nothing else exists in the case law analyzing this question concerning application of the harmless error rule with respect to 201.10(b)(iii)'s regulatory requirements.  This case, however, is readily distinguishable.  Here, unlike in *Burroughs*, the termination notice, as set forth above, does have some information relating to the works that ultimately are at issue.  This is simply not a case of complete and total absence of information, a circumstance that the Court itself has recognized as one to which consideration of harmless error is not applicable.

Defendants note that the district court's decision in *Burroughs* was affirmed by the Second Circuit.  Admittedly, on appeal from the denial of the Burroughs' heirs preliminary injunction motion, the Second Circuit did affirm the district court, but it did so by way of a summary table disposition without giving any reason thereto.  *See Burroughs v. Metro Goldwyn Mayer, Inc.*, 636 F.2d 1200(2nd Cir. 1980) (noting only "AFFIRMED").  Given that the district court offered five different, and independently adequate reasons for the result it reached, the Second Circuit's later summary disposition cannot, with any degree of intellectual honesty, be argued as having held, adopted or otherwise incorporated the district court's "reasoning" with respect to one of those rationales.

Later, when the *Burroughs* case was before the Second Circuit for a second time in 1982 on appeal from the district court's disposition of the case on summary

judgment in favor of MGM, the court (as noted in the Court's earlier order) was not

presented with, and did not engage in, an analysis regarding the harmless error

rule; in fact, it did not even mention the harmless error rule, let alone incorporate it

into its decision.   Defendants do not dispute this.[14]   Instead, the Second Circuit's

1982 decision in *Burroughs* only concerned whether the omission of the works

rendered the entire notice invalid insofar as recapture of the copyright in the Tarzan

character, or just invalid insofar as the omitted works were concerned.   The Second

Circuit considered nothing else insofar as the omission was concerned.   Despite

this fact (namely, the failure of the litigants to raise the issue with the Second Circuit

in *Burroughs*, and that court's failure to hold one way or the other on it), it is argued

by defendants as somehow proof that the court necessarily decided it, but thought

the result so obvious that it decided not to state its holding:  "It is so clear from the

face of the regulations that the harmless error exception cannot apply to entirely

omitted works, it goes – and went --- without saying.  There was no need for either

court to belabor the point."  (Defs' Reply at 2).  In our common law system of

jurisprudence, such articulation of a court's holding is absolutely necessary for it to

be cited as precedent on a contested point, and its absence cannot be vouched as

a substitute for it.

Nor can it be said, as argued by defendants, that the district court in *Music

Sales* somehow purported to consider the issue of harmless error in the context of

201.10(b)(iii)'s requirements. The district court in *Music Sales* did note as an aside

that "only the works specified in a termination notice are terminated, even where the

notice purports to terminate the grant including more works than actually listed in

the notice." 73 F. Supp.2d at 380.  The district court's sole citation for authority for

---

[14]   Defendants bizarrely make the supposition that the reason the Second
Circuit did not refer to the harmless error rule was "because it no longer had
application or relevance to the case," which only reinforces this Court earlier
conclusion that the decision has "limited persuasive value to the Court's current
analysis."  *Siegel*, - F. Supp.2d -, 2009 WL 2512842, at *51.

its statement was the Second Circuit's 1982 *Burroughs* decision, which, as noted above, did not even consider application of the harmless error rule. Moreover, to the extent that *Music Sales* spoke of the question, it is a factually distinguishable circumstance given that there is absolutely no information in the notice with which to work with in identifying the work at issue. To state that the Second Circuit's decisions in *Burroughs* or that the district court's decision in *Music Sales* are "squarely on point," as defendants contend, is simply unfounded.

Far from creating a "new rule," the Court's August 12 Order constitutes the first time the harmless error rule has been actually interpreted by any court in a context even approaching that found in the current case.

## F.    *Conclusion*

Although defendants understandably believe its scrivener error construction of the harmless error rule is much more "certain," easily applied and beneficial, which it most assuredly is (especially from a grantee's perspective), the Register thought otherwise when it introduced the concept of harmless error as a means to provide relief from meeting these very formalities. Although defendants may disparage such "after-the-fact" arguments, the Register clearly contemplated that, through issuance of its harmless error rule, such "disputes" would indeed occur as a result of the rule's application by the courts. It was to that end that the Register created a safe harbor in subsection (e)(2) for which no dispute need arise. If the Register had wished to so confine its harmless error rule to the items found in (e)(2), it could have easily done so by removing the opening proviso clause to (e)(2) and instead closing that subsection with the provision "and other similar types of errors." It did not. The Register could have refrained from placing cautionary statements in the accompanying commentary insofar as to how rigid the formalities contained in said regulations should be applied and mistakes as to any number of the requirements (including those to identification of the works) could arise due to long passage of time that has elapsed since the underlying work in question was

created and published.  Again, it did not.  And finally, the Register could have refrained from tying the "materiality" of an error with the "purposes" undergirding the termination provisions themselves, purposes which are most assuredly not the one-way street in favor of grantees as defendants would have the Court to so read the regulations.  Defendants' suggestion that actually applying the harmless error rule in this case would lead to it nullifying another regulation (identifying each work) is grossly overstated.  The entire purpose of a harmless error rule is to excuse non-compliance with another regulation.  The broader rule is not nullified, but, given the circumstances of the particular case, is found not to be sufficient to warrant invalidating the termination notice to those works in question.

The Court ends its analysis of this question much as it did previously: "In the end, the Court finds that some consideration must be given to the nature of the copyrights sought to be recaptured" the "rights to works involving a particular character that has been continuously exploited for decades. . . . [W]hen the notice evidences a demonstrable effort at cataloguing all the relevant and related works, where the universe of those works is large" as is in the case of such a character as Superman, "and where the number of omitted works is minute relative to the included works, the presence of a comprehensive catch-all provision such as that found here leads to the conclusion that the relevant omission was harmless error and the termination notice should be found to be effective even as to the omitted works." *Siegel*, - F. Supp.2d -, 2009 WL 2512842, at *52, 53.  The absence of any one of these facts and the Court would not have found the error in the notice harmless.  In combination, under these particular circumstances, the Court finds that the purposes of section 304(c) are adequately served and the error is harmless.

## PLAINTIFFS' MOTION FOR RECONSIDERATION

This leaves plaintiffs' motion for reconsideration.  Plaintiffs' argue that Judge Learned Hand in *Fawcett Publications* made a finding regarding the non-work for hire nature of the strips Siegel and Shuster created for the newspaper syndicate

because he described McClure as the "proprietor" of the strips.  Admittedly, the 1909 Act in some places distinguishes the proprietor to a copyright from the author to the same, an author being a term that would include an employer of a work made for hire.  However, as noted by the Court in its August 12 Order, the term "proprietor" was also used by courts under the 1909 Act in the more colloquial sense as simply indicating ownership or title to the copyright without regard to whether such ownership was by way of work for hire or assignment.  Given that the work for hire nature of the creation of the strips was not presented by the parties (the artists themselves were not parties to the case), to imply Judge Hand sought to extend the reach of his ruling to questions beyond the narrow confines of the case before him to those now before this Court some fifty years later is simply misdirected.

Plaintiffs also make much of the Court's finding that the "expense" test was met.  What plaintiffs fault was (ironically given the above discussion) a typographical error in the Court's order.  The Court never sought to expressly make a finding one way or the other on just the expense element; instead, at the end of its analysis, the Court held that, given the totality of the circumstances, the "instance and expense" test was met.  The error was subsequently located in the process of submitting the order for publication (a circumstance not altogether surprising given the length of the Order), and the corrected version of the Order appears there.  To remove any discrepancies between the published order of the Court and that submitted to the parties, the Court hereby **AMENDS** its August 12 Order so as to make it consistent with that published at - F. Supp.2d -, 2009 WL 2512842.

Finally, plaintiffs reargue about the payment of royalties, joint venture, and their assertion that *Picture Music* was simply wrongly-decided.  As far as the royalties are concerned, nowhere in the case law has it ever been held that payment of royalties automatically means a given work was not made for hire.  Instead, the case law speaks of that "generally" being true, or that such a fact

"weighs heavily against" it being a work for hire.  The form of payment an artist receives is but a proxy for trying to determine the larger question concerning the precise business relationship the parties had entered into.  It is generally true that employers, especially during the time of the 1909 Act, did not pay their employees or even independent contractors a share in the royalties generated from the commercial exploitation of their work.  But just because that generally was the case, and served to cause courts to pause before finding to the contrary, does not mean that the parties' business relationship in every other measure was inconsistent with that found in an employer-employee or commissioning party-independent contractor setting.

The various types and forms in which employment compensation is contractually provided for can oftentimes be only exceeded by the imagination of the individuals and their employers involved in the contracting process.  In this sense, notions of instance and expense are but proxies for the larger overarching inquiry of what was the nature of the parties' relationship.  Just as in *Picture Music*, payment solely in the form of royalties could nonetheless still be found to be done in the context of an employment setting, so too here.  Indeed, between the two, this case is much *stronger* for a finding of work for hire than in *Picture Music*.  The artist in *Picture Music* was commissioned to create a single discrete project (writing a song), upon the completion of which she would receive thereafter royalties from the profits generated.  The business relationship, insofar as the instance prong was concerned, was fairly week.  Here, on the other hand, Siegel and Shuster entered into a five year contractual relationship calling for them to produce certain works, subjecting them to close editorial supervision, and giving their boss(es) the right to fire them and have them replaced by others.  But for the payment in royalties, these are fairly strong hallmarks of an employment relationship.

In the end, despite the closeness of the question, the Court sees no reason to alter its decision.  Plaintiffs' motion is therefore **DENIED**.

DATE:  October 30, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE