COPY

FILED

2011 FEB 17 PM 3:38

CLERK US DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:  (845) 265-2819

11 Attorneys for Defendants and Counterclaimant

12

13                **UNITED STATES DISTRICT COURT**

14                **CENTRAL DISTRICT OF CALIFORNIA**

15

16 JOANNE SIEGEL and LAURA
   SIEGEL LARSON,                        Case No. CV-04-8400 ODW (RZx)

17                Plaintiffs              **SECOND AMENDED
                                         COUNTERCLAIMS**
18
                                         The Hon. Otis D. Wright II
19      v.

20 WARNER BROS.
   ENTERTAINMENT INC., DC
21 COMICS, and DOES 1-10,

22                Defendants

23 WARNER BROS
   ENTERTAINMENT INC, DC
24
   COMICS, and DOES 1-10
25
26              COUNTERCLAIMANT
27
        v.
28 JOANNE SIEGEL and LAURA
   SIEGEL LARSON

        COUNTERDEFENDANTS.

                                         SECOND AMENDED
                                         COUNTERCLAIMS

On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16. Docket Nos. 637, 643.  For purposes of completeness, defendants hereby reassert the counterclaims contained in the First Amended Counterclaims, Docket No. 42, with changes to reflect only the current date, the updated pleading title, and the Court's dismissal of Time Warner Inc. as a party to this action.  Defendants reserve all rights, including to amend these counterclaims as and when appropriate.

Defendant/Counterclaimant DC Comics, for its Second Amended Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, alleges:

## PARTIES

1.     Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a New York General Partnership engaged in the business of, *inter alia*, creating, exploiting, and licensing comic book stories and characters.  DC is the successor in interest to all rights under copyright and other rights, including trademark rights and the good will in and to the first Superman story and all other works and products relating to the Superman character.

2.     Upon information and belief, Plaintiff/Counterclaim Defendant Joanne Siegel is an individual and citizen of the State of California, in the County of Los Angeles.  Upon further information and belief, Joanne Siegel is the widow of Jerome Siegel, the individual credited as a co-creator of the first Superman stories.

3.     Upon information and belief, Plaintiff/Counterclaim Defendant Laura Siegel Larson is an individual and citizen of the State of California, in the County of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson are referred to herein as "the Siegels."

SECOND AMENDED
COUNTERCLAIMS

## JURISDICTION AND VENUE

4.     This Court has jurisdiction of the subject matter hereof under the provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections 1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332, 1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18 U.S.C. § 1367.

5.     Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information and belief, a substantial part of the events giving rise to DC's claims occurred or a substantial part of the properties that are the subject of these counterclaims are situated in this District and/or the Plaintiffs/Counterclaim Defendants may be found in this District.

## FACTS COMMON TO ALL COUNTERCLAIMS

### Background And History

6.     Upon information and belief, in or about 1933, Jerome Siegel ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated on creating a number of stories, including a story entitled "The Reign of the Superman," which was published in a magazine put out by Siegel and Shuster themselves entitled "Science Fiction."  Upon further information and belief, other than the same name, the "Superman" character in this story shared very little, if any, similarity with the character that would later become known as Superman.

7.     Upon information and belief, in early 1933, Siegel and Shuster began collaborating on "comic strips," initially for syndication and eventually for publication in "comic books," a new and growing medium.  Among their work together were a number of comic strips featuring a character they named Superman. This Superman character bore virtually no resemblance to the character of the same name that had previously appeared in the "Science Fiction" magazine.  Upon

further information and belief, those works, which were never published, included: (a) twenty four (24) days of Superman comic strips intended for newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page synopsis covering an additional two months of daily comic strips; and (e) fifteen daily comic strips (collectively the "Unpublished Superman Works").

8.     Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9.     Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10.     On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years.  Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11.     Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics."  In that connection, upon information and belief, DCI was provided with the twenty four (24) days of Superman comic strips from the Unpublished Superman Works for review.  At the instance and expense of DCI and subject to its right to control, Siegel and Shuster cut and pasted the comic strips, and added certain additional material, to create a thirteen page comic book story which was accepted for publication by DCI.

12.     In an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip

- 3 -

1   entitled 'Superman' . . . all good will attached thereto and exclusive right to the use

2   of the characters and story, continuity and title of strip . . ." and agreed not to

3   employ Superman and other characters in the strip "by their names contained

4   therein."

5          13.    DCI advertised the publication of the new comic story Superman and

6   the new title "Action Comics No. 1" in others of its publications, including but not

7   limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New

8   Adventure Comics No. 26," all of which are cover dated May 1938 and, upon

9   information and belief, were distributed in copies to the public on or before April 1,

10  1938.  These advertisements (the "Superman Ads"), which depict the Superman

11  character in his costume, exhibiting super-strength, show almost the entirety of

12  what would become the cover of "Action Comics No. 1."

13         14.    Upon information and belief, sometime prior to April 16, 1938, but

14  after the Superman Ads, DCI published the thirteen page Superman comic book

15  comprising the first Superman story in "Action Comics No. 1," bearing the "cover"

16  date June 1938 (hereinafter "Action Comics No. 1").  However, Action Comics No.

17  1 was not comprised entirely of the pre-existing Unpublished Superman Works.

18  Rather, upon information and belief, in response to DCI's instruction that the

19  Unpublished Superman Works be presented as a thirteen page comic book and

20  subject to DCI's right to control, Siegel and Shuster created additional materials to

21  complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

22         15.    After the publication of Action Comics No. 1, upon information and

23  belief, Siegel and Shuster supplied further original Superman stories at DCI's

24  instance and expense and subject to its right to control.  On September 22, 1938,

25  Siegel and Shuster entered into another employment agreement (the "DCI

26  September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been

27  doing the art work and continuity for said comics [including Superman comics] for

28  us. We wish you to continue to do said work and hereby employ and retain you for

1  said purposes . . . ."  The DCI September 22, 1938 Agreement also contained an

2  acknowledgement that DCI was the "exclusive" owner of Superman.

3       16.    Also on September 22, 1938, Siegel and Shuster entered into an

4  agreement with DCI and with the McClure Newspaper Syndicate (the "McClure

5  September 22, 1938 Agreement") concerning the use of Superman in newspaper

6  strips.

7       17.    All of Siegel and Shuster's contributions to Superman comic books

8  and comic strips published subsequent to Action Comics No. 1 as well as the

9  Additional Action Comics No. 1 Materials, were made either under the DCI March

10  1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure

11  September 22, 1938 Agreement, or contemporaneous oral agreements confirmed by

12  one or more of these Agreements, or certain subsequent agreements affirming those

13  agreements, as employees of DCI or its successors or at DCI's instance and expense

14  and subject to DCI's right of control, with the result that the copyrights to all

15  Superman materials created by them after preparation of materials included in

16  Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are

17  owned exclusively by DC Comics as works made for hire under the then applicable

18  1909 Copyright Act.

19       18.    On November 30, 1938, Siegel wrote to DCI (the "November 1938

20  Letter") suggesting that it do a comic book named Superboy, "which would relate

21  to the adventures of Superman as a youth."  The November 30, 1938 Letter does

22  not contain any discussion of plot, dialogue, appearance, or any other copyrightable

23  material relating to Superboy.  DCI decided not to publish a "Superboy" comic at

24  that time.

25       19.    In 1939, among the Superman comics prepared by Siegel and Shuster

26  at the instance and expense of DCI and subject to its right of control, was Superman

27  No. 1, with a cover date of Summer 1939.  In Superman No. 1, Clark Kent was

28  depicted as a youth with super powers.

20.    On December 19, 1939, Siegel and Shuster entered into a new agreement with DCI (the "December 19, 1939 Agreement"), which agreement modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips.  In addition, the December 19, 1939 Agreement provided for payment for Siegel and Shuster for uses of Superman beyond comic books and newspaper strips, such as radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

21.    Upon information and belief, in approximately December 1940, Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script"), renewing his suggestion to DCI that it publish a comic book about Superman as a youth.  The December 1940 Superboy Script, which sets forth a credit line of "By Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests... America's outstanding boy hero: SUPERBOY!"  The Unpublished 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided not to publish a "Superboy" comic at that time.

22.    Upon information and belief, on a date prior to November 18, 1944, DCI published its first comic book containing the adventures of Superboy, who was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon information and belief, DCI employed Shuster or an artist from Shuster's art studio (with Shuster's knowledge and under his supervision) to create the artwork and writer Don Cameron to write the Superboy story contained in "More Fun Comics No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any

SECOND AMENDED
COUNTERCLAIMS

1  resemblance to anything contained in the Unpublished 1940 Superboy Script, and

2  such similarities as may exist are common to earlier Superman related material

3  owned by DCI.

4       23.    In 1947, Siegel and Shuster brought suit against, *inter alia*, DCI's

5  successor in interest, National Comics Publications, Inc. ("National") in the New

6  York Supreme Court in Westchester County (the "Westchester Action").  The

7  Westchester Action was, in part, the culmination of a dispute between Siegel and

8  Shuster and National over what Siegel and Shuster claimed was DCI's

9  unauthorized publication of Superboy.  In the Westchester Action, in addition to

10  seeking redress in connection with Superboy, Siegel and Shuster sought to

11  invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938

12  Agreement was obtained by duress, and sought to recapture all rights in Superman.

13       24.    On November 21, 1947, the Court in the Westchester Action issued an

14  opinion (the "Westchester Opinion") after trial in which it found that the March 1,

15  1938 Agreement transferred to DCI all rights in Superman and that the DCI

16  September 22, 1938 Agreement was valid and not obtained under duress.  The

17  Court also held that in publishing Superboy, DCI had acted "illegally."

18       25.    At the Court's request, the parties to the Westchester Action submitted

19  proposed fact findings and conclusions of law.  On April 12, 1948, the Court

20  adopted fact findings and conclusions of law and issued an interlocutory judgment

21  (collectively the "Westchester Action Interlocutory Judgment").  The defendants in

22  the Westchester Action filed a notice of appeal, and the Westchester Action

23  Interlocutory Judgment was stayed pending appeal.

24       26.    Shortly thereafter, the parties to the Westchester Action entered into

25  two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948

26  Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948

27  Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster: (a)

28  agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledge

- 7 -

that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; (c) acknowledged National was sole and exclusive owner of Superman, the conception, idea, continuity, pictorial representation and formula thereof in all media; (d) agreed that they were enjoined from creating, publishing or distributing any Superman work or any imitation thereof, and from using the title Superman or title that contained the word "Super"; (e) acknowledged that National was the sole owner of and owned exclusive rights in Superboy; (f) agreed that they were enjoined from creating, publishing or distributing Superboy or any imitation thereof; (g) agreed they were prohibited from representing their past connection with Superman and Superboy in such a way to confuse the public that such connection still existed; and (h) agreed they were prohibited from using any coloring, lettering or printing in referring to Superman or Superboy that was imitative of that used by National.

27.    In the 1960s, Siegel and Shuster again brought suit against National, this time in the United States District Court for the Southern District of New York for a declaration that they (and not National) owned the copyright in the renewal copyright term for Action Comics No. 1.  In a decision published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the district court held, *inter alia*, that the agreements between Siegel and Shuster on the one hand and DCI (and later National) on the other, intended to assign all rights in Superman to DCI and National, including renewal copyright rights.

28.    In a decision published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the lower court's ruling relating to National's ownership of all rights in Superman. Siegel and Shuster did not further appeal the ruling.

29.    On December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications, Inc., then National's parent company (the

SECOND AMENDED
COUNTERCLAIMS

"December 23, 1975 Agreement").  Under this agreement, Siegel and Shuster again acknowledged that Warner Communications, Inc. was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised . . . ."

30.    Under the December 23, 1975 Agreement, Siegel and Shuster each were to and did receive throughout their lives annual payments as well as medical insurance coverage. Upon Siegel's death, annual payments were to be made to Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life.  The amount of the annual payment pursuant to the December 23, 1975 Agreement was increased over the years. Since Siegel's passing in 1996, Joanne Siegel has continuously received and accepted annual payments and health insurance under that agreement.

**DC Comics' Development And Licensing**

**Of Superman Works And Products**

31.    The initial graphic representations of the Superman character in 1938, now stylistically dated, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. From the portrayal of the Superman character in "Action Comics No. 1," we only know that he is an upright hero who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age.  Superman is also depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap $1/8^{th}$ of a mile, hurdle a twenty-story building and run faster than an express train.  In his ordinary life, the character is depicted as a mild-mannered newspaper reporter for The Daily Star known as Clark Kent, and in his alter ego,

- 9 -

Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime.

32.     Since the publication of "Action Comics No. 1," DC Comics has authored, published and distributed several thousand other comic books containing the adventures of Superman throughout the United States and abroad in many millions of copies, adding more than 60 years worth of material to further define, update and improve upon the Superman character and presenting an ongoing new flow of Superman exploits and characters resulting in the creation of an entire fictional Superman "universe."

33.     In addition to the publication of new comic books containing the Superman comic strip character, DC Comics has over the last 66 years participated in the creation, development and licensing of numerous Superman live action and animated feature length motion pictures, motion picture serials, radio and television serials and live theatrical presentations.  These works have also significantly contributed to the modernizing and evolution of the Superman character from his 1938 appearance.

34.     Over the years since Action Comics No. 1, the presentations of Superman provided first by DCI and then DC Comics did not present a static depiction but an ever-evolving portrayal of Superman continuously, featuring new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Most notably, many of Superman's powers that are among his most famous today did not appear in Action Comics No. 1 but only appeared in later publications. These include: his ability to fly; his super-vision which enables him to see through walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his invulnerability to injury which is most often shown as bullets bouncing off his chest and/or arms.

SECOND AMENDED
COUNTERCLAIMS

35.     One notable part of the evolution of the appearance of the Superman character undertaken by DC Comics and its predecessors, has been the transformation of the emblem on the chest of Superman's costume. In Action Comics No. 1, the emblem was comprised of a small yellow inverted triangle bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics No. 1 Crest").  Thereafter, in changing the appearance of Superman and his costume, DC Comics and/or its predecessors significantly changed the Action Comics No. 1 Crest.  Bearing little if any resemblance to the original, it is now a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red (the "S in Shield Device").  The S in Shield Device, as transformed by DC Comics and its predecessors, has become a strong symbol, standing alone, of all goods and services relating to Superman and his sole source, DC Comics and its predecessors.

36.     At all relevant times, DC Comics, its predecessors in interest and licensees have duly complied with the provisions of the 1976 Copyright Act and its 1909 predecessor statute with respect to securing copyright protection for the numerous works in which the Superman character has appeared and establishing DC Comics' copyright ownership thereof, including the original and all works based upon and derived therefrom, and have received from the Register of Copyrights, valid and subsisting certificates of copyright registration and renewal with respect thereto.

37.     DC Comics and its predecessors have, since 1938, continuously held themselves out as the exclusive owners of all rights under copyright in Superman.

38.     DC Comics has over many decades adopted and made long, continuous and exclusive use of (a) the name and mark Superman and (b) certain key symbols and indicia of origin in connection with and to identify all authorized uses of the Superman character in print and all other media (sometimes hereinafter the "Superman symbols and indicia of origin").  The Superman name and mark and

- 11 -

1  Superman symbols and indicia of origin include, *inter alia*, Superman's

2  characteristic outfit, comprised of a full length blue leotard with red cape, a yellow

3  belt, the S in Shield Device, as well as certain key identifying phrases.  Most

4  notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a plane!...It's

5  Superman!" first used in the introduction to the 1940 radio program The

6  Adventures of Superman, and thereafter continuously repeated in Superman

7  television programming and various Superman publications.  All of these Superman

8  symbols and indicia of origin have been used on and in connection with a wide

9  variety of publications and licensed goods and services, as they have been added to

10  the Superman character and mythology under DC Comics' and/or its predecessors'

11  supervision and direction, but, in any event, for the earliest symbols, since as early

12  as 1938.

13       39.    As a result of the above-described continuous and exclusive use by DC

14  Comics of the Superman name and mark, as well as the Superman symbols and

15  indicia of origin for over sixty years, the names, marks and symbols and the

16  appearance of the Superman character have become famous and the public has

17  come to recognize that all publications, entertainment and products featuring

18  Superman or bearing such marks all come from the same source, namely, DC

19  Comics, and that DC Comics is the exclusive source of the Superman character and

20  all uses of the character on and in connection with any goods and services.

21       40.    DC Comics owns dozens of federal trademark registrations for

22  Superman related indicia across a broad array of goods and services.  Those

23  registrations include, but are not limited to the following for the following marks:

24  (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177,

25  1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803,

26  1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b)

27  SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026,

28  1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

- 12 -

SECOND AMENDED
COUNTERCLAIMS

1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the "S in Shield" Device (either alone or as part of a rendering of Superman) 2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233, 1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630, 1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150, 1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No. 2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g) SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623, 1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i) SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881; (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306; (1) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304; (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No. 1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No. 1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and indicia of origin, the "Superman Marks").

41.    These registrations alone suffice to show the unusual breadth and scope of the use of such marks related to Superman by DC Comics or its licensees on or in connection with a broad range of goods and services, all of which have come to be seen over six decades by countless consumers as indicating an exclusive authorization or sponsorship thereof by plaintiff DC Comics, the publisher and source of all Superman comic books and other Superman productions and products.

### The Superman Notices Of Termination

42.    On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled Notice

- 13 -

of Termination of Transfer Covering Extended Renewal.  Those documents purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the Siegels' share in the following grants of copyright: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19 1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975 Agreement (collectively the "Superman Notices").  However, the Siegels served no notice terminating their share of the copyright grant in the May 21, 1948 Consent Agreement.

43.    The Superman Notices purport to terminate the Siegels' share of the above grants listed therein in the Unpublished Superman Works, Action Comics No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1 Works").  However, in none of the seven Superman Notices, or anywhere else, do the Siegels purport to terminate their share of any copyright grant in the Superman Ads.

44.    In the Superman Notices, the Siegels expressly recognize and acknowledge that the character Superboy is a derivative work based on Superman. The Superman Notices expressly identify Superboy as part of the Superman "family" of characters in which the Siegels are purporting to terminate their grants. Indeed, the more than 15,000 works listed in the Superman Notices include hundreds of publications and other works that feature *only* Superboy (as opposed to Superman), and also Superman No. 1 with a cover date of Summer 1939, in which Superman is depicted as a youth.

45.    In late November, 1998, DC Comics received from Plaintiffs/Counterclaim Defendants. Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents entitled Notice of Termination of Transfer Covering Extended Renewal. Those documents purport to terminate, effective November 27, 2000, the Siegels'

- 14 -

share it the following grants of copyright relating to the character known as "The Spectre": (a) the December 4, 1937 Agreement; (b) a September 22, 1938 Agreement; (c) and October 10, 1939 Agreement and (d) a second October 10, 1939 Agreement (collectively the "Spectre Notices").

46.     The Spectre Notices purport to terminate the Siegels' share of the above grants in: (a) the Spectre character appearing in costume in an ad in issue No. 51 of "More Fun Comics" with a cover date of January 1940; (b) the first Spectre comic book story published in issue No. 52 of "More Fun Comics" with a cover date of February 1940; (c) part 2 of the first Spectre comic book story published in issue No. 53 of "More Fun Comics" with a cover date of March 1940, and hundreds of additional works listed the Spectre Notices (collectively the "Spectre Works").

**The Parties' Negotiations**

**And The Agreement Reached**

47.     On April 17, 1997, less than ten days after DC Comics received the Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation. The Siegels requested that DC Comics make an initial settlement proposal. But prior to making such proposal, DC Comics requested that the parties enter into a confidentiality agreement. Frustrated by the Siegels' delay in responding to its proposed form confidentiality agreement, on November 5, 1997, DC Comics' counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you in the past, our client has elected, for settlement purposes only, not to respond to the [Superman Notices] served upon them by challenging their validity or scope *at this time*." (Emphasis added.)

48.     On December 17, 1997, DC Comics and the Siegels finally entered into a confidentiality agreement.  On December 18, 1997, DC Comics forwarded its first substantive proposal with respect to the copyrights at issue, and in connection therewith also raised certain defects in the termination notice, stating "that there is a substantial legal issue as to the effectiveness of your clients' termination of DC's

- 15 -

interest in the Superman Comic."  For more than six months despite repeated
requests for feedback, DC Comics heard no response to its December 18, 1997
proposal. Finally, on June 19, 1998, the Siegels' counsel sent a letter to DC
Comics' counsel that did not respond to the proposal but only requested more
information.

49.    On July 23, 1998, DC Comics provided the Siegels with the answers to
the questions posed in their counsel's letter of June 19, 1998.  Despite requests for
feedback for another several months, DC Comics again received no response to its
proposal.

50.    Having heard no response from the Siegels, on April 15, 1999, one day
before the purported "Effective Date" set forth in the Superman-Notices, DC
Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim
Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things,
the reasons it considered the Superman Notices to be invalid.

51.    On April 30, 1999, DC Comics received a letter from the firm of
Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented the
Siegels in negotiations with DC Comics.  Thereafter, the parties engaged in
extensive negotiations with their respective lawyers attending meetings in
California and New York, and exchanging proposals.  During that time period, at
the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance
Payment") to the Siegels which payment was agreed to be an advance against any
future sums provided under an agreement to be entered into between the parties.

52.    On October 16, 2001, a legal representative for DC Comics made an
offer to the Siegels through Gang, Tyre by telephone.  On October 19, 2001, Kevin
Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001 offer.
That day, Mr. Marks wrote a letter confirming that the Siegels had "accepted D.C.
Comics offer of October 16, 2001" and outlined all of the material terms in detail.
Those terms included, *inter alia*, that the Siegels transferred or would transfer all of

SECOND AMENDED
COUNTERCLAIMS

their rights in the Superman property (which was defined in the letter as Superman, Superboy and related properties including but not limited to Supergirl, Steel, Lois & Clark, and Smallville) and in "The Spectre."  In exchange, the Siegels were to receive: (a) a sizeable non-returnable advance; (b) a sizeable non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d) significant guaranteed minimum payments as advances against royalties; and (e) percentage royalties from DC Comics' exploitations of Superman across all media, worldwide.

53.    By return letter of October 26, 2001, DC Comics' representative wrote back providing a "more fulsome outline" of the agreed upon points. Neither the Siegels nor any of their representatives in any way disputed the October 26, 2001 confirmatory outline from DC Comics.  On February 1, 2002, DC Comics forwarded a draft of a more formal written agreement memorializing the terms agreed to in the October 19 and 26, 2001 correspondence.

54.    After the October 2001 agreement, DC Comics entered into a written Option Purchase Agreement with Warner Bros., A Division of Time Warner Entertainment Company, L.P. (now known as defendant Warner Bros. Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics granted to Warner Bros. the option to license certain exclusive rights in Superman, and Warner Bros. has commenced photography of a feature-length motion picture based on the property.

55.    On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company acknowledging that the Siegels had accepted DC Comics' proposal of October 16, 2002, but purporting to object to unspecified provisions of the formal written draft and repudiating the agreement reached by the parties in October 2001.  To this day, the Siegels have not identified a single provision of the February 1, 2002 formal

SECOND AMENDED
COUNTERCLAIMS

draft that was inconsistent with the provisions in the Siegels' October 19, 2001 acceptance of DC Comics' proposal.

56.     On September 30, 2002, however, DC Comics received a letter from the Siegels stating they were breaking off all discussions with DC Comics and again repudiating the agreement reached by the parties in October 2001.

### The Superboy Termination Notices

57.     Notwithstanding the fact that the Siegels had already purported to terminate grants with respect to the Superboy character effective April 16, 1999, on November 8, 2002, the Siegels mailed to DC Comics another Notice of Termination of Transfer purporting to relate solely to Superboy (the "Superboy Notice"). The Superboy Notice purports to terminate, effective November 17, 2004, only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the December 23, 1975 Agreement, and identifies many of the same works identified in the Superman Notices. As was the case with the Superman Notices, the Siegels served no notice terminating the copyright grant in the May 21, 1948 Consent Agreement.

58.     The Superboy Notice purports to terminate the above grants regarding the following works: (a) the unpublished November 30, 1938 Letter; (b) the unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d) approximately 1,600 additional titles.  However, the Superboy Notice lists and purports to terminate grants of rights under copyright relating to hundreds of the same works already purportedly terminated by the earlier Superman Notices.  The Superboy Notice does not purport to terminate the 1939 depiction of Superman as a youth in Superman No. 1.

59.     In the Superboy Notice, the Siegels make the claim that Superboy is a "separate and distinct copyrighted work and character from the copyrighted work and character Superman."  This contention is erroneous.

- 18 -

SECOND AMENDED
COUNTERCLAIMS

60.     In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy.  This contention is also erroneous.

61.     Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville."  "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

62.     On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia*, that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

63.     On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

64.     On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

**The Siegels' Filing Of Two Related Cases**

65.     On October 8, 2004, 14 days prior to filing the instant action, the Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to Judge Pregerson in this Court.

SECOND AMENDED
COUNTERCLAIMS

# FIRST COUNTERCLAIM FOR DECLARATION
## THAT THE SUPERMAN NOTICES AND THE
## SUPERBOY NOTICE ARE INEFFECTIVE

66.     DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

67.     DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

**#1 The May 21, 1948 Consent Agreement Has Not Been Terminated**

68.     The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

69.     As a result of the Siegels' failure to send a Notice of Termination with respect to the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect.  Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

**#2 The December 23, 1975 Agreement**

70.     Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

71.     By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

SECOND AMENDED
COUNTERCLAIMS

72.     By letter dated August 29, 2004, DC Comics rejected the scope and
validity of the Superboy Notice, including but not limited to the Siegels' claim that
such notice terminated the December 23, 1975 Agreement.

73.     Notwithstanding the Siegels having, by virtue of the Superman
Notices, purportedly terminated the grant of copyright contained in the December
23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the
Superman Notice, after April 16, 1999, the purported effective date of such notices
of termination, DC Comics continued to perform under the December 23, 1975
Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept
the benefits under that agreement.  DC Comics has relied upon Joanne Siegel's
continued acceptance of benefits under the December 23, 1975 Agreement and has
continued to perform under that Agreement without accounting to the Siegels and
without making any other change in the manner in which it has exploited
Superman.

74.     Notwithstanding the Siegels having, by virtue of the Superboy Notice,
purportedly terminated the grant of copyright contained in the December 23, 1975
Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of
the notice of termination, DC Comics has continued to perform under the December
23, 1975 Agreement.  DC Comics has relied upon Joanne Siegel's continued
acceptance of benefits under the December 23, 1975 Agreement and has continued
to perform under that Agreement without accounting to the Siegels and without
making any other change in the manner in which it has exploited Superboy.

75.     Because of DC Comics' continued performance under the December
23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's
continued acceptance of the benefits of such agreement after she purportedly
terminated it in both the Superman Notices and the Superboy Notice, the December
23, 1975 Agreement, and the grant of copyright therein, remains in full force and
effect.

SECOND AMENDED
COUNTERCLAIMS

76.    Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (and its derivative work Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

### #3 The Unpublished Superboy Works

77.    In the Superboy Notice, the Siegels purport to terminate copyright grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy Script and approximately 1,600 additional published titles purportedly relating to Superboy (the "Published Superboy Works").

78.    Upon information and belief, as of January 1, 1978, both the November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel Superboy Proposals") remained unpublished and thus were neither in their first nor their second term of copyright as of that date.

79.    Copyright in the Published Superboy Works is owned exclusively by DC Comics by virtue of their having been prepared as works made for hire for DC Comics' and/or its predecessors, or by virtue of other copyright grants that remain in full force and effect.

80.    Pursuant to the requirements set forth by section 304 (c) of the 1976 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in their first or second term of copyright as of January 1, 1978, could be terminated under that provision.  As a result, the Superboy Notice is ineffective as to the Siegel Superboy Proposals or any portion of any derivative works containing any copyrightable material therefrom and DC Comics remains the sole owner thereof. Therefore, the Superboy Notice is ineffective.

### #4 Siegel Owned No Copyright In Superboy

81.    The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

82.     Upon information and belief, Siegel, in collaboration with Shuster, prepared the Siegel Superboy Proposals without the prior knowledge or consent of DC Comics' predecessors.

83.     Upon further information and belief, Siegel developed the contents of the Siegel Superboy Proposals within the scope of his employment contracts with DC Comics' predecessors and/or at their instance and expense and subject to their right to control.

84.     As a result of the foregoing, the Siegel Superboy Proposals were derivative works based upon Superman, prepared without the authorization of the copyright owner, and/or were works made for hire, owned ab initio by the copyright owner in Superman.

85.     Whether the Siegel Superboy Proposals were derivative works prepared without the prior authorization of the copyright owner, or were works made for hire, Siegel could not and did not own any copyright interest therein that would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c).  Thus, the Superboy Notice is ineffective.

### #5 The Superman Notices Were Not Timely Served

86.     Upon information and belief, DC Comics' predecessor in interest first secured copyright in Action Comics No. 1 by publication with copyright notice prior to April 16, 1938.

87.     All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels are ineffective for failure to comply with the legal requirements therefore prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304 (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999, was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3) and such notices

SECOND AMENDED
COUNTERCLAIMS

of termination were served less than two years before the allowable effective date in violation of 17 U.S.C. § 304 (c) (4) (A).

88.     On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

89.     A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## SECOND ALTERNATIVE COUNTERCLAIM FOR DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS

90.     DC Comics repeats and realleges paragraphs 1 - 89 above as if fully set forth herein.

91.     Since as early as 1998, Plaintiffs/Counterclaim Defendants were on notice of DC Comics' position that the Superman Notices contained legal defects. Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim Defendants were on notice that DC Comics rejected the Superman Notices and asserted exclusive ownership of all copyright in Superman.

92.     Since April 16, 1999, the purported effective date of the Superman Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of their purported co-ownership of copyright in Action Comics No. 1.

93.     In response to DC Comics' above actions and assertion and such deprivation to the Siegels of the benefits of their alleged copyright co-ownership, Plaintiffs/Counterclaim Defendants took no action until filing the instant action on October 8, 2004, more than six years after DC Comics advised Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

- 24 -

and more than five years after being placed on notice by DC Comics of its claim of exclusive ownership of copyright in Superman and that it rejected and repudiated the Superman Notices and during which time period the Siegels were deprived of benefits to which they claim they are entitled.

94.     Because Plaintiffs/Counterclaim Defendants' claim of partial ownership of copyright accrued more than three years prior to Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into consideration any purported agreements to toll the statute of limitations, any claim of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is barred by the three-year statute of limitations of the Copyright Act.

95.     On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

96.     A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## THIRD ALTERNATIVE COUNTERCLAIM
## FOR BREACH OF CONTRACT

97.     DC Comics repeats and realleges paragraphs 1 - 96 above as if fully set forth herein.

98.     In or about October 2001, Plaintiffs/Counterclaim Defendants entered into a written agreement with DC Comics memorialized by the authorized agent of Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of DC Comics, John Schulman, which subsequently was confirmed and ratified in writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"), pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1) transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

- 25 -

transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in any and all past, present, and future Superman and Superboy-related properties, works, characters, names, and trademarks (collectively, the "Superman Works"), (2) agreed to accept certain compensation from DC Comics in consideration of any and all rights, title, and interest which they may have in the Superman Works (the "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim related to the Superman Works other than for breach of the Agreement (the "Covenant Not To Sue").

99.     DC Comics has performed all of its obligations under the Agreement, except to the extent such performance has been prevented or excused by the acts or omissions of Plaintiffs/Counterclaim Defendants.  Specifically, and without limiting the foregoing, DC Comics established a reserve account of the moneys due to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which DC Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the Agreement but for their repudiation and breach of the Agreement as herein alleged. DC Comics always has been and remains ready, willing, and able to perform all of its obligations under the Agreement, and will resume doing so upon either a withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the Agreement or a final adjudication that the Agreement is enforceable and binding on the parties.

100.   Plaintiffs/Counterclaim Defendants have repudiated and otherwise breached the Agreement by, among other things:

a.     Claiming, including in this action, that they have not transferred and are not contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all of their rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, and refusing to execute a formal written transfer thereof to DC Comics;

SECOND AMENDED
COUNTERCLAIMS

b.      Repudiating the Financial Terms and claiming, including in this action, that they are entitled to additional compensation for the Superman Works; and

c.      Initiating this action in violation of the Covenant Not To Sue.

101.   As a direct and foreseeable result of the contractual breaches on the part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been damaged in an amount to be proven at trial.

## FOURTH ALTERNATIVE COUNTERCLAIM FOR DECLARATORY RELIEF REGARDING THE AGREEMENT

102.   DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.

103.   An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:

a.      Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

b.      If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c.      If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to

- 27 -

DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner.

104.   DC Comics is informed and believes, and on that basis alleges, that Plaintiffs/Counterclaim Defendants dispute these contentions.

105.   DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct.

## FIFTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION OF LIMITATIONS ON THE SCOPE OF THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE

106.   DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

107.   In the event the Superman Notices and/or the Superboy Notice are deemed effective and the settlement agreement between the parties is not enforced, DC Comics asserts the following alternative counterclaim for a declaration limiting the scope and reach of the Superman Notices and the Superboy Notice in six separate and independent ways.

108.   DC Comics contends that:

### #1 The Superman Ads

109.   The regulations governing the contents of notices of termination promulgated by the U.S. Copyright Office under authority of the 1976 Copyright Act require, in relevant part, that a notice of termination served pursuant to section 304 (c) of the 1976 Copyright Act name "each work to which the notice of termination applies."

SECOND AMENDED
COUNTERCLAIMS

110.   Upon information and belief, all of the Superman Ads first secured copyright protection by publication with copyright notice prior to April 16, 1938 and prior to publication of Action Comics No. 1.

111.   The Superman Ads contain and show the appearance of Superman, his costume, and his super-strength.

112.   The grants made by Siegel and Shuster as to the appearance of Superman, his costume, and his super-strength, are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels do not list the works in which the Superman Ads were first published.

113.   Thus, DC Comics is the exclusive owner of all copyright in and to the Superman Ads and thereby retains exclusive ownership of copyright in the appearance of Superman therein, including but not limited to, the appearance of the Superman costume.

**#2 Use Of Superman And Superboy Derivative Works**

**Prepared Prior To The Purported Effective Dates Of The**

**Superman Notices And The Superboy Notice**

114.   The Superman Notices purport to terminate the Siegels' share in the Copyright grant of Jerome Siegel in all Superman-related works thereafter derived from Action Comics No. 1, including but not limited to the more than 15,000 Superman related works (in addition to Action Comics No. 1) listed in the Superman Notices (the "Superman Derivative Works").  Included among the Superman Derivative Works is the image of the "S in Shield Device" that has become a strong trademark of Superman and his single source, DC Comics.

115.   The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

116.   The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117.   Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3 DC Comics Owns All Superman Derivative Works

118.   All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics.  DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119.   The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements").  These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman.  Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No 1 but only appeared later in the Post Action Comics No. 1 Works.

120.   Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.  Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

SECOND AMENDED
COUNTERCLAIMS

### #4 Superboy Is A Derivative Work Based On Superman

121.   In the November 1938, Letter suggesting the idea for a Superboy comic strip, Siegel stated such comic "would relate to the adventures of Superman as a youth."  In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests...America's outstanding boy hero: SUPERBOY!"

122.   As demonstrated by the foregoing, the Siegel Superboy Proposals were based upon the pre-existing Superman character and stories and are thus derivative works based thereon, and were not made at the instigation of Siegel.

123.   Thus, even if the Superboy Notice were effective, any recapture of copyright rights would be limited to any new copyrightable subject matter added by Siegel and Shuster to the pre-existing Superman character and stories exclusively owned by DC Comics and its predecessors.

124.   The new copyrightable subject matter contained in the Siegel Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture U.S. Copyrights therein, such recapture could not affect DC Comics' continuing right to create and exploit new derivative works that do not include such new copyrightable subject matter, including but not limited to, the television series "Smallville."

### #5 The Derivative Work Superboy Is A Joint Work Of Authorship

125.   Upon information and belief, the Siegel Superboy Proposals were joint works of authorship as they were prepared jointly with Shuster and because it was intended that their contents would be merged with artwork to create a comic book or comic strip.

126.   As eventually published, the works containing the Superboy character included both artwork and storyline.

SECOND AMENDED
COUNTERCLAIMS

127.   The joint author's share in the Siegel Superboy Proposals is owned by DC Comics and cannot be terminated either by the Superman Notices or the Superboy Notice.

128.   As a result of the foregoing, DC Comics right to continue to exploit the Siegel Superboy Proposals and any derivative works based thereon cannot be affected by either the Superman Notices or the Superboy Notice.

### #6 "Smallville" Is Not Derived From Superboy

129.   Among the derivative works based upon Superman and authorized b DC Comics is the weekly television series, "Smallville."

130.   Regardless of whether the Superboy Notice is effective and further regardless of whether Superboy is a derivative work based upon Superman, "Smallville" was derived from and based upon Superman and is not a derivative work based upon the Siegel Superboy Proposals or any succeeding Superboy comic or Superboy work exploited by DC Comics and/or its predecessors prior to May 21, 1948.  Beyond sharing the idea of depicting Superman as a youth, Smallville is not substantially similar to the Siegel Superboy Works.

131.   Thus, irrespective of any accounting issues relating to the Siegels' purported right to receive compensation with respect to new episodes of "Smallville," DC Comics' right to continue to authorize production, distribution, and airing of "Smallville" television episodes remains unaffected by the Superman Notices and the Superboy Notice.

### #7 The Additional Action Comics No. 1 Materials

132.   The Additional Action Comics No. 1 Materials created in 1938 were prepared at the instance and expense of DCI and subject to its right to control. Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1 Materials were "works made for hire" and copyright therein was owned by DCI *ab initio*.

133.   Because the Additional Action Comics No. 1 Materials were works made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to

17 U.S.C. § 304 (c). As a result, DC Comics remains the sole owner of the Additional Action Comics No. 1 Materials.

134.   On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

135.   A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## SIXTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION REGARDING THE PRINCIPLES TO BE APPLIED IN AN ACCOUNTING

136.   DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135 above as if fully set forth herein.

137.   DC Comics contends that in the event the Superman Notices and/or the Superboy Notice were deemed valid and effective, any accounting to which the Siegels would be entitled relating to Superman (including its derivative work Superboy, collectively for this Counterclaim "Superman") would be subject to the following limitations and reductions:

      a.    The Siegels would not be entitled to any revenues derived from exploitation of Superman outside of the United States because termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of non-United States copyrights. 17 U.S.C. § 304 (c) (6) (E).

      b.    The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works. 17 U.S.C. § 304 (c) (6) (A).

- 33 -

c.   Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d.   Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present it the Superman works subject to accounting.

e.   Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f.   The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights.  As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

- 34 -

g.   Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect expenses, taxes, and DC Comics' independent role as a publisher of Superman.

h.   Subject to all reductions aforesaid and otherwise determined by the Court to be applicable, the Siegels would be entitled to an accounting of only one-half of the copyright co-owner's profits.

138.   On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth above.  Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics as to the above issues.

139.   A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

WHEREFORE, DC Comics demands judgment as follows:

1.   Declaring that the Superman Notices and the Superboy Notice are ineffective for one or more of the reasons set forth in DC Comics' First Counterclaim;

2.   In the event that the Superman Notices and/or the Superboy Notice are deemed effective, for damages according to proof at trial on DC Comics' Third Alternative Counterclaim;

3.   In the event that the Superman Notices and/or the Superboy Notice are deemed effective, declaring on DC Comics' 'Fourth Alternative Counterclaim that, pursuant to the Agreement:

a.   Plaintiffs/Counterclaim Defendants have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

- 35 -

SECOND AMENDED
COUNTERCLAIMS

b.      In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c.      In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner;

4.      In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that the scope and effect of the Superman Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth Alternative Counterclaim;

5.      In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that any accounting to which Plaintiffs/Counterclaim Defendants may be entitled will be limited by all applicable principles, including but not limited to, those set forth in DC Comics' Sixth Alternative Counterclaim;

6.      Awarding DC Comics its costs and reasonably attorneys' fees incurred in connection with DC Comics' defenses and claims herein seeking declarations with respect to copyright ownership; and

- 36 -

SECOND AMENDED
COUNTERCLAIMS

1         7.     Awarding DC Comics such other and further relief as may be just.

2

3    Dated:     February 17, 2011     Respectfully Submitted,

4         O'MELVENY & MYERS LLP

5         By: _____

6         Daniel M. Petrocelli
          Attorneys for Defendants and
7         Counterclaimant

8

9    CC1:844136

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED
COUNTERCLAIMS