1  Marc Toberoff (State Bar No. 188547)
    mtoberoff@toberoffandassociates.com
2  Keith G. Adams (State Bar No. 240497)
    kadams@toberoffandassociates.com
3  Pablo D. Arredondo (State Bar No. 241142)
    parredondo@toberoffandassociates.com
4  David Harris (State Bar No. 255557)
    dharris@toberoffandassociates.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway, #348
6  Malibu, California, 90265
   Telephone:  (310) 246-3333
7  Fax:         (310) 246-3101

8  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
9  individually and as personal representative
   of the Estate of Joanne Siegel

10

## UNITED STATES DISTRICT COURT

11

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

12

| | |
|---|---|
| 13  LAURA SIEGEL LARSON,<br>14  individually and as personal<br>representative of the ESTATE OF<br>15  JOANNE SIEGEL,<br>                    Plaintiff,<br>16          v.<br>17  WARNER BROS. ENTERTAINMENT<br>INC., DC COMICS, and DOES 1-10,<br>18                    Defendants and<br>19                    Counterclaimants. | Case No. 04-CV-08400 ODW (RZx)*<br>Case No. 04-CV-08776 ODW (RZx)*<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE SIEGEL SUPERMAN AND SUPERBOY CASES**<br><br>*Declaration of Keith Adams and Statement of Genuine Issues of Fact and Law filed concurrently*<br><br>Date:     March 25, 2013*<br>Time:    1:30 p.m.*<br>Place:   Courtroom 11* |
| 20  LAURA SIEGEL LARSON,<br>individually and as personal<br>21  representative of the ESTATE OF<br>22  JOANNE SIEGEL,<br>                    Plaintiff,<br>23          v.<br>24  TIME WARNER INC., WARNER<br>COMMUNICATIONS INC.,<br>25  WARNER BROS. ENTERTAINMENT<br>26  INC., WARNER BROS. TELEVISION<br>PRODUCTION INC., DC COMICS,<br>27  and DOES 1-10,<br>28                    Defendants and<br>                    Counterclaimants. | *:  The Court has stated that it will take the motion(s) under submission and hold a hearing if necessary.  Dkt. 707.  Docket citations herein are to Case No. 04-CV-08400. |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS .......................................................................................3

STANDARD OF REVIEW .......................................................................................6

ARGUMENT .............................................................................................................6

I.   THE MANDATE DOES NOT SUPPORT PREMATURE JUDGMENT ..................................................................................................6

II.  ISSUES OF MATERIAL FACT PREVENT SUMMARY JUDGMENT ..................................................................................................9

    A.  The October 19, 2001 Letter Did Not Transfer The Copyrights And DC Is Not Entitled To A Declaration Of Rights To That Effect ................................................................................................9

        1.  The Letter's Language Does Not Support DC's Interpretation ................................................................................9

        2.  Any Ambiguity Must Be Resolved By The Trier Of Fact .......10

        3.  The Circuit Did Not Hold That The Siegels Assigned Rights ...........................................................................................10

        4.  A Judgment That The Siegels "Are" Obliged To Transfer Rights To DC Would Not Settle The Issue .............................11

    B.  DC Is Not Entitled To Specific Performance.....................................12

        1.  DC Did Not Perform Or Even Offer To Perform....................14

        2.  The Failure To Complete A Long-Form Agreement Did Not Excuse DC's Non-Performance.........................................15

        3.  The Siegels Did Not Breach The Letter .................................16

            a.  DC's Anticipatory Breach/Repudiation .......................16

            b.  DC's Actual Breach .......................................................19

            c.  The Siegels' Rescission.................................................20

            d.  DC's Acquiescence and Abandonment.........................22

III. FEDERAL COPYRIGHT LAW PREVENTS SUMMARY JUDGMENT AS TO SUPERBOY AND THE SUPERMAN ADS............23

CONCLUSION.......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdulkhalik v. City of San Diego,*
2009 U.S. Dist. LEXIS 110062 (S.D. Cal. Nov. 25, 2009) ................................... 12

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ....................................................................................................6

*Arachnid, Inc. v. Merit Indus., Inc.,*
939 F.2d 1574 (Fed. Cir. 1991) ................................................................................ 10

*Barndt v. County of L.A.,*
211 Cal. App. 3d 397 (1989) ..................................................................................... 12

*Beverage v. Canton Pacer Mining Co.,*
43 Cal. 2d 769 (1955) .......................................................................................... 14-15

*Blackburn v. Charnley,*
117 Cal. App. 4th 758 (2004) .................................................................................... 13

*Brown v. Grimes,*
192 Cal. App. 4th 265 (2011) .................................................................................... 19

*Campanelli v. Bockrath,*
1997 U.S. Dist. LEXIS 7981 (N.D. Cal. June 4, 1997) ............................................8

*Castaneda v. Dura-Vent Corp.,*
648 F.2d 612 (9th Cir. 1981) ..................................................................................... 10

*CDF Firefighters v. Maldonado,*
158 Cal. App. 4th 1226 (2008) .................................................................................. 13

*City of Hollister v. Monterey Ins. Co.,*
165 Cal. App. 4th 455 (2008) .................................................................................... 16

*Classic Media, Inc. v. Mewborn,*
532 F.3d 978 (9th Cir. 2008) ..................................................................................... 24

*Darling Int'l, Inc. Baywood Partners, Inc.,*
2007 U.S. Dist. LEXIS 50985 (N.D. Cal. July 13, 2007) ........................................ 18

*Daugherty Co. v. Kimberly-Clark Corp.,*
14 Cal. App. 3d 151 (1971) ....................................................................................... 23

*Dobson v. Twin City Fire Ins. Co.,*
2012 U.S. Dist. LEXIS 93823 (C.D. Cal. July 5, 2012)........................................... 15

*Doe v. State of Nebraska,*
2002 WL 225907 (D. Neb. Dec. 14, 2002) ................................................................8

*Edgerly v. City & County of San Francisco,*
2011 U.S. Dist. LEXIS 155192 (N.D. Cal. May 26, 2011) .......................................8

*Edlin v. M/V Truthseeker,*
69 F.3d 392 (9th Cir. 1995) ...........................................................................................8

*Facebook, Inc. v. Pac. Nw. Software, Inc.,*
640 F.3d 1034 (9th Cir. 2011) .....................................................................................15

*Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.,*
822 F.2d 833 (9th Cir. 1987) .......................................................................................22

*Ferguson v. City of Cathedral City,*
197 Cal. App. 4th 1161 (2011) ....................................................................................16

*Firth v. United States,*
554 F.2d 990 (9th Cir. 1977) .........................................................................................8

*Freedman v. St. Matthias Parish,*
37 Cal. 2d 16 (1951) .....................................................................................................18

*Freeman v. Mostafavi,*
2005 Cal. App. Unpub. LEXIS 10154 (Cal. App. 2d Dist. Nov. 8, 2005).............23

*Golden West Baseball Co. v. City of Anaheim,*
25 Cal. App. 4th 11 (1994) ..........................................................................................13

*Griffin v. Beresa, Inc.,*
143 Cal. App. 2d 299 (1956) .......................................................................................22

*Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers*
192 Cal. App. 2d 268 (1961) .......................................................................................22

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.,*
531 F.3d 767 (9th Cir. 2008) .........................................................................................7

*Hall v. City of L.A.,*
697 F.3d 1059 (9th Cir. 2012) .......................................................................................8

*Hil-Mac Corp. v. Mendo Wood Products, Inc.,*
235 Cal. App. 2d 526 (1965) .......................................................................................22

*Hull v. Ray,*
211 Cal. 164 (1930) ......................................................................................................20

*Honda v. Reed,*
156 Cal. App. 2d 536 (1958) .......................................................................................23

*Industrial Indemnity v. Superior Court,*
224 Cal. App. 3d 828 (1990) .......................................................................................10

*Irwin v. American Interactive Media,*
1994 U.S. Dist. LEXIS 16223 (C.D. Cal. Apr. 14, 1994) ......................................21

*Jaunich v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*,
647 F. Supp. 209 (N.D.Cal.1986) ..................................................................21

*Johnson v. Goldberg*,
130 Cal. App. 2d 571 (1955) .......................................................................18

*Katz v. Cal-Western Reconveyance Corp.*,
2010 U.S. Dist. LEXIS 98940 (N.D. Cal. Sept. 21, 2010) .....................13

*Lancaster v. Tilton*,
2007 U.S. Dist. LEXIS 48403 (N.D. Cal. June 21, 2007) .........................8

*Larson v. Warner Bros. Entm't, Inc.*,
2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013) ................1, 7, 11

*Li'l Red Barn, Inc. v. Red Barn Sys., Inc.*,
322 F. Supp. 98 (N.D. Ind. 1970) ................................................................9

*Local 659, I.A.T.S.E. v. Color Corp. of America*,
47 Cal. 2d 189 (1956) .................................................................................16

*Loop Building Co. v. De Coo*,
97 Cal. App. 354 (1929) ........................................................................17, 20

*Maffei v. N. Ins. Co. of N.Y.*,
12 F.3d 892 (9th Cir. 1993) .......................................................................10

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*,
191 Cal. App. 4th 435 (2010) ...............................................................16, 18

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) .......................................................................24

*McCreary v. Mercury Lumber Distributors*,
124 Cal. App. 2d 477 (1957) ......................................................................23

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ....................................................................24

*Mycogen Corp. v. Monsanto Co.*,
28 Cal. 4th 888 (2002) ................................................................................12

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) ....................................................................................24

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) ........................................................................6

*Ninety Nine Invest. v. Overseas Courier Service (Sing.) Priv.*,
113 Cal. App. 4th 1118 (2003) ...................................................................14

*Odima v. Westin Tucson Hotel*,
53 F.3d 1484 (9th Cir. 1995) ........................................................................8

*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*,
411 F.2d 889 (9th Cir. 1969) ............................................................17, 19

*Peer Int'l Corp. v. Pausa Records, Inc.*,
909 F.2d 1332 (9th Cir. Cal. 1990) ...........................................................21

*Pichignau v. Paris*,
264 Cal. App. 2d 138 (1968) .....................................................................18

*Portsmouth Square, Inc. v. Shareholders Protective Comm.*,
770 F.2d 866 (9th Cir. 1985) ....................................................................12

*Posner v. Grunwald-Marx, Inc.*,
56 Cal. 2d 169 (1961) ...............................................................................19

*Rubin v. Fuchs*,
1 Cal. 3d 50 (1969) ...................................................................................21

*SCO Group, Inc. v. Novell, Inc.*,
2004 WL 4737297 (D. Utah June 9, 2004) ..................................................9

*Siegel v. Warner Bros. Entertainment, Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) .......................................................5

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ....................................................................6

*U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*,
498 F.2d 335 (9th Cir. 1974) .....................................................................21

*Union Oil Co. of California v. Greka Energy Corp.*,
165 Cal. App. 4th 129 (2008) ....................................................................13

*Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP*,
593 F. Supp. 2d 1153 (S.D. Cal. 2008) ......................................................15

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007) ......................................................................6

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1 (1995) ....................................................................................9

*Walters v. Calderon*,
25 Cal. App. 3d 863 (1972) .......................................................................13

*Wilson v. Lewis*,
106 Cal. App. 3d 802 (1980) .....................................................................21

**Statutes**

17 U.S.C. § 304(c)(5) ................................................................................24

17 U.S.C. § 304(c)(6)(D) ......................................................................2, 23

Cal. Civ. Code § 1439 ................................................................................... 14

Cal. Civ. Code § 1639 ..................................................................................... 9

Cal. Civ. Code § 1689(b) .............................................................................. 20

Cal. Civ. Code § 1691 ................................................................................... 20

Cal. Civ. Code § 1657 ................................................................................... 20

Cal. Civ. Code § 1693 ................................................................................... 22

Cal. Civ. Code §1657 .................................................................................... 20

Fed. R. Civ. P. 56(c) ....................................................................................... 6

Fed. R. Civ. P. 56(f) ..................................................................................... 12

# INTRODUCTION

Defendant DC Comics' ("DC") summary judgment motion ("Mot.") is falsely premised.  DC cannot rush this case to judgment based on its willful misreading of the Ninth Circuit's recent decision.  The Circuit did ***not*** hold that the October 19, 2001 letter from the Siegels' attorney to DC actively transferred the Siegels' copyrights to DC, as DC solely argues.  It held only that the letter was "an acceptance of terms negotiated between the parties" that "was sufficient" to create a contract on October 19, 2001, and remanded this case for adjudication of DC's counterclaims.  *Larson v. Warner Bros. Ent., Inc.*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. January 10, 2013).  What the resulting October 19, 2001 agreement meant, and whether and to what extent it is still enforceable given DC's subsequent conduct, are entirely separate questions raised by DC's counterclaims.  The answers to those questions show that DC is not entitled to summary judgment – and why DC did not bring a proper summary judgment motion as to its counterclaims.

As a matter of law, the October 19, 2001 letter could not have transferred the Siegels' copyrights, as it unambiguously states that the Siegels "would" transfer their rights in the future.  DC thus requires specific performance of the October 19, 2001 letter.  But specific performance requires that DC first prove that the Siegels <u>breached</u> the agreement plus additional elements, which DC cannot establish and has not even attempted to prove in its motion.  Tellingly, DC asked in its motion that its Third Counterclaim for breach of contract be *dismissed*.  DC can neither prove the elements of breach nor obtain specific performance under California law.

Today, DC insists that the terms are "everything in this [October 19] letter, nothing more."  But in 2001-2002, DC acted as though it was not bound by it.  For instance, the October 19, 2001 letter set forth a clear unequivocal obligation of DC to pay the Siegels by March 31, 2002, and there is no condition in the October 19, 2001 letter that any "long-form" agreement first be negotiated.  That day came and went.  DC did not pay or even offer to pay, on March 31, 2002 in exchange for the Siegels'

performance, as it had promised, breaching its agreement.  Instead, DC conditioned its performance on new and revised terms found nowhere in the October 19, 2001 letter, all of which favored DC and hurt the Siegels.

After attempting to grind and muscle the Siegels, DC cannot now have its cake and eat it too, and avoid the consequences of its actions in 2001-2002.  Under clear California law, DC's anticipatory breach, followed by its actual breach of the October 19, 2001 letter, excused the Siegels' performance and allowed them to rescind the October 19, 2001 letter.  In May 2002, the Siegels rejected DC's overreaching attempts to "claw back" on its promises to them, and exercised their right of rescission.  In response, DC did not retract its demands and revert to the October 19, 2001 letter.  DC did not offer to perform under the October 19, 2001 letter or claim that the Siegels were bound by the October 19, 2001 letter.  Instead, DC acquiesced and engaged in new negotiations with the Siegels.  DC asserted no rights under the October 19, 2001 letter until after the Siegels filed this action in October, 2004.

In short, when it mattered, DC did not honor the October 19, 2001 letter, anticipatorily breaching and then actually breaching its terms, causing justifiable rescission of the October 19, 2001 letter, and precluding its enforcement today.

At a minimum, this raises genuine issues of material fact barring summary judgment.  DC entirely failed to address these issues in its motion, and they cannot be decided *ad hoc* as that would violate Ms. Larson's right to due process.

In addition, the October 19, 2001 letter could not have transferred the Siegels' recaptured Superboy copyrights or their rights in the early Superman promotional announcements ("Ads").  Under 17 U.S.C. § 304(c)(6)(D), a terminated copyright can only be re-granted to the original grantee *after* the notice of termination is served. The Siegels did not serve Superboy termination notices until 2002, and did not serve termination notices regarding the Ads until 2012.  The October 19, 2001 letter could not have transferred to DC the Siegels' termination interests in Superboy or the Ads as a matter of law, and therefore the October 19, 2001 letter has no bearing on the

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

Siegels' *Superboy* case (C.D. Cal. Case No. 04-CV-08776).

DC's rush to judgment must be rejected, and its motion denied.

## STATEMENT OF FACTS

In 1997, Joanne Siegel and Laura Siegel Larson (the "Siegels") served notices of termination pursuant to the Copyright Act as to Jerome Siegel's Superman copyright grants to DC.  Statement of Issues ("SGI") ¶2.  In 1999, the parties entered into formal negotiations, in which the Siegels were represented by attorney Kevin Marks and DC by Warner's then-General Counsel, John Schulman.  SGI ¶3.

On October 16, 2001, DC made a settlement offer to the Siegels.  SGI ¶3.  On October 19, 2001, Marks sent a "term sheet," in letter form, to Schulman, which the Ninth Circuit later held was a valid acceptance of DC's offer creating an agreement (the "October 19, 2001 Letter").  SGI ¶5.  DC now argues and admits that these were the only terms the parties ever agreed to.  SGI ¶52-53.  The October 19, 2001 Letter contained a specific, time-sensitive obligation of DC:  "an annual guarantee of $500,000 per year payable for ten years beginning March 31, 2002."  SGI ¶6.  There was also a $1,000,000 "signing bonus," presumably payable before March 31, 2002, and a $2,000,000 "advance" for the period beginning January 1, 2000.  *Id.*  At the time the parties agreed to this March 31, 2002 deadline, they intended the terms of the October 19, 2001 Letter to be transposed into an agreement format for signature by the parties, which should have been a relatively simple task.  SGI ¶7.

DC did not accept the October 19, 2001 Letter as the parties' agreement. Instead, on October 26, 2001, Schulman sent a letter to Marks, enclosing a "more fulsome outline" of deal terms (the "October 26, 2001 Letter").  SGI ¶8.  The October 26, 2001 Letter was sent when Marks was in China for a long period; he did not return until late November 2001, and it was <u>not</u> forwarded to the Siegels.  SGI ¶9.

As is evident from the October 26, 2001 Letter, and as Marks testified, Schulman's "outline" contained new and changed terms that were materially different from those in the October 19, 2001 Letter, all in DC's favor.  SGI ¶¶10-16.  Among

other changes, the outline required the Siegels to assign additional copyrights to DC, reduced the Siegels' royalty in many instances, changed when and where credit would be given, and added numerous warranty and indemnity provisions found nowhere in the October 19, 2001 Letter. *Id.* The October 26, 2001 Letter also states that DC was preparing a "draft agreement." SGI ¶8. The October 26, 2001 Letter confirms the "Annual Payment (Advance)" of "$500,000 per year for ten years, commencing 2002, payable 3/31 of year," *i.e.*, beginning March 31, 2002. SGI ¶17.

After over three months, DC finally sent Marks a draft agreement on February 1, 2002 (the "February 1, 2002 Draft"), which was vastly different from the October 19, 2002 Letter, as Marks testified. SGI ¶¶6, 18-21. In addition to the new material terms in DC's October 26, 2013 Letter, DC insisted on numerous new and changed terms – all to DC's benefit and the Siegels' detriment. SGI ¶¶19-21.

The March 31, 2002 payment deadline came and went; DC did not pay or even tender the $500,000 annual payment, the $1,000,000 signing bonus, or the $2,000,000 advance, as DC had expressly promised and as set forth in the October 19, 2001 Letter. SGI ¶24.

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, COO of DC's parent, AOL Time Warner Inc., objecting to the February 1, 2002 Draft and stating: "When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago [the October 19, 2001 agreement], we were stabbed in the back with a shocking [February 1, 2002] contract" and that "[a]fter four years we have no deal and this contract makes an agreement impossible." SGI ¶25; Declaration of Keith Adams ("AD"), Ex. 4.

On May 21, 2002, Time Warner sent a reply letter to Joanne, stating it was "quite troubled by [her] feeling[s]." SGI ¶26. However, it did not retract its aggressive demands in the February 1, 2002 Draft, or go back to the terms in the October 19, 2001 Letter that the Siegels confirmed was their agreement. SGI ¶¶26-27. Instead, DC falsely maintained that the draft "accurately represented the

agreement previously reached," when a plain comparison of its Draft to the October 19, 2001 Letter revealed that this was not true.  SGI ¶¶6, 18-21, 26.

On September 21, 2002, the Siegels sent a letter in which they terminated Marks and provided "formal notification that we are totally stopping and ending all negotiations with DC Comics … effective immediately."  SGI ¶29.  Later, in November 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective date of November 17, 2004.  SGI ¶30.

In response to all of these events, DC did not claim rights under the October 19, 2001 Letter.  SGI ¶33.  Nor did DC comply, or offer to comply, with its obligations under the October 19, 2001 Letter.  SGI ¶32.  Instead, in 2003-04, DC simply resumed negotiations with the Siegels.  SGI ¶31.

The parties' new negotiations were unsuccessful and accordingly, on October 8 and October 22, 2004, the Siegels filed suits to enforce their statutory terminations as to Superman and Superboy, respectively.  SGI ¶¶34-35.  On November 22, 2004, DC counterclaimed, and contended for the first time in three years that the October 19, 2001 Letter constituted an agreement.  SGI ¶¶36-37.  DC also alleged for the first time that the Siegels had repudiated that agreement by their May 9, 2002 and September 21, 2002 letters.  SGI ¶38.  DC's Third Counterclaim against the Siegels was for breach of contract, and its Fourth Counterclaim (on which it now moves) sought only declaratory relief as to the October 19, 2001 Letter.  SGI ¶¶39-40.

Judge Larson concluded on summary judgment that the parties had failed to reach an agreement, citing the "materially different" terms of the October 26, 2001 Letter and the "vastly different" terms of the February 1, 2002 Draft.  SGI ¶47.  This Court then entered a Rule 54(b) judgment, and both sides appealed.  SGI ¶¶48-49.

On March 6, 2012, Ms. Larson served a termination notice on DC regarding early Superman Ads, with an effective date of March 12, 2014.  SGI ¶63.

On January 10, 2013, the Circuit reversed Judge Larson's ruling, holding that the October 19, 2001 Letter constituted a valid acceptance of DC's offer sufficient to

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

form an agreement on October 19, 2001.  SGI ¶58.  The Circuit did not disturb Judge Larson's findings as to the "materially" and "vastly different" terms in DC's October 26, 2001 Letter and February 1, 2002 Draft, and remanded the case for further adjudication of DC's contract claims – its Third and Fourth Counterclaims.  SGI ¶59.

On January 29, 2013, DC, for the first time in 12 years, offered "to tender payment" to Ms. Larson under the October 19, 2001 Letter, subject to purported "rights of offset," rendering its offer illusory.  SGI ¶60.  DC also not provide the basis for its calculations, leaving it completely uncertain whether DC's tender complied with the complicated royalty scheme in the October 19, 2001 Letter.  SGI ¶61.  Troublingly, the amount of Superman royalties DC claimed it owed Ms. Larson in 2013, subject to DC's purported "rights of offset," was not much higher that what DC had testified was owed Ms. Larson seven years earlier in 2006.  SGI ¶62.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of identifying evidence demonstrating the absence of a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).  The "non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  The court must make all "credibility determinations" in favor of the nonmoving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## ARGUMENT

## I.   THE MANDATE DOES NOT SUPPORT PREMATURE JUDGMENT

DC's entire argument in support of judgment is premised on its outright misrepresentation that the Ninth Circuit "held" that "[Ms.] Larson … transferred any

1  copyrights that may have been recaptured to DC." Mot. at 1.

2      A plain reading of the opinion shows that the Circuit held no such thing. The

3  Circuit held only "that the October 19, 2001, letter did constitute … an acceptance"

4  and "was sufficient" to create a contract on that date. *Larson*, 2013 U.S. App. LEXIS

5  671, at *3. The Circuit did not interpret the contract, set forth its terms, determine if

6  the terms are enforceable, or even determine if the agreement is still in effect, as such

7  contract matters should be adjudicated in the first instance by a district court. *See*

8  *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 788 (9th Cir.

9  2008) (remanding case; "[b]ecause … factual issues exist with regard to the

10  contracts' interpretation, the district court is in a better position to 'make these

11  determination in the first instance'") (citation omitted). Accordingly, the Circuit

12  remanded to this Court for adjudication of DC's contract counterclaims.

13      DC admits that it specifically "ask[ed] the Ninth Circuit to enter judgment in

14  its favor on all claims in the *Siegel* Superman case" on the grounds it now asserts

15  here. Mot. at 4. In fact, DC expressly asked the Ninth Circuit "to enter judgment" in

16  its favor at least ***five*** times in its briefs. SGI ¶50.[1]

17      The Circuit was well aware of this request, and questioned DC about it. SGI

18  ¶51; AD, Ex. 19 at 344 (The Court: "[I]f that's correct, is this matter for trial rather

19  than summary judgment for you [DC]?"), 345-46 (The Court: "Judge Reinhardt was

20  asking you, 'Is there sufficient evidence [] for summary judgment in your favor?'").

21      Despite DC's clear requests and the Circuit's awareness of them, the Circuit

22  did ***not*** remand with instructions to enter judgment in DC's favor. Instead, it directed

23  this Court "to reconsider DC's third and fourth [contract] counterclaims in light of

24  our holding." *Larson*, 2013 U.S. App. LEXIS 671, at *6. In other words, the Circuit

---

26  [1] *See* AD, Ex. 16 at 230 (DC: "Marks' October 19, 2001, letter reflects a legally enforceable
agreement to resolve all claims at issue here"), 252 (DC: "This Court should grant judgment as a
27  matter of law on DC's settlement … counterclaims and dismiss the remainder of this appeal on that
basis."); Ex. 18 at 316 (DC: "Judgment should be entered in DC's favor, and the 2001 settlement
28  agreement should be enforced."), 318 (DC: "[The evidence] … justifies this Court entering
judgment in DC's favor."), 324 (DC: "The Court should enter judgment in DC's favor on its
settlement defense.").

remanded for further proceedings.  *See Doe v. State of Nebraska*, 2002 WL 225907, at *6 (D. Neb. Dec. 14, 2002) ("[T]he mandate issued in this case makes clear that some additional inquiry is necessary….  I see no other reason why the [] Circuit would remand this case 'for reconsideration in light of [opinion],'… if such analysis were not required.").

If the Circuit thought its ruling on the October 19, 2001 Letter disposed of DC's counterclaims, it would have said so.  *See Lancaster v. Tilton*, 2007 U.S. Dist. LEXIS 48403, at *9-10 (N.D. Cal. June 21, 2007) (rejecting argument about effect of a Circuit ruling because "[h]ad the court intended [that effect], it could have done so explicitly").  The fact that the Circuit instead "remand[ed] for further proceedings indicate[s] that [it] believed that there was more to do." *Edgerly v. City & County of San Francisco*, 2011 U.S. Dist. LEXIS 155192, at *7 (N.D. Cal. May 26, 2011)

And "there [is] indeed more to do." *Id.* at *8.  "'[A] mandate is controlling as to all matters within its compass, while leaving any issue not expressly or impliedly disposed of on appeal available for consideration by the trial court on remand.'" *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995) (quoting *Firth v. United States*, 554 F.2d 990, 993-94 (9th Cir. 1977)).

Thus, "when a court is confronted with issues that the remanding court never considered, the 'mandate requires respect for what the higher court decided, not what it did not decide.'" *Hall v. City of L.A.*, 697 F.3d 1059, 1067 (9th Cir. 2012).  "[A]ny issue not decided by the court of appeals may be addressed by the district court on remand, even if such issue varies or expands the scope of the original record." *Campanelli v. Bockrath*, 1997 U.S. Dist. LEXIS 7981, at *8 (N.D. Cal. June 4, 1997) (citing *Edlin v. M/V Truthseeker*, 69 F.3d 392, 393 (9th Cir. 1995)).

While the Circuit held that there was an agreement **on October 19, 2001**, the issue now is what, if anything, that means **today**.  As detailed below in Section II, there are a host of reasons under well-established contract law why the October 19, 2001 Letter is no longer enforceable based on DC's refusal to abide by it.  As DC's

1   own counsel told the Ninth Circuit, "[t]he question of whether the subsequent events

2   undid the prior agreement or didn't undo the prior agreement, that's a fact question"

3   that should not be decided on summary judgment.  SGI ¶55; AD, Ex. 19 at 345.

4        DC has not even attempted to show that it is entitled to summary judgment on

5   any of these critical issues, as they implicate numerous issues of material fact

6   precluding summary judgment in DC's favor.

7   **II.    ISSUES OF MATERIAL FACT PREVENT SUMMARY JUDGMENT**

8        **A.    <u>The October 19, 2001 Letter Did Not Transfer The Copyrights And</u>**

9               **<u>DC Is Not Entitled To A Declaration Of Rights To That Effect</u>**

10              **1.    The Letter's Language Does Not Support DC's Interpretation**

11       DC's motion requests a declaratory judgment that the October 19, 2001 Letter

12   actively "transferred" the Siegel's copyrights at the time the letter was signed.[2]  The

13   Ninth Circuit made no such ruling, as it is contrary to the Letter's plain language.

14       Under California contract law, "the interpretation of a contact must give effect

15   to … 'the mutual intention of the parties at the time the contract is formed.'"  *Waller*

16   *v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1636,

17   1639).  "When a contract is reduced to writing, the intention of the parties is to be

18   ascertained from the writing alone, if possible…."  Cal. Civ. Code § 1639.

19       Here, the October 19, 2001 Letter is plain.  The Siegel family agreed only that

20   it "***would*** transfer all of its rights in the 'Superman' properties."  SGI ¶6 (emph.

21   added).  At most, this shows an intent to transfer the copyrights at some future date.

22   "A mere promise to assign rights in the future is not an actual assignment…."  *SCO*

23   *Group, Inc. v. Novell, Inc.*, 2004 WL 4737297 (D. Utah June 9, 2004); *see Li'l Red*

24   *Barn, Inc. v. Red Barn Sys., Inc.*, 322 F. Supp. 98, 106-07 (N.D. Ind. 1970) ("The

25   wording of the contract here demonstrates clearly that neither of the parties intended

---

27  [2] *See* Dkt. 702 at 1 ("DC's Fourth Counterclaim … sought a declaration that the settlement
28  agreement was enforceable and that DC owns all of the Superman and Superboy copyright"); 702-5
(DC's Proposed Judgment) at 1 ("In the parties' October 19, 2001, settlement agreement, Larson …
"**transfer[red]** all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics.  This
complete transfer bars Larson's remaining claims….") (alterations in original) (emphasis added).

the reassignment to have any immediate legal effect."); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991) ("Although an agreement to assign in the future [patent rights] … may vest the promisee with equitable rights … such an agreement does not by itself vest legal title to [the rights] in the promise.").

DC admitted that the October 19, 2001 Letter provided that rights "would" be transferred in the future, not that they had already been transferred.  SGI ¶46.

The plain language of the October 19, 2001 Letter bars DC's interpretation that it actively "transferred" copyrights to DC.  It would be reversible error for this Court on summary judgment to contradict that plain language and declare that it did.  *See Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990) ("We decline to rewrite the clear terms of the contract.  When parties have … entered into an unambiguous contract courts will not write a new contract for them.").

## 2.     Any Ambiguity Must Be Resolved By The Trier Of Fact

DC may argue that the term "would transfer" is somehow susceptible to its interpretation.  If the Court accepts that the term "would" is ambiguous – as opposed to flatly contradicting DC's interpretation – summary judgment in DC's favor remains improper.  Words are ambiguous if they are "susceptible of more than one construction or interpretation."  *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981).  "What the parties intended by an ambiguous contract" is "a triable issue of fact." *Id.* at 619-20.  As a matter of contract law and civil procedure, "would transfer" cannot be read as "hereby transfers" on summary judgment against the non-movant.  *See Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 898 (9th Cir. 1993) ("[S]ummary judgment is improper because different views of the intent of parties will raise genuine issues of material fact.").

## 3.     The Circuit Did Not Hold That The Siegels Assigned Rights

In reply, DC will selectively quote the Circuit's opinion out of context as purported support for its argument that the October 19, 2001 Letter actively transferred rights.  DC has already alluded to such arguments, which misinterpret the

1  Circuit's decision.  Mot. at 7.  Ms. Larson argued on appeal that (a) the October 19,

2  2001 Letter was not a valid contract because it was not a writing signed by both

3  parties; and (b) the October 19, 2001 Letter did not comply with the Copyright Act's

4  writing requirement in § 204(a).  SGI ¶56.  In response, the Ninth Circuit held:

5      [U]nder California's statute of frauds**, *the only signature that is required is that of the party against whom a contract is sought to be enforced*.**
6      *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 149 Cal. App. 4th 333, 57 Cal. Rptr. 3d 1, 4-5 (Cal. Ct. App. 2007); *see also* 1 B.E. Witkin,
7      *Summary of California Law, Contracts* § 359 (10th ed. 2005).  ***Nor is 17 U.S.C. § 204(a) a bar to the validity of any such contract***; that statute
8      expressly permits an agreement transferring ownership of a copyright to be signed by a 'duly authorized agent' of the copyright owner, and Larson
9      does not contest that the heirs' attorney was such an agent.

10 *Larson*, 2013 U.S. App. LEXIS 671, at *5-6 (emphasis added).  Thus the Circuit

11 merely held that the statute of frauds and § 204(a)'s writing requirement is not "a bar

12 to the validity" of the October 19, 2001 Letter.  The Circuit did not determine that the

13 "would transfer" language of October 19, 2001 Letter actually transferred any rights,

14 and remanded such contract issues to this Court for adjudication in the first instance.

15      Tellingly, the Circuit held that because "a judgment on [the Third and Fourth

16 Counterclaims] in DC's favor *would* appear to render moot all of the other questions

17 in this lawsuit, we decline to address these other issues *at this time*." *Id.* at *6

18 (emphasis added).  If the Circuit had ruled, as DC claims, that Ms. Larson had

19 transferred all of her recaptured Superman copyrights to DC in the October 19, 2001

20 Letter, such "other issues" (*e.g.*, the "work for hire" issues on appeal that determine

21 which Superman works were subject to statutory termination) would already be

22 moot.  The Circuit's closing phrase "at this time" further indicates that these issues

23 are still in play pending adjudication of the contract issues remanded to this Court.

### 4.    A Judgment That The Siegels "Are" Obliged To Transfer Rights To DC Would Not Settle The Issue

26      In reply, DC may switch gears and argue for a declaration that Ms. Larson is

27 contractually obliged to transfer her recaptured copyrights. SGI ¶41.

28      However, a declaration that Ms. Larson is still obligated, under the October 19,

<u>2001 Letter, to transfer her Superman rights to DC is procedurally flawed and does little to resolve this matter</u>.  Courts recognize a clear distinction between a declaration of rights under a contract and specific performance, in which the court orders a party to perform.  *See Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 898 (2002) ("Unlike coercive relief (such as [] specific performance, or an injunction) … a declaratory judgment merely declares the legal relationship between the parties.").  Without an order of specific performance, DC would still not own the recaptured copyrights.  *See Barndt v. County of L.A.*, 211 Cal. App. 3d 397, 406 n.12 (1989) ("Plaintiff argues that even though specific performance may not be available here, he is entitled to litigate his cause of action for declaratory relief.  ….[T]hat remedy does not avail plaintiff anything….  [A] declaration of rights and liabilities under the settlement agreement would be inconsequential in the absence of any enforceable remedy.").  Mere declaratory relief is not a solution.  If affirmed, DC would still have to seek specific performance.  If reversed, all of the issues below would also remain to be litigated.  "Granting DC a premature judgment will only lead to problems on appeal and further delay a complete and final resolution of this case."  Dkt. 708 at 10.

## B.  DC Is Not Entitled To Specific Performance

DC may attempt on reply to seek specific performance – *i.e.*, an order that Ms. Larson must transfer her copyrights to DC – but that is procedurally defective.  DC failed to move on this ground, and cannot do so on reply.  *Abdulkhalik v. City of San Diego*, 2009 U.S. Dist. LEXIS 110062, at *33 (S.D. Cal. Nov. 25, 2009) ("The City failed to move for summary judgment on the [] claim in its initial motion.  Raising [this] for the first time in a reply brief is inappropriate and will not be considered by the Court."), citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).[3]

DC is also not entitled to specific performance.  Under California law,

---

[3] As a matter of due process, the Court would need to give "notice and a reasonable time to respond" to Ms. Larson before judgment could be entered on grounds "not raised" by DC.  Fed. R. Civ. P. 56(f); *see Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985) (noting that a *sua sponte* grant of summary judgment must meet "the requirements of the Federal Rules and the demands of due process").

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

"[s]pecific performance is not itself a cause of action, but rather ***a remedy for breach
of contract.***" *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 49
(1994) (emphasis added). *See also Katz v. Cal-Western Reconveyance Corp.*, 2010
U.S. Dist. LEXIS 98940, at *15 (N.D. Cal. Sept. 21, 2010) ("[S]pecific performance
is a remedy for breach of contract, a cause of action which requires proof the contract
was breached."). <u>A plaintiff seeking specific performance must therefore first prove
a **breach** of contract.</u> *Id.* <u>Instead, DC's motion affirmatively asks the Court to
"dismiss [] as moot" its Third Counterclaim for breach of contract.</u>  Dkt. 702-5 at 2.

Moreover, "[a] cause of action for breach of contract requires proof of the
following elements:  (1) existence of the contract; (2) plaintiff's performance or
excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a
result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239
(2008).  In addition to demonstrating these elements of breach, to establish a right to
specific performance DC must also show that "'(1) [the] terms are sufficiently
definite; (2) consideration is adequate; (3) there is substantial similarity of the
requested performance to the contractual terms; (4) there is mutuality of remedies;
and (5) plaintiff's legal remedy is inadequate.'" *Union Oil Co. of California v. Greka
Energy Corp.*, 165 Cal. App. 4th 129, 134 (2008) (quoting *Blackburn v. Charnley*,
117 Cal. App. 4th 758, 766 (2004)).

Here, the Circuit held only that a contract was formed on October 19, 2001.
DC's motion is entirely silent on the other three requirements for a breach of
contract, and the five requirements for specific performance[4] – for good reason.  It
cannot meet them as a matter of law and, in any event, they raise genuine issues of
material fact barring summary judgment in DC's favor.

---

[4] As DC did not address the elements of specific performance in its motion, Ms. Larson does not
fully address the "specific performance" elements here.  Among other factual issues presented by
such elements is whether DC's agreed payments were adequate consideration for the Siegels'
rights underlying the multi-billion-dollar "Superman" franchise. *See Walters v. Calderon*, 25 Cal. App.
3d 863, 875 (1972) ("[T]here is the further question of whether the consideration is adequate to
warrant the equitable relief requested" and that "the consideration must be equitably adequate.").

### 1.   DC Did Not Perform Or Even Offer To Perform

In order to show "performance" by DC sufficient to obtain "specific performance" from Ms. Larson, DC "must have (a) performed, (b) offered to have performed, or (c) proved a sufficient excuse for not performing, ***all*** the conditions required of [it] by the agreement." *Beverage v. Canton Pacer Mining Co.*, 43 Cal. 2d 769, 777 (1955) (emph. added); *see Ninety Nine Invest. v. Overseas Courier Service (Sing.) Priv.*, 113 Cal. App. 4th 1118, 1126 (2003) ("To obtain specific performance, [a plaintiff] must establish its own performance or excuse for nonperformance."); Cal. Civ. Code § 1439 (for specific performance a party "must fulfill all conditions precedent … and must be able and offer to fulfill all conditions concurrent").

DC indisputably did ***not*** perform or offer to perform "all" conditions required of it by the October 19, 2001 Letter.  For instance, DC agreed to provide the Siegels: (1) "[a] non-returnable, non-recoupable signing bonus of [$]1,000,000"; (2) "[a] non-returnable, but recoupable advance of $2,000,000"; (3) additional payments, starting with $500,000 on March 31, 2002; (4) royalty statements starting on March 31, 2002; (5) credit "By Special Arrangement with the Jerry Siegel Family" on all Superman publications starting October 19, 2001; and (6) medical and dental insurance.  SGI ¶6.  DC did ***none*** of this nor even offered to do it.  SGI ¶¶24, 32.  Instead, DC conditioned its performance on the new and revised terms, *all* in DC's favor, in its October 26, 2001 Letter and February 1, 2002 Draft, and tried to muscle the Siegels into changing the terms in the October 19, 2001 Letter.  SGI ¶¶8-24.

DC has claimed that it performed when it allegedly "negotiate[ed] for [the Siegels] to receive their credits on *Superman Returns* … and … set up a reserve account for … payments."  SGI ¶43.  This is highly disputed; the Siegels received no such credit and it appears that DC's "account" never existed.  SGI ¶¶45, 62.  Even if DC took these small steps, it would still fall far short of the necessary performance of "all" the conditions required of DC in the October 19, 2001 Letter.

Although DC subsequently alleged that it was ready and willing to tender

performance in 2001 (Dkt. 646 ¶99), DC never once actually "offered to … perform[]… all the conditions required." *Beverage*, 43 Cal. 2d at 777.  Indeed, it was not until January 29, **2013** that DC sent a letter purporting to "tender" performance under the October 19, 2001 Letter.  SGI ¶60.  This was eleven years too late.[5]  DC should have performed, or at least offered to perform, in 2001, or by **March 31, 2002**, its agreed payment and accounting deadline.  Instead, DC continued to grind the Siegels and act as though it were not bound by the October 19, 2001 Letter.

DC's rushed motion does not even address, let alone "prove [] a sufficient excuse" for, its nonperformance.  *Beverage*, 43 Cal. 2d 769, 777.  DC's motion must be denied.  *See Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP*, 593 F. Supp. 2d 1153, 1161 (S.D. Cal. 2008) ("[T]o obtain a summary judgment, the moving party must offer evidence sufficient to support a finding upon *every element* of his … claim.") (quotations/citations omitted); *Dobson v. Twin City Fire Ins. Co.*, 2012 U.S. Dist. LEXIS 93823, at *16 (C.D. Cal. July 5, 2012) (denying summary judgment where plaintiff failed to show performance or excuse for nonperformance).

## 2.    The Failure To Complete A Long-Form Agreement Did Not Excuse DC's Non-Performance

DC represented to the Circuit that the only terms are those contained in October 19, 2001 Letter.  SGI ¶¶52-53; AD, Ex. 19 at 346:23-347:1 (DC: "Our position is [the terms are] everything in this letter, nothing more.").  DC thus cannot argue that its performance (*e.g.*, payment by the March 31, 2002 deadline, credit on publications after October 19, 2001) was conditioned on a "long-form" agreement because that condition appears nowhere in the October 19, 2001 Letter.  The Circuit held that the October 19, 2001 Letter was sufficient to constitute an agreement, citing *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011), which held a short-form agreement was binding even though "everyone understood

---

[5] Even DC's January 29, 2013 letter and subsequent letters continued to hedge and leverage DC's position, as it did not provide the royalty "accounting" required to determine if DC was complying with the royalty scheme in the October 19, 2001 Letter, and DC asserted an unlimited right to "offset" its claims against the amounts owed pursuant to the October 19, 2001 Letter.  SGI ¶¶60-61.

that some material aspects of the deal would be papered later." Thus, when a "long-form" agreement was not consummated within a reasonable time or by March 31, 2002, DC was obliged under the October 19, 2001 Letter to at least tender performance in exchange for the Siegels' performance, but never did.

Even if a "long-form" was somehow construed as a condition precedent to DC's obligations, contrary to *Facebook*, DC frustrated that condition precedent by its concerted delay (waiting 3 ½ months to provide its draft, SGI ¶18) and failure to negotiate the long-form in good faith. SGI ¶¶6-28. *See City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 508 (2008) ("A party to a contract may not avail itself of a condition precedent where by its own conduct it has rendered compliance therewith impossible.") (quotation omitted).

### 3.     The Siegels Did Not Breach The Letter

DC has pled that it did not perform because the Siegels supposedly breached the October 19, 2001 Letter first. SGI ¶38. This raises a whole host of disputed factual issues as to who did what and when, and whose performance was thereafter excused. As detailed below, the Siegels did not breach the October 19, 2001 Letter because their performance was excused by (a) DC's anticipatory breach, (b) DC's actual breach, (c) the Siegels' warranted rescission based on DC's anticipatory and actual breach, and (d) DC's acquiescence or abandonment of any agreement.

### a.     DC's Anticipatory Breach/Repudiation

Under California law, once a party anticipatorily breaches or repudiates a contract, the other party "is no longer bound by the contract" and need not perform. *Ferguson v. City of Cathedral City*, 197 Cal. App. 4th 1161, 1169 (2011) (quotations omitted); *see Local 659, I.A.T.S.E. v. Color Corp. of America*, 47 Cal. 2d 189, 198 (1956) ("A repudiation of a contract … excuses performance."). A party repudiates an agreement if, like DC, it attempts to change or add new terms to the agreement. *See Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 467 (2010) ("Annexing an unwarranted condition to an offer of

performance is a refusal to perform."); *Loop Building Co. v. De Coo*, 97 Cal. App. 354, 364 (1929) ("If one who is bound to perform a contract annexes an unwarranted condition to his offer of performance, there is, in effect, a refusal to perform.").

Here, Marks' October 19, 2001 Letter listed the specific terms of the agreement.  SGI ¶6.  As DC admitted before the Ninth Circuit, these were the *only* terms that the parties had agreed to.  SGI ¶52; AD, Ex. 19 at 346:23-347:1 (DC: "Our position is [the terms are] everything in this letter, nothing more.").  The October 19, 2001 Letter should have ended the matter.  Had DC acted in good faith, confirmed that the terms were those that the parties had agreed upon, obeyed its terms, and adapted the letter into a simple agreement for signature, there would be no dispute.

However, DC refused to do this or abide by the deal.  As Marks testified, Judge Larson ruled, and the Ninth Circuit did not dispute, Schulman's "more fulsome outline" of the parties' agreement in his October 26, 2001 Letter contained numerous terms that were materially different from the October 19, 2001 Letter.  SGI ¶¶8-16, 47.  *See Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 895 (9th Cir. 1969) ("If the offeror is not asserting a good faith interpretation of the contract terms, that fact may be evidence that he is repudiating the agreement.").  Schulman's outline expanded the agreement to require the Siegels to assign additional copyrights to DC, added numerous reductions to the Siegels' royalty, changed when and where credit would be given to the Siegels, and tacked on a host of new warranty and indemnification provisions.  SGI ¶¶8-16.

DC now backtracks, arguing that "[t]o the extent that Mr. Shulman's [October 26, 2001] letter is perceived to have added terms or suggested new terms, they're not part of the deal."  SGI ¶53; AD, Ex. 19 at 347:1-4.

But at the time, DC doubled down and insisted on even more favorable terms.  As Marks testified and Judge Larson ruled, DC's February 1, 2002 Draft was not just different from the October 19, 2001 Letter, it was "*vastly* different."  SGI ¶¶19-21.  DC attempted to reduce the Siegels' royalty even further, and expanded the instances

17

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

in which the Siegels would receive no royalty payments at all.  SGI ¶21.  Marks also testified in detail about the draft's deceptive accounting "trap doors."  *Id.*  When the Siegels duly objected, DC falsely insisted that its February 1, 2002 Draft "accurately represented the agreement previously reached."  SGI ¶26.

As with the October 26, 2001 Letter, DC now disavows the February 1, 2002 Draft and says the opposite.  SGI ¶54; AD, Ex. 16 at 239 ("[E]ven if the February 2002 draft included different terms, it is the new terms that would be unenforceable, not the October 19 terms."), 240 ("The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers.").

Notwithstanding DC's current self-serving spin, in 2001-02, when it mattered, DC did not accept the terms of the October 19, 2001 Letter.  Instead, it repudiated them by demanding "terms different from the original contract" and/or insisting that the contract's "meaning or legal effect [were] different … from the true meaning or effect."  *Darling Int'l, Inc. Baywood Partners, Inc.*, 2007 U.S. Dist. LEXIS 50985, at *85 (N.D. Cal. July 13, 2007) (quotations omitted).  *See Johnson v. Goldberg*, 130 Cal. App. 2d 571, 576 (1955) ("Annexing an unwarranted condition to an offer of performance is a refusal to perform, making tender and demand by the other party unnecessary."); *Mammoth Lakes Land Acquisition, LLC,* 191 Cal. App. at 467 (same); *Loop Building Co.,* 97 Cal. App. at 364 (same).

The cold hard truth is that DC did not once indicate a willingness to be bound by or perform under the October 19, 2001 Letter until over *three years* later in an effort to thwart the Siegels' suit to enforce their statutory terminations.  This is too little, too late, because Ms. Larson already acted on DC's repudiation of the October 19, 2001 Letter when she ended negotiations and filed suit.  *See Freedman v. St. Matthias Parish*, 37 Cal. 2d 16, 19 (1951) (holding a "repudiation…if acted upon by defendant before it was retracted, would excuse performance on defendant's part and make plaintiff's repudiation a total breach of contract"); *Pichignau v. Paris*, 264 Cal. App. 2d 138, 141-42 (1968) (if a party "desires to retract his repudiation and restore

the agreement to its former vigor, the action must be taken *before* the other party has changed his position") (emphasis added).  Viewed in the light most favorable to Ms. Larson, DC's October 26, 2001 Letter and February 1, 2002 Draft were clear repudiations of the October 19, 2001 Letter.  *See Pacific Coast Engineering Co.*, 411 F.2d at 894 ("In each case, it is a question of fact whether or not a party has committed an anticipatory breach by repudiating the contract.").

<blockquote>b.  <u>DC's Actual Breach</u></blockquote>

After DC anticipatorily breached, it did not retract its "outline" or "draft," nor honor the October 19, 2001 Letter.  Instead, DC proceeded to actually breach its promises.  The October 19, 2001 Letter made it clear that DC would pay an annual guarantee of $500,000 on March 31, 2002 for the year 2002-03.  SGI ¶6.  DC's October 26, 2001 Letter and the February 1, 2002 Draft said the same thing.  SGI ¶¶17, 23.  The October 19, 2001 Letter also required DC to provide the Siegels with a royalty accounting on March 31, 2002 (and additional payment to the extent the royalty exceeded DC's advance payments).  SGI ¶6.  DC did not pay or even offer to pay that $500,000, nor did it provide a royalty accounting to the Siegels, on March 31, 2002, materially breaching DC's agreement.  SGI ¶¶24, 32.  The October 19, 2001 Letter also required DC to give the Siegel family credit on all subsequent Superman publications, which DC did not do or offer to do.  SGI ¶¶6, 32.

DC's breach of the October 19, 2001 Letter prevents DC from proving its own performance – an essential element of its claims.  *See Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011) ("When a party's failure to perform a contract obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."); *Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d 169, 187 (1961) (noting "substantial performance" is required for breach of contract claim; "[w]hat constitutes substantial performance is a question of fact, but it is essential that there be no willful departure from the terms of the contract.").

In addition, DC promised to make two other payments under the October 19,

2001 agreement – a $1 million "signing bonus" and a $2 million recoupable advance for the period beginning January 1, 2000.  SGI ¶6.  Under Cal. Civ. Code § 1657, "[i]f the act is in its nature capable of being done instantly – as, for example, if it consists in the payment of money only  –  it must be performed immediately upon the thing to be done being exactly ascertained."  The $1 million "signing bonus" should have thus been paid "immediately" after the October 19, 2001 agreement was signed, and DC's non-performance breached its promise to pay.

As to the $2 million advance, under California law, "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." Cal. Civ. Code §1657.  It would not make sense to pay a $500,000 "annual guarantee" on March 31, 2002 for 2002-03, before paying a $2 million "advance" designed to cover the period beginning January 1, 2000.  The "reasonable time" to pay the $2 million was prior to March 31, 2002, and DC breached this term as well.

Actions speak louder than words:  whatever DC says now, it did not consider the October 19, 2001 Letter enforceable when the time came for *DC* to perform in 2002.  Instead, DC simply breached, and such breaches preclude DC's current after-the-fact efforts to enforce the October 19, 2001 Letter against Ms. Larson.

c.   The Siegels' Rescission

Under California law, one party may rescind a contract if the other refuses or fails to fully perform.  *See* Cal. Civ. Code § 1689(b) (rescission permitted if performance "fails in a material respect from any cause"); *Loop Bldg. Co.*, 97 Cal. App. at 364 ("A refusal or failure of a party fully to perform his part of the contract … gives the other party a right to rescind.").  The rescinding party need only give "notice" to the other party.  Cal. Civ. Code § 1691.  The notice need not be "formal and explicit;" it must simply "show[] the intention of the person rescinding to consider the contract at an end." *Hull v. Ray*, 211 Cal. 164, 167 (1930).

DC failed to perform or offer to perform, and implicitly conditioned its performance on the Siegels' acceptance of DC's new terms, giving the Siegels a right

to rescind.  *See U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 339 (9th Cir. 1974) ("[R]escission is justified where there is either an extended and unreasonable delay [or] imposition of new and onerous conditions to payment…."); *Rubin v. Fuchs*, 1 Cal. 3d 50, 53 (1969) (defendants were "entitled to, and did, rescind the contract" because plaintiff did not make payment under contract).

For instance, DC failed to provide a royalty statement to the Siegels by March 31, 2001, as agreed in the October 19, 2001 Letter, and failed to pay or offer to pay the Siegels their royalties.  It is well-settled that a breach of the royalty provisions in a copyright contract can give rise to a right of rescission.  *See Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335 (9th Cir. 1990) (holding there was no "triable issue of fact" that plaintiff had right to rescind where "although [defendant] made sporadic payments, they never complied with the royalty and accounting requirements" of copyright agreement); *Irwin v. American Interactive Media*, 1994 U.S. Dist. LEXIS 16223, at *17-19 (C.D. Cal. Apr. 14, 1994) (holding there was "a triable issue of fact as to whether Defendants' failure to pay [$2,000] … constituted a material breach of the [copyright] license entitling Plaintiff to revocation" of license).

Joanne Siegel properly invoked her right of rescission and provided DC with notice in a letter she sent on May 9, 2002:

> ….  Negotiations dragged on for four difficult years.  We made painful concessions assured if we did we would arrive at an agreement. When we made these difficult concessions and reluctantly accepted [DC's] last proposal [on October 19, 2001]…we were stabbed in the back by a shocking contract.
> Your company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the [October 16] proposal.  ….
> After four years we have no deal and this [February 1] contract makes an agreement impossible.

SGI ¶25.  *See Wilson v. Lewis*, 106 Cal. App. 3d 802, 809 (1980) ("[I]f facts exist that justify a rescission by one party, and he declares a rescission in some effectual manner, he terminates the contract."); *Jaunich v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 647 F. Supp. 209, 215–16 (N.D.Cal.1986) (affirming valid rescission

sent three months after learning basis for rescission); Cal. Civ. Code § 1693. The Siegels' September 21, 2002 letter confirmed their rescission by "formal notification that we are totally stopping and ending all negotiations with DC." SGI ¶29.

At a minimum, this raises genuine issues of material fact that cannot be decided on DC's perfunctory motion. *See Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.*, 822 F.2d 833, 840 (9th Cir. 1987) ("Whether a breach … [is] sufficient to be deemed material and thus to warrant rescission … is a question of fact properly determined by the trial court."); *Hil-Mac Corp. v. Mendo Wood Products, Inc.*, 235 Cal. App. 2d 526, 530 (1965) ("The determination of whether a party entitled to rescind a contract has [rescinded] … depends upon the particular facts of each case. The question is one of fact, to be resolved in the first instance by the trier of fact….").

### d.   DC's Acquiescence and Abandonment

After Joanne Siegel sent her May 9, 2002 letter rescinding the October 19, 2001 Letter due to DC's breach (SGI ¶25), DC acquiesced. DC's May 21, 2002 letter in response did ***not*** argue that the Siegels were in breach or had otherwise acted improperly (SGI ¶28), nor did DC claim any rights under the October 19, 2001 Letter. SGI ¶33; *see Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers* 192 Cal. App. 2d 268, 279-280 (1961) ("It is well settled that an abandonment of a contract may be implied from the acts of the parties and this may be accomplished by the repudiation of the contract by one of the parties and by the acquiescence of the other party….") (citations omitted); *Griffin v. Beresa, Inc.*, 143 Cal. App. 2d 299, 301 (1956) ("[A]bandonment of a contract … may be accomplished by the repudiation of the contract by one of the parties and the acquiescence of the other party in such repudiation....").

After the Siegels' September 21, 2002 letter providing "formal notification" that they were "totally stopping and ending all negotiations" (SGI ¶29), DC again did *absolutely nothing*. DC did not assert that it owned the Siegels' recaptured copyrights pursuant to the October 19, 2001 Letter or say anything about the October

19, 2001 Letter.  SGI ¶33; *see McCreary v. Mercury Lumber Distributors*, 124 Cal. App. 2d 477, 486 (1957) (holding that "acquiescence is shown … by the absence of a showing that [the plaintiff] claimed any further rights under the old contract prior to the commencement of the subject action").

Then, in 2003-04, DC simply recommenced negotiations with the Siegels, further acquiescing in their rescission.  SGI ¶31; *see McCreary*, 124 Cal. App. at 486 ("Acquiescence is shown by the negotiations for a new contract."); *Freeman v. Mostafavi*, 2005 Cal. App. Unpub. LEXIS 10154, at *24 (Cal. App. 2d Dist. Nov. 8, 2005) ("Rescission may be implied from … the negotiation of a new and different contract regarding the same subject matter."); *Honda v. Reed*, 156 Cal. App. 2d 536, 539 (1958) ("Abandonment … may be implied from … negotiating for a new and different contract concerning the same property or subject matter.").

DC's behavior over this three-year period (2001-04) – when it acted as though there were no binding agreement, recommenced negotiations, and never claimed rights – raises genuine issues of material fact as to acquiescence that cannot be properly decided now.  *See Daugherty Co. v. Kimberly-Clark Corp.*, 14 Cal. App. 3d 151, 155 (1971) ("conflict of facts" prevented summary judgment on acquiescence).

## III.   FEDERAL COPYRIGHT LAW PREVENTS SUMMARY JUDGMENT AS TO SUPERBOY AND THE SUPERMAN ADS

To the extent DC's motion seeks the transfer of Ms. Larson's copyrights to Superboy recaptured by her 2002 termination notice, or the early Superman Ads[6] to be recaptured by her 2012 termination (not pled), it is barred by the Copyright Act. When Congress created the termination right, it expressly provided that authors and heirs cannot anticipatorily re-grant their copyrights; rather, they can only re-grant their copyrights back to the terminated grantee "***after the notice of termination has been served***." 17 U.S.C. 304(c)(6)(D) (emphasis added).

DC's assertion that the October 19, 2001 Letter transferred the copyrights to

---

[6] DC concedes that these Ads, "in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features" and grant a copyright interest in such elements.  SGI ¶57.

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

1  Superboy is a legal impossibility.  The Superboy termination notice was not served

2  until November 8, **2002,** and not effective until November 17, **2004**; the Ads

3  termination notice was not served until 2012, and does not take effect until 2014.

4  SGI ¶¶30, 63.  The October 19, 2001 Letter, as a matter of law, could not have re-

5  granted these copyrights years before the notices were served.

6          Nor can the October 19, 2001 Letter be read to waive, settle or release the

7  Siegels' termination right or termination interest regarding Superboy or the Ads.  In a

8  further effort to protect authors and their heirs from publishers' superior bargaining

9  power, Congress made the termination right "inalienable."  *N.Y. Times v. Tasini*, 533

10 U.S. 483, 496 (2001) (emphasizing the "inalienable" right "to revoke a copyright

11 transfer").  Congress was explicit that "[t]ermination of the grant may be effected

12 notwithstanding any agreement to the contrary, including an agreement to make a

13 will or to make any future grant."  17 U.S.C. § 304(c)(5).  Thus to the extent DC

14 argues that the October 19, 2001 Letter settled Ms. Larson's termination right as to

15 Superboy or the Ads, it is unenforceable.  *See Marvel Characters v. Simon*, 310 F.3d

16 280, 291 (2d Cir. 2002) (to the extent settlement agreement characterized works as

17 non-terminable "works for hire" it is void as "agreement to the contrary").

18         DC will likely attempt to circumvent the Copyright Act's protections by

19 arguing that the October 19, 2001 Letter somehow revoked Jerome Siegels'

20 venerable pre-1978 copyrights grants and simultaneously re-granted his original

21 copyrights to DC.  *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1044-46 (9th

22 Cir. 2005); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 982 (9th Cir. 2008).

23         However, in light of Congress' clear objectives, the Ninth Circuit has made

24 plain that any such "revocation and re-grant" must be "express."  *Milne*, 430 F.3d at

25 1040; *Mewborn*, 532 F.3d at 989.  Here, nothing in the October 19, 2001 Letter even

26 suggests, let alone expressly states, that the parties intended to revoke Jerome

27 Siegel's copyright grants and to re-grant his copyrights.  SGI ¶¶6, 52-53; AD, Ex. 19

28 at 346:23-347:1 (DC: "Our position is [the terms are] everything in this [October 19]

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

letter, nothing more."). The letter simply states: "The Siegel Family would transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy')." SGI ¶6. There is no mention of revocation and without a clear and unequivocal revocation the Siegels had no Superboy rights to transfer to DC in 2001 (prior to their 2002 termination), as DC has owned Superboy since 1948. *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1119 (C.D. Cal. 2007).

Tellingly, while the October 19, 2001 Letter contains no language of revocation or regrant (SGI ¶6), Schulman's October 26, 2001 outline and DC's February 1, 2002 draft both do. SGI ¶¶11, 22. This hurts DC, more than helps. The Siegels unequivocally rejected DC's new terms. SGI ¶25. And DC concedes that "[t]o the extent that [the October 26, 2001] letter is perceived to have added terms or suggested new terms, they're not part of the deal." AD, Ex. 19 at 347:1-4; *see also* AD, Ex. 18 at 316 ("If any material difference does exist, DC has long agreed: the October 19 letter controls."). In short, the relief DC seeks cannot end the *Siegel* Superboy case (C.D. Cal. Case No. 04-CV-08776) because the October 19, 2001 Letter could not anticipatorily settle or "transfer" the Siegels' Superboy termination interest until *after* the Superboy termination was served on November 8, 2002.

## CONCLUSION

DC's groundless motion for summary judgment must be denied.

Dated: March 4, 2013           RESPECTFULLY SUBMITTED,
                                /s/ Marc Toberoff
                                _____
                                TOBEROFF & ASSOCIATES, P.C.
                                Attorneys for Plaintiff, Laura Siegel Larson

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT