1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@toberoffandassociates.com*
2  Keith G. Adams (State Bar No. 240497)
    *kadams@toberoffandassociates.com*
3  Pablo D. Arredondo (State Bar No. 241142)
    *parredondo@toberoffandassociates.com*
4  David Harris (State Bar No. 255557)
    *dharris@toberoffandassociates.com*
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:   (310) 246-3333
7  Fax:         (310) 246-3101

8  Attorneys for Plaintiff-Counterclaim
   Defendant, Laura Siegel Larson,
9  individually and as personal representative
   of the Estate of Joanne Siegel

10

              **UNITED STATES DISTRICT COURT**

11

       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | Case No: CV 04-8400 ODW (RZx)* Case No: CV 04-8776 ODW (RZx)* Hon. Otis D. Wright II, U.S.D.J. Hon. Ralph Zarefsky, U.S.M.J. **PLAINTIFF'S STATEMENT OF GENUINE ISSUES AND ADDITIONAL FACTS RE: DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL* SUPERMAN AND SUPERBOY CASES** *Opposition Brief and Declaration of Keith Adams filed concurrently* Date:    March 25, 2013* Time:    1:30 p.m.* Place:   Courtroom 11* *:  The Court has stated that it will take the motion(s) under submission and hold a hearing if necessary.  Dkt. 707.  Docket citations herein are to Case No. 04-CV-08400. |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

| | DC's Alleged Uncontroverted Fact | Plaintiff's Response |
|---|---|---|
| 1 | **DC's Fact:**  The agreement set forth in Kevin Marks' October 19, 2001, letter to John Schulman states:<br><br>"The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property….<br><br>The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics<br><br>**DC's Evidence:** Declaration of Daniel M. Petrocelli, Ex. B at 19, 21; *Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241 at *1-2 (9th Cir. Jan 10, 2013). | **Undisputed** that Kevin Marks sent a letter to John Schulman on October 19, 2001 containing the quoted language.<br><br>**Disputed** to the extent Warner argues that the October 19, 2001 letter transferred Ms. Larson's copyright interests in Superman or that Ms. Larson is obligated today to transfer such copyright. |

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

| | | Plaintiff's Additional Statement of Fact | Plaintiff's Evidence |
|---|---|---|---|
| | **2** | In 1997, Joanne Siegel and Laura Siegel Larson (the "Siegels") served notices of termination pursuant to the Copyright Act as to Jerome Siegel's Superman copyright grants to DC Comics ("DC"). | Dkt. 646 (DC's Second Amended Counterclaims; "Counterclaims") ¶¶42-43 |
| | **3** | In 1999, the Siegels and DC entered into formal negotiations, in which the Siegels were represented by attorney Kevin Marks and DC by Warner's then-General Counsel, John Schulman | Counterclaims ¶51; Dkt. 656 (Plaintiff's Answer to DC's Second Amended Counterclaims ("Answer") at ¶51 |
| | **4** | On October 16, 2001, DC made a settlement offer to the Siegels. | Declaration of Keith Adams ("AD") Ex. 1 at 4-9 |
| | **5** | On October 19, 2001, Mr. Marks sent a "term sheet," in letter form, to Mr. Schulman (the "October 19, 2001 Letter") | AD Ex. 1 at 4-9 |
| | **6** | The October 19, 2001 Letter sets forth the terms of the parties' agreement and states in relevant part as follows:<br><br>Dear John:<br><br>This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in | AD Ex. 1 at 4-9 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | respect of the "Superman" and "Spectre" properties. The terms are as follows: | |

A. <u>Definitions.</u>

1.  "The Property" means all Superman, Sueprboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

2.  "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

B. <u>Financial Terms.</u>

1.  A non-returnable, but recoupable advance of $2,000,000.

2.  A non-returnable, non-recoupable signing bonus of 1,000,000.

3.  D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.  There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| 1 | | | |

5. A royalty of 6% of Superman/Spectre Gross Revenues.  This applies Pwithout limitation) to the use of the entire Property, including the so-called superman library, in any and all media now or hereafter known (Excluding DC Comics publications), in or on merchandise and in promotional campaigns.  This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragrah C(10).  This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Sueprfriends" and "superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. comic's characters and Looney Toones characters).

6. A royalty of 1% of the cover price of DC Comics' publications.  This royalty applies when the Property is used alone, and will be adjusted pro-rate when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7. Recoupment begins as of January 1, 2000.

…

C. Other Terms.

1. The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2. If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | be applicable against the compensation (if any) for a future transfer. This would <u>not</u> result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgment, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel family under this deal.<br><br>3.  Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.<br><br>4.  D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.<br><br>5.  The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).<br><br>…<br><br>8.  D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000. | |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | Plaintiff's Additional Statement of Fact | Plaintiff's Evidence |
|---|---|---|

9.  DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.  Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the Lois & Clark" television program deal, the WB television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products.  There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors.  D.C. would also include in the "safe harbors" the Salking or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% of the original rights deal.

11.  At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.  The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13. Siegel Family would not make any warranties as to the nature of rights, but would represent that they have no transferred the rights to any party.  The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C.

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | Comics.  D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.<br><br>14.  Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for D.C. or affiliate actions.<br><br>It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal. | |
| | 7 | The parties intended the terms of the October 19, 2001 Letter to be transposed into an agreement format for signature by the parties. | AD Ex. 2 at 10; Ex. 10 at 115:21-116:1 |
| | 8 | On October 26, 2001, Mr. Schulman sent a letter to Mr. Marks, in which he enclosed a supposedly "more fulsome outline" of deal terms (the "October 26, 2001 Letter"). The letter stated in relevant part:<br><br>Dear Kevin:<br><br>I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road.<br><br>I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.<br><br>Thank you.<br><br>…<br><br>Transfer<br>• Regrant, grant, etc.<br>• 100% of rights, wherever created, arising out | AD Ex. 2 at 10-17 |

7

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public<br>• 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties – even if not created for DC Comics<br>• All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")<br>• In perpetuity and worldwide<br>• Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact<br>• Siegels warrant and represent no termination nor any rights remaining except for rights under this agreement and the written agreement to include various provision to ensure same (jointly and severally)<br>• Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)<br>• Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)<br>• Give copy of all documents relating to rights/history<br>• Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)<br>• Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual). Right to use J. Siegel bio and photos in publicity, etc., re property.<br>• The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, | |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|

interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

Initial Payment
- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

Annual Payment (Advance)
- $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
- Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
- Terminate when Action #1 US copyright terminates

Widows Benefits (not assignable or transferrable)
- $135,000/year
- Payable for Joanne's life, personal,
- Paid as now
- Medical, comparable to past, for life

Royalty
- Commencing for revenue received on or after 1/1/00
- All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year or payment
- 6% of DC's receipts from all Media licenses for use of the Properties, except:
1)  with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%
2)  with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|

Heroes), the 6% shall be reduced to 1.5%.

- 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketing in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

2) with respect to licensees which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends Super Heroes), the 6% shall be reduced to 1.5%

3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|

1

2   • 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered

3   based on the Properties when one of the characters that comprise the Properties shall be

4   the title of the publication (e.g., Superman) or shall be the title of all the features within the

5   publication (e.g., Action Comics containing only Superman stories)

6   1) with respect to publications which are based

7   on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

8   2) there will be no reduction of the royalties payable hereunder for the appearance of

9   characters from other properties in publications or stories based on the Properties when those

10  other characters do not appear in the title of the publication or feature in question

11  3) there will be no royalties payable hereunder

12  when the Properties appear in publication or stories based on other properties and the

13  Properties characters do not appear in the title of the publication or feature in question

14  • [section moved to above] Ceases when US copyright Action #1 ceases, except on motion

15  pictures released in last five years before end of term, which shall earn royalty for five years

16  from release and TV series, which shall earn royalty for three years from last initial TV

17  broadcast of consecutive years of original

18  episodes, even if goes beyond term of copyright of Action #1.

19

20  **Payment**
    All monies due the Siegels hereunder, except

21  widow's benefit, shall be paid in following manner:

22      47.5% Joanne Siegel
        23.75% Laura Siegel Larson

23      23.75% Michael Siegel
        5.00% Gang Tyre Ramer & Brown

24  Notwithstanding the foregoing, each of the first three listed above may designate one or more

25  persons to receive monies due him or her to up to three such persons. Such designations (who

26  sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against

27  DC Comics.

28  Advise (Non-assignable or transferrable; subject

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | to confidentiality) | |

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing TV series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.)
Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions. | |

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals with fall outside the safe harbors.

Safe Harbors for Intercompany Deals
- Salkind (Motion Pictures)
- Lois & Clark (TV)
- WB Television Animation Deal
- Merchandising representation practice

Expedited Dispute Resolution (Any claims between the parties)
- Arbitration
- Compensation damages only to Siegels
- No injunction against DC/WB breaches, no termination of rights, no reversion
- DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

Medical Coverage/Son & Daughter (Grandsons only through minority) (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

Release and covenant not to sue by Siegels

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | • Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)<br>• Approve all deals made before 12/31/00<br><br>Miscellaneous<br>• Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels; if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]<br>• Siegels defend and indemnify re third party claims<br>• Siegels defend and indemnify re Dennis claim<br>• Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign<br>• DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts<br>• Siegels to refer all inquiries relating in any way to Properties to DC/WB.<br>• At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d. | |
| 9 | | The October 26, 2001 Letter was sent when Mr. Marks was in China for an extended period; he did not return until late November 2001, and it was not forwarded to the Siegels. | AD Ex. 10 at 104:9-22; Ex. 9 at 97:22-98:13 |
| 10 | | There were material differences between the October 19, 2001 Letter and the October 26, 2001 Letter, all to DC's benefit and the Siegels' detriment. | *Compare* AD Ex. 1 to Ex. 2; *Siegel v. Warner Bros. Entertainment, Inc.,* |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | | 542 F. Supp. 2d 1908, 1137-39 (C.D. Cal. 2008) |
| | 11 | The October 26, 2001 Letter contemplates a "regrant" of the Siegels' rights. | AD Ex. 2 at 11 |
| | 12 | Marks testified to the material differences between the October 19, 2001 Letter and the October 26, 2001 Letter. | AD Ex. 10 at 107:4-116:1 |
| | 13 | The October 26, 2001 Letter required the Siegels to assign additional copyrights to DC.  As Marks testified:<br><br>I know that one area of difference [between the terms of the October 19, 2001 Letter and the terms of Schulman's October 26, 2001 Letter] was the scope of the rights granted.  In my letter it referred to – very specifically to the Superman property and the Spectre property.  That's what we had been talking about the whole time of our negotiations going back to the first meeting in 2 – 1999.  And, of course, as you see here, the consideration, at least as set forth in my letter, for that matter I guess in John's letter, is based on revenue from the Superman and Spectre properties, yet John's letter referred more generally to all properties authored by Siegel for DC Comics and was not limited to the Superman and Spectre properties that we had been talking about. | *Compare* AD Ex. 1 *with* Ex. 2; Ex. 10 at 107:16-108:4 |
| | 14 | The October 26, 2001 Letter reduced the Siegels' royalty in many instances.  At Marks testified:<br><br>I recall in [Schulman's October 26, 2001 Letter] new terms concerning how the royalty could be reduced.  My understanding of our agreement, what I set forth in the October 19th letter, was that on media and merchandising licenses the royalty was 6 percent.  If the other DC Comics | *Compare* AD Ex. 1 to Ex. 2; Ex. 10 at 110:4-111:12 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | characters appeared in the media program or in licensing or merchandising, that royalty could be reduced to a floor of 3 percent.<br><br>…<br><br>[In the October 26th letter the] categories where the 3 percent can be further reduced are broadened. | |
| | 15 | The October 26 Letter changed when and where credit would be given to the Siegel family.  As Marks testified:<br><br>In terms of the credit to be accorded Siegel and Shuster, which was a point that I had as my point C.4, a point that I thought had long been agreed, that there would be a credit in paid ads of motion pictures, which is certainly in my experience is something that's very important to clients.  They want to see credit in the full-page ads in newspapers and posters, movie theaters and the like, and John's [October 26, 2001] letter provided for credit on screen only and not in paid ads. | *Compare* AD Ex. 1 to Ex. 2; Ex. 10 at 113:12-20 |
| | 16 | The October 26 Letter added numerous warranty and indemnity provisions found nowhere in the October 19, 2001 Letter.  As Marks testified:<br><br>Another area where [Schulman's October 26, 2001 Letter] differed involved warranties and representations and, in turn, indemnities. If you recall, we spoke earlier about the view that the only warranty and representation the Siegel family would make would be that they have not transferred rights to any other party, and in John's letter there are broader warranties than that, warranties that go beyond that.<br><br>…<br><br>John's warranties go beyond that, and so too in his letter he would have the Siegels indemnifying for areas that were not agreed and, | *Compare* AD Ex. 1 to Ex. 2; Ex. 10 at 108:4-19 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | indeed, not event discussed.  So there's broader warranties and representations and, as a result, broader indemnities. And in fact there are additional indemnities added; for example, indemnifying for any claims brought by Dennis Larson. | |
| **17** | The October 26, 2001 Letter confirmed the "Annual Payment (Advance)" of "$500,000 per year for ten years, commencing 2002, payable 3/31 of year," *i.e.*, beginning March 31, 2002. | AD Ex. 2 at 14 |
| **18** | On February 1, 2002, DC's outside counsel sent Mr. Marks a draft long-form agreement (the "February 1, 2002 Draft"). | AD Ex. 3 |
| **19** | There were vast differences between the October 19, 2001 Letter and the February 1, 2002 Draft, all to DC's benefit and the Siegels' detriment. | *Compare* AD Ex.1 to Ex. 3; *Siegel*, 542 F. Supp. 2d at 1137-39 |
| **20** | Marks testified to the vast differences between the October 19, 2001 Letter and the February 1, 2002 Draft. | AD Ex. 10 at 125:13-133:8 |
| **21** | Among other changes, the February 1, 2002 Draft altered the Siegels' royalty, to DC's benefit.  Marks testified to such "trap doors" in which the Siegels would receive no royalties at all:<br><br>[The February 1 2002 Draft] is purporting to say or at least raise the problem that licensing revenues would not include that body of 60 years of derivative works that the people that DC Comics, Paul Levitz and others, made such an impression upon us as being so different from the original work and was the basis of the Superman library, which was contrary to what was agreed.  The whole idea was to pick up all works and not to exclude works created by other people. | AD Ex. 10 at 128:3-22 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | I mentioned that at the DC Comics meeting there was a specific discussion about an American Express ad campaign where Jerry Seinfield, who was in that campaign, specifically requested that the Curt Shaw version of Superman be used in the campaign. Under this [February 1, 2002] draft the proceeds of that campaign would be excluded, or at least there was an argument that they would be excluded, and that wasn't the intent.  To parse through that language and to get there is very difficult, and I found – I considered that deceptive drafting and a trap door and highly, highly problematic. | |
| | 22 | The February 1, 2001 Draft provides for a revocation and regrant of the Siegels' rights. | AD Ex. 3 at 31-32, ¶(1)(a)(i)-(ii) |
| | 23 | The February 1, 2001 Draft also confirmed the $500,000 annual advance, to be paid on March 31, 2002. | AD Ex. 3 at 39-40 |
| | 24 | DC did not pay or even tender the $500,000 annual payment, the $1,000,000 signing bonus, or the $2,000,000 advance, as DC had expressly promised and as set forth in the October 19, 2001 agreement, by March 31, 2002. | Counterclaims ¶¶99-100 |
| | 25 | On May 9, 2002, Joanne Siegel sent a letter to Richard D. Parsons, COO of  AOL Time Warner Inc., objecting to the February 1, 2002 Draft.  Ms. Siegel's May 9, 2002 letter read in relevant part:<br><br>Dear Dick,<br><br>I am Joanne Siegel, widow of Superman's creator Jerry Siegel. In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright. | AD Ex. 4 at 75-77 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
| | With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner.<br><br>…<br><br>Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead. We then hired two additional Beverly Hills entertainment attorneys as our negotiators. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.<br><br>Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.<br><br>…<br><br>[W]e are owed more than three years of profits accounting on Superman and related properties which has not been paid.<br><br>…<br><br>As for the contract, your representatives surely know that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful. | |

| | Plaintiff's Additional Statement of Fact | Plaintiff's Evidence |
|---|---|---|
| | After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more.<br><br>…<br><br>It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.<br><br>This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future?<br><br>…<br><br>After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the wont possible light. Is that the reputation you want? | |
| 26 | On May 21, 2002, Mr. Parsons sent a reply letter to Joanne.  Mr. Parson's letter stated:<br><br>Dear Joanne:<br><br>Thank you for your letter of May 9th. Your husband and his creations and his family have been a cherished part of the Warner, Time Warner and now AOL Time Warner family for many years. I was, therefore, quite troubled by your feeling. Consequently, I have been in contact with John Schulman and Paul Levitz and have been informed that each of the major points covered in the draft agreement which was provided to your representatives, more than | AD Ex. 5 at 78 |

|   | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|
|   | three months ago, accurately represented the agreement previously reached between your representatives and AOLTW's. Those negotiating the agreement for AOLTW even improved - to your benefit- the terms of our $250,000 recoupable advance; they proposed as a part of the overall deal that the advance be non-applicable and non-recoupable. So, I am a bit at a loss to understand the level and intensity of your distress.<br><br>As in all negotiations, including the lengthy ones which have brought us this far, we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve. John and Paul look forward to meeting with your representatives, and we continue to hope that this agreement can be closed based upon the earlier discussions with your lawyers.<br><br>In the interim, I want you to know that AOLTW is determined to do the right thing for the heirs of Jerry Siegel, you and your family, and that we continue to count SUPERMAN among America's cultural treasures with which we are proud to be associated. |   |
| 27 | Mr. Parson's May 21, 2002 letter did not retract the aggressive demands in the February 1, 2002 Draft, or go back to the terms in the October 19, 2001 Letter the Siegels had confirmed was the agreement. | AD Ex. 5 at 78 |
| 28 | Mr. Parson's May 21, 2002 letter did not argue the Siegels were in breach, demand the Siegels' performance, or assert DC's rights under the October 19, 2001 Letter. | AD Ex. 5 at 78 |
| 29 | On September 21, 2002, the Siegels sent a letter to their attorneys and copied DC, in which they terminated Mr. Marks and provided "formal | AD Ex. 6 at 79 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | notification that we are totally stopping and ending all negotiations with DC Comics … effective immediately." | |
| | 30 | On November 8, 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective date of November 17, 2004 | AD Ex. 7 |
| | 31 | In 2003-04, DC simply resumed settlement negotiations with the Siegels. | AD Ex. 8; Ex. 11 at 139:12-146:2; Ex. 23 at 376 |
| | 32 | At no time between October 19, 2001 and October 8, 2004, or thereafter, did DC:  pay the $500,000 annual advances, the $1,000,000 signing bonus, or the $2,000,000 advance; provide an accounting of royalties; provide the "By Special Arrangement with the Jerry Siegel Family"; or provide the Siegels medical and dental insurance. | Counterclaims ¶¶99-100; *Siegel*, 542 F. Supp. 2d at 1114-1116; AD Ex. 5 |
| | 33 | At no time between October 19, 2001 and October 8, 2004 did DC file suit against the Siegels, claim rights under the October 19, 2001 Letter, retract or disclaim the October 26, 2001 Letter or February 1, 2002 draft, or claim that the October 19, 2001 Letter was an enforceable agreement. | Counterclaims ¶¶99-100; *Siegel*, 542 F. Supp. 2d at 1114-1116; AD Ex. 5 |
| | 34 | On October 8, 2004, the Siegels filed suit against DC regarding their Superman termination ("*Siegel*"). | Case No. 04-CV-08400, Dkt. 1 |
| | 35 | On October 22, 2004, the Siegels filed suit against DC regarding their Superboy termination. | Case No. 04-CV-08776, Dkt. 1 |
| | 36 | On November 22, 2004, DC filed counterclaims in | Case No. 04-CV- |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | the *Siegel* Superman and Superboy Cases. | 08400, Dkt. 14 |
| | 37 | DC's counterclaims alleged for the first time that the October 19, 2001 Letter was an enforceable agreement. | Counterclaims ¶¶97-105 |
| | 38 | DC's counterclaims alleged for the first time that the Siegels had repudiated that agreement by their May 9, 2002 and September 21, 2002 letters. | Counterclaims ¶¶99-100 |
| | 39 | DC's Third Counterclaim was for breach of contract re: the October 19, 2001 Letter. | Counterclaims ¶¶97-101 |
| | 40 | DC's Fourth Counterclaim was for declaratory relief re: the October 19, 2001 Letter. | Counterclaims ¶¶101-105 |
| | 41 | DC's Fourth Counterclaim asked the court to declare that the October 19, 2001 Letter either (1) transferred Ms. Larson's copyrights to DC or (2) contractually obligated Ms. Larson to transfer her copyrights in the future. | Counterclaims ¶103 |
| | 42 | The Siegels' answer to DC's Counterclaims specifically pled the affirmative defenses of "waiver and "acquiescence" as well as "No Settlement Agreement Was Consummated." | Answer ¶¶152, 185 |
| | 43 | In *Siegel*, DC argued that it negotiated for the Siegels to receive credit on "Superman Returns" and set up a "reserve account." | AD Ex. 13 at 167-68, 178 |
| | 44 | In *Siegel*, DC testified and represented to the court how much money was in a supposed "reserve account." | AD Ex. 12 at 159:6-11; Ex. 13 at 168 n.18 |
| | 45 | In *Siegel*, the district court took note of the dubious | AD Ex. 14 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | nature of DC's supposed "reserve account." | |
| | 46 | In *Siegel*, DC admitted that the October 19, 2001 Letter provided that copyrights "would" be transferred in the future, not that they had already been transferred. | AD Ex. 13 at 167-68, 177-78 |
| | 47 | In *Siegel* in 2008, Judge Larson concluded on summary judgment that the parties had failed to reach an agreement, citing the "materially different" terms of the October 26, 2001 Letter and the "vastly different" terms of the February 1, 2002 Draft. | *Siegel*, 542 F. Supp. 2d at 1138 |
| | 48 | In *Siegel,* on May 20, 2010, this Court entered a Rule 54(b) judgment based on Judge Larson's summary judgment order. | Dkt. 669 |
| | 49 | Both sides appealed the Rule 54(b) judgment in *Siegel* (9th Cir. Appeal Nos. 11-55863, 11-56034; the "*Siegel* Appeal"). | Dkt. 671, 674 |
| | 50 | In the *Siegel* Appeal, DC expressly asked the Ninth Circuit to enter judgment in its favor at least five times in its briefs. | AD Ex. 16 at 230, 252; Ex. 18 at 316, 318, 325 |
| | 51 | In the *Siegel* Appeal, the Ninth Circuit was well aware of DC's request for judgment, and questioned DC about it during oral argument. | AD Ex. 19 at 344:17-344:2. |
| | 52 | In the *Siegel* Appeal, DC argued and admitted that the terms in the October 19, 2001 Letter were the only ones that the parties ever agreed to. | AD Ex. 16 at 239-40; AD, Ex. 18 at 316 |
| | 53 | In the *Siegel* Appeal, DC argued and admitted that new or changed terms in the October 26, 2001 Letter | AD Ex. 19 at 346:23-347:4 |

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | were "not part of the deal." | |
| | 54 | In the *Siegel* Appeal, DC disavowed the February 1, 2002 Draft. | AD Ex. 16 at 239-40 |
| | 55 | In the *Siegel* Appeal, DC told the Ninth Circuit that whether the "subsequent events undid" the October 19, 2001 was a "fact question." | AD Ex. 19 at 345:18-21 |
| | 56 | In the *Siegel* Appeal, Ms. Larson argued that (a) the October 19, 2001 Letter was not a valid contract, because it was not a writing signed by both parties; and (b) the October 19, 2001 Letter did not comply with the Copyright Act's writing requirement in 17 U.S.C. § 204(a). | AD Ex. 17 |
| | 57 | In the *Siegel* Appeal, DC contended that the Superman Ads were important and that they, "in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features" and grant a copyright interest in such elements. | AD Ex. 16 at 248 |
| | 58 | In the *Siegel* Appeal, on January 10, 2013, the Ninth Circuit reversed Judge Larson's opinion, holding that that the October 19, 2001 Letter constituted a valid acceptance of an offer by DC that "was sufficient" to create a contract. | *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013) |
| | 59 | In the *Siegel* Appeal, the Ninth Circuit did not disturb Judge Larson's findings as to the "materially" and "vastly different" terms in the October 26, 2001 Letter and the February 1, 2002 Draft, and remanded the case for further adjudication of DC's contract | *Larson*, 2013 U.S. App. LEXIS 671; *Siegel*, 542 F. Supp. 2d at 1138 |

| | | **Plaintiff's Additional Statement of Fact** | **Plaintiff's Evidence** |
|---|---|---|---|
| | | claims – its Third and Fourth Counterclaims. | |
| | 60 | On January 29, 2013, DC, for the first time in twelve years, offered "to tender payment" to Ms. Larson under the October 19, 2001 Letter, subject to purported "rights of offset," rendering its offer illusory. | AD Ex. 20 |
| | 61 | Despite requests by Ms. Larson, DC would also not provide the basis for its calculation of payment, leaving it completely uncertain whether DC's tender complied with the complicated royalty scheme of the October 19, 2001 Letter. | AD Ex. 24; Ex. 25 |
| | 62 | DC's 2013 "tender" of Superman royalties owed was not much higher than what DC had testified was owed seven years earlier, in 2006. | AD Ex. 12 at 159:6-11; Ex. 13 at 168 n.18; Ex. 25 |
| | 63 | On March 6, 2012, Ms. Larson signed a § 304(d) notice of termination regarding Superman "Ads," with an effective date of March 12, 2014. | AD Ex. 15 |

## CONCLUSIONS OF LAW

As set forth in Plaintiff's Opposition to DC's motion:

1.     DC's motion is denied.  The Ninth Circuit did not hold that the October 19, 2001 letter from the Siegels' attorney to DC actively transferred the Siegels' copyrights to DC, as DC solely argues.  The Circuit only held that the letter was "an acceptance of terms negotiated between the parties" that "was sufficient" to create a contract.  *Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. January 10, 2013).  DC's Third and Fourth Counterclaims remain for adjudication.

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT

1   Dated: March 4, 2013          RESPECTFULLY SUBMITTED,
2                                  /s/ Marc Toberoff

3                                  TOBEROFF & ASSOCIATES, P.C.
                                   Attorneys for Plaintiff Laura Siegel Larson
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DC'S MOTION FOR SUMMARY JUDGMENT