Marc Toberoff (State Bar No. 188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (State Bar No. 240497)
 *kadams@toberoffandassociates.com*
Pablo D. Arredondo (State Bar No. 241142)
 *parredondo@toberoffandassociates.com*
David Harris (State Bar No. 255557)
 *dharris@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway, #348
Malibu, California, 90265
Telephone:   (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Plaintiff-Counterclaim
Defendant, Laura Siegel Larson,
individually and as personal representative
of the Estate of Joanne Siegel

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br><br> Plaintiff, <br><br> v. <br><br> WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, <br><br> Defendants and Counterclaimants. | Case No: 04-CV-08400 ODW (RZx)* <br> Case No: 04-CV-08776 ODW (RZx)* <br><br> Hon. Otis D. Wright II, U.S.D.J. <br> Hon. Ralph Zarefsky, U.S.M.J. <br><br> **DECLARATION OF KEITH ADAMS RE: DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE *SIEGEL* SUPERMAN AND SUPERBOY CASES** <br><br> *Opposition and Statement of Genuine Issues filed concurrently* |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, <br><br> Plaintiff, <br><br> v. <br><br> TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, <br><br> Defendants and Counterclaimants. | Date:       March 25, 2013* <br> Time:       1:30 p.m.* <br> Place:      Courtroom 11* <br><br> *:  The Court has stated that it will take the motion(s) under submission and hold a hearing if necessary.  Dkt. 707.  Docket citations herein are to Case No. 04-CV-08400. |

# INDEX

| Ex. | Title | Page |
|:---:|---|:---:|
| 1 | October 19, 2001 letter from Kevin Marks to John Schulman | 4 |
| 2 | October 26, 2001 letter from Schulman to Marks | 10 |
| 3 | February 1, 2002 letter from Patrick Perkins to Marks | 18 |
| 4 | May 9, 2002 letter from Joanne Siegel to Richard D. Parsons | 75 |
| 5 | May 22, 2002 letter from Parsons to Joanne Siegel | 78 |
| 6 | September 21, 2002 letter from the Siegels to Marks | 79 |
| 7 | November 8, 2002 Notice of Termination re: Superboy | 80 |
| 8 | Letter sent by Ari Emanuel to Bruce Rosenblum | 93 |
| 9 | Excerpts from August 1, 2006 deposition of Laura Siegel Larson | 94 |
| 10 | Excerpts from October 7, 2006 deposition of Kevin Marks | 101 |
| 11 | Excerpts from November 2, 2006 deposition of Ari Emanuel | 135 |
| 12 | Excerpts from November 11, 2006 deposition of Paul Levitz | 149 |
| 13 | Excerpts from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed May 29, 2007 | 163 |
| 14 | October 23, 2007 Order | 183 |
| 15 | March 5, 2012 Notice of Termination re: Superman Advertisements | 188 |
| 16 | DC's Second Brief on Cross-Appeal in the *Siegel* Appeal, filed on March 23, 2012 | 194 |
| 17 | Larson's Third Brief on Cross-Appeal in the *Siegel* Appeal, filed on May 24, 2012. | 253 |
| 18 | DC's Fourth Brief on Cross-Appeal in the *Siegel* Appeal, filed on June 19, 2012 | 309 |
| 19 | September 5, 2012 Oral Argument in the *Siegel* Appeal | 326 |
| 20 | January 29, 2013 Letter from Daniel Petrocelli to Marc Toberoff | 368 |
| 21 | February 9, 2013 Letter from Toberoff to Petrocelli | 370 |
| 22 | February 12, 2013 Letter from Petrocelli to Toberoff | 373 |
| 23 | Excerpts from DC's Statement of Genuine Issue re: Motion for Summary Judgment in *DC Comics*, filed on February 16, 2013. | 375 |
| 24 | February 27, 2013 Letter from Toberoff to Petrocelli | 379 |
| 25 | February 28, 2013 Letter from Petrocelli to Toberoff | 380 |

INDEX TO DECLARATION OF KEITH ADAMS

# DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.     I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for plaintiff-counterclaim defendant Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel ("Plaintiff"), in the above-captioned actions, and submit this declaration in opposition to Defendant DC Comics' Motion for Summary Judgment.

2.     Attached hereto as Exhibit "1" is a true and correct copy of an October 19, 2001 letter from Kevin Marks to John Schulman.

3.     Attached hereto as Exhibit "2" is a true and correct copy of an October 26, 2001 letter from John Schulman to Kevin Marks.

4.     Attached hereto as Exhibit "3" is a true and correct copy of a February 1, 2002 letter from Patrick Perkins to Kevin Marks.

5.     Attached hereto as Exhibit "4" is a true and correct copy of a May 9, 2002 letter from Joanne Siegel to Richard Parsons.

6.     Attached hereto as Exhibit "5" is a true and correct copy of a May 22, 2002 letter from Richard Parsons to Joanne Siegel.

7.     Attached hereto as Exhibit "6" is a true and correct copy of a September 21, 2002 letter from Joanne and Laura Siegel to Kevin Marks.

8.     Attached hereto as Exhibit "7" is a true and correct copy of a November 8, 2002 Notice of Termination for Superboy.

9.     Attached hereto as Exhibit "8" is a true and correct copy of a letter from Ari Emanuel to Bruce Rosenblum.

10.     Attached hereto as Exhibit "9" is a true and correct copy of excerpts from the August 1, 2006 deposition of Laura Siegel Larson.

11.     Attached hereto as Exhibit "10" is a true and correct copy of excerpts from the October 7, 2006 deposition of Kevin Marks.

12.     Attached hereto as Exhibit "11" is a true and correct copy of excerpts

DECLARATION OF KEITH ADAMS RE: DC'S MOTION FOR SUMMARY JUDGMENT

from the November 2, 2006 deposition of Ari Emanuel.

13.    Attached hereto as Exhibit "12" is a true and correct copy of excerpts from the electronic transcript of the November 11, 2006 deposition of Paul Levitz.

14.    Attached hereto as Exhibit "13" is a true and correct copy of excerpts from Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, filed on May 29, 2007.

15.    Attached hereto as Exhibit "14" is a true and correct copy of an order issued on October 23, 2007.

16.    Attached hereto as Exhibit "15" is a true and correct copy of a March 5, 2012 Notice of Termination for Superman Advertisements.

17.    Attached hereto as Exhibit "16" is a true and correct copy of excerpts from DC's Second Brief on Cross-Appeal in the *Siegel* Appeal (9th Cir. Case No. 11-55863), filed on March 23, 2012.

18.    Attached hereto as Exhibit "17" is a true and correct copy of excerpts from Ms. Larson's Third Brief on Cross-Appeal in the *Siegel* Appeal, filed on May 24, 2012.

19.    Attached hereto as Exhibit "18" is a true and correct copy of excerpts from DC's Fourth Brief on Cross-Appeal in the *Siegel* Appeal, filed on June 19, 2012.

20.    Attached hereto as Exhibit "19" is a true and correct copy of the transcript of the September 5, 2012 oral argument in the *Siegel* Appeal.

21.    Attached hereto as Exhibit "20" is a true and correct copy of a January 29, 2013 letter from Daniel Petrocelli to Marc Toberoff.

22.    Attached hereto as Exhibit "21" is a true and correct copy of a February 9, 2013 letter from Marc Toberoff to Daniel Petrocelli.

23.    Attached hereto as Exhibit "22" is a true and correct copy of a February 12, 2013 letter from Daniel Petrocelli to Marc Toberoff.

24.    Attached hereto as Exhibit "23" is a true and correct copy of Excerpts

DECLARATION OF KEITH ADAMS RE: DC'S MOTION FOR SUMMARY JUDGMENT

from DC's Statement of Genuine Issue re: Motion for Summary Judgment filed in *DC Comics* (C.D. Cal. Case No. 10-CV-03633) on February 16, 2013.

25.    Attached hereto as Exhibit "24" is a true and correct copy of a February 27, 2013 letter from Marc Toberoff to Daniel Petrocelli.

26.    Attached hereto as Exhibit "25" is a true and correct copy of a February 28, 2013 letter from Daniel Petrocelli to Marc Toberoff.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on March 4, 2013, at Malibu, California.

_____

Keith G. Adams

DECLARATION OF KEITH ADAMS RE: DC'S MOTION FOR SUMMARY JUDGMENT

# GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD R. PASSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILENBUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1988)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

<u>**VIA TELECOPIER and U.S. MAIL**</u>

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

      Re:   <u>Siegel Family – "Superman"</u>

Dear John:

      This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

A.   <u>Definitions</u>.

     1.   "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

     2.   "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

B.   <u>Financial Terms</u>.

     1.   A non-returnable, but recoupable advance of $2,000,000.

236172.1

312

**EXHIBIT 1**
4

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2.    A non-returnable, non-recoupable signing bonus of 1,000,000.

3.    D.C. Comics will forgive the $250,000 advance from last year -- stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.    There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002.  The annual guarantee is recoupable from royalty payments (under 5 and 6 below).  The annual guarantee is paid March 31st of each year.  If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped).  If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5.    A royalty of 6% of Superman/Spectre Gross Revenues.  This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns.  This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10).  This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6.    A royalty of 1% of the cover price of DC Comics' publications.  This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

313

EXHIBIT 1

5

## GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 3

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7.      Recoupment begins as of January 1, 2000.

8.      During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9.      Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C.      Other Terms.

1.      The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2.      If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

314

EXHIBIT 1

6

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3.   Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads:  "By Special Arrangement with the Jerry Siegel Family".  The size and placement of credit is to be in D.C. Comics' discretion.

4.   D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5.   The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6.   In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7.   Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8.   D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors.  Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

315

EXHIBIT 1
7

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 5

9.      DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.     Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11.     At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.     The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13.     Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14.     Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

316

EXHIBIT 1
8

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By

Kevin S. Marks

KSM:ljl

cc:    Joanne Siegel
       Laura Siegel Larson
       Bruce Ramer
       Don Bulson

236172.1

317

**EXHIBIT 1**
**9**

OCT-26-2001  17:24        JOHN SCHULMAN                          818 954 4768      P.01



**WARNER BROS.**

4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john.schulman@warnerbros.com

John A. Schulman
Executive Vice President
and General Counsel

October 26, 2001

<u>Via Facsimile (310) 777-4801</u>
Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown
132 S. Rodeo Drive
Beverly Hills, CA  90212

        Re:    <u>Siegels</u>

Dear Kevin:

        I have received, and have finally had a chance to review, your outline fax of October 19.  I apologize for not responding earlier; I have been on the road.

        I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is.  We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.

        Thank you.

                                Sincerely,

                                John A. Schulman

JAS:hjl
cc:  '  Bruce Ramer, Esq. (w/encl)

                                                **GTRB 0145**

                                                A Time Warner Entertainment Company

                                                                        318

**EXHIBIT 2**
**10**

<u>October 2001 Outline</u>

<u>Transfer</u>
- Regrant, grant, etc.
- 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public
- 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties -- even if not created for DC Comics
- All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")
- In perpetuity and worldwide
- Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact
- Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement and the written agreement to include various provisions to ensure same (jointly and severally)
- Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement. (jointly and severally)
- Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)
- Give copy of all documents relating to rights/history
- Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)
- Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual). . Right to use J. Siegel bio and photos in publicity, etc., re property.
- The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

<u>Initial Payment</u>
- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

319

**EXHIBIT 2**
11

OCT-25-2001  17:25        JOHN SCHULMAN                        818 954 4768    P.03

320

EXHIBIT 2
12

OCT-25-2001  17:25          JOHN SCHULMAN                    818 954 4768    P.04

321

EXHIBIT 2
13

### Annual Payment (Advance)
* $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
* Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
* Terminate when Action #1 US copyright terminates

### Widows Benefits (not assignable or transferrable)
* $135,000/year
* Payable for Joanne's life, personal,
* Paid as now
* Medical, comparable to past, for life

### Royalty
* Commencing for revenue received on or after 1/1/00
* All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment
* 6% of DC's receipts from all Media licenses for use of the Properties, except:

    1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%.

    2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

* 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

    1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

    2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

    3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

    4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

322

**EXHIBIT 2**

**14**

OCT-25-2001  17:26        JOHN SCHULMAN                        818 954 4768      P.06

- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros.' overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

- 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).

    1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

    2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

    3) there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question.

- [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

<u>Payment</u>

All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:

    47.5% Joanne Siegel
    23.75% Laura Siegel Larson
    23.75% Michael Siegel
    5.00% Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

<u>Advise</u> (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major

323

EXHIBIT 2
15

changes planned in publications), and the Siegel family will have an opportunity to give its
input, but this does not rise to the level of a consultation right. The Siegel family will be
informed of such developments periodically. To facilitate this, the family will appoint a single
representative who will receive occasional written updates from DC and with whom, upon
request, a DC representative will meet once a year to provide a broader overview of current
developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing tv series)
along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry
Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster"
(as applicable) on motion pictures (main titles on screen, only), television programs (main
titles only), and on all other works where credit to creators is customary. (Credit must be
consistent with guild and other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later
episodes of ongoing tv series) and initially released during the term of the U.S. copyright of
Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel
Family" (as applicable). Our choice of size and placement. Same credit on all Superman
publications (comics and/or books) first created after the date hereof and initially published
during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other
obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in
excess of recoupable Annual and Initial Advances and interest, if applicable) to be paid no
later than March 31 following the close of the annual accounting period. Year 2000 statement
and payment, if any, to be accounted with year 2001. Standard WB provisions.

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be
an expedited dispute resolution procedure for challenging intercompany deals which fall
outside the safe harbors.

Safe Harbors for Intercompany Deals
- Salkind (Motion Pictures)
- Lois & Clark (TV)
- WB Television Animation Deal
- Merchandising representation practice

324

**EXHIBIT 2**
**16**

OCT-25-2001  17:27        JOHN SCHULMAN                              818 954 4768      P.08

<u>Expedited Dispute Resolution</u> (Any claims between the parties)

- Arbitration
- Compensation damages only to Siegels
- No injunction against DC/WB breaches, no termination of rights, no reversion
- DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

<u>Medical Coverage/Son & Daughter (Grandsons only through minority)</u> (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

<u>Release and covenant not to sue by Siegels</u>

- Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)
- Approve all deals made before 12/31/00

<u>Miscellaneous</u>

- Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels: if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]
- Siegels defend and indemnify re third party claims
- Siegels defend and indemnify re Dennis claim
- Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign
- DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts
- Siegels to refer all inquiries relating in any way to Properties to DC/WB.
- At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d.

**GTRB 0152**

TOTAL P.02

**EXHIBIT 2**

**17**

325

# FROSS ZELNICK LEHRMAN & ZISSU, P.C.

ALVIN FROSS
.ALD J. LEHRMAN
STEPHEN BIGGER
MICHAEL I. DAVIS
ROGER L. ZISSU
MARIE V. DRISCOLL
RICHARD Z. LEHV
CAROL F. SIMKIN
MARGARET F. GOLDSTEIN
DAVID W. EHRLICH
SUSAN UPTON DOUGLASS
JANET L. HOFFMAN
PETER J. SILVERMAN
LAWRENCE ELI APOLZON
BARBARA A. SOLOMON
LISA PEARSON
MARK D. ENGELMANN
NADINE H. PARKER JACOBSON
ANDREW N. FREDBECK
GEORGES NAHITCHEVANSKY
CRAIG S. NENDE
PATRICK T. PERKINS
J. ALLISON STRICKLAND

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

RECEIVED
FEB 0 4 2002

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: fzlz@frosszelnick.com

JAMES D. SILBERSTEIN
RUTH LAZAR
COUNSEL

MICHELLE P. FOXMAN
ROBERT A. BECKER
TAMAR NIV BESSINGER
ANGELA KIM
JOHN P. MARGIOTTA
LYDIA T. GOBENA
DIANE B. MELNICK
MICHAEL CHIAPPETTA
DANA WRUBEL
JESSICA MANN
JOSEPH R. MOLKO
EVAN GOURVITZ
CARLOS CUCURELLA
NANCY C. DICONZA
TANYA FICKENSCHER
ZOE HILDEN
LAUREN J. MANDELL

February 1, 2002

**VIA FEDEX**

Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

Re:   Superman

Dear Kevin:

I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. As our clients have not seen this latest version of the agreement, I must reserve their right to comment. In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

Very truly yours,

Patrick T. Perkins

Encls.

cc:   John Schulman, Esq.
      Paul Levitz
      Lillian J. Laserson, Esq.
      Carol F. Simkin, Esq.

I:\PPERKINS\DCC\SUPER\020201 Ltr-K. Marks.doc

326

**EXHIBIT 3**
**18**

02/01/02
4:51 PM

## AGREEMENT

AGREEMENT made this __ day of ___ 2002, by and between DC COMICS, a New York General Partnership comprised of Time Warner Entertainment, Co. L.P. and Warner Communications, Inc. (hereinafter "DC COMICS"), having its principal office at 1700 Broadway, New York, New York 10019, and Joanne Siegel, residing at 13900 Panay Way, R-115, Marina del Rey, CA 90292, Laura Siegel Larson, residing at 6400 Pacific Avenue, No. 106, Playa del Rey, CA 90293, the Estate of Jerome Siegel, (collectively "SIEGEL") and Michael Siegel, residing at _____ (except as otherwise indicated, hereinafter Joanne Siegel, Laura Siegel Larson and Michael Siegel are referred to collectively and individually as "The SIEGELS").

## DEFINITIONS

1.      The term "Works" is hereinafter defined collectively and individually as follows: any and all works, creations, material, matter, contributions, adaptations, modifications, derivative works and all other works of any kind whatsoever, including but not limited to all stories, literary and/or graphic works, episodes, elements, characters, treatments, likenesses, images, depictions, drawings, renderings, sketches, notes and/or indicia, and/or any component, draft of, or part or portion of any of the foregoing, regardless of whether or not subject to copyright protection, regardless of whether or not published, regardless of whether or not any person knows of the existence of the foregoing, wherever in the world created, and whenever created , and regardless of the medium or form of expression or exploitation (whether or not now existing).

327

**EXHIBIT 3**
**19**

2.    The term "SUPERMAN" is hereinafter defined as the original comic book character now known as "SUPERMAN," jointly created by JEROME SIEGEL (the writer) and JOSEPH SHUSTER (the artist), whether or not called Superman at the time of creation.

3.    The phrase "SUPERMAN Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SUPERMAN and the first story in which SUPERMAN appeared in Action Comics No. 1, dated June, 1938, "Action Comics No. 1" and in Action Comics No. 2, dated July, 1938, "Action Comics No. 2") that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SUPERMAN Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Superman Notices" referenced *infra* in definition paragraph number ___.

4.    The phrase "ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created simultaneously with or before the creation of, whether or not included in, Action Comics No. 1 and/or Action Comics No. 2.

2

328

**EXHIBIT 3**
**20**

5.     The phrase "POST ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created after the creation of Action Comics No. 1 and Action Comics No. 2.

6.     The phrase "SUPERMAN Notices" is hereinafter defined as the seven (7) notices SIEGEL served upon DC COMICS purporting to terminate pursuant to Section 304 (c) of the U.S. Copyright Act as of April 16, 1999, grants by Jerome Siegel to DC COMICS's predecessor(s) of copyright rights in some or all of the SUPERMAN Works (copies of the SUPERMAN Notices, excluding the voluminous listing of SUPERMAN Works referenced therein, are attached hereto as Exhibits A - G).

7.     The phrase "SUPERMAN Derivative Works" is hereinafter defined as collectively and individually as follows:  all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the ACTION COMICS NO. 1 SUPERMAN Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST ACTION COMICS NO. 1 SUPERMAN Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

8.     The phrase "SUPERMAN Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, character names, fictional elements, words,

3

329

**EXHIBIT 3**
**21**

phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, associated with, or arising out of or relating to the use and/or exploitation of the SUPERMAN Works and/or the SUPERMAN Derivative Works.

9.   The term "SUPERMAN Property" is hereinafter defined to mean the following: (i) each of the pre-existing characters and elements which first appeared in the SUPERMAN Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A.   (1) First appearance in a story or programming (including comics, television, film and other media) with Superman and/or Superman logo as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2) First appearance in a story or programming (including comics, television, film and other media) without Superman and/or Superman logo as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 9(A)(1) above or any of the characters or elements which appear in the SUPERMAN Works; and

B.   Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

4

330

**EXHIBIT 3**
**22**

10.     The term "SPECTRE" is hereinafter defined as the original character known as "SPECTRE," created by JEROME SIEGEL.

11.     The phrase "SPECTRE Works" is hereinafter defined collectively and individually as follows:  all Works (including but not limited to SPECTRE and the first Spectre stories launched: (1) in an ad in More Fun Comics issue No. 51, dated January 1940 (the appearance of the SPECTRE character); (2) in More Fun Comics issue No. 52, dated February 1940 (illustrated 10-page comic book story); (3) in More Fun Comics issue No. 53, dated March 1940 (illustrated 10 page comic book story); and (4) in More Fun Comics issue No. 54, dated April 1940 (illustrated 10 page comic book story)) that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SPECTRE, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant.  The phrase "SPECTRE Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Spectre Notices" referenced _infra_ in definition paragraph number ___.

12.     The phrase "MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created

5

331

**EXHIBIT 3**
**23**

simultaneously with or before the creation of, whether or not included in More Fun Comics issue No. 51, dated January 1940 and More Fun Comics Issue No. 52, dated February 1940.

13.    The phrase "POST MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created after the creation of More Fun Comics issue No. 52, February 1940.

14.    The phrase "SPECTRE Notices" is hereinafter defined as the four (4) notices SIEGEL served upon DC COMICS purporting to terminate as of November 27, 2000 pursuant to Section 304 (c) of the U.S. Copyright Act, grants by Jerome Siegel to DC COMICS' predecessor(s) of copyright rights in some or all of the SPECTRE Works (copies of the SPECTRE Notices are attached hereto as Exhibits _ - _.).

15.    The phrase "SPECTRE Derivative Works" is hereinafter defined as collectively and individually as follows:  all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the MORE FUN COMICS SPECTRE Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST MORE FUN COMICS SPECTRE Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

6

332

**EXHIBIT 3**
**24**

16.     The phrase "SPECTRE Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of or relating to the use and/or exploitation of the SPECTRE Works and/or the SPECTRE Derivative Works.

17.     The term SPECTRE Property is hereinafter defined to mean the following: (i) each of the pre-existing characters which first appeared in the SPECTRE Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A. (1)  First appearance in a story or programming (including comics, television, film and other media) with Spectre as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2)  First appearance in a story or programming (including comics, television, film and other media) without Spectre as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 17(A)(1) above or any of the characters or elements which appear in the SPECTRE Works; and

B.  Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

7

333

**EXHIBIT 3**
**25**

18.     The phrase "OTHER SIEGEL Works" is hereinafter defined individually and collectively as those Works, other than the SUPERMAN Works or the SPECTRE Works, if any, that were created in whole or in part by Jerome Siegel, with respect to which he received any payment or compensation from DC COMICS and/or its predecessor(s), regardless of the terms surrounding, or amount of, such payment or compensation  or whether such Works were created on a work-for-hire basis for DC COMICS and/or its predecessor(s) and regardless of whether or not any or all rights were granted by Jerome Siegel to DC COMICS and/or its predecessor(s) in such Works, and regardless of whether The SIEGELS have sought to terminate any such right.

19.     The phrase the "OTHER Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of, or relating to the use and/or exploitation of the OTHER SIEGEL Works.

20.     The phrase "The WORKS" is hereinafter defined collectively and individually as the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works.  (It is intended that the definition of The WORKS includes all elements, parts and/or portions of the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works and all material and/or matter contained therein.)

21.     The phrase "The MARKS" is hereinafter defined collectively and individually as the SUPERMAN Marks, the SPECTRE Marks and the OTHER Marks.

22.     The "Tolling Agreement" refers to the Agreement dated April 6, 2000 between DC COMICS and the SIEGELS tolling the statute of limitations claims of the respective parties.

334

**EXHIBIT 3**
**26**

23.    The terms "Licensing" and "License(s)" refer to DC COMICS authorizing any third party to commercially exploit the SUPERMAN Property and the SPECTRE Property.

24.    The term "Revenues" is hereinafter defined as all amounts actually received by DC COMICS in United States Dollars from the Licensing of rights in the SUPERMAN Property and the SPECTRE Property, less any unrecouped foreign taxes, import duties and/or currency exchange losses.  Revenues shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property and the SPECTRE Property.  Any advance against royalties paid to DC COMICS by a licensee shall be considered actually received by DC COMICS when the advance becomes nonreturnable.  Notwithstanding the foregoing, in such cases where an advance is paid in respect of multiple properties which include the SUPERMAN Property or the SPECTRE Property, the advance shall be considered received when and as it is allocated among all such properties.

25.    The term "Net Sales" is hereinafter defined as the number of copies or units which are actually sold by DC COMICS through DC COMICS' wholesale and retail distribution channels, less the number of copies or units which are returned, damaged, lost, distributed by DC COMICS as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent (70%) off of cover price.

26.    The term "Dispute" shall mean any and all controversies, Claims or disputes arising out of or related to The WORKS, The MARKS, or to this Agreement or to the Stand Alone Assignments, or any one of them, or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of the state or federal statutory or common law rights or duties.

335

**EXHIBIT 3**
**27**

27.    "Reversionary" rights shall mean:

a.    any and all reversionary rights and interests similar in effect to and including those referred to in the proviso to section 5(2) of the U.K. Copyright Act 1911 and/or those referred to in paragraph 27 of Schedule 1 to the U.K. Copyrights, Designs and Patents Act 1988;

b.    any and all reversionary rights and interests similar in effect to and including those referred to in Section 14 of the Canadian Copyright Act;

c.    any and all termination rights and renewals and extensions of the term of copyright similar in effect to and including those provided for under the laws of the U.S.;

d.    any all reversionary rights and interests similar in effect to and including those which arise in countries with compulsory heirs or inheritance provisions such as in Columbia, Spain, Cuba or Panama;

e.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) similar in effect to reversionary rights which have vested absolutely or contingently or which might hereafter vest absolutely or contingently by operation of law or otherwise in any part of the world in The SIEGELS and/or any heir, successor, assign or personal representative of The SIEGELS;

f.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) including any copyright rights or rights in the nature of copyright rights which at any time revert to or are acquired by The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS for any reason at any time and/or which form part of or accrue to Jerome Siegel's residuary estate;

10

336

**EXHIBIT 3**
**28**

g.    in each case, for all countries or jurisdictions, present and future, throughout the world, affected by such rights or in which such rights exist, for the full term thereof including all renewals, extensions, revisions, and revivals thereof, whenever arising and including all vested and future reversionary rights whether now existing or hereafter created or conferred and together with all rights of action (including without limitation the right to use for past infringements), powers and benefits belonging or accrued to the foregoing or any of them or to The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS in respect thereof.

## WHEREAS CLAUSES

WHEREAS, it is the parties' intent and DC COMICS' desire to acknowledge and honor the contributions made by Jerome Siegel by granting to The SIEGELS the benefits and payments provided herein; and

WHEREAS, it is the parties' intent and The SIEGELS' desire to vest in DC COMICS, forever, exclusive enjoyment and control over and all right, title and interest in, and arising out of The WORKS and The MARKS, including all future use thereof by DC COMICS and any and all future versions and adaptations thereof in any form or medium, including all rights The SIEGELS own, have ever owned or could ever claim to own on any basis in and to The WORKS and The MARKS (including any rights The SIEGELS could claim as members of the public, whether upon the expiration of any copyrights relating to The WORKS or otherwise, and/or whether upon the cancellation, loss or abandonment of any of The MARKS), including but not limited to all copyright and trademark rights and good will associated therewith throughout the world, whenever and wherever any of said rights arise; and

11

337

**EXHIBIT 3**
**29**

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties acknowledge that the SUPERMAN Derivative Works and the SPECTRE Derivative Works were created as works made for hire for DC COMICS and/or its predecessor(s) in interest but that if for any reason, any one of the SUPERMAN Derivative Works or the SPECTRE Derivative Works, or any portion thereof was not a work made for hire for any reason whatsoever: (i) the SIEGELS hereby simultaneously terminate any existing grant therein, if any, and make a new grant to DC COMICS of all rights without limitation whatsoever throughout the world therein, and (ii) such shall have no effect whatsoever on the fact that the remaining SUPERMAN Derivative Works and/or SPECTRE Derivative Works, or any portion thereof are works made for hire;

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated by the SUPERMAN AND SPECTRE Notices, and  to make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to the SUPERMAN Works and SPECTRE Works; and

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties hereby wish simultaneously to terminate contractually all grants (if any) relating to the OTHER SIEGEL Works by Jerome Siegel and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its

**EXHIBIT 3**
**30**

predecessor(s) and make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to such works, and

WHEREAS, it is the parties' intent that this Agreement supersede all prior agreements, negotiations, and/or understandings between DC COMICS and/or its predecessors on the one hand and Jerome Siegel and/or The SIEGELS on the other;

NOW, THEREFORE, in consideration of good and valuable consideration, receipt of which The SIEGELS hereby acknowledge, it is mutually agreed by and between The SIEGELS and DC COMICS as follows.

## TERMS

1. GRANT OF RIGHTS. The parties expressly agree that in order to effectuate the parties' intent as set forth herein, the "Stand Alone Assignment" documents attached hereto as Exhibits -__- (hereinafter "Stand Alone Assignment(s)") shall be executed simultaneously with the execution of this Agreement. The parties further agree that upon execution of this Agreement each of the Stand Alone Assignments shall be a separate transfer of rights and forever after shall be irrevocable and remain effective, independent of, and separate and apart from the other text and provisions set forth in this Agreement and shall have full force and effect, irrevocably and in perpetuity, regardless of the enforceability, validity, invalidity of or compliance by DC COMICS with any of such other text and provisions.

a) Grant Of All Rights In The SUPERMAN Works.

i) Grant Of All Rights In The ACTION COMICS NO. 1

SUPERMAN Works. If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the

339

**EXHIBIT 3**
**31**

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of April 15, 1999, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

      ii)    <u>Grant Of All Rights In The POST ACTION COMICS NO. 1 SUPERMAN Works.</u> The SIEGELS acknowledge that all of the POST ACTION COMICS NO. 1 SUPERMAN Works were created as works made for hire for DC COMICS's predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they do not have and will never come into any rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST

**340**

EXHIBIT 3
32

ACTION COMICS NO. 1 SUPERMAN Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

   b)   Acknowledgement/Grant Of All Rights In The SUPERMAN Derivative Works.  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of

15                                               341

EXHIBIT 3
33

any kind and can never claim any rights of any kind in the SUPERMAN Derivative Works as such works were prepared as works made for hire for DC COMICS and its predecessors in interest and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Derivative Works or in any portion thereof, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SUPERMAN Works or SUPERMAN Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SUPERMAN Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

c)   Acknowledgement/Grant Of All Rights In The SUPERMAN Marks.  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SUPERMAN Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Marks for whatever reason whatsoever (including as members of the public anywhere in the world should the SUPERMAN Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the SUPERMAN Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

16

342

**EXHIBIT 3**
**34**

d) Grant Of All Rights In The SPECTRE Works.

i) Grant Of All Rights In The MORE FUN COMICS SPECTRE Works. If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the MORE FUN COMICS SPECTRE Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

ii) Grant Of All Rights In The POST MORE FUN COMICS SPECTRE Works. The SIEGELS acknowledge that all of the POST MORE FUN COMICS

17

343

**EXHIBIT 3**
**35**

SPECTRE Works were as works made for hire for DC COMICS' predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they have no and will never come into any such rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST MORE FUN COMICS SPECTRE Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel , or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works was not terminated by the SPECTRE Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective November 23, 2000,  upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST MORE FUN COMICS SPECTRE Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or

18

344

**EXHIBIT 3**
**36**

could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

e) <u>Acknowledgement/Grant Of All Rights In The SPECTRE Derivative Works</u>. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Derivative Works and that all such rights are owned solely and exclusively by DC COMICS.  However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Derivative Works, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SPECTRE Works or SPECTRE Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SPECTRE Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

f) <u>Acknowledgement/Grant Of All Rights In The SPECTRE Marks.</u>  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Marks and that all such rights are owned solely and exclusively by DC COMICS.  However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Marks for whatever reason whatsoever, (including as members of the public anywhere in the world should the SPECTRE Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS) they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

19

345

**EXHIBIT 3**
**37**

effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest in the SPECTRE Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

g) <u>Grant Of All Rights In The OTHER SIEGEL Works.</u> To the extent that any OTHER SIEGEL Works exist, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS's compliance with the next sentence in this paragraph, The SIEGELS have the right to, and are, contractually terminating any grant made at any time to DC COMICS and/or its predecessor(s) in interest by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in The OTHER SIEGEL Works, concerning such OTHER SIEGEL Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective upon the signing hereof, and forever after all rights, title and interest of every kind whatsoever, including but not limited to copyright rights, throughout the world for all terms of protection, including any renewals or extensions thereof, The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public with respect to the OTHER SIEGEL Works when the copyright(s) or any of them therein expire and all claims or causes of action of any kind relating or appurtenant thereto.

h) <u>Acknowledgement/Grant Of All Rights In The OTHER Marks.</u> The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the OTHER Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the OTHER Marks for whatever reason

20

346

EXHIBIT 3
38

whatsoever, (including as members of the public anywhere in the world should the OTHER Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the OTHER Marks including any goodwill associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

    2.  <u>Payments To The Siegels And Other Financial And Related Terms.</u>  In complete consideration to The SIEGELS for any and all rights arising out of Jerome Siegel's contributions and authorship, and the other understandings and agreements herein made by The SIEGELS, DC COMICS shall pay (or shall provide, where applicable) to The SIEGELS the following:

      a)  <u>Initial Payments</u>

        i)  Upon full execution of this Agreement, a non-recoupable payment of $1,000,000;

        ii)  Upon full execution of this Agreement, an advance of $2,000,000 against The SIEGELS' royalty payments under ¶2(d) hereof;

        iii) Upon full execution of this Agreement , the payment of $250,000 heretofore made to the SIEGELS pursuant to the agreement of November 20, 2000 between SIEGEL and DC COMICS, receipt of which is hereby acknowledged by The SIEGELS, shall become non-recoupable.

      b)  <u>Annual Payments (Advances)</u>

        i)  For ten years commencing in 2002, payable on March 31st of each year, an annual, recoupable advance of $500,000 against any amount due to The SIEGELS hereunder.

EXHIBIT 3
39

ii) Commencing in 2012, and annually thereafter, DC COMICS shall pay The SIEGELS an advance payment calculated as follows:

(A) For each year in which DC COMICS has fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), the following year's advance shall be an amount equal to 75% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

(B) For each year in which DC CCOMICS shall not have fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), then until such time, if ever, as DC COMICS shall have fully recouped all the foregoing advances, the following year's advance shall be an amount equal to the greater of $100,000 or 25% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

iii) All payments made under this paragraph shall be non-interest bearing for the year in which each such payment is made. Thereafter, interest shall be calculated at 100% of the prime interest rate charged from time to time by The Bank of America or, if such institution is defunct, any other commercially recognized financial institution designated by DC COMICS on amounts paid that remain unrecouped as of December 31st of the year of payment, and shall be recoupable against any amount due to The SIEGELS hereunder.

22

348

**EXHIBIT 3**
**40**

iv)   The Siegels shall receive no further payments under this paragraph 2(b) after March 31 of the year immediately following the year in which the copyright in Action Comics No. 1 expires;

c)   <u>Widow's Benefits</u>

i)   For each year of Joanne Siegel's life, a non-assignable, non-transferable annual payment to Joanne Siegel of $135,000, payable periodically, but not less frequently than in equal monthly installments and The SIEGELS acknowledge such payments have been paid through 2001 and through _____, 2002;

ii)   Medical benefits will be provided to Joanne Siegel for the duration of her life with terms comparable to those provided to her in the past [include exhibit with details]. DC COMICS shall cooperate with Joanne Siegel in her efforts to obtain a medical identification card.

d)   <u>Royalties</u>

i)   Commencing for Revenues received on or after January 1, 2000;

ii)   6% of DC's Revenues from all media Licenses, including Licenses for motion pictures, television, radio, legitimate stage, sound recordings, and electronic media, for use of the SUPERMAN Property and/or the SPECTRE Property, except:

(A)   with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC COMICS property similar in stature and used in a like manner (e.g., a Superman and Batman film video), the 6% shall be reduced to 3%;

(B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC COMICS properties and where

23

349

**EXHIBIT 3**
**41**

the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

   iii)  6% of DC COMICS' Revenues from all publishing Licenses and merchandising Licenses for use of the SUPERMAN Property and/or the SPECTRE Property (including but not limited to product Licensing, promotional Licensing, and Licenses for the sale of entertainment goods and services such as theme parks or publications), except:

   (A) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reduced to 3%;

   (B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

   (C) with respect to Licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the SUPERMAN Property and/or the SPECTRE Property, DC shall allocate Revenues derived from the License based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reduced to not less than 1%;

   (D) with respect to merchandise relating to the SUPERMAN Property and/or the SPECTRE Property actually produced by DC Comics, 10% of Revenues

350

**EXHIBIT 3**
**42**

less costs, and subject to the pro rata allocations set forth above, shall be deemed DC Comics' Revenues for purposes of royalty computation.

iv)     1% of Revenues derived from extraordinary mixed Licenses, such as the License agreement dated April 1, 1998 by and between Warner Bros. Consumer Products, DC COMICS, Premier Parks Inc., and Six Flags Theme Parks Inc. (which involves numerous characters, including DC COMICS and Looney Toons characters), and other Licenses where Revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share.

v)     1% of the cover price of Net Sales of DC COMICS' own editions of publications based on the SUPERMAN Property and/or the SPECTRE Property. A publication shall be considered based on the SUPERMAN Property when one of the characters that comprises the SUPERMAN Property shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories). A publication shall be considered based on the SPECTRE Property when one of the characters that comprises the SPECTRE Property shall be the title of the publication (e.g., Spectre) or shall be the title of all the features within the publication (e.g., More Fun Comics containing only Spectre stories). However:

(A)     with respect to publications which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and

351

**EXHIBIT 3**
**43**

where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the publication in question (e.g., Justice League, Superfriends, Superman and Batman team up stories), the 1% shall be reduced to ½ %;

(B)    with respect to publications which are comprised of multiple stories and include one or more stories based on the SUPERMAN Property and/or the SPECTRE Property, the 1% shall be calculated on DC Comics' pro rata allocation of Net Sales among all stories which comprise the publication;

(C)    with respect to publications which are sold to the public through DC COMICS' customary distribution channels and that do not have a cover price or a suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated on an amount equal to twice the wholesale price received by DC COMICS on account of such publications.

(D)    with respect to publications which are sold to the public through distribution channels other than DC COMICS' customary distribution channels, whether or not with a cover price or suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications;

(E)    with respect to publications which are given away to the public without charge for a purpose other than for providing the equivalent of a public service announcement, or for advertising, promoting or publicizing DC COMICS and/or AOLTW Companies, their businesses, products or services, the 1% (as may be reduced in accordance

26

352

**EXHIBIT 3**
**44**

with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications.

(F)     there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the SUPERMAN Property and/or the SPECTRE Property when those other characters do not appear in the title of the publication or feature in question;

(G)     there will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE Property appears in publications or stories based on other properties and the characters do not appear in the title of the publication or feature in question.

vi)     All royalties hereunder shall cease to be earned by The SIEGELS for Revenues received after the expiration of the U.S. Copyright in Action Comics No. 1, except on motion pictures released in the last five years before the end of the copyright term of Action Comics No. 1, which shall earn royalties for five years from the date of the release, and except on television series, which shall earn royalties for three years from the last initial television broadcast of consecutive years of original episodes, even if such goes beyond the term of copyright of Action Comics No. 1. It is expressly understood and agreed that royalty payments made under this subparagraph shall be due only on Revenues received directly from the Licensing of exhibition and/or broadcast rights to the above motion pictures and television series and not from Revenues received indirectly, such as from the sale of any goods or provision of any services ancillary or collateral thereto.

vii) The SIEGELS acknowledge that DC COMICS, and/or other companies either wholly or partially controlled by DC COMICS' corporate parent AOL Time

27

**EXHIBIT 3**
**45**

Warner, Inc. (the "AOLTW Companies"), shall have the unlimited right to use the WORKS, and the MARKS in all forms of advertising, promotion and publicity to promote DC COMICS, AOLTW, their businesses, products and services without any payment obligation to The SIEGELS.

    e)   <u>Payment Designations</u>  All monies due The SIEGELS hereunder, except the widow's benefit, shall be paid in the following manner:

        47.5% to Joanne Siegel

        23.75 to Laura Siegel Larson

        23.75 to Michael Siegel

        5.00 to Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three persons listed above may designate one or more persons to receive money due to him or her with a limit of up to three such persons during the life of DC COMICS' payment obligations hereunder.  Such designations shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

    f)   <u>Medical Insurance For Michael Siegel, Laura Siegel Larson, James Larson and Michael Larson</u>  DC Comics shall provide medical and dental insurance, or reimbursement for the cost of the same at DC COMICS's then current cost, for Laura Siegel Larson and Michael Siegel for their lives, and for James Larson and Michael Larson for the period of their minority (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is understood that neither Laura Siegel Larson nor Michael Siegel is an employee of DC Comics) (Attached as Exhibit __ hereto is a copy of the medical coverage guidelines that currently apply).  DC Comics shall reimburse Laura Siegel Larson for premiums

354

**EXHIBIT 3**
**46**

she has paid for medical and dental insurance for her and James and Michael Larson  from November 20, 2000 through the date of commencement of the insurance provided hereunder.

g)      Acknowledgement Of No Entitlement To Any Further Or Additional Payment.  The SIEGELS hereby acknowledge and agree that, but for the payments provided for in paragraph 2 herein, they are not entitled to, and never shall be entitled to, and shall not receive any other payments or consideration of any kind whatsoever from DC COMICS and/or its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and/or past, present or future parents, subsidiaries, divisions, affiliates, related companies, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys or licensees.

3.  DC COMICS Exclusive Ownership Of All Rights In The WORKS And The MARKS.  The SIEGELS acknowledge that, by the grant set forth in Paragraph 1 above, or otherwise, DC COMICS retains the sole and exclusive enjoyment and control and continuous, sole and exclusive ownership of, and sole and exclusive right to exploit The WORKS, to make such changes therein as DC COMICS in its sole discretion may determine, to exploit the same by means of any possible derivative works in any and all media or otherwise and to copyright such derivative works in its own name and the name of its nominee(s), for all terms of protection, including any renewals or extensions thereof, throughout the world, in all languages and forms, in all media now known or hereafter known, along with all claims or causes of action appurtenant thereto.  DC COMICS also retains the sole and exclusive enjoyment and control over, and sole ownership of, and sole and exclusive right to exploit The MARKS as DC COMICS in its sole discretion may determine, including all goodwill associated therewith, along with all claims or causes of action appurtenant to The MARKS.

29

355

**EXHIBIT 3**
**47**

4. <u>The SIEGELS Reserve No Rights With Respect To The WORKS Or The MARKS.</u>
The SIEGELS acknowledge and agree that it is the intent of this Agreement to vest in DC
COMICS ____ exclusively, all rights of any kind in The WORKS and The MARKS, and all
future depictions and forms of exploitation based thereon, for DC COMICS's sole and exclusive
use, enjoyment, control, and benefit.  The SIEGELS acknowledge and agree that effective with
the grant made herein, and regardless of anything that occurs or does not occur in the future,
including but not limited to, any change(s) in law(s) applicable in any manner whatsoever to this
Agreement or its terms, whether facts are, or evidence is, learned or claimed to have been
learned relating in any manner whatsoever to this Agreement or its terms, whether any person or
entity believes for whatever reason, justified or otherwise, that this Agreement and/or its terms
are in any manner just or unjust to The SIEGELS or any of them, and/or whether or not any of
the works that are the subject of this Agreement fall into the public domain for any reason
whatsoever, The SIEGELS have no right to use nor any right, title, or interest of any nature in
The WORKS or The MARKS.  By way of example only and without limitation, as of the
effective date hereof and forever thereafter, The SIEGELS have no, and shall have no right to,
and covenant not to, exploit, or enter into any negotiations or transactions with respect to, or
related to, or to terminate any grant in or relating to The WORKS and/or The MARKS, and own
no and shall own no rights, title or interest, including but not limited to any Reversionary Rights,
of any kind whatsoever anywhere in the world in The WORKS and/or The MARKS or have any
right to use or authorize the use of any of the foregoing on any basis.

5. <u>The SIEGELS Shall Not Challenge DC Comics's Rights Granted Hereunder Or
Under The Stand Alone Assignments.</u>  The SIEGELS covenant not to and shall not challenge,
make any claim against or concerning, or take any action, directly or indirectly, to interfere with

30

356

**EXHIBIT 3**
**48**

or reduce DC COMICS's ownership or exclusive benefit from, control over, and enjoyment of, or exclusive right to exploit The WORKS or The MARKS, including but not limited to the rights granted in The WORKS or The MARKS hereunder, or authorize, aid, abet or assist any other person or entity in doing so.

6.  No Right To Terminate New Grant.  Further to paragraph 4, The SIEGELS hereby acknowledge that, by serving the SUPERMAN AND SPECTRE Notices, they have sought to terminate any and all earlier grants by Jerome Siegel to DC COMICS and/or its predecessors in interest in the SUPERMAN and SPECTRE Works pursuant to Section 304(c) of the Copyright Act and they know of no such grants which were not identified in said Notices.  The SIEGELS further acknowledge and represent and warrant that, within the meaning of the Copyright Act, this Agreement is a new grant in the SUPERMAN and SPECTRE Works and OTHER SIEGEL Works (and the SUPERMAN and SPECTRE Derivative Works), and that pursuant to this Agreement, neither they nor anyone claiming rights under or through them or Jerome Siegel have any right(s) or will ever have any right(s) whatsoever to terminate the grants contained herein or to claim any Reversionary Rights in The WORKS or The MARKS under any provision of the Copyright Act, or under any other statute, regulation, common law principle, body of law or otherwise throughout the world.  The SIEGELS hereby designate DC COMICS as the administrator, personal representative, and/or trustee of Jerome Siegel for the purposes of termination of copyright grants with respect to the SUPERMAN and SPECTRE Works.

7.  Third Party And Intercompany Licenses.

a)      DC COMICS shall enter into any and all Licenses with unaffiliated third parties with respect to the SUPERMAN Property and the SPECTRE Property as DC COMICS, in its sole discretion, elects to and The SIEGELS shall have no right whatsoever to challenge any such

357

**EXHIBIT 3**
**49**

License or any of the terms thereof entered into by DC COMICS, its parents, affiliates, subsidiaries, licensees or sub-licensees, for any reason whatsoever or to make any claim for breach of this Agreement or liability hereunder on account of any such License or the terms thereof.

(b)     The SIEGELS hereby acknowledge their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in so doing, may License, *inter alia*, the SUPERMAN Property. The SIEGELS shall have no right whatsoever to challenge any such License or any of the terms thereof, on any basis, provided that: (i) the terms of such License are commercially reasonable and fair as if entered into with an unaffiliated third party at the time entered into: or (ii) DC COMICS' share of proceeds on account of such License are no less favorable to DC COMICS than its share of proceeds in the applicable safe harbor agreement identified below which safe harbor agreements are hereby acknowledged to be commercially reasonable and fair within the meaning of subparagraph (i) above; or (iii) if DC COMICS' share of proceeds is less favorable to DC COMICS than under the applicable safe harbor agreement identified below, if DC COMICS pays The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below. If DC COMICS enters into an intercompany agreement that is not covered by an applicable safe harbor agreement or if DC COMICS elects not to pay The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below, , then The SIEGELS may challenge such agreement under the procedures set forth in the Dispute Resolution section paragraph __, but only on the basis that the agreement is not commercially reasonable and fair in light of all the circumstances. In no event shall The SIEGELS have the

358

**EXHIBIT 3**
**50**

right to challenge any intercompany deal on the basis that it is a transaction with an AOLTW

Company, or on the basis of whether or not there is an advance or guarantee, or because DC

COMICS did not hold an auction in respect thereof.

    c)    The applicable safe harbor agreements are as follows:

        i)    For live action and animated feature length theatrical motion

pictures: the larger of 5% of worldwide gross revenues or 7.5% of domestic gross revenues

received by an affiliated motion picture distributor in the United States in U.S. Dollars from

exploitation of the motion pictures, less taxes (including duties and other governmental fees),

collection costs and trade association dues.  Notwithstanding the foregoing, in respect of

Licenses of exhibition or distribution rights by means of video discs, cassettes or similar

devices or delivered electronically to the consumer, gross revenues shall mean 20 % of (i)

gross wholesale rental income received therefrom by an affiliated distributor and (ii) gross

wholesale sales income received therefrom by an affiliated distributor, less a reasonable

amount for returns.

        ii)    For animated direct to home video productions:  $80,000 for each

hour of the direct to home video production (pro rata for longer or shorter) and 30% of Defined

Proceeds received by an affiliated animation production company in the United States in U.S.

Dollars from exploitation of the home video production.  As used herein, Defined Proceeds

shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation

(or any successor in interest thereto).

        iii)    For live action television programs: 3% of the first 1.5 million

dollars of Gross Receipts received by an affiliated television production company in the United

States in U.S. Dollars from exploitation of each program , and 4.5% of Gross Receipts on all

**EXHIBIT 3**
**51**

amounts in excess of 1.5 million dollars received by an affiliated television production company in the United States in U.S. Dollars from such exploitation. As used herein, Gross Receipts shall mean the then standard definition of Gross Receipts used by Warner Bros. Television (or any successor in interest thereto).

        iv)     For animated television programs: a flat fee of $35,000 per episode for the first 65 episodes; $40,000 per episode thereafter; and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the programs. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

        v)     For video games:

        (A)     For products intended for PC/Mac platforms: 10% of net sales of up to 150,000 units of each product received by an affiliated video game company in the United States in U.S. Dollars, and 13% of such sales in excess of 150,000 units. As used in this paragraph (v), "net sales" shall mean the affiliated video game company's then standard definition of net sales.

        (B)     For Products intended for all other platforms: 5% of net sales received by an affiliated video game company in the United States in U.S. Dollars for each such product.

        vi)     For licensed merchandise excluding any of the other categories set forth in this safe harbor provision: Arrangement between DC COMICS and Warner Bros. Consumer Products, pursuant to which Warner Bros. Consumer Products deducts a 25% fee

34

360

EXHIBIT 3
52

from gross revenues received in the United States in U.S. Dollars on account of licensed

merchandise agreements, and remits 75% of such gross revenues to DC COMICS.

       vii)    For licensed publishing:  10% of net wholesale sales received by

an affiliated publishing company in the United States in U.S. Dollars for each licensed

publication.  As used herein, "net wholesale sales" shall mean the affiliated publishing

company's then standard definition of net wholesale sales.

       viii)    For website uses of Flash Animations and collateral material

intended to supplement or support the Flash Animations: 5% of an affiliated online production

company's Gross Proceeds received in the United States in U.S. Dollars from its exploitation

of the animations and collateral material after it has recouped its Production Costs.  As used

herein, Gross Proceeds and Production Costs shall mean the then standard definition of Gross

Proceeds and Production Costs used by Warner Bros. Online (or any successor in interest

thereto).

    8.   <u>Accounting.</u>  Royalties due in accordance with paragraph 2(d) hereof (i.e., amounts in

excess of recoupable Annual and Initial Advances and interest, if applicable) shall be payable

annually on March 31 of the year following the close of the annual accounting period.  All

payments shall be accompanied by a statement of account.  The year 2000 statement and

payment, if any, shall be made on March 31, 2002

    9.   <u>Audit.</u>  The SIEGELS may audit the books and records of DC COMICS solely in

order to verify statements issued to The SIEGELS hereunder.  Any such audit shall be at The

SIEGELS' expense.  Any audit shall be conducted only upon reasonable notice by a certified

public accountant during regular business hours at DC COMICS' offices and in such manner as

not to interfere with DC COMICS' normal business activities.  In no event shall an audit with

35

361

**EXHIBIT 3**
**53**

respect to any statement start later than twelve (12) months after the date of that statement nor shall any audit continue for longer than five (5) consecutive business days, nor shall audits be made more frequently than once a year, nor shall the books and records supporting any statement be audited more than once. All statements shall be binding upon The SIEGELS and not subject to any claims or proceedings unless objection is made in writing by a majority of The SIEGELS stating the basis thereof and delivered to DC COMICS within twelve (12) months of the date of the statement to which objection is made, or if an audit is started within that period, then within thirty (30) days of the completion of that audit. The SIEGELS and their certified public accountant (and any employee thereof) shall keep confidential all information received from DC COMICS during the Audit.

10.    Appointment Of DC COMICS As Attorney-in-Fact; Provision And Filing Of Documents.

a) The SIEGELS Shall Furnish DC COMICS With Documents And Shall File Assignments and Execute Documents. Within _____ of the effective date hereof, and thereafter, The SIEGELS shall at all times cooperate with and furnish DC COMICS with copies of all documents in their custody, possession or control or that of their attorneys pertaining to the rights in and history and creation of The WORKS and/or The MARKS. The SIEGELS further undertake that they shall within _____ of the effective date hereof file with the United States Copyright Office and serve true and correct copies on DC COMICS of the Stand Alone Assignments attached hereto as Exhibit _ and shall execute any and all other documents as requested by DC COMICS to confirm DC COMICS' ownership of The WORKS and The MARKS. The parties hereto each agree to execute and deliver any and all further documents as may be required to carry out the terms and intentions of this Agreement, including but not

36

**EXHIBIT 3**
**54**

limited to all assignments, powers of attorney and other appropriate documents relating to the copyrights, trademarks and all other rights at issue and/or which DC COMICS may reasonably request for filing and recording or other purposes.

b) <u>The SIEGELS Appoint DC COMICS as Their Attorney-In-Fact.</u> The SIEGELS hereby further irrevocably appoint DC COMICS, and/or any persons designated by it, as their attorney-in-fact, coupled with an interest therein, with respect to The WORKS and The MARKS. DC COMICS is, thus, hereby made fully authorized to execute any and all such documents for and in the name of The SIEGELS, or any of them, and to bind The SIEGELS and their heirs, successors and assigns thereby with respect to The WORKS and The MARKS.

<u>11.</u>    <u>Conduct Of The Business.</u>

a) <u>No Disparagement By Parties.</u> The SIEGELS shall not disparage or criticize DC COMICS, its parent, related companies, affiliates, subsidiaries, employees, officers, directors, attorneys, agents, predecessors, successors, assigns, or licensees or their properties. DC COMICS shall not disparage or criticize and shall not authorize the disparagement or criticism of The SIEGELS or their employees, officers, directors, attorneys, agents, predecessors or successors.

b) <u>Press Releases And Promotion.</u> The SIEGELS and DC COMICS shall issue a joint press release in the form attached as Exhibit _ announcing their entry into this Agreement. Thereafter, The SIEGELS:

(i)     upon DC COMICS' request, shall continue to positively publicize The WORKS, including making themselves reasonably available for public appearances (with any travel or related expenses paid by DC COMICS and subject to their health and availability);

37                                    **363**

**EXHIBIT 3**
**55**

(ii)     shall not make any personal appearances, issue statements, grant interviews, and/or engage in other activities they may wish to conduct relating to The WORKS (and/or The MARKS) without the prior written consent of DC COMICS, not to be unreasonably withheld;

(iii)     shall not contact or cause any third party to contact any licensee or sublicensee of DC COMICS of any of The WORKS or The MARKS.

c)   The SIEGELS Shall Refer Inquiries.   The SIEGELS shall not, directly or indirectly, indicate to any other person or entity, that they own any rights in, or have any role with respect to the future exploitation of The WORKS and/or The MARKS in any manner, or have any role in DC COMICS' business in relationship to The WORKS and/or The MARKS. However, if The SIEGELS should receive inquiries concerning The WORKS and/or The MARKS, they shall promptly and fully refer any and all such inquiries to DC COMICS.

d)   Advise.  DC COMICS shall provide the opportunity for The SIEGELS who sign this Agreement to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), concerning The SUPERMAN Works and The SIEGELS will have an opportunity to give their input with respect thereto, but this does not rise to the level of a consultation right.  The SIEGELS will be informed of such developments periodically.  To facilitate this, The SIEGELS will appoint one of them to receive occasional written updates from DC COMICS and with whom, upon request, a DC COMICS representative will meet once a year to provide a broader overview of current developments.  The SIEGELS may not at any time or for any reason, assign or transfer to any other person or entity the right to receive the information or provide the input described

EXHIBIT 3
56

herein.  Further, The SIEGELS shall at all times keep the information provided to them by DC COMICS confidential and not disclose it to any other person or entity.

    e)   <u>Credit.</u>

       (i) On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster", or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations.  DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

    (ii)    On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of the copyright of Action Comics No. 1, DC COMICS shall provide the following credit: "By Special Arrangement with the Jerry Siegel Family".  The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

EXHIBIT 3

57

(iii) On new works based upon the SPECTRE Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Spectre created by Jerry Siegel and Bernard Bailey", "Created by Jerry Siegel and Bernard Bailey", or "Based on the characters created by Jerry Siegel and Bernard Bailey"(as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary.  The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations.  DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(iv) No failure to comply with the provisions of this paragraph nor any failure of any other person to comply therewith shall constitute a breach by DC COMICS of this Agreement, such as to entitle The SIEGELS to injunctive relief; provided, upon notice by The SIEGELS, DC COMICS shall use reasonable efforts to prospectively cure any such failure to comply with the provisions of this paragraph.

f)    DC COMICS Right To Use Materials.  DC COMICS shall have the right at its sole discretion to use photos and "bios" of or concerning Jerome Siegel in publicity or advertising materials concerning its properties, including The WORKS and/or The MARKS.

g)    DC COMICS Shall Have Exclusive Control Over The WORKS And The MARKS.  DC COMICS shall have exclusive control over the manner, forum, medium, and all other exploitation of The WORKS and The MARKS, and such matters will be within its sole discretion and The SIEGELS shall have no right of approval whatsoever in regard thereto. Nothing in this Agreement shall be construed as requiring DC COMICS to exploit, or continue to

40

366

**EXHIBIT 3**
**58**

exploit, The WORKS and The MARKS nor shall anything in this Agreement be construed so as to create a fiduciary duty owed to The SIEGELS.

     h)    First Opportunity To Negotiate. The SIEGELS shall offer DC COMICS, or such parent, related company, affiliate, subsidiary and/or division as it may designate a first opportunity to negotiate for the rights in any biographical works in any media pertaining to Jerome Siegel.

12. Representations And Warranties, Covenant Not To Sue And Indemnification.

     a)   The SIEGELS Have The Right and Power To Enter Agreement. The SIEGELS hereby represent, warrant, agree and covenant that (i) they have the right and power to enter into this Agreement and to grant all rights which are granted by them herein and covered by this Agreement, (ii) neither they nor Jerome Siegel have granted any right, license, or permission, or entered into any transaction or agreement in relation to or with respect to, the subject matter hereof, to any other party or encumbered any of The SIEGELS' (or Jerome Siegel's) rights or interests in The WORKS or The MARKS in any way, (iii) they know of no other party with any rights of any kind to or that claim to have any rights of any kind to The WORKS or The MARKS, (iv) they shall not, at any time hereafter, solicit, initiate or enter into any negotiation, transaction or agreement or grant any right, license, or permission in relation or with respect to the subject matter covered by this Agreement to any other party or otherwise encumber, in any way, any rights granted to DC COMICS herein, including, but not limited to, any copyright termination interest or any Reversionary Rights in any rights relating to The WORKS; (iv) they shall not at anytime hereafter, regardless of whether The WORKS fall into the public domain, or any other occurrence or non-occurrence, exploit The WORKS or The MARKS, or license or authorize anyone else to do so, except to the extent provided herein; (v)

**367**

EXHIBIT 3
59

any and all rights that they own, owned, claim or claimed in The WORKS or The MARKS, including but not limited to all trademark rights (if any) and copyright rights, and all termination rights arising under the U.S. Copyright Act and Reversionary Rights, if any, derive and flow directly and only from Jerome Siegel; (vi) no person or entity other than The SIEGELS and/or DC COMICS own any rights or could possibly claim any rights of any nature in, or arising out of, any Works created by Jerome Siegel; (vii) they know of no Works other than the SUPERMAN Works and SPECTRE Works (notwithstanding and without diminishing in any manner the provisions in this Agreement relating to The OTHER SIEGEL Works and the OTHER Marks) created by Jerome Siegel in which they claim any rights; (viii) they know of no Works included among the SUPERMAN Works that were not listed in the SUPERMAN Notices (ix) Joanna Siegel is the sole executor, trustee, administrator and personal representative of Mr. Siegel and his estate.

      b)   <u>Release And Covenant Not To Sue By The SIEGELS.</u>

    i)     As of the date of execution of this Agreement, The SIEGELS and their descendants, ancestors, dependents, estates, heirs, predecessors, successors and assigns and past, present and future, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively referred to as "RELEASOR"), hereby release and discharge now and forever DC COMICS and its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and past, present and future parents, subsidiaries, divisions, affiliates, related companies, partners, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively

42

368

**EXHIBIT 3**<br>**60**

referred to as "RELEASEE") from any and all past, present, future, actual and/or potential claims, demands, entitlements, obligations, actions, injuries, causes of action, suits, debts, dues, sums of money, accounts, reckonings, losses, (including but not limited to lost earnings, revenues, fees and/or royalties) bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, settlements, expenses, counsel fees, costs, extents and executions (hereinafter referred to collectively and individually as "Claim(s)") throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASOR could have asserted or could assert against RELEASEE relating in any manner to The WORKS and/or The MARKS, regardless of whether or not such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property, including but not limited to any Claim(s) to benefit in any manner, other than as provided for herein from any transactions, understandings and agreements made with respect to The WORKS and/or The MARKS as of the date of execution of this Agreement.

ii)    In addition to the foregoing and except as otherwise provided herein, RELEASOR hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner, or in any forum, anywhere in the world, whatsoever, against the RELEASEE arising out of any of RELEASEE'S past, present or future acts relating to The WORKS and/or The MARKS or out of any other claim of rights or from facts acquired by RELEASOR, subsequent to the last date of execution hereof.

RELEASOR expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law

369

EXHIBIT 3
61

(including but not limited to any Reversionary Rights, and/or any rights and benefits under California Civil Code, Section 1542, and any and all other provisions of all comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement..

c) <u>Release And Covenant Not To Sue By DC COMICS.</u>

i)     As of the date of execution of this Agreement, RELEASEE hereby releases and discharges now and forever RELEASOR from any and all Claim(s) throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASEE could have asserted or could assert against RELEASOR relating in any manner to The WORKS and/or The MARKS, regardless of whether such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property.

ii)     In addition to and in accordance with the foregoing, and except as otherwise provided herein, RELEASEE hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner whatsoever, or in any forum, anywhere in the world, against the RELEASOR arising out of any of RELEASOR'S acts as of, or prior to, the last date of execution hereof, relating to The WORKS and/or The MARKS.

RELEASEE expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law (including but not limited to California Civil Code, Section 1542, and any and all other provisions of all

44

370

**EXHIBIT 3**
**62**

comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement.

d)   The SIEGELS Indemnify DC Comics.  RELEASOR shall jointly and severally indemnify, defend and hold harmless RELEASEE against any and all Claim(s)  at the time such Claim(s) are incurred, resulting or arising from any claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) by:

(i)      RELEASEE  against RELEASOR  arising out of a breach or claimed breach by RELEASOR  (or any of the successors, assigns, heirs, estates, trustees, administrators or executors  of Jerome Siegel) of any of the terms of this Agreement;

(ii)     RELEASOR, the estate and/or heirs of Jerome Siegel, Dennis Larsen, and/or any other person or entity, without any limitation whatsoever,

(a)      asserting any right in The WORKS and/or The MARKS;

(b)      seeking to terminate any grant(s) made, or right(s) granted herein or in the Stand Alone Assignments;

(c)      claiming any Reversionary Rights in The WORKS or The MARKS;

(d)      that in any manner interferes with DC COMICS' exclusive rights in and/or ownership of The WORKS and/or The MARKS, including but not limited to any claim or challenge to DC COMICS' right and power to enter into this Agreement with The SIEGELS and/or to DC COMICS' exercise, to the full extent authorized, of the right to exploit

371

**EXHIBIT 3**
**63**

the rights granted to it herein and to deliver as compensation to The SIEGELS the payment and options set forth herein;

        (e)      relating to The SIEGELS representations and warranties herein, including but not limited to: i) their representations and warranties of ownership; and ii) their right or power to enter into this agreement and to grant to DC COMICS the rights granted herein;

        (iii)    Dennis Larsen against RELEASEE in any manner relating to compensation or payments under this Agreement.

RELEASOR's obligation to indemnify RELEASEE hereunder is fully binding regardless of whether or not any of the aforementioned claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) are founded, valid, established in law or fact, or based on evidence.

    e)    DC COMICS Indemnifies The SIEGELS.  DC COMICS agrees to and shall defend and indemnify those members of the Siegel family who sign this Agreement against any claims or damages incurred by them arising out of or relating to claims brought by third parties against The SIEGELS due to wrongful acts by DC COMICS and/or Warner Bros. concerning The WORKS and/or The MARKS.  DC COMICS shall do this, at its option, by adding those members of the Siegel family who sign this Agreement as named insured(s) on any applicable Errors & Omissions Insurance policy, or through direct indemnification, subject to the limitations set forth in this Agreement.

13. Confidentiality.  Except for the agreed upon press release and the information contained therein referred to in paragraph __ above, The SIEGELS shall keep confidential all contents of this Agreement.

372

**EXHIBIT 3**
**64**

14.  Dispute Resolution.

a)  Choice of Law. This Agreement, and all claims of any nature or type whatsoever related to or concerning the subject matter of this Agreement, shall be governed by New York law

b)  DC COMICS' Equitable Remedies Unlimited. The SIEGELS agree that this Agreement and all rights granted herein by them to DC COMICS may be specifically enforced by DC COMICS, including by an action seeking temporary, preliminary and/or permanent injunctive relief. It is further agreed that any attempt by the SIEGELS to use, authorize others to use, or to attempt to prevent others from using the SUPERMAN Property and the SPECTRE Property will cause immediate and irreparable harm to DC COMICS and that the SIEGELS are estopped from making any argument that DC COMICS is not irreparably harmed by such action. Any Dispute asserted by DC COMICS may, at the sole option of DC COMICS, be adjudicated in any court of competent jurisdiction, including but not limited to, the courts of the State of New York, in the borough of Manhattan. The SIEGELS hereby consent to the jurisdiction of New York state and federal courts in the borough of Manhattan.

c)  Arbitration As Sole Remedy To Address Disputes By The SIEGELS. Any Dispute raised by The SIEGELS shall be resolved exclusively by arbitration according to the procedures set forth in the "Arbitration Procedures Rider" attached as Exhibit __ hereto and incorporated herein by reference. The remedies of The SIEGELS under or with respect to this Agreement shall be strictly and irrevocably limited to arbitration for an accounting of moneys due. The SIEGELS shall have no right to, and irrevocably waive and release any rights they may

47

373

**EXHIBIT 3**
**65**

otherwise have or obtain in the future to seek, any injunctive or other equitable relief of any kind, for any reason whatsoever. Under no circumstances, including the failure of DC COMICS to keep or perform any of its duties or obligations under this Agreement, shall The SIEGELS, or any of them or anyone claiming rights through or under them or Jerome Siegel, have the right to rescind, revoke, cancel or terminate this Agreement, the Stand Alone Assignments, or any of the rights granted in any of those documents to DC COMICS and covenant not to do so. Further, in no event shall any such rights revert to or be possessed by The SIEGELS or anyone claiming rights through or under them.

    d)    <u>Limit On Remedy Available To The SIEGELS</u>. If for any reason whatsoever this Agreement and/or The SIEGELS' grant of rights to DC COMICS provided herein is claimed to be, or is, ineffective, void, voidable or revocable, in whole or in part, or if for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against or challenge to DC COMICS' sole and exclusive ownership of and right to exploit any and all rights in The WORKS or any other works owned by DC COMICS throughout the world, or any part thereof, on any basis or on any theory, or somehow obtain any Reversionary Rights in The WORKS or The MARKS it is expressly understood and agreed that the sole remedy is to seek compensation due under this Agreement pursuant to the Arbitration Procedures set forth in Exhibit __ hereto. The SIEGELS further agree that in the event any such claim or challenge results in any liability or damage to DC COMICS, except for the amount provided in paragraph _ below (i.e. annual compensation to ____ of $100,000), any amounts that might otherwise be due to The SIEGELS under this Agreement shall be reduced by an amount equivalent to any liability or damage suffered by DC COMICS on such claim or challenge, which DC COMICS may offset against

**EXHIBIT 3**
**66**

any sums due to The SIEGELS herein. The parties acknowledge that the financial benefit flowing to The SIEGELS under this Agreement represents a greater amount than what The SIEGELS would have received from a court of competent jurisdiction in an attempt to enforce the Notices and any purported rights thereunder. As consideration for this, The SIEGELS expressly agree that in any event, including but not limited to any change in law or otherwise, the compensation owing to The SIEGELS pursuant to paragraphs ___ of this Agreement shall constitute a cap upon the amount DC COMICS shall ever be liable for or obligated to pay to The SIEGELS or anyone else claiming under or through The SIEGELS and/or Jerome Siegel regardless of the basis of any such claim.

e)   No Payment Due Unless Provided For Herein   Except as provided in paragraph 2(e), The SIEGELS acknowledge that any right to payment for any use of the SUPERMAN or SPECTRE Works to which Michael Siegel may be entitled shall be limited to a percentage of sums paid pursuant to this Agreement and to be negotiated directly between SIEGEL and Michael Siegel. None of The SIEGELS or their heirs, executors, trustees, administrators, successors or assigns are due, or ever will be due, anything whatsoever from DC COMICS to the extent it is not expressly provided for herein.

f)   Suspension Of Payments To The SIEGELS.   If for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against, or challenge to, or in any manner diminish, or interfere with, whether directly, indirectly or by operation of law, DC COMICS' sole and exclusive ownership and enjoyment of and right to exploit in any manner it so chooses in The WORKS and/or The MARKS or any other works or marks owned by DC COMICS throughout the world and/or any and all rights therein, or any part thereof, on any basis or on any

**EXHIBIT 3**
**67**

theory (including but not limited to claiming any Reversionary Rights in The WORKS or The MARKS), it is expressly understood and agreed that all payments to The SIEGELS shall be suspended until the claim is finally resolved.

15.    Non Assignability Of Rights Granted To The Siegels.  The SIEGELS shall not assign, transfer, sell, license, or give away any of the rights provided to them under this Agreement, and any such assignment shall be null and void.  The SIEGELS expressly agree that their heirs and/or all person(s) or entity or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement are expressly bound by this Agreement to the same extent to which The SIEGELS are bound by it.  The SIEGELS shall expressly notify in writing (in their wills and/or other documentation as appropriate) their heirs and/or all person(s) or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement that such person(s) or entity or entities are bound by the terms hereof to the same extent to which The SIEGELS are bound by it.

16. MISCELLANEOUS

a)  Severability.  In the event any provision hereof affecting The SIEGELS' grant of rights to DC COMICS under or pursuant to this Agreement is determined for any reason by any competent court to be unenforceable, such determination shall not affect the effectiveness of any other provision hereof providing for the grant of rights by The SIEGELS to DC COMICS, so that The SIEGELS's grant of rights shall be enforced to the fullest extent allowable by law in accordance with the parties' intent hereunder.

b)  Successors.  This Agreement is enforceable against and binding upon the parties' heirs, executors, trustees, administrators, agents, attorneys, licensees, officers, employees, directors, consultants, successors and assigns.

376

EXHIBIT 3
68

c) <u>Amicable Resolution.</u> This Agreement represents the amicable resolution of the dispute between DC COMICS and The SIEGELS referenced in paragraph 7 of the Tolling Agreement.

d) <u>Modification in Writing.</u> This Agreement may be modified only by a writing signed by each party hereto.

e) <u>Entire Agreement.</u> This Agreement contains the complete understanding between the parties concerning the subject matter hereof and all prior representations, agreements and understandings are merged herein.

f) <u>Arms Length.</u> The parties hereto mutually acknowledge and agree that this Agreement and the terms and provisions memorialized herein have been fully negotiated with the assistance of qualified legal counsel at "arms length" and, consequently, no rule of interpretation or construction which would result in any interpretation or construction in favor, or to the detriment of, one party over another party shall apply.

g) <u>Counterparts.</u> The parties shall execute this Agreement in 4 counterparts so that each party may retain an original.

h) <u>Captions.</u> The captions of this Agreement are for convenience only and shall not be construed as part hereof or affect the construction or interpretation of any provisions of this Agreement.

<u>AGREED AND ACCEPTED</u>:

DC COMICS, a division of Warner Bros., a          By: _____
Time-Warner Entertainment Company                        Joanne Siegel


By: _____          Date: _____


377

51

**EXHIBIT 3**
**69**

Title: _____

Date: _____

By: _____

    Laura Siegel Larson

Date: _____

The Estate of Jerome Siegel

By: _____
Joanne Siegel as sole executor, trustee,
administrator and personal representative of
Jerome Siegel and his estate

Date: _____

By: _____

    Michael Siegel

Date: _____

52

**378**

**EXHIBIT 3**
**70**

## **ACKNOWLEDGMENT**

STATE OF          )

                        SS.:

COUNTY OF        )


On _____ __, 2001 before me _____ personally came _____ to me known, by me duly sworn, did depose and say that deponent resides at _____ that deponent is the _____ of DC COMICS, a division of Warner Bros., a Time-Warner Entertainment Company, the entity described in, and which executed the foregoing Agreement that [deponent knows the seal of the corporation, that the seal affixed thereto is the corporate seal, that it was affixed by order of the board of the corporation; and that deponent signed deponent's name thereto by like order.]

53

379

**EXHIBIT 3**
**71**

## **ACKNOWLEDGMENT**

State of         )

               :ss:

County of       )


        On           2001 before me personally came Joanne Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.


_____

                 Notary Public

**380**

**EXHIBIT 3**
**72**

## ACKNOWLEDGMENT

State of            )

                 :ss:

County of            )

On        2001 before me personally came Laura Siegel Larson to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.

_____
Notary Public

381

**EXHIBIT 3**
**73**

## <u>ACKNOWLEDGMENT</u>

State of          )

                 :ss:

County of      )

On        2001 before me personally came Michael Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that he executed the same.

————————————————

Notary Public

\\UNP1\VOL2\FIRMDOCS\PPERKINS\DCC\SUPER\Siegel Draft Agreement 020201.doc

56

**EXHIBIT 3**
**74**

JOANNE SIEGEL
13929 Marquesas Way #201-A
Marina Del Rey, CA  90292
(310) 821-5894
May 9, 2002

Richard D. Parsons
Co-Chief Operating Officer
AOL Time Warner Inc.
75 Rockefeller Plaza
New York, New York 10019

Dear Dick,

I am Joanne Siegel, widow of Superman's creator Jerry Siegel.  In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright.

With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner.  For years we had had a friendly relationship with the D C Comics people and were on very friendly terms with Jerry Levin.  We remained friends after the terminations were filed.  They knew that we acted not out of malice but were exercising our rights granted by the U. S. Congress.  Because Joe Shuster, Superman's artist, had no surviving spouse or children, his rights were not terminated but are held by D C Comics.

Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead.  We then hired two additional Beverly Hills entertainment attorneys as our negotiators.  Negotiations dragged on for four difficult years.  We made painful concessions assured if we did we would arrive at an agreement.  When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.

Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal.  The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve.  It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.

Page 1

000000676

EXHIBIT  Z

**EXHIBIT 4**
75

232

That contract was sent to us three months ago.  The company may think its representatives are very clever but with that contract they have sunk not only themselves and the company but you, Jerry Levin and Steve Case down to a very low level.

Granted, Jerry gave us an advance two years ago which while very much appreciated, was of short term help.  But we are owed more than three years of profits accounting on Superman and related properties which has not been paid.  In addition, my disabled daughter still has not received the medical coverage she and her children were promised several years ago.

As for the contract, your representatives surely know that we would never do the unethical things demanded by them.  For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.

After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied.  The beast hungers for more.  Just like the Gestapo, your company wants to strip us naked of our legal rights.  Is that moral?  Does that contract demonstrate the company's true "core values" as stated in the Stockholders Annual Report?  What about the "social responsibility" that's supposed to be the mission of  the company's Values and Human Development Committee on which you serve?  Is it all a lie to the stockholders and the public?

It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us.  There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.

This contract shows  AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act.  Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future?  Isn't it about time?  Shouldn't everyone be treated fairly?  Or is that not "good business" in this company?

I had hoped that Laura's and my good relationships with Jerry Levin and D C Comics would continue after we reached an agreement.  When my husband died, Jerry Levin told me that my daughter and I were part of the Time Warner family, part of the company's history.  They were beautiful words we appreciated.  Another time, in a letter to me, he talked about honoring Jerry because of his huge

Page 2

000000677

EXHIBIT 4
76

233

contribution to the company. It sounded sincere. But this contract seeks to discredit Jerry Siegel and to undermine our rights, a direct contradiction to what was said.

After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the worst possible light. Is that the reputation you want?

Joanne Siegel

Page 3

000000678

EXHIBIT 4
77

234

__AOL Time Warner__

*Siegel*
*(5)*

Richard D. Parsons
Chief Executive Officer

May 21, 2002

Ms. Joanne Siegel
13929 Marquesas Way, #201-A
Marina Del Rey, CA 90292

Dear Joanne:

     Thank you for your letter of May 9th.  Your husband and his creations and his family have been a cherished part of the Warner, Time Warner and now AOL Time Warner family for many years.  I was, therefore, quite troubled by your feeling.  Consequently, I have been in contact with John Schulman and Paul Levitz and have been informed that each of the major points covered in the draft agreement which was provided to your representatives, more than three months ago, accurately represented the agreement previously reached between your representatives and AOLTW's.  Those negotiating the agreement for AOLTW even improved – to your benefit – the terms of our $250,000 recoupable advance; they proposed as a part of the overall deal that the advance be non-applicable and non-recoupable.  So, I am a bit at a loss to understand the level and intensity of your distress.

     As in all negotiations, including the lengthy ones which have brought us this far, we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve.  John and Paul look forward to meeting with your representatives, and we continue to hope that this agreement can be closed based upon the earlier discussions with your lawyers.

     In the interim, I want you to know that AOLTW is determined to do the right thing for the heirs of Jerry Siegel, you and your family, and that we continue to count SUPERMAN among America's cultural treasures with which we are proud to be associated.

Sincerely,

*Dick P*

RDP:pb

cc: Paul Levitz
    John Schulman

EXHIBIT
30

AOL Time Warner Inc. • 75 Rockefeller Plaza • New York, NY 10019
tel 212 484 8100 • fax 212 275 3085

Confidential

WB004014

**EXHIBIT 5**
**78**

**Joanne Siegel**
13929 Marquesas Way #201A
Marina Del Rey, CA 90292

**Laura Siegel Larson**
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

September 21, 2002

Kevin S. Marks, Esq.
Bruce M. Ramer, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212

Dear Kevin and Bruce,

As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately.

This letter is also notification that, effective immediately, we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's partners, associates and employees as representatives of the Siegel Family interest regarding Superman, Superboy, the Spectre and all related characters and entities. We instruct you to take no further actions on our behalf.

Please return all materials regarding the above including but not limited to files, correspondence, notes and documents to us forthwith. These should be sent to Joanne Siegel at the above address.

It is a shame that four years were wasted due to DC Comics and AOL Time Warner's greed. We have no intention of publically disparaging DC or any individual in the parent company. However, should DC or its parent company, officers, attorneys, representatives or spokespersons disparage us or our rights, we will vigorously respond in kind.

Sincerely,                                    Sincerely,

*Joanne Siegel*                              *Laura Siegel Larson*

Joanne Siegel                                Laura Siegel Larson

CC: Michael Siegel
    Don Bulson, Esq.
    Paul Levitz

**EXHIBIT 6**
**79**

Notice of Termination of Transfer
Covering Extended Renewal Term

*Superboy*

000000612

EXHIBIT 7

80

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To: AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

000000613

**EXHIBIT 7**
**81**

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

2

000000614

**EXHIBIT 7**

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: AOL Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020; AOL Time Warner Book Group, Inc., 1271 Avenue of the Americas, New York, NY 10020; Warner Books, Inc., 1271 Avenue of the Americas, New York, NY 10020; Little, Brown, and Company, 1271

000000615

**EXHIBIT 7**
**83**

Avenue of the Americas, New York, NY 10020; DC Comics Inc., 1700 Broadway, 7th Floor, New York, NY 10019; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY 10019; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; Milton Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Wildstorm Productions, 888 Prospect Street, Suite 240, La Jolla, CA 92037; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Cantharus Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819; Hallmark Entertainment, Inc., 1325 Avenue of the Americas, 21st Floor, New York, NY 10019; Marvel Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016; Golden Books Publishing, 1540 Broadway, New York, NY 10036; Random House Golden Books for Young Readers, 1540 Broadway, New York, NY 10036; Inkworks, 4320 Delta Lake Drive, Raleigh, NC 27612; DK Publishing, Inc., 375 Hudson Street, New York, NY 10014; Scholastic, Inc., 557 Broadway, New York, NY 10012.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, and additionally, by certified mail, return receipt requested, to the above grantees or successors at the addresses shown.

2.     Each work to which this Notice of Termination applies is as follows: The title of the original copyrighted work to which this Notice of Termination applies is SUPERBOY, which was published and embodied in the illustrated comic book story in More Fun Comics, No. 101, January-February, 1945 issue, for which copyright was originally secured on November 23, 1944 under Copyright Registration No. B653651 and which was published in or about November 18, 1944. SUPERBOY and this work were previously adjudicated to have been based upon and embodied in the character,

000000616

**EXHIBIT 7**
**84**

concept, script and scenario solely written and created by Jerome Siegel and to be a separate and distinct copyrighted work and character from the copyrighted work and character, SUPERMAN.[1] Renewal for the work was made July 17, 1972, in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under Copyright Renewal Registration No. R532582. SUPERBOY and the aforesaid work were based upon and embodied the following works to which this Notice of Termination also applies: (i) a three page summary or synopsis of the concept and plan for a new comic strip to be known as SUPERBOY solely originated, created, conceived and written by Jerome Siegel (c. 1938) and submitted by Jerome Siegel to Detective Comics, Inc. on or about November 30, 1938; and (ii) a complete thirteen page script containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip, SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, solely originated, created,

---

[1] In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., Supreme Court of the State of New York, Case No. 1099-1947(1948), the Court signed findings of fact and conclusions of law on April 12, 1948 (from which neither side perfected an appeal) including, without limitation, that on or about November 30, 1938, Jerome Siegel submitted to Detective Comics, Inc. for its consideration a synopsis or summary of the conception and plan for a new comic strip entitled SUPERBOY (attached as Exhibit 16 thereto); that during December, 1940 Jerome Siegel submitted to Detective Comics, Inc. for its further consideration a complete script (attached as Exhibit 36 thereto) containing the continuity, plan and dialogue for the first "release" or "releases" of SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, all set forth by Jerome Siegel with detail and particularity; that the comic strip, SUPERBOY, published by Detective Comics, Inc. embodied and was based upon the idea, plan, conception and direction contained in said original material solely created by Jerome Siegel; that SUPERMAN did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY and that SUPERBOY was a work different and distinct from SUPERMAN; that the publication of all such comic strip material entitled SUPERBOY by Detective Comics, Inc. was at all times without the permission of Jerome Siegel; and accordingly, that Jerome Siegel, was the originator and owner of the comic strip feature, SUPERBOY, and had the sole and exclusive right to create, sell and distribute comic strip material under the title SUPERBOY, of the type and nature theretofore published by Detective Comics, Inc. Subsequent to these court findings, the parties entered into the above referenced agreement dated May 19, 1948 wherein Jerome Siegel assigned rights in SUPERBOY to National Periodical Publications, Inc., to which assignment this Notice of Termination applies, without limitation. In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., 364 F. Supp. 1032, 1033 (S.D.N.Y. 1973), aff'd in part, 508 F.2d 909 (2nd Circuit 1974), the Court held that the aforementioned findings by the Supreme Court of the State of New York in 1948 are binding and that any dispute with respect thereto is barred by the doctrines of res judicata and collateral estoppal.

5

000000617

**EXHIBIT 7**
**85**

conceived, and written by Jerome Siegel in detail and with particularity, and submitted by Jerome Siegel to Detective Comics, Inc. on or about December, 1940. The remaining works to which this Notice of Termination applies[2] are:

| Title | Name of Author[3] | Date Copyright Secured[4] | Copyright Reg. No. |
|---|---|---|---|
| **SUPERBOY IN[5]:** | | | |
| More Fun Comics#101 | Detective Comics, Inc. | Nov. 18, 1944 | B653651 |
| More Fun Comics#102 | " | Jan. 16, 1945 | B661073 |
| More Fun Comics#103 | " | Mar. 20, 1945 | B669959 |
| More Fun Comics#104 | " | May 28 1945 | B679484 |
| More Fun Comics#105 | " | July 23 1945 | B687306 |
| More Fun Comics#106 | " | Sept. 23, 1945 | B696308 |
| More Fun Comics#107 | " | Nov. 20, 1945 | B701661 |

---

[2] This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERBOY or the SUPERBOY stories, such as, without limitation, *Superboy*, *Smallville*, *Lana Lang* and *Pete Ross*. Every reasonable effort has been made to find and list herein every such SUPERBOY-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

[3] Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a "work made for hire;" nor is anything else herein to be construed as any such admission. Nothing contained in this Notice of Termination shall be construed to in any way limit or waive any right or remedy that the undersigned might have, at law or in equity, with respect to the subject matter hereof, all of which is hereby expressly reserved.

[4] Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g. "DCRE: 1979"), followed by the specific registration date.

[5] "SUPERBOY IN:" means any and all works as described in footnote no. 2.

6

000000618

**EXHIBIT 7**
**86**

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Dichotic (aka Smallville # 209) | Warner Bros. Television | 2002 | No record |
| Skinwalker (aka Smallville # 210) | " | 2002 | No record |
| Visage (aka Smallville # 211) | " | 2002 | No record |
| Smallville DVD (Episode #101: "Pilot" and Episode #102: "Metamorphosis") | " | 2002 | No record |

**SMALLVILLE NOVELIZATIONS**

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Smallville #1: Arrival | D C Comics, Inc. and AOL Time Warner, Inc. | 2002 | In progress |
| Smallville #2: See No Evil | " | Oct. 17, 2002 | In progress |
| Smallville #2: Dragon | " | Oct., 2002 | In progress |
| Smallville: Strange Visitors | " | Oct. 7, 2002 | In progress |
| Smallville #3: Flight | " | Dec., 2002 | In progress |
| Smallville #3: Hauntings | " | Dec., 2002 | In progress |
| Smallville #3: Pet Peeves | " | Dec., 2002 | In progress |
| Smallville #4: Whodunnit | " | Mar., 2003 | In progress |

3.    The grant(s) to which this Notice of Termination applies is(are) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand.[7]

4.    The effective date of termination shall be November 17, 2004.

---

[7] To the extent the following agreements are found or claimed to contain a grant(s) of, pertaining to or affecting  SUPERBOY, in whole or in part, this Notice of Termination shall apply to such agreements as well: Agreement dated December 4, 1937 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other had; Agreement dated March 1, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc. and The McClure Newspaper Syndicate, on the other hand; and Agreement dated December 19, 1939 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand.

52

000000664

**EXHIBIT 7**

**87**

5.    Jerome Siegel died on January 28, 1996. Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel. Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: November 8, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

000000665

**EXHIBIT 7**
**88**

## CERTIFICATE OF INVESTIGATION

We hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable investigation to be made on our behalf as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct. Executed this ___8th___ day of November, 2002, at Los Angeles, California.


Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292


Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293


54

000000666


**EXHIBIT 7**
**89**

## CERTIFICATE OF SERVICE

We hereby certify that we caused a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM to be served this 8th day of November, 2002, by First Class Mail, postage prepaid, upon the following:

To:  AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

55

000000667

**EXHIBIT 7**
**90**

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

56

000000668

**EXHIBIT 7**
**91**

We declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of November, 2002, at Los Angeles, California.

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

57

000000669

**EXHIBIT 7**
**92**

CONFIDENTIAL



endeavor

<u>Via Messenger</u>

Mr. Bruce Rosenblum
Warner Bros.
4000 Warner Blvd.
Bldg. 2, Room 215
Burbank, CA 91522

Dear Bruce,

As discussed, I represent Joanne Siegel and Laura Siegel Larson, the heirs of Jerry Siegel, the sole creator of SUPERBOY.

I've enclosed a courtesy copy of the Notice of Termination regarding SUPERBOY which applies as well to SMALLVILLE. The Termination document was served on November 8, 2002 by certified mail, return receipt requested and regular mail on a number of Warner Bros. people including Barry Meyer and Peter Roth.

The Termination was recorded with the Copyright Office on November 20, 2002. In fact, when my assistant went to the US Copyright internet site and punch in SMALLVILLE, the Termination comes up.

I'm informed that <u>effective November 17, 2004</u> this terminates prior assignments of SUPERBOY to WB's predecessors, at which time the entire U.S. copyright to SUPERBOY reverts to my clients and that afterwards WB can not make any new programs based on this copyright including new SMALLVILLE episodes.

Apparently in a prior 1947 New York case against WB's predecessor the Court decided that the story of Superman as a teenager with superpowers is a separate copyright from SUPERMAN (called SUPERBOY) solely owned by Mr. Siegel; that after the lawsuit Siegel assigned this to WB's predecessors, but that under US Copyright law my clients are now entitled to get back this copyright by the Termination. It seems the central issue here was already decided in 1947 and that this is binding today – that depicting SUPERMAN as a teenager is a separate copyright (called SUPERBOY) owned by Mr. Siegel and soon his heirs.

If both sides are willing to try I believe if with my help we can find a real business solution to this before it gets turned over to the lawyers and their self-fulfilling prophecies of a drawn out legal nightmare.

Best,

dbnr
Ariel Emanuel

Talent Agency  9701 Wilshire Boulevard, 10th Floor, Beverly Hills, Ca 90212  310 248-2000  Fax 248-2020

TOTAL P.02

**EXHIBIT 8**
**93**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

     Plaintiffs,

    vs.              No. 04-8400 (RSWL)(RZx)
                      -and-
WARNER BROS. ENTERTAINMENT  No. 04-8776 (RSWL)(RZx)
INC., et al.,

     Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934

www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

EXHIBIT 9
94

```
 1                 UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
 5
            Plaintiffs,
 6
        vs.                      No. 04-8400 (RSWL) (RZx)
 7
     WARNER BROS. ENTERTAINMENT
 8   INC., et al.,
 9          Defendants.
                                         -and-
10   _____
     JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
11
            Plaintiffs,
12                               No. 04-8776 (RSWL)(RZx)
        vs.
13
     TIME WARNER INC., WARNER
14   COMMUNICATIONS INC., WARNER
     BROS. ENTERTAINMENT INC., WARNER
15   BROS. TELEVISION PRODUCTION INC.,
     DC COMICS, and DOES 1-10,
16
            Defendants.
17   _____
     AND RELATED COUNTERCLAIMS.
18
     _____
19
20          Deposition of LAURA SIEGEL LARSON, taken on
21   behalf of Defendants and Counterclaimants, at 9665
22   Wilshire Boulevard, 9th Floor, Beverly Hills, California,
23   beginning at 10:05 AM and ending at 8:50 PM on Tuesday,
24   August 1, 2006, before DAVID S. COLEMAN, Certified
25   Shorthand Reporter No. 4613.
```

2

```
 1          Beverly Hills, California, Tuesday, August 1, 2006

 2                    10:05 AM - 8:50 PM

 3

 4               LAURA SIEGEL LARSON,

 5    having been administered an oath, was examined and

 6    testified as follows:

 7

 8                      EXAMINATION

 9    BY MR. ZISSU:

10        Q    Could you tell us your name?

11        A    Laura Siegel Larson.

12        Q    And where do you live?

13        A    6400 Pacific Avenue, No. 106, in Playa Del Rey,

14    California 90293.

15             MR. ZISSU:  Now, we will have certain

16    stipulations, which I think are normal.  Objections

17    except as to form are reserved.

18             Okay?

19             MR. TOBEROFF:  That's fine.

20    BY MR. ZISSU:

21        Q    Should I call you Miss Larson or Miss Siegel

22    or...

23        A    Miss Siegel.

24        Q    What do you prefer?

25        A    Miss Siegel would be fine, thank you.
```

9

```
 1    reluctantly accepted John Schulman's last proposal six
 2    months ago, we were stabbed in the back with a shotgun
 3    contract," close quote.
 4              Now, first, it's true that your mother uses the
 5    word "accepted" here, not "approved," which you say you
 6    prefer.
 7              Isn't that true?
 8        A    I prefer the word "approved."
 9        Q    But she said "accepted."
10        A    She said that in this letter.
11        Q    Right.
12              And, by the way, what was John Schulman's last
13    proposal six months ago?
14        A    It was the -- our understanding of the
15    discussion that he had had with Kevin Marks --
16        Q    What was --
17        A    -- on October 16th.
18        Q    Was -- okay.  Is that a reference to a letter
19    that Mr. Schulman wrote?
20        A    No, there was no letter.  It was a verbal
21    discussion.
22              MR. ZISSU:  Let's have marked as Defendants'
23    Exhibit 24 a letter dated October 26 from John Schulman
24    to Kevin Marks.
25              (Defendants' Exhibit 24 marked.)
```

139

BY MR. ZISSU:

Q   Have you seen that before?

A   The first time I saw this was when Warner Bros. produced this during this litigation.

Q   You never saw that before?

A   No.

Q   Did your mother see it before?

A   No.

Q   So her -- your mother's reference wasn't to that letter --

A   No.

Q   -- in the --

A   She never saw --

Q   In this Defendants' Exhibit 23, your mother was not referring to Defendants' Exhibit 24.

        Correct?

A   Correct.

Q   Now going back to Defendants' Exhibit 23, and I will read again the last sentence of the portion I read before:  "When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract."

        Now, your mother didn't say that the acceptance was conditional, did she, in this letter?

140

1

2

3

4

5

6

7

8          I, LAURA SIEGEL LARSON, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14          EXECUTED this _17th_ day of _September_,

15   20_06_, at _Playa Del Rey,_____, _California_.
                    (City)                    (State)

16

17

18

19        _Laura Siegel Larson_
          LAURA SIEGEL LARSON

20

21

22

23

24

25

278

1

2

3

4        I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6            That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14            I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17            IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19            AUG 1 8 2006

20  Dated: _____

21

22

23            DAVID S. COLEMAN, CSR NO. 4613

24

25

**EXHIBIT 9**
**100**

ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA          )
SIEGEL LARSON,                   )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )     No. 04-8400 (RSWL)(RZx)
                                 )
WARNER BROS. ENTERTAINMENT )           -and-
INC., et al.,                    )
                                 )     No. 04-8776 (RSWL)(RZx)
          Defendants.            )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL** *Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

EXHIBIT 10
101

```
 1          Deposition of KEVIN S. MARKS, taken on

 2       behalf of Defendants and Counterclaimants,

 3       at 9665 Wilshire Boulevard, 9th Floor, Beverly

 4       Hills, California, beginning at 10:05 AM on

 5       Saturday, October 7, 2006, before DAVID S.

 6       COLEMAN, Certified Shorthand Reporter No. 4613.

 7

 8

 9   APPEARANCES:

10

11   For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
         BY:  MARC TOBEROFF
13       Attorney at Law
         2049 Century Park East, Suite 2720
14       Los Angeles, California 90067
         310-246-3333
15

16   For Defendants and Counterclaimant:

17       WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
         BY:  MICHAEL BERGMAN
18       Attorney at Law
         9665 Wilshire Boulevard, 9th Floor
19       Beverly Hills, California 90212
         310-858-7888
20       mbergman@wwllp.com

21          -and-

22       PERKINS LAW OFFICE
         BY:  PATRICK T. PERKINS
23       Attorney at Law
         1711 Route 9D
24       Cold Springs, New York 10516
         845-265-2820
25
```

                                                        2

**U.S. LEGAL SUPPORT**

**EXHIBIT 10**
**102**

1           Beverly Hills, California, Saturday, October 7, 2006

2                           10:05 AM

3

4

5                       KEVIN S. MARKS,

6           having been first administered an oath,

7           was examined and testified as follows:

8

10:05 9                        EXAMINATION

10:05 10   BY MR. BERGMAN:

10:05 11       Q   Good morning, Mr. Marks.

10:05 12       A   Good morning.

10:05 13       Q   Would you state your full name for record,

10:05 14   please?

10:05 15       A   Kevin Stuart Marks, K E V I N, S T U A R T,

10:06 16   M A R K S.

10:06 17       Q   And am I correct, Mr. Marks, that you're a

10:06 18   partner in the firm of Gang, Tyre, Ramer & Brown?

10:06 19       A   Technically a member.  You can call me a

10:06 20   partner, yes.

10:06 21       Q   Okay.  Both you and Gang, Tyre have been served

10:06 22   with subpoenas for particular documents, and your counsel

10:06 23   has produced documents stamped GTRB 001 through 0635, and

10:06 24   we will be reviewing certain of those documents as we

10:06 25   proceed along with other documents.  You've also produced

                                                              8

04:35 1      Q    Still your assistant?

04:35 2      A    Yes.

04:35 3      Q    The log also refers at items 630 through -32 to

04:35 4  a paralegal at your firm by the name of Hillel Elkins.

04:35 5           Is Mr. Elkins still employed by the firm?

04:35 6      A    No.

04:35 7      Q    Do you know where he is presently employed?

04:35 8      A    I don't.

04:36 9           MR. BERGMAN:  Will you then mark as Exhibit 21

04:36 10 an October 26 letter from Mr. Schulman to Mr. Marks, GTRB

04:36 11 145 through 152.

04:36 12          (Deposition Exhibit 21 marked.)

04:36 13 BY MR. BERGMAN:

04:36 14     Q    Had you left the office, Mr. Marks, by the time

04:36 15 this October 26 letter was faxed?

04:37 16     A    Yes.

04:37 17     Q    And when you returned to the office around

04:37 18 Thanksgiving, as you stated, in 2001, how soon after your

04:37 19 return do you believe you reviewed the October 26th

04:37 20 letter?

04:37 21     A    I don't specifically recall, but it would have

04:37 22 either been that week or certainly the following week.

04:37 23     Q    After you reviewed the letter, did you discuss

04:37 24 it with Mr. Ramer?

04:37 25          MR. MARMARO:  I think -- I was going to say the

                                                                    149

04:37 1    nature of the question, even though it's phrased as a yes

04:37 2    or no question, calls for the witness to divulge work

04:37 3    product information which is to discuss matters with, and

04:38 4    I would object and instruct on that basis.

04:38 5            (Instruction not to answer.)

04:38 6            MR. BERGMAN:  Okay.

04:38 7       Q    After you reviewed this October 26 letter, did

04:38 8    you compare the terms set forth in the letter with those

04:38 9    set forth in your October 19 letter?

04:3810           THE WITNESS:  Can I answer that?

04:3811           MR. MARMARO:  Yes, unless Mr. Toberoff has an

04:3812    issue with it.

04:3813           MR. TOBEROFF:  I'm not going to object.  It's

04:3914    work product, but I think it's yours.

04:3915           MR. MARMARO:  As long as you have no objection,

04:3916    he can answer the question.

04:3917           THE WITNESS:  I was even a month or five or six

04:3918    weeks after the fact of the October 19th letter pretty

04:3919    familiar with the terms that set -- that were set forth

04:3920    in that letter, so on first read I didn't -- I don't

04:3921    believe I did a line-by-line comparison, but I believe I

04:3922    later did.

04:3923    BY MR. BERGMAN:

04:3924       Q    Okay.  Did you at any time after that line-by-

04:3925    line comparison advise Mr. Schulman that there was any

                                                                     150

EXHIBIT 10
105

04:47 1   objection to -- subject to those objections, having

04:47 2   Mr. Marks answer the question.

04:47 3        MR. TOBEROFF:  I object on work product

04:47 4   privilege, but I think I am not asserting that on behalf

04:47 5   of the clients.  I am not asserting that on behalf of the

04:47 6   Siegels.

04:47 7        MR. MARMARO:  Mr. Marks would be prepared to

04:47 8   answer the question if the Siegels have no objection to

04:47 9   it.

04:4710        MR. TOBEROFF:  As to your personal belief, no

04:4711   objection.

04:4712        THE WITNESS:  Well, if the question is did I

04:4713   think at this point there was a final, binding,

04:4714   enforceable agreement, the answer would be no, but I did

04:4715   believe that we had come to an agreement back on October

04:4716   19th, 2001, that was reflected exactly in the terms that

04:4817   I set out.

04:4818        At the end of that letter I wrote to John in

04:4819   substance and effect, "John, if I've gotten anything

04:4820   wrong, if I've misstated any of these terms, please let

04:4821   me know."  When John writes back on October 26, which I

04:4822   see later, in effect his letter is, "Yeah, you've got

04:4823   terms wrong.  My outline of the deal terms is different

04:4824   than your outline of the deal terms."  So while I thought

04:4825   we had an agreement on these terms, John evidently

                                                         154

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4        Q    What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7            MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:4910            MR. TOBEROFF:  Not to the extent you are

04:4911    comparing the documents.

04:4912            MR. MARMARO:  Maybe we should have the documents

04:4913    in front of us.  Do you have any objection to him looking

04:4914    at Mr. Schulman's letter?

04:4915            MR. BERGMAN:  Not at all.

04:4916            THE WITNESS:  I know that one area of difference

04:4917    was the scope of the rights granted.  In my letter it

04:4918    referred to -- very specifically to the Superman property

04:4919    and the Spectre property.  That's what we had been

04:5020    talking about the whole time of our negotiations going

04:5021    back to the first meeting in 2 -- 1999.  And, of course,

04:5022    as you see here, the consideration, at least as set forth

04:5023    in my letter, for that matter I guess in John's letter,

04:5024    is based on revenue from the Superman and Spectre

04:5025    properties, yet John's letter referred more generally to

155

**EXHIBIT 10**
**107**

04:50 1    all properties authored by Siegel for DC Comics and was

04:50 2    not limited to the Superman and Spectre properties that

04:50 3    we had been talking about.

04:50 4        Another area where it differed involved

04:50 5    warranties and representations and, in turn, indemnities.

04:50 6    If you recall, we spoke earlier about the view that the

04:51 7    only warranty and representation the Siegel family would

04:51 8    make would be that they have not transferred rights to

04:51 9    any other party, and in John's letter there are broader

04:51 10   warranties than that, warranties that go beyond that.

04:51 11       Oh, and by the way, that is also reflected in

04:51 12   the October 19th letter.  John's warranties go beyond

04:51 13   that, and so too in his letter he would have the Siegels

04:51 14   indemnifying for areas that were not agreed and, indeed,

04:51 15   not even discussed.  So there's broader warranties and

04:51 16   representations and, as a result, broader indemnities,

04:51 17   and in fact there are additional indemnities added; for

04:52 18   example, indemnifying for any claims brought by Dennis

04:52 19   Larson.

04:52 20       There is, I recall, a provision that talks about

04:52 21   furnishing DC Comics with historical information about

04:52 22   the properties and rights information about the

04:52 23   properties, and I felt from my representation of the

04:52 24   client that that was going to be problematic, in fact I

04:52 25   knew it was problematic, and it was not a point that had

156

04:52 1    been discussed before, it was not a point that had been

04:52 2    agreed before, and it was not a point that was in my

04:52 3    letter.

04:52 4         I know that there was a right of first

04:52 5    negotiation for any biographical material outlined in

04:52 6    John's letter.  Again, I don't recall ever discussing

04:53 7    that point before, much less agreeing to that point, and

04:53 8    it was not reflected in my letter.

04:53 9         When you get to elsewhere in John's letter, I

04:53 10   know he refers to an affirmative obligation on the part

04:53 11   of the Siegels to positively publicize the property and

04:53 12   to make themselves available or reasonably available for

04:53 13   travel, and what John and I had discussed and I had

04:53 14   believed agreed was that there would be mutual

04:53 15   non-disparagement, neither party would say anything bad

04:53 16   about the other, but we had not discussed and we had not

04:53 17   agreed about an affirmative obligation on the part of the

04:54 18   Siegels to positively publicize.

04:54 19        And in terms of the travel, I thought that was a

04:54 20   problem because we were dealing with a woman of advanced

04:54 21   years and a woman who was ill, and travel on them could

04:54 22   be a burden, notwithstanding that I think there was a

04:54 23   carve-out for -- subject to their health and

04:54 24   availability.  I wouldn't have wanted there to be any

04:54 25   dispute that they were not fulfilling an obligation about

157

04:54 1   going to travel to an event and that the failing to

04:54 2   travel to an event being the basis for claiming breach

04:54 3   and withholding royalty payments and the like.

04:54 4        I recall in this document new terms concerning

04:54 5   how the royalty could be reduced.  My understanding of

04:54 6   our agreement, what I set forth in the October 19th

04:55 7   letter, was that on media and merchandising licenses the

04:55 8   royalty was 6 percent.  If the other DC Comics characters

04:55 9   appeared in the media program or in licensing or

04:5510   merchandising, that royalty could be reduced to a floor

04:5511   of 3 percent.

04:5512        And in our October telephone conversations this

04:5513   issue was the subject of conversation, and John brought

04:5514   up two other instances that would give rise to further

04:5615   reductions of the royalty, and I know those instances

04:5616   were specifically the use of Superman in conjunction with

04:5617   properties called The Justice League, Superfriends and

04:5618   Superheroes.  I recall that John initially said it should

04:5619   go down to 1 percent, and we agreed that in fact the

04:5620   floor in that specific instance would be 1.5 percent.

04:5621        And also in this October period John brought up

04:5622   a further area where he said sometimes there are very

04:5623   extraordinary licenses where the Time Warner licenses DC

04:5624   properties, and, for example, Looney Tunes properties,

04:5625   and he spoke specifically about Six Flags Magic Mountain

158

**EXHIBIT 10**
**110**

04:56 1     amusement park, where there are strolling characters and

04:57 2     signage and the like that use numerous characters, and he

04:57 3     suggested that the royalty should be further reduced in

04:57 4     that case to 1 percent, which we came to an understanding

04:57 5     on that.

04:57 6             In the October 19th letter there are broader

04:57 7     categories where the royalty --

04:57 8             MR. MARMARO:  Do you mean the October 19th

04:57 9     letter?

04:5710            THE WITNESS:  I'm sorry.  The October 26th

04:5711     letter.  The categories where the 3 percent can be

04:5712     further reduced are broadened.

04:5713            I know we've talked today about intercompany

04:5714     deals and safe harbors as one of the points throughout

04:5715     the discussion, and as I think I testified to earlier, we

04:5816     had agreed, I thought, that -- and I think it's reflected

04:5817     in John's letter, that if the Siegels were to challenge

04:5818     an intercompany deal that was outside a safe harbor,

04:5819     there would be an expedited dispute resolution procedure.

04:5820     That was the only discussion we had about alternative

04:5821     dispute resolution.  We never discussed arbitration in

04:5822     general applying to all of this, and yet John's letter

04:5823     provided for arbitration of disputes.  My letter did not.

04:5824            We talked earlier about the issue about for how

04:5825     long would the 6 percent royalty run and there being

                                                                    159

**EXHIBIT 10**
**111**

04:58 1    disagreement on the parties as to the length of time.

04:59 2    The DC Comics position was the royalty would terminate

04:59 3    when Action Comics No. 1 went into the public domain, and

04:59 4    I believe it was at that July 12th meeting, 2001 meeting

04:59 5    that we sat at John's table and discussed what happens if

04:59 6    a Superman movie, SUPERMAN 18, comes out a year before

04:59 7    Action Comics No. 1 goes into the public domain; there

04:59 8    should be a tail on that, to which John agreed.

04:59 9         So we agreed upon a tail where there was a movie

04:59 10   that was released close to the end of the period that

04:59 11   Action Comics No. 1 was still in copyright.  We agreed

04:59 12   that there would be a tail for television, and we had

04:59 13   agreed that there would be a tail -- at least my

04:59 14   understanding was we'd agreed that there would be a tail

05:00 15   for other substantial projects.  After all, 10 years from

05:00 16   now, 20 years from now it's not clear what media -- in

05:00 17   what media contents will be exploited, so I wanted to be

05:00 18   able to cover that.  John did not include that other

05:00 19   area, other substantial projects in the tail, as I

05:00 20   recall.

05:00 21        We had talked about throughout a full indemnity,

05:00 22   and E&O insurance.  I think the E&O insurance wasn't in

05:00 23   John's letter, and I think the indemnity proposed here

05:00 24   was a partial, what I considered to be a partial

05:01 25   indemnity.

                                                                160

05:01 1          On the credit point --

05:01 2    BY MR. BERGMAN:

05:01 3        Q    Before you get to that one, Mr. Marks --

05:01 4          MR. MARMARO:  Can I just interject, because I

05:01 5    think I may have placed a possible ambiguity in the

05:01 6    record when I mentioned before Mr. Marks went into this

05:01 7    explanation of the differences that the letters be placed

05:01 8    before him, and until this very last point he has not

05:01 9    been testifying from the letter.  I just wanted to note

05:0110    that for the record in case -- well, I just wanted to

05:0111    note that for the record.

05:0112          THE WITNESS:  In terms of the credit to be

05:0113    accorded Siegel and Shuster, which was a point that I had

05:0114    as my point C.4, a point that I thought had long been

05:0215    agreed, that there would be a credit in paid ads of

05:0216    motion pictures, which is certainly in my experience is

05:0217    something that's very important to clients.  They want to

05:0218    see the credit in the full-page ads in newspapers and

05:0219    posters, movie theaters and the like, and John's letter

05:0220    provided for credit on screen only and not in paid ads.

05:0221    BY MR. BERGMAN:

05:0222        Q    If I could just ask you a question about that,

05:0223    and I am going, with your indulgence, to go back to some

05:0224    of these --

05:0225        A    Yes.

                                                              161

05:02 1          Q    -- but I'm looking at C.4, the specific item you

05:02 2     indicated in the October 19, and it -- I see what you're

05:02 3     referring to.  You're referring to the paid ads.

05:02 4          A    Correct.  I mean it's two words, but it's two

05:03 5     meaningful words.

05:03 6          Q    Okay.

05:03 7          A    Again, Mr. Marmaro said I hadn't gone -- I

05:03 8     hadn't reviewed this for purposes of testifying now going

05:03 9     line by line, but those are to me the major areas, but

05:03 10    they may not be the exclusive points.

05:03 11         Q    Let me -- before turning to a closer examination

05:03 12    of those, let me ask you this:  Here you've been

05:03 13    negotiating an agreement for two and a half years, and

05:03 14    you leave on vacation and you believe that it's been

05:03 15    resolved, and you review the October 26 letter, and it

05:04 16    appears to have differences, as you've recounted them.

05:04 17              Given what had transpired in the past in your

05:04 18    relationship with Mr. Schulman, was there a reason why

05:04 19    you didn't call him and sit down with him and say,

05:04 20    "Look," in essence, "we have an inconsistency here, and

05:04 21    let's try to resolve it"?

05:04 22              MR. MARMARO:  As with the other questions, if

05:04 23    Mr. Toberoff has no issue with the response, then

05:04 24    Mr. Marks would be willing to respond.

05:04 25              MR. TOBEROFF:  I don't.

                                                                    162

**EXHIBIT 10**
**114**

05:04 1          THE WITNESS:  John's letter -- cover letter that

05:04 2     attaches the outline says, "We're working on the draft

05:04 3     agreement so that by the time you have accomplished

05:04 4     something of truly momentous import, we will have the

05:04 5     super-matter transaction in document form," and I very

05:05 6     much took that to mean that by the time you get back,

05:05 7     you'll have a long-form agreement that we can work off

05:05 8     of, and I wanted to see that long-form agreement.

05:05 9     BY MR. BERGMAN:

05:05 10         Q    I see.  And anticipated that the disparities

05:05 11    between the two short forms to be resolved in the long

05:05 12    form?

05:05 13         MR. MARMARO:  I'm going to object to the form of

05:05 14    the question.  Vague and ambiguous and -- well, vague and

05:05 15    ambiguous.

05:05 16         MR. TOBEROFF:  Same objection and leading.

05:05 17         MR. MARMARO:  You're asking if that was the

05:05 18    reason?

05:05 19         Go ahead, you can answer subject to the

05:05 20    objections.

05:05 21         THE WITNESS:  I hope I'm answering the question.

05:05 22    I thought it would be a good thing for the process to get

05:05 23    the long form to move it forward rather than bring it to

05:05 24    a screeching halt at this point, so I wanted to allow

05:06 25    this process to move forward.  My thought was let's raise

                                                             163

EXHIBIT 10
115

05:06 1    these issues in the context of the long form.

05:06 2              MR. BERGMAN:  I see.

05:06 3              Why don't we take a five-minute break.

05:06 4              MR. MARMARO:  Sure.

05:06 5              (Recess.)

05:13 6              MR. BERGMAN:  Back on the record.

05:13 7        Q    Just to complete this question of the two

05:13 8    letters, Mr. Marks, when you prepared your October 19

05:13 9    letter, did you believe that you accurately recorded the

05:14 10   deal as Mr. Schulman had offered it to you?

05:14 11       A    I believe that I had accurately recorded the

05:14 12   deal that was negotiated between the parties.

05:14 13       Q    Okay.

05:14 14       A    Mr. Bergman, I do want to be clear, on October

05:14 15   16 I don't recall the conversation as being a recitation

05:14 16   of each term.  The October 16th conversation was focused

05:14 17   on the one open item.  That's my recollection.

05:14 18       Q    I understand that.  I appreciate it.

05:14 19       A    But I -- to answer your question, yes, I believe

05:15 20   I at this confirmation letter set forth the terms as

05:15 21   agreed.  Of course, I invited John to tell me if I had

05:15 22   misstated it in any way.

05:15 23       Q    Okay.  And at no time until you had reviewed the

05:15 24   long-form agreement did you have any discussion with

05:15 25   Mr. Schulman concerning any disparity that might exist

                                                              164

05:15  1    between the two letters?

05:15  2            MR. MARMARO:  Do you mean the draft long form?

05:15  3            MR. BERGMAN:  Yes.

05:15  4            THE WITNESS:  I did put a call in to

05:15  5    Mr. Schulman during this time period, but I don't recall

05:15  6    that we spoke.  I found out he was on vacation.  Or I

05:16  7    would later learn he was on vacation.

05:16  8    BY MR. BERGMAN:

05:16  9        Q    Returning to your phone register at page 614 --

05:1610        A    One moment, please.

05:1611        Q    There is a reference to a phone call from

05:1612    Mr. Toberoff at 6:09.  Was that call completed that day?

05:1613    Did you return it?

05:1614        A    I don't know if it was completed that day.

05:1615        Q    Did you return it at some point?

05:1616        A    Yes, I believe so.

05:1717        Q    Before I get into that, let me just make sure.

05:1718    If you look at page 615, you'll see another reference to

05:1719    a phone call from Mr. Toberoff.

05:1720            Was your reply to the phone call that you

05:1721    received on the 24th made prior to the 30th, or was it

05:1722    after the 30th?

05:1723            MR. MARMARO:  30th of July?

05:1724            MR. BERGMAN:  Yes.

05:1725            THE WITNESS:  I believe, looking at these

                                                                    165

BY MR. BERGMAN:

Q   Okay.  In response to the second paragraph of this letter, did you make any attempt to telephone Mr. Schulman and tell him in substance that there were disparities between the October 19 and 26 letters?

MR. MARMARO:  Let me have that question read back, please.

(Record read.)

THE WITNESS:  I had made an attempt before this letter, but I don't recall making an attempt after this letter.

MR. BERGMAN:  Would you mark as Exhibit 23 a letter dated February 1, 2002, with an attachment, a draft long-form agreement, Bates stamped GTRB 350 through 399.

(Deposition Exhibit 23 marked.)

BY MR. BERGMAN:

Q   Am I correct, Mr. Marks, that Exhibit 23 is a copy of the long-form agreement that you received in early February?

A   Yes.

Q   Did there come a time following your receipt of this agreement when you began a redraft of the agreement?

MR. MARMARO:  The question is vague and ambiguous, and again I am going to...  I'm going to state

177

05:40 1   that if Mr. Toberoff has an objection to Mr. Marks

05:40 2   answering this question, I'd like to know about it.  If

05:41 3   not, Mr. Marks will answer.

05:41 4          MR. TOBEROFF:  As to the fact of your attempting

05:41 5   a redraft and the date, I don't mind you testifying

05:41 6   because that's already been disclosed, I believe, in a

05:41 7   letter to a third party, but other than that, as to any

05:41 8   other substantive questions on that redraft, we object to

05:41 9   that as attorney-client privilege and attorney work

05:41 10  product from the clients' points of view.

05:41 11         MR. MARMARO:  We will follow that objection and

05:41 12  instruct on that basis.

05:41 13         MR. BERGMAN:  As to yes or no --

05:41 14         MR. MARMARO:  I think he said no.  I'm going to

05:41 15  let Mr. Toberoff talk.  I had understood he said

05:41 16  Mr. Marks can answer that question yes or no but not

05:42 17  beyond that.

05:42 18         MR. BERGMAN:  Oh.

05:42 19         MR. TOBEROFF:  Right.  And also the date if he

05:42 20  wants.

05:42 21         THE WITNESS:  There came a time where I began to

05:42 22  prepare a completely new draft, as opposed to a redraft,

05:42 23  of what I had understood the terms had been reached by

05:42 24  the parties back in October.

05:42 25  BY MR. BERGMAN:

178

**EXHIBIT 10**
**119**

05:42 1          Q   Can you tell us approximately when you commenced

05:42 2     that redraft?

05:42 3          MR. MARMARO:   Object to the use of the word

05:42 4     "redraft."

05:42 5          MR. TOBEROFF:   Object as well.

05:42 6          THE WITNESS:   I do not recall approximately when

05:42 7     I began the draft agreement.

05:43 8     BY MR. BERGMAN:

05:43 9          Q   Do you recall speaking with Mr. Schulman on May

05:43 10    16, '02, and I refer you to your privilege -- to your

05:43 11    telephone register, 608, which indicates a call from

05:43 12    Mr. Schulman?

05:43 13         MR. TOBEROFF:   I am sorry.   What was the Bates

05:43 14    number?

05:43 15         THE REPORTER:   608.

05:43 16    BY MR. BERGMAN:

05:43 17         Q   Do you recall that, sir?

05:43 18         A   Yes.

05:43 19         Q   And did you in fact speak with Mr. Schulman on

05:43 20    the 16th?

05:43 21         A   I believe I spoke with Mr. Schulman at least

05:43 22    once on or around the 16th.

05:44 23         MR. BERGMAN:   I'm going to ask the reporter to

05:44 24    mark as Exhibit 24 a one-page handwritten document Bates

05:44 25    stamped WB 005972.

                                                             179

05:44 1         (Deposition Exhibit 24 marked.)

05:44 2  BY MR. BERGMAN:

05:44 3     Q   Mr. Marks, let me tell you that Mr. Schulman has

05:44 4  not yet been deposed in connection with this matter, but

05:44 5  I will represent to you that, if and when deposed, will

05:45 6  identify this document as notes of a conversation that he

05:45 7  took with you and -- on May 16 of statements that you had

05:45 8  made to him with respect to the draft long-form

05:45 9  agreement.

05:45 10        The first purported quotation by Mr. Schulman

05:45 11  is, quote, "'not expect contract like that,'" close

05:45 12  quote.

05:45 13        Do you recall stating in substance to

05:45 14  Mr. Schulman with respect to the draft long form that you

05:45 15  did not expect a contract like that?

05:45 16     A   While I don't have a specific recollection of

05:46 17  this statement, it is in fact the case that I did not

05:46 18  expect a draft like the one that came in early February.

05:46 19     Q   Okay.  The next statement attributed to you is,

05:46 20  quote, "'very aggressive 1st draft,'" close quote.

05:46 21        Do you recall stating that in substance to

05:46 22  Mr. Schulman?

05:46 23     A   Yes.

05:46 24     Q   The next statement attributed to you is, quote,

05:46 25  "'can deal with it,'" close quote.

EXHIBIT 10
121

05:46 1         Do you recall stating that to Mr. Schulman with

05:46 2    respect to the draft long form?

05:46 3         A    Not with respect to the draft long form.

05:46 4         Q    Okay.  Do you recall during that conversation

05:46 5    stating to Mr. Schulman anything to the effect of "can

05:46 6    deal with it"?

05:47 7         MR. MARMARO:  The question is vague in the --

05:47 8    well, the question is vague and ambiguous, but go ahead

05:47 9    and answer.

05:4710        THE WITNESS:  Yes, but some context is required

05:4711    here.

05:4712    BY MR. BERGMAN:

05:4713         Q    Please give me the context.

05:4714         A    In this time period I believe there are two

05:4715    calls.  The first call, John calls me and says -- said,

05:4716    "Did you know that your client had written to Dick

05:4717    Parsons and accused the Time Warner people of acting like

05:4718    Gestapo," and I said "No."

05:4719         He said, "Well, I've just received a letter."

05:4720         I said, "Could you send it to me?"  John asked

05:4721    for my fax number, and he sent it to me.

05:4822         And I read the letter, and I think I called him

05:4823    back and said, "As you're presenting it to me, I knew

05:4824    nothing about this."

05:4825         And I think John would have in the letter, among

                                                              181

EXHIBIT 10
122

05:48 1    other things -- it was a letter from Joanne Siegel -- was

05:48 2    critical of the draft document that had been sent, and I

05:48 3    think John was asking me what I thought about it.

05:48 4          And now to get to your question, my -- I think

05:48 5    my comment goes to I can deal with the process of it.  I

05:48 6    think by this time I had formed an opinion that I could

05:48 7    not deal with that draft itself, but I could deal with

05:48 8    the process of moving forward on a long form.  I don't

05:49 9    think that long form.  At least that's how I felt at the

05:49 10   time.

05:49 11      Q    Okay.  The next statement attributed to you in

05:49 12   Exhibit 24 is, quote, "'contains a lot of sep,'" which I

05:49 13   take to mean separate, "'docs,'" which I am assuming

05:49 14   documents; that is, it would read, quote, "'contains a

05:49 15   lot of separate documents,'" close quote.

05:49 16          MR. MARMARO:  Is that what you're representing

05:49 17   Mr. Schulman -- because that's not my reading of it.

05:49 18          THE WITNESS:  I read it differently as well.

05:49 19          MR. BERGMAN:  Then I may be wrong.

05:49 20          MR. MARMARO:  But if you're representing

05:49 21   that's --

05:49 22          MR. BERGMAN:  No, I am not.  I am representing

05:49 23   that that is how I read what Mr. Schulman states are his

05:49 24   notes.

05:49 25      Q    How do you read that phrase?

182

05:49 1          A    Well, with the qualification that I am not an

05:50 2    expert in reading John's handwriting, I believe this

05:50 3    says, "'contains a lot of trap doors,'" which I would

05:50 4    have said because it is how I felt.

05:50 5          Q    Can you explain what you meant by that?

05:50 6          A    Yes, if I could do so with reference to the

05:50 7    document.

05:50 8          Q    You certainly could, sir.

05:50 9          MR. MARMARO:  And again assuming there is no

05:5010    objection from Mr. Toberoff to this.

05:5011    BY MR. BERGMAN:

05:5012          Q    Incidentally, before you begin reviewing that, I

05:5013    should make note of the fact that this copy which I've

05:5014    introduced and was produced by you is missing a few

05:5015    pages, 13, 20 and 42.

05:5016          MR. MARMARO:  The first I've heard of it.  If

05:5117    you had called me before the deposition, I would have

05:5118    looked into it.

05:5119          MR. TOBEROFF:  This particular copy or --

05:5120          MR. BERGMAN:  That particular copy -- if you

05:5121    gentlemen would like, I can -- or if the witness would

05:5122    like, I have another copy which contains --

05:5123          MR. MARMARO:  Because they're consecutively

05:5124    Bates stamped, which would indicate to me that there is a

05:5125    copying issue at our end or maybe how we -- how the

                                                              183

05:51 1   document was maintained.

05:51 2         MR. BERGMAN:  Why don't we see if the witness

05:51 3   can proceed.  Meanwhile, I will have --

05:51 4         MR. TOBEROFF:  Can you just repeat those

05:51 5   numbers, by the way?

05:51 6         MR. BERGMAN:  13, 20, 42.

05:51 7         MR. TOBEROFF:  Thank you.

05:51 8         MR. BERGMAN:  You're welcome.

05:52 9    Q   You were looking at the agreement to --

05:5210    A   I was -- can we wait a moment?

05:5211         MR. MARMARO:  Off the record.

05:5212        (Discussion held off the record.)

05:5213        THE WITNESS:  In my October 19, 2001 letter,

05:5314   "The Property" was defined quite specifically to mean

05:5315   "all Superman, Superboy and related properties

05:5316   (including, for example, Supergirl, Steel, Lois & Clark

05:5317   and Smallville), and the Spectre property, and includes

05:5318   all pre- and post-termination works (including the

05:5319   so-called Superman library), characters, names and

05:5320   trademarks relating to the Property," and that's what we

05:5321   had discussed throughout the negotiation.

05:5322       I recall there was one time where DC made a

05:5323   proposal to have a royalty attach only on post-

05:5324   termination works, which was rejected by the Siegels.  In

05:5325   the conversations the negotiations was to a royalty that

184

05:54 1     covered all the works.

05:54 2              In this agreement at page 9 there is a

05:54 3     definition of "Revenues." It's paragraph 24.  The

05:54 4     revenues -- "The term 'Revenues' is hereinafter defined

05:54 5     as all amounts actually received by DC COMICS in the

05:54 6     United States [sic] from the licensing of the rights in

05:54 7     the SUPERMAN property" --

05:54 8              MR. MARMARO:  "In United States Dollars."

05:54 9              THE WITNESS:  Excuse me.  Thank you.

05:54 10             -- "in United States Dollars from the Licensing"

05:54 11    with a capital L "of rights in the SUPERMAN Property and

05:54 12    the SPECTRE Property," and the sentence and indeed the

05:54 13    paragraph continues.

05:54 14             In paragraph 23 it says, "The terms 'Licensing'"

05:54 15    with a capital L and "'Licenses'" with a capital L "refer

05:54 16    to DC COMICS authorizing any third party to commercially

05:54 17    exploit the SUPERMAN Property and the SPECTRE Property."

05:54 18             So now we have to look to find the definition of

05:55 19    "SUPERMAN Property" and "SPECTRE Property."  Superman --

05:55 20    that definition is at page 4, paragraph 9.  That says,

05:55 21    "The term super property -- [sic] 'SUPERMAN Property',"

05:55 22    in quotes, "is hereinafter defined to mean the following:

05:55 23    (i) each of the pre-existing characters and elements

05:55 24    which first appeared in the SUPERMAN Works; and (ii) such

05:55 25    other characters and/or elements, if any, that may be

                                                              185

05:55 1    hereafter -- [sic] that may be created hereafter and meet

05:55 2    the following criteria," and then there is an extensive

05:55 3    definition of criteria.

05:55 4         So subpart 2 is the definition of "SUPERMAN

05:56 5    Property" includes some, but not all, works created from

05:56 6    and after the date of the agreement, and what is defined

05:56 7    as the "SUPERMAN Works."  So then we go to the definition

05:56 8    of "SUPERMAN Works."

05:56 9         That definition is at page 3 -- No, I'm sorry,

05:5610    page 2, paragraph 3, and if you parse through the

05:5611    language, it says, quote, "The phrase 'SUPERMAN Works' is

05:5612    hereinafter defined collectively and individually as

05:5613    follows," and rather than -- if you would like me to read

05:5614    it into the record, I can, but notably it continues,

05:5615    "...that in any manner depict, include, embody, refer to,

05:5716    describe, relate to, concern, are associated with, or

05:5717    preceded, lead to and/or contributed in any manner to the

05:5718    development of, or derive from, are based upon and arise

05:5719    out of SUPERMAN, that were ever created (in whole, in

05:5720    part or jointly) by JEROME SIEGEL."  So "SUPERMAN Works"

05:5721    refer to work created by Jerome Siegel.

05:5722         In this document at paragraph 7, page 3, there

05:5723    is a definition of yet another category of works which is

05:5724    called the "SUPERMAN Derivative Works," and to summarize,

05:5725    those are works relating to the Superman character and

                                                                    186

05:57 1  the like that are created by persons other than Jerome

05:57 2  Siegel.

05:57 3       So when you put this together, this document is

05:58 4  purporting to say or at least raise the problem that

05:58 5  licensing revenues would not include that body of 60

05:58 6  years of derivative works that the people that DC Comics,

05:58 7  Paul Levitz and others, made such an impression upon us

05:58 8  as being so different from the original work and was the

05:58 9  basis of the Superman library, which was contrary to what

05:58 10 was agreed.  The whole idea was to pick up all works and

05:58 11 not to exclude works created by other people.

05:58 12      I mentioned that at the DC Comics meeting there

05:58 13 was a specific discussion about an American Express ad

05:58 14 campaign where Jerry Seinfeld, who was in that campaign,

05:59 15 specifically requested that the Curt Shaw version of

05:59 16 Superman be used in the campaign.  Under this draft the

05:59 17 proceeds of that campaign would be excluded, or at least

05:59 18 there was an argument that they would be excluded, and

05:59 19 that wasn't the intent.  To parse through that language

05:59 20 and to get there is very difficult, and I found -- I

05:59 21 considered that deceptive drafting and a trap door and

05:59 22 highly, highly problematic.

05:59 23 BY MR. BERGMAN:

05:59 24      Q    I understand the "problematic" part.

05:59 25           Did you believe at the time that it was

                                                              187

| | |
|---|---|
| 05:59 1 | purposely drafted that way or that it was, you know, a |
| 05:59 2 | trap door that existed due to inadvertence or drafting |
| 05:59 3 | rather than an intentional attempt to deprive the Siegels |
| 06:00 4 | of something? |
| 06:00 5 | A   Well, I know from the cover letter there were |
| 06:00 6 | multiple versions of this internally, because what |
| 06:00 7 | Mr. Perkins transmitted was what he described as the |
| 06:00 8 | latest version of the work, so that suggested to me that |
| 06:00 9 | this had been -- and this is the first version that I |
| 06:00 10 | ever saw, so that suggested to me that there had been at |
| 06:00 11 | least one and perhaps more versions of the work that had |
| 06:00 12 | been vetted, and this looked to me to be an agreement |
| 06:00 13 | that -- a document that had been very purposefully |
| 06:00 14 | drafted.  That was my take away from it. |
| 06:00 15 | I have another example too. |
| 06:00 16 | Q   Please let me hear it. |
| 06:01 17 | A   Returning to page 9, paragraph 24, the second |
| 06:01 18 | sentence, "Revenues shall not include any sums received |
| 06:01 19 | by DC Comics for providing any services or materials in |
| 06:01 20 | connection with the licensing of rights in the SUPERMAN |
| 06:01 21 | Property and SPECTRE Property."  Well, what this |
| 06:01 22 | suggested to me was that there would be or could be or |
| 06:01 23 | could arguably be a deduction from revenues for services |
| 06:01 24 | attributable to DC Comics or materials supplied by DC |
| 06:01 25 | Comics. |

188

**EXHIBIT 10**

**129**

06:01 1          Going back to our meeting -- second meeting with

06:02 2    Paul Levitz at Warner Bros. and our meeting in DC Comics,

06:02 3    one of the points that Paul made in connection with what

06:02 4    he described as the licensor share was that DC

06:02 5    contributes a lot in the management, in the exploitation

06:02 6    of the property, and that's a reason why any royalty to

06:02 7    the Siegels should be further reduced, because there

06:02 8    should be some of that pot attributable to DC Comics'

06:02 9    efforts.

06:02 10         I read this and viewed this as a double dip,

06:02 11   because that had already been accounted for in arriving

06:02 12   at the 6 percent, and I was very concerned that this

06:02 13   could be used to further reduce the ultimate royalty.

06:03 14       Q   Again, did you attribute that to an intentional

06:03 15   attempt to, as you have put it, double dip or just to,

06:03 16   with all due respect to the drafters of the agreement,

06:03 17   sloppy drafting?

06:03 18       A   Well, as I read this, this had the earmarks of

06:03 19   very studied, careful, intentional drafting.  I could not

06:03 20   go so far as to know with certainty what the intention of

06:03 21   any or -- of all or any of the people on the DC team was,

06:03 22   but when I told John there are trap doors in it, these

06:03 23   are the trap doors.  I mean, bear in mind this is an

06:03 24   agreement that took a long time to produce, and that also

06:04 25   led me to believe that it had been at least carefully

189

EXHIBIT 10
130

06:04 1    drafted, and at a minimum this raised concerns for me and

06:04 2    red flags for me.

06:04 3        Q    When you stated to Mr. Schulman that there were

06:04 4    trap doors in the agreement, did he ask you what you

06:04 5    meant, or did he ask you for an example?

06:04 6        A    I don't believe he did.

06:04 7        Q    Applying that term as you have, it's true, isn't

06:04 8    it, that those kind of problems or, as you put it, trap

06:04 9    doors can exist without intentional acts, just through

06:0410    the -- not being able to clearly think through a problem

06:0411    and properly document it?

06:0412            Hasn't that been your experience?

06:0513            MR. MARMARO:  Calls for speculation.

06:0514            MR. TOBEROFF:  I was going to make that

06:0515    objection.  It's also vague and ambiguous, leading.

06:0516            THE WITNESS:  It can be true that drafters make

06:0517    mistakes in drafting that are consequential, adversely

06:0518    consequential.

06:0519    BY MR. BERGMAN:

06:0520        Q    When you spoke with John Schulman, did you

06:0521    indicate to him that you felt that those trap doors were

06:0522    purposely created or that it was inadvertent, or did you

06:0523    say nothing in that regard?

06:0524        A    I don't recall that I said they were purposeful,

06:0525    and I don't recall that I said they were inadvertent.  I

                                                               190

| | |
|---|---|
| 06:05 1 | just recall saying that they were there. |
| 06:05 2 | Q   Okay.  As I read the notes of Mr. Schulman, the |
| 06:06 3 | next item says, "'could have been 20, not 60 pages.'" |
| 06:06 4 | Do you recall saying that in substance to |
| 06:06 5 | Mr. Schulman? |
| 06:06 6 | A   Yes. |
| 06:06 7 | Q   The next purported statement is, "contains stuff |
| 06:06 8 | not agreed to," and I don't know if the last item is a |
| 06:06 9 | continuation of that or not, but let me stop there. |
| 06:0610 | Did you tell Mr. Schulman that the draft |
| 06:0611 | contains stuff not agreed to? |
| 06:0612 | MR. MARMARO:  I don't have an objection to the |
| 06:0613 | question, but I have an observation which I think is |
| 06:0614 | important -- |
| 06:0615 | MR. BERGMAN:  Please. |
| 06:0616 | MR. MARMARO:  -- to place the question in |
| 06:0617 | context.  The five statements that you just read all |
| 06:0618 | purport to have quote marks around them.  The statement |
| 06:0619 | you just read does not, and you did not indicate that in |
| 06:0720 | your question, but I think the record should indicate |
| 06:0721 | that. |
| 06:0722 | MR. BERGMAN:  Okay. |
| 06:0723 | MR. TOBEROFF:  And my objection is it misstates |
| 06:0724 | the evidence. |
| 06:0725 | BY MR. BERGMAN: |

191

U.S. LEGAL SUPPORT

**EXHIBIT 10**
**132**

| | |
|---|---|
| 06:07 1 | Q   As you'll observe, Mr. Marks, as your client -- |
| 06:07 2 | as your attorney has pointed out, the phrase "contains |
| 06:07 3 | stuff not agreed to" is not incorporated within quotation |
| 06:07 4 | marks. |
| 06:07 5 | Do you recall saying that in substance to |
| 06:07 6 | Mr. Schulman? |
| 06:07 7 | A   I recall saying in substance yes, there were |
| 06:07 8 | many things not agreed to. |
| 06:07 9 | Q   The last sentence, which also lacks quotation |
| 06:0710 | marks, says, "not contrary to what agreed to." |
| 06:0811 | Do you recall saying that in substance to |
| 06:0812 | Mr. Schulman? |
| 06:0813 | A   I recall saying, as I said before, it contained |
| 06:0814 | many additional terms that were not agreed to, not even |
| 06:0815 | discussed, and John saying something like, "Anything |
| 06:0816 | contrary?" with a question mark at the end of the |
| 06:0817 | sentence, and I have a recollection or a sense of saying, |
| 06:0818 | "Not as to the money terms, the 1 million, the 2 million, |
| 06:0819 | the 500,000, that's right." |
| 06:0820 | Q   Okay.  When you redrafted the long form, was it |
| 06:0821 | more than 20 pages? |
| 06:0822 | MR. TOBEROFF:  Objection -- |
| 06:0823 | MR. MARMARO:  Let me just hear Mr. Toberoff's |
| 06:0924 | objections. |
| 06:0925 | MR. TOBEROFF:  I don't want you talking about |

192

```
1   STATE OF CALIFORNIA      )
                             ) ss
2   COUNTY OF LOS ANGELES    )

3

4          I, DAVID S. COLEMAN, a Certified Shorthand

5   Reporter, do hereby certify:

6          That prior to being examined, the witness in

7   the foregoing proceedings was by me duly sworn to

8   testify to the truth, the whole truth, and nothing

9   but the truth;

10         That said proceedings were taken before me at

11  the time and place therein set forth and were taken

12  down by me in shorthand and thereafter transcribed

13  into typewriting under my direction and supervision;

14         I further certify that I am neither counsel

15  for, nor related to, any party to said proceedings,

16  nor in anywise interested in the outcome thereof.

17         In witness whereof, I have hereunto subscribed

18  my name.

19

20  Dated: ____OCT 1 7 2006____

21

22

23                _____
                  DAVID S. COLEMAN
24                CSR No. 4613

25
```

**EXHIBIT 10**
**134**

09:58

ORIGINAL SHIPPED   NOV 0 9 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA )
SIEGEL LARSON,            )
                         )
         Plaintiffs,      )
                         )
    vs.                   )      No. 04-8400 (RSWL)(RZx)
                         )
WARNER BROS. ENTERTAINMENT )     -and-
INC., et al.,             )
                         )      No. 04-8776 (RSWL)(RZx)
         Defendants.      )
_____ )
AND RELATED COUNTERCLAIMS.

**CERTIFIED ORIGINAL**

DEPOSITION OF ARIEL Z. EMANUEL

Beverly Hills, California

Thursday, November 2, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

**EXHIBIT 11**
**135**

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

1              Deposition of ARIEL Z. EMANUEL, taken

2      on behalf of Defendants and Counterclaimants,

3      at 9665 Wilshire Boulevard, 9th Floor, Beverly

4      Hills, California, beginning at 3:08 PM on

5      Thursday, November 2, 2006, before DAVID S.

6      COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
         BY:  MARC TOBEROFF
13       Attorney at Law
         2049 Century Park East, Suite 2720
14       Los Angeles, California 90067
         310-246-3333
15

16

17   For Defendants and Counterclaimant:

         WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
18       BY:  MICHAEL BERGMAN
              ADAM HAGEN
19       Attorneys at Law
         9665 Wilshire Boulevard, 9th Floor
20       Beverly Hills, California 90212
         310-858-7888
21       mbergman@wwllp.com

22

23

24

25

                                                            2

1     APPEARANCES (Continued):

2

3     For the Witness:

4         ALSCHULER GROSSMAN STEIN & KAHAN
          BY:  MICHAEL J. PLONSKER
5         1620 26th Street, 4th Floor - North Tower
          Santa Monica, California 90404-4060
6         310-907-1000

7

8     ALSO PRESENT:  TOM McGUIRE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            3

EXHIBIT 11

Beverly Hills, California, Thursday, November 2, 2006

3:08 PM


ARIEL Z. EMANUAL,

having been first administered an oath,

was examined and testified as follows:


EXAMINATION

BY MR. BERGMAN:

Q    Would you state your full name for the record, please.

A    **Ariel Zev Emanuel.**

Q    Mr. Emanuel, have you had your deposition taken before?

A    **Yes.**

Q    On how many occasions, approximately?

A    **I don't recall.**

Q    A number of them?

A    **I don't know how many.**

Q    Okay.  Let me just emphasize a few points.

I, of course, am here representing the DC parties who are defendants and counterclaimants in this action brought by Joanne and Laura Siegel.  I'll be asking you questions, the reporter will take down everything that is said verbatim and, at the conclusion

6

I'm -- you know, the -- and I appreciate it.  You brought

up -- it's the first time I remembered this thing from

Cleveland, but that's the -- I'll think about it some

more, but I don't think so.

BY MR. BERGMAN:

Q    Okay.  Thank you.  If you recall --

**A    I'll let you know.**

Q    -- during the course of the deposition, please

say so.

Okay?

**A    Sure.**

Q    Do you recall discussing the Laura and Joanne

Siegel interest in Superman with Bruce Rosenblum?

**A    No.**

MR. BERGMAN:  Would the reporter mark as Exhibit

6 a document that is undated.  It has previously been

introduced as an exhibit at a prior deposition and

purports to be from Mr. Emanuel.

(Deposition Exhibit 6 marked.)

BY MR. BERGMAN:

Q    Could you review that letter, Mr. Emanuel, and

tell me if it refreshes your recollection --

MR. PLONSKER:  Of -- I'm sorry.  I thought you

were done.  About?

BY MR. BERGMAN:

70

Q   -- about having any discussion with

Mr. Rosenblum concerning the Siegel interest?

THE WITNESS:  Repeat the question.  I'm sorry.

MR. BERGMAN:  Yes.  Could you repeat it, please.

(Record read as follows:

"Could you review that letter, Mr.

Emanuel, and tell me if it refreshes

your recollection about having any

discussion with Mr. Rosenblum

concerning the Siegel interest?")

THE WITNESS:  No, it does not.

BY MR. BERGMAN:

Q   And I asked you that, sir, because you realize you begin by saying, "As discussed"?

A   I appreciate that.

Q   I notice the initials above your name "dbnr." Does that have any meaning to you?

A   Since I was once a secretary, dictated not read.

Q   Thank you.

A   I was a good secretary.

Q   I'll bet you were.

A   I was.

Q   Now, subsequent to this letter, although it isn't dated, but you did in fact have a meeting with John Schulman and certain other parties concerning the Siegel

71

interest, didn't you?

A     I have no idea of the time frame.

Q     Okay.  At any point in time.

A     I did have a meeting with a large gentleman from Warner Bros., a lawyer, and a person from DC Comics and Mr. Toberoff and myself.

Q     Okay.

A     I mean you're asking me about names.  I don't recall except his and mine.

Q     Mr. Schulman is a large gentleman.

        MR. PLONSKER:  He will be happy to be described that way.

        MR. BERGMAN:  Yes.

        THE WITNESS:  He's a nice guy.

        MR. PLONSKER:  Yes, he is.

BY MR. BERGMAN:

Q     What do you recall saying at that meeting?

A     I don't recall much.  The main discussions I think were between Mr. Toberoff and...

        MR. PLONSKER:  Mr. Schulman?

        THE WITNESS:  ...Mr. Schulman, and I think the gentleman from DC who had flown in, I think he said he had flown in for the meeting, as I recall, and all I remember him saying is something to the effect that all we have is -- Mr. Schulman said something to the effect

72

that -- something about DC being a sub something.  It was so convoluted.  And DC saying all we really have is 5 percent of gross of Superman, and that's all I -- I mean there was kind of back-and-forth between them, and I was kind of just taking it in.  I don't remember what I said, if I said anything at all.  And I'm sorry that's a little convoluted, so...

BY MR. BERGMAN:

    Q    During the course of the meeting, did either you or Mr. Toberoff make an offer as to the amount of money which the Siegels were prepared to accept in exchange for their rights?

    **A    I don't recall.**

    Q    Do you recall any discussion as to the financial basis upon which the matter could be resolved?

    **A    I'm assuming it might have happened.  All I remember -- the only major financial kind of conclusion of it I remember was the guy from DC saying that all they had was 5 percent of gross, and it was a sub-company of Warner Bros., and I really didn't remember why that had anything to do with this situation, but that's what I remember.**

    Q    Do you recall during the course of that meeting offering to convey the Siegel rights to DC --

    **A    Actually, excuse me, I want to --**

73

Q   Okay.

A   I do remember the large gentleman saying that he thought that -- he did go over -- he did say -- he said something about their pension and paying their pension, and this whole pension thing came up a lot, and that he thought they were being fair, and I think I made the statement, my normal statement, that fair is where you end up.  I think that's -- I think that was stated from my side.  I do remember that.  And that's all I really recall.

Q   Do you remember either you or Mr. Toberoff stating in substance that the Siegels wanted to end up with $50 million for their interest?

A   I don't recall that.

Q   Do you recall any figure being given to DC by either you or Mr. Toberoff during that meeting?

A   Not...  I don't -- all I remember is them talking about money.  I don't -- and I don't remember what the numbers were.  I don't, really.  I'm sorry.

Q   Okay.  As you went into that meeting, Mr. Emanuel, did you have in mind any particular amount of money or objective that you wanted to achieve in that meeting?

A   I was just there to kind of listen and take it all in and see if I could -- you know, kind of in my head

74

just kind of take it all in and see where people stood. I wasn't in there to negotiate, from my perspective going in.

Q   Okay.  And was there any discussion as to the amount of revenues that the Superman property was generating at that time?

A   There might have been.  I don't recall.  There might have been.

Q   Now, you say you weren't there to negotiate. What was -- what were you there for?

A   Really I was there, you know, to -- I was observing it, mainly.  I was kind of a presence.  I was there to observe the parties.  I wasn't negotiating.

Q   Okay.  Was it discussed between you and Mr. Toberoff that he would handle the negotiation at that meeting?

A   I don't recall if there was a pre-meeting -- I don't think there was a pre-meeting to that.

Q   Before you and Mr. Toberoff went into this meeting with Mr. Schulman -- and the gentleman from DC Comics is Paul Levitz, I believe.

A   Shorter gentleman.

Q   Yes.

Before going into that meeting, had you made any determination in your mind as to the amount of money you

75

wanted to obtain for the Siegels?

        A    Not to my knowledge.

        Q    Did you ever reach that point where you decided
I want to get X dollars for their interest?

        A    You know, in my other life as an agent, I never
determine value.  As -- again, as I said to you, fair is
where you end up so -- taught to me from a person from
Warner Bros., Art Stolnitz.

              So when you say to me did I determine value, I
never do that, because where we end up is where we end
up.  That's where fair is from your side and from my
side.  So I never -- when you ask me do you have this
pre -- I don't.  I never do that.

        Q    But isn't where you end up --

        A    Is fair.

        Q    -- molded and shaped by where you start?

        A    No, not from my knowledge.  You should take some
lessons.  I've done -- my father says I've done pretty
well.

        Q    How did the meeting at Warner Bros. end?

        A    Schulman, the tall guy, I think said that, you
know -- I think he ended it that there was nothing more
to discuss or that we would -- I think that's what he
said, something like that.

        Q    Did Mr. Schulman say that after a specific

                                                              76

figure had been raised by either Mr. Toberoff or by you?

A   **Not to my knowledge.  I don't recall that.**

Q   Did you report to Joanne or Laura Siegel following that meeting as to what had transpired at that meeting?

A   **Did I?**

Q   Yes.

A   **I don't remember.**

Q   Do you recall having a meeting with the two Siegel women following the Warner's meeting?

A   **I only remember four meetings with the Siegels.**

Q   Okay.  We've covered two.

A   **I don't remember in what timeline.**

Q   Okay.  What do you recall transpiring at the third meeting?

A   **I can't actually put it in context of a first, second and third meeting.  I know there was a third meeting because I remember there was four meetings.  I don't remember.  I'm sorry.**

Q   Okay.  Do you have any recollection at all as to what happened in either of the last two meetings that you had with the Siegels?

A   **I don't want to assume anything because I'm told -- I don't want to assume anything that then leads to more hours here.  I'm assuming something was said, but**

77

I, ARIEL Z. EMANUAL, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _____,

20____, at _____, _____.
               (City)               (State)


_____
ARIEL Z. EMANUAL

86

```
1  STATE OF CALIFORNIA    )
                          ) ss
2  COUNTY OF LOS ANGELES  )

3

4        I, DAVID S. COLEMAN, a Certified Shorthand

5  Reporter, do hereby certify:

6        That prior to being examined, the witness in the

7  foregoing proceedings was by me duly sworn to

8  testify to the truth, the whole truth, and nothing

9  but the truth;

10 That said proceedings were taken before me at

11 the time and place therein set forth and were taken

12 down by me in shorthand and thereafter transcribed

13 into typewriting under my direction and supervision;

14 I further certify that I am neither counsel

15 for, nor related to, any party to said proceedings,

16 nor in anywise interested in the outcome thereof.

17       In witness whereof, I have hereunto subscribed

18 my name.

19

20 Dated:  NOV 0 8 2006

21

22

23 _____

24 DAVID S. COLEMAN
   CSR No. 4613

25
```

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      -- - - -

 4  JOANNE SIEGEL, an individual;  )
    and LAURA SIEGEL LARSON, an    )
 5  individual,                    )
                      Plaintiffs,  )
 6       vs.                       )  Civil Case No.
                                   )  04-8840 (RXz)
 7  WARNER BROS. ENTERTAINMENT INC.,)      &
    a corporation; TIME WARNER INC.,)  04-8776 (RXz)
 8  a corporation; DC COMICS, a    )
    general partnership; and DOES  )
 9  1-10,                          )
                      Defendants.  )
10  DC COMICS,                     )
                 Counterclaimant,  )
11       vs.                       )
                                   )
12  JOANNE SIEGEL, an individual;  )
    andLAURA SIEGEL LARSON, an     )
13  individual,                    )
                 Counterclaim      )
14               Defendants.       )

15

16             DEPOSITION OF PAUL LEVITZ

17              Los Angeles, California

18             Tuesday, November 7, 2006

19           Volume II:  Pages 223 to 464

20

21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com

23

24  REPORTED BY:  Sharon Campbell, CSR NO. 8643, RPR

25  FILE NO.:  A009B58
```

EXHIBIT 12
149

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     -- - - -

 4   JOANNE SIEGEL, an individual;  )
     and LAURA SIEGEL LARSON, an    )
 5   individual,                    )
                        Plaintiffs, )
 6         vs.                      )  Civil Case No.
                                    )  04-8840 (RXz)
 7   WARNER BROS. ENTERTAINMENT INC.,)        &
     a corporation; TIME WARNER INC.,)  04-8776 (RXz)
 8   a corporation; DC COMICS, a    )
     general partnership; and DOES  )
 9   1-10,                          )
                        Defendants. )
10   DC COMICS,                     )
                 Counterclaimant,   )
11         vs.                      )
                                    )
12   JOANNE SIEGEL, an individual;  )
     andLAURA SIEGEL LARSON, an     )
13   individual,                    )
                 Counterclaim       )
14               Defendants.        )

15         DEPOSITION OF PAUL LEVITZ, a Witness
     herein, taken on behalf of the Plaintiffs at
16   2049 Century Park East, Suite 2720,
     Los Angeles, California, commencing at
17   9:52 A.M., Tuesday, November 7, 2006, before
     Sharon Campbell, CSR No. 8643, RPR.
18

19

20

21

22

23

24

25
```

**EXHIBIT 12**
**150**

```
1                A P P E A R A N C E S

2

3    For the Plaintiffs and Counterclaim Defendants
     Joanne Siegel and Laura Siegel Larson:
4
     LAW OFFICES OF MARC TOBEROFF, PLC
5    BY:  MARC TOBEROFF
     2049 Century Park East
6    Suite 2720
     Los Angeles, California 90067
7    (310) 246-3333

8
     For the Defendants:
9
     WEISSMANN, WOLFF, BERGMAN, COLE,
10   GRODIN & EVALL LLP
     BY:  MICHAEL BERGMAN
11   9665 Wilshire Boulevard
     Ninth Floor
12   Beverly Hills, California 90212
     (310) 858-7888
13

14   ALSO PRESENT:  Zazi Pope
                    Wayne Smith
15                  Warner Bros. Entertainment, Inc.

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 12**
**151**

1          LOS ANGELES, CALIFORNIA; NOVEMBER 7, 2006

2                   TUESDAY, 9:52 A.M.

3

4     MR. TOBEROFF:  I'd like to mark, as Exhibit 18, the

5     document entitled "'Superman' Option Purchase

6     Agreement."  It's dated as of November 7, 1999, Bates

7     stamp WB 4199 to 4231.

8          (Plaintiffs' Exhibit No. 18 was

9          marked for identification by the

10         reporter and is included herewith.)

11

12                   PAUL LEVITZ,

13          having been first duly sworn, was

14          examined and testified as follows:

15

16                   EXAMINATION

17   BY MR. TOBEROFF:

18     Q    Have you ever seen this document before today?

19     A    I think so.  I think this is -- I don't know if

20   this is the final form or -- yes.  This is the executed

21   one, yes.

22     Q    "Yes"?

23     A    Yes.  I have seen this.

24     Q    Did you take part in the negotiation of this

25   agreement?

**EXHIBIT 12**
**152**

1      MR. BERGMAN:  That's a wholly inappropriate

2   question to ask the witness at a deposition.  It's a

3   proper subject of an interrogatory.

4           I do instruct the witness not to answer.

5   MR. TOBEROFF:  I see.

6           Can you mark that question, please.

7   Q    If you can turn to page 27, paragraph 99.

8   A    (Witness complies.)

9   Q    If you go -- the second sentence starts:

10          "Specifically, and without limiting

11     the foregoing, DC Comics established a

12     reserve account of the monies due to

13   Plaintiff's/Counterclaim Defendants based upon

14     the Financial Terms."

15          And the financial terms are financial terms of

16   a purported agreement with the Siegels regarding their

17   termination interests.

18          Do you see that sentence?

19   A    I do.

20   Q    Okay.

21          To your knowledge, did DC establish such a

22   reserve account?

23   A    We did.

24   Q    Okay.  What bank is that -- does that

25   reserve -- when did you establish that reserve account?

EXHIBIT 12
153

1      A      Approximately when we reached the agreement.

2      Q      When?

3      A      I don't remember the dates.

4      Q      Is it in 2000?  2001?  2002?

5      A      I don't remember the dates.  I'm sorry.

6      Q      Who opened that account?

7      MR. BERGMAN:  Objection.

8             Assumes a fact not in evidence, lacks

9      foundation.

10     THE WITNESS:  A reserve account is not necessarily

11     a physical bank account.

12     Q      BY MR. TOBEROFF:  Okay.

13     A      It's -- it's establishing the financial --

14     financial reserve, setting aside an identified amount

15     as due and owing for a particular purpose.

16     Q      So you're speaking of a bookkeeping function,

17     keeping track of?

18     MR. BERGMAN:  Object to the characterization as to

19     what the witness is referring to.

20     THE WITNESS:  It's -- it's a bookkeeping function.

21     It's a financial function.

22     Q      BY MR. TOBEROFF:  Okay.

23            But you -- are you saying you did not actually

24     establish a bank account in which monies were

25     deposited; is that correct?

EXHIBIT 12
154

1      A      To the best of my knowledge, there's not a

2  separate bank account.

3      Q      Okay.

4             Other than -- are you saying you kept track of

5  what monies would be owed them; is that correct?

6      MR. BERGMAN:  Objection.

7             Mischaracterizes the witness's testimony.

8      MR. TOBEROFF:  I'm not attempting to characterize.

9  I'm asking if it's correct or not.

10     MR. BERGMAN:  But when you say, in other words,

11 Mr. Toberoff, you are characterizing.

12     MR. TOBEROFF:  No, I'm not.  I'm trying to

13 understand him.

14     THE WITNESS:  It was accrued as an amount on the

15 books of the company.

16     Q      BY MR. TOBEROFF:  But other than keeping track

17 of it on the books of the company, was there anything

18 else you did with respect to this reserve account?

19     MR. BERGMAN:  Objection.

20            Mischaracterizes the witness's testimony.

21     THE WITNESS:  It would, I believe, impact our --

22 our taxes, any other financially driven system.

23     Q      BY MR. TOBEROFF:  I'm not really asking what it

24 impacted.  I'm trying to -- let me break this down.

25 I'm trying to get a simple understanding of what you

**EXHIBIT 12**
**155**

1    actually did, and so far you've told me something to

2    the effect of -- and I'm not trying to mischaracterize

3    your testimony.

4            Just trying to get at the heart of what DC did.

5    It says we established a reserve account.  And I asked

6    what does that mean, and so far what I'm hearing is

7    that something to the effect of keeping track of what

8    monies would be owed the Siegels under that purported

9    agreement in your bookkeeping.

10           Is that basically correct?

11       MR. BERGMAN:  Object to the preamble to that, and

12   object as misstating the testimony of the witness.

13       THE WITNESS:  We established it as a liability of

14   the company.

15       Q    BY MR. TOBEROFF:  What does that mean --

16   established?

17           What did you do -- physically do?

18       A    I physically did nothing.  I did not keep the

19   books of the company.

20       Q    Okay.

21           What did DC physically do?

22       A    If your question is the physical acts involved,

23   you would be better asking that of one of our financial

24   people.  I don't --

25       Q    Thank you.  But I'm asking you your knowledge

**EXHIBIT 12**
**156**

1    what did DC do.

2        A    I have told you what DC did.  We established an

3    accrual as a financial liability of the company for the

4    amounts as would be due under that agreement.

5        Q    Could you put that in plain Brooklyn English --

6    what you did.

7            Does that mean you kept track of the amounts

8    that would be due the Siegels under the agreement in

9    your bookkeeping?

10           Is that what that means?

11       MR. BERGMAN:  Asked and answered.  Misstates

12   testimony of the witness.

13       THE WITNESS:  We accrued those amounts as a

14   financial liability of the company.

15       Q    BY MR. TOBEROFF:  What does that mean --

16   accrued?

17       A    Accrual is a form of accounting where you take

18   acknowledgment of a liability as it is incurred rather

19   than cash accounting when you take note of a liability

20   when it is actually paid.

21       Q    So --

22       A    I'm not an accountant, either.  But that's what

23   I remember from cost accounting 101.

24       Q    Okay.

25           So am I correct that what you essentially did

**EXHIBIT 12**
**157**

1    by establishing reserve accounts is you kept track of

2    the monies that would be owed the Siegels under that

3    agreement if that agreement was effective?

4         MR. BERGMAN:  Objection.

5              Mischaracterized the testimony of the witness.

6         Q    BY MR. TOBEROFF:  Is that correct?

7              "Yes" or "no"?

8         MR. BERGMAN:  Again --

9         THE WITNESS:  I don't believe that is the full

10   import of establishing accrual.

11        Q    BY MR. TOBEROFF:  I'm not asking for the

12   import.

13             I'm asking is this a fair characterization of

14   what you did?

15        A    No.  I don't think that's a fair

16   characterization of what an accrual --

17        Q    Okay.

18             So you did not keep track of the monies that

19   would be owed the Siegels under this purported

20   agreement?

21        A    We kept track and we accrued those amounts as a

22   liability on the books of the company.

23        Q    Okay.

24             Anything else you did with regard to this

25   reserve account in addition to keeping track?

EXHIBIT 12
158

1        MR. BERGMAN:  Objection.

2            Mischaracterizes the testimony of the witness.

3    Q    BY MR. TOBEROFF:  Anything else you did?

4    A    I would not be aware if there was anything else

5    physically done.

6    Q    How much money is in this, quote, reserve

7    account, end quote?

8    A    I'm not sure what the current balance is.

9    Q    Any idea?

10   A    I would estimate that it's to the order of

11   $20 million at this point.

12   Q    And when was the last time you checked that

13   balance?

14   A    I probably received some information on the

15   balance several months ago.

16   Q    Is this accrual done electronically?

17       MR. BERGMAN:  Objection.

18           Vague and ambiguous.

19       THE WITNESS:  I don't know how the physical

20   processes are done.  I mean, it would involve something

21   in computer technology somewhere along the way.

22       MR. TOBEROFF:  Okay.

23           Again, this is one of the areas where I find it

24   appalling that you have not produced these numbers to

25   us although they were requested under multiple

**EXHIBIT 12**
**159**

1    publications that I've mentioned.

2        Q    Other than that, are there any others?

3        A    I've answered this three times.  I don't think

4    so.

5        MR. TOBEROFF:  Okay.  I have no further questions.

6        THE WITNESS:  Yay.

7        MR. BERGMAN:  I have none.

8            Propose the normal stipulation that the court

9    reporter will be relieved of her statutory obligations;

10   that she will send a copy of Mr. Levitz's transcript to

11   me; that within 30 days of my receipt, we will make any

12   necessary corrections and sign it under penalty of

13   perjury; and that I will notify Mr. Toberoff of any

14   changes that are made.

15           Is that agreeable?

16       MR. TOBEROFF:  Agreed.  Thank you.

17

18   (The Deposition concluded at 4:17 P.M.)

19

20                    *   *   *

21

22

23

24

25

**EXHIBIT 12**
**160**

```
1   STATE OF CALIFORNIA    )
                           ) ss
2   COUNTY OF LOS ANGELES )

3

4

5          I, the undersigned, declare under

6       penalty of perjury that I have read the

7       foregoing transcript, and I have made any

8       corrections, additions, or deletions that I

9       was desirous of making; that the foregoing

10      is a true and correct transcript of my

11      testimony contained therein.

12

13         EXECUTED this      day of         ,

14    at                    ,             .
           (City)                 (State)
15

16

17                    PAUL LEVITZ

18

19

20

21

22

23

24

25
```

**EXHIBIT 12**
**161**

```
1    STATE OF CALIFORNIA    )
                            ) ss
2    COUNTY OF LOS ANGELES  )

3

4

5         I, SHARON CAMPBELL, C.S.R. No. 8643, RPR,

6    Certified Shorthand Reporter, certify:

7         That the foregoing proceedings were taken

8    before me at the time and place therein set forth, at

9    which time the witness was put under oath by me;

10        That the testimony of the witness and all

11   objections made at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed;

14        That the foregoing is a true and correct

15   transcript of my shorthand notes so taken.

16        I further certify that I am not a relative

17   or employee of any attorney or of any of the parties,

18   nor financially interested in the action.

19        I declare under the penalty of perjury under

20   the laws of the State of California that the

21   foregoing is true and correct.

22        Dated this 15th day of November 2006.

23

24        _____
             Sharon Campbell, CSR No. 8643, RPR
25
```

**EXHIBIT 12**
**162**

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
4  Telephone:  310-858-7888
   Fax:            310-550-7191
5
   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6  Roger L. Zissu (Admitted *pro hac vice*)
   866 United Nations Plaza
7  New York, New York 10017
   Telephone: 212-813-5900
8  Fax:            212-813-5901
9  PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
10 1711 Route 9D
   Cold Spring, NY 10516
11 Telephone: 845-265-2820
   Fax:            845-265-2819
12
   Attorneys for Defendants and Counterclaimant
13
14              UNITED STATES DISTRICT COURT
15      CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
16 JOANNE SIEGEL and LAURA          )  Case No. 04-8400 SGL (RZx)
   SIEGEL LARSON,                   )
17                                  )  Hon. Stephen G. Larson, U.S.D.J.
                                    )
18              Plaintiffs,         )
                                    )  **DEFENDANTS' OPPOSITION
19      vs.                         )  TO PLAINTIFFS' MOTION FOR
                                    )  PARTIAL SUMMARY
20 WARNER BROS. ENTERTAINMENT       )  JUDGMENT AND
   INC.; TIME WARNER INC.; DC       )  MEMORANDUM OF POINTS
21 COMICS; and DOES 1-10,           )  AND AUTHORITIES IN
                                    )  SUPPORT THEREOF**
22              Defendants.         )
                                    )  [Defendants' Opposition to Local
23                                  )  Rule 56.1 Statement; Declaration of
                                    )  Michael Bergman and exhibits
24                                  )  thereto]
                                    )
25                                  )  Date:     July 23, 2007
                                    )  Time:     10:00 a.m.
26                                  )  Place:    Courtroom 1
                                    )
27 _____ )
   AND RELATED COUNTERCLAIMS.       )
28                                  )

**EXHIBIT 13**

1   profits arising from any foreign exploitation of the character. (FASMC, ¶ 58(a);

2   Pl. Mem. at 25-28.) Plaintiffs further allege that they are entitled to a share of the

3   profits arising from the exploitation the Superman trademarks, including the

4   related characters and symbols associated with the character. (FASMC, ¶¶ 61-63,

5   107.) Finally, Plaintiffs allege that they are entitled to share in the profits of

6   Defendants from the post-termination exploitation of derivative works that had

7   been prepared by Defendants before the effective date of the termination.

8   (FASMC, ¶¶ 58(c), 66-73.)[11]

9   ### E.    The Parties' 2001 Settlement

10      Shortly after receiving the Superman Notices in April, 1997, DC Comics

11  initiated discussions with Plaintiffs' representative (then Arthur Levine, a

12  prominent copyright attorney with the Washington, D.C. firm of Finnegan,

13  Henderson, Farabow, Garret & Dunner) in an attempt to determine if the parties

14  could come to an acceptable resolution of their respective claims concerning the

15  Superman property. (Bergman Decl. Exh. R (transcript of Paul Levitz deposition

16  ("Levitz Tr.")) at 175:5-175:15; id. Exh. S ("Marks Tr.") at 27:19- 28:6.) When

17  sporadic discussions over the following months yielded no results, on April 15,

18  1999 – the day before the purported effective date of the Superman Notices – DC

19  set forth in a comprehensive writing its formal rejection of the Notices,[12]

20  contesting both their validity and their scope, and asserting that DC remained the

21  sole copyright owner of all aspects of the Superman property, with full right to

22  exploit that property as it chose, without the need to account to or share with

23  Plaintiffs any of the proceeds of that exploitation. (Toberoff Decl. Exh. Q.)

24

25  [11] Plaintiffs' claims that they are entitled to profits arising from exploitation of
    Superman trademarks and post-termination exploitation of derivative works prepared
26  prior to the effective date of termination are not the subject of this motion. Defendants,
    have, however, moved for summary judgment on these claims, which motion is currently
27  pending before the Court.

28  [12] DC had previously notified Plaintiffs of certain deficiencies in the Notices in letters
    set to Plaintiffs' counsel on November 5, 1997 (Bergman Decl. Exh. T) and December
    18, 1997 (id. Exh. U).

**EXHIBIT 13**
18

Two weeks later, on April 30, 1999, DC was contacted by Bruce Ramer, an attorney with the Beverly Hills law firm of Gang, Tyre, Ramer & Brown, Inc. ("Gang Tyre"), and was advised that Gang Tyre had been retained to represent Plaintiffs' interests in connection with the Superman Notices. (Bergman Decl. Exh. V.) The parties then began negotiations in earnest, with Kevin Marks of Gang Tyre ultimately becoming the lead negotiator for Plaintiffs, and John Schulman, General Counsel and Executive Vice President of Warner Bros. Entertainment Inc. ("Warner Bros."), the lead negotiator for DC. (Declaration of John Schulman ("Schulman Decl."), ¶ 4; Bergman Decl. Exh. S (Marks Tr.) at 24:15-25:10.)[13]

The discussions between Mr. Marks and Mr. Schulman were extensive and far-reaching, spanning some two and a half years, and consisting of several face to face meetings as well as numerous communications both written and oral, with the parties addressing and resolving certain key issues before moving on to other issues. (Schulman Decl. ¶ 5.)[14] These negotiations culminated on October 16, 2001, when Mr. Marks and Mr. Schulman reached agreement on what they both understood to be the final outstanding deal point in a global resolution designed to settle all of Plaintiffs' claims and potential claims related to the Superman Notices. (Bergman Decl. Exh. S (Marks Tr.) at 132:11-134:11; Schulman Decl. ¶¶ 6-7.)[15] Accordingly, on October 19, 2001, apparently after obtaining his clients' approval (Bergman Decl. Exh. S (Marks Tr.) at 145:16-146:4), Mr. Marks called Mr.

---

[13] Although Mr. Schulman remained exclusively employed by Warner Bros., his services were provided to DC for this purpose. (Bergman Decl. Exh. W (Schulman Tr.) at 95:14-96:16; Schulman Decl. ¶ 4.)

[14] On April 6, 2000, Plaintiffs and Defendant DC Comics entered into a tolling agreement to encourage continued negotiations (the "Tolling Agreement"). (Schulman Decl. ¶ 5; Toberoff Decl. Exh. Z.)

[15] Contrary to Plaintiffs' unsupported assertion in their moving papers (*see* Pl. Mem. at 46 lines 13-16), Mr. Marks and Mr. Schulman did not discuss "many different terms, including contingent compensation formulas" in that conversation. Instead, the conversation was limited to one item, agreement on which "closed the deal," because the parties had already previously come to an understanding on all of the other components of the agreement. (Bergman Decl. Exh. S (Marks Tr.) at 132:11-134:11.)

**EXHIBIT 13**
**165**

19

1   Schulman to tell him that "we are closed" (*id.* at 134:19-135:5); he then sent Mr.

2   Schulman a letter confirming their earlier telephone conversation and expressly

3   stating that "the Siegel Family (through Joanne Siegel and Laura Siegel Larson the

4   majority owners of the terminated copyright interests) has accepted D.C. Comics

5   offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties."

6   (Toberoff Decl. Exh. BB, hereinafter the "Marks Letter".)[16]  The Marks Letter

7   went on to set forth, in six single-spaced pages, the terms of the parties' deal,

8   concluding with a thanks to Mr. Schulman for his "help and patience in reaching

9   this monumental accord." (*Id.*)  As Mr. Marks testified to at deposition, as of

10   October 19, 2001, he "believed that an accord had been reached on the terms

11   exactly set forth in this letter." (Bergman Decl. Exh. S (Marks Tr.) at 148:3-

12   148:14.)

13        The deal reached by the parties contemplated, among other things, that upon

14   transfer to DC of all of Plaintiffs' Superman interests, DC would provide Plaintiffs

15   with up-front payments in the amount of $3 million, as well as a substantial

16   guaranteed advance against certain royalties based on DC's on-going exploitation

17   of the Superman properties. (Toberoff Decl. Exh. BB (Marks Letter) at ¶ B;

18   Schulman Decl. ¶ 6.)  Although the parties anticipated that a more formal

19   document would be drawn up, neither Mr. Marks nor Mr. Schulman − nor, indeed,

20   any other representatives of the parties − expressed in any way that the parties'

21   October 19 agreement was not complete or would not be binding unless and until

22   that more formal document was executed. (Schulman Decl. ¶ 10.)

23        On October 26, 2001, Mr. Schulman started the process of the long-form

24   documentation, by sending Mr. Marks a letter enclosing "a more fulsome outline"

25   of the deal, and noting that they were working on a draft so that the transaction

26   could be "in document form" shortly. (Schulman Decl. ¶ 8; Toberoff Decl. Exh.

27

28        [16] "Spectre," another property authored by Jerry Siegel, was the subject of a separate
     termination notice served by Plaintiffs, and is not at issue in these actions.

EXHIBIT 13
166
20

CC (hereinafter the "Schulman Letter").)  The five-page outline reiterated the material points in the Marks Letter, fleshing out some details on certain terms that Mr. Marks had generally addressed, and, in at least one instance, including an agreed-upon point that Mr. Marks appeared to have forgotten to include.  (*Id.*)

Mr. Marks reviewed the Schulman Letter some weeks later.  (Bergman Decl. Exh. S (Marks Tr.) at 149:17-149:22.)  Although he testified at deposition that he noted some differences between the Schulman Letter and his letter of October 19, Mr. Marks acknowledged that he did not discuss it with or send it on to his clients (*id.* at 203:10-14), and he *never* advised Mr. Schulman that his "more fulsome outline" of the parties' deal materially changed, misstated, or otherwise did not in fact accurately reflect their prior discussions and ultimate agreement.  (*Id.* at 150:24-151:3; Schulman Decl. ¶ 9.)  Instead, Mr. Marks expected to address the differences he noted in the Schulman Letter in the context of finalizing the documentation of the long-form contract.  (Bergman Decl. Exh. S (Marks Tr.) at 163:21-164:1.)

Thereafter, DC prepared a long form contract reflecting the material terms of the agreement, and providing for the formal assignment of any copyright interests Plaintiffs might have in the Superman property to DC.  (Schulman Decl. ¶ 9.)  DC immediately acted on the agreement, by including in the license agreement it was then finalizing with Warner Bros. for the next Superman motion picture a specific contractual requirement that Warner Bros. accord two separate screen credits – namely, "Superman created by Jerry Siegel and Joe Shuster" and "By Special Arrangement with the Jerry Siegel Family" – which credits had been negotiated by Plaintiffs and were required under the terms of the parties' October agreement. (Schulman Decl. ¶ 10.)[17]  DC also set up a reserve account for the monies that would be due to Plaintiffs under the financial terms of the agreement upon the

---

[17] That agreement was negotiated in the latter part of 2001, and was executed in the Spring of 2002.  (Schulman Decl. ¶ 10.)

**EXHIBIT 13**
**167** [21]

1  formal transfer of their Superman interests to DC.  (Bergman Decl. Exh. R (Levitz

2  Tr.) at 289:9-290:1.)[18]

3        In or about late November, 2001, shortly after the parties reached their

4  accord – and completely unbeknownst to DC – Mr. Marks was contacted by

5  Plaintiffs' present counsel, Marc Toberoff, who was then acting as a principal for

6  an entity called "IP Worldwide, LLC" ("IPW") which was, according to Mr.

7  Toberoff, in the business of acquiring intellectual property rights.  (Bergman Decl.

8  Exh. S (Marks Tr.) at 151:4-152:19; *id.* Exh. X (Toberoff Tr.) at 87:5-87:10.)  Mr.

9  Toberoff also was a principal of Pacific Pictures Corporation ("PPC"), a motion

10  picture production company which had, just a few days earlier, entered into a joint

11  venture agreement with the heirs of Joe Shuster "for the purpose of retrieving,

12  enforcing and exploring" all of Shuster's "rights, claims, copyrights, property, title

13  and interests" in his "creations," particularly Superman.  (Bergman Decl. Exh.

14  Y.)[19]  Mr. Toberoff informed Mr. Marks that he was interested in acquiring the

15  Siegels' interest in the Superman property, but was advised by Mr. Marks that

16  Plaintiffs were already in the "documentation phase" with DC for those interests.

17  (Bergman Decl. Exh. S (Marks Tr.) at 152:3-153:22.)

18        On February 1, 2002, DC's attorneys forwarded to Mr. Marks a long-form

19  contract for his review.  (Schulman Decl. ¶ 9; Bergman Decl. Exh. S (Marks Tr.) at

20  177:18-177:21; Toberoff Decl. Exh. DD) (hereinafter the "February Draft".)  Mr.

21  Marks received and reviewed the February Draft (Bergman Decl. Exh. S (Marks

22  Tr.) at 182:1-182:2), and apparently sent it on to his clients.  Mr. Marks did not

23  inform Mr. Schulman, or DC's attorneys who had prepared the document, that the

24

25

26     [18] As of the latter part of 2006, that reserve account totaled approximately $20
million.  (*Id.* at 295:6-295:15.)

27     [19] The joint venture agreement provides for the venture to retain the services of Marc
28  Toberoff to render legal services in connection with all disputes concerning Shuster's
rights.  (*Id.* Exh. Y)  It also provides for the Shusters to share any proceeds "from the
enforcement, settlement or exploitation" of their rights 50/50 with PPC.  (*Id.*)

**EXHIBIT 13**
**168**
22

1   February Draft was contrary in any material respect to the deal that had been

2   agreed to by the parties in October. (Schulman Decl. ¶ 11.)

3          On May 9, 2002, more than three months after being sent the February

4   Draft, Joanne Siegel − without the participation or even the prior knowledge of Mr.

5   Marks (Bergman Decl. Exh. S (Marks Tr.) at 181:14-181:24) − sent a letter to

6   Richard Parsons, the Chief Executive Officer of Time Warner Inc. (then known as

7   AOL Time Warner Inc.), complaining that the proposed long-form contract was

8   "unconscionable." (Bergman Decl. Exh. Z.) Mrs. Siegel acknowledged that

9   Plaintiffs had "accepted John Schulman's last proposal six months ago" but stated

10   that the February Draft contained "demands which were not in the proposal we

11   accepted . . . ." (Id.)

12          On May 16, 2002, after receiving a copy of Mrs. Siegel's letter, Mr.

13   Schulman called Mr. Marks to ask what had prompted the letter, and whether there

14   were any problems he should be aware of. (Schulman Decl. ¶ 11; Bergman Decl.

15   Exh. S (Marks Tr.) at 181:14-182:10.) Mr. Marks advised Mr. Schulman that he

16   had not seen and did not know about the letter. (Schulman Decl. ¶ 11; Bergman

17   Decl. Exh. S (Marks Tr.) at 181:14-181:24.) Mr. Marks further stated, in

18   substance, that while the February Draft was "very aggressive" he could "deal with

19   it," and that although the draft contained certain things that had not been agreed to,

20   it was "not contrary to what [had been] agreed to." (Schulman Decl. ¶ 11 & Exh.

21   A.)[20]

22          On May 21, Mr. Parsons sent a letter in response to Mrs. Siegel's May 9

23   missive, in which he stated that "each of the major points covered in the draft

24   agreement which was provided to your representatives, more than three months

25   ago, accurately represented the agreement previously reached between your

26   representatives and [AOL Time Warner]" and concluding that he hoped the

27

28          ─────────────
[20] Schulman Decl. Exhibit A is Mr. Schulman's contemporaneous notes of his May
16, 2002 telephone conversation with Mr. Marks. (Id. ¶ 11.)

**EXHIBIT 13**
**169**
23

1    agreement could be "closed" based upon the prior discussions. (Bergman Decl.

2    Exh. <u>AA</u>.)  Neither Mrs. Siegel nor any of her representatives ever responded to

3    this letter.

4         Mr. Marks thereafter drafted a long-form contract that he apparently felt

5    would be more acceptable to his clients. (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at

6    196:21-197:15; Bergman Decl. Exh. <u>BB</u>.)  That draft long-form was transmitted to

7    Plaintiffs on July 15, 2002, but was not provided to DC. (Bergman Decl. Exh. <u>S</u>

8    (Marks Tr.) at 198:25-199:3; Schulman Decl. ¶ 12.)[21]

9         On July 30, Mr. Toberoff again contacted Mr. Marks to inquire as to the

10   status of Plaintiffs' dealings with DC on the Superman property. (Bergman Decl.

11   Exh. <u>S</u> (Marks Tr.) at 165:25-167:3.)  When informed that there was a

12   confidentiality agreement in place and that Mr. Marks would not speak with him

13   about DC, Mr. Toberoff asked if Mr. Marks would be willing to enter into separate

14   negotiations with him regarding the sale of the Siegels' Superman interests. (*Id.*)

15   Mr. Marks declined to do so, but told Mr. Toberoff that if he had an offer to make,

16   Mr. Marks would present it to his clients. (*Id.*)  Accordingly, in early August,

17   2002, Mr. Toberoff's company, IPW, offered to purchase Plaintiffs' Superman

18   copyright interests for $15 million and "a meaningful back-end." (*Id.* at 167:7-

19   169:25.)  Mr. Marks communicated that offer to his clients. (*Id.* at 169:21-170:12.)

20        On September 21, 2002, Plaintiffs abruptly terminated Mr. Marks' and Gang

21   Tyre's representation of them, without any prior notice, via a letter copied to Paul

22   Levitz,  DC's President and Publisher. (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at

23   202:1-202:16; *Id.* Exh. <u>DD</u>.)  On the same day, Plaintiffs sent a separate letter to

24   DC repudiating the parties' October 19 agreement and purporting to break off all

25   further negotiations, and claiming that February Draft contained "outrageous,

26   _____

27   [21] Defendants have not seen a copy of that draft long-form, and Plaintiffs have refused
     to produce it on the basis of the attorney client privilege. Defendants' motion to compel

28   its production was denied by Magistrate Zarefsky. (Bergman Decl. Exh. <u>CC</u>)  It is
     therefore not possible to know what was in that draft or if it differed materially from the
     February Draft.

EXHIBIT 13
170                                          24

1  never discussed, unacceptable demands." (Bergman Decl. Exh. BB.)  Plaintiffs

2  then promptly retained Mr. Toberoff to represent them (id. Exh. X (Toberoff Tr. at

3  106:1-107:4; 132:4-134:7), and after being advised by Mr. Toberoff's business

4  partner that DC's offer for their Superman copyright interests was "ridiculously

5  low" (id. Exh. EE (Laura Siegel Larson Tr.) at 28:15-28:18), entered into an

6  agreement with IPW dated October 3, 2002 pursuant to which Plaintiffs retained

7  IPW to be their exclusive representative in connection with their Superman

8  interests.  (Bergman Decl. Exh. FF.)[22]

9      Later attempts by the parties to resolve these issues did not reach fruition,

10  and Plaintiffs subsequently filed these actions.  DC has accordingly filed

11  counterclaims against Plaintiffs for breach of contract and to enforce the terms of

12  the October 19, 2001 agreement between the parties.  (Id. Exh. GG.)[23]

### F.    Corrections With Respect to Plaintiffs' Statement
### Concerning Judge Lew's Decision in The Superboy Action

15      As the Court now knows from Defendants' Motion for Reconsideration,

16  Judge Lew's March 24, 2006 Order (the "Lew Order," Toberoff Decl. Exh. U) did

17  not, as Plaintiffs assert, find that the copyright law defenses which formed the basis

18  for Defendants' own cross motion for partial summary judgment in the Superboy

19  Action substantively "lacked merit."  (Pl. Mem. at 9.)  In fact, the scope and effect

20  of the Lew Order is limited – relying almost exclusively on the vacated

21  Interlocutory Findings in the Westchester Action, and reaching only the extent of

22  Plaintiffs' very narrow cross-motion for partial summary judgment in the Superboy

23  Action.  Significantly, Plaintiffs did not move in either case to dismiss DC's

24  affirmative defenses or First Amended Counterclaims, the bulk of which do not

---

[22] Pursuant to the representation agreement, IPW was to provide the services of Marc
Toberoff in connection with the negotiation, sale or license of Plaintiffs' Superman
rights, but the parties agreed that such services would not include litigation, which
services, if required, would be provided by Mr. Toberoff subject to good faith negotiation
of a mutually acceptable agreement.  (Id.)

[23] DC's First Amended Counterclaims (Bergman Decl. Exh. GG) are hereinafter
referred to as the "FACC."

**EXHIBIT 13**
**171**
25

conflict with the termination provisions for post 1978 grants set forth in section

203 of the Copyright Act, it was pre-empted and "federal law must control." *Id.*

As noted above, in crafting the termination provisions of the statute as it did,

Congress drew a very clear line dividing just what rights could and could not be

recaptured via termination.  Under these circumstances, any rule or principle of

state law that conflicts with that decision must fall and is foreclosed by the

Copyright Act.  Here, insofar as Superman is concerned, because the termination

of only *Siegel's domestic* Superman copyright grants is involved, the Superman

Notices can have no effect on DC's legal right as the sole owner of the foreign

copyrights to continue to exploit those works outside of the United States without

any obligation to account to Plaintiffs.[48]

## III.   WHETHER THE PARTIES ENTERED INTO AN ENFORCEABLE AGREEMENT ON OCTOBER 19, 2001 IS A QUESTION OF FACT WHICH CANNOT BE RESOLVED ON SUMMARY JUDGMENT

Plaintiffs move this Court for an order dismissing DC's Third and Fourth

Alternative Counterclaims for breach of contract and declaratory relief, asserting

that there was no enforceable agreement between the parties as alleged by DC.

That is, Plaintiffs would have this Court summarily resolve the question of whether

or not a binding contract was formed between the parties on October 19, 2001

regarding the transfer of Plaintiffs' Superman copyright interests to DC.  But such

a determination is not the province of the Court at this juncture:  It would require

the Court to address and resolve questions of fact, weigh the evidence, and assess

the credibility of the witnesses, none of which can properly be done on summary

---

[48] As noted above, any act by DC or its licensees in the exercise of some or all of the rights of copyright as a co-owner in the United States and exclusive owner outside the country can *never* constitute an *infringing* act in the United States or overseas.  DC, which remains the sole owner of the foreign copyrights in foreign jurisdictions, is entitled to exercise all rights of ownership in such other jurisdictions without infringing any rights which may be held by Plaintiffs.

**EXHIBIT 13**
172   67

1   judgment.  Indeed, it has routinely been held that the question of the formation of a

2   contract is <u>for the trier of fact</u> upon considering the appropriate evidence.  *See*

3   *Banner Entm't v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) (whether

4   parties mutually intended to be bound by terms contained in a proposed written

5   agreement is to be determined from the facts and circumstances of a particular case

6   and is a question of fact); *Symphony Fabrics Corp. v. Podell Indus., Inc.,* 94 Civ.

7   4373 (BSJ) 1996 U.S. Dist. LEXIS 12767, *14 (S.D.N.Y. Aug. 30, 1996) (to

8   determine whether a contract has been formed, the trier of fact must evaluate the

9   objective manifestations of the intent of the parties).

10          In general, an enforceable contract requires a meeting of the minds on the

11   material terms, along with an intention by the parties to be bound.  *Apablasa v.*

12   *Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959); *Callie v. Near*, 829 F.2d 888,

13   891 (9th Cir. 1987) ("In addition to the intent of the parties to bind themselves, the

14   formation of a settlement contract requires agreement on its material terms.").

15   Plaintiffs have failed to provide any sworn testimony from either of them

16   containing any objective evidence that the October 19, 2001 Letter did not

17   represent a "meeting of the minds" on all material terms.  This evidentiary failing

18   alone dooms Plaintiffs' motion.

19          Moreover, as demonstrated below, Defendants have presented sufficient

20   admissible evidence for a trier of fact to conclude that in October, 2001, (i) the

21   parties' attorneys Mr. Schulman and Mr. Marks, with full authority from their

22   respective clients, reached a meeting of the minds on all material terms pursuant to

23   which Plaintiffs would convey their Superman copyright interests to DC, (ii) that

24   this agreement was contemporaneously memorialized and affirmed in a writing

25   executed by Plaintiffs' counsel on October 19, 2001, and (iii) that the parties

26   intended and expected to be bound by the terms of that agreement notwithstanding

27   the fact that they contemplated negotiating and executing a more formal contract

28   thereafter.  In fact, the parties were proceeding along on that basis, with the

**EXHIBIT 13**
**173**
68

1   drafting and re-drafting of their more formal documentation, until Plaintiffs

2   suddenly appeared to have second thoughts after being presented with a seemingly

3   more lucrative offer by their current counsel, and abruptly jettisoned both the deal

4   and their attorneys who negotiated it.

5         This evidence cannot be rejected or negated *as a matter of law* as would be

6   required in a motion for summary judgment. *See Alexander v. Codemasters Group*

7   *Ltd.*, 104 Cal. App. 4th 129, 141 (2002) ("where the existence and not the validity

8   or construction of a contract or the terms thereof is the point in issue, and the

9   evidence is conflicting or admits of more than one inference, it is for the jury or

10  other trier of the facts to determine whether the contract did in fact exist.").

11  Indeed, in assessing the existence of a contract on summary judgment, the court

12  *must* draw all inferences in the light most favorable to the non-moving party.

13  *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1116 (C.D. Cal. 2002) (citing

14  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th

15  Cir. 1987)). Accordingly, Plaintiffs' motion for partial summary judgment on

16  these claims must be denied, and DC should be permitted to present its contract

17  Counterclaims to a jury for determination at trial.

18        **A.**    **It Has Been Established In This Action That Mr. Marks**

19                **Had Full Authority to Act on Behalf of Plaintiffs in**

20                **Connection with The October 19, 2001 Agreement**

21        As a preliminary matter, the question of Mr. Marks' authority to act on

22  behalf of and to bind Plaintiffs to an agreement with DC is no longer an issue in

23  this case. Generally, an attorney is *presumed* to have authority to act on his

24  client's behalf, and a settlement entered into by the attorney can be set aside only

25  upon affirmative proof that the client did not give the attorney the appropriate

26  authority. *See In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2nd Cir. 1996). In their

27  Reply to DC's Counterclaims on the contract issues, Plaintiffs expressly asserted

28  as their Thirty-Seventh affirmative defense that "Plaintiffs' attorneys lacked

**EXHIBIT 13**
**174** 69

authority and/or exceeded the scope of their authority with respect to the purported settlement agreement alleged by Counterclaimant." (Bergman Decl. Exh. II.) Notwithstanding this stated defense, Plaintiffs vigorously resisted all attempts by Defendants to inquire into the scope of Mr. Marks' authority, and specifically into whether or not Plaintiffs had authorized in advance or had consented to his communication to DC on October 19, 2001, that "the Siegel Family . . . has accepted" DC's offer. (Bergman Decl. JJ; *see also id.* Exh. S (Marks Tr.) at 146:21-147:11.) However, in response to Defendants' motions to compel Plaintiffs and Mr. Marks to produce documents and respond to deposition questions regarding his authority – and in an apparent attempt to forestall any order by the Court in that regard – Plaintiffs' current attorney, Mr. Toberoff, conceded in open court, *without qualification*, that the Marks Letter represented the statements of Plaintiffs themselves. (Bergman Decl. Exh. KK.) Accordingly, relying on Mr. Toberoff's statement and finding it to be binding on Plaintiffs, the Court *dismissed* Plaintiffs' affirmative defense denying Mr. Marks' authority, and ruled that the statements contained in the Marks Letter are the statements of Plaintiffs:

> To make sure of Plaintiffs' position, the Court, at the hearing on April 30, 2007, directly asked Plaintiffs' counsel whether the statements in the October 19, 2001 letter represented the statements of Plaintiffs. Plaintiffs' counsel replied with an unqualified "yes." That answer binds Plaintiffs here. To further make absolutely sure that there is no remaining issue as to Mr. Marks' authority in connection with the October 19, 2001 letter, the Court hereby strikes the thirty-seventh affirmative defense from the reply to the counterclaims in both cases.

EXHIBIT 13
175

1   (Bergman Decl. Exh. <u>LL</u>.)[49]

2      **B.**   **The Fact That the Parties Contemplated the Later**

3              **Negotiation and Execution of a Long-Form Contract Does**

4              **Not Negate the October 19 Agreement as a Matter of Law**

5      Plaintiffs assert that even if the parties had "provisionally" agreed on all

6   material terms of their deal in October, 2001, "given the importance and

7   complexity of the subject matter and proposed deal points, any agreement would

8   need to be reduced to a written contract in mutually acceptable fashion." (Pl.

9   Mem. at 59-60.) From this premise, Plaintiffs argue that since no long-form

10  contract was in fact finalized and executed, no enforceable agreement can exist.

11  (*Id.* at 60-61.) But the mere fact that the parties contemplated, and embarked on

12  the process of drafting, a later, long-form contract, does not establish *as a matter of*

13  *law* that the parties did not intend their agreement, as memorialized in the Marks

14  Letter, to be binding. *See Inamed Corp.,* 275 F. Supp. 2d at 1116 ("whether the

15  parties intended that the letter agreement be a binding contract or rather an

16  agreement to negotiate a further contract is a question of fact."); *Beck v. American*

17  *Health Group Int'l,* 211 Cal. App. 3d 1555, 1562 (1989) ("Whether a writing

18  constitutes a final agreement or merely an agreement to make an agreement

19  depends primarily upon the intention of the parties.").

20      Thus, where the parties intend to be bound – even if they expect to further

21  reduce their informal writing to a more formal one – "the failure to follow it with a

22  more formal writing <u>does not negate the existence of the prior contract</u>." *Harris v.*

23  *Rudin, Richman & Appel,* 74 Cal. App. 4th 299, 307 (1999) (emphasis added).[50]

24  *See also Louis Lesser Enters., Ltd. v. Roeder,* 209 Cal. App. 2d 401, 404 (1962)

---

[49] The Court's order also found that "An attorney is presumed to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *In re Artha Mgm't, Inc.,* 91 F.3d 326, 329 (2d Cir. 1996) (Bergman Decl. Ex. <u>LL</u>.)

[50] Holding, in overruling a demurrer, that "[w]hether the parties intended their communications to be a binding settlement agreement or an agreement to further negotiate after a formal draft was prepared is a factual question. . . ." *Id.* at 308.

**EXHIBIT 13**
**176**

1   ("[P]reliminary negotiations ordinarily result in a binding contract when all of the

2   terms are definitely understood, even though the parties intend to execute a formal

3   writing."); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 at n3 (1991)

4   (an agreement which contemplates subsequent, more detailed documentation is <u>not</u>

5   invalid if the parties have agreed to its existing terms).

6          Defendants do not dispute that the parties contemplated further

7   documentation of their agreement, including the preparation of formal assignments

8   reflecting the transfer of Plaintiffs' copyright interests to DC.  However, they

9   contend that the evidence – and the reasonable inferences to be drawn from that

10  evidence – supports a finding that the parties intended to be bound to the terms of

11  their agreement reached on October 19, 2001, even before any such formal

12  document was prepared and signed:  Unlike the circumstances of the cases on

13  which Plaintiffs rely,[51] neither Mr. Marks nor Mr. Schulman conditioned their

14  agreement on the execution of more formal documentation, either in their

15  correspondence, or orally.  (Schulman Decl. ¶ 10.)  In fact, both the Marks Letter

16  and the Schulman Letter speak to a *presently existing* agreement.  (Toberoff Decl.

17  Exhs. <u>BB</u>, <u>CC</u>.)[52]  Thus, for example, the detailed Marks Letter states of the

18  parties' agreement that "the terms are as follows," and contains many references to

19  "this deal."  It sets forth all the material terms of the parties' agreement, and makes

20  no mention of the preparation of a long-form agreement – that is, it operates as a

21  stand alone document.  Indeed, the only mention of additional documentation in

22  the Marks Letter is with respect to ministerial-type documents relating to the

23

24  [51] *See, e.g., Patch v. Anderson*, 66 Cal. App. 2d 63, 66 (1944); *Beck v. American Health Group Int'l, Inc.*, 211 Cal. App. 3d 155, 163 (1989); *Duran v. Duran*, 150 Cal. App. 3d 176, 180 (1983); *Roth v. Marquez*, 942 F.2d 617, 626 (9th Cir. 1991); *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360 (1957)

25

26  [52] The Marks Letter expressly states that "the Siegel Family ... <u>has accepted</u> D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties," and acknowledges that a deal has been reached:  "Many thanks for help and patience in <u>reaching this monumental accord</u>."  (Toberoff Decl. Exh. <u>BB</u>.)  Mr. Schulman's follow up correspondence encloses "a more fulsome outline of what we believe <u>the deal we've agreed to</u> is," filling in a few details, but otherwise in accord with the material terms set forth in the Marks Letter. (*Id.* Exh. <u>CC</u>.)

27

28

**EXHIBIT 13**

177

1    copyright transfers: "The Siegel Family would agree to execute further

2    documents, and D.C. Comics would be appointed as attorney-in-fact to execute

3    such documents if the Siegel Family fails to do so within a reasonable period of

4    time." (*Id*. Exh. BB.)  The Schulman Letter similarly states only that the "Siegels

5    will execute further documents as may be necessary to evidence DC's ownership

6    of rights; designate WB as attorney in fact." (*Id*. Exh. CC.)

7         Nor is there any other type of indication in the Marks Letter that the

8    agreement the parties had reached as reflected therein was not immediately

9    binding.  On the contrary, Mr. Marks' choice of language reflects a deliberate

10   effort to fully document the parties' agreement in the letter without the necessity

11   for further negotiation of outstanding terms, without the need for additional

12   documentation, and inviting the very type of response Mr. Schulman provided in

13   his letter of October 26, 2001.  (*Id*. Exh. BB)  Likewise, the Schulman Letter (*id*.

14   Exh. CC), which started the process of the more formal documentation that was

15   admittedly contemplated by the negotiators, also contains no indication that the

16   parties are not bound unless a more formal agreement is executed.  In fact, DC

17   *affirmatively acted* on the understanding that there was an immediate agreement,

18   by negotiating for Warner Bros. to include Plaintiffs' credits in the upcoming

19   motion picture *Superman Returns* (Schulman Decl. ¶ 7), and by setting up a

20   reserve for the payment of all monies due to Plaintiffs pursuant to the terms of the

21   agreement.  (Bergman Decl. Exh. R (Levitz Tr.) at 289:9-290:1.)

22        Similarly, in her May 9, 2002 letter to Richard Parsons, Mrs. Siegel

23   *acknowledged* that the parties had reached an accord six months earlier, but

24   protested only – *albeit* strongly – that the February Draft (Toberoff Decl. Exh.

25   DD) did not reflect that agreement.  (Bergman Decl. Exh. Z.)[53]  Tellingly,

26

27

28   [53] "We made painful concessions assured if we did we would arrive at an agreement.
     When we made those difficult concessions and reluctantly accepted John Schulman's last
     proposal six months ago, we were stabbed in the back with a shocking contract. . . . For
     your representatives to condition our receiving financial compensation for our rights on

EXHIBIT 13
178
73

1   Plaintiffs have submitted no evidence of any contemporaneous objective

2   manifestation by them or their counsel of an intent not to be bound until the

3   execution of a long-form.  Indeed, Plaintiffs' have submitted *no evidence*

4   *whatsoever* of their purported intention not to be bound − whether objective or

5   subjective − in connection with this motion.

6       C.   **The October 19, 2001 Agreement Is An Acceptance Of DC**

7            **Comics' Offer And Is Not A "Counteroffer" That Was**

8            **Rejected By Defendants**

9       Plaintiffs concede that the October 19, 2001 Agreement is drafted as an

10  "acceptance" of an offer made on October 16, 2001.  (Pl. Mem. at 57.)  However,

11  because Plaintiffs now attempt to avoid the agreement reached via that acceptance,

12  they seek to characterize the October 19, 2001 Agreement as a "counteroffer" that

13  was later rejected by Defendants.  (*Id.*)  Defendants absolutely reject this

14  characterization − Defendants have consistently maintained and assert again now

15  that the October 19, 2001 Agreement represented an acceptance of all material

16  terms offered by Mr. Schulman on behalf of Defendant DC.  (Schulman Decl. ¶¶

17  10, 13-15.)

18      As noted above, a contract is established when there is a meeting of the

19  minds between the parties on all material terms of their agreement, *Apablasa*, 176

20  Cal. App. 2d at 726, and its formation is a question *of fact* to be determined from

21  the particular circumstances of each case, *Banner Entertainment*, 62 Cal. App. 4th

22  at 358.  *What* the material terms of the contract are "depends on the circumstances

23  of the agreement, including the agreement and its context, the subsequent conduct

24  of the parties, and the remedy sought."  *House of Prayer, etc. v. Evangelical Assoc.*

25  *for India*, 113 Cal. App. 4th 48, 53 (2003).  To ascertain whether the requisite

26  meeting of the minds exists − that is, whether the parties have assented "to the

27

28  demands which were not in the proposal we accepted, is deceitful."  (*Id.*, emphasis
    added.)

**EXHIBIT 13**
**179**
74

1  same thing in the same sense" – the trier of fact must evaluate the evidence of the

2  parties' objective intent; namely "the outward manifestations of [their] consent."

3  *Banner Entm't*, 62 Cal. App. 4th at 358; *Beard v. Goodrich*, 110 Cal. App. 4th

4  1031, 1039-40 (2003).

5      The evidence before the Court certainly supports the conclusion that as of

6  the October 19, 2001 Marks Letter (Toberoff Decl. Exh. <u>BB</u>) the parties had

7  agreed to all material terms of their agreement, and intended to be bound thereby.

8  First, Mr. Marks, an experienced transactional lawyer, carefully worded his letter

9  to use the powerful legal language of acceptance – "The Siegel Family . . . *has*

10  *accepted* D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and

11  'Spectre' properties." (*Id*.) This choice of binding contractual language was not

12  accidental. Rather, the only reasonable inference is that the use of this language

13  was a deliberate attempt on the part of Plaintiffs' former counsel to conclude what

14  had been lengthy and complex negotiations and bind DC to the agreement.

15      Second and further supporting the conclusion that the October 19, 2001

16  Agreement contains all material terms agreed to by the parties, is the fact that Mr.

17  Marks painstakingly outlined in six single-spaced pages all of the material terms

18  that Plaintiffs were accepting. The only reasonable inference is that Mr. Marks

19  documented the terms he (and thus his clients) considered to be the material terms

20  accepted by Plaintiffs.

21      Third, DC's main negotiator, Mr. Schulman, has confirmed under oath in

22  response to Plaintiffs' current motion that the October 19, 2001 Agreement

23  accurately documented the material terms that had been offered on behalf of DC.

24  (Schulman Decl. ¶ 7.)

25      Plaintiffs point to alleged discrepancies between the Marks Letter, the

26  Schulman Letter, and the February Draft in an attempt to get out from under the

27  October 19, 2001 Agreement. But even *if* the Schulman Letter or the February

28  Draft did not comport in some respects with the parties' agreement as

**EXHIBIT 13**
**180**      75

1   memorialized in the Marks Letter, or added additional terms that had not been

2   discussed, that would mean only that the Schulman Letter and the February Draft

3   did not constitute the agreement of the parties, *not* that the previous October 19

4   agreement was somehow vitiated. *See e.g. Kitty-Anne Music Co. v. Swan*, 112 Cal.

5   App. 4th 30, 37-38 (2003) (holding that the parties had an enforceable agreement

6   which plaintiffs breached, notwithstanding the fact that they never executed a draft

7   long-form agreement prepared by plaintiffs which contained terms "drastically"

8   different from the parties' prior deal memo, because the additional documentation

9   was simply "intended to carry out the terms of the deal memo" which of itself

10   constituted the parties' contract). *See also King v. Stanley*, 32 Cal. 2d 584, 589

11   (1948) (letters constituted enforceable written agreement for purchase of real

12   property; court rejected defendant's contention that the escrow instructions did not

13   follow the alleged contract obligations but included different terms which had not

14   been accepted on the basis that "such instructions do not take the place of the

15   agreement of sale <u>but merely carry it into effect. They are subject to modification</u>

16   <u>without affecting the finality of the agreement already reached.</u>") (emphasis

17   added); and *Ersa Grae Corp.*, 1 Cal. App. 4th at 624 (in rejecting argument that

18   executed counteroffer was merely an agreement to agree, court noted that

19   "[s]pecific definitions and lease terms were to be the subject of subsequent

20   documentation and the parties were obligated to complete the documentation in

21   good faith. No more is required.").

22          DC does not assert in its Counterclaim that the Schulman Letter or the

23   February Draft constitutes the agreement of the parties; instead, it is seeking to

24   enforce, and suing for breach of, the agreement reached on October 19, 2001 by

25   Mr. Marks and Mr. Schulman as expressly reflected in the Marks Letter.

26   (Bergman Decl. Exh. <u>GG</u>, ¶¶ 98-105.) Accordingly, if the admissible evidence and

27   the reasonable inferences drawn therefrom can support a finding that the parties

28   reached an agreement on all material terms on October 19, 2001, and intended to

**EXHIBIT 13**
**181**   76

1   be bound to those terms − as Defendants contend they do − then DC's

2   Counterclaims are sufficient to go to a jury *whether or not* any subsequent

3   correspondence or proposed draft long-form agreement might have changed or

4   added terms, and despite the fact that no formal contract was never executed.[54]

5           Indeed, the evidence supports the conclusion that Plaintiffs' belated claim

6   that the Schulman Letter changed the deal or that the February Draft was

7   "unacceptable" is nothing other than an *ex post facto* excuse for Plaintiffs to reject

8   the deal they had already made for the promise of a much more lucrative payday

9   from their current counsel and the companies he controlled:  Mr. Marks *never*

10  disputed anything in the Schulman Letter, and similarly voiced *no* concern about

11  the February Draft until after he learned about his client's complaining letter to

12  Time Warner's Chief Executive Officer; and even then he acknowledged to Mr.

13  Schulman that although the draft was "very aggressive" and contained some things

14  which had not been discussed *it was not contrary to what the parties had agreed

15  to.* (Schulman Decl. ¶ 11.) Mr. Marks even tried his hand at re-crafting the draft

16  into a form that would be acceptable to his client. (Bergman Decl. Exh. S (Marks

17  Tr.) at 196:21-197:15, 198:25-199:3; *id.* Exh. BB.), but the effort came to naught

18  when Plaintiffs abruptly fired Mr. Marks and terminated discussions with DC

19  shortly after receiving Mr. Toberoff's "$15 million plus" offer. (*Id.* Exh. S (Marks

20  Tr.) at 168:1-169:20.)

21          In sum, Defendants assert that there is a triable issue of fact on the question

22  of the parties' intent to be bound to the terms of their October 19, 2001 agreement

23  as reflected in the Marks Letter prior to the execution of an anticipated long-form

24

25

26

27  [54] As noted above, DC acted on the agreement by negotiating for Plaintiffs to receive

28  their credits on *Superman Returns* (Schulman Decl. ¶ 10) and by setting up a reserve
    account for Plaintiffs' payments under the agreement. (Bergman Decl. Exh. R (Levitz
    Tr.) at 289:9-290:1.)

**EXHIBIT 13**
**182** 77

# PRIORITY SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-08400-SGL (RZx)                    Date:  October 23, 2007

Title:   JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
corporation; DC COMICS INC., a corporation; and DOES 1-10
==================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                              None Present
Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

None present                            None present

PROCEEDINGS:   ORDER DENYING PLAINTIFFS' OCTOBER 4, 2007, <u>EX PARTE</u>
APPLICATION (IN CHAMBERS)

     The Court has received and reviewed plaintiffs' October 4, 2007, <u>ex parte</u> application for an
order compelling defendants' compliance with the Court's September 17, 2007, discovery order,
and defendants' opposition thereto.  The basic subject matter of the <u>ex parte</u> application concerns
defendants' production of its internal profit projections (commonly referred to in the entertainment
industry as "ultimates") for, among other things, its movie <u>Superman</u> <u>Returns</u> and the television
series <u>Smallville</u>, as well as the turnover of documentation regarding a reserve account defendants
purportedly created in anticipation of the parties' settlement of the present dispute, such
documentation being referred to by the parties as the "settlement reserve account documents."

     Before addressing each of the production issues, some prefatory remarks are in order.
From reviewing the parties' correspondence it is apparent to the Court that the source of the
parties' dispute stems from the parties' divergent understanding of both the scope and extent of
the document production required by the Court's September 17, 2007, Order, a proper
understanding of which turns on the impact the Court's earlier August 13, 2007, discovery order
had on plaintiffs' then existing motions to compel, which themselves encompassed the same
subject matter as the production issues in the present <u>ex parte</u> request.  It is to that earlier

MINUTES FORM 90                                          Initials of Deputy Clerk __jh__
CIVIL -- GEN                                                                    1



DOCKETED ON CM

OCT 2 4 2007

BY

**EXHIBIT 14**
044**83**

Plaintiffs' <u>ex</u> <u>parte</u> request goes far beyond what the parties had themselves agreed was required for defendants to produce. This is important because the only reason the Court made mention of the "settlement reserve account documents" in its September 17, 2007, Order was simply to memorialize what the parties themselves represented during the September 17 hearing that they had agreed was to be produced. Notably, during oral argument at the September 17 hearing, plaintiffs' counsel acknowledged that, "[i]n the course of meeting and conferring pursuant to your order regarding outstanding requests, we have come to an agreement with respect to certain documents, which we have not yet all received, and we've come to an understanding with the defendants that even though they did not give us those documents when they had hoped to give them to us, they will not use the joint stipulation schedule against us should they not give us the documents . And we believe they will give us the documents." The correspondence between the parties during their meet and confer reveals that the documents to which plaintiffs' counsel referred as subject of the "agreement" were the settlement reserve account documents. (Decl. Marc Toberoff, Exs. I, K). This was confirmed by defense counsel during the hearing:

THE COURT:        What about these supplemental documents that Mr. Toberoff just referred to regarding [w]hat you're supposed to produce but that he has not received yet?

MR. PERKINS:      I can speak to that, Your Honor.

THE COURT:        Thank you.

MR. PERKINS:      These are, I believe, documents from DC Comics, and there's one category of documents that we had trouble pulling them together in time, but they are —

THE COURT:        And how do you refer to these documents?

MR. PERKINS:      They are the reserve account documents.

                       . . . .

THE COURT:        Are you producing them?

MR. PERKINS:      Yes, we are.

THE COURT:        When?

MR. PERKINS:      This week, Your Honor.

The parameters of defendants obligations to produce the settlement reserve account

MINUTES FORM 90                           Initials of Deputy Clerk __jh_____
CIVIL -- GEN                 6

**EXHIBIT 14**
**184**

documents are set forth in the correspondence exchanged between the parties following the August 13, 2007, discovery order.  The August 30, 2007, letter from James Weinberger to plaintiffs' counsel references the only documented evidence as to what specifically the parties' had agreed to following their August 17, 2007, meet and confer:

> With respect to the settlement reserve account referenced in DC's counterclaim, I confirm our conversation that the settlement reserve is an accounting of liability under the settlement agreement. None of the Defendants has ever represented to you, your clients, or to the Court that an actual escrow fund had been created.  As I advised you, the only documents in DC's possession, custody and control which reflect this reserve are (I) the general ledger, which incorporates the reserve in its balances but does not have line-item entries showing the precise amounts owed to the Siegels, and (ii) statements prepared periodically (with some gaps) that show the relevant balances.  As we discussed, subject to your agreement that production will not constitute any waiver of privilege, we will provide you with copies of all of these summary statements prepared by DC which reflect the balances in the account as of the date listed.  We are collecting these documents now; I will let you know when they are available.

(Decl. Mark Toberoff, Ex. G at 3).

Nowhere in the August 30, 2007, letter did defense counsel represent that defendants would produce, as now suggested by plaintiffs, "the schedules and other documentation demonstrating the computations and assumptions underlying" these periodic statements.  (Pls' Memo. in Supp. at 2).  Even more importantly, plaintiffs' counsel never communicated to defense counsel following receipt of this letter that anything contained therein misstated the nature of the parties' agreement concerning production of the settlement reserve account documents.

Later plaintiffs' counsel affirmed the nature of the parties' agreement with respect to the nature and scope of production relating to the settlement reserve account documents during a telephone conversation with defense counsel on September 11, 2007.  Counsel's affirmance is reflected in a follow up letter defense counsel sent to plaintiffs' counsel on the same day, in which defense counsel noted from "our discussion today . . . some concerns you raised regarding our meet and confer on outstanding DC Comics discovery issues" and "confirm[ed] that in the event DC does not produce the statements evidencing the settlement reserve account <u>as we agreed to do in my August 30, 2007, letter</u> . . ., we will not oppose a motion to compel on the grounds that it was served after the September 11, 2007, deadline for serving a joint stipulation under the Court's August 13, 2007 Order." (Decl. Marc Toberoff, Ex. K at 1 (emphasis added)).  Again, plaintiffs' counsel remained silent, not raising any objection or qualification to the nature and scope of the parties' agreement concerning production of the settlement reserve account documents that was set forth in defense counsel's August 30, 2007, letter.

MINUTES FORM 90                                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                              7

**EXHIBIT 14**
**185**

On September 21, 2007, defendants produced to plaintiffs 14 pages worth of summary statements concerning the settlement reserve account referred to in Mr. Weinberger's August 30, 3007, letter and his later September 11, 2007, letter. (Decl. Marc Toberoff, Ex. P). Specifically, those summary statements comprise periodic excerpts consisting of one-line quarterly total entries for "Siegel and Shuster – Superman" amidst other line entries, covering a period from September 30, 2002, through June 30, 2006 (with some gaps for that period). Such a production is entirely consistent with what defense counsel represented to plaintiffs would be produced in his August 30, 2007, letter.

Nonetheless, plaintiffs' counsel, for the first time, voiced objections to the nature of the documents produced. In a letter dated September 24, 2007, plaintiffs' counsel complained that the summaries were "highly inadequate" as they did not contain any "back-up documentation whatsoever that reflects the analysis and calculations made in arriving at" the totals indicated on the summaries themselves. Furthermore, plaintiffs' counsel complained that the summaries produced were "not current, as it only extends until 6/30/06." Then plaintiffs' counsel mentioned, again for the first time, his understanding of the parties agreement following the August 17, 2007, meet and confer and contrasted it to what was represented in defense counsel's earlier correspondence:

> [I]n our August 17, 2007 "meet and confer," pursuant to the Court's August 13, 2007 order, you agreed to produce all responsive documents, without waiver of DC's purported attorney-client privilege. Notwithstanding this, your letter dated August 30, 2007, hedged and carefully backtracked by circumscribing the "reserve account" documents and your prior claims that the "reserve account" was reflected in DC's (undecipherable) general ledger (now re-stated in your August [30], 2007 [letter] as "incorporating the reserve in its balances but does not have line-item entries showing the precise amounts owed to the Siegels.")
>
> . . . .
>
> Please be advised that in the event DC does not agree to produce and thereafter promptly produce all documents relating to the "reserve account" repeatedly claimed by DC and testified to by its President, Paul Levitz, that Plaintiffs will have no choice but to move ex parte regarding this troubling matter.

(Decl. Marc Toberoff, Ex. Q (emphasis in original)).

Defendants were understandingly annoyed by plaintiffs' counsel's letter, and responded by sending a letter of their own on September 25, 2007, reiterating that the documents produced relating to the settlement reserve account were in conformity with the representations they made in the August 30, 3007, letter memorializing the parties' understanding following their earlier meet

MINUTES FORM 90
CIVIL -- GEN                                                                 8

Initials of Deputy Clerk __jh_____

**EXHIBIT 14**
**186**

**IT IS SO ORDERED.**

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:  Time Warner Inc.
One Time Warner Center
New York, NY 10019-8016
Attn: Jeffrey L. Bewkes
Chairman & C.E.O.

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

## EXHIBIT 15
## 188

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Laura Siegel Larson, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's ownership share of the renewal copyright(s)) in and to the copyrighted "SUPERMAN" work(s) made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:[1]

1.     The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group, 400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260 Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard, Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the notices of termination (Document Nos. V3410 D577, V3410 D607, V3410 D630, V3410 D653, V3410 D807, V3410 D830, V3410 D853) served April 3, 1997, by Joanne Siegel and Laura Siegel Larson, that were recorded at the U.S. Copyright Office on February 2, 1998, or the notice of termination (Document No. V3491 D823) served November 8, 2002 by Joanne Siegel and Laura Siegel Larson, that was recorded at the U.S. Copyright Office on November 20, 2002.

Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2.    The works (individually, "Work"; collectively, the "Works") to which this Notice of Termination applies are as follows:  the illustrated front cover of the SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, <u>as</u> <u>depicted</u> in a reduced black and white form in the advertisements for Action Comics, Vol. 1, No. 1, appearing in the following magazines:[2]

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1, 1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notices of termination dated April 3, 1997 regarding "Superman" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson or the notice of termination dated November 8, 2002 regarding "Superboy" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson.  Every reasonable effort has been made to find and list herein every such work. Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

**EXHIBIT 15**
**190**

| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |

3.      This Notice of Termination applies to the following grants, assignments, and transfers and/or agreements to the extent, if any, each grant transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)      A one page agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on the other, executed on or about March 1, 1938;

(b)      A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 4, 1937;

(c)      A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(d)      A three-page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(e)      A two-page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 19, 1939;

(f)      A seven-page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May 19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (*see Siegel v. Warner Bros Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

(g)   A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

4.   The effective date of termination shall be March 12, 2014.

5.   No prior termination of the grants of rights in the copyright <u>of the aforementioned Works</u> for their renewal copyright term has been exercised by the Author, Jerome Siegel, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

6.   Jerome Siegel died on January 28, 1996.  There is no living widow of Jerome Siegel, and Laura Siegel Larson is the only living child of Jerome Siegel. Michael Siegel, Jerome Siegel's other child, is deceased and had no children.  As such, the undersigned, Laura Siegel Larson, is the sole person entitled to exercise Jerome Siegel's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary

to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March 6, 2012

Laura Siegel Larson
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

6

**EXHIBIT 15**
**193**

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,

*Defendants, Counterclaimants, Appellees, and Cross-Appellants*.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS AND
## APPELLEES WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

———————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

EXHIBIT 16
194

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, cross-appellants and appellees Warner Bros. Entertainment Inc. and DC Comics, by and through their counsel of record, hereby disclose:

1.  Warner Bros. Entertainment Inc. is a corporation that is an indirect, wholly-owned subsidiary of Time Warner Inc.

2.  DC Comics is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation.  Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC Comics.

Dated:  March 23, 2012                 O'MELVENY & MYERS LLP

                                       By:  /s/ Daniel M. Petrocelli
                                            Daniel M. Petrocelli
                                            Attorneys for Warner Bros.
                                            Entertainment Inc. and DC Comics

**EXHIBIT 16**
**195**

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..........................................................................1

INTRODUCTION ...............................................................................................1

STATEMENT OF ISSUES PRESENTED............................................................5

STATEMENT OF THE CASE.............................................................................6

STATEMENT OF FACTS ...................................................................................9

      A.    Statutory Background ..............................................................9

      B.    Factual Background ...............................................................10

            1.    Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s...............................................................10

            2.    Litigation Over Superman During The 1940s, 1960s, And 1970s .........................................14

            3.    Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement..............15

            4.    Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement....................................................18

      C.    Proceedings Below.................................................................19

STANDARD OF REVIEW .................................................................................22

SUMMARY OF ARGUMENT ...........................................................................23

ARGUMENT ......................................................................................................25

      <u>DC's Cross-Appeal On Its Second Through Fourth Counterclaims</u>

    I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE ..................25

EXHIBIT 16
196

A.  Under California Law, A Contract Is Enforceable So
    Long As Parties Agree On Its Essential Terms, Even
    Absent Formalized Documentation ..........................................25

B.  The October 19, 2001, Writing Constitutes An
    Enforceable Agreement As A Matter Of Law .........................28

C.  At A Minimum, DC Is Entitled To Factfinding As To
    Whether The Parties Intended To Be Bound By The
    Essential Terms Identified In The October 19, 2001,
    Letter ......................................................................................34

II.  THE DISTRICT COURT ERRED IN GRANTING
     SUMMARY JUDGMENT TO LARSON ON DC'S
     LIMITATIONS COUNTERCLAIM ................................................37

                 Larson's Appeal Of Her First Claim And
           DC's Cross-Appeal On Both Parties' First Claims

I.   LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE
     HER CLAIM HAS NOT BEEN FULLY AND FINALLY
     ADJUDICATED ..............................................................................40

II.  THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-
     FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT
     FROM TERMINATION....................................................................41

A.  A Work Is Made-For-Hire Under The 1909 Copyright
    Act When It Is Created At The "Instance And Expense"
    Of The Commissioning Party ..................................................42

B.  The District Court Correctly Held That *Action Comics
    #2-3, #5-61*, *Superman #1 (Pages 1-2)-23*, And The Post-
    McClure Strips Were Works-For-Hire ....................................45

    1.  *Action Comics #2-3, #5-6* ..............................................48

    2.  *Action Comics #7-61* And *Superman #1-23*.................51

    3.  Post-McClure Newspaper Strips ....................................55

EXHIBIT 16
197

C.    The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4*, *Superman #1* (Pages 3-6), And Pre-McClure Strips ........................................................................61

    1.    *Action Comics #1* ..............................................................61

        a.    Key Elements Of *Action Comics #1* Were Made-For-Hire ............................................................... 61

        b.    *National* Is Not Preclusive As To The Work-For-Hire Status Of *Action Comics #1* ........................ 68

    2.    Pre-McClure Strips ......................................................... 71

        a.    The Pre-McClure Strips Were Made At DC's Instance And Expense ......................................... 71

        b.    Larson's Failure To List The Pre-McClure Strips In Her Termination Notice Also Precludes Termination ....................................................... 72

    3.    Pages 3-6 Of *Superman #1* ............................................77

    4.    Artwork In *Action Comics #4* .......................................79

    5.    Promotional Announcements .........................................80

CONCLUSION ...................................................................................87

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM

EXHIBIT 16
198

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Almond v. ABB Indus. Sys., Inc.*,
   2001 WL 242548 (S.D. Ohio Mar. 6, 2001)........................................................78

*Ariz. State Carpenters Pension Trust Fund v. Miller*,
   938 F.2d 1038 (9th Cir. 1991) ............................................................................40

*Atla-Medine v. Crompton Corp.*,
   2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001)......................................................36

*Banner Entm't, Inc. v. Super. Ct.*,
   62 Cal.App.4th 348 (1998) .......................................................................... 29, 35

*Beck v. Am. Health Grp. Int'l, Inc.*,
   211 Cal.App.3d 1555 (1989)...............................................................................29

*Boisson v. Banian, Ltd.*,
   273 F.3d 262 (2d Cir. 2001).................................................................................62

*Burroughs v. M-G-M, Inc.*,
   683 F.2d 610 (2d Cir. 1982).................................................................... 74, 75, 76

*Bustamante v. Intuit, Inc.*,
   141 Cal.App.4th 199 (2006) ........................................................................ 29, 35

*Callie v. Near*,
   829 F.2d 888 (9th Cir. 1987)...............................................................................35

*CCNV v. Reid*,
   490 U.S. 730 (1989) .............................................................................................43

*Chaffin v. U.S.*,
   176 F.3d 1208 (9th Cir. 1999) ............................................................................44

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
   538 U.S. 440 (2003)..............................................................................................43

*Clarke v. Fiedler*,
   44 Cal.App.2d 838 (1941)............................................................................ 26, 27

**EXHIBIT 16**
**199**

*Comm'r v. Sunnen*,
   333 U.S. 591 (1948) ..................................................................................68

*Cool Fuel, Inc. v. Connett*,
   685 F.2d 309 (9th Cir. 1982)...................................................................82

*Cuellar de Osorio v. Mayorkas*,
   656 F.3d 954 (9th Cir. 2011)...................................................................22

*Dolman v. Agee*,
   157 F.3d 708 (9th Cir. 1998)................................................... 42, 43, 44

*Easter Seal Soc'y v. Playboy Enters.*,
   815 F.2d 323 (5th Cir. 1987)...................................................................42

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
   697 F.2d 27 (2d Cir. 1982)................................................................ 63, 64

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
   119 Cal.App.4th 263 (2004) ....................................................................26

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997) ................................................................63

*EPIC, Inc. v. Pac. Lumber Co.*,
   257 F.3d 1071 (9th Cir. 2001) ................................................................71

*Ersa Grae Corp. v. Fluor Corp.*,
   1 Cal.App.4th 613 (1991) ........................................................................26

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
   2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) ........................................53

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
   342 F.3d 149 (2d Cir. 2003).......................................................... 42, 47, 59

*Estate of Thottam*,
   165 Cal.App.4th 1331 (2008) ..................................................................26

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ......................................................................... 63, 80

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
    773 F.2d 1068 (9th Cir. 1985) ............................................................71

*Gaiman v. McFarlane*,
    360 F.3d 644 (7th Cir. 2004)..............................................................80

*Gausvik v. Perez*,
    392 F.3d 1006 (9th Cir. 2004) ............................................... 22, 51, 81

*Granite Rock Co. v. Teamsters*,
    649 F.3d 1067 (9th Cir. 2011) ................................................... 68, 70

*Harper & Row, Publishers v. Nation Enters.*,
    471 U.S. 539 (1985) ............................................................................51

*Harris v. Rudin, Richman & Appel*,
    74 Cal.App.4th 299 (1999) ........................................................ 26, 27, 29

*In re Smith*,
    964 F.2d 636 (7th Cir. 1992)..............................................................58

*Inamed Corp. v. Kuzmak*,
    275 F.Supp.2d 1100 (C.D. Cal. 2002) ...............................................34

*Jachetta v. U.S.*,
    653 F.3d 898 (9th Cir. 2011)..............................................................51

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008)..............................................................62

*Jim Henson Prods. v. John T. Brady & Assocs.*,
    16 F.Supp.2d 259 (S.D.N.Y. 1997)....................................................60

*Lamle v. Mattel, Inc.*,
    394 F.3d 1355 (Fed. Cir. 2005)..........................................................29

*Levin v. Knight*,
    780 F.2d 786 (9th Cir. 1986)..............................................................29

*Lin-Brook Builders Hardware v. Gertler*,
    352 F.2d 298 (9th Cir. 1965).................................................. 42, 43, 59

*Lozano v. Ashcroft*,
   258 F.3d 1160 (10th Cir. 2001) ............................................................83

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch.*
   *of Contemporary Dance, Inc.*,
   380 F.3d 624 (2d Cir. 2004)..............................................................55

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002)........................................................ 45, 70

*Marvel Worldwide, Inc. v. Kirby*,
   777 F.Supp.2d 720 (S.D.N.Y. 2011)................................. 44, 49, 53, 78

*Mattel, Inc. v. MGA Entm't, Inc.*,
   2011 WL 3420603 (C.D. Cal. Aug. 4, 2011).....................................35

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010)................................................ 24, 35, 39

*May v. Morganelli-Heumann & Assocs.*,
   618 F.2d 1363 (9th Cir. 1980) ............................................. 42, 43, 45

*Medina v. Ramsey Steel Co.*,
   238 F.3d 674 (5th Cir. 2001)..............................................................36

*Meyer v. Holley*,
   537 U.S. 280 (2003) ...........................................................................44

*Murray v. Gelderman*,
   566 F.2d 1307 (5th Cir. 1978) ..................................................... 43, 49

*Music Sales Corp. v. Morris*,
   73 F.Supp.2d 364 (S.D.N.Y. 1999)....................................................75

*Narayan v. EGL, Inc.*,
   616 F.3d 895 (9th Cir. 2010)..............................................................23

*Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.*,
   191 F.2d 594 (2d Cir. 1951)........................................................ 58, 69

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ...........................................................................39

*Nike, Inc. v. Just Did It Enters.*,
   6 F.3d 1225 (7th Cir. 1993)...................................................................36

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
   558 F.2d 1090 (2d Cir. 1977)..............................................................62

*Pantone, Inc. v. A. I. Friedman, Inc.*,
   294 F.Supp. 545 (S.D.N.Y. 1968)........................................................62

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
   347 U.S. 89 (1954) ..............................................................................51

*Patel v. Liebermensch*,
   45 Cal.4th 344 (2008) ..........................................................................27

*Picture Music, Inc. v. Bourne, Inc.*,
   457 F.2d 1213 (2d Cir. 1972)...................................................... *passim*

*Playboy Enters., Inc. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995).................................................... 43, 49, 53

*Recycling Solutions Tech., LLC v. Rosenberg*,
   2011 WL 1696826 (E.D. Ky. May 4, 2011) .......................................36

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
   77 F.3d 309 (9th Cir. 1996)..................................................................29

*S. Cal. Painters v. Best Interiors, Inc.*,
   359 F.3d 1127 (9th Cir. 2004) .............................................................35

*Samuels v. Holland Am. Line-USA Inc.*,
   656 F.3d 948 (9th Cir. 2011)................................................................22

*Sargent v. Am. Greetings Corp.*,
   588 F.Supp. 912 (N.D. Ohio 1984)......................................................62

*Scherr v. Universal Match Corp.*,
   297 F.Supp. 107 (S.D.N.Y. 1967)........................................................44

*Scherr v. Universal Match Corp.*,
   417 F.2d 497 (2d Cir. 1969) ................................................................79

viii

**EXHIBIT 16**
**203**

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) .............................................................40

*Seiler v. Lucasfilm, Ltd.*,
   808 F.2d 1316 (9th Cir. 1986) .............................................................82

*Self-Realization Fellowship Church v. Ananda Church of Self-
   Realization*,
   206 F.3d 1322 (9th Cir. 2000) .............................................. 42, 43, 44

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
   161 F.2d 406 (2d Cir. 1946).................................................................80

*Shaw v. Hahn*,
   56 F.3d 1128 (9th Cir. 1995)................................................................70

*Siegel v. Nat'l Periodical Publ'ns*,
   364 F.Supp. 1032 (S.D.N.Y. 1973)........................................ 15, 68, 69

*Siegel v. Nat'l Periodical Publ'ns*,
   508 F.2d 909 (2d Cir. 1974)................................................. 11, 15, 68

*St. Paul Water Co. v. Ware*,
   83 U.S. 566 (1872) ..............................................................................44

*Tex Print Indus., Inc. v. Zayre Corp.*,
   1977 WL 22752 (D. Mass. Feb. 10, 1977) .........................................83

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
   640 F.3d 1034 (9th Cir. 2011) ................................................... *passim*

*Thomas v. Ponder*,
   611 F.3d 1144 (9th Cir. 2010) .............................................................23

*Toledano v. O'Connor*,
   501 F.Supp.2d 127 (D.D.C. 2007) ......................................................29

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869
   (9th Cir. 2005)........................................................................... *passim*

*U.S. v. Alexander*,
   326 F.2d 736 (4th Cir. 1964)................................................................83

**EXHIBIT 16**

*U.S. v. Diaz-Lopez*,
  625 F.3d 1198 (9th Cir. 2010) ............................................................82

*U.S. v. Resnick*,
  594 F.3d 562 (7th Cir. 2010).................................................................78

*Vass v. Compaq Computer Corp.*,
  953 F.Supp. 114 (D. Md. 1997) ...........................................................36

*Wallace v. City of San Diego*,
  479 F.3d 616 (9th Cir. 2007).................................................................23

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ..............................................................49

*Webster Indus., Inc. v. Northwood Doors, Inc.*,
  320 F.Supp.2d 821 (N.D. Iowa 2004)...................................................36

*Weddington Prods., Inc. v. Flick*,
  60 Cal.App.4th 793 (1998) ...................................................................31

## STATUTES

17 U.S.C. §4 (1909) (repealed 1976).........................................................9

17 U.S.C. §7 (1909) (repealed 1976).......................................................47

17 U.S.C. §24 (1909) (repealed 1976)............................................. *passim*

17 U.S.C. §26 (1909) (repealed 1976)............................................... 9, 41

17 U.S.C. §203 ..................................................................................... 10, 41

17 U.S.C. §203 .............................................................................................74

17 U.S.C. §304 ...................................................................................... *passim*

17 U.S.C. §507 .............................................................................................37

17 U.S.C. §702 .............................................................................................73

28 U.S.C. §1291 ............................................................................................1

28 U.S.C. §1331 ............................................................................................1

**EXHIBIT 16**
**205**

28 U.S.C. §1338 .........................................................................................1

28 U.S.C. §1367 .........................................................................................1

Cal. Civ. Code §1550 ..............................................................................25

**RULES**

Fed. R. Civ. P. 54(b) ...................................................................... *passim*

Fed. R. Civ. P. 56(a) ...............................................................................22

Fed. R. Evid. 1002 ..................................................................................82

Fed. R. Evid. 801(d)(2)(A) .....................................................................78

**REGULATION**

37 C.F.R. §201.10 .......................................................................... *passim*

**OTHER AUTHORITIES**

42 F.R. 45916-21 ............................................................................ 74, 77

52 F.R. 23443-46 (1987) ........................................................................62

76 F.R. 32320 (June 6, 2011) .................................................................75

1 William F. Patry, Patry on Copyright (1st ed. 2007) ....................76

41 Am. Jur. 2d *Independent Contractors* §§8, 14, 19, 47 (2005) ..........44

6 Weinstein's Federal Evidence §1003.02[3] (2011).........................82

Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 Loy. L.A. Ent. L. Rev. 301 (2003) ..............................................................34

Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 Va. Sports & Ent. L.J. 101 (2001)...................................28

Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film Agreements*, L.A. Law. 18 (Apr. 1999) .............................................28

xi

**EXHIBIT 16**
**206**

Jay M. Spillane,
  *Lawsuits over "Handshake Deals" Are As Old As the*
  *Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. &
  SPORTS LAW. 15 (1993) ......................................................................................29

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
  (2011) ...................................................................................... 62, 76

RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-429 (1965)................................44

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
  LAW, 94TH CONG. 304 (1975).............................................................................16

**EXHIBIT 16**
**207**

## STATEMENT OF JURISDICTION

This appeal arises from a partial judgment under FED. R. CIV. P. 54(b) on appellant Laura Siegel Larson's First Claim for Relief and cross-appellants Warner Bros. Entertainment Inc. and DC Comics' (together "DC's") First through Fourth Counterclaims. Larson's First Claim asserts that copyright termination notices she served make her joint owner of several early Superman works. DC's Counterclaims assert that the notices are invalid (First Counterclaim); Larson's lawsuit is time-barred (Second Counterclaim); and Larson's claims are barred by an October 2001 settlement agreement (Third and Fourth Counterclaims).

The district court had jurisdiction over these claims. 28 U.S.C. §§1331, 1338, 1367. This Court has jurisdiction over DC's Second, Third, and Fourth Counterclaims, because they were fully and finally adjudicated below. 28 U.S.C. §1291. This Court lacks jurisdiction over Larson's First Claim and DC's First Counterclaim, which were not fully and finally adjudicated. *Infra* at 40-41.

## INTRODUCTION

This case is about the ownership of copyright in the earliest comics that introduced elements of the iconic Superman character and story, including aspects of his appearance, powers, and background. As it comes before this Court—an appeal and cross-appeal addressing multiple rulings below—the case presents an

**EXHIBIT 16**
**208**

unusually broad array of doctrinal, factual, and procedural issues.  But much of the case reduces to a familiar proposition:  a deal is a deal.

The doctrinal issues focus on an intersection between the 1909 Copyright Act and the 1976 amendments to that Act.  The 1976 Act extended existing copyrights under the 1909 Act—including copyrights that had been assigned— while giving the original authors and certain of their heirs the right to terminate previous assignments of their copyrights and to negotiate new assignments with existing rights holders or other parties.

By design, the 1976 Act struck a careful balance.  On the one hand, it gave authors (and certain heirs) a fresh start on their original rights and new leverage to renegotiate old assignments.  On the other hand, it gave rights owners who had acquired and then developed the assigned works—sometimes into exceedingly valuable commercial properties—continuing rights to exploit derivative works created under the assignments, as well as an exclusive, first opportunity to negotiate new deals to reclaim any terminated rights.

At first, the negotiation process contemplated by the 1976 Act worked here just as intended.  The heirs to Superman's original story writer served notices of termination as to certain early Superman works.  While DC contested the notices on various grounds—including that the works at issue were made-for-hire and hence not subject to termination—that dispute was shelved for four years while the

**EXHIBIT 16**
**209**

parties worked to negotiate a resolution that would both secure DC's rights, and ensure the family reaped financial benefits from DC's continued exploitation of Superman. The family, represented by a prominent entertainment law firm, ultimately struck a deal with DC—one that included every essential term for a re-grant of rights, provided for various other non-essential terms, and guaranteed the family many millions of dollars in cash, royalties, and other compensation.

But after agreeing to this deal in writing, the family was approached by a self-styled "intellectual property entrepreneur" who dangled the prospect of even more money. In short order the family reneged on its deal with DC, refused to complete discussions over a "long form" contract formalizing the agreement, and fired their lawyers. The family asserted there was no deal without a long form, and the district court agreed, casting aside established California contract law principles—principles essential to the entertainment industry, where many business deals are never formalized. The rule there is simple, however: a deal is a deal, long form or not.

That principle also lies at the core of the underlying copyright dispute here. Superman's creators conceived the Superman character, but no one would publish it. It was only DC, years later, that recognized Superman's commercial potential. DC employed the creators as artists, purchased the entirety of their rights in Superman, and promoted and published the first Superman story. DC developed

Superman not just commercially, but creatively as well, employing many artists—including but not limited to the original creators—to develop many of the now-widely-recognized elements of the Superman mythos.

For their valuable contributions to DC's efforts, DC paid the original creators millions of dollars in today's terms, pursuant to agreements that could not have been clearer:  DC paid them to create new Superman material for DC, the exclusive owner of all rights in the character and story.  Over the years, the creators tried to undo their original Superman agreements, but the courts repeatedly rejected their efforts.  And now it is Larson who contends that her father's 1930s deals with DC, like her own 2001 deal, were not deals at all—she says her father was not creating Superman for DC, as his agreements plainly said, but for himself, and that she should now own rights that her father never did.

The 1976 Act does not sanction her claims.  It was intended to allow authors and heirs to "recapture" copyrights they initially owned and then assigned—not copyrights they never owned in the first place.

This long-running dispute should be brought to an end.  Enforcing Larson's deal will afford her tens of millions of dollars for which she bargained in 2001, while protecting the deal her own father struck in the 1930s, when DC employed him to create new Superman material on DC's behalf.

## STATEMENT OF ISSUES PRESENTED

### *DC's Cross-Appeal On Its Second Through Fourth Counterclaims*

1.  a.  Whether DC is entitled to entry of judgment on all claims on the basis of an October 2001 settlement agreement, confirmed by a letter from Larson that explicitly "accepted D.C. Comics' offer" and described in detail all essential "terms" of the parties' "monumental accord."

b.  Whether DC is at least entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in Larson's October 2001 letter.

2.  Whether Larson's claims are barred by the Copyright Act's three-year limitations period.

### *Larson's Appeal On Her First Claim And*
### *DC's Cross-Appeal On Both Parties' First Claims*

1.  Whether this Court lacks jurisdiction over the appeal of the parties' respective First Claims because the district court did not fully and finally adjudicate the scope of rights to early Superman works at issue in those claims.

2.  Assuming the Court has jurisdiction to hear these claims:

a.  Whether the district court properly ruled that Superman works created by Larson's father Jerome Siegel and his collaborator Joseph Shuster at DC's instance and expense—after Siegel and Shuster assigned all of their Superman rights to DC and entered into various employment agreements with DC—were works-for-hire.

5

**EXHIBIT 16**

**212**

b. Whether the district court erred in ruling that Larson was entitled to recapture a handful of early Superman works that were made at DC's instance and expense and/or were not listed in Larson's copyright termination notices.

c. Whether the district court erred in ruling *sua sponte* on the copyrightable elements in certain promotional announcements owned by DC, without giving DC notice or an opportunity to be heard on the issue, and without examining the actual announcements or a legible copy of them.

## STATEMENT OF THE CASE

Superman was co-created by Siegel and Shuster in the 1930s, and introduced to the world by DC in *Action Comics #1*, published in 1938.  ER-1019; SER-9-10. This copyright dispute arises more than a half-century later because of a 1976 amendment to the Copyright Act, which allows "authors"—within the meaning of that term under the 1909 version of the Act—of copyrighted works (and certain of their heirs) to terminate earlier assignments of their copyrights and reclaim those copyrights for themselves.  Nobody denies that Siegel and Shuster were the authors of certain foundational elements of Superman, but neither does anyone deny that most other elements appeared for the first time in derivative works—comic books, newspaper strips, and other media—created *after* Siegel and Shuster assigned to DC all rights to Superman, and were hired by DC along with many other artists to create new Superman works.  The dispute here centers on whether certain of the

6

**EXHIBIT 16**
**213**

earliest derivative works were "made for hire" on DC's behalf, making DC the "author" of the works under the 1909 Act and precluding termination by Siegel's heirs.

During their lifetimes, neither Siegel nor Shuster—despite a long history of litigation against DC—sought to exercise any termination rights in Superman. Within a year of Siegel's death in 1996, however, his widow Joanne (now deceased) and daughter Larson served termination notices seeking to recapture a broad range of Superman works. ER-1024-92. DC disputed most aspects of the termination notices, but sought to resolve the controversy through negotiation with Larson and her lawyer Kevin Marks. ER-16; SER-393, 100-01. The parties reached a settlement agreement on October 19, 2001, in which DC agreed to pay Larson $3 million in up-front cash, annual guarantees worth $5 million, and tens of millions more in future profit sharing, in exchange for which DC would receive all of the putative Superman rights Larson claimed to own. SER-132, 147-48, 434-35, 456-61. A little more than six months later, however, Larson repudiated the agreement, fired Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights. SER-133-34, 182-83, 404, 417-20, 422-25, 819-20, 835-37. No buyer emerged; and in 2004, Larson (now using Toberoff as her lawyer) filed this lawsuit, seeking a declaration that her termination notices were valid and entitled her to an

**EXHIBIT 16**
**214**

accounting of Superman-related profits. ER-325. DC counterclaimed asserting, *inter alia*, that the notices were invalid and Larson's claims were barred by the parties' October 2001 agreement and the statute-of-limitations. ER-273-310.

In 2008, the district court granted partial summary judgment against DC on its Second through Fourth Counterclaims, holding Larson's claims were neither time-barred nor precluded by the October 2001 agreement. SER-61-62, 66.

The court also issued a series of partial rulings on Larson's First Claim and DC's First Counterclaim. The court ruled the vast majority of works listed in Larson's termination notices were works-for-hire as a matter of law and thus could not be terminated. ER-43-140. But it held that certain other works were *not* made-for-hire and thus could be terminated. ER-81, 114, 189. The court did not, however, resolve the scope of the rights at issue. *Infra* at 20-21.

Larson now appeals some (not all) of the adverse rulings on her First Claim, asserting that the court erred in finding that the following works were made-for-hire: *Action Comics #2-3, #5-61*; pages 1-2 of *Superman #1*, *Superman #2-23*; and newspaper strips created after the parties entered into a syndication agreement with McClure in 1938. ER-81, 114, 189.

DC cross-appeals the rejection of its threshold limitations and settlement counterclaims. DC also contends that Larson's appeal on her First Claim is unripe because the court did not declare the scope of rights at issue in that claim and thus

did not fully adjudicate it (or DC's First Counterclaim). But assuming this Court has jurisdiction to address the parties' First Claims, DC cross-appeals, asserting that while the court's work-for-hire rulings were correct as to the works contested by Larson, the court erred in rejecting work-for-hire as to the following works (or certain key elements therein): *Action Comics #1* and *#4*; pages 3-6 of *Superman #1*, and two weeks of newspaper strips created before the McClure agreement. DC also cross-appeals the court's ruling that pre-*Action Comics #1* promotional announcements, while owned by DC, do not fully depict certain key Superman elements.

## STATEMENT OF FACTS

### A. Statutory Background

The 1909 Copyright Act governs the copyright in all works—including those at issue here—published before January 1, 1978, the effective date of the 1976 Copyright Act. Under the 1909 Act, copyright could be secured for "all the writings of an author." 17 U.S.C. §4 (1909) (repealed 1976). Under the 1909 Act, an "author" was entitled to a copyright for an initial 28-year period and an additional 28-year "renewal" period. *Id*. §24.

The 1909 Act defined the statutory term "author" to "include an employer in the case of works made for hire." 17 U.S.C. §26 (1909). It also provided that "in the case of … any work copyrighted by … an employer for whom such work is

made for hire," the author/employer was entitled to renewal rights. *Id*. §24. These
two sections thus made clear that an "employer" in the case of a "work for hire"
was a statutory "author" with full rights in both the original copyright and the
renewal term. For this reason, the 1976 Act's provisions addressing "termination"
of the extended renewal term—the provisions at issue here—have no application to
works that were made-for-hire under the 1909 Act, 17 U.S.C. §§203(a), 304(c)-(d),
as Larson concedes, LB-21.

A person or entity who commissions a work is the statutory "author" of that
work under the work-for-hire provision of the 1909 Act whenever the work was
created at the "instance and expense" of the commissioning party, unless the
parties expressly agreed that "the employee or independent contractor retained the
copyright in his work." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429
F.3d 869, 881 (9th Cir. 2005); *see infra* at 42-43.

### B.    Factual Background

1.    *Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s*

Siegel, a young writer in Cleveland, and his high-school friend Shuster, an
illustrator, worked together to conceive many fictional characters—including a
crime-fighting hero named "Superman." SER-6-7. Between 1933 and 1937,
Siegel and Shuster submitted draft Superman comic strips to several publishers,
without success. ER-584; SER-12, 678.

In 1937, DC[1] hired Siegel and Shuster to do comic-book work. On December 4, 1937, Siegel and Shuster entered into an employment agreement providing that DC would "employ [Siegel and Shuster] as Artists for a period of two years," pay them $10 per page of material, and, in return, Siegel and Shuster would "give their exclusive services" in producing certain comic features and submit all material for any new features to DC. ER-602-03. This "1937 Employment Agreement" also provided that if Siegel or Shuster left DC's employ, they were prohibited from using or copying "any of the products or work or creations or characters or plots used, made or created by [them] while in the employ of [DC]." ER-602.

Siegel and Shuster submitted various comic strips to DC under this agreement, including their existing black-and-white Superman drafts. SER-12-13, 678. DC chose to include the Superman story in its new *Action Comics* comic book, to be published April 18, 1938, with a June 1938 cover date. DC editor Vin Sullivan directed Siegel and Shuster to "revise[] and expand[]" the unfinished Superman drafts into a "full-length 13-panel production suitable for magazine publication." ER-957; *see Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 911 (2d Cir. 1974). At Sullivan's direction, Siegel and Shuster revised the material and

---

[1] "DC" refers to DC Comics as well as its predecessors and successors (including Detective Comics and National Comics Publications).

**EXHIBIT 16**
**218**

added "several additional pictures to illustrate the story continuity"—including a new picture showing Superman with a distinct "S" on his chest, which DC's own artists colored red. ER-654; SER-385-86. DC's artists colorized the strips, choosing and adding the iconic blue-and-red color scheme to Siegel's and Shuster's black-and-white drafts. SER-441-43. DC's artists also created a cover for *Action Comics #1* based on a panel that featured Superman in his DC-colorized costume—red cape and boots, blue leotard, and heraldic red "S" crest—and exhibiting super-strength by lifting a car. SER-14, 234-35, 728.

DC artists also created "Promotional Announcements"—a black-and-white version of its artists' cover art—to promote *Action Comics #1*. SER-15, 678, 730. These Promotional Announcements were published beginning on April 5, 1938, before *Action Comics #1* was published on April 18, 1938. ER-1019; SER-572, 579-580. DC has filed a motion to lodge an original version of one comic book containing a Promotional Announcement (*Detective Comics #15*, published on April 10, 1938) with the Court for its review. *See also* SER-729-96.

On March 1, 1938, before the publication of *Action Comics #1*, Siegel and Shuster assigned to DC in writing all of their rights in Superman and agreed "not to employ said characters or said story ... without obtaining [DC's] written consent" ("1938 Assignment"). ER-917. Superman was a success, and after *Action Comics #1* was published, Siegel and Shuster continued to supply DC with draft Superman

material, for which they were paid $10 per page.  ER-83, 960.

The parties memorialized their arrangement in a September 22, 1938, agreement ("1938 Employment Agreement"), which provided that Siegel and Shuster "have been doing the art work and continuity for [Superman and other comics] for us.  We wish you to continue to do said work and hereby employ and retain you for said purposes."  ER-605.  DC maintained the "right to reasonably supervise the editorial matter of all features," and agreed to continue paying Siegel and Shuster $10 per page.  ER-606-07.  The agreement also gave DC the right to terminate Siegel and Shuster and retain other artists to produce new Superman works.  ER-606.  The same day, DC entered into an agreement with the McClure Syndicate ("Syndication Agreement") giving McClure permission to publish Superman strips in newspapers in exchange for royalties.  ER-609-11.

DC exercised "constant editorial supervision" over Siegel and Shuster's creation of new material, requiring them to send all drafts to DC's editors for review, giving detailed instructions on story elements and illustrations, and even suggesting that the pair move "to New York where we can be at a moment's touch with everything that you do."  SER-219-49, 264-66.  This relationship continued throughout most of the 1940s, during which time Superman's popularity grew and expanded into other media.  ER-858-86.  Broad newspaper syndication, successful merchandising, and effective exploitation of Superman in movie serials, animated

cartoons, and merchandising resulted in royalty payments, bonuses, and other compensation for Siegel and Shuster amounting to $5.4 million (in today's terms) from 1938 to 1946 alone. ER-466, 585-86, 945.

 2. *Litigation Over Superman During The 1940s, 1960s, And 1970s*

 DC's relationship with Siegel and Shuster became contentious. Other artists and editors brought Superman to new media, including radio and film, and created many of the now-familiar story-lines and catch phrases—*e.g.*, "Up, up, and away," or "It's a bird, it's a plane, it's Superman." SER-680-81. Siegel also left to serve in World War II; and while gone, DC, working with Shuster, published "Superboy" stories that Siegel argued DC had no permission to publish. SER-590-95, 603-07, 680.

 In 1947, Siegel and Shuster filed an action against DC in New York state court seeking to invalidate the 1938 Assignment ("Westchester Action"). SER-20, 597. The Westchester court issued an interlocutory ruling concluding, *inter alia*, that the 1938 Assignment granted "all" Superman rights to DC, but that publishing the Superboy stories was improper. ER-939-93. In May 1948, DC, Shuster, and Siegel entered into a stipulation and consent judgment under which Siegel and Shuster acknowledged that the 1938 Assignment transferred to DC all rights in Superman, including "the title, names, characters, concept and formula" as set forth in *Action Comics #1*. ER-995-1017.

By the late 1950s, Siegel, Shuster, and DC had reconciled their differences. Siegel again wrote Superman stories for DC, and Shuster received a stipend. SER-294-96. But in 1965, Siegel and Shuster challenged DC's copyright renewal rights in Superman, and in 1969 they filed a lawsuit seeking a declaration that they owned the Superman renewal copyrights. The court held that Siegel and Shuster assigned to DC *all* rights in Superman, including renewal rights. *Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d at 913-14.

After this loss, Siegel and Shuster approached DC for financial help. In 1975, DC agreed to provide them a lump sum of $17,500 each, annual payments of $20,000 each, lifetime medical benefits, and benefits and payments to their heirs. SER-641-75. In return, Siegel and Shuster acknowledged DC was the exclusive owner of "all right, title and interest" in Superman. SER-641. DC increased its annual payments to more than $125,000 annually, paid special bonuses, and provided other benefits to Siegel, Shuster, and their families. *See* SER-390, 427-31, 448, 641-75, 680.

    3.    *Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement*

Congress amended the Copyright Act in 1976 to extend the copyright term and give authors and certain heirs limited rights to terminate prior copyright grants for works subject to the extension term. The Act struck a careful "compromise" between the interests of authors and grantees, the latter of whom often invested

15

EXHIBIT 16
222

decades of effort to develop copyrighted works into successful properties. SECOND
SUPP. REG. REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975).

In 1997, after Siegel's death, his widow and daughter served notices
purporting to terminate, as of 1999, various of Siegel's Superman copyright grants
to DC ("Notices"). ER-1018-83. DC disputed the Notices' validity; but rather
than litigate, the parties spent the next four years trying to reach a business deal.
Larson was represented by Kevin Marks of the leading entertainment law firm
Gang Tyre, which represents the likes of Clint Eastwood and Steven Spielberg.
SER-98-99, 433-34. DC's lead negotiator was then-General Counsel of Warner
Bros., John Schulman. SER-433-34.

Negotiations progressed, and when expectations grew that a deal would be
reached, DC paid Larson a non-refundable advance of $250,000. SER-416. On
October 16, 2001, DC made a settlement offer to Larson. SER-105, 434. On
October 19, Marks called Schulman to accept the offer and report "we are closed."
SER-107-08. Later that day, he sent Schulman a letter (1) confirming that Larson
had "accepted D.C. Comics' offer"; (2) documenting the deal's material terms in
six, single-spaced pages; and (3) thanking Schulman for his "help and patience in
reaching this monumental accord." SER-25, 61-62, 456-61, 111-12.

Under the parties' October 19 agreement, Larson was to assign to DC all of
her rights "in the 'Superman' and 'Spectre' properties (including 'Superboy')," in

exchange for, *inter alia*, $3 million, an annual guarantee of $500,000 per year for 10 years, and 6% of gross revenues from all media and merchandising revenues (*e.g.*, television, movies, and toys). SER-456-61. Almost all the money would be Larson's alone—Gang Tyre's fee was 5%. SER-798-99.

On October 26, 2001, Schulman wrote back, confirmed the parties' agreement, set forth "a more fulsome outline of what we believe the deal we've agreed to is," and indicated DC would begin drafting a long-form document so "we will have this super-matter transaction in document form." SER-118-19, 397-98, 463-70. Neither Marks nor Larson objected to Schulman's letter. ER-435. DC began performing its obligations under the October 19 agreement, including establishing a significant reserve for monies owed, which quickly grew to $20 million. SER-397, 399.

DC's outside counsel worked on the separate long-form document for three months and sent Marks a draft on February 1, 2002. SER-125, 435, 472-528. Neither Marks nor Larson raised any objection until May 9, 2002, when Larson's mother sent DC a letter acknowledging that Larson had "accepted" DC's October 16, 2001, offer, but objecting to unspecified portions of the long-form document and concluding that "we have no deal[,] and this [long-form] contract makes an agreement impossible." SER-412-14. Marks told DC the long-form was "aggressive," but "not contrary to what had been agreed to," and the parties would

**EXHIBIT 16**

"deal with it." SER-126-27, 130, 436, 439. For the next two months, Marks

reworked the draft, which he sent to Larson on July 15, 2002. SER-131-32.

4.  *Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement*

Starting in 2001, Toberoff, the self-described "rights-hunter," "movie

producer," and "intellectual property entrepreneur," began pursuing Siegel's and

Shuster's heirs. SER-115-16, 182-84, 404, 817-23, 835-36, 859-63. In November

2001, he induced the Shusters to become his business partners and to repudiate

their existing contractual arrangements with DC. SER-183, 858-61.[2] Thereafter,

the Shusters served a termination notice purporting to recapture certain Superman

rights as of October 26, 2013. SER-844-56.

Toberoff targeted the Siegels as well. SER-115-16, 182-83. He wrote

Larson's brother and called Marks seeking to secure the Siegels' Superman rights

for himself. SER-814. Marks rebuffed Toberoff, telling him in February, July,

and August 2002 that Larson had made a deal with DC. SER-115-16, 119-24, 182-

83, 811. Toberoff insisted in August 2002 that Marks communicate to Larson that

he and agent Emanuel had an unnamed "investor" willing to purchase her rights for

$15 million cash and generous "back-end" compensation. SER-122-24, 811, 875-

76. Marks conveyed this offer to Larson, but admonished her that she had a "deal"

---

[2] Toberoff's business misconduct is the subject of another lawsuit and two
appellate matters before this Court. Appeal Nos. 11-56934, 11-71844 ("*Shuster*").

with DC, and if she repudiated it, Marks would have to "testify against [her] in court." SER-183, 811.

On September 21, 2002, Larson fired Marks, and sent a letter to DC stating she was "ending negotiations." SER-418-20. A month later, Larson signed an agreement with Toberoff's production company, IP Worldwide, to act as her agent to exploit her putative Superman rights. SER-184, 422-25. But the promised $15 million investor never materialized, and Toberoff never produced any other buyers. SER-122-23, 184-87, 811-13, 875-76. Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery. SER-187, 839-44, 860-63.[3]

## C.    Proceedings Below

Larson filed suit on October 8, 2004. Her First Claim sought a declaration that her termination notices were valid and effective as of 1999, entitling her to an accounting of Superman-related profits from 1999 forward. ER-338. DC's First Counterclaim sought a declaration that the Notices were invalid; its Second Counterclaim alleged Larson's claims were time-barred; and its Third and Fourth Counterclaims asserted that Larson's claims were barred by the parties' 2001 settlement agreement. ER-293-301.

---

[3] Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee. SER-186, 860-63.

In March 2008, the district court issued a partial summary judgment order. SER-5-90.  It held that Larson recaptured certain unspecified rights in *Action Comics #1*, but did not recapture the Promotional Announcements containing the first appearance of Superman.  SER-43-44.  The order rejected DC's settlement counterclaims, holding that while the parties had formed "an agreement on all major points of dispute," the terms in Marks' October 19, 2001, letter "differ in substance from those set forth in [DC's] later letter of October 26, 2001 … such that there was no unequivocal acceptance of an offer and, thus, no agreement." SER-63.  The court rejected DC's limitations counterclaim as well, accepting Larson's representations that she did not terminate settlement negotiations until September 21, 2002, making her claims timely by four days.  ER-198.

The parties submitted briefing to resolve remaining work-for-hire issues.  In August 2009, the court ruled that the vast majority of works at issue—including *Action Comics #2-3, #5-61*; pages 1-2 of new material in *Superman #1* (which reprinted the stories in *Action Comics #1-4*, with some changes to the *Action Comics #1* story); *Superman #2-23*; and the newspaper strips created after the Syndication Agreement—were works-for-hire and thus exempt from termination. ER-43-140.  But the court also ruled that *Action Comics #4*, *Superman #1* (pages 3-6), and two weeks of strips created before Syndication Agreement were *not* works-for-hire and thus were recaptured.  ER-80-81, 140.

The district court expressly reserved ruling on key issues concerning the scope of rights Larson recaptured. It did not determine the extent to which Larson's recaptured rights were diminished by DC's rights in the Promotional Announcements. SER-298-305, 310-13, 321-24, 2-3. It left open whether its enumeration of the limited Superman elements in *Action Comics #1*—as compared to the universe of elements DC owns outright—was intended to be "dicta," as Larson had argued. SER-305-08, 313-19, 325-26, 2-3. And it deferred ruling on these and other open issues "until shortly before the time of" a later accounting trial. SER-198.

That accounting trial never occurred, and the open questions flagged by the court were never answered. In 2009, the judge presiding over the Superman cases resigned, and the cases were reassigned. The parties submitted a joint status report agreeing that the "promotional announcement" and "dicta" questions had to be answered before Larson's First Claim could be fully resolved. SER-146-70.

DC filed *Shuster*, and Larson and Toberoff responded by moving to stay that case, and seeking an interlocutory appeal here. SER-143-45. The district court denied Larson's Rule 54 and stay motions, listing seven open issues—including the "promotional announcement" and "dicta" issues—that "foreclosed a finding that [Larson's First Claim] … is final." SER-141. Larson amended her complaint to remove the request for an accounting of profits from the First Claim, but she did

not eliminate the request for a scope of rights declaration. Dkt. No. 5-1 at 12-14.
She moved again for entry of Rule 54(b) judgment, and on May 17, 2011, the court
entered partial final judgment on Larson's First Claim and DC's First through
Fourth Counterclaims. ER-235-41.

Larson appealed and DC cross-appealed. ER-228, 230.[4] DC moved to
dismiss Larson's appeal, and the Appellate Commissioner denied the motion
without prejudice to its reargument in merits briefing. Dkt. Nos. 5-1, 9.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's grant of summary
judgment." *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011).
Summary judgment is appropriate if "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.
56(a). "In considering a motion for summary judgment, [the court] must draw all
reasonable inferences in favor of the nonmoving party." *Samuels v. Holland Am.
Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011). The "non-moving party's
evidence is to be believed, and all justifiable inferences are to be drawn in [its]

---

[4] Larson's brief does not challenge (and thus waives the right to challenge,
*Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004)), several adverse rulings
on her First Claim, including that she did not recapture the Promotional
Announcements, that certain pre-1938 material created by Siegel was *not*
copyrightable, and that she was not entitled to profits from foreign exploitation of
Superman. ER-76-77, 180-81, 207.

favor," such that its "version of any disputed issue of fact is … presumed correct." *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010). The court must make "[c]redibility determinations" and "weigh[] … the evidence" in favor of the non-moving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

### *DC's Cross Appeal On Its Second Through Fourth Counterclaims*

DC's Second, Third, and Fourth Counterclaims allege that Larson's claims below are barred by the parties' 2001 settlement agreement and the Copyright Act's three-year limitations period. These threshold claims were fully adjudicated by the district court's Rule 54(b) judgment and are ripe for appeal.

I. Marks' October 19, 2001, letter reflects a legally enforceable agreement to resolve all claims at issue here, because it details all the essential terms of an agreement: the scope of rights at issue, a significant cash payment, and generous royalty terms, amounting to tens of millions of dollars for Larson. The letter expressly stated that Larson "accepted" DC's offer and referred to the parties' "monumental accord." Both parties' representatives testified that they understood an agreement had been reached. Given the parties' agreement on the essential terms detailed in the October 19, 2001, letter, it is irrelevant that the parties

**EXHIBIT 16**
**230**

subsequently failed to conclude a formalized deal document.  *E.g.*, *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011).  At a minimum, DC is entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in the October 19 letter.  *E.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010).

II.  DC was entitled to factfinding on its limitations counterclaim.  Under the parties' tolling agreement, the limitations period restarted ten days after either party "terminat[ed]" negotiations in writing.  Larson herself has taken conflicting positions as to when negotiations were terminated.  Under the theory she asserted below—which the district court accepted on summary judgment—her claims were timely.  But in *Shuster*, to avoid a tortious interference claim, she asserted a theory of termination that would make her claims here time-barred.  Her conflicting positions confirm the existence of a factual dispute only a jury can resolve.

*Larson's And DC's Appeals On Their Respective First Claims*

I.  The district court entered Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, but the judgment did not fully and fairly adjudicate those claims, because the court never conclusively determined all "rights and obligations" in the Superman works at issue.

II.  Assuming the judgment on the parties' First Claims is ripe for appeal, the judgment should be affirmed in part and reversed in part.  The court held that the

vast majority of works at issue were created as works-for-hire, including *Action Comics #2-3*, *#5-61*, pages 1-2 of new material in *Superman #1*, *Superman #2-23*, and all strips created after the Syndication Agreement with McClure. Those rulings all involve Superman works created entirely after Siegel and Shuster assigned all Superman rights to DC and entered into employment agreements with DC to produce new Superman work under DC's direction. Those works are obviously and unambiguously works-for-hire. But the court also held that *Action Comics #1* and *#4*, *Superman #1* (pages 3-6), and the two weeks of Strips created before the Syndication Agreement were not works-for-hire and thus could be recaptured. Those rulings were incorrect. The district court also erred in ruling on rights contained within certain Promotional Announcements without examining the best visual evidence of their contents.

**ARGUMENT**

**DC'S CROSS-APPEAL ON ITS**
**SECOND THROUGH FOURTH COUNTERCLAIMS**

**I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE**

**A.     Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation**

Under California law, an enforceable agreement is formed where one party accepts another party's offer in exchange for consideration. CAL. CIV. CODE

25

**EXHIBIT 16**
**232**

§1550.  And once a party accepts an offer, an enforceable agreement may arise

even if subsequent documentation is contemplated, or additional terms and

conditions are subsequently raised.  *See Facebook*, 640 F.3d at 1037-38; *Estate of*

*Thottam*, 165 Cal.App.4th 1331, 1340-41 (2008); *Elite Show Servs., Inc. v.*

*Staffpro, Inc.*, 119 Cal.App.4th 263, 268-69 (2004); *Harris v. Rudin, Richman &*

*Appel*, 74 Cal.App.4th 299, 307 (1999); *Ersa Grae Corp. v. Fluor Corp.*, 1

Cal.App.4th 613, 624 & n.3 (1991).

The question is simply whether the agreed-upon terms are "sufficiently

definite that a court can ascertain the parties' obligations thereunder and determine

whether those obligations have been performed or breached."  *Elite*, 119

Cal.App.4th at 268.  So long as "the parties have agreed to its existing terms," and

those terms are definite, the "fact that an agreement contemplates subsequent

documentation does not invalidate the agreement."  *Ersa*, 1 Cal.App.4th at 624 n.3;

*see Facebook*, 640 F.3d at 1037-38; *Thottam*, 165 Cal.App.4th at 1340-41.

"Any other rule" would allow a party to repudiate a contract "whenever the

understanding was that it should be reduced to another written form, by simply

suggesting other and additional terms and conditions."  *Clarke v. Fiedler*, 44

Cal.App.2d 838, 847 (1941).  "If this were the rule, the contract would never be

completed in cases where, by changes in the market, or other events … it became

the interest of either party to adopt that course in order to escape or evade

obligations incurred in the ordinary course of commercial business." *Id.* Put simply, "few contracts would be enforceable if … subsequent disputes were taken as evidence that an agreement was never reached." *Patel v. Liebermensch*, 45 Cal.4th 344, 352 (2008). Accordingly, "[w]here the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one,'" the parties' "failure to follow it with a more formal writing does not negate the existence of the prior contract." *Harris*, 74 Cal.App.4th at 307.

*Facebook* illustrates this rule. After one day of settlement negotiations, the parties signed a handwritten, one-and-a-third page term sheet reflecting basic terms of a corporate acquisition, including cash and stock consideration and mutual releases. 640 F.3d at 1037. The settlement subsequently foundered during negotiation over documents that Facebook said were "required to finalize" the agreement, including a stock agreement and release form. *Id.*

This Court held that the parties had formed an enforceable agreement, because the existing writing showed that the parties "meant to bind themselves and each other, even though everyone understood that some material aspects of the deal would be papered later." *Id.* at 1038. An informal agreement is not enforceable, the Court explained, if it lacks "necessary term[s]," but it will be enforced "so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred" and fashion an appropriate remedy. *Id.* at 1037-38.

The test for enforceability, this Court remarked, is not "very demanding," and was "easily" passed by the term sheet: "The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives." *Id.*

Much the same is true here, as the following sections show.

### B.    The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law

The uncontradicted, documentary evidence establishes that Larson accepted DC's offer on October 19, 2001, in a written letter that identifies all the essential terms of the settlement.

1.  The October 19 letter explicitly stated: "The Siegel Family … has accepted D.C. Comics' offer of October 16, 2001." SER-456. The letter congratulated DC on "this monumental accord." SER-461. And it detailed "[t]he terms" of the agreement in six, single-spaced, typewritten pages, *id.*—a much more thorough and detailed writing than the one-and-a-third page handwritten sheet enforced in *Facebook*. SER-456-61.

In the entertainment industry, it is standard for parties to recognize and perform contractual obligations in the absence of a formalized, long-form contract (or, sometimes, any written contract). *See* Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101, 117-20 (2001); Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film*

*Agreements*, L.A. Law. 18, 19 (Apr. 1999); Jay M. Spillane, *Lawsuits over*

*"Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily*

*Avoided)*, 11 Ent. & Sports Law. 15, 15 (1993).  The question, as in *Facebook*, is

simply whether the essential terms of the agreement can be identified.  Here the

October 19 letter specified every term "deemed essential as a matter of law" in a

copyright assignment, *i.e.*, "the subject matter, the price, and the party against

whom enforcement is sought."  *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986);

*see Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361-62 (Fed. Cir. 2005); *Toledano v.*

*O'Connor*, 501 F.Supp.2d 127, 142 (D.D.C. 2007).  The letter identified:

> • the full scope of rights assigned:  "all of [their] rights in the 'Superman'
> and 'Spectre' properties (including 'Superboy'), resulting in 100%
> ownership to D.C. Comics"
>
> • the precise cash terms:  an "advance of $2,000,000" and a "signing bonus
> of $1,000,000"
>
> • the specific royalty terms:  "6% of Superman/Spectre Gross Revenues"
> from "all media" other than publications and "1% of the cover price of DC
> Comics' publications."  SER-456-58.

Nowhere did the letter contain any suggestion that Larson's acceptance was

tentative or contingent on formal documentation.[5]  The extrinsic record confirms

---

[5] Under California law, an initial writing is not enforceable if it *clearly*
demonstrates that the parties did *not* intend to be bound until other documents were
executed.  *See Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208-11 (2006);
*Harris*, 74 Cal.App.4th at 307; *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th
348, 358 (1998); *Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal.App.3d 1555, 1562-
63 (1989); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996).

the opposite.  Marks testified he worked through "the last open point" of the agreement with Schulman on October 16, which "closed the deal," and he "believed that an accord had been reached on the terms exactly set forth in this letter."  SER-105-06, 111-12.  Schulman testified the October 19 letter "accurately set forth all material terms of our agreement."  SER-435.  DC manifested its understanding that an agreement was reached by beginning performance, setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie—both terms required by the October 19 writing.  SER-397, 399, 435-36, 459.

2.  The district court nevertheless held that no agreement was formed on October 19, finding that the terms of Marks' October 19 acceptance letter were "materially different" from DC's five-page letter of October 26, 2001, and "vastly different" from the 56-page "long form" draft of February 1, 2002.  SER-64.  These differences, the court found, showed that the parties "had not passed the threshold where they had finalized and assented to all material terms," because "as they attempted to sketch in the finer details of a settlement from the broad outlines contained in the October 19 letter, more and more issues arose upon which they could not reach agreement, resulting in the negotiations falling apart."  SER-63-64.

That analysis misses the point. Marks' October 19 acceptance of DC's offer settled the matter, and none of the subsequent discussions undid that contract. The fact that the parties did not reach agreement on issues that "arose" as they attempted to formalize the deal has no bearing on whether the parties had previously agreed on the *essential* terms of the deal, while understanding "that some material aspects of the deal would be papered later." *Facebook*, 640 F.3d at 1038. And the court nowhere identified in the October 26 letter any disagreement over any *essential* term specified in the October 19 letter—*i.e.*, the scope of rights transferred or key financial terms.[6]

Rather than revealing a disagreement over essential terms, DC's October 26 letter expressly confirms its understanding that a binding agreement had been reached. The letter states that Schulman was merely providing a "more fulsome outline of what we believe the deal *we've agreed to* is," and that DC would begin "working on the draft agreement" to put "this super-matter transaction *in document form*." SER-463 (emphasis added). The October 26 letter itself was thus neither

---

[6] The court wrongly suggested that this case is like *Weddington Prods., Inc. v. Flick*, 60 Cal.App.4th 793 (1998), because in both cases "the parties had agreed to a rough outline of an agreement, but were thereafter unable to reach agreement on the finer details and the negotiations fell apart." SER-62. In fact, *Weddington* held the settlement agreement at issue unenforceable only because the parties had failed to agree on *the most essential matter in dispute between them*—the terms of a license for a "sound library," which "was a material issue to both sides" and thus not "a minor, immaterial or separable issue." 60 Cal.App.4th at 815.

an "acceptance" nor a "rejection" of an "offer" by the Siegels—it was instead a confirmation of terms *already agreed to*, as set forth in the October 19 letter, with further recognition that the deal would be "papered." *Facebook*, 640 F.3d at 1038.

The district court's focus on the "vastly different" February 2002 long-form agreement was even more misplaced. It was, of course, vastly different in the sense that it was a 56-page, detailed, formal draft contract, rather than a listing of terms—just the kind of formal documentation that was attempted without success in *Facebook*. But, again, nowhere did the court identify any essential term in the long-form agreement that differed from the essential terms in the October 19 letter. Marks himself did not express any reservations about the February 2002 long-form until three months later, after he learned that Larson had complained about it. SER-436. Even then, Marks told Schulman the draft was "not contrary to what [had been] agreed to" and the parties could "deal with it." SER-126-27, 130, 436.

In any event, even if the February 2002 draft included different terms, it is the *new* terms that would be unenforceable, not the October 19 terms. As this Court explained in holding that Facebook's duty to draft deal documents did not render the preexisting term sheet unenforceable: "[I]f Facebook should draft terms that are unfair or oppressive, or that deprive the Winklevosses of the benefit of their bargain, the district court could reject them as a breach of the implied covenant of good faith and fair dealing …. The district court got it exactly right

**EXHIBIT 16**
**239**

when it found the Settlement Agreement enforceable but refused to add the stack of documents drafted by Facebook's deal lawyers." 640 F.3d at 1038. The same analysis applies here. The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers. A binding contract already existed, in the essential terms the Siegels accepted on October 19.

3.   Although the district court itself identified no disagreements over essential terms reflected in the correspondence and drafts following the October 19 letter, Larson offered up some 10 pages of differences. But none were raised at the time (*i.e.*, six years earlier, in 2001), nor did they reflect material differences over an essential term. For example, Larson contended the October 19 and October 26 letters described the rights transfer differently, but both merely used different lawyerly phrases to say that DC would receive 100% of the rights in all Superman properties. *Compare* SER-458, *with* SER-464. Larson also asserted that the letters state different terms for royalty reductions in "extraordinary cases" involving the use of Superman rights with other properties, but the only difference is that while the October 19 letter gives one *example* of such a use, the October 26 letter provides additional examples; the basic contractual term is identical. *Compare* SER-457-58, *with* SER-467-68. Larson also pointed to language about Superman "cameo" appearances in other characters' stories, SER-553-54, but both letters provide that royalties for "cameos" will be zero, *compare* SER458, *with* SER-467,

consistent with industry standards, SER-172-75; Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301, 320, 371 (2003).[7]

Other purported differences Larson identified—*e.g.*, representations and warranties, an obligation to provide certain historical documents, a right of first refusal on biographical works, publicity obligations, advertising credits, dispute-resolution procedures, and indemnities—likewise do not represent material differences concerning essential terms. *See Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002) (terms concerning license termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute resolution not essential). The differences in language thus do not undermine the basic agreement that is reflected in the plain terms of the October 19 letter and confirmed by the parties' contemporaneous conduct and subsequent testimony.

### C. At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter

At minimum, if there were any genuine dispute as to whether the parties intended to be bound by the essential terms identified in the October 19 letter, that

---

[7] As Schulman explained, the different language in his letter concerned the precise definition of "cameo," SER-437, which would have been worked out in the long form. Marks did not object to Schulman's description of "cameos" at the time, and when asked at his deposition to identify all differences between his letter and Schulman's, he did not mention "cameos." SER-118-19, 435, 533-44.

dispute should have been resolved by a jury. The question whether parties intended to be bound by terms expressed in an informal agreement is one of fact, *see Bustamante*, 141 Cal.App.4th at 208; *Banner*, 62 Cal.App.4th at 358, and thus "summary judgment is inappropriate" where that question is materially contested, *S. Cal. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004); *see Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("summary enforcement inappropriate" where there is "conflicting evidence" as to whether parties agreed on "material terms" of settlement agreement).[8]

The record described above, especially when viewed favorably to DC, plainly precludes summary judgment against DC on this question. In *Mattel*, this Court reversed the same district court for making improper determinations concerning contractual intent on summary judgment, where they "turn[ed] in part on the credibility of conflicting extrinsic evidence." 616 F.3d at 910; *see Mattel, Inc. v. MGA Entm't, Inc.*, 2011 WL 3420603, *2 (C.D. Cal. Aug. 4, 2011) (jury finding on remand opposite of what court held on summary judgment).

The district court made the same mistake here. Rather than accepting all inferences and making all credibility determinations in DC's favor, it engaged in its own factfinding as to the parties' intent, and rejected inferences favoring DC.

---

[8] The district court said *Callie* found "no enforceable agreement" because of disagreements over its "finer details," SER-64, but *Callie* actually found disputed factual issues concerning agreement on *essential* terms, *see* 829 F.2d at 890-91.

For example, the court speculated that DC's post-agreement conduct "could as much be seen as goodwill gestures on defendants' part while the negotiations continued as [they] could reflect an indication on [DC's] part that they thought they were contractually bound to do the same." SER-65. But on summary judgment, the court was required to adopt the inference favorable to DC.

Similarly, in analyzing the differences among the letters and February draft agreement, the court observed that "materiality is in the eye of the beholder," and then held that the differences were material enough to establish that there was no agreement on October 19, 2001. SER-63. But any question whose answer depends on "the eye of the beholder" is a classic jury question. *Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, *6 (S.D.N.Y. Nov. 7, 2001) (where issues are "in the eyes of the beholder," "[r]are is the case where summary judgment would be appropriate").[9] The district court also appeared to credit Marks' subsequent

---

[9] *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681-82 (5th Cir. 2001) ("what constitutes 'substantial sales experience' is in the eye of the beholder" and thus "the trier-of-fact's duty to determine"); *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment ruling on parody defense because "[h]umor … is in the eyes of the beholder"); *Recycling Solutions Tech., LLC v. Rosenberg*, 2011 WL 1696826, *1 (E.D. Ky. May 4, 2011) ("Beauty may be in the eye of the beholder, but summary judgment requires something a bit more concrete."); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 824-25 (N.D. Iowa 2004) (though "fraud, like beauty, is in the eye of the beholder … this court's task on motions for partial summary judgment [is to] determine only whether the resisting parties have generated genuine issues of material fact"); *Vass v. Compaq Computer Corp.*, 953 F.Supp. 114, 119 (D. Md. 1997) ("judgment made through the eyes of the beholder" is "not to be summarily determined").

testimony about the relevant events over testimony from DC witnesses, including testimony concerning the "goodwill gesture" point, which DC witness Paul Levitz disputed, and the materiality of differences between the October 19 and 26 letters, which Schulman addressed. SER-67, 397-99, 435-37.

Beyond the record evidence already discussed, new evidence has come to light further indicating that Larson knew she was bound by the October 19 terms. In *Shuster*, the district court compelled Larson to produce a July 2003 letter she wrote to her brother, in which she repeatedly states that Marks insisted, in August 2002, that Larson had a "deal with Time Warner/DC." SER-810-14, 824-25. The letter states that Marks would "testify against [her] in court" if she repudiated the deal and accepted Toberoff's offer. SER-811. The letter confirms that Marks told Toberoff that Larson had a "deal" with DC. SER-811. Given this letter, there is *at least* a jury question as to whether Larson understood she was bound to the October 19 terms.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM

The district court's order granting summary judgment against DC on its limitations counterclaim also erroneously resolves factual disputes against DC.

Copyright claims must be filed "within three years after the claim accrued," or 1,095 days. 17 U.S.C. §507(b). Larson's claims accrued on April 16, 1999—

is independently copyrightable, *Feist*, 499 U.S. at 363, and because it was created at DC's instance and expense, it is owned by DC.

Second, DC is at least joint owner of the overall Superman story in *Action Comics #4*, including its artwork.  *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("The contents of a comic book are typically the joint work of four artists—the writer, the penciler[,] the inker[,] … and the colorist who colors it."). Under the 1909 Act, a joint work was created where multiple authors made contributions to be integrated into a single work.  *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 410 (2d Cir. 1946).  Siegel obviously intended the football-story script to be combined with illustrations to form a comic strip, and DC of course intended its artwork to be combined with Siegel's story. Accordingly, DC is at least a joint owner of the entire *Action Comics #4* story.

5.    *Promotional Announcements*

While the district court correctly held that Promotional Announcements published prior to *Action Comics #1* were not recaptured, SER-43-44, it erred in describing the copyrightable elements encompassed therein, SER-44-45.

The court's ruling arose from partial summary judgment motions that were never intended to address the *scope* of rights at issue in the Announcements, but only threshold questions concerning the validity of Larson's Notices as to those works.  DC argued—and the district court agreed—that Larson failed to recapture

the Announcements published before *Action Comics #1* because they fell outside the Notice's statutory time limit. SER-43-44; 699-712. Larson has not appealed that holding, waiving any right to challenge it. *See Gausvik*, 392 F.3d at 1008 n.1.

The court's order, however, made gratuitous and inaccurate comments concerning the copyrightable elements in the Announcements, based on the court's review of a poor, multiple-generation photocopy. SER-44-45. DC filed a motion for clarification asserting that these statements could not be binding because neither party moved for summary judgment as to the scope of the Announcements. SER-328-343. The district court found otherwise, on the ground that Larson's opposition to DC's motion raised "questions concerning the scope of the copyrightable material contained in those announcements." SER-1. Larson's opposition, however, contended only that DC's motion raised "classic issues of fact" concerning the scope of rights in the Announcements, "precluding summary judgment" on the very scope question the court then decided. SER-356-57. Indeed, an entire section of Larson's brief was titled "The Question Of What Literary Elements Are Actually Contained In The Ad [Is] A Genuine Issue Of Material Fact." SER-356. On reply, DC fully agreed that this issue should be reserved for trial and was *not* an issue for summary judgment. ER-353.

Before a court can grant summary judgment *sua sponte*, the moving party must have "reasonable notice" and "a full and fair opportunity to ventilate the

issues." *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982). DC had neither. The only issue on summary judgment was whether the Announcements were covered by Larson's Notices. While the scope question came up in briefing, both parties agreed it was a disputed issue for trial.

The court below also denied DC an opportunity to be heard. Because the only issue properly before the court was when the Announcements were first published—and not their copyrightable content—DC did not present original versions of them. Instead, DC appended a multiple-generation photocopy from *More Fun Comics #31* and a photocopied printout of a photo of *Detective Comics #15*. *See* SER-329-43. After reviewing these poor copies, the district court stated at oral argument: "[Y]ou can hardly make out whether it's an 'S' or a '5' or what it is on his chest." SER-339-340 . Rather than reserving the issue for trial or reviewing an original version, the court's summary judgment order concluded that "the 'S' crest" is not "recognizable." SER-44.

That ruling was incorrect. Where, as here, the content of a work is at issue, "[a]n original writing … is required in order to prove its content." FED. R. EVID. 1002; *see Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986). Given "the hazards of inaccurate or incomplete duplication," *id.*; *see U.S. v. Diaz-Lopez*, 625 F.3d 1198, 1201 (9th Cir. 2010), a copy of lesser quality than the original is not an adequate substitute, *see* 6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3]

(2011); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001); *U.S. v. Alexander*, 326 F.2d 736, 742-43 (4th Cir. 1964); *Tex Print Indus., Inc. v. Zayre Corp.*, 1977 WL 22752, *1 n.1 (D. Mass. Feb. 10, 1977).

The court's failure to review an original version of the Announcements resulted in multiple errors. As is clear from the copy of *Detective Comics #15* DC seeks to lodge and from the true-to-scale image on the next page below, the Announcements, in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features. Indeed, the S-shield is as recognizable in the Announcements as in the original *Action Comics #1* cover[24]:

---

[24] The cover reproduced in the summary judgment order was not the version that appeared in 1938—it is from the DC Comics Archive Edition published in 1997. This special edition completely reconstructed the original, which had low color registration making the "S" difficult to discern.



# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR --

Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

### 10c at all Newsstands

## SPECIAL PRIZES AND AWARDS!

---

## MORE FUN COMICS

*The National Comics Magazine*

---

**VINCENT A. SULLIVAN**

*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

**GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.**

*Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle*



*Version Electronically Filed By DC Below*



*Version Delivered to Chambers By DC Below*

This Court should reverse the district court's ruling and remand so the

copyrightable elements in the Announcements can be determined at trial.

## CONCLUSION

This Court should grant judgment as a matter of law on DC's settlement and statute-of-limitations counterclaims and dismiss the remainder of this appeal on that basis. Alternatively, this Court should remand so the district court can hold a trial on these counterclaims and fully adjudicate Larson's First Claim and DC's First Counterclaim as well. If this Court decides to reach the merits of the parties' First Claims now, it should affirm in part and reverse in part, as described above.

Respectfully submitted,

JONATHAN D. HACKER                          DANIEL M. PETROCELLI
O'MELVENY & MYERS LLP                        MATTHEW T. KLINE
1625 Eye Street, N.W.                        CASSANDRA L. SETO
Washington, D.C. 20006                       O'MELVENY & MYERS LLP
                                             1999 Avenue of the Stars, 7th Floor
PATRICK T. PERKINS                           Los Angeles, California 90067
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: March 23, 2003

APPELLATE CASE NO. 11-55863;
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

———————————

**APPELLANT LAURA SIEGEL LARSON'S THIRD BRIEF ON CROSS-APPEAL**

———————————

Appeal From The United States District Court for the Central District of California,
Case No. CV-04-8400 ODW (RZx), Hon. Otis D. Wright II

———————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
  *mtoberoff@ipwla.com*
Keith G. Adams
  *kgadams@ipwla.com*
Pablo D. Arredondo
  *parredondo@ipwla.com*
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Plaintiff-Appellant,*
*Laura Siegel Larson, individually and*
*as personal representative of the Estate*
*of Joanne Siegel*

**EXHIBIT 17**
**253**

# **TABLE OF CONTENTS**

COUNTER-STATEMENT OF JURISDICTION ...................................................1

INTRODUCTION ....................................................................................................1

ISSUES PRESENTED ON CROSS-APPEAL .....................................................4

STATEMENT OF FACTS ON CROSS-APPEAL ..............................................5

      A.      Settlement Negotiations Between The Siegels and DC .......................5

SUMMARY OF ARGUMENT ...............................................................................8

ARGUMENT ..........................................................................................................13

I.      NO AGREEMENT WAS REACHED BY THE PARTIES .........................13

      A.      The October 19 Letter Was A Counter-Offer That Warner
              Never Accepted ....................................................................................14

             1.      Contract Formation Requires An Objectively Manifested
                     Agreement To The Same Material Terms .................................14

             2.      There Was No Accepted Offer, Merely An Exchange Of
                     Unaccepted Counteroffers .......................................................15

      B.      The Numerous Material Differences Between The Proposals
              Demonstrate That No Agreement Was Consummated ......................17

             1.      Material Differences As To Scope Of The Agreement ...........17

             2.      Material Differences As To Monetary Terms...........................18

             3.      Other Material Differences .......................................................22

      C.      Warner's Cases On This Issue Are Manifestly Inapposite As
              They Concern The Enforceability Of Signed Agreements ................24

**EXHIBIT 17**

**254**

D.     A Final Written Agreement Signed By The Parties Was Required ...........................................................26

E.     The Clear Reservations Demonstrate That No Contract Was Formed..............................................................28

F.     Established Contract Law Applies To The Film Industry .................30

G.     Summary Judgment Is Appropriate Because No Enforceable Agreement Existed As A Matter of Law..............................................31

       1.     Summary Judgment As To Contract Formation Is Proper ......31

       2.     None Of Warner's Purported Evidence Does Anything To Establish That A Contract Was Formed..............................33

II.     THE SIEGELS' ACTION WAS TIMELY FILED .......................................36

III.     NO PART OF *ACTION COMICS, NO. 1* IS WORK-FOR-HIRE................39

A.     The District Court Properly Rejected Warner's "Work-for-Hire" Claim As To *Action Comics, No. 1* ...........................................39

       1.     Claim And Issue Preclusion Apply To Issues And Claims Raised Or Which Could Have Been Raised ...........................40

       2.     Warner's Arguments Are Unpersuasive ...................................42

             a.     The "Work-For-Hire" Issue Was Decided ....................42

             b.     The "Work-For-Hire" Issue Was Litigated And The Second Circuit's Ruling Is Not Dicta......................43

B.     The Alleged Additions Were Not "Work-For-Hire" .........................45

C.     DC Is Not A Joint Author Of *Action Comics, No. 1* ...........................52

IV.     *ACTION COMICS, NO. 4* AND *SUPERMAN, NO. 1* ARE NOT WORKS-FOR-HIRE ...................................................................53

V.    THE SIEGELS' TERMINATION RECAPTURED THE FIRST TWO
      WEEKS OF SUPERMAN NEWSPAPER  STRIPS ...................................54

      A.    The Strips Were Not "Work-For-Hire"..................................54

      B.    Not Listing the Strips Separately In The Termination Was
            Harmless Error ................................................................56

            1.    "Harmless Error" Is Broadly Defined ....................56

            2.    Warner Was On Notice Of The Siegels' Intent To
                  Terminate The Newspaper Strips .............................57

            3.    Warner's Reliance On *Burroughs* Is Misplaced......................58

            4.    Warner's Remaining Arguments Lack Merit ...........................58

VI.   SIEGEL AND SHUSTER'S OTHER SUPERMAN WORKS WERE
      NOT "WORKS-FOR-HIRE" ...............................................................59

      A.    *Action Comics, Nos. 2-3, 5-6*..............................................61

      B.    The Newspaper Strips ......................................................62

      C.    *Action Comics, Nos. 7-61, Superman, Nos. 1-23* ...............................66

VII.  THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE
      FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS.................68

      A.    The District Court Fully Adjudicated The First Claim and First-
            Fourth Counterclaims, Which Did Not Include The "Ads" Issue ......68

      B.    The District Court Accurately Described The Promotional
            Announcements ................................................................71

CONCLUSION .....................................................................................74

CERTIFICATE OF COMPLIANCE.......................................................75

STATUTORY ADDENDUM ...................................................................76

EXHIBIT 17
256

CERTIFICATE OF SERVICE ................................................................77

**EXHIBIT 17**
**257**

# TABLE OF AUTHORITIES

## CASES

*Aalmuhammed v. Lee,*
202 F.3d 1227 (9th Cir. 2000) ................................................................52

*Amerisource Bergen Corp. v. Dialysist West, Inc.,*
465 F.3d 946 (9th Cir. 2006) ..................................................................69

*Apablasa v. Merritt & Co.,*
176 Cal. App. 2d 719 (1959) ........................................................... 15-16

*Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
352 F. Supp. 2d 1119 (C.D. Cal. 2005) .................................................44

*Banner Entertainment, Inc. v. Superior Court,*
62 Cal. App. 4th 348 (1998) ........................................................ 27, 32, 35

*Batjac Productions Inc. v. GoodTimes Home Video Corp.,*
160 F.3d 1223 (9th Cir. 1998) ................................................................73

*Beyene v. Coleman Security Services, Inc.,*
854 F.2d 1179 (9th Cir. 1988) ................................................................67

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
683 F.2d 610 (2d Cir. 1982) ...................................................................58

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
491 F. Supp. 1320, 1322 (S.D.N.Y. 1980) ............................................58

*Bustamante v. Intuit, Inc.,*
141 Cal. App. 4th 199 (2006) ..................................................... 15, 31-32

*Callie v. Near,*
829 F.2d 888 (9th Cir. 1987) ..................................................................32

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................31

**EXHIBIT 17**
**258**

*Chicot County Drainage Dist. v. Baxter State Bank*,
308 U.S. 371 (1940)................................................................................. 44-45

*Clarke v. Fiedler*,
44 Cal. App. 2d 838 (1941) .................................................................32

*Core-Vent Corp. v. Nobel Indus. AB*,
11 F.3d 1482 (9th Cir.1993) ...............................................................68

*Curtiss-Wright Corp. v. General Electric Co.*,
446 U.S. 1 (1980).................................................................................68

*Davis & Cox v. Summa Corp.*,
751 F.2d 1507 (9th Cir. 1985) ........................................................ 41-42

*Devereaux v. Harper*,
210 Cal. App. 2d 519 (1962) ........................................................ 16-17

*Dolman v. Agee*,
157 F.3d 708, 712 (9th Cir. 1998) .....................................................46

*Duran v. Duran*,
150 Cal. App.3d 176 (1983) ...............................................................27

*Durkin v. Shea & Gould*,
92 F.3d 1510 (9th Cir. 1996) .............................................................41

*Effects Assocs. v. Cohen*,
908 F.2d 555 (9th Cir. 1990) .............................................................30

*Elite Show Servs. Inc. v. Staffpro, Inc.*,
119 Cal. App. 4th 263 (2004) ............................................................26

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ...........................................................51

*Epoch Producing Corp. v. Killiam Shows, Inc.*,
522 F.2d 737 (2nd Cir. 1975)..............................................................59

*Ersa Grae Corp. v. Fluor Corp.*,
1 Cal. App. 4th 613 (1991) ...................................................................25

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003)..................................................... 48, *passim*

*Estate of Thottam*,
165 Cal. App. 4th 1331, (2008) ...........................................................25

*Goodworth Holdings Inc. v. Suh*
99 Fed. Appx. 806...............................................................................28

*Hydranautics v. FilmTec Corp.*,
204 F.3d 880 (9th Cir. 2000) .............................................................41

*In Harris v. Rudin, Richman & Appel*,
74 Cal. App. 4th 299 (1999) ...............................................................25

*In re Eliapo*,
468 F.3d 592 (9th Cir. 2006) ..............................................................28

*In re Marshall*,
600 F.3d 1037 (9th Cir. 2010) ...........................................................41

*In re Pago Pago Air Crash*,
 637 F.2d 704 (9th Cir. 1981) ............................................................16

*Industrial Indemnity v. Superior Court*,
224 Cal. App. 3d 828 (1990) .............................................................26

*Janes v. Wal-Mart Stores, Inc.*,
279 F.3d 883 (9th Cir. 2002) .............................................................38

*Jim Henson Productions v. John T. Brady & Associates*,
16 F. Supp. 2d 259 (S.D.N.Y. 1997) ..................................................65

*Kamilche Co. v. United States*,
53 F.3d 1059 (9th Cir. 1995) .................................................. 40-42, 45

vii

**EXHIBIT 17**
**260**

*Krasley v. Superior Court*,
101 Cal. App. 3d 425 (1980) ........................................................... 31-32

*Landberg v. Landberg*,
24 Cal. App. 3d 742 (1972) ............................................................ 15-16

*LIN Broadcasting Corp. v. Metromedia Inc.*,
74 N.Y.2d 54 (1989) .................................................................. 48, 56

*Louis Lesser Enterprises, Ltd. v. Roeder*,
209 Cal. App. 2d 401 (1962) .............................................................17

*Lowry v. Barnhart*,
329 F.3d 1019 (9th Cir. 2003) .............................................................33

*Martha Graham School and Dance Foundation Inc. v. Martha Graham Center of Contemporary Dance, Inc.*
380 F.3d 624 (2d Cir. 2004) ....................................................61, 63, 67

*Meyer v. Benko*,
55 Cal. App. 3d 937 (1976) ..............................................................33

*Montana v. U.S.*,
440 U.S. 147 (1979) .....................................................................40

*Music Sales Corp. v. Morris*,
73 F. Supp.2d 364 (S.D.N.Y. 1999) .......................................................57

*National Comics Publications, Inc. v. Fawcett Publications, Inc.*,
191 F.2d 594 (2d Cir. 1951) .......................................................... 12, 64

*Norris v. Grosvenor Mktg. Ltd.*,
803 F.2d 1281 (2d. Cir. 1986) ............................................................45

*Novak v. Warner Bros Pictures, LLC*,
387 Fed.Appx. 747 (9th Cir. 2010) .......................................................31

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F. 3d 708 (9th Cir. 2001) ............................................................41

**EXHIBIT 17**

*Panagotacos v. Bank of America,*
60 Cal App 4th 851 (1998) ................................................................. 15-16

*Patel v. Liebermensch,*
45 Cal. 4th 344 (2008) ........................................................................ 25

*Paulo v. Holder,*
669 F.3d 911 (9th Cir. 2011) .............................................................. 44

*Picture Music v. Bourne, Inc.,*
457 F.2d 1213 (2d Cir. 1972)............................................................ 60-61

*Playboy Enters. v. Dumas,*
53 F.3d 549 (2d Cir. 1995)........................................................ 43, 63, 67

*Portsmouth Square Inc. v. Shareholders Protective Committee,*
770 F.2d 866 (9th Cir. 1985) ............................................................. 71

*Public Ledger v. N.Y. Times,*
275 F. 562 (S.D.N.Y. 1921)............................................................... 64

*Radio TV Espanola S.A. v. New World Entertainment, Ltd.,*
183 F.3d 922 (9th Cir. 1999) ............................................................. 28

*Rael v. Davis,*
166 Cal. App. 4th 1608 (2008) ........................................................ 33-34

*Reiter v. Cooper,*
507 U.S. 258 (1993)........................................................................... 69

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
77 F.3d 309 (9th Cir. 1996) .............................................................. 27

*Rice v. Fox Broad. Co.,*
330 F.3d 1170 (9th Cir. 2003) ........................................................... 51

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.,*
531 F.3d 962 (9th Cir. 2008) ............................................................. 52

**EXHIBIT 17**

*Roth v. Garcia Marquez*,
942 F.2d 617 (9th Cir. 1991) ...................................................................18

*Roth v. Malson*,
67 Cal. App. 4th 552, 559 (1998) ............................................................15

*S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*
359 F.3d 1127 (9th Cir. 2004) .................................................................32

*Schrock v. Learning Curve Int'l, Inc.*,
586 F.3d 513 (7th Cir. 2009) ...................................................................55

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
206 F.3d 1322 (9th Cir. 2000) ........................................................... 46, 59

*Siegel v. Nat'l Periodical Publications*,
364 F. Supp. 909 (S.D.N.Y. 1973) .................................................. 43, 46-47

*Siegel v. Nat'l Periodical Publications*,
508 F.2d 909 (2d Cir. 1974) ........................................................ 2, *passim*

*Siegel v. Time Warner Inc.*,
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ...................................................55

*Stewart v. Abend*,
495 U.S. 207 (1990) ......................................................................... 55, 60

*Stewart v. U.S. Bancorp*,
297 F.3d 953 (9th Cir. 2002) ...................................................................40

*Texaco, Inc. v. Ponsoldt*,
939 F.2d 794 (9th Cir.1991) ....................................................................68

*The Facebook Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ........................................................... 24-26

*Tibbs v. Smart & Final Iris Co.*,
152 Cal. App. 2d 618 (1957) ...................................................................16

x

**EXHIBIT 17**
**263**

*Twentieth Century Fox Film Corp. v. Entertainment Distributing*,
429 F.3d 869 (9th Cir. 2005) ................................................................ 40, *passim*

*Valente-Kritzer Video v. Callan-Pickney*,
881 F.2d 772, 775 (9th Cir. 1989) ................................................................ 28-29

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) ................................................................ 61

*Weddington Productions, Inc. v. Flick*,
60 Cal. App. 4th 793 (1998) ................................................................ 15

*Weinstein Co. v. Smokewood Entm't Group*, LLC,
664 F. Supp. 2d 332 (S.D.N.Y. 2009) ................................................................ 30

*Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*,
106 F.3d 894 (9th Cir. 1997) ................................................................ 45

*Wolff v. Inst. of Elec. & Electronics Engineers, Inc.*,
768 F. Supp. 66 (S.D.N.Y. 1991) ................................................................ 50

## RULES

Fed. R. Civ. P. 54(b) ................................................................ *passim*

F.R.A.P. 10(a) ................................................................ 33

Ninth Circuit Rule 10-2 ................................................................ 33

## STATUTES

17 U.S.C. § 204(a) ................................................................ *passim*

17 U.S.C. § 209 ................................................................ 65

17 U.S.C. § 304(c)(1) ................................................................ 69

17 U.S.C. § 304(c)(4) ................................................................ `69

17 U.S.C. § 507(b) ................................................................ 36

28 U.S.C. § 1291 .................................................................................1

Cal. Civil Code § 998 ........................................................................26

Cal. Civ. Code § 1585 ................................................................. 15-16

**REGULATIONS**

37 C.F.R. § 201.10(b)(1)(iii) ............................................................69

37 C.F.R. § 201.10(b) ................................................................ *passim*

**OTHER AUTHORITIES**

ARTHUR CORBIN, CORBIN ON CONTRACTS (2006)
§ 3.36 ................................................................................................16

M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT (2011)
§ 5.03[B][2][d] ............................................................................ 59-60

§ 6.03 ...............................................................................................54

WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007)
§ 5:54 ......................................................................................... 59, 67

§ 5:61 .........................................................................................60, 63

*Oral Contracts In the Ent Industry*,
1 Va. Sports & Ent. L.J. 101 (2001) ........................................ 28, 30

*Resolving Disputes over Oral and Unsigned Film Agreements*,
L.A. Law. 18 (Apr. 1999) ......................................................... 28, 30

**EXHIBIT 17**
**265**

## COUNTER-STATEMENT OF JURISDICTION

This court has jurisdiction over the F.R.C.P. 54(b) judgment on Plaintiff Laura Siegel Larson's First Claim, and Defendant DC Comics' First through Fourth Counterclaims. 28 U.S.C. § 1291.

## INTRODUCTION

The opposition and cross-appeal brief (Docket No. 31-1; "Opp.") of DC Comics (including its predecessors, "DC") and its parent, Warner Bros. Entertainment Inc. (including DC, "Warner") does little to address the real legal issues in this case. Instead, Warner uses catchphrases divorced from the law, erroneous arguments never made below, *ad hominem* attacks on opposing counsel, and extra-record materials to evade plaintiff Laura Siegel Larson's ("Plaintiff") statutory notices of termination regarding Superman ("Termination").

Touting "a deal is a deal" and Hollywood "custom and practice," Warner pretends it entered into a binding contract with Plaintiff in October 2001, when nothing could be further from the truth. In the three years before Plaintiff filed this action in 2004 to enforce her Termination, Warner never once claimed such a contract existed, and for good reason. The parties' objective written exchange of counteroffers with many different material terms, amply demonstrate that no contract was formed. As the District Court correctly held, "there is no document or set of documents reflecting agreement by the parties to singular, agreed terms."

ER 202.[1]

Warner's arguments as to the other issues fare no better. As to its purported statute of limitations defense, Warner argues, for the first time, a "trigger" date in May 2002, contradicting both its position below and the explicit terms of the parties' "tolling agreement."

As to its erroneous argument that Siegel and Shuster's conversion of their Superman story to a magazine format in *Action Comics, No. 1* was "work-for-hire," Warner pretends that the Second Circuit's decision in *Siegel v. Nat'l Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) – from which it has greatly benefited for four decades – is no longer preclusive.

Nor does Warner do anything to meaningfully counter Plaintiff's focused arguments in her opening brief (Docket No. 12; "App.") that the Superman newspaper strips, *Action Comics, Nos. 2-56* and *Superman, Nos. 1-6*, were not "work-for-hire." For pre-January 1, 1978 works, this sole exception to statutory termination is governed by the "instance and expense" test. "Expense" requires the publisher to assume upfront the expense and thus, the financial risk of a work's *creation*, which DC chose not to do. "Instance" requires that the publisher has the legal right to supervise and control the process and elements of creation, which DC

---

[1] "ER" refers to Plaintiff's excerpts of record, served on December 22, 2011; "SER" refers to Warner's supplemental excerpts of record, served on March 23, 2012; "RER" refers to Plaintiff's reply excerpts of record, served concurrently.

lacked.  Accordingly, Warner failed to meet its burden on summary judgment of demonstrating "instance and expense" by credible, admissible evidence.

On appeal, Warner sidesteps this governing test and spuriously argues that DC's ownership of underlying Superman rights renders every derivative work "for-hire," contrary to the Copyright Act and clear precedent.  Warner also revises history to assert that Superman material produced in 1938-43 by Siegel and Shuster's independent Cleveland operation was "work-for-hire," when DC's agreements said no such thing and independent contractors were not held to produce "work-for-hire" until the mid-1960s.

As Warner cannot meet its evidentiary burden, it freely distorts the record with misleading statements and fabrications in the hope this Court will not catch them – *e.g.*, falsely pretending that Jerry Siegel's extra-record memoir supports their position.

In further desperation, Warner resorts to baseless irrelevant attacks on Plaintiff's counsel to elicit prejudice and distract from the merits.  Warner's concocted "tortious interference" allegations, repeated here, were not before the District Court; are the subject of a different lawsuit (*DC Comics v. Pacific Pictures Corp., et al.*, C.D. Cal. Case No. 10-CV-03633 ODW (RZx)) still to be adjudicated; and are addressed in Plaintiff's pending Anti-SLAPP appeal.  9th Cir. Case No. 11-71844.  In willful violation of established appellate procedures,

**EXHIBIT 17**
**268**

Warner lards its excerpts of record with scores of documents that were also not before the District Court.

This Court should firmly reject Warner's meritless attempts to undermine and evade Plaintiff's statutory rights, affirm the District Court's judgment on Warner's cross-appeal, and reverse the District Court's judgment and remand for further proceedings on Plaintiff's appeal.

## ISSUES PRESENTED ON CROSS-APPEAL

1.      Did the District Court correctly find, based on the undisputed documentary evidence, that no contract was formed when the parties exchanged counteroffers with numerous differences in material terms, and there was no signed written agreement, as contemplated by the parties and required by 17 U.S.C. § 204(a)?

2.      Did the District Court correctly find that Plaintiff's claims were timely due to an explicit written tolling agreement between the parties?

3.      Did the District Court correctly find that *Action Comics, No. 1* was not a "work-for-hire," where Warner's arguments were variations on those made by it and rejected by the Second Circuit in prior litigation, and Warner, in any event, has not met its evidentiary burden?

4.      Did the District Court correctly find that portions of *Action Comics, No. 4* and *Superman, No. 1*, based on Siegel's pre-existing material, before any

**EXHIBIT 17**
**269**

relationship with DC, were not "work-for-hire"?

5.      Did the District Court correctly find as to the first two weeks of "Superman" newspaper strips that: (a) they were not "work-for-hire" because they were created on a purely speculative basis; and (b) their inadvertent omission from Plaintiff's notices of termination was "harmless error" under 37 C.F.R. §201.10(e)(1), because Plaintiff's intent to "terminate" the strips was clear?

6.      Did the District Court correctly enter a Rule 54(b) judgment on Plaintiff's First Claim and Warner's First Counterclaim, where such claims focused on the validity of Plaintiff's Termination and were fully adjudicated by the District Court?

## STATEMENT OF FACTS ON CROSS-APPEAL

The facts set forth below concern parts of Warner's cross-appeal.  The facts relevant to Plaintiff's appeal and "work-for-hire" issues are set forth in her opening brief.

### A.      <u>Settlement Negotiations Between The Siegels And DC</u>

On April 3, 1997, the widow (Joanne Siegel) and daughter (Laura Siegel Larson) of Jerry Siegel (the "Siegels"), exercised their rights under 17 U.S.C.§ 304(c) by serving on DC/Warner and filing with the Copyright Office seven notices of termination of Jerry Siegel's Superman copyright grants.  ER 1023-1092.

Laura/Joanne Siegel and DC/Warner thereafter engaged in settlement negotiations. ER 161. On April 15, 1999, the day before the Siegel Termination was to take effect, DC contested its "validity and scope." SER 390. Thereafter, the Siegels hired attorney Kevin Marks ("Marks"), and signed an explicit "Tolling Agreement" with DC as to any time-based defenses to contemplated litigation (the "Tolling Agreement"). SER 348-351.

The parties continued settlement negotiations in 2000-2001, conducted on DC's behalf by Warner's then-general counsel, John Schulman ("Schulman"). SER 456-528. The negotiations were complex, spanning a range of terms including copyright assignments, intricate studio definitions/calculations of multi-tiered royalties for different media, warranties and indemnifications. *Id.* Negotiations progressed in a telephone conference on October 16, 2001 between Schulman and Marks. SER 536:12. On October 19, 2001, Marks sent Schulman a six-page letter outlining the substance of what he believed was Warner's settlement offer in the October 16, 2001 conference. SER 456-461. On October 26, 2001, DC responded with a materially different outline and counter-offer that contemplated further explication in a formal written agreement. SER 463-470. Months later, on February 1, 2002, DC sent the Siegels a 56-page settlement proposal with many more new and changed material terms, not in Marks' October 19, 2001 offer or DC's October 26, 2001 counter-offer. SER 472-528.

6

**EXHIBIT 17**
**271**

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, President of AOL Time Warner, Inc., stating "we were stabbed in the back …. [y]our company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the proposal…. After four years we have no deal and this contract makes an agreement impossible." SER 412-414.[2] Parsons wrote back on May 21, 2002, stating that "we expected that you and your representatives would have comments and questions on the draft, which comments and questions we would need to resolve" and "we continue to hope this agreement can be closed." SER 416.

Aware of the Siegels' extreme dissatisfaction with the "new" and "inconsistent" material terms, Marks began drafting a new proposal, which he never sent to DC. SER 418; RER 39:21-40:15. Nor did DC ever attempt to agree to Marks' October 19, 2001 proposal, or to modify or retract DC's October 26, 2001 or February 1, 2002 counter-proposals.

On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC's Paul Levitz, terminating Marks and providing "notification that we are

_____

[2] Warner's unsupported allegations that its settlement proposal generously "guaranteed" the Siegels "tens of millions" (Opp. 3, 4, 7) is both irrelevant to contract formation and false. Warner's February 2002 Draft is rife with Hollywood accounting tricks for which studios in general, and Warner in particular, are notorious. SER 472- 523; *Ladd v. Warner Bros. Entm't, Inc.*, 184 Cal. App. 4th 1298, 1300 (2010). Warner would not be trying to force on Plaintiff, and Plaintiff would never have rejected, such a lucrative settlement. SER 412-414.

**EXHIBIT 17**
**272**

totally stopping and ending all negotiations with DC." SER 418; *see Siegel I*, 542

F. Supp. 2d at 1136. As this letter arguably did not comply with the express terms

of the Tolling Agreement, the Siegels sent a further letter on October 28, 2002 that

complied with such terms. SER 349-50 ¶7; RER 96-97 (October 28 2002 Letter).[3]

## SUMMARY OF ARGUMENT

I.     No agreement was reached between the Siegels and DC as a matter of

law. The parties' correspondence shows that Kevin Marks' October 19, 2001

letter, John Schulman's October 26 letter, and Warner's February 1, 2002 draft all

had sharply varying material terms, and hence under clear California law were

*counteroffers*, not acceptances, that terminated the preceding offer. Neither the

basic scope of the agreement as to copyrights to be assigned, the complex royalties

to be paid, the parties' warranties and indemnifications, nor numerous other

material terms were ever agreed-upon, as shown by this objective documented

exchange. Furthermore, the parties clearly contemplated, and the Copyright Act

required, a formal written agreement, executed by both parties, which never

happened due to their disagreements over material terms. Against this, Warner

---

[3] Warner's gratuitous recitation of an August 2002 offer by Ari Emanuel (Opp. 18-19) and citation to extraneous materials, ***not*** part of the District Court record, is irrelevant to the legal issue of whether the parties formed a contract in October 2001. Warner's improper inclusion in its Excerpts of Record of 166 pages of extra-record material, and raising of prejudicial, irrelevant new arguments on appeal, are addressed more fully in Plaintiff's motion to strike, and in the appellants' opening brief in *DC Comics v. Pacific Pictures Corp.*, 9th Cir. Case No. 11-71844.

cites inapposite cases where a written instrument *signed by both parties* was found to be enforceable, and pleads for the first time that established contract law should not apply to the entertainment industry. The District Court, applying well-settled California law to the parties' undisputed evidence, properly found that no agreement had been reached.

II.     The District Court also correctly held that the Siegels' claims were timely filed due to the parties' written Tolling Agreement. On appeal, DC abandons all of its prior arguments, and frivolously argues for the first time that the May 9, 2002 letter from Joanne Siegel to AOL Time Warner's President, complaining about Warner's February 2002 draft, somehow cancelled the Tolling Agreement. But the Tolling Agreement expressly required specific, formal notice of cancellation by certified mail to both DC's general counsel and outside counsel, and the May 9, 2002 letter did none of this. The District Court correctly found that notice of cancellation was not given to DC until September 21, 2002 at the earliest, and Warner concedes that in such event this action would be timely. In fact, notice of cancellation, as explicitly defined in the Tolling Agreement, was not given until October 28, 2002.

III.    The District Court correctly found that no part of Siegel and Shuster's Superman story, as published in Action Comics, No. 1 ("*Action Comics, No. 1*"), was "work-for-hire." The Second Circuit's decision in *Siegel v. Nat'l Periodical*

*Publications,* 508 F.2d 909, 914 (2d Cir. 1974), which specifically <u>rejected</u> Warner's "work-for-hire" arguments (based on Siegel and Shusters' conversion of their strip to a magazine format) bars Warner under preclusion doctrines. Notwithstanding this, Warner has presented no evidence that DC made the contributions it alleges (*e.g.*, choice of colors) or that Siegel and Shuster's reformatting revisions were "work-for-hire." Moreover, the alleged items, when compared to Siegel and Shuster's pre-existing illustrated story contain minimal, if any, protectable new elements. Finally, even if "work-for-hire" and marginally protectable, these limited revisions would not transform DC into a "co-author" of Siegel and Shuster's celebrated Superman story, per established precedent.

IV.    The District Court correctly found that parts of *Action Comics, No. 4,* and *Superman, No. 1* were not "work-for-hire" and were successfully terminated, because they had been fully developed by Siegel "on spec" prior to any involvement by DC, and hence were not DC's "work-for-hire."

V.    The District Court correctly found that the first two weeks of "Superman" newspaper strips were not "work-for-hire." The strips were also created "on spec" by Siegel and Shuster who, on their own initiative, pitched these sample strips to several newspaper syndicators. The inadvertent omission of these strips from the hundreds of Superman newspaper strips from the same period listed in the Siegels' Termination notices was correctly held to be "harmless error" under

37 C.F.R. § 201.10. DC had clear notice of the Siegels' intent to terminate all Superman works subject to termination, as this was both stated in and otherwise evident from their Termination notices.

VI.     As set forth in Plaintiff's opening brief, the District Court erred in finding that *Action Comics, Nos. 2-3, 5-6, Superman, Nos. 1-23,* and *Action Comics, Nos. 7-56* were "works-for-hire." The works were done without any guaranteed financial compensation, negating "expense," and Warner's own evidence amply demonstrates that DC lacked any legal "right" to supervise and control Siegel and Shuster's creative process, negating "instance."

As to the remaining 1938-43 "Superman" newspaper strips, the District Court held on summary judgment that these strips were on "the outer edges of the work-for-hire doctrine" (ER 103), even though DC had failed to meet its burden of proving that the strips were created at DC's "instance and expense." The strips were not created at DC's "instance," as Siegel and Shuster, not DC, were the motivating factor in their creation and syndication; nor at DC's "expense," because Siegel and Shuster paid all expenses of creating the strips, were solely entitled to a contingent royalty, and thus assumed the costs and financial risks of creation.

The District Court also erred in ignoring other significant evidence that the strips were not "work-for-hire" including: (i) the McClure Syndicate's presumptively correct copyright registrations listing Siegel and Shuster as authors

of the strips; (ii) the September 22, 1938 joint venture agreement between McClure, Siegel and Shuster, and DC (the "McClure Agreement") in which Siegel and Shuster were to receive a very large share of the profits, and DC a minor share; (iii) *National Comics Publications, Inc. v. Fawcett Publications, Inc.* ("*National Comics*"), 191 F.2d 594 (2d Cir. 1951), which held that McClure, the syndicator, was the assignee or "proprietor" of the strips, not the author; and (iv) McClure's subsequent written <u>assignment</u> of the strips to DC.

      VII.   The District Court's Rule 54(b) judgment was proper. Plaintiff's First Claim, and Warner's First through Fourth Counterclaims, required ***only*** that the District Court decide whether the Termination was valid and which Superman *works* were subject to termination as non-"work-for-hire." The District Court fully adjudicated the First Claim and Warner's purported defenses in three voluminous published opinions. Warner erroneously argues that the Rule 54(b) judgment is improper, because the District Court did not fully adjudicate the *literary elements* present in each "terminated" work. But such issues only pertain, if at all, to Plaintiff's Second through Fourth Claims, concerning Warner's accounting obligations, and are excluded from the Rule 54(b) judgment. For this reason, DC's "Ads" argument is also a red herring. Even were this Court inclined to consider the Ads, the District Court correctly determined that the Ads contained no original Superman content. Lastly, Warner did not contest the Rule 54(b) judgment as to

its Second through Fourth Counterclaims, conferring jurisdiction in any event.

## ARGUMENT

## I.  NO AGREEMENT WAS REACHED BY THE PARTIES

In 2004, after the Siegels filed suit for a declaration that they had successfully recaptured Siegel's original Superman and Superboy copyrights, Warner contended for the first time that they had reached a binding agreement with the Siegels in October 2001.  ER 298-301.

Three key documents conclusively demonstrate that no agreement was consummated:  (1) an October 19, 2001 letter (SER 456-61; the "October 19 Letter") from the Siegels' then-counsel, Kevin Marks to Warner's general counsel, John Schulman, containing one set of terms; (2) an October 26, 2001 reply from Schulman to Marks, containing a "more fulsome outline" of materially different deal terms (SER 463-70; the "October 26 Letter") to be fleshed out in a "draft agreement;" and (3) Warner's proposed February 1, 2002 draft agreement (SER 472-528; the "February 2002 Draft").

The fundamental differences between these counteroffers included the properties at issue (Superman, Superboy and Spectre in Marks' draft; nearly everything Siegel ever wrote in Warner's), the classification and calculation of royalties, warranties/indemnifications of/by the Siegels, and many other material differences.  RER 140-49.

As the District Court aptly held, "[o]ne need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 2002, 2002 draft to reach the conclusion that the parties failed to come to an agreement on all material terms."  ER 202.

On appeal Warner advances erroneous arguments that:  (i) the October 19 Letter, which Warner did not accept, still "settled the matter;" and (ii) despite the many material differences between the counteroffers, there are supposedly no differences in "essential terms."  For all of this, Warner relies on inapposite cases which simply find that clear agreements, *signed by both parties*, are enforceable.

A.  **The October 19 Letter Was A Counter-Offer That Warner Never Accepted**

1.  **Contract Formation Requires An Objectively Manifested Agreement To The Same Material Terms**

The glaring differences, set forth below, between the parties' respective write-ups (Marks' October 19 Letter and Schulman's October 26 Letter), made within a week after the parties thought they had arrived at terms, demonstrate that the parties had not reached agreement.  This divergence becomes even clearer with Warner's February 2002 Draft, elaborating upon its October 26 Letter.

Contract formation requires that the parties "agree upon the same thing in

the same sense." Cal. Civ. Code § 1580. "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Weddington Productions, Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998).

"[I]f the material facts are certain or undisputed, the existence of a contract is a question for the court to decide." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006). *See Roth v. Malson*, 67 Cal. App. 4th 552, 559 (1998) (affirming summary judgment that no contract was formed because counteroffer was not accepted).

## 2. There Was No Accepted Offer, Merely An Exchange Of Unaccepted Counteroffers

It is black-letter law that the "terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract." *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-856 (1998) (citing *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959)).

"'[A] qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer'" (*id.*), and that "new proposal or counteroffer [] must be accepted by the former offeror now turned offeree before a binding contract results." *Landberg v. Landberg*, 24 Cal. App. 3d 742, 750 (1972); *see* Cal. Civ. Code § 1585 ("An acceptance must be absolute.... A qualified

acceptance is a new proposal.").  "If the acceptance contains conditions not embraced in the offer or adds new terms, there is no meeting of the minds and no acceptance."  *In re Pago Pago Air Crash,* 637 F.2d 704, 706 (9th Cir. 1981). Thus, a counteroffer terminates the original offer and the power to accept the original offer.  *See Panagotacos,* 60 Cal App 4th at 855-856; 1-3 *Corbin on Contracts* § 3.36 (2006).

Here, it is crystal-clear from the objective exchange of counteroffers that each contained material terms not accepted by the other party.

Marks' October 19 Letter, though styled as an "acceptance" of Schulman's oral "offer" of October 16, 2001, was actually a "counteroffer" because, according to Schulman and his October 26 "more fulsome outline," something very different was discussed on October 16.  SER 456-461; 463-470.  *See Tibbs v. Smart & Final Iris Co.*, 152 Cal. App. 2d 618, 618, 623 (1957) (affirming summary judgment where "there is no enforceable written contract" despite a letter purporting to "accept[] said offer").

Schulman's October 26 Letter, which purported to outline Warner's October 16 "offer," contained materially different terms (more favorable to Warner) than those in Marks' purported October 19 "acceptance," "putting an end to" Marks' counter-offer.  *Apablasa*, 176 Cal. App. 2d at 726.  *See* ER 201; *Devereaux v. Harper,* 210 Cal. App. 2d 519, 524-525 (1962) (no contract where "one person

16
**EXHIBIT 17**
**281**

offers to do a definite thing and another introduces a new term into the acceptance"); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal. App. 2d 401, 407 (1962) (no binding agreement where letters contain "substantial changes in the proposed terms" that indicate the initial letter "was never intended to be the final memorial of the agreement of the parties").

The February 2002 Draft, contemplated by Schulman's October 26 outline, elaborated upon it with even more new or revised material terms, further showing that no agreement had been reached. SER 472-528.

**B. <u>The Numerous Material Differences Between The Proposals Demonstrate That No Agreement Was Consummated</u>**

**1. Material Differences As To Scope Of The Agreement**

Warner concedes that the scope of the rights assigned is an "essential" term. Opp. 29. But Warner fails to address the blatant differences: Marks' October 19 Letter was specifically limited to "Superman, Superboy and related properties … and the Spectre property." SER 456. Schulman's October 26 Letter was far broader, and included "all rights" in (1) anything related to "Superman, Superboy, Spectre and related properties – even if not created for DC Comics," and (2) anything "arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published)," and whether or not related to Superman, Superboy or the Spectre. SER 456, 464, 533-4, 541-42.

17

**EXHIBIT 17**
**282**

Warner's counteroffers thus significantly broadened the scope of properties to be assigned, which alone is sufficient to defeat Warner's claim that a binding contract was formed. *See Roth v. Garcia Marquez*, 942 F.2d 617, 626-627 (9th Cir. 1991) (no contract where long-form document unsigned due to dispute over scope of rights to be transferred).

### 2. Material Differences As To Monetary Terms

Warner also concedes that the royalty terms are "essential" (Opp. 29), but fails to address the substantial differences.

Recoupment: Under the October 19 and October 26 counteroffers, Warner would advance $500,000/year, "recoupable" against the Siegels' royalties. Under Marks' October 19 proposal, those advances would never accumulate interest if unrecouped (*i.e.,* if advances exceeded royalties); under Warner's proposals, all advances were "non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment." SER 458, 467.

Media Royalties: Marks' October 19 Letter proposed a royalty of 6% of DC's "gross revenues" derived from the "use of the property in any and all media, in and on merchandise and in promotional campaigns." SER 457.

Schulman's October 26 Letter proposed "6% of DC's receipts from all Media licenses for use of the Properties" (compare SER 457 and SER 467), without providing the definition of "Media licenses." Revenues from sources other

than "Media licenses" (*e.g.,* from direct sales or assignment by DC to third-parties as opposed to licenses) are thus excluded.

So, while the October 19 and October 26 letters both use "6%," the "6%" applies to different things.

The February 2002 Draft deviated further, limiting the 6% royalty to "amounts actually received" by DC "in United States Dollars" from "licensing," and excluding "any sums received by DC Comics for providing any services or materials in connection with the licensing." SER 481, 545:17-546:13. The draft further reduced the applicable revenue stream by excluding cash advances paid to DC (against its royalties), unless such monies were or became non-returnable. SER 481.

Marks' October 19 Letter envisioned a 6% royalty from any and all media and merchandising uses of Superman, subject to reduction (a) to 3% on a "pro rata" basis "when the property is used in conjunction with other book characters," (b) to 1.5% in three instances: "Justice League of America," "Superfriends" and "Superheroes," and (c) to 1% in "extraordinary cases … such as [Warner's] license to Six Flags." SER 457 ¶5, 536:4-537:5.

In contrast, Schulman's October 26 counteroffer, and subsequent February 2002 Draft, reduced the 6% (a) to 3% for "licenses which commingle the Properties with another DC property similar in stature and used in a like manner,"

and (b) to 1.5% for "licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (*e.g.,* Justice League, Superfriends, Superheroes)." SER 467, 495. This transformed a limited reduction in three instances ("*i.e.*"), into a general principle ("*e.g.*").

Merchandising Royalties: There were also material differences as to merchandising royalties – an extremely significant source of revenue.

As with "Media Royalties," Marks' and Schulman's proposals differed in their 6%/3%/1.5% categorizations.

Furthermore, Marks' October 19 letter limited the "1%" category to "extraordinary cases," with the "Six Flags" license as an example. SER 457 ¶5. Schulman's October 26 counteroffer added an entirely new category "with respect to licenses …. [for] a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensees, but to the extent such information is not available, the 6% shall be reducible to not less than 1%" – meaning that the category was not limited to "extraordinary cases," **and** the "floor" could be under 1% (based on purported licensee information). SER 467.

The February 2002 Draft added further new terms, including no payments

for the use of Superman in advertising and that "only 10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC would be included.  SER 496-97, 499-500.  This contrasted sharply with Marks' October 19 Letter, which stated that the 6% *would* apply to "promotional campaigns" and did not restrict revenue from merchandising.  SER 457.

Publishing Royalties:  The parties also never reached agreement on the royalty applicable to Superman's exploitation in DC's "non-Superman" publications.  The October 19 Letter provided a baseline royalty of "1% of the cover price," with a "pro rata" adjustment for non-"cameo" appearances, to a floor of .5%.  SER 457-58 ¶6.  Warner's October 26 Letter stated that "there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties do not appear in the title of the publication or feature in question."  SER 468 ¶25.

The February 2002 Draft expanded upon Warner's new floor of *no royalties whatsoever* where Superman did not appear "in the title of the publication or feature."  SER 499.  The February 2002 Draft further added that no royalties would be paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts of excess of seventy percent off of cover price."  SER 481.

Thus, under Marks' October 19 proposal, the Siegels would have been paid

for nearly all appearances of Superman. Under Warner's October 26 and February 2002 counteroffers, there were numerous new exclusions and reductions of the royalty rate and the revenues to which it would apply (*e.g.,* no revenues even if Superman appears for months as a main character in a "Green Arrow" comic).

### 3. Other Material Differences

Other material differences concerned, *inter alia*, warranties, indemnification, arbitration, audit rights, and credits. RER 140-49 (chart detailing differences between the proposals).

As to "warranties and representations," the October 19 Letter stated that the "Siegel Family would ***not*** make any warranties as to the nature of rights, but would [only] ***represent that they have not transferred the rights to any party***." SER 460 ¶13 (emphasis added). Schulman's October 26 Letter stated the "Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement," and "no contract of any kind with any other party with respect to or related to the Properties," and "not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use." SER 464. Such broader warranties result in significant potential liability. SER 534:6-10.

As to "indemnification," the October 19 Letter stated only: "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions" – all to

their benefit.  SER 460 ¶14.  Schulman's October 26 Letter specifically added that the "Siegels defend and indemnify re third party claims," "Siegels defend and indemnify re Dennis [Laura's ex-husband] claims," and "Widow and daughter [Joanne and Laura] indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to Sign."  SER 470; *see also* SER 517-18.  In essence, Warner turned the October 19 Letter's indemnification from Warner to the Siegels into significant obligations of the Siegels to indemnify Warner.

Furthermore, Marks' October 19 Letter provided only for mutual non-disparagement.  SER 460 ¶13.  Schulman's October 26 counteroffer required the Siegels to "positively publicize the Properties," including "travel" for "public appearances," and to "consult with DC prior to any personal appearances, written statements, interviews or other activities."  SER 464,535:19-536:3  (Marks: "[T]hat was a problem because we were dealing with a woman of advanced years and a woman who was ill, and travel on them could be a burden…. I wouldn't have wanted there to be any dispute that they were not fulfilling an obligation … and that … being the basis for claiming breach and withholding royalty payments and the like.").

The parties also diverged as to the credits to be accorded Jerome Siegel. *Compare* SER 459 ¶4 ER (October 19 Letter:  credit to be given in "paid ads"

concerning the Properties) *with* SER 469 ER (October 26 Letter: no credit in "paid ads"); *see* SER 539:12-17 (Marks: "[C]redit in paid ads … is something that's very important to clients. They want to see the credit in the full-page ads in newspapers and posters, movie theaters and the like, and John's letter provided for credit on screen only and not in paid ads.").

Just as Schulman couched his October 26 counteroffer as a "more fulsome outline," Warner dismisses vast differences in the February 2002 Draft as simply the product of it being a "long-form" or more "detailed." Opp. 32. Warner's subjective characterizations do nothing to change the objective manifestations of the parties' intent in their competing written counteroffers, nor the numerous material differences between them. ER 201 ("Defendants … seek to create issues of fact through <u>post hoc</u> testimony and rationalizations. None of this subjective belief is sufficient to defeat the objective manifestation of the parties' intent relayed in the documents ….").

## C. <u>Warner's Cases On This Issue Are Manifestly Inapposite As They Concern The Enforceability Of Signed Agreements</u>

To evade this clear lack of an agreement, Warner cites to cases that stand for the unremarkable proposition that a written agreement, signed by the parties, is an enforceable contract if sufficiently "definite."

Warner relies primarily on *The Facebook Inc. v. Pac. Nw. Software, Inc.*,

640 F.3d 1034 (9th Cir. 2011) ("*Facebook*") (Opp. 26-27), which is inapposite as it

concerned an agreement <u>signed</u> by both parties.  Furthermore, "[t]he parties

stipulated that the Settlement Agreement was … 'binding', and 'may be submitted

[to a court] to enforce [it].'"  *Id*. at 1037.  The question was whether the signed

document had sufficiently definite material terms to be enforceable.  *Id*.  As the

material terms were a lump-sum payment and a specified amount of stock, this

Court unsurprisingly found the executed agreement binding and enforceable.  *Id*.

 *Facebook* is similar to *In Harris v. Rudin, Richman & Appel*, 74 Cal. App.

4th 299, 307 (1999), also relied upon by Warner (Opp. 26), which upheld an

agreement to pay $250,000 in exchange for a general release, executed by all

parties, under a signature block stating "[a]ccepted and agreed."

 Warner's other cases similarly involve a signed instrument demonstrating

the parties' intent to be bound.  *See Estate of Thottam,* 165 Cal. App. 4th 1331,

1340-41 (2008) (parties agreed "by initial and by signature" and the terms are

"sufficiently clear to determine obligations to which the parties agreed"); *Ersa*

*Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 (1991) (enforcing signed

agreement where agreed-upon material terms were "undisputed"); *Patel v.*

*Liebermensch*, 45 Cal. 4th 344, 346 (2008) (signed contract enforceable, though it

did not specify the "time and manner of payment" because "a reasonable time is

allowed").

25

**EXHIBIT 17**

**290**

Warner also relies on *Elite Show Servs. Inc. v. Staffpro, Inc.*, 119 Cal. App. 4th 263, 268-69 (2004), which did not concern contract formation, but simply found that a Cal. Civil Code § 998 litigation settlement offer (entitling one to fees and costs) was sufficiently definite.

If Marks' October 19 proposal contained signature lines executed by the parties, then *Facebook* and the other cases Warner cites might be applicable to whether the terms were sufficiently definite to be enforceable. That obviously did not happen. Instead, the parties' counteroffers demonstrate disagreement as to material terms preventing the formation of a contract.

Nor is it this Court's responsibility to relieve Warner from its failure to respond to Marks' October 19 Letter with an unqualified acceptance. As the District Court correctly noted, "there is no document or set of documents reflecting agreement by the parties to singular, agreed terms." ER 202. And where the parties have not agreed upon terms, "courts will not write a new contract" for them. *Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990).

### D.    <u>A Final Written Agreement Signed By The Parties Was Required</u>

It is equally clear from the parties' words and conduct that, given the importance and complexity of the subject matter and deal points, any agreement was subject to documentation and would need to be reduced to a mutually-acceptable written contract. ER 463 ("We're working on the draft agreement"),

SER 472.  *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (affirming summary judgment; no contract as a matter of law where "the parties intended … not to be bound unless and until a subsequent agreement was made").

"[W]hen it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract."  *Duran v. Duran*, 150 Cal. App.3d 176, 180 (1983) (citations omitted).  *See Banner Entm't Inc. v. Superior Court (Alchemy Filmworks Inc.)*, 62 Cal. App. 4th 348, 358 (1998) ("When it is clear … that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created.") (citation omitted).

Moreover, as any such agreement would involve an assignment of the Siegels' recaptured copyright interests, a written contract was required as a matter of law.  17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").[4]

---

[4] On appeal Warner argues for the first time that a purported "handshake" is sufficient and relies on "principles essential to the entertainment industry, where many business deals are never formalized" (Opp. 3, 28-29), and on secondary

Marks' October 19 Letter cannot possibly qualify as the required "writing." While "[n]o magic words must be included in a document to satisfy § 204(a) …. the parties' intent as evidenced by the writing must demonstrate ***a transfer*** of the copyright." *Radio TV Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) (emphasis added). The October 19 Letter is not "a transfer" of the Siegels' copyrights to Warner; rather, it contemplates that the Siegels "would [make such] transfer" in a final executed agreement. SER 458.

Here, a signed written agreement assigning the Siegels' copyrights was both contemplated by the parties and required, but never approved and executed. *See Goodworth Holdings Inc. v. Suh* 239 F. Supp.2d 947, 958 (N.D. Cal. 2002) (granting summary judgment where parties "had a lot of conversations about putting a deal together, but when it finally came down to determining material terms … in order to put them into writing, both parties walked away").

### E.    The Clear Reservations Demonstrate That No Contract Was Formed

In *Valente-Kritzer Video v. Callan-Pickney*, 881 F.2d 772, 775 (9th Cir.

---

sources that nonetheless flag § 204(a)'s writing requirement, both placing it at issue. Opp. 28; *Oral Contracts In the Ent Industry* ("*Oral Contracts*"), 1 Va. Sports & Ent. L.J. 101, at 108-109), *Resolving Disputes over Oral and Unsigned Film Agreements* ("*Resolving Disputes*"), L.A. Law. 18 (Apr. 1999) at 20. Furthermore, as this "issue is one of law and … the [factual] record has been fully developed," it can properly be raised on appeal. *In re Eliapo*, 468 F.3d 592, 603 (9th Cir. 2006). Plaintiff also addressed § 204(a)'s writing requirement on summary judgment (RER 100), albeit on another point.

1989), an attorney for one party sent a draft agreement accompanied by a letter that stated in part "Thank you for your cooperation and congratulations on landing the deal" and "Please call if you have problems." This Court found that that there was no binding contract, despite the attorney's repeated references to "the deal," because the correspondence contained reservations, including the right to comment and a request for the other party to communicate any disagreements. *Id.*

The same type of reservations appears throughout the correspondence here, demonstrating that neither side viewed their proposals as final. Marks' October 19 Letter concluded by stating "John, if there is any aspect of the above that is somehow misstated, please let me know…." SER 461. Schulman's responsive October 26 Letter similarly stated "I enclose herewith … ***a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement*** … we will have this super-matter transaction in document form." SER 463 (emphasis added). The correspondence accompanying Warner's February 2002 Draft stated:

> I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. ***As our clients have not seen this latest version*** of the agreement, ***I must reserve their right to comment.*** In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

SER 472 (emphasis added). Such reservations, along with the numerous material

**EXHIBIT 17**
**294**

differences in the parties' counteroffers, make plain that they had not arrived at a contract.

### F.    Established Contract Law Applies To The Film Industry

This Court should give no currency to Warner's frivolous suggestion – not made below – that the entertainment industry requires deviation from established contract and copyright law. Opp. 28. *See Effects Assocs. v. Cohen*, 908 F.2d 555, 556-557 (9th Cir. 1990) (rejecting argument that "[m]oviemakers do lunch, not contracts" and enforcing 17 U.S.C. § 204(a)); *Weinstein Co. v. Smokewood Entm't Group*, LLC, 664 F. Supp. 2d 332, 348 (S.D.N.Y. 2009) (same).

In support of the proposition that it is "standard" in the entertainment industry to forgo written contracts, Warner cites to articles, not before the District Court, that contradict their position and, in any event, are unsupported by any testimony, expert or otherwise. Opp. 28-29. *Oral Contracts*, 1 Va. Sports & Ent. L.J. at 108-09, 111-12, cautions against oral agreements for anything but "simple and short-term contracts;" and notes that 17 U.S.C. § 204(a) mandates an executed written instrument for copyright transfers. *Resolving Disputes*, L.A. Law. at 20, 48, notes "evidence of industry custom and practice is not [admissible] if it is offered to prove or disprove whether or not a contract was formed," and similarly emphasizes § 204(a)'s writing requirement.

**EXHIBIT 17**
**295**

### G. Summary Judgment Is Appropriate Because No Enforceable Agreement Existed As A Matter of Law

#### 1. Summary Judgment As To Contract Formation Is Proper

Warner contends that "at a minimum" a jury should consider its position. Opp. 34-37. However, Warner has not met the threshold to survive summary judgment. Once Plaintiff met her initial burden of demonstrating the absence of a genuine issue of fact, the burden shifted to Warner to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). Warner points to no real evidence contradicting the facially-obvious correspondence that objectively demonstrates that no contract was formed. As this documentary evidence is "undisputed," the question of whether or not a contract was formed "is a question [of law] for the Court to determine." *Bustamante*, 141 Cal. App. 4th at 208.

Courts thus routinely decide the issue of whether a contract was formed on summary judgment. *See Novak v. Warner Bros Pictures, LLC,* 387 Fed. Appx. 747, 749 (9th Cir. 2010) (affirming summary judgment where "[t]he evidence conclusively establishes that, when negotiations broke off, the parties had not reached agreement" and "[n]o rational jury could find that a contract was entered between the Producers and Warner"); *Krasley v. Superior Court*, 101 Cal. App. 3d 425, 432 (1980) ("A number of cases have found [summary judgment] proper and

**EXHIBIT 17**
**296**

indeed required in situations involving … contracts which were in fact illusory and consisted only of … offers and counteroffers.") (collecting cases and upholding summary judgment).

While Warner claims "whether parties intended to be bound by terms expressed in an informal agreement is one of fact," and summary judgment somehow improper, the cases it cites are either inapposite or to the contrary.  Opp. 35; *Bustamante*, 141 Cal. App. 4th at 208 (affirming summary judgment that "no enforceable contract was ever formed between the parties," despite purported oral agreement); *Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359-62 (unsigned draft agreements did not create enforceable contract despite testimony as to oral agreements); *Clarke v. Fiedler*, 44 Cal. App. 2d 838, 846 (1941) ("When, as here, the evidence indisputably shows that all the terms and conditions of the understanding between the parties were definitely agreed upon … the parties are bound."); *S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1132 (9th Cir. 2004) (applying federal labor law, not California law, to find "triable issues of fact" as to a collective-bargaining agreement); *Callie v. Near*, 829 F.2d 888 (9th Cir. 1987) (applying Arizona law regarding a "court['s] equitable power to enforce summarily a ['*complete*'] agreement to settle a case pending before it").

### 2. None Of Warner's Purported Evidence Does Anything To Establish That A Contract Was Formed

To distract from glaring material differences in the parties' written counteroffers, Warner grossly mischaracterizes Marks' testimony to claim that a binding contract had been reached. Opp. 28-29, 32. Warner asserts that "Marks told Schulman the draft was 'not contrary to what [had been] agreed to' and the parties could 'deal with it.'" Opp. 32. The quotes were not even Marks' words, but inadmissible hearsay in the form of Schulman's purported notes that Plaintiff objected to below. RER 88 ¶15. Marks testified to the opposite. SER 127. Marks also testified in detail how Warner's counteroffers contained "many additional terms not agreed to." SER 128, 533-547.

Warner leans heavily on Marks' alleged subjective beliefs as to "a deal." [5] This approach is fundamentally incorrect, because whether a binding contract was formed is not based on subjective belief, but on objective manifestation of intent – here, the competing counteroffers. *See Meyer v. Benko*, 55 Cal. App. 3d 937, 942–943 (1976) (mutual consent "is determined by objective rather than subjective criteria"); *Rael v. Davis*, 166 Cal. App. 4th 1608, 1618 n.11 (2008) ("Contract

---

[5] To do so, Warner improperly goes well "beyond the record evidence" and mischaracterizes inadmissible hearsay in a letter from Plaintiff to her half-brother. Opp. 37. Plaintiff's concurrently-filed motion to strike details Warner's brazen attempt to inject 166 pages of new material into the record on appeal in willful violation of established appellate procedures. F.R.A.P. 10(a); Circuit Rule 10-2; *Lowry v. Barnhart*, 329 F.3d 1019, 1025-26 (9th Cir. 2003).

EXHIBIT 17
298

formation is governed by objective manifestations, not subjective intent of any individual involved.").

Notwithstanding this, Marks' testimony is consistent with the evidence and the District Court's ruling that a binding contract was never consummated. RER 55 (Marks: "Well, if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no ....").

Warner falsely asserts that the differences between the outlines were not raised at the time. Opp. 33. Schulman sent his October 26 Letter when Marks was away for a month in China. SER 461; RER 21:16-24. Upon Marks' return he attempted to contact Schulman, but Schulman was on vacation. RER 29:4-7. On May 9, 2002, Joanne Siegel wrote a letter to Parsons, President of AOL Time Warner, specifically condemning the "unconscionable contract dated February, 2002 [which] contained new, outrageous demands that were not in the proposal." SER 412-414.

Warner also conspicuously omits Parsons' May 21, 2002 reply to Ms. Siegel, in which he states "we continue to hope that this agreement can be closed." SER 416. Parson did *not* claim a binding agreement had ever been reached, but instead indicated that the parties had yet to reach an agreement. *See* ER 163 (District Court: "Time Warner 'expected' that the submission of the draft agreement would result in further 'comments and questions on the draft' by Siegel

family's representatives that 'would need to [be] resolve[d].'").

Warner also relies on its purported post-agreement conduct. Yet, at no time in the three years before the Siegels filed suit did Warner/DC ever assert that a settlement agreement had been reached. Nor did Warner/DC ever retract their October 26, 2001 or February 1, 2002 counteroffers.

Warner weakly claims that DC "manifested its understanding of the agreement" by "setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie." Opp. 30. This supposed "reserve account" was anything but. RER 73-74 (DC: "None of the Defendants have ever represented … that an actual escrow fund had been created," and admitting that DC had only "summary statements … consisting of one-line quarterly total entries."). Warner also never states that it provided the Siegel family credit on its 2005 film. SER 459 ¶4.

Warner's *de minimis* purported performance does nothing to overcome the fact that there was no meeting of the minds. *See Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359 ("[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*") (emphasis in original).

35

EXHIBIT 17
300

* * *

As the District Court correctly held: "[Warner's] argument … is premised on the notion that they can limit the scope of the legal analysis to the October 19, 2001, letter, and call it a contract, regardless of their materially different October 26, 2001 letter … and their vastly different February 1, 2002 draft, which were both part and parcel of the same settlement negotiation." ER 201. None of Warner's arguments can withstand the great weight of the objective evidence that no contract was formed.

## II.     THE SIEGELS' ACTION WAS TIMELY FILED

The Copyright Act provides a three-year statute of limitations for copyright claims. 17 U.S.C. § 507(b). The District Court held, and Warner does not dispute here, that the Siegels' claims accrued at the earliest on April 16, 1999. ER 197.

To facilitate settlement negotiations, DC and the Siegels entered into a tolling agreement dated and effective April 6, 2000 (the "Tolling Agreement") (SER 348-51) that neither "would assert any statute of limitations or laches defenses relating to …the [Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof." SER 348 at ¶1. Paragraph 7 provides that the Tolling Agreement remain in force "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices [of

Given the above, the District Court's granting of summary judgment on this issue was erroneous, as at a minimum a reasonable trier of fact could readily find that *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* were not "for-hire."

## VII.  THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS

### A.  <u>The District Court Fully Adjudicated The First Claim And First – Fourth Counterclaims, Which Did Not Include The "Ads" Issue</u>

Federal Rule of Civil Procedure 54(b) allows a district court to enter an appealable judgment on interlocutory orders that constitute "an ultimate disposition of an individual claim," provided there is no just reason to wait until the entire case concludes. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980).

Rule 54(b) certification is left to the sound discretion of the district court, and is proper if it aids in expeditious resolution while avoiding piecemeal appeals. *See Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1484 (9th Cir.1993).  "The trend is towards greater deference to a district court's decision to certify under Rule 54(b)."  *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 798 (9th Cir.1991).

Plaintiff's First Claim, as amended, requests only the following relief:

74.    For a declaration as follows:
a.    That pursuant to the Copyright Act, 17 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each and/or all of the Works; and

     b.    That, as of the Termination Date, Plaintiffs owned and continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

ER 343-44 ¶74.  Plaintiff's First Claim thus required the District Court:  (a) to determine that the Termination complied with section 304(c) of the Copyright Act; and (b) to determine those "works" recaptured by the Termination.  *See* 17 U.S.C. §§ 304(c)(1), (4) (referring to "the work"); 37 C.F.R. § 201.10(b)(1)(iii) (focusing on "each work to which the notice of termination applies").  It did ***not*** call for the adjudication of the literary elements contained in each work.  In contrast, Plaintiff's Second through Fourth Claims, which seek an accounting of profits from such works, could involve an evaluation of their literary "elements" due to general exploitation of the Superman franchise.

    In several lengthy decisions, the District Court found that the Termination is valid as to *Action Comics, No. 1*, as well as *Action Comics, No. 4*, *Superman, No. 1* (pages 3-6), and the Spec Strips, but that the remaining Superman works within the 1938-43 termination window were "for-hire."  ER 1-227.

    The District Court also fully adjudicated Warner's First through Fourth Counterclaims, which sought to invalidate the Termination on various grounds.[13]

    Accordingly, on May 17, 2011, the District Court properly entered a Partial

---

[13] Warner admits that the Rule 54(b) judgment on its Second through Fourth Counterclaims was proper (Opp. 1), which alone is a sufficient basis for jurisdiction.  *See Reiter v. Cooper*, 507 U.S. 258, 265 (1993); *Amerisource Bergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 954 (9th Cir. 2006).

**EXHIBIT 17**
**303**

Judgment under Rule 54(b) as to Plaintiff's First Claim and as to Warner's First through Fourth Counterclaims. ER 232-3, 293-300 ¶¶66-105, 343-344 ¶74.

Warner argues that Rule 54(b) certification was supposedly improper because (a) there are purported open issues as to the impact, if any, of limited promotional materials ("Ads") held to be excluded from the Termination, and (b) there is disagreement as to whether statements regarding literary elements in *Action Comics, No. 1* made in the background section of the District Court's first order, constitute "dicta." Opp. 40-41.

The "dicta" issue is irrelevant to the First Claim, which does <u>not</u> seek relief as to the "literary elements" contained in *any* work. ER 343-44 ¶74.

The District Court decided two "Ads" issues. ***First,*** it held that the Ads were not subject to the Termination because their publication date fell outside the termination "window." ER 167-76. This is all that is relevant to the First Claim. ***Second,*** it properly determined that the derivative Ads' content was extremely limited (ER 176-82), as the Ads' reduced, black-and-white, and wholly derivative copy of the *Actions Comics, No. 1* cover was divorced from the Superman storyline and character in *Actions Comics, No. 1.* But this determination is not part of the First Claim, which solely concerned whether the Termination was effective as to a given work.[14] At most, this issue affects Plaintiff's Second through Fourth

---

[14] Warner's contention that Plaintiff has "waived" her right to challenge the

"accounting" claims (ER 344-346 ¶¶75-79), none of which are part of the Rule 54(b) Judgment.

As the First Claim and the First through Fourth Counterclaims have been fully adjudged and are severable from the other claims, the District Court's Rule 54(b) judgment was proper.

## B. <u>The District Court Accurately Described The Promotional Announcements</u>

If the Court is nonetheless inclined to reach the issue of the "copyrightable content" of the Ads, the District Court's ruling as to the Ads' negligible content was correct.

Warner falsely claims the "the *scope* of the rights at issue" was not at issue in the summary judgment motion. Warner acknowledges (Opp. 81-82) that courts have the inherent power to order summary judgment *sua sponte* so long as the adverse party had "a full and fair opportunity to develop and present facts and legal arguments" and "reasonable notice that the sufficiency of his or her claim will be in issue." *Portsmouth Square Inc. v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

---

District Court's limited "Ads" ruling (Opp. 80-81) is misleading. Plaintiff maintains that, while the trivial, wholly derivative Ads were not "terminated," they have no impact on the copyrights (*e.g.*, *Action Comics, No. 1*) recaptured by the Termination. As this issue is not part of the Rule 54(b) judgment, Plaintiff could hardly have raised it on appeal. *See* Docket No. 7 at 11.

"Reasonable notice" requires that the party be on notice that the court might "reach" the issue. *Id*. at 869-70.

Warner had more than adequate notice. In fact, Warner asserted on summary judgment that "DC and its licensees continue to have the right to use the copyrightable elements contained in the [Ads] without the need to account to Plaintiffs." SER 708. In response, Plaintiff emphasized the lack of "copyrightable elements" in the Ads and submitted the reports of both parties' experts on the subject. SER 356:19-357:6; RER 104-106, 108-133 ¶¶30-41. In reply, Warner argued that the Ads "represent the first publication of the appearance of the Superman character" (RER 91:16-20), that "any question about [the Ads'] contents is most obviously answered by the ads which speak for themselves," and that "no special 'lens' is required." RER 93:18-20.

Finally, the Court clearly indicated at the hearing on the parties' summary judgment motions that it believed the Ads contained minimal copyrightable material, at best, and gave Defendants a fair opportunity to respond. RER 78:17-24. Defendants' counsel even discussed this issue with the Court:

> The Court: How do you respond to ***counsel's argument that all you have is the actual picture itself***, and not necessarily any of the elements therein?
> Mr. Zissu: Okay. Well, the thing about visual works, multi-media works, is that pictures are worth -- can be worth many words. We do have, if you look at it -- ***if you look at it, you have the figure of Superman as he appears there in his costume; you have his strength lifting a car; and you don't have that much more***.

The Court:  ***That's about it; right***.

RER 80:12-22 (emphasis added).

Warner was not "denied" "an opportunity to be heard" but rather had a full and fair opportunity to litigate, ample warning that the Court was considering the issue, engaged with the District Court, and chose to dodge questioning and submit what it now dismisses as a "multiple-generation photocopy" only after losing on the issue.  Opp. 82.

Warner's arguments about the contents of the Ads – an issue which it concedes is not part of this appeal (Opp. 86) – are erroneously premised.  Siegel's copyright in *Action Comics, No. 1* was correctly held by the District Court to have been recaptured pursuant to the Termination.  ER 133-4.  The Ads' reduced black-and-white copy of the mere cover of *Action Comics, No. 1* are entirely derivative, add no new copyrightable elements, and under clear Ninth Circuit law, derivative works ***cannot*** limit, restrict, or divest the copyrights in underlying work.  *See Batjac Productions Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1227 (9th Cir. 1998) ("[P]ublication of a derivative work does not affect the validity of a subsisting copyright in the preexisting work.").

Furthermore, the critical point is that the image on the comic book cover has meaning *only* in the context of the Superman storyline, character and other aspects of *Action Comics, No*. 1, not found in the Ads:  "[N]othing concerning the

Superman storyline, that is, the literary elements contained in <u>Action Comics</u>, Vol.

1, is on display in the ads." ER 181:9-10.

## CONCLUSION

Plaintiff respectfully requests that this Court: (1) affirm the judgment of the

District Court that no agreement was reached between the Siegels and DC Comics;

that Plaintiff's action was timely filed; that *Action Comics, Nos. 1* and *4,*

*Superman, No. 1* and the first two weeks of Superman newspaper strips were not

"work-for-hire;" and were successfully recaptured by the Siegel Termination; and

(2) reverse the judgment of the District Court with instructions to enter partial

summary adjudication in Plaintiff's favor as to the Superman works within the

1938-1943 Termination window (i.e., *Action Comics, Nos. 2-3, 5-56, Superman,*

*Nos. 1-6,* and the remaining "Superman" newspaper strips); and (3) to remand for

further proceedings.

Dated:  May 24, 2011          TOBEROFF & ASSOCIATES, P.C.

                             /s/ Marc Toberoff
                             _____
                             Marc Toberoff

                             Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT 17**
**308**

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

## LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZX)

————————

## REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 18**
**309**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION............3

    A. Larson And DC Formed An Agreement On October 19, 2001 ..........3

    B. Contemplating A Long-Form Document Does Not Defeat A Deal.......................................................................................................7

    C. Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings ..........10

        1. Scope Of Rights ......................................................................10

        2. Monetary Terms ......................................................................11

        3. "Other" Non-Essential Terms .................................................13

        4. The February 2002 Long-Form ...............................................14

    D. Marks' August 2002 Memo Confirms A Deal Was Made ...............14

II. DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM .......................................................16

III. LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS .....17

    A. Elements Of *AC#1* Were Made-For-Hire ..........................................17

        1. *National* Is Not Preclusive ......................................................17

        2. The 1938 Additions Were Made-for-Hire ..............................19

            a. New Content ..................................................................20

            b. Colorization ..................................................................21

            c. Cover Art ......................................................................22

    B. DC Owns The Pre-McClure Strips....................................................23

        1. The Strips Were Made-for-Hire...............................................23

        2. Larson's Failure To Terminate The Strips Is Dispositive .......24

    C. Pages 3-6 Of *S#1* Are Works-For-Hire .............................................25

    D. Artwork In *AC#4* Is Work-For-Hire .................................................26

    E. Copyrightable Elements In DC's Promotional Announcements .......27

CONCLUSION ................................................................................28

**EXHIBIT 18**
**310**

# TABLE OF AUTHORITIES

## Cases

*Aalmuhammed v. Lee*,
    202 F.3d 1227 (9th Cir. 1999) .................................................................... 19, 20

*Banner Entm't, Inc. v. Super. Ct.*,
    62 Cal.App.4th 348 (1998) ................................................................................7

*Blix St. Records, Inc. v. Cassidy*,
    191 Cal.App.4th 39 (2010) ................................................................................7

*Burroughs v. M-G-M, Inc.*,
    491 F.Supp. 1320 (S.D.N.Y. 1980) ..................................................................23

*Burroughs v. M-G-M, Inc.*,
    683 F.2d 610 (2d Cir. 1982) .............................................................................23

*Chicot County Drainage Dist. v. Baxter County Bank*,
    308 U.S. 371 (1940) .........................................................................................18

*Clarke v. Fiedler*,
    44 Cal.App.2d 838 (1941) ..................................................................................5

*Comm'r v. Sunnen*,
    333 U.S. 591 (1948) .........................................................................................18

*Davis & Cox v. Summa Corp.*,
    751 F.2d 1507 (9th Cir. 1985) .........................................................................18

*Digerati Holdings, LLC v. Young Money Entm't, LLC*,
    194 Cal.App.4th 873 (2011) .............................................................................13

*Dolman v. Agee*,
    157 F.3d 708 (9th Cir. 1998) ...........................................................................21

*Duran v. Duran*,
    150 Cal.App.3d 176 (1983) ............................................................................5, 8

*Effects Assocs., Inc. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990) .............................................................................6

i

**EXHIBIT 18**
**311**

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
 119 Cal.App.4th 263 (2004) ............................................................ 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
 122 F.3d 1211 (9th Cir. 1997) ............................................................22

*Ersa Grae Corp. v. Fluor Corp.*,
 1 Cal.App.4th 613 (1991) ............................................................6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
 342 F.3d 149 (2d Cir. 2003) ............................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
 499 U.S. 340 (1991) ............................................................26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
 773 F.2d 1068 (9th Cir. 1985) ............................................................19

*Gaiman v. McFarlane*,
 360 F.3d 644 (7th Cir. 2004) ............................................................ 19, 26

*Granite Rock Co. v. Teamsters*,
 649 F.3d 1067 (9th Cir. 2011) ............................................................18

*Harris v. Rudin, Richman & Appel*,
 74 Cal.App.4th 299 (1999) ............................................................5, 7

*In re Pacific Pictures Corp.*,
 2012 WL 1640627 (9th Cir. May 10, 2012) ............................................................16

*Inamed Corp. v. Kuzmak*,
 275 F.Supp.2d 1100 (C.D. Cal. 2002) ............................................................13

*Leather v. Eyck*,
 180 F.3d 420 (2d Cir. 1999) ............................................................18

*Levin v. Knight*,
 780 F.2d 786 (9th Cir. 1986) ............................................................ 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby*,
 777 F.Supp.2d 720 (S.D.N.Y. 2011) ............................................................24

ii

**EXHIBIT 18**
**312**

*Mattel, Inc. v. MGA Entm't, Inc.*,
  616 F.3d 904 (9th Cir. 2010) ...................................................................4

*Murray v. Gelderman*,
  566 F.2d 1307 (5th Cir. 1978) ...............................................................24

*Norris v. Grosvenor Mktg. Ltd.*,
  803 F.2d 1281 (2d Cir. 1986) ................................................................18

*O'Brien v. R.J. O'Brien & Assocs., Inc.*,
  998 F.2d 1394 (7th Cir. 1993) ...............................................................16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
  107 Cal.App.4th 516 (2003) ...................................................................11

*Picture Music, Inc. v. Bourne, Inc.*,
  457 F.2d 1213 (2d Cir. 1972) ................................................................23

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995) ....................................................................24

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
  77 F.3d 309 (9th Cir. 1996) .....................................................................7

*Sanborn v. Fed. Crop Ins. Corp.*,
  93 Cal.App.2d 59 (1949) ........................................................................16

*Siegel v. Nat'l Periodical Publ'ns*,
  508 F.2d 909 (2d Cir. 1974) ........................................................ 17, 18, 19

*Stephan v. Maloof*,
  274 Cal.App.2d 843 (1969) ......................................................................7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
  640 F.3d 1034 (9th Cir. 2011) ........................................................ *passim*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
  429 F.3d 869 (9th Cir. 2005) ........................................................ 20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney*,
  881 F.2d 772 (9th Cir. 1989) ....................................................................9

iii

**EXHIBIT 18**
**313**

**Statutes**

17 U.S.C § 204(a) ........................................................................................6

37 C.F.R. § 201.10(e)(1)-(2)......................................................................24

Cal. Civ. Code § 1624 ...............................................................................6

**Rules**

Fed. R. Evid. 1002 .....................................................................................27

iv

**EXHIBIT 18**
**314**

# INTRODUCTION

This case should have ended long before it began.  The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute.  Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer.  Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C."  RER-13.  DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter.  Even now, Larson tells the Court:  "the parties thought they had arrived at terms" in October 2001.  LOR-14.

And indeed they had arrived at terms.  The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties.  Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form.  As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay.  DC would receive peace with Larson and certainty in its Superman rights.  The deal went bad

1

**EXHIBIT 18**
**315**

only when—and only because—Hollywood businessman Marc Toberoff entered the picture, seeking to reopen the dispute and obtain the Superman rights himself.

But Toberoff's theory for escaping the 2001 deal is unavailing. Under Toberoff's guidance, Larson asserts that, although all parties said they reached agreement on October 19, they were mistaken about essential terms. Her only evidence is an October 26 letter sent by DC's negotiator, John Schulman—which Larson says differs materially from the October 19 letter. She is incorrect, and neither she nor Marks took this position at the time. Every essential term in Schulman's letter is identical in substance to those in Marks' letter. Any difference either involves a non-essential term or is one of semantics. If any material difference does exist, DC has long agreed: the October 19 letter controls.

DC also owns the large majority of Superman copyrights addressed in the 2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire rules. Those rules and deals Larson's father made with DC control here, assuming the Court reaches these issues. Each of the disputed Superman works was created by Siegel or other DC artists that DC employed, directed, and paid to create them.

DC's deals with the Siegels should be honored, and "[a]t some point, litigation must come to an end. That point [is] now…." *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011). Judgment should be entered in DC's favor, and the 2001 settlement agreement should be enforced.

2

**EXHIBIT 18**
**316**

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer. SER-105, 434. Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent. SER-107-08, 456-61. A contract was formed on October 19; its terms stated in Marks' letter. While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal. And none reflects a disagreement on a material term.

### A. Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute. SER-434. By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one. SER-105-08, 434-35. The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16. SER-105-07, 434-35. DC made an offer on that final point and all other material terms. *Id.* On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed." SER-107-08. Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet. SER-456-61.

3

EXHIBIT 18
317

Marks' October 19 call and letter sealed the deal. The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61. The letter unequivocally accepted DC's offer. SER-456 ("The Siegel Family… has accepted D.C. Comics offer of October 16, 2001…."). The acceptance was signed by Larson's agent, "the party against whom enforcement is sought." *Levin*, 780 F.2d at 787. A binding agreement was formed. *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter. Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer." LOR-14-17. But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer. SER-110, 435. That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor. Larson does not dispute this Court may enter judgment for DC. DCB-28. At a minimum, the issue must be remanded for trial. *Id*. at 34. For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

4

**EXHIBIT 18**
**318**

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter. SER-463-70. Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf. LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor. First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute. Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term. *Infra* at 10-14. Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement. If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer. No additional writing or signature was required. *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

5

**EXHIBIT 18**
**319**

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL. CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and subscribed by the party to be charged *or by the party's agent*") (emphasis added); DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be "signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson concedes Marks was her agent, RER-9, and his letter clearly expresses her "acceptance" to "transfer all of [her] rights in … 'Superman,'" SER-456, 458. "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated for two years, and resolved their last deal point on October 16. SER-456, 463-64. Larson suggests the October 16 deal was so hastily made that within days Marks and Schulman could not remember its terms; exchanged conflicting term sheets; and then let those conflicts fester. LOR-16-17. This account is unsupported. The parties stopped negotiating in October because they had a deal, and Marks *never* objected to Schulman's letter or called it a counter-offer. DC undertook the separate task of preparing a long-form, SER-435, and began performing on the

6

**EXHIBIT 18**
**320**

2001 deal, reserving amounts due.  These are all acts of parties who had a deal.[2]

## B.    Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it "was subject to documentation and would need to be reduced to a mutually-acceptable written contract."  LOR-26.  But (i) Marks' October 19 letter contains no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v. Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St. Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express reservation* to make a contract unenforceable for lack of later documentation, *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of intent not binding because it expressly stated it was "of no binding effect on any party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998) (draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may need to say this to mislead Larson about the deal he induced her to abandon—but the *record fact* remains that a reserve was set; it totals more than $20 million, SER-397-99; and the funds will be paid to Larson if this Court enforces the 2001 agreement.  Larson gets all of this money, though Marks may have a claim to 5%; only Toberoff loses his improperly obtained 40% (or more) cut.  DCB-16-19.

7

**EXHIBIT 18**
**321**

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By _____
>
> Kevin S. Marks

8

EXHIBIT 18
322

Marks never reserves Larson's rights pending a final agreement. That is especially clear when read in conjunction with the first paragraph of Marks' letter, which contain an unambiguous "acceptance" by Larson on defined "terms":

Dear John:

> This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an agreement had already been reached—nothing in it constitutes a "clear reservation" either. Just the opposite: it expressly confirms "the deal we've agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting together the contemplated long-form. And there is no reservation, clear or otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

9

**EXHIBIT 18**
**323**

### E.  Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate.  The court held the Announcements were not subject to termination—and Larson does not challenge this ruling.  LOR-71 n.14.  The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy.  SER-44-45.  Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it.  DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing.  LOR-72.  Not so.  DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day."  LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002.  *See* DCB-82-83 (collecting cases).  And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial.  In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements.  DCB-84; Docket Nos. 30-1, 36-1.

**EXHIBIT 18**
**324**

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or, at the least, reverse and remand on that defense and DC's limitations defense for trial. If the Court finds it has jurisdiction on the copyright issues presented, and it finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: June 19, 2012

28

EXHIBIT 18
325

ORAL ARGUMENT - 11/5/2012

Appeal Nos. 11-56863, 11-56034

CERTIFIED COPY

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON,
Plaintiff, Counterclaim-Defendant, Appellant,
and Cross Appellee,

v.

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
Defendants, Counterclaimants, Appellees,
and Cross-Appellants.

———————————

ON APPEAL FROM THE UNITIED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————————

ORAL ARGUMENT

HEARD BEFORE NINTH CIRCUIT PANEL:

REINHARDT, THOMAS, SEDWICK

NOVEMBER 5, 2012

TRANSCRIBED BY:  MELANIE M. FAULCONER

CSR NO. 6420

EXHIBIT 19
326

ORAL ARGUMENT - 11/5/2012

```
 1                   PASADENA, CALIFORNIA

 2                   NOVEMBER 5, 2012

 3

 4                        ---0---

 5

 6      MARC TOBEROFF, ESQ.:  May it please the Court.  Good

 7   morning, your Honors.  My name is Marc Toberoff and I

 8   represent the Plaintiff, Laura Siegel Larson.

 9           I'd like to reserve 10 minutes of my 20 minutes

10   for rebuttal, if I may.

11           The Copyright Act's termination provisions were

12   designed to remedy the tremendous imbalance of power

13   between author/creators and media companies and to give

14   an author and an author's family an opportunity after a

15   very long waiting period to participate in the increased

16   market value of their works by finally recovering their

17   copyrights for the extended renewal term.

18           This case has become emblematic of the kind of

19   war of attrition an author's family must endure before

20   vindicating those rights.

21           I'm going to first turn to Warner Bros.'s

22   alleged settlement agreement defense.

23           Warner Bros.'s defense is based on a false

24   contract -- construct that it can artificially limit the

25   legal analysis to a single October 19th letter from the
```

EXHIBIT 19
327

ORAL ARGUMENT - 11/5/2012

Page 3

```
 1    Siegels' attorney and call that a contract, regardless
 2    of the differing the terms in Warner Bros.'s October
 3    26th counteroffer and vastly different terms in Warner
 4    Bros.'s February 1st counteroffer, which were part and
 5    parcel of the exact same contract negotiation.
 6           The cases Warner Bros. relies on are in the
 7    opposite, particularly the Facebook case.
 8           In the Facebook case, unlike here, you had a
 9    binding contract signed by the parties.  That contract
10    also contained a stipulation saying that it would be
11    binding and enforceable in a court of law.  So the
12    question before the Ninth Circuit was whether the terms
13    of that contract were sufficiently definite to be
14    enforceable.  And of course this Court, since it
15    basically called for the payment of fixed amounts of
16    cash and stock, found that it was enforceable.
17           None of that exists here.  After the
18    termination --
19    JUDGE REINHARDT:  Are you saying there was no
20    contract or that the contract, if it existed, was not --
21    not a contract that could be enforced?
22    MARC TOBEROFF, ESQ.:  There was no contract signed
23    by the parties.
24    JUDGE REINHARDT:  No.  I said -- that's your first
25    contention, that there's no contract.
```

**EXHIBIT 19**

**328**

ORAL ARGUMENT - 11/5/2012

```
 1              Is it your second contention or is that the

 2      issue, whether there was a contract?

 3          MARC TOBEROFF, ESQ.:  In this case --

 4          JUDGE REINHARDT:  Yes.

 5          MARC TOBEROFF, ESQ.:  -- the issue is whether

 6      there's a binding contract.

 7          JUDGE REINHARDT:  Okay.

 8          MARC TOBEROFF, ESQ.:  So here after the effective

 9      date of the settlement -- of the Siegels' termination in

10      April of 1999, on again/off again settlement discussions

11      ensued.

12              And on October 9th, John Schulman on behalf of

13      Warner Bros., their general counsel, and Kevin Marks on

14      behalf of the Siegels held a telephone conference.

15              On October 16th, Marks sends over a letter

16      purporting to set forth the terms that were discussed on

17      October 16th.

18              On October 19th in his letter, he's -- he's

19      going over the terms, but it's an equivocal letter

20      because at the end he says, "John, if I got anything

21      wrong, please let me know."

22          JUDGE THOMAS:  Why do you say that's equivocal?

23          MARC TOBEROFF, ESQ.:  Because it shows at the very

24      beginning it's indefinite because he's unsure of --

25          JUDGE THOMAS:  No.  That's using typical language.
```

**EXHIBIT 19**
**329**

```
 1    It makes -- "this is what I see."

 2         I mean, the response to it, if they -- if they

 3    had written back and said, "No.  You're right," you'd

 4    have to agree that there's a contract; right?

 5    MARC TOBEROFF, ESQ.:  That could be the case.

 6    JUDGE REINHARDT:  What could be the case?

 7    MARC TOBEROFF, ESQ.:  Well, you said --

 8    JUDGE REINHARDT:  "This is absolutely right.  This

 9    is the contract we agreed to," isn't -- wouldn't that be

10    enough?

11    MARC TOBEROFF, ESQ.:  It's further along than the

12    facts here, but what happened here isn't --

13    JUDGE REINHARDT:  That I know, but that wasn't the

14    question.

15    MARC TOBEROFF, ESQ.:  Okay.

16    JUDGE REINHARDT:  All right.  So this could be the

17    contract if the parties agreed to it?

18    MARC TOBEROFF, ESQ.:  That's correct, if the party

19    agreed to material terms, you could have a contract.

20    JUDGE REINHARDT:  Yeah.

21         So you don't think that it's proper for a

22    lawyer who says, "This is the contract we agreed to.  If

23    you have any question about it" --

24    MARC TOBEROFF, ESQ.:  I don't think it's --

25    JUDGE REINHARDT:  -- "tell me"?
```

```
 1        MARC TOBEROFF, ESQ.:  -- improper at all, but I
 2     don't think that forms --
 3        JUDGE REINHARDT:  But, I mean, that shows
 4     uncertainty?
 5        MARC TOBEROFF, ESQ.:  It's not an unequivocal
 6     acceptance of terms, but -- but even that --
 7        JUDGE REINHARDT:  No.  It's a statement of the
 8     terms.
 9        MARC TOBEROFF, ESQ.:  It's a statement of what he
10     perceived the terms as discussed on October 16th.
11           On October 26th, Schulman writes back while
12     he -- Marks then goes off to China.  On October 26th,
13     Schulman writes back and in effect says, "You got it
14     wrong.  Enclosed is a more fulsome outline of what we
15     believe the terms of the deal are."
16           That constitutes a counteroffer because the
17     terms outlined in the October 26th letter from Schulman
18     materially differ from the terms in the October 19th
19     letter from Marks.
20           A counteroffer in the State of California
21     extinguishes Marks' offer.  Marks' offer itself is a
22     counteroffer because he purports to accept an offer on
23     October 16th that Schulman then tells him was never
24     made.  You could stop right there --
25        JUDGE THOMAS:  He didn't say that.  He said that's
```

EXHIBIT 19
331

ORAL ARGUMENT - 11/5/2012

Page 7

```
 1    "a more fulsome outline."

 2           I mean, we have a -- there are sort of two

 3    issues.  One is, did the parties ever agree to the

 4    terms?  And -- and, two, were the terms embodied in the

 5    first letter and-- and should a court enforce that?

 6           And we've had -- there are cases that go a

 7    little bit all over the map on that, but, I mean, there

 8    are a lot of cases in which you say, "All right.  We

 9    know you added some terms, but this is the agreement the

10    Court is going to enforce," and it's the simple

11    agreement as to terms.

12           So what -- what tells you that they're making a

13    true counteroffer as opposed to adding a bunch of

14    conditions that a court could later say, "Well, we're

15    not going to put those in because obviously the parties

16    didn't agree to them"?

17    MARC TOBEROFF, ESQ.:  Well, there's no agreement by

18    Warner Bros. as to the terms set forth in his letter.

19    In fact, there's disagreement.  There's disagreement as

20    to the properties that are being assigned.  There's

21    disagreement as to the essential term of compensation,

22    which you're dealing with a -- you're not dealing here

23    with a payment of cash and stock.  You're dealing with a

24    complex royalty system applicable to multiple media

25    where you're dealing with Marks that says, "We will not
```

EXHIBIT 19
332

1    indemnify Warner Bros.  We'll only warrant -- we haven't

2    sold these rights to someone else," and Warner Bros.

3    adding six or seven warranties with indemnifications

4    attached.

5        JUDGE REINHARDT:  Well, both sides agreed that they

6    had agreed to a contract.

7        MARC TOBEROFF, ESQ.:  No.  Both sides perceived that

8    they had a deal in principle.  And the cases have said

9    that a deal in principle does not make a binding

10   contract.

11       What happens is in his October 26th

12   counteroffer Schulman doesn't stop there but he makes

13   reference and incorporates by reference a February 1st

14   draft that then comes in and widens the gap between the

15   parties even further.

16       On -- on May 9th, Joanne Siegel reacts to the

17   new and different terms that are being added by Warner

18   Bros. and -- and rejects those terms and says, "There

19   will -- there is no agreement."

20       And on May 26th -- she wrote a letter to the

21   CEO of Time Warner, Dick Parsons.  On May 26th, 2002

22   Dick Parsons writes back and acknowledges that they had

23   no agreement.  He says, "We hope the parties can arrive

24   at an agreement."

25       From that point on, from October 19th of 2001

EXHIBIT 19
333

ORAL ARGUMENT - 11/5/2012

Page 9

```
 1    until we filed suit in -- in October of 2004, Warner
 2    Bros. not once said that, "We have an agreement and we
 3    accept the terms in the October 19th letter."  They were
 4    totally silent for three years about that.
 5         They come up with this concocted defense when
 6    we filed suit to enforce the termination rights.  Under
 7    cop- --
 8    JUDGE THOMAS:  You've described a lot of factual
 9    considerations.
10         Why -- why isn't this a matter for trial as
11    opposed to summary judgment?
12    MARC TOBEROFF, ESQ.:  Because contract formation is
13    based on the objective manifestations of the parties'
14    intent.  And here you have that objective manifestation
15    in the form of three or four undisputed documents: the
16    October 19th offer or counteroffer, the October 26th
17    counteroffer, the February 26th counteroffer, the May
18    9th rejection, and the May 26th letter in response
19    acknowledging that there's no agreement.
20         Warner has not come up with anything that
21    creates a genuine issue of material fact.
22         It -- the Court not only was allowed to rule on
23    summary judgment, it was required to rule on summary
24    judgment.
25    JUDGE THOMAS:  Why do you say that, "required"?
```

EXHIBIT 19

334

ORAL ARGUMENT - 11/5/2012

1        MARC TOBEROFF, ESQ.:  Because -- because based on --

2    based on this undisputed objective manifestation of the

3    parties' intent there, was no meeting of the minds on

4    the material terms.  The Court rightly said, "I can

5    point to no document that contains the parties'

6    agreement."

7        Warner Bros. -- a negotiation is a give and

8    take.  You can't take an offer -- you can't go back

9    freeze in time and take an offer that a party made, a

10   proposal that you eviscerated by the counteroffer,

11   continued to grind the other side in negotiations, and

12   when that fails, reach back and try and resuscitate a

13   offer that has been extinguished by a counteroffer.

14       JUDGE REINHARDT:  Well, an agreement was reached,

15   according to your client's lawyer -- right? -- and he

16   advised the other side on August 9th that, "I must

17   caution.  I believe an agreement was reached last

18   October, albeit subject to documentation."

19       So the issue was whether the documentation

20   reflected the agreement.

21       MARC TOBEROFF, ESQ.:  The contract fell apart, as

22   many contract negotiations, in the attempt to focus on

23   the details of the agreement.

24       JUDGE REINHARDT:  There was an agreement and then

25   there was a dispute over the details, the documentation

EXHIBIT 19
335

ORAL ARGUMENT - 11/5/2012

```
 1    of it.

 2        MARC TOBEROFF, ESQ.:  No.  There was a deal in

 3    principle.  But that deal in principle, for instance,

 4    involved a 6 percent royalty.  That 6 percent royalty

 5    had all sorts of sliding scale reductions.  There were

 6    exclusions as to revenues to -- to which that royalty

 7    would apply, would not apply.  You had very important

 8    issues (unintelligible) studio agreements.  You have a

 9    series of warranties that have indemnifications attached

10    to them, and if someone is found that you've breached

11    that warranty, they withhold the money on the royalty.

12        JUDGE THOMAS:  No.  I understand that.

13        MARC TOBEROFF, ESQ.:  The question is not whether

14    that's an unusual term.  The question is whether it

15    had -- it was contained in the October 19th letter.  And

16    here he's saying, "There will be no indemnification from

17    the Siegels."

18            So the question is, does that become a material

19    term of the agreement?

20            And it certainly is a material term.  The fact

21    you have such indemnities customarily in agreements I

22    would submit is not the issue.

23            The question is, did they agree to it on

24    October 19th?  And they didn't.

25            Did Warner Bros. make that the condition of an
```

**EXHIBIT 19**
**336**

ORAL ARGUMENT - 11/5/2012

Page 12

```
 1    agreement?  Yes, they did.

 2          And if-- and if these -- you know, people say

 3    "a deal is a deal" precisely when they don't have a

 4    binding contract.

 5          If these terms were not material to Warner

 6    Bros., then why did they insist upon them?

 7          If a deal is a deal, then why did they go --

 8    why didn't they just accept the October 19th recitation

 9    of the terms and why did they continue to grind the

10    Siegels in the October 26th outline and in their

11    horrendous contract?

12          If you -- the same attorney, Marks, who sent

13    that attorney-client communication, which ordinarily

14    would have been privileged but for the fact it was

15    stolen from my law offices, the same attorney that wrote

16    that testified at length at deposition why, although he

17    thought there was a deal, there was no binding contract,

18    and he goes term by term by term in sworn testimony

19    comparing the huge gaps between the parties that had

20    developed.

21          You can't form a contract for the parties.  The

22    contract -- the parties have to form a contract

23    themselves.  Nor can you go back and -- and arrest the

24    legal analysis.

25          JUDGE REINHARDT:  I don't understand what that
```

**EXHIBIT 19**

**337**

ORAL ARGUMENT - 11/5/2012

1    means.

2          You can't form a contract between the parties

3    if you're their representative?

4    MARC TOBEROFF, ESQ.:  No.  A court cannot write a

5    contract for the parties when the parties themselves

6    cannot agree upon the terms.

7    JUDGE THOMAS:  No.  The only question is whether

8    they had an agreement in the earlier deal -- that's the

9    question -- and whether then there was a counteroffer

10   made later?  I mean, those are -- those are the two

11   questions.

12         I mean, if they had -- we have all sorts of

13   cases where you -- it happens all the time in

14   mediation.  Parties agree on principle.  They draft up a

15   set of principal points, and then they go draft

16   documents, and then another fight erupts and they say,

17   "Well, we can't agree on this."  It might be

18   indemnity.  It might be something else.  And then the

19   Court says, "All right.  I'm going to enforce the

20   initial agreement that you made, period."

21         Isn't that the question here?

22   MARC TOBEROFF, ESQ.:  No.  Here you don't even have

23   the first point.

24   JUDGE REINHARDT:  Well, that's --

25   MARC TOBEROFF, ESQ.:  Unlike --

**EXHIBIT 19**
**338**

1        JUDGE THOMAS:  That's why --

2        MARC TOBEROFF, ESQ.:  Unlike in the Facebook case

3   where you have a signed document signed by the parties

4   agreeing to certain terms that are definite and

5   enforceable, you don't even have that here.

6            And the reason we know you don't have that here

7   is because rather than accept -- in your hypothetical

8   you say they would accept the October 19th terms.  They

9   did the opposite.  They didn't accept them.

10        JUDGE THOMAS:  Well, they purported to by saying,

11  "Here's a more fulsome."

12           Now, you -- you would say -- you say that's

13  artifice and they were actually counter- --

14        MARC TOBEROFF, ESQ.:  Of course.

15        JUDGE THOMAS:  -- counterclaiming.

16        MARC TOBEROFF, ESQ.:  In the Valente -- in the

17  Valente-Kritzer case this Court held that congratulatory

18  words as to --

19        JUDGE THOMAS:  Yeah.

20        MARC TOBEROFF, ESQ.:  -- finally arriving at a deal

21  or in our case a monumental accord are meaningless.

22           What you look to is the objective manifestation

23  and you don't have an agreement where you don't have a

24  mutual meeting of the minds on the material terms of an

25  agreement.

**EXHIBIT 19**

**339**

ORAL ARGUMENT - 11/5/2012

1           And here the objective evidence proves that.

2   And that's why in summary judgment the Court was

3   required to find there was no agreement.  And there is

4   nothing that they put forward that raised a genuine

5   issue of fact as to contract formation.

6           I'd like to reserve the remainder for rebuttal.

7       JUDGE REINHARDT:  Thank you.

8       MARC TOBEROFF, ESQ.:  Thanks.

9       DANIEL M. PETROCELLI, ESQ.:  May it please the

10  Court.  Daniel Petrocelli with my colleagues Cassandra

11  Seto and Matt Kline for the DC Comics parties.

12          Turning initially to the issue of the

13  settlement agreement, it's our fundamental position that

14  this was not a matter appropriate for summary judgment

15  and that the Court should have allowed this to go to

16  trial on the lynchpin factual issues of whether or not

17  the parties reached an agreement, and if so, to what?

18          And our position in the Court below and in this

19  appeal was that the parties did reach an agreement with

20  the acceptance letter that the plaintiff's lawyer sent

21  to DC Comics on October 19, 2001 at SER 456.

22          This is a detailed recitation of terms written

23  in powerful legal language of acceptance which says, "We

24  hereby -- the Siegel family has accepted DC Comics'

25  offer," and then it goes on to say, "The terms are as

EXHIBIT 19

340

1    follows," and this was the culmination of two-and-a-half

2    years of back and forth negotiations, and the record

3    before the District Court was that this letter was

4    written following a phone call between the two principal

5    negotiators where they resolved the last deal point, and

6    the testimony of Mr. Marks, the plaintiff's

7    representative was, "We are closed.  We will send you

8    the document."  Mr. Schulman responded, "Great.  We'll

9    start working on a long form."

10         This document is then sent, and a week later

11   Mr. Schulman responds, and, very importantly, this

12   document is sent by one of the most experienced lawyers

13   in one of the most experienced law firms in the country

14   dealing with entertainment contracts.  This lawyer who

15   knows and probably has written thousands of times a

16   reservation of rights that this document is not binding

17   until and unless a long form or a more formal document

18   is executed says no such thing in this letter.

19        JUDGE REINHARDT:  Now, are you talking about

20   Mr. Schulman's letter?

21        DANIEL M. PETROCELLI, ESQ.:  No.  I'm talking about

22   the acceptance letter, the document that constitutes the

23   contract.  That's the letter of October 19, 2001.

24        JUDGE REINHARDT:  All right.  And then you said -- I

25   thought you said that the reply --

EXHIBIT 19
341

```
1        DANIEL M. PETROCELLI, ESQ.:  Okay.

2        JUDGE REINHARDT:  -- was written by Schulman.

3        DANIEL M. PETROCELLI, ESQ.:  I may have misspoken.

4             But in this document following the conversation

5    with the DC representative, there's no indication in

6    here that the parties do not intend to be bound until

7    some future event.  There's no reservation, and the

8    testimony in the record is, "We are closed."

9             Then a week later, Mr. Schulman, the recipient

10   of Mr. Marks' letter and the other negotiator, responds

11   to it, and he states -- and I won't characterize it as a

12   counteroffer because I think that's begging the issue.

13   He states, "I've received it.  I've reviewed it.  I

14   enclose herewith for you and Bruce a more fulsome

15   outline of what we believe the deal we've agreed to is.

16   We're working on the draft agreement so that by the time

17   you have accomplished something of truly momentous

18   import, we will have this super matter transaction in

19   document form."  And then he goes on and flushes out in

20   more detail the same terms that appear in the October 19

21   letter and adds some things here and there to be sure,

22   like an indemnity or he flushes out a detail on some of

23   these royalty provisions.  These are essentially

24   immaterial variations and differences that are the

25   normal part of a process of commencing a long -- a long
```

1    form document.

2         Now, the error, the fundamental error of

3    analysis here both by the District Court and by

4    Mr. Toberoff is -- is the fact that this process is

5    going on, that there's now an effort to create a long

6    form is dispositive of the -- of conclusion that

7    there is no contract.

8         And that's what the District Court ruled.

9    Simply because the parties after the contract was formed

10   in the -- in the unambiguous acceptance letter, just

11   because of that, the fact that they now endeavor to do a

12   long form, the judge concluded as a matter of law there

13   can be no agreement.

14        And that's just wrong.

15        There are scores of cases.  This is an

16   extremely familiar situation where parties believe

17   they've reached a deal.  They have a confirmatory letter

18   or document.  They go off to prepare the long document.

19   Something happens, things breakdown, and one side then

20   says, "We don't have a deal."

21   JUDGE REINHARDT:  Was there any affidavit or

22   information introduced in the District Court as to the

23   custom and practice in the industry of reaching an

24   agreement, proceeding with it and then having the

25   documents prepared?

1        DANIEL M. PETROCELLI, ESQ.:  There was no custom and

2    practice evidence in the record, but to be sure, that

3    would be highly relevant on the issue.

4        Mr. Schulman had a direct declaration in the

5    record saying that Mr. Larson's (sic) letter accurately

6    reflected all the terms of the deal and that he wasn't

7    intending to change anything and he was just flushing

8    out the detail.

9        Now the proof is in the pudding.

10       In response to this letter of October 26, which

11   the plaintiffs want to suggest is some material

12   departure, they even go so far as to say this is a

13   counteroffer.  In response to Mr. Schulman's letter,

14   Mr. Marks never objects.  He never reaches out and says,

15   "Wait a second.  You got a problem.  That's not what

16   we've agreed to."

17       JUDGE REINHARDT:  Tell me why, if that's correct, is

18   this matter for trial rather than summary judgment for

19   you?

20       DANIEL M. PETROCELLI, ESQ.:  Well, we did not move

21   for summary judgment in the Court below.

22       JUDGE REINHARDT:  You're not asking for that here?

23       DANIEL M. PETROCELLI, ESQ.:  Well, we think the

24   record evidence that there is an agreement is so strong

25   that we do think it can support a judgment in our favor,

EXHIBIT 19
344

```
 1    but we -- at the very minimum we believe that we're

 2    entitled to a trial.

 3           The judge just departed wildly from the summary

 4    judgment standard.  He drew all that adverse inference

 5    against us.  He -- he did not understand that the

 6    question of whether or not the long form process does or

 7    does not negate a prior agreement is a factual

 8    question.

 9           Your Honor dealt with that issue, if I may, in

10    the -- you had a case with Judge Pregerson on -- it was

11    the Best Interior -- the Best Interiors case, the same

12    situation.  The plaintiff was a labor union and they --

13    and they sued this company, and they had an agreement,

14    they had a handshake agreement, and then they went on to

15    do a long form, and things broke down, and the judge

16    concluded there was no deal as a matter of law, and this

17    Court reversed that and this Court said that the

18    question of the intent to contract is a fact issue.  The

19    question of whether the subsequent events undid the

20    prior agreement or didn't undo the prior agreement,

21    that's a fact question.

22    JUDGE THOMAS:  So are there undisputed facts or

23    not?

24           I mean, I -- I'm not sure I -- I understand

25    your answer because Judge Reinhardt was asking you, "Is
```

EXHIBIT 19
345

```
 1    there sufficient evidence to -- for summary judgment in

 2    your favor?"  And -- and you said, "Well, yes, there are

 3    fact issues," so I'm --

 4         DANIEL M. PETROCELLI, ESQ.:  There are -- there

 5    are --

 6         JUDGE THOMAS:  Tell me aside from the documents

 7    themselves what genuine issues of material fact you

 8    would raise.

 9         DANIEL M. PETROCELLI, ESQ.:  The ques- -- the

10    threshold question of whether the parties intended to be

11    bound and by this letter, by this -- by this acceptance

12    letter or whether they intended not to be bound at that

13    time but only upon such time as they agreed to a long

14    form.  We say that they intended to be bound at this

15    time.

16         But that question and all the events that

17    happened, that's evidence that's relevant to the

18    threshold issue of whether or not there was a deal in

19    the first place.  It is not dispositive that there was

20    no deal.

21         And so that's the -- that's the fundamental

22    factual issue.

23         There's a second factual issue, I suppose, and

24    that's what -- what terms the parties agreed to.

25         Well, we -- our position is it's everything in
```

EXHIBIT 19
346

1    this letter, nothing more.  To the extent that

2    Mr. Schulman's letter is perceived to have added terms

3    or suggested new terms, they're not part of the deal.

4    It's that simple.

5        JUDGE THOMAS:  Why isn't that a matter of law that

6    you can decide on the basis of the documents

7    themselves?

8        DANIEL M. PETROCELLI, ESQ.:  You can decide as a

9    matter of law that if the parties reached the contract

10   as of October 19, everything thereafter doesn't matter.

11          What can't be decided as a matter of law is

12   that the parties did not reach an agreement.  That

13   cannot possibly be resolved against us with this record

14   of direct admissions by the plaintiffs that there was an

15   agreement, not only in the acceptance letter, not only

16   in the no response to Mr. Schulman's letter, thereby

17   indicating there was nothing significant or new or

18   different about it, but --

19       JUDGE REINHARDT:  Well, the second one was even more

20   fulsome than the first, I guess.

21       DANIEL M. PETROCELLI, ESQ.:  Excuse me?

22       JUDGE REINHARDT:  The second one was more fulsome

23   than the first.

24       DANIEL M. PETROCELLI, ESQ.:  The second one to be

25   sure was 50 pages of boilerplate, yes, but --

EXHIBIT 19
347

ORAL ARGUMENT - 11/5/2012

1      JUDGE THOMAS:  Well, except -- except perhaps as to

2   royalty rate.

3      DANIEL M. PETROCELLI, ESQ.:  Excuse me?

4      JUDGE THOMAS:  Except perhaps as to royalty rate.

5      DANIEL M. PETROCELLI, ESQ.:  Well, under royalty

6   rate, if you really read the letter between Mr. Schulman

7   and Mr. Marks, they're -- they're flushing out very

8   precise little details about when the royalty rate gets

9   reduced, if multiple characterizes are involved, if it's

10   a cameo appearance, if it's a special project.  I mean,

11   this is why sometimes documents take 50 pages or more.

12          But that's not a material term, the absence of

13   which would negate a contract, and if it were, that

14   itself is a question of fact.  And case after case say

15   the -- the importance to which the parties attach to

16   particular terms is a fact question.

17          There was a question to Mr. Toberoff earlier I

18   think by Judge Reinhardt about whether this document,

19   this -- this contract, this acceptance letter of October

20   19 has sufficient material terms to constitute a

21   contract.

22          It does.  It easily passes the test.  I mean,

23   the threshold, as the Facebook case illustrates, is very

24   low: price, term.  So there's no question that this

25   document contains sufficient terms that a court could

EXHIBIT 19
348

ORAL ARGUMENT - 11/5/2012

Page 24

1    never look at this document and conclude as a matter of

2    law that it's not sufficient to be a contract.

3          Whether there are new and additional terms that

4    the parties wanted and whether that somehow gets added

5    on here or doesn't get on, that's a fact question that

6    takes testimony about the significance to which parties

7    attach to -- to the point, did they discuss it in their

8    negotiations, did they not discuss it, did they forget

9    to put in something, did they not forget, and that's the

10   subject of testimony.

11         Counsel has conflated this idea of the

12   objective hearing of contracts, which to be sure is how

13   the issue is decided, with the rules of evidence about

14   what kind of testimony is admitted in order to prove up

15   intent.

16         All kinds of testimony is admitted, including

17   custom and practice, including parties' state of mind as

18   to why they did certain things, why they said certain

19   things.

20         So at bottom we think that this case never

21   should have been thrown out, and importantly this has

22   the potential to dispose of this entire dispute.

23         Under this agreement, which took three years to

24   negotiate, the plaintiffs would receive an immediate

25   payment of $20 million, plus substantial future

**EXHIBIT 19**
**349**

1    consideration for the duration of the copyright term,

2    which is 2033, plus medical benefits for their family

3    and all kinds of other benefits.

4            On the other hand, DC gets the transfer of the

5    copyright interests that were recaptured by the Siegel

6    family.  So they -- they transfer the copyright

7    interests, and they get a lot of money.

8        JUDGE REINHARDT:  Well, that's not -- that's

9    not -- no need to try to persuade us it's a good deal

10   for them.  If they think it's a good deal --

11       DANIEL M. PETROCELLI, ESQ.:  Well --

12       JUDGE REINHARDT:  -- for them, they wouldn't be

13   here.

14       DANIEL M. PETROCELLI, ESQ.:  Well, that's correct,

15   your Honor, because they believed they had a better deal

16   when someone came along and offered them more, and --

17   and they then repudiated this agreement.

18           And one final comment.

19           This question about what we did and did not do

20   afterwards, that's a very incomplete recitation that was

21   received, but all of that is simply more relevant

22   evidence on the question of whether the parties at the

23   inception when they made their deal intended to be bound

24   or not.  That's just evidence of subsequent conduct of

25   the parties.  Whether it bears on the contract formation

EXHIBIT 19
350

1    or not is a relevance issue that's up to the trial judge

2    here.

3        JUDGE SEDWICK:  Let me ask you this question.

4            We had read your papers to suggest you were

5    seeking summary judgment, but assuming that you're

6    either now only seeking a remand for trial or that we

7    should independently decide that that's the most you

8    could get, do you think that this Court needs to decide

9    any of the other issues if we remand this case for trial

10   and whether there was an agreement?

11       DANIEL M. PETROCELLI, ESQ.:  I believe that since

12   this is potentially dispositive, it does not have to

13   because if this contract is proven and this contract is

14   enforced, that ends once and for all this dispute.

15   Every issue that is before your Honors and these very

16   large amount of briefs would all -- would all resolve.

17   That's why it took three years to do.  This wasn't some

18   initial offer.

19       JUDGE REINHARDT:  You may not be the one to answer

20   this question, but just out of curiosity, would it

21   resolve the prior case also?

22       DANIEL M. PETROCELLI, ESQ.:  Well, it would have a

23   significant impact at least on the damages in the prior

24   case and my view is it would go a long way to resolving

25   that one as well, at least insofar as the Siegel side is

EXHIBIT 19
351

1    concerned.

2         I don't know if I have any time left.

3         JUDGE REINHARDT:  You have five minutes.

4         DANIEL M. PETROCELLI, ESQ.:  I would like to turn to

5    one other legal issue that's on a totally separate

6    subject, if your Honors don't have any additional

7    questions on this topic, and that has to do with a

8    decision, purely legal decision that the District Court

9    below made.

10        And what the Court decided was that this very

11   first Superman comic book, which is called "Action

12   Comics Number 1," SER 714, the District Court decided

13   that since this was largely created by Mr. Siegel and

14   Mr. Shuster long before DC came into the picture, "this"

15   being the character Superman in black and white

16   sketches, that he awarded the copyrights in the various

17   elements in this action comics book entirely to the

18   Siegels and the Shusters.

19        The error -- we -- we said to the judge, "We

20   don't challenge that in the main, except for this.  We,"

21   DC, "back in 1938 came up with the idea of making a

22   comic book.  Siegel and Shuster had drawn sketches of

23   Superman for newspaper strips in black and white.  We

24   want to create a comic book.  We want to put it in

25   color.  And we then retained them to do so."

EXHIBIT 19
352

ORAL ARGUMENT - 11/5/2012

Page 28

```
 1            It is undisputed that certain elements of this
 2    were done by DC in concert with Shuster and Siegel but
 3    with other employees and artists.  So we asked the Court
 4    to declare certain parts of this -- certain parts of
 5    this owned by DC, either as a work for hire or as a
 6    joint work or other theories of ownership.
 7            The Court said he was -- the Court concluded it
 8    was precluded from doing so because of a decision back
 9    in the seventies in the Second Circuit by DC's
10    predecessor and Siegel and Shuster called the National
11    case, and the Court believed that the National case was
12    res judicata and/or collateral estoppel and prevented DC
13    from litigating the issue of whether it had ownership
14    interest and admittedly part of the contributions that
15    it made to Action Comics 1.
16            And I only wanted to address the Court's ruling
17    on collateral estoppel.  But it was clearly wrong for
18    the following reason, and this is a purely legal issue.
19            The National case back in the seventies was a
20    lawsuit about who owned the renewal copyright in Action
21    Comics 1, and this was before the new termination
22    legislation came about, the second 28-year renewal
23    term.
24            DC contended that it owned the renewal term for
25    two separate and independent reasons.
```

EXHIBIT 19
353

ORAL ARGUMENT - 11/5/2012

1         One, the Siegel and Shuster parties transferred

2     full ownership of their Superman elements way back when

3     when they first met with DC and documented March 1.  So

4     they said, "We own it by contract."

5         Second, secondly DC said -- actually it was

6     National, its predecessor, but I'll just call it "DC."

7     DC said, "We own it because it was work for hire and we

8     were the author of it, and so we own the renewal

9     rights."  So they said, "We own the renewal right for

10    those reasons."

11        The District Court agreed on both counts, and

12    it went up to the Second Circuit.

13        The Second Circuit affirmed on the ground that

14    the conveyance of rights back in 1938 from Siegel and

15    Shuster to Na- -- to DC included the conveyance of the

16    rights to the renewal term, and so the decision below

17    was correct and it was affirmed.

18        The Second Circuit then went on to say,

19    however, that the ruling about work for hire was

20    incorrect, and it made some references to the fact that

21    Superman had been developed before DC came along, so how

22    could the entirety of Action Comics 1 be a work for

23    hire?

24        It's that language that the judge in this case,

25    the District Court, felt was binding on him.

EXHIBIT 19
354

```
 1              We pointed out below and pointed out in our

 2   papers, as a matter of law that cannot be res judicata

 3   or collateral estoppel because that was an adverse

 4   determination made in favor of a prevailing party and it

 5   was not necessary to the decision and it was dictum.

 6   We, for example, never could have appealed that

 7   decision.  We won, National did.  It never could have

 8   appealed solely for the purpose of addressing the

 9   alternative statement by the Court of Appeal that was

10   adverse to -- to National.

11              And case after case make this clear, including

12   the Fireman's Fund case in the Ninth Circuit, the --

13        JUDGE REINHARDT:  All right.  We're running out of

14   time.  Let me just ask you.

15              Is this -- is this issue resolved if you win on

16   the summary judgment question?

17        DANIEL M. PETROCELLI, ESQ.:  Yes.  Everything goes

18   away on the summary judgment, everything, your Honor.

19   It's -- it's the end of this case once and for all.

20        JUDGE REINHARDT:  All right.  Thank you very much.

21        DANIEL M. PETROCELLI, ESQ.:  Thank you very much,

22   your Honors.

23        MARC TOBEROFF, ESQ.:  Your Honors, Warner Bros.

24   cannot point to any place in 2001 where they accepted

25   the terms set forth in the October 19th, 2001 letter
```

EXHIBIT 19
355

1    from Marks.

2            I don't know how one can find that a contract

3    exists without mutual agreement of both sides.

4            Instead of agreement from Warner Bros. we have

5    disagreement as reflected in the October 26th letter and

6    as reflected in Warner Bros.'s agreements.

7            It's -- it's insane to say this is purely a

8    question of formal documentation of an agreement of the

9    parties when there is --

10   JUDGE REINHARDT:  The problem -- and maybe you can

11   comment on this, Mr. Toberoff.  The problem is that the

12   October 26th letter doesn't reject the October 19th

13   letter.  It says, "a more ful- -- I'm enclosing a

14   fulsome outline of what we believe the deal we've agreed

15   to is."

16           Now, the argument on the other side is that

17   that says, "We've agreed to a deal but we're giving you

18   a more expansive outline of what that deal is."

19           Now, what's the answer to that?

20   MARC TOBEROFF, ESQ.:  The answer to that is whether

21   or not there's a contract is not based on verbiage such

22   as "a more fulsome outline."  It's based on the

23   comparison of the terms.  And anything less than an

24   unequivocal acceptance of an offer is a counteroffer

25   extinguishing that offer.  It's been that way forever in

EXHIBIT 19
356

1   California and it's still that way in California.   So

2   regardless of how you --

3      JUDGE REINHARDT:   Well, take -- take the example of

4   a movie distribution deal or a movie production deal

5   where the parties make -- they agree to the deal.   They

6   then start with the movie.   Finally in the middle of the

7   movie they get down to reducing everything to writing

8   and there's a disagreement but both parties agree that

9   "we have a deal."

10         Now, is that not an agreement without the

11   written exposition of it?

12      MARC TOBEROFF, ESQ.:   It depends on the terms of the

13   agreement.   Here -- here -- and there have been cases

14   about that where one side has argued, "In California and

15   Hollywood we do lunch.   We don't do contracts," and

16   they've rejected those arguments when it came down to

17   specific contract formation issues like this.

18         They cannot point to an acceptance of the terms

19   of the October 19th letter.   And instead we have --

20      JUDGE THOMAS:   Well, it depends on who is the

21   offerer and who is the-- who is the accepting party.

22         What-- what the October 19th letter says, "This

23   is to confirm our telephone conversation," it goes on to

24   say, "which we accept the DC Comics' offer of October

25   16th."

EXHIBIT 19
357

ORAL ARGUMENT - 11/5/2012

1           So if there's a legitimate offer on the 16th

2      and accepted on the 19th, does it really matter what

3      happened after that?

4           MARC TOBEROFF, ESQ.:  Yes, it does because on --

5           JUDGE THOMAS:  I mean, if there's a contract

6      formation as of this and it's reflected in the letter of

7      the 19th, then -- then there's a deal.

8           MARC TOBEROFF, ESQ.:  But this is an ongoing

9      negotiation that continues into 2002.

10          JUDGE THOMAS:  No.  I understand that.

11          MARC TOBEROFF, ESQ.:  And that's acknowledged by all

12     the parties.  So you can't artificially limit the

13     analysis to an oral communication on October 16th and a

14     written communication on October 19th.

15          JUDGE THOMAS:  I'm just saying, to my mind at least,

16     I haven't come to rest on it, but it certainly suggests

17     that it's a more complicated situation, and therefore

18     there's a -- probably a genuine issue of material fact.

19          MARC TOBEROFF, ESQ.:  I -- I can see none.  And I

20     can tell you why.  Because when he refers to the October

21     16th conferen- -- teleconference and -- and asks, "Do

22     you agree that these are the terms?" because that's what

23     he says, he says, "If I got anything wrong, let me

24     know," he's essentially asking, "Do you agree, Warner

25     Bros., that these are the terms?" and all they would

EXHIBIT 19
358

ORAL ARGUMENT - 11/5/2012

Page 34

```
 1    have to have done is said, "Yes," then you would have a
 2    different situation.
 3              And that's not the situation that exists here,
 4    and the objective evidence shows that -- the undisputed
 5    evidence shows that it's not the situation that exists
 6    here.
 7              What it shows is that Warner Bros. said,
 8    "That's not what I believe" --
 9         JUDGE THOMAS:  They didn't say that.
10         MARC TOBEROFF, ESQ.:  Yes, they did.
11         JUDGE THOMAS:  They said, "Here's -- here's a --
12    here's a larger outline."
13              Now today they say, "Well, that's essentially
14    the same terms."  And you can say, "Well, it's not the
15    same terms."
16              And, you know, obviously they didn't agree --
17    the parties did not agree on indemnity, period.  There's
18    no agreement on indemnity.
19              But the question for the Court is not
20    necessarily whether there was -- whether -- the question
21    is whether there was a contract formed before that.
22         MARC TOBEROFF, ESQ.:  Exactly.  This isn't -- well,
23    there's not a contract formed before that if when he
24    says, "This is the terms that we believe were
25    discussed," he doesn't just say, "more fulsome outline,"
```

**EXHIBIT 19**

**359**

ORAL ARGUMENT - 11/5/2012

Page 35

1    he says, "a more fulsome outline of what we believe the

2    terms are."  They then send over a contract and reserve

3    the right of Warner Bros. to -- to -- to revise the

4    terms, and they acknowledge that the Siegels can also

5    revise the terms.  It's not just a matter of these

6    indemnity provisions.

7            I would refer the Court --

8        JUDGE THOMAS:  No.  I understand that.  I just used

9    that as an example.

10           I mean, it often happens where you have a deal

11   reached, a deal letter like this, and then the parties

12   add terms, and they say, "Well, that's not part of our

13   deal," and then they may agree or disagree on subsequent

14   terms, but that doesn't alter the original agreement or

15   the fact that it's been made.

16       MARC TOBEROFF, ESQ.:  The problem is you have no

17   acceptance to those original terms.  The hypothetical

18   doesn't apply here.

19       JUDGE THOMAS:  Unless you say that this -- the --

20   the letter of the 19th accepts an offer of the 16th.

21       MARC TOBEROFF, ESQ.:  And -- and we have a letter

22   from October 26th saying that wasn't the offer, "This is

23   what we believe the deals are."

24           Now, I want to draw the Court's attention to a

25   chart in our reply brief below which impressed the

**EXHIBIT 19**

**360**

ORAL ARGUMENT -- 11/5/2012

Page 36

```
 1    District Court who dealt with this in tremendous
 2    detail.  It's in our reply excerpts at Pages 140 to 149
 3    where we outline the material differences.
 4              Warner acknowledges that the properties being
 5    assigned is an essential term using -- using words from
 6    the -- from the Facebook case.
 7              Well, the properties in the Marks' memo are
 8    limited to three properties: Superman, Superboy and
 9    Spectre.
10              The properties in Schulman's memo and then in
11    the February 1st agreement concern Superman, Superboy,
12    related properties and anything created for DC, whether
13    published or unpublished, by Siegel.  So there's an
14    expansion of what is even being assigned.
15              Secondly, the royalties.  You have a very
16    complex royalty situation here.  It's not like in
17    Facebook with a fixed amount of money and a fixed amount
18    of stock.  You have a 6 percent royalty which was
19    reducible to 3 percent, which is then reducible to 1 1/2
20    percent to 1 percent as an absolute floor.
21              Warner Bros. drills all sorts of holes in that
22    floor rendering them illusory and -- and having
23    situations where they would receive no money whatsoever
24    for the exploitation of Superman.
25              These are material contract terms.  You can't
```

EXHIBIT 19
361

ORAL ARGUMENT - 11/5/2012

Page 37

1    ignore them.  They change the -- the -- the dance

2    between offer and counteroffer.  And that's the way

3    contract formation is analyzed in the State of

4    California.

5            Warner Bros. has a situation where if Superman

6    appears in a -- in another character's contract

7    published by DC, like Green Arrow, for weeks Superman is

8    appearing but the name is not in the title of the comic

9    book, under -- under Schulman's scenario, you would

10   receive a -- excuse me -- under Marks' scenario, you

11   would receive a royalty.  Under Warner Bros.'s scenario,

12   you receive no royalty.

13           It comes as no surprise that all of the changes

14   made by Warner Bros., which they now say are boilerplate

15   and not material, were all decidedly in Warner Bros.'s

16   favor and affect the key terms of the agreement: the

17   scope of the properties, the royalties and

18   compensation.

19           The -- the warranties and indemnifications is

20   not a small matter because what happens with the studios

21   when you enter in a contract and you have substantial

22   contingent compensation and there's any claim by a third

23   party or anything happens which they can claim triggers

24   a warranty, they will withhold your -- they will

25   withhold your royalty payments.

EXHIBIT 19
362

ORAL ARGUMENT - 11/5/2012

Page 38

```
 1              There are credit provisions where Marks says,
 2      "We want credit in paid ads," because that's very
 3      important to his clients and he testifies that to
 4      effect.
 5              Warner Bros.'s October 26th outline and their
 6      long form says, "No credit in paid ads."  Warner Bros.
 7      requires an elderly Joanne Siegel who is in her late
 8      eighties to go on publicity tours promoting Superman.
 9      None of this exists.  There's --
10          JUDGE REINHARDT:  Well, that doesn't sound like
11      (unintelligible) form.  As David's (sic) saying, "These
12      are the sort of -- the kind of things we put in our
13      contracts."
14              And, you know, that clause isn't drawn for her
15      individual -- you know, because they're concerned about
16      her.  That's a boilerplate provision.
17          MARC TOBEROFF, ESQ.:  Well, it's not boilerplate to
18      say that the Siegels have to indemnify Warner Bros. for
19      a claim for her ex-husband.
20          JUDGE REINHARDT:  No, no.  I'm talking about that
21      Joanne -- that Joanne Siegel has to go on a tour.  You
22      know, those are the kinds of things that have to be
23      worked out after there's a contract.
24          MARC TOBEROFF, ESQ.:  Well, but the royalty
25      provisions and the scope of the properties assigned go
```

EXHIBIT 19

363

ORAL ARGUMENT 11/5/2012

Page 39

```
 1    to the heart of this.  And under Section 204(a) of the

 2    Copyright Act when you have an assignment of a

 3    copyright, it has to be in writing signed by the

 4    assignee.

 5           Marks' letter does not assign any trans- -- any

 6    copyrights.  It says, "We will.  We anticipate signing

 7    those contracts."

 8           Nobody in this exchange viewed the October 19th

 9    letter outlining deal terms or the October 26th letter

10    outlining different deal terms as a binding, enforceable

11    contract.  Everybody understood that considering the

12    magnitude of these rights and the complexity of the

13    agreement that was being discussed that you would have a

14    final written agreement signed by both parties.

15    JUDGE THOMAS:  So how do we -- how do we determine

16    that as a matter of summary judgment, that everybody

17    understood?

18    MARC TOBEROFF, ESQ.:  Because -- because --

19    JUDGE THOMAS:  No.  I mean, you can't -- you can't

20    do that without -- without extrinsic evidence of the

21    parties.

22           And you well may be right.  I'm just saying.

23    But if you can't do it on the basis of the documents

24    alone.  If you have to rely on what you say is that

25    everybody understood, then that's extrinsic evidence
```

EXHIBIT 19
364

1    that requires a resolution by a fact-finder.

2       MARC TOBEROFF, ESQ.:  I respectfully disagree, your

3    Honor.  If you look at the October 26th Warner Bros.

4    communication, it specifically refers, "We will have

5    this matter drafted in contract form and we will send it

6    to you."  So right there you know --

7       JUDGE THOMAS:  Well, that's what happens in all

8    cases.  You don't have a -- you always have --

9       MARC TOBEROFF, ESQ.:  But that's not extrinsic

10   evidence.  That's objective evidence saying that --

11   showing that the parties anticipated that the form of

12   agreement would be a written agreement signed by both

13   parties.  And that's what's required by the Copyright

14   Act.  That never happened.  And then they send it over

15   and they reserve the right to --

16      JUDGE THOMAS:  I don't mean to quarrel with you.

17   I'm just -- you know, we're working through these --

18   these cases.

19          But what often happens when you have a

20   situation like this is the Court will say, "If you have

21   enough for specific enforcement of the terms to which

22   you agreed," and therefore you execute the unnecessary

23   assignments and so forth.

24          The fact that they weren't all executed I don't

25   think is dispositive.  /

EXHIBIT 19
365

```
1              Now, you may well be right on it.  I'm just
2    saying that it's a more complicated issue than --
3    MARC TOBEROFF, ESQ.:  Your Honor, I believe if you
4    peel back the veneer of comments like "a deal is a deal"
5    and look at the actual facts of this case carefully, you
6    will see that under every single principle in California
7    law about contract formation this fails as a matter of
8    law and you can make that determination on this
9    objective exchange of undisputed documents.  The parties
10   absolute -- in the State of Calif- --
11   JUDGE REINHARDT:  I think we've explored this
12   fully.  And you're seven minutes are over, so --
13             I mean, you know, these are not simple issues,
14   and I don't mean that the answer may not be simple, but
15   the case, as you say, you know, we're going to -- to the
16   extent that we haven't sufficiently read them, we'll
17   certainly explore them all, and, you know, we understand
18   the arguments of both side, and they're legitimate
19   arguments, so --
20   MARC TOBEROFF, ESQ.:  I'd just like to read to you
21   from a memo that you pointed out, Marks' memo, which by
22   the way is an extra-record document that should be made
23   part of this record, but I'd like to read to you what
24   Marks actually says in that memo.
25             He says, "I believe a deal will be finalized
```

EXHIBIT 19
366

ORAL ARGUMENT - 11/5/2012

Page 42

1   with DC Comics, even if this process is not entirely

2   smooth -- smooth.  If the parties cannot reach final

3   agreement, then the negotiations would be terminated."

4   That's what he says in an attorney-client communication

5   that they're saying proves there was a binding

6   contract.

7        JUDGE REINHARDT:  Okay.  Thank you.

8        MARC TOBEROFF, ESQ.:  Thank you, your Honor.

9        JUDGE REINHARDT:  The case just argued will be

10   submitted.

11                        ---0---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 19
367

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

January 29, 2013

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

<u>**VIA E-MAIL**</u>

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

Re:     <u>**October 19, 2001 Settlement Agreement Payment**</u>

Dear Marc:

In view of the Ninth Circuit's January 10th decision "that the October 19, 2001, letter created an agreement," DC Comics is prepared to tender payment under that Agreement. In that regard, we ask you to confirm that your clients are now prepared to perform under the Agreement pursuant to its terms.

The Agreement provides that DC Comics shall make payment directly to four parties: Joanne Siegel (47.5%), Laura Siegel Larson (23.75%), Michael Siegel (23.75%) and Gang, Tyre, Ramer & Brown (5%). However, as Joanne Siegel and Michael Siegel are deceased, it appears that payments of their respective shares should be made directly to their respective estate's representatives. We understand that Laura Siegel Larson is the Personal Representative of the Estate of Joanne Siegel and that Melvin Banchek is the Fiduciary of the Estate of Michael Siegel.

The Agreement also provides that DC Comics is to reimburse Laura Siegel Larson for costs of medical and dental insurance for her and her sons (for so long as they were minors) incurred since November 2000. Please have Ms. Larson provide us with appropriate documentation so that these amounts can be reimbursed.

Finally, Paragraph C.9 of the Agreement provides the opportunity for the Siegel Family to be informed about, and provide input regarding, major Superman developments. If Ms. Larson is interested in exercising this opportunity with respect to the forthcoming motion picture *Man of Steel*, please so advise and I will have Diane Nelson of DC Entertainment make appropriate arrangements.

**EXHIBIT 20**
**368**

O'MELVENY & MYERS LLP
January 29, 2013, Page 2


        The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved.


                                        Very truly yours,

                                        /s/ Daniel M. Petrocelli

                                        Daniel M. Petrocelli
                                        of O'MELVENY & MYERS LLP

cc:     Melvin Banchek
        Gerald Berk
        Donald Bulson
        Richard Kendall
        Arthur Levine
        John Pettker
        Bruce Ramer
        Gary Ruttenberg
        George Zadorozny


**EXHIBIT 20**
**369**

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

February 9, 2013

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     <u>*Larson v. Warner Bros. Entertainment Inc., et al.*</u>, Case No. 10-CV-08400 ODW (RZx)

Dear Dan:

I write on behalf of plaintiff Laura Siegel Larson, in response to your January 29, 2013 letter. Therein, defendant DC Comics purports to offer to tender performance pursuant to an October 19, 2001 letter.

As a preliminary matter, while the Ninth Circuit held that the October 19, 2001 letter constituted an acceptance sufficient to create a contract on that date, it decidedly did not order the district court to enter judgment in DC's favor. Instead, the Ninth Circuit expressly remanded and directed the district court to adjudicate "DC's third and fourth counterclaims" regarding the October 19, 2001 letter. DC's contract counterclaims and Ms. Larson's defenses to those counterclaims will need to be litigated, pursuant to the same legal standards and procedures applicable to any such claims and defenses.

DC's prodding the district court to hastily "enter judgment" in DC's favor with no regard for well-worn legal standards, such as those governing summary judgment and trial of material issues of fact, is transparent and improper.

DC's purported and belated "tender" of performance under the October 19, 2001 letter is facially incomplete and illusory. Among other deficiencies, and reserving all of Ms. Larson's rights and defenses, are the following:

1.      While DC offers to tender "payment," it does not specify the amount. Under the terms of the October 19, 2001 letter, DC would have been obligated to pay fixed compensation of at least $8.5 million over the past decade, commencing with $3.5 million on March 31, 2002. DC would also have been obligated to render annual accountings commencing on March 31, 2002 of the

**EXHIBIT 21**
**370**

**TOBEROFF & ASSOCIATES, P.C.**

February 9, 2013
Re:      *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:   2 of 2

amounts due in cash and the contingent back-end participation set forth in the October 19, 2001 term sheet.

In addition, because the October 19, 2001 letter deems all but $1 million of the above cash payment as *an advance* against Ms. Larson's alleged contingent royalty set forth in the October 19, 2001 letter, DC's supposed "tender" of payment is meaningless and not susceptible to calculation without inclusion of detailed accounting statements computing the amount of Ms. Larson's alleged royalties thereunder.  As DC has repeatedly represented to the Court that it has kept a "reserve account" for the benefit of Ms. Larson pursuant to the October 19, 2001 letter and an ongoing accounting of monies it says are payable to Ms. Larson under the October 19, 2001 letter, DC could have readily provided this information but once again failed to do so.

Rendering DC's "tender" even more illusory, DC states in its January 29 letter that its supposed tender of payment is "without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved."  In short, DC vaguely offers to "tender" payment of an unspecified amount, but reserves the right to reduce that amount to a nullity.

DC's recently filed motions for summary judgment in *Larson v. Warner Bros. Entertainment Inc.* confirm that DC will seek to reduce or eliminate the monies it now pretends to "tender." C.D. Cal. Case No. 04-CV-08400 ODW (RZx), Dkt. 702 at 8 ("DC will seek its attorney's fees under the Copyright Act and its Fourth Claim in these cases….").

2.      Paragraph C.9 of the October 19, 2001 letter expressly states that DC will "provide the opportunity to be informed about major developments (*e.g.*, motion pictures, television programs …), and the Siegel Family will have an opportunity to give its input," and that the "Siegel Family will be informed of such [major] developments early enough in the development process so that their opportunity to give input is *meaningful*." (Emphasis added).  DC's offer of compliance regarding the forthcoming *Man of Steel* movie is thus illusory as well, as that film is slated for release on June 14, 2013, and it is our understanding that principal photography of that film has already been completed.

3.      DC's offer with respect to medical and dental insurance is incomplete, as it does not offer to reimburse the estate of Michael Siegel for his mental and dental insurance, from 2001 until his death in 2006.

4.      DC's tender of performance under the October 19, 2001 letter is further deficient in that it ignores other purported DC obligations in that letter, including the provision of credits "on Superman comics and other publications, movies and television programs," as set forth in Paragraphs C.3 and C.4, and "Full E&O and general liability" insurance coverage against liability for DC or its affiliates' actions, as set forth in Paragraph 14.

**EXHIBIT 21**

**TOBEROFF & ASSOCIATES, P.C.**

February 9, 2013
Re:    *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:  3 of 3

On a different note, DC's copying of its January 29 letter to virtually every attorney it is aware of who has ever been even tangentially connected with Ms. Larson or the Shuster estate is a blatantly improper attempt to indirectly communicate with our clients in violation of Cal. R. Prof. Conduct Rule 2-100, sow confusion, and interfere with our firm's attorney-client relationships.  It also gratuitously burdens Ms. Larson and the Shuster estate with unnecessary legal fees.

As DC well knows:  Mr. Kendall does not represent Ms. Larson, or any other party in the *Siegel* litigations; he represents me regarding DC's frivolous tort claims.  Mr. Levine handled the Siegel's notices of termination in 1997, but has had very limited involvement since then, and no involvement in this litigation which commenced in 2004.  Mr. Bulson ceased representing Michael Siegel upon his death in 2006, and is in the midst of a dispute with his estate, of which Ms. Larson is the sole beneficiary.  Mr. Zadorozny does not represent Ms. Larson in these litigations, and, as Ms. Larson testified at her 2012 deposition, he infrequently advises her on an *ad hoc* basis on tangential matters.  Finally, as DC also knows, Mr. Pettker has had no relationship with Ms. Larson at all – rather he is the attorney who probated Joseph Shuster's estate back in 2003.

Due to these improprieties, Ms. Larson has instructed me to remind DC and your firm of your obligation to direct all communications to my law firm, her chosen attorneys of record in these cases, and not to prior or present counsel who do not represent her in these litigations.

Nothing in this letter should be construed as a waiver or limitation of Ms. Larson's rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT 21**
**372**

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

February 12, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:   **October 19, 2001 Settlement Agreement Payment**

Dear Marc:

This responds to your letter of February 9, 2013.

In my letter of January 29, 2013, I advised you that DC Comics was prepared to tender payment under the October 19, 2001 Agreement ("Agreement") of "all amounts accrued through December 31, 2012." I then asked you to confirm that your client Laura Siegel Larson is now prepared to perform under the Agreement pursuant to its terms. Despite three pages of argument and rhetoric, your letter deliberately refused to provide the requested assurance that Ms. Larson is duly prepared to perform the Agreement. Therefore, DC reserves all its rights under the Agreement and the law, including the right to suspend its performance in view of your clients' continuing repudiation.

As to the remainder of your letter, DC's tender of performance under the Agreement was not deficient. DC was not required to reiterate every obligation under the Agreement. In addition to offering to pay "all amounts due," DC called out specific obligations requiring the active participation or cooperation of your clients. The credit obligations you mentioned, for example, do not require your clients' participation and as such were not specifically addressed. Nor does DC's reservation of rights undermine its tender of performance. If and when DC were to obtain an order for the payment of attorney's fees against your clients, then DC would have a right of offset, in addition to other relief.

Likewise without merit is your assertion that DC's tender regarding Paragraph C.9 of the Agreement is "illusory" because it comes too late. To date, your clients elected not to participate with DC and provide input based on their decision to wrongfully repudiate the

**EXHIBIT 22**
**373**

O'MELVENY & MYERS LLP
February 12, 2013, Page 2

Agreement.   This is a circumstance entirely of their own making, and one you and your clients are prolonging by continuing to repudiate the Agreement.

Also unfounded is your criticism of DC's tender because it did not offer to reimburse the estate of Michael Siegel for "mental [sic] and dental insurance, from 2001 until his death."  My letter was addressed to you in your capacity as Ms. Larson's counsel.   I do not understand that you are counsel to the Estate of Michael Siegel.  DC, of course, stands ready to reimburse those expenses under the Agreement if the Estate supplies the appropriate documentation.

The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

CC:    Melvin Banchek
       Gerald Berk
       Donald Bulson
       Richard Kendall
       Arthur Levine
       Bruce Ramer

**EXHIBIT 22**
**374**

1 DANIEL M. PETROCELLI (S.B. #097802)
 dpetrocelli@omm.com
2 MATTHEW T. KLINE (S.B. #211640)
 mkline@omm.com
3 CASSANDRA L. SETO (S.B. #246608)
 cseto@omm.com
4 O'MELVENY & MYERS LLP
 1999 Avenue of the Stars, 7th Floor
5 Los Angeles, CA 90067-6035
 Telephone: (310) 553-6700
6 Facsimile: (310) 246-6779

7 Attorneys for Plaintiff DC Comics

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11 DC COMICS,

12　　　　　　Plaintiff,

13　　　　v.

14 PACIFIC PICTURES
 CORPORATION, IP WORLDWIDE,
15 LLC, IPW, LLC, MARC TOBEROFF,
 an individual, MARK WARREN
16 PEARY, as personal representative of
 the ESTATE OF JOSEPH SHUSTER,
17 JEAN ADELE PEAVY, an individual,
 LAURA SIEGEL LARSON, an
18 individual and as personal
 representative of the ESTATE OF
19 JOANNE SIEGEL, and DOES 1-10,
 inclusive,
20
　　　　　　Defendants.
21

22

23

24

25

26

27

28

Case No. CV 10-3633 ODW (RZx)

**DC COMICS' STATEMENT OF
GENUINE ISSUES OF
MATERIAL FACT AND
RESPONSE TO DEFENDANTS'
CONCLUSIONS OF LAW IN
OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT ON DC'S
FOURTH, FIFTH AND SIXTH
CLAIMS**

Hon. Otis D. Wright II

**Hearing Date**:　　March 11, 2013
　　　　　　　　(*Hearing Vacated*)

**EXHIBIT 23**
**375**

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | LLC, and Emanuel, both in his individual capacity and as a representative for Endeavor. *See* Petrocelli Decl. ¶¶ 13-15, 21; DN 585 at 1-2, 6-14. |
| 22  | In 2003, Mr. Toberoff and Mr. Emanuel, on the Siegels' behalf, recommenced settlement negotiations with DC. <br><br> Defendants' Evidence: AD, Ex. L, Ex. T at 158:12-165:2, Ex. EE at 461-62 | **Disputed**, to the extent this disregards that, as the Ninth Circuit rightly held, the parties had already entered into a "binding" settlement agreement on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. <br><br> Moreover, to the extent Toberoff is disclosing legal advice he gave the Siegels, he has effected a subject-matter waiver concerning that advice and must immediately produce all communications—whether he claimed privilege over them before or not—on this subject matter. DN 205 at 14; FED. R. CIV. P. 502; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992); *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 23-25 (9th Cir. 1981); *U.S. v. Nobles*, 422 U.S. 225, 239 (1975); *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.'"); *Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 472 (N.D. Cal. 2012) (holding that where party "attempted to use [privilege] as both a shield and a |

- 26 -

**EXHIBIT 23**
**376**

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|----------------------------------------------|----------------|
| | | sword, that is, to reveal a limited aspect of privileged communications in order to gain a tactical advantage in litigation" that the party "has waived the attorney-client privilege and work product protection as to all … communications concerning" the same subject). Toberoff's knowing choice to inject this issue into this case, on an affirmative motion of his own, compels a finding of waiver. *Id.* |
| 23 | On October 8, 2004, Mr. Toberoff, as attorney for the Siegels, filed the *Siegel v. Warner Bros. Entertainment, Inc.* case (C.D. Cal. Case No. 04-CV-08400, ODW (RZx) ("*Siegel*")[,] which sought to validate the Siegel Termination, and to enforce the Siegels' copyright interests. <br> Defendants' Evidence: FAC ¶ 91 | **Undisputed**, although it disregards that the Ninth Circuit held that the parties entered into a binding settlement agreement on October 19, 2001, and, as of that date, the Siegels transferred whatever copyrights they purported to hold to DC. *Larson*, 2012 WL 6822241, at *1; Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |
| 24 | On February 17, 2005, DC counterclaimed in *Siegel*, that the October 19, 2001 letter constituted an enforceable contract. <br> Defendants' Evidence: AD, Ex. AA at 425-428 | **Undisputed**. The Ninth Circuit has held, "as a matter of law," that the parties did, in fact, enter into a "binding" settlement agreement on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. DC has filed a motion for summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims. Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

**EXHIBIT 23**
**377**

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| based solely on rights equivalent to those protected by the federal copyright laws," it is preempted. *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998). DC's state-law Sixth Claim merely reformulates DC's Third Claim (FAC ¶¶165-73) under the Copyright Act and is premised on the same alleged Copyright Act violation, which it incorporates by reference. The claim is therefore preempted. *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987); *Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987). | (Opp. 21-22). |
| (c).  DC's Sixth Claim is also largely barred by the applicable four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Unfair competition claims begin to run "on the date the cause of action accrued, not on the date of discovery." *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002). Insofar as it is based on the 2001 and 2003 PPC Agreements, which were cancelled in 2004, the claim is barred by the statute of limitations. | DC's Sixth Claim is not time-barred, for the reasons set forth in DC's opposition (Opp. 19-21). |

Respectfully submitted,

Dated:  February 15, 2013

By:  /s/ Daniel M. Petrocelli
      Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

OMM_US:71349970

- 64 -

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

* Also admitted in New York

February 27, 2013

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     *Siegel v. Warner Bros. Ent., Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx)

Dear Dan:

We disagree with the conclusions and characterizations in your letters of February 9, 2013.

What is the total dollar amount of the "payment," inclusive of royalties that DC Comics is purportedly "prepared to tender,"  under the October 19, 2001 letter, to all parties, including Laura Siegel Larson, and the estates of Joanne Siegel and Michael Siegel?

The forgoing is without prejudice to plaintiff's claims, defenses and remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT 24**
**379**

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

February 28, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:     **October 19, 2001 Settlement Agreement Payment**

Dear Marc:

This responds to your letter of February 27, 2013.

In my letters of January 29, 2013 and February 12, 2013, I advised you that DC Comics was prepared to tender payment under the October 19, 2001 agreement ("Agreement") of all amounts accrued through December 31, 2012, provided that Ms. Larson (for herself and on behalf of the estate of Joanne Siegel) was prepared to perform under the Agreement pursuant to its terms.  Although it has been a month since my first letter, you have not responded to my requests that you confirm Ms. Larson is prepared to do so.  As a result, DC may continue to suspend its performance in view of your clients' ongoing repudiation of the Agreement.

In the absence of your clients' repudiation, the total amount that DC Comics would be prepared to tender to all parties (Laura Siegel Larson, the estates of Joanne Siegel and Michael Siegel, and the Gang, Tyre law firm) under the Agreement, accrued through December 31, 2012, is $21,557,352.  As provided in paragraph C.10 of the Agreement, your clients have audit rights with respect to any payments made by DC.

To reiterate, DC remains prepared to tender all amounts owing under the Agreement.  Accordingly, please let us know by close of business tomorrow if Ms. Larson is prepared to perform under the Agreement.

Finally, while you reference "letters" I sent to you on February 9, 2013, I believe you are referring to your own letter to me of that date, which I responded to on February 12, 2013.

**EXHIBIT 25**
**380**

O'MELVENY & MYERS LLP
February 28, 2013, Page 2


            The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, any rights of offset that may arise, all of which are hereby reserved.

                                        Very truly yours,

                                        /s/ Daniel M. Petrocelli

                                        Daniel M. Petrocelli
                                        of O'MELVENY & MYERS LLP


CC:     Melvin Banchek
        Gerald Berk
        Donald Bulson
        Richard Kendall
        Arthur Levine
        Bruce Ramer

**EXHIBIT 25**
**381**