O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>        Plaintiff,<br><br>  v.<br><br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1–10,<br><br>        Defendants. | **\*Case No. 2:04-cv-08400-ODW(RZx)\***<br>Case No. 2:04-cv-08776-ODW(RZx)<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ORDERING FURTHER BRIEFING [04-cv-8400, ECF No. 702] [04-cv-8776, ECF No. 222]** |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br><br>        Plaintiff,<br><br>  v.<br><br>TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1–10,<br><br>        Defendants. | |

/ / /

/ / /

## I. INTRODUCTION

Defendants DC Comics; Warner Bros. Entertainment Inc.; Warner Communications, Inc.; Warner Bros. Television Production, Inc.; and Time Warner Inc. (collectively "DC") move for summary judgment in these consolidated Superman and Superboy cases following entry of the Ninth Circuit's February 4 Mandate. The Ninth Circuit has directed this Court to reconsider DC's third and fourth counterclaims in view of its holding that an October 19, 2001 letter from the legal representative of the heirs to Superman co-creator Joe Siegel to Warner Bros. (and by extension DC Comics) created an agreement between the parties. DC has effectively withdrawn its third counterclaim, and the Court **GRANTS** Defendants' Motion on its fourth counterclaim.

## II. FACTUAL BACKGROUND

In 2004, Joanne Siegel and Laura Siegel Larson,[1] the heirs to Superman co-creator Jerry Siegel, sued DC seeking a judicial declaration that the copyright termination notices the Siegels served on DC in 1997 effectively recaptured their copyright interests in Superman. DC counterclaimed that the parties had entered into a settlement agreement that the Siegels repudiated. Specifically, DC's third counterclaim alleges that the Siegels breached a written October 19, 2001 agreement drafted by the Siegels' then-legal representative, Kevin Marks. (Second Amended Counterclaims (SACC) ¶¶ 97–101.) This agreement memorialized an earlier October 16, 2001 telephone conversation between Marks and Warner Bros.'s then-general counsel, John Schulman, during which the parties negotiated the final points of a deal giving DC the continued rights to Superman in exchange for substantial financial consideration. (*See id.*)

///

---

[1] Joanne Siegel, Jerry Siegel's widow, has since passed away. As a result, Plaintiff Laura Siegel Larson remains the only Plaintiff in this matter, both in her individual capacity and as the personal representative of the estate of the late Joanne Siegel. For consistency with earlier rulings and the earlier facts of this case, Court will continue refer to Plaintiff as "the Siegels."

DC's fourth counterclaim, in turn, sought a declaration that, by the October 19, 2001 agreement, the Siegels had "transferred or [is] contractually obligated to transfer to DC Comics" any and all of their Superman rights. (*Id.* ¶¶ 102–05.)

On March 26, 2008, now-resigned Judge Steven G. Larson held on partial summary judgment "that the parties' settlement negotiations did not result in an enforceable agreement [on October 19, 2001,] resolving the issues before the Court." (ECF No. 293, at 62.) In so holding, Judge Larson considered the parties' 2001–2002 settlement negotiations and found that "[o]ne need only review the language of the parties' correspondence, their conduct in relation thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002[] draft to reach the conclusion that the parties failed to come to an agreement on all material terms." (ECF No. 293, at 61.) Judge Larson's holding effectively rejected DC's third and fourth counterclaims.

On November 5, 2012, the Ninth Circuit reversed Judge Larson's March 26, 2008 summary-judgment order, holding that the much-disputed October 19, 2001 letter from Marks to Schulman "constituted an acceptance of terms negotiated between the parties, and thus was sufficient to create a contract" as a matter of law. *Larson v. Warner Bros. Entmt., Inc.*, – F. App'x –, –, 2012 WL 6822241, at *1 (9th Cir. 2012). The court further explained that it

> reject[ed the Siegels'] arguments that either state or federal law precludes a finding that such a contract could have been created by the October 19, 2001, letter. California law permits parties to bind themselves to a contract, even when they anticipate that some material aspects of the deal will be papered later. This principle applies notwithstanding the lack of an express reference to an intended future agreement, so long as the terms of any contract that may have been formed are sufficiently definite that a court could enforce them (as is undoubtedly the case here). *Larson*, 2012 WL 6822241, at *1 (internal quotation marks, alterations, and citations omitted).

/ / /

1  The Ninth Circuit then directed this Court "to reconsider DC's third and fourth counterclaims in light of [its] holding that the October 19, 2001, letter created an agreement." *Id.* at *2.

DC brings the issue back before the Court on remand by way of its February 7, 2013 Motion for Summary Judgment. DC contends quite simply that the "Ninth Circuit's binding ruling compels judgment in DC's favor on its Fourth Counterclaim in both Siegel cases; renders DC's remaining counterclaims in the cases moot . . . ; and requires denial of [the Siegels'] claims in the cases." (Mot. i.) The Siegels, on the other hand, maintain that the Court's job isn't quite so simple, as the Court (or the factfinder, as the case may be) must now determine "[w]hat exactly the October 19, 2001 agreement meant, and whether and to what extent it is still enforceable given DC's subsequent conduct." (Opp'n 2.) While DC perhaps overstates the simplicity of the matter, it is nevertheless correct that the Ninth Circuit's ruling obliges the Court to grant its fourth counterclaim.

### III.  LEGAL STANDARD

On remand, this Court is bound by the Ninth Circuit's mandate. Fed. R. App. P. 41(c); *see also Ins. Grp. Comm. v. Denver & R.G.W.R.R.*, 329 U.S. 607, 612 (1947) ("When matters are decided by an appellate court, [the appellate court's] rulings, unless reversed by it or by a superior court, bind the lower court."). "[A] mandate is controlling as to all matters within its compass, while leaving any issue not expressly *or impliedly* disposed of on appeal available for consideration by the trial court on remand." *Odima v. Westin Tuscon Hotel*, 53 F.3d 1484, 1498 (9th Cir. 1995) (emphasis added) (quoting *Firth v. United States*, 554 F.2d 990, 993 (9th Cir. 1977)).

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

/ / /

/ / /

## IV. DISCUSSION

While DC insists the Court need only enter judgment in its favor to resolve this matter once and for all, the Siegels urge on remand that the Court must instead conduct further proceedings in light of the Ninth Circuit's holding to determine what the October 19 agreement means today. (Opp'n 7–8.) DC concedes that its third counterclaim for breach of the October 19, 2001 agreement "can be dismissed without prejudice, if DC prevails on its Fourth Counterclaim."[2] (Mot. 1.) The Court therefore looks first to DC's fourth counterclaim to determine the extent to which the Ninth Circuit's mandate leaves open additional questions for resolution by this Court. Because the Court finds that resolution of additional issues impacting the continued enforceability of the agreement remains necessary to resolve DC's fourth counterclaim, the Court proceeds to address and resolve those issues. The Court holds that the agreement remains enforceable and therefore does not reach DC's third counterclaim.[3]

### A. The Ninth Circuit's Mandate does not fully resolve DC's fourth counterclaim

The Court begins its analysis with the recognition that the Ninth Circuit's "holding that the October 19, 2001, letter created an agreement" does not dispense entirely with DC's fourth counterclaim—at least not immediately. Indeed, had the Circuit thought its ruling on the October 19, 2001 Letter disposed of DC's counterclaims, it would have said so.

DC's fourth counterclaim asks the Court to declare, based on a finding that the October 19 agreement remains binding and enforceable, that the Siegels either already

/ / /

---

[2] DC apparently intends to seek attorney's fees under the Copyright act and for its fourth counterclaim rather than pursuing damages for breach of contract under its third counterclaim. (Mot. 8.)

[3] As noted *supra* at 2, DC's third counterclaim alleges the Siegels' breach of the October 19, 2001 agreement. (Second Amended Counterclaims ¶¶ 97–101.)

have or now remain contractually obligated to transfer their rights in the Superman works to DC:

> An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement *is binding and enforceable* and, therefore, that: Plaintiffs/Counterclaim Defendants *either have transferred or are contractually obligated to transfer to DC Comics*, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works. . . . DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct. (Second Amended Counterclaims ¶¶ 103(a), 105 (emphasis added).)

The Ninth Circuit's holding didn't go quite so far as to fully settle this claim. The Ninth Circuit held only that "the October 19, 2001, letter *created an agreement*." Both this holding and the related finding that the October 19 letter created an agreement with terms sufficiently definite for a court to enforce necessarily imply only that the agreement was binding and enforceable *at the time of the agreement's creation*. But subsequent events may have affected the present enforceability of that contract, as by a material breach followed by an effective rescission of the deal. In order to pass on the present enforceability of the October 19 contract, the Court must therefore proceed to determine whether events after October 19, 2001, rendered the October 19 agreement subsequently unenforceable.

**B.    The October 19, 2001 agreement remains enforceable**

The Court is concerned here only with the present enforceability of the October 19 contract. The Siegels' breach and repudiation defenses do not affect the enforceability of the agreement, but rather constitute grounds for termination or a breach-of-contract action. *See, e.g.*, *Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 602 (1969) ("A breach does not terminate a contract as a matter of course but is a ground for termination at the option of the injured party.") Because no

party presently asserts a breach-of-contract claim, these defenses therefore are not properly before the Court. But the Siegels' rescission and abandonment defenses do inform the continued enforceability of the October 19 agreement, as the Siegels' rescission or DC's abandonment of that agreement could have discharged the agreement, thereby rendering it presently unenforceable. These defenses therefore merit consideration.

> 1. *The Siegels failed to rescind the October 19, 2001 agreement*

The Siegels contend that the October 19, 2001 agreement is no longer enforceable because that agreement was properly rescinded on May 9, 2002, and their rescission was subsequently confirmed on September 21, 2002.

Under California law, one party to a contract may rescind the contract if the other party refuses or fails to fully perform. Cal. Civ. Code § 1689(b)(2); *Loop Bldg. Co. v. De. Coo*, 97 Cal. App. 354, 364 (1929). To properly effect a rescission, the rescinding party must "give notice of rescission to the party as to whom he rescinds" and either restore or offer to restore "to the other party everything of value which he has received from him under the contract." Cal. Civ. Code § 1691. A section 1691 notice of rescission need not be formal and explicit; rather, "it is sufficient that notice shall be given to the other party which clearly shows the intention of the person rescinding to consider the contract at an end." *Hull v. Ray*, 211 Cal. 164, 167 (1930). Further, the requirement of a restoration of consideration is unnecessary where, as here, nothing of value was received by the plaintiff. *See* Cal. Civ. Code § 1691(b) (must restore "everything of value"); *Rosemead Co. v. Shipley Co.*, 207 Cal. 414, 421 (1929). Failure to comply with section 1691's rescission procedures bars judicial enforcement of rescissory relief. *Golem v. Fahey*, 191 Cal. App. 2d 474, 477 (1961) ("Since appellant failed to rescind upon learning of the mistake or within a reasonable time thereafter and failed to comply with any of the provisions of Civil Code, section 1691, he cannot now seek relief in this forum.").

/ / /

In response to Kevin Marks's October 19 letter to John Shulman "accept[ing] D.C. Comics [*sic*] offer of October 16, 2001," Shulman sent Marks a letter on October 26, 2001, enclosing what he believed was a "more fulsome outline" of the deal terms. (SUF 8; Adams Decl. Ex. 2.) On February 1, 2002, DC's outside counsel followed up with a draft long-form agreement. (SUF 18; Adams Decl. Ex. 3.)[4]

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, Chief Operating Officer of DC's parent, AOL Time Warner Inc., objecting to the February draft. The Siegels now contend that the following language in the May 2002 letter "properly invoked [their] right of rescission":

> We made painful concessions assured if we did we would arrive at an agreement. When we made these difficult concessions and reluctantly accepted John Shulman's last proposal [on October 19, 2001], we were stabbed in the back with a shocking contract.
> Your company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the [October 16] proposal. . . . (SUF 25; Adams Decl. Ex. 4.)
> After four years we have no deal and this [February 1] contract makes an agreement impossible. (SUF 25; Adams Decl. Ex. 4.)

Several months later, on September 21, 2002, the Siegels wrote to Marks to terminate him as their legal representative and reaffirm their intent, as the Siegels now contend, to "rescind" their contract with DC:

> As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February [1], 2002. We similarly reject your redraft of [that] document which you sent us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics . . . . (SUF 29; Adams Decl. Ex. 6.)

---

[4] These letters (and the new and materially different terms they allegedly contained) formed the basis of the Siegels and DC's dispute over whether Marks's October 19 letter had formed an agreement at all.

The Court finds as a matter of law that the May 9 and September 21, 2002, letters do not constitute proper notices of rescission under section 1691. First and foremost, neither letter even recognizes a contract at all, much less expresses the intent to rescind the contract. While a rescission notice does not have to be formal or explicit, basic logic suggests that one cannot "clearly indicate to the defaulting party that the injured party considers the contract to be terminated," *Whitney*, 273 Cal. App. 2d 594, 602, while simultaneously rejecting the very existence of the contract in the first place. Indeed, repudiation and rescission are distinct legal concepts that can yield very different legal rights and remedies.

Granted, the May 9 letter notes that the Siegels had "reluctantly accepted John Shulman's last proposal" on October 19, 2001. But any indication that this language recognized the existence of a contract on October 19 is undermined by the subsequent reference to DC's "unconscionable contract dated February [1]" and unambiguous statement that "[a]fter four years *we have no deal*." The clear objective intent of the May and September 2002 letters was thus to deny the existence of a contract altogether (or otherwise repudiate the continued existence of one due to a breakdown in negotiations), not to rescind it. And the Ninth Circuit's holding that a contract did in fact exist does not empower the Siegels now to retroactively convert that intent just because it turns out the facts were not what they believed at the time—especially when the unambiguous contents of those letters simply don't support the Siegels' newfound interpretation of the letters' meaning.

Even if the Court could concede that the May and September letters recognized the existence of a contract the Siegels clearly intended to rescind, the stated grounds on which the Siegels sought to rescind nevertheless do not warrant rescission as a matter of law. Both letters cite the Siegels' disdain for DC's February 1, 2002 long-form draft contract as the basis for the breakdown in negotiations (or for rescission of the contract, as they now contend on remand). But disputes over the terms of the long-form contract cannot invalidate or breach the underlying short-form agreement.

*Clark v. Fiedler*, 44 Cal. App. 2d 838, 847 (1941) (allowing draft long-form agreements to undermine the earlier agreement would improperly allow a party to escape a contract "by simply suggesting other and additional terms"); *see Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037–38 (9th Cir. 2011). And, "[o]f course, a mere notice purporting to rescind an agreement cannot have that effect unless the party giving such notice is entitled to rescind." *Brown v. Roberts*, 121 Cal. App. 654, 659 (1932).

The Court does acknowledge that a statement in the notice of certain grounds for rescission does not prevent the party from thereafter relying upon different and proper grounds. *Hull*, 211 Cal. at 167. The Siegels' Opposition to DC's Motion appears to do just that by arguing that DC had materially breached the October 19 agreement when it "failed to provide a royalty statement to the Siegels by March 31, 2001, as agreed in the October 19, 2001 Letter, and failed to pay or offer to pay the Siegels their royalties." (Opp'n 21; *see also id.* ("It is well-settled that a breach of the royalty provisions in a copyright contract can give rise to a right of rescission.").) But the Siegels' change of pace now is too little too late. As DC correctly notes, the Siegels have argued since the inception of this litigation only that no contract was formed with DC at all. Until now, they have not contended that DC breached the deal or that the Siegels rescinded it. Further, Federal Rule of Civil Procedure 8(d) permits parties to plead inconsistent defenses in the alternative, and the Siegels chose not to. "Allowing [the Siegels] to raise such defenses now—when DC was deprived discovery on them or the chance the litigate them before—would violate Rule 8, prejudice DC, and be an affront to the multiple courts that spent years adjudicating DC's settlement claim and Larson's defense that no deal was ever made." (Reply 6.)

In sum, the Court finds that the Siegels' May 9 and September 21, 2002 letters failed to effect a rescission under California Civil Code section 1691 because those letters do not clearly and objectively convey their intent to rescind an existing contract. The plain text of those letters manifestly conveyed the intent to *deny or*

1  *repudiate* the very existence of a contract; grafting the intent to *rescind* onto those
2  letters now—more than ten years after the fact—would be to entertain a fiction.

3         2.      *DC did not abandon the October 19, 2001 agreement or acquiesce to its
4                  rescission*

5        The Siegels also seek to destroy the current enforceability of the October 19
6  agreement on grounds that DC acquiesced in the Siegels' rescission or otherwise
7  abandoned the October 19 agreement. They contend that Parsons's May 21, 2002,
8  letter in response to their May 9 letter "did ***not*** argue that the Siegels were in breach or
9  had otherwise acted improperly, nor did DC claim any rights under the October 19,
10 2001 Letter." (Opp'n 22 (citing SUF 28, 33).) But nor did the May 21 letter
11 acquiesce to the Siegels' purported rescission (to the extent their May 9 letter could be
12 construed as such). In fact, Parsons's May 21 letter actually *supports* the notion that
13 an agreement existed on October 19 and would be followed by additional negotiations
14 regarding the long-form contract. Parsons notes, "As in all negotiations, . . . we
15 expected that you and your representatives would have comments and questions on
16 the draft, which comments and questions we would need to resolve." (Adams Decl.
17 Ex. 5.) And despite the Siegels' clear statement in their May 9 letter that "[a]fter four
18 years we have no deal and this [February 1] contract makes an agreement impossible,"
19 Parsons persists in the May 21 response with the "hope that this agreement can be
20 closed based upon the earlier discussions with your lawyers." *Id.* On its face, the
21 May 21 letter simply does not support DC's acquiescence in any purported rescission
22 by the Siegels.

23       As for the Siegels' contention that DC did nothing to enforce the October 19
24 agreement following receipt of their September 21 letter, this argument is belied by
25 the entire course of this litigation. As DC notes, "Over the past eight years, DC spent
26 *millions of dollars* litigating and enforcing the 2001 agreement." (Reply 10.) DC
27 even specifically counterclaimed for breach of the October 19 agreement on October
28 18, 2005, noting that it "always has been and remains ready, willing, and able to

11

perform all of its obligations under the Agreement." (First Amended Counterclaims (ECF No. 42) ¶ 99.)

Aside from the fact that the Siegels have waited nearly eight years to raise their abandonment and acquiescence defenses, those defenses are simply unsupported by the factual record and are insufficient to preclude the enforceability of the October 19 agreement. Further, the parties' arguments regarding breach and repudiation are not properly before this Court on DC Comics's fourth counterclaim for declaratory relief, as those arguments go to performance of the October 19 agreement, not the agreement's underlying enforceability today. Because the Court finds there was no rescission, acquiescence, or abandonment as a matter of law, the contract remains in existence and enforceable, and any claims for breach of that agreement are now appropriate in a separate state-law action for breach of contract.

## C. The October 19, 2001 agreement transferred the Siegels Superman rights to DC

Having found that the October 19, 2001 agreement remains enforceable, the Court must now determine and declare "the parties' rights and obligations." The pivotal dispute in this fray is whether the October 19 letter itself effected a transfer of the Siegels' Superman rights, or whether the actual transfer remains to be made. According to DC, "the Ninth Circuit also held that the [October 19] contract satisfied all the requirements for a valid copyright transfer under the Copyright Act." (Mot. 7.) The Siegels respond that the October 19 letter could not have transferred the Siegels' copyrights because the very terms of that agreement state that "[t]he Siegel Family *would* transfer all of its rights in the 'Superman' and 'Spectre properties (including 'Superboy').' (*See* Opp'n 1.) They further maintain that should the Court accept "that the term 'would' is ambiguous – as opposed to flatly contradicting DC's interpretation – summary judgment in DC's favor remains improper." (Opp'n 10.)

Viewed in a vacuum, the language of the October 19 agreement plainly supports the Siegels' contention that the agreement itself did *not* operate to transfer

12

the Siegels' Superman rights to DC Comics. The plain language of the agreement—"The Siegel Family *would* transfer all of its rights"—suggests that the transfer wasn't immediately operative. Rather, insofar as the October 19 letter was a valid contract, it appears to have created a contractual duty on the Siegels' part to transfer their rights and a contractual right on DC's part to receive those rights.

Nevertheless, a somewhat perplexing aspect of the Ninth Circuit's mandate cause the Court to question its reading of the October 19 agreement in this way. It appears instead that the Ninth Circuit implicitly found the October 19 agreement to constitute "an agreement transferring ownership of a copyright" under 17 U.S.C. § 204(a).

In their briefs before the Ninth Circuit, the Siegels argued that the October 19 letter could not have created an enforceable contract because "a written contract was required as a matter of law" under 17 U.S.C. § 204(a), and "Marks'[s] October 19 Letter could not possibly qualify as the required 'writing.'" (Kline Decl. Ex B, at 123–25.) Thus, the Siegels posited on appeal that "[t]he October 19 Letter is not 'a transfer' of the Siegels' copyrights to Warner; rather, it contemplates that the Siegels 'would [make such] transfer in a final executed agreement." (*Id.* at 125.) The Siegels' counsel made an identical argument at oral argument: "Marks' letter does not assign any trans— any copyrights. It says, 'We will. We anticipate signing those contracts.'" (Adams Decl. Ex. 19, at 364:5–7.)

Apparently in direct response to the Siegels' arguments, the Circuit explicitly found that § 204(a) was not "a bar to the validity of [the October 19] contract[, as] that statute expressly permits an agreement transferring ownership of a copyright to be signed by a 'duly authorized agent' of the copyright owner, and [the Siegels do] not contest that the heirs' attorney was such an agent." This Court reads this language to reflect the Ninth Circuit's view that the October 19 letter *was* a proper written transfer of copyright ownership under § 204(a) signed by the Siegels' duly authorized agent. Indeed, § 204(a) solely concerns the "transfer of copyright ownership, other than by

operation of law"; had the Ninth Circuit determined that the October 19 agreement did not itself operate as a presently operative transfer of the Siegels' Superman rights to DC, there would have been no need to raise § 204(a) at all. The Court therefore holds, in keeping with the Ninth Circuit's mandate, that the October 19, 2001 agreement operated to transfer the Siegels' Superman rights to DC as of the date of that agreement.

Finally, the Court notes that the determination whether the Siegels have already transferred their rights is of little consequence to the final resolution of this case considering the Court's holding that the agreement remains enforceable. The Court is bound by the Ninth Circuit's implied finding that the October 19 letter did in fact transfer copyright ownership under § 204(c). But to the extent one prefers this Court's reading of the agreement over the Ninth Circuit's presumed reading, the Siegels maintain that "[a] declaration that [the Siegels are] still obligated, under the October 19, 2001 Letter, to transfer her Superman rights to DC is procedurally flawed and does little to resolve this matter" because DC would have to seek specific performance to enforce that obligation. (Opp'n 12.) To this, the Court responds that its declaration that the October 19, 2001 agreement remains enforceable *does* conclude this matter, as DC seeks *only* declaratory relief. How DC would choose to proceed from here armed with a declaration that the contract remained enforceable but that the Siegels were still obligated to effect the transfer is beyond the purview of this Court.

In short, DC's fourth counterclaim seeks only declaratory—not affirmative—relief. The Court **GRANTS** DC's motion for summary judgment on DC's fourth counterclaim and holds that the October 19, 2001 agreement remains enforceable and operated itself to transfer the Siegels Superman rights to DC. This ends this Court's involvement in the parties' dispute (save for resolution of the Superboy and Superman Ad issue, as discussed below). That DC may have additional rights and duties

/ / /

flowing from the Court's declaration that the October 19 agreement does not prevent final termination of this case.

## D. The Court requires additional briefing on the issues of Superboy and Superman ads

What may preclude immediate closure of this chapter of the continuing Superman saga, however, is the lingering issue of what to do with Superboy and the early Superman ads.

Upon review of the parties' papers and the nearly insurmountable record in these cases, the Court has determined that it requires additional briefing on the effect of the October 19, 2001 agreement on the Superboy and early Superman ad works. The parties are therefore **ORDERED** to file supplemental briefs addressing how the Court's holding that the October 19 agreement remains binding and enforceable today affects the parties' respective rights to Superboy and the Superman ad works. The briefs should not exceed 15 pages in length and should devote particular attention to the relevant factual and procedural history with respect to these works, including the continued effect various earlier rulings by the Court have on these claims today. The briefs must also include a brief proposal for swift resolution of the Superboy and Superman ad issues should the Court find that the October 19 agreement does not extend to these works. The parties shall submit all documents on which they rely as exhibits. The parties' supplemental briefs are due no later than 5:00 p.m. on Thursday, March 28, 2013.

## V. CONCLUSION

Because there has, to date, been no unequivocal rescission or termination of the October 19, 2001 agreement (embodied in Kevin Marks' letter of the same date), that agreement remains binding and enforceable. As a result, the parties are bound by the terms memorialized in Marks's October 19 letter; nothing more. *See Facebook*, 640 F.3d at 1038. Whether and how that right has been affected by the parties' actions after October 19, 2001, is not now before the Court, as DC has voluntarily

1 dismissed its third counterclaim for breach of contract, and the Siegels do not assert any contract claims related to the October 19 agreement. Thus, to the extent that any party contends any delay in performance or other breach gives rise to any damages, such a claim is properly subject to a separate state-court action for breach of contract.

Because the Court finds that DC must prevail on its fourth counterclaim as a matter of law, the Court dismisses DC's third counterclaim as moot. The Court will enter judgment and close this case following resolution of the lingering Superboy and Superman Ad issues.

**IT IS SO ORDERED.**

March 20, 2013

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**