# EXHIBIT 16



1  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
2  James D. Weinberger (Admitted *pro hac vice*)
   Justin Deabler (Admitted *pro hac vice*)
3  866 United Nations Plaza
   New York, New York 10017
4  Telephone: (212) 813-5900
   Fax: (212) 813-5901
5
   PERKINS LAW OFFICE, P.C.
6  Patrick T. Perkins (Admitted *pro hac vice*)
   1711 Route 9D
7  Cold Spring, New York 10516
   Telephone: (845) 265-2820
8  Fax: (845) 265-2819
9  WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
10 Michael Bergman (SBN 37797)
   David L. Burg (SBN 130403)
11 Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
12 Beverly Hills, California 90212
   Telephone: (310) 858-7888
13 Fax: (310) 550-7191

14 Attorneys for Defendants and Counterclaimant

15             **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17 JOANNE SIEGEL and LAURA SIEGEL LARSON. | Case No. CV 04-8776 (RSWL) (RZx) |
| 18            Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 19        vs. | |
| 20 TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER | Date:       March 20, 2006 |
| 21 BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION | Time:       9:00 a.m. Courtroom:  21 – 5th Floor |
| 22 PRODUCTION INC., DC COMICS, and DOES 1-10, | Judge Ronald S.W. Lew |
| 2            Defendants. | |
| 24 | |
| 25 AND RELATED COUNTERCLAIM | |

26

27

28

**EXHIBIT 16**
787



**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................. 3

    The Origins of Superman and Superboy ........................................ 3

    Procedural History ..................................................................... 7

LEGAL BACKGROUND AND ARGUMENT ..................................... 8

    Copyright Protection .................................................................. 8

    Copyright Ownership ................................................................. 9

    Joint Works ............................................................................. 9

    Derivative Works ..................................................................... 9

    Duration and Copyright Termination............................................ 10

    Summary Judgment Standard ..................................................... 10

Summary of Argument ................................................................... 11

I.    AS A MATTER OF COPYRIGHT LAW, THE SUBMISSIONS ARE DERIVATIVE WORKS BASED ON SUPERMAN ..................... 12

II.    PLAINTIFFS' CLAIMS MUST FAIL BECAUSE THE SUPERBOY NOTICE IS LEGALLY INEFFECTIVE UNDER SECTION 304(C) ................... 14

    A.    Because The Submissions Were Never Published Or Registered As Unpublished Works, There Was No "Copyright Subsisting In Either Its First Or Renewal Term On January 1, 1978" And Thus Such Works Are Not Eligible for Termination ...................... 15

    B.    The Superboy Notice Is Also Ineffective Because The Submissions Were "Works Made For Hire" Not Subject To Termination. ............ 16

        1.    The "Instance" Factor Is Established As A Matter Of Law............... 17

        2.    Detective Possessed The Right To Reject Or Modify The Works ..... 19

        3.    The Works Were Prepared at the Expense Of DC's Predecessor....... 19

    C.    By Leaving In Place The May 21, 1948 Grant, Plaintiffs Have Not Terminated The Grants Of Copyright In The Submissions ................... 20

III.    AS A MATTER OF LAW, PLAINTIFFS CAN POINT TO NO COPYRIGHTABLE MATERIAL IN THE SUBMISSIONS THAT IS INFRINGED BY *SMALLVILLE*................... 21

**EXHIBIT 16**
**788**

A.    Applying The "Filtration Process" To The Submissions Demonstrates That Plaintiffs Own Virtually No Copyrightable Subject Matter Therein, If Any At All ...............................22

B.    No Episode Of *Smallville* Created After November 14, 2004 Infringes Any Right Of Plaintiffs ........................................23

CONCLUSION ............................................................................................25

ii

**EXHIBIT 16**
**789**



## **TABLE OF AUTHORITIES**

### **Cases**

*Alchemy II, Inc. v. Yes! Entm't Corp.,*
        844 F. Supp. 560 (C.D. Cal. 1994) ........................................................10

*Aliotti v. R. Dakin & Co.,*
        831 F.2d 898 (9th Cir. 1987) ..............................................................21

*Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242 (1986).............................................................................10

*Apple Computer, Inc. v. Microsoft Corp.,*
        35 F.3d 1435 (9th Cir. 1994) ..............................................................21

*Brattleboro Publ'g Co. v. Winmill Publ'g Corp.,*
        369 F.2d 565 (2d Cir. 1966)................................................................17

*Brother Records, Inc. v. Jardine,*
        432 F.3d 939 (9th Cir. 2005) ..............................................................13

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
        683 F.2d 610 (2d Cir. 1982).........................................................15, 20

*Celotex Corp. v. Catrett,*
        477 U.S. 317 (1986).............................................................................10

*Community for Creative Non-Violence v. Reid,*
        490 U.S. 741 (1980).............................................................................19

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
        62 U.S.P.Q.2d 1301 (S.D.N.Y. 2002), *aff'd*, 342 F.3d 149 (2d Cir. 2003).......17, 19

*Feist, Publications, Inc. v. Rural Tel. Serv. Co.,*
        499 U.S. 340 (1991)...............................................................................9

*Idema v. Dreamworks, Inc.,*
        162 F. Supp. 2d 1129 (C.D. Cal. 2001),
        *aff'd in part, dismissed in part*, 90 Fed.Appx. 496 (9th Cir. 2003) ..................21, 22

*Kouf v. Walt Disney Pictures & Television,*
        16 F.3d 1042 (9th Cir. 1994) ..............................................................22

*Litchfield v. Spielberg,*
        736 F.2d 1352 (9th Cir. 1984) ............................................................20

*Lin-Brook Builders Hardware v. Gertler,*
        352 F.2d 298 (9th Cir. 1965) ..............................................................17

*In re Marvel Entm't Group,*
        254 B.R. 818 (D. Del. 2000)................................................................18

*May v. Morganelli-Heumann & Assocs.,*
        618 F.2d 1363, 1368-69 (9th Cir. 1980) ..............................................17

iii

**EXHIBIT 16**
**790**



*Milne v. Stephen Slesinger, Inc.,*
   430 F.3d 1036 (9th Cir. 2005) ............................................................... 10, 14, 15, 20

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,*
   856 F.2d 1341 (9th Cir. 1988) ............................................................... 12, 20

*Neuman v. Pike,*
   456 F. Supp. 1192, 1205 (S.D.N.Y. 1978) ............................................................... 13

*Niss v. Columbia Pictures Indus., Inc.,*
   57 U.S.P.Q.2d 1346 (S.D.N.Y. 2000),
   *aff'd,* 25 Fed.Appx. 76 (2d Cir. 2002) ............................................................... 18, 19, 20

*Oddo v. Ries,*
   743 F.2d 63033 (9th Cir. 1984) ............................................................... 9, 20

*Pamfiloff v. Giant Records, Inc.,*
   794 F. Supp. 933 (N.D. Cal. 1992) ............................................................... 20

*Picture Music, Inc. v. Bourne, Inc.,*
   457 F.2d 1213 (2d Cir. 1972), *cert. denied,* 409 U.S. 997 (1972) ............ 17, 19

*Playboy Enters., Inc. v. Dumas,*
   53 F.3d 549 (2d Cir. 1995) ............................................................... 17, 20

*Pye v. Mitchell,*
   574 F.2d 476, 480 (9th Cir. 1978) ............................................................... 9

*Rice v. Fox Broad. Corp.,*
   330 F.3d 1170 (9th Cir. 2003) ............................................................... 10-11

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
   206 F.3d 1322 (9th Cir. 2000) ............................................................... 16-17, 20

*Scherr v. Universal Match Corp.,*
   417 F.2d 497 (2d Cir. 1969) ............................................................... 18

*Shaw v. Lindheim,*
   809 F. Supp. 1393 (C.D. Cal. 1992) ............................................................... 21

*Shaw v. Lindheim,*
   919 F.2d 1353 (9th Cir. 1990) ............................................................... 11

*Siegel v. National Periodical Publications, Inc.,*
   364 F. Supp. 1032 (S.D.N.Y. 1969), *aff'd in part,*
   *rev'd in part,* 508 F.2d 909 (2d Cir. 1974) ............................................... 7, 13, 20

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984) ............................................................... 15

*Stewart v. Abend,*
   495 U.S. 216 (1990) ............................................................... 9-10, 12, 20-21, 23

*Three Boys Music v. Bolton,*
   212 F.3d 477 (9th Cir. 2000) ............................................................... 22

iv

**EXHIBIT 16**
**791**



*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
429 F.3d 869 (9th Cir. 2005) ...................................... 16-17, 18, 19

*Wilkes v. Rhino Records, Inc.*,
No. 96-56238, 1997 WL 800275 (9th Cir. Dec. 17, 1997)...................................18

**1909 Copyright Act**

17 U.S.C. § 2 (repealed) ...................................................................15

17 U.S.C. § 7 (repealed) .................................................................9, 20

17 U.S.C. § 10 (repealed) .................................................................15

17 U.S.C. § 12 (repealed) .................................................................15

17 U.S.C. § 28 (repealed) .................................................................17

**1976 Copyright Act**

17 U.S.C. § 101 ...........................................................................9, 12

17 U.S.C. § 102(a) .............................................................................8

17 U.S.C. § 102(b) ................................................................8-9, 21, 23

17 U.S.C. § 103(a) ......................................................................9, 10, 20

17 U.S.C. § 103(b) ...........................................................9, 12, 20, 22, 23

17 U.S.C. § 106 ..................................................................................9

17 U.S.C. § 201(a) ..............................................................................9

17 U.S.C. § 201(b) ..........................................................................9, 17

17 U.S.C. § 301 .................................................................................15

17 U.S.C. § 303 .................................................................................15

17 U.S.C. § 304(a) .............................................................................10

17 U.S.C. § 304(c) ....................................................................... *passim*

**Copyright Act Legislative History**

H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. (1976) .............. 8, 9, 14, 15, 17, 22

Supplementary Register's Rep. on the Gen. Revision of U.S. Copyright L. (1965)........14

**Other Statutes**

28 U.S.C. § 1338 .................................................................................6

v

**EXHIBIT 16**
**792**

**Rules**

Fed R. Civ. P. 56(c) ........................................................................10

**Regulations**

37 C.F.R. § 201.10 (b)(1)(iii) ...........................................................20

**Treatises**

Melville B. Nimmer & David Nimmer,
        *Nimmer on Copyright*, (2005) ..................................... 9, 12, 15-16, 17, 20

vi

**EXHIBIT 16**
**793**



1    Defendants Time Warner Inc., Warner Communications Inc., Warner Bros.
2  Entertainment Inc., Warner Bros. Television Production Inc. and Defendant and
3  Counterclaimant DC Comics ("DC" and collectively, "Defendants"), hereby submit this
4  memorandum of law in support of their motion for summary judgment.

**PRELIMINARY STATEMENT**

6    The 1976 Copyright Act introduced a new right of authors to terminate prior grants
7  of copyright under specified conditions and prescribed procedures.  This case, the second
8  of two consolidated actions seeking termination of certain copyright grants, should never
9  have been brought: the central dispute here – concerning the Superboy character based on
10 Superman – is part of and belongs in the companion action, Case No. CV 04-8400,
11 concerning the Superman character (the "Superman Action"), and should be addressed
12 there.[1]

13    The plaintiffs in both cases are Joanne Siegel and Laura Siegel Larson
14 ("Plaintiffs"), respectively the widow and daughter of Jerome Siegel ("Siegel") who
15 together with Joseph Shuster ("Shuster") authored the first Superman comic (*Action
16 Comics #1*) published in 1938 by defendant DC's predecessor in interest Detective
17 Comics, Inc. ("Detective").  In April 1997, Plaintiffs served notices under section 304(c)
18 of the 1976 Copyright Act purporting to terminate Siegel's copyright grants to DC's
19 predecessor (the "Superman Notices").  The Superman Notices claimed that, effective
20 April 1999, Seigel's one-half share of the copyright in *Action Comics #1*, as well as in
21 hundreds of derivative works and characters developed by DC over the past sixty years,
22 had been recaptured by Plaintiffs.

23    Expressly listed among the purportedly terminated items are "Superboy" and
24 numerous Superboy works.  Plaintiffs' Superman Notices and the Superman Action
25 conceded that all Plaintiffs could recapture was a 50% share of the rights in the
26 terminated grants: since *Action Comics #1* was a joint work created with Shuster, and
27 since the rights to Shuster's share have not been terminated, they remain with DC.  Thus,

---

28  [1] *See generally* Superman Action Complaint, attached as Exhibit A to the Declaration of
Roger L. Zissu ("Zissu Ex. _").

**EXHIBIT 16**
**794**

1  the Superman Action seeks a declaration that the Superman Notices are valid, and asks

2  for an accounting of a one-half share of profits from exploitation of Superman, including

3  the derivative Superboy, since April 1999.

4         In October of 2001, after years of negotiation regarding the Superman Notices, the

5  parties reached an agreement resolving all claims, including those related to Superboy.

6  However, Plaintiffs later tried to repudiate that settlement, and in November 2002 served

7  a "new" notice of termination (the "Superboy Notice"), this time directed solely at works

8  featuring the Superboy character.  In the Superboy Notice, Plaintiffs contradicted their

9  prior admission that Superboy was derivative of Superman and was a joint creation of

10 Siegel and Shuster, and instead claimed that Superboy was completely unrelated to

11 Superman and that Siegel was its sole creator.  Accordingly, this action alleges that

12 Plaintiffs have recaptured 100% of Superboy, and that Defendants' post-termination

13 production of the successful television series *Smallville* − which features Superman as an

14 adolescent − constitutes copyright infringement and should be enjoined.

15        Through this legal sleight of hand, Plaintiffs attempt to divest DC of any post-

16 termination ownership in the story of Superman's childhood and youth, thus substantially

17 increasing their leverage and the recovery to which they might otherwise be entitled by

18 virtue of their potential half-ownership in Superman alone.[2]  But the artificial distinction

19 which Plaintiffs seek to maintain between these two actions requires the court to accede

20 to the fiction that the Superboy character has nothing to do with the Superman character.

21 It also requires the court to ignore the statutory definition of derivative works and the

22 bedrock precept that ideas, as opposed to expression, are not copyrightable.  Finally, it

23 requires the Court to disregard the clearly expressed conditions and rules that Congress

24 has established to effectuate a copyright termination.

25        Respectfully, for each of the reasons discussed below, there simply is no basis in

26 the law for Plaintiffs to assert a claim regarding Superboy which is separate and apart

27 ────────────────
   [2] This posture is part of a larger pattern of conduct, which includes claiming a share of

28 revenues for foreign exploitation of Superman, even though the Copyright Act expressly
   excludes this (17 U.S.C. § 304(c)(6)(E)), and claiming a share of DC's licensee's direct
   income, as opposed to DC's profits, a position also legally without foundation.

2

**EXHIBIT 16**

1  from Plaintiffs' existing claim regarding Superman, and this action should be dismissed.

2  Dismissal will not leave Plaintiffs without recourse; whether they are entitled to a share of

3  profits from the exploitation of *Smallville* will be addressed and resolved in the Superman

4  Action, where the issue belongs.

## STATEMENT OF FACTS

6  **The Origins of Superman and Superboy.**  In the 1930s, Siegel and Shuster

7  jointly conceived of and created a cartoon strip that became the first Superman story.

8  After a syndicated strip of Superman was rejected numerous times over several years,

9  Detective agreed to publish the first Superman story in *Action Comics #1*. (Zissu Ex. A,

10  ¶¶ 16-26.)  On March 1, 1938 Siegel and Shuster executed an assignment to Detective of

11  all rights in Superman (the "1938 Assignment") (*Id.* Ex. C.)  Thereafter, Siegel and

12  Shuster agreed to provide further Superman stories for subsequent issues of *Action*

13  *Comics*. (*Id.* Ex. A, ¶¶ 27, 28.)  On September 22, 1938, Siegel and Shuster entered into

14  two further agreements (collectively the "September 1938 Agreements").  The first

15  agreement with Detective reaffirmed its copyright ownership of Superman and

16  memorialized the terms of Siegel and Shuster's existing and future engagement and

17  compensation. (*Id.* Ex. D.)  The second agreement included the McClure Newspaper

18  Syndicate ("McClure") as a third party and added the terms under which Siegel and

19  Shuster would prepare Superman newspaper comic strips. (*Id.* Ex. E; *see also id.* Ex. F.)

20  Under the first of the September 1938 Agreements, Siegel and Shuster agreed that, if they

21  created any material suitable for comics, they would provide Detective the right of first

22  refusal to publish them.  Further, the Agreements make clear that Siegel and Shuster were

23  to furnish Superman comics *only* to Detective. (*Id.* Exs. D, E.)

24  On November 30, 1938, shortly after signing the September 1938 Agreements,

25  Siegel sent a letter to Detective enclosing some of his work assignments and "pitching"

26  some ideas for new comics (the "Pitch"). (*Id.* Ex. G; see also *id.* Ex. L, ¶ 18.)  Among the

27  ideas submitted was one for a comic entitled Superboy "which would relate to the

28  adventures of Superman as a youth." (*Id.* Ex. G.)  The Pitch discussed conceptually the

**EXHIBIT 16**
**796**



1  physical format for such a comic but did not set forth any new characteristics or story

2  elements.  (*Id.*)  Detective was not interested.  (*Id.* Ex. <u>L</u>, ¶ 19.)

3       In December 1940, pursuant to the September 1938 Agreements, Siegel made

4  another submission of a thirteen-page typed script under the byline of Siegel *and* Shuster

5  (the "Script" and, collectively with the Pitch, the "Submissions").  (*Id.* Ex. <u>H</u>; *see also id*.

6  Ex. <u>L</u>, ¶ 22.)  The Script, which contains dialogue and describes panels, was hardly novel

7  and sought again to capitalize on the then-existing popularity of Superman.  Indeed, the

8  very first "script box" reads: "It has to happen!  So many faithful followers of today's

9  leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark

10  Kent as a youth . . . ."  (*Id.* Ex. <u>G</u> at 1.)  Siegel went on to repeat Superman's provenance

11  and early upbringing from prior Superman publications, including but not limited to,

12  *Action Comics #1* (*id.* Ex. <u>I</u>), a series of newspaper comic strips published in 1939 (*id*. Ex.

13  <u>F</u>), and *Superman #1* (*id.* Ex. <u>J</u>), published in May 1939.  These works were owned

14  exclusively by Detective and pre-dated the Script.  The chart below shows each of the

15  pre-existing Superman elements included in the Script alongside the corresponding

16  element from Detective's previous publications (the "Chart"):

| Script Element | Pre-existing Superman Element |
|---|---|
| "as the distant planet, <u>Krypton</u>, burst into fragments, superscientist Jor-L and his wife Lora, launched their infant son toward the planet Earth in a trial space-ship . . . ."  (Script (Zissu Ex. <u>H</u>) at 1) | "As a distant planet was destroyed by old age, a scientist placed his infant son within a hastily devised space-ship, launching it toward Earth!" (*Action Comics #1* (Ex. <u>I</u>) at 1)<br><br>"Jor-L, Krypton's foremost scientist" (1939 Strip (*id.* Ex. <u>F</u>) at 1, panel 2), and his wife Lora (*id.* at 1, panel 4), launch their son, Kal-L in a rocket ship Earth as "<u>Krypton</u> explodes into a million fragments." (*id.* at 5, panels 5-8)<br><br>"Just before the doomed planet, *Krypton*, exploded into fragments, a scientist placed his infant son within an experimental rocket-ship, launching it toward Earth!" (*Superman #1* (*id.* Ex. <u>J</u>) at 1, panel 1) |
| Panel would "show[] the space-ship hurtling up from the surface of <u>Krypton</u> into space as the planet blows to bits." (*Id.* at 1.) | Same scene shown in: (1) *Action Comics #1* at 1, panel 1; (2) 1939 Strip at 5, panels 5-8; and (3) *Superman #1* at 1, panel 1. |
| "As the solitary vessel hurtled thru [sic] interplanetary space, it narrowly dodged oblivion in | "Peril after peril is narrowly avoided by the rocketing space-flier: – a great jagged meteor . . . The gravity of a giant sun almost draws the vessel to a molten death" |

4

**EXHIBIT 16**
**797**



| Script Element | Pre-existing Superman Element |
|---|---|
| the form of comets, meteors, and other stellar obstacles . . . ." (*Id.* at 1.) | (1939 Strip at 6, panels 1-3) |
| "Alighting upon Earth, it burst into flames. Its tiny passenger was saved by a passing motorist" and a panel is described as showing the motorist lifting the child from the vessel. The motorist then takes the child to an orphanage. (*Id.* at 1.) | "When the vehicle landed on Earth, a passing motorist, discovering the sleeping babe within, turned the child over to an orphanage." (*Action Comics #1* at 1, panel 2) <br><br> "The sleeping babe is rescued from the burning space ship by a passing motorist, and turned over to an orphan asylum . . ." (1939 Strip at 6, panel 5) <br><br> An elderly couple, the Kents, discover the child in the space ship and take him to the orphan asylum. (*Superman #1* at 1, panel 2-3) |
| "But the motorist – Charles Kent – finds he can't forget the infant" and from his armchair says "I can't get that little rascal out of my mind, Mary!" The Kents decide to adopt the child. (*Id.* at 2.) | "We – we couldn't get that sweet child out of our mind. We've come to adopt him if you'll permit us." (*Superman #1* at 1, panel 4.) |
| The infant exhibits great strength at the orphanage, wrecking equipment and scaring the staff. The orphanage happily allows the Kents to adopt the infant. (*Id.* at 2-3.) | The infant astounds the orphanage staff with his "feats of strength." (*Action Comics #1*, at 1, panel 3; 1939 Strip at 6, panel 6; *Superman #1* at 1, panel 3.) <br><br> When the Kents arrive at the asylum, the orphanage director happily allows the Kents to adopt the infant and thinks "Whew! Thank goodness they're taking him away before he wrecks the asylum!" (*Superman #1*, at 1, panel 4) |
| The Kents vow to keep his power a secret so he that he does not become an outcast. (*Id.* at 5-7.) | Clark Kent's father tells the young Clark "Now listen to me Clark! This great strength of yours – you've got to hide it from people or they'll be scared of you!" His mother adds "but when the time comes, you must use it to assist humanity." (*Superman #1* at 1. panel 4.) |
| "The bullets careen harmlessly off his super-tough skin" (*Id.* at 11.) | "The bullet ricochets off Superman's tough skin." (*Action Comics #1* at 4, panel 1) |
| "I could put my hidden strength to work for a good purpose." (*Id.* at 13.) | "But when the time comes, you must use [your strength] to assist humanity." (*Superman #1* at 1, panel 5) |

In addition to the lengthy recap of Superman's origins, the Script then contains dialogue and caption headings for contemplated comic strips involving the young Clark Kent; first as a toddler (Zissu Ex. H at 6-8), then as a kindergartner (*id.* at 8-9), and finally as a fifth grader (*id.* at 11-12), concluding with the young Superman deciding to create his own "masquerade costume" in order to hide his true identity. (*Id.* at 13.) The Script does not

5

EXHIBIT 16
798



1  describe the costume, but from the context it can be inferred that the Script contemplates

2  the Superman costume that was already famous from previously published comics. (*See*,

3  *e.g.*, *id*. Exs. F, I, J.)

4       On or around November 18, 1944, Detective published a comic strip entitled

5  "Superboy" in *More Fun Comics #101* (*id*. Exs. K, L, ¶ 31) and continued to do so bi-

6  monthly until 1946 and monthly thereafter for many years (*id*. Ex. L, ¶¶ 31, 37). Other

7  than the idea of depicting Superman as a youth and the inclusion of previously-published

8  portions of the origins of Superman, there is no similarity between the *Superboy* stories

9  published in *More Fun Comics #101* and the Script. (*Compare id*. Ex. H *with* K.)

10       In 1947, Siegel and Shuster commenced an action in the Supreme Court of the

11  State of New York (the "Westchester Action") against, *inter alia,* DC's predecessor

12  National Comics Publications, Inc. ("National"), Detective's parent company. (Zissu Ex.

13  M.) The Westchester Action did not involve federal copyright doctrines, which only

14  could have been adjudicated in federal court, 28 U.S.C. § 1338. Instead, Siegel and

15  Shuster sought to annul and rescind agreements with Detective in an effort to recapture

16  rights in Superman. Siegel and Shuster also alleged that, pursuant to their September 22,

17  1938 agreement, Detective had not exercised its right of first refusal to publish Superboy

18  and thus did not have a right to publish it. (Zissu Ex. M.) On November 21, 1947, the

19  referee to whom the case was referred issued a report rejecting almost entirely Siegel and

20  Shuster's claims. (*Id*. Ex. N.) However, the referee found that Superboy "was a separate

21  and distinct entity" from Superman (*id*. Ex. N at 41a-42a) and in Findings of Fact and

22  Conclusions of Law dated April 12, 1948 (the "Interlocutory Findings"), the referee

23  found that Detective's publication of Superboy "embodied and was based upon the idea,

24  conception, and plan" contained in the Pitch and in the Script. (*Id*. Ex. O, ¶¶ 163-166.)

25  Based on his interlocutory rulings, the referee subsequently entered an "Interlocutory

26  Judgment" which, *inter alia*, provided for enjoining the defendants from publishing

27  *Superboy* and declaring that Siegel was the "sole owner of the comic strip feature

28  SUPERBOY." (*Id*. Ex. P at 5.) The parties filed timely notices of appeal. (*See id*. Ex. R

**EXHIBIT 16**
**799**

1 | at 2.)

2 |      Thereafter, on May 19, 1948, the parties to the Westchester Action entered into a

3 | stipulation (the "Stipulation") under which the Interlocutory Judgment was to be "in all

4 | respects vacated" and the action would be dismissed in its entirety. (*Id.* Ex. Q.) Siegel

5 | and Shuster also agreed, *inter alia*, to assign any rights they owned in Superboy to

6 | National, and agreed to be enjoined from either using or associating themselves with

7 | Superman or Superboy. (*Id.* Ex. Q.) As consideration, Siegel and Shuster were to be

8 | paid $94,013.16. (*Id.*) Pursuant to the Stipulation, on May 21, 1948, the parties to the

9 | Westchester Action entered into a second agreement – a "Final Judgment" on consent,

10 | duly executed by all of the parties, their counsel, and the Court (the "Final Consent

11 | Agreement"). Therein, the parties withdrew their notices of appeal and Siegel and

12 | Shuster effectuated their executory stipulation by providing definitively for the transfer of

13 | all rights in Superboy to National.[3] (*Id.* Ex. R.)

14 | **Procedural History.** On April 3, 1997, Plaintiffs mailed the Superman Notices,

15 | purporting to terminate Siegel's share as a co-author in seven grants of rights under

16 | copyright made by Siegel and Shuster in the Superman character and stories dating back

17 | to 1937 to defendant DC's predecessors-in-interest. 17 U.S.C. § 304(c). (Zissu Exs. S-

18 | Y.)[4] The Superman Notices purport to affect only Siegel's – but not Shuster's –

19 | participation in these grants. (*Id.* Exs. S-Y at 2.) The Superman Notices also list in

20 | excess of 15,000 allegedly terminated Superman works. (*See, e.g., id.* Ex. T at 5-550.)

21 | Notably, "Superboy" is among the characters expressly identified therein (*id.* Exs. S-Y at

22 | 3 n.1), and the Superman Notices list *hundreds of works featuring Superboy* (*see, e.g., id.*

23 | Ex. T at 5-550).[5]

---

24 | [3] Notwithstanding the Final Consent Agreement, Siegel and Shuster unsuccessfully sued DC's predecessor in federal court in 1969, claiming ownership of the renewal copyright

25 | for *Action Comics #1*. *See Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1969), *aff'd in part, rev'd in part*, 508 F.2d 909 (2d Cir. 1974).

26 | [4] DC, by letter dated April 15, 1999, rejected the Superman Notices as untimely and legally invalid. (*Id.* Ex. Z.)

27 | [5] Each of the Superman Notices states: "This Notice of Termination applies to each and every work . . . that includes or embodies any character, story element, or indicia

28 | reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, . . . Superboy [and] Smallville." (*Id.* Exs. S-Y at 3 n.1.)

7

**EXHIBIT 16**
**800**

1    On November 8, 2002, Plaintiffs mailed the Superboy Notice, purporting to

2 terminate grants by Siegel contained in the Stipulation and a December 23, 1975

3 agreement with Warner Communications, Inc. (the "1975 Agreement"), and listing

4 hundreds of allegedly affected works identical to those listed in the Superman Notices.

5 (*Compare id.* Ex. <u>AA</u> at 6-52 *with, e.g.*, <u>T</u> at 5-550.)[6]  In the Superboy Notice, Plaintiffs

6 purported to terminate the Superboy copyright grant to be made pursuant to the

7 Stipulation in the Westchester Action but failed to terminate the actual assignment

8 effectuated in the Final Consent Agreement, a copy of which was in their possession.[7]

9 (*Id.* Ex. <u>AA</u>).

10    On October 8, 2004, Plaintiffs filed the Superman Action, which is mainly a case

11 for an accounting.  (*Id.* Ex. <u>A</u>.)  On October 22, 2004, Plaintiffs filed this action (the

12 "Superboy Action"), seeking a declaration that Plaintiffs have recaptured all rights in

13 Superboy.  Plaintiffs allege further that "[d]efendants' ongoing exploitation of the

14 'Superboy' mythology, including but not limited to the Superboy Comic Books, and other

15 publications, 'Superboy' merchandising, animated and live action television

16 programming (*e.g.*, the *Smallville* Series)" infringes Plaintiffs' copyright rights in the

17 "Siegel Superboy Material," namely, the Submissions. (*Id.* Ex. <u>L</u>, ¶ 67.)

18    **LEGAL BACKGROUND AND ARGUMENT**

19    **Copyright Protection.**  Section 102 of the currently effective Copyright Act (the

20 "1976 Act") carries forward "the standard of originality established by the courts" under

21 the predecessor 1909 Copyright Act (the "1909 Act").  H.R. Rep. No. 94-1476, 94th

22 Cong. 2d Sess. at 51 (1976) ("H. Rep.").  Section 102(b) provides that copyright

23 protection subsists for "original works of authorship," 17 U.S.C. §102(a), but "[i]n no

24 case does copyright protection . . . extend to any idea . . . [or] concept . . . regardless of

25 the form in which it is described, explained, illustrated, or embodied in such work."  17

26 _____

[6] DC, by letter dated August 27, 2004, also rejected the Superboy Notice as untimely and
27 legally invalid.  (*Id.* Ex. <u>BB</u>).

[7] Plaintiffs have produced such a copy in discovery herein (*id.* Ex. <u>R</u>), and refer to the
28 Stipulation and Final Consent Agreement as separate instruments in their complaint in
this action (*Id.* Ex. <u>L</u>, ¶ 33).

**EXHIBIT 16**
**801**

 

1  U.S.C. §102(b); *See Feist, Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350

2  (1991); H. Rep. at 56 ("[c]opyright does not preclude others from using the ideas or

3  information revealed by the author's works.")

4    **Copyright Ownership.**  Section 201 of the 1976 Act also carried forward the

5  basic principles that copyright "vests initially in the author or authors of the work," that

6  "authors of a joint work are co owners of [the] copyright" and that "[i]n the case of works

7  made for hire the employer . . . is considered the author . . ." and initial owner of

8  copyright.  17 U.S.C. § 201(a) & (b).  *See also* H. Rep. at 120-21.

9    **Joint Works.**  Under the 1909 Act, as today, each joint author is a co-owner who

10  possesses "an undivided ownership in the entire work, including all of the contributions

11  contained therein" (1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, §

12  6.03, at 6-7 (2005) ("*Nimmer*"); *see Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978)),

13  and who can nonexclusively exercise all the rights of the copyright owner subject only to

14  a duty to account to other co-owners for their share of profits earned from such use or

15  licensing (*Nimmer* § 6.10; *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984)).  A joint

16  author *cannot* be liable for infringement of copyright from such use or licensing.  *Id.*

17    **Derivative Works.**  As under section 7 of the 1909 Act, 17 U.S.C. § 7 (repealed),

18  the current statute provides for protection of "derivative works based upon the

19  copyrighted work," 17 U.S.C. § 106 and 103(a), similarly defining a "derivative work" as

20  "a work based upon one or more preexisting works, such as . . . any . . . form in which a

21  work may be recast, transformed, or adapted."  17 U.S.C. § 101.  Section 103(b) provides

22  that the "copyright in a . . . derivative work extends only to the material contributed by

23  the author of such work, as distinguished from the preexisting material employed in the

24  work, and does not imply any exclusive right to the preexisting material."  17 U.S.C. §

25  103(b).  "The most important point here is one that is commonly misunderstood today

26  [under the 1909 Act]: copyright in a 'new version' covers only the material added by the

27  later author, and has no effect one way or the other on the copyright or public domain

28  status of the preexisting material."  H. Rep. at 57; *accord  Stewart v. Abend*, 495 U.S.

**EXHIBIT 16**
**802**



207, 224 (1990).  Section 103(a) also denies protection to any part of a derivative work employing pre-existing material "in which such material has been used" without permission.  17 U.S.C. § 103(a).

**Duration and Copyright Termination.**  Under the 1909 Act, an original 28 year term of copyright protection could be renewed for another 28 year "renewal" term.  Among the changes made by the 1976 Act was that the renewal term of protection for copyrights subsisting on January 1, 1978 was extended by nineteen years (the "extended renewal term"), thereby extending the combined term of protection from fifty-six to seventy-five years.  *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1037 (9th Cir. 2005); *see also* 17 U.S.C. § 304(a).  Section 304(c) of the 1976 Act also included a new statutory right of "termination," which right enabled the author and the author's heirs to recapture copyrights in specific works by terminating copyright grants made by the author or his heirs to third persons prior to January 1, 1978.  17 U.S.C. § 304(c); *Milne*, 430 F.3d at 1040.  Such recapture applies only to the U.S. copyright in the original work under the grant – it does not affect foreign copyright rights, trademark rights, or the right to continue to exploit any "derivative work prepared . . . before" the effective date.  17 U.S.C. §§ 304(c)(6)(A), (E).

**Summary Judgment Standard.**  Rule 56(c) provides for summary judgment when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  A fact is "material" if it could affect the outcome of the suit under the governing substantive law.  *Id.* at 248. The burden then shifts to the nonmoving party to establish that there is a genuine issue for trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  Courts enter summary judgment in copyright actions where a plaintiff fails to establish one element of its claim, to spare a defendant the burden of meritless litigation.  *See, e.g., Alchemy II, Inc. v. Yes! Entm't Corp.*, 844 F. Supp. 560, 565-69 (C.D. Cal. 1994) (citing *Celotex*, 477 U.S. at 322); *Rice v. Fox Broad.*

10

**EXHIBIT 16**
**803**

 

1  *Corp.*, 330 F.3d 1170, 1174 (9th Cir. 2003); *Shaw v. Lindheim,* 919 F.2d 1353, 1358-59

2  (9th Cir. 1990) (summary judgment in a copyright case is the same as in other civil

3  actions).

### Summary of Argument

5       The Superboy Action seeks a declaration that the Superboy Notice was effective

6  separately and apart from the Superman Notice, and served to vest in Plaintiffs 100% of

7  the copyright ownership in Superboy (as opposed to the 50% they are seeking in

8  Superman).  In support of their position, Plaintiffs claim that certain of the works in

9  which Superboy has appeared were not related to or based upon Superman.  Plaintiffs

10 further assert that as a result of the separate Superboy Notice, Defendants' rights in

11 "Superboy" have been extinguished.  Finally, Plaintiffs allege that the television program

12 *Smallville* is based upon and thus infringes their rights in "Superboy."

13      Plaintiffs' claims rest on the untenable assertion that Superboy is not the Superman

14 character as a young boy – a "derivative work" as that term is used in the 1976 Act – but

15 is an unrelated work from a copyright standpoint.  But Plaintiffs' position is based on an

16 artificial construct which cannot withstand scrutiny: even a cursory review of the

17 Submissions demonstrates, as a matter of law, that Superboy is derivative of Superman

18 and cannot be divorced from that prior creation (Pt. I).  (*See* Chart.)  Further, whether or

19 not Superboy is derivative of Superman, the Submissions are not eligible for copyright

20 termination under section 304(c) for a number of separate reasons: first, due to their

21 "unpublished" status, neither of these works were in their first or original term of

22 copyright on January 1, 1978 (Pt. II.A.); second, both of these works were "works made

23 for hire" (Pt. II.B.); and third, Plaintiffs failed to terminate the May 21, 1948 grant of

24 rights to these works (Pt. II.C.).  Finally, even if the Superboy Notice was effective,

25 Plaintiffs' infringement claim must be dismissed since the Submissions consist almost

26 entirely of elements taken from pre-existing Superman story material not owned by

27 Siegel at the time they were submitted; any arguably new material protected by copyright

28 has not been used by Defendants, either pre- or post-termination, and nothing in

11

**EXHIBIT 16**
**804**



1  *Smallville* is copied from the Submissions (Pt. III).

2  **I.    AS A MATTER OF COPYRIGHT LAW, THE SUBMISSIONS ARE DERIVATIVE WORKS BASED ON SUPERMAN**

3      Section 101 of the 1976 Act defines a "derivative work" as one "based upon one or

4  more preexisting works, such as . . . any . . . form in which a work may be recast,

5  transformed, or adapted." 17 U.S.C. § 101.[8]  *See also Mirage Editions, Inc. v.*

6  *Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988).  Under section 103(b), any

7  copyright protection for a derivative work can only extend to the material newly added

8  "as distinguished from the pre existing material employed" therein and cannot in any way

9  affect the "ownership" of the underlying material.  17 U.S.C. § 103(b).

10      Here, there can be no genuine dispute that the Submissions are derivative of

11  preceding Superman comics.  As demonstrated by the Chart, the Submissions are based

12  upon and, indeed dominated by, pre-existing, published Superman elements owned

13  *exclusively* and previously published by Detective at the time the works were submitted

14  by Siegel.  Indeed, the Submissions expressly refer the reader to the pre-existing

15  Superman story and propose publication of a prequel:[9] Superboy "would relate to the

16  adventures of Superman as a youth" (Zissu Ex. G, at 2); and "[s]o many faithful

17  followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding

18  the adventures of Clark Kent as a youth" (*Id.* Ex. H at 1).  Plaintiffs also have admitted in

19  the Superman Notices that Superboy is both a derivative and joint work, not only because

20  they expressly purport to terminate the Superboy character (*compare id*. Exs. S-Y at 3 n.1

21  *with* Ex. AA), but also because the same Superboy works purportedly covered by the

22  Superboy Notice in 2002 were previously listed as terminated in the Superman Notices in

23  1999.  (*compare id. e.g.*, Ex. T at 5-550 *with* Ex. AA at 6-52.)  Accordingly, Siegel could

24  have no ownership in any derivative, pre-existing material reused in the Submissions, and

25

---

26  [8] With respect to copyright ownership of derivative works, there is no difference between the 1909 and 1976 Acts.  As noted by the Supreme Court, "the well-settled rule" under

27  the 1909 Act for determining the extent of the derivative author's copyright ownership was "made explicit" in section 103(b) of the 1976 Act.  *Stewart*, 495 U.S. at 224.

28  [9] As Nimmer explains, ". . . a subsequently written story employing the same characters in a time setting prior to, rather than contemporaneous with or subsequent to, the time setting in the first story is referred to as a 'prequel.'" 3 *Nimmer*, § 10.14[L] at 10-112.

**EXHIBIT 16**

**805**



1  the Superboy Notice could not apply to such underlying material.

2      In seeking to avoid the rules of ownership under copyright law, and, in particular,

3  the obvious fact that Superboy is a derivative work based upon Superman, Plaintiffs will

4  undoubtedly, as they do in their pleading, misstate the Second Circuit's holding in *Siegel*

5  *v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974).  In particular,

6  Plaintiffs allege in their pleading that the Second Circuit held that the Westchester Action

7  Referee's interlocutory findings of fact and conclusions of law that Siegel was the

8  originator and sole owner of Superboy "were binding on the parties under the doctrine of

9  *res judicata*," thus foreclosing any claim now that "Superboy" is derivative of

10  Superman.  (Zissu Ex. L, ¶¶ 33-36; O, ¶¶ 164-68; 171-72.)  Plaintiffs' characterization of

11  that decision is demonstrably false.  In fact, the Second Circuit in *National* gave *res*

12  *judicata* effect *only* to the Westchester Action *Final Consent Agreement. National,* 509

13  F.2d at 912-14.[10]  Indeed, as a matter of law, the Second Circuit *could not* have given *res*

14  *judicata* effect to the referee's findings because they were, by their own terms,

15  interlocutory and were not a final judgment.  *See Neuman v. Pike*, 456 F. Supp. 1192,

16  1205 (S.D.N.Y. 1978) (interlocutory judgment not final for purposes of *res judicata*

17  under New York law); *see also Brother Records, Inc. v. Jardine*, 432 F.3d 939, 942 (9th

18  Cir. 2005).  Moreover, in the Final Consent Agreement, the parties *expressly vacated* the

19  referee's interlocutory judgment.  (Zissu Ex. R at 2.)  Since the Final Consent Agreement

20  does not state that Siegel owned Superboy, let alone that it was not a derivative work

21  based upon Superman, Plaintiffs' reliance on the Second Circuit's decision is misplaced.

22      Plaintiffs' attempt to claim sole ownership of an idea and pre-existing story

23  elements embodying Superman's origins and youth – elements either not subject to

24  _____

25  [10] The Second Circuit made the following holdings: "[w]e are persuaded here that the court below properly decided that the state court *judgment* of *May 21st, 1948* [the date of

26  the Final Consent Agreement] effectively estopped the plaintiffs from relitigating the issue of the ownership of the renewal copyright" (*National*, 509 F.2d at 912-913);

27  "[t]here is no doubt that the *judgment* of the state court is binding in this subsequent federal action . . .[i]t is . . . clear that a *consent judgment* does have res judicata effect"

28  (*id.* at 913); and "[s]ince we hold that the state *judgment* action [sic] determined that the defendants owned all of the rights to the Superman strip without reservation, the doctrine of res judicata is properly applicable" (*id.* at 914, n.1) (emphasis added in all).

13

**EXHIBIT 16**
**806**

1 copyright ownership or undisputedly solely owned by Detective *prior* to the Submissions

2 – is impermissible as a matter of law.  As Plaintiffs have conceded in the Superman

3 Notices, they can at best claim only a *partial* ownership of these elements – a claim

4 which is already the subject of the companion Superman Action.

5 **II.** **PLAINTIFFS' CLAIMS MUST FAIL BECAUSE THE SUPERBOY**
   **NOTICE IS LEGALLY INEFFECTIVE UNDER SECTION 304(C)**

6    Plaintiffs' claims first fail because the Submissions do not, as a matter of law,

7 qualify for copyright termination under Section 304(c) of the 1976 Act.  The termination

8 right was added to the 1976 Act to improve the "bargaining position of authors" by

9 giving them another chance to sell rights in their works after they had been sufficiently

10 "exploited" to determine their "value." H. Rep. at 124.  However, in drafting the

11 termination provision, Congress crafted "a practical compromise that [would] further the

12 objectives of the copyright law while recognizing the problems and legitimate needs of

13 all interests involved." *Id.  See also* Supplementary Register's Rep. on the Gen. Revision

14 of U.S. Copyright L. at 72 (1965) (termination provisions were intended to be "of

15 practical benefit to authors and their families without being unfair to publishers, film

16 producers, and other users.").  That compromise included significant statutory limitations

17 to the termination right: only grants with respect to copyrights subsisting in their original

18 or renewal statutory terms can be terminated, while grants relating to "works made for

19 hire" cannot (17 U.S.C. § 304(c), first par.).  Even when exercised, the statutory

20 termination is not unlimited: it applies only to the U.S. copyright in the original work

21 under the grant – it cannot affect foreign copyright rights, trademark rights, or the right to

22 continue to exploit any "derivative work prepared . . . before" the effective date.  17

23 U.S.C. §§ 304(c)(6)(A), (E).

24    In addition, the copyright termination right is neither "automatic" (H. Rep. at 124),

25 nor "inalienable." *Milne*, 430 F.3d at 1043.  Rather, section 304(c) specifies the

26 procedure for exercise of the right.  Namely, a termination can only be "effected by

27 serving an advance notice in writing upon the grantee or the grantee's successor in title,"

28 and "the form, content and manner of service" of which "shall [be] prescribe[d] by the

14

**EXHIBIT 16**
**807**

1  Register of Copyright."  17 U.S.C. §§ 304(c)(4), (4)(B).  Moreover, failure to exercise the
2  termination right within the time specified in the statute results in an inability to exercise
3  such right.  17 U.S.C. § 304(c)(3).  These requirements resulted from a 20 year legislative
4  effort.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 462 n.9 (1984).
5  In crafting these provisions, Congress was cognizant that a failure to comply with them
6  would mean that no termination would occur.  *See, e.g., Burroughs v. Metro-Goldwyn-*
7  *Mayer, Inc.*, 683 F.2d 610, 621-22 (2d Cir. 1982) (failure to identify certain works while
8  specifying others in notice of termination left grant relating to former unterminated);
9  *Milne*, 430 F.3d at 1048 (attempt by granddaughter of author of "Winnie the Pooh" to
10  terminate copyright grant rejected because statutory requirements not met).  Because the
11  Superboy Notice seeks to terminate grants in works not subject to termination, and
12  because it fails to terminate a still-operative grant, it is ineffective as a matter of law.

13  **A.    Because The Submissions Were Never Published Or Registered As Unpublished Works, There Was No "Copyright Subsisting In Either Its First Or Renewal Term On January 1, 1978" And Thus Such Works Are Not Eligible for Termination.**
14

15  The 1976 Act specifies that only grants relating to "any copyright subsisting in
16  either its first or renewal term on January 1, 1978" are subject to termination.  17 U.S.C.
17  § 304(c).  Under the 1909 Act, which provided for original and renewal terms of 28 years
18  each, works that were not published with notice in compliance with section 10 or
19  registered as unpublished works under section 12 were not protected under the Act, but
20  rather, under section 2, remained protected by common law copyright (*i.e.*, under state
21  law rather than the federal statute).  17 U.S.C. §§ 10, 12, 2 (repealed).[11]  Works protected
22  by common law copyright could not, by definition, be in either their "first" or their
23  "renewal" terms, as those terms relate solely to statutory copyright protection under the
24  1909 Act.  In explaining the effect of common law copyrights subsisting on January 1,
25  1978 on termination, Nimmer states:
26
         a grant of common law copyright (by hypothesis made before January 1, 1978) . . .
27

28  _____
[11] With the advent of the 1976 Act, effective January 1, 1978, *see* 17 U.S.C. §§ 301, 303, this "dual system" of copyright was abolished and all copyright protection for such works can exist only under the federal statute.  (H. Rep. at 129.)

15

**EXHIBIT 16**
**808**

1    will not be subject to termination if the work in which this interest is granted

2    remained in common law copyright until January 1, 1978 . . . It will not be subject

3    to termination under Section 304(c) because . . . such terminations pertain only to

4    grants "of the renewal copyright or of any right under it." In the case of a work

5    protected by common law copyright until the effective date of the current Act,

6    there is no renewal copyright even after the work has acquired statutory copyright;

7    these works instead fall within the new unitary term gauged by the life of the

8    author, subject to a certain minimum period of protection. Therefore, the

9    termination provisions of Section 304(c), which relate only to grants "of the

10    renewal copyright," are inapplicable.

11    3 *Nimmer* § 11.02[A][1] at 11-11. Plaintiffs admit that the Submissions were

12    unpublished and never registered as unpublished works as of January 1, 1978.[12] (Zissu

13    Ex. AA at 5-6.) As a result, the Submissions were neither in their first nor renewal term

14    as of that date and not eligible for termination.

15    **B.    The Superboy Notice Is Also Ineffective Because The Submissions Were "Works Made For Hire" Not Subject To Termination.**

16    Even if the Submissions had been subsisting copyrighted works on January 1,

17    1978, they were "works made for hire" and thus not eligible for termination because they

18    were submitted under Siegel and Shuster's contractual relationship with Detective. 17

19    U.S.C. § 304(c) (termination only allowed for "other than a copyright in a work made for

20    hire"). Therefore, both the Submissions remain owned in their entirety by DC.

21    The Ninth Circuit has held that, under the 1909 Act, whenever the person who

22    commissions another is the "motivating factor" in producing a creative work, the work is

23    made for hire.[13] *Self-Realization Fellowship Church v. Ananda Church of Self-*

24    _____

25    [12] In an apparent attempt to overcome this fact that renders the entire Superboy Notice a nullity, in the Superboy Notice Plaintiffs claim that the Submissions are "embodied" in

26    *More Fun Comics #101*, which itself was published and registered in November 1944. (Zissu Ex. AA, ¶ 2; *see also id.* Ex. L, ¶ 42.) Of course, even a cursory comparison of

27    *More Fun #101* and the Submissions demonstrates that there is no similarity between them except as to material that had previously been published and was owned exclusively by Detective. (*Compare id.* Ex. K with G & H.)

28    [13] The 1909 Act governs whether works created before January 1, 1978 are works for hire. *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 876 (9th Cir.

16

**EXHIBIT 16**
**809**



1   *Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000) (quoting *Lin-Brook Builders Hardware*

2   *v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965)).[14] A finding that the hiring party is the

3   motivating force gives rise to a "presumption" of work for hire ownership that could only

4   be altered by an "express" agreement of the hiring party to the contrary. *May v.*

5   *Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980).[15] Indeed, to

6   avoid arguments based upon self-serving assertions of subjective intent or other irrelevant

7   facts, the motivating factor inquiry looks only to judicially prescribed, "objective" facts.

8   *Hogarth*, 62 U.S.P.Q.2d at 1327; *May*, 618 F.2d at 1369. The inquiry focuses on three

9   factors: (a) at whose instance the work was prepared; (b) whether the hiring party had the

10   power to "accept, reject or modify the work"; and (c) at whose expense the work was

11   created. *Self-Realization*, 206 F.3d at 1326; *Lin-Brook*, 352 F.2d at 300.

12       **1.   The "Instance" Factor Is Established As A Matter Of Law.** Where an

13   independent contractor has prepared a "derivative work" based upon a pre-existing

14   original work whose copyright is owned by the hiring party, the work is produced at the

15   instance and subject to the right of control of the employing party. *Playboy Enters., Inc.*

16   *v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995) (citing *Picture Music*, 457 F.2d at 1216-17;

17   *Hogarth*, 342 F.3d at 163; *accord* 3 *Nimmer* § 9.03[D] at 9-28.3. As established in

18   Section I, *supra*, the Submissions were undisputedly derivative works. This, along with

19   the parties' contractual relationship giving Detective a right of first refusal over Siegel

20   and Shuster's creations and denying them the right to use the Superman character without

21   Detective's approval (Zissu Ex. D, at 1), establishes that Detective was the "motivating

22   2005).

23   [14] In *Picture Music, Inc. v. Bourne, Inc.*, the Second Circuit described the test as met

24   when "the motivating factor in producing the work was the employer who induced the creation." 457 F.2d 1213, 1216 (2d Cir. 1972), *cert. denied*, 409 U.S. 997 (1972) (internal quotation marks and citation omitted).

25   [15] *See also Brattleboro Publ'g Co. v. Winmill Publ'g Corp.*, 369 F.2d 565, 567 (2d Cir.

26   1966); *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 62 U.S.P.Q.2d 1301, 1318 (S.D.N.Y. 2002), *aff'd*, 342 F.3d 149 (2d Cir. 2003); 1 *Nimmer* § 5.03[D] at 5-

27   56.10; section 201(b) of the 1976 Act ("[i]n the case of a work made for hire," the hiring party "is considered the author . . . *unless the parties have expressly agreed otherwise* in

28   a written instrument signed by them.") (emphasis added), which the legislative history describes as adopting the basic principle of 1909 Act law, H. Rep. at 121, and 17 U.S.C. § 28 (repealed).

**EXHIBIT 16**
**810**



1  factor" for these Submissions.  If the Submissions were authorized efforts, then they had

2  to have been efforts initiated for the benefit and under the authority of Detective.

3      Instance is also established where, as here, a publisher has a right to supervise,

4  reject or modify an independent contractor's creative efforts.  *Twentieth Century,* 429

5  F.3d at 880.  In addition, where an incomplete work is provided to a "company" as an

6  "audition," the company is held to be the "motivating factor" behind the creation of that

7  work and at whose instance it is produced.  *See, e.g., Niss v. Columbia Pictures Indus.,*

8  *Inc.,* 57 U.S.P.Q.2d 1346, 1353-55 (S.D.N.Y. 2000), *aff'd,* 25 Fed.Appx. 76 (2d Cir.

9  2002) (citing *Wilkes v. Rhino Records, Inc.,* No. 96-56238, 1997 WL 800275, at *1 (9th

10  Cir. Dec. 17, 1997) (holding work submitted for purpose of auditioning to be a work for

11  hire)).[16]  In *Niss,* the Court held that where the writer had submitted the "'bare bones' of a

12  story" and a draft of a "screenplay [that] was incomplete," the studio was "the motivating

13  factor in [the] development of the [w]ork" which was held to be a work for hire.  57

14  U.S.P.Q.2d at 1354.  The Court held that the works at issue were produced at the studio's

15  instance because, even though the writer was not yet hired, he prepared and "auditioned"

16  works that were "not fully developed."  *Id.* at 1354, 1355.  In reaching this conclusion,

17  the court relied on *Wilkes,* in which the Ninth Circuit held that works created by an artist

18  *before* he was hired were works made for hire because they were created "for the purpose

19  of auditioning for [the] position" of art director of the Monterey Festival and, thus, the

20  Festival was the motivating factor for the production of the artwork.  57 U.S.P.Q.2d at

21  1354.[17]

22      Here, the Submissions were incomplete works that had to be submitted to

23  Detective by Siegel as an audition or proposal for an ongoing series of Superboy comic

24

25  [16] Because the Ninth Circuit's opinion in *Wilkes* is unpublished, we only refer to this decision to the extent it is cited and excerpted in the Southern District of New York's published decision in *Niss.*

26  [17] *See also Scherr v. Universal Match Corp.,* 417 F.2d 497, 499 (2d Cir. 1969) (discussed in *Niss*) (copyright in statue made by servicemen on their leisure time owned by United States); *In re Marvel Entm't Group,* 254 B.R. 818, 830-31 (D. Del. 2000) (discussed in *Niss*) (writer failed to negate hiring party's instance where he had proposed a "nascent" idea for comic book, submitting "not fully developed" write up "for a character and story").

27

28

18

EXHIBIT 16
811



1   books.  They contain only general concepts and inchoate story proposals – the Pitch

2   merely suggested "a strip named SUPERBOY, which would relate to the adventures of

3   Superman as a youth," but provided reference to only the physical format and the briefest

4   "sales pitch" for such a comic (Zissu Ex. <u>G</u> at 2), *see Niss*, 57 U.S.P.Q.2d at 1353-55, and

5   the Script offered a thirteen-page treatment, without any illustrations, for the first of a

6   series of comics (Zissu Ex. <u>H</u>).  Siegel sent these solicitations to Detective (and not

7   elsewhere) because Detective was the only party entitled to publish and market Superman

8   works, including any derivative works based thereon; that the Submissions were not

9   created pursuant to an express request by Detective is legally irrelevant to determining

10  the element of instance.  Accordingly, since the Submissions were derivative works

11  submitted to Detective – pursuant to the September 1938 Agreements, the only entity that

12  could have published and had the right to control Superboy – for this reason alone

13  Detective must be deemed, as a matter of law, to have induced the creation of the

14  Submissions and to be the motivating force behind their creation.

15      **2.      Detective Possessed The Right To Reject Or Modify The Works.**  With

16  respect to this factor, the recipient need only possess the power to "accept, reject, or

17  modify" the work at issue.  *Twentieth Century*, 429 F.3d at 880 (citing *Picture Music,*

18  457 F.2d at 1217).  Because Detective controlled the underlying works upon which the

19  Submissions were based, it alone possessed the right to direct and supervise any work

20  derived therefrom.  *Hogarth*, 342 F.3d at 163; *Picture Music*, 457 F.2d at 1216-17.  The

21  Submissions by their own terms and context invited Detective's acceptance or rejection

22  of the comics Siegel proposed for publication; they were not and could not have been

23  submitted for consideration by other publishers.

24      **3.      The Works Were Prepared at the Expense Of DC's Predecessor.**  As a

25  matter of law, where the work at issue is to be produced by the hiring party who takes on

26  "all the financial risk" – exactly what Siegel proposed here – the work is created at the

27  hiring party's expense.  *Twentieth Century,* 429 F.3d at 881; *see also Community for*

28  *Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989).  The expense element is also

19

**EXHIBIT 16**
**812**

1    satisfied whenever the employing party "simply" pays any sum certain to the creator

2    regardless of amount and regardless of whether these works were ever published.

3    *Playboy*, 53 F.3d at 555. *See also Niss*, 57 U.S.P.Q.2d at 1354. It is immaterial under

4    this analysis that Siegel did not receive payment at the time he submitted the Pitch or the

5    Script to Detective: Siegel received his portion of a payment of $94,013.16 in or around

6    May 1948 for, *inter alia,* his pitch of "Superboy." *National*, 362 F. Supp. at 1035. In

7    sum, because Detective was the motivating party at whose instance and expense the

8    Submissions were prepared, with the power to accept, reject or modify them (*Self-*

9    *Realization*, 206 F.3d at 1327), they are works made for hire which, as a matter of law,

10   cannot be terminated. 17 U.S.C. § 304(c).[18]

11   **C.    By Leaving In Place The May 21, 1948 Grant, Plaintiffs Have Not Terminated The Grants Of Copyright In The Submissions.**

12          As set forth above, the 1976 Act termination provisions sought to forge a balance

13   between authors' rights to renegotiate and fair notice to publishers. This is why a notice

14   of termination "must" identify "the grant" to which it applies. 37 C.F.R. § 201.10

15   (b)(1)(iv). Thus, if an author has entered into five separate grants of rights for the same

16   work, and a notice of termination identifies only four of the grants, the fifth grant remains

17   "intact" and the grantee's rights thereunder unaffected. *Cf. Burroughs*, 683 F.2d at 621-

18   22; *Milne*, 430 F.3d at 1048 (copyright termination invalid where pre-1978 grant is still

19   effective); 3 *Nimmer*, § 11.06[B] at 11-40.22(1) n.63. The Superboy Notice identifies for

20   termination only the grants contained in the Stipulation and the 1975 Agreement, and

21   references the other grants in the Superman Notices. (Zissu Ex. AA, ¶ 3 & n.7.) It *fails*

22   to terminate the grant in the Final Consent Agreement in which Siegel, *inter alia,*

---

23   [18] If the Submissions were not works made for hire, their preparation was unauthorized

24   and fell outside the scope of permitted activities under the parties' contractual relationship. This would also render them ineligible for termination because, then,

25   neither Siegel nor Shuster could claim any copyright ownership in the Submissions. As established in Section I, *supra*, under both the 1909 Act and the 1976 Act, copyright

26   protection in a derivative work extends only to the new material added. 17 U.S.C. § 7 (repealed); 17 U.S.C. § 103(b). However, protection for any new material in a derivative

27   work *does not* attach if the underlying work is used without permission. 17 U.S.C. § 7 (repealed); 17 U.S.C. § 103(a). *See, e.g., Pamfiloff v. Giant Records, Inc.*, 794 F. Supp.

28   933, 938 (N.D. Cal. 1992); 1 *Nimmer* § 3.06 at 3-34.30. *See also Litchfield v. Spielberg,* 736 F.2d 1352, 1357 (9th Cir. 1984); *Oddo*, 743 F.2d at 634; *Mirage*, 856 F.2d at 1343.

**EXHIBIT 16**
**813**



1  effectuated the transfer to National of the sole and exclusive ownership of all rights

2  relating to "Superboy." (*Id.* Exs. <u>AA</u> and <u>R</u> at 5.) Because Plaintiffs failed to identify the

3  Final Consent Agreement, the grant of rights in "Superboy" found therein remains intact.

4  **III.   AS A MATTER OF LAW, PLAINTIFFS CAN POINT TO**
        **NO COPYRIGHTABLE MATERIAL IN THE**
5        **SUBMISSIONS THAT IS INFRINGED BY *SMALLVILLE***

6        Plaintiffs have sought to manufacture a claim for copyright infringement by

7  claiming that the *Smallville* television series is not based upon Superman but actually

8  copies the Submissions and thus is infringing. That this claim is completely unsupported

9  by any facts is revealed once the Submissions and the *Smallville* show are actually

10  compared in accordance with the established requirements of copyright law.

11        In order to prove copyright infringement, Plaintiffs must show (1) ownership of a

12  valid copyright and (2) Defendants' copying of protected elements of the copyrighted

13  work. *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442 (9th Cir. 1994).

14  However, a plaintiff "may place '*no* reliance upon any similarity in expression resulting

15  from 'unprotectable elements.'" *Id.* at 1443 (quoting *Aliotti v. R. Dakin & Co.,* 831 F.2d

16  898, 901 (9th Cir. 1987)). In assessing a claim of copyright infringement, courts must

17  engage in a "filtration process," removing from the comparison of the works any portion

18  of the plaintiff's work not protected under copyright or not owned by the plaintiff. *Apple*,

19  35 F.3d at 1443; *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1176-77 (C.D. Cal.

20  2001, *aff'd in part, dismissed in part*, 90 Fed.Appx. 496 (9th Cir. 2003). Among the

21  elements to be filtered out are "ideas" as opposed to their expression ("[i]n no case does

22  copyright protection for an original work of authorship extend to any idea . . . concept,

23  principle or discovery, regardless of the form in which it is described, explained,

24  illustrated, or embodied in such work" 17 U.S.C. § 102 (b)), as well as material repeated

25  from pre-existing works (*i.e.*, all Superman works pre-dating the Script), *Shaw v.*

26  *Lindheim,* 809 F. Supp. 1393, 1402 (C.D. Cal. 1992), or "elements borrowed from

27  another author." *Idema*, 162 F. Supp. 2d at 1177. "The aspects of a derivative work

28  added by the derivative author are that author's property, but the element drawn from the

21

**EXHIBIT 16**
**814**

1  pre existing work remains on grant from the owner of the pre-existing work." *Stewart*,

2  495 U.S. at 223 (1990).[19]

3      Once the non-copyrightable elements and matter not owned by the plaintiff are

4  filtered out of the work, an objective comparison of the remaining copyrightable elements

5  of the works at issue is conducted.  For literary works, a court will compare such original

6  elements as "plot, theme, dialogue, mood, pace, setting, characters, and sequence of

7  events."  *See Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.

8  1994).  The "filtration" described above is part of the Ninth Circuit's "extrinsic" test of

9  substantial similarity, an objective legal test "generally employed at summary judgment .

10  . . ."  *Idema*, 162 F. Supp. 2d at 1177 (citing *Three Boys Music v. Bolton*, 212 F.3d 477,

11  481 (9th Cir. 2000)).

12      Plaintiffs' entire claim to exclusive rights in Superboy rests upon the Submissions.

13  (*See* Zissu Ex. L, ¶¶ 18-25.)  However, when these works are stripped of both pre-

14  existing derivative and other unprotectable material, such as ideas, Plaintiffs are left with

15  very little, if any, copyrightable material and, as shown below, none used in any

16  *Smallville* episode created after November 14, 2004, the effective date of the Superboy

17  Notice.

18      A.    **Applying The "Filtration Process" To The Submissions Demonstrates That Plaintiffs Own Virtually No**
19          **Copyrightable Subject Matter Therein, If Any At All.**

20      Seeking to establish some "copyrightable" elements that they own in the

21  Submissions, Plaintiffs grossly misrepresent the contents of the Script.  For example, they

22  allege that the Script establishes "'Superboy's character, origins, family and social life as

23  a youth growing up in a small town in the rural American heartland." (Ex. L, ¶ 25.)

24  None of this is true.  As demonstrated in the Chart (*see* pages 4-5, *supra*), the character,

25  origins, and family life of young Superman were all established well before 1940 in

---

26  [19] This point is explained in the legislative history, "[t]he most important point here is one

27  that is commonly misunderstood today: copyright in a 'new version' covers only the material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material." H. Rep. at 57; *see also* 17

28  U.S.C. § 103(b) ("copyright in a . . . derivative work extends only to the material contributed by the author of such [derivative] work").

22

**EXHIBIT 16**
**815**

1  materials owned exclusively by Detective. Except for the references to a toddler and

2  grade-school Superman, the Script contains no development of Superman's social life.

3  Nor does the Script reference Superman being raised in "a small-town in the rural

4  American heartland." (*Compare id.* Ex. <u>H</u> *with* <u>L</u>, ¶ 25.) Any claim that the Script "starts

5  with the youth at age eleven or twelve, while he attends junior high school" is similarly

6  false – the Script describes Superman as being in kindergarten and in fifth grade. (*Id.* Ex.

7  <u>H</u> at 8-9.)

8       As noted, Superman's origins and appearance as a youth had already been

9  published by Detective when the Script was submitted. (*See* Chart and Zissu Exs. <u>F</u>, <u>I</u>,

10  <u>J</u>.)[20] Thus, virtually all arguably copyrightable components in the Submissions are taken

11  from that preexisting Superman comics owned exclusively by Detective. As a matter of

12  law, Siegel (and now Plaintiffs) cannot claim ownership in pre-existing material.

13  *Stewart*, 495 U.S. at 223. Once copyrightable components not original to or owned by

14  Siegel are stripped away, *see* 17 U.S.C. § 103(b), the Submissions contain no more than

15  the general concept of a youth with superpowers – an uncopyrightable idea, *see* 17 U.S.C.

16  § 102(b), inevitable in a prequel to Superman.[21] That is, after application of the filtration

17  process, all that remains in the Submissions that is arguably copyrightable is their literal

18  text.

19       **B.    No Episode Of *Smallville* Created After November**
        **14, 2004 Infringes Any Right Of Plaintiffs.**

20       Under section 304(c)(6), even if Plaintiffs could recapture the copyright for

21  Superboy, this only affects DC's right to prepare "*after the termination . . . other*

22  *derivative works* based upon the copyrighted work" (emphasis added). 17 U.S.C. §

23

---

24  [20] In addition to the previously published works identified in Section I, *supra*, such idea
    was also published in *The Adventures of Superman*, a novel by George Lowther

25  published in 1942 (Zissu Ex. <u>CC</u>), as well as in a newspaper strip published in May 1942
    (*id.* Ex. <u>DD</u>). Neither of these works is named in the Superboy Notice, nor is the notice

26  timely as to such works.
    [21] Even the Westchester Action Interlocutory Findings upon which Plaintiffs rely state

27  only that *More Fun Comics* embodied and were "based upon the *idea, conception, and*
    *plan*" contained in the Pitch and in the Script, and do not identify any copyrightable

28  subject matter included in *More Fun Comics*. (Zissu Ex. <u>O</u>, ¶¶ 163-166) (emphasis
    added). *Accord* 17 U.S.C. § 102(b).

23

**EXHIBIT 16**
**816**



1  304(c)(6).  The only specific work of Defendants that Plaintiffs claim infringes the

2  Submissions is *Smallville*.  The series premiered in the fall of 2001, and chronicles the

3  adventures of Clark Kent while in high school in the town of Smallville.  A major

4  premise of *Smallville* – presented only in its first episode – is that, on the day the infant

5  Superman arrived in his space capsule from the planet Krypton, a shower of meteors

6  (Kryptonite) from Krypton also struck Smallville, plaguing the town with a number of

7  unexplained supernatural phenomena ever since.  (*See* Declaration of Melinda Hage

8  ("Hage Decl."), ¶ 3 & Exs. A, B.)  These elements emanate from pre-existing Superman

9  comic books.  (Zissu Exs. F, I, J.) [22]

10     From this background and through the use of familiar Superman characters,

11  *Smallville* moves in its own, new direction.  The show centers around Clark Kent as a

12  modern teenager coming to terms with his powers and dealing with the unusual

13  occurrences in Smallville.  (Hage Decl., ¶ 3.)  The action also highlights his relationships

14  with Lana Lang (his love interest) and a young Lex Luthor, who would eventually

15  become Superman's main enemy.  (*Id.* ¶ 3.)  As the series has progressed, it has

16  increasingly devoted more of its story lines to the supernatural and science fiction – with,

17  among other things, a focus on Superman's discovery of his origins on the planet

18  Krytpon and his father, Jor-El, all elements that predated the Submissions.  (*Id.* ¶ 3 &

19  Exs. A-J; *compare with* Chart, *supra*.)  None of these elements are present in the

20  Submissions.

21     The only similarity between *Smallville* on the one hand, and the Submissions on

22  the other, is that they refer to Superman's origins and embody the idea of Superman as a

23  youth.  As a matter of law, Plaintiffs cannot claim ownership of an idea or of the pre-

24  existing Superman story elements reused in the Submissions.  Once these ideas and pre-

25  existing foundation story elements are "filtered out," what remains of the works that may

26  be copyrightable and owned by Plaintiffs does not resemble any of the expressive content

27  in *Smallville*, including any episodes prepared *after* November 14, 2004, the effective

28  _____

[22] As is the case with Superboy, Plaintiffs also conceded in the Superman Notices that *Smallville* is a derivative work based on Superman.  (*Id.* Exs. S-Y at 3 n.1.)

24

**EXHIBIT 16**
**817**

1  date of the Superboy Notice.  Further distinguishing *Smallville* from the Submissions is

2  the way the idea of Superman as a youth is presented in each work.  (*Compare* Zissu Exs.

3  G, H, *with* Hage Exs. A-J.)  The concept pitched by Siegel of a simple Superboy going

4  around in the Superman costume bears no resemblance to the complex teenage Clark

5  Kent in *Smallville*, who never wears the Superman costume (Hage Decl. ¶ 3) and whose

6  life circumstances are dictated as much by who he is as the modern, supernatural world in

7  which he lives.

8      Accordingly, despite Plaintiffs' boilerplate allegations of substantial similarity

9  between the Script and *Smallville*, (*see* Zissu Ex. L, ¶¶ 37-40, 45), as a matter of law

10  Plaintiffs cannot identify any original, copyrightable expressive element from the Script

11  (or Pitch) exploited in *Smallville* after November 14, 2004.  (*See* pages 3-6, *supra*.)  The

12  works are so entirely different that there is no possible actionable similarity.

### CONCLUSION

14      The Superman Action is the proper forum to adjudicate all claims Plaintiffs may

15  have relating to their purported co-ownership of Superman, including its derivative,

16  Superboy.  As a matter of law, there is simply no basis for Plaintiffs' separate claims

17  with respect to Superboy, and Defendants therefore respectfully request that the Court

18  grant their summary judgment motion in its entirety.

19  DATED: February 15, 2006          Respectfully submitted,

20                                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                      PERKINS LAW OFFICE, P.C.
21

22                                          -and-

23                                    WEISSMANN WOLFF BERGMAN
                                        COLEMAN GRODIN & EVALL LLP
24

25                                    By:  *Roger L. Zissu*
                                          Roger L. Zissu
26

27                                    *Attorneys for Defendants and Counterclaimant*

I:\jweinberger\dcc\Siegel Litigation\Pleadings\04cv8776\060215-0425344-Memo of Law in Support of MSJ Superboy-jdw.DOC

28

25

**EXHIBIT 16**
**818**

# EXHIBIT 17

Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
LAW OFFICES OF MARC TOBEROFF, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

**ORIGINAL**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>　　　　　Defendants.<br><br>DC COMICS,<br><br>　　　　　Counterclaimant,<br>　　vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>　　　　　Counterclaim Defendants. | Case No. CV 04-08776 RSWL (RZx)<br><br>[Honorable Ronald S. W. Lew]<br><br>**PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Complaint filed: October 22, 2004]<br><br>Date:　March 20, 2006<br>Time:　9:00 a.m.<br>Place:　Courtroom 21, 5th Floor<br><br>[Statement of Genuine Issues and Declaration of Marc Toberoff Filed Concurrently Herewith] |



MAR - 6 2006

BY _____ 004

67

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**819**

## TABLE OF CONTENTS

I.    INTRODUCTION................................................................1

II.   PROCEDURAL BACKGROUND.............................................2

III.  FACTUAL BACKGROUND................................................3

IV.   LEGAL ANALYSIS......................................................4

    A.    Standard of Review............................................4

    B.    The Findings, Conclusions And Opinion In The 1947
         Action Bind Defendants Under Doctrines Of Res
         Judicata Or Collateral Estoppel...............................4

    C.    "Superboy" Constitutes A Separate Copyright.......................10

    D.    Siegel's Superboy Material Were Not "Works Made
         For Hire".......................................................12

    E.    Siegel's Superboy Was Published In More Fun Comics
         No. 101........................................................16

    F.    Plaintiffs' Termination Notice Was Not Required To
         List The 1948 Consent Judgment Because It Was Not
         A Copyright Grant.............................................17

    G.    Defendants' Joint Work Defense Is Unavailing.....................20

    H.    Genuine Issues of Material Fact Prevent Summary
         Judgment Re: Whether Smallville Infringes Plaintiffs'
         Superboy Copyright...........................................21

V.    CONCLUSION..............................................................25

i

**EXHIBIT 17**
**820**

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                  **Page**

*Allen v. McCurry,*
    449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980)...................5, 8

*Anderson v. Liberty Lobby,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)...................4

*Ashe v. Swenson,*
    397 U.S. 436, 25 L. Ed. 2d 469, 90 S. Ct. 1189 (1970)..................13

*Baxter v. MCA, Inc.,*
    812 F.2d 421 (9th Cir. 1987)................................................24

*Becher v. Countoure Laboratories, Inc.,*
    279 U.S. 388, 49 S.Ct. 356, 73 L.Ed.752 (1929).........................8

*Brother Records, Inc. v. Jardine,*
    432 F.3d 939 (9th Cir. 2005)................................................9

*Burroughs v. Metro-Goldwyn Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1982)...............................................19

*Dolman v. Agee,*
    157 F.3d 708 (9th Cir. 1998)..............................................15

*EFCO Corp. v. U.W. Marx, Inc.,*
    124 F.3d 394 (2d Cir. 1997)................................................5

*Fisher v. Dees,*
    794 F.2d 432 (9th Cir. 1986)..............................................24

*Fuchsberg & Fuchsberg v. Galizia,*
    300 F.3d 105 (2d Cir. 2002)................................................5

*Garguili v. Thompkins,*
    790 F.2d 265 (2d Cir. 1986).............................................5, 6

*Hamilton v. State Farm Fire & Cas. Co.,*
    270 F.3d 778 (9th Cir. 2001)..............................................10

*Hoehling v. Univ. City Studios, Inc.,*
    618 F.2d 972 (2d Cir. 1980)...............................................22

ii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**821**

*Jasper v. Bovina Music, Inc.,*
    314 F.3d 42 (2d Cir. 2002)................................................14

*Jerome Siegel et al. v. National Periodical Publications, et al.,*
    364 F. Supp. 1032 (S.D.N.Y. 1973)..............................passim

*Jerome Siegel et al. v. National Periodical Publications, et al.,*
    509 F.2d 909 (2d Cir. 1974)........................................passim

*Johnson v. Watkins,*
    101 F.3d 792 (2d Cir. 1996)...............................................5

*Knickerbocker Toy Co. v. Faultless Starch Co.,*
    467 F.2d 501 (C.C.P.A. 1972)........................................8, 14

*Lin-Brook Blders Hrdwre v. Gertler,*
    352 F.2d 298 (9th Cir. 1965)............................................16

*Marrese et al. v. American Academy of Orthopedic Surgeons,*
    470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).....................8

*Matsushita Elec. Indus. Co. v. Epstein,*
    516 U.S. 367, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996)..................5, 8

*Migra v. Warren City Sch. Dist. Bd. of Ed.,*
    465 U.S. 75, 104 S.Ct. 892, 79 L.Ed. 2d 56 (1984)......................5

*Milne v. Stephen Slesinger, Inc.,*
    430 F.3d 1036 (9th Cir. 2005).......................................19-20

*Montana v. U. S.,*
    440 U.S. 147, 99 S. Ct. 970, 59 L. Ed.2d 210 (1979).....................7

*Morse v. Fields,*
    127 F. Supp. 63 (S.D.N.Y. 1954)........................................17

*Murphy v. Gallagher,*
    761 F.2d 878 (2d Cir. 1985).............................................6

*Music Sales Corp. v. Morris,*
    73 F. Supp. 2d 364 (S.D.N.Y. 1999).....................................19

*Neuman v. Pike,*
    456 F. Supp. 1192 (S.D.N.Y. 1978).......................................9

*New Hampshire v. Maine,*
    532 U.S. 742, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)................9

*Norris v. Grosvenor Mktg. Ltd.,*
    803 F.2d 1281 (2d Cir. 1986)..........................................5, 6

*Pension Trust Fund for Oper. Engineers v. Triple A Machine Shop, Inc.,*

iii

**EXHIBIT 17**
**822**

942 F.2d 1457 (9th Cir. 1991)...........................................5

*Picture Music, Inc. v. Bourne, Inc.*,
   457 F.2d 1213 (2d Cir. 1972)..................................16

*Russell v. Price*,
   612 F.2d 1123 (9th Cir. 1979)..................................12

*Saturday Evening Post Co. v. Rumbleseat Press, Inc.*,
   816 F.2d 1191 (7th Cir. 1987)..................................8

*Self-Realization Fellowship Ch. v. Ananda Ch.*,
   206 F.3d 1322 (9th Cir. 2000)...........................15,17

*Stewart v. Abend*,
   495 U.S. 207, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990)...........12, 16

*Szekely v. Eagle Lion Films, Inc.*,
   242 F.2d 266 (2d. Cir. 1957)..................................21

*T.B. Harms Co. v. Eliscu*,
   339 F.2d 823 (2d Cir. 1964)..................................13

*Twentieth Century Fox Film Corp. v. Entertainment Distrib.*,
   429 F.3d 869 (9th Cir. 2005)...........................15, 22

*Vernitron Corp. v. Benjamin*,
   440 F.2d 105 (2d Cir. 1971)..................................7

**STATE CASES**

*O'Brien v. City of Syracuse*,
   54 N.Y.2d 353 (1981)..................................5, 6

*Reilly v. Reid*,
   45 N.Y.2d 24 (1978)..................................5

*Smith v. Russell Sage College*,
   54 N.Y.2d 185 (1981)..................................5

**STATUTES**

17 U.S.C. § 7 (repealed)..................................12

17 U.S.C. § 26 (repealed)...........................12, 16

17 U.S.C. § 103(a)..................................12

17 U.S.C. § 304(c)...........................1, 12, 17, 19, 20

28 U.S.C. § 1338(a)..................................14

iv

28 U.S.C. § 1738.................................................................................5, 8

28 U.S.C. § 2283.....................................................................................9

37 C.F.R. § 201.10..........................................................................1, 18-20

Fed. R. Civ. Proc. Rule 56(c)....................................................…........4, 22

**MISCELLANEOUS**

*Bender, Fed. Civ. Pro. Before Trial*, § 14:31...................................…..........4

133 *Moore's Federal Practice-Civil*§ 133.30 ............................................5

18 *Moore's Federal Practice-Civil* § 134.30............................................10

3-30 *Moore's Fed'l Practice and Proc.* § 30.73.....................................13

3-12 *Nimmer On Copyright* § 12.01..................................................…...............8

3-12 *Nimmer On Copyright* § 12.07..................................................8, 13

v

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**824**

# I.    INTRODUCTION

Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel ("Siegel"), the creator of "Superboy." On November 8, 2002, Plaintiffs availed themselves of their legal right under the U. S. Copyright Act (17 U.S.C. § 304 (c)) to recapture the "Superboy" copyright by serving notice on the Defendants that Plaintiffs were terminating Siegel's prior grant(s) of "Superboy" to Defendants' predecessors (the "Termination"). Termination was noticed to take effect on November 17, 2004, sixty-six years after Siegel had created "Superboy." Plaintiffs' Termination duly complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations of the Register of Copyrights.

Defendants' motion ("Mot.") cannot succeed in light of a prior 1947 litigation involving the same underlying facts in New York Supreme Court between the parties' predecessors. The findings therein regarding Siegel's independent creation and ownership of "Superboy" and the contractual relationship between Siegel and Defendants' predecessor bind Defendants under the doctrines of *res judicata* or collateral estoppel. The preclusive effect of the 1947 action was explicitly confirmed in *Jerome Siegel et al. v. National Periodical Publications, et al.*, 509 F.2d 909, 912-913 (2nd Cir. 1974), a subsequent *federal copyright action* against Defendants' predecessor. *See* Opposition Declaration of Marc Toberoff ("Tob. Decl."), Exh. G.

Faced with insurmountable legal hurdles to their Motion, Defendants' Preliminary Statement resorts to disparaging Plaintiffs with false and extraneous remarks. Defendants similarly mischaracterize Plaintiffs' "Superboy" action (No. CV 04-8776) as merely redundant of Plaintiffs' Superman action (No. CV 04-8400). Defendants misstate that the two actions are consolidated, when Defendants' Motion to Consolidate, filed on February 9, 2005, was *denied*; and, at Plaintiffs' suggestion, discovery in the actions was consolidated only for convenience.

Defendants' "straw man" that Plaintiffs assert "[Superboy] has nothing to do with [Superman]" is similarly disingenuous. In 1947, Defendants' predecessor argued

1

1  the same thing:  that they own "Superboy" because "Superboy" is purportedly just a

2  younger version of "Superman."  The 1947 Court disagreed, holding that "Superboy"

3  is sufficiently original to constitute a "distinct" work.

4          Defendants wish to selectively re-litigate the 1947 Court's findings that Siegel

5  owned all rights to "Superboy," while still profiting greatly from the 1947 Court's

6  concurrent finding that their predecessor owned all rights to "Superman."  In addition

7  to the preclusive effect of *res judicata* and collateral estoppel, Defendants are

8  judicially estopped from doing so.

9  **II.    PROCEDURAL BACKGROUND**

10          In 1947, Siegel and illustrator Joseph Shuster ("Shuster"), the co-creators of

11  "Superman," instituted an action in the Supreme Court of New York, against

12  Defendants' predecessor, National Comics Publications, Inc. ("National") seeking a

13  declaration of the rights of the parties with respect to "Superman" and "Superboy."

14  *See Siegel*, 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 509 F.2d at 912-913

15  (describing procedural background of 1947 Action); Tob. Decl., Exhs. F, G.

16          By consent of the parties, all of whom were represented by counsel, the action

17  was tried before Official Referee Judge Addison Young ("Judge Young").  After trial

18  of the action, Judge Young rendered a detailed opinion ("Opinion") on November 21,

19  1947, specifically holding that all rights to "Superman" belonged to National, but that

20  all rights to "Superboy" belonged to Siegel.  Tob. Decl., Exh. A.   Subsequent to the

21  trial of the action, Judge Young made lengthy findings of fact ("1948 FOF") and

22  conclusions of law ("1948 COL") dated April 12, 1948 (collectively, "Findings and

23  Conclusions," Tob. Decl., Exh. B), finding that Siegel was the sole author and

24  exclusive owner of "Superboy."  1948 COL, Nos. 25-26, Tob. Decl., Exh. B.

25          Judge Young thereafter entered an interlocutory Judgment on April 12, 1948

26  from which neither side perfected an appeal.  Instead, they entered into settlement

27  negotiations which resulted in a stipulation dated May 19, 1948 ("1948 Stipulation");

28  and pursuant to its express terms, Judge Young's entry of a consent judgment dated

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**826**

1   May 21, 1948 ("Consent Judgment"). *See Siegel,* 364 F. Supp. at 1034-1035; 509 F.2d

2   at 912-913; 1948 Stipulation and Consent Judgment, Tob. Decl., Exhs. C, D.

3   In the 1948 Stipulation Defendants' predecessor, National, agreed to pay to Siegel and

4   Shuster money in exchange for Siegel's rights in "Superboy" and any remaining rights

5   to "Superman." 1948 Stipulation, Tob. Decl., Exh. C.

6          In 1969, Siegel and Shuster sought declaratory relief in the United States

7   District Court for the Southern District of New York regarding ownership of the

8   renewal copyright to "Superman," resulting on appeal in the Second Circuit's decision

9   in *Siegel, supra.* The district court held and the Second Circuit affirmed that Judge

10  Young's Opinion, Facts and Conclusions and Consent Judgment after settlement were

11  binding on the parties under the doctrine of *res judicata;* and based thereon, that

12  National owned the renewal copyright to "Superman." *Siegel,* 509 F.2d at 912-913.

13  **III.    FACTUAL BACKGROUND**

14         On September 22, 1938, Siegel and Shuster entered into an agreement with

15  Detective (the "September 22, 1938 Agreement") to produce five existing comic strips

16  created by them, including "Superman." 1948 FOF, Facts 39, 46, Tob. Decl., Exh. B.

17  In addition, the Agreement permitted Siegel and Shuster to create new comic book

18  features, provided National had a right of first refusal to accept or reject same within

19  six weeks of the submission thereof.  1938 Agreement, p.1, Tob. Decl., Exh. E.

20         On November 30, 1938 Siegel submitted to Detective for its acceptance or

21  rejection under the terms of the September 22, 1938 Agreement, a written "synopsis or

22  summary" of the "conception and plan of a new comic strip to be known as

23  SUPERBOY" ("Superboy Synopsis," Tob. Decl., Exh. H).  By letter dated December

24  2, 1938, Detective did not buy the Superboy Synopsis "under the terms of the contract

25  dated September 22, 1938 Agreement." 1948 FOF, Facts 155-159, Tob. Decl., Exh. B.

26         Thereafter, in December, 1940, Siegel authored a complete original "Superboy"

27  story ("Superboy Story," Tob. Decl., Exh. I, collectively referred to with the Superboy

28  Synopsis, as the "Siegel Superboy Material"). *Id.,* Fact 160. Siegel's Superboy Story

3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**827**

1  contained "in detail and with particularity" the unique "conception and the character of

2  SUPERBOY;" the "continuity, plan and dialogue for the first 'release' or 'releases' of

3  the proposed new comics strip SUPERBOY," and "the entire plan for the future

4  publication of said comic strip SUPERBOY." *Id.*, Facts 156, 160.  In December, 1940,

5  Siegel submitted his Superboy Story to Detective; but it again failed to purchase the

6  Superboy Story per the September 22, 1938 Agreement.  *Id.*, Facts 160, 162.

7       Siegel entered the U.S. Army in July, 1943.  *Id.*, Fact 182.  While he was

8  stationed abroad Detective wrongfully used the Siegel Superboy Material in an

9  illustrated comic book story entitled "Superboy" in the magazine issue, More Fun

10  Comics, No. 101, which was published in December, 1944.  *Id.*, Facts 163-166, 168.

11  Thereafter, Detective released "Superboy" comic strips in magazines bi-monthly until

12  February, 1946 and monthly thereafter.  1948 FOF, Fact 169. The Court is respectfully

13  referred to the Statement of Facts in Plaintiff's Motion for Partial Summary Judgment.

14  **IV.   LEGAL ANALYSIS**

15       **A.   <u>Standard Of Review</u>**

16       Rule 56(c) of the Federal Rules of Civil Procedure provides for summary

17  judgment when "there is no genuine issue of any material fact and [] the moving party

18  is entitled to judgment as a matter of law." "Because summary judgment is a drastic

19  remedy and deprives a party of the right to a jury trial, strict standards apply."

20  Lawrence Bender, Fed. Civ. Pro. Before Trial, §14:31.  In reaching its decision, the

21  court must assess whether there are any factual issues to be tried, while resolving

22  ambiguities and drawing reasonable inferences against the moving party.  *Anderson v.*

23  *Liberty Lobby*, 477 U.S. 242, 249-250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

24       **B.   <u>The Findings, Conclusions And Opinion In The 1947 Action Bind</u>**

25           **<u>Defendants Under Doctrines Of Res Judicata Or Collateral Estoppel</u>**

26       The law is well settled that a federal court determines the preclusive effect of the

27  findings and conclusions in a prior state court action by looking to the laws of that

28  state to determine whether principles of *res judicata* or collateral estoppel bar the

4

1   parties' arguments. *Pension Trust Fund for Oper. Engineers v. Triple A Machine*
2   *Shop, Inc.*, 942 F.2d 1457, 1464-1465 (9th Cir. 1991).
3       The Full Faith and Credit Act, 28 U.S.C. § 1738, also commands that a federal
4   court accord a state court's resolution of issues the same preclusive effect as would be
5   accorded in the rendering state. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S.
6   367, 369, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996); *Allen v. McCurry*, 449 U.S. 90, 96,
7   101 S. Ct. 411, 66 L. Ed. 2d 308 (1980). This rule generally applies regardless of
8   whether the state court construes state or federal law. *Allen*, 449 U.S. at 104; *see* 18-
9   133 *Moore's Federal Practice-Civil* § 133.30. Preclusion applies to claims raised and
10  to claims that could have been raised at the time of the earlier action. *Migra v. Warren*
11  *City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed. 2d 56 (1984).
12      New York has adopted a transactional approach to the doctrine of *res judicata* or
13  claim preclusion. *Garguili v. Thompkins*, 790 F.2d 265, 269 (2d Cir. 1986); *Reilly v.*
14  *Reid*, 45 N.Y.2d 24, 29-30 (1978). That is, if a subsequent claim arises from the same
15  "factual grouping" as a previously resolved claim, the subsequent claim is barred
16  regardless of whether the two suits are based on different legal theories or seek
17  different remedies. *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192 (1981); *Reilly*,
18  45 N.Y.2d at 29-30; *see also EFCO Corp. v. U.W. Marx, Inc.*, 124 F.3d 394, 397 (2d
19  Cir. 1997). *See O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981) ("claims
20  arising out of the same transaction or series of transactions are barred").
21      "Collateral estoppel prevents a party from re-litigating an issue decided against
22  that party in a prior adjudication" in which that party had a "'full and fair opportunity'"
23  to litigate. *Fuchsberg & Fuchsberg v. Galizia*, 300 F.3d 105, 109 (2d Cir. 2002),
24  *quoting Johnson v. Watkins*, 101 F.3d 792, 794-95 (2d Cir. 1996). The preclusive
25  effect extends to issues not specifically addressed but which "by necessary
26  implication... [are] contained in that which [was] explicitly decided." *Norris v.*
27  *Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986). Collateral estoppel
28  promotes judicial efficiency, reduction of inconsistent rulings and promotion of the

5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**829**

1    finality of judgments. *Murphy v. Gallagher*, 761 F.2d 878, 882 (2d Cir. 1985).

2         Defendants' motion essentially claims that Plaintiffs' Termination is ineffective

3    to recapture Siegel's original copyright in "Superboy" because Siegel's "Superboy"

4    was purportedly (1) unoriginal; (2) never published and (3) a "work made for hire"

5    owned at inception by Defendants' predecessor, Detective Comics, Inc. ("Detective").

6         Defendants' three claims were either already decided against Defendants'

7    predecessors in the 1947 Action, or arise out of the same "factual groupings,"

8    regarding "Superboy" as were litigated in the 1947 Action. *Garguili*, 790 F.2d at 269;

9    *O'Brien* 54 N.Y.2d at 357.  Each issue was either litigated or is inherent, directly or by

10   implication, in matters adjudicated in the 1947 Action. *Norris*, 803 F.2d at 1285.

11        In a nutshell, each of Defendants' three assertions is barred by Judge Young's

12   holdings in the 1947 Action, as follows:

13        (1)    Superboy vs. Superman: "I cannot accept defendants' view that Superboy

14   was in reality Superman.  I think Superboy was a separate and distinct entity." 1947

15   Opn. at pp.41a-42a, Tob. Decl., Exh. A; "SUPERMAN...did not contain the plan,

16   scheme, idea or conception of the comic strip SUPERBOY as it was later submitted

17   by...SIEGEL to DETECTIVE COMICS, INC. in [the Siegel Superboy Materials],"

18   1948 FOF, Fact 166, Tob. Decl., Exh. B.

19        (2)    Publication of Siegel's Superboy Material: Detective's first "comic strip

20   release entitled SUPERBOY published in December of 1944 [in More Fun Comics,

21   No. 101] embodied and was based upon the idea, plan and conception contained in the

22   [Superboy Story] submitted by...SIEGEL to DETECTIVE COMICS, INC. in

23   December of 1940," and "[a]ll of the comic strip material published under the title

24   SUPERBOY was based upon the idea, plan, conception and direction contained in the

25   [Siegel Superboy Materials]." 1948 FOF, Facts 164- 165, 171-172, Tob. Decl., Exh. B.

26        (3)    Ownership of Siegel Superboy Materials: "Siegel is the originator and the

27   sole owner of the comic strip feature SUPERBOY" and "ha[d] the sole and exclusive

28   right to create, sell and distribute comic strip material under the title SUPERBOY of

6

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**830**

1    the type and nature [t]heretofore published [by Detective and National]." 1948 COL,

2    No. 25-26, Tob. Decl., Exh. B.

3        The application here of the doctrines of *res judicata* and collateral estoppel

4    doctrines is based on good reason. Judge Young's Findings and Conclusions in 1948,

5    eight to nine years after the events in question, are much more factually reliable than

6    any findings that can be made today, sixty-seven years after such events. The law,

7    public policy and common sense requires giving *res judicata* or collateral estoppel

8    effect to the 1947 findings because they were based upon a review of substantial

9    evidence at a time when all the key witnesses were alive and the evidence was fresh.

10        Judge Young's detailed Findings and Conclusions concerned the *same facts and*

11    *transactions* as Defendants and Plaintiffs' cross-motions, and provide a much more

12    reliable index of the truth than anything that can be drummed up by Defendants today.

13    Allowing parties to re-litigate previously adjudicated claims or issues frustrates the

14    goal of judicial economy and invites judicial inconsistencies which erode public

15    confidence in the judicial system. *Montana v. U. S.*, 440 U.S. 147, 153-154, 99 S. Ct.

16    970, 59 L. Ed.2d 210 (1979).

17        The district court in *Siegel* explicitly relied on Judge Young's Findings and

18    Conclusions, holding that "the findings of the State Supreme Court in the Westchester

19    action are binding on us here." 364 F. Supp. at 1035-1036, *citing Vernitron Corp. v.*

20    *Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971), *aff'd Siegel*, 509 F.2d at 913. The district

21    court decided and the Second Circuit affirmed that National owned the "Superman"

22    renewal copyright based on the *res judicata* effect of Judge Young's holding that

23    National owned "all rights" in "Superman." *Siegel*, 508 F.2d at 912-914. Under the

24    same principles of *res judicata*, it follows that Siegel owned the *copyright* to

25    "Superboy" based on Judge Young's holding that Siegel owned "all rights" in

26    "Superboy" without reservation. *See* 1948 COL, Nos. 25-26.

27        In fact, *Nimmer* cites *Siegel, supra*, as the seminal case wherein the *res judicata*

28    effect of a prior *state* court action is invoked in a *federal* copyright action, contrary to

7

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

831

1   Defendants newfound assertions that the 1947 Action does not have *res judicata* or

2   collateral estoppel effect because it was not a federal copyright action.  3-12 *Nimmer*

3   *On Copyright* § 12.07.  *Siegel*, *supra*, is well supported.  In *Matsushita Elec. Indus.*

4   *Co. v. Epstein*, 516 U.S. 367, 380, 11 S.Ct. 873, 134 L.Ed. 2d 6 (1996) the Supreme

5   Court held that state court proceedings "may have preclusive effect in a subsequent

6   action within the exclusive jurisdiction of the federal courts."  *See Allen*, 449 U.S. at

7   105 (no "universal right to litigate a federal claim in a federal district court").

8       In *Becher v. Countoure Laboratories, Inc.*, 279 U.S. 388, 391, 49 S.Ct. 356, 73

9   L.Ed.752 (1929), the Supreme Court affirmed the Second Circuit's ruling that the facts

10  in a state breach of contract action were sufficiently similar to those in a later *patent*

11  *infringement* case to bar re-litigation of patent issues in *federal court*.  *See Marrese et*

12  *al. v. American Academy of Orthopedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327,

13  84 L.Ed.2d 274 (1985) (In a federal anti-trust action, state court decisions have

14  preclusive effect under the full faith and credit clause, 28 U.S.C. § 1738).

15      Nimmer is also in accord: "Because contractual rights arise under state law,

16  jurisdiction lies solely with the state courts in an action to enforce contracts relating to

17  works subject to statutory copyright or rights under those contracts….The fact that

18  questions of copyright law may also have to be determined in such an action does not

19  oust state jurisdiction."  3-12 *Nimmer on Copyright* § 12.01; *see Knickerbocker Toy*

20  *Co. v. Faultless Starch Co.*, 467 F.2d 501, 509 (C.C.P.A. 1972); *Saturday Evening*

21  *Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1198 (7th Cir. 1987).

22      Defendants alternatively attempt to cherry pick application of the *res judicata*

23  doctrine to the 1948 Consent Judgment alone, claiming that the Second Circuit in

24  *Siegel*, *supra*, only relied on the Consent Judgment.  On the contrary, in *Siegel*, *supra*,

25  the Second Circuit discusses, liberally quotes from and gives *res judicata* effect to the

26  Judge Young's Opinion, Findings and Conclusions and Consent Judgment in the 1947

27  Action, 508 F.2d at 912-913,[1] and affirms the district court which expressly gives *res*

28  _____
    [1]  In holding that National owns the renewal copyright to "Superman," based on the
    determination in the 1947 Action that its predecessor Detective owned all rights to

                                    8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

1  *judicata* effect to Judge Young's Findings and Conclusions.  364 F. Supp. at 1035.

2      Defendants nonetheless claim that Judge Young's extensive Findings and

3  Conclusions are to be categorically ignored, arguing that such are interlocutory.

4  Defendants rely on two cases for this incorrect proposition.  The first, *Neuman v. Pike*,

5  questioned the preclusive effect of fact-findings in the context of a motion for

6  preliminary injunction relief, which, by its very nature, is "subject to change after a full

7  hearing and …is interlocutory, tentative, provisional." 456 F. Supp. 1192, 1204

8  (S.D.N.Y. 1978).  The second, *Brother Records, Inc. v. Jardine*, is unrelated, focuses

9  on the Anti-Injunction Act, 28 U.S.C. § 2283, and does not even remotely stand for the

10  proposition for which Defendants cite it.  432 F.3d 939, 942 (9th Cir. 2005).

11      While enjoying for years the full benefits of the doctrines of *res judicata* and

12  collateral estoppel regarding the 1947 Action when it comes to the "Superman"

13  copyright, Defendants now whistle a very different tune regarding the same 1947

14  court's Findings and Conclusions with respect to "Superboy."

15      In fact, Defendants' predecessor specifically claimed to the district court and the

16  Second Circuit in *Siegel*, *supra*, that Judge Young's Opinion, Findings and

17  Conclusions in the 1947 Action were binding under principles of *res judicata* or

18  collateral estoppel regarding its *federal* claim that it owned the *renewal copyright* in

19  "Superman," although this had not been addressed in the 1947 Action.  *See* Appellate

20  Brief of National, *et al.,* pp. 2, 6-14, Tob. Decl., Exh. O ("It should be noted that

21  application of the doctrines of *res judicata* and collateral estoppel here is not only

22  proper but based on good reason." *Id.* at 12.)

23      Defendants should be judicially estopped from arguing the reverse.  Judicial

24  estoppel is an equitable doctrine that precludes a party from gaining an advantage by

---

25  "Superman," the Second Circuit states: "J. Addison Young, in an opinion dated 21
26  November 1947, concluded that the March 1938 Agreement was valid and transferred
   to Detective "all of plaintiffs' rights to Superman (emphasis added).  Shortly
27  thereafter, on 12 April 1948, [Judge Young] signed findings of fact and conclusions of
   law.  The first such conclusion stated: '…plaintiffs transferred all of their rights in and
28  to the comic strip SUPERMAN…[and Detective] became the absolute owner of the
   comic strip SUPERMAN.'  508 F.2d at 912-913.

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**833**

1  asserting one position, and then later seeking an advantage by taking a clearly

2  inconsistent position. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th

3  Cir. 2001); *see* 18 *Moore's Federal Practice* § 134.30 (3d ed. 2000).

4       The Supreme Court in *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct.

5  1808, 149 L. Ed. 2d 968 (2001) lists three factors that courts may consider in

6  determining whether to apply the doctrine of judicial estoppel: (i) the party's later

7  position must be "clearly inconsistent" with its earlier one; (ii) the party has succeeded

8  in persuading a court to accept its earlier position; (iii) the party would derive an unfair

9  advantage or impose an unfair detriment on the opposing party if not estopped.  As set

10  forth above, Defendants' current conduct fits all three factors to a tee.

11       There can be no dispute that the Findings and Conclusions in the 1947 Action

12  are binding on Defendants.  Defendants' should not be permitted to now re-open and

13  dissect the 1947 Action, and to conveniently re-write history almost sixty years later.

14  **C.    "Superboy" Constitutes A Separate Copyright**

15       That "Superboy" is a distinct intellectual property previously owned by Siegel,

16  has heretofore been adjudicated in the 1947 Action.  In the 1947 Action, Defendants'

17  predecessor, National, argued just as Defendants do now, that Siegel's "Superboy" was

18  not original, but *merely* a younger version of "Superman" and that because National

19  controlled the rights to "Superman," Siegel's consent was not required for them to

20  publish "Superboy."  1947 Opn. at pp. 41a-42b, Tob. Decl., Exh. A.

21       After reviewing considerable testimonial and documentary evidence regarding

22  "Superboy" (when all witnesses were alive and all relevant documents available) Judge

23  Young firmly disagreed with National and held that: (i) the original "Superboy"

24  material authored solely by Jerome Siegel contained in detail the conception and

25  character of "Superboy" and the continuity, plan and dialogue for the first release(s) of

26  "Superboy";  (ii) "Superman" did not contain the scheme, conception or character of

27  Siegel's "Superboy;" (iii) "Superboy" was a work different and distinct from

28  "Superman;" (iv) even though Detective owned "Superman," their publication of

10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**834**

1   "Superboy" comic books from 1944-1948 was at all times illegal as it was without the

2   permission of Siegel; and (iv) Siegel had the sole, exclusive right to create, sell and

3   distribute comic strip material under the title "Superboy." 1947 Opn. at pp. 41a-42b;

4   1948 FOF, Facts 163-172; 1948 COL, Nos. 1, 25-26, Tob. Decl., Exhs. A, B.

5       Judge Young's November 21, 1947 Opinion states:

6       "It is quite clear to me, however, that in publishing Superboy that
7       Detective Comics, Inc. acted illegally. <u>I cannot accept defendants view
       that Superboy was in reality Superman. I think Superboy was a separate
8       and distinct entity.</u> In having published Superboy without right, plaintiffs
       are entitled to an injunction preventing such publication and under the
9       circumstances I believe the defendants should account as to the income
       received from such publication and that plaintiffs should be given the
10      opportunity to prove any damages they have sustained on account
       thereof." 1947 Opn. at pp.41a-42a (emph. added), Tob. Decl., Exh. A.

11      Judge Young specifically acknowledged Siegel's "Superboy" Synopsis which

12   stated, in part, that "[Superboy] would relate to the adventures of Superman as a

13   youth." *See* FOF, Fact 156, Tob. Decl., Exh. B. Yet, Judge Young found that although

14   National owned "Superman," "Superboy" is sufficiently new and original to constitute

15   a separate and distinct work from "Superman," wholly owned by Siegel, its sole

16   author. 1948 FOF, Facts 163-172, 1948 COL, Nos. 1, 25-26. After these Findings and

17   Conclusions were rendered, National negotiated the purchase of "Superboy" from

18   Siegel resulting in the 1948 Stipulation of settlement and entry of the Consent

19   Judgment. Tob. Decl., Exhs. C, D; *Siegel*, 508 F.2d at 912-913.

20      With a blind eye to the 1947 Action, Defendants insist that "[Siegel's Superboy]

21   consists entirely of elements taken from pre-existing Superman" squarely contradicting

22   Judge Young's conclusions that Siegel's "Superboy" is "distinct" and that Siegel "was

23   the sole owner of the comic strip feature SUPERBOY," while National owned all

24   rights to "Superman." 1948 COL, Nos. 1, 25; Tob. Decl., Exh. B. Since Defendants'

25   predecessor did not perfect an appeal in the 1947 Action, Defendants are not permitted

26   to re-litigate this issue simply because it suits a new agenda.

27      Defendants' argument that "Superboy" is merely a derivative work is to a large

28   extent a "straw man" argument. Plaintiffs have *never* claimed that "Superboy" is

11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

1  "unrelated" to "Superman" or that "the Superboy character has nothing to do with the

2  Superman character" as Defendants misleadingly assert in their Motion. In fact, Judge

3  Young's Opinion, Findings and Conclusions regarding "Superboy" are easily

4  reconciled with Defendants claim that "Superboy" is derivative of "Superman."

5      The ability to copyright a derivative work containing both original and pre-

6  existing elements is clear and specifically contemplated by both the 1909 and 1976

7  Copyright Acts. 17 U.S.C. § 103(a); *see* 1909 Copyright Act, 17 U.S.C. § 7

8  (repealed); *see Stewart v. Abend*, 495 U.S. 207, 223, 110 S. Ct. 1750, 109 L. Ed. 2d

9  184 (1990) ("The aspects of a derivative work added by the derivative author are that

10 author's property."); *Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979), *cert.*

11 *denied*, 446 U.S. 952, 100 S. Ct. 2919, 64 L. Ed. 2d 809 (1980) ("well-established

12 doctrine" that a derivative copyright protects new material in a derivative work). The

13 new elements in "Superboy" authored by Siegel, including the themes, characters,

14 relationships, mood, settings, locale and the interplay of such elements, are squarely

15 protected by the Copyright Act.

16     In light of Judge Young's conclusion of law that "Superman" "did not contain

17 the plan, scheme, idea or conception of the comic strip SUPERBOY" and thus, that

18 "SUPERBOY was a separate and distinct entity," Defendants may not re-open the

19 issue of "Superboy's" originality. 1948 COL, No. 167, Tob. Decl., Exh. B.

20     **D.    Siegel's Superboy Material Were Not "Works Made For Hire"**

21     Section 304(c)'s termination provisions do not apply to a "work made for hire."

22 17 U.S.C. § 304(c). Defendants thus try to argue that the Siegel Superboy Materials

23 were owned by Detective as "works made for hire" under the now repealed 1909

24 Copyright Act. 17 U.S.C. § 26. Defendants argument is barred by the 1947 Action

25 under the doctrines of *res judicata* or *collateral estoppel*.

26     In the 1947 Action, Judge Young found that even though Siegel and Shuster

27 were to produce five specifically named comic books under their September 22, 1938

28 Agreement with Detective, Siegel's "Superboy" fell under the category of new comic

12

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**836**

1  strip material for which <u>Detective held only a right of first refusal for six weeks</u> after

2  its submission.  Defendants admit this key fact.  Mot. 17:19-20.  Judge Young found

3  that Detective declined to exercise its right to purchase Siegel's Superboy Material.

4  1948 FOF, Facts 156-157; September 22, 1938 Agreement, p.1, Tob. Decl., Exh. E.

5        On this basis Judge Young concluded that "Plaintiff Siegel, as the originator and

6  sole owner of the comic strip feature SUPERBOY has the sole and exlusive right to

7  create, sell and distribute comic strip material under the title SUPERBOY", and

8  National "is perpetually enjoined and restrained from creating, publishing, selling or

9  distributing... SUPERBOY" 1948 COL, Nos. 25-26, Tob. Decl., Exh. B.

10        As set forth above, such Findings and Conclusions bind Defendants under the

11  doctrines of *res judicata* or *collateral estoppel* and contradict Defendants' newfound

12  assertion that "Superboy" was owned by Detective / National *at inception* as a "work

13  made for hire."  Although Judge Young did not mention the phrase, "work for hire,"

14  issue preclusion extends not only to litigated issues but, by implication, to any

15  connected issue. "In other words when the issue for which preclusion is sought is the

16  only rational one that the fact finder could have found, then that issue is considered

17  foreclosed by implication, even if no explicit finding of that issue has been made."

18  3-30 *Moore's Fed'l Practice and Proc.* § 30.73, *see Ashe v. Swenson*, 397 U.S. 436,

19  444, 25 L. Ed. 2d 469, 90 S. Ct. 1189 (1970).

20        Defendants argue that the 1947 state action has no bearing on federal copyright

21  issues.  To the contrary, *Siegel*, 508 F.2d at 912-914, held that the Findings and

22  Conclusions of the 1947 state action are dispositive of a subsequent federal copyright

23  action between the parties or their successors concerning the same facts, as detailed

24  above. *See also* 3-12 *Nimmer On Copyright*, § 12.07.

25        Moreover, matters of contract interpretation [e.g., an employment agreement]

26  relating to copyright typically fall within state court jurisdiction. 3-12 *Nimmer on*

27  *Copyright* § 12.01; *see T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 826 (2d Cir. 1964)

28  ("copyright has not been thought to infuse with any national interest a dispute as to

13

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**837**

1  ownership…turning on the facts or on ordinary principles of contract law."); *Jasper v.*
2  *Bovina Music, Inc.*, 314 F.3d 42, 46 (2d Cir. 2002)( "if the case concerns a dispute as
3  to ownership of a copyright, and the issue of ownership turns on the interpretation of a
4  contract, the case presents only a state law issue"); *Knickerbocker*, 467 F.2d at 509
5  ("Although 28 USC 1338(a) provides that the federal district courts' original
6  jurisdiction over copyright actions 'shall be exclusive of the courts of the states,'
7  the state courts clearly may pass on the validity of a copyright… in the course of
8  deciding a case over which they do have jurisdiction." ).

9      Thus, in *Siegel, supra* the Second Circuit found that National owned the
10  renewal copyright to "Superman" based on Judge Young's first conclusion of law that
11  "[b]y virtue of the instrument of March 1, 1938…DETECTIVE COMICS, INC.
12  became the absolute owner of the comic strip SUPERMAN…" even though the 1947
13  state action did not concern or address the renewal *copyright* issues raised by Siegel
14  and Shuster.  503 F.2d at 912; 1948 COL, No. 1, Tob. Decl. Exh. B.  The Second
15  Circuit held "the state court action determined that the agreements conveyed *all* of the
16  plaintiffs' rights in Superman to the defendants…Under the doctrine of *res judicata* we
17  are not free collaterally to re-examine the agreements to determine whether the
18  construction placed on them was warranted." 503 F.2d at 913.  "The state court was
19  called upon to construe these instruments…that decision is binding on us here." *Id.*

20      Likewise, the state court in the 1947 Action was called upon to construe the
21  September 22, 1938 Agreement and found that under such instrument Defendants'
22  predecessor, Detective, held a six month right of first refusal with respect to the Siegel
23  Superboy Materials and that by virtue of Detective's election not to exercise their right
24  to purchase such material and to employ Siegel to write further Superboy material,
25  Siegel was the "originator and sole owner of [] SUPERBOY." 1948 COL, Nos. 25, 26.

26      Defendants "work for hire" argument, though using new buzz words ("instance
27  and expense," "motivating factor"), attempts to re-litigate the same relationship
28  between the same parties under the same September 22, 1938 Agreement.  Mot. 16:22,

14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

**838**

1   17:14-22; 19:15, 19:24.  Defendants even re-spin Detective's same right of first refusal

2   under such agreement.  Mot. at 17.  Defendants are barred from re-litigating ownership

3   of "Superboy" and re-dissecting the Siegel/Detective relationship under the September

4   22, 1938 Agreement, under the guise of "work for hire" theory,  just as Siegel and

5   Shuster were barred from re-litigating ownership of "Superman" under new "renewal

6   copyright" theories.  *Siegel*, 503 F.2d at 912-914.  After immensely benefiting for 58

7   years from the 1947 Action and from *Siegel, supra,* regarding "Superman," Defendants

8   now assume positions regarding "Superboy" contrary to both decisions.

9       Even if the Court re-opened the issue of whether Siegel owned "Superboy,"

10  contrary to the preclusive doctrines of *res judicata* and collateral estoppel, the

11  underlying findings of *fact* in the 1947 Action as to the parties' contractual relationship

12  and Siegel's wholly independent creation of "Superboy" inevitably also preclude that

13  "Superboy" was a "work made for hire" under the 1909 Copyright Act ("1909 Act").

14      Under the 1909 Act, federal courts applied the work-for-hire doctrine only to

15  traditional hierarchical employment relationships.  However, "[i]n the last decade that

16  the [1909] Act the Courts expanded the doctrine somewhat to include less traditional

17  relationships." *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d

18  869, 877 (9th Cir. 2005) *quoting Self-Realization Fellowship Ch. v. Ananda Ch.*, 206

19  F.3d 1322, 1331 (9th Cir. 2000).  The Ninth Circuit has "consistently evaluated claims

20  that a work was "made for hire" by requiring "credible evidence that the work was

21  done at the 'instance and expense' of the commissioning party." *Self-Realization*, 206

22  F.3d at 877, *quoting Dolman v. Agee*, 157 F.3d 708, 711-712 (9th Cir. 1998).

23      Judge Young found that Siegel independently created his original Superboy

24  Synopsis and Superboy Story under the terms of the September 22, 1938 Agreement,

25  which permitted him to originate new comic strip concepts and stories outside the five

26  comic strips Siegel and Shuster were then producing, subject to a right on the part of

27  Detective to accept or reject same with six weeks of their submission.  1948 FOF,

28  Facts 156-162, Tob. Decl. Exh. B.  Judge Young further found that Siegel submitted

15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**839**

1    his "Superboy" material to Detective which did not elect to purchase and publish such

2    material within the six weeks allotted to it in the September 22, 1938 Agreement. *Id.*

3    This first refusal procedure and time limit is inapposite to any notion or intent that

4    Detective owned such material as the "author" of a "work made for hire. 17 U.S.C. §

5    26 (repealed). *See Lin-Brook Blders Hrdwre v. Gertler*, 352 F.2d 298, 300 (9th Cir.

6    1965) (work for hire status turns on "*mutual intent of the parties* [] that the title of the

7    copyright shall be in the person at whose instance and expense the work was done").

8    Siegel was under no obligation to create Superboy.  Detective never requested such

9    work, nor compensate Siegel for such work until forced to do so in the 1947 Action.

10        For their "work for hire" test, Defendants rely on *Picture Music, Inc. v. Bourne,*

11    *Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972) ("the motivating factor in producing the work

12    was the employer who induced the creation").  However, the findings of fact in the

13    1947 Action explicitly show that Siegel created his "Superboy" work on his own

14    volition and that he consistently tried to interest Detective in purchasing and

15    publishing such work, but that Detective declined to do so.  1948 FOF, Facts 156-162,

16    Tob. Decl., Exh. B.  Such previously adjudicated facts completely contradict

17    Defendants' invented claim that Detective was the "motivating factor" behind Siegel's

18    creation of "Superboy" or that "Superboy" was created at Detective's "instance and

19    expense." *See Self-Realization*, 206 F.3d at 1326, *Lin-Brook*, 352 F.2d at 300.

20        Defendants circularly argue that if "Superboy" is a derivative of "Superman," it

21    is, "as a matter of law," a "work for hire" created "at the instance and expense" of

22    Detective, mis-citing cases which in no way stand for this dubious proposition.  Mot.,

23    17:12-21.  Defendants' argument cannot prevail since it contradicts the clear ability of

24    an author to own the copyright to a derivative work. *Stewart,* 495 U.S. at 223.

25    **E.    Siegel's Superboy Was Published in More Fun Comics No. 101**

26        The Siegel Superboy Materials secured a statutory copyright on November 23,

27    1944 upon registration with the Copyright Office of the serialized magazine, More Fun

28    Comics, No. 101 (registration no. B653651) in which the Siegel Superboy Materials

16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**840**

1  were published in December of 1944. 1948 FOF, Fact 164-165; Tob. Decl., Exh. B.

2  The statutory copyright in More Fun Comics, No. 101, a collective periodical, secured

3  the statutory copyright in its component part -- the Siegel Superboy Materials. *See*

4  *Self-Realization*, 206 F.3d at 1329 (a blanket copyright on a periodical protects its

5  constituent parts); *Morse v. Fields*, 127 F. Supp. 63, 64-65 (SDNY 1954) (publication

6  in a collective work will secure a copyright in all component parts); *see also* 2-7

7  Nimmer on Copyright § 7.12 ("The rule with respect to collective works under the

8  1909 Act…provided that a single notice in the name of the copyright owner of the

9  collective work was sufficient to protect each contribution contained therein.").

10    Defendants disingenuously assert that "Plaintiffs admit that the [Siegel

11  Superboy Materials] were unpublished," citing pages 5-6 of Plaintiffs' Termination

12  Notice. Mot. 16:11. In fact, the Termination Notice at pages 4-5 explicitly state that

13  the Siegel Superboy Materials "w[ere] published and embodied in More Fun Comics,

14  No. 101. *See* Termination Notice, Tob. Decl. Decl, Exh. M.

15    It is indisputable that the Siegel Superboy Materials were published in More Fun

16  Comics No. 101. In the 1947 Action, Judge Young found that Detective's "comic strip

17  release entitled SUPERBOY published [in More Fun Comics, No. 101] in December

18  of 1944 embodied and was based upon the idea, plan and conception contained in the

19  [Siegel Superboy Story] submitted by…SIEGEL to DETECTIVE COMICS, INC. in

20  December of 1940," and "embodied and was based upon the idea, plan and conception

21  contained in the [Siegel Superboy Synopsis] dated November 30, 1938. 1948 FOF,

22  Facts 164-165, Tob. Decl., Exh. B. Such factual findings in the 1947 Action, to which

23  no appeal was taken, are binding on Defendants under the doctrines of *res judicata* or

24  *collateral estoppel* as set forth above.

25    **F.    Plaintiffs' Termination Notice Was Not Required To List The 1948**

26         **Consent Judgment Because It Was Not A Copyright Grant**

27    The regulations promulgated under 17 U.S.C. § 304(c) by the Register of

28  Copyrights ask for "a brief statement reasonably identifying the grant to which the

17

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**841**

1    notice of termination applies." 37 C.F.R. § 201.10 (b)(1)(iv).  In compliance,

2    Plaintiffs' Termination Notice explicitly identifies the 1948 Stipulation wherein Siegel

3    received compensation for transferring "Superboy" to Defendants' predecessor.

4    Termination Notice, ¶ 3, p. 52, Tob. Decl., Exh. M.   The Termination Notice also

5    identified a 1975 agreement regarding "Superman," to the extent relevant.

6         Defendants nonetheless argue that Plaintiffs' Termination is ineffective under

7    37 C.F.R. § 201.10 (b)(1)(iv) for not also listing the 1948 Consent Judgment.

8    However, such regulation merely asks for the reasonable identification of the copyright

9    "grant" to which a Notice of Termination applies; and the Consent Judgment is a

10   judgment, not a "grant." 37 C.F.R. § 201.10 (b)(1)(iv).

11        The chronology regarding "Superboy" clarifies that the Consent Judgment was

12   not a "grant."  Judge Young held that "Superboy" was solely owned by Siegel and that

13   Defendants' predecessor, National, is enjoined from further exploiting "Superboy."

14   1948 COL, No. 25, Tob. Decl., Exh. B.  Rather than perfecting an appeal, National

15   negotiated to purchase "Superboy" from Siegel.  The parties entered into the 1948

16   Stipulation wherein Siegel transferred "Superboy" to National in exchange for a sum

17   of money and agreed to consent to a judgment reflecting National's ownership of

18   "Superboy" and enjoining Siegel from exploiting "Superboy."  Tob. Decl., Exh. C.

19   Accordingly, the Consent Judgment which simply states that National owns

20   "Superboy" and enjoins Siegel from exploiting "Superboy."  Tob. Decl., Exh. D.

21        Defendants' transparent naming of the Consent Judgment as the "Final Consent

22   Agreement" does not change the instrument's real nature.  The Consent Judgment

23   dated May 21, 1948 merely follows the parties' 1948 Stipulation entered into two days

24   earlier on May 19, 1948.  The 1948 Stipulation clearly constitutes the underlying

25   operative grant of "Superboy" to Defendants' predecessor not the Consent Judgment

26   and, as such, the 1948 Stipulation is explicitly identified in the Termination Notice.

27   Moreover, since Siegel transferred "Superboy" to National on May 19, 1948 in the

28   1948 Stipulation, the subsequent <u>Consent Judgment dated May 21, 1948 could not as a</u>

18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

842

1 | matter of law have conveyed "Superboy" which was already in National's possession.

2 | Finally, the Consent Judgment has no adverse impact on Plaintiffs' Termination

3 | as "[t]ermination…may be effected notwithstanding any agreement to the contrary" 17

4 | U.S.C. § 304(c)(5) and neither Siegel's nor Plaintiffs' reversionary termination interest

5 | under Section 304(c) could have been assigned until "after the notice of termination

6 | ha[d] been served [in 2002]". 17 U.S.C. § 304(c)(6)(B),(D).

7 | In the unlikely event the Court views the Consent Judgment as a "grant," the

8 | identification of the underlying 1948 Stipulation "reasonably identifies" the parallel

9 | Consent Judgment issued pursuant to the stipulation. 37 C.F.R. §201.10 (b)(1)(iv).

10 | There is little case law on notice of termination formalities. Defendants,

11 | however, mis-cite *Burroughs v. Metro-Goldwyn Mayer, Inc.*, 683 F.2d 610 (2d Cir.

12 | 1982) for their unsupported proposition that if a termination notice lists five grants but

13 | omits one, the grantee's rights remain unaffected. *Burroughs* held that a notice of

14 | termination only applies to *works* that are listed in the notice. *Id.* at 622. In fact, with

15 | respect to *grants*, the *Burroughs* Court found that a notice of termination identifying a

16 | single 1923 grant and 35 titles was not rendered ineffective with respect to such 35

17 | titles by the fact that many of the titles were assigned in subsequent grants that had not

18 | been identified in the notice. *Id.* at 610, 614, 618, 622 (Court merely noted "as further

19 | Tarzan books were written, the rights in these were also transferred").

20 | *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 378 (SDNY 1999), came to a

21 | similar conclusion. There, the termination notice simply identified the grant as "grant

22 | or transfer of copyright and the rights of copyright proprietor, including publication

23 | and recording right only." *Id.* The Court held that the notice was adequate even

24 | though this "generic statement would not seem to reasonably identify the grant." *Id.*

25 | Defendants also mis-cite *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th

26 | Cir. 2005) as holding "copyright termination invalid where pre-1978 grant is still

27 | effective." *Milne* has nothing to do with listing purported "grants" in a termination

28 | notice. *Milne* held that a *post-1978 grant* could not be terminated under 17 U.S.C. §

19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

**843**

1    304(c), where its parallel pre-1978 grant had long ago been revoked. *Id.* at 1048.

2          Defendants received more than ample notice within the statutory time frame of

3    Plaintiffs' intention to terminate prior grants of "Superboy" and were in no way

4    prejudiced by Plaintiffs not listing the 1948 Consent Judgment in addition to the

5    underlying 1948 Stipulation. The Register of Copyright's regulations, on which

6    Defendants purport to rely for their hyper-technical argument, specifically dissuade

7    such attempts to invalidate termination notices: "Harmless errors in a notice that do not

8    materially affect the adequacy of the information required to serve the purposes of

9    …section 304(c) of title 17, U.S.C.…shall not render the notice invalid." 37 CFR §

10    201.10(e)(1), nor is such a result supported by case law.

11    **G.    Defendants' Joint Work Defense Is Unavailing**

12          Defendants falsely assert that the Siegel Superboy Materials are joint works, co-

13    owned by Plaintiffs and Defendants; and on this purported basis claim that they can

14    continue to exploit "Superboy," notwithstanding the reversion of the original copyright

15    therein pursuant to Plaintiffs' Termination. Like the rest of Defendants' arguments,

16    this flies in the face of the 1947 Action which binds Defendants as set forth above.

17    Therein, Judge Young held the following:

18          25.    Plaintiff Siegel is the originator and the sole owner of the comic
       strip feature SUPERBOY, and the defendants … are perpetually enjoined and
19    restrained from creating, publishing, selling or distributing any comic strip
       material of the nature now or heretofore sold under the title SUPERBOY, or any
20    other comic strip material made in imitation of the conception, characters,
       nature, incidents, action or plot of the Plaintiff's comic strip SUPERBOY.
21
          26.    Plaintiff Siegel, as the originator and owner of the comic strip
22    feature SUPERBOY has the sole and exclusive right to create, sell and distribute
       comic strip material under the title SUPERBOY of the type and nature
23    heretofore published under that title…" 1948 COL, 25-26, Tob. Decl., Exh. B.

24          It was thus previously adjudicated that Siegel was the sole and exclusive owner

25    of "Superboy" and that National be enjoined from exploiting "Superboy." Yet, if

26    National jointly owned "Superboy" as Defendants contend, it would have had a non-

27    exclusive right to exploit "Superboy." Defendants' "joint work" defense, like their

28    "work-for-hire" defense is completely contrary to the decision in the 1947 Action.

**EXHIBIT 17**
**844**

1  After this decision, National, rather than perfect an appeal, entered into the 1948

2  Stipulation to purchase "Superboy" from Siegel.

3      *Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266 (2d. Cir. 1957), is on point and

4  instructive. The plaintiff screenwriter wrote a screenplay derived from a novel

5  controlled by defendant, but defendant used the screenplay without paying for it. In

6  defense to plaintiff's infringement claim defendant argued, as Defendants do here, that

7  the screenplay, re-written by an author under defendant's employ, was a "joint work"

8  bestowing on defendant a non-exclusive right to exploit it. The Second Circuit held

9  such "joint work" defense inapplicable because any contemplation of the screenplay as

10 a joint work was subject to "plaintiff's consent, which was not sought or obtained." *Id.*

11 at 268. The plaintiff's infringement claim was also successful even though defendant's

12 rights in the novel prohibited him from independently selling his screenplay. *Id.*

13      Here, Defendants are likewise precluded from claiming that Siegel's "Superboy"

14 was a joint work due to his initial intent that Shuster illustrate "Superboy," because

15 such intent was contractually conditioned upon Detective exercising its right of refusal

16 and paying for Siegel's work under the September 22, 1938 Agreement. Instead,

17 Detective used his work "illegally." 1947 Opinion, Tob. Decl., Exh. A. While, the

18 joint work defense may not have been raised in the 1947 Action it certainly could have

19 been raised, and the applicable contract *was* fully adjudicated. Defendants' purported

20 defense leads to the anomalous conclusion that one can steal an author's material so

21 long as the author initially intended it to be a joint work.

22   **H.    Genuine Issues of Material Fact Prevent Summary Judgment Re:**

23        **Whether Smallville Infringes Plaintiffs' Superboy Copyright**

24      Defendants misleadingly claim that "the only specific work that Plaintiffs' claim

25 infringes the [Superboy copyright] is *Smallville*." This is false. Plaintiffs' complaint

26 clearly alleges that the "exploitation by Defendants...on or after November 17, 2004

27 [the Termination date] of *new* derivative works or products based on the "Superboy"

28 mythology, including, but not limited to, new publications, merchandising, motion

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**

**845**

 

1  pictures, new episodes of the Smallville Series and/or other new derivative television

2  programs infringes Plaintiffs' Recaptured Copyrights." *See* First Amended

3  Supplemental Complaint ("FASC"), ¶¶ 67-69, Tob. Decl., Exh. M.

4      Defendants then claim that "there is no genuine issue as to any material fact" as

5  to whether the *Smallville* television series is derived from "Superboy," arguing that it

6  is solely derived from "Superman" and demanding judgment on this factual issue "as a

7  matter of law." Fed. R. Civ. P. 56.

8      As a rule, summary judgment is generally disfavored on copyright infringement

9  issues such as this, for courts are understandably reluctant to make subjective

10 comparisons. *See Twentieth Century,* 715 F.2d at 1330 ("Since substantial similarity is

11 usually an extremely close question of fact, summary judgment has traditionally been

12 disfavored in copyright litigation"); *citing Hoehling v. Univ. City Studios, Inc.*, 618

13 F.2d 972, 977 (2d Cir. 1980), *cert. den.*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed. 2d 49

14 (1980); ("Because substantial similarity is customarily an extremely close question of

15 fact," summary judgment for lack of such similarity should ordinarily be denied).

16     "Superman" was grounded in a cosmopolitan environment called "Metropolis,"

17 and its stories emanated from that urban setting and Superman/Clark Kent's job as a

18 big city reporter.  By contrast, Siegel's "Superboy" was set in a small rural town where

19 its lead attends school while coming to grips with his emerging superpowers,

20 adolescent angst and all which that entails in a small town environment.  Siegel's

21 "Superboy" undeniably led to the comic book issue, "Superboy No. 2" where

22 "Superboy's" town was first named -- *Smallville*.  *See* Tob. Decl., Exh. K.  To say that

23 the *Smallville* series has nothing to do with "Superboy" is patently false.

24     The Siegel Superboy Materials set forth the following: "Superboy's" character,

25 family and social life as a youth growing up in a rural small-town; while grappling

26 with the challenges of growing up, "Superboy" must face the challenges and

27 responsibilities of his extraordinary strength and developing powers and of concealing

28 that he is very different from others; "Superboy" is raised in his small town by foster

22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**846**

1  parents, humble, moral people who are sensitive to their "son's" uniqueness, keep his

2  secret and gently guide him.  After briefly describing "Superboy's" antics as a baby

3  and how he is taught by his adoptive parents to restrain or conceal his tremendous

4  strength, Siegel's "Superboy" series starts with the youth, while he attends school in

5  the hometown where his adventures take place. "Superboy" protects his small town,

6  including his classmates, from accidents and evil doers; "Superboy's" central dilemma,

7  while facing adolescence, school cliques, bullies and "bad guys" alike is to repress his

8  true self while using his powers to help those in need. *See* Siegel's Superboy Story,

9  Tob. Decl., Exh. I; FASC, ¶ 25, Tob. Decl., Exh. N.

10      As originally conceived by Siegel, "Superboy" was to naturally mature from a

11  pre-teen in fifth grade to an older teen in high school.  His Superboy Synopsis

12  suggested starting with "characters…of about twelve years rather than adults."  The

13  majority of his first Superboy Story takes place in the fifth grade (age 12): we follow

14  "Superboy" from a toddler through kindergarten to pre-junior high.  The first issue of

15  "Superboy" in More Fun Comics No. 101 follows the same rapid progression.  Tob.

16  Decl., Exh. G.  The Superboy comic books from 1945 to 1984, derived from Siegel's

17  Superboy follow his adventures through age eighteen. *See* Tob. Decl., Exhs. J, M.

18      By comparison, the "Superman" materials which pre-date Siegel's Superboy

19  Story (Action Comics No. 1, 1939 newspaper strips and Superman No. 1, Zissu Decl.,

20  Exhs. F, I, J) do not contain the same elements or focus.  In Action Comics No. 1,

21  where "Superman" debuted in 1938, we see "Superman" as an infant in only one panel

22  on page one.  By the next panel on page one he has already become an adult with fully

23  developed superpowers. *See* Action Comics No. 1, Zissu Decl., Exh. I.

24      "Superboy's" small town adventures were published in "More Fun Comics,"

25  Nos. 101-107 (1944-1948), "Adventure Comics" Nos. 103-503 (1946-1983),

26  "Superboy" Nos. 1-235 (1949-1977), "The New Adventures of Superboy" Nos. 1-54

27  (1979-1984), "The Adventures of Superboy" Nos. 1-100 (1989-2002) and in numerous

28  other comic book publications.  "Superboy" has also been exploited in several

1  television series, including the animated "The Adventures of Superboy" (1966), the

2  live action series "The Adventures of Superboy" (1988-1992) and "Smallville" (2001-

3  ongoing).  Termination Notice, FASC, ¶ 37, Tob. Decl., Exhs. M, N; Answer ¶ 37.

4      As set forth above "Superboy's" fictional town was named *Smallville* early on in

5  "Superboy No. 2," published in 1949.  In the Superboy comic books and in the

6  animated and live action "Superboy" television series, "Superboy's" adventures have

7  mostly taken place in *Smallville*, the hometown he protects.  For more than 50 years in

8  this large body of "Superboy" material, which was clearly derived from the Siegel

9  Superboy Materials, *Smallville,* has been associated with "Superboy."

10     In the *Smallville* television series, the lead's best friend is "Pete Ross" and the

11 lead has a crush on the high school heart throb, "Lana Lang."  Superboy's best friend,

12 Pete Ross, first appeared in 1961 in Superboy No. 86 and "Lana Lang" first appeared

13 in 1950 in Superboy No. 10 entitled "The Girl In Superboy's Life."  Unsurprisingly,

14 the on-line Internet Movie Database (www.imdb.com), a major entertainment industry

15 resource regarding credits, lists Siegel as an author of *Smallville* as follows: "Jerry

16 Siegel ('Superboy' comic book and characters)."  Tob. Decl., Exhs. K, L.

17     Defendants contend that Siegel's "simple Superboy bears no resemblance to the

18 complex teenage[r]" in *Smallville*.  Such arguments are self-serving.  Comics by

19 definition are representational and will always appear simple or even primitive when

20 compared to their derivative big budget progeny.  *Smallville's* derivation and use of

21 "Superboy" is far more than de minimis and is easily recognizable. *Fisher v. Dees*, 794

22 F.2d 432, 434 n. 2 (9th Cir. 1986); *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir.

23 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if

24 qualitatively important, the finder of fact may properly find substantial similarity.").

25     *Smallville* is set in "Superboy's" small rural hometown from which the series

26 takes its name. *Smallville* focuses on a youth with extraordinary powers raised in a

27 small town environment, who, while grappling with adolescence, must face the

28 responsibilities of his emerging powers.  Like the Siegel Superboy Materials,

24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**848**

1  *Smallville* follows the adventures of its superhero in the small town he protects, while

2  examining the character's social (school friendships, bullies and "cliques") and family

3  life. *See* Superboy Story, Tob. Decl., Exh. I.

4      The "Superman" materials cited by Defendants which pre-date the Siegel

5  Superboy Materials simply do <u>not</u> contain such elements. Zissu, Exhs. F, I, J.  A

6  central relationship in *Smallville*, as in the Siegel Superboy Story, is between the lead

7  character and his earnest and understanding adoptive parents to whom he turns for

8  guidance as he faces daily challenges due to his differences of which he gradually

9  becomes aware.  In Siegel's Superboy Story, eight of its thirteen pages are devoted to

10  "Superboy's" relationship with his adoptive parents who gently guide him.  Yet, of the

11  Superman material which pre-dates the Superboy Story (i.e., Action Comics No. 1,

12  1939 newspaper strips and Superman No. 1) only Superman No. 1 shows his foster

13  parents with him as a boy in *one* brief panel.  *See* Zissu Decl., Exhs. F, I, J at p. 129.

14      *Smallville* is clearly derived from Siegel's Superboy Material and the

15  "Superboy" comic book line and mythology to which it gave rise.  But for Siegel's

16  "Superboy" there would be no *Smallville*.  Given all the above, *Smallville's* derivation

17  at this stage of the action is rife with genuine issues of material fact and certainly not

18  an issue on which Defendants can prevail as a matter of law on summary judgment.

19  **V.    CONCLUSION**

20      For the foregoing reasons, Plaintiffs respectfully request that the Court deny

21  Defendants' motion for summary judgment in its entirety and grant Plaintiffs' motion

22  for partial summary adjudication.

23

24  DATED: March 1, 2006        LAW OFFICES OF MARC TOBEROFF, PLC

25                  By_____

26                        Marc Toberoff

27                  Attorneys for Plaintiffs JOANNE SIEGEL
                    and LAURA SIEGEL LARSON

28

25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 17**
**849**

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 1999 Avenue of the Stars, Suite 1540, Los Angeles, California 90067.

On March 1, 2006, I served the attached documents described as:

1. PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

2. PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S STATEMENT OF GENUINE ISSUES

3. DECLARATION OF MARC TOBEROFF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

as follows:

[X]   :<u>BY FACSIMILE</u>:

As follows: I caused the transmission of the above named documents to the fax number set forth below, or on the attached service list.

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Facsimile No. 212-813-5901

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Facsimile No. 845-265-2819

David L. Burg
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile No. 310-550-7191

[X]   :<u>BY MAIL</u>:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**EXHIBIT 17**
**850**

1    James D. Weinberger
     FROSS ZELNICK LEHRMAN & ZISSU, P.C.
2    866 United Nations Plaza
     New York, NY 10017

3    [X]  :BY HAND:

4        As follows:  I delivered to the address listed below by hand the documents listed herein.

5    David L. Burg
     WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
6    9665 Wilshire Boulevard, Ninth Floor
     Beverly Hills, CA 90212

7
         :(STATE) - I declare under penalty of perjury under the laws of the State of California that the
8    above is true and correct.

9    [X]  :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at
     whose direction the service was made.

10
         I declare under penalty of perjury that the foregoing is true and correct.

11
         EXECUTED on March 1, 2006, in Los Angeles, California.

12

13                                              _____
14                                                  Alexander M. Merino

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 17**
**851**

# EXHIBIT 18

1  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
2  James D. Weinberger (Admitted *pro hac vice*)
   Justin Deabler (Admitted *pro hac vice*)
3  866 United Nations Plaza
   New York, New York 10017
4  Telephone: (212) 813-5900
   Fax: (212) 813-5901
5
   PERKINS LAW OFFICE, P.C.
6  Patrick T. Perkins (Admitted *pro hac vice*)
   1711 Route 9D
7  Cold Spring, New York 10516
   Telephone: (845) 265-2820
8  Fax: (845) 265-2819
9  WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
10 Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
11 Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
12 Beverly Hills, California 90212
   Telephone: (310) 858-7888
13 Fax: (310) 550-7191

14 Attorneys for Defendants and Counterclaimant

15            UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
16

17 | JOANNE SIEGEL and LAURA SIEGEL | Case No. CV 04-8776 (RSWL) (RZx)
   | LARSON,
18 |                                 | **REPLY MEMORANDUM OF POINTS**
   |         Plaintiffs,             | **AND AUTHORITIES IN FURTHER**
19 |     vs.                         | **SUPPORT OF DEFENDANTS'**
   |                                 | **MOTION FOR SUMMARY**
20 | TIME WARNER INC., WARNER        | **JUDGMENT**
   | COMMUNICATIONS INC., WARNER
21 | BROS. ENTERTAINMENT INC.,       | Date:      March 20, 2006
   | WARNER BROS. TELEVISION         | Time:      9:00 a.m.
22 | PRODUCTION INC., DC COMICS, and | Courtroom: 21 – 5th Floor
   | DOES 1-10,                      | Judge Ronald S.W. Lew
2  |
   |         Defendants.
24 |
25 | AND RELATED COUNTERCLAIM
26
27
28

DOCKETED ON CM
MAR 17 2006
BY ____ 004

76

**EXHIBIT 18**
**852**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ...................................................................................................... 1

I.   PLAINTIFFS MISSTATE THE PRIOR ACTIONS ................................. 1

    A.   The Westchester Action ................................................................. 1

    B.   Plaintiffs' Contentions Concerning The Westchester Action ........ 3

    C.   The Southern District Of New York Action .................................. 4

    D.   The Second Circuit Opinion ......................................................... 5

II.  THE INTERLOCUTORY FINDINGS RENDERED IN THE WESTCHESTER ACTION HAVE NO PRECLUSIVE EFFECT ......... 5

    A.   *Res Judicata* Is Inapplicable Here Because, *Inter Alia*, The Interlocutory Findings And Judgment Were Not "Final" ............... 6

    B.   Similarly, The Required Elements For The Application Of Collateral Estoppel To the Findings Are Not Present Here ............ 8

    C.   The District Court And Second Circuit Decisions Do Not Establish The Preclusive Effect Of The Findings ..................... 9

    D.   The Doctrine Of Judicial Estoppel Does Not Apply ................... 10

III. WHILE THE SUBMISSIONS MAY CONSTITUTE "SEPARATE" COPYRIGHTS, THEY ARE NONETHELESS DERIVATIVE WORKS ........... 11

IV.  THE SUBMISSIONS ARE WORKS MADE FOR HIRE AND THEREFORE NOT TERMINABLE UNDER SECTION 304(c) ......................... 12

V.   PLAINTIFFS DID NOT HAVE A VALID AND SUBSISTING COPYRIGHT IN THE SUBMISSIONS ON JANUARY 1, 1978 ...................... 16

VI.  PLAINTIFFS FAILED TO TERMINATE THE FINAL JUDGMENT ................. 17

VII. PLAINTIFFS HAVE FAILED TO POINT TO ANYTHING COPYRIGHTABLE IN THE SUBMISSIONS THAT ALSO APPEARS IN *SMALLVILLE* ........................................................................ 18

    A.   Infringement Is "Often" Determined On Summary Judgment .................... 19

    B.   Plaintiffs Cannot Meet Their Burden Of Establishing Substantial Similarity Between The Submissions And *Smallville* .................................. 19

        1.   Plaintiffs Mischaracterize The Basis Of Their Copyright Claim And The Content Of The Submissions ..................................... 20

**EXHIBIT 18**

**853**

2.    Plaintiffs Ignore The "Filtration" Process
      The Court Must Undertake On This Motion .......................................... 21

3.    Plaintiffs Fail To Demonstrate Any Similarities
      In Plot, Theme, Dialo ue, Mood, Setting, Pace,
      And Sequence Between The Works ....................................................... 24

CONCLUSION ...................................................................................................... 25

**EXHIBIT 18**

**854**

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Allen v. McCurry,*
   449 U.S. 90, 94 (1980) ...................................................................... 7, 8

*Apple Computer, Inc. v. Microsoft Corp.,*
   35 F.3d 1435 (9th Cir. 1987) ............................................................... 21

*Batjac Prods., Inc. v. Goodtimes Home Video Corp.,*
   160 F.3d 1223 (9th Cir. 1998) .......................................................... 16-17

*Berkic v. Crichton,*
   761 F.2d 1289 (9th Cir. 1985) ................................................... 19, 23, 24

*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,*
   18 F. Supp. 2d 297 (S.D.N.Y. 1998) ................................................... 10

*Brattleboro Publ'g Co. v. Winmill Publ'g Corp.,*
   369 F.2d 565 (2d Cir. 1966) ........................................................... 14-15

*Brugos v. Hopkins,*
   14 F.3d 787 (2d Cir. 1993) ..................................................................... 7

*Community for Creative Non-Violence v. Reid,*
   490 U.S. 741 (1980) ............................................................................. 18

*Computer Assoc. Int'l, Inc. v. Altai, Inc.,*
   126 F.3d 365 (2d Cir. 1997) ................................................................... 6

*DeCarlo v. Archie Comics Publs., Inc.,*
   127 F. Supp. 2d 497 (S.D.N.Y. 2001) ................................................... 9

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
   342 F.3d 149 (2d Cir. 2003) ................................................................ 14

*Greene v. United States,*
   79 F.3d 1348 (2d Cir. 1996) ................................................................ 10

*Hamilton v. State Farm Fire & Cas. Co.,*
   270 F.3d 778 (9th Cir. 2001) ......................................................... 10, 11

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,*
   970 F.2d 1138 (2d Cir. 1992) ................................................................ 8

*Hoehling v. Universal Studios, Inc.,*
   618 F.2d 972 (2d Cir. 1980) ......................................................... 19, 22

*In re Hyman,*
   335 B.R. 32 (S.D.N.Y. 2005) ................................................................. 6

*Idema v. Dreamworks, Inc.,*
   162 F. Supp. 2d 1129 (C.D. Cal. 2001),
   *aff'd in part, dismissed in part,* 90 Fed.Appx. 496 (9th Cir. 2003) ........ 21

iii

**EXHIBIT 18**
855

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
   400 F.3d 1007 (7th Cir. 2005) ................................................................ 2

*Johnson v. Watkins*,
   101 F.3d 792 (2d Cir. 1996) .................................................................. 9

*Kouf v. Walt Disney Pictures Television*,
   16 F.3d 1042 (9th Cir. 1994) ................................................................ 20

*Lawlor v. National Screen Serv. Corp.*,
   349 U.S. 322 (1955) ............................................................................. 7

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) .............................................................. 23

*Lin-Brook Builders Hardware v. Gertler*,
   352 F.2d 298 (9th Cir. 1965) ........................................................ 13, 15

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
   49 F.3d 807 (1st Cir. 1995) ................................................................... 2

*Marvel Characters v. Simon*,
   310 F.3d 280 (2d Cir. 2002) ................................................... 6, 7, 8, 9

*May v. Morganelli-Heumann & Assocs.*,
   618 F.2d 1363 (9th Cir. 1980) .............................................................. 14

*Matjack Prods., Inc. v. Goodtimes Home Video Corp.*,
   30 U.S.P.Q.2d 1959 (C.D. Cal. 1994) (Lew, J.),
   *aff'd*, 81 F.3d 881 (9th Cir. 1996) ....................................................... 24

*Mehlop v. Central Union Trust Co.*,
   235 N.Y. 102 (1923) ......................................................................... 8-9

*Menna v. Joy*,
   449 N.Y.S.2d 48 (1st Dep't 1982) ........................................................ 8

*Mercantile & General Reins. Co. v. Colonial Assurance*,
   556 N.Y.S.2d 183 (N.Y. Sup. 1989) ..................................................... 8

*Metz v. Duenas*,
   707 N.Y.S.2d 598 (Dist. Ct. Nass. Co. 2000) ....................................... 9

*Morley v. Quiniones*,
   617 N.Y.S.2d 841 (2d Dep't 1994) ....................................................... 9

*Music Sales Corp. v. Morris*,
   73 F. Supp. 2d 364 (S.D.N.Y. 1999) .............................................. 9, 18

*National Rural Telecomm. Coop. v. DirecTV, Inc.*,
   319 F. Supp. 2d 1040 (C.D. Cal. 2003) .............................................. 10

*New Hampshire v. Maine*,
   232 U.S. 742 (2001) ........................................................................... 10

iv

**EXHIBIT 18**

*Niagara Mohawk Power Corp. v. Townawanda Band of Seneca Indians,*
  94 F.3d 747 (2d Cir. 1996) ............................................................. 10

*Nichols v. Universal Pictures Corp.,*
  45 F.2d 119 (2d Cir. 1930) ............................................................. 23

*Niss v. Columbia Pictures Indus., Inc.,*
  57 U.S.P.Q.2d 1346 (S.D.N.Y. 2000),
  *aff'd,* 25 Fed.Appx. 76 (2d Cir. 2002) ................................... 14, 15

*Pension Trust Fund for Oper. Eng'rs v. Tripe A Mach. Shop, Inc.,*
  942 F.2d 1457 (9th Cir. 1991) ......................................................... 6

*Picture Music, Inc. v. Bourne, Inc.,*
  314 F. Supp. 640 (S.D.N.Y. 1970), 457 F.2d 1213 (2d Cir. 1972) .............. 12, 14

*Playboy Enters., Inc. v. Dumas,*
  53 F.3d 549 (2d Cir. 1995) ............................................ 12, 13, 14, 15

*Rice v. Fox Broad. Co.,*
  330 F.3d 1170 (9th Cir. 2003) ....................................................... 22

*Richards v. Calvet,*
  No. 99 CV 12172, 2005 WL 743251 (S.D.N.Y. Mar. 31, 2005) .................... 6

*Rissetto v. Plumbers & Steamfitters Loc. 343,*
  94 F.3d 597 (9th Cir. 1996) .......................................................... 10

*Ruben v. American & Foreign Ins. Co.,*
  592 N.Y.S.2d 167 (4th Dep't 1992) .................................................. 8

*See v. Durang,*
  711 F.2d 141 (9th Cir. 1983) .................................................... 19, 22

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
  206 F.3d 1322 (9th Cir. 2000) ....................................................... 13

*Siegel v. National Periodical Publications, Inc.,*
  364 F. Supp. 1032 (S.D.N.Y. 1969), *aff'd in part,*
  *rev'd in part,* 508 F.2d 909 (2d Cir. 1974) ................................. *passim*

*Stewart v. Abend,*
  495 U.S. 216 (1990) .................................................................. 21

*Twentieth Century Fox Film Corp. v. Entm't Distrib.,*
  429 F.3d 869 (9th Cir. 2005) ................................................ 13, 14, 15

*Universal City Studios, Inc. v. Nintendo Co.,*
  578 F. Supp. 911 (S.D.N.Y. 1983), *aff'd,* 746 F.2d 112 (2d. Cir. 1984) ......... 6

*In re Westchester Tank Fabricators, Ltd.,*
  207 B.R. 391 (E.D.N.Y. 1997) ........................................................ 10

*Wilkes v. Rhino Records, Inc.,*
  No. 96-56238, 1997 WL 800275 (9th Cir. Dec. 17, 1997) ....................... 14

v

**EXHIBIT 18**

**1909 Copyright Act**

17 U.S.C. § 2 (repealed) ................................................................ 16

17 U.S.C. § 10 (repealed) .............................................................. 16

17 U.S.C. § 12 (repealed) .............................................................. 16

**1976 Copyright Act**

17 U.S.C. § 102(b) .................................................................... 2, 19

17 U.S.C. § 103(b) ............................................................ 11, 12, 17

17 U.S.C. § 201(b) .................................................................. 15-16

17 U.S.C. § 205(c) ....................................................................... 18

17 U.S.C. § 304(c) .................................................................*passim*

**Copyright Act Legislative History**

H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. (1976) ................ 11, 12, 15

**Federal Copyright Regulations**

37 C.F.R. § 201.10(b)(1) .............................................................. 18

**Other Federal Statutes**

Fed. R. Civ. P. 56(e) ....................................................... 17, 19, 24

15 U.S.C. § 1125(a) ..................................................................... 23

28 U.S.C. § 1338(a) (2005) ............................................................ 8

28 U.S.C. § 41(7) (1940) (repealed) ............................................... 8

28 U.S.C. § 371(5) (1940) (repealed) ............................................. 8

**State Statutes and Regulations**

N.Y. Comp. Codes R. & Regs. (2005) ............................................. 9

N.Y. Civ. Prac. Act §§ 557-74 (1924) (repealed) ............................. 9

**Treatises**

J. Wm. Moore, Moore's Federal Practice (2005) .............................. 6

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2005) ......... 14, 16, 23

N.Y. Jur. 2d Judgments (2005) ....................................................... 9

William F. Patry, *Latman's The Copyright Law* (6th ed. 1982) ............ 16

vi

**EXHIBIT 18**

**858**

## PRELIMINARY STATEMENT

Unable to dispute the documentary evidence or to respond on the merits to Defendants' motion, Plaintiffs try to run from the law and uncontroverted facts. Plaintiffs' opposition rests almost entirely on the purported preclusive effect of the Interlocutory Findings of the Referee in the Westchester Action.[1]  However, *nowhere* in either Plaintiffs' opposition or their moving brief on their own motion for partial summary judgment do Plaintiffs disclose the key fact that defeats the possibility of preclusion: the Interlocutory Judgment based on these findings was *expressly vacated* by the parties' settlement of that action in a final judgment, thus depriving the Interlocutory Findings of "finality," the *sine qua non* of both *res judicata* and collateral estoppel.  Once the veil of Plaintiffs' preclusion arguments is lifted, it becomes clear that Plaintiffs' instant action should be dismissed for any one of several reasons.  Not only are the works at issue ineligible for termination under section 304(c) of the Copyright Act, but also the required comparison of these works with episodes of the *Smallville* television show prepared after the purported effective date of Plaintiffs' Superboy Notice demonstrates that there is no actionable similarity between the works.

## ARGUMENT

### I.  PLAINTIFFS MISSTATE THE PRIOR ACTIONS

Since Plaintiffs' opposition is based so extensively on the claimed preclusive effect of the Interlocutory Findings, before demonstrating why preclusion has no application here, it is useful to revisit what actually occurred in the prior actions between the parties.

**A. The Westchester Action.**  In the 1947 Westchester Action, Siegel and Shuster sought to annul and rescind their prior agreements, including the March 1938 Agreement, in which they conveyed to Detective all of their interest in Superman, on the basis of fraud, duress and breach.  Additionally, Siegel and Shuster alleged that Detective and its successor, National, had no right to publish a "Superboy" comic strip, because they had failed to exercise their contractual right of first refusal for that concept and had thereby

---

[1] Except as noted, the definitions employed in this brief are the same as those used in Defendants' initial brief in support of this motion ("Def. Mem.")

**EXHIBIT 18**
**859**

1  misappropriated the idea of publishing a comic feature under the title "Superboy."[2]

2  Siegel and Shuster made no claim that Detective had infringed any copyright in the

3  Submissions; rather, they alleged that, in violation of the parties' agreements, defendants

4  published Superboy "which said comic strip did use and was based upon the conception

5  and idea" submitted by Siegel.[3]

6       The Referee issued a report rejecting Siegel and Shuster's claims concerning

7  Superman, but finding that Superboy "was a separate and distinct entity" from

8  Superman.[4]  (Zissu Ex. N at 41a.)  In Interlocutory Findings issued thereafter, the

9  Referee, while finding that Siegel and Shuster had transferred all of their rights in

10 Superman to Detective (id. Ex. O, Concl. of Law ¶¶ 1-24), with respect to Superboy,

11 found that Detective's publication of that comic strip "embodied and was based upon the

12 idea, conception, and plan" contained in the Submissions (id. ¶ 163-66).  Based on those

13 Findings, the Referee entered an Interlocutory Judgment which repeated the conclusion

14 that all rights in Superman had been conveyed to Detective, but declaring that Siegel was

15 the "sole owner of the comic strip feature SUPERBOY." (Id. Ex. P at 4-5.)  The parties

16 filed timely notices of appeal from the Interlocutory Judgment.  (Id. Ex. R at 2.)

17      Thereafter, and upon settlement, the parties entered into a Stipulation under which

18 [2] Siegel and Shuster alleged that More Fun #101 "was based entirely upon" Siegel's
   Pitch, which contained the idea for a Superboy comic: "I suggest[] . . . that we use a strip
19 named SUPERBOY, which would relate the adventures of Superman as a youth. . . . Tho
   the strip would feature super-strength it would be very much different from the
20 SUPERMAN strip inasmuch as SUPERBOY would be a child and the type of adventures
   very much different.  There'd be lots humor, action, and the characters would be mainly
21 children of about 12-years rather than adults." (See Decl. of Roger L. Zissu submitted in
   support of this motion ("Zissu Ex. __"), Exs. M at 7-11; G at 2-3 (emph. added).)
22 [3] The current Copyright Act, carrying forward 1909 Act law, expressly excludes from
   copyright protection any "idea . . . method of operation, [or] concept." 17 U.S.C. §
23 102(b); Incredible Techs., Inc. v. Virtual Techs., Inc., 400 F.3d 1007, 1012 (7th Cir.
   2005) (method of operation not copyrightable) (citing Lotus Dev. Corp. v. Borland Int'l,
24 Inc., 49 F.3d 807, 816 (1st Cir. 1995)).
   [4] Specifically, Siegel and Shuster alleged that "Superman was a concept or an idea and
25 had no physical existence, and was not transferable" and on that basis sought to
   invalidate their March 1938 transfer of rights. (Zissu Ex. N at 38a-39a.)  In response,
26 National argued that what became Action Comics #1 "constituted the formula for the
   continuing [Superman] series to come." (Id.)  In finding for National, the Referee held
27 that what was assigned by Siegel and Shuster in the March 1938 Agreement was not just
   Action Comics #1 but "a formula for the continuing series to come . . . ." (Id. at 40a)  It is
28 within this context that the Referee concluded that Action Comics #1 did not contain the
   "the plan, scheme, idea or conception of the comic strip SUPERBOY." (Id. Ex. O ¶ 166.)

2

**EXHIBIT 18**
**860**

1  the Interlocutory Judgment was to be "in all respects vacated." (*Id.* Ex. Q at 80a.)

2  Pursuant to the Stipulation, the parties and the Referee executed a "Final Judgment"

3  which was entered by the court on May 21, 1948.[5] (*Id.* Ex. R).  The Final Judgment

4  expressly stated that the Interlocutory Judgment "*be and the same hereby is in all*

5  *respects vacated.*" (*Id.* at 2 (emph. added).)  It also provided that *National* "is the sole

6  and exclusive owner of and has the sole and exclusive right to" Superboy.[6] (*Id.* at 5.)  As

7  reflected in the Final Judgment, the parties withdrew their notices of appeal. (*Id.* at 2.)

8      **B. Plaintiffs' Contentions Concerning The Westchester Action.** Plaintiffs

9  accuse Defendants of trying to "selectively re-litigate" on this motion three assertions

10  they claim are in conflict with the Interlocutory Findings: (1) the Submissions are

11  "unoriginal" and not "separate copyright[s];" (2) the Submissions were never published;

12  (3) the Submissions were "works made for hire." (Plaintiffs' Memorandum of Law in

13  Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.") at 6, 10.)

14  Plaintiffs either misstate Defendants' arguments, the Interlocutory Findings, or both.

15      Nowhere in this motion do Defendants claim that the Submissions are "unoriginal"

16  or not "separate copyrights" from Superman.  Rather, Defendants note that the

17  Submissions are derivative works based upon and dominated by pre-existing Superman

18  story elements.  In response, Plaintiffs repeat over and over the Interlocutory Finding that

19  Superboy "was a separate and distinct entity" from Superman. (Pl. Opp. at 2, 6, 10-11.)[7]

20  This is a *non sequitur*: Plaintiffs *concede* that the Submissions are derivative works and

21  that such position is "easily reconciled" with that Finding. (*Id.* at 12; *see* Pt. III, *infra.*)

22  While there is no dispute that the Submissions are subject to a "separate copyright,"

23  Plaintiffs concede that Siegel only could have owned – and now can only recapture –

24  

25  [5] The Final Judgment in the Westchester Action has previously been referred to by Plaintiffs as the "Consent Judgment" and by Defendants as the "Final Consent Agreement."  In view of Plaintiffs' contentions on preclusion, this Reply Memorandum

26  will refer to the document by its court designated title: "Final Judgment."

[6] With respect to *Superman*, the *Final Judgment* incorporated almost *verbatim* the

27  Referee's first conclusion of law regarding Siegel and Shuster's prior transfer to Detective of all of their rights in Superman in March 1938.

28  [7] As shown above, at issue in the Westchester Action was whether the *idea* of a comic strip entitled "Superboy" was encompassed in *Action Comics #1.*

3

**EXHIBIT 18**
**861**

1  "new elements" Siegel added to the derivative Submissions. (*Id.*)  However, Plaintiffs

2  identify no copyrightable "new elements" from the Submissions that appear in 1944 in

3  *More Fun #101* or anywhere else (Pts. V, VII).

4        Plaintiffs also claim that Defendants' assertion that the Submissions were never

5  published is in direct conflict with the Interlocutory Finding that states that *More Fun*

6  *#101* "embodied and was based upon the idea, plan and conception" contained in the

7  Submissions.  (Pl. Opp. at 17.)  On this issue, it is Plaintiffs, and not Defendants, who

8  take a position inconsistent with the Interlocutory Findings.  As noted at page 2, the

9  Referee found that *More Fun #101* only contained non-copyrightable elements from the

10  Submissions and expressly omitted reference to any copyrightable material, including the

11  continuity and dialogue.  Choosing instead to hide behind their mischaracterization of the

12  non-binding Interlocutory Findings, Plaintiffs do not identify *a single copyrightable*

13  *element* owned by Siegel that is present in the Submissions that is also in *More Fun #101*.

14        Plaintiffs further argue that the contention that the Submissions were "works made

15  for hire" is contrary to the Interlocutory Finding that states that Siegel was the "originator

16  and sole owner of the comic strip feature SUPERBOY" and that he had "the sole and

17  exclusive right to create, sell and distribute comic strip under the title SUPERBOY."  (Pl.

18  Opp. at 13.)  Again, Plaintiffs mix apples and oranges.  As established above, Siegel and

19  Shuster's Superboy claims were directed at use of the idea of a Superboy comic, not at

20  ownership of copyright in any particular work.  What is more, as established below (Pt.

21  IV), all of the Interlocutory Findings are consistent with Defendants' position that the

22  Submissions were prepared at the "instance and expense" of National, the legal test

23  employed to evaluate who owned any new copyrightable matter as work for hire.

24      **C. The Southern District Of New York Action.**  In 1973, Siegel and Shuster

25  filed an action against National in the Southern District of New York (the "Federal

26  Action"), alleging that they, and not National, owned the renewal copyrights in

27  Superman.  The Court disagreed, and held that the Westchester Action, which determined

28  that in March 1938 Siegel and Shuster had transferred *all* of their rights in Superman to

**EXHIBIT 18**
**862**

1   Detective, encompassed the renewal rights and was binding on plaintiffs. *Siegel v.*

2   *National Periodical Publ'ns, Inc.*, 364 F. Supp. 1032, 1037-38 (S.D.N.Y. 1973).  The

3   District Court noted that the Referee's first conclusion of law, which found that Siegel

4   and Shuster had transferred all of their Superman rights to Detective, had been

5   incorporated almost verbatim first into the Interlocutory Judgment, then into the

6   Stipulation, and finally into the Final Judgment.  364 F. Supp. at 1035.  Stating that the

7   Findings in the Westchester Action, along with the Stipulation and the Final Judgment,

8   were "binding" on it, the District Court held (1) that Superman was a "work for hire"

9   under the 1909 Act; and (2) that the prior agreements between the parties, along with the

10  Findings,[8] the Stipulation, and the consent Final Judgment, collectively established an

11  intent by plaintiffs to transfer *all* rights in Superman, including the renewal rights. *Id.* at

12  1035-38.

13          **D. The Second Circuit Opinion.**  On appeal, the Second Circuit affirmed that the

14  Final Judgment operated as *res judicata* establishing National's ownership of all rights to

15  Superman, including renewal rights.[9] *Siegel v. National Periodical Publ'ns, Inc.*, 508

16  F.2d 909, 912-14 (2d Cir. 1974).  However, it reversed the District Court's holding that

17  the Superman works had been "works for hire" under the Copyright Act.[10] *Id.* at 914.

18  **II.    THE INTERLOCUTORY FINDINGS RENDERED IN THE
    WESTCHESTER ACTION HAVE NO PRECLUSIVE EFFECT[11]**

19          The parties agree that this Court must determine the preclusive effect of the

20  Westchester Action by reference to the laws of the state in which the action was litigated,

21  _____

22  [8] The District Court did not discuss or apply any of the Findings related to Superboy.
    The court merely referred to Superboy as "another comic strip created by plaintiffs whose
23  ownership was contested" in the Westchester Action. *Id.* at 1035.
    [9] The Second Circuit focused its opinion on the *Final Judgment* that was entered in the
    Westchester Action, but did note that the Referee's first conclusion of law was adopted
24  first into the parties' Stipulation, and then into the Final Judgment on consent. *National*,
    508 F.2d at 912.
25  [10] "While it is evident that the state court concluded as a matter of law that the plaintiffs
    conveyed all their rights in Superman to the defendants, there was no conclusion of law
26  in the state court that the comic strip was a work for hire so as to create the presumption
    that the employer was the author.  That issue was not litigated at all in the state court."
27  *National*, 508 F.2d at 914.  Yet, Plaintiffs still insist that the work for hire issue was
    litigated in the Westchester Action.
28  [11] The issues which Plaintiffs seek to preclude from examination in this case are set forth
    in Pl. Opp. at 6-7.

**EXHIBIT 18**
**863**

1  *i.e.,* New York. (Pl. Opp. at 5.)  *See also Pension Trust Fund for Oper. Eng'rs v. Triple A*

2  *Mach. Shop, Inc.,* 942 F.2d 1457, 1460 (9th Cir. 1991).  Similarly, in deciding the

3  preclusive effect of the Federal Action, the Court must apply federal law.  *Marvel*

4  *Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir. 2002).  Under both New York and

5  federal law, the burden of proof is on *Plaintiffs* to establish that *res judicata* or collateral

6  estoppel applies in support of their claims.  *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 126

7  F.3d 365, 369 (2d Cir. 1997).  Indeed, that burden must be met with "certainty," *Richards*

8  *v. Calvet,* No. 99 CV 12172, 2005 WL 743251, *8 (S.D.N.Y. Mar. 31, 2005), and "any

9  reasonable doubt . . . should be resolved by deciding against . . . estoppel," *In re Hyman,*

10  335 B.R. 32, 38 (S.D.N.Y. 2005).

11  **A.    *Res Judicata* Is Inapplicable Here Because, *Inter Alia*, The
       Interlocutory Findings And Judgment Were Not "Final"**

12     Plaintiffs seek to ascribe *res judicata* effect to the Interlocutory Findings which

13  were rendered in support of the Referee's Interlocutory Judgment.  "Under the doctrine of

14  *res judicata* . . . a final judgment on the merits of an action precludes the parties or their

15  privies from relitigating claims that were or could have been raised in that action."

16  *Simon,* 310 F.3d at 286-87 (citations omitted).  It is hornbook law, however, that a

17  vacated judgment such as the Interlocutory Judgment and the findings on which it is

18  based cannot be the basis for *res judicata*: "'A judgment that has been vacated, reversed,

19  or set aside on appeal is thereby deprived of all conclusive effect, both as *res judicata* and

20  as collateral estoppel.'"  *Universal City Studios, Inc. v. Nintendo Co.,* 578 F. Supp. 911,

21  919 (S.D.N.Y. 1983), *aff'd,* 746 F.2d 112 (2d. Cir. 1984) (quoting 1 J. Wm. Moore,

22  Moore's Federal Practice ¶ 0.416[2] at 2231)).  Thus, *res judicata* cannot lie here.

23     Further, even a final judgment on the merits can only preclude relitigation of

24  claims that *were or could have been* raised.  *Simon,* 310 F.3d at 286-87.  The claim urged

25  by Plaintiffs in this action[12] is that the Superboy Notice validly effected a termination

26  under 1976 Act section 304(c), and that as a result Plaintiffs have recaptured Siegel's

27  copyright interests in Superboy.  That claim was not litigated in the Westchester Action.

28  ────────────────

[12] This case and the Superman Action have been consolidated for discovery on consent.

6

**EXHIBIT 18**
**864**

1    *Simon* — another copyright termination case in which one party attempted to

2    invoke *res judicata* — is directly on point. There, plaintiff Marvel sought a ruling that

3    defendant author's termination notice under section 304(c) was invalid because, *inter*

4    *alia,* in settling a prior action, the author had expressly acknowledged in the settlement

5    agreement that the subject work was a "work made for hire" under the 1909 Act. Since a

6    "work made for hire" cannot be terminated, Marvel sought to preclude the author from

7    arguing in the later case that the work was *not* "made for hire," and therefore *was* subject

8    to termination. The Second Circuit first noted that "a prior judgment cannot be given the

9    effect of extinguishing claims which did not even then exist and which could not possibly

10   have been sued upon in the previous case." *Simon,* 310 F.3d at 287 (citing *Lawlor v.*

11   *National Screen Serv. Corp.*, 349 U.S. 322 (1955)). The Court then rejected Marvel's

12   argument that *res judicata* prevented the author from arguing contrary to his prior

13   settlement, because the *claims* asserted in the two actions "[a]lthough they spring from

14   the same underlying facts" were different:

15       [N]either the extended copyright term nor the termination right existed at the time
         of the Prior Actions. Indeed, the termination right is an entirely new and wholly
16       separate right than the renewal right. Hence, the Prior Actions could not have
         resolved the question of whether Simon was entitled to termination rights in the
17       extended copyright term. . . . [I]t does not follow, as Marvel suggests, that since the
         Work's authorship was at issue in the previous actions, Simon's termination claim
18       is precluded here.

19   *Id.* at 287-288 (emph. added). The same is true here: at the time of the Westchester

20   Action, the termination right did not exist. Thus, no claim preclusion can attach here.

21       Furthermore, the court in the Westchester Action did not have the jurisdiction to

22   adjudicate the copyright claims at issue here. In *Allen v. McCurry*, 449 U.S. 90 (1980),

23   Justice Stewart explained that, in order for a state court judgment to have a preclusive

24   effect on later federal claims, the state court must be "acting within its proper

25   jurisdiction." *Id.* at 104. *See also Brugos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1993)

26   (no *res judicata* if original forum did not have power to grant full measure of relief

27   sought in later case). Under the 1909 Act (as under the 1976 Act), the federal courts had

28   jurisdiction "exclusive of the courts of the states" with regard to disputes concerning

**EXHIBIT 18**
**865**

1  statutory, *i.e.*, federal, copyright. *See* 28 U.S.C. § 1338 (a); *accord* 28 U.S.C. §§ 41(7),

2  371(5) (1940) (repealed). The state court in the Westchester Action could not have

3  adjudicated or evaluated any federal copyright law claims because if it had, it would not

4  have been "acting in its proper jurisdiction." *Allen*, 449 U.S. at 104.

### B.  Similarly, The Required Elements For The Application Of Collateral Estoppel To The Findings Are Not Present Here

6      Under the doctrine of collateral estoppel, an issue (as opposed to a claim) is

7  precluded from re-litigation when *all* of the following conditions are met: (1) the

8  resolution of the issue was necessary to support a valid and final judgment on the merits;

9  (2) the identical issue was raised in the prior proceeding; (3) the issue was actually

10  litigated and decided in the prior case; and (4) there was a "full and fair" opportunity to

11  litigate the issue. *Simon,* 310 F.3d at 288-89. Here, we need go no further than to note

12  that the Interlocutory Findings on which Plaintiffs rely were vacated.

13      Where a judgment is vacated, "it lacks finality and cannot be given collateral

14  estoppel effect." *Ruben v. American & Foreign Ins. Co.*, 592 N.Y.S.2d 167, 169 (4th

15  Dep't 1992); *Mercantile & General Reins. Co. v. Colonial Assurance*, 556 N.Y.S.2d 183,

16  187 (N.Y. Sup. 1989) ("the vacatur of a judgment is not a meaningless act for the

17  purposes of issue preclusion"). *See also Harris Trust & Sav. Bank v. John Hancock Mut.*

18  *Life Ins. Co.*, 970 F.2d 1138, 1146 (2d Cir. 1992) ("It is well-settled in this circuit that a

19  vacated order has no collateral estoppel effect."). Because the Interlocutory Findings

20  were rendered in support of the Interlocutory Judgment, which was subsequently vacated

21  and superseded by the Final Judgment, they lack preclusive effect.[13]

22      Plaintiffs' invocation of the Interlocutory Findings is also unfounded because: (i)

23  they were not "necessary" to the Final Judgment on the merits, *Simon,* 310 F.3d at 288-

24  89; *accord Menna v. Joy*, 449 N.Y.S.2d 48, 49 (1982); *Mehlop v. Central Union Trust*

---

[13] In *Mercantile*, as here, while appeals were pending, the parties settled the action, and the judgment was vacated as part of the settlement. In a second action involving one of the same parties, defendants argued that although the *judgment* in the prior case had been vacated, the judge's pre-settlement *findings* on the summary judgment motion could still be given preclusive effect independently of the judgment. The court disagreed, noting that plaintiff gave up its appeal "in reasonable reliance on the basic principle that a vacated judgment is of no effect." 556 N.Y.S.2d at 186.

8

**EXHIBIT 18**
**866**

1   *Co.,* 235 N.Y. 102, 108 (1923); 73A NY Jur. Judgments § 351 (2005); (ii) the issues in

2   the Westchester Action were not "identical" to those in the instant case; *Simon,* 310 F.3d

3   at 288-89; *see also Music Sales Corp. v. Morris,* 73 F. Supp. 2d 364, 377-78 (S.D.N.Y.

4   1999) (doctrine does not apply where issues are different and governed by different

5   principles of law, such as copyright termination rules); *DeCarlo v. Archie Comics Publs.,*

6   *Inc.,* 127 F. Supp. 2d 497, 505 (S.D.N.Y. 2001) (determination of authorship "will

7   require construction of [Copyright] Act's work-for-hire provisions"); and (iii) Defendants

8   did not have a "full and fair" opportunity to litigate the issues in the Interlocutory

9   Findings before termination of the Westchester Action, *Metz v. Duenas,* 707 N.Y.S.2d

10  598, 600 (Dist. Ct. Nass. Co. 2000) (citing *Morley v. Quiniones,* 617 N.Y.S.2d 841 (2d

11  Dep't 1994)); *see also Johnson v. Watkins,* 101 F.3d 792 (2d Cir. 1996) (collateral

12  estoppel will not bar reconsideration of an issue where appellate review could not be had

13  even though appeal taken).

14      Plaintiffs' statement that Detective did not "perfect" its appeal in the Westchester

15  Action (Pl. Opp. at 2) is a transparent attempt to confuse the Court concerning the

16  effectiveness of the Final Judgment vacating the Interlocutory Findings and Interlocutory

17  Judgment.[14]  As noted above, after the Referee issued his Interlocutory Judgment, both

18  sides filed notices of appeal from portions of that judgment.  (*National,* 508 F.2d at 913;

19  Zissu Ex. R at 2 (DC's predecessor "duly served and filed . . . [a] notice[] of appeal").)

20  However, when the Westchester Action was settled, the appeals were withdrawn, the

21  Interlocutory Judgment was vacated, and Siegel's and Shuster's claims were dismissed

22  with prejudice.  This was done *before* the parties could "challenge the interlocutory

23  ruling." *Metz,* 707 N.Y.S.2d at 600.  Thus, the Interlocutory Findings cannot be given

24  preclusive effect. *See, e.g., Johnson,* 101 F.3d at 796.

25      **C.    The District Court And Second Circuit Decisions Do**
         **Not Establish The Preclusive Effect Of The Findings**
26

---

27  [14] "Perfecting an appeal" in New York means that an appellant has taken all steps
    necessary to place the appeal on the court's calendar for argument (*i.e.,* by filing a brief
28  and the record). 22 N.Y. Comp. Codes R. & Regs. Tit. 22 § 670.2[a][4] (2005). *See also*
    N.Y. Civ. Prac. Act §§ 557-74 (1924) (repealed) (steps required to "perfect" appeal).

1    National's ownership of the renewal copyright for Superman (as opposed to

2  Superboy) comic books was the only issue in the Federal Action. The Second Circuit

3  only expressly affirmed the District Court's *res judicata* reliance on the *Final Judgment*

4  (as opposed to the Findings) in the Westchester Action with respect to Superman, and did

5  not address the preclusive effect of any Findings not incorporated into that Final

6  Judgment, such as those relating to Superboy. (Pt. I.) The District Court's decision – to

7  the extent it was not adopted or discussed by the Second Circuit – has no preclusive

8  effect. *See Niagara Mohawk Power Corp. v. Townawanda Band of Seneca Indians*, 94

9  F.3d 747, 754 (2d Cir. 1996) ("if an appellate court considers only one of a lower court's

10  alternative bases for its holding, affirming the judgment without reaching the alternative

11  bases, only the basis that is actually considered can have any preclusive effect in

12  subsequent litigation"); *Greene v. United States*, 79 F.3d 1348, 1352 (2d Cir. 1996)

13  ("[T]here is not collateral estoppel as to the unreviewed ground . . . .").

14    **D.    The Doctrine Of Judicial Estoppel Does Not Apply**

15    In another attempt to avoid the undisputed facts, Plaintiffs seek to invoke the

16  doctrine of judicial estoppel.[15] (Pl. Opp. at 9-10.) For this to apply, among other things

17  the court must find that "a party's later position [was] clearly inconsistent with its earlier

18  position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001)

19  (citing *New Hampshire v. Maine*, 232 U.S. 742 (2001); internal citations and quotations

20  omitted).[16] Plaintiffs cannot meet their burden to establish any judicial estoppel here.

21  Defendants' position in the Federal Action was that *res judicata* prevented the plaintiffs

22  from challenging the Final Judgment entered in the Westchester Action, which held that

23  *all of Siegel and Shuster's rights in Superman* had been validly conveyed to Detective.

24  The Findings on that issue were restated and incorporated into the Westchester Action

---

[15] And as with *res judicata* and collateral estoppel, the party urging the application of judicial estoppel has the burden thereon. *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 18 F. Supp. 2d 297, 301 (S.D.N.Y. 1998); *In re Westchester Tank Fabricators, Ltd.*, 207 B.R. 391, 400 (E.D.N.Y. 1997).

[16] *National Rural Telecomm. Coop. v. DirecTV, Inc.*, 319 F. Supp. 2d 1040, 1049 n.11 (C.D. Cal. 2003) ("Whether sitting in diversity or not, 'federal law governs the application of judicial estoppel in federal court.'") (quoting *Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 604 (9th Cir. 1996)).

10

**EXHIBIT 18**
**868**

1   Final Judgment itself, and were necessary for the holding. In contrast here, Defendants

2   take the position that *the Interlocutory Findings related to Superboy* – which were *not*

3   incorporated into, and in fact, are contrary to the Final Judgment* – do not have preclusive

4   effect. These positions are not inconsistent, do not "mislead" the court, and would not

5   impose an "unfair detriment" to Plaintiffs. *See Hamilton*, 270 F.3d at 782-83.

**III.   WHILE THE SUBMISSIONS MAY CONSTITUTE "SEPARATE" COPYRIGHTS, THEY ARE NONETHELESS DERIVATIVE WORKS**

7       There is no dispute about the facts or law with regard to the derivative work status

8   of the Submissions, but as shown below, only a disagreement about the significance of

9   these facts to this motion. Despite the effort of the Superboy complaint to divorce the

10  Superboy character pitched in the Submissions from the pre-existing Superman comics

11  (Zissu. Ex. L, ¶¶ 18-32), Plaintiffs have again contradicted themselves. Protesting that

12  they "have *never* claimed that 'Superboy' is unrelated to 'Superman'" (Pl. Opp. at 11-12)

13  (emph. in original), Plaintiffs now admit that Superboy is a derivative work of Superman

14  and that this fact is "easily reconciled" with the Referee's findings. (*Id*. at 12.)[17]

15      Plaintiffs also claim that Siegel's Submissions, though derivative, are separate

16  works from the previously published Superman works entitled to a "separate" copyright.

17  (*Id*.) However, the devastating consequences of Plaintiffs' concession that the

18  Submissions are derivative works cannot be escaped by the fact that all derivative works

19  are considered to be separate from the preexisting works on which they are based and that

20  separate copyright registrations are issued for derivative works that meet the originality

21  requirement applicable to all works. *See* H.R. Rep. No. 94-1476, 94th Cong. 2d Sess.

22  (1976) ("H. Rep.") at 57. As provided in the current Copyright Act, which carried

23  forward this principle from prior 1909 Act law, *id.,* a derivative work is considered

24  separate from the underlying work but only to the extent that the protection extends

25  solely to the material *that is newly added*. 17.U.S.C. § 103(b); Space 6 of Exhibit EE to

26  ───────────────

27  [17] This concession accords with Defendants' contention that while any reader would find a Superman comic book to be "different" from a Superboy comic book, this distinction is not inconsistent with Superboy being a derivative work based on earlier Superman works

28  and thus irrelevant to any issue in this case. (*See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, at 13 n.9.)

11

**EXHIBIT 18**

1 the Reply Declaration of Roger L. Zissu ("Reply Zissu Ex. _"); H. Rep. at 57 ("the most

2 important point here is one that is commonly misunderstood today: copyright in a 'new

3 version' covers only the material added by the later author"). The only things that count

4 in the present case, however, are that such protection does not extend to the "pre-existing

5 material" included in the derivative work (*i.e.,* the pre-existing Superman story elements),

6 and that the addition of "new material" to the derivative does not "affect" the

7 "ownership" of "the pre-existing material employed" in the work. *Id.*

8     The latter rule is crucial here on two points, either of which is a basis for granting

9 Defendants' motion. First, it confirms the "work made for hire" status of the

10 Submissions because of the legal rule that wherever the copyright in an underlying work

11 is owned and controlled by a hiring party, an independent contractor's derivative work

12 based thereon, as a matter of law, is deemed to be produced "at the instance" of such

13 hiring party.[18] *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995); *Picture

14 Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972). (Pt. IV.) Second,

15 Superboy's derivative work status requires the Court to factor out and disregard the pre-

16 existing material[19] in any comparison to determine the copyright relationship - for

17 ownership or infringement purposes – (a) between the Submissions and *More Fun #101*

18 and (b) between the Submissions and any *Smallville* episode. (*See* Pt. VII, *infra*)

19 **IV.**    **THE SUBMISSIONS ARE WORKS MADE FOR HIRE AND**
           **THEREFORE NOT TERMINABLE UNDER SECTION 304(c)**

20

21     Here again, Plaintiffs do not contest any of the facts relating to whether Siegel's

22 Submissions to Detective were works for hire, all of which are found in documentary

23 evidence. Nor do they question that the 1909 Act "instance and expense" test determines

---

[18] Plaintiffs' emphasis on the uncontroversial proposition that an author of a derivative work owns a separate copyright in the new, original matter therein, 17 U.S.C. § 103(b), is an effort to confuse on the work for hire issue. The issue there is not whether there is a separate copyright but whether Detective was the motivating factor in the preparation of the works and consequently under the instance and expense test the legal "author" and initial copyright owner of such new material. (*See* Pt. IV, *infra.*)

[19] This includes, in addition to pre-existing Superman comics, any material published before 59 years prior to the alleged termination date – November 14, 1943. *See* 17 U.S.C. § 304(c)(3), (4)(A). Among those is a 1942 novel entitled *The Adventures of Superman* licensed by Detective, which contains extensive descriptions of Superman's life as a boy (Zissu Ex. <u>CC</u>) and a 1942 strip depicting boyhood scenes (*id.* Ex. <u>DD</u>).

**EXHIBIT 18**
**870**

1    this issue.[20]  Plaintiffs cannot avoid such facts and law by relying upon the Interlocutory

2    Findings, not only because they were not part of the Final Judgment and did not address,

3    nor could have adjudicated, the uniquely federal law issue of whether the Submissions

4    were works for hire (Pts. I & II), but also because, as noted above, there is nothing in

5    them that is inconsistent with the clear answers yielded by the 1909 Act motivating factor

6    inquiry.[21]  Such answers mandate the conclusion that the Submissions were "for hire"

7    owned from inception by the hiring party, Detective, irrespective of whatever Plaintiffs

8    claim to be new in them.

9          The motivating factor inquiry requires evaluation of (a) at whose instance the work

10   was prepared; (b) whether the hiring party had the power to "accept, reject or modify the

11   work"; and (c) at whose expense the work was produced. *Self-Realization,* 206 F.3d at

12   1326-27; *Lin-Brook,* 352 F.2d at 300.  To the limited extent Plaintiffs address these

13   inquiries, their arguments reveal a basic misconception of the law and only confirm that

14   the works at issue were made for hire for Detective. This is evidenced most strikingly by

15   Plaintiffs' unpersuasive responses to the instance inquiry, as well as their failure to

16   address the right to "accept or reject" and "expense factors," which are thereby conceded.

17         Based on the undisputed and admitted facts the Court can now rule that the works

18   at issue were prepared at Detective's instance for any one or all of the following reasons:

19   (i) Siegel prepared the Submissions only *after* being under contract to Detective

20   (*Twentieth Century Fox Film Corp. v. Entm't Distrib.,* 429 F.3d 869, 880 (9th Cir. 2005)

21   (critical that author "had [not] begun drafting the book before he reached his agreement"

22   with publisher); *Playboy,* 53 F.3d at 554); (ii) the Submissions were concededly

23

24   [20] "Instance" and "expense" are not "new buzz words" (Pl. Opp. at 14) but, rather, is the
     governing test referred to in the case law. *See, e.g., Self-Realization Fellowship Church
     v. Ananda Church of Self-Realization,* 206 F.3d 1322, 1326 (9th Cir. 2000); *Lin-Brook*

25   *Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir. 1965).
     [21] Notwithstanding the cases cited by Plaintiff (Pl. Opp. at 8), decisions about the key

26   copyright issues here could not possibly, as Plaintiffs claim, be made under "ordinary
     principles of contract law" of any state (*id.* at 14).  While a state court may be able to

27   decide the simple contractual question of who owns the renewal copyright where B paid
     $1000.00 to A for assigning to B all of A's rights in the renewal copyright, *see National,*

28   503 F.2d at 917, there is only federal jurisprudence – the "instance and expense" test – to
     look to for the rules governing 1909 Act work for hire copyright ownership.

13

**EXHIBIT 18**

**871**

1  derivative works based on the Superman works of which Detective was the copyright

2  owner (*Playboy*, 53 F.3d at 554; *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,

3  342 F.3d 149, 163 (2d Cir. 2003); *accord* 3 Melville B. Nimmer & David Nimmer,

4  *Nimmer on Copyright* ("*Nimmer*"), § 9.03[D] at 9-28.3 (2005)); (iii) Detective had the

5  right to accept or reject them (*Twentieth Century*, 429 F.3d at 880); and (iv) the

6  Submissions were incomplete works that Siegel submitted as an "audition" inducement to

7  Detective to develop them (*Niss v. Columbia Pictures Indus., Inc.*, 57 U.S.P.Q.2d 1346,

8  1353-55 (S.D.N.Y. 2000), *aff'd*, 25 Fed.Appx. 76 (2d Cir. 2002) (citing *Wilkes v. Rhino*

9  *Records, Inc.*, No. 96-56238, 1997 WL 800275, at *1 (9th Cir. Dec. 17, 1997)).

10       On instance, Plaintiffs admit that Siegel "created" his Submissions "under the

11  terms of the September 22, 1938 Agreement, *which permitted him* to originate new comic

12  strip concepts . . . *subject to a right* on the part of Detective *to accept or reject the same*

13  with [sic] six weeks of their submission." (Pl. Opp. at 15) (emph. added).  This alone

14  shows that Detective was the party that took the initiative, that Siegel needed permission

15  to prepare the works and that Detective had the right to "accept or reject."  This more

16  than satisfies the "instance" inquiry, as well as the uncontested right to "accept, reject or

17  modify" factor.  Plaintiffs' further argument that the parties' September 1938 Agreement

18  and the "first refusal procedure [provided therein] . . . is inapposite to any notion or intent

19  that Detective owned such material as 'author' of a 'work made for hire'" (Pl. Opp. at 16)

20  confirms even further that Detective was the motivating factor.  Such a contention

21  establishes that Siegel's Submissions took place under a contractual framework set up *by*

22  Detective which thereby "took the initiative" in producing the works and thus was the

23  motivating factor in their preparation.  *Playboy*, 53 F.3d at 554 (quoting *Picture Music*,

24  457 F.2d at 1217).  Any arguments about what was Siegel's supposed subjective "intent"

25  in 1938 and 1940 are not only after-the-fact speculation by counsel (Pl. Opp. at 16), they

26  are irrelevant: the only way to have altered the outcome of the above- noted judicially

27  prescribed inquiries was an "express" agreement of the hiring party to the contrary, *May*

28  *v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980); *Brattleboro*

14

**EXHIBIT 18**

**872**

1  *Publ'g Co. v. Windmill Publ'g Corp.*, 369 F.2d 565, 567 (2d Cir. 1966); *Playboy*, 53 F.3d

2  at 554. There was none here.[22]

3        Plaintiffs' further contentions that the works were not "for hire" because "Siegel

4  independently created" the materials he submitted (Pl. Opp. at 15) and that he "created

5  his "Superboy work on his own volition" (*id.* at 16) are equally misplaced. Since the

6  "instance and expense" inquiry only comes into play with regard to the efforts of

7  independent contractors, as opposed to regular employees, such an argument has always

8  been rejected as irrelevant. *See Twentieth Century*, 429 F.3d at 877 ("Dastar's arguments

9  that independent contractors cannot create works-for-hire as a matter of law essentially

10  seeks to overturn forty years of established case law within this circuit . . . .") (citations

11  omitted).  The fact that, as Plaintiffs contend, Siegel "consistently tried to interest

12  Detective in purchasing and publishing such work, but . . . Detective declined to do so"

13  (Pl. Opp. at 16), is only more proof that his Submissions were prepared at Detective's

14  instance, either under his contract with Detective, *Twentieth Century*, 429 F.3d at 880, or

15  by reason of the audition rule which would apply even if there had been no pre-arranged

16  submission procedure, *Niss*, 57 U.S.P.Q.2d at 1353-55.

17        Plaintiffs' other factual assertions with regard to instance, including those

18  concerning the Interlocutory Findings, suffer from demonstrable inaccuracies and are

19  also legally beside the point.  First, nothing in the 1938 Agreements or any other contract

20  required Detective to "purchase" rights in Siegel's Submissions in order to obtain and

21  retain its copyright ownership in these works, as Plaintiffs claim.  (Pl. Opp. at 13.)  Any

22  such provision would also stand copyright ownership principles on their head.  As

23  explained in the legislative history, H. Rep. at 121, Congress in section 201 of the 1976

24  Act carried forward the rules governing initial copyright ownership under the 1909 Act,

25  including that "in the case of a work made for hire, the employer or other person for

26  whom the work is prepared is considered the author for the *purposes of this title*, and

27  [22] Plaintiffs' italicized reliance on the reference in *Lin-Brook*, 352 F.2d at 300, to the

28  "mutual intent of the parties" (Pl. Opp. at 16) disregards the rest of the Court's sentence making it clear that it is the parties' mutual intent to have "the title of the copyright" be "*in the person at whose instance the work was done*." 352 F.2d at 300 (emph. added).

**EXHIBIT 18**
**873**

1  unless the parties have expressly agreed otherwise in a written ins ument signed by

2  them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b) (emph.

3  added). The Referee never could have made or purported to make any determination

4  under the 1909 Act work for hire rules that Siegel was the initial copyright owner of the

5  Submissions, without regard to any use by him of the word "originator" in reference to a

6  comic feature entitled Superboy. (Pl. Opp. at 13.)[23]

7  **V.  PLAINTIFFS DID NOT HAVE A VALID AND SUBSISTING**
   **COPYRIGHT IN THE SUBMISSIONS ON JANUARY 1, 1978**

8      Plaintiffs cannot and do not dispute that termination under section 304(c) does not

9  lie unless the terminated work was entitled to protection under the 1909 Act "subsisting

10  in either its first or renewal term on January 1, 1978." 17 U.S.C. § 304(c). *See also* 3

11  *Nimmer* § 11.02[A][1] at 11-11-11-12; William F. Patry, *Latman's The Copyright Law*

12  (6th ed. 1982), at 133 (recognizing "termination gap" for works unprotected under the

13  1909 Act).[24] If the Submissions were neither registered under the 1909 Act nor published

14  by January 1, 1978, they would not be subject to a subsisting copyright and thus neither

15  in their first nor renewal term as of that date. In this case, they are not eligible for

16  termination under section 304(c).

17      To avoid this inevitable consequence, Plaintiffs claim that the Submissions were

18  "published," not as independent works but years later through Detective's 1944 *More*

19  *Fun #101*, the first Superboy story. Following their pattern in this opposition, Plaintiffs

20  do not acknowledge the governing law on whether one work is published in another

21  under the copyright laws, as set forth in the Ninth Circuit's decision in *Batjac*

22  *Productions, Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223, 1233-35 (9th Cir.

---

23  [23] Plaintiffs' Superboy Notice, in describing the renewal registration for *More Fun #101*,
24  which Plaintiffs claim embody the Submissions (Zissu Ex. AA at 5), disregards the fact
    that this registration was made by National as "[p]roprietor of a work made for hire." To
25  the extent that Plaintiffs claim that the Submissions were embodied and published in
    *More Fun #101*, they admit that these are works made for hire not subject to termination
26  under section 304(c). (*See More Fun #101* Renewal Certificate Reply Zissu Ex. FF).)
    [24] Under the 1909 Act, which provided for original and renewal terms of 28 years each,
27  works that were not published with notice or registered as unpublished were not protected
    under the Act, but remained protected by common (state) law copyright and could not be
28  in either their "first" or their "renewal" terms, as those terms relate solely to statutory
    copyright protection. 17 U.S.C. §§ 10, 12, 2 (repealed).

16

**EXHIBIT 18**
**874**

1    1998). Instead, they turn once again to the vacated Interlocutory Findings. But the
2    Interlocutory Findings *do not* state that any portions of *the Submissions* were *published* in
3    *More Fun #101*. (Zissu Ex. O, ¶¶ 164-65.) Rather, they state that only the
4    uncopyrightable "idea, plan, and conception" for a Superboy comic strip appear in *More*
5    *Fun #101*. (*Id*.) Indeed, the vacated Interlocutory Findings do not identify among the
6    material appearing in *More Fun #101* the "dialogue and continuity" which represent the
7    only expressive, arguably copyrightable portions of the Submissions. (*Id*. ¶¶ 163-67.)
8            While Plaintiffs recite the vacated Interlocutory Finding that *More Fun #101*
9    "embodied and was based upon Siegel's idea, plan and conception," they have failed to
10   come forward with "specific facts" to identify any "portions" of the Submissions actually
11   included in *More Fun #101*, as required by Fed. R. Civ. P. 56(e). In order for one work
12   to "publish" another within the meaning of the 1909 Act, the first work must be
13   "incorporated" into the second so that "portions" of first work become a "component" of
14   the second. *Batjac*, 160 F.3d at 1233-35. Here, Plaintiffs have failed to be specific
15   because a comparison of the Script and *More Fun #101* clearly shows that there are no
16   incorporated portions of copyrightable material from the Script,[25] with the exception of
17   limited reference to the Superman origin story and a more expansive series of verbal
18   panels in *More Fun #101* retelling that story, previously published and owned by DC.
19   (*Compare* Zissu Ex. H, Reply Zissu Ex. GG *with* K.). As a matter of law, Siegel could
20   not claim ownership of these (17 U.S.C. § 103(b); Def. Mem. at 4-5, 12-14), and such
21   material cannot be terminated by the Superboy Notice.
22   **VI.   PLAINTIFFS FAILED TO TERMINATE THE FINAL JUDGMENT**
23           Plaintiffs' failure to terminate the Final Judgment is also fatal to their Superboy
24   Notice and this case. Knowing this, Plaintiffs admit that the Superboy Notice failed to
25   identify the Final Judgment as a terminated grant (Pl. Opp. at 18), and do not contest that
26   a judgment, like the Final Judgment, can contain the relevant transfer or license language.
27   Instead, they claim that the Final Judgment "merely follows the parties' 1948 Stipulation

---

28   [25] For the Court's convenience, Plaintiffs have submitted a more legible re-typed copy of
     the Script as Reply Zissu Ex. GG.

1    entered two days earlier" rather than constituting a separate grant of copyright.  (*Id.*)

2    According to Plaintiffs, since Siegel transferred "Superboy" to National in the

3    Stipulation, the Final Judgment entered two days later "could not as a matter of law have

4    conveyed 'Superboy' which was already in National's possession." (*Id.* at 18-19).  This

5    is illogical and belied by Plaintiffs' actions in drafting the Superboy Notice, in which

6    they identified in addition to the Stipulation a 1975 agreement in which rights "to the

7    Superman . . . characters" (Reply Zissu Ex. HH at 1), were transferred.  If Plaintiffs'

8    theory about the Stipulation being the only operative grant is correct, why terminate the

9    later 1975 grant?  Moreover, the fact that the Final Judgment came only two days after

10    the Stipulation is of no moment – without it no rights would have been transferred.

11        Plaintiffs also argue that Defendants were on notice of their termination attempt, and that

12    the omission of the Final Judgment did not affect Defendants' understanding of the purported

13    scope of termination.[26]  But the termination provisions of the 1976 Act and the regulations

14    promulgated thereunder do not include such an exception, *see* 37 C.F.R. § 201.10(b)(1).  And

15    they require more than notice to copyright owners: "as a condition to its taking effect," a notice

16    must be recorded in the Copyright Office to give constructive notice to all existing

17    licensees and their actual and potential downstream sublicensees.  17 U.S.C. §§

18    304(c)(4)(A), 205(c).  These requirements were part of Congress' larger goal to foster

19    predictability with respect to ownership.  *Community for Creative Non-Violence v. Reid*,

20    490 U.S. 741, 749 (1980) ("Congress' paramount goal in revising the 1976 Act [was]

21    enhancing predictability and certainty of copyright ownership").

22    **VII.  PLAINTIFFS HAVE FAILED TO POINT TO ANYTHING**

23          **COPYRIGHTABLE IN THE SUBMISSIONS THAT ALSO**
           **APPEARS IN *SMALLVILLE***

24        Plaintiffs won't come right out and say it, but it is clear that they claim to own any

25    [26] Plaintiffs' reliance on *Music Sales*, 73 F. Supp. 2d at 378, which upheld termination
26    where the author provided a broad statement incorporating many grants instead of
     identifying specific grants, is misplaced.  (Pl. Opp. at 19.)  Had Plaintiffs taken such a
27    "broad" approach in the Superboy Notice the case might have some relevance here.  But
     Plaintiffs instead chose to identify certain specific grants (those contained in the
     Stipulation and a 1975 agreement between the parties), omitting the Final Judgment.
28    Moreover, Plaintiffs included a "catch-all" footnote to their identification listing several
     other grants and again omitting the Final Judgment.

**EXHIBIT 18**
**876**

1  depiction of Superman as a youth.  This extreme position is directly contrary to the law

2  that expressly excludes ideas from protection.  17 U.S.C. § 102(b).  *See also Berkic v.*

3  *Crichton,* 761 F.2d 1289, 1293 (9th Cir. 1985) ("[n]o one can own the basic idea for a

4  story").  Meanwhile, in response to the instant motion, Plaintiffs avoid discussion or

5  comparison of any *specific* works, as required under the law of this Circuit.  Rather,

6  Plaintiffs resort to mischaracterizing the substance of Defendants' motion and the actual

7  contents of the Submissions.  Plaintiffs have failed to meet their burden of demonstrating

8  that there is a genuine issue for trial on their infringement claim.

9        **A.      Infringement Is "Often" Determined On Summary Judgment**

10       Plaintiffs cite a Ninth Circuit case out of context to imply that summary judgment

11  should not be granted in copyright cases.  (Pl. Opp. at 22.)  This implication is false.  In

12  this Circuit, "'no special standard is employed in determining whether summary

13  judgment is appropriate on the issue of substantial similarity . . . .'"  *Berkic,* 761 F.2d at

14  1292 (quoting *See v. Durang,* 711 F.2d 141, 142 (9th Cir. 1983)).  Rather, "[s]ummary

15  judgment is proper if reasonable minds could not differ as to the presence or absence of

16  substantial similarity of expression."  *Durang,* 711 F.2d at 143 (citations omitted).  Thus,

17  the issue of substantial similarity "'may often be decided as a matter of law,'" and the

18  Ninth Circuit has "frequently affirmed summary judgments in favor copyright defendants

19  on the substantial similarity issue.'"  *Berkic,* 761 F.2d at 1292-93 (citations omitted).  In

20  this case, as a matter of law, reasonable minds cannot differ – there is no similarity of

21  copyrightable expression between the Submission and any episode of *Smallville.*[27]

22       **B.      Plaintiffs Cannot Meet Their Burden Of Establishing**
          **Substantial Similarity Between The Submissions And *Smallville***
23

24       In opposition to the instant motion, instead of coming forth with "specific facts" as

25  required by Fed. R. Civ. P. 56(e), Plaintiffs mischaracterize the content of their own

26  [27] In *Hoehling v. Universal Studios, Inc.,* one of the cases on which Plaintiffs rely, the
      Court explained that while, up until that point, summary judgment had been traditionally
27  frowned upon on the issue of substantial similarity, recent decisions "signaled an
      important development in the law of copyright, permitting courts to put 'a swift end to
28  meritless litigation' and to avoid lengthy and costly trials," by granting summary
      judgment on the issue of substantial similarity.  618 F.2d 972, 977 (2d Cir. 1980).

**EXHIBIT 18**

1   work.  Meanwhile, they ignore the "filtration" process *required* in this Circuit, *i.e.*,

2   removing from consideration any materials that are either not protected under copyright

3   or not owned by the Plaintiffs.  Instead, Plaintiffs offer up purported similarities that

4   appear on the most generic and general level and that are based upon elements that are

5   either not protected by copyright or cannot be owned by Plaintiffs.  Plaintiffs also avoid

6   any specific comparison of plots, themes, dialogues, mood, setting, pace, and sequence in

7   the works at issue in favor of asserting the conclusion that these aspects of the works are

8   similar.  (Pl. Opp. at 21-25.)

9       **1.    Plaintiffs Mischaracterize The Basis Of Their
              Copyright Claim And The Content Of The Submissions**

10      To evaluate an infringement claim, the Court must compare the works.  *See, e.g.,*

11  *Kouf v. Walt Disney Pictures Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  Plaintiffs

12  desperately seek to avoid the required comparison by employing loose and misleading

13  terminology to describe their own works, which they refer to as "Superboy," or the

14  "Superboy Material," and also misleadingly reference the "large body of 'Superboy'

15  material" exploited for more than 50 years.  (Pl. Opp. at 23-24.)  The only works that

16  could possibly be the basis of their infringement claim are the Submissions – the two

17  paragraph "Pitch" and the 13-page "Script."  (Zissu Ex. L, ¶¶ 20-23.)  Plaintiffs use this

18  mischaracterization of their work to misstate the basis of Defendants' motion, asserting

19  that Defendants' claim is that the *Smallville* television series is not derived from

20  "Superboy" but instead "solely from "Superman."  (Pl. Opp. at 22, ll. 5-7.)  In fact, the

21  basis of Defendants' motion is much narrower: nothing *in the Submissions* that is

22  conceivably owned by the Plaintiffs is present in *Smallville*.

23      Meanwhile, because the content of the Submissions and *Smallville* is so vastly

24  different, Plaintiffs persist in mischaracterizing the contents of the Submissions hoping to

25  make them more similar to *Smallville*.  For example, Plaintiffs claim the Submissions are

26  set in a "small rural town," and that in them young Clark Kent is "coming to grips with

27  his emerging superpowers [and] adolescent angst."  (Pl. Opp. at 22.)  *None of this is*

28  *present in the Submissions* – there is no description of Clark Kent's town being "small"

**EXHIBIT 18**
**878**

1     or "rural." (Zissu Exs. G, H.)  Neither is there any indication that young Clark Kent

2     discovers his powers "emerging" or that he is "coming to grips" with that or anything

3     else. (*Id.*)  The assertion that Clark Kent experiences "adolescent angst" (Pl. Opp. at 22,

4     l. 20) is also false – in the Script, Clark is not an adolescent and exhibits no "angst" of

5     any kind (Zissu Ex. H).  Plaintiffs further assert that the majority of the Script "takes

6     place in the fifth grade" when Clark Kent is 12 years old. (Pl. Opp. at 23.)  However,

7     only five of the 13 pages of the Script portray young Clark Kent in the fifth grade, where

8     students are typically *10* years old – *not 12*. (Zissu Ex. H.)

9           **2.**      **Plaintiffs Ignore The "Filtration" Process**
                      **The Court Must Undertake On This Motion**

10        Plaintiffs do not dispute, and thus concede that in determining whether there is

11     "substantial similarity" between the parties' works, the Court must engage in a filtration

12     process, removing from consideration any portion of the Plaintiffs' work that is either not

13     protected under copyright or not owned by the Plaintiffs. *Apple Computer, Inc. v.*

14     *Microsoft Corp.*, 35 F.3d 1435, 1442-43 (9th Cir. 1987).  The Court must "filter out"

15     elements borrowed from another author, *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d

16     1129, 1177 (C.D. Cal. 2001), *aff'd in part, dismissed in part*, 90 Fed.Appx. 496 (9th Cir.

17     2003), and, in a derivative work, the pre-existing elements from the owner of the pre-

18     existing work. *Stewart v. Abend*, 495 U.S. 216, 223 (1990).  Plaintiffs repeatedly ignore

19     this bedrock principle, relying upon purported similarities between *Smallville* and

20     elements in the Submissions originating from works pre- or post-dating the Submissions.

21        Both works are stories about Superman.  As a result, any plot elements or

22     characters in the Submissions relating to or found in Superman that were previously

23     published – such as the story of his provenance from another planet, the character's

24     powers, his name "Clark Kent," his adoptive parents the Kents, the story of his early

25     childhood and adoption, the advice from the Kents to hide his powers until such time as

26     he can use them to assist humanity, and his use of his powers to help the world around

27     him – cannot be considered as part of the "work" owned by Plaintiffs that purports to

28     serve as the basis of an infringement claim since the Submissions are entirely dominated

21

**EXHIBIT 18**
**879**

1 | by elements from previously published Superman stories. (*See* Chart, Def. Mem. at 4-5

2 | and citations therein.)  Once these are removed from the Submissions, there is very little

3 | to virtually nothing left, and certainly nothing that Plaintiffs have identified that is also in

4 | *Smallville*.  Plaintiffs all but concede that any similarities between the works stem from

5 | their common reliance on Superman characters and stories that pre-dated the

6 | Submissions.  For example, they rely on Superman's "emerging superpowers" (Pl. Opp.

7 | at 22), his protection of the town in which he lives, and his relationship with the Kents.

8 | (*Id.* at 24-25.)  These are themes previously developed in pre-existing Superman stories

9 | and cannot be the basis of Plaintiffs' infringement claim.  (Def. Mem. at 4; 21-25.)

10 |         Similarly, Plaintiffs' reliance on use in *Smallville* of the town name "Smallville"

11 | and the characters Lana Lang and Pete Ross from *Superboy* comics not authored by

12 | Siegel and which post-date the Submissions is to no avail.  (Pl. Opp. at 24.)  These

13 | commonalities do not support Plaintiffs' claim because, as Plaintiffs themselves concede,

14 | the creator of new matter in a derivative work owns only that new matter.  (*Id.* at 12; *see*

15 | *also* 17 U.S.C. § 103(b)).  Even if Plaintiffs could establish that any of the elements cited

16 | above were derivative of the Submissions, which they cannot, it is undisputed that the

17 | Submissions themselves do not contain a town called "Smallville" or characters named

18 | Lana Lang or Pete Ross. (Zissu Exs. G, H.)  Those elements were later created by DC's

19 | predecessor companies (*see* Ex. K to Decl. of Marc Toberoff at 120, 122) and thus must

20 | be "filtered out" and cannot be the basis of Plaintiffs' claim.  The Court must also "filter

21 | out" unprotectable elements present in both works such as ideas or other forms of

22 | unprotectable expression such as so-called "scenes a faire," *e.g.*, stock scenes or scenes

23 | that flow necessarily from common unprotectable ideas. *See Rice v. Fox Broad. Co.*, 330

24 | F.3d 1170, 1175 (9th Cir. 2003); *Hoehling*, 618 F.2d at 979. "'Common' in this context

25 | means common to the works at issue" and not "commonly found in other artistic works."

26 | *Durang*, 711 F.2d at 143.

27 |         Plaintiffs' entire infringement claim rests upon such unprotectable elements.  For

28 | example, Plaintiffs allege that the town "Smallville" is "associated with 'Superboy.'"

**EXHIBIT 18**
**880**

1   (Pl. Opp. at 24.)[28]  This claim is irrelevant.  First, as established above, the name

2   "Smallville" is not contained in the Submissions and thus, Plaintiffs cannot claim

3   ownership in the name.      hat is more, the name of a location, without more, is not

4   protected by copyright.  *See* 1 *Nimmer* § 2.12 at 2-178.25 n 5.1 (name of fictitious

5   character not protected by copyright).  Thus, the name "Smallville," must be "filtered

6   out" of Plaintiffs' work and cannot be considered in infringement analysis.

7       Plaintiffs also claim that *Smallville* copies the following elements from the

8   Submissions: (1) the idea of young Clark Kent maturing from a pre-teen to an older teen

9   in high school (Pl. Opp. at 23); (2) the focus "on a youth with extraordinary powers

10  raised in a small town environment" who grapples with adolescence and faces the

11  "responsibilities of his emerging powers;" (*Id*. at 24); (3) "the adventures of its superhero

12  in the small town he protects, while examining the character's social . . . and family life;"

13  (*Id*. at 24-25); and (4) a focus on the relationship between Clark Kent and his "earnest

14  and understanding adoptive parents to whom he turns for guidance."  (*Id*. at 25.)  These

15  elements are textbook examples of "general plot ideas," not protected by copyright but

16  "remain[ing] forever the common property of artistic mankind."  *Berkic*, 761 F.2d at

17  1293 (common plot in two works about criminal organizations that murder healthy young

18  people and sell organs to the wealthy held to be unprotectable "general plot ideas");

19  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356-57 (9th Cir. 1984) (similarities in plots

20  between movie *E.T.* and play about two aliens stranded on earth and befriended by

21  children held to "exist only at a general level" and not protectable); *Nichols v. Universal*

22  *Pictures Corp.*, 45 F.2d 119, 121-23 (2d Cir. 1930) (L. Hand, J.).  Moreover, these ideas

23  "flow necessarily" from the common idea in both the Submissions and *Smallville*,

24  namely, a story about Superman's youth.  Stories about Superman's youth are bound to

25  include themes flowing from the nature and prior development of the Superman

---

26  [28] It is undisputed that the term "Smallville" has become inextricably associated with
    Superman.  While not a copyright concept, this "association" creates trademark rights in

27  the word "Smallville." 15 U.S.C. § 1125(a).  Such trademark rights are owned by DC
    and cannot be affected by copyright termination.  17 U.S.C. § 304(c)(6)(E) (termination

28  affects only copyright and "in no way affects rights arising under any other Federal,
    State, or foreign laws.")

23

**EXHIBIT 18**
**881**

1    character: (1) advancing age; (2) coping with emerging powers (although this is not in the

2    Submissions) and surroundings; (3) attempts to save and protect (a staple of any

3    Superman or other superhero story) while also developing friendships; and (4) an

4    exploration of the relationship between young Clark Kent and his adoptive parents. In

5    sum, any "similarities" pointed to by Plaintiffs all relate to pre-existing Superman

6    elements Siegel did not author or could not own, unprotectable general plot ideas, or

7    scenes that necessarily flow from the idea of depicting Superman as a youth.

8              3.    **Plaintiffs Fail To Demonstrate Any Similarities In Plot, Theme, Dialogue, Mood, Setting, Pace, And Sequence Between The Works**

9        Because Plaintiffs have the burden of proof at trial to establish copyright

10    infringement *Berkic*, 761 F.2d at 1291, Defendants have met their burden on this motion

11    "simply by showing that there is an 'absence of evidence' to support the nonmoving

12    party's case." *Matjack Prods., Inc. v. Goodtimes Home Video Corp.*, 30 U.S.P.Q.2d

13    1959, 1960 (C.D. Cal. 1994) (Lew, J.), *aff'd*, 81 F.3d 881 (9th Cir. 1996). In their

14    opposition, Plaintiffs were required to "designate specific facts showing that there is a

15    genuine issue for trial." *Id.*; Fed. R. Civ. P. 56(e). This they have failed to do.

16        As set forth in Defendants' moving papers, in determining whether there is

17    "substantial similarity," a term of art, the Court must compare the plots, themes,

18    dialogues, mood, setting, pace, and sequence of the works at issue. *Berkic,* 761 F.2d at

19    1293. In response to Defendants' assertion of an "absence of evidence" of similarity of

20    any of these required elements, Plaintiffs have not identified any similarities in any of

21    these areas. The reason for this is clear – there are none:

22        **Plot.** As set forth above, similarity of "general plot ideas" is not actionable.

23    Rather, there must be similarity between the "actual concrete elements that make up the

24    sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d

25    at 1293. Plaintiffs could not point to a single one of the 101 episodes of *Smallville* in

26    the record that shared any similarity of plot with the Submissions.

27        **Theme.** The Submissions follow closely in theme previously published Superman

28    stories that preceded them – a depiction of a young, upright hero, who dons a costume to

24

**EXHIBIT 18**
**882**

1  hide his identity while he helps mankind. *Smallville*, in contrast, depicts a costume-less,

2  almost reluctant hero in the midst of self-discovery and struggling with his relationships.

3  Moreover, as the seasons have progressed, the program has devoted more of its storylines

4  to the supernatural and science fiction. (*See* Decl. of Melinda Hage, ¶ 3 & Exs. <u>A</u>, <u>B</u>.)

5          **Dialogue.** Plaintiffs have not identified any similarity in dialogue.

6          **Mood.** The Pitch identifies Siegel's Superboy stories as having "lots of humor,

7  action, and the characters would be mainly children of about 12-years rather than adults."

8  (Zissu Exh. <u>G</u> at 3.) In contrast, *Smallville* is not humorous but is dark, heavily oriented

9  around science fiction, and none of the characters are children. Rather, Clark Kent and

10 Lana Lang are in and/or have graduated high school and Lex Luthor is a young adult.

11         **Setting.** The Submissions are set in the 1940s; *Smallville* takes place in the present.

12         **Pace.** The pace of both works are different. While the Submissions sketch three

13 episodes in 13 pages, requiring little development and quick resolution, each *Smallville*

14 episode is approximately one hour long, with story arcs that cover multiple episodes.

15         **Sequence of Events.** Other than the different presentation of Superman's arrival

16 to Earth, a pre-existing Superman element undisputedly owned by Defendants, there is no

17 similarity of any events between the two works, let alone their sequence.

18                              **CONCLUSION**

19         For the reasons set forth herein, and as set forth in their moving brief, Defendants

20 respectfully request that the Court grant their summary judgment motion in its entirety.

21 DATED: March 10, 2006              Respectfully submitted,

22                                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                      PERKINS LAW OFFICE, P.C.
23                                              -and-
                                      WEISSMANN WOLFF BERGMAN
24                                      COLEMAN GRODIN & EVALL LLP

25

26                                    By: _____
                                          Roger L. Zissu
27
                                      *Attorneys for Defendants and Counterclaimant*
28

I:\jweinberger\doc\Siegel Litigation\Pleadings\04cv8776\060310-0425344-Reply Memo of Law in Support of MSJ Superboy-jdw.DOC

25

**EXHIBIT 18**
**883**

**PROOF OF SERVICE**

STATE OF CALIFORNIA         )
                                    ) ss.

COUNTY OF LOS ANGELES     )

     I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9665 Wilshire Blvd, Suite 900, Beverly Hills, CA 90212.  On the date shown below, I served the documents described as: **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on the interested parties in said action, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Marc Toberoff
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
**Fax No.: (310) 246-3101**

\_\_\_    **(BY MAIL)**   I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

\_\_\_    **(FACSIMILE SERVICE)** I caused such document to be transmitted via facsimile to the offices of the addressees at the numbers listed above.

**XX**    **(PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the addressees above.

\_\_\_    **(BY FEDERAL EXPRESS)** I caused a copy of such document(s) to be delivered to the offices of the addressee(s) via Federal Express, next business day delivery service.

Executed on **March 10, 2006**, at Beverly Hills, California.

\_\_\_    **STATE**    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**XX**    **FEDERAL**    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

*Ticci Bennett*
Ticci Bennett

**EXHIBIT 18**
**884**

# EXHIBIT 19



FILED
CLERK US DISTRICT COURT

MAR 23 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 24 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

JOANNE SIEGEL & LAURA )
SIEGEL LARSON, )
)
          Plaintiffs )
)
    v. )
)
)
TIME WARNER, INC., )
et al., )
)
)
)
)
)
          Defendants. )
)
)

CV 04-8776 R (RZx)

**ORDER
GRANTING PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT &
DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

DOCKETED ON CM

MAR 24 2006

BY                    003

        Plaintiffs Joanne Siegel and Laura Siegel Larson's

Motion for Partial Summary Judgment and Defendant Time

1

**EXHIBIT 19**
**885**

1  Warner, Inc.'s Motion for Summary Judgment came on regularly

2  for hearing on March 20, 2006.  This Court has considered

3  all of the papers and argument submitted on the matter and

4  **NOW FINDS AND RULES AS FOLLOWS:**

5

6  As a preliminary matter, this Court **GRANTS** Plaintiffs'

7  and Defendants' requests for Judicial Notice pursuant to

8  Fed. R. Evid. 201.

9

10  This copyright dispute arises out of facts stemming

11  back to 1938 and earlier, and including two previous cases

12  in 1947 and 1973.  Plaintiffs in this case are Joanne

13  Siegel, widow of Jerome Siegel,[1] and their daughter, Laura

14  Siegel Larson.  Jerome Siegel and Joseph Shuster are the

15  creators of Superman.  Jerome Siegel is the originator,

16  creator of Superboy with Joseph Shuster providing much of

17  the illustration.  Defendants in this case are Time Warner

18  Inc., the parent company of DC Comics ("Defendants").  DC

19  Comics predecessor in interest was National Comics

20  Publications, Inc. ("National") and its predecessor in

21  interest was Detective Comics ("Detective").

22

23  In 1947, Jerome Siegel and Joseph Shuster sued National

24  in the New York Supreme Court for the County of Westchester

25

26  _____

[1] Jerome Siegel passed away on January 28, 1996.

2

**EXHIBIT 19**
**886**

1  ("the state court action") seeking a determination that

2  their March 1, 1938 contract was void.  Additionally, the

3  state court action sought to determine who owned the rights

4  to Superman and to Superboy.

5

6      On November 1, 1947 Judge Addison Young, the official

7  referee in the state court action, rendered a detailed

8  interlocutory judgment.  Then on April 12, 1948, Judge Young

9  signed a detailed findings of fact and conclusions of law.

10 He found that Jerome Siegel was the originator and sole

11 owner of the comic strip feature Superboy with the sole and

12 exclusive right to create, sell, and distribute the comic

13 strip under the title Superboy.

14

15     On May 19, 1948 the parties entered into a stipulation

16 to settle and on May 21, 1948, the Court entered a consent

17 judgment, vacating in all respects the interlocutory

18 judgment. The stipulation provided for a payment of

19 approximately $94,000.00 by National in exchange for

20 ownership in both Superman and Superboy.

21

22     In 1973, Siegel and Shuster again sued National in the

23 Southern District of New York seeking declaratory relief

24 that they were entitled to the copyright renewal rights of

25 Superman.  National counterclaimed for a finding of

26 declaratory relief in its favor.  District Judge Lasker

3

**EXHIBIT 19**
**887**

1  granted National's Motion for Summary Judgement dismissing

2  the complaint and finding "National to be the owner of the

3  copyright of all Superman strips during the renewal term."

4  Siegel & Shuster v. National Periodical Publications, Inc.,

5  364 F. Supp. 1032, 1033 (S.D.N.Y. 1973).

6

7      Judge Lasker noted that the findings of the State

8  Supreme Court of Westchester were binding on the district

9  court. Id. (citing to Vernitron Corp. v Benjamin, 440 F.2d

10 105, 108 (2d Cir. 1971)).  Judge Lasker made a clear

11 distinction between (1) the findings of fact of the state

12 court and (2) the stipulated settlement and resulting

13 consent judgment.  Siegel & Shuster, 508 F.2d at 913.

14

15     Siegel and Shuster appealed and the Second Circuit

16 affirmed finding that the district court "properly decided

17 that the state court judgment of May 21, 1948 effectively

18 estopped the plaintiffs from relitigating the issue of

19 ownership of the renewal copyright."  Siegel & Shuster v.

20 National Periodical Publications, Inc. et al., 509 F.2d 909,

21 912-13 (2d Cir. 1974).

22

23     In November 2002, Jerome Siegel's widow and daughter

24 served notices of termination for the Superboy copyrights

25 pursuant to Section 304(c).  Today, Plaintiffs seek a

26 determination that they effectively terminated Defendants'

4

**EXHIBIT 19**
**888**

1   renewal rights in Superboy pursuant to 17 U.S.C. § 304(c) on

2   November 17, 2004.

3

4       17 U.S.C. § 304(c) provides for termination of

5   transfers and licenses covering the extended renewal term.

6   Under the 1901 Copyright Act, protection was divided into

7   two separate consecutive terms of twenty-eight years: the

8   "initial term" and the "renewal term."  But as most

9   authors/creators were required to contract away both the

10  initial and renewal periods at the same time, they were

11  effectively denied the protection Congress sought to

12  provide.

13

14      As a result, on January 1, 1978, the 1976 Copyright Act

15  took effect significantly enhancing the rights of authors

16  and their heirs.  19 U.S.C. § 101, et seq.  The 1976 Act

17  extended the renewal term from 28 to 47 years, for works in

18  their renewal term when the 1976 Act took effect. Along with

19  adding 19 years to the renewal term period, the 1976 Act

20  coupled the extension with a new right of authors and their

21  heirs to recapture the renewal of the copyright in works by

22  terminating any prior grant of the work executed before

23  January 1, 1978.  17 U.S.C. § 304(c).  It is under this

24  provision that Plaintiffs have sought to recapture Jerome

25  Siegel's ownership in the Superboy copyrights.

26

5

EXHIBIT 19
889

1    Fundamental to the arguments presented by both

2   Plaintiffs and Defendants is the effect of the interlocutory

3   judgment issued by Judge Young on November 21, 1947 and the

4   detailed findings of fact and conclusions of law he issued

5   on April 21, 1948.

6

7    Currently, Defendants attempt to relitigate issues

8   determined in the 1947 state court case.  Defendants argue

9   vigorously that only the consent judgment has any preclusive

10   effect and that Judge Young's findings of fact have no

11   effect whatsoever on this litigation.  Defendants take this

12   position because their desired outcome is consistently in

13   direct conflict with the findings issued by Judge Young.

14   Specifically, Judge Young's findings contradict Defendants'

15   assertions regarding (1) the ownership of Superboy; (2)

16   whether Superboy is simply a derivative work of Superman;

17   and (3) whether Superboy was a "work for hire" solely owned

18   by Defendants' predecessors in interest, National and

19   Detective.

20

21    Defendants' current argument that Judge Young's

22   findings are not binding contradicts the position taken by

23   their predecessors in interest in the 1973 litigation and

24   the 1974 Second Circuit appeal regarding Superman.  In

25   applying the doctrine of res judicata in favor of

26   Defendants, Judge Lasker precluded, and the Second Circuit

**EXHIBIT 19**
**890**

affirmed, Plaintiffs from litigating the issue of ownership
of the renewal period of the Superman copyrights.

Having relied on Judge Young's findings for previous
favorable determinations regarding Superman, Defendants now
take the inconsistent position that this Court is not bound
by the state court findings, as they relate to Superboy.
Defendants attempt to raise genuine issues of material fact,
where the facts were clearly determined by Judge Young after
the opportunity to take evidence and hear testimony on that
evidence from the parties directly involved in creating this
relationship.

Contrary to Defendants' assertions now, both the
Southern District of New York and the Second Circuit looked
directly to, even citing to, Judge Young's findings of fact.
This Court holds that it is consistent to continue this
position and will look to Judge Young's findings as binding
where relevant.  Here, while the consent judgment vacated
the interlocutory judgment in its entirety, this Court in
keeping a consistent position with the previous litigation
holds that Judge Young's findings of fact have preclusive
res judicata and collateral estoppel effect on this Court.

This Court now finds that Plaintiffs have availed
themselves of their legal right to recapture the Superboy

7

EXHIBIT 19
891

1  copyrights pursuant to 17 U.S.C. § 304(c) and 37 C.F.R.

2  210.10.  As such, this Court **GRANTS** Plaintiffs' Motion for

3  Partial Summary Judgment.

4

5  Defendants argued that Plaintiffs' Superboy notices of

6  termination are ineffective, because the 1976 Act specifies

7  that only grants relating to "any copyright subsisting in

8  either its first or renewal term on January 1, 1978" are

9  subject to Section 304(c).

10

11  However, Plaintiffs presented uncontroverted evidence

12  supporting that the Superboy copyright was in fact

13  subsisting in its renewal term as of the 1976 Act's

14  effective date.  Specifically, Plaintiffs pointed to the

15  fact that the copyright in the serialized magazine, *More Fun*

16  *Comics*, No. 101 was secured on November 23, 1944 with

17  registration number B653651 and then renewed on July 17,

18  1972, twenty-eight years later, by National under renewal

19  registration number R532582.  In the 1947 state court

20  action, Judge Young specifically determined that Detective

21  Comics published the Superboy comic strip based upon the

22  idea, plan, and conception of Siegel, in a magazine entitled

23  *More Fun Comics*.

24

25  Alternatively, Defendants argued that, even if the

26  copyrights were subsisting in their renewal period as of

8

**EXHIBIT 19**
**892**

1  January 1, 1978, Plaintiffs' notices of termination are

2  ineffective as the submissions are not eligible for

3  termination as "works made for hire."  The Ninth Circuit has

4  summarized the work for hire doctrine as follows:

5          When one person engages another, whether as

6          employee or as an independent contractor, to

7          produce a work of an artistic nature, . . . in the

8          absence of an express contractual reservation of

9          the copyright in the artist, the presumption arises

10         that the mutual intent of the parties is that the

11         title to the copyright shall be in the person at

12         whose instance and expense the work is done.

13 Self-Realization Fellowship Church v. Ananda Church of Self-

14 Realization, 206 F.3d 1322, 1326 (9th Cir. 2000) (quoting

15 Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300

16 (9th Cir. 1965)).

17

18     Defendants' argument that Superboy was a work for hire

19 fails, as this conclusion directly conflicts with Judge

20 Young's findings in the state court action. Specifically,

21 Judge Young found that

22

23 (1) Under Siegel and Shuster's September 12, 1938 agreement

24     with Detective Comics, they were to provide Detective

25     with the right of first refusal and a six week

26

9

EXHIBIT 19
893

1    consideration period.[2]

2

3    (2)  On November 30, 1938, Siegel submitted in a writing

4         mailed to Detective for its consideration a synopsis,

5         summary of idea, conception, plan for a new comic known

6         as Superboy pursuant to the September 12, 1938

7         agreement.[3]

8

9    (3)  Detective declined to indicate its election to publish

10        Superboy within the six weeks and on December 2, 1938

11        Detective by letter to Siegel elected <u>not</u> to publish

12        Superboy.[4]

13

14        While not mentioning the term "work for hire," Judge

15   Young's findings naturally implicate the question.  Here a

16   presumption of "work for hire" cannot be found in

17   Defendants' favor, since not only did Judge Taylor find that

18   Defendants elected not to publish Superboy, but he also

19

20        [2] Judge Young found that Siegel independently created his

21   original Superboy Synopsis and Superboy Story under the terms of the
     September 12, 1938 agreement between Siegel and his publisher, which

22   permitted him to create new comic strip concepts and stories outside
     the five Siegel and Shuster were currently producing for Detective.

23   The agreement only allowed Detective a right of first refusal to
     accept/reject within six weeks of a new submission. [Decl. Toberoff

24   Exh. B, Pg. 32 FOF 156-159, 160-162].

25        [3] [Decl. Toberoff Exh. B, Pg. 32 FOF #155, 156].

26        [4] [Decl. Toberoff Exh. B, Pg. 32 FOF #158, 159].

                                  10

**EXHIBIT 19**
**894**

1  found that Plaintiff Siegel and, not National, was the sole
2  owner of the Superboy property.  This finding will not
3  support a contrary conclusion that the "mutual intent of the
4  parties" was to have ownership of Superboy always be in
5  Detective or National, and therefore, the Defendants in this
6  action.

7

8      Alternatively, Defendants argued that Siegel created
9  Superboy as a derivative work based upon a pre-existing
10  original work whose copyright was owned by the hiring party,
11  and is therefore "produced at the instance and subject to
12  the right and control of the employing party." See Playboy
13  Enters. Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995).

14

15      Here again, Defendants' argument that Superboy is
16  simply a "derivative work" of Superman is unpersuasive.  The
17  1947 state court action specifically addressed the ownership
18  rights to Superman and Superboy separately.  Defendants'
19  attempt to recast Superboy as a "derivative work" or "work
20  for hire," stands is stark contrast to Judge Young's
21  conclusion that Detective/National was "perpetually enjoined
22  and restrained from creating, publishing, selling, or
23  distributing" Superboy, based on the fact that Siegel was
24  the sole and exclusive owner.[5] Defendants' argument also

25  _____

26      [5] [Decl. Toberoff Exh. B, Pg. 5-6 COL # 25].

11

EXHIBIT 19
895

1  contradicts the fact that Siegel subsequently transferred
2  his exclusive interest in Superboy to National in the May
3  19, 1948 stipulated settlement.  Had Superboy been nothing
4  more than a derivative work, Siegel would have owned no
5  interest in the Superboy property to transfer.

6

7      Having determined that Section 304(c) applies to this
8  dispute, this Court also finds that Plaintiffs have
9  established that no genuine issue of material fact exists
10 regarding the effectiveness of their termination of the
11 Superboy copyrights.

12

13     Pursuant to 17 U.S.C. 304(c) and 37 C.F.R. §
14 201.10(b)(1)(iv), Plaintiffs' termination notices list the
15 following pre-1978 grants of Superboy: (1) the May 19, 1948
16 Agreement (stipulated settlement); and (2) the December 23,
17 1975 Agreement (where relevant, though this agreement does
18 not mention Superboy).  No post-1978 grants of rights
19 regarding Superboy exist.

20

21     Defendants argued that Plaintiffs failed to comply with
22 the termination regulations, because the termination notices
23 only list the May 19, 1948 stipulated settlement, but did
24 not list the May 21, 1948 "Final Consent Agreement."

25

26     This Court finds that no genuine issue exists that the

12

**EXHIBIT 19**
**896**

1  operative grant of "Superboy" by Jerome Siegel was the May

2  19, 1948 stipulated settlement and that the consent judgment

3  merely followed the parties' stipulation and was entered by

4  the Court two days later.  Additionally, Regulation

5  201.10(b)(1)(iv) merely requires a "brief statement

6  reasonably identifying the grant to which the notice of

7  termination applies."  In fact, Regulation 201.10(e)

8  provides that

9

10            harmless errors in a notice that do not materially

11            affect the adequacy of the information required to

12            serve the purposes of . . .section 304(c) . . .

13            shall not render the notice invalid.

14

15  Here, by listing the May 19, 1948 stipulated

16  settlement, the termination notices provide a brief

17  statement reasonably identifying the grant in question.

18  Even, if including the May 21, 1948 consent judgment would

19  have provided additional notice, its absence in no way

20  materially affected the adequacy of Plaintiffs' notice.

21

22  As Jerome Siegel's widow, Joanne Siegel owns 50% of her

23  husband's termination interest. 17 U.S.C. § 304(c)(2)(A).

24  As one of his two surviving children, Laura Siegel Larson

25  owns 25% of Siegel's termination interest.  17 U.S.C. §

26  304(c)(2)(A).  Together Plaintiffs own more than one-half of

13

EXHIBIT 19
897

1  Siegel's termination interest required to effectively

2  terminate Siegel's grant pursuant to 17 U.S.C. §304(c)(1).

3

4      Defendants argued that Plaintiffs' Superboy termination

5  notices were ineffective, because Joseph Shuster has a co-

6  ownership/joint works interest in Superboy not asserted in

7  the termination notices.   Defendants argued that since

8  Shuster has a one-half interest in Superboy, Plaintiffs only

9  have Siegel's one-half interest, not the "more than one-

10  half" needed to terminate pursuant to Section 304(c).  They

11  point to the fact that More Fun (Superboy's comic) was

12  published with the byline "Jerry Siegel and Joe Shuster."

13

14      But, while Shuster was the illustrator attached to

15  Superboy, the 1947 state court action determined that Siegel

16  was the sole originator and owner of Superboy and Siegel

17  alone possessed exclusive ownership rights.   Ownership

18  rights, which he and not Shuster, subsequently transferred

19  in the stipulated settlement.  No facts support a contrary

20  finding.

21

22      Finally, this Court finds that Plaintiffs timely and

23  properly recorded with the Copyright Office and served on

24  Defendants the notices of termination for the Superboy

25  copyrights as required by 17 U.S.C. § 304(c) and 37 C.F.R. §

26  201.10.

14

**EXHIBIT 19**
**898**

1    Therefore, this Court finds that Plaintiffs effectively

2 terminated Jerome Siegel's grants of the Superboy

3 copyrights, recapturing them on November 17, 2004.

4 To the extent that Defendants' Motion for Summary Judgment

5 makes a contrary request, this Court **DENIES** Defendants'

6 motion.

7

8    Also, as to Defendants, this Court **DENIES** Defendants'

9 request for a finding that the WB television show,

10 *Smallville*, does not infringe on Plaintiffs' recaptured

11 copyrights.  Defendants' argument reaches a quick and broad

12 conclusion that Plaintiffs' copyrights in Superboy protect

13 virtually nothing more than the idea of a "youth with super

14 powers."

15

16    In order to establish copyright infringement,

17 Plaintiffs must first establish ownership and then must show

18 the two following factors: (1) the defendant had access to

19 the copyrighted material; and (2) the defendant's material

20 is substantially similar to the copyrighted material.  Three

21 Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir.

22 2000).

23

24    Here, no genuine issue of material fact exists as to

25 Plaintiffs' ownership in the Superboy copyrights, nor is

26 there an issue that Defendants' had access to the Superboy

15

**EXHIBIT 19**
**899**

1  property.  But, because substantial similarity is

2  customarily an extremely close question of fact, summary

3  judgment has traditionally been frowned upon in copyright

4  litigation.  *Hoehling v. Univ. City Studios, Inc.*, 618 F.2d

5  972, 977 (2d. Cir. 1980).

6

7      Here, the specific question as to whether the

8  television show *Smallville* infringes on Plaintiffs' Superboy

9  copyrights requires a detailed factual comparison of each

10  property's content characteristics, much of which are

11  disputed in Plaintiffs' and Defendants' papers. Plaintiffs

12  immediately start drawing comparisons between the storylines

13  of *Smallville* and the Superboy comic strip, including the

14  cast of characters' names, personas, roles in the storyline,

15  their independent storylines, the location, etc. Enough

16  facts are presented, where this Court, contrary to

17  Defendants' request, could find that the main character in

18  *Smallville* is in fact Superboy.[6]

19

20      Therefore, this Court in construing the submitted

21  evidence in the light most favorable to the non-moving

22  party, Plaintiffs, genuine issues of material fact exist as

23  to whether Defendants' television show *Smallville* is

24  infringing Plaintiffs' copyrights.

25  ─────────────────────

26  [6] In the Superboy comic strip a billboard on the side of a rural
country road announces, "Welcome to Smallville! Home of Superboy."

16

EXHIBIT 19
900

1        Therefore, Defendants' Motion for Summary Judgment is

2    **DENIED**.

3

4        This Court adopts Plaintiff's Findings of Fact and

5    Conclusions of Law with modifications.

6

7

8    **IT IS SO ORDERED.**

                                        **RONALD S.W. LEW**
9
                                    _____
10                                      **RONALD S.W. LEW**
                                    United States District Judge
11

12   DATED: March 23, 2006

13

14

15

16

17

18

19

20

21

22

23

24

25

26

17

**EXHIBIT 19**
**901**

# EXHIBIT 20

**CONFORMED COPY**

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California 90212
4   Telephone: 310-858-7888
    Fax:        310-550-7191
5
    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6   Roger L. Zissu (Admitted *pro hac vice*)
    866 United Nations Plaza
7   New York, New York 10017
    Telephone: 212-813-5900
8   Fax:        212-813-5901

9   PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
10  1711 Route 9D
    Cold Spring, NY 10516
11  Telephone: 845-265-2820
    Fax:        845-265-2819
12
13  Attorneys for Defendants and Counterclaimant

              UNITED STATES DISTRICT COURT
14  CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

15  JOANNE SIEGEL and LAURA        ) Case Nos. [Consolidated for
    SIEGEL LARSON,                 ) Discovery]
16                                 ) CV 04-8400 SGL (RZx)
            Plaintiffs,            ) CV 04-8776 SGL (RZx)
17                                 ) Hon. Stephen G. Larson, U.S.D.J.
        vs.                        ) Hon. Ralph Zarefsky, U.S.M.J.
18                                 )
    TIME WARNER INC., WARNER       ) **DECLARATION OF PAUL**
19  COMMUNICATIONS INC., WARNER    ) **LEVITZ IN SUPPORT OF**
    BROS. ENTERTAINMENT INC.,      ) **DEFENDANTS' MOTION FOR**
20  WARNER BROS. TELEVISION        ) **PARTIAL SUMMARY**
    PRODUCTION INC., DC COMICS,    ) **JUDGMENT**
21  and DOES 1-10,                 )
                                   )
22          Defendants.           ) Time:      10:00 a.m.
                                   ) Date:      July 16, 2007
23                                 ) Courtroom  1
                                   ) Judge Stephen G. Larson
24                                 )
25                                 )
26                                 )
27  ─────────────────────────────  )
    AND RELATED COUNTERCLAIMS.     )
28                                 )

DECLARATION OF PAUL LEVITZ

**EXHIBIT 20**
**902**

# DECLARATION OF PAUL LEVITZ

I, PAUL LEVITZ, declare:

1.    I am the President & Publisher of DC Comics ("DC"), a defendant and counter-claimant in this action. My business address is 1700 Broadway, New York, New York 10019. The facts set forth in this Declaration are within my personal knowledge except where stated to be on information and belief, and as to those latter facts I am informed and believe them to be true and correct. If called as a witness I could and would testify competently as to the facts contained in this Declaration.

2.    I first started working for DC over 30 years ago, initially as a free-lancer while I was still in high school. Since then I have held a number of positions at the company, rising from Assistant Editor to Vice President, to my current position as President & Publisher. I have been in charge of developing the vision that has guided DC's growth over the past five years, and for the previous two decades was one of the two principal executives with that responsibility. In my current position, I participate in the daily operations of DC and also delegate authority to DC executives and employees to oversee those daily operations.

3.    This Declaration will address the corporate history of DC and its relationship with defendants Time Warner Inc. ("TWI") and Warner Bros. Entertainment Inc. ("WBEI"). It also will set forth some of the background of the Superman property, and DC and its predecessors' relationship with Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster"), who together created the original Superman character. Because this history and the parties' relationship reach back almost 70 years, some of the facts stated in this Declaration are necessarily on information and belief and/or are based on the records and files of DC and its predecessors. However, this early history is part of the acknowledged background of Superman, and is non-controversial.

1

**DECLARATION OF PAUL LEVITZ**

**EXHIBIT 20**

**903**

## __The Creation and Development of Superman and Superboy__

4.      I am informed and believe that in the 1930s, Plaintiffs' predecessor, Siegel, along with his creative partner, artist Shuster, jointly conceived of and created a cartoon strip that ultimately became the first Superman story. Their proposed syndicated strip of Superman was rejected numerous times over several years by a number of different publishers; but in 1938, Detective Comics, Inc. ("Detective"), the predecessor-in-interest to DC, agreed to publish Superman in its upcoming new comic book series, *Action Comics*.  Siegel and Shuster had been providing Detective with comic book features since late 1935, and had entered into an agreement with Detective in December 1937, which provided that "any new and additional features which [Siegel and Shuster] produce for use in a comic magazine are to be first submitted to [Detective]."  Siegel and Shuster submitted their Superman strip to Detective under the December 1937 agreement.

5.      On March 1, 1938, Siegel and Shuster executed an assignment to Detective of all of their rights in Superman and in any previously created work employing that character.  At Detective's direction, Siegel and Shuster adapted and expanded their existing Superman strips into a format suitable for a comic book, and Detective announced the debut of its *Action Comics* series, and Superman, in full page announcements in its May, 1938 issues of some of its existing publications.  Thereafter, the first Superman story was published by Detective on April 18, 1938 in *Action Comics No. 1*, which had a cover date of June 1938.

6.      The initial graphic representations of the Superman character in 1938, in a simple cartoon style, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period.  In the almost 70 years since the publication of *Action Comics No. 1*, DC has authored or supervised the creation of, and has published and distributed, thousands of other comic books and syndicated newspaper comic strips containing the adventures of Superman throughout the United States and abroad in many millions of copies.  In

__DECLARATION OF PAUL LEVITZ__

**EXHIBIT 20**
**904**

1    addition, it has overseen the creation, development and licensing of the character in

2    a variety of media, including but not limited to, radio, novels, live action and

3    animated motion pictures, television, live theatrical productions, merchandise and

4    theme park exploitations.  In these tens of thousands of iterations, DC has changed

5    Superman's appearance and has added decades of new material to further define,

6    update and develop the character in an ongoing flow of new exploits and

7    supporting characters resulting in the creation of an entire fictional Superman

8    "universe."

9          7.      The presentations of Superman since 1938, provided first by Detective

10   and then DC, were not a static depiction but an ever-evolving portrayal, featuring

11   new super-powers, new villains and new components to the Superman universe

12   and back-story.  Significantly, many of Superman's powers that are among his

13   most famous today did *not* appear in *Action Comics No. 1* but only appeared in

14   later publications.  These include his ability to fly; his super-vision which enables

15   him to see through walls ("x-ray" vision) and across great distances ("telescopic"

16   vision); his super-hearing which enables him to hear conversations at great

17   distances; his ability to survive in space without atmospheric protection; and his

18   "heat vision," the ability to aim rays of extreme heat with his eyes.  Also absent

19   from *Action Comics No. 1* was any reference to some of the more famous story

20   elements now associated with Superman but at the time not yet created, such as

21   "Kryptonite" or the name of Superman's home planet, "Krypton," the "Fortress of

22   Solitude," and the "Daily Planet."  In addition, some of the most famous

23   supporting characters associated with Superman do not appear in *Action Comics*

24   *No. 1*, including Jimmy Olsen and villains Lex Luthor and Brainiac.  Unlike many

25   creative properties developed for media in later decades, in its early days there was

26   no Superman "bible" which explored aspects of the property not yet presented in

27   the comics.  On information and belief, the Superman story and characters evolved

28   on an episode-by-episode basis as directed by the editors of DC for decades.

3

**DECLARATION OF PAUL LEVITZ**

**EXHIBIT 20**
**905**

8.    In November, 1938, Siegel sent to Detective a letter "pitching" the idea of a comic strip starring a juvenile Superman, and in December, 1940 submitted a script, under the byline of Siegel and Shuster, titled "Superboy," and containing some episodes depicting Superman's parents on Krypton, and Superman on Earth as a baby, a toddler, and an elementary school-age boy.  By the time the script was submitted, Superman's "origin story" on Krypton, and his childhood with his adopted Earth parents, the Kents, had been explored in a series of daily and Sunday comic strips, and in the comic book *Superman No. 1*, published in 1939.  Superman's childhood continued to be depicted thereafter, by DC and its licensees, including in a 1941 animated cartoon from the Max Fleischer studios, in a May 31, 1942 Sunday comic strip and in a 1942 novel by George Lowther called *The Adventures of Superman*.

9.    Detective did not proceed with either of Siegel's "Superboy" submissions.  However, in November, 1944, without Siegel's or Shuster's participation, Detective published a comic strip entitled "Superboy" in *More Fun Comics No. 101*.  Detective continued to publish "Superboy" comic strips – again without Siegel's or Shuster's participation – bi-monthly until 1946 and monthly thereafter for many years.

10.    Throughout the almost 70 year history of Superman, DC has built up strong trademark rights in the name and mark "Superman" and in certain key symbols and indicia of origin in connection with, and to identify all authorized uses of, the Superman character in print and all other media.  Indeed, DC owns dozens of federal trademark registrations for Superman related indicia across a broad array of goods and services.  These include, *inter alia*, Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, and the "S" emblem, as well as certain key identifying phrases.  Most notable among the latter is "Look! . . . Up in the sky! . . . It's a bird! . . . It's a plane! . . . It's Superman!" first used in the introduction to the 1940 radio program *The*

4

**DECLARATION OF PAUL LEVITZ**

**EXHIBIT 20**
**906**

1   *Adventures of Superman*, and thereafter repeated in Superman television

2   programming and used on Superman licensed products.

3       11.    All of these Superman symbols and indicia of origin have been used

4   on and in connection with a wide variety of publications and licensed goods and

5   services, as they have been added to the Superman character and mythology under

6   DC's and/or its predecessors' supervision and direction, since as early as 1938.

7   The development of one particularly strong trademark corresponded with the

8   evolution of the appearance of the emblem on the chest of Superman's costume.  In

9   *Action Comics No. 1*, the emblem was a small yellow inverted triangle bearing the

10   letter "S" shown in yellow and sometimes in red.  Thereafter, the emblem changed

11   significantly, and today is a large yellow five-sided shield, outlined in the color

12   red, and bearing the letter "S" in the middle, also in the color red (the "S in Shield

13   Device").  The S in Shield Device, as transformed by DC and its predecessors, has

14   become a strong symbol, standing alone, of all goods and services relating to

15   Superman and his sole source, DC and its predecessors.

16   **Corporate History and Relationships**

17       12.    The company now known as DC Comics began in the 1930s as

18   "National Allied Publishing."  Through a series of name changes, mergers, and

19   acquisitions in the 1930s and 1940s, National Allied Publishing became Detective

20   Comics, Inc., then "National Comics Publications, Inc." and then "National

21   Periodical Publications, Inc." ("NPP").  In 1967, NPP was purchased by Warner

22   Communications, Inc. ("WCI").  In 1976, NPP's name was changed to DC

23   Comics, Inc. (the "DC" standing for "Detective Comics").

24       13.    In 1993, DC Comics, Inc. was dissolved and converted to a New York

25   general partnership called "DC Comics" and has remained in that same form

26   through the present.  Since the formation of the DC Comics partnership in 1993, its

27   partners have undergone one change.  From 1993 through March 2003, the

28   partners of DC were WCI and Time Warner Entertainment Company, L.P.

5

**DECLARATION OF PAUL LEVITZ**

**EXHIBIT 20**
**907**

("TWEC"), a Delaware limited partnership, and each held a one-half interest in the partnership. In March, 2003, Time Warner Inc. ("TWI") completed a restructuring of TWEC, and in connection with that restructuring WCI contributed its 50% interest in DC to E.C. Publications, Inc. ("EC") and TWEC distributed its assets, including its partnership interest in DC, to WCI. As a result, today the partners of DC are EC and WCI, each holding a one-half interest. EC is also a subsidiary of WCI, and is the publisher of magazines and comic books such as *Mad Magazine*. WBEI has no ownership or partnership interest in DC. A true and correct chart of the current corporate structure and affiliations between DC, WBEI and TWI is attached to this Declaration as Exhibit A.

14.    DC is in the business of creating, publishing, and licensing comic book stories and characters. DC publishes scores of titles, amounting to an output of hundreds of different comic books and graphic novels annually. DC is not in the business of producing movies, television shows, or animated programs. For that reason, DC enters into license agreements to exploit its intellectual property through those and other media outlets. DC and its predecessors have entered into a number of license agreements over the years – with both affiliates and non-affiliates – that involve the rights to market or exploit Superman. Some of the agreements grant exclusive licenses to Superman in certain markets or media, and some grant non-exclusive rights. For example, in November, 1974, NPP entered into a production agreement for movies based on the Superman property with Film Export A.G. ("Film Export"), an independent party not affiliated with any TWI entity. The agreement granted Film Export the exclusive right to produce, exhibit, and distribute movies based on Superman for a period of up to twenty-five years. Over the years, WBEI acquired – from Film Export and its representatives – certain of the rights that Film Export had acquired from NPP.

15.    Since April 16, 1999 (the purported effective date of Plaintiffs' Superman Termination Notices), and prior to the restructuring of TWEC in 2003,

**DECLARATION OF PAUL LEVITZ**

**EXHIBIT 20**
**908**

1  DC entered into several license agreements with various divisions of TWEC

2  concerning Superman, including agreements for the production and distribution of

3  the motion picture *Superman Returns* and of the television series *Smallville*.  Both

4  the motion picture and the television episodes note that the characters in the movie

5  and the programs are the copyright of DC.

6          16.    The agreement for *Superman Returns* is an "Option Purchase

7  Agreement" dated as of November 6, 1999, pursuant to which DC granted to

8  Warner Bros., a division of TWEC, the exclusive right to produce a feature motion

9  picture utilizing the Superman property.  The agreement for *Smallville* is a "Rights

10  Option and Assignment Agreement" dated as of December 5, 2000, as amended

11  September 5, 2002, pursuant to which DC granted Warner Bros. Television

12  Production, a division of TWEC, the exclusive license to produce a live action

13  episodic television series based on "the stories and adventures of the comic book

14  character known as 'Clark Kent' or 'Superman'."  DC approved the name

15  "Smallville" for the series, which was contemplated to be an hour-long dramatic

16  action series focusing on Clark Kent as a teenager, before he became Superman.

17  After the 2003 restructuring of TWEC, those license agreements were ultimately

18  assigned to WB Studio Enterprises Inc., an indirect wholly-owned subsidiary of

19  WBEI.

20          17.    While DC has in the past, and continues to have, a business

21  relationship with WBEI, DC and WBEI are in *separate businesses* and establish

22  their own business plans; have *separate offices*; maintain *separate bank accounts*

23  and other books and records; and have mostly different executive officers.  For

24  financial reporting purposes, both DC and WBEI fall within the "filmed

25  entertainment" group of TWI companies – which also includes New Line Cinema

26  Corporation and Castle Rock Entertainment – and for operating management

27  purposes, DC reports to its ultimate corporate parent through WBEI.  Accordingly,

28  I report to and obtain approvals from WBEI's President and Chief Operating

7

**DECLARATION OF PAUL LEVITZ**

EXHIBIT 20
909

1  Officer before making significant acquisitions or certain financial decisions or

2  investments that are outside the scope of DC's customary acquisitions and

3  investments; before implementing meaningful strategic changes; and before

4  embarking on something substantially outside DC's normal course of business.

5  However, neither WBEI nor TWI has day to day involvement in DC's core

6  creative or business decisions and operations other than in areas where they

7  provide administrative support, such as real estate services; DC does not

8  commingle its funds and assets with those of WBEI or TWI, and DC is not used as

9  a mere shell or conduit for the affairs of either WBEI or TWI.

10

11         I declare under penalty of perjury under the laws of California and of

12  the United States that the foregoing is true and correct and that I executed this

13  Declaration this 26ᵗʰ day of April, 2007, at New York, New York

14

15                                                   _____

16                                                   PAUL LEVITZ

17

18

19

20

21

22

23

24

25

26

27

28

8

**DECLARATION OF PAUL LEVITZ**

**EXHIBIT 20**
**910**

# EXHIBIT 21



1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   E-mail: MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

**ORIGINAL**

7            **UNITED STATES DISTRICT COURT**

8           **CENTRAL DISTRICT OF CALIFORNIA**

9

10  JOANNE SIEGEL, an individual; and       Case No. CV 04-08400 SGL (RZx)
    LAURA SIEGEL LARSON, an
11  individual,                             [Honorable Stephen G. Larson]

12            Plaintiffs,                    **PLAINTIFFS JOANNE SIEGEL**
                                             **AND LAURA SIEGEL LARSON'S**
13       vs.                                 **OPPOSITION TO**
                                             **DEFENDEANTS' MOTION FOR**
14  TIME WARNER INC., a corporation;         **PARTIAL SUMMARY**
    WARNER COMMUNICATIONS               **JUDGMENT**
15  INC., a corporation; WARNER
    BROS. ENTERTAINMENT INC., a
16  corporation; WARNER BROS.
    TELEVISION PRODUCTION INC.,             [Complaint filed: October 8, 2004]
17  a corporation; DC COMICS, a general
    partnership; and DOES 1-10,
18                                           Date:   July 23, 2007
19                                           Time:   10:00 a.m.
              Defendants.                    Place:  Courtroom 1
20

21  DC COMICS,

22            Counterclaimant,

23       vs.

24  JOANNE SIEGEL, an individual; and
    LAURA SIEGEL LARSON, an
25  individual,

26
              Counterclaim Defendants.
27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT



DOCKETED ON CM
JUN - 4 2007
BY

**EXHIBIT 21**
**911**

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND.........................4

    A.      Prior Legal Actions Between The Parties' Predecessors...........4

        1.   The 1947 Westchester Action.........................................4

        2.   The Federal Action.........................................................5

    B.      The Creation of Superman...........................................7

    C.      "Superman's" Success With The Public...............................9

    D.      Plaintiffs' Notices of Termination....................................10

        1.   Superman Termination Notices.................................10

        2.   Superboy Termination Notices.................................11

    E.      The Current Actions..................................................12

        1.   The Superman Action............................................12

        2.   The Superboy Action............................................12

LEGAL ANALYSIS........................................................13

I.      THE RECAPTURE RIGHT UNDER THE U.S. COPYRIGHT ACT....13

    A.      The Recapture Right Under The 1909 Copyright Act.................13

    B.      The Termination Rights Under The 1976 Copyright Act...........14

II.     STANDARD OF REVIEW..................................................... 17

III.    DEFENDANTS' CONSOLIDATED MOTION IS PROCEDURALLY
    IMPROPER AND DEFECTIVE............................................18

IV.     PLAINTIFFS HAVE A RIGHT TO SHARE IN THE PROFITS FROM
    NEW EXPLOITATIONS OF THE RECAPTURED "SUPERMAN"
    COPYRIGHT INTEREST IN FOREIGN TERRITORIES................18

V.      PLAINTIFFS ARE ENTITLED TO PROFITS EARNED ABROAD
    FROM THE EXPLOITATION OF THE RECAPTURED SUPERBOY
    COPYRIGHTS.......................................................22

VI.     DEFENDANTS MUST ACCOUNT TO PLAINTIFFS FOR PROFITS
    FROM THE EXPLOITATION OF ANY MIXED USES OF

i

**EXHIBIT 21**
**912**

COPYRIGHT AND TRADEMARK..........................................24

VII.   DEFENDANTS HAVE A DUTY TO ACCOUNT FOR PROFITS
       FROM PRE-TERMINATION DERIVATIVE WORKS THAT
       CONTAIN NEW POST-TERMINATION MATERIAL...................27

VIII.  THE STATE LAW ISSUE OF WHETHER AN ACCOUNTING
       SHOULD INCLUDE WARNER'S PROFITS PRESENTS
       GENUINE ISSUES OF MATERIAL FACT BARRING
       SUMMARY JUDGMENT....................................................29

       A.   Defendants Fail To Meet Their Burden Of Presenting Evidence
            To Show The Absence Of A Genuine Issue Of Fact.................30

       B.   Warner Has "Stepped Into DC's Shoes" Exclusively With Respect
            To "Superman" Motion Picture And Television Copyrights........33

       C.   State Law Equitable Principles Of Unjust Enrichment And
            Constructive Trust Entitle Plaintiffs To An Accounting...........37

       D.   Even The "Alter Ego" Doctrine On Which Defendants Solely
            Focus Involves The Application Of Equitable Principles To
            Facts And Inferences Which Cannot Be Determined On
            Summary Judgement...................................................41

IX.    DETECTIVE'S ADS HAVE NO EFFECT ON PLAINTIFFS'
       TERMINATION UNDER THE COPYRIGHT ACT........................43

       A.   Defendants' Argument Is Falsely Premised On The
            Incorrect Assumption That The Depiction Of The Cover
            Of Action Comics No. 1 In An Announcement Results
            In A Competing Copyright...........................................43

       B.   The Announcements, At Best, Are Derivative Works In Which
            Defendants Exclusively Own Only The Added Material, Not
            The Pre-Existing Illustration Of Superman..........................45

       C.   Detective's "In House Announcements" Did Not Divest The
            Superman Story / Action Comics No. 1 Of Its Copyright...........46

       D.   The Date Of Publication Of The Ads Is, In Any Event, A
            Genuine Issue of Material Fact Precluding Summary Judgment..47

ii

**EXHIBIT 21**
**913**

E.     The Question Of Which Literary Elements Are Actually
       Contained In The Ad, Itself, Is Also A Genuine Issue Of
       Material Fact.................................................................50

F.     Plaintiffs Were Not Required To List The Obscure Ads In
       Their Termination Notices............................................51

G.     Plaintiffs Cannot Be Expected To List Obscure 1938 Ads
       Which A Reasonably Diligent Search Of The U.S. Copyright
       Office Records Does Not Reveal.....................................52

H.     The Notices of Termination Provided Defendants With More
       Than Ample Notice; The Ads' Omission Was Harmless............55

X.    DEFENDANTS ATTEMPT TO RE-ARGUE A SUMMARY
      JUDGMENT MOTION THAT WAS PREVIOUSLY DENIED IS
      IMPROPER AND VIOLATES L.R. 7-18...................................55

A.     Defendants Prior Motion For Summary Judgment Contained The
       Exact Same Arguments Which Were Considered And Denied.....55

B.     Defendants' Motion Violates L.R. 7-18...............................57

C.     Defendants' Motion Violates L.R. 7-17...............................59

D.     No "New Or Different" Facts Exist That Were Not Previously
       Available To Defendants................................................61

       1.    Copyright Analysis Is Based On The Works Themselves......62

       2.    Defendants May Not Simply Re-Submit The Same Motion
             Based On Previously Available Facts, Works and Discovery..62

E.     Defendants' Motion Ignores The Strong Policies According
       Deference To The Decisions Of A Prior Judge in The Same Case.63

XI.   WHETHER SMALLVILLE INFRINGES PLAINTIFFS'
      RECAPTURED SUPERBOY COPYRIGHTS RAISES GENUINE
      ISSUES OF MATERIAL FACT PROPERLY LEFT FOR TRIAL ......64

A.     Relevant Factual And Procedural Background......................65

iii

**EXHIBIT 21**
**914**

1.  Siegel's Creation of "Superboy" ..........................................65

2.  Siegel's "Superboy" Was Published In Detective's More Fun
    Comics No. 101 And Subsequent "Superboy" Comics .........66

3.  Siegel's "Superboy" Spawned A Separate Line of Derivative
    "Superboy" Comics And Television Series ......................68

B.  Copyright Infringement Analysis .......................................69

C.  Plaintiffs' Evidence Of Smallville's Historical Derivation From
    Siegel's Superboy Obviates The Need To Establish Copying By
    An Inferential Analysis .................................................70

    1.  Plaintiffs Own A Valid Copyright Interest ......................70

    2.  "Smallville" Is Clearly Derived From Siegel's "Superboy" .....70

    3.  As A Derivative Work, "Smallville" By Definition Infringes
        The Recaptured Superboy Copyrights And Requires A
        License From Plaintiffs .........................................73

D.  To The Extent An Inferential Analysis Is Employed, Summary
    Judgment On The Issue Of Substantial Similarity Is Disfavored ....74

E.  In Applying an Extrinsic Analysis A Court Must Still Consider The
    Response of An Ordinary Observer To The Works As A Whole ....75

    1.  Inverse Ratio Rule Applies .....................................77

F.  Defendants Methodology Is Improper ..................................77

    1.  Deconstruction, Abstraction And Dissection Is Disfavored ...77

    2.  Defendants Focus On The Works' Differences Is Improper ...80

    3.  Defendants' Reliance On Prior Art Is Improper .................82

    4.  Defendants Erroneously Limit The Analysis To "Smallville"
        Episodes Produced After November 17, 2004 ..................83

G.  As Held By Judge Lew, The Similarities Between Siegel's
    "Superboy" And "Smallville" Are More Than Sufficient To

iv

**EXHIBIT 21**
**915**

Raise A Triable Issue Of Fact...........................................83

1.   Characters / Relationships...........................................84

2.   Setting...............................................................92

3.   Key Themes........................................................94

4.   Plots...............................................................95

H.   Siegel's "Superboy" Is Comprised Of Far More Than Mere
     "Scenes A Faire".....................................................96

I.   The Prior "Superman" Materials Clearly Do Not Contain The Same
     Elements, Themes Or Focus As The Siegel Superboy Materials...97

J.   "Smallville" Takes The Essence Of Siegel's "Superboy"............99

CONCLUSION.................................................................101

v

**EXHIBIT 21**
**916**

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page**

*Acme Precision Products, Inc. v. American Alloys Corporation,*
   422 F.2d 1395 (8th Cir. 1970)..................................................42

*Adobe Sys. v. Southern Software,*
   1998 U.S. Dist. LEXIS 1941 at *9-10 (ND CA 1998).....................69

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.,*
   191 F.2d 99, (2d Cir. 1951)...........................................................47

*Allarcom Pay Television Ltd. v. General Instrument Corp.,*
   69 F.3d 381, 387 (9th Cir. 1995).................................................22

*Allen v. McCurry,*
   449 U.S. 90, 96, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).................16

*Anderson v. Liberty Lobby,*
   477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).17,29,32,75

*Apple Computer v. Microsoft Corp.,*
   821 F. Supp. 616, 624 (N.D. Cal. 1993).......................................79

*Arica Institute, Inc. v. Palmer,*
   970 F.2d 1067, 1072 (2d Cir. 1992)..........................................98

*Ashton-Tate Corp. v. Ross,*
   916 F.2d 516, 522 (9th Cir. 1990).......................................38,44

*Asia Entertainment Inc. v. Nguyen,*
   40 U.S.P.Q.2d 1183, 1185 (C.D. Cal. 1996)..............................81

*Bank Melli Iran v. Pahlavi,*
   58 F.3d 1406, 1412 (9th Cir. 1995)..........................................30

*Baxter v. MCA, Inc.,*
   812 F.2d 421, 425 (9th Cir.1987) *cert. denied*, 484 U.S. 954,
   108 S. Ct. 346, 98 L. Ed. 2d 372 (1987)...........................74,76,99

*Berlitz Sch. Of Lang. of Am., Inc. v. Everest House,*
   619 F.2d 211, 215 (2d Cir. 1980)............................................15

*Bernstein & Co. v. Jerry Vogel Music Co.,*
   221 F.2d 569 (2nd Cir. 1955), *modified*, 223 F.2d 252 (1955)........19,44

*Bevan v. Columbia,*
   329 F. Supp. 601 (S.D.N.Y. 1971)...........................................81

vi

1
2     *Bhatnagar v. Surrendra Overseas Ltd.*,
        52 F3d 1220, 1231 (3rd Cir. 1995)..........................................62

3     *Boisson v. Banian, Ltd.*,
4       273 F.3d 262, 272 (2d Cir. 2001)...........................76,77,79,98

5     *Brown Bag Software v. Symantec Corp.*,
        960 F.2d 1465, 1472 (9th Cir. 1992).................................75

6
7     *Burroughs v. Metro-Goldwyn Mayer, Inc.*,
        683 F.2d 610 (2d Cir. 1982)............................................51

8     *CBS Broad., Inc. v. ABC*,
        2003 U.S. Dist. LEXIS 20258, *13-14 (S.D.N.Y. 2003)................78
9

10    *Celotex Corp. v. Catrett*,
        477 U.S. 317, 327, 106 S.Ct. 2548 (1986)..........................17
11

12    *Community for Creative Non-Violence*,
        846 F.2d 1485, 1498 (D.C. Cir. 1988)..............................19,36

13
14    *Dastar Corp. v. Twentieth Century Fox Film Corp.*,
        539 U.S. 23, 33-34, 123 S. Ct. 2041 (2003).......................24,26

15    *Dead Kennedys v. Biafra*,
16      37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999)........................21

17    *Dr. Seuss Enter. v. Penguin Books USA, Inc.*,
        109 F.3d 1394, 1399 (9th Cir. 1997)...............................78
18

19    *Ellis v. Diffie*,
        177 F.3d 503, 506 (6th Cir. 1999)..................................76
20

21    *Elvis Presley Enters. v. Passport Video*,
        349 F.3d 622, 630 (9th Cir. Cal. 2003)............................98

22    *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
        122 F.3d 1211, 1220 (9th Cir. 1997), *cert. denied*,
23      523 U.S. 1021, 118 S. Ct. 1302, 140 L. Ed. 2d 468 (1998)...........27,81

24    *Ets-Hokin v. Skyy Spirits*,
        225 F.3d 1068, 1073 (9th Cir. 2000)..............................24,81
25

26    *Famous Music Corp. v. Seeco Records, Inc.*,
        201 F. Supp. 560, 568-69 (S.D.N.Y. 1961)..........................22

27    *Fay Corp. v. Bat Holdings I, Inc.*,
28      651 F. Supp. 307, 309 (W.D. Wash. 1987)...........................63

vii

*Feist Publications v. Rural Tel. Service Co.,*
     499 U.S. 340, 362, 111 S. Ct. 1282 (1991)................................78

*Filmvideo v. Hastings,*
     509 F. Supp. 60, 65-66 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 91
     (2d Cir. 1981)........................................................82

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,*
     462 U.S. 611, 629-30, 103 S. Ct. 2591, 2601 (1983)..................42

*Fisher v. Dees,* 794 F.2d 432, 434 n. 2
     (9th Cir. 1986).......................................................80

*Fleener v. Trinity Broadcasting Network,*
     203 F. Supp. 2d 1142, 1149 (C.D. Cal. 2001)..........................79

*Flintkote Co. v. Gen. Accident Assur. Co. of Can.,*
     410 F. Supp. 875, 884 (N.D. Cal. 2006)...............................37

*Fred Fisher, Inc. v. Dillingham,*
     298 F.145 (S.D.N.Y 1924).............................................100

*Fred Fisher Music Co. v. M. Witmark & Sons,*
     318 U.S. 643, 657-59 (1943).......................................14-16

*Frederick S. Wyle, P.C. v. Texaco, Inc.,*
     764 F.2d 604, 605 (9th Cir. 1985)....................................63

*Goodman v. Lee,*
     78 F.3d 1007 (5th Cir. 1996) *cert denied* 519 U.S. 861 (1996)....20-22

*Greenberg v. National Geographic Society,*
     244 F.3d 1267, 1274 (11th Cir. 2001).................................28

*Hamil Am., Inc. v. GFI, Inc.,*
     193 F.3d 92, 102 (2d Cir. 1998)......................................80

*Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
     896 F.2d 1542, 1550-51 (9th Cir. 1990)...............................36

*Harper & Row, Publishers v. Nation Enterprises,*
     471 U.S. 539, 564-65, 105 S. Ct. 2218 (1985)........................81

*Heim v. Universal Pictures Co.,*
     154 F.2d 480, 488 (2d. Cir. 1946)....................................80

*Hopkins v. Andaya,*
     958 F.2d 881, 887, fn. 5 (9th Cir. 1992).............................63

viii

**EXHIBIT 21**
**919**

*Hub Floral Corp. v. Royal Brass Corp.,*
    454 F.2d 1226, 1229 (2d Cir. 1972)...........................................47

*Ideal Toy Corp. v. Fab-Lu, Ltd.,*
    360 F.2d 1021, 1022 (2d Cir. 1966).......................................77,86

*In re Carmona,*
    224 F. Supp. 497, 498 (S.D. Cal. 1963)......................................64

*In re Teltronics Servs., Inc.,*
    762 F.2d 185, 193 (2d Cir. 1985)............................................15

*Jarvis v. K2 Inc.,*
    2007 U.S. App. LEXIS 9909 (9th Cir. 2007).............................28,29

*Jerome Siegel et al. v. National Periodical Publications, et al.,*
    364 F. Supp. 1032 (S.D.N.Y. 1973)....................................7,8,18

*Jerome Siegel et al. v. National Periodical Publications, et al.,*
    508 F.2d 909 (2d Cir. 1974)...........................................4,8,17

*Johnson Controls v. Phoenix Control Sys.,*
    886 F.2d 1173, 1175 (9th Cir. 1989)........................................69

*Johnson v. Watkins,*
    101 F.3d 792, 794-95 (2d Cir. 1996)........................................15

*Kamilche Co. v. United States,*
    53 F.3d 1059, 1062 (9th Cir. 1995).........................................15

*Knitwaves,Inc. v. Lollytags Ltd.,*
    71 F.3d 996, 1003 (2d Cir. 1995)...........................................78

*Korman v. Iglesias,*
    736 F. Supp. 261, 265 (S.D. Fla. 1990).....................................25

*Levine v. McDonalds Corp.,*
    735 F.Supp. 92, 96 (SDNY 1990)............................................78

*Litchfield v. Spielberg,*
    736 F.2d 1352, 1355 1984 (9th Cir. Cal. 1984).........................62,75

*Los Angeles News Serv. v. Reuters TV Int'l,*
    149 F.3d 987, 994 (9th Cir. 1998)..........................................27

*Los Angeles News Service v. Reuters Television Int'l Ltd.,*
    340 F.3d 926, 931 (9th 2003), *cert. denied* 541 U.S. 1041 (2004).........28

*Maljack Productions v. UAV Corp.,*
    964 F. Supp. 1416, 1422 (C.D. CA 1997).....................................33

ix

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**920**

*Marvel Characters, Inc. v. Simon*
310 F.3d 280 (2d Cir. 2002).................................................13

*Matsushita Elec. Indus. Co. v. Epstein,*
516 U.S. 367, 369, 116 S. Ct. 873, 878, 134 L. Ed. 2d 6 (1996).........16

*Mazer v. Stein,*
347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954)..............14,30

*Meeropol v. Nizer,*
560 F.2d 1061, 1071 (2d Cir. 1977)....................................81

*Metcalf v. Bochco,*
294 F.3d 1069, 1074 (9th Cir. 2002)...................................79

*Mfg. Co. v. Artic Int'l, Inc.,*
704 F.2d 1009, 1013-14 (7th Cir. 1983), *cert. denied,*
464 U.S. 823 (1983)..................................................33

*Migra v. Warren City Sch. Dist. Bd. of Ed.,*
465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed. 2d 56 (1984)..................16

*Miller v. Miramax Film Corp.,*
2001 U.S. Dist. LEXIS 25967 *15, *26-7 (C.D. Cal. 2001)..............81

*Mills Music, Inc. v. Snyder,*
469 U.S. 153, 185, 105 S. Ct. 638; 83 L. Ed. 2d 556 (1985)......12,13,31

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,*
856 F.2d 1341, 1343 (9th Cir. 1988)..................................33

*Montana v. U.S.,*
440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979).........15

*Morrill v. Smashing Pumpkins,*
157 F. Supp. 2d 1120, (C.D. Cal. 2001)...............................27

*Negus v. Abbott Critical Care,*
1994 U.S. Dist. LEXIS 21311, *8 (N.D. Cal 1994).......................36

*New Hampshire v. Maine,*
532 U.S. 742, 749 (2001)............................................17

*New Line Cinema Corp. v. Easter Unlimited, Inc.,*
1989 U.S. Dist. LEXIS 17340, *10 (EDNY 1989).......................81

*Nihon Keizai Simbun, Inc. v. Comline Bus. Data, Inc.,*
166 F.3d 65, 70-71 (2d Cir. 1999)....................................78

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,*
558 F.2d 1090, 1093 n.4 (2d Cir.1977)................................78

*N.Y. Times v. Tasini,*

x

533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001)……..……13

*O'Brien v. City of Syracuse,*
54 N.Y.2d 353, 357 (1981)…………………………………..………16

*Oddo v. Ries,*
743 F.2d 630, 633 (9th Cir.1984)………………….……….19-22,25,27,37

*Osler v. Joplin Life Insurance Co.,*
164 S.W.2d 295 (Mo. 1942)………………………………..…47

*Pasillas v. McDonald's Corp.,*
927 F.2d 440, 442 (9th Cir. 1991)……………………………………76

*Pension Trust Fund for Oper. Engrs v. Triple A Mach. Shop, Inc.,*
942 F.2d 1457, 1464-1465 (9th Cir. 1991)………………………………16

*Piantadosi v. Loew's Inc.,*
137 F.2d 534, 536-537 (9th Cir. 1943)………………………….………23

*Picture Music, Inc. v. Bourne, Inc.,*
457 F.2d 1213 (2d Cir. 1972)………………….......17,18,25,42,46,48,49

*Pye v. Mitchell,*
574 F.2d 476,480 (9th Cir. 1978)………………………………..22,47,49

*Raz Imports v. Target Stores,*
1997 U.S. Dist. LEXIS 21164 at*4 (CD CA 1997)………………..…69

*Reilly v. Reid,*
45 N.Y.2d 24, 29-30 (1978)………………………………………16

*Rojas-Gutierrez v. Hoy,*
61 F. Supp. 448, (D. Cal. 1958)………………………………64

*Roy Export Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v. Columbia Broadcasting System, Inc.,*
503 F. Supp. 1137, 1149 (S.D.N.Y. 1980)……………………………33

*Rushton v. Vitale,*
218 F.2d 434, 436 (2d Cir. 1955)………………………………………47

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,*
183 F3d 155, 160 (2d. Cir. 1999)……………………………………36

*Satava v. Lowry,*
323 F.3d 805, 811 (9th Cir. 2003)………………………………78

*School Dist. No. 1J, Multnomah County, Or. V. AC and S, Inc.,*
5 F3d 1255, 1263 (9th Cir 1993)……………………………………58

*Schwartz v. Pub. Adm'r,*
24 N.Y.2d 65, 71 (1969)………………………………………16

xi

*S. C. Johnson & Son, Inc. v. Drop Dead Co.,*
  201 F. Supp. 442, 443 (S.D. Cal. 1961).................................................52

*SEC v. Richie,*
  2006 U.S. Dist. LEXIS 57258, *6 (C.D. Cal. Aug. 14, 2006)............61

*See v. Durang,*
  711 F.2d 141, 143 (9th Cir 1983)...................................................81

*Self-Realization Fellowship Church v. Ananda Church,*
  206 F.3d 1322, 1329 (9th Cir. 2000)...............................................20

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,*
  161 F.2d 406, 409 (2d Cir. 1946) *cert. denied,*
  67 S.Ct. 1310 (1947).......................................................23,25,49

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
  81 F.2d 49, 56 (2d Cir. 1936), cert. denied, 298 U.S. 669 (1936)..23,81,82

*Shaw v. Lindheim,*
  919 F.2d 1353, 1355 (9th Cir. 1990)..................................75,77,79

*Sid & Marty Krofft Television Products, Inc. v. McDonald's Corp.,*
  562 F.2d 1157, 1163 n.5 (9th Cir. 1981)........................28,62,76-8

*Silverman v. CBS, Inc.,*
  632 F. Supp. 1344, 1355 (S.D.N.Y. 1986)..........................................86

*Smith v. Jackson,*
  84 F.3d 1213, 1218 (9th Cir 1996).........................................75,77

*Smith v. Russell Sage College,*
  54 N.Y.2d 185, 192 (1981)............................................................16

*Sofitel, Inc. v. Dragon Med. and Scient. Commns, Inc.,*
  118 F.3d 955, 964 (2d Cir. 1997)....................................................78

*Sony Corp. v. Universal Studios,*
  464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)............14,30

*S.O.S., Inc. v. Payday, Inc.,*
  886 F.2d 1081,1085 n.3 (9th Cir. 1989)...........................................61

*Steinbeck v. McIntosh & Otis, Inc.,*
  433 F. Supp. 2d 395, 398 (S.D.N.Y. 2006)........................................13

*Stewart v. Abend,*
  495 U.S. 207, 219 (1990)...........................................................13,14,46

*Streetwise Maps, Inc. v. Vandam, Inc.,*
  159 F.3d 739, 748 (2d Cir. 1998)...................................................77

*Subafilms, Ltd. v. MGM-Pathe Communications Co.,*
  24 F.3d 1088 (9th Cir. 1994).........................................................28

xii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**923**

*Sweet Music, Inc. v. Melrose Music Corp.,*
   187 F. Supp. 655, 659 (S.D. Cal. 1960)......................................22

*Swirsky v. Carey,*
   376 F.3d 841, 844 (9th Cir. 2004).......................................74,75

*Three Boys Music Corp. v. Bolton,*
   212 F.3d 477, 481 (9th Cir. 2000)..........................................75

*Tillman v. Nat. City Bank of N.Y.,*
   118 F.2d 631, 634 (2d Cir. 1941)...........................................15

*Traffix Devices v. Mktg. Displays,*
   532 U.S. 23, 29, 164 121 S Ct 1255 (2001)..............................30

*Twentieth Century-Fox Film Corp. v. MCA, Inc.,*
   715 F.2d 1327, 1330 (9th Cir. 1983)........................................75

*Twentieth v. Stonesifer,*
   140 F.2d 579 (9th Cir. 1944)...............................................82

*Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,*
   996 F.2d 1366, 1372 (2d Cir. 1993).........................................99

*United States ex rel. Holder v. Special Devices, Inc.,*
   296 F. Supp. 2d 1167, (C.D. Cal. 2003)....................................61

*Universal City Studios, Inc. v. Film Ventures Int'l, Inc.,*
   543 F. Supp. 1134, 1137-38 (C.D. Cal. 1982)............................86

*Universal Pictures v. Harold Lloyd,*
   162 F.2d 354 (9th Cir, 1947)...............................................80

*Update Art, Inc. v. Modiin Publ'g, Ltd.,*
   843 F. 2d 67, 72-73 (2d Cir. 1988)........................................28

*Vernitron Corp. v. Benjamin,*
   440 F.2d 105, 108 (2d Cir. 1971).......................................17,18

*Walt Disney Productions v. Air Pirates,*
   581 F.2d 751 (9th Cir. 1978)...............................................86

*Warner Bros., Inc. v. American Broadcasting Companies, Inc.,*
   720 F.2d 231, 236 (2d Cir. 1983)..........................................87

*Woods v. Bourne Co.,*
   60 F.3d 978, 993 (2d Cir. 1995)............................................61

*Woods v. Dunlop Tire Corp.,*
   972 F.2d 36, 38 (2d Cir. 1992), *cert. denied*, 506 U.S. 1053 (1993)....15

*Watanabe v. Home, Inc. Depot United States,*
   2003 U.S. Dist. LEXIS 27016 (C.D. Cal. 2003)...........................61

xiii

**EXHIBIT 21**
**924**

*Wood v. Midland Credit Mgmt., Inc.,*
     2005 U.S. Dist. LEXIS 31919 (C.D. Cal 2005)............................61

*Yang Ming Marine Transp. Corp. v. Oceanbridge Shipping Int'l, Inc.,*
     48 F. Supp. 2d 1032, 1039 (C.D. Cal. 1999)...............................36

*Zuill v. Shanahan,*
     80 F. 3d 1366,  1369 (9th Cir. 1996)...........…..................19,37

**STATE CASES**

*Alan Alda v. Twentieth Century Fox Film Corp.,*
     L.A. Super. Ct. Case No. BC 185779 (Feb.1998)......................40

*Barry Levinson v. NBC Studios, Inc.,*
     L.A. Super. Ct., Case No. BC 226456 (Mar. 2000).....................40

*Brodie v. Barnes,*
     56 Cal. App.2d 315, 321-323 (1942).......................................38

*Calistoga Civic Club v. City of Calistoga,*
     143 Cal.App.3d 111, 116 (1983)........................................38

*Conway v. Bughouse, Inc.,*
     105 Cal. App. 3d 194, 202 (1980)........................................38

*David Duchovny v. Fox. Entertainment Group,*
     L.A. Super. Ct., Case No. SC 058329 (Aug. 1999).....................40

*Durgom v. Janowiak,*
     74 Cal. App. 4th 178, (Cal. App. 4th Dist. 1999).........................23

*Elbert, Ltd., v. Federated etc. Properties,*
     120 Cal.App.2d 194, 200 (1953)........................................38

*GHK Associates v. Mayer Group, Inc.,*
     24 Cal. App. 3d 856, (Cal. App. 2d Dist. 1990)..........................41

*Ghirardo v. Antonioli,*
     14 Cal. 4th 39, 51 (1996)..............................................38

*Great-West Life & Annuity Ins. Co. v. Knudson,*
     534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635, (2002)...............38

*Haskel Engineering & Supply Co. v. Hartford Acc. & Indem. Co.,*
     78 Cal App.3d 371, 375 (1978)........................................38

*In re Marriage of Worth,*
     195 Cal. App. 3d 768, 776 (Cal. App. 1st Dist. 1987)...................26

xiv

**EXHIBIT 21**
**925**

*Jones v. H.F. Ahmanson & Co.,*
    1 Cal.3d 93, 111 (1969)................................................................41

*Kohn v. Kohn,*
    95 Cal. App. 2d 708 (1950).......................................................43

*McLoughlin v. L. Bloom Sons Co., Inc.,*
    206 Cal. App. 2d 848, 854 (1962)............................................43

*Mesler v. Bragg Management Co.,*
    39 Cal. 3d 290, 300-01 (S.Ct. Cal.1985)................................42

*Middlecoff v. Cronise,*
    155 Cal. 185, 189 (1909).........................................................40

*Steven Bochco v. Twentieth Century Fox Film Corp.,*
    L.A. Super. Ct., Case No. BC 216801 (Sept. 1999)...............40

*Weis v. Marcus,* 51 Cal App.3d 590, 600 (1975)..................................38

**STATUTES**

Copyright Act of 1909, § 10.....................................................................19

17 U.S.C. § 7 (repealed)...............................................................11,19,50

17 U.S.C. § 24..........................................................................................11

17 U.S.C. § 26..........................................................................................50

17 U.S.C. § 101........................................................................................50

17 U.S.C. § 101(a)....................................................................................12

17 U.S.C. § 102........................................................................................34

17 U.S.C. §103(a).....................................................................................50

17 U.S.C. § 106........................................................................................14

17 U.S.C. § 203(a)....................................................................................15

17 U.S.C. § 301(a)....................................................................................15

17 U.S.C. § 302(a)....................................................................................15

17 U.S.C. § 304(c)..............................8,9,11,12,13,15,19,20-4,32,34,55-7

17 U.S.C. § 304(c)(1).........................................................................20,22

17 U.S.C. § 304(c)(2)...............................................................................20

17 U.S.C. § 304(c)(3)...............................................................................16

xv

17 U.S.C. §304(c)(5)..................................................16

17 U.S.C. § 304(c)(4)(A)............................................16

17 U.S.C. § 304(c)(6)(A)..........................................50,56

17 U.S.C. §304(c)(6)(b)..............................................14

17 U.S.C. § 304(d)................................................11,13,14

17 U.S.C. § 304(d)(1)................................................20

28 U.S.C. § 1292(b)..................................................60

28 U.S.C. § 1338(a).................................................. 28

28 U.S.C. § 1738....................................................16

Sonny Bono Copyright Term Extension Act of 1998......................15

**COPYRIGHT ACT LEGISLATIVE HISTORY**

H. Rep. No. 2222, 60th Congress, 2d Sess., 14 (1909)..................11

H.R. Rep. No. 94-1476, at 124 (1976)................................20

H. Rep. No. 104-315, at 22-23 (1996)................................13

**RULES**

37 C.F.R. § 201.10............................................1,10-12,51-3,55

37 C.F.R. § 210.10 (e)..............................................59

Fed. R. Civ. Proc. Rule 56(c)........................................58

Fed. R. Civ. Proc. Rule 56(d)........................................58

Fed. R. Civ. Proc. 56(e)..........................................30,58

Local Rule 7-17...................................................59-64,84

Local Rule 7-18...................................................59-64,84

**TREATISES**

Lawrence Bender, *Federal Civil Procedure Before Trial*, § 14:31 (2006).......10

*Mathew Bender Practice Guide: Fed Pretrial Civ. Proc. in CA* § 26.36..........58

xvi

**EXHIBIT 21**
**927**

*Rutter Guide: Federal Civil Procedure Before Trial* § 12.158.1 (2006)..........58

*Nimmer On Copyright* § 9.02.........................................................................11

1 *Nimmer* § 6.03, at 6-6................................................................48,49

1-3 *Nimmer* § 3.01.............................................................................27

1-6 *Nimmer* § 6.12[B]..............................................................................37

2-7 *Nimmer* § 7.16...................................................................................53

3 *Nimmer* § 9.11[B] [1]..........................................................................13

3 *Nimmer* § 11.02[B][2].............................................................................28

3-12 Nimmer, § 12.01[A][1][b]........................................................24,25

4-13 *Nimmer* § 13.03[A][1].........................................................................99

4-17 *Nimmer* § 17.02 ...............................................................................28

Schwartzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*, §
14.33 (The Rutter Group 2005)...................................................................18

**MISCELLANEOUS**

*The Adventures of Superman Collecting*.....................................................9

David Waterman, *Viacom-CBS Merger: CBS-Viacom and the Effects
of Media mergers: An economic Perspective,*
        52 Fed. Comm. L.J. 531, 538 (May 2000)...................................39

E. Nelson Bidwell, Introduction, *The Great Superman Comic Book Collection:
Time-Honored Classics*, DC Comics, 1981.............................................53

Latt , Subsidiaries and Affiliated Corporations (1936), p. 191...................43

James Vance, "A Job for Superman,", *Superman: The Dailies*, 1939-1940,
Kitchen Sink Press/DC Comics, 1999................................................53

Jeff Rovin, *The Encyclopedia of Super Heroes, Facts on File Publications,*
1985.....................................................................................53

Les Daniels, *DC Comics: Sixty Years of the World's Favorite Comic Book
Heroes*, Bulfinch Press, 1995.....................................................53

Mark Waid, *The Golden Age of Superman: The Greatest Covers of Action
Comics from the '30s to the '50s,*

xvii

Artabras/DC Comics, 1993.................................................................53

Mark Waid, *Superman: The Man of Tomorrow, Archives* Volume 1,
DC Comics, 2004.........................................................................53

Robert Greenberger, *The DC Comics Encyclopedia: The Definitive
Guide to the Characters of the DC Universe*, DK Publishing, Inc, 2004......,.53

Scott Beatty, p. 112, *The Ultimate Guide to the Man of Steel*,
DK Publishing Inc., 2002................................................................53

Stanton L. Stein & Marcia J. Harris, *Vertically Challenged*,
Los Angeles Lawyer, May 2003 at 30...............................................39

xviii

**EXHIBIT 21**
**929**

## INTRODUCTION

Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel ("Siegel"), the co-author of the world renowned comic book hero, "Superman," and the author of "Superboy." These cases arise out of Plaintiffs' proper exercise of their right under section 304(c) of the 1976 United States Copyright Act, 17 U.S.C. § 304(c), to recapture Siegel's original copyrights in "Superman" and "Superboy" by serving statutory notices on the defendants Time-Warner Inc. ("Time-Warner"), Warner Bros. Entertainment Inc. ("Warner"), Warner Communications Inc. ("WCI") and Warner Bros. Television Productions Inc. ("WBTV") ("Defendants") on April 3, 1997 and November 8, 2002, respectively terminating Siegel's prior grant(s) of "Superman" (the "Superman Termination") and "Superboy" (the "Superboy Termination") to Defendants' predecessor(s).  Plaintiffs' statutory terminations complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations promulgated thereunder by the Register of Copyrights.

On April 16, 1999, the noticed "Superman" termination date, Siegel's joint copyright interest in "Superman" duly reverted to Plaintiffs, sixty-one years after Siegel's original conveyance on March 1, 1938.  On November 17, 2004, the noticed "Superboy" termination date, the copyrights that Siegel had conveyed in "Superboy" to Defendants' predecessors duly reverted to Plaintiffs, fifty-six years after Siegel's original conveyance.

In the "Superboy" action (Case No. 04-8776 SGL (RZx)) Plaintiffs and Defendants filed cross-motions for partial summary judgment and summary judgment, respectively.  The Honorable Ronald S.W. Lew denied Defendants' motion in its entirety and granted Plaintiffs' motion in its entirety, holding that Plaintiffs' Superboy Termination is valid and that Plaintiffs thereby recaptured the original "Superboy" copyrights. (The "March 24, 2006 Order").  In so holding the Court found that each of Defendants' purported defenses lacked merit.  Defendants have

1

**EXHIBIT 21**
**930**

1  asserted a number of the same defenses with respect to the Superman Termination.

2  Plaintiffs have cross-moved for partial summary judgment on the grounds that

3  their statutory Superman Termination is valid as a matter of law with respect to the

4  original "Superman" story published in "Action Comics, No. 1," and that Plaintiffs

5  have thereby recaptured Siegel's co-author share of the copyright therein.  Plaintiffs

6  also moved to dismiss Defendants' meritless defenses to the Superman Termination.

7  Plaintiffs also seek a ruling that they are entitled to *an accounting* by Defendants of

8  all *profits* earned from Plaintiffs' recaptured "Superman" copyrights both in the

9  United States and abroad because once joint ownership of a copyright is established

10  such accounting is governed by well settled state law principles entitling co-owners to

11  an accounting of *all* profits as "tenants-in-common."  Plaintiffs further seek an order

12  dismissing Defendants' Third and Fourth Alternative Counterclaims on the ground

13  that no binding written agreement disposing of Plaintiffs' recaptured copyrights was

14  consummated by the parties in October, 2001, or thereafter, as a matter of law.

15  Defendants' motion for partial summary judgment ("Motion" or "Mot.") to a

16  large degree sets up a series of straw men by exaggerating Plaintiffs' straightforward

17  claims under the Copyright Act and state law.  Defendants portray Plaintiffs as

18  "overreaching" (Mot. at 21) and themselves as benevolent corporations, when the

19  truth is that despite the Copyright Act's clear mandate and Defendants' prior

20  admissions that Plaintiffs' Terminations are valid, they have refused to account to

21  Plaintiffs *since April 16, 1999* (the effective Termination date) for one penny earned

22  by the valuable  "Superman" copyrights *co-owned* by Plaintiffs.

23  Specifically, Defendants' Motion misstates or misconstrues the law and fails

24  on each count as set forth below:

25  1.    Accounting

26  (a)    Foreign Profits:  Defendants, as joint owners of the

27  recaptured "Superman" copyrights must account to Plaintiffs for *all profits*

28  earned by such copyrights.  It is well settled that once joint ownership of a

2

**EXHIBIT 21**
**931**

copyright is established *the duty of each co-owner to account* to one another for profits is governed not by the Copyright Act, but by equitable *state law* principles governing "tenants in common." Such duty to account entails "all profits" earned in the United States as well as abroad.

(b)    Warner: This issue is far more complicated than the straw man "alter ego" issue posed by Defendants. Defendants DC and Warner are close corporate siblings owned by the same parent company and vertically integrated in their exploitation of content. DC assigned to Warner *all* of DC's "Superman" motion picture and television copyrights in perpetuity, and Warner's consumer products division handles DC's merchandising. As such, Warner has stepped into DC's shoes as co-owner and controls such copyrights. In addition, state law equitable principles of unjust enrichment and constructive trust which govern an accounting by joint owners will, in appropriate circumstances, impress a constructive trust upon intra-corporate profits to avoid the unfair diminution through self-dealing of a co-owner's profit share. Plaintiffs' claim that it is entitled to an accounting of upstream profits at the point received by Warner presents a close question of material fact barring summary judgment on this issue.

(c)    Trademarks: Trademark law does not preempt or supersede Federal copyright law. Therefore to the extent exploitation by Defendants of an alleged "Superman" trademark entails a mixed use of the copyrights co-owned by Plaintiffs, Plaintiffs would be entitled to their fair share of profits from such exploitation. This naturally must be assessed on a case by case basis, entails genuine issues of material fact as to the extent of any such mixed use, and is therefore not conducive to summary judgment. Similarly, while Defendants' undoubtedly own certain trademarks, in most instances, the particular trademark or trade dress at issue and whether it has acquired the requisite "secondary meaning" also present genuine issues of material fact

3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**932**

barring summary judgment.

(d)    Derivative Works:  Under Section 304(c) of the Copyright Act, Defendants are free to continue to exploit pre-termination derivative works under the terms of Siegel's original grant(s), but must account to Plaintiffs with respect to all post-termination derivative works.  However, any material alteration or addition to a pre-termination derivative work constitutes a new derivative work under the Copyright Act, triggering Defendants' duty to account.

2.    1938 Ads For Action Comics No. 1:  Defendants' theory that they can chop-off an illustration from a copyrighted joint work – Siegel and Shuster's first "Superman" story, published in Action Comics, No. 1 – and by an "in-house announcement" of this publication, establish a competing copyright which somehow divests the "Superman" story of key elements, is untenable as a matter of law.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Prior Legal Actions Between The Parties' Predecessors

#### 1.    The 1947 Westchester Action

In 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester (the "1947 Action") against Defendant DC Comics' predecessor, National Comics Publications, Inc. ("National"), to determine the validity of various contracts between Siegel and Shuster and National's predecessors, including Detective Comics, Inc. ("Detective"), pursuant to which National claimed to own "Superman," and to determine ownership of Siegel's "Superboy."  *See Jerome Siegel and Joseph Shuster v. National Periodical Publications et al.*, 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909, 912-913 (2nd Cir. 1974)(both the district court and Second Circuit describe the background of the 1947 Action).

Pursuant to stipulation of the parties the action was tried before an Official

4

**EXHIBIT 21**

**933**

Referee of the New York Supreme Court, Judge Addison Young ("Judge Young"). *Id.* After trial of the 1947 Action, Judge Young rendered a comprehensive opinion dated November 21, 1947. *Id.* On April 12, 1948, Judge Young signed detailed findings of fact and conclusions of law and rendered an interlocutory judgment from which no appeal was perfected. *Id.* After reviewing considerable documentary and testimonial evidence, Judge Young found that National owned "Superman" pursuant to a written grant dated March 1, 1938 (the "March 31, 1938 Grant") but that Siegel was the sole author and owner of "Superboy." *See* Judge Young's Findings of Fact ("1948 FOF") and Conclusions of Law ("1948 COL") dated April 12, 1948 (collectively, the "1948 Findings"), Bergman Decl., Ex. S.

Settlement negotiations ensued, resulting in a stipulation of settlement by the parties dated May 19, 1948, and pursuant to the stipulation, the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948. *Siegel,* 364 F. Supp. at 1034-1035; 508 F.2d at 912-913. *See* Bergman Decl., Exs. U, V.

## 2.    The Federal Action

In 1969, Siegel and Shuster sought declaratory relief in the U.S. District Court for the Southern District of New York regarding ownership of the *renewal copyright* to "Superman," resulting on appeal in the Second Circuit's decision in *Siegel, supra.* The district court and Second Circuit relied upon Judge Young's opinion, findings of fact, conclusions of law and resultant consent judgment after settlement of the 1947 Action and held them binding on the parties under the doctrine of *res judicata. Siegel,* 364 F. Supp. at 1034-1035, *aff'd* 508 F.2d at 912-13. Based thereon it was held that National owned the renewal copyright to "Superman" under the March 31, 1948 Grant. *Siegel,* 508 F.2d at 912-913.

The *Siegel* district court explicitly relied on the 1948 findings of fact in holding that the 1948 Action was *res judicata* as to National owning the "Superman" renewal copyright. 364 F. Supp. at 1035-1036 ("The findings of the State Supreme Court in the Westchester action are binding on us here."), *citing Vernitron,* 440 F.2d at 108;

5

1   and also quoted and gave preclusive effect to the 1948 conclusions of law. 364 F.

2   Supp. at 1035-1036.

3        The Second Circuit, in affirming the district court's decision, likewise *quoted*

4   Judge Young's first conclusion of law ("[b]y virtue of the instrument of March 1,

5   1938...Detective Comics, Inc. became the absolute owner of the comic strip

6   Superman"), *Siegel*, 508 F.2d at 912; and delved into the heart of the case: "the state

7   court action determined that the agreements conveyed *all* of the plaintiffs'

8   rights...Under the doctrine of *res judicata* we are not free collaterally to re-examine

9   the agreements to determine whether the construction placed on them was

10   warranted." *Id*. at 913. "The state court...construe[d] these instruments...[and] that

11   decision is binding on us here." *Id*.

12        Defendants' predecessor, National, emphatically claimed in *Siegel* that the

13   1948 Findings were strictly binding under *res judicata* or collateral estoppel

14   regarding its *federal* claim that it owned the *renewal copyright* in "Superman," even

15   though this copyright issue was *not* addressed in the 1948 state action. *See* March 24,

16   2006 Order at 6-7, Toberoff Decl, Ex. L.

17        Defendants have benefited enormously from this position and the *Siegel*

18   holding for over thirty years. The 1948 Findings of Judge Young, nine years after the

19   events in question, provide "a much more reliable index of the truth" than anything

20   that can be mustered today. *See Picture Music,* 314 F. Supp. at 652. There is little

21   about these underlying facts that can be supplied by new testimonial evidence. Siegel

22   is no longer alive and the majority of those who dealt with "Superman" at the time of

23   its creation by Siegel and Shuster are also dead.

24        On summary judgment in the Superboy Action, Judge Lew thus held that the

25   1948 Findings had preclusive effect:

26       "Having relied on Judge Young's findings for previous favorable
        determinations regarding Superman, Defendants now take the

27       inconsistent position that this Court is not bound by the state court
        findings ... Defendants attempt to raise genuine issues of material fact,

28       where the facts were clearly determined by Judge Young after the
        opportunity to take evidence and hear testimony on that evidence from

6

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**935**

the parties directly involved in creating this relationship.

Contrary to Defendants' assertions now, both the Southern District of New York and the Second Circuit looked directly to, even citing to, Judge Young's findings of facts. This Court holds that it is consistent to continue this position and will look to Judge Young's findings as binding where relevant … [T]his Court in keeping a consistent position with the previous litigation holds that Judge Young's findings of fact have preclusive res judicata and collateral estoppel effect on this Court.

March 24, 2006 Order, at 7, Toberoff Decl., Ex. L.

## B.    The Creation of Superman

The facts and conclusions set forth below are from the 1948 Findings, the district court's and Second Circuit's decisions in *Jerome Siegel et al. v. National Periodical Publications, et al.*, 508 F.2d 909 (2d Cir. 1974),, and/or from Defendants' First Amended Counterclaims as noted below.

In 1933, Siegel conceived of the original idea of a cartoon strip featuring a unique man of superhuman powers who would perform feats for the public good. Siegel called him "Superman." *Siegel*, 508 F.2d at 911, 1948 FOF, fact 9; FACC, ¶ 6. In or about 1933 Siegel wrote, and the artist, Shuster illustrated and "inked" multiple "Superman" comic strips intended for publication in a newspaper format, *Siegel*, 508 F.2d at 911, 1948 FOF, Facts 8, 10; FACC, ¶ 7; Toberoff Decl. Ex. A, which consisted of "(a) twenty-four days (four weeks) of Superman comic strips intended for newspapers (the "1933 Superman Strip"); (b) a seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis covering an additional two months of daily [Superman] comic strips; and (e) fifteen daily comic strips. FACC, ¶ 7; *see* 1948 FOF, Facts 8, 10.

By 1934, "Superman and his miraculous powers were completely developed [by Siegel and Shuster]." *Siegel*, 508 F.2d at 911, 914; 1948 FOF, Facts 8-11. "Superman" was submitted by Siegel and Shuster "to a number of prospective publishers and newspaper syndicates," but was not accepted for publication. FACC, ¶ 8; 1948 FOF, Fact 10.

7

1    One of the early entities to which Siegel had submitted "Superman" was The

2  McClure Newspaper Syndicate ("McClure"). In or about early 1938, McClure

3  forwarded Siegel and Shuster's 1934 Superman Comic Strip to Detective Comics for

4  potential publication in its new magazine, "Action Comics." 1948 FOF, Facts 18-19;

5  *see* FACC, ¶ 11, Toberoff Decl., Ex. A.

6    In early 1938, when Detective Comics expressed interest to Siegel and Shuster

7  in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster

8  "cut and pasted" it into a thirteen page format (the "Re-cut 1933 Superman Strip"), so

9  as to render their newspaper strip more suitable for a magazine publication. *Siegel*,

10  508F.2d at 911; 1948 FOF, Facts 17-18, 31-33; FACC, ¶ 11. Siegel and Shuster

11  submitted their Re-cut 1933 Superman Strip to Detective in February, 1938.

12  1948 FOF, Fact 22. (The 1933 Superman Strip and the Re-cut 1933 Superman Strip

13  are hereinafter collectively referred to as the "Original Superman Story")

14    "In an agreement with [Detective] dated March 1, 1938 [the March 1, 1938

15  Grant], Siegel and Shuster...transferred to [Detective] 'the strip entitled

16  'Superman'...and all goodwill attached thereto and exclusive rights to use the

17  characters and story, continuity and title of the strip'" in consideration for $130.

18  FACC, ¶ 12; 1948 FOF, Facts 24, 25, 32; Bergman Decl., Ex. F. The Re-cut 1933

19  Superman Strip "w[as] in existence...before the execution of the instrument of March

20  1, 1938." 1948 FOF, Fact 32. The "March 1, 1938 [Grant]...was executed by

21  [Siegel and Shuster] by reason of their desire to see SUPERMAN in print and in

22  order to induce its publication by DETECTIVE COMICS, INC." 1948 FOF, Fact 28.

23    Thereafter, Detective published Siegel and Shuster's thirteen page Original

24  Superman Story in the "June, 1938" issue of "Action Comics No. 1," which was first

25  published on April 18, 1938. 1948 FOF, Fact 31; Bergman Decl. Ex. S.[1]

---

26  [1] Detective thereafter registered the Action Comics, No. 1 periodical with the Register of
   Copyrights under copyright registration number B: 379787 in the name of Detective Comics, Inc,
27  which was later renewed on June 1, 1965 in the name of National Periodical Publications, Inc.
   under copyright renewal registration number R: 362187. The copyright in the "Superman" story
28  contained in the Action Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of

8

1    Siegel and Shuster thereafter continued to create "Superman" comic strips
2    which were published by Detective in subsequent periodical issues. 1948 FOF, Fact
3    35. On September 22, 1938, Siegel and Shuster entered into both an agreement with
4    Detective to produce the "artwork and continuity" for five existing comic strips
5    created by Siegel and Shuster, including "Superman," 1948 FOF, Facts 39, 46;
6    FACC, ¶ 15, and an agreement with Detective and McClure concerning the use of
7    Superman in newspaper strips. FACC, ¶ 16.
8    On December 19, 1939, Detective and Siegel and Shuster entered into a
9    supplemental agreement raising Siegel and Shuster's per page compensation rate for
10   their production of the increasingly popular "Superman" comic strip. 1948 FOF, Fact
11   52; FACC, ¶ 20. On December 23, 1975, Siegel and Shuster entered into an
12   agreement with Warner Communications Inc.("WCI") (the "December 23, 1975
13   Agreement"), then National's alleged parent company, which re-acknowledged that
14   WCI was the exclusive owner of "Superman," and provided Siegel and Shuster with
15   credit as the "creators" of "Superman." FACC, ¶ 30, Toberoff Decl., Ex. A.

16   **C.    "Superman's" Success With The Public**
17   After "Superman" made its debut in Action Comics, No. 1, he was an instant
18   success with the public. DC's book, *The Adventures of Superman Collecting*,
19   Bergman Decl., Ex. HH, at 1133, relied on by Defendants, sums this up:

20   "[The] first [Superman] story appeared in the premiere (June, 1938)
     edition of *Action Comics*. A poll in the fourth issue revealed that
21   Superman was the overwhelming favorite of *Action* readers, and from
     then on the Man of Steel was emblazoned on every cover. And the
22   magazine sold out every month. Then, Superman became the star of his
     own comic book, which was also an immediate and overpowering
23   success. A legion of imitators materialized, creating a big boom in
     superheroes, and transforming the fledgling comic book industry into a
24   multi-million dollar business."

25   "Superman was a born salesman. From the earliest days of the
     character's inception it was apparent – to his creators and publishers
26   alike – that the Man of Steel could move merchandising mountains."

27

28   National Periodical Publications, Inc., claiming as proprietor of copyright, under copyright renewal
     registration number R: 362188. *See* 1948 FOF, Fact 31, Bergman Decl., Ex. S.

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**938**

1      In fact, DC's own book specifically credits Siegel and Shuster with initiating

2  "Superman's" merchandising bonanza. *Id.*, at 1134-1135.

3        "By December of 1940 – just a few short months after Superman, Inc.
   had announced the availability of the Superman character for license to

4        manufacturers –there were over 20 Superman items on the market…By
   late 1941 there were more than 40 manufacturers of toys, games,

5        clothing and candies producing and selling Superman licensed
   merchandise throughout the United States and Canada." *Id.*

6

7      Siegel and Shuster's "Superman" was embraced by the public from the outset.

8  He gave the public security in a hostile, chaotic world, and most importantly,

9  encouraged people to believe in themselves. "[H]e would always evoke in us a sense

10 of the tremendous powers, which we, the Clark Kents of the world, might possess…"

11 *Id.* at 1133.   For this reason, the successful format and core literary elements

12 established by Siegel and Shuster in their Original Superman Story – Superman's

13 origins from a doomed planet; his miraculous powers; his alter ego as Clark Kent, the

14 mild mannered reporter at a big city newspaper; the gruff Editor who hands out his

15 assignments, the love triangle between Superman/Clark and the feisty reporter, Lois,

16 and Superman's role as a "Champion of the Oppressed" – have endured virtually

17 unchanged for seventy years.

18     **D.**   **Plaintiffs' Notices of Termination**

19         **1.**   **Superman Termination Notices**

20     On April 3, 1997, Plaintiffs availed themselves of their legal right under the

21 Copyright Act, 17 U.S.C. § 304 (c) ("Section 304(c)"), as Siegel's widow and

22 daughter, respectively, to at last participate in "Superman's financial success by

23 recapturing Siegel's co-authorship share of the copyrights in the Original Superman

24 Story and other Superman works, via service on Defendants of statutory notices of

25 termination of the March 1, 1938 Grant and subsequent agreements, to the extent

26 relevant (the "Termination Notices").  Bergman Decl., Exs. X- FF.

27     In each of the Termination Notices, the termination of the grant or potential

28 grant listed in the respective notice (the "Termination(s)") was noticed to take effect

10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**939**

1   on April 16, 1999 (the "Termination Date").  The Termination Notices were each
2   served by Regular Mail, as required, and additionally by Certified Mail, Return
3   Receipt Requested.  *See* 37 C.F.R. § 201.10.  Plaintiffs' Termination duly complied
4   with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the
5   regulations promulgated thereunder by the Register of Copyrights.
6        Defendants originally acknowledged that the Notices of Termination are
7   effective, and that Plaintiffs thereby recaptured and jointly own the copyright(s) to at
8   least the original "Superman" elements authored by Siegel and Shuster.  On April 16,
9   1997, in response to the April 3, 1997 service of the Notices of Termination, John A.
10  Schulman, Executive Vice President and General Counsel of Defendant Warner Bros.
11  wrote a letter to Joanne Siegel, stating in relevant part:
12       "As to the Notices of Termination, I wasn't surprised at their
        arrival…After the effective date of the termination, there will still
13       remain 14 years of copyright protection left to the joint copyright holders
        of the original Superman elements.  Those are what we should share."
14
15  Toberoff Decl., Ex. B.
16       Defendants similarly acknowledged their duty to account to Plaintiffs for
17  Defendants' exploitation of the original "Superman" copyright(s).  On October 10,
18  1997, Paul Levitz ("Levitz"), President and Publisher of Defendant DC Comics,
19  wrote a letter to Plaintiffs, stating in relevant part:
20       "The [Superman] rights involved are non-exclusive; they are shared with
        DC.  Since both you and DC would have these rights, we would each
21       have the obligation to pay the other for using those rights if you did not
        re-grant them to DC."
22
23  Toberoff Decl., Ex. C.
24       However, two years later, when Defendants' initial overtures to buy-out
25  Plaintiffs had not succeeded, DC sent a letter to Plaintiffs, dated April 15, 1999, *one*
26  *day* before the Termination Date, denying the validity of the Terminations with
27  respect to any "Superman" copyrights.  Toberoff Decl., Ex. D.
28       **2.    Superboy Termination Notices**

11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**940**

On November 8, 2002, Plaintiffs availed themselves of their legal right under Section 304(c) to recapture the "Superboy" copyright by serving notice on the Defendants that Plaintiffs were terminating Siegel's 1948 grant of "Superboy" after the 1947 Action (the "Superboy Termination Notice"). Termination was noticed to take effect on November 17, 2004 (the "Superboy Termination Date") sixty-six years after Siegel had created "Superboy." Plaintiffs' Termination duly complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10., the regulations promulgated thereunder by the Register of Copyrights.

## E.    The Current Actions

### 1.    The Superman Action

On October 8, 2004, Plaintiffs commenced the instant action for declaratory relief as to the validity of the "Superman" Notices of Termination, an accounting to Plaintiffs as of April 16, 1999, the Termination Date, as the joint owner of copyright in the Original Superman Story and other early "Superman" copyrights; and for related relief (Case No. 04-8770 SGL (RZx)) (the "Superman Action"). *See* First Amended Complaint ("FAC"), Bergman Decl, Ex. EE.

### 2.    The Superboy Action

On October 22, 2004, Plaintiffs commenced an action for declaratory relief, copyright infringement and an accounting regarding the "Superboy" Notice of Termination. (Case No. 04-8776 SGL (RZx))(the "Superboy Action"). *See* First Amended Supplemental Complaint ("FASC"), Bergman Decl, Ex. GG.

On March 24, 2006, this Court (the Honorable Ronald S. W. Lew presiding) entered an order in the Superboy Action granting Plaintiffs' motion for partial summary judgment and denying Defendants' motion for summary judgment. Toberoff Decl., Ex. L. Judge Lew found that Plaintiffs' notice of termination regarding "Superboy" was valid and that Plaintiffs thereby recaptured Siegel's original "Superboy" copyright on November 17, 2004, the noticed termination date. *Id.*, at 14-15. In so holding, the Court found that Defendants' purported defenses

12

1  lacked merit. *Id.*, at 8-14.  The Court preserved for trial the fact intensive issue of

2  Defendants' infringement of Plaintiffs' "Superboy" copyrights. *Id.*, at 14-16.

3      Defendants thereafter moved for certification/interlocutory appeal of the March

4  24, 2006 Order under 28 U.S.C. §1292(b), which motion was denied by the Court by

5  an order entered on May 23, 2006.[2]

6                              **LEGAL ANALYSIS**

7  **I.      THE RECAPTURE RIGHT UNDER THE U.S. COPYRIGHT ACT**

8      The importance and legislative purpose of the current Copyright Act's

9  termination provisions at issue herein (17 U.S.C. § 304(c)) are best understood by

10 reviewing the policies underlying its enactment and the predecessor provisions which

11 led up to it.  For over two centuries, the United States Copyright Act has consistently

12 provided authors and their families with the right to regain previously transferred

13 copyright interests.  Over time, Congress strengthened and enhanced such "recapture"

14 rights to protect authors and their heirs so as to enable them to realize the enhanced

15 value of an authors' copyrighted work.  *See Stewart v. Abend*, 495 U.S. 207, 219, 110

16 S. Ct. 1750, 109 L. Ed. 2d 184 (1990), *quoting* M. Nimmer & D. Nimmer, *Nimmer*

17 *On Copyright* (hereinafter, "*Nimmer*"), § 9.02.  These protections culminated in the

18 current Copyright Act's termination provisions.  17 U.S.C. §§ 203(a), 304(c) and

19 304(d).

20     **A.      The Recapture Right Under The 1909 Copyright Act**

21     Under the Copyright Act of 1909 ("1909 Act"), copyright protection was

22 divided into two separate, consecutive terms of twenty-eight years:  the "initial" term

23 and the "renewal" term.  17 U.S.C. § 24; *see* H. Rep. No. 2222, 60th Congress, 2d

24 Sess., 14 (1909).  The renewal term was intended to be a new grant reverting to the

25 author at the end of the initial term, not merely an extension thereof.  In fashioning

26

27 [2] Judge Lew took senior status and recused himself, whereupon this case was re-assigned to the
Honorable Stephen G. Larson.  Defendants seized this as an opportunity to improperly *re-argue* the
28 parties' motions for summary judgment and Defendants' motion for certification in a purported
"motion for reconsideration" of both of Judge Lew's orders, which motion is pending.

                                   13

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**942**

1  the renewal term Congress was aware that authors had relatively little bargaining

2  power. The renewal term was intended to protect authors who may have struck

3  imprudent bargains by allowing them to realize a portion of the increased economic

4  value of their work. *See Abend*, 495 U.S. at 217-20 (legislative and judicial history

5  of the 1909 Act's renewal provision).

6      This legislative purpose of the renewal term was emasculated by the Supreme

7  Court's decision in *Fred Fisher Music Co.* v. *M. Witmark & Sons*, 318 U.S. 643, 657-

8  59 (1943) which held that authors were able to assign their interest in the renewal

9  term during the initial term. After *Fred Fisher*, publishers routinely insisted that

10  authors assign *both* copyright terms in one initial transfer, eliminating the

11  reversionary renewal right under the 1909 Act, and the author's ability to share in his

12  work's success. *Stewart*, 495 U.S. at 219; *see also Mills Music, Inc. v. Snyder*, 469

13  U.S. 153, 185, 105 S. Ct. 638; 83 L. Ed. 2d 556 (1985) (White, J., dissenting) (*Fred*

14  *Fisher* "substantially thwarted" Congress' goal of protecting authors through

15  copyright recapture).

**B.    The Termination Rights Under The 1976 Copyright Act**

17      On January 1, 1978, the Copyright Act of 1976 went into effect, and with it

18  major changes to U.S. copyright law that significantly affected the rights of author's

19  and their families. 17 U.S.C. § 101 *et seq.* (1978). The 1976 Act extended the

20  renewal term from 28 to 47 years for works, such as the early "Superman" works,

21  that were in their renewal term on January 1, 1978 when the 1976 Act took effect. 17

22  U.S.C. § 304(a). Congress intended to give the benefit of the 19 additional years of

23  copyright protection to authors and their families rather than to grantees, for whom

24  the automatic grant of the extended term would have constituted an unjustified

25  windfall. *See* H.R. Rep. No. 94-1476 ("H. Rep."), at 140 (1976).

26      To that end, Congress coupled the term extension with a *new* right, at issue in

27  this case, of authors and their statutory heirs (principally spouse, children and

28  grandchildren) to terminate transfers of rights in a copyright's renewal term,

14

1  provided that the grant was "executed before January 1, 1978," *i.e.,* before the 1976

2  Act went into effect. 17 U.S.C. § 304(c). The termination clause provides in

3  pertinent part:

4      "In the case of any copyright subsisting in either its first or renewal term on
       January 1, 1978, other than a copyright in a work made for hire, the
5      exclusive or nonexclusive grant of a transfer or license of the renewal
       copyright or any right under it, executed before January 1, 1978, by any of
6      the persons designated by subsection (a)(l)(C) of this section, otherwise
       than by will, is subject to termination..."
7

8  17 U.S.C. §§ 304(c) and 304(c)(5).[3]

9      As the Supreme Court noted in *Mills Music* "[t]he principal purpose of...§ 304

10 was to provide added benefits to authors...More particularly, the termination right

11 was expressly intended to relieve authors of the consequences of ill-advised and

12 unremunerative grants..." *Mills Music,* 469 U.S. at 172-73 *citing* H. Rep. No. 94-

13 1476, at 124 (1976). In devising Section 304(c), Congress recognized that authors

14 commonly agree to one-sided copyright grants which publishers with far greater

15 bargaining power designed to be as expansive as possible in exchange for as little

16 payment as possible. H. Rep. at 124. The results are often supremely unfair, as when

17 a work proves financially successful for many years, but enriches only the grantee

18 and not the author or the author's family.

---

19 [3] A closely related termination provision governs works copyrighted after January 1, 1978. *See* 17

20 U.S.C. § 203(a). Sections 203 and 304 are structurally parallel but diverge in some particulars. For
   works copyrighted after January 1, 1978, Congress established the copyright term as the life of the

21 author plus 50 years (later extended for another 20 years). *See* 17 U.S.C. §302(a) (1982). Congress
   also allowed the author or the author's surviving family members to terminate any license 35 years

22 after any grant. *See* 17 U.S.C. § 203(a). Thus, for both existing and future copyrights, Congress

23 granted authors and their family members the right to terminate any grant after a period of time in
   order to recapture the author's copyright.

24

25 The Sonny Bono Copyright Term Extension Act of 1998 ("CTEA") became effective October 27,
   1998 and extended the term of protection for works created prior to January 1, 1978 from seventy-

26 five to ninety-five years, 17 U.S.C. § 304(b). As with the 1976 Act's original term extension,
   Congress intended this second term extension as a benefit to authors and their families, not as a

27 windfall for grantees. Congress therefore once again coupled the extended term with an inalienable
   termination right for authors (and their surviving spouses, children and grandchildren) so they could

28 recapture the additional twenty years of copyright protection. *See* 17 U.S.C. § 304(d). *See* S. Rep.
   No. 104-315, at 22-23 (1996); 3 *Nimmer on Copyright* § 9.11[B] [1].

15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**

**944**

1    Indeed, the Supreme Court recently recognized the overall intent of the 1976

2  Act to "enhance the author's position" and to adjust "the author/publisher balance,"

3  emphasizing the "inalienable authorial right to revoke a copyright transfer." *N.Y.*

4  *Times v. Tasini*, 533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001) ; *see*

5  *also Stewart*, 495 U.S. at 230 ("[1976 Act] provides an inalienable termination

6  right"); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (settlement

7  agreement cannot bar termination right); *accord Steinbeck v. McIntosh & Otis, Inc.*,

8  433 F. Supp. 2d 395, 398 (S.D.N.Y. 2006).

9    The termination right lies in stark contrast to ordinary contract principles, as it

10  empowers authors and their statutory heirs to terminate grants of copyright *without*

11  *cause*, regardless of the contracting parties' promises, intent or the assignee's

12  expectations at the time the grant was made.  17 U.S.C. §304(c)(5).

13    In creating the new termination right, Congress directly addressed the

14  inequities caused by *Fred Fisher* and sought to prevent the erosion of the right of an

15  author and his family to regain and profit from the author's copyright.  Thus, in

16  further abrogation of "freedom of contract" principles, Congress clarified that the

17  termination right cannot be waived or contracted around, that "[t]ermination of the

18  grant may be effected notwithstanding any agreement to the contrary," 17 U.S.C. §

19  304(c)(5) and that "[a] further grant...of any right covered by a terminated grant is

20  valid only if it is made after the effective date of termination... [or as to] the original

21  grantee or such grantee's successor in title, after the notice of termination has been

22  served..." 17 U.S.C. § 304(c)(6)(B).

23    Termination is carried out by serving advance notice of the termination on the

24  original grantees or their successors "not less than two or more than ten years before"

25  its effective date.  17 U.S.C. § 304(c)(4)(A).  Authors and their statutory heirs are

26  permitted to terminate such grants during a five year window beginning fifty-six

27  years after copyright had originally been secured in order to "recapture" their

28  copyrights for the extended renewal term.  17 U.S.C. § 304(c)(3).

16

1    The philosophy behind our copyright law is the conviction that the public
2    welfare is advanced by providing economic incentives to authors to exercise their
3    creative talents. *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630
4    (1954); *Sony Corp. v. Universal Studios*, 464 U.S. 417, 429, 104 S.Ct. 774, 78
5    L.Ed.2d 574 (1984).  Congress provided this incentive by giving authors and,
6    thereafter, their immediate family, exclusive copyrights to their work and the ability
7    to market those rights.  17 U.S.C. §106.  When Congress' reversionary renewal
8    scheme was thwarted, it carefully fashioned the 1976 Act's termination provisions
9    and subsequently CTEA's termination provisions to cure the inequities caused by
10   *Fred Fisher*, "level the playing field" and further promote the economic interests of
11   authors. 17 U.S.C. §§304(c),(d).

12   **II.    STANDARD OF REVIEW**

13       Rule 56(c) of the Federal Rules of Civil Procedure provides for summary
14   judgment when "there is no genuine issue of any material fact and [] the moving
15   party is entitled to judgment as a matter of law."  The moving party bears the burden
16   of identifying evidence that demonstrates the absence of a genuine issue of material
17   fact for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L.
18   Ed. 2 d 202 (1986).  A fact is "material" if it affects the outcome of the suit under the
19   governing substantive law. *Liberty*, 477 U.S. at 248.

20       Rule 56 must be considered "with due regard …for the rights of persons
21   asserting claims and defenses that are adequately based in fact to have those claims
22   and defenses tried to a jury…" *Celotex Corp. v. Catrett* 477 U.S. 317, 327, 106 S.Ct.
23   2548 (1986); *see also Liberty*, 477 U.S. at 255; Lawrence Bender, *Federal Civil
24   Procedure Before Trial*, § 14:31 (2006)("Because summary judgment is a drastic
25   remedy and deprives a party of the right to a jury trial, strict standards apply.")

26       In reaching its decision, the court must assess whether there are any factual
27   issues to be tried, while resolving all ambiguities and drawing reasonable inferences
28   against the moving party. *Liberty*, 477 U.S. at 249-250.

17

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**946**

The standards and procedures regarding a motion for "partial summary judgment" on some but not all claims or issues within a claim, are the same as those for summary judgment. Schwartzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*, § 14.33 (The Rutter Group 2005); Fed. R. Civ. P. 56(c), (d).

## III.  DEFENDANTS' CONSOLIDATED MOTION IS PROCEDURALLY IMPROPER AND DEFECTIVE

Defendants have filed, without legal authority, a consolidated motion for partial summary judgment regarding two separate actions. Defendants moved to consolidate these actions on February 9, 2005. Plaintiffs vigorously opposed the motion because the two litigations, though involving the same parties, involved plainly different facts, claims and theories of recovery. Toberoff Decl., Ex. N. The Superman Action is essentially for an accounting by copyright co-owners; whereas the Superboy Action is for copyright infringement. Plaintiffs argued that Defendants improperly sought consolidation to blur the lines between "Superman" and "Superboy" in support of their argument that "Superboy" is an indistinct property, and to muddy the distinct legal standards which favor Plaintiffs. *Id.*

The Court (the Honorable Dean D. Pregerson) denied Defendants' motion on March 14, 2005, but, at Plaintiffs' suggestion, consolidated the cases for discovery purposes only. Despite this clear ruling *against* consolidation, Defendants unilaterally filed their consolidated summary judgment motion in blatant contravention of the Court's order. Their motion lumps the Superboy Action and Superman Action together on some arguments, but not others, and vaguely segues from one property to other, confusing the actions and the different legal principles applicable thereto. Plaintiffs were inclined to file separate oppositions in each case, but were effectively forced to file this combined opposition to avoid further confusion or inconvenience to the Court, while reserving their rights.

18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 21
947

IV.    **PLAINTIFFS HAVE A RIGHT TO SHARE IN THE PROFITS FROM**
**NEW EXPLOITATIONS OF THE RECAPTURED "SUPERMAN"**
**COPYRIGHT INTEREST IN FOREIGN TERRITORIES**

Defendants contend that their duty to account to Plaintiffs for profits earned from Plaintiffs' "Superman" copyright interests, recaptured under Section 304(c), does not include profits earned from the foreign exploitation of such jointly owned copyrights (Mot. at 17). Defendants contort federal copyright case-law to support their incorrect position. However, the fatal flaw in their analysis is that while co-ownership of the subject copyrights is established under the Copyright Act, *i.e.*, 17 U.S.C. §304(c), once it is established, the co-owners' duty to account as tenants in common arises under and is governed by state law, not the Copyright Act. *See* Melville B. Nimmer & David Nimmer, 3-12, *Nimmer on Copyright* ("*Nimmer*"), § 12.01[A][1][b], *citing Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984). *Accord Zuill v. Shanahan*, 80 F. 3d 1366, 1369 (9th Cir. 1996). Defendants clearly acknowledge and admit this *in their own argument*, but then conveniently ignore its implications (Mot. at 25).

In building their argument, Defendants discuss the copyright law's general doctrine of non-extraterritoriality, and then impute a straw man "predicate acts" *copyright infringement* argument to swiftly knock it down. Ironically, Defendants conclude by relying on Plaintiffs' leading case on this issue:

> "In *Oddo v. Ries*, *supra*, 743 F.2d at 633 the Court held that, as between co-owners of a copyright 'the duty to account does not derive from the copyright law's proscription of infringement. Rather it comes from 'equitable doctrines relating to unjust enrichment and general principles of laws governing the rights of co-owners.'" *Accord Zuill*, 80 F.3d at 1369."

(Mot. at 25). Plaintiffs agree.[4] Thus, Plaintiffs *admit* that accounting claims by a co-owner of a copyright, such as Plaintiff, are *not* governed by copyright law, but by state common law property principles governing tenancies in common. *Oddo v. Ries*,

---

[4] *See* Plaintiffs' Motion for Partial Summary Judgment filed April 30, 2007, at pp. 25-28.

19

**EXHIBIT 21**
**948**

1   The Fifth Circuit held that while the issue of joint ownership of the song arises under

2   copyright law, once this issue was resolved, the accounting dispute among joint

3   owners was properly governed by state law. *Id.* The court held:

4   "The applicability of federal law ends with that [joint ownership]
    determination, as Goodman's claim for an accounting is governed in all

5   respects by state law. It is widely recognized that "[a] co-owner of a
    copyright must account to other co-owners for any profits he earns from

6   the licensing or use of the copyright... Significantly, '*the duty to account
    does not derive from the copyright law's proscription of infringement.*

7   *Rather, it comes from"... general principles of law governing the rights
    of co-owners.*' As those general principles are rooted in state law, we

8   look to the law of Louisiana for answers to the remaining issues
    presented by this appeal." *Id.* (emphasis in the original).

9   **Notably, the 5th Circuit affirmed the district court's finding that the co-**

10  **owners of the song "Let the Good Times Roll" had to account to each other for**

11  **royalties earned both domestically *and outside the United States*:**

12
    "It is true that United States Copyright laws do not have extraterritorial
13  effect and therefore, 'infringing actions that take place entirely outside
    the United States are not actionable.' Plaintiff's claim for an accounting
14  of royalties as co-owner of the copyright to 'Let the Good Times Roll' is
    not, however, an action based upon an infringement of her copyright.
15  Indeed, a co-owner of a copyright cannot be liable to another co-owner
    for infringement of the copyright. 'Consequently, a suit to bring the co-
16  owner of a copyright to account does not fall within the district court's
    jurisdiction over actions arising under the copyright law.' *The extra-*
17  *territorial nature of copyright law is inapposite to whether plaintiff is
    entitled to an accounting of foreign royalties received by defendants*."

18  (internal citations omitted). *Goodman v. Lee*, 1994 U.S. Dist. LEXIS 18468, *11, 13

19  (E.D. La. 1994), *aff'd* 78 F.3d at 1015; *Oddo v. Ries,* 743 F.2d at 633 ("A co-owner
20
    of a copyright must account to other co-owners for *any* profits he earns from
21
    licensing or use of the copyright")(emphasis added).
22
    California state courts, as well as federal courts, have consistently applied the
23
    rule that an action for an accounting between joint owners of a copyright is governed
24
    by state law under which they are entitled, as tenants in common, to share in *all*
25
    *proceeds* from such jointly owned copyright. *See In re Marriage of Worth*, 195 Cal.
26
    App. 3d 768, 776 (Cal. App. 1st Dist. 1987)(because husband and wife hold title to
27
    copyrights as tenants in common the wife is entitled "to share in *all* of the proceeds
28
    therefrom, including any settlement or award of damages resulting from the copyright

21

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**949**

1  infringement"); *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1153 (N.D. Cal.

2  1999)(action for accounting between joint authors brought in federal court remanded

3  to California state court because an "action for an accounting...as between alleged

4  co-owners is founded in state law and does not arise under the copyright laws");

5  *Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120, (C.D. Cal. 2001)("[e]ach

6  author of a joint work is a tenant in common"); *Durgom v. Janowiak*, 74 Cal. App.

7  4th 178, (Cal. App. 4th Dist. 1999)(court held royalty non-payment is a contract issue

8  not preempted by federal copyright law; states are expressly permitted to regulate

9  activities violating legal or equitable rights, including the right to an accounting).

10      Having relied on *Oddo v. Ries*, 743 F.2d at 633, for the principle that federal

11  copyright law does not govern the accounting relationship between joint owners,

12  Defendants cannot now contend otherwise. Plaintiffs are entitled as a matter of law

13  to an accounting from Defendants for half the profits earned by the now jointly

14  owned copyright in the original "Superman" story published in Action Comics, No.

15  1, and other jointly owned "Superman" copyrights. *Oddo v. Ries*, 743 F.2d at 633.

16      As noted in *Goodman*, 1994 U.S. Dist. LEXIS 18468, at 11, 13, *aff'd* 78 F. 3d

17  at 1015, this naturally includes profits from the exploitation of such copyrights in

18  foreign territories because an accounting between copyright co-owners is governed

19  by state law principles governing tenants-in-common, and is not subject to the

20  copyright law's "extraterritoriality" proscription.

21  **V.    PLAINTIFFS ARE ENTITLED TO PROFITS EARNED ABROAD**

22      **FROM THE EXPLOITATION OF THE RECAPTURED SUPERBOY**

23      **COPYRIGHTS**

24      As Defendants themselves concede, the "predicate act" doctrine is the "basis in

25  law" for Plaintiffs to recover profits earned abroad from the exploitation of the

26  recaptured Superboy copyrights. (Mot. at 24:9). Indeed, Defendants cite *Los Angeles*

27  *News Service v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991-92 (9th

28  1998)(*Reuters III*), in which the Ninth Circuit adopted the Second Circuit's rule that

22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**950**

1   profits from copyright infringement include those earned in foreign territories which

2   flow from a predicate infringing act in the United States. *Id.* at 991-92; *see also*

3   *Allarcom Pay Television Ltd. v. General Instrument Corp.*, 69 F.3d 381, 387 (9th Cir.

4   1995) (for the Copyright Act to apply to foreign profits, "at least one alleged

5   infringement" must be within the United States); 4-17 *Nimmer* § 17.02; 3 *Nimmer* §

6   11.02[B][2] (copyright holders acquire an equitable interest in infringing works

7   produced in the United States as soon as works are created, and "the work is

8   thereafter impressed with a constructive trust so that plaintiff is entitled to profits

9   accruing from the exploitation of the work anywhere in the world"); *Update Art, Inc.*

10  *v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 72-73 (2d Cir. 1988) (permitting recovery of

11  copyright damages accruing abroad from illegal copying in the United States);

12  *Famous Music Corp. v. Seeco Records, Inc.*, 201 F. Supp. 560, 568-69 (S.D.N.Y.

13  1961) (same).

14      Defendants completely mis-cite and misconstrue *Reuters III* as holding that for

15  liability to attach, there must be "an infringing act overseas"(Mot. at 24:16). As set

16  forth above, this is *not* the law, and *Reuters III* nowhere states this. *Los Angeles News*

17  *Service, supra*, 149 F.3d 987. As the Ninth Circuit reiterated in *Los Angeles News*

18  *Service v. Reuters Television Int'l Ltd.*, 340 F.3d 926, 931 (9th 2003), *cert. denied* 541

19  U.S. 1041 (2004) (*Reuters IV*):

20      "Relying on *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52
        (2d Cir.1939), *aff'd*, 309 U.S. 390, 84 L. Ed. 825, 60 S. Ct. 681 (1940),
21      which held that profits from overseas infringement can be recovered on
        the theory that the infringer holds them in a constructive trust for the
22      copyright owner, [in *Reuters III*] we reversed the grant of summary
        judgment. We held that [plaintiff was] *entitled to recover damages*
23      *flowing from exploitation abroad of the **domestic acts of infringement**
        committed by defendants*."[6] (Emphasis added).

24

25      Similarly misguided is Defendants' reliance on *Subafilms, Ltd. v. MGM-Pathe*

26  *Communications Co.*, 24 F.3d 1088 (9th Cir. 1994), which is no more than an attempt

27  _____

28  [6] The court clarified the term "damages" to mean profits, stating that the language in *Reuters III*
    must be interpreted in the context of *Sheldon, supra*, where the recovery of profits was at issue. *Id.*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**951**

1   to fit a square peg in a round hole. The *Reuters III* court itself distinguished

2   *Subafilms* as "inapplicable" as it "concerned liability based solely on the

3   authorization of infringing acts" 149 F.3d at 992 (emphasis added).

4       In contrast, here, as in the *Reuters* cases, "The issue before us – which the

5   *Subafilms* court did not resolve – is whether [Plaintiff] 'may recover damages for

6   international distribution of the [works] based on the theory that an act of direct

7   infringement, in the form of a reproduction of the [works], took place in the United

8   States.'" *Id.* at 991, *quoting Subafilms*, 24 F.3d at 1099. The *Reuters* Court adopted

9   the Second Circuit's "predicate act" rule, holding: "plaintiff could recover the profits

10  from exhibiting a motion picture abroad where the infringing copy had been made in

11  the United States." *Id.*

12      Defendants fail to refute Plaintiffs' declaratory relief claim in the Superboy

13  Action, based on well settled Ninth Circuit law, that Plaintiffs are entitled to profits

14  earned by Defendants abroad which flow from their domestic acts of infringement of

15  the recaptured "Superboy" copyrights.   Accordingly, Plaintiffs respectfully request

16  that Defendants' motion should be denied and Plaintiffs' motion for partial summary

17  judgment should be granted on this claim; and that the Court issue an Order that, to

18  the extent Defendants are found to have infringed Plaintiffs' recaptured "Superboy"

19  copyrights in the United States, Plaintiffs are entitled to Defendants' profits abroad

20  which flow from such domestic acts of infringement.

21  **VI.**  **DEFENDANTS MUST ACCOUNT TO PLAINTIFFS FOR PROFITS**

22         **FROM THE EXPLOITATION OF ANY MIXED USES OF**

23         **COPYRIGHT AND TRADEMARK**

24      Defendants erroneously argue that because a termination under Section 304(c)

25  "in no way effects rights under any other Federal [or] State...laws," 17 U.S.C.

26  304(c)(6)(E), that Plaintiffs cannot "recover a share of Defendants' profits

27  attributable to DC's continuing use of the Superman trademarks" (Mot. at 26).

28      Under the Copyright Act, the words and symbols which first appeared in Siegel

24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**952**

1   and Shuster's original Superman story published in Action Comics No. 1 (e.g., the
2   moniker "Superman," and the rendering of the hero in blue tights with an triangulated
3   "S" crest on his chest) form part of the copyrighted matter that Plaintiffs recaptured
4   upon exercising their Section 304(c) termination right.  Therefore any mixed use of
5   copyright and trademark (e.g., a Superman action figure) featuring words, symbols
6   or images from or derivative of the copyright to the original Superman story in
7   Action Comics No. 1, is thus subject to an accounting between Defendants and
8   Plaintiffs as joint owners of the copyright therein.  *See Oddo v. Reis,* 743 F.2d 630,
9   632-633 (9th Cir. 1984) (copyright co-owners have a duty account for profits); 1
10  *Nimmer* §§ 6.03, 6.10 (2006).
11      As the Supreme Court held in *Dastar Corp. v. Twentieth Century Fox Film*
12  *Corp.*, 539 U.S. 23, 33-34, 123 S. Ct. 2041 (2003), trademark is necessarily
13  subsidiary to copyright where copyright legislation exists because the Lanham Act
14  should not be read to conflict with copyright law:

15      "The problem with this argument according special treatment to
        communicative products is that it causes the Lanham Act to conflict with the
16      law of copyright, which addresses that subject specifically...Thus, in
        construing the Lanham Act, we have been 'careful to caution against misuse
17      or over-extension' of trademark and related protections into areas
        traditionally occupied by patent or copyright."
18

19  *Id.* at 33-34, *quoting Traffix Devices v. Mktg. Displays,* 532 U.S. 23, 29, 164 121 S Ct
20  1255 (2001).  *See Sony Corp. of Amer. v. Universal City Stud. Inc.*, 464 U.S. 417, 439
21  & n.19, 104 S. Ct. 774 (1984), *citing Mazer v. Stein*, 347 U.S. 201, 217-218, 74 S. Ct.
22  460 (1954); *Bobbs-Merrill Co. v. Straus*, 210 U.S., 339, 345, 28 S. Ct. 722 (1908).
23      In *Ets-Hokin v. Skyy Spirits*, 225 F.3d 1068, 1080 (9th Cir. 2000), the Ninth
24  Circuit refused to extend trademark to areas "peculiar to the copyright law" as
25  "[f]ollowing such a path would be contrary to the Copyright Act and would disrupt
26  divisions basic to intellectual property law." *Id.*, *citing Sony Corp. of America*, 464
27  U.S. at 439 & n.19; see also *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90,
28  97-98, 39 S. Ct. 48 (1918).

25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**953**

1    The Copyright Act's termination of transfer provisions provide for an author or

2    an author's statutory heirs to reclaim a copyright, *along with any rights under that*

3    *copyright*. *See* 17 U.S.C. §§ 203, 304.  Nothing in the Act suggests that a recaptured

4    copyright would be rendered less potent or valuable if aspects of a copyrighted work

5    had come to be used as trademarks.  Indeed, such a notion is antithetical to the strong

6    legislative policies behind the termination right; namely, to give an author who had

7    underestimated the value of his creation at the outset an opportunity to reap the

8    benefits of its eventual success.

9    The termination right thus corrects the unfair imbalance inherent in an author's

10    weaker bargaining position.  As the Supreme Court explained: "the concept of a

11    termination right itself, obviously intended to make the rewards for the creativity of

12    authors more substantial.  More particularly, the termination right was expressly

13    intended to relieve authors of the consequences of ill-advised and unremunerative

14    grants that had been made before the author had a fair opportunity to appreciate the

15    true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73;

16    105 S. Ct. 638 (1985); *see* H.R. Rep. No. 94-1476, at 124 (1976)("[a] provision of

17    this sort is needed because of the unequal bargaining position of authors, resulting in

18    part from the impossibility of determining a work's value until it has been exploited").

19    This action concerns Plaintiffs' recaptured joint copyright interest in the

20    original "Superman" copyrights under Copyright Act and rights which flow from

21    such co-ownership.  It does not concern the scope or validity of Defendants' alleged

22    trademark interests. Defendants improperly seek to use alleged trademarks [7] to curtail

23    or circumvent the benefits of a copyright, which the law does not countenance.

24    *Dastar*, 539 U.S. at 33-34.

25

26    [7] Defendants present as a undisputed fact that *all* of its alleged "Superman" trademarks or trade
dress have acquired the requisite "secondary meaning" to be afforded protection under the Lanham

27    Act, however, this itself presents classic issues of fact inappropriate to summary judgment, and
which, in any event, would need to be determined on a case by case basis. *See Meeker v. Meeker,*

28    2004 U.S. Dist. LEXIS 22708, *9 (N.D. Cal. July 6, 2004)(Trial courts disfavor deciding trademark
cases in summary judgment because the ultimate issue is so inherently factual).

26

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 21
954

To the extent a given exploitation by Defendants of an alleged "Superman" trademark includes a use of content (text or illustration) protected under Plaintiffs' recaptured "Superman" copyrights, Defendants are required to account to Plaintiffs. *Oddo v. Reis,* 743 F.2d 630, 632-633. Whether any given exploitation entails a use or mixed use of Plaintiffs' copyright interests must be decided on a case-by-case basis and clearly presents genuine issues of material fact precluding summary judgment.

## VII.   DEFENDANTS HAVE A DUTY TO ACCOUNT FOR PROFITS FROM PRE-TERMINATION DERIVATIVE WORKS THAT CONTAIN NEW POST-TERMINATION MATERIAL

Section 304(c) of the Copyright Act contains an exception that specifically circumscribes a grantee's continuing right to "utilize" a derivative work post-termination: "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, *but this privilege does not extend to the preparation after the termination of other derivative works based on the copyrighted work covered by the terminated grant.*" 17 U.S.C. §§ 203(b)(1),304(c)(6)(A) (emphasis added); *see Mills Music, Inc. v. Snyder,* 469 U.S. 153, 174 n. 42 ("any remake rights covered by the contract would be cut off"), *citing* H. R. Rep. No. 94-1476, at 127.

Pursuant to Section 304(c) of the Copyright Act Plaintiffs are therefore entitled to receive profits from derivative works prepared after the effective termination dates, including derivative works modifying, transforming, adapting or recasting pre-termination "Superman" and "Superboy" derivative works. *See* 1-3 *Nimmer* § 3.01.

Section 103(a) of the Copyright Act provides that the subject matter of copyright as specified by Section 102 includes derivative works. The Copyright Act defines a derivative work as follows:

> "A work based upon one or more pre-existing works, such as a translation, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'"

27

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**955**

17 U.S.C. § 101.

The level of variation required to constitute a new derivative work under the Copyright Act is minimal: "all that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial variation'..." *Entertainment Research Group Inc. v. Genesis Creative Group Inc.*, 122 F.3d 1211 (9th Cir. 1997) *quoting Sid & Marty Krofft Television Products, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 n.5 (9th Cir. 1981).

Any "distinguishable variation" of a prior work will constitute a new derivative work, including translations, re-edited motion picture versions, reproductions, abridgments, condensations, and other recasting, transformation or adaptation. 1-3 *Nimmer* § 3.01 ("In general, the applicable standard in determining the necessary *quantum* of originality is that of a 'distinguishable variation' that is more than 'merely trivial.'"). *See Nimmer* § 11.02 (a re-edited film negative, for example, would be excluded from the Section 304(c)'s derivative works exception). *See e.g., Jarvis v. K2 Inc.*, 2007 U.S. App. LEXIS 9909 (9th Cir. 2007) (finding collage ads were derivative rather than collective works where plaintiff's original images were edited into different though still recognizable form); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988) (original art prints encased in a black plastic border resulted in a new derivative work); *Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416, 1428 (C.D. Cal. 1997)(holding as a matter of law that "pan and scan" changes to a motion picture constitute a new derivative work); *Greenberg v. National Geographic Society*, 244 F.3d 1267, 1274 (11th Cir. 2001) (photograph repositioned from a horizontal to vertical representation of a diver constituted a new derivative work); *Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1013-14 (7th Cir. 1983), *cert. denied*, 464 U.S. 823 (1983) (speeded-up version of the same video games qualified as new derivative work); *Roy Export Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v. Columbia Broadcasting System, Inc.*, 503 F. Supp. 1137, 1149 (S.D.N.Y. 1980)(a new derivative work created by compiling multiple

28

**EXHIBIT 21**
**956**

1  scenes from prior Charlie Chaplin movies).

2      Accordingly, as a matter of law, Plaintiffs are entitled to receive an accounting

3  for any "Superman" and "Superboy" pre-termination derivative works modified or

4  recast post-termination for exploitation by Defendants.

5      To the extent Defendants invoke the "derivative works exception" in failing to

6  account to Plaintiffs, the burden of proof is on them as the party claiming a statutory

7  exception. *See Woods v. Bourne Co.,* 60 F.3d 978, 993 (2d Cir. 1995) (burden of

8  proving application of Section 304(c)'s "derivative works exception" falls on the

9  assignee, pursuant to the general rule that the burden falls on a party claiming rights

10 under a statutory exception); *see also* 3-11 *Nimmer* § 11.02 (2006).

11     This determination will necessarily have to be made on a case by case basis to

12 ensure that Plaintiffs receive a proper accounting for profits earned by their

13 recaptured "Superman" copyright interests. The adjudication of whether a post-

14 termination "distinguishable variation" of a pre-termination derivative work

15 constitutes a new post-termination derivative work under 17 U.S.C. § 102 and §

16 304(c) clearly involves *genuine issues of material fact. See Jarvis,* 2007 U.S. App.

17 LEXIS 9909 at *12 ("the question of whether the [work is] derivative ...is a mixed

18 question of law and fact"). As such, such a case by case determination is *not*

19 conducive to a blanket ruling on summary judgment.

## VIII. THE STATE LAW ISSUE OF WHETHER AN ACCOUNTING
### SHOULD INCLUDE WARNER'S PROFITS PRESENTS GENUINE
### ISSUES OF MATERIAL FACT BARRING SUMMARY JUDGMENT

23     Defendants' Motion focuses solely on refuting the applicability of the "alter

24 ego" doctrine (Mot. at 90-96). However, Plaintiffs' claim that it is entitled to an

25 accounting of Warner's profits earned from the subject "Superman" copyrights is not

26 grounded in or limited to this doctrine. DC and Warner are close corporate siblings

27 owned by the same parent company and vertically integrated in their exploitation of

28 content. (Mot. at 78-79). DC assigned to Warner *all* of DC's "Superman" *motion*

29

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**957**

1   *picture and television copyrights* exclusively and in perpetuity, and Warner's

2   consumer products division handles DC's merchandising.  Toberoff Decl., Exs. E-G.

3   As such, Warner has stepped exclusively into DC's shoes with respect to such motion

4   picture and television copyrights.  In addition, state law equitable principles of unjust

5   enrichment and constructive trust which govern an accounting by joint owners will,

6   in appropriate circumstances, impress a constructive trust upon intra-corporate profits

7   to avoid the unfair diminution through self-dealing of a co-owner's profit share.

8   Plaintiffs' claim that it is entitled to an accounting and constructive trust regarding

9   upstream profits at the point received by Warner presents a close question of material

10  fact barring summary judgment on this critical issue.

11      **A.  Defendants Fail To Meet Their Burden Of Presenting Evidence To**

12          **Show The Absence Of A Genuine Issue Of Fact**

13      Defendants' contention that Plaintiffs are not entitled to reach the "Superman"

14  profits of Defendants Warner or Time Warner because these entities are purportedly

15  "mere licensees" of the wholly owned subsidiary, DC, fails for several reasons.

16  Firstly, Defendants, as the moving parties, bear the burden of presenting evidence

17  that demonstrates the absence of a genuine issue of material fact for trial.  *Liberty*

18  *Lobby*, 477 U.S. at 256.  Defendants have presented wholly inadmissible evidence

19  regarding the "facts" supporting their claims.

20      The only evidence submitted to prove the corporate history and structure of

21  Defendants and their intra-corporate contractual relations are the declarations of

22  Defendants' employees Paul Levitz, Janice Cannon and Julie Spencer.  As further

23  discussed in Plaintiffs' accompanying evidentiary objections, the statements of these

24  executives' are admittedly not based on personal knowledge, offer inadmissible lay

25  opinions, impermissible legal conclusions and are steeped in hearsay.  Most

26  alarmingly, not a single piece of supporting documentation has been provided to

27  support their various statements.

28      Fed. R. Civ. Proc. 56(e) demands that "[s]upporting and opposing affidavits

30

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**958**

1  shall be made on personal knowledge, shall set forth such facts as would be
2  admissible in evidence, and shall show affirmatively that the affiant is competent to
3  testify to the matters stated therein." *Negus v. Abbott Critical Care*, 1994 U.S. Dist.
4  LEXIS 21311, *8 (N.D. Cal 1994)("To be considered in a summary judgment
5  motion, a declaration must be admissible evidence."); *Sarno v. Douglas Elliman-*
6  *Gibbons & Ives, Inc.*, 183 F3d 155, 160 (2d. Cir. 1999)(a "hearsay assertion that
7  would not be admissible if testified to at trial is not competent material for a Rule 56
8  affidavit"); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550-51
9  (9th Cir. 1990). Statements "that are not within the personal knowledge of the
10  declarant are inadmissible." *Negus v. Abbott Critical Care*, 1994 U.S. Dist. LEXIS
11  21311, *8 (N.D. Cal 1994).

12      Declarations may not be made on "information and belief;" nor may they
13  include conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d
14  1040, 1045 n.3 (9th Cir. 1989); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th
15  Cir. 1995)(declarations on "information and belief" entitled to "no weight" where
16  declarant lacks personal knowledge); *Yang Ming Marine Transp. Corp. v.*
17  *Oceanbridge Shipping Int'l, Inc.*, 48 F. Supp. 2d 1032, 1039 (C.D. Cal. 1999)("*On a*
18  *motion for summary judgment, admissible declarations or affidavits must be based on*
19  *personal knowledge*, must set forth facts that would be admissible evidence at trial,
20  and must show that the declarant or affiant is competent to testify as to the facts at
21  issue. *Declarations on 'information and belief' are inappropriate to demonstrate a*
22  *genuine issue of fact*." (internal citations omitted, emphasis added)).

23      Defendants cannot remedy this fatal deficiency by presenting new evidence in
24  a reply. 4-29 *MB Practice Guide: Fed Pretrial Civ Proc in CA* § 29.24 ("reply brief
25  or memorandum should not contain new issues, evidence, or argument that the
26  movant could have raised in its moving papers."); *see also Provenz v. Miller*, 102
27  F.3d 1478, 1483 (9th Cir. 1996)(The court should not consider new evidence
28  presented in a reply without giving the non-movant an opportunity to respond.).

31

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**959**

Defendants' have not met their burden to present admissible evidence of their factual claims regarding DC's corporate structure and licensing relationship with Warner and Time Warner. Paul Levitz, President and Publisher of DC ("Levitz") admits in paragraph 1 of his declaration that it is, in good part, based on "information and belief." In paragraph 3 he further admits "[b]ecause this history and the parties' relationship reach back almost 70 years, some of the facts stated in this Declaration are necessarily on information and belief and/or based on the records and files of DC and its predecessors." Levitz also testifies in paragraph 12 about the early history of DC's purported predecessors-in-interest. This is improper. *Flintkote Co. v. Gen. Accident Assur. Co. of Can.*, 410 F. Supp. 2d 875, 884 (N.D. Cal. 2006)("Defendants are correct that Mr. Bay may not testify about events as to which he lacks personal knowledge. Fed. R. Evid. 602. The portions of the Bay declarations that cover the general history of [company] prior to Mr. Bay's arrival at the company are therefore inadamissible"). Levitz, in paragraph 13, discusses the purported present structure of DC without offering any competent documentary evidence to support his assertions.

Instead of providing documentation to support the claim that "today the partners of DC are EC and WCI, each holding a one-half interest," Levitz provides a "chart" with no indication of how, why, when or by whom it was prepared. Finally, in paragraphs 15 and 16, Levitz offers impermissible legal conclusions about the purpose and effect of various agreements between DC and its corporate parents, again without attaching the operative documents. Fed. R. Evid. 701.

Janice Cannon, Director of Legal Affairs for Time Warner Inc. too admits her declaration is based, in part, on "information and belief." *See* paragraph 1. She also readily admits she is only "generally familiar" with the information she presents in her declaration. *See* paragraph 2. Not only does she discuss matters about which she admittedly has no personal knowledge, but she also fails to attach any documentation to support her claims, particularly the "facts" essential to establish that Warner is a mere licensee of DC.

32

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**960**

1   The declaration of Julie F. Spencer, Warner's Director, Corporate Legal,

2   suffers the same admissibility problems.  Again, another executive of Defendants is

3   making assertions based on "information and belief."  *See* Paragraph 1.  Ms. Spencer

4   never states how long she has worked for the company, so there is no credible

5   indication she was present or even employed during the transactions about which she

6   speaks in paragraph 2 of her declaration.  Again, no supporting documentation is

7   provided.

8   Defendants' entire motion on this issue is based on these three defective

9   declarations.  For failing to support their motion with competent, admissible

10   testamentary and documentary evidence, Defendants' motion on this issue must be

11   denied.  *Liberty Lobby*, 477 U.S. at 256.

12   **B.   Warner Has "Stepped Into DC's Shoes" Exclusively With Respect**

13   **To "Superman" Motion Picture And Television Copyrights**

14   Warner entered into a "'Superman' Option Purchase Agreement" dated as of

15   November 6, 1999 with DC ("November 6, 1999 Agreement"), which gave Warner

16   an "exclusive and irrevocable option to *purchase* all rights in the ["Superman"]

17   Property as set forth in Paragraph 5 thereof."  Toberoff Decl., Ex. E, at 1.

18   Exhibit "A" defines the "Property" very broadly as:

19   "*All material tangible and intangible detailing the stories and*
    *adventures of the comic book character known as 'Superman*'" as

20   depicted in publications and television series, "together with associated
    characters which have appeared (or will appear) together with

21   'Superman' and all now and hereafter existing rights of every kind and
    character whatsoever therein, *and the complete, unconditional and*

22   *unencumbered title therein for all purposes...*"

23   Paragraph 5 of the agreement, entitled "Grant of Rights," states:

24   "If the option is exercised, *Warner shall own,* and subject only to such
    exercise DC assigns and sells to Warner, *exclusively, in perpetuity and*

25   *throughout the universe, all rights, title and interest in the Property*
    except for the Reserved Rights set forth in Paragraph 6 hereof (the

26   "Rights").  Without limiting the generality of the foregoing, the Rights
    herein granted include: ...

27

28   (a)   Audiovisual Works:  *The right to produce audiovisual works of*
    *all types now known or hereafter devised...*and all other derivative
    works based thereon, intended for exploitation in any medium now know

33

or hereafter devised…"

    (b)   Copyrights/Exploitation Rights: With respect to works produced pursuant to the rights granted in Paragraph 5(a) hereof, *all copyrights*, neighboring rights and any *and all other ownership and exploitation rights in the Property now or hereafter recognized in any and all territories and jurisdictions…"*

*Id.* at 2-3. Paragraph 6 reserves to DC certain rights including television rights, however DC is forbidden to exploit television rights in the Property with any entity other than an "affiliate of Warner" (in 2002 DC assigned exclusive television rights to WBTV as set forth below), and merchandising rights in the Property, provided that DC must split 50/50 with Warner, all merchandising proceeds relating to "additional elements" from any Warner audiovisual work based on the Property. *Id.* at 5.

    Paragraph 14 of the agreement states that "Warner shall have the right to assign any and all rights under this Agreement to any person…" *Id.* at 14.

    The initial fee for the exclusive option to purchase is $1.5 million for a 3 year term, and is thereafter extendable *for thirty-three years* (the remaining life of the original "Superman" copyright at that time) by the payment of $500,000 per year escalating by 20% in the 14th year and again in the 24th year. *Id.* at 1-2.

    The option to purchase may be exercised merely "by giving DC written notice of its commencement of principal photography of a feature-length motion picture based on the Property." *Id.* at 2. No purchase price is payable to DC, and if the option is exercised the yearly option payments cease. *Id.* If Warner produces "a feature-length motion picture based on the Property" DC is to receive contingent compensation equal to the greater of 5% of Warner's defined receipts worldwide or 7.5% of defined receipts in the U.S. *Id.* at 2. However, there are no payments to DC for other "Superman" audiovisual works produced by Warner, as broadly defined in the agreement. *See Id.*, ¶ 5.

    Warner exercised its option to purchase the Rights in connection with

34

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**962**

1  its 2005 feature film, "Superman Returns." *Id.* at 2.

2      Warner's television division, WBTV, similarly entered in an agreement

3  dated December 5, 2000 with DC ("December 5, 2000 Agreement"), which

4  granted WBTV "an exclusive and irrevocable option...*to acquire* from [DC]

5  those rights set forth ...in Exhibit "A"...in and to the Character" as set forth in

6  Exhibit "A." Toberoff Decl., Ex. F, at 1 (emphasis added). Exhibit "A" is an

7  assignment wherein:

8        "Detective Comics...(referred to herein as "*Assignor*") does hereby
      *assign, grant, bargain, sell, transfer,* convey, and set over...forever, to

9        Warner Bros. Television Production...("*Assignee*") *the exclusive
      worldwide television production rights*...accruing in and to all literary

10        material described as follows: *All material tangible and intangible
      detailing the stories and adventures of the comic book character*

11        *known as 'Clark Kent' or 'Superman'*" as depicted in publications and
      television series "together with associated characters which have

12        appeared (or will appear) together with 'Clark Kent' or 'Superman' and
      all now and hereafter existing rights of every kind and character

13        whatsoever therein, *and the complete, unconditional and
      unencumbered title therein for all purposes*..."

14  

15  *Id.* at 6 (emphasis added). In Paragraph 4 of the assignment, the assignor DC

16  reserves certain rights including theatrical film rights (assigned to Warner) and

17  merchandising rights (subject to the same split of proceeds as in the November 6,

18  1999 Agreement). *Id.* at 7-9.

19      The option fee is a mere $10,000 for one year, extendable for an additional

20  year for the same sum. *Id.* at 1. The option to purchase may be exercised by written

21  notice; no purchase price is payable to DC. *Id.* at 2. If an "episodic television series"

22  is produced DC is to receive $45,000 per episode, which is treated as an advance

23  against contingent compensation of 3% of defined receipts, escalating to 5%. Id., ¶¶

24  6-7 at 2. However, there is no money payable to DC for WBTV's production of other

25  forms of live action television programming based on the assigned rights (*e.g.*, a

26  "Superman" television "special" or "movie-of-the-week").

27      This option was exercised and a "*Short Form Assignment*" to WBTV was

28  executed on February 12, 2001 by DC, in which DC "irrevocably sells, grants and

35

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**963**

1 assigns" to WBTV "in perpetuity and throughout the universe, *all exclusive*

2 *television rights* in and to the literary work in the form of a comic book (the

3 "Property") described hereafter, including without limitation, all allied, ancillary and

4 incidental rights…: Title: 'Superman' Author: Jerry Siegel and Joe Shuster

5 …*including all …copyrights therein*…" Toberoff Decl., Ex. G. It further states:

6 "Owner hereby acknowledges that Purchaser may freely assign this assignment or

7 any of Purchaser's rights hereunder." *Id*.

8     The November 6, 1999 Agreement and December 5, 2000 Agreement are

9 clearly *exclusive assignments* by DC to Warner of the core motion picture (plus other

10 audiovisual) and television copyrights to "Superman" and its related mythology, a

11 world renowned, extremely valuable one-of-a-kind property.

12     Section 201(d)(2) of the Copyright Act provides:

13     Any of the exclusive rights comprised in a copyright, including any
    subdivision of any of the rights specified in section 106, may be

14     transferred … and owned separately. The owner of any particular
    exclusive right is entitled, to the extent of that right, to all of the

15     protection and remedies accorded to the copyright owner by this title.

16     This is an "explicit statutory recognition of the principle of divisibility of

17 copyright." 3-10 *Nimmer* § 10.02. Under Section 201(d)(2) WB owns the exclusive

18 "Superman" motion picture and television copyrights or rights under copyright, and

19 the express language of the above agreements confirm this. Toberoff Decl. Ex. E, ¶

20 5(b) at 3; Ex. G, "Short Form Assignment." Indivisibility is abolished with respect

21 to exclusive licensees or assignees, which are regarded as the copyright owners of the

22 rights that they have been licensed or assigned. 3-10 *Nimmer* § 10.02.

23     Because Warner has exclusively stepped into DC's shoes with respect to DC's

24 "Superman" motion pictures and television copyrights, Warner must account to

25 Plaintiffs for profits earned by the "Superman" copyrights, jointly owned by

26 Plaintiffs. As noted by *Nimmer*, "one joint owner may transfer his own interest in a

27 joint work without such transfer being consented to or joined in by the other joint

28 owners. In such circumstances the transferor ceases to be a joint owner, and the

36

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**964**

1  transferee, stepping into his transferor's shoes, becomes a joint owner. It follows,

2  then, that the obligation of a joint owner to account for profits from use and from

3  licensing obtains as to a transferee." 1-6 *Nimmer* § 6.12; *see Middlecoff v. Cronise*,

4  155 Cal. 185, 189 (1909)("one cotenant cannot by a conveyance of his interest in a

5  portion of the property held in common, etc., prejudice the rights of his cotenants.

6  The grantee or successor of such a cotenant simply steps into the shoes of his grantor,

7  subject to all the rights of the other cotenants and their successors").

8      Defendants may claim that the above does not apply as DC has not assigned its

9  entire joint ownership interest. *See* 1-6 *Nimmer* § 6.12. However, because each of

10  the exclusive rights comprising a copyright constitutes a divisible copyright interest

11  under 17 U.S.C. § 201(d)(2), *supra*, there is no logical or legal distinction between

12  Warner stepping into DC's shoes *exclusively* with respect to DC's entire joint

13  copyright interest or stepping into DC's shoes *exclusively* with respect to DC's entire

14  joint motion picture and television copyright interests.

15  **C.    State Law Equitable Principles Of Unjust Enrichment And**

16  **Constructive Trust Entitle Plaintiffs To An Accounting**

17      Defendants admit "that as between co-owners of a copyright, 'the duty to

18  account does not derive from the copyright law's proscription of infringement.

19  Rather it comes from 'equitable doctrines relating to unjust enrichment and general

20  principles of laws governing the rights of co-owners.'"" Mot., at 25:18-22, *quoting*

21  *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984), *and citing Zuill*, 80 F.3d at 1369.

22  Defendants thus acknowledge that claims by a copyright co-owner for an accounting

23  are not governed by copyright law, but by state common law property principles such

24  as "tenancy in common." 743 F.2d 630, 633 (9th Cir. 1984). *See Community for*

25  *Creative Non-Violence,* 846 F.2d 1485, 1498 (D.C. Cir. 1988) ("Joint authors co-

26  owning copyright in a work are deemed to be tenants in common, with each having

27  an independent right to use or license the copyright, subject only to a duty to account

28  to the other co-owner for any profits owned thereby.") (internal quotations omitted),

37

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**965**

1     *aff'd on other grounds*, 490 U.S. 730 (1989).

2        Equitable principles of constructive trust and unjust enrichment are regularly

3     applied to the relationship amongst copyright tenants in common. *See Picture Music,*

4     *Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 646-647 (S.D.N.Y. 1970)(holding, as

5     between co-owners of copyrights in musical compositions "compensation obtained

6     from the unilateral exploitation of the joint work by one of the co-owners without the

7     permission of the others is held in a 'constructive trust' for the mutual benefit of all

8     co-owners and there is a duty to account therefore"(citations omitted.)); *see also*

9     *Elbert, Ltd., v. Federated etc. Properties*, 120 Cal.App.2d 194, 200 (1953).

10        Under California's common law equitable principles, a "constructive trust may

11     be imposed in practically any case where there is a wrongful acquisition or detention

12     of property to which another is entitled." *Weis v. Marcus*, 51 Cal App.3d 590, 600

13     (1975). Fraud or intentional misrepresentation is <u>not</u> required for the imposition of a

14     constructive trust to prevent unjust enrichment and for other equitable purposes.

15     *Calistoga Civic Club v. City of Calistoga*, 143 Cal.App.3d 111, 116 (1983).

16        A constructive trust upon profits entitles the plaintiff *to trace* the fund to its

17     ultimate product or profit. *Brodie v. Barnes*, 56 Cal. App.2d 315, 321-323 (1942);

18     *see also Haskel Engineering & Supply Co. v. Hartford Acc. & Indem. Co.*, 78 Cal

19     App.3d 371, 375 (1978). *See Great-West Life & Annuity Ins. Co. v. Knudson,* 534

20     U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635, (2002)(in an accounting for profits a

21     plaintiff is entitled to a constructive trust on particular property held by the defendant

22     and "he may also recover profits produced by the defendant's use of that property");

23     *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996)("Under the law of restitution, an

24     individual may be required to make restitution if he is unjustly enriched at the

25     expense of another. A person is enriched if he receives a benefit at another's

26     expense.").

27        As co-owners of the copyright to the Original Superman Story and other

28     "Superman" copyrights, Plaintiffs are entitled to an accounting of their equal share of

38

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**966**

1   the profits earned by such copyrights, as of the April 16, 1999 Termination Date.

2      Yet, Defendants have failed and refused to pay Plaintiffs any such profits.

3   Plaintiffs therefore request that a constructive trust be impressed on such intellectual

4   property, encompassing Warner's profits, to avoid the unfair diminution through

5   vertical self-dealing of Plaintiffs' co-ownership profit share. This is necessary to

6   counteract the inequity – the diminution of DC's profits – resulting from the vertical

7   integration of sister content companies, DC and Warner, within the Time-Warner

8   family.

9      A co-owner of copyright is generally not entitled to the profits of a mere third

10  party licensee of the other co-owner. *Ashton-Tate v. Ross*, 916 F.2d 516, 522-23 (9th

11  Cir. 1990). However, *none of the cases* cited by Defendants or standing for this

12  proposition concerns exclusive intra-corporate transactions and their potential for

13  self-dealing like those presented in the Superman Action. If the "licensee rule" were

14  blindly applied to intra-corporate deals in a vertically integrated company, it would

15  allow large corporations to shift money away from copyright co-owners, at will,

16  while the true profits earned by the co-owned copyright flows steadily into the same

17  corporate pocket. *See* Mot. at 79 ("[F]or financial reporting purposes, both

18  [Defendants] DC and WBEI [Warner] fall within the "filmed entertainment" group of

19  TWI companies…and for operating management purposes, DC reports to its ultimate

20  corporate parent through WBEI. Accordingly DC's President and Publisher reports to

21  and obtains approvals from WBEI's President and Chief Operating Officer…").

22     Media conglomerates such as Time-Warner and Warner are vertically

23  integrated in the first place to *maximize* profits from content. *See* David Waterman,

24  *Viacom-CBS Merger: CBS-Viacom and the Effects of Media Mergers: An Economic*

25  *Perspective*, 52 Fed. Comm. L.J. 531, 538 (May 2000). Warner, in considering the

26  various businesses in its exploitation chain, may have legitimate or illegitimate

27  strategic reasons for licensing rights at below-market rates from one sub-entity to

28  another. As several commentators have suggested, media conglomerates may

1    deliberately undervalue the license fee in order to avoid paying revenue to profit

2    participants. *See, e.g.*, Stanton L. Stein & Marcia J. Harris, *Vertically Challenged*,

3    Los Angeles Lawyer, May 2003 at 30.

4           Whatever the motivation, Plaintiffs are likely to receive *less profits* from their

5    co-owned "Superman" copyright in an internal vertically integrated transaction

6    between DC and Warner.  With respect to "licensing" motion picture and television

7    rights to DC's content, DC must account to a host of third parties (*e.g.*, writers and

8    illustrators) involved in the creation of such content.  As such it is in Warner's *and*

9    DC's interest, as in the case with their "Superman" transactions, to circumscribe the

10   profits payable to DC, while maximizing Warner's profits and ultimately Time

11   Warner's profits to which they both financially report.  Warner increases its profits

12   (and Time-Warner's bottom line) while the profits which must be shared with

13   Plaintiffs, and other profit participants are reduced.  Although vertically integrated

14   companies, such as Defendants may assert business reasons for vertical transactions,

15   the practical significance cannot be reasonably disputed – reduced profits to Plaintiffs

16   and increased profits to Defendants from co-owned "Superman" copyrights.

17          A true third party licensee, subject to open market forces and arm's length

18   negotiations is surely distinct from such a vertically integrated transaction.[8]  The

19   cases cited by Defendants all involve true third party licensees, not arrangements

20   between vertically integrated intra-corporate siblings.  The prohibition on copyright

21   co-owners reaching licensees' profits makes sense if the third party is truly

22   independent.  However these concerns are not present with an intra-corporate

23   transaction.  Warner, the purported "licensee," is not an independent entity bargaining

24   on the open market requiring protection by the "licensee rule;" from an economic

---

[8]  A host of high profile cases have been filed in recent years against major Studios, such as Warner, by profit participants who have seen their share of profits significantly diluted by these intra-corporate licensing deals resulting from the Studios' vertical integration. *See Alan Alda v. Twentieth Century Fox Film Corp.*, L.A. Super. Ct. Case No. BC 185779 (Feb.1998); *David Duchovny v. Fox. Entertainment Group*, L.A. Super. Ct., Case No. SC 058329 (Aug. 1999); *Steven Bochco v. Twentieth Century Fox Film Corp.*, L.A. Super. Ct., Case No. BC 216801 (Sept. 1999); *Barry Levinson v. NBC Studios, Inc.*, L.A. Super. Ct., Case No. BC 226456 (Mar. 2000).

40

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 21
968

1  perspective it and DC are aligned within the same vertically integrated company.
2  Equity and common sense militate in favor of Defendants accounting to Plaintiffs, as
3  co-owner of the "Superman" copyrights, for the real profits earned by the copyrights.

4      Defendants must not be allowed to manipulate the corporate form to prevent
5  Plaintiffs from sharing in such profits. *GHK Associates v. Mayer Group, Inc.*, 224
6  Cal. App. 3d 856, (Cal. App. 2d Dist. 1990) (finding that although appellant
7  developer had subsequently transferred the property to other subsidiaries, the ultimate
8  holder of the property could be held liable as a constructive trustee to respondent).[9]
9  *See Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 111 (1969)( "Self-dealing in
10  whatever form it occurs should be handled with rough hands…And while it is often
11  difficult to discover self-dealing in mergers, consolidations, sale of all the assets or
12  dissolution and liquidation, the difficulty makes it even more imperative that the
13  search be thorough and relentless").

14      Plaintiffs should be permitted to establish at trial the causal connection
15  between Defendants' corporate relationship and Plaintiffs' losses, which is the
16  difference between what their jointly owned copyrights truly earn and the diluted
17  share they get from an accounting inequitably pegged too far down the corporate food
18  chain.  Defendants' sole reliance on the defective declarations of three of their
19  executives requires "the invaluable privilege of cross-examining the defendant[s] –
20  the 'crucial test of credibility' – in the presence of the jury rather than by
21  deposition." *Arnstein v. Porter*, 154 F.2d 464, 469-70 (2d Cir. 1946) (citations
22  omitted); *Sandberg & Sikorski Corp. v. Andin Int'l, Inc.*, 50 U.S.P.Q.2D (BNA) 1699,

---

23  [9] In many areas of the law when the court is trying to achieve substantial justice it will look to the
24  reality of the relationship between vertically integrated companies, not to mere corporate
    formalities, to achieve an equitable result. *See generally Solar Gear, Inc. v. Sunglass Hut Int'l*,
    1994 U.S. Dist. LEXIS 19711, 32 U.S.P.Q.2d 1355, 1357-58 (N.D. Cal. 1994) (finding jurisdiction
25  over both defendants, the holding company and its wholly-owned subsidiary, where the subsidiary
    represented it owned the trademark, which was the subsidiary's initials, and the holding company
26  benefited financially from the subsidiary's forum-related business); *Dainippon Screen Mfg., Co. v.
    CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998) (finding jurisdiction over parent and subsidiary
27  defendants, where the subsidiary benefited financially from the parent company's business, and the
    parent company's acts were indistinguishable from the subsidiary's act because it was licensed to
28  act on defendant company's behalf).

41

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**969**

1  *8 (SDNY 1999) ("in order to decide whether [the] defense has merit, it will be
2  necessary for the Court to hear the live (and disputed) testimony of [defendant] which
3  forms the heart of that defense"). The credibility of the Defendants with respect to
4  self-dealing should be tested in open court, rather than on summary judgment.

   **D.  Even The "Alter Ego" Doctrine On Which Defendants Solely Focus
        Involves The Application Of Equitable Principles To Facts And
        Inferences Which Cannot Be Determined On Summary Judgement**

8      Defendants' Motion focuses solely on refuting the applicability of the "alter
9  ego" doctrine (Mot. at 90-96). However, since adjudication of this issue necessarily
10 involves factual determinations and inferential evidence, resolution cannot be
11 determined in the summary judgment stage. *See Dow Jones Co. v. Avenel*, 151 Cal.
12 App. 3d 144, 148 (1984) ("the trial court here could not have determined the issue of
13 appellants' alter ego liability at the hearing on the motion for summary judgment.");
14 *Robertson v. Roy L. Morgan, Production Co.*, 411 F.2d 1041, 1043 (10th Cir.1969)
15 ("the factual basis for disregarding the corporate entity must appear in the
16 unchallenged findings of the trial court"); *Schmid v. Roehm GmbH*, 544 F. Supp. 272
17 (U.S. Dist. Kan. 1982) (disregarding the corporate entity "is a fact question which
18 should ordinarily be submitted to the jury").

19     Even though Plaintiffs do not rely on the "alter ego" doctrine, the well
20 established equitable principles underlying the "alter ego" theory are relevant here,
21 where (1) Defendants DC and Warner are part of an integrated corporate family and
22 as such have a unity of interest in the bottom line of their publicly held parent, Time-
23 Warner; and (2) Defendants' intra-corporate transactions have resulted in an inequity
24 to Plaintiffs in the form of greatly diluted profits. *See First Nat'l City Bank v. Banco
25 Para el Comercio Exterior de Cuba*, 462 U.S. 611, 629-30, 103 S. Ct. 2591, 2601
26 (1983) ("our cases have long recognized 'the broader equitable principle that the
27 doctrine of corporate entity, recognized generally and for most purposes, will not be
28 regarded when to do so would work...injustice.'"), *quoting Taylor v. Standard Gas*

42

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**970**

1   *Co.*, 306 U.S. 307, 322 (1939). *See also Bangor Punta Operations, Inc. v. Bangor &*

2   *Aroostook R. Co.*, 417 U.S. 703, 713 (1974) ("the corporate form may be disregarded

3   in the interests of justice"); *Mesler v. Bragg Management Co.*, 39 Cal. 3d 290, 300-01

4   (S. Ct. Cal. 1985); *Acme Precision Products, Inc. v. American Alloys Corporation*,

5   422 F.2d 1395 (8th Cir. 1970) (disregarding a subsidiary's separate status and treating

6   it and the parent as a single entity in order to prevent an injustice); *Osler v. Joplin*

7   *Life Insurance Co.*, 164 S.W.2d 295 (Mo. 1942) (same).

8       The California Court of Appeals described the "alter ego" doctrine as follows:

9   "[It] is an issue of whether in the particular case presented and for the purposes of

10  such case justice and equity can best be accomplished…and unfairness defeated by a

11  disregard of the distinct entity of the corporate form…The law of this state is that the

12  separate corporate entity will not be honored where to do so would be to defeat the

13  rights and equities of third persons." *Kohn v. Kohn*, 95 Cal. App. 2d 708 (1950); *see*

14  *McLoughlin v. L. Bloom Sons Co., Inc.*, 206 Cal. App. 2d 848, 854 (1962) (bypassing

15  the corporate entity for the sole purpose of avoiding an injustice).

16      As the California Supreme Court explained: "The essence of the alter ego

17  doctrine is that justice be done. 'What the formula comes down to, once shorn of

18  verbiage about control, instrumentality, agency, and corporate entity, is that liability

19  is imposed to reach an equitable result.'" *Mesler v. Bragg Management Co.*, 39 Cal.

20  3d 290, 300-01 (S.Ct. Cal.1985), *quoting* Latty, Subsidiaries and Affiliated

21  Corporations (1936), p. 191.

22  **IX.    DETECTIVE'S ADS HAVE NO EFFECT ON PLAINTIFFS'**

23        **TERMINATION UNDER THE COPYRIGHT ACT**

24      Defendants make a great fuss over "two in-house announcements" of Action

25  Comics, No. 1, arguing that "Plaintiffs are not allowed to recapture any copyright

26  grant" thereof because Plaintiffs' "Superman" termination notices did not specifically

27  list these obscure ads; and claiming that the unverified and unverifiable publication

28  dates of the magazines in which the two adds appeared excludes the ads by five and

ten days, respectively. (Mot. at 30, 37).

**A.    Defendants' Argument Is Falsely Premised On The Incorrect
Assumption That The Depiction Of The Cover Of Action Comics
No. 1 In An Announcement Results In A Competing Copyright**

Defendants' entire argument is falsely premised on the erroneous assumption that they can take the cover of Action Comics, No. 1, one of many illustrated panels in Siegel and Shuster's first "Superman" comic book story, rip it from this copyrighted *joint work*, and own a separate copyright in the illustration in the form of a mere "in house announcement" depicting a reduced image of the illustration. *See* Action Comics, No. 1, Bergman Decl., Ex. E at 19, 28; Ex. D at 14, 16 ( the "Ads").

Siegel and Shuster's "Superman" comic book story first published in June, 1938 in Action Comics, No. 1 is a classic collaborative "joint work" in which the pictures and text are deemed merged into a unitary whole. *Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 645-647 (S.D.N.Y. 1970), *aff'd*, 457 F.2d 1213 (2d Cir. 1972); *see* 1 *Nimmer* § 6.03, at 6-6; Bergman Decl., Ex. E.   A single panel of Siegel and Shuster's "Superman" story featured on the cover of Action Comics, No. 1 cannot be unilaterally plucked from this copyrighted *joint work* and copyrighted separate and apart from the unitary work it comprises.

Defendants plainly acknowledge the above in their Motion: "In the 1930's, Plaintiffs' predecessor, Siegel, along with his creative partner, artist Joseph Shuster ... *jointly* conceived of and created a comic strip that ultimately became the first Superman story." (Mot. at 5:13-15 (emphasis added)).  "Under the 1909 Act, as today, each joint author is a co-owner who possesses 'an *undivided* ownership in the entire work, including all of the contributions contained therein,'" *quoting* Nimmer, § 6.03, at 6-7 (emphasis added) and *Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978). (Mot. at 19:2-6).

Under the 1909 Act, such a joint work resulted "[w]hen two or more authors pursuing a common design together create a single work." *Picture Music*, 314 F.

44

**EXHIBIT 21**
**972**

1  Supp. at 645-647, *aff'd*, 457 F.2d 1213 (2d Cir. 1972). Intent is evident from a

2  collaborative effort to merge components into a unitary whole, as Siegel and

3  Shuster's words and pictures are merged in Action Comics, No. 1. *See Edward B.*

4  *Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944),

5  *modified*, 140F.2d 268 (2d Cir. 1944) ("it is enough that they mean their contributions

6  to be complimentary in the sense that they are to be embodied in a single work").

7  The definition of a "joint work" under the 1909 Act was adopted and restated in the

8  1976 Act, 17 U.S.C. §101: "A 'joint work' is a work prepared by two or more

9  authors with the intention that their contributions be merged into inseparable or

10  interdependent parts of a unitary whole." *See* 1 *Nimmer* § 6.03, at 6-6 (The essence

11  of joint authorship is a joint laboring in furtherance of a pre-concerted common

12  design); *see also Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990).

13  Defendants turn this well settled legal precept on its head by arguing that Detective

14  could unilaterally extract an illustrated picture from Siegel and Shuster's unitary joint

15  work, display it in a publicity ad, and thereby establish *a separate and competing*

16  copyright, given the duplication of images. *See* William F. Patry, 2 *Patry on*

17  *Copyright* § 5:123 ("There is no such thing as divisibility of the [joint] work.").

18      In addition to Defendants' legally untenable chopping-up of a joint work, their

19  "in-house announcements" advertising the forthcoming publication of this work, do

20  not serve to publish the underlying work that is advertised under the 1909 Copyright

21  Act.   Section 26 of the 1909 Act defines "the date of publication" as occurring

22  "when copies of the first authorized *edition* were placed on sale, sold, or publicly

23  distributed by the proprietor of the copyright or under his authority."  17 U.S.C. § 26

24  (repealed)(emphasis added).  Accordingly, Defendants' attempt to assert a separate

25  competing copyright in the Action Comics No. 1 cover depicted in the ads,

26  purportedly "beyond the reach of Plaintiffs' Notices," fails as a matter of law.

27  **B.      The Announcements, At Best, Are Derivative Works In Which**

28  **         Defendants Exclusively Own Only The Added Material Not The**

45

### Pre-Existing Illustration Of Superman

Detective's "in-house announcements," at best, are derivative works based on the pre-existing cover and interior panel of Siegel and Shuster's pre-existing "Superman" story. 17 U.S.C. §7 (repealed); *see* 17 U.S.C. §§106, 103(a), 101 (similarly defining a "derivative work" as "a work based upon one or more preexisting works"). As emphasized by Defendants:

> "Section 103 (b) provides that the 'copyright in a...derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.' 17 U.S.C. §103(b). As explained in the legislative history, "[t]he most important point here is one that is commonly misunderstood today[under the 1909 Act]: copyright in a 'new version' covers only the material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material. H. Rep. at 57; *accord Stewart v. Abend*, 495 U.S. 207, 224 (1990)."

(Mot. at 19:19 - 20:2).

Therefore, Defendants' purported copyright in the Ads "only extends to the new "material contributed by the author [Detective] of such work [the Ads] as extinguished from the preexisting material employed in the work [the "Superman" illustration on the cover of Action Comics, No. 1] and does not imply any exclusive right in the preexisting material [the "Superman" illustration]." 17 U.S.C.§ 103 (b).

Defendants could continue to publish the Ads pursuant to the terms of the original March 1, 1938 Grant under the Section 304(c)'s exception for pre-termination derivative works, 17 U.S.C. § 304(c)(6)(A), however, they would not own exclusive rights to the pre-existing "Superman" illustration shown in the Ads or any elements therein. *Abend*, 495 U.S. at 224.

### C.   Detective's "In House Announcements" Did Not Divest The Superman Story / Action Comics No. 1 Of Its Copyright

Defendants claim that the copyright in Siegel and Shuster's Original Superman Story comprising the Superman story in Action Comics, No. 1 is somehow divested of key elements by the "in-house announcements" publicizing Action Comics, No. 1.

46

**EXHIBIT 21**
**974**

1   Defendants purport to deduce this result via blind application of rules regarding the

2   service of notice of termination under Section 304(c), yet they never "connect the

3   dots" regarding their copyright divestiture theory.

4         Defendants' entire theory appears based on the claim that their "in house

5   announcements" showing a reduced photograph of the Action Comics, No. 1 cover

6   "was published *before* the initial publication of the comic book." (Mot. at 38:17-19)

7   While never bothering to articulate their theory, Defendants appear to claim that

8   because the announcement was allegedly published a few days before Action Comics,

9   No. 1, it achieved through publication a prior statutory copyright, purportedly

10   divesting Siegel and Shuster's Superman story of copyright in its cover and nearly

11   identical interior panel.

12         However, the case law is squarely against Defendants' dubious theory. The

13   courts have consistently held that the appearance of a mere picture of or from a

14   copyrighted work to publicize the work in a periodical announcement does not

15   constitute a "publication" of that work under the Copyright Act.

16         In *Rushton v. Vitale,* 218 F.2d 434, 436 (2d Cir. 1955), the Court held that

17   illustrations of a doll appearing in a trade journal without copyright notice for the

18   purpose of publicizing the product *did not publish* the copyrighted doll, so as to inject

19   it into the public domain: "Nor can we agree with defendants' contention that

20   plaintiffs waived their copyright by permitting photographs of Zippy to appear in

21   trade journals…reproductions in trade journals do not result in loss of the copyright."

22   *See Hub Floral Corp. v. Royal Brass Corp.,* 454 F.2d 1226, 1229 (2d Cir. 1972)("It

23   has long been settled that the taking of orders through employment of samples,

24   catalogs, or *advertisements of a work does not amount to publication of the*

25   *work.*"(collecting cases, emphasis added); *S. C. Johnson & Son, Inc. v. Drop Dead*

26   *Co.,* 201 F. Supp. 442, 443 (S.D. Cal. 1961) (plaintiff's distribution of advertising

27   placards to grocers throughout the United States with a picture of its cans of "Pledge"

28   did not constitute a publication for copyright purposes); *Alfred Bell & Co. v. Catalda*

47

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**975**

1　*Fine Arts, Inc.,* 191 F.2d 99, (2d Cir. 1951)("Nor were the copyrights lost because of

2　the reproduction of the mezzotints in catalogues").

3　　　　Accordingly, Detective's "in house announcement" of Action Comics, No. 1

4　did not suffice to "publish" Action Comics, No. 1 under the Copyright Act, nor divest

5　it of any portion of its copyright.

6　　　**D.　　The Date Of Publication Of The Ads Is, In Any Event, A Genuine**

7　　　　　　**Issue Of Material Fact, Precluding Summary Judgment**

8　　　　As set forth above, Defendants' partial copyright divestiture theory based on

9　mere announcements containing one illustration from an indivisible joint work fails

10　as a matter of law for the reasons set forth above. Notwithstanding this, the dates on

11　which the Ads were purportedly published, in any event, present a genuine issue of

12　material fact barring summary judgment. Defendants' doubtful claim is based on

13　their factual allegation that three "in house announcements" of Action Comics', No. 1

14　("More Fun Comics, No. 31," "Detective Comics, No. 15" and "New Adventure

15　Comics, No. 26") were published just days before April 16, 1938 (more than 61 years

16　prior to the noticed April 16, 1999 termination date).

17　　　　Defendants allege that More Fun Comics, No. 31 with a cover date of "May,

18　1938" was published April 5, 1938; that Detective Comics, No. 15 with a cover date

19　of "May, 1938" was published on April 10, 1938; and that New Adventure Comics,

20　No. 26 with a cover date of "May, 1938" is "believed to have been published on April

21　8, 1938."

22　　　　Defendants' sole evidence for the purported first publication date of

23　Detective's More Fun Comics, No. 31 is an unauthenticated certificate of registration

24　of the copyright filed, not on or around the time of such publication, but 28 years later

25　on March 29, 1966 by Detective's successor, National. *See* Bergman Decl., Ex. C at

26　11-12. Oddly this is not a renewal copyright registration (filed in the 28th year of the

27　original copyright term), but purports to be a very late first time registration of More

28　Fun Comics, No. 31. *Id.; see* 2-7 Nimmer § 7.16("[W]here there was a failure to

48

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**976**

1  promptly register and deposit, under the 1909 Act, some questions as to the viability

2  of the copyright might be raised").

3      Defendants claim to own a statutory copyright in More Fun Comics, No. 31

4  and the Ad therein, yet they fail to attach a renewal copyright certificate for More Fun

5  Comics, No. 31. If a renewal registration was never filed, Defendants cannot claim to

6  own the copyright in More Fun Comics, No. 31; it would be in the public domain.

7      Defendants' sole evidence for the purported first publication date of

8  Detective's Detective Comics, No. 15 is an unauthenticated certificate of renewal

9  copyright registration filed, not on or around the time of such publication, over *27*

10 *years later* on October 12, 1965 by Detective's successor, National. *See* Bergman

11 Decl., Ex. D, at 17-18. Defendants do not provide the original copyright registration

12 certificate, and the numerical reference in the renewal certificate to the purported

13 original registration number appears to have been altered at some point. *Id.*

14 Moreover, the certificate is not properly authenticated, but is merely attached to the

15 declaration of Defendants' attorney, who appears to have no personal knowledge of

16 it. *Id.*, ¶ 5.

17     With respect to New Adventure Comics, No. 26, Defendants present no

18 evidence whatsoever as to its publication date only speculation that it is "believed to

19 have been published on April 8, 1938," as apparently no copyright registration

20 certificate or renewal certificate is on file at the Copyright Office (Mot. at 38, fn. 26).

21     Defendants rely on "beating" the effective termination date in Plaintiffs'

22 notices by just a few days (11 days in the case of More Fun Comics, No. 31 and 5

23 days in the case of Detective Comics, No. 15) based on these largely unsubstantiated

24 publication dates. The truth is that Defendants and the Court have no way knowing

25 the actual date that copies of these comic books were distributed to the public.

26     The cover date of each comic is May, 1938. It is well accepted in the comic

27 book industry, and amongst comic book collectors, that a particular comic book's

28 exact date of publication, particularly in this nascent period of the industry, is

1  difficult, if not impossible to determine; and that the dates listed by publishers are

2  mere guesstimates. *See* Declaration of Mark Evanier ("Evanier Decl."), ¶¶ 10-12.

3  While this may not be true for a famous comic like Action Comics, No. 1, in which

4  Superman debuted, it is certainly true for forgotten, run of the mill comics like More

5  Fun Comics, No. 31 or Detective Comics, No. 15. *Id.*, ¶¶ 10-12. The dates provided

6  by publishers were often the dates initially scheduled for publication, but the actual

7  dates often varied with printing, delivery and other delays. *Id.*; Toberoff Decl., Ex.

8  H. This is especially true in 1938 when comic book publishers were still "mom and

9  pop" operations. Evanier Decl., ¶¶ 10-12.

10      This historical reality is compounded in the case of More Fun Comics, No. 31,

11  where Defendants' only evidence is National setting a specific date in a 1966

12  copyright registration on which its predecessor Detective purportedly distributed this

13  comic book to the public *28 years earlier*. Bergman Decl., Ex. C. The same goes for

14  Detective Comics, No. 15 in which the only evidence of its alleged 1938 publication

15  date is a 1965 registration by Detective's successor, National. Bergman Decl., Ex. D.

16      Accordingly, the actual date in 1938 on which copies of the Ads were

17  distributed to the public is a genuine issue of material fact precluding summary

18  judgment on Defendants' claim.

19      **E.    The Question Of What Literary Elements Are Actually Contained**

20      **In The Ad, Itself, Is Also A Genuine Issue Of Material Fact**

21      Defendants' legal theory, however untenable, also raises an issue of material

22  fact as to what elements are really contained in the announcements' greatly reduced

23  black and white print of the cover of Action Comics, No. 1. *See* Bergman Decl., Exs.

24  C, D. In assessing this issue one must not look at the announcement through the lens

25  of the "Superman" story contained in Action Comics, No. 1 (or even its full blown

26  color cover), or the mythology it spawned, but at the announcement, itself.

27      Viewing the announcement, it is impossible to tell whether the figure holding

28  up the car is a "good guy" scaring off fleeing criminals or a "bad guy" terrorizing

50

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**978**

1  innocent victims; whether he is an alien with superpowers or a strongman from the

2  Circus; and there is no sense of time or place. Other than his cape, very little of the

3  figure's appearance is discernable: no chiseled features, no curl on his forehead, no

4  signature red and blue costume, no defined crest. In fact, he looks like he is barefoot.

5  Such impressions and conclusions are classic issues of fact, precluding summary

6  judgment. *See* Steranko Decl., ¶¶ 30- 41, Exs. B, D.

7      **F.**    **Plaintiffs Were Not Required To List The Obscure Ads In Their**

8           **Termination Notices**

9      Defendants' second argument that Plaintiffs' omission of the announcements in

10  their termination notices resulted in their forfeiture, is likewise without merit.

11      Under the administrative regulations promulgated by the Register of

12  Copyrights, a notice of termination under Section 304(c) is to list among other things

13  the "title and the name of at least one author of, and the date copyright was originally

14  secured in, each work to which the notice of termination applies; and, if possible and

15  practicable, the original copyright registration number." 37 C.F.R. § 201.10

16  (b)(1)(ii).

17      To put this in perspective, Section 304(c) provides to authors and their

18  statutory heirs a right to recapture an author's copyright in a work by enabling the

19  termination of the author's or his heirs' grant(s) of such copyright. 17 U.S.C.

20  §304(c). The grant is terminated, not the work, and upon the noticed effective date of

21  termination, the copyright in the work previously granted logically reverts to the

22  author or heirs. *Id.* Notwithstanding this recapture of the works originally granted, as

23  a legislative compromise the terminated party may continue to exploit pre-

24  termination derivative works created under the terminated grant pursuant to the terms

25  of such grant. 17 U.S.C. § 304(c)(6)(A); H. Rep. at 127, 94th Cong. 2d Sess. (1976).

26      For instance, Siegel and Shuster assigned the copyright to their Original

27  Superman Story (published in Action Comics, No. 1) to Detective in the March 1,

28  1938 Grant. Plaintiffs therefore duly listed pursuant to 17 U.S.C. §304(c) and 37

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**979**

1 | C.F.R. § 201.10, the March 1, 1938 Grant subject to termination, and the title, author
2 | and date copyright was secured in the works thereby granted (the Original Superman
3 | Story). On April 16, 1999, the noticed date of the termination of the March 1, 1938
4 | Grant, the copyright to the works transferred thereunder (*i.e.*, the Original Superman
5 | Story) reverted to Plaintiffs.

6 |    As set forth above, the Ads, at best, constitute derivative works produced by
7 | Detective under authority of the March 1, 1938 Grant, which derivative works need
8 | not have been listed in Plaintiffs' termination notices for the termination of such grant
9 | and the recapture of the copyright to the Original Superman Story transferred to be
10 | effective. The fact that Defendants might continue to exploit the Ads, per se, does
11 | not prevent Plaintiffs' recapture of the copyright to the Original Superman Story.

12 |    Defendants rely on *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610,
13 | 622 (2d Cir.1982), which is distinguishable. At issue were five "Tarzan" *books*
14 | *which had been assigned in the grant* listed in plaintiff's termination notice but not
15 | included in the list of affected works. *Id.* The Court held that the termination was
16 | effective but not as to the books/copyright transferred in the subject grant but not
17 | listed in the notice. *Id.* Here, the Ads were not works conveyed in the March 1, 1938
18 | Grant. Moreover, as set forth above, the announcements were mere publicity notices
19 | for Siegel and Shuster's jointly authored "Superman" work plainly *listed in Plaintiffs'*
20 | *termination notices* and, unlike the Tarzan books, do not rise to the level of
21 | "Superman" works.

22 |    **G.    Plaintiffs Cannot Be Expected To List Obscure 1938 Ads That A**
23 |    **Reasonably Diligent Search Of The U.S. Copyright Office Records**
24 |    **Does Not Reveal**

25 |    Plaintiffs' extremely detailed termination notices evidence that Plaintiffs
26 | conducted an *extensive* investigation of all "Superman" works in which "Superman"
27 | appears, or related to "Superman," including the dates copyright was originally
28 | secured and the original copyright registration number, pursuant to the above

52

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**980**

comic book experts, Mark Waid and Jeff Rovin, point to Action Comics, No. 1 as the first appearance of Superman and his miraculous powers.[11]  While claiming that the Ads are widely known, Defendants can point to only an obscure reference to More Fun Comics, No. 31 amidst the minutia of a comic book *collector* guide, attaching an illegible copy (Bergaman Decl., Ex. II); and purportedly quote from a DC *collector's* book, while the quote appears nowhere in their attachment.  *Id.*

It is well settled that the termination provisions of the Copyright Act were designed to correct unremunerative, one-sided grants to publishers with greater bargaining power, and to give authors/heirs the opportunity to financially participate in the success of the author's works for the extended renewal term.  *Mills Music*, 469 U.S. at 172-73.  Surely Congress did not intend that this objective be thwarted or substantially diminished where an author/heir, after reasonably diligent investigation,

---

COMICS #1)" – Scott Beatty, p. 112, *The Ultimate Guide to the Man of Steel*, DK Publishing Inc., 2002.  Copyright **2002 by DC**. Toberoff Decl. Ex. I.

"Superman first streaked across the sky in *Action Comics* #1, dated June 1938." "The first Superman story in *Action Comics* #1…"; Les Daniels, pp. 21-22, *DC Comics: Sixty Years of the World's Favorite Comic Book Heroes*, Bulfinch Press, 1995.  Copyright **1995 by DC Comics**. *Id.*

"Another of [Siegel & Shuster's] creations had just debuted in the first issue of *Action Comics* (cover-dated June 1938[])…No one could have predicted the colossal success of Superman."; James Vance, "A Job for Superman," p. 6, *Superman: The Dailies, 1939-1940*, Kitchen Sink Press/**DC Comics, 1999**. *Id.*

"The first issue of *Action Comics* (June, 1938) marked the debut of the Man of Steel, and he has starred in well over 500 of them since!" E. Nelson Bidwell, Introduction, *The Great Superman Comic Book Collection: Time-Honored Classics*, **DC Comics**, 1981. Toberoff Decl. Ex. I.

[11] "As even quite a few non-fanatics know today, Superman first appeared in ACTION COMICS # 1, and his success fathered an entire industry." **Mark Waid** [Defendants' expert], Foreword, p. 5, *Superman: The Man of Tomorrow, Archives Volume 1*, **DC Comics, 2004**. Toberoff Decl. Ex. J

"[Superman's] *First Appearance*: 1938, *Action Comics* #1, DC Comics;" **Jeff Rovin**, p. 294, *The Encyclopedia of Super Heroes*, Facts on File Publications, 1985. *Id.*

"The first appearance of Superman in *Action Comics*, in like-new condition, is extremely rare and valuable…" **Mark Waid**, Introduction, p. 8, *The Golden Age of Superman: The Greatest Covers of Action Comics from the '30s to the '50s*, Artabras/**DC Comics, 1993**. *Id.*

54

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**981**

1  could not locate and therefore did not list a publisher's obscure "in-house

2  announcement" of a work *which is listed* in the termination notice,[12]

**H.    The Notices of Termination Provided Defendants With More Than Ample Notice; The Ads' Omission Was Harmless**

5  To the extent that the cover of Action Comics, No. 1 depicted in the Ads is

6  considered a work (it is not), the central identification of Action Comics, No. 1 in the

7  Superman notices of termination reasonably identifies the cover of Action Comics,

8  No. 1 for notice purposes, pursuant to 37 C.F.R. §201.10 (b)(1)(iii). The purpose of a

9  notice of termination, after all, is to give notice to the current copyright proprietors of

10  works so that they can adjust their businesses accordingly. Defendants received more

11  than ample notice of Plaintiffs' intention to terminate prior grants of "Superman,"

12  The Register of Copyright's regulations, on which Defendants purport to rely

13  for their hyper-technical argument, specifically dissuade such attempts to invalidate

14  termination notices. 37 C.F.R. § 210.10 (e) provides:

15  "(e) Harmless errors. (1) Harmless errors in a notice that do not
materially affect the adequacy of the information required to serve the

16  purposes of section 203, section 304(c), or section 304(d) of title 17,
U.S.C., whichever applies, shall not render the notice invalid."

17

18  Surely neither Congress, nor the Register of Copyrights intended that the form

19  of the notice be parsed and used in a game of Gotcha!, as Defendants attempt to do.

20  Accordingly, Defendants fail in their claim that they "remain free to use any

21  and all copyrightable elements in the Announcements without liability to or recourse

22

23  [12] Significantly, the provisions of 37 C.F.R. 210.10 (d)(2) regarding service of a termination notice

24  under 17 U.S.C. §§ 203, 304(c) or 304(d) states that "service will be satisfied if, before the notice of
termination is served, *a reasonable investigation* is made by the person or persons executing the
notice as to the current ownership of the rights being terminated, and based on such investigation:

25  (i) If there is no reason to believe that such rights have been transferred by the grantee to a
successor in title, the notice is served on the grantee; or (ii) If there is reason to believe that such

26  rights have been transferred by the grantee to a particular successor in title, the notice is served on
such successor in title.

27

28  37 C.F.R. 210.10 (d)(3) states that "[f]or purposes of paragraph (d)(2) of this section, *a reasonable
investigation includes, but is not limited to, a search of the records in the Copyright Office*."

**EXHIBIT 21**
**982**

1  by Plaintiffs." (Mot. at 30:6-9). At a minimum, this issue should be resolved by the

2  trier of fact, and not on a motion for summary judgment.

3  **X.    DEFENDANTS ATTEMPT TO RE-ARGUE A SUMMARY JUDGMENT**

4  **MOTION, PREVIOUSLY DENIED, IS IMPROPER AND VIOLATES**

5  **L.R. 7-18**

6  **A.    Defendants Prior Motion For Summary Judgment Contained The**

7  **Exact Same Arguments Which Were Considered And Denied**

8  Defendants impermissibly attempt to reargue a summary judgment motion they

9  have previously argued and lost in clear violation of L.R. 7-18.  On February 15,

10  2006, Defendants moved for summary judgment that episodes of the *Smallville*

11  televisions series do not infringe Plaintiffs' recaptured "Superboy" copyrights.

12  Toberoff Decl. Ex. K, at 21- 25.   Judge Ronald S.W. Lew denied Defendants'

13  motion on March 24, 2006, noting that "because substantial similarity is customarily

14  an extremely close question of fact, summary judgment has traditionally been

15  frowned upon in copyright litigation."  Toberoff Decl., Ex. L at 16.

16  Judge Lew nonetheless thoroughly considered Defendants' motion and

17  Plaintiffs' opposition and in so doing analyzed and compared the Siegel Superboy

18  Materials to the "Smallville" episodes:

19  "Here, the specific question as to whether the television show *Smallville*
infringes on Plaintiffs' Superboy copyrights requires a detailed factual

20  comparison of each property's content characteristics, much of which are
disputed in Plaintiffs' and Defendants' papers. Plaintiffs immediately start

21  drawing comparisons between storylines of *Smallville* and the Superboy
comic strip, including the cast of characters' names, personas, roles in the

22  storyline, their independent storylines, the location, etc. Enough facts are
presented, where this Court, contrary to Defendants' request, could find

23  that the main character in *Smallville* is in fact Superboy."

24  *Id*. at 16.  Defendants did not file a motion for Judge Lew to reconsider his March 24,

25  2006 because grounds for reconsideration did not exist under L.R. 7-18.

26  Defendants moved to have Judge Lew's March 24, 2006 certified for

27  interlocutory appeal under 28 U.S.C. § 1292(b).   This motion was denied by Judge

28  Lew on May 23, 2006. Defendants did not file a motion for Judge Lew to reconsider

56

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**983**

1  his May 23, 2006 Order because grounds for reconsideration did not exist under L.R.

2  7-18.

3       Yet, shortly after Judge Lew took senior status and the case was re-assigned,

4  Defendants filed on January 12, 2007 an improper motion for reconsideration of

5  Judge Lews two orders which failed to satisfy any of the requirements of L.R. 7-18. [13]

6  Contrary to the express prohitions of L.R. 7-18 and well settled caselaw, Defendants

7  simply repeated their old arguments regarding the preclusive effect of the findings

8  and conclusions after full trial of the 1947 action between the parties' predecessors

9  and Judge Lew's denial of certification.  The motion did not ask the Court to

10  reconsider Judge Lew's ruling that Plaintiffs' termination notices had complied with

11  17 U.S.C. §304(c) nor that portion of his March 24, 2006 order which *denied*

12  Defendants' summary judgment on the issue of copyright infringement.

### B.   Defendants' Motion Violates L.R. 7-18

14       Defendants, having lost their motion, bring the exact same motion regarding

15  *Smallville*'s infringement of "Superboy," yet again.  Such a motion for

16  reconsideration is strictly governed by Local Rule 7-18:

17       "A motion for reconsideration of the decision on *any motion* may be made
18       *only* on the grounds of (a) *a material difference of fact or law from that
presented to the Court before such decision that in the exercise of
reasonable diligence could not have been known to the party moving for
19  the reconsideration at the time of such decision*, or (b) the emergence of
new material facts or a change of law occurring after the time of such
20  decision, or (c) a manifest showing of a failure to consider material facts
presented to the Court before such decision. *No motion for
21  reconsideration shall in any manner repeat any oral or written
argument made in support of or in opposition to the original motion.*"

23  L.R. 7-18 (emphasis added).  Knowing that they do not qualify under L.R. 7-18 and

24  reluctant to bring a *second* motion for reconsideration of the same March 24, 2006

25  order on a subject they omitted, Defendants attempt to circumvent fatal procedural

26  defects by simply not calling their motion – a motion for reconsideration.  This does

27  not get Defendants off the hook; it is an improper motion for reconsideration

28

[13] Defendants motion for reconsideration is still before the Court.

57

**EXHIBIT 21**
**984**

1 nonetheless.

2      Motions for reconsideration are "rarely appropriate" and generally

3 unwelcome. *Lerner v. Sartori*, 1999 U.S. Dist. LEXIS 16054, *2 (D. Ariz. 1999),

4 *aff'd mem.*, 229 F.3d 1158 (9th Cir. 2000); *see also Rutter Guide: Federal Civil*

5 *Procedure Before Trial* § 12.158.1 (2006)("motions for reconsideration are

6 generally unwelcome.")  A motion for reconsideration is <u>not</u> an avenue to re-

7 litigate issues and arguments on which the court *already* has ruled. *School Dist.*

8 *No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.

9 1993); *U.S. v. James,* 915 F. Supp. 1092, 1098 (S.D. Cal. 1995); *see Virgin*

10 *Atlantic Airways v. Nat. Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

11 ("litigants...once battl[ing] for the court's decision...should neither be required,

12 nor without good reason permitted, to battle for it again.").

13      Circumstances justifying re-argument of the same motion rarely arise and

14 motions for reconsideration should be equally rare. *Lerner*, 1999 U.S. Dist.

15 LEXIS 16054, *2 (D. Ariz. 1999), *aff'd* 229 F3d 1158 (9th Cir. 2000); 4-26

16 *Mathew Bender Practice Guide: Fed Pretrial Civ. Proc. in CA* § 26.36.  Abuse of

17 discretion is the standard of review for denial of a motion for reconsideration.

18 *Smith v. Pacific Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004).

19      Defendants' current Motion fails to satisfy L.R. 7-18's governing test; a test

20 Defendants have specifically addressed in prior motions for reconsideration.[14]

21 Defendants specifically (i) fail to set forth any material difference in fact or law from

22 that which in the "exercise of reasonable diligence could not have been known to

23 [Defendants] at the time of such decision[s];" (ii) fail to show "the emergence of *new*

24 material facts or a change of law" occurring after Judge Lew's decision and (iii) make

25 no showing that Judge Lew failed to consider "*material facts*" before rendering his

26     ———————
[14] In Defendants' unsuccessful September 1, 2006 motion for reconsideration of a failed discovery
27 motion they admitted in their reply:  "In accordance with the restrictions of L.R. 7-18, *which*
*expressly prohibits the repetition of any oral or written argument made in support of the original*
28 *motion*, Defendants will not reiterate their prior arguments..." *See* Toberoff Decl., Ex. M, p. 9, ln.
13-16.

58

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**985**

decisions.[15] *See* Toberoff Exs. L, at 6-13.

Instead, Defendants simply repeat the *exact same arguments* previously made in their failed motion for summary judgment. *See* Tob. Ex.__, at 21-25; Mot. at 59. Such recycling of identical arguments is *expressly* barred by L.R. 7-18: "*[n]o motion for reconsideration shall in any manner repeat any oral or written argument...in the original motion.*"

### C.    Defendants' Motion Violates L.R. 7-17

Defendants, knowing that their redundant Motion is barred by L.R. 7-18, improperly ignore L.R. 7-18 and, instead, argue without any citation or support that they need only to comply with L.R. 7-17. This convenient reading of the rules is simply incorrect. Moreover, even under Defendants' own analysis, the motion even fails to comply under L.R. 7-17.

Firstly, L.R. 7-17 does not supplant L.R. 7-18, simply because a new judge is assigned to a case. In fact, L.R. 7-17 reflects the Central District's heightened sensitivity to not only a motion for reconsideration, but to having such motion resubmitted to a different judge, due to policies in favor of judicial comity and against forum shopping.

Local Rule 7-17 states:

"If any motion, application or petition has been made to any judge of this Court and has been denied in whole or in part...any subsequent motion for the same relief in whole or in part...shall be presented to the same judge whenever possible. *If presented to a different judge, it shall be the duty of the moving party to file and ser  e a declaration setting forth... **the new or different facts or circumstances claimed to warrant relief** and why such facts or circumstances were not shown to the judge who ruled on the motion. Any failure to comply with the foregoing requirements shall be the basis for setting aside any order made on such subsequent motion,* either sua sponte or on motion or application, and the offending party or attorney may be subject to the sanctions provided by L.R. 83-7." (emphasis added).

To read L.R. 7-17 as an alternative to L.R. 7-18, as Defendants conveniently

---

[15] As shown above, Judge Lew clearly indicated he analyzed the parties' arguments and evidence to support his denial of Defendants' motion. Despite this, in the present motion, Defendants label Judge Lew's opinion the result of "simple conclusions" (Mot. at 49).

59

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**986**

1  do, would gut the more rigorous requirements of L.R. 7-18 because parties seeking

2  reconsideration of an order would simply re-argue the same motion again under L.R.

3  7-17, circumventing L.R. 7-18 express prohibition of this. It would also encourage

4  parties to file undernourished summary judgment motions piecemeal, knowing they

5  can take additional bites at the apple by simply alleging that "new or different facts"

6  have emerged.  This reading would further encourage intra-district forum shopping

7  because, as the cases demonstrate, parties know how difficult it is to have a motion

8  for reconsideration granted by the judge who heard the original motion.  None of

9  these results promote judicial efficiency or comity, nor jibe with the plain meaning or

10 spirit of L.R. 7-17 and 7-18.  Thus, L.R. 7-17's declaration requirement should be

11 viewed *in addition to* the strictures of L.R. 7-18.

12      These rules clearly reflect the concern of the Central District with parties re-

13 submitting motions and both rules demand that a party justify why purportedly "*new*

14 *or different facts...claimed to warrant relief*" could not have been presented to the

15 prior judge.  L.R. 7-17's declaration requirement acts as an appropriate additional

16 hurdle for a party wishing to have a motion previously ruled upon by one judge to be

17 reconsidered by a different judge.

18      Here, Defendants "seek the same relief" from a different judge of the same

19 court by merely recycling arguments from their previous motions.   Moreover,

20 Defendants do not and cannot explain, as shown below, why the purported "new"

21 facts, if any, presented in the current motion were not shown to Judge Lew before he

22 issued his ruling, as they are required to demonstrate by both L.R. 7-17 and 7-18.

23      In their original motion, Defendants argued that *Smallville* episodes created

24 after November 17, 2004 do not infringe Plaintiffs' recaptured Superboy copyrights.

25 Toberoff Decl., Ex. K, at 21-22.  Defendants argued, just as they do here, that after

26 filtering out purportedly "unoriginal" elements appearing in prior works, non-

27 copyrightable "ideas" and *scenes a faire* that little or no copyrightable material

28 remains.  *Id.*  Defendants submitted a chart wherein they argued, as they do here, that

60

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**987**

1  elements in Siegel's Superboy Story were borrowed from purportedly "pre-existing
2  Superman elements." *Id.* at 4-5.

3          In their new motion, Defendants repeat, often verbatim the denied arguments
4  "cut and pasted" from their prior motion in express violation of L.R. 7-18 and L.R. 7-
5  17 (e.g., compare Toberoff Decl., Ex. K, at 21-22 to Mot. at 59: "stripped of both pre-
6  existing material (such as any material from the Prior Superman Publications) and
7  other unprotectable material...Plaintiffs are left with very little"). Defendants also
8  repeat their denied argument that "none of that copyrightable material has been used
9  in any Smallville episode created after November 17, 2004." (Mot. at 59).

10          On this basis alone, Defendants' motion for summary judgment on the *same*
11  copyright infringement claim based on *identical* arguments must be denied. *See Wood*
12  *v. Midland Credit Mgmt., Inc*, 2005 U.S. Dist. LEXIS 31919 (C.D. Cal 2005) (citing
13  L.R. 7-18, denied motion for reconsideration as "procedurally improper" because it
14  repeated rejected arguments made in the original motion); *Watanabe v. Home, Inc.*
15  *Depot United States*, 2003 U.S. Dist. LEXIS 27016 (C.D. Cal. 2003)(motion for
16  reconsideration denied because party improperly argued "the exact same points"
17  raised in prior motion for summary judgment); *United States ex rel. Holder v. Special*
18  *Devices, Inc.*, 296 F. Supp. 2d 1167, 2003 U.S. Dist. LEXIS 22571, * 1 (C.D. Cal.
19  2003)(reconsideration of summary judgment motion denied because party merely
20  repeats rejected arguments and facts in violation of L.R. 7-18); *SEC v. Richie*, 2006
21  U.S. Dist. LEXIS 57258, *6 (C.D. Cal. Aug. 14, 2006)(reconsideration denied motion
22  for failure to comply with L.R. 7-18: "all Local Rules must be complied with, in spirit
23  and to the letter").

24      **D.    No "New Or Different" Facts Exist That Were Not Previously**
25          **Available To Defendants**

26          Defendants try to skirt L.R. 7-17 and 7-18 and justify bringing the same motion
27  again by claiming that "Defendants have developed additional facts not previously
28  available to them." Mot. at 53, fn. 4. This assertion is plainly false. Firstly,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**988**

1  Defendants motion with respect to these works is based on the same facts and

2  arguments as its prior motion for summary judgment. Secondly, these actions were

3  filed in October, 2004. Defendants' first summary judgment motion was not brought

4  until February 15, 2006, sixteen months later. Defendants had plenty of time to serve

5  the discovery they claim is "new" well before the filing of their first motion; but

6  failed to do so. They also could have retained the same experts they now present

7  before filing their first motion in 2006. Alternatively, Defendants could easily have

8  waited for such discovery and experts prior to filing their first motion.

9      **1.    Copyright Analysis Is Based On The Works Themselves**

10         Furthermore, as Defendants argued in both motions, copyright analysis in

11  based on an examination and comparison of the works themselves (Mot. at 56). *Sid*

12  *& Marty Krofft Television Prods.*, Inc. v. McDonald's Corp., 562 F.2d 1157, 1164

13  (9th Cir. 1977). Therefore, all the requisite "facts" were in the parties' possession and

14  before the Court when Defendants filed their prior motion for summary judgment.

15  Defendants can hardly rely under L.R. 7-17 on responses to interrogatories, wherein

16  Plaintiffs' present lists of similarities in works already before the Court, while

17  exclaiming:

18         "While lists of similarities have sometimes been used by the courts, they
           are drawn up by counsel and therefore self-serving, the Ninth Circuit has
19         noted that "they are inherently subjective and unreliable" Litchfield v.
           Spielberg, 736 F.2d 1352, 13566 (9th Cir. 1984). Plaintiffs'
20         list...similarly proves itself to be inherently unreliable."

21  (Mot. at 53, fn. 54). It is clear that Defendants fail under L.R. 7-17 to set forth *"new*

22  *or different facts or circumstances claimed to warrant relief and why such facts or*

23  *circumstances were not shown to the judge who ruled on the [prior] motion"* and

24  similarly fail under L.R. 7-18 to demonstrate *"a material difference of fact or law*

25  *from that presented to the Court before such decision that in the exercise of*

26  *reasonable diligence could not have been known... at the time of such decision."*

27      **2.    Defendants May Not Simply Re-Submit The Same Motion**

28             **Based On Previously Available Facts, Works And Discovery**

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**989**

1    Plaintiffs may not under any circumstances resubmit the same motion for
2  summary judgment based on facts and works already in their possession previous and
3  which, in any event, could easily have been discovered and presented prior to the
4  court's ruling.  *Hopkins v. Andaya*, 958 F.2d. 881, 887, fn. 5 (9th Cir. 1992);
5  *Frederick S. Wyle, P.C. v. Texaco, Inc.*, 764 F.2d 604, 605 (9th Cir. 1985)( the movant
6  is "*obliged* to show not only that this evidence was newly discovered or unknown to
7  it until after the hearing, but also that it could not with reasonable diligence have
8  discovered and produced such evidence at the hearing")(emphasis in original); *Fay*
9  *Corp. v. Bat Holdings I, Inc.*, 651 F. Supp. 307, 309 (W.D. Wash. 1987)(second
10 motion "not justified on the basis of new evidence which could have been discovered
11 prior to the Court's ruling"); *School Dist. No. 1J, Multnomah County, Or. V. ACandS,*
12 *Inc.*, 5 F3d 1255, 1263 (9th Cir 1993)("failure to file documents in an original motion
13 does not turn late filed documents into 'newly discovered evidence.'"); *Bhatnagar v.*
14 *Surrendra Overseas Ltd.*, 52 F3d 1220, 1231 (3rd Cir. 1995)("reargument should not
15 be used as a means to reargue new facts or issues that inexcusably were not presented
16 to the court in the matter previously decided").

17    To the extent Defendants present any new information, they could have either
18 presented this during the first motion or held off until they had gathered it.  Instead
19 *they chose* to plow ahead and having lost, have impermissibly tried for a "second bite
20 at the apple."  Defendants simply cannot satisfy L.R. 7-17 and L.R.'s 7-18 prohibition
21 against presenting facts one could have reasonably presented before the Court ruled.
22 Defendants can offer no justification for why new information, if any, was "not
23 shown to the judge who ruled on the motion" beyond Defendants' own carelessness.
24 L.R. 7-17.  The declaration of Defendants' counsel, Michael Bergman ("Bergman
25 Decl.") admits they did not serve the interrogatories on which they purport to rely in
26 the present motion until after Judge Lew's ruling.  *See* L.R. 7-17; L.R. 7-17 Bergman
27 Decl., ¶ 7. Accordingly, Defendants must not be allowed to proceed on their recycled
28

1   motion.[16]

2     **E.**   **Defendants' Motion Ignores The Strong Policies According**

3         **Deference To The Decisions Of A Prior Judge in The Same Case**

4       Finally, Defendants' motion not only ignores L.R. 7-17 and L.R. 7-18, but also

5   ignores the deference a judge must show to the decisions of a prior judge in the same

6   case sitting on the same court. For judges of co-ordinate jurisdiction "to presume to

7   overrule one another usually adds only unseemly conflict and confusion where

8   certainty and predictability are most to be desired. The 'overruling' decision settles

9   nothing, and more often than not serves only to compound uncertainty as to the

10   correct rule to be followed." *Rojas-Gutierrez v. Hoy*, 161 F. Supp. 448, (D. Cal.

11   1958)[17]; *In re Carmona*, 224 F. Supp. 497, 498 (S.D. Cal. 1963) ("[W]here a judge

12   has decided a question of law in one manner a judge of co-ordinate jurisdiction

13   should not normally undertake to decide it another way. This rule, based upon

14   judicial comity as well as good judicial administration, is of great universality.").[18]

15       Exceptional circumstances simply do not exist to justify this Court overruling

16   Judge Lew's March 24, 2006 order which denied Defendants' motion for summary

17   judgment on the basis that the issue of whether "Smallville" infringes the recaptured

18   "Superboy" copyrights involves genuine issues of material fact barring summary

19   judgment. Defendants' conduct in bringing their thoroughly redundant Motion to a

20   new judge of the same court is expressly prohibited by L.R. 7-17 and 7-18 and should

21

22   [16] A renewed motion that is substantially identical to an earlier motion that was denied and presents
no new grounds may be treated as in bad faith, justifying an award of sanctions under FRCP 56(g).

23   *See* California Practice Guide- Federal Civil Procedure Before Trial: 14:368 (2006)

24   [17] *See* 20 A.L.R. Fed. 13: "Many reasons have been cited by the courts for this general rule, for
example, to prevent defeated parties from "shopping" for judges more favorably inclined to the

25   position of the defeated party, to preserve the orderly functioning of the judicial system, to avoid
unseemly conflicts, to avoid confusion, and to speedily conclude litigation."

26

27   [18] This hesitancy to overrule another judge, especially in the summary judgment context, has also
been incorporated in California procedures: Section 437c of the Code of Civil Procedure "does not
permit a judge subsequently assigned to the matter to review issues already determined in earlier

28   summary judgment proceedings." *Conway v. Bughouse, Inc.*, 105 Cal. App. 3d 194, 202 (1980).

64

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**991**

1 | not be countenanced by the Court.

2 | **XI.    WHETHER *SMALLVILLE* INFRINGES PLAINTIFFS' RECAPTURED**

3 | **SUPERBOY COPYRIGHTS RAISES GENUINE ISSUES OF**

4 | **MATERIAL FACT PROPERLY LEFT FOR TRIAL**

5 | Plaintiffs' complaint alleges that the "exploitation by Defendants...on or after

6 | November 17, 2004 [the Superboy Termination Date] of *new* derivative works or

7 | products based on the "Superboy" mythology, including, but not limited to, new

8 | publications, merchandising, motion pictures, new episodes of the Smallville Series

9 | and/or other new derivative television programs infringes Plaintiffs' Recaptured

10 | Copyrights." *See* FASC, ¶¶ 67-69, Bergman Decl., Ex. GG.

11 | Defendants admit that the "Smallville" television series "focus[es] on Clark

12 | Kent as a teenager *before* he became Superman." (emphasis added). (Mot. at 46:18).

13 | In comic book history and mythology it is indisputable that this story is widely

14 | known as "Superboy." *See* Declaration of James Steranko, ("Steranko Decl."), ¶ 22-

15 | 29, Exs. A-C; Declaration of Mark Evanier ("Evanier Decl."), ¶¶ 6-8; Exs. A, B.  It

16 | is no wonder then that Defendants chose to name *Smallville* after "Superboy's" iconic

17 | hometown.  Bergman Decl., Ex. LL.  Yet, Defendants dubiously contend that there is

18 | no genuine issue of material fact as to whether the *Smallville* television series is

19 | derived in whole or in part from "Superboy" and demand judgment on this factual

20 | issue "as a matter of law." Fed. R. Civ. P. 56.

21 | Defendants preface their claim with the "straw man" argument that "Plaintiffs

22 | have alleged that the series is not derivative of Superman...but rather

23 | infringes...Superboy." (Mot. at 43:7-9).  Plaintiffs have never alleged this.  Whereas,

24 | Defendants oddly insist that "Smallville" has absolutely nothing to do with

25 | "Superboy," Plaintiffs' recognize that the television series is clearly derived from

26 | both sources, and that the two are *not* mutually exclusive.

27 | **A.    Relevant Factual And Procedural Background**

28 | **1.    Siegel's Creation of "Superboy"**

1    On September 22, 1938, Siegel and Shuster entered into an agreement with

2    Detective (the "September 22, 1938 Agreement") to produce five existing comic

3    strips created by them, including "Superman." 1948 FOF, Facts 39, 46, Bergman

4    Decl., Exs. F, S.   The Agreement permitted Siegel and Shuster to create new comic

5    book features, provided National had a right of first refusal to accept or reject same

6    within six weeks of the submission thereof.   Bergman Decl. Ex. F, S.

7    In or about 1938, Siegel conceived of a new comic strip series entitled

8    "Superboy."  1948 FOF, Fact 155. Bergman Decl. Ex. S. On November 30, 1938, a

9    few months after "Superman" was first published in Action Comics No. 1, Siegel

10   submitted to Detective for its acceptance or rejection under the September 22, 1938

11   Agreement, a written synopsis or summary of the character, conception and plan for

12   his "Superboy" comic strip series (the "Superboy Synopsis"), which Siegel suggested

13   could run in Detective's magazine, "More Fun Comics." 1948 FOF, Facts 155-156.

14   *Id.*, Ex. H.

15   By letter to Siegel dated December 2, 1938, Detective did not elect to purchase

16   Siegel's "Superboy." 1948 FOF, Facts 157-159. *Id.* Ex. S.  Thereafter, some time

17   prior to December, 1940, Siegel authored a complete original "Superboy" story

18   ("Superboy Story"; collectively referred to with the Superboy Synopsis, as the

19   "Siegel Superboy Material").  1948 FOF, Fact 160.  The Siegel Superboy Material

20   contained in detail and with particularity the unique conception and character of

21   "Superboy;" the continuity and dialogue for the first "release" or "releases" of

22   "Superboy;" and the plan for the future publication of a "Superboy" comic book

23   series. *Id.*

24   In December, 1940, Siegel submitted his Superboy Story to Detective; but

25   again, Detective failed to purchase the Superboy Story per the September 22, 1938

26   Agreement.  1948 FOF, Facts 160, 162, *Id.*, Ex. I.

27   **2.    Siegel's "Superboy" Was Published In Detective's More Fun**

28   **Comics No. 101 And Subsequent "Superboy" Comics**

66

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**993**

1    Jerome Siegel entered the U.S. Army in July, 1943 to serve his country during

2   World War II. *See* 1948 FOF, Fact 182. While Siegel was stationed abroad,

3   Detective, without notice to Siegel, used and published the Siegel Superboy Material

4   as an illustrated comic book story entitled "Superboy" in the body of the magazine

5   issue, More Fun Comics, No. 101, which was published and issued for sale in

6   December, 1944. 1948 FOF, Facts 163-166, 168. Thereafter, Detective released

7   "Superboy" comic strips in magazines bi-monthly until February, 1946, and monthly

8   thereafter. 1948 FOF, Facts 169.

9    Detective's first "comic strip release entitled SUPERBOY published in

10   December of 1944 [in More Fun Comics, No. 101] embodied and was based upon the

11   idea, plan and conception contained in the [Superboy Story] submitted by...SIEGEL

12   to DETECTIVE COMICS, INC. in December of 1940," 1948 FOF, Fact 165; and

13   "embodied and was based upon the idea, plan and conception contained in the

14   [Superboy Synopsis] dated November 30, 1938. 1948 FOF, Fact 164.

15    In fact, "[a]ll of the comic strip material published [by Detective] under the

16   title SUPERBOY was based upon the idea, plan, conception and direction contained

17   in the [Siegel Superboy Material]." 1948 FOF, Facts 171-172.

18    "SUPERMAN...did not contain the plan, scheme, idea or conception of the

19   comic strip SUPERBOY as it was later submitted by...SIEGEL to DETECTIVE

20   COMICS, INC. in [the Siegel Superboy Material]," 1948 FOF, Fact 166; and "did not

21   contain the plan, scheme, idea or conception of the comic strip SUPERBOY as

22   published ...from December, 1944 until [April, 1948]." 1948 FOF, Fact 167.

23    "Siegel is the originator and the sole owner of the comic strip feature

24   SUPERBOY." 1948 COL, No. 25. "Siegel, as the originator and owner of the comic

25   strip feature ha[d] the sole and exclusive right to create, sell and distribute comic strip

26   material under the title SUPERBOY of the type and nature [t]heretofore published

27   [by Detective and National]." 1948 COL, No. 26. Upon Siegel's return from the war

28   in January of 1946, Detective entered into negotiations with Siegel to purchase the

67

1  Siegel Superboy Material and to hire Siegel to write additional "Superboy" comic

2  strips.  However, no agreement was reached.  1948 FOF, Facts 183-184.

3        Based on his above findings of fact and conclusions of law after full trial of the

4  1947 Action on the merits, Judge Young concluded that the defendants National *et al.*

5  be "perpetually enjoined and restrained from creating, publishing selling or

6  distributing any comic strip material of the nature now and heretofore sold under the

7  title SUPERBOY, or any other comic strip material made in imitation of the

8  conception, characters, nature, incidents, actions or plot of [Siegel's] comic strip

9  SUPERBOY…" 1948 COL, No. 25; and that defendants "account to… Siegel for all

10  profits derived from the publication, sale and distribution of all comic strip material

11  entitled SUPERBOY…" 1948 COL, No. 27; 1947 Opinion, Bergman Decl., Ex. R, at

12  11-12.

13        Following Judge Young's opinion, findings of fact and conclusions of law,

14  settlement negotiations ensued, resulting in the 1948 Stipulation of settlement

15  between the parties. Bergman Decl., Ex. U.  In the 1948 Stipulation, Siegel, in

16  exchange for a settlement payment, agreed that National shall own the exclusive

17  rights to "Superboy." 1948 Stipulation, ¶¶ 9-10, *Id.*

18        **3.**    **Siegel's "Superboy" Spawned A Separate Line of Derivative**

19                **"Superboy" Comics And Television Series**

20        After Siegel's "Superboy" was published in More Fun Comics No. 101, it took

21  off.  1948 FOF, Facts 164-165, 171-172.  "Superboy's" small town adventures were

22  published in "More Fun Comics," Nos. 102-107 (1944-1948), "Adventure Comics"

23  Nos. 103-503 (1946-1983), "Superboy" Nos. 1-235 (1949-1977), "The New

24  Adventures of Superboy" Nos. 1-54 (1979-1984), "The Adventures of Superboy"

25  Nos. 1-100 (1989-2002) and in numerous other comic book publications.

26  "Superboy" has also been exploited in several television series, including the

27  animated "The Adventures of Superboy" (1966), the live action series "The

28  Adventures of Superboy" (1988-1992) and "Smallville" (2001-ongoing).  *See*

68

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**995**

1  Superboy Termination Notice, Bergman, Ex. FF, FASC, ¶ 37; Answer ¶ 37.

2  As set forth above, "Superboy's" fictional town was named "Smallville" early

3  on in "Superboy No. 2," published in 1949.  Bergman Decl., Ex. LL.  In the

4  Superboy comic books, and in the animated and live action "Superboy" television

5  series, "Superboy's" adventures have mostly taken place in "Smallville," the

6  hometown he protects.  For over 50 years, "Smallville" has been associated with

7  "Superboy" in this large body of "Superboy" material, which was clearly derived

8  from the Siegel Superboy Material.  Steranko Decl., at ¶ 12- 29, Exs. A-C, Evanier

9  Decl. Exs. A, B; Toberoff Decl., Exs. O-W.

10  **B.   Copyright Infringement Analysis**

11  Section 106 of the Copyright Act sets forth the *exclusive* rights of a copyright

12  owner, including the right "to make copies" and the right "to prepare derivative

13  works." 17 U.S.C. § 106.   "Anyone who violates the exclusive rights of the copyright

14  owner in section 106…is an infringer…" 17 U.S.C. §501(a).   To prevail on its

15  copyright infringement claim, Plaintiffs must therefore show (1) that it owns a valid

16  copyright interest and (2) that Defendants have infringed Plaintiffs' copyright interest

17  by violating one or more of the exclusive rights guaranteed to copyright holders

18  under 17 U.S.C. § 106.  *See Johnson Controls v. Phoenix Control Sys.,* 886 F.2d

19  1173, 1175 (9th Cir. 1989); *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081,1085 n.3  (9th

20  Cir. 1989).

21  Copyright infringement may be shown by direct evidence of an infringing

22  work's derivation or copying, or by circumstantial evidence.  *Three Boys Music*

23  *Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir. 2000).  *See also Raz Imports v. Target*

24  *Stores,* 1997 U.S. Dist. LEXIS 21164 at*4 (CD CA 1997) ("copying can be proved in

25  one of two ways.  First, and most obvious, is through direct evidence"); *Adobe Sys. v.*

26  *Southern Software,* 1998 U.S. Dist. LEXIS 1941 at *9-10 (ND CA 1998) ("Copying

27  may be established by direct evidence…or circumstantial evidence.").  Where direct

28  evidence shows that a work is copied or derived from an underlying work, the Court

69

1    need go no further. *Id.*

2    When direct evidence is unavailable, proof of infringement may be

3    demonstrated *inferentially* by showing that (i) the defendant had "access" to the

4    plaintiff's work and (ii) that the two works are "substantially similar." *Three Boys*

5    *Music,* 212 F.3d at 481 (9th Cir. 2000). Here, Warner's "access" is undisputed.

6    WBTV's production of "Smallville" is based on an agreement between DC and

7    WBTV dated as of December 5, 2000 under which DC optioned and thereafter

8    assigned to WBTV exclusive television rights to "Superman" *and* "Superboy."

9    Toberoff Decl., Ex. F. Moreover, Warner and DC are closely affiliated corporate

10   siblings, owned by the same parent company. *See* Declaration of Paul Levitz In

11   Support of Defendants' Motion, Ex. A.

12   **C.    Plaintiffs' Evidence Of Smallville's Historical Derivation From**

13   **Siegel's Superboy Obviates The Need To Establish Copying By An**

14   **Inferential Analysis**

15   **1.    Plaintiffs Own A Valid Copyright Interest**

16   Plaintiffs have already been held in this action to own the original "Superboy"

17   copyrights as of November 17, 2004. March 24, 2006 Order, Toberoff Decl., Ex. L.

18   Thus, "Defendants do not challenge for purposes of the instant Motion" Plaintiffs'

19   ownership of a valid copyright in the Siegel Superboy Material – the first prong of

20   infringement analysis. (Mot. at 43:12-18).

21   **2.    "Smallville" Is Clearly Derived From Siegel's "Superboy"**

22   It is beyond dispute that the "Smallville" television series is derived from

23   Siegel's "Superboy" in comic book history.

24   As set forth above, after the Siegel Superboy Material was first published in

25   More Fun Comics, No. 101, it gave rise to a new copyrighted line of "Superboy"

26   comics (*i.e.*, in More Fun Comics, Nos. 102-107, Adventure Comics, Nos. 103-503,

27   Superboy, Nos. 1-235, The New Adventures of Superboy, Nos. 1-54, The Adventures

28   of Superboy, Nos. 1-100) that were separately copyrighted by Detective and distinct

70

**EXHIBIT 21**
**997**

1    from Detective's "Superman" comics.  March 24, 2006 Order at 8, Toberoff Decl.,

2    Ex. L; 1948 FOF, Facts 164-165, 171-172; Bergman Decl, Ex. M.   It is undisputed

3    that these adventures of a young Clark Kent, *before he became "Superman,"* growing

4    up with his adoptive parents and attending school in a small rural town, is the story of

5    "Superboy," and indisputable that such story is derived from the Siegel Superboy

6    Material. *Id.*

7        Unsurprisingly, the on-line Internet Movie Database (www.imdb.com), a major

8    entertainment industry resource regarding credits, specifically lists Siegel as an

9    author of *Smallville* as follows: "Jerry Siegel ('Superboy' comic book and

10   characters)."  Toberoff Decl., Ex. O.

11       Defendants' claim that their "Smallville" television series has nothing to do

12   with "Superboy," raises more than a few eyebrows.  It is undisputed that

13   "Superboy's" hometown was dubbed "Smallville" in "Superboy, No. 2."  In the

14   "Smallville" series, the lead character's best friend was "Pete Ross" and the lead has

15   a crush on the high school heart throb, "Lana Lang."  Declaration of Melinda Hage

16   ("Hage Decl."), Exs. A-H.  "Superboy's" best friend, Pete Ross, first appeared in

17   1961 in "Superboy, No. 86" and "Lana Lang" first appeared in 1950 in "Superboy,

18   No. 10" entitled "The Girl In Superboy's Life." [19]  *See* Toberoff Decl., Ex. P; Evanier

19   Report at 11-14; Evanier Decl., Ex. A.

20       For these obvious reasons, the "Smallville" series is often referred to within

21   and outside the entertainment industry as the "Superboy" series.  *See Variety*, January

22   25, 2006 ("'Superboy' was the one word sales pitch when the series that became

23   'Smallville' was birthed."); *Variety*, January 17, 2007 ("the sixth season of the

24

25   [19] Pete Ross, in both the "Superboy" comics and "Smallville," discovers Clark's hidden powers and
     must keep his secret.  Toberoff Ex. P; Hage Decl., Exs. A-H. Lana Lang, in both the "Superboy"
26   comics and "Smallville," has an on again, off again romances with Clark, is often snooty, gives him
     grief and is regularly transformed into someone else due to supernatural forces. *Id.*  By "Superboy,
27   No. 145," Clark's adoptive parents regain their youth and are the same age as in "Smallville."
     Toberoff Decl., Ex. X. In the Superboy comics, Lex Luthor and Superboy are originally friends, like
28   in "Smallville," until Lex blames Superboy for an accident. Hage Decl., Exs. A- H; Evanier Decl.
     Ex. A, Toberoff Decl., Ex. X.

                                                71

     PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**998**

1  Superboy series Smallville"); *Variety*, September 30, 2003 ("updated Superboy into a

2  winner with Smallville"); *New York Times*, April 20, 2006 ("8 P.M. (11)

3  SMALLVILLE … Poor Clark Kent, aka Superboy (Tom Welling) ); *New York*

4  *Times*, June 5, 2005 ("9 P.M. (11) SMALLVILLE …This is not the best time for

5  young Clark (Tom Welling) aka Superboy…"); *New York Times*, October 27, 2005

6  ("8 P.M. (11) SMALLVILLE…Meanwhile Superboy's friend Lana Lang (Kristen

7  Kreuk)…"); *Entertainment Weekly*, September 13, 2002 ("Smalville The WB, 9-10

8  PM…Superboy faces a new challenge…").  Toberoff Decl., Exs. Q, R.

9      A prior "Superboy" television series (1988-1992) depicted a *teenage* Clark

10  Kent interacting with his classmates *in college* and was aptly called "Superboy" a.k.a.

11  "The Adventures of Superboy." Evanier Decl., Ex. A.  "Smallville" is produced by

12  WBTV.  The President of WBTV, now and when "Smallville" was first developed in

13  2000 is/was Peter Roth ("Roth").  In 1979, Roth had been a television executive at

14  ABC, where he tried to develop a live action show around the character of

15  "Superboy."  *See* exerpts of Roth's deposition transcript ("Roth Tr.") at 34:6-14,

16  50:1-53:18; 54:19-56-15; Toberoff Decl., Ex. S.  He had one problem – the rights to

17  the character were controlled by Warner Bros. – which did not want to license ABC

18  the rights.  *Id.* at 38: 7-10, 46: 20-47: 2, 49: 1-22.  These facts are recounted in part in

19  *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 236 (2d

20  Cir. 1983) wherein Warner sued ABC for copyright infringement when ABC

21  nonetheless went ahead in 1981 and produced a "superhero" series with Stephen

22  Cannell titled "The Greatest American Hero."  In 1986, Roth left ABC and joined

23  Stephen Cannell Productions.  Roth Tr. 16: 18-20.

24      In March of 1999, Roth joined WBTV as its President and for the first time

25  (since his desire to launch a "Superboy" series in1970) he finally had access to the

26  "Superboy" rights.  Roth Tr. 12: 16-17, 21: 25-22: 1.  Toberoff Decl., Ex. S.  By 2000,

27  Roth and WBTV were developing the "Smallville" series.  Roth Tr. 63: 9-17, 68:22-

28  25.  WBTV hired David Nutter (Nutter) to direct the pilot episode of "Smallville."

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**999**

1  *See* exerpts from Nutter's deposition transcript ("Nutter Tr.") at 31: 9-17; Toberoff

2  Decl., Ex. U.  Nutter had directed no less than twenty-two episodes of the prior

3  "Superboy" television series a.k.a. "The Adventures of Superboy" (1988-92). *Id.*

4         Roth con irms that "Smallville" and "Superboy" share the same character and

5  that this character is <u>not</u> "Superman."

6         Q.    ... I understand that it's believed that Superboy is really the depiction of

7  Clark Kent before he became Superman.  Is that your understanding?

8         A.    Yes.

9  Roth Tr. 58: 18-22.

10        Q.    ...Do you believe Smallville is derived from the Superman movies?

11        A.    The origination of Smallville was to do a young Clark Kent.  That was

12  the origination and derivation of the show, a prequel to Clark Kent, the adult.

13        Q.    Before he becomes Superman?

14        A.    Correct.

15  Roth Tr. 108: 9-15.[20]

16        In a 2004 interview, Alfred Gough ("Gough"), one of the two "showrunners"

17  (*i.e.*, writer/producer) of "Smallville" recounted the genesis of the series:

18        "Miles [Millar] and I were brought in by Peter Roth, the president of
       Warners Television.  And he always wanted to do Superboy...We also
19     came up with the idea for the meteor shower...which is 'kryptonite
       mutates people and gives them super powers,' otherwise who the hell
20     does Clark fight every week? He is 'Superboy' after all."

21  Toberoff Decl., Ex. V.  In his deposition, Mr. Gough claimed these references to

22  "Superboy" were a "mere inadvertence."  See excerpts of Gough deposition transcript

23  ("Gough Tr.") at 73:1-74:1-25; 76:12-17, Toberoff Decl., Ex. T.  Yet, in another 2004

24  Gough interview, it was again reported "Warner Bros...ask[ed] Gough and his

25  partner to develop a TV series about Superboy for the WB network."  Toberoff Decl,

26

27  [20] Roth further confirmed that because Warner Bros. Pictures had long been developing a new
    "Superman" movie they naturally did not want a WBTV series to compete with Warner Bros.
28  Pictures' planned "Superman" film. Roth Tr. 111: 19-25. Whereas a "Superman" series would
    compete, WBTV's Superboy/Smallville series would not.

                                        73

    PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1000**

1   Ex. V. *See also* Gough Tr. 78: 11- 79: 12, Toberoff Decl., Ex. T.

2      It is no wonder that Judge Lew, in denying Defendants' duplicate motion for

3 summary judgment, found that "[e]nough facts are presented where this Court,

4 contrary to defendants' request, could find that the main character in "Smallville" is,

5 in fact, "Superboy." [21]   March 24, 2006 Order at 16, Toberoff Decl., Ex. L.

6     **3.**    **As A Derivative Work, "Smallville" By Definition Infringes**

7           **The Recaptured Superboy Copyrights And Requires A**

8           **License From Plaintiffs**

9      "The very definition of a derivative work requires that the author of the

10 derivative work receive consent from the author of the underlying work(s)." *Maljack*

11 *Productions v. UAV Corp.*, 964 F. Supp. 1416, 1422 (C.D. CA 1997); 17 U.S.C. §

12 301. "If the pre-existing work that serves as the basis for a derivative or collective

13 work is itself protected by copyright, then its unauthorized incorporation into a

14 derivative or collective work constitutes copyright infringement…In a derivative

15 work, that incorporation violates the right to prepare derivative works based upon the

16 pre-existing work." 1-3 *Nimmer* § 3.06; *see* 17 U.S.C. § 106 ("the owner of copyright

17 under this title has exclusive rights to do and to authorize any of the following: ….(2)

18 to prepare derivative works based upon the copyrighted work").

19      The Copyright Act clearly provides a cause of action for such infringement. 17

20 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a

21 copyright is entitled…to institute an action for any infringement of that particular

22 right committed while he or she is the owner of it.").

23      Because Plaintiffs can *directly* show that "Smallville" is historically derived

24 from "Superboy" and that Plaintiffs own the copyright to the underlying work, an

25 inferential analysis ("access" and "substantial similarity") is superfluous. Defendants

26 *by definition* infringe Plaintiffs' rights under 17 U.S.C. §106(2) by their continued

27

28 ----
[21] Judge Lew noted that "[i]n the Superboy comics a billboard on the side of a rural country road
announces, "Welcome To Smallville! Home of Superboy." See Toberoff Decl., Ex. L.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1001**

production of a clearly derivative work.

D.    **To The Extent An Inferential Analysis Is Employed, Summary Judgment On The Issue Of Substantial Similarity Is Disfavored**

It is well settled that "[s]ince substantial similarity is usually an extremely close question of fact, summary judgment has traditionally been disfavored in copyright litigation." *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329-30 (9th Cir. 1983) (reversing grant of summary judgment); *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990)(summary judgment is "not highly favored on questions of substantial similarity in copyright cases"); *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir 1996)(summary judgment is disfavored "on questions of substantial similarity in copyright cases"); *Litchfield v. Spielberg*, 736 F.2d 1352, 1355 1984 (9th Cir. 1984)("substantial similarity is usually an extremely close issue of fact and summary judgment has been disfavored in cases involving intellectual property"); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980), *cert. den.*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed. 2d 49 (1980); ("Because substantial similarity is customarily an extremely close question of fact," summary judgment for lack of such similarity should ordinarily be denied); *Levine v. McDonalds Corp.*, 735 F.Supp. 92, 96 (SDNY 1990)(substantial similarity is normally a jury question).

Where "reasonable minds could differ on the issue of substantial similarity . . . summary judgment is improper." *Twentieth Century*, 715 F.2d at 1329-30. *See also Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir.1987) *cert. denied*, 484 U.S. 954, 108 S. Ct. 346, 98 L. Ed. 2d 372 (1987) (reversing grant of summary judgment because reasonable minds could differ on similarity of musical theme in film); *See v. Durang*, 711 F.2d 141, 143 (9th Cir 1983). If the non-moving party presents "'indicia of a sufficient disagreement concerning the substantial similarity of [the] two works,' then the case must be submitted to a trier of fact." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *see Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472

75

**EXHIBIT 21**
**1002**

1  (9th Cir. 1992) ("A 'genuine issue' exists when the plaintiff provides indicia of 'a

2  sufficient disagreement' concerning the substantial similarity of two works 'to require

3  submission to a jury.'"); *quoting Liberty Lobby,* 477 U.S. at 256.

### E.    In Applying An Extrinsic Analysis A Court Must Still Consider The Response Of An Ordinary Observer To The Works As A Whole

6          The Ninth Circuit determines whether substantial similarity exists by looking

7  to *both* extrinsic and intrinsic factors. *See Three Boys,* 212 F.3d at 485. "The

8  extrinsic test considers whether two works share a similarity of ideas and expression

9  as measured by external, objective criteria," such as the work's plot, theme,

10 characters, dialogue, mood, setting, pace, and sequence of events. *Swirsky,* 376 F.3d

11 at 845.  The intrinsic test is subjective and asks "whether the ordinary, reasonable

12 person would find the total concept and feel of the works to be substantially similar."

13 *Id.* at 485 *quoting Pasillas v. McDonald's Corp.,* 927 F.2d 440, 442 (9th Cir. 1991)).

14         The Ninth Circuit has held that in determining substantial similarity for

15 purposes of summary judgment, the objective criteria of the extrinsic test should not

16 be applied in a vacuum without regard to a work as a whole.  In the seminal case

17 involving substantial similarity of literary works, *Sid & Marty Krofft Television*

18 *Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1169 (9th Cir. 1977), the

19 Ninth Circuit cautioned:

20         "Defendants would have this court ignore that intrinsic quality which they
           recognized to embark on an extrinsic analysis of the two works...Lest we
21         fall prey to defendants' invitation to dissect the works, however, we should
           remember that it is the combination of many different elements which may
22         command copyright protection because of its particular subjective quality.
           'While any one similarity taken by itself seems trivial, I cannot say at this
23         time that it would be improper for a jury to find that the over-all impact and
           effect indicate substantial appropriation.'" (internal citations omitted).
24

25         In *Baxter v. MCA, Inc.,* 812 F.2d 421, 424-5 (9th Cir. 1987), the Ninth Circuit

26 reversed the district court's grant of summary judgment on the issue of substantial

27 similarity because it lost sight of the "intrinsic test" in applying extrinsic factors:

28         "Determinations of substantial similarity of expression are subtle and
           complex. The test to be applied has been labeled an 'intrinsic' one by

76

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1003**

1  this Court in that it depends not upon external criteria, but instead upon
the response of the ordinary reasonable person to the works. 'Analytic
dissection' and expert testimony are not called for; the gauge of
2  substantial **similarity** is the response of the ordinary lay hearer;"

3  citing *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946), *cert. denied*, 330 U.S.

4  851, 67 S. Ct. 1096, 91 L. Ed. 1294, (1947). The *Baxter* court explained:

5  "[D]efendant's "argument ignores the fundamental notion that no bright
line rule exists as to what quantum of similarity is permitted before
6  crossing into the realm of substantial similarity. Here, the ear of the
court must yield to the ears of jurors..." *Id.* at 425.

7

8  The Second Circuit similarly employs an inferential copyright infringement

9  analysis whereby the extrinsic elements are examined in the context of an "ordinary

10  observer" test to determine substantial similarity. *See Arica Institute, Inc. v. Palmer*,

11  970 F.2d 1067, 1072 (2d Cir. 1992), *citing Ideal Toy Corp. v. Fab-Lu, Ltd.*, 360 F.2d

12  1021, 1022 (2d Cir. 1966), in which the courts compare the ***total concept and feel*** of

13  contested works. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001);

14  *Knitwaves, Inc. v. Lollytags Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995); *Streetwise Maps*,

15  *Inc. v. Vandam, Inc.*, 159 F.3d 739, 748 (2d Cir. 1998).

16  **1.    Inverse Ratio Rule Applies**

17  Where, as here, access is undisputed, the Ninth Circuit applies the so-called

18  "inverse ratio rule" which "'require[s] a lower standard of proof of substantial

19  similarity." *Three Boys Music*, 212 F.3d at 485-6, *quoting Smith v. Jackson*, 84 F.3d

20  1213, 1217 (9th Cir. 1996); *Shaw*, 919 F.2d at 1361-1362 ("In applying the extrinsic

21  test, we require a lower standard of proof on substantial similarity when a high degree

22  of access is shown."); *Krofft.*, 562 F.2d **at** 1172 (holding that high "degree of access

23  justifies a lower standard of proof to show substantial similarity"). Other circuits are

24  in accord. *See e.g., Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999) (the degree of

25  proof of access is inversely proportional to the similarity between the works at issue).

26  **F.    Defendants Methodology Is Improper**

27  **1.    Deconstruction, Abstraction And Dissection Is**

28  **Disfavored**

77

**EXHIBIT 21**
**1004**

1    Defendants' analysis intentionally "misses the forest for the trees" and
2    selectively deconstructs, dissects and abstracts Siegel's "Superboy" into allegedly
3    unoriginal or "scenes a faire" components to avoid the import of his copyrightable
4    work as whole.

5        However, the Courts specifically *reject* Defendants' deconstruction technique.
6    *Krofft*, 562 F.2d at 1169; *Baxter*, 812 F.2d 421, 424-5. As set forth in *Boisson*, 273
7    F.3d at 272:

8        "[A] court is not to dissect the works at issue into separate components
         and compare only the copyrightable elements. To do so would…result
9        in almost nothing being copyrightable because original works broken
         down into their composite parts would usually be little more than basic
10       unprotectable elements like letters, colors and symbols. *Id.* This
         outcome -- affording no copyright protection to an original compilation
11       of unprotectable elements -- would be contrary to the Supreme Court's
         holding in *Feist Publications* (internal citations omitted)."
12

13       Substantial similarity can be found in a combination of elements, even if those
14   elements are individually unprotected. *See Satava v. Lowry*, 323 F.3d 805, 811 (9th
15   Cir. 2003). Because the Supreme Court held in *Feist Publications v. Rural Tel.*
16   *Service Co.*, 499 U.S. 340, 362, 111 S. Ct. 1282 (1991) that an original compilation
17   thoroughly unprotectable elements is itself copyrightable, Defendants' approach of
18   singling out and abstracting elements of Siegel's work as purportedly unprotectable
19   does *not* refute Plaintiffs' infringement claim as a matter of law. *See Knitwaves, Inc.*
20   *v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. N.Y. 1995)(courts not "required to
21   dissect [works] into their separate components, and compare only those elements
22   which are in themselves copyrightable…if we took this argument to its logical
23   conclusion, we might have to decide that 'there can be no originality in a painting
24   because all colors of paint have been used somewhere in the past'").
25       Such "dissection" of a works' subject matter into allegedly protected and
26   unprotected elements is rejected as of "no assistance." *Novelty Textile Mills, Inc. v.*
27   *Joan Fabrics Corp.*, 558 F.2d 1090, 1093 n.4 (2d Cir.1977); *Levine v. McDonalds*
28   *Corp.*, 735 F.Supp. 92, 97 (SDNY 1990). *See also Sofitel, Inc. v. Dragon Med. and*

78

**EXHIBIT 21**
**1005**

1   *Scient. Commns, Inc.*, 118 F.3d 955, 964 (2d Cir. 1997); *Nihon Keizai Simbun, Inc. v.*

2   *Comline Bus. Data, Inc.*, 166 F.3d 65, 70-71 (2d Cir. 1999) (focused not on whether

3   facts protected but whether the organization of facts were substantially similar); *CBS*

4   *Broad., Inc. v. ABC*, 2003 U.S. Dist. LEXIS 20258, *13-14 (S.D.N.Y. 2003)

5   ("applying this [substantial similarity] test a court is not to dissect the works at issue

6   into separate components and compare only the copyrightable elements.").

7         In *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002), the Ninth Circuit

8   reversed the district court's grant of summary judgment, finding that "[t]he totality of

9   the similarities goes beyond the necessities of the theme and belies any claim of

10  literary accident.' *Id.* at 1074, *quoting Shaw*, 919 F.2d at 1363 ("Even if none of

11  these [common] plot elements is remarkably unusual in and of itself… these similar

12  events gives rise to a triable question of substantial similarity of protected

13  expression."). The Ninth Circuit held that "generic similarities and the common

14  patterns in which they arise…satisfy the extrinsic test…Each note in a scale, for

15  example, is not protectable, but a pattern of notes in a tune may earn copyright

16  protection." *Id.* at 1074.

17        Thus, in *Fleener v. Trinity Broadcasting Network*, 203 F. Supp. 2d 1142, 1149

18  (C.D. Cal. 2001) this Court held:

19        "[E]ven if Defendant could succeed in characterizing each element as too
          general, copyright also protects the expressive act of arranging completely
20        unprotected works….the significant overlap of important plot developments
          combined with thematic and setting similarities creates a genuine issue of
21        material fact as to substantial similarity." (Internal citations omitted)

22  *See Kroft,* 562 F.2d at 1166-67 n.9 (relying on "trees, caves, a pond, a road and a

23  castle" in finding substantial similarity); *Dr. Seuss Enter. v. Penguin Books USA,*

24  *Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997)(back cover illustration and drawings of hat

25  sufficient under objective analysis); *See v. Durang*, 711 F.2d 141 (9th Cir. 1983).

26        Defendants' dissective filtering is antithetical to the mandate to examine works

27  in the context of their *overall* expression. *Kroft*, 562 F.2d at 1169; *Baxter*, 812 F.2d

28  at 424-5. Even where subject to random isolated attacks as conventions or scenes a

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 21
1006

1  faire,[22] the elements of Siegel's "Superboy" clearly coalesce to create a protectable

2  work, from which "Smallville" is unquestionably derived.  Defendants' erroneous

3  approach would leave no copyright protected, except in cases of mechanical

4  duplication.  Under Defendants' microscope, a Seurat painting is but a series of dots,

5  not a beautiful lakeshore scene.  *See Knitwaves,* 71 F.3d at 1003.  In light of the

6  injustice that would consistently result from Defendants' skewed analysis, both the

7  Ninth Circuit and Second Circuit require that a court take a step back and consider

8  the overall impression of a work as a whole on the "ordinary observer."  *See Kroft,*

9  562 F.2d at 1169; *Baxter,* 812 F.2d at 424-5; *see Hamil Am., Inc. v. GFI, Inc.,* 193

10 F.3d 92, 102 (2d Cir. 1998); *Boisson,* 273 F.3d at 273.

11        2.    **Defendants Focus On The Works' Differences Is Improper**

12        Defendants improperly rely on "Smallville's" differences.  In copyright

13 infringement analysis Courts are to focus on the works' similarities, not differences

14 because "even if a copied portion be relatively small in proportion to the entire work,

15 if *qualitatively* important, the finder of fact may properly find substantial similarity."

16 *Baxter,* 812 F.2d at 425 (emphasis added); *see also Apple Computer v. Microsoft*

17 *Corp.,* 821 F. Supp. 616, 624 (N.D. Cal. 1993)("Of course, quantitatively

18 insignificant infringement may be substantial if the material is qualitatively important

19 to plaintiff's work").  *See also Swirsky,* 376 F.3d 841 at 844; *Walt Disney Productions*

20     ---
[22] The creative expression in Siegel's Superboy Story goes far beyond mere *scenes a faire*.  See
Bergman Decl., Ex. I.  The lead character is an alien with superpowers and though raised as a
human by loving parents and yearning to be accepted as a human, he must come to grips with the
fact that he is fundamentally different from all others. These elements are greatly heightened by
Siegel's other elements and creative choices; for instance, his choice that the lead character be cast
as an adolescent attending school, and his choice that the story be set in a small town environment
where it is far harder to blend into the crowd.  In Siegel's story the leads' literal "alienation" from
his classmates and inability to disclose who he really is for fear of rejection, coupled with his desire
to be accepted (a member of the *Thick 'n Thin* club), is a compelling literary metaphor for
adolescence, itself, to which the comics' target teen audience can easily relate.  In other words,
while any one element isolated or abstracted might be attacked, when properly viewed as a whole
they comprise protectible expression.  An expression so compelling that it lead to and endured as a
distinct line of "Superboy" comics, separately copyrighted by Defendants' predecessors and DC
alike, which now claims it is unoriginal and unprotectible. Steranko Decl., at ¶ 12- 29, Exs. A-C,
Evanier Decl. Exs. A.

80

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1007**

1  *v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) (cartoon figure in adult comic books);

2  *Universal Pictures v. Harold Lloyd*, 162 F.2d 354 (9th Cir, 1947) (one sequence from

3  a film); *Heim v. Universal Pictures Co.*, 154 F.2d 480, 488 (2d. Cir. 1946)(single

4  brief phrase so idiosyncratic as to preclude coincidence might suffice to show

5  copying); *Fred Fisher, Inc. v. Dillingham*, 298 F.145 (S.D.N.Y 1924) (L. Hand, J.)

6  (eight note "ostinato" held to infringe copyright in song); *Meeropol v. Nizer*, 560 F.2d

7  1061, 1071 (2d Cir. 1977) (copyrighted letters constituted less than 1% of infringing

8  work but were prominently featured).  *See generally Nimmer* § 13.03[A][2] at 13-36

9  (notion that copying three bars from musical work can never constitute infringement

10 is without foundation).

11        As the Supreme Court held in *Harper & Row, Publishers v. Nation*

12 *Enterprises*, 471 U.S. 539, 564-65, 105 S. Ct. 2218 (1985) "the statutory language

13 indicates a taking may not be excused merely because it is insubstantial with respect

14 to the infringing work.  As Judge Learned Hand cogently remarked, 'no plagiarist can

15 excuse the wrong by showing how much of his work he did not pirate,'" quoting

16 *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936), *cert.*

17 *denied*, 298 U.S. 669 (1936).

18        Therefore, in copyright infringement actions, courts refuse to take Defendants'

19 approach of focusing on the differences between the works.  *See v. Durang*, 711 F.2d

20 141, 143 (9th Cir. 1983) (citing cases establishing that the presence of additional,

21 dissimilar material does not negate similarity between works); 3-10 *Nimmer* § 13.02

22 [B][1][a], p. 13-53; *Novelty Textile,* 558 F.2d 1093 n.4 ("The key…is therefore the

23 similarities rather than the differences.").  "Even when two works are dissimilar in

24 many respects, substantial similarity between them may still be found where their

25 similarities are important in the overall context, whether qualitatively or

26 quantitatively." *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309(S.D.N.Y. 1999); *See*

27 *New Line Cinema Corp. v. Easter Unlimited, Inc.*, 1989 U.S. Dist. LEXIS 17340, *10

28 (EDNY 1989) ("[e]ven if a copied portion be relatively small in proportion to the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1008**

1   entire work, if qualitatively important, the finder of fact may find substantial

2   similarity"); *Miller v. Miramax Film Corp.*, 2001 U.S. Dist. LEXIS 25967 *15, *26-7

3   (C.D. Cal. 2001) (denying summary judgment on infringement claim where despite

4   numerous differences, reasonable minds could differ as to whether a script and film

5   shared similarities).

6       Moreover, courts recognize that where, as here, a literary work is transformed

7   to a different medium or form of presentation, a great number of dissimilarities in the

8   final product results; and this, in turn must be discounted in infringement analysis.

9   *See Filmvideo v. Hastings*, 509 F. Supp. 60, 65-66 (S.D.N.Y. 1981), *aff'd*, 668 F.2d

10  91 (2d Cir. 1981); *Twentieth v. Stonesifer*, 140 F.2d 579 (9th Cir. 1944); *Computer*

11  *Assocs. v. Altai*, 982 F.2d 693 (2d Cir. 1992); *Bevan v. Columbia*, 329 F. Supp. 601

12  (S.D.N.Y. 1971); *Sheldon*, 81 F. 2d at 49.

13      Defendants' pointing to aspects of "Smallville" which have no counterparts in

14  "Superboy" is particularly misplaced. The operative analysis for the derivative

15  "Smallville" is how much of "Superboy" is in "Smallville," not vice versa. *See* 1-3

16  *Nimmer* §3.03 (2007); *Asia Entertainment Inc. v. Nguyen*, 40 U.S.P.Q.2d 1183, 1185

17  (C.D. Cal. 1996); *Entertainment Research Group, Inc. v. Genesis Creative Group,*

18  *Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997), *cert. denied*, 523 U.S. 1021, 118 S. Ct.

19  1302, 140 L. Ed. 2d 468 (1998) (a derivative work too similar to underlying work

20  would give derivative copyright holder undue "power to interfere with subsequent

21  derivative works from the same underlying work"); *see also Ets-Hokin v. Skyy*

22  *Spirits*, 225 F.3d 1068, 1073 (9th Cir. 2000); H.R. Rep. No. 94-1476, at 62 (1976)

23  (maintaining in the 1976 Act the historical distinction between reproduction and

24  derivative rights that exists because a derivation would not necessarily incorporate

25  the entire work, or even a substantial part thereof).

26      **3.    Defendants' Reliance On Prior Art Is Improper**

27      Defendants' tactic of identifying alleged similarities in prior art to purportedly

28  show that Superboy is unoriginal is also shunned by the courts. *See Sheldon*, 81 F.2d

82

**EXHIBIT 21**
**1009**

1    at 53 (Hand, J.) ("[Defendants] have filled the record with earlier instances of the

2    same dramatic incidents and devices, as though, like a patent, a copyrighted work

3    must be not only original, but new.").

4        In *Feist*, 499 U.S. at 345, the Supreme Court explained the minimal

5    requirement of originality necessary to copyright a work:

6        "Original, as the term is used in copyright, means only that the work was
independently created by the author ... and that it possesses at least some
7    minimal degree of creativity... To be sure, the requisite level of creativity is
low; even a slight amount will suffice. The vast majority of works make the
8    grade quite easily, as they possess some creative spark, 'no matter how
crude, humble or obvious' it might be. . . (citations omitted)."
9

10        Thus, the degree of originality required for a work to be copyrightable is

11    relatively small. *ETS-Hokin.*, 225 F.3d at 1073 (referring to "the low threshold

12    for originality under the Copyright Act"). *See Nimmer* § 3.30 at 3-13 ("The

13    applicable standard in determining the necessary quantum of originality is that of

14    a 'distinguishable variation' that is more than 'merely trivial'." ).

15        **4.**   **Defendants Erroneously Limit Their Analysis To**

16            **"Smallville" Episodes Produced After November 17, 2004**

17        Defendants improperly circumscribe their analysis to only the "Smallville"

18    episodes produced after the Superboy Termination Date (November 17, 2004).

19    Pursuant to 17 U.S.C. § 304(c)(6)(A), Defendants are free to continue to

20    distribute pre-November 17, 2004 "Smallville" episodes under Siegel's original

21    1948 Grant.  However, this does not mean that such episodes are irrelevant to

22    whether the post-Termination episodes infringe Siegel Superboy Material.

23        The "Smallville" series consists of the first "pilot" episode ("Pilot"),

24    followed by a series of sequel episodes.[23]  Its audience tunes in each week to

25    follow the evolution of their favorite characters, themes and plotlines in each new

26    _____

27    [23] Of particular significance is the "Smallville" Pilot, because the pilot episode of a television series
establishes the continuing format for the show. Steranko Decl., ¶ 28.  If the "Smallville" Pilot could
28    reasonably appear to a juror to be derivative of Siegel's "Superboy," the later episodes in the series
which, by definition, are derived from the Pilot are derivative of the same source material.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1010**

1  episode. The elements in later episodes therefore inherently include those of

2  earlier episodes engrained in both the series and its audience. Accordingly, the

3  post-Termination episodes should not be viewed in a vacuum when assessing

4  their content, but in the context of the Pilot and of the series as a whole. *See*

5  Steranko Decl., ¶ 28.

**G.**   **As Held By Judge Lew, The Similarities Between Siegel's**
6

7        **"Superboy" And "Smallville" Are More Than Sufficient To Raise A**

8        **Triable Issue Of Fact**

9        The evidentiary and historic link between Siegel's "Superboy" and the

10  derivative "Smallville" is so strong as to directly evidence infringement, thereby

11  obviating the need for an inferential analysis. Plaintiffs nonetheless have set forth

12  below similarities between the works which even under a purely inferential analysis

13  are sufficient to raise a genuine issue of material fact as to this issue.  The Court is

14  additionally referred to the declarations of Plaintiffs' experts, James Steranko and

15  Mark Evanier filed concurrently herewith, to their attached expert reports, and to the

16  matrix of additional similarities attached to the declaration of James Steranko, broken

17  down and keyed to the "post-termination" episodes of "Smallville" which are

18  identified by season, episode and DVD chapter. Steranko Decl., at ¶ 12- 29, Exs. A-

19  D, Evanier Decl. Exs. A, B; Toberoff Decl., Exs. O-W.

20        Judge Lew clearly found, after reviewing Plaintiffs' detailed content

21  comparisons "in the light most favorable to the non-moving party" that "genuine

22  issues of material fact exist as to whether Defendants' television show *Smallville* is

23  infringing Plaintiffs' copyrights." March 24, 2006 Order at 16, Toberoff Decl., Ex.

24  L.

25        Defendants falsely state and misleadingly emphasize that Plaintiffs provided

26  only vague general similarities in response to Defendants' interrogatories and were

27  "ordered by the Court" to present specific similarities. Mot. at 61:1, *see* Bergman

28  "L.R. 7-17" Decl., ¶ 10. In fact, Magistrate Zarefsky's October 27, 2006 Order

84

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1011**

1   (denying in part and granting in part Defendants' motion to compel) to which

2   Defendants refer, but conveniently fail to cite to in their Motion, confirms that

3   Plaintiffs "listed, fairly *specifically in the Court's view*, certain themes, settings and

4   characters which they believe have been infringed by the themes, setting and

5   characters in the *Smallville* episodes." Bergman Decl., Ex. QQ at 1240:26-28. [24]

### 1.   Characters / Relationships

Superboy / Young Clark

8   The Siegel Superboy Material established "Superboy's" character, family and

9   social life as an alien with superpowers growing up and attending school in a small

10  rural American town. Bergman Decl. Ex. I. He is an alien, yet raised as a human by

11  his adoptive parents who instill in him the need to conceal his powers.  While

12  grappling with growing up and wanting to be accepted by his peers, "Superboy" must

13  face the challenges and responsibilities of his extraordinary developing powers while

14  concealing his true self. "Superboy" is portrayed as a rather modest, thoughtful young

15  man, who is somewhat a loner. Steranko Decl., at ¶ 12- 29, Exs. A-D, Evanier Decl.

16  Exs. A, B. His concealment of his powers converges with his adolescent desire to "fit

17  in," despite his differences.  He experiences adolescence and all which that entails in

18  the greatly heightened context of coming to grips with his alien identity/powers and

19  that he is very different from everyone else.  He arrives at the self-discovery that he is

20  destined for a greater purpose – to use his power to help those in need.

21  "Smallville" sets forth the lead character's family and social life as an alien

22  with superpowers growing up and attending school in a small rural American town.

23  Steranko Decl., at ¶ 12- 29, Exs. A-C, Evanier Decl. Exs. A, B; Toberoff Decl., Exs.

24  O-W; Hage Decl., Exs. B, D, F, H. Even though he is an alien, he is raised as human

25  by his adoptive parents who instill in him the need to conceal his powers. *Id*. While

26

27  [24] Magistrate Zarefsky ordered that Plaintiffs supplement their responses with "specific passage(s),
    image(s) or scene(s)" because that language, now quoted by Defendants out of context, was

28  contained in a stipulation reached by the parties in the "meet and confer" process. *Id.* at 1240:1-
    1241:6.

85

**EXHIBIT 21**
**1012**

1  struggling with adolescence and yearning for acceptance by his classmates, he faces

2  the challenges and responsibilities of his extraordinary emerging powers while

3  concealing his true self. *Id.* He is depicted as a modest, thoughtful young man, who

4  is somewhat a loner. *Id.* His concealment of his powers converges with his adolescent

5  desire to "fit in," despite his differences, and "to be normal." *Id.* He experiences

6  adolescence and all which that entails in the greatly heightened context of coming to

7  grips with his alien identity/powers and that he is very different from everyone else.

8  He gradually comes to the self-discovery that he has a greater purpose in life – to use

9  his power to help those in need.

10      After insisting that the Court dissect and compare elements in an inferential

11  analysis, including the characters, Defendants incorrectly claim that characters, such

12  as "Superboy," are not copyrightable. *See Universal City Studios, Inc. v. Film*

13  *Ventures Int'l, Inc.*, 543 F. Supp. 1134, 1137-38 (C.D. Cal. 1982) (finding that the

14  local shark expert in the film "Great White" constituted a combination of the shark

15  expert and the local police chief in "Jaws"); *Silverman v. CBS, Inc.*, 632 F. Supp.

16  1344, 1355 (S.D.N.Y. 1986) (finding that the characters from "Amos 'n' Andy" were

17  afforded copyright protection); *Ideal Toy Corp. v. Kenner Prods. Div. of General*

18  *Mills Fun Group, Inc.*, 443 F. Supp. 291, 301 (S.D.N.Y. 1977) (finding characters in

19  the movie "Star Wars" to be copyright protected).

20      Indeed, copyright protection is particularly afforded to comic book characters

21  such as "Superboy." *See Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th

22  Cir. 1978), cert. denied, 439 U.S. 1132, 99 S. Ct. 1054, 59 L. Ed. 2d 94 (1979)

23  (holding a comic book character more likely to contain unique elements of

24  expression, and that as the "plot of the piece not only centers around the character but

25  is quite subordinated to the character's role"). As Siegel's "Superboy" was held to be

26  published in More Fun Comics, No. 101 in both the 1947 Action, and again by Judge

27  Lew in this action; and Defendants explicitly assume this to be true for purposes of

28  their motion (Mot. at 43:15-16), they can hardly argue that Siegel's "Superboy" is not

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 21
1013

1   a defined and protectable comic book character. *Id.*

2       Defendants also surprisingly claim "that the kind of superhero traits repeated in

3   the Superboy character…have been judicially held to be too common in the superhero

4   genre or are *scenes a faire*," mis-citing *Warner Bros., Inc. v. American Broadcasting*

5   *Co.*, 654 F. 2d 204, 210-211 (2d Cir. 1981). Firstly, this case found that although the

6   comic book character "Superman" *is* copyright protected, defendants' parody did not

7   infringe the copyright. Secondly, with the exception of the last "splash panel" (not

8   considered part of the story) in the Superboy Story and in More Fun Comics, No.

9   101, "Superboy," like the lead in "Smallville," is dressed in civilian clothes and does

10   not exhibit what *today* may be commonplace "superhero" traits. The focus of the

11   character in the Superboy Story, like in "Smallville" is much more on his interaction

12   with his parents and classmates. Bergman Decl., Ex. I.

13       Importantly, the distinctive and original qualities of Siegel's Superboy should

14   not be judged from a contemporary perspective, when superheroes are commonplace,

15   but from the time it was created. In fact, it is well settled that Siegel spawned the

16   "superhero" genre so prevalent in our entertainment and publishing industries.

17   Bergmann Decl., Ex. HH; Steranko Decl., at ¶ 12- 29, Exs. A-C, Evanier Decl. Exs.

18   A. In 1938 and 1940 when Siegel wrote the Siegel Superboy Materials, the story of

19   an alien with superpowers who is raised as a human, experiences adolescence in

20   smalltown U.S.A., and embarks on adventures with his classmates, was so original

21   that it sparked a distinct line of successful comic books, animated and live action

22   television series. For Defendants to now scoff at that which they have so handsomely

23   profited from over the last 67 years is ironic.

24       Defendants generalize and falsely describe the expression of the lead character

25   in the Siegel Superboy Material as simply "a boy engaged in light adventure" who

26   shows no internal or adolescent struggle. Siegel's Superboy Story states otherwise.

27   When the Kents first realize that their son is not "normal," the framework of the story

28   is established in the following dialogue:

87

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1014**

1    Charles:   The strengths of a dozen elephants yet it still possesses the
2              instincts of a normal child!…
3    Charles:   Mary, I'm just beginning to realize!  We've a problem child
4              on our hands!  And in more ways than one!
5    Mary:      I see what you mean.  Our boy's extraordinary strength may
6              make him the object of everyone's envy and fear.…cause
7              him to be an outcast.  We musn't let THAT happen!"

8    Bergman Decl., Ex. I at 46.  Later the caption reads:  "The task of teaching the infant

9    Clark to conceal his tremendous strength begins."  *Id.* at 47.

10         Superboy's adoptive mother later states "I've been dreading this for a long

11   time…but I believe the time has come when we're obliged to place Clark in school."

12   *Id.,* at 49.  As the story unfolds "Superboy" is shown attending pre-junior high school

13   and is the butt of school pranks and bullies, but cannot reveal who he really is.  *Id.* at

14   50.  He nonetheless wants to be accepted – to belong.  When asked by Tom whether

15   he "[w]ant[s] to join the Thick-and-Thin Club?," he emphatically responds: "Oh

16   Yes!"  *Id.*  However, this is but another cruel prank ("Tom:  This kid Clark always

17   keeps off by himself.   Let's pretend we want him to join the club an' give him th'

18   works.")  *Id.*  In the ensuing adventure "Superboy" heroically saves his undeserving

19   classmates, yet when congratulated by his adoptive parents ("You're quite a hero

20   Clark, aren't you since that write-up in the papers?") he replies:  "I didn't do much."

21   *Id.* at 51-53.  That evening he lies on his bed in his room contemplating his future and

22   "feels a strange premonition" of things to come.  *Id.* at 54; Steranko Decl., at ¶ 12-

23   29, Exs. A-C, Evanier Decl. Exs. A.

24         Defendants similarly misrepresent More Fun Comics, No. 101 stating:  "There

25   is no exploration of Clarks' thoughts [and] feelings…"  Mot. at 67:12.  In the comic

26   a caption reads:  "By the time young Clark is a grown boy, he has learned that he is

27   different from others."  Bergman Decl., Ex. M at 137.  Later, a panel portrays Clark

28   walking to a rural school with his books under his arms *thinking*: "I can't let people

88

1  know **how** different I am! I'll just have to hold myself in check and go along like all

2  the other kids…" *Id.* At the end, he sits at his desk in his room, his head leaning on

3  his hand, *contemplating*: "Super strength! It's a little frightening. My powers give

4  me the chance to do a lot of good -- but I can't let people know…the knowledge

5  might be dangerous." *Id.* at 138.

6       Siegel's story is a comic book story and therefore simple and representational

7  by nature.   However, these elements which shape and depict "Superboy's" character

8  do not appear by happenstance in the Superboy Story.  Like all smart writers, Siegel

9  drops symbolic hints and foreshadows what was intended to be an episodic series, not

10  unlike the "Smallville" Pilot.  Thus, Superboy is presented as a loner ("This kid Clark

11  always keeps off by himself") coupled with his parents' admonitions to conceal his

12  true self.  Yet, his adolescent and all too "human" desire to fit in and be accepted by

13  his peers is represented by his hazing by the *Thick 'N Thin Club*.  Steranko Decl., at ¶

14  12- 29, Exs. A-C, Evanier Decl. Exs. A. While experiencing adolescence in the

15  heightened context of an alien with emerging superpowers the character is redeemed

16  by helping even those who rejected him and perceives that he is destined for

17  something more important. *See* Bergman Decl., Ex. I.

18       These core traits, which Defendants try to ignore, bare considerable similarity

19  to those which pervade the main character and his relationships in "Smallville."

20  Defendants make much of the fact that the lead character in Smallville is a teenager

21  in high school.  Thus, with respect to the Siegel Superboy Material, Defendants claim

22  that its elements are "too generalized," but when it comes to "Smallville" a mere age

23  differential is purportedly decisive.  Defendants' conflicting arguments *from both*

24  *ends* of what *they* deem "bedrock [copyright] principles" pervade their Motion and

25  underscore why substantial similarity in cases such as this is a close question for the

26  trier of fact. *Twentieth Century-Fox,* 715 F.2d at 1330; *Hoehling,* 618 F.2d at 977.

27       While the lead character in the Siegel Superboy Material is a few years

28  younger than in "Smallville," "Superboy," as originally conceived by Siegel, was to

89

**EXHIBIT 21**
**1016**

1  naturally mature. *See* Steranko Decl., ¶ 12-22. His Superboy Synopsis suggested

2  starting with "characters…of about twelve years rather than adults." His Superboy

3  Story follows "Superboy" from a toddler through kindergarten to pre-junior high; the

4  majority taking place in the fifth grade (age 11-12). The first issue of "Superboy" in

5  More Fun Comics No. 101 follows the same rapid age progression. Bergman Decl.,

6  Ex. M. The ensuing "Superboy" comic books from 1945 to 1984, clearly derived

7  from the Siegel Superboy Material follow "Superboy's" adventures as he naturally

8  matures through age eighteen, with the majority depicting "Superboy" as a teenager.

9  Steranko Decl., ¶ 22-29. The derivative televisions "Superboy" a.k.a. "The

10  Adventures of Superboy" depict the same character attending college. Steranko Decl.,

11  at ¶ 12- 29, Exs. A-C; Evanier Decl. Ex. A.

12      <u>The Kents</u>

13      "Superboy's" adoptive parents (the "Kents") are principal characters of

14  Siegel's Superboy Story. While appearing briefly in one or two similar panels in

15  prior Superman works, *these characters and their relationship with their adoptive son*

16  *are fleshed out for the very first time in the Superboy Story.* Bergman Decl., Exs. E,

17  K, L. In fact, eight of its thirteen pages are devoted to the close nurturing relationship

18  between Superboy and his adoptive parents. Bergman Decl., Ex. I. This nurturing

19  relationship is similarly a central relationship and focus of the "Smallville" series /

20  episodes and it bears many of the same attributes. Steranko Decl., at ¶ 12- 29, Exs. A-

21  C; Evanier Decl. Ex. A.

22      In both works, the Kents are earnest and moral people who, while aware that

23  "Superboy" is not of this world, raise him as a human being, and love and nurture

24  him as if he were their *son*. While simple country folk, the Kents are very sensitive

25  to Superboy's" uniqueness and to the challenges posed by their "son's" predicament

26  of growing up *with superpowers*. Both the Superboy Story and Smallville explore the

27  interesting ongoing problem of the Kents raising this special boy and coping with the

28  fact that they have an alien in their midst. The Kents are equally aware that others

90

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1017**

1  will be far less accepting of their boy's differences, and that if the truth be known, he

2  will be feared, envied and treated as an outcast. Throughout the Superboy Story and

3  Smallville, the Kents thus gently counsel "Superboy" on the need to restrain and

4  conceal his great power.

5    Defendants attempt to distinguish the Kents in "Smallville" by the unexplained

6  blanket statement that "[t]he Kents have a complex and deeply explored relationship

7  with the teenage Clark Kent" (Mot. at 68). In so doing, they admit that in

8  "Smallville" this relationship lies at the heart of the series, as in Siegel's Superboy

9  Story. *Id*. This is indisputably *not* the case in the "Superman" material preceding the

10  Superboy Story (Action Comics, No. 1, the 1939 Newspaper Strips and Superman

11  No. 1) where Clark, as a boy, is shown with his adoptive parents in but one brief

12  panel in Superman, No. 1. Bergman Decl., Ex. E, K, L. Defendants again argue

13  both sides of their copyright "precepts" as it suits them. With respect to Siegel's 13

14  page Superboy Story they portray the lead character as one dimensional in

15  comparison to the "Smallville" character portrayed in over 100 hour-long episodes.

16  Yet, when comparing eight pages of the Siegel Story which for the first time flesh out

17  Clark's relationship with his parents, they claim such is not original or protectable

18  due to a single panel in Superman No. 1. Such double standards run throughout

19  Defendants' Motion, tarnish their credibility and have no place in copyright analysis.

20    While making much of the Kents' age in "Smallville," Defendants admit that

21  the Kents are not assigned an age in the Superboy Story (Mot. at 68:7). Defendants

22  also make much of the fact that the Kents are farmers in "Smallville," whereas with

23  respect to the Superboy Story, Defendants would be the first to argue that such a

24  "common" generality is not subject to copyright protection. Defendants cannot have

25  it both ways. Moreover, in More Fun Comics, No. 101 – where "Superboy" is

26  depicted carrying huge logs of wood through a wide country door into a house with a

27  big-plank wooden floor, past a simple table with checkered table cloth and, in the

28  next panel, is jumping over a barn filled with hay – it certainly looks like he is

91

1  growing up on a farm.  Bergman Decl., Ex. M at 137.

2  ## Other Characters

3  As set forth above the Superboy Story is only the first in what was intended to

4  be and became a continuing series of "Superboy" comics.  *See* Bergman Decl., Ex. m.

5  As such, supporting characters were naturally to be fleshed out in subsequent

6  derivative comics.  As further described above, "Superboy's" love interest, Lana

7  Lang, and best friend, Pete Ross soon appeared (for the first time) in the "Superboy"

8  comics and are likewise key supporting characters in "Smallville."  The Superboy

9  Story sets the forum from which such supporting characters will be drawn –

10  "Superboy's" classmates.   In the Superboy Story, as in "Smallville," the lead's

11  primary relationship with his parents, and his secondary set of relationships are with

12  his classmates, which form the basis for his many adventures.

13  ## 2.    Setting

14  The setting of the Superboy Story is a small rural town (later named

15  "Smallville" in Superboy, No. 2) which the "Smallville" series shares and from where

16  takes its name.   The choice of this small town environment is significant in the

17  Superboy Story and "Smallville" because it heightens "Superboy's" predicament of

18  concealing his true self.  People in a small town tend to know each other's business,

19  and it is harder to blend in and to fit it.  In the Siegel Story this is exemplified by a

20  scene with prying lady who arrives unannounced to see the Kents' special boy she

21  has been hearing so much about.  Bergman Decl., Ex. I.  Interestingly, this simple

22  nostalgic setting also lies in sharp contrast to the leads' supernatural powers and

23  heightens their miraculous effect.

24  The Superboy Story and the "Smallville" episodes also share the central setting

25  and perspective of the lead character attending school and confronting all which that

26  entails.  This shared setting is also key because it poses a host of plot lines and

27  predicaments (e.g., school cliques, hazing, bullies, pranks, friendships), but in the

28  thoroughly original context of a "closet" alien with superpowers.

92

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1019**

1    Defendants make a number of unpersuasive arguments regarding this shared

2  element, again playing both sides of the issue. After insisting that the Court must

3  dissect the works by such elements (characters, setting, themes, plot), Defendants

4  argue that this *shared* setting is an unprotectable generality, even though the setting is

5  sufficiently specific and defining for the series to adopt it as its symbolic namesake –

6  *Smallville.* Cognizant of this weakness and the derivative link it provides to

7  "Superboy," Defendants disingenuously argue that "indeed, it is undisputed that

8  **Superman's** home town of "Smallville" did not receive its name until *Superboy* No.

9  2…a work which was never created or owned by Siegel." Mot. at 62:9-10 (emphasis

10  added); Bergman Decl., Ex. LL. Such revisionist history pervades Defendants'

11  motion as it is beyond dispute that the Superboy Story, as published in More Fun

12  Comics, No, 101 led to Superboy, No. 2. Steranko Decl., at ¶ 12- 29, Exs. A-C,

13  Evanier Decl., Ex. A

14    Incredibly, Defendants, in apparent denial, go on to claim that the Siegel's

15  Superboy Story and More Fun Comics, No. 101 does not take place in a *rural setting.*

16  Mot. at 63. Yet Defendants do not (because they cannot) explain how then the

17  Superboy Story entails the Kents' "car …stuck in [a] muddy ditch; the fifth grade

18  club's "meeting tonight at Tom's father's garage;" Clark's hazing by visiting "the old

19  haunted house on Judson Street," which is in walking distance from school ("racing

20  swiftly the members of the club reach the house before Clark") and is surrounded by

21  "darkness" and "blackness;" and the ensuing adventure which entails speeding from

22  the house "down the mountainside," a "mountain road" and an "auto skid[ding] to a

23  stop bare inches from a cliff's brink." Bergman Decl., Ex. I, at 45, 50-53; 136-137.

24  These panels surely depict "Superboy" growing up in a rural or farm setting and

25  attending school in a rural town. This is undiminished by the portrayal of an

26  adventure at the end of the comic in what appears to be a larger town or urban setting,

27  highlighted by Defendants. *Id*. at 138.

28    In fact, the combination of the above fits precisely in Defendants' description

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1020**

1    of the "Smallville" setting: "*Smallville* decidedly takes place in a small town and on
2    a farm among encroaching development and industrialization." (Mot. at 63:18-19).

3         "Superman" was grounded in a teeming cosmopolitan environment called
4    "Metropolis," and its stories emanated from that fast paced urban setting and
5    Superman/Clark Kent's job as a big city reporter. *See* Bergman Decl., Exs. E, L. By
6    contrast, Siegel's "Superboy" was set in a small rural town where its lead attends
7    school while coming to grips with his emerging superpowers, adolescence and all
8    which that entails in a small town environment. Siegel's "Superboy" undeniably led
9    to the comic book issue, "Superboy No. 2" where "Superboy's" small rural town was
10   dubbed – *Smallville*, the key setting of the TV series which take its name. Steranko
11   Decl., at ¶ 12- 29, Exs. A-C, Evanier Decl., Ex. A.

12        **3.**    **Key Themes**

13        The central theme(s) of Siegel's "Superboy" and "Smallville" is that of the
14   supernatural lead coming to grips with his real identity, his differences and his
15   purpose in life.   While a youth who wants to "fit in" and be accepted by his peers, he
16   must repress and conceal his true self – themes which re-interpret, amplify and
17   express the predicaments of adolescence in a wish fulfillment fantasy context, that the
18   youth audience, targeted by both works, can easily relate to. In both works, he is a
19   loner, trying to fit-in, to be accepted, but he can never fit in. By contrast, Superman
20   "dumbs himself down" as Clark Kent and pretends to be a nerd so that people will
21   leave him alone. Steranko Decl., at ¶ 12- 29, Exs. A-C, Evanier Decl. Ex. A.

22        Another key set of themes shared by both works involve the coming-of-age and
23   self-discovery of a young man destined for greatness as an iconic superhero. Both
24   concern the lead coming to grips with his superpowers and contemplating the role
25   such will play in his life. This foreshadowing and novel focus on "the making of a
26   superhero" lies at the heart of the Siegel Superboy Material and "Smallville." At the
27   close of the Superboy Story and More Fun Comics, No. 101, "Superboy" comes to
28   the realization that he must use his powers to help those in need. In many ways the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1021**

1  entire "Smallville" series is about Clark coming to this vital realization.

2  Defendants improperly resort to the random isolation of similarities out of

3  sequence or context to abstract them as unoriginal "ideas." Defendants thereby argue

4  that common themes in the subject works are mere unprotectible ideas. However,

5  "Superboy's" original *expression* of such themes in an unusual story told from the

6  perspective of an alien with superpowers, attending school, and experiencing

7  adolescence in smalltown U.S.A., as if he was all too human, *is* protectable. The

8  similarities between Siegel's "Superboy" and "Smallville are first and foremost

9  similarities of expression and cannot be dismissed as mere unprotectable ideas. *See*

10  *Swirsky*, 376 F.3d at 845; *Twentieth Century-Fox Film,* 715 F.2d at1330 (material

11  issue of fact as to whether expression of Plaintiffs' ideas was copied).

12  Prior to Siegels' Superboy Material *no other work* had explored the "making

13  of" an iconic superhero and the expression of "Superboy's" themes in substantially

14  the same way. *See* Steranko Decl., at ¶ ¶ 19-21.

15  **4.   Plots**

16  Like "Smallville's" Pilot, the Superboy Story was intended to be the first in an

17  episodic series of stories and plotlines. As such, Defendants premise that the plotline

18  of this single 13 page story be compared to the plots of over 60 post-Termination

19  episodes is a misdirected exercise. Additionally, in copyright analysis Courts place

20  less emphasis on plotlines and will find infringement, notwithstanding plot

21  dissimilarities. *See Bevan v. Columbia Broadcasting System, Inc.*, 329 F. Supp. 601,

22  605 (S.D.N.Y. 1971) (copyright infringement may be found in the absence of

23  similarity in the overall plots). More significant, is the sequence of events and

24  structure of the works. *See* 4-13 *Nimmer* § 13.03[A][1]. In this regard the

25  "Smallville" Pilot, even though a pre-Termination episode, is noteworthy because it

26  sets the format and structure of the series, including post-Termnation episodes. *See*

27  Steranko Decl., ¶ 28.

28  The Pilot bears many similarities in structure and the sequencing of events to

95

1  the Superboy Story, the "pilot" of the "Superboy" comic book series that succeeded

2  it. Both works, begin with a spaceship hurtling towards earth with "comets, meteors

3  and other stellar objects." Bergman Decl., Ex. I at 42. "Alighting upon it burst into

4  flames. Its tiny passenger was saved by a passing motorist [Mr. Kent]." *Id*. The

5  Kents adopt the child and though aware that he is not of this Earth, raise him as their

6  son and as a human being. Steranko Decl., at ¶ 12- 29, Exs. A-C; Evanier Decl., Ex.

7  A.

8         Both stories then establish that the Kents are very concerned and counsel Clark

9  to control his powers and conceal who he is. This dovetails with Clark's subsequent

10  depiction in both works as a loner ("This kid Clark Kent always keeps off by

11  himself.") In both, we follow Clark in school where he is publicly alienated and it is

12  established that he is not a member of the "in" crowd. It is also plainly established in

13  both that he wants very much to be accepted and to belong as if he was normal (e.g.,

14  trying to join the *Thick 'N Thin Club* in the Superboy Story; " I just want to be

15  normal" in the Pilot). In both, Clark is then subjected to a hazing ritual. (haunted

16  house in the Superboy Story; "scarecrow" in the Pliot). Thereafter, an adventure

17  ensues in which Clark saves the lives of even his undeserving classmates and is

18  redeemed in his on eyes. Both end with a foreshadowing of his greater destiny.

19  **H.    Siegel's "Superboy" Is Comprised Of Far More Than Mere**

20  **"Scenes A Faire"**

21         In an effort to strip Plaintiffs' Recapture Superboy Copyrights of copyright

22  protection, Defendants claim that Siegel's Superboy Story is comprised of mere

23  *scenes a faire. Scenes a faire* have been described as "incidents, characters or

24  settings which are as a practical matter indispensable, or at least standard, in the

25  treatment of a given topic." *Hoehling*, 618 F.2d at 979.

26         The creative expression in Siegel's Superboy Story began with an original

27  premise from which very little can "naturally" follow:  the adolescent awakening of

28  an alien with superpowers on earth who does what other adolescents do but from the

1  perspective and in the context that he can never be like everyone else. From this

2  original expression came many other choices involving further creative expression.

3      A superhero does not necessarily grow up in a small rural town where it is

4  much harder to conceal his true self. It also does not necessarily follow that an alien,

5  even if adopted, would have a close relationship with his adoptive parents and accept

6  their guidance. One would expect an alien to be misunderstood and beyond control.

7  Normal children, particularly adolescents, are often "alienated" from their real

8  parents. It also does not necessarily follow that an alien would be raised as a "human

9  being" or that he would attend school or that he would want to be "part of the club"

10 or seek acceptance from his human classmates. With a now established "Superboy"

11 mythology these things may be expected, but from the perspective of when they were

12 created, the choices were endless. These choices alone, and taken together as

13 expressed in the Siegel Superboy Material, are protectable expression, not scenes a

14 faire. *See also* Steranko Decl., ¶¶ 19-20.

15 **I.    The Prior "Superman" Materials Clearly Do Not Contain The Same**

16 **Elements, Themes Or Focus As The Siegel Superboy Materials**

17     By comparison, the "Superman" materials which pre-date Siegel's Superboy

18 Story (Action Comics No. 1, the 1939 Newspaper Strips and Superman No. 1,

19 Bergman Decl., Exs. E, K, L) do not contain the same elements or focus as Siegel's

20 Superboy Story. In Action Comics No. 1, where Siegel and Shuster's "Superman"

21 debuted in June, 1938, we see "Superman" as an infant in only one brief panel on

22 page one. *See* Bergman Decl., Ex. E. By the next panel on page one "Superman" has

23 already become an adult with fully developed superpowers. *Id.* The 1939

24 Newspaper Strips also depict "Superman" as an infant and then jump to a fully

25 developed "Superman." *See* Bergman Decl., Ex. K at 64. Siegel and Shuster's

26 Superman No. 1, published in May 1939, similarly depict "Superman" as an infant in

27 the same single panel as in Action Comics No. 1 and the 1939 Newspaper Strips, and

28 as boy in just two panels: one depicts him with his parents and the other depicts him

97

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1024**

1  jumping between *big city* skyscrapers. *See* Bergman Decl., Ex. L at 67-68.

2  Defendants' premise in pointing to these prior works is erroneous. For

3  instance, *one* brief panel (by Siegel and Shuster) in Superman, No. 1, depicting

4  "Superman" as a boy with his parents does <u>not</u>, as a matter of law and fact, render the

5  *8 pages* in the Superboy Story devoted to Superboy's relationship with parents

6  unoriginal or unprotectible.   Firstly, this relationship is not fleshed out in Superman,

7  No. 1's single panel, nor is it a central focus of the story as it is in the Superboy Story

8  and in "Smallville." Defendants might argue that the 8 pages are derivative of the

9  single panel, however, it is well settled that the copyright in even a derivative work

10  protects all additional material.

11  Defendants and their experts also improperly point to George Lowther's book

12  "The Adventures of Superman," to purportedly show that Siegel's "Superboy" was

13  unoriginal.  However, the Lowther book was not written and published by Detective

14  until November 2, **1942**, well after Siegel's creation and submission of his Superboy

15  Story to Detective *in* **1940**. [25] Bergman Decl., Ex. N; 1948 FOF, Fact 160.

16  Defendants also mis-cite to "Superman" works in a "Saturday Evening Post"

17  (alleged publication date: June 4, 1941), Superman Sunday Strip # 135 (alleged

18  publication date: May 31, 1942), however these works were also produced by

19  Detective after its receipt of Siegel's Superboy Story in December, 1940. (Mot.,

20  "Schedule B").  1948 FOF, Fact 160.

21  Defendants misleadingly mislabel these and other **"Superman"** comic books

22  and strips (such as Action Comics No. 1 and Superman, No. 1) "Non-Terminated

23  **Superboy** Works" (Mot. at 30:14) and "Exemplary Unterminated '**Superboy'**

24  Works" (Mot., Schedule B).  Defendants also misleadingly list "All Other Superboy

25  works published prior to November 17, 1943" when they well know that "Superboy"

26

27  [25] In addition, though the Lowther novel was registered with the Copyright Office under entry no. A

28  168596, there is no record of renewal and, as such, it is in the public domain. Therefore, DC can not
lay claim to any purportedly original elements in the Lowther book in trying to usurp Siegels'
"Superboy" for which the copyright has been maintained. *See* 10/27/06 Order at 8.

98

1  was *first published after that date* in More Fun Comics, No. 101. 1948 FOF, Fact

2  165.

3      Defendants' misnomers contradict both the findings and conclusions of Judge

4  Young in the 1947 Action and of Judge Lew *in this action* that "Superboy" is a

5  distinct property from "Superman." 1948 FOF, Facts 166,171-172; 1948 COL, No.

6  25; March 27, 2006 Order at 11.  This is well known, as matter of comic book

7  history, and further supported by DC's separate line of copyrighted "Superboy"

8  comics.  Steranko Decl., ¶ 21.

9      As held by Judge Lew, Plaintiffs effectively recaptured the original

10  "Superboy" copyrights via proper service and filing of their "Superboy" terminatin

11  notice.  March 27, 2006 Order at 14-15.  There was certainly no need to list these

12  "Superman" works in such notices.  While their Motion assumes that the "Superboy"

13  termination was effective (Mot. at 43), Defendants conflictingly rely on erroneous

14  "Non-Terminated Superboy Works."

15      **J.    "Smallville" Takes The Essence Of Siegel's "Superboy"**

16      A defendant is guilty of copyright infringement if it has "appropriated the

17  fundamental essence or structure of Plaintiffs' work." *Arica Institute, Inc. v. Palmer*,

18  970 F.2d 1067, 1073 (2d Cir. 1992), *quoting* 4-13 *Nimmer on Copyright* §

19  13.03[A][1]; *see also Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.* 996

20  F.2d 1366, 1372 (2d Cir. 1993) (describing "global similarities in structure and

21  sequence"); *Los Angeles News Serv. v. Reuters TV Int'l*, 149 F.3d 987, 994 (9th Cir.

22  1998)(infringer used "heart" of party's news broadcasts).[26]  In this respect a court's

---

[26] The Supreme Court has been especially vigilant in protecting the creative "heart" of a work from copying in alleged "fair use" cases. *See Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 630 (9th Cir. Cal. 2003)("although the clips are relatively short when compared to the entire shows that are copyrighted, they are in many instances the heart of the work"); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 564-65, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (magazine's unauthorized use of verbatim quotes from the heart of unpublished Ford memoirs).  *See also Salinger v. Random House, Inc.*, 811 F.2d 90, 98-99 (2d Cir. 1987), *cert. denied*, 484 U.S. 890, 108 S. Ct. 213, 98 L. Ed. 2d 177 (1987) (use of virtually all of the most interesting passages from Plaintiffs' unpublished letters).

99

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 21**
**1026**

1  "analysis ...should be instructed by common sense." *Boisson*, 273 F.3d at 273;

2  *Hamil*, 193 F.3d at 102 (Courts guided by "common sense").

3      "Superman" was grounded in a cosmopolitan environment called

4  "Metropolis," and its stories emanated from that urban setting and Superman/Clark

5  Kent's job as a big city reporter.  *See* Bergman Decl., Exs. E, L.  By contrast,

6  *Smallville* is set in "Superboy's" rural hometown from which the series takes its

7  name.[27]  In Siegel's "Superboy" and "Smallville" we follow the lead character as he

8  attends school and comes to grips with adolescence and all that entails in the

9  heightened context as a "closet" alien with emerging superpowers in a small town

10 environment.  Both works portray the character as modest and somewhat of a "loner"

11 alienated by school cliques and bullies alike, yet wanting to be accepted as if he were

12 human.  While grappling with growing up, he faces the responsibility of his powers

13 and his destiny, foreshadowed throughout both works.

14     The focal point in *Smallville*, as in the Siegel Superboy Story[28], is the

15 relationship between the lead character and his earnest and understanding adoptive

16 parents to whom he turns as he faces daily challenges due to his differences.  Both

17 works also follow the leads' adventures with his classmates in the small town he

18 protect, while examining the character's social and family life.

19     The "Superman" materials which pre-date the Siegel Superboy Materials

20 simply do <u>not</u> contain such elements, themes or focus.  Bergman Decl., Exs. E, K, L;

21 Steranko Decl., at ¶¶ 12- 29, Exs. A-C; Evanier Decl., Ex. A.

22     *Smallville* is clearly derived from Siegel's Superboy Material and the

23 derivative "Superboy" comic book line and mythology to which it gave rise.  But for

24 Siegel's "Superboy" there would be no *Smallville*.  Comic books by nature are

25

26 [27] As set forth above, Siegel's "Superboy" undeniably led to the comic book issue, "Superboy No.
   2," where "Superboy's" town was dubbed – *Smallville*.  *See* Bergman Decl., Ex. LL.; Steranko
27 Decl. Ex. A.

28 [28] In Siegel's Superboy Story, as set forth above, no less than *eight of its thirteen pages are devoted
   to "Superboy's" relationship with his adoptive parents* who counsel him.  Bergman Decl., Ex. I.

100

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EXHIBIT 21
1027

representational and will always appear simplistic or even primitive when compared to their derivative big budget progeny. However, "from a tiny acorn, a mighty oak grows." *Smallville's* derivation and use of "Superboy" is easily recognizable and in fact, widely recognized. *See Fisher v. Dees*, 794 F.2d 432, 434 n. 2 (9th Cir. 1986); *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.").

Given all the above, *Smallville's* derivation from Siegels' "Superboy" is rife with genuine issues of material fact and certainly not an issue, as already held by Judge Lew, on which Defendants can or should prevail as a matter of law on summary judgment.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for partial summary judgment in its entirety and that the Court grant Plaintiffs' motion for partial summary judgment in its entirety.

DATED: May 29, 2007             LAW OFFICES OF MARC TOBEROFF, PLC


By _____
                Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

101

EXHIBIT 21
1028

1

## PROOF OF SERVICE

2      STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3          I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720,

4      Los Angeles, California 90067.

5          On May 29, 2007, I served the attached documents described as

6      **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

7

8      **DECLARATION OF MARC TOBEROFF IN SUPPORT OF OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT- FILED UNDER SEAL**

9      **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S L.R. 56-2 STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY**

10     **JUDGMENT**

11     **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S EVIDENTIARY OBJECTIONS IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

12

13     **DECLARATION OF MARK EVANIER IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

14     **DECLARATION OF JAMES STERANKO IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

15

16     **DECLARATION OF LAURA SIEGEL LARSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

17     as follows:

18     [X]  :BY HAND:

19         As follows:  I delivered to the address listed above by hand the documents listed herein.

20     Michael Bergman
       WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

21     9665 Wilshire Boulevard, Ninth Floor
       Beverly Hills, CA 90212

22     [X]  :BY MAIL:

23

24         As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of

25     business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in

26     affidavit.  I placed ____ the original  X  a true copy thereof enclosed in sealed envelope(s) addressed as follows:

27     James D. Weinberger

28     FROSS ZELNICK LEHRMAN & ZISSU, P.C.

**EXHIBIT 21**
**1029**

866 United Nations Plaza
New York, NY 10017

[X]  :BY FACSIMILE:

As follows: I caused the transmission of the above named documents to the fax number set forth below, or on the attached service list.

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Facsimile No. 212-813-5901

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Facsimile No. 845-265-2819

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile No. 310-550-7191

:(STATE) - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]  :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on May 29, 2007, in Los Angeles, California.

Nicholas C. Williamson

**EXHIBIT 21**
**1030**