# EXHIBIT 22

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).



ENTERED
CLERK, U.S. DISTRICT COURT

JUL 30 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only



FILED
CLERK, U.S. DISTRICT COURT

JUL 27 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

JIM HOLMES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | ) |
| | ) CASE NO. CV-04-8776-SGL (RZx) |
| Plaintiffs, | ) [Consolidated for pre-trial and discovery purposes with CV-04-8000-SGL (RZx)] |
| v. | ) |
| TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., and D.C. COMICS, | ) ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION |
| Defendants. | ) |

This case is the latest chapter in the continuing saga over who owns the copyright to "Superboy," the youthful persona of the iconic comic book super hero "Superman," spanning from the golden age of print media comics to the present-day revolution in digital media. Like the entire spectrum of graphics media technology, the law governing ownership rights to copyrights has changed dramatically, and it is precisely these changes in the law that bring this case to this Court.

Although the story of how Superman and later Superboy came into being has become the stuff of legend among comic book fans, the Court will recite it once



DOCKETED ON CM

JUL 30 2007

ORIGINAL

**EXHIBIT 22**
**1031**

1   more for those unfamiliar with the tale.

2       Jerome Siegel and Joseph Shuster are Superman's creators.  In 1933,

3   Siegel conceived of the idea of a comic strip featuring a character who is sent to

4   Earth from a distant planet and, with superhuman powers, performs daring feats for

5   the public good.  Siegel named his character "Superman."  Siegel discussed his

6   idea with Shuster, an artist, and together they crafted a comic strip consisting of

7   several weeks worth of material (both dialogue and artwork, some of the latter

8   being completely "inked in" and ready for publication, and some consisting of no

9   more than black-and-white pencil drawings)  suitable for newspaper syndication

10  embodying that idea.  The two shopped the character around for a number of years

11  to numerous publishers but were unsuccessful in having it published.  In the

12  meantime, Siegel and Shuster penned other comic book strips at their artist studio

13  in Cleveland, Ohio, and sold them for publication, most notably "Slam Bradley" and

14  "The Spy" to Nicholson Publishing Co., who purchased their material for resale to

15  Detective Comics.  When Nicholson folded shop in 1937, Detective Comics

16  acquired some of its magazine properties, including the comic book strips penned

17  by Siegel and Shuster.

18      The two entered into an agreement with Detective Comics on December 4,

19  1937, whereby they agreed to furnish some of the existing comic strips for the next

20  two years and further agreed "that all of these products and work done by [them] for

21  [Detective Comics] during said period of employment shall be and become the sole

22  and exclusive property of [Detective Comics] and [Detective Comics] shall be

23  deemed the sole creator thereof . . . ."  The agreement further provided that any

24  new or additional features by Siegel and Shuster were to be submitted first to

25  Detective Comics, who was given the initial option (to be exercised within sixty days

26  after submission) to publish the material.  Soon thereafter Detective Comics

27  became interested in publishing Siegel and Shuster's now well-traveled Superman

28  idea (but in an expanded 13-page comic book format), the interest eventually

2

EXHIBIT 22
1032

culminating with Superman's release in April, 1938, in the first volume of <u>Action</u>
<u>Comics</u>, a new comic magazine issued by Detective Comics.  The Superman comic
strip became an instant success and Superman's popularity continues to endure to
this day as his depiction has been transferred to varying media formats.

On March 1, 1938, before Superman's publication, Siegel and Shuster
assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]"
to Superman in exchange for $130.  This assignment in ownership rights was later
confirmed in a September, 22, 1938, employment agreement in which Siegel and
Shuster acknowledged that Detective Comics was "the exclusive owners" of not
only the other comic strips they had penned earlier for Nicholson (and continued to
pen for Detective Comics) but Superman as well; that they would continue to supply
the art work and storyline (or in the parlance of the trade, the "continuity") for said
comics at varying per page rates depending upon the comic in question (Superman
being paid at the highest rate offered of $10 per page) for the next five years; that
Detective Comics had the "right to reasonably supervise the editorial matter" of
those existing comic strips; that Siegel and Shuster would not furnish "any art or
copy . . . containing the . . . characters or continuity thereof or in any wise similar" to
said comic strips to a third party; and Detective Comics would have the right o f first
refusal (to be exercised within a six week period after the comic's submission) with
respect to any future comic strip creations conceived by Siegel or Shuster:

> In the event you shall do or make any other art
> work or continuity suitable for use as comics or comic
> strips, you shall first give us the right to first refusal
> thereof by submitting said copy and continuity ideas to
> us.  We shall have the right to exercise that option for six
> weeks after submission to us at a price no greater than
> offered to you by any other party.

Not long thereafter, on November 30, 1938, Siegel pitched the idea to
Detective Comics of serializing a comic concerning the exploits of Superman as a
young man.  Siegel called his character "Superboy."  As Siegel explained the
synopsis for the new comic strip:

1
2
3
4
5
6
7

Superboy . . . would relate the adventures of Superman as a youth. . . . I'd like the strip to have a large number of pages, such as 13 so that I could develop it as well as Superman. . . . Tho the strip would feature super-strength, it would be very much different from the Superman strip inasmuch as Superboy would be a child and the type of adventures very much different. There'd be lots of humor, action, and the characters would be mainly children of about 12-years rather than adults. Also, inasmuch as this strip will probably be used as a newspaper feature, I should think that you would want to own all rights to it by having it first appear in your magazine.

8    Detective Comics, by a letter dated December 2, 1938, effectively declined

9  to publish Siegel's proposed Superboy comic.  Siegel later re-pitched the idea in

10  December, 1940, through the submission of a lengthy script containing the storyline

11  and dialogue for the proposed comic strip's first release or releases that fleshed out

12  in greater detail the outlines of the Superboy story arch.  Detective Comics again

13  effectively declined to publish Superboy.

14    Siegel entered the United States Army in July, 1943, to serve his country

15  during World War II.  In December, 1944, while Siegel was stationed abroad,

16  Detective Comics published, without notice to Siegel and without his consent, an

17  illustrated five- page comic strip entitled "Superboy" appearing as one among many

18  other comics strips in the body of volume 101 of its magazine More Fun Comics.

19  The illustrations for the first Superboy comic strip were done by Shuster at the

20  direction of Detective Comics.  When Detective Comics published volume 101 to

21  More Fun Comics it also secured a copyright in all the contents of the same under

22  Copyright Registration No. B653651.  Thereafter Detective Comics continued to

23  publish (and Shuster for a period of time continued to illustrate) "Superboy" comic

24  strips, first in its serialized magazine More Fun Comics, then in Adventure Comics,

25  and eventually as a stand-alone feature in the self-titled comic book Superboy.

26    Detective Comics' publication of Superboy increased an already growing rift

27  between the parties predicated largely upon Siegel and Shuster's conclusion that

28  Detective Comics had not paid them their fair share of profits generated from the

**EXHIBIT 22**
**1034**

exploitation of their Superman creation, as well as the profits generated from

characters like Superboy, which had his roots in the original Superman character.

As a result, in 1947, Siegel and Shuster brought an action against Detective

Comics' successor, National Periodical Publications, Inc., in New York Supreme

Court, Westchester County, seeking to annul and rescind their previous

agreements with Detective Comics as void for lack of mutuality and consideration.

As part of the suit Siegel argued that Detective Comics had no right to publish his

"Superboy" creation.        Towards that end, the third cause of action in the New

York state court complaint asserted that the release of the Superboy comic strip in

More Fun Comics, no. 101, "was based entirely upon the synopsis submitted" by

Siegel to Detective Comics, "and contained in detail the same characters, incidents

and plot" in the synopsis. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 at

¶ 30). The complaint further alleged that Detective Comics' publication of Superboy

was done "without the consent of" and without payment to Siegel. (Defs' App. of

Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 31, 33). These points were important as the

third cause of action averred that Siegel's Superboy submissions belonged to him

alone in light of Detective Comics' failure to exercise its right of first refusal under

the parties' September, 1938, contract. (Defs' App. of Docs. in Supp. Mot.

Recons., Ex. 7 ¶¶ 28-29). Essentially, the third cause of action pled that Detective

Comics had stolen Siegel's Superboy idea. (Defs' App. of Docs. in Supp. Mot.

Recons., Ex. 7 ¶ 31 (averring that Detective Comic's publication of Superboy

"use[d] and was based upon the conception and idea as submitted in writing and

detail by the plaintiff, SIEGEL")).

        In the alternative, the fourth cause of action in the complaint alleged that the

"plot, conception and incidents" contained in Detective Comics' Superboy

publication "were based upon and copied from the plot, conception and incidents"

of Siegel and Shuster's Superman character, and that such misassociation

between Siegel's Superman creation and Detective Comic's Superboy was

**EXHIBIT 22**
**1035**

exacerbated by Detective Comics affixing, without Siegel's consent, his name as the author to each of the Superboy releases. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 36, 37). In so publishing Superboy, it was alleged Detective Comics had "deceived the public" into believing that Siegel "was the author of the continuity dialogue and action of each of the individual releases" when in fact he "was not the author." (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 36). Labeling such publication as "wrongful," the fourth cause of action alleged that such unauthorized misassociation between the two was "injurious" to Siegel's reputation. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 38).

The complaint sought an accounting of the profits generated from Superboy's publication and that further publication of Superboy be enjoined. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 at page 29-30).

After a trial, official referee J. Addison Young, in an opinion dated November 21, 1947, concluded that the March 1, 1938, assignment of the rights to Superman to Detective Comics was valid and supported by consideration, and that, therefore, Detective Comics was the exclusive owner of "all" the rights to Superman. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 8 at 371). With respect to Superboy, the referee found that it was solely Siegel's creation; that Superboy was a work distinct from Superman (thus falling within the right of first refusal provision contained in the parties' September 22, 1938, agreement); and that, on account of Detective Comics' failure to exercise its option to publish Superboy when first presented with the idea, the rights to Superboy belonged to Siegel. As explained by the referee:

> It is quite clear to me, however, that in publishing Superboy the Detective Comics, Inc. acted illegally. I cannot accept defendants view that Superboy was in reality Superman. I think Superboy was a separate and distinct entity. In having published Superboy without right, plaintiffs are entitled to an injunction preventing such publication and under the circumstances I believe the defendants should account as to the income received from such publication and that plaintiffs should be given an opportunity to prove any damages they have sustained on account thereof.

6

**EXHIBIT 22**

**1036**

(Decl. Marc Toberoff, Ex. N at 323-24).

Shortly thereafter, on April 12, 1948, the referee signed a thirty-six page findings of fact and conclusions of law expanding upon the statements contained in the opinion he had tendered earlier. The factual findings pertinent to Superboy were as follows:

156. On or about November 30, 1938, the plaintiff SIEGEL, in writing and by mail, submitted to DETECTIVE COMICS, INC. for its consideration and acceptance or rejection, for publication, under the terms of the contract dated September 12, 1938, . . . a synopsis or summary of the idea and conception and plan of a new comic strip to be known as SUPERBOY[, which would narrate the adventures of SUPERMAN as a youth] .

157. On December 2, 1938, DETECTIVE COMICS, INC. deferred consideration of a SUPERBOY comic strip until some future time.

158. DETECTIVE COMICS, INC. did not within six weeks indicate its election to publish the said new comic strip SUPERBOY.

159. DETECTIVE COMICS, INC. on or about December 2, 1938, by its letter in writing to the plaintiff SIEGEL did elect not to publish the said comic strip SUPERBOY under the terms of the contract dated September 22, 1938, . . . .

160. During the month of December, 1940, the plaintiff SIEGEL submitted to DETECTIVE COMICS, INC. for its further consideration a complete script or scenario, containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip SUPERBOY, and that the said synopsis contained within itself the entire plan for the future publication of the said comic strip SUPERBOY and the conception of the character SUPERBOY, all set forth with detail and particularity.

162. DETECTIVE COMICS, INC. did not within six weeks after the submission of the said script or scenario indicate its election to publish the said comic strip SUPERBOY.

163. Thereafter and during December of 1944 DETECTIVE COMICS, INC. did publish a certain comic strip release entitled SUPERBOY in a magazine entitled "More Fun Comics."

164. The said comic strip release entitled SUPERBOY embodied and was based upon the idea,

7

EXHIBIT 22
1037

plan and conception contained in the plaintiffs,
SIEGEL's letter to DETECTIVE COMICS, INC. dated
November 30, 1938    . . . .

165.    The said release of the said comic strip
SUPERBOY published in December of 1944 embodied
and was based upon the idea, conception and plan
contained in the script or scenario submitted by the
plaintiff SIEGEL to DETECTIVE COMICS, INC. in
December of 1940 . . . .

166.    Said first thirteen pages of SUPERMAN material
[in <u>Action Comics</u> no. 1] did not contain the plan,
scheme, idea or conception of the comic strip
SUPERBOY as it was later submitted by the plaintiff
SIEGEL to DETECTIVE COMICS, INC. [in the 1938
pitch or the later 1940 script].

167.    Said first thirteen pages of SUPERMAN material
[in <u>Action Comics</u> no. 1] did not contain the plan,
scheme, idea or conception of the comic strip
SUPERBOY as published by DETECTIVE COMICS,
INC. . . . from December, 1944, until the date of the trial
herein.

168.    The said publication was without the permission
of the plaintiff SIEGEL.

171.    All of the comic strip material published under the
title SUPERBOY was based upon the idea, plan, conception
and direction outlined in the [1938 pitch].

172.    All of the comic strip material published under the
title SUPERBOY was based upon the idea, plan,
conception and direction contained in the scenario or
script . . . submitted by the plaintiff SIEGEL to DETECTIVE
COMICS, INC. [in 1940].

173.    The publication of all comic strip material entitled
SUPERBOY was at all times without the permission of
the plaintiff SIEGEL.

174.    Plaintiff SIEGEL has received no payment on
account of the publication of any of the material entitled
SUPERBOY.

175.    All publications of SUPERBOY by DETECTIVE
COMICS, INC. from April, 1945 until . . . the date of the trial
herein, contained affixed thereto the name of the plaintiffs
SIEGEL and SHUSTER.

176.    The use of the name of the plaintiff SIEGEL . . .
was without the consent of the plaintiff SIEGEL.

179.    Defendant INDEPENDENT NEWS CO., INC.
knowing of the rights of the plaintiff SIEGEL, under the

8

**EXHIBIT 22**

[September 22, 1938, contracts], sold and distributed to newsdealers for resale to the public throughout the United States, magazines containing the material entitled SUPERBOY as hereinafter described and set forth.

180.    All the art work for the SUPERBOY releases was prepared by plaintiff SHUSTER under the direction of DETECTIVE COMICS, INC.

181.    Plaintiff SHUSTER was paid in full by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. for all the art work furnished by him in connection with said SUPERBOY comic strip releases.

182.    At the time that publication of the SUPERBOY comic strip was commenced, plaintiff SIEGEL was unavailable to furnish any of the continuity therefor being absent in military service.

183.    Upon the return of plaintiff SIEGEL to civilian status in January, 1946, DETECTIVE COMICS, INC. entered into negotiations with him regarding SUPERBOY, proposing certain payments to him and affording him the opportunity of supplying the continuity for SUPERBOY releases.

184.    No agreement was reached between Detective COMICS, INC. and plaintiff SIEGEL as a result of the aforesaid negotiations; however, defendant NATIONAL COMICS PUBLICATIONS, INC. has offered to pay plaintiff SIEGEL for SUPERBOY releases heretofore published, the same rate as he was paid for SUPERMAN magazine releases for which he did not furnish the continuity, i.e., at the rate of $200 per release of standard length of thirteen pages.

(Decl. Marc Toberoff, Ex. O at 355-58).

In conjunction therewith, the referee also made the following conclusions of law: "Plaintiff Siegel is the originator and the sole owner of the comic strip feature SUPERBOY, and . . . that the defendants . . . are perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material of the nature now and heretofore sold under the title SUPERBOY. . . . Plaintiff Siegel, as the originator and owner of the comic strip feature SUPERBOY has the sole and exclusive right to create, sell and distribute comic strip material under the

9

**EXHIBIT 22**
**1039**

1  title SUPERBOY." (Id. at 365-66). Thereafter both sides filed an appeal from the

2  referee's findings of fact and conclusions of law. (Decl. Marc Toberoff, Ex. Q at

3  379).

4      While the matter was still on appeal, the parties reached a settlement on

5  May 19, 1948, and signed a stipulation which called for the payment of over

6  $94,000 to Siegel and Shuster. In addition, the stipulation provided that the

7  referee's findings were to be vacated in all respects; reiterated the referee's earlier

8  determination that Detective Comics owned the rights to Superman; and contained

9  the following proviso concerning the ownership rights to Superboy: "Defendant

10  NATIONAL COMICS PUBLICATION, INC. is the sole and exclusive owner of and

11  has the sole and exclusive right to the use of the title SUPERBOY and to create,

12  publish, sell and distribute and to cause to be created, published, sold and

13  distributed cartoon or other comic strip material containing the character

14  SUPERBOY . . . ." (Decl. Marc Toberoff, Ex. P at 374).

15      Two days later, on May 21, 1948, the referee entered a final consent

16  judgment that, among other things, vacated the referee's findings of fact and

17  conclusions of law entered on April 12, 1948, and expressly acknowledged that

18  Detective Comics is the "sole and exclusive owner of and has the sole and

19  exclusive right to the use of the title SUPERBOY." (Decl. Marc Toberoff, Ex. Q at

20  379, 382).

21      The expiration of the initial copyright term for Superman in the mid-1960s led

22  to another round of litigation between the parties.[1]  In 1969 Siegel and Shuster filed

23  suit in federal district court in New York seeking a declaration that they, and not

24

25      [1]  Under the Copyright Act of 1909 (the "1909 Act"), in effect at the time of
Siegel and Shuster's creation of Superman and later assignment of the same to
26  Detective Comics, an author was entitled to a copyright in his work for twenty-eight
years from the date of its publication. See 17 U.S.C. § 24, repealed by Copyright
27  Act of 1976, 17 U.S.C. § 101 et seq. Upon expiration of this initial twenty-eight
year term, the author could renew the copyright for a second twenty-eight year
28  period (the "renewal term").

**EXHIBIT 22**
**1040**

1   Detective Comics' successor, National Periodical Publications, Inc., were the

2   owners of the copyright renewal rights to Superman. See Siegel v. National

3   Periodical Publications, Inc., 364 F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d

4   909 (2nd Cir. 1974). In the process of analyzing their claim, both the federal district

5   court and later the Second Circuit made mention of both the referee's April, 1948,

6   vacated findings as well as the parties' May, 1948, final consent judgment. See

7   364 F.Supp. at 1035; 508 F.2d at 912-13. The courts, however, diverged as to

8   which of the various court documents coming out of the Westchester action should

9   have binding effect.

10      The district court found both the referee's vacated findings as well as the

11  final consent judgment to be binding upon it, see 364 F.Supp. at 1035 ("we note

12  that the findings of the State Supreme Court in the Westchester action are binding

13  upon us here. The terms of the stipulation of settlement in that action, and the

14  consent judgment are also binding"), whereas the Second Circuit only made

15  mention of the binding effect that the final consent judgment had on the case. See

16  508 F.2d at 913 ("There is no doubt that the [May 21, 1948,] judgment of the state

17  court is binding in this subsequent federal action"). Both courts, however,

18  concluded, in conformity with Supreme Court precedent at the time, see Fred

19  Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 656-59 (1943) (holding that

20  renewal rights were assignable by an author during the initial copyright term, before

21  the renewal right vested), that, in transferring "all their rights" to Superman to

22  Detective Comics pursuant to the final consent judgment, Siegel and Shuster had

23  assigned not only Superman's initial copyright term but the renewal term as well,

24  even though those renewal rights had yet to vest when the consent judgment was

25  entered. See 364 F. Supp. at 1037-38; 508 F.2d at 913-14.

26      Thus ended the tale of the battle over the ownership to the copyrights to

27  Superman and, by extension, Superboy. Or at least that was what everyone

28  believed at the conclusion of the Second Circuit litigation.

**EXHIBIT 22**
**1041**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 13 of 343    Page
Case 2:04-cv-08776-ODW-RZ    Document 151    Filed 07/27/2007    Page 12 of 73
ID #:17290

With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape concerning author's transfers of their copyrights in their creations. The 1976 Act expanded the duration of the renewal period for existing works already in their renewal term at the time of the Act for an additional nineteen years, see 17 U.S.C. § 304(b), and, more importantly for this case, gave authors the ability to terminate any prior grants of the rights to their creations that were executed before January 1, 1978, irrespective of the terms contained in such assignments, e.g., that all the rights (the initial and renewal) belonged exclusively to the publisher. Specifically, section 304(c) to the Act provides that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . is subject to termination. . . . notwithstanding any agreement to the contrary . . . ."

It is this right to termination that Joanne Siegel, Jerome Siegel's widow, and Laura Siegel Larson, his daughter, now seek to employ in this case. In November, 2002, they served a notice of termination to defendants[2] directed solely at works featuring Superboy, claiming to undo as of November 17, 2004, any grant provided by Jerome Siegel to defendants' predecessors in interest contained in the May 19, 1948, stipulation.[3] The present suit by Joanne Siegel and Laura Siegel Larson seeks a declaration from this Court that the Superboy termination notice is valid

---

[2] The defendants consist of Detective Comics' successor in interest, DC Comics, and DC Comics' parent company, Time Warner, Inc., ("Time"), and Time's subsidiaries, Warner Communications, Inc., Warner Brothers Entertainment, Inc., and Warner Brothers Television Production, Inc. (collectively "defendants").

[3] Plaintiffs have also brought an action, Joanne Siegel, et al. v. Warner Brothers Entertainment, et al., CV-04-8400-SGL (RZx), seeking the Court to declare that they have effectively terminated and recaptured the assignment of the Superman copyrights to defendants that took place by operation of the 1938 agreements executed by Siegel and Shuster with Detective Comics.

**EXHIBIT 22**
**1042**

1  and that they have recaptured all of the copyright to Superboy since the effective

2  date of the termination.

3        This question – the validity of the termination notice – was addressed in a

4  March 24, 2006, Order, by the Honorable Ronald S.W. Lew of this Court, which

5  held:  (1) The referee's findings from the 1948 Westchester action were binding,

6  notwithstanding their vacatur; (2) the referee's findings conclusively determined

7  certain unique and exclusive copyright issues, namely, that Siegel's Superboy

8  submissions were later "published" (as that term is used in copyright law) in

9  Detective Comics' More Fun Comics #101, and that the Superboy submissions

10  were neither a "work for hire," a "derivative work" of Superman, or a "joint work"

11  between Siegel and Shuster; and (3) the termination notice was otherwise valid

12  pursuant to the terms of the 1976 Act and the regulations promulgated thereunder.

13  The end result of the March 24, 2006, Order was that Joanne Siegel and Laura

14  Siegel Larson had recaptured the copyright to Superboy, leaving for trial whether

15  defendants (notably, by producing and broadcasting the successful WB television

16  series Smallville) had infringed Superboy's copyright since the effective termination

17  date and the scope of accounting for the profits defendants had reaped in exploiting

18  the copyright subsequent to the termination date.  Thereafter, defendants' request

19  to certify the Order for an interlocutory appeal was denied.

20        On October 30, 2006, the matter was reassigned to the present judicial

21  officer, and defendants promptly sought reconsideration of the March 24, 2006,

22  Order, and the decision to deny certifying the matter for an interlocutory appeal.

23  For the reasons set forth below, the Court **GRANTS** defendants' motion for

24  reconsideration of the March 24, 2006, Order.

25        The legal questions at stake in the present motion are two-fold:

26        (1) Whether the referee's vacated findings from the Westchester action have

27

28

**EXHIBIT 22**
**1043**

1  any binding effect in this case as a matter of judicial or collateral estoppel;[4] and,

2      (2)  If they do have a preclusive effect, whether those findings foreclose

3  further consideration of or otherwise impact, certain questions at issue in this case

4  that are unique to copyright law.  More to the point, the issue focuses on whether

5  the referee's findings preclude further litigation on whether, as a matter of copyright

6  law, (a) Siegel's submissions outlining the idea (and indeed the storyline and

7  dialogue) for Superboy were later "published" in volume 101 of More Fun Comics;

8  (b) the submissions were done under the auspices of a "work for hire"; (c) the

9

10      [4]  Notably, the related doctrine of res judicata (or claim preclusion) has no
    application in this case given the claim for terminating prior copyright grants
11  contained in the 1976 Act did not exist at the time of the Westchester action.  See
    Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287-88 (2nd Cir. 2002).  In
12  Simon, the publisher argued that the co-creator of the late Captain America was
    barred, as a matter of res judicata, from exercising his termination right under the
13  1976 Act because, in a settlement agreement reached between the parties during
14  a prior action in New York state court in the 1960s, the co-creator acknowledged
    his contribution was done as work for hire.  According to the publisher, there was
15  "no meaningful distinction between the authorship issue raised in the prior action
    and the termination right at issue."  Id. at 286.  The Second Circuit disposed of the
16  publisher's argument, commenting that neither "the termination right" contained in
17  the 1976 Act nor the relief requested in the current case (termination of a prior
    valid grant of a copyright in one's creation) existed at the time of the prior state
18  court action.  Id. at 287.  The court did acknowledge, however, that although res
    judicata could not bar the co-creator from exercising the claim to terminate rights
19  under the 1976 Act, principles of collateral estoppel (or issue preclusion) may still
20  apply to bar litigation of certain issues that were actually decided in the prior
    action, including whether the co-creator's contribution to the comic was done as a
21  work for hire:

22          Marvel also argues, correctly, that despite the
            enactment of the 1976 Act, the 1909 Act governs the
23          authorship of the Works at issue here.  However, it
            does not follow, as Marvel suggests, that since the
24          Work's authorship was at issue in the previous actions,
25          Simon's termination claim is precluded here.  While
            Simon's assertion of authorship is the sine qua non of
26          both his prior claim to renewal rights and his present
            claim to termination rights, it is merely an issue that
27          determines the validity of each claim.

28
    Id. at 288 (emphasis in original).

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 16 of 343   Page
Case 2:04-cv-08776-ODW-RZ   Document 193   Filed 07/27/2007   Page 15 of 73
ID #:17293

submissions are nothing more than a derivative work based upon Superman with

no original copyrightable elements contained therein; and (d) Siegel is the sole

author of the work or whether the work is a "joint work" containing Siegel's storyline

and Shuster's illustrations.

Ultimately, the Court concludes that, in conformity with the March 24, 2006,

Order, the referee's findings must be given preclusive effect, but as a matter of

collateral estoppel rather than judicial estoppel; however, contrary to the March 24,

2006, Order, those findings are not necessarily determinative of all the issues

specified above, but require independent application of the governing body of

copyright law to those findings to render a decision about the same.

## I.   ARE THE REFEREE'S VACATED FINDINGS

## BINDING AS A MATTER OF JUDICIAL ESTOPPEL?

In the process of passing on the plaintiffs' motion for partial summary

judgment, the Court's March 24, 2006, Order held that the referee's vacated

findings should be given preclusive effect on account of defendants' predecessors

taking an inconsistent position as to those findings' binding nature during the 1970s

Superman litigation in the Second Circuit:

> Defendants' current argument that Judge Young's
> findings are not binding contradicts the position taken by
> their predecessors in interest in the 1973 litigation and
> the 1974 Second Circuit appeal regarding Superman. In
> applying the doctrine of res judicata in favor of
> defendants, Judge Lasker precluded, and the Second
> Circuit affirmed, plaintiffs from litigating the issue of
> ownership of the renewal period of the Superman
> copyrights.
>
> Having relied on Judge Young's findings for
> previous favorable determinations regarding Superman,
> defendants now take the inconsistent position that this
> Court is not bound by the state court findings, as they
> relate to Superboy. Defendants attempt to raise
> genuine issues of material fact, where the facts were
> clearly determined by Judge Young after the opportunity
> to take evidence and hear testimony on that evidence
> from the parties directly involved in creating this
> relationship.
>
> Contrary to defendants' assertions now, both the

15

**EXHIBIT 22**

**1045**

Southern District of New York and the Second Circuit
looked directly to, even citing to, Judge Young's findings
of fact. This Court holds that it is consistent to continue
this position and will look to Judge Young's findings as
binding where relevant.

(Decl. Marc Toberoff, Ex. A at 9-10). Although not explicitly using the term, the

Court's March 24, 2006, Order clearly invoked the doctrine of judicial estoppel. The

Order specifically pointed to the fact that defendants' predecessor had sought to

utilize the preclusive effect of the referee's vacated findings in connection with the

1970s Superman litigation and noted that such a position is fundamentally

inconsistent with their present position that those same findings have no preclusive

effect with respect to Superboy. Such a concern — preventing parties from seeking

to take inconsistent legal positions in subsequent proceedings from those taken in

earlier ones — is the hallmark feature of judicial estoppel. See New Hampshire v.

Maine, 532 U.S. 742, 749-750 (2001); Rissetto v. Plumbers & Steamfitters Local

343, 94 F.3d 597, 600 (9th Cir. 1996). As one respected treatise noted, "Judicial

estoppel is an equitable concept  intended to prevent the perversion of the judicial

process. It is to be applied where intentional self-contradiction is being used as a

means of obtaining unfair advantage." 18 JAMES WM. MOORE, MOORE'S FEDERAL

PRACTICE § 134.30 at 134-63 to 134-64 (3rd ed. 2006) (internal quotation marks

and citations omitted).

 That the doctrine is equitable in nature does not mean its application is

unlimited. The Supreme Court has set out three questions to guide a court's

decision whether to apply the doctrine in a given case:  (1) Is the party's later

position clearly inconsistent with its earlier position?; (2) Did the party succeed in

persuading a court to accept its earlier position?; and (3) Would the party derive an

unfair advantage or impose an unfair detriment on the opposing party were the

court to allow it to pursue its now inconsistent position? New Hampshire, 532 U.S.

at 750-51.

 Applying this test here, the Court readily finds that defendants' present

16

**EXHIBIT 22**

**1046**

1  position is clearly inconsistent with the one taken in the 1970s Superman litigation.

2  Defendants unquestionably sought to have the federal courts in that litigation bar

3  Siegel and Shuster's claim to the renewal rights to the Superman copyright by

4  reference, in part, to the referee's vacated findings.  Now they argue that those very

5  findings have no preclusive effect.  The first factor, therefore, weighs in favor of

6  application of judicial estoppel.

7        The second factor, whether defendants succeeded in having those courts

8  accept their position, is more problematic.  Although at least one of those courts did

9  conclude that the referee's vacated findings were binding, see 364 F. Supp. at

10  1035; the difficulty lies in the fact that this particular legal point was not material to

11  the outcome in the case.  Given that the referee's vacated findings and the parties'

12  final consent judgment were consistent with one another as to the ownership of

13  Superman, the federal courts during the 1970s Superman litigation were not called

14  upon to take a position, one way or the other, over the legally binding nature of the

15  referee's vacated findings separate and apart from the parties' final consent

16  judgment.  Both the findings and the consent judgment supported those courts'

17  decisions that defendants were the owners of the renewal term to the Superman

18  copyright.

19        Here, in contrast, the separate legally binding nature of the referee's vacated

20  findings is very much in dispute because those findings are in direct conflict with the

21  parties' final consent judgment over the ownership rights to Superboy.  In light of

22  the fact that the federal courts in the earlier Superman litigation did not have to

23  accept (and one in fact did not accept) defendants' earlier inconsistent position in

24  order to rule in defendants' favor in the manner in which they did, it is hard to

25  fathom how allowing defendants to now take a contrary position in this litigation

26  somehow operates to create the perception that either of the courts deciding the

27  1970s Superman litigation, or this Court for that matter, have been misled through

28  defendants inconsistent positions.  See New Hampshire, 532 U.S. at 750 (noting

**EXHIBIT 22**
**1047**

1   that result sought to be avoided by second factor is the creation of "the perception

2   that either the first or the second court was misled"). As one court explained:

3           [J]udicial estoppel is an "extraordinary remed[y] to be
            invoked when a party's inconsistent behavior will

4           otherwise result in a miscarriage of justice." It is not
            meant to be a technical defense for litigants seeking to

5           derail potentially meritorious claims, especially when the
            alleged inconsistency is insignificant at best and there is

6           no evidence of intent to manipulate or mislead the
            courts. Judicial estoppel is not a sword to be wielded by

7           adversaries unless such tactics are necessary to "secure
            substantial equity."

8

9   Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3rd Cir.

10  1996).

11          The third factor weighs against application of judicial estoppel for much the

12  same reason. No miscarriage of justice or substantial inequity would take place

13  from allowing defendants to now take a position inconsistent with that taken during

14  the 1970s Superman litigation precisely because the prior contrary position was

15  itself immaterial to the outcome in those prior proceedings. See New Hampshire,

16  532 U.S. at 750-51 ("Absent success in a prior proceeding, a party's later

17  inconsistent position introduces no 'risk of inconsistent court determinations' and

18  thus poses little threat to judicial integrity"). No matter how the federal courts in the

19  Superman litigation parsed the matter, be it pursuant to the referee's vacated

20  findings, the parties' final consent judgment, or both, the conclusion reached would

21  be the same: Defendants were the owners to the renewal term to the Superman

22  copyright. It is not inequitable to allow defendants to now take a position

23  inconsistent with one taken in a prior litigation if the conclusion reached in that prior

24  litigation would have been the same regardless of the defendants' advocated

25  position.

26          Judicial estoppel is guided by pragmatic considerations geared towards "the

27  facts of the particular dispute in mind"; it is not meant as "a set of hard and fast

28  rules that might be circumvented by a clever litigant, on the one hand, or serve as a

**EXHIBIT 22**

**1048**

1 trap for an unwary litigant, on the other." 18 JAMES WM. MOORE, MOORE'S FEDERAL

2 PRACTICE § 134.31 at 134-72 (3rd ed. 2006). Just because defendants took an

3 inconsistent position in the past on a point that was not material to the outcome of

4 that litigation does not mean they are bound to that position forevermore.

5 Accordingly, the Court finds the March 24, 2006, Order's reliance on the doctrine of

6 judicial estoppel is misplaced.

## II. ARE THE REFEREE'S VACATED FINDINGS BINDING
## AS A MATTER OF COLLATERAL ESTOPPEL?

9 This leaves whether the referee's vacated findings are binding through

10 operation of collateral estoppel.

11 Federal courts must give a state court judgment the same preclusive effect

12 as would be given to that judgment "under the law of the State in which the

13 judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Ed., 465 U.S. 75,

14 81 (1984); see also Marrese v. American Academy of Orthopaedic Surgeons, 470

15 U.S. 373, 380 (1985) ("a federal court should determine the preclusive effect of a

16 [earlier] state court judgment [through reference] to the law of the State in which

17 judgment was rendered"); Pension Trust Fund v. Triple A Mach. Shop, 942 F.2d

18 1457, 1460 (9th Cir. 1991) (examining California law for purposes of determining

19 res judicata effect of an earlier California state court judgment). Thus, in

20 determining the preclusive effect of the vacated findings from the 1948 Westchester

21 action, the Court must look to New York law.

22 Under New York law, collateral estoppel applies when (1) the identical issue

23 was raised in a previous proceeding; (2) the issue was actually litigated and

24 decided in the previous proceeding; (3) the party had a full and fair opportunity to

25 litigate the issue; and (4) the resolution of the issue was necessary to support a

26 valid and final judgment on the merits. See Mercantile & General Reinsurance Co.

27 v. Colonial Assurance Co., 147 Misc.2d 804, 805-806 (N.Y. Sup. Ct. 1989)

28 ("Collateral estoppel . . . requires that there have been a final, binding

determination in a prior action in which there was a full and fair opportunity to litigate the issue involved"); see also Marvel, 310 F.3d at 288-89 (setting forth the above elements for collateral estoppel under New York law). The result achieved through invocation of collateral estoppel is to prevent parties or their privies, such as defendants in this case, from re-litigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding.

Defendants position on this point is fairly straightforward: The referee's findings were vacated by the parties' May, 19, 1948, stipulation and the subsequent entry of the final consent judgment; with this vacatur, so too lapsed the binding effect of the referee's findings because no final judgment was left in place to enforce. Defendants correctly note that, under New York law, a judgment that has been vacated loses its preclusive effect. See Ruben v. American and Foreign Ins. Co., 592 N.Y.S.2d 167, 169 (N.Y. App. Div. 1992) ("Because the judgment was vacated, the jury verdict lacks finality and cannot be given collateral estoppel effect"); Church v. New York State Thruway Authority, 791 N.Y.S.2d 676, 679 (N.Y. App. Div. 2005) ("when the judgment is subsequently vacated, collateral estoppel is inapplicable"); see also Universal City Studios, Inc. v. Nintendo Co., 578 F.Supp. 911, 919 (S.D.N.Y. 1983) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel").

That said, courts outside of New York have recognized an exception to this rule and have given preclusive effect to vacated judgments if those judgments were the product of a trial and there is a significant lapse of time between the proceedings. See Aetna Casualty & Surety Co. v. Jeppeson & Co., 440 F. Supp. 394, 405 (D. Nev. 1977); Angstrohm Precision, Inc. v. Vishay Intertechnology, Inc., 567 F. Supp. 537, 541 (E.D.N.Y. 1982) (construing Virginia law); see also Ringsby Truck Lines v. Western Conference of Teamsters, 686 F.2d 720, 722 (9th Cir. 1982) (noting that the answer to whether to give preclusive effect to a trial court's

**EXHIBIT 22**
**1050**

1  judgment after the parties settle the case while the matter is on appeal "may be
2  different in different cases as equities and hardships vary the balance between the
3  competing values of right to relitigate and finality of judgment" citing RESTATEMENT
4  (SECOND) OF JUDGMENTS § 28 (1982)).

5       There appears to be no authority conclusively determining whether such an
6  exception exists under New York law. In one New York state case, Mercantile &
7  General Reinsurance Co. v. Colonial Assurance Co., 147 Misc.2d 804 (N.Y. Sup.
8  Ct. 1989), the court did, however, make mention of the possibility of giving such
9  preclusive effect to vacated judgments in circumstances not all that different from
10  those in this case.

11       Then Justice (now federal district court judge) Harold Baer, Jr., issued a
12  comprehensive ruling examining the very question now in dispute in this case. In
13  Mercantile, a reinsurer sought a declaratory judgment that it was not bound to
14  provide reinsurance with respect to certain insurance policies. Id. at 805. The
15  reinsurer's obligations had been previously litigated in a prior New York state court
16  action involving the same insurance and reinsurance contracts, which resulted in
17  the grant of partial summary judgment against it. Id. While the matter was on
18  appeal the parties settled. Id. As an element of the settlement, the trial court
19  issued an order vacating the judgment and sealing the record. Id.

20       The question before Justice Baer was whether the vacated judgment from
21  the prior action collaterally estopped the reinsurer from seeking to relitigate those
22  issues in the case before him. He began his analysis by noting the general rule
23  that "a judgment that has been vacated will not provide a basis for collateral
24  estoppel." Id. at 806. The court then noted that some courts outside of New York,
25  while recognizing this general rule, had recognized that it may not "apply when the
26  vacatur has occurred after 'the expenditure of the court's resources in a jury trial.'"
27  Id. at 807. Although the expenditure of such judicial resources had not occurred in
28  the case before him, Justice Baer nonetheless chose to address the question,

**EXHIBIT 22**
**1051**

1    explaining that it appeared to be one of "first impression" under New York law. Id.

2    In examining this question Justice Baer recognized that competing

3    considerations affected the analysis. On the one hand, weighing in favor of

4    continuing to afford preclusive effect to the vacated judgment, was the public's

5    interest in the conservation of judicial resources. The more "resources of a hard-

6    pressed judicial system [are] expended in resolving a matter," the more significant

7    this factor becomes in preserving the results generated by that system. Id. at 808.

8    On the other hand, weighing against giving preclusive effect to a vacated

9    judgment, is not only the private interest expressed by the parties themselves not to

10    be bound by that judgment, but the court's similar conclusion in the prior action as

11    well. As Justice Baer observed, "[h]ad the judge wished to allow preclusion, he

12    could have dismissed [the case] rather than vacat[ing the findings as well]." Id. at

13    808. Additionally, there is the public interest in facilitating settlement by the parties,

14    an interest which would be undermined if the effects of such settlement (notably,

15    the agreement to vacate earlier court orders) was negated. Id. at 809 ("There M&G

16    gave up its appeal on the basis of the settlement. It did so in reasonable reliance

17    on the basic principle that a vacated judgment is of no effect"). The negative result

18    of undermining the ability of parties to effectively settle their disputes would also

19    spill over into parties litigating every possible issue in any "case in which there was

20    any chance of a later suit."

21    Every move possible and every countermove imaginable
    would become imperative. Every appealable ruling

22    would have to be appealed. The system--and therefore
    the public interest--would suffer from this increase in the

23    volume and ferocity of litigation.

24    Id. at 809.

25    In the end, Justice Baer returned to where he began his analysis,

26    finding that none of the "exceptional circumstances" that may weigh in favor of

27    giving preclusive effect to a vacated judgment existed in the case before him. The

28    expenditure of judicial resources in the prior action was limited, as the prior

**EXHIBIT 22**

**1052**

1   judgment was entered as a result of a partial summary judgment motion, not a trial.

2   Id. at 809-810. Moreover, given the relatively short gap in time between the two

3   proceedings, critical evidence (be it testimonial or documentary) still remained

4   available. Id. For these reasons Justice Baer left it for another occasion whether to

5   "carve out an exception to the rule that the vacatur of a judgment is not a

6   meaningless act for the purposes of issue preclusion." Id. at 809.

7         Despite defendants' protestations to the contrary, Justice Baer did not

8   find that under no set of circumstances could the general rule against affording

9   preclusive effect to vacated judgments give way. Justice Baer expressly left open

10  the possibility that an exception may exist where certain circumstances were

11  present. Id. at 810. The Mercantile court's decision not to categorically foreclose

12  application of collateral estoppel to vacated judgments is consistent with the

13  recognition in New York law that application of collateral estoppel is not a rigid and

14  inflexible concept, but one which produces varied results in different cases based

15  on how particular circumstances in those case tilt the equities and/or hardships.

16  See Juan C. v. Cortines, 89 N.Y.2d 659, 667 (1997) (describing collateral estoppel

17  as a "equitable doctrine" that is "grounded on concepts of fairness and should not

18  be rigidly or mechanically applied"). Such recognition is reflected by a long line of

19  New York cases citing approvingly to section 28 of the Restatement (Second) of

20  Judgments which allows courts to avoid applying the collateral estoppel doctrine

21  when otherwise warranted if special circumstances exist.[5] This is the very section

22  that the Ninth Circuit in Ringsby described as epitomizing the principal under

23  collateral estoppel that the "answer may be different in different cases as equities

24  and hardships vary the balance between the competing values of right to relitigate

25  and finality of judgment." 686 F.2d at 722. Thus, after Mercantile, there remains

26

27        [5] See Hodes v. Axelrod, 70 N.Y.2d 364 (1987); Juan C. v. Cortines, 89
    N.Y.2d 659 (1997); Augustine v. Sugrue, 779 N.Y.S.2d 515 (2004); People v.

28  Roselle, 602 N.Y.S.2d 50 (1993); Goldstein v. Consolidated Edison Co. of New
    York, Inc., 462 N.Y.S.2d 646 (1983).

**EXHIBIT 22**
**1053**

1   the possibility that a vacated judgment could be afforded preclusive effect if

2   exceptional circumstances are present to warrant it. See Mercantile,147 Misc.2d at

3   810 (observing that whether such an exception should apply in a future case "may

4   well require consideration of factors that the parties have not briefed or discussed

5   and that might necessitate reflection not available to me as this trial approaches"

6   (citing Ringsby)).

7          The exceptional circumstances noted in Mercantile are present here.

8   Mercantile approvingly noted the district court decisions in Aetna and Angstrohm as

9   worthy exemplars of when application of such an exception is warranted. In both

10  cases, a judgment was entered after a trial, the judgment was later vacated by the

11  court after the parties reached a settlement, and, at least in Aetna, a significant

12  period of time (more than eight years) then passed before a separate proceeding

13  was instituted where the preclusive effect of the earlier vacated judgment became

14  an issue. Here, the vacated referee's findings were made following a trial that was

15  conducted more than sixty years ago; all of the material witnesses to the

16  transactions in question are now deceased; and some of the documents from that

17  time are now lost. These facts fundamentally alter the balance of interests

18  observed in Mercantile.

19         Failure to give preclusive effect to the referee's vacated findings here would

20  seriously compromise the conservation and efficient use of judicial resources. The

21  referee's findings were tendered after that court's expenditure of numerous

22  resources in conducting a trial, listening to testimony, parsing over the record, and

23  then rendering a judgment. All of those hard-pressed resources will simply be

24  squandered were the Court not to afford those findings preclusive effect. This by

25  itself, however, would probably not be enough to give preclusive effect to the

26  referee's findings. See Ruben, 592 N.Y.S.2d at 171 (refusing to afford collateral

27  estoppel effect to a vacated judgment that had been tendered following a trial and a

28  verdict returned by a jury). But there is more: Absent reliance on the referee's

**EXHIBIT 22**
**1054**

1   vacated findings, the lengthy passage of time since the trial and decision would

2   seriously threaten the reliability of any judgment handed down in the present case.

3   To believe that the factual issues actually litigated before the referee in the 1947

4   Westchester action could be relitigated in the present proceeding without a

5   significant degradation of the reliability of the conclusions reached in this

6   proceeding would give this Court and the parties' counsel too much credit.  Here, all

7   the Court has is some, but not all, the documents from the relevant period;

8   additionally, there are no witnesses who could testify to give life and context to

9   those documents still in existence.  Some of the copyright questions under

10  examination in this proceeding will require much more understanding than a partial

11  paper trial could provide.  Understanding the meaning of a document is oftentimes

12  the product of much more than simply looking at its words; live witness testimony

13  provides color, understanding, and context of the document's existence and

14  meaning.  The only court with the opportunity to assess the credibility of such live

15  testimony in connection with this legal dispute was presided over by the referee in

16  the Westchester action.  To refuse to afford the findings the referee made after

17  consulting all the documents, and hearing all the live testimony on the topic would

18  to be to deprive the record of the permutations, nuances, and subtleties those

19  witnesses' recollections placed on the meaning of those documents now brought

20  before this Court to examine.  If the eight-year gap in Aetna was sufficient to

21  warrant a finding that exceptional circumstances existed to give preclusive effect to

22  a vacated judgment due to the "dimmed" memories of those witnesses who could

23  still be found and the loss of documents that occurred in the interim, 440 F. Supp.

24  at 405, a sixty-year gap certainly suffices.

25       All that defendants can point to in rebuttal is that the parties bargained for

26  wiping the evidentiary slate clear, replacing it with their settlement agreement and

27  the final consent judgment.  Admittedly, this fact does weigh against giving

28  preclusive effect to the referee's findings, but the significance of the parties'

**EXHIBIT 22**
**1055**

1    expectations is diminished by the particular concerns implicated in this case.  To fail

2    to give preclusive effect to the referee's findings in a case with such a lengthy gap

3    between proceedings may very well make it extremely difficult, if not impossible, to

4    create any reliable findings in the present litigation over plaintiffs' attempt to

5    terminate the grants conferred to defendants shortly after those referee's findings

6    were made.  See Aetna, 440 F. Supp. at 405.  Focusing solely on the parties'

7    expressed intent as the lodestar for deciding whether collateral estoppel applies or

8    not in this case would be to place the thumb too heavily on the side of the scale

9    against preclusion without sufficiently taking account of the serious concerns that

10    have arisen weighing in favor of preclusion due to the passage of time since the

11    Westchester action took place.

12        This leads to another significant issue:  The scope of the parties' private

13    interest.  Although it is undoubtedly true that the parties sought to avoid giving the

14    referee's vacated findings preclusive effect, it must be remembered the context in

15    which that private interest was expressed.  The parties' sought to bar the further

16    relitigation of claims relating to the scope of the grant itself to Superman's and

17    Superboy's copyright (the ownership question); the stipulation and consent

18    judgment served to end further debate on that point.[6]  See Siegel, 508 F.2d at 913

19

20        [6] The parties' consent judgment would not have estopped further litigation
21    of the issues related to the ownership question, such as work for hire status, etc.,
      because neither the consent judgment nor the stipulation contain any findings with
22    respect to those issues; instead, the consent judgment simply declares that
      Detective Comics was the sole and exclusive owner of Superman and Superboy,
23    and leaves it at that.  See Marvel, 310 F.3d at 289 ("where a stipulation of
      settlement is 'unaccompanied by findings,' it does 'not bind the parties on any
24    issue . . . which might arise in connection with another cause of action.  Here,
      although the Settlement Agreement contained detailed findings on the authorship
25    issue, neither of the stipulations filed in the Prior Actions contain any specific
      findings as to whether Simon authored the Works independently or whether the
26    Captain America character was created as a work for hire.  Nor do the stipulations
      reference the Settlement Agreement in any way.  Therefore, the stipulations do
27    not collaterally estop Simon from litigating the issue of authorship underlying his
28    termination claim in this action").

EXHIBIT 22
1056

1  (noting that effect of parties' stipulation and final consent judgment was to "finally

2  determine[] that Detective . . . owned all rights to Superman without limitation").

3  Neither side, however, had any inkling of the existence of the current copyright

4  claim at issue in this case — namely, the 1976 Act's creation of the right to

5  terminate grants to copyrights.  Reference to the private parties' interest as a

6  means to defeat giving preclusive effect to the referee's vacated findings in this

7  case, therefore, would be to stretch the parties' intentions to cover the litigation of

8  issues in a cause of action (the termination of ownership) they themselves had no

9  idea would exist or that they even sought to safeguard against.  Cf. Marvel, 310

10  F.3d at 288 (refusing to afford res judicata to parties' earlier pre-1976 Act

11  settlement agreement concerning nature of grant of copyright in subsequent suit

12  seeking to litigate termination of that grant).

13      Undoubtedly some of the factual questions considered in the present effort

14  to terminate the grant of rights to the Superboy copyright will touch upon the same

15  facts as litigated in the state action over ownership to that same copyright.

16  Nonetheless, the point remains that those issues are brought in the context of a

17  legal right that was not conferred until decades later in the 1976 Act.  Without giving

18  preclusive effect to the referee's vacated findings in this case, the right Congress

19  sought to give to artists and their heirs would be seriously (if not, fatally)

20  undermined simply through the passage of time, leaving in its wake nothing but a

21  partial documentary record, uncolored or given context by live testimony,

22  concerning factual questions critical in exercising that right to terminate prior grants.

23  Again, there are no detailed findings contained in the parties' stipulation or final

24  consent judgment to which the Court could otherwise defer, leaving the evidentiary

25  slate clean in this case save for the referee's vacated findings.

26      Indeed, the concern with the passage of time is invariably present with the

27  exercise of the termination rights conferred by the 1976 Act; through passage of

28  section 304 Congress effectively resurrected ownership to copyrights that had

**EXHIBIT 22**
**1057**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 29 of 343   Page
Case 2:04-cv-08776-ODW-RZ   Document 151   Filed 07/27/2007   Page 28 of 73
ID #:17506

1   otherwise long ago been thought to belong to the publisher since the Supreme

2   Court's 1943 decision in <u>Fred Fisher Music</u>. Here, concerns with the effectiveness

3   of the 1976 Act termination remedy are alleviated to some extent with the presence

4   of the referee's vacated findings.  Those findings essentially encapsulate the

5   perception and recollection of the key participants to many of the factual questions

6   now at issue in this case.  This point is important to keep in mind as it further

7   diminishes the weight of the interest against giving preclusive effect to the referee's

8   findings.

9        When the private interest of the parties from the Westchester action is

10  compared to the substantial concerns weighing in favor of continuing to give

11  preclusive effect to the referee's vacated findings — preventing the loss of the

12  considerable judicial resources expended in the Westchester action that will

13  otherwise not be effectively replicated in the present proceeding with as much

14  assurance as the prior proceeding due to the loss of critical witnesses and

15  documents over the ensuing sixty year period — it is clear to this Court that

16  exceptional circumstances exist to give continuing preclusive effect to the referee's

17  findings despite their later vacatur.

## III. INTERSECTION OF COLLATERAL ESTOPPEL DOCTRINE
## WITH CONCEPTS UNIQUE TO COPYRIGHT LAW

20       Although the vacatur of the referee's findings does not, <u>ipso</u> <u>facto</u>, defeat

21  treating those findings as an estoppel, there remains a complicating wrinkle that

22  affects the scope and contours of the estoppel effect of those findings — the

23  longstanding Congressional grant of exclusive jurisdiction over copyright to the

24  federal courts.  <u>See</u> 28 U.S.C. § 1338(a) ("The district courts shall have original

25  jurisdiction of any civil action arising under any Act of Congress relating to . . .

26  copyrights . . . .  Such jurisdiction shall be exclusive of the courts of the states in . . .

27  copyright cases"); <u>see also</u> 28 U.S.C. §§ 41(7), 371(5) (repealed).  This legal reality

28  is important to this case as a number of the issues that must be addressed in

**EXHIBIT 22**
**1058**

1   determining the validity of the Superboy termination notice are unique to federal

2   copyright — specifically, whether the copyrightable material, if any, contained in

3   Siegel's Superboy submissions was ever "published," done as a "work for hire,"

4   done as a "joint work" with Shuster, or as "derivative work" of Superman.

5          To begin, there is little question that state law matters are inextricably

6   intertwined with many of the issues that arise in copyright disputes, whether it be

7   matters involve the interpretation of contracts or concern the legal effects flowing

8   from the formation of various business associations.  It is well-established in the

9   case law that state courts can determine matters of state law, the subject of which

10  is a copyright, and federal courts must afford preclusive effect to those findings,

11  even if giving such preclusive effect impacts, in whole or in part, consideration of

12  matters peculiar to copyright law.  See Vanderveer v. Erie Malleable Iron Co., 238

13  F.2d 510, 513 (3rd Cir. 1956) ("Although the bringing of actions arising under the

14  patent laws is admittedly restricted to the federal courts, it has long been

15  established that actions brought to enforce contracts of which a patent is the

16  subject [may] . . . be brought in the state courts.  The Supreme Court has held that

17  a state court is empowered to determine questions, as distinguished from cases,

18  arising under the patent laws, . . . and the court has given no indication that the

19  conclusive effect between the parties of the determination of these questions is to

20  be limited to the state courts"); T.B. Harms Co. v. Eliscu, 339 F.2d 823, 826 (2nd

21  Cir. 1964) ("copyright has not been thought to infuse with any national interest a

22  dispute as to ownership . . . turning on the facts or on ordinary principles of contract

23  law"); Knickerbocker Toy Co. v. Faultless Starch Co., 467 F.2d 501, 509 (C.C.P.A.

24  1972) ("Although 28 U.S.C. § 1338(a) provides that the federal district courts'

25  original jurisdiction over copyright actions 'shall be exclusive of the courts of the

26  states,' the state courts clearly may pass on the validity of a copyright . . . in the

27  course of deciding a case over which they do have jurisdiction"); Murphy v.

28  Gallagher, 761 F.2d 878, 886 (2nd Cir. 1985) (giving preclusive effect to state court

29

**EXHIBIT 22**
**1059**

1   resolution of the dissolution of a corporation even though such resolution

2   conclusively determined later federal securities fraud claim); Jasper v. Bovina

3   Music, Inc., 314 F.3d 42, 46 (2nd Cir. 2002) ("if the case concerns a dispute as to

4   ownership of a copyright, and the issue of ownership turns on the interpretation of a

5   contract, the case presents only a state law issue"); see also Note, The Collateral

6   Estoppel Effect of Prior State Court Findings in Cases Within Exclusive Federal

7   Jurisdiction, 91 HARV. L. REV. 1281, 1285 (1978) (noting that exclusiveness of

8   federal jurisdiction does not upset "the interests of the state courts in the integrity of

9   their findings on matters of state law within the normal sphere of their

10  competence").

11      That said, a state court's direct findings on matters peculiar to copyright law

12  itself would not be entitled to preclusive effect, either because such findings are not

13  necessary to the resolution of the case or, if necessary, then the state court's

14  finding exceeds its jurisdiction.[7] See Note, 91 HARV. L. REV. at 1287 ("[F]ederal

15  courts should give preclusive effect to state determinations of state questions

16  pleaded in the complaint, even if such issues arise in a subsequent action within

17  exclusive federal jurisdiction.  No preclusive effect, however, should be given to

18  state court determinations of federal [questions] arising under laws whose

19  enforcement is within the exclusive jurisdiction of the federal courts").  Nor should a

20  state court's findings on matters of state law be neatly and uncritically translated

21  verbatim as a finding on a legal concept unique to copyright law simply because it

22  used the same phrase as the concept in question.  See Music Sales Corp. v.

23  Morris, 73 F.Supp.2d 364, 377-78 (S.D.N.Y. 1999) ("Finally, the issues raised in this

24  dispute and in the 1989 [state court l]itigation are different and are governed by

25  different principles of law. This difference violates the estoppel requirement that the

26  _____

27      [7]  This principle would not, however, hold true of state court decisions
    concerning unpublished material made during the time the 1909 Act was effective.

28  Such "copyright" decisions were expressly left by the 1909 Act for state courts to
    determine under the common law.

EXHIBIT 22

1060

1   issues be identical in <u>fact and law</u>.  In the first action, Morris and the Strayhom

2   Estate, then plaintiffs, sought, inter alia, the rescission of the 1962 Agreement and

3   1965 Amendment based upon Tempo's nonperformance.  They did not raise the

4   terminability or invalidity of those contracts under copyright law, the issues raised in

5   this dispute. These different issues are governed by entirely different law. Issues

6   are not identical where the statutes, legal principles, or legal standards governing

7   them differ — even when the different issues rest on the same facts" (emphasis in

8   original)).  However, even in such situations where a state court's proper and

9   legitimate findings necessarily impact a matter of peculiar copyright law, those

10  factual findings by the state court, save for the ultimate legal conclusion on a matter

11  exclusively of copyright law, are entitled to preclusive effect.  <u>See</u> Note, 91 HARV. L.

12  REV. at 1289 ("the federal court can give preclusive effect only to those specific

13  findings which can be deduced from the state mixed finding of fact and law").

14          The present case and that decided in the Westchester action concem

15  discrete and separate legal claims:  The latter involved state law claims for

16  misappropriation of property while the former involves federal copyright claims.  To

17  be sure, these claims have significant factual overlap, but the resolution of the legal

18  claims in the Westchester action are not necessarily determinative of the purely

19  copyright legal claims in the present action.

20          The best illustration of this point is the Supreme Court's decision in <u>Becher v.</u>

21  <u>Contoure Laboratories, Inc.</u>, 279 U.S. 388 (1929).  In that case, Becher, a

22  machinist, was employed to construct Oppenheimer's invention as well as the

23  improvements he made to his invention from time to time.  As part of his

24  employment, Becher agreed to keep secret and confidential the information he

25  obtained from his employment and to not use it for his own benefit or for that of

26  anyone else.  Contrary to his employment agreements, Becher obtained a patent

27  for himself based on information he learned from making instruments for

28  Oppenheimer.  Oppenheimer obtained a judgment in a state court suit against

31

**EXHIBIT 22**
**1061**

1   Becher for breaches of contract and fiduciary duty, that determined that Becher's

2   attainment of the patent was without Oppenheimer's knowledge and was done "in

3   violation of his agreement" with Oppenheimer, and required Becher to, among other

4   things, deliver "an assignment of the . . . patent and give up instruments similar to

5   the invention." Instead of abiding by the state court judgment, Becher brought a

6   federal suit for patent infringement, arguing that the earlier state court judgment

7   should be disregarded because, if it was sustained, it would serve to establish the

8   invalidity of his patent, and questions concerning the validity of patents are

9   questions for the federal courts alone.

10      Justice Holmes, writing for a unanimous court, affirmed the lower court's

11  ruling that the state court determinations precluded relitigation of those factual

12  issues in the patent case in federal court.  The opinion began by noting that the

13  validation of Oppenheimer's claims in state court did not arise under or require the

14  consultation of the patent laws, but were purely state law determinations

15  independent of patent. Id. at 391 ("Oppenheimer's claim was an undisclosed

16  invention which did not need a patent to protect it from disclosure by breach of

17  trust"). Turning to the argument that, in establishing Oppenheimer's state law claim

18  that a breach of fiduciary duty and a breach of contract occurred, the state

19  judgment necessarily invalidated Becher's patent, Justice Holmes reasoned that

20  the grant of exclusive jurisdiction "does not give sacrosanctity" to questions of fact

21  which might also be conclusive of the federal claim. Id.  Again, the state court

22  proceedings addressed only state law matters "independent of the patent law." Id.

23  Though giving preclusive effect to the state court's factual findings led to the legal

24  conclusion of an invalid patent, "that is not the effect of judgment.  Establishing a

25  fact and giving a specific effect to it by judgment are quite distinct." Id.  "A fact is

26  not prevented from being proved in any case in which it is material, by the

27  suggestion that if it is true an important patent is void . . . ." Id. at 391-92.

28      The principle to be culled from Becher is that federal courts are to give

**EXHIBIT 22**
**1062**

1  preclusive effect to earlier state determinations of state questions pleaded in the

2  complaint, even if such state law issues arise in a subsequent action within the

3  federal court's exclusive jurisdiction, like copyright or patent.  Such estoppel,

4  however, only operates as to the purely state law claims (and attendant facts)

5  decided by the state court.  A federal court cannot simply transplant a state court's

6  finding as including the legal conclusions of the purely and exclusively federal

7  issues before it; although in some instances, those state findings may prove

8  "material" to the resolution of the exclusively federal law claim, such resolution of

9  that federal question must involve the application of those state findings to the

10  governing federal law on the topic in question before making the legal conclusion

11  concerning the exclusively federal issues.

12       The boundaries established by the Supreme Court in Becher were

13  highlighted in the Second Circuit's influential decision in Lyons v. Westinghouse

14  Electric Corp., 222 F.2d 184 (2nd Cir. 1955).  There Westinghouse brought suit in

15  state court arguing that Lyons had breached a contract "made with it as its agents

16  for the sale of electric lamps."  Id. at 185.  Lyons interposed as a defense that the

17  contract was unenforceable as it was the product of a conspiracy between

18  Westinghouse and General Electric "to restrain competition in the marketing of

19  such lamps" by requiring agents to "observe uniform price schedules" and

20  prohibiting them "from competing among each other," all in violation of the federal

21  anti-trust laws.  Id. at 186.  After a trial, the state court found the federal defense

22  without merit and awarded judgment to Westinghouse.  While the matter was on

23  appeal, Lyons filed an action in federal district court alleging the same conspiracy to

24  violate the federal anti-trust laws.  The district court stayed the federal proceedings

25  pending resolution of the state appeal.  The Second Circuit granted Lyons a writ of

26  mandamus and ordered the district court to vacate the stay.

27       In granting mandamus relief, Judge Learned Hand, writing for the majority,

28  made clear that, absent such relief, the state proceedings would be allowed to

EXHIBIT 22
1063

1  culminate in final settlement of the matter, leaving Westinghouse "in a position to

2  plead the [state court] judgment as an estoppel, and, if it is successful, that will

3  dispose of the action at bar without a trial." Id. at 186. Judge Hand explained that

4  such estoppel will "in substance" end the federal proceedings as it "will conclude

5  any future consideration of the existence of the conspiracy" upon which "all else

6  depends" for Lyons' federal suit. Id. Such a result would thus threaten the

7  Congressional grant to federal courts of exclusivity over jurisdiction of the federal

8  anti-trust laws. Acknowledging that the state court "had undoubted jurisdiction . . .

9  to decide the merits of" Lyons' defense, Judge Hand nonetheless reasoned that the

10  existence of exclusive federal jurisdiction over federal anti-trust claims required a

11  more limited preclusive effect be given to state court judgments when later litigating

12  such federal claims in federal court. Towards that end, Judge Hand analyzed

13  Becher, and relying on section 71 of the Restatement of Judgments,[8] distilled the

14  following principal from the Supreme Court's decision: "[There is a] distinction . . .

15  between the finding of one of the constituent facts that together make up a claim

16  and the entire congeries of such facts, taken as a unit; an estoppel is good as to

17  the first but not as to the second." Id. at 188; see also Red Fox v. Red Fox, 564

18  F.2d 361, 365 n.3 (9th Cir. 1977) (citing with approval quoted proposition from

19  Lyons). "The distinction between 'constituent' facts and 'congeries' of facts is

20  generally equated with the distinction between findings of fact and the application of

21  law to fact." Note, 91 HARV. L. REV. at 1284.

22       This principal has found expression in modern cases' reliance on state laws

23  that deny giving preclusive effect to an earlier state court judgment where such

24  estoppel would be a bar to litigating a claim within the exclusive jurisdiction of the

25  federal courts. See Marrese, 470 U.S. at 381-82 ("To be sure, a state court will not

26

27       [8] That section provided that "[w]here a court has incidentally determined a
matter which it would have had no jurisdiction to determine in an action brought
28  directly to determine it, the judgment is not conclusive in a subsequent action
brought to determine the matter directly."

34
**EXHIBIT 22**
**1064**

have occasion to address the specific question whether a state judgment has issue

or claim preclusive effect in a later action that can be brought only in a federal

court. Nevertheless, a federal court may rely in the first instance on state

preclusion principles to determine the extent to which an earlier state judgment bars

subsequent litigation. . . . a federal court can apply state rules of issue preclusion to

determine if a matter actually litigated in state court may be relitigated in a

subsequent federal proceeding"). Thus, courts have found that an earlier state

court judgment did not preclude litigation of issues within the exclusive jurisdiction

of federal courts because (citing to state law preclusion principles) of the lack of

identity between the state law claims and the federal ones at issue. See RX Data

Corp. v. Department of Social Servs., 684 F.2d 192, 197-98 (2nd Cir. 1982)

(refusing to afford preclusive effect from prior state court action because there was

a lack of identity of issues between the state and federal suits).

     Collateral estoppel has also been found not to apply because (under state

law preclusion principles) the particular federal issue could not be addressed by the

state court (or, if it was, the state court's judgment was a nullity) as it was beyond

its jurisdiction. Id. at 198 (refusing to afford preclusive effect to earlier New York

Court of Claims decision because a claim for copyright infringement was beyond its

jurisdiction to decide). Indeed, the Supreme Court itself has noted that fresh

consideration of most issues peculiar to a matter of exclusive federal jurisdiction

would not be barred by earlier state court rulings that purported to address those

same issues, because the matter would lie beyond the state court's jurisdiction to

decide and hence not be entitled to preclusive effect under state law. See Marrese,

470 U.S. at 382 ("we note that claim preclusion generally does not apply where 'the

plaintiff was unable to rely on a certain theory of the case or to seek a certain

remedy because of the limitations on the subject matter jurisdiction of the courts.' If

state preclusion law includes this requirement of prior jurisdictional competency,

which is generally true, a state judgment will not have claim preclusive effect on a

**EXHIBIT 22**

**1065**

1    cause of action within the exclusive jurisdiction of the federal courts").[9]

2    These same limits to collateral estoppel and related doctrines are present in

3    New York law. See Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 485

4    (1979) (noting that collateral estoppel analysis of whether state court judgment is

5    entitled to preclusive effect is determined, in part, by whether there exists "a

6    judgment on the merits by a court of competent jurisdiction"); Mural Arts v.

7    Sonsandi, 82 N.Y.S.2d 153, 154-55 (N.Y. Sup. 1948) ("no judgment may be held to

8    be res judicata as to an issue over which there was no jurisdiction in the Court

9    rendering the judgment"); see also Accolla v. Ladestri, 1989 WL 129484 *2

10   (S.D.N.Y. Oct. 26, 1989) ("Under New York law, it is clear that 'a claim is not barred

11   by res judicata if the court in which the first action was brought lacked subject

12   matter jurisdiction to adjudicate the claim'").

13   In the final analysis, then, when confronted with the effect of a prior state

14   court judgment on the present litigation of an issue that is uniquely within the

15   exclusive jurisdiction of the federal courts, federal courts must focus on what the

16   particular matters at issue in the state suit were and analyze the potential preclusive

17   effect of that state court's judgment through that lens. When viewed in this context,

18   many of the matters resolved by the state court will not address directly the unique

19   federal issues, leaving it to the parties in the federal suit to present evidence and for

20   the federal court to resolve the federal issue. Although many of the state court's

21   findings may properly bear on the analysis of the federal issue, in the end, the

22   federal court's conclusion must be the product of the application of federal law to

23   those state court findings and any additional evidence properly considered by the

24   federal court.

---

25   [9] Again, the matter would be much more difficult if the Westchester action
26   involved a state law that was a mirror image of federal copyright law or involved
     ownership to unpublished material as such matters were generally left for state
27   courts to resolve under the 1909 Act. Here, however, the parties suit concerned
     state common law tort claims involving the alleged "wrongful publication" of
28   Siegel's idea clearly implicating the governing body of federal copyright law.

**EXHIBIT 22**
**1066**

1    Here, many of the conclusions contained in the Court's March 23, 2006,

2  Order were not the result of such a careful consideration and comparison of what

3  was (and what was not) decided in the state court to resolve the state law claims

4  there and of the federal questions at issue in the present case. Instead, the

5  conclusions were the product of the Court simply treating (and then transcribing)

6  the referee's findings en masse (especially those that contained the same phrases

7  as those at issue in the present copyright matter), as if the Westchester action was

8  a copyright case that conclusively settled issues unique to copyright. The Order's

9  analysis failed to apply the governing body of copyright law to the referee's findings

10  as is required under <u>Lyons</u> and the collateral estoppel doctrine under New York law.

11  Although the referee's findings are relevant to some of the copyright issues in this

12  case (most notably, whether Superboy was a work for hire), they are not wholly

13  dispositive.

14    The March 26, 2006, Order missteps near its beginning when it

15  characterizes defendants' arguments as an "attempt to relitigate issues <u>determined</u>

16  in the 1947 state court case," (Order at 6) suggesting that the copyright issues at

17  stake in the present litigation were litigated and resolved in the Westchester action.

18  This perspective is reflected in the Order's treatment of the previously mentioned

19  copyright issues. For instance, the Order observes that the referee "specifically

20  determined that Detective Comics published the Superboy comic strip based upon

21  the idea, plan, and conception of Siegel, in a magazine entitled *More Fun Comics*."

22  (Order at 8). Notably absent from the Court's analysis was any indication whether

23  such printing of the idea or concept of Superboy envisioned by Siegel necessarily

24  meant that Siegel's submissions themselves (as opposed to the general idea

25  embodied within) was published as a matter of federal copyright law, or whether

26  such printing of general ideas contained in an otherwise detailed submission is

27  sufficient to count as a publication. Instead, the finding was accepted as if the

28  referee engaged in this detailed analysis in making that finding because the finding

**EXHIBIT 22**

**1067**

1   contained the term "published." If that was what the referee did, he exceeded his

2   jurisdiction to do so.

3         When speaking of the joint work issue, the Order simply notes that the

4   referee found that Siegel was the sole originator and owner of Superboy, and

5   concludes that this finding means Superboy could not be a joint work. (Order at

6   14). Again, the Order does not apply governing federal copyright law to the

7   referee's findings so as to independently reach a conclusion whether Superboy was

8   a joint work nor does it examine the nature of the Westchester action to determine

9   what was being decided when the referee made that finding; instead, recitation of

10   the referee's finding alone is used to directly perform that function.

11         On whether Superboy is a derivative work of Superman, the Order simply,

12   without any analysis, states that litigation of such a question would be inconsistent

13   with the referee's findings that Siegel owned Superboy and the payment for the

14   subsequent transfer of the same per the parties' settlement agreement. (Order at

15   11-12).

16         Given all this, the Court finds defendants' motion for reconsideration of the

17   Order well taken. Accordingly, the Court turns its attention to determining whether

18   and to what extent the referee's vacated findings compel any conclusions as to the

19   peculiar federal copyright issues before it; specifically, whether those findings

20   impact the issues of whether Siegel's Superboy submissions were "works for hire,"

21   whether they were the product of a "joint authorship," whether they were

22   subsequently "published," and whether they were a "derivative work."

23   **A.    Work Made For Hire**

24         Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

25   prior grant in the copyright to his or her creation does not apply to a "work made for

26   hire" because the copyright in such a creation never belonged to the artist in the

27   first instance to grant. See 17 U.S.C. § 304(c). This proscription naturally raises

28   the important question of whether Siegel's Superboy submissions were a "work

**EXHIBIT 22**
**1068**

1  made for hire." If so, then Siegel's heirs cannot seek to terminate his earlier grant

2  of the Superboy copyright to defendants' predecessors in interest, such a grant

3  being merely a superfluous act that did not alter the pre-existing ownership rights to

4  that copyright. See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir.

5  1995) ("Once it is established that a work is made for hire, the hiring party is

6  presumed to be the author of the work").

7       Resolution of this question, as with all the copyright questions presented in

8  this case, is controlled by the governing body of law in existence at the time Siegel

9  submitted his Superboy material to Detective Comics, that is, the 1909 Act and the

10  precedent developed thereunder. See Self-Realization Fellowship v. Ananda

11  Church, 206 F.3d 1322, 1325 (9th Cir. 2000) ("Because all of the copied works

12  were created before 1978, the Copyright Act of 1909 governs the validity of the

13  initial copyrights"); Twentieth Century Fox Film Corp. v. Entertainment Distributing,

14  429 F.3d 869, 876 (9th Cir. 2005) ("We first consider Twentieth Century Fox

15  Parties' infringement claims under the now repealed Copyright Act of 1909 because

16  Crusade in Europe was published before the . . . effective date of the 1976

17  Copyright Act").

18       The 1909 Act provided that, "[i]n the interpretation and construction of this

19  title[,] . . . the word 'author' shall include an employer in the case of works made

20  for hire." 17 U.S.C. § 26 (repealed). "Thus, with respect to works for hire, the

21  employer is legally regarded as the 'author,' as distinguished from the creator of the

22  work, whom Learned Hand referred to as 'the "author" in the colloquial sense.'"

23  Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of

24  Contemporary Dance, Inc., 380 F.3d 624, 634 (2nd Cir. 2004). Nowhere did the

25  1909 Act define what was meant by "work made for hire" or "employer"; only the

26  consequences flowing from such a designation were spelled out. The task of giving

27  meaning to these terms fell to the courts. The Ninth Circuit eventually formulated

28  the "instance and expense test" to determine whether a work is one made for hire

1   under the 1909 Act. As explained by the Ninth Circuit:

2           [W]hen one person engages another, whether as
3           employee or as an independent contractor, to produce a
        work of an artistic nature, that in the absence of an
4           express contractual reservation of the copyright in the
        artist, the presumption arises that the mutual intent of
5           the parties is that the title to the copyright shall be in the
        person at whose instance and expense the work is
        done.

6

7   Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965). The

8   test sought to match the concept of a work made for hire with the purpose of the

9   Copyright Act. As one court explained: "[T]he law directs its incentives towards the

10  person who initiates, funds and guides the creative activity, namely, the employer,

11  but for whose patronage the creative work would never have been made.

12  Copyright law 'is intended to motivate the creative activity of authors . . . by the

13  provision of a special reward.'" Estate of Hogarth v. Edgar Rice Burroughs, Inc.,

14  2002 WL 398696, at *19 (S.D.N.Y. March 15, 2002) (quoting Sony Corp. v.

15  Universal City Studios, Inc., 464 U.S. 417, 429 (1984)). Toward that end, the

16  instance and expense test requires the evaluation of three factors: (1) At whose

17  instance was the work prepared; (2) whether the hiring party had the power to

18  accept, reject, modify, or otherwise control the work; and (3) at whose expense was

19  the work created. See Twentieth Century, 429 F.3d at 879, 881. Such an inquiry is

20  a mixed question of law and fact. See id. at 877.

21       Because such an inquiry requires the application of facts to the law, the

22  parties spar over whether the referee's vacated findings did (or could) conclusively

23  determine whether Siegel's Superboy submissions were a work made for hire.

24       Plaintiffs begin by arguing that the referee's finding that Siegel was the

25  "originator and sole owner" of Superboy conclusively establishes that his

26  submissions were not a work for hire and that defendants are estopped from

27  seeking to relitigate that finding. The Court disagrees. Nowhere in his findings did

28  the referee once speak of work for hire (and plaintiffs, to their credit, acknowledge

1    that the referee "did not mention the phrase"). Certainly, the referee made findings

2    dealing with the parties' business and contractual relationship concerning Siegel's

3    Superboy submission, factual issues that touch upon the work made for hire

4    question, but that was as far as the referee went. Whether those findings, when

5    applied to the governing body of law under the 1909 Act, establish that those

6    submissions were made as a work for hire is a question left for this Court to answer

7    in the first instance.

8        Perhaps the best and most important example of this point is found in the

9    Second Circuit's decision in Siegel. One of the issues pressed by the parties in that

10   case was whether the referee's findings conclusively resolved the issue of whether

11   Superman was a work made for hire. The district court found that it did because

12   the parties' business dealings demonstrated the "existence of an arrangement

13   going beyond an assignor-assignee relationship" to one more akin to a "classic

14   employment relationship." 364 F.Supp. at 1036. In reaching this conclusion, the

15   district court pointed to the referee's findings that Siegel and Shuster were under a

16   contract of employment with Detective Comics at the time Superman was

17   published; that Detective Comics's required Siegel and Shuster to return their

18   original 1933 Superman material for revision and expansion before it could be

19   published in Action Comics; and that the resubmitted material constituted the

20   formula for the continuing Superman series. See Id. at 1036-37. The district court

21   further concluded that Siegel and Shuster were barred by res judicata from seeking

22   to relitigate the factual basis of the work made for hire question. Id. at 1037.

23       For its part, the Second Circuit disagreed with the district court's invocation

24   of res judicata. The court of appeals noted that, "[w]hile it is evident that the state

25   court concluded as a matter of law that the plaintiffs conveyed all their rights in

26   Superman to the defendants," there was "no conclusion of law in the state court

27   that the comic strip was a work for hire so as to create the presumption that the

28   employer was the author. That issue was not litigated at all in the state court." 508

41

**EXHIBIT 22**

1  F.2d at 914. That said, the Second Circuit did note that several of the referee's

2  findings were underline relevant to the question of whether Superman was a work for hire,

3  but, unlike the district court, concluded that those findings pointed against a

4  determination that Superman was a work made for hire as a matter of federal

5  copyright law. Id. The Second Circuit seized on the referee's findings concerning

6  the nature of the 1933 Superman material as indicating that "Superman and his

7  miraculous powers were completely developed long before the employment

8  relationship was instituted," and further diminished the significance of the revisions

9  called for by Detective Comics as "simply to accommodate Superman to a

10  magazine format." Id. Given these facts, the Second Circuit concluded that

11  Superman did not meet the "instance and expense" test under the 1909 Act. Id. In

12  essence, by looking to and applying those specific factual findings by the referee to

13  the relevant body of copyright law on works made for hire, the Second Circuit

14  concluded that the original renderings of Superman constituted the original works,

15  later elaborations of which constituted, at most, derivative works. Id. at 914; see

16  also 1 Nimmer § 5.03[B][1][b] at 5-31 n.92.

17        Thus, to say that the referee's findings conclusively held one way or the

18  other on the question is mistaken. Rather, resolution of the issue requires this

19  Court to do exactly what the Second Circuit in its time did — apply the governing

20  body of copyright law under the 1909 Act to those findings made by the referee that

21  are relevant to the question, and render a legal judgment. Such an undertaking is

22  not, as plaintiffs argue, an attempt to "re-litigate" the nature of the parties'

23  relationship, but rather to litigate, for the first time, that which was not addressed in

24  the Westchester action — given the parties' business relationship as determined by

25  the referee, was the submission of Superboy to Detective Comics a work made for

26  hire. It is to that question that the Court now turns, with initial reference to the

27  instance and expense test set forth above.

28        The "expense" requirement is met where a "hiring party simply pays an

1   [employee or] independent contractor a sum certain for his or her work." <u>Playboy</u>

2   <u>Enterprises</u>, 53 F.3d at 555.  Such regular, periodic payments of a sum certain bear

3   the hallmark of the wages of an employee required to produce the work in question

4   for his or her employer, and not that of a party who is free to engage those other

5   than the commissioning party in marketing his or her work.  <u>See</u> <u>Donaldson</u>

6   <u>Publishing Co. v. Bregman, Vocco & Conn, Inc.</u>, 375 F.2d 639, 642-43 (2nd Cir.

7   1967).  "In contrast, where the creator of a work receives royalties as payment, that

8   method of payment generally weighs against finding a work-for-hire relationship."

9   <u>Playboy Enterprises</u>, 53 F.3d at 555; <u>see</u> <u>also</u> <u>Twentieth Century</u>, 429 F.3d at 881

10  (finding that "expense" requirement met when publisher agreed to pay the author "a

11  lump sum for writing the book, instead of negotiating a royalty deal").

12          Here, it is true that none of the costs or expenses incurred in creating the

13  Superboy material (the paper on which the dialogue and story elements was

14  printed, the typewriter used to put into concrete form the author's concepts of the

15  same, <u>etc.</u>,) was borne by Detective Comics.  The material was created at Siegel

16  and Shuster's artist studio in Cleveland, Ohio, using office supplies and other

17  materials bought and paid for by Siegel for the studio.  Nothing from Detective

18  Comics' offices in New York City was utilized in the creation of the Superboy

19  material.  All that said, nothing in the referee's findings or in the materials submitted

20  by the parties in this case would suggest that this was not also the case for the

21  other comic strips (Superman included) that Siegel and Shuster penned for

22  Detective Comics pursuant to the September, 1938, employment contract.  In

23  addition, courts employing the instance and expense test have discounted reliance

24  on the circumstances and the cost borne for the production of the work.  Such

25  consideration relates to the question of whether "an artist worked as an

26  independent contractor and not as a formal employee," a distinction that has "no

27  bearing on whether the work was made at the hiring party's expense." <u>Playboy</u>

28  <u>Enterprises</u>, 55 F.3d at 555.

**EXHIBIT 22**
**1073**

1    Moreover, Siegel was also paid nothing by Detective Comics when he

2    submitted his Superboy material to it, and it rejected the material for publication.

3    Nor was Siegel paid when Detective Comics ultimately published the material

4    (assuming that Siegel's Superboy submissions were "published" in the magazine,

5    see infra III.C.) in More Fun Comics, no. 101 four years later.  The lack of payment

6    of any kind for the material itself would ordinarily negate a finding that the expense

7    requirement was met.  This lack of payment for the Superboy material itself is

8    particularly glaring considering that the referee found that Detective Comics would

9    periodically pay Siegel and/or Shuster at their regular per page rate for editions of

10   the Superman comic strip (a work for which they were employed to provide) even

11   when neither of them had contributed any of the continuity (Siegel) or illustrations

12   (Shuster) for the strip.  A reasonable inference to draw from this practice would be

13   that Detective Comics paid artists at least something for work they were employed

14   to produce even if the material submitted ultimately was not published; however,

15   with Superboy, no payments were ever made, regular or otherwise, leading to the

16   clear legal conclusion that Siegel was not employed by Detective Comics to create

17   the Superboy comic strip.

18       Defendants seek to downplay the absence of payment by noting that

19   Detective Comics ultimately did pay Siegel over $90,000 in settlement of the

20   Westchester action.  This fact, however, only bolsters the finding that the Superboy

21   submissions were not made at the expense of Detective Comics; instead, this

22   payment was made only after Detective Comics had been publishing Superboy for

23   a number of years.  If the material was part of a work made for hire arrangement,

24   such payment would have occurred at a time more contemporaneous with its

25   creation and submission, not years later and only then after the publisher had been

26   sued by the author for the unauthorized publication of the same (and not for breach

27   of an employment contract or agreement).  There is simply no evidence indicating

28   that the parties had a business understanding or contractual relationship allowing

**EXHIBIT 22**
**1074**

1  for lengthy gaps in time between the creation of a work and payment for the same.

2  In the end, the complete lack of any periodic payment of a sum certain for

3  Siegel's Superboy material leads the Court to find that the expense requirement

4  has not been met in this case.

5  The "instance" component of the test inquires into "whether 'the motivating

6  factor in producing the work was the employer who induced the creation."

7  Twentieth Century, 429 F.3d at 879.  That the commissioning party be the

8  motivating factor is not a "but for" test — that is, but for the artist's employment the

9  work would not have been created — but instead is a more narrow inquiry focused

10  on the nature and scope of the parties' business relationship.  As one court

11  explained:

12  No doubt Graham was a self-motivator, and
   perhaps she would have choreographed her dances
13  without the salary of Artistic Director, without the
   Center's support and encouragement, and without the
14  existence of the Center at all, but all that is beside the
   point.
15

16  . . . .

17  . . . . There is no need for the employer to be the
   precipitating force behind each work created by a
18  salaried employee, acting within the scope of her regular
   employment.  Many talented people . . . are expected by
19  their employers to produce the sort of work for which
   they were hired, without any need for the employer to
20  suggest any particular project.  'Instance' is not a term of
   exclusion as applied to specific works created within the
21  scope of regular employment.  It may have more
   significance in determining whether an employee's work
22  somewhat beyond such scope has been created at the
   employer's behest or to serve the employer's interests
   . . . .
23

24  Martha Graham, 380 F.3d at 640-41.  Thus, "under the 1909 Act a person could be

25  an employee yet create a work 'as a special job assignment, outside the line of the

26  employee's regular duties.'  In that event, the work is not a work for hire."  Id. at 635

27  (citing Shapiro Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (2nd

28  Cir. 1955)).  The critical factor is what, if any, employment relationship (be it as an

45

**EXHIBIT 22**
**1075**

1   employee-employer or an employer-independent contractor) existed between the

2   parties beforehand, and whether the work in question fell within the scope of those

3   job duties. Toward that end, the "instance" requirement is also "shaped in part by

4   the degree to which the hiring party had the right to control or supervise the artist's

5   work," a circumstance reflective of the work being created within the confines of an

6   employment relationship. Twentieth Century, 429 F.3d at 879 (internal quotation

7   marks and citations omitted). Although it is not critical that the commissioning party

8   actually exercise its right of control and supervision in the creation of the work in

9   question, it is necessary that the party have the right to direct, control, or otherwise

10  edit the artist's work. See Martha Graham, 380 F.3d at 635 ("The right to direct and

11  supervise the manner in which the work is created need never be exercised"

12  (emphasis in original)).

13       Plaintiffs rely heavily on the referee's finding that Siegel submitted Superboy

14  pursuant to the right of first refusal provision in the parties' September, 1938,

15  agreement, and therefore it was not material Siegel was otherwise obligated to

16  provide to Detective Comics (unlike the comic strips for Superman, Slam Bradley,

17  the Spy, etc.,) in the course of his regular employment with the publisher. Given

18  that the publisher had yet to agree to publish the material when Siegel submitted

19  Superboy to Detective Comics, plaintiffs argue that Detective Comics could not

20  possibly be seen as owning the material at the inception, something which it claims

21  is a predicate for a work for hire.

22       Deciding not to publish material and owning the material beforehand are not

23  mutually exclusive propositions. A publisher could own the material from its

24  inception, but decline to publish it. Publication (or lack thereof) is not dispositive;

25  what is critical, however, is the referee's finding that the creation of Superboy fell

26  outside the scope of Siegel's regular job duties. The parties' contract called for

27  Siegel (and Shuster) to provide Detective Comics the continuity and illustrations for

28  certain specified comic strips in exchange for remuneration at a specified sum

**EXHIBIT 22**

**1076**

certain; Superboy was not among the comics Siegel was required to perform work

for per the parties contract. The referee found that "Superboy was a separate and

distinct entity" apart from Superman for purposes of the scope of the parties'

September, 1938, agreement. It was for this reason that the referee thereafter

analyzed the claims relating to Superboy through the lens of the right of first refusal

provision. Siegel's presentation of Superboy to Detective Comics (rather than

some other comic publisher) therefore was the result of the provision in the parties'

contract requiring Siegel and Shuster to "first give [Detective Comics] the right to

first refusal" for "any other art work or continuity suitable for use as comics or comic

strips." Siegel's creation of the Superboy submissions was thus independent —

entirely separate and apart — of his regular job duties with Detective Comics.

        This then leads to the question of whether Siegel necessarily made his

Superboy submissions specifically for the publisher, Detective Comics.

        Here, there is no evidence that Siegel attempted to pitch his Superboy

submissions to any other comic book publisher after Detective Comics initially

turned him down. In fact the precise opposite is true. A little more than a year later

he re-pitched the idea to Detective Comics, but in a more fully developed format.

When this, too, was turned down by Detective Comics, there is no indication that

Siegel went elsewhere to pitch his idea. Instead, it appears (much like with his

original 1933 Superman material) Siegel tabled the material and continued to work

on other, existing projects. Shortly thereafter, Siegel joined the United States

armed forces and fought in World War II. When he returned home from his service

to the country, the opportunity to pitch the Superboy submissions to other comic

publishers was gone; Detective Comics had already been publishing a Superboy

comic for a period of time in Siegel's absence. Nothing in the parties' papers or in

the referee's findings shed any light as to whether Siegel only envisioned Detective

Comics as the publisher for his material, or if in fact other publishers were also

considered by him. Instead, the Court is left simply with the nature and structure of

**EXHIBIT 22**

**1077**

1   the parties' contractual relationship in formulating a decision as to whether Siegel's

2   Superboy submissions were works made for hire.

3        Viewed from this perspective, the situation is akin to a specially-

4   commissioned work, rather than one produced in the regular course of an

5   employee's job duties.  Nimmer has drawn the same parallels for situations not that

6   different than the present one:

7              [A] situation may arise where the employer finds
               the employee's work unsuitable . . . .  It seems probable
8              that such unused material belongs to the employer, at
               least if the contract of employment contains language
9              purportedly [conveying to the employer] 'all' material
               [created by the employee].  Even when there is an
10             agreement between employer and employee that
               employer shall own certain material to be created by the
11             employee, if in the creation of such material, the
               employee is to work as an independent contractor (even
12             if for other duties he is an employee), then the employer
               must claim such ownership by virtue of an assignment,
13             rather than by virtue of his status as an employer.

14   1 Nimmer § 5.03[B][1][b] at 5-37 (emphasis added).  Here, nothing in the parties'

15   contract purported to convey to Detective Comics ownership to all the material

16   Siegel and Shuster ever created; rather, the contract conveyed only the material

17   created with respect to certain specified comic strips of which Superboy was not

18   one.  With respect to works other than those enumerated comic strips, the most

19   Detective Comics had was a one-time opportunity to lay claim to Siegel's Superboy

20   material.  See Broadcasting Corp. v. Metromedia Inc., 74 N.Y.2d 54, 56 (1989) ("a

21   right of first refusal merely provides . . . a chance to buy").  The right of first refusal

22   (and especially one that is not exercised) is fundamentally incompatible with a

23   finding that a work falling within its provisions is a work made for hire.  Cf. 1 Nimmer

24   § 5.03[B][2][d] at 5-56.8 ("[A] commission relationship may not exist, even if the

25   work is prepared at the request of another, and even if such other person bears the

26   costs of its creation, where the person requesting the work is expressly granted only

27   a one-time use").  Such a contractual provision is predicated upon the assumption

28   that the material being submitted for the exercise of the option to publish belongs to

**EXHIBIT 22**
**1078**

1    the artist at the outset. See LIN v. Metromedia, Inc., 74 N.Y.2d 54, 56 (1989)

2    (noting that, under New York law, a "right of first refusal" requires the "owner, when

3    and if he decides to sell, to offer the property first to the party holding the

4    preemptive right so that he may meet a third-party offer or buy the property at some

5    other price" (emphasis added)). If this were not so, there would be no need for the

6    publisher to have the first opportunity at publishing the material; rather, it would

7    already belong to the publisher, regardless of whether it publishes the material or

8    not. Because material that is a work made for hire belongs at the inception to the

9    publisher, having that same material submitted to the publisher in the first instance

10    under a right of first refusal strongly suggests that it did not belong to the publisher

11    when it was created.

12        A case illuminating this point is Playboy Enterprises, Inc. v. Dumas, 960 F.

13    Supp. 710 (S.D.N.Y. 1997). Among the paintings at issue in that case were several

14    that the artist had submitted to but were turned down by Playboy. Although it

15    turned down publishing the paintings, Playboy nonetheless paid the artist a "turn-

16    down" fee for the work. The parties squabbled over the impact these turned-down

17    paintings had on whether the paintings that were accepted for publication were

18    works made for hire. Playboy argued that its payment for paintings that it did not

19    publish bolstered the impression that creation of the paintings (whether they were

20    used or not) was due to it "request[ing] a submission from [the artist] each month,"

21    and undermined any argument that payments to the artist for those paintings were

22    only for a one-time use. Id. at 715. The court agreed with Playboy, finding that the

23    payments for unused works "show[ed] that it at least implicitly requested [the artist]

24    to submit at least one painting a month and that it therefore was the motivating

25    factor in the creation of those paintings." Id. As the district court elaborated: "The

26    fact that Playboy made payments for unused work undercuts [the argument] that

27    [those payments] must have been for the right to one-time use of the disputed

28    works because [it] is all that Playboy required. But if Playboy never published a

**EXHIBIT 22**
**1079**

1   work at all, there would have been no reason to pay anything for it absent a for-hire

2   relationship, as it would have had no need for any rights in such a case." Id. at 716.

3         The converse would also be true. The failure to pay for unused work,

4   notably those falling outside the artist's regular job duties, supports the conclusion

5   that the parties understood that such works fell outside the confines of any for-hire

6   relationship between them and were created at the artist's instance. While

7   payment demonstrates an acknowledgment on the publisher's part that the work

8   was being done for their benefit, the absence of such payment creates just the

9   opposite impression. Cf. id. ("The logical conclusion, and the one to which this

10  Court comes, is that Playboy paid Nagel for works it did not use because he

11  created them at its instance").

12        Thus, it appears that, at least viewed through the prism of the parties'

13  business and contractual relationship, Siegel's submission of Superboy to Detective

14  Comics was not a work made for hire. Defendants' attempt to cloud the issue by

15  focusing on the derivative or non-derivative status of the Superboy material itself, a

16  separate question on which the Court at this point reserves its ruling (see infra

17  III.D.). If any of Siegel's Superboy material is derivative of Superman, then,

18  defendants argue, use of that material would require the consent of Detective

19  Comics, as the owner to the Superman copyright, before it is published. It is this

20  required prior consent for publication that defendants contend impacts the work

21  made for hire question. Such control over the material, it is argued, translates into

22  Detective Comics holding the right to direct and supervise Siegel's Superboy

23  material, something which they contend is sufficient by itself to render the material

24  a work made for hire. In this regard defendants cite to Estate of Burne Hogarth v.

25  Edgar Rice Burroughs, Inc., 342 F.3d 149, 163 (2nd Cir. 2003) and Picture Music,

26  Inc. v. Bourne, Inc., 457 F.2d 1213, 1216-17 (2nd Cir. 1972).

27        Defendants argument sweeps too broadly. Were the Court to adopt

28  defendants' approach, every derivative work would also be considered a work

made for hire.  The ramifications of such a holding would be contrary to the 1909

Act's statutory scheme concerning derivative works, and is also unsupported by the

case law construing the Act.

As noted earlier, the copyright to a work made for hire is owned at its

inception by the commissioning party.  If a derivative work is always a work made

for hire, then there would be nothing left for the creator of the additional

copyrightable material contained in the derivative work to own; the artist would have

no copyright to that material, it instead being owned by the copyright holder to the

pre-existing work.  The 1909 Act, however, recognized that such additional material

contained within a derivative work was itself "subject to copyright" protection.  17

U.S.C. § 7 (repealed).  Indeed, the 1909 Act specifically noted that "publication of

any such new works" would not undermine the validity of the copyright in the pre-

existing work.  Id.  For this reason, cases decided under the 1909 Act recognized

that "[t]he aspects of a derivative work added by the derivative author are that

author's property, but the element drawn from the pre-existing work remains on

grant from the owner of the pre-existing work." Stewart v. Abend, 495 U.S. 207,

223 (1990).  If, as defendants contend, derivative works are always the property of

the copyright holder of the pre-existing work owing to their work for hire status,

there would be no need for the 1909 Act's concern with whether publication of that

derivative work implied that the derivative author had "an exclusive right to such use

of the original works," or, on the other hand, that "consent" of the owner to the pre-

existing work must be obtained before adaptations to that work are produced by the

derivative author.  17 U.S.C. § 7 (repealed).  Those concerns would be internally

inconsistent as a matter of logic and common sense.  The copyright holder to the

"original works" would necessarily be the owner of the additional material contained

in the derivative work; its prior consent would be unnecessary as it would own the

material for which consent is sought, and any such waiver would be logically

inconsistent as the material for which such waiver would be sought would also be

EXHIBIT 22
1081

1    owned by the same entity.

2        Nor does the case law under the 1909 Act support defendants' position.  In

3    all the cases cited by defendants, the copyright holder of the pre-existing work

4    approached the artist and specifically requested for the artist to create a work

5    derived from that pre-existing material and then paid the artist for the derivative

6    work in question, facts notably absent here.  See Hogarth, 342 F.3d at 151-52;

7    Picture Music, 457 F.2d at 1217.  It was these additional elements of requesting

8    and paying for specific derivative works that served to demonstrate that the creation

9    of the derivative work was at the instance of the commissioning party, not the

10   simple fact that the work itself was derivative.  Nimmer in his treatise similarly

11   distinguishes the principal case cited by defendants on that very basis.  See 3

12   Nimmer § 9.03[D] at 9-28.3 ("Picture Music is limited to the situation where the

13   commissioning party supplies to the independent contractor an underlying work

14   upon which the independent contractor [then] fashions a derivative work" (emphasis

15   in original)).

16       Here, in contrast, Detective Comics never requested that Siegel create

17   Superboy nor did it approach him to utilize the pre-existing material from Superman

18   for some unspecified derivative work.  Instead, the idea for creating Superboy

19   occurred while Siegel was talking to a Mr. Nimis (whose relationship to the parties is

20   not disclosed in the pleadings or the referee's findings) about what "'top' [comic]

21   strip to use on the Sunday [newspaper] page of Superman," and Siegel suggested

22   using "a strip named Superboy" relaying "the adventures of Superman as a youth."

23   (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 4).  Nowhere did Mr. Nimis (even

24   assuming he is affiliated with defendants' predecessors in interest) approach,

25   request, or suggest that Siegel use the pre-existing Superman copyright material as

26   a launching point for creating the comic strip to be placed at the top of Superman's

27   Sunday comic strip.  That idea was Siegel's creation alone.

28       All that said, the Court agrees with defendants that, if Siegel's Superboy

52

**EXHIBIT 22**

**1082**

submissions were a derivative work, such a designation would have vested

Detective Comics with the right to control that material (Detective Comics' consent

being necessary for the material's production). The Court finds that this right to

control, however, is not sufficient to conclude that Siegel's Superboy submissions

were a work made for hire. Those submissions were neither prepared at Detective

Comics' instance nor at its expense, points the Court finds more weighty in

resolving the work made for hire question in this case. Those points are predicated

upon the particular circumstances of the parties' relationship and the creation of the

works in question, something that is not as particularized with respect to a statutory

right inherent in all derivative works regardless of the relationship of the parties.

Accordingly, the Court finds that Siegel's Superboy submissions were not

works made for hire.

**B.     Joint Work**

Defendants next argue that Siegel's Superboy submissions were

contributions to a joint work with Shuster. The effort to characterize the

submissions as part of a joint work is understandable. Under the 1909 Act, each

joint author of a copyrightable work is a co-owner of the same and possesses "an

undivided ownership in the entire work, including all of the contributions contained

therein." 1 Nimmer § 6.03, at 6-7; see also Davis v. Blige, 419 F.Supp.2d 493, 500

(S.D.N.Y. 2005) ("a co-owner has a legal right to grant a license in a work without

another co-owner's permission or to transfer his rights in the copyright freely.

Absent an agreement to the contrary, one joint owner may always transfer his

interest in the work to a third party"). Given that Shuster provided the illustrations to

Superboy at the direction of and was paid for the same by Detective Comics, those

illustrations are arguably provided as a work for hire for the publisher, thus giving

ownership over the same to Detective Comics.[10] If Superboy is determined to be a

---

[10] The question of whether the illustrations Shuster provided for More Fun
Comics no. 101 were in fact prepared as a work made for hire is not argued in the

**EXHIBIT 22**
**1083**

1   joint work, Detective Comics would own half of the copyright either as the author of

2   Shuster's alleged work for hire artwork or as a consequence of the reversion of

3   Shuster's half to them given his or his heirs failure to timely exercise the right to

4   termination, thereby allowing it to continue to exploit the copyright to Superboy

5   subject only to having to provide an accounting to plaintiffs for any profits gained

6   therefrom.  See 1 Nimmer § 6.10; see also Oddo v. Ries, 743 F.2d 630, 632-33

7   (9th Cir. 1984).

8         The 1976 Act, which codified the principles for joint authorship established in

9   the case law under the 1909 Act, see 1 Nimmer § 6.01 at 6-3 n.1, does not provide

10   a definition for an "author" or "joint authors" in a copyright, but instead defines a

11   "joint work" as one "prepared by two or more authors with the intention that their

12   contribution be merged into inseparable or interdependent parts of a unitary

13   whole."[11]  17 U.S.C. § 101.  Components of a unitary work are "inseparable" when

14   they have little or no meaning standing alone, such as paragraphs in a novel, and

15   the components are considered "interdependent" when they could stand alone but

16   achieve a greater effect when combined, such as the lyrics and melody of a song.

17   See H.R. Rep. No. 94-1476, at 120 (1976), reprinted in 1976 U.S.C.C.A.N. 5659,

18   5736.  Here, the copyright to Superboy (if a joint work) would be considered

19   comprised of interdependent parts — Siegel's dialogue and storyline (as contained

20   in his submissions) and Shuster's artwork giving life and color to those words.  The

21   parties do not dispute that Shuster's illustrations for the Superboy comic released in

22   _____

23   parties' papers.  This is understandable given Shuster or his heirs failure to join in
     or file separately a notice of termination related to either the Superman or
24   Superboy copyright.  Given that the time to exercise the termination right has
     passed, ownership over Shuster's half of the copyrights reverts to defendants.

25

26   [11]  Nimmer in his treatise has commented that the 1976 Act's definition for a
     "joint work" actually defines "joint authorship" and is simply designated incorrectly
27   in the Act.  1 Nimmer on Copyright § 6.01 at 6-3.  Regardless, courts have utilized
     the statutory definition for "joint works" in delimiting the parameters of whether
28   someone was a joint author of a copyright.  See Aalmuhammed v. Lee, 202 F.3d
     1227, 1231 (9th Cir. 2000).

1   More Fun Comics would otherwise qualify for joint authorship status.  Anyone

2   looking at the Superboy comic contained in that magazine would know that it owed

3   its existence to both Shuster's illustrations and Siegel's words (assuming that the

4   submissions were published in More Fun Comics, no. 101).  See Aalmuhammed,

5   202 F.3d at 1232 ("It is . . . easy to apply the word ['author'] to two people who work

6   together in a fairly traditional pen-and-ink way, like, perhaps, Gilbert and Sullivan.

7   In the song, 'I Am the Very Model of a Modern Major General,' Gilbert's words and

8   Sullivan's tune are inseparable, and anyone who has heard the song knows that it

9   owes its existence to both men, Sir William Gilbert and Sir Arthur Sullivan, as its

10   creative originator").

11          Rather, the central question with respect to the joint authorship issue in this

12   case is whether Siegel prepared the Superboy submissions with the knowledge and

13   intent that the comic strip would be a joint work, with Shuster providing illustrations

14   to the comic strip if it were published.  As far as the joint preparation and intention

15   of the authors, the Senate Committee Report submitted with the passage of the

16   1976 Act states as follows:

17                  [A] work is "joint" if the authors collaborated with
                each other, or if each of the authors prepared his or her
18              contribution with the knowledge and intention that it
                would be merged with the contributions of other authors
19              as "inseparable or interdependent parts of a unitary
                whole."  The touchstone here is the intention, at the time
20              the writing is done, that the parties be absorbed or
                combined into an integral unit . . . .

21

22   S. Rep. No. 94-473, at 103 (1975).

23          Here, the referee's findings make clear that Shuster had collaborated in the

24   past on all the other comic strips conceived by Siegel; he did the illustrations for not

25   only Superman, but for Siegel's other comic strip incantations, such as The Spy

26   and Slam Bradley.  With respect to Superboy, however, the two did not engage in

27   the usual collaborative effort of the past.  Siegel submitted the conception, including

28   a script of the dialogue, for the Superboy comic to Detective Comics, but then a

**EXHIBIT 22**

**1085**

1   four-year hiatus occurred before Shuster drew the illustrations for the same. When

2   Shuster created those illustrations, Siegel was abroad serving in the military. There

3   is absolutely no information submitted by the parties or contained in the referee's

4   findings suggesting that Siegel brainstormed with Shuster in their studio when

5   drafting his Superboy submissions.

6        However, contemporaneous and coordinated action between Siegel and

7   Shuster is not required.  As Judge Learned Hand explained, "it makes no

8   difference whether the authors work in concert, or even whether they know each

9   other; it is enough that they mean their contributions to be complimentary in the

10  sense that they are to be embodied in a single work . . . ." Edward B. Marks Music

11  Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2nd Cir. 1944).  That said, there

12  are indications that, when Siegel created the Superboy submissions, he envisioned

13  those submissions as part of a unitary comic strip incorporating Shuster's artwork.

14  The proposed script Siegel submitted for the Superboy comic itself, in the same

15  way as all the other Siegel and Shuster comics were presented, contained the by-

16  line crediting its authorship to "Jerry Siegel and Joe Shuster." Such shared billing in

17  Siegel's submission is strong evidence of the intent to create a joint work.  See

18  Aalmuhammed, 202 F.3d at 1234 ("putative coauthors make objective

19  manifestations of a shared intent to be coauthors, as by denoting the authorship of

20  The Pirates of Penzance as 'Gilbert and Sullivan'"); Childress v. Taylor, 945 F.2d

21  500, 508 (2nd Cir. 1991).

22        Moreover, the audience appeal of Siegel's Superboy, as with all the other

23  comic strips he helped conceive, was tied to Shuster's contribution of the

24  illustrations. See Aalmuhammed, 202 F.3d at 1234 (citing as an objective

25  manifestation of parties' mutual intent to create a joint work as whether "the

26  audience appeal of the work turns on both contributions"). Superboy's appeal to

27  the public was not only in reading the harrowing tales of the superhero's exploits

28  but also in the colorful imagery Shuster provided to grip the reader's imagination.

EXHIBIT 22
1086

See generally Maurel v. Smith, 220 F. 195, 200 (S.D.N.Y. 1915) (Learned Hand, J.) (characterizing the separately provided dialogue, plot, and music contributions to a comedic opera as being "like mosaics from which, though you may lift a stone, it loses the significance of its setting"). This evidence also supports a conclusion that Superboy is a joint work. See Aalmuhammed, 202 F.3d at 1234.

Plaintiffs make no effort to deny that any of this objective evidence would otherwise lead to the conclusion that Siegel's Superboy submissions were envisioned by Siegel as part of a unitary work comprised with Shuster's illustrations. Instead, their argument is more nuanced.

First, they seek to side-step the issue by arguing that the referee's finding that Siegel was "the originator and sole owner" of Superboy forecloses further discussion of whether the copyright to the creation of the same was a joint work. Plaintiffs' reliance on the referee's finding is misplaced. The referee was simply signifying that, as between Siegel and Detective Comics, Siegel was the sole owner and originator to the same. The question (and the ramifications flowing from the same) as to Shuster's authorship of the Superboy material was not presented to the referee to decide. Plaintiffs make mention that Detective Comics noted in its answer filed in the Westchester action that "substantial artwork for said comic strip entitled 'SUPERBOY' was performed by . . . SHUSTER and paid therefor by" Detective. (Reply Decl. Marc Toberoff in Supp. Mot. Partial Summ. J., Ex. A ¶ 14 at 6). Plaintiffs read into this averment that Detective Comics was seeking to utilize Shuster's illustrations as a basis to lay claim to partial ownership in Superboy itself, by labeling Shuster's contribution as a work for hire. The Court disagrees with this reading. To begin, the Second Circuit in Siegel held that the work for hire issue was not litigated in the Westchester action. 508 F.2d at 914 ("That issue was not litigated at all in the state court"). If the issue was not litigated directly before the referee, it certainly was not done indirectly through the guise of a joint authorship argument, which itself was predicated upon there being a work made for hire.

57

**EXHIBIT 22**

**1087**

1   Moreover, the averment in question was interposed by Detective Comics in

2   connection with Siegel and Shuster's fourth cause of action. (Id. ¶ 14 at 5 ("Deny

3   each and every allegation contained in paragraphs 'THIRTY-SIXTH', 'THIRTY-

4   SEVENTH', 'THIRTY-EIGHTH', and 'THIRTY-NINTH' of the complaint"). The fourth

5   cause of action was plaintiffs' alternative claim for "the wrongful publication" of

6   Superboy in which it argued that its "plot, conception and incidents were based

7   upon and copied from the plot, conception and incidents of the plaintiff's comic strip

8   Superman" (which the complaint argued in the first two causes of action belonged

9   to Siegel and Shuster), and further argued that Detective Comics mislead the public

10  into believing that Siegel was "the author of the continuity dialogue and action of

11  each of the individual releases" for Superboy by affixing his name to the strip as its

12  author. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 36-37, at 10). It was

13  in this context that Detective Comics sought to divine meaning from Shuster's

14  illustrations and their payment for the same to him. Detective Comics stated in its

15  answer that those facts indicated Shuster's tacit consent to the publication of

16  Superboy (thereby negating that Detective Comics utilized Superman elements

17  without the plaintiffs' consent, as one of the purported co-owners of Superman

18  approved said publication) and also as constituting approval for the publisher to use

19  Siegel and Shuster's by-line on the comic strip. (Reply Decl. Marc Toberoff, Ex. A

20  ¶ 14, at 6 ("affixing of the name of plaintiff SIEGEL to some of said 'SUPERBOY'

21  releases was with the knowledge and approval of plaintiff SHUSTER"). Thus,

22  defendants' noting that Shuster had done the illustrations for the Superboy

23  illustrations and paid for the same had nothing to do with the work made for hire

24  nature of that contribution; rather, it merely countered the factual allegations in

25  plaintiffs' fourth cause of action.

26      Nothing submitted by the parties conclusively shows the purpose for

27  Detective Comic's representation that Shuster provided the illustrations for the

28  comic was otherwise. Indeed, plaintiffs themselves note that Detective Comics'

EXHIBIT 22
1088

recitation of Shuster's participation signified that it "claimed <u>or could have claimed</u>
in the 1947 Action that they co-own 'Superboy' by virtue of co-owning the artwork."
(Pls' Reply in Supp. Mot. Partial Summ. J. at 16 (emphasis added)). This tacit
admission by plaintiffs undercuts their argument that, in making the finding that
Siegel was the originator and "sole owner" of Superboy, the referee <u>did find</u> that
Shuster was not a joint author of the work. Undoubtedly, were this Court to hold
that Superboy was a "joint work" between Siegel and Shuster, this would effectively
undermine the referee's finding that Siegel was the "sole owner" of Superboy and
could, assuming that Shuster's artwork is considered a work for hire, negate the
injunction the referee placed against Detective Comics from exploiting Superboy.
That this would be the result from such a ruling does not mean that the referee
therefore must have considered and ruled on any potential question that could
unravel his decision. Rather, it simply underscores the potential pitfalls in litigating
cases that touch on the subject matter of copyright in state court, a forum where not
all the issues that could impact rights to a copyright are, or can, be litigated.

Switching gears, plaintiffs next argue that, regardless of whether or not
Siegel intended for his material to be part of a joint work with Shuster, this intention
was fundamentally altered when Detective Comics later published his material
without his consent. (Pls' Reply in Supp. Mot. Partial Summ. J. at 17-18). Plaintiffs
argue that consent to publication is necessary for the material to be treated as a
joint work. The Court disagrees. What the case law does suggest is that a
contributor's consent is required for the use or inclusion of his or her material as
part of a joint work, but not that, absent a contractual provision to the contrary, his
or her consent to publication of the joint work is required once that author has
already intended for the material to be part of a joint work. In each of the cases
cited to by plaintiffs, the consent issue addressed was the author's consent for his
or her material to be used in a joint work, not consent to the joint work's later
publication.

**EXHIBIT 22**
**1089**

In _Szekely v. Eagle Lion Films, Inc._, 242 F.2d 266 (2nd Cir. 1957), a license-holder approached Szekely to write the screen play based on a novel for which the license-holder had the motion picture rights. _Id_. at 267.  The parties' contract contained a provision contemplating that there may be a need for collaboration on Szekely's screenplay, but conditioned such collaboration on Szekely's consent. _Id_. at 268.  Furthermore, the parties' contract specifically provided that "all rights and title in the manuscript [were] to remain in Szekely until he received the agreed minimum compensation for his effort [of] $35,000." _Id_. at 267.  The movie producer never paid Szekely the minimum compensation required under the contract, even after he "presented the final draft of his script," informing Szekely "that his screen play was not being used in the movie." _Id_.  The movie producer's statement to Szekely was false.  Instead, owing to financial constraints, the movie producer, without any notification to or obtaining of consent from Szekely, found another screenwriter to make revisions to Szekely's script, presumably for an amount less than that owed to Szekely under the contract. _Id_.  After the movie was finished and released for distribution, Szekely sued, arguing that his rights to script were infringed.  Defendants argued that Szekely "was merely a joint owner" with the other screenwriter, and that screenwriter's subsequent license of his rights to the script to the film producer entitled him to publish it without Szekely's consent. _Id_. at 268.

The Second Circuit disagreed.  The court noted that the other screenwriter's "adaptation of [Szekely's] screen play . . . was not contemplated at the inception of the work, which was not planned as a joint work."  In fact, Szekely specifically contracted with the movie producer that such collaboration (which could transform his screenplay into a joint work) could only happen "on [Szekely's] consent, which was not sought or obtained" before the other screenwriter was brought in to revise Szekely's screenplay. _Id_.  The rule to be drawn from _Szekely_ is simply that consent to inclusion of an author's separate material into a joint work is necessary; where

**EXHIBIT 22**

**1090**

1  the author never intended for his material to be part of a joint work, he retains the

2  rights to that material, particularly where, as in Szekely, there exists a contractual

3  provision requiring the author's consent before adaption or other contribution to his

4  material can occur.  Those circumstances are not present here.  When Siegel

5  prepared his Superboy submissions, he clearly contemplated Shuster's contribution

6  of artwork to his material.  Moreover, there is absolutely no evidence presented by

7  the parties or contained in the referee's findings demonstrating an understanding or

8  arrangement between Siegel and Shuster that such prior consent was necessary

9  before the other contributed his material to their comic strips.

10          Plaintiffs argue that to hold that Superboy was a joint work would be for the

11  Court to sanction a publisher's theft of an author's work without fear of copyright

12  infringement "so long as the author initially intended that his work be included in a

13  joint or collective work." (Pls' Reply in Supp. Mot. Summ. J. at 17).  Plaintiffs'

14  argument collapses two different concepts, and ignores the consequences flowing

15  from the fact that Siegel intended from the beginning for his Superboy submissions

16  to be part of a joint work.  Whether Detective Comics (or its successors in interest)

17  should fear a suit for infringement of Siegel's material turns exclusively on the

18  heretofore unlitigated question of whether Shuster's artwork was a work made for

19  hire.  Absent a finding that this was so, Detective Comics would remain liable for its

20  publication of Superboy in More Fun Comics, no. 101 and subsequent thereto

21  (assuming, of course, that the strip in More Fun Comics published the copyrightable

22  material, if any, in Siegel's Superboy submissions).  The absolution plaintiffs seek

23  to give to Detective Comics from an infringement claim is thus premature.  Similarly,

24  the "theft" spoken of by plaintiffs is puzzling.  Siegel intended all along to share the

25  profits realized from his contribution to Superboy, the only difference being that he

26  thought he would be sharing those profits with Shuster and now he (or rather his

27  heirs) may have to share it with Detective Comics (or rather its successors).  The

28  only party who could possibly be seen as having something stolen would be

61

**EXHIBIT 22**

**1091**

1   Shuster.  Indeed, were the Court to hold that Siegel alone is entitled to the
2   copyright to and all the profits realized from Superboy because of Detective
3   Comic's "theft" from Shuster, the Court would be placing Siegel — the party whose
4   copyright rights were unaffected by the publisher's conduct — in a superior position
5   than that which even he envisioned to possess, all to the denigration of the
6   contribution (and the rights thereto) Shuster supplied to the joint work.

7        The one factor preventing the Court from finding that Siegel's Superboy
8   submissions were contributions to a joint work with Shuster's illustrations in the
9   Superboy comic is the unresolved issue (see infra III.D.) of whether there was in
10  fact any original copyrightable material in Siegel's Superboy submissions.  The rule
11  in this circuit is that something is a joint work only if each contribution to that work,
12  standing alone, was independently copyrightable material.  See Ashton-Tate Corp.
13  v. Ross, 916 F.2d 516, 521 (9th Cir. 1990) ("joint authorship requires each author to
14  make an independently copyrightable contribution"); but see Gaiman v. McFarlane,
15  360 F.3d 644, 658-59 (7th Cir. 2004) (refusing to apply above rule to situations
16  "where two or more people set out to create a character jointly in such mixed media
·17  as comic books and motion pictures and [through their efforts] succeed in creating
18  a copyrightable character"); 1 Nimmer § 6.07[A][3][a], at 6-22 ("if authors A and B
19  work in collaboration, with A contributing sparkling plot ideas and B weaving them
20  into a completed screenplay, it cannot be doubted that both have made more than
21  a de minimis contribution to the resulting script.  On that basis, both A and B should
22  be considered joint authors of the work even though, standing alone, plot ideas may
23  not be copyrightable").  At a minimum, there must be some copyrightable material
24  in Siegel's Superboy submissions, otherwise that material could not have formed a
25  predicate contribution to render Superboy a joint work.  If, however, the Court were
26  to find that those submissions were completely derivative of Superman, then there
27  was no independently copyrightable material within those submissions and
28  Superboy is not a joint work.

EXHIBIT 22
1092

## C.    Publication

"Under the 1909 Act, it was necessary to publish the work with proper notice to obtain copyright [protection]." Stewart, 495 U.S. at 233; see also 17 U.S.C. § 10 ("Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title"). Publication was an important concept under the 1909 Act as the act of publication "constituted the dividing line between" common law copyright protected under state law and statutory copyright protected under federal law; publication of the work by itself divested an author of common law copyright protection, leaving the federal copyright statute as the only means to keep the work from becoming a part of the public domain. See Stewart, 495 U.S. at 233 ("Publication of a work without proper notice automatically sent a work into the public domain"). "The concept of publication was of immense importance under the 1909 Act.  It became a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." 1 Nimmer § 4.01, at 4-3.

Although this line of demarcation was erased with the 1976 Act's pre-emption of common law copyright, see 17 U.S.C. § 301, the concept retains importance even under the 1976 Act.  Specifically, section 304(c) only grants the right to terminate earlier grants to those "copyright[s] subsisting in either its first or renewal term on January 1, 1978."  The only copyright subsisting in either its first or renewal term before the effective date of the 1976 Act were those protected under the 1909 Act, that is, those that had been published (as opposed to unpublished material protected by state common law) and registered. See 3 Nimmer § 11.02[A][1] at 11-12 ("the termination provisions of Section 304(c) apply only if the work in question was the subject of statutory copyright prior to the effective date of the current Act").

The 1909 Act, unlike the present governing statute, contained no definition for when a work was considered "published."  Nonetheless, the definition for

**EXHIBIT 22**
**1093**

1   publication contained in section 101 to the 1976 Act is seen as generally codifying

2   the meaning of the concept as developed by the case law under the 1909 Act.  See

3   1 Nimmer § 4.04, at 4-20.1 (observing that the 1976 Act's definition for publication

4   "in general constitutes a codification of the definition evolved by case law prior to

5   adoption of the present Act").  The 1976 Act defined "publication" as "the

6   distribution of copies . . . of a work to the public by sale or other transfer of

7   ownership . . . ."  Thus, under the 1909 Act publication occurred "when by consent

8   of the copyright owner the original or tangible copies of a work are sold . . . or

9   otherwise made available to the general public."  1 Nimmer § 4.04 at 4-21.

10      Defendants contend that Siegel's Superboy submissions "were never

11  [separately] published or registered as unpublished works as of January 1, 1978."

12  (Defs' Opp. to Pls' Mot. Partial Summ. J. at 20).  Plaintiffs counter that the

13  copyrightable material contained in Siegel's Superboy submissions were later

14  "published" in the Superboy comic strip found in volume 101 of Detective Comic's

15  More Fun Comics, to which Detective Comics contemporaneously registered a

16  copyright.  The copyright to the magazine, it is contended, secured statutory

17  copyright protection to all its constituent parts, namely all the comic strips contained

18  in that volume of the magazine including Superboy.  See Self-Realization, 206 F.3d

19  at 1329 ("A blanket copyright on a periodical protects its constituent parts"); see

20  also Batjac Prods., Inc. v. Goodtimes Home Video Corp., 160 F.3d 1223, 1233-35

21  (9th Cir. 1998) (holding that, to the extent copyrightable material in an unpublished

22  work "is incorporated" in a published derivative work based thereon and actually

23  becomes a "component" thereof, it will be considered published by the later work).

24  Defendants do not dispute this legal point, but argue that none of the copyrightable

25  material contained in Siegel's Superboy submissions (assuming that there were any

26  contained therein) was printed in the Superboy comic strip published in volume 101

27  to More Fun Comics.  The point raised by defendants' argument stems from the

28  fact that the Superboy comic strip in More Fun Comics no. 101 does not track

EXHIBIT 22
1094

1   verbatim the script, dialogue or storyline contained in Siegel's Superboy
2   submissions, in particular his 1940 proposed script. Given the discrepancy
3   between the two, the question becomes not so much whether Detective Comics'
4   issuance of More Fun Comics no. 101 constituted a publication, as it clearly did, but
5   whether any of the copyrightable material in Siegel's Superboy submissions was
6   published through the same.

7          Plaintiffs argue that the question of publication was conclusively determined
8   by the referee's finding that Detective Comics' "comic strip release entitled
9   SUPERBOY published [in More Fun Comics no. 101] in December of 1944
10  embodied and was based upon the idea, plan and conception contained in" Siegel's
11  Superboy submissions. The problem for plaintiffs is that the referee's factual
12  finding does not go far enough. The referee's findings do not stand for the
13  proposition that everything (copyrightable or otherwise) contained in Siegel's
14  Superboy submissions was reprinted in More Fun Comics volume 101, but, instead,
15  only that the Superboy comic in More Fun Comics made concrete the "idea, plan
16  and conception" for a Superboy comic that was pitched and elaborated upon in
17  Siegel's submissions. This distinction is important as an "idea" as such is not
18  copyrightable, either under the 1909 Act or the 1976 Act. See National Comics
19  Publication, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) ("a
20  copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and
21  that no one infringes, unless he descends so far into what is concrete as to invade
22  that 'expression'"). Thus, the referee's finding leaves unanswered the critical point
23  for purposes of the question in this case: Whether any of the copyrightable
24  material in Siegel's Superboy submissions was in fact later published. Because the
25  question of whether and to what extent any copyrightable material was contained in
26  Siegel's Superboy submissions remains to be determined (see infra III.D.), the
27  Court is in no position at this time to make a final determination whether said
28  material, however characterized, was published in More Fun Comics no. 101.

**EXHIBIT 22**
**1095**

**D.    Derivative Work**

Section 7 to the 1909 Act discussed derivative works as being the "[c]ompilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter," and treated such additional material "as new works subject to copyright . . . ." 17 U.S.C. § 7 (repealed); see also Stewart, 495 U.S. at 231 (observing that section 7 to the 1909 Act signified "the types of works that may be derivative works"). Thus described, a derivative work is "any work based in whole, or in substantial part, upon a pre-existing work, if it satisfies the requirements of originality . . . and is not itself an infringing work, [and] will be separately copyrightable." 1 Nimmer § 3.01, at 3-3. If an author contributes additional original material to a pre-existing work so as to recast, transform or adapt that work, then that additional material is subject to copyright protection, that is, it is a protectable derivative work. See id. § 3.03, at 3-10; see also Asia Entertainment Inc. v. Nguyen, 40 U.S.P.Q.2d 1183, 1185 (C.D. Cal. 1996). The resulting work need not be a qualitative improvement over the prior work; rather, what is necessary is that "the additional material injected in a prior work, or the manner of rearranging or otherwise transforming a prior work, must constitute more than a minimal contribution." Id. at 3-11; see also Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991); Grove Press, Inc. v. Collectors Publication, Inc., 264 F.Supp. 603 (C.D. Cal. 1967). "[T]he applicable standard in determining the necessary quantum of originality is that of a 'distinguishable variation' that is more than 'merely trivial.' Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in any meaningful manner will be sufficient." 1 Nimmer, at 3-12 to 3-13.

Defendants contend that Siegel's Superboy submissions are almost completely derivative of Superman, contain no original copyrightable element within

**EXHIBIT 22**
**1096**

1   them, and, therefore, are not a protectable derivative work. (Defs' Opp. to Pls' Mot.

2   Partial Summ. J. at 24 ("derivative works based upon and incorporating pre-existing

3   Superman elements and ideas that were previously published")). To defendants,

4   "the submissions are based upon and, indeed dominated by, pre-existing,

5   published Superman elements . . . previously published by Detective at the time the

6   works were submitted by Siegel." (Defs' Mot. Summ. J. at 12). When these pre-

7   existing elements are removed from Siegel's submissions, all that is left, according

8   to defendants, is the unelaborated concept of Superman as a youth, or as plaintiffs

9   deride it, "'Superboy' is merely 'Superman' in smaller tights." (Pls' Reply in Supp.

10  Mot. Partial Summ. J. at 1). Viewing this singular additional material to be merely

11  trivial and insufficiently distinguishable, defendants argue that there is no

12  copyrightable material within Siegel's Superboy submissions.

13      Plaintiffs again respond by pointing to the referee's findings as conclusively

14  establishing that Superboy is not a completely derivative work. In particular,

15  plaintiffs note the referee's observation in his November, 1947, opinion: "I cannot

16  accept defendants view that Superboy was in reality Superman . . . . Superboy was

17  a separate and distinct entity"; this finding, plaintiffs argue, is fundamentally

18  inconsistent with a finding that Siegel's Superboy submissions is completely a

19  derivative work. (Pls' Reply in Supp. Mot. Partial Summ. J. at 18). Plaintiffs

20  characterize the referee's statement as a conclusion that Siegel's Superboy

21  submissions were "sufficiently new and original to constitute a distinct work from

22  Superman." (Id. at 19). Bolstering their view is the referee's separate finding that

23  Superman "did not contain the plan, scheme, idea or conception of the comic strip

24  Superboy."

25      The problem with this argument is two-fold. First, such a pure finding

26  relating to copyright law — that Superboy is not a "derivative work" under the 1909

27  Act — would, for the reasons set forth above, be well beyond the referee's

28  jurisdiction to make. There was no state law claim requiring consideration of

1   whether there was any original elements contained in Siegel's Superboy

2   submissions.  More importantly, the Court finds nothing in the referee's findings and

3   conclusions relied upon by plaintiffs that would preclude litigation in this proceeding

4   concerning the derivative nature, if any, of Siegel's Superboy submissions pursuant

5   to federal copyright law.

6        Although at first glance the referee's findings may appear to speak directly

7   and conclusively to the issue of whether Superboy is a derivative work, upon further

8   assessment that is not necessarily the case.  One must remember the context in

9   which the referee's statement was made:  The question for the referee to resolve

10   was whether Superboy was part and parcel of Superman for purposes of whether

11   the first refusal rights contained in the parties' September, 1938, agreement were

12   implicated.  The question resolved by the referee was a matter of contract

13   interpretation — what did the parties mean when they used the phrase "Superman"

14   in their contract — not whether Superboy contained any original elements worthy

15   of copyright protection.  That Siegel's Superboy was distinct from Superman (even

16   assuming that the referee was speaking beyond the confines of the narrow contract

17   claim in dispute before him and making a larger observation of the two characters'

18   separateness) does not inform this Court's decision as to whether that which made

19   Siegel's Superboy distinct is also original (or more particularly, more than a merely

20   trivial variation from Superman) as that term is understood in federal copyright law

21   so as to render Siegel's creation subject to copyright protection.  In addition, even

22   more problematic is the fact that the referee nowhere identifies in what way or

23   manner Siegel's Superboy is distinct from Superman, such differentiation forming

24   the subject of any copyrightable material in this case.

25        By way of further argument, plaintiffs seek to describe, in the most general of

26   ways, the additional material supplied by Siegel:

27        Siegel's "Superboy" focuses on the character, family and
            social life of a youth growing up in a small rural town
28        who faces the challenges of adolescence while
            repressing who he really is.  Siegel's story is primarily

EXHIBIT 22
1098

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 70 of 343   Page
ID #:17347
Case 2:04-cv-08776-ODW-RZ   Document 457   Filed 07/27/2007   Page 69 of 73

1            devoted to the close relationship between "Superboy"
2            and his earnest adoptive parents, and follows
           "Superboy's" small town adventures with his school
3            classmates and townsfolk. . . . "Superboy" [is] a
           sufficiently original and distinct character and story from
4            "Superman" to warrant independent copyright protection.

5 (Pls' Reply in Supp. Mot. Partial Summ. J. at 19, 20).

6        From this description it appears to the Court that, in addition to any argument

7 that Superboy himself (or perhaps Ma and Pa Kent) was a separate copyrightable

8 character, plaintiffs also argue that certain plot lines contained in Siegel's script

9 were sufficiently distinct as to warrant separate copyright protection. (Pls' Opp. to

10 Defs' Mot. Summ. J. at 12 ("The new elements in 'Superboy' authored by Siegel,

11 including the themes, characters, relationships, mood, settings, locale and the

12 interplay of such elements, are squarely protected by the Copyright Act")).

13        The Court is mindful that plaintiffs have never claimed that Siegel's

14 Superboy is not derivative of Superman.  Instead, they argue that his submissions

15 contained original additional material that is itself entitled to copyright protection.

16 (Pl's Opp. to Defs' Mot. Summ. J. at 11-12 ("Plaintiffs have <u>never</u> claimed that

17 'Superboy' is 'unrelated' to 'Superman' or that 'the Superboy character has nothing

18 to do with the Superman character")).  The problem the Court has with the parties'

19 briefing on this issue is that, aside from seeking to delineate the "additional"

20 material supplied by Siegel in his submissions, neither side has attempted to

21 demonstrate how that material (whatever it may be, either by itself or when viewed

22 as a whole) was more than a trivial variation from the pre-existing material in

23 Superman, other comic book characters in general, or even more broadly with other

24 fictional characters.

25        The Court, for example, has been presented with no evidence addressing

26 whether other adolescent superhero comic book characters existed before Siegel

27 conceived of Superboy in his submissions.  Defendants make mention of a couple

28 of panels in earlier Superman comic books where Superman was shown as an

**EXHIBIT 22**
**1099**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 71 of 343    Page
Case 2:04-cv-08776-ODW-RZ    Document 351    Filed 07/27/2007    Page 70 of 73
ID #:17358

1   infant, but nowhere have they pointed to comic strips where the storyline

2   delineating this aspect of the Superman character had been so fleshed out as to

3   comprise part of the pre-existing work.

4          Case law under the 1909 Act speaks to the issue of originality in the context

5   of fictional characters in general and Superman in particular.  The controlling

6   principle was stated by Judge Learned Hand long ago when he added that fictional

7   characters may be protected by copyright "quite independently of the 'plot' proper,"

8   but added such characters must be sufficiently developed beyond "stock

9   characters" to obtain protection:

10              Upon any work . . . a great number of patterns of
                increasing generality will fit equally well, as more and
11              more incident is left out.  The last may perhaps be no
                more than the most general statement of what the play
12              is about, and at times might consist only of its title; but
                there is a point in this series of abstractions where they
13              are no longer protected . . . .  If Twelfth Night were
                copyrighted, it is quite possible that a second comer
14              might so closely imitate Sir Toby Belch or Malvolio as to
                infringe, but it would not be enough that for one of his
15              characters he cast a riotous knight who kept wassail to
                the discomfort of the household, or a vain and foppish
16              steward who became amorous of his mistress.  These
                would be no more than Shakespeare's "ideas" in the
17              play, as little capable of monopoly as Einstein's Doctrine
                of Relativity or Darwin's theory of the Origin of Species.
18              It follows that the less developed the characters, the less
                they can be copyrighted; that is the penalty an author
19              must bear for making them too indistinctly.

20   Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2nd Cir. 1930).

21          By the same token, the less developed a character in a prior work, the more

22   room for the addition of material that will comprise more than a trivial variation from

23   that character and, hence, be subject to copyright protection.  Thus, the relevant

24   question is how much, and to what extent, had the Superman character been

25   fleshed out by the time Siegel submitted his Superboy material to Detective

26   Comics.  A decision by the Second Circuit concerning the Superman copyright

27   contemporaneous with Siegel's submissions, Detective Comics, Inc. v. Bruns

28   Publications, Inc., 111 F.2d 432 (2nd Cir. 1940), sheds some light on the matter.

**EXHIBIT 22**
**1100**

1    There the court described the protectable elements of the Superman character as:

2         "a man of miraculous strength and speed . . . [who] at
          times conceals his strength beneath ordinary clothing
3         but after removing his cloak stands revealed in full
          panoply in a skin-tight acrobatic costume. . . . [He] is
4         termed the champion of the oppressed. [He] is shown
          running toward a full moon 'off into the night,' and . . . is
5         shown crushing a gun in his powerful hands.
          'Superman' is pictured as stopping a bullet with his
6         person. . . . 'Superman' is shown as leaping over a
          twenty story building . . . [and is] endowed with sufficient
7         strength to rip open a steel door. [He] is described as
          being the strongest man in the world and . . . as battling
8         against 'evil and injustice.'

9    111 F.2d at 433; see also National Comics Publications, Inc. v. Fawcett

10   Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) (Learned Hand, J.) (describing

11   earlier decision in Bruns Publishing as "limit[ing] the copyright to the specific

12   exploits of 'Superman,' as each picture portrayed them"). It is thus the character's

13   traits and attributes, as well as the character's interaction with other characters

14   (notably compatriots and villains), that help define the boundaries of the copyright

15   to a character. As Nimmer has observed in his treatise, "a visual similarity

16   (although not completely identical in appearance) plus a similarity in character

17   traits, may prove sufficient to constitute an infringement, even where the names of

18   the plaintiff's and defendant's characters differ." 1 Nimmer § 2.12, at 2-178.29 to 2-

19   178.30; see also Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 241

20   (2nd Cir. 1983); Sapon v. DC Comics, 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002)

21   (examining whether author's additional material was sufficiently original as to be

22   considered a protectable derivative work of Batman).

23        Given the factually intensive nature of the question, and the lack of

24   elaboration in the parties' briefs on the topic, the Court finds that the better course

25   at this point is to allow the parties an opportunity to more fully explore and provide

26   their positions as to the derivative nature, if any, of Siegel's Superboy submissions,

27   bearing in mind the legal principles set forth in Nichols as expounded in Bruns

28   Publications, Warner Bros, and Sapon.

**EXHIBIT 22**

1　Accordingly, the Court finds that Siegel's Superboy submissions were not a

2　work made for hire. However, for the reasons set forth above, the Court finds that it

3　cannot, at this stage, make a determination whether Siegel's Superboy

4　submissions were completely derivative of Superman or, if not, to what extent those

5　submissions contained additional, original copyrightable material. Without resolving

6　this point, the Court cannot make a corresponding finding whether Siegel's

7　Superboy submissions were published in volume 101 of More Fun Comics or

8　whether those submissions were contributions to a joint work with Shuster. Given

9　the critical nature of the derivative work issue to this case, the Court hereby

10　**ORDERS** that the parties submit simultaneous competing briefs within thirty (30)

11　days from the date of this Order concerning that issue, and that issue alone.

12　### IV. CONCLUSION

13　As set forth herein, the Court **GRANTS** defendants' motion for

14　reconsideration. Consistent with this holding, the Court **VACATES** the following

15　portions of the March 23, 2006, Order: Page 4, line 23 through page 12, line 5;

16　page 14, line 2 through page 14, line 20; and page 15, line 1 through page 15, line

17　6. The portion of the March 23, 2006, Order denying defendants' motion for

18　summary judgment on the question of infringement remains in effect. The Court

19　also **VACATES** the portions of the plaintiffs' statement of facts, entered on March

20　27, 2006, that are inconsistent with this Order.

21　The Court finds that the referee's findings from the 1947 Westchester

22　County action must be given preclusive effect pursuant to the doctrine of collateral

23　estoppel. Based on the referee's findings, the Court has determined that Siegel's

24　Superboy submissions were not a work made for hire, but the Court is unable to

25　conclude whether the requisite "publication" of the Superboy submissions occurred

26　due to the unresolved matter regarding the submissions' derivative nature.

27　Similarly, the Court was unable to conclude whether the Superboy submissions

28　were part of a joint work, but only because the issue of whether the submissions

**EXHIBIT 22**
**1102**

1  are a derivative work remains unresolved (and a subject of further court-ordered

2  briefing).

3      IT IS SO ORDERED.

4

5  DATE: ___7/27/07___

6

7  STEPHEN G. LARSON
   UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

73

**EXHIBIT 22**
**1103**

# EXHIBIT 23

FILED

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   Adam Hagen (SBN 218021)
    9665 Wilshire Boulevard, Ninth Floor
4   Beverly Hills, California 90212
    Telephone: (310) 858-7888
5   Fax: (310) 550-7191

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   James D. Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
8   New York, New York 10017
    Telephone: (212) 813-5900
9   Fax: (212) 813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, New York 10516
12  Telephone: (845) 265-2820
    Fax: (845) 265-2819

13  Attorneys for Defendants and Counterclaimant

14
                  **UNITED STATES DISTRICT COURT**
15                **CENTRAL DISTRICT OF CALIFORNIA**

16  JOANNE SIEGEL and LAURA          Case No.: CV 04-8776 SGL (RZx)
    SIEGEL LARSON,
17                                   Hon. Stephen G. Larson, U.S.D.J.
                                     Hon. Ralph Zarefsky, U.S.M.J.
18            Plaintiffs,
         vs.                         **SUPPLEMENTAL MEMORANDUM**
19                                   **OF POINTS AND AUTHORITIES**
    TIME WARNER INC.; WARNER         **ON DERIVATIVE WORK ISSUE**
20  COMMUNICATIONS INC.; WARNER      **PURSUANT TO COURT'S JULY 27,**
    BROS. ENTERTAINMENT INC.;        **2007 ORDER GRANTING**
21  WARNER BROS. TELEVISION          **DEFENDANTS' MOTION FOR**
    PRODUCTION INC.; DC COMICS;      **RECONSIDERATION**
22  and DOES 1-10,
                                     Time: 1:30 p.m.
23            Defendants.            Date: September 17, 2007
                                     Courtroom: 1
24  AND RELATED COUNTERCLAIMS        Judge Stephen G. Larson

25

26

27

28

    {F0100474.10 }

**EXHIBIT 23**
**1104**

DOCKETED ON CM
SEP 13 2007
BY

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ..................................................................................3

    A.    Detective's Preexisting Published Superman Works............................3

          *Action Comics #1* ............................................................................3

          *Superman Daily Strips* ...................................................................4

          *Superman #1* ..................................................................................4

          Pre-1940 Script Development of Additional Superman Powers and Familiar Characters ........................5

    B.    Siegel's Superboy Submissions .........................................................6

          The Pitch...........................................................................................6

          The Script .........................................................................................7

ARGUMENT .......................................................................................................11

I.    SIEGEL'S SUPERBOY SUBMISSIONS ARE BASED ON THE SUPERMAN CHARACTER AND HIS BACKSTORY AS EXPRESSED IN DETECTIVE COMICS' FULLY PROTECTED PREEXISTING SUPERMAN WORKS..............................11

II.    THE NEW COPYRIGHTABLE ELEMENTS IN SIEGEL'S SUPERBOY SUBMISSIONS ARE LIMITED TO THE MINIMAL ADDITIONS OF A FEW ABBREVIATED CHILDHOOD SEQUENCES AND DIALOGUE........................14

    A.    Plaintiffs' Generalized Claims of Originality Are Legally Irrelevant.................................................................17

    B.    Plaintiffs' Description of the Purported Original Content of the Script is Riddled With Inaccuracies............................21

CONCLUSION ....................................................................................................23

{F0100474.10 }

**EXHIBIT 23**
**1105**

1

# TABLE OF AUTHORITIES

2

<u>Cases</u>

3

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.,*
  191 F.2d 99 (2d Cir. 1951) ................................................................ 14

4

5

*Apple Computers, Inc. v. Microsoft Corp.,*
  35 F.3d 1435 (9th Cir. 1994) ............................................................. 18

6

*Benjamin v. Walt Disney Co.,*
  Case No. CV-05-2280 GPS, 2007 WL 1655783 (C.D. Cal. June 5, 2007) ..21

7

8

*Burroughs v. Metro-Goldwyn-Mayer,*
  683 F.2d 610 (2d Cir. 1982) .............................................................. 20

9

*Detective Comics, Inc. v. Bruns Publ'ns, Inc.,*
  111 F.2d 432 (2d Cir. 1940) ................................................... 11, 12, 13

10

11

*Durham Indus., Inc. v. Tomy Corp.,*
  630 F.2d 905 (2d Cir. 1980) .............................................................. 16

12

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*
  122 F.3d 1211 (9th Cir. 1997) ........................................... 15, 19, 22-23

13

14

*Ets-Hokin v. Skyy Spirits, Inc.,*
  323 F.3d 763 (9th Cir. 2003) ............................................................. 23

15

*Feist Publ'ns., Inc. v. Rural Tel. Serv.,*
  499 U.S. 340 (1991) ................................................................... 14, 15

16

17

*Funky Films, Inc. v. Time Warner Entm't Co.,*
  462 F.3d 1072 (9th Cir. 2006) .................................................18, 20, 21

18

*Metcalf v. Bochco,*
  294 F.3d 1069 (9th Cir. 2002) ........................................................... 18

19

20

*National Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.,*
  191 F.2d 594 (2d Cir. 1951) ..................................................12, 14, 17

21

22

*Nichols v. Universal Pictures Corp.,*
  45 F.2d 119 (2d Cir. 1930) ...................................12, 14, 15, 17, 18, 20, 22

23

*Rice v. Fox Broad. Co.,*
  330 F.3d 1170 (9th Cir. 2003) ..............................................12, 20, 21, 22, 23

24

*Sapon v. DC Comics,*
  62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002) .......................................12, 14, 16

25

26

*Siegel v. Time Warner Inc.,*
  496 F. Supp. 2d 1111 (C.D. Cal. 2007) ................................................ 1

27

*Warner Bros. v. Am. Broad. Cos.,*
  720 F.2d 231 (2d Cir. 1983) ......................................................... 11, 12

28

**EXHIBIT 23**
**1106**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

17 U.S.C. § 7 (1909 Act) (repealed) ..............................................................11, 20

17 U.S.C. § 102(a) ..............................................................14

17 U.S.C. § 102(b) ..............................................................1, 14

17 U.S.C. § 103(b) ..............................................................2

17 U.S.C. § 304(c) ..............................................................14, 15

**Treatises and Articles**

Melville Nimmer & David Nimmer, *Nimmer on Copyright* ..............................11, 15

Hon. Jon O. Newman, "New Lyrics for an Old Melody: The
     Idea/Expression Dichotomy in the computer Age," 17
     *Cardozo Arts & Ent. L.J.*, 691, 697-698 (1999)..............................12

{F0100474.10 }

iii

**EXHIBIT 23**

**1107**

1    Defendants Time Warner Inc., Warner Communications Inc., Warner Bros.

2  Entertainment Inc., Warner Bros. Television Production Inc. and defendant and

3  counterclaimant DC Comics (collectively "Defendants") submit this supplemental

4  memorandum of points and authorities pursuant to the Court's July 27, 2007

5  Opinion and Order granting Defendants' motion for reconsideration.[1]

6                        **PRELIMINARY STATEMENT**

7    The Court has requested supplemental briefing on "the derivative nature, if

8  any, of Siegel's Superboy submissions, bearing in mind the legal principles set forth

9  in *Nichols* as expounded in *Bruns Publications, Warner Bros.,* and *Sapon*."  (Op. at

10  71.)  The briefing is required to assist the Court in determining "whether Siegel's

11  Superboy submissions were completely derivative of Superman or, if not, to what

12  extent those submissions contained additional, original copyrightable material."

13  (Op. at 72.)[2]

14    The question posed by the Court is as straightforward as is its answer:  The

15  only new material contained in Siegel's Superboy submissions, aside from

16  uncopyrightable ideas, consists of very specific, abbreviated, and thinly protected

17  sequences depicting the Superman character as a toddler, a kindergartner and,

18  finally, a fifth grader.  Everything else in the submissions is taken either from

19  preexisting Superman works owned by DC's predecessor or from the public domain.

20  Most significantly, the submissions add nothing copyrightable to the characterization

21  of the three main characters at issue here – the young Clark Kent/Superman and his

22  adoptive parents, the Kents.

23    Section 102 (b) of the 1976 Copyright Act, which carries forward prior 1909

24  Act law, provides that "[i]n no case does copyright protection for an original work of

---

[1] *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111 (C.D. Cal. 2007).  Because complete federal supplement citations were not available as of the time of this writing, Defendants cite instead to the July 27 slip opinion ("Op.")

[2] Siegel's Superboy submissions consist of a letter dated November 30, 1938 and a 13-page typed script submitted in December, 1940 (the "Script").

{F0100474.10 }

**EXHIBIT 23**
**1108**

1   authorship extend to any idea . . . concept, principle or discovery regardless of the

2   form in which it is described, explained, illustrated, or embodied in such work."

3   Section 103(b) of the 1976 Act, which similarly carries forward the 1909 rule,

4   provides that "[t]he copyright in a . . . derivative work extends only to material

5   contributed by the author of such work, as distinguished from the preexisting

6   material employed in the work."  The answer to the question posed by the Court is

7   found in the application, under the guidelines of the governing judicial precedent, of

8   these bed-rock principles of copyright law.

9          From these principles courts have developed the following rules to determine

10  whether any work that is based on a prior work or public domain material contains

11  new copyrightable material:  First, as with any work, uncopyrightable elements, such

12  as ideas – whether or not new or claimed to be novel – must be factored out.

13  Second, the Court is to remove from consideration any potentially copyrightable

14  expression which is *not original* to the later work but is "pre-existing," *i.e.*, taken or

15  reused from underlying, prior copyrightable works or the public domain.  Third, to

16  qualify as original, the new aspects of the work must be non-trivial additions.  These

17  cannot be satisfied by mere reproduction of the work in a different medium and

18  cannot affect the scope of any copyright protection in the preexisting material.

19  These principles are vitally important as they are designed to preclude protection for

20  an addition whenever its similarity to the underlying work(s) might empower the

21  derivative work author to interfere with the rights of the owner of the original work

22  to create subsequent derivative works and to prevent infringements.

23         After these precepts are followed, what remains, if there is anything

24  sufficiently expressive to meet the originality requirement, constitutes what can be

25  protected under copyright as a derivative work.  As discussed below, application of

26  this analysis to Siegel's Superboy submissions shows that, even viewing the

27  evidence in the light most favorable to Plaintiffs, the submissions contain only one

28  kind of newly added *copyrightable* material, namely, the particular text comprising

{F0100474.10 }                                   2

EXHIBIT 23
1109

1  the brief dialogues and sequences of the Superman character as a toddler,

2  kindergartner and fifth grader as set forth in the Script submitted to DC in 1940.

3  **FACTUAL BACKGROUND**

4      The Court has noted that the answer to the question of what new

5  copyrightable material appears in Siegel's Superboy submissions necessarily

6  requires a review of the copyrightable Superman material that preexisted the

7  submissions: ". . . the relevant question is how much, and to what extent, had the

8  Superman character been fleshed out by the time Siegel submitted his Superboy

9  material to Detective Comics." (Op. at 70.)  As a first step in that analysis, a

10  description of the preexisting Superman works and Siegel's Superboy submissions,

11  and a detailed comparison of the works, are set out below.

12      A.   **Detective's Preexisting Published Superman Works**[3]

13      *Action Comics #1.*  In early April 1938, DC's predecessor, Detective Comics,

14  published the first Superman story in *Action Comics #1*.[4]  (Bergman Decl. Ex. A at

15  9-23.)  The story begins with a succinct, one-panel presentation of the "Origin

16  Story" – Superman's provenance from a "distant planet destroyed by old age" when

17  that planet's "scientist placed his infant son within a hastily devised space-ship,

18  launching it toward Earth!" (*Id.* at 11.)  In a subsequent small panel, we learn that

19  the infant and space ship are discovered by a "passing motorist" who turns the infant

20  over to an orphanage. (*Id.*)  At the orphanage, as a baby, Superman already displays

21  his great strength and is depicted lifting a chair over his head. (*Id.*)  Three

22  succeeding brief panels introduce Superman's early childhood and development of

23  his great powers – the ability to leap 1/8th of a mile, to lift tremendous weights, and

24  to run faster than an express train. (*Id.*)  The text states that these powers, after

25      [3] Reproductions of *Action Comics #1-30*, Superman Daily and Sunday Strips,

26  *Superman #1-8* and other Superman publications that predate the December 1940 Script (collectively the "pre-existing Superman works"), have been submitted herewith as exhibits to the Declaration of Michael Bergman ("Bergman Decl.").

27      [4] The appearance of the Superman character contained on the cover of *Action Comics*

28  *#1* had been earlier published in *More Fun Comics #31* and *Detective Comics #15*.

{F0100474.10 }         3

**EXHIBIT 23**
**1110**

1  being initially demonstrated as a toddler, were developed by the time "maturity was

2  reached" – suggesting during the intervening years a boy and youth with

3  extraordinary abilities. (*Id.*) *Action Comics #1* goes on to chronicle Superman's

4  first adventure, among other things showing his imperviousness to bullets and

5  knives, as well as introducing his alter ego, Clark Kent, the mild mannered reporter,

6  and his colleague and object of his affection, Lois Lane. (*Id.* at 11-23.) Also central

7  to the comic book is the visual depiction of Superman – both in costume and dressed

8  as his alter ego, Clark Kent. These visual depictions also further fleshed out the

9  super-powers exhibited by the character. (*Id.*)

10    *Superman Daily Strips.* In 1939, Detective licensed Superman for publication

11  in daily newspaper strips (the "Daily Strips"). (Bergman Decl. Exs. D at 13-18.)

12  The Daily Strips further expand the story and visual elements from *Action Comics*

13  *#1*, fleshing out in particular the origin story, which had been explained in only one

14  panel in *Action Comics #1*. Specifically, 11 separate Daily Strips – comprised of 44

15  separate panels – introduce: (1) Superman's natural parents (Jor-L and Lora), (2)

16  Superman's home planet – Krypton; and (3) the back story concerning Krypton's

17  destruction. (*Id.*)

18    *Superman #1.* In 1939, Detective decided to launch a separate Superman

19  comic book. *Superman #1* (*id.* Ex. E at 7-72), published in May 1939, featured an

20  expanded and further fleshed out version of the story of Superman's origin and

21  youth. For example, the story of the discovery of Superman is amplified. In this

22  version, a large panel pictures and introduces Superman's elderly adoptive parents,

23  the Kents, who were not present in *Action Comics #1*. (*Id.* at 9.) *Superman #1* also

24  fleshes out the back story of Clark Kent's childhood, as the reader learns and sees

25  that the infant Superman was adopted by the Kents, the couple who found him on

26  the road. (*Id.*) In addition, in a significant panel dense with information, we see

27  depicted a youthful Clark Kent and learn that "[t]he love and guidance of

28

{F0100474.10 }

4

**EXHIBIT 23**
**1111**

1  [Superman's] kindly foster parents was to become an important factor in the shaping
2  of the boy's future":



10  (*Id*. at 9.)  Here, we observe the interaction between Clark and the Kents, and learn
11  their advice that he (i) hide his great strength so that people are not afraid of him and
12  (ii) use his strength to assist humanity when the proper time comes.  (*Id*.)  *Superman*
13  *#1* further expands on *Action Comics #1*, by showing graphically a young Clark's
14  development and discovery of his powers, including the ability of "the lad" to
15  "hurdle skyscrapers . . . to leap an 1/8th of a mile . . . to raise tremendous weights
16  [and] run faster than a streamline train."  (*Id*. at 10.)  The exposition concludes with
17  the passing of his adoptive parents, further cementing his determination to use his
18  powers to benefit mankind.  (*Id*.)

19  <u>Pre-1940 Script Development of Additional Superman Powers and Familiar</u>
20  <u>Characters.</u>  Aside from the major "origin" and backstory narratives developed in
21  1938's *Action Comics #1* and 1939's *Superman #1*, other familiar characters,
22  storylines and powers of Superman were introduced and developed before the 1940
23  Script was submitted to Detective.  These include, but are not limited to: x-ray vision
24  (mentioned in *Action Comics #11*, May 1939 (*id*. Ex. <u>A</u> at 90, panel 49), used in
25  *Action Comics #18*, December 1939 (*id*. at 186, panels 30-31)); super-endurance
26  (*Action Comics #2*,[5] July 1938 (*id*. Ex. <u>E</u> at 27-39)); super-breath (*Action Comics*

27  _____
   [5] *Action Comics #2* was reprinted in *Superman #1*. (*See* Bergman Decl. Ex. <u>A</u> at Table
28  of Contents.)

{F0100474.10 }

5

**EXHIBIT 23**
**1112**

1   #20, January 1940 (id. Ex. A at 221, panels 89-90)); telescopic vision (Action

2   Comics #20 (id. at 216, panel 50)); microscopic vision (Action Comics #24, June

3   1940 (id. Ex. B at 57, panel 43)); super-hearing (Action Comics #8, January 1939, id.

4   Ex. A at 42, panel 13)); and super-memory (Superman #5, Summer 1940 (id. Ex. F

5   at 22, bottom left panel)).

6       **B.    Siegel's Superboy Submissions**

7       The Pitch.  On November 30, 1938, Siegel sent a letter to Detective enclosing

8   some of his work assignments and "pitching" some ideas for new comics (the

9   "Pitch").  (Id. Ex. H.)  Among the ideas submitted was one for a comic book entitled

10  Superboy "which would relate to the adventures of Superman as a youth."  (Id. at 2.)

11  The Pitch discussed conceptually the physical format for such a comic, and noted

12  that "[t]here'd be lots of humor, action, and the characters would be mainly children

13  of about 12-years rather than adults," but did not set forth any new characteristics or

14  story elements which would be included.  (Id. at 3.)

15      The idea of producing a "prequel" to an existing work, focusing on an

16  established protagonist's youth, was not novel or unique at the time of the Pitch.  As

17  set forth in the accompanying Declaration of Defendants' expert, Jeff Rovin ("Rovin

18  Decl."), the idea of the "young hero" prequel in the literature of the time can be

19  traced to Edgar Rice Burroughs' Tarzan in 1912.[6]  The youthful escapades of Tarzan

20  were subsequently presented in "comic book" format in 1929, nine years before the

21  debut of Superman.  (Rovin Decl. ¶ 4.)[7]  The concept of the superhero as a youth

22  was also examined in the 1919 story The Curse of Capistrano (the training and

23

24

---

25      [6] The Court has queried whether "other adolescent superhero comic book characters
    existed before Siegel conceived of Superboy in his submissions." (Op. at 69.)  At the time
26  of the parties' 2006 cross-motions for summary judgment, they had not named their
    experts, and neither fact nor expert discovery was completed.

27      [7] One advertisement promoting the publication declared, "Tarzan was born in the
    jungle.  Do you remember the story of his strange boyhood?"  (Id. ¶ 4.)
28

{F0100474.10 }                                  6

**EXHIBIT 23**
**1113**

1  exploits of Zorro), and in the 1930 Philip Wylie novel *Gladiator*, which Siegel has

2  acknowledged influenced the creation of Superman.  (*Id.* ¶¶ 5, 6.)[8]

3      <u>The Script.</u>  In December 1940, Siegel submitted to DC the thirteen-page

4  typed Script under the byline of Siegel and Shuster.  (Bergman Decl. Ex. I.)[9]  The

5  Script, which contains dialogue and describes in words various panels that were to

6  be illustrated by Shuster, again embodied the idea of capitalizing on the then-

7  existing popularity of Superman.  Thus, the very first proposed "script box" reads:

8  "It has to happen!  So many faithful followers of today's leading adventure comic

9  strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth

10  that the creation of this newest and most promising magazine comic strip character

11  was inevitable!  And so here it is at last . . . the answer to your requests . . .

12  America's outstanding boy hero: SUPERBOY!"  (*Id.* Ex. I at 1.)[10]

13      The concept presented in the Script was to graphically portray in comic books

14  and newspaper comic strips Superman's early exploits, exemplified in proposed

15  sequences for the character at several stages of his childhood.  To do this, the Script

16  first described in words the illustrations and textual material found in preexisting

17  Superman works showing the character's provenance and early development.  In

18  many instances the Script lifted exact text and verbally referenced specific illustrated

19  panels from the prior works.  These included a textual regurgitation of the so-called

20  "origin story" as well as other "origin" storylines from preexisting works.

21  Specifically, the first three and one-half pages of the Script re-tell the following

22

---

23     [8] *Gladiator* features the extensive boyhood and teenaged exploits of a super-powered
being who lives alone with his parent.  Described as being "made out of iron" this youth

24  can "jump higher'n a house . . . run faster'n a train . . . pull up big trees an' push 'em
over."  (*Id.* ¶ 6.)

25     [9] For ease of review, Defendants submit a retyped version of the Script at Bergman

26  Decl. Ex. I.

   [10] By this time, a number of adolescent superheros had been depicted in comic books,

27  including *Wonder Boy* (July, 1940); *Toro* (sidekick to the *Human Torch*) (Fall, 1940);
*Robin the Boy Wonder* (sidekick to *Batman*) (1940); and *Roy the Super-Boy* (sidekick of

28  the *Wizard*) (1940).  (Rovin Decl. ¶ 8.)

**EXHIBIT 23**
**1114**

1  previously published story elements: (1) the destruction of Superman's home planet

2  of Krypton; (2) his natural parents, Jor-L and Lora, launch their infant son to Earth

3  in a space-ship; (3) the space-ship "narrowly dodged oblivion" on its way to Earth;

4  (4) the space-ship lands on Earth and is discovered by a "passing motorist" who

5  takes the infant to an orphanage; (5) at the orphanage, the infant shows his great

6  strength, causing mayhem and alarming the employees there; (6) the motorist –

7  Charles Kent – cannot "get that little rascal" out of his mind and returns with his

8  wife to the orphanage to adopt the infant; and (7) the Kents name the infant "Clark."

9  Upon discovering young Clark's great strength, as they do in *Superman #1*, the

10  Kents vow to train their child to keep it a secret.  (*Id.* at 1-6.)

11        The chart set forth below lists material that the Script copied verbatim or

12  closely paraphrased from the texts of Detective's earlier Superman works, as well as

13  the character delineation, storylines and scenes the Script captured from Detective's

14  earlier illustration art in those works:

| Script Element | Preexisting Superman Element [11] |
|---|---|
| "as the distant planet, <u>Krypton</u>, burst into fragments, superscientist Jor-L and his wife Lora, launched their infant son toward the planet Earth in a trial space-ship . . . ." (Script (Bergman Decl. Ex. I) at 1) | "As a distant planet was destroyed by old age, a scientist placed his infant son within a hastily devised space-ship, launching it toward Earth!" **Visual depiction showing exploding planet and traveling space ship** (*Action Comics #1*, Bergman Decl. Ex. <u>A</u>) at 11.) |
| | "Jor-L, Krypton's foremost scientist" (Daily Strip, *id*. Ex. D at 13, top strip panel 2), and his wife Lora (*id.* panel 4), **launch their son, Kal-L in a rocket ship Earth as "***Krypton* **explodes into a million fragments."  Panels depict action being described.** (*id.* at 17, both strips.)** |
| | "Just before the doomed planet, *Krypton*, exploded into fragments, a scientist placed his infant son within an experimental rocket-ship, launching it toward Earth!"  **Panel depicting action being described.** (*Superman #1*, *id.* Ex. <u>E</u> at 9, panel 1.) |
| Panel would "show[] the space-ship hurtling up from the surface | **Same scene shown in: (1)** *Action Comics #1*, *id.* **Ex.** <u>A</u> **at 11, panel 1); (2) Daily Strip,** *id.* |

---

[11] Copied illustration art is referenced in bold.

{F0100474.10 }

8

**EXHIBIT 23**
**1115**

| Script Element | Preexisting Superman Element |
|---|---|
| of Krypton into space as the planet blows to bits." (*Id.* at 1.) | **Ex. D at 5, panels 5-8; and (3)** *Superman #1*, *id.* **Ex. E at 9, panel 1.** |
| "As the solitary vessel hurtled thru [sic] interplanetary space, it narrowly dodged oblivion in the form of comets, meteors, and other stellar obstacles . . . ." (*Id.* at 1.) | "Peril after peril is narrowly avoided by the rocketing space-flier: -- a great jagged meteor . . . The gravity of a giant sun almost draws the vessel to a molten death." **Panel depicting action being described. (Daily Strip,** *id.* **Ex. D at 6, panels 1-3.)** |
| "Alighting upon Earth, it burst into flames. Its tiny passenger was saved by a passing motorist" and a panel is described as showing the motorist lifting the child from the vessel. The motorist then takes the child to an orphanage. (*Id.* at 1.) | "When the vehicle landed on Earth, a passing motorist, discovering the sleeping babe within, turned the child over to an orphanage." (*Action Comics #1*, *id.* Ex. A at 11, panel 2.) "The sleeping babe is rescued from the burning space ship by a passing motorist, and turned over to an orphan asylum . . . ." (Daily Strip, *id.* Ex. D at 6, panel 5.) **An elderly couple, the Kents, discover the child in the space ship and take him to the orphan asylum. (*Superman #1*, *id.* Ex. E at 9, panels 2-3.)** |
| "But the motorist -- Charles Kent -- finds he can't forget the infant" and from his armchair says "I can't get that little rascal out of my mind, Mary!" The Kents decide to adopt the child. (*Id.* at 2.) | "We -- we couldn't get that sweet child out of our mind. We've come to adopt him if you'll permit us." (*Superman #1*, *id.* Ex. E at 9, panel 4.) |
| The infant exhibits great strength at the orphanage, wrecking equipment and scaring the staff. The orphanage happily allows the Kents to adopt the infant. (*Id.* at 2-3.) | The infant astounds the orphanage staff with his "feats of strength." **Panel showing infant lifting chair over his head. (*Action Comics #1*, *id.* Ex. A at 11, panel 3; Daily Strip, *id.* Ex. D at 18, bottom strip panel 2; *Superman #1*, *id.* Ex. E at 9, panel 3.)** When the Kents arrive at the asylum, the orphanage director happily allows the Kents to adopt the infant and thinks "Whew! Thank goodness they're taking him away before he wrecks the asylum!" **Panel showing infant lifting dresser over his head. (*Superman #1*, *id.* Ex. E at 9, panel 4,)** |
| The Kents vow to keep his super strength a secret so he that he does not become an outcast. (*Id.* at 5-7.) | Clark Kent's father tells the young Clark "Now listen to me Clark! This great strength of yours -- you've got to hide it from people or they'll be scared of you!" His mother adds "but when the time comes, you must use it to assist humanity." (*Superman #1*, *id.* Ex. E at 9, panel 4.) |

{F0100474.10 }

9

**EXHIBIT 23**
**1116**

| Charles (abruptly noting child holding rear end of car off of road): Mary—L-LOOK! <br> Mary: I am! — And I still don't believe my eyes! (*Id.* at 5.) | **Panel depicting Superman lifting rear of car. (Action Comics #24, *id.* Ex. B at 59, panels 5-6.)** |
|---|---|
| Brat (dancing with pain, holding fist): Ouch! My fist! My fist! <br> Girl: Let that be a lesson to you! (*Id.* at 9.) | **Panels depicting man's fist in pain after punching Superman (*Superman #2*, *id.* Ex. F at 85, panels 4-5; *Action Comics #28*, *id.* Ex. B at 114, panel 6.)** |
| "The bullets careen harmlessly off his super-tough skin" (*Id.* at 11.) | "The bullet ricochets off Superman's tough skin." (*Action Comics #1*, *id.* Ex. A at 14, panel 26.) |
| "As the car takes off Clark makes a flying leap after it . . . that lands him noiselessly atop the rear tire." (*Id.* at 11.) | "Easily overtaking the car, Superman takes one might spring . . ." **Panel showing flying leap over car. (*Action Comics #12*, *id.* Ex. A at 104, panel 50.)** <br> ". . . and lands within the rear of the car." Corresponding dialogue refers to Superman's arrival as that of a "ghost." **Panel shows landing. (*Action Comics #12*, *id.* Ex. A at 104, panel 51.)** |
| Caption: Down springs Clark in the very face of the firing weapons. The bullets careen harmlessly off his super-tough skin, but due to the darkness the crooks believe they have missed.... <br> Clark (cracking their heads together as he strokes down): Let's see how thick-skulled you are! (*Id.* at 11-12.) | "The bullet ricochets off Superman's tough skin." (*Action Comics #1*, *id.* Ex. A at 14, panel 26.) <br> **Panel depicting bullets bouncing "off Superman's super-tough skin." (Action Comics #24, *id.* Ex. B at 63, panel 5.)** <br> **Panel depicting Superman cracking crooks' heads together. (*Action Comics #26*, *id.* Ex. B at 92, panel 4.)** |
| "I could put my hidden strength to work for a good purpose." (*Id.* at 13.) | "But when the time comes, you must use [your strength] to assist humanity." (*Superman #1*, *id.* Ex. E at 9, panel 5.) |

In addition to the above recapitulation of earlier Superman material, the Script goes on to present specific dialogue and caption headings for contemplated comic strip panels involving the young Clark Kent, first as an infant causing a commotion at the orphanage (Bergman Decl. Ex. I at 2-3); then as a toddler besting a bully by punching him (*id.* at 6-8); next as a kindergartner impervious to a simple school prank (*id.* at 8-9); and finally as a fifth grader caught up in a slightly more extended adventure involving a school clique, a purported haunted house, and a gang of thieves (*id.* at 11-12). The Script concludes with the young Superman deciding to

**EXHIBIT 23**

**1117**

1  create his own "masquerade costume" in order to hide his true identity. (*Id.* at 13.)

2  Although the Script does not describe the costume, from the context it can be

3  inferred that the Script is referencing the Superman costume that was already famous

4  from previously published comics. (*See, e.g., id.* Exs. <u>A</u>-<u>G</u>.)

**ARGUMENT**

6  **I.    SIEGEL'S SUPERBOY SUBMISSIONS ARE BASED ON**

7  **THE SUPERMAN CHARACTER AND HIS BACKSTORY**

8  **AS EXPRESSED IN DETECTIVE COMICS' FULLY**

9  **PROTECTED, PREEXISTING SUPERMAN WORKS**

10      As noted in the Court's Opinion, "a derivative work is 'any work based in

11  whole, or in substantial part, upon a pre-existing work, if it satisfies the

12  requirements of originality. . . .'" (Op. at 66 (citing 1 Melville Nimmer & David

13  Nimmer, *Nimmer on Copyright* §3.01, at 3-3 (2006) ("*Nimmer*") and 17 U.S.C. § 7

14  (repealed)).) There is no dispute that Siegel's Superboy submissions were based in

15  whole or in substantial part on the preexisting Superman works. As Siegel admitted

16  in the Pitch, the character to be featured in the contemplated new strip is "Superman

17  as a youth" (Bergman Decl. Ex. <u>H</u> at 2), and he proposed that the first Script panel

18  state that the new feature was in response to reader demand for "the adventures of

19  Clark Kent as a youth." (*Id.* Ex. <u>I</u> at 1.) *See also* Op. at 69 ("The Court is mindful

20  that plaintiffs have never claimed that Siegel's Superboy is not derivative of

21  Superman.").

22      Similarly, there can be no dispute that copyright protection exists for each of

23  the preexisting Superman works at issue, and for the characters described therein.

24  In the case of copyrighted works consisting of combined and individual visual and

25  literary elements – such as comic books – copyright protects character delineation,

26  story elements and setting or locale as portrayed in each graphic image as well as in

27  the accompanying text. *Detective Comics, Inc. v. Bruns Publ'ns, Inc.*, 111 F.2d 432,

28  433 (2d Cir. 1940) (Superman); *Warner Bros. v. Am. Broad. Cos.*, 720 F.2d 231,

[F0100474.10 ]                          11

**EXHIBIT 23**
**1118**

1  240 (2d Cir. 1983) (there is "no doubt that copyright protection is available for

2  characters portrayed in cartoons"); *National Comics Publ'ns, Inc. v. Fawcett*

3  *Publ'ns, Inc.*, 191 F.2d 594, 600 (2d Cir. 1951) (Superman); *Sapon v. DC Comics,*

4  62 U.S.P.Q.2d 1691, 1697 (S.D.N.Y. 2002) (Batman).  And because a comic book's

5  graphic representations are, by their nature, concrete and detailed, any graphic

6  illustration is entitled by its own terms to more expansive protection under copyright

7  than a brief verbal expression describing such illustration.  *Nichols v. Universal*

8  *Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).[12]

9      Thus, while only "sufficiently delineated" characters are accorded copyright

10  protection, *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175-76 (9th Cir. 2003), *Nichols*,

11  45 F.2d at 121, because of their inherently graphic concreteness, copyright

12  protection for *visual depictions* accompanied by text in comic books or strips cannot

13  be doubted.  *See generally Bruns,* 111 F.2d 432; *Fawcett*, 191 F.2d 594; *Warner*

14  *Bros.*, 720 F.2d 231.  Indeed, one cannot underestimate the capability of works of

15  comic art to convey meaning and portray characterization as well as events.  In a

16  comic book or strip, the work's images function as a short hand storytelling device –

17  each picture worth many words and functioning as part of a series to form the total

18  expressive content of the work.

19      In *Bruns*, the Second Circuit had the opportunity to consider the precise

20  question of the extent of copyright protection afforded to the expression of

21  Superman in the very preexisting Superman works at issue here.  In its opinion

22  issued in April, 1940 (and thus pre-dating the Script), that Court held that the

23  "pictorial representations and verbal descriptions" of Superman described therein

24  were sufficiently fleshed out to justify an injunction against not only similar

---

25  [12] As held in *Sapon*, in the case of elements of a character that appear in comic books,

26  these require analysis of both the material's "linear, literary mode and the multi-
   dimensional total perception."  62 U.S.P.Q.2d at 1694 (quoting Hon. Jon O. Newman,

27  "New Lyrics for an Old Melody: The Idea/Expression Dichotomy in the computer Age,"
   17 *Cardozo Arts & Ent. L.J.*, 691, 697-698 (1999)); *see also Warner Bros.*, 720 F.2d at

28  241.

**EXHIBIT 23**
**1119**

1  cartoons "portraying any of the feats of strength or powers performed by

2  'Superman'" but also "any periodical or book" doing the same or "closely imitating

3  his costume or appearance in any feat whatever." 111 F.2d at 434.  Thus, the

4  copyrights in the preexisting Superman works were held to encompass the

5  depictions of the Superman character's physical attributes (*e.g.*, miraculous strength,

6  speed, physique as pictured in skin tight costume, hand strength, ability to stop and

7  imperviousness to bullets, leaping ability and dual identity, pictured in "ordinary

8  clothing" concealing his strength), as well as his personal traits (*e.g.*, being a battler

9  "against 'evil and injustice'"), all of which were held to be combined and expressed

10  in sufficient detail in "pictorial representations and verbal descriptions" to be

11  copyrightable and protected against infringement.  *Id.* at 433.

12      Accordingly, it is beyond dispute that the copyrighted Superman works

13  predating Siegel's Script encompassed all of the following elements: (i) the

14  depictions of Superman's origin, landing on Earth and Krypton backstory; (ii) his

15  early demonstrations of fantastic strength and subsequent adoption from the

16  orphanage; (iii) his boyhood and further development of powers; (iv) the other

17  Superman characters including Clark Kent and his adoptive parents; (v) Superman's

18  personality traits, including his purpose to battle against evil and injustice and how

19  he came to learn that goal and the need to keep his powers secret; and (vi) the

20  character's physical attributes, including miraculous strength, speed, physique as

21  pictured in ordinary clothing and a skin tight costume, hand strength, ability to stop

22  and imperviousness to bullets and leaping ability.  As held in *Bruns*, taken as a

23  whole, these elements are clearly sufficient in their detail to be copyrightable and

24  fully protected against infringement.  111 F.2d at 433-34.

25

26

27

28

{F0100474.10 }

13

**EXHIBIT 23**
**1120**

II.    **THE NEW COPYRIGHTABLE ELEMENTS IN SIEGEL'S SUPERBOY SUBMISSIONS ARE LIMITED TO THE MINIMAL ADDITIONS OF A FEW ABBREVIATED CHILDHOOD SEQUENCES AND DIALOGUE**

Copyright "subsists in original works of authorship," and does not protect ideas but only their expression.  17 U.S.C. §§ 102(a), (b); *Feist Publ'ns., Inc. v. Rural Tel. Serv.*, 499 U.S. 340, 344-35, 349 (1991)); *Nichols*, 45 F.2d at 121; *see* Op. at 66.  This rule applies with equal force to "all works," including derivative works.  *Feist*, 499 U.S. at 347.[13]  Therefore, as a threshold matter in determining if there is any original material in Siegel's Superboy submissions that is capable of copyright protection, it is necessary to eliminate from consideration anything that is simply an "idea."  Even to the extent it had not been previously presented, "Superman as a youth" or "Clark Kent as a youth" is just such an idea that is incapable of protection under copyright principles.  *See, e.g., Feist*, 499 U.S. at 344-35, 349; *Nichols*, 45 F.2d at 121.  The Pitch is nothing other than the presentation of the idea of a comic strip based on the adventures of Superman as a youth, and therefore contains nothing independently protectable under copyright.[14]  The appropriate analysis of whether Siegel's Superboy submissions contain any newly copyrightable elements must therefore necessarily focus on the Script.

In order to constitute a derivative work capable of independent copyright protection, the newly added material in the Script (other than "ideas") must satisfy

---

[13] The author of newly added material cannot obtain protection for any ideas, whether new or old. *Sapon*, 62 U.S.P.Q.2d 1691, 1697-98; *Fawcett*, 191 F.2d at 600; *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-03 (2d Cir. 1951).

[14] To the extent the *idea* of Superboy is protectable under some other law, any claim that may have existed has been exhausted in litigation with which this Court and Plaintiffs have great familiarity, namely, the Westchester Action, which this Court has held did not and could not have dealt with federal copyright law.  Plaintiffs cannot relitigate those state law claims in this federal copyright action more than 50 years later.  Moreover, any such uncopyrightable idea was assigned to DC's predecessor as part of the settlement of the Westchester Action, and such grant is not susceptible to termination since it does not constitute a copyright grant.  17 U.S.C. § 304(c).

**EXHIBIT 23**
**1121**

1  the requirements of "originality" — that is, (1) independent creation and (2) a

2  minimal quantum of creativity.  *Feist*, 499 U.S. at 345-46.  The first requirement

3  means "only that the work was independently created (as opposed to copied from

4  other works)" and does not signify "novelty," a patent law concept.  *Id.* at 345.  *See*

5  *also Nichols*, 45 F.2d at 122.[15]  With respect to the second requirement, a work

6  contains a sufficient quantum of creativity if it "possesses at least some minimal

7  degree of creativity . . . ." *Feist*, 499 U.S. at 346 (quoting 1 *Nimmer* §§ 2.01 [A], [B]

8  (1990)).

9        Additionally, with respect to a derivative work, in order to ensure that the

10  granting of copyright for newly added material will not affect the scope of any

11  copyright protection in the preexisting material, the courts have established a further

12  inquiry into the requisite quantum of creativity whenever the derivative work in

13  question is based upon a preexisting work or works that are copyrighted and owned

14  by the person to or for whom the derivative work is prepared.  *See Entertainment*

15  *Research Group, Inc.* v. *Genesis Creative Group, Inc.* 122 F.3d 1211, 1220 (9th Cir.

16  1997).  In *Entertainment Research,* the Ninth Circuit held that when the derivative

17  work's similarity to the preexisting copyrighted work is based upon preexisting

18  copyrighted character delineation, the courts must draw the line in such a way that

19  the derivative work author will not be empowered to harass or interfere with the

20  rights of the original work owner to use and license the underlying work through

21  actual or threatened litigation.  *Id.* at 1220.[16]  For this reason, "the aspects of the

22

23  ────────────
   [15] "[A] work may be original even though it closely resembles other works so long as
   the similarity is fortuitous, not the result of copying." *Feist*, 499 U.S. at 345; *Nichols*, 45
24  F.2d at 122.

25  [16] The Ninth Circuit decided upon such a rule because of its concern about "the impact
   a derivative copyright will have on the copyright privileges and rights of the owner of the
   underlying work" and its view that "the body of law regarding derivative copyrights is
26  designed to strike a balance between the holder of a copyright in the underlying work and
   the creator of a work that is made by copying that underlying work." *Id.* at 1268.  This has
27  great significance in the context of copyright termination because in section 304(c), 17
   U.S.C. § 304(c)(6), Congress explicitly excepted from termination any "derivative work
28  prepared under authority of the terminated grant."

{F0100474.1O }                              15

**EXHIBIT 23**
**1122**

1   derivative work" that the court will accept as "original . . . must reflect the degree to

2   which it relies on pre-existing material and must not in any way affect the scope of

3   any copyright protection in that preexisting material." *Id.* (quoting *Durham Indus.,*

4   *Inc. v. Tomy Corp.,* 630 F.2d 905, 909 (2d Cir. 1980)).[17]  In terms of methodology,

5   to determine whether a derivative work possesses the requisite originality, courts

6   must compare the derivative work to the pre-existing work. *Sapon*, 62 U.S.P.Q.2d

7   at 1697.

8           Plaintiffs' claims of originality rest on counsel's generally stated and hollow,

9   conclusory assertions, rather than on the actual expressive content shown in the

10  Pitch or Script.[18]  In their 2006 briefing on these motions, Plaintiffs  asserted that

11  "Superboy is a sufficiently original and distinct character and story from Superman

12  to warrant independent copyright protection," and that the following contributions in

13  the Script reflect that necessary originality:

14          Siegel's 'Superboy' focuses on the character, family and social life of
            a youth growing up in a small rural town who faces the challenges of
15          adolescence while repressing who he really is.  Siegel's story is
            primarily devoted to the close relationship between 'Superboy' and
16          his earnest adoptive parents, and follows 'Superboy's' small town
            adventures with his school classmates and townsfolk.
17
18  (Plaintiffs' March 1, 2006 Reply Memorandum in Support of their Motion for

    Partial Summary Judgment ("March 1, 2006 Reply") at 19, 20.  *See also id.* at 22-
19
    23.)  Plaintiffs further claimed that these allegedly new elements consist of "the
20
    themes, characters, relationships, mood, settings, locale, and the interplay of such
21

22      [17] The policy behind this rule has particular relevance here, where Plaintiffs attempt to
    rely on Siegel's Superboy submissions in an effort to interfere with Defendants' lawful
23  exercise of their continuing co-ownership rights to use the original Superman works in
    ongoing licensing of new works based thereon such as *Smallville*.

24      [18] Previously, Plaintiffs' principal tactic was to incorrectly insist that the Westchester
    Action Referee's findings decided this question, which the Court has now rejected.
25  Further, in depositions, Plaintiffs declined to answer the question of what new material
    was included in the Script that had not appeared in earlier Superman works on the ground
26  this called for expert testimony. (Bergman Decl. Ex. K at 111-12.)  When the similar
    question was posed to Plaintiffs' expert Mark Evanier of whether there was, for example,
27  any power of Superboy in the Script that had not appeared in a prior Superman work, he
    was unable to respond, testifying instead that he was "not prepared to address that." (*Id.*
28  Ex. L at 190-91.)

**EXHIBIT 23**
**1123**

1  elements." (*Id.* at 12.)  However, these claims are neither legally relevant nor

2  factually accurate in identifying the requisite level of detail and "incident" or

3  detailed expression required to give copyright protection to any new material in the

4  Script. *See Nichols,* 45 F.2d at 121-23.

5      **A.  Plaintiffs' Generalized Claims of Originality Are Legally Irrelevant**

6        As the legally required comparisons show, the Script (like the Pitch)

7  communicated to Detective the *idea* for additional comic books and strips featuring

8  the exploits of Superman as a youth.  The Script consisted of thirteen pages of typed

9  textual material, *not* yet fleshed out with illustrations, consisting in significant part

10  of copied and/or paraphrased verbal re-runs of material from Detective's earlier,

11  already published textual and graphically illustrated storylines and character

12  delineations of Superman himself and other Superman characters.  (*See* Chart,

13  *supra.*)

14        Indeed, *all* the essentials of the Superman characters (Clark Kent and his

15  adoptive parents), characteristics and backstory that appear in the Script are taken

16  from the preexisting material.  The Court has stated that "Defendants make mention

17  of a couple of panels in earlier Superman comic books where Superman was shown

18  as an infant, but nowhere have they pointed to comic strips where the storyline

19  delineating this aspect of the Superman character had been so fleshed out as to

20  comprise part of the pre-existing work." (Op. at 70.)  While there is no single

21  "episode" of Superman that pre-dates the Script that is devoted entirely to

22  Superman's childhood, it is undisputed that six separate panels of *Superman #1*

23  (Bergman Decl. Ex. E at 9-10) relate to Clark Kent as a boy.  In any event, because

24  comic strips are brief and tell stories in a sort of shorthand, even one panel can be

25  significant in the development of a comic book story and character, and thus, its

26  copyright. *See Fawcett*, 191 F.2d at 600.  For example, the foundational "origin

27  story" in *Action Comics #1* (Bergman Decl. Ex. A at 11) is told in only one panel.

28  This story element, albeit brief, is a central part of the preexisting copyrighted

{F0100474.10 }

17

**EXHIBIT 23**
**1124**

1    Superman story and character.  This same brief – but significant – storytelling device

2    was used in *Superman #1* to establish the adoption of the infant Superman, the

3    relationship between him and his adoptive parents, and the profound influence they

4    had on him as a youth.  (*See* panel at p.5, *supra* (Bergman Decl. Ex. E at 9).)

5        The preexisting aspects of Superman's persona and history, including the all-

6    important thematic need for him to hide his powers and use them for the betterment

7    of humanity, play a key role in determining the content of any portrayal of his

8    childhood such as that outlined in the Script.  The Script's limited new material

9    consists only of the three very specific, abbreviated and thinly protected sequences

10    depicting the Superman character as a toddler, kindergartner and fifth grader.  While

11    the proposed dialogue and captions themselves were not previously published, they

12    are dominated by familiar attributes and actions of the already established

13    Superman: demonstrations of great strength, attempts to keep his superpowers

14    hidden from his peers, and jumping onto moving cars to save friends and capture

15    villains.

16        Moreover, these kinds of scenes flow naturally, if not inevitably, from the idea

17    of presenting scenes of a child Superman and embody the basic attributes and traits

18    of the character taken from the preexisting works.[19]  The scenes are toddlers'

19    playrooms, classrooms and school yards, and the neighborhood "haunted house,"

20    which are stock and standard locales for depicting the Superman character's powers

21    and attributes at these stages of his life; the simple dialogue they contain are

22    similarly common for the settings, interchangeable with those that could be used for

23    similar contexts.  They fall into familiar, stereotypical patterns where the younger,

24

25        [19] Material considered to be "scenes a faire" is treated like ideas and likewise is not
      protectable.  *Nichols*, 45 F.2d at 121; *Funky Films, Inc. v. Time Warner Entm't Co.*, 462
26    F.3d 1072, 1077 (9th Cir. 2006).  Scenes a faire include material or scenes that are "as a
      practical matter indispensable, or at least standard, in the treatment of a given [idea],"
27    *Apple Computers, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994), as well as
      scenes and relationships which flow naturally from or are generic from basic plot lines.
28    *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002); *Funky Films*, 462 F.3d at 1077.

**EXHIBIT 23**
**1125**

1  supposedly weaker boy prevails over the bully tormentor or where the teasing,

2  taunting schoolmates are rescued from danger by the nonconformist outsider they

3  then recognize as a hero.  This very limited new material barely passes the Ninth

4  Circuit's test for triviality as established in *Entertainment Research*.

5       Nor can Plaintiffs demonstrate any new copyrightable subject matter present

6  in the Script with respect to any of the three main characters – Clark Kent (as a

7  youth and as Superboy) and the two Kents.  Other than repeating a presentation of

8  Superman as a boy with pre-established powers, putting him into the preexisting

9  Superman costume, and calling him "Superboy," there is nothing about his

10 personality, history, or powers that is new or that warrants protection of the

11 character as a "new" character under the copyright law.  Indeed, the young Clark

12 Kent is not visually depicted in the Script, but is merely described as generally

13 possessing the same physical attributes of special strength of Superman, but as a

14 young child – attributes that had already been explored in earlier Superman works.

15 To the extent these constitute "differences," they are trivial variations and ideas that,

16 under *Entertainment Research*, cannot give rise to independent copyright protection

17 in the characters.

18       The same is true of the depiction of the Kents: there are no new copyrightable

19 elements in these characters present in the Script that were not present in previous

20 Superman works.  The coming duality of Clark's existence, springing from the need,

21 as seen by his parents, to hide his powers and ultimately use them to better

22 humankind, is copied from the preexisting Superman works and not further

23 developed.  The preexisting material with regard to Superman's adoption and his

24 adoptive parents, the Kents, is also referred to but not delineated in the Script with

25 particular detail.  Their age is similarly unstated.  Nor does the Script indicate how

26 they live or earn a living or otherwise provide any specific setting or locale

27 identified other than a mention of Superboy "streaking over the city" on the last

28 page.

{F0100474.10 }                                        19

**EXHIBIT 23**
**1126**

1    In purely literary works, such as the Script, copyright protection cannot exist

2  for components of a work that are only developed at a general or abstract level but

3  not sufficiently detailed, or in the words of Judge Learned Hand, adequately fleshed-

4  out with "incident." *Nichols*, 45 F.2d at 121; *see Rice*, 330 F.3d at 1175. With

5  respect to literary characters – such as the young Superman and the Ma and Pa Kent

6  characters depicted in the Script – to achieve protection their delineation must be

7  developed in detail, otherwise they will be no more than stock figures or character

8  types. *Nichols*, 45 F.2d at 121-22 ("the less developed . . . the less they can be

9  copyrighted"). This is true as well for any newly added "variant" in a derivative

10  work. 17 U.S.C. § 7 (1909 Act) (repealed). For storylines, there is a point at which

11  the generality of what occurs cannot be protected, since otherwise an author could

12  prevent the use of his or her "'ideas,' to which . . . his property is never extended."

13  *Nichols*, 45 F.2d at 121. The same standards rule out copyright protection for

14  generic settings and locale. *Id.*; *Burroughs v. Metro-Goldwyn-Mayer*, 683 F.2d 610,

15  624 (2d Cir. 1982); *Funky Films*, 462 F.3d at 1077-78.

16    Thus, with respect to the literary element of characterization, schematic

17  descriptions or general portrayals of a character or of the nature of his personality

18  and attributes, or of the quality or nature of his relationship with others, are not

19  entitled to protection under copyright. *See Nichols,* 45 F.2d at 121, 123. That a

20  literary character is shown to be "loving," warm, supportive or anxious, or that

21  he/she has a loving, dependent or angry relationship with another, or that he is

22  physically strong or possessed of miraculous strength does not pass muster. *Id.*

23  With respect to plot, it is similarly impossible to monopolize general subject matter

24  and abstractions, such as David battling Goliath or schoolyard bullies and teasers

25  beaten at their own game. It is therefore no answer to this test for Plaintiffs to state

26  over and over again that the Script's copyrightability resides in its "themes,

27  characters, relationships, mood, settings, locale and interplay of such elements,"

28  because Siegel's submissions allegedly show Superboy's character, origins, family

{F0100474.10 }

20

**EXHIBIT 23**
**1127**

1   and social life as a youth growing up in a small town in the rural American

2   heartland. (*See, e.g.* March 1, 2006 Reply at 12, 19-20, 22-23.) Even if these

3   attributes were true – and they are not – and even if any material that can be

4   described in this manner had actually originated in the Script rather than been

5   copied from preexisting Superman works, such circular assertions devoid of any

6   specification of "incident" only confirm their legal insufficiency.

7        **B.**   <u>**Plaintiffs' Description of the Purported Original Content of the**</u>

8           <u>**Script is Riddled With Inaccuracies**</u>

9        The factual inaccuracy of Plaintiffs' claims is made evident by reading their

10  pronouncements against the actual contents of preexisting Superman works and of

11  the Script itself. First, as demonstrated in the Chart, *supra*, the character, origins,

12  and family life of young Clark Kent with his adoptive parents were all established

13  well before 1940 in materials owned exclusively by Detective. Second, except for

14  the references to a toddler and grade-school Clark Kent, the Script contains no

15  development of his social life. Nor does the Script refer to Clark Kent being raised

16  "in a small rural town" – the only setting referenced in the Script at all is a "city,"

17  but the Script does not indicate that this is where Clark Kent lives. (Bergman Decl.

18  Ex. I at 13.)[20] Plaintiffs also point to allegedly "copyrightable new matter in the

19  Script that relates to Superman's parents. (Plaintiffs' May 29, 2007 Memorandum

20  in Opposition to Defendants' Motion for Partial Summary Judgment ("Pls. May 29,

21  2007 Opp. Br.") at 90-92.) But, as shown above, there is only the barest schematic

22

23      [20] Furthermore, Plaintiffs cannot "own" a general rural setting. Rather, the settings
need to be similar in their expression, *i.e.*, the detail. *Rice*, 330 F.3d at 1177; *Funky Films*,
24  462 F.3d at 1077-78. Most recently, Judge Schiavelli discussed the differences in rural
settings in *Benjamin v. Walt Disney Co.*, Case No. CV-05-2280 GPS, 2007 WL
25  1655783 (C.D. Cal. June 5, 2007). In that case, both of the parties' works took place, at
least in part, in rural scenes. However, the Court pointed to the differences in expression
26  of such rural settings and to the role they played in the respective works, thus finding them
not to be similar. *Id.* at *5-6. As Plaintiffs' expert Evanier also conceded, there are
27  "different kinds of rural settings" (Bergman Decl. Ex. L at 240), the Script makes "no
reference to farming," and there is nothing to indicate that the Kents are farmers. (*Id.* at
28  243, 245.)

**EXHIBIT 23**
**1128**

1  development of the Kents in the Script beyond what was concretely presented in

2  *Superman #1*.  Similarly inaccurate and misguided are Plaintiffs' quests for new

3  copyrightable material in the Script's alleged depictions of the Kents as raising their

4  son as a "human being, loving and nurturing him as if he were their son" and

5  encouraging him to hide his powers.  (*See id*. at 90.)  No matter how many times

6  Plaintiffs repeat these kinds of claims, it is clear that the Kents' love for their

7  adopted son, their decision to raise him as a "human being," and their decision to

8  encourage him to hide his powers are not only insufficiently detailed elements of the

9  Script to merit copyright protection, *Nichols*, 45 F.2d at 121-22, but also were all

10  firmly established in pictures and words in the preexisting Superman works.  (*See*,

11  *e.g.*, Panel at p.5, Chart, *supra*.)

12      Plaintiffs also cannot credibly state that the relationship between Clark and

13  his parents and their encouraging him to hide his powers is "fleshed out" in the

14  Script.  (Pl. May 29, 2007 Opp. Br. at 90.)  Indeed, how much more fleshed out, for

15  example, is the concept of encouraging young Clark Kent not to reveal his powers

16  than his parents telling him in *Superman #1* "Now listen to me Clark!  This great

17  strength of yours – you've got to hide it from people or they'll be scared of you!"

18  (Bergman Decl. Ex. I at 3).  In any event, Plaintiffs cannot, as they claim, own the

19  idea of exploring "the interesting ongoing problem of the Kents raising this special

20  boy and coping with the fact that they have an alien in their midst" (Pl. May 29,

21  2007 Opp. Br. at 90): such a general theme is an idea that Plaintiffs as a matter of

22  law cannot own and anyone else is free to explore.  *See Rice*, 330 F.3d at 1175;

23  *Nichols*, 45 F.2d at 121.

24                    *       *       *

25      Plaintiffs cannot by their overreaching characterizations of the Script prove

26  that it contains anything new and copyrightable other than the limited and specific

27  aspects of the three childhood sequences.  Applying the law of this Circuit and the

28  specialized rule for evaluating derivative works explained in *Entertainment*

{F0100474.10 }

22

**EXHIBIT 23**
**1129**

1   *Research*, 122 F.3d at 1220, the characters of Superman as a youth and young Clark

2   Kent as they appear in the Script are thus not sufficiently differentiated from their

3   prior incarnations to rise to the level of "derivative works."  All that remains that

4   could qualify as a derivative work is the limited quantitative and qualitative content

5   of the few added childhood sequences.  While the prototypical dialogue and abstract

6   caption lines of this material, to the extent not literally present in preexisting works,

7   are entitled to some "thin" protection, because they must be stripped of the

8   preexisting main characters, unprotectable ideas and scenes-a-faire, they have

9   limited significance and border on being merely trivial additions.  *Ets-Hokin v. Skyy*

10   *Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) ("thin" protection allows the owner

11   to stop only verbatim copying).[21]

## CONCLUSION

13      In view of the foregoing, it is indisputable that the Siegel Superboy

14   submissions contained little or no new copyrightable matter because they so

15   extensively incorporate and depend upon preexisting Superman works in presenting

16   the non-copyrightable idea of Superman as a youth and the related, already

17   developed idea of the character's need to hide his special powers.  Such ideas for a

18   comic book or strip featuring Superman as a youth are not subject to copyright

19   protection.  The standard or indispensable ways that Siegel's Superboy submissions

20   exemplified such ideas in the added childhood sequences are substantially the

21   equivalent of ideas, as they reflect little more than concepts communicated with

22   limited expressive text consisting of necessary, one-dimensional dialogue and the

23   predictable, almost inevitable words in which to describe the scene or events.  At

24   best, these very specific and abbreviated sequences, which have never been

---

25   [21] Where there are only a limited number of ways to express an idea, the so-called

26   "merger doctrine" is used to balance carefully the lines between ideas and expression, for
copyright law protects only expressive content, not the idea that content embodies.  *Rice*,

27   330 F.3d at 1176 ("[where] only a discrete number of ways to express a magician revealing
the secrets behind magic tricks and illusions while disguising his identity . . . limiting

28   doctrines of merger and scenes a faire" preclude protection).

**EXHIBIT 23**
**1130**

1  published by DC, can be only minimally protectable as a derivative work.  Indeed,

2  their potential significance is limited to the hypothetical circumstance where such

3  dialogue or captions were actually used by DC – a situation that Plaintiffs do not

4  allege, and that in fact never did occur.

5

6  DATED:  September 10, 2007        WEISSMANN WOLFF BERGMAN

7                                                              COLEMAN GRODIN & EVALL, LLP

8                                                      FROSS ZELNICK LEHRMAN & ZISSU, P.C.

9                                                              -and-

10                                                    PERKINS LAW OFFICE, P.C.

11

12                                                    By:  Michael Bergman

13                                                           Michael Bergman
                                                             Attorneys for Defendants and Counterclaimant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{F0100474.10 }

24

**EXHIBIT 23**
**1131**

# EXHIBIT 24

1

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                  - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    JOANNE SIEGEL, ET AL.,          )
                                     )
8                  PLAINTIFFS,       )
                                     )
9        VS.                         )   NO. CV 04-08776-SGL
                                     )
10   TIME WARNER, INC., ET AL.,      )
                                     )   CROSS MOTIONS FOR
11                 DEFENDANTS.       )   PARTIAL SUMMARY JUDGEMENT
     _____)
12                                   )
     AND RELATED CASES,              )
13   _____)

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17          MONDAY, SEPTEMBER 17, 2007

18                  1:38 P.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
       FEDERAL OFFICIAL COURT REPORTER
24        3470 12TH STREET, RM. 134
        RIVERSIDE, CALIFORNIA  92501
25           (951) 274-0844
        CSR11457@SBCGLOBAL.NET

**CERTIFIED COPY**

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1132**

2

1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFFS:

3
                    LAW OFFICES OF MARC TOBEROFF
4                   BY:  MARC TOBEROFF
                    BY:  NICHOLAS WILLIAMSON
5                   2049 CENTURY PARK EAST,
                    SUITE 2720
6                   LOS ANGELES, CALIFORNIA  90067
                    310-246-3333
7

8
     ON BEHALF OF DEFENDANTS:
9
                    WEISSMANN WOLFF BERGMAN COLEMAN
10                   GRODIN & EVALL LLP
                    BY:  MICHAEL BERGMAN
11                  9665 WILSHIRE BOULEVARD,
                    NINTH FLOOR
12                  BEVERLY HILLS, CALIFORNIA  90212
                    310-858-7888
13

14

15   ON BEHALF OF DEFENDANTS:

16                  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                    BY:  ROGER L. ZISSU
17                  866 UNITED NATIONS PLAZA
                    AT FIRST AVENUE & 48TH STREET
18                  NEW YORK, NEW YORK  10017
                    212-813-5900
19

20
     ON BEHALF OF DEFENDANTS:
21
                    PERKINS LAW OFFICE, P.C.
22                  BY:  PATRICK T. PERKINS
                    1711 ROUTE 9D
23                  COLD SPRINGS, NEW YORK  10516
                    845-265-2820
24

25

SEPTEMBER 17, 2007                  SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1133**

3

1    RIVERSIDE, CALIFORNIA; MONDAY, SEPTEMBER 17, 2007; 1:38 P.M.

2                              -oOo-

3         **THE CLERK:**  CALLING CALENDAR ITEM 11, CASE NUMBER

4    CV 04-8400-SGL, AND -8776, JOANNE SIEGEL VERSUS TIME WARNER

5    INC., ET AL.                                                    01:26

6         MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

7    YOUR APPEARANCES FOR THE RECORD.

8         **MR. BERGMAN:**  MICHAEL BERGMAN FOR DEFENDANTS.

9         **MR. ZISSU:**  ROGER ZISSU, YOUR HONOR, FOR THE

10   DEFENDANTS.                                                     01:38

11        **MR. PERKINS:**  PATRICK PERKINS FOR DEFENDANTS, YOUR

12   HONOR.

13        **MR. TOBEROFF:**  GOOD AFTERNOON, YOUR HONOR.

14        MARK TOBEROFF FOR THE PLAINTIFFS.

15        **MR. WILLIAMSON:**  GOOD AFTERNOON, YOUR HONOR.          01:38

16        NICHOLAS WILLIAMSON FOR THE PLAINTIFFS.

17        **THE COURT:**  GOOD AFTERNOON, COUNSEL.

18        WE'RE ON CALENDAR THIS AFTERNOON TO CONSIDER

19   CROSS MOTIONS FOR SUMMARY JUDGMENT RELATED TO BOTH THE SUPERBOY

20   AND THE SUPERMAN CASES.                                         01:38

21        I ALSO HAVE BEFORE ME AN EX-PARTE APPLICATION BROUGHT

22   BY THE PLAINTIFFS I'VE RECEIVED IN OPPOSITION FROM THE DEFENSE

23   WHICH THE COURT IS PREPARED TO TAKE UP THIS AFTERNOON AS WELL.

24   I'LL DEAL WITH THAT TOWARDS THE END OF THE HEARING.

25        WHAT I'D LIKE TO DO IS BEGIN WITH THE CROSS MOTIONS       01:38

**EXHIBIT 24**
**1134**

4

1    FOR PARTIAL SUMMARY JUDGMENT BROUGHT ON THE SUPERBOY MATTERS,

2    AS WELL AS THE SUPPLEMENTAL BRIEFS THAT WERE FILED ON THE

3    DERIVATIVE WORKS ISSUE WHICH I ASKED YOU TO SUBMIT; AND I

4    APPRECIATE YOU DOING SO.

5            LET ME BEGIN WITH THE DEFENSE, IF I COULD.                    01:38

6            I GUESS THE FIRST QUESTION I HAVE ABOUT BOTH CROSS

7    MOTIONS, GIVEN WHERE THE COURT IS GOING ON THIS IN LIGHT OF THE

8    COURT'S LAST ORDER, THAT THIS IS MORE, AT THIS POINT --

9    ASSUMING THAT I FIND THAT IT ULTIMATELY IS A JOINT WORKS ISSUE

10   AND IT'S AN ACCOUNTING CASE, AS OPPOSED TO AN INFRINGEMENT           01:39

11   CASE -- MY QUESTION IS, WHY ARE THESE MOTIONS NOT MOOT?

12           MR. BERGMAN:  I TOTALLY AGREE WITH YOU, YOUR HONOR.

13   I WAS GOING TO RAISE THAT.  I DIDN'T WANT TO BE PRESUMPTUOUS,

14   BUT AS I READ YOUR HONOR'S DECISION OF JULY 27TH, ONE OF TWO

15   THINGS ARE THE CASE; EITHER THE SIEGEL SUBMISSIONS HAVE            01:39

16   SUFFICIENT COPYRIGHTABLE PROTECTABLE MATTER TO CONSTITUTE A

17   JOINT WORK, IN WHICH EVENT D.C., AS THE GRANTEE OF MR. SHUSTER,

18   WOULD BE A CO-OWNER OF THAT WORK AND, THEREFORE, COULD NOT

19   POSSIBLY INFRINGE THE WORK; OR MR. SIEGEL'S SUBMISSIONS DO NOT

20   HAVE SUFFICIENT COPYRIGHTABLE MATERIAL, IN WHICH EVENT THERE'S    01:40

21   NOTHING TO INFRINGE.

22           THE COURT:  OKAY.  SO YOU AGREE, FROM YOUR

23   PERSPECTIVE, THAT THAT WOULD RESOLVE THE INFRINGEMENT ISSUE?

24           MR. BERGMAN:  WE DO INDEED, YOUR HONOR.

25           THE COURT:  OKAY.                                          01:40

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1135**

5

1        SO THEN THE QUESTION BECOMES WHETHER OR NOT THOSE

2   WORKS DO HAVE SUCH SUFFICIENT ORIGINAL CREATIVE ASPECTS TO WHAT

3   THE SCRIPT -- IN PARTICULAR, WHETHER IT HAS SUFFICIENT CREATIVE

4   ASPECTS TO IT AS TO CONSTITUTE A COPYRIGHTABLE WORK.

5        **MR. BERGMAN:**  IN THAT RESPECT, YOUR HONOR, IF I MAY,      01:40

6   I'D LIKE TO HAVE MR. ZISSU ADDRESS THAT POINT.

7        **THE COURT:**  VERY WELL.

8        AND I'LL CERTAINLY BE GIVING THE PLAINTIFF A CHANCE

9   TO FULLY ADDRESS THESE ISSUES.  I'M NOT ASSUMING THAT YOU AGREE

10  WITH ANY OF THIS AT THIS POINT.                                  01:40

11       **MR. ZISSU:**  GOOD AFTERNOON, YOUR HONOR.

12       **THE COURT:**  GOOD AFTERNOON, COUNSEL.

13       I GUESS I FRAMED THE OPENING QUESTION TO YOU.

14       I GUESS I'M HARD-PRESSED TO EVEN CONTEMPLATE THE

15  CONTENTION THAT THE SCRIPT, AS IT WERE, IS COMPLETELY LACKING    01:41

16  IN ANY KIND OF CREATIVE ORIGINAL WORK.  I WOULD ASSUME THAT YOU

17  WOULD BE WILLING TO CONCEDE, AND PERHAPS I'M MISTAKEN, THAT

18  THERE IS SOME ELEMENT OF CREATIVE ORIGINAL WORK.  PERHAPS THERE

19  MIGHT BE A DEBATE ON THE SCOPE OF THAT AND HOW BROAD THAT IS,

20  BUT IS IT REALLY YOUR CONTENTION THAT THERE IS NOTHING THERE?    01:41

21       **MR. ZISSU:**  NO.

22       YOUR HONOR, THE SCRIPT, IN A PURELY -- IF THE

23  QUESTION IS PURELY IF IT ISN'T COPYRIGHTABLE, YES, IT'S

24  COPYRIGHTABLE.

25       THERE ARE MANY ASPECTS OF OUR ARGUMENT THAT GO TO NOT       01:41

SEPTEMBER 17, 2007              SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1136**

6

1  ONLY THE SCOPE OF WHAT'S PROTECTABLE, BUT THEN THE

2  ALL-IMPORTANT QUESTION OF WHO OWNS WHAT THE CONTRIBUTIONS ARE

3  THAT ARE PROTECTABLE, AND THE EXTENT OF THEM; SO WE AGREE WITH

4  YOUR HONOR ON THAT.

5          AND I MIGHT ADD THAT THE COPYRIGHTABILITY -- IF YOU        01:41

6  SENT THE SCRIPT TO THE COPYRIGHT OFFICE, THE QUESTION WOULD BE

7  PURELY, 'IS IT COPYRIGHTABLE?'  AND THEY WOULD RECEIVE IT, AND

8  THEY WOULD, IN MY VIEW, IN OUR VIEW, ISSUE A REGISTRATION.

9          THAT'S A DIFFERENT QUESTION FROM THE QUESTION YOUR

10  HONOR POSED, WHICH IS WHETHER, UNDER 103(B), THE EXTENT OF      01:42

11  OWNERSHIP IN THE NEW CONTRIBUTIONS VERSUS, REALLY, WHAT'S OWNED

12  IN THE ORIGINAL WORK, WHICH IS THE BASIS FOR THE DERIVATIVE

13  WORK.

14          SO WE THINK THE PLAINTIFFS REALLY HAVE ADDRESSED THE

15  WRONG QUESTION BY SAYING 'IS IT COPYRIGHTABLE?'              01:42

16          SURE, IT'S COPYRIGHTABLE.

17          THEN WE HAVE YOUR HONOR'S QUESTION, WHICH IS WHAT

18  103(B) REQUIRES.  AND WE'RE NOT STRICTLY SPEAKING IN THE

19  CONTEXT OF COPYRIGHTABILITY.  THE CONTEXT WE FIND OURSELVES IN

20  IS A LITIGATION, A DISPUTE, AND THERE ARE TWO ASPECTS OF THAT   01:43

21  DISPUTE.  THERE'S AN INFRINGEMENT CLAIM GOING ON, UNLESS IT'S

22  RENDERED MOOT.  BUT IN THAT CONTEXT, WE ARE IN THE CONTEXT OF

23  INFRINGEMENT; AND A CHALLENGE IS BEING MADE TO THE EXTENT OF

24  THE COPYRIGHT OWNERSHIP OF THE AUTHORS, OR THE CO-AUTHORS, OF

25  THE ORIGINAL WORK.  AND THAT, TOO, IS A DISPUTED CONTEXT,      01:43

SEPTEMBER 17, 2007              SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1137**

7

1   BECAUSE THERE'S A CHALLENGE AND THE DISPUTE AS TO THAT

2   COPYRIGHT OWNERSHIP.  SO IN THAT CONTEXT, WE'RE FORCED TO MOVE

3   AWAY FROM THE PURE QUESTION, 'IS IT COPYRIGHTABLE?'

4        IN ANSWERING THE QUESTIONS IN THEIR SUBMISSIONS, THE

5   PLAINTIFFS HAVE ANSWERED THE WRONG QUESTION, BECAUSE THEY'RE          01:43

6   REALLY ONLY GOING TO THE FIRST QUESTION, WHICH YOUR HONOR

7   ASKED, WHICH IS, WHERE DO WE START?  AND THEY SEEM TO THINK

8   FROM THAT THAT IT'S A VERY SIMPLE THING.

9        IF IT'S COPYRIGHTABLE, THEN THEY WANT TO REACH BACK

10  ON THE EXTENT OF THEIR OWNERSHIP AND WHAT'S BEEN NEWLY ADDED        01:44

11  AND REACH BACK AND SOMEHOW OWN THE UNDERLYING MATERIAL, WHICH

12  IS NOT NEWLY ADDED AND WHICH RESTS WITH THE AUTHORS, OR

13  CO-AUTHORS, OF THE ORIGINAL WORK.

14        **THE COURT:**  I UNDERSTAND THAT, AND I GUESS WHEN I

15  LOOK BACK THROUGH -- I THINK YOU REFER TO IT AS THE ORIGINAL        01:44

16  MATERIAL, PRESCRIPT MATERIAL, I'M REFERRED TO FRAMES, MOST

17  NOTABLY THE FRAME -- I'VE HAD SOME WONDERFUL BOOKS PROVIDED TO

18  ME HERE -- I GUESS THIS IS EXHIBIT 3 TO THE BERGMAN

19  DECLARATION, PAGE 9, WHERE I HAVE PROBABLY THE MOST DEVELOPED,

20  IF THAT'S THE RIGHT WORD TO USE, DEPICTION OF SUPERBOY IN THIS      01:44

21  KIND OF PRESCRIPT MATERIAL.

22        **MR. ZISSU:**  YES.

23        **THE COURT:**  AND ASSUMING ARGUENDO THAT THAT IS

24  CLEARLY NOT CAPTURED BY THE SCRIPT, THE QUESTION IS, HOW MUCH

25  OF THAT IS CAPTURED BY THE SCRIPT, OR HOW MUCH OF THE SCRIPT        01:45

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1138**

8

1  DOES IT CAPTURE AND HOW MUCH DOES IT NOT?  THAT'S WHAT I'M

2  HAVING TROUBLE DOING, IS TRYING TO FIGURE OUT HOW MUCH OF THE

3  THEME, HOW MUCH OF THE CONCEPT, HOW MUCH OF THE DIALOGUE, HOW

4  MUCH HAS ALREADY BEEN COPYRIGHTED BY THAT EARLIER WORK AND HOW

5  MUCH IS COPYRIGHTABLE NOW BY THIS SCRIPT?  BECAUSE I THINK IT          01:45

6  IS PRETTY CLEAR THAT IT IS COPYRIGHTABLE.

7        THE QUESTION IS, WHAT DOES IT ADD?  WHAT IS SEPARATE

8  AND APART FROM WHAT WAS PREVIOUSLY DONE?  AND THAT'S NOT CLEAR.

9        **MR. ZISSU:**  IT'S NEVER GOING TO BE 100 PERCENT CLEAR.

10  IT JUST IS NOT SUSCEPTIBLE TO THAT.                                  01:45

11        THE PROBLEM, IF YOU WILL, WITH THE SCRIPT IS, IT'S

12  PURELY LITERARY, SO IT HAS SOME ISSUES AS TO THE EXTENT TO

13  WHICH VERBALLY COPYRIGHT PROTECTION WOULD BE AFFORDED FOR

14  WHATEVER IS NEW.

15        **THE COURT:**  YOU GET A PRETTY GOOD SENSE OF WHAT IT'S        01:46

16  ABOUT FROM READING THE SCRIPT.

17        **MR. ZISSU:**  RIGHT.  BUT IT HAS TO BE -- AND I WAS

18  GOING TO GET TO THIS -- TO JUST SAY IT'S COPYRIGHTABLE IS THE

19  BEGINNING OF THE QUESTION.  JUST TO SAY IT'S COPYRIGHTABLE

20  DOESN'T REALLY TAKE US VERY FAR IN TERMS OF --                       01:46

21        **THE COURT:**  I UNDERSTAND.  I'M TRYING TO GET TO THAT

22  NEXT POINT.

23        **MR. ZISSU:**  THE PATRY TREATISE SAYS -- AND THIS IS,

24  WE THINK, THE WRONG APPROACH -- THAT ONE APPROACH IS TO SAY A

25  LIGHT IS TURNED ON -- IT'S LIKE A LIGHT SWITCH; IF THE LIGHT        01:46

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1139**

9

1    SWITCH IS ON, THEN SOMEHOW THE -- IF THERE'S SOMETHING

2    COPYRIGHTABLE, THE NEW MATTER INCLUDES EVERYTHING AND THE

3    DERIVATIVE WORK OWNER OWNS EVERYTHING.

4            BUT PATRY SAYS IT'S REALLY LIKE A DIMMER; THE DEGREES

5    OF WHAT'S ADDED THAT WOULD BE RECOGNIZED AS OWNED ARE GRADUALLY    01:46

6    INCREASED ACCORDING TO WHAT'S CREATIVE OR THE LIGHT THAT'S

7    BROUGHT TO THINGS.

8            THE COURT:  I AGREE WITH THAT.

9            MR. ZISSU:  OKAY.  SO WE'RE WORKING ON THE CONCEPTS.

10           THERE IS A CASE WE WOULD LIKE TO BRING TO YOUR    01:47

11   ATTENTION, YOUR HONOR, WHICH ADDS, I THINK, A LITTLE BIT

12   EXACTLY ON YOUR QUESTION, AND IT'S A CASE -- IT'S

13   JUDGE WILSON'S DECISION IN 2003, IN A CASE CALLED SOBHANI

14   AGAINST RADICAL, MEDIA INC., IN WHICH --

15           THE COURT:  WHAT'S THE CITE, COUNSEL?    01:47

16           MR. ZISSU:  I'M SORRY.

17           THE CITE IS 257 F. SUPP. 2D 1234, AT 1239-40.

18           THE COURT:  YOU MEAN F.3D, I PRESUME?

19           MR. ZISSU:  I'M SORRY.  FED SUPP.

20           THE COURT:  OH, FED SUPP.  I'M SORRY.  THANK YOU.    01:47

21           MR. ZISSU:  FED SUPP.

22           AND THIS REALLY SPEAKS TO THIS.  HE HAD A SIMILAR

23   QUESTION TO YOUR HONOR'S, AND HE SAID, "HOWEVER, THERE IS AN

24   IMPORTANT LIMITATION SUGGESTED BY BOTH AUTHORITIES AND IGNORED

25   ENTIRELY BY PLAINTIFF.  COPYRIGHT PROTECTION DOES NOT EXTEND TO    01:48

SEPTEMBER 17, 2007                SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1140**

10

1  DERIVATIVE WORKS IF THE PREEXISTING WORK TENDS TO PERVADE THE

2  ENTIRE DERIVATIVE WORK," AND HE CITES -- HE'S QUOTING FROM

3  NIMMER, AT SECTION 306.

4        THE COURT:  I THINK THAT'S VERY INSTRUCTIVE LANGUAGE,

5  LANGUAGE THAT I WOULD BE, PERHAPS, INCLINED TO ADOPT MYSELF.          01:48

6  BUT THAT GETS US THEN BACK TO THE QUESTION, HOW MUCH OF THIS

7  PERVADES THIS?

8        MR. ZISSU:  WE THINK, EXCEPT FOR AS WE ARGUED IN OUR

9  BRIEF, CERTAIN SEQUENCES, INCLUDING THE DIALOGUE AND THE

10 IN-HEIGHT VERBA TEXT, IS PRETTY LIMITED.  EVERYTHING ELSE IS         01:48

11 PERVADED BY THE PREEXISTING SUPERMAN WORKS, THE THEMES, BUT

12 MORE IMPORTANTLY, THE VISUAL DEPICTIONS SHOWING THE POWERS OF

13 SUPERMAN.

14       THE COURT:  YOU'RE TALKING ABOUT SUPERBOY HERE?

15       MR. ZISSU:  I AM.  BUT SUPERMAN THAT PERVADES -- THE           01:49

16 DESCRIPTIONS OF SUPERBOY IN THE SCRIPT ARE PERVADED BY;

17 DOMINATED BY; INFUSED, IF YOU WILL, BY THE SUPERMAN PREEXISTING

18 WORKS.  AND THAT'S THE ISSUE THAT THIS -- I'LL CALL IT A

19 PERVASION RULE APPLIES.

20       AND THE DIFFERENCE IN TYPES OF WORKS IS VERY                   01:49

21 IMPORTANT HERE.  IN ONE OF THE CASES YOUR HONOR CITES ON THE

22 JOINT WORK ISSUE, JUDGE POSNER'S DECISION IN GAIMAN AGAINST

23 MCFARLANE, HE MAKES THE DISTINCTION IN THAT CASE THAT THE

24 REASON HE VIEWS THE WORK DONE BY GAIMAN AS A PROTECTABLE WORK

25 AND AS A COPYRIGHTABLE CONTRIBUTION, PUTTING ASIDE THE HANDS-ON      01:49

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1141**

11

1   ISSUE, IS THAT IT'S BECAUSE IT'S DEPICTED VISUALLY.  HE DOES

2   NOT SAY, AS PLAINTIFFS ARGUE, THAT A STOCK CHARACTER -- YOU CAN

3   GET COPYRIGHT PROTECTION FOR A STOCK CHARACTER IN A LITERARY

4   WORK.  HE SAYS THE REASON IT BECAME PROTECTABLE IS IT WAS

5   MOVING FROM LITERARY TO DEPICTION SO THAT IT COULD BE                 01:50

6   CONCRETELY SHOWN.  SO THAT IS AT, I THINK, 661 AND 662 OF

7   JUDGE POSNER'S DECISION.  BUT IT'S A VERY GOOD DISCUSSION OF

8   THIS ISSUE.

9          THE PERVASION IS THE PROBLEM.  IT'S SUBSTANTIALLY

10  PERVADED.                                                            01:50

11         THE IDEA THAT THE PLAINTIFFS COULD, IN THIS CASE, OWN

12  THE THEMATIC INTERACTION BETWEEN THE PARENTS OF SUPERMAN, THE

13  KENTS, AND THE YOUNG MAN, OR THE BOY, REALLY -- AND OWN THAT

14  AND OWN THE THEME OF THE PARENTS TELLING THE BOY HE'S GOT TO

15  HIDE HIS POWERS SO THAT HE CAN USE THEM FOR HUMANITY -- THAT         01:51

16  SOMEHOW THAT'S SWEPT INTO WHAT CAN BE OWNED BY THE DERIVATIVE

17  WORK AUTHOR, IT DOESN'T MAKE ANY SENSE BECAUSE --

18         **THE COURT:**  BUT LET'S PUT THAT ASIDE.

19         LET'S SAY WE WERE TO PUT ASIDE THOSE TWO ELEMENTS,

20  BECAUSE ON THAT ONE FRAME, THAT'S EXACTLY WHAT IS DISCUSSED,         01:51

21  IS, 'YOU'VE GET TO HIDE YOUR SUPERPOWERS, OTHERWISE PEOPLE ARE

22  GOING TO MAKE FUN OF YOU OR HARASS YOU; AND WHEN YOU USE YOUR

23  POWERS, YOU'VE GOT TO USE THEM FOR THE BENEFIT OF HUMANITY.'

24         PUTTING ASIDE THOSE TWO ELEMENTS, THAT STILL LEAVES A

25  LOT OF DEVELOPMENT, CREATIVE DEVELOPMENT, MANIFESTED IN THE          01:53

SEPTEMBER 17, 2007              SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1142**

12

1   13-PAGE SCRIPT THAT IS NOT CAPTURED BY THOSE TWO COMPONENTS, IF

2   YOU WOULD, OF THE FRAME.

3          MR. ZISSU:  THAT'S JUST ONE.

4          WE WENT THROUGH -- WE SUBMITTED A CHART WHERE WE

5   SHOWED A LOT OF THE PREEXISTING MATERIAL AND WHERE IT ENDED UP          01:52

6   IN THE SCRIPT.

7          AFTER YOU FINISH THE FIRST FIVE OR SIX PAGES OF THE

8   SCRIPT, YOU START TO GET OUTSIDE OF THE THINGS THAT ARE

9   LITERALLY TAKEN, BUT THEY'RE STILL PERVADED BY SUPERMAN, THE

10  PREEXISTING SUPERMAN CHARACTER.  ALL THAT'S BEEN ADDED --              01:52

11  EXCEPT FOR THESE PARTICULAR SEQUENCES, LIKE THE HAUNTED HOUSE

12  EPISODE -- WHAT'S BEEN ADDED IS, "IT'S A BOY."  AND IRONICALLY,

13  WHAT THE PLAINTIFFS SAY IS NEW ABOUT THE SUPERBOY IS THAT THEY

14  ARE PRESENTING THE CHARACTER FULLY DEVELOPED.

15         WELL, FULLY DEVELOPED MEANS SUPERMAN.                           01:52

16         THE COURT:  WELL, FULLY DEVELOPED AS A BOY, AS

17  OPPOSED TO --

18         MR. ZISSU:  THEY SAY HIS POWERS ARE FULLY DEVELOPED.

19  THAT'S WHAT THEY SAY IS THE MOST IMPORTANT NOVELTY.  AND

20  NOVELTY, WE THINK, IS IRRELEVANT IN WHAT'S NEW, PUTTING THAT           01:53

21  ASIDE; SO YOU REALLY JUST HAVE -- IF YOU OR I SAT DOWN AND WE

22  SAID, 'I WANT TO PRESENT SUPERMAN AS A BOY,' WE WOULD COME UP

23  WITH DIFFERENT SCENARIOS.  WE MIGHT COME UP AS A BABY.  YOU'D

24  HAVE TO SHOW HIS INCREDIBLE STRENGTH AS A KINDERGARTNER; HIS

25  TOUGH SKIN; HIS IMPERVIOUSNESS TO A SPITBALL ATTACK.  YOU'D            01:53

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1143**

1   HAVE TO SHOW HIS STRENGTH.

2           THE COURT:  BUT YOU DON'T GET -- AS A COPYRIGHT

3   HOLDER, SUPERMAN AS A BOY, AND THEN THAT FREEZES THE FIELD.

4   THERE IS ROOM FOR CREATIVE DEVELOPMENT.

5           **MR. ZISSU:**  THERE IS.  BUT THE QUESTION IS, WHAT DO      01:53

6   WE FIND IN THE SCRIPT?  AND THERE ARE THREE OR FOUR OF THESE

7   KINDS OF SCENARIOS, WHICH, EXCEPT FOR THEIR LITERAL TEXT, ARE

8   SCENES A FAIRE.  AND SCENES A FAIRE ARE CONSIDERED IN THE

9   CONTEXT OF INFRINGEMENT.  THEY ARE CONSIDERED IN THE CONTEXT OF

10  THE 103(B) DISPUTE.  THERE IS A DISPUTE GOING ON.              01:54

11          COPYRIGHT OWNERSHIP OF THE OWNERS OF THE UNDERLYING

12  WORK, VERSUS THE DERIVATIVE WORK AUTHOR IS AT STAKE IN AN

13  ADVERSARY CONTEXT.  AND IT'S FOR THE PURPOSE OF MAKING AN

14  INFRINGEMENT CLAIM.  BECAUSE WHAT THE PLAINTIFFS ARE DOING

15  HERE, THEY'RE TRYING TO USE THE ALLEGED COPYRIGHT OWNERSHIP AND  01:54

16  WHAT THEY SAY THEY ADDED IN THE SCRIPT TO REACH BACK, SOMEHOW

17  OWN AND PREVENT THE OWNER OF THE UNDERLYING WORK FROM

18  CONTINUING TO EXPLOIT THAT WORK.

19          THAT'S EXACTLY THE DANGER THAT ENTERTAINMENT RESEARCH

20  TALKS ABOUT.  AND THAT DANGER EXISTS FOR TWO REASONS:  IT'S NOT  01:54

21  ONLY BECAUSE YOU DON'T WANT THE DERIVATIVE WORK AUTHOR TO END

22  UP DOING ANYTHING OR OWNING ANYTHING THAT WOULD UNDERMINE AND

23  ADVOCATE THE RIGHT OF THE COPYRIGHT OWNER OF THE ORIGINAL WORK.

24  THERE'S ANOTHER DIMENSION TO IT.

25          IF DERIVATIVE WORK OWNERSHIP COULD BE USED IN THAT       01:54

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1144**

14

1   WAY, IT WOULD VIOLATE THE CONSTITUTIONAL AND BASIC PRECEPT OF

2   COPYRIGHT LAW THAT COPYRIGHT PROTECTION IS LIMITED FOR LIMITED

3   TIMES, BECAUSE -- AND THIS IS WHAT JUDGE POSNER TALKS ABOUT,

4   ALSO, IN GAIMAN AND HE DOES IT IN ANOTHER CASE HE CITES IN

5   GAIMAN CALLED PRINCE AGAINST PICKETT.  A DERIVATIVE WORK AUTHOR   01:55

6   COULD COME ALONG AND SAY, WELL, I USED SOMETHING PREEXISTING,

7   BUT I'M AN OWNER AND IT'S A COPYRIGHT THAT I HAVE; AND THEN THE

8   COPYRIGHT PROTECTION COULD BE EXTENDED ON THAT BASIS.  SOMEBODY

9   COULD KEEP MAKING DERIVATIVES SO THAT THERE WOULD BE NEW

10  COPYRIGHT, AND THE NEW COPYRIGHT WOULD END UP EXTENDING INTO    01:55

11  WHAT IS UNDERLYING, FOR WHICH PROTECTION HAS TO EXPIRE AT SOME

12  POINT.

13        SO THIS IS NOT A THEORETICAL THING.  YOU'LL FIND

14  JUDGE POSNER DISCUSSING THAT.

15        THE COURT:  BUT THAT'S NOT WHAT WE HAVE HAPPENING    01:55

16  HERE.

17        MR. ZISSU:  WELL, WE DON'T HAVE THE DURATION PROBLEM,

18  BUT WE DO HAVE THE PROBLEM OF -- WHAT THE PLAINTIFFS ARE TRYING

19  TO DO IS TO TAKE WHATEVER LITTLE THEY ADDED, TO SWEEP INTO THAT

20  THE PREEXISTING MATERIAL THAT'S GIVING THEM SOME POSITION.  AND  01:56

21  THE REASON THEY'RE DOING THAT IS SO THAT WHEN THEY GET TO

22  MORE FUN COMICS NUMBER 101, THEN THEY CAN SAY IT'S SIMILAR.

23        THE COURT:  I UNDERSTAND.

24        LET ME HEAR FROM THE PLAINTIFFS HERE.

25        MR. ZISSU:  I'M SORRY?

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1145**

36

1    INFRINGEMENT, EVEN THOUGH THEY CLEARLY STOLE YOUR STORY OR

2    LYRIC.  THAT COULD NOT POSSIBLY BE THE RESULT THAT YOUR HONOR

3    IS LOOKING FOR.

4            THE COURT:  I UNDERSTAND YOUR ARGUMENT.

5            OKAY.  VERY GOOD.                                    02:28

6            I DO WANT TO MOVE ON TO THE SUPERMAN MOTION.  WE'VE

7    DEVOTED AN HOUR TO SUPERBOY.  LET'S MOVE ALONG HERE.

8            MR. BERGMAN:  YOUR HONOR, IF I MAY, JUST ONE SENTENCE

9    TO WRAP UP THE POINT, AND MR. TOBEROFF LED RIGHT INTO IT.

10            THE COURT:  YOU MAY.

11            MR. BERGMAN:  THE SCRIPT WAS EITHER PUBLISHED IN 101

12    OR IT WAS NOT.  IF IT WAS PUBLISHED IN 101, IT'S A JOINT WORK,

13    UNDER YOUR PRIOR RULING.  IF IT WASN'T PUBLISHED, IT CAN'T BE

14    TERMINATED.

15            IN EITHER EVENT, IT CAN'T BE THE SUBJECT OF AN        02:28

16    INFRINGEMENT.

17            THANK YOU.

18            THE COURT:  ON SUPERMAN, THERE'S A NUMBER OF ISSUES

19    RAISED, AND THE WAY I LAID THEM OUT IN MY NOTES WAS TO GO

20    THROUGH THEM IN CHRONOLOGICAL ORDER, STARTING WITH THE EARLIEST  02:29

21    ISSUES, NAMELY THE PROMOTIONAL ADVERTISEMENT, AND KIND OF

22    MOVING FORWARD.

23            I DON'T HAVE A LOT OF QUESTIONS ON A NUMBER OF THE

24    ISSUES.  I DO HAVE QUESTIONS ON SOME OF THEM.  WHAT I WOULD

25    LIKE TO DO IS GO THROUGH MY QUESTIONS FIRST, AND THEN I WILL    02:29

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1146**

129

1               CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

6

7    _____            9-21-07
     THERESA A. LANZA, CSR, RPR           _____
8    FEDERAL OFFICIAL COURT REPORTER            DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

**EXHIBIT 24**
**1147**

# EXHIBIT 25

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 122 of 343
Page ID #:17399
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 1 of 72

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA SIEGEL LARSON,

                Plaintiffs,

v.

WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS,

                Defendants.

CASE NO. CV-04-8400-SGL (RZx)

[Consolidated for pre-trial and discovery purposes with CV-04-8776-SGL (RZx)]

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

      The termination provisions contained in the Copyright Act of 1976 have aptly been characterized as formalistic and complex, such that authors, or their heirs, successfully terminating the grant to the copyright in their original work of authorship is a feat accomplished "against all odds." 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 7:52 (2007).

      In the present case, Joanne Siegel and Laura Siegel Larson, the widow and the daughter of Jerome Siegel, seek a declaration from the Court that they have overcome these odds and have successfully terminated the 1938 grant by Jerome Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's half of the copyright in the same. No small feat indeed. It requires traversing the

**EXHIBIT 25**
**1148**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 123 of 343
Page ID #:17400
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 2 of 72

many impediments — many requiring a detailed historical understanding both factually and legally of the events that occurred between the parties over the past seventy years — to achieving that goal and, just as importantly, reckoning with the limits of what can be gained through the termination of that grant.

Any discussion about the termination of the initial grant to the copyright in a work begins, as the Court does here, with the story of the creation of the work itself.

In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High School in Cleveland, Ohio. Siegel was an aspiring writer and Shuster an aspiring artist; what Siegel later did with his typewriter and Shuster with his pen would transform the comic book industry. The two met while working on their high school's newspaper where they discovered their shared passion for science fiction and comics, the beginning of a remarkable and fruitful relationship.

One of their first collaborations was publishing a mail-order fanzine titled "Science Fiction: The Advance Guard of Future Civilization."[1] In the January, 1933, issue, Siegel and Shuster's first superman character appeared in the short story "The Reign of the Superman," but in the form of a villain not a hero. The story told of a "mad scientist's experiment with a deprived man from the breadlines" that transformed "the man into a mental giant who then uses his new powers — the ability to read and control minds — to steal a fortune and attempt to dominate the world." (Decl. Michael Bergman, Ex. HH at 1126). This initial superman character in villain trappings was drawn by Shuster as a bald-headed mad man.

A couple of months later it occurred to Siegel that re-writing the character as a hero, bearing little resemblance to his villainous namesake, "might make a great comic strip character." (Decl. Michael Bergman, Ex. HH at 1126). Much of Siegel's desire to shift the role of his protagonist from villain to hero arose from Siegel's exposure to despair and hope: Despair created by the dark days of the Depression

---

[1] A fanzine is a publication, usually distributed at no or nominal cost, produced by fans of a particular topic (such as comic books, opera, murder mystery stories, etc.) for others who share their interest.

2

EXHIBIT 25
1149

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 124 of 343
Page ID #:17401
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 3 of 72

1 and hope through exposure to the "gallant, crusading heros" in popular literature

2 and the movies. (Decl. Michael Bergman, Ex. HH at 1126). The theme of hope

3 amidst despair struck the young Siegel as an apt subject for his comic strip:

4 "Superman was the answer — Superman aiding the downtrodden and oppressed."

5 (Decl. Michael Bergman, Ex. HH at 1126).

6        Thereafter, Siegel sat down to create a comic book version of his new

7 character. While he labored over the script, Shuster began the task of drawing the

8 panels visualizing that script. Titling it "The Superman," "[t]heir first rendition of the

9 man of steel was a hulking strongman who wore a T-shirt and pants rather than a

10 cape and tights." (Decl. Michael Bergman, Ex. HH at 1129). And he was not yet

11 able to hurdle skyscrapers, nor was he from a far away planet; instead, he was

12 simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or

13 Tarzan, who combated crime. Siegel and Shuster sent their material to a publisher

14 of comic books — Detective Dan — and were informed that it had been accepted

15 for publication. Their success, however, was short-lived; the publisher later

16 rescinded its offer to publish their submission. Crestfallen, Shuster threw into the

17 fireplace all the art for the story except the cover (reproduced below), which Siegel

18 rescued from the flames.

3

**EXHIBIT 25**
**1150**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 125 of 343
Page ID #:17402
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 4 of 72



Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip. The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by Detective Dan in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips — not comic books — were the most popular medium for comics. As one observer of the period has commented:

> It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day. The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format. When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips. The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

4

EXHIBIT 25
1151

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 126 of 343
Page ID #:17403
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 5 of 72

1  (Decl. Mark Evanier, Ex. A at 5-6).

2        On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming

3  over plot ideas for this new feature when an idea struck him: "I was up late counting

4  sheep and more and more ideas kept coming to me, and I wrote out several weeks

5  of syndicate script for the proposed newspaper strip.  When morning came, I

6  dashed over to Joe [Shuster]'s place and showed it to him." (Decl. Michael

7  Bergman, Ex. HH at 1129).  Siegel re-envisioned his character in more of the mythic

8  hero tradition of Hercules, righting wrongs in present-day society.  His inspiration

9  was to couple an exaggeration of the daring on-screen acrobatics performed by

10  such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make

11  such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John

12  Carter of Mars stories, and placing all of this within a storyline that was the reverse

13  of the formula used in the Flash Gordon serials.  The end product was of a

14  character who is sent as an infant to Earth aboard a space ship from an unnamed

15  distant planet (that had been destroyed by old age) who, upon becoming an adult,

16  uses his superhuman powers (gained from the fact that his alien heritage made him

17  millions of years more evolved than ordinary humans) to perform daring feats for the

18  public good.

19        Siegel named his character "Superman."  Unlike his previous incarnation,

20  Siegel's new Superman character's powers and abilities were much more

21  extraordinary and fantastic:  Superhuman strength; the ability to leap 1/8th of a mile,

22  hurdle a twenty-story building, and run faster than an express train; and nothing less

23  than a bursting shell could penetrate his skin.  Siegel placed his character in a very

24  cosmopolitan environment that had the look and feel of mid-thirties America.  He

25  also humanized his character by giving his superhero an "ordinary person" alter

26  ego:  Mild-mannered, big-city newspaper reporter Clark Kent.  Siegel developed

27  this concept of Superman's secret identity both as a means for his superhero to

28  maintain an inconspicuous position in everyday society and as a literary device to

5

EXHIBIT 25
1152

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 127 of 343
Page ID #:17404
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 6 of 72

1   introduce a conflict — and the potential for story lines centered around that conflict

2   — between the character's dual identities, a conflict played out no more

3   dramatically than in the love "triangle" between the character's dual identities and

4   another newspaper reporter, Lois Lane.

5           Shuster immediately turned his attention to giving life and color to Siegel's

6   idea by drawing illustrations for the story.  Shuster conceived of the costume for

7   Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S"

8   emblazoned on an inverted triangular crest on his chest, and boots as footwear.  In

9   contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed

10  glasses, combed black hair, and sporting a fedora.  He drew Superman and his

11  alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive

12  curl over his forehead, and endowed him with a lean, muscular physique.  Clark

13  Kent hid most of these physical attributes behind his wardrobe, which he could

14  quickly doff revealing his Superman costume underneath when he was called to

15  action by someone in need of his superpowers.  One of the earliest of Shuster's

16  sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted

17  below:

18

19

20

21

22

23

24

25

26

27

28

6

EXHIBIT 25
1153

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 128 of 343
Page ID #:17405
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 7 of 72





The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. (Decl. Michael Bergman, Ex. H at 1). The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication. (Decl. Michael Bergman, Ex. H at 1). The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings. (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations: A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips. (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

7

EXHIBIT 25
1154

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 129 of 343
Page ID #:17406
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 8 of 72

2).

The two shopped the character for a number of years to numerous publishers but were unsuccessful. As Siegel later recalled: One publisher "expressed interest in Superman," but preferred that it be "published in comic book form where it would be seen in color" rather than "a black-and-white daily strip," a suggestion to which he and Shuster balked given their earlier experience with the comic book publisher of Detective Dan. (Decl. Michael Bergman, Ex. H at 2).

In the meantime, Siegel and Shuster penned other comic strips, most notably "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company. When Nicholson folded shop in 1937, Detective Comics acquired some of its comic strip properties, including "Slam Bradley" and "The Spy."

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics whereby they agreed to furnish some of these existing comic strips for the next two years, and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics,] and [that Detective Comics] shall be deemed the sole creator thereof . . . ." (Decl. Michael Bergman, Ex. A). The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given a sixty-day option to publish the material.

Soon thereafter Detective Comics decided to issue a new comic book magazine titled Action Comics and began seeking new material. Inquiry was made of many newspaper comic strip publishers, including McClure Newspaper Syndicate. Amongst the material submitted by McClure to Detective Comics was the previously rejected Siegel and Shuster Superman comic strip. Detective Comics soon became interested in publishing Siegel and Shuster's now well-traveled Superman material, but in an expanded thirteen-page comic book format, for release in its first volume of Action Comics.

8

EXHIBIT 25
1155

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 130 of 343
Page ID #:17407
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 9 of 72

1    On February 1, 1938, Detective Comics returned the existing Superman

2    newspaper comic strip material to Siegel and Shuster for revision and expansion

3    into a full-length, thirteen-page comic book production.  Detective Comics' desire to

4    place Superman in a comic book required that Siegel and Shuster reformat their

5    existing Superman newspaper material by re-cutting the strip into separate panels

6    and then re-pasting it into a comic book format.

7    An issue emerged due to Detective Comics' additional requirement that there

8    be eight panels per page in the comic book.  Siegel and Shuster's existing

9    Superman newspaper material did not have enough drawings to meet this format.

10    In response, portions of the thirteen-page comic went forward with fewer than eight

11    panels per page, and in the remaining pages Shuster either trimmed or split existing

12    panels to stay within the page size, or drew additional panels from the existing

13    dialogue to meet the eight-panel requirement.  As Shuster later recounted:

> The only thing I had to do to prepare Superman for
> comic book publication was to ink the last three weeks of
> daily strips which I had previously completely penciled in
> detail.  In addition, I inked the lettering and the dialogue
> and story continuity and inked in the balloons containing
> the dialogue.  Certain panels I trimmed to conform to
> Detective's page size.  I drew several additional pictures
> to illustrate the story continuity and these appear on
> page 1 of the first Superman release.  This was done so
> that we would be certain of having a sufficient number of
> panels to make a thirteen page release.  Finally, I drew
> the last panel appearing on the thirteenth page.
> Detective's only concern was that there would be panels
> sufficient for thirteen complete pages.  Jerry told me that
> Detective preferred having eight panels per page but in
> our judgment this would hurt the property.  I specifically
> refer to the very large panel appearing on what would be
> page 9 of the thirteen page release.  We did not want to
> alter this because of its dramatic effect.  Accordingly, on
> this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2).  Siegel similarly recollected:

> Upon receiving word from Detective that we could
> proceed, Joe Shuster, under my supervision, inked the
> illustrations, lettering and dialogue balloons in the three
> weeks of daily strips that had been previously penciled.
> In addition, he trimmed certain pictures to meet
> Detective's panel specifications and extended others.
> To assure ourselves of having the proper number of

9

**EXHIBIT 25**
**1156**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 131 of 343
Page ID #:17408
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 10 of 72

1

2

3

> panels we added several pictures to illustrate the story
> continuity, I had already written.  Added as well for this
> reason was the scientific explanation on page 1 of the
> release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

4

5

6

7

8

9

On or around February 16, 1938, the pair resubmitted the re-formatted

Superman material to Detective Comics.  Soon thereafter Detective Comics

informed Siegel that, as he had earlier suggested to them, one of the panels from

their Superman comic would be used as the template (albeit slightly altered from the

original) for the cover of the inaugural issue of Action Comics.  (Decl. Michael

Bergman, Ex. I).

10

11

12

13

14

15

16

17

On March 1, 1938, prior to the printing of the first issue of Action Comics,

Detective Comics wrote to Siegel, enclosing a check in the sum of $130,

representing the per-page rate for the thirteen-page Superman comic book release

and enclosing with it a written agreement for Siegel and Shuster's signatures.  The

agreement assigned to Detective Comics "all [the] good will attached . . . and

exclusive right[s]" to Superman "to have and hold forever."  (Decl. Michael

Bergman, Ex. F).  Siegel and Shuster executed and returned the written assignment

to Detective Comics.

18

19

20

21

22

23

24

25

26

27

28

This world-wide grant in ownership rights was later confirmed in a September

22, 1938, employment agreement in which Siegel and Shuster acknowledged that

Detective Comics was "the exclusive owner[]" of not only the other comic strips they

had penned for Nicholson (and continued to pen for Detective Comics), but

Superman as well; that they would continue to supply the artwork and storyline (or

in the parlance of the trade, the "continuity") for these comics at varying per-page

rates depending upon the comic in question for the next five years; that Detective

Comics had the "right to reasonably supervise the editorial matter" of those existing

comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing

the . . . characters or continuity thereof or in any wise similar" to these comics to a

third party; and that Detective Comics would have the right of first refusal (to be

EXHIBIT 25
1157

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 132 of 343
Page ID #:17409
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 11 of 72

1   exercised within a six-week period after the comic's submission) with respect to any

2   future comic creations by Siegel or Shuster.

3        Detective Comics announced the debut of its <u>Action Comics</u> series with full

4   page announcements in the issues of some of its existing publications.  Specifically,

5   in <u>More Fun Comics</u>, Vol. 31, with a cover date of May, 1938, Detective Comics

6   placed the following black-and-white promotional advertisement on the comic's

7   inside cover, which reproduced the cover of the soon-to-be published first issue of

8   <u>Action Comics</u>, albeit in a greatly reduced size:



25        Similarly, <u>Detective Comics</u>, Vol. 15, with a cover date of May, 1938, had a

26   full-page black-and-white promotional advertisement on the comic's inside cover

27   which contained within it a reproduction of the cover (again in a reduced scale) of

28   the soon-to-be published first issue of <u>Action Comics</u>:

EXHIBIT 25
1158

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 133 of 343
Page ID #:17410
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 12 of 72



To provide some context and contrast, the cover of the first issue of <u>Action Comics</u> is notable for its difference from the promotional advertisements both in its scale and its colorized format.

**EXHIBIT 25**
**1159**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 134 of 343
Page ID #:17411
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 13 of 72



Superman itself was published by Detective Comics on April 18, 1938, in

Action Comics, Vol. 1, which had a cover date of June, 1938. A full reproduction of

the original Superman comic contained in Action Comics, Vol. 1, is attached as an

addendum to this Order. See Attachment A to this Order. The Superman comic

became an instant success, and Superman's popularity continues to endure to this

day as his depiction has been transferred to varying media formats.

The Superman character has evolved in subsequent works since his initial

depiction in Action Comics, Vol. 1. These additional works have added decades of

new material to further define, update, and develop the character (such as his

origins, his relationships, and his powers and weaknesses) in an ongoing flow of

new exploits and supporting characters, resulting in the creation of an entire fictional

Superman "universe." For instance, absent from Action Comics, Vol. 1, was any

EXHIBIT 25
1160

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 135 of 343
Page ID #:17412
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 14 of 72

reference to some of the more famous story elements now associated with

Superman, such as the name of Superman's home planet "Krypton." Many of

Superman's powers that are among his most famous today did not appear in <u>Action</u>

<u>Comics</u>, Vol. 1, including his ability to fly (even through the vacuum of space); his

super-vision, which enables him to see through walls ("x-ray" vision) and across

great distances ("telescopic" vision); his super-hearing, which enables him to hear

conversations at great distances; and his "heat vision," the ability to aim rays of

extreme heat with his eyes. The "scientific" explanation for these powers was also

altered in ensuing comics, initially as owing to differences in gravity between Earth

and Superman's home planet (the latter being much larger in size than the former),

and later because Krypton orbited a red sun, and his exposure to the yellow rays of

Earth's sun somehow made his powers possible. In a similar Earth-Krypton

connection, it was later revealed that Superman's powers could be nullified by his

exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

Aside from the further delineation of Superman's powers and weaknesses,

many other elements from the Superman story were developed in subsequent

publications. Some of the most famous supporting characters associated with

Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and

Brainiac, were created long after <u>Action Comics</u>, Vol. 1, was published. Moreover,

certain elements contained in <u>Action Comics</u>, Vol. 1, were altered, even if slightly, in

later publications, most notably Superman's crest. In <u>Action Comics</u>, Vol. 1, the

crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the

middle, shown throughout the comic as solid yellow in most instances and as a red

"S" in two instances. Thereafter, the emblem changed, and today is a large yellow

five-sided shield, outlined in the color red, and bearing the letter "S" in the middle,

also in the color red.

The acclaim to which the release of <u>Action Comics</u>, Vo. 1, was greeted by

the viewing public quickly made Superman not only the iconic face for the comic

EXHIBIT 25
1161

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 136 of 343
Page ID #:17413
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 15 of 72

1   book industry but also a powerful super-salesman for his publisher. Detective

2   Comics oversaw the creation, development, and licensing of the Superman

3   character in a variety of media, including but not limited to radio, novels, live action

4   and animated motion pictures, television, live theatrical productions, merchandise

5   and theme parks. From such promotional activity, Detective Comics came to "own[]

6   dozens of federal trademark registrations for Superman related indicia, such as

7   certain key symbols across a broad array of goods and services." (Decl. Paul Levitz

8   ¶ 10). The most notable of these marks that are placed on various items of

9   merchandise are "Superman's characteristic outfit, comprised of a full length blue

10  leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key

11  identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a

12  plane! . . . It's Superman!" (Decl. Paul Levitz ¶ 10).

13      Meanwhile, Siegel continued to submit other comic book characters to

14  Detective Comics that were also published. Sometimes these submissions were

15  without Shuster serving as an illustrator and sometimes, such as in the case of

16  Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.

17  Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.

18  Among these subsequent creations was "The Spectre," a comic written by Siegel

19  and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'

20  More Fun Comics, Vol. 52. The comic told the story about a superhero with a

21  supernatural bent — the character being the spirit of a police officer killed in the line

22  of duty while investigating a gangland overlord and who, after meeting a higher

23  force in the hereafter, is sent back to Earth with nearly limitless abilities but offered

24  eternal rest only when he has wiped out all crime.

25      With Superman's growing popularity, a growing rift developed between the

26  parties. Siegel and Shuster believed that Detective Comics' poached the artists

27  apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-

28  house to its New York offices, and further believed that Detective Comics had not

**EXHIBIT 25**
**1162**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 137 of 343
                                        Page ID #:17414
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 16 of 72

1    paid them their fair share of profits generated from the exploitation of their

2    Superman creation and from the profits generated from copycat characters that

3    they believed had their roots in the original Superman character. As a result, in

4    1947, Siegel and Shuster brought an action against Detective Comics' successor in

5    interest in New York Supreme Court, Westchester County, seeking, among other

6    things, to annul and rescind their previous agreements with Detective Comics

7    assigning their ownership rights in Superman as void for lack of mutuality and

8    consideration.

9         After a trial, official referee J. Addison Young issued detailed findings of fact

10   and conclusions of law wherein he found that the March 1, 1938, assignment of the

11   Superman copyright to Detective Comics was valid and supported by valuable

12   consideration and that, therefore, Detective Comics was the exclusive owner of "all"

13   the rights to Superman. The parties eventually settled the Westchester action and

14   signed a stipulation on May 19, 1948, whereby in exchange for the payment of over

15   $94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding

16   that Detective Comics owned all rights to Superman. Two days later, the official

17   referee entered a final consent judgment vacating his earlier findings of fact and

18   conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

19        The feud between the parties did not end after the Westchester action. In

20   the mid-1960s, the simmering dispute boiled anew when the expiration of the initial

21   copyright term for Superman led to another round of litigation over ownership to the

22   copyright's renewal term.[2] In 1969, Siegel and Shuster filed suit in federal district

23   court in New York seeking a declaration that they, not Detective Comics' successor

24   _____

25        [2] Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at
26   the time of Siegel and Shuster's creation of Superman and later assignment of
     rights in the same to Detective Comics, an author was entitled to a copyright in his
27   work for twenty-eight years from the date of its publication. See 17 U.S.C. § 24,
     repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq. Upon the expiration of
28   this initial twenty-eight year term, the author could renew the copyright for a
     second twenty-eight year period (the "renewal term").

**EXHIBIT 25**

**1163**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 138 of 343
Page ID #:17415
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 17 of 72

1    (National Periodical Publications, Inc.), were the owners of the renewal rights to the

2    Superman copyright. See Siegel v. National Periodical Publications, Inc., 364

3    F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974). The end

4    result of the litigation was that, in conformity with United States Supreme Court

5    precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S.

6    643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1,

7    1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation),

8    Siegel and Shuster had assigned not only Superman's initial copyright term but the

9    renewal term as well, even though those renewal rights had yet to vest when the

10   grant (and later the stipulation) was made.

11         After the conclusion of the 1970s Superman litigation, the New York Times

12   "ran a story about how the two creators of Superman were living in near destitute

13   conditions":

14              Two 61-year-old men, nearly destitute and worried about
               how they will support themselves in their old age, are
15             invoking the spirit of Superman for help. Joseph Shuster,
               who sits amidst his threadbare furniture in Queens, and
16             Jerry Siegel, who waits in his cramped apartment in Los
               Angeles, share the hope that they each will get pensions
17             from the Man of Steel.

18   Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y.

19   TIMES, Nov. 22, 1975, at 62.

20         Apparently in response to the bad publicity associated with this and similar

21   articles, the parties thereafter entered into a further agreement, dated December

22   23, 1975. See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-

23   president of Warner Communications, Inc.,] said, 'but I sure feel that there is a

24   moral obligation on our part'"). In the agreement, Siegel and Shuster re-

25   acknowledged the Second Circuit's decision that "all right, title and interest in"

26   Superman ("including any and all renewals and extensions of . . . such rights")

27   resided exclusively with DC Comics and its corporate affiliates and, in return, DC

28   Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

EXHIBIT 25
1164

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 139 of 343
Page ID #:17416
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 18 of 72

1    Siegel and Shuster with modest annual payments for the remainder of their lives;

2    provided them medical insurance under the plan for its employees; and credited

3    them as the "creators of Superman." In tendering this payment, Warner

4    Communications, Inc. specifically stated that it had no legal obligation to do so, but

5    that it did so solely "in consideration" of the pair's "past services . . . and in view of

6    [their] present circumstances," emphasizing that the payments were "voluntary."

7    The 1975 agreement also made certain provisions for Siegel's spouse Joanne,

8    providing her with certain monthly payments "for the balance of her life if Siegel"

9    died before December 31, 1985. Finally, Warner Communications, Inc. noted that

10    its obligation to make such voluntary payments would cease if either Siegel or

11    Shuster (or their representatives) sued "asserting any right, title or interest in the

12    'Superman' . . . copyright." As the years went by Warner Communications, Inc.

13    increased the amount of the annual payments, and on at least two occasions paid

14    the pair special bonuses.

15        As the time grew nearer to the December 31, 1985, cutoff date for surviving

16    spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her

17    "terrible worry" over the company's refusal to provide Jerome Siegel life insurance

18    in the 1975 agreement. (Decl. Michael Bergman, Ex. NN). She voiced her concern

19    that, should anything happen to her husband after the cutoff date, she and their

20    daughter "would be left without any measure of [financial] security." (Decl. Michael

21    Bergman, Ex. NN). The parties thereafter agreed by letter dated March 15, 1982,

22    that Warner would pay Joanne Siegel the same benefits it had been paying her

23    husband if he predeceased her, regardless of the time of his death. (Decl. Michael

24    Bergman, Ex. OO). Jerome Siegel died on January 28, 1996, and Joanne Siegel

25    has been receiving these voluntary survival spouse benefits since that time.

26        In the meantime, changes in the law resurrected legal questions as to the

27    ownership rights the parties had to the Superman copyright. With the passage of

28    the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

**EXHIBIT 25**
**1165**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 140 of 343
Page ID #:17417
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 19 of 72

1    concerning artists' transfers of the copyrights in their creations.  First, the 1976 Act

2    expanded by nineteen years the duration of the renewal period for works, like the

3    initial release of Superman in Action Comics, Vol. 1, that were already in their

4    renewal term at the time of the Act's passage.  See 17 U.S.C. § 304(b).

5        Second, and importantly for this case, the 1976 Act gave artists and their

6    heirs the ability to terminate any prior grants of the rights to their creations that were

7    executed before January 1, 1978, regardless of the terms contained in such

8    assignments, e.g., a contractual provision that all the rights (the initial and renewal)

9    belonged exclusively to the publisher.  Specifically, section 304(c) to the 1976 Act

10   provides that, "[i]n the case of any copyright subsisting in either its first or renewal

11   term on January 1, 1978, other than a copyright in a work made for hire, the

12   exclusive or nonexclusive grant of a transfer or license of the renewal copyright or

13   any right under it, executed before January 1, 1978, . . . is subject to termination . . .

14   notwithstanding any agreement to the contrary . . . ."

15       It is this right of termination that Joanne Siegel and Laura Siegel Larson now

16   seek to vindicate in this case.[3]  In pursuing such a claim, the two heirs, initially

17   sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

18   _____

19       [3]  Although the present case only concerns the Siegel heirs' efforts to
     terminate the 1938 grant, it has come to the Court's attention that the estate of
20   Superman co-creator Joseph Shuster has recently filed termination notices to
     reclaim the rights to the Superman copyright.  According to documents filed with
21   the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister
     and the court-appointed representative of the Shuster estate, has given notice of
22   the estate's intent to terminate the 1938 grant of the Superman copyright to
     Detective Comics and its successors effective 2013.  As executor of the Shuster
23   estate, Peary is entitled, under changes made to the 1976 termination provisions
     by the 1998 Sonny Bono Copyright Term Extension Act, to make the same
24   termination claims for the Superman copyright that Shuster or his heirs would have
     been entitled to bring beforehand.  See 17 U.S.C. § 304(c)(2); 3 NIMMER ON
25   COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was
     originally passed if an author died without leaving heirs before exercising the right
26   to termination "the result was that no one could exercise [that] right," but this
     "harsh result" was "ameliorated" through the passage of the 1998 Act by providing
27   that, "instead of lapsing," the termination right could be exercised by "the author's
     executor, administrator, personal representative, or trustee").
28

EXHIBIT 25
1166

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 141 of 343
Page ID #:17418
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 20 of 72

1   Levine, in compiling the information necessary to draft the termination notice itself.[4]

2       On April 3, 1997, the two heirs served seven separate notices of termination

3   under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's

4   potential grant(s) in the Superman copyright to defendants, including the March 1,

5   1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975,

6   agreement.  The termination notices also specified that they covered hundreds of

7   works, with the added proviso that the intent was for the termination notice to apply

8   "to each and every work . . . that includes or embodies" Superman, and the failure

9   to list any such work in the notice was "unintentional and involuntary."  Each of the

10  termination notices had an effective date of April 16, 1999.  A flurry of settlement

11  discussions between the parties quickly ensued, but just as quickly fizzled out.

12  Nearly two years then passed without much discussion between the parties.

13      The day before the purported termination was to take effect, defendants sent

14  a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the

15  termination notices.  (Decl. Marc Toberoff, Ex. Q at 171).  The same day DC

16  Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel

17  that his company would "continue to provide the income and insurance benefits you

18  . . . have been receiving under the 1975 agreement, without prejudice to [the

19  company's] rights under that agreement, as long as we all continue to pursue the

20  goal of working together."  (Decl. Michael Bergman, Ex. P).

21      Not long after the termination notices' effective date passed, the Siegel heirs

22  retained new counsel and the parties re-entered into settlement discussions to

23  resolve their respective claims to the Superman copyright.  Towards that end, DC

24  Comics (and its "successors, past and present subsidiaries or affiliates") and the

25  Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed

26  that neither would "assert any statute of limitations . . . defense[] relating to . . . the

27  _____

28      [4]  Before going into private practice, Mr. Levine served as General Counsel
    for the United States Copyright Office and also as Executive Director for the
    National Commission on New Technological Uses of Copyright Works.

20

EXHIBIT 25
1167

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 142 of 343
Page ID #:17419
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 21 of 72

1   [Termination] Notices" based on "the passage of time during the period from the

2   date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7

3   hereof (the 'Tolling Period')" while the parties attempted "to find an amicable

4   resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex.

5   A at 1). The agreement further provided that the tolling period would remain in

6   effect "until 10 business days after the earlier of: (a) one of the parties terminating

7   negotiations, in writing, relating to the [Termination] Notices, or (b) the parties

8   reaching an amicable resolution of the disputes between them relating to the

9   Notices." (Reply Decl. Marc Toberoff, Ex. A at 2).

10       At some point the broad outline of a global settlement concerning the

11   copyright to the Superman material, as well as to other works Siegel either authored

12   or contributed material to Detective Comics (notably, Superboy and The Spectre

13   properties), was reached. Specifically, on October 19, 2001, counsel for Joanne

14   Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General

15   Counsel confirming and summarizing the substance of the settlement. The letter

16   concluded that "if there is any aspect of the above that is somehow misstated,

17   please let me know by [October 22, 2001] at 2:00, as I will be out of the office —

18   and likely difficult to reach — for the following four weeks." (Decl. Marc Toberoff,

19   Ex. BB).

20       A week later, on October 26, 2001, Warner Bros' General Counsel John

21   Shulman responded with a letter, stating that he had "reviewed" the summary set

22   forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of

23   what we believe the deal we've agreed to is"; the outline was five pages long.

24   (Decl. Marc Toberoff, Ex. CC). The letter concluded that Warner Bros. was

25   "working on the draft agreement" so as to "have this super-matter transaction in

26   document form." (Decl. Marc Toberoff, Ex. CC).

27       A few months later, on February 1, 2002, outside counsel for Warner Bros.

28   provided a copy of the promised draft agreement (spanning fifty-six pages), with the

EXHIBIT 25
1168

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 143 of 343
Page ID #:17420
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 22 of 72

proviso that, "[a]s our clients have not seen this latest version of the agreement, I must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was also made in the draft agreement for the need of certain "Stand Alone Assignments" that had as yet not been finalized, something which Warner's outside counsel promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time Warner's Chief Operating Officer Richard Parsons, recounting that she and her daughter had "made painful concessions and reluctantly accepted John Shulman's last [settlement] proposal [in October, 2001]," but upon reading the proposed draft agreement learned that they had been "stabbed in the back," as it "contained new, outrageous demands that were not in the [October, 2001] proposal," such as "condition[ing] recei[pt of] financial compensation for our rights on demands which were not in the proposal we accepted." (Decl. Michael Bergman, Ex. Z). The letter concluded that "[a]fter four years we have no deal and this contract makes an agreement impossible." (Decl. Michael Bergman, Ex. Z).

Time Warner's CEO quickly responded with a letter of his own on May 21, 2002, expressing shock and dismay as "each of the major points covered in the draft agreement . . . accurately represented the agreement previously reached" by the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by acknowledging that, as with all lengthy negotiations, Time Warner "expected" that the submission of the draft agreement would result in further "comments and questions on the draft" by Siegel family's representatives that "would need to [be] resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming Time Warner's continued interest "that this agreement can be closed based upon the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman, Ex. AA).

Not long thereafter, the Siegel heirs' lawyers submitted for the family's review and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

EXHIBIT 25
1169

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 144 of 343
Page ID #:17421
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 23 of 72

1   (Decl. Marc Toberoff, Ex. AA).  The Siegel heirs, on September 21, 2002, rejected

2   the redraft and fired their attorneys.  (Decl. Marc Toberoff, Ex. AA).  That same day

3   Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General

4   Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing]

5   negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of

6   its representatives and associates concerning" their rights to, among other things,

7   Superman.  (Decl. Michael Bergman, Ex. DD).

8        Joanne Siegel and Laura Siegel Larson thereafter filed the present action,

9   with the assistance of new counsel, Marc Toberoff, on October 8, 2004.  Both sides

10  have since filed cross-motions for partial summary judgment.

11       Reduced to their essentials, the legal questions at stake in the parties' cross-

12  motions are two-fold:

13       (1) The validity and enforceability of the termination notices in light of

14  (a) whether any copyrightable Superman material contained in the promotional

15  advertisements for Action Comics, Vol. 1, lies outside the reach of the termination

16  notice (and hence, the termination notice is not enforceable against it);  (b) whether

17  certain portions of the Superman comic in Action Comics, Vol. 1, are in the nature of

18  a work for hire (and hence, not subject to termination); (c) whether the failure to list

19  the 1948 consent judgment in the notices as one of the grants sought to be

20  terminated materially affects the notices of termination; (d) whether the post-

21  termination receipt of benefits under the 1975 agreement acts as a novation to re-

22  grant the Superman copyright; (e) whether the statute of limitations ran out before

23  the instant action was instituted thereby forestalling this lawsuit; and (f) whether the

24  settlement negotiations that took place between the parties resulted in an

25  enforceable agreement disposing of the claims asserted in the present action; and,

26       (2) The parameters of what was recaptured (and the rights flowing therefrom)

27  through the termination notices, namely, (a) whether plaintiffs have a right to

28  defendants' post-termination foreign profits from the exploitation of the Superman

EXHIBIT 25
1170

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 145 of 343
Page ID #:17422
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 24 of 72

1    copyright; (b) whether plaintiffs are entitled to profits from any of the various

2    trademarks that defendants have procured since the grant in marketing Superman;

3    (c) whether plaintiffs are entitled to profits from the derivative works of the

4    Superman material published by Detective Comics and its successors in interest

5    prior to the termination notice's effective date; and (d) whether any recovery of

6    profits extends beyond those made through DC Comics' exploitation of the

7    Superman copyright to that of its corporate siblings and parent who are licensees to

8    that copyright's movie and television rights, be it based on an alter-ego theory or

9    other notion of equity.

10          I.       Validity and Enforceability of Termination Notices

11          The 1976 Act created a new right allowing authors and their heirs the ability

12   to terminate a prior grant to the copyright in their creations.  See 17 U.S.C.

13   § 304(c).  The 1976 Act also set forth specific steps concerning the timing and

14   contents of the notices that had to be served to effectuate the termination of a prior

15   grant.  One of the most important steps was placing a limit on the temporal reach

16   such a notice could have on what was subject to being recaptured.  Specifically, the

17   "[t]ermination of the grant may be effected at any time during a period of five years

18   beginning at the end of fifty-six years from the date copyright was originally

19   secured."  17 U.S.C. § 304(c)(3) (emphasis added).  Moreover, the notice is

20   required to be "served not less than two or more than ten years before" its effective

21   date.

22          Taken together, someone seeking to exercise the termination right must

23   specify the effective date of the termination, and that effective date must fall within a

24   set five-year window which is at least fifty-six years, but no more than sixty-one

25   years, from the date the copyright sought to be recaptured was originally secured,

26   and such termination notice must be served two to ten years before its effective

27   date.  The purpose of this time window for terminating pre-1978 grants was so that

28   the only rights to the copyright affected thereby were those to the 19-year extension

EXHIBIT 25
1171

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 146 of 343
Page ID #:17423
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 25 of 72

1    in the renewal term created by the 1976 Act, leaving undisturbed the grantee's

2    vested interest to the original 28-year renewal term as set forth in the 1909 Act, the

3    governing statute at the time the grant itself was made.

4         Additional procedures required to be followed to make the termination notice

5    effective were specified as well:  The author or his or her heirs had to serve "an

6    advance notice in writing upon the grantee or the grantee's successor in title"; the

7    notice had to be signed by the author or his or her heirs; the notice was required to

8    "state the effective date of the termination"; and the notice must be "recorded in the

9    Copyright Office before the effective date of termination." 17 U.S.C. § 304(c)(4).

10        Beyond these statutory requirements, the notice was also required to

11   "comply, in form, content, and manner of service, with [the] requirements that the

12   Register of Copyrights . . . prescribe[s] by regulation." 17 U.S.C. § 304(c)(4)(B).

13   Toward that end, the Register promulgated regulations implementing this statutory

14   proviso.  See 37 C.F.R. § 201.10.  Among those regulations was one requiring the

15   terminating party to identify in the notice "each work as to which the notice of

16   termination applies." 37 C.F.R. § 201.10(b)(1)(ii).

17        As one noted author has commented, "[i]t is difficult to overstate the

18   intricacies of these [termination] provisions, the result of which is that they are

19   barely used, no doubt the result desired by lobbyists for assignees."  William Patry,

20   Choice of Law and International Copyright, 48 AM. J. COMP. L. 383, 447 (2000);

21   see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir.

22   1982) (commenting that the steps necessary to make a termination effective

23   oftentimes create "difficult, technical questions").  Those intricate provisions

24   oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating

25   party to reclaim the full measure of the copyright in a work of authorship.  This case

26   is no different.

EXHIBIT 25
1172

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 147 of 343
Page ID #:17424
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 26 of 72

1.    <u>Promotional Announcements</u>

Plaintiffs gave notice that the effective date of the termination notices was April 16, 1999, meaning that, backdating from that date sixty-one years, the termination notices would leave unaffected (or better said, beyond their reach) any statutory copyright that had been secured in the Superman material before April 16, 1938. Defendants contend that the promotional announcements for <u>Action Comics</u>, Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the five-year effective window of plaintiffs' termination notices; therefore, they argue, any copyright material contained in those promotional announcements, notably the illustration of Superman on the cover of <u>Action Comics</u>, Vol. 1, is unaffected by the termination notices and remains theirs to exploit exclusively. As defendants frame it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of limitations[;] . . . if any work falls outside the five-year window established by the [termination] effective date, it <u>cannot</u> be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability." (Defs' Mot. Partial Summ. J. at 29). Thus, any work that was published with notice prior to April 16, 1938, <u>i.e.</u>, sixty-one years before the stated effective date, remains untouched by the termination notice.[5]

Plaintiffs do not dispute the legal consequence section 304(c)'s five-year window has in this case on the effective reach of their termination notices. As drafters of the notice, Siegel's heirs were given <u>carte blanche</u> in identifying the termination notices' effective date. Once they chose a date, certain consequences flowed therefrom, the most important of which is to cabin the five-year window

---

[5] Defendants also contend that the promotional advertisements are not effected by the termination notices because plaintiffs failed to list those works in their notices. As the Court finds that the promotional advertisements fall outside the five-year window during which those notices could effectively terminate the grant in the copyright contained in them, the Court will not pass on the consequences, if any, stemming from plaintiffs' additional failure to list those promotional announcements in their notices.

EXHIBIT 25
1173

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 148 of 343
Page ID #:17425
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 27 of 72

1    within which the notice can recapture any copyright secured in the material to which

2    the grant was directed.  A copyright in a work statutorily secured even just days

3    outside this five year window is beyond the effective reach of the termination notice,

4    in much the same way a tardily-filed renewal registration has been held to be

5    ineffective.  <u>Cf.</u> 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even

6    several days is fatal and that the purported renewal is void to rescue the subject

7    work from the public domain, whether filed after expiration of the one year or prior to

8    its initiation").  A leading treatise supports such a calculation and the consequences

9    flowing from it:

10           The appropriate dates for termination notices are
             measured from "the date copyright was originally
11           secured, or beginning on January 1, 1978, whichever is
             later."  In the case of pre-January 1, 1978 works,
12           "secured" means the actual date the work was first
             published with notice (or in the case of unpublished
13           works, the date of registration), e.g., April 15, 1970, not
             December 31, 1970.  Failure to pay attention to the
14           differences between the date the copyright was originally
             secured for purposes of section 304(c) termination of
15           transfer and section 305 expiration of term may lead to
             an untimely notice of termination.
16

17    2 PATRY ON COPYRIGHT § 7:43; <u>see also</u> 3 NIMMER ON COPYRIGHT § 11.05[B][1] at

18    11-40.11 ("Suppose that statutory copyright for a song were first secured on May

19    21, 1925.  Based on the statutory provision that termination may be effected

20    'beginning at the end of fifty-six years from the date copyright was originally

21    secured,' the first effective date for termination should be May 21, 1981"); 3 JAY

22    DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL

23    CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a

24    work was so published predates the current year by more than sixty-one years, then

25    the termination right [to that work] under section 304(c) has expired.  The statute

26    apparently requires calculation of all these termination periods from the exact date

27    of publication, rather than from the end of the publication year, as is appropriate for

28    determining copyright terms under the 1976 Act").

EXHIBIT 25
1174

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 149 of 343
Page ID #:17426
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 28 of 72

1    It is in this sense that one can say whether a termination notice is timely or

2    not, a question that does not go to the notice's validity (the notice remains valid with

3    respect to a copyright in works that was secured during the five year window) but as

4    to its enforceability against a copyright in a particular work pre- or post-dating that

5    window. Thus, the key in deciding this timeliness question begins with a

6    determination of when the copyright in the work in question was secured, and not

7    when the work itself was created.

8    The determination of when the copyright in a work is secured is when the

9    material was protected by statute, meaning when the copyright in such a work

10    secured protection under this country's copyright laws. Under the 1909 Act, "works

11    could have obtained statutory copyright . . . , without the necessity of registration,

12    simply by the act of publishing copies of the work bearing a proper copyright notice.

13    As to such works, registration did not create the copyright, but merely recorded it."

14    2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17

15    U.S.C. § 10 (repealed). Thus, the initial question is whether the comic books

16    containing the promotional announcements bore such a copyright notice upon

17    them.

18    Section 19 of the 1909 Act delineated what constituted proper notice: "The

19    notice of copyright required by section 10 of this title shall consist either of the word

20    'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of

21    the copyright proprietor, and if the work be a printed literary, musical, or dramatic

22    work, the notice shall include also the year in which the copyright was secured by

23    publication." If the comic books in question contained such a notice, then the date

24    of publication is also the date the copyright in the material contained therein was

25    secured. If not, then any of the copyrightable material in the works (including the

26    promotional announcements) was never secured (absent evidence that the material

27    had been registered beforehand with the Copyright Office when it was in an

28    unpublished state) but instead was injected into the public domain.

EXHIBIT 25
1175

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 150 of 343
Page ID #:17427
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 29 of 72

1    Here, the material submitted by defendants (the cover page for the magazine

2    and the page on which the promotional announcements is displayed) does contain

3    such a notice.  At the bottom of the promotional announcement itself is the

4    following:  "Entire contents copyright 1938 by Detective Comics, Inc."  (Decl.

5    Michael Bergman, Ex. C at 10 & Ex. D at 14).  Thus, the copyright for any of the

6    works contained in the comic books in question was secured on the date they were

7    published.

8    This leads to the next question:  What are the publication dates for the two

9    comic books that contained the promotional announcements for Action Comics,

10    Vol. 1, featuring an illustration of Superman?  Defendants have submitted the initial

11    copyright registrations for these comics, which indicate that More Fun Comics,

12    Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13    plaintiffs' termination notices, and that Detective Comics, Vol. 15, was published on

14    April 10, 1938, six days outside the temporal reach of the termination notices.

15    Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16    constituted prima facie evidence of the publication date for a work.[6]  See 17 U.S.C.

17

18    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

19    [6]  Defendants' suggestion that the addition of section 304(a)(4)(B) by the
Copyright Amendments Act of 1992 somehow extended this rule by extending the
prima facie imprimatur to renewals like those in this case is simply mistaken.
20    (Defs' Reply at 40 & n.16).  That section provides that, so long as the renewal
occurred "within 1 year before [the] expiration" of the initial term, then "the
21    certificate of such registration shall constitute prima facie evidence as to the . . .
the facts stated in the certificate."  However, the 1992 Act's provisions placed one
22    very important proviso on its applicability — its provisions applied only where a
party was filing a renewal registration to the "extended term of copyright in a work."
23    Thus, the amendments' provisions were limited to renewal claims to works that
were still in their initial term when the 1976 Act became effective, January 1, 1978,
24    meaning for copyrights whose first term of copyright was secured on or after
January 1, 1950.  That is to say, section 304(a)(4)(B)'s provisions only applies to
25    works that had yet reached the time for renewal before the 1976 Act extended the
term of the renewal period (unlike Superman in Action Comics, Vol. 1, or the
26    comics containing the promotional announcements).  For those works, the 1992
amendments allowed such renewal to be made at anytime, but provided incentives
27    for prompt renewal, the most notable being the extension of the prima facie rule to
such promptly filed renewal claims.  See 2 PATRY ON COPYRIGHT § 7:50 ("Effective

28

29

**EXHIBIT 25**
**1176**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 151 of 343
Page ID #:17428
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 30 of 72

1    § 209 (repealed) (providing that a "certificate of registration" issued by the Register

2    of Copyrights "shall be admitted in any court as prima facie evidence of the facts

3    stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d

4    737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the

5    reason that renewal certificates issued during the 1909 Act were not accorded

6    prima facie status was because of the "minimal attention" the Register of Copyrights

7    paid to the information contained therein; "[a]s long as original registration for a

8    work has been made, the Copyright Office accept[ed] it at face value").

9        Plaintiffs attempt to refute this prima facie evidence through expert testimony

10   and by legal argument.

11       As to the latter, plaintiffs seek to discredit the value of the initial copyright

12   registration for More Fun Comics, Vol. 31, because Detective Comics' successor

13   did not obtain that registration until nearly 28 years after its publication, on the eve

14   of the expiration of the initial copyright term.  The 1909 Act required that, once

15   copyright had been secured by publication with notice, "there shall be promptly

16   deposited" the required copies of the published work and the registration claim

17   itself.  17 U.S.C. § 13 (repealed).  Plaintiffs suggest that such a "late" initial

18   registration raises questions as to the trustworthiness of any of the information

19   contained in that registration.  (Pls' Opp. at 48-49).  Plaintiffs correctly point out that

20   Professor Nimmer in his treatise has commented that, "where there was a failure to

21   ─────────────────────

22   June 26, 1992, Congress abolished the requirements that works in their first term
     of copyright published or registered between 1964 and 1977 must be timely

23   renewed in order to enjoy the (now) 67-year renewal term.  Instead, these works
     are now automatically renewed for the full term of 75 years.  Copyrights whose

24   first term of copyright was secured between January 1, 1950, and December 31,
     1963, still had to have been renewed according to the requirements of the 1909

25   Act.  Failure to do so resulted in the work falling into the public domain. . . .
     Renewal claims may still be filed at any time during the renewal period, and a

26   number of incentives have been added to encourage filing.  [One such] incentive[]

27   for renewing provided in the Copyright Act of 1992 are the prima facie status that
     is accorded to the validity of the work").  Given that none of the comics in question

28   fall within the class affected by section 304(a)(4)(B), that section's expansion of
     the prima facie status to renewal claims does not apply here.

30

**EXHIBIT 25**

1177

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 152 of 343
Page ID #:17429
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 31 of 72

promptly register and deposit, under the 1909 Act, some questions as to the viability of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150. But Professor Nimmer's comments as to the collateral consequences flowing from such a delay were not geared toward the validity of the copyright itself, but to the existence of an impediment to bringing an action for infringement. See id. at 7-149 (noting that Supreme Court's Washingtonian decision effectively read the "words 'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . . requirement was (as it still is) clearly a condition precedent to the right to bring an infringement action").

Although the general line of reasoning plaintiffs seek to draw from such a "late-in-time" registration makes sense from a policy perspective, plaintiffs have cited no authority that such long delays in registration vitiates or otherwise diminishes the statutorily conferred prima facie presumption to which such registration claims (and the information contained therein) are entitled, especially once a registration has (as here) been tendered. Moreover, even were the Court to entertain plaintiffs' invitation, there remains the initial registration for the other comic book in question — Detective Comics, Vol. 15 — which was obtained shortly after that comic book's publication and, hence, the problem pressed by defendants with the promotional announcement contained therein falling outside the effective reach of the termination notice remains.

Plaintiffs next contend that the copies of the registration certificates submitted by defendants have not been authenticated by the declarant to whose declaration they are affixed, and hence, are not admissible as proof of the comic books' publication date. (Pls' Opp. at 48-49 ("the certificate is not properly authenticated, but is merely attached to the declaration of defendants' attorney, who appears to have no personal knowledge of it"). Such extrinsic evidence of authenticity by the declarant is unnecessary for these copyright registration

EXHIBIT 25
1178

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 153 of 343
Page ID #:17430
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 32 of 72

1   certificates. Under Federal Rule of Evidence 902(1), a "document bearing a seal

2   purporting to be that of the United States . . . or of a . . . department, officer, or

3   agency thereof," with "a signature purporting to be an attestation or execution," is

4   considered self-authenticated. Close inspection of the copyright registration

5   certificates submitted by defendants clearly reveals the seal issued by the United

6   States Copyright Office, signed by the Register of Copyrights, and bearing the

7   following legend: "[A]ttached are additional certificates for the [comics in question]

8   which were registered in accordance with provisions of the United States Copyright

9   Law." (Decl. James Weinberger, Ex. B & C). The requirements of Rule 902(1)

10  have been met, rendering the copies of the copyright registration certificates as self-

11  authenticated and, thus, admissible.

12          The obscure nature of these promotional announcements does not alter this

13  analysis. It is undoubtedly true that the existence of these announcements was not

14  widely recognized even by comic book aficionados. That, however, does not

15  change the effect their existence has vis-à-vis the termination notices' effective

16  reach. Once a termination effective date is chosen and listed in the notice, the five-

17  year time window is an unbendable rule with an inescapable effect, not subject to

18  harmless error analysis. See 37 C.F.R. § 201.10(e) (limiting application to

19  "[h]armless errors in a notice" that does not "materially affect the adequacy of the

20  information") (emphasis added). That good cause may have existed for failing to

21  structure the termination notices so as to sweep the announcements within its reach

22  does not obviate application of the rule itself.

23          The importance such promotional announcements may have on the reach of

24  a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr.

25  Levine, who drafted the termination notices in this case. He also drafted plaintiffs'

26  termination notice with respect to The Spectre copyright, and structured it in such a

27  way so as to include among the works affected by the notice's five-year window a

28  promotional announcement for The Spectre contained in a comic published a month

**EXHIBIT 25**
**1179**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 154 of 343
Page ID #:17431
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 33 of 72

before the one containing the first comic book story of the character. (Decl. Michael Bergman, Exs. WW-YY (termination notice describing among the works affected by the notice the promotional announcement as "Spectre character appearing in costume in an ad in issue No. 51 of More Fun Comics, copyrighted November 28, 1939, as Copyright Registration No. B437786, publication date January 1940") & Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

Having provided prima facie evidence of the comic books' publication dates, the burden shifts to the plaintiffs to produce some evidence calling into question those dates. The burden of production is not a heavy one (in large measure owing to the fact that so little is proffered by the applicant or scrutinized by the Copyright Office in the application process to procure the registration in the first instance), but it is one that must be met nonetheless. See 3 PATRY ON COPYRIGHT § 9:14 ("the Copyright Office has no ability to verify facts stated in the certificate, and not surprisingly makes no effort to do so. . . . At the most, the Office can take notice of any inconsistent facts that appear on the deposit copy and request clarification from the claimant . . . . In any event, [the opposing party] should be required to present only a small degree of evidence calling into question the fact at issue in order to rebut the certificate's presumption").

On that point all that plaintiffs have submitted is the opinion of a comic book historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among other things, assist it "in attempting to determine approximate dates of past publication" of its comics. (Decl. Mark Evaier ¶ 12). From this particular experience, as well as his long history in the comic book industry, Mr. Evanier seeks to cast doubt on the veracity of the asserted publication dates for the comics containing the promotional announcements. The general thrust of his expert opinion is that, outside the first printing of certain famous comic superheros such as Superman in Action Comics, Vol. 1, a particular "run of the mill" comic book's exact date of publication during the 1930s and 1940s is difficult to determine, rendering

33

EXHIBIT 25
1180

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 155 of 343
Page ID #:17432
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 34 of 72

1  the dates listed on the certificates as nothing more than "mere guesstimates" by the

2  publisher.  (Decl. Mark Evanier ¶ 10).  Furthermore, Mr. Evanier downplays the

3  significance of the fact that the comic books in question contained promotional

4  announcements for Action Comics, Vol. 1, as necessarily meaning that their

5  publication must have preceded Action Comics publication.  As Mr. Evanier

6  explains, the dates provided by publishers were often the dates initially scheduled

7  or intended for publication, but the actual dates often varied with printing, delivery,

8  and other delays.  (Decl. Mark Evanier ¶ 11).

9      Mr. Evanier's expert opinion is chalk full of information on the publication of

10  comic books in general during this time period, but is void of any specific evidence

11  or opinion as to the publication of the particular comic books in question in this

12  case.  He offers no evidence of any specific printing, delivery, or other problems that

13  may have affected the publication of More Fun Comics, Vol. 31, or Detective

14  Comics, Vol. 15.  His general opinion thus does not sufficiently refute the prima

15  facie evidence set forth in the initial copyright registration certificates for these

16  particular comic books.  At most, his opinion raises some doubts as to the precision

17  of the dates contained in initial copyright registrations for comic books in general

18  from this period.  However, those copyright notices were completed at a time which,

19  by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate

20  as possible in listing those dates and long before any incentive to provide

21  inaccurate dates by virtue of contemplating this present litigation or the termination

22  provisions of the 1976 Act existed.  Plaintiffs evidence does no more than inform the

23  Court that, despite efforts to be precise about publication dates for comic books

24  during this particular period, mistakes could be made; it is not at all probative on the

25  issue of whether mistakes were in fact made with respect to the information

26  contained in the particular registration certificates at issue in this case.  The Court

27  therefore finds that the promotional announcements containing an illustration of

28  Superman from the cover of Action Comics, Vol. 1, are outside the effective reach

34

EXHIBIT 25
1181

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 156 of 343
Page ID #:17433
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 35 of 72

1   of the termination notices.

2       Perhaps anticipating this finding, plaintiffs next seek to downplay the

3   significance of the promotional announcements themselves by arguing that, legally

4   and factually, little, if any, copyrightable Superman material is contained in those

5   announcements. Specifically, plaintiffs submit that Siegel and Shuster's material

6   was an indivisible joint work, and that the advertisements were a derivative work of

7   the authors' material. Thus, they claim that none of the Superman material

8   contained in the promotional announcements (namely, the cover artwork from

9   Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue

10   to exploit the same, regardless of the termination notice. As framed by plaintiffs:

11   "Defendants' entire argument is falsely premised on the erroneous assumption that

12   they can take the cover of Action Comics, No. 1, one of many illustrated panels in

13   Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted

14   joint work, and own a separate copyright in the illustration in the form of a mere 'in

15   house announcement' depicting a reduced image of the illustration. [Moreover,]

16   Detective's 'in-house announcements,' at best, are derivative works based on the

17   pre-existing cover and interior panel of Siegel and Shuster's pre-existing

18   'Superman' story." (Pls' Opp. at 44, 46).

19       This emphasis on the joint nature of Siegel and Shuster's Superman material

20   is rendered nugatory by the fact that Siegel and Shuster granted the copyright in

21   their material to Detective Comics on March 1, 1938, well before the promotional

22   advertisements were published by Detective Comics in April of that year. Thus, by

23   the time the promotional announcements were published, Siegel and Shuster's

24   Superman material was owned solely by Detective Comics to do with it as it saw fit,

25   whether it be as a full-length comic or as artwork in its advertising. That Siegel and

26   Shuster intended their work to be combined together and depicted as a unitary

27   whole is a separate and distinct question from whether, in later using some of

28   Shuster's artwork from that combined material it had acquired, Detective Comics

EXHIBIT 25
1182

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 157 of 343
Page ID #:17434
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 36 of 72

1   somehow unraveled the copyrightability in that portion of the work.  The manner of a

2   work's authorship is entirely separate from the way in which an assignee may

3   exploit that material once it has acquired exclusive ownership of the same and,

4   correspondingly, whether there were anything copyrightable in the work the

5   assignee subsequently published using only parts of that material.

6          In this respect it is important to remember that a joint work can consist of

7   either inseparable or interdependent parts, the latter example of which include "the

8   collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result

9   of the interdependent contributions of the collaborators, i.e., one person wrote the

10  lyrics and the other the music, either of which could on its own [stand] as an

11  independent work, but which, when combined, form a single[, separate]

12  'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6.  The original Superman

13  material was the product of the story and dialogue written by Siegel and the art work

14  drawn by Shuster; each on its own could have been a work in its own right subject

15  to copyright protection, but when merged together they formed a single new and

16  unified interdependent work.  See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111,

17  1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright

18  to [the same] (if a joint work) would be considered comprised of interdependent

19  parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and

20  color to those words").

21         At most, Detective Comics took a part of Shuster's independently

22  copyrightable art work out of the joint work and utilized it, in conjunction with other

23  material (namely, the advertising slogan), in a promotional announcement.  There is

24  no rule preventing a publisher or others from publishing portions or excerpts of

25  works, joint or otherwise, that it solely owns, and then seeking a separate copyright

26  in the same.  Indeed, the opposite is true — the holder of a copyright is expressly

27  entitled to prepare derivative works based upon a copyrighted work it owns or to

28  utilize portions of that work in other materials.  See 17 U.S.C. § 106(2); see

EXHIBIT 25
1183

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 158 of 343
Page ID #:17435
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 37 of 72

1  generally 17 U.S.C. § 1 (repealed). Detective Comics could just as well have

2  decided to split up the Superman material for publication into two or three

3  installments as it could (and did) decide to publish a portion of that material in an

4  advertisement to promote the comic.

5      This leads to plaintiffs' contention that the "derivative nature" of the

6  promotional advertisement itself works to exclude any of the copyright in the pre-

7  existing Superman material (notably, the art work for the Action Comics, Vol. 1

8  cover) contained therein from enuring to the benefit of the defendants to continue to

9  exploit. Generally, if an author contributes additional original material to a pre-

10 existing work so as to recast, transform, or adapt that work, then the copyright

11 protection afforded to the author of that derivative work extends only to that

12 additional material and in no way extends to the underlying, pre-existing material.

13 See 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not

14 extend to any part of that work using "preexisting material in which copyright

15 subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10. Thus, it is asserted that the

16 author of the pre-existing material work (here Siegel and Shuster) would continue to

17 retain ownership in the same despite its use in the derivative work (the promotional

18 announcement).

19      Even assuming that the changes made to the cover page for Action Comics,

20 Vol. 1, in the promotional announcements is not merely a reproduction, but

21 sufficiently "recast, transform, or adapts" the pre-existing material so as to be

22 considered a derivative work thereof (e.g, the cover is shown in black and white

23 instead of color, the scale of the artwork itself is diminished, and text is placed

24 alongside the artwork), there remains a complicating wrinkle. At the time the

25 promotional announcements were placed in Detective Comics' existing comic book

26 publications, the underlying pre-existing Superman material from which a portion of

27 the announcements were derived (again the artwork for the cover) had yet to be

28 published, and, hence, copyright in the same was protected at the time under state

EXHIBIT 25
1184

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 159 of 343
Page ID #:17436
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 38 of 72

1    common law. See 17 U.S.C. § 2 (repealed).

2    Given that the portion of the pre-existing material at issue had yet to achieve

3    statutory copyright protection when it was first published in More Fun Comics, Vol.

4    31, and Detective Comics, Vol. 15, it was injected into the public domain upon the

5    publication of the promotional announcements themselves, absent investiture of

6    statutory copyright protection through its publication. See 17 U.S.C. § 10

7    (repealed). That is to say, the copyright in the cover of Action Comics, Vol. 1, itself

8    first achieved statutory protection, if at all, upon its publication in the

9    announcements, not its later publication in Action Comics, Vol. 1. See 2 PATRY ON

10    COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work

11    copyright covers the unpublished material").

12    This fact has repercussions on plaintiffs' derivative works argument, as it

13    alters the general rule described above. Once Detective Comics published a

14    portion of the previously unpublished pre-existing material — as was its right as

15    owner of the material at that time — its continued protection resided exclusively

16    under statutory copyright in the derivative work itself lest that portion of the pre-

17    existing material (the art work for the cover) be injected into the public domain. See

18    Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th

19    Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished

20    material is included in an authorized published derivative work, the derivative work

21    publishes the previously unpublished material"). As Professor Nimmer explains:

22    Because a derivative work by definition to some extent
incorporates a copy of the pre-existing work, publication
23    of the former necessarily constitutes publication of the
copied portion of the latter. Of course, an article that
24    merely describes a pre-existing work but does not
incorporate any substantial portion of it is not a
25    derivative work and hence, does not publish the pre-
existing work. Unless the basic work is reproduced in
26    the published work, it is not published. If only the broad
outlines or other fragmentary portion of the pre-existing
27    work are copied and published in the derivative work,
then only to that extent is the pre-existing work
28    published.

38

EXHIBIT 25
1185

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 160 of 343
Page ID #:17437
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 39 of 72

1 NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

("any work published prior to January 1, 1978, was not only thereby divested of

common law copyright; it was also injected into the public domain, unless at the

moment of publication copies of the work bore a proper copyright notice").

Thus, included in defendants' right to continue to exploit the copyright in the

derivative work (the promotional announcements) is the right to the copyright in that

part of the pre-existing work (the illustration from the cover) that was published for

the first time in that derivative work.

The cases cited by plaintiffs as standing for the contrary are all

distinguishable, as either the act of publication in question fell within the "limited"

publication exception because the material was distributed for promotional purposes

to members in the trade and not, as here, the general public itself, see Rushton v.

Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

derivative work was itself in the public domain (unlike here where the underlying

material was in an unpublished state protected by common law copyright), thereby

mooting any question about divestiture of the underlying work through publication.

See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

Here, the promotional announcements represent the first time Superman

appeared to the public, and consequently, the first time any of Siegel and Shuster's

Superman material was protected by statutory copyright, albeit in conjunction with

the other material contained in the advertisement itself. Thus, all of the material in

the promotional announcement (which included the graphic depiction of Superman

later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

protection before the earliest possible date covered by the plaintiffs' termination

notices. The Court therefore finds that the publication date for at least one of the

comics containing the promotional announcements falls outside the reach of the

termination notice and, therefore, any copyrightable material contained therein

EXHIBIT 25
1186

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 161 of 343
Page ID #:17438
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 40 of 72

1   (including that found in the cover to Action Comics, Vol. 1, as depicted in those

2   announcements) remains for defendants to exploit.

3        This leads to the question of the scope of the copyrighted material remaining

4   in defendants' possession by way of the promotional announcements, a question

5   that defendants themselves acknowledge "is most obviously answered by [looking

6   at] the ads which speak for themselves" and that does not require some "special

7   'lens'" to resolve.  (Defs' Reply at 44).

8        The Court begins by observing what is not depicted in the announcements.

9   Obviously, nothing concerning the Superman storyline (that is, the literary elements

10  contained in Action Comics, Vol. 1) is on display in the ads; thus, Superman's

11  name, his alter ego, his compatriots, his origins, his mission to serve as a champion

12  of the oppressed, or his heroic abilities in general, do not remain within defendants

13  sole possession to exploit.  Instead the only copyrightable elements left arise from

14  the pictorial illustration in the announcements, which is fairly limited.

15       The person in question has great strength (he is after all holding aloft a car).

16  The person is wearing some type of costume, but significantly the colors, if any, for

17  the same are not represented, as the advertisement appears only in black and

18  white.  The argument that the "S" crest is recognizable in the promotional

19  advertisement is not persuasive.  What is depicted on  the chest of the costume is

20  so small and blurred as to not be readily recognizable, at best all that can be seen is

21  some vague marking or symbol its precise contours hard to decipher.  The Court

22  thus concludes that defendants may continue to exploit the image of a person with

23  extraordinary strength who wears a black and white leotard and cape.  What

24  remains of the Siegel and Shuster's Superman copyright that is still subject to

25  termination (and, of course, what defendants truly seek) is the entire storyline from

26  Action Comics, Vol. 1, Superman's distinctive blue leotard (complete with its

27  inverted triangular crest across the chest with a red "S" on a yellow background), a

28  red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

EXHIBIT 25
1187

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 162 of 343
Page ID #:17439
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 41 of 72

1    and run faster than a locomotive, none of which is apparent from the

2    announcement.

3          2.    Work Made for Hire Aspect of Portions of Action Comics, Vol. 1

4          Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5    prior grant in the copyright to a creation does not apply to a "work made for hire,"

6    because the copyright in such a creation was never the artist's to grant, belonging

7    instead to the one who employed the artist to create the work. See 17 U.S.C.

8    § 304(c); Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)

9    ("Once it is established that a work is made for hire, the hiring party is presumed to

10    be the author of the work").  The manner in which Siegel and Shuster's Superman

11    material was submitted, then re-submitted in a reformatted version, and finally

12    accepted for publication by Detective Comics raises questions about the work for

13    hire status of the re-formatted material (but not the initial material submitted to the

14    publisher) later published in Action Comics, Vol. 1.

15          Defendants argue that portions of the copyrightable material contained in

16    Action Comics, Vol. 1, are unaffected by the termination notice because those

17    portions belong exclusively to them as "works for hire," arguing that certain material

18    found in the comic book was created by Detective Comics' in-house employees, or

19    that the material was added to the underlying Superman material by Siegel and

20    Shuster at the publisher's direction. (Defs' Opp. at 27).  Specifically, the alleged

21    "additional" material provided by Detective Comics' in-house employees is the color

22    choices made throughout the comic, notably, the red color of the letter "S" on

23    Superman's crest and the art work for the cover to the magazine itself (albeit

24    modeled after a interior panel in the Superman comic illustrated by Shuster).

25    Similarly, the additional material supplied in response to the publisher's February 1,

26    1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27    "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28    the first Superman release" and "the last panel appearing on the thirteenth page."

EXHIBIT 25
1188

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 163 of 343
Page ID #:17440
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 42 of 72

(Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here. In that litigation, defendants' predecessors-in-interest presented much of the same evidence now submitted in this case to argue that this additional material transformed the <u>entirety</u> of Siegel and Shuster's pre-existing Superman material published in Action Comics, Vol. 1, into a work made for hire. The Second Circuit rejected this argument, elaborating: "In the case before us, Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the [comic book] strip was a work for hire." Siegel, 508 F.2d at 914. This conclusion forecloses any further litigation on the point of whether Shuster's additional drawings when reformatting the underlying Superman material into a comic book format or other facts related to such a theory such as the colorization process for Action Comics, Vol. 1, or the party responsible for the illustration of the cover to the magazine, rendered all or portions of the resulting comic book a work made for hire.

Defendants seek to avoid the collateral estoppel effect of the Second Circuit's decision by arguing that the only issue concerning the work for hire status of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions," and not what was "added to the first Superman story by Detective's employees," amongst whom defendants count Siegel and Shuster after they executed the December, 1937, contract. (Defs' Opp. at 36). Such a reading conflicts with the record. The evidence that was proffered during the 1970s litigation in the trial court on the work for hire question included declarations from Siegel and Shuster discussing what took place during the reformatting process. This is the same

42

EXHIBIT 25
1189

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 164 of 343
Page ID #:17441
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 43 of 72

1    evidence that defendants now seek to use in this case to argue that the reformatted

2    material was a work made for hire.

3          Moreover, the circumstances surrounding the reformatting of the underlying

4    Superman material was not only mentioned by the Second Circuit, but discounted

5    by that court in passing on the work for hire nature of <u>Action Comics</u>, Vol. 1, itself,

6    not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.

7    It would be incongruous for the Court, in respecting as it must the Second Circuit's

8    judgment, to now hold that, while that reformatted material did not transform the

9    entirety of the material in <u>Action Comics</u>, Vol. 1, into a work made for hire, some

10   subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)

11   was somehow excised out and should be accorded work made for hire status. The

12   litigation of the larger question sweeps within it defendants' opportunity to litigate a

13   subpart thereof.

14         A contrary holding would transgress certain core principles of collateral

15   estoppel: "A new contention is not necessarily a new issue. If a new legal theory or

16   factual assertion raised in the second action is relevant to the issues that were

17   litigated and adjudicated previously, the prior determination of the issue is

18   conclusive on the issue despite the fact that new evidence or argument relevant to

19   the issue was not in fact expressly pleaded, introduced into evidence, or otherwise

20   urged." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25

21   (3rd ed. 2007). Significantly, much of the evidence underlying defendants'

22   arguments was presented in the Second Circuit litigation (notably Siegel and

23   Shusters' declarations submitted in that litigation) or, if not, was certainly available

24   to be used in that case (the colorization process for the initial printing of

25   <u>Action Comics</u>, Vol. 1, or that in-house employees supposedly drew the cover to the

26   magazine). "A party may be precluded from re-litigating an issue if evidence

27   supporting the party's position on the issue could have been submitted in previous

28   litigation but, for whatever reason, was not properly raised. Evidence that is not the

43

EXHIBIT 25
1190

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 165 of 343
                                    Page ID #:17442
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 44 of 72

1    result of a different factual situation or changed circumstances, but is instead

2    historical in nature and could have been admitted at the first trial if properly

3    submitted, cannot be introduced in subsequent litigation of the same issue." Id. §

4    132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d

5    245, 257 (D.C. Cir. 1992)).

6        Nowhere have defendants explained why they did not bring up the question

7    of the colorization process for Action Comics, Vol. 1, or the cover art work for the

8    magazine, before the courts handling the 1970s Superman litigation. The question

9    about the legal effect the reformatting of the underlying Superman material had on

10   the work for hire question was litigated by the parties and resolved by the courts

11   during the 1970s Superman matter. Similarly, the question about the colorization

12   and cover art work (and who was responsible for the same) could have been raised

13   in conjunction with the work for hire question, but defendants failed or decided not

14   to do so. Having litigated the question and having the opportunity to present all the

15   evidence that pressed on the issue, defendants are now barred from seeking to

16   relitigate it anew even under the purported limited guise that it is now being offered.

17       Some noted treatise writers have commented that the Second Circuit's

18   analysis focusing on the work for hire nature of the additional reformatted material

19   should have been analyzed as a derivative work, that is, that the additional material

20   was derivative of the underlying Superman material. See 1 NIMMER ON COPYRIGHT

21   § 5.03[B] [1][b][I] at 5-33 n.92. ("The Siegel decision . . . may be understood as

22   holding that the first expression of the Superman character was the underlying

23   work, and the later development of the character was a derivative work. Because

24   only the derivative work was produced in a for-hire relationship, the underlying work

25   remains the property of the creators"). However, this analysis does not benefit

26   defendants.

27       First, no additional literary material was supplied in re-formatting the

28   underlying Superman material. All the dialogue and

                                        44

EXHIBIT 25
1191

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 166 of 343
Page ID #:17443
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 45 of 72

1  storyline contained in Action Comics, Vol. 1, was present before Detective Comics

2  requested the pair to provide a reformatted version of the material, and that literary

3  material remained unchanged through the reformatting process. All that is left was

4  supplying some additional illustrations by Shuster, the precise ones specified in his

5  declaration. From the Court's review of these additional illustrations, it appears that

6  the material is completely derivative of other panels in the Action Comics, Vol. 1,

7  comic, with its origins in the underlying Superman material. Thus, for instance,

8  while the final panel on page 13 shows Superman's crest with a red "S" on a yellow

9  background, so, too, does another panel containing the underlying, pre-existing

10  material. Similarly, while the panels on the first page to the comic show Superman

11  leaping skyscapers, running at high rates of speed, and demonstrating feats of

12  great strength, so, too, do other panels containing the pre-existing material. Indeed,

13  the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical

14  depiction of Superman was well on its way to being completely developed before

15  the re-formatted material in question was created some three years later. Thus,

16  even if the additional material in question was tendered as a derivative work that

17  was made for hire by Shuster, all the potentially copyrightable material contained

18  therein is completely derivative of the pre-existing material and, hence, is not

19  subject to independent copyright protection in the first instance. This, then, lends

20  strong support to the Second Circuit's observation: "Superman and his miraculous

21  powers were completely developed long before the employment relationship was

22  instituted." Siegel, 508 F.2d at 914.

23      Defendants also argue that the coloring for Action Comics, Vol. 1, was not

24  created or chosen by Siegel or Shuster, but was instead the product of some of

25  Detective Comics' in-house employees working in the printing department. Even if

26  this argument was not otherwise precluded by collateral estoppel, the evidence

27  produced in support is less than persuasive. According to "eye-witness" Jack Adler,

28  the material contained in comic books "at the time" was provided by artists to the

**EXHIBIT 25**
**1192**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 167 of 343
Page ID #:17444
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 46 of 72

1    Detective Comics' production staff in black and white. (Decl. Jack Adler ¶ 3).

2    "Typically," members of the staff then decided upon the color that would be applied

3    throughout the magazine, something that defendants argue is an additional element

4    added to the underlying Superman material that is itself subject to copyright

5    protection. (Decl. Jack Adler ¶ 3). Defendants' argument depends entirely upon

6    Mr. Adler's declaration, which is not as clear as they suggest.

7         Mr. Adler does not state that he worked on the colorizing of Action Comics,

8    Vol. 1, itself. Instead he states that he "worked for the engraving company that

9    made the metal plates for printing of, among other things, comic books for Detective

10   Comics." (Decl. Jack Adler ¶ 3). He then states that, "[a]t the time, comic book

11   artists . . . submitted drawn and inked comic book work in black and white." (Id.).

12   Mr. Adler further states that the black-and-white pages "were then photographed by

13   the engraver and a photo print was hand[-]colored by staff at Detective and by the

14   engravers." (Id.). Of course, nothing in this statement precludes the possibility that,

15   even if the Superman material was so submitted, Siegel and Shuster may have also

16   placed certain color directions with their material to be utilized in the engraving

17   process. In fact, that the earlier incarnation of Superman as hulking strongman in

18   the tradition of Tarzan was created by the pair as a comic book with color

19   illustrations lends to the possibility that they already had pre-conceived color

20   choices in mind for the later comic if it were later reformatted into a comic book,

21   rather than a newspaper comic strip.

22        Moreover, viewed in context, Mr. Adler's declaration appears to describe

23   procedures generally employed in the printing process, not as evidence of what

24   actually occurred with respect to the printing of Action Comics, Vol. 1, itself. His

25   statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value

26   in light of his candid admission that he has "no knowledge of Siegel and Shuster

27   selecting any of the color in Action Comics, No.1." (Id. ¶ 4). Mr. Adler attempts to

28   temper his admission of lack of knowledge by stating, without any basis, that he is

EXHIBIT 25
1193

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 168 of 343
Page ID #:17445
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 47 of 72

1  "aware that Detective staff member, Ed Eisenberg, selected the color for

2  Superman's 'S' in Shield on his costume." (Id.) Of course, Mr. Adler's statement on

3  this point is inadmissible as it is based on hearsay. Without any direct link between

4  Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists

5  an insufficient evidentiary foundation for his conclusions concerning the manner in

6  which the Superman material was supplied to the printer and the colorization of the

7  same was handled.

8      Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn

9  by Detective Comics' in-house artists. However, the scant evidentiary basis

10  provided in support of this argument is ambiguous. In a letter sent to Jerome Siegel

11  dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a

12  silverprint of the cover of Action Comics," with the observation that Detective

13  Comics "used one of those panel drawings of SUPERMAN, as you suggested in

14  your recent letter." (Decl. Michael Bergman, Ex. I). The inference sought to be

15  drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an

16  interior illustration from the Superman comic for the cover artwork he was stating

17  that one of the publisher's in-house artists saw the interior panel in question and

18  then drew the cover using the interior panel as inspiration. Of course, given the

19  limited nature of the information contained in the passage it could also be argued

20  that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion

21  for the comic book's cover and Detective Comics decided to "use" this suggestion.

22  This alternative reading is not implausible. As demonstrated by the pair's attempt to

23  have their earlier incarnation of Superman published by Detective Dan, Shuster had

24  in the past drawn exemplars for the cover illustration for his comics well before they

25  were ever accepted for publication.

26      In conclusion, the Court finds that the question of the work-for-hire nature of

27  certain portions of the Superman material published in Action Comics, Vol. 1, is

28  precluded from further litigation by operation of the 1974 Second Circuit decision.

EXHIBIT 25
1194

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 169 of 343
Page ID #:17446
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 48 of 72

1    Accordingly, the binding nature of that court's decision leads to the conclusion that

2    all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-

3    for-hire and therefore is subject to termination.

4         3.    Failure to Include 1948 Consent Judgment

5         Among the regulatory requirements promulgated by the Register of

6    Copyrights concerning the termination notice's "form, content, and manner of

7    service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must

8    "reasonably" identify "the grant" to which it applies. 37 C.F.R. § 201.10(b)(1)(iv).

9    Thus, if the author entered into five separate grants of rights for the same work, and

10   a notice of termination identifies only four of those grants, the fifth grant remains

11   "intact," and the grantee's rights thereunder remain unaffected. <u>See</u> 3 NIMMER ON

12   COPYRIGHT § 11.06[B] at 11–40.22(1) n.63 ("if a grant was not effectively terminated,

13   then the rights licensed under such grant remain").

14        Here, defendants argue that plaintiffs' failure to identify the 1948 consent

15   judgment from the Westchester action is fatal to their attempts to terminate their

16   grant to the copyright in Superman, as that consent judgment was among the

17   grants leading to the transfer of ownership from the artists to Detective Comics.

18   Such argumentation is predicated upon the notion that, notwithstanding the

19   plaintiffs' act of identifying the stipulation between the parties from the Westchester

20   litigation that resulted in the consent judgment, identification of the consent

21   judgment from the Westchester action itself as (or part of) a "grant" was necessary

22   because it constituted the final step in "effectuat[ing] the transfer to [Detective

23   Comics] of the sole and exclusive ownership of all rights relating to 'Superman'";

24   "without it the rights identified in the Stipulation would not have been transferred."

25   (Defs' Opp. at 39). The Court disagrees.

26        Although the 1976 Act nowhere defines the term "grant," the central question

27   raised is plainly one of transfer: Did Siegel and Shuster transfer any rights to

28   Superman through or in conjunction with the 1948 consent judgment? If so, then it

48

EXHIBIT 25
1195

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 170 of 343
Page ID #:17447
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 49 of 72

1    operated as a grant by the artists in the same.

2    On that point, the 1976 Act is helpful as it defines a "transfer of copyright

3    ownership" as "an assignment, mortgage, exclusive license, or any other

4    conveyance, alienation, or hypothecation of a copyright." 17 U.S.C. § 101; see

5    Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125

6    U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to

7    any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right

8    comprised in a copyright. [Thus, a] 'transfer' includes not only assignments (as

9    understood under the [1909] Act), but also exclusive licenses and any other

10   conveyance of copyright or of any exclusive right comprised in a copyright").

11   The consent judgment at issue did not effectuate any transfer of rights from

12   Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of

13   the Westchester action, such a transfer was effectuated by the execution of the

14   earlier stipulated agreement of the parties, not a document created two days later

15   which simply memorialized the transfer that the stipulation itself had accomplished.

16   The binding nature of the transfer contained in the stipulation was completed the

17   moment that agreement was executed.  The consent judgment was a mere

18   formality whose execution (or lack thereof) did not detract from the otherwise

19   binding nature of the parties' earlier agreement.  It merely parroted what was

20   already agreed to by the parties in the stipulation itself.

21   Finally, even if the 1948 consent judgment is a "grant" separate and apart

22   from (or part and parcel with) the 1948 stipulation, the regulations recognize that not

23   all errors in compliance with its terms impact the validity of the termination notice:

24   "Harmless errors in a notice that do not materially affect the adequacy of the

25   information required to serve the purposes of . . . section 304(c) . . . shall not render

26   the notice invalid." 37 C.F.R. § 201.10(e)(1).  Here, viewing the issue in the light

27   most favorable to the defendants, the 1948 consent judgment simply served to

28   culminate or otherwise finalize the transfer of the Superman copyright achieved

49

EXHIBIT 25
1196

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 171 of 343
Page ID #:17448
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 50 of 72

1  through the stipulation the parties reached two days earlier.  That plaintiffs only

2  identified the latter rather than the former does not materially affect defendants'

3  understanding of the "grant" sought to be affected by the notice.  Indeed, courts

4  have required much less in meeting the regulation's requirement of providing "a

5  brief statement reasonably identifying the grant being terminated."  See Music Sales

6  Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of

7  the grant in the termination notice as the "grant or transfer of copyright and the

8  rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on

9  termination notices customarily accepted by the Register of Copyrights"); see also 2

10  PATRY ON COPYRIGHT § 7:45 (approving Music Sales).  Nowhere do defendants

11  argue why the harmless error rule should not apply in a situation such as this where

12  one document that is a part in the process leading to the "transfer" of rights is

13  identified, but its necessary corollary was not.

14      Accordingly, the Court concludes that, even if the consent judgment is

15  viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant

16  subject to the termination notice was a harmless error that did not diminish the

17  notice defendants received regarding the nature of the grant (and resulting transfer

18  of rights) that plaintiffs intended to terminate.

19      4.    Continued Acceptance of Benefits Under 1975 Agreement

20      Defendants argue that Joanne Siegel's continued acceptance of benefits

21  under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto

22  post-termination grant of rights in the Superman copyright to defendants under the

23  terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-

24  accepted the terms of the grant").  (Defs' Opp. at 41).  The legal premise of their

25  argument is that the 1976 Act recognizes that, once a termination notice has been

26  served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is

27  free to make "a further grant . . . of any right covered by a terminated grant" to the

28  original grantee or its successor in title.  17 U.S.C. § 304(c)(6)(D).  The Court

EXHIBIT 25
1197

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 172 of 343
Page ID #:17449
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 51 of 72

1   ultimately rejects this argument as unpersuasive because it mistakenly assumes the

2   1975 agreement was a "grant" to the Superman copyright.

3        A look at the context leading up the execution of the 1975 agreement

4   illuminates in what way the parties believed (and just as importantly did not intend)

5   for that agreement to bind them.  The 1975 agreement appears to have been

6   drafted in response to bad publicity (apparently due to the juxtaposition of the

7   creators' misfortune and the Superman character's commercial success), and not

8   as a means to transfer or convey the party's rights to the Superman copyright.  The

9   agreement observed that nothing therein should be construed as undermining the

10  rights defendants had been conferred by virtue of the March 1, 1938, assignment,

11  rights which were later vindicated in the Westchester action and the 1970s Second

12  Circuit litigation.  Indeed, the agreement reaffirmed defendants' existing rights to

13  Superman and provided plaintiffs with annual payments, medical insurance, and

14  screen credits.  Such conferral of benefits was identified in the agreement as a

15  "voluntary" act by defendants in recognition of Siegel and Shuster's "past services."

16  The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's

17  widow on the timing of her husband's death.

18        This context and the language in the agreement itself demonstrate that the

19  1975 agreement was not a "grant."  The agreement's execution did not result in the

20  transfer or assignment of the Superman copyright.  Indeed, the agreement itself

21  expressly disavows such an interpretation by including language that the conferring

22  of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in

23  recognition of the pair's "past services," and that nothing therein should be

24  construed as undermining the rights defendants had been conferred in the March 1,

25  1938, assignment as vindicated in the Westchester action and the 1970s Second

26  Circuit litigation.   Thus, by its own terms, no rights were transferred through the

27  execution of that agreement.  A reaffirmation of existing rights without more is no

28  more "an assignment" or "conveyance" of rights to a copyright than it would if

EXHIBIT 25
1198

Case 2:04-cv-08400-ODW-RZ     Document 720-7     Filed 04/04/13     Page 173 of 343
Page ID #:17450
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 52 of 72

1   Detective Comics had instead issued a press release declaring that previous court

2   rulings had recognized its existing ownership rights to that copyright.

3          Similarly, the 1982 codicil under which Joanne Siegel continued to receive

4   annual payments and benefits did not transfer any rights.  The codicil consists of

5   five paragraphs.  The first merely notes that the letter is in response to a letter

6   written by Joanne Siegel to the company's executive officer regarding her concern

7   over how she would provide for herself after her husband's death.  The second

8   referenced the 1975 agreement, noted the increase in the amount of the annual

9   payments from $20,000 to $50,000 thereunder, and the payment of an additional

10  bonus.  The third clarified a royalty policy that applied to creators other than Siegel

11  and Shuster.  The fourth set forth the agreement to continue to pay benefits to

12  Joanne Siegel for the balance of her life in the event her husband predeceased her

13  before 1985.  The fifth and final paragraph merely wishes Joanne Siegel and her

14  family well.  Nowhere in these five humble paragraphs is a transfer of rights to be

15  inferred, much less explicitly found.

16         Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain

17  contained in the 1975 agreement post-termination somehow operated as a de facto

18  re-acceptance of the agreement itself (and the obligations flowing thereunder),

19  nowhere among those re-accepted "obligations" or "commitments" in that

20  agreement was there a grant to the Superman copyright.  Defendants protest the

21  Court drawing this conclusion, arguing that plaintiffs have admitted in their

22  pleadings (their complaint, and by filing a  termination notice directed at the 1975

23  agreement) that the 1975 agreement contained a grant to the Superman copyright.

24  It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are

25  considered judicial admissions" that bind the party who made them.  American Title

26  Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).  That being said,

27  "courts still have discretion not to apply the doctrine in particular cases." 18 JAMES

28  WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

**EXHIBIT 25**
**1199**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 174 of 343
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 53 of 72
Page ID #:17451

(citing <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001) ("Because the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion'")).

As noted at the outset, the termination provisions contained in the 1976 Act are among the most complex and technical ones in the statute. Given this complexity, it is not surprising that a party seeking to harness its machinery may, out of an abundance of caution, be more "over-inclusive" in terms of listing the possible "grants" it seeks to terminate. To penalize a party for being over-inclusive rather than under-inclusive is all the more inequitable given the high hurdles the termination provisions put in place. Here, plaintiffs were represented by highly experienced counsel who decided to list the 1975 agreement as a "grant" so as to leave no stone unturned; an approach all the more justified given the extremely technical and arcane arguments that have been advanced in this litigation concerning the efficacy and enforceability of the termination notices themselves. The Court therefore concludes that in these circumstances discretion counsels against applying the judicial estoppel doctrine in the manner advocated by defendants.

Accordingly, the Court concludes that Joanne Siegel's continued receipt of payments and benefits under the 1975 agreement and 1982 codicil thereto does not constitute a "further grant" or "an agreement to make a further grant" pursuant to 17 U.S.C. § 304(c)(6)(D).

5.    Statute of Limitations

Defendants contend that the present action was filed untimely. The statute of limitations itself is clear enough. The Copyright Act of 1976 provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The issue raised by defendants implicates the latter clause and requires the Court to determine when plaintiffs' claims accrued.

EXHIBIT 25
1200

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 175 of 343
Page ID #:17452
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 54 of 72

1    At the outset, a clarification of terms is in order. The instant matter, although

2    couched in terms of terminating the 1938 grant, is in effect one for co-ownership of

3    the copyright in the Superman material contained in Action Comics, Vol. 1,

4    because, if successful, plaintiffs would gain only a joint ownership interest in that

5    material with DC Comics, owing to the fact that Shuster left no heirs who could

6    simultaneously seek to terminate his half of the grant in the material. Claims of co-

7    ownership accrue when there is a "plain and express repudiation of co-ownership

8    . . . communicated to the claimant." Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir.

9    1996).

10    Here, defendants assert that such a repudiation was expressed by a letter

11    submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of

12    negotiations that took place between the parties shortly after the submission of the

13    termination notices. The Court finds to the contrary. As explained more fully below,

14    although the letter stated a position that the termination notices were "defective," the

15    letter addressed only the scope of the rights that could be recaptured by the

16    termination notices and left unchallenged the notices' validity and enforceability,

17    thus falling short of the required repudiation.[7]

18    

19    [7] One could quibble with whether any date other than the termination
     effective date itself can serve as the accrual date in a case involving the right to
20    termination of a grant. Much like having to await a judicial determination whether
     one is a heir (as opposed to instances when an ownership claim is based on
21    whether or not someone is a creator) has been held to be the earliest instant for
     an accrual date, see Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992) (Hank
22    Williams' putative daughter's claim to be an owner had to await judicial
     determination that she was in fact his daughter and heir, thus accrual date was not
23    triggered when Hank Williams' first contested her putative status but instead when
     state court made determination that she was his heir), so too a claim of ownership
24    by way of termination of a grant cannot be realized unless and until after the
     termination's effective date. Stated another way, a party's status as a creator is a
25    factual question subject to being challenged by the other putative co-owner at any
     time, and hence, the accrual date for the same would begin at that instant. The
26    same, however, is not true of a putative co-owner by way of termination. Their
     status as co-owner is not predicated upon a pre-existing factual scenario, like
27    whether they were involved in jointly creating the material per se. Instead, their
     status as a co-owner is predicated upon a legal mechanism — the exercise of a
28    

54

EXHIBIT 25
1201

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 176 of 343
Page ID #:17453
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 55 of 72

1      Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2  Mr. Levine, that they considered "the Superman Notices to be defective in several

3  respects." (Defs' Opp. at 50).  What is telling is that the areas of defect elaborated

4  upon in the letter did not relate to the validity or enforceability of the termination

5  notices themselves, but pointed to areas curtailing the scope of what could be

6  recaptured even assuming the notice to be properly presented.  These defects thus

7  did not call into question plaintiffs asserted right to termination contained in the

8  notices.  For example, the letter remarks that defendants would still retain its rights

9  in trademarks that it had secured over the years to certain Superman-related

10 material, and that the termination would not give plaintiffs access to an accounting

11 of the foreign profits defendants gained from exploiting the copyright.  Far from

12 repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13 validity of that ownership interest.  Thus, the letter remarked that, "if the Siegels do

14 not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15 joint owners of the United States copyright in the 'Superman' comic published in

16 Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17     Even more telling was DC Comics' subsequent conduct.  The parties'

18 negotiations quickly broke down and not much of substance was communicated

19 between the parties thereafter.  Then, the day before the termination effective date,

20 DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22 _____

23 new statutory right revoking an earlier transfer in the copyright in question, be it
   one they solely or jointly created — that takes place at a certain defined point in
   time.  Unless and until that legal triggering point is passed, there is nothing for the
24 other co-owner to reject or challenge.  This is particularly the case given that
   termination notices can be served up to ten years before the effective termination
25 date.  Defendants' position would, as a matter of logic, countenance scenarios
   where due to an early "rejection" of the termination notice, the passage of the
26 limitations period would occur well before the termination effective date even
   arrived (and with it the putative co-owner's rights even vested).  Nonetheless, the
27 Court need not resolve this question as the letter in question does not constitute a
   plain and express repudiation of plaintiffs' termination notice (and, hence, its right
28 to co-ownership to the copyright in the Siegel and Shuster Superman material).

EXHIBIT 25
1202

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 177 of 343
Page ID #:17454
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 56 of 72

1    notice, proclaiming:

2         The absence of any steps towards negotiation for two
      years, particularly on the 'eve' of the April 16, 1999
3         purported 'effective' date of the termination, leaves us
      concerned.  Thus our client has no alternative but to
4         move to the stage of <u>putting your clients on clear notice</u>,
      as set forth below, of DC Comics' rights and of its
5         determination, if it becomes necessary, to take all
      appropriate and necessary steps to protect those rights.
6         First, <u>your clients are hereby put on notice that DC
      Comics rejects both the validity and scope of the Notices</u>
7         . . . .

8    (Decl. Marc Toberoff, Ex. Q (emphasis added)).

9         If, as defendants contend, such notice of intent had been so clearly and

10   unmistakably communicated over a year and half earlier, it is odd for them to have

11   to repeat it and then state that they were "putting" plaintiffs "on notice" about it.

12   Accordingly, the Court finds that the present action seeking declaratory relief

13   regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the

14   effective date of that termination.  DC Comics' submission of the letter the day

15   before that date denying the validity of the termination notice gave a plain and

16   express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity

17   of their termination notice was now ripe.  <u>See</u> 28 U.S.C. § 2201 ("In a case of actual

18   controversy within its jurisdiction, . . . any court of the United States, upon the filing

19   of an appropriate pleading, may declare the rights and other legal relations of any

20   interested party seeking such declaration, whether or not further relief is or could be

21   sought.")

22        Applying both the date of the accrual of the claim, the parties' tolling

23   agreement to the three-year statute of limitations, and the filing date of this action,

24   the Court concludes that it is timely.  The effective date of the termination notice,

25   and therefore the date of accrual, is April 16, 1999.  The parties entered into a

26   tolling agreement on April 6, 2000, which amounts to nine days less than one year

27

28

**EXHIBIT 25**
**1203**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 178 of 343
Page ID #:17455
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 57 of 72

that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until

ten business days after plaintiffs' September 21, 2002, letter providing written notice

that they were ending settlement negotiations, that is, October 4, 2002, at which

time the limitations clock started ticking once more.[9]  The present action was filed

two years and four days later, on October 8, 2004.  Adding the periods of time the

limitations period was running together, it is clear that they add up to a period of

time just short of the three-year period set forth in § 507(b).

Accordingly, the Court concludes that the present action is timely.

6.    The 2001-2002 Settlement Negotiations

Defendants contend that plaintiffs' termination notice is no longer effective as

the parties' settlement negotiations led to them entering into a binding post-

termination agreement that resolved the issues presently before the Court.  A brief

review of the time line regarding those negotiations is helpful to the Court's analysis

of the present issue:

October 19, 2001    Pursuant to the parties' negotiations, plaintiffs' counsel
                    sent to defendants' counsel a six-page letter outlining
                    the substance of a settlement offer from defendants that

---

[8]  Defendants' argument that the tolling agreement does not apply to
plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc.,
because neither was a "party to" or bound by that agreement is disingenuous.
(Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound
not only DC Comics but also its "past and present subsidiaries or affiliates." (Decl.
Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate
sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly
qualifies as a corporate affiliate to the same; a point defendants later admit when
speaking to the alter ego question presented in the pleadings.  (Defs' Mot. Summ.
J. at 79 ("the following is a chart of the current corporate structure and affiliations
between DC, WBEI and TWI")).  Moreover, representatives for both companies
were actively involved in the settlement negotiations themselves, further
undermining any suggestion that they were bystanders to the process.

[9]  Defendants argue that the tolling period concluded much earlier based on
the parties earlier having reached "an amicable resolution of the dispute." (Defs'
Opp. at 51 (emphasis in original)).  Given that the Court finds that no such
"resolution," as opposed to a naggingly close potential for the same, occurred
through the parties settlement discussion post-termination, see infra A.6, their
argument is without merit.

57

EXHIBIT 25
1204

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 179 of 343
Page ID #:17456
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 58 of 72

| | | |
|---|---|---|
| 1 | | was "accepted" by the plaintiffs. |
| 2 | October 26, 2001 | Defendants responded, noting they were working on a draft agreement and enclosing "a more fulsome outline" |
| 3 | | of "what" they "believe the deal" they have "agreed" to is. |
| 4 | February 1, 2002 | Defendants' counsel provided a fifty-six page draft agreement that reserved the right to have their clients |
| 5 | | comment upon it and noted that certain, related "stand alone" assignments were in the process of being |
| 6 | | finalized. |
| 7 | May 5, 2002 | Plaintiffs responded to defendants' draft by stating that the proposed agreement contained new, unacceptable |
| 8 | | terms to which they had not agreed. |
| 9 | May 21, 2002 | Defendants sent a letter to plaintiffs stating that they believed that each of the major points in the settlement |
| 10 | | had already been agreed upon. |
| 11 | Sept 21, 2002 | Plaintiffs rejected their counsel's proposed draft agreement and advised defendants in writing that they |
| 12 | | were ending negotiations. |

The parties are in agreement that California law should be applied in deciding this question, but disagree as to its application. "California law is clear that there is no contract until there has been a meeting of the minds on all material points." Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998). The failure to reach a meeting of the minds on all material points prevents the formation of a contract even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract. Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12 (1970). Similarly, the terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. See Panagotacos v. Bank of America, 60 Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719, 726 (1959). A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror, which must also be unequivocally accepted by the former offeror for a binding contract to form. See Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159 Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

**EXHIBIT 25**
**1205**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 180 of 343
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 59 of 72
Page ID #:17457

acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer'"); In re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE § 1585 ("A qualified acceptance is a new proposal.").

The parties disagree over whether the terms contained in plaintiffs' October 19, 2001, letter differ in substance from those set forth in defendants' later letter of October 26, 2001 (and accompanying outline), such that there was no unequivocal acceptance of an offer and, thus, no agreement. As with much in both life and law, materiality is in the eye of the beholder. From the Court's reading of the parties' correspondence, it is clear that the parties went well beyond reaching a settlement in principle regarding their respective positions to the Superman property. Rather, as suggested by the time line above, the parties' correspondence, and the actions taken in response thereto, illustrates that they found themselves in the all-too-familiar situation in which verbal settlement negotiations result in what the parties believe to be an agreement on all the major points of dispute, but which, upon further discussion, falls short of the agreement needed to resolve their dispute. The devil, as it often is, was in the details.

That material details remained is evidenced by defendants' response to plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the deal" they had "agreed to." Moreover, defendants' February, 2002, draft agreement was not even considered final by its authors, who reserved the right for their clients to "comment" on it, and would also require the further submission of a number of "stand alone" agreements yet to be finalized. Indeed, Time Warner's CEO later commented that submission of the draft agreement was "expected" to result in further "comments and questions" from the Siegel heirs that "would need to be resolved."

This give and take reveals that the parties, while close to agreeing to a complete and comprehensive settlement of their dispute, had not passed the

EXHIBIT 25
1206

1  threshold where they had finalized and assented to all material terms of such a

2  settlement. Rather, as they attempted to sketch in the finer details of a settlement

3  from the broad outlines contained in the October 19 letter, more and more issues

4  arose upon which they could not reach agreement, resulting in the negotiations

5  falling apart. In this respect, the present case is not unlike Callie v. Near, 829 F.2d

6  888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

7  which the courts held that no enforceable agreement was reached when the parties

8  had agreed to a rough outline of an agreement, but were thereafter unable to reach

9  agreement on the finer details and the negotiations fell apart.

10        Defendants' argument to the contrary is premised on the notion that they can

11  limit the scope of the legal analysis to the October 19, 2001, letter and call it a

12  contract, regardless of their materially different October 26, 2001, letter in reply ("I

13  enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

14  vastly different February 1, 2002, draft, which were both part and parcel of the same

15  settlement negotiation. Ignoring these contemporaneous communications is at

16  odds with the requirement in contract formation that courts must consider "all the

17  surrounding circumstances." Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

18  These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

19  agreement provides context and meaning as to the understanding the parties had

20  about the effect of the October 19 letter itself.

21        Defendants further seek to create issues of fact through post hoc testimony

22  and rationalizations. None of this subjective belief is sufficient to defeat the

23  objective manifestation of the parties' intent relayed in the documents referenced

24  above that aptly demonstrate that there was no "meeting of the minds" on all

25  material terms. See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

26  existence of mutual consent is determined by objective rather than subjective

27  criteria, the test being what the outward manifestations of consent would lead a

28  reasonable person to believe. Accordingly, the primary focus in determining the

EXHIBIT 25
1207

existence of mutual consent is upon the acts of the parties involved"); Stewart v. Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a contract is based upon objective and outward manifestations of the parties"); CAL. CIV. CODE § 1639.

One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002, draft to reach the conclusion that the parties failed to come to an agreement on all material terms. See Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12 (1970) (failure to reach meeting of the minds on all material points prevents contract formation even though parties orally agreed on many terms, or have taken action relating to the contract). Far from signifying that the parties' "negotiations . . . result[ed] in a binding contract" leaving nothing more than the drafting of more formal documentation memorializing that agreement, see Louis Lesser Enterprises, Ltd. v. Roeder, 209 Cal.App.2d 401, 404 (1962), these submissions between the parties went far beyond that by adding in or further refining areas from what was contained in the October 19 letter.  That after the submission of the October 19 letter defendants began the process of creating a settlement trust account and the parties negotiated about providing Siegel and Shuster screen credits in the then upcoming movie Superman Returns could as much be seen as goodwill gestures on defendants' part while the negotiations continued as it could reflect an indication on their part that they thought they were contractually bound to do the same.

From all of this there is no document or set of documents reflecting agreement by the parties to singular, agreed terms.  Defendants cannot explain to the Court what from the parties' differing exchange constitutes this purported contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance" reflected in the October 19 letter and either festoon upon it all the terms contained in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

**EXHIBIT 25**
**1208**

1    clearly and unequivocally rejected that latter draft agreement), or have the Court

2    perform that task.  The Court's responsibility is not to create a patch-quilt agreement

3    by stringing together certain expressions of assent made at one point (October 19),

4    and attaching to it material terms spelled out later in time (and to which the

5    supposedly assenting party promptly rejected).  See Industrial Indemnity v. Superior

6    Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7            Accordingly, the Court concludes that the parties' settlement negotiations did

8    not result in an enforceable agreement resolving the issues presently before the

9    Court.

10   B.      Limitations on Scope of Recaptured Rights

11           The principal purpose behind the creation of the termination right was to give

12   authors (and their heirs) a chance to retain the extended renewal term in their work

13   and then re-bargain for it when its value in the marketplace was known.  See H.R.

14   REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the

15   termination right "safeguarding authors against unremunerative transfers . . .

16   because of the unequal bargaining position of authors, resulting in part from the

17   impossibility of determining a work's prior value until it has been exploited").

18           The need for such a second bite at the apple flowed from the fact that the

19   1909 Act created a dual term in the copyright to a work, one realized upon the

20   work's publication and the second occurring twenty-eight years later with the

21   copyright's renewal.  Justification for this splitting of terms was based, in part, on the

22   understanding that an author's ability to realize the true value of his or her's work

23   was often not apparent at its creation, but required the passage of time (and the

24   marketing efforts by a publisher) to materialize.  The renewal term in the copyright

25   to the work thus served as a mid-course re-valuation tool allowing the author, by

26   giving him or her the right of renewal in the work, leverage in re-negotiating a better

27   deal with the original grantee or any other suitor who desired to continue to market

28   the copyright.  See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

EXHIBIT 25
1209

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 184 of 343
Page ID #:17461
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 63 of 72

theory behind a dual system of term was that it gave the author or the author's heirs a 'second bite at the apple;' when the renewal term came around, the value of the copyright would be better known than at the time of initial publication. With this information, a new bargain could be struck that would more accurately reflect the market rate"). This re-valuation mechanism provided by the renewal term under the 1909 Act was largely frustrated by the Supreme Court's decision in <u>Fred Fisher Music</u>, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their rights to both the initial and the renewal term.

Although the termination right contained in the 1976 Act sought to correct the damage done by <u>Fred Fisher</u> to an author's ability to renegotiate through the reversion of rights, it did not revert to the author the full panoply of rights he or she would have enjoyed upon renewal under the 1909 Act. Owing in large measure to objections by publishers seeking to minimize the disruption to "existing contracts and authorized derivative works already in distribution" that such a recapture right would engender, <u>see</u> 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain limitations on what authors (or their heirs) gained from exercising the termination right. It is to these limits on the termination right that the Court now turns.

1.    Foreign Profits

Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code, governing copyrights], and in no way affects rights arising under any other Federal, State, or foreign laws." Defendants read from this a statutory limitation on the scope of any accounting arising from the termination notices in this case to those profits realized by the domestic exploitation of the Superman copyright contained in <u>Action Comics</u>, Vol. 1, excluding those realized from foreign sources. The Court finds this argument persuasive.

Although the Court can locate no case that has specifically addressed the issue of accounting profits from the foreign exploitation of a copyright that is subject

EXHIBIT 25
1210

1   to a valid termination notice, the statutory text could not be any clearer on this

2   subject. Through this section, Congress expressly limited the reach of what was

3   gained by the terminating party through exercise of the termination right;

4   specifically, the terminating party only recaptured the domestic rights (that is, the

5   rights arising under title 17 to the United States Code) of the grant to the copyright

6   in question. Left expressly intact and undisturbed were any of the rights the original

7   grantee or its successors in interest had gained over the years from the copyright

8   through other sources of law, notably the right to exploit the work abroad that would

9   be governed by the copyright laws of foreign nations. Thus, the statute explains

10  that termination "in no way affects rights" the grantee or its successors gained

11  "under foreign laws."

12      Such a reading is supported by leading commentators, who are in agreement

13  as to the effect of § 304(c)(6)(E) has in a case such as this.

14      Professor Nimmer states:

15          A grant of copyright "throughout the world" is
            terminable only with respect to uses within the
16          geographic limits of the United States. Because
            copyright has no extraterritorial operation, arguably
17          American law is precluded from causing the termination
            of rights based upon foreign copyright laws. A response
18          to this argument is that the nonextraterritoriality of
            copyright is irrelevant because the question here is one
19          of contract law, not copyright law, in that it concerns the
            effect of a contract granting certain rights. The contract
20          law of one nation may be applicable in another nation
            under the latter's conflict-of-laws rule. The conclusive
21          answer to this problem lies in the text of the termination
            provisions of the Copyright Act, which expressly provide
22          that statutory termination "in no way affects rights arising
            under . . . foreign laws" — that is, under foreign copyright
23          (not contract) laws. Thus, even if the conflicts rule of a
            foreign nation were to call for application of the American
24          termination rule as a rule of contract law, that rule by its
            own terms excepts from termination the grant of those
25          rights arising under foreign copyright laws.

26  3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

27      Professor Patry agrees: "Accordingly, where a U.S. author conveys

28  worldwide rights and terminates under either section, grants in all other countries

64

**EXHIBIT 25**
**1211**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 186 of 343
Page ID #:17463
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 65 of 72

1  remain valid according to their terms or provisions in other countries' laws." 7

2  PATRY ON COPYRIGHT § 25:74.

3        Plaintiffs argue, however, that the section also allows for the possibility that

4  the terminating party gains not only the domestic rights to the copyright in question

5  (the "rights covered by the grant that arise under this title"), but also retains

6  whatever other rights it may have under "Federal, State, or foreign laws." From this

7  premise, plaintiffs argue that, because an accounting between co-owners in a

8  copyright is governed by state law, and California state law allows for the sharing of

9  foreign profits between tenants in common, so, too, should defendants be forced to

10  account for their foreign profits. This argument misses the fact that all plaintiffs

11  have gained from the termination right is a recapturing of the <u>domestic</u> copyright in

12  the Superman material published in <u>Action Comics</u>, Vol. 1. Defendants continue to

13  hold, unaffected, separate rights to that copyright arising under <u>foreign</u> copyright

14  laws. This distinction is important for two reasons.

15        First, such an open effort to extend the reach of U.S. copyright law overseas,

16  as plaintiffs' reading of the statute avows, would be in direct contradiction to not only

17  the plain terms of the statute (stating that termination does <u>not</u> affect another

18  parties' rights arising under the copyright laws of "foreign" nations), but stands in

19  stark juxtaposition to the longstanding rule "that the copyright laws [of this country]

20  have no application beyond the U.S. border." <u>Los Angeles News Serv. v. Reuters</u>

21  <u>TV Intern.</u>, 340 F.3d 926, 931 (9th Cir. 2003). If Congress contemplated the ability

22  to attach or otherwise force the accounting of foreign profits to which the original

23  grantee or its successors are legally entitled under the copyright laws of other

24  nations through the backdoor of applying state law tenant in common principles,

25  one would have expected such an intention to have been made expressly, and

26  certainly with some explanation given the incongruity that arises from the statutory

27  language's notation that termination did <u>not</u> affect another's rights under "foreign

28  laws."

**EXHIBIT 25**
**1212**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 187 of 343
Page ID #:17464
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 66 of 72

1    Second, the cases cited by plaintiffs requiring one co-owner to account to the

2    other for both domestic and foreign profits involved parties who were co-owners to

3    the "world-wide" copyright in the work and, not as with the termination right, to only

4    the domestic copyright. See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996)

5    (noting that declaratory action was filed after other co-owner obtained a "renewal of

6    the copyright" listing himself as the sole author in the song "Let the Good Times

7    Roll"). Plaintiffs have directed the Court to no case wherein a co-owner of the

8    domestic copyright in a work was allowed an accounting of a co-owner's foreign

9    profits. See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as

10   were originally the subject of a grant will revert upon the termination of that grant.

11   [T]o the extent that a grant includes rights based upon federal law other than the

12   Copyright Act, state law, or foreign law, such rights are not subject to termination").

13   Accordingly, the Court holds that the termination notice affects only the

14   domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to

15   Detective Comics of the copyright in the Superman material contained in Action

16   Comics, Vol. 1. The termination notice is not effective as to the remainder of the

17   grant, that is, defendants exploitation of the work abroad under the aegis of foreign

18   copyright laws. Thus, although defendants retain the unfettered right to exploit the

19   works (and retain the profits derived therefrom) in foreign nations, they may do so

20   domestically only as a co-owner (through Shuster's share) of the works. See Oddo

21   v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an

22   independent right to use or license the use of the copyright. . . . . A co-owner of a

23   copyright must account to other co-owners for any profits he earns from licensing or

24   use of the copyright . . . ."). As such, defendants must account to plaintiffs only for

25   the profits from such domestic exploitation of the Superman copyright.

26       2.    Trademark Rights and Ownership of Pre-Termination Derivative

27             Works

28   As noted in the previous section, the right to termination leaves undisturbed

66

**EXHIBIT 25**
**1213**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 188 of 343
Page ID #:17465
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 67 of 72

the original grantee or its successors in interests rights arising under "federal law." 17 U.S.C. § 304(c)(6)(E). Among the rights based on federal law that defendants secured over the years were several trademarks that utilized or incorporated portions of the copyrighted material found in Action Comics, Vol. 1. Defendants seek a declaration from the Court that, even if successful in terminating the Superman copyright contained in Action Comics, Vol. 1, plaintiffs cannot share in defendants' profits "purely attributable to [Superman] trademark rights." (Defs' Reply at 11). Plaintiffs admirably concede the point in their briefs, but argue that they are "entitled to profits from mixed trademark uses to the extent such exploit recaptured copyright elements (e.g., 'Superman costume')." (Pls' Reply at 49 n.28).

Similarly, defendants seek a declaration that, to the extent plaintiffs are entitled to an accounting as a result of their successfully terminating the 1938 grant, it should not include any profits attributable to the "post-termination exploitation of derivative works [of Action Comics, Vol. 1,] prepared prior to termination." (Defs' Mot. Summ. J. at 28). Again, plaintiffs concede, as they should, this point. (Pls' Reply at 49 n.28). Section 304(c)(6)(A) provides that derivative works created during the grant (meaning up until the termination effective date) may continue to be exploited after termination. Again, however, plaintiffs hold out as a separate question the existence of pre-termination derivative works that are "altered so as to become post-termination derivative works." (Pls' Reply at 49 n.28).

Given that these contentions by plaintiffs — the recapture or accounting from the mixed use of trademark and copyright and what to do with any alteration in pre-termination derivative works — are not the subject of the present motion, the Court will not address them in this Order. Even though it is clear that these issues will impact the accounting of profits in some manner, they cannot be fully adjudicated based on the narrow record currently before the Court and absent a full briefing of the particular mixed uses or altered pre-termination derivative works that are specifically at issue.

EXHIBIT 25
1214

1    Accordingly, the Court holds that the profits defendants garner from the use

2    of Superman trademarks that "are purely attributable to [those] trademark rights,"

3    and from its use of unaltered pre-termination derivative works are not subject to

4    accounting.

5    3.    Accounting for Profits of Warner Bros. Entertainment, Inc., and Time

6    Warner, Inc.

7    The parties are in disagreement over whether plaintiffs may directly share in

8    the profits from the exploitation of the works by DC Comics corporate sibling,

9    Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time

10    Warner, Inc. ("TWI"). The genesis for this claim stems from certain inter-corporate

11    transactions amongst these actors concerning the Superman copyright. In the

12    same year that plaintiffs' termination notices became effective, DC Comics

13    executed an exclusive license in favor of WBEI (and a year later a separate

14    exclusive license with WBEI's television division) to exploit the Superman copyright

15    for the remainder of its extended renewal term in certain media formats, notably

16    movies, television, and home video. (Decl. Marc Toberoff, Exs. E & F). Defendants

17    contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an

18    accounting of the profits made by DC Comics (in the form of the licensing fees it has

19    collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has

20    made pursuant to the license.[10]

21    Defendants' argument is not without support. The Court  starts with the

22    general principle that "each co-owner has an independent right to use or license the

23    use of the copyright[, but that a] co-owner of a copyright must account to other

24    co-owners for any profits he earns from licensing or use of the copyright." Oddo,

25    743 F.2d at 633. Licensees, on the other hand, are accountable only to their

26    _____

27    [10] It appears to the Court that because TWI is not a licensee of the works, it

28    may not have any profits to account for; however, absent evidence of this fact from
either side (or the representation that such is not the case), the Court cannot rule
on this issue at this time.

68

EXHIBIT 25
1215

Case 2:04-cv-08400-ODW-RZ  Document 720-7  Filed 04/04/13  Page 190 of 343
Page ID #:17467
Case 2:04-cv-08400-SGL-RZ  Document 293  Filed 03/26/2008  Page 69 of 72

1   licensors, and owe no duty of accounting to the non-licensor co-owner of a

2   copyright the licensee exploits.  See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523

3   (9th Cir. 1990).

4        Plaintiffs, however, take a different view of the licenses, arguing that "Warner

5   has stepped exclusively into DC's shoes with respect to such motion picture and

6   television copyrights." (Pls' Opp. at 30).  In other words, the exclusive license had

7   the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs

8   (assuming the successful termination of the 1938 grant) insofar as the exploitation

9   of the copyright in the mediums in which those licenses are concerned.

10       This theory, however, requires large legal leaps that are not countenanced

11   by current law.  To begin, in order for an exclusive license in the entirety of the

12   interest in a joint work itself (such as Superman) to be effective, the consent of both

13   joint owners in the copyrighted work is required.  See 2 PATRY ON COPYRIGHT § 5:7

14   ("A joint author (or co-owner) may not, however, transfer all interest in the work

15   without the other co-owner's express (and written) authorization, since that would

16   result in an involuntary transfer of the other joint owner's undivided interest in the

17   whole"). The same requirement for prior consent holds true even with respect to the

18   wholesale transfer of exclusive licenses in subparts to a copyright, such as a license

19   transferring all the stage rights (not just the joint owner's rights) to a novel but not

20   the movie or literary rights. Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-

21   39.

22       Such consent simply did not occur here.  DC Comics unilaterally sought to

23   give an exclusive license to the entirety in the Superman property's movie and

24   television rights to WBEI post-termination.  As a result, the attempt to provide an

25   exclusive license was ineffective.  At best, all that was conveyed was a non-

26   exclusive license, and, at worst, a license agreement whose terms are null and void

27   absent ratification by plaintiffs.  See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

28       Applying these principles in a vacuum, the Court would readily reach the

69

EXHIBIT 25
1216

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 191 of 343
Page ID #:17468
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 70 of 72

1  conclusion championed by defendants: WBEI, as a licensee, is answerable only to

2  DC Comics as its licensor; that DC Comics is the only entity that must account for

3  profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that

4  DC Comics' accounting to plaintiffs is limited to those profits derived from licensing

5  the Superman copyright to WBEI.

6       However, the Court's analysis does not occur in vacuum; rather, it must take

7  into account the relevant facts of this case, particularly given that the accounting

8  sought by plaintiffs in this action is an equitable remedy, and the Court must

9  conduct its inquiry accordingly.  See Oddo, 743 F.2d at 633 ("A co-owner of a

10  copyright must account to other co-owners for any profits he earns from licensing or

11  use of the copyright, . . . but the duty to account does not derive from the copyright

12  law's proscription of infringement.   Rather, it comes from equitable doctrines

13  relating to unjust enrichment and general principles of law governing the rights of

14  co-owners.") (internal quotation marks and citations omitted).

15       Here, the relatedness of the transferor and the transferee entities cannot be

16  ignored.  The evidence before the Court reveals that the relevant entities are all

17  closely related entities — parent corporations, wholly and partially-owned

18  subsidiaries, partners, sibling business entities (owned directly or indirectly by the

19  same parent) — although it is not entirely clear to the Court exactly what those

20  relationships have been at all relevant times.  This fact alone raises a specter of a

21  "sweetheart deal" entered into by related entities in order to pay a less than market

22  value fee for licensing valuable copyrights.  If such were the case, the related entity

23  might be able to exploit the copyrights without the responsibility of answering to the

24  co-owner of a joint work, and the licensor co-owner would thereby be relieved of the

25  responsibility of accounting for any profits (other than a greatly reduced licensing

26  fee) to the non-licensor co-owner.  This result would be inequitable.

27       This concern is bolstered by the declaration of Paul Levitz, President and

28  Publisher for DC Comics, which states that under the post-2003 corporate

EXHIBIT 25
1217

restructuring of Time Warner's business, "for operating management purposes, DC reports" not to immediate corporate parent WCI, but to its sibling corporation "WBEI," the licensee of the rights at issue in this action.  (Decl. Paul Levitz ¶ 17). As Levitz explains, "I report to and obtain approvals from WBEI's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC's normal course of business." (Id.).  Although this is not evidence of what occurred at the time of the license, it is still probative evidence of the relatedness of the licensee and licensor that could result in an extremely favorable licensing arrangement that works to the detriment of the non-licensor co-owner.  These open issues also touch upon factors to be considered in analyzing alter ego claims.  See Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290 (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an opposing party is using the corporate form unjustly, is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result").

Whether the license fees paid represents the fair market value therefor, or whether the license for the works between the related entities was a "sweetheart deal," are questions of fact that are not answered on summary judgment, certainly not without the benefit of expert testimony which has not been presented by either party on this topic.  The Court therefore concludes that summary judgment on this issue is inappropriate at this time. [11]

---

[11]  Because the Court concludes that defendants' motion for summary adjudication of this issue must be denied for the reasons stated above, the Court does not at this time resolve other arguments raised by plaintiffs regarding this issue.

**EXHIBIT 25**
**1218**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 193 of 343
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 72 of 72
Page ID #:17470

1

**CONCLUSION**

2      After seventy years, Jerome Siegel's heirs regain what he granted so long

3  ago — the copyright in the Superman material that was published in <u>Action Comics</u>,

4  Vol. 1.  What remains is an apportionment of profits, guided in some measure by

5  the rulings contained in this Order, and a trial on whether to include the profits

6  generated by DC Comics' corporate sibling's exploitation of the Superman

7  copyright.

8      DATE:  March 26, 2008

9

10

11                    STEPHEN G. LARSON
                      UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 25**
**1219**

# EXHIBIT 26

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 195 of 343
Page ID #:17472
Case 2:04-cv-08400-ODW-RZ    Document 294    Filed 03/31/2008    Page 1 of 2

**"O"**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-08400-SGL (RZx)                    Date:  March 31, 2008

Title:    JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -*v*-
          WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
          corporation; DC COMICS INC., a corporation; and DOES 1-10
==========================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Jim Holmes                            None Present
          Courtroom Deputy Clerk                Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

None present                          None present

PROCEEDINGS:    ORDER DENYING AS MOOT PARTIES CROSS-MOTIONS FOR PARTIAL
                SUMMARY JUDGMENT IN CV-04-8776 CASE; ORDER REQUIRING
                PARTIES TO ENGAGE IN MEANINGFUL SETTLEMENT NEGOTIATIONS;
                ORDER SETTING PRE-TRIAL AND TRIAL DATES; ORDER STAYING
                RULING ON OUTSTANDING ISSUES CONTAINED IN JULY 27, 2007,
                ORDER PENDING SETTLEMENT DISCUSSIONS   (IN CHAMBERS)

        As the Court stated during the September 17, 2007, hearing on the parties' cross-motions
for partial summary judgment in these cases, the issues raised by the parties in the Superboy
action, Case No. CV-04-8776-SGL, were, in light of the Court's earlier ruling on July 27, 2007, and
with a forthcoming ruling in the companion Superman action, Case No. CV-04-8400-SGL, would
be rendered moot.  With the Court's issuance of its Order on March 26, 2008, the Court finds that
the issues raised in the parties' cross-motions for partial summary judgment in the Superboy case
are, in fact, moot.

        In light of the Court's rulings to date in these companion cases, which have narrowed the
areas of dispute between the parties, the Court believes that it would be prudent at this juncture for
the parties to engage in meaningful settlement talks before their jointly chosen mediator, JAMS
Mediator Hon. Daniel Weinstein (Ret.), something which they apparently have not done since the
inception of this litigation in 2004.

MINUTES FORM 90                                      Initials of Deputy Clerk __jh_____
CIVIL -- GEN                            1

**EXHIBIT 26**
**1220**

Case 2:04-cv-08400-ODW-RZ     Document 720-7     Filed 04/04/13     Page 196 of 343
Page ID #:13473
Case 2:04-cv-08400-ODW-RZ     Document 294     Filed 03/31/2008     Page 2 of 2

Accordingly, the Court hereby **ORDERS** the parties to devote the next sixty (60) days to engaging in a good faith effort to settle their dispute in the Superman and Superboy litigation before the JAMS Mediator. At the conclusion of this period, on June 1, 2008, the parties are to file a joint report, outlining the efforts that they have taken in furtherance of settlement and the results of those efforts.

Thereafter, the Court will, if the parties have not settled these cases, set out a briefing schedule and a hearing date on the five issues identified in the parties' February 21, 2008, Stipulation Requesting Status Conference and Briefing Schedule Regarding Certain Trial and Pre-Trial Matters, as well as the following issues left unresolved in this Court's March 26, 2008, Order in the Superman case: Whether and to what extent do the following fall within the scope of what plaintiffs regained through their termination notices: 1)   Post-termination alterations to pre-termination derivative works; and 2)   Mixed use of trademarks and copyright.

The Court also finds that there is a need for the placement of firm pre-trial and trial dates to both assist the Court in case management and to give predictability to counsel as to when the litigation in this case will come to an end. The Court therefore sets the following pre-trial and trial dates:

1.     The Court will conduct a pre-trial conference in the Superman case on October 6, 2008, at 11:00 a.m. in Courtroom One.

2.     Thereafter, the court will hold a hearing on any motions in limine in the Superman on October 20, 2008, at 11:00 a.m. in Courtroom One.

3.     Trial in the Superman case is set for November 4, 2008, at 9:30 a.m. in Courtroom One.

As a final matter, the Court reserves issuing an order on the remaining issues brought up in the Court's July 27, 2007, Order in the Superboy case (and to which the parties have provided both supplemental briefing and oral argument), and setting the pre-trial and trial dates in the Superboy matter, if needed, until after the conclusion of the trial in the Superman case.

**IT IS SO ORDERED.**

**EXHIBIT 26**
**1221**

# EXHIBIT 27

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 198 of 343
Page ID #:17475
Case 2:04-cv-08400-ODW-RZ   Document 307   Filed 05/14/2008   Page 1 of 25

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   Adam Hagen (SBN 218021)
    9665 Wilshire Boulevard, Ninth Floor
4   Beverly Hills, California 90212
    Telephone:  310-858-7888
5   Fax:         310-550-7191

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   James D. Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
8   New York, New York 10017
    Telephone:  212-813-5900
9   Fax:         212-813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, NY 10516
12  Telephone:  845-265-2820
    Fax:         845-265-2819

13
    Attorneys for Defendants and Counterclaimant
14

15            UNITED STATES DISTRICT COURT

16      CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

17  JOANNE SIEGEL and LAURA          )   Case No. CV 04-08400 SGL (RZx)
18  SIEGEL LARSON,                   )
                                     )   **DEFENDANTS' NOTICE OF**
19          Plaintiffs,              )   **MOTION AND MOTION FOR**
                                     )   **CLARIFICATION AND/OR**
20      vs.                          )   **RECONSIDERATION;**
                                     )   **MEMORANDUM OF POINTS**
21  TIME WARNER INC., WARNER         )   **AND AUTHORITIES;**
    COMMUNICATIONS INC., WARNER      )   **DECLARATION OF WAYNE M.**
22  BROS. ENTERTAINMENT INC.,        )   **SMITH; AND EXHIBITS IN**
    WARNER BROS. TELEVISION          )   **SUPPORT THEREOF**
23  PRODUCTION INC., DC COMICS,,     )
    and DOES 1-10,                   )
24                                   )   Date:      July 7, 2008
          Defendants.                )   Time:      10:00 a.m.
25                                   )   Place:     Courtroom 1
                                     )
26                                   )
    AND RELATED COUNTERCLAIMS.       )
27                                   )
28

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...............................................................1

II.   RELEVANT FACTUAL BACKGROUND ...........................................2

      A.    The Parties Did Not Argue the Substance of the Promotional
            Announcements In their Cross-Motions for Summary
            Judgment ...........................................................................................2

      B.    Defendants' Circumscribed Summary Judgment Motion Did
            Not Include The Evidence Defendants Plan To Present During
            Trial Regarding The Scope Of The Material In The
            Promotional Announcement. ...........................................................3

      C.    Defendants Reaffirmed The Limited Scope Of Their
            Summary Judgment Request During The September 17, 2007
            Oral Argument. ................................................................................4

      D.    The Court's Order On Summary Judgment ....................................5

III.  DEFENDANTS REQUEST CLARIFICATION THAT THEY MAY
      PRESENT EVIDENCE ON THE CONTENT OF THE
      PROMOTIONAL ANNOUNCEMENT TRIAL ......................................7

IV.   THE COURT SHOULD NOT HAVE GRANTED SUMMARY
      JUDGMENT ON THE DISPUTED FACTUAL ISSUE OF THE
      COPYRIGHTABLE CONTENT OF THE PROMOTIONAL
      ANNOUNCEMENT ..............................................................................12

      A.    Defendant Did Not Have A "Full And Fair Opportunity"
            To Litigate The Scope Of The Copyrightable Content Of The
            Promotional Announcements .........................................................14

      B,    The Court's Discussion Of The Contents Of The Promotional
            Announcements Also Appears To Decide Genuine Issues Of
            Material Fact Inappropriate For Adjudication On Summary
            Judgment ........................................................................................16

      C.    Because The Court Did Not Have The Benefit Of A Clear
            Version Of The Promotional Announcement And Of The
            Parties' Briefing On The Subject, The Order Contains
            Certain Clearly Demonstrable Errors Of Fact And Law ...............18

V.    CONCLUSION.......................................................................................20

i

**EXHIBIT 27**
**1223**

# <u>**TABLE OF AUTHORITIES**</u>

## FEDERAL CASES

*Chem. Producers & Distribs. Ass'n v. Helliker*,
   2004 U.S. Dist. LEXIS 16260 (C.D. Cal. June 28, 2004) ........................... 14

*City of Los Angeles v. Santa Monica Baykeeper*,
   254 F.3d 882 (9th Cir. 2001) ................................................. 13

*Cool Fuel, Inc. v. Connett*,
   685 F.2d 309 (9th Cir. 1982) ............................................. 14. 16

*Delay v. Pacific N.W. River Basins Comm'n*,
   475 F.3d 1039 (9th Cir. 2007) ............................................... 13

*Detective Comics, Inc. v. Bruns Publishers, Inc.*,
   111 F.2d 432 (2d Cir. 1940) ................................................. 16

*Magnesystems, Inc. v. Nikken, Inc.*,
   933 F. Supp. 944 (C.D. Cal. 1996) ............................................ 7

*Milgard Tempering, Inc. v. Selas Corp. of America*,
   902 F.2d 703 (9th Cir. 1990) ................................................. 7

*National Rural Telecoms. Cooperative v. DIRECTV, Inc.*,
   319  F. Supp. 2d 1059 (C.D. Cal. 2003) ...................................... 13

*Portsmouth Square, Inc. v. Shareholders Protective Committee*,
   770 F.2d 866 (9th Cir. 1985) ............................................... 14

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   146 F.3d 1088 (9th Cir. 1998) ............................................... 7

*Siegel v. Time Warner Inc.*,
   496 F. Supp. 2d 1111 (C.D. Cal. 2007) ................................... 13, 14

*St. Paul Fire & Marine Insurance Co. v. F.H.*,
   55 F.3d 1420 (9th Cir. 1995) ............................................... 13

## FEDERAL STATUTES

17 U.S.C. §  304 (c) ............................................................ 20

## RULES

Central District of California Local Rule 7.18 ................................. 13

Fed. R. Civ. P. Rule 60 ...................................................... 1. 13

ii

**EXHIBIT 27**
**1224**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 201 of 343
Case 2:04-cv-08400-ODW-RZ   Document 307478 Filed 05/14/2008   Page 4 of 25
Page ID #:17478

1   TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2        PLEASE TAKE NOTICE that on June 16, 2008, at 10:00 a.m. or as soon

3   thereafter as counsel may be heard, in Courtroom 1 of the above-entitled Court,

4   located at 3470 12th Street, Riverside, California, defendants Time Warner Inc.,

5   Warner Communications Inc., Warner Bros. Entertainment Inc., Warner Bros.

6   Television Production Inc., and Defendant and Counter-claimant DC Comics

7   ("Defendants"), will and hereby do move the Court under its inherent power and

8   Rule 60(b)(1) and/or (6), Fed. R. Civ. P. for clarification or, in the alternative,

9   reconsideration of that portion of the Court's order of March 26, 2008 relating to

10  the granting of Defendants' motion for partial summary judgment that plaintiffs

11  Joanne Siegel and Laura Siegel Larson ("Plaintiffs") failed to terminate and

12  recapture any rights under copyright in two comic books that included an

13  advertisement (the "Promotional Announcements") representing the first

14  publication of the visual depiction of the Superman character.  Specifically,

15  Defendants seek clarification regarding the extent to which they will be able to

16  present evidence at trial regarding the scope of the copyrighted material

17  remaining in Defendants' possession by virtue of their ownership of the

18  Promotional Announcements.  Alternatively, to the extent that the Court issued a

19  binding holding regarding the substance of the Promotional Announcements,

20  Defendants respectfully request that the Court reconsider its holding.

21        This motion is based upon this notice, the attached Memorandum of Points

22  and Authorities, the declaration of Wayne M. Smith and the attached Exhibits

23  thereto, the pleadings and documents in the record, and such additional evidence

24  or argument as might be presented prior to or at the hearing of this matter.

25  / / /

26  / / /

27  / / /

28

1

EXHIBIT 27
1225

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 202 of 343
Page ID #:17479
Case 2:04-cv-08400-ODW-RZ    Document 307    Filed 05/14/2008    Page 5 of 25

1    This motion is made following the conference of counsel pursuant to L.R.

2    7-3 which took place on April 11, 2008.

3

4                                    Respectfully submitted,

5    DATED:  May 12, 2008        WEISSMANN WOLFF BERGMAN
                                 COLEMAN GRODIN & EVALL LLP
6
                                          -and-
7
                                 FROSS ZELNICK LEHRMAN & ZISSU, P.C.
8
                                          -and-
9
                                 PERKINS LAW OFFICE, P.C.
10

11
                                 By: _Michael Bergman_____
12
                                          Michael Bergman
13                                Attorneys for Defendants and Counterclaimant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 27**
**1226**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   PRELIMINARY STATEMENT

Defendants respectfully request that the Court clarify and, if need be, modify its March 26 Order (the "Order") to make clear that Defendants can offer evidence and prove at trial the scope of what they remain free to exploit from the two Promotional Announcements the Court has now held are not subject to recapture by Plaintiffs.

The Court granted Defendants' motion for partial summary judgment that Plaintiffs' notices of termination failed to reach the Promotional Announcements and that, as a result, Plaintiffs failed to recapture any ownership interest therein. Defendants have brought this motion because although that was the only affirmative ruling sought regarding the Promotional Announcements, the Court's Order also goes on to address the substance and extent of the copyrighted material contained in those Promotional Announcements – something which both sides argued was not appropriate for summary judgment and should be reserved for trial.

Accordingly, because that additional issue was not before the Court, Defendants seek clarification that the Court's statements are not binding, and that Defendants therefore may present at trial the evidence they have developed regarding the content of the Promotional Announcements and the corresponding effect of Plaintiffs' failure to terminate those announcements.

Alternatively, to the extent that the Court deems its statements to be a holding regarding the content of the Promotional Announcements, Defendants respectfully request that the Court reconsider that ruling, which was based on the Court's conclusions regarding two low-quality photocopies of the Promotional Announcements, without the benefit of further argument or the fact and expert testimony that Defendants have developed during these proceedings and are prepared to present at trial.

1

**EXHIBIT 27**
**1227**

## II.  RELEVANT FACTUAL BACKGROUND

### A.  The Parties Did Not Argue the Substance of the Promotional Announcements In Their Cross-Motions For Summary Judgment.

On April 30, 2007 the parties filed cross-motions for partial summary judgment.  Among the relief sought by Defendants in their motion was a limited request relating to whether or not Plaintiffs had successfully recaptured the copyrightable material in the Promotional Announcements.  Defendants contended that Plaintiffs had not recaptured the copyrightable material and sought "an Order determining that DC and its licensees are entitled to continue to exploit all of the copyrightable elements contained in the [Promotional] Announcement[] without the need to account to or share with Plaintiffs any of the profits generated from such use...."  (Defs' SJ Memo at 42.)

In their Opposition, Plaintiffs mischaracterized the scope of Defendants' summary judgment request, arguing, *inter alia*, that Defendants' motion should be denied because "the question of what literary elements are actually contained in the [Promotional Announcements], itself, is [] a genuine issue of material fact." (Pls' Opp at 50.)  Plaintiffs also argued that "[i]n assessing this issue one must not look at the announcement through the lens of the 'Superman' story contained in *Action Comics, # 1* (or even its full blown color cover), or the mythology it spawned, but at the announcement, itself." (*Id.*)

In their Reply and in response to Plaintiffs' claim that there was a fact issue as to the content of the Promotional Announcements, Defendants reiterated the limited scope of their request for summary judgment:

> [t]he question of what literary elements are contained in the Announcements (Pl. Mem. at 50) misses the point of Defendants' motion which only seeks to establish that they are outside the termination window.  In addition, any question about their contents is most obviously answered

2

1        by the ads which speak for themselves.  Notwithstanding

2        Plaintiffs' urging, id., no special "lens" is required.  For

3        now, however, the Court *is only being asked to rule that*

4        *Defendants' rights to use these works (and their contents)*

5        *have not been terminated.*

6   (Defs' Reply at 44) (emphasis added).

7        **B.     Defendants' Circumscribed Summary Judgment Motion Did Not**

8               **Include The Evidence Defendants Plan To Present During Trial**

9               **Regarding The Scope Of The Material In The Promotional**

10              **Announcements.**

11        As Plaintiffs rightfully pointed out in their Opposition, the question of the

12  *content* of the terminated Promotional Announcements was not properly

13  presented at the summary judgment stage because it involves genuine issues of

14  material fact.  Accordingly, Defendants limited their evidence to the issue at hand

15  – whether the Promotional Announcements fell outside the scope of the

16  termination window.

17        Thus, other than the general observation that the Promotional

18  Announcements depicted the cover of *Action Comics #1*, Defendants presented

19  no evidence on the Motion as to their content.  Defendants also did not raise on

20  the motion any issue regarding the consequences flowing from the failure to

21  terminate the Promotional Announcements, and as such did not place, or offer to

22  place, an original of one of the Announcements before the Court.  Instead, and

23  consistent with the limited relief being sought, Defendants attached only two low

24  quality copies of the Promotional Announcements – one a multiple generation

25  photocopy from *More Fun Comics No. 31*, and the other a photocopied plain

26  paper printout of a photograph taken of *Detective Comics No. 15*.  Because

27  Defendants sought only an order that they (and not Plaintiffs) owned all

28  copyright rights in the contents of the Promotional Announcements and did not

3

**EXHIBIT 27**
**1229**

1   seek a ruling on the scope of material in the Promotional Announcements,

2   Defendants did not submit the originals or even high quality reproductions of the

3   Promotional Announcements, and did not present evidence as to the effect of

4   Plaintiffs' failure to recapture.  Similarly, Defendants did not present evidence

5   and testimony from their expert explaining what copyrightable elements from the

6   Superman backstory are present in the Promotional Announcements.

7          While Plaintiffs, in their Opposition, did present the Court with some of

8   the evidence they had developed regarding the content of the Promotional

9   Announcements, they did so only for the purpose of demonstrating to the Court

10  that the scope of that content was *disputed* and therefore not a proper subject for

11  summary judgment.  This evidence included a declaration from their expert

12  witness, James Steranko, attaching his rebuttal expert report articulating

13  Plaintiffs' position regarding the scope of the copyrightable content in the

14  Promotional Announcements.  Mr. Steranko's declaration also included several

15  paragraphs disputing the opinions reached by Defendants' expert witness, Jeff

16  Rovin, on that subject, and attached a copy of Mr. Rovin's report. (Declaration of

17  James Steranko in Opposition to Defendants' Motion for Partial Summary

18  Judgment, ¶¶ 30-41.)[1]

19  **C.    Defendants Reaffirmed The Limited Scope Of Their Summary**

20          **Judgment Request During The September 17, 2007 Oral**

21          **Argument.**

22         The Court held oral argument on the parties' respective cross-motions for

23  partial summary judgment on September 17, 2007.  At argument, the Court gave

24  its "tentative thoughts" on the Promotional Announcements, which included the

25  Court's thoughts on both the issue of whether Plaintiffs had terminated the

26

27

28  [1] As Defendants pointed out on Reply, Mr. Steranko purported to rebut testimony from
    Mr. Rovin even though Defendants offered no such testimony in their moving papers.
    (*See* Defs' Reply at 15.)

**EXHIBIT 27**
**1230**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 207 of 343
Case 2:04-cv-08400-ODW-RZ    Document 397    Filed 05/14/2008    Page 10 of 25
Page ID #:17484

1   Announcements and the separate issue of the content of the Announcements.

2   (*See* Transcript ("Tr.") at 37-38).

3          Later in the argument, Defendants' counsel described the narrow contours

4   of their summary judgment request regarding the Promotional Announcements,

5   and made it clear that the *content* of the Announcements was not an issue before

6   the Court:

7                  [T]here are certain things, obviously, in the ads. *But our*

8                  *summary judgment motion seeks to establish the principle*

9                  *that the ads were not covered*, and, therefore, *whatever they*

10                 *included* would be freed up.  For later, we have experts on

11                 that, and that's really a question of apportionment and

12                 allocation that would come up later.

13  (*Id.* at 43) (emphasis added).  Defendants' counsel subsequently reemphasized

14  that the content of the Promotional Announcements was a factual issue that both

15  parties would address at trial:

16                 I mean, we didn't address that in the motion, and we have

17                 experts on that who can tell you that they can see more into

18                 that than the Plaintiffs see.  And the Plaintiffs will say there's

19                 nothing in it.  *That is something for another day.*

20  (*Id.* at 44) (emphasis added).  The Court did not ask Defendants' counsel to

21  describe the evidence Defendants had developed on the issue, and Plaintiffs'

22  counsel, like Defendants' counsel, did not argue the content of the Promotional

23  Announcement during the oral argument.

24          D.     **The Court's Order On Summary Judgment.**

25          On March 26, 2008, the Court issued its Order on the parties' cross-

26  motions for summary judgment.  In beginning its discussion, the Court set forth

27  the "legal questions at stake in the parties' cross-motions," describing the only

28  issue relating to the Promotional Announcements as "whether any copyrightable

**EXHIBIT 27**
**1231**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 208 of 343
Case 2:04-cv-08400-ODW-RZ   Document 307   Filed 05/14/2008   Page 11 of 25
Page ID #:17485

1   Superman material contained in the promotional advertisements for *Action*

2   *Comics*, Vol. 1, lies outside the reach of the termination notice (and hence, the

3   termination notice is not enforceable against it)."  (Order at 23.)  Thereafter,

4   pages 26-42 of the Order are devoted to Defendants' claim on the Promotional

5   Announcements.  The Court adopted Defendants' position, finding that "the

6   publication date for at least one of the comics containing the Promotional

7   Announcements falls outside the reach of the termination notice and, therefore,

8   any copyrightable material contained therein (including that found in the cover to

9   Action Comics, Vol. 1 as depicted in those announcements) remains for

10  defendants to exploit."  (Order at 39-40.)

11       However, the Court did not conclude its discussion with a ruling on the

12  issues raised in Defendants' motion.  Rather, it went on to state its observations

13  regarding the *content* of the Promotional Announcements, as determined from the

14  low quality photocopies before it:

15  • "[N]othing concerning the Superman storyline (that is, the literary

16     elements contained in Action Comics, vol. 1) is on display"

17     including "Superman's name, his alter ego, his compatriots, his

18     origins, his mission to serve as a champion of the oppressed, or his

19     heroic abilities in general" (*id.* at 40);

20  • The pictorial illustration of Superman is "fairly limited" (*Id.*);

21  • The person depicted has "great strength" and is "wearing some type

22     of costume" but "significantly" the costume is in black and white

23     (*Id.*);

24  • The "S" crest is not recognizable but rather "[w]hat is depicted on

25     the chest of the costume is so small and blurred as to not be readily

26     recognizable, at best all that can be seen is some vague marking or

27     symbol its precise contours hard to decipher."  (*Id.*)

28

DEFENDANTS' MOTION FOR CLARIFICATION AND/OR RECONSIDERATION

**EXHIBIT 27**
**1232**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 209 of 343
Case 2:04-cv-08400-ODW-RZ    Document 307    Filed 05/14/2008    Page 12 of 25
Page ID #:17486

1       The Court went on to state "that defendants may continue to exploit the

2 image of a person with extraordinary strength who wears a black and white

3 leotard and cape. What remains of the Siegel and Shuster's Superman copyright

4 that is still subject to termination (and, of course, what defendants truly seek) is

5 the entire storyline from <u>Action Comics</u> Vol. 1, Superman's distinctive blue

6 leotard (complete with its inverted triangular crest across the chest with a red "S"

7 on a yellow background), a red cape and boots, and his superhuman ability to

8 leap tall buildings, repel bullets, and run faster than a locomotive, none of which

9 is apparent from the announcement." (*Id.* at 40-41.)

10       These statements are the subject of this motion.

11 **III.**   **DEFENDANTS REQUEST CLARIFICATION THAT THEY MAY**

12       **PRESENT EVIDENCE ON THE CONTENT OF THE**

13       **PROMOTIONAL ANNOUNCEMENTS AT TRIAL**

14       The law of the case doctrine generally prevents a court from

15 "reconsidering an issue previously decided by the same court." *Milgard*

16 *Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990).

17 It is black letter law that an issue must be decided on the merits before it becomes

18 the law of the case, and the necessary corollary to this well-established

19 proposition is that dicta – language that is superfluous or unnecessary to an issue

20 before the Court – cannot be the law of the case. *Id.*; *Rebel Oil Co.. v. Atlantic*

21 *Richfield Co.*, 146 F.3d 1088, 1093 (9th Cir. 1998). Defendants accordingly seek

22 clarification from the Court on the proper import of its statements regarding the

23 *content* of the Promotional Announcements: Were they necessary to its summary

24 judgment ruling, and therefore the law of the case, or were they commentary on

25 the subset of evidence the Court had before it, and therefore dicta that does not

26 preclude Defendants from presenting their evidence on the issue at trial?[2]

27

28   [2] Even if a Court's interlocutory ruling is considered the be the law of the case, the
Court retains the inherent authority to alter that ruling. *See Magnesystems, Inc. v.
Nikken, Inc.*, 933 F. Supp. 944, 949 (C.D. Cal. 1996) ("with regard to interlocutory

7

**EXHIBIT 27**

**1233**

1    Defendants respectfully submit that the Court's observations about the content of

2    the Promotional Announcements should not be considered binding because

3    neither party placed the issue before the Court.

4        It is evident from the record that *was* before the Court – consisting of the

5    parties' respective summary judgment papers and the statements they made

6    during oral argument – that neither party asked the Court to determine the

7    contents of the Promotional Advertisements.  Defendants expressly and

8    purposely limited the scope of their motion on the Promotional Announcements

9    to the legal issue of whether Plaintiffs properly terminated the works.  As

10   described in the fact section above, in their moving brief Defendants only

11   requested a limited "Order determining that DC and its licensees are entitled to

12   continue to exploit all of the copyrightable elements contained in the

13   [Promotional] Announcements."  (Defs' SJ Memo at 42.)  And on reply

14   Defendants reiterated the narrow reach of their motion, namely, that "the Court is

15   only being asked to rule that Defendants' rights to use these works (and their

16   contents) have not been terminated."  (Defs' Reply at 44.)

17       Plaintiffs likewise did not argue that the Court should rule on the content

18   of the Promotional Announcements at the summary judgment stage.  In fact, even

19   though Defendants did not raise the issue in their affirmative motion, Plaintiffs

20   responded in their Opposition that the substance of the Promotional

21   Announcements *should not* be decided on summary judgment because the

22   determination involved "classic issues of fact, precluding summary judgment."

23   (Pls' Opp. at 51.)

24

25

26   decisions made at the trial level, the law of the case doctrine is little more than a
     management practice to permit logical progression toward judgment") (citations and
27   internal quotations omitted); *see also Siegel v. Time Warner Inc.*, 496 F. Supp. 2d
     1111, 1134-35 (C.D. Cal. 2007).  In Part IV below, Defendants explain why the Court
28   should exercise its discretion to reconsider its statements regarding the scope of the
     Promotional Announcements, even if the Court considers those statements to be
     binding.

8

DEFENDANTS' MOTION FOR CLARIFICATION AND/OR RECONSIDERATION

**EXHIBIT 27**
**1234**

1    Nor did either party present its affirmative evidence regarding the content

2    of the Promotional Announcements − evidence that each party has developed for

3    trial. Defendants, who did not move on the disputed factual issue, had no reason

4    to submit their expert Jeff Rovin's report on the topic. And they likewise had no

5    reason to submit a declaration from Mr. Rovin further elucidating his report. In

6    addition, the copies of the Promotional Announcements that Defendants attached

7    to their filing were of low quality − sufficient only to establish Defendants' claim

8    that a cover image of *Action Comics #1* was published in the pertinent comic

9    books, as Defendants were not seeking a ruling on the content of those

10    Announcements.[3]

11    Likewise, Plaintiffs did not present evidence to establish the content of the

12    Announcements. While they submitted a declaration from their rebuttal expert

13    James Steranko explaining his opinion regarding the content of the

14    Announcements and challenging the conclusions Mr. Rovin reached in his

15    report,[4] they did so not to establish the content of the Promotional

16    Announcements but to buttress their argument that the issue was not one that

17    could be decided on summary judgment. (Pls' Opp. at 51.) Because Defendants

18    agreed that the issue was not to be decided on summary judgment, and indeed

19    had not placed the issue before the Court, there was no need for Defendants'

20    expert, Mr. Rovin, to draft a responsive declaration addressing the substantive

21    matters contained in Mr. Steranko's declaration.

22    As set forth above, the positions the parties took during the September 17

23    argument did not diverge from the positions they presented in their summary

24    judgment papers; namely, that the content of the Announcements was not at

25

26    [3] High resolution copies of those Announcements are attached to the Declaration of
27    Wayne M. Smith ("Smith Decl.") as Exs. "A", "B" and "C", Defendants will have an
original of one of the Promotional Announcements available for the Court's inspection
at the hearing on the motion.

28    [4] Plaintiffs also included Mr. Rovin's initial expert report and Mr. Steranko's rebuttal
report as exhibits to Mr. Steranko's declaration.

9

DEFENDANTS' MOTION FOR CLARIFICATION AND/OR RECONSIDERATION

EXHIBIT 27
1235

1   issue.  When confronted with the Court's impressions of the Promotional

2   Announcements, Defendants' counsel reiterated the scope of their motion:

3                [T]here are certain things, obviously, in the ads.  But our

4                summary judgment seeks to establish the principle that

5                the ads were not covered, and, therefore, whatever they

6                included would be freed up.  For later, we have experts

7                on that, and that's really a question of apportionment and

8                allocation that would come up later. . . . I mean, we

9                didn't address [the content of the Announcements] in the

10               motion, and we have experts on that who can tell you

11               that they can see more into that than the Plaintiffs see.

12               And the Plaintiffs will say there's nothing in it.  That is

13               something for another day.

14   (Tr. at 43-44.)  Plaintiffs' counsel did not dispute the limited scope of

15   Defendants' summary judgment request or address the substance of the

16   Announcements during the argument.

17        The Court's Order cites to language from Defendants' Reply brief that at

18   first glance appears to suggest that the Court should determine the copyrightable

19   content of the Promotional Announcements without the benefit of further

20   evidence or testimony:  "any question about the[] contents [of the

21   Announcements] is most obviously answered by the ads which speak for

22   themselves.  Notwithstanding Plaintiffs['] urging [] no special 'lens' is required."

23   (Defs' Reply at 44; Order at 40.)  However, these comments were not intended to

24   and did not place the issue squarely before the Court.  In fact, when the quotation

25   is placed back into the context of defendants' Reply brief, bracketed by the

26   language reaffirming the limited scope of defendants' Motion, it is evident that

27   Defendants did not place the content of the Announcements at issue:

28

10

DEFENDANTS' MOTION FOR CLARIFICATION AND/OR RECONSIDERATION

**EXHIBIT 27**
**1236**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 213 of 343
Case 2:04-cv-08400-ODW-RZ    Document 307    Filed 05/14/2008    Page 16 of 25
Page ID #:17490

1       <u>The question of what literary elements are contained in</u>

2       <u>the Announcements (Pl Mem. at 50) misses the point of</u>

3       <u>Defendants' motion which only seeks to establish that</u>

4       <u>they are outside of the termination window.</u>  In addition,

5       any question about their contents is most obviously

6       answered by the ads which speak for themselves.

7       Notwithstanding Plaintiffs['] urging, *id.*, no special 'lens'

8       is required.  <u>For now, however, the Court is only being</u>

9       <u>asked to rule that Defendants' rights to use these works</u>

10      <u>(and their contents) have not been terminated.</u>

11 (Defs' Reply at 44 (emphasis added).)  It is also clear upon a careful reading of

12 the parties' summary judgment papers that Defendants' statement that the

13 Announcements "speak for themselves" was an affirmation of the facts of the

14 Announcements' identity and their publication before *Action Comics #1* and of

15 Plaintiffs' "argument" that the Announcements should not be evaluated "through

16 the lens of the 'Superman' story contained in Action Comics, No. 1." (Pls' Opp.

17 at 50.)[5]  This affirmation was not a retreat from Defendants' position that the

18 issue of the content of the Announcements, viewed through whatever lens,

19 involves fact determinations that cannot be addressed — and were not presented —

20 at the summary judgment stage.  While the statement was perhaps superfluous to

21 Defendants' argument that Plaintiffs had not terminated the copyrighted material

22 in the Announcements, it was by no means a request for the Court to issue a

23 ruling on the content of those Announcements.

24     In sum, the only relief Defendants sought regarding the Promotional

25 Announcements was a determination that DC and its licensees are entitled to

26 continue to exploit the copyrightable elements of those announcements without

27

28 [5] Plaintiffs' argument was part of their attempt to create the specter of material fact issues on the underlying relief Defendants sought by raising the independent issue of what was contained in the Announcements.

11

1   having to account to Plaintiffs.  Although, after ruling on the issue presented, the

2   Court went on to discuss the separate issue of the *content* of the Announcements,

3   Defendants respectfully submit that the Court's discussion of the content should

4   not bind the parties because that issue was not properly before the Court.

5   Accordingly, Defendants seek clarification from the Court that both parties may

6   present the disputed evidence they have developed on this issue at trial.

7   **IV.    THE COURT SHOULD NOT HAVE GRANTED SUMMARY**

8           **JUDGMENT ON THE DISPUTED FACTUAL ISSUE OF THE**

9           **COPYRIGHTABLE CONTENT OF THE PROMOTIONAL**

10          **ANNOUNCEMENTS**

11          If the Court rejects Defendants' motion for clarification by construing its

12   statements regarding the content of the Promotional Announcements to be a

13   ruling that is binding on the parties, Defendants respectfully request that the

14   Court reconsider that ruling for several reasons.  First, Defendants submit that the

15   Court's ruling, which it made *sua sponte*, impinged on Defendants' due process

16   rights.  Due to the Court's unforeseen willingness to go beyond the parties'

17   motions, Defendants had no notice that the Court was going to adjudicate the

18   issue at the summary judgment stage, and they did not present their arguments or

19   their best evidence – which would have included an original (or at the very least

20   a "clean" copy) of the Promotional Announcements, as well as expert testimony

21   on the significance of what is viewable and communicated to the reader who

22   perceives them.  Second, as Plaintiffs themselves argued, the issue of the content

23   of the Promotional Announcements cannot be resolved at the summary judgment

24   stage because it involves disputed questions of fact.  Third, because the Court did

25   not have the benefit of briefing from the parties articulating their respective

26   positions regarding the disputed content of the Promotional Announcements,

27   Defendants respectfully assert that the Court has erred in some of its conclusions.

28   Accordingly, Defendants seek a full and fair opportunity to present the fact finder

DEFENDANTS' MOTION FOR CLARIFICATION AND/OR RECONSIDERATION

**EXHIBIT 27**
**1238**

1   with their argument and evidence supporting their position regarding the content

2   of the Promotional Announcements.

3          As an initial matter, there is no doubt that the Court has the authority to

4   reconsider its interlocutory Order.  It is well settled in this District that, in

5   addition to the particular circumstances addressed by Local Rule 7.18,

6   interlocutory orders granting partial summary judgment may be reconsidered at

7   any time.  *Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059

8   (C.D. Cal. 2003) ("[A]n interlocutory decision, such as a grant of partial

9   summary judgment, is not final and may be reconsidered at any time."); *St. Paul*

10   *Fire & Marine Ins. Co. v. F.H.*, 55 F.3d 1420, 1425 (9th Cir. 1995) (partial

11   summary judgment is not a final judgment and is subject to reconsideration on

12   proper motion).  Such reconsideration of interlocutory rulings is based on the

13   Court's inherent power to reconsider, rescind, or modify an interlocutory order

14   for any cause seen by it to be sufficient, and is grounded in the common law, not

15   on any procedural rules.  *City of Los Angeles v. Santa Monica Baykeeper*, 254

16   F.3d 882, 885-86 (9th Cir. 2001) ("Nothing in the Rules limits the power of the

17   court to correct mistakes made in its handling of a case so long as the court's

18   jurisdiction continues, *i.e.*, until the entry of judgment.  In short, the power to

19   grant relief from erroneous interlocutory orders, exercised in justice and good

20   conscience, has long been recognized as within the plenary power of courts until

21   entry of final judgment and is not inconsistent with any of the Rules.").  *See also*

22   *Siegel*, 496 F. Supp. 2d at 1134-35.

23          The Court's ability to reconsider and set aside a prior order is also

24   provided for in Rule 60(b)(6).  This provision contains an "equitable remedy . . .

25   to prevent or correct an erroneous judgment" where a party can demonstrate both

26   injury and circumstances beyond his control that prevent him from proceeding

27   with the prosecution or defense in a proper fashion."  *Delay v. Pacific N.W. River*

28

13

**EXHIBIT 27**
**1239**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 216 of 343
Case 2:04-cv-08400-ODW-RZ    Document 307    Filed 05/14/2008    Page 19 of 25
Page ID #:17493

1  *Basins Comm'n*, 475 F.3d 1039, 1044 (9th Cir. 2007). *See also Siegel*, 496 F.

2  Supp. 2d at 1134-35.

     **A.**     **Defendants Did Not Have A "Full And Fair Opportunity" To**

4              **Litigate The Scope Of The Copyrightable Content Of The**

5              **Promotional Announcements.**

6        If taken as binding, the Court's statements concerning the content of the

7  Announcements are tantamount to summary judgment rulings. However, a Court

8  may grant summary judgment *sua sponte* in favor of a non-moving party only

9  where "the party that had moved for summary judgment had reasonable notice

10  that the Court might do so and so long as the party against whom summary

11  judgment was rendered had 'a full and fair opportunity to ventilate the issues

12  involved in the motion.'" *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir.

13  1982); *Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866

14  (9th Cir. 1985)." *Chem. Producers & Distribs. Ass'n v. Helliker*, 2004 U.S. Dist.

15  LEXIS 12650 at *5 (C.D. Cal. June 28, 2004). "In determining whether the

16  moving party had reasonable notice that the court might grant summary judgment

17  against it sua sponte, courts examine the case record. *See Cool Fuel*, 685 F.2d at

18  312." *Id.* Here, it is clear from the record that was before the Court that

19  Defendants did not have a "full and fair opportunity to ventilate the issue" of the

20  *scope* of copyrightable material in the Promotional Announcements, and that

21  Defendants did not have notice that the Court would rule on the issue. (*See*

22  Section III, *supra*.)

23        Based upon the clearly articulated contours of Defendants' motion and

24  Plaintiffs' unequivocal position that the issue of what is contained in the

25  Promotional Announcements is one of fact not appropriate for summary

26  judgment, Defendants had no notice that the issue was "in play" and would be

27  decided at the summary judgment stage. As a result, the Court was presented

28  with an unbalanced evidentiary record. Plaintiffs submitted factual evidence

**EXHIBIT 27**
**1240**

Case 2:04-cv-08400-ODW-RZ    Document 320-7    Filed 04/04/13    Page 217 of 343
Case 2:04-cv-08400-ODW-RZ    Document 307    Filed 05/14/2008    Page 20 of 25
Page ID #:17494

1   regarding the content of the Announcements, including a declaration from

2   Plaintiffs' expert Mr. Steranko attaching Mr. Steranko's rebuttal report on the

3   issue and disputing the expert testimony presented in Mr. Rovin's expert report.

4   However, that evidence was submitted not for the purpose of establishing the

5   scope of the copyrightable material contained in the Announcements, but in

6   support of Plaintiffs' argument that the determination involved factual issues that

7   could not properly be decided on summary judgment.

8       Defendants, who did not dispute that the issue (which had not even been

9   placed by them before the Court) involved factual determinations that should be

10  reserved for trial, did not present any contradictory evidence.  Thus, Defendants

11  did not proffer the evidence they had developed (such as a clean copy of one of

12  the Announcements) in support of their position that the Promotional

13  Announcements contain significant copyrightable components that are now

14  entirely owned by DC Comics and which elements should be discounted in any

15  accounting to Plaintiffs.  Furthermore, they did not challenge Mr. Steranko's

16  declaration rebutting Mr. Rovin's report, reserving argument on the disputed

17  factual issues for trial.

18      At trial, Defendants would present to the fact finder an original of each of

19  the two comic books containing the Promotional Announcements.  As is evident

20  from the first generation copies attached to the instant motion, with an increase in

21  quality and resolution, what is depicted – Superman in costume, including a

22  plainly recognizable S shield – is even more clear.  (Smith Decl. at ¶¶ 2-6, Exhs.

23  "A", "B" and "C" thereto.)  In addition, Defendants' expert Jeff Rovin would

24  testify as to what copyrightable literary elements and meaning are conveyed to

25  the reader in the visible components of the Promotional Announcements.[6]  As

26

27  _____

    [6] Mr. Rovin is well qualified to render an opinion on this topic.  He has been a writer,
    critic, historian and consultant in the film, television and publishing industries for
28  thirty-seven years, with special expertise in the areas of science fiction, fantasy and
    horror.  He has also been the media editor/critic for the Hugo-Award winning *Science
    Fiction Chronicle* for over thirteen years and was the science fiction media reporter for

15

DEFENDANTS' MOTION FOR CLARIFICATION AND/OR RECONSIDERATION

EXHIBIT 27
1241

1  Defendants' counsel noted in oral argument, in the particular medium at issue,

2  comic books, any particular visual image can convey a multitude of significant

3  story and character elements that would take many written words to depict. (Tr.

4  at 37-38.)[7]

5       Under the standard articulated in *Cool Fuel*, it would be procedurally

6  improper to grant summary judgment without giving Defendants the opportunity

7  to present this evidence regarding the copyrightable content of the Promotional

8  Announcements, and Defendants respectfully submit that it was error to rule

9  before trial on the scope and significance of the un-terminated Announcements.

10      **B.**    **The Court's Discussion Of The Contents Of The Promotional**

11              **Announcements Also Appears To Decide Genuine Issues Of**

12              **Material Fact Inappropriate For Adjudication On Summary**

13              **Judgment.**

14       Defendants further respectfully submit that the Court erred in ruling on the

15  scope and meaning of the copyrightable elements found in the Promotional

16  Announcements – as distinguished from the facts of their existence, publication

17  dates and surface-level graphic content – on the additional ground that such is a

18  genuine issue of material fact not appropriate for determination on summary

19  judgment. Indeed, the Court's entire discussion as to what actually appears in the

20  Promotional Announcements (beyond identification of the Announcements

21  themselves) consists of a factual determination – based upon incomplete and low

22  quality evidence – as to what creative elements thereof are not subject to

23  recapture,

24       For example, in speaking about the emblem on Superman's chest at oral

25

26  *Omni* Magazine. As a novelist who works frequently in the genre of science fiction, he
has authored a dozen *New York Times* bestselling novels and spent many years as a

27  comic book editor, writer, and creator. (Declaration of Jeff Rovin In Support Of
Defendants' Motion For Summary Judgment, ¶¶ 1-2.)

28  [7] *See Detective Comics, Inc. v. Bruns Publishers, Inc.*, 111 F.2d 432, 433, 439 (2d Cir.
1940) (pictorial representations are capable of conveying a multitude of elements of
characterization and story with one picture having the value of many words).

16

**EXHIBIT 27**
**1242**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 219 of 343
Case 2:04-cv-08400-ODW-RZ   Document 307   Filed 05/14/2008   Page 22 of 25
Page ID #:17496

1  argument, the Court stated that "you can hardly make out whether it's an 'S' or a

2  '5' or what it is on his chest." (Tr. at 37.)  In its Order, the Court chose among

3  the various options articulated at argument – i.e., whether an "S" or "5" or

4  something else appears in the Announcements:

> "The argument that the 'S' crest is recognizable in the promotional
>
> advertisement is not persuasive.  What is depicted on the chest of
>
> the costume is so small and blurred as to not be readily
>
> recognizable, at best all that can be seen is some vague marking or
>
> symbol its precise contours hard to decipher." (Order at 40.)

10  Notably, in making this statement, the Court had before it only a low

11  resolution, multiple generation photocopy of the announcement – one that was

12  not presented for the purpose of having the Court evaluate its content.  Thus,

13  while the Court's description of the "S" crest in the photocopy before it as

14  "blurred" was accurate, it does an injustice to the original.  This becomes readily

15  apparent when the "S" crest from the photocopied image of the *More Fun*

16  *Comics #31* Announcement in the Court's Order is compared to a full resolution

17  scan of the same image taken directly from the original of *More Fun Comics #31*:

  

*More Fun #31* – 1200 dpi scan          *More Fun #31* - Court's Order

25  *See* Smith Decl. at ¶ 7.

26  In sum, the Court made a finding of fact as between the various possible

27  outcomes it identified at oral argument.  Defendants respectfully assert that this

28  was error – as these were findings of fact reserved to the fact finder at trial and,

17

**EXHIBIT 27**
**1243**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 220 of 343
Case 2:04-cv-08400-ODW-RZ   Document 307-9   Filed 05/14/2008   Page 23 of 25
PageID #:17497

1   as both parties agreed, not appropriately determined on a motion for summary

2   judgment.

3       **C.    Because The Court Did Not Have The Benefit Of A Clear**

4           **Version Of The Promotional Announcement And Of The**

5           **Parties' Briefing On The Subject, The Order Contains Certain**

6           **Clearly Demonstrable Errors Of Fact And Law.**

7           Defendants further respectfully assert that the Court's Order as it relates to

8   the content of the Promotional Announcements contains substantive errors of law

9   and fact – errors that would not have occurred if the Court had the benefit of the

10  "full ventilation" of issues as required under the law of this Circuit, including

11  briefing and a full record.

12          For example, contrary to the statement in the Order, and as demonstrated

13  above, a review of the actual Promotional Announcements shows that the "S"

14  crest and the emblem are visibly discernable.  (Smith Decl. Exhs. A-C.)

15  Moreover, Defendants submit that they are at least as "readily recognizable" as

16  they are in the published color version of *Action Comics #1*.  In this regard, the

17  *Action Comics #1* cover reproduced at page 13 of the Order (where a red "S" is

18  clearly visible), is not as it originally appeared in 1938.  Rather, it is a reproduced

19  cover from the DC Comics Archive Edition published in 1997, which as

20  indicated on the indicia page of the book, is a complete reconstruction of the

21  original.  The cover of *Action Comics #1* as it actually appeared in the June 1938

22  edition typically suffers from marginal to poor color registration – *i.e.*, the colors

23  do not line up properly – and as a result the "S" in the crest can be difficult to

24  clearly discern.  Thus, at trial Defendants intend to demonstrate that the "S" from

25  the *Action Comics # 1* cover depicted in *More Fun Comics #31* is at least as

26  "readily recognizable" as the "S" that appears in the actual color published

27  versions of *Action Comics #1*, and often more so:

28

18

**EXHIBIT 27**

**1244**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 221 of 343
Case 2:04-cv-08400-ODW-RZ   Document 307   Filed 05/14/2008   Page 24 of 25
Page ID #:17498




More Fun #31 (4/5/38)            Action Comics # 1 (4/16/38)

*See* Smith Decl. at ¶ 8.

Similarly the Court characterizes (in Defendants' view incorrectly) the copyrightable elements from the Promotional Announcements as "fairly limited." (Order at 40.)  Defendants respectfully assert, however, that upon review of a full record – including expert testimony – the fact finder would agree with Defendants that the Promotional Announcements represent the first visual depiction of the Superman character in costume.  While the Announcement is in black and white, the costume is more than just a "black and white leotard and cape" but is identical in all aspects (except color) to the costume as it appears in *Action Comics # 1*.  In other words, it is a costume devoid of color (because of the black-and-white medium used for the Announcements), as opposed to a costume consisting of the colors black and white.

The evidence would also demonstrate that the facial features of Superman in the Promotional Announcements are clearly discernable and are identical to those of the Superman character in *Action Comics # 1*.  Similarly, while the Court appears to hold that of all of Superman's powers, only his "great strength" appears in the Promotional Announcements, a full record would demonstrate the pivotal importance of this one characteristic in Superman as he appears in *Action Comics # 1* and thereafter.

Additionally, the Court states in its Order that, *inter alia*, "Superman's name . . . do[es] not remain within defendants' sole possession to exploit." (Order at 40.)  While it is true that Superman's name appears nowhere in the Promotional Announcements, the name is not the subject matter of copyright

19

**EXHIBIT 27**
**1245**

1 protection. (Cite.) As a result, it could not be the subject of Plaintiffs' copyright

2 termination under 17 U.S.C. § 304 (c). What is more, the word "Superman" has

3 become a valuable *trademark* exclusively owned by DC Comics. As the Court

4 has ruled, trademark rights are expressly excluded from the reach of Plaintiffs'

5 copyright termination. (Order at 68; 17 U.S.C. § 304 (c)(6)(E).) Thus, Plaintiffs'

6 copyright termination cannot affect Defendants' exclusive rights in the Superman

7 name, and Defendants respectfully submit that to the extent the Order holds

8 otherwise it is in error.

9 **V.** **CONCLUSION**

10 For the foregoing reasons, Defendants respectfully request that this Court

11 clarify that the portion of the Order discussing the scope of copyrighted material

12 in the Promotional Announcements is non-binding and therefore dicta, not the

13 law of the case. Alternatively, if the Court construes that language in the Order

14 to be a binding determination, Defendants respectfully request that the Court

15 reconsider and reverse that determination, and allow the parties to address that

16 issue at trial.

17 Respectfully submitted,

18 DATED: May 12, 2008 WEISSMANN WOLFF BERGMAN
COLEMAN GRODIN & EVALL LLP

19

20 By: Michael Bergman

21 Michael Bergman

22 *Attorneys for Defendants and Counterclaimant*

23

24

25

26

27

28

# EXHIBIT 28

Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 1 of 34

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON

6
                    UNITED STATES DISTRICT COURT
7
          CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION
8

9   JOANNE SIEGEL, an individual; and       Case No. CV 04-8400 SGL (RZx)
10  LAURA SIEGEL LARSON, an
    individual,                              [Honorable Stephen G. Larson]
11
                    Plaintiffs,             **PLAINTIFFS JOANNE SIEGEL**
12                                          **AND LAURA SIEGEL LARSON'S**
            vs.                             **MEMORANDUM OF POINTS AND**
13                                          **AUTHORITIES IN SUPPORT OF**
    TIME WARNER INC., a corporation;        **MOTION FOR CLARIFICATION**
14  WARNER COMMUNICATIONS             **AND/OR RECONSIDERATION OF**
    INC., a corporation; WARNER            **THE COURT'S MARCH 26, 2008**
15  BROS. ENTERTAINMENT INC., a     **PARTIAL SUMMARY**
    corporation; WARNER BROS.              **JUDGMENT ORDER**
16  TELEVISION PRODUCTION INC.,
    a corporation; DC COMICS, a general     [Complaint filed: October 8, 2004]
17  partnership; and DOES 1-10,
                                            Date:   July 14, 2008
18                                          Time:   10:00 a.m.
                                            Place:  Courtroom 1
19                  Defendants.
                                            [Notice Of Motion; Declaration
20                                          of Marc Toberoff Filed Previously]
    DC COMICS,
21
                    Counterclaimant,
22
            vs.
23
    JOANNE SIEGEL, an individual; and
24  LAURA SIEGEL LARSON, an
    individual,
25
26                  Counterclaim Defendants.
27
28

    PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

EXHIBIT 28
1247

## TABLE OF CONTENTS

<u>INTRODUCTION</u> ................................................................... 1

<u>ARGUMENT</u> ........................................................................ 3

I.   **DEFENDANTS, AT BEST, HOLD A COPYRIGHT IN THE
     "IMAGE" OF THE ACTION COMICS NO. 1 COVER "AS
     DEPICTED" IN THE AD, DEVOID OF SUPERMAN
     CONTEXT** ................................................................... 3

     A.   <u>The Copyright In A Pictorial Work Protects Only
          Its Visual Content And Objective Appearance</u> ..................... 4

     B.   <u>Defendants Cannot Own The Basic Ideas Or Subject
          Matter Depicted In The Ad</u> ...................................... 5

     C.   <u>Publication of the Ad Did Not "Copyright" Superman
          Elements</u> ...................................................... 6

II.  **REPRODUCTION IN THE AD OF THE PRE-EXISTING
     COVER DOES NOT QUALIFY FOR COPYRIGHT
     PROTECTION** ................................................................ 8

     A.   <u>The Reproduction in the Ad of the Cover of Action
          Comics No. 1 is Not Sufficiently "Original" To Be
          Copyrightable</u> .................................................. 8

          1.   <u>The Variations in the Advertisement are Trivial</u> ............. 9

          2.   <u>An Unwarranted Copyright In The Ad's "Cover
               Image" Improperly Threatens the Copyright in the
               Underlying Work</u> ........................................... 11

III. **THE PROMOTIONAL ANNOUNCEMENTS DO NOT
     HAVE DIVESTIVE EFFECT ON PLAINTIFFS'
     COPYRIGHT** ................................................................ 13

     A.   <u>***Batjac's*** Narrow Holding Regarding Derivative Works in
          the Public Domain and the Policies Behind It Do Not Fit
          This Case</u> ..................................................... 13

i

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 226 of 343
Page ID #:17503
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 3 of 34

    B.    **There is No Precedent For Expanding _Batjac_ Beyond The Public Domain Context To Subsisting Statutory Copyrights As It Conflicts With Longstanding Copyright Precepts** ..................................................................14

IV.    **PLAINTIFFS NEED NOT HAVE INCLUDED THE ADS IN THEIR TERMINATION NOTICES AS THE ADS WERE DETECTIVE'S DERIVATIVE WORKS, NOT SIEGEL'S WORKS** ...............................................................16

V.    **PLAINTIFFS' FAILURE TO LOCATE THE OBSCURE ADS CONSTITUTES HARMLESS ERROR; THEIR TERMINATION NOTICES PROVIDED DEFENDANTS WITH AMPLE NOTICE** ...........................................17

VI.    **THE ORDER'S HISTORICAL SUMMARY INCLUDES CONTESTED FACTS PROPERLY DECIDED AT TRIAL** .......20

    A.    **The Order May Be Interpreted As "Ruling" on Issues of Fact Not Before the Court** .........................................20

    B.    **The Disputed Contents of Action Comics, No. 1 Present Issues of Fact Inappropriate for Summary Judgment** ........21

    C.    **Even if the Court Were to Rule As to the Disputed Literary Elements in Action Comics No. 1, Due Process Requires Giving the Parties an Opportunity to Brief the Issues** ........................................................................22

    D.    **Elements Listed in the Court Order as Being the Preserve of the Defendants First Appeared in Action Comics No. 1** ...............................................................23

**CONCLUSION** ........................................................................25

ii

1

## TABLE OF AUTHORITIES

2  **<u>Federal Cases</u>**                                                        **<u>Page</u>**

3
  *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts,*
4  402 F.3d 700 (6th Cir. 2005) ...................................................................... 11

5
  *Batjac Productions Inc. v. Goodtimes Home Video Corp.,*
6  160 F.3d 1223 (9th Cir. 1998) ............................................................. *passim*

7
  *Berkic v. Crichton,*
8  761 F.2d 1289 (9th Cir. 1990) ..................................................................... 5

9
  *Buckingham v. U.S.,*
10  998 F.2d 735 (9th Cir. 1993) ...................................................................... 23

11
  *Cavalier v. Random House,*
12  297 F.3d 815 (9th Cir. 2002) ................................................................... 2, 4

13
  *Celotex Corp. v. Catrett,*
14  477 U.S. 317 (1986) .................................................................................... 22

15
  *Classic Film Museum, Inc. v. Warner Bros., Inc.,*
16  597 F.2d 13 (1st Cir. 1979) ......................................................................... 14

17
  *Cordon Holding B.V. v. Northwest Publishing Corp.,*
18  63 U.S.P.Q.2d 1013, 2002 WL 530991 (S.D.N.Y. 2002) ........................... 15

19
  *Cordon Art B.V. v. Walker,*
20  40 U.S.P.Q.2d 1506, 1996 WL 672969 (S.D. Cal. 1996) ............................ 8

21
  *Corwin v. Walt Disney Co.,*
22  2004 WL 5486639 (M.D. Fla. 2004) ........................................................... 4

23
  *Cosmos Jewelry Ltd. v. Po Sun Hon Co.,*
24  470 F.Supp.2d 1072 (C.D. Cal. 2006) ....................................................... 10

25
  *Darden v. Peters,*
26  488 F.3d 277 (4th Cir. 2007) ...................................................................... 11

27

28

**EXHIBIT 28**
**1250**

Case 2:04-cv-08400-ODW-RZ     Document 720-7     Filed 04/04/13     Page 228 of 343
Page ID #:17505
Case 2:04-cv-08400-SGL-RZ     Document 312     Filed 05/16/2008     Page 5 of 34

*Donald v. Zack Meyer's TV Sales*,
426 F.2d 1027 (5th Cir. 1970) ............................................................... 9

*Durham Indus., Inc. v. Tomy Corp.*,
630 F.2d 905 (2d Cir. 1980) ............................................................ 9-11

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ......................................................... 9-12

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
499 U.S. 340 (1991).......................................................................... 15

*Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*,
462 F.3d 1072 (9th Cir. 2006) ............................................................ 2

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
193 F.2d 162 (1st Cir. 1951) ............................................................... 6

*Gardenia Flowers, Inc. v. Josehp Markovits, Inc.*,
280 F.Supp. 776 (S.D.N.Y. 1968) .................................................... 9, 11

*Gracen v. Bradford Exch.*,
698 F.2d 300 (7th Cir. 1983) ............................................................ 11

*Greene v. Solano County Jail*,
513 F.3d 982 (9th Cir. 2008) ............................................................ 23

*Harris Custom Builders, Inc. v. Hoffmeyer*,
92 F.3d 517 (7th Cir. 1996) ......................................................... 12, 14

*Hearn v. Meyer*,
664 F.Supp.832 (S.D.N.Y. 1987) ................................................... 10-11

*JCW Investments, Inc. v. Novelty, Inc.*,
482 F.3d 910 (7th Cir. 2007) ............................................................. 4

*Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Fun Group, Inc.*,
443 F. Supp. 291 (S.D.N.Y. 1977) ....................................................... 7

*L. Batlin & Son, Inc. v. Snyder*,
536 F.2d 486 (2d Cir. 1976) ......................................................... 9-11

TABLE OF AUTHORITIES

iv

**EXHIBIT 28**
**1251**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 229 of 343
Page ID #:17506
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 6 of 34

*Levine v. McDonalds Corp.*,
735 F.Supp. 92 (S.D.N.Y. 1990) ................................................................ 22

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) ................................................................... 4

*Magic Marketing, Inc. v. Mailing Services of Pittsburgh, Inc.*,
634 F.Supp. 769 (W.D. Pa. 1986).............................................................. 9

*Maljack Productions, Inc. v. UAV Corp.*,
964 F.Supp. 1416 (C.D. Cal. 1997) ......................................................... 12

*Masterson Marketing, Inc. v. KSL Recreation Corp.*,
495 F. Supp. 2d 1044 (S.D. Cal. 2007)...................................................... 4

*Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*,
724 F.2d 357 (2d Cir. 1983) ..................................................................... 6

*McCulloch v. Albert E. Price, Inc.*,
823 F.2d 316 (9th Cir. 1987) ..................................................................... 4

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) .................................................................. 7

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)................................................................................. 18

*Milton H. Greene Archives, Inc. v. BPI Communications, Inc.*,
378 F.Supp.2d 1189 (C.D. Cal. 2005) ..................................................... 15

*Oddo v. Reis*,
743 F.2d 630 (9th Cir. 1984) ............................................................... 1, 17

*Pasillas v. McDonald's Corp.*,
927 F.2d 440 (9th Cir. 1991) ..................................................................... 4

*Past Pluto Prods. Corp. v. Dana*,
627 F.Supp. 1435 (S.D.N.Y. 1986) .................................................... 10, 12

*Perry v. Sonic Graphic Sys.*,
94 F.Supp.2d 616 (E.D. Pa. 2000)........................................................... 21

TABLE OF AUTHORITIES

v

**EXHIBIT 28**

**1252**

*Portsmouth Square, Inc. v. Shareholders Protective Comm.,*
770 F.2d 866 (9th Cir.1985) ........................................................ 23

*Satava v. Lowry,*
323 F.3d 805 (9th Cir. 2003) .................................................... 6, 9

*Scholastic Entertainment, Inc. v. Fox Entertainment Group, Inc.,*
336 F.3d 982 (9th Cir. 2003) ...................................................... 23

*Shaw v. Lindheim,*
919 F.2d 1353 (9th Cir. 1990) .................................................. 5, 21

*Shea v. Fantasy Inc.,*
Not Reported in F.Supp.2d, 2003 WL 881006 (N.D.Cal. 2003) .................. 15

*Sherry Manufacturing Co. v. Towel King of Florida, Inc.,*
753 F.2d 1565 (11th Cir. 1985) .................................................. 10

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
309 U.S. 390 (1940) .............................................................. 21

*Shoptalk, Ltd. v. Concorde-New Horzions Corp. ("Shoptalk"),*
168 F.3d 586 (2d Cir. 1999) .............................................. *passim*

*Sid & Marty Krofft Television v. McDonald's Corp.,*
562 F.2d 1157 (9th Cir. 1977) ................................................... 21

*Silverman v. CBS, Inc.,*
632 F. Supp. 1344 (S.D.N.Y. 1986) ............................................... 7

*Sobhani v. @Radical.Media Inc.,*
257 F.Supp.2d 1234 (C.D. Cal. 2003) ............................................ 12

*Spilman v. Mosby-Yearbook, Inc.,*
115 F. Supp. 2d 148 (D. Mass. 2000) ............................................ 11

*Swirsky v. Carey,*
376 F.3d 841 (9th Cir. 2004) .................................................... 5

*Three Boys Music Corp. v. Bolton,*
212 F.3d 477 (9th Cir. 2000) ................................................... 21

TABLE OF AUTHORITIES

vi

**EXHIBIT 28**
**1253**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 231 of 343
Page ID #:17508
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 8 of 34

1
2   *Toho Co. Ltd. v. William Morrow & Co.,*
    33 F.Supp.2d 1206 (C.D. Cal. 1998) ............................................................ 7
3
4   *Toliver v. Sony Music Ent.,*
    149 F. Supp. 2d 909 (D. Alaska 2001) ........................................................ 5
5
6   *Twentieth Century-Fox Film Corp. v. MCA, Inc.,*
    715 F.2d 1327 (9th Cir. 1983) .................................................................... 21
7
8   *Walker v. Forbes, Inc.,*
    28 F.3d 409 (4th Cir. 1994) ........................................................................ 21
9
10  *Walt Disney Prods. v. Air Pirates,*
    581 F.2d 751 (9th Cir. 1978) ........................................................................ 7
11
12  *Warner Bros., Inc v. American Broadcasting Cos.,*
    530 F. Supp. 1187 (S.D.N.Y. 1982) ............................................................ 7
13
14  *Winfield Collection, Ltd. v. Gemmy Indus., Corp.,*
    311 F. Supp. 2d 611 (E.D. Mich. 2004) ...................................................... 4
15
16  *Woods v. Universal City Studios, Inc.,*
    920 F. Supp. 62 (S.D.N.Y. 1996) ................................................................ 5
17
    **Federal Authorities**                                               **Page**
18
19  17 U.S.C. § 101 .......................................................................................... 8-9
20  17 U.S.C. § 103 ...................................................................................... 12, 15
21
22  17 U.S.C. § 304 .................................................................................... 1, 16-19
23  37 C.F.R. §202.1 ........................................................................................ 11
24  37 C.F.R. § 210.10 .................................................................................. 17-18
25
26  H.R. Rep. No. 94-1476 (1976) .................................................................... 5
27  Compendium I,
    Compendium of Copyright Office Practices .............................................. 13
28

TABLE OF AUTHORITIES

**EXHIBIT 28**
**1254**

Compendium II,
Compendium of Copyright Office Practices ........................................... 11, 13

**Other Authorities**                                                              **Page**

3 JAY DRATLER, JR. & STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW:
COMMERCIAL CREATIVE AND INDUSTRIAL PROPERTY § 6.04A..................... 18

1 NIMMER ON COPYRIGHT § 2.01 ..................................................... 9

1 NIMMER ON COPYRIGHT § 2.12 ..................................................... 7

1 NIMMER ON COPYRIGHT § 3.03 ..................................................... 15

1 NIMMER ON COPYRIGHT § 4.12 ................................................. 12, 16

3 NIMMER ON COPYRIGHT § 9.05 ..................................................... 18

3 NIMMER ON COPYRIGHT § 11.05 .................................................... 18

3 NIMMER ON COPYRIGHT § 13.03 ..................................................... 5

1 PATRY ON COPYRIGHT § 2:17 (2008) ............................................... 19

1 PATRY ON COPYRIGHT § 2:21 (2008) ............................................... 19

2 PATRY ON COPYRIGHT § 6:35 (2008) ............................................... 16

2 PATRY ON COPYRIGHT § 7:43 (2008) ............................................... 18

TABLE OF AUTHORITIES

**EXHIBIT 28**
**1255**

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION**

3       The Court's March 26, 2008 order ("Order") on the parties' cross-motions for

4   partial summary judgment upheld the validity of Plaintiffs' "Superman" Notices of

5   Termination filed pursuant to 17 U.S.C. § 304(c) and Plaintiffs' recapture of Jerome

6   Siegel's co-authorship share of the original illustrated <u>Superman</u> story published in

7   Action Comics No. 1 ("Action Comics No. 1"). The Order also held that at least one

8   "promotional announcement" containing a depiction of the cover of Action Comics

9   No. 1 "obtained statutory copyright protection *before* the earliest possible date

10  covered by Plaintiffs' termination notices" and "thus falls outside the reach of the

11  termination notice." Order at 39:22-28 (emphasis in original). The Court further

12  ruled on the scope of the material contained in the "promotional announcement,"

13  which "remains for defendants to exploit." Order at 40:1-23. Plaintiffs respectfully

14  request that the Court: (a) clarify that Defendants did not secure any copyrightable

15  <u>Superman</u> elements via the "promotional announcements;" and/or (b) reconsider the

16  Court's application of *Batjac Prods., Inc. v. GoodTimes Home Video Corp.*, 160 F.3d

17  1223 (9th Cir. 1998) to Action Comics No. 1's <u>statutory</u> copyright.

18      With the Superman Terminations upheld as valid, the focus of the parties will

19  be on establishing the scope of the Superman work(s) recaptured by Plaintiffs for

20  purposes of Defendants' accounting to Plaintiffs as co-owners and determining the

21  parameters of what Plaintiffs may exploit subject to a duty to account to Defendants.

22  *See Oddo v. Reis*, 743 F.2d 630, 632-33 (9th Cir. 1984).

23      After ruling that at least one promotional announcement was beyond the reach

24  of Plaintiffs' termination notices, the Court severely circumscribed the scope of

25  Defendants' purported copyrighted material therein:

26      *"Obviously, nothing concerning the Superman storyline (that is, the literary
        elements contained in Action Comics, Vol. 1) is on display in the ads*; thus,

27      Superman's name, his alter ego, his compatriots, his origins, his mission to
        serve as a champion of the oppressed, or his heroic abilities in general, do not

28      remain within defendants sole possession to exploit."

1

1    Order at 40: 9-13(emphasis added).

2    "*Instead the only copyrightable elements left arise from the pictorial illustration in the announcements, which is fairly limited*.

3    The person in question has great strength (he is after all holding aloft a car). The person is wearing some type of costume, but significantly the

4    colors, if any, for the same are not represented, as the advertisement appears only in black and white. The argument that the "S" crest is recognizable in the

5    promotional advertisement is not persuasive. What is depicted on the chest of the costume is so small and blurred as to not be readily recognizable, at best all

6    that can be seen is some vague marking or symbol its precise contours hard to decipher. *The Court thus concludes that defendants may continue to exploit*

7    *the image of a person with extraordinary strength who wears a black and white leotard and cape*."

8

9    Order at 40:13-23 (emphasis added).

10    Plaintiffs seek clarification of this conclusion – "defendants may continue to

11    exploit the image of a person with extraordinary strength who wears a black and

12    white leotard and cape" – for three reasons.  Firstly, Plaintiffs wish to have the

13    contours of this "image" firmly delimited, to ensure that Defendants are not able to

14    use this extremely narrow black and white snapshot to fashion a putative Superman

15    character and derivative Superman works without accounting to Plaintiffs, thereby

16    diminishing the value of Plaintiffs' recaptured copyright. Secondly, Plaintiffs seek to

17    ensure that Defendants' right to exploit "a person with extraordinary strength who

18    wears a black and white leotard and cape" does not in any way affect Plaintiffs' right

19    to exploit Action Comics No. 1, as its co-owner, including "Super-strength" on

20    display throughout Action Comics No. 1.[1]

21    _____

22    [1] Plaintiffs disagree with Defendants' sudden protest that the Court could not rule on the copyrightable contents of the promotional announcement, especially considering that Defendants had placed this at issue and insisted that the "[the Ads] speak for themselves and do not require some 'special lens' to resolve."

23    Order at 40:5-7, quoting Defendant's Reply in Support of Summary Judgment at 44.  *See also* Defendant's Motion for Summary Judgment at 38:8-39:4 (claimed an "unfettered right to use the content of the

24    Announcements"); 42:7-9 (requesting an order "determining that [Defendants] are entitled to continue using all of the copyrightable elements contained in the Announcements").  The assessment of the Ad is limited to

25    the drawing itself, which is, as admitted by Defendants, of such a basic nature that the Court's competency to analyze it cannot be disputed.  *See Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d

26    1072, 1077 (9th Cir. 2006) (Courts can look at objective "actual concrete elements" and reach summary judgment); *Cavalier v. Random House*, 297 F.3d 815, 826 (9th Cir. 2002) (Courts can consider "the

27    objective details in appearance" when examining pictorial works on summary judgment).  Since Defendants

28    placed the content of the Ads at issue, they cannot be heard to complain just because they dislike the results.

2

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**

**1257**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 235 of 343
Page ID #:17512
Case 2:04-cv-08400-SGL-RZ   Document 312   Filed 05/16/2008   Page 12 of 34

1    The Court's ruling, that Defendants have retained only the specific "image of a

2 person with extraordinary strength who wears a black and white leotard and cape,"

3 appears to limit Defendants to this image alone because this diminished, vague black

4 and white reproduction ("Cover Image") of the actual cover of Action Comics No. 1

5 ("Cover") is *not the* detailed full color Cover Image, nor can it be viewed in the

6 literary context of Action Comics No. 1, the joint work that the Cover adorns.

7    However, Plaintiffs fear that Defendants will claim that, notwithstanding

8 Plaintiffs' recapture of Jerome Siegel's ("Siegel") copyright in Action Comics No. 1,

9 Plaintiffs cannot exploit it without infringing Defendants' purportedly "exclusive"

10 copyright in the Ad's graphic image.  Plaintiffs further fear that Defendants will use

11 the protectable and non-protectable elements contained in this simple, finite image to

12 derive their own "Superman," purportedly not subject to an accounting.  Both

13 scenarios would effectively emasculate Plaintiffs' recapture of Action Comics No. 1,

14 and seriously undermine the policy goals of the Copyright Act's termination

15 provisions.

16                                **ARGUMENT**

17 **I.    DEFENDANTS, AT BEST, HOLD A COPYRIGHT IN THE "IMAGE" OF THE ACTION COMICS NO. 1 COVER "AS DEPICTED" IN THE AD, DEVOID OF SUPERMAN CONTEXT**

18

19    By the Court's Order, Defendants have exclusively retained all rights to the

20 Ad, but not any part of the Superman story, character, themes or other *literary*

21 elements contained in Action Comics No. 1, which fell within Plaintiffs' termination.

22 Order at 39:26- 41:2.  Defendants are thus limited to the copyrightable material, if

23 any, conveyed by such publication:  The vague "Cover Image" of Action Comics No.

24 1 is not the Cover (or the similar interior panel on page 8 of Action Comics No. 1),

25 and is not imbued with any part of the *later* published story of Action Comics No. 1.

26 The indistinguishable black and white image cannot be viewed in the context of the

27 now famous Superman character and mythology thereafter published in Action

28

3

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

EXHIBIT 28
1258

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 236 of 343
Page ID #:17513
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 13 of 34

1    Comics No. 1.  Thus, the image in the Ad depicts "a person of extraordinary

2    strength," but not Superman's Super-strength.   As the Court acknowledged:

3         "What remains of the Siegel and Shuster's Superman copyright that is still
          subject to termination (and, of course, which defendants truly seek) is *the*
4         *entire storyline* from Action Comics, Vol. 1…, *none of which is apparent*
          *from the announcement*."
5
     Order at 40:23-41:2 (emphasis added).
6
          **A.**    **The Copyright In A Pictorial Work Protects Only Its Visual**
7                    **Content And Objective Appearance**

8         In copyright infringement cases involving pictorial works, the works are

9    objectively compared in a side-by-side analysis of actual visual content, not literary

10   or thematic elements subjectively invoked by the works.

11        In *Cavalier v. Random House*, 297 F.3d 815 (9th Cir. 2002), a copyright

12   infringement suit involving illustrated children's stories, the Ninth Circuit noted that

13   the analysis for pictorial works differs from that used to assess literary works in that

14   it focuses *exclusively* on the objective appearance of the works:

15        "The precise factors evaluated for literary works do not readily apply to
          art works.  Rather a court looks to the similarity of the objective details
16        in appearance.  *See McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316,
          319 (9th Cir. 1987) [citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356
17        (9th Cir. 1984)]."

18   *Cavalier*, 297 F.3d at 826.  *See also Corwin v. Walt Disney Co.*, 2004 WL 5486639,

19   at *15 (M.D. Fla. 2004) ("When analytically dissecting…protectable and

20   unprotectable elements, the Court will focus on objective details in appearance.")

21   The Ninth Circuit's methodology in *Cavalier* which considers only a pictorial work's

22   objective appearance is amply supported.[2]

23

24   ───────────────

[2] *See Pasillas v. McDonald's Corp.*, 927 F.2d 440, 441–42 (9th Cir. 1991) (Court analyzed similarity
between man-in-the-moon masks by focusing on their objective features); *Winfield Coll., Ltd. v. Gemmy*
25   *Indus., Corp.*, 311 F. Supp. 2d 611, 617 (E.D. Mich. 2004) (three-dimensional figures of witches "crashing"
not substantially similar because witches did not look the same); *Woods v. Universal City Studios, Inc.*, 920
26   F. Supp. 62, (S.D.N.Y. 1996) (motion picture "12 Monkeys" copied plaintiff's drawing when comparison
showed that film replicated drawing in striking detail); *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910,
27   916 (7th Cir. 2007) (two dolls are substantially similar as a matter of law when an objective observer would
think they were the same); *Masterson Marketing, Inc. v. KSL Recr. Corp.*, 495 F. Supp. 2d 1044, 1048-49
28   (S.D. Cal. 2007) (photo of Arizona Biltmore Hotel in Squaw Peak did not infringe earlier photo of same
locale, from same vantage point in same horizontal format, as photos did not use same color adjustment,
dodging-burning or image sharpening.).

4

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION
**EXHIBIT 28**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 237 of 343
Page ID #:17514
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 14 of 34

**B.    Defendants Cannot Own The Basic Ideas Or Subject Matter Depicted In The Ad**

In line with the above case law governing pictorial works, the *ideas* or *subject matter* depicted in the Ad – a person in black and white tights and cape, a person of extraordinary strength, or a person lifting a car – are not copyrightable. *See* 17 U.S.C. § 102(b)("In no case does copyright protection for an original work of authorship extend to any idea…concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.")[3]

Thus the Ad's effectively generic depiction of a man with "extraordinary strength" does not entitle Defendants to lay claim to this concept. *See Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) ("Copyright law protects an author's expression; facts and ideas within a work are not protected."); 1 Nimmer & Nimmer, NIMMER ON COPYRIGHT ("*NIMMER*") § 2.03 [D] ("Copyright may be claimed only in the 'expression' of a work of authorship, and not in its 'idea.'") *See also* 3 NIMMER § 13.03[B][2][a]; *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1990); *Swirsky v. Carey*, 376 F.3d 841, 845 n.4 (9th Cir. 2004). "Extraordinary strength," outside of its special context in the Superman mythology, is an idea that cannot be copyrighted. *See Toliver v. Sony Music Ent.* 149 F. Supp. 2d 909, 919 (D. Alaska 2001) ("Were Plaintiff to own the copyright to all other songs depicting the tale of a woman rejecting a man's dominance, she would most certainly be among the wealthiest troubadours in the land.") The literary cannon is replete with characters exhibiting "extraordinary strength" (e.g., Hercules, Samson, Perseus, Beowulf, and Frankenstein).

Therefore, the *subject matter* of the pictorial "image" in the Ad, as opposed to the image itself, is unprotected by copyright. *See F.W. Woolworth Co. v.*

---

[3] This provision merely "restate[s], in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged." H.R. REP. NO. 94-1476, at 57 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670.

5

1  *Contemporary Arts, Inc.*, 193 F.2d 162, 164 (1st Cir. 1951) ("[C]opyright on a work

2  of art does not protect a subject, but only the treatment of a subject."); *Satava v.*

3  *Lowry*, 323 F.3d 805 (9th Cir. 2003) (glass-in-glass sculpture of jellyfish not

4  protected by copyright; consists of unprotected elements and ideas).

5      In *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357 (2d Cir. 1983), the

6  Second Circuit ruled that Mattel, the manufacturer of the "Masters of the Universe"

7  action figures, could not bring a copyright infringement suit against a competing line

8  of action figures because it could not hold a copyright in mere super-strong

9  characters with muscular torsos: "[N]early all of the similarity can be attributed to

10  the fact that both are artist's renderings of the same unprotectible idea – a

11  superhuman muscleman crouching in what since Neanderthal times has been a

12  traditional fighting pose. The rendering of such an idea is not in itself protectible;

13  only the particularized expression of that idea." *Id.* at 360.

14      Accordingly, Defendants could only hold a copyright, if at all, in the particular

15  "image of *a person* with extraordinary strength who wears a black and white leotard

16  and cape" depicted in the promotional announcements. Order at 40:20-21 (emphasis

17  added). And that "person" is not Superman.

18      **C.    Publication of the Ad Did Not "Copyright" Superman Elements**

19      The Court appears to clearly distinguish the vague black and white "image" of

20  the "Cover Image" in the Ad from the Cover of Action Comics No. 1, and, indeed,

21  refers to the Ad as depicting a "person," not "Superman." Order at 40:15-23. The

22  Cover is in color and clearly defines the "Superman" character, his physical

23  appearance, costume and "S" shield. In contrast, the Ad is "fairly limited." Order at

24  40: 14-21. Even if Defendants are held to hold a statutory copyright in the Ad's

25  "image," via its publication, the parameters of that copyright are necessarily confined

26  to what the Ad communicated at the time of publication. The Ad makes no reference

27  to Superman, and the Ad's Cover Image could not serve, as matter of law, to have

28  conveyed or "published" any Superman element.

6

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 239 of 343
Page ID #:17516
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 16 of 34

1    The stand alone, black and white reproduction of the Cover in the Ad,

2    diminished to the point of being barely legible, is a far cry from the well articulated

3    actual color Cover.  Aside from its visual appearance, the Cover, unlike the Ad, is

4    not viewed in a vacuum, but in the context of the joint work of which it is a part.

5    The actual Cover no longer depicts "a person with extraordinary strength" (Order at

6    40:22-23), but Superman's "Super-strength" as an inextricable part of Siegel and

7    Shuster's specific expression of *the protectable Superman character.  Metcalf v.*

8    *Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("[P]rotectable expression includes the

9    specific details of an author's rendering of ideas.")  *See Walt Disney Prods. v. Air*

10   *Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) (comic book character more likely to

11   contain unique elements of expression, as the "plot of the piece not only centers

12   around the character but is quite subordinated to the character's role"); 1 NIMMER §

13   2.12 (A character is more readily protectible when depicted in "cartoons …rather

14   than 'word portraits.'")[4]  The Cover, like the interior panel it mimics, is part of

15   Action Comics No. 1, successfully recaptured on April 16, 1999.  Order at 72.

16        Superman's "Super-strength," as expressed in Action Comics No. 1, is

17   inarguably featured on nearly every page of the comic book story, essentially

18   defining the copyrightable character.[5]  The "image" in the Ad clearly does not depict

19   _____

[4] As Plaintiffs have noted in the past, characters can be copyrighted apart from the story in which they

20   appear. 1 NIMMER § 2.12 ("[I]t is clearly the prevailing view that characters *per se* are entitled to copyright

protection."); *Warner Bros., Inc v. American Broadcasting Cos.*, 530 F. Supp. 1187 (S.D.N.Y. 1982)

21   ("Superman" character is protectible); *Toho Co. Ltd. v. William Morrow & Co.*, 33 F.Supp.2d 1206, 1216

(C.D. Cal 1998) (Godzilla character held protectible); *Silverman v. CBS, Inc.*, 632 F. Supp. 1344, 1355

22   (S.D.N.Y. 1986) (characters from "Amos 'n' Andy" held protectible); *Ideal Toy Corp. v. Kenner Prods. Div.*

*of General Mills Fun Group, Inc.*, 443 F. Supp. 291, 301 (S.D.N.Y. 1977) (finding characters in the movie

23   "Star Wars" to be copyright protected).

24   [5] Panel 4 on page 1 of Action Comics No. 1 (found in Addendum A to the Court's March 26, 2008 order),

states that Superman "could easily raise tremendous weights;" panel 5 states: "Early, Clark decided he must

25   turn his titanic strength into channels that would benefit mankind and so was created…." Panel 6 states:

"Superman! Champion of the oppressed.  The physical marvel who had sworn to devote his existence to

26   helping those in need!"  Page 2, panel 1, depicts Superman carrying a woman as he races across the sky.

Page 2, panel 5, shows Superman knocking down the door of the Governor's mansion. Page 2, panel 8 has

27   Superman carrying the Governor's servant with one arm up the stairs of the mansion.  On page 3, panel 3,

Superman is seen knocking down a steel door.  Page 5, panel 7, shows Superman knocking a wife beater

28   against a wall hard enough to knock off the plaster.  Page 9, panels 1-3 show Superman lifting up a car full

of hoodlums.  First he lifts the car with one arm. He then shakes the hoodlums out of the car before finally

EXHIBIT 28
1262

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 240 of 343
Page ID #:17517
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 17 of 34

1  Superman's "Super-strength" or other Superman traits for the reasons set forth

2  above.  Superman's "heroic abilities in general, do not remain within defendants

3  sole possession to exploit." Order at 40: 9-13; 40:23-41:2.

4       Plaintiffs respectfully request that the Court confirm that Defendants do not

5  exclusively own *any* Superman elements to Plaintiffs' detriment by virtue of the

6  Ad's slightly earlier publication and specifically that Superman's "Super-strength" is

7  part of the recaptured Action Comics No. 1 character and story.

8  **II.    REPRODUCTION IN THE AD OF THE PRE-EXISTING COVER
         DOES NOT QUALIFY FOR COPYRIGHT PROTECTION**

9
       **A.    The Reproduction in the Ad of the Cover of Action Comics No. 1 is
10             Not Sufficiently "Original" To Be Copyrightable**

11       There is no question that the Ad constitutes a derivative work and that

12  Detective Comics had "the right" pursuant to the March 1, 1938 grant from Siegel

13  and Shuster to reproduce the Cover of Action Comics, No. 1 in the Ad.[6]  The key

14  question here is whether and to what extent Detective Comics obtained a copyright in

15  this Cover Image.  That issue turns on the following:

16       "First, to support a copyright the original aspects of a derivative work must be
         more than merely trivial.  Second, the scope of protection afforded a derivative
17       work must reflect the degree to which it relies on preexisting material and
         must not in any way affect the scope of any copyright protection in that
18       preexisting material."

19  *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211,

20  1219 (9th Cir. 1997).

21

22  _____

23  smashing the car "to bits." Page 9, panels 5-6, depict Superman carrying a hoodlum into the sky with one
    arm. Page 10, panel 3, has Superman carrying Lois through the sky.  Page 11, panel 4, has Superman

24  clinging to the side of a skyscraper.  Page 12, panels 3-5 and page 12, panels 1-6, portray Superman carrying
    a man through the sky under one arm.

25  [6]  The promotional announcement for the pre-existing Action Comics No. 1 remains derivative of Action
    Comics No. 1 even if published a few days prior. *Any* work that is "based upon one or more pre-existing

26  works" is a derivative work.  17 U.S.C. §101.  Even if a derivative work is published *before* the pre-existing

27  work is itself published, that first-published work is still a "derivative" work. *See Cordon Art B.V. v. Walker*,
    40 U.S.P.Q.2d 1506, 1996 WL 672969 at *5 (S.D. Cal. 1996)("The art reproductions that Defendant copied

28  were prepared from and based upon the [unpublished] original drawings and master blocks; *as such, the
    copied works are derivative works* under § 101 of the 1976 U.S. Copyright Act.")(emphasis added).

**EXHIBIT 28**
**1263**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 241 of 343
Page ID #:17518
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 18 of 34

1          1.    <u>The Variations in the Advertisement are Trivial</u>

2          Plaintiffs submit that the differences between the Ad's "Cover Image and the

3    Cover, namely that it is "fuzzy" and unarticulated due to substantial reduction and in

4    black and white, do not constitute more than trivial variations of the prior Cover, and

5    thus do not satisfy the fundamental "originality" prerequisite to copyright protection.

6    Moreover, even if the variations in the Cover Image were viewed as sufficiently

7    "original" to merit copyright protection, such would, as a matter of law, extend only

8    to the limited *visual differences* between the Cover Image and the Cover itself.  1

9    *NIMMER* § 3.04[A].[7]

10         A trivial or "miniscule variation" between the underlying and derivative work

11   will not suffice.  *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir.

12   1980).  *See  Satava v. Lowry*, 323 F.3d 805, 813 (9th Cir. 2003) (While the amount

13   of "creative input by the author required to meet the originality standard is low, it is

14   not negligible."); *Donald v. Zack Meyer's TV Sales*, 426 F.2d 1027, 1030-31 (5th

15   Cir. 1970) ("The variation must be meaningful and must result from original creative

16   work" and not be a "mere copycat."); *Magic Marketing, Inc. v. Mailing Services of*

17   *Pittsburgh, Inc.*, 634 F.Supp. 769, 771 (W.D. Pa. 1986) (even "independent efforts"

18   can be "too trivial" to be original); *Gardenia Flowers, Inc. v. Josehp Markovits, Inc.*,

19   280 F.Supp. 776, 782 (S.D.N.Y. 1968) (no originality "[w]hen the copyright

20   claimant has added nothing of his own to a work").

21         Reproductions, such as the Cover Image, even those involving technical skill,

22   do not merit copyright protection.  *See Entertainment Research Group*, 122 F.3d at

23   1222 (even "quite difficult and intricate decisions" that "enable one to reproduce or

24   transform an already existing work into another medium or dimension" are

25

26   [7] *See also Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) ("[C]opyrights in derivative works secure
     protection only for the incremental additions of originality contributed by the authors of the derivative
27   works."); *L. Batlin & Son, Inc. v. Snyder* 536 F.2d 486, 491 (2d Cir. 1976) ("[T]here must be at least some
     substantial variation, not merely a trivial variation such as might occur in the translation to a different
28   medium" for a derivative work to qualify for copyright protection.)

9

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**

**1264**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 242 of 343
Page ID #:17519
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 19 of 34

1  insufficient); *L. Batlin & Son, Inc.*, 536 F.2d 486 491-93 ("true artistic skill" is

2  required "to make [a] reproduction copyrightable"); *Hearn v. Meyer*, 664 F.Supp.

3  832, 835-40 (S.D.N.Y. 1987) (No originality in reproductions of illustrations where

4  the variations included one being "greener than the original," another's being "lighter

5  than the original which has a bluer sky and a deeper brown."); *Durham Indus., Inc.*,

6  630 F.2d at 910 (no originality through "the demonstration of some 'physical,' as

7  opposed to 'artistic' skill.")

8      Derivative works are routinely denied copyright when they involve only minor

9  – even if perceptible – variations on the underlying work. *See, e.g., L. Batlin & Son*,

10  536 F.2d at 489 (differences in the shape and elements of design were "minor" and

11  not sufficiently original to be afforded copyright protection). The changes here, like

12  those of *Hearn, supra*, were trivial at best – "the cover is shown in black and white

13  instead of color, [and] the scale of the artwork itself is diminished...." Order at

14  37:22-23. The "Cover Image" makes little or no original contribution to the Cover

15  and interior panel of Action Comics No. 1 from which it is derived. Given that more

16  substantial differences in medium and dimensionality are insufficient for copyright

17  protection, it can hardly be said that mere size reduction constitutes originality.[8]

18  Miniscule variations in spacing and position are also insufficient to establish

19  originality.[9] Nor does the change from color to black and white merit copyright

20  _____

21  [8] *See, e.g., Cosmos Jewelry Ltd. v. Po Sun Hon Co.*, 470 F.Supp.2d 1072, 1082 (C.D. Cal. 2006) (no
    originality in depiction of "flower as having five petals slightly overlapping, slightly longer than they are
22  wide, and with slightly pointed tips," with different types of "finish"); *Past Pluto Prods. Corp. v. Dana*, 627
    F.Supp. 1435, 1440-43 (S.D.N.Y. 1986) (no originality in soft foam sculpture of Statue of Liberty).

23  [9] *See Sherry Manufacturing Co. v. Towel King of Florida, Inc.*, 753 F.2d 1565, 1568-69 (11th Cir. 1985) (no
24  originality where "the majority of those distinguishing details are so minor that they are virtually
    unnoticeable upon a cursory comparison," and "[t]hose variations which do eventually rise to the forefront
25  of our attention do so only because they entail simple, but more obvious, changes in the spacing and
    dimensions of non-detailed features"); *L. Batlin & Son, Inc.*, 536 F.2d at 489 (differences in "very minute
26  details," such as shapes being "smooth" and "rough," a "fatter" base, holding arrows instead of leaves, the
    "shape" of a face, altogether insufficient to establish copyright protection). Even noticeable differences are
27  insufficient if "it cannot be said that such variances affect the arrangements of the components or the overall
    impression" of the work. *Gardenia Flowers, Inc.*, 280 F.Supp. at 782 (denying copyright where author "did
28  not create anything new" in floral arrangements). *See ATC Dist. Group v. Whatever It Takes Trans.& Parts*,
    402 F.3d 700, 712 (6th Cir. 2005) (no protection where "[t]he illustrations were...a form of slavish copying
    that is the antithesis of originality").

10

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

EXHIBIT 28
1265

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 243 of 343
Page ID #:17520
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 20 of 34

1  protection. *See* 37 C.F.R. §202.1(a) ("[M]ere variations …of coloring" "not subject
2  to copyright.")[10]

3      Therefore, the miniscule visual differences between the Cover Image and the
4  Action Comics, No. 1 Cover and interior panel do not render the Cover Image
5  sufficiently "original" to be copyrightable.  That this derivative material was
6  "published" first is beside the point:  to grant a derivative Cover Image, with such a
7  trivial degree of originality, copyright protection is impermissible.

8          2.   An Unwarranted Copyright In The Ad's "Cover Image"
           Improperly Threatens the Copyright in the Underlying Work
9

10      The second prong of the "originality" analysis is necessary in order to avoid
11  granting the owner of a derivative work a "*de facto* monopoly" in the underlying
12  work, foreclosing exploitation of the underlying copyright.  *See Entertainment*
13  *Research Group,* 122 F.3d at 1219 (protection for a derivative work "must not in any
14  way affect the scope of any copyright protection in that preexisting material");
15  *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983) (requiring a
16  "sufficiently gross difference between the underlying and the derivative work to
17  avoid entangling subsequent artists depicting the underlying work in copyright
18  problems").[11]  *See* 17 U.S.C. § 103(b) (a derivative work "does not imply any

19  ─────────────────────────────────────────

20  [10] *See Compendium of Copyright Office Practices* § 5.03.02(a) (1984) ("[M]ere coloration cannot support a
copyright even thought it may enhance the aesthetic appeal or commercial value of a work."); *Darden v.*
21  *Peters*, 488 F.3d 277, 287 (4th Cir. 2007) (no originality where derivative works made only slight color
variations); *Spilman v. Mosby-Yearbook, Inc.*, 115 F. Supp. 2d 148 (D. Mass. 2000) (derivative book lacked
22  minimum degree of originality when changes were only enhancements such as coloration of the text and
variations in typographic ornamentation); *Hearn*, 664 F.Supp. at 835-40 (S.D.N.Y. 1987) (No originality in
23  reproductions of illustrations where variations included one being "greener than the original," another being
"lighter than the original which has a bluer sky and a deeper brown," and a face having a "deeper yellow.")
24

[11] *See also Durham Indus., Inc. v. Tomy Corp.* 630 F.2d 905, 909 (2d Cir. 1980) (copyright in derivative
25  work "must not in any way affect the scope of any copyright protection in [the] preexisting material");
*Gracen v. Bradford Exch.* 698 F.2d 300, 304 (7th Cir. 1983) ("[E]specially as applied to derivative works,
26  the concept of originality…[has] a legal rather than aesthetic function – to prevent overlapping claims.");
*Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir. 1996) (It is a fundamental precept of
27  copyright law that "publication of a derivative work does not affect the validity of a copyright in the
preexisting work, despite the incorporation of the underlying work into the derivative work."); *Maljack*
28  *Productions, Inc. v. UAV Corp.*, 964 F.Supp. 1416, 1422 (C.D. Cal. 1997) ("[P]ublication of a derivative
work does not affect the validity of the copyright in a preexisting work."); *Past Pluto Prods. Corp.*, 627

             11

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 244 of 343
Page ID #:17521
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 21 of 34

1  exclusive right in the preexisting material. The copyright in such work is independent

2  of, and does not affect or enlarge the scope, duration, ownership, or subsistence of,

3  any copyright protection in the preexisting material.")[12]

4        To grant a copyright in the derivative Cover Image would be contrary to well

5  settled law and invite *precisely* the situation that the statute and case law governing

6  derivative works are meant to avoid.[13]  That the promotional announcement was

7  published just prior to Action Comics No. 1 does not alter the conclusion that the

8  Cover Image therein was not sufficiently original to be copyrightable, avoiding the

9  prohibited use of the derivative Ad to entangle and limit the copyright of the

10 underlying Action Comics No. 1.

11

12

13

14

15

---

16  F.Supp. at 1441 (a derivative work copyright "in no way embraces or protects the underlying, pre-existing work"); Berne Convention, Art. 2(3) ("[A]lterations of a literary or artistic work" are "without prejudice to the copyright in the original work.")

17

18  [12] Section 103(b) of the current Act parallels its predecessor, section 7 of the 1909 Act, 17 U.S.C. § 7 (repealed) ("[P]ublication of any such new [derivative] works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works..."); Berne Convention, Art. 2(3) ("[A]lterations of a literary or artistic work" are "without prejudice to the copyright in the original work."); 1 *NIMMER* § 4.12[A] at 4-60 (noting that divestiture of copyright in the underlying work due to the publication of a derivative work only occurs if the publication injects the underlying work into the public domain, such as publication without notice).

19

20

21

22  [13] Indeed, Defendants have made detailed arguments that derivative works cannot be allowed to interfere with underlying works, conceding the *Entertainment Research Group* standard.  To counter Plaintiffs' infringement claim in the "Superboy" action, Defendants have argued pursuant to 17 U.S.C. § 103(b) that Siegel's 13 page Superboy story is derivative of Superman and thus cannot interfere with the Superman or *Smallville* copyrights.  *See Defendants' Supplemental Memorandum of Points and Authorities of Derivative Work Issue Pursuant to Court's July 27, 2007 Order*, filed September 10, 2007, at 15:18-21 ("[T]he courts must draw the line in such a way that the derivative work author will not be empowered to harass or interfere with the rights of the original work owner to use and license the underlying work through actual or threatened litigation.") and 16:4-6 ("In terms of methodology, to determine whether a derivative work possesses the requisite originality, courts must compare the derivative work to the pre-existing work.") Defendants counsel Roger Zissu furthered this derivative works argument during oral argument on the parties' cross motions for summary judgment, relying on *Sobhani v. @Radical.Media Inc.*, 257 F.Supp.2d 1234, 1239-40 (C.D. Cal. 2003). Toberoff Decl. Ex. C, 5:11-14:25.

23

24

25

26

27

28

12

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

EXHIBIT 28
1267

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 245 of 343
Page ID #:17522
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 22 of 34

III.    **THE PROMOTIONAL ANNOUNCEMENTS DO NOT HAVE DIVESTIVE EFFECT ON PLAINTIFFS' COPYRIGHT**

A.    ***Batjac's* Narrow Holding Regarding Derivative Works in the Public Domain and the Policies Behind It Do Not Fit This Case**

The promotional announcements cannot act to divest Superman elements from Plaintiffs' recaptured Action Comics No. 1 copyright.  There is no support for the broad proposition that publication of a derivative work has a divestive effect on the copyright of the underlying work where the underlying work *has a statutory copyright* and neither works are in the public domain.  *Batjac Prods., Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998) does <u>not</u> stand for this.

Unlike the instant case, where the underlying work *has a statutory copyright* and neither works are in the public domain, in *Batjac* a copyright holder tried  to use a purported common-law copyright in an unpublished screenplay to recover and revive a statutorily copyrighted derivative film from the public domain.[14]  Had *Batjac* reached a different result, "the perpetual protection provided to common law copyrights would 'swallow the rule of limited monopoly found in the constitution and copyright statutes'" and "through [an] unpublished screenplay, an author could maintain perpetual control over the [a public domain] motion picture…. [and] extend protection of the film beyond its statutory maximum."  *Batjac*, 160 F.3d at 1234.  Neither *Batjac*, nor the authority it relies on, has ever been expanded beyond its

---

[14] Screenplays to motion pictures are treated as a special case by the copyright office, as "[w]here a preexisting unpublished screenplay is embodied in a motion picture," those elements are published.  See Compendium II, Compendium of Copyright Office Practices 910-04, cited in *Batjac*, 160 F.3d at 1230.  However, the unique status of screenplays can be seen in the Copyright Office's markedly different approaches with respect to dramatic and literary works: a "detailed plot summary of a play" does not publish the play, and "publication of a movie version of an unpublished story," does not publish the story.  See Compendium I: Compendium of Copyright Office Practices, § 3.1.1 IV(a), cited in *Batjac*, 160 F.3d at 1230.  Additionally, screenplays are given special attention when registered for copyright, as examiners are directed to "question an application for a feature film or a network television production which is limited to the authorship of the 'script,'" as the Office still regards a motion picture as an "integrated, single work, and [] it is unusual for separate claims in component parts of the motion picture to be submitted."  Toberoff Decl., Ex. D, Decision of the Copyright Office Board of Appeals re: "Husbands," dated May 14, 2002, at 5.

13

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 246 of 343
Page ID #:17523
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 23 of 34

1  *narrow* consideration of the relationship between an underlying common law

2  copyright and a derivative work in the public domain.[15]

3      *Batjac's* result oriented decision, to a large degree, relied on policy that

4  copyright law should not reward those who circumvent the Act and improperly try to

5  co-opt works in public domain or extend the life of a statutory copyright beyond its

6  statutory term.  It adopted the argument of the U.S. Register of Copyright which

7  "turns upon impropriety of the moviemakers' use of artifice to extend the term limits

8  set forth in the Act for copyrighted works and so continues to have force today." *Id.*

9  at 1234.

10      Indeed, *Batjac* expressly limited its holding to "the narrow case before us"

11  wherein the entity responsible for placing a film in the public domain by failing to

12  renew its copyright attempted an end run around the Copyright Act by asserting a

13  *common law copyright* in the film's underlying screenplay. *Id.* at 1231.  *Batjac* did

14  not consider and expressly declined to apply its holding to situations where, as here,

15  the underlying work (Action Comics No. 1) is squarely protected by a statutory

16  copyright. *Id.* at 1231 (limiting holding to "the narrow case before us").[16]

17  **B.    There is No Precedent For Expanding *Batjac* Beyond The Public
       Domain Context To Subsisting Statutory Copyrights As It Conflicts
18      With Longstanding Copyright Precepts**

19      The basic copyright precepts governing derivative works preclude *Batjac's*

20  application to the instant facts, where *both* works have subsisting statutory

---

[15] *See Batjac*, 160 F.3d at 1225 ("[A] common law copyright in the underlying screenplay does not survive the motion picture's loss of copyright and falls into the public domain due to a failure to renew the movie's copyright.")(citations omitted); *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 591–93 (2d Cir. 1999) (publication of the motion picture divested the common law copyright in the underlying screenplay only because the motion picture entered the public domain after its term of statutory copyright); *Classic Film Museum, Inc. v. Warner Bros., Inc.*, 597 F.2d 13 (1st Cir. 1979) (publication of the motion picture divested the copyright in the underlying screenplay as otherwise the holder of the underlying screenplay would control the motion picture even after its term of statutory copyright).

[16] Other Courts faced with the same fact pattern and reaching the same result have similarly limited their holdings. *See, e.g., Harris Custom Builders, Inc.*, 92 F.3d at 520 (finding a divestiture of copyright where the underlying work was unpublished and remained so, but noting that "[i]f the basis of Harris' claim of copyright was that the underlying architectural plans were registered or published with notice, it could prevail.")

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION
**EXHIBIT 28**
**1269**

Case 2:04-cv-08400-ODW-RZ     Document 720-7     Filed 04/04/13     Page 247 of 343
Page ID #:17524
Case 2:04-cv-08400-SGL-RZ     Document 312     Filed 05/16/2008     Page 24 of 34

1  copyrights, but the derivative work was published or registered first.  To secure a

2  statutory copyright a "work must be original to the author." *Feist Publications, Inc.*

3  *v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 345 (1991).  Thus, as correctly

4  noted by the Court, the copyright in a derivative work only extends to newly added

5  copyrightable material, not to the pre-existing material from which it is derived.

6  Order at 37:9-15; 17 U.S.C. § 103(b) ("The copyright in a...derivative work extends

7  only to the material contributed by the author of such work, as distinguished from the

8  preexisting material employed in the work, and does not imply any exclusive right in

9  the preexisting material."); 1 NIMMER § 3.03, at 3-10.

10      To hold otherwise would enable the owner of a derivative work to claim it had

11  seized the entirety or heart of an underlying work by merely publishing or registering

12  the derivative work first – in this case, a mere eight days before – even though the

13  underlying work still has a subsisting statutory copyright.

14      As a manifestation of the harsh and anomalous result of expanding *Batjac*,[17]

15  Defendants will now claim that notwithstanding Plaintiffs' joint ownership of a valid

16  statutory copyright in the original Action Comics No.1, Plaintiffs may not exploit it

17  without infringing Defendants' putative copyright in the diminutive Cover Image

18  reproduced in a obscure, purely derivative announcement promoting the imminent

19  publication of Action Comics No. 1.  In this instance, Defendants' claim fails

20  because the Ad communicates very little.  However, the Ad could just as well have

21  contained a full-blown color copy of the Cover.

22

23

---

24  [17] Cases following *Batjac* have been limited to situations where the owner of an unpublished work sought to use a purported copyright in the underlying work to secure protection for work that had been ejected into the public domain.  *See Milton H. Greene Archives, Inc. v. BPI Communications, Inc.*, 378 F.Supp.2d 1189, 1197 (C.D. Cal. 2005) (publication of photographs in a magazine without proper notice "published" the underlying photographs and ejected them into the public domain); *Shea v. Fantasy Inc.*, 2003 WL 881006 at *4 (N.D. Cal. 2003) (underlying photograph that had been published as part of a derivative album that lacked a copyright notice was in the public domain); *Cordon Holding B.V. v. Northwest Publishing Corp.*, Not Reported in F.Supp.2d, 2002 WL 53099 at *5 (S.D.N.Y. 2002) (where derivative reproduction of unpublished drawings and models had been published without proper notice, underlying drawings and models were ejected into the public domain).

15

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**

**1270**

1    Such a result would undermine the legislative objective of the Copyright Act's

2  termination provisions to relieve authors and their heirs from unremunerative grants,

3  by permitting grantees to use derivative works created under such grants to entangle

4  and divest the original recaptured work, even though such work remains protected by

5  a *statutory* copyright.  *See* 3 NIMMER § 11.01[A].[18]  Unlike the plaintiff in *Batjac*,

6  which improperly sought to control a work in the public domain by manipulating

7  copyright law, the Siegel heirs simply exercised their right under the Copyright Act

8  to recapture Siegel's statutory copyright in Superman for the remainder of its

9  extended statutory term.[19]  The policy concerns underlying *Batjac* (protecting the

10 public from extending copyrights through artifice) are simply not present here.

11 **IV.    PLAINTIFFS NEED NOT HAVE INCLUDED THE ADS IN THEIR
         TERMINATION NOTICES AS THE ADS WERE DETECTIVE'S
12       DERIVATIVE WORKS, NOT SIEGEL'S WORKS**

13     Section 304(c) of the Copyright Act provides for the termination by an

14 author's statutory heirs of the author's copyright grants, not a grantee's rights in

15 derivative works, which are protected under the "derivative works exception."  17

16 U.S.C. § 304(c)(6)(A).  Section 304(c) measures the permissible termination

17 "window" as commencing fifty-six years after *the author's work* first secured

18 statutory copyright because a key objective of section 304(c) is to enable author's

19 and their heirs to benefit from Congress' extension of the renewal copyright beyond

20 the copyright's fifty-six year term.  *See* H.R. Rep. No. 94-1476 at 140 (1976),

21 reprinted at 1976 U.S.C.CAN. 5654, 5756.  There is no requirement to list in a

22 termination notice derivative works owned by the grantee at inception and *not*

23 subject to recapture.  17 U.S.C. § 304(c)(6)(A).

24 

---

25 [18] NIMMER and PATRY both implicitly acknowledge that *Batjac* does not stand for a general principle that
publication causes divestiture.  *See* 1 NIMMER §§ 4.12[A] at 4-60 (noting that the copyright in a pre-existing
26 common law copyright is only eliminated "if publication itself causes that result," as where publication is
with an invalid notice or "publication is followed by the maximum length of time for copyright to subsist");
27 2 PATRY (*infra*) § 6:35 (2008) (noting that publication of a derivative work "does not mean, however, that all
protection for the unpublished work is forfeited, only that any forfeiture due to publication of the derivative
28 work without notice or for lack of a timely renewal forfeits so much of the underlying work as is included
with permission.")

16

**EXHIBIT 28**
**1271**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 249 of 343
Page ID #:17526
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 26 of 34

1    As held by the Court, Plaintiffs properly terminated the March 1, 1938 grant

2  with respect to Siegel's copyright in his work, Action Comics No. 1.  Order at 72.

3  As joint owner's of the Action Comics, No. 1 copyright, Plaintiffs' have the non-

4  exclusive right to exploit it, subject to a duty to account to Defendants.  *See Oddo v.*

5  *Reis*, 743 F.2d 630, 632-33 (9th Cir. 1984).

6  **V.    PLAINTIFFS' FAILURE TO LOCATE THE OBSCURE ADS
       CONSTITUTES HARMLESS ERROR; THEIR TERMINATION**

7  **NOTICES PROVIDED DEFENDANTS WITH AMPLE NOTICE**

8    Notwithstanding the above, the omission of the Ads and the mistake in setting

9  the termination date mere days earlier to encompass the Ads qualify as inadvertent

10  harmless error under 37 C.F.R. § 201.10(e)(1), and should have no effect on the

11  application of the notices of termination to the Ads or the scope of copyright

12  recaptured by the termination.  The omissions did not "materially affect the adequacy

13  of the information in the notice."  *See* Order at 49.  The notice unambiguously

14  terminated the operative grant of copyright in Superman to Defendants' predecessors

15  and just as unambiguously provided notice of Plaintiffs' intent to include every even

16  remotely relevant Superman work.  Defendants cannot reasonably claim that they

17  were not given fair and comprehensible notice under section 304(c).  Given the scope

18  and detail of their well researched termination notices, Plaintiffs clearly would have

19  listed the Ads if they had known of their existence, <u>and</u> would have set the effective

20  termination date to encompass the Ads.  If the former is considered harmless error

21  under 37 C.F.R. § 201.10(e)(1), so should the latter.

22    The authorities cited by Defendants and the Court regarding *renewal* notices

23  are inapposite.  The harsh enforcement of deadlines for filing renewal applications

24  derives directly from the statutory language for renewals, which differs significantly

25  from the statutory language for termination notices.[20]  *See* 3 NIMMER § 9.05[A][1]

26

27  ─────────────
   [20] Section 24 of the 1909 Copyright Act read: "That in default of the registration of such application for
28  renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years
   from first publication." Before 1992, Section 304(a) of the 1976 Act contained virtually the same language.

17

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION
**EXHIBIT 28**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 250 of 343
Page ID #:17527
Case 2:04-cv-08400-SGL-RZ   Document 312   Filed 05/16/2008   Page 27 of 34

1  ("The formality of renewal was hence an absolute condition to copyright subsistence
2  past the 28[th] year....")  The termination provisions of the 1976 Act contain no such
3  language.  Instead, section 304(c)(4)(B) delegates to the Register of Copyrights the
4  responsibility of deciding the necessary content of termination notices which
5  explicitly provided that harmless errors will not impair a termination.  37 C.F.R. §
6  210.10(e)(1).

7        Congress enacted the termination provisions of section 203 and section 304 in
8  part to eliminate the harsh formalities of the renewal system, under which renewal
9  applications often failed because of technical formalities.  2 W. Patry, *PATRY ON*
10  *COPYRIGHT* ("*PATRY*") § 7:27 ("The complete loss of copyright under these
11  circumstances was harsh and unnecessary.")  The past policy of enforcing strict
12  compliance with provisions for renewal notices should not act as persuasive authority
13  for undermining section 304(c)'s benefits to authors, or curtailing the "harmless
14  error" provision of 17 U.S.C. § 304(c)(4)(B) and 37 C.F.R. § 201.10(e)(1).  *See Mills*
15  *Music, Inc. v. Snyder*, 469 U.S. 153, 172-173 (1985) ("The principal purpose of the
16  amendments in § 304 was to provide added benefits to authors.")  The failure of
17  Plaintiffs to take into account the promotional advertisements (which they had no
18  possibility of ascertaining) in choosing a termination date in the notices should not
19  result in the kind of prejudice associated with an untimely filing of a renewal
20  notice.[21]

21        Defendants also make a hollow distinction between errors that render a notice
22  *invalid* and errors that impair the *effect* of a notice, claiming that the language of 37
23  C.F.R. § 201.10(e)(1) precludes a harmless analysis.  Yet, when the meaning of
24  statutory language is indeterminate or ambiguous, one should look at the context of
25

---

26  [21] The sections from *PATRY*, *NIMMER* and *Dratler & McJohn* relied on by the Court do not vitiate the
harmless error doctrine.  Instead, these authorities simply remind the reader to calculate the termination
window for a work from the actual date of publication, and to not rely on the expiration of the 28-year
27  renewal term at the end of the calendar year.  2 *PATRY* § 7:43; *NIMMER* § 11.05[B][1]; 3 DRATLER &
MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL CREATIVE AND INDUSTRIAL PROPERTY §
28  6.04A[3][a] (2008).

18

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION
**EXHIBIT 28**
**1273**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 251 of 343
Page ID #:17528
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 28 of 34

1    the language. 1 *PATRY* §§ 2:17, 2:21. The parallel provision, Section 201.10(e)(2),

2    offers clarification by providing that good faith errors in the description of the date or

3    registration number of a work "shall not affect the *validity* of the notice…,"

4    presumably with respect to such work (emphasis added). The statute provides that

5    such mistakes will not impair the effect of the notice upon the work, and does so by

6    stating that such mistakes will not "affect the *validity* of the notice." 37 C.F.R. §

7    201.10(e)(2).[22] The drafters of Section 201.10(e) did not recognize a distinction

8    between errors that render a notice invalid and errors that render a notice invalid with

9    respect to some works, but not others. The drafters used the word "validity" to

10    provide that harmless errors did not impair the effect or obvious objective of the

11    termination notice. As Sections 201.10(e)(1) and Section 201.10(e)(2) are parallel

12    sections that together constitute the "harmless error" provision of Section 201.10, the

13    use of the word "validity" in Section 201.10(e)(2) demonstrates the context of the

14    use of the word "invalid" in Section 201.10(e)(1). The drafters of Section

15    201.10(e)(1) clearly intended that harmless errors would not render a termination

16    notice invalid with respect to particular works.[23]

17       The Court acknowledged and applied this harmless error policy in rejecting

18    Defendants' arguments regarding Plaintiffs' failure to list the 1948 consent judgment

19    in their notices. Order at 49:21-50:13. The same reasoning should apply to the

20    promotional announcement(s): Having terminated the operative March 1, 1938 grant,

21    Plaintiffs failure to list the ads, due to their practical inability, after diligent search, to

22

---

[22] One could not credibly argue that this section operates only to protect an entire termination notice from being ruled invalid on the basis of one mistake in the description of the publishing date or registration number of one work. Instead, the common sense construction of this section is that a good-faith mistake in the publishing date or registration number will not affect the application of the termination notice *to that work*.

[23] Defendants err in arguing that the "harmless error" clause of 37 C.F.R. § 210.10(e)(1) is inconsistent with the statutory language of the Copyright Act. Nowhere in the Copyright Act does Congress require termination notices to list works on penalty of copyright forfeiture, or state that the "harmless error" doctrine does not apply. 17 U.S.C. § 304(c). Indeed, Congress sets forth a broad description of termination notices and explains that termination notices "shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation." 17 U.S.C. § 304(c)(4)(B).

19

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**
**1274**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 252 of 343
Page ID #:17529
Case 2:04-cv-08400-SGL-RZ   Document 312   Filed 05/16/2008   Page 29 of 34

1   locate them, "did not diminish the notice defendants received regarding the nature of

2   the grant that plaintiffs intended to terminate." *Id.*  The public policy of providing

3   relief to authors and their heirs from unremunerative grants will be undercut if this

4   Court rules that the harmless error doctrine cannot cure the Siegel heirs' inadvertent

5   omission of the obscure "promotional announcement(s)."  Such would elevate

6   Defendants' hyper-technical sophistry above the remedial policy objectives of the

7   Copyright Act's termination provisions.

8   **VI.   THE ORDER'S HISTORICAL SUMMARY INCLUDES CONTESTED**
    **FACTS PROPERLY DECIDED AT TRIAL**
9

    **A.   The Order May Be Interpreted As "Ruling" on Issues of Fact Not**
10  **Before the Court**

11        In the historical background section of the Order, certain passages will be

12   construed by Defendants as a "ruling" by the Court that various Superman elements

13   are not included in Action Comics No. 1, so as to restrict the Superman elements

14   recaptured by Plaintiffs' termination notices.

15        "Many of Superman's powers that are among his most famous today did not
          appear in Action Comics, Vol. 1, including his ability to fly...; his super-
16        vision...; his super-hearing....The "scientific" explanation for these powers
          was also altered in ensuing comics..."
17
    Order at 14:2-14.
18
          Plaintiffs' understanding is that the Court was not ruling on such issues, but
19
    rather was providing historical background and orientation as to the Superman
20
    mythos.[24]  Plaintiffs believe that certain "powers" described by the Court as not
21

22   ────────────────────
     [24]The part of the opinion listing the various literary elements largely follows Defendants' discussion of the
23   "facts" in their opening papers at page 8:3-22, for which Defendants *solely relied* on paragraphs 6 and 7 of
     the declaration of Paul Levitz, President and Publisher of DC Comics to support these allegations.  Plaintiffs
24   strenuously objected to this testimony in paragraphs 38 and 39 (pages 22- 23) of their Evidentiary
     Objections In Opposition to Defendants' Motion for Partial Summary Judgment as well as in paragraphs 14-
25   18 (pages 11- 14) of their L.R. 56-2 Statement of Genuine Issues.  The Court also appeared to confirm the
     substance of Defendants' purported Superman trademarks without Plaintiffs having the opportunity to brief
26   this important issue: "The most notable of these marks that are placed on various items of merchandise are
     'Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S
27   in Shield Device, as well as certain key identifying phrases[,]" such as " 'Look! ... Up in the sky! ... It's a
     bird! ... It's a plane! ... It's Superman!'"  Order at 14-15.  The discussion of the trademarks similarly appears
28   to be from Defendants' opening papers at pages 10:13- 11:16, in which Defendants solely relied on
     paragraphs 10 and 11 of the same declaration of Paul Levitz.  Plaintiffs objected to this testimony as well, in
     paragraphs 42-48 (pages 25-29) of their Evidentiary Objections as well as in paragraphs 28-32 (pages 21-24)
     of their L.R. 56-2 Statement.

                                                    20

          PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**
**1275**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 253 of 343
Page ID #:17530
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 30 of 34

1    present in Action Comics No. 1 are, in fact, present in that work, and respectfully

2    request that the Court clarify its ruling, as its statements, while arguably *dicta*, could

3    be taken as conclusive findings with respect to the literary contents of Action Comics

4    No. 1.

5    **B.    The Disputed Contents of Action Comics, No. 1 Present Issues of**

6    **Fact Inappropriate for Summary Judgment**

7        In a copyright action the content and associated elements of a literary work are

8    questions of fact properly reserved for the ultimate trier of fact. *See Sid & Marty*

9    *Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977) (claims

10    for actual damages requiring apportionment between literary elements, involve

11    matters of fact and implicate the constitutional right to jury trial); *Sheldon v. Metro-*

12    *Goldwyn Pictures Corp.*, 309 U.S. 390, 396-98 (1940) (trier of fact resolved dispute

13    involving allotment of literary elements).  An analysis of whether Superman's

14    "super-hearing" or "telescopic vision" is found in the literary content of Action

15    Comics No. 1 is a subjective analysis best left to a jury. *See Three Boys Music Corp.*

16    *v. Bolton*, 212 F.3d 477, 487 (9th Cir. 2000) (affirming jury determination of the

17    proportion of profits attributable to infringing musical elements); *Perry v. Sonic*

18    *Graphic Sys.*, 94 F.Supp.2d 616, 623 (E.D. Pa. 2000) (apportionment of creative

19    elements "an issue of fact that must be decided by a jury"); *Walker v. Forbes, Inc.*,

20    28 F.3d 409, 416 (4th Cir. 1994) (approving jury determination of infringing

21    elements).

22        In the closely related copyright infringement cases, which require an analysis

23    of the "elements" of works and their similarity, it is well settled that "[s]ince

24    substantial similarity is usually an extremely close question of fact," summary

25    judgment is "disfavored." *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d

26    1327, 1329-30 (9th Cir. 1983) (reversing grant of summary judgment). *See Shaw v.*

27    *Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990) (summary judgment is "not highly

28

21

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**

**1276**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 254 of 343
Page ID #:17531
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 31 of 34

1  favored" on substantial similarity of elements); *Levine v. McDonald's Corp.*, 735

2  F.Supp. 92, 96 (S.D.N.Y. 1990) (normally a jury question.)

3      Plaintiffs seek clarification that the Court in discussing Superman's historical

4  background was not in fact ruling on such issues, as such subjects are properly

5  reserved for the trier of fact.[25]

6      **C.**    <u>**Even if the Court Were to Rule As to the Disputed Literary**</u>

7  <u>**Elements in Action Comics No. 1, Due Process Requires Giving the**</u>
<u>**Parties an Opportunity to Brief the Issues**</u>

8      Plaintiffs respectfully submit that even if the Court had intended to "rule" as to

9  the disputed literary elements contained in Action Comics No. 1, it lacked the power

10  to do so, as due process requires that before the Court makes a *sua sponte* summary

11  judgment ruling it give the parties a full and fair opportunity to brief the issues

12  decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (Courts may enter

13  judgment *sua sponte* if "the losing party was on notice that she had to come forward

14  with all of her evidence.") [26]

15      As discussed below, the literary contents of Action Comics, No. 1 are hotly

16  disputed and involves genuine issues of material fact, inappropriate for summary

17  judgment, particularly *sua sponte* summary judgment, if that was even the Court's

18  intention.  Given that neither party had moved for summary judgment on this key

19  [25] Whether Siegel's Superman works after Action Comics No. 1 (e.g., Action Comics No. 2-6, prior to

20  Siegel entering into the September 22, 1938 "Employment Agreement") were also not "works-for-hire,"
presents genuine issues of material fact reserved for trial. This is strongly disputed by the parties as it has a

21  direct impact on the Superman elements recovered by Plaintiffs.  The Court appeared to be giving an
historical description of Action Comics No. 1 in its Order, rather than determining such work-for-hire

22  issues, as such issues of fact were neither before the Court, nor conducive to summary judgment.  However,
for the avoidance of doubt, Plaintiffs respectfully request that the Court confirm this point as well.

23

24  [26] *See also Greene v. Solano County Jail*, 513 F.3d 982, 990 (9th Cir. 2008) ("*Sua sponte* grants of summary
judgment are only appropriate if the losing party has reasonable notice that the sufficiency of his or her

25  claim will be in issue."); *Buckingham v. U.S.*, 998 F.2d 735, 742 (9th Cir. 1993) (*Sua sponte* summary
judgment inappropriate where "facts remained in dispute" and where the litigant ruled against "did not

26  receive sufficient notice of the district court's potential entry of summary judgment against it and therefore
did not have the opportunity to present arguments."); *Scholastic Ent, Inc. v. Fox Ent. Group, Inc.*, 336 F.3d

27  982, 985 (9th Cir. 2003) (Due process requires "notice and an opportunity to respond" before claims are
dismissed *sua sponte*); *Portsmouth Square, Inc. v. Shareholders Prot. Comm.*, 770 F.2d 866, 869 (9th

28  Cir.1985) (Courts must meet "the requirements of the Federal Rules and the demands of due process" in
granting summary judgment *sua sponte*.)

22

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**
**1277**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 255 of 343
Page ID #:17532
Case 2:04-cv-08400-SGL-RZ    Document 312    Filed 05/16/2008    Page 32 of 34

1    issue, presumably because it is an issue of fact for trial, Plaintiffs did not brief the

2    issue of whether Superman's "ability to fly … super-vision … "x-ray" vision …

3    "telescopic" vision …[and] super-hearing " were elements contained in Action

4    Comics No. 1.  Order at 14:4-8.  Plaintiffs had no notice that this issue was to be

5    determined on summary judgment, nor were they given the opportunity to present

6    evidence on this issue.

7        D.    **Elements Listed in the Court Order as Being the Preserve of the**
             **Defendants First Appeared in Action Comics No. 1**
8

9        Plaintiffs believe that some of the elements listed in the Court's order as

10   among "Supermans's powers … [that] did not appear in <u>Action Comics</u>, Vol. 1," in

11   fact did appear in that historic work, and are included in the copyrightable elements

12   recaptured by Plaintiffs' termination, notably Superman's "super-senses." *See*

13   Toberoff Decl., Ex. A (Plaintiffs' Expert Rebuttal Witness Disclosure of Mark

14   Evanier) at p. 25 (referring to "the array of superpowers with which Superman is

15   armed in Action No. 1" as including "super-senses."); Toberoff Decl., Ex. B

16   (Deposition of Mark Evanier).  Plaintiffs are not requesting that the Court rule on

17   these issues, but are merely providing this information to demonstrate genuine issues

18   of material fact.

19       For example, Superman's "super-hearing" is clearly depicted in panels 4-8 of

20   page 11 of Action Comics No. 1.  Superman is shown clinging to the outside of a

21   skyscraper, many floors above the street, listening to a conversation *inside* the

22   building between Senator Barrows and Alex Greer, "the slickest lobbyist in

23   Washington."  There is no depiction or indication of an open window.  Superman, in

24   panel 4, is described as "an eavesdropper" who "listens in on an interesting

25   conversation!"  The next three panels display the lobbyist and the Senator discussing

26   their scheme and the financial kickbacks they will enjoy.  Senator Barrows says to

27   the lobbyist "I suppose you're going to be well taken care of yourself," to which

28   Superman, again *outside the building*, sarcastically rejoins to himself, "YOU BET

1   HE WILL!" It is apparent from these panels that Superman has "super" hearing, as

2   he is able to hear a conversation inside a skyscraper while he is outside, subject to the

3   bustle and noise of the city.

4      Superman's "super-vision," whether described as "telescopic" or "X-ray"

5   vision, also makes an appearance in Action Comics No. 1. Lois and Clark's dinner is

6   interrupted by some hoodlums who embarrass Clark. *See* Action Comics No. 1 at p.

7   6 (panels 7-8)-7 (panels 1-6). Lois slaps one of the thugs before making her exit in a

8   cab. *Id.* at p. 7 (panels 3-6). The hoodlums decide they will "show that skirt she

9   can't make a fool out of Butch Mason!" *Id.* at p. 7 (panel 7). The next panel shows

10   Superman standing on what appears to be the top of a building, at night, staring down

11   far below at a car driving past on the street. *Id.* at p. 7 (panel 8). As it would be

12   from such a far away perspective, the car windows are depicted as opaque and the

13   passengers are not discernable in the passing car. Yet, the panel notes Superman is

14   "observing" Butch and his fellow hoodlums, despite these figures not being

15   distinguishable in the passing car. *Id.* at p. 7 (panel 8). The hoodlums subsequently

16   force Lois' cab into a ditch and abscond with her in their car. *Id.* at p. 8 (panels 1-3).

17   The next panel shows Superman suddenly appearing in front of the speeding car, as

18   he knows Lois is inside. *Id.* at p. 8 (panel 5). Superman seizes the car and rescues

19   Lois. *Id.* at p. 9 (panels 1-3).

20      Collectively, these panels plainly illustrate Superman's "super-vision" as he is

21   apparently able to see over great distances into darkened cars; he is first able to

22   discern that the hoodlums are in the car, and then he sees that the hoodlums are

23   holding Lois in the speeding car he stops. In combination with the "eavesdropping

24   scene," Superman's "super-senses" are plainly evident, as without them, his

25   accomplishments would not be possible.[27]

26

27     [27] In addition, whereas, some have opined that in Action Comics, No. 1, Superman "leaps" tall buildings and
incredible distances, but does not yet "fly," this may be a distinction without a difference as he is seen

28     effortlessly soaring through the air. The result is the same. In fact, in certain panels of Action Comics, No.
1, Superman certainly looks like he is flying as he hovers effortlessly over the Capital dome, with a man
tucked under his arm. Action Comics No. 1, page 12, panels 3-5; page 13, panels 1-6.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**

**1279**

1    Plaintiffs should be afforded the full and fair opportunity to present evidence,

2    including expert testimony, in open court as to the Superman elements recaptured by

3    Plaintiffs in Action Comics No. 1.

4                          **CONCLUSION**

5    For the foregoing reasons, Plaintiffs' respectfully request that the Court grant

6    Plaintiffs' Motion for Clarification.

7

8    DATED: May 16, 2008          LAW OFFICES OF MARC TOBEROFF, PLC

9

10                          By _____/s/_____
                                      Marc Toberoff

11

12   Attorneys for Plaintiffs JOANNE SIEGEL
     and LAURA SIEGEL LARSON

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION

**EXHIBIT 28**

**1280**

# EXHIBIT 29

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 259 of 343
Case 2:04-cv-08400-ODW-RZ    Document 721 Filed 09/07/10   Page 2 of 53   Page ID
#:17536
Page ID
#:13610
1

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE OTIS D. WRIGHT

4       UNITED STATES DISTRICT JUDGE PRESIDING

5                  - - -

6

Joanne Siegel, et al.,          )
7                      PLAINTIFF,   )
                                    )
8    VS.                           )   NO. CV 04-8400 ODW
                                    )   NO. CV 04-8776 ODW
9    Warner Bros Entertainment, Inc., et)
al.,                            )
10                     DEFENDANT,   )
_____)

11

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          LOS ANGELES, CALIFORNIA

16          FRIDAY, AUGUST 13, 2010

17

18

19    _____

20       KATIE E. THIBODEAUX, CSR 9858
         U.S. Official Court Reporter
21       312 North Spring Street, #436
         Los Angeles, California 90012

22

23

24                                    COPY

25

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 29
1281

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 260 of 343
Case 2:04-cv-08400-ODW-RZ   Document 272-17587ed 09/07/10   Page 20 of 53   Page ID
#:13628                                                                    19

1    about.

2        MR. TOBEROFF:  On the promotional ads, I need to

3    correct Mr. -- certain misstatements that were made by

4    Mr. Petrocelli.  It is not so that Judge Larson did not

5    rule regarding the contents of the promotional ads.  He

6    specifically did in one of his published rulings, and I

7    can read you a small portion of it.

8        What happened is that the promotional ads are

9    something that unless -- that the Siegels, when they did

10   their termination notices and they were represented by

11   counsel in Washington, looked up at the copyright office

12   every single Superman work, and if you look at the

13   termination notices, they are yay high, and they did

14   exhaustive research.  But advertisements appear in a page

15   in a magazine that has some different title.  It doesn't

16   say Superman.  It says Zorro or some other character.

17       So they had no way of finding searching under

18   Siegel and Schuster or searching under Superman these ads

19   at the copyright office so for that reason they didn't

20   elicit a termination notice.  Judge Larson found that for

21   technical reasons, the ads were not terminated but after

22   so holding, he went out of his way to point out that the

23   ads which merely contained a black and white picture of

24   the Action Comics Number 1 cover which was recaptured,

25   and so it is redundant of something that actually was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 29
1282

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 261 of 343
Case 2:04-cv-08400-ODW-RZ    Document 24-7588ed 09/07/10   Page 21 of 53   Page ID
#:13629                                                                          20

```
 1   recaptured, has very little significance.  And he went

 2   out of his way to say, yes, you have got the ads back,

 3   but there is nothing in the ads.  They are a hard-to-read

 4   black and white depiction divorced from the story of

 5   Superman.  So a person in -- running around in black and

 6   white tights with a cape, you don't know if he is a good

 7   guy, a bad guy, you don't even know he is Superman.

 8           What you see is what you get, and what you see

 9   is something completely divorced from the Superman story.

10   So after saying on a technicality that the ads weren't

11   included, he made crystal clear in his published

12   decision, and I can point you to the page number.  The

13   cite is 542 F.Supp.2d 1098, on page 1126, where he says:

14           "This leads to the question of the scope of

15   the copyrighted material remaining in defendant's

16   possession by way of the promotional announcements, a

17   question that defendants themselves acknowledge," quote,

18   "is most obviously answered by looking at the ads which

19   speak for themselves."

20           "The Court begins by observing what is not

21   depicted in the announcements, obviously, nothing

22   concerning the Superman storyline, that is the literary

23   elements contained in Action Comics Number 1, paren,

24   which was recaptured is on display in the ads.

25           "Thus Superman's name, his alterego, his
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

23

EXHIBIT 29
1283

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 262 of 343
Case 2:04-cv-08400-ODW-RZ    Document 728-1 #:17539 Filed 09/07/10    Page 22 of 53    Page ID
#:13630                                                                                    21

1   compatriots, his origins, his mission to serve as the

2   champion of the oppressed or his heroic abilities in

3   general do not remain within defendant's sole possession

4   to exploit.

5          "Instead, the only copyrightable elements left

6   arise from the pictorial illustration of the

7   announcements which is fairly limited.  The person in

8   question has great strength.  He is, after all, holding

9   aloft a car.  The person is wearing some type of costume,

10  but, significantly, the colors if any for the same are

11  not represented as the advertisement appears only in

12  black and white.

13         "The argument that the 'S crest is recognizable

14  in the promotional advertisements is not persuasive.

15  What is depicted on the chest of the costume is so small

16  and blurred as to not be readily recognizable.  At best,

17  all that can be seen is some vague marking or symbol, its

18  precise contours hard to decipher.

19         "The Court, thus, concludes that defendants

20  may continue to exploit the image of a person with

21  extraordinary strength who wears a black and white

22  leotard and a cape.  What remains of the Siegel and

23  Schuster Superman copyright that is still subject to

24  termination, of course, what defendants truly seek is the

25  entire storyline from Action Comics Number 1, Superman's

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 29
1284

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 263 of 343
Case 2:04-cv-08400-ODW-RZ    Document #:17540    Page ID Filed 09/07/10    Page 23 of 53    Page ID
#:13631                                                                                        22

1    distinctive blue leotard complete with its embroidered

2    triangular crest across the chest with a red S on a

3    yellow background, a red cape and boots and his

4    superhuman ability to leap tall buildings, repel bullets

5    and run faster than a locomotive, none of which is

6    apparent from the announcement."

7           So not so that Judge Larson did not rule as to

8    the effect of the ads after saying on a technicality that

9    it is not in the termination.  He said, but it is not

10   that relevant because the ads are a strong man in black

11   and white running around in leotards and a cape.  That is

12   not Superman.

13          I -- I think the best way, and I understand

14   that there is a massive record here.  I think the best

15   way for your Honor to be able to most quickly come up to

16   speed on this fairly complex case is actually to read

17   those three published opinions if you haven't already

18   done so because they really lay this stuff out

19   exhaustively, and it is because these opinions -- I will

20   just wait.

21          (Pause in proceedings.)

22          MR. TOBEROFF:  And one of the good reasons for

23   54(b) entry of judgment is because the analysis in these

24   opinions as you can see from the little section I have

25   just read, it is so exhaustive that that is another very

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 29
1285

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 264 of 343
Case 2:04-cv-08400-ODW-RZ    Document 217-1    Filed 09/07/10    Page 30 of 53    Page ID
#:13638
Page ID #:17541

1

2                            CERTIFICATE

3

4

5    I hereby certify that pursuant to Section 753, Title 28,

6    United States Code, the foregoing is a true and correct

7    transcript of the stenographically reported proceedings held

8    in the above-entitled matter and that the transcript page

9    format is in conformance with the regulations of the

10   Judicial Conference of the United States.

11   Date:   8/24/10

12

13

14   _W. Thibodeaux_

15

16   Katie E. Thibodeaux, CSR No. 9858

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

32

EXHIBIT 29
1286

# EXHIBIT 30

Case 2:04-cv-08400-ODW-RZ     Document 720-7     Filed 04/04/13     Page 266 of 343
Page ID #:17543
Case 2:04-cv-08400-ODW-RZ   Document 620   Filed 08/25/10   Page 1 of 3   Page ID #:13471

1   MARC TOBEROFF (S.B. #188547)
      mtoberoff@ipwla.com
2   NICHOLAS C. WILLIAMSON (S.B. #231124)
      nwilliamson@ipwla.com
3   KEITH G. ADAMS (S.B. #240497)
      kgadams@ipwla.com
4   TOBEROFF & ASSOCIATES, P.C.
    2049 Century Park East, Suite 2720
5   Los Angeles, CA 90067
    Telephone:   (310) 246-3333
6   Facsimile:    (310) 246-3101

7   Attorneys for Plaintiffs and Counterdefendants

8   (continued on next page)

9
                    **UNITED STATES DISTRICT COURT**
10
                    **CENTRAL DISTRICT OF CALIFORNIA**
11

12  JOANNE SIEGEL and LAURA            Case No. CV-04-8400 ODW (RZx)
    SIEGEL LARSON,                     Case No. CV-04-8776 ODW (RZx)
13
                  Plaintiffs and       **STIPULATION RE: RELEVANT**
14                Counterdefendants,   **BRIEFING AND DOCKET**
                                       **ENTRIES PURSUANT TO**
15       v.                            **COURT'S AUGUST 13, 2010**
                                       **MINUTE ORDERS**
16  WARNER BROS.
    ENTERTAINMENT INC., DC             The Hon. Otis D. Wright II
17  COMICS, and DOES 1-10,

18                Defendants and
                  Counterclaimant.
19
    JOANNE SIEGEL and LAURA
20  SIEGEL LARSON,

21                Plaintiffs and
                  Counterdefendants,
22
         v.
23
    TIME WARNER INC., WARNER
24  COMMUNICATIONS INC.,
    WARNER BROS.
25  ENTERTAINMENT INC., WARNER
    BROS. TELEVISION PRODUCTION
26  INC., DC COMICS, and DOES 1-10,

27                Defendants and
                  Counterclaimant.
28

                                       STIPULATION RE: COURT'S
                                       AUGUST 13, 2010 MINUTE ORDERS

                    **EXHIBIT 30**
                    **1287**

1    (continued from previous page)

2    DANIEL M. PETROCELLI (S.B. #097802)
        dpetrocelli@omm.com
3    MATTHEW T. KLINE (S.B. #211640)
        mkline@omm.com
4    CASSANDRA L. SETO (S.B. #246608)
        cseto@omm.com
5    O'MELVENY & MYERS LLP
      1999 Avenue of the Stars, 7th Floor
6    Los Angeles, CA  90067-6035
      Telephone:  (310) 553-6700
7    Facsimile:   (310) 246-6779

8    PATRICK T. PERKINS (admitted *pro hac vice*)
        pperkins@ptplaw.com
9    PERKINS LAW OFFICE, P.C.
10   1711 Route 9D
      Cold Spring, NY 10516
11   Telephone:  (845) 265-2820
      Facsimile:   (845) 265-2819
12

13   Attorneys for Defendants and Counterclaim Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION RE: COURT'S
AUGUST 13, 2010 MINUTE ORDERS

**EXHIBIT 30**
**1288**

Pursuant to the Court's August 13, 2010 minute orders, the parties hereby submit the following docket entries for the Court's review:

**A.   Superman Action – Case No. CV 04-8400**

| Agreed Entries | Plaintiffs' Additional Suggestions | Defendants' Additional Suggestions |
|---|---|---|
| Briefing | | |
| Docket Nos. 336, 339, 348, 349, 602, 617 | Docket Nos. 584, 587 | None |
| Court Orders | | |
| Docket Nos. 293, 560 | Docket No. 595 | None |

**B.   Superboy Action – Case No. CV 04-8776**

| Agreed Entries | Plaintiffs' Additional Suggestions | Defendants' Additional Suggestions |
|---|---|---|
| Briefing | | |
| Docket Nos. 52, 56, 67, 70, 76, 78, 155, 166 | Docket Nos. 116 (at 43-75), 132, 135, 141, 144; Docket No. 186 (at 65-101) in CV 04-8400 | None |
| Court Orders | | |
| Docket No. 151; Transcript of the Sept. 17, 2007 hearing | Docket No. 85 | Docket No. 175 |

Dated: August 25, 2010          TOBEROFF & ASSOCIATES. P.C.

By: _____
           Marc Toberoff

Attorneys for Plaintiffs and Counterdefendants

Dated: August 25, 2010          O'MELVENY & MYERS LLP

By: _____
           Daniel M. Petrocelli

Attorneys for Defendants and Counterclaimant

- 1 -

STIPULATION RE: COURT'S
AUGUST 13, 2010 MINUTE ORDERS

**EXHIBIT 30**
**1289**

# EXHIBIT 31

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 270 of 343
Page ID #:17547
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 09/03/10   Page 1 of 74   Page ID #:3610

COPY

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  Attorneys for Plaintiff DC COMICS

8  (continued on next page)

9
                 UNITED STATES DISTRICT COURT
10
                 CENTRAL DISTRICT OF CALIFORNIA
11

12  DC COMICS,                        Case No. CV 10-3633 ODW (RZx)

                   Plaintiff,         **FIRST AMENDED COMPLAINT**
13                                     **FOR:**
          v.
14                                     (1)  Declaratory Relief re: Invalidity of
    PACIFIC PICTURES                        Copyright Termination Notice;
15  CORPORATION, IP
    WORLDWIDE, LLC, IPW, LLC,          (2)  Declaratory Relief re: Scope of
16  MARC TOBEROFF, an individual,           Copyright Termination Notice;
    MARK WARREN PEARY, as
17  personal representative of the     (3)  Declaratory Relief re: DC Comics
    ESTATE OF JOSEPH SHUSTER,               Period of Exclusivity re: Shuster;
18  JEAN ADELE PEAVY, an
    individual, JOANNE SIEGEL, an      (4)  Interference with 1992 Shuster
19  individual, LAURA SIEGEL               Agreement;
    LARSON, an individual, and DOES
20  1-10, inclusive,                   (5)  Interference with Prospective
                                           Economic Advantage re: Siegel-
21                 Defendants.             DC Comics Agreement; and

22                                     (6)  Declaratory Relief re: Invalidity of
                                           Copyright Assignment and
23                                         Consent Agreements

24                                     **DEMAND FOR JURY TRIAL**

25                                     **Hon. Otis D. Wright II**

26

27

28

                                         FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1290**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 271 of 343
Page ID #:17548
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 09/03/10   Page 2 of 74   Page ID #:3611

1   (continued from previous page)

2   PATRICK T. PERKINS (admitted *pro hac vice*)
3     pperkins@ptplaw.com
    PERKINS LAW OFFICE, P.C.
4   1711 Route 9D
    Cold Spring, NY 10516
5   Telephone:   (845) 265-2820
    Facsimile:   (845) 265-2819
6

7   Attorneys for Plaintiff DC COMICS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1291**

1   (continued from previous page)

2   PATRICK T. PERKINS (admitted *pro hac vice*)
3     pperkins@ptplaw.com
    PERKINS LAW OFFICE, P.C.
4   1711 Route 9D
    Cold Spring, NY 10516
5   Telephone:  (845) 265-2820
    Facsimile:   (845) 265-2819
6

7   Attorneys for Plaintiff DC COMICS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

EXHIBIT 31
1292

# I.  STATEMENT OF THE CASE

1.    This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.    Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.    In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra*.

- 1 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1293**

1    Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff

2    purported to secure a majority and controlling financial stake in copyright interests

3    in Superman assertedly held by the Siegel and Shuster heirs and to preclude the

4    heirs from freely entering into new agreements with DC Comics for the continued

5    exploitation of Superman.  As detailed below, these agreements are unlawful under

6    the copyright laws, are void as against public policy, and both violate DC Comics'

7    rights and threaten the ongoing viability of the Superman property.

8        4.    During their lifetimes, Jerry Siegel and Joe Shuster—both well aware

9    of the termination provisions in amendments to the Copyright Act—never once

10   sought to terminate any of DC Comics' copyright interests, even though they could

11   have attempted to do so as early as 1984.  Instead, Siegel and Shuster rightly

12   honored their agreements with DC Comics, under which they and their families

13   enjoyed significant compensation, lifetime pensions, and other important benefits.

14   After their deaths, Siegel and Shuster's heirs reached separate agreements with DC

15   Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001.  These agreements

16   provided the heirs substantial compensation and fully and finally resolved any

17   claims of termination to any rights in Superman and confirmed that DC Comics

18   owned all right, title, and interest in and to Superman.

19       5.    In or around 2001, Toberoff learned of these agreements between DC

20   Comics and the Siegel and Shuster heirs and engineered a course of conduct to

21   induce the heirs to repudiate those agreements and enter into new agreements with

22   Toberoff and his companies netting him the controlling stake in the heirs' asserted

23   interests in Superman.

24       6.    Toberoff induced the Shuster heirs to repudiate their 1992 agreement

25   with DC Comics and enter into a 50/50 joint venture with defendant Pacific

26   Pictures Corporation, a film-production company wholly owned and controlled by

27   Toberoff, pursuant to which the heirs conveyed the entirety of their purported

28   Superman copyright termination rights to the venture.  The stated purpose of the

- 2 -                    FIRST AMENDED COMPLAINT

EXHIBIT 31
1294

1    venture was to secure and exploit DC Comics' copyright interest in Superman.

2    Toberoff procured this joint-venture agreement even though he knew that the

3    Shusters' 1992 agreement with DC Comics operated to grant any and all of the

4    heirs' interest in Superman to DC Comics and extinguish any termination rights the

5    heirs might have held.  Toberoff also induced the Shuster heirs to serve a notice of

6    termination purporting to terminate and recapture the same alleged interests they

7    had granted to DC Comics under the parties' 1992 agreement.  This termination

8    notice was invalid:  among other defects, it was filed by a party lacking the

9    necessary majority interest to terminate.  Furthermore, any putative right to

10   terminate held by Joe Shuster ceased to exist when he died having elected not to

11   exercise it during his lifetime and having died without leaving a surviving spouse,

12   child, or grandchild to inherit and exercise it.

13        7.     Toberoff similarly induced the Siegel heirs to repudiate their 2001

14   agreement with DC Comics.  After years of negotiations following a copyright

15   termination notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs

16   reached an agreement providing that DC Comics would retain all rights to

17   Superman and entitling the Siegels to receive a significant portion of the Superman

18   profits.

19        8.     Toberoff became aware of the existence of the 2001 agreement

20   between the Siegels and DC Comics and understood it diminished his stake in the

21   putative Superman rights held by his joint venture with the Shusters.  In pursuit of

22   his plan to corner and control all potential Superman termination rights and thereby

23   block further exploitation of the property by DC Comics, Toberoff set out to derail

24   the 2001 Siegel agreement.  Toberoff presented himself as a film producer and

25   falsely represented to the Siegels that if they repudiated their agreement with DC

26   Comics and entered into an agreement with him instead, a "billionaire investor"

27   was prepared immediately to pay the Siegels $15 million for their Superman rights,

28   plus a generous back-end profit participation in any future exploitations of the

- 3 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1295**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 276 of 343
Page ID #:17553
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 09/03/10   Page 7 of 74   Page ID #:3616

1    Superman property. Toberoff also falsely represented that they would help the

2    Siegels produce their own Superman motion picture that would compete

3    successfully with a Superman motion picture that Warner Bros.—DC Comics'

4    licensee—was then developing. Based on Toberoff's inducements, the Siegels

5    repudiated their 2001 agreement with DC Comics, terminated the employment of

6    their then-law firm Gang, Tyre, Ramer & Brown, and ultimately entered into

7    agreements with Toberoff and defendant IP Worldwide LLC, an entity controlled

8    by Toberoff. Under these agreements, Toberoff and his company received a 45%

9    interest in any recovery by the Siegels—an 800% increase over the 5% fee in the

10   Siegels' agreement with the Gang Tyre firm.

11          9.     As a result of his arrangements with both the Shuster and Siegel heirs,

12   Toberoff secured control of the largest financial stake in the collective, putative

13   Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster

14   heirs—25%). Toberoff sought further control, however. In order to assert that DC

15   Comics had *no* further rights to exploit the derivative Superman character

16   "Superboy"—including in the highly popular *Smallville* network television series—

17   Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of

18   Shuster—was the sole creator of Superboy. Toberoff did so with full knowledge

19   that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'*

20   asserted joint rights in Superboy, consistent with the long-held view of Shuster,

21   Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

22          10.    Despite these incontestable facts concerning Superboy's creation—

23   facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his

24   companies ratified and affirmed over time—Toberoff induced the Siegels and

25   Shusters to falsely position Siegel as the *sole* creator of Superboy. In 2002, the

26   ──────────────

27   [2] As explained *infra*, DC Comics fully agrees that Shuster and Siegel jointly
     contributed to Superboy. It is DC Comics' position, however, that Superboy is a
     work entirely derivative of Superman and thus Superboy is not subject to
28   termination under the Copyright Act's termination regime.

-4-                               FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1296**

1  Siegels then filed a copyright termination notice asserting sole ownership of

2  Superboy.  Toberoff then induced the Shusters in 2003 to amend their joint-venture

3  agreement with Pacific Pictures to *delete* all references to Superboy.  The deletion

4  of Superboy was directly contrary to the Shusters' interests and occurred solely to

5  park *all* of the alleged Superboy rights with the Siegels.  Having manipulated the

6  Superboy rights in favor of the Siegels, and directly contrary to copyright filings

7  that the Siegels and Shusters had previously made, Toberoff then filed a termination

8  notice on behalf of the Shusters that purported to terminate only Superman rights,

9  leaving out all mention of Superboy.  These artifices positioned the Siegels to claim

10  100% ownership of Superboy in order to later bring a copyright infringement claim

11  against DC Comics, Warner Bros., and the *Smallville* series.  That case—which was

12  filed in 2004—remains pending today.

13      11.    Yet another component of Toberoff's scheme to gain complete control

14  over the heirs to the putative Superman termination rights was preventing the Siegel

15  and Shuster heirs from freely entering into agreements with DC Comics—even if it

16  was in their respective economic interest to do so.  In violation of DC Comics'

17  statutory period of exclusivity under the copyright laws, Toberoff induced the

18  Siegels and Shusters to enter into agreements transferring their respective interests

19  to his companies and preventing them from conveying any rights to DC Comics

20  without each other's—and Toberoff's—consent.  As a result of these illicit

21  agreements, DC Comics has been deprived of its ability to enter into agreements

22  with the heirs to secure their purported termination rights, in violation of the

23  Copyright Act, other laws, and public policy promoting the free and fair settlement

24  of legal claims.

25      12.    To protect its rights under the copyright laws, agreements, and

26  interests with the Shusters and Siegels and remove the cloud that Toberoff's actions

27  have unlawfully placed over the Superman property and its future, DC Comics

28  brings this action to seek declaratory judgments and other relief as set forth below.

- 5 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1297**

## II. PARTIES

13.    Plaintiff DC COMICS ("DC Comics") is a general partnership organized and existing under the laws of the State of New York and has its principal place of business in the State of New York.  DC Comics is the successor-in-interest to all rights, including rights under copyright, relating to the Superman works and character.

14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific Pictures") is a New York corporation organized under the laws of the State of New York, and was registered as a foreign corporation doing business in the State of California, with its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the sole shareholder and registered agent for service of process of Pacific Pictures.  Upon information and belief, Pacific Pictures forfeited its active status as a New York corporation and as a registered foreign corporation in California as of early 2009.

15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and registered as a foreign entity doing business in the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IP Worldwide and owns the controlling interest therein.

16.    Defendant IPW, LLC ("IPW") is a California limited liability company organized and existing under the laws of the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IPW, is its registered agent for service of process, and owns the controlling interest in IPW.  Upon information and belief, IPW is a successor-in-interest to all or part of IP Worldwide's interests.

- 6 -                              FIRST AMENDED COMPLAINT

**EXHIBIT 31**

**1298**

17.     Defendant MARC TOBEROFF ("Toberoff") is an individual who resides in the County of Los Angeles in the State of California, and upon information and belief, is and at all times has been a citizen of the United States. Upon information and belief, Toberoff is a shareholder and member of defendants PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

18.     Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is an individual who resides in the State of New Mexico and is, and at all times has been, a citizen of the United States. Peary is the nephew of Joseph Shuster, and a California court appointed him as the personal representative of the Shuster Estate.

19.     Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a probate estate established by the Los Angeles Superior Court in 2003 (LASC Case No. BP-080635).

20.     Defendant JEAN ADELE PEAVY ("Jean Peavy" or "Peavy") is an individual who resides in the State of New Mexico and, upon information and belief, is, and at all relevant times has been, a citizen of the United States. Peavy was the sister of Joseph Shuster, and under the terms of Shuster's purported will, the sole beneficiary of the Shuster Estate. Peavy has actively participated in the Shuster probate proceedings pending in Los Angeles, California, personally disposed of property of the Shuster Estate in California pursuant to the provisions of the California Probate Code, and is a party to certain agreements formed in California at issue in this action.

21.     Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who resides in the County of Los Angeles in the State of California and is, and at all times has been, a citizen of the United States. Joanne Siegel is the widow of Jerome Siegel.

22.     Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an individual who resides in the County of Los Angeles in the State of California and

-7-

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1299**

1   is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is

2   the daughter of Jerome Siegel and Joanne Siegel.

3        23.    Upon information and belief, Toberoff is, and at all relevant times has

4   been, the sole shareholder and principal of Pacific Pictures and a member and

5   principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the

6   alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all

7   relevant times has been, such unity of interest between Toberoff, Pacific Pictures,

8   IP Worldwide, and IPW that any individuality and separateness between them did

9   not and does not exist, and adherence to the fiction of the independent and separate

10  existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and

11  Toberoff would promote injustice and inequity.

12       24.    Upon information and belief, the fictitiously-named DOES 1-10 are in

13  some manner responsible for the events giving rise to the claims set forth herein.

14  The true names and capacities of such fictitiously-named defendants, whether

15  individual, corporate, or otherwise, are presently unknown to DC Comics.  DC

16  Comics will amend this Complaint to assert the true names and capacities of such

17  fictitiously-named defendants when this information has been ascertained.  Each

18  reference herein to a named defendant shall also refer to DOES 1-10.

19                    III.  **JURISDICTION AND VENUE**

20       25.    As noted, the Court has subject matter jurisdiction over the claims set

21  forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

22  jurisdiction over DC Comics' claims arising under the Copyright Act and

23  supplemental jurisdiction over its related state-law claims.

24       26.    The Court has personal jurisdiction over defendants, *inter alia*,

25  because a substantial part of the events giving rise to the claims set forth herein

26  occurred in the State of California and the defendants have extensive contacts with

27  the State, including the following:

28

- 8 -                      FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1300**

Case 2:04-cv-08400-ODW-RZ    Document 720-7    Filed 04/04/13    Page 281 of 343
Page ID #:17569
Case 2:10-cv-03633-ODW-RZ    Document 49    Filed 05/03/10    Page 12 of 74    Page ID #:3621

a.    Defendants Marc Toberoff, the Shuster Estate, Peary, and Peavy established a joint venture in California under California law for the purpose of terminating and recapturing prior grants of the copyrights at issue in this action.

b.    On behalf of the joint venture, Peary and Peavy initiated a probate action in Los Angeles Superior Court—which, upon information and belief, remains pending—in order to effectuate the purpose of the California joint venture.  A California court appointed Peary executor of the Shuster Estate, and Peary serves in that capacity as a matter of California law.  In that capacity, Peary served one of the copyright termination notices at issue in this action.

c.    Upon information and belief, defendants Pacific Pictures and IP Worldwide are foreign entities registered as doing business in the State of California, and they have their principal places of business and are headquartered in the State of California and the County of Los Angeles.

d.    Upon information and belief, defendant IPW is a California limited liability company organized and existing under the laws of the State of California and has its principal place of business and headquarters in the State of California and the County of Los Angeles.

e.    Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson reside and conduct business in the State of California and the County of Los Angeles.

f.    Defendants Joanne Siegel and Laura Siegel Larson filed two related actions against DC Comics in this District and Court to resolve ownership of the rights in Superman and Superboy.  (Case Nos. CV-04-8400 ODW (RZx), CV-04-8776 ODW (RZx)).

-9-

FIRST AMENDED COMPLAINT

EXHIBIT 31
1301

1    27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

2  Defendants are subject to personal jurisdiction in this District, and a substantial part

3  of the events giving rise to the claims set forth herein occurred in this District.

4    **IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

5  **A.    DC Comics' Development of Superman**

6    28.    In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph

7  Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named

8  "Superman," whom they originally envisioned as a criminal mastermind, and then

9  reconceived as a hero fighting for social justice. Aside from the name, the

10  character shared little similarity with the figure that would later become known

11  throughout the world as Superman. Between 1933 and 1937, Siegel and Shuster

12  submitted the Superman comic strips to a number of prospective publishers and

13  newspaper syndicates, all of which rejected them. According to a 1941 *Saturday*

14  *Evening Post* profile of the pair, "by this time [Siegel and Shuster] had abandoned

15  hope that Superman would ever amount to much."

16    29.    A company that would come to be known as DC Comics—and for

17  whom Siegel and Shuster worked for hire developing fictional characters—would

18  eventually decide to publish a 13-page comic story featuring "Superman" in the

19  first issue of a 64-page comic book entitled "Action Comics." As explained below,

20  this original version of Superman had few, limited powers, and his fictional world

21  and back-story were not well developed.

22    30.    Months before this "Action Comics" book ("Action Comics No. 1")

23  was published, Siegel and Shuster entered into, on December 4, 1937, an

24  "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-

25  in-interest to DC Comics (the "December 4, 1937 Agreement"). Siegel and Shuster

26  renewed their employment arrangement with DCI in agreements on September 22,

27  1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22,

28  1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

- 10 -                  FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1302**

31.    In 1938, at the instance and expense of DCI and subject to its right of control, Siegel and Shuster adapted the preexisting Superman comic strips they had created and added new material to create the 13-page comic book story entitled "Superman." This story—like all the Superman works that Siegel and Shuster thereafter created—was created for DC Comics as a work made for hire. Moreover, Siegel and Shuster only contributed to a part of this work. Upon information and belief, Shuster submitted black-and-white illustrations to DCI that were later colorized by printers or engravers working at DCI's direction. DCI also prepared one or more cover illustrations for Action Comics No. 1, which depicted Superman and was published in other comic books prior to the publication of Action Comics No. 1. Action Comics No. 1 itself was published in April 1938.

32.    To the extent Siegel and Shuster created any copyrightable Superman-related works outside their work-for-hire relationship with DC Comics (and DC Comics has disputed that they did), those works consisted solely of certain panels and portions of the Action Comics No. 1 comic book and other minor creations in the 1930s, which Siegel and Shuster conveyed to DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March 1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel and Shuster again assigned to DCI all of their rights in Superman, including "all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip." Siegel and Shuster confirmed DCI's sole and exclusive ownership of all Superman rights in the DCI September 22, 1938 Agreement and December 19, 1939 Agreement.

33.    The initial appearance of Superman in Action Comics No. 1 presented a limited view of the character. The readers learn only that Superman was sent to Earth as an infant aboard a space ship from an unnamed planet that was destroyed by old age. He secretly possessed five super-human powers: the abilities to leap 1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster

- 11 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1303**

1  than an express train; and repel bullets and knives by virtue of his "tough skin." In

2  his alter-ego life, Superman was depicted as Clark Kent, a "coward" and a

3  "weakling" who worked as a reporter for "The Daily Star," with a female co-

4  worker named "Lois," whose last name is not mentioned. In his life as Superman,

5  he was depicted as a costumed vigilante who uses his super-human abilities to fight

6  criminals and mete out his own brand of justice. In Action Comics No. 1,

7  Superman is said to have grown up in an orphanage and is depicted (both in words

8  and images) as a child with super-human strength.

9     34.   Since the publication of Action Comics No. 1 in 1938, DC Comics—

10  with its teams of work-for-hire writers and artists (including Siegel and Shuster)—

11  has added more than 70 years of material defining, updating, expanding, and

12  improving upon the Superman myth and creating a continuous flow of new exploits

13  and characters, resulting in a vast Superman "universe."

14     35.   DC Comics has authored, published, and distributed hundreds of

15  millions of copies of thousands of comic book issues throughout the United States

16  and abroad depicting the adventures of Superman. These comic books have been

17  authored and illustrated by dozens of DC Comics' talented staff writers and artists,

18  and many of most iconic images and stories of Superman were created by these

19  work-for-hire artists who reshaped his image over time.

20     36.   DC Comics has also created, developed, distributed, and licensed

21  numerous feature-length motion pictures, motion-picture serials, radio serials,

22  television shows, novels, and live theatrical presentations based on Superman.

23  Indeed, the radio, television, and motion-picture projects in particular—with which

24  Siegel and Shuster had nothing or little to do—were largely responsible for

25  spreading the Superman myth and popularity and expanding the Superman

26  storyline.

27     37.   As a result of DC Comics' significant and sustained investment in and

28  stewardship of Superman—and 70-plus years of character and story development

- 12 -                        FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1304**

1  by some of the most creative and talented minds in the comic-book, radio,

2  television, and motion-picture industries—Superman has remained constantly in the

3  public's eye and has become one of the most famous and beloved fictional

4  characters in the world.  Over these 70 years, Superman has evolved from the few

5  black-and-white illustrations originally drawn by Shuster into a full-blown, color

6  character inhabiting a multi-dimensional universe.

7       38.    DC Comics' development of Superman over many decades has

8  represented a continuous and ever-evolving portrayal of the character, featuring

9  new elements in the Superman back-story, new super-powers, new characters, and

10  changes in Superman's appearance.  Many of the most famous story elements and

11  characters associated with Superman were developed long after 1938, and by

12  illustrators and story writers other than Shuster and Siegel working for hire for DC

13  Comics.  These include stories about and depictions of:  (a) "Smallville," the town

14  where Superman grew up; (b) "Kryptonite," or surviving fragments of the

15  destroyed planet Krypton, which have the power to harm or affect Superman;

16  (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis

17  (traditionally located in the Arctic, but also placed in the Andes and Amazon

18  rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work;

19  (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love

20  interests, such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac;

21  (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto"

22  the Superdog as well as Supergirl.  Other aspects of Superman's evolution included

23  the development of new super-powers, including:  (a) the ability to fly (a key

24  component, especially of the Superman motion pictures); (b) super-vision, which

25  enables him to see through walls ("X-ray" vision); (c) telescopic vision, which

26  allows him to see across great distances; (d) "heat vision," which empowers him to

27  aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to

28  hear conversations at great distances; (f) invulnerability to injury; and (g) the ability

**EXHIBIT 31**
**1305**

1   to survive in outer space without protective gear.  It is this constant and

2   uninterrupted evolution of the Superman mythology that allows Superman to

3   remain a force in popular consciousness decades after so many contemporary

4   characters have been forgotten or deemed old-fashioned.

5         39.    In *Superman: The Action Comics Archives, Vol. 1* (1997), renowned

6   comic-book historian Mark Waid explained the dramatic transformation Superman

7   underwent over the past 70 years and stark contrast between the Superman that

8   Siegel and Shuster conceived in the 1930s and the one the world now knows:

> The whole world knows Superman.  He is kind, he is wise, he is
> gentle, he upholds the law and the mores of a decent society.  He is
> half boy scout, half policeman.  In fact, here is what the citizens of
> 1939 Metropolis have to say about him:
>
> > "It is the devil himself!"
> > "You're breaking the law, sir!"
> > "Don't hit me again!  I'll give ya anything ya want!"
> > "Hundreds of officers—all incapable of stopping the mad course
> > of one hoodlum!"
>
> I thought I knew everything about Superman.  Then I read the [early
> Superman stories].  Within these pages, I met a head-bashing
> Superman who took no prisoners, who made his own law and enforced
> it with his fists, who gleefully intimidated his foes with a wicked grin
> and a baleful glare.  A Superman who reveled in his strength, who
> clearly enjoyed raising a little hell and who didn't care who got in his
> way as he bounded through Metropolis meting out his own brand of
> justice .…  How could he have started out so different?

19  **B.    Early Disputes Regarding the Superman Rights**

20        40.    Siegel and Shuster served in a work-for-hire capacity for DCI from the

21  early 1930s through the late 1940s, helping draw and write Superman comic strips

22  and comic books.  They were paid substantial sums for their work, and DC Comics

23  renegotiated the pair's contract numerous times to give them greater and greater

24  stakes in the success of Superman.  By 1940 (at the end of the Great Depression),

25  Siegel and Shuster were paid the equivalent of well over a million dollars in today's

26  dollars.  The pair's earnings were even greater in 1941, exceeding $1.5 million in

27  today's terms, and in the years that followed, Siegel and Shuster would earn the

28

-14-                          FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1306**

1    equivalent of millions more.  Yet despite the financial success shared by DC

2    Comics and Siegel and Shuster, the relationship eventually became contentious.

3        41.    In 1947, Siegel and Shuster filed an action against DCI's successor,

4    National Comics Publications, Inc. ("National"), in the New York Supreme Court

5    in Westchester County (the "Westchester Action").  In the Westchester Action,

6    Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also

7    sought to recapture all rights in Superman, arguing that the DCI September 22,

8    1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as

9    unauthorized DCI's publication in November 1944 of a series of comic-book

10   stories entitled "Superboy," which featured the adventures of Superman as a youth.

11      42.    On November 21, 1947, a referee in the Westchester Action issued an

12   opinion after trial (the "Westchester Opinion") holding that the March 1, 1938

13   Agreement assigned "all" of the Superman rights to DCI, and that the DCI

14   September 22, 1938 Agreement was valid and not obtained under duress.  The

15   referee found that DCI had acted improperly in publishing Superboy.

16      43.    At the referee's request, the parties to the Westchester Action

17   submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the

18   referee adopted findings of fact and conclusions of law and issued an interlocutory

19   judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which

20   he made statements based on a script that Siegel had submitted that Siegel

21   originated and owned the comic strip Superboy to the exclusion of DC Comics.

22   National filed a notice of appeal, and the Westchester Action Interlocutory

23   Judgment was stayed pending appeal.

24      44.    Shortly thereafter, the parties to the Westchester Action entered into

25   two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948

26   Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948

27   Consent Agreement").  Under both documents, *inter alia,* Siegel and Shuster:

28   (a) agreed to vacate the Westchester Action Interlocutory Judgment;

- 15 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1307**

1   (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred

2   to DCI all rights in and to Superman, including "the title, names, characters,

3   concept and formula" as set forth in Action Comics No. 1; and (c) agreed that

4   National was the sole and exclusive owner of all rights in Superman and Superboy.

5   In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

6       45.    Following the commencement of the Westchester Action, Siegel

7   attempted to launch a new comic book and syndicated strip feature entitled

8   "Funnyman." The *Funnyman* comic book, however, was cancelled after only six

9   issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers

10   and dropped prior to the end of 1949. By the late 1950s, Siegel was unable to find

11   employment in the comic book field. Having exhausted his savings and needing to

12   support his family, he approached DC Comics asking for work. Despite Siegel's

13   prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire

14   him and thereafter employed Siegel continuously as a work-for-hire writer until the

15   mid-1960s, when he once again challenged DC Comics' rights to Superman.

16       46.    In April 1965, Siegel (while still working for DC Comics) and Shuster

17   (who was being paid a monthly stipend by DC Comics) filed copyright renewal

18   notices in their own names, claiming to own the renewal copyrights in the

19   Superman character and in Action Comics No. 1. This was followed by a lawsuit

20   filed by Siegel and Shuster against National in 1969 in the District Court for the

21   Southern District of New York, seeking a declaration that they owned the

22   "renewal" copyright terms for Superman and Action Comics No. 1. (Under the

23   then-applicable 1909 Copyright Act, the period of copyright protection for a work

24   included an initial term of 28 years and an optional renewal term of 28 years.)

25   Again, Siegel and Shuster's arguments were rejected, and the federal district court

26   held, *inter alia*, that the agreements between Siegel and Shuster, on the one hand,

27   and DCI (later National), on the other, had assigned "all" rights in Superman to

28   DCI and National, including all renewal copyrights. *See Siegel v. Nat'l Periodical*

- 16 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1308**

1    *Publ'ns, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973). The Court of Appeals for the

2    Second Circuit affirmed the district court's ruling that National owned all rights in

3    Superman. *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir.

4    1974). Siegel and Shuster did not further appeal that ruling.

5         47.    Following the failure of their second lawsuit to recapture copyrights in

6    Superman, Siegel and Shuster ran into financial difficulties of their own making.

7    Siegel publicized their financial plight, and there were calls for companies like

8    National (and even for Congress) to help such artists. On December 23, 1975, and

9    despite Siegel and Shuster's two prior lawsuits against National, Warner

10    Communications, Inc. ("WCI"), National's then-parent company, agreed to provide

11    them financial assistance. Under an agreement entered into in 1975 (the "1975

12    Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole

13    and exclusive owner of "all right, title and interest in and to the 'Superman'

14    concept, idea, continuity, pictorial representation, formula, characters, cartoons and

15    comic strips, title, logo, copyrights and trademarks, including any and all renewals

16    and extensions of such rights, in the United States and throughout the world, in any

17    and all forms of publication, reproduction and presentation, whether now in

18    existence or hereafter devised." In exchange, WCI agreed to provide Siegel and

19    Shuster with, *inter alia*, annual payments of $20,000 each (around $80,000 in

20    current dollars), annual payments to their heirs after their death, medical insurance

21    coverage, and a lump sum of $17,500 each. With respect to Shuster's heirs, WCI

22    agreed that after Shuster's death, it would make annual payments to his brother,

23    Frank Shuster, of $10,000 until December 31, 1985, and then $5,000 a year for the

24    rest of his life.

25         48.    In the years following the 1975 Agreement, DC Comics increased the

26    annual payments to Siegel and Shuster, made periodic cost-of-living increases,

27    provided insurance, and paid special bonuses. During the last several years,

28    Siegel's widow, for example, has received $135,000 per year plus reimbursement

- 17 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1309**

1    for all medical expenses.  In all, DC Comics has paid Siegel, Shuster, and their

2    heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements—

3    benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue

4    to accept.

5         49.    In 1976, Congress amended the Copyright Act to give authors and

6    certain of their heirs certain limited rights to terminate prior grants of copyright.

7    *See* 17 U.S.C. § 304(c) (1976).  This amendment did not apply to works-made-for-

8    hire (the company paying for the production of those works would always own

9    them), and entitled authors and certain heirs to recapture copyrighted interest only

10    in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture

11    derivative works the grantee may have developed pursuant to the original grant,

12    such as the original Superman radio and television shows, or Superman-related

13    characters, such as "Superboy" or "Lex Luthor").

14         50.    Despite their previous legal battles with National and the widespread

15    publicity surrounding this legislation, neither Jerry Siegel nor Joe Shuster ever

16    endeavored to exercise any termination rights under the statute.  Instead, for the rest

17    of their lives, Siegel and Shuster accepted and enjoyed the benefits under the 1975

18    Agreement.  This decision made sense, given Siegel and Shuster's work-for-hire

19    relationship with DC Comics, the narrow sliver of rights (if any) to which they

20    might claim an interest, and the significant contributions made to Superman in the

21    past 70 years to which they could claim no interest.  Moreover, the 1975 Agreement

22    paid Shuster and Siegel an annual pension and medical insurance for the rest of

23    their lives and, upon their death, paid annual pensions to their heirs.  Although

24    Shuster's and Siegel's "window of time" in which to attempt to terminate prior

25    grants of copyright interests in Superman theoretically opened in 1984, at no time

26    during their lives did they attempt to exercise any such right.

27

28

- 18 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1310**

C.    **Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

51.    Joe Shuster passed away on July 30, 1992. He was survived only by his brother Frank Shuster, sister Jean Peavy, and Ms. Peavy's two children, Mark Peary and Dawn Peavy (the "Shuster Heirs"). (Mark Peary changed his last name from "Peavy" to "Peary.") Shuster did not leave a widow and never had children or grandchildren. Shuster's purported will appoints Jean Peavy the sole beneficiary and executrix of his estate. (An alleged copy of this will surfaced and was probated in 2003, after Toberoff intervened. In addition to certain irregularities in the will, probate papers filed by the Shuster Heirs falsely represented that Joe Shuster was never married and omitted that Joe Shuster had a sibling, Frank Shuster, who also survived him.)

52.    On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC Comics explaining that she was the sole heir to Shuster's estate and that Shuster had left "a crushing burden of unpaid debts and bills and only a tiny estate." Ms. Peavy stated: "It's unbelievable to me that Joe could have so little considering the generosity shown by Time Warner in raising the pension income of Siegel and Shuster." She also disclosed that 20% of Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an agent's commission for getting pay raises for Siegel and Shuster" following the December 23, 1975 Agreement. Much of the remainder of Shuster's income was spent by him during "compulsive buy[ing]" and "shopping sprees" and on expensive stereo equipment and other personal items. As a result, Shuster had accumulated "almost $20,000 in credit card debts and unpaid bills" that, "[a]s heir to his Will, [Ms. Peavy was] responsible for paying." Ms. Peavy asked that Time Warner and DC Comics "pay his final debts and expenses."

53.    In September 1992, Time Warner and DC Comics offered to pay off Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1311**

1    Shuster's annual survivor payments under the 1975 Agreement from $5,000 to
2    $25,000 per year.
3         54.    In a September 10, 1992 letter sent to DC Comics (the "September 10,
4    1992 Letter"), Frank Shuster, on behalf of himself and Jean Peavy, requested that
5    the annual payments due and owing Frank Shuster be made to Jean Peavy in order
6    to take advantage of certain tax benefits.  Frank Shuster and Jean Peavy further
7    promised that, if an agreement could be reached, Jean Peavy "would not pursue the
8    termination of the Superman copyright as provided for to creators' heirs in the 1976
9    U.S. Copyright Act."
10         55.    Based on Jean Peavy and Frank Shuster's letter and the parties' further
11    discussions, DC Comics, Jean Peavy, and Frank Shuster entered into a written
12    agreement on October 2, 1992 (the "1992 Agreement").  The 1992 Agreement,
13    which did not have an integration clause, confirmed that it "fully settles all claims
14    to any payments or other rights or remedies which you may have under any other
15    agreement or otherwise, whether now or hereafter existing regarding the copyrights,
16    trademarks, or other property right in any and all work created in whole or in part
17    by your brother, Joseph Shuster, or any works based thereon," and that the Shuster
18    Heirs "covenant not to assert any claim of right, by suit or otherwise, with respect
19    to the above, now and forever."  The 1992 Agreement provided that the Shuster
20    Heirs "now grant to us [DC Comics] any … copyrights, trademarks, or other
21    property right in any and all work created in whole or in part by your brother,
22    Joseph Shuster, or any works based thereon."  The 1992 Agreement thus operated
23    to revoke, rescind, and replace Shuster's prior copyright grants and agreements.
24    After the 1992 Agreement, DC Comics enjoyed an amicable relationship with the
25    Shuster Heirs.
26         56.    On September 7, 1999, Jean Peavy sent a letter to DC Comics
27    confirming that the clear effect of the 1992 Agreement was to revoke and regrant
28    any prior copyright grants that could otherwise have been subject to termination: "I

- 20 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1312**

1   have learned from the Internet that Joanne Siegel has filed a copyright claim for

2   SUPERMAN [*i.e.*, the Siegel Superman Termination Notice]. I want you to know

3   that I intend to honor our pension agreement."

4       57.    To date, DC Comics and its affiliates have paid the Shuster Heirs close

5   to $500,000 under the 1992 Agreement. On April 27, 1995, Jean Peavy sent a letter

6   to DC Comics expressing gratitude for their generosity and concluding: "You know

7   we appreciate your thoughtfulness." Even after Frank Shuster's death in 1996, DC

8   Comics has continued to this day to pay $25,000 per year to Jean Peavy.

9   **D.    Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**

10          **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

11      58.    This state of affairs remained undisturbed for almost a decade. In

12  2001, Toberoff and his motion-picture production company, Pacific Pictures,

13  induced the Shuster Heirs to violate their 1992 Agreement and wrongfully attempt

14  to acquire and exploit future copyright interests in Superman.

15      59.    Toberoff is a self-described "intellectual property entrepreneur." His

16  business—conducted through a variety of corporate entities like Pacific Pictures—

17  is to locate the authors of valuable copyrighted works or their heirs and acquire, or

18  prevent them from conveying to others, asserted rights to present or future

19  copyright interests. To convince these authors and heirs to go into business with

20  him, Toberoff holds himself out as a producer with the financial resources and

21  connections to exploit recaptured rights in all media in the entertainment industry.

22      60.    In or around 2001, Toberoff made contact with the Shuster Heirs and

23  embarked on a course of conduct with them to disrupt their relationship with DC

24  Comics, including DC Comics' rights under the 1992 Agreement. On November

25  28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific

26  Pictures (the "2001 Pacific Pictures Agreement") for the stated purpose of

27  "exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property,

28  title and interests in and to Joe Shuster's creations"—despite the fact that these

- 21 -                              FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1313**

1    rights had been granted to DC Comics in the 1992 Agreement.  The 2001 Pacific

2    Pictures Agreement provided that this purpose would be realized in part "via the

3    establishment of Joe Shuster's estate … and the estate's termination pursuant to [17

4    U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright

5    interest in his creations."

6           61.    The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights

7    being assigned as including all "rights, claims, title, copyrights and interests in and

8    to each character, story element, and indicia associated with … 'SUPERMAN'

9    [and] *Superboy*."  (Italics added.)

10          62.    Pursuant to the 2001 Pacific Pictures Agreement, Jean Peavy and her

11   son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and

12   interest" in Shuster's purported Superman and Superboy rights.  The Agreement

13   provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared,

14   divided and payable:  fifty percent (50%) to [the Shuster Heirs] and fifty percent

15   (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in

16   the event of termination of the Venture *for any reason*, all Rights, property or assets

17   of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty

18   percent (50%) by PPC."  (Emphasis added.)

19          63.    The 2001 Pacific Pictures Agreement also provided that the Shuster

20   Heirs could not enter into any agreement with respect to the Superman and

21   Superboy rights "without the express written consent" of Pacific Pictures, an entity

22   controlled solely by Toberoff.

23          64.    The 2001 Pacific Pictures Agreement did not represent a legal retainer

24   agreement.  Rather, the Agreement provided that the joint venture would separately

25   "retain Marc Toberoff, Esq. to render legal services in connection with the Rights

26   and the Venture."  In a subsequent agreement in 2003, the parties confirmed that

27   "PPC … is not a law firm."  Toberoff signed the 2001 Pacific Pictures Agreement

28   on behalf of "Pacific Pictures Corporation" as "Marc Toberoff, President"—as

- 22 -                      FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1314**

1    opposed to "Marc Toberoff, Esq."  Upon information and belief, Toberoff and the

2    Shuster Heirs did not enter into a legal retainer agreement until 2004—*three years*

3    after entering into the 2001 Pacific Pictures Agreement.

4         65.    After entering into the 2001 Pacific Pictures Agreement, the Shuster

5    Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster

6    Estate (the "Probate Action").  (*See* LASC Case No. BP-080635.)  Under the terms

7    of Shuster's purported will, Jean Peavy was appointed the sole beneficiary and

8    executrix of his estate.  In the Probate Action, however, the Shuster Heirs asked the

9    Superior Court to authorize Mark Peary to serve as executor in Jean Peavy's place.

10   The Superior Court appointed Peary executor on October 7, 2003; one month later,

11   Peary served a copyright termination notice on DC Comics on behalf of the newly-

12   formed Shuster Estate.

13   **E.    Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics**

14        **Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

15        66.    Having orchestrated this joint venture with the Shuster Heirs, Toberoff

16   used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and

17   Laura Siegel Larson (collectively, the "Siegel Heirs").  Toberoff sought to corner

18   the other putative "half" of putative Superman termination rights.  Toberoff knew,

19   however, that the Siegels had reached an agreement with DC Comics in 2001

20   resolving their putative termination claims.  Nevertheless, Toberoff and his

21   companies set out to interfere with this agreement in order to acquire a stake in the

22   Siegel Heirs' putative copyright interests in Superman.

23        67.    In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

24   employed counsel and served notices to terminate grants of Superman rights that

25   Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

26   The Siegel Superman Termination Notice, which was prepared by prior counsel,

27   listed Superboy works and elements as among the "character[s], story element[s], or

28   indicia reasonably associated with SUPERMAN," in recognition of the fact that

- 23 -                     FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1315**

1  Superboy was a complete derivative of Superman rather than a stand-alone, non-

2  derivative work based upon Superman.

3      68.    The Siegel Heirs and DC Comics began negotiations, and in these

4  talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre

5  entertainment law firm. As the parties' negotiations progressed, and as

6  expectations grew that an agreement would soon be reached, DC Comics paid the

7  Siegels a non-refundable advance of $250,000.

8      69.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.

9  On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the

10  Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001." On October 26,

11  2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.

12  DC Comics then began drafting a long-form agreement. DC Comics sent the Siegel

13  Heirs a copy of the long-form document on February 1, 2002. As a result of the

14  parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on

15  the brink of receiving significant portions of the Superman profits—sums that

16  would immediately and dramatically change their lives. Moreover, virtually all of

17  the money would be theirs alone to keep, as the Gang Tyre firm had agreed to

18  represent the Siegels for the standard 5% fee.

19      70.    Toberoff has admitted that he closely tracked the progress of the Siegel

20  Heirs' termination attempt. On learning of the Siegel-DC Comics Agreement, he

21  knew his company's joint-venture interest in the Shuster rights was limited and that

22  he could assert greater leverage only if he could disrupt the Siegel-DC Comics

23  Agreement and corner both "halves" of the putative Superman termination rights.

24  Given that Joe Shuster and his heirs held whatever Superman copyright interests

25  they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC

26  Comics obtained the rights from the Siegels to exploit new Superman properties, it

27  could do so freely without any ability on the part of the Shusters to claim their

28  interests were being infringed.

- 24 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1316**

71.     With knowledge that his actions would interfere with DC Comics'
actual and prospective economic advantages under the Siegel-DC Comics
Agreement, on or around November 29, 2001— six days after signing the 2001
Pacific Pictures Agreement with the Shuster Heirs—Toberoff, identifying himself
as a film producer, approached the Siegel Heirs, including and/or through their
representative Kevin Marks, for the purpose of acquiring their rights.

72.     Toberoff contacted Marks again on or around February 6, 2002
regarding a "potential buyout" of the Siegel Heirs' rights.  Marks informed
Toberoff that the Siegel Heirs had already reached a binding agreement with DC
Comics, which was in the process of being further documented in a long-form
agreement.  Undeterred, Toberoff continued his efforts to interfere with the Siegel-
DC Comics Agreement.

73.     On or around February 9, 2002, Toberoff approached Steven Spira, a
Warner Bros. Pictures executive, at a social function and told him:  "You have a
Superman rights problem."

74.     On February 12, 2002, Toberoff formed IP Worldwide as a joint
venture between Pacific Pictures and a well-known Hollywood talent agent.

75.     While Toberoff was undertaking these activities to disrupt DC Comics'
relationship and agreements with the Siegels, on May 9, 2002, Joanne Siegel sent a
letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC
Comics' October 16, 2001 offer, but purporting to object to certain unspecified
portions of the long-form document.

76.     DC Comics objected to the Siegel Heirs' sudden and unfounded
objections expressed in their May 9 letter, but continued working with the Siegels'
counsel (Kevin Marks) to finalize the long-form agreement.  On May 16, 2002,
Marks, who had discussed the long-form agreement with the Siegel Heirs, told
Warner Bros. general counsel John Schulman that his long-form agreement was
"aggressive," but that the Siegels could "deal with it" and that it was "not contrary

- 25 -                    FIRST AMENDED COMPLAINT

EXHIBIT 31
1317

1    to what had been agreed to." Throughout the summer of 2002, Marks worked on a

2    re-draft of the February 1, 2002 long-form agreement, which he submitted to the

3    Siegels for their approval on July 15, 2002.

4         77.   In or around August 2002, as Marks was finalizing the Siegels'

5    revisions to the long-form document, Toberoff contacted Marks again regarding the

6    Siegel-DC Comics Agreement. Upon information and belief, Marks informed

7    Toberoff he could not discuss the matter, including the terms of the agreement,

8    because of a confidentiality agreement between DC Comics and the Siegel Heirs.

9    Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights. On

10   August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the

11   Siegels, which Marks said he would convey.

12        78.   Upon information and belief, Toberoff's offer stated that he had found

13   a billionaire investor willing to purchase the Siegel Heirs' Superman rights.

14   Toberoff claimed the investor would give the Siegel Heirs $15 million cash up

15   front, plus generous royalty and "back-end" rights on any properties developed,

16   including a new Superman motion picture. Marks asked whether the offer was

17   contingent on a due diligence investigation, and Toberoff stated that he had already

18   conducted due diligence. Upon information and belief, Toberoff also falsely

19   offered to help the Siegel Heirs produce a movie that would compete directly with

20   the Superman movie in development at the time at Warner Bros., DC Comics'

21   licensee, even though he knew that the Siegels' limited rights in the recaptured

22   copyright, if any, would make such a competing motion picture all but impossible

23   to produce and distribute.

24        79.   Upon information and belief, although Marks conveyed Toberoff's

25   offer to the Siegels, he advised them that they had already reached a binding

26   agreement with DC Comics. Nonetheless, as a result of Toberoff's fraudulent

27   inducements, the Siegel Heirs stated that they would repudiate their agreement with

28

     FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1318**

1   DC Comics and accept Toberoff's offer.  On or around September 21, 2002, the

2   Siegel Heirs sent a letter to Marks terminating him as their attorney.

3        80.   On or around September 21, 2002, based on Toberoff's inducements

4   and other acts of interference described above, the Siegel Heirs sent a letter to DC

5   Comics repudiating the Siegel-DC Comics Agreement.  On October 28, 2002, the

6   Siegel Heirs sent a letter to DC Comics confirming that the September 21, 2002

7   letter "totally stopped and ended negotiations with DC Comics, Inc." And in a

8   2006 discovery response in the Siegel Actions, the Siegel Heirs denied that "[b]y

9   the May 9 Letter, [the Siegel Heirs] terminated negotiations with Defendants

10   concerning the Superman Notices."

11        81.   On October 23, 2002, the Siegel Heirs formalized an agreement with

12   defendant IP Worldwide for the purpose of "arrang[ing] and negotiat[ing] the sale,

13   lease, license and all other dispositions or exploitations" of the Siegel Heirs'

14   Superman rights (the "IP Worldwide Agreement").  The Siegel Heirs agreed to pay

15   IP Worldwide a fee of 10% of the gross proceeds generated by those rights.  Upon

16   information and belief, the fee was subsequently reduced to 5%.

17        82.   The IP Worldwide Agreement provided that the Siegel Heirs could

18   "not transfer, assign, license or in any manner encumber the Rights … other than

19   through or as a result of IPW's exclusive representation thereunder."

20        83.   The IP Worldwide Agreement was not a legal retainer agreement.  It

21   confirmed that "the scope of this Agreement does not include legal services and/or

22   expenses in connection with litigation," and provided that "[t]he provision of such

23   services and advancing of such expenses … will be rendered by Marc Toberoff,

24   Esq., subject to good faith negotiation of a mutually acceptable agreement executed

25   by Mr. Toberoff" and the Siegel Heirs.  Upon information and belief, it was not

26   until 2004—two years after entering into the IP Worldwide Agreement—that the

27   Siegel Heirs entered into an agreement with Toberoff granting him 40% of their

28

- 27 -

FIRST AMENDED COMPLAINT

EXHIBIT 31
1319

1  Superman rights and retaining him as their attorney (the "Siegel-Toberoff

2  Agreement").

3      84.    Upon information and belief, as a result of the Siegel-Toberoff

4  Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial

5  interest in the Siegel Heirs' purported Superman rights.

6      85.    Upon information and belief, Toberoff admitted to the Siegel Heirs

7  that he misled them about the existence of the billionaire investor he used as an

8  inducement to obtain their putative rights.  He also acknowledged that even if the

9  Siegel Heirs succeeded in recapturing any Superman rights, he could not follow

10  through on his false promise to make a competing Superman movie for them.  His

11  reasons:  "1. the clout of WB Consumer Products in the licensing industry;

12  2, perception that WB owns S[uperman] and that to understand what you own

13  requires an understanding of the nuances of copyright law; 3. fear of being sued or

14  embroiled in litigation."

15  **F.    Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely**

16  **    Claiming that Superboy Was the Sole Creation of Jerry Siegel**

17      86.    After Toberoff induced the Siegel Heirs to repudiate the Siegel-DC

18  Comics Agreement, on November 8, 2002, the Siegel Heirs served a second

19  copyright termination notice on DC Comics directed at the character Superboy (the

20  "Siegel Superboy Termination Notice").  The notice not only erroneously stated

21  that Superboy was a copyrightable work not derivative of Superman, but falsely

22  recited that Superboy was created *solely* by Siegel (without contribution from

23  Shuster), thereby entitling the Siegel Heirs to terminate and recapture 100% of the

24  putative Superboy rights.

25      87.    Defendants knew these claims were false.  To begin, in the Siegel

26  Superman Termination Notice served by the Siegel Heirs in 1997—the one served

27  prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy

28  works and elements as among the "character[s], story element[s], or indicia

                                    - 28 -              FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1320**

1    reasonably associated with SUPERMAN." This earlier notice acknowledged—as is

2    in fact the case—that Superboy was a derivative work of Superman, rather than a

3    separately copyrightable work.

4        88.    As to the representation that Superboy was created solely by Jerry

5    Siegel, defendants knew that claim was untrue as well. Among other reasons:

6    • One year earlier, through defendant Pacific Pictures, Toberoff had entered

7      into the 2001 joint-venture agreement with the Shuster Heirs, specifying that

8      the *Shuster Heirs* owned an interest in "Superboy."

9    • The original Superboy "script" on which the Siegel Heirs' ownership claims

10     rely openly contains the byline: "By Jerry Siegel *and Joe Shuster*"—not just

11     Jerry Siegel alone. (Emphasis added.)

12   • In 1948, a Court in Westchester, New York found that Joe Shuster provided

13     the artwork for the Superboy story in More Fun Comics No. 101, the comic

14     book which the Siegel Superboy Termination Notice claims is the first

15     published Superboy work.

16   • In 1972 and 1973, Siegel and Shuster together filed their own copyright

17     renewal notices with the copyright office for Superboy, in which they

18     identified Superboy as a work that they had *jointly* created.

19   • And long before the alleged first publication of "Superboy" in November

20     1944, Shuster illustrated works for DC Comics that included various

21     depictions of Superman as a boy, exhibiting super-human strength. Several

22     examples are reproduced below. In "Action Comics No. 1," for example,

23     Shuster drew Superman as a very young boy displaying an "astonish[ing]

24     feat[]" of super-human strength, holding a chair above his head:

25

26

27

28

                               - 29 -              FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1321**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 302 of 343
Page ID #:17579
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 09/03/10   Page 33 of 74   Page ID #:3642



Action Comics No. 1 (1930)

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1," a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,

Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":

EXHIBIT 31
1322



Superman Sunday Strip (May 31, 1942)

89.    Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative copyrightable elements in Superboy.  They did so to enable the Siegels to claim a sole ownership interest in Superboy elements allegedly subject to recapture and thereby prevent DC Comics from exploiting Superboy without the Siegels' authorization and without being subject to claims of copyright infringement.  (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of Superman and disputes that it is a work that Shuster and Siegel owned.)

90.    To manufacture this claim of sole ownership by the Siegels, Toberoff (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001 joint venture between Pacific Pictures and the Shuster Heirs all claims by the Shusters to alleged rights in any and all Superboy elements.  Toberoff accomplished this by creating a new joint-venture agreement—signed October 30, 2003—that *deleted* any reference to Superboy.  Defendants Mark Peary and Jean Peavy signed this agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position the Siegel Heirs to recapture 100% of these rights and

- 31 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1323**

1  assert a copyright infringement action against DC Comics—and seek an injunction

2  against the television program *Smallville* on that basis.

3        91.  In October 2004, the Siegels filed two actions in this Court seeking

4  declaratory relief as to the validity of the Superman and Superboy termination

5  notices, and in April 2005, the Siegels supplemented their pleadings in the

6  Superboy action to assert copyright infringement (the "Siegel Actions").  (Case

7  Nos. CV-04-8400 ODW; CV-04-8776 ODW.)  Both actions remain pending before

8  this Court.

9  **G.    The Shusters' Flawed Termination Notice**

10        92.  On November 10, 2003, one week after the 2003 Pacific Pictures

11  Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of

12  Termination of Transfer Covering Extended Copyright Renewal Term of

13  'Superman'" (the "Shuster Termination Notice").

14        93.  The form submitting the Shuster Termination Notice for recordation in

15  the U.S. Copyright Office was certified under penalty of perjury by Toberoff on

16  behalf of "IP Worldwide/Estate of Joseph Shuster."  IP Worldwide is the Toberoff

17  entity which, upon information and belief, holds a portion of the Siegel Heirs'

18  Superman and Superboy rights pursuant to the IP Worldwide Agreement.

19        94.  The Shuster Termination Notice purports to terminate, under 17 U.S.C.

20  § 304(d), effective October 26, 2013, the following Shuster copyright grants:

21  (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the

22  DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938

23  Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948

24  Stipulation; and (g) the December 23, 1975 Agreement.

25        95.  The Shuster Termination Notice does *not* purport to terminate the

26  copyright grants in the May 21, 1948 Consent Agreement or, even more

27  importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

28

- 32 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1324**

96.     The Shuster Termination Notice purports to apply to the following works:  (a) certain unpublished material created before Action Comics No. 1; (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3; (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6; (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

97.     The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

98.     The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate." The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights.  Nor does the Notice mention Pacific Pictures or its putative ownership stake in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

99.     On September 10, 2004, Pacific Pictures and the Shuster Heirs signed a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific Pictures Agreement "have been cancelled."  However, because the Shuster Heirs and Pacific Pictures had agreed that all rights held by their joint venture would be divided 50/50 upon termination of the joint venture "for any reason," the apparent effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs' purported share of Shuster's rights to Toberoff or his companies.

100.    DC Comics is informed and believes that Toberoff (or his companies) now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the Siegel Heirs' putative rights.  This gives Toberoff the largest financial stake among defendants' collective asserted rights in Superman and in the pending legal disputes

- 33 -                    FIRST AMENDED COMPLAINT

EXHIBIT 31
1325

1   concerning those rights (*i.e.*, Toberoff—47.5%; Siegel Heirs—27.5%; Shuster

2   Heirs—25%).

3       101.   DC Comics is also informed and believes that Toberoff, Pacific

4   Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more

5   agreements preventing the Siegels or Shusters from conveying rights to DC Comics

6   or entering into other agreements with DC Comics, including for the settlement of

7   their putative termination claims or litigation, without the consent of other parties.

8   For example, in the 2001 and 2003 Pacific Pictures Agreements, the Shuster Heirs

9   agreed not to settle any claims with respect to the Superman rights without Pacific

10   Pictures' or Toberoff's consent.  Such consent agreements are void as against

11   public policy, violate DC Comics' rights, and impede the administration of justice.

12   **H.**     **Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff**

13       **Timeline**

14       102.   Pursuant to federal court orders dated September 26, 2008 and

15   December 4, 2008, Toberoff was compelled to produce to DC Comics a document

16   titled "Superman – Marc Toberoff Timeline" (the "Toberoff Timeline," attached

17   hereto as Exhibit A), which Toberoff has acknowledged was written by an attorney

18   he previously employed.  To prevent DC Comics from obtaining and using the

19   document, Toberoff asserted that it was privileged, but his position was repeatedly

20   rejected by this Court.  The Toberoff Timeline was produced to DC Comics on

21   December 10, 2008.

22       103.   The Toberoff Timeline describes and discloses Toberoff's wrongful

23   activities in pursuing the Siegel and Shuster Heirs' putative interests in the

24   Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to

25   repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at

26   this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC

27   Comics in 2002 for his own personal gain"); his efforts to acquire as "much

28   ownership of the Superman copyright personally as he can"; and his attempt to

- 34 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1326**

1   conceal certain of his illicit activities from the Siegel and Shuster Heirs. (Emphasis

2   in original.) As a result, "*the single person who would stand to gain the MOST in*

3   *a settlement with Time Warner [and DC Comics] regarding the ongoing*

4   *SUPERMAN legal dispute would not be the heirs themselves, but Marc*

5   *Toberoff.*" (Emphasis in original.)

6        104.   The Toberoff Timeline discloses many of the facts alleged herein, and

7   concludes: "[Toberoff] is solely motivated *at all times* not by his clients' interests,

8   but manipulating pieces of the puzzle so that he may receive the greatest percentage

9   from a very possible large Time Warner settlement, through part ownership and

10  unconscionable fees." (Emphasis in original.) The Toberoff Timeline explains that

11  "[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff,

12  and many have left due to ethical issues." Many of these and other disturbing,

13  salient facts detailed herein have only recently come to light in the past 20 months.

14                              **V.  CLAIMS FOR RELIEF**

15  **A.    First Claim for Relief: Declaratory Relief re: Invalidity of Copyright**

16          **Termination Notice (Against Defendants Shuster Estate, Peary, and**

17          **Peavy)**

18        105.   DC Comics re-alleges and incorporates by reference each and every

19  allegation contained in the paragraphs above.

20        106.   The Shuster Termination Notice is invalid, and thus ineffective, for at

21  least five separate, independent, and alternative reasons:

22           **(1) There Is No Statutory Basis for the Shusters to Terminate**

23        107.   The Copyright Act does not provide any basis for the Shuster Estate to

24  terminate. Shuster's termination right was lost when he died in 1992 without

25  having exercised it and without leaving a statutory heir to inherit it under the then-

26  applicable provisions of the Copyright Act.

27        108.   The 1976 Copyright Act gave authors the ability to terminate certain

28  pre-1978 copyright grants. According to the original termination provisions:

                                         - 35 -          FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1327**

"Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren." 17 U.S.C. § 304(c)(2) (1976).  In other words, the right of termination could only be exercised by an author during his or her lifetime, or by a widow, child, or grandchild after the author's death.  As the language of the statute establishes, and its legislative history confirms, the right of termination was lost if an author died without exercising it and without leaving a widow, child, or grandchild to inherit it.

109.    Shuster could have exercised his putative termination right beginning in April 1984.  The 1976 Copyright Act provided that a copyright grant could be terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56 years after the April 1938 publication of Action Comics No. 1), and that notice of termination could be served 10 years before the termination date (*i.e.*, April 1984, or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

110.    During his lifetime, Shuster chose not to exercise his termination right. Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to his termination right under section 304(c) of the 1976 Copyright Act.  As a result, Shuster's termination right ceased to exist on his death.

111.    The 1999 Copyright Term Extension Act ("CTEA") extended the term of copyright by 20 years and also provided an opportunity to authors and selected heirs to terminate for this new extended time period in circumstances where the "[t]ermination rights provided for in subsection (c) have expired on or before the effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the termination right has not previously exercised such termination right."  17 U.S.C. § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author is dead, the termination right can be exercised by his widow, children, or grandchildren or, "[i]n the event that the author's widow or widower, children and grandchildren *are not living*, the author's executor, administrator, personal representative, or trustee...."  (Emphasis added).  These are the provisions that

- 36 -                FIRST AMENDED COMPLAINT

EXHIBIT 31
1328

1   defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

2   Shuster Termination Notice, but they have no application here.  By its own terms,

3   section 304(d) only applies where an author's window for exercising the

4   termination right opened and closed or "expired" (*not* when an author died while

5   the window was open without exercising the right or leaving any heirs to do so),

6   and where a deceased author's widow, child, or grandchild is "not living," but who

7   did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

8   acting on behalf of the Shuster Estate, has no right to file the invalid notice of

9   termination that he did.

10      **(2)  The 1992 Agreement Bars the Shusters from Pursuing Termination**

11      112.   The 1992 Agreement that Frank Shuster and Jean Peavy entered into

12  with DC Comics bars the Shuster Estate from pursuing termination because, *inter*

13  *alia*, in exchange for valuable consideration, the 1992 Agreement effected a

14  rescission, revocation, and re-grant of all prior copyright grants, which eliminated

15  any pre-1978 grant that could be subject to termination under section 304 of the

16  Copyright Act.

17      113.   The 1992 Agreement, which was executed on October 2, 1992,

18  provides that Shusters' heirs "fully settle[]" and forfeit any and all rights under

19  Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding

20  those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any …

21  copyrights, trademarks, or other property right in any and all work created in whole

22  or in part by your brother, Joseph Shuster, or any works based thereon."  (Emphasis

23  added.)

24      114.   Section 304(d) of the Copyright Act only allows for termination of

25  copyright grants "executed before January 1, 1978."  Because the 1992 Agreement

26  left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply,

27  and the Shuster Estate has no copyright grant that it may terminate.

28

- 37 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1329**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 310 of 343
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 09/03/10   Page 41 of 74   Page ID #:3650
Page ID #:17587

1      115.   Shuster's heirs approached DC Comics in 1992 seeking increased

2   annual payments, certain tax benefits, and payment of Shuster's debts and

3   expenses.  At the time, Shuster's heirs recognized the value of Superman as a

4   property.  As the result of DC Comics' development, promotion, and exploitation

5   of Superman from 1938 to 1992, Superman had evolved from the black-and-white

6   figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry.

7   Moreover, in correspondence with DC Comics, the Shusters adverted to the

8   termination rights provided for under the Copyright Act.  As Shuster's heirs

9   requested, the 1992 Agreement provided that DC Comics would:  (a) increase its

10   annual payments to the Shuster Heirs to $25,000 per year—five times higher than

11   the amount it was obligated to pay under the December 23, 1975 Agreement;

12   (b) make these annual payments to Jean Peavy for purposes of a tax benefit; and

13   (c) pay the approximately $20,000 representing Shuster's final debts and expenses.

14   DC Comics continues to make annual payments under the 1992 Agreement, and

15   has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms

16   that it "fully settles *all claims to any payments or other rights or remedies* which

17   you may have under any other agreement or otherwise, *whether now or hereafter*

18   *existing* regarding the copyrights, trademarks, or other property right in any and all

19   work created in whole or in part by your brother, Joseph Shuster, or any works

20   based thereon."  (Emphasis added.)  Shuster's heirs agreed "not to assert any claim

21   of right, by suit or otherwise, with respect to the above, now and forever."

22      116.   By effectively rescinding, revoking, and re-granting any and all prior

23   grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of

24   the Superman copyrights.  Defendant Peavy has recognized that this was the clear

25   effect of the 1992 Agreement; in a September 7, 1999 letter to DC Comics, she

26   confirmed:  "I have learned from the Internet that Joanne Siegel has filed a

27   copyright claim for SUPERMAN [*i.e.*, the Siegel Superman Termination Notice].  I

28   want you to know that I intend to honor our pension agreement."

- 38 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1330**

1     117.   At the very least, because of DC Comics' continued performance

2   under the 1992 Agreement, and the Shusters' continued acceptance of benefits

3   under the Agreement—even after filing the Shuster Termination Notice—the

4   Shusters are estopped from disputing that the 1992 Agreement remains in full force

5   and effect, which operates to preclude the assertion of any termination right.

6          **(3) The Shusters Lack the Majority Interest Necessary to Terminate**

7     118.   The Shuster Termination Notice is also invalid because the party that

8   filed it—if defendants' own contractual documents are to be believed—lacked

9   authority to do so. Section 304(c)(1) of the Copyright Act provides that termination

10   of a grant executed by an author who is not living may be exercised only "by the

11   person or persons who … own and are entitled to exercise a total of *more than one-*

12   *half of that author's termination interest*." 17 U.S.C. § 304(c)(1) (emphasis added).

13   Copyright Office regulations require that a termination notice include "specific

14   indication of the person or persons executing the notice who constitute more than

15   one-half of that author's termination interest" and "shall be signed by the number

16   and proportion of the owners of that author's termination interest required under

17   section 304(c)." 37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

18     119.   According to the Pacific Pictures agreements (to the extent they are

19   valid and enforceable), the Shuster Estate does not own—and did not own at the

20   time the Shuster Termination Notice was executed—the "more than one-half"

21   majority interest necessary to terminate under section 304(c)(1) of the Copyright

22   Act.

23     120.   Pursuant to the 2001 Pacific Pictures Agreement, defendants Mark

24   Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and

25   interest" in all of Shuster's copyrights and creations to their joint venture with

26   Pacific Pictures. In the 2003 Pacific Pictures Agreement, Peary confirmed the

27   terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

28

- 39 -         FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1331**

121.    One week later, on November 10, 2003, Peary served the Shuster Termination Notice on behalf of the Shuster Estate. At the time, the Shuster Estate did not own *any* of the purported termination right, as this and all other rights had been transferred to the joint venture with Pacific Pictures. At most, the Shuster Estate owned only a 50% interest in that joint venture. As a result of the September 10, 2004 Letter purporting to cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001 and 2003 agreements themselves, any putative rights held by the joint venture were split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the joint venture agreement: "[Upon] winding-up of the Venture or in the event of termination of the Venture *for any reason, all Rights, property or assets of the Venture will be held* fifty percent (50%) by the [Shuster Heirs] *and fifty percent (50%) by PPC.*" (Emphasis added.) The Shuster Termination Notice is therefore invalid under section 304(c)(1) of the Copyright Act.

122.    The Shuster Termination Notice represents that Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice had been "signed by all persons whose signature is necessary to terminate." Peary's failure to disclose that he had purported to transfer this putative termination right to the joint venture with Pacific Pictures, or include a signature on behalf of the joint venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R. § 201.10(c)(2).

123.    Peary's failure to disclose the requisite information in the Shuster Termination Notice was not harmless. Upon information and belief, these omissions were not inadvertent, but were intended to conceal material information from DC Comics, including: (a) the various conflicts of interest arising from Toberoff's and his companies' significant ownership interest in the Shuster Estate's and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff

- 40 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1332**

1    procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements

2    with DC Comics regarding those rights.

3        124.    The Copyright Act's termination provisions were crafted to avoid the

4    trafficking in future interests by third parties like Toberoff and his companies, yet

5    that is exactly what his agreements with the Shuster and Siegel Heirs accomplish,

6    and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright

7    Office by serving and filing the Shuster Termination Notice.

8        **(4) The Shusters Do Not Attempt to Terminate Certain**

9        **All-Encompassing Copyright Grants**

10        125.    The 1992 Agreement includes a "grant" by Shuster's heirs to DC

11    Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and

12    all work created in whole or in part by … Joseph Shuster, or any works based

13    thereon." In the Shuster Termination Notice, defendants did not terminate (or even

14    mention) the 1992 Agreement.

15        126.    The May 21, 1948 Consent Agreement also includes a grant by Siegel

16    and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and

17    Shuster's rights in Superman and Superboy. (If the 1992 Agreement is not read as

18    a rescission, revocation, and re-grant of all prior agreements between Shuster and

19    DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains

20    in effect.)

21        127.    Defendants do not attempt to terminate the May 21, 1948 Consent

22    Agreement, and do not identify the May 21, 1948 Consent Agreement in the

23    Shuster Termination Notice.

24        128.    As the result of defendants' failure to terminate the 1992 Agreement

25    and May 21, 1948 Consent Agreement, the grants contained therein remain in full

26    force and effect. Thus, DC Comics is and continues to be the sole owner of all

27    rights, including rights under copyright, in Superman pursuant to the 1992

28    Agreement and May 21, 1948 Consent Agreement.

- 41 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1333**

**(5) The Doctrine of Unclean Hands Bars the Shusters from Terminating**

129.    The doctrine of unclean hands requires that the Shuster Termination Notice be deemed invalid because it contains material misrepresentations intended to mislead the courts, Copyright Office, and DC Comics—all to the detriment of DC Comics.

130.    The Shuster Heirs did not disclose Pacific Pictures' purported ownership interest in the rights sought to be terminated. Just one week before filing the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures Agreement, reaffirming its transfer of 100% of its rights in any Superman-related copyrights to the joint venture with Pacific Pictures. Copyright Office regulations require that a termination notice include "specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest" and "shall be signed by the number and proportion of the owners of that author's termination interest required under section 304(c)." 37 C.F.R. § 201.10(b)(1)(vii), (c)(2). Yet Pacific Pictures is conspicuously absent from the Shuster Termination Notice. This omission was not inadvertent, as explained above.

131.    Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice. This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics. Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy. For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101. Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship

- 42 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1334**

1    both in the Superboy character, and in More Fun Comics No. 101, which contained

2    the first comic book story denominated "Superboy."

3        132.   Additionally, in the 2001 Pacific Pictures Agreement, entered into

4    before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the

5    Shuster Heirs expressly identified "Superboy" as among the universe of rights that

6    Shuster had jointly created with Siegel. Yet just two years later in 2003, and only

7    *after* Toberoff had entered into an agreement with the Siegel Heirs securing control

8    over their rights, did the Shuster Heirs suddenly reverse course. The 2003 Pacific

9    Pictures Agreement omitted all reference to Superboy, and the Shuster Termination

10   Notice filed one week later avoided any overt mention of Superboy elements or

11   works.[3] But even the termination notice served by the Shuster Heirs, while

12   carefully drafted to avoid any mention of Superboy, could not completely rewrite

13   history. The Shuster Termination Notice expressly identifies Action Comics No. 1

14   and Superman No. 1 as terminated works. Both of these works, however, clearly

15   depict Superman as a boy with super-powers: *i.e.*, a "Superboy." For example,

16   Action Comics No. 1 features Superman as a very young boy exhibiting super

17   strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

18       133.   After the Shuster Termination Notice was filed, the Siegel Heirs

19   brought a copyright infringement claim against DC Comics on the frivolous ground

20   that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate

21   and recapture 100% of the Superboy rights (as opposed to the 50% share they

22   would be entitled to recapture if Superboy was a joint work). The Siegel Heirs

23   threatened to enjoin the popular *Smallville* television series, which they wrongly

24   claimed infringed their exclusive rights in Superboy. As a result, DC Comics has

25   incurred substantial expenses defending against the claim Toberoff manufactured

26

27       [3] As noted, DC Comics maintains that Superboy is a derivative work based upon
the preexisting Superman, and in any event, is owned solely and exclusively by DC
Comics, *inter alia*, because it is a work-for-hire and the script submitted by Siegel

28   and Shuster is unpublished and, thus, is not terminable.

- 43 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1335**

1    and the Shusters facilitated.  Defendants compromised the integrity of the

2    Copyright Office and judicial system by crafting the Shuster Termination Notice in

3    this way, and the Shuster Termination Notice should be held invalid on this and the

4    other related grounds set forth herein.

5                                    *        *        *

6        134.    Each of the foregoing reasons is a separate, independent, and

7    alternative basis for declaring the Shuster Termination Notice to be invalid and thus

8    ineffective.  A declaration by this Court regarding the validity of the Shuster

9    Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

10   §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with

11   respect to the copyright interest in the Superman material.

12   **B.**    **Second Claim for Relief:  Declaratory Relief re: Limited Scope of**

13          **Copyright Termination Notice (Against Defendants Shuster Estate,**

14          **Peary, and Peavy)**

15       135.    DC Comics re-alleges and incorporates by reference each and every

16   allegation contained in the paragraphs above.

17       136.    This Second Claim for Relief is advanced in the alternative—*i.e.*, if the

18   Court does not grant DC Comics' First Claim for Relief set forth above and hold

19   that the Shuster Termination Notice is invalid.

20                      **(1) Additional Factual Background**

21       137.    Upon information and belief, in or around 1933, Siegel and Shuster

22   began co-creating comic strips, some of which included stories featuring a character

23   named Superman.  The materials created by Siegel and Shuster during this time are

24   believed to include: (a) 24 days of Superman comic strips intended for newspapers;

25   (b) a seven-page synopsis of the last 18 days (weeks two through four) of such

26   comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page

27   synopsis of an additional two months of daily comic strips; and (e) 15 daily comic

28   strips (collectively, the "Unpublished Superman Works").  None of these materials

- 44 -                          FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1336**

1   was published in its original form, most were never published at all, and some are

2   apparently lost.

3        138.   Upon information and belief, between 1933 and 1937, Siegel and

4   Shuster submitted the Unpublished Superman Works to a number of prospective

5   publishers and newspaper syndicates, all of which rejected them.

6        139.   On December 4, 1937, Siegel and Shuster entered into the December

7   4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive

8   services" in producing certain comic features for a period of two years.  Siegel and

9   Shuster were required to submit any new continuity to DCI, which reserved the

10  right to accept or reject them for a period of sixty days.

11       140.   In early 1938, DCI was seeking material for use in a new comic book

12  it was developing entitled "Action Comics."  Pursuant to the December 4, 1937

13  Agreement, the 24 days of Superman comic strips from the Unpublished Superman

14  Works were provided to DCI for review.  DCI decided to publish a Superman story

15  in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI

16  were neither in a form that was acceptable for publication in a comic book, nor

17  were they complete.  Therefore, at the instance and expense of DCI and subject to

18  its right of control, Siegel and Shuster adapted the 24 days of comic strips, and

19  added certain new material, to create a 13-page uncolored comic book story entitled

20  "Superman."  Cover art featuring Superman that was used for Action Comics No. 1

21  was thereafter created by DCI.  DCI's printers or engravers, working at the

22  direction of DCI, chose colors for the Superman character and colored the 13-page

23  story and cover.

24       141.   Siegel and Shuster assigned to DCI all of their rights in Superman in

25  the March 1, 1938 Agreement.  This included "all good will attached thereto and

26  exclusive right to the use of the characters and story, continuity and title of strip."

27  Siegel and Shuster agreed not to use Superman or any other character featured in

28  the strip "by their names contained therein."

- 45 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**

**1337**

142.    Before the April 1938 publication of Action Comics No. 1, which was cover-dated June 1938, DCI promoted the upcoming Superman story in some of its other publications, including "More Fun Comics No. 31" and "Detective Comics No. 15." These publications were cover-dated May 1938 and were published prior to Action Comics No. 1. The promotions (the "Promotions") depict Superman in his costume—including a cape, boots, leotard, and inverted triangular "S" crest on his chest—exhibiting his super-strength by holding a car over his head as bystanders watch in awe. The Promotions show almost the entirety of what would become the cover of Action Comics No. 1 in clarity and detail.

143.    Action Comics No. 1 was comprised not only of the 24 days of Superman comic strips from the pre-existing Unpublished Superman Works (as modified and edited by Siegel and Shuster), but of additional new material created by Siegel and Shuster at DCI's instance and expense and subject to its right of control.

144.    Upon information and belief, after the publication of Action Comics No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at DCI's instance and expense and subject to its right of control. On September 22, 1938, Siegel and Shuster entered into another employment agreement with DCI confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us. We wish you to continue to do said work and hereby employ and retain you for said purposes." The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

145.    Also on September 22, 1938, Siegel and Shuster entered into the McClure September 22, 1938 Agreement with DCI and the McClure Newspaper Syndicate concerning the use of Superman in newspaper strips.

146.    All of Siegel and Shuster's contributions to Superman comic books and comic strips were made pursuant to the December 4, 1937 Agreement, March

- 46 -

FIRST AMENDED COMPLAINT

EXHIBIT 31
1338

1   1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure

2   September 22, 1938 Agreement, contemporaneous oral agreements confirmed by

3   one or more of those agreements, or certain subsequent agreements affirming those

4   agreements, as employees of DCI (or its successors) and at DCI's instance and

5   expense and subject to its right of control.  In particular, upon information and

6   belief, Shuster continued to work for DCI and/or its successors as a staff artist even

7   when Siegel did not, and therefore may have had oral or written employment

8   agreements independently of Siegel.  As a result, all of these materials constitute

9   works for hire under the 1909 Copyright Act, and the copyrights therein are owned

10   exclusively by DC Comics and are not subject to termination under later

11   amendments to the Copyright Act.

12       147.  On November 30, 1938, Siegel wrote a letter to DCI (the "November

13   1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which

14   would relate to the adventures of Superman as a youth."  The November 30, 1938

15   Letter does not contain any discussion of plot, dialogue, appearance, or any other

16   copyrightable material relating to Superboy.  DCI decided not to publish a

17   Superboy comic book at that time, and had already published comic books,

18   discussed *supra*, that showed Superman as a young boy and exhibiting super-

19   human strength.  For example, in 1939, among the Superman material prepared by

20   Siegel and Shuster at the instance and expense of DCI and subject to its right of

21   control was Superman No. 1.  In Superman No. 1, Clark Kent is depicted as a boy

22   with super-powers.

23       148.  On December 19, 1939, Siegel and Shuster entered into the December

24   19, 1939 Agreement with DCI, which modified the DCI September 22, 1938

25   Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for

26   Superman comic books and newspaper strips and providing for payment to Siegel

27   and Shuster for uses of Superman in media such as radio, motion pictures, and toys.

28

- 47 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**

**1339**

1   Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged

2   DCI's sole ownership of Superman.

3       149.  Upon information and belief, in December 1940, Siegel, on behalf of

4   himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy

5   (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI

6   publish a comic book depicting Superman as a youth.  The Unpublished 1940

7   Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster,"

8   states: "So many faithful followers of today's leading adventure comic strip,

9   SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth … And

10   so here he is at last … the answer to your requests … America's outstanding boy

11   hero: SUPERBOY!"  The Unpublished 1940 Superboy Script explains that "[i]n

12   later years [Superboy] was to become the might[y] figure known as SUPERMAN!"

13   The Unpublished 1940 Superboy Script was derived entirely from pre-existing

14   Superman elements and ideas that had been published by DCI as part of works for

15   hire, and contained no original copyrightable element.  Again, DCI decided not to

16   publish a Superboy comic book at that time.

17       150.  Upon information and belief, sometime prior to November 18, 1944,

18   DCI published a comic book depicting the adventures of Superman as a youth,

19   called Superboy, in "More Fun Comics No. 101," which had a cover date of

20   January-February 1945 and was illustrated at least in part by Shuster.  Upon

21   information and belief, Siegel did not participate in the creation of this comic book

22   or the Superboy story it contained.  Other than retelling the Superman origin story

23   from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

24   resemblance to the Unpublished 1940 Superboy Script.

25       151.  In the more than 70 years since the publication of Action Comics No.

26   1 in 1938, DC Comics has created a vast universe of Superman material spanning

27   virtually all media, including comic books, graphic novels, live action pictures,

28   feature-length motion pictures, motion picture serials, radio and television serials,

- 48 -

FIRST AMENDED COMPLAINT

EXHIBIT 31
1340

1   and live theatrical presentations.  DC Comics' extensive development and

2   exploitation of Superman has generated new characters, new super-powers, new

3   components to the Superman universe, new elements in the Superman back story,

4   and new changes in Superman's appearance.

### (2) Claim for Declaratory Relief re: Limited Scope of
### Copyright Termination Notice

7   152.   In the event that the Shuster Termination Notice challenged in the First

8   Claim for Relief above is deemed to be effective, the scope and reach of the Notice

9   must be declared limited in the following ways:

#### a. Unpublished Superman Works

11  153.   The Shuster Termination Notice purports to terminate certain portions

12  of the Unpublished Superman Works, including:  (a) "twenty-four days … of

13  previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

14  (b) "SUPERMAN story in comic book form … created c. 1933," and (c) "15

15  SUPERMAN daily comic strips … created c. 1934."

16  154.   To the extent that any portion of the Unpublished Superman Works

17  may be considered published for purposes of the Copyright Act (and this is

18  disputed), those portions were published only as a result of their adaptation for

19  inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

20  Act expressly provides that "a work made for hire" cannot be subject to

21  termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

22  ineffective as to the Unpublished Superman Works.

#### b. Pre-Action Comics No. 1 Promotions

24  155.   The Shuster Termination Notice does not attempt to terminate DC

25  Comics' rights in the Promotions published before Action Comics No. 1.

26  156.   Moreover, upon information and belief, the Promotions, depicting in

27  sum and substance what was subsequently published as the cover of Action Comics

28  No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

- 49 -                           FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1341**

1    by DCI or at the instance and expense of DCI and subject to its right of control.  As

2    a result, the Promotions were works made for hire and any copyright therein was

3    owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-

4    (d).

5        157.   DC Comics remains the sole owner of the Promotions, all copyrights

6    therein, and the various copyrightable elements contained therein.  The Shusters

7    may not seek to terminate copyright interests comprised in the Promotions.

8                              **c. Works for Hire**

9        158.   The Shuster Termination Notice purports to recapture the rights in

10   Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman

11   Works").  Each of the Superman Works was prepared at the instance and expense

12   of DCI and subject to its right of control.  As a result, the Superman Works were

13   works made for hire and any copyright therein was owned by DCI *ab initio* and

14   cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

15       159.   DC Comics remains the sole owner of the Superman Works, all

16   copyrights therein, and the various copyrightable elements contained therein.[4]

17                             **d. Derivative Works**

18       160.   All Superman-related works prepared after the publication of Action

19   Comics No. 1 were derivative works based on pre-existing copyrightable material

20   and created under the authority of valid copyright grants (the "Derivative Works").

21       161.   The Derivative Works include new characters, new super-powers, new

22   components to the Superman universe, new elements in the Superman back-story,

23   and changes in the appearance of Superman.

24

25

---

26   [4] The court in the Siegel Action agreed with this position almost entirely, ruling
     that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's
27   Superman works were created as "works for hire" on behalf of DC Comics and thus
     could not be terminated.  DC Comics reserves all rights with respect to these
28   interim rulings in the Siegel case.

                                    - 50 -            FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1342**

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 323 of 343
Page ID #:17600
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 08/03/10   Page 54 of 74   Page ID #:3663

1    162.   Regardless of whether the Shuster Termination Notice is deemed

2   valid, DC Comics remains the sole owner of the Derivative Works and retains the

3   continuing right to exploit the Derivative Works under section 304 of the Copyright

4   Act, 17 U.S.C. § 304(c)(6)(A).

5                          **e. Scope of Shuster Notice**

6    163.   The Shuster Termination Notice, in addition to specifying works to be

7   terminated, also describes certain elements purportedly encompassed by the works

8   sought to be recaptured.  Many of these elements do not appear in the specified

9   works.  In addition to identifying elements that are not present, the Shuster

10   Termination Notice is also notable for its failure to specify elements that are

11   present.  For example, although both the purportedly terminated works Action

12   Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers,

13   the Shuster Termination Notice is silent on this element.  Accordingly, a dispute

14   has arisen between the parties regarding the scope of the Shuster Termination

15   Notice with respect to the elements that appear, or which do not appear, in the

16   allegedly terminated identified in the Shuster Termination Notice, including, but

17   not limited to, the following:

18          a.     Superman's "telescopic vision"

19          b.     Superman's "super hearing"

20          c.     Superman's "super ... sense of smell"

21          d.     Superman as a boy with super-powers (*i.e.*, "Superboy")

22          e.     "[D]iamond-shaped "S" insignia on [Superman's] chest"

23          f.     "[L]ove triangle between Superman, Lois Lane and Clark Kent"

24          g.     "Perry White"

25          h.      "Daily Planet newspaper"

26          i.     "Metropolis"

27          j.     "Jor L"

28          k.     "Krypton"

- 51 -                              FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1343**

1    164.   A declaration by this Court regarding the scope of the Shuster

2    Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

3    § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect

4    to the copyright interest in the Superman material.  The Shusters may not seek to

5    terminate copyright interests owned by DC Comics, including those materials listed

6    above.

7  **C.    Third Claim for Relief:  Declaratory Relief re: Shuster Period of**

8  **        Exclusivity (Against All Defendants)**

9    165.   DC Comics re-alleges and incorporates by reference each and every

10   allegation contained in the paragraphs above.

11   166.   This Third Claim for Relief is advanced in the alternative—*i.e.*, if the

12   Court does not grant DC Comics' First Claim for Relief set forth above and hold

13   that the Shuster Termination Notice is invalid.

14   167.   The Copyright Act establishes an exclusive period between the time a

15   copyright termination notice is served and the effective termination date in which

16   the original copyright grantee may enter into an agreement with the original

17   copyright author or their heirs regarding the rights sought to be recaptured.  Section

18   304(c)(6)(D) provides:  "A further grant, or agreement to make a further grant, of

19   any right covered by a terminated grant is valid only if it is made after the effective

20   date of the termination."  17 U.S.C. § 304(c)(6)(D).  While the statute bars third

21   parties (like Toberoff and his companies) from trafficking in such future copyright

22   interests during this exclusive time period, it protects the rights and interests of

23   original grantees like DC Comics, providing that "an agreement for such a further

24   grant may be made between the author or [his heirs] and the original grantee or [its

25   successor (*e.g.*, DC Comics)], after the notice of termination has been served."  *Id.*

26   168.   Section 304(c)(6)(D) of the Copyright Act establishes a right of DC

27   Comics from November 10, 2003 (when the Shuster Heirs served the Termination

28   Notice) until October 26, 2013 (the effective date of the Notice), during which DC

- 52 -                                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1344**

1  Comics is the sole party that can enter into an agreement with the Shuster Heirs for

2  the rights sought to be terminated.  This right has been described by Congress, in its

3  legislative history, and the United States Court of Appeals as a "right of first

4  refusal."  Any restriction or limitation on this period of exclusivity must be deemed

5  unenforceable under section 304(c)(6)(D).

6      169.  Upon information and belief, the Shuster Heirs have entered into

7  agreements that frustrate and impede DC Comics' period of exclusivity.  For

8  example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs'

9  putative present and future copyright interests and provides that "any and all

10  agreements regarding any of the Rights [in Shuster's creations, including copyright]

11  shall be subject to the express written approval" of Pacific Pictures.  This

12  improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs

13  from entering into an agreement with DC Comics concerning their purported

14  rights—in clear violation of section 304(c)(6)(D).  Although Pacific Pictures and

15  the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures

16  Agreements in their September 10, 2004 Letter, this improper agreement was in

17  effect at least from the time it was executed on October 30, 2003 through

18  September 10, 2004, which means that it improperly eliminated most of the first

19  year of DC Comics' period of exclusivity.  Moreover, the original 2001 Pacific

20  Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures

21  is terminated "for any reason," then Pacific Pictures will hold 50% of "the property

22  or assets of the Venture," including all the alleged Shuster Superman copyright

23  interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff

24  still have improperly encumbered, to this day, DC Comics' period of exclusivity.

25      170.  Upon information and belief, Toberoff has induced the Siegel and

26  Shuster Heirs to enter into additional agreements, which prohibit either family from

27  entering into agreements conveying rights to DC Comics without the express

28  approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster

- 53 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1345**

1   Heirs, and Toberoff and his companies.  These agreements and others like it that

2   may exist—which upon information and belief remain in effect to this day—violate

3   section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes

4   with the Shusters and Siegels and lawfully pursue its business.

5        171.   The Shuster Heirs' agreements with Toberoff, his companies, and the

6   Siegels improperly interfere with DC Comics' period of exclusivity with the

7   Shuster Heirs regarding their purported Superman rights.

8        172.   A declaration by this Court is warranted under the Declaratory

9   Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

10   and obligations with respect to the copyright interest in the Superman material.

11   This declaration should establish that: (a) DC Comics is the sole party with whom

12   the Shuster Heirs can enter into an agreement to convey their putative Superman

13   rights during the exclusivity period, through and including October 26, 2013;

14   (b) any agreement with any third party regarding those putative rights during the

15   exclusivity period is invalid and unenforceable; and (c) any agreements requiring

16   consent of other parties to settle termination claims violate the exclusivity period

17   and, therefore, are invalid and unenforceable.

18        173.   DC Comics seeks an injunction (a) barring the Shuster Heirs from

19   entering into any agreement with any third party regarding the rights sought to be

20   recaptured in the Shuster Termination Notice until October 26, 2013; and

21   (b) restoring to DC Comics its 10-year period of exclusivity.

22   **D.**    **Fourth Claim for Relief:  Intentional Interference with 1992 Shuster**

23         **Agreement (Against Defendants Toberoff and Pacific Pictures)**

24        174.   DC Comics re-alleges and incorporates by reference each and every

25   allegation contained in the paragraphs above.

26        175.   In October 1992, the Shuster Heirs and DC Comics executed a final

27   written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s]

28   created in whole or in part by … Joseph Shuster." Since 1992, DC Comics has paid

- 54 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**

**1346**

1   the Shuster Heirs nearly half a million dollars under the 1992 Agreement. To DC

2   Comics' knowledge, the Shuster Heirs have never disputed the validity or existence

3   of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the

4   Shusters' prior grants of rights in the Superman properties to DC Comics—to the

5   contrary, the Shuster Heirs have expressly acknowledged that this was the effect of

6   the 1992 Agreement. In that 1992 Agreement, the Shuster Heirs further agreed that

7   they would not—either then or in the future—make any claim of right to any work

8   created in whole or part by Joe Shuster.

9       176.   DC Comics' 1992 Agreement with the Shuster Heirs was both a valid

10  contract and had the probability of future economic benefit to DC Comics. The

11  Shuster Heirs fully relinquished their rights under any prior agreement and re-

12  granted to DC Comics all of their Superman-related rights. This confirmation

13  allowed DC Comics to continue freely developing and exploiting those rights

14  without the risk of termination of the alleged Shuster rights or expensive and

15  protracted legal disputes regarding the ownership of those rights.[5]

16       177.   Toberoff and Pacific Pictures were aware of the 1992 Agreement and

17  DC Comics' ongoing business relationship with the Shusters. Toberoff knew that

18  his actions in having his company enter into a joint venture with the Shusters for

19

---

20      [5] DC Comics maintains that the 1992 Agreement is a binding, enforceable
agreement with the Shuster Heirs. Even assuming this agreement was deemed
21  invalid, DC Comics also has a long-established economic relationship with the
Shusters giving rise to an interference with prospective economic advantage claim.
22  This relationship dates back to 1935, when DC Comics' predecessor hired the
unknown artist Joseph Shuster to illustrate comic strips for its publications. Even
23  after their employment arrangement ended, Shuster continued to benefit from his
early work on Superman under the 1975 Agreement, which provided him with an
24  annual pension, medical insurance, and a lump-sum payment in exchange for
acknowledgement of DC Comics' sole and exclusive ownership of the Superman
25  rights. At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and
the Shuster Heirs had an agreement in place for almost 10 years, which resolved all
26  claims concerning Shuster's putative share of the Superman rights. DC Comics'
27  agreement with the Shusters and the economic relationship they contemplated had
28  the probability of future economic benefit to DC Comics.

- 55 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1347**

1    the purpose of terminating DC Comics' rights were substantially certain to interfere

2    with DC Comics' 1992 Agreement with the Shusters.  Toberoff's ultimate purpose

3    in approaching the Shuster Heirs was to induce them to repudiate the 1992

4    Agreement and grant him the rights they had already granted to DC Comics.  For

5    this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures

6    for the express purpose of "exploiting all of Joe Shuster's, and his estate's rights,

7    claims, copyrights, property, title and interests in and to Joe Shuster's creations"

8    through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers

9    by Joe Shuster of any copyright interest in his creations."

10         178.   Toberoff and Pacific Pictures engaged in independently wrongful

11    conduct to achieve this goal.  They induced the Shuster Heirs to breach the 1992

12    Agreement and enter into the illegal joint-venture agreements described above.

13    Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.

14    Toberoff engaged in this misconduct in his role as businessman and shareholder of

15    Pacific Pictures.

16         179.   As the direct result of Toberoff's and Pacific Pictures' actions, the

17    Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the

18    value of the Agreement and forcing DC Comics to incur substantial attorneys' fees

19    and costs in an amount to be proven at trial.

20    **E.**    **Fifth Claim for Relief:  Intentional Interference with Prospective**

21          **Economic Advantage re: Siegel-DC Comics Agreement (Against**

22          **Defendant Toberoff)**

23         180.   DC Comics re-alleges and incorporates by reference each and every

24    allegation contained in the paragraphs above.

25         181.   DC Comics reached a binding, enforceable agreement with the Siegel

26    Heirs.  After the Siegel Heirs served the Superman Termination Notice in 1997,

27    they engaged in negotiations with DC Comics for four years.  On October 16, 2001,

28    DC Comics made a settlement offer to the Siegel Heirs.  On October 19, 2001, the

**EXHIBIT 31**
**1348**

1   Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the

2   material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer

3   of October 16, 2001." On October 26, 2001, DC Comics sent a return letter

4   confirming the parties' agreed-upon terms. DC Comics then drafted a long-form

5   contract memorializing the agreement, which it sent to the Siegel Heirs on February

6   1, 2002. Marks has confirmed that all parties understood that they had a binding

7   agreement.[6]

8        182.   Even in the event that this agreement is finally adjudicated and deemed

9   to be invalid, DC Comics had a long-established economic relationship with the

10  Siegel Heirs giving rise to an interference with prospective economic advantage

11  claim. This relationship dates back as far as 1935, when DC Comics' predecessor

12  hired an unknown writer named Jerome Siegel to write comic strips for its

13  publications. Over the years, Siegel worked on-and-off as an employee of DC

14  Comics and its predecessors. Even after the employment arrangement ended,

15  Siegel continued to benefit from his early work on Superman under the 1975

16  Agreement, which provided him and his family with an annual pension, medical

17  insurance, and lump payment in exchange for acknowledgement of DC Comics'

18  sole and exclusive ownership of the Superman rights. When a dispute arose in

19  1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

20

21      [6] The district court in the Siegel Actions determined that this agreement was not
    binding because there was no "meeting of the minds" between the parties. Of
22  course, this was before the Toberoff Timeline had been produced, which confirmed,
    *inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel
23  Heirs—understood that the 2001 agreement was final and binding. Indeed, Marks
    communicated his position to the Siegel Heirs in August 2002, in an attempt to
24  convince them to reject Toberoff's attempts at interference. DC Comics reserves
    all rights to challenge the district court's ruling in the Siegel Actions based on this
25  newly discovered evidence and otherwise, and DC Comics respectfully submits that
    the district court's interim ruling on this issue is contrary to fact and law. If DC
26  Comics' claims are accepted, it will amend this Complaint to include a claim for
    interference with contract arising out of Toberoff's tortious interference with this
27  binding agreement. DC Comics contends that the district court's summary
    judgment ruling on this settlement issue also runs afoul of the Ninth Circuit's recent
28  decision in *Mattel, Inc. v. MGA Entm't, Inc.*, 2010 WL 2853761 (9th Cir. July 22,
    2010).

- 57 -                      FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1349**

1    Superman rights, DC Comics and Siegel commenced negotiations, which lasted

2    over four years.  At the time Toberoff approached the Siegel Heirs in 2001, DC

3    Comics and the Siegel Heirs had finally reached an agreement resolving their

4    claims to the Superman and Superboy rights.

5        183.    The economic relationship that the Siegel Heirs and DC Comics had

6    contemplated and agreed to had the probability of future economic benefit to DC

7    Comics.  The Siegel Heirs recognized DC Comics' sole and exclusive ownership of

8    all rights in Superman and Superboy, allowing it to continue freely developing and

9    exploiting those rights, and avoid the possibility of an expensive and protracted

10   lawsuit regarding ownership of those rights.

11       184.    Toberoff was well aware of the agreement between DC Comics and

12   the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel Heirs'

13   termination efforts through Internet reports.  Moreover, upon information and

14   belief, when Toberoff approached the Siegel Heirs and their representatives in late

15   2001 and 2002 to express interest in purchasing their Superman rights, he was

16   informed that the Siegel Heirs had already reached an agreement with DC Comics.

17       185.    Toberoff knew his actions were substantially certain to interfere with

18   the Siegel Heirs' agreement and ongoing business dealings with DC Comics.

19   Toberoff intentionally engaged in independently wrongful conduct to carry out his

20   interference by, among other things:  falsely misrepresenting to the Siegel Heirs

21   that he had a billionaire investor ready to purchase their Superman rights if they

22   repudiated their settlement agreement with DC Comics; falsely representing to the

23   Siegels that he would help them produce a competing Superman motion picture;

24   and wrongly inducing the Siegels to repudiate their agreement and business

25   relationship with DC Comics.  Toberoff engaged in this misconduct in his role as

26   businessman and shareholder of IP Worldwide.

27       186.    As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

28   the Siegel-DC Comics Agreement with DC Comics and ended all further

- 58 -                    FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1350**

1  discussions, causing DC Comics to lose the value of the agreement, to lose their

2  ongoing business relationship with the Siegels, and to incur millions of dollars in

3  subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered

4  actual damages in an amount to be proven at trial.

5  **F.**  **Sixth Claim for Relief**: **Declaratory Relief re: Invalidity of Copyright**

6      **Assignment and Consent Agreements (Against All Defendants)**

7      187.  DC Comics re-alleges and incorporates by reference each and every

8  allegation contained in the paragraphs above.

9      188.  The various copyright assignment and consent agreements between

10  Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

11  unenforceable, including under California's unfair competition laws, *e.g.*, CAL.

12  BUS. & PROF. CODE §§ 17200 *et seq*.  The copyright assignments secured by

13  Toberoff and/or his companies are unlawful and violate DC Comics' rights and

14  interests for the reasons set forth above.  The consent agreements Toberoff has

15  procured are void as a matter of law and public policy because they strip the Siegels

16  and Shusters of their right freely to settle their claims and violate DC Comics'

17  concomitant right freely to negotiate settlement of such claims.  The Pacific

18  Pictures and IP Worldwide Agreements secured by Toberoff and/or his companies,

19  for example, are unlawful and unfairly violate DC Comics' rights and interests.

20      189.  A declaration by this Court is warranted under the Declaratory

21  Judgment Act, 28 U.S.C. §§ 2201 *et seq*., to establish the parties' respective rights

22  and obligations with respect to the copyright interest in the Superman material.

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1351**

# VI.  PRAYER FOR RELIEF

WHEREFORE, DC Comics prays for judgment against defendants as follows:

190.   A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

191.   In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

192.   A declaration that:  (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

193.   A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

194.   An injunction that:  (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

195.   As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

196.   An award of reasonable attorneys' fees and costs; and

197.   Such other and further relief as this Court deems just and proper.

- 60 -

FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1352**

1

## VII.  DEMAND FOR JURY TRIAL

2        198.   Plaintiff DC Comics hereby demands a trial by jury on all issues

3  triable by a jury.

4

5        Dated:  September 3, 2010            Respectfully submitted,

6                                            O'MELVENY & MYERS LLP

7
                                            By: _____
8                                               Daniel M. Petrocelli
                                               Attorneys for Plaintiff DC Comics
9

10

11  CC1.834998

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 61 -                          FIRST AMENDED COMPLAINT

**EXHIBIT 31**
**1353**

# EXHIBIT A

**EXHIBIT 31**
**1354**

## SUPERMAN -- MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

**••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••**

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, _not as an attorney but as a film producer_, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

Q 0002

EXHIBIT A
63

EXHIBIT 31
1356

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. *(please see enclosed letter; this letter lays out well MT's scheme).* Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.    Also that MT has not even made contact with Time Warner.  Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.**  MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest.  Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement.  The estate attorney will thereby not be entitled to statutory compensation.
Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.*  The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

EXHIBIT A
65

Q 0004

EXHIBIT 31
1358

Case 2:04-cv-08400-ODW-RZ   Document 720-7   Filed 04/04/13   Page 339 of 343
Case 2:10-cv-03633-ODW-RZ   Document 49   Filed 06/03/10   Page 70 of 74   Page ID #:3679
Page ID #:17616

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately —- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...".     In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50.  **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN __PERSONALLY__ BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.**  MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.  He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.  In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*."  MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.  MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well).  Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.***** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).  According to the settlement amount, he received an unconscionable 50% contingency fee.

6

Q 0006

EXHIBIT A
67

**EXHIBIT 31**
**1360**

Very strong likelihood that Marc <u>created an entity for the purposes of the lawsuit</u> (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

cc:     Alan F. Horn
        Jeff Robinov
        John Schulman
        Patti Connolly

7

Q 0007

**EXHIBIT 31**
**1361**

DANIEL M. PETROCELLI (S.B. #97802)
 dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
(see attachment for complete list)

**COPY**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>                           PLAINTIFF(S)<br>v.<br>PACIFIC PICTURES CORPORATION, IP<br>WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF,<br>an individual, MARK WARREN PEARY, as personal<br>representative of the ESTATE OF JOSEPH SHUSTER,<br>JEAN ADELE PEAVY, an individual, JOANNE<br>SIEGEL, an individual, LAURA SIEGEL LARSON,<br>an individual, and DOES 1-10, inclusive,<br>                           DEFENDANT(S). | CASE NUMBER<br><br>CV 10-3633 ODW (RZx)<br><br><br>**SUMMONS** |

TO:  JEAN ADELE PEAVY, an individual,

     A lawsuit has been filed against you.

     Within <u>21</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☒ first amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Daniel M. Petrocelli</u>, whose address is <u>O'Melveny & Myers LLP, 1999 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067-6035</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: September 3, 2010 _____

By: ____Julie Prado____
                 Deputy Clerk

(Seal of the Court)

**SEAL**

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

---

CV-01A (12/07)                                  SUMMONS                                American LegalNet, Inc.<br>www.USCourtForms.com

**EXHIBIT 31**
**1362**

## ATTACHMENT TO SUMMONS
**Complete List of Attorneys for Plaintiff DC Comics**

DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone: (310) 553-6700
Facsimile:  (310) 246-6779

Attorneys for Plaintiff DC COMICS

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:(845) 265-2820
Facsimile:(845) 265-2819

Attorneys for Plaintiff DC COMICS

**EXHIBIT 31**
**1363**