# EXHIBIT 32

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 2 of 95    Page
ID #:14622
Case 2:04-cv-08400-ODW-RZ    Document 642    Filed 02/03/11    Page 1 of 25    Page ID
#:14161

1  Marc Toberoff (CA State Bar No. 188547)
    *mtoberoff@ipwla.com*
2  Nicholas C. Williamson (CA State Bar No. 231124)
    *nwilliamson@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 2720
4  Los Angeles, CA 90067
   Telephone: (310) 246-3333
5  Facsimile: (310) 246-3101

6  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON

7
                    UNITED STATES DISTRICT COURT
8
         CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION
9

10  JOANNE SIEGEL, an individual;          Case No. CV 04-08400 ODW (RZx)
11  and LAURA SIEGEL LARSON, an
    individual,                            **THIRD AMENDED COMPLAINT**
12                                         **FOR**:
13              Plaintiffs,                [1] DECLARATORY RELIEF RE:
                                               TERMINATION,
14         vs.                                 17 U.S.C. §304(c);
15                                         [2] DECLARATORY RELIEF RE:
    WARNER BROS.                               PROFITS;
16  ENTERTAINMENT INC., a                  [3] DECLARATORY RELIEF RE:
17  corporation; DC COMICS, a                  USE OF "S" CREST; and
    general partnership; and DOES 1-      [4] ACCOUNTING FOR PROFITS.
18  10,
19                                         DEMAND FOR JURY TRIAL
                Defendants.
20

21

22

23

24

25

26

27

28

**EXHIBIT 32**
**1364**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 3 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 84623    Filed 02/03/11    Page 2 of 25    Page ID
#:14162

1    DC COMICS,

2                    Counterclaimant,

3

4             vs.

5    JOANNE SIEGEL, an individual;
     and LAURA SIEGEL LARSON, an
6    individual,

7
                    Counterclaim Defendants.
8

9

10        Plaintiffs JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter

11   the "Plaintiffs"), by and through their attorneys of record, hereby allege as

12   follows:

13                        **JURISDICTION AND VENUE**

14        1.    This is a civil action seeking declaratory relief, and an accounting

15   for profits and related claims arising out of Plaintiffs' termination of prior grants

16   of copyright in and to the original character and work known as "Superman"

17   and subsequent "Superman" works pursuant to the United States Copyright Act

18   of 1976, 17 U.S.C. § 304(c), and defendants' willful misconduct with respect

19   thereto.

20        2.    This Court has subject matter jurisdiction over the claims set forth

21   in this Complaint pursuant to the United States Copyright Act (hereinafter, the

22   "Copyright Act"), 17 U.S.C. § 101 *et al.* and 28 U.S.C. §§ 1331, 1332, 1338(a)

23   and (b).

24        3.    This Court has supplemental jurisdiction over the related state

25   claims herein under 18 U.S.C. § 1367 in that these claims form part of the same

26   case and controversy as the federal claims herein.

27        4.    This Court has personal jurisdiction over the defendants in that

28   defendants are regularly doing business in the State of California and in this

                                    2

                    Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**
**1365**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 4 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 674624 Filed 02/03/11    Page 3 of 25    Page ID
#:14163

1  District, and because a substantial part of the relevant acts complained of herein

2  occurred in the State of California and this District.

3       5.    Venue is proper in the United States District Court for the Central

4  District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a)

5  because a substantial part of the wrongful acts that give rise to the claims herein

6  below occurred in this district and because WARNER BROS.

7  ENTERTAINMENT INC. has its principal place of business in this district.

8                       **PARTIES**

9       6.    Plaintiff JOANNE SIEGEL (hereinafter "Joanne Siegel") is an

10  individual and citizen of and resides in the State of California, in the County of

11  Los Angeles, and is and at all times has been a citizen of the United States.

12  Joanne Siegel is the widow of famed comic book creator Jerome (a.k.a. "Jerry")

13  Siegel.

14       7.    Plaintiff LAURA SIEGEL LARSON (hereinafter "Laura Siegel")

15  is an individual and a citizen of and resides in the State of California, in the

16  County of Los Angeles, and is and at all times has been a citizen of the United

17  States.  Laura Siegel is the daughter of Jerome Siegel.

18       8.    Plaintiffs are informed and believe and based thereon allege that

19  defendant WARNER BROS. ENTERTAINMENT INC. (hereinafter "Warner

20  Bros.") is a corporation organized and existing under the laws of the State of

21  Delaware, which has its principal place of business in Los Angeles County,

22  California.  Warner Bros. is a wholly owned subsidiary of Time Warner Inc.

23       9.    Plaintiffs are informed and believe and based thereon allege that

24  Defendant DC COMICS (hereinafter "DC") is a general partnership organized

25  and existing under the laws of the State of New York, which has its principal

26  place of business in the State of New York; and that DC regularly conducts

27  significant business in the State of California and in the County of Los Angeles.

28  DC is also a wholly owned subsidiary of defendant Warner Bros.  (Warner Bros.

<div align="center">3</div>

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 5 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 646-25 Filed 02/03/11    Page 4 of 25    Page ID
#:14164

1  and DC are sometimes collectively referred to hereinafter as the "Defendants";

2  and each reference to Defendants shall also refer to each Defendant).

3      10.    Plaintiffs are informed and believe and based thereon allege that on

4  or about September 30, 1946, the New York corporations, Detective Comics,

5  Inc., Superman, Inc., All American Comics, Inc., Jolaine Publications, Inc.,

6  Wonderwoman Publishing, Inc., Hop Harrigan Enterprise, Inc., Gainlee

7  Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc. and

8  Trafalgar Printing Co., Inc. were consolidated into the New York corporation

9  National Comics Publications, Inc., the name of which was later changed to

10 National Periodical Publications, Inc., and eventually to DC Comics, Inc.; and

11 further that DC, and Warner Bros., and/or each of them, are the alleged

12 successor(s)-in-interest to National Periodical Publications, Inc.

13     11.    Plaintiffs are informed and believe and based thereon allege that

14 Time Warner Inc. (hereinafter "Time Warner") is a corporation organized and

15 existing under the laws of the State of Delaware, which has its corporate

16 headquarters in the State of New York, and that Time Warner regularly

17 conducts significant ongoing business in the State of California and in the

18 County of Los Angeles.  Time Warner is the parent company of both Warner

19 Bros. and DC.[1]

20     12.    Plaintiffs are informed and believe and based thereon allege that

21 Defendant DC never, or rarely, exploits "Superman," independently of its

22 controlling parent company, Warner Bros.; that even relatively linear functions

23 such as "Superman" licensing are not handled directly by DC, but are exploited

24 exclusively through Warner Bros.; that the agreements and other arrangements

25 between Defendants Warner Bros. and DC regarding "Superman" are not "arms

26 length" agreements, serve primarily Warner Bros.' interests, and thus, do not

27
28 [1] Plaintiffs have omitted Time Warner Inc. as a party pursuant to the Court's May 19,
2009 and July 8, 2009 orders.  Plaintiffs respectfully reserve all rights to appeal such
rulings and to reinstate Time Warner in the event the orders are reversed.

4

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**

**1367**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 6 of 95    Page
ID #:84626
Case 2:04-cv-08400-ODW-RZ    Document 4626    Filed 02/03/11    Page 5 of 25    Page ID
#:14165

1    reflect the appropriate market values of the copyrights to "Superman," at issue

2    herein.

3        13.    Plaintiffs are informed and believe and based thereon allege that

4    Defendants Warner Bros. and DC are, and at all times material hereto were, the

5    alter-egos of each other and there exists and has existed at all times material

6    hereto a unity of interest and ownership among such Defendants such that any

7    separateness has ceased to exist in that Defendants, and/or each of them, used

8    assets of the other Defendants, and/or each of them, for its and/or their separate,

9    individual purposes, and caused valuable assets, property, rights and/or interests

10   to be transferred to each other without adequate consideration.

11       14.    Plaintiffs are informed and believe and based thereon allege that

12   the fictitiously named Defendants captioned hereinabove as Does 1 through 10,

13   inclusive, and each of them, were in some manner responsible or legally liable

14   for the actions, damages, events, transactions and circumstances alleged herein.

15   The true names and capacities of such fictitiously named defendants, whether

16   individual, corporate, associate, or otherwise are presently unknown to

17   Plaintiffs, and Plaintiffs will amend this Complaint to assert the true names and

18   capacities of such fictitiously named Defendants when the same have been

19   ascertained.  For convenience, each reference herein to a named Defendant shall

20   also refer to the Doe Defendants and each of them.

21       15.    Plaintiffs are informed and believe and based thereon allege that

22   each of the Defendants was the agent, partner, servant, employee, or employer

23   of each of the other Defendants herein, and that at all times herein mentioned,

24   each of the Defendants was acting within the course and scope of such

25   employment, partnership and/or agency and that each of the Defendants is

26   jointly and severally responsible for the damages hereinafter alleged.

27            **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

28       16.    In 1933 Jerome Siegel conceived the original idea of a cartoon strip

5

1   featuring a unique man of superhuman strength and powers who would perform

2   feats of great importance for the public good.  Siegel conceived, in essence, the

3   first "superhero" -- an original concept which embodied our nation's ideals at

4   the World's darkest hour, became a cultural icon and spawned, what is today, a

5   booming industry.  Jerry Siegel entitled his character -- "Superman."

6       17.    In or about 1934, Jerome Siegel authored twenty-four days (four

7   weeks) of "Superman" comic strips intended for newspaper publication, a

8   synopsis of comic strips for weeks two, three and four, a paragraph previewing

9   future "Superman" exploits and a nine page synopsis covering approximately

10  two months of daily "Superman" newspaper comic strips (at six days per week).

11  Plaintiffs are informed and believe and based thereon allege that these works,

12  though originally unpublished, were thereafter included or incorporated in the

13  early "Superman" comic strips thereafter published from on or about April 18,

14  1938 to April 13, 1943 (collectively, referred to hereinafter as the "Initially

15  Unpublished Works").

16      18.    In or about 1934, Jerome Siegel and the artist, Joe Shuster

17  (hereinafter collectively, "Siegel and Shuster") co-authored *fifteen* daily

18  "Superman" comic strips, consisting of one week (six days) of completely inked

19  daily "Superman" comic strips and three additional six day weeks of

20  "Superman" comic strips in penciled form (the "1934 Superman Comic Strip").

21  "Superman" was submitted by Siegel and Shuster to numerous publishers over

22  the next few years.

23      19.    Although "Superman" was not picked up for publication for some

24  time, Siegel and Shuster did get other features they created into print with the

25  Nicholson Publishing Company including "Henri Duval" and "Dr. Occult."  In a

26  letter dated October 4, 1935, the company's owner Malcolm Wheeler-

27  Nicholson, wrote to Mr. Siegel expressing an interest in publishing "Superman"

28  in comic book form but Siegel and Shuster rejected his offer.  Nicholson

6

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 8 of 95   Page
Case 2:04-cv-08400-ODW-RZ   Document 645-28   Filed 02/03/11   Page 7 of 25   Page ID
#:14167

1  became involved with a new comic magazine company, Detective Comics, Inc.

2  (hereinafter, "Detective Comics") and two Siegel and Shuster features, "Slam

3  Bradley" and "Spy," which appeared in "Detective Comics No. 1."

4       20.   On or about December 4, 1937, Siegel and Shuster, as independent

5  contractors, entered into an agreement with Detective Comics (the "1937

6  Agreement") to continue to produce the comic magazine features, "Slam

7  Bradley" and "The Spy," which agreement provided, in part, that any new and

8  additional features which Siegel and Shuster produced for use in a comic

9  magazine were to be first submitted to Detective Comics which reserved the

10 right to accept or reject same within sixty days.

11      21.   One of the early entities to which Siegel had submitted "Superman"

12 was The McClure Newspaper Syndicate.  In or about early 1938, the head of the

13 syndicate sought Siegel's permission to forward Siegel and Shuster's 1934

14 Superman Comic Strip material to Detective Comics for potential publication in

15 its contemplated new magazine, "Action Comics."  By this time, "Superman"

16 and his miraculous powers had already been completely developed by Siegel

17 and Shuster.

18      22.   In or about January–February 1938, when Detective Comics

19 expressed interest to Siegel and Shuster in publishing their 1934 Superman

20 Comic Strip in a magazine, Siegel and Shuster cut and pasted their

21 aforementioned 1934 Superman Comic Strip into more than ninety separate

22 panels ("Revised 1934 Superman Comic Strip"), so as to render their newspaper

23 strip more suitable for a magazine layout.

24      23.   The "Superman" material described hereinabove, which was the

25 independent, original creation of Siegel and Shuster, contained virtually all of

26 the signature elements and characters of the "Superman" mythology and

27 constituted the formula for the continuing "Superman" series to come.  It

28 depicted and narrated the origin of the "Superman" character, and contained a

7

Third Amended Complaint for Declaratory Relief and Accounting

EXHIBIT 32
1370

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 9 of 95    Page
ID #:47629
Case 2:04-cv-08400-ODW-RZ    Document 84-29    Filed 02/03/11    Page 8 of 25    Page ID
#:14168

1   complete delineation of the literary and pictorial representation of "Superman,"

2   including without limitation, his habits, character, superhuman powers,

3   appearance, costume, secret identity and attributes, and the sphere of public

4   good "Superman" was to enhance.

5        24.    By an instrument dated March 1, 1938 (hereinafter, the "1938

6   Grant"), which had been prepared by Detective Comics, Siegel and Shuster

7   agreed to the publication of their Revised 1934 Superman Comic Strip by

8   Detective Comics in consideration for the sum of $10 per page for this thirteen

9   page installment equal to a total of $130.

10        25.    Thereafter, Detective Comics published Siegel and Shuster's

11   "Revised 1934 Superman Comic Strip" in the "June, 1938" issue of "Action

12   Comics No. 1," which was issued for sale on April 18, 1938.

13        26.    Action Comics No. 1 and the predecessor materials created solely

14   by Siegel and Shuster contained the essential elements of "Superman" which

15   continue to this day, including without limitation, Superman's origin from the

16   distant planet, his "back-story" (sent to Earth as an infant in a spaceship by his

17   scientist father), his core physical and mental traits, his mission as a champion

18   of the oppressed to use his great powers to benefit humankind, his secret

19   identity as newspaper reporter, "Clark Kent," his relationship with other key

20   characters such as the newspaper editor from whom he takes his assignments

21   and his romantic interest in Lois, who rebuffs Clark as a coward, while

22   romantically inclined towards "Superman."

23        27.    Action Comics No. 1 was followed by further issues published at

24   regular intervals, with each subsequent issue containing additional "Superman"

25   material created by Siegel and Shuster.

26        28.    Between on or about March, 1938 and on or about September,

27   1938, Siegel and Shuster continued to create "Superman" strips, stories and

28   continuities.

**EXHIBIT 32**

**1371**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 10 of 95    Page
ID #:34630
Case 2:04-cv-08400-ODW-RZ    Document 645-30 Filed 02/03/11    Page 9 of 25    Page ID
#:14169

29.     On or about September 22, 1938, Detective Comics, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate (hereinafter, the "1938 McClure Agreement") regarding the newspaper syndication of a "Superman" comic strip.

30.     On or about September 22, 1938, Detective Comics and Siegel and Shuster therefore entered into an agreement (hereinafter, the "1938 Agreement") which for the first time provided that Detective Comics would thereby "employ and retain" Siegel and Shuster to do the "artwork and continuity" for five comic strips, including "Superman."

31.     Prior to September 22, 1938, Siegel and Shuster solely created six comic book issues of "Superman," published as Action Comics Nos. 1 through 6. Of these, Action Comics Nos. 1 through 5 had been published prior to September 22, 1938; and Action Comics No. 6 was published four days later on September 26, 1938.

32.     Action Comics No. 1 is not a "work made for hire." Action Comics Nos. 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, are also not "works made for hire."

33.     On or about December 19, 1939, Detective Comics and Siegel and Shuster entered into a supplemental agreement (hereinafter, the "1939 Agreement") which raised Siegel and Shuster's per page compensation rate for the increasingly popular "Superman" comic strip.

34.     Plaintiffs are informed and believe and thereon allege that the "Superman" works created by Siegel and Shuster after they entered into the 1938 Agreement with Detective Comics were also not "works made for hire." The 1938 Agreement for the first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent work on "Superman," yet Siegel and Shuster were never employees of Detective Comics. Siegel and Shuster operated their own independent comic book production business. Without

9

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 11 of 95    Page
ID #:14631
Case 2:04-cv-08400-ODW-RZ    Document 64    Filed 02/03/11    Page 10 of 25    Page ID
#:14170

1  limitation, Siegel and Shuster were not paid a salary, but were consistently paid

2  on a "per page" basis, and only for materials actually delivered by them to

3  Detective Comics and published by Detective Comics.  Plaintiffs are further

4  informed and believe and thereon allege that in compensating Siegel and

5  Shuster, Detective Comics did not withhold or deduct payroll, social security

6  and other taxes normally deducted from employee salaries; Detective Comics

7  did not provide employee benefits to Siegel and Shuster; Siegel and Shuster

8  worked from their own premises (not Detective Comic's premises); determined

9  their own hours and days of work; supplied, used and paid for their own

10  instrumentalities, tools and materials; and hired and paid for their own

11  employees who worked at Siegel and Shuster's instance and expense, under

12  Siegel and Shuster's direction and full control.

13      35.    In or about 1947, Siegel and Shuster filed an action in the Supreme

14  Court of the State of New York, County of Westchester against National Comics

15  Publications, Inc. (hereinafter, the "1947 Action" ) to determine the validity of

16  the contracts between National Comics Publications, Inc.'s predecessors –in–

17  interest and Siegel and Shuster with respect to "Superman."  Pursuant to a

18  stipulation of the parties the action was referred for decision to an Official

19  Referee of the New York Supreme Court.  After trial of the action the Official

20  Referee rendered an opinion dated November 1, 1947.  On April 12, 1948, the

21  Official Referee signed detailed findings of fact and conclusions of law and

22  entered an interlocutory judgment upholding the contracts in some respects, to

23  which notices of appeal were filed by all said parties.  Settlement negotiations

24  ensued, resulting in a stipulation of settlement between said parties executed on

25  or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the

26  New York Supreme Court of a final consent judgment dated May 21, 1948.

27      36.    In or about the early 1970's, a dispute arose between Siegel and

28  Shuster and National Periodical Publications, Inc. regarding the renewal

10

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 12 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 614-32    Filed 02/03/11    Page 11 of 25    Page ID
#:14171

1  copyright to "Superman," resulting in Siegel and Shuster's filing of an action

2  against National Periodical Publications, Inc. in the United States District Court

3  for the Southern District of New York for a declaration that Siegel and Shuster

4  were entitled to the renewal copyright to "Superman."  The District Court held

5  in <u>Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et</u>

6  <u>al.</u>, 364 F. Supp. 1032 (1973) that the initial "Superman" comic strip, published

7  in Action Comics No. 1, is a "work for hire" within the meaning of the

8  Copyright Act, 17 U.S.C. § 26, and that, in any event, the various agreements

9  between the parties, prior to the action, transferred the renewal copyright in this

10  material to Detective Comics.

11      37.   On appeal, the United States Court of Appeals for the Second

12  Circuit held in <u>Jerome Siegel and Joseph Shuster v. National Periodical</u>

13  <u>Publications, Inc. et al.</u>, 509 F.2d 909 (2nd Cir. 1974), that the District Court

14  erred in finding that Superman was a "work for hire" under the Copyright Act,

15  17 U.S.C. § 26, and that "Superman" and his miraculous powers were created

16  by Siegel and Shuster long before any employment relationship with Detective

17  Comics.  The Second Circuit nonetheless held that the Official Referee's

18  determination in the 1947 Action that Siegel and Shuster had transferred all

19  rights in "Superman" to Detective Comics implicitly included a determination

20  that Siegel and Shuster had transferred the renewal copyright in "Superman" to

21  Detective Comics; and that this determination was binding under the doctrine of

22  *res judicata.*

23      38.   On or about December 23, 1975, Siegel and Shuster entered into an

24  agreement with Warner Communications Inc. (hereinafter the "1975

25  Agreement") the alleged parent company of National Periodical Publications,

26  Inc., which provided for (i) annual payment of $20,000 to Siegel and Shuster

27  each for their respective lifetimes, plus medical benefits to Siegel and Shuster

28  each; and (ii) that Siegel and Shuster would be given credit on certain

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**

**1374**

1   "Superman" publications and derivative works as the "creators" of Superman, in

2   exchange for Siegel and Shuster's acknowledgement that Warner

3   Communications, Inc. was the exclusive owner of all right, title and interest in

4   and to "Superman." (The 1937 Agreement, the 1938 Grant, the 1938 McClure

5   Agreement, the 1938 Agreement, the 1939 Agreement, the 1948 Stipulation and

6   the 1975 Agreement described hereinabove are hereinafter sometimes referred

7   to collectively as the "Alleged Grants.")

8        39.   On April 3, 1997, Plaintiffs, Joanne Siegel and Laura Siegel,

9   served by first class mail, postage prepaid, notices of termination, as permitted

10   by the Copyright Act, 17 U.S.C. § 304(c) (hereinafter, the "Termination

11   Notices") on each of the Defendants and a number of their subsidiaries,

12   licensees and affiliates, terminating the Alleged Grants of the renewal copyright

13   to (i) the copyrightable "Superman" character, (ii) the 1934 Superman Comic

14   Strip and the Revised 1934 Superman Comic Strip, both published as/in Action

15   Comics No. 1, (iii) the material published as/in Action Comics Nos. 1-6

16   (statutory copyright to Action Comics No. 6 was secured on September 26,

17   1938), (iv) the material published as/in Action Comics Nos. 7- 61 (statutory

18   copyright to Action Comics No. 61 was secured on April 13, 1943), and/or (v)

19   subsequent works involving "Superman," all as set forth in the Notices of

20   Termination (hereinafter sometimes referred to collectively as the "Works").

21        40.   Plaintiffs are informed and believe and based thereon allege the

22   Initially Unpublished Works set forth in the Termination Notices were

23   incorporated or included in Works published thereafter, to which the

24   Termination applies.

25        41.   Plaintiffs are further informed and believe and based thereon allege

26   that the copyrights to all the Works were duly renewed.

27        42.   The Notices of Termination were drafted, served on Defendants

28   and filed with the United States Copyright Office, all in full compliance with

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 14 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 634    Filed 02/03/11    Page 13 of 25    Page ID
#:14173

1    the Copyright Act, 17 U.S.C. § 304(c), and the regulations promulgated

2    thereunder by the Register of Copyrights, 37 C.F.R. § 201.10 (2003). (Plaintiffs'

3    aforesaid exercise of their termination rights under 17 U.S.C. § 304(c) regarding

4    "Superman" is sometimes hereinafter referred to as the "Termination").

5         43.    As the original co-author of each Work Jerome Siegel owned an

6    undivided fifty percent (50%) of the copyright of each Work prior to any

7    alleged transfer or assignment of any such Work pursuant to any Alleged Grant.

8         44.    The Notices of Termination terminated on April 16, 1999

9    (hereinafter, the "Termination Date") all prior grants or purported grants of the

10   renewal copyrights in and to each and/or all the Works for their extended

11   renewal terms (hereinafter, sometimes referred to individually and collectively

12   as the "Recaptured Copyrights"), including, but not limited to, the Alleged

13   Grants.

14        45.    On April 16, 1999, the Termination Date, Plaintiffs re-gained

15   ownership to Jerome Siegel's undivided fifty percent (50%) copyright interest

16   in and to each and/or all the Works for their extended renewal terms.  In

17   accordance with 17 U.S.C. § 304(c), and as set forth in the Notices of

18   Termination, Jerome Siegel's surviving son, Michael Siegel, is also entitled to

19   share in the proceeds from this recaptured interest.

20        46.    Defendants have acknowledged that the Notices of Termination are

21   effective.  Defendants have further admitted that Plaintiffs thereby co-own the

22   copyright(s) to at least the original "Superman" elements authored by Siegel and

23   Shuster; and that Defendants have a duty to account to Plaintiffs for

24   Defendants' exploitation of such copyright(s).

25        47.    On April 16, 1997, in response to the service of the Notices of

26   Termination, John A. Schulman, Executive Vice President and General Counsel

27   of Defendant Warner Bros., wrote a letter to Joanne Siegel, stating in relevant

28   part:

<center>13</center>

<center>Third Amended Complaint for Declaratory Relief and Accounting</center>

<center>**EXHIBIT 32**</center>

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 15 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 647-35    Filed 02/03/11    Page 14 of 25    Page ID
#:14174

1                    "As to the Notices of Termination, I wasn't surprised

2                    at their arrival…After the effective date of the

3                    termination, there will still remain 14 years of

4                    copyright protection left to the joint copyright holders

5                    of the original Superman elements.  Those are what we

6                    should share."

7        48.     Similarly, on October 10, 1997, Paul Levitz, President and

8 Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in

9 relevant part:

10                    "The [Superman] rights involved are non-exclusive;

11                    they are shared with DC.  Since both you and DC

12                    would have these rights, we would each have the

13                    obligation to pay the other for using those rights if you

14                    did not re-grant them to DC."

15        49.     Yet, on April 15, 1999, one day before the Termination Date,

16 Defendant DC, by its attorneys (Fross Zelnick, *et al*) sent a letter to the

17 Plaintiffs' attorney, Arthur J. Levine, frivolously denying the validity of the

18 termination with respect to *any* "Superman" copyrights, stating in relevant part:

19                    "[Y]ou are hereby put on notice that DC Comics

20                    rejects both the validity and scope of the notices and

21                    will vigorously oppose any attempt by your clients to

22                    exploit or authorize the exploitation of any copyrights,

23                    or indeed, any rights at all, in Superman."

24        50.     Defendant DC's April 15, 1999 letter constituted a thinly veiled

25 threat that if Plaintiffs ever attempted to exploit *any* of their recaptured

26 copyright interests in "Superman," Defendants would engage in a campaign of

27 intimidation, including, but not limited to, instituting frivolous litigation against

28 Plaintiffs and using Defendants' enormous market power to restrict Plaintiffs'

<div align="center">14</div>

ability to exploit their Recaptured Copyright interests. Given that Time Warner is one of the largest media companies in the world with over $38 billion in annual revenues, Defendants' threats had a devastating and chilling effect on Plaintiffs' freedom to exploit the copyright interests they had properly regained under the Copyright Act, 17 U.S.C. § 304(c), thereby damaging Plaintiffs and causing them great emotional distress.

51. In the nearly 9 ½ years since the Termination Date, none of the Defendants has ever accounted to the Plaintiffs for any proceeds or profits whatsoever from their ongoing exploitation of "Superman" and the jointly owned Recaptured Copyrights.

**FIRST CLAIM FOR RELIEF**

(Declaratory Relief Re: Termination, 17 U.S.C. § 304(c) - Against All Defendants)

52. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53. By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants under Federal copyright law, 17 U.S.C. §§ 101 *et seq.*, concerning their respective rights and interests in and to the copyright to various "Superman" works, for which Plaintiffs desire a declaration of rights.

54. Plaintiffs contend and Defendants deny that:

a. The Notices of Termination terminated on April 16, 1999 all prior grants, assignments or transfers of copyrights for the extended renewal term in and to each and/or all of the Works (as defined in paragraph 39 hereinabove) to any of the Defendants and other parties duly served with the Notices of Termination, including their predecessors-in-interest; and

b. As of the effective Termination Date, April 16, 1999, Plaintiffs owned and continue to own an undivided fifty percent (50%) of the

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 17 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 642-37    Filed 02/03/11    Page 16 of 25    Page ID
#:14176

1  Recaptured Copyrights to each and/or all the Works for their renewal terms.

2       55.    A declaration of the Court is necessary pursuant to the Declaratory

3  Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their

4  respective rights and obligations with respect to the Termination and the

5  copyright interests thereby recaptured by Plaintiffs.

6                       **SECOND CLAIM FOR RELIEF**

7       (Declaratory Relief Re:  Profits from Recaptured Copyrights - Against All

8                               Defendants)

9       56.    Plaintiffs re-allege and incorporate by reference paragraphs 1

10  through 55 inclusive, as though fully set forth herein.

11      57.    By reason of the foregoing facts, an actual and justiciable

12  controversy has arisen and now exists between Plaintiffs and Defendants

13  concerning how Profits from Recaptured Copyrights should be defined for

14  purposes of Defendants and Plaintiffs accounting to one another as joint owners

15  of the Recaptured Copyrights.

16      58.    Plaintiffs contend and Defendants deny that:

17             a.     Profits include Defendants' revenues from the post - April

18  16, 1999 exploitation of the Recaptured Copyrights in foreign territories, when

19  such exploitation results from the predicate exercise *in the United States* of any

20  right(s) under the Recaptured Copyrights by any Defendant, their licensees or

21  assigns;

22             b.     There should be no *apportionment* of Profits since Plaintiffs

23  are entitled to fifty percent (50%) of such Profits as *joint owners* of the

24  Recaptured Copyrights;

25             c.     Alternatively, *apportionment*, if any, should apply only to

26  profits from the exploitation of the Recaptured Copyrights in *derivative works*

27  *created by a Defendant*, but not to profits from mere *licensing* of the Recaptured

28  Copyrights.  Any such apportionment should weigh heavily in Plaintiffs' favor,

                                    16

1  since the value of the "Superman" franchise exploited by the Defendants

2  ("Superman Franchise") is largely attributable to the unique "Superman"

3  mythology protected by the Recaptured Copyrights.  The Superman Franchise

4  capitalizes on the success of, and is hardly distinguishable from, the underlying

5  Recaptured Copyrights co-owned by Plaintiffs;

6      d.    Profits include profits from any merchandise or other

7  derivative works created, produced or manufactured on or after the Termination

8  Date, April 16, 1999, notwithstanding that the underlying licensing agreement

9  for such exploitations may have been executed prior thereto;

10      e.    Profits are not limited to the Profits of Defendant DC,

11  Warner Bros.' wholly owned subsidiary, but include the Profits of Defendant

12  Warner Bros., as well; and

13      f.    In determining Profits, deductible costs should include only

14  reasonable costs directly attributable to the exploitation of the Recaptured

15  Copyrights, of the type customarily deducted in arms' length agreements to

16  exploit copyrights of comparable value, all in compliance with Generally

17  Accepted Accounting Principles ("GAAP").

18      59.    A declaration of the Court is necessary pursuant to the Declaratory

19  Judgment Act, 28 U.S.C. §§ 2201 *et seq.* so that the parties may know their

20  respective rights and obligations with respect to Profits from the exploitation of

21  the Recaptured Copyrights after the Termination Date.

22                  **THIRD CLAIM FOR RELIEF**

23  (Declaratory Relief Re:  Use of the "Superman" Crest - Against All Defendants)

24      60.    Plaintiffs re-allege and incorporate by reference paragraphs 1

25  through 59 inclusive, as though fully set forth herein.

26      61.    By reason of the foregoing facts, an actual and justiciable

27  controversy has arisen and now exists between Plaintiffs and Defendants

28  concerning whether Plaintiffs are entitled, after the Termination Date, to

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**

**1380**

1  commercially exploit the "Superman" crest comprised of a large red "S"

2  centered on a broad triangular yellow field, first appearing (as part of

3  "Superman's" costume, centered on and highlighting Superman's "V" shaped

4  muscular chest) in the 1934 Superman Comic Strip and the 1934 Revised

5  Superman Comic Strip created by Siegel and Shuster and published as Action

6  Comics No. 1, and in only slightly revised form in subsequent Works

7  (hereinafter the "Superman Crest"); and whether Defendants' duty to account,

8  as non-exclusive joint owners of such Recaptured Copyrights, includes Profits

9  from the licensing of this crest.

10        62.    Defendants allege a trademark interest in a "Superman" shield

11  (hereinafter the "Superman Shield" and/or "Superman Trademark") which is

12  also comprised of a large red "S" on a broad triangular yellow field, first

13  appearing in later Works, as part of "Superman's" costume, centered on and

14  highlighting Superman's "V" shaped muscular chest, with the upper corners of

15  the triangular crest slightly cropped.

16        63.    Plaintiffs contend and Defendants deny that:

17              a.    The Recaptured Copyrights include the copyright to the

18  "Superman" crest comprised of a large red "S" centered on a broad triangular

19  yellow field, first appearing as part of "Superman's" costume, centered on and

20  highlighting Superman's "V" shaped muscular chest, in the 1934 Superman

21  Comic Strip and the Revised 1934 Superman Comic Strip published as Action

22  Comics No. 1, and appeared in subsequently published Works in only slightly

23  revised form (hereinafter the "Superman Crest").

24              b.    Defendants' alleged Superman Trademark design arose

25  directly from, and is substantially identical to, Siegel and Shuster's copyrighted

26  Superman Crest;

27              c.    Defendants receive significant proceeds and value from the

28  utilization and copying of the Superman Crest and/or substantially identical

18

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 20 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 624-8 Filed 02/03/11    Page 19 of 25    Page ID
#:14179

1  Superman Shield for which Defendants must account to Plaintiffs;

2         d.    In turn, Plaintiffs should likewise be allowed to exercise

3  their rights under copyright with respect to the Superman Crest, including

4  without limitation the right to commercially exploit the Superman Shield in

5  merchandise;

6         e.    Defendants, in any event, cannot use the alleged Superman

7  Trademark or any other purported trademark interest regarding "Superman" to

8  prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of their rights

9  under the Copyright Act in any of the jointly owned Recaptured Copyrights.

10        64.    A declaration of the Court is necessary pursuant to the Declaratory

11  Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, so that the parties may know their

12  respective rights and obligations with respect to the Superman Crest and the

13  Superman Shield.

14                    **FOURTH CLAIM FOR RELIEF**

15              (Accounting for Profits - Against All Defendants)

16        65.    Plaintiffs re-allege and incorporate by reference paragraphs 1

17  through 64 inclusive, as though fully set forth herein.

18        66.    On or after the Termination Date, April 16, 1999, Defendants

19  and/or each of them have licensed and/or commercially exploited and will

20  continue to license or exploit the Recaptured Copyrights, including without

21  limitation, *via* merchandising, publishing, and derivative motion picture and

22  television programming.

23        67.    As result of such licensing and/or commercial exploitation of the

24  Recaptured Copyrights on or after April 16, 1999, Defendants and/or each of

25  them have received and will continue to receive substantial Profits, fifty percent

26  (50%) of which is payable to Plaintiffs as the joint owner of the Recaptured

27  Copyrights.

28        68.    Defendant Warner Bros. has acted and continues to act in most

19

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**
**1382**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 21 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 647-4    Filed 02/03/11    Page 20 of 25    Page ID
#:14180

1    instances as the effective joint-owner and licensor (as opposed to licensee) of

2    the Recaptured Copyrights; and, as such, Warner Bros., along with the other

3    Defendants, owes a duty to account to Plaintiffs.

4        69.    To date, the Profits received by Defendants and/or each of them

5    from such licensing and/or commercial exploitation on or after April 16, 1999 is

6    estimated to be in excess of $50 million, however the exact sums actually

7    received and to be received by Defendants and/or each of them, are unknown to

8    Plaintiffs at this time, for these amounts can be properly determined only by an

9    accounting.

10       70.    Plaintiffs have demanded an accounting by Defendants on a

11   continuing basis of all amounts received by them and/or payable to them from

12   such licensing and other commercial exploitation on or after April 16, 1999, and

13   that Defendants pay Plaintiffs their fifty percent (50%) share of all such Profits.

14       71.    In nearly 9 ½ years since the Termination Date, Defendants have,

15   nonetheless, never accounted to or paid any Profits whatsoever to Plaintiffs.

16       72.    Plaintiffs at no time waived their rights to receive their share of such

17   Profits, nor have Plaintiffs at any time consented to the use and exploitation of

18   the Recaptured Copyrights in the United States or any foreign territories.

19       73.    Plaintiffs are entitled to an ongoing accounting from Defendants

20   regarding all amounts received, realized by or payable to Defendants on or after

21   April 16, 1999 from the licensing and any other commercial exploitation of the

22   Recaptured Copyrights and "Superman Franchise," and to the payment by

23   Defendants to Plaintiffs of fifty percent (50%) of all such Profits.

24

25       WHEREFORE, Plaintiffs pray for relief as follows:

26                          **PRAYER FOR RELIEF**

27                    <u>ON THE FIRST CLAIM FOR RELIEF</u>

28       74.    For a declaration as follows:

                                 20

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**
**1383**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 22 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 604-4    Filed 02/03/11    Page 21 of 25    Page ID
#:14181

1      a.      That pursuant to the Copyright Act, 17 U.S.C.§ 304(c),

2  Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or

3  transfers to any of the Defendants and any of their predecessors-in-interest, of

4  the renewal copyrights in and to each and/or all of the Works; and

5      b.      That, as of the Termination Date, Plaintiffs owned and

6  continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

7                    ON THE SECOND CLAIM FOR RELIEF

8      75.    For a declaration as follows:

9      a.      That as joint owners of the Recaptured Copyrights, Plaintiffs

10  are entitled to an accounting for Profits received or payable to the Defendants;

11      b.      That Profits include Defendants' revenues from the post -

12  April 16, 1999 exploitation of the Recaptured Copyrights in territories outside

13  of the United States whenever such exploitation is based on the predicate

14  exercise *in the United States* of any right(s) in and to the Recaptured Copyrights

15  by any Defendant, their licensees or assigns;

16      c.      That there should be no *apportionment* of Profits since

17  Plaintiffs are entitled to fifty percent (50%) of such Profits as joint owners of

18  the Recaptured Copyrights;

19      d.      Alternatively, that apportionment should apply only to profits

20  from the exploitation of the Recaptured Copyrights in *derivative works created*

21  *by a Defendant*, but not to profits from *licensing* of the Recaptured Copyrights;

22      e.      That apportionment, if any, should weigh strongly in

23  Plaintiffs' favor, since the value of the Superman Franchise is largely

24  attributable to the unique "Superman" character and other elements created by

25  Siegel and Shuster and protected by the Recaptured Copyrights, in a percentage

26  that the court may deem just and proper;

27      f.      That Profits include profits from any merchandise or other

28  derivative works created, produced or manufactured on or after the Termination

                                    21

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 23 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 642-3    Filed 02/03/11    Page 22 of 25    Page ID
#:14182

1  Date, April 16, 1999, notwithstanding that underlying licensing for such

2  exploitation may have occurred prior thereto;

3         g.    That Profits include the Profits of Defendants DC, Warner

4  Bros. and Time Warner, their subsidiaries and divisions; and

5         h.    That in determining Profits, only reasonable costs directly

6  attributable to the exploitation of the Recaptured Copyrights, of the type

7  customarily deducted in arms' length agreements to exploit copyrights of

8  comparable value to the Recaptured Copyrights, should be deducted from gross

9  revenues, all in compliance with GAAP.

10             ON THE THIRD CLAIM FOR RELIEF

11     76.   For a declaration as follows:

12         a.    That by the Termination, Plaintiffs recaptured a fifty percent

13  (50%) interest in the copyright to the Superman Crest created by Siegel and

14  Shuster;

15         b.    That Defendants' Superman Shield design arose directly

16  from, and is substantially identical to, the copyrighted Superman Crest created

17  by Siegel and Shuster;

18         c.    That Defendants must account to Plaintiffs for fifty percent

19  (50%) of the proceeds they receive from the licensing or other exploitation of

20  the Superman Crest and/or Superman Shield;

21         d.    That Plaintiffs, as co-owners of the copyright in and to the

22  Superman Crest, likewise are permitted to license or otherwise exploit the

23  Superman Crest, subject to a duty to account to Defendants for any such

24  exploitation; and

25         e.    That Defendants cannot use their alleged trademark in the

26  Superman Shield or any other alleged trademark interest with respect to

27  "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or

28  exploitation of Plaintiffs' rights under the Copyright Act in the jointly owned

<div align="center">22</div>

<div align="center">Third Amended Complaint for Declaratory Relief and Accounting</div>

<div align="center">

**EXHIBIT 32**

</div>

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 24 of 95   Page
Case 2:04-cv-08400-ODW-RZ   Document 644   Filed 02/03/11   Page 23 of 25   Page ID
#:14183

1  Recaptured Copyrights.

<div align="center">ON THE FOURTH CLAIM FOR RELIEF</div>

3      77.    For an accounting by the Defendants, jointly and severally, of any
and all proceeds from the licensing and any other exploitation of the Recaptured
Copyrights or Superman Franchise on or after the Termination Date, April 16,
1999;

7      78.    For 50% of any and all proceeds from the licensing and any other
exploitation of the Recaptured Copyrights or "Superman Franchise" on or after
April 16, 1999 pursuant to such accounting; and

10     79.    For the imposition of a constructive trust for the benefit of
Plaintiffs on all sums received and to be received by the Defendants, jointly or
severally, derived from the licensing and any other exploitation of the
Recaptured Copyrights or "Superman Franchise" on or after April 16, 1999.

<div align="center">ON ALL CLAIMS FOR RELIEF</div>

15     80.    For Plaintiffs' costs of suit;

16     81.    For interest at the highest lawful rate on all sums awarded Plaintiffs
other than punitive damages;

18     82.    For reasonable attorneys' fees; and

19     83.    For such other and further relief as the Court may deem just and
proper.

Dated: January 31, 2011                    TOBEROFF & ASSOCIATES, P.C.

                                           Marc Toberoff
                                           Attorneys for Plaintiffs,
                                           JOANNE SIEGEL and LAURA
                                           SIEGEL LARSON

<div align="center">23</div>

<div align="center">Third Amended Complaint for Declaratory Relief and Accounting</div>

<div align="center">**EXHIBIT 32**</div>

<div align="center">**1386**</div>

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 25 of 95    Page
Case 2:04-cv-08400-ODW-RZ    Document 644645  Filed 02/03/11   Page 24 of 25   Page ID
#:14184

1

## JURY TRIAL DEMANDED

2         Plaintiffs hereby request a trial by jury on each claim for relief alleged in

3   the Complaint for which trial by jury is allowable.

4

5   Dated:  January 31, 2011                    TOBEROFF & ASSOCIATES, P.C.

6

7                                               Marc Toberoff
                                                Attorneys for Plaintiffs,
8                                               JOANNE SIEGEL and LAURA
                                                SIEGEL LARSON
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

Third Amended Complaint for Declaratory Relief and Accounting

**EXHIBIT 32**

**1387**

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 26 of 95   Page
Case 2:04-cv-08400-ODW-RZ   Document 646   Filed 02/03/11   Page 25 of 25   Page ID
#:14185

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On February 3, 2011, I served the attached documents described as

**THIRD AMENDED COMPLAINT**

as follows:

[ ]   :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. I placed ____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

[X]   :BY HAND:

As follows: I delivered to the address listed below by hand the documents listed herein.

Daniel M. Petrocelli, Esq.
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

[X]   :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February 3, 2011, in Los Angeles, California.

Nicholas C. Williamson

**EXHIBIT 32**
**1388**

# EXHIBIT 33

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 28 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 496-48 Filed 09/21/12    Page 1 of 30    Page ID
#:30144

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:    (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11              Plaintiff,              **PLAINTIFF DC COMICS'
                                        OPPOSITION TO DEFENDANTS'**
12        v.                            **MOTION FOR PARTIAL
                                        SUMMARY JUDGMENT ON**
13  PACIFIC PICTURES                    **FIRST, SECOND AND THIRD**
    CORPORATION, IP WORLDWIDE,          **CLAIMS FOR RELIEF**
14  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          STATEMENT OF GENUINE
15  PEARY, as personal representative of ISSUES; DECLARATION AND
    the ESTATE OF JOSEPH SHUSTER,       FED. R. CIV. P. 56(D) AFFIDAVIT
16  JEAN ADELE PEAVY, an individual,    OF DANIEL M. PETROCELLI;
    LAURA SIEGEL LARSON, an             DECLARATION OF DAMON
17  individual and as personal          BONESTEEL; OBJECTIONS; AND
    representative of the ESTATE OF      [PROPOSED] ORDER FILED
18  JOANNE SIEGEL, and DOES 1-10,       CONCURRENTLY HEREWITH
    inclusive,
19                                      Hon. Otis D. Wright II
              Defendants.
20
21                                      **Hearing Date**:    Oct. 15, 2012
22                                      **Hearing Time**:    1:30 p.m.
                                        **Courtroom**:       11
23
24
25
26
27
28
                                             DC'S OPP. TO DEFS.'
                                        MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1389**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 29 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49-64 Filed 09/21/12   Page 2 of 30   Page ID
#:30145

1

## <u>TABLE OF CONTENTS</u>

2

3

I.    INTRODUCTION ............................................................................. 1

II.   SUMMARY JUDGMENT SHOULD BE GRANTED IN DC'S
      FAVOR ON ITS FIRST CLAIM, BASED ON THE 1992
      AGREEMENT. .................................................................................. 2

III.  THE SHUSTERS' UNCLEAN HANDS ALSO BAR
      TERMINATION. ............................................................................ 17

IV.   CONCLUSION ............................................................................... 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1390**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 30 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 49-50  Filed 09/21/12   Page 3 of 30   Page ID
#:30146

# TABLE OF AUTHORITIES

## CASES

*Am. Meat Inst. v. Leeman,*
   180 Cal. App. 4th 728 (2009) ................................................................ 18

*Barry v. Donnelly,*
   781 F.2d 1040 (4th Cir. 1986) .............................................................. 18

*Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.,*
   No. SACV 05-1083 (Oct. 13, 2006) ...................................................... 25

*Classic Media, Inc. v. Mewborn,*
   532 F.3d 978 (9th Cir. 2008) ......................................................*passim*

*Connell v. City of N.Y.,*
   230 F. Supp. 2d 432 (S.D.N.Y. 2002) .................................................. 24

*Cosden Oil & Chem. Co. v. Am. Hoechst Corp.,*
   543 F. Supp. 522 (D. Del. 1982) .......................................................... 18

*Eazypower v. Alden Corp.,*
   2003 WL 22859492 (N.D. Ill. Dec. 2, 2003) ....................................... 19

*Effects Assocs., Inc. v. Cohen,*
   908 F.2d 555 (9th Cir. 1990) ............................................................... 10

*Estate of Molino,*
   165 Cal. App. 4th 913 (2008) ................................................................ 6

*Gucci Am, Inc. v. Guess?, Inc.,*
   2012 WL 2304247 (S.D.N.Y. June 18, 2012) ...................................... 24

*Huthwaite, Inc. v Randstad Gen. Partner,*
   2006 WL 3065470 (N.D. Ill. Oct. 24, 2006) .................................. 18, 22

*In re Kalt's Estate,*
   16 Cal. 2d 807 (1940) ............................................................................ 6

*In re McKesson HBOC, Inc. ERISA Litig.,*
   391 F. Supp. 2d 812 (N.D. Cal. 2005) ................................................. 18

*Linzer Prods. Corp. v. Sekar,*
   499 F. Supp. 2d 540 (S.D.N.Y. 2007) ................................................. 18

*Lucky's Detroit, LLC v. Double L Inc.,*
   2012 WL 219418 (E.D. Mich. Jan. 25, 2012) ..................................... 24

*Makaeff v. Trump Univ., LLC,*
   2011 WL 613571 (S.D. Cal. Feb. 11, 2011) ........................................ 25

**EXHIBIT 33**
**1391**

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 31 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 490-51   Filed 09/21/12   Page 4 of 30   Page ID
#:30147

1

## TABLE OF AUTHORITIES

2

3    *Marvel Characters, Inc. v. Simon,*
         310 F.3d 280 (2d Cir. 2002) ........................................................ 4, 5, 16

4    *McCormick v. Cohn,*
5         1992 WL 687291 (S.D. Cal. July 31, 1992) ........................................ 18

6    *Metabolife Int'l, Inc. v. Wornick,*
         264 F.3d 832 (9th Cir. 2001) ...................................................... 2, 19

7    *Milne v. Stephen Slesinger, Inc.,*
8         430 F.3d 1036 (9th Cir. 2005) ................................................*passim*

9    *Mitchell Bros. Film Group v. Cinema Adult Theater,*
         604 F.2d 852 (5th Cir. 1979) ....................................................... 17

10

11   *New York Times Co., Inc. v. Tasini,*
         533 U.S. 483 (2001) .................................................................. 3

12   *Pelich v. I.N.S.,*
13        329 F.3d 1057 (9th Cir. 2003) ...................................................... 18

14   *Penguin Grp. (USA) Inc. v. Steinbeck,*
         537 F.3d 193 (2d Cir. 2008) ................................................*passim*

15   *Perform. Unlimited, Inc., v. Questar Publishers, Inc.,*
16        52 F.3d 1373 (6th Cir. 1995) ................................................... 22, 23

17   *R&R Recreation Prods., Inc. v. Joan Cook Inc.,*
         1992 WL 88171 (S.D.N.Y. Apr. 14, 1992) ....................................... 11

18

19   *Rupert v. Jones,*
         2011 WL 855849 (N.D. Cal. Mar. 9, 2011) ....................................... 1

20   *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.,*
21        482 F. Supp. 980 (S.D.N.Y. 1980) ......................................... 17, 22, 25

22   *Shloss v. Sweeney,*
         515 F. Supp. 2d 1068 (N.D. Cal. 2007) ........................................... 18

23   *Stewart v. Abend,*
24        495 U.S. 207 (1990) ............................................................. 3, 5

25   *Texas Partners v. Conrock Co.,*
         685 F.2d 1116 (9th Cir. 1982) ..................................................... 19

26

27   *U.S. v. Hardesty,*
         977 F.2d 1347 (9th Cir. 1992) .................................................. 5, 12

28

iii

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1392**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 32 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49652    Filed 09/21/12    Page 5 of 30    Page ID
#:30148

# TABLE OF AUTHORITIES

*Vogue Ring Creations, Inc. v. Hardman,*
   410 F. Supp. 609 (D.C.R.I. 1976) ........................................................ 18

*Walczyk v. Rio,*
   496 F.3d 139 (2d Cir. 2007) ............................................................... 24

*Wilton v. Seven Falls Co.,*
   515 U.S. 277 (1995) ...................................................................... 18-19

## STATUTES

17 U.S.C. § 304(c) ................................................................................. 4, 23

17 U.S.C. § 304(c)(5) ............................................................................. 3, 4

17 U.S.C. § 304(c)(6)(D) ............................................................................ 24

17 U.S.C. § 304(d)(1) ........................................................................... 24, 25

28 U.S.C. § 2201(a) ................................................................................. 18

## RULES AND REGULATIONS

37 C.F.R. 201.10(b)(1)(vii) .................................................................... 24, 25

FED. R. CIV. P. 54(b) ................................................................................ 25

FED. R. CIV. P. 56(d) .......................................................................... 2, 19

## OTHER AUTHORITIES

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102
   Stat. 2853 (1988) ........................................................................ 11

3 NIMMER ON COPYRIGHT § 7.20[B] (2012) ............................................... 18

4 NIMMER ON COPYRIGHT § 13.09[B] (2012) .............................................. 18

**EXHIBIT 33**
**1393**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 33 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49653 Filed 09/21/12    Page 6 of 30    Page ID
#:30149

## I.    INTRODUCTION

Defendants' cross-motion for summary judgment should be denied as procedurally improper and substantively without basis.  It is procedurally defective because it rehashes the same arguments the parties addressed on DC's pending summary judgment motion, Petrocelli Decl. ("PD") Ex. 4, and seeks to resolve issues—including DC's unclean-hands claim—that are not ripe for review.

As to DC's Third Claim, the Court ruled in DC's favor on the claim in its recent tentative, *id*. Ex. 1 ("Tentative") at 17-18, and defendants raised *no* argument concerning that ruling in their hour-long challenge to the Court's opinion, *id*. Ex. 2 ("Hr'g Tr.").  Summary judgment should enter in DC's favor on its Third Claim, and there is no need to re-brief that issue yet again.

DC's Second Claim, pled in the alternative to DC's First Claim, is not ripe for summary adjudication.  It alleges that, even if the Shusters' termination notice is valid (a premise that the First Claim contests), the Shusters may recapture only a limited sliver of rights (if any) because, *e.g.*, the works listed in their notice are non-terminable unpublished works, works-made-for-hire, and derivative works.  Docket No. 49 ¶¶ 152-64.  If the Court rules in DC's favor on DC's First Claim, there is no need to reach this Second Claim now.  *E.g.*, *Rupert v. Jones*, 2011 WL 855849, at *3 n.6 (N.D. Cal. Mar. 9, 2011).  Moreover, the Second Claim presents several issues currently before the Ninth Circuit in the *Siegel* case set to be heard November 5, 2012, Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1 at 41-87; 49 at 17-28; 65-1—only further reason not to address this Second Claim now.

That leaves DC's First Claim, large parts of which defendants improperly reargue in their cross-motion.  DC asserted five bases for this First Claim, two of which it will address in detail below.  The other three bases require no further briefing presently.  The first basis—DC's "expired" argument, Docket No. 49 ¶¶ 107-11—was fully briefed by the parties months ago, Docket Nos. 458 at 21-23; 468 at 9-10; Docket No. 186 at 14-17, and there is no reason to re-brief it yet again,

<div align="center">1</div>

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1394**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 34 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49654 Filed 09/21/12    Page 7 of 30    Page ID
#:30150

1   especially given that defendants spent no time addressing the issue on September 5.

2   The second basis—DC's "majority interest" argument, Docket No. 49 ¶¶ 118-24—

3   was fully briefed, Docket Nos. 458 at 18-20; 468 at 8; Docket No. 186 at 20-21,

4   and the Court tentatively ruled against DC on it, Tentative at 15-17, although DC

5   respectfully disagrees with that conclusion.  The third basis—the Shusters' failure

6   to terminate 1992 and 1948 grants, Docket No. 49 ¶¶ 112-17—can and will be

7   mooted if the Court rules in DC's favor on its 1992 Agreement claim.

8        The two remaining bases for DC's First Claim—the 1992 Agreement, and

9   unclean-hands—merit discussion.  The Court tentatively ruled in DC's favor on the

10  1992 Agreement, and that tentative should stand.  Defendants materially misstated

11  the facts and law about the 1992 Agreement in their cross-motion and at the

12  September 5 hearing, and DC now corrects those misstatements.

13       Defendants also direct their motion at DC's unclean-hands claim, another

14  independent basis for its First Claim.  Defendants' motion fails to cite the case law

15  demonstrating that DC's unclean-hands claim, brought as a declaratory relief

16  action, is a fully proper way to challenge the Shuster termination notice.  Their

17  motion also ignores that discovery into this claim is ongoing, will take months to

18  complete (particularly given delays defendants have caused), and bars their motion.

19  *See* FED. R. CIV. P. 56(d); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th

20  Cir. 2001); PD ¶¶ 5-22 (detailing ongoing, needed discovery).

21       In short, no part of defendants' motion is well taken; it should be denied.

22  **II.    SUMMARY JUDGMENT SHOULD BE GRANTED IN DC'S FAVOR**

23  **ON ITS FIRST CLAIM, BASED ON THE 1992 AGREEMENT.**

24       As shown by its tentative opinion and the oral argument it held on September

25  5, the Court is well aware of DC's First Claim concerning the 1992 Agreement.

26  DC will not repeat its prior briefing or argument, but instead responds to significant

27  misrepresentations about the 1992 Agreement and its legal effect, made both in

28  defendants' cross-motion and argument at the September 5 hearing.

2

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1395**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 35 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49655 Filed 09/21/12   Page 8 of 30   Page ID
#:30151

1     *1. The Lead Premise of Defendants' Argument:  That The Termination Right*

2 *Is "Inalienable" And Congress "Abrogated" Contract Law.*  Defendants say Jean

3 Peavy is not bound by the $600,000-and-counting, lifetime contract she signed with

4 DC in 1992 because the "termination right is inalienable" and, in enacting the

5 termination and agreement-to-the-contrary laws in the Copyright Act, Congress

6 rewrote "everything that we are taught in law school" about contracts, including a

7 "deal is a deal."  Hr'g Tr. at 31:12-32:5; *id.* at 8:19-9:2; Cross-Mot. at 3, 12.

8     The Ninth Circuit rejected this position seven years ago in *Milne v. Stephen*

9 *Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005).  Below are the *Milne* court's

10 own words, refuting defendants' "inalienability" argument—which Clare Milne,

11 like defendants here, based on dicta in the *Stewart* case, *see* Hr'g Tr. at 32:6:

12     To support her theory that the 1983 agreement falls under the
13 category of "an agreement to the contrary," Clare reads the Supreme
    Court's decision in *Stewart v. Abend*, 495 U.S. 207, 110 S. Ct. 1750,
14 109 L. Ed. 2d 184 (1990), <u>as holding that Congress intended to make</u>
    <u>the termination right inalienable for authors and their families.</u>
15 *Stewart*, however, <u>did not</u> interpret the "agreement to the contrary"
    language of section 304(c)(5) or its counterpart under section
16 203(a)(5).  In fact, the only discussion in *Stewart* pertaining to
    inalienability is the Court's relatively brief portrayal of the evolution
17 of copyright law, beginning with the Copyright Act of 1790 and
    ending with the 1976 Copyright Act.  Accordingly, *Stewart* <u>does not</u>
18 support the broad "plain meaning" that Clare attributes to section
19 304(c)(5) [the agreement-to-the-contrary provision in the Act].

20 *Milne*, 430 F.3d at 1043 (footnote and cites omitted; underlining added).[1]

21     *Milne* also rejected the argument made by defendants here—again, notably

22 unsupported by any case law, *see* Cross-Mot. at 3:15-26—that the Copyright Act

23 rewrote the copyright law to forbid all contracts that bar later termination claims:

24     Relying on legislative history, the district court [in *Milne* correctly]
25 read the House Report for the 1976 Copyright Act as confirming the
    rule that "[n]othing in the Copyright Acts has altered the power of

26     [1] Defendants' cite to a *parenthetical* in a *footnote* in *New York Times Co., Inc. v.*
27 *Tasini*, 533 U.S. 483, 496 n.3 (2001), Cross-Mot. at 3:4, is equally unavailing—and
no more a "holding" on this issue, *cf.* Hr'g Tr. at 32:8, than the dicta in *Stewart* that
28 *Milne* openly discounted.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1396**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 36 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49-56    Filed 09/21/12    Page 9 of 30    Page ID
#:30152

1    private parties to contract." H.R. REP. NO. 94-1476, 94th Cong., 2d

2    Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5743.

3        Clare [Milne] criticizes the district court's approach to statutory construction, arguing that section 304(c)'s meaning is clear on its face and that there was no need for the district court to consider legislative

4    history. She maintains that the district court used legislative history to override the statute itself.

5        <u>We disagree.</u> Section 304(c)(5) states that "[t]ermination … may be

6    effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. §

7    304(c)(5). As we have noted, the phrase "agreement to the contrary" is unclear…..

8        [A review of the legislative history shows] Congress specifically

9    stated that it did <u>not intend for the statute to "prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate</u>

10   <u>an existing grant and negotiating a new one[.]"</u> H.R. REP. NO. 94-1476 at 127. Congress further stated that "<u>nothing in this section or</u>

11   <u>legislation is intended to change the existing state of the law of</u> <u>contracts</u> concerning the circumstances in which an author may

12   terminate a license, transfer or assignment." H.R. REP. NO. 94-1476 at

13   142. <u>Congress therefore anticipated that parties may contract, as an</u> <u>alternative to statutory termination, to revoke a prior grant by replacing</u>

14   <u>it with a new one.</u> Indeed, <u>Congress explicitly endorsed the continued</u> <u>right</u> of "parties to a transfer or license" to "voluntarily agree[] <u>at any</u>

15   <u>time</u> to terminate an existing grant and negotiate[e] a new one." H.R. REP. NO. 94-1476 at 127.

16

17   *Milne*, 430 F.3d at 1045-46 (footnote and cites omitted; underlining added).[2]

18       In *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 203 (2d Cir. 2008),

19   the Second Circuit, relying on *Milne*, held the same as *Milne*—again rejecting

20   defendants' arguments that Congress intended to "abrogate" contract law:

21       <u>There is also no indication in the statutory text or the legislative</u>

22   <u>history of the Copyright Act that elimination of a termination right</u> <u>through termination of a pre-1978 contractual grant was precluded or</u>

23   ───────────

    [2] Defendants cite *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002)

24   to argue the termination right cannot be "contractually waived or circumvented," and that Congress "abrogated freedom of contract principles…." Cross-Mot. at

25   3:15-23. This ignores *Milne*, and disregards *Marvel*'s holding that the parties there could have settled their dispute and barred any termination claim had they just filed

26   a proper "statement of settlement" that complied with the collateral-estoppel rules. 310 F.3d at 291-92. It also ignores that *Marvel* had *nothing* to do with a post-1978

27   copyright grant replacing all pre-1978 grants—as was the case in *Milne*, *Steinbeck*, and here. Rather, *Marvel* involved a *1969* settlement agreement, made years before

28   the termination right was created in the late 1970s. 310 F.3d at 283-84, 287.

                                        4                    DC'S OPP. TO DEFS.'
                                                             MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1397**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 37 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497657    Filed 09/21/12    Page 10 of 30    Page ID
#:30153

1  undesirable. The House Report for the 1976 amendments noted, for
2  example, that "nothing in [the Copyright Act] is intended to change the
existing state of the law of contracts concerning the circumstances in
3  which an author may cancel or terminate a license, transfer, or
assignment." H.R. Rep. No. 94-1476, at 128 (1976).… So, provided
4  that a post-1978 agreement effectively terminates a pre-1978 grant,
Congress did not manifest any intent for the earlier agreement to survive
5  simply for purposes of exercising a termination right in the future. *See*
*Milne*…, 430 F.3d [at] 1046 … (post-1978 agreement superseding pre-
6  1978 agreement was of "the type expressly contemplated and endorsed
by Congress" because it enabled an author's statutory heirs to
7  renegotiate the terms of an original grant with full knowledge of the
market value of the works at issue). (Underlining added.)
8

9  Despite these holdings, defendants told the Court at the September 5 hearing

10  that, if Jean Peavy held the right of termination in 1992 and agreed with DC not to

11  pursue the right for $25,000 per year going forward, her 1992 contract with DC

12  would be "totally void," because that right is "inalienable," and Congress barred all

13  such agreements to the contrary. Hr'g Tr. at 31:14-32:5. *Milne* and *Steinbeck*

14  expressly reject defendants' erroneous assertions.[3]

15  *2. Jean's Ability To Dispose Of Joe Shuster's Rights And What Those Rights*

16  *Were In October 1992.* Defendants sowed confusion—both in their cross-motion,

17  and at the September 5 hearing, Docket No. 478 at 12, 15; Hr'g Tr. at 37:18-

18

19  [3] Defendants also rely on dicta in *Classic Media, Inc. v. Mewborn*, 532 F.3d 978,
20  985-86 (9th Cir. 2008), to make their "inalienability" arguments. But the earlier-
decided Ninth Circuit opinion—*i.e., Milne*—"controls," *U.S. v. Hardesty*, 977 F.2d
21  1347, 1347 (9th Cir. 1992), and the Second Circuit in *Steinbeck* overturned the
district court opinion on which *Mewborn* mistakenly relied. *Compare Mewborn*,
22  532 F.3d at 986, *with Steinbeck*, 537 F.3d at 199-200, 202-04.
23  At all events, the "alienability" issue that motivated Congress—that authors in
*their first contracts with publishers* would assign their termination rights in works
24  when they had no idea what the works would be worth decades later, *see Stewart*,
495 U.S. at 225-30; *Marvel*, 310 F.3d at 290-91; *Steinbeck*, 527 F.3d at 197-98;
25  *Mewborn*, 532 F.3d at 983-84—is not present here. Jean Peavy knew full well
what Superman was worth in 1992; her son and co-defendant, Mark Peary, admits
26  this. *Infra* at 14. And as in *Milne*, when Jean made her deal in 1992, she was not
making a forbidden "'agreement to make a future will'" or "'future grant'" not
27  knowing what Superman was worth. *Milne*, 430 F.3d at 1043. Instead, knowing
Superman's full value in 1992, she freely granted to DC all copyrights, claims, or
28  other rights in any and all of Joe's creations. *Infra* at 13-14; Tentative at 3-4, 8-10.

5

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1398**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 38 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497-6 Filed 09/21/12    Page 11 of 30    Page ID
#:30154

1    43:25—about whether Jean Peavy (or Joe Shuster) had any Superman rights to

2    grant to DC when Jean made the 1992 Agreement.  The Court asked several

3    questions on this issue as well.  Hr'g Tr. at 51:7-54:19.  The case law and

4    undisputed facts confirm the Court's tentative opinion was fully correct.

5         a. As Joe Shuster's designated executrix and sole heir, Docket No. 459-3 at

6    182, 275-76, Jean had full right in 1992 to contract on behalf of Joe's estate and

7    dispose of any copyrights or contracts he held, even if his will was not probated.  *In*

8    *re Kalt's Estate*, 16 Cal. 2d 807, 811 (1940); *Estate of Molino*, 165 Cal. App. 4th

9    913, 921 (2008).  California law is clear on this point, and defendants have never

10   disputed it.  Docket Nos. 186 at 12-13; 334 at 9-10; 458 at 15; 468 at 7-8.  Indeed,

11   it was only *Joe's rights* that Jean could have granted DC in 1992, because, unlike

12   her brother Frank, Jean had no rights or contracts with DC to settle, other than those

13   she received from Joe.  Docket No. 458 at 5-6; 468 at 7; *cf.* Hr'g Tr. at 19, 40:6-24.

14        In making the 1992 Agreement, Jean stood in the same shoes as did

15   Christopher Milne and as Elaine Steinbeck—as an author's authorized successor

16   making an agreement that would affect the rights of any heirs and statutory rights

17   holders who followed.  *Steinbeck*, 537 F.3d at 200-01; *Milne*, 430 F.3d at 1044-46.

18        b. As in *Steinbeck* and *Milne*, before DC made its agreement with Jean, DC

19   owned all of the underlying copyrights in Superman—based on then-existing

20   copyright grants from Joe Shuster to DC.  Docket Nos. 458 at 3-5; Tentative at 2-3.

21   The same was true in *Steinbeck*:  Before Elaine made her 1994 Agreement with

22   Penguin, Penguin held copyrights grants from the 1930s in John Steinbeck's books,

23   537 F.3d at 196, and when Elaine made the 1994 Agreement, she had no present

24   right to terminate those grants, *id.* at 202-03 & n.5; *infra* at 14-15.  In *Milne*,

25   Christopher *potentially* could have filed a notice of copyright termination in 1983 in

26   several of his father's Winnie the Pooh books, but he had *not* done so, and so when

27   he made his 1983 Agreement with the Slesinger company, neither he nor his father

28   owned the relevant Winnie the Pooh copyrights.  430 F.3d at 1040; *infra* n.10.

DC'S OPP. TO DEFS.'
                                      MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1399**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 39 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497-65 Filed 09/21/12    Page 12 of 30    Page ID
#:30155

1      c. In their respective 1992, 1994, and 1983 agreements, the parties here and

2  in *Steinbeck* and *Milne* each engaged in a simultaneous, two-part transaction—*the*

3  *first part of which gave back to the heirs the rights their relatives once held.* In the

4  first part of the 1992 Agreement, DC "fully settled" all of its agreements with Joe—

5  thereby superseding its agreements with Shuster under New York contract law,

6  Docket No. 458 at 6 ("this agreement <u>fully settles</u> all claims to any payments or

7  *other rights or remedies which you may have under <u>any other agreement</u> or*

8  *otherwise,* whether now or hereafter existing regarding any <u>*copyrights,*</u> trademarks,

9  or other property right *in any and all work* created in whole or in part by [Joe

10  Shuster]"); *id.* at 13-14; Docket No. 468 at 2-4. Likewise, Penguin "cancel[led] and

11  supersede[d]" its agreements with John Steinbeck, as the first step of its 1994

12  contract, *Steinbeck,* 537 F.3d at 196, and Slesinger "revoked" A.A. Milne's grants

13  to it, as the first step in its 1983 agreement with Christopher. 430 F.3d at 1044.[4]

14

---

[4] Defendants argued repeatedly there was "no language" in the 1992 Agreement or any extrinsic evidence that supported DC's position that the 1992 Agreement expressly and impliedly superseded all of Joe Shuster's pre-1978 grants. Hr'g Tr. at 14:24-25, 19:22-21:20, 22:6-22, 40:6-24, 47:18-48:5; Cross-Mot. at 11-12, 16; Docket No. 462 at 15-16. But, as the Court's tentative ruling correctly held:

    The broad and all-encompassing language of the 1992 Agreement <u>unmistakably operates to supersede all prior grants.</u> (See Petrocelli Decl. Exh. 24.) Unlike *Mewborn,* where the post 1978 agreement transferred rights "in addition to" those transferred in pre 1978 grants, <u>the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements, settling and displacing "all claims … under any agreement"</u> related to "any and all" works "created in whole or in part by … Joseph Shuster." (UF 19.)….

    Defendants insist "the [1992] agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.) Surely Defendants recognize that "any and all work created in whole or in part by … Joseph Shuster" necessarily includes his most famous creation, Superman. <u>And, just as clear, when … a party seeks to supersede all prior agreements, that party need not specifically list every superseded agreement, lest that party forget one such agreement and thus leave open the door for subsequent disputes.</u> Indeed, Defendants' own expansive language that the 1992 Agreement does not mention "Joseph Shuster's key 1938 Grant and subsequent Superman grants" lends credence to the need for all-encompassing language.

<div align="center">7</div>

<div align="right">DC'S OPP. TO DEFS.'<br>MOT. FOR PARTIAL SUMM. J.</div>

**EXHIBIT 33**
**1400**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 40 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497-6 ID #:1766 Filed 09/21/12    Page 13 of 30    Page ID
#:30156

1      d. In the second part of each of the 1992, 1983, and 1994 contracts—and for

2   new and valuable consideration given to the heirs—Jean, Christopher, and Elaine

3   each then granted their relatives' copyrights back to the publisher in question:

4      • Jean Peavy expressly "grant[ed]" to DC "any copyrights" in "any and all

5         work created in whole or in part by [her] brother, Joseph Shuster...."

6         Adams Decl. Ex. O; Tentative at 9; Docket No. 468 at 4-5.  In

7         consideration, while DC had owed Jean *nothing* before the 1992

8         Agreement, it agreed to pay her $25,000 a year for the rest of her life.  *Id.*

9         This new and valuable consideration—which Jean obtained only after

10        expressly threatening to assert a termination claim, Docket No. 460-1 at

11        28; Tentative at 10—netted Jean and her family over $600,000, and that

12        sum is still growing today, Docket No. 468 at 6-7; Tentative at 4-5, 14.

13     • Christopher Milne likewise re-granted all of his father's copyrights to

14        Slesinger in the second part of his contract.  *Milne*, 430 F.3d at 1040.  The

15        Pooh Properties Trust was already entitled to tens of millions of dollars in

16        royalties before Christopher made the 1983 agreement, but under the new

17        contract—made after Christopher threatened termination—Christopher

18        "doubled" the Trust's royalty share.  *Id.* at 1046.

19   _____

     Tentative at 9-10 (underlining added).

20       Not only did the 1992 Agreement *expressly* "fully settle" "any other agreement"
     Joe had with DC—embracing any and all grants he gave DC in the 1930s or after,

21   *id.* at 9—Paul Levitz told Jean and Frank that the 1992 Agreement would create

22   final and total peace between the parties, exactly what the New York law on
     superseding prior contracts contemplates.  Docket No. 468 at 7.

23       Defendants do not and cannot dispute this testimony.  Instead, they argue the
     1992 Agreement (and Levitz) needed to use magic words like "revoke" or "cancel."

24   Cross-Mot. at 14; Hr'g Tr. at 14:24-25, 19:22-21:20, 22:6-22, 40:6-24, 47:18-48:5.
     But *none* of the cases defendants cite say these words are required, Docket No. 468

25   at 2-4; the cases they cite using these words post-date the 1992 Agreement by a

26   decade, *id.*; and the words "fully settle" "all other agreements" are the sort of words
     DC needed to supersede its prior contracts under New York law.  Tentative at 9;

27   Docket No. 468 at 4-5.  New York law is the *very law defendants argued must

28   apply* until confronted with DC's summary judgment motion and the Court's
     tentative.  *Compare* Tentative at 7; Docket No. 468 at 2, *with* Hr'g Tr. at 46:2-12.

                                                8                    DC'S OPP. TO DEFS.'
                                                                     MOT. FOR PARTIAL SUMM. J.

EXHIBIT 33
1401

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 41 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 49766 Filed 09/21/12    Page 14 of 30    Page ID
#:30157

1    • In *Steinbeck*, Elaine was already receiving significant royalties from

2       Penguin for her husband's books, but in exchange for replacing her

3       husband's old agreements with Penguin, and making new post-1978

4       grants, she received "larger guaranteed advance payments" and royalties

5       calculated based on retail, not wholesale prices.  537 F.3d at 200.

6       e.  What these cases recognize—and as the 1992 Agreement provides—is

7    that there is significant value to a publisher like DC, Penguin, or Slesinger in

8    getting an heir to enter into a post-1978 transaction that both (a) returns the

9    creator's copyrights to the family and (b) re-grants those copyrights to the

10   publisher.  The value exists because the post-1978 agreement that replaces the

11   earlier ones—and fully settles all the parties' claims—is *not* subject to termination

12   under § 304, and is *not* a forbidden agreement to the contrary.  *See Steinbeck*, 537

13   F.3d at 201-03; *Milne*, 430 F.3d at 1043-46.  As *Steinbeck* explained it:

14       Contrary to the district court's observation that "[a]t no point did
15       Penguin lose or gain any rights other than those originally granted to it
         under the 1938 Agreement," *Steinbeck*, 433 F. Supp. at 401-02, the
16       1994 Agreement obligated Penguin to pay larger guaranteed advance
         payments and royalties….

17   537 F.3d at 200.  And as *Steinbeck* made clear, post-1978 agreements may not be

18   terminated under § 304—period—even if the party making the post-1978

19   agreement tried to preserve its termination claims for a later day.  *Id.* at 199-204.[5]

20

21       [5] *Id.* at 201 ("It is of … little relevance that the 1994 Agreement might have
22   intended that earlier created termination rights survive it, for our central inquiry is
     not the parties' intent to preserve these rights—which are granted by statute, not
23   contract—but rather their intent to terminate the 1938 Agreement.  The availability
     of termination rights under the Copyright Act is not dependent on the intent of the
24   parties but on, among other things, the date that a grant of rights was executed and
     the relationship to the author of those seeking to exercise the termination right.  So,
25   even if we accept that the 1994 Agreement 'explicitly carries forward possible
     future termination,' *Steinbeck*, 433 F. Supp. 2d at 401, it does not matter inasmuch
26   as the pre-1978 grant of rights no longer existed.  To the extent that the 1994
27   Agreement might also have contemplated the potential preservation of termination
     rights, it does not abrogate the 1994 Agreement's clear expression of intent to
28   terminate all prior grants of a transfer or license in the subject copyrights.").

9                                                  DC'S OPP. TO DEFS.'
                                                   MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1402**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 42 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 467-6  Filed 09/21/12    Page 15 of 30    Page ID
#:30158

Here, and as in *Milne*, the facts are even stronger for DC than in *Steinbeck*. In inducing DC to sign the 1992 Agreement, Frank and Jean expressly told DC that if Jean received the $25,000 per year for the rest of her life, Jean would not pursue a termination claim, Docket No. 460-1 at 28, just as Christopher had done, *Milne*, 430 F.3d at 1046; Tentative at 9-10. She reaffirmed this promise after the 1992 Agreement was made, including in 1999. Docket No. 460-2 at 236; Tentative at 4-5. In fact, *Jean has never disavowed making any of these promises*, nor have defendants submitted a shred of testimony from her. Instead, they rely on lawyer arguments masquerading as witness testimony. *E.g.*, *supra* n.4; *infra* nn.5-6.

f. Finally, defendants' claim that Jean never possessed Joe's copyright interests, Hr'g Tr. at 41:4-9, 17:22-24, 19:6-11, is not only contrary to law, but refuted by defendants' own conduct. In 2001, on behalf of his company defendant Pacific Pictures, Toberoff signed an agreement with Jean and Peary expressly obtaining an assignment to Joe's copyrights in Superman. Docket No. 468 at 8; Adams Decl. Ex. Z; Tentative at 15-16; PD Ex. 3. Toberoff's argument that Jean never had any of Joe's rights to assign—meant only to stave off this Court's tentative ruling—is precisely the opposite of what he said and did in his own private, business contract with Jean in 2001. *Id.*

*3. Whether The 1992 Agreement Was A "Grant" And Whether DC Relied On That Grant Before.* Likewise without merit are defendants' attacks on the 1992 Agreement as too "short" and "flimsy" to constitute a valid copyright grant. Cross-Mot. at 1:21; Hr'g Tr. at 45:9-11. In 1990, before the 1992 Agreement was made, the Ninth Circuit held that a copyright agreement needed only to be *one-line long*:

> [The] writing requirement [in section 204 of the Copyright Act] is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do.

*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (Kozinski, J.).

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1403**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 43 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 457-3    Filed 09/21/12    Page 16 of 30    Page ID
                                   #:30159

1    The 1992 Agreement fully satisfies this test, and while defense counsel

2    attempted at the September 5 hearing to testify as a fact witness about what DC's

3    copyright contracts usually say, how long they are, and where it files them,[6] there is

4    no competent record evidence to support those assertions.  Defendants cite no

5    testimony from any DC witness; no opinion testimony from an expert; no testimony

6    from Jean; and no competent evidence to establish DC's protocols.  Docket No. 473

7    at 5-7 (DC's objections to alleged evidence of its practices).  And since 1989 the

8    law has been clear that DC need not publicly file its copyright agreements.  Pub. L.

9    No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v.*

10   *Joan Cook Inc.*, 1992 WL 88171, at *4 (S.D.N.Y. Apr. 14, 1992).

11   Defendants also falsely argue that DC "contrived" its arguments concerning

12   the 1992 Agreement when it hired Daniel Petrocelli in 2010.[7]  Defendants provide

13   no evidence of this—for good reason.  Long before hiring Petrocelli, the 1992

14   Agreement was the subject of discovery and communications among the parties in

15   *Siegel.  E.g.*, PD Exs. 35-39; Docket No. 334-10 at 43-44.  And *years before* DC

16   hired Petrocelli, Warner Bros. relied upon the 1992 Agreement to establish its

17   ownership of Joe Shuster's Superman copyrights.  Bonesteel Decl. ¶¶ 2-3.[8]

18

19   [6] Hr'g Tr. at 47:5-48:5 ("I know Warner Brother … and DC agreements"; the
     1992 Agreement is "flimsy"; DC and Warner Bros. "filed [the contracts] with the

20   copyright office to give the wor[l]d constructive notice of their copyrights").

21   [7] *See* Hr'g Tr. at 24:15-24 ("You know what the first time is [DC] mentioned the
     1992 agreement? After they replaced their lawyers and they hired new counsel, and

22   new counsel came up with this theory.  But, that is what I meant, your Honor, when
     I was talking about fancy.  I wasn't referring to your tentative.  I was referring to a

23   new argument that is being contrived by lawyers…."); *id.* at 34:15-22 ("DC has
     never acted as if this 1992 agreement is the basis of its chain of title"); *id.* at 39:18-

24   40:4 ("They came up with that argument when they hired Mr. Petrocelli in 2010.").

25   [8] Defendants' claim that the "billion" dollar Superman franchise hangs on this
     one agreement, and hence it should be longer, is also false.  *Cf.* Hr'g Tr. at 20:1-17;

26   34.  The 1938 grant is a few lines long, *id.* at 55; the *Cohen* case makes clear this is
     proper; and Joe's Superman contributions he seeks to terminate—*i.e.*, a few early

27   comic strips—represent a tiny fraction of the 70 years of Superman content that DC
     owns free and clear of any claims by Shuster.  *E.g.*, Docket Nos. 49 ¶¶ 34-39; Case

28   No. CV-04-8400, Docket Nos. 336 at 24-25; 623 at 4-6.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1404**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 44 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 401    Filed 09/21/12    Page 17 of 30    Page ID
#:30160

1      *4. DC Also Prevails Under Any "Waiver," "Fairness," Or Other Test
2  Defendants Assert.* Defendants plainly lose under *Milne* and *Steinbeck*, which bar
3  termination where a post-1978 agreement—like the 1992 Agreement—replaces all
4  pre-1978 copyright grants that might otherwise be terminable. *Supra* at 5-11.

5      a. Defendants propose jettisoning the test established by *Milne* and *Steinbeck*
6  in favor of a multifactor test, asserting that, among other factors, an author or heir
7  can relinquish a termination right only by knowingly using the threat of termination
8  "as leverage to bargain a new deal" that "realize[s] the increased market value" of
9  the author's work. Hr'g Tr. at 13:14-14:2; Docket Nos. 478 at 13-14, 462 at 11.

10     In the first place, no court has ever adopted defendants' test. During oral
11  argument, defendants argued that *Mewborn* modified the test announced in *Milne*,
12  and they represented that in *Mewborn* (a) Classic Media called its 1978 agreement
13  with Winifred Mewborn "a revocation and a regrant," (b) "the district court bought
14  that argument and said [Winifred] had no termination right," and (c) the Ninth
15  Circuit reversed on the ground that there was no "express revocation" and, thus,
16  "limit[ed]" *Milne* and adopted defendants' test. Hr'g Tr. at 14:9-24, 15:4-14.

17     Each of these contentions is demonstrably false. First, *Mewborn* could not
18  "limit" *Milne*, as Ninth Circuit rules hold. *Hardesty*, 977 F.2d at 1347. Second, as
19  shown by his own brief in *Mewborn*, Toberoff's characterization of the facts of
20  *Mewborn* to this Court were untrue. Contrary to Toberoff's claims here about what
21  arguments the district court in *Mewborn* "bought," Hr'g Tr. at 14:18-20, he told the
22  Ninth Circuit in *Mewborn* "[t]he district court … found that the 1978 Assignment
23  *did not revoke and replace the 1976 Assignment*," and, instead, only granted rights
24  "in addition to the rights granted" in 1976. PD Ex. 16 at 536 (emphases added).
25  The Ninth Circuit in *Mewborn*, 532 F.3d at 982, noted exactly the same.

26     Thus, the focus of *Mewborn* was *not* whether the 1978 agreement superseded
27  and replaced all pre-1978 copyright grants—which is the issue here, and was the
28  issue in *Milne* and *Steinbeck*—but, rather, in the context of a non-superseded *pre-*

<div align="center">12</div>

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

<div align="center">**EXHIBIT 33**
**1405**</div>

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 45 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 407665   Filed 09/21/12   Page 18 of 30   Page ID
#:30161

1   *1978 grant*, whether in making an "additional" *post-1978* grant, Winifred

2   "intend[ed] to relinquish a known termination right."  *Mewborn*, 532 F.3d at 989.

3   Because Winifred, unlike Jean—was totally unaware of the termination provisions,

4   did not know what rights she was supposedly relinquishing, "had nothing in hand

5   with which to bargain," and was paid a mere $3,000, *Mewborn* held that her 1978

6   deal with Classics did not meet the objectives of the termination laws and could not

7   be enforced.  *Id.* at 979-81, 989.  The undisputed facts here are the opposite:  Jean

8   threatened a claimed right of termination—and used it to obtain lifetime, annual

9   payments, which she has never renounced and receives to this day, 20 years later.

10       b.  To the extent such an "intent to relinquish" test exists separate and apart

11   from the supersede-and-replace formulation in *Milne* and *Steinbeck*, DC meets it.

12   As *Steinbeck* and *Milne* both observed, "post-1978 agreement[s] superseding pre-

13   1978 agreement[s]"—like the 1992 Agreement—were "'expressly contemplated

14   and endorsed by Congress'" because they "enabled an author's statutory heirs to

15   renegotiate the terms of an original grant with full knowledge of the market value

16   of the works at issue."  *Steinbeck*, 537 F.3d at 203 (quoting *Milne*, 430 F.3d at

17   1046).  And as this Court held in its tentative, "[u]nlike the heirs in *Mewborn*":

18       Jean and Frank were aware of the Copyright Act's termination rights
        when they bargained for and entered into the 1992 Agreement.  (*See* UF
19       17, 21, 22.)  As DC points out, "the fact that Jean and Frank were able to
        obtain hundreds of thousands of dollars in benefits ... shows that
20       Mewborn's concerns about [the heirs'] ignorance are inapt here."  (Mot.
        at 17.)....  And, unlike in *Mewborn*, the record here is rife with "evidence
21       ... to support a finding that [Jean Peavy], when entering into the [1992]
        Agreement, considered ... termination rights ... [and] that [Jean]
22       intended to waive or relinquish them."  *Mewborn*, 532 F.3d at 989.[9]
23

24       As defendants concede, and cases like *Milne* hold, the goal of the termination

25   law was to allow authors or heirs to make a new deal with publishers decades after

---

26   [9] Tentative at 9-10; *see also* Hr'g Tr. at 30:9-15 ("THE COURT:  ... Now, with
    respect to the Shusters, they kept saying over and over again that they would not
27   seek to reclaim any rights in the future.  They said that over and over again.  They
    made their intent clear; right?  And I guess in exchange for that, DC continued to
28   give them checks.  MR. TOBEROFF:  Correct, Your Honor.").

13                                          DC'S OPP. TO DEFS.'
                                            MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1406**

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 46 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 497666 Filed 09/21/12   Page 19 of 30   Page ID
#:30162

1    their initial grants, when the authors or heirs "knew what the value of these

2    creations were," and when they had new leverage—a threatened termination

3    claim—to secure a new and better financial deal.  Hr'g Tr. at 9:10-18, 13:14-19;

4    *Milne*, 430 F.3d at 1044-45 & n.8, 1046-47; *Steinbeck*, 537 F.3d at 197-98.

5         That purpose was realized here when Jean, in 1992—after invoking the

6    termination provisions and expressly offering "not [to] pursue the termination of

7    the Superman copyright," Docket No. 460-1 at 28; Tentative at 10—made a deal

8    with DC for all of Joe's Superman rights.  To date, the deal has netted Jean over

9    half a million dollars, and lifetime security—neither of which DC ever owed her

10   before.  Jean (and all the world) knew Superman's value in 1992.  Peary testified he

11   and Jean believed, *in 1992*, Superman had generated "billions of dollars," they had

12   not received their full share, and—knowing this and being of "sound mind"—Jean

13   still signed the 1992 deal.  Docket No. 305-37 at 1253:23-1257:22.  That Peary

14   (and Toberoff) now wish that Jean had held out for more money does not undo the

15   1992 Agreement.  An heir's "current dissatisfaction" with a predecessor heir's post-

16   1978 agreement in no way "discredit[s] the validity of [that] agreement and the

17   rights conferred thereby."  *Milne*, 430 F.3d at 1045; *Steinbeck*, 537 F.3d at 204.

18         c.  Contrary to defendants' suggestions at oral argument, Hr'g Tr. at 15:25-

19   16:6, 25:4-15, 34:9-35:23, it is immaterial whether Jean had a then-existing

20   termination right when she entered into the 1992 Agreement—the salient point is

21   that she "wield[ed] the threat of termination," even if she had no present right, to

22   extract benefits from DC.  *Steinbeck*, 537 F.3d at 202.  Defendants run from

23   *Steinbeck*, asserting that Elaine's 1994 Agreement with Penguin was enforceable

24   only because she was "in the termination window" when she executed it.  Hr'g Tr

25   at 35:9-14.  This is wrong.  As *Steinbeck*, 537 F.3d at 202, 203 n.5, stated:

26       It is <u>undisputed</u> that the Steinbeck Descendants <u>could not</u> have
         exercised their termination rights in 1994 because they lacked more
27       than one-half of the author's termination interest.... [And t]here is
         some question as to why Penguin agreed to terminate and renegotiate

28

                                    14                    DC'S OPP. TO DEFS.'
                                                          MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1407**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 47 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 407667  Filed 09/21/12    Page 20 of 30    Page ID
#:30163

1       the 1938 Agreement, for without a majority termination interest, <u>it</u>

2   <u>appears that Elaine Steinbeck would have been *unable* to terminate the</u>
    <u>1938 Agreement on her own</u>.... (Emphases added.)

3   The court nonetheless held that Elaine's 1994 contract with Penguin—which had

4   the legal effect of barring future termination claims her stepsons would assert—was

5   enforceable. *Id.* at 203-04. And this was so even though her 1994 contract with

6   Penguin actually tried to preserve such future termination rights. *Supra* at 9.

7       *Steinbeck* said it was "immaterial" whether Elaine had a present right of

8   termination in 1994, 537 F.3d at 203 n.5, and instead held that what mattered was

9   that she "did renegotiate and cancel the 1938 Agreement while wielding the threat

10  of termination. Indeed, this kind of renegotiation appears to be exactly what was

11  intended by Congress." *Id.* at 202. *Steinbeck* also "reject[ed] the suggestion that,

12  notwithstanding the plain language of the 1994 Agreement, there was no effective

13  termination of the 1938 Agreement because the 1994 Agreement provided no

14  opportunity—no 'moment of freedom'—for those holding the termination right to

15  renegotiate the terms of the grant," once the termination occurred. *Id.* at 201.

16      The court summed up its reasoning, *id.* at 204, which equally applies here:

17        It should be noted that under our view, authors or their statutory
18  heirs holding termination rights are still left with an opportunity to
    threaten (or to make good on a threat) to exercise termination rights
19  and extract more favorable terms from early grants of an author's
    copyright. But nothing in the statute suggests that an author or an
20  author's statutory heirs are entitled to more than one opportunity,
    between them, to use termination rights to enhance their bargaining
21  power or to exercise them.... In this case, Elaine Steinbeck had the
    opportunity in 1994 to renegotiate the terms of the 1938 Agreement to
22  her benefit, for at least some of the works covered by the agreement
    were eligible, or about to be eligible, for termination. By taking
23  advantage of this opportunity, she exhausted the single opportunity
    provided by statute to Steinbeck's statutory heirs to revisit the terms of
24  her late husband's original grants of licenses to his copyrights. It is no
    violation of the Copyright Act to execute a renegotiated contract where
25  the Act gives the original copyright owner's statutory heirs the
    opportunity and incentive to do so. *See Milne*, 430 F.3d at 1046; *cf.*
26  *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 989 (9th Cir. 2008)
27  (termination right preserved, notwithstanding a March 1978—i.e. post-
28  1978—grant of rights, where termination right could not have been

                                                    DC'S OPP. TO DEFS.'
                                                    MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1408**

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 48 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 407-66   Filed 09/21/12   Page 21 of 30   Page ID
#:30164

1    exercised until 1984 at the earliest, and where "[n]either party intended
2    to revoke and replace (or even modify)" a 1976 grant of rights).

3        Other cases recognize that contracts may serve as alternatives to termination,
4    regardless of whether the requirements to terminate (*e.g.*, a present termination
5    right, filing a termination notice, etc.) are met.[10] As in *Milne* and *Steinbeck*, Jean
6    took her family's one opportunity decades after Joe created Superman to cash in on
7    any asserted termination claims. The deal she bargained for must be enforced.

8        *5. Defendants' Misstatements About Jean's Authority And Role.* Defendants
9    deflect from the facts that (a) Jean is the beneficiary of the purported termination
10   right they claim Joe's Estate holds, and (b) that Joe's will named Jean not only as
11   his sole heir, but as executor of his Estate to enforce such rights. Docket No. 459-3
12   at 275-76; Hr'g Tr. at 41:20-21, 25:19-27:4. To do so, Toberoff and Peary induced
13   Jean to be replaced by Peary as executor of Shuster's Estate in 2003, Adams Decl.
14   Ex. CC, in an effort to avoid the dispositive effect of the 1992 Agreement, which
15   Jean knowingly signed in 1992, just weeks after Jean told the California courts and
16   DC she was Joe's sole heir and executor of his estate. Docket Nos. 186 at 12-13;
17   334 at 9-10; 458 at 15; 468 at 7-8; 460-1 at 9; Adams Decl. Ex. M at 156, 182.
18   Peary and Toberoff also refuse to close the 2003 probate case or to distribute the
19   Estate's assets to Jean—as Joe's will and California law require—because Peary
20   and Toberoff wish to persist in their arguments that Jean never obtained the

_____

21   [10] Defendants conceded at oral argument that *Milne* enforced Christopher's 1983
22   agreement "although [he] didn't follow the statutory formalities of termination" and
     "contractually terminated instead." Hr'g Tr. at 13:20-21, 34:1-3; *see Milne*, 430
23   F.3d at 1045 ("[a]lthough Christopher <u>presumably</u> could have served a termination
     notice, he elected instead to use his leverage to obtain a better deal"); *id.* at 1040
24   ("faced with the <u>possibility</u> that Christopher <u>might</u> seek to terminate ... Disney
     proposed that the parties renegotiate") (emphases added). In *Marvel*, the court
25   recognized that parties could have barred a termination claim by drafting—*even
     before 1978*—a "stipulation of settlement, complete with sufficient factual findings
26   on authorship," defining a work as a non-terminable work-for-hire. 310 F.3d at
     291. And, again, in *Steinbeck*, 537 F.3d at 200-03, the Second Circuit rejected the
27   district court's conclusion that "'[a]ny interpretation of the 1994 Agreement having
     the effect of disinheriting the statutory heirs to the termination interest ... must be
28   set aside as contrary to the very purpose of the termination statute.'"

                              16                    DC'S OPP. TO DEFS.'
                                                    MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1409**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 49 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497669 Filed 09/21/12    Page 22 of 30    Page ID
#:30165

1   termination rights, and thus she is not bound by her 1992 Agreement. *E.g.*, Docket

2   Nos. 186 at 13; 334 at 9-13; 458 at 8, 15; 468 at 7-8.

3        The Court pressed defendants on these issues at the September 5 hearing, and

4   once again Toberoff was not candid about the true facts. *E.g.*, Hr'g Tr. at 41:20-21,

5   25:19-27:4.  He claimed Jean "declined to act [as executor in 2003] because she

6   was 82." *Id.* at 42:19.  But Peary testified Jean was "competent" and "had the

7   ability to serve as an executor" in 2003, and that Jean *never* said she was "unable or

8   unwilling to serve." Docket No. 305-37 at 1286:1-3, 1374:17-1375:4.  Peary also

9   admitted: "I'm the one that has initiated the whole -- the whole project.  I've been

10  involved in it with Toberoff from the beginning and I'm active and knowledgeable

11  on it." *Id.* at 1374:20-25.  Peary did this without "any discussion" with Jean, and

12  Jean confirmed in 2006:  "I don't know what's going on" with Shuster's "estate."

13  Docket No. 305-59 at 2107:10-13.  Defendants cannot and should not be rewarded

14  for such duplicitous efforts to manipulate the termination process or this Court.

15  **III.    THE SHUSTERS' UNCLEAN HANDS ALSO BAR TERMINATION.**

16       The Shusters Notice contains at least two material misrepresentations, either

17  of which suffices to invalidate it.  First, it conceals defendants' fraudulent scheme

18  to manipulate the Siegel and Shuster heirs' Superboy rights.  Second, it attests that

19  the Shuster Estate holds Shuster's putative termination interest, but omits that 10

20  days before the notice was served, the Estate purported to assign all of its

21  "termination interest" to the Pacific Pictures Joint Venture—a deception this Court

22  rightly found to be "problematic." Tentative at 16.  Unclean hands bars copyright

23  enforcement where a putative owner engages in "wrongful acts … affecting the

24  equitable relations between the parties." *Mitchell Bros. Film Group v. Cinema*

25  *Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).  The doctrine applies when, as

26  here, a party "fails to advise the Copyright Office of facts," *Russ Berrie & Co., Inc.*

27  *v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980), or "misrepresents

28  the scope of his copyright to the court or opposing party," *Huthwaite, Inc. v*

17

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1410**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 50 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497670    Filed 09/21/12    Page 23 of 30    Page ID
#:30166

1    *Randstad Gen. Partner*, 2006 WL 3065470, at *9 (N.D. Ill. Oct. 24, 2006)."[11]

2        A. The Law.  Citing two cases that do not involve an unclean-hands claim

3    asserted as a declaratory-relief claim, defendants argue that because unclean hands

4    is an equitable defense, it cannot be asserted as an affirmative claim.  Mot. 19

5    (citing *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D.

6    Cal. 2005) (request for remediation); *Pelich v. I.N.S.*, 329 F.3d 1057, 1062 (9th Cir.

7    2003) (habeas petition)).  Neither case so holds, *id.*, and defendants identify *no* case

8    precluding an unclean-hands claim brought as a declaratory-relief action.

9        None exists, and as DC showed at the Rule 12 stage, courts allow declaratory

10    relief claims based on anticipated defenses like unclean hands.[12]  If the rule were

11    otherwise, parties would be confronted with "the rock-and-a-hard-place choice to

12    cease [their activity] or fac[e] an infringement suit" and only then assert unclean

13    hands as a defense.  *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 557 n.96

14    (S.D.N.Y. 2007).  "The Declaratory Judgment Act was designed to prevent such

15    situations," *id.*, empowering courts to "declare the rights and other legal relations of

16    any interested party … whether or not further relief is or could be sought," 28

17    U.S.C. § 2201(a).  The Declaratory Judgment Act gives "federal courts unique and

18    substantial discretion in deciding whether to declare the rights of litigants," *Wilton*

19

20    [11] *See Vogue Ring Creations, Inc. v. Hardman*, 410 F. Supp. 609, 616 (D.C.R.I.
1976); *McCormick v. Cohn*, 1992 WL 687291, at *4 (S.D. Cal. July 31, 1992).

21    Defendants attack a straw man, saying DC's unclean-hands claim fails because it
does not meet the test for a claim of "fraud on the Copyright Office." Mot. 20.

22    Unclean hands has long been recognized as a separate and distinct doctrine,

23    *compare* 4 NIMMER ON COPYRIGHT § 13.09[B] (unclean hands), *with* 3 *id.* § 7.20[B]
(fraud on the Copyright Office)—the two standards cannot be conflated.

24    [12] *E.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1081-82 (N.D. Cal. 2007)

25    (unclean-hands claim was "properly before the Court" because "if Defendants had
sued Plaintiff for copyright liability, she could have raised an unclean hands

26    defense"); *Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*, 543 F. Supp. 522, 548,
554 (D. Del. 1982) (granting "unenforceability" claim, which is "rooted in the

27    equitable concept of 'unclean hands'"); *Barry v. Donnelly*, 781 F.2d 1040, 1043 n.8
(4th Cir. 1986) (affirmative claim based on statute-of-limitations defense); *Am.*

28    *Meat Inst. v. Leeman*, 180 Cal. App. 4th 728, 744 (2009) (same; preemption).

18                                                      DC'S OPP. TO DEFS.'
                                                        MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1411**

1    *v. Seven Falls Co.*, 515 U.S. 277, 286 (1995), which is essential here.  If DC were

2    forced to wait until the Shusters brought a lawsuit after the 2013 termination date to

3    assert unclean hands, it would be unfairly impeded in conducting and planning its

4    business.  Such economic harm is grounds for an unclean-hands claim to proceed.

5    *Eazypower v. Alden Corp.*, 2003 WL 22859492, at *2-3 (N.D. Ill. Dec. 2, 2003).

6        <u>B.  The Merits.</u>  Defendants' challenges to the merits of DC's unclean-hands

7    claim turn on contested factual issues that are the subject of ongoing discovery, PD

8    ¶¶ 12-18—which is itself grounds to deny defendants' motion.  FED. R. CIV. P.

9    56(d); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982);

10    *Metabolife*, 264 F.3d at 846.  Defendants' merits arguments fail in any event.

11        *1.  Superboy Fraud.*  From 1940 to 2002, Siegel, Shuster, and their families

12    asserted that Superboy was a joint creation of Siegel and Shuster.  For example:

13    •  A 1940 script that Toberoff says features the first appearance of Superboy

14        contains the joint byline:  "By Jerry Siegel and Joe Shuster."  Statement of

15        Genuine Issues ("SGI") 1.

16    •  Before the 1940 script, Shuster illustrated works for DC featuring Superman

17        as a boy with super-powers.  In *Action Comics #1*, Shuster drew Superman

18        as a very young boy displaying astounding "feats of strength":



*Action Comics #1* (1938), SGI 2

28    Shuster also showed Superman as a boy with super-powers in *Superman #1*:

EXHIBIT 33
1412



*Superman #1* (1939), SGI 3

- In a 1942 Sunday comic strip, Shuster depicted Superman as a "youth" who could "outrun the express" train and had other "amazing powers":

Superman Sunday Strip (1942), SGI 4

- In 1948, a New York court found that Shuster provided the artwork for the first stand-alone Superboy story, printed in *More Fun Comics #101*.  SGI 5.

- In 1972 and 1973, Jerry Siegel and Joe Shuster filed copyright renewal notices identifying Superboy as their *joint creation*.  SGI 6.

- In 1982, Siegel's widow Joanne sent a letter to DC stating:  "It's no mystery who the creators were in Jerry and Joe's case.  Not only of Superman, *but Superboy and other comics*."  SGI 7 (emphasis added).

- In 2001, Jean and Peary signed the Pacific Pictures Agreement, defining "Superboy" as among "Joe Shuster's creations."  SGI 9.

20

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1413**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 53 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497 Filed 09/21/12    Page 26 of 30    Page ID
#:30169

1       This all changed in 2002, when Toberoff orchestrated an illicit scheme to

2   position Jerry Siegel as the sole creator of Superboy so the Siegels could assert a

3   baseless Superboy-related copyright infringement claim against DC in one of the

4   two *Siegel* cases.  In 1997, years before Toberoff interfered, Siegel's heirs filed a

5   termination notice seeking to terminate Siegel's prior Superman grants.  SGI 8.

6   The notice expressly included *Superboy* works and elements among the "character,

7   story element, or indicia reasonably associated with SUPERMAN," in recognition

8   of the fact that Superboy is a complete derivative of Superman.  *Id.*

9       In November 2001—right when he entered into the 2001 Pacific Pictures

10  Agreement with the Shusters—Toberoff set out to acquire the Siegels' interests,

11  hoping to obtain their putative Superman rights and secure for himself a majority

12  interest in the Siegel and Shuster heirs' collective rights.  SGI 10.  He succeeded.

13  In October 2002, the Siegels signed an agreement with Toberoff's company IP

14  Worldwide to exploit their putative Superman rights.  SGI 11.  The next month, the

15  Siegels filed another termination notice directed at Superboy, which listed the same

16  Superboy works and elements identified in the 1997 notice (along with a handful of

17  additional Superboy titles that had fallen into the termination window).  SGI 12.

18      The Siegels' 2002 notice contained two crucial falsehoods:  (1) it erroneously

19  stated that Superboy was a copyrightable work "separate and distinct" from

20  Superman—though their 1997 notice acknowledged that Superboy was purely a

21  derivative of Superman, SGI 13; and (2) it falsely recited that Superboy was "solely

22  written and created" by Siegel and sought to recapture 100% of Superboy rights—

23  enabling the Siegels to bring an infringement claim against DC in *Siegel*.  *Id.*

24      While the Shusters believed that Joe Shuster had co-authored Superboy, to

25  induce them to join his fraudulent scheme, Toberoff colluded with Peary to agree

26  that Superboy was created by Siegel alone.  Without receiving any independent

27  legal advice, without conducting any factual investigation, and without consulting

28  with Jean, Peary agreed to disclaim any interest in Superboy, and defendants

<div align="center">21</div>

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

<div align="center">**EXHIBIT 33**

**1414**</div>

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 54 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497674 Filed 09/21/12  Page 27 of 30   Page ID
#:30170

1    amended the 2001 Pacific Pictures Agreement to delete all reference to "Superboy"

2    and redefine the Shusters' putative rights as including only "Superman."  SGI 14.

3        Peary then filed the termination notice, which deceived the Copyright Office,

4    courts, and DC by misrepresenting Shuster's copyright interests, omitting all

5    references to Superboy-specific works and elements, and concealing defendants'

6    plan to falsely position Siegel as the sole creator of Superboy.  SGI 15; *Russ Berrie*,

7    482 F. Supp. at 988 ("failure to advise the Copyright Office of facts" unclean

8    hands); *Huthwaite*, 2006 WL 3065470, at *9 ("misrepresenting the scope of [one's]

9    copyright" unclean hands); *Perform. Unlimited, Inc., v. Questar Publishers, Inc.*, 52

10   F.3d 1373, 1383 (6th Cir. 1995) ("conduct involving fraud, deceit" unclean hands).

11       To complete this fraudulent scheme, in 2004, the Siegels filed a copyright

12   claim against DC in *Siegel* and sought to enjoin the successful *Smallville* television

13   show.  The *Siegel* court rightly rejected this claim, holding that to the extent there

14   was "any original copyrightable material in Siegel's Superboy submissions," such

15   material was part of "<u>a joint work with Shuster's illustrations</u>."  Case No. CV-04-

16   8776 ODW, Docket No. 151 at 62 (underlining added).

17       Toberoff and defendants have blocked full inquiry into their financial deals,

18   including the *quid pro quo* the Shusters received for falsely forfeiting their interest

19   in Superboy.  PD ¶¶ 12-18.  What we do know at present is that defendants' 2008

20   consent agreement, which remains in effect, binds the Siegels and Shusters together

21   by barring either family from making an agreement with DC without the other's

22   consent.  SGI 16.  It is also clear from defendants' selective disclosures about the

23   agreement that it requires the Siegels to pay a portion of their recovery from *Siegel*

24   to the Shusters.  SGI 17.  Defendants' motion carefully asserts the Shusters have no

25   claim to "the Siegels' Superboy termination," Cross-Mot. 22, but *does not deny* the

26   consent agreement entitles them to share in the Siegels' *Superman* recovery.

27       Defendants' efforts to excuse their Superboy frauds all fail:

28       a. Defendants say the Shusters were barred from claiming an interest in

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1415**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 55 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497675 Filed 09/21/12    Page 28 of 30    Page ID
#:30171

1    Superboy by a 1948 ruling by a Westchester County court. *Id.* at 21. Not so. Judge

2    Larson held in *Siegel* the Westchester ruling did *not* establish that Superboy was a

3    sole creation of Siegel. Case No. CV-04-8776 ODW, Docket No. 151 at 5-38. To

4    the contrary, he held that to the extent Superboy was separately copyrightable from

5    Superman—and he left that question open—it was a "joint work" by Siegel and

6    Shuster. *Id.* at 62. Siegel and Shuster told the Copyright Office the same thing in

7    1972 and 1973—some 25 years *after* the Westchester case, and 30 years before

8    Toberoff and Peary engaged in unclean hands by rewriting history. *Supra* at 20.

9        b. Defendants also say the timing limitations of the termination laws barred

10    the Shusters from seeking to recapture Superboy. Again, untrue. Under 17 U.S.C.

11    § 304(c), the Shusters could have served a termination notice seeking to recapture

12    the rights in *More Fun Comics #101*, which was published on November 18, 1944,

13    at any point between November 18, 1990 and November 18, 2003—just as the

14    Siegels did. 17 U.S.C. § 304(c) (allowing termination 56-61 years after work's

15    publication provided notice is served 2-10 years in advance). The Shusters served

16    their notice under § 304(d) on November 10, 2003, eight days before the cut-off.

17        The Shusters also could have attempted to recapture rights in Superboy by

18    claiming the character was purely derivative of Superman—the same approach the

19    Siegels took in their 1997 notice by listing dozens of Superboy-specific works and

20    including a broad "catch-all" footnote identifying "Superboy" as among the

21    universe of Superman elements. SGI 8. The Shusters' notice does not list *any*

22    Superboy-specific works, and its catch-all footnote—which mirrors the Siegels' in

23    many other respects—deliberately omits all reference to Superboy. SGI 15.

24        c. Defendants' attempt to cast their illegal dealings as a legitimate effort to

25    gain a "tactical advantage," which they argue "cannot constitute 'unclean hands,'"

26    Mot. 21-22, is both false and illogical. Why would any party engage in "conduct

27    involving fraud, deceit,… or bad faith," *Questar*, 52 F.3d at 1383, except to gain

28    some perceived advantage? Indeed, courts frequently apply the doctrine of unclean

<div align="center">23</div>

<div align="right">DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.</div>

<div align="center">**EXHIBIT 33**
**1416**</div>

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 56 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 197  Filed 09/21/12    Page 29 of 30    Page ID
#:30172

1  hands based on a party's "strategic choice." *E.g.*, *Walczyk v. Rio*, 496 F.3d 139,

2  146 (2d Cir. 2007) (plaintiff "made the strategic choice" to "initiate[] and direct[]"

3  fraudulent lawsuit); *Connell v. City of N.Y.*, 230 F. Supp. 2d 432, 439 (S.D.N.Y.

4  2002) ("unclean hands comes to mind" where party acted for "strategic reason").[13]

5      *2. Concealment of Pacific Pictures.*  A termination notice can only be filed

6  "by the person or persons who … own and are entitled to exercise a total of more

7  than one-half of [an] author's termination interest," 17 U.S.C. § 304(d)(1), and

8  "must include a clear identification of … the person or persons executing the notice

9  who constitute more than one-half of that author's termination interest." 37 C.F.R.

10  201.10(b)(1)(vii).  Ten days before Peary filed the termination notice, the Shuster

11  Estate purported to transfer *100%* of Shuster's termination interest to the Pacific

12  Pictures Joint Venture.  Defendants withheld this key fact from the Copyright

13  Office and DC.  Docket Nos. 458 at 7-9, 18-20; 468 at 8; Tentative at 16.

14      Defendants concede that the Pacific Pictures agreements are "not lawful" and

15  were "void *ab initio*" under § 304(c)(6)(D) of the Copyright Act, *e.g.*, Docket No.

16  191 at 8, and, on that basis, assert "there were no misrepresentations to the

17  Copyright Office." Cross-Mot. 20.  But as Peary admitted at his depositions, he did

18  not know these agreements were illegal, until *after* he filed his termination notice in

19  2003.  Docket No. 305-37 at 1326:16-1336:11; *see* PD Ex. 3 at 356:2-357:7

20  (Toberoff says not sure when he knew).  In its Tentative, the Court rightly observed

21  that, whether the Pacific Pictures agreements could legally transfer the Shusters'

22

23      [13] Defendants' cases are inapposite and merely conclude that the specific facts in
    those cases did not constitute unclean hands. *Gucci Am, Inc. v. Guess?, Inc.*, 2012
24  WL 2304247, at *34 (S.D.N.Y. June 18, 2012) (decision to delay filing suit was
    motivated by legitimate budgeting decisions rather than bad faith); *Lucky's Detroit,*
25  *LLC v. Double L Inc.*, 2012 WL 219418, at *15 (E.D. Mich. Jan. 25, 2012)
    (privilege objection was insufficient to "arise to unclean hands in this case").
26  Defendants erroneously describe *Sears* as holding that "unclean hands 'cannot [be]
    based on … litigation strategy,'" Mot. 22, when the court denied the unclean-hands
27  claim because plaintiff's misconduct was unrelated to its infringement claim—not
    because it was motivated by strategy, 744 F. Supp. 1297, 1310 (D. Del. 1990).
28

24                                          DC'S OPP. TO DEFS.'
                                            MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1417**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 57 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 497677 Filed 09/21/12    Page 30 of 30    Page ID
#:30173

1  termination interest, "the Court finds problematic Defendants' conduct—especially

2  their failure to inform the copyright office of agreements which they themselves

3  believed would affect ownership of the subject copyrights...." Tentative at 16.

4      Such intentional deception constitutes unclean hands and bars enforcement.

5  In *Russ Berrie*, 482 F. Supp. at 988, a designer copyrighted a toy design, but did not

6  "disclose to the Copyright Office ... pre-existing works on which his designs" were

7  based. The court refused to enforce the copyright, finding the "knowing failure to

8  advise the Copyright Office of facts which might have occasioned a rejection of the

9  application" was reason to deny "enforcement on the ground of unclean hands." *Id.*

10  Likewise, Peary knew full well when he filed the Notice that, *one week earlier*, he

11  had purported to transfer 100% of the Shusters' "termination interest" to the Joint

12  Venture, and if he disclosed this key fact to the Copyright Office, the Notice could

13  be challenged and rejected. 17 U.S.C. § 304(d)(1), 37 C.F.R. 201.10(b)(1)(vii).[14]

14  **IV.    CONCLUSION**

15      This Court should deny defendants' motion, and enter judgment in favor of

16  DC on its First and Third Claims as set forth in the Court's tentative order.[15]

17  Dated: September 21, 2012        Respectfully submitted,

18           By:   /s/  Daniel M. Petrocelli

19             Daniel M. Petrocelli

[14] That defendants "produced the PPC agreements" years later, Cross-Mot. 20—rather than suppressing them, as they have many other harmful documents, Docket No. 477-2 at 119-45—does not absolve defendants of liability. Defendants never withdrew the false statements in their Notice or filed a corrected one.

[15] Defendants' request for judgment under FED. R. CIV. P. 54(b), Cross-Mot. 25, is premature. It will be ripe once these motions are resolved. DC disputes the claim that its Fourth through Sixth Claims are "stayed" pending defendants' SLAPP appeal. *Id.* A central question presented in the appeal is whether the Ninth Circuit has jurisdiction to hear it. Appeal No. 11-56934, Docket No. 37-1 at 26-27; *and compare Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, No. SACV 05-1083, Docket No. 54 (Oct. 13, 2006) (no stay), *with Makaeff v. Trump Univ., LLC*, 2011 WL 613571, at *2 (S.D. Cal. Feb. 11, 2011) (stay).

25       DC'S OPP. TO DEFS.' MOT. FOR PARTIAL SUMM. J.

**EXHIBIT 33**
**1418**

# EXHIBIT 34

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 59 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 30079 Filed 10/17/12    Page 1 of 18    Page ID
#:35084

1                                                                                    O

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    CENTRAL DISTRICT OF CALIFORNIA

8                         WESTERN DIVISION

9

10   DC COMICS,                        )    CASE NO. CV 10-3633 ODW (RZx)
                                       )
11              Plaintiff,             )
                                       )    ORDER  GRANTING  PLAINTIFF'S
12   vs.                               )    MOTION  FOR  PARTIAL  SUMMARY
                                       )    JUDGMENT      [458]   AND   DENYING
13   PACIFIC PICTURES CORP., *et al.*  )    DEFENDANTS' CROSS-MOTION [478]
                                       )
14              Defendants.            )
                                       )
15   ─────────────────────────────────

16

17   **I.    INTRODUCTION**

18          DC Comics ("DC" or "Plaintiff") filed this action in May 2010 to secure its claimed

19   interest in the Superman copyrights after certain heirs of Joseph Shuster, the first illustrator

20   of Superman, served DC with a copyright termination notice purporting to recapture certain

21   early Superman works as of October 26, 2013.

22          DC now moves for partial summary judgment as to the First and Third Claims.

23   DC's First Claim contests the validity of the termination notice at issue here, and its Third

24   Claim, pled in the alternative, challenges the web of agreements that Marc Toberoff and

25   his entertainment companies and business partners engineered in alleged violation of DC's

26   rights under the Copyright Act.  (Mot. at 1 ("There is a pressing need to resolve these

27   claims now, given the imminence of the 2013 termination date.").)

28   / / /

**EXHIBIT 34**
**1419**

## II.    FACTS

Semantic quibbles aside, the following facts are undisputed.  On March 1, 1938, Jerome Siegel and Joseph Shuster assigned to DC the "exclusive right to the use of the [Superman] characters and story." (UF 3.)  "Action Comics #1 ('AC#1'), published on April 18, 1938, with a cover date of June 1938, featured an adapted version of Siegel and Shuster's Superman story." (UF 4.) Defendants purport to, but do not actually dispute this fact by arguing "AC #1 did not feature an 'adapted version of Siegel and Shuster's Superman story.'  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format." (Id.) All the same, after AC#1 was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  (UF 5.)

By 1941, the Saturday Evening Post reported that Siegel and Shuster stood to make over $2 million (in today's dollars) in the next year alone.  (UF 6 ("All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.").)  In 1947, Siegel and Shuster sued DC in New York to invalidate the 1938 assignment.  The court found that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster acknowledged that the 1938 assignment granted DC all rights in Superman.  (UF 7.)

In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  Siegel and Shuster acknowledged that DC owned all Superman-related copyrights.  (UF 8.) Defendants argue DC does not disclose its financial assumptions for its calculation (though provided earlier), contending instead that the 1975 agreement called for "monthly payments of $20,000 . . . and a lump sum payment of $17,500." (Id.)

///

2

**EXHIBIT 34**
**1420**

Case 2:04-cv-08400-ODW-RZ     Document 720-8     Filed 04/04/13     Page 61 of 95     Page
Case 2:10-cv-03633-ODW-RZ   Document 507-81 Filed 10/17/12   Page 3 of 18   Page ID
#:35086

1      DC has voluntarily increased the annual payments; made periodic cost-of-living

2   adjustments; given special bonuses; and paid to have Siegel, Shuster, and their families

3   travel to Superman-related events. (UF 9.)  All told, the Siegels and Shusters have been

4   paid over $4 million under the 1975 agreement, not including medical benefits or bonuses.

5   (UF 10.)  Shuster passed away on July 30, 1992.  (UF 12.)

6      Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole

7   beneficiary and executrix of his estate.  (UF 13.)  Defendants dispute this, arguing the

8   statement "omits that Shuster's will named Mark Warren Peary, Jean's son, as beneficiary

9   in the event Jean predeceased him and omits that the will states: 'In the event that my sister

10  is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint

11  Mark Warren Peary to act as executor.'" (Opp'n UF.)  On August 17, 1992, Jean filed an

12  affidavit in California state court identifying herself as Shuster's "successor" and sole heir

13  and requesting that certain property "be paid, delivered or transferred to her."  (UF 14.)

14     Four days after filing her affidavit in state court, Jean wrote to DC, identifying

15  herself as "heir to [Joeseph Shuster's] Will" and asking DC to pay Shuster's "final debts

16  and expenses." (UF 15.)  Defendants attempt, but again fail to dispute this fact by pointing

17  out that Jean actually stated " [a]ny help that Time Warner could give to the family of Joe

18  Shuster to pay his final debts and expenses would be warmly appreciated."  (Opp'n UF.)

19  DC offered to cover Joe's debts and increase survivor payments to his brother Frank from

20  $5,000 to $25,000 per year.  (UF 16; Petrocelli Decl. Exh. 24.)

21     On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President,

22  Paul Levitz, stating he was "extremely pleased" with the increased payments and asking,

23  after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean,

24  who would "send [Frank] whatever money [he] wanted as a gift which would not be

25  taxable to [him]."  Frank asked if he and Jean could meet with Levitz in New York to

26  discuss the issue. (UF 17.)  Defendants' sole objection to this fact is that it misleadingly

27  fails to include subsequent correspondence.  (Opp'n UF.)

28  / / /

3

**EXHIBIT 34**
**1421**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 62 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-2    Filed 10/17/12    Page 4 of 18    Page ID
#:35087

1    Paul Levitz dealt with many authors and heirs during his decades as president of DC.

2    When DC agreed to grant an author or heir's request for additional money, Levitz would

3    give them this admonition: "this agreement would represent the author/heir's last and final

4    deal with DC, and would fully resolve any past, present, or future claims against DC."

5    Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they

6    understood and agreed. (UF 18.) The parties executed an agreement on October 2, 1992

7    under which DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of

8    her life. In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed

9    never to assert a claim to such rights. (UF 19; Petrocelli Decl. Exh. 24.)

10    Over the next decade, DC maintained good relations with the Shusters, and Jean and

11    Paul Levitz corresponded regularly. In the close-to-60 letters back and forth between Paul

12    and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested

13    bonus payments in excess of those required. (UF 20.) Defendants contend that, over this

14    decade, Jean expressed displeasure at the amount and form of her payments and requested

15    changes. (Opp'n UF.) In a 1993 letter, Jean confirmed she would "stick to our bargain"

16    and not attempt "to reclaim the Superman copyright," but asked for an increase in

17    payments "plus a yearly increment to account for inflation." (UF 21.) Defendants contend

18    "Jean stated that at the present time 'Frank and I are not planning to reclaim the Superman

19    copyright.' [And]: 'We believe we have a right to expect that you will be fair with us as

20    well and will grant our request for increased payment. We will stick to our bargain which

21    we signed, dated as of October 1, 1992'" (Opp'n UF.)

22    In 1999, Congress amended the copyright statute to grant additional statutory heirs

23    termination rights under 17 U.S.C. § 304(d). Upon learning that Jerry Siegel's heirs had

24    served a copyright termination notice on DC, Jean reiterated her commitment "to honor"

25    the 1992 Agreement, and again asked for a bonus:

26    I have learned from the Internet that Joanne Siegel has filed a copyright claim for
Superman. I want you to know that I intend to continue to honor our pension

27    agreement. I would, however, appreciate a generous bonus for this year as you had
done many times in the past.

28    (UF 22.)

4

**EXHIBIT 34**
**1422**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 63 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-3 Filed 10/17/12   Page 5 of 18   Page ID
#:35088

1    In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional

2    bonuses to Jean, ranging from $10,000 to $25,000. (UF 23.) In one instance when Jean

3    asked for a bonus, DC made clear its position that Jean had no legal right to make such

4    requests, but would pay her a bonus anyway, for which she thanked DC. (UF 24.) Jean's

5    50-year-old son, Mark Warren Peary (born Peavy) testified that Jean was of sound mind

6    when she sent these letters to DC. (UF 26.) Mark Peary, Jean's doctor, and Jean's

7    daughter all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has

8    aphasia, and has difficulty communicating and "understand[ing] what people are saying."

9    (UF 27.) On November 7, 2003, Mark Warren Peary (as substitute executor of the Shuster

10    estate) served on DC a notice of termination of the prior grants of Shuster's Superman

11    copyrights. (*See* Petrocelli Decl. Exh. 37.) Other facts shall be discussed as necessary.

12    **III.    DISCUSSION**

13    As to its First Claim, DC seeks a declaration that the "Shuster Termination Notice

14    [is] invalid." (First Amended Complaint "FAC", Docket No. 49 ¶¶ 106–34. DC argues

15    it is entitled to summary judgment on three grounds: (1) "The 1992 Agreement Bars the

16    Shusters from Pursuing Termination[;]" (2) "The Shusters Lack the Majority Interest

17    Necessary to Terminate" because they assigned 50% of their putative rights to Pacific

18    Pictures; and (3) "There Is No Statutory Basis for the Shusters to Terminate, given that Joe

19    Shuster had no statutory heir under the Copyright Act when he died." (Mot. at 9.) "DC's

20    Third Claim, pled in the alternative, alleges that the Pacific Pictures Agreements and 2008

21    consent agreement improperly restrict the Shuster heirs' ability to enter into agreements

22    with DC, in violation of § 304(c)(6)(D) of the Copyright Act." (Id.)

23    *1992 Agreement*

24    The Copyright Act provides a termination right for the prior grant of a copyright

25    transfer or license *only if* the grant was made *prior* to January 1, 1978. 17 U.S.C. § 304(d).

26    Our inquiry begins, then, with whether the 1992 Agreement superseded "Joseph Shuster's

27    key 1938 Grant and subsequent Superman grants[,]" as Defendants put it. (Opp'n at 12.)

28

5

**EXHIBIT 34**
**1423**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 64 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 508 Filed 10/17/12    Page 6 of 18    Page ID
#:35089

1         DC argues the 1992 agreement between DC and Jean Shuster Peavy and Frank

2 Shuster – Joseph's siblings – bars the Shusters from exercising their statutory termination

3 rights. (Mot. at 10.)  That agreement provides, in pertinent part:

4         We [DC] ask you to confirm by your signatures below that this agreement *fully
        settles all claims* to any payments *or* other rights *or* remedies which you may have

5         under *any other agreement or otherwise*, whether now *or* hereafter existing
        *regarding any copyrights*, trademarks, or other property right in any and all work

6         created in whole or in part by your brother, Joseph Shuster, or any works based
        thereon. *In any event*, you now grant to us any such rights and release us, our

7         licensees and all others acting with our permission, and covenant not to assert any
        claim of right, by suit or otherwise, with respect to the above, now and forever.

8 (SUF 19; Petrocelli Decl. Exh. 24 (emphasis added).)

9         As Defendants argued earlier in this litigation, New York law governs the 1992

10 Agreement.   (*See* Docket No. 191 at 4 n.6 (applying choice of law principles and

11 concluding "New York law clearly applies"); Docket No. 333 at 21; *see also* Reply at 2

12 (Defendants agree, "'whether [an] Agreement terminated and superseded [another],' is

13 determined by governing state law – in this case, as in *Steinbeck*, 'New York law'"

14 (quoting *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2nd Cir. 2008))).)

15         Under New York law, "parties to an agreement can mutually agree to terminate it

16 by expressly assenting to its rescission while simultaneously entering into a new agreement

17 dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (quoting *Jones v. Trice*,

18 608 N.Y.S.2d 688, 688 (N.Y. App. Div. 1994); *see also Northville Indus. Corp. v. Fort*

19 *Neck Oil Term. Corp.*, 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 1984) ("[W]here [ ] parties

20 have clearly expressed . . . their intention that a subsequent agreement supersede or

21 substitute for an old agreement, the subsequent agreement extinguishes the old one and the

22 remedy for any breach thereof is to sue on the superseding agreement.").    The pertinent

23 inquiry is thus "whether the subsequent agreement, . . . in whatever form it may be, is[, as]

24 a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old

25 agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 171 N.Y.S.2d 194, 199 (N.Y. App.

26 Div. 1958) (emphasis added).

27         Defendants argue "the language of the 1992 Agreement clearly demonstrates that it

28 was not a revocation or re-grant of Joe Shuster's prior Superman copyright grants and ends

**EXHIBIT 34**
**1424**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 65 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507685Filed 10/17/12    Page 7 of 18    Page ID
#:35090

1   the analysis." (Opp'n at 15.)  The Court does not share Defendants' view of clarity.  With

2   a broad release and all-encompassing language, it would here appear that the 1992

3   Agreement does indeed aim to supersede all prior agreements between the parties.  (*See*

4   SUF 19 ("[T]his agreement *fully settles all claims* to *any payments or other rights or*

5   *remedies* which you *may have* under *any other agreement or otherwise, whether now or*

6   *hereafter existing* regarding *any copyrights . . . in any and all work* created *in whole or in*

7   *part by your brother, Joseph Shuster*." (emphasis added)).)   Just as it says, the 1992

8   Agreement "fully settles" all obligations under any and all agreements.

9         As Defendants themselves acknowledge, "[w]here, as here, a contract's terms are

10  unambiguous, the 'intent of the parties must be determined from their final writing and no

11  parol evidence or extrinsic evidence is admissible.'"  (Opp'n at 15 (quoting *Int'l Klafter*

12  *Co., Inc. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989)));  *see also Duane Reade, Inc.*

13  *v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005) ("Whether a contract

14  is ambiguous is a threshold question of law . . . [for] the court.").

15        Like Defendants, the Court finds no ambiguity in the parties' agreement.  Unlike

16  Defendants, however, the Court finds that the 1992 Agreement does in fact settle all prior

17  agreements.  As Black's Law Dictionary confirms, "full settlement" is "a settlement and

18  release of all pending claims between the parties."  Black's Law Dictionary 1497 (9th ed.

19  2009).  The 1992 Agreement extends such release to "all claims to any payments or other

20  rights or remedies which [the Shusters] may have under any other agreement or otherwise,

21  whether now or hereafter existing regarding any copyrights . . . ."  (SUF 19.)  Accordingly,

22  the 1992 Agreement not only settled and released all "claims . . . rights [and] remedies"

23  concerning the Shuster copyrights under all prior agreements, but it also extended the

24  release to such rights and remedies as might exist "otherwise."  (Id.)

25        Immediately after so settling all rights, the 1992 Agreement expressly and

26  unambiguously provides: "In any event, you [Shuster's heir] now grant to us any *such*

27  *rights* and release us, our licensees and all others acting with our permission, and covenant

28  not to assert any claim of right, by suit or otherwise, *with respect to the above*, now and

7

**EXHIBIT 34**
**1425**

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 66 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 30786   Filed 10/17/12   Page 8 of 18   Page ID
#:35091

1    forever." (SUF 19; Petrocelli Decl., Exh. 24 (emphasis added).)

2         Plainly, this subsequent grant deals with the same subject matter settled immediately

3    above (DC's copyright interests).   In other words, the 1992 Agreement first settled all

4    claims, and then granted DC "such rights" as were just settled, essentially revoking and re-

5    granting all copyright agreements and interest.  As New York law recognizes, "parties to

6    an agreement can mutually agree to terminate it by expressly assenting to its rescission

7    while simultaneously entering into a new agreement dealing with the same subject matter."

8    *Steinbeck*, 537 F.3d at 200 (citation omitted); *see also Milne v. Stephen Slesinger, Inc.*, 430

9    F.3d 1036, 1046 (9th Cir. 2005) (1983 agreement superseding pre-1978 grant "is not

10   subject to termination under section 304(d) because it was not 'executed before January 1,

11   1978,' as the statute expressly requires").

12        *Milne* involved the rights to Winnie the Pooh.  In 1930, Pooh's author, A.A. Milne,

13   granted his copyright interest in Winnie the Pooh to SSI in exchange for a share of future

14   royalties. 430 F.3d at 1040. In 1983, A.A.'s son, Christopher, re-granted those same rights

15   to SSI and agreed not to pursue termination in exchange for increased royalties.

16   Subsequently, Christopher's daughter Clare attempted to terminate A.A.'s 1930 grant to

17   SSI.  The Ninth Circuit held that her father's 1983 contract revoked all pre-1978 grants

18   which might otherwise have been terminable.  *Id.*  As Defendants note, "[i]n lieu of

19   statutory termination, Christopher agreed to the contractual 'revocation of the [1930]

20   agreement[] in favor of the new agreement, followed by the re-granting (on the same page)

21   of the rights in the Pooh works to SSI.'"  (Opp'n at 9 ("*Milne* held there was no longer a

22   1930 grant to terminate, because the 1983 contract had expressly *revoked* it and expressly

23   *re-granted* the copyrights to SSI." (citation omitted)).)

24        Relying in part on *Milne*, *Steinbeck* reached a similar conclusion.  In 1938, John

25   Steinbeck granted the copyrights in his most popular works to his publisher.  After John's

26   death, his termination interest passed by statute to his widow Elaine and his children.

27   *Steinbeck*, 537 F.3d at 196, 203.  Though Elaine did not hold the majority share of John's

28   termination interest in 1994 necessary to terminate, as successor by will to John's

8

**EXHIBIT 34**
**1426**

1    copyrights, she entered into an agreement with the publisher superseding the 1938

2    agreement in exchange for increased royalties and other benefits.    John's children

3    subsequently served a notice to terminate the 1938 grant, arguing Elaine's 1994 agreement

4    was an "agreement to the contrary" because it had the effect of depriving them of their

5    termination rights.  Finding against the children, the Second Circuit found it improper to

6    read the prohibition on "'agreement[s] to the contrary' so broadly that it would include any

7    agreement that has the effect of eliminating a termination right." *Id.* at 202 (noting heirs

8    can "threaten (or . . . make good on a threat) to exercise termination rights and extract more

9    favorable terms from early grants of an author's copyright," but they do not have "more

10   than one opportunity, between them, to use termination rights to enhance their bargaining

11   power or to exercise them.").

12          Pointing in opposition to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir.

13   2008), Defendants argue the "Ninth Circuit emphasized that Mewborn's 1978 agreement,

14   unlike [that] in *Milne*, did not '*expressly* revoke the earlier … assignments.'"  (Opp'n at

15   11 (quoting *Mewborn*, 532 F3d at 989).)   In *Mewborn*, the Ninth Circuit upheld a

16   termination notice regarding the novel "Lassie Come Home."   In 1976, the author's

17   daughter, Mewborn, assigned her share of Lassie rights to the publisher. *Id.* at 980.  In

18   1978, she signed a second contract, which purported to assign additional copyrights. *Id.*

19   at 981.  In 1996, Mewborn served a termination notice of her 1976 grant.  The publisher

20   sued, claiming the 1978 grant "superseded" the 1976 grant and cannot be terminated.

21   Finding *Milne* inapplicable, the Ninth Circuit upheld the termination and rejected the

22   publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant." *Id.* at

23   989.

24          Contrary to Defendants' assertion, however, the Ninth Circuit did not rest its

25   decision on the lack of an express revocation of earlier agreements.  *See id.* at 989

26   ("Because we conclude that the 1978 Assignment did not expressly *or impliedly* transfer

27   Mewborn's termination right as to the 1976 Assignment . . . , the district court improperly

28   concluded that the 1978 Assignment included a grant of Mewborn's termination right."

9

**EXHIBIT 34**
**1427**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 68 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507 Filed 10/17/12    Page 10 of 18    Page ID
#:35093

1   (emphasis added)).  Rather than revoke and supersede prior agreements, the Ninth Circuit

2   found that the "1978 Assignment simply assigned to Classic's predecessor-in-interest the

3   additional enumerated rights that Mewborn had not assigned in 1976." *Id.*

4       Such is not the case here.  The broad and all-encompassing language of the 1992

5   Agreement unmistakably operates to supersede all prior grants. (*See* Petrocelli Decl. Exh.

6   24.)  Unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to"

7   those transferred in pre-1978 grants, the 1992 Agreement deals squarely with the same

8   subject matter as the parties' earlier agreements, settling and  displacing "all claims . . . .

9   under any agreement" "or otherwise" related to "any and all" works "created in whole or

10  in part by . . . Joseph Shuster." (UF 19.)  Unlike the heirs in *Mewborn*, moreover, Jean and

11  Frank were aware of the Copyright Act's termination rights when they bargained for and

12  entered into the 1992 Agreement. (*See* UF 17, 21, 22.)  As DC points out, "the fact that

13  Jean and Frank were able to obtain hundreds of thousands of dollars in benefits . . . shows

14  that *Mewborn*'s concerns about [the heirs'] ignorance are inapt here." (Mot. at 17.)

15      Defendants insist "the [1992] agreement does not even mention Superman or Joseph

16  Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.)  Surely

17  Defendants recognize that "any and all work created in whole or in part by . . . Joseph

18  Shuster" necessarily includes his most famous creation, Superman. And, just as clear, once

19  a party seeks to supersede all prior agreements, that party need not specifically list every

20  superseded agreement, lest that party forget one such agreement and thus leave open the

21  door for subsequent disputes.  Indeed, Defendants' own expansive language that the 1992

22  Agreement does not mention "Joseph Shuster's key 1938 Grant *and subsequent Superman*

23  *grants*" counsels in favor of all-encompassing language.

24      It bears noting here that, as one New York court put it, "while the question of

25  whether a substituted agreement effects a discharge of a prior agreement constitutes a

26  triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact

27  does not arise when the opponent offers no evidence as to the parties' intent in making the

28  agreement." *Callanan Indus., Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712

10

**EXHIBIT 34**
**1428**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 69 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507685    Filed 10/17/12    Page 11 of 18    Page ID
#:35094

1    (N.Y. App. Div. 1986) (citations omitted).

2        As in *Callanan*, although Defendants have alleged in conclusory terms that they did

3    not intend for the 1992 Agreement to discharge and supersede all prior copyright grants,

4    they have offered no evidence in support of that conclusion.  Nor, indeed, have Defendants

5    even controverted the facts alleged in Plaintiff's moving papers with anything other than

6    "patently insufficient" general denials.  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

7    323–24 (1986) (explicating the parties' relative burdens on summary judgment).

8        To the extent Defendants argue "the 1992 Agreement by Frank and Jean cannot bar

9    the Shuster Executor's exercise of his termination rights" (Opp'n at 8), they are wrong.

10    As noted in *Steinbeck*, "nothing in the statute suggests that an author or an author's

11    statutory heirs are entitled to more than one opportunity, between them, to use termination

12    rights to enhance their bargaining power or to exercise them."  537 F.3d at 204.

13        Jean Peavy, Joseph Shuster's sister and sole heir, entered into the 1992 Agreement

14    (along with Frank) which renegotiated the terms of the parties' prior agreements to her and

15    Frank's benefit.  By taking advantage of this opportunity, she exhausted the single

16    opportunity provided by statute to the Shuster heirs to revisit the terms of Shuster's original

17    grants of his copyrights.  As in *Milne*, Defendants "present[] no authority suggesting that

18    Congress designed the statutory termination provisions to prevent parties from agreeing to

19    a simultaneous revocation and new grant of rights."  *Milne*, 430 F.3d at 1046–47

20    ("Certainly with regard to [*Milne*], [the heir's] concerns are unfounded.  The 1983

21    agreement came about some seven years after the copyright owner felt empowered to

22    exercise his right of termination under the 1976 Copyright Act, and after he was able to

23    assess the works' value over the course of more than five decades.").

24        Similarly here, the 1992 Agreement came about several years "after the copyright

25    owner felt empowered to exercise his right of termination under the 1976 Copyright

26    Act . . . ."  *Id.*  Joseph Shuster, who himself passed away in 1992, never terminated his

27    prior grants of the Superman copyrights to DC.  And, by entering into the 1992 Agreement

28    —which increased Frank and Jean's payments—the heirs essentially struck a deal that binds

11

**EXHIBIT 34**
**1429**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 70 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-9 Filed 10/17/12    Page 12 of 18    Page ID
#:35095

1    all other heirs.    *See Steinbeck*, 537 F.3d at 202. ("Once the termination right is

2    extinguished, it is extinguished with respect to all parties holding a termination interest,

3    whether or not they agreed to its exercise.").[1]

4        Defendants next argue that an author or his estate may exercise termination rights

5    "notwithstanding any agreement to the contrary . . . . 17 U.S.C. § 304(c)(5)." (Opp'n at

6    8 ("Thus, any agreement that purports to waive, settle or limit the termination right is

7    unenforceable.").)  Such argument was previously considered and rejected in *Steinbeck*:

8        We do not read the phrase 'agreement to the contrary' so broadly that it would
         include any agreement that has the effect of eliminating a termination right.
9        To do so would negate the effect of other provisions of the Copyright Act that
         explicitly contemplate the loss of termination rights. . . . Moreover,
10       the 1994 Agreement did not divest the Steinbeck Descendants of any
         termination right under section 304(d) when the parties entered into that
11       agreement.  In 1994, only 17 U.S.C. § 304(c) provided a termination
         right-section 304(d) would not become effective for another four years.  It is
12       undisputed that the Steinbeck Descendants could not have exercised their
         termination rights in 1994 because they lacked more than one-half of the
13       author's termination interest.  As of 1994, then, the agreement . . . did not
         deprive the Steinbeck Descendants of any rights they could have realized at
14       that time.  None of the parties could have contemplated that Congress would
         create a second termination right four years later.  Had Elaine Steinbeck not
15       entered into the 1994 Agreement, the section 304(c) termination right would
         have expired, and Penguin would have been bound only by the 1938
16       Agreement for the duration of the copyright terms absent (as ultimately
         happened) Congressional action. *We cannot see how the 1994 Agreement*
17       *could be an 'agreement to the contrary' solely because it had the effect of*
         *eliminating termination rights that did not yet exist.*
18

19   *Steinbeck*, 537 F.3d at 202–03 (emphasis added).

20        The same holds true here.  In 1992, when Joseph Shuster passed away and his heirs

21   entered into the 1992 Agreement, "neither the parties to the 1992 Agreement, nor anybody

22   else, held a termination right . . . ." (Opp'n at 16.)  As of 1992, then, "the agreement

23   entered into by [Jean and Frank] did not deprive the [Shuster heirs] of any rights they could

24   have realized at that time." *Steinbeck*, 537 F.3d at 203.  Nor, of course, could the parties

25

26

27   [1] To the extent Defendants believe Jean and Frank struck a bad deal, "merely increas[ing] their pension
     from $5,000 to $25,000," it is not this Court's place to renegotiate the parties' contracts, notwithstanding
28   Defendants' objection that "this small sum bears no relation to the value of Superman." (Opp'n at 17.)

**EXHIBIT 34**
**1430**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 71 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-69    Filed 10/17/12    Page 13 of 18    Page ID
#:35096

1    have contemplated that Congress would create a second termination right six years later.

2    In short, this Court agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not "an

3    'agreement to the contrary' solely because it had the effect of eliminating termination rights

4    that did not yet exist." *Id.*

5         Defendants contend "DC's motion is defective [because] it fails to address most of

6    Defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's

7    favor, while permitting summary judgment against DC on its erroneous legal theories."

8    (Opp'n at 2.)  The Court disagrees.  It is not Plaintiff's duty to disprove Defendants'

9    affirmative defenses, but rather, it is Defendants who bear the burden of proving the

10   applicability of their affirmative defenses. *See, e.g.*, *Clark v. Capital Credit & Collection*

11   *Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a defendant bears the burden of

12   proof at summary judgment with respect to affirmative defenses); *c.f. Digital Control Inc.*

13   *v. McLaughlin Mfg. Co., Inc.*, 248 F. Supp. 2d 1019, 1023–24 (W.D. Wash. 2003) ("Since

14   the affirmative defense of obviousness is Defendant's burden, by failing to challenge the

15   issue on summary judgment, Defendant fails to raise a genuine issue of material fact.").

16        In sum, the Court finds that the 1992 Agreement, which represented the Shuster

17   heirs' opportunity to renegotiate the prior grants of Joe Shuster's copyrights, superseded

18   and replaced all prior grants of the Superman copyrights.  The 1992 Agreement thus

19   represents the parties' operative agreement and, as a post-1978 grant, it is not subject to

20   termination under 17 U.S.C. § 304(d).

21        ***Majority Interest***

22        Section 304(d) of the Copyright Act provides that a termination notice must be

23   served "by the person or persons who . . . own and are entitled to exercise a total of more

24   than one-half of [an] author's termination interest" and "shall be signed by the [requisite]

25   number and proportion of the owners."  (Mot. at 18 (quoting 17 U.S.C. §§ 304(d)(1),

26   (c)(1)–(4))); *see also Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not

27   have exercised their termination rights" if "they lacked more than one-half of the author's

28   termination interest" at the time their notice was served).

13

**EXHIBIT 34**
**1431**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 72 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-2  Filed 10/17/12    Page 14 of 18    Page ID
#:35097

1    DC contends "[a]ccording to the Shuster heirs' written contracts and deposition

2    admissions, the Estate owned 0% of Shuster's putative termination interest when the Estate

3    served the [Termination] Notice." (Mot. at 18.)  In 2001, after all, the Shusters had

4    "transfer[red] and assign[ed] . . . all current and future rights, claims, title, copyrights and

5    interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture with Marc

6    Toberoff. (UF 31.) In 2003, the Estate "confirm[ed]" these rights included any "copyright

7    termination interest in 'Superman' pursuant to Section 304(d) of the U.S. Copyright Law."

8    (UF 32.) Mark Warren Peary even admitted under oath that he understood when he signed

9    the agreement "that all of [ ] Joe Shuster rights, termination rights, to the extent they

10   existed, were being transferred and assigned to the venture just as it says." (UF 33.)

11   Defendants contend "copyrights recaptured pursuant to a termination notice cannot

12   be anticipatorily transferred to anyone prior to the service of a termination notice, and can

13   be transferred only to the grantee [i.e., DC] or its successor before 'the effective date of the

14   termination' – here, October 26, 2013." (Opp'n at 18 (quoting 17 U.S.C. § 304(c)(6)(D)).)

15   Thus, argue Defendants, "as a pure matter of law, the 2001/2003 [Pacific Pictures

16   Corporation] PPC Agreements – pre-dating both the effective date and the service of the

17   Shuster Executor's termination notice – could not and did not transfer the prospective

18   copyrights to be recovered by the Shuster Termination." (Opp'n at 18.)

19   DC argues Defendants must be held accountable for entering into these agreements,

20   notwithstanding their illegality.  (Reply at 8 ("This illegality defense fails for two

21   reasons.").) First, although defendants say the Pacific Pictures contracts "did not transfer

22   the prospective copyrights to be recovered by the Shuster Termination," Peary testified

23   under oath, and without any objection, that the 2001 contract "transferr[ed] and assign[ed]

24   to the venture" "all of the Joe Shuster rights, termination rights, to the extent they existed . .

25   . ." (Reply at 8 (citations omitted).) "The 2003 agreement reaffirmed the 2001 Agreement

26   [and] [t]hese admissions and facts are fatal to defendants' defense." (Id.)

27   While the Court finds problematic Defendants' conduct – especially their failure to

28   inform the copyright office of agreements which they themselves believed would affect

14

**EXHIBIT 34**
**1432**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 73 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-3    Filed 10/17/12    Page 15 of 18    Page ID
#:35098

1   ownership of the subject copyrights – these agreements do not alter the fact that the "right

2   to serve the Shuster Termination could not have been transferred to PPC." (Opp'n at 18

3   ("No contract with PPC could create a new statutory class eligible or required to sign a

4   termination notice.  Only the signature of Mr. Peary, the Shuster Executor, was required

5   and allowed by statute.  17 U.S.C. § 304(c)(4).").)  Thus, although Defendants may have

6   believed that their contracts transferred the Shuster heirs' termination rights, those

7   agreements did not and, indeed, could not have done so.

8        Second, DC argues Defendants fail "to address the public-policy rule that they may

9   not assert the illegality of their own contracts as a defense."  (Reply at 8 ("Like a swindler

10   who induces a minor to sign a contract, [D]efendants cannot claim their contracts are illegal

11   to avoid liabilities they create.").)  While that may be so, the Court does not believe that

12   estoppel is applicable here.  In fact, were the Court to hold Defendants to their contracts

13   (and find they lacked the majority interest necessary to terminate), it would essentially

14   rewrite copyright law, allowing parties to traffic in future rights.  *See Milne*, 430 F.3d at

15   1047 (law "prohibit[s] a new grant of rights terminated by statute until after the effective

16   date of termination – to avoid trafficking in future interests" by third parties).  The Court

17   thus finds the agreements did not transfer ownership of the subject copyrights, and that

18   Defendants retained the requisite majority share.

19       ***Statutory Right to Terminate***

20        The 1998 Copyright Term Extension Act allows an "author's executor" to terminate

21   when the "[t]ermination rights provided for in subsection (c) have expired on or before the

22   effective date of the [CTEA]" – October 27, 1998 – and the author "has not previously

23   exercised such termination right." (Mot. at 21 (quoting 17 U.S.C. § 304(d)) ("The Shuster

24   Estate – formed by Peary, as its executor, in 2003 – relies on this provision to terminate,

25   but § 304(d) has no application here.").)  DC argues "[b]y its plain language, § 304(d)

26   applies only where the window for exercising a termination right under the 1976 Copyright

27   Act opened and closed – i.e., 'expired' – and an author or statutory heir failed to terminate

28   during that window.  It does not apply where [as here] an author died while the window

**EXHIBIT 34**
**1433**

Case 2:04-cv-08400-ODW-RZ   Document 720-8   Filed 04/04/13   Page 74 of 95   Page
Case 2:10-cv-03633-ODW-RZ   Document 507-9   Filed 10/17/12   Page 16 of 18   Page ID
#:35099
#:50769

1   was open without terminating, without leaving a statutory heir, and when his sole heir,

2   Jean, fully resolved his estate in 1992." (Id. at 22.)

3        Given the Court's finding that the 1992 Agreement bars termination, as well as the

4   perfunctory briefing of the issue, the Court will not explore the matter at this time.

5       ***Third Claim***

6        DC argues it is entitled to summary judgment on its Third Claim, contending

7   "Defendants' consent agreements violate section 304(c)(6)(D) of the Copyright Act by (i)

8   purporting to assign the Shusters' copyright interests to Pacific Pictures before the effective

9   termination date in 2013, and (ii) barring the Shusters from making any deal with DC

10  without Toberoff's and the Siegels' consent." (Reply at 10.)

11    Section 304(c)(6)(D) provides:

12  > A further grant, or agreement to make a further grant, of any right covered by
13  > a terminated grant is valid only if it is made after the effective date of the
14  > termination. As an exception, however, an agreement for such a further grant
    > may be made between the author or [his heirs] and the original grantee or [its
    > successor], after the notice of termination has been served . . . .

15  17 U.S.C. § 304(c)(6)(D).

16       As such, between November 10, 2003 (when the Notice was served) and October 26,

17  2013 (its effective date), DC was and is the only party that may enter into an agreement

18  with the Shuster heirs regarding the Superman rights sought to be recaptured. (Mot. at 23

19  ("Section 304(c)(6)(D) not only bars third parties like Toberoff from 'trafficking in future

20  [copyright] interests,' *Milne*, 430 F.3d at 1047, it protects original grantees who, like DC,

21  spent decades developing and promoting the copyrighted property.")). As DC points out,

22  "Congress described this right in the original grantee's favor as 'in the nature of a right of

23  'first refusal.'" (Mot. at 23 (quoting H.R. REP. NO. 94-1476 at 127).) In *Milne*, the Ninth

24  Circuit reviewed the statutory text and legislative history, and confirmed that Section

25  304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin

26  to a "right of 'first refusal.'" 430 F.3d at 1047.

27  / / /

28

<center>16</center>

<center>**EXHIBIT 34**
**1434**</center>

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 75 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507-95    Filed 10/17/12   Page 17 of 18   Page ID
#:35100

1    Defendants concede that "copyrights recaptured pursuant to a termination notice

2    cannot be anticipatorily transferred to anyone prior to the service of the termination notice,

3    and can be transferred only to the grantee or its successor before 'the effective date of the

4    termination' – here, October 26, 2013." (Opp'n at 18 (quoting 17 U.S.C. §304(c)(6)(D)).)

5        The Court further agrees with Defendants that, "as a pure matter of law, the

6    2001/2003 PPC Agreements – pre-dating both the effective date and the service of the

7    Shuster Executor's termination notice – *could not* and did not transfer the prospective

8    copyrights to be recovered by the Shuster Termination." (Opp'n at 18 (emphasis added).)

9    Such is the declaration DC seeks by this, its Third Claim.[2]

10       Defendants do not dispute that they entered into multiple agreements purporting to

11   grant and otherwise encumber rights covered by a (to be) terminated grant; indeed, they

12   agree that those agreements are void insofar as they aim to transfer the subject copyrights.

13   (*See* Opp'n at 18.)  Those agreements run afoul of 17 U.S.C. § 304(c)(6)(D) as well and,

14   accordingly, are hereby deemed invalid.

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23

_____

24   [2] The Court finds curious Defendants' argument that section 304(c)(6)(D) "does not state that 'a [third
party] grant is valid only if negotiated after the termination date.'" (Opp'n at 22 (citation omitted).) For

25   one, DC does not base its Third Claim on Defendants' negotiations, but rather on Defendants' finalized
agreements.  That section, moreover, *does* in fact state that a third party grant agreement "is valid only

26   if it is *made after* the effective date of termination." § 304(c)(6)(D) (emphasis added). And, finally, it is

27   beyond dispute that the subject agreements at issue here were *made* well *before* the termination date.

28

**EXHIBIT 34**
**1435**

Case 2:04-cv-08400-ODW-RZ    Document 720-8    Filed 04/04/13    Page 76 of 95    Page
Case 2:10-cv-03633-ODW-RZ    Document 507696    Filed 10/17/12    Page 18 of 18    Page ID
#:35101

1    IV.    **CONCLUSION**

2        As discussed above, DC's motion for summary judgment is **GRANTED**. [458]

3    Defendants' cross-motion for summary judgment is **DENIED**.[3] [478]

4

5

6    **SO ORDERED**

7    October 17, 2012

8

9                                                            _____
10                                                               OTIS D. WRIGHT, II
                                                            UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24    _____
25    [3] Defendants' cross-motion also attacks DC's Second Claim concerning the scope of Defendants'
      termination notice.  As Defendants point out, however, "DC's Second Claim (FAC ¶¶135–64) seeks to
26    re-litigate, and overlaps with, issues in *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No.
      04-08400 ODW (RZx), currently on appeal.  Much of this claim is barred by the doctrine of issue
27    preclusion/collateral estoppel." (Defs' MSJ, Dkt No. 478 at 3 (citations omitted).)  As that claim is related
      to one currently on review before the Ninth Circuit, this Court declines to rule on that aspect of
28    Defendants' motion.

**EXHIBIT 34**
**1436**

# EXHIBIT 35

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:   Time Warner Inc.
One Time Warner Center
New York, NY 10019-8016
Attn: Jeffrey L. Bewkes
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 35**
**1437**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Mark Warren Peary, personal representative of the estate of Joseph Shuster, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Joseph Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted "SUPERMAN" works made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:[1]

1.    The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group, 400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260 Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard, Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019.  Pursuant to

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the Notice of Termination (Document # V3505D773) served November 10, 2003 by Mark Warren Peary on behalf of the estate of Joseph Shuster, that was recorded at the U.S. Copyright Office on December 8, 2003.

**EXHIBIT 35**
**1438**

37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2.     The works (individually, "Work"; collectively, the "Works") to which this Notice of Termination applies are as follows:  the illustrated front cover of the SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, <u>as depicted</u> in a reduced black and white form in the advertisements for the first Superman comic book story in Action Comics, Vol. 1, No. 1, appearing in the following magazines:[2]

| <u>Title</u> | <u>Name of Author</u> | <u>Date Copyright Secured</u> | <u>Copyright Reg. No.</u> |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1,1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |
| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |

3.     This Notice of Termination applies to the following grants, assignments,

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notice of termination dated November 10, 2003 previously served pursuant to 17 U.S.C. § 304(d) by Mark Warren Peary on behalf of the estate of Joseph Shuster.  Every reasonable effort has been made to find and list herein every such work.  Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

**EXHIBIT 35**
**1439**

and transfers and/or agreements to the extent, if any, each grant transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)    A one page agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on the other, executed on or about March 1, 1938;

(b)    A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, on the other, executed on or about December 4, 1937;

(c)    A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(d)    A three-page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(e)    A two-page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 19, 1939;

(f)    A seven-page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May 19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of

EXHIBIT 35
1440

Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (*see Siegel v. Warner Bros Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

(g)     A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

4.     The effective date of termination shall be March 12, 2014.

5.     No prior termination of the grants of rights in the copyright <u>of the aforementioned Works</u> for their renewal copyright term has been exercised by the Author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

6.     Joseph Shuster died on July 30, 1992. There is no living widow, child or grandchild of Mr. Shuster.  The undersigned, Mark Warren Peary, is the personal representative of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March &#x1F6;&#x1F7;, 2012

Mark Warren Peary
Personal Representative of the Estate of
Joseph Shuster
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

**EXHIBIT 35**
**1441**

**CERTIFICATE OF INVESTIGATION**

We hereby certify that before serving the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable

investigation to be made on our behalf as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of

the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this ⁶ᵗʰ day of March, 2012, at Los Angeles, California.

_____

Marc Toberoff, Esq.
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, California 90265
Counsel for the Estate of Joseph Shuster

**EXHIBIT 35**
**1442**

**CERTIFICATE OF SERVICE**

We hereby certify that we caused a true copy of the foregoing document

described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED

RENEWAL TERM to be served this ___ day of March, 2012, by First Class Mail,

postage prepaid, upon the following:

To:  Time Warner Inc.
     One Time Warner Center
     New York, NY 10019-8016
     Attn: Jeffrey L. Bewkes
     Chairman & C.E.O.

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 35**
**1443**

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, California 90265

**EXHIBIT 35**
**1444**

# EXHIBIT 36

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:   Time Warner Inc.
      One Time Warner Center
      New York, NY 10019-8016
      Attn: Jeffrey L. Bewkes
      Chairman & C.E.O.

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 36**
**1445**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Laura Siegel Larson, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's ownership share of the renewal copyright(s)) in and to the copyrighted "SUPERMAN" work(s) made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:[1]

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group, 400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260 Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard, Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the notices of termination (Document Nos. V3410 D577, V3410 D607, V3410 D630, V3410 D653, V3410 D807, V3410 D830, V3410 D853) served April 3, 1997, by Joanne Siegel and Laura Siegel Larson, that were recorded at the U.S. Copyright Office on February 2, 1998, or the notice of termination (Document No. V3491 D823) served November 8, 2002 by Joanne Siegel and Laura Siegel Larson, that was recorded at the U.S. Copyright Office on November 20, 2002.

**EXHIBIT 36**
**1446**

Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

    2.    The works (individually, "Work"; collectively, the "Works") to which this Notice of Termination applies are as follows:  the illustrated front cover of the SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, <u>as depicted</u> in a reduced black and white form in the advertisements for Action Comics, Vol. 1, No. 1, appearing in the following magazines:[2]

| <u>Title</u> | <u>Name of Author</u> | <u>Date Copyright Secured</u> | <u>Copyright Reg. No.</u> |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1, 1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notices of termination dated April 3, 1997 regarding "Superman" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson or the notice of termination dated November 8, 2002 regarding "Superboy" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson.  Every reasonable effort has been made to find and list herein every such work.  Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

**EXHIBIT 36**
**1447**

| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |
|---|---|---|---|

3.      This Notice of Termination applies to the following grants, assignments, and transfers and/or agreements to the extent, if any, each grant transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)      A one page agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on the other, executed on or about March 1, 1938;

(b)      A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 4, 1937;

(c)      A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(d)      A three-page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(e)      A two-page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 19, 1939;

(f)      A seven-page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one

4

**EXHIBIT 36**
**1448**

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May 19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (*see Siegel v. Warner Bros Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

     (g)    A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

     4.    The effective date of termination shall be March 12, 2014.

     5.    No prior termination of the grants of rights in the copyright <u>of the aforementioned Works</u> for their renewal copyright term has been exercised by the Author, Jerome Siegel, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

     6.    Jerome Siegel died on January 28, 1996.  There is no living widow of Jerome Siegel, and Laura Siegel Larson is the only living child of Jerome Siegel. Michael Siegel, Jerome Siegel's other child, is deceased and had no children.  As such, the undersigned, Laura Siegel Larson, is the sole person entitled to exercise Jerome Siegel's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary

**EXHIBIT 36**
**1449**

to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March 6, 2012

Laura Siegel Larson
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

6

**EXHIBIT 36**
**1450**

## CERTIFICATE OF INVESTIGATION

We hereby certify that before serving the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable

investigation to be made on our behalf as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of

the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this 6ᵗʰ day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C,
22631 Pacific Coast Highway #348
Malibu, California 90265
Counsel for Laura Siegel Larson

7

**EXHIBIT 36**
**1451**

**CERTIFICATE OF SERVICE**

We hereby certify that we caused a true copy of the foregoing document

described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED

RENEWAL TERM to be served this 6th day of March, 2012, by First Class Mail,

postage prepaid, upon the following:

To:  Time Warner Inc.                    Time Warner
     One Time Warner Center              Entertainment Company, L.P.
     New York, NY 10019-8016             c/o Time Warner Cable
     Attn: Jeffrey L. Bewkes             60 Columbus Circle, 16th Floor
     Chairman & C.E.O.                   New York, NY 10023

     Warner Bros. Entertainment Inc.     Warner Bros. Inc.
     4000 Warner Boulevard               4000 Warner Boulevard
     Burbank, CA 91522                   Burbank, CA 91522
     Attn: Barry M. Meyer                Attn: Barry M. Meyer
     Chairman & C.E.O.                   Chairman & C.E.O

     Warner Communications Inc.          Warner Bros. Television
     c/o Time Warner Inc.                4000 Warner Boulevard
     One Time Warner Center              Burbank, CA 91522
     New York, NY 10019                  Attn: Peter Roth, President
     Attn: Jeffrey L. Bewkes
     Chairman and C.E.O.

     Warner Bros. Pictures Group         Warner Bros. Consumer Products
     4000 Warner Boulevard               4000 Warner Boulevard
     Burbank, CA 91522                   Burbank, CA 91522
     Attn: Jeff Rabinov, President       Attn: Brad Globe, President

     Time/Warner Retail Sales &          DC Entertainment
     Marketing                           4000 Warner Boulevard
     260 Cherry Hill Road,               Burbank, CA 91522
     Parsippany NJ 07054                 Attn: Diane Nelson, President
     Attn: Rich Jacobsen, President

     DC Comics                           DC Direct
     1700 Broadway, 7th Floor            c/o DC Comics
     New York, NY 10019                  1700 Broadway, 7th Floor
     Attn: Diane Nelson, President       New York, NY 10019

8

**EXHIBIT 36**
**1452**

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C,
22631 Pacific Coast Highway #348
Malibu, California 90265

**EXHIBIT 36**
**1453**