# EXHIBIT 37

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

## LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee,*

*v.*

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS AND
## APPELLEES WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

———————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Telephone:  (845) 265-2820

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 37**
**1454**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, cross-appellants and appellees Warner Bros. Entertainment Inc. and DC Comics, by and through their counsel of record, hereby disclose:

1. Warner Bros. Entertainment Inc. is a corporation that is an indirect, wholly-owned subsidiary of Time Warner Inc.

2. DC Comics is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation. Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC Comics.

Dated: March 23, 2012

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Warner Bros.
Entertainment Inc. and DC Comics

**EXHIBIT 37**
**1455**

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..................................................................1

INTRODUCTION .........................................................................................1

STATEMENT OF ISSUES PRESENTED.......................................................5

STATEMENT OF THE CASE.........................................................................6

STATEMENT OF FACTS ............................................................................9

    A.    Statutory Background ...............................................................9

    B.    Factual Background ................................................................10

          1.    Siegel And Shuster's Work-For-Hire
               Arrangements With DC During The 1930s And
               1940s ...........................................................................10

          2.    Litigation Over Superman During The 1940s,
               1960s, And 1970s ........................................................14

          3.    Larson's Termination Notices Under The 1976 Act
               And The Parties' 2001 Settlement Agreement..............15

          4.    Larson Allies With A New Business Partner Who
               Induces Her To Repudiate The 2001 Settlement
               Agreement...................................................................18

    C.    Proceedings Below..................................................................19

STANDARD OF REVIEW ...........................................................................22

SUMMARY OF ARGUMENT .....................................................................23

ARGUMENT ..............................................................................................25

<u>DC's Cross-Appeal On Its Second Through Fourth Counterclaims</u>

    I.    THE DISTRICT COURT ERRED IN GRANTING
         SUMMARY JUDGMENT TO LARSON ON THE
         THRESHOLD SETTLEMENT AGREEMENT ISSUE ...................25

i

**EXHIBIT 37**
**1456**

A.    Under California Law, A Contract Is Enforceable So
      Long As Parties Agree On Its Essential Terms, Even
      Absent Formalized Documentation ............................................25

B.    The October 19, 2001, Writing Constitutes An
      Enforceable Agreement As A Matter Of Law ........................28

C.    At A Minimum, DC Is Entitled To Factfinding As To
      Whether The Parties Intended To Be Bound By The
      Essential Terms Identified In The October 19, 2001,
      Letter ......................................................................................34

II.   THE DISTRICT COURT ERRED IN GRANTING
      SUMMARY JUDGMENT TO LARSON ON DC'S
      LIMITATIONS COUNTERCLAIM ..............................................37

            Larson's Appeal Of Her First Claim And
          DC's Cross-Appeal On Both Parties' First Claims

I.    LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE
      HER CLAIM HAS NOT BEEN FULLY AND FINALLY
      ADJUDICATED ..........................................................................40

II.   THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-
      FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT
      FROM TERMINATION................................................................41

A.    A Work Is Made-For-Hire Under The 1909 Copyright
      Act When It Is Created At The "Instance And Expense"
      Of The Commissioning Party ..................................................42

B.    The District Court Correctly Held That *Action Comics
      #2-3, #5-61, Superman #1 (Pages 1-2)-23*, And The Post-
      McClure Strips Were Works-For-Hire ....................................45

      1.    *Action Comics #2-3, #5-6* ..............................................48

      2.    *Action Comics #7-61* And *Superman #1-23* ................51

      3.    Post-McClure Newspaper Strips ....................................55

ii

**EXHIBIT 37**
**1457**

C.    The District Court Erred In Granting Summary Judgment
Against DC On The Work-For-Hire Status Of *Action
Comics #1* And *#4, Superman #1* (Pages 3-6), And Pre-
McClure Strips ........................................................................61

1.    *Action Comics #1* ..........................................................61

a.    Key Elements Of *Action Comics #1* Were Made-
For-Hire ............................................................... 61

b.    *National* Is Not Preclusive As To The Work-For-
Hire Status Of *Action Comics #1* ...................... 68

2.    Pre-McClure Strips ...................................................... 71

a.    The Pre-McClure Strips Were Made At DC's
Instance And Expense ......................................... 71

b.    Larson's Failure To List The Pre-McClure Strips
In Her Termination Notice Also Precludes
Termination ....................................................... 72

3.    Pages 3-6 Of *Superman #1* ...........................................77

4.    Artwork In *Action Comics #4* ........................................79

5.    Promotional Announcements ........................................80

CONCLUSION ................................................................................87

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM

iii

**EXHIBIT 37**
**1458**

# TABLE OF AUTHORITIES

## CASES

*Almond v. ABB Indus. Sys., Inc.,*
  2001 WL 242548 (S.D. Ohio Mar. 6, 2001)........................................................78

*Ariz. State Carpenters Pension Trust Fund v. Miller,*
  938 F.2d 1038 (9th Cir. 1991) ........................................................................40

*Atla-Medine v. Crompton Corp.,*
  2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001).....................................................36

*Banner Entm't, Inc. v. Super. Ct.,*
  62 Cal.App.4th 348 (1998) ......................................................................... 29, 35

*Beck v. Am. Health Grp. Int'l, Inc.,*
  211 Cal.App.3d 1555 (1989)...........................................................................29

*Boisson v. Banian, Ltd.,*
  273 F.3d 262 (2d Cir. 2001)............................................................................62

*Burroughs v. M-G-M, Inc.,*
  683 F.2d 610 (2d Cir. 1982)................................................................ 74, 75, 76

*Bustamante v. Intuit, Inc.,*
  141 Cal.App.4th 199 (2006) ...................................................................... 29, 35

*Callie v. Near,*
  829 F.2d 888 (9th Cir. 1987)...........................................................................35

*CCNV v. Reid,*
  490 U.S. 730 (1989)........................................................................................43

*Chaffin v. U.S.,*
  176 F.3d 1208 (9th Cir. 1999) .........................................................................44

*Clackamas Gastroenterology Assocs., P.C. v. Wells,*
  538 U.S. 440 (2003).........................................................................................43

*Clarke v. Fiedler,*
  44 Cal.App.2d 838 (1941)......................................................................... 26, 27

**EXHIBIT 37**
**1459**

*Comm'r v. Sunnen,*
   333 U.S. 591 (1948) ................................................................68

*Cool Fuel, Inc. v. Connett,*
   685 F.2d 309 (9th Cir. 1982) .................................................82

*Cuellar de Osorio v. Mayorkas,*
   656 F.3d 954 (9th Cir. 2011) .................................................22

*Dolman v. Agee,*
   157 F.3d 708 (9th Cir. 1998) ................................... 42, 43, 44

*Easter Seal Soc'y v. Playboy Enters.,*
   815 F.2d 323 (5th Cir. 1987) .................................................42

*Eden Toys, Inc. v. Florelee Undergarment Co.,*
   697 F.2d 27 (2d Cir. 1982) ............................................ 63, 64

*Elite Show Servs., Inc. v. Staffpro, Inc.,*
   119 Cal.App.4th 263 (2004) ..................................................26

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,*
   122 F.3d 1211 (9th Cir. 1997) ..............................................63

*EPIC, Inc. v. Pac. Lumber Co.,*
   257 F.3d 1071 (9th Cir. 2001) ..............................................71

*Ersa Grae Corp. v. Fluor Corp.,*
   1 Cal.App.4th 613 (1991) .....................................................26

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
   2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) ......................53

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
   342 F.3d 149 (2d Cir. 2003) ....................................... 42, 47, 59

*Estate of Thottam,*
   165 Cal.App.4th 1331 (2008) ...............................................26

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991) ..................................................... 63, 80

**EXHIBIT 37**
**1460**

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place,*
   773 F.2d 1068 (9th Cir. 1985) ...........................................................71

*Gaiman v. McFarlane,*
   360 F.3d 644 (7th Cir. 2004)............................................................80

*Gausvik v. Perez,*
   392 F.3d 1006 (9th Cir. 2004) ............................................ 22, 51, 81

*Granite Rock Co. v. Teamsters,*
   649 F.3d 1067 (9th Cir. 2011) ............................................... 68, 70

*Harper & Row, Publishers v. Nation Enters.,*
   471 U.S. 539 (1985)........................................................................51

*Harris v. Rudin, Richman & Appel,*
   74 Cal.App.4th 299 (1999) .............................................. 26, 27, 29

*In re Smith,*
   964 F.2d 636 (7th Cir. 1992)............................................................58

*Inamed Corp. v. Kuzmak,*
   275 F.Supp.2d 1100 (C.D. Cal. 2002) ............................................34

*Jachetta v. U.S.,*
   653 F.3d 898 (9th Cir. 2011)...........................................................51

*Jada Toys, Inc. v. Mattel, Inc.,*
   518 F.3d 628 (9th Cir. 2008)...........................................................62

*Jim Henson Prods. v. John T. Brady & Assocs.,*
   16 F.Supp.2d 259 (S.D.N.Y. 1997)................................................60

*Lamle v. Mattel, Inc.,*
   394 F.3d 1355 (Fed. Cir. 2005).......................................................29

*Levin v. Knight,*
   780 F.2d 786 (9th Cir. 1986)...........................................................29

*Lin-Brook Builders Hardware v. Gertler,*
   352 F.2d 298 (9th Cir. 1965)............................................... 42, 43, 59

**EXHIBIT 37**
**1461**

*Lozano v. Ashcroft,*
  258 F.3d 1160 (10th Cir. 2001) ........................................................83

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch.*
  *of Contemporary Dance, Inc.,*
  380 F.3d 624 (2d Cir. 2004)........................................................55

*Marvel Characters, Inc. v. Simon,*
  310 F.3d 280 (2d Cir. 2002)................................................ 45, 70

*Marvel Worldwide, Inc. v. Kirby,*
  777 F.Supp.2d 720 (S.D.N.Y. 2011)............................... 44, 49, 53, 78

*Mattel, Inc. v. MGA Entm't, Inc.,*
  2011 WL 3420603 (C.D. Cal. Aug. 4, 2011)................................35

*Mattel, Inc. v. MGA Entm't, Inc.,*
  616 F.3d 904 (9th Cir. 2010)................................... 24, 35, 39

*May v. Morganelli-Heumann & Assocs.,*
  618 F.2d 1363 (9th Cir. 1980) ............................... 42, 43, 45

*Medina v. Ramsey Steel Co.,*
  238 F.3d 674 (5th Cir. 2001).....................................................36

*Meyer v. Holley,*
  537 U.S. 280 (2003)............................................................44

*Murray v. Gelderman,*
  566 F.2d 1307 (5th Cir. 1978) ......................................... 43, 49

*Music Sales Corp. v. Morris,*
  73 F.Supp.2d 364 (S.D.N.Y. 1999)..........................................75

*Narayan v. EGL, Inc.,*
  616 F.3d 895 (9th Cir. 2010)................................................23

*Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.,*
  191 F.2d 594 (2d Cir. 1951)........................................ 58, 69

*New Hampshire v. Maine,*
  532 U.S. 742 (2001)...........................................................39

**EXHIBIT 37**
**1462**

*Nike, Inc. v. Just Did It Enters.*,
    6 F.3d 1225 (7th Cir. 1993)....................................................................36

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
    558 F.2d 1090 (2d Cir. 1977)................................................................62

*Pantone, Inc. v. A. I. Friedman, Inc.*,
    294 F.Supp. 545 (S.D.N.Y. 1968).........................................................62

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
    347 U.S. 89 (1954)................................................................................51

*Patel v. Liebermensch*,
    45 Cal.4th 344 (2008) ..........................................................................27

*Picture Music, Inc. v. Bourne, Inc.*,
    457 F.2d 1213 (2d Cir. 1972)......................................................*passim*

*Playboy Enters., Inc. v. Dumas*,
    53 F.3d 549 (2d Cir. 1995)....................................................43, 49, 53

*Recycling Solutions Tech., LLC v. Rosenberg*,
    2011 WL 1696826 (E.D. Ky. May 4, 2011) .........................................36

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
    77 F.3d 309 (9th Cir. 1996)..................................................................29

*S. Cal. Painters v. Best Interiors, Inc.*,
    359 F.3d 1127 (9th Cir. 2004) ..............................................................35

*Samuels v. Holland Am. Line-USA Inc.*,
    656 F.3d 948 (9th Cir. 2011).................................................................22

*Sargent v. Am. Greetings Corp.*,
    588 F.Supp. 912 (N.D. Ohio 1984).......................................................62

*Scherr v. Universal Match Corp.*,
    297 F.Supp. 107 (S.D.N.Y. 1967).........................................................44

*Scherr v. Universal Match Corp.*,
    417 F.2d 497 (2d Cir. 1969)..................................................................79

**EXHIBIT 37**
**1463**

*SEC v. Platforms Wireless Int'l Corp.,*
   617 F.3d 1072 (9th Cir. 2010) ........................................................40

*Seiler v. Lucasfilm, Ltd.,*
   808 F.2d 1316 (9th Cir. 1986) ........................................................82

*Self-Realization Fellowship Church v. Ananda Church of Self-*
   *Realization,*
   206 F.3d 1322 (9th Cir. 2000) ............................................ 42, 43, 44

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,*
   161 F.2d 406 (2d Cir. 1946) ...........................................................80

*Shaw v. Hahn,*
   56 F.3d 1128 (9th Cir. 1995) ..........................................................70

*Siegel v. Nat'l Periodical Publ'ns,*
   364 F.Supp. 1032 (S.D.N.Y. 1973) ..................................... 15, 68, 69

*Siegel v. Nat'l Periodical Publ'ns,*
   508 F.2d 909 (2d Cir. 1974) .............................................. 11, 15, 68

*St. Paul Water Co. v. Ware,*
   83 U.S. 566 (1872) .........................................................................44

*Tex Print Indus., Inc. v. Zayre Corp.,*
   1977 WL 22752 (D. Mass. Feb. 10, 1977) .....................................83

*The Facebook, Inc. v. Pac. Nw. Software, Inc.,*
   640 F.3d 1034 (9th Cir. 2011) .................................................*passim*

*Thomas v. Ponder,*
   611 F.3d 1144 (9th Cir. 2010) ........................................................23

*Toledano v. O'Connor,*
   501 F.Supp.2d 127 (D.D.C. 2007) ..................................................29

*Twentieth Century Fox Film Corp. v. Entm't Distrib.,* 429 F.3d 869
   (9th Cir. 2005) .....................................................................*passim*

*U.S. v. Alexander,*
   326 F.2d 736 (4th Cir. 1964) ..........................................................83

**EXHIBIT 37**
**1464**

*U.S. v. Diaz-Lopez*,
    625 F.3d 1198 (9th Cir. 2010) .................................................................82

*U.S. v. Resnick*,
    594 F.3d 562 (7th Cir. 2010)...................................................................78

*Vass v. Compaq Computer Corp.*,
    953 F.Supp. 114 (D. Md. 1997) ............................................................36

*Wallace v. City of San Diego*,
    479 F.3d 616 (9th Cir. 2007)..................................................................23

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ...............................................................49

*Webster Indus., Inc. v. Northwood Doors, Inc.*,
    320 F.Supp.2d 821 (N.D. Iowa 2004).....................................................36

*Weddington Prods., Inc. v. Flick*,
    60 Cal.App.4th 793 (1998) ....................................................................31

**STATUTES**

17 U.S.C. §4 (1909) (repealed 1976).............................................................9

17 U.S.C. §7 (1909) (repealed 1976)...........................................................47

17 U.S.C. §24 (1909) (repealed 1976)....................................................*passim*

17 U.S.C. §26 (1909) (repealed 1976)................................................... 9, 41

17 U.S.C. §203 ........................................................................... 10, 41

17 U.S.C. §203 ...............................................................................74

17 U.S.C. §304 ........................................................................*passim*

17 U.S.C. §507 ...............................................................................37

17 U.S.C. §702 ...............................................................................73

28 U.S.C. §1291 ...............................................................................1

28 U.S.C. §1331 ...............................................................................1

x

**EXHIBIT 37**
**1465**

28 U.S.C. §1338 ................................................................1

28 U.S.C. §1367 ................................................................1

CAL. CIV. CODE §1550 ......................................................25

**RULES**

FED. R. CIV. P. 54(b) ................................................... *passim*

FED. R. CIV. P. 56(a) ........................................................22

FED. R. EVID. 1002 ...........................................................82

FED. R. EVID. 801(d)(2)(A) ...............................................78

**REGULATION**

37 C.F.R. §201.10 ...................................................... *passim*

**OTHER AUTHORITIES**

42 F.R. 45916-21 ....................................................... 74, 77

52 F.R. 23443-46 (1987) ...................................................62

76 F.R. 32320 (June 6, 2011) .............................................75

1 WILLIAM F. PATRY, PATRY ON COPYRIGHT (1st ed. 2007) ....................................76

41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005) ...........................44

6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3] (2011) ...........................................82

Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301 (2003) ............................34

Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101 (2001) ....................28

Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film Agreements*, L.A. LAW. 18 (Apr. 1999) ....................28

xi

**EXHIBIT 37**
**1466**

Jay M. Spillane,
   *Lawsuits over "Handshake Deals" Are As Old As the
   Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. &
   SPORTS LAW. 15 (1993) ........................................................................29

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
   (2011) .................................................................................... 62, 76

RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-429 (1965)...............................44

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
   LAW, 94TH CONG. 304 (1975) .............................................................16

xii

**EXHIBIT 37**
**1467**

## STATEMENT OF JURISDICTION

This appeal arises from a partial judgment under FED. R. CIV. P. 54(b) on
appellant Laura Siegel Larson's First Claim for Relief and cross-appellants Warner
Bros. Entertainment Inc. and DC Comics' (together "DC's") First through Fourth
Counterclaims.  Larson's First Claim asserts that copyright termination notices she
served make her joint owner of several early Superman works.  DC's
Counterclaims assert that the notices are invalid (First Counterclaim); Larson's
lawsuit is time-barred (Second Counterclaim); and Larson's claims are barred by
an October 2001 settlement agreement (Third and Fourth Counterclaims).

The district court had jurisdiction over these claims.  28 U.S.C. §§1331,
1338, 1367.  This Court has jurisdiction over DC's Second, Third, and Fourth
Counterclaims, because they were fully and finally adjudicated below.  28 U.S.C.
§1291.  This Court lacks jurisdiction over Larson's First Claim and DC's First
Counterclaim, which were not fully and finally adjudicated.  *Infra* at 40-41.

## INTRODUCTION

This case is about the ownership of copyright in the earliest comics that
introduced elements of the iconic Superman character and story, including aspects
of his appearance, powers, and background.  As it comes before this Court—an
appeal and cross-appeal addressing multiple rulings below—the case presents an

1

**EXHIBIT 37**
**1468**

unusually broad array of doctrinal, factual, and procedural issues.  But much of the case reduces to a familiar proposition:  a deal is a deal.

The doctrinal issues focus on an intersection between the 1909 Copyright Act and the 1976 amendments to that Act.  The 1976 Act extended existing copyrights under the 1909 Act—including copyrights that had been assigned— while giving the original authors and certain of their heirs the right to terminate previous assignments of their copyrights and to negotiate new assignments with existing rights holders or other parties.

By design, the 1976 Act struck a careful balance.  On the one hand, it gave authors (and certain heirs) a fresh start on their original rights and new leverage to renegotiate old assignments.  On the other hand, it gave rights owners who had acquired and then developed the assigned works—sometimes into exceedingly valuable commercial properties—continuing rights to exploit derivative works created under the assignments, as well as an exclusive, first opportunity to negotiate new deals to reclaim any terminated rights.

At first, the negotiation process contemplated by the 1976 Act worked here just as intended.  The heirs to Superman's original story writer served notices of termination as to certain early Superman works.  While DC contested the notices on various grounds—including that the works at issue were made-for-hire and hence not subject to termination—that dispute was shelved for four years while the

2

**EXHIBIT 37**
**1469**

parties worked to negotiate a resolution that would both secure DC's rights, and ensure the family reaped financial benefits from DC's continued exploitation of Superman.  The family, represented by a prominent entertainment law firm, ultimately struck a deal with DC—one that included every essential term for a re-grant of rights, provided for various other non-essential terms, and guaranteed the family many millions of dollars in cash, royalties, and other compensation.

But after agreeing to this deal in writing, the family was approached by a self-styled "intellectual property entrepreneur" who dangled the prospect of even more money.  In short order the family reneged on its deal with DC, refused to complete discussions over a "long form" contract formalizing the agreement, and fired their lawyers.  The family asserted there was no deal without a long form, and the district court agreed, casting aside established California contract law principles—principles essential to the entertainment industry, where many business deals are never formalized.  The rule there is simple, however:  a deal is a deal, long form or not.

That principle also lies at the core of the underlying copyright dispute here.  Superman's creators conceived the Superman character, but no one would publish it.  It was only DC, years later, that recognized Superman's commercial potential.  DC employed the creators as artists, purchased the entirety of their rights in Superman, and promoted and published the first Superman story.  DC developed

**EXHIBIT 37**
**1470**

Superman not just commercially, but creatively as well, employing many artists—including but not limited to the original creators—to develop many of the now-widely-recognized elements of the Superman mythos.

For their valuable contributions to DC's efforts, DC paid the original creators millions of dollars in today's terms, pursuant to agreements that could not have been clearer:  DC paid them to create new Superman material for DC, the exclusive owner of all rights in the character and story.  Over the years, the creators tried to undo their original Superman agreements, but the courts repeatedly rejected their efforts.  And now it is Larson who contends that her father's 1930s deals with DC, like her own 2001 deal, were not deals at all—she says her father was not creating Superman for DC, as his agreements plainly said, but for himself, and that she should now own rights that her father never did.

The 1976 Act does not sanction her claims.  It was intended to allow authors and heirs to "recapture" copyrights they initially owned and then assigned—not copyrights they never owned in the first place.

This long-running dispute should be brought to an end.  Enforcing Larson's deal will afford her tens of millions of dollars for which she bargained in 2001, while protecting the deal her own father struck in the 1930s, when DC employed him to create new Superman material on DC's behalf.

4

**EXHIBIT 37**
**1471**

## STATEMENT OF ISSUES PRESENTED

### *DC's Cross-Appeal On Its Second Through Fourth Counterclaims*

1. a. Whether DC is entitled to entry of judgment on all claims on the basis of an October 2001 settlement agreement, confirmed by a letter from Larson that explicitly "accepted D.C. Comics' offer" and described in detail all essential "terms" of the parties' "monumental accord."

b. Whether DC is at least entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in Larson's October 2001 letter.

2. Whether Larson's claims are barred by the Copyright Act's three-year limitations period.

### *Larson's Appeal On Her First Claim And*
### *DC's Cross-Appeal On Both Parties' First Claims*

1. Whether this Court lacks jurisdiction over the appeal of the parties' respective First Claims because the district court did not fully and finally adjudicate the scope of rights to early Superman works at issue in those claims.

2. Assuming the Court has jurisdiction to hear these claims:

a. Whether the district court properly ruled that Superman works created by Larson's father Jerome Siegel and his collaborator Joseph Shuster at DC's instance and expense—after Siegel and Shuster assigned all of their Superman rights to DC and entered into various employment agreements with DC—were works-for-hire.

5

**EXHIBIT 37**
**1472**

b. Whether the district court erred in ruling that Larson was entitled to recapture a handful of early Superman works that were made at DC's instance and expense and/or were not listed in Larson's copyright termination notices.

c. Whether the district court erred in ruling *sua sponte* on the copyrightable elements in certain promotional announcements owned by DC, without giving DC notice or an opportunity to be heard on the issue, and without examining the actual announcements or a legible copy of them.

## STATEMENT OF THE CASE

Superman was co-created by Siegel and Shuster in the 1930s, and introduced to the world by DC in *Action Comics #1*, published in 1938. ER-1019; SER-9-10. This copyright dispute arises more than a half-century later because of a 1976 amendment to the Copyright Act, which allows "authors"—within the meaning of that term under the 1909 version of the Act—of copyrighted works (and certain of their heirs) to terminate earlier assignments of their copyrights and reclaim those copyrights for themselves. Nobody denies that Siegel and Shuster were the authors of certain foundational elements of Superman, but neither does anyone deny that most other elements appeared for the first time in derivative works—comic books, newspaper strips, and other media—created *after* Siegel and Shuster assigned to DC all rights to Superman, and were hired by DC along with many other artists to create new Superman works. The dispute here centers on whether certain of the

6

**EXHIBIT 37**
**1473**

earliest derivative works were "made for hire" on DC's behalf, making DC the

"author" of the works under the 1909 Act and precluding termination by Siegel's

heirs.

During their lifetimes, neither Siegel nor Shuster—despite a long history of

litigation against DC—sought to exercise any termination rights in Superman.

Within a year of Siegel's death in 1996, however, his widow Joanne (now

deceased) and daughter Larson served termination notices seeking to recapture a

broad range of Superman works.  ER-1024-92.  DC disputed most aspects of the

termination notices, but sought to resolve the controversy through negotiation with

Larson and her lawyer Kevin Marks.  ER-16; SER-393, 100-01.  The parties

reached a settlement agreement on October 19, 2001, in which DC agreed to pay

Larson $3 million in up-front cash, annual guarantees worth $5 million, and tens of

millions more in future profit sharing, in exchange for which DC would receive all

of the putative Superman rights Larson claimed to own.  SER-132, 147-48, 434-35,

456-61.  A little more than six months later, however, Larson repudiated the

agreement, fired Marks, and began working with Marc Toberoff (a Hollywood

producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights.

SER-133-34, 182-83, 404, 417-20, 422-25, 819-20, 835-37.  No buyer emerged;

and in 2004, Larson (now using Toberoff as her lawyer) filed this lawsuit, seeking

a declaration that her termination notices were valid and entitled her to an

**EXHIBIT 37**
**1474**

accounting of Superman-related profits.  ER-325.  DC counterclaimed asserting, *inter alia*, that the notices were invalid and Larson's claims were barred by the parties' October 2001 agreement and the statute-of-limitations.  ER-273-310.

In 2008, the district court granted partial summary judgment against DC on its Second through Fourth Counterclaims, holding Larson's claims were neither time-barred nor precluded by the October 2001 agreement.  SER-61-62, 66.

The court also issued a series of partial rulings on Larson's First Claim and DC's First Counterclaim.  The court ruled the vast majority of works listed in Larson's termination notices were works-for-hire as a matter of law and thus could not be terminated.  ER-43-140.  But it held that certain other works were *not* made-for-hire and thus could be terminated.  ER-81, 114, 189.  The court did not, however, resolve the scope of the rights at issue.  *Infra* at 20-21.

Larson now appeals some (not all) of the adverse rulings on her First Claim, asserting that the court erred in finding that the following works were made-for-hire: *Action Comics #2-3, #5-61*; pages 1-2 of *Superman #1, Superman #2-23*; and newspaper strips created after the parties entered into a syndication agreement with McClure in 1938.  ER-81, 114, 189.

DC cross-appeals the rejection of its threshold limitations and settlement counterclaims.  DC also contends that Larson's appeal on her First Claim is unripe because the court did not declare the scope of rights at issue in that claim and thus

8

**EXHIBIT 37**
**1475**

did not fully adjudicate it (or DC's First Counterclaim).  But assuming this Court

has jurisdiction to address the parties' First Claims, DC cross-appeals, asserting

that while the court's work-for-hire rulings were correct as to the works contested

by Larson, the court erred in rejecting work-for-hire as to the following works (or

certain key elements therein):  *Action Comics #1* and *#4*; pages 3-6 of *Superman*

*#1*, and two weeks of newspaper strips created before the McClure agreement.  DC

also cross-appeals the court's ruling that pre-*Action Comics #1* promotional

announcements, while owned by DC, do not fully depict certain key Superman

elements.

## STATEMENT OF FACTS

### A.  Statutory Background

The 1909 Copyright Act governs the copyright in all works—including

those at issue here—published before January 1, 1978, the effective date of the

1976 Copyright Act.  Under the 1909 Act, copyright could be secured for "all the

writings of an author."  17 U.S.C. §4 (1909) (repealed 1976).  Under the 1909 Act,

an "author" was entitled to a copyright for an initial 28-year period and an

additional 28-year "renewal" period.  *Id.* §24.

The 1909 Act defined the statutory term "author" to "include an employer in

the case of works made for hire."  17 U.S.C. §26 (1909).  It also provided that "in

the case of ... any work copyrighted by ... an employer for whom such work is

**EXHIBIT 37**
**1476**

made for hire," the author/employer was entitled to renewal rights.  *Id.* §24.  These

two sections thus made clear that an "employer" in the case of a "work for hire"

was a statutory "author" with full rights in both the original copyright and the

renewal term.  For this reason, the 1976 Act's provisions addressing "termination"

of the extended renewal term—the provisions at issue here—have no application to

works that were made-for-hire under the 1909 Act, 17 U.S.C. §§203(a), 304(c)-(d),

as Larson concedes, LB-21.

A person or entity who commissions a work is the statutory "author" of that

work under the work-for-hire provision of the 1909 Act whenever the work was

created at the "instance and expense" of the commissioning party, unless the

parties expressly agreed that "the employee or independent contractor retained the

copyright in his work."  *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429

F.3d 869, 881 (9th Cir. 2005); *see infra* at 42-43.

**B.**    **Factual Background**

1.    *Siegel And Shuster's Work-For-Hire Arrangements With DC During
      The 1930s And 1940s*

Siegel, a young writer in Cleveland, and his high-school friend Shuster, an

illustrator, worked together to conceive many fictional characters—including a

crime-fighting hero named "Superman."  SER-6-7.  Between 1933 and 1937,

Siegel and Shuster submitted draft Superman comic strips to several publishers,

without success.  ER-584; SER-12, 678.

**EXHIBIT 37**
**1477**

In 1937, DC[1] hired Siegel and Shuster to do comic-book work. On December 4, 1937, Siegel and Shuster entered into an employment agreement providing that DC would "employ [Siegel and Shuster] as Artists for a period of two years," pay them $10 per page of material, and, in return, Siegel and Shuster would "give their exclusive services" in producing certain comic features and submit all material for any new features to DC. ER-602-03. This "1937 Employment Agreement" also provided that if Siegel or Shuster left DC's employ, they were prohibited from using or copying "any of the products or work or creations or characters or plots used, made or created by [them] while in the employ of [DC]." ER-602.

Siegel and Shuster submitted various comic strips to DC under this agreement, including their existing black-and-white Superman drafts. SER-12-13, 678. DC chose to include the Superman story in its new *Action Comics* comic book, to be published April 18, 1938, with a June 1938 cover date. DC editor Vin Sullivan directed Siegel and Shuster to "revise[] and expand[]" the unfinished Superman drafts into a "full-length 13-panel production suitable for magazine publication." ER-957; *see Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 911 (2d Cir. 1974). At Sullivan's direction, Siegel and Shuster revised the material and

---

[1] "DC" refers to DC Comics as well as its predecessors and successors (including Detective Comics and National Comics Publications).

11

**EXHIBIT 37**
**1478**

added "several additional pictures to illustrate the story continuity"—including a

new picture showing Superman with a distinct "S" on his chest, which DC's own

artists colored red. ER-654; SER-385-86. DC's artists colorized the strips,

choosing and adding the iconic blue-and-red color scheme to Siegel's and

Shuster's black-and-white drafts. SER-441-43. DC's artists also created a cover

for *Action Comics #1* based on a panel that featured Superman in his DC-colorized

costume—red cape and boots, blue leotard, and heraldic red "S" crest—and

exhibiting super-strength by lifting a car. SER-14, 234-35, 728.

DC artists also created "Promotional Announcements"—a black-and-white

version of its artists' cover art—to promote *Action Comics #1*. SER-15, 678, 730.

These Promotional Announcements were published beginning on April 5, 1938,

before *Action Comics #1* was published on April 18, 1938. ER-1019; SER-572,

579-580. DC has filed a motion to lodge an original version of one comic book

containing a Promotional Announcement (*Detective Comics #15*, published on

April 10, 1938) with the Court for its review. *See also* SER-729-96.

On March 1, 1938, before the publication of *Action Comics #1*, Siegel and

Shuster assigned to DC in writing all of their rights in Superman and agreed "not to

employ said characters or said story ... without obtaining [DC's] written consent"

("1938 Assignment"). ER-917. Superman was a success, and after *Action Comics

#1* was published, Siegel and Shuster continued to supply DC with draft Superman

**EXHIBIT 37**
**1479**

material, for which they were paid $10 per page.  ER-83, 960.

The parties memorialized their arrangement in a September 22, 1938, agreement ("1938 Employment Agreement"), which provided that Siegel and Shuster "have been doing the art work and continuity for [Superman and other comics] for us.  We wish you to continue to do said work and hereby employ and retain you for said purposes."  ER-605.  DC maintained the "right to reasonably supervise the editorial matter of all features," and agreed to continue paying Siegel and Shuster $10 per page.  ER-606-07.  The agreement also gave DC the right to terminate Siegel and Shuster and retain other artists to produce new Superman works.  ER-606.  The same day, DC entered into an agreement with the McClure Syndicate ("Syndication Agreement") giving McClure permission to publish Superman strips in newspapers in exchange for royalties.  ER-609-11.

DC exercised "constant editorial supervision" over Siegel and Shuster's creation of new material, requiring them to send all drafts to DC's editors for review, giving detailed instructions on story elements and illustrations, and even suggesting that the pair move "to New York where we can be at a moment's touch with everything that you do."  SER-219-49, 264-66.  This relationship continued throughout most of the 1940s, during which time Superman's popularity grew and expanded into other media.  ER-858-86.  Broad newspaper syndication, successful merchandising, and effective exploitation of Superman in movie serials, animated

13

**EXHIBIT 37**
**1480**

cartoons, and merchandising resulted in royalty payments, bonuses, and other

compensation for Siegel and Shuster amounting to $5.4 million (in today's terms)

from 1938 to 1946 alone.  ER-466, 585-86, 945.

     2.   *Litigation Over Superman During The 1940s, 1960s, And 1970s*

     DC's relationship with Siegel and Shuster became contentious.  Other artists

and editors brought Superman to new media, including radio and film, and created

many of the now-familiar story-lines and catch phrases—*e.g.*, "Up, up, and away,"

or "It's a bird, it's a plane, it's Superman."  SER-680-81.  Siegel also left to serve

in World War II; and while gone, DC, working with Shuster, published

"Superboy" stories that Siegel argued DC had no permission to publish.  SER-590-

95, 603-07, 680.

     In 1947, Siegel and Shuster filed an action against DC in New York state

court seeking to invalidate the 1938 Assignment ("Westchester Action").  SER-20,

597.  The Westchester court issued an interlocutory ruling concluding, *inter alia*,

that the 1938 Assignment granted "all" Superman rights to DC, but that publishing

the Superboy stories was improper.  ER-939-93.  In May 1948, DC, Shuster, and

Siegel entered into a stipulation and consent judgment under which Siegel and

Shuster acknowledged that the 1938 Assignment transferred to DC all rights in

Superman, including "the title, names, characters, concept and formula" as set

forth in *Action Comics #1*.  ER-995-1017.

14

**EXHIBIT 37**
**1481**

By the late 1950s, Siegel, Shuster, and DC had reconciled their differences.

Siegel again wrote Superman stories for DC, and Shuster received a stipend.  SER-

294-96.  But in 1965, Siegel and Shuster challenged DC's copyright renewal rights

in Superman, and in 1969 they filed a lawsuit seeking a declaration that they

owned the Superman renewal copyrights.  The court held that Siegel and Shuster

assigned to DC *all* rights in Superman, including renewal rights.  *Siegel v. Nat'l

Periodical Publ'ns*, 364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d at 913-14.

After this loss, Siegel and Shuster approached DC for financial help.  In

1975, DC agreed to provide them a lump sum of $17,500 each, annual payments of

$20,000 each, lifetime medical benefits, and benefits and payments to their heirs.

SER-641-75.  In return, Siegel and Shuster acknowledged DC was the exclusive

owner of "all right, title and interest" in Superman.  SER-641.  DC increased its

annual payments to more than $125,000 annually, paid special bonuses, and

provided other benefits to Siegel, Shuster, and their families.  *See* SER-390, 427-

31, 448, 641-75, 680.

    3.    *Larson's Termination Notices Under The 1976 Act And The Parties'
        2001 Settlement Agreement*

Congress amended the Copyright Act in 1976 to extend the copyright term

and give authors and certain heirs limited rights to terminate prior copyright grants

for works subject to the extension term.  The Act struck a careful "compromise"

between the interests of authors and grantees, the latter of whom often invested

**EXHIBIT 37**
**1482**

decades of effort to develop copyrighted works into successful properties.  SECOND

SUPP. REG. REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975).

In 1997, after Siegel's death, his widow and daughter served notices

purporting to terminate, as of 1999, various of Siegel's Superman copyright grants

to DC ("Notices").  ER-1018-83.  DC disputed the Notices' validity; but rather

than litigate, the parties spent the next four years trying to reach a business deal.

Larson was represented by Kevin Marks of the leading entertainment law firm

Gang Tyre, which represents the likes of Clint Eastwood and Steven Spielberg.

SER-98-99, 433-34.  DC's lead negotiator was then-General Counsel of Warner

Bros., John Schulman.  SER-433-34.

Negotiations progressed, and when expectations grew that a deal would be

reached, DC paid Larson a non-refundable advance of $250,000.  SER-416.  On

October 16, 2001, DC made a settlement offer to Larson.  SER-105, 434.  On

October 19, Marks called Schulman to accept the offer and report "we are closed."

SER-107-08.  Later that day, he sent Schulman a letter (1) confirming that Larson

had "accepted D.C. Comics' offer"; (2) documenting the deal's material terms in

six, single-spaced pages; and (3) thanking Schulman for his "help and patience in

reaching this monumental accord."  SER-25, 61-62, 456-61, 111-12.

Under the parties' October 19 agreement, Larson was to assign to DC all of

her rights "in the 'Superman' and 'Spectre' properties (including 'Superboy'),'' in

**EXHIBIT 37**
**1483**

exchange for, *inter alia*, $3 million, an annual guarantee of $500,000 per year for

10 years, and 6% of gross revenues from all media and merchandising revenues

(*e.g.*, television, movies, and toys).  SER-456-61.  Almost all the money would be

Larson's alone—Gang Tyre's fee was 5%.  SER-798-99.

On October 26, 2001, Schulman wrote back, confirmed the parties'

agreement, set forth "a more fulsome outline of what we believe the deal we've

agreed to is," and indicated DC would begin drafting a long-form document so "we

will have this super-matter transaction in document form."  SER-118-19, 397-98,

463-70.  Neither Marks nor Larson objected to Schulman's letter.  ER-435.  DC

began performing its obligations under the October 19 agreement, including

establishing a significant reserve for monies owed, which quickly grew to $20

million.  SER-397, 399.

DC's outside counsel worked on the separate long-form document for three

months and sent Marks a draft on February 1, 2002.  SER-125, 435, 472-528.

Neither Marks nor Larson raised any objection until May 9, 2002, when Larson's

mother sent DC a letter acknowledging that Larson had "accepted" DC's October

16, 2001, offer, but objecting to unspecified portions of the long-form document

and concluding that "we have no deal[,] and this [long-form] contract makes an

agreement impossible."  SER-412-14.  Marks told DC the long-form was

"aggressive," but "not contrary to what had been agreed to," and the parties would

**EXHIBIT 37**
**1484**

"deal with it."  SER-126-27, 130, 436, 439.  For the next two months, Marks

reworked the draft, which he sent to Larson on July 15, 2002.  SER-131-32.

      4.     *Larson Allies With A New Business Partner Who Induces Her To*
           *Repudiate The 2001 Settlement Agreement*

      Starting in 2001, Toberoff, the self-described "rights-hunter," "movie

producer," and "intellectual property entrepreneur," began pursuing Siegel's and

Shuster's heirs.  SER-115-16, 182-84, 404, 817-23, 835-36, 859-63.  In November

2001, he induced the Shusters to become his business partners and to repudiate

their existing contractual arrangements with DC.  SER-183, 858-61.[2]  Thereafter,

the Shusters served a termination notice purporting to recapture certain Superman

rights as of October 26, 2013.  SER-844-56.

      Toberoff targeted the Siegels as well.  SER-115-16, 182-83.  He wrote

Larson's brother and called Marks seeking to secure the Siegels' Superman rights

for himself.  SER-814.  Marks rebuffed Toberoff, telling him in February, July,

and August 2002 that Larson had made a deal with DC.  SER-115-16, 119-24, 182-

83, 811.  Toberoff insisted in August 2002 that Marks communicate to Larson that

he and agent Emanuel had an unnamed "investor" willing to purchase her rights for

$15 million cash and generous "back-end" compensation.  SER-122-24, 811, 875-

76.  Marks conveyed this offer to Larson, but admonished her that she had a "deal"

---

    [2] Toberoff's business misconduct is the subject of another lawsuit and two
appellate matters before this Court.  Appeal Nos. 11-56934, 11-71844 ("*Shuster*").

**EXHIBIT 37**
**1485**

with DC, and if she repudiated it, Marks would have to "testify against [her] in court."  SER-183, 811.

On September 21, 2002, Larson fired Marks, and sent a letter to DC stating she was "ending negotiations."  SER-418-20.  A month later, Larson signed an agreement with Toberoff's production company, IP Worldwide, to act as her agent to exploit her putative Superman rights.  SER-184, 422-25.  But the promised $15 million investor never materialized, and Toberoff never produced any other buyers.  SER-122-23, 184-87, 811-13, 875-76.  Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery.  SER-187, 839-44, 860-63.[3]

### C.    Proceedings Below

Larson filed suit on October 8, 2004.  Her First Claim sought a declaration that her termination notices were valid and effective as of 1999, entitling her to an accounting of Superman-related profits from 1999 forward.  ER-338.  DC's First Counterclaim sought a declaration that the Notices were invalid; its Second Counterclaim alleged Larson's claims were time-barred; and its Third and Fourth Counterclaims asserted that Larson's claims were barred by the parties' 2001 settlement agreement.  ER-293-301.

---

[3] Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee.  SER-186, 860-63.

19

EXHIBIT 37
1486

In March 2008, the district court issued a partial summary judgment order. SER-5-90. It held that Larson recaptured certain unspecified rights in *Action Comics #1*, but did not recapture the Promotional Announcements containing the first appearance of Superman. SER-43-44. The order rejected DC's settlement counterclaims, holding that while the parties had formed "an agreement on all major points of dispute," the terms in Marks' October 19, 2001, letter "differ in substance from those set forth in [DC's] later letter of October 26, 2001 … such that there was no unequivocal acceptance of an offer and, thus, no agreement." SER-63. The court rejected DC's limitations counterclaim as well, accepting Larson's representations that she did not terminate settlement negotiations until September 21, 2002, making her claims timely by four days. ER-198.

The parties submitted briefing to resolve remaining work-for-hire issues. In August 2009, the court ruled that the vast majority of works at issue—including *Action Comics #2-3, #5-61*; pages 1-2 of new material in *Superman #1* (which reprinted the stories in *Action Comics #1-4*, with some changes to the *Action Comics #1* story); *Superman #2-23*; and the newspaper strips created after the Syndication Agreement—were works-for-hire and thus exempt from termination. ER-43-140. But the court also ruled that *Action Comics #4, Superman #1* (pages 3-6), and two weeks of strips created before Syndication Agreement were *not* works-for-hire and thus were recaptured. ER-80-81, 140.

**EXHIBIT 37**
**1487**

The district court expressly reserved ruling on key issues concerning the

scope of rights Larson recaptured.  It did not determine the extent to which

Larson's recaptured rights were diminished by DC's rights in the Promotional

Announcements.  SER-298-305, 310-13, 321-24, 2-3.  It left open whether its

enumeration of the limited Superman elements in *Action Comics #1*—as compared

to the universe of elements DC owns outright—was intended to be "dicta," as

Larson had argued.  SER-305-08, 313-19, 325-26, 2-3.  And it deferred ruling on

these and other open issues "until shortly before the time of" a later accounting

trial.  SER-198.

That accounting trial never occurred, and the open questions flagged by the

court were never answered.  In 2009, the judge presiding over the Superman cases

resigned, and the cases were reassigned.  The parties submitted a joint status report

agreeing that the "promotional announcement" and "dicta" questions had to be

answered before Larson's First Claim could be fully resolved.  SER-146-70.

DC filed *Shuster*, and Larson and Toberoff responded by moving to stay that

case, and seeking an interlocutory appeal here.  SER-143-45.  The district court

denied Larson's Rule 54 and stay motions, listing seven open issues—including

the "promotional announcement" and "dicta" issues—that "foreclosed a finding

that [Larson's First Claim] … is final."  SER-141.  Larson amended her complaint

to remove the request for an accounting of profits from the First Claim, but she did

21

**EXHIBIT 37**
**1488**

not eliminate the request for a scope of rights declaration. Dkt. No. 5-1 at 12-14.

She moved again for entry of Rule 54(b) judgment, and on May 17, 2011, the court

entered partial final judgment on Larson's First Claim and DC's First through

Fourth Counterclaims. ER-235-41.

Larson appealed and DC cross-appealed. ER-228, 230.[4] DC moved to

dismiss Larson's appeal, and the Appellate Commissioner denied the motion

without prejudice to its reargument in merits briefing. Dkt. Nos. 5-1, 9.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's grant of summary

judgment." *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011).

Summary judgment is appropriate if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). "In considering a motion for summary judgment, [the court] must draw all

reasonable inferences in favor of the nonmoving party." *Samuels v. Holland Am.*

*Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011). The "non-moving party's

evidence is to be believed, and all justifiable inferences are to be drawn in [its]

---

[4] Larson's brief does not challenge (and thus waives the right to challenge, *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004)), several adverse rulings on her First Claim, including that she did not recapture the Promotional Announcements, that certain pre-1938 material created by Siegel was *not* copyrightable, and that she was not entitled to profits from foreign exploitation of Superman. ER-76-77, 180-81, 207.

22

**EXHIBIT 37**
**1489**

favor," such that its "version of any disputed issue of fact is … presumed correct."

*Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  The court must make

"[c]redibility determinations" and "weigh[] … the evidence" in favor of the non-

moving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must

disregard all evidence favorable to the moving party that the jury is not required to

believe," *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

*DC's Cross Appeal On Its Second Through Fourth Counterclaims*

DC's Second, Third, and Fourth Counterclaims allege that Larson's claims

below are barred by the parties' 2001 settlement agreement and the Copyright

Act's three-year limitations period.  These threshold claims were fully adjudicated

by the district court's Rule 54(b) judgment and are ripe for appeal.

I. Marks' October 19, 2001, letter reflects a legally enforceable agreement

to resolve all claims at issue here, because it details all the essential terms of an

agreement:  the scope of rights at issue, a significant cash payment, and generous

royalty terms, amounting to tens of millions of dollars for Larson.  The letter

expressly stated that Larson "accepted" DC's offer and referred to the parties'

"monumental accord."  Both parties' representatives testified that they understood

an agreement had been reached.  Given the parties' agreement on the essential

terms detailed in the October 19, 2001, letter, it is irrelevant that the parties

23

**EXHIBIT 37**
**1490**

subsequently failed to conclude a formalized deal document. *E.g.*, *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011). At a minimum, DC is entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in the October 19 letter. *E.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010).

II. DC was entitled to factfinding on its limitations counterclaim. Under the parties' tolling agreement, the limitations period restarted ten days after either party "terminat[ed]" negotiations in writing. Larson herself has taken conflicting positions as to when negotiations were terminated. Under the theory she asserted below—which the district court accepted on summary judgment—her claims were timely. But in *Shuster*, to avoid a tortious interference claim, she asserted a theory of termination that would make her claims here time-barred. Her conflicting positions confirm the existence of a factual dispute only a jury can resolve.

*Larson's And DC's Appeals On Their Respective First Claims*

I. The district court entered Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, but the judgment did not fully and fairly adjudicate those claims, because the court never conclusively determined all "rights and obligations" in the Superman works at issue.

II. Assuming the judgment on the parties' First Claims is ripe for appeal, the judgment should be affirmed in part and reversed in part. The court held that the

24

**EXHIBIT 37**
**1491**

vast majority of works at issue were created as works-for-hire, including *Action Comics #2-3, #5-61*, pages 1-2 of new material in *Superman #1, Superman #2-23*, and all strips created after the Syndication Agreement with McClure. Those rulings all involve Superman works created entirely after Siegel and Shuster assigned all Superman rights to DC and entered into employment agreements with DC to produce new Superman work under DC's direction. Those works are obviously and unambiguously works-for-hire. But the court also held that *Action Comics #1* and *#4, Superman #1* (pages 3-6), and the two weeks of Strips created before the Syndication Agreement were not works-for-hire and thus could be recaptured. Those rulings were incorrect. The district court also erred in ruling on rights contained within certain Promotional Announcements without examining the best visual evidence of their contents.

## ARGUMENT

### DC'S CROSS-APPEAL ON ITS SECOND THROUGH FOURTH COUNTERCLAIMS

I.   **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE**

A.   **Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation**

Under California law, an enforceable agreement is formed where one party accepts another party's offer in exchange for consideration. CAL. CIV. CODE

**EXHIBIT 37**
**1492**

§1550. And once a party accepts an offer, an enforceable agreement may arise

even if subsequent documentation is contemplated, or additional terms and

conditions are subsequently raised. *See Facebook*, 640 F.3d at 1037-38; *Estate of*

*Thottam*, 165 Cal.App.4th 1331, 1340-41 (2008); *Elite Show Servs., Inc. v.*

*Staffpro, Inc.*, 119 Cal.App.4th 263, 268-69 (2004); *Harris v. Rudin, Richman &*

*Appel*, 74 Cal.App.4th 299, 307 (1999); *Ersa Grae Corp. v. Fluor Corp.*, 1

Cal.App.4th 613, 624 & n.3 (1991).

The question is simply whether the agreed-upon terms are "sufficiently

definite that a court can ascertain the parties' obligations thereunder and determine

whether those obligations have been performed or breached." *Elite*, 119

Cal.App.4th at 268. So long as "the parties have agreed to its existing terms," and

those terms are definite, the "fact that an agreement contemplates subsequent

documentation does not invalidate the agreement." *Ersa*, 1 Cal.App.4th at 624 n.3;

*see Facebook*, 640 F.3d at 1037-38; *Thottam*, 165 Cal.App.4th at 1340-41.

"Any other rule" would allow a party to repudiate a contract "whenever the

understanding was that it should be reduced to another written form, by simply

suggesting other and additional terms and conditions." *Clarke v. Fiedler*, 44

Cal.App.2d 838, 847 (1941). "If this were the rule, the contract would never be

completed in cases where, by changes in the market, or other events … it became

the interest of either party to adopt that course in order to escape or evade

**EXHIBIT 37**
**1493**

obligations incurred in the ordinary course of commercial business." *Id.*  Put
simply, "few contracts would be enforceable if … subsequent disputes were taken
as evidence that an agreement was never reached." *Patel v. Liebermensch*, 45
Cal.4th 344, 352 (2008).  Accordingly, "[w]here the writing at issue shows 'no
more than an intent to further reduce the informal writing to a more formal one,'"
the parties' "failure to follow it with a more formal writing does not negate the
existence of the prior contract." *Harris*, 74 Cal.App.4th at 307.

   *Facebook* illustrates this rule.  After one day of settlement negotiations, the
parties signed a handwritten, one-and-a-third page term sheet reflecting basic terms
of a corporate acquisition, including cash and stock consideration and mutual
releases.  640 F.3d at 1037.  The settlement subsequently foundered during
negotiation over documents that Facebook said were "required to finalize" the
agreement, including a stock agreement and release form.  *Id.*

   This Court held that the parties had formed an enforceable agreement,
because the existing writing showed that the parties "meant to bind themselves and
each other, even though everyone understood that some material aspects of the deal
would be papered later." *Id.* at 1038.  An informal agreement is not enforceable,
the Court explained, if it lacks "necessary term[s]," but it will be enforced "so long
as the terms it does include are sufficiently definite for a court to determine
whether a breach has occurred" and fashion an appropriate remedy. *Id.* at 1037-38.

27

**EXHIBIT 37**
**1494**

The test for enforceability, this Court remarked, is not "very demanding," and was "easily" passed by the term sheet: "The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives." *Id.*

Much the same is true here, as the following sections show.

### B.    The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law

The uncontradicted, documentary evidence establishes that Larson accepted DC's offer on October 19, 2001, in a written letter that identifies all the essential terms of the settlement.

1. The October 19 letter explicitly stated: "The Siegel Family … has accepted D.C. Comics' offer of October 16, 2001." SER-456. The letter congratulated DC on "this monumental accord." SER-461. And it detailed "[t]he terms" of the agreement in six, single-spaced, typewritten pages, *id.*—a much more thorough and detailed writing than the one-and-a-third page handwritten sheet enforced in *Facebook.* SER-456-61.

In the entertainment industry, it is standard for parties to recognize and perform contractual obligations in the absence of a formalized, long-form contract (or, sometimes, any written contract). *See* Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101, 117-20 (2001); Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film*

**EXHIBIT 37**
**1495**

*Agreements*, L.A. LAW. 18, 19 (Apr. 1999); Jay M. Spillane, *Lawsuits over*

*"Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily*

*Avoided)*, 11 ENT. & SPORTS LAW. 15, 15 (1993).  The question, as in *Facebook*, is

simply whether the essential terms of the agreement can be identified.  Here the

October 19 letter specified every term "deemed essential as a matter of law" in a

copyright assignment, *i.e.*, "the subject matter, the price, and the party against

whom enforcement is sought."  *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986);

*see Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361-62 (Fed. Cir. 2005); *Toledano v.*

*O'Connor*, 501 F.Supp.2d 127, 142 (D.D.C. 2007).  The letter identified:

> • the full scope of rights assigned:  "all of [their] rights in the 'Superman'
> and 'Spectre' properties (including 'Superboy'), resulting in 100%
> ownership to D.C. Comics"

> • the precise cash terms:  an "advance of $2,000,000" and a "signing bonus
> of $1,000,000"

> • the specific royalty terms:  "6% of Superman/Spectre Gross Revenues"
> from "all media" other than publications and "1% of the cover price of DC
> Comics' publications."  SER-456-58.

Nowhere did the letter contain any suggestion that Larson's acceptance was

tentative or contingent on formal documentation.[5]  The extrinsic record confirms

-----

[5] Under California law, an initial writing is not enforceable if it *clearly*
demonstrates that the parties did *not* intend to be bound until other documents were
executed.  *See Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208-11 (2006);
*Harris*, 74 Cal.App.4th at 307; *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th
348, 358 (1998); *Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal.App.3d 1555, 1562-
63 (1989); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996).

**EXHIBIT 37**
**1496**

the opposite. Marks testified he worked through "the last open point" of the

agreement with Schulman on October 16, which "closed the deal," and he

"believed that an accord had been reached on the terms exactly set forth in this

letter." SER-105-06, 111-12. Schulman testified the October 19 letter "accurately

set forth all material terms of our agreement." SER-435. DC manifested its

understanding that an agreement was reached by beginning performance, setting

aside a reserve account for the Siegels and including in its license agreement with

Warner Bros. a requirement that the Siegel family be given screen credit in an

upcoming Superman movie—both terms required by the October 19 writing. SER-

397, 399, 435-36, 459.

     2. The district court nevertheless held that no agreement was formed on

October 19, finding that the terms of Marks' October 19 acceptance letter were

"materially different" from DC's five-page letter of October 26, 2001, and "vastly

different" from the 56-page "long form" draft of February 1, 2002. SER-64.

These differences, the court found, showed that the parties "had not passed the

threshold where they had finalized and assented to all material terms," because "as

they attempted to sketch in the finer details of a settlement from the broad outlines

contained in the October 19 letter, more and more issues arose upon which they

could not reach agreement, resulting in the negotiations falling apart." SER-63-64.

**EXHIBIT 37**
**1497**

That analysis misses the point.  Marks' October 19 acceptance of DC's offer

settled the matter, and none of the subsequent discussions undid that contract.  The

fact that the parties did not reach agreement on issues that "arose" as they

attempted to formalize the deal has no bearing on whether the parties had

previously agreed on the *essential* terms of the deal, while understanding "that

some material aspects of the deal would be papered later." *Facebook*, 640 F.3d at

1038.  And the court nowhere identified in the October 26 letter any disagreement

over any *essential* term specified in the October 19 letter—*i.e.*, the scope of rights

transferred or key financial terms.[6]

Rather than revealing a disagreement over essential terms, DC's October 26

letter expressly confirms its understanding that a binding agreement had been

reached.  The letter states that Schulman was merely providing a "more fulsome

outline of what we believe the deal *we've agreed to* is," and that DC would begin

"working on the draft agreement" to put "this super-matter transaction *in document*

*form*."  SER-463 (emphasis added).  The October 26 letter itself was thus neither

---

[6] The court wrongly suggested that this case is like *Weddington Prods., Inc. v.
Flick*, 60 Cal.App.4th 793 (1998), because in both cases "the parties had agreed to
a rough outline of an agreement, but were thereafter unable to reach agreement on
the finer details and the negotiations fell apart."  SER-62.  In fact, *Weddington* held
the settlement agreement at issue unenforceable only because the parties had failed
to agree on *the most essential matter in dispute between them*—the terms of a
license for a "sound library," which "was a material issue to both sides" and thus
not "a minor, immaterial or separable issue."  60 Cal.App.4th at 815.

31

**EXHIBIT 37**
**1498**

an "acceptance" nor a "rejection" of an "offer" by the Siegels—it was instead a

confirmation of terms *already agreed to*, as set forth in the October 19 letter, with

further recognition that the deal would be "papered." *Facebook*, 640 F.3d at 1038.

The district court's focus on the "vastly different" February 2002 long-form

agreement was even more misplaced. It was, of course, vastly different in the

sense that it was a 56-page, detailed, formal draft contract, rather than a listing of

terms—just the kind of formal documentation that was attempted without success

in *Facebook*. But, again, nowhere did the court identify any essential term in the

long-form agreement that differed from the essential terms in the October 19 letter.

Marks himself did not express any reservations about the February 2002 long-form

until three months later, after he learned that Larson had complained about it.

SER-436. Even then, Marks told Schulman the draft was "not contrary to what

[had been] agreed to" and the parties could "deal with it." SER-126-27, 130, 436.

In any event, even if the February 2002 draft included different terms, it is

the *new* terms that would be unenforceable, not the October 19 terms. As this

Court explained in holding that Facebook's duty to draft deal documents did not

render the preexisting term sheet unenforceable: "[I]f Facebook should draft terms

that are unfair or oppressive, or that deprive the Winklevosses of the benefit of

their bargain, the district court could reject them as a breach of the implied

covenant of good faith and fair dealing .... The district court got it exactly right

32

**EXHIBIT 37**
**1499**

when it found the Settlement Agreement enforceable but refused to add the stack

of documents drafted by Facebook's deal lawyers." 640 F.3d at 1038. The same

analysis applies here. The 56 pages drafted by DC's lawyers were just that—pages

drafted by DC's lawyers. A binding contract already existed, in the essential terms

the Siegels accepted on October 19.

     3. Although the district court itself identified no disagreements over

essential terms reflected in the correspondence and drafts following the October 19

letter, Larson offered up some 10 pages of differences. But none were raised at the

time (*i.e.*, six years earlier, in 2001), nor did they reflect material differences over

an essential term. For example, Larson contended the October 19 and October 26

letters described the rights transfer differently, but both merely used different

lawyerly phrases to say that DC would receive 100% of the rights in all Superman

properties. *Compare* SER-458, *with* SER-464. Larson also asserted that the letters

state different terms for royalty reductions in "extraordinary cases" involving the

use of Superman rights with other properties, but the only difference is that while

the October 19 letter gives one *example* of such a use, the October 26 letter

provides additional examples; the basic contractual term is identical. *Compare*

SER-457-58, *with* SER-467-68. Larson also pointed to language about Superman

"cameo" appearances in other characters' stories, SER-553-54, but both letters

provide that royalties for "cameos" will be zero, *compare* SER458, *with* SER-467,

33

**EXHIBIT 37**
**1500**

consistent with industry standards, SER-172-75; Benjamin A. Goldberger, *How the*
*"Summer of the Spinoff" Came to Be: The Branding of Characters in American*
*Mass Media*, 23 Loy. L.A. Ent. L. Rev. 301, 320, 371 (2003).[7]

Other purported differences Larson identified—*e.g.*, representations and
warranties, an obligation to provide certain historical documents, a right of first
refusal on biographical works, publicity obligations, advertising credits, dispute-
resolution procedures, and indemnities—likewise do not represent material
differences concerning essential terms.  *See Inamed Corp. v. Kuzmak*, 275
F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002) (terms concerning license termination,
indemnification, sublicenses, transfer of rights, confidentiality, and dispute
resolution not essential).  The differences in language thus do not undermine the
basic agreement that is reflected in the plain terms of the October 19 letter and
confirmed by the parties' contemporaneous conduct and subsequent testimony.

**C.**      **At A Minimum, DC Is Entitled To Factfinding As To Whether**
**The Parties Intended To Be Bound By The Essential Terms**
**Identified In The October 19, 2001, Letter**

At minimum, if there were any genuine dispute as to whether the parties
intended to be bound by the essential terms identified in the October 19 letter, that

---

[7] As Schulman explained, the different language in his letter concerned the
precise definition of "cameo," SER-437, which would have been worked out in the
long form.  Marks did not object to Schulman's description of "cameos" at the
time, and when asked at his deposition to identify all differences between his letter
and Schulman's, he did not mention "cameos."  SER-118-19, 435, 533-44.

34

**EXHIBIT 37**
**1501**

dispute should have been resolved by a jury.  The question whether parties

intended to be bound by terms expressed in an informal agreement is one of fact,

*see Bustamante*, 141 Cal.App.4th at 208; *Banner*, 62 Cal.App.4th at 358, and thus

"summary judgment is inappropriate" where that question is materially contested,

*S. Cal. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004); *see*

*Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("summary enforcement

inappropriate" where there is "conflicting evidence" as to whether parties agreed

on "material terms" of settlement agreement).[8]

The record described above, especially when viewed favorably to DC,

plainly precludes summary judgment against DC on this question.  In *Mattel*, this

Court reversed the same district court for making improper determinations

concerning contractual intent on summary judgment, where they "turn[ed] in part

on the credibility of conflicting extrinsic evidence."  616 F.3d at 910; *see Mattel,*

*Inc. v. MGA Entm't, Inc.*, 2011 WL 3420603, *2 (C.D. Cal. Aug. 4, 2011) (jury

finding on remand opposite of what court held on summary judgment).

The district court made the same mistake here.  Rather than accepting all

inferences and making all credibility determinations in DC's favor, it engaged in

its own factfinding as to the parties' intent, and rejected inferences favoring DC.

---

[8] The district court said *Callie* found "no enforceable agreement" because of
disagreements over its "finer details," SER-64, but *Callie* actually found disputed
factual issues concerning agreement on *essential* terms, *see* 829 F.2d at 890-91.

35

**EXHIBIT 37**
**1502**

For example, the court speculated that DC's post-agreement conduct "could as much be seen as goodwill gestures on defendants' part while the negotiations continued as [they] could reflect an indication on [DC's] part that they thought they were contractually bound to do the same." SER-65. But on summary judgment, the court was required to adopt the inference favorable to DC.

Similarly, in analyzing the differences among the letters and February draft agreement, the court observed that "materiality is in the eye of the beholder," and then held that the differences were material enough to establish that there was no agreement on October 19, 2001. SER-63. But any question whose answer depends on "the eye of the beholder" is a classic jury question. *Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, *6 (S.D.N.Y. Nov. 7, 2001) (where issues are "in the eyes of the beholder," "[r]are is the case where summary judgment would be appropriate").[9] The district court also appeared to credit Marks' subsequent

---

[9] *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681-82 (5th Cir. 2001) ("what constitutes 'substantial sales experience' is in the eye of the beholder" and thus "the trier-of-fact's duty to determine"); *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment ruling on parody defense because "[h]umor … is in the eyes of the beholder"); *Recycling Solutions Tech., LLC v. Rosenberg*, 2011 WL 1696826, *1 (E.D. Ky. May 4, 2011) ("Beauty may be in the eye of the beholder, but summary judgment requires something a bit more concrete."); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 824-25 (N.D. Iowa 2004) (though "fraud, like beauty, is in the eye of the beholder … this court's task on motions for partial summary judgment [is to] determine only whether the resisting parties have generated genuine issues of material fact"); *Vass v. Compaq Computer Corp.*, 953 F.Supp. 114, 119 (D. Md. 1997) ("judgment made through the eyes of the beholder" is "not to be summarily determined").

36

**EXHIBIT 37**
**1503**

testimony about the relevant events over testimony from DC witnesses, including

testimony concerning the "goodwill gesture" point, which DC witness Paul Levitz

disputed, and the materiality of differences between the October 19 and 26 letters,

which Schulman addressed.  SER-67, 397-99, 435-37.

Beyond the record evidence already discussed, new evidence has come to

light further indicating that Larson knew she was bound by the October 19 terms.

In *Shuster*, the district court compelled Larson to produce a July 2003 letter she

wrote to her brother, in which she repeatedly states that Marks insisted, in August

2002, that Larson had a "deal with Time Warner/DC."  SER-810-14, 824-25.  The

letter states that Marks would "testify against [her] in court" if she repudiated the

deal and accepted Toberoff's offer.  SER-811.  The letter confirms that Marks told

Toberoff that Larson had a "deal" with DC.  SER-811.  Given this letter, there is *at

least* a jury question as to whether Larson understood she was bound to the

October 19 terms.

## II.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM

The district court's order granting summary judgment against DC on its

limitations counterclaim also erroneously resolves factual disputes against DC.

Copyright claims must be filed "within three years after the claim accrued,"

or 1,095 days.  17 U.S.C. §507(b).  Larson's claims accrued on April 16, 1999—

**EXHIBIT 37**
**1504**

the day her Notices purport to take effect.  SER-62.  Accordingly, Larson was

required to file her claim by April 16, 2002.  The parties, however, entered into a

tolling agreement on April 6, 2000—356 days into the 1,095-day limitations

period, with 739 days left to run—providing that it would expire, as relevant here,

"10 business days after … either party terminat[es] negotiations, in writing,

relating to the Notices."  SER-348-51.

There are two possible termination "triggers" for this provision.  One

occurred on May 9, 2002, when Larson's mother sent DC a letter stating that the

February 2002 draft long-form contract "makes an agreement impossible."  SER-

234.  If that letter terminated negotiations, then the limitations period restarted on

May 20, 2002, and ended May 28, 2004—five months before Larson filed suit.

The other possible event occurred on September 21, 2002, when the Siegels

sent a letter to DC stating that "we are totally stopping and ending negotiations."

SER-420.  If that letter terminated negotiations for purposes of the tolling

agreement, then the limitations period restarted 10 days later, on October 4, 2002,

and closed on October 11, 2004—four days after Larson filed suit.

Larson herself has taken conflicting positions as between these two

possibilities.  In the district court below, she contended that negotiations were not

terminated until the later date of September 21, 2002.  The court agreed, holding

her claims to be timely.  SER-60-61.

**EXHIBIT 37**
**1505**

Since that ruling, however, Larson has argued the opposite in *Shuster*. In *Shuster*, DC alleges that Toberoff interfered with DC's business relationship with Larson by wrongfully inducing her to repudiate the 2001 settlement and cut ties with DC. SER-816-19. Toberoff and Larson filed an unsuccessful motion to strike this claim, arguing he "had [nothing] to do with the May 9[, 2002] letter that ended DC's purported 'prospective economic advantage'" and made settlement discussions "moribund." SER-825, 868, 878-79; *see* Appeal Nos. 11-55863, 11-71844 .

Larson cannot have it both ways. Either the parties' settlement negotiations "ended" on May 9, 2002—in which case Larson's claims here are time-barred—or on September 21, 2002—in which case Larson has essentially conceded Toberoff's liability for DC's interference claim in *Shuster*. Settled principles of estoppel prevent Larson (and Toberoff) from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). At the very least, her shifting positions demonstrate that a jury, too, could go either way. *See Mattel*, 616 F.3d at 910.

**EXHIBIT 37**
**1506**

## LARSON'S APPEAL OF HER FIRST CLAIM AND
## DC'S CROSS-APPEAL ON BOTH PARTIES' FIRST CLAIMS

I.    **LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE HER CLAIM HAS NOT BEEN FULLY AND FINALLY ADJUDICATED**

Before this Court can exercise jurisdiction over an interlocutory appeal, it must determine *de novo* whether the claim on appeal has been fully adjudicated. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1084 (9th Cir. 2010). Rule 54(b) requires final judgment on an *entire* claim. *Ariz. State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991).

The Rule 54(b) judgment on DC's Second through Fourth Counterclaims was proper, as those claims were fully adjudicated. The Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, however, was invalid and thus not appealable. *See* Dkt. No. 5-1.

Larson's First Claim seeks a declaration regarding the parties' "respective *rights and obligations* with respect to the Termination and the *copyright interests thereby recaptured.*" ER-338-39 ¶¶53-55 (emphasis added). The district court's judgment did not fully determine the parties' "rights and obligations" or the scope of the "copyright interests" assertedly recaptured by Larson. For example, the judgment does not establish the extent to which Larson's recaptured rights—if any—are diminished by the Promotional Announcements owned by DC, which feature key story elements from *Action Comics #1*. Dkt. No. 5-1, at 11-17. The

40

**EXHIBIT 37**
**1507**

court also left open whether its description of the limited elements in *Action Comics #1* was intended to be "dicta," as Larson argued below.  SER-305-08, 313-19, 325-26, 2-3.

As discussed *supra* at 20-22, both Larson and the district court acknowledged that the court's summary judgment rulings left open key legal and factual questions concerning the "scope of [Larson's] recaptured copyrights."  SER-198, 298-305, 310-13, 321-24, 2-3.  Larson sought finality on the First Claim by amending it to remove a request for an accounting, but the accounting request was only *one* of the unresolved matters.  The First Claim will be finally adjudicated only when the parties' "rights and obligations" and "copyright interests" are fully determined.

## II.    THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT FROM TERMINATION

Assuming the Court has jurisdiction to consider the remainder of this appeal, the questions largely concern whether certain early Superman works qualify as "works for hire" under the 1909 Copyright Act, 17 U.S.C. §§24, 26 (1909) (repealed 1976).  As Larson acknowledges, LB-21, a work made-for-hire under the 1909 Act is not subject to the termination provisions created by the 1976 Act, 17 U.S.C. §§203(a), 304(c)-(d).  The district court held that the vast majority of works

41

**EXHIBIT 37**
**1508**

at issue were created as works-for-hire, but it held a few works were not, and thus

could be recaptured. The first category of rulings was correct, the second was not.

**A.    A Work Is Made-For-Hire Under The 1909 Copyright Act When It Is Created At The "Instance And Expense" Of The Commissioning Party**

1. It has been "the well-established law of this circuit"—and others—for

decades that a work qualifies as made-for-hire under the 1909 Act whenever it was

created at the "instance and expense" of another party. *Fox*, 429 F.3d at 879-81.[10]

The instance-and-expense test embodies a presumption "when one person engages

another ... to produce a work of an artistic nature ... the title to the copyright shall

be in" the employer. *Lin-Brook*, 352 F.3d at 300.

The "instance" requirement is met where the hiring party was the

"motivating factor in producing the work." *Fox*, 429 F.3d at 879. What matters is

"the degree to which the 'hiring party had the right to control or supervise the

artist's work,'" irrespective of whether it was actually exercised. *Id.* The

"expense" requirement can be satisfied in different ways: (1) the hiring party may

assume "the financial risk of the [work's] success," *id.* at 881, or (2) "simply

---

[10] *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000); *Dolman v. Agee*, 157 F.3d 708, 711-12 (9th Cir. 1998); *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158-63 (2d Cir. 2003); *Easter Seal Soc'y v. Playboy Enters.*, 815 F.2d 323, 325-27 (5th Cir. 1987).

42

**EXHIBIT 37**
**1509**

pay[]" a sum for its creation, *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d

Cir. 1995), or (3) the hired party may "expect[] to be compensated" for his work,

*Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978).

If the "instance and expense" test is satisfied, the court must presume the

parties agreed the copyright "lies *ab initio* with the commissioning party." *Fox*,

429 F.3d at 881; *see Self-Realization*, 206 F.3d at 1326; *Dolman*, 157 F.3d at 711-

12. That presumption is rebutted *only* if the party seeking to defeat work-for-hire

status adduces evidence proving that the parties expressly agreed the

commissioning party would *not* own the copyright. *Fox*, 429 F.3d at 881; *Dolman*,

157 F.3d at 712-13; *May*, 618 F.2d at 1368-69; *Lin-Brook*, 352 F.2d at 300.

2. In a tacit concession that she cannot prevail under the settled instance-

and-expense test, Larson labors to escape it. She first complains the test has been

"criticized," but concedes it has been this Circuit's controlling law for decades.

LB-23.[11]

---

[11] Although the criticism is therefore irrelevant, it is also wrong. The
commentators Larson cites would limit work-for-hire to traditional "employees"—
excluding works made by independent contractors at the "instance and expense" of
another—on the theory that the 1909 Act refers to the "employer" in the case of a
work-for-hire. LB-26-27. But the word "employer" plainly does *not* limit work-
for-hire to the "more conventional master-servant relationship." LB-26; *see* LB-
57-58. The cases Larson cites refer only to use of the word "employee," which
*does* generally refer to common-law master-servant relationships. *See Clackamas
Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003); *CCNV v.
Reid*, 490 U.S. 730, 738-40 (1989). The term "employer" has no such connotation,
because it is perfectly conventional to refer to the "employer of an independent

43

**EXHIBIT 37**
**1510**

Larson also suggests that the instance-and-expense test should be applied differently in the context of termination rights under the 1976 Act (LB-27-28), but she cites nothing in the Act's text or history supporting such a rule,[12] and it makes no sense. A work is either made-for-hire or it is not—it cannot be a work-for-hire for all purposes *except* termination rights. In the termination context as in any other, if the work was made at the instance and expense of the employer—whether by a traditional employee or an independent contractor—then the employer was the statutory "author" *ab initio*, leaving no authorship rights for anyone else to recapture. *E.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (applying instance-and-expense test in termination context to find work-for-hire).[13]

---

contractor." *See Meyer v. Holley*, 537 U.S. 280, 290 (2003); *St. Paul Water Co. v. Ware*, 83 U.S. 566, 576-77 (1872); *Chaffin v. U.S.*, 176 F.3d 1208, 1212 (9th Cir. 1999); RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-29 (1965); 41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005).

[12] Indeed, leading cases like *Picture Music* and *Lin-Brook* had already applied work-for-hire beyond traditional employer-employee relationships by 1976, and Congress did nothing to alter the doctrine as it applied to works governed by the 1909 Act. What is more, this Court's precedents largely solidified the instance-and-expense test *after* 1976—starting with *May* in 1980, *supra* n.10—refuting any suggestion that the 1976 Act somehow undermined the test.

[13] Larson also errs in asserting that the instance-and-expense test is "ill-suited for summary adjudication due to its inherently fact-intensive nature." LB-57. Courts frequently apply the test on summary judgment where, as here, there are no disputes of historical fact. *E.g.*, *Self-Realization*, 206 F.3d at 1324, 1330; *Dolman*, 157 F.3d at 711; *Kirby*, 777 F.Supp.2d at 738, 743; *Scherr v. Universal Match Corp.*, 297 F.Supp. 107, 113 (S.D.N.Y. 1967), *aff'd*, 417 F.2d 497 (2d Cir. 1969).

**EXHIBIT 37**
**1511**

**B.    The District Court Correctly Held That** *Action Comics #2-3, #5-61, Superman #1 (Pages 1-2)-23,* **And The Post-McClure Strips Were Works-For-Hire**

In the time period at issue here, DC published and distributed Superman stories in various formats, including:  as part of *Action Comics*, as the standalone comic *Superman*, and in "strips" syndicated in daily newspapers.  The district court held that the following works were made-for-hire:  the Superman works in *Action Comics #2-3* and *#5-61*, pages 1-2 of *Superman #1* and *Superman #2-23*, and newspapers strips created after DC entered into the Syndication Agreement with McClure ("Strips").

All of the foregoing works were both created and published after Siegel and Shuster entered into two relevant agreements with DC:  the 1937 Employment Agreement of December 7, 1937, and the 1938 Assignment, pursuant to which Siegel and Shuster assigned all rights in all aspects of Superman.  *Supra* at 11-12.

Under those agreements, DC possessed complete control over creation of new Superman stories and elements.  Nothing could be done without DC's consent.  DC warned Siegel and Shuster that DC would "not tolerate or accept slipshod work," and that if their new Superman stories and artwork did not "show a marked improvement," DC would "make other arrangements to have it done."

---

In the cases cited by Larson, summary judgment was precluded by credible, admissible, direct evidence that the parties did not intend the commissioning work to be made-for-hire.  *See Fox*, 429 F.3d at 875; *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002); *May*, 618 F.2d at 1368.

45

**EXHIBIT 37**
**1512**

SER-223, 249.  Given the 1938 Assignment, DC had the right to employ other artists to create new Superman works if Siegel and Shuster could not meet DC's quality and timing demands.  The parties' correspondence further shows that DC:

- advised Siegel and Shuster that they "need[ed] constant editorial supervision and an alter-ego who can criticize and point out small details … which may make or break the strip," SER-220;
- required them to submit their draft material far enough "in advance" that DC could go over it "with a fine tooth comb," SER-220, 224, 228-35;
- made substantive revisions to the draft material, SER 223-24, 231, 242;
- demanded that Siegel "re-write" scripts and sent him synopses to "elaborate in detail," SER 223-24, 231, 237-38;
- provided detailed instructions for the illustrations, SER-234-35, 242, 244-45;
- directed Siegel as to story elements and themes, SER-223-24, 234-38; and
- insisted that Siegel and Shuster submit sketches of cover art for DC to "okay," SER-224, 234-35, 242.

The record also established without ambiguity that DC incurred significant expense to create new Superman works after retaining Siegel and Shuster and requiring their assignment of all rights in the character and story.  DC made a major financial investment in commissioning Siegel and Shuster to create new Superman material—DC compensated them significantly for that material, and bore all the costs of printing, distributing, and promoting the Superman works, which itself suffices to satisfy the expense requirement.  ER-425-27, 960; SER-223-24, 678-79; *Fox*, 429 F.3d at 881.

**EXHIBIT 37**
**1513**

After Siegel and Shuster spent years unsuccessfully trying to sell their nascent character and story, DC was the one party willing to take the "tremendous gamble" of purchasing the rights to Superman, hiring Siegel and Shuster to create new Superman works, and developing those works into a successful property. ER-425-27. Further, DC assumed a significant financial risk in relying entirely on Siegel and Shuster, rather than hiring additional artists to meet the demands of producing daily copy for syndicated newspaper comic pages. If Siegel and Shuster did not satisfy their obligations to provide quality work on a timely basis, the result would be empty pages in *Action Comics*, blank space in daily newspaper funny pages, and financial loss to DC's brand and bottom line.

Finally, it bears emphasis that after the 1938 Assignment, DC owned the Superman character and story outright. ER-917. When the commissioning party owns the copyright in the underlying work, that party necessarily has full authority to control and develop the work, thus making any derivative work a work-for-hire. *See Hogarth*, 342 F.3d at 163; *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); 17 U.S.C. §7 (1909) (derivative works "produced with the consent of the proprietor of copyright … shall be regarded as new works").[14]

---

[14] It is true that an artist *can* own the copyright in his contributions to a derivative work (LB-31), but *not* if the derivative work is made-for-hire.

**EXHIBIT 37**
**1514**

Nothing in the foregoing factual record is disputed, and it plainly establishes that all new Superman stories and elements published after the 1937 Employment Agreement and 1938 Assignment were created because DC employed and paid Siegel and Shuster to create them. If DC at any point became dissatisfied with their work, DC could have terminated the relationship and paid someone else to develop DC's exclusive rights in Superman. ER-427, 917. The undisputed record shows, in short, that the new, derivative Superman works created after March 1938 were created at DC's instance and expense, and thus it is presumed that the parties agreed that DC would own the copyright in those works *ab initio*, unless Larson can establish an express agreement to the contrary. *Supra* at 43.

Larson does not even *attempt* to identify any such agreement, because none exists. That should end the matter. Larson instead proffers a litany of arguments with respect to each category of works, in an effort to show that the works were not created at DC's instance, or expense, or both. Those efforts are futile.

1.   *Action Comics #2-3, #5-6*

a.   The district court correctly held that *Action Comics #2-3, #5-6*, which were published between May and September 1938, were "done at the instance of" DC. ER-83. Before *Action Comics #1* was published, DC made clear that Superman would be a "new feature" requiring Siegel and Shuster regularly to supply DC with new material. ER-423. Consistent with their agreement, DC set

48

**EXHIBIT 37**
**1515**

aside space for the Superman feature in its comic books, including "every

succeeding monthly issue of Action Comics for the period in question," ER-83,

which was "published at regular intervals." ER-960.  For each installment, Siegel

and Shuster submitted Superman strips to DC and were paid $10 per page.  *Id.*

     b.  Larson's arguments that *Action Comics #2-3, #5-6* were not created at

DC's instance and expense are meritless.  Larson first contends the works cannot

be works-for-hire because DC did not commit to accepting new material, and thus

there was no "guaranteed compensation" and the expense factor is not satisfied.

LB-29.  That argument has been "roundly rejected."  *Kirby*, 777 F.Supp.2d at 742.

No court has ever held that the "expense" factor requires guaranteed compensation.

*See Murray*, 566 F.2d at 1311 n.7 ("neither the form of compensation, nor the

amount, is determinative"); *Picture Music*, 457 F.2d at 1216 (lack of fixed

payment "is never conclusive").  To the contrary, courts have found work-for-hire

where there was *no* obligation to pay an artist for unpublished works.  *E.g.*,

*Playboy*, 53 F.3d at 555; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136,

1142 (9th Cir. 2003); *Picture Music*, 457 F.2d at 1216.  In fact, the lack of a long-

term guarantee "is not something which is atypical" in a work-for-hire situation.

ER-86.  The expense requirement is satisfied, for example, where an artist is paid

only in royalties, which may amount to nothing if the work does not succeed.

*Warren*, 328 F.3d at 1142.

49

**EXHIBIT 37**
**1516**

Larson next argues that the 1938 Employment Agreement undermines the work-for-hire status of *Action Comics #2-3, #5-6* because it states that DC "*hereby employ*[s] and retain[s] you." LB-30 (emphasis added). But that language simply signifies that Siegel and Shuster were now subject to the particular terms of the 1938 Employment Agreement—it does nothing to establish that Siegel and Shuster were not already producing Superman work at DC's instance and expense. The 1938 Employment Agreement, in fact, expressly states that Siegel and Shuster "*have been* doing the art work and continuity *for us*" and that DC wanted the pair "to *continue* to do said work." ER-605 (emphasis added). The new written agreement thus simply "formalized what had informally been ongoing beforehand." ER-85.

Finally, Larson contends that "Siegel had already written" the Superman stories in *Action Comics #2-3, #5-6*, before 1938. LB-32. Larson's first theory is that because the district court held that certain elements of *Action Comics #4* and *Superman #1* were created before 1938—which is erroneous in any event, *infra* at 61-68—it must be true that the other *Action Comics* contained preexisting elements. LB-32. But Larson has pointed to absolutely no *evidence* that *Action Comics #2-3, #5-6* were based on preexisting materials. Absent such evidence,

50

**EXHIBIT 37**
**1517**

there is no basis for any inference that they were.[15]  Larson's second theory is that

the new works were based on a paragraph written by Siegel in 1934 that

"previewed" Superman's future exploits (LB-32), but the district court rejected that

argument, holding that the so-called "preview" paragraph "constitutes mere *ideas*

for future works rather than *expressions* of those ideas, and thus contains no

copyrightable material."  ER-75; *see Harper & Row, Publishers v. Nation Enters.*,

471 U.S. 539, 547 (1985) ("no author may copyright facts or ideas").  Larson did

not appeal that ruling, thereby waiving this contention.  *See Partmar Corp. v.

Paramount Pictures Theatres Corp.*, 347 U.S. 89, 99 (1954); *Gausvik*, 392 F.3d at

1008 n.1.

   2.   *Action Comics #7-61* And *Superman #1-23*

   a.  *Action Comics #7-61* and *Superman #1-23* were produced by Siegel and

Shuster not only after the 1938 Assignment gave DC exclusive rights in Superman,

but after the 1938 Employment Agreement formalized the artists' working

relationship.  ER-87.  The 1938 Employment Agreement confirmed that the works

were created at DC's instance:

- Siegel and Shuster "will supply us each and every month …, in sufficient
   time for publication …, sufficient copy and art";

- "The standard of said comics shall be equal to the present standards";

---

   [15] As for *Action Comics #6*, Larson never argued below that this work was
based on pre-existing material, so the argument is waived.  *See Jachetta v. U.S.*,
653 F.3d 898, 906 (9th Cir. 2011).

**EXHIBIT 37**
**1518**

- "[I]f at any time the art and continuity of any feature shall not be up to the standard …, [DC] may terminate this agreement and substitute other artists";
- DC "shall have the right to reasonably supervise the editorial matter of all features." ER-605-07.

These works were also created at DC's expense. All three means of satisfying the expense requirement, *supra* at 42-43, were present here: DC assumed the financial risk of Superman's success and bore responsibility for printing, distributing, and promoting these works; DC paid Siegel and Shuster for these works; and Siegel and Shuster expected to be compensated pursuant to the 1938 Agreement, which provided that DC would "pay you on publication, for any and all of said comics," according to a fixed pay scale. ER-606.

Because *Action Comics #7-61* and *Superman #1-23* were plainly created at DC's instance and expense, they are works-for-hire as a matter of law.

b. None of Larson's barrage of contrary arguments has merit. Larson first contends that these works were not created at DC's "expense" because DC was obligated to pay only for works DC decided to publish. LB-49. But Larson did not below and does not now seek to recapture any unpublished, unpaid-for, non-copyrighted work (nor could she)—making this issue irrelevant. And she was paid for the works that were published, and no work-for-hire precedent requires *fixed compensation* for every possible submission to satisfy the "expense" test. *Supra* at

**EXHIBIT 37**
**1519**

49.  The *Kirby* court correctly described Larson's argument to the contrary

(advanced by her same counsel here) as "roundly rejected."  777 F.Supp.2d at 742.

It is beside the point that Siegel and Shuster *also* incurred costs to create

these new Superman works.  LB-48.  It is undisputed that they were more than

compensated for those costs under the payment schedule established by the 1938

Agreement—they both became wealthy as a result of those payments.  ER-466,

585-86, 605-07; *see Playboy*, 53 F.3d at 555 (fact that artist provided own tools

and studio, hired assistants, paid taxes and benefits, and set his own work schedule

had "no bearing on whether the work was made at the hiring party's expense");

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 WL 398696, *20 (S.D.N.Y.

Mar. 15, 2002) (artist cannot "unilaterally ... disrupt a work for hire arrangement

by paying certain costs of the project that he was not contractually bound to pay").

Larson says DC's payments under the 1938 Employment Agreement were

"by law" not payments for work produced at DC's instance, but "a discretionary

*purchase* of completed material."  LB-49.  Larson cites no "law" so holding, and

the facts preclude that conclusion.  DC *already owned all rights to Superman*, so

there was nothing for DC to "purchase."  *Supra* at 47.[16]  Under the 1938

_____

[16] Larson says that testimony of DC expert Mark Waid proves DC did not own
the rights in not-yet-published Superman material, because Waid sought the
"blessing" of the Siegels to publish a newly discovered, unpublished Superman
work.  LB-52-53.  There is no evidence that Waid did so because he thought it was
legally required—indeed, a "blessing" is obviously not equivalent to a "license."

53

**EXHIBIT 37**
**1520**

Employment Agreement, DC paid the artists for work they were obligated to create on a specified timely basis, under quality standards enforced by DC.[17]  ER-605-07.

Larson next contends that *Action Comics #7-61* and *Superman #1-23* were not made at DC's instance because DC did not exercise complete control over Siegel's and Shuster's creative processes.  LB-55.  "All [DC] really had," Larson says, "was the purchasing power of any buyer."  *Id.*  No.  DC had much more— most significantly, it had the power to terminate Siegel and Shuster outright if they did not produce publishable-quality work, to retain other artists to create Superman works and, as the sole owner of Superman, to bar Siegel and Shuster from ever creating any more Superman works of any kind.  *Supra* at 12-13.  DC also had the right to supervise their work to determine whether it satisfied "present standards" of publication.  *See Fox*, 429 F.3d at 880 ("complete control over the author's work is not necessary").  The law does not require the employer to insert itself directly

---

And whatever Waid personally thought does not bind DC as a corporation, nor could his personal state of mind create or eliminate rights that existed as a matter of law in 1938 based on contractual agreements.  Finally, rights in unpublished works are not at issue here.  *Supra* at 52.

[17] The district court concluded that Larson "failed to present evidence that Siegel and Shuster were not, in any given instance, paid for their work."  ER-89.  Rather, the court held, a 1939 agreement between the parties suggested that the "pattern and practice" was for DC to pay Siegel and Shuster even for Superman material they had *not* created.  ER-90; *see* ER-965.  Larson addresses the court's inference at great length (LB-51-54), but her entire discussion misses the point: even if Siegel and Shuster were *not* paid for unpublished work, the works that *were* published plainly were created at DC's instance and expense.

**EXHIBIT 37**
**1521**

into the artist's creative process—after all, the whole point of commissioning an

artist is to engage the artist's creative talents. *See Martha Graham Sch. & Dance

Found., Inc. v. Martha Graham Sch. of Contemporary Dance, Inc.*, 380 F.3d 624,

635 (2d Cir. 2004). The employer need not dictate or shape how works are made:

"talented people … are expected by their employers to produce the sort of work for

which they were hired," *id.* at 640-41—exactly as Siegel and Shuster did here.[18]

    3.    *Post-McClure Newspaper Strips*

    a. Siegel and Shuster created many Strips after executing the 1938

Employment and Syndication Agreements. It is plain they were created at DC's

instance—Siegel and Shuster were engaged by DC for the express purpose of

creating them, as the district court held. ER-103. The Syndication Agreement

provided: "Detective agrees to permit [Siegel and Shuster] to supply 'Superman'

strip exclusively to us for syndication…." ER-609. The Syndication Agreement

also reaffirmed DC's exclusive ownership of Superman: "[T]he title 'Superman'

shall always remain the property of [DC]." ER-610. And the 1938 Employment

Agreement reinforced that Siegel and Shuster would timely "furnish … all of the

---

[18] Larson asserts in passing that the parties "could not have intended" these
works to be made-for-hire because courts in this time period applied the work-for-
hire doctrine only to "traditional employees." LB-56. This Court rejected the
identical argument in *Fox*, holding that General Eisenhower's war memoir, written
during the same time period at issue here, was a work-for-hire even though he was
not a traditional employee. *Compare* 429 F.3d at 877, *with id.* at 881 (Nelson,
D.W., J., dissenting).

**EXHIBIT 37**
**1522**

art and continuity for the newspaper strip entitled 'Superman'" to McClure.  ER-

605.  That Agreement also gave DC the express "right to reasonably supervise the

editorial matter of all features."  ER-607.  And again, the 1938 Employment

Agreement authorized DC to terminate Siegel and Shuster and retain other artists

to produce the Strips.  *Supra* at 12-13.

As the parties' correspondence establishes, DC gave Siegel and Shuster

"constant editorial supervision," insisting that the pair "send all the [newspaper]

material here before it goes to the syndicate for release" so its editors could review

the draft strips, make substantive revisions to the script and artwork, correct "any

mistakes," and "okay" the final strip before sending it to McClure.  ER-431-40,

445-56, 453, 460.  In a January 23, 1940, letter, an editor reminded Siegel:

"[P]lease do not forget that all copy must clear though our office … You've got to

give us plenty of time for okaying, so get busy."  ER-435.  DC made clear that if

the newspaper strips did not meet its editorial standards, "we shall have to consider

it 'unacceptable', and make other arrangements to have it done."  ER-460.

As the court below observed, the facts of this case are "eerily similar" to

those in *Picture Music*, 457 F.2d at 1214, and compel the same work-for-hire

conclusion.  ER-104.  As in *Picture Music*, the artists (Siegel and Shuster) worked

with another party (McClure) to create derivative works owned by a third party

(DC).  As in *Picture Music*, the employer here (DC) owned the original work, per

**EXHIBIT 37**
**1523**

the 1938 Assignment.  As in *Picture Music*, the artists here exercised substantial

creative license in creating the work, but as in *Picture Music*, the employer here

had a right to accept, reject, or modify the pair's work.  *Id.* at 1217.  As in *Picture*

*Music*, it is irrelevant whether they operated as independent contractors.

The Strips also were created at DC's expense.  Siegel and Shuster were

handsomely compensated for their work pursuant to the 1938 Employment

Agreement.  As explained, it is irrelevant that they were not paid a guaranteed

amount.  *Supra* at 49.  Further, DC assumed the financial risk of Superman's

newspaper syndication; while DC did not expect syndication to be tremendously

profitable, it owned all of the underlying rights, and stood to lose the value of those

rights if the syndication failed.  *See Fox*, 429 F.3d at 881.  The Post-McClure

Strips were clearly works-for-hire.

b.  Larson contends otherwise, but her arguments are meritless.  *First*, she

says that Siegel's involvement in soliciting newspaper syndication proves the

Strips were made at his own "instance."  LB-37.  But there can be no dispute that

the Strips were created pursuant to Siegel's and Shuster's *contractual obligation to*

*create them for DC*.  *Supra* at 55-56.  And DC itself also actively sought

newspaper syndication.  *E.g.*, SER-290.

*Second*, Larson tries to distinguish *Picture Music*, saying the employer-artist

relationship there was a traditional employer-employee arrangement, while the

**EXHIBIT 37**
**1524**

relationship between Siegel, Shuster, and DC was more akin to a joint venture. LB-34, 40.  But again, it is settled that the work-for-hire doctrine applies equally to independent contractors and traditional employees.  *Supra* at 42-43 & n.11.[19]

*Third*, Larson argues that a finding in *Fawcett* that McClure owned the "proprietor" copyright in the Strips precludes a finding that the Strips were made-for-hire pursuant to an obligation to DC.  But the work-for-hire status of the Strips was *never* before the *Fawcett* court, which considered the limited question whether Superman rights had fallen into the public domain due to McClure's failure to properly affix copyright notices to certain newspaper strips, and if so, whether those errors were chargeable to DC.  191 F.2d at 599.  As the district court concluded, "to imply Judge Hand [the judge in *Fawcett*] sought to extend the reach of his ruling to questions beyond the narrow confines of the case before him to those now before this Court fifty years later is simply misdirected."  ER-40.

*Fourth*, Larson says McClure and DC owned the Strips not as works-for-hire but by an "implied assignment of Siegel and Shuster's common law copyrights in

_____

[19] In any event, as the district court explained, the right of control held by both DC and McClure was "reflective of a more traditional employment engagement." ER-104.  Larson notes that the district court in *Nat'l Comics Pubs., Inc. v. Fawcett Pubs., Inc.*—a lawsuit DC filed in the 1940s alleging that the Captain Marvel comic books infringed its rights in Superman—likened the parties' syndication arrangement to a joint venture, but on appeal the Second Circuit did *not* accept that formulation, 191 F.2d 594, 599 (2d Cir. 1951), so it carries no weight.  *In re Smith*, 964 F.2d 636, 638 (7th Cir. 1992).

**EXHIBIT 37**
**1525**

the strips." LB-43.  But even if Larson were correct that there was an assignment

(she is not), this Court has held that an assignment of rights is not "inimical with

the work-for-hire doctrine." *Fox*, 429 F.3d at 881.  Once the instance-and-expense

test has been satisfied, the work-for-hire "presumption may be rebutted only by

evidence that the parties did not intend to create a work-for-hire"—an assignment

"is insufficient to rebut the presumption." *Id.*; *Lin-Brook*, 352 F.2d at 300.

*Fifth*, Larson says a work-for-hire conclusion is contrary to McClure's

copyright registrations for the Strips, which identify Siegel and Shuster as the

"author" and McClure as the "owner." LB-43.  But the sole case she cites *rejects*

her position, holding that a publisher's reference to the hired party as an "author"

did *not* change the work-for-hire status of its book, because "author" "was being

used, not as a 'legal conclusion,' but 'colloquially.'" *Hogarth*, 342 F.3d at 166-67

& n.24; *see Picture Music*, 457 F.2d at 1214 & n.1.  There is no evidence McClure

intended to use "author" in anything other than its colloquial sense.  ER-610.

*Sixth*, Larson notes that in 1944, McClure assigned to DC "all its right, title

and interest in all copyrights in Superman," which she says was unnecessary if DC

owned the copyright in the Strips.  LB-45.  But DC only allowed McClure to

register copyrights in its name for practical purposes—the Syndication Agreement

**EXHIBIT 37**
**1526**

made clear that DC retained beneficial ownership of all Superman rights and the copyrights in the Strips would "revert" back to DC.  ER-610.[20]

*Finally*, Larson argues that DC's ownership of rights is inconsistent with the Syndication Agreement's allowing DC to use the Strips in its comic books "six months after newspaper release."  LB-46.  But DC could grant McClure a six-month exclusive license in the Strips—in exchange for 40-50% of the net proceeds from the Strips—precisely *because* DC owned their rights.  ER-609-10.[21]

The conclusion that the Strips were created at DC's instance-and-expense, pursuant to the 1938 Employment and Syndication Agreements, is unassailable.

---

[20] Larson similarly argues that if DC owned the Strips as works-for-hire, then Siegel and Shuster would not have needed to execute the Syndication Agreement. LB-46.  But that agreement imposed obligations on Siegel and Shuster, so their execution was necessary.  Notably, the agreement took care to reaffirm that the pair had *no* rights in the Strips, were employees of DC, and could be replaced at any time. *E.g.*, ER-610.

[21] Nothing about the "indivisibility" doctrine would have precluded DC from granting such a license, as the very case cited by Larson shows.  LB-47 (citing *Jim Henson Prods. v. John T. Brady & Assocs.*, 16 F.Supp.2d 259, 288 (S.D.N.Y. 1997) ("indivisible" right means "the transfer of anything less than all rights was deemed a license rather than an assignment")).  Nor does the holding in *Fawcett* (LB-47) preclude that result.  *Supra* at 58.

**EXHIBIT 37**
**1527**

**C.     The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4, Superman #1* (Pages 3-6), And Pre-McClure Strips**

The district court incorrectly held that *Action Comics #1* and *#4, Superman #1* (pages 3-6), and the two weeks of strips created before the Syndication Agreement ("Pre-McClure Strips") were not works-for-hire.

1.     Action Comics #1

a.     *Key Elements Of Action Comics #1 Were Made-For-Hire*

The undisputed record shows that key graphic and story elements from the Superman story in *Action Comics #1* were made-for-hire for DC.  Indeed, some elements were not even created by Siegel and Shuster, but by other DC artists.

DC's Colorization.  DC colorist Jack Adler testified that, in keeping with industry custom, Siegel and Shuster submitted black-and-white panels to DC for use in *Action Comics #1*.  SER-442.  DC's other artists decided what colors to use and applied those colors to the story, including Superman's iconic blue leotard, red cape, and red S-crest.  *Id.*  The unique combination of these colors with the story elements in *Action Comics #1* will always be DC's property—meaning that DC has an irrevocable joint-ownership stake in *Action Comics #1* even if Larson is able to recapture certain story elements.

The district court erroneously assumed that DC's use of color in *Action Comics #1* was *not* independently copyrightable.  SER-49-51.  In fact, "adding

61

**EXHIBIT 37**
**1528**

colors to a previously black and white picture may constitute an original

copyrightable contribution." MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON

COPYRIGHT §2.14 (2011); *see Boisson v. Banian, Ltd.*, 273 F.3d 262, 271 (2d Cir.

2001); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 n.6

(2d Cir. 1977); 52 F.R. 23443-46 (1987) (colorization of black-and-white motion

pictures is copyrightable and may be registered). While color alone may not be

copyrightable, the selection and use of color in combination with other protectable

elements can be sufficiently creative to warrant copyright protection. *See Boisson*,

273 F.3d at 271; *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 n.6 (9th Cir.

2008); *Sargent v. Am. Greetings Corp.*, 588 F.Supp. 912, 919 (N.D. Ohio 1984);

*Pantone, Inc. v. A. I. Friedman, Inc.*, 294 F.Supp. 545, 547 (S.D.N.Y. 1968).

DC's unique selection and application of colors to the *Action Comics #1*

story far exceeds the minimal standard for copyrightability. Larson's own expert

acknowledged that "Superman's distinctive iconic costume is very much about its

colors," SER-370, and the story was promoted as being in "***Color!***," *infra* at 84.

DC's Cover Art. DC's artists also created the cover of *Action Comics #1*,

which introduces the Superman story that immediately follows. ER-388; SER-

728. A February 22, 1938, letter from DC editor Vin Sullivan to Siegel provided:

"I'm enclosing a silverprint of the cover of Action Comics. You'll note that we

already used one of those panel drawings of SUPERMAN, as you suggested in

**EXHIBIT 37**
**1529**

your recent letter." SER-388. In other words, per Siegel's suggestion, DC used one of the panel drawings from the Superman story as a template to create the cover art. Siegel confirmed these events in his memoir. SER-803-04. The court below suggested, however, that Sullivan's letter *could* be read to imply that Siegel created the cover art and enclosed it with his "letter" to Sullivan. SER-51. That reading is at odds with the plain language of the letter and Siegel's own account.

Larson argued below that DC's cover was not independently copyrightable because it was derivative of Siegel and Shuster's preexisting creation. A derivative work is independently copyrightable if it contains "non-trivial" variations from the original work, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997)—*i.e.*, it possesses "more than a de minimis degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991).

In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir. 1982), the court considered these two illustrations:



*Original Illustration*    *Derivative Illustration*

**EXHIBIT 37**
**1530**

While the individual distinctions are minimal, the court found that "the numerous changes made by [the second artist]—the changed proportions of the hat, the elimination of individualized fingers and toes, the overall smoothing of lines—combine to give the [second] drawing a different, cleaner 'look'" than the original sketch. *Id.* The second illustration was thus independently copyrightable. *Id.*

Here, there are numerous non-trivial distinctions between the cover of *Action Comics #1* and the panel that inspired it:

- On the cover, Superman has distinguishable facial features and musculature, bears a visible S-crest on his chest, and wears the now-iconic red boots. In the panel, Superman's face, musculature, and S-crest are obscured, and he wears socks.

- The cover depicts a man under the car who was shaken out of the car by Superman—the panel does not.

- The man featured on the bottom left foreground of the cover has different hair, facial features, and clothing than the man in the panel. He is touching his temples in disbelief and his tie is blowing in the wind. In the panel, the man is covering his ears and his tie is stationary.

- The man featured in the left background of the cover has different hair and clothes than the version in the panel, and has discernible facial features.

- In the cover, Superman appears larger than the closest figure(s). In the panel, he appears to be the same size.

- The car featured on the cover is fully visible and contains different rear wheel wells, headlights, and other details than the car in the panel. On the

**EXHIBIT 37**
**1531**

cover, the tire that flew off the car is angled differently than the panel, emphasizing the force with which Superman smashed the car into the rocks.

- The scale, layout, and background landscape of the two images are different.
- Even the rocks in the background of the two images are different; they are less detailed and prominent in the cover art.



*Panel in* Action Comics #1

**EXHIBIT 37**
**1532**



*Cover of* Action Comics #1

66

**EXHIBIT 37**
**1533**

These differences warrant independent copyright protection for the cover.

<u>Siegel and Shuster's 1938 Material</u>.  Siegel and Shuster created certain

elements of the Superman story in *Action Comics #1* ("Preexisting Material")

before entering into employment with DC.  That Preexisting Material is not at

issue here.  Siegel and Shuster testified, however, that in early 1938, they made

key additions to the Preexisting Material, including:  (1) "several additional

pictures to illustrate the story continuity," which appear on the first page of *Action*

*Comics #1*, ER-654; SER-386; (2) the last panel, which features Superman in his

cape, leotard, and S-crest breaking through a chain with his chest, ER-654; SER-

386; and (3) "the scientific explanation on page 1 … and the last panel," ER-654.

These additions were made at DC's instance and expense, further making

*Action Comics #1* and the Superman story therein a joint work that will always be

co-owned by DC.  Siegel's sworn affidavit avers that he and Shuster created this

material *only after* DC told the pair they "could proceed" and agreed to publish

their work.  ER-654.  DC also had the "right to control or supervise" Siegel and

Shuster's work, and in fact exercised that right.  *See Fox*, 429 F.3d at 879.  DC sent

Siegel and Shuster a letter on February 1, 1938, directing them to "[s]tart

immediately on the thirteen (13) page feature of SUPERMAN for the new Action

Comics Magazine."  SER-379.  DC instructed the pair to adapt the Preexisting

Material "into a full length … strip suitable for magazine production," demanding

**EXHIBIT 37**
**1534**

that their work be "the very best" and "without imperfections." ER-957; SER-381.

Siegel and Shuster "compli[ed] with the said request of DC" and submitted the

revised and expanded material on February 22, 1938. ER-957. DC later chastised

the pair for failing to comply with the formatting requirements, saying that if DC

were not so pressed for time, it "would have rejected" their submission. SER-383.

Siegel and Shuster's additions were also created at DC's expense—Siegel

and Shuster were paid for their *Action Comics #1* contributions, and DC assumed

the financial risk and burden of publishing, distributing, and marketing *Action

Comics #1*. ER-75, 425-27, 917, 958, 960; SER-383, 804.

> b.    National *Is Not Preclusive As To The Work-For-Hire Status Of* Action
>        Comics #1

The court below erroneously held that the "thrust" of DC's argument that

key elements of *Action Comics #1* were made-for-hire "was made and rejected" in

*National* "and is thus precluded as a matter of collateral estoppel." SER-46.

Collateral estoppel applies only where "the matter raised in the second suit is

identical in all respects with that decided in the first proceeding." *Comm'r v.

Sunnen*, 333 U.S. 591, 599-600 (1948); *see Granite Rock Co. v. Teamsters*, 649

F.3d 1067, 1070 (9th Cir. 2011). That threshold requirement is not satisfied here.

The issue in *National* was whether Siegel and Shuster owned the renewal

copyright in the Superman story in *Action Comics #1*. 364 F.Supp. at 1033. That

publication, which contained multiple comic features, was considered a periodical

**EXHIBIT 37**
**1535**

magazine under the 1909 Act.  17 U.S.C. §24 (1909).  That Act provided that the

owner of a copyright in a periodical magazine (*i.e.*, DC) could obtain a renewal

copyright for the entirety of the magazine, and the author of a discrete portion of

that magazine could obtain a renewal copyright for its discrete contribution—

unless it was a work-for-hire.  *Id.*  DC's predecessor, National, renewed the

copyright in the entirety of *Action Comics #1* in 1965 "as a proprietor of a work for

hire."  ER-1018.  In 1969, Siegel and Shuster sued National for a declaration that

they owned the renewal copyright for the Superman story in *Action Comics #1*.

The district court in *National* found against Siegel and Shuster on two

separate, independent grounds.  First, the parties' prior agreements assigned all of

their rights in Superman to DC, including any copyright renewal rights.  *Nat'l*, 364

F.Supp. at 1037-38.  Second, the Westchester Court's prior findings concerning the

creation of *Action Comics #1* were binding and compelled the conclusion that

Siegel and Shuster's contribution was a work-for-hire.  *Id.* at 1035-37.

The Second Circuit affirmed on the sole basis that Siegel and Shuster had

assigned their renewal rights to DC.  *Nat'l*, 508 F.2d at 914.  As such, the Second

Circuit did not need to reach the second basis for the district court's ruling.  In

dicta, however, the Second Circuit disagreed with that ruling, stating that "there

was no conclusion of law in the [Westchester Action] that the comic strip was a

work for hire so as to create the presumption that the employer was the author."

69

**EXHIBIT 37**
**1536**

*Id.*  The Second Circuit also commented that the evidence was not otherwise

"sufficient to create the presumption that the strip was a work for hire" as to Siegel

and Shuster's contribution to *Action Comics #1*.  *Id.*  But neither the district court

nor the Second Circuit reached the opposite conclusion, much less considered

whether Superman elements in *Action Comics #1* that were created by DC other

artists or added by Siegel and Shuster at DC's instance and expense were works-

for-hire—the questions now before this Court.  This alone forecloses application of

collateral estoppel.  *Granite Rock*, 649 F.3d at 1070.

It is irrelevant that, as the court below found, "much of the evidence" cited

in DC's motion to prove that the Additional Material was made-for-hire "could

have been admitted [in *National*]," but was not.  SER-46-48.  Collateral estoppel

applies only where the identical issue was "actually litigated" and "necessarily

decided."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002);

*Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995).

Nor was the Second Circuit's limited discussion of the work-for-hire issue

"necessary to support a valid and final judgment on the merits," as is also required.

*Simon*, 310 F.3d at 288-89; *see Shaw*, 56 F.3d at 1132 n.5.  The Second Circuit's

ruling was based on its finding that Siegel and Shuster assigned all of their rights to

DC.  Its rejection of the district court's alternative work-for-hire ruling clearly was

not "necessary" to its judgment *in DC's favor* affirming that Siegel and Shuster did

**EXHIBIT 37**
**1537**

not own any renewal copyright in *Action Comics #1*. Such dicta has "no preclusive

effect," *EPIC, Inc. v. Pac. Lumber Co.*, 257 F.3d 1071,1077 (9th Cir. 2001), just as

"determination[s] adverse to the winning party do not have preclusive effect,"

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985).

The district court's ruling should be reversed, and this Court should rule as a

matter of law that DC owns the color elements and cover art in *Action Comics #1*,

as well as the material added by Siegel and Shuster in 1938.

> 2.    *Pre-McClure Strips*
> a.    *The Pre-McClure Strips Were Made At DC's Instance And Expense*

After entering into the 1937 Employment Agreement and assigning all of

their Superman rights to DC in the 1938 Assignment, but before the parties'

business relationship with McClure was formalized in the Syndication Agreement,

Siegel and Shuster drafted two weeks of newspaper strips on behalf of DC. ER-

615; SER-582-89. The court below wrongly concluded that these Pre-McClure

Strips were not made-for-hire because they were created before the Syndication

Agreement. ER-109-14.

The Syndication Agreement was not necessary to establishing that the Pre-

McClure Strips were made at DC's instance and expense. The Pre-McClure Strips

were created during the term of the 1937 Employment Agreement and, even more

significantly, after DC became 100% owner of all rights in Superman pursuant to

**EXHIBIT 37**
**1538**

the 1938 Assignment. *Supra* at 11-12. Given that assignment, DC had full

authority to control the development of Superman by artists of its choosing,

making any resulting derivative work a work-for-hire. *Supra* at 47.

The district court erroneously assumed that "Siegel created the script and

Shuster created the artwork for the [Pre-McClure Strips] without any indication

that they received permission to do so beforehand from Detective Comics." ER-

111. As Siegel's own account makes clear, these strips were only completed *after*

DC gave its consent. ER-615-17, 620. Siegel created a "script"—which did not

include any artwork—and sent it to McClure. ER-615. He then approached DC to

request permission to proceed. ER-616. DC responded that Siegel needed a

"definite offer" from a syndicate. *Id.* It was only then that Shuster "illustrat[ed

Siegel's] script" and Siegel sent the completed strips to McClure. *Id.*

DC also incurred the expense of compensating Siegel and Shuster for their

work on the Strips, and (along with McClure) bore the financial risk of the Strips'

success. ER-609-11, 466. The Pre-McClure Strips were, in short, made at DC's

instance and expense, just like other derivative Superman works produced under

similar conditions during the same time period.

> b.   *Larson's Failure To List The Pre-McClure Strips In Her Termination
>       Notice Also Precludes Termination*

Wholly apart from their status as works-for-hire, there is a separate reason

Larson cannot terminate DC's rights in the Pre-McClure Strips: Larson did not

**EXHIBIT 37**
**1539**

identify them in her termination notice, as the Copyright Act requires.  ER-1023-92.

The Act requires that a termination notice "comply, in form, content, and manner of service, with requirements" that the Copyright Office prescribes.  17 U.S.C. §304(c)(4)(B); *see id.* §702.  The Copyright Office's regulations provide that such a notice must "include a clear identification" of "[t]he title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number."  37 C.F.R. §201.10(b)(1)(ii).  It is undisputed that Larson's Notices provide *none* of this information for the Pre-McClure Strips—no title, author, copyright date, or registration number.

The court below nevertheless held that this violation of §201.10(b)(1)(ii) was "harmless error," because the Notices include a "catch-all" footnote:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories ....  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

ER-132-33; SER-1026.  Under 37 C.F.R. §201.10(e)(1), however, an error in a termination notice is harmless only when it "do[e]s not materially affect the

73

**EXHIBIT 37**
**1540**

adequacy of the information required to serve the purposes of [17 U.S.C.

§304(c)]." Section 201.10(e)(2) identifies the types of immaterial mistakes

covered by this rule: good-faith errors made in (1) "giving the date or registration

number," (2) identifying the "effective date of termination," (3) "or in describing

the precise relationships" between deceased authors and their statutory heirs. The

C.F.R. comments confirm that the harmless error rule applies only to mistakes

concerning those "specific items" of information. 42 F.R. 45917-19.

None of that applies to the error here, which involves the *complete omission*

of *all* information required by §201.10(b)(1)(ii) concerning the Pre-McClure

Strips. Larson's Notice deprived DC of any "reasonable opportunity to identify the

affected grant and work from the information given in the notice," 42 F.R. 45916-

21, 45918, and denied the public its right under the Act to "constructive notice of

the facts stated in the recorded document," which is supposed to "specifically

identif[y] the work to which it pertains," 17 U.S.C. §§304(c)(4), 205.

The only case to consider this issue confirmed that the complete omission of

a work from a termination notice bars recapture of that work. In *Burroughs v. M-

G-M, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982), the heirs of Tarzan's creator served a

termination notice listing 35 Tarzan stories, including the first, but omitting five

later Tarzan works. The Second Circuit affirmed the district court's conclusion

that the notice was invalid as to the unlisted works, even though their omission was

74

**EXHIBIT 37**
**1541**

"undoubtedly inadvertent," and even though the works contained elements in

common with other Tarzan works that were listed and could be recaptured. *Id.*

Although *Burroughs* did not use the words "harmless error." ER-36-37, the

necessary implication was that the heirs' "inadvertent" omission was not harmless.

Rather than follow *Burroughs*, the district court relied on *Music Sales Corp.*

*v. Morris*, 73 F.Supp.2d 364 (S.D.N.Y. 1999), but that case actually supports DC's

position. *Morris* considered whether a termination notice's vague description of

the grant to be terminated was sufficient to satisfy §201.10(b)(1)(iv)'s notice

requirement. *Morris* did not hold that the failure to identify a *work* was harmless.

To the contrary, it acknowledged that a notice "must list all the works in which the

grantee's rights are to be terminated," and twice emphasized that "only the works

specified in a termination notice are terminated." *Id.* at 378, 380 & 380 n.29.[22]

The district court cited four additional reasons that Larson's omission of the

Pre-McClure Strips from her termination notice was harmless.  None is persuasive.

---

[22] As for the vague grant definition *Morris* addressed, the court held it adequate
because "it appears to be boilerplate on termination notices customarily accepted
by the Register of Copyrights" for recordation. *Id.* at 378.  The court read that
statement to demonstrate "how little concrete information need be conveyed and
yet still be considered adequate." ER-18.  But 37 C.F.R. §201.10(f)(6) (formerly
(f)(5)) provided at the time that mere recordation of a termination notice by the
Copyright Office "does not mean that it is otherwise sufficient under the law," and
that recordation "is without prejudice to any party claiming that the legal and
formal requirements for issuing a valid notice have not been met."  The Copyright
Office has recently reaffirmed that "recordation of a notice does not mean that the
notice meets the requirements of the law." 76 F.R. 32320 (June 6, 2011).

**EXHIBIT 37**
**1542**

*First*, it found that the Pre-McClure Strips were inextricable from the works listed in the Notices because "the Superman character exists as a conglomerate." ER-28, 31. Larson, however, is only entitled to recapture rights in certain *works*, not an entire character. *See Burroughs*, 683 F.2d at 622-23; 1 WILLIAM F. PATRY, PATRY ON COPYRIGHT §3:164 (1st ed. 2007).

*Second*, the district court found that the catch-all footnote's reference to "Krypton" pointed to the Pre-McClure Strips, which contained the first use of "Krypton." ER-16, 17. But the footnote listed *dozens* of common Superman elements, the vast majority of which were undeniably created by DC and thus not subject to termination—including, *e.g.*, "Smallville," the town where Superman grew up; "Kryptonite," fragments of Krypton that have the power to harm Superman; Clark Kent's co-workers "Jimmy Olsen" and "Perry White"; villain "Lex Luthor"; Superman's adoptive parents, the Kents; love interest "Lana Lang"; and allies like "Supergirl." ER-1026, 2036. The unsurprising fact that the long list of elements in the Notices included *one* element that appeared in the Pre-McClure Strips hardly suffices to give notice that Larson sought to terminate those strips.

*Third*, the district court cited the relatively low number of works omitted from the voluminous Notices. ER-28-29, 132. This makes no sense. Of the more than 15,000 works listed in the Notices, only 15 were deemed subject to termination by the court below: *Action Comics #1*, *Action Comics #4*, portions of

76

EXHIBIT 37
1543

*Superman #1*, and the 12 Pre-McClure Strips. ER-80, 189. The remaining 15,000-

plus works reflect obvious overreaching. The 12 Pre-McClure Strips, which

represent 80% of the works held to be terminated, were completely omitted from

the Notices. The district court's rule would create a perverse incentive to waste

hundreds of pages listing non-terminable works to preserve the argument that the

notice was intended to encompass all potentially terminable works.

*Fourth*, the court said the "amount of effort" Larson took to prepare the

Notices weighed in favor of harmless error. ER-4. But weighing the terminating

party's effort in the harmlessness analysis would override the essential balance

struck by §201.10(b)(1)(ii). In crafting the provision, the Copyright Office

adopted authors' requests to delete certain requirements as unduly burdensome,

while accepting movie studios' request to ensure that notices contain "information

necessary to give notice" to grantees. 42 F.R. 45917-18. The "amount of effort"

required to file a proper notice, in other words, is reflected in the notice

requirements themselves—it cannot excuse the failure to meet those requirements.

3.    *Pages 3-6 Of* Superman #1

*Superman #1* contains the Superman stories published in *Action Comics #1-*

*#4*, plus some new material. As for the story based on *Action Comics #1*, DC

revised the first two pages (which the district court held were made-for-hire, ER-

81), and added four new pages. ER-761. The court below erroneously concluded

**EXHIBIT 37**
**1544**

that these four new pages—which became pages 3-6 of *Superman #1*—were not

made-for-hire based on hearsay speculation by commentator James Steranko in a

foreword to DC's 1989 reprinting of *Superman #1*. ER-81.

Steranko opined that, "according to legend," these pages were part of the

original Superman story created by Siegel and Shuster in 1935—before their

employment by DC—but were cut from *Action Comics #1*. SER-272. Siegel

himself debunked this theory in his memoir, explaining: "[Commentators] state

Superman magazine No. 1 contains pages omitted from the Action Comics No. 1

origin story. *The truth is that the additional pages were specifically created for*

*use in Superman Magazine No. 1*." SER-803 (emphasis added). Siegel also

recounted in *The Story Behind Superman No. 1* that a DC editor sent him a letter

on March 27, 1939 specifying in detail the contents of "the first six pages,"

including specific panels and headings. ER-761. That is, pages 3-6 were created

along with the rest of *Superman #1* in 1939—*after* Siegel was employed by DC—

and were thus made as a work-for-hire.[23]

---

[23] Even beyond Siegel's direct repudiation of the "legend," the law requires
evidence, not folklore. *See Fox*, 429 F.3d at 880 n.3 (rejecting hearsay statements
in magazine that Eisenhower wrote portions of manuscript before being retained by
Doubleday); *accord U.S. v. Resnick*, 594 F.3d 562, 570 n.4 (7th Cir. 2010); *Kirby*,
777 F.Supp.2d at 729; *Almond v. ABB Indus. Sys., Inc.*, 2001 WL 242548, *7-8
(S.D. Ohio Mar. 6, 2001). The district court appeared to assume that the party-
admission rule would apply because DC published the reprint of *Superman #1*
containing Steranko's foreword. ER-81. But there is no evidence that Steranko
was speaking on DC's behalf, *cf.* FED. R. EVID. 801(d)(2)(A) (party-admission rule

**EXHIBIT 37**
**1545**

4.    _Artwork In_ Action Comics #4

The district court held that Siegel wrote a script in 1934 "telling the story of

Superman interceding in a college football game and using his superpowers on the

field," which was incorporated into _Action Comics #4_. ER-51-52, 77-80. It is

undisputed that Siegel did not create _any_ artwork to accompany his 1934 script.

Even so, the district court held that Larson could recapture the artwork created for

_Action Comics #4_. ER-77-90.

That conclusion was wrong for two reasons. First, DC created the artwork

and thus owns it as a work-for-hire. _See Scherr v. Universal Match Corp._, 417

F.2d 497 (2d Cir. 1969). In _Scherr_, a soldier created a "small clay table model" of

an infantryman, and an officer asked him to create a large statue based on the

model. 417 F.2d at 499. The court held that the large statue was made-for-hire,

because "[w]hile the idea for the statue originated from the smaller clay model, the

statue differs from the model." _Id._ Here, the distinction between Siegel's 1934

script and _Action Comics #4_ is equally or more substantial—unlike the script,

_Action Comics #4_ contains 99 panels of detailed artwork illustrating the story. ER-

551-58. That artwork did not exist at all prior to Siegel's employment by DC.

Because the artwork possesses "more than a _de minimis_ quantum of creativity," it

---

applies to statements made "in an individual or representative capacity"), and even
if he were, the foreword obviously contains multiple levels of hearsay.

**EXHIBIT 37**
**1546**

is independently copyrightable, *Feist*, 499 U.S. at 363, and because it was created at DC's instance and expense, it is owned by DC.

Second, DC is at least joint owner of the overall Superman story in *Action Comics #4*, including its artwork. *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("The contents of a comic book are typically the joint work of four artists—the writer, the penciler[,] the inker[,] … and the colorist who colors it."). Under the 1909 Act, a joint work was created where multiple authors made contributions to be integrated into a single work. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 410 (2d Cir. 1946). Siegel obviously intended the football-story script to be combined with illustrations to form a comic strip, and DC of course intended its artwork to be combined with Siegel's story. Accordingly, DC is at least a joint owner of the entire *Action Comics #4* story.

### 5.    *Promotional Announcements*

While the district court correctly held that Promotional Announcements published prior to *Action Comics #1* were not recaptured, SER-43-44, it erred in describing the copyrightable elements encompassed therein, SER-44-45.

The court's ruling arose from partial summary judgment motions that were never intended to address the *scope* of rights at issue in the Announcements, but only threshold questions concerning the validity of Larson's Notices as to those works. DC argued—and the district court agreed—that Larson failed to recapture

**EXHIBIT 37**
**1547**

the Announcements published before *Action Comics #1* because they fell outside

the Notice's statutory time limit.  SER-43-44; 699-712.  Larson has not appealed

that holding, waiving any right to challenge it.  *See Gausvik*, 392 F.3d at 1008 n.1.

The court's order, however, made gratuitous and inaccurate comments

concerning the copyrightable elements in the Announcements, based on the court's

review of a poor, multiple-generation photocopy.  SER-44-45.  DC filed a motion

for clarification asserting that these statements could not be binding because

neither party moved for summary judgment as to the scope of the Announcements.

SER-328-343.  The district court found otherwise, on the ground that Larson's

opposition to DC's motion raised "questions concerning the scope of the

copyrightable material contained in those announcements."  SER-1.  Larson's

opposition, however, contended only that DC's motion raised "classic issues of

fact" concerning the scope of rights in the Announcements, "precluding summary

judgment" on the very scope question the court then decided.  SER-356-57.

Indeed, an entire section of Larson's brief was titled "The Question Of What

Literary Elements Are Actually Contained In The Ad [Is] A Genuine Issue Of

Material Fact."  SER-356.  On reply, DC fully agreed that this issue should be

reserved for trial and was *not* an issue for summary judgment.  ER-353.

Before a court can grant summary judgment *sua sponte*, the moving party

must have "reasonable notice" and "a full and fair opportunity to ventilate the

**EXHIBIT 37**
**1548**

issues." *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982). DC had

neither. The only issue on summary judgment was whether the Announcements

were covered by Larson's Notices. While the scope question came up in briefing,

both parties agreed it was a disputed issue for trial.

The court below also denied DC an opportunity to be heard. Because the

only issue properly before the court was when the Announcements were first

published—and not their copyrightable content—DC did not present original

versions of them. Instead, DC appended a multiple-generation photocopy from

*More Fun Comics #31* and a photocopied printout of a photo of *Detective Comics

#15*. *See* SER-329-43. After reviewing these poor copies, the district court stated

at oral argument: "[Y]ou can hardly make out whether it's an 'S' or a '5' or what

it is on his chest." SER-339-340 . Rather than reserving the issue for trial or

reviewing an original version, the court's summary judgment order concluded that

"the 'S' crest" is not "recognizable." SER-44.

That ruling was incorrect. Where, as here, the content of a work is at issue,

"[a]n original writing … is required in order to prove its content." FED. R. EVID.

1002; *see Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986). Given

"the hazards of inaccurate or incomplete duplication," *id.*; *see U.S. v. Diaz-Lopez*,

625 F.3d 1198, 1201 (9th Cir. 2010), a copy of lesser quality than the original is

not an adequate substitute, *see* 6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3]

**EXHIBIT 37
1549**

(2011); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001); *U.S. v. Alexander*, 326 F.2d 736, 742-43 (4th Cir. 1964); *Tex Print Indus., Inc. v. Zayre Corp.*, 1977 WL 22752, *1 n.1 (D. Mass. Feb. 10, 1977).

The court's failure to review an original version of the Announcements resulted in multiple errors. As is clear from the copy of *Detective Comics #15* DC seeks to lodge and from the true-to-scale image on the next page below, the Announcements, in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features. Indeed, the S-shield is as recognizable in the Announcements as in the original *Action Comics #1* cover[24]:

---

[24] The cover reproduced in the summary judgment order was not the version that appeared in 1938—it is from the DC Comics Archive Edition published in 1997. This special edition completely reconstructed the original, which had low color registration making the "S" difficult to discern.

**EXHIBIT 37**
**1550**

# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR --



Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

### 10c at all Newsstands

## SPECIAL PRIZES AND AWARDS!

---

## MORE FUN COMICS

*The National Comics Magazine*

---

**VINCENT A. SULLIVAN**
*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.
Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle

84

EXHIBIT 37
1551



*Version Electronically Filed By DC Below*

**EXHIBIT 37**
**1552**



*Version Delivered to Chambers By DC Below*

This Court should reverse the district court's ruling and remand so the

copyrightable elements in the Announcements can be determined at trial.

86

**EXHIBIT 37**
**1553**

## CONCLUSION

This Court should grant judgment as a matter of law on DC's settlement and statute-of-limitations counterclaims and dismiss the remainder of this appeal on that basis. Alternatively, this Court should remand so the district court can hold a trial on these counterclaims and fully adjudicate Larson's First Claim and DC's First Counterclaim as well. If this Court decides to reach the merits of the parties' First Claims now, it should affirm in part and reverse in part, as described above.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: March 23, 2003

87

**EXHIBIT 37**
**1554**

# CERTIFICATE OF COMPLIANCE

I certify that this brief is accompanied by an unopposed motion for leave to file an oversize brief pursuant to Fed. R. App. P. 27, 28.1, and 32 and Circuit Rules 27-1 and 32-2 and is 19,862 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated:  March 23, 2012                     O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
                                                   Daniel M. Petrocelli
                                                   Attorneys for Warner Bros.
                                                   Entertainment Inc. and DC Comics

**EXHIBIT 37**
**1555**

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, DC identifies the following related cases currently pending before this Court:

1. *Pacific Pictures Corp. v. U.S. Dist. Ct.*, Appeal No. 11-71844 (9th Cir.) (filed June 30, 2011) (argued Feb. 7, 2012) (Kozinski, C.J.; O'Scannlain, J.; Smith, J.); and

2. *Pacific Pictures Corp. v. DC Comics*, Appeal No. 11-56934 (9th Cir.) (filed Nov. 2, 2011).

DC has filed concurrently herewith a motion requesting assignment of these appeals to the same panel that is presiding over Appeal No. 11-71844.

Dated: March 23, 2012

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
　　　Daniel M. Petrocelli
　　　Attorneys for Warner Bros.
　　　Entertainment Inc. and DC Comics

**EXHIBIT 37**
**1556**

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2012, I caused to be electronically filed the Principal And Response Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on March 23, 2012, at Los Angeles, California.

/s/ Cassandra Seto
_____
Cassandra Seto

OMM_US:70649074

**EXHIBIT 37**
**1557**

# EXHIBIT 38

APPELLATE CASE NO. 11-55863;
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

### LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

### WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

---

### APPELLANT LAURA SIEGEL LARSON'S THIRD BRIEF ON CROSS-APPEAL

---

Appeal From The United States District Court for the Central District
of California,
Case No. CV-04-8400 ODW (RZx), Hon. Otis D. Wright II

---

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 mtoberoff@ipwla.com
Keith G. Adams
 kgadams@ipwla.com
Pablo D. Arredondo
 parredondo@ipwla.com
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Plaintiff-Appellant,
Laura Siegel Larson, individually and
as personal representative of the Estate
of Joanne Siegel*

**EXHIBIT 38**
**1558**

## TABLE OF CONTENTS

COUNTER-STATEMENT OF JURISDICTION ...................................................1

INTRODUCTION ...........................................................................................1

ISSUES PRESENTED ON CROSS-APPEAL ....................................................4

STATEMENT OF FACTS ON CROSS-APPEAL ................................................5

     A.    Settlement Negotiations Between The Siegels and DC .......................5

SUMMARY OF ARGUMENT ..........................................................................8

ARGUMENT ...............................................................................................13

I.    NO AGREEMENT WAS REACHED BY THE PARTIES ..........................13

     A.    The October 19 Letter Was A Counter-Offer That Warner
           Never Accepted ....................................................................14

          1.    Contract Formation Requires An Objectively Manifested
                Agreement To The Same Material Terms .................................14

          2.    There Was No Accepted Offer, Merely An Exchange Of
                Unaccepted Counteroffers .....................................................15

     B.    The Numerous Material Differences Between The Proposals
           Demonstrate That No Agreement Was Consummated .......................17

          1.    Material Differences As To Scope Of The Agreement ............17

          2.    Material Differences As To Monetary Terms...........................18

          3.    Other Material Differences .....................................................22

     C.    Warner's Cases On This Issue Are Manifestly Inapposite As
           They Concern The Enforceability Of Signed Agreements .................24

i

**EXHIBIT 38**
**1559**

D.    A Final Written Agreement Signed By The Parties Was
       Required ...................................................................................26

E.    The Clear Reservations Demonstrate That No Contract Was
       Formed......................................................................................28

F.    Established Contract Law Applies To The Film Industry .................30

G.    Summary Judgment Is Appropriate Because No Enforceable
       Agreement Existed As A Matter of Law.............................................31

       1.    Summary Judgment As To Contract Formation Is Proper ......31

       2.    None Of Warner's Purported Evidence Does Anything
             To Establish That A Contract Was Formed..............................33

II.    THE SIEGELS' ACTION WAS TIMELY FILED .......................................36

III.    NO PART OF *ACTION COMICS, NO. 1* IS WORK-FOR-HIRE................39

A.    The District Court Properly Rejected Warner's "Work-for-
       Hire" Claim As To *Action Comics, No. 1* ............................................39

       1.    Claim And Issue Preclusion Apply To Issues And Claims
             Raised Or Which Could Have Been Raised .............................40

       2.    Warner's Arguments Are Unpersuasive ...................................42

             a.    The "Work-For-Hire" Issue Was Decided ....................42

             b.    The "Work-For-Hire" Issue Was Litigated And
                   The Second Circuit's Ruling Is Not Dicta......................43

B.    The Alleged Additions Were Not "Work-For-Hire" ..........................45

C.    DC Is Not A Joint Author Of *Action Comics, No. 1* ...........................52

IV.    *ACTION COMICS, NO. 4* AND *SUPERMAN, NO. 1* ARE NOT
       WORKS-FOR-HIRE ......................................................................53

**EXHIBIT 38**
**1560**

V.  THE SIEGELS' TERMINATION RECAPTURED THE FIRST TWO
    WEEKS OF SUPERMAN NEWSPAPER STRIPS ....................................54

    A.  The Strips Were Not "Work-For-Hire"................................................54

    B.  Not Listing the Strips Separately In The Termination Was
        Harmless Error ....................................................................................56

        1.  "Harmless Error" Is Broadly Defined ......................................56

        2.  Warner Was On Notice Of The Siegels' Intent To
            Terminate The Newspaper Strips .............................................57

        3.  Warner's Reliance On *Burroughs* Is Misplaced.......................58

        4.  Warner's Remaining Arguments Lack Merit ...........................58

VI. SIEGEL AND SHUSTER'S OTHER SUPERMAN WORKS WERE
    NOT "WORKS-FOR-HIRE" ....................................................................59

    A.  *Action Comics, Nos. 2-3, 5-6*..............................................................61

    B.  The Newspaper Strips ........................................................................62

    C.  *Action Comics, Nos. 7-61, Superman, Nos. 1-23* .................................66

VII. THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE
    FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS..................68

    A.  The District Court Fully Adjudicated The First Claim and First-
        Fourth Counterclaims, Which Did Not Include The "Ads" Issue ......68

    B.  The District Court Accurately Described The Promotional
        Announcements ..................................................................................71

CONCLUSION ...............................................................................................74

CERTIFICATE OF COMPLIANCE................................................................75

STATUTORY ADDENDUM .........................................................................76

iii

**EXHIBIT 38**
**1561**

CERTIFICATE OF SERVICE ................................................................................77

iv

**EXHIBIT 38**
**1562**

# TABLE OF AUTHORITIES

## CASES

*Aalmuhammed v. Lee,*
202 F.3d 1227 (9th Cir. 2000) .................................................................52

*Amerisource Bergen Corp. v. Dialysist West, Inc.,*
465 F.3d 946 (9th Cir. 2006) ...................................................................69

*Apablasa v. Merritt & Co.,*
176 Cal. App. 2d 719 (1959) ............................................................ 15-16

*Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
352 F. Supp. 2d 1119 (C.D. Cal. 2005) .................................................44

*Banner Entertainment, Inc. v. Superior Court,*
62 Cal. App. 4th 348 (1998) .................................................... 27, 32, 35

*Batjac Productions Inc. v. GoodTimes Home Video Corp.,*
160 F.3d 1223 (9th Cir. 1998) .................................................................73

*Beyene v. Coleman Security Services, Inc.,*
854 F.2d 1179 (9th Cir. 1988) .................................................................67

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
683 F.2d 610 (2d Cir. 1982) ...................................................................58

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
491 F. Supp. 1320, 1322 (S.D.N.Y. 1980) ...........................................58

*Bustamante v. Intuit, Inc.,*
141 Cal. App. 4th 199 (2006) ................................................... 15, 31-32

*Callie v. Near,*
829 F.2d 888 (9th Cir. 1987) ...................................................................32

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ..................................................................................31

v

**EXHIBIT 38**
**1563**

*Chicot County Drainage Dist. v. Baxter State Bank,*
308 U.S. 371 (1940).........................................................................44-45

*Clarke v. Fiedler,*
44 Cal. App. 2d 838 (1941) ..................................................................32

*Core-Vent Corp. v. Nobel Indus. AB,*
11 F.3d 1482 (9th Cir.1993) ...................................................................68

*Curtiss-Wright Corp. v. General Electric Co.,*
446 U.S. 1 (1980)................................................................................68

*Davis & Cox v. Summa Corp.,*
751 F.2d 1507 (9th Cir. 1985) ...........................................................41-42

*Devereaux v. Harper,*
210 Cal. App. 2d 519 (1962) .............................................................16-17

*Dolman v. Agee,*
157 F.3d 708, 712 (9th Cir. 1998) ..........................................................46

*Duran v. Duran,*
150 Cal. App.3d 176 (1983) ..................................................................27

*Durkin v. Shea & Gould,*
92 F.3d 1510 (9th Cir. 1996) .................................................................41

*Effects Assocs. v. Cohen,*
908 F.2d 555 (9th Cir. 1990) .................................................................30

*Elite Show Servs. Inc. v. Staffpro, Inc.,*
119 Cal. App. 4th 263 (2004) ................................................................26

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,*
122 F.3d 1211 (9th Cir. 1997) ...............................................................51

*Epoch Producing Corp. v. Killiam Shows, Inc.,*
522 F.2d 737 (2nd Cir. 1975)................................................................59

**EXHIBIT 38**
**1564**

*Ersa Grae Corp. v. Fluor Corp.,*
1 Cal. App. 4th 613 (1991) ................................................................25

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,*
342 F.3d 149 (2d Cir. 2003)................................................. 48, *passim*

*Estate of Thottam,*
165 Cal. App. 4th 1331, (2008) .........................................................25

*Goodworth Holdings Inc. v. Suh*
99 Fed. Appx. 806.............................................................................28

*Hydranautics v. FilmTec Corp.,*
204 F.3d 880 (9th Cir. 2000) ............................................................41

*In Harris v. Rudin, Richman & Appel,*
74 Cal. App. 4th 299 (1999) .............................................................25

*In re Eliapo,*
468 F.3d 592 (9th Cir. 2006) ............................................................28

*In re Marshall,*
600 F.3d 1037 (9th Cir. 2010) ..........................................................41

*In re Pago Pago Air Crash,*
 637 F.2d 704 (9th Cir. 1981) ...........................................................16

*Industrial Indemnity v. Superior Court,*
224 Cal. App. 3d 828 (1990) ............................................................26

*Janes v. Wal-Mart Stores, Inc.,*
279 F.3d 883 (9th Cir. 2002) ............................................................38

*Jim Henson Productions v. John T. Brady & Associates,*
16 F. Supp. 2d 259 (S.D.N.Y. 1997) ................................................65

*Kamilche Co. v. United States,*
53 F.3d 1059 (9th Cir. 1995) ............................................... 40-42, 45

vii

**EXHIBIT 38**
**1565**

*Krasley v. Superior Court,*
101 Cal. App. 3d 425 (1980) ............................................................ 31-32

*Landberg v. Landberg,*
24 Cal. App. 3d 742 (1972) ............................................................. 15-16

*LIN Broadcasting Corp. v. Metromedia Inc.,*
74 N.Y.2d 54 (1989) ...................................................................... 48, 56

*Louis Lesser Enterprises, Ltd. v. Roeder,*
209 Cal. App. 2d 401 (1962) .............................................................17

*Lowry v. Barnhart,*
329 F.3d 1019 (9th Cir. 2003) ..........................................................33

*Martha Graham School and Dance Foundation Inc. v. Martha Graham
Center of Contemporary Dance, Inc.*
380 F.3d 624 (2d Cir. 2004) .................................................61, 63, 67

*Meyer v. Benko,*
55 Cal. App. 3d 937 (1976) ..............................................................33

*Montana v. U.S.,*
440 U.S. 147 (1979) .........................................................................40

*Music Sales Corp. v. Morris,*
73 F. Supp.2d 364 (S.D.N.Y. 1999) ...................................................57

*National Comics Publications, Inc. v. Fawcett Publications, Inc.,*
191 F.2d 594 (2d Cir. 1951) ........................................................ 12, 64

*Norris v. Grosvenor Mktg. Ltd.,*
803 F.2d 1281 (2d. Cir. 1986) ...........................................................45

*Novak v. Warner Bros Pictures, LLC,*
387 Fed.Appx. 747 (9th Cir. 2010) .....................................................31

*Owens v. Kaiser Found. Health Plan, Inc.,*
244 F. 3d 708 (9th Cir. 2001) ...........................................................41

viii

**EXHIBIT 38**
**1566**

*Panagotacos v. Bank of America,*
60 Cal App 4th 851 (1998) ................................................................. 15-16

*Patel v. Liebermensch,*
45 Cal. 4th 344 (2008) ........................................................................25

*Paulo v. Holder,*
669 F.3d 911 (9th Cir. 2011) ..............................................................44

*Picture Music v. Bourne, Inc.,*
457 F.2d 1213 (2d Cir. 1972)..................................................... 60-61

*Playboy Enters. v. Dumas,*
53 F.3d 549 (2d Cir. 1995)...................................................... 43, 63, 67

*Portsmouth Square Inc. v. Shareholders Protective Committee,*
770 F.2d 866 (9th Cir. 1985) ..............................................................71

*Public Ledger v. N.Y. Times,*
275 F. 562 (S.D.N.Y. 1921)................................................................64

*Radio TV Espanola S.A. v. New World Entertainment, Ltd.,*
183 F.3d 922 (9th Cir. 1999) ..............................................................28

*Rael v. Davis,*
166 Cal. App. 4th 1608 (2008) ..................................................... 33-34

*Reiter v. Cooper,*
507 U.S. 258 (1993)............................................................................69

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
77 F.3d 309 (9th Cir. 1996) ...............................................................27

*Rice v. Fox Broad. Co.,*
330 F.3d 1170 (9th Cir. 2003) ...........................................................51

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.,*
531 F.3d 962 (9th Cir. 2008) .............................................................52

ix

**EXHIBIT 38**
**1567**

*Roth v. Garcia Marquez,*
942 F.2d 617 (9th Cir. 1991) ..................................................................18

*Roth v. Malson,*
67 Cal. App. 4th 552, 559 (1998) ...........................................................15

*S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*
359 F.3d 1127 (9th Cir. 2004) ................................................................32

*Schrock v. Learning Curve Int'l, Inc.,*
586 F.3d 513 (7th Cir. 2009) ..................................................................55

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
206 F.3d 1322 (9th Cir. 2000) .......................................................... 46, 59

*Siegel v. Nat'l Periodical Publications,*
364 F. Supp. 909 (S.D.N.Y. 1973) ................................................. 43, 46-47

*Siegel v. Nat'l Periodical Publications,*
508 F.2d 909 (2d Cir. 1974) ..................................................... 2, *passim*

*Siegel v. Time Warner Inc.,*
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ..................................................55

*Stewart v. Abend,*
495 U.S. 207 (1990) ......................................................................... 55, 60

*Stewart v. U.S. Bancorp,*
297 F.3d 953 (9th Cir. 2002) ..................................................................40

*Texaco, Inc. v. Ponsoldt,*
939 F.2d 794 (9th Cir.1991) ...................................................................68

*The Facebook Inc. v. Pac. Nw. Software, Inc.,*
640 F.3d 1034 (9th Cir. 2011) ..........................................................24-26

*Tibbs v. Smart & Final Iris Co.,*
152 Cal. App. 2d 618 (1957) ..................................................................16

x

**EXHIBIT 38**
**1568**

*Twentieth Century Fox Film Corp. v. Entertainment Distributing,*
429 F.3d 869 (9th Cir. 2005) ........................................ 40, *passim*

*Valente-Kritzer Video v. Callan-Pickney,*
881 F.2d 772, 775 (9th Cir. 1989) .................................. 28-29

*Warren v. Fox Family Worldwide, Inc.,*
328 F.3d 1136 (9th Cir. 2003) ...........................................61

*Weddington Productions, Inc. v. Flick,*
60 Cal. App. 4th 793 (1998) ..............................................15

*Weinstein Co. v. Smokewood Entm't Group,* LLC,
664 F. Supp. 2d 332 (S.D.N.Y. 2009) ..................................30

*Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.,*
106 F.3d 894 (9th Cir. 1997) ............................................45

*Wolff v. Inst. of Elec. & Electronics Engineers, Inc.,*
768 F. Supp. 66 (S.D.N.Y. 1991)........................................50

**RULES**

Fed. R. Civ. P. 54(b) ...............................................*passim*

F.R.A.P. 10(a) .........................................................33

Ninth Circuit Rule 10-2................................................33

**STATUTES**

17 U.S.C. § 204(a) ...............................................*passim*

17 U.S.C. § 209........................................................65

17 U.S.C. § 304(c)(1)..................................................69

17 U.S.C. § 304(c)(4)..................................................`69

17 U.S.C. § 507(b)....................................................36

xi

**EXHIBIT 38**
**1569**

28 U.S.C. § 1291 ..................................................................................1

Cal. Civil Code § 998..........................................................................26

Cal. Civ. Code § 1585 ................................................................... 15-16

**REGULATIONS**

37 C.F.R. § 201.10(b)(1)(iii)................................................................69

37 C.F.R. § 201.10(b) ..................................................................... *passim*

**OTHER AUTHORITIES**

ARTHUR CORBIN, CORBIN ON CONTRACTS (2006)
§ 3.36.................................................................................................16

M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT (2011)
§ 5.03[B][2][d] .............................................................................. 59-60

§ 6.03.................................................................................................54

WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007)
§ 5:54........................................................................................... 59, 67

§ 5:61........................................................................................... 60, 63

*Oral Contracts In the Ent Industry,*
1 Va. Sports & Ent. L.J. 101 (2001) ............................................ 28, 30

*Resolving Disputes over Oral and Unsigned Film Agreements,*
L.A. Law. 18 (Apr. 1999) ............................................................ 28, 30

**EXHIBIT 38**
**1570**

## COUNTER-STATEMENT OF JURISDICTION

This court has jurisdiction over the F.R.C.P. 54(b) judgment on Plaintiff

Laura Siegel Larson's First Claim, and Defendant DC Comics' First through

Fourth Counterclaims. 28 U.S.C. § 1291.

## INTRODUCTION

The opposition and cross-appeal brief (Docket No. 31-1; "Opp.") of DC

Comics (including its predecessors, "DC") and its parent, Warner Bros.

Entertainment Inc. (including DC, "Warner") does little to address the real legal

issues in this case. Instead, Warner uses catchphrases divorced from the law,

erroneous arguments never made below, *ad hominem* attacks on opposing counsel,

and extra-record materials to evade plaintiff Laura Siegel Larson's ("Plaintiff")

statutory notices of termination regarding Superman ("Termination").

Touting "a deal is a deal" and Hollywood "custom and practice," Warner

pretends it entered into a binding contract with Plaintiff in October 2001, when

nothing could be further from the truth. In the three years before Plaintiff filed this

action in 2004 to enforce her Termination, Warner never once claimed such a

contract existed, and for good reason. The parties' objective written exchange of

counteroffers with many different material terms, amply demonstrate that no

contract was formed. As the District Court correctly held, "there is no document

or set of documents reflecting agreement by the parties to singular, agreed terms."

1

**EXHIBIT 38**
**1571**

ER 202.[1]

Warner's arguments as to the other issues fare no better.  As to its purported statute of limitations defense, Warner argues, for the first time, a "trigger" date in May 2002, contradicting both its position below and the explicit terms of the parties' "tolling agreement."

As to its erroneous argument that Siegel and Shuster's conversion of their Superman story to a magazine format in *Action Comics, No. 1* was "work-for-hire," Warner pretends that the Second Circuit's decision in *Siegel v. Nat'l Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) – from which it has greatly benefited for four decades – is no longer preclusive.

Nor does Warner do anything to meaningfully counter Plaintiff's focused arguments in her opening brief (Docket No. 12; "App.") that the Superman newspaper strips, *Action Comics, Nos. 2-56* and *Superman, Nos. 1-6*, were not "work-for-hire." For pre-January 1, 1978 works, this sole exception to statutory termination is governed by the "instance and expense" test.  "Expense" requires the publisher to assume upfront the expense and thus, the financial risk of a work's *creation*, which DC chose not to do.  "Instance" requires that the publisher has the legal right to supervise and control the process and elements of creation, which DC

---

[1] "ER" refers to Plaintiff's excerpts of record, served on December 22, 2011; "SER" refers to Warner's supplemental excerpts of record, served on March 23, 2012; "RER" refers to Plaintiff's reply excerpts of record, served concurrently.

**EXHIBIT 38**
**1572**

lacked.  Accordingly, Warner failed to meet its burden on summary judgment of demonstrating "instance and expense" by credible, admissible evidence.

On appeal, Warner sidesteps this governing test and spuriously argues that DC's ownership of underlying Superman rights renders every derivative work "for-hire," contrary to the Copyright Act and clear precedent.  Warner also revises history to assert that Superman material produced in 1938-43 by Siegel and Shuster's independent Cleveland operation was "work-for-hire," when DC's agreements said no such thing and independent contractors were not held to produce "work-for-hire" until the mid-1960s.

As Warner cannot meet its evidentiary burden, it freely distorts the record with misleading statements and fabrications in the hope this Court will not catch them – *e.g.*, falsely pretending that Jerry Siegel's extra-record memoir supports their position.

In further desperation, Warner resorts to baseless irrelevant attacks on Plaintiff's counsel to elicit prejudice and distract from the merits.  Warner's concocted "tortious interference" allegations, repeated here, were not before the District Court; are the subject of a different lawsuit (*DC Comics v. Pacific Pictures Corp., et al.*, C.D. Cal. Case No. 10-CV-03633 ODW (RZx)) still to be adjudicated; and are addressed in Plaintiff's pending Anti-SLAPP appeal.  9th Cir. Case No. 11-71844.  In willful violation of established appellate procedures,

**EXHIBIT 38**
**1573**

Warner lards its excerpts of record with scores of documents that were also not before the District Court.

This Court should firmly reject Warner's meritless attempts to undermine and evade Plaintiff's statutory rights, affirm the District Court's judgment on Warner's cross-appeal, and reverse the District Court's judgment and remand for further proceedings on Plaintiff's appeal.

## ISSUES PRESENTED ON CROSS-APPEAL

1.    Did the District Court correctly find, based on the undisputed documentary evidence, that no contract was formed when the parties exchanged counteroffers with numerous differences in material terms, and there was no signed written agreement, as contemplated by the parties and required by 17 U.S.C. § 204(a)?

2.    Did the District Court correctly find that Plaintiff's claims were timely due to an explicit written tolling agreement between the parties?

3.    Did the District Court correctly find that *Action Comics, No. 1* was not a "work-for-hire," where Warner's arguments were variations on those made by it and rejected by the Second Circuit in prior litigation, and Warner, in any event, has not met its evidentiary burden?

4.    Did the District Court correctly find that portions of *Action Comics, No. 4* and *Superman, No. 1*, based on Siegel's pre-existing material, before any

4

**EXHIBIT 38**
**1574**

relationship with DC, were not "work-for-hire"?

     5.    Did the District Court correctly find as to the first two weeks of "Superman" newspaper strips that: (a) they were not "work-for-hire" because they were created on a purely speculative basis; and (b) their inadvertent omission from Plaintiff's notices of termination was "harmless error" under 37 C.F.R. §201.10(e)(1), because Plaintiff's intent to "terminate" the strips was clear?

     6.    Did the District Court correctly enter a Rule 54(b) judgment on Plaintiff's First Claim and Warner's First Counterclaim, where such claims focused on the validity of Plaintiff's Termination and were fully adjudicated by the District Court?

## STATEMENT OF FACTS ON CROSS-APPEAL

The facts set forth below concern parts of Warner's cross-appeal.  The facts relevant to Plaintiff's appeal and "work-for-hire" issues are set forth in her opening brief.

**A.**    <u>**Settlement Negotiations Between The Siegels And DC**</u>

On April 3, 1997, the widow (Joanne Siegel) and daughter (Laura Siegel Larson) of Jerry Siegel (the "Siegels"), exercised their rights under 17 U.S.C.§ 304(c) by serving on DC/Warner and filing with the Copyright Office seven notices of termination of Jerry Siegel's Superman copyright grants.  ER 1023-1092.

EXHIBIT 38
1575

Laura/Joanne Siegel and DC/Warner thereafter engaged in settlement negotiations. ER 161. On April 15, 1999, the day before the Siegel Termination was to take effect, DC contested its "validity and scope." SER 390. Thereafter, the Siegels hired attorney Kevin Marks ("Marks"), and signed an explicit "Tolling Agreement" with DC as to any time-based defenses to contemplated litigation (the "Tolling Agreement"). SER 348-351.

The parties continued settlement negotiations in 2000-2001, conducted on DC's behalf by Warner's then-general counsel, John Schulman ("Schulman"). SER 456-528. The negotiations were complex, spanning a range of terms including copyright assignments, intricate studio definitions/calculations of multi-tiered royalties for different media, warranties and indemnifications. *Id.* Negotiations progressed in a telephone conference on October 16, 2001 between Schulman and Marks. SER 536:12. On October 19, 2001, Marks sent Schulman a six-page letter outlining the substance of what he believed was Warner's settlement offer in the October 16, 2001 conference. SER 456-461. On October 26, 2001, DC responded with a materially different outline and counter-offer that contemplated further explication in a formal written agreement. SER 463-470. Months later, on February 1, 2002, DC sent the Siegels a 56-page settlement proposal with many more new and changed material terms, not in Marks' October 19, 2001 offer or DC's October 26, 2001 counter-offer. SER 472-528.

**EXHIBIT 38**
**1576**

On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, President of
AOL Time Warner, Inc., stating "we were stabbed in the back .... [y]our
company's unconscionable contract dated February [1], 2002 contained new,
outrageous demands that were not in the proposal.... After four years we have no
deal and this contract makes an agreement impossible." SER 412-414.[2] Parsons
wrote back on May 21, 2002, stating that "we expected that you and your
representatives would have comments and questions on the draft, which comments
and questions we would need to resolve" and "we continue to hope this agreement
can be closed." SER 416.

Aware of the Siegels' extreme dissatisfaction with the "new" and
"inconsistent" material terms, Marks began drafting a new proposal, which he
never sent to DC. SER 418; RER 39:21-40:15. Nor did DC ever attempt to agree
to Marks' October 19, 2001 proposal, or to modify or retract DC's October 26,
2001 or February 1, 2002 counter-proposals.

On September 21, 2002, the Siegels sent a letter to Marks, with a copy to
DC's Paul Levitz, terminating Marks and providing "notification that we are

_____

[2] Warner's unsupported allegations that its settlement proposal generously
"guaranteed" the Siegels "tens of millions" (Opp. 3, 4, 7) is both irrelevant to
contract formation and false. Warner's February 2002 Draft is rife with
Hollywood accounting tricks for which studios in general, and Warner in
particular, are notorious. SER 472- 523; *Ladd v. Warner Bros. Entm't, Inc.*, 184
Cal. App. 4th 1298, 1300 (2010). Warner would not be trying to force on Plaintiff,
and Plaintiff would never have rejected, such a lucrative settlement. SER 412-414.

**EXHIBIT 38**
**1577**

totally stopping and ending all negotiations with DC." SER 418; *see Siegel I*, 542

F. Supp. 2d at 1136. As this letter arguably did not comply with the express terms

of the Tolling Agreement, the Siegels sent a further letter on October 28, 2002 that

complied with such terms. SER 349-50 ¶7; RER 96-97 (October 28 2002 Letter).[3]

## SUMMARY OF ARGUMENT

I.    No agreement was reached between the Siegels and DC as a matter of

law. The parties' correspondence shows that Kevin Marks' October 19, 2001

letter, John Schulman's October 26 letter, and Warner's February 1, 2002 draft all

had sharply varying material terms, and hence under clear California law were

*counteroffers*, not acceptances, that terminated the preceding offer. Neither the

basic scope of the agreement as to copyrights to be assigned, the complex royalties

to be paid, the parties' warranties and indemnifications, nor numerous other

material terms were ever agreed-upon, as shown by this objective documented

exchange. Furthermore, the parties clearly contemplated, and the Copyright Act

required, a formal written agreement, executed by both parties, which never

happened due to their disagreements over material terms. Against this, Warner

---

[3] Warner's gratuitous recitation of an August 2002 offer by Ari Emanuel (Opp. 18-19) and citation to extraneous materials, ***not*** part of the District Court record, is irrelevant to the legal issue of whether the parties formed a contract in October 2001. Warner's improper inclusion in its Excerpts of Record of 166 pages of extra-record material, and raising of prejudicial, irrelevant new arguments on appeal, are addressed more fully in Plaintiff's motion to strike, and in the appellants' opening brief in *DC Comics v. Pacific Pictures Corp.*, 9th Cir. Case No. 11-71844.

**EXHIBIT 38**
**1578**

cites inapposite cases where a written instrument *signed by both parties* was found

to be enforceable, and pleads for the first time that established contract law should

not apply to the entertainment industry.  The District Court, applying well-settled

California law to the parties' undisputed evidence, properly found that no

agreement had been reached.

II.    The District Court also correctly held that the Siegels' claims were

timely filed due to the parties' written Tolling Agreement.  On appeal, DC

abandons all of its prior arguments, and frivolously argues for the first time that the

May 9, 2002 letter from Joanne Siegel to AOL Time Warner's President,

complaining about Warner's February 2002 draft, somehow cancelled the Tolling

Agreement. But the Tolling Agreement expressly required specific, formal notice

of cancellation by certified mail to both DC's general counsel and outside counsel,

and the May 9, 2002 letter did none of this.  The District Court correctly found that

notice of cancellation was not given to DC until September 21, 2002 at the earliest,

and Warner concedes that in such event this action would be timely.  In fact, notice

of cancellation, as explicitly defined in the Tolling Agreement, was not given until

October 28, 2002.

III.    The District Court correctly found that no part of Siegel and Shuster's

Superman story, as published in <u>Action Comics</u>, No. 1 ("*Action Comics, No. 1*"),

was "work-for-hire."  The Second Circuit's decision in *Siegel v. Nat'l Periodical*

**EXHIBIT 38**
**1579**

*Publications,* 508 F.2d 909, 914 (2d Cir. 1974), which specifically <u>rejected</u>

Warner's "work-for-hire" arguments (based on Siegel and Shusters' conversion of

their strip to a magazine format) bars Warner under preclusion doctrines.

Notwithstanding this, Warner has presented no evidence that DC made the

contributions it alleges (*e.g.*, choice of colors) or that Siegel and Shuster's

reformatting revisions were "work-for-hire." Moreover, the alleged items, when

compared to Siegel and Shuster's pre-existing illustrated story contain minimal, if

any, protectable new elements. Finally, even if "work-for-hire" and marginally

protectable, these limited revisions would not transform DC into a "co-author" of

Siegel and Shuster's celebrated Superman story, per established precedent.

IV.    The District Court correctly found that parts of *Action Comics, No. 4,*

and *Superman, No. 1* were not "work-for-hire" and were successfully terminated,

because they had been fully developed by Siegel "on spec" prior to any

involvement by DC, and hence were not DC's "work-for-hire."

V.    The District Court correctly found that the first two weeks of

"Superman" newspaper strips were not "work-for-hire." The strips were also

created "on spec" by Siegel and Shuster who, on their own initiative, pitched these

sample strips to several newspaper syndicators. The inadvertent omission of these

strips from the hundreds of Superman newspaper strips from the same period listed

in the Siegels' Termination notices was correctly held to be "harmless error" under

**EXHIBIT 38**
**1580**

37 C.F.R. § 201.10.  DC had clear notice of the Siegels' intent to terminate all Superman works subject to termination, as this was both stated in and otherwise evident from their Termination notices.

VI.    As set forth in Plaintiff's opening brief, the District Court erred in finding that *Action Comics, Nos. 2-3, 5-6, Superman, Nos. 1-23,* and *Action Comics, Nos. 7-56* were "works-for-hire."  The works were done without any guaranteed financial compensation, negating "expense," and Warner's own evidence amply demonstrates that DC lacked any legal "right" to supervise and control Siegel and Shuster's creative process, negating "instance."

As to the remaining 1938-43 "Superman" newspaper strips, the District Court held on summary judgment that these strips were on "the outer edges of the work-for-hire doctrine" (ER 103), even though DC had failed to meet its burden of proving that the strips were created at DC's "instance and expense."  The strips were not created at DC's "instance," as Siegel and Shuster, not DC, were the motivating factor in their creation and syndication; nor at DC's "expense," because Siegel and Shuster paid all expenses of creating the strips, were solely entitled to a contingent royalty, and thus assumed the costs and financial risks of creation.

The District Court also erred in ignoring other significant evidence that the strips were not "work-for-hire" including:  (i) the McClure Syndicate's presumptively correct copyright registrations listing Siegel and Shuster as authors

11

**EXHIBIT 38**
**1581**

of the strips; (ii) the September 22, 1938 joint venture agreement between McClure, Siegel and Shuster, and DC (the "McClure Agreement") in which Siegel and Shuster were to receive a very large share of the profits, and DC a minor share; (iii) *National Comics Publications, Inc. v. Fawcett Publications, Inc.* ("*National Comics*"), 191 F.2d 594 (2d Cir. 1951), which held that McClure, the syndicator, was the assignee or "proprietor" of the strips, not the author; and (iv) McClure's subsequent written <u>assignment</u> of the strips to DC.

VII.    The District Court's Rule 54(b) judgment was proper.  Plaintiff's First Claim, and Warner's First through Fourth Counterclaims, required *only* that the District Court decide whether the Termination was valid and which Superman *works* were subject to termination as non-"work-for-hire." The District Court fully adjudicated the First Claim and Warner's purported defenses in three voluminous published opinions.  Warner erroneously argues that the Rule 54(b) judgment is improper, because the District Court did not fully adjudicate the *literary elements* present in each "terminated" work.  But such issues only pertain, if at all, to Plaintiff's Second through Fourth Claims, concerning Warner's accounting obligations, and are excluded from the Rule 54(b) judgment.  For this reason, DC's "Ads" argument is also a red herring.  Even were this Court inclined to consider the Ads, the District Court correctly determined that the Ads contained no original Superman content.  Lastly, Warner did not contest the Rule 54(b) judgment as to

12

**EXHIBIT 38**
**1582**

its Second through Fourth Counterclaims, conferring jurisdiction in any event.

## ARGUMENT

### I.    NO AGREEMENT WAS REACHED BY THE PARTIES

In 2004, after the Siegels filed suit for a declaration that they had

successfully recaptured Siegel's original Superman and Superboy copyrights,

Warner contended for the first time that they had reached a binding agreement with

the Siegels in October 2001.  ER 298-301.

Three key documents conclusively demonstrate that no agreement was

consummated:  (1) an October 19, 2001 letter (SER 456-61; the "October 19

Letter") from the Siegels' then-counsel, Kevin Marks to Warner's general counsel,

John Schulman, containing one set of terms; (2) an October 26, 2001 reply from

Schulman to Marks, containing a "more fulsome outline" of materially different

deal terms (SER 463-70; the "October 26 Letter") to be fleshed out in a "draft

agreement;" and (3) Warner's proposed February 1, 2002 draft agreement (SER

472-528; the "February 2002 Draft").

The fundamental differences between these counteroffers included the

properties at issue (Superman, Superboy and Spectre in Marks' draft; nearly

everything Siegel ever wrote in Warner's), the classification and calculation of

royalties, warranties/indemnifications of/by the Siegels, and many other material

differences.  RER 140-49.

13

**EXHIBIT 38**
**1583**

As the District Court aptly held, "[o]ne need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 2002, 2002 draft to reach the conclusion that the parties failed to come to an agreement on all material terms." ER 202.

On appeal Warner advances erroneous arguments that: (i) the October 19 Letter, which Warner did not accept, still "settled the matter;" and (ii) despite the many material differences between the counteroffers, there are supposedly no differences in "essential terms." For all of this, Warner relies on inapposite cases which simply find that clear agreements, *signed by both parties*, are enforceable.

A.      **The October 19 Letter Was A Counter-Offer That Warner Never Accepted**

1.      **Contract Formation Requires An Objectively Manifested Agreement To The Same Material Terms**

The glaring differences, set forth below, between the parties' respective write-ups (Marks' October 19 Letter and Schulman's October 26 Letter), made within a week after the parties thought they had arrived at terms, demonstrate that the parties had not reached agreement. This divergence becomes even clearer with Warner's February 2002 Draft, elaborating upon its October 26 Letter.

Contract formation requires that the parties "agree upon the same thing in

14

**EXHIBIT 38**
**1584**

the same sense." Cal. Civ. Code § 1580. "If there is no evidence establishing a

manifestation of assent to the 'same thing' by both parties, then there is no mutual

consent to contract and no contract formation." *Weddington Productions, Inc. v.

Flick*, 60 Cal. App. 4th 793, 811 (1998).

"[I]f the material facts are certain or undisputed, the existence of a contract

is a question for the court to decide." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th

199, 208 (2006). *See Roth v. Malson*, 67 Cal. App. 4th 552, 559 (1998) (affirming

summary judgment that no contract was formed because counteroffer was not

accepted).

### 2.    There Was No Accepted Offer, Merely An Exchange Of Unaccepted Counteroffers

It is black-letter law that the "terms proposed in an offer must be met

exactly, precisely, and unequivocally for its acceptance to result in the formation of

a binding contract." *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-

856 (1998) (citing *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959)).

"'[A] qualified acceptance amounts to a new proposal or counteroffer

putting an end to the original offer'" (*id.*), and that "new proposal or counteroffer

[] must be accepted by the former offeror now turned offeree before a binding

contract results." *Landberg v. Landberg*, 24 Cal. App. 3d 742, 750 (1972); *see*

Cal. Civ. Code § 1585 ("An acceptance must be absolute.... A qualified

**EXHIBIT 38**
**1585**

acceptance is a new proposal."). "If the acceptance contains conditions not embraced in the offer or adds new terms, there is no meeting of the minds and no acceptance." *In re Pago Pago Air Crash,* 637 F.2d 704, 706 (9th Cir. 1981). Thus, a counteroffer terminates the original offer and the power to accept the original offer. *See Panagotacos,* 60 Cal App 4th at 855-856; 1-3 *Corbin on Contracts* § 3.36 (2006).

Here, it is crystal-clear from the objective exchange of counteroffers that each contained material terms not accepted by the other party.

Marks' October 19 Letter, though styled as an "acceptance" of Schulman's oral "offer" of October 16, 2001, was actually a "counteroffer" because, according to Schulman and his October 26 "more fulsome outline," something very different was discussed on October 16. SER 456-461; 463-470. *See Tibbs v. Smart & Final Iris Co.,* 152 Cal. App. 2d 618, 618, 623 (1957) (affirming summary judgment where "there is no enforceable written contract" despite a letter purporting to "accept[] said offer").

Schulman's October 26 Letter, which purported to outline Warner's October 16 "offer," contained materially different terms (more favorable to Warner) than those in Marks' purported October 19 "acceptance," "putting an end to" Marks' counter-offer. *Apablasa,* 176 Cal. App. 2d at 726. *See ER 201; Devereaux v. Harper,* 210 Cal. App. 2d 519, 524-525 (1962) (no contract where "one person

16

**EXHIBIT 38**
**1586**

offers to do a definite thing and another introduces a new term into the acceptance"); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal. App. 2d 401, 407 (1962) (no binding agreement where letters contain "substantial changes in the proposed terms" that indicate the initial letter "was never intended to be the final memorial of the agreement of the parties").

The February 2002 Draft, contemplated by Schulman's October 26 outline, elaborated upon it with even more new or revised material terms, further showing that no agreement had been reached.  SER 472-528.

**B.**    **The Numerous Material Differences Between The Proposals Demonstrate That No Agreement Was Consummated**

**1.**    **Material Differences As To Scope Of The Agreement**

Warner concedes that the scope of the rights assigned is an "essential" term. Opp. 29.  But Warner fails to address the blatant differences:  Marks' October 19 Letter was specifically limited to "Superman, Superboy and related properties … and the Spectre property."  SER 456.  Schulman's October 26 Letter was far broader, and included "all rights" in (1) anything related to "Superman, Superboy, Spectre and related properties – even if not created for DC Comics," and (2) anything "arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published)," and whether or not related to Superman, Superboy or the Spectre.  SER 456, 464, 533-4, 541-42.

17

**EXHIBIT 38**
**1587**

Warner's counteroffers thus significantly broadened the scope of properties to be assigned, which alone is sufficient to defeat Warner's claim that a binding contract was formed. *See Roth v. Garcia Marquez*, 942 F.2d 617, 626-627 (9th Cir. 1991) (no contract where long-form document unsigned due to dispute over scope of rights to be transferred).

### 2.   Material Differences As To Monetary Terms

Warner also concedes that the royalty terms are "essential" (Opp. 29), but fails to address the substantial differences.

Recoupment:  Under the October 19 and October 26 counteroffers, Warner would advance $500,000/year, "recoupable" against the Siegels' royalties.  Under Marks' October 19 proposal, those advances would never accumulate interest if unrecouped (*i.e.,* if advances exceeded royalties); under Warner's proposals, all advances were "non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment."  SER 458, 467.

Media Royalties:  Marks' October 19 Letter proposed a royalty of 6% of DC's "gross revenues" derived from the "use of the property in any and all media, in and on merchandise and in promotional campaigns."  SER 457.

Schulman's October 26 Letter proposed "6% of DC's receipts from all Media licenses for use of the Properties" (compare SER 457 and SER 467), without providing the definition of "Media licenses."  Revenues from sources other

18

**EXHIBIT 38**
**1588**

than "Media licenses" (*e.g.,* from direct sales or assignment by DC to third-parties as opposed to licenses) are thus excluded.

So, while the October 19 and October 26 letters both use "6%," the "6%" applies to different things.

The February 2002 Draft deviated further, limiting the 6% royalty to "amounts actually received" by DC "in United States Dollars" from "licensing," and excluding "any sums received by DC Comics for providing any services or materials in connection with the licensing." SER 481, 545:17-546:13. The draft further reduced the applicable revenue stream by excluding cash advances paid to DC (against its royalties), unless such monies were or became non-returnable. SER 481.

Marks' October 19 Letter envisioned a 6% royalty from any and all media and merchandising uses of Superman, subject to reduction (a) to 3% on a "pro rata" basis "when the property is used in conjunction with other book characters," (b) to 1.5% in three instances: "Justice League of America," "Superfriends" and "Superheroes," and (c) to 1% in "extraordinary cases … such as [Warner's] license to Six Flags." SER 457 ¶5, 536:4-537:5.

In contrast, Schulman's October 26 counteroffer, and subsequent February 2002 Draft, reduced the 6% (a) to 3% for "licenses which commingle the Properties with another DC property similar in stature and used in a like manner,"

19

**EXHIBIT 38**
**1589**

and (b) to 1.5% for "licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (*e.g.,* Justice League, Superfriends, Superheroes)." SER 467, 495. This transformed a limited reduction in three instances ("*i.e.*"), into a general principle ("*e.g.*").

Merchandising Royalties: There were also material differences as to merchandising royalties – an extremely significant source of revenue.

As with "Media Royalties," Marks' and Schulman's proposals differed in their 6%/3%/1.5% categorizations.

Furthermore, Marks' October 19 letter limited the "1%" category to "extraordinary cases," with the "Six Flags" license as an example. SER 457 ¶5. Schulman's October 26 counteroffer added an entirely new category "with respect to licenses …. [for] a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensees, but to the extent such information is not available, the 6% shall be reducible to not less than 1%" – meaning that the category was not limited to "extraordinary cases," **and** the "floor" could be under 1% (based on purported licensee information). SER 467.

The February 2002 Draft added further new terms, including no payments

20

**EXHIBIT 38**
**1590**

for the use of Superman in advertising and that "only 10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC would be included. SER 496-97, 499-500. This contrasted sharply with Marks' October 19 Letter, which stated that the 6% *would* apply to "promotional campaigns" and did not restrict revenue from merchandising. SER 457.

Publishing Royalties: The parties also never reached agreement on the royalty applicable to Superman's exploitation in DC's "non-Superman" publications. The October 19 Letter provided a baseline royalty of "1% of the cover price," with a "pro rata" adjustment for non-"cameo" appearances, to a floor of .5%. SER 457-58 ¶6. Warner's October 26 Letter stated that "there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties do not appear in the title of the publication or feature in question." SER 468 ¶25.

The February 2002 Draft expanded upon Warner's new floor of *no royalties whatsoever* where Superman did not appear "in the title of the publication or feature." SER 499. The February 2002 Draft further added that no royalties would be paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts of excess of seventy percent off of cover price." SER 481.

Thus, under Marks' October 19 proposal, the Siegels would have been paid

**EXHIBIT 38**
**1591**

for nearly all appearances of Superman.  Under Warner's October 26 and February 2002 counteroffers, there were numerous new exclusions and reductions of the royalty rate and the revenues to which it would apply (*e.g.,* no revenues even if Superman appears for months as a main character in a "Green Arrow" comic).

### 3.    Other Material Differences

Other material differences concerned, *inter alia*, warranties, indemnification, arbitration, audit rights, and credits.  RER 140-49 (chart detailing differences between the proposals).

As to "warranties and representations," the October 19 Letter stated that the "Siegel Family would ***not*** make any warranties as to the nature of rights, but would [only] ***represent that they have not transferred the rights to any party***."  SER 460 ¶13 (emphasis added).  Schulman's October 26 Letter stated the "Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement," and "no contract of any kind with any other party with respect to or related to the Properties," and "not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use."  SER 464.  Such broader warranties result in significant potential liability.  SER 534:6-10.

As to "indemnification," the October 19 Letter stated only:  "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions" – all to

EXHIBIT 38
1592

their benefit. SER 460 ¶14. Schulman's October 26 Letter specifically added that the "Siegels defend and indemnify re third party claims," "Siegels defend and indemnify re Dennis [Laura's ex-husband] claims," and "Widow and daughter [Joanne and Laura] indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to Sign." SER 470; *see also* SER 517-18. In essence, Warner turned the October 19 Letter's indemnification from Warner to the Siegels into significant obligations of the Siegels to indemnify Warner.

Furthermore, Marks' October 19 Letter provided only for mutual non-disparagement. SER 460 ¶13. Schulman's October 26 counteroffer required the Siegels to "positively publicize the Properties," including "travel" for "public appearances," and to "consult with DC prior to any personal appearances, written statements, interviews or other activities." SER 464,535:19-536:3 (Marks: "[T]hat was a problem because we were dealing with a woman of advanced years and a woman who was ill, and travel on them could be a burden.... I wouldn't have wanted there to be any dispute that they were not fulfilling an obligation ... and that ... being the basis for claiming breach and withholding royalty payments and the like.").

The parties also diverged as to the credits to be accorded Jerome Siegel. *Compare* SER 459 ¶4 ER (October 19 Letter: credit to be given in "paid ads"

**EXHIBIT 38**
**1593**

concerning the Properties) *with* SER 469 ER (October 26 Letter: no credit in "paid

ads"); *see* SER 539:12-17 (Marks: "[C]redit in paid ads … is something that's very

important to clients. They want to see the credit in the full-page ads in newspapers

and posters, movie theaters and the like, and John's letter provided for credit on

screen only and not in paid ads.").

Just as Schulman couched his October 26 counteroffer as a "more fulsome

outline," Warner dismisses vast differences in the February 2002 Draft as simply

the product of it being a "long-form" or more "detailed." Opp. 32. Warner's

subjective characterizations do nothing to change the objective manifestations of

the parties' intent in their competing written counteroffers, nor the numerous

material differences between them. ER 201 ("Defendants … seek to create issues

of fact through post hoc testimony and rationalizations. None of this subjective

belief is sufficient to defeat the objective manifestation of the parties' intent

relayed in the documents ....").

**C.    Warner's Cases On This Issue Are Manifestly Inapposite As They
Concern The Enforceability Of Signed Agreements**

To evade this clear lack of an agreement, Warner cites to cases that stand for

the unremarkable proposition that a written agreement, signed by the parties, is an

enforceable contract if sufficiently "definite."

Warner relies primarily on *The Facebook Inc. v. Pac. Nw. Software, Inc.*,

**EXHIBIT 38**
**1594**

640 F.3d 1034 (9th Cir. 2011) ("*Facebook*") (Opp. 26-27), which is inapposite as it

concerned an agreement <u>signed</u> by both parties.  Furthermore, "[t]he parties

stipulated that the Settlement Agreement was … 'binding', and 'may be submitted

[to a court] to enforce [it].'"  *Id.* at 1037.  The question was whether the signed

document had sufficiently definite material terms to be enforceable.  *Id.*  As the

material terms were a lump-sum payment and a specified amount of stock, this

Court unsurprisingly found the executed agreement binding and enforceable.  *Id.*

   *Facebook* is similar to *In Harris v. Rudin, Richman & Appel*, 74 Cal. App.

4th 299, 307 (1999), also relied upon by Warner (Opp. 26), which upheld an

agreement to pay $250,000 in exchange for a general release, executed by all

parties, under a signature block stating "[a]ccepted and agreed."

   Warner's other cases similarly involve a signed instrument demonstrating

the parties' intent to be bound.  *See Estate of Thottam,* 165 Cal. App. 4th 1331,

1340-41 (2008) (parties agreed "by initial and by signature" and the terms are

"sufficiently clear to determine obligations to which the parties agreed"); *Ersa*

*Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 (1991) (enforcing signed

agreement where agreed-upon material terms were "undisputed"); *Patel v.*

*Liebermensch*, 45 Cal. 4th 344, 346 (2008) (signed contract enforceable, though it

did not specify the "time and manner of payment" because "a reasonable time is

allowed").

**EXHIBIT 38**
**1595**

Warner also relies on *Elite Show Servs. Inc. v. Staffpro, Inc.*, 119 Cal. App.

4th 263, 268-69 (2004), which did not concern contract formation, but simply

found that a Cal. Civil Code § 998 litigation settlement offer (entitling one to fees

and costs) was sufficiently definite.

If Marks' October 19 proposal contained signature lines executed by the

parties, then *Facebook* and the other cases Warner cites might be applicable to

whether the terms were sufficiently definite to be enforceable. That obviously did

not happen. Instead, the parties' counteroffers demonstrate disagreement as to

material terms preventing the formation of a contract.

Nor is it this Court's responsibility to relieve Warner from its failure to

respond to Marks' October 19 Letter with an unqualified acceptance. As the

District Court correctly noted, "there is no document or set of documents reflecting

agreement by the parties to singular, agreed terms." ER 202. And where the

parties have not agreed upon terms, "courts will not write a new contract" for

them. *Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990).

### D.    A Final Written Agreement Signed By The Parties Was Required

It is equally clear from the parties' words and conduct that, given the

importance and complexity of the subject matter and deal points, any agreement

was subject to documentation and would need to be reduced to a mutually-

acceptable written contract. ER 463 ("We're working on the draft agreement"),

**EXHIBIT 38**
**1596**

SER 472.  *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (affirming summary judgment; no contract as a matter of law where "the parties intended … not to be bound unless and until a subsequent agreement was made").

"[W]hen it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract." *Duran v. Duran*, 150 Cal. App.3d 176, 180 (1983) (citations omitted).  *See Banner Entm't Inc. v. Superior Court (Alchemy Filmworks Inc.)*, 62 Cal. App. 4th 348, 358 (1998) ("When it is clear … that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created.") (citation omitted).

Moreover, as any such agreement would involve an assignment of the Siegels' recaptured copyright interests, a written contract was required as a matter of law.  17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").[4]

---

[4] On appeal Warner argues for the first time that a purported "handshake" is sufficient and relies on "principles essential to the entertainment industry, where many business deals are never formalized" (Opp. 3, 28-29), and on secondary

**EXHIBIT 38**
**1597**

Marks' October 19 Letter cannot possibly qualify as the required "writing."
While "[n]o magic words must be included in a document to satisfy § 204(a) ….
the parties' intent as evidenced by the writing must demonstrate *a transfer* of the
copyright." *Radio TV Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d
922, 927 (9th Cir. 1999) (emphasis added). The October 19 Letter is not "a
transfer" of the Siegels' copyrights to Warner; rather, it contemplates that the
Siegels "would [make such] transfer" in a final executed agreement. SER 458.

Here, a signed written agreement assigning the Siegels' copyrights was both
contemplated by the parties and required, but never approved and executed. *See
Goodworth Holdings Inc. v. Suh* 239 F. Supp.2d 947, 958 (N.D. Cal. 2002)
(granting summary judgment where parties "had a lot of conversations about
putting a deal together, but when it finally came down to determining material
terms … in order to put them into writing, both parties walked away").

### E.    The Clear Reservations Demonstrate That No Contract Was Formed

In *Valente-Kritzer Video v. Callan-Pickney*, 881 F.2d 772, 775 (9th Cir.

---

sources that nonetheless flag § 204(a)'s writing requirement, both placing it at
issue. Opp. 28; *Oral Contracts In the Ent Industry* ("*Oral Contracts*"), 1 Va.
Sports & Ent. L.J. 101, at 108-109), *Resolving Disputes over Oral and Unsigned
Film Agreements* ("*Resolving Disputes*"), L.A. Law. 18 (Apr. 1999) at 20.
Furthermore, as this "issue is one of law and … the [factual] record has been fully
developed," it can properly be raised on appeal. *In re Eliapo*, 468 F.3d 592, 603
(9th Cir. 2006). Plaintiff also addressed § 204(a)'s writing requirement on
summary judgment (RER 100), albeit on another point.

28

**EXHIBIT 38**
**1598**

1989), an attorney for one party sent a draft agreement accompanied by a letter that stated in part "Thank you for your cooperation and congratulations on landing the deal" and "Please call if you have problems." This Court found that that there was no binding contract, despite the attorney's repeated references to "the deal," because the correspondence contained reservations, including the right to comment and a request for the other party to communicate any disagreements. *Id.*

The same type of reservations appears throughout the correspondence here, demonstrating that neither side viewed their proposals as final. Marks' October 19 Letter concluded by stating "John, if there is any aspect of the above that is somehow misstated, please let me know…." SER 461. Schulman's responsive October 26 Letter similarly stated "I enclose herewith … ***a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement*** … we will have this super-matter transaction in document form." SER 463 (emphasis added). The correspondence accompanying Warner's February 2002 Draft stated:

> I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. ***As our clients have not seen this latest version*** of the agreement, ***I must reserve their right to comment.*** In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

SER 472 (emphasis added). Such reservations, along with the numerous material

29

**EXHIBIT 38**
**1599**

differences in the parties' counteroffers, make plain that they had not arrived at a contract.

**F.    Established Contract Law Applies To The Film Industry**

This Court should give no currency to Warner's frivolous suggestion – not made below – that the entertainment industry requires deviation from established contract and copyright law. Opp. 28. *See Effects Assocs. v. Cohen*, 908 F.2d 555, 556-557 (9th Cir. 1990) (rejecting argument that "[m]oviemakers do lunch, not contracts" and enforcing 17 U.S.C. § 204(a)); *Weinstein Co. v. Smokewood Entm't Group*, LLC, 664 F. Supp. 2d 332, 348 (S.D.N.Y. 2009) (same).

In support of the proposition that it is "standard" in the entertainment industry to forgo written contracts, Warner cites to articles, not before the District Court, that contradict their position and, in any event, are unsupported by any testimony, expert or otherwise. Opp. 28-29. *Oral Contracts*, 1 Va. Sports & Ent. L.J. at 108-09, 111-12, cautions against oral agreements for anything but "simple and short-term contracts;" and notes that 17 U.S.C. § 204(a) mandates an executed written instrument for copyright transfers. *Resolving Disputes*, L.A. Law. at 20, 48, notes "evidence of industry custom and practice is not [admissible] if it is offered to prove or disprove whether or not a contract was formed," and similarly emphasizes § 204(a)'s writing requirement.

30

**EXHIBIT 38**
**1600**

**G.     Summary Judgment Is Appropriate Because No Enforceable**

**Agreement Existed As A Matter of Law**

**1.     Summary Judgment As To Contract Formation Is Proper**

Warner contends that "at a minimum" a jury should consider its position.

Opp. 34-37.  However, Warner has not met the threshold to survive summary

judgment.  Once Plaintiff met her initial burden of demonstrating the absence of a

genuine issue of fact, the burden shifted to Warner to "designate 'specific facts

showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986) (citation omitted).  Warner points to no real evidence

contradicting the facially-obvious correspondence that objectively demonstrates

that no contract was formed.  As this documentary evidence is "undisputed," the

question of whether or not a contract was formed "is a question [of law] for the

Court to determine."  *Bustamante*, 141 Cal. App. 4th at 208.

Courts thus routinely decide the issue of whether a contract was formed on

summary judgment.  *See Novak v. Warner Bros Pictures, LLC,* 387 Fed. Appx.

747, 749 (9th Cir. 2010) (affirming summary judgment where "[t]he evidence

conclusively establishes that, when negotiations broke off, the parties had not

reached agreement" and "[n]o rational jury could find that a contract was entered

between the Producers and Warner"); *Krasley v. Superior Court*, 101 Cal. App. 3d

425, 432 (1980) ("A number of cases have found [summary judgment] proper and

**EXHIBIT 38**
**1601**

indeed required in situations involving … contracts which were in fact illusory and consisted only of … offers and counteroffers.") (collecting cases and upholding summary judgment).

    While Warner claims "whether parties intended to be bound by terms expressed in an informal agreement is one of fact," and summary judgment somehow improper, the cases it cites are either inapposite or to the contrary. Opp. 35; *Bustamante*, 141 Cal. App. 4th at 208 (affirming summary judgment that "no enforceable contract was ever formed between the parties," despite purported oral agreement); *Banner Entertainment, Inc.,* 62 Cal. App. 4th at 359-62 (unsigned draft agreements did not create enforceable contract despite testimony as to oral agreements); *Clarke v. Fiedler*, 44 Cal. App. 2d 838, 846 (1941) ("When, as here, the evidence indisputably shows that all the terms and conditions of the understanding between the parties were definitely agreed upon … the parties are bound."); *S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1132 (9th Cir. 2004) (applying federal labor law, not California law, to find "triable issues of fact" as to a collective-bargaining agreement); *Callie v. Near*, 829 F.2d 888 (9th Cir. 1987) (applying Arizona law regarding a "court['s] equitable power to enforce summarily a ['*complete*'] agreement to settle a case pending before it").

**EXHIBIT 38**
**1602**

### 2.     None Of Warner's Purported Evidence Does Anything To Establish That A Contract Was Formed

To distract from glaring material differences in the parties' written counteroffers, Warner grossly mischaracterizes Marks' testimony to claim that a binding contract had been reached. Opp. 28-29, 32. Warner asserts that "Marks told Schulman the draft was 'not contrary to what [had been] agreed to' and the parties could 'deal with it.'" Opp. 32. The quotes were not even Marks' words, but inadmissible hearsay in the form of Schulman's purported notes that Plaintiff objected to below. RER 88 ¶15. Marks testified to the opposite. SER 127. Marks also testified in detail how Warner's counteroffers contained "many additional terms not agreed to." SER 128, 533-547.

Warner leans heavily on Marks' alleged subjective beliefs as to "a deal."[5] This approach is fundamentally incorrect, because whether a binding contract was formed is not based on subjective belief, but on objective manifestation of intent – here, the competing counteroffers. *See Meyer v. Benko*, 55 Cal. App. 3d 937, 942–943 (1976) (mutual consent "is determined by objective rather than subjective criteria"); *Rael v. Davis*, 166 Cal. App. 4th 1608, 1618 n.11 (2008) ("Contract

_____

[5] To do so, Warner improperly goes well "beyond the record evidence" and mischaracterizes inadmissible hearsay in a letter from Plaintiff to her half-brother. Opp. 37. Plaintiff's concurrently-filed motion to strike details Warner's brazen attempt to inject 166 pages of new material into the record on appeal in willful violation of established appellate procedures. F.R.A.P. 10(a); Circuit Rule 10-2; *Lowry v. Barnhart*, 329 F.3d 1019, 1025-26 (9th Cir. 2003).

33

**EXHIBIT 38**
**1603**

formation is governed by objective manifestations, not subjective intent of any

individual involved.").

Notwithstanding this, Marks' testimony is consistent with the evidence and

the District Court's ruling that a binding contract was never consummated.  RER

55 (Marks:  "Well, if the question is did I think at this point there was a final,

binding, enforceable agreement, the answer would be no ….").

Warner falsely asserts that the differences between the outlines were not

raised at the time.  Opp. 33.  Schulman sent his October 26 Letter when Marks was

away for a month in China.  SER 461; RER 21:16-24.  Upon Marks' return he

attempted to contact Schulman, but Schulman was on vacation.  RER 29:4-7.  On

May 9, 2002, Joanne Siegel wrote a letter to Parsons, President of AOL Time

Warner, specifically condemning the "unconscionable contract dated February,

2002 [which] contained new, outrageous demands that were not in the proposal."

SER 412-414.

Warner also conspicuously omits Parsons' May 21, 2002 reply to Ms.

Siegel, in which he states "we continue to hope that this agreement can be closed."

SER 416.  Parson did *not* claim a binding agreement had ever been reached, but

instead indicated that the parties had yet to reach an agreement.  *See* ER 163

(District Court:  "Time Warner 'expected' that the submission of the draft

agreement would result in further 'comments and questions on the draft' by Siegel

**EXHIBIT 38**
**1604**

family's representatives that 'would need to [be] resolve[d].'").

Warner also relies on its purported post-agreement conduct. Yet, at no time in the three years before the Siegels filed suit did Warner/DC ever assert that a settlement agreement had been reached. Nor did Warner/DC ever retract their October 26, 2001 or February 1, 2002 counteroffers.

Warner weakly claims that DC "manifested its understanding of the agreement" by "setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie." Opp. 30. This supposed "reserve account" was anything but. RER 73-74 (DC: "None of the Defendants have ever represented ... that an actual escrow fund had been created," and admitting that DC had only "summary statements ... consisting of one-line quarterly total entries."). Warner also never states that it provided the Siegel family credit on its 2005 film. SER 459 ¶4.

Warner's *de minimis* purported performance does nothing to overcome the fact that there was no meeting of the minds. *See Banner Entertainment, Inc.*, 62 Cal. App. 4th at 359 ("[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*") (emphasis in original).

35

**EXHIBIT 38**
**1605**

* * *

As the District Court correctly held: "[Warner's] argument ... is premised on the notion that they can limit the scope of the legal analysis to the October 19, 2001, letter, and call it a contract, regardless of their materially different October 26, 2001 letter ... and their vastly different February 1, 2002 draft, which were both part and parcel of the same settlement negotiation." ER 201. None of Warner's arguments can withstand the great weight of the objective evidence that no contract was formed.

## II.    THE SIEGELS' ACTION WAS TIMELY FILED

The Copyright Act provides a three-year statute of limitations for copyright claims. 17 U.S.C. § 507(b). The District Court held, and Warner does not dispute here, that the Siegels' claims accrued at the earliest on April 16, 1999. ER 197.

To facilitate settlement negotiations, DC and the Siegels entered into a tolling agreement dated and effective April 6, 2000 (the "Tolling Agreement") (SER 348-51) that neither "would assert any statute of limitations or laches defenses relating to ...the [Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof." SER 348 at ¶1. Paragraph 7 provides that the Tolling Agreement remain in force "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices [of

**EXHIBIT 38**
**1606**

Termination], or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices,'" and that "[a]ny [such] notices required under this Agreement shall be sent by United States Mail, Return Receipt Requested to:  To DC Comics['] Lillian J. Laserson[,] General Counsel … With a copy to:  Carol F. Simkin/Roger L. Zissu," DC's outside counsel.  SER. 349-350.

On September 21, 2002, the Siegels mailed a letter to their counsel, terminating them, and stating that "effective immediately, we are totally stopping and ending all negotiations with DC."  A copy of this letter was sent by regular mail to Paul Levitz, then President of DC.  RER 96-97.

Realizing that such cancellation notice did not precisely comport with paragraph 7 of the Tolling Agreement, the Siegels sent formal notification of cancellation on October 28, 2002 "[p]er the Tolling Agreement."  SER 420.

The District Court correctly found that notice of cancellation was given, at the earliest, by the September 21, 2002 letter.  Warner admits that "[i]f [the September 21, 2002] letter terminated negotiations" the Siegels' claims would be timely.  Opp. 38.  As "cancellation of th[e] Tolling Agreement" (SER 348 at ¶1, 349-50 at ¶7) did not occur until September 21, 2002, at the earliest, or October 28, 2002, at the latest, this action is timely.

Tellingly, Warner argued to the District Court that the statute was triggered on October 30, 2001 (RER 134-37), but now argues for the first time that "[t]here

37

**EXHIBIT 38**
**1607**

are two possible … 'triggers'" – May 9, 2002 or September 21, 2002.  Opp. 38.

Warner's argument is premised on a false construct.  Opp. 37-39.  Warner improperly claims for the first time on appeal (see *Janes v. Wal-Mart Stores, Inc.,* 279 F.3d 883, 888 n.4 (9th Cir. 2002)) that Joanne Siegel's May 9, 2002 letter to Parsons at Time Warner, complaining about the February 2002 Draft, triggered the statute because she said it "makes an agreement impossible."  Opp. 38.[6]  The May 9, 2002 letter did not constitute "cancellation of th[e] Tolling Agreement pursuant to paragraph 7 [t]hereof" as it was not "sent by United States Mail, Return Receipt Requested" to DC's general and outside counsel – it was not even sent to DC.

Warner argues that a statement in another lawsuit that negotiations were "moribund" as of the May 9, 2002 letter is at odds with the fact that the Tolling Agreement was not cancelled until months later.  Opp. 39.  First, "moribund" means dying, not cancelled or terminated.  Second, this has no bearing on the plain language and effect of the Tolling Agreement, which expressly requires a formal cancellation notice "pursuant to paragraph 7 [t]hereof."  SER 348 at ¶1, 349-50 at ¶7.

The District Court correctly concluded that "the present action is timely."  ER 198.

---

[6] Before the District Court, Warner took the opposite position that the May 9, 2002 letter "confirmed" an "amicable resolution."  RER 136.

38

**EXHIBIT 38**
**1608**

## III.    NO PART OF *ACTION COMICS, NO. 1* IS WORK-FOR-HIRE

### A.    The District Court Properly Rejected Warner's "Work-for-Hire" Claim As To *Action Comics, No. 1*

The District Court correctly rejected Warner's tenuous claim that random aspects of *Action Comics, No. 1* (*i.e.*, sparse added panels, colorization and cover art by Shuster) necessary to convert it from a newspaper format to a magazine format were "work-for-hire," because "the thrust of [Warner's] argument was made and rejected by the Second Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here." ER 183.

In *Siegel v. Nat'l Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) ("*Siegel*"), the Second Circuit held that *Action Comics, No. 1* was not a work-for-hire, based on the record before it and 1948 findings of fact from a prior state-court lawsuit between the authors and DC:

> The court below held that Superman was also a 'work for hire' within the meaning of the Copyright Act, 17 U.S.C. § 26 …. We disagree…. On the contrary, th[e] [state] court's finding of fact no. 8 was that the plaintiffs were "the originators and authors of the cartoon character SUPERMAN and of the title SUPERMAN and first created cartoon material in which the said character and title first appeared in 1934 … ." The court below instead relied upon finding of fact no. 22 in which the state court found that ***the plaintiffs did revise and expand the Superman material at the request of the defendants and that this revised material constituted the formula for the ensuing series of strips. We do not consider this tantamount to a conclusion that Superman was a work for hire. …. In the case before us Superman and his miraculous powers were completely developed long before the employment relationship was***

39

**EXHIBIT 38**
**1609**

*instituted. The record indicates that the revisions directed by the
defendants were simply to accommodate Superman to a magazine
format. We do not consider this sufficient to create the
presumption that the strip was a work for hire.*[7]

As the District Court correctly held, Warner's claim is precluded by this decision

that the "revisions …were simply to accommodate a magazine format," and that

this is "not … sufficient" to establish "work-for-hire." *Id.*

**1.    Claim And Issue Preclusion Apply To Issues And Claims**

**Raised Or Which Could Have Been Raised**

Findings in prior litigation are binding on the parties and their successors in

subsequent litigation under claim and issue preclusion. *Kamilche Co. v. United

States*, 53 F.3d 1059, 1062 (9th Cir. 1995).  *See Montana v. U.S.*, 440 U.S. 147,

153-154 (1979) (preclusion doctrines protect litigants against "the expense and

vexation attending multiple lawsuits, conserve judicial resources, and foster

reliance on judicial action by minimizing … inconsistent decisions").

"[C]laim preclusion[] prohibits lawsuits on 'any claims that were raised *or

could have been raised*' in a prior action." *Stewart v. U.S. Bancorp*, 297 F.3d 953,

956 (9th Cir. 2002) (emphasis added).

Claim preclusion applies where there is "'(1) an identity of claims, (2) a

---

[7] The Second Circuit spoke of a "presumption" because satisfaction of the
"instance and expense test" creates a rebuttable presumption that a work is "for-
hire" under the 1909 Act. *Twentieth Century Fox Film Corp. v. Entertainment
Distributing* ("*Twentieth Century*"), 429 F.3d 869, 881 (9th Cir. 2005).

40

**EXHIBIT 38**
**1610**

final judgment on the merits, and (3) identity or privity between parties.'" *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F. 3d 708, 713 (9th Cir. 2001). Identity of claims exists when two suits arise from "the same transactional nucleus of facts." *Id.* What matters are the facts constituting the cause of action, not the legal theory upon which a party chooses to frame its complaint. *Id.*

Issue preclusion "bars relitigation of issues 'actually litigated and necessarily determined by a court'" in "'subsequent suits based on a different cause of action involving a party to the prior litigation.'" *Durkin v. Shea & Gould*, 92 F.3d 1510, 1515 (9th Cir. 1996) (citations omitted). Issue preclusion applies where:

> (1) [T]he issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom [issue preclusion] is asserted was a party or in privity with a party at the first proceeding.

*Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (citation omitted).

As with claim preclusion, "'once an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case.'" *Kamilche Co. v. United States*, 53 F.3d 1059, 1063 (9th Cir. 1995) (citations omitted). *See In re Marshall*, 600 F.3d 1037, 1061 (9th Cir. 2010) ("[P]reclusion applies even when the subsequent litigation rests on a new theory of recovery."); *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985)

41

EXHIBIT 38
1611

("The judgment prevents litigation of all grounds and defenses that were or could have been raised in the action.").

Accordingly, the Second Circuit's *Siegel* decision that *Action Comics, No. 1* was not a work-for-hire prevents Warner from again arguing that *Action Comics, No. 1*, in whole or in part, was a "work-for-hire." *Kamilche*, 53 F.3d at 1062.

## 2.    Warner's Arguments Are Unpersuasive

Warner lamely claims that, notwithstanding the Second Circuit's clear decision in *Siegel*, 508 F.2d at 912-914, that "portions" of *Action Comics, No. 1* were "work-for-hire."

### a.    The "Work-For-Hire" Issue Was Decided

Warner argues that, while the Second Circuit clearly stated "the evidence was not otherwise 'sufficient to create the presumption that [*Actions Comics No. 1*] was a work-for-hire' .... neither the district court nor the Second Circuit reached the opposite conclusion." Opp. 70.

This is sophistry. *Siegel* acknowledges that "the court below held that Superman was [] a 'work-for-hire,'" explains the district court's reasoning, and plainly holds:  "We disagree."  508 F.2d at 909.  The Second Circuit found that *Action Comics, No. 1* was **not** a "work-for-hire," as later recognized by both this and the Second Circuit. *See Twentieth Century,* 429 F.3d at 880 (stating that *Siegel* held that "the Superman comic strip was not created at the employer's instance

42

**EXHIBIT 38**
**1612**

where the Superman character 'had been spawned by the [author] four years before the relationship between [the] authors and the [employer]'"); *Playboy Enters. v. Dumas* ("*Playboy*"), 53 F.3d 549, 554 (2d Cir. 1995) ("[I]n *Siegel,* we found that the comic strip character Superman was not a "work-for-hire" because although the creators revised and expanded the comic strip at the request of the publishers and were paid for that work, the Superman character was completely developed long before the employment relationship existed.").

> b.    The "Work-For-Hire" Issue Was Litigated And The Second Circuit's Ruling Is Not *Dicta*

Warner falsely argues that, because it purportedly did not present the same arguments about revisions and colorization to the Second Circuit in *Siegel*, the issue was not "'actually litigated.'"  Opp. 70.

In *Siegel*, Warner sought summary judgment that it owned the Superman renewal copyright, arguing that *Action Comics, No. 1* was "work-for-hire," which the district court accepted.  *Siegel v. Nat'l Periodical Publications,* 364 F. Supp. 909, 1033-37 (S.D.N.Y. 1973).  In rejecting this, the Second Circuit expressly considered DC's so-called "revised and expanded material" (Opp. 68), and concluded that this was insufficient to establish "work-for-hire," as the "the revisions … were simply to accommodate Superman to a magazine format." *Siegel*, 508 F.2d at 914.  As the District Court correctly noted, DC's supposed

43

**EXHIBIT 38**
**1613**

"contributions" were expressly litigated and considered in *Siegel*:

> The evidence that was proffered during the 1970s litigation in the trial court on the work-for-hire question included declarations from Siegel and Shuster discussing what took place during the reformatting process. This is the same evidence that defendants now seek to use in this case to argue that the reformatted material was a work made for hire.

ER 183-184; *see* ER 653-54 (Siegel affidavit); SER 385-386 (Shuster affidavit).

On appeal, DC again relies on the testimony of Siegel and Shuster's testimony in *Siegel*. Opp. 67.

Nor was the Second Circuit's finding "dicta." Opp. 69. If DC had owned this Superman story as a "work-for-hire," there would have been no need for the remainder of the Second Circuit's holding that Siegel and Shuster owned this copyright, but transferred it to DC in a March 1, 1938 assignment (ER 917; the "March 1938 Grant").

To the extent Warner relies on evidence or argument not presented in *Siegel*, such does not change the analysis. *See Paulo v. Holder,* 669 F.3d 911, 918 (9th Cir. 2011) ("If a new legal theory or factual assertion raised in the second action is relevant to the issues that were litigated and adjudicated previously, the prior determination of the issue is conclusive…."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 352 F. Supp. 2d 1119, 1125 (C.D. Cal. 2005) ("Preclusion cannot be avoided simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first."); *Chicot County Drainage Dist. v. Baxter*

**EXHIBIT 38**
**1614**

*State Bank*, 308 U.S. 371, 378 (1940) (preclusion applies "not only as respects

matters actually presented … 'but also as respects any other available matter which

might have been presented to that end'") (citation omitted).

The Second Circuit specifically considered and addressed the additions to

*Action Comics, No. 1*. *Siegel*, 508 F.2d at 914.  However, even if it had not,

Warner's claim that limited portions of *Action Comics, No. 1* are "work-for-hire" is

naturally subsumed within the litigated issue of whether *all* of it was a "work-for-

hire."  As the entirety of *Action Comics, No. 1* was held <u>not</u> to be "work-for-hire,"

a portion of it cannot be "work-for-hire."  *See Kamilche*, 53 F.3d at 1063; *Norris v.

Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d. Cir. 1986) (issue preclusion

extends to issues which "by necessary implication... [are] contained in that which

[was] explicitly decided."); *Westinghouse Elec. Corp. v. General Circuit Breaker

& Elec. Supply, Inc.*, 106 F.3d 894, 901 (9th Cir. 1997) (same).

**B.**    **<u>The Alleged Additions Were Not "Work-For-Hire"</u>**

Even notwithstanding the preclusive effect of *Siegel*, no part of *Action

Comics, No. 1* was "work-for-hire."

<u>Siegel and Shuster's 1938 Material</u>:  Warner's claim that it owns as "work-

for-hire" Siegel and Shuster's limited "additions" to their pre-existing material

when they re-cut it to accommodate a magazine format is unpersuasive.  Opp. 67-

68.  When Siegel and Shuster re-cut their Superman strip they did so "on spec" of

45

**EXHIBIT 38**
**1615**

their own volition, as they were still merely trying to get their pre-existing work published. ER 511-12, 960 ¶¶32, 34.

To prove "work-for-hire," DC must establish "instance" – which requires that the "hiring party had 'the right to control or supervise the artist's work'" (*Self-Realization Fellowship Church v. Ananda Church of Self-Realization* ("*Self-Realization*"), 206 F.3d 1322, 1327 (9th Cir. 2000)) and "expense" – which requires that the hiring party take on the "financial risk" of the work's creation. *Twentieth Century*, 429 F.3d at 881. DC had neither.

DC purchased Siegel and Shuster's pre-existing thirteen-page strip in the March 1, 1938 Grant *after* it was re-cut with extra interstitial panels, submitted to DC and accepted for publication. *See* ER 960 ¶32 ("The first thirteen pages of SUPERMAN material … were in existence … before the execution of the instrument of March 1, 1938."); *Siegel*, 364 F. Supp. at 1034; 508 F.2d at 911.

DC's purchase of this finished product in the March 1, 1938 Grant belies the notion that the reformatted strip was "for hire." *See* ER 917; *Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998) (noting that, "even if [defendant] had established that [the author] created the songs at the instance and expense of [employer] or [movie company], [plaintiff] rebutted the work-for-hire presumption" by executing an assignment to his employer's company).

Warner grossly mischaracterizes Siegel and Shuster's 1970s affidavits

EXHIBIT 38
1616

regarding the minor revisions they made to convert their Superman strip to a magazine format. Opp. 67. Siegel and Shuster both clearly testified that this was done on their own volition and at their own expense to facilitate their story's acceptance for publication. SER 386; ER 653-54; *Siegel*, 364 F. Supp. at 1034; 508 F.2d at 911, 914. DC merely provided format specifications (13 pages with 8 panels per page) and left it to the authors to figure it out. *See* SER 386 (DC: "just lay the thing out.").

Shuster was adamant that none of these revisions were done at DC's direction: "I am aware that the defendants on this motion have taken the position that they directed Jerry and I to revise and expand the Superman material submitted to them. This contention is false…. We were given no instructions or directions by Detective as to what to do or what to include in Superman." SER 386. Shuster explains that these changes were done only to "conform to [DC]'s page size" and to be certain of "having a sufficient number of panels to make a thirteen page release." *Id.*

Siegel is equally clear in his affidavit: "At no time did [DC] direct or even request that this material be revised. In fact it was published as we submitted it…." ER 653-54. Siegel also points out that the minor panels added to satisfy the format "illustrated the story continuity [Siegel] had already written." ER 654.

Nor did the March 1937 agreement between Siegel and Shuster and DC (ER

**EXHIBIT 38**
**1617**

1115-16; the "March 1937 Agreement") make Siegel and Shuster's work "for-hire." *Siegel*, 508 F.2d at 914. That agreement concerned other properties (*Slam Bradley* and *The Spy*) and merely gave DC a right of "first refusal" to purchase additional material, incompatible with ownership of "work-for-hire" at the moment of creation. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.* ("*Hogarth*"), 342 F.3d 149, 162 (2d Cir. 2003) ("[W]ith a true work for hire, copyright ownership. . . [is] with the employer automatically upon the employee's creation of the work"); *LIN Broadcasting Corp. v. Metromedia Inc.*, 74 N.Y.2d 54, 56 (1989) ("[A] right of first refusal merely provides . . . a chance to buy.").

Colorization: Warner contends, without support, that DC, not Siegel and Shuster, chose the colors in *Action Comics, No. 1*, and misrepresents the declaration of Jack Adler (Opp. 61-62), which the District Court properly eviscerated:

> ***Mr. Adler does not state that he worked on the colorizing of Action Comics, Vol. 1, itself.*** Instead he states that he "worked for the engraving company that made the metal plates for printing of, among other things, comic books for Detective Comics." ….. Siegel and Shuster may have also placed certain color directions with their material to be utilized in the engraving process. ***In fact, that the earlier incarnation of Superman as hulking strongman in the tradition of Tarzan was created by the pair as a comic book with color illustrations lends to the possibility that they already had pre-conceived color choices in mind ….***
> ***Moreover, viewed in context, Mr. Adler's declaration appears to describe procedures generally employed in the printing process, not as evidence of what actually occurred with respect to the printing of Action Comics, Vol. 1, itself.*** …. Without any direct link

**EXHIBIT 38**
**1618**

between Mr. Adler's work and the printing of Action Comics, Vol. 1,
in particular, there exists an insufficient evidentiary foundation for his
conclusions ….

ER 186-87 (citations omitted).  This conclusion was supported by expert

testimony.  *See* RER 84-85 ¶¶6-10.  As noted by the District Court, even if the

physical colorization of *Action Comics, No. 1* was handled by others, this would

not prevent Siegel and Shuster from choosing the colors in the form of "color

guides" or sketches for their "pet project."  This was both commonplace for

contemporary comic artists, and there was evidence that Siegel and Shuster

actually did so.  RER 85 ¶9.

Cover Art:  Warner's claim that DC's artists "created" the *Action Comics,*

*No. 1* cover ("Cover") is equally unpersuasive.  Opp. 62.  Warner cites to an

ambiguous letter by Vince Sullivan (Opp. 63), which the District Court properly

viewed as just as easily referring to a pre-existing cover illustration by Shuster.  ER

188 ("[G]iven the limited nature of the information contained in the passage it

could also be argued that, in his earlier letter, Siegel enclosed an illustration by

Shuster as a suggestion for the comic book's cover and Detective Comics decided

to 'use' this suggestion.").

DC misleads when it claims "per Siegel's suggestion, DC used one of the

panel drawings from the Superman story as a template to create the cover art.

Siegel confirmed these events in his memoir."  Opp. 63.  First, the part of the

**EXHIBIT 38**
**1619**

memoir it cites was not before the District Court and is not part of the record.

Second, the memoir confirms that the District Court's "alternative reading" was

correct – Shuster's pre-existing promotional art was used for the Cover, and not as

a mere "template" by DC:

> A couple **large promotional** panel-drawings had several years earlier
> been prepared by Joe and me to illustrate Superman in action; these
> were shown by Joe and me to syndicate editors to demonstrate the
> impact and appeal of the feature. ***At my suggestion, Sullivan selected
> one of them and used it for the now very famous cover for [Action
> Comics, No. 1]. …. This cover has been very frequently reprinted***.

SER 804.  Shuster's "large promotional" drawing, used as the Cover, was

obviously adapted from the similar interior panel.  Opp. 65.  DC pretends that

Siegel's memoir refers to the interior panel (as opposed to Shuster's "promotional"

drawing) to falsely claim that "DC's artists … created the cover."  Opp. 62.

Moreover, DC's contention that the Cover is "independently copyrightable"

(Opp. 62) leads nowhere.  <u>First</u>, the Cover is so closely derived from an interior

panel of Siegel and Shuster's Superman story that it is a part of that joint work.

See *Wolff v. Inst. of Elec. & Electronics Engineers, Inc.*, 768 F. Supp. 66, 68

(S.D.N.Y. 1991) ("[N]o substance to. . . argument that the cover of [a work] should

be regarded as a 'derivative work constitut[ing] an entirely new copyrighted

product that is separate and distinct from the pre-existing work[] on which it is

based.'").  <u>Second</u>, a comparison of the Cover to that interior panel and the

remainder of Siegel and Shuster's illustrated story reveals differences so *de*

**EXHIBIT 38**
**1620**

*minimis* or "trivial" as not to qualify it as a copyrightable derivative work.

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d

1211, 1222 (9th Cir. 1997) (holding that, though not "exact replica" of underlying

copyrighted character, works contained "trivial" differences unworthy of

copyright).[8] <u>Third</u>, even if the Cover was an "independently copyrightable"

derivative work, its copyright would only adhere to these minor differences, to the

extent each are not unprotectable. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170,

1175 (9th Cir. 2003).

\* \* \* \*

Warner has utterly failed to provide admissible evidence demonstrating that

DC chose the colors of *Action Comics, No. 1*, that it tweaked Siegel and Shuster's

interior panel to produce to the Cover, or that the disparate additional panels added

by Siegel and Shuster in the reformatting process were DC's "work-for-hire."

Even if Warner were not precluded by *Siegel*, it provided no admissible evidence

to sustain its "work-for-hire" defense.

---

[8] Warner's assertion that Superman "bears a visible S-crest on his chest" or has
"facial features and musculature" is irrelevant as *all of this* also exists in the pre-
existing Superman story.  ER 214-227.  To highlight supposed differences Warner
also improperly compares a high-resolution copy of the Cover to a low-resolution
copy of only the interior panel, ignoring the rest of the Superman story.  Opp. 65-
66.

51

**EXHIBIT 38**
**1621**

**C.     DC Is Not A Joint Author Of *Action Comics, No. 1***

Finally, even if Warner could show that certain additions were DC's "work-for-hire" *and* copyrightable, none of this rises to the level of making DC a joint author/owner of Siegel and Shuster's celebrated work, as it erroneously contends. Opp. 61-62, 64.

Warner assertion that such things as "adding colors … may constitute an original copyrightable contribution," or its dubious contention that the trivial differences between the Cover and interior panel are copyrightable, are both irrelevant. *Id.* As this Court held in *Aalmuhammed v. Lee*, 202 F.3d 1227, 1232-1233 (9th Cir. 2000), the "authorship [] required under the statutory definition of a joint work [17 U.S.C. §101] … is not the same thing as making a valuable and copyrightable contribution" and "contribution of independently copyrightable material to a work …. will not suffice to establish authorship of a joint work."[9]

*Aalmuhammed* declined to extend joint authorship to the writer of *original scenes* in a movie. 202 F.3d at 1231, 1236. In so doing, this Court emphasized that it is "'the inventive or master mind' who 'creates or gives effect to the idea'" who is a co/joint-author, and that "putative coauthors make objective manifestations of a shared intent to be coauthors, as by denoting the authorship of

---

[9] "Because the 1976 Act incorporated the well-established case law interpreting the definition of 'joint work' under the 1909 Act, we may assess [joint authorship claims] under the more fully developed rubric of the 1976 Act." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008).

52

**EXHIBIT 38**
**1622**

The Pirates of Penzance as 'Gilbert and Sullivan.'" *Id.* at 1234 (citations omitted).

Consistent with Siegel and Shuster's status as the only "authors" of Superman, the very first page of DC's *Action Comics, No. 1* states its authorship – "Superman: Jerome Siegel & Joseph Shuster." ER 215. DC does not, and cannot, point to *any* "objective manifestation of a shared intent" that DC or its staff be considered "coauthors" of the *Action Comics, No. 1*.

## IV.  *ACTION COMICS, NO. 4* AND *SUPERMAN, NO. 1* ARE NOT WORKS-FOR-HIRE

The District Court correctly found that portions of *Action Comics, No. 4* and *Superman, No. 1*, like *Action Comics, No. 1*, were not "works-for-hire" because they were created independently "on spec," prior to any involvement by DC.

<u>*Superman, No. 1*</u>:  Plaintiff demonstrated to the District Court through <u>both</u> a detailed comparison and expert testimony that Siegel's 1934 scripts for 15 Superman daily comic strips, published in *Superman, No. 1*, predated any contractual relationship with DC. *See* ER 514, 516, 526, 785-88; RER 69:13-70:15.

DC falsely claims that Siegel created this work after a DC editor "specif[ied] in detail the contents of 'the first six pages'" (Opp. 78); in fact, as found by the District Court, "there is nothing in Mr. Gaines' letter indicating that the material was created contemporaneously with Superman No. 1's publication in 1939" (ER

**EXHIBIT 38**
**1623**

80-81), nor is there any "admission" by Siegel to that effect.

Finally, Warner, who had the burden on "work-for-hire," presented "no evidence" (ER 81) that this material was "work-for-hire."

*Action Comics, No. 4*:  Warner does not contest the ruling that Siegel's 1934 script published in *Action Comics, No. 4* was not "work-for-hire," as it predated his relationship with DC.  Instead, DC frivolously argues it owns Joe Shuster's artwork as "work-for-hire."  This is erroneous, but not before the Court in this appeal.  Warner also completely contradicts the notion that the artwork is "independently copyrightable" (Opp. 79) by admitting that *Action Comics, No. 4* is a "joint work."  Opp. 80.  As joint authors, Siegel and Shuster each owned an undivided fifty percent interest in the entire copyrights.  1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 6.03 at 6-7 (2011) (joint owner possesses "undivided ownership in the entire work, including all of the contributions contained therein").  Thus, Plaintiff's Termination recaptured Siegel's joint copyright interest in *Action Comics, No. 4*.

## V.    THE SIEGELS' TERMINATION RECAPTURED THE FIRST TWO WEEKS OF SUPERMAN NEWSPAPER STRIPS

### A.    The Strips Were Not "Work-For-Hire"

The District Court correctly found that the first two weeks of the "Superman" newspaper strips (the "Spec Strips") were *not* works-for-hire because

EXHIBIT 38
1624

they "were not created at the instance of either [DC] or McClure." ER 109-14.

The evidence is clear:  Siegel wrote the Spec Strips without DC's involvement (ER 615; 954-57 ¶¶9-10, 20); Shuster illustrated the strips before McClure committed to buy them (ER 615-16, 625-30); Siegel submitted the strips to syndicators other than McClure (ER 622); Siegel and Shuster were not engaged to produce this material; and Siegel and Shuster were compensated only later, under the September 1938 McClure Agreement, in the form of a royalty percentage of "net profits," in any.  ER 606, 609.

DC ignores the "instance and expense" test, and asserts its ownership of the underlying Superman rights transforms the Spec Strips into "works-for-hire." DC's argument is contrary to controlling Supreme Court precedent, which permits authors of derivative works to own the copyright to their added material.  *See Stewart v. Abend*, 495 U.S. 207, 223 (1990) (recognizing, under the 1909 Act, that "[t]he aspects of a derivative work added by the derivative author are that author's property"); *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1142 (C.D. Cal. 2007) ("Were the Court to adopt defendants' approach [of basing "work-for-hire" determinations on ownership of underlying rights], every derivative work would also be considered a work made for hire."); *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 523 (7th Cir. 2009) ("[T]here is nothing in the Copyright Act requiring the author of a derivative work to obtain permission to copyright his

55

**EXHIBIT 38**
**1625**

work from the owner of the copyright in the underlying work.").

Similarly false is DC's suggestion (Opp. 71) that the March 1937 Agreement rendered Siegel and Shuster's work "for-hire" (see *Siegel,* 508 F.2d at 914), when it only gave Detective a right of "first refusal" to purchase new material by the authors. *See LIN Broadcasting Corp.,* 74 N.Y.2d at 56 ("[A] right of first refusal merely provides . . . a chance to buy."). This is fundamentally incompatible with "work-for-hire," which a putative employer owns at inception as the "author." *Hogarth,* 342 F.3d at 162.

Lastly, Warner asserts that "these strips were only completed *after* DC gave its consent," but undermines itself by admitting that Siegel had Shuster illustrated his scripts without any "'definite offer.'" Opp. 72. In any event, DC cites no supporting authority that such is sufficient to transform the Spec Strips into "work-for-hire."

**B.**    **Not Listing The Strips Separately In The Termination Was Harmless Error**

    **1.**    **"Harmless Error" Is Broadly Defined**

As the District Court correctly found, any failure to specifically list the Spec Strips in the Siegels' Termination was "harmless error," under the regulations governing such notices:

> (e)(1) *Harmless errors in a notice that do not materially affect* the adequacy of the information required to serve *the purposes* of ... *section 304(c)*... shall not render the notice invalid.

56

**EXHIBIT 38**
**1626**

(2) ***Without prejudice to the general rule provided by paragraph (e)(1)*** of this section, errors made in [examples given] ... shall not affect the validity of the notice if the errors were made in good faith ... .

37 C.F.R. § 201.10(e) (emphasis added). *See also* 74 F.R. 12554, 12555.

Contrary to this clear language, Warner claims that harmless error "applies

***only*** to mistakes concerning those 'specific items' of information" listed in (e)(2).

Opp. 74. The obvious objective of the "harmless error" rule is to avoid invalidating

termination notices based on inadvertent mistakes where, as here, the terminated

party has actual or effective notice of the intent to terminate. *See Music Sales Corp.*

*v. Morris*, 73 F. Supp.2d 364, 378 (S.D.N.Y. 1999) (finding actual notice although

"generic statement would not seem to reasonably identify the grant").[10]

2.    **Warner Was On Notice Of The Siegels' Intent To Terminate The Newspaper Strips**

Warner cannot seriously claim that it did not have notice of the Siegels'

intent to terminate the dozen Spec Strips inadvertently omitted from the

Termination, which listed *hundreds* of such "Superman" strips. ER 161:6-9. The

Siegel Termination unambiguously provided notice of intent to terminate *all* grants

of copyright in Superman to Warner's predecessors; as to every work portraying

Superman; and states "if any such work has been omitted, such omission is

unintentional and involuntary." ER 1026, 1036, 1046, 1056. As the District Court

---

[10] Warner relies on *dicta* in *Music Sales*, 74 F. Supp.2d at 380, which did not concern a failure to list any works in a termination notice. Opp. 75.

**EXHIBIT 38**
**1627**

noted, "any recipient of the termination notice would quickly understand that the plaintiffs have sought to reclaim the copyright in any and all Superman works ever created." ER 131.

### 3.    Warner's Reliance On *Burroughs* Is Misplaced

Warner relies on *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 618, 622 (2d Cir. 1982), which does not concern § 201.10(e)'s "harmless error" rule. *Burroughs* is also distinguishable because (1) the termination notice intentionally omitted five Tarzan titles (see ER 132:11-18, RER 51-52); and (2) the termination notice did not, as here, contain a statement of intent to terminate *all works* relating to the character. The single, terminated 1923 grant assigned specified titles, not Tarzan, and excluded four works published after 1923 which were thus omitted from the termination notice. *See Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320, 1322 (S.D.N.Y. 1980). The fifth work omitted from the notice was not renewed, injecting it into the public domain. *Id.*; *see* RER 51-52.

### 4.    Warner's Remaining Arguments Lack Merit

Warner's remaining arguments (Opp. 76-77) are likewise untenable.

Superman's characterization as a "conglomerate" or a "character" is irrelevant to the court's "harmless error" analysis, as is the court's mention of "Krypton," because the court did not base its decision on this. Plaintiff's concerted

**EXHIBIT 38**
**1628**

efforts in assembling a comprehensive list of nearly all Superman copyrights supported the conclusion that the omission of the Spec Strips was inadvertent.

Warner's math is also misleading. The Termination attempted to list every Superman work out of an abundance of caution. The Spec Strips inadvertently not listed constitute a tiny fraction of the hundreds of Superman works that fell within the 1938-1943 statutory termination window. 17 U.S.C. § 304(c)(3).

## VI.    SIEGEL AND SHUSTER'S OTHER SUPERMAN WORKS WERE NOT "WORKS-FOR-HIRE"

Siegel and Shuster's other 1938-1943 Superman works were not created at DC's "instance and expense." "Instance" requires that "the motivating factor in producing the work was the employer who induced the creation." *Self-Realization,* 206 F.3d at 1326; *Siegel,* 508 F.2d at 914 (same). Courts also look at the degree to which the "hiring party had 'the [legal] right to control or supervise the artist's work.'" *Self-Realization,* 206 F.3d at 1327 (citing 1 *Nimmer* § 5.03[B][1][a][i] (1999)). A work is created at a party's "expense" if that party takes on "all the financial risk" of the work's *creation. Twentieth Century,* 429 F.3d at 881. As a publisher invariably bears the costs of publication, that is immaterial. *See* 2 *Patry* § 5:54; *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 745 (2nd Cir. 1975). "Plainly, it is the expense of creation, rather than publication, that is relevant" to the "expense" test. 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 n.171c.

59

EXHIBIT 38
1629

Where payment is *contingent* (*e.g.*, a royalty), this weighs very heavily against "work-for-hire," as the author bears the financial risk of creation. *Twentieth Century*, 429 F.3d at 881; 2 *Patry* § 5:61 ("Where payment is solely by royalties, this fact weighs against [work-for-hire]."); 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 (same).

As set forth above, (1) the March 1937 Agreement, which related to *Slam Bradley* and *The Spy*, not *Superman*, is irrelevant to Superman works published after DC's purchase of Superman in the March 1938 Grant; and (2) DC's ownership of the underlying rights is not determinative, and works are not "for hire" simply because they are derivative. *See Stewart*, 495 U.S. at 223.[11]

Warner cannot refute that Siegel and Shuster assumed all of the financial risk of *creation*: they paid their own overhead, materials, and other expenses, including the expenses of multiple employees at their Cleveland company, none of which DC reimbursed. ER 583, 597-600, 606, 699-700, 726-754, 788, 812-813. Warner instead conflates the risks of creation with those relating to *publication and distribution* (*e.g.,* "printing, distributing, and promoting"). Opp. 46. *See* 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 n.171c ("[I]f funding publication could convert a manuscript into a "work-for-hire," then the category would soon subsume all

---

[11] Nothing in either *Hogarth* or *Picture Music, Inc.* even remotely stands for the ridiculous proposition that "any derivative work [is] a work-for-hire" when "the commissioning party owns the copyright in the underlying work," as DC erroneously contends. Opp. 47.

EXHIBIT 38
1630

published material ….").

## A.    *Action Comics, Nos. 2-3, 5-6*

DC fails to meet its burden of demonstrating that these early Superman

stories were "for-hire." As the District Court noted, "there was no guarantee by

[DC] that it would accept it and thereby pay Siegel and Shuster for their work,"

negating expense. ER 84.  Warner's claim that "courts have found work-for-hire

where there was no obligation to pay for unpublished works" is not supported by

its citations.  Opp. 49.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136,

1142 (9th Cir. 2003) (arising under the 1976 Act, not 1909 Act, and involving

contract that specified "work-for-hire"); *Picture Music,* 457 F.2d at 1216

(guaranteed payment); *Playboy*, 960 F. Supp. 710, 715-16 (S.D.N.Y. 1997)

(obligation to pay "'turn-down'" fee for "unused work" weighs in favor of "work-

for-hire"; "Playboy paid Nagel for works it did not use.").

Furthermore, there was no evidence that DC "had the [legal] right to control

or supervise" the creation of *Action Comics, Nos. 2-3, 5-6*, as required for

"instance." *Twentieth Century*, 429 F.3d at 879; *see also Martha Graham School

and Dance Foundation Inc. v. Martha Graham Center of Contemporary Dance,

Inc.* ("*Martha Graham*"), 380 F.3d 624, 635 (2d Cir. 2004).

The September 22, 1938 Agreement, entered into well after the creation of

*Action Comics, Nos. 2-3, 5-6*, specifies "[DC] *hereby* employ[s] and retain[s]"

61

**EXHIBIT 38**
**1631**

Siegel and Shuster (ER 605 (emphasis added)), as they had **not** previously been engaged to create Superman stories. DC plainly waited six months to see if Superman was successful.

Nor was there any evidence that the September 22, 1938 Agreement "simply 'formalized what had informally been ongoing beforehand.'" Opp. 50, quoting ER 85. Prior to that, DC had only purchased Siegel and Shuster's Superman story in the March 1938 Grant; there is no evidence that DC did otherwise with respect to *Action Comics, Nos. 2-6.* This is further supported by the "spec" stories written by Siegel corresponding to *Action Comics, No. 4* and *Superman, No. 1,* and Siegel's preview of stories corresponding to the plots of *Action Comics, Nos. 2, 5,* and *7,* which long predated their DC relationship. ER 502-531; RER 65-70.

DC failed to meet its burden as to *Action Comics, Nos. 2-6,* and the District Court, on summary judgment, improperly ignored the reasonable inferences that such works were not "for-hire."

### B.    The Newspaper Strips

As set forth above, the "Superman" newspaper strips ("Strips") were Siegel and Shuster's brainchild, and the entire project was undertaken at their initiative.

DC presents no evidence that the Strips "were created at DC's expense." Opp. 57. Pursuant to the McClure Agreement, Siegel and Shuster were solely entitled to a contingent royalty equal to 36-40% of "net profits," with the

**EXHIBIT 38**

**1632**

syndicator McClure entitled to 56.5% -50%, and DC as licensor of underlying

rights only entitled to 7.5-10%."[12]  Siegel and Shuster paid for all the costs of

producing the Strips in exchange for a purely contingent percentage of "net

profits," if any, and thus bore the financial risk of the Strips' success.

Warner's argument that "it is irrelevant that [Siegel and Shuster] were not

paid a guaranteed amount" (Opp. 57) is contradicted by every precedent.  *See*

*Twentieth Century,* 429 F.3d at 881 ("expense" test met because employer "took

on all the financial risk" and "agree[d] to pay … a lump sum for writing the book,

instead of negotiating a royalty deal"); *Martha Graham,* 380 F.3d at 641 (evidence

that author "received royalties" for her work weighs against "work-for-hire");

*Playboy,* 53 F.3d at 555 ("royalty" payments "generally weigh[] against finding a

work-for-hire relationship"); 2 *Patry* § 5:61 ("Where payment is solely by

royalties, this fact weighs against [work-for-hire].").

Nor does Warner fare any better on "instance."  It again improperly relies on

DC's status as a rightsholder, and on letters showing its lack of control over the

creative process.  Opp. 55-56.  Faced with uncontroverted evidence that Siegel was

the motivating factor behind the syndication of their strips (ER 109-14), DC

attempts to bootstrap "instance" with weak argument that "DC itself also actively

---

[12] Warner baldly misrepresents that Detective "grant[ed] McClure a six-month
exclusive license in the Strips – in exchange for 40-50% of the net proceeds from
the Strips."  Opp. 60.

**EXHIBIT 38**
**1633**

sought newspaper syndication" (Opp. 57) – citing a single advertisement in *Action Comics, No. 2* imploring fans to send letters.  SER 290.

DC falsely claims that Siegel and Shuster had a "contractual obligation to create [the Strips] for DC" under a September 22, 1938 agreement (Opp. 57), which merely references the "agreement … with the McClure Syndicate, [and] all of the art and continuity for the newspaper strips entitled 'Superman' called for by said agreement."  ER 607

Warner also does nothing to rebut the detailed arguments in Plaintiff's opening brief that showed that the parties did not intend or understand the Strips to be "work-for-hire."  App. 41-47.

Warner limply argues that "work-for-hire" was not at issue in *National Comics*, 191 F.2d 594, 599 (2d Cir. 1951), which focused on whether and how McClure and/or DC owned the Strips.  Warner does not to distinguish *National Comics'* holding that McClure was "the 'proprietor' of the copyrights" in the Strips under the 1909 Act, and that "the copyrights [in the strips] were only in the future to become [DC's] property."  *Id.*  Under the 1909 Act, the "proprietor" of the Strips is clearly an "assign," not the "author" of a "work-for-hire."  *See Public Ledger v. N.Y. Times*, 275 F. 562, 563-64 (S.D.N.Y. 1921) (Hand, L.); App. 41-43.  Thus, under *National Comics,* McClure owned the Strips not as "works-for-hire," nor as DC's assignee, but as the assignee of Siegel and Shuster – the authors.

**EXHIBIT 38**
**1634**

Warner also does nothing to refute that McClure owned the Strips by implied assignment from the authors, and that DC later obtained the strips via a written assignment from McClure.  App. 43-47.  Rather, Warner misrepresents *Twentieth Century*, 429 F.3d at 881, as holding that "assignment" language is irrelevant, when it merely found, under its facts, that surplus assignment language "alone … is insufficient" to rebut "work-for-hire" because "instance and expense" had been firmly established.  As DC cannot establish "instance and expense," McClure's express assignment to DC is telling.

Warner dismisses McClure's copyright registration of the Strips, listing Siegel and Shuster as "authors," and mischaracterizes *Hogarth*.  Opp. 59.  A copyright registration constitutes "prima facie evidence of the facts stated therein." 17 U.S.C. § 209 (1974).  Accordingly, in *Hogarth*, 342 F.3d at 167, the registrations weighed against "work-for-hire;" but, unlike here, the putative employer "discharged its burden of rebutting the presumption to be accorded the facts reflected in the original registrations."

Finally, Warner vaguely argues that DC "could [have] grant[ed] McClure a six-month exclusive license in the Strips."  Opp. 60.  But under the 1909 Act, "the transfer of anything less than all rights was deemed a license rather than an assignment" as copyrights were "indivisible."  *Jim Henson Productions v. John T. Brady & Associates*, 16 F. Supp. 2d 259, 288 (S.D.N.Y. 1997).  If McClure was

EXHIBIT 38
1635

the "licensee" of the Strips, its improper registration in its own name would have injected them into the public domain. As that did not happen, the only explanation is that McClure owned the Strips via implied assignment from Siegel and Shuster, and later assigned the Strips to DC, consistent with the McClure Agreement, McClure's registrations, and McClure's assignment to DC.

All of this evidence did not merely "place this case on the outer edges of the work-for-hire doctrine" (ER 103, 108) – it demonstrated that the Strips were *not* "works-for-hire." As Warner did not come close to meeting its burden of establishing its "work-for-hire" defense, the District Court should have granted summary judgment to the Siegels on this issue.

**C.    *Action Comics, Nos. 7-61, Superman, Nos. 1-23***

The 1938 Agreement did not make *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* "works-for-hire." "Expense" was not met because Siegel and Shuster shouldered all the financial risks of creating their material, while DC was only obligated to pay them for submissions it chose to publish (ER 606; Opp. 52 ("DC was obligated to pay only for works DC decided to publish")); and "instance" was not met by DC's standard editorial role as a publisher. ER 605-607.

Warner admits that Siegel and Shuster "incurred [the] costs" of creating their material. Opp. 53. As DC was not obligated to purchase the material or reimburse costs, Siegel and Shuster naturally bore "the financial risk" of creation.

66

**EXHIBIT 38
1636**

*Twentieth Century,* 429 F.3d at 881.  If legally the hiring party "had no commitment to purchase...[the author's] work" this supports a finding that such was not "made-for-hire."  *Playboy,* 53 F.3d at 563.

Warner's "instance" claim boils down to another variation on its unpersuasive argument that ownership of underlying Superman rights transforms any derivative work into a "work-for-hire." Opp. 54.  Warner fails to demonstrate the requisite legal "right" to "participate in the elements of the work's creation." 2 *Patry* § 5:54; *Martha Graham,* 380 F.3d at 635.

Warner cannot evade the evidence that DC lacked editorial control (ER 758, 812-813); that Siegel did not submit scripts to DC for approval before Shuster illustrated them (ER 618, 761, 812); and that DC, like every publisher, was "limited to accepting or rejecting the finished stories [Siegel and Shuster] submitted."  ER 788, 812-813.

Nor do the letters Warner relies on change this analysis. First, none were properly authenticated, but were simply attached to an attorney's declaration, as objected to below.  RER 62.  *See Beyene v. Coleman Security Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir. 1988) ("A writing is not authenticated simply by attaching it to an [attorney's] affidavit....").  Second, the letters do not evidence "control," but frustrations as to DC's lack of control over Siegel and Shuster's creative process.  *See* ER 431, 434, 442, 445, 451.

**EXHIBIT 38**
**1637**

Given the above, the District Court's granting of summary judgment on this

issue was erroneous, as at a minimum a reasonable trier of fact could readily find

that *Action Comics, Nos. 7-61* and *Superman, Nos. 1-23* were not "for-hire."

## VII. THIS COURT HAS JURISDICTION OVER THE APPEAL OF THE FIRST CLAIM AND FIRST – FOURTH COUNTERCLAIMS

### A. The District Court Fully Adjudicated The First Claim And First – Fourth Counterclaims, Which Did Not Include The "Ads" Issue

Federal Rule of Civil Procedure 54(b) allows a district court to enter an

appealable judgment on interlocutory orders that constitute "an ultimate disposition

of an individual claim," provided there is no just reason to wait until the entire case

concludes. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980).

Rule 54(b) certification is left to the sound discretion of the district court,

and is proper if it aids in expeditious resolution while avoiding piecemeal appeals.

*See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir.1993). "The

trend is towards greater deference to a district court's decision to certify under

Rule 54(b)." *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir.1991).

Plaintiff's First Claim, as amended, requests only the following relief:

74.   For a declaration as follows:
a.     That pursuant to the Copyright Act, 17 U.S.C.§ 304(c),
Plaintiffs validly terminated on April 16, 1999 all prior grants,
assignments or transfers to any of the Defendants and any of their
predecessors-in-interest, of the renewal copyrights in and to each
and/or all of the Works; and

68

**EXHIBIT 38**

**1638**

     b.    That, as of the Termination Date, Plaintiffs owned and continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

ER 343-44 ¶74.  Plaintiff's First Claim thus required the District Court:  (a) to determine that the Termination complied with section 304(c) of the Copyright Act; and (b) to determine those "works" recaptured by the Termination.  *See* 17 U.S.C. §§ 304(c)(1), (4) (referring to "the work"); 37 C.F.R. § 201.10(b)(1)(iii) (focusing on "each work to which the notice of termination applies").  It did ***not*** call for the adjudication of the literary elements contained in each work.  In contrast, Plaintiff's Second through Fourth Claims, which seek an accounting of profits from such works, could involve an evaluation of their literary "elements" due to general exploitation of the Superman franchise.

     In several lengthy decisions, the District Court found that the Termination is valid as to *Action Comics, No. 1*, as well as *Action Comics, No. 4*, *Superman, No. 1* (pages 3-6), and the Spec Strips, but that the remaining Superman works within the 1938-43 termination window were "for-hire."  ER 1-227.

     The District Court also fully adjudicated Warner's First through Fourth Counterclaims, which sought to invalidate the Termination on various grounds.[13]

     Accordingly, on May 17, 2011, the District Court properly entered a Partial

---

[13] Warner admits that the Rule 54(b) judgment on its Second through Fourth Counterclaims was proper (Opp. 1), which alone is a sufficient basis for jurisdiction.  *See Reiter v. Cooper*, 507 U.S. 258, 265 (1993); *Amerisource Bergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 954 (9th Cir. 2006).

**EXHIBIT 38**
**1639**

Judgment under Rule 54(b) as to Plaintiff's First Claim and as to Warner's First

through Fourth Counterclaims.  ER 232-3, 293-300 ¶¶66-105, 343-344 ¶74.

Warner argues that Rule 54(b) certification was supposedly improper

because (a) there are purported open issues as to the impact, if any, of limited

promotional materials ("Ads") held to be excluded from the Termination, and (b)

there is disagreement as to whether statements regarding literary elements in

*Action Comics, No. 1* made in the background section of the District Court's first

order, constitute "dicta."  Opp. 40-41.

The "dicta" issue is irrelevant to the First Claim, which does <u>not</u> seek relief

as to the "literary elements" contained in *any* work.  ER 343-44 ¶74.

The District Court decided two "Ads" issues.  ***First,*** it held that the Ads

were not subject to the Termination because their publication date fell outside the

termination "window."  ER 167-76.  This is all that is relevant to the First Claim.

***Second,*** it properly determined that the derivative Ads' content was extremely

limited (ER 176-82), as the Ads' reduced, black-and-white, and wholly derivative

copy of the *Actions Comics, No. 1* cover was divorced from the Superman storyline

and character in *Actions Comics, No. 1.*  But this determination is not part of the

First Claim, which solely concerned whether the Termination was effective as to a

given work.[14]  At most, this issue affects Plaintiff's Second through Fourth

---

[14] Warner's contention that Plaintiff has "waived" her right to challenge the

**EXHIBIT 38**
**1640**

"accounting" claims (ER 344-346 ¶¶75-79), none of which are part of the Rule 54(b) Judgment.

As the First Claim and the First through Fourth Counterclaims have been fully adjudged and are severable from the other claims, the District Court's Rule 54(b) judgment was proper.

### B.    The District Court Accurately Described The Promotional Announcements

If the Court is nonetheless inclined to reach the issue of the "copyrightable content" of the Ads, the District Court's ruling as to the Ads' negligible content was correct.

Warner falsely claims the "the *scope of the rights at issue*" was not at issue in the summary judgment motion. Warner acknowledges (Opp. 81-82) that courts have the inherent power to order summary judgment *sua sponte* so long as the adverse party had "a full and fair opportunity to develop and present facts and legal arguments" and "reasonable notice that the sufficiency of his or her claim will be in issue." *Portsmouth Square Inc. v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

---

District Court's limited "Ads" ruling (Opp. 80-81) is misleading. Plaintiff maintains that, while the trivial, wholly derivative Ads were not "terminated," they have no impact on the copyrights (*e.g.*, *Action Comics, No. 1*) recaptured by the Termination. As this issue is not part of the Rule 54(b) judgment, Plaintiff could hardly have raised it on appeal. *See* Docket No. 7 at 11.

71

**EXHIBIT 38**
**1641**

"Reasonable notice" requires that the party be on notice that the court might "reach" the issue. *Id.* at 869-70.

Warner had more than adequate notice. In fact, Warner asserted on summary judgment that "DC and its licensees continue to have the right to use the copyrightable elements contained in the [Ads] without the need to account to Plaintiffs." SER 708. In response, Plaintiff emphasized the lack of "copyrightable elements" in the Ads and submitted the reports of both parties' experts on the subject. SER 356:19-357:6; RER 104-106, 108-133 ¶¶30-41. In reply, Warner argued that the Ads "represent the first publication of the appearance of the Superman character" (RER 91:16-20), that "any question about [the Ads'] contents is most obviously answered by the ads which speak for themselves," and that "no special 'lens' is required." RER 93:18-20.

Finally, the Court clearly indicated at the hearing on the parties' summary judgment motions that it believed the Ads contained minimal copyrightable material, at best, and gave Defendants a fair opportunity to respond. RER 78:17-24. Defendants' counsel even discussed this issue with the Court:

> The Court: How do you respond to ***counsel's argument that all you have is the actual picture itself***, and not necessarily any of the elements therein?
> Mr. Zissu: Okay. Well, the thing about visual works, multi-media works, is that pictures are worth -- can be worth many words. We do have, if you look at it -- ***if you look at it, you have the figure of Superman as he appears there in his costume; you have his strength lifting a car; and you don't have that much more.***

72

**EXHIBIT 38**
**1642**

The Court:  ***That's about it; right.***

RER 80:12-22 (emphasis added).

Warner was not "denied" "an opportunity to be heard" but rather had a full and fair opportunity to litigate, ample warning that the Court was considering the issue, engaged with the District Court, and chose to dodge questioning and submit what it now dismisses as a "multiple-generation photocopy" only after losing on the issue.  Opp. 82.

Warner's arguments about the contents of the Ads – an issue which it concedes is not part of this appeal (Opp. 86) – are erroneously premised.  Siegel's copyright in *Action Comics, No. 1* was correctly held by the District Court to have been recaptured pursuant to the Termination.  ER 133-4.  The Ads' reduced black-and-white copy of the mere cover of *Action Comics, No. 1* are entirely derivative, add no new copyrightable elements, and under clear Ninth Circuit law, derivative works ***cannot*** limit, restrict, or divest the copyrights in underlying work.  *See Batjac Productions Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1227 (9th Cir. 1998) ("[P]ublication of a derivative work does not affect the validity of a subsisting copyright in the preexisting work.").

Furthermore, the critical point is that the image on the comic book cover has meaning *only* in the context of the Superman storyline, character and other aspects of *Action Comics, No*. 1, not found in the Ads:  "[N]othing concerning the

73

**EXHIBIT 38**
**1643**

Superman storyline, that is, the literary elements contained in <u>Action Comics</u>, Vol. 1, is on display in the ads." ER 181:9-10.

**CONCLUSION**

Plaintiff respectfully requests that this Court:  (1) affirm the judgment of the District Court that no agreement was reached between the Siegels and DC Comics; that Plaintiff's action was timely filed; that *Action Comics, Nos. 1* and *4, Superman, No. 1* and the first two weeks of Superman newspaper strips were not "work-for-hire;" and were successfully recaptured by the Siegel Termination; and (2) reverse the judgment of the District Court with instructions to enter partial summary adjudication in Plaintiff's favor as to the Superman works within the 1938-1943 Termination window (i.e., *Action Comics, Nos. 2-3, 5-56, Superman, Nos. 1-6,* and the remaining "Superman" newspaper strips); and (3) to remand for further proceedings.

Dated:  May 24, 2011          TOBEROFF & ASSOCIATES, P.C.

                              /s/ Marc Toberoff
                              _____
                              Marc Toberoff

                              Attorneys for Appellant, Laura Siegel Larson

74

**EXHIBIT 38**
**1644**

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that this brief is accompanied by an unopposed motion, pursuant to F.R.A.P. 27, 28

and 32, and Circuit Rules 27-1 and 32-2,  for leave to file an oversize brief of no

more than 17,500 words, and that the attached opposition and reply brief is

proportionately spaced, has a typeface of 14 points or more, and contains __,____

words, as measured by the Microsoft Word program used to generate the brief.

Dated:  May 24, 2011            TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff

Marc Toberoff

Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT 38**
**1645**

## STATUTORY ADDENDUM

All applicable statutes, rules, regulations, etc., are contained in the Statutory

Addendum of Appellant Laura Siegel Larson's First Brief on Cross-Appeal and of

the Principal and Response Brief of Cross-Appellants and Appellees Warner Bros.

Entertainment Inc. and DC Comics.

**EXHIBIT 38**
**1646**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served electronically

by the Court's ECF system and by first class mail on those parties not registered

for ECF pursuant to the rules of this court.  Pursuant to Circuit Rule 31-1,

submission of one original and seven copies of the brief was deferred.  Pursuant to

Circuit Rule 30-1.3, four copies of the reply excerpts of the record have been

mailed to the Court, and one copy of the excerpts of the record have been mailed to

opposing counsel on the date this brief was electronically filed.

Dated:  May 24, 2011          TOBEROFF & ASSOCIATES, P.C.

/s/ Pablo D. Arredondo

Pablo D. Arredondo

Attorneys for Appellant, Laura Siegel Larson

77

**EXHIBIT 38**
**1647**

# EXHIBIT 39

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

### LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee,*

*v.*

### WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

---

## REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

---

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 39**
**1648**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY
       JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION............3

       A.     Larson And DC Formed An Agreement On October 19, 2001 ..........3

       B.     Contemplating A Long-Form Document Does Not Defeat A
              Deal..................................................................................................7

       C.     Larson Has Not Raised Any Material Difference On Any
              Essential Term Between The Marks And Schulman Writings .........10

              1.     Scope Of Rights ......................................................................10

              2.     Monetary Terms......................................................................11

              3.     "Other" Non-Essential Terms .................................................13

              4.     The February 2002 Long-Form ...............................................14

       D.     Marks' August 2002 Memo Confirms A Deal Was Made ...............14

II.    DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-
       OF-LIMITATIONS COUNTERCLAIM ....................................................16

III.   LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS .....17

       A.     Elements Of *AC#1* Were Made-For-Hire ..........................................17

              1.     *National* Is Not Preclusive .....................................................17

              2.     The 1938 Additions Were Made-for-Hire ...............................19

                     a.     New Content ..................................................................20

                     b.     Colorization ..................................................................21

                     c.     Cover Art ......................................................................22

       B.     DC Owns The Pre-McClure Strips....................................................23

              1.     The Strips Were Made-for-Hire...............................................23

              2.     Larson's Failure To Terminate The Strips Is Dispositive .......24

       C.     Pages 3-6 Of *S#1* Are Works-For-Hire ..........................................25

       D.     Artwork In *AC#4* Is Work-For-Hire ...............................................26

       E.     Copyrightable Elements In DC's Promotional Announcements .......27

CONCLUSION...................................................................................................28

**EXHIBIT 39**
**1649**

# TABLE OF AUTHORITIES

**Cases**

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 1999) ......................................................... 19, 20

*Banner Entm't, Inc. v. Super. Ct.,*
  62 Cal.App.4th 348 (1998)....................................................................7

*Blix St. Records, Inc. v. Cassidy,*
  191 Cal.App.4th 39 (2010) ...................................................................7

*Burroughs v. M-G-M, Inc.,*
  491 F.Supp. 1320 (S.D.N.Y. 1980) .....................................................23

*Burroughs v. M-G-M, Inc.,*
  683 F.2d 610 (2d Cir. 1982) ...............................................................23

*Chicot County Drainage Dist. v. Baxter County Bank,*
  308 U.S. 371 (1940) ............................................................................18

*Clarke v. Fiedler,*
  44 Cal.App.2d 838 (1941) ...................................................................5

*Comm'r v. Sunnen,*
  333 U.S. 591 (1948) ............................................................................18

*Davis & Cox v. Summa Corp.,*
  751 F.2d 1507 (9th Cir. 1985)............................................................18

*Digerati Holdings, LLC v. Young Money Entm't, LLC,*
  194 Cal.App.4th 873 (2011) ...............................................................13

*Dolman v. Agee,*
  157 F.3d 708 (9th Cir. 1998) ..............................................................21

*Duran v. Duran,*
  150 Cal.App.3d 176 (1983) .............................................................5, 8

*Effects Assocs., Inc. v. Cohen,*
  908 F.2d 555 (9th Cir. 1990).................................................................6

i

**EXHIBIT 39**
**1650**

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
   119 Cal.App.4th 263 (2004) ............................................................. 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997) ............................................................ 22

*Ersa Grae Corp. v. Fluor Corp.*,
   1 Cal.App.4th 613 (1991) ............................................................... 6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
   342 F.3d 149 (2d Cir. 2003) ............................................................. 23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ...................................................................... 26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
   773 F.2d 1068 (9th Cir. 1985) ............................................................ 19

*Gaiman v. McFarlane*,
   360 F.3d 644 (7th Cir. 2004) ........................................................ 19, 26

*Granite Rock Co. v. Teamsters*,
   649 F.3d 1067 (9th Cir. 2011) ............................................................ 18

*Harris v. Rudin, Richman & Appel*,
   74 Cal.App.4th 299 (1999) ............................................................. 5, 7

*In re Pacific Pictures Corp.*,
   2012 WL 1640627 (9th Cir. May 10, 2012) ............................................... 16

*Inamed Corp. v. Kuzmak*,
   275 F.Supp.2d 1100 (C.D. Cal. 2002) .................................................... 13

*Leather v. Eyck*,
   180 F.3d 420 (2d Cir. 1999) ............................................................. 18

*Levin v. Knight*,
   780 F.2d 786 (9th Cir. 1986) ........................................................ 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby*,
   777 F.Supp.2d 720 (S.D.N.Y. 2011) ..................................................... 24

ii

**EXHIBIT 39**
**1651**

*Mattel, Inc. v. MGA Entm't, Inc.,*
  616 F.3d 904 (9th Cir. 2010) ................................................................4

*Murray v. Gelderman,*
  566 F.2d 1307 (5th Cir. 1978) ...........................................................24

*Norris v. Grosvenor Mktg. Ltd.,*
  803 F.2d 1281 (2d Cir. 1986) ............................................................18

*O'Brien v. R.J. O'Brien & Assocs., Inc.,*
  998 F.2d 1394 (7th Cir. 1993) ...........................................................16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.,*
  107 Cal.App.4th 516 (2003) ..............................................................11

*Picture Music, Inc. v. Bourne, Inc.,*
  457 F.2d 1213 (2d Cir. 1972) ............................................................23

*Playboy Enters., Inc. v. Dumas,*
  53 F.3d 549 (2d Cir. 1995) ................................................................24

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
  77 F.3d 309 (9th Cir. 1996) .................................................................7

*Sanborn v. Fed. Crop Ins. Corp.,*
  93 Cal.App.2d 59 (1949) ...................................................................16

*Siegel v. Nat'l Periodical Publ'ns,*
  508 F.2d 909 (2d Cir. 1974) ................................................... 17, 18, 19

*Stephan v. Maloof,*
  274 Cal.App.2d 843 (1969) ..................................................................7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.,*
  640 F.3d 1034 (9th Cir. 2011) .................................................... *passim*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.,*
  429 F.3d 869 (9th Cir. 2005) ..................................................20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney,*
  881 F.2d 772 (9th Cir. 1989) ...............................................................9

iii

**EXHIBIT 39**
**1652**

**Statutes**

17 U.S.C § 204(a) ....................................................................................................6

37 C.F.R. § 201.10(e)(1)-(2)....................................................................................24

CAL. CIV. CODE § 1624 ............................................................................................6

**Rules**

FED. R. EVID. 1002 ..................................................................................................27

**EXHIBIT 39**
**1653**

# INTRODUCTION

This case should have ended long before it began. The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute. Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer. Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C." RER-13. DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter. Even now, Larson tells the Court: "the parties thought they had arrived at terms" in October 2001. LOR-14.

And indeed they had arrived at terms. The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties. Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form. As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay. DC would receive peace with Larson and certainty in its Superman rights. The deal went bad

1

**EXHIBIT 39**
**1654**

only when—and only because—Hollywood businessman Marc Toberoff entered

the picture, seeking to reopen the dispute and obtain the Superman rights himself.

   But Toberoff's theory for escaping the 2001 deal is unavailing.  Under

Toberoff's guidance, Larson asserts that, although all parties said they reached

agreement on October 19, they were mistaken about essential terms.  Her only

evidence is an October 26 letter sent by DC's negotiator, John Schulman—which

Larson says differs materially from the October 19 letter.  She is incorrect, and

neither she nor Marks took this position at the time.  Every essential term in

Schulman's letter is identical in substance to those in Marks' letter.  Any

difference either involves a non-essential term or is one of semantics.  If any

material difference does exist, DC has long agreed:  the October 19 letter controls.

   DC also owns the large majority of Superman copyrights addressed in the

2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire

rules.  Those rules and deals Larson's father made with DC control here, assuming

the Court reaches these issues.  Each of the disputed Superman works was created

by Siegel or other DC artists that DC employed, directed, and paid to create them.

   DC's deals with the Siegels should be honored, and "[a]t some point,

litigation must come to an end.  That point [is] now...."  *The Facebook, Inc. v.

Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011).  Judgment should be

entered in DC's favor, and the 2001 settlement agreement should be enforced.

2

**EXHIBIT 39**
**1655**

# I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer. SER-105, 434. Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent. SER-107-08, 456-61. A contract was formed on October 19; its terms stated in Marks' letter. While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal. And none reflects a disagreement on a material term.

## A. Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute. SER-434. By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one. SER-105-08, 434-35. The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16. SER-105-07, 434-35. DC made an offer on that final point and all other material terms. *Id.* On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed." SER-107-08. Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet. SER-456-61.

3

**EXHIBIT 39**
**1656**

Marks' October 19 call and letter sealed the deal.  The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61.  The letter unequivocally accepted DC's offer.  SER-456 ("The Siegel Family… has accepted D.C. Comics offer of October 16, 2001…").  The acceptance was signed by Larson's agent, "the party against whom enforcement is sought." *Levin*, 780 F.2d at 787.  A binding agreement was formed. *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter.  Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer."  LOR-14-17.  But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer.  SER-110, 435.  That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor.  Larson does not dispute this Court may enter judgment for DC.  DCB-28.  At a minimum, the issue must be remanded for trial. *Id.* at 34.  For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

4

**EXHIBIT 39**
**1657**

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter.  SER-463-70.  Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf.  LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor.  First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute.  Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term.  *Infra* at 10-14.  Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement.  If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…."  *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer.  No additional writing or signature was required.  *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

_____

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

**EXHIBIT 39**
**1658**

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL.
CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and
subscribed by the party to be charged *or by the party's agent*") (emphasis added);
DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be
"signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson
concedes Marks was her agent, RER-9, and his letter clearly expresses her
"acceptance" to "transfer all of [her] rights in ... 'Superman,'" SER-456, 458. "If
the copyright holder agrees to transfer ownership to another party, that party must
get the copyright holder to sign a piece of paper saying so. It doesn't have to be
the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v.
Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated
for two years, and resolved their last deal point on October 16. SER-456, 463-64.
Larson suggests the October 16 deal was so hastily made that within days Marks
and Schulman could not remember its terms; exchanged conflicting term sheets;
and then let those conflicts fester. LOR-16-17. This account is unsupported. The
parties stopped negotiating in October because they had a deal, and Marks *never*
objected to Schulman's letter or called it a counter-offer. DC undertook the
separate task of preparing a long-form, SER-435, and began performing on the

6

**EXHIBIT 39**
**1659**

2001 deal, reserving amounts due. These are all acts of parties who had a deal.[2]

## B.    Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it "was subject to documentation and would need to be reduced to a mutually-acceptable written contract." LOR-26. But (i) Marks' October 19 letter contains no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v. Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St. Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express reservation* to make a contract unenforceable for lack of later documentation, *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of intent not binding because it expressly stated it was "of no binding effect on any party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998) (draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may need to say this to mislead Larson about the deal he induced her to abandon—but the *record fact* remains that a reserve was set; it totals more than $20 million, SER-397-99; and the funds will be paid to Larson if this Court enforces the 2001 agreement. Larson gets all of this money, though Marks may have a claim to 5%; only Toberoff loses his improperly obtained 40% (or more) cut. DCB-16-19.

**EXHIBIT 39**
**1660**

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By _____
>
> Kevin S. Marks

8

**EXHIBIT 39**
**1661**

Marks never reserves Larson's rights pending a final agreement. That is especially clear when read in conjunction with the first paragraph of Marks' letter, which contain an unambiguous "acceptance" by Larson on defined "terms":

> Dear John:
>
>     This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an agreement had already been reached—nothing in it constitutes a "clear reservation" either. Just the opposite: it expressly confirms "the deal we've agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting together the contemplated long-form. And there is no reservation, clear or otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

**EXHIBIT 39**
**1662**

**C.    Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings**

Larson does not dispute the only essential terms to a copyright transfer are "the subject matter, the price, and the party against whom enforcement is sought." *Levin*, 780 F.2d at 787; LOR-29.  But she spends pages of her brief citing places where, in her view, Marks' October 19 and Schulman's October 26 letters differ.  Some of the purported differences result from Larson's misapplication of the rules of contract interpretation.  Others result from her failure to read the entire letters.  The remainder are at most minor differences on non-essential terms.  Even if any one met the high test for materiality (and none does), it would not matter.  Sworn testimony from Schulman and Marks establishes that Marks precisely understood DC's October 16 offer, and set forth and accepted its terms.  SER-110, 112, 435.  Inconsistent terms DC tried to add—if there are any—must be ignored.  *Facebook*, 640 F.3d at 1037-38.  And while Larson says Schulman tried to get a better deal for DC, DC's position has been throughout:  *if* there are any material differences in Schulman's letter, Marks' letter controls.  RER-6; DCB-31; SER-435-37.

1.  *Scope Of Rights*.  Larson asserts that a material difference exists as to the scope of the properties—that Marks' letter applies to Superman, Superboy, Spectre, and related properties, but Schulman's supposedly expands the coverage to unnamed other properties.  LOR-17.  But in eight years of litigation, Larson has never identified a single property or work that she believes is covered by

10

**EXHIBIT 39**
**1663**

Schulman's supposedly more expansive language, and DC has never asserted any rights over these mystery properties.  That is because no such rights exist.

2. *Monetary Terms*.  Larson asserts that Marks' letter does not allow DC to recover interest on the advances it provides, while the Schulman draft provides that interest "at 100% of prime" can be recovered after December 31 "of year of payment." LOR-18 (citing SER-458, 467).  Larson is incorrect.  Paragraph 8 of *Marks'* letter provides that "beginning January 1 of the following year," after DC pays an advance, "there shall be interest at the prime lending rate."  SER-458. This provision, which Larson fails to mention, shows no difference exists at all.

Larson also suggests that "6% of DC's receipts from all Media licenses" is materially different from "6% of DC's 'gross revenues' derived from 'use of the property in any and all media,'" because "media licenses" is not defined in the Schulman letter, and thus might exclude direct sales or assignments.  LOR-18-19. But the Schulman letter plainly uses the term "media license" in the broader sense to include such revenues.  It lists revenue from sales of "merchandise actually produced by DC" as an example of revenue from "merchandising licenses."  SER-467.  Because his term "license" includes direct sales, it has the broader meaning that Larson says only Marks' letter included.  *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516, 526 (2003).

11

**EXHIBIT 39**
**1664**

Larson also points to semantic differences between the letters without assigning any weight to their materiality other than her own conclusory statements. For instance, she focuses on the fact that Marks' letter specifies three instances where the 6% media license fee would be reduced to 1.5%, whereas the Schulman draft cited these three instances as "examples." SER-457-58, 467-68, 495. In years of litigation, Larson has never pointed to a fourth property that was swept in.

Larson also suggests Schulman's letter allows DC to pay royalties below 1% in certain cases. LOR-20. Larson never raised this interpretation in her briefing or testimony below. Marks did not read the language that way, SER-536-37, nor did DC's later long-form draft, which clearly set the floor at 1%, SER-497. Even if Larson's new interpretation were correct, she cannot show it materially altered the agreement—particularly since it would permit *more* than 1% royalty in cases where Marks' letter capped the royalty at 1%. LOR-20.

Larson also says Schulman's letter departed Marks' letter by defining the term "extraordinary cases." SER 457, 467. It is hardly surprising that a vague term would be given a more precise definition, and the definition Schulman gave tracks the purpose articulated in the Marks draft, which stated that Six Flags would serve as an example because it "involves numerous characters." SER 457.

Along the same vein, Larson says Schulman's letter amended Marks' by defining "cameo" to mean stories where the subject "characters do not appear in

12

**EXHIBIT 39**
**1665**

the title of the publication or feature." SER-468. This definition accords with

custom, DCB-33-34, and applied reciprocally—DC would not reduce Larson's

royalties if one of its other characters (*e.g.*, Batman) made a cameo in Superman.

Noting an accepted definition for a vague term is hardly a material change.

      3. *"Other" Non-Essential Terms.* Larson also complains of differences in

language concerning warranties, indemnification, publicity, and credit, but none

are essential terms to a copyright transfer. DCB-34; *Inamed Corp. v. Kuzmak*, 275

F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002). Even if there were disagreement over

such non-essential terms, a contract arose on October 19 when agreement on all

*essential* terms was reached. *Facebook*, 640 F.3d at 1037-38.

      In any event, Larson does not identify material differences as to these non-

essential terms. As to the warranties, Larson would have been required to provide

"100% ownership" to DC and be subject to a duty of good faith and fair dealing

not to interfere with the contract, which is an implied provision of every contract in

California. *See Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194

Cal.App.4th 873, 885 (2011). The trivial difference in language concerning

warranties thus could hardly give rise to "significant potential liability." LOR-22.

      Similarly, the so-called "indemnification" provision merely implements the

requirement that the "Siegel Family would transfer all of its rights … resulting in

100% ownership to D.C.," SER-458, and that the "Siegel Family" acted "through

13

**EXHIBIT 39**
**1666**

Joanne Siegel and Laura Siegel Larson," SER-456, in providing these rights. Far

from being "significant obligations of the Siegels to indemnify," LOR-23, the

Siegel Family was asked to indemnify DC against suits by the Siegel Family.[5]

 4. *The February 2002 Long-Form.* Larson also points to so-called "vast

differences" between Marks' letter and DC's February 2002 long-form, LOR-24,

but she identifies only a few provisions in that draft that even arguably conflict.

As explained above and in DC's principal brief, DCB-32-33, even if DC proposed

materially different terms in the February 2002 draft long-form, those differences

cannot erase the October 19 agreement. *Facebook*, 640 F.3d at 1038.[6]

**D. Marks' August 2002 Memo Confirms A Deal Was Made**

 A document this Court recently ordered Larson to produce confirms the

parties made a binding agreement in October 2001. In an August 2002 memo,

---

[5] Larson's remaining items scarcely merit mention. She says Schulman required travel for Joanne Siegel and this was a material difference given her poor health. LOR-23. But Schulman's letter made clear any travel was "subject to [her] health." SER-464. Larson also cites a divergence as to credits in paid ads. LOR-23. But Schulman's letter requires credit on all "works where credit to creators is customary," SER-469, and Larson presents no evidence such credit was otherwise.

[6] Any differences are not material and are typical of clarifications in a long-form. Larson says the draft excluded services from the royalty sums. LOR-19. But because services were never addressed in the prior drafts, this is not a different term. The same is true of units, *e.g.*, returned or lost, for which there would be no revenue to pay royalties. LOR-21. Larson also says the draft excludes cash advances, LOR-19, but it does no such thing—it states a time when sums paid to DC would vest, SER-481. Unsurprisingly, Marks told Schulman the February long-form was "consistent" with the October deal. SER-125-28, 436, 440.

14

**EXHIBIT 39**
**1667**

Marks reminds Larson *four times* that she made a "deal" or "agreement" with DC in October 2001, and said he might have to testify against her if she repudiated it. RER-13. Even though Marks drafted his memo long after receiving Schulman's October 26 letter and after DC sent its February long-form, Marks never suggested that either altered the binding effect of the October 19 deal. Marks never said the parties viewed these two later documents as "counter-offers." Nor did he suggest that these post-agreement documents revealed a "mistake" about the terms of the deal. Rather, Marks stressed again and again that "an agreement was reached" between DC and Larson, and breaching it would subject her to suit. RER-13-14.

As both sides understood at the time, Schulman's October 26 letter and DC's draft long-form were simply parts of hammering out the formal documentation for an agreement that had already been reached. SER-435; RER-13-14. Had Larson worked with DC to document the fine points of their agreement, this matter could have long ago been resolved. But instead, lured by Toberoff's false promises, Larson reneged.

\*      \*      \*

The 2001 deal should be enforced, judgment should be entered in DC's favor, and this case should end. At a minimum, the district court's summary judgment order should be reversed, and the case remanded for a trial on DC's settlement defense.

15

**EXHIBIT 39**
**1668**

## II.    DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM

DC's limitations defense turns on one disputed fact—whether settlement talks were terminated by a May 9, 2002, letter from Larson's mother to DC (making this action untimely), or a September 2002 letter from the Siegels to DC. DCB-37-39.  While Larson argued below that settlement talks ended in September, she recently argued in the related *Pacific Pictures* case that the May 9 letter "ended" any chance of settling the matter.  SER-827, 878-79.  A jury should have a chance to hear this evidence and decide which letter ended settlement talks.

Larson contends the May 9 letter did not meet the requirements of the parties' tolling agreement, but that is a jury question.  *Sanborn v. Fed. Crop Ins. Corp.*, 93 Cal.App.2d 59, 65 (1949).  She also says that in *Pacific Pictures*, she described the May 9 letter as making negotiations "moribund," which means "dying," not dead.  But she argued in *Pacific Pictures* the May 9 letter "ended" any prospect of resolving the matter, SER-825—which is possible only if the letter did, in fact, terminate negotiations.

Larson may have taken her new factual position to shield Toberoff from tort liability in *Pacific Pictures*—casting even more doubt on his relationship with her.  *Cf. In re Pacific Pictures Corp.*, 2012 WL 1640627, at *1 (9th Cir. May 10, 2012).  But whatever her motive, if it is credible for Larson to argue in *Pacific Pictures*

16

**EXHIBIT 39**
**1669**

that the May 9 letter ended any prospect of completing negotiations, then a jury in this case could find the same thing, and thus find that her lawsuit was untimely.

## III.    LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS

DC's cross-appeal challenges the district court's summary-judgment ruling that four Superman works were not made-for-hire: portions of *Action Comics #1* ("*AC#1*"); *Action Comics #4* ("*AC#4*"); *Superman #1* (pages 3-6) ("*S#1*"); and two weeks of "Pre-McClure Strips." Larson's opposition is unavailing.

### A.    Elements Of *AC#1* Were Made-For-Hire

Key elements of *AC#1*, added in 1938, were made-for-hire. *Compare* ER-706, *with* SER-78; *see also* ER-654, 917, 957-59; SER-379-88, 442, 803. The court in *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909 (2d Cir. 1974), did not hold otherwise, and Larson's preclusion and merits arguments are without basis.

#### 1.    National *Is Not Preclusive*

Larson argues *National* precludes DC from making its work-for-hire arguments about the 1938 additions to *AC#1*, but she is mistaken. The sole issue in *National* was whether Siegel and Shuster owned the renewal copyright in *AC#1*. *National* never considered the issue now before this Court: whether the 1938 additions in *AC#1* were made-for-hire and thus are not subject to termination. Larson's suggestion (LOR-43) that *National* ruled on the work-for-hire status of the 1938 additions is inaccurate. It merely concluded that these "revisions" were

17

**EXHIBIT 39**
**1670**

not "sufficient to create the presumption that *the strip* [*i.e.*, the *AC#1* Superman strip *in toto*] was a work for hire." 508 F.2d at 914 (emphasis added).

Larson concedes this case involves "evidence [and] argument not presented in [*National*]," but says issue-preclusion applies to any issue DC "could have" raised in *National*. LOR-44. Larson conflates issue-preclusion with claim-preclusion—it is only the latter doctrine that precludes litigating a claim that could have been raised. *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948); *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999). Larson offers seemingly contrary quotations from *Chicot County Drainage Dist. v. Baxter Cnty. Bank*, 308 U.S. 371, 378 (1940), and *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985), but the quotes refer specifically to *res judicata* (or claim-preclusion).

Under settled *issue*-preclusion rules, a ruling in a prior case is preclusive only if the issue previously resolved is *identical* to the issue now raised, the issue was *actually litigated* before, and resolving it was *necessary*. *Sunnen*, 333 U.S. at 599-600; *Granite Rock Co. v. Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011); DCB-70. Larson's cases confirm this, *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986), and she fails all three elements of the test.

Here, new evidence and argument is presented concerning a new issue—the standalone work-for-hire status of the 1938 additions. And *National*'s comments about work-for-hire were "unnecessary" to its decision. *National* affirmed the

18

**EXHIBIT 39**
**1671**

district court's ruling that Siegel transferred his rights in *AC#1*, and, thus, it did not need to address the district court's alternative ruling that *AC#1* was made-for-hire. Additional "determination[s] adverse to the winning party [*i.e.*, DC] do[] not have preclusive effect." *Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985). Larson disagrees, saying *National* could only reach the transfer-of-rights issue because it found *AC#1* was not a work-for-hire. LOR-44. *National* belies that reading: its comments on work-for-hire are *four sentences* at the end of the opinion, *after* affirming the district court's transfer-of-rights ruling.

> 2.    *The 1938 Additions Were Made-for-Hire*

Larson's merits arguments are equally unpersuasive. The disputed *AC#1* elements were all added in 1938, after DC employed Siegel and Shuster as artists to create new and derivative works for DC. Because these elements were added at DC's "instance and expense," they are either works-for-hire in their own right, or DC is a joint owner of the works that contain them. DCB-42-43, 61-68.[7]

-----

[7] Larson concedes "authors of derivative works … own the copyright to their added material." LOR-55. DC thus at least owns the copyright in the 1938 elements. Larson denies DC can be a joint owner because there was no intent "that DC or its staff be considered 'coauthors.'" LOR-53. But her own case— *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 1999)—confirms that a joint work is created where multiple authors make independent contributions intending that their contributions be integrated into a single work. Here, that was plainly the case. DC exercised control over the creation and merging of the new elements into *AC#1*. DCB-67-68. "[C]omic book[s] are typically the joint work of four artists— the writer, the penciler[,] the inker[,] … and the colorist," *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004), and DC staff artists did the latter work. Larson

**EXHIBIT 39**
**1672**

a. *New Content.* Pursuant to the 1937 Employment Agreement, DC instructed Siegel and Shuster to adapt their preexisting Superman story "into a full length ... strip" to be included in *AC#1*. ER-957; SER-379, 381.  Siegel and Shuster "compli[ed]," ER-957, and "revised and expanded" their story to include new panels, text, and illustrations. ER-654, 957; SER-385-86.  DC paid Siegel and Shuster for their contributions, ER-917, 958; SER-383, 804, and had the right to control and supervise them, ER-957; SER-379, 381, 383.  These facts are undisputed, and easily satisfy the instance-and-expense test.  DCB-67-68.

Larson quotes Shuster's testimony that DC did not give them specific directions "as to what to do or what to include in Superman," LOR-47, but the instance-and-expense test does not require particular directions—only that the work itself be ordered and paid for by the employer, DCB-54-55.  It is the *right* to dictate substance that matters, *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879-80 (9th Cir. 2005), and DC owned and did exercise the rights one would expect an employer to exercise, ER-957, SER-379, 381, 383.

---

touts that Siegel and Shuster's names appear on the byline, LOR-53, but this is a custom not remotely dispositive of authorship.  Indeed, the pair's names appear on many works made-for-hire that Larson did not seek to terminate, and DC's name appears on *AC#1*, the Promotional Announcements (which make no reference to Siegel or Shuster), and *all* Superman publications.  Finally, the Announcements feature the cover art DC created and tout *AC#1*'s "**Color!**," SER-370, making clear these DC-created elements were instrumental to *AC#1*'s "appeal," *Aalmuhammed*, 202 F.3d at 1234.

20

**EXHIBIT 39**
**1673**

Larson also argues the 1938 Assignment proves that the new material—created before the Assignment—was not work-for-hire. LOR-46. This is wrong for many reasons. Among them, the 1938 Assignment assigned to DC the parts of *AC#1* that Siegel and Shuster created *before* working for DC; it is the work the pair did on the new elements that was made-for-hire. *Fox*, 429 F.3d at 881, also rejects Larson's claim about the assignment. Because the instance-and-expense test is satisfied for the 1938 additions, *supra* at 19-20, the presumption that DC owned all copyright in those works may be overcome only by evidence proving the parties *expressly agreed* Siegel would own the copyright, DCB-43. Larson has no such evidence, and *Fox* holds the mere existence of a later assignment does not qualify.[8]

    *b. Colorization.* DC colorist Jack Adler—the only percipient witness—testified that Siegel and Shuster submitted the *AC#1* panels in black-and-white, and other DC artists selected colors to add. DCB-61. Larson does not defend the trial court's erroneous ruling that colorization cannot be copyrighted. *Id.* at 61-62. But she does cite the court's equally erroneous criticism of Adler. LOR-48-49. The court said Adler only "describe[d] procedures generally employed in the printing process," rather than "what actually occurred with respect to" *AC#1*, SER-50, when, in fact, Adler addressed those specifics. He testified it was industry custom

---

    [8] Larson rewrites *Dolman v. Agee*, 157 F.3d 708, 712-13 (9th Cir. 1998), as holding, contrary to *Fox*, that an assignment alone rebuts the work-for-hire presumption. LOR-46. *Dolman*,157 F.3d at 713, cited an assignment as but one of *numerous* factors that *together* sufficed. None of the other factors is present here.

**EXHIBIT 39**

**1674**

for artists to submit "comic book work … in black and white," and that this "*was the case with Action Comics No. 1*." SER-442 (emphasis added). He elaborated: "Siegel and Shuster provided the artwork in black and white. Color was applied as part of the regular printing process," and he even identified, by name, the DC artist who "selected the color for Superman's 'S.'" *Id.* Larson speculates Siegel or Shuster submitted "color guides," LOR-49, but no evidence supports this claim.

c. *Cover Art.* DC's February 22, 1938, letter to Siegel makes clear—and Siegel's memoir confirms—that DC's artists "used one of those panel drawings of SUPERMAN" as a template to create "the cover" of *AC#1*. SER-388, 803. Larson says the cover was based on Shuster's "large promotional panel-drawings," LOR-50, but whatever drawing was used as a "template," what matters is that the cover was created *by DC artists* and thus is owned by DC, DCB-62-67.

Larson asserts DC's cover art is not independently copyrightable because it is "closely derived" from an interior panel and any differences are "de minimis." LOR-51. But Larson concedes that the cover features Superman with "a visible S-crest on his chest" as well as "facial features and musculature," LOR-51 n.8, while the interior panel does not.[9] Those differences satisfy the test in *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220, 1226 (9th Cir. 1997), that a derivative work is copyrightable if it contains "non-trivial" variations

---

[9] DC did not use a "low-resolution copy" of the panel. LOR-51n.8. In fact, it enlarged the panel to make it more visible. *Compare* DCB-65-66, *with* SER-86.

22

**EXHIBIT 39**
**1675**

from the original work. Larson says the different S-crest, facial features, and musculature appear in *other* panels in *AC#1*, LOR-51 n.8, but those elements first appeared in the Promotional Announcements that DC owns, DCB-80-81, 84. And, in any event, DC's cover contains *seven other* non-trivial variations, DCB-64-65—all of which meet the *Genesis* test, and none of which Larson disputes.

**B.    DC Owns The Pre-McClure Strips ("Strips")**

1.    *The Strips Were Made-for-Hire*

The Strips were created *after* Siegel and Shuster entered into the 1937 employment agreement with DC, and *after* the pair assigned all of their Superman rights to DC in 1938. ER-602-03, 615, 917; SER-582-89. DC does not "ignore" the "instance and expense" test because of these agreements. LOR-55. Just the opposite: the agreements are what *satisfy* the "instance" prong, because they mean the Strips were *necessarily* created at DC's instance. DCB-71-72. Since DC was the sole owner of all rights in Superman properties, it had complete control over the creation of new Superman material. *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); DCB-47, 56-57. It is thus irrelevant that Siegel and Shuster exercised creative independence. LOR-55.[10]

---

[10] While authors of authorized derivative works "own the copyright to their added material" (LOR-55), where—as here—the derivative work is made-for-hire, the statutory "author" is the hiring party. *Fox*, 429 F.3d at 881; DCB-9-10, 42-43.

23

**EXHIBIT 39**
**1676**

Larson concedes "Siegel and Shuster were compensated" for their work, LOR-55, which is enough to satisfy the "expense" prong. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995). And she concedes they created the Strips *expecting* to be compensated for their work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978), and that DC and McClure bore "the financial risk," *Fox*, 429 F.3d at 881—again establishing "expense." But she says the "expense" factor is not satisfied, because Siegel and Shuster were paid a royalty on net profits, rather than guaranteed compensation. LOR-55. Courts "roundly reject[]" that asserted distinction, as Toberoff well knows. *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (collecting cases).

2.    *Larson's Failure To Terminate The Strips Is Dispositive*

Larson does not deny that her termination notice omitted *all* information concerning the Strips required by federal law—title, author, copyright date, and registration number. Rather, she argues the omission was harmless, because her notice included a "catch-all" footnote indicating an intent to recapture "every … omitted work." LOR-57. That theory contradicts the plain terms of the rule, which treats as harmless *only* those mistakes that "do[] not materially affect the adequacy of the information" in the notice. 37 C.F.R. §201.10(e)(1)-(2). The *complete omission* of all required information obviously *does* materially affect the adequacy of the notice—even with a catch-all, the required information is nonexistent.

24

EXHIBIT 39
1677

*Burroughs v. M-G-M, Inc.*, 491 F.Supp. 1320, 1326 (S.D.N.Y. 1980) (omission of five Tarzan works "'materially affect(s)' the adequacy of the Notice").[11]

If a termination notice could simply refer to "all works, including omitted works," there would be no point in requiring *any* information concerning particular works. The rules specifically define errors that are harmless, Larson's error is not among them, and courts cannot engraft new exceptions, especially given the careful "compromise" the Copyright Act strikes between the rights of heirs and grantees like DC. DCB-15-16 (citing legislative history).[12]

## C.   Pages 3-6 Of *S#1* Are Works-For-Hire

Larson maintains that pages 3-6 of *S#1* were created as part of the original Superman story in 1935—before Siegel and Shuster entered into a work-for-hire relationship with DC—and says there is "no evidence" to the contrary. LOR-53. Incredibly, Larson has no response (other than to ask the Court not to read it) to Siegel's refutation of this theory in his memoir: "[Commentators] state Superman magazine No. 1 contains pages omitted from the Action Comics No. 1 origin story. The truth is that the additional pages were specifically created for use in Superman

---

[11] Larson's effort to distinguish *Burroughs* fails. It held the omission was "not harmless," 491 F.Supp. at 1326, and the Second Circuit ruled the "incomplete notice left [the grantee] with license to use" the works. 683 F.2d 610, 622.

[12] Larson complains about DC's "math," LOR-59, but the numbers do not lie: of the 15 Superman works deemed subject to termination, the 12 Strips—80%— were completely omitted from her notices. DCB-76-77. That Larson wildly "over-noticed" other Superman works cannot turn a *nonexistent* notice of the Strips into an *adequate* one.

25

**EXHIBIT 39**
**1678**

Magazine No. 1." SER-805. Siegel's admission and DC's other evidence confirms these pages were made-for-hire on behalf of DC. DCB-78; SER-761.

**D.    Artwork In *AC#4* Is Work-For-Hire**

It is undisputed Siegel created *no* artwork to accompany the 1934 script that DC later incorporated into *AC#4*—a story illustrated by DC's staff artists. DCB-79-80. Larson's contention that DC cannot simultaneously own these illustrations as the author of a work-for-hire and as a joint author (LOR-54) misunderstands DC's argument. DC's primary submission is that the artwork is owned outright by DC as a work-for-hire, as the 99 panels of illustrations possess far more than the "*de minimis* quantum of creativity" necessary to be copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991). The artwork is also a joint work between Siegel and DC, as both intended the script and illustrations to be combined into a comic strip. *Gaiman*, 360 F.3d at 659; *supra* n.7. Larson has no response, except to assert—without explanation—that the ownership of the *AC#4* artwork is "not before the Court." LOR-54. It is. DC claimed ownership below, RER-3, and the district court considered but "decline[d] to address" it in its August 2009 order being appealed, ER-78-79. The issue is preserved. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1397 n.1 (7th Cir. 1993).

26

**EXHIBIT 39**
**1679**

### E.    Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate.  The court held the Announcements were not subject to termination—and Larson does not challenge this ruling.  LOR-71 n.14.  The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy.  SER-44-45.  Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it.  DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing.  LOR-72.  Not so.  DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day."  LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002.  *See* DCB-82-83 (collecting cases).  And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial.  In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements.  DCB-84; Docket Nos. 30-1, 36-1.

27

**EXHIBIT 39**
**1680**

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or, at the least, reverse and remand on that defense and DC's limitations defense for trial. If the Court finds it has jurisdiction on the copyright issues presented, and it finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER                DANIEL M. PETROCELLI
O'MELVENY & MYERS LLP             MATTHEW T. KLINE
1625 Eye Street, N.W.             CASSANDRA L. SETO
Washington, D.C. 20006            O'MELVENY & MYERS LLP
                                  1999 Avenue of the Stars, 7th Floor
                                  Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated:  June 19, 2012

**EXHIBIT 39**
**1681**

<u>**CERTIFICATE OF COMPLIANCE**</u>

I certify that this brief complies with the type-volume limitation of FED. R.

APP. P. 28.1(e)(2)(C) because it contains 6,796 words, excluding the portions

exempted by FED. R. APP. P. 32(a)(7)(B)(iii).  This brief's type size and type face

comply with FED. R. APP. P. 32(a)(5) and (6).

Dated:  June 19, 2012                    O'MELVENY & MYERS LLP

                                         By:  /s/ Matthew T. Kline
                                               Matthew T. Kline
                                               Attorneys for Warner Bros.
                                               Entertainment Inc. and DC Comics

**EXHIBIT 39**
**1682**

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2012, I caused to be electronically filed the Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed on June 19, 2012, at Los Angeles, California.

/s/  Cassandra Seto
Cassandra Seto

**EXHIBIT 39**
**1683**