# EXHIBIT 40

1 | Marc Toberoff (State Bar No. 188547)
  | *mtoberoff@toberoffandassociates.com*
2 | Keith G. Adams (State Bar No. 240497)
  | *kadams@toberoffandassociates.com*
3 | Pablo D. Arredondo (State Bar No. 241142)
  | *parredondo@toberoffandassociates.com*
4 | David Harris (State Bar No. 255557)
  | *dharris@toberoffandassociates.com*
5 | TOBEROFF & ASSOCIATES, P.C.
  | 22337 Pacific Coast Highway, #348
6 | Malibu, California, 90265
  | Telephone:  (310) 246-3333
7 | Fax:          (310) 246-3101

8 | Attorneys for Plaintiff-Counterclaim
  | Defendant, Laura Siegel Larson,
9 | individually and as personal representative
  | of the Estate of Joanne Siegel

10

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | Case No: 04-CV-08400 ODW (RZx)* Case No: 04-CV-08776 ODW (RZx)* Hon. Otis D. Wright II, U.S.D.J. Hon. Ralph Zarefsky, U.S.M.J. **PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT IN THE SIEGEL SUPERMAN AND SUPERBOY CASES** *Declaration of Keith Adams and Statement of Genuine Issues of Fact and Law filed concurrently* Date:      March 25, 2013* Time:      1:30 p.m.* Place:     Courtroom 11* *:  The Court has stated that it will take the motion(s) under submission and hold a hearing if necessary. Dkt. 707.  Docket citations herein are to Case No. 04-CV-08400. |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, Plaintiff, v. TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10, Defendants and Counterclaimants. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 3 of 111    Page
ID #:17351
Case 2:04-cv-08400-ODW-RZ    Document 709    Filed 03/04/13    Page 2 of 32    Page ID #:15407

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ......................................................................................3

STANDARD OF REVIEW .....................................................................................6

ARGUMENT ...........................................................................................................6

I.    THE MANDATE DOES NOT SUPPORT PREMATURE
      JUDGMENT ..................................................................................................6

II.   ISSUES OF MATERIAL FACT PREVENT SUMMARY
      JUDGMENT ..................................................................................................9

      A.    The October 19, 2001 Letter Did Not Transfer The Copyrights
            And DC Is Not Entitled To A Declaration Of Rights To That
            Effect .................................................................................................9

            1.    The Letter's Language Does Not Support DC's
                  Interpretation ..........................................................................9

            2.    Any Ambiguity Must Be Resolved By The Trier Of Fact .......10

            3.    The Circuit Did Not Hold That The Siegels Assigned
                  Rights ...................................................................................10

            4.    A Judgment That The Siegels "Are" Obliged To Transfer
                  Rights To DC Would Not Settle The Issue ...........................11

      B.    DC Is Not Entitled To Specific Performance.....................................12

            1.    DC Did Not Perform Or Even Offer To Perform ....................14

            2.    The Failure To Complete A Long-Form Agreement Did
                  Not Excuse DC's Non-Performance.......................................15

            3.    The Siegels Did Not Breach The Letter .................................16

                  a.    DC's Anticipatory Breach/Repudiation .........................16

                  b.    DC's Actual Breach .....................................................19

                  c.    The Siegels' Rescission...............................................20

                  d.    DC's Acquiescence and Abandonment...........................22

III.  FEDERAL COPYRIGHT LAW PREVENTS SUMMARY
      JUDGMENT AS TO SUPERBOY AND THE SUPERMAN ADS............23

CONCLUSION......................................................................................................25

i

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 4 of 111    Page
ID #:17952
Case 2:04-cv-08400-ODW-RZ    Document 705    Filed 03/04/13    Page 3 of 32    Page ID #:15408

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Abdulkhalik v. City of San Diego,*
4  2009 U.S. Dist. LEXIS 110062 (S.D. Cal. Nov. 25, 2009) .................................... 12

5  *Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) ........................................................................................ 6

6

*Arachnid, Inc. v. Merit Indus., Inc.,*
7  939 F.2d 1574 (Fed. Cir. 1991) ...................................................................... 10

8  *Barndt v. County of L.A.,*
   211 Cal. App. 3d 397 (1989) .......................................................................... 12
9

*Beverage v. Canton Pacer Mining Co.,*
10  43 Cal. 2d 769 (1955) ............................................................................... 14-15

11  *Blackburn v. Charnley,*
    117 Cal. App. 4th 758 (2004) ......................................................................... 13
12

*Brown v. Grimes,*
13  192 Cal. App. 4th 265 (2011) ......................................................................... 19

14
    *Campanelli v. Bockrath,*
15  1997 U.S. Dist. LEXIS 7981 (N.D. Cal. June 4, 1997) ..................................... 8

16  *Castaneda v. Dura-Vent Corp.,*
    648 F.2d 612 (9th Cir. 1981) .......................................................................... 10
17

*CDF Firefighters v. Maldonado,*
18  158 Cal. App. 4th 1226 (2008) ....................................................................... 13

19  *City of Hollister v. Monterey Ins. Co.,*
    165 Cal. App. 4th 455 (2008) ......................................................................... 16
20

21  *Classic Media, Inc. v. Mewborn,*
    532 F.3d 978 (9th Cir. 2008) .......................................................................... 24

22  *Darling Int'l, Inc. Baywood Partners, Inc.,*
23  2007 U.S. Dist. LEXIS 50985 (N.D. Cal. July 13, 2007) .................................. 18

24  *Daugherty Co. v. Kimberly-Clark Corp.,*
    14 Cal. App. 3d 151 (1971) ............................................................................ 23
25

*Dobson v. Twin City Fire Ins. Co.,*
26  2012 U.S. Dist. LEXIS 93823 (C.D. Cal. July 5, 2012) .................................... 15

27  *Doe v. State of Nebraska,*
    2002 WL 225907 (D. Neb. Dec. 14, 2002) ....................................................... 8
28

*Edgerly v. City & County of San Francisco,*
2011 U.S. Dist. LEXIS 155192 (N.D. Cal. May 26, 2011).....................................8

*Edlin v. M/V Truthseeker,*
69 F.3d 392 (9th Cir. 1995) ....................................................................................8

*Facebook, Inc. v. Pac. Nw. Software, Inc.,*
640 F.3d 1034 (9th Cir. 2011) ..............................................................................15

*Fed. Deposit Ins. Corp. v. Air Florida Sys., Inc.,*
822 F.2d 833 (9th Cir. 1987)..................................................................................22

*Ferguson v. City of Cathedral City,*
197 Cal. App. 4th 1161 (2011) ..............................................................................16

*Firth v. United States,*
554 F.2d 990 (9th Cir. 1977) ...................................................................................8

*Freedman v. St. Matthias Parish,*
37 Cal. 2d 16 (1951) ..............................................................................................18

*Freeman v. Mostafavi,*
2005 Cal. App. Unpub. LEXIS 10154 (Cal. App. 2d Dist. Nov. 8, 2005)..............23

*Golden West Baseball Co. v. City of Anaheim,*
25 Cal. App. 4th 11 (1994) ....................................................................................13

*Griffin v. Beresa, Inc.,*
143 Cal. App. 2d 299 (1956) .................................................................................22

*Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers*
192 Cal. App. 2d 268 (1961) .................................................................................22

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.,*
531 F.3d 767 (9th Cir. 2008) ...................................................................................7

*Hall v. City of L.A.,*
697 F.3d 1059 (9th Cir. 2012) .................................................................................8

*Hil-Mac Corp. v. Mendo Wood Products, Inc.,*
235 Cal. App. 2d 526 (1965) .................................................................................22

*Hull v. Ray,*
211 Cal. 164 (1930) ...............................................................................................20

*Honda v. Reed,*
156 Cal. App. 2d 536 (1958) .................................................................................23

*Industrial Indemnity v. Superior Court,*
224 Cal. App. 3d 828 (1990) .................................................................................10

*Irwin v. American Interactive Media,*
1994 U.S. Dist. LEXIS 16223 (C.D. Cal. Apr. 14, 1994) ......................................21

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 6 of 111    Page
ID #:17954
Case 2:04-cv-08400-ODW-RZ    Document 705    Filed 03/04/13    Page 5 of 32    Page ID #:15410

*Jaunich v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*,
647 F. Supp. 209 (N.D.Cal.1986) ...................................................................21

*Johnson v. Goldberg*,
130 Cal. App. 2d 571 (1955) ........................................................................18

*Katz v. Cal-Western Reconveyance Corp.*,
2010 U.S. Dist. LEXIS 98940 (N.D. Cal. Sept. 21, 2010) ..........................13

*Lancaster v. Tilton*,
2007 U.S. Dist. LEXIS 48403 (N.D. Cal. June 21, 2007) ............................8

*Larson v. Warner Bros. Entm't, Inc.*,
2013 U.S. App. LEXIS 671 (9th Cir. January 10, 2013) ...............1, 7, 11

*Li'l Red Barn, Inc. v. Red Barn Sys., Inc.*,
322 F. Supp. 98 (N.D. Ind. 1970) ..................................................................9

*Local 659, I.A.T.S.E. v. Color Corp. of America*,
47 Cal. 2d 189 (1956) ..................................................................................16

*Loop Building Co. v. De Coo*,
97 Cal. App. 354 (1929) .........................................................................17, 20

*Maffei v. N. Ins. Co. of N.Y.*,
12 F.3d 892 (9th Cir. 1993) ..........................................................................10

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*,
191 Cal. App. 4th 435 (2010) ..................................................................16, 18

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) .........................................................................24

*McCreary v. Mercury Lumber Distributors*,
124 Cal. App. 2d 477 (1957) ........................................................................23

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ......................................................................24

*Mycogen Corp. v. Monsanto Co.*,
28 Cal. 4th 888 (2002) ..................................................................................12

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) ......................................................................................24

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) ..........................................................................6

*Ninety Nine Invest. v. Overseas Courier Service (Sing.) Priv.*,
113 Cal. App. 4th 1118 (2003) ......................................................................14

*Odima v. Westin Tucson Hotel*,
53 F.3d 1484 (9th Cir. 1995) ...........................................................................8

iv
Tables of Contents and Authorities

**EXHIBIT 40**

**1688**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 7 of 111    Page
ID #:17955
Case 2:04-cv-08400-ODW-RZ    Document 709    Filed 03/04/13    Page 6 of 32    Page ID #:15411

*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*,
411 F.2d 889 (9th Cir. 1969) ................................................................. 17, 19

*Peer Int'l Corp. v. Pausa Records, Inc.*,
909 F.2d 1332 (9th Cir. Cal. 1990) ............................................................... 21

*Pichignau v. Paris*,
264 Cal. App. 2d 138 (1968) ....................................................................... 18

*Portsmouth Square, Inc. v. Shareholders Protective Comm.*,
770 F.2d 866 (9th Cir. 1985) ....................................................................... 12

*Posner v. Grunwald-Marx, Inc.*,
56 Cal. 2d 169 (1961) ............................................................................... 19

*Rubin v. Fuchs*,
1 Cal. 3d 50 (1969) .................................................................................. 21

*SCO Group, Inc. v. Novell, Inc.*,
2004 WL 4737297 (D. Utah June 9, 2004) ....................................................... 9

*Siegel v. Warner Bros. Entertainment, Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ........................................................... 5

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ...................................................................... 6

*U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*,
498 F.2d 335 (9th Cir. 1974) ....................................................................... 21

*Union Oil Co. of California v. Greka Energy Corp.*,
165 Cal. App. 4th 129 (2008) ...................................................................... 13

*Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP*,
593 F. Supp. 2d 1153 (S.D. Cal. 2008) ........................................................... 15

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007) ........................................................................ 6

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1 (1995) .................................................................................. 9

*Walters v. Calderon*,
25 Cal. App. 3d 863 (1972) ........................................................................ 13

*Wilson v. Lewis*,
106 Cal. App. 3d 802 (1980) ....................................................................... 21

**Statutes**

17 U.S.C. § 304(c)(5) ................................................................................ 24

17 U.S.C. § 304(c)(6)(D) ........................................................................ 2, 23

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 8 of 111    Page
ID #:17956
Case 2:04-cv-08400-ODW-RZ    Document 709    Filed 03/04/13    Page 7 of 32    Page ID #:15412

Cal. Civ. Code § 1439 ................................................................................................ 14

Cal. Civ. Code § 1639 .................................................................................................. 9

Cal. Civ. Code § 1689(b) ........................................................................................... 20

Cal. Civ. Code § 1691 ................................................................................................ 20

Cal. Civ. Code § 1657 ................................................................................................ 20

Cal. Civ. Code § 1693 ................................................................................................ 22

Cal. Civ. Code §1657 ................................................................................................. 20

Fed. R. Civ. P. 56(c) ................................................................................................... 6

Fed. R. Civ. P. 56(f) .................................................................................................. 12

**EXHIBIT 40**

**1690**

## INTRODUCTION

Defendant DC Comics' ("DC") summary judgment motion ("Mot.") is falsely premised. DC cannot rush this case to judgment based on its willful misreading of the Ninth Circuit's recent decision. The Circuit did *not* hold that the October 19, 2001 letter from the Siegels' attorney to DC actively transferred the Siegels' copyrights to DC, as DC solely argues. It held only that the letter was "an acceptance of terms negotiated between the parties" that "was sufficient" to create a contract on October 19, 2001, and remanded this case for adjudication of DC's counterclaims. *Larson v. Warner Bros. Ent., Inc.*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. January 10, 2013). What the resulting October 19, 2001 agreement meant, and whether and to what extent it is still enforceable given DC's subsequent conduct, are entirely separate questions raised by DC's counterclaims. The answers to those questions show that DC is not entitled to summary judgment – and why DC did not bring a proper summary judgment motion as to its counterclaims.

As a matter of law, the October 19, 2001 letter could not have transferred the Siegels' copyrights, as it unambiguously states that the Siegels "would" transfer their rights in the future. DC thus requires specific performance of the October 19, 2001 letter. But specific performance requires that DC first prove that the Siegels <u>breached</u> the agreement plus additional elements, which DC cannot establish and has not even attempted to prove in its motion. Tellingly, DC asked in its motion that its Third Counterclaim for breach of contract be *dismissed*. DC can neither prove the elements of breach nor obtain specific performance under California law.

Today, DC insists that the terms are "everything in this [October 19] letter, nothing more." But in 2001-2002, DC acted as though it was not bound by it. For instance, the October 19, 2001 letter set forth a clear unequivocal obligation of DC to pay the Siegels by March 31, 2002, and there is no condition in the October 19, 2001 letter that any "long-form" agreement first be negotiated. That day came and went. DC did not pay or even offer to pay, on March 31, 2002 in exchange for the Siegels'

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT
**EXHIBIT 40**
**1691**

1  performance, as it had promised, breaching its agreement.  Instead, DC conditioned

2  its performance on new and revised terms found nowhere in the October 19, 2001

3  letter, all of which favored DC and hurt the Siegels.

4          After attempting to grind and muscle the Siegels, DC cannot now have its cake

5  and eat it too, and avoid the consequences of its actions in 2001-2002.  Under clear

6  California law, DC's anticipatory breach, followed by its actual breach of the October

7  19, 2001 letter, excused the Siegels' performance and allowed them to rescind the

8  October 19, 2001 letter.  In May 2002, the Siegels rejected DC's overreaching

9  attempts to "claw back" on its promises to them, and exercised their right of

10  rescission.  In response, DC did not retract its demands and revert to the October 19,

11  2001 letter.  DC did not offer to perform under the October 19, 2001 letter or claim

12  that the Siegels were bound by the October 19, 2001 letter.  Instead, DC acquiesced

13  and engaged in new negotiations with the Siegels.  DC asserted no rights under the

14  October 19, 2001 letter until after the Siegels filed this action in October, 2004.

15          In short, when it mattered, DC did not honor the October 19, 2001 letter,

16  anticipatorily breaching and then actually breaching its terms, causing justifiable

17  rescission of the October 19, 2001 letter, and precluding its enforcement today.

18          At a minimum, this raises genuine issues of material fact barring summary

19  judgment.  DC entirely failed to address these issues in its motion, and they cannot be

20  decided *ad hoc* as that would violate Ms. Larson's right to due process.

21          In addition, the October 19, 2001 letter could not have transferred the Siegels'

22  recaptured Superboy copyrights or their rights in the early Superman promotional

23  announcements ("Ads").  Under 17 U.S.C. § 304(c)(6)(D), a terminated copyright

24  can only be re-granted to the original grantee *after* the notice of termination is served.

25  The Siegels did not serve Superboy termination notices until 2002, and did not serve

26  termination notices regarding the Ads until 2012.  The October 19, 2001 letter could

27  not have transferred to DC the Siegels' termination interests in Superboy or the Ads

28  as a matter of law, and therefore the October 19, 2001 letter has no bearing on the

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT
**EXHIBIT 40**
**1692**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 11 of 111
Case 2:04-cv-08400-ODW-RZ    Document 700-1    Filed 03/04/13    Page 10 of 32    Page ID
#:15415

1     Siegels' *Superboy* case (C.D. Cal. Case No. 04-CV-08776).

2         DC's rush to judgment must be rejected, and its motion denied.

3         **STATEMENT OF FACTS**

4         In 1997, Joanne Siegel and Laura Siegel Larson (the "Siegels") served notices

5 of termination pursuant to the Copyright Act as to Jerome Siegel's Superman

6 copyright grants to DC. Statement of Issues ("SGI") ¶2. In 1999, the parties entered

7 into formal negotiations, in which the Siegels were represented by attorney Kevin

8 Marks and DC by Warner's then-General Counsel, John Schulman. SGI ¶3.

9         On October 16, 2001, DC made a settlement offer to the Siegels. SGI ¶3. On

10 October 19, 2001, Marks sent a "term sheet," in letter form, to Schulman, which the

11 Ninth Circuit later held was a valid acceptance of DC's offer creating an agreement

12 (the "October 19, 2001 Letter"). SGI ¶5. DC now argues and admits that these were

13 the only terms the parties ever agreed to. SGI ¶52-53. The October 19, 2001 Letter

14 contained a specific, time-sensitive obligation of DC: "an annual guarantee of

15 $500,000 per year payable for ten years beginning March 31, 2002." SGI ¶6. There

16 was also a $1,000,000 "signing bonus," presumably payable before March 31, 2002,

17 and a $2,000,000 "advance" for the period beginning January 1, 2000. *Id.* At the

18 time the parties agreed to this March 31, 2002 deadline, they intended the terms of

19 the October 19, 2001 Letter to be transposed into an agreement format for signature

20 by the parties, which should have been a relatively simple task. SGI ¶7.

21         DC did not accept the October 19, 2001 Letter as the parties' agreement.

22 Instead, on October 26, 2001, Schulman sent a letter to Marks, enclosing a "more

23 fulsome outline" of deal terms (the "October 26, 2001 Letter"). SGI ¶8. The

24 October 26, 2001 Letter was sent when Marks was in China for a long period; he did

25 not return until late November 2001, and it was <u>not</u> forwarded to the Siegels. SGI ¶9.

26         As is evident from the October 26, 2001 Letter, and as Marks testified,

27 Schulman's "outline" contained new and changed terms that were materially different

28 from those in the October 19, 2001 Letter, all in DC's favor. SGI ¶¶10-16. Among

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 12 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-1 Filed 03/04/13    Page 11 of 32    Page ID
#:15416

1    other changes, the outline required the Siegels to assign additional copyrights to DC,

2    reduced the Siegels' royalty in many instances, changed when and where credit

3    would be given, and added numerous warranty and indemnity provisions found

4    nowhere in the October 19, 2001 Letter. *Id.* The October 26, 2001 Letter also states

5    that DC was preparing a "draft agreement." SGI ¶8. The October 26, 2001 Letter

6    confirms the "Annual Payment (Advance)" of "$500,000 per year for ten years,

7    commencing 2002, payable 3/31 of year," *i.e.*, beginning March 31, 2002. SGI ¶17.

8        After over three months, DC finally sent Marks a draft agreement on February

9    1, 2002 (the "February 1, 2002 Draft"), which was vastly different from the October

10    19, 2002 Letter, as Marks testified. SGI ¶¶6, 18-21. In addition to the new material

11    terms in DC's October 26, 2013 Letter, DC insisted on numerous new and changed

12    terms – all to DC's benefit and the Siegels' detriment. SGI ¶¶19-21.

13        The March 31, 2002 payment deadline came and went; DC did not pay or even

14    tender the $500,000 annual payment, the $1,000,000 signing bonus, or the

15    $2,000,000 advance, as DC had expressly promised and as set forth in the October

16    19, 2001 Letter. SGI ¶24.

17        On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, COO of DC's

18    parent, AOL Time Warner Inc., objecting to the February 1, 2002 Draft and stating:

19    "When we made those difficult concessions and reluctantly accepted John

20    Schulman's last proposal six months ago [the October 19, 2001 agreement], we were

21    stabbed in the back with a shocking [February 1, 2002] contract" and that "[a]fter

22    four years we have no deal and this contract makes an agreement impossible." SGI

23    ¶25; Declaration of Keith Adams ("AD"), Ex. 4.

24        On May 21, 2002, Time Warner sent a reply letter to Joanne, stating it was

25    "quite troubled by [her] feeling[s]." SGI ¶26. However, it did not retract its

26    aggressive demands in the February 1, 2002 Draft, or go back to the terms in the

27    October 19, 2001 Letter that the Siegels confirmed was their agreement. SGI ¶¶26-

28    27. Instead, DC falsely maintained that the draft "accurately represented the

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 13 of 111
Case 2:04-cv-08400-ODW-RZ    Document 701-7 Filed 03/04/13   Page 12 of 32   Page ID
#:15417

1    agreement previously reached," when a plain comparison of its Draft to the October

2    19, 2001 Letter revealed that this was not true.  SGI ¶¶6, 18-21, 26.

3         On September 21, 2002, the Siegels sent a letter in which they terminated

4    Marks and provided "formal notification that we are totally stopping and ending all

5    negotiations with DC Comics … effective immediately."  SGI ¶29.  Later, in

6    November 2002, the Siegels served a § 304(c) notice of termination regarding

7    Superboy, with an effective date of November 17, 2004.  SGI ¶30.

8         In response to all of these events, DC did not claim rights under the October

9    19, 2001 Letter.  SGI ¶33.  Nor did DC comply, or offer to comply, with its

10   obligations under the October 19, 2001 Letter.  SGI ¶32.  Instead, in 2003-04, DC

11   simply resumed negotiations with the Siegels.  SGI ¶31.

12        The parties' new negotiations were unsuccessful and accordingly, on October 8

13   and October 22, 2004, the Siegels filed suits to enforce their statutory terminations as

14   to Superman and Superboy, respectively.  SGI ¶¶34-35.  On November 22, 2004, DC

15   counterclaimed, and contended for the first time in three years that the October 19,

16   2001 Letter constituted an agreement.  SGI ¶¶36-37.  DC also alleged for the first

17   time that the Siegels had repudiated that agreement by their May 9, 2002 and

18   September 21, 2002 letters.  SGI ¶38.  DC's Third Counterclaim against the Siegels

19   was for breach of contract, and its Fourth Counterclaim (on which it now moves)

20   sought only declaratory relief as to the October 19, 2001 Letter.  SGI ¶¶39-40.

21        Judge Larson concluded on summary judgment that the parties had failed to

22   reach an agreement, citing the "materially different" terms of the October 26, 2001

23   Letter and the "vastly different" terms of the February 1, 2002 Draft.  SGI ¶47.  This

24   Court then entered a Rule 54(b) judgment, and both sides appealed.  SGI ¶¶48-49.

25        On March 6, 2012, Ms. Larson served a termination notice on DC regarding

26   early Superman Ads, with an effective date of March 12, 2014.  SGI ¶63.

27        On January 10, 2013, the Circuit reversed Judge Larson's ruling, holding that

28   the October 19, 2001 Letter constituted a valid acceptance of DC's offer sufficient to

Case 2:04-cv-08400-ODW-RZ   Document 720-10   Filed 04/04/13   Page 14 of 111
Case 2:04-cv-08400-ODW-RZ   Document 701-7   Filed 03/04/13   Page 13 of 32   Page ID
#:15418

1  form an agreement on October 19, 2001.  SGI ¶58.  The Circuit did not disturb Judge

2  Larson's findings as to the "materially" and "vastly different" terms in DC's October

3  26, 2001 Letter and February 1, 2002 Draft, and remanded the case for further

4  adjudication of DC's contract claims – its Third and Fourth Counterclaims.  SGI ¶59.

5       On January 29, 2013, DC, for the first time in 12 years, offered "to tender

6  payment" to Ms. Larson under the October 19, 2001 Letter, subject to purported

7  "rights of offset," rendering its offer illusory.  SGI ¶60.  DC also not provide the

8  basis for its calculations, leaving it completely uncertain whether DC's tender

9  complied with the complicated royalty scheme in the October 19, 2001 Letter.  SGI

10  ¶61.  Troublingly, the amount of Superman royalties DC claimed it owed Ms. Larson

11  in 2013, subject to DC's purported "rights of offset," was not much higher that what

12  DC had testified was owed Ms. Larson seven years earlier in 2006.  SGI ¶62.

13  **STANDARD OF REVIEW**

14       Summary judgment is appropriate only if the record discloses "that there is no

15  genuine issue as to any material fact and that the moving party is entitled to judgment

16  as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of

17  identifying evidence demonstrating the absence of a genuine issue of material fact for

18  trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).  The "non-moving

19  party's evidence is to be believed, and all justifiable inferences are to be drawn in

20  [its] favor."  *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  The court must

21  make all "credibility determinations" in favor of the nonmoving party, *Narayan v.*

22  *EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must disregard all evidence

23  favorable to the moving party that the jury is not required to believe."  *Wallace v.*

24  *City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

25  **ARGUMENT**

26  **I.   THE MANDATE DOES NOT SUPPORT PREMATURE JUDGMENT**

27       DC's entire argument in support of judgment is premised on its outright

28  misrepresentation that the Ninth Circuit "held" that "[Ms.] Larson … transferred any

6

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT
**EXHIBIT 40**
**1696**

Case 2:04-cv-08400-ODW-RZ     Document 720-10     Filed 04/04/13     Page 15 of 111
Case 2:04-cv-08400-ODW-RZ     Document 709-1 Filed 03/04/13   Page 14 of 32   Page ID
#:15419

1    copyrights that may have been recaptured to DC." Mot. at 1.

2        A plain reading of the opinion shows that the Circuit held no such thing. The

3    Circuit held only "that the October 19, 2001, letter did constitute … an acceptance"

4    and "was sufficient" to create a contract on that date. *Larson*, 2013 U.S. App. LEXIS

5    671, at *3. The Circuit did not interpret the contract, set forth its terms, determine if

6    the terms are enforceable, or even determine if the agreement is still in effect, as such

7    contract matters should be adjudicated in the first instance by a district court. *See*

8    *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 788 (9th Cir.

9    2008) (remanding case; "[b]ecause … factual issues exist with regard to the

10   contracts' interpretation, the district court is in a better position to 'make these

11   determination in the first instance'") (citation omitted). Accordingly, the Circuit

12   remanded to this Court for adjudication of DC's contract counterclaims.

13       DC admits that it specifically "ask[ed] the Ninth Circuit to enter judgment in

14   its favor on all claims in the *Siegel* Superman case" on the grounds it now asserts

15   here. Mot. at 4. In fact, DC expressly asked the Ninth Circuit "to enter judgment" in

16   its favor at least *five* times in its briefs. SGI ¶50.[1]

17       The Circuit was well aware of this request, and questioned DC about it. SGI

18   ¶51; AD, Ex. 19 at 344 (The Court: "[I]f that's correct, is this matter for trial rather

19   than summary judgment for you [DC]?"), 345-46 (The Court: "Judge Reinhardt was

20   asking you, 'Is there sufficient evidence [] for summary judgment in your favor?'").

21       Despite DC's clear requests and the Circuit's awareness of them, the Circuit

22   did *not* remand with instructions to enter judgment in DC's favor. Instead, it directed

23   this Court "to reconsider DC's third and fourth [contract] counterclaims in light of

24   our holding." *Larson*, 2013 U.S. App. LEXIS 671, at *6. In other words, the Circuit

25

---

[1] *See* AD, Ex. 16 at 230 (DC: "Marks' October 19, 2001, letter reflects a legally enforceable
agreement to resolve all claims at issue here"), 252 (DC: "This Court should grant judgment as a
matter of law on DC's settlement … counterclaims and dismiss the remainder of this appeal on that
basis."); Ex. 18 at 316 (DC: "Judgment should be entered in DC's favor, and the 2001 settlement
agreement should be enforced."), 318 (DC: "[The evidence] … justifies this Court entering
judgment in DC's favor."), 324 (DC: "The Court should enter judgment in DC's favor on its
settlement defense.").

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT
**EXHIBIT 40**
**1697**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 16 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-7    Filed 03/04/13    Page 15 of 32    Page ID
#:15420

1    remanded for further proceedings. *See Doe v. State of Nebraska*, 2002 WL 225907,

2    at *6 (D. Neb. Dec. 14, 2002) ("[T]he mandate issued in this case makes clear that

3    some additional inquiry is necessary.... I see no other reason why the [] Circuit

4    would remand this case 'for reconsideration in light of [opinion],'... if such analysis

5    were not required.").

6        If the Circuit thought its ruling on the October 19, 2001 Letter disposed of

7    DC's counterclaims, it would have said so. *See Lancaster v. Tilton*, 2007 U.S. Dist.

8    LEXIS 48403, at *9-10 (N.D. Cal. June 21, 2007) (rejecting argument about effect of

9    a Circuit ruling because "[h]ad the court intended [that effect], it could have done so

10   explicitly"). The fact that the Circuit instead "remand[ed] for further proceedings

11   indicate[s] that [it] believed that there was more to do." *Edgerly v. City & County of*

12   *San Francisco*, 2011 U.S. Dist. LEXIS 155192, at *7 (N.D. Cal. May 26, 2011)

13       And "there [is] indeed more to do." *Id.* at *8. "'[A] mandate is controlling as

14   to all matters within its compass, while leaving any issue not expressly or impliedly

15   disposed of on appeal available for consideration by the trial court on remand.'"

16   *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995) (quoting *Firth v.*

17   *United States*, 554 F.2d 990, 993-94 (9th Cir. 1977)).

18       Thus, "when a court is confronted with issues that the remanding court never

19   considered, the 'mandate requires respect for what the higher court decided, not what

20   it did not decide.'" *Hall v. City of L.A.*, 697 F.3d 1059, 1067 (9th Cir. 2012). "[A]ny

21   issue not decided by the court of appeals may be addressed by the district court on

22   remand, even if such issue varies or expands the scope of the original record."

23   *Campanelli v. Bockrath*, 1997 U.S. Dist. LEXIS 7981, at *8 (N.D. Cal. June 4, 1997)

24   (citing *Edlin v. M/V Truthseeker*, 69 F.3d 392, 393 (9th Cir. 1995)).

25       While the Circuit held that there was an agreement **on October 19, 2001**, the

26   issue now is what, if anything, that means **today**. As detailed below in Section II,

27   there are a host of reasons under well-established contract law why the October 19,

28   2001 Letter is no longer enforceable based on DC's refusal to abide by it. As DC's

8
PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT
**EXHIBIT 40**
**1698**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 17 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-7    Filed 03/04/13    Page 16 of 32    Page ID
#:15421

1   own counsel told the Ninth Circuit, "[t]he question of whether the subsequent events

2   undid the prior agreement or didn't undo the prior agreement, that's a fact question"

3   that should not be decided on summary judgment.  SGI ¶55; AD, Ex. 19 at 345.

4        DC has not even attempted to show that it is entitled to summary judgment on

5   any of these critical issues, as they implicate numerous issues of material fact

6   precluding summary judgment in DC's favor.

7   **II.    ISSUES OF MATERIAL FACT PREVENT SUMMARY JUDGMENT**

8        **A.    <u>The October 19, 2001 Letter Did Not Transfer The Copyrights And</u>**

9             **<u>DC Is Not Entitled To A Declaration Of Rights To That Effect</u>**

10            **1.    The Letter's Language Does Not Support DC's Interpretation**

11       DC's motion requests a declaratory judgment that the October 19, 2001 Letter

12  actively "transferred" the Siegel's copyrights at the time the letter was signed.[2]  The

13  Ninth Circuit made no such ruling, as it is contrary to the Letter's plain language.

14       Under California contract law, "the interpretation of a contact must give effect

15  to … 'the mutual intention of the parties at the time the contract is formed.'"  *Waller*

16  *v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1636,

17  1639).  "When a contract is reduced to writing, the intention of the parties is to be

18  ascertained from the writing alone, if possible…."  Cal. Civ. Code § 1639.

19       Here, the October 19, 2001 Letter is plain.  The Siegel family agreed only that

20  it "*would* transfer all of its rights in the 'Superman' properties."  SGI ¶6 (emph.

21  added).  At most, this shows an intent to transfer the copyrights at some future date.

22  "A mere promise to assign rights in the future is not an actual assignment…."  *SCO*

23  *Group, Inc. v. Novell, Inc.*, 2004 WL 4737297 (D. Utah June 9, 2004); *see Li'l Red*

24  *Barn, Inc. v. Red Barn Sys., Inc.*, 322 F. Supp. 98, 106-07 (N.D. Ind. 1970) ("The

25  wording of the contract here demonstrates clearly that neither of the parties intended

26

_____

27  [2] *See* Dkt. 702 at 1 ("DC's Fourth Counterclaim … sought a declaration that the settlement
    agreement was enforceable and that DC owns all of the Superman and Superboy copyright"); 702-5
28  (DC's Proposed Judgment) at 1 ("In the parties' October 19, 2001, settlement agreement, Larson …
    "**transfer[red]** all of [their] rights" to DC, "resulting in 100% ownership to D.C. Comics.  This
    complete transfer bars Larson's remaining claims….") (alterations in original) (emphasis added).

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 18 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-17    Filed 03/04/13    Page 17 of 32    Page ID
#:15422

1   the reassignment to have any immediate legal effect."); *Arachnid, Inc. v. Merit*

2   *Indus., Inc.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991) ("Although an agreement to assign

3   in the future [patent rights] … may vest the promisee with equitable rights … such an

4   agreement does not by itself vest legal title to [the rights] in the promise.").

5        DC admitted that the October 19, 2001 Letter provided that rights "would" be

6   transferred in the future, not that they had already been transferred.  SGI ¶46.

7        The plain language of the October 19, 2001 Letter bars DC's interpretation that

8   it actively "transferred" copyrights to DC.  It would be reversible error for this Court

9   on summary judgment to contradict that plain language and declare that it did.  *See*

10  *Industrial Indemnity v. Superior Court*, 224 Cal. App. 3d 828, 832 (1990) ("We

11  decline to rewrite the clear terms of the contract.  When parties have … entered into

12  an unambiguous contract courts will not write a new contract for them.").

13       **2.     Any Ambiguity Must Be Resolved By The Trier Of Fact**

14       DC may argue that the term "would transfer" is somehow susceptible to its

15  interpretation.  If the Court accepts that the term "would" is ambiguous – as opposed

16  to flatly contradicting DC's interpretation – summary judgment in DC's favor

17  remains improper.  Words are ambiguous if they are "susceptible of more than one

18  construction or interpretation."  *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619

19  (9th Cir. 1981).  "What the parties intended by an ambiguous contract" is "a triable

20  issue of fact." *Id.* at 619-20.  As a matter of contract law and civil procedure, "would

21  transfer" cannot be read as "hereby transfers" on summary judgment against the non-

22  movant. *See Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 898 (9th Cir. 1993)

23  ("[S]ummary judgment is improper because different views of the intent of parties

24  will raise genuine issues of material fact.").

25       **3.     The Circuit Did Not Hold That The Siegels Assigned Rights**

26       In reply, DC will selectively quote the Circuit's opinion out of context as

27  purported support for its argument that the October 19, 2001 Letter actively

28  transferred rights.  DC has already alluded to such arguments, which misinterpret the

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 40**
**1700**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 19 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-1 7967 Filed 03/04/13    Page 18 of 32    Page ID
#:15423

1    Circuit's decision.  Mot. at 7.  Ms. Larson argued on appeal that (a) the October 19,

2    2001 Letter was not a valid contract because it was not a writing signed by both

3    parties; and (b) the October 19, 2001 Letter did not comply with the Copyright Act's

4    writing requirement in § 204(a).  SGI ¶56.  In response, the Ninth Circuit held:

5        [U]nder California's statute of frauds, ***the only signature that is required
         is that of the party against whom a contract is sought to be enforced.***
6        *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 149 Cal. App. 4th 333,
         57 Cal. Rptr. 3d 1, 4-5 (Cal. Ct. App. 2007); *see also* 1 B.E. Witkin,
7        *Summary of California Law, Contracts* § 359 (10th ed. 2005).  ***Nor is 17
         U.S.C. § 204(a) a bar to the validity of any such contract***; that statute
8        expressly permits an agreement transferring ownership of a copyright to
         be signed by a 'duly authorized agent' of the copyright owner, and Larson
9        does not contest that the heirs' attorney was such an agent.

10   *Larson*, 2013 U.S. App. LEXIS 671, at *5-6 (emphasis added).  Thus the Circuit

11   merely held that the statute of frauds and § 204(a)'s writing requirement is not "a bar

12   to the validity" of the October 19, 2001 Letter.  The Circuit did not determine that the

13   "would transfer" language of October 19, 2001 Letter actually transferred any rights,

14   and remanded such contract issues to this Court for adjudication in the first instance.

15       Tellingly, the Circuit held that because "a judgment on [the Third and Fourth

16   Counterclaims] in DC's favor *would* appear to render moot all of the other questions

17   in this lawsuit, we decline to address these other issues *at this time*."  *Id.* at *6

18   (emphasis added).  If the Circuit had ruled, as DC claims, that Ms. Larson had

19   transferred all of her recaptured Superman copyrights to DC in the October 19, 2001

20   Letter, such "other issues" (*e.g.*, the "work for hire" issues on appeal that determine

21   which Superman works were subject to statutory termination) would already be

22   moot.  The Circuit's closing phrase "at this time" further indicates that these issues

23   are still in play pending adjudication of the contract issues remanded to this Court.

24       **4.    A Judgment That The Siegels "Are" Obliged To Transfer

25              Rights To DC Would Not Settle The Issue**

26       In reply, DC may switch gears and argue for a declaration that Ms. Larson is

27   contractually obliged to transfer her recaptured copyrights.  SGI ¶41.

28       However, a declaration that Ms. Larson is still obligated, under the October 19,

Case 2:04-cv-08400-ODW-RZ   Document 720-10   Filed 04/04/13   Page 20 of 111
Case 2:04-cv-08400-ODW-RZ   Document 709-1   Filed 03/04/13   Page 19 of 32   Page ID
#:15424

1  2001 Letter, to transfer her Superman rights to DC is procedurally flawed and does

2  little to resolve this matter.  Courts recognize a clear distinction between a declaration

3  of rights under a contract and specific performance, in which the court orders a party

4  to perform.  *See Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 898 (2002)

5  ("Unlike coercive relief (such as [] specific performance, or an injunction) … a

6  declaratory judgment merely declares the legal relationship between the parties.").

7  Without an order of specific performance, DC would still not own the recaptured

8  copyrights.  *See Barndt v. County of L.A.*, 211 Cal. App. 3d 397, 406 n.12 (1989)

9  ("Plaintiff argues that even though specific performance may not be available here,

10  he is entitled to litigate his cause of action for declaratory relief.  ….[T]hat remedy

11  does not avail plaintiff anything….  [A] declaration of rights and liabilities under the

12  settlement agreement would be inconsequential in the absence of any enforceable

13  remedy.").  Mere declaratory relief is not a solution.  If affirmed, DC would still have

14  to seek specific performance.  If reversed, all of the issues below would also remain

15  to be litigated.  "Granting DC a premature judgment will only lead to problems on

16  appeal and further delay a complete and final resolution of this case."  Dkt. 708 at 10.

17  **B.     DC Is Not Entitled To Specific Performance**

18  DC may attempt on reply to seek specific performance – *i.e.*, an order that Ms.

19  Larson must transfer her copyrights to DC – but that is procedurally defective.  DC

20  failed to move on this ground, and cannot do so on reply.  *Abdulkhalik v. City of San

21  Diego*, 2009 U.S. Dist. LEXIS 110062, at *33 (S.D. Cal. Nov. 25, 2009) ("The City

22  failed to move for summary judgment on the [] claim in its initial motion.  Raising

23  [this] for the first time in a reply brief is inappropriate and will not be considered by

24  the Court."), citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).[3]

25  DC is also not entitled to specific performance.  Under California law,

26

_____

27  [3] As a matter of due process, the Court would need to give "notice and a reasonable time to
respond" to Ms. Larson before judgment could be entered on grounds "not raised" by DC.  Fed. R.

28  Civ. P. 56(f); *see Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869
(9th Cir. 1985) (noting that a *sua sponte* grant of summary judgment must meet "the requirements
of the Federal Rules and the demands of due process").

PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT
**EXHIBIT 40**
**1702**

Case 2:04-cv-08400-ODW-RZ   Document 720-10   Filed 04/04/13   Page 21 of 111
Case 2:04-cv-08400-ODW-RZ   Document 709-1 Filed 03/04/13   Page 20 of 32   Page ID
#:15425

1  "[s]pecific performance is not itself a cause of action, but rather *a remedy for breach*

2  *of contract*." *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 49

3  (1994) (emphasis added).  *See also Katz v. Cal-Western Reconveyance Corp.*, 2010

4  U.S. Dist. LEXIS 98940, at *15 (N.D. Cal. Sept. 21, 2010) ("[S]pecific performance

5  is a remedy for breach of contract, a cause of action which requires proof the contract

6  was breached.").  A plaintiff seeking specific performance must therefore first prove

7  a ***breach*** of contract.  *Id.*  Instead, DC's motion affirmatively asks the Court to

8  "dismiss [] as moot" its Third Counterclaim for breach of contract.  Dkt. 702-5 at 2.

9      Moreover, "[a] cause of action for breach of contract requires proof of the

10  following elements:  (1) existence of the contract; (2) plaintiff's performance or

11  excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a

12  result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239

13  (2008).  In addition to demonstrating these elements of breach, to establish a right to

14  specific performance DC must also show that "'(1) [the] terms are sufficiently

15  definite; (2) consideration is adequate; (3) there is substantial similarity of the

16  requested performance to the contractual terms; (4) there is mutuality of remedies;

17  and (5) plaintiff's legal remedy is inadequate.'" *Union Oil Co. of California v. Greka*

18  *Energy Corp.*, 165 Cal. App. 4th 129, 134 (2008) (quoting *Blackburn v. Charnley*,

19  117 Cal. App. 4th 758, 766 (2004)).

20      Here, the Circuit held only that a contract was formed on October 19, 2001.

21  DC's motion is entirely silent on the other three requirements for a breach of

22  contract, and the five requirements for specific performance[4] – for good reason.  It

23  cannot meet them as a matter of law and, in any event, they raise genuine issues of

24  material fact barring summary judgment in DC's favor.

25

26  ───────────────

[4] As DC did not address the elements of specific performance in its motion, Ms. Larson does not
fully address the "specific performance" elements here.  Among other factual issues presented by

27  such elements is whether DC's agreed payments were adequate consideration for the Siegels' rights
underlying the multi-billion-dollar "Superman" franchise. *See Walters v. Calderon*, 25 Cal. App.

28  3d 863, 875 (1972) ("[T]here is the further question of whether the consideration is adequate to
warrant the equitable relief requested" and that "the consideration must be equitably adequate.").

Case 2:04-cv-08400-ODW-RZ   Document 720-10   Filed 04/04/13   Page 22 of 111
Case 2:04-cv-08400-ODW-RZ   Document 709-17   Filed 03/04/13   Page 21 of 32   Page ID
#:15426

1          **1.      DC Did Not Perform Or Even Offer To Perform**

2          In order to show "performance" by DC sufficient to obtain "specific

3   performance" from Ms. Larson, DC "must have (a) performed, (b) offered to have

4   performed, or (c) proved a sufficient excuse for not performing, ***all*** the conditions

5   required of [it] by the agreement." *Beverage v. Canton Pacer Mining Co.*, 43 Cal. 2d

6   769, 777 (1955) (emph. added); *see Ninety Nine Invest. v. Overseas Courier Service*

7   *(Sing.) Priv.*, 113 Cal. App. 4th 1118, 1126 (2003) ("To obtain specific performance,

8   [a plaintiff] must establish its own performance or excuse for nonperformance.");

9   Cal. Civ. Code § 1439 (for specific performance a party "must fulfill all conditions

10  precedent … and must be able and offer to fulfill all conditions concurrent").

11         DC indisputably did ***not*** perform or offer to perform "all" conditions required

12  of it by the October 19, 2001 Letter.  For instance, DC agreed to provide the Siegels:

13  (1) "[a] non-returnable, non-recoupable signing bonus of [$]1,000,000"; (2) "[a] non-

14  returnable, but recoupable advance of $2,000,000"; (3) additional payments, starting

15  with $500,000 on March 31, 2002; (4) royalty statements starting on March 31, 2002;

16  (5) credit "By Special Arrangement with the Jerry Siegel Family" on all Superman

17  publications starting October 19, 2001; and (6) medical and dental insurance.  SGI

18  ¶6.  DC did ***none*** of this nor even offered to do it.  SGI ¶¶24, 32.  Instead, DC

19  conditioned its performance on the new and revised terms, *all* in DC's favor, in its

20  October 26, 2001 Letter and February 1, 2002 Draft, and tried to muscle the Siegels

21  into changing the terms in the October 19, 2001 Letter.  SGI ¶¶8-24.

22         DC has claimed that it performed when it allegedly "negotiate[ed] for [the

23  Siegels] to receive their credits on *Superman Returns* … and … set up a reserve

24  account for … payments."  SGI ¶43.  This is highly disputed; the Siegels received no

25  such credit and it appears that DC's "account" never existed.  SGI ¶¶45, 62.  Even if

26  DC took these small steps, it would still fall far short of the necessary performance of

27  "all" the conditions required of DC in the October 19, 2001 Letter.

28         Although DC subsequently alleged that it was ready and willing to tender

14
PLAINTIFF'S OPPOSITION TO DC COMICS' MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 40**
**1704**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 23 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-1 Filed 03/04/13   Page 22 of 32   Page ID
#:15427

1  performance in 2001 (Dkt. 646 ¶99), DC never once actually "offered to …

2  perform[]… all the conditions required." *Beverage*, 43 Cal. 2d at 777.  Indeed, it was

3  not until January 29, **2013** that DC sent a letter purporting to "tender" performance

4  under the October 19, 2001 Letter.  SGI ¶60.  This was eleven years too late.[5]  DC

5  should have performed, or at least offered to perform, in 2001, or by **March 31,**

6  **2002**, its agreed payment and accounting deadline.  Instead, DC continued to grind

7  the Siegels and act as though it were not bound by the October 19, 2001 Letter.

8         DC's rushed motion does not even address, let alone "prove [] a sufficient

9  excuse" for, its nonperformance.  *Beverage*, 43 Cal. 2d 769, 777.  DC's motion must

10  be denied.  *See Vaxiion Therapeutics, Inc. v. Foley & Lardner, LLP*, 593 F. Supp. 2d

11  1153, 1161 (S.D. Cal. 2008) ("[T]o obtain a summary judgment, the moving party

12  must offer evidence sufficient to support a finding upon ***every element*** of his …

13  claim.") (quotations/citations omitted); *Dobson v. Twin City Fire Ins. Co.*, 2012 U.S.

14  Dist. LEXIS 93823, at *16 (C.D. Cal. July 5, 2012) (denying summary judgment

15  where plaintiff failed to show performance or excuse for nonperformance).

16         **2.      The Failure To Complete A Long-Form Agreement Did Not**

17                 **Excuse DC's Non-Performance**

18         DC represented to the Circuit that the only terms are those contained in

19  October 19, 2001 Letter.  SGI ¶¶52-53; AD, Ex. 19 at 346:23-347:1 (DC: "Our

20  position is [the terms are] everything in this letter, nothing more.").  DC thus cannot

21  argue that its performance (*e.g.*, payment by the March 31, 2002 deadline, credit on

22  publications after October 19, 2001) was conditioned on a "long-form" agreement

23  because that condition appears nowhere in the October 19, 2001 Letter.  The Circuit

24  held that the October 19, 2001 Letter was sufficient to constitute an agreement, citing

25  *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011),

26  which held a short-form agreement was binding even though "everyone understood

---

[5] Even DC's January 29, 2013 letter and subsequent letters continued to hedge and leverage DC's
position, as it did not provide the royalty "accounting" required to determine if DC was complying
with the royalty scheme in the October 19, 2001 Letter, and DC asserted an unlimited right to
"offset" its claims against the amounts owed pursuant to the October 19, 2001 Letter.  SGI ¶¶60-61.

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 24 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-1    Filed 03/04/13    Page 23 of 32    Page ID
#:15428

1  that some material aspects of the deal would be papered later." Thus, when a "long-

2  form" agreement was not consummated within a reasonable time or by March 31,

3  2002, DC was obliged under the October 19, 2001 Letter to at least tender

4  performance in exchange for the Siegels' performance, but never did.

5          Even if a "long-form" was somehow construed as a condition precedent to

6  DC's obligations, contrary to *Facebook*, DC frustrated that condition precedent by its

7  concerted delay (waiting 3 ½ months to provide its draft, SGI ¶18) and failure to

8  negotiate the long-form in good faith. SGI ¶¶6-28. *See City of Hollister v. Monterey

9  Ins. Co.*, 165 Cal. App. 4th 455, 508 (2008) ("A party to a contract may not avail

10  itself of a condition precedent where by its own conduct it has rendered compliance

11  therewith impossible.") (quotation omitted).

12              **3.    The Siegels Did Not Breach The Letter**

13          DC has pled that it did not perform because the Siegels supposedly breached

14  the October 19, 2001 Letter first. SGI ¶38. This raises a whole host of disputed

15  factual issues as to who did what and when, and whose performance was thereafter

16  excused. As detailed below, the Siegels did not breach the October 19, 2001 Letter

17  because their performance was excused by (a) DC's anticipatory breach, (b) DC's

18  actual breach, (c) the Siegels' warranted rescission based on DC's anticipatory and

19  actual breach, and (d) DC's acquiescence or abandonment of any agreement.

20              a.    DC's Anticipatory Breach/Repudiation

21          Under California law, once a party anticipatorily breaches or repudiates a

22  contract, the other party "is no longer bound by the contract" and need not perform.

23  *Ferguson v. City of Cathedral City*, 197 Cal. App. 4th 1161, 1169 (2011) (quotations

24  omitted); *see Local 659, I.A.T.S.E. v. Color Corp. of America*, 47 Cal. 2d 189, 198

25  (1956) ("A repudiation of a contract … excuses performance."). A party repudiates

26  an agreement if, like DC, it attempts to change or add new terms to the agreement.

27  *See Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal.

28  App. 4th 435, 467 (2010) ("Annexing an unwarranted condition to an offer of

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 25 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-1 Filed 03/04/13    Page 24 of 32    Page ID
#:15429

1   performance is a refusal to perform."); *Loop Building Co. v. De Coo*, 97 Cal. App.

2   354, 364 (1929) ("If one who is bound to perform a contract annexes an unwarranted

3   condition to his offer of performance, there is, in effect, a refusal to perform.").

4       Here, Marks' October 19, 2001 Letter listed the specific terms of the

5   agreement.  SGI ¶6.  As DC admitted before the Ninth Circuit, these were the *only*

6   terms that the parties had agreed to.  SGI ¶52; AD, Ex. 19 at 346:23-347:1 (DC: "Our

7   position is [the terms are] everything in this letter, nothing more.").  The October 19,

8   2001 Letter should have ended the matter.  Had DC acted in good faith, confirmed

9   that the terms were those that the parties had agreed upon, obeyed its terms, and

10  adapted the letter into a simple agreement for signature, there would be no dispute.

11      However, DC refused to do this or abide by the deal.  As Marks testified,

12  Judge Larson ruled, and the Ninth Circuit did not dispute, Schulman's "more fulsome

13  outline" of the parties' agreement in his October 26, 2001 Letter contained numerous

14  terms that were materially different from the October 19, 2001 Letter.  SGI ¶¶8-16,

15  47.  *See Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d

16  889, 895 (9th Cir. 1969) ("If the offeror is not asserting a good faith interpretation of

17  the contract terms, that fact may be evidence that he is repudiating the agreement.").

18  Schulman's outline expanded the agreement to require the Siegels to assign

19  additional copyrights to DC, added numerous reductions to the Siegels' royalty,

20  changed when and where credit would be given to the Siegels, and tacked on a host

21  of new warranty and indemnification provisions.  SGI ¶¶8-16.

22      DC now backtracks, arguing that "[t]o the extent that Mr. Shulman's [October

23  26, 2001] letter is perceived to have added terms or suggested new terms, they're not

24  part of the deal."  SGI ¶53; AD, Ex. 19 at 347:1-4.

25      But at the time, DC doubled down and insisted on even more favorable terms.

26  As Marks testified and Judge Larson ruled, DC's February 1, 2002 Draft was not just

27  different from the October 19, 2001 Letter, it was *vastly* different."  SGI ¶¶19-21.

28  DC attempted to reduce the Siegels' royalty even further, and expanded the instances

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 26 of 111
Case 2:04-cv-08400-ODW-RZ    Document 701-5    Filed 03/04/13    Page 25 of 32    Page ID
#:15430

1    in which the Siegels would receive no royalty payments at all.  SGI ¶21.  Marks also

2    testified in detail about the draft's deceptive accounting "trap doors."  *Id.*  When the

3    Siegels duly objected, DC falsely insisted that its February 1, 2002 Draft "accurately

4    represented the agreement previously reached."  SGI ¶26.

5         As with the October 26, 2001 Letter, DC now disavows the February 1, 2002

6    Draft and says the opposite.  SGI ¶54; AD, Ex. 16 at 239 ("[E]ven if the February

7    2002 draft included different terms, it is the new terms that would be unenforceable,

8    not the October 19 terms."), 240 ("The 56 pages drafted by DC's lawyers were just

9    that—pages drafted by DC's lawyers.").

10        Notwithstanding DC's current self-serving spin, in 2001-02, when it mattered,

11   DC did not accept the terms of the October 19, 2001 Letter.  Instead, it repudiated

12   them by demanding "terms different from the original contract" and/or insisting that

13   the contract's "meaning or legal effect [were] different ... from the true meaning or

14   effect."  *Darling Int'l, Inc. Baywood Partners, Inc.*, 2007 U.S. Dist. LEXIS 50985, at

15   *85 (N.D. Cal. July 13, 2007) (quotations omitted).  *See Johnson v. Goldberg*, 130

16   Cal. App. 2d 571, 576 (1955) ("Annexing an unwarranted condition to an offer of

17   performance is a refusal to perform, making tender and demand by the other party

18   unnecessary."); *Mammoth Lakes Land Acquisition, LLC,* 191 Cal. App. at 467

19   (same); *Loop Building Co.,* 97 Cal. App. at 364 (same).

20        The cold hard truth is that DC did not once indicate a willingness to be bound

21   by or perform under the October 19, 2001 Letter until over *three years* later in an

22   effort to thwart the Siegels' suit to enforce their statutory terminations.  This is too

23   little, too late, because Ms. Larson already acted on DC's repudiation of the October

24   19, 2001 Letter when she ended negotiations and filed suit.  *See Freedman v. St.*

25   *Matthias Parish*, 37 Cal. 2d 16, 19 (1951) (holding a "repudiation...if acted upon by

26   defendant before it was retracted, would excuse performance on defendant's part and

27   make plaintiff's repudiation a total breach of contract"); *Pichignau v. Paris*, 264 Cal.

28   App. 2d 138, 141-42 (1968) (if a party "desires to retract his repudiation and restore

18

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 27 of 111
Case 2:04-cv-08400-ODW-RZ    Document 091-7 Filed 03/04/13    Page 26 of 32    Page ID
#:15431

1   the agreement to its former vigor, the action must be taken *before* the other party has

2   changed his position") (emphasis added).  Viewed in the light most favorable to Ms.

3   Larson, DC's October 26, 2001 Letter and February 1, 2002 Draft were clear

4   repudiations of the October 19, 2001 Letter.  *See Pacific Coast Engineering Co.*, 411

5   F.2d at 894 ("In each case, it is a question of fact whether or not a party has

6   committed an anticipatory breach by repudiating the contract.").

7                              b.    DC's Actual Breach

8          After DC anticipatorily breached, it did not retract its "outline" or "draft," nor

9   honor the October 19, 2001 Letter.  Instead, DC proceeded to actually breach its

10  promises.  The October 19, 2001 Letter made it clear that DC would pay an annual

11  guarantee of $500,000 on March 31, 2002 for the year 2002-03.  SGI ¶6.  DC's

12  October 26, 2001 Letter and the February 1, 2002 Draft said the same thing.  SGI

13  ¶¶17, 23.  The October 19, 2001 Letter also required DC to provide the Siegels with a

14  royalty accounting on March 31, 2002 (and additional payment to the extent the

15  royalty exceeded DC's advance payments).  SGI ¶6.  DC did not pay or even offer to

16  pay that $500,000, nor did it provide a royalty accounting to the Siegels, on March

17  31, 2002, materially breaching DC's agreement.  SGI ¶¶24, 32.  The October 19,

18  2001 Letter also required DC to give the Siegel family credit on all subsequent

19  Superman publications, which DC did not do or offer to do.  SGI ¶¶6, 32.

20         DC's breach of the October 19, 2001 Letter prevents DC from proving its own

21  performance – an essential element of its claims.  *See Brown v. Grimes*, 192 Cal.

22  App. 4th 265, 277 (2011) ("When a party's failure to perform a contract obligation

23  constitutes a material breach of the contract, the other party may be discharged from

24  its duty to perform under the contract."); *Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d

25  169, 187 (1961) (noting "substantial performance" is required for breach of contract

26  claim; "[w]hat constitutes substantial performance is a question of fact, but it is

27  essential that there be no willful departure from the terms of the contract.").

28         In addition, DC promised to make two other payments under the October 19,

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 28 of 111
Case 2:04-cv-08400-ODW-RZ    Document 691-7    Filed 03/04/13    Page 27 of 32    Page ID
#:15432

1  2001 agreement – a $1 million "signing bonus" and a $2 million recoupable advance

2  for the period beginning January 1, 2000.  SGI ¶6.  Under Cal. Civ. Code § 1657,

3  "[i]f the act is in its nature capable of being done instantly – as, for example, if it

4  consists in the payment of money only  –  it must be performed immediately upon the

5  thing to be done being exactly ascertained."  The $1 million "signing bonus" should

6  have thus been paid "immediately" after the October 19, 2001 agreement was signed,

7  and DC's non-performance breached its promise to pay.

8        As to the $2 million advance, under California law, "[i]f no time is specified

9  for the performance of an act required to be performed, a reasonable time is allowed."

10 Cal. Civ. Code §1657.  It would not make sense to pay a $500,000 "annual

11 guarantee" on March 31, 2002 for 2002-03, before paying a $2 million "advance"

12 designed to cover the period beginning January 1, 2000.  The "reasonable time" to

13 pay the $2 million was prior to March 31, 2002, and DC breached this term as well.

14       Actions speak louder than words:  whatever DC says now, it did not consider

15 the October 19, 2001 Letter enforceable when the time came for *DC* to perform in

16 2002.  Instead, DC simply breached, and such breaches preclude DC's current after-

17 the-fact efforts to enforce the October 19, 2001 Letter against Ms. Larson.

18                    c.    The Siegels' Rescission

19       Under California law, one party may rescind a contract if the other refuses or

20 fails to fully perform.  *See* Cal. Civ. Code § 1689(b) (rescission permitted if

21 performance "fails in a material respect from any cause"); *Loop Bldg. Co.*, 97 Cal.

22 App. at 364 ("A refusal or failure of a party fully to perform his part of the

23 contract … gives the other party a right to rescind.").  The rescinding party need only

24 give "notice" to the other party.  Cal. Civ. Code § 1691.  The notice need not be

25 "formal and explicit;" it must simply "show[] the intention of the person rescinding

26 to consider the contract at an end."  *Hull v. Ray*, 211 Cal. 164, 167 (1930).

27       DC failed to perform or offer to perform, and implicitly conditioned its

28 performance on the Siegels' acceptance of DC's new terms, giving the Siegels a right

Case 2:04-cv-08400-ODW-RZ     Document 720-10     Filed 04/04/13     Page 29 of 111
Case 2:04-cv-08400-ODW-RZ     Document 709-1 Filed 03/04/13     Page 28 of 32     Page ID
#:15433

1   to rescind.  *See U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d

2   335, 339 (9th Cir. 1974) ("[R]escission is justified where there is either an extended

3   and unreasonable delay [or] imposition of new and onerous conditions to

4   payment...."); *Rubin v. Fuchs*, 1 Cal. 3d 50, 53 (1969) (defendants were "entitled to,

5   and did, rescind the contract" because plaintiff did not make payment under contract).

6        For instance, DC failed to provide a royalty statement to the Siegels by March

7   31, 2001, as agreed in the October 19, 2001 Letter, and failed to pay or offer to pay

8   the Siegels their royalties.  It is well-settled that a breach of the royalty provisions in

9   a copyright contract can give rise to a right of rescission.  *See Peer Int'l Corp. v.*

10  *Pausa Records, Inc.*, 909 F.2d 1332, 1335 (9th Cir. 1990) (holding there was no

11  "triable issue of fact" that plaintiff had right to rescind where "although [defendant]

12  made sporadic payments, they never complied with the royalty and accounting

13  requirements" of copyright agreement); *Irwin v. American Interactive Media*, 1994

14  U.S. Dist. LEXIS 16223, at *17-19 (C.D. Cal. Apr. 14, 1994) (holding there was "a

15  triable issue of fact as to whether Defendants' failure to pay [$2,000] ... constituted a

16  material breach of the [copyright] license entitling Plaintiff to revocation" of license).

17       Joanne Siegel properly invoked her right of rescission and provided DC with

18  notice in a letter she sent on May 9, 2002:

19       .... Negotiations dragged on for four difficult years.  We made
20       painful concessions assured if we did we would arrive at an
         agreement. When we made these difficult concessions and reluctantly
21       accepted [DC's] last proposal [on October 19, 2001]...we were
         stabbed in the back by a shocking contract.
22            Your company's unconscionable contract dated February [1], 2002
         contained new, outrageous demands that were not in the [October 16]
23       proposal. ....
              After four years we have no deal and this [February 1] contract makes
24       an agreement impossible.

25  SGI ¶25.  *See Wilson v. Lewis*, 106 Cal. App. 3d 802, 809 (1980) ("[I]f facts exist

26  that justify a rescission by one party, and he declares a rescission in some effectual

27  manner, he terminates the contract."); *Jaunich v. Nat'l Union Fire Ins. Co. of*

28  *Pittsburgh, PA.*, 647 F. Supp. 209, 215–16 (N.D.Cal.1986) (affirming valid rescission

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 30 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-19 Filed 03/04/13    Page 29 of 32    Page ID
#:15434

1   sent three months after learning basis for rescission); Cal. Civ. Code § 1693. The

2   Siegels' September 21, 2002 letter confirmed their rescission by "formal notification

3   that we are totally stopping and ending all negotiations with DC." SGI ¶29.

4       At a minimum, this raises genuine issues of material fact that cannot be

5   decided on DC's perfunctory motion. *See Fed. Deposit Ins. Corp. v. Air Florida*

6   *Sys., Inc.*, 822 F.2d 833, 840 (9th Cir. 1987) ("Whether a breach … [is] sufficient to

7   be deemed material and thus to warrant rescission … is a question of fact properly

8   determined by the trial court."); *Hil-Mac Corp. v. Mendo Wood Products, Inc.*, 235

9   Cal. App. 2d 526, 530 (1965) ("The determination of whether a party entitled to

10   rescind a contract has [rescinded] … depends upon the particular facts of each case.

11   The question is one of fact, to be resolved in the first instance by the trier of fact….").

12             d.     DC's Acquiescence and Abandonment

13       After Joanne Siegel sent her May 9, 2002 letter rescinding the October 19,

14   2001 Letter due to DC's breach (SGI ¶25), DC acquiesced. DC's May 21, 2002

15   letter in response did **not** argue that the Siegels were in breach or had otherwise acted

16   improperly (SGI ¶28), nor did DC claim any rights under the October 19, 2001

17   Letter. SGI ¶33; *see Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated*

18   *Clothing Workers* 192 Cal. App. 2d 268, 279-280 (1961) ("It is well settled that an

19   abandonment of a contract may be implied from the acts of the parties and this may

20   be accomplished by the repudiation of the contract by one of the parties and by the

21   acquiescence of the other party….") (citations omitted); *Griffin v. Beresa, Inc.*, 143

22   Cal. App. 2d 299, 301 (1956) ("[A]bandonment of a contract … may be

23   accomplished by the repudiation of the contract by one of the parties and the

24   acquiescence of the other party in such repudiation….").

25       After the Siegels' September 21, 2002 letter providing "formal notification"

26   that they were "totally stopping and ending all negotiations" (SGI ¶29), DC again did

27   *absolutely nothing*. DC did not assert that it owned the Siegels' recaptured

28   copyrights pursuant to the October 19, 2001 Letter or say anything about the October

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 31 of 111
Case 2:04-cv-08400-ODW-RZ    Document 709-19    Filed 03/04/13    Page 30 of 32    Page ID
#:15435

1  19, 2001 Letter.  SGI ¶33; *see McCreary v. Mercury Lumber Distributors*, 124 Cal.

2  App. 2d 477, 486 (1957) (holding that "acquiescence is shown … by the absence of a

3  showing that [the plaintiff] claimed any further rights under the old contract prior to

4  the commencement of the subject action").

5         Then, in 2003-04, DC simply recommenced negotiations with the Siegels,

6  further acquiescing in their rescission.  SGI ¶31; *see McCreary*, 124 Cal. App. at 486

7  ("Acquiescence is shown by the negotiations for a new contract."); *Freeman v.*

8  *Mostafavi*, 2005 Cal. App. Unpub. LEXIS 10154, at *24 (Cal. App. 2d Dist. Nov. 8,

9  2005) ("Rescission may be implied from … the negotiation of a new and different

10  contract regarding the same subject matter."); *Honda v. Reed*, 156 Cal. App. 2d 536,

11  539 (1958) ("Abandonment … may be implied from … negotiating for a new and

12  different contract concerning the same property or subject matter.").

13         DC's behavior over this three-year period (2001-04) – when it acted as though

14  there were no binding agreement, recommenced negotiations, and never claimed

15  rights – raises genuine issues of material fact as to acquiescence that cannot be

16  properly decided now.  *See Daugherty Co. v. Kimberly-Clark Corp.*, 14 Cal. App. 3d

17  151, 155 (1971) ("conflict of facts" prevented summary judgment on acquiescence).

18  **III.   FEDERAL COPYRIGHT LAW PREVENTS SUMMARY JUDGMENT**

19  **AS TO SUPERBOY AND THE SUPERMAN ADS**

20         To the extent DC's motion seeks the transfer of Ms. Larson's copyrights to

21  Superboy recaptured by her 2002 termination notice, or the early Superman Ads[6] to

22  be recaptured by her 2012 termination (not pled), it is barred by the Copyright Act.

23  When Congress created the termination right, it expressly provided that authors and

24  heirs cannot anticipatorily re-grant their copyrights; rather, they can only re-grant

25  their copyrights back to the terminated grantee "***after the notice of termination has***

26  ***been served.***" 17 U.S.C. 304(c)(6)(D) (emphasis added).

27         DC's assertion that the October 19, 2001 Letter transferred the copyrights to

28

---

[6] DC concedes that these Ads, "in fact, clearly do depict Superman's S-shield, super-strength,
costume, and facial features" and grant a copyright interest in such elements.  SGI ¶57.

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 32 of 111
Case 2:04-cv-08400-ODW-RZ    Document 701-9?    Filed 03/04/13    Page 31 of 32    Page ID
#:15436

1  Superboy is a legal impossibility.  The Superboy termination notice was not served

2  until November 8, **2002,** and not effective until November 17, **2004**; the Ads

3  termination notice was not served until 2012, and does not take effect until 2014.

4  SGI ¶¶30, 63.  The October 19, 2001 Letter, as a matter of law, could not have re-

5  granted these copyrights years before the notices were served.

6       Nor can the October 19, 2001 Letter be read to waive, settle or release the

7  Siegels' termination right or termination interest regarding Superboy or the Ads.  In a

8  further effort to protect authors and their heirs from publishers' superior bargaining

9  power, Congress made the termination right "inalienable."  *N.Y. Times v. Tasini*, 533

10  U.S. 483, 496 (2001) (emphasizing the "inalienable" right "to revoke a copyright

11  transfer").  Congress was explicit that "[t]ermination of the grant may be effected

12  notwithstanding any agreement to the contrary, including an agreement to make a

13  will or to make any future grant."  17 U.S.C. § 304(c)(5).  Thus to the extent DC

14  argues that the October 19, 2001 Letter settled Ms. Larson's termination right as to

15  Superboy or the Ads, it is unenforceable.  *See Marvel Characters v. Simon*, 310 F.3d

16  280, 291 (2d Cir. 2002) (to the extent settlement agreement characterized works as

17  non-terminable "works for hire" it is void as "agreement to the contrary").

18       DC will likely attempt to circumvent the Copyright Act's protections by

19  arguing that the October 19, 2001 Letter somehow revoked Jerome Siegels'

20  venerable pre-1978 copyrights grants and simultaneously re-granted his original

21  copyrights to DC.  *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1044-46 (9th

22  Cir. 2005); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 982 (9th Cir. 2008).

23       However, in light of Congress' clear objectives, the Ninth Circuit has made

24  plain that any such "revocation and re-grant" must be "express."  *Milne*, 430 F.3d at

25  1040; *Mewborn*, 532 F.3d at 989.  Here, nothing in the October 19, 2001 Letter even

26  suggests, let alone expressly states, that the parties intended to revoke Jerome

27  Siegel's copyright grants and to re-grant his copyrights. SGI ¶¶6, 52-53; AD, Ex. 19

28  at 346:23-347:1 (DC: "Our position is [the terms are] everything in this [October 19]

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 33 of 111
Case 2:04-cv-08400-ODW-RZ    Document 701-1    Filed 03/04/13    Page 32 of 32    Page ID
#:15437

1   letter, nothing more."). The letter simply states: "The Siegel Family would transfer

2   all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy')."

3   SGI ¶6. There is no mention of revocation and without a clear and unequivocal

4   revocation the Siegels had no Superboy rights to transfer to DC in 2001 (prior to their

5   2002 termination), as DC has owned Superboy since 1948. *Siegel v. Time Warner*

6   *Inc.*, 496 F. Supp. 2d 1111, 1119 (C.D. Cal. 2007).

7       Tellingly, while the October 19, 2001 Letter contains no language of

8   revocation or regrant (SGI ¶6), Schulman's October 26, 2001 outline and DC's

9   February 1, 2002 draft both do. SGI ¶¶11, 22. This hurts DC, more than helps. The

10  Siegels unequivocally rejected DC's new terms. SGI ¶25. And DC concedes that

11  "[t]o the extent that [the October 26, 2001] letter is perceived to have added terms or

12  suggested new terms, they're not part of the deal." AD, Ex. 19 at 347:1-4; *see also*

13  AD, Ex. 18 at 316 ("If any material difference does exist, DC has long agreed: the

14  October 19 letter controls."). In short, the relief DC seeks cannot end the *Siegel*

15  Superboy case (C.D. Cal. Case No. 04-CV-08776) because the October 19, 2001

16  Letter could not anticipatorily settle or "transfer" the Siegels' Superboy termination

17  interest until *after* the Superboy termination was served on November 8, 2002.

18                                  **CONCLUSION**

19       DC's groundless motion for summary judgment must be denied.

20  Dated:  March 4, 2013            RESPECTFULLY SUBMITTED,
                                     /s/ Marc Toberoff
21                                   _____
                                     TOBEROFF & ASSOCIATES, P.C.
22                                   Attorneys for Plaintiff, Laura Siegel Larson

23

24

25

26

27

28

# EXHIBIT 41

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 35 of 111
Page ID #:17983
Case 2:04-cv-08400-ODW-RZ    Document 715    Filed 03/18/13    Page 1 of 6    Page ID #:16187

1   Marc Toberoff (State Bar No. 188547)
       *mtoberoff@toberoffandassociates.com*
2   Keith G. Adams (State Bar No. 240497)
       *kadams@toberoffandassociates.com*
3   TOBEROFF & ASSOCIATES, P.C.
    22337 Pacific Coast Highway, #348
4   Malibu, California, 90265
    Telephone:   (310) 246-3333
5   Fax:         (310) 246-3101

6   Attorneys for Plaintiff-Counterclaim
    Defendant, Laura Siegel Larson,
7   individually and as personal representative
    of the Estate of Joanne Siegel

8                  **UNITED STATES DISTRICT COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 10  LAURA SIEGEL LARSON, | Case No: 04-CV-08400 ODW (RZx)* |
| 11  individually and as personal | Case No: 04-CV-08776 ODW (RZx)* |
| 12  representative of the ESTATE OF | |
|     JOANNE SIEGEL, | Hon. Otis D. Wright II, U.S.D.J. |
| 13          Plaintiff, | Hon. Ralph Zarefsky, U.S.M.J. |
| 14       v. | **PLAINTIFF'S COURT-** |
| 15  WARNER BROS. ENTERTAINMENT | **AUTHORIZED SUR-REPLY TO** |
|     INC., DC COMICS, and DOES 1-10, | **DC COMICS' MOTION FOR** |
| 16          Defendants and | **SUMMARY JUDGMENT IN** |
|     Counterclaimants. | **THE SIEGEL SUPERMAN AND** |
| 17  | **SUPERBOY CASES**** |
| 18  LAURA SIEGEL LARSON, | Date:    March 25, 2013* |
|     individually and as personal | Time:    1:30 p.m.* |
| 19  representative of the ESTATE OF | Place:   Courtroom 11* |
| 20  JOANNE SIEGEL, | *:  The Court has stated that it will take |
|          Plaintiff, | the motion(s) under submission and hold |
| 21       v. | a hearing if necessary.  Dkt. 707.  Docket |
| 22  TIME WARNER INC., WARNER | citations herein are to Case No. 04-CV- |
|     COMMUNICATIONS INC., | 08400. |
| 23  WARNER BROS. ENTERTAINMENT | **:  The Court *sua sponte* granted |
| 24  INC., WARNER BROS. TELEVISION | Plaintiff leave to file a sur-reply.  Dkt. |
|     PRODUCTION INC., DC COMICS, | 714. |
| 25  and DOES 1-10, | |
| 26          Defendants and | |
|     Counterclaimants. | |
| 27 | |
| 28 | |

PLAINTIFF'S COURT-AUTHORIZED SUR-REPLY RE: MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 41**
**1716**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 36 of 111
Page ID #:17984
Case 2:04-cv-08400-ODW-RZ    Document 715    Filed 03/18/13    Page 2 of 6    Page ID #:16188

1.    "Attorney-In-Fact" Argument:  DC's new argument is that it can unilaterally assign the Siegels' copyrights via a supposed "power of attorney" in ¶ C.12 of the October 19, 2001 Letter. Dkt. 711 ("Reply") at 1, 4. DC is wrong. **Paragraph C.1** states that the Siegels "would transfer" their rights. Dkt. 709-2, Ex. 1 at ¶C.1. An assignment is a present transfer; a promise to assign in the future has no legal effect. *See* Rest. (2d) of Contracts, § 330 (1979); *Bd. of Trs. v. Roche Molecular Sys.*, 131 S. Ct. 2188, 2194 (2011) ("mere promise to assign [IP] rights in the future" is ineffective). **Paragraph C.12** is similarly infirm:  "The Siegel Family would agree to execute further documents, and [DC] would be appointed as attorney-in-fact to execute such documents...." *Id.* at ¶ C.12. The letter facially contemplated a regular agreement that never happened, due to DC conditioning its performance on new/revised terms. Dkt. 709-1 ("SGI") ¶¶10-24.  What the Siegels "would agree" to do is not the same as doing it, especially as to something so vital as forever assigning copyrights or granting a power of attorney to adverse parties. Compounding this, DC's "would be" appointment applies to undefined "further documents" the Siegels "would [later] agree to execute." Moreover, the use in C.12 of "further documents" (not "any documents") suggests it was not intended to apply to the core assignment.

DC also circularly assumes the 2001 letter is enforceable after rescission. Finally, "a power [of attorney] is revocable unless it is coupled with 'a ... present and coexisting interest in the subject of the power.'" *Jay v. Dollarhide*, 3 Cal. App. 3d 1001, 1023 (1970) (cit'n omitted); Cal. Civil Code § 2356(a)(1) (same). Even if C.12 gave DC a power of attorney, it would be revocable as DC had no "present interest" in the Siegels' recaptured copyrights, and they revoked any power long ago. Dkt. 646 ¶¶55-56, 100. DC's sole citation, *Niss v. Columbia Pic. Ind.,Inc.*, 2000 U.S. Dist. LEXIS 18328 (S.D.N.Y. Dec. 20, 2000), is an inapposite "work-for-hire" case.

2.    DC's Non-Performance:  DC must prove the elements of breach to get specific performance, including DC's "performance or excuse for nonperformance," which it cannot prove on summary judgment. *CDF Firefighters v. Maldonado*, 158

1
**EXHIBIT 41**
**1717**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 37 of 111
Page ID #:17995
Case 2:04-cv-08400-ODW-RZ   Document 719   Filed 03/18/13   Page 3 of 6   Page ID #:16189

1     Cal. App. 4th 1226, 1239 (2008).  The October 19, 2001 Letter contained numerous

2     obligations DC had to perform by **March 31, 2002.**  Dkt. 709 at 14-15; 709-2 ¶¶6,

3     24, 32.  DC argues that this was all excused because Plaintiff "repudiated" the deal

4     on **May 9, 2002** (Reply at 7), which makes no sense as a matter of timing.  None of

5     this is an "affirmative defense."  DC's Fourth Claim is premised on a currently

6     "enforceable" contract.  Dkt. 646 ¶103.  A court cannot declare contractual rights in a

7     vacuum, without determining the threshold issue of DC's failure to perform.

8          DC argues it "is *undisputed* that DC began performing on the 2001 deal right

9     away, by reserving payments it owed Larson."  Reply at 9 n.6.  But this is highly

10    disputed.  DC first mentioned its purported "reserve account" in 2004 counterclaims.

11    Dkt. 646 ¶¶98-99.  Plaintiff denied DC's performance allegation, as silent internal

12    actions are no substitute for performance.  Dkt. 656 ¶¶98-99.  DC's President in 2006

13    testified that its "reserve account" was mere bookkeeping of Siegel royalties, totaling

14    approximately $20 million in less than *5 years*.  Dkt. 709-2, Ex. 12 at 153-58.  DC

15    reconfirmed this amount in 2007.  Dkt. 709-2, Ex. 13 at 168 n.18.  Yet, when DC

16    finally purported to "tender" performance on February 28, 2013, it implausibly stated

17    that the royalties owed ***after 6 more years*** were $21.5 million.  *Id.*, Ex. 25 at 380.

18          3.    No Waiver of Defenses:  First, it is DC's burden to *prove* performance

19    or an excuse for non-performance.  "A defense which demonstrates that plaintiff has

20    not met its burden of proof is not an affirmative defense."  *Zivkovic v. S. Cal. Edison*

21    *Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).  Second, Ms. Larson pleaded sufficient

22    defenses, including "No Settlement Agreement," encompassing DC's anticipatory

23    repudiation and rescission,[1] DC's "**Unclean Hands**" and "**Bad Faith**," barring its

24    equitable relief, and DC's "**Acquiescence**," "**Waiver**" and "**Laches**" in not asserting

25    the 2001 letter for 3 years.  Dkt. 656 ¶¶149-153.  DC's motion to strike the defenses

26    as vague (Reply at 6 n.5) should have been made in a Rule 12(f) motion "before

---

27

28    [1] *See also* Dkt. 656 ¶¶185 (alleging "many unacceptable material terms that had never been …
agreed to by Plaintiffs"); 53(DC insisted on "terms that differed from and/or substantially diluted
the terms negotiated"), 55 (May 9, 2002 rescission), 56 (September 21, 2002 rescission).

PLAINTIFF'S COURT-AUTHORIZED SUR-REPLY RE: MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 41**
**1718**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 38 of 111
Page ID #:17986
Case 2:04-cv-08400-ODW-RZ    Document 719    Filed 03/18/13    Page 4 of 6    Page ID #:16190

1   responding to the pleading," and DC's cases all concern timely Rule 12(f) motions.

2         Third, Ms. Larson has not waived these issues because DC "must [] have

3   suffered some prejudice in order to apply waiver." *McGinest v. GTE Serv. Corp.*,

4   257 Fed. Appx. 72, 75 (9th Cir. 2007) ("Affirmative defenses that were not pleaded

5   in an answer may be raised for the first time on summary judgment."). "[S]trict

6   adherence to the pleading requirement is inappropriate when the purpose … has been

7   otherwise fulfilled.  The purpose … is to give the opposing party notice …[and] a

8   chance to argue…" *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (9th Cir. 2006).  DC has

9   long been aware of these issues.  It counterclaimed that it "has performed all of its

10  obligations under the agreement," pointing to the same "reserve account" it points to

11  now. Dkt. 646 ¶99.  DC's allegations and Plaintiff's denials (Dkt. 656 ¶¶53, 55-56,

12  97-105) sufficiently put DC's "non-performance" at issue. *See Simmons v. Navajo

13  County*, 609 F.3d 1011, 1023 (9th Cir. 2010) (answer that "denied the allegation,"

14  and summary judgment opposition, gave plaintiff adequate "notice" of defense).  The

15  Siegels consistently maintained that DC altered the material terms of the October 19,

16  2001 Letter in bad faith.  The factual underpinnings of the defenses have been argued

17  and reargued, and DC has taken discovery, here and in *DC Comics*, for 9 years. *See,

18  e.g., Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098 at 1115-16,

19  1136-39 (C.D. Cal. 2008); *Cripe v. City of San Jose*, 261 F.3d 877, 886 (9th Cir.

20  2001) ("[Defendant] argued the relevant facts…that sufficiently put the plaintiffs and

21  the court on notice of the actual issue.").  In 2010, the defendants in *DC Comics*,

22  pleaded "rescission" and "failure of consideration," among other defenses to the

23  October 19, 2001 Letter, giving DC even more notice.  Case 10-CV-03633, Dkt. 348

24  at 33-35 ¶¶193, 201; 347 at 33- 35 ¶¶193, 202, 205.  Despite DC's rhetoric, Ms.

25  Larson has pled/asserted the facts and her defenses, and is permitted to make

26  alternative legal arguments based on the Circuit's ruling. *See* Fed. R. Civ. P. 8(c)(2).

27        4.    Rescission: DC argues the May 2002 letter did not "acknowledge[] the

28  existence of an underlying contract" (Reply at 10), but it expressly stated "[we]

3
PLAINTIFF'S COURT-AUTHORIZED SUR-REPLY RE: MOTION FOR SUMMARY JUDGMENT

**EXHIBIT 41**
**1719**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 39 of 111
Page ID #:17987
Case 2:04-cv-08400-ODW-RZ    Document 718    Filed 03/18/13    Page 5 of 6    Page ID #:16191

1 | reluctantly accepted [DC's] last proposal six months ago." Dkt. 702-2, Ex. 4 at 75.

2 | DC represented the opposite to Judge Larson *and* the Circuit: "[o]n May 9, 2002 ….

3 | Mrs. Siegel acknowledged" an agreement. Dkt. 181 at 23; Dkt. 709-2, Ex. 16 at 224.

4 |       5.  <u>Acquiescence</u>: DC's argument that it did not acquiesce in 2001-2004

5 | because it counterclaimed in late 2004 does not add up. SGI ¶31; *Honda v. Reed*,

6 | 156 Cal. App. 2d 536, 538 (1958) ("abandonment" where parties did not perform,

7 | "negotiated for a new and different agreement" but "could not agree on terms").

8 |       6.  <u>The Ninth Circuit Ruling</u>: DC again selectively quotes the Circuit's

9 | opinion, which speaks for itself. The Circuit held that the October 19, 2001 Letter

10 | "*was* sufficient to create a contract," but did not construe it. *Larson v. Warner Bros.*

11 | *Entm't*, 2013 U.S. App. LEXIS 671, at *3 (9th Cir. Jan. 10, 2013) (emphasis added).

12 | DC misrepresents that the Circuit held the letter "afforded DC the 'continued right to

13 | produce Superman works'" (Reply at 3), omitting that it merely described it: "What

14 | follows is five pages of terms outlining substantial compensation … in exchange for

15 | DC's continued right to produce Superman works." *Id.* at *3. DC misrepresents that

16 | the Circuit "held … that Marks validly transferred the copyrights" (Reply at 3) when

17 | it held, in response to Plaintiff's 17 U.S.C. § 204(a) writing requirement argument,

18 | that a letter by a "'duly authorized agent'" satisfies the writing requirement. *Id.* at *6.

19 | The Circuit did not address the issues here nor anything after October 19, 2001 – *i.e.*,

20 | DC's October 26, 2001 Letter, February 1, 2002 Draft, or the Siegels' May 9 and

21 | September 21, 2002 letters – and remanded DC's contract claims for adjudication by

22 | this Court in the first instance. *Id.* at *6; *Pullman-Standard v. Swint*, 456 U.S. 273,

23 | 291-92 (1982) ("[f]actfinding is the [] responsibility of district courts"); *Vincent v.*

24 | *Trend W. Tech. Corp.*, 828 F.2d 563, 570-571 (9th Cir. 1987) (cautioning against

25 | transforming "the court of appeals into a court of first instance"). DC's Appendix of

26 | arguments the Circuit did not address is irrelevant for that reason.

27 |       7.  <u>Superboy and "Ads"</u>: The Siegels' 1997 termination did not apply to the

28 | "Superboy" works or the "Superman" Ads as a matter of law. Ms. Larson's

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 40 of 111
Page ID #:17998
Case 2:04-cv-08400-ODW-RZ    Document 719    Filed 03/18/13    Page 6 of 6    Page ID #:16192

1   "Superman" terminations were served in 1997 (Dkt. 644 ¶¶39-45), and could only

2   recapture works published by 1943, under 17 U.S.C. §304(c)(3)-(4)'s time windows.

3   *See Siegel*, 542 F. Supp. 2d at 1119-23 (Ads were published outside the termination

4   "window" and "outside the effective reach of the termination notices").  Ms. Larson's

5   2002 termination applied to "Superboy" works, first published in *More Fun Comics*,

6   No. 101 (November 1944), that DC owned under a 1948 Stipulation. Dkt. 709-2, Ex.

7   7 at 84-87.  Her 2012 termination under § 304(d) applied to the Ads, missed by her

8   1997 termination.  The October 19, 2001 Letter could ***not*** transfer the Siegels'

9   termination interest in "Superboy" or the Ads because, as this Court held, per 17

10  U.S.C. § 304(c)(6)(D), termination interests cannot be assigned prior to service of a

11  termination notice. *See DC Comics v. Pac. Pictures Corp.,* 2012 U.S. Dist. LEXIS

12  149532, at *28 (C.D. Cal. Oct. 17, 2012).

13          DC contends that the October 19, 2001 Letter revoked Jerry Siegel's venerable

14  Superman/Superboy grants and re-granted his copyrights (already owned for decades

15  by DC) to DC.  But the letter contains no indication of this, and DC conceded that it

16  controls.  SGI ¶¶11, 22, 52.  The Ninth Circuit has also made plain that any

17  "revocation and re-grant" must be "express," given Congress' objective to protect the

18  termination right. *See* 17 U.S.C. §§ 304(c)(5), (c)(6)(D); *Milne v. Stephen Slesinger,*

19  *Inc.*, 430 F.3d 1036, 1040 (9th Cir. 2005); *Classic Media v. Mewborn*, 532 F.3d 978,

20  987 (9th Cir. 2008); 9th Cir. Case No. 12-57245, Dkt. 11 at 23-28; *Alexander v.*

21  *Angel*, 37 Cal. 2d 856, 860 (1951) ("evidence… of a novation must be 'clear and

22  convincing'") (cited by DC) (citation omitted).  Moreover, DC has relied on Siegel's

23  original Superman and Superboy grants in these very cases, well after the October 19,

24  2001 Letter.  Dkt 646 ¶¶ 68-69, 87 ("All grants made by Siegel and Shuster of rights

25  in Action Comics No. 1 are still in effect...");  Case No. 04-CV-08776, Dkt. 37 ¶35.

26  Dated:  March 18, 2013          RESPECTFULLY SUBMITTED,
                                    /s/ Marc Toberoff
27                                  ─────────────────────────────
                                    TOBEROFF & ASSOCIATES, P.C.
28                                  Attorney for Plaintiff, Laura Siegel Larson

# EXHIBIT 42

O

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11    LAURA SIEGEL LARSON,                 **\*Case No. 2:04-cv-08400-ODW(RZx)\***
      individually and as personal          Case No. 2:04-cv-08776-ODW(RZx)
12    representative of the ESTATE OF
      JOANNE SIEGEL,                        **ORDER GRANTING IN PART**
13                                          **DEFENDANTS' MOTION FOR**
                       Plaintiff,           **SUMMARY JUDGMENT AND**
14           v.                             **ORDERING FURTHER BRIEFING**
                                            **[04-cv-8400, ECF No. 702]**
15    WARNER BROS. ENTERTAINMENT            **[04-cv-8776, ECF No. 222]**
      INC., DC COMICS, and DOES 1–10,
16
                       Defendants.
17

18    LAURA SIEGEL LARSON,
      individually and as personal
19    representative of the ESTATE OF
      JOANNE SIEGEL,
20
                       Plaintiff,
21           v.

22    TIME WARNER INC., WARNER
      COMMUNICATIONS INC., WARNER
23    BROS. ENTERTAINMENT INC.,
      WARNER BROS. TELEVISION
24    PRODUCTION INC., DC COMICS,
      and DOES 1–10,
25
                       Defendants.
26

27    / / /

28    / / /

**EXHIBIT 42**
**1722**

## I.    INTRODUCTION

Defendants DC Comics; Warner Bros. Entertainment Inc.; Warner Communications, Inc.; Warner Bros. Television Production, Inc.; and Time Warner Inc. (collectively "DC") move for summary judgment in these consolidated Superman and Superboy cases following entry of the Ninth Circuit's February 4 Mandate. The Ninth Circuit has directed this Court to reconsider DC's third and fourth counterclaims in view of its holding that an October 19, 2001 letter from the legal representative of the heirs to Superman co-creator Joe Siegel to Warner Bros. (and by extension DC Comics) created an agreement between the parties. DC has effectively withdrawn its third counterclaim, and the Court **GRANTS** Defendants' Motion on its fourth counterclaim.

## II.    FACTUAL BACKGROUND

In 2004, Joanne Siegel and Laura Siegel Larson,[1] the heirs to Superman co-creator Jerry Siegel, sued DC seeking a judicial declaration that the copyright termination notices the Siegels served on DC in 1997 effectively recaptured their copyright interests in Superman. DC counterclaimed that the parties had entered into a settlement agreement that the Siegels repudiated. Specifically, DC's third counterclaim alleges that the Siegels breached a written October 19, 2001 agreement drafted by the Siegels' then-legal representative, Kevin Marks. (Second Amended Counterclaims (SACC) ¶¶ 97–101.) This agreement memorialized an earlier October 16, 2001 telephone conversation between Marks and Warner Bros.'s then-general counsel, John Schulman, during which the parties negotiated the final points of a deal giving DC the continued rights to Superman in exchange for substantial financial consideration. (*See id.*)

/ / /

---

[1] Joanne Siegel, Jerry Siegel's widow, has since passed away. As a result, Plaintiff Laura Siegel Larson remains the only Plaintiff in this matter, both in her individual capacity and as the personal representative of the estate of the late Joanne Siegel. For consistency with earlier rulings and the earlier facts of this case, Court will continue refer to Plaintiff as "the Siegels."

**EXHIBIT 42**
2
**1723**

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 44 of 111
Page ID #:17992
Case 2:04-cv-08400-ODW-RZ    Document 717    Filed 03/20/13    Page 3 of 16    Page ID #:16197

1    DC's fourth counterclaim, in turn, sought a declaration that, by the October 19,

2    2001 agreement, the Siegels had "transferred or [is] contractually obligated to transfer

3    to DC Comics" any and all of their Superman rights. (*Id.* ¶¶ 102–05.)

4        On March 26, 2008, now-resigned Judge Steven G. Larson held on partial

5    summary judgment "that the parties' settlement negotiations did not result in an

6    enforceable agreement [on October 19, 2001,] resolving the issues before the Court."

7    (ECF No. 293, at 62.)  In so holding, Judge Larson considered the parties' 2001–2002

8    settlement negotiations and found that "[o]ne need only review the language of the

9    parties' correspondence, their conduct in relation thereto, and the numerous material

10   differences between the terms relayed in the October 19 and 26, 2001, letters and the

11   February 1, 2002[] draft to reach the conclusion that the parties failed to come to an

12   agreement on all material terms."  (ECF No. 293, at 61.)  Judge Larson's holding

13   effectively rejected DC's third and fourth counterclaims.

14       On November 5, 2012, the Ninth Circuit reversed Judge Larson's March 26,

15   2008 summary-judgment order, holding that the much-disputed October 19, 2001

16   letter from Marks to Schulman "constituted an acceptance of terms negotiated

17   between the parties, and thus was sufficient to create a contract" as a matter of law.

18   *Larson v. Warner Bros. Entmt., Inc.*, – F. App'x –, –, 2012 WL 6822241, at *1 (9th

19   Cir. 2012).  The court further explained that it

20       reject[ed the Siegels'] arguments that either state or federal law precludes
21       a finding that such a contract could have been created by the October 19,
22       2001, letter.   California law permits parties to bind themselves to a
         contract, even when they anticipate that some material aspects of the deal
23       will be papered later.  This principle applies notwithstanding the lack of
24       an express reference to an intended future agreement, so long as the terms
         of any contract that may have been formed are sufficiently definite that a
25       court could enforce them (as is undoubtedly the case here). *Larson*, 2012
26       WL 6822241, at *1 (internal quotation marks, alterations, and citations
         omitted).
27

28   / / /

**EXHIBIT 42**
3
**1724**

1    The Ninth Circuit then directed this Court "to reconsider DC's third and fourth
2    counterclaims in light of [its] holding that the October 19, 2001, letter created an
3    agreement." *Id.* at *2.
4        DC brings the issue back before the Court on remand by way of its February 7,
5    2013 Motion for Summary Judgment.  DC contends quite simply that the "Ninth
6    Circuit's binding ruling compels judgment in DC's favor on its Fourth Counterclaim
7    in both Siegel cases; renders DC's remaining counterclaims in the cases moot . . . ;
8    and requires denial of [the Siegels'] claims in the cases." (Mot. i.)  The Siegels, on
9    the other hand, maintain that the Court's job isn't quite so simple, as the Court (or the
10   factfinder, as the case may be) must now determine "[w]hat exactly the October 19,
11   2001 agreement meant, and whether and to what extent it is still enforceable given
12   DC's subsequent conduct." (Opp'n 2.)  While DC perhaps overstates the simplicity of
13   the matter, it is nevertheless correct that the Ninth Circuit's ruling obliges the Court to
14   grant its fourth counterclaim.

### III.    LEGAL STANDARD

16       On remand, this Court is bound by the Ninth Circuit's mandate.  Fed. R. App.
17   P. 41(c); *see also Ins. Grp. Comm. v. Denver & R.G.W.R.R.*, 329 U.S. 607, 612 (1947)
18   ("When matters are decided by an appellate court, [the appellate court's] rulings,
19   unless reversed by it or by a superior court, bind the lower court.").  "[A] mandate is
20   controlling as to all matters within its compass, while leaving any issue not expressly
21   *or impliedly* disposed of on appeal available for consideration by the trial court on
22   remand."   *Odima v. Westin Tuscon Hotel*, 53 F.3d 1484, 1498 (9th Cir. 1995)
23   (emphasis added) (quoting *Firth v. United States*, 554 F.2d 990, 993 (9th Cir. 1977)).
24       Summary judgment should be granted if there are no genuine issues of material
25   fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.
26   56(c).
27   / / /
28   / / /

## IV.    DISCUSSION

1
2        While DC insists the Court need only enter judgment in its favor to resolve this
3  matter once and for all, the Siegels urge on remand that the Court must instead
4  conduct further proceedings in light of the Ninth Circuit's holding to determine what
5  the October 19 agreement means today.  (Opp'n 7–8.)  DC concedes that its third
6  counterclaim for breach of the October 19, 2001 agreement "can be dismissed without
7  prejudice, if DC prevails on its Fourth Counterclaim."[2]  (Mot. 1.)  The Court therefore
8  looks first to DC's fourth counterclaim to determine the extent to which the Ninth
9  Circuit's mandate leaves open additional questions for resolution by this Court.
10  Because the Court finds that resolution of additional issues impacting the continued
11  enforceability  of  the  agreement  remains  necessary  to  resolve  DC's  fourth
12  counterclaim, the Court proceeds to address and resolve those issues.  The Court holds
13  that the agreement remains enforceable and therefore does not reach DC's third
14  counterclaim.[3]

15  **A.**      **The Ninth Circuit's Mandate does not fully resolve DC's fourth**
16           **counterclaim**

17        The Court begins its analysis with the recognition that the Ninth Circuit's
18  "holding that the October 19, 2001, letter created an agreement" does not dispense
19  entirely with DC's fourth counterclaim—at least not immediately.  Indeed, had the
20  Circuit thought its ruling on the October 19, 2001 Letter disposed of DC's
21  counterclaims, it would have said so.

22        DC's fourth counterclaim asks the Court to declare, based on a finding that the
23  October 19 agreement remains binding and enforceable, that the Siegels either already
24  / / /

25

26  [2] DC apparently intends to seek attorney's fees under the Copyright act and for its fourth
27  counterclaim rather than pursuing damages for breach of contract under its third counterclaim.
   (Mot. 8.)
28  [3] As noted *supra* at 2, DC's third counterclaim alleges the Siegels' breach of the October 19, 2001
   agreement.  (Second Amended Counterclaims ¶¶ 97–101.)

1    have or now remain contractually obligated to transfer their rights in the Superman

2    works to DC:

> An actual controversy now exists between DC Comics and
> Plaintiffs/Counterclaim Defendants, in that DC Comics contends the
> Agreement *is binding and enforceable* and, therefore, that:
> Plaintiffs/Counterclaim Defendants *either have transferred or are*
> *contractually obligated to transfer to DC Comics*, worldwide and in
> perpetuity, any and all rights, title, and interest, including all United
> States copyrights, which they may have in the Superman Works. . . . DC
> Comics seeks a judicial determination of the parties' respective rights and
> obligations, which is necessary and appropriate to allow them to properly
> govern their future conduct. (Second Amended Counterclaims ¶¶ 103(a),
> 105 (emphasis added).)

12       The Ninth Circuit's holding didn't go quite so far as to fully settle this claim.

13   The Ninth Circuit held only that "the October 19, 2001, letter *created an agreement*."

14   Both this holding and the related finding that the October 19 letter created an

15   agreement with terms sufficiently definite for a court to enforce necessarily imply

16   only that the agreement was binding and enforceable *at the time of the agreement's*

17   *creation*.  But subsequent events may have affected the present enforceability of that

18   contract, as by a material breach followed by an effective rescission of the deal.  In

19   order to pass on the present enforceability of the October 19 contract, the Court must

20   therefore proceed to determine whether events after October 19, 2001, rendered the

21   October 19 agreement subsequently unenforceable.

22   **B.      The October 19, 2001 agreement remains enforceable**

23       The Court is concerned here only with the present enforceability of the

24   October 19 contract.  The Siegels' breach and repudiation defenses do not affect the

25   enforceability of the agreement, but rather constitute grounds for termination or a

26   breach-of-contract action.  *See, e.g., Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal.

27   App. 2d 594, 602 (1969) ("A breach does not terminate a contract as a matter of

28   course but is a ground for termination at the option of the injured party.")  Because no

1    party presently asserts a breach-of-contract claim, these defenses therefore are not

2    properly before the Court.  But the Siegels' rescission and abandonment defenses do

3    inform the continued enforceability of the October 19 agreement, as the Siegels'

4    rescission or DC's abandonment of that agreement could have discharged the

5    agreement, thereby rendering it presently unenforceable.  These defenses therefore

6    merit consideration.

7           1.    *The Siegels failed to rescind the October 19, 2001 agreement*

8           The Siegels contend that the October 19, 2001 agreement is no longer

9    enforceable because that agreement was properly rescinded on May 9, 2002, and their

10   rescission was subsequently confirmed on September 21, 2002.

11          Under California law, one party to a contract may rescind the contract if the

12   other party refuses or fails to fully perform.  Cal. Civ. Code § 1689(b)(2); *Loop Bldg.*

13   *Co. v. De. Coo*, 97 Cal. App. 354, 364 (1929).  To properly effect a rescission, the

14   rescinding party must "give notice of rescission to the party as to whom he rescinds"

15   and either restore or offer to restore "to the other party everything of value which he

16   has received from him under the contract."  Cal. Civ. Code § 1691.  A section 1691

17   notice of rescission need not be formal and explicit; rather, "it is sufficient that notice

18   shall be given to the other party which clearly shows the intention of the person

19   rescinding to consider the contract at an end."  *Hull v. Ray*, 211 Cal. 164, 167 (1930).

20   Further, the requirement of a restoration of consideration is unnecessary where, as

21   here, nothing of value was received by the plaintiff.  *See* Cal. Civ. Code § 1691(b)

22   (must restore "everything of value"); *Rosemead Co. v. Shipley Co.*, 207 Cal. 414, 421

23   (1929).  Failure to comply with section 1691's rescission procedures bars judicial

24   enforcement of rescissory relief.  *Golem v. Fahey*, 191 Cal. App. 2d 474, 477 (1961)

25   ("Since appellant failed to rescind upon learning of the mistake or within a reasonable

26   time thereafter and failed to comply with any of the provisions of Civil Code, section

27   1691, he cannot now seek relief in this forum.").

28   / / /

1    In response to Kevin Marks's October 19 letter to John Shulman "accept[ing]

2    D.C. Comics [sic] offer of October 16, 2001," Shulman sent Marks a letter on

3    October 26, 2001, enclosing what he believed was a "more fulsome outline" of the

4    deal terms.  (SUF 8; Adams Decl. Ex. 2.)  On February 1, 2002, DC's outside counsel

5    followed up with a draft long-form agreement.  (SUF 18; Adams Decl. Ex. 3.)[4]

6    On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons, Chief

7    Operating Officer of DC's parent, AOL Time Warner Inc., objecting to the February

8    draft.  The Siegels now contend that the following language in the May 2002 letter

9    "properly invoked [their] right of rescission":

10    We made painful concessions assured if we did we would arrive at
      an agreement.  When we made these difficult concessions and reluctantly
11    accepted John Shulman's last proposal [on October 19, 2001], we were
12    stabbed in the back with a shocking contract.

13    Your company's unconscionable contract dated February [1], 2002
      contained new, outrageous demands that were not in the [October 16]
14    proposal. . . .  (SUF 25; Adams Decl. Ex. 4.)

15    After four years we have no deal and this [February 1] contract
16    makes an agreement impossible.  (SUF 25; Adams Decl. Ex. 4.)

17    Several months later, on September 21, 2002, the Siegels wrote to Marks to

18    terminate him as their legal representative and reaffirm their intent, as the Siegels now

19    contend, to "rescind" their contract with DC:

20    As we previously discussed with you and hereby affirm, we
      rejected DC Comics' offer for the Siegel Family interest in Superman
21    and other characters sent to us by you on February [1], 2002.  We
22    similarly reject your redraft of [that] document which you sent us on July
      15, 2002.  Therefore due to irreconcilable differences, after four years of
23    painful and unsatisfying negotiations, this letter serves as formal
24    notification that we are totally stopping and ending all negotiations with
25    DC Comics . . . .  (SUF 29; Adams Decl. Ex. 6.)

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [4] These letters (and the new and materially different terms they allegedly contained) formed the basis
28    of the Siegels and DC's dispute over whether Marks's October 19 letter had formed an agreement at
      all.

8

**EXHIBIT 42**
**1729**

1    The Court finds as a matter of law that the May 9 and September 21, 2002,

2    letters do not constitute proper notices of rescission under section 1691.  First and

3    foremost, neither letter even recognizes a contract at all, much less expresses the

4    intent to rescind the contract.  While a rescission notice does not have to be formal or

5    explicit, basic logic suggests that one cannot "clearly indicate to the defaulting party

6    that the injured party considers the contract to be terminated," *Whitney*, 273 Cal. App.

7    2d 594, 602, while simultaneously rejecting the very existence of the contract in the

8    first place.  Indeed, repudiation and rescission are distinct legal concepts that can yield

9    very different legal rights and remedies.

10    Granted, the May 9 letter notes that the Siegels had "reluctantly accepted John

11    Shulman's last proposal" on October 19, 2001.  But any indication that this language

12    recognized the existence of a contract on October 19 is undermined by the subsequent

13    reference to DC's "unconscionable contract dated February [1]" and unambiguous

14    statement that "[a]fter four years *we have no deal*."  The clear objective intent of the

15    May and September 2002 letters was thus to deny the existence of a contract

16    altogether (or otherwise repudiate the continued existence of one due to a breakdown

17    in negotiations), not to rescind it.  And the Ninth Circuit's holding that a contract did

18    in fact exist does not empower the Siegels now to retroactively convert that intent just

19    because it turns out the facts were not what they believed at the time—especially

20    when the unambiguous contents of those letters simply don't support the Siegels'

21    newfound interpretation of the letters' meaning.

22    Even if the Court could concede that the May and September letters recognized

23    the existence of a contract the Siegels clearly intended to rescind, the stated grounds

24    on which the Siegels sought to rescind nevertheless do not warrant rescission as a

25    matter of law.  Both letters cite the Siegels' disdain for DC's February 1, 2002 long-

26    form draft contract as the basis for the breakdown in negotiations (or for rescission of

27    the contract, as they now contend on remand).  But disputes over the terms of the

28    long-form contract cannot invalidate or breach the underlying short-form agreement.

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 51 of 111
Case 2:04-cv-08400-ODW-RZ    Document 717-1  Filed 03/20/13   Page 10 of 16    Page ID
#:16204

1   *Clark v. Fiedler*, 44 Cal. App. 2d 838, 847 (1941) (allowing draft long-form
2   agreements to undermine the earlier agreement would improperly allow a party to
3   escape a contract "by simply suggesting other and additional terms"); *see Facebook,*
4   *Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037–38 (9th Cir. 2011). And, "[o]f
5   course, a mere notice purporting to rescind an agreement cannot have that effect
6   unless the party giving such notice is entitled to rescind." *Brown v. Roberts*, 121 Cal.
7   App. 654, 659 (1932).

8          The Court does acknowledge that a statement in the notice of certain grounds
9   for rescission does not prevent the party from thereafter relying upon different and
10  proper grounds. *Hull*, 211 Cal. at 167. The Siegels' Opposition to DC's Motion
11  appears to do just that by arguing that DC had materially breached the October 19
12  agreement when it "failed to provide a royalty statement to the Siegels by March 31,
13  2001, as agreed in the October 19, 2001 Letter, and failed to pay or offer to pay the
14  Siegels their royalties." (Opp'n 21; *see also id.* ("It is well-settled that a breach of the
15  royalty provisions in a copyright contract can give rise to a right of rescission.").) But
16  the Siegels' change of pace now is too little too late. As DC correctly notes, the
17  Siegels have argued since the inception of this litigation only that no contract was
18  formed with DC at all. Until now, they have not contended that DC breached the deal
19  or that the Siegels rescinded it. Further, Federal Rule of Civil Procedure 8(d) permits
20  parties to plead inconsistent defenses in the alternative, and the Siegels chose not to.
21  "Allowing [the Siegels] to raise such defenses now—when DC was deprived
22  discovery on them or the chance the litigate them before—would violate Rule 8,
23  prejudice DC, and be an affront to the multiple courts that spent years adjudicating
24  DC's settlement claim and Larson's defense that no deal was ever made." (Reply 6.)

25         In sum, the Court finds that the Siegels' May 9 and September 21, 2002 letters
26  failed to effect a rescission under California Civil Code section 1691 because those
27  letters do not clearly and objectively convey their intent to rescind an existing
28  contract. The plain text of those letters manifestly conveyed the intent to *deny or*

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 52 of 111
Case 2:04-cv-08400-ODW-RZ    Document 717-18 Filed 03/20/13    Page 11 of 16    Page ID
#:16205

1    *repudiate* the very existence of a contract; grafting the intent to *rescind* onto those

2    letters now—more than ten years after the fact—would be to entertain a fiction.

3          2.    *DC did not abandon the October 19, 2001 agreement or acquiesce to its*

4                *rescission*

5          The Siegels also seek to destroy the current enforceability of the October 19

6    agreement on grounds that DC acquiesced in the Siegels' rescission or otherwise

7    abandoned the October 19 agreement.   They contend that Parsons's May 21, 2002,

8    letter in response to their May 9 letter "did ***not*** argue that the Siegels were in breach or

9    had otherwise acted improperly, nor did DC claim any rights under the October 19,

10   2001 Letter."   (Opp'n 22 (citing SUF 28, 33).)   But nor did the May 21 letter

11   acquiesce to the Siegels' purported rescission (to the extent their May 9 letter could be

12   construed as such).   In fact, Parsons's May 21 letter actually *supports* the notion that

13   an agreement existed on October 19 and would be followed by additional negotiations

14   regarding the long-form contract.   Parsons notes, "As in all negotiations, . . . we

15   expected that you and your representatives would have comments and questions on

16   the draft, which comments and questions we would need to resolve." (Adams Decl.

17   Ex. 5.)   And despite the Siegels' clear statement in their May 9 letter that "[a]fter four

18   years we have no deal and this [February 1] contract makes an agreement impossible,"

19   Parsons persists in the May 21 response with the "hope that this agreement can be

20   closed based upon the earlier discussions with your lawyers." *Id.*   On its face, the

21   May 21 letter simply does not support DC's acquiescence in any purported rescission

22   by the Siegels.

23         As for the Siegels' contention that DC did nothing to enforce the October 19

24   agreement following receipt of their September 21 letter, this argument is belied by

25   the entire course of this litigation.   As DC notes, "Over the past eight years, DC spent

26   *millions of dollars* litigating and enforcing the 2001 agreement."   (Reply 10.)   DC

27   even specifically counterclaimed for breach of the October 19 agreement on October

28   18, 2005, noting that it "always has been and remains ready, willing, and able to

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 53 of 111
Case 2:04-cv-08400-ODW-RZ    Document 171-1 Filed 03/20/13    Page 12 of 16    Page ID
#:16206

1    perform all of its obligations under the Agreement." (First Amended Counterclaims

2    (ECF No. 42) ¶ 99.)

3         Aside from the fact that the Siegels have waited nearly eight years to raise their

4    abandonment and acquiescence defenses, those defenses are simply unsupported by

5    the factual record and are insufficient to preclude the enforceability of the October 19

6    agreement.  Further, the parties' arguments regarding breach and repudiation are not

7    properly before this Court on DC Comics's fourth counterclaim for declaratory relief,

8    as those arguments go to performance of the October 19 agreement, not the

9    agreement's underlying enforceability today.  Because the Court finds there was no

10   rescission, acquiescence, or abandonment as a matter of law, the contract remains in

11   existence and enforceable, and any claims for breach of that agreement are now

12   appropriate in a separate state-law action for breach of contract.

13   **C.    The October 19, 2001 agreement transferred the Siegels Superman rights**

14   **to DC**

15        Having found that the October 19, 2001 agreement remains enforceable, the

16   Court must now determine and declare "the parties' rights and obligations."  The

17   pivotal dispute in this fray is whether the October 19 letter itself effected a transfer of

18   the Siegels' Superman rights, or whether the actual transfer remains to be made.

19   According to DC, "the Ninth Circuit also held that the [October 19] contract satisfied

20   all the requirements for a valid copyright transfer under the Copyright Act." (Mot. 7.)

21   The Siegels respond that the October 19 letter could not have transferred the Siegels'

22   copyrights because the very terms of that agreement state that "[t]he Siegel Family

23   *would* transfer all of its rights in the 'Superman' and 'Spectre properties (including

24   'Superboy').' (*See* Opp'n 1.)  They further maintain that should the Court accept "that

25   the term 'would' is ambiguous – as opposed to flatly contradicting DC's interpretation

26   – summary judgment in DC's favor remains improper." (Opp'n 10.)

27        Viewed in a vacuum, the language of the October 19 agreement plainly

28   supports the Siegels' contention that the agreement itself did *not* operate to transfer

Case 2:04-cv-08400-ODW-RZ   Document 720-10   Filed 04/04/13   Page 54 of 111
Case 2:04-cv-08400-ODW-RZ   Document 718-1   Filed 03/20/13   Page 13 of 16   Page ID
#:16207

1   the Siegels' Superman rights to DC Comics.  The plain language of the agreement—

2   "The Siegel Family *would* transfer all of its rights"—suggests that the transfer wasn't

3   immediately operative.  Rather, insofar as the October 19 letter was a valid contract, it

4   appears to have created a contractual duty on the Siegels' part to transfer their rights

5   and a contractual right on DC's part to receive those rights.

6          Nevertheless, a somewhat perplexing aspect of the Ninth Circuit's mandate

7   cause the Court to question its reading of the October 19 agreement in this way.  It

8   appears instead that the Ninth Circuit implicitly found the October 19 agreement to

9   constitute "an agreement transferring ownership of a copyright" under 17 U.S.C.

10  § 204(a).

11         In their briefs before the Ninth Circuit, the Siegels argued that the October 19

12  letter could not have created an enforceable contract because "a written contract was

13  required as a matter of law" under 17 U.S.C. § 204(a), and "Marks'[s] October 19

14  Letter could not possibly qualify as the required 'writing.'"  (Kline Decl. Ex B, at

15  123–25.)  Thus, the Siegels posited on appeal that "[t]he October 19 Letter is not 'a

16  transfer' of the Siegels' copyrights to Warner; rather, it contemplates that the Siegels

17  'would [make such] transfer in a final executed agreement."  (*Id.* at 125.)   The

18  Siegels' counsel made an identical argument at oral argument: "Marks' letter does not

19  assign any trans— any copyrights.  It says, 'We will.  We anticipate signing those

20  contracts.'"  (Adams Decl. Ex. 19, at 364:5–7.)

21         Apparently in direct response to the Siegels' arguments, the Circuit explicitly

22  found that § 204(a) was not "a bar to the validity of [the October 19] contract[, as] that

23  statute expressly permits an agreement transferring ownership of a copyright to be

24  signed by a 'duly authorized agent' of the copyright owner, and [the Siegels do] not

25  contest that the heirs' attorney was such an agent."  This Court reads this language to

26  reflect the Ninth Circuit's view that the October 19 letter *was* a proper written transfer

27  of copyright ownership under § 204(a) signed by the Siegels' duly authorized agent.

28  Indeed, § 204(a) solely concerns the "transfer of copyright ownership, other than by

Case 2:04-cv-08400-ODW-RZ     Document 720-10     Filed 04/04/13     Page 55 of 111
Case 2:04-cv-08400-ODW-RZ    Document 718-1   Filed 03/20/13   Page 14 of 16   Page ID
#:16208

1   operation of law"; had the Ninth Circuit determined that the October 19 agreement did

2   not itself operate as a presently operative transfer of the Siegels' Superman rights to

3   DC, there would have been no need to raise § 204(a) at all. The Court therefore holds,

4   in keeping with the Ninth Circuit's mandate, that the October 19, 2001 agreement

5   operated to transfer the Siegels' Superman rights to DC as of the date of that

6   agreement.

7        Finally, the Court notes that the determination whether the Siegels have already

8   transferred their rights is of little consequence to the final resolution of this case

9   considering the Court's holding that the agreement remains enforceable. The Court is

10   bound by the Ninth Circuit's implied finding that the October 19 letter did in fact

11   transfer copyright ownership under § 204(c). But to the extent one prefers this

12   Court's reading of the agreement over the Ninth Circuit's presumed reading, the

13   Siegels maintain that "[a] declaration that [the Siegels are] still obligated, under the

14   October 19, 2001 Letter, to transfer her Superman rights to DC is procedurally flawed

15   and does little to resolve this matter" because DC would have to seek specific

16   performance to enforce that obligation. (Opp'n 12.) To this, the Court responds that

17   its declaration that the October 19, 2001 agreement remains enforceable *does*

18   conclude this matter, as DC seeks *only* declaratory relief. How DC would choose to

19   proceed from here armed with a declaration that the contract remained enforceable but

20   that the Siegels were still obligated to effect the transfer is beyond the purview of this

21   Court.

22        In short, DC's fourth counterclaim seeks only declaratory—not affirmative—

23   relief. The Court **GRANTS** DC's motion for summary judgment on DC's fourth

24   counterclaim and holds that the October 19, 2001 agreement remains enforceable and

25   operated itself to transfer the Siegels Superman rights to DC. This ends this Court's

26   involvement in the parties' dispute (save for resolution of the Superboy and Superman

27   Ad issue, as discussed below). That DC may have additional rights and duties

28   / / /

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 56 of 111
Case 2:04-cv-08400-ODW-RZ   Document 718904 03/20/13   Page 15 of 16   Page ID
#:16209

1  flowing from the Court's declaration that the October 19 agreement does not prevent

2  final termination of this case.

3  **D.      The Court requires additional briefing on the issues of Superboy and**

4  **         Superman ads**

5          What may preclude immediate closure of this chapter of the continuing

6  Superman saga, however, is the lingering issue of what to do with Superboy and the

7  early Superman ads.

8          Upon review of the parties' papers and the nearly insurmountable record in

9  these cases, the Court has determined that it requires additional briefing on the effect

10  of the October 19, 2001 agreement on the Superboy and early Superman ad works.

11  The parties are therefore **ORDERED** to file supplemental briefs addressing how the

12  Court's holding that the October 19 agreement remains binding and enforceable today

13  affects the parties' respective rights to Superboy and the Superman ad works.  The

14  briefs should not exceed 15 pages in length and should devote particular attention to

15  the relevant factual and procedural history with respect to these works, including the

16  continued effect various earlier rulings by the Court have on these claims today.  The

17  briefs must also include a brief proposal for swift resolution of the Superboy and

18  Superman ad issues should the Court find that the October 19 agreement does not

19  extend to these works.  The parties shall submit all documents on which they rely as

20  exhibits.   The parties' supplemental briefs are due no later than 5:00 p.m. on

21  Thursday, March 28, 2013.

22                              **V.     CONCLUSION**

23          Because there has, to date, been no unequivocal rescission or termination of the

24  October 19, 2001 agreement (embodied in Kevin Marks' letter of the same date), that

25  agreement remains binding and enforceable.  As a result, the parties are bound by the

26  terms memorialized in Marks's October 19 letter; nothing more.  *See Facebook*,

27  640 F.3d at 1038.   Whether and how that right has been affected by the parties'

28  actions after October 19, 2001, is not now before the Court, as DC has voluntarily

Case 2:04-cv-08400-ODW-RZ     Document 720-10     Filed 04/04/13     Page 57 of 111
Case 2:04-cv-08400-ODW-RZ     Document 717-10   Filed 03/20/13   Page 16 of 16   Page ID
#:16210

1   dismissed its third counterclaim for breach of contract, and the Siegels do not assert

2   any contract claims related to the October 19 agreement.  Thus, to the extent that any

3   party contends any delay in performance or other breach gives rise to any damages,

4   such a claim is properly subject to a separate state-court action for breach of contract.

5          Because the Court finds that DC must prevail on its fourth counterclaim as a

6   matter of law, the Court dismisses DC's third counterclaim as moot.  The Court will

7   enter judgment and close this case following resolution of the lingering Superboy and

8   Superman Ad issues.

9          **IT IS SO ORDERED.**

10

11        March 20, 2013

12

13                                          _____

14                                          **OTIS D. WRIGHT, II**
                                            **UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 43



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

January 29, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    **October 19, 2001 Settlement Agreement Payment**

Dear Marc:

In view of the Ninth Circuit's January 10th decision "that the October 19, 2001, letter created an agreement," DC Comics is prepared to tender payment under that Agreement.  In that regard, we ask you to confirm that your clients are now prepared to perform under the Agreement pursuant to its terms.

The Agreement provides that DC Comics shall make payment directly to four parties: Joanne Siegel (47.5%), Laura Siegel Larson (23.75%), Michael Siegel (23.75%) and Gang, Tyre, Ramer & Brown (5%).  However, as Joanne Siegel and Michael Siegel are deceased, it appears that payments of their respective shares should be made directly to their respective estate's representatives.  We understand that Laura Siegel Larson is the Personal Representative of the Estate of Joanne Siegel and that Melvin Banchek is the Fiduciary of the Estate of Michael Siegel.

The Agreement also provides that DC Comics is to reimburse Laura Siegel Larson for costs of medical and dental insurance for her and her sons (for so long as they were minors) incurred since November 2000.  Please have Ms. Larson provide us with appropriate documentation so that these amounts can be reimbursed.

Finally, Paragraph C.9 of the Agreement provides the opportunity for the Siegel Family to be informed about, and provide input regarding, major Superman developments.  If Ms. Larson is interested in exercising this opportunity with respect to the forthcoming motion picture *Man of Steel*, please so advise and I will have Diane Nelson of DC Entertainment make appropriate arrangements.

**EXHIBIT 43**
**1738**

O'MELVENY & MYERS LLP
January 29, 2013, Page 2


The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, damages for breach of contract, claims for attorney's fees and costs, and rights of offset, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:    Melvin Banchek
       Gerald Berk
       Donald Bulson
       Richard Kendall
       Arthur Levine
       John Pettker
       Bruce Ramer
       Gary Ruttenberg
       George Zadorozny

**EXHIBIT 43**
**1739**

# EXHIBIT 44



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

February 4, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    <u>October 19, 2001 Settlement Agreement Payment</u>

Dear Marc:

In my letter of January 29, 2013, a copy of which is attached, I advised that DC Comics is prepared to tender payment under the October 19, 2001 Agreement and asked whether, in view of the Ninth Circuit's January 10, 2013 decision, your clients were also prepared to perform.  I have received no response to my letter.

As you are aware, the mandate issued today in *Siegel*.  Therefore, we ask that you immediately advise us of your clients' position.  We also ask that you respond to the other matters raised in our letter.

If other parties copied on this letter intend to raise issues or concerns regarding payment, please immediately let us know.

The foregoing is without prejudice to DC Comics' defenses, claims, damages, and other remedies, including, without limitation, claims for attorney's fees and costs and rights of offset, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

**EXHIBIT 44**
**1740**

O'MELVENY & MYERS LLP
February 4, 2013, Page 2


CC:    Melvin Banchek
       Gerald Berk
       Donald Bulson
       Richard Kendall
       Arthur Levine
       John Pettker
       Bruce Ramer
       Gary Ruttenberg
       George Zadorozny


Enclosure

**EXHIBIT 44**
**1741**

# EXHIBIT 45

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

\* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

February 9, 2013

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *Larson v. Warner Bros. Entertainment Inc., et al.*, Case No. 10-CV-08400 ODW (RZx)

Dear Dan:

I write on behalf of plaintiff Laura Siegel Larson, in response to your January 29, 2013 letter. Therein, defendant DC Comics purports to offer to tender performance pursuant to an October 19, 2001 letter.

As a preliminary matter, while the Ninth Circuit held that the October 19, 2001 letter constituted an acceptance sufficient to create a contract on that date, it decidedly did not order the district court to enter judgment in DC's favor. Instead, the Ninth Circuit expressly remanded and directed the district court to adjudicate "DC's third and fourth counterclaims" regarding the October 19, 2001 letter. DC's contract counterclaims and Ms. Larson's defenses to those counterclaims will need to be litigated, pursuant to the same legal standards and procedures applicable to any such claims and defenses.

DC's prodding the district court to hastily "enter judgment" in DC's favor with no regard for well-worn legal standards, such as those governing summary judgment and trial of material issues of fact, is transparent and improper.

DC's purported and belated "tender" of performance under the October 19, 2001 letter is facially incomplete and illusory. Among other deficiencies, and reserving all of Ms. Larson's rights and defenses, are the following:

1.      While DC offers to tender "payment," it does not specify the amount. Under the terms of the October 19, 2001 letter, DC would have been obligated to pay fixed compensation of at least $8.5 million over the past decade, commencing with $3.5 million on March 31, 2002. DC would also have been obligated to render annual accountings commencing on March 31, 2002 of the

**EXHIBIT 45**
**1742**

**TOBEROFF & ASSOCIATES, P.C.**

February 9, 2013
Re:     *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:  2 of 2

amounts due in cash and the contingent back-end participation set forth in the October 19, 2001
term sheet.

In addition, because the October 19, 2001 letter deems all but $1 million of the above cash
payment as *an advance* against Ms. Larson's alleged contingent royalty set forth in the October
19, 2001 letter, DC's supposed "tender" of payment is meaningless and not susceptible to
calculation without inclusion of detailed accounting statements computing the amount of Ms.
Larson's alleged royalties thereunder.  As DC has repeatedly represented to the Court that it has
kept a "reserve account" for the benefit of Ms. Larson pursuant to the October 19, 2001 letter
and an ongoing accounting of monies it says are payable to Ms. Larson under the October 19,
2001 letter, DC could have readily provided this information but once again failed to do so.

Rendering DC's "tender" even more illusory, DC states in its January 29 letter that its supposed
tender of payment is "without prejudice to DC Comics' defenses, claims and remedies,
including, without limitation, damages for breach of contract, claims for attorney's fees and
costs, and rights of offset, all of which are hereby reserved."  In short, DC vaguely offers to
"tender" payment of an unspecified amount, but reserves the right to reduce that amount to a
nullity.

DC's recently filed motions for summary judgment in *Larson v. Warner Bros. Entertainment
Inc.* confirm that DC will seek to reduce or eliminate the monies it now pretends to "tender."
C.D. Cal. Case No. 04-CV-08400 ODW (RZx), Dkt. 702 at 8 ("DC will seek its attorney's fees
under the Copyright Act and its Fourth Claim in these cases....").

2.       Paragraph C.9 of the October 19, 2001 letter expressly states that DC will "provide the
opportunity to be informed about major developments (*e.g.,* motion pictures, television programs
...), and the Siegel Family will have an opportunity to give its input," and that the "Siegel
Family will be informed of such [major] developments early enough in the development process
so that their opportunity to give input is *meaningful.*" (Emphasis added).  DC's offer of
compliance regarding the forthcoming *Man of Steel* movie is thus illusory as well, as that film is
slated for release on June 14, 2013, and it is our understanding that principal photography of that
film has already been completed.

3.       DC's offer with respect to medical and dental insurance is incomplete, as it does not offer
to reimburse the estate of Michael Siegel for his mental and dental insurance, from 2001 until his
death in 2006.

4.       DC's tender of performance under the October 19, 2001 letter is further deficient in that it
ignores other purported DC obligations in that letter, including the provision of credits "on
Superman comics and other publications, movies and television programs," as set forth in
Paragraphs C.3 and C.4, and "Full E&O and general liability" insurance coverage against
liability for DC or its affiliates' actions, as set forth in Paragraph 14.

**EXHIBIT 45**
**1743**

**TOBEROFF & ASSOCIATES, P.C.**

February 9, 2013
Re:    *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:  3 of 3

On a different note, DC's copying of its January 29 letter to virtually every attorney it is aware of who has ever been even tangentially connected with Ms. Larson or the Shuster estate is a blatantly improper attempt to indirectly communicate with our clients in violation of Cal. R. Prof. Conduct Rule 2-100, sow confusion, and interfere with our firm's attorney-client relationships.  It also gratuitously burdens Ms. Larson and the Shuster estate with unnecessary legal fees.

As DC well knows:  Mr. Kendall does not represent Ms. Larson, or any other party in the *Siegel* litigations; he represents me regarding DC's frivolous tort claims.  Mr. Levine handled the Siegel's notices of termination in 1997, but has had very limited involvement since then, and no involvement in this litigation which commenced in 2004.  Mr. Bulson ceased representing Michael Siegel upon his death in 2006, and is in the midst of a dispute with his estate, of which Ms. Larson is the sole beneficiary.  Mr. Zadorozny does not represent Ms. Larson in these litigations, and, as Ms. Larson testified at her 2012 deposition, he infrequently advises her on an *ad hoc* basis on tangential matters.  Finally, as DC also knows, Mr. Pettker has had no relationship with Ms. Larson at all – rather he is the attorney who probated Joseph Shuster's estate back in 2003.

Due to these improprieties, Ms. Larson has instructed me to remind DC and your firm of your obligation to direct all communications to my law firm, her chosen attorneys of record in these cases, and not to prior or present counsel who do not represent her in these litigations.

Nothing in this letter should be construed as a waiver or limitation of Ms. Larson's rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT 45**
**1744**

# EXHIBIT 46



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

February 12, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    <u>October 19, 2001 Settlement Agreement Payment</u>

Dear Marc:

This responds to your letter of February 9, 2013.

In my letter of January 29, 2013, I advised you that DC Comics was prepared to tender payment under the October 19, 2001 Agreement ("Agreement") of "all amounts accrued through December 31, 2012." I then asked you to confirm that your client Laura Siegel Larson is now prepared to perform under the Agreement pursuant to its terms. Despite three pages of argument and rhetoric, your letter deliberately refused to provide the requested assurance that Ms. Larson is duly prepared to perform the Agreement. Therefore, DC reserves all its rights under the Agreement and the law, including the right to suspend its performance in view of your clients' continuing repudiation.

As to the remainder of your letter, DC's tender of performance under the Agreement was not deficient. DC was not required to reiterate every obligation under the Agreement. In addition to offering to pay "all amounts due," DC called out specific obligations requiring the active participation or cooperation of your clients. The credit obligations you mentioned, for example, do not require your clients' participation and as such were not specifically addressed. Nor does DC's reservation of rights undermine its tender of performance. If and when DC were to obtain an order for the payment of attorney's fees against your clients, then DC would have a right of offset, in addition to other relief.

Likewise without merit is your assertion that DC's tender regarding Paragraph C.9 of the Agreement is "illusory" because it comes too late. To date, your clients elected not to participate with DC and provide input based on their decision to wrongfully repudiate the

**EXHIBIT 46**
**1745**

O'MELVENY & MYERS LLP
February 12, 2013, Page 2

Agreement.   This is a circumstance entirely of their own making, and one you and your clients
are prolonging by continuing to repudiate the Agreement.

Also unfounded is your criticism of DC's tender because it did not offer to reimburse the
estate of Michael Siegel for "mental [sic] and dental insurance, from 2001 until his death." My
letter was addressed to you in your capacity as Ms. Larson's counsel.   I do not understand that
you are counsel to the Estate of Michael Siegel.  DC, of course, stands ready to reimburse those
expenses under the Agreement if the Estate supplies the appropriate documentation.

The foregoing is without prejudice to DC Comics' defenses, claims and remedies,
including, without limitation, damages for breach of contract, claims for attorney's fees and
costs, and rights of offset, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

CC:    Melvin Banchek
       Gerald Berk
       Donald Bulson
       Richard Kendall
       Arthur Levine
       Bruce Ramer

**EXHIBIT 46**
**1746**

# EXHIBIT 47

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

February 27, 2013

Via E-Mail

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *Siegel v. Warner Bros. Ent., Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx)

Dear Dan:

We disagree with the conclusions and characterizations in your letters of February 9, 2013.

What is the total dollar amount of the "payment," inclusive of royalties that DC Comics is purportedly "prepared to tender," under the October 19, 2001 letter, to all parties, including Laura Siegel Larson, and the estates of Joanne Siegel and Michael Siegel?

The forgoing is without prejudice to plaintiff's claims, defenses and remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT 47**
**1747**

# EXHIBIT 48



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

February 28, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    <u>October 19, 2001 Settlement Agreement Payment</u>

Dear Marc:

This responds to your letter of February 27, 2013.

In my letters of January 29, 2013 and February 12, 2013, I advised you that DC Comics was prepared to tender payment under the October 19, 2001 agreement ("Agreement") of all amounts accrued through December 31, 2012, provided that Ms. Larson (for herself and on behalf of the estate of Joanne Siegel) was prepared to perform under the Agreement pursuant to its terms. Although it has been a month since my first letter, you have not responded to my requests that you confirm Ms. Larson is prepared to do so. As a result, DC may continue to suspend its performance in view of your clients' ongoing repudiation of the Agreement.

In the absence of your clients' repudiation, the total amount that DC Comics would be prepared to tender to all parties (Laura Siegel Larson, the estates of Joanne Siegel and Michael Siegel, and the Gang, Tyre law firm) under the Agreement, accrued through December 31, 2012, is $21,557,352. As provided in paragraph C.10 of the Agreement, your clients have audit rights with respect to any payments made by DC.

To reiterate, DC remains prepared to tender all amounts owing under the Agreement. Accordingly, please let us know by close of business tomorrow if Ms. Larson is prepared to perform under the Agreement.

Finally, while you reference "letters" I sent to you on February 9, 2013, I believe you are referring to your own letter to me of that date, which I responded to on February 12, 2013.

**EXHIBIT 48**
**1748**

O'Melveny & Myers llp
February 28, 2013, Page 2


   The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, any rights of offset that may arise, all of which are hereby reserved.

            Very truly yours,

            /s/ Daniel M. Petrocelli

            Daniel M. Petrocelli
            of O'MELVENY & MYERS LLP


CC:  Melvin Banchek
   Gerald Berk
   Donald Bulson
   Richard Kendall
   Arthur Levine
   Bruce Ramer


**EXHIBIT 48**
**1749**

# EXHIBIT 49

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22631 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

* Also admitted in New York

March 7, 2013

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     <u>*Larson v. Warner Bros. Entertainment Inc., et al.*, Case No. 10-CV-08400 ODW (RZx)</u>

Dear Dan:

I write on behalf of plaintiff Laura Siegel Larson, in response to your February 28, 2013 letter, which claims that DC Comics is prepared to tender a fixed sum ("Sum") under the October 19, 2001 Letter.

Given the smaller cash payments and advances (against royalties) in the October 19, 2001 Letter, it is clear that most of this Sum represents the royalties DC claims are payable, for the 12-year period commencing January 1, 2000, pursuant to the complex royalty scheme in the October 19, 2001 Letter.

Ms. Larson, however, cannot possibly ascertain whether DC's Sum complies with the October 19, 2001 Letter unless DC first provides an accounting that details the revenues from various media to which the royalties were applied.  In other words, to make any sense of this, she needs to know precisely how DC calculated the Sum.  Even the October 19, 2001 Letter, with which DC purports to comply, requires royalty accounting statements in paragraph C.5, not simply audit rights as stated in your letter.  Moreover, when a participant conducts an audit it is of the accounting statements rendered, and is not in a vacuum.

DC accounting statements were therefore requested in my letter to you of February 9, 2013, but to no avail.  Without transparent accountings by DC, its February 28, 2013 offer of compliance is unverifiable, and, to that extent, illusory.

This is compounded by the troubling fact that the Sum that DC "tenders" in 2013 is only 5% higher than the amount DC represented was owed Ms. Larson as of 2006.  *See* Warner's Opposition to Def.'s Motion for Summary Judgment at 22 n.18 (stating that "as of the latter part of 2006" the "[Siegels'] account totaled approximately $20 million dollars").  It defies common

**EXHIBIT 49**
**1750**

**TOBEROFF & ASSOCIATES, P.C.**

March 7, 2013
Re:    *Larson,* Case No. 10-CV-08400 ODW (RZx)
Page:  2 of 2

sense that roughly 95% of the Sum accumulated in the first 6 years (since January 1, 2000), and that only 5% of Ms. Larson's royalties accumulated in the next 6 years.

If DC's purported financial tender is serious, please refrain from setting artificial deadlines and provide a full accounting sufficient to show exactly how DC computed its number.

The other contentions in your letter are disputed.  Nothing in this letter should be construed as a waiver or limitation of Ms. Larson's rights or remedies, all of which are reserved.

Please attach a copy of this letter to any filing regarding DC's purported "tender" under the October 19, 2001 Letter.

Very truly yours,

Marc Toberoff

**EXHIBIT 49**
**1751**

# EXHIBIT 50



## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

March 15, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    **October 19, 2001 Settlement Agreement Payment**

Dear Marc:

This responds to your letter of March 7, 2013.

In your letter of February 27, 2013, you requested that we advise you of "the total dollar amount of the 'payment,' inclusive or royalties that DC Comics is purportedly 'prepared to tender,' under the October 19, 2001 [Agreement]." This was the only request in your letter. In our response dated February 28, 2013, we advised of the amount that DC Comics was prepared to tender in full payment of all amounts currently due under the Agreement, provided that Ms. Larson (for herself and on behalf of the estate of Joanne Siegel) confirms that she will perform under the Agreement pursuant to its terms. Ms. Larson has not provided that confirmation.

You have now requested that DC Comics provide your client with "accounting statements" with respect to the payment amount. As your own letter points out, DC Comics is required to provide annual accounting statements under Paragraph C.5 of the Agreement. However, as we have repeatedly made clear, DC remains ready, willing, and able to perform under the Agreement and will perform all its obligations if and when your client withdraws her repudiation of the Agreement. Until then, DC's obligations are suspended under the law. Simply put, your client cannot have it both ways: she cannot demand that DC Comics perform its obligations under the Agreement while at the same time repudiating the Agreement.

To reiterate, once your client has confirmed that she will perform under the Agreement, DC Comics will promptly and fully perform all of its obligations thereunder, including by making payment and providing accounting statements.

**EXHIBIT 50**
**1752**

O'MELVENY & MYERS LLP
March 15, 2013, Page 2


The foregoing is without prejudice to DC Comics' defenses, claims and remedies, including, without limitation, any rights of offset that may subsequently arise, all of which are hereby reserved.

Please attach a copy of this letter to any sur-reply you file relating to this issue.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

CC:    Melvin Banchek
Gerald Berk
Donald Bulson
Richard Kendall
Arthur Levine
Bruce Ramer

**EXHIBIT 50**
**1753**

# EXHIBIT 51



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
905900-321

March 22, 2013

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates PC
22631 Pacific Coast Hwy, #348
Malibu, CA 90265

Bruce Ramer
Gang, Tyre, Ramer & Brown, Inc.
132 S Rodeo Drive
Beverly Hills, CA 90212

Melvin Banchek
Melvin H. Banchek Co., L.P.A.
55 Public Square, Suite 918
Cleveland, OH 44113

Donald W. Bulson
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Avenue, 19th Floor
Cleveland, OH 44115

Re:    **October 19, 2001 Settlement Agreement Payments**

Dear Counsel:

Pursuant to the Court's March 20, 2013 ruling (attached) affirming the existence and enforceability of the October 19, 2001 Agreement ("Agreement"), as well as our prior tenders of performance, and notwithstanding Laura Siegel Larson's repudiation of the Agreement, DC Comics intends to remit payment of the amounts currently due under the Agreement on April 1, 2013 (March 31, 2013 falls on a Sunday—*see* CAL. CIVIL CODE §§ 7, 11). As set forth in our letter of February 28, 2013, that amount is $21,557,352.00.

Pursuant to paragraph C.6 of the October 19, 2001 Agreement, and as we previously advised, we will remit the amounts as follows:

| | |
|---|---|
| Laura Siegel Larson: | $ 5,119,871.10 |
| Laura Siegel Larson, Personal Representative of the Estate of Joanne Siegel: | $10,239,742.20 |
| Melvin Banchek, Fiduciary of the Estate of Michael Siegel: | $ 5,119,871.10 |
| Gang, Tyre, Ramer & Brown, Inc.: | $ 1,077,867.60 |

**EXHIBIT 51**
**1754**

O'MELVENY & MYERS LLP
March 22, 2013, Page 2

If any of you disputes the above payments, please immediately advise me in writing by close of business on Monday, March 25, 2013, so that we can take appropriate action, including, without limitation, interpleading or depositing any disputed funds with the Court. If any of the above payees requests that payment be redirected to another party, we will require an appropriate payment direction executed by the designated payee above. Finally, to the extent that any of the designated payees would prefer to receive payment via wire, please provide us with those instructions.

DC Comics' payment under the Agreement as set forth above is without waiver or prejudice to any of DC Comics' rights or remedies, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

w/ Enclosure(s)

**EXHIBIT 51**
**1755**

# EXHIBIT 52

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348
MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@toberoffandassociates.com

March 25, 2011

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *Larson v. Warner Bros. Entertainment Inc. et al.* (C.D. Cal. Case No. 04-CV-8400)

Dear Dan:

I write in response to your March 22, 2013 letter, on behalf of my client, Laura Siegel Larson, individually and the personal representative of the Estate of Joanne Siegel and as the sole beneficiary of the Estate of Michael Siegel.

As you are aware, the Court's March 21, 2013 order is an interim order, subject to revision at any time pursuant to Fed. R. Civ. P. 54(b). As such, no action should be taken by DC based thereon.

Ms. Larson respectfully reserves all rights as to the March 21, 2013 ruling, including her right to appeal the ruling once judgment is entered, and/or to bring a state-court action regarding the alleged October 19, 2001 letter agreement.

Until this matter is fully and finally resolved through appeal of all pending issues or by settlement, Ms. Larson, to preserve her rights and remedies, cannot accept DC's offer of alleged performance and payments under the October 19, 2001 letter. Ms. Larson does not object to DC retaining the money that DC claims is owed under the October 19, 2001 letter until this matter is fully resolved.

We are also in receipt today of the letter to you from Melvin Banchek, Administrator of the Estate of Michael Siegel, likewise declining to accept payment until this matter is fully resolved and authorizing DC to retain such money in the interim.

In addition, as issues remain unresolved between the parties to the October 19, 2001 Letter, it would not be appropriate to make derivative payments to the Gang Tyre firm either.

**EXHIBIT 52**
**1756**

**TOBEROFF & ASSOCIATES, P.C.**

March 25, 2013
Re:     *Larson v. Warner Bros. Entertainment Inc. et al,* (C.D. Cal. Case No. 04-CV-8400)
Page:   2 of 2


Nothing in this letter should be construed as a waiver or limitation of any of Ms. Larson's rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff


cc:     Melvin Banchek
        Bruce Ramer

**EXHIBIT 52**
**1757**

# EXHIBIT 53



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

March 29, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates PC
22631 Pacific Coast Hwy, #348
Malibu, CA 90265

Bruce Ramer
Gang, Tyre, Ramer & Brown, Inc.
132 S Rodeo Drive
Beverly Hills, CA 90212

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Melvin Banchek
Melvin H. Banchek Co., L.P.A.
55 Public Square, Suite 918
Cleveland, OH 44113

Donald W. Bulson
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Avenue, 19th Floor
Cleveland, OH 44115

Re:    October 19, 2001 Settlement Agreement Payments

Dear Counsel:

My March 22, 2013 letter inadvertently did not include royalties for the character Spectre, and the royalty analysis has been further refined.  The revised payment amount is $21,691,152, an increase of $133,739 over the amount specified in my prior letter.  As such, pursuant to paragraph C.6 of the October 19, 2001 Agreement, the payment amounts DC intends to remit are as follows:

| | |
|---|---|
| Laura Siegel Larson: | $5,151,648.60 |
| Laura Siegel Larson, Personal Representative of the Estate of Joanne Siegel: | $10,303,297.20 |
| Melvin Banchek, Fiduciary of the Estate of Michael Siegel: | $5,151,648.60 |
| Gang, Tyre, Ramer & Brown, Inc.: | $1,084,557.60 |

We have received correspondence from Messrs. Banchek and Toberoff stating that their clients would not accept the payments specified in my March 22, 2013 letter, and from Mr. Ramer advising that Gang, Tyre does not object to DC temporarily withholding payment.  Please

**EXHIBIT 53**
**1758**

O'MELVENY & MYERS LLP
March 29, 2013, Page 2

let me know immediately if any party has changed its position in view of the revised payment amounts specified above.

DC Comics' payment under the Agreement as set forth above is without waiver or prejudice to any of DC Comics' rights or remedies, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

**EXHIBIT 53**
**1759**

# EXHIBIT 54



## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

April 1, 2013

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates PC
22631 Pacific Coast Hwy, #348
Malibu, CA 90265

Bruce Ramer
Gang, Tyre, Ramer & Brown, Inc.
132 S Rodeo Drive
Beverly Hills, CA 90212

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Melvin Banchek
Melvin H. Banchek Co., L.P.A.
55 Public Square, Suite 918
Cleveland, OH 44113

Re:     October 19, 2001 Settlement Agreement Payments

Dear Counsel:

Attached please find DC's accounting statement rendered pursuant to paragraph C.4 of the October 19, 2001 Agreement.  Pursuant to directions from Messrs. Toberoff, Banchek, and Ramer, we are not making payment of the amounts showing as due at this time.

This is without waiver or prejudice to any of DC's rights or remedies, all of which are hereby reserved.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

Enclosure

**EXHIBIT 54**
**1760**

**Superman/Spectre Royalties (through 12/31/12)**

| | |
|---|---:|
| Superman Media Royalty: | $ 4,900,465 |
| Superman Merchandising Royalty: | 10,323,305 |
| Superman Comics & Digital Comics Royalty: | 2,869,049 |
| Superman Licensed Publishing and Toys & Collectibles Royalty: | 2,556,795 |
| Spectre Media Royalty: | 5,820 |
| Spectre Merchandising Royalty: | 0 |
| Spectre Comics & Digital Comics Royalty: | 26,358 |
| Spectre Licensed Publishing and Toys & Collectibles Royalty: | 9,360 |
| **Total Earned Royalties:** | **$ 20,691,152** |
| Non-Recoupable Advances: | 1,250,000 |
| Previously Paid: | (250,000) |
| **Total Amount Due:** | **$ 21,691,152** |

**Payment Shares**

| | |
|---|---|
| Laura Siegel Larson (23.75%) | $ 5,151,648.60 |
| Laura Siegel Larson, Personal Representative of the Estate of Joanne Siegel (47.5%) | $10,303,297.20 |
| Melvin Banchek, Fiduciary of the Estate of Michael Siegel (23.75%) | $ 5,151,648.60 |
| Gang, Tyre, Ramer & Brown, Inc. (5%) | $ 1,084,557.60 |

**EXHIBIT 54**
**1761**

**Siegel Participations**
**For the Period through Dec 2012**

| MEDIA | Category | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 01/12 - 12/12 | Total 2000-2012 | Royalty Share | Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Worldwide Superman Revenues | | | | | | | | | | |
| DC-JLA | Film | - | - | - | - | - | - | - | - | - | - | - | 65,000 | - | 65,000 | 1.5% | 975 |
| Justice League | Film | - | 375,000 | 450,000 | 500,000 | 665,000 | 700,000 | - | 853,000 | 150,000 | 100,000 | 378,000 | - | - | 4,171,000 | 1.5% | 62,565 |
| Superman - DVD | Film | - | - | - | - | - | - | - | - | - | 247,500 | 312,500 | - | - | 560,000 | 6.0% | 33,600 |
| Superman I | Film | - | - | - | - | 45,000 | 351,000 | 578,000 | 220,000 | 153,000 | - | - | - | - | 1,347,000 | 6.0% | 80,820 |
| Superman II | Film | - | - | - | - | 47,000 | 304,000 | 515,000 | 147,000 | 125,000 | - | - | - | - | 1,138,000 | 6.0% | 68,280 |
| Superman III | Film | - | - | - | - | 82,000 | 141,000 | 117,000 | 174,000 | 64,000 | - | - | - | - | 584,000 | 6.0% | 35,040 |
| Superman IV | Film | - | - | - | - | 58,000 | 109,000 | 135,000 | 145,000 | 54,000 | - | - | - | - | 491,000 | 6.0% | 29,460 |
| Superman Returns | Film | - | - | 1,500,000 | 500,000 | 500,000 | 500,000 | 9,739,000 | 2,181,000 | 116,000 | - | 3,225,660 | - | - | 18,261,660 | 6.0% | 1,095,700 |
| Krypto | TV | 250,000 | - | - | - | 28,000 | 67,000 | 95,000 | - | - | - | - | - | - | 388,000 | 6.0% | 23,160 |
| Legion of Superheroes | TV | - | - | - | - | - | - | - | - | - | - | - | - | - | 585,000 | 1.5% | 8,775 |
| Lois & Clark | TV | - | 531,000 | 759,000 | 147,000 | 220,000 | 103,000 | 258,000 | 49,000 | - | - | - | - | - | 2,288,000 | 6.0% | 135,090 |
| Smallville | TV | - | 495,000 | 2,649,000 | 1,556,000 | 6,814,000 | 6,125,000 | 4,648,000 | 4,312,000 | 3,378,000 | 3,559,000 | 3,646,000 | 2,338,000 | 942,000 | 40,462,000 | 6.0% | 2,427,720 |
| Superfriends TV | TV | 233,000 | 2,455,000 | - | - | - | - | - | - | - | - | - | - | - | 2,688,000 | 1.5% | 40,020 |
| Superman TV | TV | - | - | - | - | 5,000 | - | - | - | - | - | - | - | - | 5,000 | 6.0% | 300 |
| Superman-Live | TV | - | - | - | - | - | 2,073,000 | - | - | - | - | - | - | - | 2,073,000 | 6.0% | 124,380 |
| DC Universe MMOG | Games | - | - | - | - | - | - | - | - | - | 398,000 | 425,000 | 5,658,000 | 2,384,000 | 9,127,000 | 1.0% | 91,270 |
| Justice League | Games | - | - | - | - | - | - | - | - | - | - | - | - | 4,000 | 1,802,000 | 1.5% | 27,030 |
| Legion of Superheroes | Games | - | - | - | - | - | - | - | - | - | - | - | - | 7,000 | 218,000 | 1.5% | 3,270 |
| Mortal Kombat vs DC Universe | Games | - | - | - | - | - | - | - | - | - | - | - | - | 115,000 | 1,184,000 | 1.0% | 11,840 |
| Superman DC Comics Core Pro | Games | - | - | - | - | 659,000 | - | 1,503,000 | 401,000 | 878,000 | (19,000) | (180,000) | 735,000 | 1,000 | 7,126,000 | 6.0% | 427,740 |
| Superman Online Gambling | Games | - | - | - | - | - | - | 2,667,000 | (884,000) | 126,000 | 90,000 | (3,109,000) | 468,000 | - | 1,410,000 | 6.0% | 84,600 |
| Superman Returns | Games | - | - | - | - | - | - | - | 625,000 | 6,712,000 | 317,000 | 506,000 | - | - | 1,000 | 6.0% | 60 |
| All Star Superman | Animation | - | - | - | - | - | - | - | - | - | - | - | 195,000 | 76,000 | 271,000 | 6.0% | 16,280 |
| JLA Doom | Animation | - | - | - | - | - | - | - | - | - | - | - | 100,000 | 312,000 | 412,000 | 1.5% | 6,190 |
| Justice League Crisis on Earth 2 | Animation | - | - | - | - | - | - | - | - | - | - | - | 65,000 | 73,000 | 138,000 | 1.5% | 2,070 |
| Superman Animation TV | Animation | - | 360,000 | - | - | 48,000 | - | - | - | - | - | - | - | - | 414,000 | 6.0% | 24,840 |
| Superman Batman Apocalypse | Animation | - | - | - | - | - | - | - | - | - | - | - | 73,000 | 62,000 | 135,000 | 3.0% | 4,050 |
| Superman Batman Public Enemies | Animation | - | - | - | - | - | - | - | - | - | - | - | 51,000 | - | 51,000 | 3.0% | 1,530 |
| Superman Brainiac | Animation | - | - | - | - | - | - | 6,000 | - | - | - | - | - | - | 100,000 | 6.0% | 6,000 |
| Superman Doomsday | Animation | - | - | - | - | - | - | - | - | - | - | - | - | 11,000 | 11,000 | 6.0% | 660 |
| Superman Shazam | Animation | - | - | - | - | - | - | - | - | - | - | - | 13,000 | - | 24,000 | 3.0% | 720 |
| Superman vs The Elite | Animation | - | - | - | - | - | - | - | - | - | - | - | - | 227,000 | 227,000 | 6.0% | 13,620 |
| Young Justice | Animation | - | - | - | - | - | - | - | - | - | - | - | 390,000 | 400,000 | 790,000 | 1.5% | 11,850 |
| **Totals** | | 483,000 | 4,190,000 | 5,358,000 | 2,703,000 | 9,171,000 | 10,800,000 | 20,500,000 | 8,846,000 | 11,869,000 | 4,692,500 | 5,653,160 | 9,680,000 | 4,616,000 | 66,506,660 | | $4,000,466 |

**EXHIBIT 54**

**1762**

Siegel Participations
For the Period through Dec 2012

| Category | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 07/12 - 12/12 | Total 2000-2012 | Royalty Share | Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MERCHANDISING** | | | | | | | | | | | | | | | | | |
| **Domestic Superman Revenue** | | | | | | | | | | | | | | | | | |
| Six Flags Theme Park | Park Fees | 1,875,000 | 1,875,000 | 1,875,000 | 1,875,000 | 1,875,000 | 3,000,000 | 2,625,000 | 2,250,000 | 2,250,000 | 2,250,000 | 2,681,250 | 2,437,500 | 2,437,500 | 29,306,250 | 1.0% | 293,063 |
| DC Justice League of America Co-Pub | Merchandise | | | | | | | | | | 348,000 | 569,000 | 1,534,000 | 1,556,000 | 4,198,000 | 1.5% | 62,970 |
| DC Universe | Merchandise | | | | | | | 120,000 | 8,000 | | | | | | 120,000 | 1.0% | 1,200 |
| Justice League of America (Animation) | Merchandise | | | 436,000 | 2,774,000 | 4,333,000 | 2,985,000 | 2,552,000 | 2,018,000 | 1,131,000 | 1,000,000 | 1,248,000 | 1,156,000 | 1,154,000 | 20,807,000 | 1.5% | 312,105 |
| Krypto | Merchandise | | | | | 206,000 | 400,000 | 86,000 | (68,000) | 410,000 | 5,000 | 11,000 | (6,674) | 6,000 | 1,034,000 | 6.0% | 62,040 |
| Legion of Superheroes | Merchandise | | | | | | | | 78,000 | 20,000 | 6,000 | 1,000 | 8,000 | 8,000 | 18,000 | 6.0% | 1,080 |
| Smallville | Merchandise | | | | | | 5,000 | 5,000 | 38,000 | 20,000 | 5,000 | 1,000 | | | 88,000 | 6.0% | 5,280 |
| Super Friends | Merchandise | | | | | | | | 465,000 | 1,767,000 | 1,518,000 | 4,288,000 | 5,246,000 | 5,869,000 | 19,173,000 | 1.5% | 287,595 |
| Super Pets | Merchandise | | | | | | | | | | | | | 2,000 | 2,000 | 6.0% | 120 |
| Superbaby | Merchandise | | | | | | 10,000 | 4,000 | 33,000 | 50,000 | 163,000 | (12,000) | 15,000 | 15,000 | 100,000 | 6.0% | 6,000 |
| Supergirl | Merchandise | | | | 842,000 | | 38,000 | 237,000 | 129,000 | 524,000 | 64,000 | 798,000 | 605,000 | 264,000 | 2,758,000 | 6.0% | 165,480 |
| Superman Animation | Merchandise | 1,661,000 | 1,521,000 | 1,325,000 | 2,485,000 | 1,350,000 | 119,000 | (125,000) | 310,000 | 665,000 | 3,895,000 | 37,000 | 36,000 | 19,000 | 7,824,000 | 6.0% | 469,440 |
| Superman DC Core Properties | Merchandise | 215,000 | 741,000 | 1,037,000 | | 4,758,000 | 4,498,000 | 12,883,000 | 8,967,000 | 5,232,500 | 3,685,000 | 4,841,000 | 5,444,000 | 4,384,000 | 60,430,500 | 6.0% | 3,625,830 |
| Superman II | Merchandise | | | | | | | | | 8,000 | 2,000 | 388,000 | 11,000 | 118,000 | 528,000 | 6.0% | 31,680 |
| Superman II | Merchandise | | | | | | | | | | | 370,000 | 3,000 | (1,000) | 372,000 | 6.0% | 22,320 |
| Superman Returns | Merchandise | | | | | | | 11,368,000 | 1,758,000 | (493,000) | 84,000 | 145,000 | 155,000 | 22,000 | 13,039,000 | 6.0% | 782,340 |
| Superman-Live | Merchandise | | | | | | | | | | 57,000 | 5,000 | | | 62,000 | 3.0% | 1,860 |
| Young Justice | Merchandise | | | | | | | | | | | 75,000 | 215,000 | (6,000) | 284,000 | 1.5% | 4,260 |
| **Domestic Totals** | | 3,755,000 | 4,137,000 | 4,673,000 | 8,376,000 | 12,522,000 | 11,050,000 | 29,755,000 | 15,986,000 | 11,765,500 | 9,457,000 | 15,461,250 | 16,861,500 | 16,422,500 | 160,217,750 | | 6,134,050 |
| | | | | | | | | | | | | | | | | | |
| **International Superman Revenue** | | | | | | | | | | | | | | | | | |
| DC Justice League Comics | Merchandise | | | | | | | | 74,158 | 199,482 | 280,989 | 478,711 | 1,215,475 | 1,747,000 | 3,995,815 | 1.5% | 59,937 |
| DC Krypto Comics | Merchandise | | | | | | | (751) | 42,016 | 113,094 | 26,661 | 11,443 | 9,474 | 6,000 | 207,337 | 6.0% | 12,440 |
| DC Superbaby Comics | Merchandise | | | | | 162,740 | 260,576 | 113,859 | 100,534 | 161,042 | 115,948 | 104,532 | 199,000 | 307,930 | 6.0% | 18,476 |
| DC Superboy Comics | Merchandise | | | | | | | 55,006 | 387,777 | 595,256 | 645,427 | 1,026,136 | 2,224,000 | 1,200,236 | 6.0% | 72,014 |
| DC Supergirl Comics | Merchandise | | | | | 244,700 | 332,838 | 245,535 | 286,027 | 251,677 | 261,470 | 385,644 | 287,000 | 4,933,602 | 6.0% | 136,479 |
| DC Universe - Manng | Merchandise | | | | | | | 12,280 | | 7,609 | | | 8,604 | | 2,274,891 | 6.0% | 8,604 |
| DC Universe | Merchandise | | | | | | | 189 | 45,926 | (48,994) | | | (31) | | (31) | 1.0% | |
| Justice League Unlimited | Merchandise | | 217,000 | | 1,262,000 | 1,616,000 | 1,789,230 | 2,460,427 | (219) | 1,682,590 | 1,577,370 | 2,017,444 | 1,442,287 | 1,595,000 | 17,776,159 | 1.5% | 266,440 |
| Justice League | Merchandise | | | | | | | | 2,255,810 | 3,160 | 10,193 | 16,700 | 325 | | 38,714 | 1.5% | 38,714 |
| Legion of Superhero | Merchandise | | | | | 8,000 | 4,960 | 204 | 7,136 | 730 | 3,202 | 63,124 | | 1,000 | 17,097 | 6.0% | 17,097 |
| Smallville | Merchandise | | | | | | | | | 91,106 | 6,555 | 6,555 | 12,205 | | 216,991 | 6.0% | 13,020 |
| Superfriends | Merchandise | | | | | | | | | | 1 | | | 44,000 | 17,097 | 6.0% | 1,063 |
| Superman | Merchandise | | | | | | | | | | | | | | 130,892 | 6.0% | 7,805 |
| Superman DC Core Properties | Merchandise | 606,000 | 304,000 | 457,000 | 895,000 | 1,134,000 | 2,569,510 | 4,304,092 | 4,280,858 | 3,076,960 | 2,795,995 | 3,720,854 | 3,571,106 | 5,208,000 | 32,913,575 | 6.0% | 1,974,815 |
| Superman I | Merchandise | | | | | | 28,479 | 1,200,078 | | 2,491 | 548 | 141,625 | 221,857 | (23,000) | 372,000 | 6.0% | 22,320 |
| Superman Returns (2006) | Merchandise | 1,446,000 | 327,000 | 525,000 | 512,000 | 690,000 | 1,155,500 | 608,130 | 6,004,590 | 290,766 | 1,092,228 | 64,513 | 172,436 | 28,000 | 18,794,972 | 6.0% | 1,127,698 |
| Superman Animation | Merchandise | | | | | | 27,410 | 4,712 | 525,757 | 332,663 | (117,263) | 367,230 | 337,059 | | 337,259 | 6.0% | 20,409 |
| Superman-Live | Merchandise | | | | | | | | | | | | | | 35,494 | 6.0% | 2,130 |
| Young Justice | Merchandise | | | | | | | | | | | | 87,000 | 60,000 | 147,000 | 1.5% | 2,205 |
| **International Totals** | | 2,252,000 | 631,000 | 1,199,000 | 2,669,000 | 3,458,000 | 5,954,200 | 19,153,453 | 13,654,164 | 6,575,328 | 6,575,461 | 8,028,477 | 8,574,940 | 11,433,000 | 90,156,022 | | |
| | | | | | | | | | | | | | | | | | |
| **Totals** | | 6,003,000 | 4,768,000 | 5,872,000 | 11,045,000 | 18,980,000 | 17,004,200 | 48,908,453 | 29,640,164 | 18,340,828 | 16,032,461 | 23,489,727 | 25,436,440 | 27,865,505 | 250,373,772 | | 310,323,505 |

**EXHIBIT 54**
**1763**

Siegel Participations
For the Period through Dec 2012

| | Category | | | | | | Worldwide Superman Revenues | | | | | | | | Total 2000-2012 | Royalty Share | Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 01/12 - 12/12 | | | |
| **COMICS AND DIGITAL COMICS** | | | | | | | | | | | | | | | | | |
| **Worldwide Superman** | | | | | | | | | | | | | | | | | |
| **Comics*** | | | | | | | | | | | | | | | | | |
| Superman | Periodicals/GN | 9,957,121 | 8,211,641 | 6,530,401 | 7,398,276 | 10,869,618 | 10,375,764 | 17,106,197 | 15,776,892 | 9,468,652 | 11,502,079 | 12,000,131 | 13,405,787 | 14,541,000 | 147,143,559 | 1.0% | 1,471,436 |
| Superman + Other Characters | Periodicals/GN | 8,786,013 | 10,480,876 | 8,122,954 | 13,465,384 | 23,996,886 | 25,948,969 | 37,073,575 | 35,358,392 | 20,799,168 | 21,519,466 | 21,848,773 | 22,817,163 | 18,244,000 | 268,451,619 | 0.5% | 1,342,308 |
| Publishing - Comics | Periodicals/GN | 18,743,134 | 18,692,517 | 14,653,355 | 20,863,659 | 34,866,504 | 36,324,734 | 54,179,771 | 51,135,285 | 30,267,820 | 33,021,544 | 33,848,904 | 36,222,951 | 32,785,000 | 415,605,178 | | 2,813,744 |
| **Digital Comics*** | | | | | | | | | | | | | | | | | |
| Superman | Digital | | | | | | | | | | | 61,000 | 758,000 | 2,085,000 | 2,904,000 | 1.0% | 29,040 |
| Superman + Other Characters | Digital | | | | | | | | | | | 293,000 | 1,675,000 | 3,285,000 | 5,253,000 | 0.5% | 26,265 |
| Publishing - Digital | Digital | | | | | | | | | | | 354,000 | 2,433,000 | 5,370,000 | 8,157,000 | | 65,305 |
| Totals | | 18,743,134 | 18,692,517 | 14,653,355 | 20,863,659 | 34,866,504 | 36,324,734 | 54,179,771 | 51,135,285 | 30,267,820 | 33,021,544 | 34,202,904 | 38,655,951 | 38,155,000 | 423,762,178 | | 2,889,049 |

*Royalties calculated based on cover price.

**EXHIBIT 54**
**1764**

Siegel Participations
For the Period through Dec 2012

| LICENSED PUBLISHING AND TOYS & COLLECTIBLES | Category | Worldwide Superman Revenues | | | | | | | | | | | | | Total 2000-2012 | Royalty Share | Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 01/12 - 12/12 | | | |
| **Licensed Publishing** | | | | | | | | | | | | | | | | | |
| Superman | Licensed Publishing | 1,684,000 | 186,000 | 685,000 | 581,000 | 236,000 | 155,000 | 1,423,000 | 458,000 | 84,000 | 503,000 | 300,000 | - | - | 6,193,000 | 6.0% | 371,580 |
| Superman/Batman | Licensed Publishing | - | - | - | 339,000 | 15,000 | (7,000) | 3,000 | 13,000 | 168,000 | 11,000 | 12,000 | - | - | 216,000 | 3.0% | 6,450 |
| Justice League | Licensed Publishing | (226,000) | 1,068,000 | 261,000 | 339,000 | 305,000 | 45,000 | 88,000 | 73,000 | 13,000 | 24,000 | 69,000 | - | - | 2,059,000 | 1.5% | 30,885 |
| DC Universe | Licensed Publishing | 12,000 | 467,000 | 88,000 | 330,000 | 238,000 | 238,000 | 239,000 | 164,000 | 584,000 | 194,000 | 548,000 | - | - | 3,491,000 | 1.0% | 34,910 |
| Licensed Publishing | | 1,470,000 | 1,719,000 | 1,034,000 | 1,250,000 | 1,189,000 | 431,000 | 1,753,000 | 708,000 | 849,000 | 732,000 | 929,000 | - | - | 11,559,000 | | $443,825 |
| | | | | | | | | | | | | | | | | | |
| **Toys & Collectibles** | | | | | | | | | | | | | | | | | |
| Superman | Toys | 1,225,000 | 1,787,000 | 2,252,000 | 2,683,000 | 2,797,000 | 1,366,000 | 6,620,000 | 2,484,000 | 858,000 | 325,000 | 2,231,620 | 2,802,321 | 746,000 | 28,397,931 | 6.0% | 1,697,276 |
| Superman/Batman | Toys | - | - | - | 115,000 | 1,300,000 | 765,000 | 2,038,000 | 811,000 | 1,702,000 | 697,068 | 841,396 | 266,000 | 8,535,659 | 3.0% | 256,064 |
| Justice League | Toys | - | 202,000 | 543,000 | 580,000 | 95,000 | 332,000 | 636,000 | 2,746,000 | 1,184,000 | 655,618 | 790,045 | 1,384,000 | 9,154,683 | 1.5% | 137,203 |
| DC Universe | Toys | 55,000 | - | - | 39,000 | | 607,000 | 27,000 | 8,000 | 476,000 | 980,000 | 188,065 | 227,006 | 2,231,071 | 1.0% | 22,311 |
| Toys & Collectibles | | 1,280,000 | 1,989,000 | 2,795,000 | 3,902,000 | 3,007,000 | 3,625,000 | 7,659,000 | 5,166,000 | 4,692,000 | 3,775,000 | 3,861,756 | 4,661,368 | 2,396,000 | 48,509,123 | | $2,112,970 |
| | | | | | | | | | | | | | | | | | |
| Totals | | 2,750,000 | 3,708,000 | 3,829,000 | 4,552,000 | 4,190,000 | 4,056,000 | 9,412,000 | 5,874,000 | 5,741,000 | 4,507,000 | 4,690,756 | 4,661,368 | 2,396,000 | 60,167,123 | | $2,556,795 |

**EXHIBIT 54**
**1765**

**Siegel Participations**
**For the Period through Dec 2012**

| MEDIA | Category | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total 2000-2012 | Royalty Share | Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Worldwide Spectre Revenues | | | | | | | | | |
| The Spectre TV/DEV 2012 | TV | - | - | - | - | - | - | - | - | - | - | - | - | 4,000 | 4,000 | 6.0% | 240 |
| Batman: The Brave & the Bold ep "Chill of the Night" | TV | - | - | - | - | - | - | - | - | - | - | 65,500 | - | - | 65,500 | 3.0% | 1,965 |
| Batman: The Brave & the Bold ep "Goatless in Our Midst" | TV | - | - | - | - | - | - | - | - | - | - | 65,500 | - | - | 65,500 | 3.0% | 1,965 |
| Batman: The Brave & the Bold ep "Crisis: 22,300 Mls Above Earth" | TV | - | - | - | - | - | - | - | - | - | - | - | 55,000 | - | 55,000 | 3.0% | 1,650 |
| Totals | | - | - | - | - | - | - | - | - | - | - | 131,000 | 55,000 | 4,000 | 190,000 | | $5,820 |

Page 5 of 6

**EXHIBIT 54**
**1766**

Siegel Participations
For the Period through Dec 2012

| | Category | 2000 | 2001 | 2002 | 2003 | 2004 | Worldwide Spectre Revenues 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total 2000-2012 | Royalty Share | Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COMICS AND DIGITAL COMICS** | | | | | | | | | | | | | | | | | |
| **Worldwide Spectre** | | | | | | | | | | | | | | | | | |
| **Contact** | | | | | | | | | | | | | | | | | |
| Spectre | Periodicals/GN | - | 839,478 | 545,731 | 353,160 | 17,440 | 93,282 | 412,305 | 101,397 | 11,413 | 9,041 | 12,772 | 10,158 | 83,839 | 2,490,014 | 1.0% | 24,900 |
| Spectre + Other Characters | Periodicals/GN | - | - | - | 291,208 | - | - | 10 | - | - | - | - | - | - | 291,218 | 0.5% | 1,456 |
| Publishing Comics | | - | 839,478 | 545,731 | 644,368 | 17,440 | 93,282 | 412,315 | 101,397 | 11,413 | 9,041 | 12,772 | 10,158 | 83,839 | 2,781,232 | | 26,356 |
| | | | | | | | | | | | | | | | | | |
| Digital Comics* | Digital | - | - | - | - | - | - | - | - | - | - | - | - | 200 | 200 | 1.0% | 2 |
| Spectre | | - | - | - | - | - | - | - | - | - | - | - | - | 200 | 200 | | 2 |
| Digital Comics | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Totals | | 0 | 839,478 | 545,731 | 644,368 | 17,440 | 93,282 | 412,315 | 101,397 | 11,413 | 9,041 | 12,772 | 10,158 | 84,039 | 2,781,432 | | $26,358 |

*Royalties calculated based on cover price.

Page 7 of 8

**EXHIBIT 54**
1767

Siegel Participations
For the Period through Dec 2012

| | Category | Worldwide Spectre Revenues | | | | | | | | | | | | Total | Royalty | Royalty |
| | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2000-2012 | Share | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOYS & COLLECTIBLES | | | | | | | | | | | | | | | | | |
| Spectre | Toys | 69,000 | - | 67,000 | - | - | - | (7,000) | - | - | - | - | - | - | 136,000 | 6.0% | 8,160 |
| Spectre + Other Characters | Toys | - | 47,000 | - | - | - | - | - | - | - | - | - | - | - | 40,000 | 3.0% | 1,200 |
| Totals | | 69,000 | 47,000 | 67,000 | 0 | 0 | 0 | (7,000) | 0 | 0 | 0 | 0 | 0 | 0 | 176,000 | | $9,360 |

Page 8 of 8

**EXHIBIT 54**
**1768**

# EXHIBIT 55



EXHIBIT 55
1769

# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR --



Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

### 10c at all Newsstands

## SPECIAL PRIZES AND AWARDS!

### MORE FUN COMICS

*The National Comics Magazine*

**VINCENT A. SULLIVAN**
Editor

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.
*Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle*











EXHIBIT 55
1770

# EXHIBIT 56

Case 2:04-cv-08400-ODW-RZ    Document 720-10    Filed 04/04/13    Page 105 of 111
Page ID #:18053



EXHIBIT 56
1771

# BRAND NEW!

### AND JUST WHAT YOU'VE BEEN WAITING FOR --



No. 1 — JUNE, 1938

**Action Comics** — 10c

Look for this dandy new magazine filled with original adventure features and pictures in

*Color!*

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

*10c at all Newsstands*

## SPECIAL PRIZES AND AWARDS!

---

## DETECTIVE COMICS

*Vincent A. Sullivan*
Editor

DETECTIVE COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post-Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates, address:

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.
Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle

EXHIBIT 56
1772

# EXHIBIT 57

Case 2:04-cv-08400-ODW-RZ Document 720-10 Filed 04/04/13 Page 108 of 111 Page ID #:18056



EXHIBIT 57
1773

# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR ..



Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

### 10c at all Newsstands

## SPECIAL PRIZES AND AWARDS!

### NEW ADVENTURE COMICS

*The International Picture Story Magazine*

**VINCENT A. SULLIVAN**
*Editor*

NEW ADVENTURE COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For Advertising rates, address.

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N Y
Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle








EXHIBIT 57
1774

# EXHIBIT 58

# BRAND NEW!

## *AND JUST WHAT YOU'VE BEEN WAITING FOR - -*



Look for this dandy new magazine filled with original adventure features and pictures in

### *Color!*

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

### *10c at all Newsstands*

# SPECIAL PRIZES AND AWARDS!

---

## MORE FUN COMICS

*The National Comics Magazine*

---

**VINCENT A. SULLIVAN**

*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.
*Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle*

EXHIBIT 58
1775