# EXHIBIT 65

Case 2:04-cv-08400-ODW-RZ   Document 726-16   Filed 04/04/13   Page 2 of 77   Page ID #:18611

# Texas Oil and Gas Developments

## HOWETH TO START KARNES WILDCAT

### Mar-Tex Also Moving In For Test In Weser Pool

Several interesting wildcats are getting ready to get started in South Texas while some are already making hole.

Roy Howeth and others, No. 1 W. J. Porter, new wildcat test in Karnes County on the Nueces diamond survey north of Chacon, is rigging up to spud in on a 4,000-foot contract. Connected locations is 1,610 feet from the north line and 300 feet from the east line of the tract. It is in the extreme Southwestern part of the Conquest of Texas...

## CRUDE OIL STOCKS SHOW INCREASE

By ALFRED WALL

TULSA, Okla., Feb. 9 (P)—Reports of continued piling up of stocks of refined products, particularly gasoline, gave the oil industry the greatest concern at the end of the first week in February...

## COASTAL FIELDS STAKE NEW WELLS

### Offset Made to Cage Well In San Patricio County

New locations for coastal fields seem the order of the day with less wildcat staked or getting started in nearly all of the electrics fields...

## EAGLE HILL FIELD WELL SETS CASING

## OIL RUNS TO STILLS MUST BE LOWERED

Continued Piling Up Refined Stocks Alarm Oil Men

WASHINGTON, Feb. 9 (P)—The Bureau of Mines reported today stocks of domestic and foreign crude petroleum at the close of the week ended Jan. 29 totaled 277,753,000 barrels, a net increase of 610,000 barrels compared with the previous week. Stocks of domestic oil increased 267,000 barrels for the week and foreign crude decreased 46,000 barrels...

## LIVE OAK WILDCAT IS CORING 800 FEET

## McKINNEY TEST IS CORING 5,590 FEET

## COLORADO WILDCAT DRILLING 5,000 FEET

## OIL SHORTS



## REAL ESTATE TRANSFERS

## CALIFORNIA SUES FOR INDIAN WARD

### Recovery of $54,620 Sought In Behalf of Dixie Joe Keeler



California Debtors Arrive

Roy B. Woolsey, left, and Milton J. Kramer, debating team of the University of California at Los Angeles, will meet Hall Wells and John Leiter of St. Mary's University at 1 p. m. Thursday in Jefferson Senior School Auditorium. They will debate the question of government spending as a stimulant to business. St. Mary's has the affirmative side.

## VITAL STATISTICS

### MARRIAGE LICENSES

### BIRTHS

## GOVERNMENT UNION UNOPPOSED

### Mayor Quin Says He Has No Objection—1,800 Employes Eligible

## Persuasive Ability at Debate Tested

A novel method of judging debate will be used at Jefferson Senior School auditorium this afternoon when the St. Mary's University team meets a team from the University of California at Los Angeles. The choice is scheduled to start at 1 o'clock and the general judging has been reversed...

## MEXICAN FLAG GIVEN SAN ANTONIO CHOIR

## LANDSCAPE PLANS MADE FOR STREET

### D. A. R. Chapter Will Help Beautify Part of Nogalitos

## COMMITTEE TO WAR ON HIGHWAY HAZARDS

## ANOTHER THEFT LAID TO FORMER SOLDIER

## EDDIE CATTAN APPOINTED TAXI INSPECTOR'S AID

## OIL MEN





THE GUMPS—PRINCE CHARMING



IS SUPERMAN LATE?    By JERRY SIEGEL AND JOE SHUSTER



SUPERMAN



EXHIBIT 65 -1839

# EXHIBIT 66

1  Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
E-mail: MToberoff@ipwla.com

5
Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              **UNITED STATES DISTRICT COURT**

8        **CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION**

9

10  JOANNE SIEGEL, an individual; and      Case No. CV 04-08400 SGL (RZx)
LAURA SIEGEL LARSON, an
11  individual,                            [Honorable Stephen G. Larson]

12              Plaintiffs,
                                           **PLAINTIFFS JOANNE SIEGEL**
          vs.                              **AND LAURA SIEGEL LARSON'S**
13                                         **MEMORANDUM OF POINTS**
                                           **AND AUTHORITIES IN**
14  WARNER BROS.                           **SUPPORT OF MOTION FOR**
ENTERTAINMENT INC., a                      **PARTIAL SUMMARY**
15  corporation; TIME WARNER INC., a       **JUDGMENT**
corporation; DC COMICS, a general
16  partnership; and DOES 1-10,
                                           [Complaint filed: October 8, 2004]
17              Defendants.

18                                         Date: ~~TBD~~ July 16, 2007
                                           Time: 10:00 a.m.
19  ─────────────────────────              Place: Courtroom 1

20  DC COMICS,
                                           [Notice of Motion; Statement of
21              Counterclaimant,           Uncontroverted Facts and
                                           Conclusions Of Law; Declaration
22          vs.                            of Marc Toberoff; Request For
                                           Judicial Notice and [Proposed]
23  JOANNE SIEGEL, an individual; and      Order Filed Concurrently
LAURA SIEGEL LARSON, an                    Herewith]
24  individual,

25              Counterclaim Defendants.

26

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT



**EXHIBIT 66**
**1840**

## TABLE OF CONTENTS

I.   INTRODUCTION...................................................................................1

II.  UNDISPUTED FACTS........................................................................3

     A.   Prior Legal Actions........................................................3

     B.   The Creation of Superman...............................................4

     C.   Plaintiffs' Notices of Termination Regarding "Superman"...........6

     D.   The Current Superman Action and Superboy Action.................9

III. LEGAL ANALYSIS.............................................................................10

     A.   Standard of Review........................................................10

     B.   The Recapture Right Under The United States Copyright Act......11

          1.   Recapture Rights Under The Copyright Acts Of 1790
               And 1831.............................................................11

          2.   Recapture Right Under The 1909 Copyright Act............12

          3.   The Termination Rights Under The 1976 Copyright Act....13

          4.   The Termination Right Under The Sonny Bono
               Copyright Term ExtensionAct...................................15

     C.   Defendants Are Bound By The 1947 State Action and 1974
          Federal Action Under *Res Judicata* and Collateral Estoppel.........16

          1.   The Findings of Fact and Conclusions Of Law in the
               1947 Action Have Preclusive Effect............................17

          2.   The Findings And Conclusions In The 1974 Action
               Have Preclusive Effect In This Action.........................20

     D.   Plaintiffs' Duly Exercised Their Termination Right And
          Recaptured Siegel's Joint Copyright Interest In The Original
          Superman Strips............................................................20

          1.   Plaintiffs' Termination Complied with the Copyright Act...20

          2.   Plaintiffs' Own An Undivided Fifty Percent Interest In
               The Copyrights To The Original Superman Strips............23

     E.   Defendants Have A Duty To Account To Plaintiffs For Fifty
          Percent Of The Profits Earned From The Recaptured
          Superman Copyright........................................................24

i

EXHIBIT 66
1841

1         1.    Defendants' Duty To Account Includes Profits Earned In Foreign Territories..............................25

2    F.    Defendants' Alleged Defenses To The Termination Lack Merit..........................................................28

            1.    Action Comics, No. 1 Was Not A Work-Made-For-Hire...28

                a.    "Work for Hire" Under The 1909 Copyright Act....29

                b.    Defendants' "Work For Hire" Claim Is Precluded By *Res Judicata* And Collateral Estoppel..............30

                c.    The Purported Additional Material, To The Extent It Exists, Was Not "Work For Hire".....................32

            2.    The Termination Notice Was Not Required To List The 1948 Consent Judgment...........................33

            3.    The December 23,1975 Agreement Was Unaffected By Defendants Later Payment Of A Pension To Joanne Siegel And, In Any Event, Was Not An Operative "Superman" Grant.....................................37

            4.    Plaintiffs' Ownership Of The Recaptured Superman Copyrights Is Not Barred By The Statute of Limitations....39

                a.    Plaintiffs Complaint Was Filed Within the Purported Statute of Limitations....................39

                 b.    Strong Policies Disfavor Using The Statute of Limitations To Bar Termination Under § 304(c)......41

                c.    Section 507(b) Is Not A Bar To Copyright Ownership..........................................43

    G.    No Agreement Was Consummated By The Parties Regarding Plaintiffs' Recaptured Superman Copyrights Or Recaptured Superboy Copyrights As A Matter Of Law............................45

            1.    The October 19. 2001 Letter Constitutes A Counteroffer That Was Not Accepted By Defendants.....................57

            2.    No Contract Was Formed Because There Was Never A "Meeting Of The Minds" On All Material Terms...........58

            3.    A Complete Written Agreement In Final Form. Signed By Both Parties. Was Clearly Contemplated But Never Completed, Approved Or Executed.........................60

IV.    **CONCLUSION**..................................................62

ii

**EXHIBIT 66**
**1842**

# TABLE OF AUTHORITIES

**CASES**                                                                                        **Page**

*Aalmuhammed v. Lee,*
    202 F.3d 1227, 1231 (9th Cir. 2000)..........................................41

*Allen v. McCurry,*
    449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).....................18

*Anderson v. Liberty Lobby,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).................10

*Berlitz Sch. Of Lang. of Am., Inc. v. Everest House,*
    619 F.2d 211, 215 (2d Cir. 1980)...........................................17

*Bernstein & Co. v. Jerry Vogel Music Co.,*
    221 F.2d 569 (2nd Cir. 1955), *modified,* 223 F.2d 252 (1955)..........25

*Burroughs v. Metro-Goldwyn Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1982).................................................35

*Callie v. Near,*
    829 F.2d 888, 891 (9th Cir. 1987)..........................................59

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)......................................................10,11

*Chase Securities Corp. v. Donaldson,*
    25 U.S. 304, 314, 89 L.Ed. 1628, 65 S.Ct. 1137 (1944)..................45

*Community for Creative Non-Violence,*
    846 F.2d 1485, 1498 (D.C. Cir. 1988).....................................26

*Dead Kennedys v. Biafra,*
    37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999)...............................28

*De Sylva v. Ballantine,*
    351 U.S. 570, 582, 76 S. Ct. 974, 100 L. Ed. 1415 (1956)..............12

*Dolman v. Agee,*
    157 F.3d 708 (9th Cir. 1998)..........................................29,32,33

*EFCO Corp. v. U.W. Marx, Inc.,*
    124 F.3d 394 (2d Cir. 1997)................................................18

*Forward v. Thorogood,*

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1843**

985 F.2d 604, 606-7 (1st Cir. 1993)..............................................30

*Fred Fisher Music Co.* v. *M. Witmark & Sons,*
 318 U.S. 643, 657-59, 63 S. Ct. 773, 87 L. Ed. 1055 (1943) .........12,13

*Fuchsberg & Fuchsberg v. Galizia,*
 300 F.3d 105 (2d Cir. 2002).................................................17

*Gardiner v. A.H. Robins Co.,*
 747 F.2d 1180, 1189 (8th Cir. 1984)........................................59

*Garguili v. Thompkins,*
 790 F.2d 265 (2d Cir. 1986).................................................18

*Gasaway v. Nothwestern Mut. Life Ins. Co.,*
 26 F.3d 957, 960 (9th Cir. 1994)...........................................10

*Goodman v. Lee,*
 1994 U.S. Dist. LEXIS 18468, *11, 13 (E.D. La. 1994)...............27

*Goodman v. Lee,*
 78 F.3d 1007 (5th Cir. 1996) *cert denied* 519 U.S. 861 (1996)........26-7

*Hamilton v. State Farm Fire & Cas. Co.,*
 270 F.3d 778 (9th Cir. 2001)................................................19

*Hampton v. Paramount Pictures Corp.,*
 279 F.2d 100, 104 (9th Cir. 1960), *cert. denied,* 364 U.S. 882 (1960)..44

*In re Pago Pago Air Crash,*
 637 F.2d 704, 706 (9th Cir. 1981)..........................................57

*In re Teltronics Servs., Inc.,*
 762 F.2d 185, 193 (2d Cir. 1985)...........................................17

*Jerome Siegel v. National Periodical Publications, Inc.,*
 364 F. Supp. 1032 (S.D.N.Y. 1973)..................................passim

*Jerome Siegel v. National Periodical Publications, Inc.,*
 508 F.2d 909 (2d Cir. 1974)........................................passim

*Johnson v. Watkins,*
 101 F.3d 792 (2d Cir. 1996)................................................17

*Kamilche Co. v. United States,*
 53 F.3d 1059, 1062 (9th Cir. 1995).....................................17,21

*Klein v. Walston Co.,*
 432 F.2d 936 (2d Cir. 1970)................................................20

iv

**EXHIBIT 66**
**1844**

*Korman v. Iglesias,*
    736 F. Supp. 261, 265 (S.D. Fla. 1990)......................................26

*Lake Nacimento Ranch Co. v. San Luis Obispo,*
    841 F.2d 872, 876 (9th Cir. 1987)................................................11

*Lin-Brook Blders Hrdwre v. Gertler,*
    352 F.2d 298 (9th Cir. 1965)......................................,,,,...............29

*Luckenbach S.S. Co. v. U.S.,*
    312 F.2d 545, 548 (2d Cir.1963).................................................43

*Marvel Characters, Inc. v. Simon,*
    *310* F.3d 280 (2d Cir. 2002)...............................................14,39

*Matsushita Elec. Indus. Co. v. Epstein,*
    516 U.S. 367, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996)....................18

*May v. Morganelli-Heumann & Assoc.,*
    618 F.2d 1363, 1368 (9th Cir.1980)...........................................29

*Mazer v. Stein,*
    347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954)..................16

*Migra v. Warren City Sch. Dist. Bd. of Ed.,*
    465 U.S. 75, 104 S.Ct. 892, 79 L.Ed. 2d 56 (1984)......................17

*Mills Music, Inc. v. Snyder,*
    469 U.S. 153, 185, 105 S. Ct. 638; 83 L. Ed. 2d 556 (1985)......13,14,42

*Montana v. U. S.,*
    440 U.S. 147, 99 S. Ct. 970, 59 L. Ed.2d 210 (1979)...................17

*Morrill v. Smashing Pumpkins,*
    157 F. Supp. 2d 1120, (C.D. Cal. 2001)....................................27

*Morse v. Fields,*
    127 F. Supp. 63 (S.D.N.Y. 1954)..........................................21

*Music Sales Corp. v. Morris,*
    73 F. Supp. 2d 364 (S.D.N.Y. 1999).......................................35

*New Hampshire v. Maine,*
    532 U.S. 742, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)..............19

*N.Y. Times v. Tasini,*
    533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001).......14,42

*Norris v. Grosvenor Mktg. Ltd.,*
    803 F.2d 1281 (2d Cir. 1986).............................................17

*O'Brien v. City of Syracuse,*
    54 N.Y.2d 353 (1981).....................................................18

v

**EXHIBIT 66**
**1845**

*Oddo v. Ries,*
    743 F.2d 630, 633 (9th Cir. 1984)...........................................25-8

*Ozyagcilar v. Davis,*
    701 F.2d 306, 308 (4th Cir. 1983)..............................................59

*Pension Trust Fund for Oper. Engineers v. Triple A Machine Shop, Inc.,*
    942 F.2d 1457 (9th Cir. 1991)..................................................18

*Piantadosi v. Loew's Inc.,*
    137 F.2d 534, 536-537 (9th Cir. 1943)......................................25

*Picture Music, Inc. v. Bourne, Inc.,*
    457 F.2d 1213 (2d Cir. 1972)........................................19,20,26

*Pye v. Mitchell,*
    574 F.2d 476,480 (9th Cir. 1978)..............................................24

*Reilly v. Reid,*
    45 N.Y.2d 24 (1978)................................................................18

*Romer v. Leary,*
    425 F.2d 186, 188 (2d Cir. 1970)..............................................43

*Roth v. Garcia Marquez,*
    942 F.2d 617, 626-627 (9th Cir. 1991)......................................60

*Self-Realization Fellowship Ch. v. Ananda Ch.,*
    206 F.3d 1322 (9th Cir. 2000)..............................................21,29

*Shapiro, Bernstein & Co. v. Jerry Music Co.,*
    223 F.2d 252 (2d Cir. 1955)...........................................26,29,43

*Smith v. BioWorks, Inc.,*
    2007 LEXIS U.S. Dist. 6157 at *27 (ED CA 2007).......................58

*Smith v. Russell Sage College,*
    54 N.Y.2d 185 (1981)............................................................18

*Sony Corp. v. Universal Studios,*
    464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)..............16

*Steinbeck v. McIntosh & Otis, Inc.,*
    *433 F. Supp. 2d 395, 398 (S.D.N.Y. 2006)*..................................14

*Stewart v. Abend,*
    495 U.S. 207, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990)...11,12,14,42

*Stone v. Williams,*
    970 F.2d 1043 (2d Cir. 1992), *cert.denied*, 508 U.S. 906 (1993).......43

vi

**EXHIBIT 66**
**1846**

*Sweet Music, Inc. v. Melrose Music Corp.*,
   187 F. Supp. 655, 659 (S.D. Cal. 1960)..............................24

*Tillman v. Nat. City Bank of N.Y.*,
   118 F.2d 631, 634 (2d Cir. 1941)....................................17

*Twentieth Century Fox Film Corp. v. Entertainment Distrib.*,
   429 F.3d 869 (9th Cir. 2005)........................................29

*Vernitron Corp. v. Benjamin*,
   440 F.2d 105 (2d Cir. 1971).....................................18,20

*Weddington Prods. v. Flick*,
   60 Cal. App. 4th 793, 801 (1998)................................59-61

*Woods v. Dunlop Tire Corp.*,
   972 F.2d 36, 38 (2d Cir. 1992), *cert. denied*, 506 U.S. 1053 (1993).....17

*Yardley v. Houghton Mifflin Co.*,
   108 F.2d 28 (2nd Cir. 1939), cert. denied, 309 U.S. 686.................29

**STATE CASES**

*Apablasa v. Merritt & Co.*,
   176 Cal. App. 2d 719, 726 (1959)...................................57

*Banner Entnm't v. Superior Court*,
   62 Cal. App. 4th 348 (1998).....................................58,59

*Duran v. Duran*,
   150 Cal. App.3d 176, 180 (1983)....................................60

*Durgom v. Janowiak*,
   74 Cal. App. 4th 178, (Cal. App. 4th Dist. 1999).........................28

*Forgeron, Inc. v. Hansen*,
   149 Cal. App. 2d. 352, 360 (1957)...................................60

*Glendale Motor Co. v. Superior Court*,
   159 Cal.App.3d 389 (1984).........................................57

*Grove v. Grove Valve & Reg. Co.*,
   4 Cal. App. 3d. 299, 311-312 (1970)................................58

*In re Marriage of Worth*,
   195 Cal. App. 3d 768, 776 (Cal. App. 1st Dist. 1987)...................27

*Kruse v. Bank of America*,
   202 Cal. App.3d 38, 59 (1988).....................................61

*Landberg v. Landberg*,
   24 Cal.App.3d 742, 750 (1972).....................................57

vii

**EXHIBIT 66**
**1847**

*Meyer v. Benko,*
    55 Cal. App. 3d 937 (1976)..................................................58

*Panagotacos v. Bank of America,*
    60 Cal App 4th 851, 855-856 (1998).................................57

*Patch v. Anderson,*
    66 Cal. App. 2d 63 (1944)................................................60

*Terry v. Conlan,*
    131 Cal. App. 4th 1445, 1460-1 (2005)..............................61

**STATUTES**

Cal. Civ. Code, § 1550....................................................58,59

Cal. Civ. Code § 1565.....................................................58,59

Cal. Civ. Code § 1585........................................................,57

Cal. Civ. Proc. Code § 664.6.................................................61

37 C.F.R. §201.10 (b)(1)(iv)..................................................35

37 CFR § 201.10(e)(1).........................................................36

17 U.S.C. § 24..................................................................12

17 U.S.C. § 26 (repealed)..................................................22,23

17 U.S.C. § 101.............................................................13,24

17 U.S.C. § 106...............................................................16

17 U.S.C. § 203(a).......................................................11,13,15

17 U.S.C. §302(a).............................................................13

17 U.S.C. § 304(b)....................................................11,13,14,16

17 U.S.C. § 304(c)........................................................passim

17 U.S.C. § 304(d)..............................................11,13,14,16,22,23

17 U.S.C. § 507(b)....................................................39-41,43,45

28 U.S.C. § 1738.............................................................18

**MISCELLANEOUS**

*1-3 Corbin on Contracts § 3.36 (2006)*....................................57

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1848**

H.R. Rep. No. 94-1476...................................................................13,14

H. Rep. No. 104-315...................................................................16

H.R. Rep. No. 150, 85th Cong., 1st Sess. 2 (1957)..........................45

*Nimmer On Copyright* § 6.12[B]...................................................25

*Nimmer On Copyright*, § 7.12......................................................21

*Nimmer On Copyright*, § 9.02......................................................12

*Nimmer on Copyright* § 9.11[B] [1]..............................................16

*Nimmer On Copyright*, §11.01[A]..................................................15

*Nimmer on Copyright* § 14.01 [A].................................................28

Sonny Bono Copyright Term Extension Act of 1998...........................16

1 Williston on Contracts (4th ed. 1990) § 4:18, § 4:26.......................60

1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 6, p. 44.......58

ix

**EXHIBIT 66**
**1849**

## I.    INTRODUCTION

1.         Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow
2. and daughter, respectively, of Jerome Siegel ("Siegel"), the co-author of the world
3. renowned comic book hero, "Superman," and the author of "Superboy."  These cases
4. arise out of Plaintiffs' proper exercise of their right under section 304(c) of the 1976
5. United States Copyright Act, 17 U.S.C. § 304(c), to recapture Siegel's original
6. copyrights in "Superman" and "Superboy" by serving statutory notices on the
7. defendants herein ("Defendants") on April 3, 1997 and November 8, 2002,
8. respectively  terminating Siegel's prior grant(s) of "Superman" (the "Superman
9. Termination") and "Superboy" (the "Superboy Termination") to Defendants'
10. predecessor(s).   Plaintiffs' statutory terminations complied with all the requirements
11. of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations promulgated
12. thereunder by the Register of Copyrights.

        On April 16, 1999, the noticed "Superman" termination date, the joint
copyright interest that Siegel had conveyed in "Superman" to Defendants'
predecessors, duly reverted to Plaintiffs, sixty-one years after Siegel's original
conveyance.  On November 17, 2004, the noticed "Superboy" termination date, the
copyrights that Siegel had conveyed in "Superboy" to Defendants' predecessors duly
reverted to Plaintiffs, fifty-six years after Siegel's original conveyance.

        In the "Superboy" action (Case No. 04-8776 SGL (RZx)) Plaintiffs and
Defendants filed cross-motions for partial summary judgment and summary
judgment, respectively.  The Honorable Ronald S.W. Lew denied Defendants' motion
and granted Plaintiffs' motion in its entirety, holding that Plaintiffs' Superboy
Termination is valid and that Plaintiffs thereby recaptured the original "Superboy"
copyrights.  In so holding the Court found that each of Defendants' purported
defenses lacked merit.  Defendants have asserted a number of the same defenses with
respect to the Superman Termination, discussed below.

        Plaintiffs hereby move for partial summary judgment that their statutory

1

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1850**

1   Superman Termination is valid as a matter of law with respect to the original

2   "Superman" comic strips comprising the "Superman" story published in "Action

3   Comics, No. 1," and that Plaintiffs have thereby recaptured Siegel's co-author share

4   of the copyrights therein.

5        Plaintiffs move to dismiss Defendants' First and Second Alternative

6   Counterclaims and parts of their Fifth Alternative Counterclaim, as such relate to

7   Plaintiffs' recapture of Siegel's original "Superman" copyrights, because the defenses

8   alleged therein lack merit.[1]

9        Plaintiffs also seek a ruling that they are entitled to an accounting by

10  Defendants of all profits earned from Plaintiffs' recaptured "Superman" copyrights

11  both in the United States and foreign territories based on "black letter" state law

12  principles entitling co-owners to an accounting of *all* profits as "tenants-in-common."

13       Plaintiffs also move for an order dismissing Defendants' Third and Fourth

14  Alternative Counterclaims on the ground that no binding written agreement disposing

15  of Plaintiffs' recaptured copyrights was ever consummated by the parties in October,

16  2001, or thereafter, as a matter of law.

17       These issues are ripe for summary judgment in Plaintiffs' favor.  There are no

18  material issues of fact because the relevant facts are undisputed or were adjudicated

19  in prior litigations between the parties' predecessors; and Defendants are unable to

20  demonstrate a genuine issue of material fact as to those matters as to which they bear

21  the burden.

22

23

---

24  [1] Defendants allege:  (i) that Action Comics No. 1 is in part excluded from 17 U.S.C. §304(c) as a
purported "work made for hire;" First Amended Counterclaims, Declaration of Marc Toberoff

25  (Toberoff Decl.), Exhibit ("Ex."), R ("FACC"), ¶¶ 132-135; (ii) that a May 19, 1948 consent
judgment, purportedly constitutes a copyright "grant," not specifically listed in Plaintiffs' notices;

26  FACC, ¶¶ 68-69;  (iii) that a December 23, 1975 agreement, purportedly constitutes a copyright
"grant," and although listed in Plaintiffs' respective notice, was somehow effectively reinstated by

27  Plaintiff Joanne Siegel's acceptance of pension benefits from Defendants; FACC, ¶¶ 70-76; (iv) that
the Superman Termination was purportedly not timely served; FACC, ¶¶ 86-89; and (v) that

28  Plaintiffs' Superman Termination is purportedly barred by the statute of limitations.  FACC, ¶¶ 90-
96

2

**EXHIBIT 66**
**1851**

## II.    UNDISPUTED FACTS

### A.    Prior Legal Actions

In 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester (the "1947 Action") against Defendant DC Comics' predecessor, National Comics Publications, Inc. ("National"), to determine the validity of various contracts between Siegel and Shuster and National's predecessors, including Detective Comics, Inc. ("Detective"), pursuant to which National claimed to own "Superman," and to determine ownership of Siegel's "Superboy." *See Jerome Siegel and Joseph Shuster v. National Periodical Publications et al.*, 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508F.2d 909, 912-913 (2nd Cir. 1974)(both the district court and Second Circuit describe the background of the 1947 Action).

Pursuant to stipulation of the parties the action was tried before an Official Referee of the New York Supreme Court, Judge Addison Young ("Judge Young"). *Id*. After trial of the 1947 Action, Judge Young rendered a comprehensive opinion dated November 21, 1947. *Id*. On April 12, 1948, Judge Young signed detailed findings of fact and conclusions of law and rendered an interlocutory judgment from which no appeal was perfected. *Id*. After reviewing considerable documentary and testimonial evidence, Judge Young found that National owned "Superman" pursuant to a written grant dated March 1, 1938 (the "March 31, 1938 Grant") but that Siegel was the sole author and owner of "Superboy." *See* Judge Young's Findings of Fact ("1948 FOF") and Conclusions of Law ("1948 COL") dated April 12, 1948 (collectively, the "1948 Findings"), Toberoff Decl., Ex. B and Request for Judicial Notice ("RJN"), Ex. B.

Settlement negotiations ensued, resulting in a stipulation of settlement by the parties dated May 19, 1948 ( the "May 19, 1948 Stipulation"), and pursuant to the stipulation the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Judgment"). *Siegel,* 364 F. Supp. at

3

1 | 1034-1035; 508 F.2d at 912-913.  *See* Toberoff Decl., Exs. S, T.

2 | In 1969, Siegel and Shuster sought declaratory relief in the U.S. District Court

3 | for the Southern District of New York regarding ownership of the *renewal*

4 | *copyright* to "Superman," resulting on appeal in the Second Circuit's decision in

5 | *Siegel*, *supra*.  The district court and Second Circuit relied upon Judge Young's

6 | opinion, findings of fact, conclusions of law and resultant consent judgment after

7 | settlement of the 1947 Action and held them binding on the parties under the doctrine

8 | of *res judicata*.  Based thereon it was held that National owned the renewal copyright

9 | to "Superman" under the March 31, 1948 Grant.  *Siegel*, F.2d at 912-913.

10 | **B.    The Creation of Superman**

11 | The facts and conclusions set forth below are from the 1948 Findings, the

12 | district court's and Second Circuit's decisions in *Siegel*, *supra*, and/or from

13 | Defendants' First Amended Counterclaims as noted below.

14 | In 1933, Siegel conceived of the original idea of a cartoon strip featuring a

15 | unique man of superhuman powers who would perform feats for the public good.

16 | Siegel called him "Superman."  *Siegel*, 508F.2d at 911; 1948 FOF, fact 9; FACC, ¶ 6.

17 | In or about 1933 Siegel wrote, and the artist, Shuster illustrated and "inked" multiple

18 | "Superman" comic strips intended for publication in a newspaper format, *Siegel*,

19 | 508F.2d at 911, 1948 FOF, Facts 8, 10; FACC, ¶ 7, which consisted of "(a) twenty-

20 | four days (four weeks) of Superman comic strips intended for newspapers (the "1933

21 | Superman Strip"); (b) a seven page synopsis of the last eighteen days (weeks 2-4) of

22 | such strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page

23 | synopsis covering an additional two months of daily [Superman] comic strips; and (e)

24 | fifteen daily comic strips.  FACC, ¶ 7; *see* 1948 FOF, Facts 8, 10.

25 | By 1934, "Superman and his miraculous powers were completely developed

26 | [by Siegel and Shuster]."  *Siegel*, 508F.2d at 911, 914; 1948 FOF, Facts 8-11.

27 | "Superman" was submitted by Siegel and Shuster "to a number of prospective

28 | publishers and newspaper syndicates," but was not accepted for publication.  FACC,

4

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1853**

¶ 8; 1948 FOF, Fact 10.

Meanwhile, from 1935 to 1937, Siegel and Shuster created other comic strips that were published. On or about December 4, 1937, Siegel and Shuster entered into an agreement with Detective (the "December 4, 1937 Agreement") to produce for publication two comic features, "Slam Bradley" and "The Spy." FACC, ¶ 10.

One of the early entities to which Siegel had submitted "Superman" was The McClure Newspaper Syndicate ("McClure"). In or about early 1938, McClure forwarded Siegel and Shuster's 1934 Superman Comic Strip to Detective Comics for potential publication in its contemplated new magazine, "Action Comics." 1948 FOF, Facts 18-19; *see* FACC, ¶ 11.

In early 1938, when Detective Comics expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster "cut and pasted" it into a thirteen page format (the "Re-cut 1933 Superman Strip"), so as to render their newspaper strip more suitable for a magazine publication. *Siegel*, 508 F.2d at 911; 1948 FOF, Facts 17-18, 31-33; FACC, ¶ 11. Siegel and Shuster submitted their Re-cut 1933 Superman Strip to Detective in February, 1938. 1948 FOF, Fact 22. (The 1933 Superman Strip and the Re-cut 1933 Superman Strip are hereinafter collectively referred to as the "Original Superman Strips.")

"In an agreement with [Detective] dated March 1, 1938 [the March 1, 1938 Grant], Siegel and Shuster...transferred to [Detective] ' the strip entitled 'Superman'...and all goodwill attached thereto and exclusive rights to use the characters and story, continuity and title of the strip'" in consideration for $130 ($10 per page for the thirteen page Re-cut 1933 Superman Strip). FACC, ¶ 12; 1948 FOF, facts 24, 25, 32; *see* March 31, 1938 Grant, Toberoff Decl., Ex. E.

The Re-cut 1933 Superman Strip "w[as] in existence...before the execution of the instrument of March 1, 1938." 1948 FOF, Fact 32. The "March 1, 1938 [Grant]...was executed by [Siegel and Shuster] by reason of their desire to see SUPERMAN in print and in order to induce its publication by DETECTIVE

5

**EXHIBIT 66**
**1854**

1  COMICS, INC.": 1948 FOF, Fact 28.

2       Thereafter, Detective published Siegel and Shuster's thirteen page "Re-cut

3  1933 Superman Strip" in the "June, 1938" issue of "Action Comics No. 1," which

4  was first published on April 18, 1938.  1948 FOF, Fact 31; Toberoff Decl., Ex. F.[2]

5       Siegel and Shuster thereafter continued to create "Superman" comic strips

6  which were published by Detective in subsequent periodical issues.  1948 FOF, Fact

7  35.  On September 22, 1938, Siegel and Shuster entered into an agreement with

8  Detective (the "September 22, 1938 Agreement") to produce the "artwork and

9  continuity" for five existing comic strips created by Siegel and Shuster, including

10 "Superman." 1948 FOF, Facts 39, 46; FACC, ¶ 15.

11      Also on September 22, 1938, Siegel and Shuster entered into an agreement

12 with Detective and McClure concerning the use of Superman in newspaper strips (the

13 "McClure September 22, 1938 Agreement").  FACC, ¶ 16.

14      On December 19, 1939, Detective and Siegel and Shuster entered into a

15 supplemental agreement raising Siegel and Shuster's compensation rate for their

16 production of the increasingly popular "Superman" comic strip from $10 to $20 per

17 page (the "December 19, 1939 Agreement"). 1948 FOF, Fact 52; FACC, ¶ 20.

18      On December 23, 1975, Siegel and Shuster entered into an agreement with

19 Warner Communications Inc.("WCI") (the "December 23, 1975 Agreement"), then

20 National's alleged parent company, which re-acknowledged that WCI was the

21 exclusive owner of "Superman," and provided Siegel and Shuster with modest annual

22 payments and finally, credit as the "creators" of "Superman."  FACC, ¶ 30.

23 **C.    Plaintiffs' Notices of Termination Regarding "Superman"**

24      On April 3, 1997, Plaintiffs availed themselves of their legal right under the

---

25 [2] Detective thereafter registered the Action Comics, No. 1 periodical with the Register of
26 Copyrights under copyright registration number B: 379787 in the name of Detective Comics, Inc,
   which was later renewed on June 1, 1965 in the name of National Periodical Publications, Inc.
27 under copyright renewal registration number R: 362187. The copyright in the "Superman" story
   contained in the Action Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of
28 National Periodical Publications, Inc., claiming as proprietor of copyright, under copyright renewal
   registration number R: 362188. *See* Toberoff Decl., Ex. F; 1948 FOF, Fact 31.

1    United States Copyright Act, 17 U.S.C. § 304 (c) ("Section 304(c)"), as Siegel's

2    widow and daughter, respectively, to recapture Siegel's co-authorship share of the

3    copyrights in the Original Superman Strips and other Superman works, by serving a

4    statutory notice of termination on the Defendants that Plaintiffs were terminating the

5    March 1938 Grant.  ("Termination Notice No. 1").  Toberoff Decl., Ex. G.

6        On April 3, 1997, Plaintiffs also served on Defendants separate notices of

7    termination of the following additional agreements, to the extent that any might be

8    construed to contain a grant to any of Siegel's "Superman" works, including the

9    Original Superman Strips:  the December 4, 1937 Agreement (non-applicable)

10   ("Termination Notice No. 2"), the September 22, 1938 Agreement("Termination

11   Notice No. 3"), the McClure September 22, 1938 Agreement ("Termination Notice

12   No. 4"), the 1948 Stipulation ("Termination Notice No. 5"), the December 19, 1939

13   Agreement ("Termination Notice No. 6") and the December 23, 1975 Agreement

14   (non-applicable) ("Termination Notice No. 7"). Toberoff Decl., Exs. H- M.

15   (Collectively, these seven notices of Termination are hereinafter referred to as the

16   "Termination Notices").

17       In particular, Termination Notice No. 2 (re:  December 4, 1937 Agreement)

18   and Termination Notice No. 7 (re:  December 23, 1975 Agreement) were served and

19   filed by Plaintiffs out of an abundance of caution.  *Id.*, Exs. H, M.  The December 4,

20   1937 Agreement did not pertain to "Superman;" and the December 23, 1975

21   Agreement did not contain a grant of copyright in "Superman," and merely

22   acknowledged that Warner already owned all rights in "Superman." *Id.*

23       In each of the Termination Notices, the termination of the grant or potential

24   grant listed in the respective notice (the "Termination(s)") was noticed to take effect

25   on April 16, 1999 (the "Termination Date").  The Termination Notices were each

26   served by Regular Mail, as required, and additionally by Certified Mail, Return

27   Receipt Requested.  *See* 37 C.F.R. § 201.10.  Plaintiffs' Termination duly complied

28   with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the

7

**EXHIBIT 66**
**1856**

1  regulations promulgated thereunder by the Register of Copyrights.

2        Defendants originally acknowledged that the Notices of Termination are

3  effective, and that Plaintiffs thereby recaptured and jointly own the copyright(s) to at

4  least the original "Superman" elements authored by Siegel and Shuster.  On April 16,

5  1997, in response to the April 3, 1997 service of the Notices of Termination, John A.

6  Schulman, Executive Vice President and General Counsel of Defendant Warner Bros.

7  wrote a letter to Joanne Siegel, stating in relevant part:

8        "As to the Notices of Termination, I wasn't surprised at their
         arrival…After the effective date of the termination, there will still
9        remain 14 years of copyright protection left to the joint copyright holders
         of the original Superman elements.  Those are what we should share."
10

11 Toberoff Decl., Ex. O.

12       Defendants similarly acknowledged that they have a duty to account to

13 Plaintiffs for Defendants' exploitation of the original "Superman" copyright(s).  On

14 October 10, 1997, Paul Levitz, President and Publisher of Defendant DC Comics,

15 wrote a letter to Plaintiffs, stating in relevant part:

16       "The [Superman] rights involved are non-exclusive; they are shared with
         DC.  Since both you and DC would have these rights, we would each
17       have the obligation to pay the other for using those rights if you did not
         re-grant them to DC."
18

19 Toberoff Decl., Ex. P.

20       However, two years later, when Defendants' initial overtures to buy-out

21 Plaintiffs had not succeeded, DC sent a letter to Plaintiffs, dated April 15, 1999, *one*

22 *day* before the Termination Date, denying the validity of the Terminations with

23 respect to any "Superman" copyrights.  Toberoff Decl., Ex. Q.

24       Soon thereafter, commencing on or about April 30, 1999, the parties started

25 negotiations of a complex transaction regarding Plaintiffs' joint interest in the

26 "Superman" copyrights.  FACC, ¶ 51.  These discussions eventually broke down,

27 however, and no agreement was consummated.  (For a detailed discussion of this

28 subject see section III. H., below.)

8

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1857**

1    On November 8, 2002, Plaintiffs exercised their right under 17 U.S.C. § 304(c)

2    to recapture Siegel's original copyright in "Superboy" by serving statutory notice on

3    the Defendants herein terminating Siegel's prior grant(s) of "Superboy" to

4    Defendants' predecessor(s) on the noticed termination date of November 17, 2004.

5    *See* FACC ¶ 57. On August 27, 2004, Defendant DC sent a letter refusing to

6    recognize the Superboy Termination and Plaintiffs' statutory recapture rights. FACC,

7    ¶ 64.

8          **D.**    **The Current Superman Action and Superboy Action**

9        On October 8, 2004, Plaintiffs commenced the instant action for declaratory

10   relief as to the validity of the "Superman" Notices of Termination, an accounting and

11   other relief with respect to "Superman" (Case No. 04-8770 SGL (RZx)) (the

12   "Superman Action"). *See* Plaintiffs' First Amended Complaint, Toberoff Decl., Ex.

13   GG. On October 22, 2004, Plaintiffs commenced a related action for declaratory

14   relief, copyright infringement and an accounting regarding the "Superboy" Notice of

15   Termination. (Case No. 04-8776 SGL (RZx))(the "Superboy Action"). *See* First

16   Amended Supplemental Complaint.

17       On March 24, 2006, this Court (the Honorable Ronald S. W. Lew presiding)

18   entered an order in the Superboy Action (the "March 24, 2006 Order") granting

19   Plaintiffs' motion for partial summary judgment and denying Defendants' motion for

20   summary judgment. Toberoff Decl., Ex. U. Judge Lew found that Plaintiffs' notice

21   of termination regarding "Superboy" was valid and that Plaintiffs thereby recaptured

22   Siegel's original "Superboy" copyright on November 17, 2004, the noticed

23   termination date. *Id.*, at 14-15. In so holding, the Court found that Defendants'

24   purported defenses lacked merit. *Id.*, at 8-14. The Court preserved for trial the issue

25   of Defendants infringement of Plaintiffs' "Superboy" copyrights. *Id.*, at 14-16.

26       Defendants thereafter moved for certification/interlocutory appeal of the March

27   24, 2006 Order under 28 U.S.C. §1292(b), which motion was denied by the Court by

28

1    an order entered on May 23, 2006.[3]  Toberoff Decl., Ex. V.

2  **III.    LEGAL ANALYSIS**

3      **A.    <u>Standard Of Review</u>**

4          Plaintiffs are entitled to the entry of summary judgment in their favor if, based

5  on the pleadings and evidence on file, there is no *genuine* issue of *material* fact and

6  Plaintiffs are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Partial

7  summary judgment" where the Court disposes of some but not all claims or issues

8  within a claim, is also permitted.  Fed. R. Civ. P. 56(c), (d).

9          "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will

10  not defeat an otherwise properly supported motion for summary judgment; the

11  requirement is that there be no genuine issue of material fact." *Anderson v. Liberty*

12  *Lobby, Inc.*, 477 U.S. 242, 247-48; 106 S. Ct. 2505, 91 L. Ed. 2d 202

13  (1986)(emphasis in original).  Once Plaintiffs has met its initial burden of

14  demonstrating the absence of a genuine issue of fact, the burden shifts to Defendants,

15  as the non-moving parties, to go beyond the pleadings and "designate 'specific facts

16  showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S.

17  317, 324; 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986); *see Gasaway v. Nothwestern*

18  *Mut. Life Ins. Co.* 26 F.3d 957, 960 (9th Cir. 1994) ("mere allegations or denials" do

19  not meet the non-movants' burden).  To avoid summary judgment the opposing party

20  must also demonstrate a "genuine" issue of "material" fact on all matters as to which

21  it bears the burden of proof.  *Celotex*, 477 U.S. at 324; *see Lake Nacimento Ranch*

22  *Co. v. San Luis Obispo*, 841 F.2d 872, 876 (9th Cir. 1987).  If Defendants do not meet

23  these burdens summary judgment must be granted in Plaintiffs' favor.

24          The instant motion presents a classic example of an issue of law that is ripe for

25  summary judgment; namely the validity of Plaintiffs' Termination under 17 U.S.C. §

26

27  ───────────────
    [3] Judge Lew took senior status and recused himself, whereupon this case was re-assigned to the

28  Honorable Stephen G. Larson.  Defendants seized this as an opportunity to improperly *re-argue* the
    parties' motions for summary judgment and Defendants' motion for certification in a purported
    "motion for reconsideration" of both of Judge Lew's orders, which motion is pending.

**EXHIBIT 66**
**1859**

1  304(c) and Plaintiffs' recapture, at a minimum, of the Original Superman Copyrights.

2  There are no material issues of fact because the relevant facts are undisputed or were

3  previously adjudicated in the 1974 Action and/or the 1947 Action, and Defendants

4  can not meet their burden as to their purported defenses to the terminations.

5  **B.    The Recapture Right Under The United States Copyright Act**

6      The importance and legislative purpose of the current Copyright Act's

7  termination provisions at issue herein (17 U.S.C. § 304(c)) are best understood by

8  reviewing the policies underlying its enactment and the predecessor provisions which

9  led up to it.  For over two centuries, the United States Copyright Act has consistently

10  provided authors and their families with the right to regain previously transferred

11  copyright interests.  Over time, Congress strengthened and enhanced such "recapture"

12  rights to protect authors and their heirs so as to enable them to realize the enhanced

13  value of an authors' copyrighted work.  *See Stewart v. Abend*, 495 U.S. 207, 219, 110

14  S. Ct. 1750, 109 L. Ed. 2d 184 (1990), *quoting* M. Nimmer & D. Nimmer, *Nimmer*

15  *On Copyright* (hereinafter, *"Nimmer On Copyright"*), § 9.02.  These protections

16  culminated in the current Copyright Act's termination provisions.  17 U.S.C. §§

17  203(a), 304(c) and 304(d).

18      **1.    Recapture Rights Under The Copyright Acts Of 1790**

19          **And 1831**

20      The initial copyright statute, the Copyright Act of 1790 (the "1790 Act"),

21  provided two separate copyright terms, an initial and renewal term of 14 years each.

22  *See* 1 Stat. 124; *Stewart*, 495 U.S. at 217.  Under the 1790 Act, authors and families

23  were permitted during a copyright's renewal term to recapture copyrights assigned

24  away during their initial term.  *Id.*

25      In the Copyright Act of 1831 (the "1831 Act"), Congress strengthened the

26  renewal/recapture right under the 1790 Act.  *See* 4 Stat. 436.  In so doing, it

27  recognized the right of authors and their families to recover copyrights during the

28  renewal term that had been previously sold to enable "the author, originally in a poor

11

**EXHIBIT 66**
**1860**

1  bargaining position, to renegotiate the terms of the grant once the value of the work

2  had been tested." *Stewart*, 495 U.S. at 217.  The 1831 Act also prohibited authors

3  from assigning away their spouse's or children's renewal rights.  *Id.*; *see* 4 Stat. 436.

4  "The evident purpose of the [renewal provision] is to provide for the family of the

5  author after his death."  *Stewart*, 495 U.S. at 217, *quoting De Sylva v. Ballantine*, 351

6  U.S. 570, 582, 76 S. Ct. 974, 100 L. Ed. 1415 (1956).

7         The renewal term was intended as a new grant reverting to the author at the end

8  of the initial term.  In fashioning the renewal term Congress was aware that authors

9  had relatively little bargaining power and often sold or assigned their copyrights to

10  publishers for small sums just to get their works published.  The renewal term was

11  intended to protect authors who may have struck imprudent bargains and to allow

12  them to realize a portion of the true economic value of their work.  *Stewart* at 217-20;

13  *see also Nimmer On Copyright*, § 9.02.

14         **2.    Recapture Right Under The 1909 Copyright Act**

15         The Copyright Act of 1909 ("1909 Act") continued the renewal system and

16  increased both the initial and renewal terms from 14 to 28 years.  *See* 17 U.S.C. § 24;

17  H.R. Rep. No. 2222, 60th Congress, 2d Sess., 14 (1909).  However, unlike the 1831

18  Act, the 1909 Act did not expressly prohibit authors from signing away their spouse's

19  or children's renewal rights.  As a result, some publishers used their superior

20  bargaining position to force authors, their spouses and children, to assign to them

21  their renewal rights long before such rights vested.  This practice of "contracting

22  around" the renewal rights was controversial until the Supreme Court in *Fred Fisher*

23  *Music Co.* v. *M. Witmark & Sons*, 318 U.S. 643, 657-59, 63 S. Ct. 773, 87 L. Ed.

24  1055 (1943), held that the renewal copyright expectancy could be assigned during the

25  initial term, before the renewal copyright vested.

26         The legislative purpose of the renewal term was thereby effectively gutted by

27  *Fred Fisher, supra.  See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185, 105 S. Ct.

28  638; 83 L. Ed. 2d 556 (1985) (White, J., dissenting) (*Fred Fisher* "substantially

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1861**

1  thwarted" Congress' goal of protecting authors through copyright recapture). After

2  *Fred Fisher*, publishers routinely insisted that authors assign *both* the initial and

3  renewal copyrights in their initial grants, effectively eliminating the intended benefits

4  to authors and their families of the renewal copyright plan. *Stewart*, 495 U.S. at 219.

### 3.    The Termination Rights Under The 1976 Copyright Act

6    On January 1, 1978, the Copyright Act of 1976 went into effect, and with it

7  major changes to U.S. copyright law that significantly affected the rights of author's

8  and their families. 17 U.S.C. § 101 *et seq.* (1978). The 1976 Act extended the

9  renewal term from 28 to 47 years for works, such as the early "Superman" works,

10  that were in their renewal term on January 1, 1978 when the 1976 Act took effect. 17

11  U.S.C. § 304(a). Congress intended to give the benefit of the 19 additional years of

12  copyright protection to authors and their families rather than to grantees, for whom

13  the automatic grant of the extended term would have constituted an unjustified

14  windfall. *See* H.R. Rep. No. 94-1476 ("H. R. Rep."), at 140 (1976).

15    To that end, Congress coupled the term extension with a *new* right, at issue in

16  this case, of authors and their statutory heirs (principally spouse, children and

17  grandchildren) to terminate transfers of rights in a copyright's renewal term,

18  provided that the grant was "executed before January 1, 1978," *i.e.,* before the 1976

19  Act went into effect. 17 U.S.C. § 304(c).[4]    The termination clause provides in

20  pertinent part:

21    "In the case of any copyright subsisting in either its first or renewal term on

22  January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal

23  copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise

24  than by will, is subject to termination under the following conditions:..."

[4] A closely related termination provision governs works copyrighted after January 1, 1978. *See* 17
U.S.C. § 203(a). Sections 203 and 304 are structurally parallel but diverge in some particulars. For
works copyrighted after January 1, 1978, Congress established the copyright term as the life of the
author plus 50 years (later extended for another 20 years). *See* 17 U.S.C. §302(a) (1982). Congress
also allowed the author or the author's surviving family members to terminate any license 35 years
after any grant. *See* 17 U.S.C. § 203(a). Thus, for both existing and future copyrights, Congress
granted authors and their family members the right to terminate any grant after a period of time in
order to recapture the author's copyright.

13

**EXHIBIT 66**
**1862**

1   17 U.S.C. §§ 304(c) and 304(c)(5).

2        As the Supreme Court noted in *Mills Music*, 469 U.S. at 173: "The principal

3   purpose of... § 304 was to provide added benefits to authors... More particularly, the

4   termination right was expressly intended to relieve authors of the consequences of ill-

5   advised and unremunerative grants..." *Mills Music*, 469 U.S. at 172-73 *citing* H.R.

6   Rep. No. 94-1476, at 124 (1976).  In devising Section 304(c), Congress recognized

7   that authors commonly agree to one-sided copyright grants that publishers with far

8   greater bargaining power design to be as expansive as possible in exchange for as

9   little payment as possible.  H.R. Rep. at 124.  The results are often supremely unfair,

10  as when a work proves financially successful for many years, but enriches only the

11  grantee and not the author or the author's family.

12        Indeed, the Supreme Court recently recognized the overall intent of the 1976

13  Act to "enhance the author's position" and to adjust "the author/publisher balance,"

14  emphasizing the "inalienable authorial right to revoke a copyright transfer." *N.Y.*

15  *Times v. Tasini*, 533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001) ; *see*

16  *also Stewart*, 495 U.S. at 230 ("[1976 Act] provides an inalienable termination

17  right"); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (settlement

18  agreement cannot bar termination right); *Steinbeck v. McIntosh & Otis, Inc.*, 433 F.

19  Supp. 2d 395, 398 (S.D.N.Y. 2006).

20        The termination right lies in stark contrast to ordinary contract principles, as it

21  empowers authors and their statutory heirs to terminate grants of copyright *without*

22  *cause*, regardless of the contracting parties' promises, intent or the assignee's

23  expectations at the time the grant was made.  17 U.S.C. §304(c)(5).

24        In creating the new termination right, Congress directly addressed the

25  inequities caused by *Fred Fisher* and sought to prevent the future erosion of the right

26  of an author and his family to regain the copyright to an author's original work.

27  Thus, in further abrogation of "freedom of contract" principles, Congress clarified

28  that the termination right cannot be waived, cancelled or contracted around, and that

1   "[t]ermination of the grant may be effected notwithstanding any agreement to the

2   contrary." 17 U.S.C. § 304(c)(5) (works copyrighted before January 1, 1978); *see* 17

3   U.S.C. § 203(a)(1) (identical for authors' grants executed after January 1, 1978).

4       To further protect authors and heirs against a repetition of *Fred Fisher*,

5   Congress specified that the termination right or interest may not be assigned away

6   until exercised by service of a notice of termination. *See* 17 U.S.C. § 304(c)(6)(B)

7   ("[a] further grant, or agreement to make a further grant, of any right covered by a

8   terminated grant is valid only if it is made after the effective date of termination…[or

9   as to] the original grantee or such grantee's successor in title, after the notice of

10  termination has been served…").  Once a prior copyright grant is terminated, an

11  author's statutory heirs may grant their recaptured copyright to whomever they wish,

12  fulfilling the purpose to provide such heirs with an opportunity to realize the

13  enhanced value of such copyrights. *Nimmer On Copyright*, §11.01[A].

14      At the same time, the 1976 Act reflected "a practical compromise that [would]

15  further the objectives of the copyright law while recognizing the problems and

16  legitimate needs of all interests involved." H.R. Rep. at 124.  Thus, termination

17  under Section 304(c) is not "automatic." *Id.*  Rather, authors and their statutory heirs

18  are only permitted to terminate such grants during a five year window beginning

19  fifty-six years after copyright had originally been secured in order to "recapture" the

20  copyright for the extended renewal term. 17 U.S.C. § 304(c)(3).  Termination is

21  carried out by serving "advance notice" of the termination "not less than two or more

22  than ten years before" its effective date. 17 U.S.C. § 304(c)(4)(A).

23          4.      **The Termination Right Under The Sonny Bono**

24                  **Copyright Term Extension Act**

25      In 1998, Congress re-affirmed their objectives with respect to the 1976 Act's

26  termination provisions.  The Sonny Bono Copyright Term Extension Act of 1998

27  ("CTEA"), effective October 27, 1998, extended the term of protection for works

28  created prior to January 1, 1978 from 75 to 95 years. 17 U.S.C. § 304(b).  As with

15

**EXHIBIT 66**

**1864**

the 1976 Act's original term extension, Congress intended this unforeseen term extension as a benefit to authors and their families, not as a windfall for grantees or their successors. Congress therefore once again coupled the extended term with a termination right for authors and their families, provided they had not exercised their termination right under Section 304(c). 17 U.S.C. § 304(d). *See* S. Rep. No. 104-315, at 22-23 (1996); *Nimmer on Copyright* § 9.11[B] [1].

The economic philosophy behind our copyright law is the conviction that the public welfare is advanced by providing economic incentives to authors to exercise their creative talents. *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Sony Corp. v. Universal Studios*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Congress provided this incentive by giving authors and thereafter, their immediate family, exclusive copyrights to their work and the ability to market those rights. 17 U.S.C. §106. When Congress' reversionary renewal scheme was thwarted, it carefully fashioned the 1976 Act's termination provisions and subsequently CTEA's termination provisions to cure the inequities caused by *Fred Fisher*, "level the playing field" and promote the economic interests of authors. 17 U.S.C. §§304(c),(d).

C. **Defendants Are Bound By The 1947 State Action and 1974 Federal Action Under *Res Judicata* and Collateral Estoppel**

It is well established that the findings in a prior litigation are binding on the parties or their successors in a subsequent litigation involving the same facts under the doctrines of *res judicata* and/or collateral estoppel. *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995). Strong policies favor repose and the finality of prior litigation on the merits. *Res judicata* and collateral estoppel protect litigants against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. U.S.*, 440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979). In light of these policies, preclusion is not to be applied in an

16

**EXHIBIT 66**
**1865**

1    overly technical manner. *Tillman v. Nat. City Bank of N.Y.*, 118 F.2d 631, 634 (2d

2    Cir. 1941).

3         For preclusion purposes, the true identity of the facts surrounding an

4    occurrence constitutes the cause of action, not the legal theory upon which a party

5    chooses to frame his complaint. *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d

6    Cir. 1992), *cert. denied*, 506 U.S. 1053 (1993). *See Berlitz Sch. Of Lang. of Am., Inc.*

7    *v. Everest House,* 619 F.2d 211, 215 (2d Cir. 1980)("When the factual predicate upon

8    which claims are based are substantially identical, the claims are deemed to be

9    duplicative for purposes of *res judicata*"); *In re Teltronics Servs., Inc.*, 762 F.2d 185,

10   193 (2d Cir. 1985)("New legal theories do not...defeat *res judicata*").

11        "Collateral estoppel prevents a party from re-litigating an issue decided against

12   that party in a prior adjudication" in which that party had a "'full and fair

13   opportunity'" to litigate. *Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 109 (2d

14   Cir. 2002), *quoting Johnson v. Watkins,* 101 F.3d 792, 794-95 (2d Cir. 1996) and

15   *Schwartz v. Pub. Adm'r,* 24 N.Y.2d 65, 71 (1969). Preclusion applies to issues raised

16   as well as to issues that could have been raised at the time of the earlier action.

17   *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed.

18   2d 56 (1984). The preclusive effect also extends to issues not specifically addressed,

19   but which "by necessary implication . . . [are] contained in that which [was] explicitly

20   decided." *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986).

21        1.    **The Findings of Fact and Conclusions Of Law in the 1947**

22              **Action Have Preclusive Effect**

23        The Full Faith and Credit Act, 28 U.S.C. § 1738, commands that a federal

24   court must accord a state court's resolution of claims and issues the same preclusive

25   effect as would be accorded in the rendering court. *See Matsushita Elec. Indus. Co.*

26   *v. Epstein*, 516 U.S. 367, 369, 116 S. Ct. 873, 878, 134 L. Ed. 2d 6 (1996); *Allen v.*

27   *McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).

28        Both parties agree that the preclusive effect of the 1947[New York]Action is

17

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**

**1866**

1    determined under New York law. *See Pension Trust Fund for Oper. Engrs v. Triple*
2    *A Mach. Shop, Inc.*, 942 F.2d 1457, 1464-1465 (9th Cir. 1991). New York has
3    adopted a transactional approach to the doctrine of *res judicata* or claim preclusion.
4    *Garguili v. Thompkins*, 790 F.2d 265, 269 (2d Cir. 1986). If a subsequent claim
5    arises from the same "factual grouping" as a previously resolved claim, the
6    subsequent claim is barred regardless of whether the two suits are based on different
7    legal theories or seek different remedies. *Smith v. Russell Sage College*, 54 N.Y.2d
8    185, 192 (1981); *Reilly v. Reid*, 45 N.Y.2d 24, 29-30 (1978); *EFCO Corp. v. U.W.*
9    *Marx, Inc.*, 124 F.3d 394, 397 (2d Cir. 1997). In New York "once a claim is brought
10   to a final conclusion, all other claims arising out of the same transaction or series of
11   transactions are barred..." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981).
12       The 1948 Findings, **as later argued by National**, were held to be binding on
13   the parties' predecessors with respect to "Superman" under *res judicata* and collateral
14   estoppel principles by the Southern District of New York and the Second Circuit in
15   the federal *copyright* action, *Siegel v. National Periodical Publ., et al.*, 364 F. Supp.
16   1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909, 912-13 (2d Cir. 1974).
17   Toberoff Exs. S, T.
18       The *Siegel* district court explicitly relied on the 1948 findings of fact in holding
19   that the 1948 Action was *res judicata* as to National owning the "Superman" renewal
20   copyright. 364 F. Supp. at 1035-1036 ("The findings of the State Supreme Court in
21   the Westchester action are binding on us here."), *citing Vernitron Corp. v. Benjamin*,
22   440 F.2d 105, 108 (2d Cir. 1971); and also quoted and gave preclusive effect to the
23   1948 conclusions of law. 364 F. Supp. at 1035-1036; Toberoff Decl., Ex. S.
24       The Second Circuit, in affirming the district court's decision, likewise *quoted*
25   Judge Young's first conclusion of law ("[b]y virtue of the instrument of March 1,
26   1938...Detective Comics, Inc. became the absolute owner of the comic strip
27   Superman"), *Siegel*, 508 F.2d at 912; and delved into the heart of the case: "the state
28   court action determined that the agreements conveyed *all* of the plaintiffs'

18

**EXHIBIT 66**
**1867**

1    rights...Under the doctrine of *res judicata* we are not free collaterally to re-examine

2    the agreements to determine whether the construction placed on them was

3    warranted." *Id.* at 913. "The state court...construe[d] these instruments...[and] that

4    decision is binding on us here." *Id.*

5          Defendants' predecessor, National, emphatically claimed in *Siegel* that the

6    1948 Findings were strictly binding under *res judicata* or collateral estoppel

7    regarding its *federal* claim that it owned the *renewal copyright* in "Superman," even

8    though this copyright issue was *not* addressed in the 1948 state action:

9          "It should be noted that application of the doctrines of *res judicata* and
         *collateral* estoppel here is not only proper but based on good reason.

10         There is little about the underlying facts and transactions that can be
         supplied by testimony of witnesses decades after the events and almost

11         twenty-six [now fifty-nine] years after the prior litigation"

12   *See* National's Appellate Brief, p. 12 *citing Picture Music, Inc. v. Bourne, Inc.* 314 F.

13   Supp. 640, 652 (S.D.N.Y. 1970), *aff'd* 457 F.2d 1213 (2d Cir. 1972), *cert. den.* 409

14   U.S. 997 (1972); *see also* pp. 2-3, 6-14, Toberoff Decl, Ex. W; March 24, 2006 Order

15   at 6-7, Toberoff Decl, Ex. U.

16         Defendants, after benefiting enormously from the *Siegel* holding for over thirty

17   years, are judicially estopped from taking inconsistent positions in this action

18   regarding the preclusive effect of the 1948 Findings. *Hamilton v. State Farm Fire &*

19   *Cas.*, 270 F.3d 778, 782 (9th Cir. 2001); *New Hampshire v. Maine*, 532 U.S. 742, 749

20   (2001). *See* March 24, 2006 Order at 6:21-24, Toberoff Decl, Ex. U.

21         The 1948 Findings of Judge Young, nine years after the events in question,

22   provide "a much more reliable index of the truth" than anything that can be mustered

23   by Defendants today. *See Picture Music,* 314 F. Supp. at 652. "The subsequent

24   [preclusive] effect...is a result which should be welcomed to avoid the task of

25   reconsidering issues that have already been settled by another competent tribunal."

26   *Vernitron Corp. v. Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971), *cert. denied*, 402 U.S.

27   987, 29 L. Ed. 2d 154, 91 S. Ct. 1664 (1971), *citing Klein v. Walston Co.*, 432 F.2d

28   936 (2d Cir. 1970). There is little about these underlying facts that can be supplied

**EXHIBIT 66**
**1868**

1  by new testimonial evidence.  Siegel is no longer alive and the majority of those who

2  dealt with "Superman" at the time of its creation by Siegel and Shuster are also dead.

3      On summary judgment in the Superboy Action, Judge Lew thus held that the

4  1948 Findings had preclusive effect:

5         Having relied on Judge Young's findings for previous favorable

6         determinations regarding Superman, Defendants now take the inconsistent position that this Court is not bound by the state court

7         findings ... Defendants attempt to raise genuine issues of material fact, where the facts were clearly determined by Judge Young after the

8         opportunity to take evidence and hear testimony on that evidence from the parties directly involved in creating this relationship.

9         Contrary to Defendants' assertions now, both the Southern District of

10        New York and the Second Circuit looked directly to, even citing to, Judge Young's findings of facts.  This Court holds that it is consistent to

11        continue this position and will look to Judge Young's findings as binding where relevant ... [T]his Court in keeping a consistent position

12        with the previous litigation holds that Judge Young's findings of fact have preclusive res judicata and collateral estoppel effect on this Court.

13 March 24, 2006 Order, at 7, Toberoff Decl., Ex. U.

14         **2.**    **The Findings And Conclusions In The 1974 Action Have**

15               **Preclusive Effect In This Action**

16     The federal copyright action between the parties predecessors, *Siegel v.*

17 *National Periodical Publ., et al.,* 364 F. Supp. 1032, (S.D.N.Y. 1973), *aff'd* 508 F.2d

18 909 (2d Cir. 1974) held that "Superman" as originally published in Action Comics,

19 No. 1 was <u>not</u> a "work made for hire" under the 1909 Copyright Act, and that Siegel

20 and Shuster transferred to National, *all* rights to "Superman," including the renewal

21 copyright, in the March 1, 1938 Grant.  The Second Circuit decision clearly has

22 preclusive effect under the doctrines of *res judicata* and collateral estoppel, where

23 relevant to the parties' "Superman" claims and defenses herein.  *Kamilche*, 53 F.3d at

24 1062.

25     **D.**    **Plaintiffs' Duly Exercised Their Termination Right And Recaptured**

26         **Siegel's Joint Copyright Interest In The Original Superman Strips**

27         **1.**    **Plaintiffs' Termination Complied with the Copyright Act**

28     Plaintiffs fully satisfied the requirements for statutory termination set forth in

**EXHIBIT 66**
**1869**

1    17 U.S.C. § 304(c) ("Section 304(c)"):

2    • Section 304(c) applies to "any copyright ... subsisting in its renewal term on

3    the effective date of the [1976 Act]." 17 U.S.C. § 304(c). Copyright in "Superman"

4    subsisted in its renewal term on the effective date of the 1976 Act, January 1, 1978.

5    It is undisputed that Siegel and Shuster's Original Superman Strips were published in

6    the serialized magazine, Action Comics, No. 1, for which copyright was first secured

7    on April 18, 1938, when Action Comics, No. 1 was first published with a copyright

8    notice. Toberoff Decl., Ex. F; see Copyright Act of 1909, § 10 ("Any person entitled

9    thereto by this title may secure copyright for his work by publication thereof with the

10   notice of copyright required by this title...."). The blanket copyright to the Action

11   Comics, No. 1 periodical was thereafter registered with the Register of Copyrights

12   under copyright registration number B: 379787 in the name of Detective Comics, Inc,

13   and renewed on June 1, 1965 in the name of National Periodical Publications, Inc.,

14   claiming as proprietor of copyright, under copyright renewal registration number R:

15   362187. Id.[5] The copyright in the story entitled "Superman" contained in the Action

16   Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of National

17   Periodical Publications, Inc., claiming as proprietor of copyright, under copyright

18   renewal registration number R: 362188. See Toberoff Decl., Ex. F; 1948 FOF, Fact

19   31.

20   • Section 304(c) applies only to transfers or licenses "executed before January

21   1, 1978," by the author, the author's surviving spouse, children (or certain other

22   designated persons). 17 U.S.C. § 304(c). The principal March 1, 1938 Grant and

23   other agreements (to the extent applicable) which were terminated by Plaintiffs were

24

25   [5] The statutory copyright in this collective periodical (Action Comics, No. 1) secures the statutory copyright in its component part – the Original Superman Strips. See Self-Realization Fellowship

26   Church v. Ananda Church, 206 F.3d 1322, 1329 (9th Cir. 2000) (a blanket copyright on a periodical protects its constituent parts); Morse v. Fields, 127 F. Supp. 63, 64-65 (SDNY 1954) (publication in

27   a collective work will secure a copyright in all component parts); see also 2-7 Nimmer on Copyright § 7.12 ("The rule with respect to collective works under the 1909 Act...provided that a single notice

28   in the name of the copyright owner of the collective work was sufficient to protect each contribution contained therein.").

21

**EXHIBIT 66**
**1870**

1  all pre-1978 instruments. No post-1978 grant of "Superman" by Siegel or his heirs

2  exists and none has been alleged by Defendants.

3        • Section 304(c) allows termination by the author's "widow" and "surviving

4  children" which together own and are entitled to exercise more than one-half of the

5  author's termination interest under the statute.  17 U.S.C. §304(c)(1) and (c)(2)(A)

6  and (B).  Plaintiff Joanne Siegel is the author Siegel's widow and she therefore owns

7  fifty percent (50%) of Siegel's termination interest.  17 U.S.C. §304(c)(2)(A); FACC,

8  ¶ 2.  Plaintiff Laura Siegel Larson is one of Siegel's two children, and she therefore

9  owns twenty-five (25%) of Siegel's termination interest.  17 U.S.C. §304(c)(2)(A);

10  FACC, ¶ 3.  Together Plaintiffs own and constitute the more than one-half of Siegel's

11  termination interest required to effect the Termination.  17 U.S.C. § 304(c)(1).

12        • Section 304(c) requires the termination notice to "state the effective date of

13  termination, which shall fall within the five-year period" "beginning at the end of 56

14  years from the date copyright was originally secured," 17 U.S.C. §§ 304(d)(1),

15  (c)(4)(A), and requires that the termination notice be "served not less than two or

16  more than ten years" before the effective date of termination.  17 U.S.C. §

17  304(c)(4)(A).  Accordingly, Plaintiffs would have had to serve notice of termination

18  on or before April 19, 1997 to comply.  Service of the Termination Notices took

19  place on April 3, 1997 by First Class Mail, postage pre-paid (per 37 C.F.R. § 201.10

20  (d)) and, in addition, by Certified Mail, Return Receipt Requested, which April 3,

21  1997 service date is "not less than two or more than ten years" before the effective

22  April 16, 1999 Termination Date.  Toberoff Decl., Exs.G-N; 17 U.S.C. §

23  304(c)(4)(A).  Plaintiffs' Termination Notice stated the date of termination, April 16,

24  1999, which fell within the proper time-frame from the date the copyright was

25  originally secured on April 18, 1938. *Id.*; 17 U.S.C. §§ 304(d)(1), (c)(4)(A).

26        • Section 304(c) requires that a copy of the termination notice be "recorded in

27  the Copyright Office before the effective date of termination," 17 U.S.C. §

28  304(c)(4)(A), and that it comply "in form, content, and manner of service, with

22

**EXHIBIT 66**
**1871**

1  requirements that the Register of Copyrights shall prescribe by regulation," 17 U.S.C.

2  § 304(c)(4)(B).  Plaintiffs' Termination Notices were recorded in the Copyright

3  Office on February 2, 1998, well before the April 16, 1999 Termination Date

4  (Toberoff Decl., Ex. F); and the notice fully complied with 37 C.F.R. § 201.10, the

5  regulations issued by the Register of Copyrights under 17 U.S.C. §304(c).

6       Because Plaintiffs met all of the statutory requirements of Section 304(c), their

7  Termination should be deemed effective.  On April 16, 1999, the noticed Termination

8  Date, Plaintiffs recaptured Siegel's joint copyright interest in the Original Superman

9  Strips comprising Action Comics, No. 1 (hereinafter, the "Recaptured Superman

10  Copyrights").

11          **2.**     **Plaintiffs' Own An Undivided Fifty Percent Interest In**

12                   **The Copyrights To The Original Superman Strips**

13       Plaintiffs' Recaptured Superman Copyrights constitutes Siegel's undivided

14  fifty percent (50%) joint interest in the copyrights to the Original Superman Strips for

15  the extended renewal term.

16       The Original Superman Strips published in Action Comics, No. 1 were joint

17  works created by co-authors, Siegel and Shuster.  The 1909 Act did not contain a

18  definition of "joint authorship" or "joint work," which was left to the Courts to

19  define.  *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 409 (2d

20  Cir. 1946) *cert. denied*, 67 S.Ct. 1310 (1947), a leading joint authorship case under

21  the 1909 Act, defined a "joint work" as "a work by two or more authors who merge

22  their contributions into a single composition which is perceived by the audience as a

23  unit."[6]

24       "Superman" satisfies this definition as Siegel merged his story/continuity with

25  Shuster's illustrations into a single composition in the Original Superman Strips

26  comprising Action Comics, No. 1 which is perceived as a unified work.  As joint

27

28

---

[6] The 1976 Copyright Act did not alter this definition.  It defines "joint work" as "a work prepared by two or more authors with the intention that their contribution be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

23

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1872**

1  authors of the Original Superman Strips, Siegel and Shuster owned an undivided fifty

2  percent interest in the entire copyrights therein as *tenants-in-common*. *See Pye v.*

3  *Mitchell*, 574 F.2d 476,480 (9th Cir. 1978); *Sweet Music, Inc. v. Melrose Music Corp.*,

4  187 F. Supp. 655, 659 (S.D. Cal. 1960). It is undisputed that Siegel and Shuster

5  conveyed their entire copyrights to the Original Superman Strips to Detective in the

6  March 1, 1938 Grant. *Siegel*, 508 F. 2d at 911, 913; FACC, ¶¶ 12, 26; 1948 FOF,

7  Facts 24 - 25, 32; *see* Toberoff Decl., Ex. E.

8      Section 304(c)(1) of the Copyright Act specifically addresses the termination

9  procedures with respect to jointly authored works, such as "Superman." A co-author,

10  if living, or if deceased, his widow, children or grandchildren, can recapture the

11  copyright for the extended renewal term to the extent of the "particular author's share

12  of the renewal copyright" in such work. 17 U.S.C. § 304(c)(1). Therefore, on April

13  16, 1999, when the March 1, 1938 Grant was terminated pursuant to Plaintiffs'

14  Termination Notice No. 1., Plaintiffs became the owners of an undivided fifty

15  percent interest in the copyrights to the Original Superman Strips comprising Action

16  Comics, No. 1, pursuant to 17 U.S.C. 304(c)(1).

17    **E.    Defendants Have A Duty To Account To Plaintiffs For Fifty Percent**

18           **Of The Profits Earned From The Recaptured Superman Copyrights**

19      Whereas, Plaintiffs recaptured Siegel's joint ownership interest in the Original

20  Superman Strips on April 16, 1999 pursuant to Section 304(c), Defendants, as the

21  successors to Detective, retain Shuster's joint ownership interest in the copyrights to

22  the Original Superman Strips, with the consequent duty to account to Plaintiffs for

23  fifty percent of the profits earned by such copyrights. *Bernstein & Co. v. Jerry Vogel*

24  *Music Co.*, 221 F.2d 569 (2nd Cir. 1955), *modified*, 223 F.2d 252 (1955); *see also*

25  *Piantadosi v. Loew's Inc.*, 137 F.2d 534, 536-537 (9th Cir. 1943) (publisher becomes

26  a joint owner of a work via assignment by a joint author). *See also 1-6 Nimmer on*

27  *Copyright* § 6.12[B] (Courts have "uniformly recognized that one joint owner is

28  accountable to the others for their rateable share of the profits that he has realized

24

1  from licensing of the work.")

2      In *Bernstein*, the co-authors of a song, the "12[th] Street Rag," each assigned

3  their respective joint fifty percent interest in the song's renewal copyright to a

4  different company. The lyricist assigned his half interest to the defendant; the

5  composer assigned his half interest to a company which, in turn, assigned it to the

6  plaintiff. The Court held that each company as a successor joint owner of the song's

7  copyright had a duty to account to the other for half the moneys earned from its

8  exploitation of the song. 221 F.2d at 571.

9      Defendants' duty to account to Plaintiffs for the profits earned from

10  Defendants' exploitation of the Original Superman Strips applies to profits earned

11  from all sources from the publication of Action Comics, No. 1 and from the

12  exploitation of new derivative "Superman" works, in any and all media, created on or

13  after the April 16, 1999 Termination Date. 17 U.S.C. § 304(c)(6)(A).

14      **1.**    **<u>Defendants' Duty To Account Includes Profits</u>**

15          **<u>Earned In Foreign Territories</u>**

16      Claims by a co-owner of a copyright for an accounting are not governed by

17  copyright law, but are governed by state common law property principles such as

18  tenancy in common. *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984) ("A co-owner of

19  a copyright must account to other co-owners for any profits he earns from licensing

20  or use of the copyright, but the duty to account does not derive from the copyright

21  law's proscription of infringement. Rather, such duty to account is derived from

22  'equitable doctrines relating to unjust enrichment and general principles of law

23  governing the rights of co-owners'") (internal citations omitted). *See also*

24  *Community for Creative Non-Violence,* 846 F.2d 1485, 1498 (D.C. Cir. 1988) ("Joint

25  authors co-owning copyright in a work are deemed to be tenants in common, with

26  each having an independent right to use or license the copyright, subject only to a

27  duty to account to the other co-owner for any profits owned thereby.") (internal

28

25

**EXHIBIT 66**

**1874**

1  quotations omitted), *aff'd on other grounds,* 490 U.S. 730 (1989).[7]

2       As there can "be no copyright infringement between co-authors of a work, it

3  follows that state courts have exclusive competence to determine the fact of co-

4  authorship and the rights of assignment *and accounting* that flow therefrom."

5  (emphasis added).   3-12 *Nimmer on Copyright* § 12.01[A][1][b] (*citing Oddo v. Ries,*

6  743 F.2d 630, n.2 (9th Cir. 1984)).  *See also Korman v. Iglesias*, 736 F. Supp. 261,

7  265 (S.D. Fla. 1990) ("The Copyright Act neglected to provide for remedies between

8  co-authors ... The District of Columbia, Second, and Ninth Circuits have held and

9  Congress must have intended that co-authors may claim for an accounting…under

10  common law principles since the Copyright Act makes no mention of how co-authors

11  should enforce their rights to royalties as against each other."  Applying state law to

12  plaintiff's claim for share of royalties derived from joint work).

13       *Goodman v. Lee*, 78 F.3d 1007 (5th Cir. 1996) *cert denied* 519 U.S. 861 (1996)

14  is instructive.  The court affirmed a judgment declaring plaintiff a joint owner of the

15  copyright to the song "Let the Good Times Roll" and awarded plaintiff royalties

16  because, as a joint owner under Louisiana law, he was entitled to an accounting and

17  royalties based on all proceeds that defendants received from the song. *Id.* at 1012.

18  The Fifth Circuit held that while the issue of joint ownership of the song arises under

19  copyright law, once this issue was resolved, the accounting dispute among joint

20  owners was properly governed by state law. *Id.*  The court held:

21       "The applicability of federal law ends with that [joint ownership]
         determination, as Goodman's claim for an accounting is governed in all
22       respects by state law.  It is widely recognized that "[a] co-owner of a
         copyright must account to other co-owners for any profits he earns from
23

24  [7]  H.R. Rep. No. 94-1476, at 120 (1976)("Under the bill, as under the present law, co-owners of a
    copyright would be treated generally as tenants in common, with each co-owner having an
25  independent right to use or license the use of a work, subject to a duty of accounting to the other co-
    owners for any profits"); *Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 646-47 (S.D.N.Y.
26  1970)("It is clearly established that where a truly 'joint work' is created, each co-owner is akin to a
    tenant in common. Accordingly…compensation obtained from the unilateral exploitation of the
    joint work by one of the co-owners without the permission of the others is held in a 'constructive
27  trust' for the mutual benefit of all owners, and there is a duty to account therefor.")(internal
    citations omitted), *aff'd on other grounds,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997
28  (1972); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 223 F.2d 252 (2d Cir. 1955).

**EXHIBIT 66**
**1875**

1    the licensing or use of the copyright.... Significantly, *'the duty to account*
      *does not derive from the copyright law's proscription of infringement.*
2    *Rather, it comes from'"... general principles of law governing the rights*
      *of co-owners.'* As those general principles are rooted in state law, we
3    look to the law of Louisiana for answers to the remaining issues
      presented by this appeal."

5    *Id.* (emphasis in the original).

6    **Notably, the 5th Circuit affirmed the district court's finding that the co-**

7    **owners of the song had to account to each other for royalties earned both**

8    **domestically *and outside the United States*:**

9        "It is true that United States Copyright laws do not have extraterritorial
          effect and therefore, 'infringing actions that take place entirely outside
10       the United States are not actionable.' Plaintiff's claim for an accounting
          of royalties as co-owner of the copyright to 'Let the Good Times Roll' is
11       not, however, an action based upon an infringement of her copyright.
          Indeed, a co-owner of a copyright cannot be liable to another co-owner
12       for infringement of the copyright. 'Consequently, a suit to bring the co-
          owner of a copyright to account does not fall within the district court's
13       jurisdiction over actions arising under the copyright law.' The extra-
          territorial nature of copyright law is inapposite to whether plaintiff is
14       entitled to an accounting of foreign royalties received by defendants."

15   (internal citations omitted). *Goodman v. Lee*, 1994 U.S. Dist. LEXIS 18468, *11, 13

16   (E.D. La. 1994). *See also Goodman v. Lee*, 78 F.3d 1007, 1015 (5th Cir. 1996);

17   *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984)("A co-owner of a copyright must

18   account to other co-owners for *any* profits he earns from licensing or use of the

19   copyright")(emphasis added).

20       Both state and federal courts in California have consistently held that an action

21   for an accounting between joint owners of a copyright is governed by state law under

22   which they are *tenants in common* entitled to share in *all proceeds* from such jointly

23   owned copyright. *See In re Marriage of Worth*, 195 Cal. App. 3d 768, 776 (Cal.

24   App. 1st Dist. 1987)(husband and wife hold title to copyrights as tenants in common

25   and thus wife entitled "to share in *all* of the proceeds therefrom, including any

26   settlement or award of damages resulting from the copyright infringement"); *Dead*

27   *Kennedys v. Biafra,* 37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999)(action for

28   accounting amongst joint authors brought in federal court remanded to California

27

1  state court because an "action for an accounting or determination of ownership as

2  between alleged co-owners is founded in state law and does not arise under the

3  copyright laws"); *Morrill v. Smashing Pumpkins,* 157 F. Supp. 2d 1120, (C.D. Cal.

4  2001)("Each author of a joint work is a tenant in common"); *Durgom v. Janowiak,* 74

5  Cal. App. 4th 178, (Cal. App. 4th Dist. 1999)(court held nonpayment of royalties was

6  a contract issue not preempted by federal copyright law, and states are expressly

7  permitted to regulate activities violating legal or equitable rights, including the right

8  to an accounting).

9       Plaintiffs are entitled as a matter of law to an accounting from Defendants for

10  half the profits earned by the jointly owned Original Superman Copyrights embodied

11  in Action Comics, No. 1. *Oddo v. Ries,* 743 F.2d at 633. As noted in *Goodman,*

12  1994 U.S. Dist. LEXIS 18468, at 11, 13 *aff'd* 78 F. 3d at 1015, this includes profits

13  from the exploitation of such copyrights and derivative works in foreign territories

14  because an accounting between copyright co-owners is governed by state law

15  principles governing tenants in common, and is not subject to the copyright law's

16  "extraterritoriality" proscription.

17       **F.    Defendants' Alleged Defenses To The Termination Lack Merit**

18            **1.    Action Comics, No. 1 Was Not A Work-Made-For-Hire**

19       Section 304(c)'s termination provisions do not apply to a "work made for

20  hire." 17 U.S.C. § 304(c). Defendants thus claim that part of the Re-Cut 1933

21  Superman Strip created by Siegel and Shuster and thereafter purchased and published

22  in Action Comics, No. 1 was still somehow owned by Detective at inception as

23  "works made for hire" under the now repealed 1909 Copyright Act. 17 U.S.C. § 26.

24  As set forth below, Defendants' argument is precluded by the Second Circuit's 1974

25  decision in *Siegel,* 508 F.2d 909, 914 under the doctrines of *res judicata* or *collateral*

26  *estoppel.* Notwithstanding this, it is also refuted by the plain fact that Detective

27  *purchased* the "Superman" material at issue in the March 1, 1938 Grant *after* it had

28  been independently created and submitted to Detective.

28

**EXHIBIT 66**

**1877**

### a.    "Work for Hire" Under The 1909 Copyright Act

The 1909 Act does not provide any definition of "work made for hire" or "employer." In the vast majority of cases under the 1909 Act, federal courts consistently applied the work-for-hire doctrine *only* to traditional hierarchical employment relationships. *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005). However, "[i]n the last decade of the [1909] Act the Courts expanded the doctrine *somewhat* to include less traditional relationships." *Id., quoting Self-Realization Fellowship Ch. v. Ananda Ch.*, 206 F.3d 1322, 1331 (9th Cir. 2000)(emphasis added). The Ninth Circuit has "evaluated claims that a work was 'made for hire' by requiring "credible evidence that the work was done at the 'instance and expense' of the commissioning party." *Self-Realization*, 206 F.3d at 877, *quoting Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998).

Under the 1909 Act, when one person employs another to create an artistic work it gives rise to a *presumption* that the parties' *mutual intent* is for title to the copyright to belong to the employer at whose instance and expense the work is created. *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir 1965) (work for hire status turns on "mutual intent of the parties"). However, the presumption of copyright in the employer is rebuttable, as it "is based on the presumed mutual intent of the parties." *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1368 (9th Cir.1980); *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2nd Cir. 1939), *cert. denied*, 309 U.S. 686 (presumption rests upon presumed intention).

Thus courts have often refused to apply the work for hire doctrine *even in the context of an employer-employee* relationship. *See e.g., Dolman*, 157 F.3d at 712 (no evidence that songs written within scope of author's employment and the written assignment of songs to employer's company rebutted any work for hire presumption); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir. 1955), *modified on other grounds*, 223 F.2d 252 (2d Cir. 1955) (where employer purchased song lyric from employee by paying him to write the lyric, court found that because

29

**EXHIBIT 66**
**1878**

1  this was in addition to his salary and a special job assignment, it was not a work for

2  hire); *see also Forward v. Thorogood*, 985 F.2d 604, 606-7 (1st Cir. 1993) (court

3  refused to apply work for hire doctrine to music demo tapes created with plaintiff's

4  financial assistance, because while he booked and paid studio to create tapes, "he

5  neither employed nor commissioned the band members.").

**b.**   <u>**Defendants' "Work For Hire" Claim Is Precluded**</u>

<u>**By *Res Judicata* And Collateral Estoppel**</u>

8  Defendants did not allege that Action Comics, No. 1 (*i.e.*, the Original

9  Superman Strips) was a work for hire in their Counterclaim or Answer, in apparent

10  recognition that it was not and that they are precluded from claiming otherwise. *See*

11  FACC (Toberoff Decl., Ex. R) and Answer.  However, Defendants allege that at

12  Detective's request Siegel and Shuster cut and pasted their pre-existing "Superman"

13  newspaper strip into a magazine format and that "upon information and belief" they

14  added additional material ("Purported Additional Material") to create the Re-cut 1933

15  Superman Strip published as Action Comics, No 1.  FACC , ¶¶ 11, 14.  Defendants

16  erroneously claim that the Purported Additional Material is "work for hire" as

17  allegedly prepared "at the instance and expense of [Detective] and subject to its right

18  of control," "and that the copyright therein was owned by Detective *ab initio*," that is,

19  from inception.  FACC, ¶ 132.

20  Defendants have the burden to prove what Purported Additional Material they

21  refer to because by all accounts the conversion of the 1933 Superman Strip

22  (newspaper format) to the Re-cut 1933 Superman Strip (magazine format) published

23  in Action Comics, No. 1 was largely mechanical involving cut and pasting, slight re-

24  lettering, and trimming panels to fit a magazine format. *Siegel,* 508 F.2d at 914.

25  In *Siegel*, 508 F.2d at 914, the Second Circuit held that "Superman" as first

26  published by Detective (in Action Comics, No. 1) was <u>not</u> a "work for hire." ("The

27  court below had held that **Superman** was also a "work for hire" within the meaning

28  of the Copyright Act, 17 U.S.C. § 26…We disagree.").  Defendants are therefore

30

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**

**1879**

precluded under *res judicata* and collateral estoppel principles from again claiming that Action Comics, No. 1, or any part thereof, is a "work for hire."

In fact, Defendants' claim as to the Purported Additional Material is specifically precluded by *Siegel*. The Second Circuit expressly considered the 1948 Findings on the conversion of Siegel and Shuster's 1933 "Superman" newspaper strip to a magazine format *at Detective's request* at that this was insufficient to transform it into a work for hire:

> "There was no conclusion of law in the state court that the comic strip was a work for hire so as to create the presumption that the employer was the author. That issue was not litigated at all in state court. On the contrary, the court's finding of fact no. 8 was that the plaintiffs were "the originators and authors of the cartoon character **SUPERMAN** and of the title **SUPERMAN** and first created cartoon material in which the said character and title first appeared in 1934. . . .'" The court below instead relied upon finding of fact no. 22 in which the state court found that the plaintiffs did not revise and expand the **Superman** material at the request of the defendants and that this revised material constituted the formula for the ensuing series of strips. We do not consider this tantamount to a conclusion that **Superman** was a work for hire."

508 F.2d at 914. The Second Circuit concluded that "Superman" and his powers had been fully developed by Siegel and Shuster on there own and that any mechanical revisions that may have been directed by Detective shortly before "Superman's" first publication in Action Comics, No. 1 were simply to accommodate a magazine format

> "Superman had been spawned by the plaintiffs four years before the relationship between the authors and the defendants existed…Superman and his miraculous powers were completely developed long before the employment relationship was instituted. *The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format.* We do not consider this sufficient to create the presumption that the strip was a work for hire."

*Id.* (emphasis added).

Defendants are thus precluded from re-litigating the claim or issue of whether the Purported Additional Materials comprising such "revisions" was a "work for hire" under the doctrines of *res judicata* or collateral estoppel.

31

**EXHIBIT 66**
**1880**

<strong>c.    The Purported Additional Material, To</strong>
<strong>The Extent It Exists, Was Not "Work For Hire"</strong>

Even if the Court re-opened the "work for hire" issue, contrary to the preclusive effect of *Siegel*, 508 F.2d at 914, Defendants' admissions and documentary evidence also mandate a finding that the Purported Additional Material, to the extent it exists, was not "work made for hire."

Defendants claim that they owned the Purported Additional Material "at inception" merely because they requested that Siegel and Shuster cut and paste their newspaper strip into a magazine format makes no sense. When Siegel and Shuster re-cut their Superman strip they did so "on spec" on their own volition as they were still merely trying to get their work published. 1948 FOF, Fact 32, 34; Toberoff Decl., Ex. B.

It is undisputed that they presented their Re-cut 1933 Superman Strip to Detective in February, 1938. *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911. At that point Detective had not even accepted their work for publication. Detective purchased Siegel and Shuster's thirteen page *Re-cut 1933 Superman Strip* in the March 1, 1938 Grant *after* it was submitted to Detective and accepted for publication. *See* 1948 FOF, Fact 32 ("The first thirteen pages of SUPERMAN material ...were in existence...before the execution of the instrument of March 1, 1938."); *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911. Defendants acknowledge this. FACC, ¶ 11 ("Siegel and Shuster cut and pasted the [newspaper]comic strips...to create a thirteen page comic book story which was accepted for publication by [Detective]").

Detective was under no obligation to pay Siegel and Shuster for their Re-cut 1933 Superman Strip until such had been completed by Siegel and Shuster on spec and Detective had accepted it for publication and *purchased* the finished product in the March 1, 1938 Grant. *See* Toberoff Decl., Ex. E.

*Dolman*, 157 F.3d at 712, is instructive. The plaintiff copyright owner sued a music publisher regarding certain movie soundtrack compositions created in the

32

<strong>EXHIBIT 66</strong>
<strong>1881</strong>

1    1930s. The author had composed the songs as an employee of a company that had

2    contracted with a movie company to create soundtracks, and he later assigned the

3    songs to the music publishing arm of his employer. The Ninth Circuit affirmed the

4    district court's refusal to apply the "work for hire" doctrine on the grounds that there

5    was no evidence that the songs were within the scope of the author's employment;

6    nor written at his employer's "instance and expense." Significantly, the Court stated:

> "Moreover, even if [defendant] had established that [the author] created the songs at the instance and expense of [his employer] or [the movie company], **[plaintiff] rebutted the work for hire presumption," by having executed an assignment to his employer's company:** "Had the works been intended to be works for hire for [his employer], there would have been no reason for [the music publishing subsidiary] to accept an invalid assignment of rights from [the author], knowing that its parent company already owned those rights." *Id.* at 712-13. Additionally, "[the music publishing subsidiary] licensed the synchronization rights in the songs to [the movie company]. Had the songs been written for [the movie company] as works for hire, there would have been no need for such a license." *Id.*

14        Here, as in *Dolman*, the very existence of the March 1,1938 Grant belies the

15   notion that the Re-cut 1933 Comic Strip was "for hire." If it were a work for hire,

16   there would be no rights to grant because the work would have been owned at

17   inception by Detective. It is undisputed that the parties executed the March 1, 1938

18   Grant after receiving the Re-cut 1933 Superman Strip in February, 1938, Detective

19   decided to publish it, and thus purchased the material in the March, 1938 Grant.

20   *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911; 1948 FOF, Fact 32. It is clear

21   that the copyright to both the Original Superman Strips resided with Siegel and

22   Shuster, to be assigned if and only if their speculative work was thereafter accepted

23   and purchased by Detective. As such, no portion of the Original Superman Strips,

24   published in Action Comics, No. 1, is "work for hire."

25        **2.      The Termination Notice Was Not Required To List The**

26                  **1948 Consent Judgment**

27        As set forth above, all rights to Siegel's Original Superman Strips were granted

28   to Defendants' alleged predecessor, Detective, in the March 1, 1938 Grant. *Siegel*,

33

**EXHIBIT 66**
**1882**

( )

1  508 F.2d at 913-914; 1948 COE; Conclusion 1. The regulations promulgated under

2  17 U.S.C. § 304(c) by the Register of Copyrights ask for "a brief statement

3  reasonably identifying the grant to which the notice of termination applies." 37

4  C.F.R. § 201.10(b)(1)(iv).  In compliance, Plaintiffs' Termination Notice No. 1

5  identified the March 31, 1938 Grant as the grant being terminated. Toberoff Decl. Ex.

6  G.  On the noticed April 16, 1999 Termination date, Siegel's joint copyright interest

7  in the Original Superman Strips reverted to Plaintiffs as further set forth above.

8      As discussed above, Plaintiffs' served on Defendants and filed with the

9  Copyright Office six additional Termination Notices, Nos. 2-7, out of an abundance

10  of caution, to the extent that the respective agreement set forth in each such notice,

11  granted *or might be construed to have granted* "Superman" works by Siegel.

12  Toberoff Decl. Ex. H-M.

13      Amongst Plaintiffs' additional notices, Termination Notice No. 6  listed the

14  May 19, 1948 Stipulation which settled the 1947 Action, wherein Siegel and Shuster

15  re-acknowledged National's ownership of "Superman" and received money for

16  Siegel's grant of "Superboy" to National. Termination Notice No. 5, ¶ 3, p. 551,

17  Toberoff Decl., Ex. K; May 19, 1948 Stipulation, Toberoff Decl., Ex. C.  The May

18  19, 1948 Stipulation provided for the May 21, 1948 Consent Judgment that was

19  entered into two days later incorporating the terms agreed upon in the stipulation.

20      Defendants nonetheless asserted that Plaintiffs' Terminations are purportedly

21  defective for not *also* listing the May 21, 1948 Consent Judgment.  *See* FACC, ¶¶ 66-

22  68.  Firstly, the May 21, 1948 Consent Judgment is a judgment, not a "grant" of

23  copyright.  *See* 37 C.F.R. § 201.10 (b)(1)(iv).  Secondly, the May 21, 1948 Consent

24  Judgment merely follows the parties' underlying May 19, 1948 Stipulation entered

25  into two days earlier which *is* explicitly identified in Plaintiffs' Termination Notice

26  No. 6.  Thirdly, because the March 1, 1938 Grant constituted the operative grant of

27  "Superman" to National's predecessors-in-interest, the subsequent May 21, 1948

28  Consent Judgment did not as a matter of law convey that which was previously

34

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1883**

1  granted in 1938, and already in National's possession on May 21, 1948. *Siegel*, 508

2  F.2d at 913-914; 1948 COL, Conclusion 1.

3  The Consent Judgment also has no adverse impact on Plaintiffs' Termination

4  as "[t]ermination…may be effected notwithstanding any agreement to the contrary"

5  17 U.S.C. § 304(c)(5); and Siegel's or Plaintiffs' reversionary termination interest

6  under Section 304(c) could not have been assigned, as a matter of law, until "after the

7  notice of termination ha[d] been served [in 1997]". 17 U.S.C. § 304(c)(6)(B),(D).

8  As stated, the 1948 Consent Judgment merely acknowledges what was

9  previously granted to Detective and National in agreements explicitly identified in

10  Plaintiffs' Termination Notices (*e.g.*, the March 1, 1938 Grant of the Original

11  Superman Strips.)  However, even if the May 21, 1948 Consent Judgment is

12  somehow deemed a grant of rights previously granted (it is not and can not be),

13  Plaintiffs' identification of the underlying May 19, 1948 Stipulation "reasonably

14  identifies" the parallel May 21, 1948 Consent Judgment which was issued pursuant to

15  the stipulation and mirrors it. *See* 37 C.F.R. §201.10 (b)(1)(iv).

16  There is little case law on notice of termination formalities.  In *Burroughs v.*

17  *MGM*, the court found that a Section 304(c) termination notice identifying a single

18  1923 grant and 35 titles, applied to only the titles listed, but was not rendered

19  ineffective with respect to those 35 titles by the fact that many of the titles were

20  assigned by the author in subsequent grants that had not been identified in the

21  termination notice. 683 F.2d 610, 614, 618, 622 (2d. Cir. 1982) ("As further Tarzan

22  books were written, the rights in these were also transferred to the corporation").

23  *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 378 (SDNY 1999), came to a

24  similar conclusion.  There, the termination notice simply identified the grant as "grant

25  or transfer of copyright and the rights of copyright proprietor, including publication

26  and recording right only." *Id.*  The Court held that the notice was adequate even

27  though this "generic statement would not seem to reasonably identify the grant." *Id.*

28  Defendants received more than ample *notice* within the statutory time frame of

1  Plaintiffs' intention to terminate prior grants of Siegel's "Superman" work and were

2  in no way prejudiced by Plaintiffs' not listing the May 21, 1948 Consent Judgment in

3  addition to the parallel May 21, 1948 Stipulation, the operative March 1, 1938 Grant

4  and three other prior agreements. *See* Terminations Nos. 1-6, Toberoff Exs. G-L.

5  The regulations of the Register of Copyright, on which Defendants purport to rely,

6  specifically dissuade such hyper-technical attempts to invalidate termination notices:

7  "Harmless errors in a notice that do not materially affect the adequacy of the

8  information required to serve the purposes of …section 304(c) of title 17,

9  U.S.C….shall not render the notice invalid." 37 CFR § 201.10(e)(1).  Nor is such a

10  result supported by case law as set forth above.

11      Defendants alleged the same unavailing Consent Judgment defense with

12  respect to Plaintiffs' Superboy Termination in the Superboy Action (Case No. 04-

13  8776).  In granting Plaintiffs' motion for partial summary judgment, Judge Lew

14  dismissed this purported defense as without merit:

15      "Defendants argued that Plaintiffs failed to comply with the termination
       regulations, because the termination notices only list the May 19, 1948

16      stipulated agreement, but did not list the May 21, 1948 'Final Consent
       Agreement.'

17
       This court finds that ***no genuine issue exists that the operative grant of***

18      ***"Superboy" by Jerome Siegel was the May 19, 1948 stipulated***
       ***settlement*** and that the consent judgment merely followed the parties'

19      stipulation and was entered by the Court two days later.  Additionally,
       Regulation 201.10(b)(1)(iv) merely requires a "brief statement

20      reasonably identifying the grant to which the notice of termination
       applies."  In fact, Regulation 201.10(e) provides that:

21
           harmless errors in a notice that do not materially affect the

22          adequacy of the information required to serve the purposes of
           …section 304(c) … shall not render the notice invalid.

23
       Here, by listing the May 19, 1948 stipulated settlement, the termination

24      notices provide a brief statement reasonably identifying the grant in
       question.  Even, if including the May 21, 1948 consent judgment would

25      have provided additional notice, its absence in no way materially
       affected the adequacy of Plaintiffs' notice."

26

27  Order Granting Plaintiffs' Motion For Partial Summary Judgment & Denying

28  Defendants' Motion for Summary Judgment, entered March 24, 2006, at pp. 12-13,

**EXHIBIT 66**
**1885**

1    Toberoff Decl., Ex. U. This holding and logic applies with equal force to the
2    Superman Action "where the operative grant" of the Original Superman Strips was
3    the March 1, 1938 Grant.

        3.    **The December 23, 1975 Agreement Was Unaffected By**
5                   **Defendants Later Payment Of A Pension To Joanne Siegel**
6                   **And, In Any Event, Was Not An Operative "Superman" Grant**

7        The December 23, 1975 Agreement was listed by Plaintiffs in the separate
8    Termination Notice No. 7 out of an abundance of caution, though it did not constitute
9    or contain a copyright grant in Siegel and Shuster's "Superman" works. Toberoff
10   Decl., Exs. M, Y. Moreover, Plaintiffs need not have served and filed Termination
11   Notice No. 7 to have recaptured Siegel's copyright interest in the Original Superman
12   Strips because this was accomplished by Plaintiffs' Termination No. 1 of the
13   operative March 1, 1938 Grant which had assigned all rights therein to Detective.
14   *Siegel*, 508 F.2d at 913-914; 1948 COL, Conclusion No. 1.

15       Yet, Defendants erroneously claim herein that Plaintiff Joanne Siegel's
16   continued receipt of a widow's benefit after the Termination Date effectively
17   reinstated and somehow transformed the December 23, 1975 Agreement into a
18   subsisting "Superman" copyright grant by Siegel and Shuster. FACC, ¶¶ 70-76.

19       The 1974 Action confirmed that Defendants' predecessor, Detective, was
20   assigned all rights in "Superman" by Siegel and Shuster in their March 1, 1938 Grant.
21   *Siegel*, 508 F.2d at 913-914.[8] WCI, to engender good will prior to the release of its
22   first "Superman" movie, nonetheless agreed in the December 23, 1975 Agreement to
23   pay Siegel and Shuster a small monthly stipend. December 23, 1975 Agreement, ¶ 5,
24   Toberoff Decl., Ex. Y. Plaintiffs were not parties to the December 23, 1975
25   Agreement. *Id.*

26

27     [8] Additional agreements followed the March 1, 1938 Grant as set forth above which re-affirmed
    Detective's and then their successors' ongoing ownership of "Superman" as follows: the September
28     22, 1938 Agreement, the McClure September 22, 1938 Agreement, and the December 19, 1939
    Agreement. *See Siegel*, 364 F. Supp. at 1034.

1    Tellingly, the December 23, 1975 Agreement specifically acknowledged that

2    the 1974 Action held that WCI already owned all rights to "Superman": "The Court

3    of Appeals unanimously decided that 'all rights in Superman, including the renewal

4    copyright, have passed forever to [National Periodical Publications, Inc., a Warner

5    subsidiary.]'" December 23, 1975 Agreement, ¶ 3, Toberoff Decl., Ex. Y; *see also*

6    *Siegel*, 508 F.2d at 913-914. The December 23, 1975 Agreement therefore

7    acknowledged that the payment to Siegel and Shuster was not a negotiated payment

8    in exchange for a grant of "Superman" rights and specifically stated that WCI had no

9    obligation to make such payment:

10        "4.    Warner does not have any legal obligation to pay you any sum of
          money whatsoever and does not acknowledge that any wrong has been
11        done to you.

12        5.    Warner has nevertheless determined, in consideration for your
          past services to Warner and in view of your present circumstances, to
13        make the following voluntary payments."

14   *Id.*, ¶¶ 4-5. The December 23, 1975 Agreement further provided as follows:

15        "In addition, if Jerry Siegel dies, on or before December 31, 1985, Warner
          will pay his wife, Joanne Siegel, if she survives him, monthly payments at
16        the rate of $20,000 a year, commencing on the date of Jerry's death, and
          ending December 31, 1985, and thereafter monthly payments at the rate of
17        $10,000 a year for the balance of her life."

18   *Id.*, ¶ 5 b. It is undisputed that Jerry Siegel died on January 28, 1996. Thus, Joanne

19   Siegel was not eligible for any payments under the December 23, 1975 Agreement.

20        At Joanne Siegel's request, Warner agreed by letter dated March 15, 1982 that

21   they would pay her a widow's pension if her husband predeceased her. This payment

22   was also voluntary and in no respect tied to any grant of rights in "Superman" or the

23   Original Superman Strips. Toberoff Decl., Ex. FF.

24        Firstly, the December 23, 1975 Agreement, as set forth above, does not contain

25   a grant of any copyrights in "Superman." Toberoff Decl., Ex. U. Secondly, the

26   December 23, 1975 Agreement, as a matter of law, could not have granted copyrights

27   in "Superman" that were already in WCI's possession, as acknowledged by the

28   December 23, 1975 Agreement, itself. This entirely moots Defendants' purported

38

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1887**

1  defense. Even in the unlikely event that Joanne Siegel's receipt of her widow's

2  benefit after April 16, 1999 was found to have somehow reinstated the December 23,

3  1975 Agreement, this, at best, could affect only Plaintiffs' Termination of the

4  December 23, 1975 Agreement. Because the December 23, 1975 Agreement did not

5  contain a grant of any rights in "Superman," and certainly did not grant rights in the

6  Original Superman Strips transferred in the March 31, 1938 Grant, this purported

7  reinstatement, no matter how unlikely, would have no affect.

8       The December 23, 1975 Agreement, even if it contained a grant and had been

9  reinstated (it did not and was not)[9], it could not, in any event, effectively assign

10  *Plaintiffs'* termination interest because Plaintiffs *were not parties* to the December

11  23, 1975 Agreement. Additionally, Plaintiffs' reversionary termination interest under

12  Section 304(c) could not have been assigned by Jerome Siegel in 1975 because under

13  the Copyright Act such an interest can not be assigned until "after the notice of

14  termination ha[d] been served [in 1997]." 17 U.S.C. § 304(c)(6)(B),(D).

15       Lastly, if Warner's agreement to pay Joanne Siegel a widow's pension is

16  misconstrued to somehow re-instate the December 23, 1975 Agreement and

17  transform it into a copyright grant such would also contradict the Copyright Act's

18  prohibition that "[t]ermination…may be effected notwithstanding any agreement to

19  the contrary" 17 U.S.C. § 304(c)(5). *See Marvel*, 310 F.3d at 291.

20       **4.    Plaintiffs' Ownership Of The Recaptured Superman**

21       **Copyrights Is Not Barred By The Statute of Limitations**

22       Plaintiffs' claims for declaratory relief as to the validity of their "Superman"

23  Terminations are not barred by the Copyright Act's three year statute of limitations,

24  17 U.S.C. § 507(b), or other statute of limitations, as alleged by Defendants. FACC,

25  ¶¶ 90-96; Answer, ¶ 110.

26  ─────────────────────
[9] As shown above, Joanne Siegel was not eligible for any payments under the express terms of the

27  December 23, 1975 Agreement because the condition precedent that Siegel "die[], on or before
December 31, 1985" did not occur. December 23, 1975 Agreement, ¶ 5 b., Toberoff Decl., Ex. U.

28  It is unlikely that her acceptance today of a pension voluntarily paid by Warner has the effect of
reinstating the December 23, 1975 Agreement to which she was not a party. Toberoff Decl., Ex. FF.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**

**1888**

### a.   Plaintiffs' Complaint Was Filed Within the
### Purported Statute of Limitations

As shown below, 17 U.S.C. § 507(b)'s three year statute of limitations does not act as a bar to copyright recapture pursuant to 17 U.S.C. §304(c). Notwithstanding this, even if the three year statute of limitations were held to be triggered by a publisher's express repudiation of a §304(c) termination, Plaintiffs nonetheless filed their complaint *before* the statute ran.

As set forth above, Plaintiffs served their Terminations on April 3, 1997 by regular mail and by certified mail, return receipt requested. Toberoff Decl., Exs. G-M. On April 15, 1999, one day before the effective Termination Date, DC sent Plaintiffs a letter (the "April 15, 1999 Letter") "rejecting the scope and validity of the [Terminations]." FACC, ¶ 71. It states in relevant part:

> "[T]he absence of any steps towards negotiation for two years, particularly on the "eve" of the April 16, 1999 purported "effective" date of the termination, leaves us concerned. Thus our client has no alternative *but to move to the stage of putting your clients on clear notice*, as set forth below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights. First, your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed any rights at all, in Supe  nan."

Toberoff Decl. Ex. Q. (emphasis added).

To facilitate settlement negotiations, the parties entered into a tolling agreement dated April 6, 2000 (the "Tolling Agreement"), effective as of said date, just in case any time based defenses could later be claimed by either side. *Id.* Ex. Z, at ¶ 1. By its express te  ns the Tolling Agreement remained in force until:

> "10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices [of Termination]."

*Id.* at ¶ 7.

On September 21, 2002, Plaintiffs sent a letter to DC, indicating that they were

40

**EXHIBIT 66**
**1889**

1   "stopping and ending negotiations with DC Comics, Inc., its parent company AOL

2   Time Warner and all of its representatives and associates, effective immediately."

3   *Id.*, Ex. AA. Consequently, the Tolling Agreement ended "10 business days" later on

4   October 4, 2002. *Id.*

5        The statute of limitations cannot be used to effectively bar Plaintiffs' section

6   304(c) Terminations. However, in the unlikely the statute is even held to apply, it

7   would not start to run until Defendants had communicated to Plaintiffs a *clear* and

8   *express repudiation* of their Terminations. *Aalmuhammed v. Lee*, 202 F.3d 1227,

9   1231 (9th Cir. 2000) (a "plain and express repudiation" is required under § 507(b)).

10        By Defendants' own admission this did not happen until **April 15, 1999**. *See*

11   FACC, ¶ 91 ("effective at least as early as April 15, 1999, Plaintiffs/ Counterclaim

12   Defendants were on notice that DC Comics rejected the Superman Notices."); *see*

13   *also* April 15, 1999 Letter ("our client has no alternative but to move to the next stage

14   of putting your clients on clear notice … that DC Comics rejects both the validity and

15   scope of the Notices"), Toberoff Decl., Ex. Q.

16        Therefore the statute of limitations calculation (to the extent the statute is even

17   applicable) is as follows. Three years equals 1,095 days. April 15, 1999 to April 6,

18   2000 (the date the Tolling Agreement commenced) equals 357 days, with 738 days

19   left to run. Tolling Agreement, ¶ 1, Toberoff Decl., Ex. Z. The Tolling Agreement

20   was in place until October 4, 2002, "ten business days after [Plaintiffs] terminat[ed]

21   negotiations" by letter dated September 21, 2002. *Id.*, ¶ 7; Toberoff Decl., Exs. Z;

22   AA. October 4, 2002 plus the 738 days left to run means the statute, if applicable,

23   would run on October 12, 2004. Thus, to the extent the statute of limitations is even

24   held to run against Plaintiffs' Terminations, they would have had until **October 12,**

25   **2004** to file their complaint in the Superman Action. Plaintiffs timely filed their

26   complaint regarding the "Superman" Terminations on **October 8, 2004**. Toberoff

27   Decl., Ex. X.

28          **b.**     **Strong Policies Disfavor Using The Statute of**

**EXHIBIT 66**
**1890**

### Limitations To Bar Termination Under § 304(c)

The legislative purpose of the Section 304(c) termination right is to relieve authors "of the consequences of ill-advised and unremunerative grants" to publishers in recognition of the unequal bargaining power between authors and publishers. *Mills Music*, 469 U.S. at 172-73. One could find not better example of this than Siegel and Shuster's March 1, 1938 Grant of "Superman" to Detective for $130 in order to see their work published. Toberoff Decl., Ex. E.

So important are the policies behind this authorial recapture right that it trumps ordinary principles of contract and can be effected simply by the ministerial act of giving notice within a defined time window. *See* 17 U.S.C. §§ 304(d)(1), (c)(4)(A). The importance Congress placed on this statutory recapture right is further evidenced by the concerted safeguards it built into the 1976 Act's termination provisions. *See e.g.*, §304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary"); 17 U.S.C. § 304(c)(6)(B),(D) (reversionary termination interest can not be conveyed to original assignee until "after the notice of termination has been served."). Thus, this recapture right has repeatedly been held to be "inalienable." *Mills Music,* 469 U.S. at 172-73, *quoting* H.R. Rep. at 124; *Stewart v. Abend*, 495 U.S. at 230; *Tasini,* 533 U.S. at 497 (discussed author's comparable termination right under 17 U.S.C. § 203(a)(5)).

Congress surely did not intend that its concerted efforts to safeguard this important recapture right could so easily be foiled by a publisher's predictable denial of a termination notice's validity, allegedly triggering the statute of limitations.[10] This would effectively mean that an author or his family, after waiting 56 years for the termination window to open, would purportedly forever lose their recaptured

---

[10]  Interestingly, if the three year statute of limitations were to apply to Plaintiffs' Termination, then it would appear that any claims by Defendants would be barred as they failed to seek declaratory relief until long after April 3, 2000, i.e., within 3 years of being served with Plaintiffs' Terminations on April 3, 1997. Plaintiffs' Termination surely constitutes a clear and express repudiation of Defendants' exclusive copyright interests in "Superman." *Aalmuhammed,* 202 F.3d at 1231. As mere successors in interest, Defendants do not sit on a higher plain than the statutorily endowed widow and children of "Superman's" co-creator. 17 U.S.C. § 304(c)(1).

42

EXHIBIT 66
1891

1  copyright if they did not undertake or, as will often be the case, could not afford to

2  undertake, the enormous expense of full blown litigation, within three years of any

3  repudiation by the publisher, *regardless of its merit. See* 17 U.S.C. §§ 304(d)(1),

4  (c)(4)(A).  Clearly such interpretation contradicts the strong policies underlying the

5  recapture right and its objective of "leveling" the playing field for authors and their

6  families.  *Stewart,* 495 U.S. at 230.

7                **c.**    **Section 507(b) Is Not A Bar To Copyright Ownership**

8        The Copyright Act's three year statute of limitations, 17 U.S.C. § 507(b),

9  does not eliminate the substantive right of copyright ownership; it only limits a

10  copyright owner's remedies to three years before suit.  In much the same way that a

11  copyright owner does not lose his copyright by failing to sue an infringer within three

12  years, an owner does not lose his copyright interest by failing to request declaratory

13  relief and an accounting within three years.  *Stone v. Williams,* 970 F.2d 1043, 1051

14  (2d Cir. 1992), *cert. denied,* 508 U.S. 906 (1993).

15        A request for declaratory relief under the Copyright Act is "a procedural device

16  used to vindicate substantive rights, it is time-barred only if relief on a direct claim

17  would also be barred." *Stone,* 970 F.2d at 1048; *see Luckenbach S.S. Co. v. U.S.,* 312

18  F.2d 545, 548 (2d Cir. 1963); *Romer v. Leary,* 425 F.2d 186, 188 (2d Cir. 1970)(in

19  declaratory relief actions, one looks to the underlying coercive claim in applying the

20  statute of limitations).  The coercive relief Plaintiffs' seek is payment of their share of

21  the income earned by the Recaptured Superman Copyrights.  Plaintiffs' property right

22  is violated each time Defendants fail to account to them and the limitations period

23  begins to run regarding that wrong.  *See Shapiro, Bernstein & Co. v. Jerry Music* Co.,

24  223 F.2d 252, 254 (2d Cir. 1955); *Stone,* 970 F.2d at 1051.  Because Plaintiffs'

25  underlying coercive claim for profits from the Recaptured Superman Copyrights is

26  not time-barred, Plaintiffs' procedural claim for declaratory relief is not time-barred.

27       *Stone, supra,* is factually on point and based on controlling law.  *Stone* held

28  that 17 U.S.C. § 507(b) does not bar a declaratory relief action to establish copyright

1  ownership or an accounting action but only limits the damages (past profits) to three

2  years within suit. 970 F.2d at 1051. While potentially limiting damages, *Stone* held

3  that the statute cannot terminate the substantive right of copyright co-ownership.

4      The plaintiff in *Stone* was the daughter of country singer songwriter Hank

5  Williams, Sr. In 1985, she filed suit seeking a declaration that she is a one-third co-

6  owner of the renewal copyright to her father's songs and to an accounting of her

7  share of profits from their exploitation. *Id.* at 1046. Ms. Stone was legally entitled to

8  share in the profits at least six years earlier in 1979. The district court granted

9  summary judgment holding her barred by § 507(b) because she had notice of her

10  copyright claim more than four years prior to filing her lawsuit. *Id.* at 1047.

11      The Second Circuit *reversed* and held, based on established precedent, that 17

12  U.S.C. § 507(b) cannot be applied to cause the forfeiture of copyright ownership as

13  the statute limits only *remedies* to three years from when suit is filed. *Id.* at 1051.

14  The *Stone* Court expressly rejected the proposition that copyright ownership is

15  forfeited when a co-owner fails to assert her rights within the limitations period. *Id.*

16  at 1050-51; *citing Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.

17  1960), *cert. denied*, 364 U.S. 882 (1960)(upheld owner's failure to assert copyright

18  for 25 years).

19      *Stone* should be applied to the case at bar given the symmetry of facts and legal

20  issues presented in the two cases. In reversing the lower court, *Stone* addressed the

21  same issue that is before this Court: the application of 17 U.S.C. §507(b) to a

22  declaratory relief action regarding a fractional copyright ownership interest and a

23  request for an accounting, constructive trust and profits. 970 F.2d at 1048; *see* First

24  Amended Complaint, ¶¶ 52-73. While Ms. Stone's copyright entitlement is based on

25  her status as Hank Williams' daughter under 17 U.S.C. § 304(a), Plaintiffs'

26  entitlement is based on their status as Siegel's widow and daughter, respectively,

27  under 17 U.S.C. §§304(a) and (c), and the exercise of their termination rights under

28  §304(c) by the ministerial act of giving notice.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1893**

1  *Stone* correctly relied on "the long established rule" directly applicable to the

2  case at bar that "statutes of limitations bar remedies, not the assertion of rights." *Id.*

3  at 1051. This bedrock principle of law is expressly acknowledged by the Supreme

4  Court: "[A]s a matter of constitutional law...statutes of limitations go to matters of

5  remedy, not to destruction of fundamental rights." *Chase Securities Corp. v.*

6  *Donaldson*, 325 U.S. 304, 314, 89 L.Ed. 1628, 65 S.Ct. 1137 (1944).

7      The Ninth Circuit also holds that "[s]tatutes of limitations generally cut off the

8  remedy without extinguishing the right." *Osmundsen v. Todd Pac. Shipyard*, 755

9  F.2d 730, 733 (9th Cir. 1985). This "constitutional" principle has been directly

10 applied to the Copyright Act. In *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 340

11 (5th Cir. 1971), the Court held that 17 U.S.C. § 507(b) "affect[s] the remedy only, not

12 the substantive right" based on the legislative history of its nearly identical

13 predecessor, § 115(b).[11] Because Plaintiffs' substantive copyright ownership exists

14 *by operation of law*, it can *not* be extinguished by § 507(b).

15      **G.    No Agreement Was Consummated By The Parties Regarding**

16          **Plaintiffs' Recaptured Superman Copyrights Or Recaptured**

17          **Superboy Copyrights As A Matter Of Law**

18      After the within actions were filed by Plaintiffs on October 4, 2004 for a

19 declaration that they had successfully recaptured Siegel's original "Superman" and

20 "Superboy" copyright interests, Defendants claimed *for the very first time* that they

21 purportedly purchased such interests in October, 2001 in a supposed written

22 agreement even though it was clear from the record and the parties' conduct that no

23

---

24 [11] The *Prather* Court referred to Senate Report which stated, "The committee [on the Judiciary]

25 wishes to emphasize that it is the committee's intention that the statute of limitations, contained in

    this bill, is to extend to the remedy of the person affected thereby, and not to his substantive rights."

26 S. Rep. No. 1014, 85th Cong., 1st Sess. 3 (1957). The House Report stated: "[A]ll state statutes of

    limitation, which now govern the Federal courts in copyright actions, are limitations upon the

27 remedy, and the present bill has been drawn to apply this concept to a uniform Federal period of

    limitations.... Moreover, it was considered that the long-standing fact that both the copyright bar and

28 the courts have become accustomed to a limitation based upon the remedy warranted a continuation

    of this concept in the present bill." H.R. Rep. No. 150, 85th Cong., 1st Sess. 2 (1957).

45

1  agreement had been made. *See* Counterclaim, ¶¶ 98-105, Answer, ¶¶ 112-113.

2      Three key documents demonstrate that as a matter of law no agreement was

3  ever consummated: (1) a letter dated October 19, 2001 (the October 19, 2001

4  Letter") from Plaintiffs' then counsel, Kevin Marks ("Marks") to Warner's general

5  counsel, John Schulman ("Schulman"), Toberoff Decl., Ex. BB; (2) a reply letter

6  dated October 26, 2001 from Schulman to Marks, attaching an outline of purported

7  deal terms (collectively, the "October 26, 2001 Letter"), Toberoff Decl., Ex. CC; and

8  (3) a proposed first draft of an agreement sent by Defendants' outside counsel to

9  Marks on February 1, 2002 (the "February 1, 2002 Draft"), Toberoff Decl., Ex. DD.

10      The relevant history is as follows. In 2000 and 2001 the parties communicated

11  sporadically concerning the potential settlement (*i.e*, purchase or license) of

12  Plaintiffs' Recaptured Superman Copyrights (and regarding another character called

13  "Spectre," not at issue herein). FACC, ¶¶ 51, 52. These negotiations became

14  increasingly complex and led to an October 16, 2001 conference between the parties'

15  counsel, Schulman and Marks, in which many different terms, including complicated

16  contingent compensation formulas, were discussed. Toberoff Decl., Exs. BB, CC.

17  Thereafter, Marks sent Schulman the October 19, 2001 Letter which stated as

18  follows:

19      "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the
     majority owners of the terminated copyright interests) has accepted D.C.

20  Comics' offer of October 16, 2001 in respect of the "Superman" and
     "Spectre" properties. The terms are as follows: . . . ."

21

22  Toberoff Decl., Ex. BB, p. 1. The October 19, 2001 Letter proceeded to set forth

23  financial and other terms and concluded by stating:

24      "*John [Schulman], if there is any aspect of the above that is somehow
     misstated, please let me know*...I will be out of the office...for the

25  following four weeks."

26  *Id*., at p. 1-6 (emphasis added).

27      Schulman responded to Marks' October 19, 2001 Letter by his October 26,

28  2001 Letter, stating as follows:

46

**EXHIBIT 66**
**1895**

( )

1    "I have received, and have finally had a chance to review, your outline ~~fax of October 19...  I enclose herewith~~ for you and Bruce
     ***a more fulsome outline of what we believe the deal we've agreed to is.***
2    We're working on the draft agreement so that by the time you

3    [return]...we will have this super-matter transaction in document form."

4    Toberoff Decl., Ex. CC (emphasis added). As clearly demonstrated below,

5    Schulman's "*more fullsome outline*" entitled "October 2001 Outline" contained *new*

6    *or different material terms* than that contained in Marks' October 19, 2001 Letter,

7    and was never accepted by Marks or Plaintiffs. *Id.*

8    Defendants' outside counsel thereafter furnished to Marks the February 1, 2001

9    Draft – a first draft of a proposed agreement – along with a cover letter dated

10   February 1, 2002, which stated as follows:

11   "I am pleased to enclose a ***draft*** agreement between your clients and DC
     Comics concerning the Superman property. ***As our clients have not***
12   ***seen this latest version of the agreement, I must reserve their right to***
     ***comment.*** In addition, you will note that the draft agreement makes
13   reference to certain 'Stand Alone Assignments.' We are finalizing those
     and, as soon as they are ready we will forward them to you."
14

15   Toberoff Decl, Ex. DD (emphasis added).

16   As demonstrated below, Defendants' February 1, 2002 Draft contained even

17   more material *new or changed terms* than that contained in Schulman's October 26,

18   2001 Letter; plus "trap doors" that effectively minimized key financial terms set forth

19   in Marks' October 19, 2001 Letter. *Id.*; *see also* Excerpts of Deposition Transcript of

20   Kevin Marks, at 183:1 - 7, 184:13 - 190:6, Toberoff Decl., Ex. EE ("Marks Depo.

21   Tr."). The February 1, 2002 Draft was rejected by Plaintiffs. Toberoff Decl., Ex. AA.

22   Disappointed and disillusioned by Defendants' overreaching tactics, Plaintiffs

23   terminated further negotiations by letter dated September 21, 2002. *Id.* Yet, at no

24   time prior to the filing of their original Answer and Counterclaim on November 22,

25   2004 did Defendants ever claim that a binding settlement agreement had been

26   reached. Nor did Defendants ever proffer to Plaintiffs the fixed compensation for

27   Plaintiffs' recaptured copyrights expressed in either the October 19, 2001 Letter, the

28   October 26, 2001 Letter or the February 1, 2001 Draft. Toberoff Decl., Exs. BB-DD.

47

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1896**

Set forth below is a graph illustrating that their was no "meeting of the minds" between the parties by showing some of the material differences between the terms set forth in Marks' October 16, 2001 Letter, Schulman's October 26, 2001 Letter and Defendants' February 1, 2002 Draft.

| TERMS | OCT. 19, 2001 LETTER | OCT. 26, 2001 LETTER | FEB. 1, 2002 DRAFT |
|---|---|---|---|
| **Scope of Agreement** | Terms applied to Superman, Superboy, & related properties (e.g., Smallville, Lois & Clark) and Spectre ("Property"), and related trademarks. *See* October 19, 2001 Letter, Toberoff Decl., Ex. BB ("10/19/01 Letter") at p.1, ¶ 1; Marks Depo. Tr. at 155:18-19; 184:22-185:1. Toberoff Decl., Ex. EE. | Terms applied to *all* Siegel properties, including but not limited to Superman, Superboy, Spectre, and all rights of all kinds. This included everything Siegel authored for DC (whether published or not) and everything related to Superman/ Spectre (whether created for DC or not). *See* October 26, 2001 Letter Toberoff Decl., Ex. CC ("10/26/01 Letter") at p. 2; Marks Depo. Tr. at 155:25-156:3. Toberoff Decl., Ex. EE. | Terms cover any Siegel work for which he received any compensation from DC or its predecessors, including Superman and Spectre, plus associated trademarks. *See* October 1, 2002 Draft, Toberoff Decl., Ex.DD ("2/1/02 Draft") at pp. 8, 12, 20; Marks Depo. Tr. at 155:25-156:3; 184:13-187:22. Toberoff Decl., Ex. EE.<br><br>This resulted in a "trap door": Plaintiffs' royalty (see below) tied to DC licensing revenues from *Siegel's* works and **failed to include revenues from all derivative Superman properties.** ***See* Marks Depo. Tr. at 184:13-187:22.** |
| **Grant of Rights** | Plaintiffs "transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy') resulting in 100% ownership to D.C Comics." *See* 10/19/01 Letter at p.3, ¶ 1. | "Grant, re-grant, etc. [of] 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published) including post term. rights as members of the public" and "100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re: Superman, Superboy, Spectre, and related properties - even if not | Grant of all rights in Action Comics No. 1 Superman works, Post Action Comics No. 1 Superman works, Superman Derivative Works, and all Superman Marks; all rights in the Spectre Works, the Post More Fun Comics Spectre Works, the Spectre Marks; and all rights in all other Siegel Works. *See* 2/1/02 Draft at pp. 13-20.<br><br>Termination of all past grants and re-grant of all rights in Superman, Superboy, |

48

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1897**

| | | | |
|---|---|---|---|
| | | created for DC Comics." *See* 10/26/01 Letter at p.2 | Spectre, as well as granting all rights in any other work ever created by Jerome Siegel. *See* 2/1/02 Draft at p. 14.<br><br>Plaintiffs must acknowledge that they do not have rights and will never have rights in any post-Action Comics No.1 Superman works and that all such works are [purportedly] "works made for hire" *See* 2/1/02 Draft at pp. 14-15. |
| **Gross Revenue Definition for Royalty Payments** | 6% of DC's "worldwide gross revenues derived from Property." *See* 10/19/01 Letter at p.1, ¶ 2. | "6% of DC's receipts from all Media licenses for use of the Properties," subject to substantial additional reductions of the royalty rate (see below). *See* 10/26/01 Letter at pp. 5-6. | 6% of "amounts actually received" by DC "in United States Dollars" from "Licensing." Revenues "shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property or SPECTRE Property" even though the 6% royalty rate already accounted for DC's services. See 2/1/02 Draft at p. 9, ¶ 24; Marks Depo. Tr. at 188:17-189:13.<br><br>Advances against royalties paid to DC by a licensee only become Revenues when the advance becomes non-returnable. *See* 2/1/02 Draft at p. 9, ¶ 24.<br><br>Revenues only derived from "Licensing," which refers to DC "authorizing any third party to commercially exploit" Superman/Spectre. *See* 2/1/02 Draft at p. 9, ¶ 23. |
| **Royalty re: Media and Merchand-ising** | 6% royalty when property is used alone or is licensed for motion picture and | Added new categories where 6% royalty could be *further reduced.* *See* 10/26/01 Letter at pp. | Added new categories where the 6% royalty could be *further reduced.* *See* 2/1/02 Draft at pp. 23-24: |

49

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**<br>**1898**

| | | | |
|---|---|---|---|
| | television. 6% royalty will be adjusted pro-rata if property is used in conjunction with other book characters (other than "cameo" type appearance) but no less than 3%. The royalty can be further reduced to 1.5% in the case of "Justice League of America," "Superfriends" and "Superheroes" merchandise and to 1% for DC Comics/Warner Bros.' overall license to Six Flags. *See* 10/19/01 Letter at p. 2, ¶ 5; Marks Depo. Tr. at 158:4-159:5. | 5-6: "[W]ith respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the license, but to the extent such information is not available, the 6% shall be reducible to not less than 1%." *Id.* "[W]ith respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation." *Id.* | Revenues to which reduced 1.5% royalty applicable are much broader, encompassing all products where Superman / Spectre is not "predominant creative element" nor the "sole predominant identity or title." *See* 2/1/02 Draft at pp. 24; Marks Depo. Tr. at 159:10-12. Revenues to which reduced 1% royalty applicable broadened to include not only Six Flags but "other Licenses where Revenues from such Licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN property and/or SPECTRE Property or to other properties in which THE PLAINTIFFS do not share..." *See* 2/1/02 Draft at p. 25. Added term that only "10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC "shall be deemed DC Comics' Revenues for purposes of royalty computation." *See* 2/1/02 Draft at pp. 24-25. Added term that there is no payment obligation for use of Properties in Time Warner advertising. *See* 2/1/02 Draft at pp. 27-28. |
| Royalty re: DC Publications | 1% of cover price of DC publications when Property is | Changed the works to which the 0.5% royalty rate is applicable. Instead | Changed the works to which the 0.5% royalty rate is applicable. Instead of paying |

50

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**

**1899**

|  |  |  |  |
|---|---|---|---|
| | used alone. Adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than "cameo" appearance), but in no event less than 0.5%." *See* 10/19/01 Letter at pp. 2-3, ¶ 6. | of paying a minimum 0.5% royalty anytime Superman or Spectre appear: "[T]here will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties' characters do not appear in the title of the publication or feature in question" *See* 10/26/01 Letter at p. 6. | a minimum 0.5% royalty anytime Superman or Spectre appear: "[T]here will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE property appear in publications or stories based on other properties and the Properties' characters do not appear in the title of the publication or feature in question." *See* 2/1/02 Draft at p. 27. Added that no royalties are paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent off of cover price." *See* 2/1/02 Draft at p. 9. |
| **Royalty Extension ("Tail")** | Royalty payments cease at the expiration of the Action Comics No. 1 copyright, except for 1) films released during last five years of the copyright (royalties paid for 5 years from release), 2) TV series where royalties would be paid until the end of consecutive original episodes plus 3 years (to cover first syndication sale), and 3) "other substantial projects" (akin to motion picture and TV projects) released during the last 5 years | Royalty payments extended only for film and TV projects for same periods, but not "other substantial projects." *See* 10/26/01 Letter at p. 6. | Royalty payments extended only for film and TV projects for same periods, but not "other substantial projects." *See* 2/1/02 Draft at p. 27. Royalties limited to revenues from direct "Licensing of exhibition and/or broadcast rights to the above motion pictures and television series," not to the associated "sale of any goods or provision of any services ancillary or collateral thereto. *See* 2/1/02 Draft at p. 27. |

51

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1900**

| | | | |
|---|---|---|---|
| | | of copyright (royalties paid for 5 years from release). *See* 10/19/01 Letter at p.3, ¶ 9. | | |
| **Right to Challenge Intra-Company DC Licensing (e.g., licenses to WB)** | Expedited dispute resolution procedure for challenging intra-company deals which fall outside "safe harbors." *See* 10/19/01 Letter at p.5, ¶ 10. | "Expedited dispute resolution procedure" applies to "any claims or between the parties." Plaintiffs limited to monetary damages only, "no injunction against DC/WB breaches, no termination rights, no reversion. DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach." *See* 10/26/01 Letter at p. 7. | Plaintiffs are to acknowledge "their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in doing so, may License, inter alia, the SUPERMAN Property." The Plaintiffs "shall have no right whatsoever to challenge any such license or any of the terms thereof" subject to safe harbor provisions. For "intercompany" agreements not covered by safe harbor provisions, Plaintiffs' may challenge agreement only on basis "that the agreement is not commercially reasonable and fair in light of all the circumstances." *See* 2/1/02 Draft at pp. 32-35. |
| **Credit** | "Until expiration of the U.S. Copyright for Action Comics No. 1, there will be credit on 'Superman' comics and other publications, movies and television programs that reads 'By Special Arrangement with Jerry Siegel Family.'" *See* 10/19/01 Letter at p.4, ¶ 3. | Such credit "on Superman movies and TV shows first created after the date hereof (excluding later episodes of ongoing tv series)." *See* 10/26/01 Letter at p. 7. | Such credit "on new [Superman] works…first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of copyright of Action Comics No. 1." *See* 2/1/02 Draft at p. 39. |
| **Credit To Plaintiffs in "Paid Ads"** | Terms provided for credit to Plaintiffs in "paid ads" concerning the Properties. *See* | Terms do <u>not</u> provide for credit to Plaintiffs in "paid ads." *See* 10/26/01 Letter at p.7; Marks Depo. Tr. at 161:12-20. | Terms do <u>not</u> provide for credit to Plaintiffs in "paid ads." *See* 2/1/01 letter at pp. 39-40; Marks Depo. Tr. at 161:12-20. |

52

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1901**

| | | | |
|---|---|---|---|
| | 10/19/01 Letter at p.4, ¶.4. Marks Depo. Tr. at 161:12-20. | | |
| **Continuing relationship/ Publicity** | Provided only for mutual non-disparagement. *See* 10/19/01 Letter at p.5, ¶ 13. | New terms that Plaintiffs must furnish DC with Jerry Siegel's biography and photos for publicity purposes, and that AOLTW companies would get "first opportunity to negotiate for any biographical works in any media" by the Plaintiffs. *See* 10/26/01 Letter at p. 2; Marks Depo. Tr. at 157:4-8.<br><br>New terms imposing an affirmative obligation on the Plaintiffs to "positively publicize the Properties," including "public appearances" and related "travel," in the future. New terms included Plaintiffs issuing "a joint press release" and "consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties." *See* 10/26/01 Letter at p. 2; Marks Depo. Tr. at 157:19-158:3. | New terms regarding continuing relationship and Plaintiffs' publicity obligations:<br><br>1) Plaintiffs have obligation to positively publicize Properties, including making themselves available for public appearances/ travel; 2) DC consent required for all appearances, statements, interviews by Plaintiffs regarding Superman, etc; 3) Plaintiffs must issue joint press release with DC; 4) No contact by Plaintiffs with DC licensees is permitted. *See* 2/1/02 Draft at p. 37; Marks Depo. Tr. at 157:19-158:3.<br><br>New terms providing DC or its designee with "the first opportunity to negotiate" to buy "any biographical works in any media pertaining to Jerome Siegel." *See* 2/1/02 Draft at p. 41; Marks Depo. Tr. at 157:19-158:3. |
| **Attorney in Fact** | Appoints DC as attorney in fact. *See* 10/19/01 Letter at p. 5, ¶ 12. | Plaintiffs "will designate WB as attorney in fact." *See* 10/26/01 Letter at p. 2 | Appoints DC as attorney in Fact. *See* 2/1/01 letter at p. 36. |
| **Provide Rights Documents** | Not mentioned. | New term that Plaintiffs "[g]ive copies of all documents relating to rights/history." *See* 10/26/01 Letter at p.2. | Not mentioned. |

53

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**

**1902**

| | | | |
|---|---|---|---|
| | | *See* Marks Depo at 156:20-157:3. | |
| **Release and Covenant Not To Sue** | Not mentioned. | Adds "[r]elease and covenant not to sue by [Plaintiffs] [t]hrough date of signing of all claims past, present, and/or future, actual or potential." Adds that Plaintiffs "[a]pprove all deals made before 12/31/00." *See* 10/26/01 Letter at p. 8. | Adds full detailed mutual release by the parties and mutual covenants not to sue. *See* 2/1/02 Draft at pp. 42-45. |
| **Plaintiffs' Warranties & Represent-ations** | "Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party." *See* 10/19/01 Letter at p.5, ¶ 13. *See also* Marks' Depo. at 156:6-10. | Changed terms requiring that the Plaintiffs "warrant and represent," "jointly and severally": 1) that they have "no termination nor any other rights remaining except for under this agreement;" 2) that they have entered into "no contract of any kind with any other party with respect to or related to the Properties;" 3) that they will not "exploit or enter into any agreements" re: the Properties; and 4) that they will not "diminish the DC/WB enjoyment of exclusive ownership, control, and use" of the Properties. *See* 10/26/01 Letter at p. 2; Marks' Depo. at 156:6-10. | Changed terms that Plaintiffs warrant and represent, jointly and severally, that: 1) Plaintiffs or Siegel have not granted any rights in or encumbered the Properties; 2) "they know of no other party with any rights of any kind or that claim to any rights of any kind" in the subject works or trademarks; 3) they shall not negotiate or enter into any agreement concerning the subject works; 4) any of their rights in the works derive from Siegel; 5) "no person or entity other than [Plaintiffs/DC] own any rights or could possibly claim any rights of any nature arising out of any [Siegel] Works;" 6) they know of no other Siegel works in which they claim any rights; 7) they know of no Superman works not listed in the Termination Notices; 8) that Joanne Siegel is the sole executor, trustee, administrator, and personal rep. of the Siegel Estate. *See* 2/1/02 Draft at pp. 41-42; Marks' Depo. at 156:6-10. |

54

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1903**

| | | | |
|---|---|---|---|
| | | | New terms affirming that Plaintiffs have no right to challenge the agreement; and that Plaintiffs have no right to terminate any new grant of the Siegel works. *See* 2/1/02 Draft at pp. 30-31. |
| **Indemnifica-tion and Insurance Coverage** | "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson against liability for DC or affiliate actions." *See* 10/19/01 Letter at p. 5, ¶ 14. *See also* Marks Depo. Tr. *at* 160:21-25. | Terms do <u>not</u> provide Plaintiffs E&O and general liability coverage.<br><br>Indemnification of Siegels who sign the agreement.<br><br>Instead, added new terms that Plaintiffs must "defend and indemnify DC re: third party claims," "defend and indemnify DC re: Dennis [Larson] claims and "indemnify re: Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign." *See* 10/26/01 Letter at p.8; Marks Depo. Tr. at 156:14-19; 160:21-25. | Terms do not obligate DC to provide Plaintiffs E&O and general liability coverage.<br><br>Indemnification of Siegel family members that sign the agreement "due to wrongful acts by [DC or WB]." *See* 2/1/02 Draft at p. 46.<br><br>**Added broad new terms that Plaintiffs must jointly and severally defend and indemnify DC for any/all :** 1) claims by DC against Plaintiffs arising from a breach or claimed breach by Plaintiffs "(or any of the successors, assigns, heirs, estates, trustees, administrators or executors of Jerome Siegel);" 2) **claims by** Plaintiffs, the estate and heirs of Siegel, Dennis Larson, or **any other person or entity; including "any claims relating to [Plaintiffs'] representations and warranties"** [see above]; and Plaintiffs **obligation to indemnify is "fully binding regardless of whether any of the…claims [etc.]…are founded, valid, established in law or fact, or based on evidence."** *See* 2/1/02 Draft at pp. 45-46; Marks Depo. Tr. at 156:14-19; 160:21-25. |
| **If Rights Not Transferred** | If transfer prevented for "legal reason" (e.g., change in law), | Changed term. In the event Plaintiffs "attempt to assert claims, all but | Changed term. In the event Plaintiffs rights grant is ineffective or Plaintiffs make |

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1904**

| | | | |
|---|---|---|---|
| | | "everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer...For the sake of clarity, this provision will not in any circumstances reduce the monies due the Siegel Family under this deal." *See* 10/19/01 Letter at p. 3 ¶ 2. | $100,000/year creditable to any other obligation WB has or may have to Siegels.  If any claim by Plaintiffs or successor results in DC expense or liability, compensation (over $100,000 annually) will be reduced thereby, and "only total due hereunder is ever due." *See* 10/26/01 Letter at p. 8. | a claim or have reversionary rights, resulting in any liability or damage to DC, any amounts due Plaintiffs will thereby be reduced (except $100,000 annually). Plaintiffs must acknowledge that the amount payable is more than they would have received in a court if they attempted to enforce their termination notices, and agree that any compensation payable to them, including due to a change in the law, will be capped by the amount payable in the agreement. *See* 2/1/02 Draft at pp. 48-49. |
| **Arbitration Provisions** | Expedited dispute resolution in one instance: "if the Plaintiffs were to challenge an intercompany deal that was outside a safe harbor." *See* 10/19/01 Letter at p.5, ¶10;Marks Depo. Tr. at 159:17-19. | Terms broadly require expedited dispute resolution / arbitration of "any claims between the parties." *See* 10/26/01 Letter at p. 8; Marks Depo. Tr. *at* 159:21-23. | Terms broadly require arbitration of any and all disputes and limits the remedies available to the Plaintiffs. *See* 2/1/02 Draft at pp. 47-50; Marks Depo. Tr. *at* 159:21-23. |
| **Audit Rights** | Plaintiffs have "full audit rights." *See* 10/19/01 Letter at p.5, ¶ 10. | Plaintiffs have audit rights subject to "[s]tandard WB language and time frames" and limitation of "[o]ne audit per any period." *See* 10/26/01 Letter at p. 7. | Plaintiffs have audit rights subject to new limitations: 1) No audit will begin later than 12 months after royalty statement provided; 2) No audit for longer than 5 business days; 3) Records supporting any royalty statement may not be audited more than once; 4) All statements binding unless majority of Plaintiffs object in writing within 12 months of receipt of statement, or if audit started, within 30 days of completion; 5) Plaintiffs audit at their own expense;  and |

56

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**

**1905**

| | | | 6) Confidentiality provisions. *See* 2/1/02 Draft at pp. 35-36. |
|---|---|---|---|

1.    **The October 19, 2001 Letter Constitutes A Counteroffer That Was Not Accepted By Defendants**

In a nutshell, Marks' October 19, 2001 Letter though styled as an "acceptance" of Schulman's "offer" of October 16, 2001 is, in reality, a "counteroffer" because, according to Schulman and his "more fulsome outline" something different was discussed on October 16, 2001 ("I enclose herewith… a more fulsome outline of what we believe the deal we've agreed to is.")  Toberoff Decl., Ex. CC. The October, 2001 Outline attached by Schulman, which purported to be Defendants' October 16, 2001 "offer," contained materially different terms (more favorable, of course, to Defendants) than that contained in the purported October 19, 2001 "acceptance." Therefore, Marks' October 19, 2001 Letter was, in reality, a counteroffer.  It was not accepted by Schulman, and did not result in a contract as a matter of law.

The terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-856 (1998); *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959).  A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror which must be accepted by the former offeror now turned offeree before a binding contract results. *Panagotacos*, 60 Cal App 4th at 855-856; *In re Pago Pago Air Crash*, 637 F.2d 704, 706 (9th Cir. 1981); *Landberg* v. *Landberg* 24 Cal.App.3d 742, 750 (1972); Cal. Civ. Code § 1585 ("An acceptance must be absolute and unqualified…A qualified acceptance is a new proposal.") *See also 1-3 Corbin on Contracts § 3.36 (2006)*(a counter-offer ordinarily terminates the power to accept the previously made offer to which it is a "counter" or reply in a negotiation.)

In *Glendale Motor Co. v. Superior Court*, 159 Cal.App.3d 389 (1984), where a settlement agreement was claimed, the court held that plaintiff's qualified acceptance

57

1  constituted a counteroffer and thus terminated the defendant's settlement offer as a

2  matter of law. The court noted that "California law has generally held that a qualified

3  acceptance or counteroffer affects the viability of the offer itself, so that 'a qualified

4  acceptance amounts to a new proposal or counteroffer *putting an end to the original*

5  *offer.*'" *Id.* at 396, *quoting Apablasa* v. *Merritt & Co.* 176 Cal.App.2d at 726.

6          In *Smith v. BioWorks, Inc.*, 2007 LEXIS U.S. Dist. 6157 at *27 (ED CA 2007)

7  the court held that the plaintiff's reservation and assertion of rights evidenced that "he

8  signed the Agreement with the proviso that he did not accept certain terms. Because

9  plaintiff's letter constituted only a qualified acceptance, no binding contract was

10  formed, and the rejection terminated defendant's offer. Defendant's response letter,

11  dated January 10, 2005, does not indicate an acceptance of plaintiff's counter-offer."

12          **2.      No Contract Was Formed Because There Was Never A**

13          **"Meeting Of The Minds" On All Material Terms**

14          "California law is clear that there is no contract until there has been a meeting

15  of the minds on *all* material points." *Banner Entnm't v. Superior Court*, 62 Cal. App.

16  4th 348 (1998) (citations omitted). The failure to reach a meeting of the minds on all

17  material points prevents the formation of a contract even though the parties have

18  orally agreed upon some of the terms, or have taken some action related to the

19  contract. *Grove v. Grove Valve & Reg. Co.*, 4 Cal. App. 3d. 299, 311-312 (1970).

20          Here, Schulman's March 26, 2001 Letter made clear ("I enclose… a more

21  fulsome outline of what we believe the deal we've agreed to is") and Defendants'

22  February 1, 2002 Draft further confirmed that there had been no "meeting of the

23  minds" between the parties and widened the gap between them by changing material

24  terms and adding new material terms than that set forth in Marks' October 19, 2001

25  Letter (counteroffer). *See* Comparison Graph, *supra*; Toberoff Decl., Exs. BB- EE.

26          An essential element of any contract is "consent." Civ. Code, § 1550; 1

27  Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 6, p. 44. Such "consent"

28  must be "mutual." Cal. Civ. Code, § 1565; 1 Witkin, Summary of Cal. Law,

1  Contracts, § 119, p. 144; *Meyer v. Benko*, 55 Cal. App. 3d 937 (1976). Consent is

2  not mutual, unless the parties agree upon the same thing in the same sense. *Banner*

3  *Entertainment, Inc. v. Superior Court,* 62 Cal.App.4th 348, 358-359 (1998). There is

4  no contract formation without a manifestation of assent to the "same thing" by both

5  parties. Cal. Civ. Code, §§ 1550, 1565 and 1580.  Contract law precludes specific

6  enforcement of a contract when it cannot be determined exactly what terms the

7  parties agreed upon. *Weddington Prods. v. Flick*, 60 Cal. App. 4th 793, 801 (1998).

8      The Ninth Circuit has made clear that district courts "may enforce only

9  complete settlement agreements." *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987).

10 *See also Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983); *Gardiner v. A.H.*

11 *Robins Co.*, 747 F.2d 1180, 1189 (8th Cir. 1984).

12      "In addition to the intent of the parties to bind themselves, the formation of a

13 settlement contract requires agreement on its *material terms*." *Callie v. Near*, 829

14 F.2d at 891.  In *Callie*, the appellants' counsel wrote a letter to the other side "'to

15 confirm' the terms of the settlement" as the parties were in agreement as to most

16 material terms, including the settlement payment. *Id.*, at 889.  However, because they

17 failed to agree on other terms, there could be no "meeting of the minds." *Id.*, at 891.

18      *Levitz v. The Warlocks*, 148 Cal. App. 4th 531, 534 (2007) is also illustrative.

19 In ruling that a settlement agreement had not been reached although key terms had

20 been agreed upon the Court held:

21      "In their first communication with the court about their tentative
        settlement, the parties notified it they had a settlement "in principle,"
22      meaning they had yet to fix its exact terms.  A settlement with open
        material terms is not a "conditional settlement."  To the contrary, it is not
23      a settlement at all because, like all contracts, it is not binding until the
        settling parties agree on all its material terms."
24

25      In this case no contract was made because the parties attempted, but failed, to

26 agree on all material terms (see above).  Moreover, even had they provisionally so

27 agreed (they did not) it is clear from their conduct that, given the importance and

28 complexity of the subject matter and proposed deal points, any agreement would need

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1908**

1  to be reduced to a written contract in a mutually acceptable fashion.  See October 26,

2  2006 Letter ("We're working on the draft agreement…").  Toberoff Decl., Ex.CC.

3          **3.**     **A Complete Written Agreement In Final Form, Signed By**

4                **Both Parties, Was Contemplated But Never Completed,**

5                **Approved Or Executed**

6        It is further evident that the parties contemplated a complete written agreement

7  in final form, which would contain additional terms, subject to the parties' mutual

8  consent; and that there would be no binding contract until such final written

9  agreement was reviewed, approved and executed by both parties.  *See* Cover letter

10  attaching Defendants' February 1, 2002 Draft ("As our clients have not seen this

11  latest version of the agreement, I must reserve their right to comment"), Toberoff

12  Decl., Ex. DD.  *See Patch v. Anderson,* 66 Cal. App. 2d 63 (1944)(court found no

13  enforceable written contract, merely an agreement to execute a contract whose

14  material terms had not all been settled and agreed upon); *see also* 1 Williston on

15  Contracts (4th ed. 1990) § 4:18, at 414; § 4:26, at 585-7.

16        "When it is clear…that both parties contemplated that acceptance of the

17  contract's terms would be signified by signing it, the failure to sign the agreement

18  means no binding contract was created." *Weddington,* 60 Cal. App. 4[th] at 801, *citing*

19  *Beck v. Amer. Health Group Intern., Inc.*, 211 Cal. App. 3d 1555, 1562 (1989).  Thus,

20  "it is a general rule…that, when it is a part of the understanding between the parties

21  that the terms of their contract are to be reduced to writing and signed by the parties,

22  the assent to its terms must be evidenced in the manner agreed upon or it does not

23  become a binding or completed contract." *Duran v. Duran*, 150 Cal. App.3d 176, 180

24  (1983) (citations omitted).  *See also Roth v. Garcia Marquez*, 942 F.2d 617, 626-627

25  (9th Cir. 1991); *Forgeron, Inc. v. Hansen*, 149 Cal. App. 2d. 352, 360 (1957).

26        "Preliminary negotiations or an agreement for future negotiations are not the

27  functional equivalent of a valid, subsisting agreement.  'A manifestation of

28  willingness to enter into a bargain is not an offer if the person to whom it is addressed

60

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1909**

1    knows or has reason to know that the person making it does not intend to conclude a

2    bargain until he has made a further manifestation of assent.'" *Kruse v. Bank of*

3    *America*, 202 Cal. App.3d 38, 59 (1988) (citations omitted).

4        *Weddington*, 60 Cal. App. at 799, like this case, concerned a disputed

5    settlement agreement which purported to license certain *copyrights*. The parties *both*

6    *signed* a settlement memorandum before a private settlement judge that, like the

7    October 19, 2001 Letter here, included "significant deal points," and described

8    payment dates and amounts material to both sides. *Id*. When, as here, subsequent

9    disagreements arose during the parties efforts to draft the final settlement agreement,

10   the settlement judge, upon application of the putative licensee, signed an expanded

11   settlement order (under Cal. Civ. Proc. Code § 664.6), imposing a copyright license

12   "consistent with" the signed settlement memorandum; which order was entered by

13   the trial court. *Id*. at 804.

14       The Court of Appeals reversed, holding that no "meeting of the minds"

15   occurred on the material terms of the contract, and that a final agreement had not

16   been signed by the parties. "As a result, there was no settlement agreement to

17   enforce, pursuant to Cal. Civ. Proc. Code § 664.6 or otherwise." *Id*. at 812. The

18   court noted: "The fact that the context was one of settlement negotiation…has no

19   analytical impact on the question of whether an enforceable contract was ever

20   formed." *Id*. at 815. It further noted that a court does not have the authority to create

21   material terms of a settlement. *Id*. at 810-811. *See Terry v. Conlan*, 131 Cal. App.

22   4th 1445, 1459-1461 (2005) (trial court improperly attempted to define material terms

23   and fill in the gaps of a settlement agreement).

24       Here, the documentary evidence and conduct of the parties clearly

25   demonstrates that there was no meeting of the minds as to all material terms of an

26   agreement, and that as a matter of law a binding contract was never reached,

27   completed, approved and executed by the parties.

28

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1910**

**IV.    CONCLUSION**

      For the foregoing reasons, Plaintiffs respectfully requests that the Court grant

their motion for summary adjudication in the form lodged separately herewith as the

Proposed Judgment.

DATED: April 30, 2007        LAW OFFICES OF    ARC TOBEROFF, PLC


By _____
               Marc Toberoff

**Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON**

62

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 66**
**1911**

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On April 30, 2007, I served the attached documents described as:

**Plaintiffs Joanne Siegel and Laura Siegel Larson's Notice of Motion And Motion For Partial Summary Judgment**

**Plaintiffs Joanne Siegel and Laura Siegel Larson's Memorandum of Points And Authorities in Support Of Motion For Partial Summary Judgment**

**Declaration of Marc Toberoff In Support of Plaintiffs' Motion For Partial Summary Judgment**

**Plaintiffs Joanne Siegel and Laura Siegel Larson's Statement of Uncontroverted Facts And Conclusions of Law in Support of Motion for Partial Summary Judgment**

**Plaintiffs Joanne Siegel and Laura Siegel Larson's Request For Judicial Notice In Support of Motion For Partial Summary Judgment**

**[Proposed] Order Following Partial Summary Judgment**

as follows:

[X]  :BY HAND:

As follows: I delivered to the address listed above by hand the documents listed herein.

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

[X]  :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017

[X]  :BY FACSIMILE:

**EXHIBIT 66**
**1912**



As follows: I caused the transmission of the above named documents to the fax number set forth below, or on the attached service list.

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Facsimile No. 212-813-5901

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Facsimile No. 845-265-2819

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile No. 310-550-7191

:(STATE) - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X] :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on April 30, 2007, in Los Angeles, California.

Nicholas C. Williamson

**EXHIBIT 66**
**1913**