Marc Toberoff (State Bar No. 188547)
  *mtoberoff@toberoffandassociates.com*
Keith G. Adams (State Bar No. 240497)
  *kadams@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway, #348
Malibu, California, 90265
Telephone:  (310) 246-3333
Fax:        (310) 246-3101

Attorneys for Plaintiff-Counterclaim Defendant, Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br>  Plaintiff,<br>v.<br>WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,<br>  Defendants and Counterclaimants. | Case No: 04-CV-08400 ODW (RZx)*<br>Case No: 04-CV-08776 ODW (RZx)*<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**PLAINTIFF'S COURT-ORDERED SUPPLEMENTAL BRIEF RE: EFFECT OF THE COURT'S MARCH 20, 2013 ORDER ON THE "ADS" AND "SUPERBOY" TERMINATIONS**<br><br>*Declarations of Keith Adams and Laura Siegel Larson filed concurrently*<br><br>*: Docket citations herein are to Case No. 04-CV-08400. |
| LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,<br>  Plaintiff,<br>v.<br>TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,<br>  Defendants and Counterclaimants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    A.    Superboy And The Superman Ads........................................................2

    B.    The 1997 Superman Termination And 2002 Superboy Termination ...3

    C.    The Superman/Superboy Litigations And The Ads Termination .........4

ARGUMENT ..........................................................................................................6

I.    THE OCTOBER 19, 2001 AGREEMENT COULD NOT TRANSFER RIGHTS IN "SUPERBOY" OR THE "ADS" AS A MATTER OF LAW ....6

    A.    Congress' Clear Intent To Protect The Termination Right...................6

    B.    The "Revocation And Regrant" Decisions ...........................................7

    C.    The October 19, 2001 Letter Cannot Bar The Superboy Or Ads Terminations As A Matter Of Law .........................................................9

    D.    The October 19, 2001 Letter Does Not Satisfy California Law As To Revocation And Regrant .......................................................................10

        1.    The October 19, 2001 Letter Could Only Transfer The Rights The Siegels Recaptured By Their 1997 Terminations..............10

        2.    The Record Evidence Demonstrates That The Letter Was Not A Revocation And Regrant......................................................11

            a.    The Letter Was Not A Novation ....................................13

PROPOSAL FOR RESOLUTION .......................................................................14

CONCLUSION .....................................................................................................15


# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Angel*,
37 Cal. 2d 856 (1951) .............................................................................................13

*Alexander v. Codemasters Group Ltd.*,
104 Cal. App. 4th 129 (2002) .................................................................................14

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ............................................................................*passim*

*Fanucchi & Limi Farms v. United Agri Prods.*,
414 F.3d 1075 (9th Cir. 2005) ................................................................................13

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943)............................................................................................. 6-7

*Greenberg v. National Geographic Society*,
533 F.3d 1244 (11th Cir. 2008) ................................................................................6

*Marvel Characters Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) .....................................................................................8

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ......................................................................... 7-9, 11

*Morey v. Vannucci*,
64 Cal. App. 4th 904 (1998) ...................................................................................11

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001)..................................................................................................7

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) .....................................................................................8

*Siegel v. National Periodical Publications, Inc.*,
508 F.2d 909 (2d Cir. 1974) ...................................................................................14

*Siegel v. Time Warner Inc.*,
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ...............................................................3, 15

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) .............................................................*passim*

*Stewart v. Abend*,
495 U.S. 207 (1990)..................................................................................................6

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ................................................................................12

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1 (1995).................................................................................................13

*Wolf v. Walt Disney Pictures & Television*,
162 Cal. App. 4th 1107 (2008) ................................................................................ 11, 14

**Statutes**

17 U.S.C. § 304 ............................................................................................................ *passim*

Cal. Civ. Code § 1636 ........................................................................................................ 13

Cal. Civ. Code § 1639 ........................................................................................................ 13

# INTRODUCTION

The October 19, 2001 letter could not transfer the Siegels' copyright expectancy from their 2002 termination notice regarding Superboy or their 2012 termination notice regarding the Superman Ads. Per 17 U.S.C. § 304(c)(6)(D), termination interests cannot be anticipatorily assigned prior to the service of a termination notice. Furthermore, under 17 U.S.C. § 304(c)(5), statutory heirs can exercise termination rights "notwithstanding any agreement to the contrary, including … an agreement to make a further grant." To the extent the 2001 letter is construed to waive, relinquish or encumber the Siegels' termination rights regarding Superboy or the Ads, it is void under the Copyright Act as an "agreement to the contrary."

The Siegels' 1997 termination notices did not apply to Superboy works, because those notices were strictly limited by the time "windows" set forth in 17 U.S.C. §§ 304(c)(3)-(4), and could only recapture works published by 1943. The Siegels' 2002 termination focused on Superboy, which was first published in 1944, and which DC owned pursuant to a 1948 grant by Jerome Siegel.

DC owned the Superman Ads pursuant to Siegel and Shuster's 1938 grant, and the Court ruled that the Ads were outside the termination "window" and "outside the effective reach of the [1997] termination notices." *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1119-23 (C.D. Cal. 2008). In 2012, Ms. Larson therefore served and filed a 17 U.S.C. § 304(d) termination notice regarding the Ads.

To circumvent the Copyright Act, DC argues that the October 19, 2001 letter silently revoked Siegel's pre-1978 grants (on which DC continued to rely *after* 2001) and re-granted to DC rights it already owned. The Ninth Circuit has made clear, however, that as a matter of federal copyright law, any "revocation and re-grant" must be "express," given § 304(c)(5) and Congress' concerted objective to protect the termination right. Thus, as a matter of Copyright law, this Court can rule that the Siegels' recaptured copyrights in Superboy and the Ads were not transferred in 2001.

Moreover, the reasonable inferences from the evidence support the Siegels,

and on DC's summary judgment motion, the Court must draw all reasonable inferences in favor of the Siegels, and against DC. The 2001 letter contains no language of revocation and, as DC conceded and this Court ruled, the 2001 letter controls, "nothing more." DC has never asserted that the 2001 letter cancelled Jerome Siegel's original grants. In fact, DC pled <u>in this very case</u> that such grants "are still in effect," relied on them to secure favorable rulings, and is judicially estopped from changing its position. Dkt. 646 ¶¶68-69. DC also relied on Siegel's pre-1978 grants outside this case, long after the 2001 letter. The first appearance of "revocation and regrant" is in *DC's* rejected 2002 draft proposal, which DC is also estopped from relying on, after repeatedly disavowing it before the Ninth Circuit.

The October 19, 2001 letter had no effect on the Siegels' 2002 Superboy and 2012 Ads terminations as a matter of federal Copyright law; and even under state contract law, DC's revisionist theory, at the very most, contrives a triable issue of fact as to the parties' mutual intent, precluding summary judgment for DC.

## BACKGROUND

### A. Superboy And The Superman Ads

In 1933-34, writer Jerome Siegel and artist Joe Shuster co-created Superman. *Siegel*, 542 F. Supp. 2d at 1102-06. On March 1, 1938, they signed an agreement selling Superman to DC for $130. *Id.* at 1107. DC intended to publish "Superman" in a new magazine, *Action Comics,* which it promoted in prior promotional announcements in two of its other magazines (the "Ads"):

> Detective Comics announced the debut of its Action Comics series with full page announcements in the issues of some of its existing publications. Specifically, in *More Fun Comics*, Vol. 31, with a cover date of May, 1938, Detective Comics placed the following black-and-white promotional advertisement on the comic's inside cover, which reproduced the cover of the soon-to-be published first issue of *Action Comics*…
> Similarly, *Detective Comics*, Vol. 15, with a cover date of May, 1938, had a full-page black-and-white promotional advertisement ….
> Superman itself was published by Detective Comics on April 18, 1938, in *Action Comics*, Vol. 1, which had a cover date of June, 1938.

*Id.* at 1107-1110. *Action Comics* was an immediate success. *Id.* at 1110-11.

Later in 1938, Siegel created Superboy:

> Not long thereafter, on November 30, 1938, Siegel pitched the idea to Detective Comics of serializing a comic concerning the exploits of Superman as a young man. Siegel called his character "Superboy." …. Detective Comics, by a letter dated December 2, 1938, effectively declined to publish Siegel's proposed Superboy comic. Siegel later re-pitched the idea in December, 1940, through the submission of a lengthy script containing the storyline and dialogue for the proposed comic strip's first release or releases that fleshed out in greater detail the outlines of the Superboy story arc. Detective Comics again effectively declined to publish Superboy.
> Siegel entered the United States Army in July, 1943, to serve his country during World War II. In December, 1944, while Siegel was stationed abroad, Detective Comics published, without notice to Siegel and without his consent, an illustrated five- page comic strip entitled "Superboy" appearing as one among many other comics strips in the body of volume 101 of its magazine *More Fun Comics*.

*Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1114-1115 (C.D. Cal. 2007). In 1947, Siegel and Shuster sued DC in Westchester, N.Y. *Id*. The court held that DC owned Superman under the 1938 grant, but that DC had stolen Superboy from Siegel while he was fighting for his country in WWII. *Id.* at 1116. The parties then settled, and Siegel transferred Superboy to DC in a May 19, 1948 stipulation. *Id.* at 1118.

**B.     The 1997 Superman Termination And 2002 Superboy Termination**

In 1997, Siegel's widow, Joanne Siegel, and daughter, Laura Siegel Larson, served 17 U.S.C. § 304(c) notices of termination as to his Superman copyright grants to DC (the "1997 Terminations"). Dkt. 644 ¶39. Under the termination "windows" set forth in §§ 304(c)(3)-(4), the 1997 Terminations applied to Siegel's Superman works published between 1938 and 1943 (*id.*), although they listed derivative works outside this "window" out of an abundance of caution. Dkt. 646 ¶43.

On April 15, 1999, DC contested the 1997 Terminations. Dkt. 646 ¶49. DC and the Siegels thereafter had settlement negotiations, culminating in an October 19, 2001 letter from the Siegels' counsel, Kevin Marks (the "October 19, 2001 Letter"). Dkt. 646 ¶56. DC did not demand that the Siegels revoke Jerome Siegel's pre-1978 grants, or mention the Superman Ads, and, as Laura Siegel Larson testified, the Siegels had no intention to contractually revoke Jerome Siegel's pre-1978 grants. Declaration of Laura Siegel Larson ("LD"), ¶¶3-4. The October 19, 2001 Letter

stated that the Siegels "would transfer all of [their] rights in the 'Superman' and 'Spectre' properties (including 'Superboy')." Declaration of Keith Adams ("AD"), Ex. 2 at 12. DC responded with an October 26, 2001 letter and a February 1, 2002 draft "long-form" contract (the "February 1, 2002 Draft"), including many "materially" and "vastly different" terms. *Siegel,* 542 F. Supp. 2d at 1139. In contrast to the simple "transfer" language in the October 19, 2001 Letter, the February draft stated:

> WHEREAS, for the purposes of this Agreement … the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated … and to make a new grant to DC Comics of all rights….
> … The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (…) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment ….

AD, Ex. 4 at 36-38; *id.* at 39-40 (similar grant for "POST ACTION COMICS NO. 1 SUPERMAN WORKS"). The Siegels flatly rejected DC's changes in letters dated May 9 and September 21, 2002. *Siegel*, 542 F. Supp. 2d at 1115-16; Dkt. 717 at 8.

On November 8, 2002, the Siegels served a § 304(c) notice of termination regarding Superboy, with an effective termination date of November 17, 2004. AD, Ex. 5. That notice terminated *More Fun Comics, No. 101* (Nov. 1944) which "published" Siegel's "Superboy" script and contained the first appearance of Superboy and other post-1944 "Superboy" works. *Id.*; AD, Ex. 1 ¶¶155-76 .

C.   **The Superman/Superboy Litigations And The Ads Termination**

On October 8 and October 22, 2004, the Siegels filed two suits to enforce their statutory terminations as to Superman and Superboy. DC counterclaimed that the terminations were ineffective and that, if effective, the Siegels had "transferred or would transfer all of their rights in the Superman property" under the October 19, 2001 Letter. Dkt. 646 ¶¶52, 97-105. DC did not allege that the Letter revoked and regranted Jerome Siegel's original copyright grants. In fact, DC's counterclaims,

filed in both the Superman and Superboy suits, contradict its new claim that the October 19, 2001 Letter was a revocation of Siegel's prior grants. DC alleged that "[a]ll grants made by Siegel and Shuster of rights in Action Comics No. 1 *are still in effect*, and all rights under copyright granted therein are still owned exclusively by DC Comics." *Id.* ¶87 (emphasis added). DC also argued that "the Siegels served no notice terminating the copyright grant in the May 21, 1948 Consent Agreement" (*id*. ¶57) and that "the grant contained therein to all copyrights related to Superman *remains in full force and effect*." *Id.* ¶69 (emphasis added). DC also specifically pled that it retained the Ads pursuant to Siegel's original Superman grants, as "[t]he grants made by Siegel and Shuster … *are still in effect*, and all rights under copyright granted therein are still owned exclusively by DC Comics because the Superman [Termination] Notices do not list the works in which the Ads were first published." *Id.* ¶112 (emphasis added). On summary judgment, Judge Larson accepted DC's argument "that the [Ads] containing an illustration of Superman from the cover of *Action Comics*, Vol. 1, are outside the effective reach of the termination notices" because they were published outside the statutory 1938-43 termination "window" of the notices. *Siegel,* 542 F. Supp. 2d at 1118-23.

In 2011, this Court entered a judgment in the Superman case, and both sides appealed. Dkt. 669, 671, 674. DC repeatedly disclaimed the October 26, 2001 and February 1, 2002 drafts on appeal, representing that "[i]f any material difference does exist, DC has long agreed: the October 19 letter controls." AD Ex. 13 at 219.

On March 6, 2012, Ms. Larson served a 17 U.S.C. § 304(d) termination notice on DC regarding the early Superman Ads. Dkt. 709-1 ¶63; AD, Ex. 12. As such, the parties' pleadings herein do not address her Ads termination notice.

On January 10, 2013, the Circuit held that the October 19, 2001 Letter was a valid acceptance of an offer by DC. On remand, DC moved for summary judgment and this Court held "that the October 19, 2001 agreement … operated itself to transfer the Siegels Superman rights to DC" and that "the parties are bound by the

terms memorialized in Marks's October 19 letter; nothing more." Dkt. 717 at 14-15. The Court ordered further briefing "on the effect of the October 19, 2001 agreement on the Superboy and early Superman ad works." *Id.* at 15.

## ARGUMENT

### I. THE OCTOBER 19, 2001 AGREEMENT COULD NOT TRANSFER RIGHTS IN "SUPERBOY" OR THE "ADS" AS A MATTER OF LAW

#### A. Congress' Clear Intent To Protect The Termination Right

Since 1831, Congress has provided authors rights to recover their copyrights, and has strengthened those rights over time. *Stewart v. Abend*, 495 U.S. 207, 217-20 (1990). The 1909 Copyright Act divided copyright into "initial" and "renewal" terms; the renewal term was intended to be owned by authors to protect those who had struck imprudent deals. *Id.* at 217-220; *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) ("[T]he renewal process was intended to give an author and his heirs a second chance …."). Congress' objective was gutted by *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), which held that the renewal interest could be anticipatorily assigned. *Stewart*, 495 U.S. at 219.

The 1976 Copyright Act "was supposed to reverse two hundred years of publishers' exploitation of authors." *Greenberg v. National Geographic Society*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008). "Congress's clear intent [was] to benefit authors and their heirs with additional years of copyright protection" rather than publishers (*Mewborn,* 532 F.3d at 982), so it coupled the extended renewal term with a *new* right of authors and heirs to terminate pre-1978 copyright grants. 17 U.S.C. § 304(c). 17 U.S.C. § 203(a) allowed termination of an author's post-1978 grants.

Congress' further extension of the copyright term in 1998 was coupled with an additional termination right for pre-1978 grants in 17 U.S.C. § 304(d). *See Mewborn,* 532 F.3d at 985 ("In 1998 Congress reaffirmed its objectives….").

The termination right contrasts starkly with ordinary contract principles, empowering authors and heirs to terminate prior copyright grants *without cause*, and

regardless of the parties' intent when the grant was made. Congress carefully safeguarded the termination right to prevent a repeat of *Fred Fisher* and "assure that its new benefits would be for the authors and their heirs." *Mewborn,* 532 F.3d at 984. Thus, the right cannot be contractually waived or circumvented: "Termination … may be effected notwithstanding any agreement to the contrary," and grants of the reversionary termination interest are only effective if made ***after*** a termination notice has been served (if to the original grantee) or after the effective termination date (if to third parties). 17 U.S.C. §§ 304(c)(5), (c)(6)(D). The Supreme Court has recognized that these provisions reflect a concerted effort to create an "inalienable authorial right to revoke a copyright transfer." *N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.3 (2001).

### B. The "Revocation And Regrant" Decisions

The Ninth Circuit has twice considered whether a post-1978 agreement that is alleged to have revoked a pre-1978 grant and regranted copyrights can legally prevent a later statutory termination. *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Mewborn*, 532 F.3d 978. Neither case questioned that the termination right cannot be waived or circumvented, and upheld Congress' mandate that the right can be exercised "notwithstanding any agreement to the contrary." *Id.* at 988 (*Milne* never found "waiver or relinquishment of [the termination] right").

*Milne* dealt with the classic children's book *Winnie-The-Pooh*. In 1983, the author's son negotiated a new deal with the publisher that expressly called for the "revocation of [1930 and 1962] agreement[s] in favor of the new [1983] agreement, followed by the re-granting (on the same page) of the rights [back to the publisher]." *Id.* at 1040-41. The Ninth Circuit emphasized the "undisputed fact[] that the 1930 grant was expressly revoked." 430 F.3d at 1040 (agreement specifically "provided for the revocation of the 1930 and 1962 agreements"). Years later, the author's granddaughter sought to terminate, but the pre-1978 agreements had been expressly revoked and the 1983 agreement was not subject to termination. *Id.* at 1047-48.

*Mewborn* revisited these issues with another classic, *Lassie Come Home*, and

rejected the publisher's attempt to extend *Milne* beyond its "distinct factual scenario." 532 F.3d at 987. In 1976, the author's daughter, Mrs. Mewborn, assigned her film, TV and radio rights to a publisher. *Id.* at 980. In 1978, she signed a second contract, which "contained the identical transfer of … rights as the 1976 Assignment, but added language assigning ancillary rights." *Id.* at 980-81. Years later, Mewborn served a notice of termination of the 1976 assignment, and the publisher sued, claiming that because the 1978 grant dealt with **the same subject matter** as the 1976 grant, it operated as a "revocation and re-grant" under *Milne*. *Id.* at 981-82.

The Ninth Circuit rejected that argument and upheld Mewborn's termination. The Circuit stressed that the 1978 assignment, like the October 19, 2001 Letter and unlike the agreement in *Milne*, did not "expressly revoke[] the earlier … assignments and simultaneously re-grant[] the same rights." *Id.* at 989. *See also id.* at 988 n.7 (contrasting 1978 assignment with the *Milne* agreement that "expressly revoked" the author's pre-1978 grants). "Because [the publisher already] owned the motion picture, television and radio rights to the Lassie Works in 1978, Mewborn had nothing to transfer by virtue of the 1978 Assignment…. [T]he language in the 1978 Assignment purporting to assign the [same] rights is a nullity." *Id.* at 986.

The Second Circuit is the only other circuit to have considered these issues. In *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 283-84 (2d Cir. 2002), the publisher sought to preclude Captain America's co-creator from terminating a 1969 settlement agreement. The Second Circuit held that, to the extent the agreement was used to preclude termination, it "constitutes an 'agreement to the contrary' under § 304(c)(5)." *Id.* at 292. *Simon* thus "affirmed that 'the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.'" *Mewborn*, 532 F.3d at 985. *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008), dealt with a situation like *Milne*. In 1994, John Steinbeck's widow renegotiated a contract with the publisher that **expressly** revoked his pre-1978 grants and re-granted his copyrights: "when signed by Author and Publisher, [this

agreement] will cancel and supersede the previous agreements." *Id.* at 196. The Second Circuit held Steinbeck's sons could not later terminate his revoked pre-1978 grant, emphasizing that the 1994 contract included a "clear expression of intent to terminate all prior grants" and replace them with the 1994 re-grant. *Id.* at 201.

### C. The October 19, 2001 Letter Cannot Bar The Superboy Or Ads Terminations As A Matter Of Law

The October 26, 2001 Letter did not transfer the Siegels' rights recaptured by their 2002 Superboy termination or 2012 Ads termination.

1. This Court held that the October 19, 2001 Letter "operated itself to transfer the Siegels' Superman rights to DC" (Dkt. 717 at 14) – *i.e.,* whatever rights the Siegels owned on that date. The Superboy notice was not served until November 8, 2002, and was not effective until November 17, 2004. The Ads notice was not served until 2012, and does not take effect until 2014. The October 19, 2001 letter could not have anticipatorily transferred the Siegels' Superboy or Ads expectancy before the notices were served, as a matter of law. 17 U.S.C. § 304(c)(6)(D).

2. The October 19, 2001 Letter was not a "revocation and regrant." The Ninth Circuit has made plain that, given Congress' clear objectives to protect the termination right in § 304(c)(5), any such "revocation and re-grant" must be "express." *Milne*, 430 F.3d at 1040-41, 1047-48; *Mewborn*, 532 F.3d at 980-81, 986, 988-89. Like the purported 1978 re-grant in *Mewborn*, the October 19, 2001 Letter contains *no language of revocation*, let alone the requisite express revocation. In stark contrast, the post-1978 agreements in *Milne*, 430 F.3d at 1040, and *Steinbeck,* 537 F.3d at 200, both <u>*expressly*</u> revoked and replaced the author's pre-1978 grants. As Siegel's 1938 grant relating to the Ads and 1948 grant of Superboy were not revoked in the October 19, 2001 Letter, DC still owned these copyrights.

3. DC may argue that the Siegels' 1997 Terminations "revoked" Jerome Siegel's grants. That makes no sense because under §§ 304(c)(3)-(4), a notice of termination ends a prior grant only as to works within a defined 5-year window –

here, April 16, 1938 to April 16, 1943. As the Superboy and Ads works were outside that "window," Siegel's pre-1978 grants to DC remained in effect as to these works.

4. Nor can the October 19, 2001 Letter be read to transfer any of Siegel's unterminated Superman or Superboy copyrights to DC <u>because DC already owned such copyrights</u>. *Mewborn* addressed this very issue in holding that a purported 1978 "assignment" of rights by an author's daughter was a "nullity" because the publisher already owned the rights from a pre-1978 assignment. 532 F.3d at 986. The situation here is identical, as DC had long owned the Superman Ads pursuant to Jerome Siegel's 1938 grant, and Superboy pursuant to his 1948 grant. Dkt. 646 ¶¶12, 15-16, 23-30, 68-69. As those works were not within the "window" of the 1997 Terminations, DC still owned them on October 19, 2001. Just like the redundant 1978 grant in *Mewborn*, the October 19, 2001 grant is a "nullity" regarding the Superman Ads and Superboy. 532 F.3d at 986.

5. DC is judicially estopped from arguing that Siegel's pre-1978 grants were revoked by the October 19, 2001 Letter. DC alleged in its pleadings and argued on summary judgment that the Ads were not recaptured by the 1997 Terminations, and that Siegel's 1938 grant underlying the Ads was still in effect. Dkt. 646 ¶112; AD, Ex. 8, Ex. 9. After using those arguments to secure a ruling on summary judgment that DC owned the "Ads" under its pre-1978 grants (*Siegel*, 542 F. Supp. 2d at 1118-23), DC cannot turn around and argue the opposite – that the pre-1978 grants were supposedly revoked on October 19, 2001 and no longer in effect. *See Williams v. Boeing Co.*, 517 F.3d 1120, 1134 (9th Cir. 2008) (judicial estoppel applies where "party was successful in persuading a court to accept its … position").

### D. The October 19, 2001 Letter Does Not Satisfy California Law As To Revocation And Regrant

#### 1. The October 19, 2001 Letter Could Only Transfer The Rights The Siegels Recaptured By Their 1997 Terminations

The Court need not reach DC's argument that the October 19, 2001 Letter

...

supposedly constitutes a "revocation and regrant" under California law (Dkt. 711 at 12) and should hold, as a matter of federal Copyright law, that the letter did not transfer any copyrights recaptured by the Superboy and Ads terminations. The Ninth Circuit required in both *Milne*, 430 F.3d at 1040-44, and *Mewborn*, 532 F.3d at 986-87, 989 that a "revocation and re-grant" be expressly stated, not as a matter of state contract law, but of federal Copyright law – to protect the termination right as Congress intended – and to ensure that statutory terminations do not devolve into a free-for-all of state contract interpretation. Neither case even mentioned state law in its discussion. *Milne*, 430 F.3d at 1045 n.8 (passing reference to California contract); *Mewborn*, 542 F.3d at 979-991 (New York contract; no reference to state law).

Even if the Court applies California law, the evidence must be viewed in the light most favorable to the Siegels, as the non-movants, and courts must interpret a contract to give effect to the "objective manifestations of the parties' intent." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998). The obvious inference from the 2001 letter's simple provision that the Siegels "transfer all of [their] rights," and this Court's holding that this was a present transfer, is that it pertained to those rights owned by the Siegels in 2001. Jerome Siegel had long ago assigned Superman and Superboy to DC. Thus, the rights held by his wife and daughter on October 19, 2001 were those recaptured by their 1997 Terminations, and that did not include the Superboy or Ads works. The analysis can and should end there. It cannot be held on summary judgment that the 2001 letter was a "revocation and regrant" or that it anticipatorily transferred the Siegels' later recaptured rights in the Ads or Superboy.

### 2. The Record Evidence Demonstrates That The Letter Was Not A "Revocation And Regrant"

Under California law, a court must provisionally examine extrinsic evidence and admit it if the evidence "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008). The October 19, 2001 Letter

11
PLAINTIFF'S SUPPLEMENTAL BRIEF RE: SUPERBOY AND ADS TERMINATIONS

unambiguously supports Plaintiff's position, and is not "reasonably susceptible" to DC's interpretation. In any event, drawing "'all justifiable inferences … in [Ms. Larson's] favor" (*Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010)), the record evidence easily supports that the parties did not intend the October 19, 2001 Letter to be a revocation and regrant, preventing summary judgment for DC.

"Revocation and regrant" was not mentioned during the parties' negotiations leading up to the October 19, 2001 Letter and is nowhere stated in the letter. Ms. Larson has clearly testified that it was never her intent to revoke her father's pre-1978 grants. LD, ¶¶3-4.

In addition to DC's allegations that the October 19, 2001 Letter was binding, DC simultaneously pled that "[a]ll grants made by Siegel and Shuster or rights in Action Comics No. 1 [1938] are still in effect, and all rights under copyright granted therein are still owned exclusively by DC." Dkt. 646 ¶87. Had the October 19, 2001 Letter actually revoked DC's pre-1978 grants, the grants would not be "still in effect." As noted above, DC likewise pled and argued that its pre-1978 grants remained effective as to all works (*e.g.,* the Ads) not covered by the Siegels' 1997 Terminations. Dkt. 646 ¶112; AD, Ex. 8 at 123-38; Ex. 9 at 140-62.

DC's filings with foreign governments in 2006 and 2007 similarly listed and relied upon Siegel and Shuster's operative pre-1978 grants, along with the October 19, 2001 Letter. AD, Ex. 7 at 111-13; Ex. 10 at 164-66.

DC will cite to its own February 1, 2002 Draft, the only document that even mentions "revocation and regrant," or to its October 26, 2001 letter, for some nebulous "intent." AD, Ex. 3 at 17; Ex. 4 at 36-39. DC cannot do so. DC told the Ninth Circuit that "[t]o the extent that [the October 26, 2001] letter is perceived to have added terms or suggested new terms, they're not part of the deal." AD, Ex. 14 at 269:1-4; *see* AD, Ex. 13 at 219 ("DC has long agreed: the October 19 letter controls."). Having used such representations to convince the Circuit to find an October 19, 2001 "agreement," DC is judicially estopped from using its later drafts

to add terms. In any event, this Court held that "the parties are bound by the terms memorialized in Marks's October 19 letter; nothing more." Dkt. 717 at 15.

Furthermore, the Siegels firmly *rejected* the new and revised terms in DC's October 26, 2001 and February 1, 2002 proposals. "[T]he interpretation of a contact must give effect to … 'the mutual intention of the parties at the time the contract is formed.'" *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1636, 1639). DC cannot use its after-the-fact terms that the Siegels rejected as evidence of the parties' "mutual intention" on October 19, 2001.

### a. The Letter Was Not A Novation

DC will argue that the October 19, 2001 Letter novates or supersedes Jerome Siegel's prior grants by simply dealing with the same subject matter. The publisher made the same "superseding" argument in *Mewborn*, which the Ninth Circuit firmly rejected – holding that Mewborn's 1978 assignment of rights already owned by the publisher was a complete "nullity." 532 F.3d at 981-82, 989-90. "In deciding whether an agreement was [a novation], California courts seek to determine the parties' intent. Determining the parties' intent is a highly fact-specific inquiry. Such inquiries are not generally suitable for disposition on summary judgment." *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005) (citations omitted). Furthermore, "evidence… of a novation must be 'clear and convincing.'" *Alexander v. Angel*, 37 Cal. 2d 856, 860 (1951). Given the Siegels' firm rejection of DC's new terms, and DC's own pleadings and conduct that contradict its new theory, there is no "clear and convincing" evidence that both the Siegels and DC intended to revoke and replace Jerome Siegel's pre-1978 grants in the October 19, 2001 Letter.

\* \* \*

The Court should find that the October 19, 2001 Letter did not transfer the Siegels' recaptured Superboy and Ads copyrights as a matter of federal copyright law. DC's interpretation can also be rejected as a matter of California contract law. The record evidence does not permit any "justifiable inference" that the Siegels

intended the October 19, 2001 letter as a "revocation and regrant." At a minimum, viewing the evidence in the light most favorable to the non-movant, Ms. Larson, the letter is "reasonably susceptible" to the interpretation that it was *not* a "revocation and regrant," precluding summary judgment in DC's favor. *See Wolf,* 162 Cal. App. 4th at 1127 ("[T]he factual conflict is to be resolved by the jury."); *Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129 (2002) (reversing summary judgment where conflicting inferences could be drawn regarding contract).

## **PROPOSAL FOR RESOLUTION**

The *DC Comics* Appeal: The appeal in the related case, *DC Comics v. Pacific Pictures Corp.*, Appeal No. 12-57245, deals with similar issues of whether a post-1978 agreement forecloses statutory termination. The Circuit expedited the appeal and set oral argument for May 23, 2013. The Court may wish to await the outcome of that appeal, so as to make its decision with the benefit of that ruling.

The Ads: Beyond deciding that the Ad works recovered by the 2012 Termination could not have been assigned by the October 19, 2001 Letter as a matter of law, the Court need not otherwise resolve the 2012 Termination, which is not mentioned or addressed in any claims or counterclaims in this case.

Superboy: As the October 19, 2001 Letter also did not transfer Superboy rights recaptured by Ms. Larson's 2002 Termination, as matter of law, the Superboy case (No. 04-CV-08776) remains to be resolved. The case was originally assigned to the Honorable Ronald S.W. Lew. Based on the findings in Siegel and Shuster's 1947 action, confirmed as binding in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), Judge Lew fully resolved the parties' summary judgment motions, because the 1947 action "specifically determined that [DC] published the Superboy comic strip based upon the idea, plan, and conception of Siegel, in … *More Fun Comics* [No. 101]." AD, Ex. 6 at 101. Judge Lew found the 2002 Superboy termination valid, and rejected DC's "derivative work," "work for hire" and "joint work" arguments, leaving only one issue to be decided: whether DC's Superboy

works infringed the Siegels recaptured copyrights. *Id.* at 101-08.

Seven months later, Judge Lew took senior status, the case was reassigned, and DC moved for reconsideration, re-arguing that Superboy was a "work for hire," that Siegel's script was a "joint work," and that the script was not "published" by *More Fun Comics*. Judge Larson reconsidered Judge Lew, but asked for further briefing:

> [T]he Court has determined that Siegel's Superboy submissions were not a work made for hire, but the Court is unable to conclude whether the requisite 'publication' of the Superboy submissions occurred due to the unresolved matter regarding the submissions' derivative nature. Similarly, the Court was unable to conclude whether the Superboy submissions were part of a joint work, but only because the issue of whether the submissions are a derivative work remains unresolved (and a subject of further court-ordered briefing).

*Siegel,* 496 F. Supp. 2d at 1155. At oral argument, however, Judge Larson appeared to recognize that the Superboy story – solely authored by Siegel – was not a "joint work" (AD, Ex. 11 at 194:2-202:5) and DC conceded that it was a copyrightable derivative work. *Id.* at 172:16. <u>Judge Larson never completed his ruling</u>.

Therefore, this Court has two paths. It could endeavor to complete Judge Larson's reconsideration ruling, based on the parties' old supplemental briefing and/or additional briefing, and thereafter adjudicate the copyright infringement and accounting issues relating to the recaptured Superboy copyrights. Alternatively, the Court could reinstate Judge Lew's clear order, based on the 1947 and 1974 rulings. This would leave the issue of whether DC's Superboy works infringed Plaintiff's recaptured Superboy copyrights, which can be expeditiously resolved.

## CONCLUSION

DC's motion regarding the Superman Ads and Superboy must be denied.

Dated: April 4, 2013        RESPECTFULLY SUBMITTED,
                            /s/ Marc Toberoff
                            TOBEROFF & ASSOCIATES, P.C.
                            Attorneys for Plaintiff, Laura Siegel Larson