1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7   JOANNE SIEGEL, ET AL.,          )
                                    )
8                     Plaintiffs,   )
                                    )
9          vs.                      )   No. CV 04-08776-SGL
                                    )
10  TIME WARNER, INC., ET AL.,      )
                                    )   CROSS MOTIONS FOR
11                    Defendants.   )   PARTIAL SUMMARY JUDGEMENT
    _____)
12                                  )
    AND RELATED CASES,              )
13  _____)

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Riverside, California

17            Monday, September 17, 2007

18                  1:38 P.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24          3470 12th Street, Rm. 134
          Riverside, California  92501
25              (951) 274-0844
            Csr11457@sbcglobal.net

1    APPEARANCES:

2    On behalf of the Plaintiffs:

3
                          LAW OFFICES OF MARC TOBEROFF
4                         BY:  MARC TOBEROFF
                          BY:  NICHOLAS WILLIAMSON
5                         2049 Century Park East,
                          Suite 2720
6                         Los Angeles, California  90067
                          310-246-3333
7

8
     On behalf of Defendants:
9

10                        WEISSMANN WOLFF BERGMAN COLEMAN
                           GRODIN & EVALL LLP
11                        BY:  MICHAEL BERGMAN
                          9665 Wilshire Boulevard,
12                        Ninth Floor
                          Beverly Hills, California  90212
13                        310-858-7888

14

15   On behalf of Defendants:

16                        FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                          BY:  ROGER L. ZISSU
17                        866 United Nations Plaza
                          At First Avenue & 48th Street
18                        New York, New York  10017
                          212-813-5900
19

20
     On behalf of Defendants:
21
                          PERKINS LAW OFFICE, P.C.
22                        BY:  PATRICK T. PERKINS
                          1711 Route 9D
23                        Cold Springs, New York  10516
                          845-265-2820
24

25


September 17, 2007                    Siegel v. Warner, et al.

```
 1      RIVERSIDE, CALIFORNIA; MONDAY, SEPTEMBER 17, 2007; 1:38 P.M.

 2                             -oOo-

 3            THE CLERK:  CALLING CALENDAR ITEM 11, CASE NUMBER

 4    CV 04-8400-SGL, AND -8776, JOANNE SIEGEL VERSUS TIME WARNER

 5    INC., ET AL.                                               01:26

 6            MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

 7    YOUR APPEARANCES FOR THE RECORD.

 8            MR. BERGMAN:  MICHAEL BERGMAN FOR DEFENDANTS.

 9            MR. ZISSU:  ROGER ZISSU, YOUR HONOR, FOR THE

10    DEFENDANTS.                                                01:38

11            MR. PERKINS:  PATRICK PERKINS FOR DEFENDANTS, YOUR

12    HONOR.

13            MR. TOBEROFF:  GOOD AFTERNOON, YOUR HONOR.

14            MARK TOBEROFF FOR THE PLAINTIFFS.

15            MR. WILLIAMSON:  GOOD AFTERNOON, YOUR HONOR.        01:38

16            NICHOLAS WILLIAMSON FOR THE PLAINTIFFS.

17            THE COURT:  GOOD AFTERNOON, COUNSEL.

18            WE'RE ON CALENDAR THIS AFTERNOON TO CONSIDER

19    CROSS MOTIONS FOR SUMMARY JUDGMENT RELATED TO BOTH THE SUPERBOY

20    AND THE SUPERMAN CASES.                                    01:38

21            I ALSO HAVE BEFORE ME AN EX-PARTE APPLICATION BROUGHT

22    BY THE PLAINTIFFS I'VE RECEIVED IN OPPOSITION FROM THE DEFENSE

23    WHICH THE COURT IS PREPARED TO TAKE UP THIS AFTERNOON AS WELL.

24    I'LL DEAL WITH THAT TOWARDS THE END OF THE HEARING.

25            WHAT I'D LIKE TO DO IS BEGIN WITH THE CROSS MOTIONS  01:38
```

```
 1   FOR PARTIAL SUMMARY JUDGMENT BROUGHT ON THE SUPERBOY MATTERS,

 2   AS WELL AS THE SUPPLEMENTAL BRIEFS THAT WERE FILED ON THE

 3   DERIVATIVE WORKS ISSUE WHICH I ASKED YOU TO SUBMIT; AND I

 4   APPRECIATE YOU DOING SO.

 5            LET ME BEGIN WITH THE DEFENSE, IF I COULD.              01:38

 6            I GUESS THE FIRST QUESTION I HAVE ABOUT BOTH CROSS

 7   MOTIONS, GIVEN WHERE THE COURT IS GOING ON THIS IN LIGHT OF THE

 8   COURT'S LAST ORDER, THAT THIS IS MORE, AT THIS POINT --

 9   ASSUMING THAT I FIND THAT IT ULTIMATELY IS A JOINT WORKS ISSUE

10   AND IT'S AN ACCOUNTING CASE, AS OPPOSED TO AN INFRINGEMENT       01:39

11   CASE -- MY QUESTION IS, WHY ARE THESE MOTIONS NOT MOOT?

12            MR. BERGMAN:  I TOTALLY AGREE WITH YOU, YOUR HONOR.

13   I WAS GOING TO RAISE THAT.  I DIDN'T WANT TO BE PRESUMPTUOUS,

14   BUT AS I READ YOUR HONOR'S DECISION OF JULY 27TH, ONE OF TWO

15   THINGS ARE THE CASE; EITHER THE SIEGEL SUBMISSIONS HAVE         01:39

16   SUFFICIENT COPYRIGHTABLE PROTECTABLE MATTER TO CONSTITUTE A

17   JOINT WORK, IN WHICH EVENT D.C., AS THE GRANTEE OF MR. SHUSTER,

18   WOULD BE A CO-OWNER OF THAT WORK AND, THEREFORE, COULD NOT

19   POSSIBLY INFRINGE THE WORK; OR MR. SIEGEL'S SUBMISSIONS DO NOT

20   HAVE SUFFICIENT COPYRIGHTABLE MATERIAL, IN WHICH EVENT THERE'S  01:40

21   NOTHING TO INFRINGE.

22            THE COURT:  OKAY.  SO YOU AGREE, FROM YOUR

23   PERSPECTIVE, THAT THAT WOULD RESOLVE THE INFRINGEMENT ISSUE?

24            MR. BERGMAN:  WE DO INDEED, YOUR HONOR.

25            THE COURT:  OKAY.                                      01:40
```

1          SO THEN THE QUESTION BECOMES WHETHER OR NOT THOSE

2    WORKS DO HAVE SUCH SUFFICIENT ORIGINAL CREATIVE ASPECTS TO WHAT

3    THE SCRIPT -- IN PARTICULAR, WHETHER IT HAS SUFFICIENT CREATIVE

4    ASPECTS TO IT AS TO CONSTITUTE A COPYRIGHTABLE WORK.

5          **MR. BERGMAN:**  IN THAT RESPECT, YOUR HONOR, IF I MAY,          01:40

6    I'D LIKE TO HAVE MR. ZISSU ADDRESS THAT POINT.

7          **THE COURT:**  VERY WELL.

8          AND I'LL CERTAINLY BE GIVING THE PLAINTIFF A CHANCE

9    TO FULLY ADDRESS THESE ISSUES.  I'M NOT ASSUMING THAT YOU AGREE

10   WITH ANY OF THIS AT THIS POINT.                                        01:40

11         **MR. ZISSU:**  GOOD AFTERNOON, YOUR HONOR.

12         **THE COURT:**  GOOD AFTERNOON, COUNSEL.

13         I GUESS I FRAMED THE OPENING QUESTION TO YOU.

14         I GUESS I'M HARD-PRESSED TO EVEN CONTEMPLATE THE

15   CONTENTION THAT THE SCRIPT, AS IT WERE, IS COMPLETELY LACKING          01:41

16   IN ANY KIND OF CREATIVE ORIGINAL WORK.  I WOULD ASSUME THAT YOU

17   WOULD BE WILLING TO CONCEDE, AND PERHAPS I'M MISTAKEN, THAT

18   THERE IS SOME ELEMENT OF CREATIVE ORIGINAL WORK.  PERHAPS THERE

19   MIGHT BE A DEBATE ON THE SCOPE OF THAT AND HOW BROAD THAT IS,

20   BUT IS IT REALLY YOUR CONTENTION THAT THERE IS NOTHING THERE?          01:41

21         **MR. ZISSU:**  NO.

22         YOUR HONOR, THE SCRIPT, IN A PURELY -- IF THE

23   QUESTION IS PURELY IF IT ISN'T COPYRIGHTABLE, YES, IT'S

24   COPYRIGHTABLE.

25         THERE ARE MANY ASPECTS OF OUR ARGUMENT THAT GO TO NOT           01:41

```
 1   ONLY THE SCOPE OF WHAT'S PROTECTABLE, BUT THEN THE
 2   ALL-IMPORTANT QUESTION OF WHO OWNS WHAT THE CONTRIBUTIONS ARE
 3   THAT ARE PROTECTABLE, AND THE EXTENT OF THEM; SO WE AGREE WITH
 4   YOUR HONOR ON THAT.
 5           AND I MIGHT ADD THAT THE COPYRIGHTABILITY -- IF YOU      01:41
 6   SENT THE SCRIPT TO THE COPYRIGHT OFFICE, THE QUESTION WOULD BE
 7   PURELY, 'IS IT COPYRIGHTABLE?'  AND THEY WOULD RECEIVE IT, AND
 8   THEY WOULD, IN MY VIEW, IN OUR VIEW, ISSUE A REGISTRATION.
 9           THAT'S A DIFFERENT QUESTION FROM THE QUESTION YOUR
10   HONOR POSED, WHICH IS WHETHER, UNDER 103(B), THE EXTENT OF      01:42
11   OWNERSHIP IN THE NEW CONTRIBUTIONS VERSUS, REALLY, WHAT'S OWNED
12   IN THE ORIGINAL WORK, WHICH IS THE BASIS FOR THE DERIVATIVE
13   WORK.
14           SO WE THINK THE PLAINTIFFS REALLY HAVE ADDRESSED THE
15   WRONG QUESTION BY SAYING 'IS IT COPYRIGHTABLE?'               01:42
16           SURE, IT'S COPYRIGHTABLE.
17           THEN WE HAVE YOUR HONOR'S QUESTION, WHICH IS WHAT
18   103(B) REQUIRES.  AND WE'RE NOT STRICTLY SPEAKING IN THE
19   CONTEXT OF COPYRIGHTABILITY.  THE CONTEXT WE FIND OURSELVES IN
20   IS A LITIGATION, A DISPUTE, AND THERE ARE TWO ASPECTS OF THAT   01:43
21   DISPUTE.  THERE'S AN INFRINGEMENT CLAIM GOING ON, UNLESS IT'S
22   RENDERED MOOT.  BUT IN THAT CONTEXT, WE ARE IN THE CONTEXT OF
23   INFRINGEMENT; AND A CHALLENGE IS BEING MADE TO THE EXTENT OF
24   THE COPYRIGHT OWNERSHIP OF THE AUTHORS, OR THE CO-AUTHORS, OF
25   THE ORIGINAL WORK.  AND THAT, TOO, IS A DISPUTED CONTEXT,       01:43
```

```
 1   BECAUSE THERE'S A CHALLENGE AND THE DISPUTE AS TO THAT
 2   COPYRIGHT OWNERSHIP.  SO IN THAT CONTEXT, WE'RE FORCED TO MOVE
 3   AWAY FROM THE PURE QUESTION, 'IS IT COPYRIGHTABLE?'
 4          IN ANSWERING THE QUESTIONS IN THEIR SUBMISSIONS, THE
 5   PLAINTIFFS HAVE ANSWERED THE WRONG QUESTION, BECAUSE THEY'RE          01:43
 6   REALLY ONLY GOING TO THE FIRST QUESTION, WHICH YOUR HONOR
 7   ASKED, WHICH IS, WHERE DO WE START?  AND THEY SEEM TO THINK
 8   FROM THAT THAT IT'S A VERY SIMPLE THING.
 9          IF IT'S COPYRIGHTABLE, THEN THEY WANT TO REACH BACK
10   ON THE EXTENT OF THEIR OWNERSHIP AND WHAT'S BEEN NEWLY ADDED         01:44
11   AND REACH BACK AND SOMEHOW OWN THE UNDERLYING MATERIAL, WHICH
12   IS NOT NEWLY ADDED AND WHICH RESTS WITH THE AUTHORS, OR
13   CO-AUTHORS, OF THE ORIGINAL WORK.
14          THE COURT:  I UNDERSTAND THAT, AND I GUESS WHEN I
15   LOOK BACK THROUGH -- I THINK YOU REFER TO IT AS THE ORIGINAL         01:44
16   MATERIAL, PRESCRIPT MATERIAL, I'M REFERRED TO FRAMES, MOST
17   NOTABLY THE FRAME -- I'VE HAD SOME WONDERFUL BOOKS PROVIDED TO
18   ME HERE -- I GUESS THIS IS EXHIBIT 3 TO THE BERGMAN
19   DECLARATION, PAGE 9, WHERE I HAVE PROBABLY THE MOST DEVELOPED,
20   IF THAT'S THE RIGHT WORD TO USE, DEPICTION OF SUPERBOY IN THIS       01:44
21   KIND OF PRESCRIPT MATERIAL.
22          MR. ZISSU:  YES.
23          THE COURT:  AND ASSUMING ARGUENDO THAT THAT IS
24   CLEARLY NOT CAPTURED BY THE SCRIPT, THE QUESTION IS, HOW MUCH
25   OF THAT IS CAPTURED BY THE SCRIPT, OR HOW MUCH OF THE SCRIPT         01:45
```

1    DOES IT CAPTURE AND HOW MUCH DOES IT NOT?  THAT'S WHAT I'M

2    HAVING TROUBLE DOING, IS TRYING TO FIGURE OUT HOW MUCH OF THE

3    THEME, HOW MUCH OF THE CONCEPT, HOW MUCH OF THE DIALOGUE, HOW

4    MUCH HAS ALREADY BEEN COPYRIGHTED BY THAT EARLIER WORK AND HOW

5    MUCH IS COPYRIGHTABLE NOW BY THIS SCRIPT?  BECAUSE I THINK IT          01:45

6    IS PRETTY CLEAR THAT IT IS COPYRIGHTABLE.

7         THE QUESTION IS, WHAT DOES IT ADD?  WHAT IS SEPARATE

8    AND APART FROM WHAT WAS PREVIOUSLY DONE?  AND THAT'S NOT CLEAR.

9         **MR. ZISSU:**  IT'S NEVER GOING TO BE 100 PERCENT CLEAR.

10   IT JUST IS NOT SUSCEPTIBLE TO THAT.                                   01:45

11        THE PROBLEM, IF YOU WILL, WITH THE SCRIPT IS, IT'S

12   PURELY LITERARY, SO IT HAS SOME ISSUES AS TO THE EXTENT TO

13   WHICH VERBALLY COPYRIGHT PROTECTION WOULD BE AFFORDED FOR

14   WHATEVER IS NEW.

15        **THE COURT:**  YOU GET A PRETTY GOOD SENSE OF WHAT IT'S          01:46

16   ABOUT FROM READING THE SCRIPT.

17        **MR. ZISSU:**  RIGHT.  BUT IT HAS TO BE -- AND I WAS

18   GOING TO GET TO THIS -- TO JUST SAY IT'S COPYRIGHTABLE IS THE

19   BEGINNING OF THE QUESTION.  JUST TO SAY IT'S COPYRIGHTABLE

20   DOESN'T REALLY TAKE US VERY FAR IN TERMS OF --                        01:46

21        **THE COURT:**  I UNDERSTAND.  I'M TRYING TO GET TO THAT

22   NEXT POINT.

23        **MR. ZISSU:**  THE PATRY TREATISE SAYS -- AND THIS IS,

24   WE THINK, THE WRONG APPROACH -- THAT ONE APPROACH IS TO SAY A

25   LIGHT IS TURNED ON -- IT'S LIKE A LIGHT SWITCH; IF THE LIGHT          01:46

```
 1   SWITCH IS ON, THEN SOMEHOW THE -- IF THERE'S SOMETHING
 2   COPYRIGHTABLE, THE NEW MATTER INCLUDES EVERYTHING AND THE
 3   DERIVATIVE WORK OWNER OWNS EVERYTHING.
 4           BUT PATRY SAYS IT'S REALLY LIKE A DIMMER; THE DEGREES
 5   OF WHAT'S ADDED THAT WOULD BE RECOGNIZED AS OWNED ARE GRADUALLY    01:46
 6   INCREASED ACCORDING TO WHAT'S CREATIVE OR THE LIGHT THAT'S
 7   BROUGHT TO THINGS.
 8           THE COURT:  I AGREE WITH THAT.
 9           MR. ZISSU:  OKAY.  SO WE'RE WORKING ON THE CONCEPTS.
10           THERE IS A CASE WE WOULD LIKE TO BRING TO YOUR             01:47
11   ATTENTION, YOUR HONOR, WHICH ADDS, I THINK, A LITTLE BIT
12   EXACTLY ON YOUR QUESTION, AND IT'S A CASE -- IT'S
13   JUDGE WILSON'S DECISION IN 2003, IN A CASE CALLED SOBHANI
14   AGAINST RADICAL, MEDIA INC., IN WHICH --
15           THE COURT:  WHAT'S THE CITE, COUNSEL?                      01:47
16           MR. ZISSU:  I'M SORRY.
17           THE CITE IS 257 F. SUPP. 2D 1234, AT 1239-40.
18           THE COURT:  YOU MEAN F.3D, I PRESUME?
19           MR. ZISSU:  I'M SORRY.  FED SUPP.
20           THE COURT:  OH, FED SUPP.  I'M SORRY.  THANK YOU.          01:47
21           MR. ZISSU:  FED SUPP.
22           AND THIS REALLY SPEAKS TO THIS.  HE HAD A SIMILAR
23   QUESTION TO YOUR HONOR'S, AND HE SAID, "HOWEVER, THERE IS AN
24   IMPORTANT LIMITATION SUGGESTED BY BOTH AUTHORITIES AND IGNORED
25   ENTIRELY BY PLAINTIFF.  COPYRIGHT PROTECTION DOES NOT EXTEND TO    01:48
```

```
 1   DERIVATIVE WORKS IF THE PREEXISTING WORK TENDS TO PERVADE THE

 2   ENTIRE DERIVATIVE WORK," AND HE CITES -- HE'S QUOTING FROM

 3   NIMMER, AT SECTION 306.

 4          THE COURT:  I THINK THAT'S VERY INSTRUCTIVE LANGUAGE,

 5   LANGUAGE THAT I WOULD BE, PERHAPS, INCLINED TO ADOPT MYSELF.          01:48

 6   BUT THAT GETS US THEN BACK TO THE QUESTION, HOW MUCH OF THIS

 7   PERVADES THIS?

 8          MR. ZISSU:  WE THINK, EXCEPT FOR AS WE ARGUED IN OUR

 9   BRIEF, CERTAIN SEQUENCES, INCLUDING THE DIALOGUE AND THE

10   IN-HEIGHT VERBA TEXT, IS PRETTY LIMITED.  EVERYTHING ELSE IS          01:48

11   PERVADED BY THE PREEXISTING SUPERMAN WORKS, THE THEMES, BUT

12   MORE IMPORTANTLY, THE VISUAL DEPICTIONS SHOWING THE POWERS OF

13   SUPERMAN.

14          THE COURT:  YOU'RE TALKING ABOUT SUPERBOY HERE?

15          MR. ZISSU:  I AM.  BUT SUPERMAN THAT PERVADES -- THE          01:49

16   DESCRIPTIONS OF SUPERBOY IN THE SCRIPT ARE PERVADED BY;

17   DOMINATED BY; INFUSED, IF YOU WILL, BY THE SUPERMAN PREEXISTING

18   WORKS.  AND THAT'S THE ISSUE THAT THIS -- I'LL CALL IT A

19   PERVASION RULE APPLIES.

20          AND THE DIFFERENCE IN TYPES OF WORKS IS VERY                  01:49

21   IMPORTANT HERE.  IN ONE OF THE CASES YOUR HONOR CITES ON THE

22   JOINT WORK ISSUE, JUDGE POSNER'S DECISION IN GAIMAN AGAINST

23   McFARLANE, HE MAKES THE DISTINCTION IN THAT CASE THAT THE

24   REASON HE VIEWS THE WORK DONE BY GAIMAN AS A PROTECTABLE WORK

25   AND AS A COPYRIGHTABLE CONTRIBUTION, PUTTING ASIDE THE HANDS-ON      01:49
```

1    ISSUE, IS THAT IT'S BECAUSE IT'S DEPICTED VISUALLY.  HE DOES

2    NOT SAY, AS PLAINTIFFS ARGUE, THAT A STOCK CHARACTER -- YOU CAN

3    GET COPYRIGHT PROTECTION FOR A STOCK CHARACTER IN A LITERARY

4    WORK.  HE SAYS THE REASON IT BECAME PROTECTABLE IS IT WAS

5    MOVING FROM LITERARY TO DEPICTION SO THAT IT COULD BE                01:50

6    CONCRETELY SHOWN.  SO THAT IS AT, I THINK, 661 AND 662 OF

7    JUDGE POSNER'S DECISION.  BUT IT'S A VERY GOOD DISCUSSION OF

8    THIS ISSUE.

9            THE PERVASION IS THE PROBLEM.  IT'S SUBSTANTIALLY

10   PERVADED.                                                            01:50

11           THE IDEA THAT THE PLAINTIFFS COULD, IN THIS CASE, OWN

12   THE THEMATIC INTERACTION BETWEEN THE PARENTS OF SUPERMAN, THE

13   KENTS, AND THE YOUNG MAN, OR THE BOY, REALLY -- AND OWN THAT

14   AND OWN THE THEME OF THE PARENTS TELLING THE BOY HE'S GOT TO

15   HIDE HIS POWERS SO THAT HE CAN USE THEM FOR HUMANITY -- THAT         01:51

16   SOMEHOW THAT'S SWEPT INTO WHAT CAN BE OWNED BY THE DERIVATIVE

17   WORK AUTHOR, IT DOESN'T MAKE ANY SENSE BECAUSE --

18           **THE COURT:**  BUT LET'S PUT THAT ASIDE.

19           LET'S SAY WE WERE TO PUT ASIDE THOSE TWO ELEMENTS,

20   BECAUSE ON THAT ONE FRAME, THAT'S EXACTLY WHAT IS DISCUSSED,         01:51

21   IS, 'YOU'VE GET TO HIDE YOUR SUPERPOWERS, OTHERWISE PEOPLE ARE

22   GOING TO MAKE FUN OF YOU OR HARASS YOU; AND WHEN YOU USE YOUR

23   POWERS, YOU'VE GOT TO USE THEM FOR THE BENEFIT OF HUMANITY.'

24           PUTTING ASIDE THOSE TWO ELEMENTS, THAT STILL LEAVES A

25   LOT OF DEVELOPMENT, CREATIVE DEVELOPMENT, MANIFESTED IN THE          01:51

1   13-PAGE SCRIPT THAT IS NOT CAPTURED BY THOSE TWO COMPONENTS, IF

2   YOU WOULD, OF THE FRAME.

3           **MR. ZISSU:**  THAT'S JUST ONE.

4           WE WENT THROUGH -- WE SUBMITTED A CHART WHERE WE

5   SHOWED A LOT OF THE PREEXISTING MATERIAL AND WHERE IT ENDED UP     01:52

6   IN THE SCRIPT.

7           AFTER YOU FINISH THE FIRST FIVE OR SIX PAGES OF THE

8   SCRIPT, YOU START TO GET OUTSIDE OF THE THINGS THAT ARE

9   LITERALLY TAKEN, BUT THEY'RE STILL PERVADED BY SUPERMAN, THE

10  PREEXISTING SUPERMAN CHARACTER.  ALL THAT'S BEEN ADDED --          01:52

11  EXCEPT FOR THESE PARTICULAR SEQUENCES, LIKE THE HAUNTED HOUSE

12  EPISODE -- WHAT'S BEEN ADDED IS, "IT'S A BOY."  AND IRONICALLY,

13  WHAT THE PLAINTIFFS SAY IS NEW ABOUT THE SUPERBOY IS THAT THEY

14  ARE PRESENTING THE CHARACTER FULLY DEVELOPED.

15          WELL, FULLY DEVELOPED MEANS SUPERMAN.                       01:52

16          **THE COURT:**  WELL, FULLY DEVELOPED AS A BOY, AS

17  OPPOSED TO --

18          **MR. ZISSU:**  THEY SAY HIS POWERS ARE FULLY DEVELOPED.

19  THAT'S WHAT THEY SAY IS THE MOST IMPORTANT NOVELTY.  AND

20  NOVELTY, WE THINK, IS IRRELEVANT IN WHAT'S NEW, PUTTING THAT       01:53

21  ASIDE; SO YOU REALLY JUST HAVE -- IF YOU OR I SAT DOWN AND WE

22  SAID, 'I WANT TO PRESENT SUPERMAN AS A BOY,' WE WOULD COME UP

23  WITH DIFFERENT SCENARIOS.  WE MIGHT COME UP AS A BABY.  YOU'D

24  HAVE TO SHOW HIS INCREDIBLE STRENGTH AS A KINDERGARTNER; HIS

25  TOUGH SKIN; HIS IMPERVIOUSNESS TO A SPITBALL ATTACK.  YOU'D        01:53

1    HAVE TO SHOW HIS STRENGTH.

2            THE COURT:  BUT YOU DON'T GET -- AS A COPYRIGHT

3    HOLDER, SUPERMAN AS A BOY, AND THEN THAT FREEZES THE FIELD.

4    THERE IS ROOM FOR CREATIVE DEVELOPMENT.

5            **MR. ZISSU:**  THERE IS.  BUT THE QUESTION IS, WHAT DO          01:53

6    WE FIND IN THE SCRIPT?  AND THERE ARE THREE OR FOUR OF THESE

7    KINDS OF SCENARIOS, WHICH, EXCEPT FOR THEIR LITERAL TEXT, ARE

8    SCENES A FAIRE.  AND SCENES A FAIRE ARE CONSIDERED IN THE

9    CONTEXT OF INFRINGEMENT.  THEY ARE CONSIDERED IN THE CONTEXT OF

10   THE 103(B) DISPUTE.  THERE IS A DISPUTE GOING ON.                       01:54

11           COPYRIGHT OWNERSHIP OF THE OWNERS OF THE UNDERLYING

12   WORK, VERSUS THE DERIVATIVE WORK AUTHOR IS AT STAKE IN AN

13   ADVERSARY CONTEXT.  AND IT'S FOR THE PURPOSE OF MAKING AN

14   INFRINGEMENT CLAIM.  BECAUSE WHAT THE PLAINTIFFS ARE DOING

15   HERE, THEY'RE TRYING TO USE THE ALLEGED COPYRIGHT OWNERSHIP AND         01:54

16   WHAT THEY SAY THEY ADDED IN THE SCRIPT TO REACH BACK, SOMEHOW

17   OWN AND PREVENT THE OWNER OF THE UNDERLYING WORK FROM

18   CONTINUING TO EXPLOIT THAT WORK.

19           THAT'S EXACTLY THE DANGER THAT ENTERTAINMENT RESEARCH

20   TALKS ABOUT.  AND THAT DANGER EXISTS FOR TWO REASONS:  IT'S NOT         01:54

21   ONLY BECAUSE YOU DON'T WANT THE DERIVATIVE WORK AUTHOR TO END

22   UP DOING ANYTHING OR OWNING ANYTHING THAT WOULD UNDERMINE AND

23   ADVOCATE THE RIGHT OF THE COPYRIGHT OWNER OF THE ORIGINAL WORK.

24   THERE'S ANOTHER DIMENSION TO IT.

25           IF DERIVATIVE WORK OWNERSHIP COULD BE USED IN THAT              01:54

```
 1   WAY, IT WOULD VIOLATE THE CONSTITUTIONAL AND BASIC PRECEPT OF

 2   COPYRIGHT LAW THAT COPYRIGHT PROTECTION IS LIMITED FOR LIMITED

 3   TIMES, BECAUSE -- AND THIS IS WHAT JUDGE POSNER TALKS ABOUT,

 4   ALSO, IN GAIMAN AND HE DOES IT IN ANOTHER CASE HE CITES IN

 5   GAIMAN CALLED PRINCE AGAINST PICKETT.  A DERIVATIVE WORK AUTHOR   01:55

 6   COULD COME ALONG AND SAY, WELL, I USED SOMETHING PREEXISTING,

 7   BUT I'M AN OWNER AND IT'S A COPYRIGHT THAT I HAVE; AND THEN THE

 8   COPYRIGHT PROTECTION COULD BE EXTENDED ON THAT BASIS.  SOMEBODY

 9   COULD KEEP MAKING DERIVATIVES SO THAT THERE WOULD BE NEW

10   COPYRIGHT, AND THE NEW COPYRIGHT WOULD END UP EXTENDING INTO      01:55

11   WHAT IS UNDERLYING, FOR WHICH PROTECTION HAS TO EXPIRE AT SOME

12   POINT.

13        SO THIS IS NOT A THEORETICAL THING.  YOU'LL FIND

14   JUDGE POSNER DISCUSSING THAT.

15        THE COURT:  BUT THAT'S NOT WHAT WE HAVE HAPPENING           01:55

16   HERE.

17        MR. ZISSU:  WELL, WE DON'T HAVE THE DURATION PROBLEM,

18   BUT WE DO HAVE THE PROBLEM OF -- WHAT THE PLAINTIFFS ARE TRYING

19   TO DO IS TO TAKE WHATEVER LITTLE THEY ADDED, TO SWEEP INTO THAT

20   THE PREEXISTING MATERIAL THAT'S GIVING THEM SOME POSITION.  AND   01:56

21   THE REASON THEY'RE DOING THAT IS SO THAT WHEN THEY GET TO

22   MORE FUN COMICS NUMBER 101, THEN THEY CAN SAY IT'S SIMILAR.

23        THE COURT:  I UNDERSTAND.

24        LET ME HEAR FROM THE PLAINTIFFS HERE.

25        MR. ZISSU:  I'M SORRY?
```

```
 1              THE COURT:  I'M GOING TO GIVE THE PLAINTIFFS A CHANCE

 2   TO RESPOND TO THIS.

 3              EVERYONE IS GOING TO HAVE PLENTY OF OPPORTUNITIES TO

 4   TALK, BUT I DON'T WANT TO GIVE ANYONE TOO MUCH TIME.

 5              MR. ZISSU:  THANK YOU, YOUR HONOR.                        01:56

 6              THE COURT:  THANK YOU, COUNSEL.

 7              COUNSEL, IF YOU COULD BEGIN WITH MY INITIAL QUESTION

 8   ABOUT --- YOU MAY HAVE A DIFFERENT TAKE ON THE MOOTNESS OF THE

 9   CROSS MOTIONS AT THIS POINT, IN TERMS OF THE INFRINGEMENT

10   VERSUS AN ACCOUNTING ACTION, AND ALSO THIS ISSUE IN TERMS OF      01:56

11   THE DERIVATIVE WORKS.

12              MR. TOBEROFF:  IT'S NOT MOOT IN TERMS OF AN

13   ACCOUNTING ACTION, BECAUSE ONE OF THE MAJOR FACTORS THAT WILL

14   LATER BE DECIDED IN AN ACCOUNTING ACTION IS TO WHAT DEGREE THE

15   RIGHT TO PROFITS IS GOING TO BE APPORTIONED.  AND IN THAT        01:57

16   REGARD, DEFENDANTS WILL TAKE CERTAIN WORKS, LIKE "SUPERMAN

17   RETURNS TO SMALLVILLE," AND THEY WILL TRACE BACK ELEMENTS OF

18   THOSE WORKS TO PRIOR WORKS AND SAY, 'WE OWN THAT WORK WHICH

19   SHOWS HIM WITH HEAT VISION, AND WE OWN THIS WORK WHICH SHOWS

20   HIM WITH SOME OTHER POWER THAT'S NOT IN THE COPYRIGHTS THAT       01:57

21   PLAINTIFFS HAVE RECAPTURED,' AND THEREBY REDUCE THE PROFITS TO

22   WHICH PLAINTIFFS ARE ENTITLED.

23              WITH RESPECT TO SOMETHING LIKE SMALLVILLE, WHICH IT'S

24   OBVIOUS IT'S DERIVED FROM BOTH SUPERMAN AND, WE BELIEVE,

25   SUPERBOY, EVEN IF YOU MIGHT FIND AN INFRINGEMENT ACTION MOOT,     01:57
```

1   IT'S STILL RELEVANT TO ASSESS THE COPYRIGHTABLE CONTRIBUTIONS

2   OF SUPERBOY TO AN APPORTIONMENT ACTION FOR SOMETHING LIKE

3   SMALLVILLE, WHICH BEARS A LOT OF COMPARISONS TO THE OVERALL

4   EXPRESSIONS IN THE SUPERBOY MATERIAL THAT WAS WRITTEN BY

5   JERRY SIEGEL.     01:57

6         SO TO THAT EXTENT, I SUBMIT IT'S MOST RELEVANT.

7         **THE COURT:**  AS FAR AS THE SUPERBOY MATERIAL, WHAT DO

8   YOU MAKE OF THIS SCRIPT AND PRESCRIPT ISSUE?

9         **MR. TOBEROFF:**  THE SCRIPT -- I THINK THE

10  DEFENDANTS -- THROUGH THE DISCUSSION, I THINK THERE HAS BEEN AN   01:58

11  ADMISSION THAT IT IS COPYRIGHTABLE.  THEY SAY THE ONLY THING

12  COPYRIGHTABLE IS HIS DEPICTION AS A TODDLER, A PRESCHOOLER, AND

13  THEN GOING TO GRADE SCHOOL.  BUT THAT'S WHAT THE WHOLE STORY IS

14  ABOUT.

15        I DON'T AGREE THAT SUPERBOY IS MERELY SUPERMAN.  HE'S   01:58

16  NOT, IF YOU REALLY LOOK CLOSELY AT IT.  AND I THINK YOU DO HAVE

17  TO LOOK CLOSELY, PARTICULARLY WHEN YOU'RE DEALING WITH COMIC

18  BOOK MATERIAL.  THE DECISION OF THE WORDS IN THE LITTLE BUBBLES

19  AND THE DECISION OF WHAT PICTURES TO SHOW IS, BY DEFINITION,

20  EXTREMELY LIMITED, PRIMITIVE, REPRESENTATIONAL; SO A LOT OF   01:59

21  THINGS ARE DONE SYMBOLICALLY AND A LOT OF THINGS ARE DONE TO

22  FORESHADOW EVENTS THAT WILL HAPPEN AFTER.

23        THIS IS PARTICULARLY TRUE IN THE COMIC BOOK SERIES,

24  AND IT'S PARTICULAR TRUE IN JERRY SIEGEL'S FIRST STORY, BECAUSE

25  THAT STORY WAS INTENDED, IF YOU WILL, TO BE THE PILOT OF THE   01:59

```
 1   COMIC BOOK SERIES; SO IT SETS UP A -- I DON'T WANT TO USE WORDS
 2   THAT SOUND LIKE 'IDEA' OR 'CONCEPT' -- IT EXPRESSES, IN A
 3   COPYRIGHTABLE MANNER, A FRAMEWORK, AN ARRANGEMENT OF LITERARY
 4   ELEMENTS, IN SUCH A WAY TO BE ABLE TO SET UP THE SUPERBOY LINE
 5   OF COMICS, WHICH ARE DIFFERENT IN HIS STORY, AND, IN FACT, WERE   01:59
 6   DIFFERENT IN REALITY.
 7          HIS STORY, WHICH NOW, IN RETROSPECT, DEFENDANTS WANT
 8   TO MINIMIZE, ACTUALLY LED TO MORE FUN 101, WHICH LED TO
 9   MORE FUN 102 AND A WHOLE BODY OF COPYRIGHTED COMIC BOOKS,
10   ANIMATED TV SHOWS, AND LIVE ACTION TV SHOWS.                     02:00
11          THE COURT:  WHAT'S CONTAINED IN THAT SCRIPT, FROM
12   YOUR PERSPECTIVE, THAT'S NOT -- HOW DO I --
13          MR. TOBEROFF:  I'M GOING TO GET RIGHT TO THAT.  I
14   PROMISE.
15          THE COURT:  OKAY.  THANK YOU.  THAT'S MY STRUGGLE.        02:00
16          MR. TOBEROFF:  THE LINEAGE AND THE DERIVATION IS
17   IMPORTANT, BECAUSE WHAT WE'RE DEALING WITH HERE IS NOT JUST A
18   COPYRIGHTABLE STORY, BUT A COPYRIGHTABLE CHARACTER.  AND TO
19   LOOK BACK OVER THIS LONG LINE OF MATERIAL ALL FEATURING
20   SUPERBOY AND TO SAY THAT THE FIRST IS NOT COPYRIGHTABLE, I       02:00
21   DON'T BELIEVE IS A CORRECT RESULT.
22          IT'S LIKE LOOKING BACK AT MICKEY MOUSE AND SAYING HE
23   WAS MERELY A TALKING ANIMAL AND THERE ARE OTHER INSTANCES OF
24   TALKING ANIMALS.
25          THERE ARE MANY DIFFERENCES BETWEEN SUPERBOY AND          02:00
```

```
1   SUPERMAN.  AND, OF COURSE, WHEN YOU START GOING INTO THIS KIND

2   OF CREATIVE ANALYSIS, A LOT OF THINGS SOUND SUBJECTIVE.  AND I

3   SUBMIT -- AND I'LL QUOTE MR. ZISSU WHEN HE SAYS THAT WE DON'T

4   KNOW.  YOU DON'T KNOW 100 PERCENT.  THAT'S WHY THESE MATTERS

5   ARE FOR A JURY; THESE KIND OF SUBJECTIVE COMPARISONS AND          02:01

6   EVALUATIONS, I SUBMIT, ARE NOT FOR A COURT TO DECIDE, BECAUSE

7   YOU DO NOT KNOW 100 PERCENT, AND IT IS A VERY SUBJECTIVE

8   CONSIDERATION.

9        IN SUPERMAN, THE CHARACTER IS SUPERMAN.  HE'S

10  SELF-ASSURED; HE'S POWERFUL; HE'S KNOWS EXACTLY WHAT HE WANTS     02:01

11  TO DO AND WHERE HE IS AND WHY HE'S DOING WHAT HE'S DOING.

12       CLARK KENT IS SUPERMAN'S COVER IN THE SUPERMAN

13  STORIES.  IN FACT, HE DUMBS HIMSELF DOWN AS THE AWKWARD, SHY,

14  RETICENT CLARK KENT SO THAT PEOPLE WILL LEAVE HIM ALONE, SO HE

15  CAN GO ABOUT HIS BUSINESS AS SUPERMAN AND SAVE THE WORLD.        02:02

16       IN THE SUPERBOY STORIES, IT'S A VERY DIFFERENT

17  DYNAMIC.  SUPERBOY IS CLARK KENT.  SUPERBOY IS DEPICTED AS

18  AWKWARD.  HE IS DEPICTED AS GOING THROUGH EMOTIONAL AND

19  PHYSICAL DEVELOPMENT.  HE IS DEPICTED AS BEING CAUGHT IN THE

20  MIDDLE OF THINKING HE'S HUMAN AND WANTING TO DO WHAT ALL HUMANS  02:02

21  DO AND EXPERIENCE ADOLESCENCE LIKE ALL HUMANS; AND AT THE SAME

22  TIME, HAVING TO COME TO GRIPS WITH THE REALITY THAT HE CAN

23  NEVER FIT IN, THAT HE CAN NEVER BE ACCEPTED.  AND THE STORY, IF

24  YOU LOOK AT IT, ON THE ONE SENSE, IT'S A SILLY LITTLE SIMPLE

25  STORY, BUT IF YOU LOOK AT IT IN TERMS OF THE SYMBOLISM -- WHEN   02:02
```

```
 1   HIS PARENTS SAY THAT "WE DREADED THIS DAY WHEN SUPERBOY HAS TO
 2   GO TO SCHOOL; WE DREADED THIS DAY," AND THEY'VE INSTILLED IN
 3   HIM THIS IDEA THAT 'YOU NEED TO KEEP YOUR POWERS SECRET,
 4   OTHERWISE YOU'LL BE AN OUTCAST,' MEANING YOU WON'T BE ACCEPTED.
 5   AND THEN YOU SEE HIM HAVING TO ENDURE SCHOOL PRANKS AND BULLIES    02:03
 6   AND A LOT OF THINGS, BUT THROUGH THE PERSPECTIVE OF THIS
 7   PECULIAR INDIVIDUAL WHO'S BOTH HUMAN AND A TOTAL ALIEN.  AND
 8   YET, HE WANTS TO BE ACCEPTED.  AND WHEN THEY SAY, "DO YOU WANT
 9   TO BE A MEMBER OF THE (UNINTELLIGIBLE) CLUB," HE SAYS, "OH,
10   YES," WITH AN EXPLANATION POINT, ONLY TO DISCOVER THIS IS A       02:03
11   CRUEL PRANK.
12         IT'S A TOTALLY DIFFERENT DYNAMIC THAN THE DYNAMIC IN
13   SUPERMAN.
14         THE COURT:  I THINK I UNDERSTAND THAT.
15         HOW IS NOT EVERYTHING YOU JUST DESCRIBED NOT              02:03
16   CONTAINED, IN ESSENCE, ON THIS ONE PAGE?
17         MR. TOBEROFF:  IN WHICH PAGE ARE YOU REFERRING?
18         THE COURT:  PAGE 96 OF EXHIBIT 3.  THIS IS THE PAGE
19   WHERE THEY FIND THE CHILD; THEY OBSERVE HIS STRENGTH IN THE
20   ORPHANAGE; THE PARENTS GO TO THE ORPHANAGE; THEY COUNSEL HIM     02:04
21   ABOUT 'KEEPING YOUR STRENGTH SECRET OR YOU'RE GOING TO HAVE
22   ADVERSE CONSEQUENCES,' AND 'YOU ULTIMATELY NEED TO DO GOOD FOR
23   HUMANITY.'
24         MR. TOBEROFF:  AND MY ANSWER TO IT:  IT STOPS THERE.
25   IT JUST STOPS WITH HIM AS A LITTLE BABY, PICKED UP AT THE        02:04
```

ORPHANAGE AND BEING ADOPTED BY PARENTS AND SAYING, 'YOU NEED TO

DO GOOD; WE NEED TO KEEP YOUR POWERS SECRET.'

FROM THERE, YOU HAVE ENDLESS CHOICES, WHICH NOW,

KNOWING ABOUT SUPERBOY AND SUPERMAN -- AND, IN FACT, YOU HAVE

TO BE AWARE THAT THE SUPERBOY DEVELOPMENT, OF SUPERBOY GROWING

UP IN SMALLVILLE, HAS ALSO BEEN INCORPORATED IN LATER SUPERMAN

WORKS; SO ALL OF THE THINGS THAT WE'RE TALKING ABOUT, YOU NOW

TAKE FOR GRANTED AND SAY IT'S COMPLETELY NATURAL:  OF COURSE,

HE GREW UP THIS WAY; AND, OF COURSE, HE WENT TO SCHOOL; AND, OF

COURSE, THEY HAD TO DEAL WITH THIS AND THAT; IT'S ONLY NATURAL.

BUT, IN FACT, AT THAT TIME, IN THE MIND OF JERRY SIEGEL, THESE

THINGS DIDN'T FLOW NATURALLY.  THERE ARE ENDLESS CHOICES.

AND MR. ZISSU, I BELIEVE, ADMITTED THAT.

THERE ARE ENDLESS CHOICES THAT JERRY SIEGEL HAD AS TO

WHAT TO DO AFTER IT STOPPED IN THAT FIRST PANEL IN ACTION ONE,

AND IN THOSE TWO PANELS IN SUPERMAN ONE.

AN EXAMPLE IS, IN SUPERMAN ONE, YOU SEE HIM TALKING

TO HIS PARENTS IN ONE PANEL, AND THEN THE NEXT PANEL, HE'S

JUMPING FROM ROOF TO ROOF OVER SKYSCRAPERS.  IT'S CLEARLY SET

IN THE CITY.  THERE ARE BIG SKYSCRAPERS.  IT'S SET IN

METROPOLIS.  IT'S SET IN SUPERMAN'S HOMETOWN.

JERRY SIEGEL CHOSE TO SET HIS SUPERMAN STORY IN THE

COUNTRY, IN A SMALL TOWN IN THE COUNTRY.

THE DEFENDANTS MAY SAY, WELL, THAT'S NOT PROTECTABLE;

THE COUNTRY IS NOT PROTECTABLE.

1          **THE COURT:**  YOU MEAN SUPERBOY?

2          **MR. TOBEROFF:**  SUPERBOY.  EXCUSE ME.

3          THE CHOICE IS NOT AN INSIGNIFICANT CHOICE, BECAUSE IN

4    THE COUNTRY, IT'S MUCH HARDER TO KEEP YOUR IDENTITY A SECRET;

5    EVERYBODY KNOWS EACH OTHER'S BUSINESS, AS EXEMPLIFIED BY THE          02:06

6    SCENE IN JERRY SIEGEL'S MATERIAL WHERE A LADY COMES OVER AND

7    SAYS, 'OH, WE'VE HEARD SO MUCH ABOUT YOUR SON,' AND SHE BARGES

8    INTO THEIR HOUSE, AND WE KNOW SHE'S PRYING BECAUSE MRS. KENT

9    SAYS, 'I HAVEN'T SEEN YOU FOR AGES.'  AND THE SCENE DEVELOPED

10   WHERE SHE'S BARGING IN; SHE'S ASKING ABOUT SUPERBOY, THE            02:06

11   ADOPTED SON WHO THEY'VE HEARD SO MUCH ABOUT.  THAT SCENE IS NOT

12   IN THERE BY ACCIDENT.  IT'S IN THERE TO SHOW EXACTLY THIS

13   POINT:  THAT IN A SMALL TOWN, IT'S GOING TO BE VERY HARD FOR

14   HIM TO KEEP HIS IDENTITY A SECRET.

15         ALSO, A SMALL TOWN, A RURAL SETTING, IS A GREAT              02:06

16   CONTRAST FOR HIS SUPER POWERS; IT'S A GREAT CONTRAST FOR THE

17   MIRACLE OF HIS SUPER POWERS.

18         **THE COURT:**  LET'S SAY I ACCEPT THIS.  YOU RAISED AN

19   INTERESTING POINT.  YOU SAID TO LEAVE THIS FOR THE JURY, THESE

20   SUBJECTIVE COMPARISONS.                                            02:06

21         HOW DO I DO THAT?  HOW DO YOU ENVISION THAT VERDICT

22   FORM ON THIS PARTICULAR QUESTION?

23         **MR. TOBEROFF:**  IT WOULD BE TO RULE THAT THE SUPERBOY

24   MATERIAL MEETS THE VERY LOW THRESHOLD OF ORIGINALITY BE

25   COPYRIGHTABLE.                                                     02:07

September 17, 2007                    Siegel v. Warner, et al.

```
1              THE COURT:  THAT'S WHAT I WAS AFRAID OF.

2              MR. TOBEROFF:  AND IT MEETS THE THRESHOLD TO BE

3    COPYRIGHTABLE.  AND A JURY WILL LOOK AT THOSE ELEMENTS

4    CONTAINED IN THAT MATERIAL, WHEN THEY ARE IN THE FULL TOTALITY

5    OF ANY APPORTIONMENT ARGUMENT, TO ASSESS ANY APPORTIONMENT          02:07

6    ARGUMENT OF DEFENDANT.  IT'S JUST ONE OF ANY OTHER PIECES OF

7    MATERIAL THAT PLAINTIFFS HAVE RECAPTURED.

8              IF YOU SAY IT WAS A JOINT WORK, THEY WOULD HAVE

9    RECAPTURED A 50-PERCENT SHARE OF THAT, AND THEY'RE ENTITLED TO

10   THAT, TO BE COMPARED TO SMALLVILLE AND OTHER SUPERBOY WORKS        02:07

11   WHICH ARE DIRECTLY SUPERBOY, TO SEE HOW MUCH OF WHAT HE DID IS

12   IN WHAT THEY'RE CURRENTLY EXPLOITING, AND, THEREFORE, HOW THE

13   PROFIT FROM THAT SHOULD BE APPORTIONED.

14             AND DEFENDANTS WILL USE APPORTIONMENT VERY HEAVILY.

15   THEY'RE TRYING TO REDUCE WHAT IS PAYABLE TO PLAINTIFFS IN          02:08

16   PROFIT.  THE REVERSE IS TRUE.  PLAINTIFFS SHOULD BE ENTITLED TO

17   USE WHATEVER COPYRIGHTS THEY HAVE GOTTEN BACK TO SHOW THE

18   ELEMENTS IN TODAY'S EXPLOITATION AND WHY THEY'RE ENTITLED TO

19   PROFITS FROM THE EXPLOITATION OF THOSE ELEMENTS.

20             THE COURT:  OKAY.                                        02:08

21             MR. BERGMAN:  YOUR HONOR, MAY I BRIEFLY SUPPLEMENT

22   WHAT MY CO-COUNSEL --

23             THE COURT:  I'M GOING TO GIVE YOU AN OPPORTUNITY.

24             I THINK YOU HAVE A FEW MORE WORDS.

25             MR. TOBEROFF:  I HAVE A FEW MORE WORDS, BUT I'D JUST      02:08
```

1   LIKE AN OPPORTUNITY AFTERWARDS TO SPEAK TO YOU AGAIN ABOUT

2   THIS.  I DON'T THINK NOW IS THE TIME TO BRING IT UP.

3          **THE COURT:**  OKAY.  VERY WELL.

4          I APPRECIATE YOUR DISCRETION.

5          YES, COUNSEL, YOU MAY RESPOND.                          02:08

6          **MR. ZISSU:**  INSTEAD OF GOING AROUND AND AROUND ABOUT

7   ENDLESS CHOICES, THAT'S NOT THE QUESTION.

8          THE QUESTION IS, WHAT'S IN HERE?  WHAT CHOICES WERE

9   MADE?  AND WE'VE ADDRESSED THAT.

10         THERE ARE PARTICULAR EPISODES THAT ARE NEW, AND          02:09

11  THAT'S IT.  THAT'S BASICALLY IT.  BUT WHAT'S PERVADED BY THE

12  BASIC CHARACTERISTICS OF THE SUPERMAN CHARACTER THROWN INTO AN

13  INFANT OR A TODDLER OR A KINDERGARTEN, THAT'S NOT NEW, AND

14  THERE ARE RULES.  WE'RE TALKING ABOUT A DERIVATIVE WORK.  THERE

15  MAY BE A LOW THRESHOLD FOR COPYRIGHTABILITY IN A PURE SENSE.    02:09

16         **THE COURT:**  ANSWER COUNSEL'S ARGUMENT.

17         HE SAYS IT'S NOT JUST A TODDLER OR AN INFANT OR A

18  TEENAGER, BUT THAT THERE'S AN ENTIRELY DIFFERENT CONTEXT;

19  THERE'S AN ENTIRELY DIFFERENT PSYCHOANALYTICAL FRAMEWORK OF

20  THIS DEVELOPING CHARACTER AND PERSONALITY.                     02:09

21         **MR. ZISSU:**  THE CONTEXT IS THEMATIC, AND THOSE ARE

22  IDEAS:  SUPERMAN AS A BABY; YOU HAVE TO SHOW SUPERMAN'S

23  STRENGTH.

24         ANYTHING THAT DERIVES FROM WHAT'S PREEXISTING CANNOT

25  BE OWNED BY WHAT THE DERIVATIVE WORK AUTHOR ADDED.  THE        02:10

1    PARTICULAR STORY OF THE BABY ON A CHANDELIER, YES, THAT

2    PARTICULAR SEQUENCE.

3          THE DIALOGUE AND THE CAPTIONS, FOR EXAMPLE, IN THE

4    HAUNTED HOUSE EPISODE, WHICH TAKE UP THE LARGEST PART OF WHAT'S

5    ADDED, THEY CAN BE OWNED BY THE DERIVATIVE WORK AUTHOR.        02:10

6          SO THAT'S THE ANSWER.

7          BUT THAT'S ONE THING.

8          AND WHEN YOU'RE DEALING WITH ANY WORK, INCLUDING,

9    ESPECIALLY, A DERIVATIVE WORK, WITH PRINCIPLES, LIMITING

10   PRINCIPLES, SUCH AS THE ONE THAT JUDGE WILSON MENTIONED, THE    02:10

11   QUESTION REQUIRES JUDICIAL LINE-DRAWING.  IT IS NOT TRUE THAT

12   EVERY CASE IN WHICH THERE'S AN ISSUE OF THIS KIND, WHETHER

13   THERE'S BEEN A NEW WORK PREPARED, IT GOES TO A JURY.

14         WHERE THE FACTS ARE NOT IN DISPUTE, THE CONTENT OF

15   THE WORKS, AND THERE'S NO ISSUE AS TO INDEPENDENT CREATION --   02:11

16   INDEPENDENT CREATION IS ONE OF THE RUBRICS OF DERIVATIVE WORK

17   INQUIRY.  AND IN THAT CONTEXT, THERE ARE FACT ISSUES THAT COME

18   UP.

19         IS THERE A PRIOR WORK?  WHAT'S INCLUDED IN THE PRIOR

20   WORK?  DID A SUBSEQUENT CREATOR MERELY, IN FACT, ACTUALLY COPY?  02:11

21   ACTUAL COPYING IS A FACT ISSUE.

22         ALL THAT IS PUT ASIDE HERE.  IT'S NOT AN ISSUE OF

23   WHETHER JERRY SIEGEL USED THE PREEXISTING SUPERMAN WORKS.  HE

24   DID; ACCESS IS THERE; COPYING IS THERE; HE SAID THAT HE BASED

25   THE SCRIPT ON THAT.                                            02:11

1      ALL THAT'S LEFT HERE IS THE QUESTION THAT PROFESSOR

2  NIMMER SAYS, IN SECTION 2.01(B), REQUIRES JUDICIAL

3  LINE-DRAWING.  AND THAT'S HOW YOU DEAL WITH THE ISSUE OF -- A

4  JURY CAN'T JUST RUN WILD HERE, BECAUSE PRINCIPLES ARE

5  ARTICULATED IN ENTERTAINMENT RESEARCH.                           02:12

6      AND BY THE WAY, ALSO BY JUDGE EASTERBROOK IN THE REED

7  UNION CASE, COME INTO PLAY.

8      THERE'S BEEN REFERENCE TO ARRANGEMENT, MR. TOBEROFF

9  MENTIONED.  WHERE IS THE ARRANGEMENT THAT WAS NEWLY ADDED

10  THAT'S BEEN AT ISSUE IN THE CASE?                               02:12

11      THERE ARE THESE SEQUENCES.  THERE ARE THREE OR FOUR

12  OF THEM.  THEY'RE NEW.  THAT'S WHAT WE SAID.  BUT THERE'S A

13  VERY THIN AND LIMITED COPYRIGHT THAT ATTACHES TO THAT, ALTHOUGH

14  IT DOES EXIST.

15      IDEAS HAVE TO BE FACTORED OUT.  THEY JUST HAVE TO BE        02:12

16  FACTORED OUT.  THAT'S THE LAW, 102(B).  SO THE QUESTION OF WHAT

17  IS EXACTLY ANSWERED -- OF COURSE, I CAN'T TALK TO THE ENDLESS

18  CHOICES, AND I CAN'T GIVE A GENERAL -- OTHER THAN THESE

19  PRINCIPLES, IT REQUIRES THE COURT TO DO THAT.  AND IT'S DONE

20  OVER AND OVER AGAIN.  THERE'S JUST TONS OF THESE KINDS OF       02:13

21  CASES.

22      WHAT WE'RE LEFT WITH -- YOU KNOW, THE MOST CREATIVE

23  THING THAT'S BEEN ADDED, EXCEPT FOR ITS REPETITION, IS REALLY

24  THE VIEWS OF WHAT'S IN THE SCRIPT BY PLAINTIFFS' COUNSEL.

25      **THE COURT:**  THANK YOU.  I THINK I UNDERSTAND YOUR       02:13

1   POSITION.

2        IS THERE ANYTHING FURTHER FROM THE PLAINTIFFS ON THIS

3   POINT, BECAUSE I'D LIKE TO MOVE ON TO THE SUPERMAN MOTIONS.

4        **MR. TOBEROFF:**  YES, YOUR HONOR.

5        FIRST OF ALL, DEFENDANTS THEMSELVES, IN LISTING THE   02:13

6   CRITERIA THAT A COURT MUST LOOK AT IN A COPYRIGHT INFRINGEMENT

7   ACTION, LISTS CHARACTERS, THEMES, SETTINGS, OUT OF NINTH

8   CIRCUIT CASES, SUCH AS FUNKY FILMS; SO THEN TO TURN AROUND AND

9   SAY THE COURT MUST LOOK AT THEMES IN ASSESSING INFRINGEMENTS,

10   WHICH IS A MUCH -- INFRINGEMENT IS A MUCH HIGHER THRESHOLD TO   02:13

11   REACH THAN COPYRIGHTABILITY; SO YOU MUST LOOK AT THEMES AND

12   SETTINGS IN ASSESSING INFRINGEMENT.

13        AND YET, THEMES ARE MERE IDEAS THAT ARE

14   UNPROTECTIBLE.  THEMES ARE ABSOLUTELY PROTECTABLE, AND SECTION

15   101 PROTECTS THE ARRANGEMENT OF EVEN UNCOPYRIGHTABLE ELEMENTS   02:14

16   AS SET FORTH BY THE SUPREME COURT IN FEIST.

17        THE REASON WHY THIS IS A JURY QUESTION IS NOT BECAUSE

18   WE KNOW THAT THE FACTS OF CREATION BY SIEGEL OR THAT WE HAVE

19   THE MATERIAL IN FRONT OF US IS SET.  THE REASON WHY THIS IS A

20   JURY QUESTION IS PRECISELY BECAUSE OF THESE SUBJECTIVE CREATIVE   02:14

21   INTERPRETATIONS.

22        THIS IS NOT A CASE WHERE SOMEBODY IS CRAWLING OUT OF

23   THE WOODWORK LIKE IN (UNINTELLIGIBLE), WHO SENT A DRAWING OF

24   BATMAN IN, UNSOLICITED DRAWINGS, AND ACCUSED D.C. OF INFRINGING

25   HIS DERIVATIVE BATMAN DRAWING.   02:14

```
 1          THIS IS A CASE OF THE CREATOR OF SUPERMAN, WITHIN

 2   MONTHS OF CREATING SUPERMAN, HAVING A NOTION THAT YOU COULD

 3   HAVE A SEPARATE LINE OF SUPERBOY COMICS, AND THEN CREATING THE

 4   FIRST PILOT OR SUPERBOY STORY.  IT'S A FAR DIFFERENT MATTER.

 5          THE OTHER THING IS THAT DEFENDANTS ARE -- WHILE WE'RE    02:15

 6   SAYING THIS ISN'T INFRINGEMENT, DEFENDANTS ARE PICKING AND

 7   CHOOSING FROM INFRINGEMENT CASES ON THE ISSUE OF

 8   COPYRIGHTABILITY.  AND THE CASES HAVE HELD, AND THE

 9   COMMENTATORS HAVE HELD, BOTH NIMMER AND PATRY, THAT WHEN IT

10   COMES TO ASSESSING WHETHER SOMETHING IS COPYRIGHTABLE, YOU DO    02:15

11   NOT LOOK AT SCENES A FAIRE; YOU DO NOT LOOK AT PRIOR ART; YOU

12   DO NOT LOOK AT NOVELTY.  IT'S A TOTALLY DIFFERENT ASSESSMENT.

13   AND THAT'S THE ASSESSMENT THAT YOU'RE ASKING FOR.  YOU'RE NOT

14   ASKING FOR AN INFRINGEMENT ASSESSMENT.  AND A NUMBER OF

15   COMMENTS THAT MR. ZISSU HAS MADE GO TO INFRINGEMENT.            02:15

16          WHEN HE TALKS ABOUT THE TESTS IN AN ENTERTAINMENT

17   RESEARCH FOR A DERIVATIVE WORK -- AND HE TALKS ABOUT USING A

18   DERIVATIVE WORK TO PREVENT THE ORIGINAL MATERIAL FROM BEING

19   EXPLOITED -- THAT'S AN INFRINGEMENT TEST, BUT THAT'S NOT WHAT

20   YOU'RE ASKING ABOUT HERE.                                      02:16

21          THE COURT:  YOU'VE WON THIS POINT.  I RECOGNIZE THAT

22   THERE IS COPYRIGHTABLE MATERIAL IN THESE 13 PAGES.

23          WHAT I'M STRUGGLING WITH IS DEFINING THE SCOPE AND

24   EXTENT OF THAT COPYRIGHTABLE MATERIAL.

25          MR. BERGMAN:  MAY I BE HEARD BRIEFLY?                    02:16
```

1        **THE COURT:**  I'LL GIVE YOU A CHANCE.

2        **MR. TOBEROFF:**  SO THE THING I WANTED TO WAIT TO

3   MENTION AT THE END OF THE SUPERBOY CONVERSATION WAS THAT YOUR

4   HONOR LEFT THE DOOR OPEN EVER SO SLIGHTLY IN THE WAY YOU WORDED

5   YOUR ORDER.  IT WAS VERY CLEAR THE DIRECTION YOU WERE LEANING.          02:16

6        I WOULDN'T BE DOING MY JOB IF I DIDN'T SPEAK BRIEFLY

7   ABOUT THE JOINT WORK ISSUE.

8        **THE COURT:**  YOU MAY, BRIEFLY.

9        **MR. TOBEROFF:**  I'D LIKE TO JUST POINT OUT A COUPLE OF

10  THINGS.          02:17

11        YOUR HONOR MENTIONED IN THE ORDER -- AND I BELIEVE

12  THIS IS ABSOLUTELY TRUE -- THAT THE DEFINITION OF JOINT WORK,

13  WHICH WAS NOT CODIFIED UNDER THE 1909 ACT, WAS CODIFIED -- THE

14  CASE LAW DEVELOPED IT UNDER THE 1909 ACT; IT WAS CODIFIED IN

15  THE '76 ACT.          02:17

16        THE '76 ACT, SECTION 101, SAYS, "A JOINT WORK IS A

17  WORK PREPARED BY TWO OR MORE AUTHORS WITH THE INTENTION THAT

18  THEIR CONTRIBUTION BE MERGED INTO INSEPARABLE OR INTERDEPENDENT

19  PARTS OF THE UNITARY WHOLE."  YOU MENTIONED THAT.

20        THE JOINT WORK IN QUESTION HERE, HOWEVER, I          02:17

21  RESPECTFULLY SUBMIT, IS NOT SIEGEL'S STORY BECAUSE THERE IS A

22  LEAP OF LOGIC HERE.  SIEGEL'S STORY WAS NOT ILLUSTRATED BY

23  JOE SHUSTER.  THE JOINT WORK IS A DERIVATIVE WORK OF SIEGEL'S

24  STORY, WHICH IS MORE FUN 101.  THAT WAS ILLUSTRATED BY

25  JOSEPH SHUSTER.  OR, WE DON'T KNOW WHO ILLUSTRATED IT.          02:18

1 DEFENDANT FIRST SAID IT WASN'T ILLUSTRATED BY JOE SHUSTER, AND

2 THEN THEY SAID THAT IT WAS ILLUSTRATED BY SOMEBODY IN HIS

3 WORKSHOP.

4       BUT, YOU SEE, THAT JOINT WORK WAS WRITTEN BY A D.C.

5 WRITER, AND WHEN THAT WAS ASSIGNED TO JOE SHUSTER TO                    02:18

6 ILLUSTRATE, JOE SHUSTER DIDN'T BELIEVE THAT HE WAS ILLUSTRATING

7 JERRY SIEGEL'S WORK.  HE WAS ILLUSTRATING THE WORK OF THE

8 AUTHOR OF MORE FUN 101.

9       NOW, IT'S TRUE THAT JERRY SIEGEL INITIALLY INTENDED

10 THAT HIS WORK BE A COMIC STRIP, WHICH, BY DEFINITION, IS A           02:19

11 JOINT WORK, WORDS AND PICTURES.

12       **THE COURT:**  NOT ONLY THAT, THE LETTER FROM

13 JERRY SIEGEL ON NOVEMBER 30, 1938 -- I'M REFERRING TO EXHIBIT 8

14 HERE -- CERTAINLY IMPLIES THAT IT'S FROM BOTH HE AND JOE.

15       **MR. TOBEROFF:**  BUT THE SCRIPT WAS NOT WRITTEN BY          02:19

16 JOE --

17       **THE COURT:**  WELL, THE SCRIPT FOLLOWS -- YES.

18       **MR. TOBEROFF:**  I DON'T BELIEVE EVEN DEFENDANTS HAVE

19 ALLEGED THAT THE SCRIPT WAS WRITTEN BY JOE SHUSTER.

20       **THE COURT:**  NO.  OBVIOUSLY, JERRY DID THE WRITING.        02:19

21       **MR. TOBEROFF:**  RIGHT.

22       SO IT'S CLEAR THAT JERRY SIEGEL ORIGINALLY INTENDED

23 AND CONTEMPLATED THAT HIS STORY BE A COMIC STRIP, WHICH, BY

24 DEFINITION, IS A JOINT WORK.  HE EVEN INTENDED THAT HIS

25 PARTNER, JOE SHUSTER, ILLUSTRATE THAT STORY.                        02:19

1          BUT THAT'S NOT WHAT HAPPENED.

2          AND TO JUMP FROM MORE FUN 101 BACK TO THE SCRIPT,

3    BACK TO MORE FUN 101, AND FOR DEFENDANT TO PLAY BOTH ENDS

4    AGAINST THE MIDDLE, LEADS TO A VERY ODD RESULT.  AND THAT ODD

5    RESULT -- AND I BELIEVE THIS IS IMPORTANT, AND IT'S NOT A                02:20

6    PARADE OF HORROR ARGUMENT; IT'S A VERY REAL ARGUMENT -- THAT

7    END RESULT IS THAT, ACCORDING TO THIS DECISION, IT WOULD

8    ABSOLUTELY MEAN THAT MERELY BECAUSE SOMEONE WRITES THE LYRICS

9    TO A SONG, WHICH BY DEFINITION IS GOING TO BE A JOINT WORK,

10   LYRICS OR MUSIC, OR WRITES A COMIC STRIP THAT HE DOESN'T                 02:20

11   ILLUSTRATE, BY DEFINITION A JOINT WORK -- HE INTENDED WHEN HE

12   WROTE IT TO BE A JOINT WORK.  AND IT MEANS THAT A COMPANY COULD

13   TAKE THAT STORY, CREATE A NEW DERIVATIVE WORK, ASSIGN AN

14   ILLUSTRATOR TO IT, OR ASSIGN A SONGWRITER TO DO THE MUSIC.

15        **THE COURT:**  LET ME STOP YOU HERE.                              02:20

16        THIS SCRIPT THAT YOU'RE REFERRING TO -- I'M LOOKING

17   AT THE FIRST PAGE 1 OF IT, IT SAYS, "PANEL OCCUPIES FULL PAGE,

18   CONTAINS THE TITLE 'SUPERBOY,' THE BY-LINE 'BY JERRY SIEGEL AND

19   JOE SHUSTER.'"

20        **MR. TOBEROFF:**  ABSOLUTELY.                                     02:21

21        **THE COURT:**  THERE'S A STRIP BOX AND AN ILLUSTRATION

22   SHOWING SUPERBOY LEAPING HIGH OVER THE CITY AT GREAT SPEED,

23   ALONGSIDE SUPERMAN.

24        HE CLEARLY INTENDED THIS TO BE A JOINT WORK WITH

25   JOE SHUSTER.                                                            02:21

September 17, 2007                    Siegel v. Warner, et al.

1          **MR. TOBEROFF:**  ABSOLUTELY.  BUT IT NEVER BECAME ONE.

2          THAT'S THE PROBLEM.  IT NEVER BECAME ONE.

3          WHAT HAPPENED WAS, THEY TOOK HIS WORK.  THEY CREATED

4   A NEW DERIVATIVE WORK, WHICH DEFENDANTS SAY DOESN'T HAVE ENOUGH

5   OF THE STORY IN IT.  THEY ASSIGNED THAT DERIVATIVE WORK,          02:21

6   WRITTEN BY A TOTALLY DIFFERENT AUTHOR AT D.C., TO JOE SHUSTER,

7   AND JOE SHUSTER'S INTENTION WAS TO ILLUSTRATE THAT WORK.  THAT

8   WAS THE JOINT WORK, NOT JERRY SIEGEL'S STORY, DESPITE HIS

9   INTENTIONS.

10         **THE COURT:**  I'LL TAKE A LOOK AT THIS, COUNSEL.          02:21

11         **MR. TOBEROFF:**  OKAY.

12         **THE COURT:**  I WANT TO GIVE THE DEFENSE A CHANCE TO

13  RESPOND.

14         **MR. BERGMAN:**  YOUR HONOR, WE'VE COME FAR ASTRAY FROM

15  YOUR HONOR'S PRIOR DECISION AND THE QUESTION YOU POSED AT THE     02:22

16  OUTSET OF THIS ARGUMENT.

17         YOUR PRIOR DECISION HELD, CORRECTLY SO, BECAUSE THE

18  WORKS WERE INTENDED TO BE A JOINT WORK, THAT IT WOULD BE A

19  JOINT WORK IF THERE WAS SUFFICIENT COPYRIGHTABILITY IN

20  MR. SIEGEL'S SUBMISSIONS.                                         02:22

21         I SAY IT DOESN'T MATTER.  EITHER WAY, D.C. OWNS HALF

22  OF THAT COPYRIGHT AND CANNOT CONCEIVABLY INFRINGE; AND,

23  THEREFORE, THERE CAN BE NO INFRINGEMENT ACTION.

24         DOES THE 13-PAGE SCRIPT HAVE ANY COPYRIGHTABLE

25  MATERIAL?                                                         02:22

1           SURE, IT DOES.

2           IT HAS MATERIAL OF A CHILD SITTING ON A TACK AND

3    BEING IMPERVIOUS.  IT HAS MATERIAL OF A CHILD TRYING TO JOIN A

4    CLUB AND BEING PUT INTO A HAUNTED HOUSE AND SAVING HIS FRIENDS.

5    IT DOESN'T INCLUDE THE ELEMENTS THAT WERE CONTAINED IN THE            02:23

6    ORIGINAL SUPERMAN WORK, BUT IT IS, FOR OUR INSTANT PURPOSES,

7    COPYRIGHTABLE.  BECAUSE IT IS, TO THAT LIMITED EXTENT,

8    COPYRIGHTABLE.

9           IT IS, AS YOU HAVE PROPERLY INDICATED, A JOINT WORK.

10          YOUR PRIOR DECISION SAID THAT THE ONE FACTOR                   02:23

11   PREVENTING THE COURT FROM FINDING IT'S A JOINT WORK IS WHETHER

12   IT'S COPYRIGHTABLE AT ALL.

13          WELL, IT IS COPYRIGHTABLE TO SOME EXTENT.  IT IS,

14   THEREFORE, SUFFICIENT AS A CONTRIBUTION TO A JOINT WORK.  THE

15   WORK THEN BECOMES A JOINT WORK.  AND D.C., BY VIRTUE OF THE           02:23

16   GRANT FROM MR. SHUSTER, OWNS HALF OF THAT JOINT WORK.

17   THEREFORE, IT CANNOT CONCEIVABLY INFRINGE BY LICENSING

18   SMALLVILLE.

19          MR. TOBEROFF IS GETTING WAY AHEAD BY ARGUING

20   APPORTIONMENT; THAT'S SOMETHING TO BE ARGUED MUCH LATER IN THE        02:24

21   CASE.  THE IMMEDIATE QUESTION, WHICH YOU RAISE IN YOUR OPINION,

22   IS WHETHER THIS WAS A JOINT WORK.

23          **THE COURT:**  HOW DO YOU RESPOND TO HIS FINAL ARGUMENT,

24   THEN?

25          **MR. BERGMAN:**  I TOTALLY DISAGREE WITH MR. TOBEROFF.        02:24

```
 1              THE COURT:  I EXPECT THAT.

 2              MR. BERGMAN:  BUT, YES, OF COURSE.

 3              THE RECORD MAKES IT CLEAR.  THE RECORD ON WHICH YOUR

 4    HONOR MADE YOUR DECISION MAKES IT CLEAR THAT MR. SIEGEL

 5    INTENDED THIS WORK, THE SCRIPT WHICH HE WANTED TO BE PRODUCED      02:24

 6    INTO A COMIC BOOK, TO BE A JOINT WORK.  THAT'S CLEAR FROM THE

 7    BY-LINE THAT HE PUT ON TO IT.  THAT'S CLEAR FROM HIS PRIOR

 8    EXPERIENCE.  MR. SIEGEL ISN'T AN ARTIST.

 9              THE COURT:  I ACCEPT THAT.  BUT HIS ARGUMENT IS, THAT

10    MAY HAVE BEEN HIS INTENT, BUT THAT DIDN'T HAPPEN.                  02:24

11              MR. BERGMAN:  WELL, FIRST OF ALL, THAT'S CONTRARY TO

12    WHAT MR. TOBEROFF HAS PREVIOUSLY ARGUED, BECAUSE HE'S

13    PREVIOUSLY ARGUED THAT THE WORK WAS PUBLISHED IN MORE FUN 101.

14              AND I SAY TO YOUR HONOR THAT UNDER THE COPYRIGHT LAW,

15    IT DOESN'T MATTER WHETHER THAT HAPPENED OR NOT.  WHAT MATTERS      02:25

16    WAS THE INTENTION OF THE JOINT AUTHORS IN CREATING THAT WORK.

17              THE COURT:  AND PERHAPS THAT'S THE QUESTION I NEED TO

18    COME BACK TO PLAINTIFFS' COUNSEL WITH.

19              WAS IT OR WAS IT NOT?  WAS THE SCRIPT OR WAS THE

20    SCRIPT NOT PUBLISHED IN MORE FUN 101?                             02:25

21              MR. TOBEROFF:  IT WAS PUBLISHED TO AN EXTENT.

22              THE COURT:  TO AN EXTENT?  TO WHAT EXTENT?

23              I'M SORRY FOR INTERRUPTING YOU, COUNSEL, BUT THIS IS

24    THE QUESTION THAT I THINK YOUR ANALYSIS LEADS BACK TO.

25              MR. TOBEROFF:  THE ANALYSIS IS THAT MORE FUN 101 WAS     02:25
```

```
1   A DERIVATIVE WORK.  AND WE'RE LOOKING -- IT'S NOT THE SAME

2   WORK.  AND, THEREFORE, LOOK AT THAT DERIVATIVE WORK --

3           THE COURT:  IT'S A DERIVATIVE FROM?

4           MR. TOBEROFF:  FROM JERRY SIEGEL'S SCRIPT.

5           THE COURT:  FROM THE SCRIPT.

6           MR. TOBEROFF:  THAT DOESN'T MEAN THAT WHEN YOU

7   ILLUSTRATE THAT DERIVATIVE WORK, YOU'RE ILLUSTRATING

8   JERRY SIEGEL'S SCRIPT.

9           THE COURT:  SO THE SCRIPT ITSELF IS UNPUBLISHED,

10  THEN?                                                           02:26

11          MR. TOBEROFF:  THE SCRIPT ORIGINALLY WAS AN

12  UNPUBLISHED WORK.

13          THE COURT:  NO.  BUT YOU'RE TELLING ME THAT ALL THAT

14  101 WAS WAS A DERIVATIVE WORK; SO THE SCRIPT ITSELF IS

15  UNPUBLISHED.  CORRECT?                                          02:26

16          MR. TOBEROFF:  IT WAS NOT PUBLISHED VERBATIM IN 101,

17  WHICH MEANS, BY DEFINITION, IT HAS TO BE A DERIVATIVE WORK.

18          THE CONCLUSION THAT DEFENDANTS ARE ADVOCATING, WHICH

19  ACTUALLY COMES FROM, I BELIEVE, JUST ONE CASE, ONE SECOND

20  CIRCUIT CASE, OR IT MAY EVEN BE A DISTRICT COURT CASE, IS WHERE 02:26

21  THEY SAID THAT IF AN ARTIST INTENDS THAT HIS CONTRIBUTION IS

22  FOR A JOINT WORK, IT DID NOT MATTER WHO THE OTHER ARTIST IS OR

23  EVEN WHEN THE OTHER ARTIST MAKES HIS CONTRIBUTION.  BUT THAT

24  DECISION ASSUMED THAT THE OTHER ARTIST IS COLLABORATING ON THE

25  SAME WORK.                                                      02:26
```

```
 1        HERE, DEFENDANTS SAY MORE FUN 101 WAS WRITTEN BY A
 2   DIFFERENT AUTHOR AND WAS ILLUSTRATED BY JERRY SIEGEL.  THAT
 3   DOES NOT TRANSFORM MR. SIEGEL'S WORK INTO A JOINT WORK.
 4        AND THE PROBLEM WITH THIS PUTTING ON THE BLINDERS AND
 5   SAYING JOINT WORK IS A QUESTION OF INTENT; HE INTENDED IT TO BE    02:27
 6   A JOINT WORK, THEREFORE IT'S A JOINT WORK -- THE PROBLEM WITH
 7   THAT IS, IT WOULD LEAD TO THE ABSURD RESULT THAT ANYONE DOING A
 8   SCRIPT FOR A COMIC STRIP, WHICH BY DEFINITION HAS TO BE A JOINT
 9   WORK, OR LYRICS FOR A SONG, BY DEFINITION A JOINT WORK, CANNOT
10   BE PROTECTED.                                                     02:27
11        THE COURT:  ISN'T IT A LITTLE DIFFERENT WHEN YOU HAVE
12   THE ACTUAL ARTIST IN MIND, WHETHER IT'S RODGERS AND
13   HAMMERSTEIN, OR IN THIS CASE, SIEGEL AND SHUSTER?
14        MR. TOBEROFF:  NO.  IT SHOULDN'T BE DIFFERENT,
15   BECAUSE THOSE CASES, IN FACT, SAY IT DOESN'T MATTER WHO THE       02:27
16   OTHER PERSON IS.
17        THE COURT:  ALL RIGHT.
18        MR. TOBEROFF:  BUT I WANT TO MAKE THIS POINT:  THE
19   ABSURD RESULT IS, IF YOU WRITE A SCRIPT FOR A COMIC, YOU WRITE
20   A LYRIC FOR A SONG, A COMPANY -- IF WHAT DEFENDANTS ARE SAYING    02:27
21   IS CORRECT -- COULD SIMPLY TAKE THAT SCRIPT FROM YOU, OR TAKE
22   THE LYRICS FROM YOU.  SAY YOU INTEND IT TO BE A JOINT WORK.
23   THEREFORE, WHAT WE TOOK FROM YOU IS PART OF A JOINT WORK.
24   THEREFORE, SINCE IT'S A JOINT WORK, WE HAVE A NONEXCLUSIVE
25   RIGHT TO EXPLOIT IT, AND YOU CAN'T SUE US FOR COPYRIGHT           02:28
```

```
 1    INFRINGEMENT, EVEN THOUGH THEY CLEARLY STOLE YOUR STORY OR

 2    LYRIC.  THAT COULD NOT POSSIBLY BE THE RESULT THAT YOUR HONOR

 3    IS LOOKING FOR.

 4            THE COURT:  I UNDERSTAND YOUR ARGUMENT.

 5            OKAY.  VERY GOOD.                                        02:28

 6            I DO WANT TO MOVE ON TO THE SUPERMAN MOTION.  WE'VE

 7    DEVOTED AN HOUR TO SUPERBOY.  LET'S MOVE ALONG HERE.

 8            MR. BERGMAN:  YOUR HONOR, IF I MAY, JUST ONE SENTENCE

 9    TO WRAP UP THE POINT, AND MR. TOBEROFF LED RIGHT INTO IT.

10            THE COURT:  YOU MAY.

11            MR. BERGMAN:  THE SCRIPT WAS EITHER PUBLISHED IN 101

12    OR IT WAS NOT.  IF IT WAS PUBLISHED IN 101, IT'S A JOINT WORK,

13    UNDER YOUR PRIOR RULING.  IF IT WASN'T PUBLISHED, IT CAN'T BE

14    TERMINATED.

15            IN EITHER EVENT, IT CAN'T BE THE SUBJECT OF AN         02:28

16    INFRINGEMENT.

17            THANK YOU.

18            THE COURT:  ON SUPERMAN, THERE'S A NUMBER OF ISSUES

19    RAISED, AND THE WAY I LAID THEM OUT IN MY NOTES WAS TO GO

20    THROUGH THEM IN CHRONOLOGICAL ORDER, STARTING WITH THE EARLIEST  02:29

21    ISSUES, NAMELY THE PROMOTIONAL ADVERTISEMENT, AND KIND OF

22    MOVING FORWARD.

23            I DON'T HAVE A LOT OF QUESTIONS ON A NUMBER OF THE

24    ISSUES.  I DO HAVE QUESTIONS ON SOME OF THEM.  WHAT I WOULD

25    LIKE TO DO IS GO THROUGH MY QUESTIONS FIRST, AND THEN I WILL    02:29
```

```
1   GIVE BOTH SIDES AN OPPORTUNITY TO AMPLIFY ANY OF THE ISSUES

2   THAT THEY MAY THINK I'VE OVERLOOKED OR ISSUES THAT NEED

3   AMPLIFICATION.

4        ON THIS ISSUE OF THE PROMOTIONAL ADVERTISEMENT AND

5   WHETHER IT FELL OUTSIDE THE 56-YEAR PERIOD OF TIME, I'LL GIVE     02:29

6   YOU MY TENTATIVE THOUGHTS, AND THEN I'D LIKE TO HEAR, ACTUALLY,

7   FROM BOTH SIDES.

8        ON THE ONE HAND, AT LEAST BASED ON THE EVIDENCE THAT

9   IS BEFORE ME NOW -- AND THAT EVIDENCE MAY CHANGE, BUT BASED ON

10  WHAT'S BEFORE ME NOW, I THINK IT'S PRETTY CLEAR THAT THE          02:30

11  PROMOTIONAL ADVERTISEMENT DID FALL OUTSIDE THE 56-YEAR PERIOD.

12       I UNDERSTAND THERE'S EXPERT TESTIMONY.  I'VE READ THE

13  EXPERT TESTIMONY THAT THESE DATES ARE DIFFICULT.  BUT BASED ON

14  THE REGISTRATION DATE FOR THE PARTICULAR MAGAZINES WHICH

15  CONTAINED THOSE PROMOTIONAL ADVERTISEMENTS, BASED ON THE          02:30

16  EVIDENCE BEFORE ME, I THINK IT'S CLEAR THAT IT FELL OUTSIDE.

17       AT THE SAME TIME, THE SCOPE OF COPYRIGHTABLE MATERIAL

18  IS EXTREMELY LIMITED, AS I THINK PLAINTIFF POINTS OUT THROUGH

19  THEIR EXPERT.  LOOKING AT THOSE ADS, WHICH DON'T EVEN CARRY THE

20  NAME "SUPERMAN," WHICH YOU CAN HARDLY MAKE OUT WHETHER IT'S AN    02:30

21  "S" OR A "5" OR WHAT IT IS ON HIS CHEST.  I MEAN, CERTAINLY YOU

22  HAVE THE CAPE THERE, AND YOU HAVE THE SUPERHUMAN STRENGTH,

23  BECAUSE HE'S CARRYING THIS CAR.  OUTSIDE OF THAT, I DON'T KNOW

24  WHAT THERE IS TO THAT WHICH GARNERS IN WARNER BROTHERS' FAVOR.

25       I MEAN, THERE'S CERTAINLY SOMETHING THERE, AND IT           02:31
```

1    APPEARS TO BE OUTSIDE THE 56 YEARS, BUT THERE DOESN'T SEEM TO

2    BE A LOT THERE; SO THAT'S MY INITIAL TAKE AFTER READING WHAT

3    YOU'VE SUBMITTED.

4          BUT LET ME HEAR FROM BOTH SIDES ON THIS ISSUE.

5          **MR. TOBEROFF:**  YOUR HONOR, REGARDLESS OF THE ISSUE OF    02:31

6    WHETHER THE ADS FALL OUTSIDE OR WHETHER THE DATES -- I BELIEVE

7    THAT'S MOOTED BY LEGAL CONSIDERATION; AND AS A MATTER OF LAW,

8    THE ADS ARE COMPLETELY IRRELEVANT TO THE ANALYSIS.  AND I'LL

9    EXPLAIN WHY.

10         THE TERMINATION PROVISION, WHICH IS PRETTY    02:31

11   STRAIGHTFORWARD -- I MEAN, BASICALLY, BY THE MINISTERIAL ACT OF

12   FILING A NOTICE, YOU GIVE THE ORIGINAL GRANTEE OR THEIR

13   SUCCESSOR'S NOTICE OF A GRANT THAT'S BEING TERMINATED, THE WORK

14   THAT WAS TRANSFERRED BY THAT GRANT, SO THAT THEY KNOW ON THE

15   EFFECTIVE TERMINATION DATE WHAT WORK IS BEING RECAPTURED BY THE    02:32

16   TERMINATING PARTY.  IT'S PRETTY STRAIGHTFORWARD.

17         THERE IS NO REQUIREMENT TO LIST DERIVATIVE WORKS IN

18   THE TERMINATION STATUTE.

19         **THE COURT:**  NOT DERIVATIVE, RIGHT.

20         **MR. TOBEROFF:**  AND THE AD IS A DERIVATIVE WORK.  AND    02:32

21   I'LL EXPLAIN WHY.

22         THE REASON WHY THERE'S NO REQUIREMENT IN THE

23   TERMINATION STATUTE TO LIST DERIVATIVE WORK -- FIRST OF ALL, IT

24   DOESN'T SAY THAT.  SECONDLY, THERE'S A DERIVATIVE WORK

25   EXCEPTION WHERE THE NOTIFIED PARTY CAN DO WHATEVER THEY WANT    02:32

1  WITH PREEXISTING DERIVATIVE WORKS; SO THERE WOULD BE NO REASON

2  TO HAVE TO MAKE SURE THAT YOU LIST EVERY SINGLE DERIVATIVE

3  WORK.  THEY CAN CONTINUE TO EXPLOIT DERIVATIVE WORKS.

4        THEIR WHOLE ARGUMENT IS BASED ON THAT PLAINTIFF HAD

5  AN OBLIGATION TO LIST THOSE ADS, AND SINCE THEY DIDN'T LIST        02:32

6  THEM, THEY CLAIM THAT SOMEHOW THOSE ARE OUTSIDE THE TERMINATION

7  AND THEY CAN CONTINUE TO EXPLOIT THEM.

8        **THE COURT:**  OR AT LEAST THOSE ELEMENTS, RIGHT.

9        **MR. TOBEROFF:**  THE ELEMENTS IN THE AD.

10        BUT THE PREMISE IS INCORRECT THAT THEY HAVE TO LIST        02:33

11  DERIVATIVE WORKS.  THERE'S NO SUCH OBLIGATION, IN THE FIRST

12  PLACE.  SECONDLY, IN THIS CASE, EVEN IF THERE WERE THAT

13  OBLIGATION, IN THIS CASE, IT WOULD BE EXTREMELY ONEROUS TO SAY

14  THAT THE -- THE TERMINATION NOTICES REFLECT THAT PLAINTIFFS

15  WENT TO A TREMENDOUS EFFORT TO LIST EVERY POSSIBLE WORK.  AND        02:33

16  THE WAY YOU FIND THESE WORKS, YOU CAN'T GET THIS INFORMATION

17  ON-LINE.  YOU HAVE TO DO IT BY HAND, BY LOOKING AT THESE OLD

18  REGISTERS.  AND YOU LOOK UNDER SIEGEL; YOU LOOK UNDER SHUSTER;

19  YOU LOOK UNDER SUPERMAN.

20        BUT SINCE THESE ADS APPEARED IN MORE FUN NUMBER 31        02:33

21  AND AREN'T LISTED UNDER SUPERMAN, IT'S VERY DIFFICULT FOR ANY

22  TERMINATING PARTY TO BE ABLE TO EVEN FIND THESE ADS.

23        **THE COURT:**  BUT WE'VE SEEN THAT HAPPEN BEFORE.

24  THEY'VE CERTAINLY BEEN IDENTIFIED IN OTHER LITIGATION.

25        **MR. TOBEROFF:**  I'M SIMPLY ADDRESSING THE POINT AS TO        02:34

```
 1   -- THE FACT THAT YOU HIT UPON AN AD AND CAN IDENTIFY IT DOESN'T

 2   MEAN THAT THERE'S A BURDEN TO HAVE TO FIND EVERY POSSIBLE WAY

 3   THAT SUPERMAN HAD BEEN EXPLOITED, INCLUDING AN OBSCURE AD.

 4          DEFENDANTS SAY IT'S WELL KNOWN THAT THE FIRST

 5   APPEARANCE OF SUPERMAN WAS IN THESE ADS.  THAT IS A COMPLETE       02:34

 6   FABRICATION.  THEIR OWN PUBLICATIONS -- AND WE LIST THEM IN

 7   THEIR PAPERS -- AND THEIR OWN EXPERTS, MARK WADE AND

 8   JEFF ROGAN, SAY THE FIRST TIME SUPERMAN APPEARED AS AN ACTION

 9   ONE, THAT'S THE COMMON KNOWLEDGE.  DEFENDANTS NEED NOT HAVE

10   EVEN LISTED ALL OF THE WORKS THAT THEY LISTED IN THEIR            02:34

11   TERMINATION NOTICES FOR THE TERMINATION TO BE VALID.  I'VE SEEN

12   TERMINATIONS THAT LIST JUST -- WOULD HAVE LISTED THE MARCH 1,

13   1938 GRANT, AND ACTION COMICS NUMBER ONE.

14          BECAUSE ACTION COMICS NUMBER ONE WAS LISTED, IT FALLS

15   WITHIN THE AMBIT OF THE TERMINATION NOTICE.  AND THEM TAKING A    02:35

16   COVER FROM ACTION NUMBER ONE DOESN'T MEAN THAT THE COVER NOW

17   FALLS OUTSIDE OF THE NOTICE BECAUSE THE COVER IS PART OF ACTION

18   NUMBER ONE; SO HOW DOES THE COVER SUDDENLY GET EXTRACTED FROM

19   THIS JOINT WORK, WHICH IS THE SECOND POINT, AND BECOME THIS

20   COMPETING COPYRIGHT THAT THEY CAN CONTINUE TO USE WITHOUT         02:35

21   ACCOUNTING TO PLAINTIFFS?

22          IT DOESN'T MAKE ANY SENSE.  BECAUSE WE'RE REQUIRED TO

23   LIST THE GRANT.  WE LISTED THE GRANT.  WE'RE REQUIRED TO LIST

24   THE WORK.  WE LISTED THE WORK.  AND THIS IS THE COVER FROM THE

25   WORK THAT WE LISTED IN THE NOTICE; SO THEIR WHOLE PREMISES IS     02:35
```

1    ERRONEOUS.

2         THE SECOND REASON WHY, AS A MATTER OF LAW, THEIR AD

3    ARGUMENT MAKES NO SENSE IS BECAUSE THEY HAVE ADMITTED, AND IT'S

4    OBVIOUS, THAT ACTION COMICS NUMBER ONE IS A JOINT WORK.

5         THE DEFINITION OF A JOINT WORK MEANS THAT ITS                02:36

6    COMPONENTS, INCLUDING ITS COLOR, INCLUDING ALL ITS BITS AND

7    PIECES, AND INCLUDING ITS COVER WHICH MIRRORS THE PANEL INSIDE

8    THE COMIC BOOK, ARE ALL PART OF AN INSEPARABLE WHOLE, A UNITARY

9    WHOLE.  WHEN IT COMES TO EXPLOITING ACTION COMICS NUMBER ONE,

10   AS ITS SUCCESSOR TO JOE SHUSTER, DEFENDANTS ARE FULLY            02:36

11   CAPITALIZING ON THAT RIGHT, THAT UNDIVIDED RIGHT.  THEY CAN'T

12   NOW EXTRACT THE COVER FROM THE JOINT WORK.

13        AND IN THE ADS, WHICH IS A DERIVATIVE WORK, THE ONLY

14   THING WHICH THEY CAN CONTINUE TO USE, THAT AD, THE ONLY THING

15   THEY CAN CONTINUE TO USE IS THAT AD.  THEY CAN'T CONTINUE TO     02:36

16   USE THE ELEMENTS IN THAT AD, BECAUSE THOSE ELEMENTS ARE

17   INCLUDED IN THE WORK THAT WAS IN THE TERMINATION NOTICE.

18        ALSO, THE COPYRIGHT THAT PROTECTS THE ADS DOESN'T

19   PROTECT THE PREEXISTING COVERED ACTION NUMBER ONE.  IT PROTECTS

20   WHATEVER IS NEW ABOUT THAT AD.                                   02:37

21        FINALLY, THEY'VE MADE AN ARGUMENT SAYING THAT THE AD

22   WAS THE FIRST TIME TO PUBLISH THE COVER.  AGAIN, YOU CAN'T JUST

23   PUBLISH A COVER.  BUT THERE ARE PILES OF CASES THAT SAY A

24   PUBLICITY NOTICE PUBLICIZING A BOOK OR A TOY OR SOME PRODUCT

25   DOES NOT PUBLISH THE WORK THAT THEY'RE PUBLICIZING.  AND THOSE   02:37

```
 1   CASES HAVE DONE THAT FOR A VARIETY OF REASONS, PARTICULARLY NOT

 2   TO THROW THAT WORK INTO THE PUBLIC DOMAIN.

 3            THE COURT:  I UNDERSTAND THAT.  THAT'S NOT REALLY THE

 4   SUGGESTION HERE.

 5            BUT IT'S NOT JUST THE AD ITSELF, THE PICTURE ITSELF.      02:37

 6   WHY IS IT NOT ALSO THE ELEMENTS:  THE CAPE?  THE STRENGTH?  I

 7   UNDERSTAND IT'S A BLACK AND WHITE AD, SO WE DON'T EVEN GET THE

 8   COLORS.

 9            MR. TOBEROFF:  BECAUSE WHAT THEY'RE SAYING IS, THOSE

10   ELEMENTS EXTRACTED FROM A WORK MENTIONED IN THE TERMINATION        02:38

11   NOTICE, BECAUSE WE DIDN'T MENTION THIS OTHER DERIVATIVE WORK,

12   WE CAN USE THOSE ELEMENTS WITHOUT HAVING TO ACCOUNT TO

13   PLAINTIFFS.  THAT'S INCORRECT.  IT'S INCORRECT UNDER THE

14   TERMINATION STATUTE.  IT'S INCORRECT UNDER THE REGULATIONS.

15            WE MENTION THE WORK, AND THIS IS THE COVER OF THE         02:38

16   WORK.  SO HOW CAN THEY POSSIBLY CLAIM THAT BY SHOWING THE COVER

17   IN THE TITLE OF THE PICTURE IS A DERIVATIVE WORK THAT WE

18   HAVEN'T CAPTURED THOSE ELEMENTS?

19            IT'S A VERY TRICKY CLAIM.

20            THE COURT:  I UNDERSTAND YOUR ARGUMENT, THOUGH.           02:38

21            MR. TOBEROFF:  I DON'T BELIEVE THE STATUTE WAS

22   DESIGNED TO WORK THAT WAY.

23            THE COURT:  LET ME HEAR FROM THE DEFENSE ON THIS

24   POINT.

25            MR. ZISSU:  LET ME START, FIRST, WITH ANSWERING YOUR      02:38
```

1    HONOR'S QUESTION, WHICH WAS, WHAT'S THE SCOPE OF WHAT'S IN

2    THESE ADS?

3           THERE ARE CERTAIN THINGS, OBVIOUSLY, IN THE ADS.

4           BUT OUR SUMMARY JUDGMENT MOTION SEEKS TO ESTABLISH

5    THE PRINCIPLE THAT THE ADS WERE NOT COVERED, AND, THEREFORE,        02:39

6    WHATEVER THEY INCLUDED WOULD BE FREED UP.  FOR LATER, WE HAVE

7    EXPERTS ON THAT, AND THAT'S REALLY A QUESTION OF APPORTIONMENT

8    AND ALLOCATION THAT WOULD COME UP LATER; HOW MUCH IS

9    ATTRIBUTABLE IN THE SUPERMAN CHARACTER AND THE ASPECTS OF IT

10   THAT ARE RECAPTURED, AND HOW MUCH OF THAT IS ATTRIBUTABLE TO        02:39

11   MATERIAL THAT IS NOT RECAPTURED BECAUSE IT WAS IN THESE ADS?

12           **THE COURT:**  HOW DO YOU RESPOND TO COUNSEL'S ARGUMENT

13   THAT ALL YOU HAVE IS THE ACTUAL PICTURE ITSELF AND NOT

14   NECESSARILY ANY OF THE ELEMENTS THEREIN?

15           **MR. ZISSU:**  OKAY.                                       02:39

16           WELL, THE THING ABOUT VISUAL WORKS, MULTI-MEDIA

17   WORKS, IS THAT PICTURES ARE WORTH -- CAN BE WORTH MANY WORDS.

18   WE DO HAVE, IF YOU LOOK AT IT -- IF YOU LOOK AT IT, YOU HAVE

19   THE FIGURE OF SUPERMAN AS HE APPEARS THERE IN HIS COSTUME; YOU

20   HAVE HIS STRENGTH LIFTING A CAR; AND YOU DON'T HAVE THAT MUCH       02:40

21   MORE.

22           **THE COURT:**  THAT'S ABOUT IT; RIGHT.

23           **MR. ZISSU:**  WHAT IT IS IS WHAT IT IS.

24           I MEAN, WE DIDN'T ADDRESS THAT IN THE MOTION, AND WE

25   HAVE EXPERTS ON THAT WHO CAN TELL YOU THAT THEY CAN SEE MORE        02:40

1    INTO THAT THAN THE PLAINTIFFS SEE.  AND THE PLAINTIFFS WILL SAY

2    THERE'S NOTHING IN IT.

3              THAT IS SOMETHING FOR ANOTHER DAY.

4              **THE COURT:**  ALL RIGHT.

5              **MR. ZISSU:**  IT'S NOT AN EASY QUESTION.  AND THESE     02:40

6    APPORTIONMENT QUESTIONS -- THERE ARE ALMOST NO ANSWERS ON

7    APPORTIONMENT.  (UNINTELLIGIBLE) IN THE SHELDON CASE, MANY,

8    MANY YEARS AGO, CAME UP WITH THE UNDERLYING WORK OF A PLAY THAT

9    WAS COPIED IN A MOTION PICTURE.  HE CAME UP WITH A 20-PERCENT

10   FIGURE.  HE'S ALMOST GOD IN THE LAW OF COPYRIGHT, BUT, YOU       02:40

11   KNOW, JUDGES AND HUMAN BEINGS, WE USE REASONABLE COMMON SENSE

12   AND WE DO SOMETHING THAT'S CALLED "FAIR" AT THE END OF THE DAY,

13   WITH THE ADVICE OF EXPERTS.

14             ON THE OTHER ARGUMENTS THAT MR. TOBEROFF HAS MADE,

15   THEY MAKE NO SENSE UNDER THE COPYRIGHT LAW.  THERE'S NO          02:41

16   PRECEDENT FROM ANY OF IT.  THE IDEA THAT BECAUSE THERE'S A

17   JOINT WORK, SOMEBODY CAN'T EXTRACT SOMETHING FROM IT... AS HE

18   SAID, YOU CAN'T JUST PUBLISH A COVER.

19             OF COURSE, YOU CAN PUBLISH A COVER.  YOU TAKE THE

20   COVER, AND YOU PUBLISH IT.  AND THEN THE QUESTION IS, DO YOU     02:41

21   HAVE THE RIGHT LEGALLY TO DO THAT?

22             WELL, IF YOU'RE THE COPYRIGHT OWNER OF THAT JOINT

23   WORK, YOU CAN PUBLISH ANY PART OF IT YOU WANT, ANYTIME YOU

24   WANT, ANYWHERE YOU WANT; SO THIS ARGUMENT GOES NOWHERE.

25   THERE'S NO NOTION THAT BECAUSE SOMETHING IS A JOINT WORK, IT'S   02:41

```
 1   A UNITARY WHOLE THAT CAN'T BE BROKEN APART.  IF YOU'RE THE

 2   COPYRIGHT OWNER, YOU COPYRIGHT -- THEY SELL POSTERS; THEY SELL

 3   POSTCARDS; THEY USE PORTIONS ON T-SHIRTS; SO IT DOESN'T GO

 4   ANYWHERE.

 5        THE SPECTOR AD, AND THE PLAINTIFFS' OWN CONDUCT IN       02:41

 6   RELATION TO IT, REALLY DISPROVES EVERYTHING THEY'RE SAYING.

 7   ASIDE FROM THE FACT ISSUES OF WHETHER THEY WERE AWARE OR SHOULD

 8   HAVE BEEN AWARE OF THESE ADS, THE FACT THAT THEY CHOSE TO

 9   INCLUDE THE SPECTOR AD IN A NOTICE OF TERMINATION MEANS THEY

10   KNOW VERY WELL THAT YOU HAVE TO CAPTURE THOSE ADS THAT ARE OUT  02:42

11   THERE OR THERE ARE CONSEQUENCES FOR NOT INCLUDING THEM IN THE

12   NOTICE OF TERMINATION.

13        THE NOTION THAT YOU HAVE TO -- THE REQUIREMENT UNDER

14   THE STATUTE IS THAT YOU MUST IDENTIFY THE WORKS THAT ARE

15   AFFECTED.                                                      02:42

16        THERE'S NO PRINCIPLE THAT SAYS YOU DON'T IDENTIFY

17   DERIVATIVE WORKS.  IN THE BOROUGHS AGAINST MGM CASE, THERE WAS

18   A LIST OF ALL THE TARZAN TITLES.  FIVE WERE OMITTED.  THEY WERE

19   DERIVATIVE WORKS BASED ON THE ORIGINAL TARZAN OF THE APES, SO

20   THE NOTICE WAS NOT EFFECTIVE AS TO THOSE FIVE TITLES.  SO      02:42

21   THAT'S NOT A CORRECT PRINCIPLE; THAT YOU SOMEHOW DON'T HAVE TO

22   NAME THE WORKS AFFECTED.

23        THEN THE QUESTION IS, WHAT'S THE WORK?

24        MR. TOBEROFF'S ARGUMENT IS THAT THE AD AND WHAT'S IN

25   THE AD IS NOT THE WORK.  IT IS A WORK.  IT WAS PUBLISHED AT A  02:43
```

1    CERTAIN DATE AS PART OF A COMIC BOOK.  304(C) SAYS THE QUESTION

2    OF THE WORK THAT'S TERMINATED IS DESCRIBED AS WHEN THE WORK WAS

3    COPYRIGHTED; WHEN IT WAS COPYRIGHTED; THAT MEANS WHEN THE WORK

4    WAS EITHER PUBLISHED UNDER THE 1909 ACT OR REGISTERED UNDER

5    SECTION 12 FOR PROTECTION.                                    02:43

6         THESE WORKS WERE COMIC BOOKS.  THEY WERE PUBLISHED ON

7    CERTAIN DAYS, AND THEY INCLUDED THIS MATERIAL.  THAT'S THE

8    WORK.  THAT'S WHAT THIS STATUTE ASKS YOU TO LOOK AT.

9         SO WE END UP WITH -- WE END UP WITH A MANIFESTABLE

10   QUESTION THAT THE EXPERTS WILL GET TO.  THERE ARE CERTAIN      02:43

11   THINGS THAT ARE OBVIOUSLY IN THE ADS, AND THERE ARE CERTAIN

12   THINGS EVERYBODY CAN ARGUE ABOUT AND SEE INTO IT OR SEE OUT OF

13   IT; SO THAT'S WHERE WE END UP, YOUR HONOR.

14        **THE COURT:**  COUNSEL, WHILE I HAVE YOU AT THE LECTERN.

15   LET ME SEGUE INTO THE NEXT ISSUE, AND THAT'S YOUR ARGUMENT     02:44

16   CONCERNING THAT THIS WAS ACTUALLY A WORK-FOR-HIRE.

17        **MR. ZISSU:**  YES.

18        **THE COURT:**  AND YOU SUBMITTED TO THE COURT SOME

19   INDIVIDUALS WHO OPINED OR EXPRESSED THEIR UNDERSTANDING THAT

20   THE COLORING, FOR EXAMPLE, WAS DONE -- THAT THEY WERE SUBMITTED 02:44

21   BLACK AND WHITE AND THE COLOR WAS DONE SUBSEQUENTLY; THAT

22   SIGNIFICANT PANELS WERE ADDED.

23        I HAVE SOME FOUNDATIONAL CONCERNS ABOUT THE WITNESSES

24   IN QUESTION AND WHETHER I CAN RELY UPON THAT FOR PURPOSES OF

25   SUMMARY JUDGMENT.  AND SPECIFICALLY WITH THE PANELS, I GUESS MY 02:44

```
 1   CONCERN IS THAT THIS WAS ALL BEFORE THE SECOND CIRCUIT.

 2            MR. ZISSU:  YES.

 3            THE COURT:  AND NOTWITHSTANDING THAT FACT, THE SECOND

 4   CIRCUIT STILL REACHED THE CONCLUSION THAT IT DID.

 5            I DON'T KNOW WHY I SHOULD DISTURB THAT AT THIS POINT.    02:45

 6            MR. ZISSU:  WE'RE NOT ASKING YOU TO DISTURB IT.

 7            THIS HAS NOTHING TO DO BEFORE THE SECOND CIRCUIT.

 8            THE SECOND CIRCUIT HELD THAT ACTION NUMBER ONE, AS A

 9   WHOLE, WAS NOT A WORK MADE FOR HIRE, ALTHOUGH THE RIGHTS WERE

10   TRANSFERRED THROUGH THE COMIC BOOK COMPANY.                      02:45

11            THE COURT:  AND THAT THE PANELS DIDN'T ADD ANYTHING

12   TO IT?

13            MR. ZISSU:  NO.

14            THE ISSUE OF WHETHER A PANEL WAS IN THERE ON A

15   WORK-FOR-HIRE BASIS OR ANY OTHER BASIS THAT WASN'T BEFORE THEM,  02:45

16   BECAUSE IF IT WERE BEFORE THEM, IT STILL WOULDN'T HAVE AFFECTED

17   THEIR DECISION THAT THE WORK AS A WHOLE WAS NOT ONE FOR HIRE

18   AND WAS OWNED BY THE COMIC BOOK COMPANY.

19            THIS POINT IS ANOTHER ACCOUNTING POINT.  THE ONLY

20   REASON WE RAISE THIS IS, IT'S NOT -- WE'RE NOT SAYING THAT THE   02:45

21   SECOND CIRCUIT IS WRONG.  WHAT WE'RE SAYING IS, THE SECOND

22   CIRCUIT NEVER ADDRESSED THE QUESTION OF WHETHER SOME

23   PORTIONS -- THEY'RE NOT ENORMOUS, OBVIOUSLY -- OF THAT WORK,

24   WHETHER SOME OF THOSE PORTIONS WERE NOT PART OF WHAT WAS

25   CONTRIBUTED BY SIEGEL AND SHUSTER, EVEN THOUGH THE WORK WAS NOT  02:46
```

```
1   A WORK MADE FOR HIRE AND THEY HAD THE RIGHT TO GIVE THOSE

2   RIGHTS TO THE COMIC BOOK COMPANY.

3           THE IDEA THAT THE -- I THINK, AS YOUR HONOR'S OPINION

4   ALSO NOTES, YOU CAN HAVE A JOINT WORK IN WHICH SOME COMPONENT

5   IS CONTRIBUTED BY A THIRD PARTY ON THE BASIS OF PERMISSION.        02:46

6           IN OTHER WORDS, (UNINTELLIGIBLE) USED TO GO OUT AND

7   THEY WANT TO USE A PICTURE OF MICKEY MOUSE IN ONE OF THEIR

8   COMIC BOOKS, SO THEY GO GET PERMISSION FROM DISNEY TO DO THAT.

9   THEY DON'T OWN MICKEY MOUSE, BUT IT'S IN THERE.

10          IF THAT WERE THE KIND OF THING THAT WERE INVOLVED        02:46

11  HERE -- AND WE WOULD ARGUE WHEN WE GET TO APPORTIONMENT, WELL,

12  THE VALUE OF WHAT YOU SHOULD GET, YOU SHOULDN'T GET 50 PERCENT

13  BECAUSE SOME OF THAT PERCENTAGE COMES FROM THE POPULARITY OF

14  MICKEY MOUSE THAT YOU HAPPENED TO INCLUDE IN YOUR COMIC BOOK.

15  SO WE WANT TO SAY THAT SHOULDN'T BE SPLIT THE WAY IT OTHERWISE   02:47

16  WOULD BE SPLIT.  THAT'S ALL THIS IS ABOUT.

17          AND IT DOESN'T VIOLATE ANY NOTION OR PRINCIPLE OR

18  RULE OF LAW OR HAS ANYTHING TO DO WITH BREAKING ANYTHING UP.

19  HISTORY PROFESSORS AND ECONOMICS PROFESSORS INCLUDE CHARTS AND

20  GRAPHS IN THEIR WORK.  THEY GET PERMISSION TO DO THAT.  THEY    02:47

21  DON'T OWN EVERYTHING IN IT.  THEY OWN THE WHOLE, AND SO FORTH.

22          SO IT'S THAT KIND OF A THING.

23      THE COURT:  I UNDERSTAND THAT.

24      MR. ZISSU:  THAT'S OUR WHOLE POINT.

25          SO I THINK THAT'S ALL WE CAN SAY ABOUT THAT.           02:47
```

1          **THE COURT:**  MOVING FORWARD TO 1948, YOU OBJECT TO THE

2    TERMINATION NOTICE AS IT'S DIRECTED TOWARDS THE STIPULATION, AS

3    OPPOSED TO THE CONSENT JUDGMENT.

4          **MR. ZISSU:**  YOUR HONOR, OBVIOUSLY, WE RECOGNIZE --

5          **THE COURT:**  I DON'T FIND THIS ARGUMENT PERSUASIVE,          02:48

6    BUT I WANTED TO GIVE YOU AN OPPORTUNITY TO ELABORATE.

7          **MR. ZISSU:**  JUDGE LEW HELD AGAINST US IN A SIMILAR

8    QUESTION IN RELATION TO SUPERBOY, AND WE'RE SAYING THAT THIS IS

9    A DIFFERENT CASE AND WE'RE SAYING HE WAS WRONG, AND WE WANT TO

10   PRESERVE THE POINT FOR APPEAL, AS WE NOTED IN OUR BRIEF.          02:48

11         WE SAY THAT THE '48 FINAL JUDGMENT IS A GRANT ON ITS

12   OWN, BECAUSE UNTIL ITS ENTRY, THE SCOPE AND MEANING OF THE

13   MARCH 31 GRANT, IN FACT, WAS CONTESTED.

14         **THE COURT:**  BUT WAS IT REALLY?

15         THE STIPULATION HAD BEEN ENTERED BY THE PARTIES.          02:49

16         WHO'S CONTESTING IT?

17         **MR. ZISSU:**  I'M SORRY.  IT COULDN'T BE FINALIZED

18   UNTIL --

19         **THE COURT:**  WASN'T THAT A FORMALITY?

20         **MR. ZISSU:**  WELL, IT'S NOT A PRIVATE CONTRACT.  THIS          02:49

21   IS PART OF A PROCESS THAT IS CULMINATED EITHER WITH THE ENTRY

22   OF THE JUDGMENT AND SO ORDERING, OR IT DOESN'T HAPPEN.

23         **THE COURT:**  BUT GIVEN THE PURPOSE OF THE NOTICE --

24   I'M NOT TALKING ABOUT THE PURPOSE OF THE CONSENT JUDGMENT OR

25   THE STIPULATION -- BUT THE PURPOSE OF THE NOTICE, ISN'T THAT          02:49

1    FULFILLED BY REFERENCING THE STIPULATION AS OPPOSED TO THE

2    CONSENT JUDGMENT?

3            **MR. ZISSU:**  WELL, IN TERMS OF THE NOTICE, YOU'RE

4    SUPPOSED TO IDENTIFY THE GRANTS.  THE <u>MUSIC SALES CASE</u> IS A

5    CASE IN THE SOUTHERN DISTRICT WHICH DOES HOLD THAT WHEN YOU SAY        02:49

6    WORDS LIKE "...AND ANY OTHER GRANT..." THE COURT HELD THAT WAS

7    NOT GOOD ENOUGH.  BUT IT SAID THAT IF YOU TOOK INTO ACCOUNT THE

8    INDUSTRY CUSTOM, THE COURT READ THAT LINE WHICH IS FILLING IN

9    AN IDENTIFICATION OF THE GRANT.

10           THEY DIDN'T CHOOSE TO USE THE AMORPHUS LANGUAGE, THE        02:50

11   CATCH-ALL; THEY WENT THROUGH AND IDENTIFIED EVERYTHING.  AND WE

12   SAY THEY LEFT THIS OUT, SO WE WIN.

13           WE COULD BE WRONG ON THAT, BUT THAT'S OUR POINT.

14           **THE COURT:**  I UNDERSTAND YOUR POINT.

15           **MR. ZISSU:**  OKAY.        02:50

16           **THE COURT:**  ALL RIGHT.

17           LET ME TURN TO THE PLAINTIFFS.

18           IF THERE'S ANYTHING YOU WANT TO ADD, IF YOU WANT TO

19   TALK ME OUT OF MY VIEWS, THAT'S FINE.

20           **MR. TOBEROFF:**  I'D LIKE TO ADDRESS THE WORK-FOR-HIRE        02:50

21   COMMENTS.

22           **THE COURT:**  MIND YOU, I'M WITH YOU ON THAT, BUT

23   PROCEED AT YOUR PERIL.

24           **MR. TOBEROFF:**  I'D JUST LIKE TO POINT OUT THAT IT'S

25   OBVIOUS IN READING THE SECOND CIRCUIT DECISION THAT THEY --        02:50

```
 1   WELL, NOT ONLY IS THERE A DECISION THAT IT'S NOT A

 2   WORK-FOR-HIRE ENCAPSULATES A DECISION THAT PARTS OF IT ARE NOT

 3   WORK-FOR-HIRE; IT'S SUBSUMED WITHIN THE LARGER DECISION.  BUT,

 4   IN FACT, THE SECOND CIRCUIT, THANK GOD, SPECIFICALLY LOOKED AT

 5   WHAT THEY ARE LOOKING AT, WHICH WAS THE PROCESS OF REVISING        02:51

 6   THEIR INITIAL MATERIAL FROM A MAGAZINE FORMAT -- FROM A

 7   NEWSPAPER FORMAT TO A MAGAZINE FORMAT.  AND THE SECOND CIRCUIT

 8   SAID THE COURT BELOW RELIED UPON FINDING OF FACT NUMBER 22 IN

 9   WHICH THE STATE FOUND THAT 'THE PLAINTIFF DID REVISE AND EXPAND

10   THE SUPERMAN MATERIAL AT THE REQUEST OF THE DEFENDANTS AND THAT    02:51

11   THIS REVISED MATERIAL CONSTITUTED THE -- SERIES OF STRIPS.  WE

12   DO NOT CONSIDER THIS TANTAMOUNT TO A CONCLUSION THAT SUPERMAN

13   WAS A WORK-FOR-HIRE.'

14        AGAIN, IT REFERS TO THE REVISION AND THE EXPANSION,

15   WHICH IS THE EXACT THING THAT DEFENDANTS ARE REFERRING TO.         02:51

16        LATER ON, THEY SAY THE RECORD INDICATES THAT THE

17   REVISIONS DIRECTED BY THE DEFENDANTS, THE SAME THING THEY'RE

18   TALKING ABOUT, THE ADDED MATERIAL, WERE SIMPLY TO ACCOMMODATE

19   SUPERMAN TO A MAGAZINE FORMAT.

20        THE COURT:  AND I UNDERSTAND THAT AND I DON'T INTEND          02:52

21   TO DISTURB THAT.

22        MR. TOBEROFF:  ON THE CONSENT JUDGMENT, ONE OF THE

23   IMPORTANT POINTS ARE NOT JUST POINTS THAT WE MADE AND WERE

24   RULED ON WITH REGARD TO SUPERBOY, WHICH WERE THAT, NUMBER ONE,

25   THAT THE SAME JUDGMENT ISN'T A GRANT, AND, NUMBER TWO, THE         02:52
```

```
 1   IDENTIFICATION OF THE UNDERLYING 1948 STIPULATION MORE THAN

 2   IDENTIFIES THE CONSENT JUDGMENT.  IN THIS PARTICULAR CASE,

 3   WE'RE MOVING FOR SUMMARY JUDGMENT THAT THE TERMINATIONS HAVE AT

 4   LEAST RECAPTURED ACTION COMICS NUMBER ONE, JOINT INTEREST

 5   ACTION COMICS NUMBER ONE.  AND WITH RESPECT TO ACTION COMICS          02:52

 6   NUMBER ONE, THE CONSENT JUDGMENT WAS THE RESULT OF ADJUDICATION

 7   IN THE 1947 ACTION THAT SPECIFICALLY SAID ALL RIGHTS TO

 8   SUPERMAN HAD BEEN CONVEYED IN THE MARCH 1, 1938 GRANT.

 9          THEY TERMINATED THE 1938 GRANT.  THERE WAS NO NEED TO

10   TERMINATE A CONSENT JUDGMENT.                                         02:53

11          IN ADDITION, IF THEY'RE HOLDING IN 1947 AND '74 THAT

12   DETECTIVE OR NATIONAL OWN ALL RIGHTS TO SUPERMAN PURSUANT TO

13   THE MARCH 1, 1938 GRANT, THE CONSENT JUDGMENT, EVEN IT WAS

14   FILED AS A GRANT, AND IT'S NOT, COULD NOT HAVE POSSIBLY

15   CONVEYED WHAT WAS ALREADY IN THEIR POSSESSION.  THEREFORE, YOU        02:53

16   WOULDN'T NEED TO TERMINATE IT.

17          THE COURT:  WHAT I'M GOING TO DO, FOR THE SAKE OF THE

18   COURT REPORTER, IS TAKE A TEN-MINUTE BREAK.  WHEN WE RESUME, I

19   WANT TO TALK TO THE PLAINTIFFS ESPECIALLY ABOUT THE NOTION OF

20   WHETHER OR NOT THE ACCOUNTING INCLUDES FOREIGN PROFITS FOR           02:53

21   JOINT WORKS; I WANT TO TALK TO THE DEFENSE ABOUT THE

22   RELATIONSHIP BETWEEN D.C. COMICS AND WARNER BROTHERS

23   ENTERTAINMENT; AND THEN I'LL OPEN IT UP FOR ANY FURTHER

24   ELABORATION THAT THE PARTIES WANT TO DO, BUT THOSE ARE THE TWO

25   TOPICS I'D LIKE TO TAKE NEXT.                                        02:53
```

```
 1            WE'LL TAKE A TEN-MINUTE BREAK, AND PLEASE BE READY TO

 2    GO IN TEN MINUTES.

 3            THE CLERK:  THE COURT STANDS IN RECESS.

 4            (BRIEF RECESS TAKEN.)

 5            THE CLERK:  RECALLING THE CASE OF JERRY SIEGEL VERSUS    03:11

 6    TIME WARNER.

 7            THE COURT:  WE'RE BACK ON THE RECORD.

 8            IF I COULD HAVE COUNSEL FOR PLAINTIFFS, I'D LIKE TO

 9    ADDRESS THIS ISSUE REGARDING THE ACCOUNTING OF FOREIGN PROFITS

10    FOR JOINT WORKS IN A CASE SUCH AS THIS.                         03:11

11            AND I GUESS MY PARTICULAR QUESTION, OR MY CONCERN

12    ABOUT THE PLAINTIFF'S POSITION ON THIS, IS THAT MY READING OF

13    THE STATUTE IS THAT IT PRETTY CLEARLY EXCLUDES COPYRIGHTS,

14    FOREIGN LAW, STATE LAW; ALL THAT'S BEING RESTORED HERE IS

15    DOMESTIC RIGHTS.  NOT FOREIGN RIGHTS.  NOT RIGHTS ARISING UNDER  03:12

16    ANYTHING ELSE.  IT'S BASICALLY A DETERMINATION -- IT'S A LIMIT.

17    IT'S NOT A TERMINATION 'PLUS' THESE ADDITIONAL RIGHTS.

18            MR. TOBEROFF:  DEFENDANTS HAVE RELIED ON THAT

19    POSITION, AND WE COULD NOT AGREE MORE THAT THEY RELIED ON THAT

20    PROVISION IN THE STATUTE, AND WE COULD NOT AGREE MORE THAT THE   03:12

21    INTENTION THERE IS TO PRESERVE THE STATUS QUO.  EXCEPT THAT

22    PROVISION DOES NOT MERELY -- IN PRESERVING THE STATUS QUO, IT

23    DOESN'T MERELY MENTION FOREIGN LAW; IT MENTIONS COPYRIGHT; IT

24    MENTIONS FEDERAL LAW, STATE LAW, AND FOREIGN LAW.  SO THE REAL

25    INTENTION THERE IS THAT IT'S PRESERVING THE STATUS QUO.         03:12
```

```
 1          THE COURT:  ISN'T THE REAL INTENTION THERE THAT IT'S
 2   JUST BASICALLY RECAPTURING THE DOMESTIC COPYRIGHT?
 3          MR. TOBEROFF:  THE RECAPTURING OF THE DOMESTIC
 4   COPYRIGHT -- ONCE YOU RECAPTURE THE DOMESTIC COPYRIGHT OR IT'S
 5   FOUND THAT YOU'RE THE CO-OWNER OF A COPYRIGHT -- THE CASES      03:13
 6   RELIED ON BY THE DEFENDANTS, AND THE LEADING CASE -- AND THERE
 7   HAPPENS TO BE A NINTH CIRCUIT CASE, ODDO V. RIES, IF I'M
 8   PRONOUNCING THE LAST NAME CORRECTLY -- SAYS THAT ONCE
 9   CO-OWNERSHIP IS ESTABLISHED, THE RIGHT TO AN ACCOUNTING DOES
10   NOT IMPLICATE COPYRIGHT LAW.  IT'S NOT UNDER THE COPYRIGHT ACT. 03:13
11   THAT'S WHEN YOU DEAL WITH INFRINGEMENT.  THE RIGHT TO
12   ACCOUNTING IS DERIVED FROM EQUITABLE PRINCIPLES.
13          THE COURT:  BUT I WET ON CASES THAT GIVE THAT RIGHT
14   TO CO-OWNERSHIP IN THE CONTEXT OF THIS STATUTE.
15          MR. TOBEROFF:  WELL, THAT'S JUST THE POINT.          03:13
16          IN OTHER WORDS, YOU'RE SAYING YOU WANT A CASE THAT
17   APPLIES ODDO V. RIES IN THE CONTEXT OF A TERMINATION?
18          THE COURT:  YES.
19          MR. TOBEROFF:  THERE ISN'T A CASE LIKE THAT.
20          BUT THE POINT IS --                                 03:14
21          THE COURT:  THAT'S WHY I'M RELYING ON THE PLAIN
22   READING OF THE STATUTE.
23          MR. TOBEROFF:  RIGHT.  BUT IF YOU LOOK AT THE
24   STATUTE, IT SAYS --
25          THE COURT:  THESE OTHER CASES THAT YOU CITE TO,     03:14
```

```
 1   INCLUDING THIS NINTH CIRCUIT CASE, ALL DEAL WITH SITUATIONS

 2   WHERE SOMEONE IS A CO-OWNER OF COPYRIGHTS, AND I UNDERSTAND

 3   THAT THAT MAY HAVE AVAILABLE TO THEM THE FULL PANOPLY OF

 4   RIGHTS.  BUT THIS IS DIFFERENT.  THIS IS A CREATION OF THIS

 5   CO-OWNERSHIP OF RIGHTS BY VIRTUE OF THE TERMINATION OF THE        03:14

 6   COPYRIGHT.  AND THE LANGUAGE THAT SO TERMINATES THE COPYRIGHT

 7   SEEMS TO LIMIT IT TO THE EFFECT ON THE DOMESTIC COPYRIGHT.

 8        MR. TOBEROFF:  RIGHT.  BUT WE, THEREFORE, HAVE TO --

 9   SINCE THERE AREN'T CASES IN THE TERMINATION CLASS, WE HAVE TO

10   LOOK AT THE CASES AND SEE WHAT THOSE CASES SAY AND THEN APPLY     03:14

11   WHAT THEY SAY TO THE CURRENT SITUATION.

12        AND THE CASES SAY VERY CLEARLY AS FOLLOWS:  ONCE YOU

13   ESTABLISH THAT YOU'RE A CO-OWNER OF A COPYRIGHT, AN ACCOUNTING

14   IS NOT UNDER STATE LAW.  IT HAS NOTHING TO DO -- IT'S NOT UNDER

15   FEDERAL LAW.                                                      03:15

16        THE COURT:  I UNDERSTAND YOU THERE THAT IT'S A

17   CONTRACT.

18        MR. TOBEROFF:  SO THAT'S RULE NUMBER ONE, THAT IT'S

19   UNDER STATE LAW.

20        THE CASES ALSO SAY THAT WHEN YOU HAVE THIS RIGHT TO          03:15

21   AN ACCOUNTING, THE COPYRIGHT ACT'S EXTRATERRITORIALITY

22   DOCTRINE, WHICH BASICALLY SAYS THAT THE COPYRIGHT ACT CANNOT

23   AFFECT RIGHTS UNDER FOREIGN COPYRIGHT -- THE CASES SAY THAT

24   THAT EXTRATERRITORIAL DOCTRINE IS NOT IMPLICATED.

25        IN THE FIFTH CIRCUIT, THEY SPECIFICALLY ADDRESS THE          03:15
```

1    POINT WHERE THE DEFENDANT SAID WHAT DEFENDANTS SAY HERE, AND

2    THEY SAID, 'WAIT A MINUTE, YOU'RE NOT ALLOWED TO FOREIGN

3    PROFITS AS A CO-OWNER OF COPYRIGHTS BECAUSE OF THE

4    EXTRATERRITORIALITY DOCTRINE.'  AND THE FIFTH CIRCUIT SAID,

5    'NO, THE EXTRATERRITORIALITY DOCTRINE HAS TO DO WITH                03:15

6    INFRINGEMENT OF A FOREIGN COPYRIGHT, WHICH IMPLICATES U.S.

7    COPYRIGHT ACT, WHICH HAS AN EXTRATERRITORIALITY DOCTRINE, AND

8    IMPLICATES FOREIGN COPYRIGHT.'

9          IF THIS WAS AN INFRINGEMENT CASE, IT WOULD IMPLICATE

10   FOREIGN COPYRIGHT LAWS.                                            03:16

11         A U.S. CO-OWNER GOING TO A U.S. DEFENDANT AND SAYING,

12   AS A TENANT IN COMMON, YOU HAVE TO ACCOUNT TO ME FOR ALL

13   PROFITS -- ODDO V. RIES SAYS ALL PROFITS -- AND SAYING A U.S.

14   CO-OWNER WHO RECEIVES MONEY COLLECTED IN THE UNITED STATES IN

15   U.S. DOLLARS CAN SAY THAT WE DON'T HAVE TO ACCOUNT TO YOU          03:16

16   BECAUSE WE ARE DISRUPTING THE EXTRATERRITORIALITY DOCTRINE, IT

17   DOESN'T IMPLICATE THAT DOCTRINE BECAUSE IT DOESN'T IMPLICATE

18   FOREIGN COPYRIGHT.  THE RIGHTS TO GET MONEY FROM A FILM WHICH

19   IS DUPLICATED IN THE UNITED STATES AND PRODUCED IN THE UNITED

20   STATES BY A U.S. COMPANY WHO THEREAFTER COLLECTS MONEY IN THE      03:16

21   UNITED STATES, THAT DOESN'T IMPLICATE FOREIGN COPYRIGHT.

22   INFRINGEMENT IN A FOREIGN COUNTRY IMPLICATES FOREIGN COPYRIGHT.

23         AND THIS HAS BEEN SPECIFICALLY APPLIED IN THAT

24   FASHION.  SO IF CASES SUCH AS GOODMAN, WHICH DEFENDANTS DON'T

25   ADDRESS -- DEFENDANTS DON'T ADDRESS IN THEIR PAPERS                03:17

1    ODDO V. RIES AND THEY DON'T ADDRESS GOODMAN.  IN THEIR

2    OPPOSITION, THEY SKIRT AROUND THOSE ISSUES, AND THE REASON WHY

3    IS, IN LIGHT OF THOSE TWO CASES, IT WOULD BE IMPOSSIBLE TO HOLD

4    -- YOU CANNOT SAY THAT THE EXTRATERRITORIALITY DOCTRINE OR THE

5    PRESCRIPTION BUILT INTO THE TERMINATION STATUTE STOPS YOU FROM        03:17

6    BEING ABLE TO GET FOREIGN PROFITS.  BECAUSE THAT PRESCRIPTION

7    SAYS THE TERMINATION WILL NOT AFFECT STATE LAW.  AND STATE LAW

8    SAYS YOU'RE ENTITLED TO AN ACCOUNTING OF ALL PROFITS.  THAT

9    PRESCRIPTION SAYS THAT TERMINATION WILL NOT AFFECT FOREIGN LAW.

10            BUT FOREIGN COPYRIGHT LAW, UNLIKE AN INFRINGEMENT          03:18

11    CASE, IS NOT IMPLICATED HERE, NOR IS U.S. COPYRIGHT LAW

12    IMPLICATED; SO WHEN THE CASES SAY AN ACCOUNTING DOES NOT

13    IMPLICATE U.S. COPYRIGHT LAW, THEN HOW WOULD IT IMPLICATE

14    FOREIGN COPYRIGHT LAW?

15            AND THAT'S THE BASIS FOR THE ARGUMENT.                     03:18

16            IT'S QUITE CLEAR.  THE FACT THAT THERE HASN'T BEEN A

17    TERMINATION CASE DOESN'T MEAN THAT WE CAN STAND THE NINTH

18    CIRCUIT'S ODDO V. RIES DECISION OR THE GOODMAN DECISION ON ITS

19    HEAD.

20            THERE IS ANOTHER CASE, WHICH IS ACTUALLY -- THE           03:18

21    JUDGE POSNER DECISION, GAIMAN V. MCFARLANE, WHICH, BY THE WAY,

22    I AGREE, IS A VERY INTERESTING DECISION FOR US ON THE SUPERBOY

23    ISSUE, BECAUSE THEY SAID THAT A MEDIEVAL VERSION OF A

24    PREEXISTING COMIC CHARACTER, WHERE THEY MERELY DRESSED HIM UP

25    AS A KNIGHT, WAS A SEPARATELY COPYRIGHTABLE CHARACTER.  BUT        03:18

1    LEAVING THAT ASIDE, GAIMAN, THE SEVENTH CIRCUIT CASE, AGREES

2    WITH THE FIFTH CIRCUIT AND THE NINTH CIRCUIT AND SAYS ONCE

3    COPYRIGHT CO-OWNERSHIP IS ESTABLISHED, QUOTE, "THE ONLY ISSUE,

4    THEREFORE, IS THE CONTRACTUAL, OR, IN THE ABSENCE OF CONTRACT,

5    THE EQUITABLE DIVISION OF THE PROFITS FROM THE COPYRIGHTED          03:19

6    WORKS.  THERE IS NO ISSUE OF COPYRIGHT LAW AND THE SUIT FOR AN

7    ACCOUNTING OF PROFITS THEREFORE ARISES UNDER STATE RATHER THAN

8    FEDERAL LAW."

9         SO IF THERE'S NO ISSUE OF COPYRIGHT LAW FOR THE U.S.

10   COPYRIGHT, HOW CAN THIS BE AN ISSUE OF FOREIGN COPYRIGHT LAW?      03:19

11        **THE COURT:**  LET ME HEAR FROM THE DEFENSE.

12        **MR. ZISSU:**  WE HAVE TO START OUT WITH THE FACT THAT

13   FROM MARCH 1, 1938, FORWARD, DETECTIVE COMICS OBTAINED ALL

14   RIGHTS UNDER COPYRIGHT OF ANY KIND, DOMESTIC AND FOREIGN, TO

15   THE SUPERMAN WORKS.  THE TERM "WORLDWIDE" WAS USED AGAIN IN        03:20

16   1975, IN THE 1975 AGREEMENT.

17        THE PLAINTIFFS ARE STARTING OUT FROM THE WRONG PLACE.

18   THEY SAY 'ONCE YOU ESTABLISH THAT YOU ARE THE CO-OWNER OF

19   COPYRIGHT.'

20        WELL, THEY'RE NOT.                                            03:20

21        SIMPLY PUT, THERE'S THE PRINCIPLE OF NATIONAL

22   TREATMENT.  THERE ARE AS MANY COPYRIGHT CO-OWNERSHIP ISSUES AND

23   AS MANY COPYRIGHT OWNERSHIP ISSUES AS THERE ARE COUNTRIES.  AND

24   THE PROBLEM WITH THIS WHOLE ARGUMENT ABOUT HAVING THE RIGHT TO

25   SHARE UNDER A STATE PRINCIPLE OF CONTRACT LAW IS THAT IN THE       03:20

```
 1    U.S. COPYRIGHT TERMINATION, THEY CAN ONLY RECAPTURE THE

 2    DOMESTIC COPYRIGHT; SO THEY ARE NOT CO-OWNERS OF ANY COPYRIGHTS

 3    EXCEPT THE U.S. COPYRIGHT LAW.

 4         ALL OF THESE CASES ARE COMPLETELY IRRELEVANT, BECAUSE

 5    NONE OF THEM INVOLVE THE SITUATION WHERE THE PLAINTIFF WAS         03:21

 6    MERELY THE OWNER OF THE U.S. COPYRIGHT RIGHTS SEEKING AN

 7    ACCOUNTING.  SO, YOU KNOW, THE DOG WON'T HUNT.  THOSE CASES ARE

 8    IRRELEVANT FOR THAT REASON AS WELL.

 9         THEN YOU HAVE ON TOP OF THAT THAT CONGRESS DID, IN

10    THE TERMINATION PROVISION THEMSELVES, CREATE A NEW RIGHT, WITH     03:21

11    A LOT OF BENEFITS AND CERTAIN LIMITATIONS, AND ONE OF THE

12    LIMITATIONS IS THAT THE U.S. COPYRIGHT TERMINATION WILL NOT

13    AFFECT ANY RIGHT UNDER FOREIGN LAW; THAT'S REALLY A

14    BELT-AND-SUSPENDERS ERROR ON THAT POINT.

15         SO THAT'S ON THE SUPERMAN CASE, WHERE THE PRINCIPLE           03:21

16    AND THE BASIS FOR SEEKING PARTICIPATION IN FOREIGN PROFITS IS

17    BASED ON SOME NOTION OF CONTRACT LAW, WHEN THEY DON'T HAVE

18    THOSE RIGHTS UNDER ANY CONTRACT; SO THAT'S WHERE THAT GOES.

19         ON THE SUPERBOY CASE, THEY HAVE A DIFFERENT THEORY.

20    IT'S A PREDICATE ACT OF INFRINGEMENT IN THE U.S, AND IF THERE'S    03:22

21    NO INFRINGEMENT, OF COURSE, IF THAT'S BECAUSE THE WORK IS A

22    JOINT WORK, WELL, THEN, THERE'S NOT GOING TO BE ANY ACCOUNTING

23    ON THAT BASIS FOR SUPERBOY, ALTHOUGH SUPERBOY THEN WILL BE

24    ROLLED INTO THE SUPERMAN CASE, BECAUSE THERE WILL BE AN

25    ACCOUNTING, REALLY.  IT'S NOT A "GOTCHA."  THERE WILL BE AN        03:22
```

```
 1   ACCOUNTING AS PART OF THE SUPERMAN (UNINTELLIGIBLE).

 2           ANYWAY, I WOULD JUST ADD ON THE SUPERBOY, THE

 3   PREDICATE ACT THEORY IS ENUNCIATED IN JUDGE HAHN'S DECISION IN

 4   THE SHELDON CASE.  AND THAT WAS IN THE CONTEXT, OF COURSE, NOT

 5   OF TERMINATION.  NEITHER THE SHELDON CASE OR ANY OF ITS PROGENY     03:23

 6   BEFORE THE 1976 COPYRIGHT ACT INVOLVED THE TERMINATION WORLD OR

 7   CONTEXT.  AND SO THOSE CASES DON'T APPLY BECAUSE THE PRINCIPLE,

 8   ULTIMATELY, IS ONE OF STATUTORY INTERPRETATION.  AND THE

 9   SUPREME COURT HAS SAID IT'S FOR THE CONGRESS TO MAKE THE

10   DECISION, AND THERE'S A PRESUMPTION ON IT.                          03:23

11           THE FINAL POINT IS, AS MR. TOBEROFF KEEPS SAYING, THE

12   PRINCIPLE AGAINST EXTRATERRITORIAL APPLICATION IS NOT

13   IMPLICATED.  IT IS IMPLICATED.  IT'S IMPLICATED BY THE FACT --

14   FOR EXAMPLE, IN THE SHELDON CASE AND ALL OF THE CASES

15   FOLLOWING, THEY TALK ABOUT THERE BEING A NARROW EXCEPTION           03:23

16   BECAUSE OF THE PRINCIPLE.  IT'S IMPLICATED.  AND WHEN YOU LOOK

17   AT THE FACT THAT IT'S IMPLICATED AND YOU LOOK AT THE STATUTE

18   AND YOU LOOK AT THE PREMISE FOR APPLYING THESE THINGS, YOU CAN

19   SEE, AT LEAST IN BOTH OF THESE SITUATIONS, THERE CANNOT BE ANY

20   PARTICIPATION IN FOREIGN PROFITS.                                   03:24

21           THE COURT:  WHILE I HAVE YOU, LET ME TAKE UP THAT

22   FINAL ISSUE THAT I WANTED TO ADDRESS, AND THIS IS THE

23   RELATIONSHIP BETWEEN WARNER BROTHERS AND D.C. COMICS.

24           I DON'T KNOW IF THAT'S YOU OR --

25           MR. ZISSU:  THAT'S MY COLLEAGUE, YOUR HONOR.                03:24
```

1          **MR. TOBEROFF:**  YOUR HONOR, COULD I JUST ADDRESS THIS

2   ONE ISSUE.

3          **THE COURT:**  ON THIS ISSUE THAT WE JUST ADDRESSED?

4          **MR. TOBEROFF:**  YES.  BEFORE WE MOVE ON.

5          **THE COURT:**  FAIR ENOUGH.                           03:24

6          THANK YOU, COUNSEL.

7          **MR. TOBEROFF:**  THANK YOU, YOUR HONOR.

8          I'D LIKE TO POINT TO OUT, IN OUR REPLY ON PAGE 51, WE

9   POINT TO THE STATUTE, THE LEGISLATIVE HISTORY OF SECTION

10  304(C), WHICH UNDERSCORES THE FACT THAT THE RIGHT TO AN      03:24

11  ACCOUNTING DOESN'T FALL UNDER COPYRIGHT LAW.

12         IT SAYS, QUOTE, "WHERE THE EXTENDED TERM REVERTS TO

13  JOINT AUTHORS OR TO A CLASS OF RENEWAL BENEFICIARIES WHO ARE

14  JOINED IN EXCLUDING A GRANT, THEIR RIGHTS WOULD BE GOVERNED BY

15  THE GENERAL PRINCIPLES OF TENANCY IN COMMON.  EACH CO-OWNER   03:25

16  WOULD HAVE AN INDEPENDENT RIGHT TO SELL HIS SHARE OR TO USE OR

17  LICENSE THE WORK --

18         **THE COURT:**  COUNSEL, YOU'VE GOT TO SLOW DOWN.

19         **MR. TOBEROFF:**  I'M VERY SORRY.  I APOLOGIZE.

20         **THE COURT:**  WHY DON'T YOU START FROM THE BEGINNING ON

21  THAT.

22         **MR. TOBEROFF:**  OKAY.

23         WHERE THE EXTENDED TERM REVERTS TO JOINT AUTHORS OR

24  TO A CLASS OF RENEWAL BENEFICIARIES...  THEIR RIGHTS WOULD BE

25  GOVERNED BY THE GENERAL RULES OF TENANCY IN COMMON, WHICH MEANS  03:25

```
1    THE STATE RULES.  EACH CO-OWNER WOULD HAVE AN INDEPENDENT RIGHT
2    TO SELL HIS SHARE OR USE OR LICENSE THE WORK, SUBJECT TO AN
3    ACCOUNTING TO THE OTHER CO-OWNERS, FOR ANY PROFITS.
4         AND THEY SAY "ANY PROFITS."
5         THIS IS SIGNIFICANT, BECAUSE THEY ARE DEFERRING TO      03:25
6    THE STATE LAW TENANCY-IN-COMMON RULE.  THERE'S NO
7    TENANCY-IN-COMMON RULES UNDER FEDERAL LAW.  AND BECAUSE THEY
8    SAY "ANY PROFITS."
9         THE OTHER POINT I'D LIKE TO MAKE IS THAT THE --
10        IT'S INTERESTING THAT MR. ZISSU BROUGHT UP THE         03:26
11   PREDICATE ACT LINE OF CASES, BECAUSE THE PREDICATE ACT LINE OF
12   CASES -- FIRST OF ALL, YOU CAN'T DRAW A COMPARISON TO PREDICATE
13   ACT CASES, BECAUSE THEY FALL UNDER THE COPYRIGHT LAW; THEY FALL
14   UNDER THE COPYRIGHT; THEY DEAL WITH INFRINGEMENT.  BUT IT'S
15   NOTEWORTHY -- AND, THEREFORE, THEY IMPLICATE U.S. COPYRIGHT LAW  03:26
16   AND CAN IMPLICATE FOREIGN COPYRIGHT INFRINGEMENT AS WELL.
17        BUT THE CASES SAY THAT EVEN IN THAT CONTEXT WHICH
18   IMPLICATES THE COPYRIGHT ACT, THE EXTRATERRITORIAL DOCTRINE OF
19   THE COPYRIGHT ACT DOESN'T PREVENT A PLAINTIFF FROM RECEIVING
20   INFRINGEMENT DAMAGES DUE TO A PREDICATE ACT OF INFRINGEMENT IN  03:26
21   THE UNITED STATES, EVEN IF THE MONEY COMES FROM OVERSEAS.
22        AND THEY HOLD, FOR INSTANCE, THAT IF YOU INFRINGE A
23   COPYRIGHT BY DUPLICATING A BOOK OR A MOVIE IN THE UNITED STATES
24   AND THEN SHIP IT ABROAD, A CONSTRUCTED TRUST IS IMPRESSED UPON
25   THAT BOOK OR MOVIE, AND ANY PROFITS THAT COME IN, INCLUDING    03:27
```

1  FROM ABROAD, WOULD BE INCLUDED IN THE MEASURE OF DAMAGES.

2          **THE COURT:**  I UNDERSTAND THAT.

3          THANK YOU, COUNSEL.

4      **MR. ZISSU:**  MAY I JUST FINISH THIS OFF?

5          **THE COURT:**  OKAY.  I HAVE A PRETTY GOOD UNDERSTANDING    03:27

6  OF YOUR POSITION, COUNSEL, BUT...

7      **MR. ZISSU:**  THE TENANCY-IN-COMMON RULES APPLY WHEN

8  YOU'RE A TENANT IN COMMON.  IF YOU'RE NOT A TENANT IN COMMON IN

9  THE FOREIGN PROPERTY, THEN THEY WOULD APPLY IN THE U.S.

10          AND THEN ON THE PREDICATE -- THAT'S IN THE SUPERMAN    03:27

11  CASE, WHERE THE BASIS FOR SEEKING FOREIGN PROFITS IS

12  CONTRACTUAL OR TENANCY IN COMMON.  AND IN THE SUPERBOY CASE,

13  WHERE THE BASIS FOR SEEKING PROFITS, IT WOULD BE ON THE BASIS

14  OF INFRINGEMENT.

15          IN 1939, IN <u>SHELDON</u>, THE U.S. CONGRESS HAD NOT SPOKEN    03:28

16  AND LEARNED HAND WAS TROUBLED ENOUGH TO FIND THAT THE PRINCIPLE

17  AGAINST THE TERRITORIAL APPLICATION OF U.S. COPYRIGHT LAWS FOR

18  FOREIGN PROFIT RECOVERY FOR WHAT WOULD BE INFRINGEMENTS

19  OCCURRING ABROAD, HE OVERCAME THAT IN A NARROW WAY AS A MATTER

20  OF EQUITY.  CASES SINCE THEN THAT FOLLOW THAT DID THAT UNTIL --    03:28

21  BUT ALONG COMES -- AT SOME POINT, ALONG COMES THE TERMINATION

22  PROVISION WHICH BECAME EFFECTIVE IN 1978.  AND THEN CONGRESS

23  HAD A CHANCE, IN THE CONTEXT OF TERMINATION, TO DECIDE WHAT

24  WERE THE REMEDIES, WHAT WERE THE LIMITATIONS.

25          SO I SUBMIT THE <u>SHELDON</u> CASE DID NOT INVOLVE SOMEBODY    03:28

```
 1   WHO COMES INTO OWNERSHIP BY TERMINATION AND IS ONLY A U.S.
 2   COPYRIGHT OWNER IN THE TERMINATION CONTEXT.  AND I WOULD SAY
 3   THAT THE SHELDON RULE WOULD NOT APPLY IN THE TERMINATION
 4   CONTEXT.  IT NEVER WAS MEANT TO.  AND TODAY, WHEN CONGRESS HAS
 5   CLEARLY SPOKEN, IT COULD NOT.  AND IT'S NOT REALLY -- SAYS THE      03:29
 6   SUPREME COURT, IT'S REALLY NOT EVEN FOR THE JUDICIARY, ONCE THE
 7   CONGRESSIONAL INTENT HAS BEEN MADE CLEAR.
 8              THANK YOU.
 9        THE COURT:  THANK YOU, COUNSEL.
10        MR. BERGMAN:  YOUR HONOR, IF I MAY JUST ADD A TAG            03:29
11   LINE.
12        THE COURT:  A TAG LINE.
13        MR. BERGMAN:  CONGRESS MAY GIVETH, AND CONGRESS MAY
14   TAKETH.  IT CAN GIVE DOMESTIC COPYRIGHT; IT CAN TAKE DOMESTIC
15   COPYRIGHT.  IT CANNOT GIVE YOU A FOREIGN COPYRIGHT; IT CANNOT      03:29
16   TAKE AWAY A FOREIGN COPYRIGHT.
17        THE COURT:  THANK YOU, COUNSEL.
18              REGARDING THE RELATIONSHIP BETWEEN D.C. COMICS AND
19   WARNER BROTHERS ENTERTAINMENT, INCORPORATED, I'VE STUDIED
20   MR. LEVITZ' DECLARATION.  I'VE TRIED TO GET AS BEST A SENSE I      03:29
21   CAN OF NOT ONLY THE RELATIONSHIP, BUT WHAT D.C. COMICS GAVE TO
22   WARNER BROTHERS IN TERMS OF AN ASSIGNMENT OF RIGHTS.
23        MR. BERGMAN:  YES, SIR.
24        THE COURT:  AND I GUESS THE TENTATIVE CONCLUSION I
25   CAME UP WITH, AT LEAST WITH RESPECT TO THE LATTER, IS THAT -- I    03:30
```

1    GUESS THE BEST WAY TO DESCRIBE WHAT WARNER BROTHERS RECEIVED

2    WAS A SWEETHEART DEAL.  BY ANY ACCOUNTING, WARNER BROTHERS

3    RECEIVED A VERY, VERY BENEFICIAL DEAL.

4            **MR. BERGMAN:**  I WOULD DISAGREE ENTIRELY FROM THAT,

5    YOUR HONOR.  OUR EXPERTS DISAGREE ENTIRELY FROM THAT.  THE          03:30

6    EVIDENCE IN THIS CASE SHOWS THAT WITH RESPECT TO SMALLVILLE,

7    WARNER BROTHERS PAID THE HIGHEST PERCENTAGE OF PROFITS THAT IT

8    HAS EVER PAID TO ANYBODY, TO D.C. FOR SMALLVILLE.

9            AND THE EVIDENCE OF OUR EXPERTS SHOWS THAT WITH

10   RESPECT TO SUPERMAN RETURNS, WHERE D.C. RECEIVED 5 PERCENT OF       03:30

11   THE GROSS WORLDWIDE RECEIPTS, OR 7.5 PERCENT OF THE GROSS

12   DOMESTIC RECEIPTS, THAT THAT IS ABOUT AS RICH A DEAL AS CAN

13   POSSIBLY BE GIVEN.

14           SO, THEREFORE, (A), I DISAGREE WITH THE PREMISE, BUT,

15   (B), THE THING WE HAVE TO BEAR IN MIND, YOUR HONOR, IN LOOKING      03:31

16   AT THE RELATIONSHIP AND THE ALTER EGO ALLEGATION IS THAT THE

17   PLAINTIFFS HAVE A SEPARATE CAUSE OF ACTION FOR WASTE AGAINST

18   THEIR CO-OWNER.

19           **THE COURT:**  THIS IS NOT WASTE, AND I'M NOT REALLY

20   GOING THERE WITH THAT.                                              03:31

21           I GUESS I'M MORE CONCERNED ABOUT THAT RELATIONSHIP.

22           AS I UNDERSTAND IT, D.C. COMICS, THE EXECUTIVES FOR

23   D.C. COMICS, ON IMPORTANT MATTERS, NEED TO REPORT TO WARNER

24   BROTHERS.  THEY NEED TO GET THE APPROVAL OF WARNER BROTHERS FOR

25   MAJOR PROJECTS; SO PUTTING ASIDE THE CHARACTERIZATION -- AND        03:31

```
 1   I'M NOT GOING TO DEBATE WHETHER OR NOT THIS WAS A GOOD DEAL OR
 2   NOT -- BUT MY READING OF IT WAS THAT IT WAS PRETTY GOOD,
 3   PARTICULARLY IN TERMS OF RESERVATION OF RIGHTS AND WHAT WOULD
 4   HAPPEN IF THE RIGHTS WERE COMPROMISED DOWN THE ROAD.
 5           BUT JUST THE NOTION THAT TO HAVE TWO SEPARATE            03:32
 6   COMPANIES ALLEGEDLY DEALING AT ARM'S LENGTH, BUT YET ONE OF THE
 7   COMPANIES HAS TO APPROVE ANY MAJOR ACTIONS OR -- (READING:)
 8   "ACCORDINGLY, I REPORT TO AND OBTAIN APPROVALS FROM WBI'S
 9   PRESIDENT AND CHIEF OPERATING OFFICER BEFORE MAKING SIGNIFICANT
10   ACQUISITIONS OR CERTAIN FINANCIAL DECISIONS OR INVESTMENTS THAT  03:32
11   ARE OUTSIDE THE SCOPE OF D.C.'S CUSTOMARY ACQUISITIONS AND
12   INVESTMENTS BEFORE IMPLEMENTING MEANINGFUL STRATEGIC CHANGES
13   AND BEFORE EMBARKING ON SOMETHING SUBSTANTIALLY OUTSIDE D.C.'S
14   NORMAL COURSE OF BUSINESS."
15           WELL, IT SOUNDS LIKE ANYTHING BEYOND THE DAY-TO-DAY      03:32
16   BUSINESS, D.C. HAS TO SEEK THE APPROVAL OF WARNER BROTHERS.
17   THAT DOES NOT EXACTLY SEEM LIKE THE KIND OF ARM'S LENGTH,
18   DISTINCT CORPORATE RELATIONSHIP THAT YOU SUGGEST IN YOUR
19   BRIEFS.
20           MR. BERGMAN:  LICENSING, YOUR HONOR, IS SOMETHING        03:32
21   THAT NO PERMISSION WAS SOUGHT FROM WARNER BROTHERS.  THERE'S NO
22   EVIDENCE OF THAT.
23           THE COURT:  WHY WASN'T THAT STATED IN THE
24   DECLARATION?
25           MR. BERGMAN:  I'M AFRAID I CAN'T ANSWER THAT.  IT        03:33
```

1    JUST MEANS THAT I DON'T THINK WE THOUGHT OF IT.

2              BEAR IN MIND, YOUR HONOR, THAT THE LICENSE BETWEEN

3    D.C. AND WARNER BROTHERS FOR THE PRODUCTION OF SUPERMAN RETURNS

4    WAS IDENTICAL TO THE LICENSE BETWEEN D.C. AND A THIRD-PARTY

5    PRODUCER, FILM EXPORT, 20 YEARS AGO, FOR THE CREATION OF THE        03:33

6    FIRST SUPERMAN MOVIE.

7              I THINK THE EVIDENCE WILL SHOW QUITE CLEARLY -- AND

8    BY VIRTUE OF THE AMOUNTS THAT ARE INVOLVED -- SHOW QUITE

9    CLEARLY THAT THE DEALS WERE EXTREMELY GENEROUS TO D.C.  THERE

10   IS CERTAINLY NO EVIDENCE TO THE CONTRARY OF THAT.                   03:33

11             THE FACT REMAINS, YOUR HONOR, THAT WHATEVER THE

12   RELATIONSHIP BETWEEN THESE PARTIES IS, THEY'RE CLEARLY NOT

13   ALTER EGOS WITH EACH OTHER.  THEY DON'T FIT ANY OF THE

14   NECESSARY REQUIREMENTS OF EITHER OF THE PRONGS, EITHER THE

15   UNITY OF INTERESTS --                                              03:34

16        **THE COURT:**  I DON'T DISAGREE; TO FIND AN ALTER EGO, I

17   THINK, WOULD BE STRETCHING IT.  BUT THERE JUST SEEMS TO BE

18   SOMETHING SHORT OF AN ARM'S LENGTH RELATIONSHIP HERE AS WELL.

19   AND THAT'S WHERE I'M TROUBLED, AND I REALLY DON'T KNOW WHAT TO

20   MAKE OF IT.                                                        03:34

21        **MR. BERGMAN:**  THEY ARE, AFTER ALL, ULTIMATELY OWNED

22   BY THE SAME COMPANY.

23        **THE COURT:**  BUT MORE THAN THAT, THERE IS THIS

24   SECONDARY ROLE FOR D.C.

25        **MR. BERGMAN:**  MORE THAN THAT, YOUR HONOR, YOU HAVE TO     03:34

1   LOOK AT THE SUBSTANCE OF THESE DEALS.

2        WARNER BROTHERS BECAME THE DISTRIBUTOR OF THE FIRST

3   SUPERMAN MOVIE THROUGH A LICENSE WITH THIS THIRD PARTY, FILM

4   EXPORT.  AND IT DID A PHENOMENAL JOB.  THEY WORKED CLOSELY WITH

5   D.C.; D.C. APPROVED THE SCRIPT; D.C. APPROVED EVERYTHING THAT      03:34

6   WAS DONE.  WARNER BROTHERS RELEASED THREE MOVIES, ALL OF WHICH

7   WERE ENORMOUSLY SUCCESSFUL.  ON THE FOURTH SUPERMAN MOVIE, D.C.

8   MADE A DEAL DIRECTLY WITH FILM EXPORT.  WARNER BROTHERS WASN'T

9   INVOLVED.  IT WAS A TERRIBLE DISASTER.

10       IN THE TELEVISION AREA, D.C. MADE A DEAL FOR THIS            03:35

11  SUPERBOY SERIES WITH A THIRD PARTY.  IT WAS A DISASTER.  IT

12  JUST DIED ON THE VINE.  THEY MADE A DEAL WITH WARNER BROTHERS

13  FOR LOIS AND CLARK, WHICH DERIVED FROM SUPERMAN.  IT WAS AN

14  ENORMOUS SUCCESS.  AND WHEN IT CAME TIME TO DO SMALLVILLE, THEY

15  MADE THE DEAL WITH WARNER BROTHERS BECAUSE THEY HAD BUILT A 20-   03:35

16  OR 25-YEAR RELATIONSHIP WITH WARNER BROTHERS IN WHICH WARNER

17  BROTHERS HAD DONE A SUPERLATIVE JOB OF DISTRIBUTING THEIR

18  PRODUCT AND TURNING IT INTO VAST PROFIT.

19       BEAR IN MIND, YOUR HONOR, D.C. HAS MADE MANY, MANY,

20  MANY, MANY MILLIONS OF DOLLARS FROM SUPERMAN RETURNS, AND HAS     03:35

21  MADE AN ENORMOUS AMOUNT OF MONEY FROM THE SMALLVILLE PROPERTY.

22  THEY GET $45,000 AN EPISODE, WHETHER THE EPISODE MAKES MONEY OR

23  NOT.  AND SO FAR, THEY'RE ALL LOSING MONEY, WHICH IS TYPICAL IN

24  THE TELEVISION INDUSTRY UNTIL LATER ON.  AND THEN THEY GET AN

25  ENORMOUS SHARE OF THE GROSS, WHICH IS THE GOAL SOUGHT BY EVERY    03:36

1  PARTICIPANT WHEN THEY DEAL WITH A STUDIO, RATHER THAN GETTING A

2  SHARE OF NET PROFITS, WHICH CAN BE SUBJECTED TO ALL SORTS OF

3  DEDUCTIONS, THEY GET A PIECE OF THE GROSS DOLLAR, AND THEY'RE

4  GOING TO MAKE A FORTUNE.

5        AND, YES, THERE IS A RELATIONSHIP BETWEEN THESE                03:36

6  COMPANIES, BECAUSE THEY'RE BOTH OWNED, ULTIMATELY, BY THE SAME

7  ENTITY.  BUT THAT DOESN'T EITHER MAKE THEM THE ALTER EGOS OF

8  EACH OTHER; IT DOESN'T CREATE ANY UNFAIRNESS.  AND WHILE I

9  UNDERSTAND THAT YOUR HONOR ISN'T FOCUSING ON WASTE NOW, IT HAS

10 TO BE BORNE IN MIND THAT IF THERE WERE SWEETHEART DEALS, IF THE    03:37

11 PLAINTIFFS COULD SHOW A SWEETHEART DEAL, THEY'VE GOT D.C., WHO

12 WOULD BE OBLIGATED TO MAKE GOOD FOR THAT WASTE OF A JOINT

13 ASSET, AND D.C. IS A VERY WELL ESTABLISHED COMPANY, ABLE TO

14 SATISFY ANY JUDGMENT THAT COULD BE RENDERED.

15       THE IDEA OF HOLDING WARNER BROTHERS AND ITS                   03:37

16 ULTIMATELY PARENT, WHO'S HAD NOTHING WHATEVER TO DO WITH THIS,

17 EITHER PROPERTY, SIMPLY IS UNWARRANTED UNDER THE LAW.  THERE IS

18 ONE CASE AFTER ANOTHER IN THE NINTH CIRCUIT WHICH SAYS THAT IF

19 A PARENT COMPANY EVEN MICROMANAGES ITS SUBSIDIARY, THAT DOESN'T

20 MAKE IT AN ALTER EGO.  AND IF IT'S NOT AN ALTER EGO -- AND        03:37

21 WARNER BROTHERS CLEARLY DID NOT SUCCEED TO THE RIGHTS OR STEP

22 INTO THE SHOES OF D.C., BECAUSE D.C. MADE TWO SEPARATE

23 CONTRACTS, ONE WITH WARNER BROTHERS' TELEVISION, GRANTING A

24 LIMITED, ALBEIT EXCLUSIVE, RIGHT IN TELEVISION; AND ANOTHER TO

25 WARNER BROTHERS' PICTURES, GRANTING A LIMITED, ALBEIT            03:38

1    EXCLUSIVE, RIGHT FOR THAT.

2            THE CASES ARE CLEAR THAT NEITHER OF THOSE GRANTS PUTS

3    WARNER BROTHERS INTO THE SHOES OF D.C., BECAUSE IN ORDER TO

4    MAKE AN EXCLUSIVE GRANT OF A CO-OWNED PROPERTY, YOU NEED THE

5    CONSENT, THE EXPRESSED CONSENT, OF YOUR CO-OWNER.  AND THE          03:38

6    PLAINTIFFS HAVE ADMITTED THAT FACT BY ALLEGING, IN

7    PARAGRAPH 54(D) OF THEIR COMPLAINT, THAT THERE CAN BE NO

8    EXCLUSIVE GRANT FROM D.C. TO WARNER BECAUSE THEY DON'T CONSENT

9    TO IT; SO IF WARNER BROTHERS IS NOT AN ALTER EGO, AND IF WARNER

10   BROTHERS HAS NOT STEPPED INTO THE SHOES OF D.C. --                  03:39

11           AND THE OTHER THING THEY ALLEGE IS THAT WARNER HAS

12   BECOME THE EFFECTIVE CO-OWNER BY VIRTUE OF THEIR CONDUCT, A

13   CONCEPT SIMPLY NOT RECOGNIZED BY COPYRIGHT LAW.  COPYRIGHT IS A

14   CREATURE OF STATUTE, AND THE STATUTE DOESN'T PERMIT THAT.  AND

15   THE NINTH CIRCUIT HAS RECENTLY HELD THAT THE ONLY RIGHTS YOU        03:39

16   CAN OBTAIN IN COPYRIGHT MUST EMANATE FROM THE STATUTE.

17           ALL THAT BEING TRUE, THE FACT THAT THESE COMPANIES

18   ARE RELATED, THAT DOESN'T GIVE THE PLAINTIFFS THE RIGHT TO LOOK

19   TO THE LICENSEES, WARNER BROTHERS AND WARNER BROTHERS'

20   TELEVISION, TO SHARE THEIR PROFITS WITH THE PLAINTIFFS.             03:39

21           THE ONLY THING THAT THE PLAINTIFFS HAVE A RIGHT TO DO

22   IS TO SHARE THE PROFITS THAT D.C., THE LICENSOR, MAKES FROM ITS

23   LICENSEES.  AND IF WARNER IS NOT THE ALTER EGO OF D.C -- WHICH

24   IT CLEARLY IS NOT; IT JUST DOESN'T BEGIN TO FIT THE PATTERN --

25   THEN IT IS ENTITLED TO THE SAME PROTECTION AS ANY OTHER STUDIO      03:40

```
 1   WOULD BE.  AND SURELY, IF D.C. HAD GRANTED THE SAME EXCLUSIVE

 2   RIGHTS, WHICH BECOME NONEXCLUSIVE BECAUSE THERE'S NO CONSENT,

 3   TO PARAMOUNT OR MGM OR UNIVERSAL IN EXCHANGE FOR GENEROUS

 4   ROYALTIES, THOSE STUDIOS WOULDN'T BECOME LIABLE ALSO TO D.C.,

 5   TO ACCOUNT TO D.C.  BLACKLETTER COPYRIGHT LAW SAYS LICENSEES DO    03:40

 6   NOT HAVE AN OBLIGATION TO ACCOUNT TO THE CO-OWNERS OF THEIR

 7   LICENSORS.

 8            THE COURT:  LET ME HEAR FROM THE PLAINTIFF.

 9            THANK YOU.

10        MR. BERGMAN:  THANK YOU.                                     03:40

11        MR. TOBEROFF:  PLAINTIFFS' CLAIM HERE IS DEFINITELY

12   NOT LIMITED TO THE ALTER EGO DOCTRINE OR THEORY.

13            THE COURT:  WHAT CLAIM ARE YOU GOING TO REST ON AT

14   THIS POINT?

15        MR. TOBEROFF:  THE CLAIM IS THAT IF THE LICENSEE AND         03:41

16   THE PURPORTED LICENSEE AND THE LICENSOR ARE BOTH PART OF THE

17   SAME COMPANY, EVEN IF THERE MAY BE LEGITIMATE BUSINESS REASONS

18   FOR THAT --

19            THE COURT:  SEPARATE CORPORATE FORMS?

20        MR. TOBEROFF:  VERTICAL AND SEPARATE CORPORATE FORMS.        03:41

21   OR, FOR THAT MATTER, LEGITIMATE BUSINESS REASONS FOR THAT

22   VERTICAL INTEGRATION.  IT'S ALMOST A GIVEN, BUT CERTAINLY

23   SOMETHING WHICH WE SHOULD BE ABLE TO CROSS-EXAMINE WITNESSES IN

24   OPEN COURT AND AT TRIAL ABOUT -- IT'S ALMOST A GIVEN THAT SINCE

25   THE HOLDER OF THE CONTENT, D.C., OR THE PRODUCER OF CONTENT,      03:41
```

```
 1   D.C., HAS TO ACCOUNT TO MANY PROFIT PARTICIPANTS REGARDING THAT

 2   CONTENT, NOT JUST PLAINTIFFS IN THIS CASE BECAUSE OF THIS

 3   RECAPTURE, BUT WRITERS AND ARTISTS ON ALL OF THEIR COMIC BOOKS.

 4   ON THE OTHER SUPERMAN COMIC BOOKS -- THERE'S A LONG LIST OF

 5   PEOPLE TO WHICH D.C. HAS TO ACCOUNT -- THAT YOU HAVE A SETUP, A     03:42

 6   VERY UNCOMFORTABLE SETUP, WHERE BY DIMINISHING THE AMOUNT OF

 7   MONEY PAID TO D.C. IN A SWEETHEART DEAL -- AND I WILL SUBMIT

 8   AND I CAN FURTHER DEMONSTRATE IN ORAL ARGUMENT --

 9        THE COURT:  GET TO THE BOTTOM LINE HERE, COUNSEL.

10   HOW ARE YOU VIEWING THIS, THEN?                                    03:42

11        IF IT'S NOT ALTER EGO, THEN WHAT IS IT?

12        MR. TOBEROFF:  WE HAVE THE ALTER EGO CLAIM.  IT'S A

13   CLAIM THAT SINCE AN ACCOUNTING IS UNDER STATE LAW, EQUITABLE

14   PRINCIPLES OF STATE LAW, GOVERNING TENANTS IN COMMON -- AND

15   ODDO V. RIES SAYS THOSE PRINCIPLES ARE UNJUST ENRICHMENT, AND      03:42

16   CONSTRUCTIVE TRUSTS -- THAT TO AVOID THE UNFAIR DIMINUTION OF

17   THE PROFITS DUE PLAINTIFFS AS A CO-OWNER, A CONSTRUCTIVE TRUST

18   SHOULD BE PLACED FARTHER UPSTREAM SO THAT WE CAN LOOK AT THE

19   TRUE PROFITS THAT ARE BEING MADE BY THE DEFENDANTS.

20        THE COURT:  DO YOU HAVE ANY AUTHORITY IN THE CONTEXT          03:43

21   OF COPYRIGHT LAW THAT WOULD SUPPORT THAT PROPOSITION?

22        MR. TOBEROFF:  ODDO V. RIES, WHICH SAYS --

23   SPECIFICALLY, NO.  AND IN FACT, THAT'S A POINT.

24        THE CASES THAT THEY RELY ON, THE LICENSEE CASES, ARE

25   CASES WHERE YOU'RE DEALING WITH A TRUE THIRD-PARTY LICENSEE,       03:43
```

1   LIKE A JAPANESE COMPANY MAKING SUPERMAN T-SHIRTS OR SUPERMAN

2   TOYS.

3          **THE COURT:**  WELL, COUNSEL IS SAYING THIS IS A TRUE

4   THIRD-PARTY LICENSEE.

5          **MR. TOBEROFF:**  THOSE CASES ARE NOT A TRUE THIRD-PARTY          03:43

6   LICENSEE.  IT'S NOT A THIRD-PARTY LICENSEE.

7          **THE COURT:**  WHAT CASE DO YOU RELY UPON IN THE CONTEXT

8   OF COPYRIGHT LAW THAT WOULD ALLOW, SHORT OF THE ALTER EGO

9   THEORY -- I UNDERSTAND IF IT WAS AN ALTER EGO, THAT WOULD BE

10  SOMETHING ELSE.  BUT LET'S SAY THE COURT DOES NOT FIND AN ALTER          03:44

11  EGO BUT IS SOMEWHAT SYMPATHETIC THAT THE RELATIONSHIP IS CLOSER

12  THAN, SAY, THE RELATIONSHIP BETWEEN D.C. AND PARAMOUNT OR D.C.

13  AND UNIVERSAL.

14          IS THERE ANYTHING --

15          **MR. TOBEROFF:**  LET'S START WITH THE ALTER EGO CASES.          03:44

16          EVEN IN THE ALTER EGO CASES, WHICH, I ADMIT, IS A

17  MUCH HIGHER THRESHOLD, EVEN IN THOSE CASES, COURTS WILL FIND

18  THAT THE ALTER EGO -- THE WHOLE ALTER EGO DOCTRINE IS THERE TO

19  AVOID AN INEQUITABLE RESULT.  IT COMES FROM EQUITY, AND THE

20  COURT'S DISPENSING EQUITY.  AND THAT DOCTRINE SAYS IN THE CASE          03:44

21  "WE WILL NOT REST ON CORPORATE FORMALITIES, IF, BY DOING SO,

22  THE DEFENDANTS WOULD ACHIEVE AN INEQUITABLE RESULT."

23          SO EVEN THOSE ALTER EGO CASES DO SUPPORT ACHIEVING AN

24  EQUITABLE RESULT BY FOLLOWING THE TRUE SOURCE OF PROFIT, SEEING

25  THE TRUE AMOUNT OF MONEY THAT DEFENDANTS ARE MAKING FROM THESE          03:44

```
 1   COPYRIGHTS, AND ALLOWING THE PLAINTIFFS TO PARTICIPATE --
 2           THE COURT:  BUT THOSE SAME COURT CASES HAVE
 3   ESTABLISHED CRITERIA FOR ESTABLISHING THAT ALTER EGO, WHICH ARE
 4   NOT -- AT LEAST TENTATIVELY, IN MY VIEW, ARE NOT NECESSARILY
 5   PRESENT HERE.                                                    03:45
 6           MR. TOBEROFF:  BUT EVEN IN THOSE CASES WHERE THEY'RE
 7   WEIGHING THOSE CRITERIA, THEY WILL OVERRIDE THAT IN INSTANCES
 8   TO ACHIEVE AN EQUITABLE RESULT.
 9           SO THAT'S THE FIRST FOUNDATION.
10           THE COURT:  ALL RIGHT.                                   03:45
11           MR. TOBEROFF:  THE SECOND FOUNDATION IS THAT YOU HAVE
12   A SITUATION WHERE WE KNOW THAT BY ODDO V. RIES AND THE OTHER
13   CASES, ITS PROGENY, THAT AN ACCOUNTING IN TENANTS IN COMMON IS
14   BASED ON EQUITABLE PRINCIPLES, CONSTRUCTIVE TRUST UNJUST
15   ENRICHMENT.  CONSTRUCTIVE TRUST, THE REMEDY OF THE CONSTRUCTIVE  03:45
16   TRUST, IS USED ALL OF THE TIME TO FOLLOW PROFITS TO THEIR TRUE
17   SOURCE.  SO THE CASES WHICH WE CITE, CONSTRUCTIVE TRUST CASES,
18   FURTHER SUPPORT THIS.
19           AND WE WOULD DISTINGUISH THOSE LICENSEE CASES WHICH
20   REALLY DO REFER -- THOSE LICENSEE CASES REFER TO AN UNWORKABLE   03:45
21   SITUATION, WHERE YOU HAVE SOME THIRD-PARTY LICENSEE IN JAPAN
22   MAKING SUPERMAN T-SHIRTS, AND YOU SAY, WELL, THE CO-OWNER HAS
23   TO ACCOUNT, BUT THE LICENSEE ALSO DOES, AND HOW DOES THAT WORK?
24   IT PRESENTS AN UNWORKABLE SITUATION.  THAT'S WHERE THE LICENSEE
25   RULE COMES FROM.                                                 03:46
```

1          NONE OF THOSE CASES DEAL WITH A SITUATION PRESENT

2   HERE, WHICH IS A LICENSE BETWEEN A VERTICAL INTEGRATED COMPANY,

3   WHICH, AS YOU RIGHTLY POINT OUT, D.C. HAS TO GET ITS DECISION

4   FROM THE LICENSEE.

5          **THE COURT:**  CERTAIN DECISIONS.  IT'S NOT CLEAR TO ME      03:46

6   THAT THIS WAS ONE OF THOSE DECISIONS.  COUNSEL SAID IT WAS NOT.

7          **MR. TOBEROFF:**  CERTAIN DECISIONS.

8          LET ME GET TO THE NEXT BASIS.

9          THE BASIS IS, IT'S INHERENT IN AN ACCOUNTING TO APPLY

10  EQUITABLE PRINCIPLES OF UNJUST ENRICHMENT AND CONSTRUCTIVE          03:46

11  TRUST, AND WE BELIEVE THAT THE DEFENDANTS ARE BEING UNJUSTLY

12  ENRICHED BY THE SELF-DEALING THAT NATURALLY FOLLOWS IN A

13  VERTICALLY INTEGRATED TRANSACTION SUCH AS THIS.

14         THERE'S ANOTHER BASIS FOR IT, AND THAT'S AS FOLLOWS:

15         THE CASES SAY THAT IF YOU ARE JOINT OWNER AND YOU            03:47

16  ASSIGN YOUR JOINT OWNERSHIP INTEREST TO ANOTHER PARTY -- LET'S

17  SAY D.C. ASSIGNED ITS JOINT OWNERSHIP INTEREST TO WARNER

18  BROTHERS, THEN WARNER BROTHERS STEPS INTO THE SHOES OF D.C. AND

19  HAS TO ACCOUNT.

20         **THE COURT:**  WAS THAT DONE HERE?                          03:47

21         **MR. TOBEROFF:**  IT WAS.

22         AND THE REASON IT WAS DONE HERE -- AND THERE SHOULD

23  BE NO LOGICAL OR LEGAL DISTINCTION BETWEEN WHAT WAS DONE

24  HERE -- IS BECAUSE COPYRIGHT IS DIVISIBLE.  A COPYRIGHT IS HELD

25  TO -- WHEN YOU HAVE A COPYRIGHT IN SUPERMAN, IT'S HELD TO          03:47

1    COMPRISE OF MANY DIFFERENT COPYRIGHTS.  THE RIGHT TO MAKE

2    MOVIES IS CONSIDERED TO BE A SEPARATE COPYRIGHT UNDER THE

3    COPYRIGHT TO SUPERMAN, AS IS THE RIGHT TO MAKE TELEVISION.

4            MOVIES AND TELEVISION AND PUBLISHING ARE PROBABLY THE

5    THREE BIGGEST BRANCHES.                                        03:48

6            SO WHEN YOU HAVE DOCUMENTS THAT THEY SAY ARE MERE

7    LICENSES, LIKE A LICENSE TO A JAPANESE T-SHIRT MANUFACTURER,

8    BUT, IN FACT, SELLS, ASSIGNS, IN PERPETUITY, TO WARNER BROTHERS

9    AND HAS ATTACHED TO IT SHORT FORM ASSIGNMENTS OF THE MOTION

10   PICTURE COPYRIGHT TO SUPERMAN FOREVER TO WARNER BROTHERS, AND   03:48

11   SHORT FORM ASSIGNMENTS OF THE SAME -- THE TELEVISION COPYRIGHT

12   TO SUPERMAN FOREVER TO WARNER BROTHERS, WARNER BROTHERS HAS

13   STEPPED INTO D.C.'S SHOES, AT LEAST WITH RESPECT TO THE MOVIE

14   COPYRIGHT AND THE TELEVISION COPYRIGHT.  AND TO SAY, WELL, THEY

15   DIDN'T GET EVERYTHING IS KIND OF A DISTINCTION WITHOUT A         03:48

16   DIFFERENCE.  AND IT'S NOT LIKE THIS -- UNLIKE THE UNMANAGEABLE

17   SITUATION WITH A LICENSEE IN JAPAN, HERE, IT'S A VERY SIMPLE

18   REMEDY.  WARNER WOULD HAVE TO ACCOUNT THROUGH PLAINTIFFS WITH

19   REGARD TO MOVIES AND TELEVISION, AND D.C. ACCOUNT TO PLAINTIFFS

20   WITH REGARD TO THE PUBLISHING COPYRIGHT.                        03:49

21           THE COURT:  IT'S AN INTERESTING THEORY.

22           DO YOU HAVE ANYTHING TO SUPPORT THIS FROM A CASE

23   STANDPOINT?

24           MR. TOBEROFF:  THE LOGIC BEHIND THE CASES WHICH SAY

25   IF YOU STEP INTO THE SHOES OF ANOTHER CO-OWNER, THEN YOU MUST    03:49

1    ACCOUNT.

2            THERE WOULD BE NO LOGICAL REASON TO DISTINGUISH

3    STEPPING INTO THE SHOES WITH RESPECT TO THE COMPLETE COPYRIGHT

4    OR STEPPING INTO THE SHOES WITH RESPECT TO THE DIVISIBLE MOTION

5    PICTURE OR FILM COPYRIGHT.                                      03:49

6            **THE COURT:**  LET ME HEAR WARNER BROTHERS' RESPONSE TO

7    THIS.

8            **MR. BERGMAN:**  YOUR HONOR, MY RESPONSE IS THAT I

9    REGRET TO SAY MR. TOBEROFF HAS THOROUGHLY MISSTATED THE LAW.

10           THE FIRST THING IS THAT THE ANSWER TO YOUR SPECIFIC      03:49

11   QUESTION, NAMELY WHETHER HE HAS A SINGLE CASE WHICH APPLIES

12   THIS THEORY IN A NON ALTER EGO SITUATION AND A COPYRIGHT CASE,

13   HE DOESN'T HAVE A CASE, BECAUSE THERE IS NO SUCH CASE.  PERIOD.

14   NONE WHATEVER.

15           SECONDLY, THE ALTER EGO CASES DO NOT SAY WHAT           03:50

16   MR. TOBEROFF HAS SAID.  THE ALTER EGO CASES REQUIRE, WHETHER

17   IT'S COPYRIGHT OR ANY OTHER KIND OF ACTION, TWO THINGS:  ONE,

18   THAT THERE BE A UNITY OF INTEREST.  AND THERE ARE A NUMBER OF

19   FACTORS; MIXED BANK ACCOUNTS, INTERCOMPANY LOANS, SAME

20   OFFICERS, SAME EMPLOYEES, A FRAUDULENT PURPOSE.  NONE OF WHICH   03:50

21   EXISTS HERE.

22           BEAR IN MIND, D.C. WAS ESTABLISHED 70 YEARS AGO WITH

23   ITS PREDECESSORS LONG BEFORE ANY CONNECTION WITH WARNER

24   BROTHERS.  IT IS NOT A SHAM COMPANY.  IT'S A LEGITIMATE COMPANY

25   THAT CAN RESPOND TO ANY CLAIM WHATSOEVER.                       03:51

1          SECONDLY, THE INJUSTICE WHICH THE COPYRIGHT CASES

2     TALK ABOUT -- AND WE BRIEFED THIS EXTENSIVELY IN OUR PAPERS --

3     IS THAT THERE HAS TO, IN EFFECT, BE A FRAUD; YOU HAVE TO BE

4     WORKING A FRAUD ON SOMEBODY BY HOLDING UP THIS COMPANY, WHICH

5     IS REALLY AN ALTER EGO FOR ANOTHER COMPANY.                    03:51

6          THERE'S NO FRAUD HERE.

7          IF THEY CAN SHOW THAT THERE WAS ANY SORT OF A

8     SWEETHEART DEAL BETWEEN THESE COMPANIES, THEY'VE GOT A CLAIM

9     AGAINST D.C. WHICH CAN RESPOND ANYTIME, FULLY, TO THE CLAIM

10    THAT THEY HAVE.                                                03:51

11         THERE'S NEITHER A UNITY OF INTEREST, NOR AN

12    INJUSTICE; AND WITHOUT THOSE TWO FACTORS, YOU CANNOT APPLY THE

13    ALTER EGO TEST.

14         FINALLY, MR. TOBEROFF'S STATEMENT THAT UNDER

15    COPYRIGHT LAW, THAT 'WHEN YOU CONVEY YOUR JOINT INTEREST TO A  03:52

16    SECOND PARTY, HE STEPS INTO YOUR SHOES,' IS FLAT OUT WRONG.

17    IT'S AN ABSOLUTE MISSTATEMENT OF COPYRIGHT LAW.

18         WHAT THE LAW IS, AND WHAT THEY SAY IN ONE SENTENCE IN

19    THEIR OPPOSITION BRIEF, IS WHAT PROFESSOR NIMMER SAYS; NAMELY,

20    THAT WHEN A CO-OWNER OF A PROPERTY MAKES AN ENTIRE ASSIGNMENT  03:52

21    TRANSFER OF HIS COMPLETE INTERESTS ON A NONEXCLUSIVE, UNDIVIDED

22    BASIS, THAT THE TRANSFEREE STEPS INTO HIS SHOES.

23         IN THIS CASE, THEY DIDN'T CONVEY THEIR ENTIRE

24    INTERESTS.  THEY ONLY CONVEYED LIMITED INTERESTS; IN ONE

25    INSTANCE, TELEVISION RIGHTS; IN ANOTHER INSTANCE, MOTION       03:52

1   PICTURE RIGHTS.  THEY RETAINED PUBLICATION RIGHTS UNDER

2   COPYRIGHT.  THEY RETAINED THEATRICAL RIGHTS UNDER COPYRIGHT.

3   THEY RETAINED MERCHANDISING RIGHTS UNDER COPYRIGHT.  THEY

4   DIDN'T CONVEY THEIR ENTIRE INTERESTS.

5          MORE IMPORTANTLY, THEY DIDN'T CONVEY A NONEXCLUSIVE     03:53

6   INTEREST.  AFTER THE SETTLEMENT AGREEMENT WAS, THEY THOUGHT,

7   ENTERED INTO, THEY PURPORTED TO CONVEY 100 PERCENT OF THE

8   INTEREST ON AN EXCLUSIVE BASIS.  AND THERE IS UNQUESTIONED

9   COPYRIGHT LAW, WHICH MR. TOBEROFF THOROUGHLY IGNORES IN HIS

10  OPPOSITION; THE BURKITT CASE AND THE BODENSTAB CASE, BOTH OF    03:53

11  WHICH SAY, UNEQUIVOCALLY, THAT WHEN YOU ATTEMPT AS A CO-OWNER

12  TO CONVEY AN EXCLUSIVE INTEREST WITHOUT THE EXPRESSED CONSENT

13  OF YOUR CO-OWNER, THAT CONVEYANCE DOES NOT OPERATE AS YOU

14  INTENDED.  IT IS NOT VOID; IT MERELY TRANSFERS A NONEXCLUSIVE

15  LICENSE.                                                        03:54

16         AND THAT'S WHAT HAPPENED HERE; WARNER BROTHERS'

17  TELEVISION, WARNER BROTHERS' PICTURES, ARE NONEXCLUSIVE

18  LICENSEES OF D.C.  COPYRIGHT LAW FROM TOP TO BOTTOM SAYS THAT A

19  NONEXCLUSIVE LICENSEE DOES NOT HAVE TO ACCOUNT TO THE CO-OWNER

20  OF HIS LICENSOR; THAT ALL THE CO-OWNER IS ENTITLED TO IS A      03:54

21  SHARE OF THE ROYALTIES RECEIVED BY THE CO-OWNER LICENSOR.

22         AND I AGAIN SAY THAT IF ANYONE WERE TO FIND THAT

23  ENOUGH MONEY WASN'T RECEIVED -- THERE'S A CLAIM THAT THEY'VE

24  ALLEGED FOR WASTE AGAINST D.C.  BUT D.C. IS THE FOCUS HERE.

25  YOU CANNOT GO TO THE LICENSEES.  ALL THEY'RE TRYING TO DO IS TO   03:54

```
 1   GRAB IN AS MUCH MONEY AS THEY POSSIBLY CAN.

 2         AND AS FAR AS THE ARGUMENT THAT WARNERS STEPPED INTO

 3   THE SHOES OF D.C., IN THEIR PAPERS, THEY WANT THE MONEY THAT

 4   D.C. MADE, THEY WANT THE MONEY THAT WARNER BROTHERS MADE.  BUT

 5   AS PROFESSOR NIMMER POINTS OUT, IN THE RARE CIRCUMSTANCE WHERE   03:55

 6   THERE HAS BEEN AN UNDIVIDED INTEREST OF A NONEXCLUSIVE RIGHT,

 7   WHICH DIDN'T HAPPEN HERE, IN WHICH CASE THE TRANSFEREE DOES

 8   STEP INTO THE SHOES, WELL, THEN, THE TRANSFEROR STEPS OUT OF

 9   HIS SHOES.  AND THE TRANSFEROR -- IN THIS CASE, D.C., IF IT

10   ACTUALLY HAPPENED, WHICH IT DIDN'T -- WOULD HAVE NO OBLIGATION   03:55

11   TO ACCOUNT.

12            THE COURT:  I UNDERSTAND.

13            THANK YOU, COUNSEL.

14         MR. BERGMAN:  THANK YOU, YOUR HONOR.

15         MR. TOBEROFF:  YOUR HONOR?                                 03:55

16         THE COURT:  YES, YOU MAY.

17         MR. TOBEROFF:  NEITHER HERE TODAY IN THIS ARGUMENT OR

18   IN THEIR PAPERS DO DEFENDANTS ADDRESS THE POINT THAT I'VE MADE

19   TO THE COURT.  AND THAT IS, THAT IF NIMMER SAYS ONE JOINT OWNER

20   MAY TRANSFER HIS OWN INTERESTS IN A JOINT WORK WITHOUT SUCH      03:56

21   TRANSFER BEING CONSENTED TO, IN SUCH CIRCUMSTANCES THE

22   TRANSFEROR CEASES TO BE THE JOINT OWNER AND THE TRANSFEREE,

23   STEPPING INTO THE TRANSFEROR'S SHOES, BECOMES A JOINT OWNER,

24   AND MUST ACCOUNT.

25         THEY HAVE NOT DISTINGUISHED THAT SITUATION WHERE YOU       03:56
```

ASSIGN YOUR MOTION PICTURE COPYRIGHT, YOUR TELEVISION

COPYRIGHT, TO SUPERMAN FOREVER.  THEY CANNOT HIDE BEHIND THE

LICENSEE RULE, WHICH IS MEANT TO APPLY TO A DIFFERENT

SITUATION.  THOSE LICENSES THAT GIVE RISE TO THE LICENSEE RULE

ARE NOT THESE EMPHATIC, IN-PERPETUITY ASSIGNMENTS OF COPYRIGHT       03:56

THAT WE'RE DEALING WITH HERE TODAY.

            **THE COURT:**  IF THAT WERE THE CASE, COUNSEL, I WOULD

THINK THAT WE WOULD HAVE SOME AUTHORITY TO SUPPORT THIS MOTION;

SOME CASE WHERE THIS HAS COME UP.

            **MR. TOBEROFF:**  WELL, THE FACT THAT IT'S COME UP       03:56

HERE -- AND THERE ARE A WHOLE SLEW OF LAWSUITS THAT WERE

SETTLED RIGHT BEFORE TRIAL; WE NAMED SOME OF THEM; MAYBE 12 OF

THEM, THAT ALL FOCUSED ON STUDIOS' DIMINUTION OF PROFITS OWN

THIRD PARTIES THROUGH SELF-DEALING WITHIN A VERTICALLY

INTEGRATED STRUCTURE.                                                03:57

            THE QUESTION HERE IS THAT IF AN ACCOUNTING IMPLICATES

EQUITABLE PRINCIPLES OF CONSTRUCTIVE TRUST, AND WE HAVE THE

REMEDY OF CONSTRUCTIVE TRUST TO PREVENT UNJUST ENRICHMENT --

AND IT'S CLEAR FROM THE SETUP -- AS YOU SAID YOURSELF, IT'S A

SWEETHEART DEAL --                                                   03:57

            **THE COURT:**  IT APPEARS AS MUCH.

            **MR. TOBEROFF:**  -- WHETHER THIS REMEDY SHOULD BE WIPED

OUT ON SUMMARY JUDGMENT.  AND THE FACT THAT WE MIGHT HAVE

REMEDIES AGAINST D.C. DOESN'T MEAN THAT IT HAS TO BE MUTUALLY

EXCLUSIVE OF A REMEDY AGAINST WARNER BROTHERS.  AND TO MAKE          03:57

1    THEIR POINT, THEY EXAGGERATE AND SET UP A STRAW MEN.

2            WE'RE NOT CLAIMING THAT WARNER WOULD HAVE TO ACCOUNT

3    TO US DIRECTLY FOR MOVIES AND D.C. WOULD HAVE TO ACCOUNT TO US

4    FOR THE MONEY THEY GET FROM WARNER BROTHERS FROM MOVIES.  WE'RE

5    SAYING WITH RESPECT TO MOVIES AND TV, IT FLOWS NATURALLY THAT         03:57

6    WARNER, STEPPING INTO THE SHOES OF D.C., SHOULD ACCOUNT TO

7    PLAINTIFF.

8            THE COURT:  FOR MOVIES.

9            MR. TOBEROFF:  FOR MOVIES; AND D.C. SHOULD ACCOUNT TO

10   PLAINTIFF.                                                            03:58

11           AND THE PROBLEM IS OBVIOUS.  IF D.C. HAS TO ACCOUNT

12   TO A WHOLE MASS OF THIRD-PARTY PARTICIPANTS, IT MAKES MORE

13   MONEY FOR THE CORPORATE PARENT TO KEEP THE MONEY WITHIN WARNER

14   BROTHERS.

15           AND BY THE WAY, CONSTRUCTIVE TRUST -- AND WE CITE             03:58

16   THESE CASES IN OUR BRIEF -- DOES NOT REQUIRE A FRAUD.  IT IS TO

17   GET TO THE TRUE SOURCE OF THE MONEY THAT'S OWED A PARTICIPANT.

18   IT DOESN'T REQUIRE AN INTENTIONAL FRAUD.

19           THE COURT:  I UNDERSTAND THAT POINT.

20           THANK YOU, COUNSEL.                                          03:58

21           MR. TOBEROFF:  THANK YOU.

22           MR. BERGMAN:  CAN I MAKE ANY RESPONSE TO THAT, YOUR

23   HONOR?

24           THE COURT:  VERY BRIEFLY, COUNSEL.

25           MR. BERGMAN:  MR. TOBEROFF KEEPS SAYING 'WHEN A              03:58

```
 1    CO-OWNER CONVEYS HIS INTEREST TO A THIRD PARTY.'

 2              THIS DIDN'T HAPPEN IN THIS CASE.

 3         THE COURT:  I UNDERSTAND.

 4         MR. BERGMAN:  D.C. PURPORTED TO CONVEY THE ENTIRE

 5    INTEREST, WHICH IT HAD NO RIGHT TO DO WITHOUT THE CONSENT OF    03:59

 6    ITS CO-OWNER, WHICH ITS CO-OWNER HAS EXPRESSLY SAID IN ITS

 7    COMPLAINT THAT IT DID NOT CONSENT TO.  AND UNDER THE BURKITT

 8    AND BODENSTAB CASES, THAT BECOMES A NONEXCLUSIVE LICENSE.

 9         THE COURT:  I UNDERSTAND.

10         MR. BERGMAN:  AND IF I MAY JUST MAKE ONE FURTHER    03:59

11    POINT, YOUR HONOR.

12              WARNER BROTHERS HAS A SCORE OF PARTNERS WHO TAKE MORE

13    MONEY THAN MR. TOBEROFF'S CLIENTS COULD EVER TAKE FROM THE

14    MOTION PICTURE.  THEY HAVE A PARTNER WHO PRODUCED IT AND WHO

15    GETS AN ENORMOUS PORTION OF THE MONEY.  THEY HAVE A DIRECTOR    03:59

16    WHO GETS AN ENORMOUS PORTION OF THE MONEY.

17              IF WARNER BROTHERS WANTED TO PLAY THE CORPORATE GAME,

18    IT WOULD PAY MORE MONEY TO ITS SUBSIDIARIES, SUCH AS D.C.,

19    RATHER THAN LESS.  IT JUST DOESN'T MAKE SENSE.  IT'S TOTALLY

20    IRRELEVANT.  BUT IT'S JUST WRONG.    04:00

21         MR. TOBEROFF:  YOUR HONOR, CAN I COMMENT ON THAT LAST

22    POINT?

23         THE COURT:  JUST BRIEFLY, COUNSEL.  I WANT TO PUT A

24    REST TO THIS ISSUE.

25         MR. TOBEROFF:  THAT'S INCORRECT THAT THOSE -- THESE    04:00
```

1    PLAYERS ARE -- SOME OF THEM ARE GROSS PLAYERS; SO THE FACT THAT

2    THEY HAVE TO PAY MONEY TO D.C. WOULD NOT LOWER THE AMOUNT OF

3    MONEY TO D.C.

4         THOSE DEALS ARE VERY INTERESTING, BECAUSE LEGENDS,

5    FOR INSTANCE -- AND THERE'S A POINT HERE THAT ALSO ADDRESSES        04:00

6    THE EVIDENCE -- BECAUSE THIS MOTION IS COMING UP FOR SUMMARY

7    JUDGMENT, WHERE WE STILL HAVEN'T GOTTEN THE EVIDENCE WE'VE

8    ASKED FOR BECAUSE OF THE MISFORTUNE OF -- THE TRAGEDY OF

9    MAGISTRATE ZAREFSKY'S WIFE DYING, AND OUR MOTIONS THAT WERE SET

10   UP A LONG TIME AGO WERE NEVER RULED ON.  WE WOULD LIKE THE        04:00

11   ABILITY AT TRIAL TO PRESENT EVIDENCE OF THESE THINGS.

12        HE MENTIONED LEGENDS, WHICH WAS A PARTICIPANT.

13   LEGEND PARTICIPATES IN A 100 PERCENT OF VIDEO.  D.C.

14   PARTICIPATES IN ONLY 20 PERCENT; SO WHEN THEY SAY D.C. HAS

15   3 PERCENT OF THE GROSS, IT'S NOT GROSS; IT'S DEFINED PROCEEDS.    04:01

16        AND AS FAR AS VIDEO IS CONCERNED, WHICH ACCOUNTS FOR

17   HALF OF THE WORLDWIDE REVENUES FROM A FILM, THEY ONLY GET

18   20 PERCENT BEFORE THEIR 3 PERCENT ATTACHES.

19        THIS IS THE TYPE OF THING WE WANT TO GET INTO DOWN

20   THE ROAD IN THIS CASE.        04:01

21        **THE COURT:**  THANK YOU, COUNSEL.

22        NOW, I KNOW THERE ARE OTHER ISSUES RAISED IN THE

23   CROSS MOTIONS, INCLUDING THE CONTINUED ACCEPTANCE OF BENEFITS

24   AFTER 1975, WHETHER OR NOT THERE'S A SETTLEMENT AGREEMENT, THE

25   STATUTE OF LIMITATIONS ARGUMENT...  THE COURT DOES NOT HAVE ANY    04:01

```
 1   QUESTIONS ON THOSE ISSUES.

 2          IF THERE'S SOMETHING THAT'S NOT COVERED IN THE

 3   PAPERS -- WHICH, TRUST ME, THE COURT HAS REVIEWED, AND WILL

 4   REVIEW FURTHER BEFORE MAKING A FINAL DECISION -- YOU MAY

 5   AMPLIFY AT THIS TIME.  BUT THE COURT DOES NOT HAVE ANY            04:01

 6   PARTICULAR QUESTIONS ON ANY OF THOSE POINTS.

 7          MR. BERGMAN:  THAT BEING THE CASE, YOUR HONOR, WE'LL

 8   STAND ON OUR PAPERS.

 9          THE COURT:  VERY WELL.

10          MR. TOBEROFF:  YOUR HONOR, I JUST HAVE A COUPLE OF        04:02

11   WRAP-UP POINTS, AND I MENTION THESE ONLY BECAUSE AT THE TIME,

12   WE SKIPPED TO THE NEXT POINT BEFORE I HAD PIPED UP.

13          THE COURT:  YOU MAY, COUNSEL.

14          MR. TOBEROFF:  I'M JUST GOING BACK BRIEFLY TO THE AD

15   SITUATION, AND I WANTED TO MENTION A COUPLE OF THINGS.           04:02

16          MR. ZISSU MENTIONED THE BOROUGHS CASE.  AND IN A WAY,

17   I'M GLAD HE DID, BECAUSE THE BOROUGHS CASE IS A VERY

18   DISTINGUISHABLE SITUATION.  IN THE BOROUGHS CASE, YOU HAD A

19   TERMINATED GRANT WHICH WAS LISTED IN THE TERMINATION NOTICE

20   WHICH GRANTED NUMEROUS WORKS.  I THINK IT WAS SOMETHING LIKE 20  04:02

21   TARZAN WORKS.  AND IN THE TERMINATION NOTICE, THEY DIDN'T LIST

22   ALL OF THE WORKS IN THE GRANT; THEY LEFT OUT FIVE OR SIX.  AND

23   THE COURT RULED THAT 'BECAUSE YOU DIDN'T LIST THE WORKS THAT

24   WERE GRANTED IN THE GRANT YOU'RE TERMINATING, YOU DON'T GET

25   THOSE WORKS BACK, EVEN THOUGH THE GRANT HAS BEEN TERMINATED.'    04:03
```

1      THAT WAS THE ONLY CASE THAT CAME TO THAT RESULT.

2          THAT'S NOT THE CASE HERE, BECAUSE YOU HAVE THE GRANT,

3   THE MARCH 1, 1938 GRANT, AND THE WORK, WHICH IS ACTION COMICS

4   NUMBER ONE, WAS LISTED; THAT SATISFIES THE TERMINATION STATUTE.

5   THEREFORE, WHAT WE GET BACK WOULD BE A RECAPTURED HALF INTEREST      04:03

6   IN ACTION COMICS NUMBER ONE, WHICH WAS LISTED IN THE

7   TERMINATION NOTICE.

8          WHAT THEY'RE TRYING TO DO IS SAY, 'NO, YOU DON'T GET

9   BACK ANY ELEMENTS THAT WERE DEPICTED IN THE COVER, BECAUSE WE

10  CREATED A DERIVATIVE WORK IN THE FORM OF AN ADVERTISEMENT,      04:03

11  ADVERTISING ACTION COMICS NUMBER ONE; AND, THEREFORE, YOU'RE

12  NOT ALLOWED TO USE THOSE ELEMENTS.'

13         THERE'S NO BASIS IN LAW -- AND WE NEVER GET TO THE

14  JURY ON THAT POINT -- THAT AMORPHOUS WEIGHING OF THE ELEMENTS,

15  BECAUSE FOR THE REASONS WE SET FORTH IN THE BRIEF, AS A MATTER      04:04

16  OF LAW, THEY DO NOT PRESENT A SINGLE COGNIZABLE THEORY UNDER

17  WHICH THEY DEPRIVE US OF THOSE ELEMENTS IN ACTION COMICS NUMBER

18  ONE WHICH IS LISTED IN THE TERMINATION NOTICE.  AND WE SAY IN

19  OUR PAPERS THAT THEY THROW THIS OUT THERE, BUT THEY NEVER

20  CONNECT THE DOTS.  AND IF THEY CAN'T CONNECT THE DOTS, IT      04:04

21  DOESN'T MAKE IT ON SUMMARY JUDGMENT.

22         **MR. ZISSU:**  YOUR HONOR --

23         **THE COURT:**  I THOUGHT YOU HAD RESTED, COUNSEL, BUT GO

24  AHEAD, BRIEFLY.

25         **MR. ZISSU:**  THE 1923 GRANT, IN THE BOROUGHS CASE, IN      04:04

1   WHICH I REPRESENTED EDGAR BOROUGHS, DID NOT INCLUDE THE FIVE

2   TITLES, BECAUSE THOSE BOOKS WERE WRITTEN LATER.  WE USED RECORD

3   EVIDENCE FROM THE CASE, AND WE SUBMITTED EVIDENCE ON WHEN THOSE

4   TITLES WERE PUBLISHED.  THEY WERE PUBLISHED LATER; THEY

5   COULDN'T HAVE BEEN IN THE 1923 GRANT.                              04:04

6           AND WE HAVE THE COPYRIGHT REGISTRATIONS FOR THOSE

7   WORKS, IF THE COURT WANTS FURTHER SUBSTANTIATION.  WE'VE GONE

8   OUT AND GOTTEN THEM AND WE HAVE CERTIFIED COPIES TO SHOW THEM.

9           ON THE ADS, THESE FIRST WORKS WERE NOT DERIVATIVE

10  WORKS BECAUSE THEY WERE PUBLISHED AND COPYRIGHTED FIRST.  IT       04:05

11  JUST DOESN'T WORK THAT WAY IN THE COPYRIGHT.

12          THANK YOU.

13          **THE COURT:**  THANK YOU, COUNSEL.

14          THE COURT IS GOING TO TAKE THE CROSS MOTIONS UNDER

15  SUBMISSION.  I'M NOT PREPARED TO RULE AT THIS TIME.  BUT I WILL    04:05

16  BE ISSUING A DETAILED WRITTEN OPINION WHICH WILL ADDRESS ALL OF

17  THE ISSUES RAISED IN THE CROSS MOTIONS, BOTH IN SUPERBOY AND

18  SUPERMAN.

19          I HAVE BEFORE ME AN EX-PARTE APPLICATION FROM THE

20  PLAINTIFFS FOR AN ORDER MODIFYING THE AUGUST 13TH DISCOVERY       04:05

21  ORDER, ESSENTIALLY TO GIVE THEM MORE TIME TO CONDUCT THE AUDIT.

22          I'D LIKE TO HEAR FROM THE PLAINTIFFS MORE ON THIS.

23          I GUESS MY CONCERN IS THAT THE RELIEF THAT I GRANTED

24  ON AUGUST 13TH, FROM MY PERSPECTIVE, WAS RATHER EXTRAORDINARY.

25  I PERMITTED YOU TO GO INTO WARNER BROTHERS AND TO D.C. COMICS      04:06

1    AND CONDUCT AN AUDIT.  BASED ON REPRESENTATIONS FROM WARNER

2    BROTHERS AND D.C. COMICS, YOU WERE TO BE GIVEN TOP PRIORITY AND

3    IMMEDIATE ADMISSION.

4         NOTWITHSTANDING THAT OPPORTUNITY, AS I GATHER FROM

5    THE PAPERS, YOU DECIDED TO GO DOWN ANOTHER ROAD AND ASK FOR THE    04:06

6    DOCUMENTS TO BE SENT TO YOU.  YOU'VE NEVER SENT AN AUDITOR TO

7    D.C. COMICS OR TO WARNER BROTHERS, AND THIS HAS NOT BEEN

8    COMPLETED.  AND NOW YOU'RE ASKING FOR MORE TIME.

9         I AM RELUCTANT TO DO THAT, UNLESS I'M MISSING

10   SOMETHING HERE.    04:06

11        **MR. TOBEROFF:**  THAT'S INCORRECT.

12        ACTUALLY, OUR ACCOUNTING EXPERT, STEVE SILLS, HAS

13   OFFICES AT WARNER BROTHERS, BECAUSE HE'S AUDITING THEM SO

14   FREQUENTLY, AND HAS RECEIVED DOCUMENTS AS PART OF AN AUDIT AT

15   WARNERS BROTHERS, AND HE EMBARKED UPON THIS IMMEDIATELY WITHOUT    04:07

16   DELAY.  THERE WAS NO DECISION SAYING, 'WE DON'T WANT TO GO TO

17   WARNER BROTHERS AND AUDIT YOU; JUST SEND US DOCUMENTS.'  THAT'S

18   NOT HOW IT WORKED.

19        AS PART OF THE AUDIT, THEY SENT DOCUMENTS TO HIS

20   OFFICE AT WARNER BROTHERS WHERE PEOPLE WERE AUDITING, AND YOU    04:07

21   GO OVER THOSE DOCUMENTS, WHICH LEADS TO FURTHER

22   FOLLOW-UP QUESTIONS, WHERE YOU SAY, 'WELL, WE HAVE THIS FOR

23   THAT, BUT WE DON'T HAVE ANYTHING PERTAINING TO THIS.'

24        **THE COURT:**  OKAY.

25        **MR. TOBEROFF:**  AND AT THAT POINT, WARNER BROTHERS    04:07

```
 1   SENDS OVER FURTHER DOCUMENTS, WHICH LEADS TO FURTHER

 2   REFINEMENTS.  AND THAT'S HOW AN AUDIT TAKES PLACE.

 3           THE COURT:  THAT HAS BEEN GOING ON SINCE ABOUT

 4   AUGUST 13TH?

 5           MR. TOBEROFF:  YES.  IT STARTED IMMEDIATELY.       04:07

 6           NOW, WHAT I WOULD URGE YOU TO --

 7           THE COURT:  WARNER BROTHERS PAINTS A DIFFERENT

 8   PICTURE IN TERMS OF WHAT HAS GONE ON.

 9           MR. TOBEROFF:  OF COURSE.  AND I'LL GET TO THE

10   REASONS FOR THAT.                                          04:08

11           I WOULD ASK THAT YOU TAKE A VERY CLOSE LOOK AT

12   STEVE SILLS' DECLARATION.  HE'S A PROFESSIONAL, AND HE HAS NO

13   AX TO GRIND.  HE'S NOT A ZEALOUS ADVOCATE.  HE JUST WANTS TO

14   COMPLETE THIS AUDIT.  AND HE SAYS IN HIS DECLARATION THAT

15   TRADITIONAL AUDITS -- AND BY THE WAY, HE DOESN'T VIEW -- HE  04:08

16   FEELS THE TERM "AUDIT" IS A BIT OF A MISNOMER, BECAUSE A

17   TRADITIONAL AUDIT IS WHERE A PROFFER PARTICIPANT, LIKE A SINGLE

18   MOTION PICTURE, IS AUDITING WARNER BROTHERS.

19           THE COURT:  THIS IS AN AUDIT FOR DAMAGES.

20           I UNDERSTAND THAT EVERY PROFESSION HAS ITS OWN       04:08

21   EXPRESSED TERMINOLOGY.  YOU KNOW WHAT YOU WERE ASKING FOR; YOU

22   WANTED AN AUDIT FOR DAMAGE PURPOSES.

23           MR. TOBEROFF:  THAT'S NOT WHY I MENTIONED THAT.  I'M

24   MENTIONING IT BECAUSE THE TRADITIONAL AUDIT THAT HE ENGAGES IN

25   WHEN YOU AUDIT -- WHEN YOU GET A -- A PROFFER PARTICIPANT GETS  04:08
```

1    A STATEMENT WHICH HAS CERTAIN NUMBERS IN IT, AND YOU NEED TO

2    VERIFY WHETHER THOSE NUMBERS ARE CORRECT, BUT YOU'RE AUDITING A

3    SINGLE MOTION PICTURE.

4         AND MR. SILLS SAYS IN HIS DECLARATION -- AND IT'S

5    ALSO BEEN MY EXPERIENCE -- THAT AN AUDIT GENERALLY TAKES SIX TO    04:09

6    TWELVE MONTHS.  AND THAT'S ONLY WITH ONE PICTURE.

7         HERE, YOU'RE DEALING WITH --

8         **THE COURT:**  COUNSEL, WE HAVE A TRIAL IN JANUARY, SO

9    DON'T TALK TO ME ABOUT SIX TO TWELVE MONTHS.  IF THAT'S WHAT

10   YOU WERE ASKING FOR IN AUGUST, THEN YOU DID NOT CONVEY TO THE    04:09

11   COURT WHAT IT WAS.  IF THIS WAS GOING TO TAKE SIX TO

12   TWELVE MONTHS, YOU SHOULD HAVE SAID, 'TIME OUT, JUDGE; WE CAN'T

13   DO THIS TRIAL UNTIL' --

14        **MR. TOBEROFF:**  WE'RE NOT SAYING WE WOULD TAKE SIX

15   MONTHS.  AND IN OUR DEFENSE, OUR REQUESTS, WHICH WE MOVED TO    04:09

16   COMPEL ON, HAD BEEN WITH DEFENDANTS FOR PROBABLY 14 MONTHS,

17   12 MONTHS.  WE'VE BEEN WAITING MONTHS AND MONTHS JUST TO GET

18   THIS BASIC MATERIAL TO WHICH WE'RE ENTITLED TO.

19        MR. SILLS IS SIMPLY SAYING IT IS AN IMPOSSIBILITY.

20   HE'S NOT ASKING FOR SIX TO TWELVE MONTHS; HE'S ASKING FOR TWO    04:10

21   MONTHS TO COMPLETE THIS.  AND I'LL GET TO WHY I DON'T BELIEVE

22   THAT PREJUDICES ANYBODY.

23        HE'S SAYING, 'I'M VERY HAPPY YOU FINALLY HAVE THE

24   RIGHT TO EXAMINE THESE DOCUMENTS TO MAKE A DAMAGE ANALYSIS, BUT

25   IT'S A LITERAL IMPOSSIBILITY FOR ME TO DO THAT WITHIN 30 DAYS.'    04:10

```
 1          THE DIFFICULTY OF DOING THAT WITHIN 30 DAYS WAS

 2   FURTHER EXACERBATED BY THE FACT THAT THOSE 30 DAYS CAME DURING

 3   A SUMMER PERIOD.

 4          I, WHO HAS TO COMMUNICATE WITH SILLS ABOUT THIS, WAS

 5   AWAY VISITING MY FATHER.  IT WASN'T A VACATION, ALTHOUGH I WAS      04:10

 6   WITH MY FAMILY, AND IT WAS VERY DIFFICULT FOR ME TO COMMUNICATE

 7   WITH HIM IN PERSON.

 8          COUNSEL, MR. BERGMAN, MR. WEINBERG, VARIOUS COUNSEL

 9   OF DEFENDANTS, WERE ALSO OUT OF THE OFFICE A GREAT DEAL DURING

10   THIS TIME.  ALTHOUGH WE COMMUNICATED WITH EACH OTHER, IT SLOWED     04:10

11   THINGS DOWN, WHICH IS UNDERSTANDABLE.

12          THERE'S NO PREJUDICE HERE TO THE DEFENDANTS.

13   DEFENDANTS HAVE SAID ON MORE THAN ONE OCCASION THAT BECAUSE OF

14   THE TIMING OF THIS SUMMARY JUDGMENT MOTION, WHERE THE DECISION

15   ON THE MOTION WON'T HAPPEN FOR SOME TIME, GIVEN THE COMPLEXITY     04:11

16   OF THE ISSUES, THAT WE NEED TO MOVE THE SETTLEMENT MEDIATION SO

17   THAT IT HAPPENS -- WHICH DOVETAILS ALSO FOR THE REASON WHY YOU

18   WANT TO BE ABLE TO ASSESS DAMAGES, TO MAKE A MORE MEANINGFUL

19   SETTLEMENT NEGOTIATION -- THEY WANT TO MOVE THAT DATE, WHICH,

20   THEREFORE, MEANS THEY WOULD ALSO WANT TO MOVE THE TRIAL DATE;      04:11

21   SO IF THEY WANT TO MOVE THOSE DATES --

22          THE COURT:  THE TRIAL DATE IS NOT GETTING MOVED.

23          MR. TOBEROFF:  OKAY.

24          SO IF THEY WANT TO MOVE THOSE DATES, HOW --

25          THE COURT:  THEY MAY WANT TO, BUT THE TRIAL DATE IS         04:11
```

```
 1   NOT GETTING MOVED, COUNSEL.

 2         MR. TOBEROFF:  THEN HOW ARE THEY PREJUDICED BY GIVING

 3   US MORE TIME TO CONDUCT THIS AUDIT?

 4         THE COURT:  THEY'RE PREJUDICED BECAUSE THE TRIAL

 5   DATES ARE NOT GOING TO BE MOVED.                              04:11

 6         MR. TOBEROFF:  BUT HOW DOES PREJUDICE BY GIVING US

 7   THE INFORMATION IN WHICH WE'RE ENTITLED TO?

 8         THE COURT:  I WANT YOU TO HAVE THE INFORMATION.

 9   YOU'VE HAD CARTE BLANCHE FOR THE LAST 30 DAYS, AND MY QUESTION

10   IS, WHY DON'T YOU HAVE EVERYTHING THAT YOU NEED AT THIS POINT? 04:12

11         MR. TOBEROFF:  BECAUSE MR. SILLS HAS TOLD US THAT IT

12   IS A LITERAL IMPOSSIBILITY TO PERFORM A BI-COASTAL AUDIT OF

13   BOTH D.C. AND WARNER BROTHERS, PERTAINING NOT JUST TO ONE

14   MOTION PICTURE BUT MULTIPLE DIFFERENT FORMS OF PROGRAMMING, AND

15   TO BE ABLE TO ARRIVE AT AN INTELLIGENT ASSESSMENT IN 30 DAYS;  04:12

16   AND THAT WAS FURTHER HANDICAPPED AND EXACERBATED BY THAT

17   30 DAYS FALLING OVER SORT OF A TRADITIONAL SUMMER HOLIDAY AT

18   THE END OF AUGUST.  ALL HE NEEDS IS A REASONABLE AMOUNT OF TIME

19   TO COMPLETE THAT AUDIT.

20         AND I BELIEVE THAT DEFENDANTS, WHO WERE THE ONES WHO     04:12

21   SHOULD HAVE GIVEN US THIS INFORMATION EARLIER AND DIDN'T,

22   SHOULDN'T BE HEARD TO COMPLAIN ABOUT GIVING US THE TIME NEEDED

23   TO PERFORM THIS AUDIT IN THE FIRST PLACE.

24         THE COURT:  LET ME ASK YOU THIS:  BESIDES THE

25   ULTIMATES, IS THERE ANY OTHER DOCUMENT THAT MR. SILLS NEEDS    04:12
```

```
 1   THAT HE HAS NOT GOTTEN?

 2        MR. TOBEROFF:  MR. SILLS HAS GOTTEN MAJOR CATEGORIES

 3   OF DOCUMENTS.  HE'S STILL GOING OVER THEM.  AS I SAID, I CAN'T

 4   ANSWER THAT QUESTION EXACTLY, BECAUSE IN THE PROCESS, YOU SEE

 5   SOMETHING THAT DOESN'T COMPORT WITH SOMETHING ELSE, AND YOU    04:13

 6   THEN HAVE TO --

 7        THE COURT:  LET ME REPHRASE IT, THEN.

 8        AT THIS DATE, ARE THE ULTIMATES THE ONLY DOCUMENT

 9   THAT HE HAS IDENTIFIED THAT HE HAS NOT RECEIVED THAT HE NEEDS

10   FOR HIS AUDIT?                                                 04:13

11        MR. TOBEROFF:  HE JUST RECEIVED -- TO ANSWER THAT

12   QUESTION, HE JUST RECEIVED ON FRIDAY, I BELIEVE, A WHOLE PILE

13   OF INFORMATION WHICH HE HASN'T HAD THE OPPORTUNITY TO

14   COMPLETELY GO THROUGH.  AND I ASKED HIM TO GO THROUGH IT,

15   BECAUSE I WAS LOOKING FOR CERTAIN THINGS, AND HE SAID, WELL, I  04:13

16   HAVE THIS, BUT I DON'T HAVE THAT, AND IT'S INCOMPLETE.

17        THE COURT:  ALL RIGHT.

18        MR. TOBEROFF:  BUT ALSO, I SHOULD SAY -- AND THIS IS

19   IMPORTANT, AND IT'S IN OUR MOTION -- D.C. DIDN'T GIVE US ANY

20   DOCUMENTS UNTIL SEPTEMBER 5TH.  THAT LEFT -- BECAUSE HE        04:14

21   OBSERVED THE ROSH HASHANAH RELIGIOUS HOLIDAYS -- THAT LEFT FOR

22   MR. SILLS -- FROM THE BEGINNING TIME THEY GAVE DOCUMENTS, EVEN

23   THOUGH WE REQUESTED THEM INITIALLY -- SOMETHING LIKE SEVEN

24   BUSINESS DAYS TO WORK ON THIS.  IT'S NOT ENOUGH.

25        WHAT I PROPOSED TO D.C., WHICH, I THINK, IS              04:14
```

1   REASONABLE, IS, I SAID, LOOK, BECAUSE YOU'RE ON THE EAST COAST

2   AND YOU CAN'T BE AT TWO PLACES AT ONCE, HE PLANS TO MAKE A TRIP

3   THE LAST TWO WEEKS IN AUGUST TO NEW YORK.  HE'S ACTUALLY

4   AUDITING WARNER BROTHERS IN ANOTHER MATTER.

5          **THE COURT:**  YOU MEAN SEPTEMBER; THE LAST TWO WEEKS OF          04:14

6   SEPTEMBER?

7          **MR. TOBEROFF:**  EXCUSE ME.  THE LAST TWO WEEKS OF

8   OCTOBER.

9          SO I SAID WITH RESPECT TO WARNER BROTHERS, SINCE HE'S

10  HERE ON THE LOT, HE WILL BE FACE TO FACE WITH THEM PERFORMING     04:14

11  THE AUDIT, WHY DON'T YOU SEND US THE DOCUMENTS, AND THEN IF HE

12  HAS ANY FOLLOW-UP QUESTIONS OR CLARIFICATION -- HE MAY NOT --

13  CAN HE BE ALLOWED, WHILE HE'S THERE IN OCTOBER, THE LAST TWO

14  WEEKS, TO MEET WITH YOUR PEOPLE AND ASK FOR CLARIFICATION?

15         ONE OF THE REASONS FOR THIS IS THAT THEY HAVE            04:15

16  PRODUCED THIS ENORMOUS GENERAL LEDGER, WHICH COMPRISES, LIKE,

17  SEVEN BOXES OF DOCUMENTS.  AND MR. SILLS HAS SAID TO ME, 'THIS

18  IS COMPLETELY USELESS; I CAN'T USE THIS; THEY'RE ALL CODED; I

19  CAN'T MAKE HEADS OR TAILS OF IT.'  AND D.C. HAS EXPLAINED TO ME

20  THAT, 'WELL, IT'S REALLY AN ELECTRONIC FUNCTION, THIS GENERAL    04:15

21  LEDGER, AND THAT'S SOMETHING YOU WOULD HAVE TO DO AT OUR

22  OFFICES.'

23         SO THERE'S A REASONABLE -- NOBODY HAS ARRANGED --

24         **THE COURT:**  I ASSUME MR. SILLS IS FAMILIAR WITH THIS,

25  SINCE HE'S DONE AUDITS WITH WARNER BROTHERS AND D.C.             04:15

1          **MR. TOBEROFF:**  NOT THIS GENERAL LEDGER, NO; HE'S NOT

2     FAMILIAR WITH THAT; SO WE SET UP, I THINK, A REASONABLE

3     SUGGESTION THAT HE BE ALLOWED MORE TIME.  IF HE DOESN'T HAVE

4     FOLLOW-UP QUESTIONS, HE DOESN'T HAVE TO VISIT D.C.  BUT HE MAY

5     HAVE A FEW FOLLOW-UP CLARIFICATIONS WHERE HE CAN INTERACT FACE          04:16

6     TO FACE IN THE LAST TWO WEEKS IN OCTOBER AND THAT TO FINISH

7     THIS, I THINK WE SAID NOVEMBER 16TH, WHICH IS ASKING FOR AN

8     EIGHT-WEEK PERIOD.

9          **THE COURT:**  LET ME HEAR FROM D.C. OR WARNER BROTHERS,

10    OR BOTH.                                                                04:16

11         **MR. BERGMAN:**  FIVE WEEKS AGO WHEN WE WERE HERE, I

12    HEARD LOUD AND CLEAR WHAT YOU WERE SAYING.  YOU WANTED

13    DISCOVERY CLOSED.  YOU WANTED US TO OPEN UP OUR BOOKS, TO PUT

14    THEM TO THE FRONT OF THE LINE, GET BUSY, AND FINISH THIS UP.

15         WE LEFT HERE.  AS OUR PAPERS INDICATE, WE WORKED AT              04:16

16    NIGHT; WE WORKED OVER THE WEEKEND; THE PARTICIPATIONS

17    DEPARTMENT WORKED OVER THE WEEKEND; WE GOT PAPERS ON MR. SILLS'

18    DESK THAT FOLLOWING FIRST MONDAY MORNING.

19         HE DIDN'T TOUCH THOSE PAPERS UNTIL AUGUST 30TH; TWO

20    AND A HALF WEEKS WENT BY WITHOUT ANY ACTIVITY WHATEVER.              04:17

21         YES, I WAS ON VACATION; MS. MANDAVIA, MY PARTNER,

22    SPOKE WITH MR. TOBEROFF WHENEVER THEY CALLED.  MR. WEINBERGER

23    WAS AVAILABLE ON THE PHONE CONSTANTLY.  WE HAVE DONE EVERYTHING

24    WE POSSIBLY COULD TO COMPLY WITH YOUR HONOR'S ORDER AND HAVE

25    SUCCEEDED IN DOING SO.                                                04:17

1    THE ONLY ISSUE REMAINING ARE THE ULTIMATES, AND THAT

2  DOESN'T REQUIRE ANY TIME.

3    AND THE PROBLEM WITH WHAT MR. TOBEROFF IS SUGGESTING

4  IS THAT IF WE GIVE TWO MONTHS, OR EVEN A MONTH, TO MR. SILLS TO

5  COMPLETE HIS ANALYSIS, WE THEN HAVE TO HIRE OUR EXPERT, WHO'S          04:17

6  GOING TO EXAMINE MR. SILLS' ANALYSIS AND MR. SILLS' EXPERT

7  REPORT, AND THEN WE ARE GOING TO HAVE TO TAKE MR. SILLS'

8  DEPOSITION; THEY ARE GOING TO HAVE TO TAKE OUR EXPERT'S

9  DEPOSITION; AND WE'RE GOING TO BE IN JANUARY BY THAT TIME.

10    WE DO NOT WANT TO CONTINUE THIS TRIAL.  THIS CASE,          04:18

11  WITH THE NEGOTIATIONS, HAS BEEN GOING ON FOR EIGHT OR NINE

12  YEARS ALREADY; IT'S TIME TO PUT AN END TO IT.

13    I HAVE SUGGESTED TO MR. TOBEROFF -- AND I DON'T WANT

14  TO BE EXACT, BECAUSE I DON'T REMEMBER EXACTLY -- IN THE EARLY

15  SPRING OF THIS YEAR, THAT WE TURN IT OVER TO MR. SILLS TO LET          04:18

16  HIM DO WHAT HE DOES, AND THAT WAS JUST REFUSED TIME AFTER TIME.

17    WE FINALLY HAVE GOTTEN THE AGREEMENT, GIVEN YOUR

18  HONOR'S ORDER.  WE MADE EVERYTHING AVAILABLE TO HIM.  WE ACTED

19  IN THE MOST EXPEDITIOUS WAY POSSIBLE.  MR. TOBEROFF DID NOT, ON

20  THE AUGUST DATE WE WERE BEFORE YOUR HONOR, SAY 'IT CAN'T BE          04:18

21  DONE IN A MONTH.'  HE DIDN'T RAISE IT.  HE DIDN'T RAISE IT IN

22  THE JOINT STATEMENT WHICH YOUR HONOR ORDERED THE FINAL ACT OF

23  RESOLVING ANY DISCOVERY DISPUTES, AND WE BELIEVE IT'S IMPROPER

24  AT THIS TIME.

25    THE TIME HAS COME AND GONE WITHIN WHICH TO CONDUCT          04:19

1    THE AUDIT.  IT IS NOT FAIR TO ALL OF THE OTHER PARTICIPANTS AT

2    WARNER BROTHERS, FRANKLY, WHO HAVE BEEN PUSHED ASIDE FOR FIVE

3    WEEKS NOW AND WHO HAVE BEEN WAITING PATIENTLY TO GET ON WITH

4    THEIR AUDITS TO SAY TO THEM, WELL, MR. SILLS HAS THE NEXT MONTH

5    OR THE NEXT TWO MONTHS.                                          04:19

6         DISCOVERY IS OVER; IT'S TIME TO MOVE TO JURY

7    INSTRUCTIONS.

8         **THE COURT:**  WHAT ABOUT THE ULTIMATES, COUNSEL?

9         **MR. BERGMAN:**  THE ULTIMATES, YOUR HONOR, WE'RE

10   PREPARED TO ADDRESS AND HAVE ADDRESSED IN OUR PAPERS; THEY ARE   04:19

11   MERE PROJECTIONS; THEY HAVE NOTHING WHATEVER TO DO WITH ACTUAL

12   DAMAGES.  THERE IS NO REASON WHY THEY SHOULD BE PRODUCED AS

13   PART OF DISCOVERY.  THEY ARE NEVER MADE AVAILABLE AS PART OF AN

14   AUDIT, AND THAT IS BECAUSE THEY SIMPLY ARE SPECULATION.  THEY

15   DON'T TELL WHAT HAS BEEN EARNED.  THEY TELL WHAT WE THINK WILL   04:20

16   EVENTUALLY BE EARNED, AND I DON'T BELIEVE THAT'S DISCOVERABLE.

17   IT SERVES NO PURPOSE.

18        **THE COURT:**  MR. SILLS SAYS THAT THE ACCESS TO THE

19   DEFENDANTS' ULTIMATES WHICH COVER THE MOTION PICTURE,

20   TELEVISION, AND ANCILLARY EXPLOITATIONS OF SUPERMAN AND         04:20

21   SUPERBOY WILL, (A), ALLOW THE PLAINTIFFS TO VERIFY THE

22   PLAINTIFFS HAVE RECEIVED DOCUMENTATION REFLECTING ALL SOURCES

23   OF REVENUE AND EXPENSES RELATED TO THESE PROPERTIES, AND, (B),

24   BETTER ENABLE PLAINTIFFS TO PROPERLY CALCULATE TRUE PROFITS.

25        WHY SHOULD I NOT DEFER TO MR. SILLS' ASSESSMENT OF          04:20

1    THAT?

2              MR. BERGMAN:  WELL, BECAUSE ALL OF THE MATERIALS THAT

3    SATISFY BOTH THOSE REQUIREMENTS HAVE ALREADY BEEN PRODUCED.

4    THERE IS NO REASON WHY THEY HAVE TO LOOK AT OUR SPECULATIVE

5    PROJECTIONS IN ORDER TO DETERMINE WHETHER WE PROPERLY                04:20

6    ACCOUNTED.  THEY HAVE BEEN GIVEN ACCESS TO OUR BOOKS AND

7    RECORDS.  THEY HAVE BEEN GIVEN ACCESS TO OUR DISTRIBUTION

8    REPORTS; NOT ONLY TO D.C. BUT TO EVERY OTHER PARTICIPATE.

9              THE COURT:  IS THERE SOMETHING ELSE, COUNSEL?  IS

10   THERE SOME OTHER REASON WHY THEY SHOULD NOT HAVE THESE              04:21

11   ULTIMATES?  IS THERE SOMETHING TO PROTECT HERE?

12             MR. BERGMAN:  THE ONLY THING TO PROTECT IS THE

13   SCIENCE OR THE ART THAT OUR PEOPLE FOLLOW IN MARKING THESE

14   PROJECTIONS AND THE FACT THAT THEY ARE GENERALLY NOT MADE

15   AVAILABLE TO ANYONE.  AND THAT THE STUDIO IS, BY VIRTUE OF          04:21

16   THAT, RELUCTANT TO MAKE IT AVAILABLE.  IT HAS NO LIKELIHOOD OF

17   LEADING TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.  IT IS NOTHING

18   OTHER THAN SAYING 'WE EXPECT THAT IN 2012, OR WHENEVER IT IS,

19   THIS PICTURE WILL BREAK EVEN,' OR 'THIS TELEVISION SHOW WILL

20   THROW OFF CERTAIN PROFITS.'                                        04:21

21             IT'S SIMPLY NOT DISCOVERY.

22             THE COURT:  ON THE ISSUE OF ULTIMATES, AND THEN I'LL

23   LET YOU GO BACK AND RESPOND TO THE OVERALL ISSUE, THE TWO

24   REASONS PROFFERED BY MR. SILLS, ONE IS JUST TO VERIFY THAT

25   EVERYTHING HAS BEEN COVERED; THAT DOESN'T REALLY SEEM TO BE         04:22

```
1    SOMETHING WHICH SUGGESTS THAT HE NEEDS TO HAVE THEM TO ACTUALLY
2    MAKE HIS AUDIT OR HIS CALCULATIONS; AND THE SECOND REASON IS TO
3    BETTER ENABLE PLAINTIFFS TO PROPERLY CALCULATE TRUE PROFITS.
4          AGAIN, THERE IS REALLY NO EXPLANATION THERE.  AND IF
5    IT REALLY IS AN ESTIMATE, AS HE DESCRIBES IT, OF FUTURE         04:22
6    PROFITS, I DON'T KNOW HOW THAT BETTER EQUIPS AN AUDITOR TO KNOW
7    WHAT THE ACTUAL OR TRUE PROFITS ARE, SINCE IT IS A GUESS OR AN
8    ESTIMATE.
9          MR. TOBEROFF:  FIRST OF ALL, WE HAVE TO THE DEAL WITH
10   THE FIRST QUESTION -- I'D LIKE US TO DEAL WITH THE FIRST       04:22
11   QUESTION OF WHETHER THE ULTIMATES ARE WITHIN THE PURVIEW OF
12   PERMISSIBLE DISCOVERY, AND THEY MOST CERTAINLY ARE, AND THEY
13   ARE MOST CERTAINLY RELEVANT TO THIS CASE.
14         IN FACT, I'VE BEEN INVOLVED IN CASES WHERE WARNER
15   BROTHERS IN A CASE INVOLVING A FILM CALLED 'THE ISLAND' WARNER  04:23
16   BROTHERS, IN A COPYRIGHT INFRINGEMENT CASE, SUBMITTED AN
17   ULTIMATE, ALONG WITH DREAMWORKS, TO SHOW THAT ANY CONSIDERATION
18   OF PROFIT SHOULD BE STRIKEN BECAUSE THE FILM WON'T BE
19   PROFITABLE.
20         THE STUDIOS, WHO ARE IN A MUCH BETTER POSITION TO         04:23
21   PROJECT THE AMOUNTS OF MONEY THAT ARE GOING TO BE ACHIEVED OVER
22   TIME THROUGH VARIOUS WINDOWS -- THEATRICAL FILM, HOME VIDEO,
23   PAY TELEVISION, FREE TELEVISION -- EACH OF THEIR DIVISIONS
24   WHICH RUN THESE COMPARABLES, THROUGH PAST DISTRIBUTION
25   EXPERIENCES, DO A LOT OF CAREFUL WORK ARRIVING AT THESE
```

1   NUMBERS.  THOSE NUMBERS ARE IMPORTANT TO MR. SILLS BECAUSE --

2   AND WHEN HE SAYS 'VERIFICATION,' HE'S REFERRING TO THINGS LIKE,

3   IF THEIR ULTIMATES SHOW INTERNET EXPLOITATION OR SHOW SOME FORM

4   OF EXPLOITATION FOR WHICH HE'S RECEIVED NO DOCUMENTS, HE CAN

5   SAY 'YOU HAVEN'T GIVEN ME DOCUMENTS.'  HE'S NOT IN A POSITION          04:24

6   TO KNOW WHETHER THEY HAVE EXPLOITED THESE THINGS.

7            THIS INTERNAL DOCUMENT ULTIMATE WILL SHOW ALL OF

8   THOSE THINGS.  AND IT WOULD ALSO ALLOW HIM, AND FOR US, IN

9   SETTLEMENT, TO PUT DAMAGES IN PERSPECTIVE.  BECAUSE ALTHOUGH

10  WHEN ONE -- WHEN YOU DO AN AUDIT, YOU'RE FREEZING THE FINANCIAL       04:24

11  ANALYSIS ONLY AT ONE POINT IN TIME.  THEREFORE, TO GET A REAL

12  PICTURE, YOU NEED TO EXTRAPOLATE OUT -- WELL, NOBODY IS IN A

13  BETTER POSITION TO EXTRAPOLATE OUT THAN THE VARIOUS DIVISIONS

14  OF THE STUDIOS THAT EACH WORK ON THE NUMBERS THAT COMPILE THESE

15  ULTIMATES; SO THEY ARE WITHIN THE AMBIT OF PERMISSIBLE               04:24

16  DISCOVERY AS BEING RELEVANT, AND MR. SILLS HAS DECLARED UNDER

17  OATH THAT THEY ARE VERY USEFUL TO HIM.

18           THE FACT THEY ARE NOT INCLUDED IN A PROFIT

19  PARTICIPATION AUDIT IS OF NO MOMENT, YOUR HONOR, BECAUSE A

20  PROFIT PARTICIPATION AUDIT IS NOT DEFINED BY THE RULES OF           04:24

21  FEDERAL DISCOVERY; A PROFIT PARTICIPATION IS DEFINED BY A

22  PARTICIPANT'S CONTRACT, AND HIS CONTRACT DOESN'T PERMIT HIM TO

23  GET THOSE ULTIMATES.

24           **THE COURT:**  ALL RIGHT.

25           **MR. TOBEROFF:**  WHEN YOU ASKED 'WHAT ARE DEFENDANTS      04:25

1    PROTECTING,' WE HAVE A PROTECTIVE ORDER, SO FOR ANY

2    CONFIDENTIALITY CONCERNS, THESE ULTIMATES WILL FALL UNDER THAT

3    PROTECTIVE ORDER.

4           **THE COURT:**  IF THEY ARE SO DESIGNATED.

5           **MR. TOBEROFF:**  IF THEY ARE DESIGNATED.  AND THEY          04:25

6    DESIGNATE MOST OF THEIR DOCUMENTS AS FALLING UNDER THE

7    PROTECTIVE ORDER.

8           **THE COURT:**  BY THE WAY, THIS IS ENTIRELY AFIELD, JUST

9    SO I DON'T FORGET, AND I'VE BEEN DOING THIS IN ALL MY CASES OF

10   THIS NATURE.  A LOT HAS BEEN SUBMITTED UNDER SEAL, AND I HAVE    04:25

11   BEEN VERY LIBERAL IN SIGNING OFF ON SEALING ORDERS AND WILL

12   CONTINUE TO DO SO DURING THE COURSE OF THE DISCOVERY PROCESS.

13          HOWEVER, ONE OF THE ISSUES THAT I WILL WANT TO

14   DISCUSS AT THE PRETRIAL CONFERENCE ISSUE IS UNSEALING ALL BUT

15   THAT WHICH REALLY NEEDS TO STAY SEALED DURING THE COURSE OF THE   04:26

16   TRIAL.

17          THERE HAVE BEEN A NUMBER OF EXAMPLES IN RECENT MONTHS

18   WHERE IT HAS BEEN REVEALED THAT ENTIRE CASES HAVE BASICALLY

19   BEEN LEFT UNDER SEAL INDEFINITELY, AND I THINK THAT RAISES

20   REAL CONCERNS IN A COUNTRY DEDICATED TO AN OPEN AND PUBLIC       04:26

21   ACCOUNTABILITY OF THE COURTS; SO JUST KEEP THAT IN MIND.  YOU

22   MIGHT WANT TO START SPEAKING AMONGST YOURSELVES HOW YOU WANT TO

23   HANDLE THAT.  BUT AT SOME POINT IN TIME I'M GOING TO BE TURNING

24   TO YOU.  I'D MUCH PREFER THIS TO COME FROM YOU IN TERMS OF A

25   PROPOSED SOLUTION TO THIS, BUT THE BLANKET SEALING OF ALL OF     04:26

1   THESE DECLARATIONS NEEDS TO BE UNDONE, BECAUSE WE CAN CERTAINLY

2   GO THROUGH THERE AND THERE'S LARGE PORTIONS OF THESE

3   DECLARATIONS THAT DO NOT CONTAIN PROPRIETARY INFORMATION OR

4   CONFIDENTIAL TRADE SECRETS.  I JUST THROW THAT OUT THERE FOR

5   YOU TO BE THINKING ABOUT OVER THE NEXT COUPLE OF MONTHS.          04:27

6   I INTERRUPTED YOU, COUNSEL.

7          **MR. TOBEROFF:**  I WANTED TO POINT OUT WITH RESPECT TO

8   -- GOING BACK TO THE 30 DAYS.  FIRST OF ALL, WE DIDN'T BRING UP

9   DURING THE INITIAL DISCUSSION THE 30 DAYS, BECAUSE I DON'T

10  BELIEVE THAT IT WAS UNTIL YOU ACTUALLY FILED YOUR WRITTEN ORDER   04:27

11  THAT YOU HAD DELINEATED A 30-DAY PERIOD.  WE HAD DEALT WITH IT

12  ON A --

13         **THE COURT:**  YOU'RE CORRECT.  I PULLED THE TRANSCRIPT

14  TO LOOK AT IT, AND YOU ARE CORRECT.  I HAD IT IN MY MIND, BUT I

15  DID NOT ARTICULATE IT ON THE RECORD.                             04:27

16         **MR. TOBEROFF:**  SO WE DEALT WITH IT IN MUCH MORE OF A

17  CASUAL BASIS.

18         ALSO, AT THAT TIME, EVEN IF YOU HAD DEALT WITH IT, I

19  WOULD HAVE HAD TO CONSULT WITH MR. SILLS, BECAUSE I DON'T KNOW

20  HOW MUCH TIME, EVEN IF HE FAST-TRACKED THIS, IT WOULD            04:27

21  REASONABLY NEED TO TAKE.

22         THERE'S ANOTHER POINT, AND I THINK IT'S IMPORTANT,

23  THAT I BELIEVE THAT DEFENDANTS ARE TRYING TO LIMIT US TO A DATE

24  AS A WAY OF LIMITING THE AMOUNT OF INFORMATION WE COULD GET

25  FROM THE AUDIT.                                                  04:28

1          THEY ARE MENTIONING GETTING ON WITH THE TRIAL AND

2    THINGS LIKE THAT AND ESSENTIALLY JAMMING US WITH RESPECT TO

3    TRIAL DEADLINES, BUT THE TRUTH IS THAT WE'RE IN THIS MESS TO

4    BEGIN WITH BECAUSE OF DEFENDANT'S STONEWALLING AND NOT GIVING

5    US THAT INFORMATION IN THE FIRST PLACE.                          04:28

6          SECONDLY, THIS IS BUMPING UP AGAINST TRIAL BECAUSE OF

7    THE MISFORTUNE WITH MAGISTRATE ZAREFSKY; IF THAT HAD NOT

8    HAPPENED, I BELIEVE WE WOULD HAVE HAD THIS RULING MONTHS AGO,

9    IN WHICH CASE WE WOULDN'T BE JAMMED UP.  BOTH THOSE REASONS ARE

10   NOT PLAINTIFF'S FAULT.  THE FIRST IS DEFENDANT'S FAULT AND THE  04:28

11   SECOND IS NOBODY'S FAULT.

12         AND IT'S NOT TRUE, BY THE WAY, THAT MR. SILLS WAITED

13   TWO WEEKS AND DID NOTHING.  HE DOES HAVE OTHER COMMITMENTS.  HE

14   HAS A SMALL SHOP, HE HAS COMMITMENTS, BUT I KNOW FOR A FACT

15   THAT HE WORKED ON THIS.                                         04:28

16         WHAT HAPPENED IS EVEN THOUGH WARNER BROTHERS

17   RESPONDED QUICKLY AND GAVE DOCUMENTS; TO THEIR CREDIT, THEY DID

18   DO THAT, IT MISSTATES THE REALITY.  THE REALITY IS DOCUMENTS

19   CAME IN, SOME IMMEDIATELY, THEN SOME A FEW DAYS LATER; THEN

20   SOME A WEEKDAY LATER.  THE MOST RECENT PILE OF DOCUMENTS CAME   04:29

21   IN JUST THIS LAST FRIDAY, AND, NATURALLY, THIS WILL LEAD TO

22   FOLLOW-UP QUESTIONS, AND MR. SILLS JUST NEEDS A LITTLE MORE

23   TIME TO GET EVERYTHING HE NEEDS TO PAINT A FULL PICTURE.

24         AND, AS I MENTIONED, D.C. DID NOT GET ANY DOCUMENTS

25   UNTIL DECEMBER 5TH; AND I HAVE TO CHECK BUT WE MAY STILL BE     04:29

1    AWAITING CERTAIN DOCUMENTS FROM D.C., LIKE THE RESERVE ACCOUNT

2    DOCUMENTS.

3            **THE COURT:**  VERY WELL.

4            **MR. PERKINS:**  COULD I RESPOND BRIEFLY ON BEHALF OF

5    D.C.?                                                              04:29

6            **THE COURT:**  PLEASE.

7            **MR. PERKINS:**  TO BE CLEAR, YOUR HONOR, MR. TOBEROFF

8    MADE A CHOICE AFTER THE ISSUANCE OF THE ORDER.  WE MADE

9    AVAILABLE TO HIM, D.C. COMICS, THAT HE COULD SEND HIS AUDITOR

10   TO COME TO D.C. COMICS AND PERFORM THE AUDIT WITHIN THE TIME      04:29

11   SET BY THE ORDER.

12           MR. TOBEROFF, INSTEAD, CHOSE TO RECEIVE DOCUMENTS IN

13   LIEU OF AN AUDIT.  THAT WAS OUR UNDERSTANDING THAT WAS THE

14   BASIS ON WHICH THOSE DOCUMENTS WERE PROVIDED TO MR. TOBEROFF.

15           WE GOT THEM TOGETHER IN A VERY QUICK TIME PERIOD AND       04:30

16   HE RECEIVED THE BULK OF THEM, AS HE ADMITS, BY SEPTEMBER 5TH.

17           WITH RESPECT TO THE GENERAL LEDGER, YOUR HONOR, HE

18   WAS INFORMED SOME TIME AGO THAT THERE IS NO KEY TO THE GENERAL

19   LEDGER WHICH HE HAS ASKED FOR REPEATEDLY.  MANY OF THE

20   DOCUMENTS, HOWEVER, THAT HE HAS BEEN PROVIDED DO PROVIDE THE      04:30

21   INFORMATION NECESSARY TO TRANSLATE WHAT IS ON THE GENERAL

22   LEDGER.

23           WHAT WE POINTED OUT IN THE PAPERS, YOUR HONOR, IS

24   THAT MR. TOBEROFF HAD THE OPPORTUNITY TO DEPOSE D.C. COMICS'

25   CFO AND NEVER ASKED A SINGLE QUESTION ABOUT THE GENERAL LEDGER    04:30

1    OR THE KEY OR ANY OF THE CODES.  HE HAD HIM IN THE CHAIR FOR

2    SEVEN HOURS AND NEVER ASKED HIM ANYTHING ABOUT IT; SO WE TAKE

3    ISSUE WITH THE NOTION THAT, AT LEAST WITH RESPECT TO D.C.

4    COMICS, THAT THIS IS D.C. COMICS' DOING.  D.C. COMICS HAS

5    WORKED VERY HARD THROUGHOUT THE CASE TO PRODUCE DOCUMENTS.          04:30

6         MANY DOCUMENTS WITH RESPECT TO FINANCES, BOTH INCOME

7    AND EXPENSES, YOUR HONOR, WERE PRODUCED MONTHS AND MONTHS AND

8    MONTHS AGO.  AND, AGAIN, VERY FEW QUESTIONS WERE EVER POSED AT

9    ANY OF THE DEPOSITIONS THAT TOOK PLACE AT D.C. COMICS.

10        **THE COURT:**  LET ME ASK YOU THIS, COUNSEL.                  04:31

11        IT CERTAINLY IS NOT A SURPRISE TO YOU, GIVEN THE

12   NATURE OF THIS CASE, THAT IN THE FINAL ANALYSIS YOU ARE

13   PRODUCING THESE FINANCIAL DOCUMENTS.

14        **MR. PERKINS:**  WELL, YOUR HONOR, NO.  BUT THE

15   DOCUMENTS THAT WERE PRODUCED THAT HE ASKED FOR IN THIS LAST        04:31

16   ROUND ARE REALLY DUPLICATIVE OF WHAT HAS ALREADY BEEN PRODUCED.

17   AND REALLY, FRANKLY, LESS HELPFUL.  AS ACTUALLY WAS EXPLAINED,

18   I THINK, AT THE LAST HEARING, D.C. COMICS DOES NOT TRACK ITS

19   REVENUE BY CHARACTER; IT'S LARGELY A PUBLISHING COMPANY AND,

20   THEREFORE, TRACKS ITS REVENUE BY TITLE OF COMIC BOOK; SO 'THE      04:31

21   DARK NIGHT THIS' AND 'JUSTICE LEAGUE THAT.'

22        WHAT D.C. COMICS DID IN THE PROCESS OF DISCOVERY WAS

23   IT WENT AND ACTUALLY CREATED A REPORT FOR THIS CASE, OSTENSIBLY

24   GOING THROUGH THE INFORMATION AND PROVIDING A DIGEST, IN

25   ADDITION TO THE GENERAL LEDGER, A DIGEST OF THE INFORMATION        04:32

1    THAT WAS SPECIFIC TO THE SUPERMAN CHARACTER, IN PART TO BE

2    HELPFUL TO THE PLAINTIFFS BUT ALSO BECAUSE WE BELIEVE THAT WAS

3    INFORMATION THAT WE WOULD NEED AT TRIAL; SO THOSE DOCUMENTS

4    WERE PRODUCED SEVERAL MONTHS AGO, YOUR HONOR.

5              THE COURT:  VERY GOOD.                                04:32

6              THANK YOU, COUNSEL.

7              IT'S BEEN REPRESENTED IN THE PAPERS, I THINK BY BOTH

8    SIDES, THAT THIS IS THE FINAL DISCOVERY DISPUTE; THAT ALL OF

9    THE OTHER MATTERS THAT HAD BEEN BRIEFED BEFORE JUDGE ZAREFSKY,

10   AND THAT YOU HAVE SUBSEQUENTLY MET AND CONFERRED ON HAVE BEEN   04:32

11   RESOLVED.  AND WHEN I SAY 'THIS,' I'M TALKING ABOUT THIS AUDIT

12   THAT'S ONGOING.  THE AUDIT, AGAIN, IS THE COURT'S WAY -- I'M

13   NOT TALKING, NECESSARILY, ABOUT A FORMAL AUDIT, BUT THE

14   PRODUCTION OF THE FINANCIAL DOCUMENTS FOR THE PURPOSE OF

15   CALCULATING DAMAGES IN THIS CASE.                              04:32

16             AS PART OF THAT, THIS ISSUE OVER THE ULTIMATES.

17             BESIDES THOSE TWO ISSUES AND THE STIPULATION THAT I

18   SIGNED CONCERNING THE DEPOSITION, THAT'S IT FOR DISCOVERY.

19             IS THAT THE PLAINTIFF'S UNDERSTANDING?

20   **MR. TOBEROFF:**  THE DEFENDANTS HAVE MADE A MOTION, NOW      04:33

21   THEIR THIRD MOTION, WHICH THEY ARE SEEKING TO GET PLAINTIFF

22   LAURA SIEGEL BACK IN THE DEPOSITION CHAIR TO ASK HER THREE

23   HOURS OF DEPOSITION QUESTIONS.

24             **THE COURT:**  WAS THAT THE SUBJECT OF THE STIPULATION?

25             WHO WAS THE SUBJECT OF THE STIPULATION?            04:33

```
 1          MR. TOBEROFF:  THAT WAS BRIAN SINGER.

 2          THE COURT:  THAT WAS BRIAN SINGER; AND THAT'S BEEN

 3  RESOLVED.

 4          THIS IS LAURA SIEGEL?

 5          MR. TOBEROFF:  THIS IS A MOTION FROM DEFENDANTS.      04:33

 6          THE COURT:  ALL RIGHT.

 7          MR. TOBEROFF:  IN THE COURSE OF MEETING AND

 8  CONFERRING PURSUANT TO YOUR ORDER REGARDING OUTSTANDING

 9  REQUESTS, WE HAVE COME TO AN AGREEMENT WITH RESPECT TO CERTAIN

10  DOCUMENTS, WHICH WE HAVE NOT YET ALL RECEIVED, AND WE'VE COME  04:34

11  TO AN UNDERSTANDING WITH THE DEFENDANTS THAT EVEN THOUGH THEY

12  DID NOT GIVE US THOSE DOCUMENTS WHEN THEY HAD HOPED TO GIVE

13  THEM TO US, THEY WILL NOT USE THE JOINT STIPULATION SCHEDULE

14  AGAINST US SHOULD THEY NOT GIVE US THE DOCUMENTS.  AND WE

15  BELIEVE THEY WILL GIVE US THE DOCUMENTS; SO...              04:34

16          THE COURT:  BACK TO THIS DEPOSITION OF LAURA SIEGEL.

17          WHAT ARE THEY SEEKING WITH RESPECT TO HER?

18          MR. TOBEROFF:  THREE HOURS OF ADDITIONAL DEPOSITION

19  TESTIMONY.

20          THE COURT:  AND YOU'RE OPPOSING THAT?               04:34

21          MR. TOBEROFF:  YES.

22          THE COURT:  WHY?

23          MR. TOBEROFF:  BECAUSE LAURA SIEGEL -- FIRST OF ALL,

24  IT'S NOT AN EASY THING FOR HER TO BE DEPOSED.  SHE HAS MULTIPLE

25  SCLEROSIS.
```

1          **THE COURT:**  I'M SORRY TO HEAR THAT.

2          **MR. TOBEROFF:**  AND SHE GAVE A DECLARATION ABOUT THAT.

3          TO GIVE YOU AN EXAMPLE, HER ORIGINAL SEVEN HOURS OF

4     QUESTIONING EXTENDED UNTIL ABOUT 10:00 AT NIGHT BECAUSE SHE HAD

5     TO CONSTANTLY TAKE BREAKS AND LIE DOWN.  AND DEFENDANTS WERE                04:34

6     KIND ENOUGH TO GIVE HER A COUCH; SO IT'S NOT AN EASY PROCESS.

7          WE'RE DEALING WITH DOCUMENTS THAT WERE RECENTLY

8     DISCOVERED, AND LAURA WILL ATTEST TO THAT, BUT THEY FALL INTO

9     THREE DISCRETE CATEGORIES.  DEFENDANTS ARE FOND OF TALKING

10    ABOUT THE NUMBER OF DOCUMENTS, BUT THEY ARE ESSENTIALLY THE          04:35

11    TRIAL TRANSCRIPT FROM THE 1947 ACTION, WHICH DEFENDANTS SHOULD

12    HAVE.  THEN THERE ARE THE EMPLOYMENT RECORDS OF SIEGEL AND

13    SHUSTER DURING THE TIME IN QUESTION; AND THEN THERE ARE SOME

14    ADDITIONAL, JUST A FEW PAGES, OF CREATIVE MATERIALS, SOME OF

15    WHICH ARE LISTED IN THE TERMINATION NOTICE.                          04:35

16          SO WHAT WE SAID TO DEFENDANTS WAS, 'WHY DO YOU HAVE

17    TO TAKE LAURA SIEGEL, PARTICULARLY IN LIGHT OF HER MEDICAL

18    CONDITION, AND GRILL HER FOR ANOTHER THREE HOURS, WHEN YOU

19    COULD ASK HER QUESTIONS IN VERIFIED INTERROGATORIES?  WHAT WERE

20    THE CIRCUMSTANCES IN WHICH YOU FOUND THESE DOCUMENTS?  HOW WERE      04:35

21    THEY KEPT... YOU'RE NOT GOING TO BE ASKING HER ABOUT EVENTS

22    THAT HAPPENED 60 YEARS AGO.

23          **THE COURT:**  OKAY.

24          ANYTHING ELSE?

25          **MR. TOBEROFF:**  THAT'S ALL I CAN THINK OF.                  04:36

September 17, 2007                    Siegel v. Warner, et al.

1        **THE COURT:**  LET ME HEAR FROM THE DEFENSE SIDE.

2        **MR. BERGMAN:**  YOUR HONOR, MR. PERKINS WILL RESPOND

3   REGARDING LAURA SIEGEL'S DEPOSITION.

4        THE ONLY OTHER MATTER THAT CONTINUES, I BELIEVE,

5   RELATES TO WHAT ARE CALLED THE ESCROW DOCUMENTS.                   04:36

6        **THE COURT:**  THE ESCROW DOCUMENTS.

7        **MR. BERGMAN:**  YES, SIR.

8        **THE COURT:**  ARE THOSE THOSE SUPPLEMENTAL DOCUMENTS

9   THAT HE WAS REFERRING TO?  OR THIS IS ANOTHER GROUP OF

10  DOCUMENTS?                                                         04:36

11       **MR. BERGMAN:**  THESE ARE OTHER DOCUMENTS, MAGISTRATE

12  JUDGE ZAREFSKY HAD ISSUED AN ORDER REQUIRING THE PRODUCTION OF

13  CERTAIN DOCUMENTS.  THE PLAINTIFFS HAVE REFUSED TO PRODUCE ALL

14  OF THOSE DOCUMENTS, AND WE HAVE BROUGHT A MOTION FOR CONTENT

15  WHICH HAS BEEN FILED BEFORE MAGISTRATE JUDGE ZAREFSKY.  I DON'T   04:36

16  KNOW WHETHER HE'S GOING TO BE HANDLING IT OR WHETHER THAT WILL

17  COME UNDER YOUR...  BUT THAT IS THE ONLY OTHER THING THAT WE

18  HAVE.

19       **THE COURT:**  WHAT ABOUT THESE SUPPLEMENTAL DOCUMENTS

20  THAT MR. TOBEROFF JUST REFERRED TO REGARDING THAT YOU'RE          04:37

21  SUPPOSED TO PRODUCE THAT HE HAS NOT RECEIVED YET?

22       **MR. PERKINS:**  I CAN SPEAK TO THAT, YOUR HONOR.

23       **THE COURT:**  THANK YOU.

24       **MR. PERKINS:**  THESE ARE, I BELIEVE, DOCUMENTS FROM

25  D.C. COMICS, AND THERE'S ONE CATEGORY OF DOCUMENTS THAT WE HAD    04:37

1    TROUBLE PULLING THEM TOGETHER IN TIME, BUT THEY ARE --

2          **THE COURT:**  AND HOW DO YOU REFER TO THESE DOCUMENTS?

3       **MR. PERKINS:**  THEY ARE THE RESERVE ACCOUNT DOCUMENTS.

4          **THE COURT:**  THE RESERVE ACCOUNT DOCUMENTS.

5    **MR. PERKINS:**  YES.                                      04:37

6       **THE COURT:**  ARE YOU PRODUCING THEM?

7    **MR. PERKINS:**  YES, WE ARE.

8       **THE COURT:**  WHEN?

9       **MR. PERKINS:**  THIS WEEK, YOUR HONOR.

10      **THE COURT:**  THIS WEEK.                               04:37

11         LET ME HEAR FROM COUNSEL ABOUT THESE ESCROW

12   DOCUMENTS.

13         I'M SORRY.  YOU COULD ALSO SPEAK ABOUT THE

14   LAURA SIEGEL DEPOSITION.

15      **MR. PERKINS:**  YES, I CAN.                            04:38

16      **THE COURT:**  APPARENTLY, SHE'S SICK.  WHY DO YOU HAVE

17   TO TAKE HER DEPOSITION AGAIN?

18      **MR. PERKINS:**  WELL, YOUR HONOR, THE DOCUMENTS THAT

19   WERE PRODUCED, AT LEAST A COUPLE OF CATEGORIES IN THEM ARE

20   QUITE SIGNIFICANT.  IN THE ADDITIONAL CREATIVE MATERIALS THAT  04:38

21   MR. TOBEROFF REFERS TO, THERE IS A SCRIPT AND SOME COMIC STRIP

22   PANELS THAT WE HAVE NEVER SEEN BEFORE THAT ARE UNPUBLISHED

23   THAT, AMONG OTHER THINGS, DEPICT SUPERMAN AS A CHILD, AND THESE

24   WERE CREATED IN 1934.

25      **THE COURT:**  AND WHY WOULD SHE KNOW ANYTHING ABOUT      04:38

1    THESE?

2         **MR. PERKINS:**  WELL, THEY WERE IN HER POSSESSION, AND

3    SHE IS JERRY SIEGEL'S DAUGHTER.  WE DON'T HAVE ANYBODY ELSE TO

4    ASK ABOUT THEM.  WE DON'T KNOW THE CIRCUMSTANCES UNDER WHICH

5    SHE RECEIVED THEM.  WE DON'T HAVE ANY WAY TO DETERMINE WHETHER          04:38

6    OR NOT THEY ARE AUTHENTIC.

7         IN ADDITION TO THAT, WITHIN THE DOCUMENTS THAT WERE

8    PRODUCED, IS A LETTER FROM JERRY SIEGEL TO HIS DAUGHTER

9    CONCERNING CERTAIN MATERIALS RELATING TO SUPERMAN THAT HE HAS

10   PROVIDED.  THERE IS A VERY REAL QUESTION WITH RESPECT TO SOME          04:39

11   OF THESE CREATIVE MATERIALS AS TO WHETHER THEY DO APPEAR ON THE

12   NOTICE OF TERMINATION, WHICH WOULD OBVIOUSLY HAVE AN IMPACT ON

13   THE SCOPE OF THE TRIAL AND THE RIGHTS AT ISSUE, YOUR HONOR.

14        IN CONNECTION WITH THIS -- JUST TO CLOSE THE LOOP ON

15   THIS, YOUR HONOR, THE COURT ORDERED US TO MEET AND CONFER WITH          04:39

16   MR. TOBEROFF ON THIS ISSUE, AND, IF WE COULD NOT COME TO

17   RESOLUTION, TO SERVE THROUGH THE JOINT STIPULATION PROCEDURE ON

18   THIS.

19        WE DID, IN FACT, SERVE OUR JOINT STIPULATION ON

20   MR. TOBEROFF ON THE DATE REQUIRED.  WHAT IS OUTLINED IN THAT          04:39

21   JOINT STIPULATION IS THAT THERE WERE DISCUSSIONS ABOUT OFFERING

22   HER FOR DEPOSITION.  WE INITIALLY WANTED TO TAKE HER FOR FIVE

23   HOURS; WE THINK THESE DOCUMENTS ARE SIGNIFICANT; HE SAID THAT'S

24   WAY TOO MUCH, CAN YOU GIVE ME YOUR BEST NUMBER.  WE WENT BACK

25   TO THE CLIENT; WE SAID, MARK, I CAN DO THIS IN THREE HOURS.  I          04:39

1    WILL DO THE BEST I CAN TO COMPLETE IT SOONER, BUT I THINK

2    CUTTING IT LESS THAN THREE HOURS IS JUST -- WE JUST CAN'T DO

3    IT.

4            HE CAME BACK AT THE ELEVENTH HOUR AND OFFERED TWO

5    HOURS FOR MRS. LARSON.  WE JUST FELT LIKE WE COULDN'T AGREE TO    04:40

6    THAT, PARTICULARLY SINCE --

7            **THE COURT:**  YOU MEAN MRS. SIEGEL.

8            **MR. PERKINS:**  IT'S LAURA SIEGEL LARSON; SHE'S THE

9    DAUGHTER, YOUR HONOR.

10           **THE COURT:**  YES.    04:40

11           **MR. PERKINS:**  WE HAVE A LITTLE BIT OF A HISTORY, AT

12   LEAST WITH THE LAST DEPOSITION, OF MRS. LARSON WHICH HAS BEEN

13   THE SUBJECT OF A COUPLE OF MOTIONS WHICH INCLUDED A FINDING BY

14   MAGISTRATE JUDGE ZAREFSKY THAT SOME OF THE OBJECTIONS BY

15   MR. TOBEROFF WERE DEVIATING FROM WHAT THE RULES REQUIRE; THERE    04:40

16   WERE OVER 285 OF THEM DURING THE DEPOSITION.  IT WAS, WE

17   CONSIDERED, TO BE EXCESSIVE.  THAT'S ONE OF THE THINGS,

18   FRANKLY, THAT WE'RE CONCERNED ABOUT IN ENSURING THAT WE HAVE

19   SUFFICIENT TIME, THAT WE DON'T GET STALLED, IF YOU WILL, BY

20   VIRTUE OF LENGTHY SPEAKING OBJECTIONS.    04:41

21           TO BE FAIR, MR. TOBEROFF AND I HAVE HAD NUMEROUS

22   DEPOSITIONS TOGETHER AND WE HAVE DONE OUR BEST TO AVOID THAT,

23   BUT IT IS A CONCERN SINCE THIS IS ONE OF THE PLAINTIFFS.

24           **THE COURT:**  VERY GOOD.

25           MR. TOBEROFF, WHAT ABOUT THESE ESCROW DOCUMENTS?    04:41

1  JUDGE ZAREFSKY IS NOT IN A POSITION TO WHERE HE NEEDS TO BE

2  HEARING MOTIONS FOR SANCTIONS RIGHT NOW; HE'S GOT OTHER THINGS

3  ON HIS MIND, AND --

4          **MR. TOBEROFF:**  I DIDN'T MAKE THE MOTION TO BE --

5          **THE COURT:**  COUNSEL, WE CAN'T BOTH SPEAK AT THE SAME      04:41

6  TIME.

7          I KNOW YOU DIDN'T MAKE THE MOTION.  I UNDERSTAND

8  THAT, ACCORDING TO THE ALLEGATIONS, YOU DID NOT PRODUCE THE

9  DOCUMENTS.  WHAT'S GOING ON HERE?

10         **MR. TOBEROFF:**  THE ALLEGATIONS ARE COMPLETELY FALSE.     04:41

11         **THE COURT:**  YOU'VE PRODUCED THE ESCROW DOCUMENTS?

12         **MR. TOBEROFF:**  NO.

13         THE ESCROW DOCUMENTS, WHAT THEY STYLE AS THE ESCROW

14  DOCUMENTS, ARE DOCUMENTS THAT WERE STOLEN FROM MY LEGAL LAW

15  OFFICE'S FILES BY A FORMER EMPLOYEE WHO IS ALSO AN ATTORNEY WHO   04:41

16  RANSACKED THE FILES -- A DISGRUNTLED ATTORNEY -- TOOK ALL SORTS

17  OF OBVIOUSLY PRIVILEGED INFORMATION; PUT IT IN THREE DUPLICATE

18  PACKAGES; SENT IT OVER TO THE DEFENDANTS.

19         THIS IS MUCH MORE COMPLEX AND DISTURBING THAN THEY

20  ARE LETTING YOU KNOW.                                            04:42

21         IN THE PROCESS, MAGISTRATE ZAREFSKY SAID 'WELL, HAVE

22  YOU PRODUCED THESE DOCUMENTS?'  AND WE SAID WE PRODUCED THEM

23  AND LISTED THOSE ON THE PRIVILEGED LOG, THOSE THAT ARE INVOLVED

24  IN THE CASE.  AND HE SAID THEN WHAT ARE WE ARGUING OVER?

25         AND EVEN THOUGH THIS IS SHOCKING, AND AS A MATTER OF       04:42

1    PRINCIPLE, IT SHOULD NOT BE USED BY THE DEFENDANTS AS A

2    WINDFALL TO GAIN SOME ADVANTAGE IN LITIGATION, WHICH IS WHAT

3    THEY ARE OBVIOUSLY DOING BY PRESSING WITH THESE DOCUMENTS -- HE

4    SAID, WHAT ARE YOU FIGHTING OVER, AND HE ISSUED AN ORDER WHICH

5    SAID 'SIMPLY PUT IN A DECLARATION BATES NUMBERS -- THESE           04:42

6    DOCUMENTS THAT WERE STOLEN WERE THEN BATES STAMPED BY THE

7    DEFENDANTS AND PUT WITH ANOTHER LAWYER WHO THEY SAID WAS A

8    NEUTRAL, BUT, IN FACT, WAS A LAWYER HIRED BY THEM AND PAID BY

9    THEM, AND THEY BATES STAMPED THESE DOCUMENTS.  AND HE SAID JUST

10   CORRESPOND THE DOCUMENTS THAT YOU HAVE PRODUCED AND THE          04:43

11   DOCUMENTS LISTED IN THE PRIVILEGED LOGS TO THOSE THAT ARE

12   BATES STAMPED.  WHICH I DID, COMPLYING WITH THE ORDER IN THE

13   DECLARATION; SO I'VE COMPLIED WITH THE ORDER.

14          THE PROBLEM IS, AFTER GETTING MAGISTRATE ZAREFSKY TO

15   ISSUE THE ORDER, THEN THEY STARTED TO ABUSE THE SITUATION;       04:43

16   CONTACTING THE PURPORTED ESCROW AGENT, ASKING HIM NOT SIMPLY TO

17   DISPERSE THE DOCUMENTS PURSUANT TO MAGISTRATE JUDGE ZAREFSKY'S

18   ORDER, BUT TO EXAMINE THE DOCUMENTS LISTED IN THE PRIVILEGED

19   LOGS, DETERMINE WHETHER OR NOT THEY ARE PRIVILEGED; ALL SORTS

20   OF THINGS WHICH BOTH ABUSE THE ORDER AND ABUSE THE SUPPOSED      04:43

21   NEUTRAL PROVISION OF THE PERSON HOLDING THESE ESCROW DOCUMENTS.

22          WE OBJECTED TO THAT.

23          THE MOTION IS ABOUT THREE DOCUMENTS OR SO THAT FELL

24   THROUGH THE CRACKS OF THE ORDER AND WHILE ADDRESSED IN MY

25   PAPERS IN FRONT OF MAGISTRATE ZAREFSKY, WERE NEVER ADDRESSED IN  04:44

1    ORAL ARGUMENTS OR BY THE RULING.

2         AND EVEN THOUGH IT MADE NO SENSE TO RELEASE THOSE

3    DOCUMENTS UNDER THE RATIONALE OF MAGISTRATE ZAREFSKY'S ORDERS,

4    THEY PRESSED THE ESCROW AGENT TO RELEASE THE DOCUMENTS; AND

5    EVEN THOUGH HE'S HIRED BY THEM AND ON RETAINER FOR THEM, HE          04:44

6    FELT UNCOMFORTABLE IN THE SITUATION BECAUSE, PRESUMABLY, HE

7    FELT THAT PLAINTIFFS HAD A POINT AND HE SAID THAT MAGISTRATE

8    ZAREFSKY NEEDS TO DECIDE THIS.

9         **THE COURT:**  SO THESE ARE THE THREE DOCUMENTS THAT

10   WERE --                                                             04:44

11        **MR. TOBEROFF:**  THERE'S A COVER LETTER WHICH WAS IN

12   THE SUBJECT OF THE MOTION, OF THIS DISGRUNTLED EMPLOYEE WHO IS

13   MAKING ALL THESE DEFAMATORY STATEMENTS.  THERE ARE DOCUMENTS

14   WHICH WEREN'T LISTED IN A PRIVILEGE LOG BECAUSE WE HAVE AN

15   AGREEMENT WITH DEFENDANTS THAT POST-LITIGATION DOCUMENTS           04:44

16   BETWEEN COUNSEL AND THEIR CLIENTS NEED NOT BE LISTED; SO THEY

17   ARE SAYING, WELL, THE ORDER SAYS YOU RELEASED --

18        **THE COURT:**  YOU HAVE TO SLOW DOWN, COUNSEL.

19        **MR. TOBEROFF:**  THERE WERE A COUPLE OF DOCUMENTS WHERE

20   COMMUNICATIONS FROM MY AND MY CLIENT, AFTER LITIGATION HAD        04:45

21   COMMENCED AND PURSUANT TO AN ADMITTED AGREEMENT, THAT THEY

22   ADMIT THEY WERE NOT ON A PRIVILEGE LOG.  THEY SAID, WELL, THE

23   BRIGHT LINE ORDER WOULD REQUIRE THE ESCROW AGENT TO RELEASE

24   THOSE ANYWAY; THAT'S THE SECOND CATEGORY THAT'S JUST A COUPLE

25   OF LETTERS.                                                        04:45

1              AND THE THIRD FALLS SQUARELY WITHIN THE ORDER,

2    BECAUSE IT'S LISTED ON A THIRD-PARTY PRIVILEGE LOG, AND THEY

3    ARE SAYING 'BECAUSE YOU DIDN'T ALSO LIST IT, THE JOINT

4    PRIVILEGE IS WAIVED'; SOMETHING THAT THEY NEVER BROUGHT IN

5    THEIR ORIGINAL MOTION TO COMPEL.                                    04:45

6              **THE COURT:**  SO IN ALL THREE CASES, YOU'RE ASSERTING

7    PRIVILEGE AT THIS POINT.

8              **MR. TOBEROFF:**  YES.

9              **THE COURT:**  LET ME HEAR A RESPONSE.

10             **MR. PERKINS:**  YOUR HONOR, THIS STORY IS A VERY LONG     04:46

11   AND COMPLICATED STORY, AND JUDGE ZAREFSKY ACTUALLY HELD ORAL

12   ARGUMENT ON THIS, AND TO SORT OF ENCAPSULATE IT, JUDGE ZAREFSKY

13   SAID --

14             **THE COURT:**  WHEN DID HE HOLD ORAL ARGUMENT ON THIS?

15             **MR. PERKINS:**  THAT'S A GOOD QUESTION.                   04:46

16             **MR. BERGMAN:**  WHEN?

17             **MR. PERKINS:**  YES.

18             **MR. BERGMAN:**  SEVERAL MONTHS AGO.

19             **THE COURT:**  SO NOT RECENTLY.

20             **MR. PERKINS:**  NOT RECENTLY, YOUR HONOR.                 04:46

21             AT THE ORAL ARGUMENT, HE BASICALLY SAID TO

22   MR. TOBEROFF, 'I'M GOING TO HOLD YOU TO YOUR REPRESENTATION.  I

23   WANT YOU TO GO THROUGH, AND YOU HAVE TO IDENTIFY BY BATES

24   NUMBER ALL OF THESE ESCROW DOCUMENTS AND IDENTIFY WHETHER THEY

25   HAVE BEEN PRODUCED OR WHETHER THEY HAVE BEEN IDENTIFIED ON YOUR     04:46

1   CLIENT'S PRIVILEGE LOG.  AND IF THEY HAVEN'T BEEN IDENTIFIED ON

2   THE CLIENT'S PRIVILEGE LOG, THE PRIVILEGE IS WAIVED.  HE SAID

3   THAT.  HE DID NOT ISSUE A WRITTEN ORDER; IT'S JUST IN THE

4   TRANSCRIPT.

5           MR. TOBEROFF THEN DID AS HE WAS ASKED; HE CREATED A          04:47

6   DECLARATION IDENTIFYING BY BATES NUMBER WHAT JUDGE ZAREFSKY HAD

7   MADE CLEAR.

8           ONE OF THE THINGS THAT WAS NOT INCLUDED ON ANY

9   PRIVILEGE LOG WAS THE LETTER, THE COVER LETTER.  THAT COVER

10  LETTER WAS THE SUBJECT OF A SUBPOENA ON MR. TOBEROFF'S OFFICE.    04:47

11  IT WAS THE SUBJECT OF A DOCUMENT REQUEST TO THE PLAINTIFFS.

12  THEY NEVER PRODUCED IT AND THEY NEVER LISTED IT ON ANY

13  PRIVILEGE LOG.

14          **THE COURT:**  IF THAT REALLY IS A LETTER FROM HIS

15  FORMER LAW ASSOCIATE TO HIM, WHY WOULD THAT BE RELEVANT TO THIS    04:47

16  LAWSUIT?

17          **MR. PERKINS:**  WELL, THAT'S A GOOD QUESTION.  I DON'T

18  KNOW.

19          FIRST OF ALL, IT'S NOT A LETTER TO MR. TOBEROFF.

20          IT'S A LETTER FROM THE DISGRUNTLED EMPLOYEE TO THE          04:47

21  PEOPLE AT WARNER BROTHERS TO WHOM THE DOCUMENTS ARE DELIVERED.

22          AS I UNDERSTAND IT, IT OUTLINES WHY HE'S DOING WHAT

23  HE'S DOING.  I DON'T KNOW, BECAUSE I HAVEN'T SEEN THE

24  DOCUMENTS.  WHAT WARNER BROTHERS DID AND WHAT JUDGE ZAREFSKY

25  FOUND TO BE ENTIRELY APPROPRIATE WAS THEY DID AN INITIAL REVIEW    04:48

1   PURSUANT TO CALIFORNIA LAW TO DETERMINE WHETHER OR NOT THE

2   DOCUMENTS WERE PRIVILEGED OR NOT.  THEY PUT THEM INTO

3   CATEGORIES, INTO PILES:  NON PRIVILEGED; MAY BE PRIVILEGED; ARE

4   PRIVILEGED.  THOSE DOCUMENTS WERE THEN BUNDLED UP AND SENT OVER

5   TO THIS THIRD-PARTY LAWYER WHERE THEY HAVE BEEN EVER SINCE, AND   04:48

6   THEY WERE NUMBERED AT THAT POINT; SO NO OUTSIDE COUNSEL HAS

7   SEEN THOSE DOCUMENTS.

8          **THE COURT:**  DO YOU HAVE ANY REASON TO DOUBT THE

9   REPRESENTATIONS THAT COUNSEL IS MAKING NOW ABOUT THE NATURE OF

10  THE PRIVILEGE ATTACHED TO THESE THREE CATEGORIES OF DOCUMENTS?   04:48

11         **MR. PERKINS:**  I DON'T KNOW, BECAUSE I HAVEN'T SEEN

12  THEM.  I DON'T KNOW OF ANY PRIVILEGE THAT WOULD ATTACH TO THE

13  LETTER.  THE LETTER WAS WRITTEN BY A LAWYER TO WARNER BROTHERS.

14  THERE'S NO ATTORNEY-CLIENT PRIVILEGE.

15         **THE COURT:**  IT'S UNCLEAR WHAT RELEVANCE THAT HAS TO    04:48

16  THIS LAWSUIT.

17         **MR. PERKINS:**  WELL, PRESUMABLY IT HAS SOME RELEVANCE,

18  BECAUSE IT HAS SOMETHING TO DO WITH THE DOCUMENTS THAT HAD BEEN

19  DELIVERED THAT ARE, ACCORDING TO THE LETTER, AT LEAST, AS I

20  UNDERSTAND IT, ARE RELEVANT TO THE CASE.                        04:49

21         SO, I MEAN, YOU KNOW, AGAIN, THAT DOCUMENT WAS NOT

22  LISTED ON ANY PRIVILEGE LOG.  THIS LETTER WAS PART OF THE

23  MOTION.  IT WAS IDENTIFIED IN THE MOTION.  JUDGE ZAREFSKY RULED

24  THE WAY THAT HE RULED, AND WE JUST WANTED THE ESCROW AGENT TO

25  BE ABLE TO PRODUCE THE DOCUMENTS THAT HAD BEEN PROVIDED.        04:49

```
 1              THE COURT:  HOW MANY DOCUMENTS ARE WE TALKING ABOUT?

 2              MR. PERKINS:  THE TOTAL NUMBER OF DOCUMENTS?

 3              THE COURT:  YES.  APPROXIMATELY, COUNSEL.

 4              MR. PERKINS:  DO YOU REMEMBER?

 5              MR. WILLIAMSON:  APPROXIMATELY 839 PAGES.          04:49

 6              THE COURT:  THE ONES NOT PRODUCED; THE THREE

 7    CATEGORIES.

 8              MR. PERKINS:  THEY SAY THE THREE DOCUMENTS THAT ARE,

 9    WHAT, 20, 30 PAGES?

10              MR. TOBEROFF:  IT'S A TOTAL OF NINE DOCUMENTS OUT OF   04:49

11    839 PAGES.

12              THE COURT:  NINE DOCUMENTS TOTALING 39 PAGES?

13              MR. TOBEROFF:  NINE DOCUMENTS OUT OF A TOTAL OF 839

14    PAGES.  OUT OF 839 PAGES THAT WERE ACCOUNTED FOR, THESE NINE

15    DOCUMENTS THAT FELL THROUGH THE CRACKS.  AND OF THOSE, FOUR OF   04:50

16    THEM ARE FAX COVER SHEETS.  THE LETTER FROM A FORMER EMPLOYEE,

17    SINCE HE WAS A LAWYER IN MY OFFICE, WHICH DESCRIBES THE

18    CONTENTS OF THE DOCUMENTS THAT ARE BEING ILLEGALLY DISCLOSED,

19    DESCRIBES PRIVILEGED INFORMATION WORK-PRODUCT WITHIN THE

20    LETTER; THAT'S WHY IT'S PROTECTED.  AND WE WOULD NEVER HAVE      04:50

21    LISTED THAT ON A PRIVILEGE LOG BECAUSE THE LETTER ITSELF WAS

22    NOT WRITTEN DIRECTLY FROM A LAWYER TO THE CLIENT.

23              THE COURT:  WHO HAS THE DOCUMENTS?  THIS ESCROW

24    AGENT?

25              MR. PERKINS:  YES, YOUR HONOR.                       04:50
```

1        **THE COURT:**  BUT YOU KNOW WHAT THESE DOCUMENTS ARE.

2        **MR. TOBEROFF:**  YES, I DO, YOUR HONOR.

3        **THE COURT:**  OKAY.

4        **MR. PERKINS:**  SO ONE OF THE THINGS THAT WE WANTED THE

5   ESCROW AGENT TO DO WAS TO SIMPLY MATCH UP THE DOCUMENTS WITH         04:51

6   MR. TOBEROFF'S DECLARATION, ESSENTIALLY TO ENSURE THAT THE

7   DOCUMENTS AS HE IDENTIFIED THEM WERE ACCURATELY IDENTIFIED.

8        **THE COURT:**  BUT HE'S SAYING THAT THEY FELL THROUGH

9   THE CRACKS AND THAT --

10        **MR. PERKINS:**  THAT'S A SEPARATE ISSUE, YOUR HONOR.         04:51

11        ONE OF THE THINGS WE HAD ASKED THE ESCROW AGENT TO DO

12   WAS TO TAKE MR. TOBEROFF'S DECLARATION AND TO GO DOCUMENT

13   NUMBER BY DOCUMENT NUMBER AND ENSURE THAT THE DOCUMENTS THAT HE

14   IDENTIFIED ON HIS DECLARATION REALLY WERE WHAT HE SAID THEY

15   WERE.  IN OTHER WORDS, HE IDENTIFIES CERTAIN ONES THAT HAD         04:51

16   ALREADY BEEN PRODUCED.

17        **THE COURT:**  LET'S NOT TALK ABOUT THE ONES THAT HAVE

18   BEEN DONE.  LET'S TALK ABOUT THE NINE THAT WE HAVE LEFT.  I

19   WANT TO RESOLVE THIS.  WE'RE GOING TO MOVE ON HERE, COUNSEL.

20        WHAT ARE WE GOING TO DO ABOUT THESE NINE DOCUMENTS?         04:51

21        HE SAYS THESE NINE DOCUMENTS FELL THROUGH THE CRACKS;

22   THAT HE DIDN'T INCLUDE THEM ON THE LOG; BUT YET, HE WANTS TO

23   ASSERT A PRIVILEGE.

24        HOW ARE WE GOING TO RESOLVE THIS?

25        **MR. PERKINS:**  AT THIS POINT, WE HAVE A RULING THAT         04:51

1    SAYS THAT ANYTHING THAT'S NOT ON A PRIVILEGE LOG, THE PRIVILEGE

2    IS WAIVED.

3         **THE COURT:**  PEOPLE MAKE MISTAKES, COUNSEL.  YOU'VE

4    MADE MISTAKES IN YOUR CAREER; YOU'VE PRODUCED DOCUMENTS OR NOT

5    PRODUCED DOCUMENTS THAT YOU SHOULD HAVE; YOU'VE INCLUDED THINGS    04:52

6    ON LOGS THAT YOU SHOULDN'T HAVE.  WE ALL MAKE MISTAKES.

7         **MR. PERKINS:**  IN THIS INSTANCE, THERE WAS A

8    CALCULATED DECISION MADE ON MR. TOBEROFF'S PART.  THERE WAS A

9    SUBPOENA SERVED ON HIS LAW OFFICE FOR THESE DOCUMENTS.

10   MR. TOBEROFF CHOSE, INSTEAD OF PRODUCING A PRIVILEGE LOG, TO    04:52

11   ASSERT OSTENSIBLY A BLANKET OBJECTION.  SIMILARLY, A DOCUMENT

12   REQUEST WAS SERVED ON HIS CLIENTS.  HE AGAIN SERVED THE SIMILAR

13   BLANKET REQUEST; DID NOT INCLUDE THESE DOCUMENTS ON THE

14   PRIVILEGE LOG.

15        I MEAN, IF THE RULE IS GOING TO BE THAT HE MADE A    04:52

16   MISTAKE, THEY HAVEN'T BEEN WAIVED, THERE'S NOTHING THAT I CAN

17   SAY TO THAT IN RESPONSE, YOUR HONOR.

18        **THE COURT:**  ALL RIGHT.  VERY WELL.

19        **MR. BERGMAN:**  COULD I SPEAK NOW?

20        DURING A HEARING IN FRONT OF JUDGE ZAREFSKY WHERE WE    04:53

21   MOVED TO COMPEL THE PRODUCTION OF THESE DOCUMENTS THAT HAD BEEN

22   SUBPOENAED, MR. TOBEROFF MADE THE UNEQUIVOCAL REPRESENTATION TO

23   MAGISTRATE JUDGE ZAREFSKY THAT HE HAD EITHER PRODUCED EVERY ONE

24   OF THESE DOCUMENTS OR HAD LISTED EVERY ONE OF THESE DOCUMENTS

25   ON A PRIVILEGE LOG.    04:53

1          **THE COURT:**  NOW HE'S SAYING HE MADE A MISTAKE AND HE

2    DIDN'T INCLUDE THESE NINE.

3          **MR. BERGMAN:**  NOW HE'S SAYING THAT THERE WERE

4    DOCUMENTS WHICH WERE NEITHER PRODUCED NOR ON A PRIVILEGE LOG.

5          IT'S BEEN QUITE A TEMPEST BETWEEN US.  IT'S SOMETHING          04:53

6    THAT IS DISTASTEFUL.  BUT WE BELIEVE THAT JUDGE ZAREFSKY'S

7    ORDER WAS MADE VERY PURPOSEFULLY, BECAUSE HE BELIEVED THAT

8    THERE WAS SOME QUESTION ABOUT WHETHER MR. TOBEROFF WAS BEING

9    TRUTHFUL IN MAKING THE REPRESENTATIONS.

10         WE RELIED ON THE REPRESENTATIONS.                              04:54

11         THE ESCROW AGENT WHO'S AN EMINENT MEMBER OF THE BAR,

12   WHEN WE TURNED THE DOCUMENTS OVER TO HIM, WE TOLD HIM TO BATES

13   STAMP EVERY PAGE.  MR. TOBEROFF TOOK THE POSITION THAT HE HAD

14   PRODUCED OR LISTED EVERYTHING, SO WE MERELY SAID, AFTER

15   JUDGE ZAREFSKY ISSUED HIS ORDER, TO THE ESCROW AGENT, 'PLEASE    04:54

16   CHECK EACH BATES STAMPED DOCUMENT AGAINST EACH DOCUMENT THAT

17   HAS BEEN PRODUCED OR EACH DOCUMENT LISTED ON THE PRIVILEGE LOG,

18   TO MAKE SURE THAT REPRESENTATION IS TRUE.'

19         MR. TOBEROFF OBJECTED TO THE ESCROW AGENT; PREVENTED

20   HIM FROM DOING THAT, THE ESCROW AGENT THREW UP HIS HANDS AND       04:55

21   SAID 'I'M NOT GOING TO DO ANYTHING; I'LL WAIT FOR A COURT

22   ORDER.'  SO WE HAVE NOW MOVED IN FRONT OF JUDGE ZAREFSKY; THE

23   PAPERS SHOULD BE AVAILABLE TO YOUR HONOR SOON, AND ALL I CAN

24   ASK IS THAT YOUR HONOR LOOK AT THE PAPERS, PERHAPS EVEN VIEW

25   THE DOCUMENTS IN CAMERA, AND MAKE YOUR OWN DECISION AS TO          04:55

1    WHETHER THEY SHOULD BE PRODUCED OR NOT; THAT WOULD BE

2    SATISFACTORY TO US.

3            **THE COURT:**  THANK YOU, COUNSEL.

4            **MR. TOBEROFF:**  I'M SORRY, YOUR HONOR.  COUNSEL IS

5    MISSTATING OR MISREPRESENTING THE SITUATION.  THIS IS NOT HOW        04:55

6    THIS WENT DOWN.

7            OUT OF 839 DOCUMENTS -- LET ME BACKTRACK.

8            THERE'S A LOGIC TO MAGISTRATE JUDGE ZAREFSKY'S ORDER,

9    AND THAT IS IF IT'S PRIVILEGED, YOU LIST IT ON A PRIVILEGE LOG.

10   IF IT'S NOT, YOU WOULD PRODUCE IT AND JUST SORT IT OUT BY THESE      04:55

11   BATES NUMBERS SINCE YOU'RE SAYING YOU'VE PRODUCED IT ANYWAY.

12           HE'S ASKED ME, HAVE YOU PRODUCED THESE DOCUMENTS OR

13   LISTED THEM ON A PRIVILEGE LOG, AND I OUT OF 839 PAGES OF

14   DOCUMENTS, AT THE TIME, I NEGLECTED, WHEN I SAID 'YES,' TO

15   THINK ABOUT THE DOCUMENTS WHICH FELL THROUGH THE CRACKS; FOUR       04:56

16   OF THEM WHICH ARE FAX COVER SHEETS; SO ESSENTIALLY, FIVE

17   DOCUMENTS OUT OF 839 PAGES OF DOCUMENTS, I DIDN'T THINK OF WHEN

18   I ANSWERED.

19           FIVE OF THE NINE DOCUMENTS ARE DOCUMENTS THAT WERE

20   NOT LISTED ON A PRIVILEGE LOG BECAUSE WE HAVE A STANDING            04:56

21   AGREEMENT WITH DEFENDANTS THAT YOU NEED NOT LIST DOCUMENTS ON A

22   PRIVILEGE LOG AFTER LITIGATION HAS COMMENCED.

23           **THE COURT:**  YOU STILL SHOULD HAVE LISTED THOSE ON THE

24   PRIVILEGE LOG, COUNSEL, REGARDLESS OF THAT AGREEMENT; BUT

25   THAT'S JUST A PRACTICE POINT.                                       04:56

1          **MR. TOBEROFF:**  OKAY.

2          NEITHER SIDE IN THIS LITIGATION HAVE LISTED ANY --

3          **THE COURT:**  GIVEN JUDGE ZAREFSKY'S ORDER IN THIS

4     CASE, AND GIVEN THE SPECIFIC SENSITIVITY OF THESE DOCUMENTS, I

5     THINK YOU MAY HAVE AVOIDED SOME OF THIS PROBLEM IF YOU WOULD          04:57

6     HAVE LISTED THOSE DOCUMENTS.

7          **MR. TOBEROFF:**  NO.  BY THAT TIME THERE WASN'T THE

8     OPPORTUNITY TO LIST DOCUMENTS ON THE LOG.

9          I ASSERTED THAT THEY MAINTAIN THEIR PRIVILEGE, GIVEN

10    JUDGE ZAREFSKY'S ORDERS, BECAUSE OF THE RATIONALE OF THE ORDER.      04:57

11    FOR THEM TO SAY THEY HAVE AN AGREEMENT THAT WE NEED NOT LIST

12    DOCUMENTS ON A PRIVILEGE LOG BUT WE'VE WAIVED THE PRIVILEGES BY

13    THE STANDING ORDER MAKES NO SENSE.

14         **THE COURT:**  I UNDERSTAND YOUR ARGUMENT.

15         **MR. TOBEROFF:**  THAT ACCOUNTS FOR FIVE OF THE NINE           04:57

16    DOCUMENTS OUT OF 830 PAGES OF DOCUMENTS.

17         **THE COURT:**  AND THE OTHER FOUR?

18         **MR. TOBEROFF:**  THE OTHER FOUR CONSIST OF A COVER

19    LETTER WHICH, BECAUSE IT'S A COVER LETTER, IT DESCRIBES THE

20    DOCUMENTS THAT THE PERSON WHO STOLE THESE FILES FROM MY OFFICE       04:57

21    WERE SENDING OVER TO WARNER BROTHERS AND THEREBY, BY DESCRIBING

22    DOCUMENTS WHICH ARE LISTED ON A PRIVILEGE LOG, IT'S DISCLOSING

23    PRIVILEGE INFORMATION AND WORK PRODUCT.  AND THAT FALLS, AGAIN,

24    WITHIN THE RATIONALE OF THE ORDER, BECAUSE HE'S SAYING 'IF IT'S

25    LISTED ON THE PRIVILEGE LOG, YOU NEED NOT PRODUCE IT; SO WHY         04:57

```
 1   WOULD YOU PRODUCE A COVER LETTER THAT'S DISCLOSING INFORMATION

 2   THAT'S LISTED ON A PRIVILEGE LOG SIMPLY BECAUSE IT DIDN'T FALL

 3   SQUARELY WITHIN SOMETHING YOU WOULD LIST ON A PRIVILEGE LOG

 4   SINCE IT WASN'T A LETTER FROM AN ATTORNEY TO A CLIENT.

 5           THE COURT:  ALL RIGHT, COUNSEL.                        04:58

 6           MR. TOBEROFF:  AND THEN THE OTHER DOCUMENT COMPLIES

 7   WITH THE OTHER TWO DOCUMENTS, ARE LETTERS WHICH COMPLY WITH

 8   JUDGE ZAREFSKY'S ORDER, BECAUSE THEY ARE LISTED ON A

 9   THIRD-PARTY PRIVILEGE LOG.  HIS ORDER WASN'T LIMITED TO

10   PLAINTIFF'S PRIVILEGE LOG.  IT WENT TO ANY PRIVILEGE LOG.      04:58

11           IN FACT, IN COMPLYING WITH THE ORDER, THERE ARE MANY

12   DOCUMENTS WHICH ARE LISTED ON THIRD-PARTY PRIVILEGE LOGS, AND

13   BASED ON THAT ASSERTION OF PRIVILEGE, THE ESCROW AGENT WAS NOT

14   GOING TO RELEASE THOSE DOCUMENTS.

15           THESE PARTICULAR TWO DOCUMENTS THEY ARE INTERESTED     04:58

16   IN, SO THEY ARE MAKING NEW ARGUMENTS ABOUT JOINT INTEREST

17   PRIVILEGE THAT THEY NEVER MADE IN THEIR MOTION; THAT'S THE

18   REALITY OF IT.

19           THE COURT:  THANK YOU, COUNSEL.

20           MR. TOBEROFF:  I JUST WANT TO MAKE ONE POINT ABOUT     04:58

21   LAURA SIEGEL.

22           THE LAURA SIEGEL SITUATION, AGAIN, IS SOMETHING THAT

23   CAN BE DEALT WITH IN VERIFIED INTERROGATORIES.  WHEN I ASKED

24   DEFENDANTS 'WHY DON'T YOU SERVE US WITH VERIFIED

25   INTERROGATORIES; ASK ANY QUESTION YOU WANT; WE'D BE MORE THAN  04:59
```

1    HAPPY TO ANSWER THEM,' THEY DIDN'T GIVE ME THE REASON.

2         TO PUT THIS IN CONTEXT, THEY HAVE TRIED, NOW -- I

3    GUESS THEY ARE NOT HAPPY WITH THEIR DEPOSITION OF

4    LAURA SIEGEL -- THEY HAVE TRIED -- THIS IS NOW THE THIRD

5    OCCASION WHERE THEY HAVE TRIED TO REOPEN HER DEPOSITION.  THE                04:59

6    FIRST OCCASION, THEY SAID MY OBJECTIONS STOPPED THEM FROM BEING

7    ABLE TO CONDUCT THE DEPOSITION.  THAT MOTION WAS DENIED BY

8    MAGISTRATE ZAREFSKY; SO IN WHAT THEY ARE QUOTING OF MAGISTRATE

9    ZAREFSKY, SAYING MY OBJECTIONS WEREN'T PROPER, OUT OF THE

10   COURSE OF THE SEVEN-HOUR DEPOSITION, HE SAID 'ALTHOUGH SOME OF              04:59

11   THE OBJECTIONS I MIGHT QUARREL WITH, THOUGH MAY NOT BE

12   IMPROPER, ON THE WHOLE, I DON'T BELIEVE IT IMPEDED YOUR

13   DEPOSITION.'

14        **THE COURT:**  THANK YOU, COUNSEL.

15        I THINK I HAVE BEFORE ME ALL OF THE DISCOVERY                          05:00

16   DISPUTES.

17        **MR. PERKINS:**  I NEED TO MAKE ONE CORRECTION OF

18   SOMETHING THAT I SAID.

19        THE LAST PIECE OF WHAT I OFFERED TO MR. TOBEROFF WAS

20   THAT I, IN FACT, OFFERED TO TAKE MRS. LARSON'S DEPOSITION IN               05:00

21   TWO AND A HALF HOURS, EXCLUSIVE OF ANY COLLOQUY ON THE RECORD.

22   SORT OF LIKE, AS I EXPLAINED TO MR. TOBEROFF, LIKE A SOCCER

23   STOPPAGE TIME.

24        **THE COURT:**  I UNDERSTAND.

25        **MR. PERKINS:**  THANK YOU, YOUR HONOR.                              05:00

1          **THE COURT:**  ALL RIGHT.

2          I'VE ALREADY INDICATED THAT I HAVE TAKEN THE

3   CROSS-MOTIONS IN BOTH THE SUPERMAN AND THE SUPERBOY CASE UNDER

4   SUBMISSION.

5          WITH RESPECT TO DISCOVERY DISPUTES, DISCOVERY IS                    05:00

6   COMPLETELY CLOSED EXCEPT FOR THE FOLLOWING:

7          NUMBER ONE:  WE HAVE THE BRIAN SINGER DEPOSITION

8   WHICH HAS BEEN SCHEDULED.

9          AND COUNSEL, SOMEONE REFRESH MY RECOLLECTION, WHEN IS

10  THAT SCHEDULED FOR, TO TAKE PLACE ON OR BEFORE WHAT DATE?            05:00

11         **MR. TOBEROFF:**  END OF NOVEMBER.

12         **THE COURT:**  VERY WELL.

13         SECOND, THE RESERVE ACCOUNT DOCUMENTS WILL BE

14  PRODUCED THIS WEEK;

15         THIRD:  THE LAURA SIEGEL LARSON DEPOSITION WILL TAKE          05:01

16  PLACE ON OR BEFORE OCTOBER 9, 2007; TWO HOURS MAXIMUM.

17         FOURTH:  THE ULTIMATES WILL BE PRODUCED.

18         FIFTH.  I'LL GIVE YOU AN EXTENSION UNTIL OCTOBER 9,

19  2007, TO CONTINUE WITH THIS AUDIT.  YOU'RE GOING TO HAVE TO

20  WORK IT OUT WITH MR. SILLS;                                         05:01

21         NUMBER SIX:  THE ESCROW DOCUMENTS WILL BE PROVIDED IN

22  CAMERA TO THE COURT SO THE ESCROW ATTORNEY CAN BE RELIEVED OF

23  THIS; ALONG WITH THE DECLARATION OF COUNSEL SITTING FORTH YOUR

24  PRIVILEGES AND A SINGULAR RESPONSE DOCUMENT TO THOSE PRIVILEGES

25  FILED BY THE DEFENSE.                                               05:01

1          AND THEN I WILL ISSUE AN ORDER ON THAT AND THEN WE'RE

2     DONE.

3          ANY QUESTIONS?  NOW IS THE TIME.

4          **MR. TOBEROFF:**  WHAT IS THE DEADLINE FOR THE ESCROW

5     DOCUMENTS?                                                      05:02

6          **THE COURT:**  THE ESCROW DOCUMENTS SHOULD BE PRODUCED

7     THIS WEEK.  I PRESUME IT'S JUST A MATTER OF THE ATTORNEY

8     TURNING THEM OVER TO THE COURT.  HE SHOULD DO THAT FORTHWITH;

9     AND I'LL GET A DECLARATION FROM YOU BY FRIDAY, AND FAX IT OVER

10    TO THE DEFENSE AND GET A RESPONSE FROM YOU BY TUESDAY.          05:02

11         **MR. BERGMAN:**  THANK YOU, YOUR HONOR.

12         **MR. PERKINS:**  THE ONLY OTHER ISSUE, YOUR HONOR,

13    RELATES TO AFTER THE AUDIT IS COMPLETED, A SCHEDULE FOR

14    MR. SILLS TO PROVIDE US WITH HIS REPORT AND FOR US TO BE ABLE

15    TO RESPOND WITH OUR EXPERT REPORT AND THE DEPOSITIONS OF THOSE  05:02

16    FOLKS.

17         **THE COURT:**  YOU SHOULD SCHEDULE THOSE EXPEDITIOUSLY.

18         ANY FURTHER QUESTIONS?

19         **MR. BERGMAN:**  NO, SIR.

20         **THE COURT:**  GOOD AFTERNOON.                            05:02

21         **MR. TOBEROFF:**  THANK YOU, YOUR HONOR.

22         **MR. BERGMAN:**  THANK YOU, YOUR HONOR.

23         **MR. PERKINS:**  THANK YOU, YOUR HONOR.

24    / / /

25    / / /

1                              CERTIFICATE

2

3    I hereby certify that pursuant to section 753, title 28, United
     States code, the foregoing is a true and correct transcript of
4    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
5    conformance with the regulations of the judicial conference of
     the United States.

6

7    /s/ Theresa A. Lanza                    _____
                CSR, RPR                                   Date
8    Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

September 17, 2007                          Siegel v. Warner, et al.