```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4                        - - -

 5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                        - - -

 7  JOANNE SIEGEL, ET AL.,            )
                                      )
 8                    Plaintiffs,  )
                                      )
 9           vs.                      )   No. CV 04-08776-SGL
                                      )
10  TIME WARNER, INC., ET AL.,        )
                                      )
11                    Defendants.  )
    _____)   HEARING
12                                    )
    AND RELATED CASES,                )
13  _____)

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 Riverside, California

17             Tuesday, September 16, 2008

18                     2:15 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24              3470 12th Street, Rm. 134
              Riverside, California  92501
25                  (951) 274-0844
                  WWW.theresalanza.com
```

```
 1    APPEARANCES:

 2

 3    On behalf of Plaintiffs:

 4
                          LAW OFFICES OF MARC TOBEROFF
 5                        BY:  MARC TOBEROFF
                          BY:  NICHOLAS WILLIAMSON
 6                        2049 Century Park East,
                          Suite 2720
 7                        Los Angeles, California  90067
                          310-246-3100
 8

 9
      on behalf of Defendants:
10

11                        WEISSMANN WOLFF BERGMAN COLEMAN
                           GRODIN & EVALL LLP
12                        BY:  MICHAEL BERGMAN
                          9665 Wilshire Boulevard,
13                        Ninth Floor
                          Beverly Hills, California  90212
14                        310-858-7888

15

16    On behalf of Defendants:

17
                          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
18                        BY:  ROGER L. ZISSU
                          866 United Nations Plaza
19                        At First Avenue & 48th Street
                          New York, New York  10017
20                        212-813-5900

21

22    On Behalf of DC Comics:

23                        PERKINS LAW OFFICE, P.C.
                          BY:  Patrick Perkins
24                        1711 Rt. 90
                          Cold Spring, New York  10516
25                        845-265-2820
```

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

```
 1                          I N D E X

 2                                              Page

 3    HEARING........................................    4

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, September 16, 2008                 Siegel V. Warner, Et Al.

```
 1     Riverside, California; Tuesday, September 16, 2008; 2:15 P.M.
 2                            -oOo-
 3          THE CLERK:  Calling calendar item one, Joanne Siegel,
 4    et cetera, Plaintiff, versus Warner Brothers Entertainment,
 5    defendant, ED CV 04-8400.                                      02:15
 6          May we have counsel please come forward and state
 7    your appearances for the record.
 8          MR. TOBEROFF:  Marc Toberoff, attorney for
 9    plaintiffs.
10          MR. BERGMAN:  Michael Bergman, attorney for            02:15
11    defendants.
12          MR. WILLIAMSON:  Nicholas Williamson for plaintiffs.
13          MR. ZISSU:  Roger Zissu for the defendants.
14          MR. PERKINS:  Patrick Perkins for the defendants.
15          THE COURT:  Good afternoon, Counsel.                   02:16
16          I really appreciate you coming back today.  I
17    apologize for having to postpone yesterday's scheduled hearing,
18    but this way The Court is able to devote its attention fully to
19    this matter.
20          The Court has before it a number of additional issues  02:16
21    that essentially were left over after The Court had previously
22    ruled on the motions for summary judgment.
23          I am treating the parties' briefs on these issues, at
24    least the substantive issues, as essentially motions for
25    summary judgment, or partial summary adjudication as the case  02:16
```

1    may be.  I'd like to begin with the "work for hire" arguments

2    and hear from counsel on that.  I had given some indication

3    yesterday off the record as to one area The Court was concerned

4    in, but in fact there are several areas.

5            The Court has divided the works in question basically    02:17

6    into four different areas, and I'll try to put this together.

7    I have the pre-1938 Superman material; I have the post-1938

8    Superman material in general.  I then have the post March 1938

9    Superman comic book material, up to the September 1938

10   employment agreement.  And then of course we have what I    02:17

11   referred to yesterday, the Superman newspaper strips published

12   from 1939 through 1943, by McClure.  And of course for some of

13   these cases it's a lot easier than others to address the issue

14   of the work for hire points.  The one I'm struggling with the

15   most, as I indicated to you yesterday, is that fourth category,    02:18

16   what to do with the newspaper, because it's not at all clear to

17   me that we even have everyone before The Court that I need to

18   have before The Court.  I really don't know what to do with

19   McClure's interest, if any, in all of this.

20           But I'd like to hear from the parties on all these    02:18

21   points, so let's begin our focus on the "work for hire"

22   arguments.  Whoever wishes to proceed first may do so.

23           **MR. ZISSU:**  Your Honor, I guess since this is in the

24   nature of a summary judgment motion, as your Honor stated,

25   defendants will go first on this one.    02:18

```
 1              THE COURT:  Sure.

 2              MR. ZISSU:  Basically, to start with one point I

 3      think hopefully we can eliminate.  I think there are answers in

 4      the record and in the law with respect to McClure.  McClure has

 5      no rights in any of the material at issue.  That's the bottom      02:19

 6      line.  First of all, one background aspect of this is the

 7      doctrine of indivisibility of copyright.

 8              THE COURT:  Under the 1909 Act.

 9              MR. ZISSU:  Yes.

10              This doctrine is referred to in the House Report for      02:19

11      the 76 Act at pages 115 and 116 as troublesome and as an area

12      of confusion and danger for authors.  The cases your Honor

13      asked us about address and outline what the dangers were, and

14      we cited a case in our supplemental brief, a section of the

15      Playboy decision at the District Court level before the first      02:19

16      appeal in that case, where Judge Tenney went through the same

17      indivisibility doctrine background.  We cited that because it

18      was written in 1993 and it sort of maybe had a look backward

19      about how things had evolved.

20              But the problem was this:  To be a copyright -- in      02:20

21      order to own -- the doctrine did not permit divisibility of

22      copyright; you couldn't divide up and own parts of the

23      copyright, the way you can today.  The matter's been taken care

24      of under the new statute.

25              Under section nine of the 1909 Act, the copyright      02:20
```

1    proprietor, somebody claiming copyright, had to own all of the

2    rights in the copyright, and there was another requirement that

3    the notice had to be in the name of the copyright proprietor.

4    If the would-be copyright proprietor did not own all of the

5    rights and the notice appeared in that entity's name, then the          02:21

6    notice was improper and there was a forfeiture of copyright and

7    the work went into the public domain.

8         The problem was that when you went into the

9    periodical field, which includes magazines but it also includes

10   newspapers, the practice was for the magazine to put the               02:21

11   copyright notice in its own name.

12        **THE COURT:**  Establish a trust essentially, though.

13        **MR. ZISSU:**  They developed different ways to protect

14   authors to deal with the problem, and one of them was a trust.

15   Another one was the idea that it was deemed that all rights had         02:21

16   been transferred to the magazine proprietor, whether or not

17   they actually had, at least for the purpose of not letting the

18   work go into the public domain.

19        But going back to the -- so in the magazine field --

20   and Nimmer notes this in his treatise -- it was usually the            02:22

21   case that the magazine always used what they called a banner or

22   copyright notice, and they did not want to and it was not their

23   practice to put in separate notices for different contributors.

24        In the newspaper field, at least in the syndication

25   field, it was the syndicator McClure who would have a copyright        02:22

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

```
 1    notice, so it was parallel to what the magazines did.  And when

 2    this happened, if it turned out that either the magazine

 3    proprietor or the syndicator didn't own all of the copyrights

 4    with the copyright notice in their own name, the work went into

 5    the public domain due to an improper notice.  It was highly                    02:22

 6    technical and full of pitfalls which have now been corrected in

 7    the 1976 Act.  That was the problem for Detective Comics when

 8    wishing to license, as we'll see in a second because we'll look

 9    at the agreement, very limited rights to McClure.

10            So when they set up this transaction in these two                      02:23

11    agreements -- one was an agreement between the so-called

12    employment agreement and the other was a McClure agreement --

13    in order to deal with that problem -- and Detective was in the

14    magazine business so they were very mindful of the problem.  So

15    what they did in the McClure agreement, they said "We're not                   02:23

16    going to leave things to chance and have to depend on trust

17    arguments or the idea that all rights were deemed to be

18    transferred."  On the second page, the fourth paragraph down,

19    states:  "The material contained in the feature which we

20    syndicate will be copyrighted in our name, meaning McClure, but               02:23

21    copyright reverts to Detective at the termination of the

22    contract.  The title Superman shall always remain the property

23    of Detective and a feature may be used by Detective for any

24    other purpose except daily or weekly newspaper publication."

25            Our agreement covers newspaper rights only; radio,                     02:24
```

1    motion picture, silent and talkie book and all other rights are

2    retained and owned by Detective.

3            THE COURT:  But that same agreement, though, provided

4    the right to supervise and edit everything going on there was

5    held by McClure and that the legal ownership of the copyright          02:24

6    was held by McClure during that period of time.

7            MR. ZISSU:  It did, and that was -- first of all,

8    this prevented the problem of forfeiture.  The rights

9    in-between the parties is another question, and I think I can

10   deal with that as well.                                               02:25

11           THE COURT:  I'll look forward to --

12           MR. ZISSU:  There was a right of reasonable

13   supervision by McClure.  But this agreement was not a

14   stand-alone agreement; it was part of a total transaction.

15   There were two agreements signed in the same day; they were          02:25

16   developed together, and when you read those agreements, you'll

17   see there was a role, of course, also, for Detective to have

18   control and the right of acceptance, modification, rejection.

19   And it turns out through the correspondence, that right was not

20   only insisted upon, it was exercised.  In Exhibit B to our           02:25

21   supplemental submission, there is this correspondence.

22           THE COURT:  So you take the position that Detective

23   had control --

24           MR. ZISSU:  Yes.

25           THE COURT: -- of what was being published in the             02:25

```
 1   newspaper --

 2            MR. ZISSU:  In the first instance, if they did not

 3   like what was being said to McClure and they didn't like what

 4   they saw, they could discharge Siegel and Shuster, yes.

 5            And this is a classic form of very limited rights,      02:26

 6   but you couldn't set it up this way unless you transferred the

 7   copyright.  But the copyright reverts.  It was for a limited

 8   time, during which the contract endured, and it was a very

 9   limited right.  That's the way it was dealt with.

10            They could have relied on the courts, those that        02:26

11   would do that, to enforce and say that what McClure did was

12   held in trust for the contributors, for Detective, and had to

13   be reassigned.  Another way they could have done it would be

14   for a Court to say, "Look, we're going to deem everything to

15   have been transferred to McClure for the purposes of its being  02:26

16   a copyright proprietor."

17            THE COURT:  What language would you refer The Court

18   to that suggests Detective retained the right to supervise and

19   edit the work that was being done on the newspaper strips?

20            MR. ZISSU:  First of all, you cannot dissect the        02:27

21   overall relationship where these agreements and you can't

22   separate them from the other.

23            If you read the agreement with --

24            THE COURT:  In other words, there is no such

25   language.                                                        02:27
```

| | |
|---|---|
| 1 | **MR. ZISSU:**  No, there is such language.  It says in |
| 2 | the agreement between Siegel and Shuster, the employment |
| 3 | agreement, that agreement is the basis for entering into the |
| 4 | McClure agreement.  I can get you the exact words.  It says it, |
| 5 | literally. |
| 6 | **THE COURT:**  The employment agreement between |
| 7 | Detective Comics? |
| 8 | **MR. ZISSU:**  Yes.  It says they would not enter into |
| 9 | the second agreement until the first was signed as part of the |
| 10 | same thing. |
| 11 | **THE COURT:**  I understand that part.  But in terms of |
| 12 | actually editing and supervising the strips that were -- |
| 13 | **MR. ZISSU:**  I'll tell you another way. |
| 14 | The employment agreement says that all features are |
| 15 | subject to the right of control of Detective. |
| 16 | **THE COURT:**  As referring to the newspaper? |
| 17 | **MR. ZISSU:**  It is, because the word "feature" is the |
| 18 | same word "feature" used on the same day in the McClure |
| 19 | agreement.  In fact, in the McClure agreement, over and over |
| 20 | again, the word "feature" is used to cover newspaper strips. |
| 21 | "Feature" meant whatever, whether it was comic books or |
| 22 | newspapers.  And you can't read "feature" to exclude |
| 23 | newspapers. |
| 24 | Another reason why it includes newspaper strips in |
| 25 | the employment agreement, the scope of the employment agreement |

02:27
02:27
02:27
02:28
02:28

1    included newspaper rights.

2            For example, there's a provision that says Siegel and

3    Shuster cannot be -- I guess it's the -- the fourth

4    paragraph -- no.  The seventh.

5            "You agree, Siegel and Shuster, that you will not          02:29

6    hereafter at any place in the United States or in any foreign

7    country furnish to any other person, firm, corporation,

8    newspaper or magazine, any art or continuity for any comics to

9    be used in any strip or comic or newspaper or magazine

10   containing the above titles or the characters or continuity     02:29

11   thereof, or in any ones similar thereto, but you should furnish

12   such matter exclusively to us for the duration of this

13   agreement as such matter may be required by us or as designated

14   by us in writing."

15           If you start reading these agreements together, the      02:29

16   word "feature," the scope of the employment agreement --

17           **THE COURT:**  That certainly would have stopped them

18   from going to another newspaper or somebody else.  I understand

19   that.  At the same time that they are entering into that

20   agreement, they are entering into the syndication agreement     02:30

21   with the newspaper, and another feature of that is this royalty

22   dimension, this does not have the normal hallmark of a work for

23   hire in the sense that their work is going to be -- it's

24   predicated on royalties, not on a sum certain.

25           **MR. ZISSU:**  Let me separate out two things.          02:30

Tuesday, September 16, 2008                     Siegel V. Warner, Et Al.

1              When we get back to the point of the issue between

2      Detective and Siegel and Shuster as to work for hire, once we

3      eliminate McClure -- and we'll get to that -- but royalties,

4      sometimes indicate non work for hire, putting aside who's the

5      hiring party.                                                          02:30

6              **THE COURT:**  I may be getting the cart before the

7      horse.

8              **MR. ZISSU:**  There's law that says but the absence of

9      a fixed salary is never, never, conclusive.  That is stated in

10     Playboy.  The proposition is stated originally on the basis of        02:31

11     Picture Music, these cases.  That's first of all.

12             Second of all, this whole arrangement was not just a

13     newspaper syndication deal.  It was a combination of things

14     involved.  After March 1, 1938, everything centered around

15     Detective.  McClure was just the really agent or the                   02:31

16     syndication arm of that arrangement.

17             I want to come back to, your Honor, one point, the

18     last paragraph of the employment agreement, it says "Your

19     signature to this agreement is one of the inducements for us to

20     execute the above-mentioned McClure contract.  And we agree to        02:31

21     use our best efforts to determine the publishing of magazines

22     containing the above-mentioned features."

23             "Features" there is not meaning the comic book

24     features, it means the newspaper features, because they are

25     already publishing the comic book.                                     02:32

```
 1            THE COURT:  Wait a second.
 2            When that employment agreement is talking about
 3   features, there is clear language where it refers to the
 4   approximate features in the comic books as opposed to the
 5   strips in the newspaper --                                   02:32
 6            MR. ZISSU:  Right.
 7            THE COURT:  -- and there's clear language which
 8   indicated that Detective Comics maintained right to edit and
 9   supervise the features in the comic books.  Not so much so when
10   it came to the newspaper strips.                             02:32
11            MR. ZISSU:  Correct.  It's not perfect.
12            THE COURT:  Okay.
13            MR. ZISSU:  But the paragraph I just read you, the
14   word "features" means the comic book, the comic strip daily
15   newspaper features.                                          02:32
16            They talk about -- this is one of the inducements to
17   enter into the McClure agreement and then the Detective also
18   says we'll use our best efforts to publish the aforementioned
19   features.  They are not talking about the comic book features
20   any more.
21            THE COURT:  I'm going to have to --
22            MR. ZISSU:  So you'll see these things run together.
23   That's what it is.  And they run together because this whole
24   thing is one business.  After March 1, '38, a major decision
25   was made that a new comic book magazine would be launched, a   02:33
```

1    new business would go forward, to develop and market the

2    characters Superman.  All rights were in Detective.  The way

3    this thing was set up accomplishes that.  You'll find features

4    is broader than as limited that way.

5              **THE COURT:**  Let me ask you this, counsel --                    02:33

6         **MR. ZISSU:**  In 1939, they modify the employment

7    agreement.  Ten times in that agreement the word "features" is

8    used, and it clearly, again, means newspaper; that's the

9    December 4, 1939 agreement.  It includes newspaper strips as

10   well as features.  They run together.                                02:34

11             **THE COURT:**  Let me ask you this.

12        Admittedly, it's not perfect.  I think that may be an

13   understatement.  Is there any other evidence -- and I'll be

14   asking plaintiffs' counsel the same thing -- is there any other

15   evidence out there besides the agreement, correspondence,           02:34

16   anything that would shed light on what they were talking about?

17        One of the -- I don't want to say it's frustrating,

18   but one of the things The Court has observed is there's been an

19   unfolding of evidence as this case has matured.  I certainly

20   have evidence before me now that I did not have before me           02:34

21   earlier on.  I just want make sure I don't have a moving target

22   here, at least on this point.

23        Is there any other evidence of correspondence,

24   documentation, that might shed light on this that's part of the

25   record that's been attached to these motions?                       02:35

1          **MR. ZISSU:**  Yes.

2          On the question of -- this is more on the

3     work-made-for-hire point, but in 1947 in the so-called 1948

4     Action, Siegel and Shuster filed a complaint which started that

5     action.                                                          02:35

6          **THE COURT:**  Right.

7          **MR. ZISSU:**  And in their own complaint, there are a

8     series of paragraphs that make very clear that the McClure

9     newspaper agreement was part of this overall thing, and this

10    was one transaction.  I can read to you -- these have been      02:35

11    exchanged in discovery.  They probably are earlier in summary

12    judgment motions, this complaint, but I don't think there's a

13    dispute about the document.

14         At Paragraph 100, it states that "on or about

15    September 22, 1938, the plaintiffs entered into an agreement in  02:36

16    writing with Detective Comics and the Defendant the McClure

17    Newspaper Syndicate as is herein above set forth which

18    agreement is hereto...." and so forth.  If you go down -- and

19    characterizing, part of the Siegel and Shuster claim is that as

20    an inducement for them to enter into the McClure agreement,      02:36

21    they were misled, fraudulently misled, by Detective Comics and

22    its two principals, Donenfeld and Liebowitz, telling them --

23    and this is paragraph 102 -- that said Detective Comics Inc.

24    had the sole and exclusive right to publish cartoon material

25    with regard to Superman.  That's broader than comic books.      02:36

1      **THE COURT:**  When they say misled, are they referring

2   to the April 8th letter?  What's that in reference to?

3      **MR. ZISSU:**  They are referring to conversations and

4   correspondence, including, in particular, a September 28, 1938

5   letter, which is in Exhibit B to our supplemental submissions,      02:37

6   where I think it's either Liebowitz or Donenfeld; Liebowitz

7   probably said "you don't own anything; you can be discharged at

8   any time," and so forth.  We quote this in our supplemental

9   submission in our brief.

10      It goes on to say that the plaintiffs relied upon          02:37

11  said statements and representations and believed them to be

12  true and as a result thereof were induced and did enter into

13  the aforesaid agreement of September 22, '38 -- and that's

14  referring to the McClure agreement -- and did enter diverse

15  modifications thereon, and so forth.                          02:37

16      That's one piece of additional evidence.

17      There is a finding of fact Number 38 by the

18  referee -- 37 and 38 -- 37 refers to the September 28, 1938

19  letter.  That's the letter that says "if you don't accept this,

20  you're going to be the loser."  It refers to that letter in   02:38

21  paragraph 37.  In paragraph 38, this is the findings of facts,

22  in September '38, Detective Comics, Inc., represented to

23  plaintiffs that it owned all rights to Superman.  Said

24  representations were believed by Detective Comics to be true

25  and was in fact true.                                         02:38

1          So these things cannot be dissected that way.  They

2    do run together.  But if I could return to the history and see

3    where McClure gets out of the picture here.  And then if it's

4    all right with your Honor, I'll come back to work made for

5    hire, because there are other points.                                02:39

6          **THE COURT:**  All right.

7          **MR. ZISSU:**  Basically, McClure's rights were very

8    limited and whatever rights they had would revert to Detective.

9    And if you look at the 1938 agreement, there was no grant, of

10   course, to McClure therein, the McClure agreement, of any right    02:39

11   to the renewal copyright.

12          Under the law and the 1909 Act, you did not transfer

13   a renewal copyright unless it was clear from the instrument or

14   the conduct of the parties that you intended to transfer the

15   renewal copyright.                                                  02:39

16          And on the contrary here, there was this limited

17   newspaper right; that was the only thing granted, and it wasn't

18   denominated as going to the renewal terms.

19          **THE COURT:**  So what was it, then?  Was it a license?

20          **MR. ZISSU:**  It was a license.  It was a very limited     02:39

21   license.  But in order to do that, you had to go through this

22   -- twist yourself into a pretzel and make sure you did not lose

23   the copyright.  This was a major problem which was changed by

24   the 1976 Act.

25          So McClure didn't have an unlimited license.  Their         02:40

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

```
 1   license did not go into the renewal term.  And then we find out

 2   some more evidence which everybody has known about, is, we

 3   attached, as Exhibit R to our supplemental submissions, copies

 4   of the renewal copyright registrations for the newspaper

 5   strips.  I think we attached the first week's, the first two          02:40

 6   weeks, or whatever.  These are documents that have been

 7   available to the parties throughout the case.  We can hand up

 8   to everybody a set of the copyright registration and the

 9   renewal registration, which says that the renewal is made by

10   National Periodicals Publications which succeeded to the rights      02:41

11   of Detective as proprietor of copyright in a work made for

12   hire.  That was done in every case.

13          THE COURT:  What you attached to The Court's

14   documents, if I recall, was just a couple of examples.

15          Are you saying that you've now discovered that they          02:41

16   all --

17          MR. ZISSU:  The first two weeks -- we have them all.

18          THE COURT:  And they are all the same.

19          MR. ZISSU:  Yes.  They were the first publication in

20   the Milwaukee Journal of the McClure strip.                          02:41

21          Now, just to digress to cover one other point.

22          We're not claim that these are prima facie evidence,

23   the renewal certificates, the facts stated therein.  Your Honor

24   noted last time that that's not right.  We screwed up on that

25   one in an earlier point in the case.  So the renewal copyright       02:41
```

```
 1   registration is not prima facie evidence, but it is evidence

 2   and it's admissible.

 3         If you go to the Twentieth Century Fox case, they

 4   talk about the renewal registrations for the Eisenhower book

 5   crusade in Europe.  It's work for hire evidence.  It indicates     02:42

 6   the relationships between the parties and conduct and course of

 7   conduct of a lesser -- of course, there's other evidence, but

 8   it's pretty good evidence; so we have that here.

 9         So McClure is out of the picture certainly by the

10   time the renewal copyright registrations are filed, and this      02:42

11   battle is between Siegel and Shuster and Detective as to work

12   for hire, which I'll turn to in a second.

13         THE COURT:  What is the status of McClure at this

14   point?  Does anybody --

15         MR. ZISSU:  We did some searching today on the Web.          02:42

16   It seems that at some point, McClure merged into a company

17   called McClure Bell.  McClure Bell ended up being owned by

18   United Features Syndicated.  And today, that's in the Scripps

19   Howard Family, and that's where they are today.

20         Interestingly enough, the notice of termination in          02:43

21   this case served by the plaintiffs did not serve McClure,

22   McClure Bell, Scripps Howard, United Features Syndicated; so if

23   McClure is in the picture, which they really are not, they were

24   not served.

25         Those notices of termination, by the way, do not list       02:43
```

1  among the works affected the first two weeks of these strips

2  published in January 1939.

3         THE COURT:  The Court certainly understands why both

4  parties in this litigation would probably be best served by

5  McClure not having any role in this.                          02:43

6         MR. ZISSU:  They have not published the strip for

7  decades, so I don't think they are involved in this.

8         I think that's where we end up on McClure.

9         There's another point.  With these renewal

10  registrations in the name of National Periodical Publications,  02:44

11  there's a point at which a statute of limitations would run on

12  any claim by McClure.  Under the Ninth Circuit decision in

13  Zuill, which we talked about before, at some point you have to

14  come forward and assert on ownership claims.  After three

15  years, you don't have those; so that's just another thing that  02:45

16  would bear on McClure.

17         In talking now further about -- coming back to work

18  made for hire, there is a lot of evidence here in the findings

19  of fact -- we have sometimes in the past looked at different

20  findings when they became relevant at different points in the  02:45

21  case.

22         I think defendants satisfied the burden of coming

23  forward on work made for hire in terms of the instance expense

24  and right of control.

25         THE COURT:  What are you referring to now, Counsel,    02:45

1    because The Court has --

2         **MR. ZISSU:**  In our initial papers on this motion, we

3    addressed the 1909 Act test of instance and control and

4    expense.

5         **THE COURT:**  I'm asking you, what are you referring          02:46

6    to?  The Court has grouped the --

7         **MR. ZISSU:**  I'm sorry.

8         I guess that's a lead in to your four points.

9         We thought we satisfied everything, and then we got

10   responses on that, and one way around what we thought is our       02:46

11   initial showing would be there was an agreement to the

12   contrary.  None has been proffered, but we did get the

13   categories of arguments your Honor referred to.

14        We can talk first about the pre-1938 material.  It

15   was material that was created before March 1, 1938.  And then      02:46

16   the question there is taking that material -- first of all, if

17   it was never published, it's not subject to termination as

18   something that was copyrighted before January 1, 1978; so the

19   question is, was it published?

20        We've gotten arguments on that in a couple of areas.          02:47

21        On Action Comics number two, and the plaintiffs say

22   three and five, I think they mean four, because three is not

23   the one that had the football game; it's four.  But anyway,

24   they point to three early Action Comics that they say publish

25   preexisting material.                                              02:47

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

1          In looking through that material, the preexisting

2    material is a preview of ideas that might be treated in

3    subsequent comic books.  If anybody had access to that, anybody

4    could use the ideas therein.  It's true that if somebody sent

5    to the copyright office that preview business, which is one                    02:48

6    paragraph, they could register that text.  But they couldn't

7    prevent anybody from using the ideas therein, such as the idea

8    of Superman's involved battling on the right side for a war.

9    He takes on a plane.

10          **THE COURT:**  Counsel, I'm going to let opposing                       02:48

11    counsel address this, because I tend to agree with you, at

12    least on this point concerning the pre-1938 material.

13          Why don't you address the post-1938 material.

14          **MR. ZISSU:**  Okay.  There are two categories of comic

15    books.  Basically we say the world changed on March 1, 1938,                  02:48

16    not September 22, 1938.  There was a course of conduct and a

17    pattern of relationship between the parties that evolved right

18    from the Action Comics number two going forward.

19          Basically, we've cited the Playboy case on remand

20    where Judge Kaplan had to apply the Second Circuit decision.                  02:49

21    Where the subject matter of the works is determined by the

22    needs of the publisher and where the parties understand there's

23    going to be a regular feature, that's an indication of who the

24    motivating party is; namely, the publisher.

25          In addition, Twentieth Century tells us that instance                   02:49

```
 1    is shaped, in part, by the right of control.  And here the
 2    right of control was established by -- in a lot of ways, it's
 3    evidenced in the correspondence, but it is also established by
 4    the need for consent, because Siegel and Shuster after March 1,
 5    '38 could not draw one line or write one word about Superman          02:50
 6    without permission.
 7              THE COURT:  It's clearly established as of September.
 8    The March to September --
 9              MR. ZISSU:  I know.  But the question is, where in
10    the record -- there's a pattern of regular payments, features        02:50
11    regularly appearing.  There's correspondence indicating who was
12    driving that -- there's no indication that the September 22,
13    1938 employment agreement came out of the blue and that all of
14    a sudden it was reversed; that before then it was not work for
15    hire, and now was.  That agreement contains indicia indicating       02:51
16    that the parties related to work for hire.  There's talk about
17    continue.  We have a finding of fact, which I think is
18    number 45, where the referee finds that the employment
19    agreement, quote, "expressly confirmed" -- we didn't add -- we
20    argued that it confirmed, but we didn't do that on the basis of      02:51
21    just say so.  That's a finding of fact by the referee that it
22    confirmed the relationship.
23              If we look at that finding by said agreement, meaning
24    the employment agreement, plaintiffs expressly confirmed that
25    Detective Inc. was the exclusive owner of the comic strip known      02:52
```

1    as Superman and of the right to publish said comic strip and

2    the characters contained therein and the continuity thereof and

3    further provided that plaintiffs would not go elsewhere.

4            We have that.  We also --

5            The right of control brought about by the need for                02:52

6    consent to make a derivative work has not been debunked as

7    plaintiffs claim by your Honor.  In fact, your Honor's prior

8    decision, at least insofar as the right of control, recognized

9    that was a very important factor.

10           The Second Circuit so held in Picture Music.  The           02:53

11   Second Circuit so held in the estate of Hogarth.  There is no

12   case that dismisses that factor in general on instance or on

13   right of control.  It's there.  And there's no dichotomy

14   between the circuits.  The one thing that has become clear to

15   me is -- I have read all of the cases being in the Ninth             02:53

16   Circuit now, these two circuits, they interweave their

17   decisions.  Twentieth Century makes that clear.  They all say

18   that; so I think that establishes instance on these.

19           Expense.  There is payment at a fixed rate in the

20   Playboy case, the payment of any fixed sum is deemed                 02:53

21   sufficient, even if it's $250.  And the argument in the Playboy

22   case as that payment was so small that there was an argument

23   made by Ms. Dumas -- and I made that argument -- how can you

24   say the publisher underwent the expense when they paid so

25   little?  And then we learned that the District Court erred on        02:54

```
 1   that point; and so really a small amount was sufficient.

 2          Now, here we also have another factor, another way to

 3   establish expense, is that the publisher undertook the expense

 4   of the project.  It's not true that the publisher has to pay

 5   every nickel and dime that's related to the project.  But here     02:54

 6   there can't be any doubt that the expense of launching a new

 7   magazine, developing a new character, going out and negotiating

 8   to exploit that character, including newspaper syndication,

 9   paying salaries, paying for office space, the success or the

10   failure would turn on the risk taken by the publisher; so I        02:55

11   don't think there could be any serious doubt about.

12          THE COURT:  Let's focus on the work for hire nature

13   of the newspaper strips from 1939 to '43.

14          MR. ZISSU:  Okay.

15          The effort to deal with those is essentially based on       02:55

16   an effort to dissect out of this relationship the newspaper

17   strip, to say that somehow they were exempted.  I don't think,

18   based on the agreements we've gone through, based on the way

19   the parties are related, I don't think they can be exempted

20   from this overall relationship.                                    02:55

21          THE COURT:  It's a different relationship though, is

22   it not?

23          MR. ZISSU:  Well, there are different ways in which

24   the publisher can exploit the work.  It's different because

25   it's newspaper syndication.                                        02:55
```

1     **THE COURT:**  What risks was Detective Comics taking

2  during this period?  This was all in the McClure syndicate.

3     **MR. ZISSU:**  If you dissect each little thing out of

4  this relationship -- the relationship with Detective Comics was

5  they were a publisher, they were in the business of developing  02:56

6  a whole new line of business -- if you take out newspaper strip

7  and you look at it separately, it's artificial.  There was a

8  pattern here.

9     If you look at these two agreements, everything

10  centers on Detective.  It was Detective who had received the  02:56

11  payment from McClure and then make whatever deal they had to

12  make.  And royalties isn't determinate -- the case of <u>Donaldson</u>

13  <u>Versus Breckman</u>, which is cited by plaintiffs -- saying, if you

14  follow the money, that will tell you whether it's work made for

15  hire.  That's not an independent contractor case.  It was a 19,  02:56

16  I think, 67 case in the Second Circuit, and the issue there was

17  whether Donaldson, who set up his own firm with somebody else

18  to exploit his music -- the question there is whether he was an

19  employee in the traditional sense.  There's no analysis of

20  instance, expense and right of control; so it is a case about  02:57

21  money, but it's about money in the context of a traditional

22  employment.

23     I think I've covered the royalties in earlier

24  discussions with your Honor.  But basically there's just no

25  evidence -- and the letters and the correspondence really show  02:57

1    when looked at in totality that Siegel and Shuster could be

2    discharged at any point; that there was right of control; that

3    they were told that; and the referre found that they were

4    truthfully told that.  And even in response to the

5    September 28, 1938 letter, Mr. Siegel said he's completely          02:57

6    satisfied by that.

7            So the presumption in any event that is established

8    initially, in going forward as we have, is considered

9    irrebuttable, virtually irrebuttable.  Virtually is what the

10   cases say.                                                          02:58

11           I think there are some red herrings here that I

12   wanted to address on this too, and it covers all of these.  The

13   joint venture idea.  If you look at these two, it's not a joint

14   venture.  A joint venture requires to be treated as partners as

15   to the whole venture.  There's no agreement to share profits       02:58

16   with Siegel and Shuster.

17           By the way, they say it's a tri-party joint venture.

18   There's certainly no agreement that McClure participated in the

19   profits and losses of Detective coming out of this tri-party

20   arrangement.  A joint venture also means people act as             02:58

21   partners; that means each party is responsible for the

22   liabilities of the other partner.  We all know -- that's why

23   everybody says, in almost any agreement you ever see any more,

24   "this shall not be considered a partnership of joint venture."

25   But there's just no satisfaction of joint venture.                 02:59

1            Now, on the copyright registrations, it's true that

2       McClure did register them for the initial term, and then the

3       question is, well, that gives prima facie evidentiary effect to

4       the facts stated in those registrations, including that the

5       authors were Siegel and Shuster.                                02:59

6            But that prima facie effect has only been held to

7       only order the burden of going forward and the burdens of

8       proof.  And where those are overcome, then that's overcome.

9       And in this case, in line with other cases where there have

10      been registrations issues in Hogarth, where it's shown after   03:00

11      the instance expense and right of control, inquiries made where

12      that's satisfied, that overcomes registrations.

13           And also, it's not clear that McClure was speaking

14      advisedly as to a legal conclusion that Siegel and Shuster were

15      the authors, meaning that it was not a work for hire.  First of  03:00

16      all, that's a statement made by McClure.  If it had been made

17      by Detective, it would be more significant.  But it might have

18      been used just colloquially.  After all, Siegel and Shuster

19      were the people who were doing the drawings; and that was the

20      situation in the Hogarth case.                                  03:00

21           I talked about royalties.

22        **THE COURT:**  Counsel, I'm going to lead you to another

23      area altogether, and I'll certainly give plaintiffs' counsel an

24      opportunity to address all of these areas.

25        **MR. ZISSU:**  I think I covered the newspaper strips        03:01

1    and the comic books after September.

2              **THE COURT:**  You did.

3              Assume for the sake of this discussion that The Court

4    is going to find that both the issue with respect to request

5    appears to corporate veil and the issue with respect to the                    03:01

6    accounting of profits are equitable.  The Court will be issuing

7    an opinion explaining its rationale, but The Court has received

8    sufficient briefing on both those points.  And of course, the

9    parties have already agreed that the unfair competition claim

10   is equitable.  The Court would then proceed with the Lanham Act           03:01

11   and the copyright claim for waste by the co-owners; that would

12   be what would be subject to a jury trial, as the parties have

13   agreed.  Since it makes sense, of course, for the jury issues

14   to precede the equitable issues, and the remaining concerns

15   about the method of the accounting are all wrapped up in the                03:02

16   equitable claims, The Court would be inclined probably to defer

17   ruling on that until we've had this jury trial.  There was some

18   indication yesterday and some concern about proceeding with the

19   jury trial, so I'd like counsel to --

20             **MR. ZISSU:**  My colleague.                                            03:02

21             **MR. BERGMAN:**  I misspoke a bit yesterday, because I

22   didn't quite understand what your Honor was indicating

23   tentatively.

24             If we are going to be dealing with a jury trial with

25   strictly the question of waste and the Lanham Act, then I don't        03:02

```
 1  think any of these additional issues really bear upon it.  I

 2  don't think it's necessary for us to get into any

 3  determinations to the additional issues before we try that

 4  case.

 5          THE COURT:  That's The Court's sense as well.          03:02

 6          MR. BERGMAN:  And if that were the universe, we would

 7  indeed be prepared to proceed on November 4th.

 8          THE COURT:  Okay.  Very well.  Thank you, Counsel.

 9          Let hear from the plaintiffs, in any order you

10  prefer, but I want to hear on the work for hire issues and then  03:03

11  on the trial issues.

12          MR. TOBEROFF:  I'll start with the McClure newspaper

13  strips and then work back.

14          THE COURT:  Very well.

15          MR. TOBEROFF:  Just looking at this from a real world  03:03

16  perspective, McClure was the publisher and distributor of the

17  strips.  Siegel and Shuster produced the strips, the continuity

18  illustrations, handed them over to McClure.  There was really

19  no reason to even have Detective as part of that agreement,

20  except for one thing:  Pursuant to the March 1, 1938 agreement,  03:04

21  Detective owned the character Superman, owned the underlying

22  rights; so its role is really limited to an underlying rights

23  licensor.  The derivative work, the ownership of the derivative

24  work which are the syndicated strips is another matter

25  entirely.  Just like you could own rights to a character;      03:04
```

```
 1   license it to a film studio; the studio will make a derivative
 2   work of the film; the film studio will own the copyright in the
 3   film or the artist, depending on the relationship.  But the
 4   underlying licensor does not own the copyright and the
 5   derivative work.                                                   03:04
 6            And the parties' agreement, which is their objective
 7   manifestation of their intent shows just that -- it uses the
 8   words "Detective will permit in the letter, will permit Siegel
 9   and Shuster to create these things for distribution by
10   McClure."                                                          03:05
11            Also, the fact that they have the smallest net
12   proceeds, 7.5 percent, going to 10 percent, where Siegel and
13   Shuster has something like 36 or 32.5 percent, going
14   40 percent, and McClure has the remainder, suggests a very
15   limited role also on the part of Detective as an underlying      03:05
16   rights licensor.  Even the letter pointed to by defendants
17   where they are sort of chastising Siegel and Shuster regarding
18   syndication, they are well aware this has always been the dream
19   of Siegel and Shuster.  Because in those days, the place to be
20   for cartoonists was in the newspapers, not in the comic books.   03:05
21   Comic books were thought of as the home video, a second way of
22   distributing newspaper cartoons.
23            So knowing this is the dream, they basically said
24   'We'll only give you permission to go ahead and do this venture
25   if you continue to supply us with comic books.'  They are two    03:06
```

```
 1   separate agreements.
 2            If on the other hand, as they suggest, Detective --
 3   so there was a very limited role for Detective, and there's
 4   really no place for a role for Detective.  Detective wasn't
 5   creating the comic books.  The issue of control is not control   03:06
 6   by virtue of ownership of underlying rights.  And you did
 7   debunk that theory in the Superboy Action; you pointed out that
 8   otherwise all derivative works would be work for hire.
 9            The issue of control -- and the cases say this issue
10   -- and the issue of expense in all of the cases and financial   03:06
11   risk is related to the creation of the work.  The focus, when
12   you're dealing with work for hire, is on the creation of the
13   work.  Not all of these things that defendants are trying to
14   bring in and pull in in order to make a case when there is not
15   one.                                                              03:07
16            THE COURT:  So from your view, then, what's the
17   upshot then of this book or --
18            MR. TOBEROFF:  The upshot is that products supplier
19   -- it was not a work for hire, so it's not owned at inception
20   by Detective, certainly, and not by McClure.  It's owned by the  03:07
21   creators of the product.  And there's obviously within that
22   document an implied assignment of the common law copyrights to
23   McClure where McClure is allowed to be the owner.  But the
24   authors of the work -- and I'm saying that in the copyright
25   sense -- remains Siegel and Shuster.                             03:07
```

1    **THE COURT:**  What about the reassignment that's called

2    for in the agreement?

3    **MR. TOBEROFF:**  You could have that as well.  You

4    could have a reassignment for McClure.  I'm going to get to the

5    assignments in a moment, because there actually is a chain of                03:07

6    title, and I'm surprised the defendants have not brought that

7    up, because I would assume they are aware of their own chain of

8    title.  McClure is out of the picture.

9    I just want to take it back a couple of steps.

10   Siegel and Shuster, there was no control over Siegel              03:08

11   and Shuster by Detective.  In fact, the agreement states that

12   Siegel and Shuster would supply their continuity and art work

13   to McClure and McClure would make available to Detective the

14   continuity and the art work, which suggests that Siegel wasn't

15   supplying it to Detective and Detective was supplying it to              03:08

16   McClure as a proprietor of a work made for hire.

17   They also give Detective the ability at no charge to

18   later, in a subsequent window, use the material.  If this was

19   Detective's work for hire, it would have been superfluous for

20   Siegel and Shuster to be a signatory to that.  And I believe it              03:08

21   is a joint venture agreement because Detective would have had

22   an agreement with McClure supplying it to the syndicator.  To

23   McClure.  I said to McClure.

24   If they were the owners as proprietors of work made

25   for hire, they would have simply entered into agreement with              03:09

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

1    the syndicator.  When Warner Brothers television syndicates a

2    TV series, it doesn't have the show runners of the TV series

3    enter into an agreement with their syndicators, with their

4    distributors of the show.  They do it because they own it as a

5    work made for hire.                                                          03:09

6              Here, it was really a constant supplier of syndicated

7    material to a distribution of that material.

8          **THE COURT:**  Unlike TV shows, this was going to be an

9    ongoing creative process here, going forward.

10         **MR. TOBEROFF:**  A TV show is an ongoing creative                     03:09

11   process also; episode after episode.

12         **THE COURT:**  I was thinking that the syndicated shows

13   have already been created.

14         **MR. TOBEROFF:**  Here they are syndicating it as you do

15   it.  But what I'm saying is, if it was work for hire, Detective            03:09

16   would have simply just entered an agreement with its syndicator

17   that we're going to supply you with our materials that we own

18   as work for hire.

19             So you see a situation here where the agreement

20   itself says that title of the copyright will be in the name of             03:10

21   McClure.  Then you have the copyright registrations in the name

22   of McClure stating Siegel and Shuster as authors, which is

23   prima facie evidence and runs counter to defendants' claims.

24   Then you have Siegel and Shuster, they point to the renewals of

25   National Periodical Publications of a work made for hire.  But             03:10

```
 1    Siegel and Shuster also renewed those copyrights as authors; so
 2    that would cancel out any evidentiary weight from National's
 3    renewal because Siegel and Shuster did the same thing.  They
 4    renewed it as authors.  In fact, Siegel's renewal as authors is
 5    totally consistent evidence with the original registration         03:10
 6    mentioning that Siegel and Shuster are authors.  They are not
 7    authors if it's a work made for hire.  Detective would be the
 8    author.
 9            Finally, another piece of evidence in this chain of
10    title -- and, again, I'm curious as to why defendants did not      03:11
11    come forth with this information -- we had a Thompson and
12    Thompson copyright search, an old search, that we listed in our
13    privilege log as work product.  And in that search, they point
14    to a deliberate assignment from McClure to Detective of the
15    copyright in the periodicals.                                      03:11
16            I'll read you from the --
17            THE COURT:  In the periodicals or in the newspaper?
18            MR. TOBEROFF:  Newspaper strips, the Superman
19    newspaper strips.  It is Document 1222, pages 348 to 369,
20    report on February 4, 1966; and that document shows transfers      03:11
21    between National Periodicals, which is the predecessor of
22    Detective Comics.
23            MR. ZISSU:  What was the date?
24            MR. TOBEROFF:  February 4, 1966.  It actually shows
25    Detective Comics, Inc. is a successor to National Periodicals      03:12
```

```
 1   Publications.  They attached to that an Exhibit A, dated
 2   July 3, 1944, which is an assignment from the McClure newspaper
 3   syndicate assigned to Detective Comics, Inc., all its right
 4   title and interests in all copyrights from Superman, including
 5   the copyrights and all extensions thereof in the newspaper          03:12
 6   strip.  And it states within that document that National Comics
 7   is invested with title to all the copyrights and renewals in
 8   the artistic and literary works consisting of newspaper cartoon
 9   strips or continuities entitled "Superman" which the McClure
10   number syndicate -- here Detective is making a statement in its     03:12
11   own document that the McClure newspaper syndicate had the
12   copyrights from the first day of publication to July 3, 1944;
13   so an inference can be:  Here we have a chain.  We have a
14   registration of Siegel and Shuster as the authors, yet McClure
15   is the owner, suggesting an assignment.  And under the 1909        03:13
16   Copyright Act, you can have implied assignments and you can
17   have oral assignment.
18          You then have Siegel and Shuster's renewal
19   registration renewing the copyright as authors, even though
20   it's subject to an assignment.  And you have an assignment from    03:13
21   McClure specifically of the newspaper strips in 1944 to
22   Detective.
23          Now, there's a case which we cited in our briefs
24   which says that if an inference can be drawn, why would you
25   enter into a meaningless gratuitous assignment if you already      03:13
```

```
 1   owned the rights as a work for hire?  In that case, it's legit
 2   to draw inference to such an assignment, that you didn't own
 3   the works as a work for hire; that's why you required the party
 4   to assign it to you.  All of these things run against finding
 5   of work for hire, and on summary judgment, the ambiguities have      03:14
 6   to be resolved in the favor of the nonmoving party here.
 7           We have to keep sight of the fact this is a summary
 8   judgment motion, and here, the evidence is actually looking
 9   like it was non work for hire, let alone them being able to
10   meet the substantial burden that it was work for hire.               03:14
11           So I'd like to examine the other things, because I
12   notice that defendants have shied away -- they have really
13   espoused the 1909 Act, the instance and expense test; they
14   really pushed hard.  But when it comes to the newspaper strips,
15   they have no -- it's kind of a fudge.  They refer to the             03:14
16   March 1st agreement.  They refer to the agreement that preceded
17   the March 1st agreement.  They never really connect the dots of
18   instance and expense because they can't; and so I want to look
19   at those things both in terms of the way the case law
20   interprets them and the way this Court has looked at those           03:15
21   factors.
22           First of all, on the control issue, I believe The
23   Court is correct -- at least you seem to be leaning that
24   direction -- that Detective did not have control over the
25   creation of the newspaper strips; it was that of the loop.  As       03:15
```

1    mentioned, Siegel and Shuster did not provide Detectives with

2    their works; they were provided to McClure.  There had to be a

3    provision -- entitled to get a copy of those at some point in

4    the future.

5            The fact it's a derivative work, it does not control     03:15

6    creation, and that has been debunked.

7            On the issue of going back to the March 1st agreement

8    where they say that established the Superman business,

9    everything springs from that.  That's not true.  In March 1st,

10   they could have had an agreement with Siegel and Shuster to      03:16

11   create further works, but they didn't.  The March 1st agreement

12   is limited to the acquisition of a single Superman story which

13   was published in Action Comics number one.

14           The first couple of Action Comics didn't do well,

15   according to newspaper articles which we've attached.  After     03:16

16   that, when it picked up, they entered into the September 22,

17   1938 agreement; so there's nothing from the March 1st

18   agreement.  There's nothing from the prior agreement with

19   Siegel and Shuster which has anything to do with these

20   newspaper strips.                                                03:16

21           When you look at the September 22nd agreement, it's

22   clear from the September 22, 1938 agreement, the one entitled

23   "Employment Agreement With Siegel and Shuster, they create the

24   magazine stories.  Whenever they refer to the provision of the

25   newspaper strips, they specifically say "your provision of the   03:17

1    McClure newspaper strips pursuant to the McClure agreement."

2    That is stated at least twice in the agreement.  The clear

3    wording of that agreement states that those newspaper strips

4    are not being furnished and provided pursuant to the agreement

5    with Detective, but are being furnished and provided pursuant          03:17

6    to the McClure newspaper strip.

7           It is also untrue that the word "features" in the

8    agreement with Detective alone does not apply to the newspaper

9    strips.  The paragraphs that they mentioned and that defendants

10   mention in their brief actually leaves out key language that           03:17

11   shows you that it applies to the magazine stories.

12          For instance, defendants refer to -- on Page 2, there

13   are no paragraph numbers.  It says, "However, if at any time

14   the art and continuity for any feature shall not be up to the

15   standard required for the magazines, we at our option may             03:18

16   terminate this agreement."

17          So it's untrue that they may terminate the agreement

18   if the newspaper strips aren't up to the standards -- they are,

19   when they say features in the magazines -- there's no reason

20   McClure -- yes, sometimes you could refer to a strip as a              03:18

21   feature generally, but you see, there's no reason in the

22   McClure agreement to distinguish between features and strips,

23   between magazine stories and strips.  So they sometimes will

24   call them features in the McClure agreement, but in the

25   agreement with Detective, there is a reason to distinguish.            03:18

```
1   And in that agreement they do distinguish between the two.

2   Whenever they speak about features, it's clear they are talking

3   about magazines and whenever they are speaking about the

4   newspaper strips, they refer to the McClure strips, the McClure

5   newspaper strips, the strips to be furnished pursuant to the      03:19

6   McClure agreement; so you can apply the paragraphs that mention

7   features to suggest they have editorial control or to suggest

8   they could fire them if their strips were not up to par.

9          How would they even know if they are not up to par

10  until they are already published if they are not being           03:19

11  furnished with the material except later on by McClure?

12         So any way you look at it, from all the angles, their

13  role in that agreement, licensing the underlying rights, that

14  does not turn Siegel and Shuster's creation into a work for

15  hire.  And we do have evidence of how this came about, and we    03:19

16  know it was Siegel's dream.

17         THE COURT:  Is there any additional evidence that's

18  not before The Court on these motions?  I'm really trying to

19  pin down a moving target on this.

20         MR. TOBEROFF:  The Thompson report.  I could give you     03:20

21  a copy of that.  I redacted some notations.

22         THE COURT:  Anything else?

23         MR. TOBEROFF:  Having to do with the McClure part?

24         THE COURT:  Start there.

25         MR. TOBEROFF:  I don't believe so on the McClure          03:20
```

```
 1   part.

 2            THE COURT:  Let's move on, Counsel, to the other work

 3   for hire.

 4            MR. TOBEROFF:  I'd like to deal with instance, if I

 5   may, because -- expense on McClure, because it's critical.          03:20

 6            The cases have held, and this Court has held in the

 7   Superboy Action, that if you're paid a royalty -- which means

 8   your payment is not guaranteed, it's contingent because you

 9   don't know if there are going to be any profits or royalties --

10   that ways heavily against the finding of work for hire.  Under     03:20

11   the McClure agreement, they were surely not paid a guaranteed

12   sum.  They weren't paid salary.  They weren't paid anything

13   that approaches a sum certain.  They took on all of the

14   financial risk.  Again, it's the risk of creation.  Not the

15   broadly looking at risk of an enterprise.                          03:21

16            It's the risk of creation.  And they took on the

17   financial risk of the creation, meaning they paid for all the

18   employees, the materials, the ink, all of that, and the

19   shipping, and they sent it to McClure.  McClure then took on

20   some overhead in terms of syndicating it, but if McClure's        03:21

21   expenses did not exceed McClure's receipts, they would get zip

22   for their efforts and they would have a loss.  They took on all

23   of the financial risk of the creations.  McClure didn't take on

24   any financial risk of the creation, nor did Detective Comics.

25            In addition, defendants themselves have conceded and     03:21
```

1   cited Twentieth Century Fox, the leading Ninth Circuit case

2   which is a binding authority here; they have conceded that it's

3   the party that takes on all of the financial risks which is

4   determinative.  They have said that when it's been in their

5   interest, and now they have to backpedal by that because it's          03:22

6   clear that the only people who took the financial risk of

7   creation on the McClure agreement was Siegel and Shuster.  And

8   they can't get around that.

9           So you don't have the control of the creation that

10  goes with -- and there's no evidence that McClure controlled          03:22

11  the creation.  Again, when you are looking at control, the

12  cases say -- and Twentieth Century makes a point of this --

13  they say "control regarding creation is satisfy the instance

14  prong does not refer to the normal process of a publisher where

15  they will receive galleys from, for example, someone who writes       03:23

16  a novel, they will write galleys, and the publisher will

17  suggest certain revisions to that work after it's already

18  substantially completed.  Every single publisher does that.  So

19  that's not what's meant by control.

20          Control is a more hands-on control or the right to           03:23

21  actually control the creation of the work.

22          And there's no evidence of any control by a

23  syndicator, nor would it seem to be the way businesses handle

24  -- and you say, by the way, is there any other evidence, I just

25  thought of additional evidence.  Additional evidence could be        03:23

1    in the way of custom and usage, because in the work for hire

2    issues, you're allowed to present custom and usage through

3    expert testimony, how publishers and syndicators functioned in

4    those days.

5              There's no evidence in the record as to that McClure    03:23

6    controlled the creative process here.  We know that Siegel and

7    Shuster largely controlled it.  And certainly Detective didn't

8    control it.  And we also know that Siegel and Shuster took on

9    all of the financial risks.  Therefore, it is not work for hire

10   for either McClure or for Detective, which means it was owned    03:24

11   at inception by Siegel and Shuster.  They had a common-law

12   copyright.  That can be conveyed through implication which it

13   was in the September 22, 1938 McClure agreement.  And then

14   afterwards it was assigned to Detective; so Detective is the

15   successor of McClure.  Detective successors received notice of    03:24

16   the termination.  The McClure agreement was set forth in the

17   termination, and all of the newspaper strips were listed in the

18   termination.  Therefore the termination is effective to

19   recapture the newspaper strips.

20             I believe that we have shown sufficient evidence that    03:24

21   it was absolutely not work for hire on the standards set forth

22   in the case, and the standards set forth by The Court and the

23   standards set forth by the defendants themselves.

24             Certainly, on summary judgment they have not met

25   their burden of showing that no reasonable jury could find that    03:25

1    the McClure strips were not work for hire.  They have not met

2    that burden.

3           **THE COURT:**  Let's address the other work for hire

4    issues, counsel.

5           **MR. TOBEROFF:**  Addressing, in chronological order,              03:25

6    the pre Action Comics number one material, it's a very simple

7    proposition, and that is it's already been ruled by the Second

8    Circuit and the 1974 Action, and also by this Court, that what

9    Siegel and Shuster did before March 1, 1938, is not work for

10   hire.  So it's a very simple question that to the extent that       03:25

11   work was published in later publications which received

12   statutory copyrights through publication, that would protect

13   Siegel and Shuster's copyright interest.  And they were

14   mentioned in termination notices.  Then they would be captured

15   pursuant to the termination.                                         03:26

16          The determination of whether and to what extent those

17   elements were published I believe is a determination to be made

18   at trial by a jury, because it is a subjective determination;

19   it requires the weighing of literary elements; it's not

20   something that -- different people would have different            03:26

21   opinions about.  And I think that should be done at trial, not

22   on summary judgment.

23          Now, we offered examples that we've already found of

24   this publication, and defendants try and throw ice water on

25   that by claiming that these are mere ideas, you can't copyright      03:27

1    ideas.  But I'll remind you, when we're showing that various

2    things have been published in post Action Comics number one, we

3    are pointing to various single panels.  The defendants

4    themselves have pointed to the same panels in the Superboy

5    Action.                                                          03:27

6            Do you remember in the Superboy Action when we were

7    talking about how it's a major part of Superboy, that it's

8    about how Superman became the man he is through the guidance

9    and love of his parents and the counseling, and they said that

10   is not Superboy, that preexists in Superman from in a copyright  03:27

11   sense, an they pointed to that single panel and they blew it up

12   the size of a page.  So for them to say now, "Oh, just one

13   panel does not cut it for publication," I disagree.

14           And they also mentioned, if you'll recall, that

15   because comics are so representational that a single panel      03:28

16   means a lot more in a comic than a single frame, for instance,

17   in a film or a single page in a book.

18           And here, we're just looking for a ruling that to the

19   extent these things were published post Action Comics number

20   one, they are subject to recapture in the termination.  And in  03:28

21   a way, it's axiomatic.  We give examples of that to show you

22   that it's not an open and shut because they make the claim that

23   other than Action Comics number one, nothing before March 1,

24   1938 was published.  They say that.  And we rebut that with

25   examples.  And I believe more evidence will come to the fore at  03:28

1    trial, and I'll get to that in a second.  But the evidence that

2    does exist is as follows:

3            James Steranko, a noted comic book historian and our

4    expert, and obviously someone who defendants once viewed as an

5    expert because they have him right the forward to one of their          03:29

6    archival editions dealing with Superman, when he talks about

7    Action Comics number one, he talks about several weeks of

8    newspaper strips that were recut to create Action Comics number

9    one.  But therein he says that the first two weeks of the

10   newspaper strips were left out because they didn't have enough         03:29

11   room to fit into Action Comics number one.  This is the forward

12   of D.C.'s own book.

13           He then says those first two weeks later appear in

14   Superman number one.  It's well known that Superman number one

15   was an enlarged version of Action Comics number one; so right          03:29

16   there we have it that those two weeks, which we'll attempt to

17   pinpoint, is pre-1938 material, published post-1938 and that

18   would be subject to termination.

19           That's example number one.

20           Example number two -- and this may be the area where            03:30

21   you say you tend to agree with defendants -- is Siegel writes

22   at the end of one of his continuities -- mind you, in 1934 -- a

23   description of or a preview of Superman stories to come.  Now,

24   first of all, the fact you write something as a preview or

25   summary does not mean it's copyrightable.                               03:30

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

1          **THE COURT:**  It strikes The Court more as Learned

2     Hand's distinction between the summary attempt and an actual

3     work that's copyrightable.

4          **MR. TOBEROFF:**  Well, I think, your Honor, it may not

5     be copyrightable but we believe it is copyrightable.  But what          03:30

6     I'm trying to say is, two lines are copyrightable.  Just

7     because something is short does not mean it's copyrightable.

8     What you look at is expression, and the expression is not a

9     person winning a war, a person diverting a flood; those are

10    mere ideas.                                                             03:31

11         This is an enlargement of his expression of the

12    Superman character.  An alien from another planet existing

13    among humans with super human powers that he displays among

14    humans and astounds humans with, and because he's doing that on

15    earth, all of that is magnified.  So it's not a person winning          03:31

16    a war, it's one person single-handedly winning a war, and that

17    person is Superman.

18         When that later shows up in a story -- I don't have

19    the exact number; it's either two or five, I think it's

20    number five -- that's publishing his expression, and I believe          03:31

21    that's copyrightable.

22         If I say a story of a person single-handedly wins a

23    war, I believe that's novel enough to be copyrightable.  A

24    person who single-handedly battles an airplane in midair,

25    that's totally original.  Where have we ever seen a person              03:32

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

battling a fighter plane in midair?  It shows up post

Action Comics number one.  An alien from another planet

single-handedly winning a football game, which is sort of a

symbol, an American symbol.  But all of a sudden, if you have

an alien winning a football game, that's a totally original                03:32

expression that later shows up.

          But just as important, whether this was a later

publication of a copyrightable expression, which we say it is,

is the fact that we're on summary judgment, we're looking at

evidence, and the inferences have to be drawn in favor of the              03:32

nonmoving party.  This is Blackletter.

          So an inference can be drawn when in 1934 he

described these stories as if he's already worked them out.  An

inference can be drawn that he actually created those stories

before 1938.  And the kicker on this is, I recently, through --            03:33

because a lot of people are writing about this case on the

Internet and there's a lot of old documents that have been --

basically a lot of Superman things have been collected over the

years by a lot of people.  People are starting to come forward

with things that they have that are relevant to this case.  So             03:33

I believe that I'll shortly have in my possession a copy of the

football story.  The actual continuity created in 1934 when

that preview was created which I believe were the cover letter

proving that it was in 1934, and it's the entire football

story.                                                                     03:34

1          So we have an inference here from what we've already

2    shown to The Court.  We want to be able to prove this at trial.

3    And not only that, but I believe I'll have the actual evidence

4    and the actual story which would mean that football story,

5    which was published in Action Comics number one, I believe --        03:34

6    they said three or four -- that would be subject to recapture.

7          **THE COURT:**  Let's move on to the March to September

8    period, Counsel.

9          **MR. TOBEROFF:**  Okay.

10         The next sector is Action Comics two through six.             03:34

11         In order to have work for hire, whether it be an

12    independent contractor or an employee, a traditional employment

13    relationship, that person has to be engaged to create an

14    artistic work.  Linbrook says that.  This Court says that.

15    It's clear.                                                         03:35

16         There's no engagement in the March 1st agreement to

17    create Action Comics two through six.  They are simply

18    purchasing spec material that has been written by Siegel and

19    Shuster.  There is simply no engagement.

20         They could have engaged them.  They could have bought         03:35

21    that material and say "We want you to write more material for

22    us."  But they didn't.  And the reason is clear.  They wanted

23    to publish it, see how it did.  The first one didn't do that

24    great; the second one didn't do that great, you know; the third

25    one started to pick up.  And they said "We better retain these     03:35

1    guys, because this is really doing business."

2         So there's no engagement of them to create and no

3    evidence.  It's not our burden, because work for hire is a

4    defense, to come forth with evidence.  It's their burden to

5    come forward with evidence showing an engagement for                     03:35

6    Action Comics two through six.

7         And what have they done?  What did they do?

8         This is all they have done.  They pointed to the

9    agreement which existed prior to the March 1, 1938 agreement,

10   and they have said "We had a right of first refusal as to any          03:36

11   new material."  In other words, we had an option to buy any new

12   material other than Slam Bradley and the other one, the name of

13   which I can't remember.

14        And they said because we had this option to purchase

15   it, it comes within the ambit of that engagement and,                  03:36

16   therefore, we own it as work for hire.  It makes no sense.

17        In fact, that argument is an argument in our favor;

18   that the way they got Action two through six was because, yes,

19   they did have an option to purchase it, and they exercised that

20   option, just like they did with Action Comics number one; so           03:36

21   Action Comics number two through six is no more a work for hire

22   than Action Comics number one.  And the fact they bought it for

23   $10 a page does not mean it's a sum certain; no more than

24   buying Action Comics number one for $10 a page means that it's

25   at their expense in terms of the work for hire test.  Because          03:37

```
 1   the work for hire test is not just that it's a sum certain,
 2   meaning a finite sum.  If that was the test, then non work for
 3   hires and work for hires would all be work for hires.  Because
 4   when you buy a spec screenplay -- when a studio buys it and
 5   turns it into a film, it's for a sum certain, it's right in the     03:37
 6   agreement, and it can be fixed, not just a profit
 7   participation, usually it's both.  So it's not the sum certain
 8   but it's that they must certainly pay the sum and that they are
 9   financially on the hook.
10          The difference in a work for hire situation -- and I        03:37
11   think this is key, your Honor -- and this is why
12   Twentieth Century which is binding Ninth Circuit authority,
13   talks about financial risks.  If you go to a screen writer and
14   say "I'm going to pay you $100,000 to write a screenplay, half
15   now and half on delivery," it could turn into the worst           03:38
16   screenplay you've ever read, you're still on the hook.  And a
17   lot of studios have that problem.  You're still on the hook to
18   pay that money.
19          But if a writer writes a spec screenplay, even if you
20   have posted an ad that you'll pay $100,000 for a spec             03:38
21   screenplay, even if that sum is certain, $100,000, that's not
22   work for hire; that's clearly not work for hire.  So if these
23   standards or these -- you can't take these words and abstract
24   them from the Second Circuit cases and say that creates work
25   for hire, because the way the defendants do it, everything       03:38
```

1   would be work for hire.

2          So Actions two through six is there's no engagement.

3   There's no guarantee payment.  They are simply submitting it

4   and they are buying it at some going rate that they have at the

5   time of $10 a page.                                              03:38

6          There's also no evidence of any control over the

7   creative content of Actions two through six.  In fact, the

8   evidence is to the contrary.  There's two things we have in the

9   record from Siegel; one is testimony from the 1947 Action and

10  another is his unpublished autobiography that he registered     03:39

11  with the copyright office.  Defendants can't really challenge

12  that autobiography as evidence, because they have relied upon

13  it repeatedly in this case.

14         In both those pieces of evidence, Siegel, first he

15  testifies and he states that the early Superman works --        03:39

16  essentially, he would do the continuities, Shuster would

17  illustrate his continuity, they would send it in, and it would

18  get published.  There's no indication of any stories being

19  supplied by Detective; there's no indication of them being

20  advised along the way.  In fact, the letters that defendants    03:40

21  have submitted do more to indicate a lack of control or that

22  the situation is out of control from Detective's point of view

23  than control, because what they do is essentially complain that

24  you're not giving us the continuities before you're

25  illustrating them; you're not giving us the opportunity to have  03:40

1   any feedback in them.

2           Later, there's articles written in D.C. publications

3   where editors of Siegel state that pretty much he wanted to

4   control his characters, which is understandable; so the letters

5   don't suggest control.  The fact you're complaining about work,          03:40

6   people complain all of the time.  Studios complain about

7   screenplays; publishers complain about galleys in books.  The

8   fact you complain about work doesn't mean you control it, and I

9   think it suggests the opposite.

10          Also, when you're looking at these letters, I would          03:41

11  point out that you can't look at a letter that complains about

12  a magazine story to evidence control about newspaper strips.

13  All the letters they put which, number one, don't evidence

14  control, but even if they did, they mention magazine stories

15  and not newspaper strips, including the letters referred to          03:41

16  today by Mr. Zissu.

17          So in Action Comics two through six, they have not

18  met their burden again for work for hire, and if you just take

19  a straight look at it, it looks like it wasn't work for hire,

20  because there's no engagement of them until the September 22,          03:41

21  1938 agreement.  So I think the case is very strong for the

22  pre-March -- as long as it's published, and we want to submit

23  this new story and keep this open for trial -- and in the

24  Action Comics number two through six and in the newspaper

25  strips, it's very strong.          03:42

```
 1              I also want to point out that the newspaper strips

 2     should also be divided into two sections, because it's the

 3     first two weeks of the newspaper strips which are important

 4     because they tell the origin story on planet Krypton.  In other

 5     words, they flesh out that single panel in Action Comics number       03:42

 6     one, about the planet exploding is fleshed out in the first two

 7     weeks of the newspaper strips.  The evidence is in the record

 8     that that material was written purely on a speculative basis by

 9     Siegel and Shuster.

10              McClure spells out in the letter with Siegel and         03:42

11     Shuster that we are not guaranteeing payment for this; you're

12     doing this purely on spec.  They almost use the word spec in

13     that letter.  So those first two weeks -- none of the newspaper

14     strips were work for hire, but those first two weeks were

15     definitely not work for hire, and I would make a sub category        03:43

16     for that.

17              Finally, there seems to be an assumption that the

18     comic books that were created by Siegel and Shuster after

19     September 22, 1938, which is Detective Comics seven through --

20     it's in our briefs, and then Superman Comics, essentially those      03:43

21     comics published during the termination window, which is

22     April 16, 1938 to April 16, 1943.  It seems to be an assumption

23     that because it's called employment agreement, that those are

24     definitely work for hire and that we really should not -- why

25     are we even talking about them?                                      03:44
```

1          I think that's incorrect, particularly on summary

2    judgment, not at trial, for the following reasons:

3          The fact they use the label employment agreement

4    while evidence is not dispositive.  In the Captain America case

5    Simon versus Marvel, the Second Circuit specifically says that          03:44

6    you don't look to names or labels; you look to the facts and

7    you look to the actual historical relationship between the

8    parties.

9          **THE COURT:**  What fact, Counsel, would you suggest is

10   most dispositive of this?          03:44

11         **MR. TOBEROFF:**  The way you analyze work for hire

12   under the 1909 Act and the very tests that have been espoused

13   by defendants and stated by this Court.  So I'll take the one

14   that I think puts a crowbar in the spokes of this work for hire

15   conclusion.          03:45

16         The agreement itself does not say you're going to

17   receive a guaranteed salary, you're going to receive a

18   guaranteed payment.  In the Superboy decision, you make the

19   comment, and I think it's a good one, that a consistent

20   repetitive pavement of a sum certain favors work for hire          03:45

21   determination, because it is like the steady salary of an

22   employee.  Which brings me to an important point.

23         Just because under the 1909 Act, an independent

24   contractor can perform work for hire when he's commissioned to

25   do independent artistic work doesn't mean that it's as easily          03:45

found an independent contractor is creating work for hire as a

steady employee.  It's obviously easier to find that a salary

employee who creates work within the scope of his employment

has created work for hire.  It's a no-brainer.

          **THE COURT:**  Get back to my question, Counsel.                03:46

          What is your best fact, the most dispositive fact,

that this was not a work for hire under the employment

agreement?

          **MR. TOBEROFF:**  That they took on the financial risk

of their creation; that the agreement says -- its own words,         03:46

the agreement says that you will be paid upon acceptance of

publication and publication.

          I have a copy of the agreement, I will read it to

you.

          The agreement itself says that payment is not              03:46

guaranteed.  Payment is contingent.  The agreement didn't have

to say that, but it did.  The agreement says as follows:  "We,

meaning Detective, agree to pay you on publication for any and

all of said comics published by us and supplied by you."

          So they are only paid for comics published, and they      03:47

are only paid on publication.  They don't turn in a steady

supply of work and when it arrives, a check goes out.  The

clear implication -- and that says Superman $10 per page; Slam,

$10 per page; Spy, $10 per page.

          So yes, it's a steady stream from a product supplier      03:47

```
 1   to a product distributor, and yes, Siegel and Shuster -- they

 2   had a whole shop there called the American Artist League, and

 3   he essentially, we have evidence that what they supplied was

 4   published with very little creative control during the

 5   important period to which this termination applies, which are    03:48

 6   the very early years, only the first five years.

 7        So the question is and the cases say that it weighs

 8   heavily against -- unless the putative employer takes on -- and

 9   defendants in their papers said all of the finance risks.  I'm

10   not even going to insist on all of the financial risk.  Let's    03:48

11   just say a lot of the financial risk -- unless the putative

12   employer takes on most of the financial risk of the creation,

13   it weighs heavily against work for hire.

14        There are a lot of Southern District cases and

15   out-of-circuit cases that defendants have cited on work for      03:48

16   hire, but we have cases in the Ninth Circuit that are binding,

17   and Twentieth Century is one of them.  And Twentieth Century is

18   the one quoted by defendants for this proposition when it

19   suited them in the Superboy Action, states that it's

20   significant the party who takes on the financial risk.           03:49

21        And going back to my example, if somebody sends you

22   spec material, and you pay them for it a thick sum, that's

23   obviously not work for hire.  If you hire someone to create

24   something and they know they are going to get a check for it

25   whether you like it or not or use it or not, that suggests work  03:49
```

1    for hire.  But that was not the case by the plain wording of

2    the agreement.

3           That alone would stop summary judgment.  Given the

4    way summary judgment must be assessed with inferences drawn in

5    our favor; given the fact that Detective drafted this agreement          03:49

6    and ambiguities must be construed against them, and the way

7    evidence is weighed and this objective manifestation of the

8    parties' intent, that alone should stop summary judgment on the

9    work for hire issue.

10          And I believe that's the strongest point, and I don't          03:50

11   see any way around it.  And defendants have not gotten around

12   it.  They basically punted because there is no way around it.

13          I should bring up two things:  In the Superboy Action

14   in passing, The Court made reference that there appears to be

15   some evidence that, in fact, Siegel and Shuster were paid for          03:50

16   certain material that was not published.  But if you look at

17   the citations for that, that was material created after the

18   September 22, 1938 agreement -- there was a subsequent

19   agreement in December of '39, I'm not sure of the exact date,

20   but in the substantive agreement at that point they          03:50

21   specifically agreed because Shuster's eyesight was failing and

22   there were certain problems with the production where other

23   people had to be brought in because it was becoming -- there

24   was such an explosive interest in Superman, that Siegel and

25   Shuster weren't actually creating everything.  They agreed to          03:51

```
 1   pay them a highly reduced figure on materials created by

 2   somebody else.  And the findings and facts pointed to by the

 3   defendants on this issue refer to that period outside the

 4   termination window; so it's moot and it's irrelevant and it's

 5   not evidence of what happened inside of the termination window.   03:51

 6        The other place where they paid is when Siegel went

 7   off to war, it was after that agreement that I'm speaking of,

 8   and while he was at war, it was also a reason to take military

 9   leave to continue to pay them some money.  But those instances

10   are not within the termination window.  There's no evidence     03:51

11   that they would -- despite the agreement -- and you see the

12   relationship between Siegel and Shuster and Liebowitz and

13   Detective; they are pretty tough businessmen.  It's hard to

14   imagine the agreement says they don't have to pay Siegel and

15   Shuster, and they pay them anyway, just for the hell of it,     03:52

16   particularly when they are complaining all day long about their

17   performance.  It never happened.

18        We actually have some very interesting evidence, not

19   only the agreement itself, that they wouldn't pay them on

20   Superman stories they didn't publish, and there's a very        03:52

21   interesting story about K-Metal from Krypton.  Which also

22   throws into question ownership, for purposes of this case, of

23   the Kryptonite element.

24        For years, the story has been told, and it was told

25   by defendants in their papers, that Krypton first appeared in   03:52
```

```
 1    the radio series.  It wasn't part of Siegel and Shuster.
 2    Whitt Ellsworth happened to be the producer of the radio
 3    series; prior to that, he was the editor looking over Siegel's
 4    submissions.  In 1940, there's evidence -- and I'll describe to
 5    you how this evidence came about -- that Siegel wrote a story        03:53
 6    about K-Metal from the planet Krypton, and it was upon being
 7    exposed to this K-Metal, Siegel was shocked to find out and was
 8    in disbelief that he lost his powers.  And there's a part of
 9    the continuity where he's landing from one of his giant leaps,
10    and he crumbles to the ground.                                      03:53
11          It's Kryptonite.  They don't call it Kryptonite, it's
12    a special metal from the planet Krypton submitted to
13    Whitt Ellsworth and later shows up in the radio series.
14          There have been bits and pieces and talk from various
15    collectors about this Siegel story.  And then Mark Wade, who's      03:54
16    defendants' expert, while he was working at Detective Comics --
17    and he's a comic book historian, very well renowned, he
18    found -- because people up until that time had only found bits
19    and pieces -- he found what I believe was the entire continuity
20    for Siegel's unpublished K-Metal for Krypton story which he was     03:54
21    able to date in 1940.  He wrote an article about it, and I
22    questioned him at his deposition.  And in the article, in the
23    deposition, and I believe it's in the article as well, he was
24    speaking about this fantastic historical discovery; for any
25    collector, it was a huge discovery; it had great historical        03:54
```

1   significance regarding Superman, because up until that point,

2   everybody thought that Kryptonite came in the radio show.  So

3   he testified that he brought it to Detective, and naturally

4   Detective had wanted to publish it.

5        So what did they do?  They went to the Siegels for                03:55

6   permission.  And when the Siegels didn't give them their

7   blessing, they didn't publish it; which is evidence that

8   Detective's predecessor didn't own it because they didn't

9   publish it; and if they didn't publish it, they didn't purchase

10  it and they didn't pay for it, and that's not work for hire.          03:55

11       **THE COURT:**  Thank you, counsel.

12       I'd like to move on to the issue with respect to the

13  trial.  As The Court indicated, with respect to both the alter

14  ego and the accounting of the profits, I believe these are

15  equitable claims and I'll set forth my reasoning.  On the             03:55

16  alter ego theory, for example, it clearly calls for a weighing

17  of the equities that I can't really fathom how a jury

18  instruction could be drawn up to satisfy or that could be used

19  by a jury.

20       Putting that aside for a moment, would plaintiff                 03:56

21  otherwise be prepared to proceed on the Lanham Act and the

22  copyright waste claim on November 4th?

23       **MR. TOBEROFF:**  I have not -- Mr. Bergman noted he had

24  gone back and thought about your comments in terms of the

25  schedule.  I didn't look at it that way yet.                          03:56

1          I'd like to have the opportunity just to look at it

2    tonight.

3          **THE COURT:**  I'm not really offering this as an

4    option.  The trial date is November 4th.  The Court has set

5    aside that time.  I got the sense that there was some issue as          03:56

6    to why we could not proceed.  If there's not, this is not --

7    I'm not throwing this up there as something to consider.

8          Is there anything that you're aware of --

9          **MR. TOBEROFF:**  The issue about proceeding prior was

10   that there were various deadlines, things that have to be          03:56

11   submitted that we could not submit until you rule on these

12   motions; so I wanted to look at if that problem is alleviated

13   by the specific way you're handling it, if I may.

14         **THE COURT:**  You can always bring to The Court's

15   attention a problem that you think exists.          03:57

16         **MR. TOBEROFF:**  Other than that, I'm here in November.

17         **THE COURT:**  Very well.

18         The only change I would make is, right now the

19   pretrial conference is set for October 20th.  I'm going to move

20   that to October 27th at 11:00 a.m.  We had previously moved the          03:57

21   pretrial conference from October 6th to October 20th at the

22   parties' request.  The Court is going to move it to the 27th,

23   just to coincide with The Court's calendar.  But the trial date

24   is going to remain in place on November 4, 2008.

25         The Court will certainly consider all of the          03:57

1    arguments well made by counsel today, and I will take a close

2    look at this all again but I am hopeful to have something out

3    very shortly to you to address all of these issues with the

4    exception of the accounting points, which I think could be

5    deferred until we get to that second phase of the trial, namely      03:58

6    the defense trial which deals with the accounting.  I don't

7    know if that's necessary to get into at this point.

8           I would like to get a sense from both counsel, in

9    terms of just the Lanham Act and the waste aspects, what their

10   estimate is for the length of the trial.                             03:58

11          MR. TOBEROFF:  Again, I'd have to -- I have not

12   broken -- this is the first time I've thought this would be in

13   this shape, so I'd like to give you an intelligent answer.

14          THE COURT:  Fair enough.

15          MR. TOBEROFF:  I do have a question because I think      03:58

16   it goes on this whole issue of jury, and that is, you mentioned

17   that The Court would be deciding an accounting.  One of the big

18   issues here is if we're following strict legal equitable

19   distinctions, an apportionment is solely -- there's no

20   precedent for apportionment.  It only appears in copyright          03:59

21   infringement cases where such accountings are not decided by

22   courts, they are decided by juries.

23          Has The Court reached a determination on what it

24   plans to do on the apportionment issue?

25          THE COURT:  I have not.  I have not.                         03:59

        1          **MR. TOBEROFF:**  Will we have the opportunity to

        2    present oral argument on that part of our briefing?

        3          **THE COURT:**  I think I've got a pretty good sense of

        4    your position from your briefs, and The Court is working out

        5    the finer details of its position.                                    03:59

        6          Is there anything that you have not presented in your

        7    papers?

        8          **MR. TOBEROFF:**  Yes.

        9          **THE COURT:**  And why didn't you present it in your

       10    papers?                                                               04:00

       11          **MR. TOBEROFF:**  Because I didn't know The Court would

       12    be deciding to -- because I didn't believe that The Court would

       13    be deciding the profit issue.  And if The Court decides the

       14    profit issue, I think it's imperative to stress that either

       15    there is no apportionment if we're going to stick with these        04:00

       16    legal distinctions, because there's no precedent for it.  And

       17    when there's no precedent, usually you don't do it.

       18          **THE COURT:**  Is there any reason why that can't be

       19    done, though?  I'm hard pressed as to why The Court, as part of

       20    the accounting, cannot conduct the apportionment.                    04:00

       21          **MR. TOBEROFF:**  Two things.  Number one, a reason why

       22    there should not be apportionment, which I'd like to tell you,

       23    and number two --

       24          **THE COURT:**  I'm not suggesting there should be.  I'm

       25    just saying in terms of whether there is or is not, why The         04:00

1    Court cannot do that as part of its function.

2         **MR. TOBEROFF:**  There is no instance of an

3    apportionment other than an apportionment by a jury, and

4    there's good reason for it, because an apportionment in this

5    case is not a computation.  It really has to do with the          04:01

6    audience appeal of a communicative work, a communicative

7    product, an entertainment product, a literary work.  And

8    generally in cases when you're looking at audience appeal,

9    audience perception:  Why do people buy a ticket?  What is it

10   about Superman that excites them?  Is it the heat vision, or do   04:01

11   they most remember his dual identity as Clark Kent and his love

12   triangle with Lois Lane?  Those things, that's a very

13   subjective determination, and usually for that determination

14   you want it being handled by a cross-section of the community.

15   Not one person's opinion, even though, respectfully, a learned   04:01

16   judge.

17        **THE COURT:**  I understand.

18        **MR. TOBEROFF:**  It's still one person's opinion about

19   the creative appeal or allure or importance of something; so

20   for that reason, apportionment really should be decided by a     04:02

21   jury.  And that essentially would come down to percentage,

22   which then could be applied by The Court in fashioning the

23   final remedy.

24        I was going to say that an important thing to think

25   about and a way to cover all the bases, if you will, is that if  04:02

1    you decide there must be an apportionment -- which by the way,

2    greatly increases the burdens in this case -- you could cover

3    all bases by empanelling a jury to give you an advisory opinion

4    as to what that apportionment figure should be.  And that way

5    you will get an advisory opinion.  Even though the decision is          04:02

6    ultimately yours, you will get an opinion that will help inform

7    you, and courts very often do that in these types of

8    circumstances.

9          A good example of another reason why a jury should

10   decide it, if you look at the copyright infringement case where        04:03

11   they say a jury should decide apportionment, those cases, those

12   profit figures are equitable.  It's to prevent unjust

13   enrichment and defendant is made to disgorge profits to prevent

14   unjust enrichment; so it is equitable but it still goes to a

15   jury under Dairy Queen and under the modern federal trends            04:03

16   which says that in questionable instances, the matter should go

17   to the jury, and you look to the real mechanics of the remedy,

18   not the historical distinctions.  You look to what's really

19   being done.

20         In those cases, in patent cases, in trademark cases,            04:03

21   in copyright cases, where you're owed money because you're an

22   owner of that intellectual property, a determination has to be

23   made as to what profits flow from that intellectual property.

24   The same determination that is being made here.  In those cases

25   where one side said 'that must go to a judge because they are         04:04

1    dealing with unjust enrichment; that's equitable,' The courts

2    have held, no, it's essentially looking -- you're dealing with

3    money damages which is classically legal in nature.  And under

4    Dairy Queen, it's no longer too complex for a jury to decide.

5    And when in doubt, so we don't have constitutional problems,                04:04

6    these things should be decided by a jury.

7            THE COURT:  Thank you, Counsel.

8            MR. BERGMAN:  May I be heard on that point?

9            THE COURT:  On that last point alone.

10           MR. BERGMAN:  Your Honor, apportionment in a typical            04:04

11   infringement case is done by a jury because they are looking at

12   damages.  Your Honor has indicated in this case on a number of

13   occasions that we're involved in an equitable proceeding.  And

14   because we are involved in an equitable proceeding concerning

15   apportionment, it is one that is properly done by The Court.            04:05

16           Frankly, I thought we had briefed that point

17   completely at this juncture.

18           In terms of the difficulty of the case -- and we're

19   not saying that a jury isn't capable of determining this, but

20   we're looking at a trial that is eight times, ten times as long        04:05

21   if we have a jury, discussing a work by work apportionment than

22   if we have some procedure that your Honor has agreed to and

23   that Mr. Toberoff and I can stipulate to to abbreviate the

24   issue.

25           I believe that because we are involved in an                    04:05

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

1   equitable proceeding, it's rather quite clear that the

2   apportionment is one that should be done by The Court, who has,

3   by this point in time, become very familiar with the issues

4   that we're dealing with.  So I do believe -- and frankly, we

5   fully briefed this point, and I believe Mr. Toberoff has done          04:06

6   so too.

7           **THE COURT:**  Thank you, Counsel.

8           **MR. BERGMAN:**  May I ask just one question, your

9   Honor, and then raise one housekeeping matter?

10          **THE COURT:**  Yes.                                          04:06

11          **MR. BERGMAN:**  My co-counsel Mr. Zissu would like to

12  rebut a few of the points.

13          **THE COURT:**  I'll allow that very briefly, so be

14  thinking of very concise language.  I'll give you a chance, but

15  we have to bring this to an end.                                      04:06

16          **MR. BERGMAN:**  Will your Honor's order tell us what is

17  involved in this waste trial that we are going to be --

18          **THE COURT:**  I'll try to be clear.  I have some

19  tentative language in place already, and I would hope to be as

20  clear as I can.                                                       04:06

21          **MR. BERGMAN:**  Both Professor Nimmer and Mr. Patry

22  don't have anything to say about waste.  Zero.  You can't find

23  the word in their books.

24          The final matter I wanted to raise is purely a

25  housekeeping matter.  We have one motion that has not yet been        04:07

Tuesday, September 16, 2008                    Siegel V. Warner, Et Al.

decided.  As your Honor may recall, it was briefed in

September 2007.  It deals with the escrow documents.  And when

your Honor issued his order of October 23, 2007, your Honor

noted that this remains to be the one outstanding discovery

matter that remains to be decided, and your Honor stated that    04:07

The Court intends to issue an order shortly.

        **THE COURT:**  That has slipped through the cracks,

Counsel, and I will take that up.  Thank you for bringing that

to my attention.

        **MR. BERGMAN:**  Thank you, your Honor.    04:07

        **MR. ZISSU:**  I'll be brief.

        The letters that we put in as Exhibit B to our

supplemental submissions, they do definitely cover -- a number

of them mention the newspaper strips, including, most

principally, the letter dated September 28, 1938, which says    04:08

you can be discharged from all of this, and so forth.

        Yes, Siegel and Shuster did get a higher percentage

of the money from McClure.  There's a good reason why.

Detective wanted to retain them and keep them and keep them

happy.    04:08

        The amount they are paid, and whether it's more than

Detective took from that, doesn't go to instance and right of

control and expense.  It does mean they were valuable.  It's

usually true, the creator, you do want to keep the creator

involved.    04:08

1          And why they needed them to sign that agreement and

2    they gave them money in this way, the Linbrook Hardware case

3    way back and then on the basis of that Playboy point out -- the

4    fact that there's something more than the work for hire

5    relationship, even in the form of an assignment, doesn't          04:09

6    detract from whether the work is made for hire.  There could be

7    a belt and suspenders, if you will.

8          The Thompson and Thompson trademark search shows an

9    assignment to Detective of the copyright in the newspaper

10   strips.  And the date, July 1944, it turns out that's five          04:09

11   years after -- that's the reversion time.  The rights to those

12   strips would revert when the contract ended.  The contract with

13   McClure was an option that McClure exercised for five years; so

14   when it was all done, they got an assignment.  They wanted to

15   record it.  They wanted people who were looking for rights not    04:09

16   to go to McClure.  They wanted them to come to them.  And you

17   record in the copyright office to give constructive notice to

18   the world of whom to go to and whom to deal with.

19         All this talk about actual control is really

20   irrelevant.  Twentieth Century and all the cases say it's the     04:10

21   right of control, not the actuality of interfering with the

22   artists or the writers' creation.  And the right of control

23   includes the power to reject and that includes the right to

24   discharge.

25         The September 28, 1938 letter which I just mentioned         04:10

1   makes clear that Detective had the right to discharge them at

2   any time, not only with respect to the comic books but the

3   newspaper features.

4          And then the December 19, 1939 letter talks about --

5   we have -- this is a letter to Siegel and Shuster:  "We have          04:10

6   also informed you of our activities in promoting the commercial

7   exploitations of Superman and other fields in addition to

8   magazine publication and newspaper syndication."

9          And then on the next page, paragraph number two, it

10   says that Siegel and Shuster had to reaffirm to Detective in          04:11

11   December 1939 that "you have not done or permitted any act or

12   thing which might impair any of our aforesaid rights with

13   respect to any of the aforesaid comic strips, and that so far

14   as you are concerned, our full and complete ownership thereof

15   and all reproduction rights in connection therewith are vested       04:11

16   in us free and clear of the rights of any other persons or

17   parties whatsoever," meaning McClure and others.

18          The statement that there had to be an option

19   exercised under the employment agreement in order for Siegel

20   and Shuster to do any material, comic book or otherwise, is          04:11

21   belied by the third paragraph.  It says:  "You have been doing

22   the art work and continuity for said comics for us.  We wish

23   you to continue to do said work and hereby employ and retain

24   you for said purpose and for the period of this contract."

25          This was not an option.  This was the duties they             04:12

1    were assigned, and they accepted them.

2           Contingency of payment.  You can't dissect the

3    relationship that way.  The way the parties -- if there are

4    ambiguities, you also look to the actions of the parties under

5    the agreement.  In all these years, is there any evidence that

6    their work was rejected and not paid for, and not paid for, in

7    this period?

8           And you can't dissect the relationship into the five

9    years of the termination window.  The relationship was a

10   relationship.  It didn't exist according to a termination

11   window that would come up years later under a statute that did

12   not exist.

13          The final point is, without regard to what was

14   preexisting, we come down to the bottom line:  Whatever was

15   done to give expression and give life to ideas was done after

16   March 1, '38, if an idea was used.  And we say it was an idea,

17   and therefore it falls within the work for hire relationship.

18          Thank you, your Honor.

19          **THE COURT:**  Very good.  I appreciate everyone's

20   efforts.

21          **MR. TOBEROFF:**  I have a question.

22          My question is, we had brought up previously a motion

23   for clarification regarding the advertisements.

24          **THE COURT:**  Yes.

25          **MR. TOBEROFF:**  Not because we read your Honor's

1    decision regarding the ads to be against plaintiffs' interests,

2    but because of the way your decision has been construed by

3    defendants as definitely threatening the whole capture of

4    Action Comics number one.  We had put this in a motion for

5    clarification.  You asked us to bring this as part of the          04:14

6    additional issues in motions, which we have done.

7            Do you have an idea at what point --

8            And I think that law is very important; it's the same

9    law that comes up with work for hire and other things.

10            **THE COURT:**  I appreciate that, Counsel.  I trust that    04:14

11    The Court's order will hopefully clarify it.

12            **MR. TOBEROFF:**  Thank you very much.

13            **THE COURT:**  Well, thank you, Counsel.  I appreciate

14    the outstanding quality of both your written work and your oral

15    argument.  I don't mean to sound prudish, Mr. Toberoff, but        04:14

16    please take care of your language in court.  Be mindful of

17    where you are.

18            **MR. TOBEROFF:**  I'm sorry.

19            **THE COURT:**  It's not an issue, but it's just to

20    maintain decorum.                                                  04:15

21            I didn't want to interrupt you at the time of your

22    argument because you were in the midst of it.

23            In any event, I do appreciate the tremendous work by

24    both sides.  I'll try to get something out quickly.

25    Fortunately, I don't have anything else bearing down on me too     04:15

1  hard right now, so I will have an order to you soon.

2          We have a trial date on November 4th.  You really

3  should plan for that.  I do intend on getting that in at that

4  window that I've created.  I'll look forward to seeing you at

5  the pretrial conference, if not sooner.                    04:15

6          **MR. BERGMAN:**  Thank you, your Honor.

7          **MR. TOBEROFF:**  Thank you, your Honor.

8          **THE CLERK:**  Court stands in recess.

9

10

11

12

13

14

15                          CERTIFICATE

16

17  I hereby certify that pursuant to Section 753, Title 28, United
    States Code, the foregoing is a true and correct transcript of
18  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
19  conformance with the regulations of the Judicial Conference of
    the United States.

20

21  /s/Theresa A. Lanza                    _____
            CSR, RPR                              Date
22  Federal Official Court Reporter

23

24

25